# EXHIBIT B

```
 1   H9DAASCHC                    Conference

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x

 4   UNITED STATES OF AMERICA,

 5                v.                        17 CR 548 (PAC)

 6   JOSHUA A. SCHULTE,

 7                  Defendant.

 8   ------------------------------x

 9                                          New York, N.Y.
                                            September 13, 2017
10                                          4:00 p.m.

11
     Before:
12
                          HON. PAUL A CROTTY,
13
                                            District Judge
14

15                          APPEARANCES

16   JOON H. KIM
          Acting United States Attorney for the
17        Southern District of New York
     MATTHEW LAROCHE
18        Assistant United States Attorney

19   THE LAW OFFICES OF KENNETH F. SMITH
          Attorney for Defendant Schulte
20   KENNETH F. SMITH

21   BRAFMAN & ASSOCIATES, P.C,
          Attorneys for Defendant Schulte
22   ALEXANDER B. SPIRO

23   ALSO PRESENT:  MARLON OVALLES, Pretrial Services

24

25
```

```
1              (Case called)

2              MR. LAROCHE:  Good afternoon.

3              Matt LeRoche, for the government.  With me is Jeffrey

4    David Donaldson and Richard Evancheck, both special agents with

5    the FBI.

6              THE COURT:  OK.

7              MR. SPIRO:  On behalf of my client, Alex Spiro, from

8    the Brafman firm.

9              THE COURT:  Mr. Spiro.

10             MR. KOSS:  Taylor, Koss, K-O-S-S.

11             MR. SMITH:  Kenneth Smith.

12             THE COURT:  Mr. Smith, how are you?

13             Mr. Schulte, how are you?

14             THE DEFENDANT:  I'm OK.

15             THE COURT:  You want to identify yourself,

16   Mr. Ovalles?

17             MR. OVALLES:  Yes, your Honor.

18             Marlon Ovalles, from Pretrial Services.  I'm covering

19   this matter for my colleague, John Moscado, who sends his

20   apologies for not being able to be here.

21             THE COURT:  Thank you, Mr. Ovalles.

22             MR. OVALLES:  Yes, sir.

23             Mr. LaRoche, the first thing we are going to do is

24   arraign, Mr. Schulte?

25             MR. LAROCHE:  Yes, your Honor.
```

```
 1              THE COURT:  What else do we have on the agenda.

 2              MR. LAROCHE:  The government will discuss a discovery

 3    schedule and I believe that defense counsel has asked the Court

 4    to reconsider bail.

 5              THE COURT:  Is that right, Mr. Spiro?

 6              MR. SPIRO:  Yes.

 7              THE COURT:  OK.  All right.  Mr. Schulte, have you

 8    seen a copy of the indictment?

 9              MR. KOSS:  One moment, judge?

10         (Pause)

11              THE COURT:  I have an extra if you need it.

12              MR. KOSS:  Yes.  My apologies.  Thank you very much.

13              THE COURT:  You've seen it, Mr. Schulte?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Have you had a chance to consult with your

16    counsel?  Do you what me to read it to you or do you waive the

17    reading.

18              MR. SPIRO:  We waive the reading.

19              THE COURT:  Do you want to enter your plea now,

20    Mr. Schulte.

21              THE DEFENDANT:  Not guilty.

22              THE COURT:  A plea of not guilty will be entered.

23              Mr. LaRoche, what about the discovery schedule?

24              MR. LAROCHE:  Yes, your Honor.  The government would

25    request 45 days to complete discovery.  We've already produced
```

1    initial discovery in this case but there is a voluminous amount

2    of discovered.  If I could just summarize it for the Court,

3    includes the seizure of approximately 60 electronic devices

4    that were taken from the defendant's apartment in March of

5    2017.  It also includes search warrant returns for Google and

6    other electronic accounts used by the defendant.  It includes

7    subpoena returns for various facilities used by the defendant.

8    It also includes statements made by the defendant in several

9    meetings with the government on the night that the search was

10   executed, and also statements that were made, a limited number

11   on day of his arrest.

12           I wanted to flag two issues for the Court.  I guess

13   first, the government has produced initial discovery including

14   Google searches that were conducted by the defendant and also

15   Internet relay chat logs between the defendant and others, both

16   of which have been cited in the complaint.

17           And I also just wanted to flag two issues for the

18   Court.  There is over ten thousand images of child pornography

19   that were taken from the defendant's desktop computer.

20   Obviously, they those cannot be produced in discovery.

21           There is also a limited amount of classified documents

22   that were found on the defendant's computer.  Again, they

23   cannot be produced in regular discovery.  As we've discussed

24   with defense counsel, and our plan is to make those documents

25   and electronic evidence available at the FBI for their review.

1          THE COURT:  Defense want to comment?

2          MR. SPIRO:  Your Honor, obviously, this is a very

3    complex case in terms of the computers and the forensics

4    involved.  We just learned of the government's schedule and

5    proposals outside in the hallway right before the court

6    appearance.  It's something I am going to address in small part

7    during my bail application tot he Court but I sort of think we

8    have to see how that all plays out before I know whether and

9    consider with co-counsel before I know whether that is a

10   feasible schedule from our standpoint.

