I188SCHC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

           Defendant.

------------------------------x

                                  January 8, 2018
                                  3:30 p.m.

Before:

                 HON. PAUL A. CROTTY,

                             District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
    Interim United States Attorney for the
    Southern District of New York
MATTHEW J. LAROCHE
SIDHARDHA KAMARAJU
    Assistant United States Attorneys

BRAFMAN & ASSOCIATES
    Attorneys for Defendant
JACOB KAPLAN


Also present:   EVAN SCHLESSINGER, FBI
                DAVID DONALDSON, FBI
                JOHN MOSCATO, Pretrial Services

1        (Case called)

2        THE DEPUTY CLERK:  Counsel for the government, please
3   state your appearance.

4        MR. LAROCHE:  Good afternoon, your Honor.  Matt
5   Laroche and Sid Kamaraju for the government.  With us at
6   counsel table is David Donaldson and Evan Schlessinger from the
7   FBI, and also John Moscato from pretrial services.

8        THE COURT:  Thank you for coming.

9        MR. KAPLAN:  Good afternoon, your Honor.  Jacob Kaplan
10  for Mr. Schulte.

11        THE COURT:  Mr. Kaplan.

12        Mr. Schulte, how are you?

13        I understand, Mr. Kaplan, you have an application.

14        MR. KAPLAN:  Yes, your Honor.

15        THE COURT:  Go ahead.

16        MR. KAPLAN:  Judge, on the last court date, when we
17  left, the idea was that we had consented to detention with the
18  understanding that Mr. Schulte would be sent down to Virginia
19  to face charges based on a Virginia warrant.  None of that
20  happened.  Virginia never came to get him.  Virginia just
21  didn't do anything in this case.  But before I address the bail
22  issues, I think it's important that this Court hear the full
23  story of how we actually get here.

24        At one of the previous court appearances, I believe it
25  was the November 8th date, this Court asked why the defense

1   attorney in this case would need security clearance.  And the
2   answer that was given by one of the prosecutors, I believe, was
3   that there was some top secret government information that was
4   found in Mr. Schulte's apartment, and that out of an abundance
5   of caution it would be prudent that the defense attorney get
6   clearance.  But I don't think that's entirely accurate.

7   While the current indictment charges Mr. Schulte with
8   child pornography, this case comes out of a much broader
9   perspective.  In March of 2017, there was the WikiLeaks leak,
10  where 8,000 CIA documents were leaked on the Internet.  The FBI
11  believed that Mr. Schulte was involved in that leak.  As part
12  of their investigation, they obtained numerous search warrants
13  for Mr. Schulte's phone, for his computers, and other items, in
14  order to establish the connection between Mr. Schulte and the
15  WikiLeaks leak.

16  As we will discuss later in motion practice, we
17  believe that many of the facts relied on to get the search
18  warrants were just flat inaccurate and not true, and part of
19  our belief is because later on, in the third or fourth search
20  warrant applications, they said some of the facts that we
21  mentioned earlier were not accurate.  So we will address this
22  in a Franks motion going forward, but what I think is important
23  for the Court is, in April or May of 2017, the government had
24  full access to his computers and his phone, and they found the
25  child pornography in this case, but what they didn't find was

1  any connection to the WikiLeaks investigation.
2           Since that point, from May going forward, although
3  they later argued he was a danger to the community, they let
4  him out; they let him travel.  There was no concern at all.
5  That changed when they arrested him in August on the child
6  pornography case.
7           At the initial bail conference, they argued as one of
8  the reasons to detain Mr. Schulte was that there were images on
9  his phone that showed a sexual assault.  They were able to
10 determine that it was --
11          THE COURT:  This is the application before Judge
12 Pitman.
13          MR. KAPLAN:  Yes.  In front of this Court as well on
14 the second bail hearing as well.
15          THE COURT:  I don't recall that.  I do recall seeing
16 it in the transcript from Judge Pitman.
17          MR. KAPLAN:  That is correct.  As part of that case,
18 Judge Pitman rejected that as a basis for detention, finding
19 that since the government conceded that the victim could not
20 identify Mr. Schulte, there was no basis for detention based on
21 that factor alone.
22          Not being deterred by that, it's my understanding that
23 the FBI then sent the photos that were the subject of that
24 issue to Virginia, and in November of 2015, Virginia itself
25 issued an arrest warrant for Mr. Schulte based on those facts.

1    But nothing ever happened with that arrest warrant.  November

2    15 they get the warrant, nothing happened.

