UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,              :          17 Cr. 548 (PAC)
                                                  NOTICE OF MOTION

                -v-                    :

JOSHUA ADAM SCHULTE,                   :

                        Defendant.     :

-------------------------------------------------------X

PLEASE TAKE NOTICE, that on the attached Memorandum of Law, the

undersigned will move this Court, before the Honorable Paul A. Crotty, United States

District Judge for the Southern District of New York, at a time to be designated by the

Court, for an order vacating the Special Administrative Measures pursuant to the Fifth,

Sixth, and First Amendments to the U.S. Constitution, and granting such further relief as

this Court deems just and proper.

Dated:        New York, New York
              May 9, 2019

                                        Respectfully submitted,
                                        Federal Defenders of New York

                                        /s/ Sabrina P. Shroff
                              By: _____
                                        Attorney for Defendant
                                        **Joshua Adam Schulte**
                                        52 Duane Street, 10th Floor
                                        New York, New York 10007
                                        Tel.: (212) 417-8750

TO:     GEOFFREY S. BERMAN, ESQ.
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York 10007
        Attn: **Matthew Laroche and Sidhardha Kamaraju**
        Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,       :         17 Cr. 548 (PAC)

       -v-              :

JOSHUA ADAM SCHULTE,         :

                    Defendant.   :

-----------------------------------------------------X

## DEFENDANT JOSHUA ADAM SCHULTE'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO VACATE SPECIAL ADMINISTRATIVE MEASURES

Federal Defenders of New York
Attorney for Defendant
**Joshua Adam Schulte**
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8713

**Sabrina P. Shroff**
**Edward S. Zas**
**Allegra Glashausser**
**Lauren M. Dolecki**
  Of Counsel

TO:   GEOFFREY S. BERMAN, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn: **Matthew Laroche and Sidhardha Kamaraju**
      Assistant United States Attorneys

**Table of Contents**

Table of Authorities .................................................................................................................. iii

I.      PRELIMINARY STATEMENT ........................................................................... 1

II.     BACKGROUND ................................................................................................. 3

     A.   Special Administrative Measures under 28 C.F.R § 501.2. ....................... 5

     B.   The well-documented deleterious effects of long-term solitary confinement
erode a person's sanity and constitute torture. ........................................... 6

     C.   Mr. Schulte's SAMs place significant restrictions on his third-party
communications, attorney-client communications, and the defense
team's communications with all third parties. ............................................ 8

III.    ARGUMENT ...................................................................................................... 10

     A.   The SAMs should be vacated because they do not comply with the
strictures of 28 C.F.R. § 501.2. ................................................................. 10

         i.   Mr. Schulte's extreme social isolation is unwarranted because the
government  has not shown there is a substantial risk Mr. Schulte
will use third-party communications to disclose classified information
that will pose a threat to the national security. .................................. 11

        ii.  The "attorney-client provisions" of the SAMs, which place numerous
restrictions on the attorney-client relationship and defense counsel,
exceed regulatory authority. ............................................................... 14

     B.   The SAMs are unconstitutional ................................................................. 15

         i.   The SAMs unconstitutionally punish Mr. Schulte because they are not
rationally related to the legitimate governmental interests underlying
28 C.F.R. § 501.2 ................................................................................. 17

        ii.  The SAMs impose restrictions on Mr. Schulte's defense counsel and
attorney-client communications in violation of the Sixth Amendment. ................................... 18

C.   Limitation on the "dissemination" of communications. ...........................................20

   a.   Restrictions on third-party communications. ....................................................21

D.   Overall chilling effect on defense counsel. ...............................................................22

E.   The SAMs violate Mr. Schulte's First Amendment rights by prohibiting
     non-legal contact with anyone who is not an immediate family member................23

IV.   CONCLUSION.........................................................................................................24

# Table of Authorities

## Cases

*Bell v. Wolfish*, 441 U.S. 520 (1979) .......................................................................... 2, 16, 17, 18

*Fischer v. Winter*,
   564 F. Supp. 281 (N.D. Cal. 1983) ..................................................................... 15

*Hale v. Ashcroft*,
   2008 WL 4426095 (D. Colo. Sept. 24, 2008) ..................................................... 23

*Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*,
   No. 13-CV-7360 JPO, 2015 WL 5459713 (S.D.N.Y. Sept. 16, 2015) ................. 6

*Madrid v. Gomez*,
   889 F. Supp. 1146 (N.D. Cal. 1995) ..................................................................... 7

*Maine v. Moulton*,
   474 U.S. 159 (1985) ........................................................................................... 19

*Mohammed v. Holder*,
   2011 WL 4501959 (D. Colo. Sept. 29, 2011) ..................................................... 23

*Overton v. Bazzetta*,
   539 U.S. 126 (2003) ........................................................................................... 17

*Procunier v. Martinez*,
   416 U.S. 396 (1974) ........................................................................................... 19

*Reece v. Gragg*,
   650 F. Supp. 1297 (D. Kan.1986) ....................................................................... 16

*Sattar v. Holder*,
   No. 07-CV-02698-PAB-KLM, 2012 WL 882401 (D. Colo. Mar. 15, 2012) ....... 23

*Turner v. Safley*,
   482 U.S. 78 (1987) ..................................................................................... 1, 16, 17

*United States v. El-Hage*,
   213 F.3d 74 (2d Cir. 2000) ................................................................................. 17

*United States v. Gotti*,
   755 F. Supp. 1159 (E.D.N.Y. 1991) ................................................................... 17

*United States v. Lopez*,
   327 F. Supp. 2d 138 (D.P.R. 2004) ..................................................................... 18

*United States v. Sayfullo Saipov*,
   (S1) No. 17-cr-722 (VSB), Dkt. No. 108 (S.D.N.Y. Jan. 14, 2019) ................... 20

*United States v. Stewart*,
   686 F.3d 156 (2d Cir. 2012) ............................................................................... 22

*United States v. Suleiman*,
No. 96-CR-933-WK, 1997 WL 220308 at *1-2 (S.D.N.Y. Apr. 11, 1997) ...................................... 18

*Williams v. Sec'y Pennsylvania Dep't of Corr.*,
848 F.3d 549 (3d Cir. 2017) ........................................................................................................ 7, 8

*Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*,
877 F. Supp. 634, 664 n. (D.D.C.1994) .................................................................................... 16

*Wood v. Georgia*,
450 U.S. 261 (1981) .................................................................................................................... 22


## Statutes

28 C.F.R. § 501.2 .................................................................................................................... *passim*
28 C.F.R. § 501.3 ................................................................................................................... 5, 15


## Other

Center for Constitutional Rights & Yale Law School Lowenstein International Human Rights Clinic, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons* (Sept. 14, 2017) .................................................................................................... 6, 7, 8

Christopher Logel, *Ghastly Signs and Tokens:  A Constitutional Challenge to Solitary Confinement* (March 10, 2019) ........................................................................................................................ 7

Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) .................................. 6, 7

National Security: Prevention of Acts of Violence and Terrorism, 66 FR 55062-01,
2001 WL 1334043 .................................................................................................... 5, 6, 14

Peter Schraff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441 (2006) ......................................................................... 7

Stuart Grassian, *Psychiatric Effects of Solitary Confinement* .................................................... 7

Wayne R. LaFave, et al., *Criminal Procedure* (3d ed. 2012) ................................................. 19

iv

## I.    PRELIMINARY STATEMENT

On October 26, 2018, after Mr. Schulte had been in custody for over nine months, the Attorney General imposed Special Administrative Measures ("SAMs") pursuant to 28 C.F.R. § 501.2.  We ask the Court to vacate these SAMs because they violate Mr. Schulte's rights under the Fifth, Sixth, and First Amendments.  The government's justifications for the SAMs do not satisfy the requirements set forth in the authorizing regulation.  Further, because the SAMs bear no relationship to a regulatory public-safety or penological goal, they amount to unconstitutional punishment.

28 C.F.R. § 501.2 authorizes the government to impose "special administrative measures" on a defendant to prevent disclosure of classified information if the Attorney General concludes "that the unauthorized disclosure of such information would pose a threat to the national security and that there is a danger that the inmate will disclose such information." 28 C.F.R. § 501.2(a).  Such administrative measures may include "housing the inmate in administrative detention," and "limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone."  *Id.*  In this case, the SAMs imposed on Mr. Schulte include housing him on 10-South (the most restrictive housing unit within the Metropolitan Correctional Center ("MCC")), strictly limiting his third-party communications (including with members of his own family), and also involve restrictions on how his attorneys may communicate with Mr. Schulte or on his behalf.  These limitations may pass regulatory muster only if the Court determines the government has offered information sufficient to trigger 28 C.F.R. § 501.2. Similarly, the SAMs may be deemed constitutional only if the Court finds they are not exaggerated responses to the legitimate penological and public safety concerns 28 C.F.R. § 501.2 was designed to address.  *See Turner v. Safley*, 482 U.S. 78, 87 (1987).

1

In imposing the SAMs, the government asserted that Mr. Schulte violated his bail conditions by using the Internet without authorization, communicated with the media in violation of a protective order governing the production of discovery, made three unauthorized disclosures of classified information since his incarceration, and, with another inmate, arranged for cell phones to be brought into the MCC.  The government contends that these alleged actions and the crimes he has been charged with warrant Mr. Schulte's extreme isolation and limitations on how defense counsel may conduct themselves and prepare a defense, pursuant to 28 C.F.R. § 501.2.  However, the government failed to demonstrate that the SAMs implemented were reasonably necessary due to a danger that Mr. Schulte would disclose classified information.  Several of the instances raised to argue that SAMs were warranted occurred well-before the SAMs were imposed and had already been addressed by the Court to ensure they would not happen again.  Further, given that none of Mr. Schulte's alleged behavior implicated his communications with counsel, implementing SAMs governing the attorney-client relationship could not have been "reasonably necessary to prevent the disclosure of classified information."  § 501.2(a).

Consequently, the SAMs are unwarranted because they are not supported by information sufficient to trigger 28 C.F.R § 501.2.  And since they are not reasonably related to any regulatory interests, the SAMs amount to unconstitutional punishment.  *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (holding that "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.").  Finally, the SAMs also baselessly constrain the defense team's investigation and preparation of a defense in violation of Mr. Schulte's Sixth Amendment

rights.

## II.     BACKGROUND

On August 23, 2017, Mr. Schulte was charged by complaint with child-pornography

charges.  *See* Complaint (ECF No. 1).  Mr. Schulte was arrested the next day.  At the time of

his arraignment on September 13, 2017, the Court released Mr. Schulte subject to conditions

including "[h]ome incarceration enforced with location monitoring" and that he "[r]efrain from

possessing or using a computer, computer network and/or internet access unless specifically

approved by Pretrial Services."  *See* Order Setting Bail Conditions (ECF No. 8).  Pretrial

Services retained the "discretion as to whether [Mr. Schulte] should or should not possess any

devices with internet access while out on bail."  *Id.*

On September 18, 2017, the Court entered a protective order governing the production

of discovery in this case (the "Protective Order").  *See* Protective Order (ECF No. 11).  The

Protective Order provided that protected materials should be used only in connection with

preparing Mr. Schulte's defense and that dissemination of the materials should be limited to

Mr. Schulte's counsel and other categories of individuals as specified in the Protective Order.

*See id.*

On December 7, 2017, the government submitted a letter motion requesting that Mr.

Schulte be remanded in light of unrelated state court charges pending in Virginia and because

the government believed that Mr. Schulte used the Internet since being released on bail.  *See*

Dec. 7, 2017 Letter (ECF No. 21).  On December 14, 2017, Mr. Schulte was remanded on

consent, without prejudice, so he could be arraigned on the charges in Virginia.  *See* Remand

Order (ECF No. 22); Ex. A, Dec. 14, 2017 Tr. at 3-4.  Although Mr. Schulte was never brought

to Virginia for arraignment, on January 8, 2018, the Court ordered Mr. Schulte's continued

detention based on a finding that Mr. Schulte "violated the terms of the release conditions by engaging in having his roommate access the computers using very sophisticated methodology." Ex. B, Jan. 8, 2018 Tr. at 16.  However, as explained at the January 8 conference, Mr. Schulte lived with his cousin, and based on conversations with Pretrial Services, Mr. Schulte and his cousin had a genuine misunderstanding that his cousin was allowed to check Mr. Schulte's email and run Internet searches; all of the log-ons reflected such instances.  *Id.* at 7.  Mr. Schulte did not intentionally attempt to violate the Court's bail conditions.  Nevertheless, Mr. Schulte was remanded and has remained detained since December 14, 2017.

On May 21, 2018, a court conference was held to discuss a potential breach of the Protective Order in light of press reports referencing the search warrants in the case.  Based on Mr. Schulte's recorded prison calls, the government believed that Mr. Schulte had discussed the search warrant affidavits and their contents and merely asked the Court to "reiterate to [Mr. Schulte] the terms of the protective order."  Ex. C, May 21, 2018 Tr. at 3.  The government did not ask the Court to take action to restrict Mr. Schulte's access to communications with any third-parties or for any sanctions.  *Id.* at 5.

On June 28, 2018, Mr. Schulte submitted a *pro se* bail application to the Court.  *See* Ex. D, June 28, 2018 Tr. at 3-5.  This was done in open court and in the presence of two Assistant United States Attorneys.  Although the Court briefly publicly docketed the application, defense counsel immediately requested it be removed, and it was taken down within minutes.  The application was ultimately sealed due to the possible presence of classified information.

Mr. Schulte was originally housed in MCC's general population; however, on or about October 1, 2018, Mr. Schulte was placed in "more restrictive detention conditions" in the Special Housing Unit on the ninth floor of the MCC because the government believed Mr.

Schulte had used cell phones to communicate with third-parties outside the MCC.  *See* October

31, 2018 Letter at 2 (ECF No. 67).  The SAMs were imposed on October 26, 2018, and Mr.

Schulte was then moved to 10-South.  Counsel was notified of the initiation of SAMs on

October 29, 2018.

### A.  Special Administrative Measures under 28 C.F.R § 501.2.

Mr. Schulte's SAMs were imposed pursuant to 28 C.F.R § 501.2, which permits the

Attorney General to authorize the Bureau of Prisons ("BOP") to implement "special

administrative measures" that are "reasonably necessary to prevent disclosure of classified

information" if the Attorney General concludes that such disclosure would "pose a threat to

the national security and that there is a danger that the inmate will disclose such

information."  28 C.F.R § 501.2(a).  Such measures generally include "housing the inmate

in administrative detention and/or limiting certain privileges, including, but not limited to,

correspondence, visiting, interviews with representatives of the news media, and use of the

telephone, as is reasonably necessary to prevent the disclosure of classified information."

*Id.*

Unlike 28 C.F.R. § 501.3, which governs the imposition of SAMs to prevent acts of

violence and terrorism, § 501.2 does not contain a provision regarding restricting the

attorney-client relationship.  *See* 28 C.F.R. § 501.3(d).  Notably, when § 501.3(d) was added

to the regulation in October 2001, other changes were made to § 501.2; thus, had there been

an intent to restrict the attorney-client relationship in national security cases to prevent the

disclosure of classified information, such a revision could have been made along with §

501.3(d).  *See* Scope of Rules: National Security; Prevention of Acts of Violence and

Terrorism, 66 FR 55062-01, 2001 WL 1334043 (F.R.) at *55062-64 (Oct. 31, 2001).  Yet, it

was not.  Section 501.3(d) was added based on a concern that "certain inmates who have

been involved in terrorist activities will pass messages through their attorneys (or the

attorney's legal assistant or an interpreter) to individuals on the outside for the purpose of

continuing terrorist activities."  *Id.* at *55064.  Such a concern was absent in cases regarding

the disclosure of classified information.[1]

### B.  The well-documented deleterious effects of long-term solitary confinement erode a person's sanity and constitute torture.

SAMs are synonymous with solitary confinement and, in this case, have been

imposed on someone who has also been confined in Unit 10 South of the MCC, a highly

restrictive, secure unit.  Consequently, understanding how solitary confinement affects a

person's mental and physical condition—particularly his ability to meaningfully participate

in his own defense—is crucial to fully appreciating the impact of the SAMs on Mr.

Schulte's constitutional rights.

As the Court of Appeals for the Third Circuit recently observed:

> A comprehensive meta-analysis of the existing literature on solitary
> confinement within and beyond the criminal justice setting found that "[t]he
> empirical record compels an unmistakable conclusion: this experience is
> psychologically painful, can be traumatic and harmful, and puts many of those
> who have been subjected to it at risk of long-term . . . damage."[2]  Specifically,
> based on an examination of a representative sample of sensory deprivation
> studies, the researchers found that virtually *everyone* exposed to such

---

[1] Notably, the amount of individuals on SAMs for national security cases is much fewer than those on SAMs for terrorism or violence.  Counsel does not have access to the latest statistics, but as of October 2013, only eight people were subject to SAMs under § 501.2 in comparison to the forty-six people subject to SAMs under § 501.3.  *See Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*, No. 13-CV-7360 JPO, 2015 WL 5459713, at *9 (S.D.N.Y. Sept. 16, 2015), *on reconsideration sub nom. Watch v. Dep't of Justice Fed. Bureau of Prisons*, No. 13-CV-7360 (JPO), 2016 WL 3541549 (S.D.N.Y. June 23, 2016); *see also* Aug. 11, 2015 Letter at 2, *Human Rights Watch v. Dep't of Justice Fed. Bureau of Prisons*, No. 13-CV-7360 JPO (S.D.N.Y. Aug. 11, 2015), ECF No. 64.  As of June 8, 2017, the total number of people on SAMs had risen to fifty-one.  *See* Center for Constitutional Rights & Yale Law School Lowenstein International Human Rights Clinic, *The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons*, at 2 (Sept. 14, 2017), available at: https://law.yale.edu/system/files/area/center/schell/sams_report.final_.pdf (hereinafter, "The Darkest Corner").

[2] Quoting Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) (hereinafter, "Haney & Lynch").

conditions is affected in some way.[3]  They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects."[4]  And as another researcher elaborated, "all [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."[5]

Anxiety and panic are common side effects.[6]  Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results.[7]  Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.'"[8]  In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

*Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (emphasis in original).[9]

Indeed, "[t]he effects of long-term solitary confinement mirror the effects of other forms of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide."[10] "These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation."  *Williams*, 848 F.3d at 568 (internal citations omitted).  Further, "the lack of opportunity for free movement is [also] associated

---

[3] Quoting Haney & Lynch at 500-503.

[4] Quoting Haney & Lynch at 531.

[5] Quoting Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash U. J.L. & Pol'y 325, 332 (2006) ("Grassian").

[6] Citing Haney & Lynch at 500-01.

[7] Citing *id.* at 521, 524, 530-31, 491 n.74.

[8] Quoting *id.* at 503.

[9] *See also Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) ("Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances."); Christopher Logel, *Ghastly Signs and Tokens:  A Constitutional Challenge to Solitary Confinement* at 3 (March 10, 2019), https://ssrn.com/abstract=3350146 ("A large body of research demonstrates that prolonged solitary confinement *causes* severe mental illness in most prisoners, even those without a history of mental illness."); Peter Schraff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime & Just. 441, 503 (2006) ("[S]olitary confinement—regardless of specific conditions and regardless of time and place— causes serious health problems for a significant number of inmates. The central harmful feature is that it reduces meaningful social contact to an absolute minimum: a level of social and psychological stimulus that many individuals will experience as insufficient to remain reasonably healthy and relatively well functioning.").

