UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                             :

  UNITED STATES OF AMERICA

                                             :

          - v. -                                S2 17 Cr. 548 (PAC)

                                             :

  JOSHUA ADAM SCHULTE,

                                             :

            Defendant.

                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JOSHUA ADAM SCHULTE'S <u>MOTION TO VACATE SPECIAL ADMINISTRATIVE MEASURES</u>

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for the United States of America*

Matthew Laroche
Sidhardha Kamaraju
Assistant United States Attorneys
Scott McCulloch
Trial Attorney, National Security Division
     *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................... 3

I.      The Charged Offenses and Schulte's Pretrial Conduct ............................ 3
        A.      Schulte's Theft and Transmission of Classified Information ...................... 3
        B.      The Child Pornography on Schulte's Desktop Computer .......................... 5
        C.      Schulte Violated His Bail Conditions ......................................................... 6
        D.      Schulte Violated the Protective Order ....................................................... 6
        E.      Schulte's Pro Se Bail Motion ..................................................................... 8
        F.      Schulte Declares an "Information War" from the MCC ............................ 8

II.     Saipov's Detention ................................................................................. 10
        A.      The Attorney General Authorizes the SAMs ........................................... 10
        B.      The Relevant SAMs Provisions ............................................................... 11

DISCUSSION ....................................................................................................... 13

I.      The SAMs Fully Comply with 28 C.F.R. § 501.2 and Are Reasonably Necessary to
        Protect Against the Additional Disclosures of Classified Information
        by Schulte ............................................................................................... 13
        A.      There Is a Clear Danger That Schulte Will Disclose Classified Information
                from Prison ............................................................................................... 14
        B.      The SAMs' Provisions Related to Attorney-Client Communications Are
                Appropriate ............................................................................................... 17

III.    The SAMs are Constitutional .................................................................. 18
        A.      Applicable Law ......................................................................................... 18
        B.      The SAMs Do Not Violate Schulte's Right to Due Process ..................... 20
        C.      The SAMs Do Not Violate Schulte's Sixth Amendment
                Right to Counsel ....................................................................................... 21
        D.      The SAMs Do Not Violate Schulte's First Amendment Rights ............... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................ 18, 19, 22

*Block v. Rutherford*, 468 U.S. 576 (1984) ................................................................ 19

*Casey v. Lewis*, 4 F.3d 1516 (9th Cir. 1993) ............................................................ 20

*Jones v. N.C. Prisoners' Union*, 433 U.S. 119 (1977) ................................................ 19

*Mohammed v. Holder*, 2011 WL 4501959 (D. Colo. 2011) ...................................... 25

*Pell v. Procunier*, 417 U.S. 817 (1974) ................................................................ 19, 20

*Sattar v. Holder*, 2012 WL 882401 (D. Colo. 2012) .................................................. 25

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) .............................................................. 20

*Turner v. Safley*, 482 U.S. 78 (1987) .................................................... 17, 19, 20, 25

*United States v. Aiello*, 814 F.2d 109 (2d Cir. 1987) .................................................. 22

*United States v. Basciano*, 634 F. App'x 832 (2d Cir. 2015) ...................................... 18

*United States v. Basciano*, 763 F. Supp. 2d 303 (E.D.N.Y. 2011) ............................ 18

*United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000) ........................................ 18, 20

*United States v. Felipe*, 148 F.3d 101 (2d Cir. 1998) ................................................ 19

*United States v. Gotti*, 755 F. Supp. 1159 (E.D.N.Y. 1995) ...................................... 21

*United States v. Hashmi*, 621 F. Supp. 2d 76 (S.D.N.Y. 2008) ........................ 16, 18, 24

*United States v. Kassir*, 2008 WL 2695307 (S.D.N.Y. 2008) ................................ 15, 18

*United States v. Mohamed*, 103 F. Supp. 3d 281 (E.D.N.Y. 2015) ...................... 18, 24

*United States v. Saipov*, S1 17 Cr. 722 (VSB) .......................................................... 18

*United States v. Schulte*, No. 18-145 (2d Cir. Mar. 6, 2018) ................................ 6, 15

*United States v. Suleiman*, 1997 WL 220308 (S.D.N.Y. 1997) ................................ 21

*United States v. Trabelsi*, 2014 WL 12682266 (D.D.C. 2014) .................................. 14

**Regulations**

28 C.F.R. § 501.2 ................................................................................................ 10, 17

28 C.F.R. § 501.3 ................................................................................................ 17, 18

## PRELIMINARY STATEMENT

The Government submits this memorandum of law in opposition to defendant Joshua Adam Schulte's motion ("Motion" or "Mot.")[1] to vacate the special administrative measures (the "SAMs") imposed by the Bureau of Prisons (the "BOP") at the direction of the Attorney General. For the reasons set forth below, the SAMs are entirely appropriate and reasonably tailored to Schulte's misconduct, and thus, the Court should deny the Motion.

Contrary to Schulte's attempt to characterize himself as a victim of arbitrary and vindictive BOP action, the reality is that Schulte brought the imposition of the SAMs on himself. Even before his detention at the Metropolitan Correctional Center ("MCC"), Schulte has engaged in an escalating series of willful and illegal acts that culminated in his declaration of an "information war" against the United States from the MCC. Schulte's wanton disregard for the rules governing the disclosure of classified information began during his time with the Central Intelligence Agency (the "CIA"), where he broke into CIA computer systems, stole classified information, and transmitted it to the online organization WikiLeaks.org ("WikiLeaks"), which disclosed it publicly.

