UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

UNITED STATES OF AMERICA      :      17 Cr. 548 (PAC)

                     :

         -v.-              :

                     :

JOSHUA ADAM SCHULTE,      :

                     :

       Defendant.      :

-------------------------------------------------------X

# Memorandum of Law in Support of Defendant Joshua Adam Schulte's Motion to Suppress Evidence Seized from the Metropolitan Correctional Center

Federal Defenders of New York, Inc.
Counsel for Defendant Joshua Adam Schulte
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8713

Sabrina P. Shroff
Allegra Glashausser
Lauren M. Dolecki
Edward S. Zas
   *Of Counsel*

TO:   GEOFFREY S. BERMAN, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York 10007
      Attn:  Matthew Laroche and Sidhardha Kamaraju
              Assistant United States Attorneys

# **Table of Contents**

Preliminary Statement……………………………………….…………………....…..1

Statement of Facts...........................................................................................................1

    The MCC Search Warrant ...........................................................................................2

    The "Wall Review" Warrant ......................................................................................4

    The Proton Mail Warrant ...........................................................................................5

    The Discovery Laptop Warrant..................................................................................5

    The ISP Warrants .......................................................................................................6

ARGUMENT ..................................................................................................................6

    A.  The government acted in flagrant disregard of the MCC Search Warrant..................7

        i.  The government effected a widespread seizure of items outside the scope of the MCC Search Warrant by seizing all of Mr. Schulte's notebooks……………………………………………………..…8

        ii.  Law enforcement agents also acted in bad faith by initially taking no precaution against viewing the contents of Mr. Schulte's privileged notebooks………………………………………………………10

        iii. The government's wall team did not adequately protect Mr. Schulte's privileged materials………………………………………………………14

    B.  Subsequent warrants that relied upon the notebooks also should be suppressed. ...18

    C.  Alternatively, the Court should suppress the privileged notebook pages the wall team  failed to redact. ..........................................................................................20

Conclusion.....................................................................................................................21

i

## Preliminary Statement

Joshua Adam Schulte moves to suppress all documents seized from his former cell at the Metropolitan Correctional Center. He also moves to suppress all evidence recovered from subsequent warrants that relied upon those seized documents and that authorized the search of: (1) a CD containing the contents of three encrypted email accounts; (2) two laptop computers; and (3) accounts associated with Buffer, Facebook, Twitter, Automattic, and Google. Further, Mr. Schulte moves to suppress all seized materials protected by the attorney-client and work-product privileges, and for a hearing to determine the extent to which the prosecution team was exposed to such privileged materials and used those materials to further its case.

Suppression of this evidence is warranted under the Fourth Amendment, the Sixth Amendment, and the doctrine of attorney-client privilege because: (1) the government effected a widespread seizure of materials beyond the scope of the initial warrant when it seized Mr. Schulte's presumptively privileged notebooks; (2) the government acted in bad faith by reviewing those notebooks; and (3) subsequent warrants relying upon those notebooks should be suppressed as fruits of the poisonous tree.

## Statement of Facts

Mr. Schulte has been incarcerated at the Metropolitan Correctional Center (the "MCC") in Manhattan since December 14, 2017. As the Court and the government are aware, Mr. Schulte has been very involved in his legal defense from the outset of

1

this prosecution—at times, even drafting his own motion papers and filing his own submissions. While incarcerated, he also made notes relevant to his defense, including case notes about legal strategy, attorney meetings, and discovery review, in several spiral-bound notebooks. He also drafted his own legal documents. Mr. Schulte labeled the covers of these notebooks "ATTORNEY CLIENT PRIVILEGE" and also wrote "ATTORNEY CLIENT CONFIDENTIAL" or "ATTORNEY CLIENT PRIVILEGE" on the inside covers.

The MCC Search Warrant

Between October 2 and October 26, 2018, the government obtained a series of warrants to search for evidence of offenses allegedly committed by Mr. Schulte during his detention at the MCC. The first warrant (the "MCC Search Warrant") authorized law enforcement to search the cells in 7 South Unit and 7 North Unit, including Mr. Schulte's former cell. *See* Ex. A, Attach. A, I.[1] Specifically, the MCC Search Warrant authorized the search and seizure of "[a]ny and all notes, documents, records, correspondence, or materials, in any format and medium . . . pertaining to the unauthorized retention, gathering, and transmission of classified documents or materials, and the unauthorized removal and retention of classified documents or materials." *Id.* Attach. A, III. A ¶ 6. It also authorized the seizure of evidence

---

[1] On October 1, 2018, Mr. Schulte was removed from his former cell and transferred to the Special Housing Unit ("SHU").

pertaining to contraband cell phones and concerning communications with co-conspirators.[2] *Id.* Attach. A, III. A. It did not authorize the FBI to seize privileged information.

