UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

    -against-

JOSHUA ADAM SCHULTE,

                                   Defendant.
------------------------------------------------------------X

S2 17 Cr. 548 (PAC)

**ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Joshua Schulte has been charged with stealing national defense information from the Central Intelligence Agency ("CIA") and transmitting it to WikiLeaks.[1] He was initially released on bail, but his bail was revoked after this Court found that Schulte violated the terms of his release relating to unauthorized use of the Internet. The Second Circuit subsequently affirmed the Court's detention order. Schulte was held at the Metropolitan Correctional Center ("MCC") in general population, where he allegedly violated the terms of his protective order and disclosed classified information using contraband cellphones. Subsequently, the Attorney General imposed Special Administrative Measures ("SAMs"), which resulted in Schulte being moved to 10 South—the most restrictive special housing unit at MCC—and his communications with other inmates and the outside world were severely restricted.

    Schulte moves to vacate the SAMs on the grounds that they are unconstitutional punishment and not reasonably necessary to prevent the disclosure of classified information. For the following reasons, the Court DENIES most of Schulte's motion to vacate the SAMs, but GRANTS the motion in two limited respects.

---

[1] On July 25, 2019, the Court granted Schulte's motion to sever Counts One through Eleven of the Second Superseding Indictment, which relate to these allegations of theft and transmission to WikiLeaks, from Counts Twelve through Fifteen, which involve allegations of child pornography and copyright infringement. Dkt. 117.

## BACKGROUND

I. **Allegations Forming the Basis for SAMs**

Following his initial arrest and arraignment on the child pornography charges in September 2017, Schulte was released on bail with conditions that included home incarceration with location monitoring and a prohibition on Internet use. *See* Dkt. 9. In January 2018, the Court determined that Schulte had violated his bail conditions relating to Internet use and ordered his detention to MCC. *See* Dkt. 29. The Second Circuit affirmed the Court's ruling. *See United States v. Schulte*, No. 18-145, Dkt. 34 (2d Cir. Mar. 6, 2018).

On June 18, 2018, the Government superseded the indictment to add charges relating to the WikiLeaks disclosure. Dkt. 47. Schulte remained housed in general population at MCC. The Government alleges that, between May and September 2018, Schulte engaged in a pattern of behavior from MCC that violated the protective order entered in this case, which resulted in the unauthorized disclosure of classified information. Specifically, the Government alleges that Schulte disclosed search warrants that were covered by a protective order, *see* Dkt. 11, to reporters and encouraged his family members, including his cousin, to disseminate the search warrants and "articles" written by Schulte. Dkt. 96 at 9-10. The Government also claims that Schulte sent a *pro se* filing containing classified information to an attorney and his parents in Texas, none of whom had security clearances. *Id.* at 11. Most significantly, the Government alleges that Schulte smuggled contraband cellphones into MCC, used them to access encrypted email accounts and social media accounts, and intended to engage in an "information war" with the United States by disclosing classified information. *Id.* at 11-13. The Government claims that documents seized from Schulte's cell at MCC[2] showed this plan, and included such comments

---

[2] Schulte has moved to suppress the documents seized from his cell at MCC. Dkt. 97. The Court has not yet ruled on this motion.

2

as:

> "If govt doesn't pay me $50 billion in restitution & prosecute the criminals who lied to the judge and presented this BS case then I will visit every country in the world and bear witness to the treachery . . . that is the USG [United States Government]. I will look to breakup diplomatic relationships, close embassies, and U.S. occupation around the world & finally reverse U.S. jingoism. If this one the way the U.S. govt treats one of their own, how do you think they treat allies?"
>
> "I NEED my discovery to be released to the public. I NEED my articles to be updated."
>
> "The way is clear. I will set up [two blogs]. From here, I will stage my information war . . . The [blog] will contain my 10 articles . . . ."

