*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 30, 2019

Via ECF
The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
United State Courthouse
500 Pearl Street, Courtroom 14C
New York, New York 10007

      Re:    *United States* v. *Joshua Adam Schulte*, S2 17 Cr. 548 (PAC)

Dear Judge Crotty:

      The Government submits this letter in opposition to the defendant's letter motion (the "Conflict Letter"), dated August 26, 2019, in which the defendant asks that the Court sever and conduct a separate trial on Counts Four and Eleven (the "MCC Counts") and appoint new counsel for the defendant to conduct only that trial (the "MCC Counts Trial"), based on an alleged conflict of interest for two attorneys with the Federal Defenders of New York (the "Federal Defenders")—one of whom appears to no longer represent Schulte. For Schulte to raise this purported conflict now—nearly a year after learning the underlying facts that created the alleged conflict, nine months after hearing the Government's theory of prosecution for the MCC Counts, four months after receiving a bill of particulars that detailed the MCC Counts, over two months after filing an initial severance motion and motion to suppress the evidence underlying the MCC Counts, and just a few months before trial—is staggering.

      As an initial matter, the Court should order the defense to produce immediately to the Government the details of this purported favorable testimony, so that the Government can properly evaluate the issue. But even without the benefit of seeing this evidence, the Government still respectfully submits that Schulte's request for severance be denied as untimely, baseless, and unjust. As described below, the requested severance and appointment of counsel for the MCC Counts would in no way mitigate the purported conflict—and would only further delay the resolution of this case. To the extent a potential conflict exists, the Court can address it in many ways short of the proposed severance, including through a stipulation or the disqualification of the Federal Defenders entirely.

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 2

# BACKGROUND

### A. Schulte's Initial Arrest and Detention

On August 24, 2017, the Federal Bureau of Investigation (the "FBI") arrested Schulte in connection with the FBI's discovery of approximately 10,000 images of child pornography on his personal desktop computer. Although initially detained, Schulte was eventually released on bail. After hearings in December 2017 and January 2018, however, the Court revoked Schulte's bail, finding that Schulte had violated the terms of his release by, among other things, accessing the Internet without authorization. As a result, since December 2017, Schulte has been detained at the Metropolitan Correctional Center (the "MCC").

### B. Schulte's Initial Violation of the Protective Order

In connection initially with the child pornography charges against Schulte, the Government began to produce discovery to Schulte, including search warrant application materials (the "Search Warrant Materials"). The Government produced the Search Warrant Materials to Schulte pursuant to a protective order (the "Protective Order") entered, on consent, by the Court on September 17, 2017. The Protective Order prohibited Schulte from sharing the Search Warrant Materials with anyone outside of his defense team, absent authorization from the Court.

Despite the terms of the Protective Order, Schulte nevertheless transmitted some or all of the Search Warrant Materials to one or more members of the press. In May 2018, *The New York Times* (the "*Times*") and the *Washington Post* (the "*Post*") each published articles in which the authors claimed to have access to or to have reviewed the Search Warrant Materials. On May 21, 2018, the Court held a hearing. At that hearing, the Court reiterated the terms of the Protective Order to Schulte, confirmed that he understand the terms of the Order, and explained to Schulte that if he wanted relief from the Order, Schulte had to apply to the Court, not take matters into his own hands.

### C. The First Superseding Indictment and Schulte's Pro Se Bail Motion

On June 18, 2018, the grand jury returned the first superseding indictment (the "First Superseding Indictment") against Schulte. The First Superseding Indictment re-asserted the child pornography charges for which Schulte was originally arrested, but also charged Schulte with, among other counts, illegally gathering and transferring classified national defense information, in violation of various provisions of 18 U.S.C. § 793 (the "WikiLeaks Counts") and illegally accessing and manipulating computer systems maintained by Schulte's former employer, the Central Intelligence Agency (the "CIA"), in violation of various provisions of 18 U.S.C. § 1030 (the "Computer Fraud Counts," and together with the WikiLeaks Counts, the "CIA Counts"). The CIA Counts are based on Schulte's illegal theft and disclosure of classified information about CIA cyber-tools (the "Classified Information") to WikiLeaks.org ("WikiLeaks").

