# EXHIBIT A

[redacted]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | S2 17 Cr. 548 (PAC) |
| JOSHUA ADAM SCHULTE, | : | FILED *IN CAMERA* AND UNDER SEAL |
| Defendant. | : | |

**GOVERNMENT'S MOTION PURSUANT TO SECTION 6(a) OF THE CLASSIFIED INFORMATION PROCEDURES ACT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

David W. Denton, Jr.
Sidhardha Kamaraju
Matthew Laroche
Assistant United States Attorneys
Of Counsel

[redacted]

[redacted]

# (U) TABLE OF CONTENTS

(U) Background ........ 2

I. (U) The Charged Conduct ........ 2

II. (U) The Defendant's Section 5 Notices ........ 8

III. (U) Relevant Law Under CIPA ........ 11
- A. (U) Section 5 ........ 11
- B. (U) Section 6 Hearing ........ 13

IV. (U) Discussion ........ 16
- A. (U) Relevant Law ........ 17
- B. (U) The Court Should Authorize the Redaction and Substitution of the Protected Information in the Parties' Exhibits ........ 18
- C. (U) If the Defendant Testifies, He Should Be Bound by the Same Rules ........ 32
- D. (U) The Court Should Permit the Introduction of Certain Exhibits in Classified Form in a Manner That Protects Classified Information from Public Disclosure ........ 40

V. (U) The Court Should Exclude Certain Exhibits in the Section 5 Without a Hearing ........ 42
- A. (U) The Defendant Has Not Made a Particularized Showing with Respect to Seven Exhibits and Thus Should Be Precluded from Seeking to Introduce Them ........ 42
- B. (U) Certain Exhibits in the Defendant's Section 5 Notice Are Inadmissible ........ 43
  - 1. (U) The 302s ........ 43
  - 2. (U) Polygraphs ........ 50
    - a. (U) Relevant Facts ........ 51
    - b. (U) Polygraph Examination Results and Analysis Are Inadmissible ........ 52
    - Under Rules 702 and 403 ........ 52
      - i. (U) Applicable Law ........ 52
      - ii. (U) Polygraph Examination Results Are Unreliable Under Rule 702 ........ 53
      - iii. (U) Polygraph Examination Results Are Inadmissible Under Rule 403 ........ 56
    - c. (U) Schulte's Statements During the Polygraph Examinations Are Inadmissible Hearsay If He Offers Them ........ 58
      - i. (U) Applicable Law ........ 58
      - ii. (U) Discussion ........ 59
  - 3. (U) Performance Activity Reports ........ 61
  - 4. (U) Thumb Drive Images ........ 63
  - 5. (U) Other Items ........ 64

VI. (U) In the Alternative, the Court Should Hold an *In Camera* Hearing Pursuant to CIPA Section 6(a) to Determine the Relevance and Admissibility of the Classified Material ........ 66

(U) Conclusion ........ 66

[redacted]



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | S2 17 Cr. 548 (PAC) |
| JOSHUA ADAM SCHULTE, | : | FILED *IN CAMERA* AND UNDER SEAL |
| Defendant. | : | |

## (U) GOVERNMENT'S MOTION PURSUANT TO SECTION 6(a) OF THE CLASSIFIED INFORMATION PROCEDURES ACT

(U) The Government respectfully submits this motion pursuant to Section 6 of the Classified Information Procedures Act ("CIPA") to (1) seek a pretrial ruling approving the Government's proposed approach with respect to classified information in the parties' anticipated trial exhibits and testimony; and (2) address the additional classified information noticed by the defendant, Joshua Adam Schulte, pursuant to Section 5 of CIPA on September 19, 2019 (the "First Section 5 Notice") and October 4, 2019 (the "Second Section 5 Notice," and together with the First Section 5 Notice, the "Section 5 Notices").[1] Through this motion and

1

opposition, the Government seeks an order from the Court: (1) authorizing the redaction and substitution of certain categories of classified information in the parties' proposed exhibits; (2) precluding witness testimony about these same categories of classified information; (3) permitting the Government to enter certain voluminous classified documents into evidence as classified exhibits; and (4) excluding as irrelevant and/or inadmissible a limited number of proposed exhibits noticed by the defendant in the First Section 5 Notice and a substantial amount of proposed testimony noticed by the defendant in the Second Section 5 Notice. In the alternative, the Government respectfully requests that the Court hold an *in camera* hearing to address the use, relevance, and admissibility of the classified information at issue.[2]

**(U) <u>Background</u>**

## I. (U) The Charged Conduct

(U) Schulte is charged in a 15-count superseding indictment with (1) three counts of violating 18 U.S.C. § 793(b), (d), and (e), in connection with his unlawful theft and transmittal of classified information from the Central Intelligence Agency (the "CIA") (the "WikiLeaks Charges"); (2) another count of violating Section 793(e), in connection with his unlawful disclosure and attempted disclosure of classified information from the Metropolitan Correctional Center (the "MCC") (the "MCC Leak Charge"); (3) four counts of violating 18 U.S.C. §§ 641 and 1030, in connection with Schulte's unauthorized accessing and manipulation of CIA

[2] (U) Given the complexity of the issues it raises, the Government respectfully requests permission to exceed in the instant motion the page limit set forth in the Court's rules.

[redacted]

computer systems and theft of classified information from therein (the "Computer Fraud Charges"); (4) two counts of violating 18 U.S.C. §§ 1001 and 1503, in connection with false statements Schulte made to the Federal Bureau of Investigation (the "FBI") during its investigation (the "Obstruction Charges"); (5) one count of violating 18 U.S.C. § 401(3), in connection with his willful violation of the protective order (the "Contempt Charge"); (6) three counts of violating 18 U.S.C. § 2252A, in connection with Schulte's receipt, possession, and transportation of child pornography (the "Child Pornography Charges"); and (7) one count of violating 18 U.S.C. § 2319, in connection with Schulte's criminal violation of copyrights (the "Copyright Charge"). S2 17 Cr. 548 (PAC). The Government expects that its evidence at trial will establish, among other things, the following:

**A. (U) Schulte's Theft and Transmission of Classified Information**

(U) Schulte worked at the CIA for several years, where he held various positions. In or about 2015 and 2016, Schulte worked in a specific group within the CIA (the "Group") that was responsible for developing classified cyber tools. To develop those tools, the Group maintained classified information on an isolated local-area computer network (the "LAN"). Access to the LAN was limited principally to members of the Group. Schulte not only had access to the LAN but also was part of a small group of CIA employees who had certain administrative rights on the system. These rights allowed Schulte to manipulate the LAN in specific ways, including by controlling access to various parts of the system. Through his work, Schulte had access to and knowledge of specific cyber tools the CIA employed, CIA operations that employed such tools, and identities of CIA officers.

[redacted]

[redacted]

[redacted]

[redacted]

(U) Within weeks of his transfer, Schulte began to manipulate the LAN to give himself administrative privileges that had been removed from him. Through this illegal manipulation and access, Schulte unlawfully stole a large volume of classified information, using deceit and subterfuge to try to hide his activity. Schulte manipulated the LAN to conceal his activity, erasing log files that would have shown his misconduct, and lied directly to his supervisor. Schulte later transmitted the classified information that he stole. Then, in November 2016, Schulte resigned from the CIA and moved to New York.

(U) Between March and November 2017, WikiLeaks made 26 separate online disclosures of classified information (together, the "Leaks," collectively, the "Classified Information"). The Classified Information contained, among other things, highly sensitive information including detailed descriptions of certain tools used by CIA operators. The Leaks' impact on the CIA's intelligence gathering activities and the national security of the United States was catastrophic.

**B. (U) The Child Pornography on Schulte's Desktop Computer**

(U) Immediately after the first Leak, the FBI began to investigate. As part of that investigation, the FBI executed a search warrant on Schulte's apartment in New York and recovered, among other things, multiple computers, servers, and other portable electronic storage devices, including Schulte's personal desktop computer (the "Desktop Computer"). On the Desktop Computer, FBI agents found an encrypted container (the "Encrypted Container") containing over 10,000 images and videos of child pornography (the "CP Files"). For example,

[redacted]

[redacted]

one video depicted a girl approximately three-to-six-years' old engaging in various sex acts. On August 24, 2017, the FBI arrested Schulte in connection with his possession of child pornography. The defendant was initially released on bail but was subsequently remanded in December 2017 for violating the conditions of his bail.

### C. (U) Schulte Violated the Court's Protective Order

(U) On September 18, 2017, the Court entered a protective order (the "Protective Order") governing the production of certain discovery in this case, based upon a determination that it was necessary to protect materials that, if disseminated to third parties, could jeopardize national security and the safety of others, as well as impede ongoing investigations. The Protective Order provides that Schulte and his defense team can use certain designated materials only to prepare his defense, and can disseminate protected materials only to specified individuals involved in the preparation of his defense. Schulte, through counsel, agreed to the terms of the Protective Order. The Government subsequently produced several search warrant affidavits in discovery that were subject to restrictions in the Protective Order (the "Protected Search Warrants").

(U) Despite the terms of the Protective Order, Schulte nevertheless disclosed at least one of the Protected Search Warrants to reporters with *The Washington Post* and *The New York Times*. On May 15, 2018, both *The Washington Post* and *The New York Times* published articles concerning this case that discussed the content of at least one of the Protected Search Warrants. In a recorded telephone conversation from jail, Schulte described the contents of one of the Protected Search Warrants to a reporter. When asked by the reporter whether the material was classified, Schulte responded that it was not, but stated that it was subject to the Protective Order. Recorded prison calls also showed that Schulte enlisted members of his family, including his cousin, to disseminate one or more of the Protected Search Warrants, as well as what Schulte

[redacted]

[redacted]

described as "articles" he had written. The Government subsequently recovered copies of these "articles" from Schulte's family, including at least one "article" that included classified information.

(U) On May 21, 2018, at the Government's request, the Court held a hearing. At the hearing, the Court reiterated the terms of the Protective Order to Schulte and stated, explicitly, "If you want to vary the terms of the protective order, your relief is not to do it on your own, Mr. Schulte, but to have your lawyer come into court and explain why there should be a modification of the order." May 21, 2018 Conf. Tr. at 7. The Court also confirmed that Schulte understood the provisions of the Protective Order and the requirements it imposed on him. *See id.* at 8.