11         THE COURT:  Do you have an alternative in mind, Mr.

12   Spiro?

13         MR. SPIRO:  Not as a stand here, judge, without having

14   consulted with somebody who fully understands the forensic

15   implications and conferred with my client about that proposal.

16         THE COURT:  All right.  We'll put that off till the

17   end of the conference then.  You want to make your application

18   now for bail?

19         MR. SPIRO:  Yes, your Honor.

20         This consideration is obviously de novo and I

21   understand that I've provided the minutes to the Court.  While

22   there is a minor so-called burden of production to rebut the

23   presumption that rests with the defense, the ultimate burden of

24   persuasion is, of course as the Court knows, with the

25   government.  I don't think there's any real concern of flight

risk here.  I think that was well sort of established at the

initial hearing in front of the magistrate.  It's my view that

the government does not come close to satisfying their burden

of clear and convincing evidence in terms of dangerousness.

We're talking here, judge, obviously, about so

dangerous that no possible reasonable alternative could

guarantee the safety of the community.  And that presumption of

innocence that's also within that statute and in the Adam Walsh

Act, they both -- and the Bail Reform Act, Adam Walsh Act that

then modifies it in the same way that that presumption of

innocence.

And you can't really get away from that in talking

about why this is not case that is the type of dangerousness

that courts consider in setting complete detention.  This is

somewhat anecdotal and somewhat legal but if you canvass the

case law in this area there seems to be a divide between the

cases in which an individual has child pornography or is

alleged, just alleged to have child pornography and approaches

a minor versus cases in which they have possessions on their

server or on their hard drive and do not approach a minor and

the courts seem to almost entirely, consistent with this, seem

to always essentially allow for pretrial release unless there

is compelling evidence of an actual danger to a minor.

The reason I say it's somewhat anecdotal is because of

my background in psychology and other things.  I handle a great

1    number of these cases.  I have personally never had anybody

2    under such circumstances detained prior to trial and I on

3    conferral with Pretrial and in asking Mr. Moscado the basis for

4    their recommendation.  Mr. Moscado told me his office handles

5    these cases and he exclusively essentially handles these child

6    pornography cases and in his experience and this isn't to usurp

7    your Honor's discretion and of course, we'll respect whatever

8    ruling that we get hear today, but it was Pretrial's experience

9    and their recommendation to the Court that this is not a case

10   that warrants detention.

11         You know the litigation surrounding the Adam Walsh Act

12   and detention really focuses on whether even the curfew and

13   even the electronic monitoring and even the home detention are

14   constitutional.  And I'm sure the Court is familiar with the

15   litany of cases that have come down.  My research, there's 17

16   federal courts that have addressed whether the part of the

17   act -- forget detention -- that even allows for a presumption

18   without a hearing of house arrest and electronic monitoring.

19         THE COURT:  But I gather you consent to that.

20         MR. SMITh:  I would consent to that which is my point.

21   But to be here consenting to that without even challenging it

22   when courts are really focused on if that is OK, it does say

23   something about the mindset of courts when it comes to these

24   charges and this amendment essentially to the Bail Reform Act.

25         I would also just point out that it would appear,

right, that to the degree and there are no congressional

findings or commentary on why they, a stated purpose on why

they viewed these sets of offenses to create this presumption.

But it goes to reason and it's consistent with principles of

statutory interpretation, if they are going to say that there's

a presumption and give you what they want in terms of pretrial

release conditions that they're saying in essence, at least in

my view, that OK we're creating this presumption but we're

giving you a way to do it that accounts for this kind of a

case.

          We're going to write in electronic monitoring and home

detention because this isn't like many other cases and many

other crimes in which there's a conspiracy and there could be

people on the outside and there's international ties and there

are other things that, perhaps, do support pretrial detention.

None of that have is here.  In the absence of the Adam Walsh

Act is amendment which is a decade or so old.  No one, I would

submit to the Court, would think that this man who's lived an

otherwise unblemished life on these first offense charges

presumed innocent would ever be detained pretrial.

          So I think when you consider that you get back to the

factors that are well thought out that go to how we normally

assess bail and pretrial detention.  And when we talk about the

nature and circumstances of the offense, we're talking about

approximately a decade ago is when most of these conversations

1    occur that are listed in the complaint.

2            THE COURT:  Yes.

3            MR. SPIRO:  And if you consider that's the

4    government's discovery schedule, I would submit by the time all

5    of that is done it will literally be a decade in between that

6    conversation and when my client would stand trial for those

7    charges presumed innocent.

8            So again, he is presumed innocent but looking at the

9    complaint and the evidence here, I would point out a few things

10   to the Court.  One is a search warrant's conducted.  On the

11   search warrant return and in none of the applications and

12   anything are there the kinds of devices, whatever that would

13   lead anyone to think that he is a danger to children, an active

14   danger to children.  There aren't handcuffs.  There are cases

15   where courts have weighed-in --

16           THE COURT:  The search warrant was executed when, Mr.

17   LaRoche.

18           MR. LAROCHE:  March 23, 2017.

19           THE COURT:  OK.

20           MR. SPIRO:  While this is all going on mind you, your

21   Honor -- I think the Court knows this -- my client is meeting

22   with and engaged in open conversations with the government,

23   turned in his passport, told them --

24           THE COURT:  That's why Magistrate Judge pitman found

25   there was not a danger of flight.