3            That all changes in early December of 2017.  On

4    December 5, I had a phone call with John Moscato from pretrial

5    services to discuss whether pretrial services would consent to

6    Mr. Schulte's supervision being transferred from the Southern

7    District of New York to Lubboch, Texas, where he can live with

8    his parents.  Pretrial services tells me they have no objection

9    to that at all.

10           I then had a conversation with the prosecutors who

11   told me they would object, but we could address it with the

12   court.  Two days later is when Virginia decides to do something

13   with that warrant.  Two days after we try to move Mr. Schulte

14   to Lubboch, Texas, now suddenly Virginia decide that they want

15   to arrest Mr. Schulte based on this warrant.  And, in fact,

16   when the NYPD officers came to arrest Mr. Schulte at 6 a.m. on

17   a Thursday, they told him that we came because the FBI told us

18   to come arrest you; not Virginia authorities, but the FBI came

19   and told us to arrest you.

20           What I think is important is the Virginia case is just

21   a means to keep Mr. Schulte detained.  There is no new

22   information.  The state prosecutor down in Virginia has spoken

23   with defense counsel down in Virginia and she told her,

24   candidly, that there is no new information; it's the same

25   pictures that the FBI had, that the FBI just gave to Virginia

1    and asked them to make an arrest.  She still cannot identify

2    Mr. Schulte.  Nothing has changed on that basis that would

3    be --

4                THE COURT:  By she can't identify, you mean?

5                MR. KAPLAN:  She being the victim.  And Mr. Laroche

6    candidly told that to Judge Pitman when he asked, that she

7    could not identify him as being the one who assaulted her.

8                What is kind of interesting is, while the government

9    in their detention letter had two bases, one was the Virginia

10   case, Virginia itself seems not to care.  Virginia, they had

11   him detained on a state warrant, he was incarcerated, and they

12   were gunning to get him.  They were scheduled to come December

13   20 to pick him up.  The minute we consent to federal detention,

14   and now he is no longer out, suddenly they are hands off.  They

15   didn't come to pick him up.  They don't issue a writ to come

16   get him from federal custody.  Instead, my understanding is

17   they simply have a detainer that, if this court lets him out on

18   bail, they are going to come pick him up.  So this idea that he

19   is a danger to the community, that there is new information in

20   Virginia which ties him to this crime, is just not true.

21   Virginia is just sitting back and waiting to see what happens.

22   They have no interest in Mr. Schulte, and if they did, Mr.

23   Schulte would have been there already.

24               The second basis that the government had in its letter

25   for detaining Mr. Schulte was the usage of computers.  In the

1   government's letter, they note how, if you search the IP
2   address for Mr. Schulte's apartment, they found numerous
3   log-ons to his Gmail account, in clear violation of this
4   court's order.  But what the government's letter doesn't
5   mention is that Mr. Schulte had a roommate, his cousin, Shane
6   Presnall, and this roommate, who the government and pretrial
7   services knew about, was allowed to have a computer.
8           And more than that, based on numerous conversations,
9   at least two conversations between pretrial services, John
10  Moscato, Josh Schulte and Shane Presnall, it was Shane's
11  understanding that pretrial services allowed him to check Mr.
12  Schulte's e-mail and to do searches for him on the Internet,
13  with the idea that Josh Schulte himself would not have access
14  to the computer.
15          And the government gave 14 pages of log-on information
16  to establish this point.  And, Judge, we have gone through all
17  14 pages, and every single access and log-in corresponds to a
18  time that Shane Presnall is in the apartment.  His computer has
19  facial recognition, it has an alphanumeric code, and there is
20  no point when Josh Schulte is left himself with the computer
21  without Shane being there, and that was their understanding.
22          Now, I spoke to John Moscato and he explained to me
23  that he never intended to give him such carte blanche to do
24  this, that that was a misunderstanding.  Judge, a
25  misunderstanding is not an intentional violation of this

1    court's bail conditions.  It is a misunderstanding and --

2               THE COURT:  It's a very convenient misunderstanding,
3    isn't it?

4               MR. KAPLAN:  I understand that.  But this is something
5    which, if you look at the court's original bail order, it says
6    that pretrial services has the discretion to allow them
7    computer usage, and they believed they were complying with
8    that; they believed they were complying with the judge's order
9    by discussing it with pretrial services.  They didn't go behind
10   anyone's back.

11              The whole concept of not allowing Mr. Schulte access
12   to his computers is the child pornography case, what he may do,
13   those fears are allayed when you have someone else doing it for
14   him, and that's Mr. Presnall.  And, Judge, I think it's really
15   important that in 14 pages of log-in information, every single
16   one corresponds to a time when Shane is in the apartment.  This
17   is not him with unfettered access to the Internet.