[10] The Darkest Corner at 12.

with more general physical deterioration . . . includ[ing] dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems." *Id.* (internal citations omitted).

In this case, Mr. Schulte has been placed in 10 South—a unit already hazardous to his mental and physical health.[11]  And "[g]iven that SAMs create isolation even *more* extreme than that of standard solitary confinement, the substantial risks of permanent harm are only heightened."[12]

### C. Mr. Schulte's SAMs place significant restrictions on his third-party communications, attorney-client communications, and the defense team's communications with all third parties.

It is against this backdrop that the government imposed SAMs on October 26, 2018. Defense counsel was informed of the imposition of SAMs on October 29, 2018, and each member of the defense team, including counsel, paralegals, and experts, were required to sign an affirmation acknowledging awareness of the SAMs and agreeing to abide by their provisions before meeting with Mr. Schulte.

The government's justification for imposing SAMs is based on Mr. Schulte's pending charges, the alleged violation of the Protective Order, and claims that Mr. Schulte had a "continued willingness to disclose classified information, even while incarcerated."  Ex. F, SAMs Memo at 5.  There are no allegations that Mr. Schulte has or would be likely to use his attorneys to disclose classified information or to violate the Protective Order.

The SAMs are divided into ten parts, several of which are relevant to this motion:

---

[11] *Id.* at 6 ("Detainees in the MCC's '10 South' where 'high-level' defendants – including those under SAMs – are held, have little natural light and no possibility for outdoor recreations.  'Recreational time' is provided in a closed room identical to the detainee's cell.  Unable to open windows or spend time outdoors, detainees in 10 South have no access to fresh air.") (internal citations omitted).  Mr. Schulte has submitted numerous administrative remedy requests to the MCC enumerating his complaints regarding his harsh conditions.  *See* Ex. E, BP-8s.
[12] *Id.* at 13.

Paragraph 1 ("General Provisions") prohibits Mr. Schulte "from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else" outside of the SAMs provisions.  *See id.* at ¶1(c).  This provision could be read to be so sweeping that it precludes Mr. Schulte's defense team from sharing any third-party messages with him, regardless if counsel deems it necessary to assist in the investigation or prepare a defense.

Paragraph 2 ("Attorney-Client Provisions") addresses the restrictions on how Mr. Schulte and his attorneys (along with their agents) may interact with third parties to prepare and investigate a defense to the charges.  The provision bars anyone except Mr. Schulte's counsel from "disseminat[ing] the contents of [Mr. Schulte's] communication to third parties for the sole purpose of preparing [Mr. Schulte]'s defense—and not for any other reason—on the understanding that any such dissemination shall be made solely by [Mr. Schulte's] attorney, and not by the attorney's staff."  *Id.* at ¶2c.  The SAMs also define "attorney" as Mr. Schulte's "attorney[s] of record, who [have] entered an appearance in this criminal case."  *Id.* at ¶2a n.1.

Paragraph 3 ("Inmate's Non-legal Contacts") precludes Mr. Schulte from interacting directly with anyone except immediate family members, requiring that the government monitor all such communications. *Id.* at ¶3.

Paragraphs 6 and 7 ("No Communal Cells and No Communication Between Cells" and "Cellblock Procedures") calls for the BOP to eliminate Mr. Schulte's ability, within reasonable efforts, to "communicat[e] with any other inmate by making statements audible to other inmates or by sending notes to other inmates."  *Id.* at ¶¶6 and 7.

Lastly, Paragraph 8 ("Access to Media Communications") subjects Mr. Schulte's

"access to materials of mass communications," including publications and newspapers, to a determination by the government that the resource does not "facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public." *Id.* at ¶8(a)(i).  This provision could be read to prevent them from sharing with Mr. Schulte news articles pertinent to this prosecution, including statements to news media by prospective government witnesses.

## III.    ARGUMENT

The Court should vacate the SAMs because there was no evidence that Mr. Schulte would disclose classified information such that these measures were reasonably necessary. Moreover, given that § 501.2 lacks language providing for the restriction of the attorney-client relationship, there was no basis for the attorney-client provisions contained in the SAMs. Accordingly, since the SAMs are not reasonably related to a legitimate public-safety interest, they exceed regulatory authority, unconstitutionally punish Mr. Schulte, and violate Mr. Schulte's Fifth, Sixth, and First Amendment rights by:

- placing arbitrary restrictions on the scope of Mr. Schulte's communications with the defense team, along with their third-party communications, which undermines our preparation of pre-trial motions and defenses to the charges;
- "chilling" the defense team's advocacy, forcing the attorneys, investigators, paralegals, and experts to weigh their interests against Mr. Schulte's and operate in constant fear of being prosecuted for violating the SAMs;
- burdening Mr. Schulte's relationship with his immediate family members; and
- preventing Mr. Schulte from having non-legal communications with anyone apart from immediate family members.

### A. The SAMs should be vacated because they do not comply with the strictures of 28 C.F.R. § 501.2.

The government fails to demonstrate that the SAMs are "reasonably necessary to prevent disclosure of classified information" because there was a danger that Mr. Schulte would disclose information that would pose a threat to the national security.  Further, there

was no basis to impose restrictions on the attorney-client relationship.  Thus, the SAMs are

unwarranted and not authorized by 28 C.F.R. § 501.2.

      **i.**    **Mr. Schulte's extreme social isolation is unwarranted because the government has not shown there is a substantial risk Mr. Schulte will use third-party communications to disclose classified information that will pose a threat to the national security.**

The government articulated four bases for imposing SAMs:  (1) Mr. Schulte's pending

charges regarding the theft and disclosure of classified information; (2) Mr. Schulte's alleged

violation of the Protective Order by providing either affidavits or information contained in the

affidavits to the media; (3) Mr. Schulte's alleged unauthorized disclosures of classified

information by (a) disclosing the identities of current CIA officers to a reporter in April 2018;

(b) submitting his *pro se* motion seeking bail in June 2018; and (c) mailing the *pro se* bail

motion to an attorney he was hoping to assist on his case and allegedly providing a copy to his

parents; and (4) Mr. Schulte's alleged coordination, with another inmate, for cell phones to be

delivered to the MCC.  Additionally, although not specifically noted as a reason, the SAMs

memorandum also discusses concerns over Mr. Schulte's access to the Internet while he was

on bail between November and December 2017.  However, these reasons, some of which date

back to many months before the SAMs were imposed and for which actions were already

taken to prevent future violations, do not warrant the imposition of the most extreme form of

social isolation available to the BOP.

Mr. Schulte was charged with crimes regarding the theft and disclosure of classified

information in June 2018, and the government had been investigating him for these crimes

since at least March 2017.  Given that SAMs were not imposed until October 2018, the

charges were not a basis to impose SAMs.  Moreover, in other circumstances, individuals

charged with similar crimes are not even detained, but released on bail pending trial, further

demonstrating that such charges are not ones that generally warrant the imposition of SAMs. *See, e.g.*, Order Setting Conditions of Release, *United States v. Sterling*, 10-cr-00485-LMB (E.D. Va. Jan. 25, 2011), ECF No. 22 (providing for defendant's release on bond pending trial); Order Setting Conditions of Release, *United States v. Kiriakou*, 12-cr-00127-LMB (E.D. Va. Jan. 23, 2012), ECF No. 8 (same).

To the extent the government relies on Mr. Schulte's alleged use of the Internet while on bail, as explained at the January 8, 2018 court conference, Mr. Schulte did not intentionally violate his bail conditions. The Order setting forth Mr. Schulte's bail conditions provided that "Pretrial Services shall use its discretion as to whether [Mr. Schulte] should or should not possess any devices with internet access while out on bail. If Pretrial Services believes [Mr. Schulte] can possess such device, then pretrial is authorized to monitor that device." Sept. 14, 2017 Order Setting Bail Conditions (ECF No. 8). Mr. Schulte and his cousin did not try to subvert Pretrial Services; rather, there was a genuine misunderstanding, based on conversations with Pretrial Services, that his cousin could do things such as check Mr. Schulte's email and run Internet searches so long as Mr. Schulte did not personally have access to a computer. Ex. B, Jan. 8, 2018 Tr. at 7-9. All of the log-ins reflected such instances. Moreover, Mr. Schulte did not even face charges regarding the disclosure of classified information while he was on bail; he was not indicted on the national security charges until June 2018. Finally, any concerns about Mr. Schulte impermissibly using the Internet in a similar manner no longer exist given that he has been in the BOP's custody and housed at the MCC since December 2017.

Similarly, Mr. Schulte's alleged disclosure of the contents of the search warrant affidavits to third-parties was already raised by the government and addressed by the Court at

the May 21, 2018 court conference.  Notably, the government did not ask the Court to take any action to restrict Mr. Schulte's communications with third-parties or for any sanctions, nor did the Court take any such actions; as requested, the Court just reminded Mr. Schulte of the terms of the Protective Order.  Ex. C, May 21, 2018 Tr. at 3-7.

The record also does not support that Mr. Schulte disclosed classified information about the identities of current CIA officers over the telephone. The calls from April 2018 make clear that Mr. Schulte did not disclose the identities of undercover CIA officers to a reporter.  Rather, he was careful *not* to disclose potentially classified information.  He began the call by confirming that he would not discuss any classified information, and when asked for first names of certain individuals at the CIA, Mr. Schulte did not provide their names.[13]  In any event, if the government had concerns about such a potential disclosure, they were aware of this call at the May 21 court conference given that this call was discussed at that conference due to the government's claim that Mr. Schulte discussed "the contents of the protected affidavits with third parties, including individuals who appeared to be reporters."  Ex. F at 4. Yet, the government chose not to address the alleged disclosure of CIA officers' names at that time, but rather, waited five months to raise the issue for the first time when seeking SAMs.

Moreover, although the government focused on Mr. Schulte's purported inclusion of classified material in his *pro se* bail application, there is no prohibition on placing classified information before the Court.  Although the submission was briefly docketed, Mr. Schulte had no control over that, and the motion was quickly taken down and sealed at defense counsel's request.  Further, Mr. Schulte mailed the application along with case notes to an attorney in

---

[13] The government has produced no April 2018 calls in classified discovery.  Thus, it appears the call the government references in the SAMs Memo is an April 17, 2018 call.  This call was produced in unclassified discovery precisely because it contains no classified information.

Texas in order to obtain legal advice because he wanted to get a second opinion on the potential merit of the motion. And, the government has provided no evidence to support its assertion that Mr. Schulte provided a copy to his parents.[14]

Finally, although the government alleged that Mr. Schulte, along with another inmate, arranged for two cell phones to be brought into the MCC for their use, such allegations are insufficient to warrant the imposition of SAMs. The SAMs Memo just reasons that based on the other allegations, possession of a phone that would allow him to "communicate without scrutiny, confirms that he poses a significant threat to national security." Ex. F at 4. However, there is no evidence that Mr. Schulte used or intended to use cell phones to disclose classified information.

Thus, the government failed to demonstrate how the past actions attributed to Mr. Schulte, some of which were already addressed by the Court, triggered the imposition of SAMs.

> ## ii. The "attorney-client provisions" of the SAMs, which place numerous restrictions on the attorney-client relationship and defense counsel, exceed regulatory authority.

The Court should vacate the attorney-client provisions of the SAMs because the government has failed to articulate any facts that justify such measures.

28 C.F.R. § 501.2 does not contain a provision authorizing the imposition of limits on the attorney-client relationship. When amendments were made to both § 501.2 and § 501.3 in October 2001, language permitting restrictions on communications between individuals subject to SAMs and their attorneys was added only to § 501.3. *See* Scope of Rules: National

---

[14] Moreover, it is defense counsel's understanding that members of the media obtained copies of the *pro se* bail application during the minutes in which it was publicly available; yet, the government has made no efforts to confiscate those copies.

Security; Prevention of Acts of Violence and Terrorism, 66 FR 55062-01, 2001 WL 1334043 (F.R.) at *55062-64 (Oct. 31, 2001).  Had the BOP believed it was necessary to restrict the attorney-client relationship in national security cases so as to prevent the disclosure of classified information, it easily could have added language paralleling that in § 501.3(d); however, it did not.  Moreover, under § 501.3, restrictions are not imposed on the attorney-client relationship simply because of allegations that defendant may engage in "acts of violence or terrorism."  Rather, the government must articulate facts creating a "reasonable suspicion" that, but for the SAMs, counsel would assist him in such conduct.  *See* 28 C.F.R. §501.3(d).  As such, § 501.2 does not authorize restrictions of the type imposed pursuant to § 501.3(d).  Therefore, there was no basis for the Attorney General to impose restrictions on Mr. Schulte's defense counsel.

Even if the Attorney General could restrict Mr. Schulte's attorney-client communications absent such a statutory provision, the government has presented no evidence that Mr. Schulte has tried to manipulate his attorneys, nor has the government alleged defense counsel's willingness to facilitate the disclosure of classified information.  Nevertheless, the SAMs significantly restrict Mr. Schulte's defense counsel and the attorney-client relationship.

These restrictions put defense counsel in the unenviable position of representing their client at the risk of their own prosecution, chilling Mr. Schulte's representation in violation of his right to zealous and conflict-free representation.  Since the attorney-client provisions of the SAMs have no basis in 28 C.F.R. § 501.2, the Court should vacate them.

### B.  The SAMs are unconstitutional.

The SAMs violate Mr. Schulte's Fifth, Sixth, and First Amendment rights.[15]  The

---

[15] As a pretrial detainee, Mr. Schulte enjoys greater protections than sentenced inmates.  *See, e.g.*, *Fischer v. Winter*, 564 F. Supp. 281, 298 (N.D. Cal. 1983) ("Since sentenced inmates may be held under conditions that are

SAMs unduly burden Mr. Schulte's free speech and associational rights by placing a blanket ban on any non-legal communications with individuals apart from immediate family members. Moreover, the SAMs are punitive in violation of the Due Process Clause because they are unrelated to the public-safety and penological interests underlying 28 C.F.R. § 501.2. And by arbitrarily restricting how defense counsel and their agents may interact with Mr. Schulte and other third parties to prepare a defense, the SAMs have a chilling effect on the defense team and deprive Mr. Schulte of his Sixth Amendment right to the effective assistance of counsel.

The Constitution does not tolerate punitive pre-trial confinement, and the Supreme Court distinguishes between "punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *See generally Bell*, 441 U.S. at 537 (internal citations omitted). Accordingly, upon a pre-trial detainee's challenge to his confinement conditions, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538 (internal citations omitted). And "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court articulated a four-factor

---

punitive, while pretrial inmates may not be, the courts have said that the due process clause affords greater protection to unsentenced inmates than the Eighth Amendment affords to the convicted."); *Reece v. Gragg*, 650 F. Supp. 1297, 1300 (D. Kan.1986) ("Sentenced inmates may be held under conditions that are punitive, while pretrial detainees may not be because they are still cloaked with presumption of innocence."); *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 877 F. Supp. 634, 664 n. 38 (D.D.C.1994) ("Whereas convicted [prisoners] bring a cause of action under the Eighth Amendment, pretrial detainee[s][ ] rely upon the Fifth Amendment guarantee of due process. Though the unconstitutional conditions may be the same, the threshold for establishing a constitutional violation is clearly lower for pretrial detainees." (quotation marks and internal citations omitted)), *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995).

test for determining whether a pre-trial detainee's confinement conditions violate his

constitutional rights.  After identifying the cognizable constitutional right or liberty interest

implicated by a particular prison practice or policy, the Court must consider:

1. Whether there is a valid, rational connection between the regulation and
   the legitimate governmental interest underlying it;
2. Whether there are alternative means for the prisoner to exercise the right at issue;
3. The impact that the desired accommodation will have on guards, other inmates,
   and prison resources; and
4. The absence of ready alternatives.

*United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (citing *Turner*, 482 U.S. at 89-91).

In the context of pre-trial detention, the four-factor test carries a caveat: because punishment

and rehabilitation are not legitimate governmental objectives for pre-trial detainees, the

"legitimate penological interests" served by a particular measure must go "beyond the

traditional objectives of rehabilitation and punishment."  *El-Hage*, 213 F.3d at 81.  The *Turner*

test is not a "least restrictive means" test; rather, the fourth factor asks "whether the prisoner

has pointed to some obvious regulatory alternative that fully accommodates the asserted right

while not imposing more than a *de minimis* cost to the valid penological goal." *Overton v.*

*Bazzetta*, 539 U.S. 126, 136 (2003).

> **i.   The SAMs unconstitutionally punish Mr. Schulte because they are not**
> **rationally related to the legitimate governmental interests underlying**
> **28 C.F.R. § 501.2.**

Pre-trial confinement conditions may not be punitive because pre-trial detention

serves not to punish but rather to ensure public safety and the defendant's presence at trial.

*Bell*, 441 U.S. at 535.  In this case, the SAMs are arbitrary because there is no "valid,

rational connection" between them and the legitimate security-related interests underlying

28 C.F.R. § 501.2.  *Turner*, 482 U.S. at 89.  *Cf. United States v. Gotti*, 755 F. Supp. 1159,

1162-65 (E.D.N.Y. 1991) (the fact that pre-trial detainees were charged with multiple murders, conspiracy and solicitation to murder, as well as obstruction of justice, including witness tampering, did not justify their placement in administrative detention, absent evidence that, since they had been in custody, they had committed an act or omission which posed a serious threat to inmates or to the security of the institution); *United States v. Suleiman*, No. 96-CR-933-WK, 1997 WL 220308 at *1-2 (S.D.N.Y. Apr. 11, 1997) (finding no justification for placing World Trade Center bombing defendant in administrative detention on the basis of alleged perjury during grand jury proceedings and association with individual convicted for role in the World Trade Center bombing).  Indeed, the government's imposition of SAMs based in part on the charges and incidents that occurred many months before and which were already addressed by the Court undercuts the argument that the SAMs are related to public safety or institutional security.

Accordingly, the Court "permissibly may infer the purpose of the [SAMs] is punishment that may not constitutionally be inflicted upon" Mr. Schulte as a pre-trial detainee. *Bell*, 441 U.S. at 539.  And not just any kind of punishment, but extreme solitary confinement that, if left unchecked, will erode Mr. Schulte's overall well-being and ability to meaningfully participate in his own defense.  *See United States v. Lopez*, 327 F. Supp. 2d 138, 143 (D.P.R. 2004) (expressing a "concern[] with the effect that continued administrative segregation has on Defendant's psyche and hence, his ability to aid in his defense.").

> ### ii.    The SAMs impose restrictions on Mr. Schulte's defense counsel and attorney-client communications in violation of the Sixth Amendment.

The SAMs also unconstitutionally interfere with Mr. Schulte's Sixth Amendment right to the effective assistance of counsel and a meaningful investigation into his case.