While released on bail, Schulte violated his bail conditions by accessing the Internet through a computer program that allows anonymous access to the Internet, specifically to hide his conduct from the Government, and illegally provided classified information to his family. After he was detained, Schulte enlisted his family and other inmates to help him brazenly violate a protective order entered by the Court, and then, even after the Court admonished him, he doubled down and did it again, this time also illegally disclosing classified information in the process. Finally, from the MCC, Schulte declared the aforementioned "information war" against the United

---

[1] Schulte's memorandum in support of his Motion is referred to herein as "Def. Br."

States, threatening to reveal all of the classified information he knew unless he was released. In furtherance of this so-called "war," Schulte smuggled contraband cellphones into the MCC, created encrypted email accounts and secret social media accounts, and drafted misleading "articles" for public dissemination that were not only fraught with misinformation but also contained classified information. The Court need not speculate whether Schulte would disclose classified information illegally from the MCC because he already has.

Against that backdrop, Schulte's arguments fail. His claim that the record does not support the imposition of the SAMs under the governing BOP regulations ignores his persistent disregard of the Court's orders and the laws governing classified information. His contention that the BOP is not authorized to regulate his attorney-client interactions is squarely at odds with the relevant BOP regulations. And his constitutional arguments that the SAMs are not related to a legitimate, non-punitive, governmental interest fall flat when measured against the Government's and the BOP's obvious interest in protecting the national security of the United States by preventing him from continuing to disclose classified information illegally. If there were ever a case where measures like the SAMs were appropriate, it is surely one, like Schulte's, where an inmate charged with one of the largest leaks of classified information in U.S. history has gone to extraordinary lengths – to the point of enlisting his family and friends, smuggling contraband cellphones into prison, and creating secret email and social media accounts – to try to blackmail the Government into releasing him by disclosing and threatening to disclose more classified information. The Government respectfully submits that Schulte's Motion should be denied.

2

## BACKGROUND

### I.        The Charged Offenses and Schulte's Pretrial Conduct

Schulte is charged in a 15 count superseding indictment with (1) three counts of violating 18 U.S.C. § 793, in connection with his unlawful theft and transmittal of classified information from the CIA (the "WikiLeaks Charges"); (2) another count of violating Section 793, in connection with his unlawful disclosure and attempted disclosure of classified information from the MCC (the "MCC Leak Charge"); (3) four counts of violating 18 U.S.C. §§ 641 and 1030, in connection with Schulte's unauthorized accessing of CIA computer systems and theft of classified information from therein (the "Illegal Computer Access Counts"); (4) two counts of violating 18 U.S.C. §§ 1001 and 1503, in connection with false statements Schulte made to the Federal Bureau of Investigation (the "FBI") during its investigation (the "Obstruction Charges"); (5) one count of violating 18 U.S.C. § 401(3), in connection with his willful violation of the protective order (the "Contempt Charge"); (6) three counts of violating 18 U.S.C. § 2252A, in connection with Schulte's receipt, possession, and transportation of child pornography (the "Child Pornography Charges"); and (7) one count of violating 18 U.S.C. § 2319, in connection with Schulte's criminal violation of copyrights (the "Copyright Charge").  S2 17 Cr. 548 (PAC).  The Government expects that its evidence at trial will establish, among other things, the following:

### A.        Schulte's Theft and Transmission of Classified Information

Schulte worked at the CIA for several years, where he held various positions.  In or about 2015 and 2016, Schulte worked in a specific group within the CIA (the "Group") that was responsible for developing classified cyber tools.  To develop those tools, the Group maintained classified information on an isolated local-area computer network (the "LAN").  Access to the LAN was limited principally to members of the Group.  Schulte not only had access to the LAN

3

but also was part of a small group of CIA employees who had certain administrative rights on the system.  These rights allowed Schulte to manipulate the LAN in specific ways, including by controlling access to various parts of the system.  Through his work, Schulte had access to and knowledge of specific cyber tools the CIA employed, CIA operations that employed such tools, and identities of CIA officers.

Beginning in late 2015, a dispute began between Schulte and another CIA employee ("Employee-1").  Schulte claimed that Employee-1 threatened to kill him, which led to a CIA internal investigation.  As a result of Schulte's complaint, the CIA transferred Schulte and Employee-1 to different groups within the CIA to separate them, which had the effect of limiting Schulte's privileges with respect to the LAN.  Ultimately, the CIA's investigation determined that Schulte's claim was without merit, which angered Schulte.

Within weeks of his transfer, Schulte began to manipulate the LAN to give himself administrative privileges that he should no longer have had.  Through this illegal manipulation and access, Schulte unlawfully stole a large volume of classified information.  Then, as now, Schulte used deceit and subterfuge to try to hide his activity.  Schulte manipulated the LAN to conceal his activity, erasing log files that would have shown his misconduct, and lied directly to his supervisor. Schulte later transmitted the classified information that he stole.  Then, in November 2016, Schulte resigned from the CIA and moved to New York.

Between March and November 2017, WikiLeaks made 26 separate publications of classified information (together, the "Leaks," collectively, the "Leaked Information").  The Leaked Information contained, among other things, highly sensitive information including detailed descriptions of certain tools used by CIA operators.  The Leaks' impact on the CIA's intelligence gathering activities and the national security of the United States was catastrophic.

4

### B.     The Child Pornography on Schulte's Desktop Computer

Immediately after the first Leak, the FBI began to investigate.  As part of that investigation, the FBI executed a search warrant on Schulte's apartment in New York and recovered, among other things, multiple computers, servers, and other portable electronic storage devices, including Schulte's personal desktop computer (the "Desktop Computer").  On the Desktop Computer, FBI agents found an encrypted container (the "Encrypted Container") containing over 10,000 images and videos of child pornography (the "CP Files").  For example, one video depicted a girl approximately three-to-six-years' old engaging in various sex acts.