In executing that warrant, FBI Agent Donaldson and other law enforcement officers began to review "more than approximately 300 pages of material" that MCC officials removed from Mr. Schulte's former cell (at the FBI's direction) and stored in an office at the MCC. *See* Ex. B, Wall Review Aff. ¶ 6.a-b. Virtually all of these "approximately 300 pages" were, in fact, intact notebooks labeled "attorney-client privilege." Despite this fact, agents began reviewing the contents of the notebooks—a review that was extensive enough to enable them to discover additional documents in other places. For example, agents found Mr. Schulte's *pro se* bail motion, which was contained in a folder, a page in a notebook that mentioned a John Smith email account and its password (the "John Smith page"), and other pages in the notebook entitled "FBI Agent leaks discovery to Wikileaks" (the "FBI pages."). *Id.* ¶ 6.b.ii-iv. The John Smith page and FBI pages were located on separate pages of a 164-page red notebook clearly marked "attorney-client privilege" (the "red notebook").

---

[2] Specifically, the warrant authorized the search and seizure of several cell phones; evidence pertaining to the smuggling of cell phones into the MCC; evidence concerning the identity or location of, and communications with, any co-conspirator; evidence of offenses committed on contraband cell phones; and the search and seizure of electronically stored information. *See id.* Attach. A, III. A-B.

The "Wall Review" Warrant

As agents were reviewing Mr. Schulte's notebooks, they "identified documents upon which there were markings that indicated they were potentially prepared to aid in Schulte's defense." *Id.* ¶ 6.c. The government then obtained a second warrant that authorized law enforcement agents who were not part of the prosecution team (the "wall team") to review the notebooks, segregate out materials deemed privileged, and provide materials deemed non-privileged to the prosecution team. *See* Ex. C, Wall Review Warrant, Attach. A, III. B ¶ 1-2. Agent Donaldson's affidavit in support of the wall review warrant application failed to disclose that the majority of those documents to be reviewed by the wall team were part of bound notebooks clearly labeled on the outside and inside covers as "attorney-client privilege" and "attorney-client confidential."

The wall team's review confirmed that the contents of Mr. Schulte's notebooks were overwhelmingly privileged. For example, the wall team redacted as privileged more than 100 pages of the 164-page red notebook in which the government found the John Smith and FBI pages, including the first 19 pages of the red notebook. *See* Ex. D. Similarly, the wall team redacted 43 pages of a 59-page notebook containing Mr. Schulte's case notes (the "blue notebook"). *See* Ex. E.[3]

---

[3] Because even the redacted versions of the red and blue notebooks contain unredacted privileged information, copies of these exhibits are being submitted to the Court under seal.

The Proton Mail Warrant

The government then obtained a third warrant that authorized the search of a CD containing the contents of three encrypted email accounts. *See* Ex. F, Proton Mail Warrant, Attach. A, I. Those accounts were accessed by a member of the wall team using passwords obtained from the notebooks. *See* Ex. G, Proton Mail Aff. ¶¶ 7.b, 10.a. Agent Donaldson's affidavit in support of this warrant quoted certain pages of the notebooks as evidence that Mr. Schulte "discussed setting up and using the Encrypted Accounts to send potentially classified information to third parties." *Id.* ¶ 9.a-b.

The Discovery Laptop Warrant

The government then obtained a fourth warrant that authorized the search of two laptop computers that Mr. Schulte used to review discovery in his case (the "Discovery Laptops"), to determine whether he had used the laptops to create hidden locations to store data. *See* Ex. H, Discovery Laptop Warrant, Attach. A, I, III. Agent Donaldson's affidavit in support of this warrant claimed that Mr. Schulte's notebooks "appeared to describe forensic locations on hard drives used by computers . . . like the Discovery Laptops into which data could be covertly transferred and stored." *See* Ex. I, Discovery Laptop Aff. ¶ 3. To establish probable cause, Agent Donaldson quoted the same portions of the notebooks as in his Proton Mail Affidavit, and relied on information from the three encrypted accounts obtained through the Proton Mail Warrant. *Id.* at ¶¶ 8.d.i-iv, 9.a-c.