*Id.* at 12. In addition, the Government asserts that Schulte used the encrypted email and social media accounts to disseminate and attempt to disseminate classified information. *Id.* at 12-13. For example, the Government claims Schulte pretended to be a person speaking on Schulte's behalf, and emailed a reporter and stated he would give exclusive information on several topics, such as disclosures relating to high-ranking elected officials in the United States. *Id.* at 13. Furthermore, according to the Government, Schulte again sent a reporter a copy of a protected search warrant and a document containing classified information. *Id.* at 12.

Finally, the Government claims that Schulte began to post his writings on the encrypted social media accounts, but that the contraband cellphones were seized before Schulte was able to complete his plan to disclose other classified information in the form of articles and tweets. *Id.* at 13. Some of the articles and tweets the Government describes were allegedly written by Schulte but purport to be written by other individuals at the FBI and CIA, and appear intended to communicate that Schulte was framed for the leaks. *Id.*

## II.     The Attorney General's Recommendation of SAMs

In an October 26, 2018 memorandum, the Attorney General requested that the Bureau of Prisons ("BOP") impose SAMs on Schulte. *See* Dkt. 92 Ex. F ("SAMs Memo"); 28 C.F.R. § 501.2. The memorandum stated that the Director of the CIA had certified "that the

3

implementation of [SAMs] is reasonably necessary to prevent disclosure of classified information by Schulte, and that the disclosure of such information would pose a threat to national security." SAMs Memo at 1. It continues:

> Based upon Schulte's unauthorized disclosure of classified information and the fact that he retains knowledge of such information, as well as the recommendation of the CIA, the United States Attorney for the Southern District of New York (USA/SDNY) requests that SAM be imposed on Schulte. The Chief of the Counterintelligence and Export Control Section of the National Security Division (CES/NSD) and the Federal Bureau of Investigation (FBI) concur in this request.

*Id.* at 1.

In support of the request for SAMs, the Attorney General described the allegations regarding: the WikiLeaks disclosures; child pornography; unauthorized Internet use while Schulte was out on bail; violations of the protective order; prison calls disclosing classified information; the *pro se* bail motion containing classified information; and the contraband cellphones that had been smuggled into MCC. *See id.* at 2-4. He concluded that:

> Based upon information provided to me, including Schulte's theft and disclosure of classified information to Wikileaks, his violation of the court's protective order, and his continued willingness to disclose classified information, even while incarcerated, I find that there is a danger that Schulte will disclose classified information, the unauthorized disclosure of which would pose a threat to the national security of the United States, and that SAM on Schulte are reasonably necessary to prevent disclosure of such information.

*Id.* at 4-5. The Attorney General specified that the SAMs would be in effect for one year.

### III. The Terms of Schulte's SAMs

#### A. General Restrictions

When the SAMs were imposed on October 26, 2018, Schulte was moved to 10 South, the most restrictive Special Housing Unit at MCC, where his contacts and communications with others were, and remain, severely limited. *See* Dkt. 92 at 4-5. Schulte is barred from having contact with "any other inmate, visitor, attorney, or anyone else, except as outlined [in his SAMs], that could reasonably foreseeably result in [his] communicating (sending or receiving)

4

information that could circumvent the SAM's intent of significantly limiting [his] ability to communicate (send or receive) classified information." SAMs Memo ¶ 1(c). The SAMs prohibit Schulte from being housed or communicating with another inmate. *See id.* ¶¶ 6-7.

Schulte may not: communicate with the news media, *id.* ¶ 4; engage in group prayer with other inmates, *id.* ¶ 5; or have access to news publications or books that could be determined "to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public," *id.* ¶¶ 8(a), 9.