On June 20, 2018, the Court arraigned Schulte on the First Superseding Indictment. Because venue for the CIA Counts lay in the Eastern District of Virginia, however, the parties

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 3

appeared before the Court again on June 28, 2018. At the June 28 conference, Schulte, after the Court advised him of his rights, waived his right to challenges these counts based on venue.

At the conclusion of the June 28 conference, Schulte provided the Court with a handwritten pro se bail motion (the "Pro Se Bail Motion") that he had drafted. The Pro Se Bail Motion appeared on the public docket briefly, but was removed at defense counsel's request. Following the court appearance, the Government informed defense counsel that the CIA would have to conduct a classification review of the Pro Se Bail Motion, to determine if it contained classified information. Despite the Government's warning, Schulte nevertheless sent the Pro Se Bail Motion to an attorney and his parents in Texas, none of whom had any security clearances. The CIA subsequently determined that the Pro Se Filing contained classified information, and the FBI recovered a copy of the document from the attorney in Texas.

### D. The MCC Investigation and Imposition of Special Administrative Measures

In or about September 2018, the Government learned from a confidential source (the "CW") that Schulte and other inmates were using cellphones (the "Contraband Cellphones") that had been smuggled into the MCC. Upon learning of this, the Government immediately began to investigate Schulte's conduct. Beginning on or about October 2, 2018, the Government obtained and executed six search warrants for (1) locations in the MCC used by Schulte (the "MCC Premises Warrant"); (2) unencrypted email accounts found on the Contraband Cellphones (the "Contraband Cellphone Email Accounts Warrant"); (3) a wall review of writings (the "Schulte Cell Documents") found in Schulte's cell (the "Schulte Cell Documents Warrant"); (4) encrypted email accounts referred to in some of the Schulte Cell Documents (the "Encrypted Email Accounts Warrant"); (5) social media accounts Schulte created while detained at the MCC (the "Social Media Accounts Warrant"); and (6) a laptop used by Schulte to review discovery produced by the Government in this prosecution (the "Discovery Laptop Warrant," and together with the MCC Premises Warrant, the Schulte Cell Documents Warrant, the Contraband Cellphone Email Accounts Warrant, the Encrypted Email Accounts Warrant, and the Social Media Accounts Warrant, the "MCC Warrants").

The affidavits submitted in support of the MCC Warrants (collectively, the "MCC Affidavits") laid out in explicit detail the Government's investigation, including its reliance on the Schulte Cell Documents. In particular, those affidavits described, among other things, the following:

- *The MCC Premises Warrant*: The affidavit submitted in support of the MCC Premises Warrant (the "MCC Premises Affidavit") described information provided by the CW about Schulte's use of the Contraband Cellphones, and even included images of Schulte using one or more of the Contraband Cellphones and screenshots of messages communicated using the Contraband Cellphones.

- *The Contraband Cellphone Email Accounts Warrant*: The affidavit submitted in support of the Contraband Cellphone Email Accounts Warrant (the "Contraband Cellphone Email Accounts Affidavit") included a screenshot of one of the

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 4

>Contraband Cellphones displaying the first page of one of several purported "articles" drafted by Schulte (the "Schulte Articles").

- *The Schulte Cell Documents Warrant*: The affidavit submitted in support of the Schulte Cell Documents Warrant (the "Schulte Cell Documents Affidavit") described how the FBI found (1) documents which may have been privileged; (2) copies of the Schulte Articles; (3) a document bearing an email account and password (the "JohnSmith Account"); and (4) a document that purported to be intended for WikiLeaks and drafted by an alleged FBI "whistleblower," who claimed that the Schulte was not responsible for disclosing classified information and that the FBI had planted child pornography on Schulte's personal computer (the "Fake FBI Document").

- *The Encrypted Email Accounts Warrant*: The affidavit submitted in support of the Encrypted Email Accounts Warrant (the "Encrypted Email Accounts Affidavit") described portions of the Schulte Cell Documents in which Schulte discussed how he planned to use encrypted email accounts to further an "information war," including, among other things, notations in which Schulte states that (1) Schulte thought that he had convinced his father to open an encrypted email account to "upload the articles"; (2) Schulte planned to create blogs where he would publish his "10 articles," and "stage [his] information war"; (3) Schulte had "started cleansing the phone."