**D. (U) Schulte Declared an "Information War" from the MCC**

(U) While Schulte was detained at the MCC, he and other inmates arranged to have cellphones (the "Contraband Cellphones") illegally smuggled into the prison for their use. Schulte coordinated his activities with other inmates, often using them to obtain or store the Contraband Cellphones. Schulte used the Contraband Cellphones to access encrypted email accounts (the "Encrypted Email Accounts") and social media accounts (the "Social Media Accounts"). In his own words, Schulte intended to use these accounts to engage in an "information war" with the United States by systematically disclosing classified information and materials designed to obstruct the investigation and prosecution. For example, in notebooks found in Schulte's MCC cell (the "Prison Notebooks"), Schulte wrote the following:

- (U) "If govt doesn't pay me $50 billion in restitution & prosecute the criminals who lied to the judge and presented this BS case then I will visit every country in the world and bear witness to the treachery . . . that is the USG [United States Government]. I will look to breakup diplomatic relationships, close embassies, and U.S. occupation around the world & finally reverse U.S. jingoism. If this one the way the U.S. govt treats one of their own, how do you think they treat allies?"

[redacted]

[redacted]

- (U) "I NEED my discovery to be released to the public. I NEED my articles to be updated."
- (U) "The way is clear. I will set up [two blogs]. From here, I will stage my information war: . . . The [blog] will contain my 10 articles . . . ."

(U) Schulte's "information war" was no idle musing. Rather, Schulte used the Encrypted Email and Social Media Accounts to disseminate and attempt to disseminate classified information. For example, using one of the Encrypted Email Accounts, Schulte began to correspond with a reporter. In this correspondence, Schulte pretended to be a third person who was speaking on Schulte's behalf, and told the reporter that he would give the reporter "information" on several topics—including disclosures relating to high-ranking elected officials in the United States—if the reporter published stories pursuant to a timeframe dictated by Schulte. For example, in one email Schulte stated: "If you can consent to an embargo on disclosure of the information for a limited time we would give you an exclusive to the information spanning several topics." Moreover, in another email sent in September 2018, Schulte emailed the reporter a copy of one of the Protected Search Warrants—even though Schulte previously had confirmed his understanding that the Protective Order prohibited this type of dissemination. Schulte also attached a document in which he disputed facts contained in the Protected Search Warrant and in which he included classified information.

(U) Using the Contraband Cellphones, Schulte also began to post his writings on some of the Social Media Accounts. In these posts, Schulte asserted, among other things, that the Government had planted child pornography on his computer and that, through this prosecution, the "United States government has done the job of a foreign adversary to exploit its own intelligence officers." Although the Government seized the Contraband Cellphones before Schulte was able to complete his plan, the Prison Notebooks make clear that Schulte intended to

[redacted]

[redacted]

disseminate other classified information. For example, the Prison Notebooks include (1) a purported WikiLeaks article authored by a supposed FBI "whistleblower," who claimed to have leaked Schulte's discovery to WikiLeaks and to have knowledge that Schulte had been framed by the FBI; (2) drafts of tweets allegedly written by one of Schulte's former CIA colleagues, which disclosed classified information to bolster the alleged former colleague's credibility and which claimed that Schulte had been framed, this time by the CIA; and (3) a draft "article" in which Schulte criticized the FBI's investigation and included classified information about Schulte's training at the CIA. Based on this conduct, the Government charged him with the MCC Leak Count and the Contempt Count.

## II. (U) The Defendant's Section 5 Notices

(U) On September 19, 2019, the defendant served his First Section 5 Notice on the Government, which identifies 417 total items containing classified information that he proposes to disclose or cause to be disclosed at trial. The First Section 5 Notice contains a column entitled "Reasons why testimony is necessary," which appears to define and limit the particular classified information contained within the noticed items (some of which contain a wide range of classified information) that the defendant proposes to elicit at trial.[3]

(U) Attached as Exhibit A to this motion is an Excel spreadsheet with multiple tabs. The first tab, labeled "Section 5 Notice," duplicates the defendant's First Section 5 Notice. The remaining tabs divide the 417 items listed in the First Section 5 Notice by the Government's response, as follows:

- **<u>(U) Tab "302s"</u>:** Of the 417 items, 236 consist of FBI reports documented on

[3] (U) To the extent this is not the defendant's intention and he claims to want to introduce the wide range of classified information in the proposed exhibits, the Government would object based on a lack of specificity. *See infra* Part III.A.

[redacted]

[redacted]

Form FD-302, as well as handwritten notes of FBI agents or accompanying attachments (collectively, the "302s"). The Government objects to the introduction of the 302s themselves into evidence. To the extent that the defendant's identification of these 302s is intended to provide notice that he intends to elicit the information contained in the 302s from the witnesses whose recollections are memorialized therein, the Government does not object to admissible testimony from these witnesses on the subjects identified by the defendant in the First Section 5 Notice, subject to the limitations that the Government proposes for all evidence, testimonial or otherwise, introduced by either party, as described *infra* Part V.B.1.[4]

- **(U) Tab "GX":** Of the 181 remaining potential evidentiary items identified in the First Section 5 Notice, 95 are items that the Government identified to the defendant as likely Government exhibits on or about July 29, 2019, and as to which the Government does not object, subject to the redaction of, and where appropriate substitution for, classified information described in *infra* Part IV.A.

- **(U) Tab "No Objection":** Of the remaining 86 potential defense exhibits, the Government has no objection to 40 of them, subject to the redaction of, and where appropriate substitution for, classified information described in *infra* Part IV.A.

- **(U) Tab "Wall Documents":** Three items appear to have been provided only to the Government's wall team; the Government requests that the defendant provide them to the trial team so that the trial team can respond to his request to use these documents.

- **(U) Tab "Unknown":** Seven items fail to identify with adequate specificity either the particular item of evidence or the relevant portion of a large body of evidence, such as the defendant's entire CIA workstation, that the defendant proposes to introduce. The Government objects to these proposed exhibits because the defendant has not described them with the specificity required by Section 5, *see infra* Part V.A.

- **(U) Tab "USB Images":** 23 items are forensic images of USB storage devices recovered from the defendant's cubicle at the CIA. One of these images was previously identified to the defendant as a likely Government exhibit. The remaining 22 images contain no evidence relevant to the charges, and are inadmissible, *see infra* Part V.B.4

[4] (U) With respect to the defense's proffered exhibits and testimony, their ultimate admissibility will depend on the defense's proposed use of that evidence and the Federal Rules of Evidence. Accordingly, the Government reserves its right to object to any of the defense's proposed exhibits or testimony if they are offered ultimately for an impermissible purpose or in an inappropriate form, under the Federal Rules of Evidence.

[redacted]

[redacted]

- **<u>(U) Tab "Polygraphs"</u>:** Two items pertain to polygraph examinations of the defendant, to which the Government objects as unreliable, unfairly prejudicial, and hearsay, *see infra* Part V.B.2.

- **<u>(U) Tab "PARs"</u>:** Nine items are CIA Performance Activity Reports ("PARs"). The Government does not object to the introduction of admissible portions of the defendant's four PARs dating from July 2014 through his resignation from the CIA in November 2016, subject to the redaction of, and where appropriate substitution for, classified information described in *infra* Part II.A.2. The Government does object to the other five PARs noticed by the defendant, which are dated two or more years prior to the charged conduct and, thus, irrelevant and hearsay, *see infra* Part V.B.3.

- **<u>(U) Tab "Specific Objections"</u>:** Four items as to which the Government has particularized objections described *infra* Parts V.B.5.

(U) Setting aside the 302s, the Government is ultimately objecting to the defendant's use in their entirety of only 33 of the 417 items listed in the First Section 5 Notice (22 of the items in the USB Images Tab; two items in the Polygraphs Tab; five of the items in the PARs Tab; and four items in the Specific Objections Tab). As described above and in further detail below, with respect to the remaining documents or testimony in the First Section 5 Notice, the Government does not object pursuant to CIPA Section 6(a) to the defense's ability to introduce them at trial in some form, but does object to the introduction of certain classified information contained in those exhibits as irrelevant and otherwise inadmissible. Accordingly, the Government requests that those exhibits be redacted and/or summarized and that the testimony be circumscribed so as to avoid the introduction and exposure of this classified information at trial.

(U) On October 4, 2019, the defendant served the Second Section 5 Notice, which is attached hereto as Exhibit B. The Second Section 5 Notice sets forth the topics of testimony that the defendant intends to elicit through cross-examination of the Government's witnesses, and to which the defendant intends to testify to himself. As described in more detail below, while there are some areas of proper testimony described in the Second Section 5 Notice, much of the

[redacted]

[redacted]

Second Section 5 Notice bears little resemblance to relevant testimony, and instead seems to be a clear attempt to cow the Government and the CIA into forgoing this prosecution through the indiscriminate public disclosure of classified information and false and explosive accusations. *See infra* pp. 31-39.

## ARGUMENT

### III. (U) Relevant Law Under CIPA

#### A. (U) Section 5

(U) Prior to the enactment of CIPA in 1980, the Supreme Court had "long recognized" the existence of a classified information privilege. *United States* v. *Yunis*, 867 F.2d 617, 622-23 (D.C. Cir. 1989) (citing *C. & S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948), and *United States* v. *Nixon*, 418 U.S. 683, 710 (1974)). "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig* v. *Agee*, 453 U.S. 280, 307 (1981). As a result, "[t]he government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Snepp* v. *United States*, 444 U.S. 507, 509 n.3 (1980) (quoted by *Yunis*, 867 F.2d at 623, and *CIA v. Sims*, 471 U.S. 159, 175 (1985)). Following this long-established precedent, courts have recognized the importance of the classified information privilege. *See, e.g.*, *United States* v. *Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008); *United States* v. *Smith*, 780 F.2d 1102, 1107-09 (4th Cir. 1985); *see also Yunis*, 867 F.2d at 622-23.

(U) To protect classified information, Congress enacted CIPA. *United States* v. *Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006) (quoting *Yunis*, 867 F.2d at 623). CIPA, which establishes procedures for handling classified information in criminal cases, was "meant to 'protect[] and

[redacted]

restrict[] the discovery of classified information in a way that does not impair the defendant's right to a fair trial.'" *United States* v. *Aref*, 533 F.3d 72, 78 (2d Cir. 2008) (quoting *United States* v. *O'Hara*, 301 F.3d 563, 568 (7th Cir. 2002)); *see also United States* v. *Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) (CIPA safeguards "the government's privilege to protect classified information from public disclosure"). If a defendant expects to disclose or cause the disclosure of classified information in pretrial proceedings or at trial, Section 5 of CIPA requires the defendant to provide written notice to the Government. *See* 18 U.S.C. App. 3 § 5.

(U) Specifically, CIPA lays out a separate framework to resolve assertions by the defense that it intends to disclose or cause the disclosure of classified information. Accordingly, any defendant who reasonably expects to disclose (or cause the disclosure of) classified information *in any manner* is required to file notice of such intention under Section 5 of CIPA.[5] Section 5(a) expressly requires that such notice "include a brief description of the classified information." The case law holds that such notice "must be *particularized*, setting forth *specifically* the classified information which the defendant reasonably believes to be necessary to his defense." *United States* v. *Collins*, 720 F.2d 1195, 1199 (11th Cir. 1983) (emphasis added); *see also United*

[5] (U) Section 5 provides, in pertinent part:

> (U) If a defendant reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding involving the criminal prosecution of such defendant, the defendant, shall, within the time specified by the court, or where no time is specified, within thirty days prior to trial, notify the attorney for the United States and the court in writing. Such notice shall include a brief description of the classified information.