1          MR. SPIRO:  Right.  I only mention that just in terms

2     of the timing of the search warrant because you're right.  I

3     think that that is why the magistrate so clearly found that

4     there wasn't a danger of flight.  But I think it speaks a

5     little bit also to notions of impulsivity and danger.  There

6     are communications, constant communications in which my client

7     has travel plans and is checking in with his lawyer and

8     checking-in with the government.  I mean I'm going to move to

9     character in a second but I just want the Court to just picture

10    that dynamic about how dangerous he is walking into a

11    government office weeks ago with his lawyer unfettered, no

12    issue ever in 30 years.

13         So if you continue to read on in the complaint -- I'm

14    just going to pull a couple snippets because he's presumed

15    innocent.  I haven't seen any of the forensics and we can't

16    have a trial here today.  Even in these little conversations

17    they pull from over a decade ago or approximately a decade ago

18    rather, just don't put something too illegal on there.  Like

19    what?  I'd be pretty pissed off if the FBI knocked on my door

20    and said I had a terrorist plan to nuke the U.S. on my server.

21         That's kind of like, I guess the government would say

22    that's consistent with concern over what's on his computer but

23    I'm not so sure that that's elicit concern.  If you are running

24    servers they mention how much data he has on his computers.  If

25    you are running servers that lots of people can put stuff on

1    there, you don't want them selling fake Louis Vuitton bags.

2    You don't want them doing all sorts of things.  And you say

3    some comment like that nine years ago, it just doesn't, to me

4    it speaks of OK, be careful don't do anything crazy on my

5    server.  You go down to the bottom of that page and on page

6    eight of the complaint, the response to Mr. Schulte:

7              Well, 15-year-old-girls are sexy but maybe that's

8    because I'm 16.

9              It's a teenager, judge.

10             You go on and they talk about the movie "Taken".  I

11   don't know if you saw that reference in the complaint.

12             THE COURT:  Yes.

13             MR. SPIRO:  And at one point they say, dude, it's

14   porn.  I don't even like porn.  But just to take a notice of

15   the movie "Taken" and again, I don't want to sort of try the

16   case right now but I would submit to the Court that my client

17   is a teenager at the time, that some of this stuff, the

18   comments are better left unsaid.  Part of it is fantasy.  Part

19   of it is -- and you know we're talking about a not nice subject

20   matter and something that is uncomfortable and something that

21   is shocking and something that is not positive in any way,

22   shape or form.  But we have to put that aside a little bit and

23   realize that the teen-aged mind may not understand that you are

24   re-victimizing people, just like the teenaged mind might stare

25   at a car crash where somebody got horribly injured and not

think oh, I'm hurting that person by staring at them because the harm had been done in the teen-aged mind.

So that is the window with which this case is being presented.  And that's what we know about the nature and circumstances.  You know the government I have no doubt will stand up as they do in all of these cases, and say there were ten thousand images, OK.  It seems to me that there are thousands of images in all of these cases.  I don't think when the law talks about the "weight of the evidence" they're talking about how many images downloaded onto a massive server that is going to take months and months and months to copy. They are not talking about that.

What the courts I believe are talking about is is there a defense?  And they're absolutely is.  And the reason that there's a defense in this case and the Court can, I think, start to see that there is a defense is because when you're dealing with all these levels of encryption, when you're dealing with public servers that people can download things on, that things can come off of, that things can come onto your computer through, it is like running an entire, like running an exchange.  And you are going to have lots of things on the exchange.  And people can excess the exchange and put things on the exchange and people can take things off the exchange.  The bigger your exchange is, the more likely there is that there is going to be things on the exchange that shouldn't be there.

That's just how running any large information storage database
would work.

THE COURT:  But Mr. Schulte was running the
information storage, right?  He had the servers on his
premises.

MR. SPIRO:  Correct.

THE COURT:  As I understand the complaint, there was a
personal computer which had an inscription feature on it that
if you penetrated the encryption feature you got into the
server.  The server then had a double encryption before the
materials became available.

MR. SPIRO:  That is relatively consistent with my
understanding at this early phase.

THE COURT:  Where am I wrong?

MR. SPIRO:  No, no, I don't think the Court is wrong.

THE COURT:  OK.

MR. SPIRO:  But of course I'm not in a position.  This
is a case that all of those --

THE COURT:  So Mr. Schulte had access to this computer
because he, behind all of the levels of encryption he had
passwords that protected his access.  Now are you saying that
other people had similar access?

MR. SPIRO:  Well, I don't know if people had similar
access but other people had the ability to access.  People had
other –

1          THE COURT:  Strike the word "similar".  How would they

2     get access to the server that was maintained -- I gather it was

3     maintained in Mr. Schulte's apartment.