18              More importantly, Judge, this is not him intentionally
19   violating this court's bail conditions.  When you look at 18
20   U.S.C. 3148, which discusses revocation of bail, it talks about
21   either probable cause that the defendant committed a crime
22   while on release.  Well, we don't have that here.

23              I will wait for your Honor.

24              THE COURT:  Go ahead.

25              MR. KAPLAN:  The other one is clear and convincing

1   evidence that the defendant violated a bail condition.

2   THE COURT:  Any other condition of release.

3   MR. KAPLAN:  Yes.  I don't see clear and convincing
4   evidence that he intentionally violated a bail condition.  This
5   was at worst a misunderstanding between not just Joshua Schulte
6   and pretrial services, but there was a third party who was
7   there, a third party who had these conversations, and based on
8   those conversations, he believed that he was able to do this.

9   So, Judge, what I am asking you is to, one, completely
10  reject the Virginia case as a basis, because Virginia itself is
11  rejecting it; they don't care.  And there is still no evidence.

12  THE COURT:  Let me see if I have the sequence right,
13  Mr. Kaplan.

14  On December 7, the government moved for
15  reconsideration of the decision to remand Mr. Schulte, correct?

16  MR. KAPLAN:  Correct.

17  THE COURT:  Thereafter you consented to that.

18  MR. KAPLAN:  Yes, on the 14th.  I consented with the
19  idea that the government had two bases -- one Virginia, one
20  the log-on information on the computers.  I wanted the Virginia
21  issue to be resolved, and we consented to detention to allow
22  Virginia to come to New York, like they were scheduled to do
23  when he was in state custody, pick him up, and bring him down
24  to Virginia to be arraigned.  That never happened.

25  THE COURT:  You agreed that we would meet today as a

1     control on that.

2             MR. KAPLAN:  The idea would be, if something happened
3     in Virginia, we would have a control date today forcing them to
4     send him back here to New York, but absolutely nothing has
5     happened.  I think the government will agree that nothing has
6     happened on the Virginia front.

7             THE COURT:  Anything else, Mr. Kaplan?

8             MR. KAPLAN:  I would ask if you could just put him
9     back on the bail conditions where he was before, since there
10    was no willful violation, and if the Court wants to make clear
11    there is no computer access at all, even with a third party, we
12    will do that.

13            THE COURT:  I think that was pretty clear before.
14            Mr. Laroche.

15            MR. LAROCHE:  Thank you, your Honor.  We still do
16    believe that detention is appropriate here, and if I could just
17    address specifically some of the points raised.

18            First, Virginia.  In no way is Virginia's conduct over
19    the past few weeks an indication that they do not care about
20    Mr. Schulte.  After the conference last time, I had
21    conversations with Virginia, in terms of how we would get him
22    down there.  I told them the easiest way to do that is if they
23    would writ him from here down to Virginia.  But I made clear to
24    them that, regardless of the outcome of their arraignment, that
25    our case would proceed first, in other words, we would be

1    taking him back up here and this case would proceed first.
2    Under those circumstances, Virginia said, We are not going to
3    writ him just so that we can have a bail determination down
4    here and you take him back; you let your case go first, and we
5    will rely on the detainer that we have already put in place to
6    keep him in custody.  So the idea that Virginia doesn't seem to
7    care about Mr. Schulte just does not pass muster.
8         I would also note, this idea that Virginia somehow
9    came up with these charges because we passed them photographs
10   also is not the case.  What happened was at the time that he
11   was arrested for the CP charges, the FBI provided Loudoun
12   County law enforcement officials with the photographs.  It's
13   our understanding that they conducted their own investigation,
14   which included interviewing the victim, the person who was on
15   those photographs, and through interviews with that person,
16   they were comfortable, through the development of that
17   evidence, that Mr. Schulte was the one whose hands are on the
18   pictures of that photograph.  And that's based on a couple of
19   things.  One, that the victim remembers the night in question.
20   It was one of the few nights that she passed out and didn't
21   remember what occurred.  She could also, apparently, identify
22   the bathroom, which was the bathroom where she was staying as a
23   roommate of Mr. Schulte's.
24        So they have developed additional information which --
25        THE COURT:  So from Virginia's standpoint, Virginia