Effective assistance of counsel, guaranteed by the Sixth Amendment, is critical during the

pre-trial stage.  *See, e.g.*, *Maine v. Moulton*, 474 U.S. 159, 170 (1985) ("[T]o deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.").  The Supreme Court has stated that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."  *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 419 (1989).

Government-imposed restrictions that interfere with defense counsel's ability to conduct a meaningful investigation and present a defense are grounds for reversing a criminal conviction. As explained in Professor LaFave's treatise on criminal procedure:

> The "right to the assistance of counsel," the Supreme Court noted in *Herring v. New York*, "has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary fact finding process."  Accordingly, state action, whether by statute or trial court ruling, that prohibits counsel from making full use of traditional trial procedures may be viewed as denying defendant the effective assistance of counsel.  In considering the constitutionality of such "state interference," courts are directed to look to whether the interference denied counsel "the opportunity to participate fully and fairly in the adversary fact finding process."  If the interference had that effect, then both the overall performance of counsel apart from the interference and the lack of any showing of actual outcome prejudice become irrelevant.  The interference in itself establishes ineffective assistance and requires automatic reversal of the defendant's conviction.

Wayne R. LaFave, et al., *Criminal Procedure* §11.8(a) (3d ed. 2012) (internal citations omitted).  The SAMs here severely impair defense counsel's ability to conduct a meaningful investigation and prepare a vigorous defense.  The restrictions on defense counsel and Mr. Schulte's attorney-client communications are arbitrary and untethered to the concerns animating 28 C.F.R. § 501.2, particularly given the lack of a section like § 501.3(d) providing for the restriction of the attorney-client relationship.  Therefore, each restriction unconstitutionally prejudices Mr. Schulte's Sixth Amendment rights and is grounds for the

Court to vacate or modify the SAMs.

**C.  Limitation on the "dissemination" of communications.**

The SAMs bar anyone except Mr. Schulte's counsel from "disseminat[ing] the contents of [Mr. Schulte's] communications to third parties . . . ."  Ex. F at ¶ 2(c)).  This provision is both overbroad and vague, for it leaves unclear the meaning of dissemination. Further, while this provision allows dissemination for "the sole purpose of preparing the inmate's defense," this limitation is also vague and, and thus overly restrictive, leaving ambiguous the meaning of "defense."  *Id.*

The "dissemination" of information is inevitable in any "investigation."  Defense counsel routinely seek information from clients and use that information to make strategic decisions in preparing a defense.  Investigators, experts, and researchers may rely on such information and incorporate it into their inquiries.  If all of the investigators, experts, and attorneys who are working on Mr. Schulte's behalf cannot disseminate information learned from him, they cannot conduct the complete inquiries necessary to develop and present a defense and to provide the effective assistance of counsel required by the Sixth Amendment.

The limitation of "dissemination" to Mr. Schulte's counsel-of-record is unreasonable and draws arbitrary distinctions between members of Mr. Schulte's defense team.  Counsel cannot personally act as their own investigators, experts, and researchers, particularly in a case involving allegations of cybercrimes that require the assistance of multiple experts to assist in the review and analysis of voluminous amounts of data.  Such persons assisting with the defense necessarily need to be kept aware of information received by defense counsel from Mr. Schulte.  *See, e.g.*, Opinion and Order, *United States v. Sayfullo Saipov*, (S1) No. 17-cr-722 (VSB), Dkt. No. 108 at 25 (S.D.N.Y. Jan. 14, 2019) (finding identical SAMs limiting

defense-related dissemination of the defendant's communications to attorneys only were "unreasonably restrictive in that they [did] not permit precleared non-attorney members of [the] defense team who have agreed to abide by the SAMs to make such disclosures for the sole purpose of preparing [the] defense").

Counsel should not have to forego using valuable information from their own client in accordance with their sound professional judgment. The SAMs provisions limiting the dissemination of communications unduly impair the defense's ability to prepare a vigorous defense and should be eliminated.

### a. Restrictions on third-party communications.

The SAMs bar counsel and the defense team from forwarding "third-party communications" to and from Mr. Schulte. Ex. F at ¶ 1(c) and ¶ 2(a).  These provisions are vague, leaving the definition of "communications" imprecise; they are also overbroad, barring counsel from conveying innocuous personal information to and from family members. For a man in solitary confinement, Mr. Schulte's contact with family is critical for his mental well-being.  Counsel is indispensable for helping to maintain that family contact, since Mr. Schulte's immediate family lives in Texas and per the SAMs, is only allowed to have two 15-minute phone calls with Mr. Schulte per month and visit him twice a month, with each visit limited to one hour for each parent.  And given the distance between New York and Texas, Mr. Schulte's parents are only able to visit him once a month.  Prior to the imposition of the SAMs, defense counsel helped maintain some contact with Mr. Schulte's family by relaying communications about Mr. Schulte's case developments and well-being with his family.  And while defense counsel continues to maintain contact with Mr. Schulte's immediate family, the SAMs create doubt about what we can say beyond confirming that we have met with him.

There is no valid, non-punitive, reason why the SAMs should hinder defense counsel from helping Mr. Schulte convey to his immediate family personal messages, unrelated to his alleged offense conduct and which pose no security risk.  These tasks are essential if counsel is to establish and maintain trust with our client.  By unreasonably thwarting such defense efforts, these provisions in the SAMs are fundamentally unfair and unduly burden Mr. Schulte's Sixth Amendment right to counsel.

### D.  Overall chilling effect on defense counsel.

Lastly, the SAMs undermine Mr. Schulte's right to the effective assistance of counsel because they have an unquantifiable "chilling effect" on the defense team, who operate under constant fear of violating the SAMs and subjecting themselves to criminal liability.

Counsel should not have to fear that using information, which anywhere else they would use in the normal course of their representation, exposes them to sanctions or prosecution for violating the SAMs.  But the defense team is well-aware of the prosecution of attorney Lynne Stewart in this district, whose false-statements conviction stemmed from her violation of SAMs in a terrorism case.  *See United States v. Stewart*, 686 F.3d 156 (2d Cir. 2012) (affirming sentence of New York defense attorney Lynne Stewart to ten years in federal prison on charges that included violating SAMs).  Therefore, members of the defense team factor the SAMs into every case-related decision, attempting to steer very clear of the ambiguous line the SAMs draw between zealous advocacy and actions the government could deem a threat to national security.  This compels the defense team to constantly weigh Mr. Schulte's interests against their own, creating a potential conflict that would deprive Mr. Schulte of his "right to representation that is free from conflicts of interest."  *Wood v. Georgia*, 450 U.S. 261, 271

(1981).

### E. The SAMs violate Mr. Schulte's First Amendment rights by prohibiting non-legal contact with anyone who is not an immediate family member.

Finally, the SAMs prevent Mr. Schulte from having non-legal contact with anyone who is not an immediate family member—*i.e.*, his parents and three brothers.  This blanket prohibition on non-legal communications with all but five members of his family unduly burdens Mr. Schulte's free speech and association rights.  *See, e.g.*, *Sattar v. Holder*, No. 07-CV-02698-PAB-KLM, 2012 WL 882401, at *5 (D. Colo. Mar. 15, 2012) (holding prohibition on inmate's communications with nieces, nephews, aunts, and uncles stated a claim for a First Amendment violation); *Mohammed v. Holder*, 2011 WL 4501959, at *7-10 (D. Colo. Sept. 29, 2011) (holding that the inmate's evidence was sufficient to establish a *prima facie* case that SAMs, which limited his communications to a "narrow and specific list of persons," violated the First Amendment); *Hale v. Ashcroft*, 2008 WL 4426095, at *4 (D. Colo. Sept. 24, 2008) (SAMs restrictions on inmate's communications with family members clearly "impaired" his "First Amendment interests").  The government's interest in preventing Mr. Schulte from disclosing classified information is not rationally related to restricting non-legal communications to immediate family only, as the government's distinction between his parents, siblings, and other extended family members is arbitrary.  And there are obvious alternatives to such a ban.  Given that all family calls and visits are subject to contemporaneous monitoring, the BOP could certainly monitor Mr. Schulte's contact with individuals beyond his immediate family, which would allow him to exercise his First Amendment rights while still protecting the government's interest in ensuring no classified information is disclosed.

Because the SAMs' blanket ban on non-legal communications with individuals apart

from his immediate family violate Mr. Schulte's First Amendment rights to free speech and free association, the Court should vacate or modify them.

## IV.    CONCLUSION

Here, the SAMs are unsupported by 28 C.F.R. § 501.2 and also violate the heightened protections afforded pretrial defendants because they are arbitrary, punitive, and unduly burdensome on Mr. Schulte's Fifth, and Sixth, and First Amendment rights.  Because the SAMs are both unsupported by the regulatory authority and unconstitutional, we ask the Court to vacate them in their entirety.

Dated:  New York, New York
        May 9, 2019

                                        Respectfully submitted,
                                        Federal Defenders of New York

                                        /s/ Sabrina P. Shroff
                                By:     _____
                                        **Sabrina P. Shroff**
                                        **Edward S. Zas**
                                        **Allegra Glashausser**
                                        **Lauren M. Dolecki**
                                        Assistant Federal Defenders
                                        52 Duane Street, 10th Floor
                                        New York, New York 10007
                                        Tel.: (212) 417-8713

# Exhibit A

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                              17 CR 548 (PAC)

5  JOSHUA ADAM SCHULTE,

6              Defendant.

7  ------------------------------x

8                                   New York, N.Y.
                                    December 14, 2017
9                                   2:30 p.m.

10

   Before:
11
                        HON. PAUL A. CROTTY,
12
                                        District Judge
13

14                        APPEARANCES

15 JOON H. KIM
        Acting United States Attorney for the
16      Southern District of New York
   MATTHEW JOSEPH LAROCHE
17      Assistant United States Attorney

18 BRAFMAN & ASSOCIATES, PC
        Attorneys for Defendant
19 BY:  JACOB KAPLAN

20 ALSO PRESENT:  JOHN MOSCATO, Pretrial Services

21

22

23

24

25

```
 1                    (Case called)

 2                    THE DEPUTY CLERK:  Counsel for the government, please

 3       state your appearances.

 4                    MR. LAROCHE:  Good afternoon, your Honor.  Matt

 5       Laroche for the government.  With me is John Moscato from

 6       pretrial services.

 7                    THE COURT:  Good afternoon, Mr. Moscato.  Thank you

 8       for coming.

 9                    MR. KAPLAN:  Good afternoon, your Honor.  Jacob Kaplan

10       with Brafman & Associates for Mr. Schulte.

11                    THE COURT:  Mr. Kaplan.  Mr. Schulte, how are you?

12                    Mr. Laroche.

13                    MR. LAROCHE:  Yes, your Honor.  We were last here on

14       November 8.  Since that time, two things have happened.  One is

15       that the defendant has changed counsel to Mr. Kaplan.

16                    The Second, as the Court is aware from our letter last

17       week, the defendant was arrested on the bases of charges out of

18       Virginia.  Based on those charges and other information that

19       we've set forth in our letter, we're now seeking the

20       defendant's detention.

21                    It is my understanding -- and I'll defer to defense

22       counsel -- that at least with respect to our application, they

23       are consenting for now without prejudice, and I'll let him

24       explain that.  The government is also ready to discuss a

25       schedule moving forward.
```

1          THE COURT:  Mr. Kaplan.

2          MR. KAPLAN:  Thank you, your Honor.

3          My colleague is correct that we are going to consent

4    to detention without prejudice.  We would like, based on our

5    conversations with the government, to allow Mr. Schulte to go

6    down to Virginia do at least address the initial arraignment on

7    the charges down there with an understanding he'll come back

8    here to appear before your Honor.

9          THE COURT:  What's the schedule for that, Mr. Kaplan?

10         MR. KAPLAN:  Nothing is happening until he gets down

11   there.  Based on my conversations with the state prosecutor,

12   because he's currently in state custody, the deputies from

13   Virginia are supposed to pick him up on December 20 from the

14   state facility.

15         Presumably they'll pick him up from the federal

16   facility instead, and they'll take him down to Virginia.  He

17   has counsel already down in Virginia.  Hopefully he'll be

18   arraigned soon after returning to Virginia.  Then depending on

19   what happens in the court there, I would hope that he could be

20   brought back here.

21         THE COURT:  When he leaves this courtroom, in whose

22   custody will he be?

23         MR. KAPLAN:  My understanding is that he'll be in

24   federal custody.

25         THE COURT:  Is that right, Mr. Laroche?

1           MR. LAROCHE:  Yes, your Honor.  I think that how it

2    would work procedurally is that after today he would be in

3    federal custody, and then the state authorities would take him

4    out, bring him to Virginia, get him arraigned, and then he

5    would be back up here still in federal custody for the next

6    matter.

7           THE COURT:  I have a remand order which I've drafted

8    which provides that, for the reasons stated on the record, bail

9    is revoked, and the defendant is remanded to the custody of the

10   U.S. Marshals for the Southern District.

11          Is that what you want?

12          MR. LAROCHE:  Yes, your Honor.

13          THE COURT:  Mr. Kaplan, is that all right?

14          MR. KAPLAN:  It is, your Honor.  While we have answers

15   to a lot of the allegations in the government's letter, we

16   think it's best to wait until the Virginia matter is resolved

17   before addressing it.

18          THE COURT:  I'm signing the order, and Mr. Schulte is

19   remanded.

20          The marshals are here?  Thank you.

21          Okay.  Mr. Laroche, what else?

22          MR. LAROCHE:  Yes, your Honor.  At the last

23   conference, I think the parties notified the Court that there

24   was one remaining issue with respect to discovery, and that was

25   specifically that the government needed a laptop computer and

an additional hard drive so we could load the remaining

discovery.

          After Mr. Kaplan was appointed counsel or became

counsel for the defendant, he provided us those materials.

We're in the process of loading them, which is taking a bit of

time because of the amount of data.  With that said, we will

have that complete by next week.  At that point, discovery in

this case will be complete.

          THE COURT:  How much time do you want, Mr. Kaplan.

          MR. KAPLAN:  Well, your Honor, we've obtained the

discovery given to prior counsel, and I've started to go

through that.  In addition, there was one other issue which I

believe was raised at our prior conference, which was a

security clearance for counsel to go through some of the

national security evidence that might be present in the case.

          While most of the national security stuff does not

involve the charges, the actual charges against Mr. Schulte,

the basis for the search warrants in this case involve national

security.

          So I'm starting the process with their office to

hopefully get clearance to go through some of the information

on that with an eye towards possibly a Franks motion going

forward.  So I would ask for more time just to get that

rolling.

          What I would hope to do, with the Court's approval, is

1  to set a hearing date, a court date, for early January just to

2  ensure that Mr. Schulte, after dealing with the issue in

3  Virginia, is brought back here to the Southern District of New

4  York.

5           In the three weeks in between now and then, I'll have

6  a better idea, based on the discovery I receive from the

7  government, as to how much time we would need for motions going

8  forward.

9           THE COURT:  What date do you want in January?

10          MR. KAPLAN:  The first week, between January 3 and

11  January 6.

12          THE DEPUTY CLERK:  Conference set for Thursday,

13  January 4 at 3:45.

14          MR. KAPLAN:  That's perfect, your Honor.

15          THE COURT:  Mr. Laroche, is that all right with you?

16          MR. LAROCHE:  That's fine, your Honor.  Thank you.

17          THE COURT:  Anything else?

18          MR. LAROCHE:  Your Honor, the government moves to

19  exclude time in the interests of justice from today until

20  January 4.  The basis for the exclusion is so that defense

21  counsel can continue considering the discovery and also

22  consider potential motions to be filed.

23          THE COURT:  Any objection?

24          MR. KAPLAN:  No objection.

25          THE COURT:  For the reasons stated, the time between

1    now and January 4 will be excluded.  It's in the interests of

2    justice.  Those interests outweigh the interests of the public

3    and the defendant in a speedy trial.

4              Okay, Mr. Kaplan.

5              MR. KAPLAN:  Thank you, your Honor.

6              By some chance if something happens before

7    January 4 --

8              THE COURT:  Come back then.

9              MR. KAPLAN:  That's all I ask.  Thank you.

10             THE COURT:  We're available.  I'm not going anywhere.

11   If there are any problems between now and January 4, drop me a

12   line.

13             MR. KAPLAN:  I appreciate it.  Happy holidays.

14             THE COURT:  Mr. Laroche?

15             MR. LAROCHE:  Thank you, your Honor.  That's all.

16             THE COURT:  Thank you very much.

17             (Adjourned)

18

19

20

21

22

23

24

25

# Exhibit B

I188SCHC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

          Defendant.

------------------------------x

                             January 8, 2018
                             3:30 p.m.

Before:

                HON. PAUL A. CROTTY,

                            District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
     Interim United States Attorney for the
     Southern District of New York
MATTHEW J. LAROCHE
SIDHARDHA KAMARAJU
     Assistant United States Attorneys

BRAFMAN & ASSOCIATES
     Attorneys for Defendant
JACOB KAPLAN


Also present:  EVAN SCHLESSINGER, FBI
                DAVID DONALDSON, FBI
                JOHN MOSCATO, Pretrial Services

I188SCHC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the government, please

3     state your appearance.

4          MR. LAROCHE:  Good afternoon, your Honor.  Matt

5     Laroche and Sid Kamaraju for the government.  With us at

6     counsel table is David Donaldson and Evan Schlessinger from the

7     FBI, and also John Moscato from pretrial services.

8          THE COURT:  Thank you for coming.

9          MR. KAPLAN:  Good afternoon, your Honor.  Jacob Kaplan

10    for Mr. Schulte.

11         THE COURT:  Mr. Kaplan.

12         Mr. Schulte, how are you?

13         I understand, Mr. Kaplan, you have an application.

14         MR. KAPLAN:  Yes, your Honor.

15         THE COURT:  Go ahead.

16         MR. KAPLAN:  Judge, on the last court date, when we

17    left, the idea was that we had consented to detention with the

18    understanding that Mr. Schulte would be sent down to Virginia

19    to face charges based on a Virginia warrant.  None of that

20    happened.  Virginia never came to get him.  Virginia just

21    didn't do anything in this case.  But before I address the bail

22    issues, I think it's important that this Court hear the full

23    story of how we actually get here.

24         At one of the previous court appearances, I believe it

25    was the November 8th date, this Court asked why the defense

I188SCHC

attorney in this case would need security clearance.  And the

answer that was given by one of the prosecutors, I believe, was

that there was some top secret government information that was

found in Mr. Schulte's apartment, and that out of an abundance

of caution it would be prudent that the defense attorney get

clearance.  But I don't think that's entirely accurate.

While the current indictment charges Mr. Schulte with

child pornography, this case comes out of a much broader

perspective.  In March of 2017, there was the WikiLeaks leak,

where 8,000 CIA documents were leaked on the Internet.  The FBI

believed that Mr. Schulte was involved in that leak.  As part

of their investigation, they obtained numerous search warrants

for Mr. Schulte's phone, for his computers, and other items, in

order to establish the connection between Mr. Schulte and the

WikiLeaks leak.