There is overwhelming evidence that the CP Files belong to Schulte.  FBI computer scientists discovered the Encrypted Container containing the CP Files beneath three layers of encryption on Schulte's Desktop Computer.  Each layer of encryption was unlocked using passwords previously used by Schulte on one of his cellphones.  Moreover, FBI agents identified Internet chat logs in which Schulte and others discussed their receipt and distribution of child pornography.  FBI agents also identified a series of Google searches conducted by Schulte in which he searched the Internet for child pornography.  Finally, during an interview with law enforcement on June 26, 2017, Schulte admitted that the Desktop Computer was his primary computer; that he was the sole and exclusive user of the desktop computer; that he had personally installed encryption software on the desktop computer; and that he had not shared with anyone else the passwords for the encrypted portions of the Desktop Computer.  On August 24, 2017, the FBI arrested Schulte in connection with his possession of child pornography.

### C.     Schulte Violated His Bail Conditions

Initially, Schulte was ordered detained pending trial, but on September 13, 2017, the Court bailed Schulte with strict conditions, including a prohibition on possessing or using a computer,

computer network, or the Internet without express authorization from Pretrial Services.  Soon after his release, however, Schulte began to violate the Court's prohibition on unauthorized Internet access, including by logging into his own email account.  Schulte also used the "TOR" network, which allows for anonymous communications on the Internet.  Schulte had previously used TOR networks to facilitate his transfer of the Leaked Information to Wikileaks.

Based on this evidence concerning Schulte's Internet usage, as well as his December 6, 2017 arrest on unrelated sexual assault charges filed in Virginia, the Government sought to remand Schulte.  At the bail hearing, Schulte's counsel – without objection from Schulte – claimed that Schulte had used the TOR network because "Mr. Schulte is writing articles, conducting research and writing articles about the criminal justice system and what he has been through, and *he does not want the government looking over his shoulder and seeing what exactly he is searching*."  *See* Mot. Ex. B at 15 (emphasis added).  On January 8, 2018, the Court determined that Schulte had violated his bail conditions by using the Internet without authorization and was a danger to the community, and ordered his detention.  The Second Circuit affirmed the Court's ruling.  *See United States v. Schulte*, No. 18-145 (2d Cir. Mar. 6, 2018) (summary order, Dkt. # 34) (the "*Schulte* Summary Order").

### D.      Schulte Violated the Protective Order

On September 18, 2017, the Court entered a protective order (the "Protective Order") governing the production of certain discovery in this case, based upon a determination that it was necessary to protect materials that, if disseminated to third parties, could jeopardize national security and the safety of others, as well as impede ongoing investigations.  The Protective Order provides that Schulte and his defense team can use certain designated materials only to prepare his defense, and can disseminate protected materials only to specified individuals involved in the

preparation of his defense.  Schulte, through counsel, agreed to the terms of the Protective Order. The Government subsequently produced several search warrant affidavits in discovery that were subject to restrictions in the Protective Order (the "Protected Search Warrants").

Despite the terms of the Protective Order, Schulte nevertheless disclosed at least one of the Protected Search Warrants to reporters with *The Washington Post* and *The New York Times*.  On May 15, 2018, both *The Washington Post* and *The New York Times* published articles concerning this case that discussed the content of at least one of the Protected Search Warrants.  In a recorded telephone conversation from jail, Schulte described the contents of one of the Protected Search Warrants to a reporter.  When asked by the reporter whether the material was classified, Schulte responded that it was not, but stated that it was subject to the Protective Order.  Recorded prison calls also showed that Schulte enlisted members of his family, including his cousin, to disseminate one or more of the Protected Search Warrants, as well as what Schulte described as "articles" he had written.  The Government subsequently recovered copies of these "articles" from Schulte's family, including at least one "article" that included classified information. [2]

On May 21, 2018, at the Government's request, the Court held a hearing.  At the hearing, the Court reiterated the terms of the Protective Order to Schulte and stated, explicitly, "If you want to vary the terms of the protective order, your relief is not to do it on your own, Mr. Schulte, but to have your lawyer come into court and explain why there should be a modification of the order." Mot. Ex. C at 7.  The Court also confirmed that Schulte understood the provisions of the Protective Order and the requirements it imposed on him.  *See id*. at 8.

---

[2] In classified submissions and correspondence, the Government has advised the Court and cleared defense counsel about the specific nature of this classified information, and other classified information that Schulte transmitted or attempted to transmit while at the MCC, *see infra* pp. 9-10.

### E.      Schulte's Pro Se Bail Motion

On June 20, 2018, the Court arraigned the defendant on the first superseding indictment filed in this case.  Approximately one week later, on June 28, 2018, Schulte appeared before the Court again and waived his venue arguments with respect to certain counts.  At the conference, Schulte provided the Court with a handwritten *pro se* filing (the "Pro Se Filing").  After the conference, the Pro Se Filing briefly appeared on the public docket, until defense counsel contacted the Court and asked for it to be removed.

Following that appearance, the Government informed defense counsel that the CIA was reviewing the Pro Se Filing to determine if it contained classified information.  Nevertheless, Schulte sent the Pro Se Filing to an attorney and his parents in Texas,[3] none of whom has any security clearances.  The CIA determined that the Pro Se Filing contained classified information, and the FBI recovered a copy of the document from the attorney in Texas.