<u>The ISP Warrants</u>

Finally, the government obtained warrants that authorized the search of Buffer, Facebook, Twitter, Automattic, and Google accounts. *See* Ex. J, ISP Warrants. Agent Donaldson's affidavit in support of these warrants stated that these accounts were identified through information obtained from the notebooks and the Proton Mail Warrant. *See* Ex. K, ISP Warrants Aff. ¶ 11. The affidavit claimed that the accounts "appear to be the facilities" through which Mr. Schulte disclosed or intended to disclose "classified information and other sensitive information protected by a protective order" and "false exculpatory information in an effort to defend against the crimes of which Schulte has been charged." *Id.* ¶ 10. Agent Donaldson again used information obtained from the notebooks to establish probable cause. *Id.* ¶¶ 14.a-b.

## ARGUMENT

### The Red and Blue Notebooks and the Evidence Derived from Those Notebooks Were Obtained and Reviewed in Violation of the Fourth Amendment, the Sixth Amendment, and the Doctrine of Attorney-Client Privilege, and Should Therefore Be Suppressed.

The government conducted a widespread search and seizure of items outside the scope of the MCC Search Warrant by taking all of Mr. Schulte's notebooks—including those clearly labelled as privileged—instead of just those materials described in the warrant. The agents' misconduct was compounded by their decision to open and review those presumptively privileged notebooks before turning them over to a wall team. Moreover, the wall team procedure itself was inadequate to protect Mr.

Schulte's privileged materials from disclosure. The government's impermissible seizure of these notebooks, combined with its reckless lack of precautions against viewing privileged pages, violates the Fourth Amendment and the attorney-client privilege, thereby also interfering with Mr. Schulte's Sixth Amendment right to effective assistance of counsel. *See United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) ("Unquestionably, government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel.") (citing *Massiah v. United States*, 377 U.S. 201 (1964)). Therefore, the red and blue notebooks should be suppressed. Further, because the red and blue notebooks were obtained and reviewed in violation of the Fourth Amendment, the Sixth Amendment, and the doctrine of attorney-client privilege, all evidence obtained from the subsequent warrants must be suppressed as well, because all of them relied on the red and blue privileged notebooks in establishing probable cause.

A. <u>The government acted in flagrant disregard of the MCC Search Warrant.</u>

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (citation omitted). Wholesale suppression is required when government agents "(1) … effect a widespread seizure of the items that were not within the scope of the warrant and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d

138, 140 (2d Cir. 2000) (citations and internal quotation marks omitted). Suppression

is also warranted when evidence is obtained in violation of the Sixth Amendment or

the attorney-client privilege. *See, e.g.*, *United States v. Longo*, 70 F. Supp. 2d 225, 264

(W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated,

the remedy for such a violation is the suppression of evidence derived from the

privileged communication.") (citations omitted)).

   i.   <u>The government effected a widespread seizure of items outside the scope of
        the MCC Search Warrant by seizing all of Mr. Schulte's notebooks.</u>

   Law enforcement agents exceeded the scope of the MCC Search Warrant when

they seized all of Mr. Schulte's notebooks, including notebooks and documents

protected by attorney-client privilege and clearly and conspicuously marked as

"Attorney Client Privileged." The MCC Search Warrant was expressly limited to

evidence pertaining to contraband cell phones, evidence concerning co-conspirators,

and "notes, documents, records, correspondence, or materials" pertaining to the

unauthorized retention or use of classified information. *See* Ex. A, Attach. A, III. A.