### B. Legal Contacts

Schulte can communicate with counsel, precleared staff, investigators, and experts to prepare his defense. *See id.* ¶ 2. Schulte's legal team is restricted, however, from forwarding third-party messages to or from the inmate. *Id.* ¶ 2(a). Schulte's attorneys, but not other legal staff, may disseminate communications from Schulte to third parties, but only for the sole purpose of preparing Schulte's defense. *Id.* ¶ 2(c). Schulte's cleared paralegals may meet and communicate with Schulte without his attorneys present, but may not communicate anything from Schulte to third parties. *Id.* ¶ 2(d).

Schulte "may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal," but "[a]n investigator may not meet alone with the inmate." *Id.* ¶ 2(e). Schulte may also have privileged, non-monitored telephone calls with his attorney or precleared staff. *Id.* ¶ 2(f). Schulte's attorneys may provide him with documents relating to his defense, including discovery materials, *id.* ¶ 2(g), and he may send and receive legal mail. *Id.* ¶ 2(h).

In addition to legal visits at the MCC, Schulte also regularly visits a secure space outside of MCC to meet with his defense team to review classified discovery. Dkt. 96 at 15 n.4.

### C. Non-Legal Contacts

Schulte may speak on the telephone with immediate family members only, a minimum of one time a month, and those conversations are monitored. SAMs Memo ¶ 3(a), (d). Schulte may have visits with immediate family members, one adult visitor at a time, and those visits are monitored. *Id.* ¶ 2(f). He may send and receive non-legal mail only from his "immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities." *Id.* ¶ 2(g). Correspondence with immediate family members "may be limited to three pieces of paper . . . doublesided, once per calendar week to a single recipient." *Id.*

### DISCUSSION

### I. Statutory Authority for SAMs

The Attorney General may authorize the BOP to:

> [I]mplement special administrative measures that are reasonably necessary to prevent disclosure of classified information upon written certification to the Attorney General by the head of a member agency of the United States intelligence community that the unauthorized disclosure of such information would pose a threat to the national security and that there is a danger that the inmate will disclose such information.

*See* 28 C.F.R. § 501.2(a). SAMs may be imposed for a maximum of one year and may then be successively renewed, or re-imposed, in increments of up to one year. *Id.* § 501.2(c). Unlike 28 C.F.R. § 501.3, which governs the imposition of SAMs to prevent acts of violence and terrorism, § 501.2 does not contain a provision regarding restricting the attorney-client relationship.

The Court has jurisdiction to consider a motion to vacate SAMs.[3] *See United States v. Hashmi*, 621 F. Supp. 2d 76, 84 (S.D.N.Y. 2008) (motion to vacate SAMs is not an "action" requiring exhaustion of administrative remedies within the meaning of the PLRA); *United States v. Saipov*, (S1) No. 17-cr-722 (VSB), Dkt. 108 (the "*Saipov* Order") at 25 (S.D.N.Y. Jan. 14,

---

[3] The Government has not raised any objection regarding the exhaustion of administrative remedies.

6

2019) (recognizing that courts in the Second Circuit have distinguished pre-trial inmates' motions to vacate SAMs from 42 U.S.C. § 1983 claims, and modifying SAMs).

## II. Imposition of SAMs

The Government claims that there is overwhelming support that "there is a danger that Schulte will disclose classified information" and that SAMs "are reasonably necessary to prevent disclosure of such information." Schulte argues that there is no evidence he would disclose classified information such that these measures were reasonably necessary, and that there is no basis for the attorney-client provisions of Schulte's SAMs under § 501.2. Accordingly, Schulte asserts that the SAMs are not reasonably necessary and violate his Fifth, Sixth, and First Amendment rights.

The imposition of SAMs on Schulte and his resulting confinement to the 10 South unit at MCC is a result of Schulte's own violations of Court orders and BOP rules, and the evidence suggesting he had and planned to disclose classified information. Schulte's post-arrest behavior—before and after his remand to MCC—demonstrates that there is a danger that he will disclose classified information. *See* 28 C.F.R. § 501.2(a).