- *The Discovery Laptop Warrant*: The affidavit submitted in support of the Discovery Laptop Warrant (the "Discovery Laptop Affidavit") described, among other things, portions of the Schulte Cell Documents in which Schulte noted the potential locations of "covert partitions," *i.e.* hidden locations, on his discovery laptop, in which data could potentially be hidden.

- *The Social Media Accounts Warrant*: The affidavit submitted in support of the Social Media Accounts Warrant (the "Social Media Accounts Affidavit") cited to numerous portions of the Schulte Cell Documents for support, including, among other things, (1) versions of the Schulte Articles found in the Schulte Cell Documents; (2) a draft press release in which Schulte accused the FBI of being a terrorist organization and declared his candidacy for Congress; (3) the Fake FBI Document; (4) draft "tweets" (the "Fake CIA Tweets") in which Schulte purported to be one of his former CIA colleagues, who claimed that Schulte was being framed for disclosing classified information; (5) threats that Schulte would "travel to every country" and "look to breakup diplomatic relationships, close embassies, and U.S. occupations around the world & finally reverse U.S. jingoism"; (6) notations that Schulte wanted his discovery (much of which is classified) to "be released to the public" or "leaked"; and (7) notations to "delete suspicious emails from my gmail."

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 5

Based in part on Schulte's conduct at the MCC, on October 26, 2018, the Attorney General of the United States directed the Bureau of Prisons to house Schulte under special administrative measures ("SAMs"). On May 10, 2019, Schulte moved to vacate the SAMs. On August 14, 2019, the Court denied Schulte's motion in part, directing two modifications to the SAMs that pertained to Schulte's interactions with his defense team and his non-immediate family members.

### E. The Second Superseding Indictment, Discovery, and Reverse Attorney Proffer

The Government's investigation into Schulte's conduct in the MCC uncovered substantial evidence of criminal activity. In addition to using the Contraband Cellphones and prohibited email and social media accounts, the Government discovered that Schulte also disclosed and attempted to disclose classified information to third parties and willfully violated the Court's Protective Order. For example, in or about September 2018, Schulte—using one of the encrypted email accounts—emailed a reporter with the *Post* and attached some of the Search Warrant Materials, which the Protective Order prohibited him from sharing with anyone outside of his defense team, as the Court had reminded Schulte at the May 21, 2018 conference. In addition, Schulte also attached a document he prepared, in which he articulated purported arguments attacking the probable cause in the Search Warrant Materials and referenced classified information. Similarly, the Schulte Cell Documents also contain documents—like the Fake CIA Tweets—that contain classified information and which appeared to be intended for public dissemination.

Based on this conduct, the grand jury returned a second superseding indictment (the "Second Superseding Indictment") against Schulte on October 31, 2018. The Second Superseding Indictment included all of the charges in the First Superseding Indictment, but added an additional count under 18 U.S.C. § 793 (the "MCC Leak Count"), based on Schulte's transmission and attempted transmission of classified national defense information from the MCC, and a count for contempt of court (the "Contempt Count," which, together with the MCC Leak Count, make up the MCC Counts), based on Schulte's willful violation of the Protective Order. The day after filing the Second Superseding Indictment, on November 1, 2018—almost ten months ago—the Government produced the MCC Warrants to the defense, including the MCC Affidavits that described the Government's reliance on information from the Schulte Cell Documents.

About six weeks later, on December 18, 2018, the Government met with defense counsel (the "Reverse Attorney Proffer"). At this meeting, the Government described for defense counsel the theory of the Government's case with respect to the charges in the Second Superseding Indictment, and answered defense counsel's questions about the charged counts, including the new counts. The Government also explicitly noted during the Reverse Attorney Proffer that it believed that the material recovered pursuant to the MCC Warrants was relevant evidence with respect to not only the MCC Counts, but also the CIA Counts.