(U) Courts have strictly enforced the time limitations in the Act. *See generally United States* v. *Badia*, 827 F.2d 1458, 1465 (11th Cir. 1987) (affirming district court's decision to disallow defendant's presentation at trial of certain evidence because he did not provide time notice under CIPA Section 5).

[redacted]

*States* v. *Smith*, 780 F.2d 1102, 1105 (4th Cir. 1985) (*en banc*). This requirement applies both to documentary exhibits and to oral testimony, whether the evidence is expected to be admitted on direct or cross-examination. *See, e.g.*, *United States* v. *Wilson*, 750 F.2d 7 (2d Cir. 1984) (testimony); *Collins*, 720 F.2d at 1199 (same).

(U) If a defendant fails to provide a sufficiently detailed notice far enough in advance of trial to permit the implementation of CIPA procedures for the use, relevance, and admissibility of classified evidence, Section 5(b) provides for preclusion of that evidence. *Badia*, 827 F.2d at 1465. Similarly, if a defendant attempts to disclose at trial classified information which is not described in his Section 5(a) notice, preclusion is the appropriate remedy prescribed by Section 5(b) of the statute. *See Smith*, 780 F.2d at 1105 ("A defendant is forbidden from disclosing any such information absent the giving of notice.").

(U) Indeed, it is based upon a defendant's Section 5 proffer that a court under Section 6(a) of CIPA must "make all determinations concerning the use, relevance or admissibility of classified information that would otherwise be made during the trial or pretrial proceedings" pursuant to the standards of the Federal Rules of Evidence, with the defendant bearing the burden of establishing that the evidence is relevant, material, and otherwise admissible. *See United States* v. *Miller*, 874 F.2d 1255, 1276-77 (9th Cir. 1989); *see also United States* v. *Cardoen*, 898 F. Supp. 1563, 1571 (S.D. Fla. 1995). The Section 5 notice requirement is designed to allow a court to determine how a defendant intends to use the classified information and ensure that a defendant is not allowed to "cloak his intentions and leave the government subject to surprise at what may be revealed in the defense." *Collins*, 720 F.2d at 1199-1200.

**B. (U) Section 6 Hearing**

(U) Upon the Government's request, "the court shall conduct . . . a hearing [pursuant to

[redacted]

[redacted]

Section 6(a)]" to "make all determinations concerning the use, relevance or admissibility of classified information" at trial, including any information identified in a defendant's Section 5 notice. *See* 18 U.S.C. App. 3 § 6(a). At the hearing, which must be held *in camera*, the defendant must proffer why the classified information that he seeks to disclose is relevant and admissible,[6] while the Government is given an opportunity to challenge the request on the standard evidentiary grounds, such as relevance and hearsay. To prevail on his application, a defendant has the burden of (1) specifying what classified information he might cause to be publicly disclosed at trial, and (2) demonstrating the relevance and admissibility of the information. As previously noted, vague assertions regarding classified information are insufficient. *See, e.g.*, *Collins*, 720 F.2d at 1197-98 (holding that defendant's request to reveal general information about the maintenance of secret bank accounts and other overseas operations was insufficiently specific to merit relief under CIPA); *Wilson*, 721 F.2d at 975 (quashing subpoena "for lack of specificity").

(U) CIPA does not change "the generally applicable evidentiary rules of admissibility." *Wilson*, 750 F.2d at 9. Accordingly, as with any piece of evidence, the Court should consider the admissibility of a piece of classified information first pursuant to the Federal Rules of Evidence. Thus, the proffered evidence must be relevant under Federal Rules of Evidence 401 and 402.

---

[6] (U) Schulte previously has argued that CIPA's pretrial disclosure obligations are unconstitutional. Courts have routinely rejected constitutional challenges, under the Fifth and Sixth Amendments, that this provision unfairly requires the defendant to reveal his trial strategy. *See Wilson*, 750 F.2d at 9; *United States* v. *Poindexter*, 725 F. Supp. 13, 31-33 (D.D.C. 1989); *United States* v. *Jolliff*, 548 F. Supp. 229, 231-32 (D. Md. 1981). However, to protect the defendant's trial strategy, at least one court has permitted the defense to tender its requests *ex parte*. *See United States* v. *Poindexter*, 698 F. Supp. 316, 321 (D.D.C. 1988); *see also United States* v. *Al Kassar*, 582 F. Supp. 2d 498, 501 (S.D.N.Y. 2008) ("After hearing from counsel for both sides at the sealed hearing, the Court also permitted counsel for defendants to make a further, *ex parte* proffer as to the purported relevance of the classified information to their defense in this case.").

[redacted]

███████

The evidence must also not be inadmissible hearsay under the Rules. Finally, even assuming that the evidence satisfies these requirements, then the evidence may still be excluded if it is barred by Federal Rule of Evidence 403 because the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see, e.g., Wilson*, 750 F.2d at 9; *United States* v. *Libby*, 453 F. Supp. 2d 35, 44 n.8 (D.D.C. 2006) ("There is no question that Rule 403, as a standard rule of evidence, impacts the admissibility of the classified information referenced in the defendant's CIPA § 5 notice."). Courts have held that the defense request to use evidence can be rejected if that evidence is offered in support of a defense that is legally invalid on its face. *See, e.g., Cardoen*, 898 F. Supp. at 1581 ("Because none of the defendants' asserted defenses are viable, the classified information which the defendants seek to introduce at trial in support of such defenses is neither relevant nor admissible."); *United States* v. *Rezaq*, 899 F. Supp. 697, 704 (D.D.C. 1995) (same).

(U) Beyond this, at least one circuit has held that, before a defense request to cause disclosure of classified information can be granted, a court must find the information relevant and material to the defense. *See Smith*, 780 F.2d at 1110. According to this view, because unnecessary disclosure of classified material risks chilling the future collection of such information, the principle enunciated by the Supreme Court in *United States* v. *Roviaro*, 353 U.S. 53 (1957), applies to the relevance of such information. *Smith*, 780 F.2d at 110 ("The *Roviaro* standard of *admissibility* is at the least more restrictive than the ordinary rules of *relevancy* would indicate."). Moreover, the ruling in *Smith* is consistent with the Second Circuit's decision in *Aref*, which requires disclosure of classified information to the defense only

15

███████

[redacted]

insofar as the classified information is both material and helpful to the defense. *Aref*, 533 F.3d at 80; *see United States* v. *Stewart*, 590 F.3d 93, 131 (2d Cir. 2009).[7]

**IV. (U) Discussion**

(U) As described above, there is significant overlap between the types of documents that the Government and defense intend to use at trial—indeed, the Government does not object to the introduction, in some form, of the overwhelming majority of the information in the First Section 5 Notice and otherwise has already identified numerous of the defendant's proposed exhibits as the Government's own trial exhibits. Thus, for a substantial number of documents in the First Section 5 Notice, the issue is not whether the Government and defendant should be allowed to use those documents at trial, but rather in what form. With respect to a small number of the proposed defense exhibits and testimony in the First Section 5 Notice, as well as a substantial portion of the proposed testimony in the Second Section 5 Notice, the Government does object and asserts that those exhibits and testimony are inadmissible as a matter of law. In this respect, through this motion, the Government seeks an order:

1. (U) Authorizing the redaction and substitution of certain categories of classified information in the parties' exhibits, because that information is not relevant to the issues in this case, and because public disclosure of that information would harm national security.[8]

2. (U) Precluding testimony from any witness—whether called by the Government

---

[7] (U) In this case, the Government has taken a broad approach to the disclosure of classified evidence in discovery. The fact that the Government has produced information to the defendant does not, however, indicate that the Government necessarily agrees that the materials produced in discovery (or the classified information contained therein) is "essential to the defense, necessary to [the] defense, and neither merely cumulative nor corroborative, nor speculative." *United States* v. *Mostafa*, 992 F. Supp. 2d 335, 338 (S.D.N.Y. 2014) (quoting *Smith*, 780 F.2d at 1110).

[8] (U) The declaration of Antoinette B. Shiner, the Information Review Officer of the CIA (the "CIA Declaration" or "CIA Decl.") is attached hereto as Exhibit C.

[redacted]

[redacted]

or the defense (and including the defendant)—about the same categories of classified information that the Government seeks to redact and substitute from the parties' exhibits.

3. (U) Authorizing the Government to introduce a limited number of voluminous documents into evidence as classified exhibits pursuant to CIPA, with excerpts of those documents introduced into evidence in a declassified form.

4. (U) Precluding the defendant from admitting a limited number of exhibits and testimony proposed by the defendant in his Section 5 Notices because those exhibits and testimony are inadmissible as a matter of law, or, in the alternative, ordering a Section 6(a) hearing.

5. (U) Prohibiting the defendant from disclosing or causing to be disclosed any classified information that is not specifically authorized by the Court in its Section 6 order.

### A. (U) Relevant Law

(U) Pursuant to CIPA, the defendant is entitled to disclose classified information at trial only upon a finding by the Court that the classified information is both relevant, helpful, and admissible at trial under the Federal Rules of Evidence. *See Miller*, 874 F.2d at 1276-77; *Wilson*, 750 F.2d at 9; *see also Cardoen*, 898 F. Supp. at 1571. Evidence is relevant if (1) "it has a tendency to make a fact more or less probable than it would be without the evidence" and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if classified information proffered by the defendant is relevant and admissible, however, CIPA permits the Government to offer a substitute or summary for introduction at trial that contains the relevant information upon which the defendant seeks to rely. *See* 18 U.S.C. App. 3 § 6(c)(1) (stating that a court must grant the motion for substitution "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information"). CIPA also permits the Government to introduce exhibits at trial in still-classified form, in a manner that protects classified information from public

[redacted]

[redacted]

disclosure. In particular, Section 8 of CIPA provides: "Writings, recordings, and photographs containing classified information may be admitted into evidence without change in their classification status." *Id.* §§ 6(c), 8(a), & (b).[9]

(U) CIPA also permits the Government to "object to any question or line of inquiry that may require the witness to disclose classified information not previously found to be admissible." *Id.* § 8(c). Similarly, "[a] criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible." *United States* v. *Bifield*, 702 F.2d 342, 350 (2d Cir. 1983); *Wilson*, 750 F.2d at 9 (affirming district court's ruling that the defendant could testify to the fact that he was employed by various U.S. intelligence agencies and participated in covert operations but was precluded from describing the details of those operations). When the Government objects to questioning that would elicit classified information, the Court should first determine whether that information is admissible and, if so, fashion a solution that "will safeguard against the compromise of any classified information." 18 U.S.C. App. 3 § 8(c).