4          MR. SPIRO:  Right.  So again, I think that all of

5     these questions are fair and I will respond but I would just

6     point out that every response is exactly the reason why I come

7     back to how complicated this is.  The passwords to the

8     different encryption levels within the servers were made

9     publicly available, meaning that there was a group of

10    individuals who all had access to the servers.  He was running

11    a host much like somebody could run an exchange.  That's why I

12    used that analogy.  He is not the only one that could input,

13    download, output onto these servers.  So it becomes very

14    complex in terms of what is available and what is not

15    available.

16         THE COURT:  But Mr. Spiro, I don't want to interrupt

17    you but he said at page 13 of the complaint at paragraph D

18    Schulte explained that he had personally installed encryption

19    on his desktop computer.  He stated that he did not share the

20    password for the encrypted portion of the desktop computer with

21    anyone else.

22         MR. SPIRO:  Right.  It is my understanding, judge,

23    that as to one component of the desktop he did have his own

24    password.  But the massive server, speaking to the government

25    and colloquially, I don't want to put words in their mouths,

but there's as much computer data in this case as almost you

could find in any case, certainly, more than in any case I've

handled so much that we're going to have to go to the FBI

headquarters for the confidential stuff.  And we're talking

about we may have to have our own servers, 12 terabytes, maybe

50 terabytes in total.

So one point of it and in that statement in that

context speaks to one point of access to one point of this

information, not all of it.  Much of it, if not the majority of

it is other people moving in and out of his server.  So all of

these questions --

THE COURT:  So he talks about the desktop computer

being encrypted and he didn't give the password to his desktop

computer.

MR. SPIRO:  I think that that is correct.

THE COURT:  So when you get through that you get

access to the server and the serve has a double encryption

level?

MR. SPIRO:  I don't think that that is entirely

correct, meaning that you can get remote access to the server

as well.  I am getting assurances that that is the accurate way

the servers work.  So you can get access to the server without

being anywhere near the computer or the encryption on the

desktop or anything else.

THE COURT:  How would that happen?

1        MR. SPIRO:  Over the Internet.  It's like hosting

2   Google.

3        THE COURT:  "Hosting"?

4        MR. SPIRO:  Google or something, right?  It's like how

5   do things get on Craig's List if you're Craig?  Everybody can

6   put it on and take it off.  So it's just, there are none of the

7   aggravating factors that we often see in child pornography

8   cases.  There's no evidence of him contacting a minor.  There's

9   no evidence of binoculars, no evidence of any pictures of

10  kidded in the neighborhood, none of that.  And there is all of

11  this complex computer stuff that's going to do a couple things.

12  One, it's going to make the case more complicated and more

13  defensible, all things equal no matter what.  And number two is

14  it's going to make this case take an extraordinary long amount

15  of time probably to get to the bottom of what happened here.

16  And if the Court were not willing to release my client it makes

17  it a very, very challenging case, judge, to properly defend it.

18       So I don't want to get -- I think the Court can see

19  even through its own questions that there is some complexity to

20  the computer systems and experts and forensics people are going

21  to have to get involved and have to bring me a little bit up to

22  speed to be candid, your Honor.

23       But really then you go down to, OK, it's a first

24  arrest child pornography case.  If you can move past the sort

25  of shock and awe of child pornography, it's a first arrest

1    child pornography case.  So what do we know about him, about

2    his character, about his danger?  I can't even believe that I'm

3    arguing about his danger.  So for the last decade here is what

4    we know.  He's worked for the federal government.

5           THE COURT:  CIA and NSA.

6           MR. SPIRO:  Being polygraphed, being watched everyday

7    to some level, great oversight.  They take that responsibility

8    very, very seriously vetted to the highest order.  No question.

9    He leaves that world and he goes to work at Bloomberg.  And I

10   don't know of a private entity really that does a better job of

11   vetting and making sure they're up to compliance and making

12   sure they understand.

13          He is then been meeting with the government for the

14   last several months so that we know a snapshot into how he

15   conducts himself in the present time.  And all the while they

16   have ten years of every inch of his history on computers, on

17   his cellphone that they voluntarily gave him, everything, all

18   of that.  We couldn't know more about his last decade.

19          And where are these crazy acts of danger that the

20   community has to be concerned about?  Where is this acting out?

21   There's acting in.  There's stuff on the computer.  So what

22   does the law say about that?  What reasonably assures?  He's go

23   a problem with the computer?  No computer at his house when he

24   is detained.  There is not a more dovetailed answer to this

25   than that.  There is no other evidence, not an iota of any

1    dangerousness outside of the computer.  So, no computer.  It

2    matches up with the law and the mandates and all of our

3    evolving senses of what bail is in the first place.

4              THE COURT:  At the time of arrest was the computer

5    seized, the personal computer?

6              MR. SPIRO:  Yes.

7              THE COURT:  And the server?

8              MR. SPIRO:  Yes.

9              THE COURT:  So and it was not replaced?

10             MR. SPIRO:  At that point --

11             THE COURT:  Well --

12             MR. SPIRO:  At that point the government without just

13   like --

14             THE COURT:  From the time of the search warrant to the

15   time of the arrest was the computer replaced?