1   has now satisfied itself, at least as a preliminary matter,
2   that the victim has been identified.
3           MR. LAROCHE:  They know the victim has been
4   identified, and they have also satisfied themselves to bring
5   felony charges against the defendant that the pictures are of
6   the defendant.
7           So this is something that we asked the court to
8   consider during the first bail arguments, and Judge Pitman
9   chose not to.  But again, given there are additional state
10  sexual assault charges pending against the defendant, we do
11  think they are reliable and should be considered by the Court.
12          Second, with respect to this idea that Mr. Schulte
13  just thought he could use his roommate to conduct searches on
14  the Internet, I just do not think that is a persuasive
15  argument, your Honor.  If you recall, during both bail
16  arguments, the government's principal concern was that this
17  defendant would have access to the Internet, and that's not
18  just because he is a child pornography defendant, it's because
19  the defendant has specific expertise with respect to computers.
20  For over six years the defendant was employed by the Central
21  Intelligence Agency and he held positions, including technical
22  development officer, and through that experience he gained
23  expertise in computers, computer networks and the Internet, and
24  the vulnerabilities of the same.  So the idea that this
25  defendant was just somehow checking his e-mail during this time

does not pass muster, and I would say is inconsistent with the arguments and the court's ruling in terms of bail.

And even more troubling, which wasn't really addressed by defense counsel, is that the defendant or someone in his apartment was using TOR in his apartment during the time when he was on pretrial release, and this is extremely troubling to the government because TOR is a way to establish anonymous connections to various Internet locations to hide the person who is actually accessing those sites. It's used to access child pornography. It's also used to access Web sites where you don't want to leave a trail. And since the defendant brought it up, I think it's particularly relevant given the other investigation which continues to be ongoing with respect to this defendant.

As defense counsel noted, in March of 2016, there was a significant disclosure of classified material from the Central Intelligence Agency. The material that was taken was taken during a time when the defendant was working at the agency. The government immediately had enough evidence to establish that he was a target of that investigation. They conducted a number of search warrants on the defendant's residence. And I would disagree with defense counsel's characterization that those search warrants haven't yielded anything that is consistent with his involvement in that disclosure. In fact, our investigation is ongoing. He remains

1  a target of that investigation. And part of that investigation
2  is analyzing whether and to what extent TOR was used in
3  transmitting classified information. So the fact that the
4  defendant is now, while on pretrial release, using TOR from his
5  apartment, when he was explicitly told not to use the Internet,
6  is extremely troubling and suggests that he did willfully
7  violate his bail conditions.
8  So under those circumstances, your Honor, I do not
9  believe that there are a set of conditions that will ensure
10 that this defendant is not going to access the Internet and
11 pose a danger to the community.
12             THE COURT: Mr. Kaplan.
13             MR. KAPLAN: Judge, as to Virginia, this is part of
14 the issue. We have two attorneys in New York debating the
15 evidence in the case of Virginia, when he can just be arraigned
16 in Virginia and let the judge there assess the situation. I
17 understand Mr. Laroche is basing his comments on information he
18 has gotten from the state prosecutors, and so are we. I had
19 defense counsel who had a very candid conversation with the
20 state prosecutor. So I'm not sure why we are having this
21 debate in New York when there is a simple way of having it in
22 Virginia and see whether the judge in Virginia feels there is
23 any basis to remand him.
24             As for the Internet, just a couple of quick points.
25 The judge's bail order on September 14, in paragraph 11,

1   specifically states, "Refrain from possessing or using a
2   computer, computer network and/or Internet access, unless
3   specifically approved by pretrial services."  That was the
4   court's written order.
5       Judge, we have a pretrial services member here in
6   court.  The Court can ask him about his conversations with the
7   defendant and with Mr. Presnall.  This idea that he was simply
8   using his roommate to do this, they asked if they could do
9   this, and they asked because they didn't want to run afoul of
10  this court's bail conditions.
11      Just briefly about this notion of TOR.  I understand
12  that the government's position is TOR is used by many, many bad
13  people.  It's also used by many, many good people.  The TOR is
14  simply a way of going online without having the government look
15  at everything you do.  Now, I understand in a case like this,
16  the government puts a nefarious intent to that.  In this case,
17  the reason why TOR was accessed was because Mr. Schulte is
18  writing articles, conducting research and writing articles
19  about the criminal justice system and what he has been through,
20  and he does not want the government looking over his shoulder
21  and seeing what exactly he is searching.  That's all it is.
22      If there is a concern about his computer access, if
23  there is a concern about him checking his e-mail, there is a
24  simple solution, no computers at all, no third-party access,
25  nothing, and that's the combination of conditions which will

ensure that he is not a danger. Besides for that, I don't see what has necessarily changed intentionally on behalf of Mr. Schulte since the court's bail order two months ago.

THE COURT: All right.

On December 14 I revoked Mr. Schulte's bail. It was on consent and without prejudice to Mr. Kaplan renewing a motion on January 4. In accordance with the proceeding that day, we agreed that we would meet again on January 4.