As we will discuss later in motion practice, we

believe that many of the facts relied on to get the search

warrants were just flat inaccurate and not true, and part of

our belief is because later on, in the third or fourth search

warrant applications, they said some of the facts that we

mentioned earlier were not accurate.  So we will address this

in a Franks motion going forward, but what I think is important

for the Court is, in April or May of 2017, the government had

full access to his computers and his phone, and they found the

child pornography in this case, but what they didn't find was

I188SCHC

1    any connection to the WikiLeaks investigation.

2              Since that point, from May going forward, although

3    they later argued he was a danger to the community, they let

4    him out; they let him travel.  There was no concern at all.

5    That changed when they arrested him in August on the child

6    pornography case.

7              At the initial bail conference, they argued as one of

8    the reasons to detain Mr. Schulte was that there were images on

9    his phone that showed a sexual assault.  They were able to

10   determine that it was --

11             THE COURT:  This is the application before Judge

12   Pitman.

13             MR. KAPLAN:  Yes.  In front of this Court as well on

14   the second bail hearing as well.

15             THE COURT:  I don't recall that.  I do recall seeing

16   it in the transcript from Judge Pitman.

17             MR. KAPLAN:  That is correct.  As part of that case,

18   Judge Pitman rejected that as a basis for detention, finding

19   that since the government conceded that the victim could not

20   identify Mr. Schulte, there was no basis for detention based on

21   that factor alone.

22             Not being deterred by that, it's my understanding that

23   the FBI then sent the photos that were the subject of that

24   issue to Virginia, and in November of 2015, Virginia itself

25   issued an arrest warrant for Mr. Schulte based on those facts.

I188SCHC

1    But nothing ever happened with that arrest warrant.  November

2    15 they get the warrant, nothing happened.

3              That all changes in early December of 2017.  On

4    December 5, I had a phone call with John Moscato from pretrial

5    services to discuss whether pretrial services would consent to

6    Mr. Schulte's supervision being transferred from the Southern

7    District of New York to Lubboch, Texas, where he can live with

8    his parents.  Pretrial services tells me they have no objection

9    to that at all.

10             I then had a conversation with the prosecutors who

11   told me they would object, but we could address it with the

12   court.  Two days later is when Virginia decides to do something

13   with that warrant.  Two days after we try to move Mr. Schulte

14   to Lubboch, Texas, now suddenly Virginia decide that they want

15   to arrest Mr. Schulte based on this warrant.  And, in fact,

16   when the NYPD officers came to arrest Mr. Schulte at 6 a.m. on

17   a Thursday, they told him that we came because the FBI told us

18   to come arrest you; not Virginia authorities, but the FBI came

19   and told us to arrest you.

20             What I think is important is the Virginia case is just

21   a means to keep Mr. Schulte detained.  There is no new

22   information.  The state prosecutor down in Virginia has spoken

23   with defense counsel down in Virginia and she told her,

24   candidly, that there is no new information; it's the same

25   pictures that the FBI had, that the FBI just gave to Virginia

I188SCHC

1   and asked them to make an arrest.  She still cannot identify

2   Mr. Schulte.  Nothing has changed on that basis that would

3   be --

4            THE COURT:  By she can't identify, you mean?

5            MR. KAPLAN:  She being the victim.  And Mr. Laroche

6   candidly told that to Judge Pitman when he asked, that she

7   could not identify him as being the one who assaulted her.

8            What is kind of interesting is, while the government

9   in their detention letter had two bases, one was the Virginia

10  case, Virginia itself seems not to care.  Virginia, they had

11  him detained on a state warrant, he was incarcerated, and they

12  were gunning to get him.  They were scheduled to come December

13  20 to pick him up.  The minute we consent to federal detention,

14  and now he is no longer out, suddenly they are hands off.  They

15  didn't come to pick him up.  They don't issue a writ to come

16  get him from federal custody.  Instead, my understanding is

17  they simply have a detainer that, if this court lets him out on

18  bail, they are going to come pick him up.  So this idea that he

19  is a danger to the community, that there is new information in

20  Virginia which ties him to this crime, is just not true.

21  Virginia is just sitting back and waiting to see what happens.

22  They have no interest in Mr. Schulte, and if they did, Mr.

23  Schulte would have been there already.

24           The second basis that the government had in its letter

25  for detaining Mr. Schulte was the usage of computers.  In the

I188SCHC

government's letter, they note how, if you search the IP

address for Mr. Schulte's apartment, they found numerous

log-ons to his Gmail account, in clear violation of this

court's order.  But what the government's letter doesn't

mention is that Mr. Schulte had a roommate, his cousin, Shane

Presnall, and this roommate, who the government and pretrial

services knew about, was allowed to have a computer.

        And more than that, based on numerous conversations,

at least two conversations between pretrial services, John

Moscato, Josh Schulte and Shane Presnall, it was Shane's

understanding that pretrial services allowed him to check Mr.

Schulte's e-mail and to do searches for him on the Internet,

with the idea that Josh Schulte himself would not have access

to the computer.

        And the government gave 14 pages of log-on information

to establish this point.  And, Judge, we have gone through all

14 pages, and every single access and log-in corresponds to a

time that Shane Presnall is in the apartment.  His computer has

facial recognition, it has an alphanumeric code, and there is

no point when Josh Schulte is left himself with the computer

without Shane being there, and that was their understanding.

        Now, I spoke to John Moscato and he explained to me

that he never intended to give him such carte blanche to do

this, that that was a misunderstanding.  Judge, a

misunderstanding is not an intentional violation of this

I188SCHC

1    court's bail conditions.  It is a misunderstanding and --

2                THE COURT:  It's a very convenient misunderstanding,

3    isn't it?

4                MR. KAPLAN:  I understand that.  But this is something

5    which, if you look at the court's original bail order, it says

6    that pretrial services has the discretion to allow them

7    computer usage, and they believed they were complying with

8    that; they believed they were complying with the judge's order

9    by discussing it with pretrial services.  They didn't go behind

10   anyone's back.

11               The whole concept of not allowing Mr. Schulte access

12   to his computers is the child pornography case, what he may do,

13   those fears are allayed when you have someone else doing it for

14   him, and that's Mr. Presnall.  And, Judge, I think it's really

15   important that in 14 pages of log-in information, every single

16   one corresponds to a time when Shane is in the apartment.  This

17   is not him with unfettered access to the Internet.

18               More importantly, Judge, this is not him intentionally

19   violating this court's bail conditions.  When you look at 18

20   U.S.C. 3148, which discusses revocation of bail, it talks about

21   either probable cause that the defendant committed a crime

22   while on release.  Well, we don't have that here.

23               I will wait for your Honor.

24               THE COURT:  Go ahead.

25               MR. KAPLAN:  The other one is clear and convincing

1    evidence that the defendant violated a bail condition.

2         THE COURT:  Any other condition of release.

3         MR. KAPLAN:  Yes.  I don't see clear and convincing

4    evidence that he intentionally violated a bail condition.  This

5    was at worst a misunderstanding between not just Joshua Schulte

6    and pretrial services, but there was a third party who was

7    there, a third party who had these conversations, and based on

8    those conversations, he believed that he was able to do this.

9         So, Judge, what I am asking you is to, one, completely

10   reject the Virginia case as a basis, because Virginia itself is

11   rejecting it; they don't care.  And there is still no evidence.

12        THE COURT:  Let me see if I have the sequence right,

13   Mr. Kaplan.

14        On December 7, the government moved for

15   reconsideration of the decision to remand Mr. Schulte, correct?

16        MR. KAPLAN:  Correct.

17        THE COURT:  Thereafter you consented to that.

18        MR. KAPLAN:  Yes, on the 14th.  I consented with the

19   idea that the government had two bases -- one Virginia, one

20   the log-on information on the computers.  I wanted the Virginia

21   issue to be resolved, and we consented to detention to allow

22   Virginia to come to New York, like they were scheduled to do

23   when he was in state custody, pick him up, and bring him down

24   to Virginia to be arraigned.  That never happened.

25        THE COURT:  You agreed that we would meet today as a

I188SCHC

1    control on that.

2              MR. KAPLAN:  The idea would be, if something happened

3    in Virginia, we would have a control date today forcing them to

4    send him back here to New York, but absolutely nothing has

5    happened.  I think the government will agree that nothing has

6    happened on the Virginia front.

7              THE COURT:  Anything else, Mr. Kaplan?

8              MR. KAPLAN:  I would ask if you could just put him

9    back on the bail conditions where he was before, since there

10   was no willful violation, and if the Court wants to make clear

11   there is no computer access at all, even with a third party, we

12   will do that.

13             THE COURT:  I think that was pretty clear before.

14             Mr. Laroche.

15             MR. LAROCHE:  Thank you, your Honor.  We still do

16   believe that detention is appropriate here, and if I could just

17   address specifically some of the points raised.

18             First, Virginia.  In no way is Virginia's conduct over

19   the past few weeks an indication that they do not care about

20   Mr. Schulte.  After the conference last time, I had

21   conversations with Virginia, in terms of how we would get him

22   down there.  I told them the easiest way to do that is if they

23   would writ him from here down to Virginia.  But I made clear to

24   them that, regardless of the outcome of their arraignment, that

25   our case would proceed first, in other words, we would be

I188SCHC

1    taking him back up here and this case would proceed first.

2    Under those circumstances, Virginia said, We are not going to

3    writ him just so that we can have a bail determination down

4    here and you take him back; you let your case go first, and we

5    will rely on the detainer that we have already put in place to

6    keep him in custody.  So the idea that Virginia doesn't seem to

7    care about Mr. Schulte just does not pass muster.

8            I would also note, this idea that Virginia somehow

9    came up with these charges because we passed them photographs

10   also is not the case.  What happened was at the time that he

11   was arrested for the CP charges, the FBI provided Loudoun

12   County law enforcement officials with the photographs.  It's

13   our understanding that they conducted their own investigation,

14   which included interviewing the victim, the person who was on

15   those photographs, and through interviews with that person,

16   they were comfortable, through the development of that

17   evidence, that Mr. Schulte was the one whose hands are on the

18   pictures of that photograph.  And that's based on a couple of

19   things.  One, that the victim remembers the night in question.

20   It was one of the few nights that she passed out and didn't

21   remember what occurred.  She could also, apparently, identify

22   the bathroom, which was the bathroom where she was staying as a

23   roommate of Mr. Schulte's.

24           So they have developed additional information which --

25           THE COURT:  So from Virginia's standpoint, Virginia

I188SCHC

1    has now satisfied itself, at least as a preliminary matter,

2    that the victim has been identified.

3            MR. LAROCHE:  They know the victim has been

4    identified, and they have also satisfied themselves to bring

5    felony charges against the defendant that the pictures are of

6    the defendant.

7            So this is something that we asked the court to

8    consider during the first bail arguments, and Judge Pitman

9    chose not to.  But again, given there are additional state

10   sexual assault charges pending against the defendant, we do

11   think they are reliable and should be considered by the Court.

12           Second, with respect to this idea that Mr. Schulte

13   just thought he could use his roommate to conduct searches on

14   the Internet, I just do not think that is a persuasive

15   argument, your Honor.  If you recall, during both bail

16   arguments, the government's principal concern was that this

17   defendant would have access to the Internet, and that's not

18   just because he is a child pornography defendant, it's because

19   the defendant has specific expertise with respect to computers.

20   For over six years the defendant was employed by the Central

21   Intelligence Agency and he held positions, including technical

22   development officer, and through that experience he gained

23   expertise in computers, computer networks and the Internet, and

24   the vulnerabilities of the same.  So the idea that this

25   defendant was just somehow checking his e-mail during this time

I188SCHC

1    does not pass muster, and I would say is inconsistent with the

2    arguments and the court's ruling in terms of bail.

3            And even more troubling, which wasn't really addressed

4    by defense counsel, is that the defendant or someone in his

5    apartment was using TOR in his apartment during the time when

6    he was on pretrial release, and this is extremely troubling to

7    the government because TOR is a way to establish anonymous

8    connections to various Internet locations to hide the person

9    who is actually accessing those sites.  It's used to access

10   child pornography.  It's also used to access Web sites where

11   you don't want to leave a trail.  And since the defendant

12   brought it up, I think it's particularly relevant given the

13   other investigation which continues to be ongoing with respect

14   to this defendant.

15           As defense counsel noted, in March of 2016, there was

16   a significant disclosure of classified material from the

17   Central Intelligence Agency.  The material that was taken was

18   taken during a time when the defendant was working at the

19   agency.  The government immediately had enough evidence to

20   establish that he was a target of that investigation.  They

21   conducted a number of search warrants on the defendant's

22   residence.  And I would disagree with defense counsel's

23   characterization that those search warrants haven't yielded

24   anything that is consistent with his involvement in that

25   disclosure.  In fact, our investigation is ongoing.  He remains

I188SCHC

1     a target of that investigation.  And part of that investigation

2     is analyzing whether and to what extent TOR was used in

3     transmitting classified information.  So the fact that the

4     defendant is now, while on pretrial release, using TOR from his

5     apartment, when he was explicitly told not to use the Internet,

6     is extremely troubling and suggests that he did willfully

7     violate his bail conditions.

8             So under those circumstances, your Honor, I do not

9     believe that there are a set of conditions that will ensure

10    that this defendant is not going to access the Internet and

11    pose a danger to the community.

12            THE COURT:  Mr. Kaplan.

13            MR. KAPLAN:  Judge, as to Virginia, this is part of

14    the issue.  We have two attorneys in New York debating the

15    evidence in the case of Virginia, when he can just be arraigned

16    in Virginia and let the judge there assess the situation.  I

17    understand Mr. Laroche is basing his comments on information he

18    has gotten from the state prosecutors, and so are we.  I had

19    defense counsel who had a very candid conversation with the

20    state prosecutor.  So I'm not sure why we are having this

21    debate in New York when there is a simple way of having it in

22    Virginia and see whether the judge in Virginia feels there is

23    any basis to remand him.

24            As for the Internet, just a couple of quick points.

25    The judge's bail order on September 14, in paragraph 11,

I188SCHC

1    specifically states, "Refrain from possessing or using a

2    computer, computer network and/or Internet access, unless

3    specifically approved by pretrial services."  That was the

4    court's written order.

5            Judge, we have a pretrial services member here in

6    court.  The Court can ask him about his conversations with the

7    defendant and with Mr. Presnall.  This idea that he was simply

8    using his roommate to do this, they asked if they could do

9    this, and they asked because they didn't want to run afoul of

10   this court's bail conditions.

11           Just briefly about this notion of TOR.  I understand

12   that the government's position is TOR is used by many, many bad

13   people.  It's also used by many, many good people.  The TOR is

14   simply a way of going online without having the government look

15   at everything you do.  Now, I understand in a case like this,

16   the government puts a nefarious intent to that.  In this case,

17   the reason why TOR was accessed was because Mr. Schulte is

18   writing articles, conducting research and writing articles

19   about the criminal justice system and what he has been through,

20   and he does not want the government looking over his shoulder

21   and seeing what exactly he is searching.  That's all it is.

22           If there is a concern about his computer access, if

23   there is a concern about him checking his e-mail, there is a

24   simple solution, no computers at all, no third-party access,

25   nothing, and that's the combination of conditions which will

16

I188SCHC

1    ensure that he is not a danger.  Besides for that, I don't see

2    what has necessarily changed intentionally on behalf of Mr.

3    Schulte since the court's bail order two months ago.

4              THE COURT:  All right.

5              On December 14 I revoked Mr. Schulte's bail.  It was

6    on consent and without prejudice to Mr. Kaplan renewing a

7    motion on January 4.  In accordance with the proceeding that

8    day, we agreed that we would meet again on January 4.

9              Having studied 18 U.S.C. 3148, sanctions for violation

10   of release conditions, I find that there is a combination of

11   events here, including the fact that the victim has now been

12   identified in Virginia, there is a clear danger, and I find

13   that the defendant violated the terms of the release conditions

14   by engaging in having his roommate access the computers using

15   very sophisticated methodology.  So bail continues to be

16   revoked and an order to that effect will be entered at the

17   conclusion of today's hearing.

18             Anything else to take up today, Mr. Laroche?

19             MR. LAROCHE:  I think there is a matter of scheduling,

20   and we did want to alert the Court to a discovery issue.  As

21   the Court will recall, there was a period of time where the

22   government had not been provided a computer and hard drive so

23   that the government could essentially reproduce the defendant's

24   desktop computer.  As the Court might recall, the desktop

25   computer is the computer on which the government found over

I188SCHC

10,000 images of child pornography.  It was set up in a way

that was sophisticated with several layers of encryption.  We

were provided that computer when Mr. Kaplan became counsel, was

retained by Mr. Schulte.

        The FBI and the government has made a number of

efforts to try to load that information on to the computer.  An

issue has arose in connection with that that we wanted to tell

the Court about.  Because there is a classified document that

is located on the defendant's computer, it is extremely

difficult, and we have determined not possible, to remove that

document forensically and still provide an accurate copy of the

desktop computer to the defendant.

        So in those circumstances, defense counsel is going to

require a top secret clearance in order to view these

materials.  It's my understanding that that process is ongoing,

and we have asked them to expedite it.  As soon as the

defendant's application is in, we believe he will get an

interim classification to review this material within

approximately two to three weeks.  Unfortunately, that hasn't

occurred yet.  So the defendant still does not have access to

that particular aspect of discovery.  So we are working through

that as quickly as we can.

        THE COURT:  So it will take two to three weeks for the

review after the top secret clearance is granted?

        MR. LAROCHE:  To get an interim clearance.

I188SCHC

1        THE COURT:  What is the schedule for the interim

2    clearance?

3        MR. LAROCHE:  Defense counsel has just been provided,

4    either early this week or last week, a document to essentially

5    get the application documents he needs to do the background

6    check for that clearance.  Once he submits that application

7    request, two to three weeks from his submitting it we believe

8    we will have an interim clearance for him so that he will have

9    access at that point.  He still will have to review the

10   materials at a location that we will make available at the FBI.

11   Unfortunately, as of right now, that is the only way we see

12   forward in terms of getting him access to be able to review it

13   in terms of discovery in this case.

14       THE COURT:  So what is the time period we are talking

15   about?  It sounds like five to six weeks.

16       MR. LAROCHE:  I know from doing these applications

17   they are extensive.  So it might take a bit of time for him to

18   get the materials together, but as soon as he gets it in, it

19   will take about two to three weeks.  So, yes, I think five to

20   six weeks from now hopefully this issue is resolved.

21       MR. KAPLAN:  Judge, if I may.  So I got a one-page

22   application last week, which I filled out and returned hours

23   later.  My understanding is, once they process that one-page

24   application, they are then going to give me access to a much

25   larger application, which will take me quite a while to answer.

I188SCHC

1   Then once that's completed, the two- to three-week process will

2   start.  So I have not yet received the larger application.  I

3   am not sure what the timetable is there.

4           THE COURT:  I should have pointed out before, when I

5   referred to a January 4 meeting, January 4 was a snow day.  So

6   we are meeting on the first day subsequent to the bail order,

7   January 8.

8           David, give me a schedule for the week of February 12.

9           THE DEPUTY CLERK:  February 15 at 4:30 p.m.

10          THE COURT:  That's a control date to see where we are

11  with regards to Mr. Kaplan's application.