### F.      Schulte Declares an "Information War" from the MCC

While Schulte was detained at the MCC – and prior to the imposition of the SAMs – he and other inmates arranged to have cellphones (the "Contraband Cellphones") illegally smuggled into the prison for their use.  Schulte coordinated his activities with other inmates, often using other inmates to obtain or store the Contraband Cellphones and using the Contraband Cellphones to pass messages covertly to other inmates.  An image showing Schulte using one of the Contraband Cellphones while at the MCC is attached hereto as Exhibit A.  Schulte used the Contraband Cellphones to access encrypted email accounts (the "Encrypted Email Accounts") and social media accounts (the "Social Media Accounts").  In his own words, Schulte intended to use

---

[3] Schulte claims that there is no evidence that he sent the Pro Se Filing to his parents, but in a recorded prison call, one of Schulte's parents confirmed receiving the document by mail from one of Schulte's defense attorneys.

these accounts to engage in an "information war" with the United States by systematically disclosing classified information and materials designed to obstruct the investigation and prosecution.  For example, in journals found in Schulte's MCC cell, Schulte wrote the following:

- "If govt doesn't pay me $50 billion in restitution & prosecute the criminals who lied to the judge and presented this BS case then I will visit every country in the world and bear witness to the treachery . . . that is the USG [United States Government].  I will look to breakup diplomatic relationships, close embassies, and U.S. occupation around the world & finally reverse U.S. jingoism.  If this one the way the U.S. govt treats one of their own, how do you think they treat allies?"

- "I NEED my discovery to be released to the public.  I NEED my articles to be updated."

- "The way is clear.  I will set up [two blogs].  From here, I will stage my information war: . . . The [blog] will contain my 10 articles . . . ."

Schulte's "information war" was no idle musing.  Rather, Schulte used the Encrypted Email and Social Media Accounts to disseminate and attempt to disseminate classified information.  For example, using one of the Encrypted Email Accounts, Schulte began to correspond with a reporter.  In this correspondence, Schulte pretended to be a third person who was speaking on Schulte's behalf, and told the reporter that he would give the reporter "information" on several topics – including disclosures relating to high-ranking elected officials in the United States – if the reporter published stories pursuant to a timeframe dictated by Schulte.  For example, in one email Schulte stated:  "If you can consent to an embargo on disclosure of the information for a limited time we would give you an exclusive to the information spanning several topics."  Moreover, in another email sent in September 2018, Schulte emailed the reporter a copy of one of the Protected Search Warrants – even though Schulte previously had confirmed his understanding that the Protective Order prohibited this type of dissemination.  Schulte also attached a document in which he disputed facts contained in the Protected Search Warrant and in which he included classified information.

Using the Contraband Cellphones, Schulte also began to post his writings on some of the Social Media Accounts.  In these posts, Schulte asserted, among other things, that the Government had planted child pornography on his computer and that, through this prosecution, the "United States government has done the job of a foreign adversary to exploit its own intelligence officers." Although the Government seized the Contraband Cellphones before Schulte was able to complete his plan, Schulte's journals make clear that he intended to disseminate other classified information. For example, Schulte's journals include (1) a purported WikiLeaks article authored by a supposed FBI "whistleblower," who claimed to have leaked Schulte's discovery to WikiLeaks and to have knowledge that Schulte had been framed by the FBI; (2) drafts of tweets allegedly written by one of Schulte's former CIA colleagues, which disclosed classified information to bolster the alleged former colleague's credibility and which claimed knowledge that Schulte had been framed, this time by the CIA; and (3) a draft "article" in which Schulte criticized the FBI's investigation and included classified information about Schulte's training at the CIA.  Based on this conduct, the Government charged him with the MCC Leak Count and the Contempt Count.

## II.    Schulte's Detention

### A.    The Attorney General Authorizes the SAMs

The Attorney General may authorize the BOP "to implement special administrative measures that are reasonably necessary to prevent disclosure of classified information."  *See* 28 C.F.R. § 501.2(a).  To do so, the Attorney General must receive a certification from a head of a U.S. intelligence agency (like the CIA) stating "that the unauthorized disclosure of such information would pose a threat to national security and that there is a danger that the inmate will disclose such information."  *Id.*  SAMs may be imposed for a maximum of one year and may then be successively renewed, or re-imposed, in increments of up to one year.  *Id.* § 501.2(c).

Here, following the discovery of the conduct that led to the MCC Leak Count and the Contempt Count, the U.S. Attorney's Office – in coordination with the FBI and the Department of Justice's Counterintelligence and Export Control Section of the National Security Division – submitted a memorandum to the Department of Justice's Office of Enforcement Operations ("OEO") recommending the imposition of SAMs. Attached to that memorandum was a letter from the Director of the CIA certifying that the implementation of SAMs was reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to the national security. OEO conducted its own review and recommended imposition of SAMs. After reviewing OEO's recommendation, the Assistant Attorney General and Deputy Attorney General then recommended imposition of SAMs to the Attorney General.

On or about October 26, 2018, the Attorney General issued a written memorandum (the "AG Memorandum") directing the BOP to implement the SAMs. The AG Memorandum described the reasons for the SAMS, including, among other things, (1) the fact that Schulte was charged with illegally stealing the Leaked Information from the CIA and disclosing it to WikiLeaks; (2) Schulte's disclosure of at least one of the Protected Search Warrants in violation of the Protective Order; and (3) Schulte's "continued willingness to disclose classified information, even while incarcerated." *See* Mot. Ex. F at 4-5.

### B.    The Relevant SAMs Provisions

In general, the SAMs limit Schulte's contacts and communications with others because such communications could result in the unauthorized disclosure of classified information. Except as allowed by the SAMs, Schulte is barred from "having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else . . . that could reasonably foreseeably result in [Schulte] communicating (sending or receiving)

information that could circumvent the SAMs' intent of significantly limiting [Schulte's] ability to communicate (send or receive) classified information." *See* Mot. Ex. F ¶ 1(c).  The SAMs prohibit Schulte from being housed or communicating with another inmate.  *See id*. ¶ 6.