Yet, a substantial portion of the seized items were of an entirely different nature. As

indicated by the obvious labeling on the front covers, these notebooks contained

presumptively privileged information such as Mr. Schulte's thoughts on legal strategy,

notes from meetings with his attorneys, and notes from discovery review. And, if the

clear labeling on the front of the notebooks was not enough, opening the notebooks

(which the agents admittedly did) only confirmed the privileged nature of the

documents. For example, the first 23 pages of the red notebook, which included both the FBI pages and John Smith page, contained privileged information. *See* Ex. D. And ultimately, over 100 pages of this 164-page notebook were later redacted as privileged by the wall team because they related to Mr. Schulte's legal representation, not to any possible use of a cell phone or disclosure of information from inside the MCC. This eventual widespread redaction of the seized materials demonstrates that the government was not acting in good faith when it exceeded the scope of the MCC Search Warrant in seizing—and reading—Mr. Schulte's clearly marked privileged notebooks. *See United States v. Debbi*, 244 F. Supp. 2d 235, 236 (S.D.N.Y. 2003) (holding law enforcement impermissibly exceeded the bounds of the warrant by seizing "items that plainly fell outside [the warrant's] parameters, such as personal and religious files, general correspondence, family financial records, [and] private patient records").

Further, the government made no apparent attempt at the time of the seizure to distinguish or separate documents that fell under the scope of the MCC Search Warrant from those that did not. Agent Donaldson's wall review affidavit simply states that in executing that warrant, law enforcement "began to review" the notebooks, without articulating a more detailed or deliberate procedure. *See* Ex. B, ¶ 6.b; *Cf. Shi Yan Liu*, 239 F.3d at 142 (agent who spent 30 minutes reviewing information in a filing cabinet before ordering the seizure of the entire cabinet did not grossly exceed the scope of the warrant because his actions "suggest a fairly systematic

inventory" of the files). Given the protected nature of Mr. Schulte's presumptively privileged documents, the government should have implemented a procedure immediately to protect the secrecy of privileged materials. *See, e.g., Matias*, 836 F.2d at 747 ("Searches involving documents must be conducted in a manner that minimizes unwarranted intrusions upon privacy") (citation and internal quotation marks omitted).

Instead, the government indiscriminately seized all Mr. Schulte's notebooks, thereby exceeding the scope of the MCC Search Warrant. *See United States v. Dzialak*, 441 F.2d 212, 216 (2d Cir. 1971) (reversing conviction based on evidence obtained outside the scope of the warrant as "the law in this area is quite clear . . . if something is not described in the warrant it cannot be seized"); *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) ("when law enforcement officers grossly exceed the scope of a search warrant in seizing property [not identified in the warrant], the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant"). Such deliberate, wholesale seizure of presumptively privileged and confidential materials mandates the suppression of evidence seized under the MCC Search Warrant.

ii.  <u>Law enforcement agents also acted in bad faith by initially taking no precaution against viewing the contents of Mr. Schulte's privileged notebooks.</u>

Law enforcement agents executing the MCC Search Warrant also acted in bad faith by opening and reviewing Mr. Schulte's red and blue notebooks. Those

notebooks were explicitly labeled "attorney-client" privilege on their outside and inside covers, thus providing clear notice that the notebooks contained presumptively protected information. Despite that notice, the executing agents acted in bad faith by immediately opening and reviewing the contents of those notebooks, instead of first applying for an amended warrant or requesting a wall review team. *Cf. United States v. Lumiere*, No. 16 CR. 483, 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (government's failure to screen for privileged materials seized by a warrant was reasonable because "the Government completed its review of the seized devices *before* being alerted to the fact that they might contain significant numbers of privileged documents") (emphasis added).

The government's initial search appears to have been extensive, given that later search warrants relied upon pages located in the middle of notebooks that contained overwhelmingly privileged material. For example, both the FBI pages and John Smith page were contained in the red notebook marked on the front cover as "ATTORNEY CLIENT PRIVILEGE" and inside cover as "ATTORNEY CLIENT CONFIDENTIAL." Ex. D. The first 19 pages of the notebook are comprised of privileged information ultimately redacted by the wall team, and overall, over 100 pages of the 164-page notebook were later redacted for privilege. Moreover, the FBI pages, which begin on page 55 of the notebook, were sandwiched between pages later redacted as privileged by the wall team. Specifically, the wall team redacted 22 consecutive pages directly before the FBI pages and 11 consecutive pages directly

11

after the FBI pages. Though Agent Donaldson dubiously claimed that the government agents "ha[d] not reviewed" these privileged pages, *see* Ex. B, Wall Review Aff. ¶ 3, it defies logic and common sense to contend that the agents somehow found the FBI pages or other documents of interest in the middle of that notebook without first having read the privileged materials surrounding it. *Cf. Lumiere*, 2016 WL 7188149, at \*6 n.9 (accepting the government's defense of "professed ignorance" because only "a small number of the approximately 25 million documents in the Government's production [we]re arguably privileged.").