First, Schulte violated the conditions of his bail relating to unauthorized use of the Internet. *See* Dkt. 29 at 16:9-17. Schulte was then remanded to MCC but was housed in general population. When he was first remanded, the Government alleges that Schulte disclosed search warrants that were covered by a protective order, encouraged his family members to disseminate the search warrants and "articles" he wrote, and sent a *pro se* filing containing classified information to an uncleared attorney and family members. At best, such post-remand behavior would show that Schulte is careless with classified information, and at worst, it would show that he intended to disclose classified information. Still, even after these incidents, SAMs were not

7

imposed on Schulte and he remained in general population.

Subsequently, when the Government obtained evidence showing that Schulte smuggled contraband cellphones into MCC, used them to access email and social media accounts, and intended to use them to disclose classified information, the Government sought imposition of SAMs on Schulte to prevent disclosure of classified information pursuant to § 501.2. Schulte was then moved to 10 South, the most restrictive special housing unit at MCC, where all inmates are in solitary confinement and are subject to SAMs specific to their cases. Such a response was reasonable considering the escalation of Schulte's post-arrest conduct and the risks of unauthorized disclosure of classified information. *See United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2008 WL 2695307, at *5 (S.D.N.Y. July 8, 2008) (rejecting argument that defendant's special administrative measures were "automatic[ally]" imposed because other al Qaeda defendants were subject to similar measures, and concluding that the Government's supporting memoranda "describe actions that Kassir has himself undertaken").

The SAMs are undoubtedly restrictive, but generally they are reasonably necessary to avoid further disclosure of classified information. Despite escalating restrictions on Schulte's freedom prior to his isolation in 10 South, Schulte continued to flout Court orders and his bail conditions, protective order, BOP rules, and procedures for handling classified information. If the Government's allegations against Schulte are true, Schulte intended to engage in an information war which would involve leaking classified information to the news media. Restrictive measures needed to be placed on Schulte to prevent unauthorized disclosure of classified information. Such measures are authorized by 28 C.F.R. § 501.2.

### III. Restrictions on Defense Team

Schulte argues that his SAMs provisions relating to attorney-client communications are

8

unauthorized because § 501.2, which relates to national security cases, does not discuss restrictions on attorney-client communications, even though § 501.3, which relates to terrorism cases, does. § 501.2(a) states that "special administrative measures ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to prevent the disclosure of classified information." This language does not preclude restrictions on attorney-client privileges.

Under his SAMs, Schulte is only permitted to talk to his legal team, his immediate family, the Court, BOP staff, and members of the Government. In this way, Schulte's SAMs reduce the risk that he will disclose classified information by limiting the universe of people with whom he can communicate, and monitoring his non-legal communications. In general, this approach is reasonably necessary and has worked to stop disclosure of protected and classified information.

The SAMs provision, limiting anyone except for Schulte's counsel, from disseminating Schulte's communications to third parties, however, places an excessive burden on Schulte's attorneys. *See* SAMs Memo at ¶ 2(c). This provision is unreasonably restrictive since it does not allowed precleared non-attorney members of Schulte's defense team (*e.g.*, paralegals, experts) to disclose Schulte's communications for the sole purpose of preparing his defense. Recently, Judge Broderick found that similar SAMs were "unreasonably restrictive in that they [did] not permit precleared non-attorney members of [the] defense team who have agreed to abide by the SAMs to make such disclosures for the sole purpose of preparing [the] defense." *See Saipov* Order at 25. These SAMs are unreasonably restrictive on Schulte's legal team, and should be modified to allow precleared non-attorney members of Schulte's legal team to

disseminate the contents of Schulte's communications for the sole purpose of preparing Schulte's defense, but only following consultation with Schulte's attorneys. *See id.*

The restrictions on Schulte's attorney-client communications do not otherwise have a chilling effect on the defense team. While this case involves a vast amount of classified discovery that complicates Schulte's ability to prepare his defense, the Court, the Government, and the Classified Information Security Officer have engaged in an iterative process to iron out issues involving the handling of classified information as they arise. As part of this process, in addition to Schulte's regular attorney calls and visits, Schulte is permitted to leave MCC twice a week to review his classified discovery in a secure facility. And as the Court has seen in the multitude of conferences and filings in this matter over the past two years, the SAMs do not prevent the defense team from zealously advocating for Schulte. Accordingly, they do not violate his Sixth Amendment right to counsel.