### F. The Bill of Particulars Response and Schulte's Pro Se Complaint

On or about April 12, 2019, Schulte filed a pro se civil complaint (the "Pro Se Complaint"), in which he complained about, among other things, the conditions of his confinement and the FBI's investigation. In the Pro Se Complaint, Schulte argued that the Government obtained the MCC

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 6

Premises Warrant illegally because the FBI allegedly had no evidence of Schulte using a cellphone in the MCC—even though the MCC Premises Affidavit contained a photograph of Schulte using a cellphone in the jail. Schulte also complained that, after obtaining the first allegedly illegal search warrant, the "Federal Terrorists," Schulte's nomenclature for the FBI, obtained a second search warrant "requesting review of attorney-client notebooks," *i.e.*, portions of the Schulte Cell Documents. Schulte further stated that "[t]he Federal Terrorists use passwords [Schulte] wrote in his legal documents for his attorneys to seize and shutdown various accounts"; "[t]he Federal Terrorists claim to find classified information in [Schulte's] legal notebooks that were only ever given to his attorneys"; and "[t]he Federal Terrorists claim this constitutes transmission and attempted transmission of national defense information and charge defendant."

On April 29, 2019, in response to a request from Schulte, the Government provided the defense with a bill of particulars (the "Bill of Particulars"). In the detailed Bill of Particulars, the Government specifically identified the classified national defense information that was the basis of the MCC Leaks Count.[1] The Government also specifically noted that this information was found in Schulte's "articles," encrypted communications from the MCC, and Schulte's "prison notebooks."

### G.  Schulte's Motions to Suppress and to Sever

On June 18, 2019, Schulte filed a motion to suppress the evidence found pursuant to the MCC Warrants (the "MCC Suppression Motion"). In the MCC Suppression Motion, Schulte argued that the Court should suppress the Schulte Cell Documents because the FBI allegedly had violated Schulte's Sixth Amendment rights by reviewing and seizing the Schulte Cell Documents, which Schulte maintained were privileged.[2] Nowhere in the MCC Suppression Motion did Schulte, however, disclose or otherwise suggest that two of his attorneys had a purported conflict with respect to the MCC Counts based on their interactions with Schulte.

The following day, on June 19, 2019, Schulte filed a motion for severance (the "Severance Motion"). In the Severance Motion, Schulte explicitly asked that the Court sever the child pornography and copyright counts, and that the Court conduct a trial on the CIA Counts and the MCC Counts together (the "Espionage Trial"). Again, Schulte did not contend in the Severance Motion that a purported conflict for two of his attorneys meant that the MCC Counts should be severed also, resulting in a third trial in this matter. On July 12, 2019, the Government consented to the Severance Motion. On July 25, 2019, the Court granted the Severance Motion and ordered that the Espionage Trial proceed first, on November 4, 2019.

---

[1] Because this information is classified, the Government does not describe it here. The Government has provided that information, however, to both the Court and the defense in other submissions.

[2] For the reasons set forth in the Government's August 2, 2019 opposition, Schulte is wrong.

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 7

Finally, on July 3, 2019, Schulte filed a motion to suppress evidence seized from his home in New York and subsequent searches of his electronic accounts (the "Home Suppression Motion"). The MCC Suppression and Home Suppression Motions are still pending.

### H. Schulte's Conflict Letter

On August 26, 2019, nearly a year after receiving the MCC Warrants materials in discovery, Schulte filed the instant Conflict Letter. In the Conflict Letter, the defense claims that in or about May or June 2018, soon after the Federal Defenders began to represent Schulte, Matthew B. Larsen, Esq. and Sabrina P. Shroff, Esq. met with Schulte to discuss his case. (*See* Confl. Ltr. p. 2). In the version of the Conflict Letter provided to the Government, the defense has redacted the detail about that conversation, but nevertheless claims that, based on that conversation, Ms. Shroff and Mr. Larsen would be able to testify on Schulte's behalf with respect to the MCC Leak Count. In particular, this purported favorable testimony appears to concern the Schulte Cell Documents, and Schulte's alleged intent in drafting some or all of those documents. (*See id.*). The defense thus requests that the Court sever the MCC Counts from the Espionage Trial and appoint new counsel to defend Schulte with respect to the MCC Counts. (*See id.* p. 4).

## DISCUSSION

### I. SCHULTE'S SEVERANCE REQUEST IS UNTIMELY AND WITHOUT MERIT

As discussed in more detail below, Schulte should be compelled to provide the Government the details of the allegedly favorable testimony so that the Government can appropriately evaluate the purported conflict issue. But regardless of the specific nature of the testimony, Schulte's proposed solution to the belatedly identified ethical issue—to sever the MCC Counts from the Espionage Trial and appoint new counsel solely on the MCC Counts—should be rejected.

As a threshold matter, Schulte has waived his severance motion. Where, as here, "a party does not meet the deadline for making [a severance] motion, the motion is untimely" and generally deemed waived absent a showing of "good cause." Fed. R. Crim. P. 12(c)(3); *see also United States v. Yousef*, 327 F.3d 56, 125 (2d Cir. 2003) (finding waiver where the defendant had "ample opportunity to raise and develop" a suppression motion in the district court, but "has not provided, much less established, any reasonable excuse for his failure to [do] so").

There is no reasonable excuse for Schulte's failure to seek severance of the MCC Counts by the deadline for filing pretrial motions.[3] As described above, by November 1, 2018, Schulte had been charged in the Second Superseding Indictment with the MCC Counts and had all of the MCC Affidavits. *See supra* p. 5. Those affidavits laid out in explicit detail the Government's reliance on multiple portions of the Schulte Cell Documents, including Schulte's declaration of an

---

[3] Schulte's counsel first alerted the Government to a potential conflict approximately one month ago. At the time, defense counsel did not disclose the substance of the potential conflict other than that it related to two specific Schulte Cell Documents, one of which, the Pro Se Bail Motion, is referenced in the Conflict Letter.

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 8

"information war" against the United States, his drafting of false exculpatory statements like the Fake FBI Document and the Fake CIA Tweets, his improper disclosure (for the second time) of some of the protected Search Warrant Materials in direct violation of the Court's Protective Order, his plan to destroy evidence, and his plan to destroy the United States' diplomatic relationships unless Schulte was released and paid $50 billion.  *See supra* pp. 3-4.  The prospect that the Schulte Cell Documents would be relevant to the MCC Counts was thus readily apparent at least ten months ago.  Indeed, Schulte himself confirmed his awareness of the connection between his writings and the MCC Counts in April 2019—two months before the pretrial motions deadline—when he wrote in the Pro Se Complaint that "Federal Terrorists" had seized "his legal documents for his attorneys to seize and shutdown various accounts," claimed "to find classified information in [his] legal notebooks that were only ever given to his attorneys," and then charged him with "transmission and attempted transmission of national defense information."  *See supra* pp. 5-6.  Moreover, if there was any doubt in the defense's mind, just two weeks later, still approximately a month and a half before the pretrial motions deadline, the Government explicitly informed the defense in the Bill of Particulars that information in the Schulte Cell Documents helped form the basis of the MCC Counts.  *See supra* p. 6.  Having still failed to raise the severance issue until months after the deadline, Schulte has waived his right to seek severance on this basis now.  *See Yousef*, 327 F.3d at 125.

Schulte's severance motion also fails on the merits.  Although Schulte does not cite any case law regarding severance, his argument appears to be based on Rule 14 of the Federal Rules of Criminal Procedure, which provides that a court may grant severance "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant."  Fed. R. Crim. P. 14.  To prevail on a severance motion under Rule 14, however, "the defendant must show not simply some prejudice but *substantial* prejudice."  *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *United States v. Werner*, 620 F.2d at 928) (internal quotations omitted) (emphasis in original).  "Substantial prejudice" means "'prejudice so great as to deny [the defendant] a fair trial.'"  *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (quoting *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991)).  In addition, "[a] defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials."  *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).

Schulte claims that he would be unfairly prejudiced by a joint trial of the CIA Counts and MCC Counts because new counsel would need to be appointed on all counts, which "would likely delay the entire trial indefinitely."  (Confl. Ltr. at 4).  This argument is without merit.  Initially, as detailed below, the Court could fashion an approach that would not require either severance or appointment of new counsel.  *See infra* pp. 10-13.  But even if the Federal Defenders were to be disqualified, Rule 14 is concerned with prejudice resulting from the joining of counts or defendants that would deny Schulte a fair trial.  *Salameh*, 152 F.3d at 115; *see also United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991) (a district court's denial of a motion to sever "will not be overturned unless the defendant demonstrates that the failure to sever caused him substantial prejudice in the form of a miscarriage of justice" (internal quotation marks omitted)); *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994) (defendant seeking severance "under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice" (internal quotation marks

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 9

omitted)).  Trial delay based on the Federal Defenders' ethical issue is not unfair to Schulte and does not deny Schulte a fair trial.  Indeed, any delay or prejudice resulting from the ethical issue is entirely of Schulte's own making.[4]  As discussed above, Schulte could and should have raised this ethical issue months ago, and had he done so, the Court could have addressed it without risking further delay of the trial schedule.

Regardless, Schulte's proposal—further severed trials and new counsel for the MCC Counts—would neither prevent trial delay nor resolve the ethical issue.  Rather, it is likely to exacerbate both.  First, appointing new counsel on the MCC Counts is likely to cause, rather than prevent, further trial delay and would complicate Schulte's defense across all counts.  Because of the interconnectedness of the MCC Counts and the CIA Counts, as well as the child pornography and copyright counts, new counsel would need to become familiar with the evidence as to all counts in order to appropriately advise and defend Schulte.  Indeed, new counsel might determine that the best course with respect to the MCC Counts would be to seek to negotiate a plea that resolves those charges along with some combination of the CIA Counts, child pornography counts, and/or copyright count.  Those negotiations could not occur until new counsel was fully familiar with all aspects of the case.  This would take a substantial amount of time given that new counsel would have to be cleared and that a substantial portion of the evidence is classified and, thus, must be reviewed in sensitive compartmented information facilities.  Moreover, even after new counsel became familiar with the case, it is possible that new counsel might have different views than current counsel concerning a variety of trial strategy decisions, including, among others, the desirability of Schulte testifying, which could impact one or all of the severed trials and would need to be coordinated among all of Schulte's attorneys.  As a result, trial on the CIA Counts could not proceed until new counsel for the MCC Counts was familiar with the entire case.  In short, the appointment of new counsel would likely further complicate this case and lead to substantial delays.

Second, severing the CIA Counts from the MCC Counts also would not resolve the purported ethical issue.  Even if the trials were severed, evidence of Schulte's prison conduct, including the Schulte Cell Documents, would still be admissible at the trial addressing the CIA Counts as both direct evidence and Rule 404(b) evidence of those crimes.  For example, in the Schulte Cell Documents, Schulte specifically identifies certain classified information that was provided to WikiLeaks but which WikiLeaks has not yet published, which is direct evidence that Schulte transmitted classified information to WikiLeaks as charged in the WikiLeaks Counts.  Similarly, Schulte's prison conduct is also admissible as to the WikiLeaks Counts for a variety of Rule 404(b) purposes including to show, among other things, consciousness of guilt, motive, opportunity, intent, absence of mistake, and modus operandi.[5]

---

[4] Moreover, the Federal Defenders may be able to remain involved in the case to help to prepare trial counsel, thus preserving the work that they have done during the course of their representation, without actually serving as trial counsel.

[5] Similarly, during a trial addressing the MCC Counts, the Government would introduce evidence relating to the CIA Counts as direct evidence to complete the story of the crime and, in the alternative, as Rule 404(b) evidence.  For example, evidence related to the CIA Counts would establish Schulte's motive for committing and ability to commit the MCC Counts, as well as his

Because the evidence at the severed trials would largely be coextensive, the ethical issue remains in play and severance is entirely inappropriate under Rule 14. *See, e.g.*, *United States v. Page*, 657 F.3d 126, 130 (2d Cir. 2011) (district court properly held joint trial of narcotics and gun counts because, among other reasons, a separate trial "would have required much of the same evidence."); *Blakney*, 941 F.2d at 116; *United States v. Charlton*, No. 18 Cr. 30 (PAC), 2019 WL 1595860, at *2 (S.D.N.Y. Apr. 15, 2019) ("Presenting this same evidence twice, to two different juries, would burden trial witnesses, lead to unnecessary duplication and inefficiencies, and risk the inequity of inconsistent verdicts. The presumption against severance, then, is particularly justified in this case."); *United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 787913, at *2 (S.D.N.Y. Mar. 4, 2013) (denying motion to sever trials for co-defendants where "charges would need to be presented and tried to a jury twice, requiring the multiple presentation of the same evidence and witnesses."); *United States v. Khandakar*, 955 F. Supp. 2d 268, 270 (S.D.N.Y. 2013) (denying motion to sever access device fraud charge from Medicaid fraud charge where the Government would use the same evidence to prove both charges); *United States v. Hernandez*, No. 93 Cr. 549 (JFK), 1994 WL 320373, at *3 (S.D.N.Y. July 5, 1994) ("There is a logical link between the guns-and-drugs conduct alleged in Counts One through Five and the obstruction conduct charged in Counts Six through Nine—the latter was allegedly designed to conceal and further the goals of the former."), *vacated in part on other grounds*, 85 F.3d 1023 (2d Cir. 1996); *United States v. Romero*, 786 F. Supp. 798, 800 (S.D.N.Y. 1992) (denying severance motion where "the requested severance would represent a duplication of effort and needlessly disadvantage the government, the Court and the public with lengthy repetitions of the same testimony").

## II. THE COURT SHOULD COMPEL FURTHER DISCLOSURE ABOUT THE ALLEGEDLY FAVORABLE TESTIMONY FROM SCHULTE'S ATTORNEYS AND PURSUE MORE APPROPRIATE MEANS OF ADDRESSING ANY CONFLICT

Given Schulte's extreme delay in bringing this issue to the Court's attention, it is questionable whether the testimony proffered by his attorneys is actually favorable or valuable to him. In any event, to properly evaluate the defense's claim that this evidence is relevant or admissible, the Government must know immediately what the testimony is.[6] That is particularly the case given that Schulte claims that this testimony creates an ethical issue for his lawyers that should warrant the drastic relief of severance for a third trial on a single indictment. *Cf. United States v. Jones*, No. 85 Cr. 1075, 1986 WL 7787, at *1 (S.D.N.Y. July 10, 1986) (noting the Court's requirement that "if the *ex parte* submission raised questions of substance about pre-trial severance, the Government would have to be put in a position to make an informed reply," but

---

knowledge that the information he unlawfully transmitted was classified national defense information. As a result, even a trial on the MCC Counts would entail introduction of much of the evidence from the Espionage Trial.

[6] Upon learning the substance of the proposed favorable testimony, the Government will also be better positioned to address Schulte's arguments concerning Rule 3.7, as well as whether a *Curcio* hearing is necessary.

denying the motion to sever without requiring "the Government to answer on the point"). And given that Schulte would necessarily have to waive his attorney-client privilege to present this evidence, early disclosure does not meaningfully prejudice him. *See In re Grand Jury Proceedings*, 219 F.3d 175, 183 n.4 (2d Cir. 2000) ("The client's offer of his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter."). Accordingly, the Government respectfully requests that the Court direct Schulte to provide the Government with a more specific description of the purportedly favorable testimony that Mr. Larsen and Ms. Shroff would offer. *Cf. United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 711 (S.D.N.Y. 2011) (directing defendants to provide notice to the Government of an advice-of-counsel defense in sufficient time to take any disputes to the magistrate judge prior to the final pretrial conference); *United States v. Hatfield*, No. 06 Cr. 550, 2010 WL 183522, at *13 (E.D.N.Y. Jan. 8, 2010) (ordering defendants to disclose whether they intended to rely on an advice-of-counsel defense and, if so, to disclose all documents concerning the defense, including "all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense").[7]

Even assuming that the proposed testimony is favorable to Schulte and admissible, he should not be permitted to admit the evidence in a way that causes substantial prejudice to the Government, by effectively precluding the Government from introducing otherwise entirely admissible (and powerful) evidence of Schulte's misconduct at the MCC at the Espionage Trial, *see supra* pp. 7-10. Rather, if the evidence is in fact favorable and admissible, the Government respectfully submits that the parties and the Court can determine how best to proceed. Potential options include (1) the evidence can be introduced in an alternate form that does not require Schulte's current trial counsel to testify or (2) the Court can appoint Schulte new trial counsel for all of the counts against him.

With respect to the first option, the evidence could be introduced through a combination of different means. For example, the parties could enter into a testimonial stipulation that would allow the jury to consider this evidence, and, indeed, could even be more favorable to Schulte, because the Government would not have an opportunity to cross-examine Schulte's attorneys. *See, e.g.*, *United States v. Cook*, 373 F. App'x 91, 92 (2d Cir. 2010) ("As to whether withdrawal was warranted by a risk that counsel would be required to testify, there was no such risk: The statement at issue was inadmissible hearsay, the government's offered stipulation would have mooted any need for the testimony, and the victim (whose statement ambiguously presented the issue) intended to testify in a way that would have fully negated any need for the lawyer's testimony."); *see also United States v. Regan*, 897 F. Supp. 748, 757 (S.D.N.Y. 1995) (denying motion to disqualify

---

[7] The Government, of course, does not know precisely what the proffered testimony is because defense counsel has redacted it from their submission. Based on the remaining context in the submission, the Government does not understand the proffered testimony to support a classic advice-of-counsel defense. Indeed, advice-of-counsel is not even a defense to a contempt of court charge, *United States v. Remini*, 967 F.2d 754, 756 (2d Cir. 1992), and it is difficult to conceive of how it would be a defense to a charge under 18 U.S.C. § 793(e), the MCC Leak Charge, which criminalizes the transmission of classified information that the defendant is not authorized to possess.

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 12

assistant U.S. attorney whom defense wished to call as a witness because, among other reasons, the Government offered to stipulate to the testimony). Moreover, Mr. Larsen, one of the two attorneys that Schulte claims has favorable information, does not appear to be part of the trial team, and thus could potentially testify.[8] *See Murray v. Metropolitan Life Ins.*, 583 F.3d 173, 178 (2d Cir. 2009) (stating that none of the attorney witnesses were properly considered trial counsel for purposes of Rule 3.7(a) where three of the lawyers called to testify at trial were "transactional lawyers who are not and will not be trial advocates; the fourth, a litigator, is a member of the trial team, but will not act as an advocate before the jury"); *Regan*, 897 F. Supp. at 757 ("Third, Assistant United States Attorney Gardephe is not participating in the trial of this case and he is available to testify even if his testimony were to be relevant."). Either of those options would address Schulte's apparent desire to introduce his attorneys' testimony without requiring his trial-team lawyers to testify.

On the other hand, if Schulte does not wish to adopt either of those options, and instead insists that Mr. Larsen and Ms. Shroff must both testify at trial, then the Federal Defenders should be disqualified as trial counsel.[9] *See also United States v. Kliti*, 156 F.3d 150, 156 (2d Cir. 1998) ("When faced with an attorney as a sworn or unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony."); *cf. United States v. Rahman*, 861 F. Supp.. 266, 276 (S.D.N.Y. 1994) ("[P]roof at trial about a lawyer's conduct may be such that his very presence at counsel table would itself distort the fact-finding process by implying to the jury the court's endorsement or condonation of that conduct."). The defense cites *Kliti* for the proposition that disqualification is mandatory. (*See* Confl. Ltr. p. 3). That is not what *Kliti* held, however. In that case, the defendant's trial counsel had previously represented another individual who had made an exculpatory statement about the defendant. *See* 156 F.3d at 155. The Government then called the attorney's former client at trial against the defendant. *See id*. Despite the fact that the attorney was the only witness available to testify about the exculpatory statement, the district court did not hold a *Curcio* hearing. On appeal, the Second Circuit found the failure to hold a *Curcio* hearing to be error: "The [District Court], therefore, was obligated to question [the defendant], in accordance with *Curcio*, to determine whether he was willing to waive his right to a conflict-free lawyer and to forgo confronting [the Government's witness] with the exculpatory statement through the testimony of [his attorney]." *See id*. at 156.

---

[8] With respect to Schulte's delivery of the Pro Se Bail Motion to the Court, there are witnesses to those events other than Schulte's attorneys, including for example, numerous law enforcement officers who attended the conference.

[9] The Government, of course, does not prefer the appointment of new counsel because doing so would delay this case indefinitely.

The Honorable Paul A. Crotty, U.S.D.J.
August 30, 2019
Page 13

      In this case, the choice is not as stark—the evidence could be presented to the jury via stipulation and/or Mr. Larsen's testimony, or conflict-free counsel could be appointed. What the Court should not permit Schulte to do, however, is, after nearly a year of delay and multiple opportunities to raise the issue, force further delay, as well as an unnecessary, highly complex third trial, all for the sake of a proposed severance that would not meaningfully address the purported conflict.

                                                          Respectfully submitted,

                                                          GEOFFREY S. BERMAN
                                                          United States Attorney

                                    By:           /s/                   
                                                       David W. Denton, Jr. / Sidhardha Kamaraju /
                                                       Matthew Laroche
                                                      Assistant United States Attorneys
                                                      Tel.: 212-637-2744 / 6523 / 2420

Cc:  Defense Counsel (via ECF)
      Daniel Hartenstine, Court Information Security Officer (via Email)