**B. (U) The Court Should Authorize the Redaction and Substitution of the Protected Information in the Parties' Exhibits**

(U) In this case, both the Government and the defense seek to introduce currently classified information into evidence at trial principally in connection with the WikiLeaks Charges, the Computer Fraud Charges, and the MCC Leak Charge. These counts charge the defendant with violations of Section 793(b), (d), and €, and Section 1030(a)(1), (a)(2)(B), and

---

[9] (U) In that regard, the Government's arguments herein relate to the admissibility of evidence as to which the defendant has served adequate notice under Section 5 of CIPA. The Court has scheduled a separate proceeding to determine how classified information will be protected at trial. Accordingly, the Government respectfully reserves arguments relating to the protection of classified information at trial, including, for example, specific redactions and substitutions and witness protections.

[redacted]

[redacted]

(a)(5)(A), which have the following elements:

- (U) Section 793(b) has three elements: (1) the defendant copied, took, or obtained a document, or attempted to do the same; (2) the document was related to the national defense; and (3) the defendant acted with the intent or with reason to believe that the document was to be used to the injury of the United States or to the advantage of a foreign country. Modern Federal Jury Instructions § 29.02.

- (U) Section 793(d) has three elements: (1) the defendant had lawful access to documents; (2) the documents were related to the national defense; and (3) the defendant willfully communicated (or delivered or transmitted or caused to be communicated, delivered, or transmitted or attempted to communicate, deliver or transmit) the document to another person, who was not entitled to receive it. *Id.* § 29.04.

- (U) Section 793(e) has three elements: (1) the defendant had unlawful access to documents; (2) the documents were related to the national defense; and (3) the defendant willfully communicated (or delivered or transmitted or caused to be communicated, delivered, or transmitted or attempted to communicate, deliver or transmit) the document to another person, who was not entitled to receive it. *Id.*[10]

- (U) Section 1030(a)(1) has four elements: (1) the defendant accessed a computer without authorization or accessed a computer with authorization, but exceeded his authority in accessing the information in question; (2) the defendant knowingly accessed that computer; (3) the defendant obtained information protected against unauthorized disclosure for reasons of

[10] With respect to 18 U.S.C. §§ 793(d) and (e), where the defendant is alleged to have transmitted intangible information, rather than documents, the Government is also obligated to prove that the defendant had reason to believe that the document could be used to the injury of the United States or to the advantage of any foreign country. Modern Federal Jury Instructions § 29.04.

[redacted]

national defense or foreign relations, or any restricted data, with the intent to use such information against the interests of the United States; and (4) the defendant willfully communicated the information obtained to any person not entitled to receive it. *Id.* § 40A.01.

- (U) Section 1030(a)(2)(B) has three elements: (1) without authorization, the defendant accessed a computer or accessed a computer with authorization, but exceeded his authority in accessing the information in question; (2) the defendant acted intentionally; and (3) the defendant obtained information from any department or agency of the United States or information from any protected computer. *Id.*

- (U) Section 1030(a)(5)(A) has four elements: (1) the defendant knowingly caused the unauthorized transmission of a program to a protected computer; (2) the defendant caused the transmission of the program with the intent to damage or deny services to a computer or computer system; (3) the defendant thereby caused damage; and (4) the offense caused damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security. *Id.*

(U) Thus, under the relevant legal standard, the only facts of "consequence," *see* Fed. R. Evid. 401(b), are facts that bear on these elements. Thus, with respect to the WikiLeaks Charges, the relevant facts are those that show whether Schulte stole and transmitted the Classified Information, whether he had lawful or unauthorized possession of or access to the Classified Information, whether the Classified Information constitutes national defense information, and whether Schulte had the necessary intent under the statute. As for the MCC Leak Charge, the relevant facts are those that concern whether Schulte transmitted the MCC Classified Information, whether Schulte's access to the MCC Classified Information was unauthorized, whether the MCC Classified Information constitutes national defense information,



and whether Schulte had the necessary intent. Finally, with respect to the Computer Fraud Charges, the relevant facts pertain to whether Schulte's actions on the LAN were authorized, whether he obtained information unlawfully through that access, whether he transmitted that information to those not entitled to receive it, whether his conduct on the LAN damaged that system in any way, and whether he intended to do so.



(U) The Government will address each category's relevance, admissibility, and the potential harm to national security from public disclosure in turn. In addition, the Government has included examples[12] of its proposed redactions and substitutions for each category.[13]

[12] (U) The Government notes that these examples, which are included as Exhibits 1 through 24 of this motion, are still, in their current form, classified, but will be declassified in advance of trial and after the Court has approved the form in which they should be entered into evidence. Notably, a small number of the Exhibits (*e.g.*, Exhibit 15, a log file from the LAN) have no proposed redactions or substitutions, but are included so the Court can understand the manner in which the Government proposes introducing certain types of exhibits like forensic files.

[13] (U) Given the volume of currently classified information that will be introduced at trial, the Government has not included proposed redacted and substituted versions of all of its exhibits with this motion. Furthermore, because the Court's ruling will necessarily impact the Government's approach to its Section 6(c) proposal with respect to certain defense exhibits, and to give the parties time to confer with the benefit of the Court's ruling on the instant motion, the Government is also not submitting with this motion its proposed 6(c) substitutions for the defense's proposed exhibits. Pursuant to the statutory scheme set forth in CIPA, the Government will propose its Section 6(c) substitutions for any documents upon which the Government cannot agree with the defense after the Court has issued its Section 6(a) ruling and by the November 18, 2019 Section 6(c) deadline set forth in the Court's scheduling order. *See* 18 U.S.C. App. § 6(c) (permitting the Government to propose summaries or substitutions for classified information "[u]pon a determination by the court authorizing the disclosure of specific classified information under the procedure established by [Section 6]"); *United States* v. *Miller*, 874 F.2d 1255, 1277 (9th Cir. 1989) ("The plain language of the provision indicates that it is not applicable unless and until the court has first ruled that the classified information is admissible.").



23

25



26



27





29



30



[15] (U) To be clear, during *voir dire*, the venire would receive the true names of all of the CIA employees, but not their affiliation with the Agency, who may be witnesses or otherwise referred to at trial, so that the potential jurors could indicate whether they know any of those individuals. After consulting with the defense, the Government will propose a plan to the Court as to how to conduct *voir dire* by, at the latest, the deadline for motions *in limine*.

[16] (U) For certain of these CIA employees with particularly sensitive roles, the Government also intends to move for additional measures to protect their physical appearances, including a limited courtroom closure with provisions to ensure the right of the public and the press to follow the trial. *United States* v. *Alimehmeti*, 284 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2018) (in terrorism prosecution, allowing four FBI undercover agents to testify in a closed courtroom, with, among other things, testimony live-streamed to separate courtroom, transcript published nightly, and pool reporter allowed in the courtroom during testimony); *Sterling*, 724 F.3d at 517 (allowing 10 CIA witnesses to testify behind a screen).

[redacted]

### C. (U) If the Defendant Testifies, He Should Be Bound by the Same Rules

(U) None of the witnesses called at trial should be allowed to testify about the Protected Information—including the defendant. In the First Section 5 Notice, the defendant claims that he should be able to testify as to all of the classified information he learned through his employment at the CIA, based on his "unfettered" right to testify. Schulte certainly has a right to testify, but that right is not "unfettered." "The accused as well as the Government must comply with the established rules of procedure and evidence in order to assure both a fair trial under the circumstances." *United States* v. *Corr*, 543 F.2d 1042, 1051 (2d Cir. 1976); *see also United States* v. *Albizu,* 107 F.3d 4 (2d Cir. 1997) ("[A] defendant simply has no constitutional right to present a jury with legally insufficient evidence."); *United States* v. *Gleason*, 980 F. 2d 1183, 1185-86 (8th Cir. 1992) ("A defendant's right to testify on his own behalf is not without limits; that the proffered testimony should have relevance to something the jury must decide is clearly an appropriate restriction."). This requirement applies with equal force to the defendant's testimony—"[a] criminal defendant's right to present a full defense and to receive a fair trial does not entitle him to place before the jury evidence normally inadmissible." *Bifield*, 702 F.2d at 350 (affirming trial court's ruling to preclude defendant to testifying about legally insufficient defense). In this case, Schulte—like all of the witnesses at trial—should not be permitted to testify about the Protected Information because that information is irrelevant, prejudicial, and confusing.

(U) The Second Circuit's decision in *Wilson* is squarely on point. In *Wilson*, the defendant had worked for various U.S. intelligence agencies. *See United States* v. *Wilson*, 586 F. Supp. 1011, 1013 (S.D.N.Y. 1983). The defendant was ultimately prosecuted in connection with

[redacted]

████████

plots to assassinate prosecutors and Government witnesses that he participated in while in prison. *See* id. at 1012. The defendant contended that he should be permitted to testify about "certain covert activities of the United States in which he claimed to have participated" because that testimony would demonstrate a "belief on his part that he would not be sentenced and imprisoned by federal authorities and this belief negated his alleged motive for tampering with witnesses," and the testimony would show "the existence of certain character traits and personal relationships that would have tended to disprove the charges against him." *See Wilson*, 750 F.2d at 10. The district court ruled that the defendant would be allowed to testify to the "the fact of his employment with various agencies in the United States intelligence community and to the fact that he was involved in covert operations." 586 F. Supp. at 1017. The district court also held, however, that the defendant would not be permitted to testify about the details of these operations, finding that those details would be confusing, prejudicial, and misleading. *See id.* at 1016-17. The district court also precluded the defendant from testifying about specific acts for the purpose of proving his alleged character traits. *See id.* at 1016.

(U) The defendant appealed the district court's ruling, arguing that he would have testified if the district court had not imposed these restrictions, and that the district court's decision was incorrect. *See* 750 F.2d at 9. The Second Circuit disagreed with the defendant and upheld the district court's ruling, noting that "this is the kind of situation that Congress had in mind when it enacted the Classified Information Procedures Act." *Id.*[17] The Second Circuit held

---

[17] (U) Schulte also has claimed that he should not be required to disclose the areas of his potential testimony to the Government because that would violate his constitutional rights. As the Court has found already, there is nothing unconstitutional about CIPA's pre-trial disclosure obligations. *See* 17 Cr. 548 (PAC), Dkt. 142. Moreover, in *Wilson*, the Second Circuit explicitly rejected the alleged unconstitutionality of Section 5's disclosure obligations as applied to the defendant's testimony: "We see no constitutional infirmity in the pretrial notification

████████

████████████

that "the district court did not err in rejecting the material under generally applicable evidentiary rules of admissibility," in particular Rule 403. *See id.* The same is true here.

████ The Government has no objection to Schulte testifying about facts within his personal knowledge about the general nature of his work (*i.e.*, that he helped develop cyber-tools for CIA intelligence-gathering operations, or that those tools included ████████ tools designed to secretly exfiltrate large amounts of data); the LAN's structure and vulnerabilities; or his various disputes with employees and supervisors over alleged threats, access to the LAN, and/or use of contractors. But as described above, the Protected Information—which includes information about CIA operations, sources, methods, and sensitive organizational data—is not relevant and creates a substantial risk of unfair prejudice, juror confusion, or misleading testimony, *see id.*; *see also Doyle*, 130 F.3d at 542 ("The trial court was well within its proper authority to decide either that Doyle's past cooperation with army intelligence had no bearing on the crimes charged, or that that any probative value was substantially outweighed by the risk of confusing the jury with extraneous matters, or of wasting the court's and jury's time."); *Anderson*, 872 F.2d at 1519 (excluding evidence pursuant to Rule 403, because evidence regarding the details of the defendant's participation in "prior covert operation. . . would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment"); *Sampol*, 636 F.2d at 633 n.31 ("In light of its dubious probative value, when the testimony began to stray too far afield, the trial court properly refused to 'put the CIA on trial in this case.'"). Accordingly, the Government requests that the Court impose the same limitations on the defendant's testimony.

---

requirements of Section 5." 750 F.2d at 9; *see also United States* v. *Bin Laden*, 2001 WL 66393, at *8 (S.D.N.Y. 2001) (application of CIPA does not violate the defendant's Fifth Amendment right to testify).

34

████████████

[redacted]

(U) While the defendant's Second Section 5 Notice includes some categories of testimony that are relevant, such as the defendant's interactions with certain employees or the general work that the Group did, the sheer breadth of irrelevant proposed testimony in the notice makes clear that the defendant intends to weaponize his rights to testify and cross-examine witnesses to further his "information war" from the witness stand. That is impermissible—CIPA was intended to "'minimize the problem of so-called graymail—a threat by the defendant to disclose classified information in the course of trial—by requiring a ruling on the admissibility of the classified information before trial.'" *United States* v. *Pappas*, 94 F.3d 795, 799 (2d Cir. 1996) (quoting S. Rep. No. 823, 96th Cong., 2d Sess. 2, reprinted in 1980 U.S.S.C.A.N. 4294, 4295). The Second Section 5 Notice demonstrates on its face that "graymail," not the introduction of relevant information that supports any defense, is the defendant's goal.

[redacted]

[redacted]





37

[redacted]

(U) Schulte's Second Section 5 Notice makes clear that his goal is principally to shift the focus of the trial from himself to the CIA, and, in doing so, seek to chill this prosecution. As discussed, Schulte is not entitled to engage in such graymail. *See Pappas*, 94 F.3d at 799. Indeed, Judge Weinfeld, writing in *Wilson*, may have captured best why Schulte's actions here are wholly inappropriate:

> Whatever the defendant's purpose, the introduction of evidence detailing classified activities will have the tendency to focus attention on what cannot be doubted is the controversial character of foreign covert intelligence and counter-intelligence operations. These have been a matter of public notice, editorial expressions of differing views by the news media, public debates and congressional investigations. Appeals to the attitudes of jurors by evidence of the alleged unseemly character of American covert activities would divert their attention from the basic issues in this case—charges centered about alleged plots to kill witnesses connected to prosecutions in the United States District Courts. Wilson is the defendant on trial, not the CIA. The introduction of evidence of the nature referred to in defendant's submission on this motion covers details of extensive activities in many countries throughout the world and its presentation would be time-consuming. But even more important, it would bring before the jury matters utterly irrelevant to the basic charge in this case and serve to divert the jury's attention from those basic issues. Assuming arguendo that evidence of covert activities, here and abroad, has some minimal probative value in this case, such proof should be excluded on the ground that it would unduly delay the trial.

*Wilson*, 586 F. Supp. at 1016 (footnote omitted). Similarly, the Eleventh Circuit recognized, in the prosecution of former Panamanian dictator Manuel Noriega, that the defendant's proposed disclosure of specific classified information was plainly for an improper purpose:

> Evidence of the purposes for which monies allegedly are given [by the CIA to the defendant] does not aid significantly in the determination of the fact and amount of such purported payments. Further, and more importantly, the district court correctly recognized that the admission of evidence regarding the nature of Noriega's assistance to the United States would have shifted unduly the focus of the trial from allegations of drug trafficking to matters of geo-political intrigue.

*United States* v. *Noriega*, 117 F.3d 1206, 1216-17 (11th Cir. 1997).

[redacted]

[redacted]

(U) Schulte's effort is hardly novel—Chief Justice Marshall rejected Aaron Burr's attempt to disclose certain sensitive diplomatic and military communications at trial, explaining that it "is apparent that he means to exercise his privileges not really in his own defence, but for purposes which the court ought to discountenance. The court would not lend its aid to motions obviously designed to manifest disrespect to the government." *United States* v. *Burr*, 25 F. Cas. 30, 35 (C.C.D. Va. 1807). More recent reported CIPA decisions are legion rejecting efforts by defendants to inject the details of sensitive intelligence operations as distractions from trials about the defendants' crimes. *See, e.g.*, *United States* v. *Rewald,* 889 F.2d 836, 853 (9th Cir. 1989), *amended*, 902 F.2d 18 (9th Cir. 1990) (affirming district court's ruling "that pursuant to Rule 403, it would not permit evidence of the details of the defendant's previous intelligence operations" because "[a]dmission of this evidence posed the substantial risk of permitting the trial to degenerate into an unfocused presentation of facts and testimony that would confuse the issues and mislead the jury"); *United States* v. *George*, 786 F. Supp. 56, 60 (D.D.C. 1992) ("The court now must reject the defendant's attempt to turn an Iran-Contra case into a three-ring circus involving all of the CIA's covert activities throughout the world. Such an absurdly overbroad request for documents admittedly not related to Iran-Contra in any way is nothing less than an attempt to put all of the CIA's activities on trial—a trial which, because of the country's interest in secrecy regarding covert operations, would never occur."); *United States* v. *North*, 708 F. Supp. 389, 395 (D.D.C. 1988) (noting that documents noticed by defendant under Section 5 "contain[s] ample evidence of North's attempt to frustrate the prosecution" by including irrelevant material related to, for example, "the precise distribution of Sandinista forces at a particular time among various villages, a possible terrorist attack on a businessman, the President's comments on legislative developments and any contacts from the White House with

[redacted]



religious leaders, how information concerning the location of hostages was obtained, and the like," and rejecting efforts to "derai[l the trial] by the myriad unrelated issues which defendant's notice comprehends").

(U) So too here—the trial before the Court is about Schulte's actions, not the CIA's alleged conduct in foreign operations. The testimony and evidence introduced thus should be tailored similarly.

**D. (U) The Court Should Permit the Introduction of Certain Exhibits in Classified Form in a Manner That Protects Classified Information from Public Disclosure**

[18] (U) Requiring the defense to disclose these portions to the Government does not prejudice the defendant given that, pursuant to Section 5 of CIPA, the defendant is obligated to notify the Government before trial of any classified information that the defendant anticipates will be disclosed at trial. Moreover, as the Court has held already, Section 5 disclosure is not unconstitutional and is required pursuant to CIPA. *See* 17 Cr. 548 (PAC), Dkt. 142.





V. **(U) The Court Should Exclude Certain Exhibits in the Section 5 Notice Without a Hearing**

(U) As noted above, the Government does not object to the introduction of the overwhelming majority of information in the Section 5 Notice, subject to Section 6 substitutions. The defendant has, however, noticed certain exhibits with insufficient specificity or that are inadmissible as a matter of law. As a result, the Government seeks an order precluding the defendant from introducing those exhibits.

**A. (U) The Defendant Has Not Made a Particularized Showing with Respect to Seven Exhibits and Thus Should Be Precluded from Seeking to Introduce Them**

(U) For seven of the rows on the Section 5 Notice, which are identified in the "Unknown" tab of Exhibit A, the defendant has failed to identify with adequate specificity either the particular item of evidence or the relevant portion of a large body of evidence, such as the defendant's entire CIA workstation, that the defendant proposes to introduce. As outlined above, Section 5 notice "must be *particularized*, setting forth *specifically* the classified information which the defendant reasonably believes to be necessary to his defense." *Collins*, 720 F.2d at 1199 (emphasis added); *see also Smith*, 780 F.2d at 1105. This requirement applies both to documentary exhibits and to oral testimony, whether the evidence is expected to be admitted on direct or cross-examination. *See, e.g.*, *Wilson*, 750 F.2d at 9 (testimony); *Collins*, 720 F.2d at 1199 (same).



**B. (U) Certain Exhibits in the Defendant's Section 5 Notice Are Inadmissible**

(U) Several of the exhibits noticed by the defendant are inadmissible as a matter of law, and the Court should preclude the defendant from introducing them at trial.

**1. (U) The 302s**

(U) More than half of the defendant's list of classified information that he intends to

[19] (U) References to "Rows" pertain to the row numbers in the First Section 5 Notice, which is duplicated at Tab Section 5 Notice of Exhibit A. These row numbers are also indicated in the Column labeled "Deft. Row Number" in the other Tabs of Exhibit A.

[20] (U) Row 146 of the Section 5 Notice, which is also on the Government's Unknown tab, appears to reference a Bates number that does not exist. In any event, the defendant's proffered reasons for using the document—"Documents seized from JAS's drawer"—is insufficient to satisfy the defendant's burden of establishing the relevance and admissibility of the document or documents.

disclose at trial consists of FBI 302s describing interviews conducted by FBI agents during the course of this investigation, as well as various handwritten notes or other attachments that accompany the 302s (identified on Tab "302s" of Exhibit A). The 302s themselves are plainly inadmissible hearsay—consisting entirely of the written recollections of FBI agents of statements made to them by various interviewees. It is beyond cavil that law enforcement memoranda of witness statements are not themselves admissible. *See, e.g.*, *United States* v. *Sampson*, 898 F.3d 287, 308 (2d Cir. 2018) ("Agent Zacher's notes [of interviews with the defendant] were hearsay not shown to fall within any exception and were therefore inadmissible under Federal Rule of Evidence 802. Sampson offered Agent Zacher's notes to prove the truth of their contents—*i.e.*, he was offering them as an accurate reflection of what occurred during his interview with the FBI. This was improper."); *United States* v. *Skelos*, 2018 WL 2254538, at *4 (S.D.N.Y. 2018) ("deposition transcripts—which consist entirely of out-of-court statements" are inadmissible at trial, describing holding of *United States* v. *Cherry*, 876 F. Supp. 547 (S.D.N.Y. 1995), as quashing requests for "statements made by eyewitnesses" because documents containing those statements are "inadmissible hearsay" and could not themselves "be introduced as evidence at trial"); *United States* v. *Boyle*, 2009 WL 484436, at *2 (S.D.N.Y. 2009) (holding that "reports, documents or other materials associated with the investigation"—including "witness statements"—"would be inadmissible at defendant's trial on hearsay grounds"); *United States* v. *Brown*, 1995 WL 387698, at *10 (S.D.N.Y. 1995) ("memoranda of interviews conducted by either the NYPD or the Bronx District Attorney's Office . . . would, of course, be hearsay, and inadmissible as evidence at trial").[21]

---

[21] (U) The defendant also suggests that a number of 302s are improperly classified, or that they contain relevant information about the circumstances of the preservation of evidence in this case.



(U) To the extent the defendant intends not to offer the 302s themselves, but rather to elicit from the witnesses whose recollections they document the testimony described in the First Section 5 Notice in the column marked "Reasons why testimony is necessary," the Government moves that such testimony be limited to the information included in the First Section 5 Notice and subject to the protection of the Protected Information, *see supra* Part IV.B.

It is unclear from the defendant's Section 5 notice whether this is merely an objection he is noting for the Court, or a fact that he seeks to disclose in Court. Moreover, months ago, the Government in fact produced in unclassified discovery dozens of the 302s as to which the defendant raises a classification objection. To the extent the defendant intends to raise this issue at trial, *see, e.g.*, Ex. A, Tab Section 5 Notice, Row 96 (asserting that "[j]ury should know that the CIA undertook no legitimate classification review"), the Government notes that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case . . . . [A]ny attempt by [the defendant] to dissect an individual law enforcement agent's state of mind during the course of the investigation, or to belabor the details of the investigation's chronological development, would be irrelevant to the central question of [the defendant's] guilt or innocence, and as such, is inadmissible." *United States* v. *Demosthene*, 334 F. Supp 2d 378, 380 (S.D.N.Y. 2004) (citing *United States* v. *Regan*, 103 F.3d 1072 (2d Cir. 1997); *United States* v. *Reyes*, 18 F.3d 65, 71 (2d Cir. 1994)). Moreover, as part of the Section 6 process, the CIA has concluded that an additional 17 302s are unclassified. The Government will produce those documents to the defense in unclassified discovery by October 15, 2019.

(U) *First*, the 302s in many instances recite the witnesses' accounts of what they heard from others about these subjects, which are inadmissible double hearsay. Although the Government does not object to the introduction of testimony on these points that were identified in the defendant's First Section 5 Notice on the ground that doing so would reveal classified information, the defendant must nevertheless demonstrate the admissibility of the evidence by laying a proper foundation for each witness's personal knowledge. "A 'witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" *United States* v. *Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (quoting Fed. R. Evid. 602). Such foundation is simply "'the familiar requirement of first-hand knowledge or observation.'" *United States* v. *Rea*, 958 F.2d 1206, 1215 (2d Cir.1992) (quoting Fed. R. Evid. 701 advisory committee notes on 1972 proposed rules). And "the proponent of any evidence . . . must establish a proper foundation for the evidence before a court may admit it." *Garcia*, 291 F.3d at 140.

(U) *Second*, and for much the same reasons, the Government also objects to the defendant's apparent intention to elicit various forms of opinion testimony from the witnesses identified in the 302s. A witness's opinion about who might have stolen the information from the LAN is plainly inadmissible. *See United States* v. *Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (precluding testimony by law enforcement agent "that, in his opinion, . . . defendant was a culpable member of the charged conspiracy" because "a 'lay opinion' as to a person's culpable role in a charged crime . . . is not presenting the jury with the unique insights of an eyewitness's personal perceptions"). Along the same lines, lay opinion about how the information might have

[redacted]

been stolen is equally impermissible.[22] The well-established distinction between a lay witness and an expert is that "although qualified experts may properly testify in response to hypothetical questions, lay witnesses generally are not entitled to express opinions based on hypothetical questions." 4 Weinstein's Federal Evidence § 701.03 (2019). Asking a fact witness in this case how the information could have been stolen is certainly speculative, and would be improper. This is doubly true in the context of this case, where any opinion about the sophisticated theft of technical data backups accessed through layers of networked computer systems would necessarily depend on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). It is for precisely this reason that the Government intends to call actual expert witnesses to testify to their technical analysis of the evidence in this case (as, apparently, does the defendant). By contrast, the Second Circuit has been clear that "the foundation requirements of Rule 701" preclude lay opinion testimony that "depend[s], in whole or in part, on . . . specialized training and experience." *United States* v. *Haynes*, 720 F.3d 178, 195 (2d Cir. 2013) (quoting *Garcia*, 413 F.3d at 215-16).

(U) *Third*, large portions of the defendant's notice also indicate that he intends to elicit his own statements from various witnesses. The Government intends to elicit the defendant's statements from its witnesses (many of whom were also identified by the defendant), as the non-hearsay statements of a party opponent, *see* Fed. R. Evid. 801(d)(2), and the Government does not object, subject to the Federal Rules of Evidence, to the defendant cross-examining the Government's witnesses about either statements that were elicited on direct examination or

[22] (U) The Government does not object to eliciting testimony from witnesses with personal knowledge about the LAN's structure and vulnerabilities, such as system administrators, about specific facts that may distinguish one method of taking the Classified Information from another, such as, for example, the relative speed that one could copy data from one location on the network as opposed to another.

[redacted]

statements that the Court determines are admissible under the rule of completeness. *See* Fed. R. Evid. 106. As a general matter, however, "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *United States* v. *Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (quoting *United States* v. *Marin*, 669 F.2d 73, 84 (2d Cir. 1982)). "Indeed, if such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States* v. *McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005); *see also id.* at 546 ("Whereas Rule 801(d)(2) authorized the Government to question Postal Inspector Locke on direct examination regarding statements made by McDaniel because of McDaniel's status as a party-opponent, any testimony by Postal Inspector Locke on cross-examination by McDaniel's counsel regarding additional statements made by McDaniel that had not already been introduced on direct examination would have constituted inadmissible hearsay that would have effectively allowed McDaniel to testify without being under oath, without cross-examination, and without direct scrutiny by the jury.").

(U) *Fourth*, it also appears from the First Section 5 Notice that the defendant intends to elicit testimony from witnesses about aspects of his purportedly good character, such as his purported patriotism, commitment to the mission of the CIA, and similar traits. Although Rule 404(a)(2) allows the defendant to introduce evidence of a "pertinent trait," that latitude is closely circumscribed. Rule 405(a) limits the defendant to introducing testimony "about the person's reputation or by testimony in the form of an opinion," and not evidence of specific instances or acts. On the contrary, "Rule 405(b) prohibits the proof of character by specific acts when the person's character or trait of character is not an essential element of a charge, claim, or defense.

[redacted]

Thus, evidence of specific acts may not be used to prove character when the evidence is to be used circumstantially to support the inference that a person acted in conformity with his or her character. In particular, there is no exception permitting a defendant to prove good character by specific acts." 2 Weinstein's Federal Evidence § 405.05 (2019).[23]

(U) The Second Circuit specifically addressed a closely analogous circumstance in *Doyle*, in which a defendant charged with violating various prohibitions on transactions with Libya was precluded from introducing "trial testimony relating to specific actions against Libya which Doyle allegedly took in cooperation with the U.S. Army Intelligence Agency to promote the U.S. security policy toward Libya." 130 F.3d at 541. The Second Circuit held that "proof of Doyle's specific acts under Rule 405(b) was not admissible," noting that "if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed." *Id.* at 542. So too here, the defendant should not be allowed to elicit testimony of specific acts or statements to prove character traits (or to disprove his alleged basis for committing the charged crimes), but should be limited to reputation or opinion testimony without reference to particular incidents or statements. *See also United States* v. *Al Kassar,* 582 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) (precluding evidence noticed under Section 5 of CIPA as inadmissible because "the Federal Rules of Evidence do not permit proof of prior acts for th[e] purpose" of proving that because the defendant "previously acted in a particular way in analogous circumstances, the jury should give more credit to his assertions that he did so here").

(U) *Finally*, in his First Section 5 Notice, the defendant identified 302s reporting the

[23] By contrast, once the defendant elicits reputation or opinion character testimony, "[o]n cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." Fed. R. Evid. 405(a).

[redacted]

recollections of approximately 150 witnesses. Large portions of their statements, even on the subjects as to which the Government does not object, appear to be highly cumulative, and calling all of them to testify would certainly cause "undue delay, wasting time, [and] needlessly presenting cumulative evidence." Fed. R. Evid. 403. For example, the defendant lists the 302s for 19 witnesses for whom the description of why the testimony is relevant is identically cut and pasted, reading either, "[d]iscusses various possibilities for how leaked data could have been taken from the network. Issues of access to leaked materials are relevant at trial," or, "[d]iscusses possible means of copying and exfiltrating data, which are relevant to the facts of the case at trial." As noted, the Government objects to such hypothetical lay opinion testimony—but even if the testimony were admissible, the Court also has "wide discretion" to preclude testimony that is "merely cumulative." *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 230 (1940). Since the defendant's notice not only suggests that he intends to offer cumulative testimony, but in fact offers verbatim justifications for the disclosures that he seeks, the Court should require the defendant to be more specific about the justifications for eliciting what appears to be highly repetitive testimony.

**2. (U) Polygraphs**

(U) Schulte seeks to compel the Government to produce a transcript of his 2009 polygraph examination and the results of that examination, as well as the results of his September 2016 polygraph examination. Based on his Section 5 Notice, Schulte intends to use his polygraph examinations—both his statements during and the results of those examinations—at trial. These requests are without merit.

(U) As an initial matter, Schulte's 2009 polygraph examination occurred before he had access to any of the classified information unlawfully disclosed to WikiLeaks and years

[redacted]

before the relevant events in this case. Thus, the pre-employment polygraph examination is wholly irrelevant and not discoverable. Regardless, and as described below, polygraph examinations are inadmissible under several of rules of evidence. Indeed, "[b]oth the United States Supreme Court and [the Second Circuit] have repeatedly upheld the exclusion of polygraph evidence because of its unreliability, its potential to confuse the issues and mislead the jury, and the danger of unfair prejudice posed by its admission." *United States* v. *Fraser*, 206 F. App'x 100, 101 (2d Cir. 2006) (citing *United States* v. *Scheffer*, 523 U.S. 303, 309 (1998); *United States* v. *Kwong*, 69 F.3d 663, 668 (2d Cir. 1995); *United States* v. *Rea*, 958 F.2d 1206, 1224 (2d Cir. 1992)). Moreover, Schulte's statements during his polygraph examinations are inadmissible hearsay. As a result, Schulte's requests for additional discovery and to use the polygraph examinations should be denied.

**a. (U) Relevant Facts**

(U) Schulte participated in two polygraph examinations in connection with his employment in the U.S. Intelligence Community. The first was administered in 2009 by the NSA prior to Schulte's employment as a student intern there. In April 2019, the Government objected to producing any materials related to the 2009 polygraph on relevance grounds. The second polygraph examination was administered by the CIA in September 2016 as part of Schulte's security clearance reinvestigation processing, but was not finally "adjudicated" because Schulte left the CIA in November 2016.[24]

[redacted]

[24] In its April 2019 letter to the Court concerning Schulte's polygraph examinations, the Government incorrectly stated that the CIA had administered the 2009 polygraph examination.

[redacted]



**b. (U) Polygraph Examination Results and Analysis Are Inadmissible Under Rules 702 and 403**

**i. (U) Applicable Law**

(U) The admission or exclusion of expert testimony rests soundly in the broad discretion of the trial court. *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 142 (1999); *Hamling* v. *United States*, 418 U.S. 87, 108 (1974); *United States* v. *DiDomenico*, 985 F.2d 1159, (2d Cir. 1993). A court may admit expert testimony under Rule 702 of the Federal Rules of Evidence as long as

> (a) the expert's scientific . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

(U) Under this rule, the district court serves as a "gatekeeper" in "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court identified several factors that courts may consider when determining whether proposed testimony is sufficiently reliable, including whether the theory or technique (1) "can be (and has been) tested," (2) has been "subjected to peer review and publication," (3) has a "known or

[redacted]

potential rate of error," (4) has "standards controlling the technique's operation," and (5) has attracted "[w]idespread acceptance" within the relevant scientific community. *Id.* at 593-94.

(U) Like all evidence, expert testimony must also "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, and may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403; *see also United States* v. *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001).

**ii. (U) Polygraph Examination Results Are Unreliable Under Rule 702**

(U) As an evidentiary matter, polygraph examination results are unreliable under the standards of Rule 702 and, thus, are inadmissible. In *Scheffer*, the Supreme Court upheld a military rule imposing a *per se* ban on the admission of polygraph evidence in court-martial proceedings. In so ruling, the Court concluded that "there is simply no consensus that polygraph evidence is reliable" and that some studies suggest that the standard polygraph test generates results "little better than could be obtained by the toss of a coin, that is, 50 percent." 523 U.S. at 310 (internal quotation marks omitted). The Court went on to state that "[a]lthough the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams." *Id.*

(U) Although the Second Circuit has "not decided whether polygraph has reached a sufficient state of reliability to be admissible," *United States* v. *Messina*, 131 F.3d 36, 42 (2d Cir. 1997), both the Second Circuit and its district courts have repeatedly and uniformly upheld the exclusion of such evidence. *See, e.g.*, *United States* v. *Hester*, 674 F. App'x 31, 35 (2d Cir.

[redacted]

2016) (finding no abuse of discretion from the district court's refusal to admit polygraph evidence and noting that "[n]o factors presented here convince us that [the defendant's polygraph] test was 'sufficiently reliable or sufficiently relevant to warrant admission.'" (quoting *Rea*, 958 F.2d at 1224)); *United States* v. *Duverge Perez*, 295 F.3d 249, 254 (2d Cir. 2002) (finding no abuse of discretion from the district court's refusal to admit polygraph evidence in connection with the defendant's sentencing); *United States* v. *Ruggiero*, 100 F.3d 284, 292 (2d Cir. 1996) (dismissing the significance of polygraph results that might corroborate a defendant's testimony because of their "questionable accuracy"); *United States* v. *Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (upholding the district court's denial of defense motion to have polygraph examiner offer opinion that defendant was truthful); *Rea*, 958 F.2d at 1224 ("This court has intimated in the past that the results of polygraph examinations are not admissible in this Circuit"); *United States* v. *Bortnovsky*, 879 F.2d 30, 35 (2d Cir. 1989) (same, collecting cases); *United States* v. *Bando*, 244 F.2d 833, 841 (2d Cir. 1957) (noting that polygraph examinations are "generally considered inadmissible" because they are unreliable); *United States* v. *Canter*, 338 F. Supp. 2d 460, 464 (S.D.N.Y. 2004) (relying on *Scheffer* and rejecting defense request to introduce results of polygraph examination at trial to show that the defendant answered certain questions truthfully related to the pending charges); *Monsanto* v. *United States*, 2000 WL 1206744, at *4 (S.D.N.Y. 2000) ("[P]olygraph examinations are considered unreliable and are inadmissible in court."); *United States* v. *Bellomo*, 944 F. Supp. 1160, 1164 (S.D.N.Y. 1996) ("[P]olygraph evidence never has been admitted in a federal trial in this Circuit, even in the three years since *Daubert* . . . ."); *United States* v. *Black*, 831 F. Supp. 120, 123 (E.D.N.Y. 1993) (holding that, even after *Daubert*, "[t]he polygraph test is simply not sufficiently reliable to be admissible"); *United States* v. *McCants*, No. 86 Cr. 163 (JMW), 1986 WL 7273, at *1 (S.D.N.Y.

[redacted]

June 26, 1986) ("The settled law in the Second Circuit and most other jurisdictions is that the results of polygraph examinations are inadmissible at trial since their scientific validity is questionable.").[25]

(U) Like the Supreme Court in *Scheffer*, the Second Circuit's concern about polygraph examinations centers on the methodology employed by the polygraph examiner, an important factor under *Daubert*. For example, in *United States* v. *Williams*, the Second Circuit drew a distinction between polygraphy and spectrography, the latter of which is generally deemed admissible:

> Spectrography is qualitatively different from polygraph evidence. In spectrography, the examiner merely compares spectrograms reflecting the purely physical characteristics of a voice. In polygraph analysis, the examiner must go on, to extrapolate a judgment of something not directly measured by the machine, *i.e.*, the credibility of the person examined. The skill of the polygraph examiner, the kinds of questions asked, natural variations in blood pressure among individuals, and in how accustomed they are to lying, are unpredictable variables that make the polygraph technique far more speculative than is spectrographic analysis.

583 F.2d 1194, 1199 n.9 (2d Cir. 1978); *see also United States* v. *McCants*, No. 86 CR. 163 (JMW), 1986 WL 7273, at *1 (S.D.N.Y. June 26, 1986) ("Polygraph tests are unreliable in that

---

[25] (U) The Second Circuit's pre-*Daubert* case law concerning polygraph examinations remains persuasive even though *Daubert* held that the Federal Rules of Evidence govern the admissibility of scientific evidence, thereby displacing the widely followed "general acceptance" test set forth in *Frye* v. *United States*, 293 F. 1013 (App. D.C. 1923). As recognized in *Daubert*, the Second Circuit had long criticized the *Frye* test and previously held that questions relating to the admissibility of scientific evidence should be determined under the Federal Rules. 509 U.S. at 587 n.5 (citing *Williams*, 583 F.2d 1194). Moreover, as described *infra*, the Second Circuit's concern about polygraph tests focuses on the methodology employed by the polygraph examiner, which is an important *Daubert* factor. Thus, courts have rejected the claim that "Second Circuit caselaw [concerning polygraphs] needs to be revisited in light of *Daubert*." *United States* v. *Lech*, 895 F. Supp. 582, 585 (S.D.N.Y. 1995) (Sotomayor, J.); *see also United States* v. *Black*, 831 F. Supp. 120, 123 (E.D.N.Y. 1993) ("[T]he Court believes that nothing in *Daubert* would disturb the settled [Second Circuit] precedent that polygraph evidence is neither reliable nor admissible." (citing *Rea*, 958 F.2d at 1211)).

[redacted]

[redacted]

the examiner must extrapolate a judgment of something not directly measured by the machine, *i.e.*, the credibility of the person examined."); *see also Meyers* v. *Arcudi*, 947 F. Supp. 581, 587-89 (D. Conn. 1996) (holding that the control question technique polygraph examination is unreliable in light of all of the *Daubert* factors).

(U) In light of the foregoing authority, the Court should reject Schulte's request to introduce the polygraph examinations at trial because they are inadmissible under Rule 702.

**iii. (U) Polygraph Examination Results Are Inadmissible Under Rule 403**

(U) Even if the polygraph examination results were admissible under Rule 702, they should still be excluded under Rule 403. As the Supreme Court explained in *Scheffer*, "[a] fundamental premise of our criminal trial system is that 'the jury is the lie detector.'" 523 U.S. at 313 (quoting *United States* v. *Barnard*, 490 F.2d 907, 912 (9th Cir. 1973)). Juries might be misled and give "excessive weight to the opinions of a polygrapher, clothed as they are in scientific expertise." *Id.* at 313-14. Indeed, "the aura of infallibility attending polygraph evidence [could] lead jurors to abandon their duty to assess credibility and guilt." *Id.*; *see also Salem* v. *U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.").

(U) Moreover, polygraphy questions—including some of those that Schulte presumably intends to introduce at trial—often call for an individual's belief about the legal implications of

[redacted]

his actions, sometimes without setting forth the factual circumstances underlying such a conclusion. As a result, "the jury would receive evidence showing [the defendant's] personal belief that he did not violate any federal criminal statute, but would not receive any information that would assist its inquiry to find the facts." *Lech*, 895 F. Supp. at 585. For these reasons as well, courts have found a "substantial possibility that the admission of [the defendant's] answers would mislead and confuse the jury, far outweighing the probativeness of the exam results." *Id.*

(U) The foregoing concerns are heightened because polygraph examinations are generally viewed as insufficiently reliable as evidence in court. As the reliability of the evidence decreases, the likelihood increases that the probative value may be substantially outweighed by the prejudicial effect. As a result, while reliability is part of the *Daubert* framework, it also "become[s] an integral part of a 403 inquiry." *United States* v. *Lea*, 249 F.3d 632, 639 (7th Cir. 2001).

(U) Applying these principles, courts in the Second Circuit also regularly exclude polygraph examinations on Rule 403 grounds. *Hester*, 674 F. App'x at 35; *Kwong*, 69 F.3d at 668 (upholding the district court's denial of defense motion to have polygraph examiner offer opinion that defendant was truthful: "Even assuming that polygraph results are admissible under Rule 702 . . . we nonetheless find that the results in this case should be excluded under Rule 403"); *Canter*, 338 F. Supp. 2d at 464 (finding that in addition to being unreliable, the defendant's polygraph examination should be excluded under Rule 403 because the particular questions asked were subject to different interpretations); *Goldstein* v. *Allstate Ins. Co.*, No. 95 Civ. 8783 (DAB), 1998 WL 811994, at *2 (S.D.N.Y. Nov. 19, 1998) (excluding results of polygraph examination at trial on Rule 403 grounds because questions were ambiguous and other party was not present for the examination); *Arcudi*, 947 F. Supp. at 588; *Lech*, 895 F. Supp. at

585. Accordingly, the Court should also exclude the polygraph examinations under Rule 403.

**c. (U) Schulte's Statements During the Polygraph Examinations Are Inadmissible Hearsay If He Offers Them**

(U) Schulte asserts in his Section 5 Notice that he intends to introduce his statements during the polygraph examinations to show his state of mind. But Schulte's statements are inadmissible hearsay and they do not qualify under the state of mind exception pursuant to Federal Rule of Evidence 803(3) because they were not made contemporaneously with his crimes.

**i. (U) Applicable Law**

(U) "Generally, a statement made by a person while not testifying at the current trial, offered by that person to prove the truth of the matter asserted in his statement, is hearsay." *United States* v. *Gupta*, 747 F.3d at 131 (citing Fed. R. Evid. 801(a)-(c)). "Hearsay generally is inadmissible if it does not fall within an exception provided by Rule 803 or 804." *Id.* (citing Fed. R. Evid. 802). Rule 803 provides an exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).[26]

(U) By focusing on the declarant's "then-existing" state of mind, Rule 803(3) incorporates a "contemporaneity requirement." *United States* v. *Farhane*, 634 F.3d 127, 171-75 (2d Cir. 2011) (Raggi, J., concurring). The contemporaneity requirement reduces the declarant's chance for reflection and, therefore, misrepresentation. *See United States* v. *Cardascia*, 951 F.2d

[redacted]

474, 488 (2d Cir. 1991) ("the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation"); *Farhane*, 634 F.3d at 171 (Raggi, J., concurring) ("the statement must evidence the declarant's 'then existing state of mind,' a circumstance presumed to reduce a declarant's chance for reflection and, therefore, misrepresentation"). Thus, statements of the declarant's state of mind in the past are not admissible under Rule 803(3). *See, e.g.*, *United States* v. *Taubman*, 297 F.3d 161, 164-65 (2d Cir. 2002); *United States* v. *Harwood*, 998 F.2d 91, 98 (2d Cir. 1993); *Cardascia*, 951 F.2d at 487-88.

(U) Even if a statement falls within Rule 803(3), "the fact that a statement falls within an exception to the hearsay rule does not mean that the statement is not to be classified as hearsay; nor does it mean that the statement is automatically admissible. It means simply that the statement—assuming that the criteria specified in the exception are met—is 'not excluded by the rule against hearsay.'" *Gupta*, 747 F.3d at 131 (quoting Fed. R. Evid. 803, 804(b)). "The court retains its normal discretion to exclude the evidence on other grounds such as lack of relevance, *see* Fed. R. Evid. 402, improper purpose, *see, e.g.*, Fed. R. Evid. 404, or undue prejudice, *see* Fed. R. Evid. 403." *Gupta*, 747 F.3d at 131 (internal quotation marks omitted).

**ii. (U) Discussion**

(U) Schulte's statements during the polygraph examinations are inadmissible hearsay and do not qualify under the hearsay exception to show his state of mind. First, Schulte made these statements at a time when his state of mind was not particularly relevant, in large part because the statements were not contemporaneous with his crimes. For example, in *United States* v. *DiMaria*, 727 F.2d 265 (2d Cir. 1984), the Second Circuit determined that in a case charging the knowing possession of stolen cigarettes, the defendant's statement that "I only came

[redacted]



here to get some cigarettes real cheap," made at the time he was caught with a truckload of stolen cigarettes that formed the basis of the charge against him, was properly within Rule 803(3)'s state of mind exception to the hearsay rule. The Court found that because DiMaria's statement concerned his then-existing state of mind about a matter relevant to the crime and was made contemporaneously with the crime, it properly fell within the exception. *Id.* at 270-71.

(U)   By contrast, in the present case, Schulte made statements to CIA security officials, at times either years before or months after he committed the charged crimes. As a result, Schulte's statements were not contemporaneous with his crimes in the same way that the statement in *DiMaria* clearly was. At bottom, Schulte's statements simply do not qualify under Rule 803(3). *See Taubman*, 297 F.3d at 164-65 (statement not admissible to show state of mind "when he went to the relevant meeting, because it was not made contemporaneously with that meeting"); *Harwood*, 998 F.2d at 98 (statements not admissible "to support an inference about conduct that had occurred five months earlier"); *Cardascia*, 951 F.2d at 487-88 (letter not admissible to show state of mind "with regard to conduct that occurred eight months earlier").

[redacted]

[redacted]

**3. (U) Performance Activity Reports**

(U) Schulte seeks to use all of his performance activity reports, or "PARs," at trial. By way of background, PARs are periodic performance reports for individual employees. These reports include sections titled "Accomplishments," in which the employee who is the subject of the PAR describes their work and accomplishments; "Rating Official Narrative," in which the employee's immediate supervisor rates the employee's performance and describes the employee's contributions; and "Reviewing Official Response," in which a management official explains whether they concur with the supervisor's rating of the employee. Generally, each PAR covers a period of approximately six months.

(U) The Government does not object to Schulte introducing his PARs that together cover the time period of July 1, 2014 through his resignation (Rows 332 through 335 of the Section 5 Notice) subject to the Federal Rules of Evidence, and the redactions and substitutions outlined above. However, the Government objects to Schulte's use of PARs that predate this time period (Rows 327 through 331 (together, the "Old PARs")) because they are dated years before the relevant events in this case and have absolutely no bearing on Schulte's activities in 2015 and 2016 that form the basis for the WikiLeaks and Computer Fraud Charges.

(U) Schulte asserts principally two bases for admission of the Old PARs. First, Schulte contends that they are relevant to show that he was a quality employee, including that he had "outstanding performance" (Row 327, December 2010 PAR); "puts the 'mission first' in order to ensure that projects are completed" (Row 328, August 2011 PAR); and was "an 'invaluable' member of OSB" (Row 329, April 2013 PAR, and Row 330, June 2013 PAR).

[redacted]



Each of those performance accolades relate to Schulte's ability to perform quality work as a CIA developer—a fact the Government does not dispute and will elicit at trial. Regardless, the employee disputes involving Schulte that are relevant to this case did not begin until the fall of 2015. Thus, Schulte's performance ratings in the Old PARs, which are dated years before the key events in this case, have no relevance to Schulte's defense. Moreover, while Schulte can offer character evidence about a relevant trait through general opinion testimony, Federal Rule of Evidence 405 prohibits him from introducing evidence of specific acts—such as the work described in the Old PARs—to prove the existence of that trait. *See Doyle*, 130 F.3d at 542 ("[P]roof of Doyle's specific acts under Rule 405(b) was not admissible," noting that "if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed").

Indeed, as discussed above in connection with the 302s, *see supra* Part V.B.1, the case law is clear that "a defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *Scarpa*, 913 F.2d at 1011.



. *See Socony-Vacuum*, 310 U.S. at 230 (stating that the court has "wide discretion" to preclude cumulative evidence). As a result, Schulte's bases for using the Old PARs are without merit.

**4. (U) Thumb Drive Images**

(U) It is black-letter law that "[e]vidence that a defendant charged with [a crime] engaged in other, non-[criminal] activity is generally irrelevant." *United States* v. *Balboa*, 12 Cr. 196 (PAC), 2013 WL 6196606, at *3 (S.D.N.Y. 2013) (quoting *United States* v. *Nekritin*, 2011 WL 2462744, at *5 (E.D.N.Y. 2011)); *see also Scarpa*, 913 F.2d at 1011; *United States* v. *Duncan*, 2019 WL 2210663, at *2-3 (S.D.N.Y. 2019) ("The fact that law enforcement officers did not observe any criminal conduct during the period of surveillance has no bearing on whether [the defendant] engaged in the fraud scheme charged in the indictment. . . . As in *Scarpa*, the fact that law enforcement observed only innocent behavior while conducting surveillance at one particular location—in this case, [the defendant]'s home—does not rebut the government's

evidence that the inculpatory activities and conversations took place somewhere else."). Accordingly, courts in this District have routinely held that evidence as to particular instances in which defendants did not commit crimes "is not relevant and therefore is not admissible pursuant to Fed. R. Evid. 401." *Duncan*, 2019 WL 2210603, at *3.

**5. (U) Other Items**

(U) Finally, the defendant noticed four other items that are not admissible by the defendant as a matter of law. These items include:

**Row 317**: An Office of Equal Employment Opportunity ("EEO") report about

[redacted]

[redacted] While the Government has no objection to testimony about the events described in the report, the report itself offers nothing more than the investigator's conclusion that Schulte's conduct did not rise to the level of harassment under the relevant regulations. Whether or not Schulte's conduct met that standard, however, does not bear on the issue of whether Schulte stole and leaked the Classified Information or illegally manipulated CIA computers.

[redacted]**<u>Rows 323 & 337</u>:** In this row, Schulte notices an investigative summary related to Schulte's application for a renewal of his security clearance. This report also contains inadmissible hearsay, in that it is replete with witness statements. To the extent Schulte wishes to elicit testimony consistent with the summary's reporting of—as Schulte puts it—"high school drama," the Government does not object. Nor does the Government object to Schulte eliciting character evidence in the form of reputation or opinion, as long as he lays the appropriate foundation. But the other information that Schulte cites to in this summary is irrelevant. First, to the extent he claims that he was "truthful" during his application, the Government disputes that characterization. But even accepting it for purposes of argument, "extrinsic evidence [like this summary] is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). [redacted]

[redacted]



## VI. (U) In the Alternative, the Court Should Hold an *In Camera* Hearing Pursuant to CIPA Section 6(a) to Determine the Relevance and Admissibility of the Classified Material

(U) To the extent the Court believes that the portions of the Section 5 Notice to which the Government objects should not be rejected outright, the Government respectfully requests that the Court schedule an *in camera* hearing pursuant to Section 6(a) of CIPA to address the use, relevance and admissibility of the classified information contained within the defendant's' Section 5 Notice. If the Court determines that any of the classified information is both relevant and admissible, the Government requests the opportunity to address *ex parte* the national security concerns implicated by the disclosure of such subset of the sought-after information. If, after consideration of the national security concerns, the Court finds that public disclosure of the information at trial is still appropriate, the Government requests that the Court schedule an *in camera* hearing pursuant to Section 6(c) of CIPA to address the potential use of substitutions for the classified information.

## (U) Conclusion

(U) For the reasons stated above, the Court should (1) preclude introduction of the Protected Information into evidence at trial, whether through exhibits or testimony; (2) authorize the introduction of certain exhibits in a classified form; and (3) either exclude the limited number

of exhibits noticed by the defendant in the Section 5 Notice to which the Government has objected or schedule a hearing pursuant to Section 6(a) to address those exhibits.  Finally, the Government respectfully requests that the instant classified submission, and the attached exhibits, be sealed and preserved in the records of the Court, by the Classified Information Security Officer, to made available in the event of an appeal.

Dated: New York, New York
      October 11, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:    /s/                       
    David W. Denton, Jr.
    Sidhardha Kamaraju
    Matthew Laroche
    Assistant United States Attorneys
    (212) 637-2744/6523/2420