16             MR. SPIRO:  Let me make sure I get that answer.

17             (Pause --

18             MR. SPIRO:  There was a simple desktop computer that

19   was replaced.  But of course at this point, judge, passports

20   are retained and any time he went anywhere he would send an

21   e-mail to his lawyer at the time who would then communicate

22   with the government and he would say I'd really like to go to

23   San Diego with the family.  And government would say, no

24   problem, provide us with the flight details.  They'd go to San

25   Diego.  No issues with the airport.  No issue anywhere in 30

1  years, judge.

2          THE COURT:  All right now, Mr. Spiro, you've been

3  going on for quite some time.  Let me see if I have your point

4  here.  Your point here is that the Magistrate Judge Pitman was

5  not correct when he found that there was a risk of danger here.

6  He found no risk of flight but he said that there was a risk of

7  danger given the salaciousness of the materials on the

8  computer.

9          MR. SPIRO:  I am saying yes, judge, unequivocally that

10  that was an incorrect determination.  And I'm asking you to de

11  novo look at that determination.  And I have been going on for

12  quite some time so I will end.

13          THE COURT:  Not end but I think --

14          MR. SPIRO:  Move to that.

15          THE COURT:  I think that I'd like to hear from the

16  government and then I'll hear your response.

17          MR. SPIRO:  Yes, judge.  I just also -- he has no

18  extreme wealth.  His family is here.  He's got a place to live

19  in Manhattan and Pretrial recommends it.  And I thank you for

20  listening, judge.

21          THE COURT:  Thank you.

22          Mr. Laroche

23          MR. LAROCHE:  Thank you, your Honor.

24          the Government believes that he is a danger to the

25  community and we agree with Judge Pitman.  We also believe he

1    is a flight risk.  But I want to focus on danger.

2          This is not a run-of-the-mill child pornography case.

3    The defendant had a enormous volume of child pornography.  Even

4    by the number of child pornography cases that we have in this

5    district.  He had over ten thousand images and videos

6          THE COURT:  How does that make him more dangerous?

7          MR. LAROCHE:  It does because of the manner in which

8    he committed this crime, your Honor.  It makes him more

9    dangerous because he is a highly sophisticated individual when

10   it comes to computers.  He buried the child pornography within

11   severals layers of encryption.  It makes him more dangerous

12   because he talked regularly in the IRC chats about the

13   distribution and receipt of child pornography.  So we do

14   believe that it makes him more dangerous and separates him

15   from --

16         THE COURT:  The IRC chats according to the complaint

17   stops in 2009.

18         MR. LAROCHE:  We don't believe that they stopped, your

19   Honor.

20         THE COURT:  No record of it.

21         MR. LAROCHE:  It's simply that we don't have a record

22   of it.  And there's nothing that indicates to us that the

23   defendant all of a sudden changed tune in 2012 or 2013 and

24   stopped discussing these types of issues.

25         THE COURT:  You have the computers now, correct?

1          MR. LAROCHE:  That's correct, your Honor.

2          THE COURT:  And the servers.

3          MR. LAROCHE:  That's correct.

4          THE COURT:  Do you have any reason to contradict

5     Mr. Spiro's suggestion that Mr. Schulte doesn't have computers

6     now?

7          MR. LAROCHE:  Well, it's our understanding that he did

8     have computers at the time of his arrest.  So as soon as -- to

9     take us back --

10          THE COURT:  -- really impose a condition that says no

11     computers, what is the danger of that?

12          MR. LAROCHE:  Well, I believe there still is a danger

13     because it's not just computers, your Honor, but electronic

14     devices are all over society and easy to procure and this type

15     of defendant having the type of knowledge he has does in terms

16     of accessing things -- so he has expertise and not only just

17     generally computers but using things such as wiping tools that

18     would allow him to access certain website and leave no trace of

19     it.  Those can be done from not just a computer but from other

20     electronic devices.

21          Based on what we've recovered from his apartment,

22     there were numerous different types of electronic devices.  So

23     we don't think that simply saying to him, you can't have a

24     computer is going to be enough to ensure that the community

25     will be safe.

1              And I will just note that defense counsel made a lot

2      of the fact that there is not evidence in the complaint that he

3      did anything to a minor.  Well, that's not the only danger that

4      courts have been concerned of when we're talking about child

5      pornography.  Just the mere fact the defendant is involved in

6      the receipt and distribution of these types of materials

7      creates a danger to the community because the production of

8      these materials necessarily involves putting children in

9      danger.  And the defendant has clearly shown a proclivity

10     towards that type of activity.

11             If I could focus back on where exactly --

12             THE COURT:  But on other cases -- I know you are going

13     to tell me this case is different because of its dimensions --

14     but in numerous other cases involving child pornography,

15     possession and receipt of child pornography, the accused has

16     been admitted to bail, correct?

17             MR. LAROCHE:  There are certainly examples of other

18     cases where in similar charges they have been provided bail,

19     your Honor.  I would not dispute that.  I wouldn't.  I would

20     just say that in this particular case --

21             THE COURT:  What makes this different?

22             MR. LAROCHE:  Several things.  The type of defendant

23     we have.  We have a defendant who is highly sophisticated when

24     it comes to computer.  As I said he is able to hide things

25     versus in several layers of encryption.  I think also the

1    personal history and characteristics of the defendant.  At the

2    last initial bail hearing we notified the Court that we found a

3    picture on the defendant's phone of one of his friends who

4    appeared to be sexually assaulted on the phone.

5         So if I can explain what the picture showed, it was

6    someone who lived with him who was unconscious on the floor.

7    Her underwear was removed.  And it appeared that fingers were

8    sexually assaulting her.  Now we just have those pictures on

9    his phone.  But what it says to the government is the defendant

10   isn't just someone who has these thoughts.  He is someone that

11   appears willing to, at a minimum, be OK with his own friends

12   being assaulted in this manner.  In some of the other IRC --

13        THE COURT:  Judge Pitman explicitly said he wasn't

14   relying on that.

15        MR. LAROCHE:  He didn't rely on it, your Honor.  We

16   are simply brining it to your attention as another factor to

17   consider.

18        I would note that there is other IRC chats that are

19   not cited in the complaint that gave us a lot of pause and

20   suggested that he condones sexually dangerous activity,

21   including IRC chats whether he talks about using the date-rape

22   drug where he talks about having sex with high school girls,

23   where he even sees a user name of "I Rape Babies".  And he says

24   in response to that user name, "That's pretty cool".  So in our

25   view this isn't the typical child pornography defendant.  It's

1    someone who's shown himself to condone sexually dangerous

2    behavior and has shown a proclivity to collect thousands of

3    images of child pornography.

4         And if I could just clarify the Court where exactly

5    that child pornography was found.  There's been a lot of talk

6    about a lot of servers and there certainly were a lot of

7    servers from the apartment.  But the child pornography itself

8    is located on the defendant's desktop computer.  They can be

9    accessed irrespective of those servers.  So if all the

10   government had was this desktop computer, we could recover the

11   child pornography.  So I think this idea that numerous people

12   had access to the serves and potentially could have put it

13   there, is simply a red herring.  This was on the defendant's

14   desktop computer.

15        And the location where it was found, this sub-folder

16   within several layers of encryption, there were other personal

17   information of the defendant in that area.  There was his bank

18   accounts.  I think there was even a resume for the defendant

19   where he was storing this information.

20        And the passwords that were used to get into that

21   location, those passwords were the same passwords the defendant

22   used to access his bank account, to access various other

23   accounts that are related to him.  So this idea that he shared

24   them with other people, the government just strongly disagrees.

25   And as the Court noted, he admitted to the government that he

1   didn't share those passwords with anyone else.

2          So when we are looking at both the nature of the

3   offense we think that this defendant is different and

4   dangerous.  When we're looking at the weight of the evidence we

5   think that it's overwhelming in this case, that it is very

6   clear and not complicated that this defendant had this

7   material.  So when you look at all those factors the government

8   believes that they cannot rebut the presumption that he is a

9   danger.

10          THE COURT:  Can you tell me why then when you were

11   arguing this matter before Judge Pitman you spent so much time

12   on servers?

13          MR. LAROCHE:  Your Honor, and that's my fault.  After

14   Judge Pitman asked those specific questions we went back and

15   talked to specific analysts who did this and they clarified for

16   me that that was not the correct way to think about where this

17   stuff was located.  They said very clearly that this was

18   located on the desktop computer.  So where the CP is has to do

19   with the desktop computer.  The servers seem to be used to run

20   a movie streaming service that the defendant seemed to be

21   involved in.  But the actual CP itself is through the desktop

22   computer irrespective of the servers.

23          THE COURT:  Anything else?

24          MR. LAROCHE:  No, your Honor.

25          THE COURT:  Mr. Spiro.

1          MR. SPIRO:  Yes.  I mean every single point made is

2     completely negated if he doesn't have a computer, and to be

3     perfectly clear, any device that could access the Internet.  So

4     that is my first response to all of those arguments.

5          THE COURT:  How would that be enforced?  It's easy to

6     impose that requirement.  How is it enforced?

7          MR. SPIRO:  As I told the Court initially and I don't

8     want to speak as if I'm a witness, but in a dozen or so cases

9     I've handled, they do spot checks.  And I spoke to Pretrial

10    about that and Mr. Moscado and my client will know that he will

11    be immediately remanded and it'll be used against him in every

12    phrase of this proceeding and if there ever was a conviction or

13    sentence in this case, if he were to violate the terms of his

14    release.  So he wouldn't have the server and it would be

15    spot-checked.  And Pretrial said that's what they do in all of

16    these run-of-the-mill child pornography cases.

17          And there's nothing that the government said, nothing

18    that it is run-of-the-mill child pornography case.  And in

19    every bail application it's "This isn't a run-of-the-mill child

20    pornography case".  There is this many images.  And the Court

21    pointed it out but it is of no moment.  It doesn't have think

22    argumentative weight.

23          The other thing is the government was right the first

24    time when they moved to have him remanded about the servers and

25    they're wrong today.  I can't have that trial here and that

1    individual isn't here to testify.  But I think it should remind

2    the Court, I'm hopeful it reminds the Court about the

3    presumption of his innocence and the triable issues here that

4    the government itself has now in the matter of days stood in

5    front and said, no, this password and this image was from this

6    server and now today oh, this desktop and this server, it shows

7    how live this issue is and that we're not at a point of wait or

8    absoluteness that rebuts my client's presumption of innocence

9    and that he should be able with those restrictions to be out.

10   They still have not come up with one colorable argument for how

11   if he has no computer and he has no other device that accesses

12   the Internet -- I mean they bring up a wiping device.  Well, a

13   wiping device is irrelevant if you don't have a computer.  So

14   he would be able to meet with his lawyers at his --

15            THE COURT:  As I understood the government's position,

16   you don't need a computer to wipe certain materials.

17            MR. SPIRO:  If you don't have a computer, what are you

18   wiping?  I will take your Honor's -- nothing.

19            THE COURT:  Well, that's what Mr. LaRoche said --

20            MR. LAROCHE:  There are a number of electronic devices

21   that potentially the defendant could get, that he would have

22   the ability and sophistication to be able to delete things.  It

23   doesn't have to be a computer.  It could be a telephone.  It

24   could be an iPad.  It could be anything that could access the

25   Internet and today that could be a wide variety of different

1    types of electronic devices.  This is an defendant whose

2    identity is computers.  After his materials were seized he

3    immediately got more cellphones and computers.  So I don't

4    think the Court can be confidently assured that just by saying

5    "no electronic devices" that this particular defendant isn't

6    going to go out and just start getting.

7         MR. SPIRO:  Judge, if I may respond to that?  The

8    government did not arrest him when they executed the search

9    warrant and they led him to be at liberty and check-in with the

10   government and didn't forbid him from having cellphones and

11   computers.  Everybody who has their cellphone damaged, lost,

12   destroyed or seized by the government replaces that cellphone.

13        What about that make it likely that he wouldn't listen

14   to the Court's order?  He's been able to serve our federal

15   government for the better part of a decade and obey all of

16   those orders.  He's been able to work at Bloomberg and obey all

17   of those orders.  He is here today obeying the Court's orders.

18   Why --

19        THE COURT:  He doesn't have much of a choice today.

20        MR. SPIRO:  He is not going to have much of a choice

21   period, judge.  He is on home detention without computers or

22   computer devices or any device -- just so we're perfectly all

23   on the same page -- that is able to access the Internet.  Like

24   what happens in many, many of those cases in which Pretrial

25   detention is not ordered.  And so he is going to be meeting

1  with lawyers and have spot checks from Pretrial and if he

2  breaches that he'll be immediately remanded and he is not going

3  to.  He is not even going to be allowed to leave his home,

4  judge.  So where is he going to get there from?  How is this

5  going to even happen?  The Court can restrict who is there in

6  all manner, shapes and forms.  He is not going any where.  He

7  is just going to be able to actually participate in his

8  defense.

9             THE COURT:  Let me hear from Mr. Ovalles.

10            Mr. Ovalles.

11            MR. OVALLES:  Yes, your Honor.

12            THE COURT:  What does Pretrial Services have to say?

13            MR. OVALLES:  Pretrial Services, as your Honor is

14  aware, makes the recommendation of the least restrictive

15  conditions without considering the weight of the evidence or

16  whether the defendant can overcome the presumption.  The

17  recommendation made by Officer Moscado back in August Pretrial

18  Services stands by that recommendation and believes that the

19  defendant can be adequately supervised by our office.

20            THE COURT:  Now Mr. Moscado updated this?

21            MR. OVALLES:  Yes, your Honor.

22            THE COURT:  As of when?

23            MR. OVALLES:  It was updated I believe it was today as

24  a matter of fact.  The only update, your Honor, is on the first

25  page of the report that is before you which makes reference

1    that the defendant appeared before Magistrate Judge Pitman on

2    August 24.  With that exception everything in the report that

3    you have before you now is the same that was before Magistrate

4    Judge Pitman.

5            THE COURT:  How would Pretrial Services enforce a

6    direction that Mr. Schulte should not have access to computers

7    or cellphones?

8            MR. OVALLES:  Well, the only way we can do that, your

9    Honor, is by conducting unannounced home visit and doing a spot

10   search.  With that exception, I can't think of any other way

11   how we can ensure the Court that there aren't any computers in

12   the house or electronic devices.

13           THE COURT:  Any other additional restraints that you

14   can recommend other than the ones set forth in the final page,

15   page four of the Pretrial report?

16           MR. OVALLES:  None right now, your Honor, no.

17           THE COURT:  Mr. LaRoche, do you have any suggestions

18   you want to make with respect to the recommendations?

19           MR. LAROCHE:  If the Court is considering a bail

20   package I would say that I think that the defendant does have

21   assets that are reflected on this report and at a minimum I

22   think he should be required to actually put up some assets.

23   And I think if the Court is considering granting some sort of

24   bail package, it should be more than two financially

25   responsible co-signers and a large bond.

1          That said, we still do believe that these conditions

2     are not enough to ensure that he is not going to continue to

3     download, receive and encourage the download and receipt of

4     child pornography.

5          THE COURT:  Well, how many responsible people do you

6     suggest?

7          MR. LAROCHE:  We'd request four co-signers, your

8     Honor.  We'd also request that the defendant put up at least

9     some property in support of a bail package.

10          THE COURT:  What property does he have?

11          MR. LAROCHE:  I believe he has a home in Virginia.

12          THE COURT:  Mr. Spiro, do you want to be heard?

13          MR. SPIRO:  Yes, judge.  I did speak to Mr. Moscado

14     myself after the initial bail hearing and he re-enforced to me

15     these recommendations and observations that I made earlier.  We

16     have no objection to all of the intense restrictions that

17     Pretrial suggests here.  I would simply state that his parents

18     are in the audience with his cousin.  That is three co-signers.

19     That is more than sufficient.  I asked Pretrial --

20          THE COURT:  Four.  I need four co-signers.

21          MR. SPIRO:  You would like a fourth co-signer.

22          THE COURT:  I want a fourth co-signers.

23          MR. SPIRO:  Understood, judge.  My last ditch effort

24     was the suggestion of three.  If the Court --

25          THE COURT:  No.  I want four.  And I agree with the

1    government's suggestion that if Mr. Schulte has a home in

2    Virginia -- and I gather he does -- that that ought to be put

3    up as well.  The other conditions are imposed --

4              MR. SPIRO:  Thank you, judge.

5              THE COURT:  -- as set forth in the recommendation of

6    Mr. Moscado of September 13th at 8:45 this morning.

7              MR. LAROCHE:  Your Honor, can I make one more request?

8              THE COURT:  Yes.

9              MR. LAROCHE:  Can I request that the Court not permit

10   his release until all conditions are met?

11             THE COURT:  All conditions have to be met prior to

12   release, including the four responsible co-signers and the

13   putting up of the house in -- where is the house in Virginia?

14             MR. LAROCHE:  Sterling, your Honor, Sterling Virginia.

15             THE COURT:  Where is Sterling, Virginia?

16             MR. LAROCHE:  I think that's near the capital area,

17   near Dulles Airport.

18             THE COURT:  All right.  Those are the conditions I am

19   going to impose.  Four financially responsible persons, the

20   house in Sterling, Virginia and each of the recommendations

21   made by Mr. Moscado on September 13 at 8:45 this morning.

22   Mr. Schulte, will not be released until all these conditions

23   have been met.

24             MR. SMITh:  Understood, your Honor.

25             THE COURT:  Anything else?  Oh, we've got to talk

1  about the schedule.

2          MR. LAROCHE:  Yes, your Honor.  I think the government

3  is requesting 45 days to complete discovery on a rolling basis,

4  and I think it would make sentence to come back for a

5  conference sometime shortly after that.

6          THE COURT:  Would 45 days would bring us to the end of

7  October?

8          MR. LAROCHE:  Yes, your Honor.

9          THE COURT:  David, gave me a date.

10         COURTROOM DEPUTY:  Tuesday, October 31st at 11:30 a.m.

11         THE COURT:  OK.

12         MR. LAROCHE:  That works for the government, your

13  Honor.

14         THE COURT:  Mr. Spiro?

15         MR. SPIRO:  Yes, your Honor.

16         THE COURT:  Is that date acceptable to the defendants?

17         MR. SPIRO:  Yes.

18         MR. LAROCHE:  One final matter, your Honor.  The

19  government would move to exclude time from today until the next

20  conference in the interests of justice under the Speedy Trial

21  Act so the government can produce discovery and the defendant

22  can review it with counsel and the parties can begin discussing

23  potential dispositions.

24         MR. SPIRO:  In light of my client's likely release, I

25  have no objection to that.

1          THE COURT:  All right.  For the reasons stated, the

2     time will be excluded between now and October 31.  Those

3     interests outweigh the interests of the defendant and the

4     public in a speedy trial.

5          I am around the next six weeks.  So any need for Court

6     intervention, you can write to Mr. Gonzalez.  He'll set up

7     promptly a conference.  Otherwise, we'll see you on October 31.

8          Anything else?

9          MR. LAROCHE:  No, your Honor.

10     Thank you.

11          MR. OVALLES:  Your Honor?

12          THE COURT:  Mr. Ovalles.

13          MR. OVALLES:  The last recommendation by Officer

14     Moscado indicates:

15          "Refrain from possessing and using a computer,

16     computer network and/or Internet access unless specifically

17     approved by Pretrial Services".

18          Is the condition imposed by the Court that the

19     defendant not have any computer or electronic devices while out

20     on bail or should we just go by the recommendation by Officer

21     Moscado?

22          THE COURT:  I read Officer Moscado's recommendation is

23     that Mr. Schulte should not have, possess or use a computer,

24     computer network, Internet access.  He shouldn't use that.  If

25     Pretrial Services wants to change that recommendation, it can

```
 1    at its discretion but otherwise Mr. Schulte is to have no or

 2    possess or use a computer, computer network and/or Internet

 3    access.

 4             MR. OVALLES:  Thank you, your Honor.

 5             THE COURT:  Is that clear?

 6             MR. SPIRO:  Yes, your Honor.

 7                       (Adjourned)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```