Having studied 18 U.S.C. 3148, sanctions for violation of release conditions, I find that there is a combination of events here, including the fact that the victim has now been identified in Virginia, there is a clear danger, and I find that the defendant violated the terms of the release conditions by engaging in having his roommate access the computers using very sophisticated methodology. So bail continues to be revoked and an order to that effect will be entered at the conclusion of today's hearing.

Anything else to take up today, Mr. Laroche?

MR. LAROCHE: I think there is a matter of scheduling, and we did want to alert the Court to a discovery issue. As the Court will recall, there was a period of time where the government had not been provided a computer and hard drive so that the government could essentially reproduce the defendant's desktop computer. As the Court might recall, the desktop computer is the computer on which the government found over

1    10,000 images of child pornography.  It was set up in a way

2    that was sophisticated with several layers of encryption.  We

3    were provided that computer when Mr. Kaplan became counsel, was

4    retained by Mr. Schulte.

5        The FBI and the government has made a number of

6    efforts to try to load that information on to the computer.  An

7    issue has arose in connection with that that we wanted to tell

8    the Court about.  Because there is a classified document that

9    is located on the defendant's computer, it is extremely

10   difficult, and we have determined not possible, to remove that

11   document forensically and still provide an accurate copy of the

12   desktop computer to the defendant.

13       So in those circumstances, defense counsel is going to

14   require a top secret clearance in order to view these

15   materials.  It's my understanding that that process is ongoing,

16   and we have asked them to expedite it.  As soon as the

17   defendant's application is in, we believe he will get an

18   interim classification to review this material within

19   approximately two to three weeks.  Unfortunately, that hasn't

20   occurred yet.  So the defendant still does not have access to

21   that particular aspect of discovery.  So we are working through

22   that as quickly as we can.

23       THE COURT:  So it will take two to three weeks for the

24   review after the top secret clearance is granted?

25       MR. LAROCHE:  To get an interim clearance.

1    THE COURT:  What is the schedule for the interim
2 clearance?
3    MR. LAROCHE:  Defense counsel has just been provided,
4 either early this week or last week, a document to essentially
5 get the application documents he needs to do the background
6 check for that clearance.  Once he submits that application
7 request, two to three weeks from his submitting it we believe
8 we will have an interim clearance for him so that he will have
9 access at that point.  He still will have to review the
10 materials at a location that we will make available at the FBI.
11 Unfortunately, as of right now, that is the only way we see
12 forward in terms of getting him access to be able to review it
13 in terms of discovery in this case.
14    THE COURT:  So what is the time period we are talking
15 about?  It sounds like five to six weeks.
16    MR. LAROCHE:  I know from doing these applications
17 they are extensive.  So it might take a bit of time for him to
18 get the materials together, but as soon as he gets it in, it
19 will take about two to three weeks.  So, yes, I think five to
20 six weeks from now hopefully this issue is resolved.
21    MR. KAPLAN:  Judge, if I may.  So I got a one-page
22 application last week, which I filled out and returned hours
23 later.  My understanding is, once they process that one-page
24 application, they are then going to give me access to a much
25 larger application, which will take me quite a while to answer.

1   Then once that's completed, the two- to three-week process will
2   start.  So I have not yet received the larger application.  I
3   am not sure what the timetable is there.
4           THE COURT:  I should have pointed out before, when I
5   referred to a January 4 meeting, January 4 was a snow day.  So
6   we are meeting on the first day subsequent to the bail order,
7   January 8.
8           David, give me a schedule for the week of February 12.
9           THE DEPUTY CLERK:  February 15 at 4:30 p.m.
10          THE COURT:  That's a control date to see where we are
11  with regards to Mr. Kaplan's application.
12          Anything else, Mr. Kaplan?
13          MR. KAPLAN:  Eventually we may have an issue with
14  speedy trial, when it comes to access to the application and
15  access to the discovery materials, but when that comes I will
16  mention it to the Court.
17          THE COURT:  Fine.
18          MR. LAROCHE:  Your Honor, the government moves to
19  exclude time until the February 15 control date in the
20  interests of justice so that the parties can complete
21  discovery, the defense counsel can begin reviewing it, and also
22  continue considering motion practice in this case.
23          THE COURT:  Any objection, Mr. Kaplan?
24          MR. KAPLAN:  I am fine as of now to this date.
25          THE COURT:  For the reasons stated, the time between

1  now and February 15 will be excluded.  It's in the interest of
2  justice to do so.  Those interests outweigh the interests of
3  the public and defendant in a speedy trial.
4          Thank you.
5          (Adjourned)