12          Anything else, Mr. Kaplan?

13          MR. KAPLAN:  Eventually we may have an issue with

14  speedy trial, when it comes to access to the application and

15  access to the discovery materials, but when that comes I will

16  mention it to the Court.

17          THE COURT:  Fine.

18          MR. LAROCHE:  Your Honor, the government moves to

19  exclude time until the February 15 control date in the

20  interests of justice so that the parties can complete

21  discovery, the defense counsel can begin reviewing it, and also

22  continue considering motion practice in this case.

23          THE COURT:  Any objection, Mr. Kaplan?

24          MR. KAPLAN:  I am fine as of now to this date.

25          THE COURT:  For the reasons stated, the time between

I188SCHC

1    now and February 15 will be excluded.  It's in the interest of

2    justice to do so.  Those interests outweigh the interests of

3    the public and defendant in a speedy trial.

4                Thank you.

5                (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C

I5lasche

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4            v.                          17 CR 548 (PAC)

5   JOSHUA ADAM SCHULTE,
                                         Conference
6                   Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         May 21, 2018
9                                        2:00 p.m.

10  Before:

11          HON. PAUL A. CROTTY

12                                       District Judge

13

14

15

16

17          APPEARANCES

18

19  GEOFFREY S. BERMAN
         United States Attorney for the
20       Southern District of New York
    MATTHEW J. LAROCHE
21  SIDHARDHA KAMARAJU
         Assistant United States Attorneys
22

23  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
24  BY:  SABRINA SHROFF

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1            (Case called)

2            THE COURT:  Good afternoon.  Mr. Laroche?

3            MR. LAROCHE:  Thank you, your Honor.

4            We are here at the government's request.  As the Court

5    is aware, on May 15th the government alerted the Court to a

6    violation, a potential breach of the protective order.  As the

7    Court is aware, in September of 2017 the Court entered the

8    protective order in this case.  The basis for entering that

9    protective order was to cover materials that, if disseminated

10   to third parties, could jeopardize the safety of others, impede

11   ongoing evaluations and potentially jeopardize national

12   security.

13           The terms of the protective order included that

14   anything marked pursuant to it could not be disclosed to anyone

15   not connected to the defense, including the information or

16   identities or other information within materials marked

17   pursuant to the protective order.  Also, the defendant could

18   not keep copies of those materials pursuant to the protective

19   order.

20           In connection with our disclosure obligations, the

21   government has produced various search warrants and search

22   warrant affidavits that were executed in connection with this

23   case.  It became published in several news articles on May 15th

24   that various reporters had apparently obtained copies of those

25   materials, of the search warrant materials, which was obviously

1    concerning to the government.

2          Since that time the government has obtained some of

3    the defendant's prison calls.  On certain of those calls it is

4    clear that the defendant is discussing both the search warrant

5    affidavits and the materials and information that is included

6    within them.  In the government's view that is a clear breach

7    of the protective order.  It is unacceptable, particularly

8    unacceptable given that this defendant has a pattern of

9    violating the Court's orders.

10          As the Court is aware, while he was on bail, he had

11   strict conditions that included not using computers unless

12   expressly authorized to do so.  Nevertheless, while he was on

13   bail he at least caused others to use Tor on his behalf in

14   violation of his bail conditions.

15          Now, coupled with this apparent breach of the protect-

16   ive order by the defendant, it is particularly concerning to

17   the government.  We are simply requesting that the Court

18   reiterate to the defendant the terms of the protective order

19   and that this type of conduct is unacceptable from the

20   government's view.

21          THE COURT:  Is it clear, Mr. Laroche, whether or not

22   the search warrants were in fact turned over to the press?

23          MR. LAROCHE:  There are two articles, your Honor, in

24   which the press has indicated that they had copies and reviewed

25   copies of the warrants.  With respect to the prison calls, it

4

1    certainly appears, based on the discussions, that they had

2    copies or at least had been told the information within the

3    search warrants.  Again, pursuant to the protective order,

4    disclosing information within those search warrants to folks

5    who are not involved in the defense of this action would be a

6    breach of the protective order.

7              THE COURT:  Ms. Shroff.

8              MS. SHROFF:  Your Honor, I'm loath to get into -- I

9    don't really know if Mr. Laroche is saying that the documents

10   were given to the press by my client.  There seems to be no

11   indication that he was the one providing the documents.  I do

12   not know the scope of how he was informed about the protective

13   order, if he signed something about the protective order.

14             THE COURT:  You have seen the protective order,

15   haven't you?

16             MS. SHROFF:  I certainly have.

17             THE COURT:  You certainly have?

18             MS. SHROFF:  Right, I certainly have.  Your Honor,

19   when I first heard about it --

20             THE COURT:  It starts out, "Whereas, in the interests

21   of expediting the discovery, the defendant, by his attorneys,

22   consents to the entry of this order."  It says here that Mr.

23   Schulte has consented to the order.

24             MS. SHROFF:  I have no doubt that that is what the

25   protective order said.  But I told the government the moment I

1    heard about this quote-unquote breach that I was not his

2    counsel prior to a certain date, I did not know the scope of

3    the explanation provided to him.

4            Honestly, your Honor, regardless of all of that, I

5    told the government that if they wished me to reiterate

6    something to the client, I would.  I am also happy to have the

7    Court reiterate whatever the Court deems appropriate.  Short of

8    that, I'm not really clear --

9            THE COURT:  Mr. Laroche, what do you want?  You just

10   want me to reiterate the impact of the order, isn't that

11   correct?  It's scope and how it applies?

12           MR. LAROCHE:  That's correct, your Honor.  One other

13   quick point.  On one of the calls the defendant actually says

14   in discussions with who we believe was a reporter that: I know

15   that these search warrant affidavits have a protective order on

16   them.  He was clearly aware of the order itself.  We think that

17   conduct and that type of statement acknowledging that one was

18   in place --

19           THE COURT:  Other than bringing the order to Mr.

20   Schulte's attention again, you are not asking for any further

21   sanctions?

22           MR. LAROCHE:  At this point we are not, your Honor.

23           THE COURT:  You don't object to that, do you, Ms.

24   Shroff?  I don't see how you can.

25           MS. SHROFF:  Not at all, your Honor.  In fact, just to

1    make sure in case his prior counsel did not provide Mr. Schulte

2    with a copy of the protective order, I will assure the Court

3    that I will.  All that would need to be remedied would be

4    remedied.  Finally, your Honor, if I'm wrong, the government

5    can correct me, but I don't think my office was assigned at the

6    time that this alleged conduct took place.

7            THE COURT:  No, you weren't assigned until December.

8    This took place in September.  But it is part of the court

9    file.

10           MS. SHROFF:  May I have one second, your Honor?

11           THE COURT:  Yes.

12           (Counsel conferred)

13           MS. SHROFF:  I have no objection to the Court

14   reiterating the confines of the protective order.  If it makes

15   the government feel any better, I'm happy to supplement that

16   and move forward.

17           THE COURT:  It is not a question of making the

18   government feel better.  It is a question of complying with the

19   court order.  We are not into feeling better here.  We are into

20   giving reasonable enforcement to the Court's order.

21           MS. SHROFF:  Your Honor, I understand.

22           I checked to see where there was a place for prior

23   counsel to have the client sign the protective order.  I don't

24   need to add further to whether or not I did what I was required

25   to do.  But going forward I'm certainly more than willing to

7

1    make sure that he receives the order, and I can confront to the

2    government --

3              THE COURT:  Does anybody have an extra copy of the

4    order?

5              MR. LAROCHE:  Yes, your Honor.

6              THE COURT:  This is a protective order dated September

7    18, 2017.  I am going to give it to Mr. Gonzalez, who will give

8    it to you, Ms. Shroff.  There is no doubt about it that that is

9    the order.  I am directing you to call that to your client's

10   attention.  I think you should warn him that the Court is

11   willing to enforce the order.  He signed it on consent.

12             It contains various provisions, including that the

13   material marked "USG Confidential" shall be used by the

14   defendant and his counsel only for purposes of this action.  It

15   is not to be disseminated to third parties, which apparently it

16   was disseminated to third parties.

17             If you want to vary the terms of the protective order,

18   your relief is not to do it on your own, Mr. Schulte, but to

19   have your lawyer come into court and explain why there should

20   be a modification of the order.  It provides for that in the

21   order itself.  That is the only means and method for disclosing

22   information or using information that is subject to the

23   protective order.

24             I take it, Mr. Laroche, that the affidavits in support

25   of the search warrant were designated as "USG Confidential"?

1          MR. LAROCHE:  Yes, your Honor.

2          MS. SHROFF:  Your Honor, I will certainly do as

3     directed by the Court.  Perhaps I will go one step further and

4     discuss with the government the possibility of having Mr.

5     Schulte sign, because the protective order itself as of now is

6     only signed by his prior counsel.  I'm happy to take that step

7     and move forward.

8          THE COURT:  All right.  That's a positive step.  When

9     will you do that?

10          MS. SHROFF:  I could go to the jail tomorrow and do

11     it.  I could go tomorrow evening.

12          THE COURT:  Mr. Schulte, do you understand?  Yes?

13          THE DEFENDANT:  I do now.

14          THE COURT:  Anything else, Mr. Laroche?

15          MR. LAROCHE:  No, thank you, your Honor.

16          THE COURT:  Ms. Shroff?

17          MS. SHROFF:  No, thank you, your Honor.

18          THE COURT:  Thank you.  Thank you, Mr. Schulte.

19          (Adjourned)

20

21

22

23

24

25

# Exhibit D

I6SVSCHC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4              v.                        17 CR 548 (PAC)

5  JOSHUA ADAM SCHULTE,

6              Defendant.               CONFERENCE

7  ------------------------------x

                                        New York, N.Y.
8                                       June 28, 2018
9                                       4:02 p.m.

10
   Before:
11
                     HON. PAUL A. CROTTY,
12
                                        District Judge
13

14                      APPEARANCES

15
   GEOFFREY S. BERMAN,
16      United States Attorney for the
        Southern District of New York
17 MATTHEW LAROCHE
   SIDHARDHA KAMARAJU
18      Assistant United States Attorneys

19 FEDERAL DEFENDERS OF NEW YORK
        Attorneys for Defendant
20 SABRINA P. SHROFF
   MATTHEW LARSON
21
   ALSO PRESENT:  MICHAEL CHANG-FRIEDEN, Paralegal, USAO
22

23

24

25

I6SVSCHC

1           (Case called)

2           MR. LAROCHE:  Good afternoon, your Honor.

3           Matt Laroche and Sid Kamaraju, for the government.

4           THE COURT:  Mr. Laroche, Mr. Kamaraju.

5           Who's with you?

6           MR. LAROCHE:  With us at counsel table is Michael

7   Chang-Frieden.  He's a paralegal at the U.S. Attorney's Office.

8           THE COURT:  Mr. Frieden.

9           THE DEPUTY CLERK:  For defendant?

10          MS. SHROFF:  Good afternoon, your Honor.

11          Federal Defenders of New York, by Sabrina Shroff and

12  Matt Larson.

13          THE COURT:  Mr. Larson.

14          MS. SHROFF:  On behalf of Mr. Schulte.

15          THE COURT:  Mr. Schulte, how are you today?

16          MS. SHROFF:  Your Honor, I'm not sure if the Court has

17  previously had Mr. Larson appear before you, but Matt Larson is

18  a lawyer in our office and usually sits in Brooklyn, but has

19  graciously agreed to help me here today.

20          THE COURT:  Good.  All right.

21          MS. SHROFF:  And on the case.

22          THE COURT:  All right.

23          We were last together on Wednesday, June 20th.  We had

24  arraigned Mr. Schulte.  I asked Mr. Schulte at that time -- I

25  told him about Counts One through Seven, alleging that the

I6SVSCHC

1    crimes charged in the indictment were said to have taken place

2    in the Eastern District of Virginia.  I asked him if he wanted

3    to waive venue with regard to Counts One through Seven.

4    Mr. Schulte said we want a week to discuss.

5           So you've had the week.  What do you want to do,

6    Ms. Shroff?

7           MS. SHROFF:  Your Honor, I understand that Mr. Schulte

8    is going to waive venue and proceed in the Southern District of

9    New York.  I just state this for the record.

10          Obviously the fact that he's waiving venue would not,

11   down the road, preclude a motion to sever certain counts from

12   the other.  We will retain that argument.

13          THE COURT:  All right.

14          I have to ask Mr. Schulte a few questions to make sure

15   that he wants to waive.

16          MS. SHROFF:  Certainly, your Honor.

17          THE DEFENDANT:  I have a pro se motion I would like to

18   submit to your Honor before.

19          THE COURT:  Before what, Mr. Schulte?

20          THE DEFENDANT:  Before the questions.

21          THE COURT:  Oh, okay.

22          THE DEFENDANT:  If that's okay.

23          THE COURT:  Fine.

24          THE DEFENDANT:  And if there's any way that we could

25   schedule the oral arguments between now and Tuesday, I'm not

1    sure if that's enough time --

2             THE COURT:  This is 137 pages, not including the

3    appendix.

4             THE DEFENDANT:  That's correct.

5             Our typewriter was broken, so unfortunately it's all

6    handwritten.

7             THE COURT:  Mr. Laroche -- did you serve a copy on the

8    government?

9             THE DEFENDANT:  No, that's the only copy there.

10            MS. SHROFF:  Your Honor?

11            THE COURT:  Yes.

12            MS. SHROFF:  I know it's a pro se motion, but we can

13   provide a copy to the government or I can provide a copy to the

14   government.

15            THE COURT:  Well, copying is easy enough to do.  We

16   can copy it.

17            But Mr. Schulte, do you want to tell me what's in your

18   motion?  Because obviously I don't want to sit here and read

19   127 pages.

20            THE DEFENDANT:  Yes, your Honor.

21            It's a bail application.  There's been information,

22   new information, discovered in the case.  And so I make a

23   couple arguments regarding my initial remand that I think was

24   done improperly.  And then a couple of other arguments that I

25   make regarding pretrial detention itself.  And then the new

I6SVSCHC

1    information in the bail application that we've discovered

2    through discovery; and based on that information, attacking the

3    presumption of danger.

4              THE COURT:  Okay.  Well, I'll read it.

5              I'd like to return now to the waiver of venue.

6              You've had a week's time now to consider it,

7    Mr. Schulte.  Am I correct that you want to waive your right to

8    challenge venue in this case?

9              THE DEFENDANT:  That's correct.

10             THE COURT:  Do you understand, with the exception that

11   Ms. Shroff makes, that by waiving challenges to venue now,

12   you're waiving your right at a later time to object to Counts

13   One through Seven being tried in the Southern District of New

14   York on the basis that venue is not appropriate in this

15   district?

16             THE DEFENDANT:  That's correct.

17             THE COURT:  Are you doing this knowingly and

18   voluntarily after you've consulted with your counsel?

19             THE DEFENDANT:  I am.

20             THE COURT:  Has anybody made any threats or promises

21   to force you to waive your right to venue in the Eastern

22   District of Virginia?

23             THE DEFENDANT:  No.

24             THE COURT:  Anything else you want me to ask,

25   Ms. Shroff or Mr. Laroche?

I6SVSCHC

1          MR. LAROCHE:  No.  Thank you, your Honor.

2          THE COURT:  Ms. Shroff?

3          MS. SHROFF:  No, your Honor.  Thank you.

4          THE COURT:  I'm going to accept the waiver as

5     knowingly and voluntarily made with respect to Counts One

6     through Seven, which allege the crime took place in the Eastern

7     District of Virginia.  Those counts will be tried here in the

8     Southern District of New York.

9          Now, with regard to the pro se motion, I'll make

10    copies and distribute them.  I'll start reading them.  I'm not

11    sure when I'll get finished with it, but I'll start reading it.

12          THE DEFENDANT:  Thank you.

13          THE COURT:  Anything else to do today, Ms. Shroff?

14          MS. SHROFF:  Yes, your Honor.

15          I hate to sort of have the Court get in the middle of

16    this, but we continue to have discovery-related problems in the

17    MCC.

18          So the government has actually given us now a second

19    hard drive.  The MCC does not have the equipment to allow

20    Mr. Schulte to actually open, I would say, three-quarters of

21    the files that are on the drive itself.  So I ask the Court --

22    I mean we've tried to try and resolve this with the MCC, and I

23    have had very little success.

24          So I'm asking the Court to either order the MCC to

25    accept from us or have the government provide to the MCC the

I6SVSCHC

1    discovery on a laptop with a program that's on the laptop that

2    allows Mr. Schulte to access each and every one of the files

3    that is part of his discovery.

4            THE COURT:  Mr. Laroche.

5            MR. LAROCHE:  Your Honor, we're working towards a

6    solution to this as soon as possible.  I think part of this is

7    complicated by the fact that the underlying discovery includes

8    a lot of extensive forensic images of various devices.

9            We are aware of the issue.  Our tech people are in

10   contact with the MCC and we are trying to resolve it as soon as

11   possible.

12           THE COURT:  "As soon as possible" means when?

13           MR. LAROCHE:  So it is our understanding, based on

14   discussions with our tech folks, that the drive that we

15   provided is -- there is equipment at the MCC that is capable of

16   viewing it.  That's our understanding today.  We're trying to

17   get a little bit -- we're going to discuss with defense counsel

18   if there are specific files that they are not able to open, and

19   then we can address those files on a case-by-case basis.  If it

20   turns out that we have to provide a laptop, we will do so as

21   soon as possible so that he does have access.

22           So we are working through this.  We are trying to do

23   it as quickly as possible.  And we certainly understand the

24   desire to get the discovery in a form that is viewable by the

25   defendant, and we will resolve it as soon as we can.

I6SVSCHC

1          THE COURT:  Well, you say as soon as you can, as

2     quickly as possible, and as reasonable.  Can we get some time

3     frames for that?

4          MR. LAROCHE:  Your Honor, I'm going to propose if we

5     can update the Court in a week by letter where we stand.  I

6     expect and hope that it will be resolved by then.  And then we

7     can report that there are no more issues with respect to the

8     discovery that's been produced.

9          THE COURT:  That would be by July 5th or 6th.

10         MR. LAROCHE:  That's correct, your Honor.  May I

11    propose Friday, just because of the holiday is in the middle?

12         THE COURT:  Yes, July 6th.

13         MR. LAROCHE:  Thank you, your Honor.

14         THE COURT:  And depending on what the answer is,

15    Ms. Shroff, we'll go from there.

16         MS. SHROFF:  That's fine.

17         THE DEFENDANT:  I have a couple other --

18         MS. SHROFF:  I'm sorry, your Honor.  I don't think

19    Mr. Schulte meant to interrupt you.

20         THE COURT:  Is there anything else?

21         MS. SHROFF:  Yes, your Honor.

22         In addition to the discovery that has already been

23    produced, I know that the government is planning to make

24    another production on the newer charges.  And I just ask that

25    the discovery that is now sent to the MCC be in a way -- is

I6SVSCHC

1    produced in a way that he can access it.

2                THE COURT:  How is that different than the first

3    request?  I thought we've already addressed that.  Obviously

4    the material that's produced has to be accessible.

5                MS. SHROFF:  Fine.

6                Then I have nothing more to say on this issue.

7                THE COURT:  Otherwise, it's not really been fully

8    produced.

9                MS. SHROFF:  Thank you, your Honor.

10               THE COURT:  Is that right, Mr. Laroche?

11               MR. LAROCHE:  That's correct, your Honor.

12               THE COURT:  Okay.

13               Ms. Shroff, do you have anything else you want to

14   raise?

15               MS. SHROFF:  I do not, your Honor.

16               THE COURT:  Okay.

17               Mr. Laroche?

18               MR. LAROCHE:  Your Honor, the government would ask

19   that the Court -- and I think we did this at the last

20   conference -- set a control date of July 20th, which was 30

21   days from the original arraignment.  The purpose of that would

22   be for the government to update the Court concerning where we

23   stand on discovery.

24               And I think the proposal from the government would be

25   to exclude time until that date, July 20th, so that the parties

I6SVSCHC

```
1    can continue their discussions and also the defendant can

2    continue reviewing discovery in this case.

3            THE COURT:  Can you make it July 19th?

4            MR. LAROCHE:  That's fair, your Honor.

5            THE COURT:  Give me a time on July 19th.

6            THE DEPUTY CLERK:  Thursday, July 19, at 11 a.m.

7            THE COURT:  Any objections to exclusion of time,

8    Ms. Shroff?

9            MS. SHROFF:  I do not, your Honor.

10            But your Honor, may I just have one minute with the

11   government please?

12            THE COURT:  Sure.

13            MS. SHROFF:  Thank you.

14            (Counsel conferred)

15            MS. SHROFF:  Your Honor, I've tried to resolve the

16   issues that Mr. Schulte wanted to raise with the Court with the

17   government.  I have their assurance that we can try and resolve

18   the matter by the end of next week.

19            THE COURT:  All right.

20            If I can make a suggestion, it would be helpful to

21   have these conversations take place before we have the hearing

22   rather than interrupt the hearing.  But do the best you can.

23            All right.  The time between now and July 19th is

24   excluded.  It's in the interest of justice to do so.  Those

25   interests outweigh the interests of the public and the
```

I6SVSCHC

1    defendant in a speedy trial.

2              So July 19th at what time, David?

3              THE DEPUTY CLERK:  11.

4              THE COURT:  11 a.m.

5              MR. LAROCHE:  Thank you, your Honor.

6              That's all from the government.

7              THE COURT:  We're going to make a copy of

8    Mr. Schulte's pro se application.

9              MS. SHROFF:  Your Honor, actually I have a copy in the

10   court.  My paralegal was kind enough to bring it.  I can give

11   it to the government.

12             THE COURT:  Okay.

13             It might take a week or so in giving you a response.

14             MR. LAROCHE:  Yes, your Honor.

15             THE COURT:  Thank you.

16             All right.  Anything else?

17             MS. SHROFF:  No, your Honor.

18             I apologize.  Next time we'll try and iron it out

19   before.

20             THE COURT:  Thank you very much.

21                            *    *    *

22

23

24

25

# Exhibit E



BP-A0148
JUNE 10                          INMATE REQUEST TO STAFF CDFRM
U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| FROM: Schultz Joshua | REGISTER NO.: 79471054 |
| WORK ASSIGNMENT: Unconstitutional restrictions | UNIT: 10S |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.

Pretrial detention is the detention of human beings legally presumed innocent; they
are detained for the "greater good" to protect the community. As such, rights AND
privileges cannot be denied pretrial inmates. If a specific right or privilege
would readily be available to the average American and would not interfere with
the legislative intent of pretrial detention to protect the community then it must be
permitted. Although the BOP is designed to deny, punish and torture slaves, it cannot
apply its sadistic punishment to people legally presumed innocent otherwise the differences
between prison (to punish) and detention (to protect the community) shrinks to nill and
permissible legislation morphs into impermissible punishment. Likewise, SAMs inmates
cannot be denied privileges granted to normal pretrial inmates that do not infringe upon
the SAMs directive. I recognize the following as unconstitutional and request immediate return

(Do not write below this line)

DISPOSITION:




| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                          Prescribed by P5511

                              This form replaces BP-148.070 dated Oct 86
                              and BP-S148.070 APR 94

A.) Punishment imposed upon pretrial SAMs Inmates without due process and entirely unrelated to the SAMs which all other inmates enjoy:

1.) Arbitrary denial to full prison commissary including body soap, pens, and paper
2.) Denial of use of Library to check-out books
3.) Denial of public defender phone to call attorney any time
4.) Denial of TRULINES email access to contact attorney any time
5.) Denial of full contact attorney visit to exchange documents
6.) Denial of full contact family visits
7.) Denial and restriction of family calls from 300 to 15 minutes per month
8.) Denial of Normal TV watching — must install TVs in cells; even Convicted BOP inmates have TVs
9.) Denial of normal prison amenities such as ice, hot water, microwaves, etc.
10.) Denial of religious services (remedied through TV)

B) Punishment unconstitutionally imposed upon pretrial inmates without due process that would be readily available to the average free American to enjoy:

1.) TVs and radios (see Section A, 8.)
2.) BOP commissary is unconstitutional monopoly, must allow competition with Amazon and other vendors for food and leisure items
3.) Purchase and/or prison provided xbox, gameboy, and other electronic devices used for typical 21st century American enjoyment.
4.) BOP phones unconstitutional monopoly, must allow cell phone usage.
5.) Internet access for all pretrial inmates as the internet is fundamental to free speech

C.) Cruel and unusual punishment illegally imposed upon pretrial SAMs inmates:

1.) Windows blacked out and bordered up to prevent view of outside to elicit psychological
2.) Clocks and time unavailable to inmate to elicit psychological TORTURE    TORTURE
3.) Pillows denied to inmates to elicit psychological TORTURE
4.) Hot water denied to inmates to elicit psychological TORTURE
5.) Religious services denied to inmate in violation of 1st amendment (see A.10)
6.) Ability to control lights denied to inmates to elicit psychological TORTURE
7.) Dental and medical care restricted and denied to inmates to elicit psychological TORTURE
8.) Monthly phone calls limited to one per month for 15min to elicit psychological TORTURE
9.) Cell heat/cold uncontrollable and set outside Normal range
10.) Solitary confinement with limited activities including inability to write, read, watch TV, or play games leaves inmate with nothing to do all day and is psychological TORTURE

NYM 1330.7
ATTACHMENT I

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _1/4/19  PROTO_

INMATE'S COMMENTS:

1. Complaint: _____

2. Efforts made by you to informally resolve: _____

3. Names of staff you contacted/Date you contacted the staff: _____

Date returned to Correctional Counselor: _1/7/19  PROTO_

_____

Inmate's Name                    Register Number                    Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _Please list items you would like to be added so that they can be discussed._

Date informally resolved: _____    Counselor Signature: _PROTO_

Date BP-229(13) Issued: _____

Unit Manager: _PROTO_

Here is a small listing of some of the items that are arbitrary and illegally denied to me: Yarmulke, Mouthwash, toothpaste, dental floss, acne clearing product, fingernail clippers, a plastic mirror, a comb, vøs body wash, Vitamin B-150, Vitamin E, a book light, a bowl, a spoon, earphones, notebooks, pens, puzzles, radios, Claritin, gas relief tabs, Sweats and shirts; Food items including adobo, barbecue sauce, cheese curls, jolly ranchers, honey buns, Shahara chips, almond chocolate bars, cheese, salt & pepper, sour pretzels, & cheese.

I am placed under SAMs for national security — unless McGann argue how my access to vøs body wash, puzzles, & some chips impact national security, its denial is arbitrary punishment & therefore illegal. I am not on IOS for violence or any violation of prison rules — and I cannot be denied similar access to these items that all other inmates have. MCC can NOT treat IOS inmates like SHU inmates, & must give us the full commissary sheet.

NYM 1330.7
ATTACHMENT I

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: 1/4/19 PROTO

INMATE'S COMMENTS:

1. Complaint: _____

_____

_____

_____

_____

2. Efforts made by you to informally resolve: _____

_____

_____

3. Names of staff you contacted/Date you contacted the staff:

_____

_____

Date returned to Correctional Counselor: 1/7/19 PROTO

_____

Inmate's Name                Register Number                Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: Your request for contact legal visits is denied for security reasons however, your attorneys can hand you up to 4 inches of paper discovery through the lieutenant at the start of each meeting. PROTO

Date informally resolved: _____   Counselor Signature: PROTO
                                                              for

Date BP-229(13) Issued: _____

Unit Manager: PROTO

As my SAMs are pursuant to 28 CFR 501.2, there is absolutely no reason to deny me reasonable access to my attorney except as punishment — which is illegal. Without the ability to pass documents and meet with my attorney and paralegals, I am denied effective assistance of counsel. Without a valid reason why MCC has imposed harsher restrictions on me than prescribed by SAMs and how denying me access to my attorney protects national security, I am denied due process.

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff.  Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: 1/4/19  PROTO

INMATE'S COMMENTS:

1.  Complaint:

2.  Efforts made by you to informally resolve:

3.  Names of staff you contacted/Date you contacted the staff:

Date returned to Correctional Counselor: 1/7/19  PROTO

_____   _____   _____
Inmate's Name                    Register Number              Date

CORRECTIONAL COUNSELOR'S COMMENTS

1.  Efforts made to informally resolve and staff contacted: You are permitted to review your laptop and hard drive in your cell.

Date informally resolved: _____   Counselor Signature: _____ PROTO

Date BP-229(13) Issued: _____

Unit Manager: Proto

Denial of discovery review violates the 5th amendments
due process clause & the 6th amendment's effective counsel
clause. I have no other access to this unclassified
discovery — which consists of terabytes of data on large
hard drives that require external power. MCC has a few
choices — bring me out to one of the 2 visit rooms for
6hrs each day (which is likely obstruct visits & violate
WA) or simply just give me a power outlet or extension cord
to power the drives myself. Regardless, MCC cannot deny a
pretrial inmate access to discovery.

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your February 21, 2019 Informal Resolution Form, in which you allege the constant lighting in your cell violates your constitutional rights.

The Facilities Department has been working to switch the lights in the cells in your housing unit to operation via external switch.   If your current cell has not been modified, please advise so that it can be addressed.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

2/28/19
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
### ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: R. Proto  2/19/19

INMATE'S COMMENTS:

1. Complaint: Uncontrollable lights that cannot be turned off cause sleep deprivation and therefore violate the 8th amendment's ban of cruel and unusual punishment. This torture results in psychological, permanent damage. There is no reason inmates should not be able to control lights and turn them off at night. 2-way switches exist to allow for a master light switch as well.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none were.

3. Names of staff you contacted/Date you contacted the staff:
Proto, Warden, 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua     79471-054     2/21/19
Inmate's Name          Register Number      Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____

Date informally resolved: _____     Counselor Signature: _____

Date BP-229(13) Issued: 3/4/18

Unit Manager: Proto

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your undated Informal Resolution Form, in which you list the commissary items that should be available to you.

Your list is being forwarded to Trust Fund staff for consideration.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

2|28|19
Date

_____
Unit Manager

BP-8 (cont) List of Commissary items that should be available as they do not constitute a danger to National Security: →▷

| Dental Items | Dietetic Items | Food/Snack Items |
|---|---|---|
| Aim Mouthwash | Honey (Sugar free) | Apple & Banana Chips |
| Colgate toothpaste Whiting | | Adobo "Y pepper |
| Dental Floss Picks | Medical Items | Bagel |
| Effergrip | A+D ointment | BBQ Sauce |
| Denta-Cup | Allergy/cold tablets | Cheese Curls |
| Oral B tooth Brush | Anesthetic oral gel | Chips Ahoy Cookies |
| Tooth brush Cover | Anti Diarrheal | Cream cheese |
| | Artificial tears | Garlic Powder |
| Vitamins | Claritin/non-drowsey | Grits |
| Vitamin B-150 | Do-Lusate 100MG | Honey Buns |
| Vitamin E | Gas Relief tab | Instant Rice |
| | Lac-hydrin lotion | Jolly Ranchers |
| Sundry | Laxative tablets | Mac & Cheese |
| Book light | Milk of Magnesia | Mayonnaise |
| Bowl | Muscle Rub | Nacho Cheese Chips |
| Bowl w/ lid | Naproxen 220MG | Oat Meal |
| Clear head phones | Prilosec Tabs | Oatmeal Cookies |
| Composition notebooks | Rolaids | Buffalo Chicken Stick |
| Fork & Spoon Set | Saline Nasal Spray | Chocolate Bar'y Almonds |
| JVC earbuds | Selenium Shampoo | Shabangs |
| | Tylenol Extra Strength | Marble Cakes |
| Eye Wear | Zantac (generic) | Cinnamon Cakes |
| Reading glasses | | Reppersint bits |

| Other | Sneakers / Shower Shoes | Halal / Koster Meals |
|---|---|---|
| Military Club Brush | Sneakers | Stuff Chicken w/ rice & mushroom |
| Mirror | Clogs Shower Shoes | Halal Beef Sausage Hot & spicy |
| MP3 Player | NB Shower Sandals | Halal Beef Sausage (Regular) |
| ~~Paper~~ ~~Presen~~ | Personal health / hygiene | Picante Sauce |
| Palmolive Dish Soap | ~~Coco Butter Lotion~~ Towel | Pinto Beans |
| Photo Albums | Dial   wash cloth | Plantain Chips |
| Pilot Pens | Facial Tissues | Raisin Bran Cereal |
| Puzzles Crossword | Fingernail Clippers | Refried Beans |
| Puzzles Sudoku | Neutrogena Acne (wary) | Roasted & Salted Pistachios |
| Radio | Noxema | Salt & pepper |
| Silicone MP3 Cover | ~~Noxxe~~ | Sazon |
| Watch Battery | Soap dish | Sharp Cheddar Cheese |
| Watches | Suave Lotion | Snack Crackers |
| Water Bottle Container | V05 Body Wash | Soups (beef, Chicken, line chili, & Vegetable |
| Mugs | | Soy Sauce |
| Writing Pad | Hair Care Products | Spam |
| | African Pride | Star light Mints |
| | Comb | Sunflower Seeds |
| Clothing | Cream of Nature | Tuna |
| 3 pck Socks | Dandruff Shampoo | Wheat Thins |
| Boxer briefs | Herbal Essence Conditioner | Yogurt Pretzels |
| Gray T-Shirts | Herbal Essence Shampoo | |
| Hat | Pink oil Lotion | Beverages |
| Micro Mesh Shorts | V05 Conditioner | Coffee: Bustelo, Taster's Choice, & Creamer |
| Sweat pants | | Diet Pepsi   Assorted Tea |
| Sweat Shirts | | Ginger Ale |
| Thermal pants | | Orange |
| Thermal tops | | Pepsi |

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your February 21, 2019 Informal Resolution Form, in which you allege the limitations to your social calls and social visitation violate your constitutional rights.

Your SAM places limitations on your social telephone access by stating you are provided calls with a minimum of one per month, and that the calls must be contemporaneously monitored by the FBI.   Your SAM similarly limits your social visiting to times the monitoring agents are available.   However, you are offered two social visits for two hours each to be comparable to the four one hour visits other non-SAM inmates are offered.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

2/28/19
Date

Unit Manager

NYM 1330.7
ATTACHMENT I

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _R. Proto 2/19/19_

INMATE'S COMMENTS:

1. Complaint: _Limited, Monitored family contact violate the 8th amendment's ben of cruel and unusual punishment. All other inmates are allocated 300 minutes per month while SAMs inmates are arbitrarily limited to 100% as unconstitutional punishment. Likewise, all other inmates receive weekly unmonitored contact visit with family while SAMs inmates are restricted to 2 visits, non-contact and monitored — this is unconstitutional_

2. Efforts made by you to informally resolve: _On Tuesday Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none were._

3. Names of staff you contacted/Date you contacted the staff: _Proto, Warden, 11/27/18_

Date returned to Correctional Counselor: _____

_Schulte, Joshua_          _79471054_          _2/21/19_
Inmate's Name             Register Number        Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _See attached response_

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _3/4/18_

Unit Manager: _Proto_

## Response to Informal Resolution Form

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your February 21, 2019 Informal Resolution Form, in which you allege the obstructed view from your window and preclusion from outside recreation violate your constitutional rights.

Many of the windows in the institution are frosted for security reasons.   You are provided access to outside light and air in your housing unit's recreation area.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

2/28/19
Date

_____
Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: R. Pross 2/19/19

INMATE'S COMMENTS:

1. Complaint: Blacked out windows and ban of outside recreation violate the 8th amendment's ban of cruel and unusual punishment. All other inmates are able to view outside — to purposefully obstruct this view for only SAMs inmates is illegal. Likewise, to ban SAMs inmates from fresh air and outside recreation when all other inmates get to enjoy such activities is illegal

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed, but none were

3. Names of staff you contacted/Date you contacted the staff:
Proto, Warden, 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua    79471454    2/21/19
Inmate's Name       Register Number      Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: See attached response

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: 3/4/19

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your February 21, 2019 Informal Resolution Form, in which you contend that your Special Administrative Measures (SAM) violate your constitutional rights by keeping you locked in your cell.

You were placed under SAMs by the Department of Justice by request from the U.S. Attorney's Office.   You were provided a memo from the Warden outlining the reasons for your SAM and the restrictions consistent with your SAM, including being celled alone in an area where your contact with other inmates is restricted.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.


2/29/19
Date

_____
Unit Manager

NYM 1330.7
ATTACHMENT 1

METROPOLITAN CORRECTIONAL CENTER, NEW YORK
ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that
prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you
MUST attempt to informally resolve your complaint through your correctional conselor.
Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in
good faith and in an honest and straightforward manner. Before completing this form, you should
make every effort to honestly attempt to informally resolve this matter verbally with staff.  Briefly
state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _R Proto 2/19/19_

INMATE'S COMMENTS:

1. Complaint: SAMs violate the 8th amendments ban of cruel & unusual punishment
"Solitary confinement is worse than any torment of the body" — Charles Dickens
The savagery of solitary confinement and permanent psychological damage
is well-known and the United Nations considers any term of solitary
confinement over 15 consecutive days as inhumane, hardcore torture. I
It is illegal to lock an animal in a small cage 24/7 unless that animal is a human being and
the individual who locks the cage is the government — then it's called justice.
2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent
a list of 35 unconstitutional issues that were reviewed by the
warden. I was told the issues would be addressed, but none were.

3. Names of staff you contacted/Date youcontacted the staff:
_Proto, Warden, 11/27/18_

Date returned to Correctional Counselor: _____

_Schulte, Joshua_          _79471054_          _2/21/19_
Inmate's Name              Register Number      Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff
contacted: _See attached response._

Date informally resolved: _?_          Counselor Signature: _PROTO Unit Mgr_

Date BP-229(13) Issued: _3/4/18_

Unit Manager: _PROTO_

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your March 6, 2019 Informal Resolution Form, in which you allege you are not receiving adequate discovery review time due to the short battery life of your laptop.   You request access to a power outlet.

For security reasons, there are no power outlets in cells on your housing unit.   We will reach out to the U.S. Attorney's Office to explore other options, e.g. a spare battery and charger.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

3|20|2019
Date

_____
Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: Insufficient discovery review and inability to work on own defense: The informal complaint was to obtain discovery — which has since been received. Officers have provided laptop when requested, however, the laptop lasts less then 2 hours due to battery life and external drives that drain battery. Normal law library discovery review outside SAMs was 6 hours per day — but now I only get 2. I request power outlet to power laptop in the cell to facilitate 24/7 case review.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none were.

3. Names of staff you contacted/Date you contacted the staff:
Proto, Warden, 11/27/18
_____
_____

Date returned to Correctional Counselor: _____

Schulte, Joshua        79471054        3/6/19
Inmate's Name          Register Number        Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____
_____
_____

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your March 6, 2019 Informal Resolution Form, in which you allege MCC New York is denying you access to books.

Your Special Administrative Measures (SAM) specifically preclude you from sharing books with any other inmate.   As such, you cannot be provided books from the institutional library.   In addition, BOP policy does not require Education staff to purchase books for you.   However, Education staff are exploring buying books for you in the future.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.


3/20/19
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor:_____

INMATE'S COMMENTS:

1. Complaint: No library usage: The MCC has denied me access to the library and forced my family to purchase books. This is unconstitutional especially considering that I am in solitary confinement. The library staff have asked me twice about books that I would like for them to purchase, yet, 4 months later, no books have been purchased. The MCC must provide its inmates with reasonable access to books.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed, but have not.

3. Names of staff you contacted/Date you contacted the staff:
Proto, Warden, 11/27/18

Date returned to Correctional Counselor:_____

Schulte, Joshua          79471054          3/6/19
Inmate's Name            Register Number    Date

CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff
contacted:_____

Date informally resolved:_____    Counselor Signature:_____

Date BP-229(13) Issued:_____

Unit Manager:_____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your March 6, 2019 Informal Resolution Form, in which you contend the security measures for SAM inmates should be different for those under SAM for violence than those under SAM for other reasons.

You are subject to the security measures in place for inmates on your housing unit.   Many of the restrictions are in place for inmates housed in SHU generally.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

3|20|2019
Date

_____
Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: No distinction between 28CFR 501.1 and 501.2: The Vast Majority (90%) of SAMs inmates are 501.1 inmates referred to SAMs due to security concerns because of violence and/or terrorism. However, the ACA placed me under 501.2 to protect national security from "disclosures of classified information". NYC makes no distinction between the two, and imposes blanket restrictions to both. I am accused of non-violent, victimless crimes — the 3-man hold, full shackles, cuffs, etc. do not ensure the safety of national security and are unnecessary. 501.2 SAMs inmates should not be grouped

2. Efforts made by you to informally resolve and burdened as if they were violent, security threats. On Tuesday 11/27 I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed, but none here.

3. Names of staff you contacted/Date you contacted the staff:
Proto, Warden 11/27/18
_____
_____

Date returned to Correctional Counselor: _____

| Schulte, Joshua | 79471054 | 3/6/19 |
|---|---|---|
| Inmate's Name | Register Number | Date |

### CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____
_____
_____

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your March 6, 2019 Informal Resolution Form, in which you request greater access to television.

A television is provided for your viewing during your recreation periods.   There are no inmates at this facility with televisions in their cells.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

3\20\2019
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

**METROPOLITAN CORRECTIONAL CENTER, NEW YORK**
**ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES**

## INFORMAL RESOLUTION FORM (BP-8)

<u>NOTE TO INMATE</u>: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you <u>MUST</u> attempt to informally resolve your complaint through your correctional counselor. Additionally, <u>in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner.</u> Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff.  Briefly state <u>ONE</u> complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

<u>INMATE'S COMMENTS</u>:

1.  Complaint: Arbitrary TV removal on SAMs: Access to a TV is certainly not a right; however, granting all inmates access to 15 hours of TV each day — EXCEPT SAMs inmates is arbitrary, unconstitutional punishment. SAMs inmates must have the same access to TV and Movies — Most sentenced inmates have TVs in their cells, why would pretrial inmates be denied TVs in their cells when convicted felons get them? ESPECIALLY given the harsh torture of solitary confinement and denial of use of the library; SAMs inmates should be permitted TVs in their cells

2.  Efforts made by you to informally resolve: On Tuesday, Nov. 27th I sent a list of 35 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none have.

3.  Names of staff you contacted/Date you contacted the staff:
Proto, Warden, 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua         79471054              5/6/19
Inmate's Name                  Register Number          Date

<u>CORRECTIONAL COUNSELOR'S COMMENTS</u>

1.  Efforts made to informally resolve and staff contacted: _____

Date informally resolved: _____     Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your March 6, 2019 Informal Resolution Form, in which you allege the hot water does not work in the sink or shower in your cell.

Facilities staff will assess the temperature of the water in the fixtures in your cell.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

3|20|2019
Date

_____
Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
### ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: No hot water in SAM's cells: The sinks in the 10S cells do not have functional hot water. This is a major health issue because washing hands and cleaning are ineffective in cold water. Additionally, the showers are often luke-warm or cold — many times depending on the time of day and cell. The showers and sinks only have buttons — no knobs for temperature control. The 10S sinks and showers should be replaced with those in normal units.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed, but none were.

3. Names of staff you contacted/Date you contacted the staff:
_____ Voto, Warden, 11/27/18 _____
_____

Date returned to Correctional Counselor: _____

Schulte, Joshua          79471854          3/6/19
Inmate's Name            Register Number    Date

### CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff
contacted:_____
_____
_____

Date informally resolved:_____   Counselor Signature:_____

Date BP-229(13) Issued:_____

Unit Manager:_____

**RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY - PART B**

Inmate Name: **SCHULTE, Joshua**
Reg. No.: **79471-054**
Administrative Remedy Id.: **971059-F1**

This is in response to your Request for Administrative Remedy dated March 6, 2019, wherein you allege that limited and monitored family contact violate the 8th Amendment's prohibition against cruel and unusual punishment. Specifically, you also allege that all other inmates are allocated 300 minutes per month while inmates under Special Administrative Measures are arbitrarily limited to 30 minutes as unconstitutional punishment. You also claim all inmates receive weekly, unmonitored contact visits with family, but SAM's inmates are restricted to two (2) non-contact, monitored visits per month.   You make no specific request for relief.

Your SAM provides that the quantity and duration of your non-legally privileged telephone calls with your immediate family members shall be set by USMS/BOP/DF, with a minimum of one call per month.   Instead of one 15 minute call per month, as is provided to inmates in the Special Housing Unit, MCC New York provides inmates under SAMs with 30-minutes of social telephone privileges monthly.   Because your SAM requires all your calls to be live monitored by FBI and/or CIA, you are provided the maximum call duration currently available to SAM inmates to facilitate the required monitoring without impinging on the visiting and social call privileges of other SAM inmates.

Regarding visiting, your SAM requires contemporaneous monitoring by the FBI and/or CIA.   As such, you are offered two, two-hour visits per month instead of the four, one-hour visits afforded to inmates in general population.   Accordingly, you are offered the same amount of social visiting privilges as non-SAM inmates.

As you make no specific request for relief, this response is for informational purpose only.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Northeast Regional Office, U.S. Customs House - 7th Floor, 2nd & Chestnut Streets, Philadelphia, PA 19106, within 20 calendar days of the date of this response.

_3/22/19_
Date

_L. N'Diaye, Warden_

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

REQUEST FOR ADMINISTRATIVE REMEDY

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: Schulte, Joshua A          79471-054   105    MCC

LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A– INMATE REQUEST**

Limited, monitored family contact violate the 8th amendment's ban of cruel and unusual punishment. It is also arbitrarily applied; all other inmates are allocated 300 minutes per month while SAMs inmates are arbitrarily limited to 10% as unconstitutional punishment. 30 minutes of contact per month is cruel and unusual — forbidding contact with loved ones. Likewise, all other inmates receive weekly, unmonitored contact visits with family while SAMs inmates are restricted to 2 visits, non-contact, and monitored. There is absolutely no reason to split the visitors and limit the visit to non-contact.

3/6/19
DATE                    SIGNATURE OF REQUESTER

**Part B– RESPONSE**

DATE                    WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE          CASE NUMBER: _____

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

DATE                    RECIPIENT'S SIGNATURE (STAFF MEMBER)

USP LVN          PRINTED ON RECYCLED PAPER          BP–229(13)
APRIL 1982

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your March 28, 2019 Informal Resolution Form, in which you request contact legal visitation to review legal documents.

Your SAM and local procedures permits your attorneys to provide you with paper discovery at the onset of every legal visit.   However, neither the SAM nor MCC policies and procedures permit you to hand anything to your attorneys during legal visits.   Hence, for the safety of staff, inmates and others, and to prevent you from circumventing your SAM, you may not have contact legal visitation.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.


4·18·19
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: Full Contact legal visit and passing of legal docs to Attorneys: I previously submit this BP-8 but either did not receive a proper copy or lost it; regardless, PS regulations require another BP-8 to file BP-9 (so I copy was made of original request then simply attach here). Preventing full contact legal visits and passing of legal docs violates my 5th and 6th amendments. I must be allowed to participate in my own defense — I am no security threat to my own attorneys who I meet twice weekly in person at the SCIF.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed, but none here.

3. Names of staff you contacted/Date you contacted the staff: Proto, Warden 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua        7947165U        3/28/19
Inmate's Name          Register Number        Date

### CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____

_____

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your March 28, 2019 Informal Resolution Form, in which you request access to email your attorneys.

Your SAM prohibition against you being able to communicate with other inmates results in you being housed in restrictive housing.   BOP Policy prohibits inmate email access in restrictive housing units.   Accordingly, you are not permitted TRULINCs email access.   However, you have other avenues available to communicate with your attorneys: legal visiting, legal correspondence, and legal calls.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

4·18·19
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
### ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff.  Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1.  Complaint: Access to email with attorneys: I was previously granted access to email with attorneys. This access should not be withdrawn merely due to SAMs. SAMs itself does not restrict access to attorneys because that would violate the 6th amendment — hence, MCC should not deny access to attorneys. We are pretrial inmates with constitutional rights to communicate with attorneys and participate in defense.

2.  Efforts made by you to informally resolve: On Tuesday, Nov. 27th I sent a list of 35 unconstitutional issues that were reviewed by the warden. I was told the issues would be addressed but none have.

3.  Names of staff you contacted/Date you contacted the staff: Proto, Warden, 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua          741710054          3/18/19
Inmate's Name            Register Number       Date

CORRECTIONAL COUNSELOR'S COMMENTS

1.  Efforts made to informally resolve and staff contacted: _____
_____
_____

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your March 28, 2019 Informal Resolution Form, in which you allege you have not been provided adequate dental and medical care.

Your concerns have been forwarded to Health Services staff to review and address.   You have an upcoming appointment with an outside cardiologist.   However, for security reasons, you will not be advised of the scheduled date in advance of the appointment.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

4·18·2019
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: No medical or dental treatment. I have sent numerous COP-outs to dental for appointments and treatment. I have always at least seen the dentist twice a year for cleanings — it is inhumane and unconstitutional that a pretrial inmate cannot receive any dental treatment & must succumb to oral disease. I have also not received any medical treatment for my bicuspid aortic valve & high blood pressure. I have been consulting with a cardiologist & taking my blood pressure daily to test medications. I

*[left margin:]* I have only had my BP taken twice? As a result I am suffering from high BP including TIAs without a cardiologist to oversee treatment.

2. Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 35 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none were.

3. Names of staff you contacted/Date you contacted the staff: Kuoto, Warden, 11/27/18

Date returned to Correctional Counselor: _____

Schulte, Joshua        79471054        2/28/19
Inmate's Name          Register Number    Date

### CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____
_____
_____

Date informally resolved: _____    Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**


This is in response to your March 28, 2019 Informal Resolution Form, in which you allege staff are too loud on your housing unit.

Your staff complaints have been forwarded to the appropriate staff to review and address.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.


4·18·19
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

**METROPOLITAN CORRECTIONAL CENTER, NEW YORK
ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES**

**INFORMAL RESOLUTION FORM (BP-8)**

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1. Complaint: Violation of Quiet hours - MCC has a quiet-time designation that it enforces in every unit except IDS. Because there is no C.O. bubble in IDS you can hear every thing the CO's say and do all day and night. At night they play movies, watch TV cell and talk all night long repeating in co particularly when there is more than one CO they talk so loudly you can hear all their sexual exploits, why they dislike the captain, every single word. 4AM-6AM is the loudest time and I get no sleep.

2. Efforts made by you to informally resolve:
Sent Copouts to Warden Proto since Nov/18

3. Names of staff you contacted/Date you contacted the staff:
Proto / Warden

Date returned to Correctional Counselor: _____

Schulte, Joshua          79471054          5/31/19
Inmate's Name                    Register Number          Date

CORRECTIONAL COUNSELOR'S COMMENTS

1. Efforts made to informally resolve and staff contacted: _____

Date informally resolved: _____   Counselor Signature: _____

Date BP-229(13) Issued: _____

Unit Manager: _____

**Response to Informal Resolution Form**

Inmate: **SCHULTE, Joshua**
Register Number: **79471-054**

This is in response to your March 28, 2019 Informal Resolution Form, in which you request access to religious services and ceremonies.

Your SAM prohibits you from engaging in group prayer.   If you would like to speak to a Catholic priest, you may submit a written request to the Supervisory Chaplain.

If you are not satisfied with this response, you may address your grievance through the administrative remedy program.

4 · 18 · 2019
Date

Unit Manager

NYM 1330.7
ATTACHMENT 1

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff.  Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor: _____

INMATE'S COMMENTS:

1.  Complaint: Free exercise of religion — The 1st amendment to the Constitution guarantees that Congress cannot prohibit the free exercise of religion. As a Catholic, it is required to attend mass and take communion. Religion is an important part of my life and I request access to religious services that is guaranteed by the Constitution. This denial also violates due process because religious ceremonies are arbitrarily denied pretrial SHU inmates without due process

2.  Efforts made by you to informally resolve: On Tuesday, Nov 27th I sent a list of 55 unconstitutional issues that were reviewed by the Warden. I was told the issues would be addressed, but none here.

3.  Names of staff you contacted/Date you contacted the staff:
_____ Proto, Warden 11/27/18 _____
_____

Date returned to Correctional Counselor: _____

Schulte, Joshua   79471054          7/26/19
Inmate's Name            Register Number            Date

### CORRECTIONAL COUNSELOR'S COMMENTS

1.  Efforts made to informally resolve and staff
contacted:_____
_____
_____

Date informally resolved:_____   Counselor Signature:_____

Date BP-229(13) Issued:_____

Unit Manager:_____

# Exhibit F



# Office of the Attorney General

## Washington, D.C. 20530

October 26, 2018

<u>LIMITED OFFICIAL USE</u>

MEMORANDUM FOR:    HUGH HURWITZ
                   ACTING DIRECTOR
                   UNITED STATES BUREAU OF PRISONS

FROM:              THE ATTORNEY GENERAL

SUBJECT:           Origination of Special Administrative Measures Pursuant to 28
                   C.F.R. § 501.2 for Federal Bureau of Prisons Pretrial Inmate
                   Joshua Adam Schulte

Joshua Adam Schulte is pending trial in the Southern District of New York on a thirteen-count indictment charging him with, among other crimes, the theft of classified information from the Central Intelligence Agency (CIA), his transmission of that material to the website WikiLeaks.org, and his efforts to lie to law enforcement and obstruct the investigation of his offenses. Trial is scheduled to commence in the spring of 2019. Schulte faces a maximum term of 135 years of imprisonment, if convicted. He is currently housed with the Federal Bureau of Prisons (BOP) at the Metropolitan Correctional Center (MCC), New York, New York.

The Director of the CIA has certified, pursuant to 28 C.F.R. § 501.2, that the implementation of special administrative measures (SAM) is reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to the national security. Based upon Schulte's unauthorized disclosure of classified information and the fact that he retains knowledge of such information, as well as the recommendation of the CIA, the United States Attorney for the Southern District of New York (USA/SDNY) requests that SAM be imposed on Schulte. The Chief of the Counterintelligence and Export Control Section of the National Security Division (CES/NSD) and the Federal Bureau of Investigation (FBI) concur in this request.

On June 18, 2018, a federal grand jury returned a thirteen-count indictment against Schulte. Of relevance to the request for SAM, Schulte is charged in Counts 1-9 with: (1) the illegal gathering of national defense information, in violation of 18 U.S.C. § 793(b); (2) transmitting national defense information to which Schulte had lawful possession, in violation of § 793(d); (3) transmitting national defense information which was in Schulte's unlawful possession, in violation of § 793(e); (4) knowingly accessing a computer, either without authorization or outside the scope of authorization, and by means of such conduct obtaining classified information and willfully communicating that information to another person who was not entitled to receive it, in violation of 18 U.S.C. § 1030(a)(1); (5) the theft of Government

property, in violation of 18 U.S.C. § 641; (6) gaining unauthorized access to a computer to obtain information from a Department or Agency of the United States, in violation of 1030(a)(2)(B); (7) causing transmission of a harmful computer program, information, code, or command, in violation of § 1030(a)(5)(A); (8) making material false statements to representatives of the FBI, in violation of 18 U.S.C. § 1001; and (9) obstruction of justice, in violation of 18 U.S.C. § 1503.[1]

Schulte is a 29 year-old native of Texas who graduated from the University of Texas at Austin with a degree in Computer Engineering. Schulte worked most recently as a Senior Software Engineer at Bloomberg in New York. Previously, he worked as a software engineer at IBM from 2008-2009 and as an intern at the National Security Agency (NSA) in 2010. Schulte was employed by the CIA from approximately 2010 to November 2016.

During his time at the CIA, Schulte was assigned to the CIA Group, which is responsible for various computer-engineering activities, including the development of tools for CIA operators. The CIA Group maintained classified information on an isolated local-area network (LAN). Access to the LAN, on which the classified information was stored, was limited to employees of the CIA Group (approximately 200 people at the time Schulte stole the classified information in question in 2016). Schulte was engaged in developing and managing computer tools that the CIA used to support operations around the globe, and as part of his job, had access to highly classified national defense information.

Between March and November 2017, WikiLeaks made 26 separate publications of classified information, disclosing over 8,000 documents and files (hereinafter, the Leak) that contain highly sensitive and valuable information including, among other things, detailed descriptions of the tools used by CIA operators in the field and the names and/or pseudonyms of multiple CIA employees. The USA/SDNY reports that the Leak is one of the largest unauthorized disclosure of classified material in CIA history and has had a substantially damaging impact on national security. The CIA determined that the Leak was catastrophic and debilitating to its operational capabilities and has hindered the Government's ability to ensure national security. Moreover, the CIA had to discontinue many of the tools compromised in the

---

[1] Schulte is also charged with: the receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B); the possession of child pornography, in violation of § 2252A(a)(5)(B); the transportation of child pornography, in violation of § 2252A(a)(1); and copyright infringement, in violation of 18 U.S.C. § 2319(b)(1). The child pornography charges stem from Schulte's receipt, possession, and transportation of over 10,000 images and videos of child pornography, which he maintained within several layers of encryption on his personal computer. The copyright infringement charges stem from Schulte's conduct downloading and sharing thousands of copyrighted movies, television shows, and songs with others.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 3

Leak in order to protect sources and methods.

Following the Wikileaks disclosures, subsequent investigation by the CIA and FBI determined that in 2016, Schulte used his access to the local area network (LAN) to steal classified information and later transmit it to WikiLeaks. In doing so, Schulte flagrantly disregarded security protocols and engaged in unauthorized and illegal activities by, among other things, granting himself administrative privileges to the LAN for the purpose of stealing the classified information, changing others' privileges, and erasing logs of his activities. The USA/SDNY reports that emails, witness testimony, and other evidence will also establish at trial that Schulte is an individual with little respect for authority who retaliated for perceived wrongs by disclosing classified information to the public. Specifically, Schulte claimed that another employee threatened his life and reported the alleged threat to his supervisors at the CIA, who investigated and ultimately found his complaint to be without merit. Schulte believed that CIA management did not take his concerns seriously.

Schulte was initially arrested on August 24, 2017, in connection with the above-referenced child pornography charges. At the time of his arraignment on September 13, 2017, the Court granted Schulte bail, imposing strict conditions to include home incarceration with electronic monitoring and prohibition on the use of computers or the Internet, except where expressly authorized by Pretrial Services. Nevertheless, Schulte violated the Court's bail conditions by using the Internet without authorization while on pretrial release. For example, data obtained from the service provider for Schulte's email account indicated that following Schulte's release on bail, his email account was regularly logged into and out of, most recently on the evening of December 6, 2017. The Internet Protocol (IP) address used to access his email account was almost always the IP address associated with the broadband internet account for Schulte's apartment—*i.e.*, the account used by Schulte in the apartment to access the Internet via a Wi-Fi network.

In addition, data from Schulte's broadband account indicated that on November 16, 2017, that account was used to access the Onion Router (TOR) network, which allows for anonymous communications on the Internet via a worldwide network of linked computer servers and multiple layers of data encryption. The broadband account showed that several additional TOR connections were made between November 17 and December 5, 2017. This conduct is particularly troubling, as TOR networks can be used to anonymously transfer encrypted data on the Internet, and there is evidence that Schulte had previously used TOR networks to facilitate his transfer of the classified information to Wikileaks.

On January 8, 2018, Judge Crotty of the U.S. District Court for the Southern District of New York ordered Schulte's detention, based upon a determination that Schulte had violated his bail conditions by using the Internet without authorization and was a danger to the community.

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                      P a g e | 4

In addition to violating his bail restrictions, Schulte also violated a protective order governing production of discovery in his case, which the court had imposed based upon a determination that a protective order was necessary to protect materials that, if disseminated to third parties, could jeopardize national security and the safety of others, as well as impede ongoing investigations. The order provides that materials designated pursuant to the order are to be used by Schulte and his counsel solely for the purpose of preparing a defense to the charges against him and limits disclosure of those materials by Schulte and his counsel to a limited set of individuals, specifically identified in the protective order, who have been determined to be necessary for Schulte's defense. Schulte, through counsel, agreed to be bound by the protective order. The Government subsequently produced several search warrant affidavits subject to the protective order.

On May 15, 2018, *The Washington Post* and *The New York Times* published articles that discussed in detail the protected affidavits. A subsequent review by law enforcement of Schulte's recorded prison calls determined that he was responsible for providing the protected affidavits (or the information contained in the affidavits) to the media in violation of the protective order. Schulte can be heard on recorded prison calls discussing the contents of the protected affidavits with third parties, including individuals who appeared to be reporters, and even acknowledged on the calls that the affidavits were subject to the protective order.

In a subsequent review of Schulte's recorded prison calls, the FBI determined that since his incarceration, Schulte has made at least three unauthorized disclosures of classified information. First, in April 2018, in a prison call with a reporter, Schulte disclosed the identities of current CIA officers, some of whom are undercover. Second, during a court appearance on June 28, 2018, Schulte submitted to the court a 138-page *pro se* handwritten motion seeking bail. Immediately following the court appearance, the USA/SDNY notified defense counsel that Schulte's bail motion might contain classified information. A subsequent classification review determined that the motion did in fact contain classified information relating to the CIA. Third, despite having been warned that his bail motion could contain classified information, Schulte mailed the motion to an attorney in Texas whom he was soliciting to assist on his case and also provided a copy to his parents.

Finally, recent developments have further underscored the need for SAM in this case. Specifically, the USA/SDNY has learned that Schulte, along with another inmate, arranged for at least two cellphones to be smuggled into the MCC, one for each of them to use. When combined with his flagrant disregard for the laws regarding the handling of classified material and for the Court's protective order, this recent conduct, which allows Schulte to communicate without scrutiny, confirms that he poses a significant threat to national security.

Based upon information provided to me, including Schulte's theft and disclosure of classified information to Wikileaks, his violation of the court's protective order, and his

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 5

continued willingness to disclose classified information, even while incarcerated, I find that
there is a danger that Schulte will disclose classified information, the unauthorized disclosure
of which would pose a threat to the national security of the United States, and that SAM on
Schulte are reasonably necessary to prevent disclosure of such information. Therefore, I am
requesting that you, pursuant to 28 C.F.R. § 501.2, implement SAM to restrict Schulte's access
to the mail, the media, the telephone, and visitors. Implementation of the SAM will commence
immediately upon notice to the inmate, and the SAM will be in effect for one year from the
date of my approval, subject to my further direction or the direction of a designated delegee.

1.     **General Provisions**

       a.     **Adherence to Usual USMS, BOP, and Detention Facility (DF) Policy
              Requirements** - In addition to the below-listed SAM, the inmate must comply
              with all usual USMS, BOP, and non-BOP DF policies regarding restrictions,
              activities, privileges, communications, etc. If there is a conflict between
              USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are
              more restrictive than usual USMS/BOP/DF policies, then the SAM shall control.
              If usual USMS/BOP/DF policies are more restrictive than the SAM, then
              USMS/BOP/DF policies shall control.

       b.     **Interim SAM Modification Authority** - During the term of this directive, the
              Director, Office of Enforcement Operations (OEO), Criminal Division, may
              modify the inmate's SAM as long as any SAM modification authorized by OEO:

              i.      Does not create a more restrictive SAM;

              ii.     Is not in conflict with the request of the USA/SDNY, FBI, CIA, or
                      USMS/BOP/DF, or applicable regulations; and

              iii.    Is not objected to by the USA/SDNY, FBI, CIA, or USMS/BOP/DF.

       c.     **Inmate Communications Prohibitions** - The inmate is limited, within the
              USMS/BOP/DF's reasonable efforts and existing confinement conditions, from
              having contact (including passing or receiving any oral, written, or recorded
              communications) with any other inmate, visitor, attorney, or anyone else, except
              as outlined and allowed by this document, that could reasonably foreseeably result
              in the inmate communicating (sending or receiving) information that could
              circumvent the SAM's intent of significantly limiting the inmate's ability to
              communicate (send or receive) classified information.

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 6

2.    **Attorney-Client Provisions**

   a.    **Attorney[2] Affirmation of Receipt of the SAM Restrictions Document** - The
         inmate's attorney (or counsel) -- individually by each if more than one -- must
         sign an affirmation acknowledging receipt of the SAM restrictions document. By
         signing the affirmation, the attorney acknowledges his or her awareness and
         understanding of the SAM provisions and his or her agreement to abide by these
         provisions, particularly those that relate to contact between the inmate and his
         attorney and the attorney's staff. The signing of the affirmation does not serve as
         an endorsement of the SAM or the conditions of confinement, and does not serve
         to attest to any of the factors set forth in the conclusions supporting the SAM.
         However, in signing the affirmation, the inmate's attorney and precleared staff[3]
         acknowledge the restriction that they will not forward third-party messages to or
         from the inmate.

      i.    The USA/SDNY shall present, or forward, the attorney affirmation of
            receipt of the SAM restrictions document to the inmate's attorney.

      ii.   After initiation of the SAM and prior to the inmate's attorney being
            permitted to have attorney-client privileged contact with the inmate, the
            inmate's attorney shall execute a document affirming receipt of the SAM
            restrictions document and return the original to the USA/SDNY.

---

[2] The term "attorney" refers to the inmate's attorney of record, who has entered an appearance in
this criminal case, who has been verified and documented by the USA/SDNY, and who has
received and acknowledged receipt of the SAM restrictions document. As used in this
document, "attorney" also refers to more than one attorney where the inmate is represented by
two or more attorneys, and the provisions of this document shall be fully applicable to each such
attorney in his or her individual capacity.

[3] "Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers
to a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the
inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who
has successfully been cleared by the FBI and USA/SDNY, and who has received a copy of the
inmate's SAM and has agreed -- as evidenced by his or her signature -- to adhere to the SAM
restrictions and requirements. As used in this document, "staff member" also refers to more than
one staff member, and the provisions of this document shall be fully applicable to each such staff
member in his or her individual capacity. A "paralegal" will also be governed by any additional
DF rules and regulations concerning paralegals.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 7

      iii.    The USA/SDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C., and the USMS/BOP/DF.

    b.    **Attorney-Client Privileged Visits** - Attorney-client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

    c.    **Attorney May Disseminate Inmate Conversations** - The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense -- and not for any other reason -- on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

    d.    **Attorney's Unaccompanied Precleared Paralegal(s) May Meet With Client** - The inmate's attorney's precleared paralegal(s) may meet with the inmate without the need for the inmate's attorney to be present.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

    e.    **Simultaneous Multiple Legal Visitors** - The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.  An investigator may not meet alone with the inmate.

    f.    **Legally Privileged Telephone Calls** - The following rules refer to all legally privileged telephone calls or communications:

      i.    **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls** - The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

      ii.    **Inmate's Initiation of Legally Privileged Telephone Calls** - Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney.  This privilege is contingent upon the following additional restrictions:

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 8

(1) The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2) The inmate's attorney must instruct his or her staff that:

    (a) The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

    (b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties.

(3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

    (a) Is to be overheard by a third party.[4]

    (b) Will be patched through, or in any manner forwarded or transmitted, to a third party.

    (c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.c. above.

    (d) Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney-client privileged communications.

(4) If the USMS/BOP/DF, FBI, CIA, or USA/SDNY determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications.

[5] Except by the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications.

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                          P a g e | 9

would circumvent the intent of the SAM, the inmate's ability to
contact his attorney by telephone may be suspended or eliminated.

g. **Documents Provided by Attorney to Inmate -** During a visit, the inmate's
attorney may provide the inmate with, or review with the inmate, documents
related to his defense, including discovery materials, court papers (including
indictments, court orders, motions, etc.) and/or material prepared by the inmate's
attorney. Any documents not related to the inmate's defense must be sent to the
inmate via general correspondence and will be subject to the mail provisions of
subparagraphs 2.h. and 3.g. Documents previously reviewed and cleared for
receipt by the inmate, and already in the inmate's possession at the outset of the
visit, may be discussed or reviewed by the inmate and the inmate's attorney
during the visit.

   i. None of the materials provided may include inflammatory materials,
   materials relating to the dissemination of classified information, or
   materials that may be used to pass messages from inmate to inmate, unless
   such materials have been precleared by the USA/SDNY and FBI.

   ii. The USA/SDNY may authorize additional documents to be presented to
   the inmate. If any document not listed or described above needs to be
   transmitted to the inmate, consent for the transmission of the document
   may be obtained from the USA/SDNY without the need to formally seek
   approval for an amendment to the SAM.

h. **Legal Mail[6] -** The inmate's attorney may not send, communicate, distribute, or
divulge the inmate's mail (legal or otherwise), or any portion of its contents, to
third parties, except when disclosure of the contents is necessary for the sole
purpose of providing necessary legal services related to the inmate's defense --
and not for any other reason.

In signing the SAM acknowledgment document, the inmate's attorney and
precleared staff will acknowledge the restriction that only inmate case-related
documents will be presented to the inmate, and that the attorney and his or her
staff are strictly prohibited from forwarding third-party mail to or from the
inmate.

---

[6] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed
to or from the inmate's attorney. All other mail, including that otherwise defined by the
USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e  | 10

3.     **Inmate's Non-legal Contacts**

a.     **Non-legally Privileged Telephone Contacts -**

i.      The inmate is only authorized to have non-legally privileged telephone calls with his immediate family members.[7]

ii.     The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

b.     **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

i.      Is to be overheard by a third party.

ii.     Is to be patched through, or in any manner forwarded or transmitted, to a third party.

iii.    Shall be divulged in any manner to a third party.

iv.    Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call.  Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

c.     **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

i.      The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

_____

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF-, or FBI-verifiable) spouse, children, parents, and siblings.  Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[8] Except by the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate -- Schulte                                        P a g e | 11

     ii.    The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

     iii.   The USMS/BOP/DF shall document each such telephone notification.

d.   **Family Call Monitoring** - All calls with the inmate's immediate family member(s) may be:

     i.     Contemporaneously monitored by the FBI.

     ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

     iii.   A copy of each telephone call recording involving an inmate/immediate family member/authorized contact shall be provided to the FBI and/or the CIA by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.   **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of the disclosure of classified information, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.   **Non-legal Visits -**

     i.     **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

     ii.    **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF-, and/or FBI- -

<u>LIMITED OFFICIAL USE</u>

approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

iii.   **Visit Criteria -** All non-legal visits may be:

(1)   Contemporaneously monitored by the USMS/BOP/DF, FBI, and/or the CIA in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

(2)   Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

(3)   Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.

(4)   Limited to one adult visitor at a time. However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.   **Non-legal Mail -** Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). In addition to non-legal mail from the inmate's attorney, as discussed in subparagraph 2.h. above, non-legal mail is only authorized with the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

i.   **General correspondence with limitations -** Correspondence is only authorized with immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI.

ii.   **General correspondence without limitations -** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e  | 13

other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution; the public; or national security; may be jeopardized.

iii.   All non-legal mail shall be –

    (1)   **Copied -** Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

    (2)   **Forwarded -** Shall be forwarded, in copy form, to the location designated by the FBI.

    (3)   **Analyzed -** After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming), or directly to the addressee (outgoing).

iv.   The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

    (1)   A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

    (2)   A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

    (3)   A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v.   **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI and/or the CIA to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging the dissemination of classified information, or actual or attempted circumvention of the SAM, the mail shall not be

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 14

delivered/forwarded to the intended recipient but referred to the FBI
and/or the CIA for appropriate action.  The inmate shall be notified in
writing of the seizure of any mail.

4.    **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate
with any member or representative of the news media in person; by telephone; by
furnishing a recorded message; through the mail, his attorney, or a third party; or
otherwise.

5.    **Religious Visitation**

a.    The inmate shall not be allowed to engage in group prayer with other inmates.

b.    If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present
for prayer with the inmate, the prayer shall be conducted as part of a contact or
non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells**

a.    The inmate shall not be allowed to share a cell with another inmate.

b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and
existing confinement conditions, from communicating with any other inmate by
making statements audible to other inmates or by sending notes to other inmates.

7.    **Cellblock Procedures**

a.    The inmate shall be kept separated from other inmates as much as possible while
in the cellblock area.

b.    The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and
existing confinement conditions, from communicating with any other inmate
while in the cellblock area.

8.    **Access to Mass Communications**

To prevent the inmate from receiving and acting upon critically timed information or
information coded in a potentially undetectable manner, the inmate's access to materials
of mass communication is restricted as follows:

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate -- Schulte                                              P a g e | **15**

  a.     **Publications/Newspapers --**

      i.     The inmate may have access to publications determined not to facilitate
             criminal activity or be detrimental to national security; the security, good
             order, or discipline of the institution; or the protection of the public. This
             determination is to be made by the USMS/BOP/DF, in consultation with
             the USA/SDNY. The inmate may correspond with the publishing
             company regarding technical aspects of the publication, i.e., availability of
             particular volumes, billing questions, etc. The review of this
             correspondence will be in accordance with section 8(a)(iii), below.

      ii.    Sections of any publication/newspaper that offer a forum for information
             to be passed by unknown and/or unverified individuals, including but not
             limited to classified advertisements and letters to the editor, should be
             removed from the publications/newspapers prior to distribution to the
             inmate.

      iii.   If restricted by the USMS/BOP/DF rules, access to a publication will be
             denied. If acceptable, upon delivery, the USMS/BOP/DF will review the
             publication and make the initial determination. If the FBI's expertise is
             required, the publication will be forwarded to the FBI for review. The
             USMS/BOP/DF will also forward the publication to the FBI if translations
             are needed to make that determination. (In these cases, the FBI shall
             respond to the USMS/BOP/DF within fourteen (14) business days.) The
             inmate shall then have access to the remaining portions of the
             publications/newspapers deemed acceptable, in accordance with
             USMS/BOP/DF policy.

      iv.    In order to avoid passing messages/information from inmate to inmate, the
             inmate shall not be allowed to share the publication(s) with any other
             inmates.

  b.     **Television and Radio -** The inmate is authorized to have television and radio
         viewing and listening privileges, in accordance with standard and applicable
         USMS/BOP/DF policies and procedures.

  c.     **Termination or Limitation -** If the USMS/BOP/DF determines that mass
         communications are being used as a vehicle to send messages to the inmate
         relating to the furtherance of criminal activities or in violation of the SAM, the
         inmate's access may be limited or terminated for a period of time to be
         determined by the USMS/BOP/DF.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                    P a g e | 16

9.   **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present
a substantial threat to national security or the security, discipline, or good order of the
institution. This initial determination is to be made by the USMS/BOP/DF and, if the
USMS/BOP/DF determines that the FBI's and/or the CIA's expertise is required, the
book(s) will be forwarded to the FBI and/or the CIA for review. In conducting its
analysis, the FBI and/or the CIA will determine whether access to the book by this
particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall
not be allowed to share books with any other inmates.

10.   **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or
any other DF, the SAM provisions authorized for this inmate shall continue in effect,
without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged
communications and family contact, are reasonably necessary to prevent the inmate from
revealing classified information. Moreover, these measures are the least restrictive that can be
tolerated in light of the ability of this inmate to divulge such classified information.

With respect to telephone privileges, the SAM are reasonably necessary because of the
high probability of calls to others in which classified information may be disclosed.

With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate
from receiving or transmitting classified information. Accordingly, I have weighed the inmate's
interest in the timely receipt and/or submission of mail, with the possible danger the contents of
the mail may pose to national security. I have determined that delaying mail delivery to allow
authorized personnel to examine a copy of the mail is the least restrictive means available to
ensure that the mail is not being used to communicate any classified information.

The SAM's prohibition of contact with the media is reasonably necessary.
Communication with the media could pose a substantial risk of disclosure of classified
information. Based upon the inmate's past behavior, I believe that it would be unwise to wait
until after the inmate attempts to disclose classified information to justify such media
restrictions.

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES**
Pursuant to 28 C.F.R. § 501.2
Inmate – Schulte                                                    P a g e | 17

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and transmitting classified information or information coded in a potentially undetectable manner.  Such messages may be placed in advertisements or communicated through other means, such as television and/or radio.  I believe that limiting and/or delaying media access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that threatens the national security.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, D.C. 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.