Notwithstanding the limits regarding third-party contacts, the SAMs permit counsel, precleared staff, investigators, and experts to communicate with Schulte in a variety of ways to prepare his defense.  *See generally* Mot. Ex. F ¶ 2.  For example, Schulte can meet with his cleared legal team in person or speak with them on the phone, *see id*. ¶ 2(b) ("Attorney/Client Privileged Visits") and ¶ 2(f) ("Legally Privileged Telephone Calls"); Schulte's attorneys are permitted to disseminate the contents of Schulte's communications to third parties for the purpose of preparing his defense, *id*. ¶ 2(c) ("Attorney May Disseminate Inmate Conversations"); Schulte's attorneys' cleared paralegals may meet and communicate with Schulte without his attorneys present, *id*. ¶ 2(d) ("Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client"); Schulte may have multiple legal visitors present at one time so long as they are accompanied by one of his attorneys or cleared paralegals, *id*. ¶ 2(e) ("Simultaneous Multiple Legal Visitors"); and Schulte's attorneys may provide him with unclassified documents related to his defense, including discovery materials, court papers, and materials prepared by his attorneys, *id*. ¶ 2(g).  Critically, the SAMs do not authorize the Government or BOP to monitor, record, or review Schulte's communications with his legal team in *any way. See, e.g.*, *id*. ¶ 2(f)(3), n.5 ("This section does not allow monitoring of attorney-client privileged communications.").[4]

Paragraph 3 of the SAMs governs Schulte's non-legal contacts and communications.  In particular, Schulte may have non-legal contacts – either by phone or in person – only with his

---

[4] In addition to legal visits at the MCC, Schulte also regularly visits a secure space outside of the prison to meet with his defense team to review classified discovery.

immediate family members.  *See id.* ¶ 3(a), (f).  These non-legal contacts are live-monitored by law enforcement officials, and the phone calls are also recorded.  *Id.* ¶ 3(d), (f)(iii).

Finally, the SAMs contain certain provisions with respect to mass media materials.  Schulte is permitted television and radio privileges, consistent with standard BOP practice.  *Id.* ¶ 8(b). With respect to mass media publications, Schulte is permitted access to such materials, provided that these materials have not been determined by the BOP, in consultation with the Government, to "facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public."  *Id.* ¶ 8(a)(i).  The SAMs permit the BOP, in consultation with the FBI, to determine whether any portions of a publication are prohibited under the SAMs.  *Id.* ¶ 8(a)(iii).

## DISCUSSION

Schulte's arguments to vacate the SAMs flounder on one unassailable fact:  Schulte is a risk of illegally disclosing information from the MCC through unregulated modes of communication because Schulte already has illegally disclosed classified information from the MCC through unregulated modes of communication.  Accordingly, the Motion should be denied.

**I.     The SAMs Fully Comply with 28 C.F.R. § 501.2 and Are Reasonably Necessary to Protect Against the Additional Disclosures of Classified Information by Schulte**

Schulte argues that the SAMs do not comply with 28 C.F.R. § 501.2 because, Schulte claims, (1) "there was no evidence Mr. Schulte would disclose classified information such that these measures were reasonably necessary," Def. Br. at 10, and (2) there is no statutory basis to restrict Schulte's attorney-client communications.  These arguments are without merit.  In fact, with respect to Schulte's second argument and as discussed below, the SAMs do not implicate his attorney-client relationship at all because they do not permit any monitoring of those communications and have not prevented him from speaking with his attorneys.

13

**A.      There Is a Clear Danger That Schulte Will Disclose Classified Information from Prison**

Schulte's repeated and willful violations of Court orders and unlawful disclosures of classified information – both before and after remand – overwhelmingly support the Attorney General's conclusion that "there is a danger that Schulte will disclose classified information" and that SAMs "are reasonably necessary to prevent disclosure of such information."  *See* Mot. Ex. F at 5.  Put bluntly, the inquiry as to whether the SAMs are necessary should begin and end with the fact that Schulte – having previously given classified information illegally to his family and violated Court orders while released on bail – has already disclosed classified information illegally from the MCC, using the Contraband Cellphones, Encrypted Email Accounts, and Social Media Accounts, as part of an "information war" against the United States.  *Id.* (AG Memorandum noting that one of the reasons to impose the SAMs was Schulte's "continued willingness to disclose classified information, even while incarcerated").  Unable to avoid this conclusion, Schulte resorts to an artificial parsing of the other reasons described in the AG Memorandum.

*First*, Schulte argues that the fact that the Government charged Schulte with the WikiLeaks Charges in June 2018 but that the BOP did not impose the SAMs until October 2018 demonstrates that the WikiLeaks Charges cannot be a basis for the imposition of the SAMs.  *See* Def. Br. at 11.  Schulte is wrong.  The WikiLeaks Charges are not the only reason to impose the SAMs, but they are a reason, because they show that probable cause exists to believe that Schulte had leaked the CIA's classified information, thus making him the type of threat that should reasonably concern BOP officials, even without more.  *See United States v. Trabelsi*, 2014 WL 12682266, at *4 (D.D.C. 2014) ("Prison regulations that are based on anticipatory concerns of prison security are rational, despite the absence of prior violence or disruptions.").  Moreover, the fact that the Attorney General waited before imposing the SAMs shows that they were a measured response to

14

all of Schulte's conduct, including his misconduct at the MCC, and not simply a blanket measure adopted due to the initial charges against him. *See United States v. Kassir*, 2008 WL 2695307, at *5 (S.D.N.Y. 2008) (rejecting argument that defendant's special administrative measures were "automatic[ally]" imposed because other al Qaeda defendants were subject to similar measures, and concluding that the Government's supporting memoranda "describe actions that Kassir has himself undertaken").

*Second*, Schulte argues that his Internet use in violation of his bail conditions does not support imposing the SAMs. Schulte initially argues, again, that the violation was the result of a "genuine misunderstanding," *see* Def. Br. at 12, but that argument has already been rejected by the Court and the Second Circuit. *See Schulte* Summary Order. Furthermore, Schulte's argument that the Court should discount his bail violation because the Government had not yet charged him with espionage misses the point entirely. The significance of Schulte's bail violation is not solely his willful disobedience of Court orders, but also that he (again) acted in an underhanded manner that evinced consciousness of guilt, using TOR to anonymize his Internet access. Indeed, Schulte's secretive conduct while on bail was prologue for his misconduct at the MCC, where he used smuggled cellphones and encrypted email accounts to hide his illegal actions from the Government and jail officials.

*Third*, Schulte seeks to minimize his violation of the Court's Protective Order by arguing that the issue was "already raised by the government and addressed by the Court at the May 21, 2018 court conference." *See* Mot. pp. 12-13. Schulte's claim that his violation of the Protective Order was a non-issue after the May 21 conference is, frankly, stunning. While Schulte attempts to tout the second chance that the Court gave him, he ignores entirely that – despite the Court's forbearance and warning to him – Schulte nevertheless again transmitted a Protected Search

15

Warrant to a reporter from the MCC, and committed a separate crime by also sending a document that contained classified information.  The May 2018 incident and the follow-on incident from the MCC do not undercut the need for the SAMs, but rather, show that Schulte will not be deterred from his misguided "information war" by less restrictive measures.

*Fourth*, Schulte disputes that his revelation of CIA employees' identities in an April 18, 2018 prison call and inclusion of classified information in the Pro Se Filing, both of which are described in the AG Memorandum, support imposing the SAMs.  Initially, Schulte ignores the other instances in which he transmitted and attempted to transmit classified information from the MCC, each of which alone justifies the SAMs.  But the two incidents described in the AG Memorandum provide additional support for the imposition of SAMs.  First, Schulte argues that because the Government produced a recording of an April 18, 2018 prison call to him in unclassified discovery, he did not disclose classified information during the call.  What Schulte omits, however, is that while the identifying information provided to the reporter may not have been classified on its own, he did describe to a reporter the roles of certain members of the Group, and directed the reporter to contact his parents for additional identifying and contact information for the individuals he described.  As Schulte well knows, information that would identify covert officers, and information associating both covert and overt officers with the CIA Group, is classified.  Thus, even though Schulte may not have provided the classified information in the call, he nevertheless gave the reporter a roadmap to learn it.  Second, Schulte's contention that he sent the Pro Se Filing to an attorney in Texas for legal advice is no defense because, again, as Schulte is aware, Schulte has no right to give classified information to anyone who does not possess a security clearance – this includes uncleared attorneys, and it certainly includes his parents.  *See United States v. Hashmi*, 621 F. Supp. 2d 76, 84 (S.D.N.Y. 2008) (Government's interest in

preventing disclosure of classified information to those without a security clearance outweighs defendant's right to choice of counsel).

### B.     The SAMs' Provisions Related to Attorney-Client Communications Are Appropriate

Schulte argues that there is no basis to regulate attorney-client communications, but that claim is a red herring because it relies on a separate and irrelevant BOP regulation.  Specifically, Schulte argues that because the BOP amended 28 C.F.R. § 501.3 – a regulation that allows for special administrative measures to prevent violence – to allow for monitoring of attorney-client interactions, *see* 28 C.F.R. § 501.3(d), but did not similarly amend Section 501.2, the BOP is now powerless to regulate attorney-client interactions unless seeking to prevent violence.   The regulation under which the SAMs were imposed on Schulte, however, gives the BOP broad latitude to regulate an inmate's interactions when the inmate poses a risk of disclosing classified information, and does not exclude attorney-client interactions from its purview.  *See* 28 C.F.R. § 501.2(a) (BOP may "limi[t] certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to prevent the disclosure of classified information.").  The only restrictions placed on Schulte's interactions with his counsel is that the cleared defense team can disseminate its communications with Schulte only to third parties "for the sole purpose of preparing [Schulte's] defense" and cannot forward third-party communications to Schulte.  *See* Mot. Ex. F ¶¶ 1(c), 2(a) & 2(c).  These restrictions are plainly reasonable given Schulte's attempts to use third parties and secretive methods to further his "information war."  *See Turner v. Safley*, 482 U.S. 78, 93 (1987) ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages.").  Thus, Section 501.2 grants the BOP the authority to impose the SAMs here.  *See*

*United States v. Saipov*, S1 17 Cr. 722 (VSB), Dkt. # 108 (the "*Saipov* Order") at 11 n.9 (rejecting same argument under identically worded provision of Section 501.3).

To be sure, the BOP's amendment of Section 501.3 gave the BOP additional authority to monitor attorney-client interactions when there is "reasonable suspicion" that the inmate will use his attorneys to further violence, *see* 28 C.F.R. § 501.3(d), but that provision is entirely irrelevant here because the SAMs imposed on Schulte do not permit monitoring of his attorney-client interactions. *See* Mot. Ex. F ¶ 2(f)(3), n.5 ("This section does not allow monitoring of attorney-client privileged communications."). Thus, there is no need to evaluate whether there is "reasonable suspicion" that Schulte would use his attorneys as part of his "information war." Accordingly, Schulte's challenge to these provisions of the SAMs is without merit.

## II.        The SAMs Are Constitutional

Schulte also raises a raft of constitutional arguments, all of which fail based on the factual record before the Court. The Second Circuit and numerous other courts have repeatedly rejected constitutional challenges to SAMs. *See, e.g.*, *United States v. El-Hage*, 213 F.3d 74, 81-82 (2d Cir. 2000); *Saipov* Order at 20; *United States v. Mohamed*, 103 F. Supp. 3d 281, 287-88 (E.D.N.Y. 2015); *United States v. Basciano*, 763 F. Supp. 2d 303, 329 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015); *Hashmi*, 621 F. Supp. 2d at 86; *Kassir*, 2008 WL 2695307 at *3-4.

### A.        Applicable Law

"Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). "Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Id*. Thus, "the Government must be able

to take steps to maintain security and order at the institution." *Id*. at 540; *see also United States v. Felipe*, 148 F.3d 101, 111 (2d Cir. 1998) (upholding severe post-conviction restrictions).

Of course, there are limits on the restrictions that prison officials may impose on a pretrial detainee.  Specifically, "under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*, 441 U.S. at 535.  In accordance with this rule, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538.  "Absent proof of intent to punish, . . . this determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Block v. Rutherford*, 468 U.S. 576, 584 (1984) (internal quotation marks and brackets omitted). "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell*, 441 U.S. at 540.

Courts should defer to the decisions of the BOP, because "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 128 (1977); *see also Turner*, 482 U.S. at 89; *Felipe*, 148 F.3d at 110.  Accordingly, "courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

Deference is particularly appropriate when the restrictions are intended to promote security concerns.  "[P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security

19

of the prison." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  Thus, if prison officials "put forward a legitimate government interest, and provide some evidence that the interest put forward is the actual reason for the regulation," the restriction likely will be upheld.  *Casey v. Lewis*, 4 F.3d 1516, 1520-21 (9th Cir. 1993) (internal quotation marks and citation omitted).

Courts consider four factors in evaluating the reasonableness of a prison regulation. *Turner*, 482 U.S. at 89; *see El-Hage*, 213 F.3d at 81 (employing the *Turner* test to uphold the constitutionality of special administrative measures).  "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  *Turner*, 482 U.S. at 89.  Second, the Court should determine "whether there are alternative means of exercising the right that remain open to prison inmates."  *Id*. at 90.  "Where 'other avenues' remain available for the exercise of the asserted right . . . , courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'"  *Id*. (quoting *Pell*, 417 U.S. at 827).  Third, the Court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id*.  Fourth, the court should consider "the absence of ready alternatives [as] evidence of the reasonableness of a prison regulation."  *Id*.  "This is not a 'least restrictive alternative' test:  prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the [defendant's] constitutional complaint."  *Id*. at 90-91.

### B.       The SAMs Do Not Violate Schulte's Right to Due Process

Schulte argues that the SAMs' provision placing him functionally in solitary confinement violated his due process rights because "there is no 'valid, rational connection' between [the SAMs] and the legitimate security-related interests underlying 28 C.F.R. § 501.2."  Def. Br. at 17.

Schulte's argument again simply ignores the record.  Prohibiting Schulte from interacting with other inmates is connected to a legitimate governmental interest:  protecting the national security of the United States by preventing Schulte from disclosing classified information to advance his "information war."  Similarly, limiting Schulte's contacts with other inmates is clearly a rational means of furthering that interest, given that Schulte already has enlisted other inmates to help him by smuggling in the Contraband Cellphones, among other things.  Thus, the SAMs are not arbitrary restrictions, but rather, are a direct response to the substantial risk that Schulte's contact with third parties will compromise the country's national security.

The cases upon which Schulte relies bolster, rather than undercut, this conclusion.  Def. Br. at 17-18.  In *United States v. Gotti*, the court held that the BOP could not hold the defendants in administrative detention because they had done nothing while in custody that showed that they were a threat to others.  *See* 755 F. Supp. 1159, 1165 (E.D.N.Y. 1995).  Similarly, in *United States v. Suleiman*, the court held that because there was no evidence that the defendant was a security risk while in custody, the BOP could not detain him in administrative detention.  *See* 1997 WL 220308, at *1-2 (S.D.N.Y. 1997).  In this case, on the other hand, there is ample evidence that Schulte is a threat of disclosing classified information while in custody – namely, that while at the MCC, he already has illegally disclosed classified information.

### C.     The SAMs Do Not Violate Schulte's Sixth Amendment Right to Counsel

Schulte also argues that the SAMs interfere with his Sixth Amendment right to counsel because the SAMS (1) permit only his defense counsel to disseminate the content of Schulte's communications to third parties; (2) prohibit Schulte's defense team from forwarding third-party communications to and from Schulte; and (3) allegedly chill defense counsel's representation of Schulte.  None of these contentions supports vacating the SAMs.

*First*, Schulte argues that the SAMs paragraph 2(c) – which provides that Schulte's "attorney[s] may disseminate the contents of [Schulte's] communication to third parties for the sole purpose of preparing the inmate's defense" – is vague and overbroad. Defense counsel, who have many years' experience with similar language in routine protective orders (including two in this case), plainly know what it means to prepare a criminal defense and disseminate information relating to that defense. In any event, the conclusory claim that paragraph 2(c) is vague and overbroad is insufficient to establish a deprivation of Schulte's Sixth Amendment right to counsel. *Cf. United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987) (claims resting on "airy generalities" and "conclusory assertions" are insufficient to sustain a claim under 18 U.S.C. § 2255).

Schulte is also wrong that the dissemination provision makes an arbitrary distinction between attorneys (who are permitted to disseminate information from Schulte) and other staff (who are not so permitted). The assessment of whether dissemination is "for the sole purpose of preparing the inmate's defense" is a legal one, which necessarily must be made by defense counsel and not non-legal members of the defense team. That is especially true when much of the information Schulte conveys to his defense team may be classified and thus should be disclosed only to individuals with appropriate security clearances. It may be burdensome for Schulte's attorneys to control which information is disseminated to third parties, but the fact that a communication restriction that is reasonably related to a legitimate penological goal also imposes a burden on the defense does not render it unconstitutional. *See Bell*, 441 U.S. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting . . . .").

For support, Schulte relies on the court's decision in *Saipov*, in which Judge Broderick modified a similar provision to allow non-attorneys to disseminate information from the defendant

after consulting with defense counsel.  *See Saipov* Order pp. 23-24.  Initially, it is important to note that Judge Broderick explicitly rejected the defense argument that this communication restriction was unconstitutionally vague.  *See id*. p. 24 n.17.  Moreover, the circumstances in *Saipov*, a capital case, are markedly different than those in this case.  First, Judge Broderick modified the provision because he concluded that it would be "unduly burdensome" to impose the provision as drafted because, among other reasons, "the criminal defense and mitigation investigation spans at least two continents."  *See id*. p. 25.  In contrast, the conduct at issue here occurred entirely in Virginia and New York.  Second, Judge Broderick concluded that the Government's concern that an attorney should make the legal decision as to what was necessary for the preparation of the defense was adequately addressed by requiring that any member of the defense team consult with defense counsel before disseminating any information from the defendant.  *See id*.  In this case, however, because much of the information that Schulte provides to his defense counsel may be classified, the issue is not simply whether a disclosure is for purposes of preparing the defense – that disclosure must also be consistent with the defense's obligation to maintain the secrecy of classified information.  This added complexity supports requiring cleared defense counsel to be the ones to disseminate information from Schulte.

*Second*, Schulte argues that the SAMs' prohibition on "forward[ing] third-party messages to or from the inmate" is vague and overbroad.  *See* Mot. Ex. F ¶¶ 1(c) & 2(a).  In particular, Schulte focuses on his counsel's ability to convey "innocuous personal information to and from family members."  Def. Br. at 21.  This bar on forwarding "messages" is not overly broad.  Observations about Schulte can certainly be shared with his family, but messages from Schulte (*i.e.*, verbal, written, or recorded communications) that are unrelated to his defense cannot be shared with any third parties, even if defense counsel perceives them to be innocuous.  *See*

*Mohamed*, 103 F. Supp. 3d at 290-91 (upholding identical provision as "sufficiently clear" and reasonably related to legitimate government objective).  In addition, the SAMs already provide that Schulte can communicate with his immediate family members directly through monitored calls, meetings, and cleared mail.  *See* Mot. Ex. F ¶ 3.  This provision of the SAMs is certainly appropriate, particularly in light of Schulte's prior use of his family to transmit classified information.  *See Saipov* Order, p. 26 n.18 (denying motion to vacate identical provision).

*Third*, Schulte argues that the SAMs have a chilling effect on the defense team.  Def. Br. at 22.  Schulte cites no precedent in which SAMs were vacated on this basis, and the Government is aware of none.  Rather, Schulte states that he is "well aware of the prosecution of Lynne Stewart in this district, whose false-statements conviction stemmed from her violation of SAMs in a terrorism case."  *Id.*  The *Stewart* case, however, does not, as Schulte argues, create an "ambiguous line . . . between zealous advocacy and actions the government could deem a threat to national security."  *Id.*  In the *Stewart* case, counsel knowingly and clearly violated SAMs (and federal law) by smuggling messages between her client and co-conspirators.  The line drawn in *Stewart* is clear, and easily avoidable by Schulte's attorneys.  *See Hashmi*, 621 F. Supp. 2d at 87 (rejecting identical argument); *see also Saipov* Order at 26 (same).

### D.    The SAMs Do Not Violate Schulte's First Amendment Rights

Finally, Schulte argues that the SAMs restrictions that allow him to interact with only immediate family violate his First Amendment rights.  Def. Br. at 23.  Initially, there is clearly a "valid, rational connection" between this limitation and the legitimate governmental interest in preventing Schulte from disclosing classified information:  Schulte has already demonstrated his willingness to use members of his extended family (like his cousin) to disseminate classified information illegally.  *See supra* pp. 6-7.  The fact that there is concrete evidence of Schulte's use

24

of extended family members to further his illegal conduct distinguishes this case from the ones upon which Schulte relies. *See Sattar v. Holder*, 2012 WL 882401, at \*5 (D. Colo. 2012) (no evidence presented as to why specific family members were not permitted to communicate with defendant); *Mohammed v. Holder*, 2011 WL 4501959, at \*8 (D. Colo. 2011) (same). Moreover, Schulte's proposal that the BOP and FBI could simply monitor all of his contacts with his extended family is untenable. In evaluating a proposed alternative to a prison regulation, the Court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *See Turner*, 482 U.S. at 89. Schulte's alternative would create an immense drain on resources because not only would the BOP and FBI be forced to expend additional resources monitoring Schulte's visits with his extended family, but, inevitably, other inmates would seek the same accommodation. When coupled with Schulte's willingness to exploit his family to serve his "information war," the cost of Schulte's proposed accommodation supports maintaining the SAMs as is.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny Schulte's motion to vacate the SAMs.

Dated:  New York, New York
           June 17, 2019                                      Respectfully submitted,

                                                             GEOFFREY S. BERMAN
                                                             United States Attorney

                                                        by: _____/s/_____
                                                             Matthew Laroche
                                                             Sidhardha Kamaraju
                                                               Assistant United States Attorneys
                                                             Scott McCulloch
                                                               Trial Attorney, National Security
                                                               Division

cc:      Defense counsel of record (by ECF)

**EXHIBIT A**