Moreover, pages of interest to the agents, which were interspersed throughout the red notebook, were flagged with Post-it notes. *See* Ex. D at 97, 114, 135. Given that these Post-it notes designated pages that were likely important to the prosecution team, the case agents must have flagged these pages during the "initial review," which must have proceeded on a page-by-page basis. For example, the first flagged page is preceded by 21 pages of material that was ultimately fully redacted as privileged. The location of these flagged pages further indicates that the government ignored clear warnings and instead conducted an extensive page-by-page search through Mr. Schulte's privileged materials in its "initial search."

Finally, there was no exigency to warrant the investigating agents reviewing Mr. Schulte's notebooks without seeking an amended warrant or a wall team. All of Mr. Schulte's notebooks were in law enforcement custody. Mr. Schulte had been transferred to the SHU. Thus, given that there was no exigency or urgency, there was

12

no reason that the agents could not have immediately sought an amended warrant or turned over Mr. Schulte's presumptively privileged materials to a wall team.

In short, law enforcement agents acted in flagrant disregard of the MCC Search Warrant by seizing hundreds of pages of Mr. Schulte's presumptively privileged materials, ignoring clear warnings that the documents were in fact privileged, and extensively reviewing those privileged documents before initiating a wall review team. This was no innocent mistake, but rather, a deliberate act taken in bad faith that caused irreparable harm because there is no way to know all the insights gleaned from Mr. Schulte's privileged writings and how they informed and influenced the prosecution team in its investigation. The government had the benefit of Mr. Schulte's thoughts on legal strategies. For example, the government read his thinking on potential severance and plea offers. This is precisely the type of conduct that mandates suppression. *See Herring v. United States*, 555 U.S. 135, 144 (2009) ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent [police] conduct."). At a minimum, an evidentiary hearing should be conducted to determine the extent to which the prosecution team (including the case agent) used privileged material to develop their case against Mr. Schulte. *See, e.g.*, *United States v. Schwimmer*, 892 F.2d 237, 245 (2d Cir. 1989) (remanding case for an "evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege").

iii.   <u>The government's wall team did not adequately protect Mr. Schulte's</u>
       <u>privileged materials.</u>

Although the government eventually implemented a wall team to review Mr.

Schulte's notebooks, even then, its procedures were inadequate to protect his

privileged notes from disclosure. Numerous courts in this district have criticized or

questioned the practice of using a government wall team to conduct a privilege review

of a defendant's documents. *See, e.g.*, *United States v. Kaplan*, No. 02 CR. 883 (DAB),

2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) ("[T]his Opinion should be

counted among those *disapproving* the Government's use of an ethical wall team to

'protect' the attorney-client and work-product privileges or to determine whether the

crime-fraud exception applies, where potentially privileged materials are turned over

to the trial team and case agents before any challenge to those determinations can be

raised by a Defendant and determined by a court."); *In re Seizure of All Funds on Deposit*

*in Accounts in Names of Nat'l Elecs., Inc., at JP Morgan Chase Bank 8765013327-65*, No.

M-18-65(HB), 2005 WL 2174052, at *3 (S.D.N.Y. Sept. 6, 2005) ("This Court agrees

that reliance on review by a 'wall' Assistant in the context of a criminal prosecution

should be avoided when possible. Therefore, if the volume of the documents

precludes review by this Court, the Court will appoint a special master to review the

documents seized to determine if they are subject to any relevant privilege."); *In re*

*Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y.

1994) ("[T]his Court notes that reliance on the implementation of a Chinese Wall,

14

especially in the context of a criminal prosecution, is highly questionable, and should be discouraged."); *United States v. Stewart*, No. 02 Cr. 395(JGK), 2002 WL 1300059, at *10 (S.D.N.Y. June 11, 2002) (appointing special master rather than government wall team to review potentially privileged materials); *see also In the Matter of Search Warrants Executed on April 9, 2018*, 18-mj-3161 (KMW) (Apr. 26, 2018) (appointing special master to conduct privilege review).

In cases where courts in this district have found a government's wall team procedures appropriate, the defendant had been given the opportunity to review and object to the wall team's determinations *before* the materials were turned over to the prosecution. *See United States v. Grant,* No. 04 CR 207BSJ, 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004) (noting defendant would not be prejudiced by the government's wall team because "after the privilege team reviews the documents for privilege, the Defendant will have the opportunity to make objections to the Court before any documents are turned over to the trial team."); *United States v. Winters,* No. 06 CR. 54 SWK, 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006) (finding the government's wall Assistant would adequately protect defendant's asserted privilege because "the wall Assistant will not communicate any of the information learned through his document review to members of the prosecution team" and "even if the wall Assistant determines that a particular item is not privileged, the defendant will at that time be permitted to make further submissions to the Court challenging the wall Assistant's determination."). Unlike the defendants in *Grant* and *Winters*, Mr. Schulte

was given no opportunity to review the wall team's determinations before they were shared with the prosecution team. This is particularly problematic because the wall team failed to adequately redact Mr. Schulte's privileged documents.

Although the wall team redacted some of Mr. Schulte's case related notes, they left unredacted many pages of privileged materials regarding his case intended for discussion with counsel. Unlike the average defendant, Mr. Schulte has a high-level of technical skills, which he used to provide input on his case to his legal team. In particular, the blue notebook contains at least nine pages of unredacted work product. For example, the wall team failed to redact pages in which Mr. Schulte flagged, from his discussions with counsel, particular IRC chats and Google searches from his discovery review. *See* Ex. E at 12-13, 40. Other unredacted pages include case-specific notes regarding a search warrant affidavit, *id.* at 38-39, issues with his discovery review, *id.* at 5, 38, Sentencing Guidelines calculations, *id.* at 30, and draft letters to the Court, *id.* at 41-42. If those pages had been properly redacted, only seven pages (not 16 pages) out of the 59 page notebook would have been left unredacted. Additionally, the wall team failed to redact Mr. Schulte's notes regarding meeting with defense experts. Ex. D.

The wall team similarly failed to redact certain writings and narrative notes that also fall under the scope of Mr. Schulte's attorney-client privilege. These writings were an outline of confidential information Mr. Schulte shared with counsel for the purpose of obtaining legal advice. Although not all of these documents were explicitly

addressed to counsel or discussed legal matters, they are privileged because they contain information Mr. Schulte intended to discuss with counsel because he believed it to be pertinent to his case. *See United States v. Defonte*, 441 F.3d 92, 96 (2d Cir. 2006) (finding attorney-client privilege would apply to writings from a journal that had been taken from an inmate's cell at the MCC as long as those writings were an outline of what the inmate wished to, and ultimately did, discuss with counsel); *Clark v. Buffalo Wire Works Co.*, 190 F.R.D. 93, 96-97 (W.D.N.Y. 1999) (notes client made "in order to inform an attorney about facts from his daily life that he considered to be relevant to his potential legal remedies" were protected by attorney-client privilege); *Bernbach v. Timex Corp.*, 174 F.R.D. 9, 9-10 (D. Conn. 1997) (notebooks written by client containing "almost daily notes of events and conditions in her life which she felt were critical for her attorneys to know" satisfied the elements of attorney-client privilege). Like the information seized in *Clark*, Mr. Schulte's narrative writings and diary entries contain information he "considered to be relevant to his potential legal remedies." For example, in a 133-page document entitled "Malware of the Mind," which Mr. Schulte wrote for and shared with counsel, he articulated legal arguments as to why he believed the FBI's warrants to search his devices were illegal. But the wall team improperly failed to redact this document as privileged and subsequently turned it over to the prosecution.

The wall team's failure to redact broad swaths of Mr. Schulte's privileged documents further demonstrates that the wall team procedures were inadequate. Had

appropriate safeguards been in place, Mr. Schulte could have asserted his privilege over a series of documents and prevented them from being disclosed to the prosecution team.

B. <u>Subsequent warrants that relied upon the notebooks also should be suppressed.</u>

Because the red and blue privileged notebooks were obtained and reviewed in violation of Mr. Schulte's rights, evidence obtained through search warrants that relied upon those notebooks to establish probable cause also must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Young v. Conway*, 698 F.3d 69, 77 (2d Cir. 2012) ("The exclusionary rule applies not only to the 'direct products' of unconstitutional invasions of defendants' Fourth Amendment rights, but also to the indirect or derivative 'fruits' of those invasions."). Absent information obtained from Mr. Schulte's notebooks, the government would not have requested the Proton Mail Warrant, Discovery Laptop Warrant, and ISP Warrants. Thus, any evidence obtained as a result of these subsequent warrants must be suppressed. *See United States v. Calhoun*, 2017 WL 1078634, at *13 (D. Conn. Mar. 21, 2017) (granting motion to suppress where the "tainted evidence play[ed] a central role" in providing probable cause to search the defendant's home); *United States v. LeClerc*, 185 F. Supp. 3d 370, 382 (W.D.N.Y. 2016) (suppressing all evidence seized pursuant to a search warrant where the "material information used for purposes of obtaining the search warrant . . . was learned as a result of the deputies' Fourth Amendment violation"). *See also United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)

("Evidence seized during an illegal search should not be included in a warrant affidavit."); *United States v. Kurniawan*, 627 F. App'x 24, 25 (2d Cir. 2015) (summary order) (noting that evidence observed during unlawful sweep should not have been included in subsequent affidavit).

As in *Calhoun* and *LeClerc*, the information obtained from the notebooks was crucial to the applications for the subsequent warrants, and there is no indication that the FBI would have thought to seek the subsequent warrants without information obtained from Mr. Schulte's notebooks. Indeed, the government could not have accessed the encrypted accounts searched by the Proton Mail Warrant without the account passwords obtained from the notebooks. *See* Ex. G, Proton Mail Aff. ¶ 3. Similarly, the Discovery Laptop Warrant would not have been requested without information from the notebooks allegedly describing locations on the computers where data could be stored covertly. *See* Ex. I, Discovery Laptop Aff. ¶ 3. The accounts searched by the ISP Warrants were identified by using Mr. Schulte's notebooks, as well as the contents of three encrypted email accounts obtained from the Proton Mail Warrant, which itself impermissibly relied on the notebooks. *See* Ex. K, ISP Warrants Aff. ¶ 11. Moreover, the affidavits for these warrants all cite and quote the notebooks extensively in establishing probable cause. *See* Ex. G ¶ 9.a-b; Ex. I ¶ 8.d; Ex. K ¶¶ 14.a-b. Because the tainted evidence "played a central role" in the affidavits for these warrants, *see Calhoun,* 2017 WL 1078634, at *13, blanket suppression is necessary.

C. <u>Alternatively, the Court should suppress the privileged notebook pages the wall team failed to redact.</u>

The attorney-client privilege protects communications made (1) between client and attorney (2) that are intended to be confidential (3) for the purpose of obtaining or providing legal advice. *See In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). This privilege encompasses writings that serve as "an outline of what client wishes to discuss with counsel and which is subsequently discussed with one's counsel." *Defonte*, 441 F.3d at 96. It is "well settled that individuals retain their attorney-client privilege when incarcerated or detained." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citing *Defonte*, 441 F.3d at 94). Absent blanket suppression, the general remedy for the violation of attorney-client privilege is the suppression of the privileged information at trial. *Lumiere*, 2016 WL 7188149, at *6.

As described *supra*, *see* A.iii, the wall team failed to adequately redact Mr. Schulte's privileged pages within the notebooks. Although the wall team redacted some of Mr. Schulte's case related notes, it left unredacted many pages of work product intended for communication with counsel regarding his case. Because these entries were case-related notes written in preparation for discussions with his attorneys regarding his pending criminal case, those documents are protected by attorney-client privilege and must be suppressed.

## Conclusion

For all of the reasons described above, the Court should grant defendant's motion to suppress the physical and electronic evidence obtained from the improper search, seizure, and review of his presumptively privileged notebooks and subsequent warrants that relied upon those notebooks, or at a minimum, order an evidentiary hearing to determine the extent to which the government's case benefitted from a violation of Mr. Schulte's attorney-client privilege. In the alternative, the Court should suppress privileged pages of the notebooks that the wall team failed to redact.

Dated:      New York, New York
            June 18, 2019

                        Respectfully submitted,

                        Federal Defenders of New York

                        /s/ Sabrina P. Shroff
            By: _____
                        Sabrina P. Shroff
                        Allegra Glashausser
                        Lauren M. Dolecki
                        Edward S. Zas

                        Assistant Federal Defenders
                        52 Duane Street, 10th Floor
                        New York, New York 10007
                        Tel.: (212) 417-8713