## IV. Restrictions on Third-Party Communications

The SAMs prevent Schulte's defense team from forwarding communications from Schulte to third parties, including his family members. Schulte claims that these provisions are vague, leave the definition of "communications" imprecise, and create doubt about what his attorneys can say to Schulte's family. The Government's response, however, provides clarity: "Observations about Schulte can certainly be shared with his family, but messages from Schulte (*i.e.*, verbal, written, or recorded communications) that are unrelated to his defense cannot be shared with any third parties, even if defense counsel perceives them to be innocuous." Dkt. 96 at 26. Moreover, Schulte can communicate with his immediate family through monitored calls, meetings, and cleared mail. SAMs Memo ¶ 3.

## V. First Amendment Challenge

The SAMs implicate First Amendment concerns as they prevent Schulte from talking to his extended family, or anyone beyond his legal team, his immediate family, the Court, BOP staff, and members of the Government. The Government claims that there is a valid, rational connection between these limitations and a legitimate governmental interest in preventing the disclosure of classified information, since Schulte encouraged an extended family member, his cousin, to disseminate his search warrants and articles he had written. But Schulte allegedly encouraged his immediate family members to disseminate these materials as well, and the SAMs still allow Schulte to communicate with his immediate family members through monitored visits, phone calls, and mail. There is a logical mismatch between the Government's stated rationale and the SAMs' permissions regarding Schulte's communications with immediate family.

While the Court must consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *see Turner v. Safley*, 482 U.S. 78, 89 (1987), such consideration should not lead the Court to tolerate pre-trial conditions that are overly restrictive. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Additionally, the SAMs provide a process for family members' identities to be confirmed in advance, for communications to be monitored (and terminated if inappropriate activity occurs), and for visits to be permitted only with a minimum of fourteen calendar days in advance. SAMs Memo ¶ 3(f). The SAMs also allow BOP discretion to determine the quantity and duration of non-legal phone calls, with a minimum of one call per month. *Id.* ¶ 3(a)(ii). The existing procedures can be followed for Schulte to call and visit with non-immediate family members, and minimize the burden on BOP staff by providing advance notice, limits, and structure for monitored visits and/or phone calls.

The inmates in the 10 South unit at MCC live in isolation, and have little means for intellectual stimulation, physical movement or activity, or social stimulation. This small step will help address the effects that Schulte might be experiencing due to the restrictions on communications with the outside world. While generally the SAMs are reasonably necessary to prevent disclosure of classified information, the provision restricting non-immediate family goes too far in restricting Schulte's rights. *See Bell*, 441 U.S. at 539; *see also Sattar v. Holder*, No. 07-CV-02698-PAB-KLM, 2012 WL 882401, at *5 (D. Colo. Mar. 15, 2012) (plaintiff's First Amendment claim survived where government did not identify the basis for limiting communications with particular family members).

## CONCLUSION

For the reasons stated, ¶ 2(c) of Schulte's SAMs shall be modified to permit precleared non-attorney members of Schulte's legal team to disclose his communications for the sole purpose of preparing his defense, following consultation with and authorization by Schulte's cleared attorneys. In addition, ¶ 3 shall be modified to allow Schulte monitored contacts (calls, visits, and mail) with non-immediate family members. The parties are directed to meet and confer concerning the language to be used to amend the SAMs in accordance with this Order. The remainder of Schulte's motion to vacate SAMs is DENIED.

Dated: New York, New York
       August 14, 2019

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge