UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA     :

                                      S2 17 Cr. 548 (PAC)

        -v-              :

JOSHUA ADAM SCHULTE,

                    *Defendant*.   :
-----------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOSHUA ADAM
SCHULTE'S MOTION TO DISMISS COUNTS ONE, TWO, THREE, FOUR,
AND SIX OF THE SECOND SUPERSEDING INDICTMENT BECAUSE
THE ESPIONAGE ACT, 18 U.S.C. § 793, AND THE FEDERAL LARCENY
STATUTE, 18 U.S.C. § 641, ARE UNCONSTITUTIONAL**

Edward S. Zas
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

Sabrina P. Shroff
233 Broadway
New York, New York 10007

*Counsel for Defendant Joshua Adam Schulte*

TO:    GEOFFREY S. BERMAN, ESQ.
       United States Attorney
       Southern District of New York
       One St. Andrew's Plaza
       New York, New York 10007
       Attn**:** Matthew Laroche, Sidhardha Kamaraju, and David Denton
          *Assistant United States Attorneys*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 2

    A. Statutory background ................................................................. 2

    B. Factual background ...................................................................... 5

ARGUMENT ................................................................................................... 7

POINT I .......................................................................................................... 7

SECTION 793 IS UNCONSTITUTIONALLY OVERBROAD. .......................... 7

    A. Applicable overbreadth principles ............................................ 7

    B. Section 793 is an unconstitutional content-based
       regulation of speech ................................................................... 9

POINT II ........................................................................................................ 15

SECTION 793 IS VOID FOR VAGUENESS ON
ITS FACE AND AS APPLIED TO MR. SCHULTE. ..................................... 15

    A. Applicable vagueness principles ............................................. 15

    B. Section 793 is vague on its face and as applied to
       Mr. Schulte ................................................................................. 17

POINT III ....................................................................................................... 19

SOME COURTS HAVE INCORRECTLY HELD THAT
SECTION 793 IS CONSTITUTIONAL ......................................................... 19

POINT IV ....................................................................................................... 24

THE FEDERAL LARCENY STATUTE, 18 U.S.C. § 641,
IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE
ON ITS FACE AND AS APPLIED TO MR. SCHULTE. ............................... 24

    A. Section 641 is overbroad. ........................................................ 24

    B. Section 641 is impermissibly vague. ....................................... 26

CONCLUSION ............................................................................................... 27

i

# TABLE OF AUTHORITIES

*Arnett v. Kennedy*,
    416 U.S. 134 (1974) ............................................................................................ 25

*Ashcroft v. Am. Civil Liberties Union*,
    535 U.S. 564 (2002) .............................................................................................. 7

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) ............................................................................................ 10

*Bryan v. United States*,
    524 U.S. 184 (1998) ............................................................................................ 14

*Citizens United v. Schneiderman*,
    882 F.3d 374 (2d Cir. 2018) .................................................................................. 7

*Crowell v. Benson*,
    285 U.S. 22 (1932) ........................................................................................ 17-18

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006) .............................................................................. 8, 9

*Gorin v. United States*,
    312 U.S. 19 (1941) .............................................................................................. 19

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................................ 17

*Jennings v. Rodriquez*,
    138 S. Ct. 830 (2018) .......................................................................................... 17

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ................................................................................... 15, 17

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ............................................................................................ 15

*Maynard v. Cartwright*,
    486 U.S. 356 (1988) ............................................................................................ 16

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) ............................................................ 2, 4, 11

*Reed v. Town of Gilbert, Ariz.*
    135 S. Ct. 2218 (2015).................................................... 7, 8, 9, 10

*Schenck v. United States*,
    249 U.S. 47 (1919) ................................................................. 2

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ......................................................... 16

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .............................................................. 10

*Turner Broad. Sys., Inc. v. FCC*,
    520 U.S. 180 (1997) ............................................................... 7

*United States v. Coppola*,
    671 F.3d 220 (2d Cir. 2012) ............................................... 16

*United States v. Drake*,
    818 F. Supp. 2d 909 (D. Md. 2011) .......................... 14-15, 19

*United States v. Fowler*,
    932 F.2d 306 (4th Cir. 1991) ............................................. 24

*United States v. Friedman*,
    445 F.2d 1076 (9th Cir. 1971) ....................................... 24, 25

*United States v. Girard*,
    601 F.2d 69 (2d Cir. 1979) .............................................. 24, 25

*United States v. Jeter*,
    775 F.2d 670 (6th Cir. 1985) ......................................... 24, 25

*United States v. Jones*,
    677 F. Supp. 238 (S.D.N.Y. 1988) .................................. 25

*United States v. Kim*,
    808 F. Supp. 2d 44 (D.D.C. 2011) .................................... 15

*United States v. Lanier*,
    520 U.S. 259 (1997) ............................................................. 15

*United States v. Matzkin*,
    14 F.3d 1014 (4th Cir. 1994) ........................................ 24, 25

*United States v. McAusland*,
    979 F.2d 970 (4th Cir. 1992) ............................................. 25

*United States v. Miller*,
    874 F.2d 1255 (9th Cir. 1989) ........................................................................... 14

*United States v. Morison*,
    604 F. Supp. 655 (D. Md. 1985) ................................................................. 20, 21

*United States v. Morison*,
    844 F.2d 1057 (4th Cir. 1988) .................................................................. *passim*

*United States v. Nichols*,
    820 F.2d 508 (1st Cir. 1987) ...................................................................... 24, 25

*United States v. Progressive, Inc.*,
    467 F. Supp. 990 (W.D. Wis. 1979) .................................................................. 2

*United States v. Rosen*,
    445 F. Supp. 2d 602 (E.D. Va. Aug. 9, 2006), *amended*, No. 1:05CR225, 2006 WL
    5049154 (E.D. Va. Aug. 16, 2006), *and aff'd*, 557 F.3d 192 (4th Cir. 2009) ............... *passim*

*United States v. Rybicki*,
    354 F.3d 124 (2d Cir. 2003) (en banc) ............................................................ 19

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................... 8, 9

*United States v. Thompson*,
    896 F.3d 155 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2715 (2019) ...................... 8-9

*United States v. Truong Dinh Hung*,
    629 F.2d 908 (4th Cir. 1980) ..................................................................... 14

*United States v. Vicenzi*,
    No. 87-222-N, 1988 WL 98634 (D. Mass. Feb 16, 1988) ............................. 24, 25

*United States v. Williams*,
    553 U.S. 285 (2008) .................................................................................. 9, 16

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ....................................................................... 16-17, 17

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ...................................................................................... 8

**Statutes**

18 U.S.C. § 641 ......................................................................................... *passim*

18 U.S.C. § 793 ......................................................................................... *passim*

18 U.S.C. § 795 ................................................................................................. 26

18 U.S.C. § 797 ................................................................................................. 26

18 U.S.C. § 798 ................................................................................................. 26

18 U.S.C. § 952 ................................................................................................. 26

42 U.S.C. § 2277 .............................................................................................. 26

50 U.S.C. § 3121 .............................................................................................. 26

50 U.S.C. § 3122 .............................................................................................. 26

**Other Authorities**

Aftergood, Steven, *Reducing Government Secrecy: Finding What Works*,
27 Yale L. & Pol'y Rev. 399 (2009) ....................................................... 23

*Constitutional Law—Due Process and Free Speech—District Court Holds
That Recipients of Government Leaks Who Disclose Information "Related
to the National Defense" May Be Prosecuted Under the Espionage Act*,
120 Harv. L. Rev. 821 (2007) ................................................................... 18

Edgar, Harold, &Schmidt, Jr., Benno C., *Curtiss–Wright Comes Home:
Executive Power and National Security Secrecy*,
21 Harv. C.R.–C.L. L. Rev. 349 (1986)..................................................... 18

Edgar, Harold, & Schmidt, Jr., Benno C., *The Espionage Statutes and Publication
of Defense Information*, 73 Colum. L. Rev. 929 (1973)............................... *passim*

Editorial, "Secrecy and the Media," *L.A. Times*, Aug. 27, 2006 .................... 4

*Examining DOJ's Investigation of Journalists Who Publish Classified Information:
Lessons from the Jack Anderson Case*: Hearing Before the S. Comm. on the Judiciary,
109th Cong. 5 (2006) (statement of Matthew Friedrich, Chief of Staff and Principal
Deputy Assistant Att'y Gen., Criminal Division, Department of Justice) ............ 11

Ignatius, David, *Why did Obama Dawdle on Russia's Hacking?* Wash. Post
(Jan 12, 2017), https://tinyurl.com/gmqce67 ................................................. 12–13

Lewis, Anthony, *National Security: Muting the "Vital Criticism,"*
34 U.C.L.A. L. Rev. 1687 (1987).................................................................. 4

Loeb, Vernon, *Clinton Ignored CIA in Pardoning Intelligence Analyst*,
   Wash. Post (Feb. 17, 2001) ................................................................... 20

Miller, Greg, & Jaffe, Greg, *Trump Revealed Highly Classified Information
   to Russian Foreign Minister and Ambassador*, Wash. Post (May 15, 2017),
   https://tinyurl.com/y3qc5tmo ............................................................... 13

Porter, Tom, *U.S. 'Prepares Charges' Against WikiLeaks Founder
   Julian Assange*, Newsweek, Apr. 21, 2017, https://tinyurl.com/y6y2pye4 ........... 11

Radack, Jesselyn, & McClellan, Kathleen, *The Criminalization of Whistleblowing*,
   2 Am. U. Lab. & Emp. L.F. 57 (2011) ................................................... 25–26

Stone, Geoffrey R., "Scared of Scoops," N.Y. Times, May 8, 2006 ........................... 11

## INTRODUCTION

Scholars, journalists, and judges have long feared that the Espionage Act, 18 U.S.C. § 793, and the federal larceny statute, 18 U.S.C. § 641, are so vaguely worded—and have been construed so broadly—that the government could use them to prosecute news organizations, and their confidential sources, for obtaining and revealing truthful and important information about government activity to the public. In this case, those fears have been realized. The government has charged Mr. Schulte, a former CIA employee, with four counts of violating § 793, and one count of violating § 641, among other charges. The government does not claim that Mr. Schulte transmitted secret information to a hostile foreign government in order to harm the United States—classic "espionage"—or that he acted for financial gain. Instead, it claims that he provided the information, which appears to be authentic and accurate, to WikiLeaks, an international "non-profit media organization" whose stated goal is "to bring important news and information to the public." About, WikiLeaks, http://wikiLeaks.org/About.html (last visited Nov. 3, 2019).

This case thus raises profound constitutional difficulties. Sections 793 and 641 were never intended to apply to this kind of public disclosure. But the laws are so vague and overbroad that they threaten to criminalize substantial amounts of protected speech essential to informed public debate in a democratic society. This Court should therefore hold that the statutes are facially overbroad, in violation of the First Amendment, and impermissibly vague, both on their face and as applied, in violation of the First and Fifth Amendments. Accordingly, the Court should dismiss Counts One, Two, Three, Four, and Six of the Second Superseding Indictment.

# BACKGROUND

## A. Statutory background

The original Espionage Act of 1917, passed into law shortly after the United States entered World War I, made it a crime to disclose or distribute information that would hinder the operations or success of U.S. military forces or, alternatively, abet the success of U.S. enemies. *See* 18 U.S.C. § 793 (originally enacted as Espionage Act of 1917, Pub. L. No. 65-24, 40 Stat. 217); Harold Edgar & Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 939–42 (1973) [hereinafter "Edgar & Schmidt"] (providing an overview of the legislative history of the Espionage Act from its inception to the present law). Though the Act had the support of President Woodrow Wilson, many people felt—even against the backdrop of fear of a worldwide German takeover—that such a law was unconstitutional. *Id.* The law sparked an ongoing congressional debate over the boundaries of First Amendment rights when juxtaposed with national security. *Id.*

First, there were concerns that the statutory text was vague and could be construed too broadly, thereby granting too much power to both the Department of Justice and the War Department. *Id.* Proponents of civil liberties were also apprehensive of the Act's infringement on First Amendment rights. *Id.* Even though *Schenck v. United States,* 249 U.S. 47, 52 (1919), upheld the Act, several courts have since raised concerns about its constitutionality. The law has never been explicitly overturned, but it was examined and questioned in the "Pentagon Papers" case, *New York Times Co. v. United States,* 403 U.S. 713 (1971), and *United States v. Progressive, Inc.,* 467 F. Supp. 990, 1000 (W.D. Wis. 1979).

Despite the controversial nature of the law, its "inartful language" was later transferred to the U.S. Code and remains current law. Edgar & Schmidt, *supra*, at 939. The Espionage Act is now codified in 18 U.S.C. § 793. *Id.* at 939–42. Today, the law still calls for criminal punishment of individuals who violate the modern Espionage Act by a fine or up to ten years in prison. 18 U.S.C. § 793(a)–(f). Subsections (d) and (e) provide that a person who possesses information relating to U.S. national defense that could injure the United States or promote the advantage of a foreign nation, *id.* § 793(d)–(e), and who "willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it," *id.*, shall be deemed in violation of the law. *Id.* The two subsections are distinct in that subsection (d) refers to individuals who possess the information lawfully, *id.* § 793(d), while subsection (e) refers to individuals who have "unauthorized" possession of the information. *Id.* § 793(e).

Neither the Supreme Court nor the Second Circuit has passed on the current statute's constitutionality or application. *See United States v. Rosen*, 445 F. Supp. 2d 602, 613 (E.D. Va. Aug. 9, 2006) (noting that "the Supreme Court has never considered a § 793(d) or (e) case"), *amended*, No. 1:05CR225, 2006 WL 5049154 (E.D. Va. Aug. 16, 2006), *and aff'd*, 557 F.3d 192 (4th Cir. 2009). Some courts in the Fourth Circuit have upheld the Act against vagueness and overbreadth challenges, though not without reservations. *See, e.g.*, *United States v. Morison*, 844 F.2d 1057, 1060 (4th Cir. 1988) (denying vagueness and First Amendment challenges to § 793 as applied to a naval intelligence officer who transmitted classified satellite photography of Soviet naval preparations to a British periodical); *id.* at 1081 (Wilkinson, J., concurring) (recognizing that the "First Amendment interests" raised by

3

Morison were not "insignificant"); *id.* at 1085 (Phillips, J., concurring) (noting that "the first amendment issues raised by Morison are real and substantial and require … serious attention"). And numerous commentators and journalists—and some judges—have argued that the statute is unconstitutional as written, particularly insofar as it allows the government to prosecute news organizations and their sources. *See Rosen*, 445 F. Supp. 2d at 613 ("Over the years, numerous commentators have criticized these provisions as excessively complex, confusing, indeed impenetrable.") (citing *New York Times Co.*, 403 U.S. at 754 (Harlan, J., dissenting) (describing § 793(e) as a "singularly opaque statute"); *Morison*, 844 F.2d at 1086 (Phillips, J., concurring) (urging Congress to pass "carefully drawn legislation" replacing § 793). *See generally* Harold Edgar & Benno C. Schmidt, Jr., *Curtiss–Wright Comes Home: Executive Power and National Security Secrecy*, 21 Harv. C.R.–C.L. L. Rev. 349, 393 & n.159 (1986) ("The espionage statutes are incomprehensible if read according to the conventions of legal analysis of text, while paying fair attention to legislative history. This is especially true of the sections relating to publication of defense information and the preliminary acts of information-gathering and communication."); Anthony Lewis, *National Security: Muting the "Vital Criticism,"* 34 U.C.L.A. L. Rev. 1687, 1698 (1987) ("The espionage sections of the Federal Criminal Code are a singularly impenetrable warren of provisions originally passed by Congress under the stresses of World War I."); Edgar and Schmidt, *supra*, at 998 (referring to subsections 793(d) and (e) as "the most confusing and complex of all the federal espionage statutes").

**B. Factual background**

As relevant to this motion, the Second Superseding Indictment ("Indictment") charges Mr. Schulte with four counts of violating 18 U.S.C. § 793 and one count of violating 18 U.S.C. § 641. *See* Indictment ¶¶ 1–4, 6.

Count One alleges a violation of 18 U.S.C. § 793(b). *Id.* ¶ 1. It charges that, in or about 2016, Mr. Schulte, "for the purpose of obtaining information respecting the national defense," and "with intent or reason to believe that the information would be used to the injury of the United States, or to the advantage of any foreign nation," took a document, writing, or note connected with the national defense." *Id.* Specifically, according to Count One's "to wit" clause, he took information maintained by the CIA, and which had been determined to require protection against unauthorized disclosure for reasons of national defense or foreign relations, for the purpose of providing it to, and causing it to be provided to, the organization known as WikiLeaks. *Id.*

Count Two alleges a violation of 18 U.S.C. § 793(d). *Id.* ¶ 2. It charges that, in or about 2016, Mr. Schulte, "having lawful possession of, access to, control over, and being entrusted with information related to the national defense, …which information the defendant had reason to believe could be used to the injury of the United States and to the advantage of a foreign nation, did knowingly and willfully communicate, deliver and transmit that aforesaid information to a person not entitled to receive it." *Id.* Specifically, according to Count Two's "to wit" clause, Mr. Schulte caused classified information to be transmitted to WikiLeaks. *Id.*

Counts Three and Four allege violations of 18 U.S.C. § 793(e). *Id.* ¶¶ 3–4. Count Three charges that, in or about 2016, Mr. Schulte, "having unauthorized possession of, access to, and control over records containing information related to the national defense, which

information the defendant had reason to believe could be used to the injury of the United States and to the advantage of a foreign nation, willfully retained the records and failed to deliver it [*sic*] to the officer or employee of the United States entitled to receive it [*sic*]." *Id.* ¶ 3. Specifically, according to Count Three's "to wit" clause, Mr. Schulte retained a portion of classified information to which he did not have lawful access and caused it to be transmitted to WikiLeaks. *Id.*

Count Four charges that, "in or about December 2017, up to and including at least in or about October 2018," Mr. Schulte, "having unauthorized possession of, access to, and control over records containing information related to the national defense, which information the defendant had reason to believe could be used to the injury of the United States and to the advantage of a foreign nation, willfully retained the records and failed to deliver it [*sic*] to the officer or employee of the United States entitled to receive it [*sic*], and willfully communicated, delivered, and transmitted … the same to a person not entitled to receive it." *Id.* ¶ 4. Specifically, according to Count Four's "to wit" clause, Mr. Schulte retained portions of classified information and other national defense information maintained by the CIA to which he did not have lawful access, and caused this information to be transmitted, or attempted to transmit it, to third parties not entitled to receive it. *Id.*

Count Six charges Mr. Schulte with theft of government property, in violation of 18 U.S.C. § 641. *Id.* ¶ 6. It alleges that, in or about 2016, he "embezzle[d], st[ole], purloin[ed], and knowingly convert[ed] to his own use … things of value to the United States, which exceeded the sum of $1,000, and … receive[d], conceal[ed], and retain[ed] the same with intent to convert it to his own use and gain, knowing it to have been embezzled, stolen,

purloined and converted." *Id.* Specifically, according to Count Six's "to wit" clause, Mr.

Schulte unlawfully obtained classified information belonging to the CIA. *Id.*

## ARGUMENT

## POINT I

## SECTION 793 IS UNCONSTITUTIONALLY OVERBROAD.

**A. Applicable overbreadth principles**

The First Amendment provides: "Congress shall make no law ... abridging the freedom

of speech." U.S. Const. amend. I. "[A]s a general matter, the First Amendment means that

government has no power to restrict expression because of its message, its ideas, its subject

matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002).

"Content-based laws—those that target speech based on its communicative content—are

presumptively unconstitutional" and subject to "strict scrutiny": the government must

"prove[] that they are narrowly tailored to serve compelling state interests." *Reed v. Town of

Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). A "content-neutral" law, in contrast, is subject

to lesser, but still "exacting," "intermediate scrutiny," *Citizens United v. Schneiderman*, 882

F.3d 374, 381–82 (2d Cir. 2018): the government must show that the law "advances

important governmental interests unrelated to the suppression of free speech and does not

burden substantially more speech than necessary to further those interests." *Turner Broad.

Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

"Government regulation of speech is content based if a law applies to particular speech

because of the topic discussed or the idea or message expressed." *Town of Gilbert*, 135 S. Ct.

at 2227. "This commonsense meaning of the phrase 'content based' requires a court to

consider whether a regulation of speech 'on its face' draws distinctions based on the message

a speaker conveys." *Id.* "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* "Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.*

The Supreme Court has "also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys." *Id.* "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Id.*

A statute is overbroad and facially invalid in the First Amendment context if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010).

Mr. Schulte's particular conduct is irrelevant to this analysis. Overbreadth challenges are premised on a concern that "enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). For that reason, overbreadth challenges present "an exception to the general rule against third-party standing," *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) (Sotomayor, J.). Thus, a defendant making such a challenge "claims that[,] although a statute did not violate his or her [own] First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Id.* All overbreadth challenges are therefore facial challenges. *United States v.*

*Thompson*, 896 F.3d 155, 162–63 (2d Cir. 2018) (citing *Farrell*, 449 F.3d at 498), *cert. denied*, 139 S. Ct. 2715 (2019).

**B. Section 793 is an unconstitutional content-based regulation of speech.**

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008); *United States v. Stevens*, 559 U.S. 460, 474 (2010).

Like the animal-cruelty statute invalidated in *Stevens*, the Espionage Act "create[s] a criminal prohibition of alarming breadth." *Id.* Indeed, the seminal article on the Act recognizes that subsections 793(d) and (e) "are so sweeping as to be absurd." Edgar & Schmidt, *supra*, at 1032. The Act purports to criminalize, *inter alia*, the obtaining, § 793(b), transmission, § 793(d), communication, *id.*, and "unauthorized" retention, § 793(e), of any "document, writing, or note of anything connected with the national defense," § 793(b), or "information relating to the national defense," § 793(d)–(e). The government need not prove that the defendant knew or intended that the information would be used to injure the United States—only that he had "reason to believe" that the information "could" or "would" be so used. § 793(a), (b), (d), (e). Thus, though the statute was intended to curb classic "spying" or traditional international "espionage"—i.e., providing national security secrets to foreign agents with intent to harm the United States—it was written so broadly (and vaguely) as to cover substantial amounts of protected speech based on its content. This content-based restraint is therefore subject to strict scrutiny and presumptively unconstitutional. *Town of Gilbert*, 135 S. Ct. at 2226.

First, because the Act restricts the flow of "information," it undeniably restricts "speech." The Supreme Court has held "that the creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "If the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (internal citations omitted).[1]

Moreover, the Act explicitly regulates speech based on its content—the statute only punishes speech "relating to the national defense." The Supreme Court has held that "[a] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Town of Gilbert,* 135 S. Ct. at 2230. Laws that "single[] out specific subject matter for differential treatment," as the Espionage Act does, are facially content based and therefore subject to strict scrutiny. *Id.*

Section 793 cannot withstand strict (or even intermediate) scrutiny. The statute is so expansive that it allows the government to prosecute private citizens for obtaining, writing, publicly disclosing, or even retaining documents and information somehow "relating to the national defense." The individuals need only have "reason to believe" that the information "could" be used to injure the United States or to benefit a foreign power. § 793(d)–(e).

Journalists, commentators, and even Supreme Court Justices have recognized that the vagueness and breadth of Section 793 could allow the government to prosecute members of

---

[1] While subsection 793(b), unlike subsections 793(d) and (e), prohibits the copying, making, or obtaining of documents, rather than their transmission or communication to others, it nevertheless threatens freedom of speech because obtaining or copying information is often an essential preliminary step toward transmitting or communicating it to the public. *See* Edgar & Schmidt, *supra*, at 968.

10

the media for obtaining and publishing truthful information about U.S. foreign policy and national defense. *See, e.g.*, *New York Times Co.*, 403 U.S. at 737–39 (White, J., concurring) (listing §793(e) as among those sections under which he "would have no difficulty in sustaining convictions" against the newspaper defendants in the case if appropriate facts were shown); Edgar & Schmidt, *supra*, at 998 (pointing out that the "scattergun" drafting of § 793(d) and (e) causes those subsections to pose a significant threat of prosecution to journalists who obtain or publish defense information); Editorial, "Secrecy and the Media," *L.A. Times*, Aug. 27, 2006, at M4 (warning that the "Espionage Act could mutate into a British-style Official Secrets Act that could be used against journalists"). In fact, former Attorney General Alberto Gonzales admitted that the Department of Justice was considering prosecuting the New York Times for exposing the federal warrantless wiretapping program and the Washington Post for reviewing the CIA's use of secret prisons in Eastern Europe to detain and interrogate persons of interest in the "war on terror." Geoffrey R. Stone, "Scared of Scoops," *N.Y. Times*, May 8, 2006, at A21; *see also Examining DOJ's Investigation of Journalists Who Publish Classified Information: Lessons from the Jack Anderson Case*: *Hearing Before the S. Comm. on the Judiciary*, 109th Cong. 5 (2006) (statement of Matthew Friedrich, Chief of Staff and Principal Deputy Assistant Att'y Gen., Criminal Division, Department of Justice) (agreeing that it is "the position of the Department of Justice today that [the Espionage Act] would … authorize the prosecution of a newspaper and a reporter").

More recently, President Trump has, on an almost weekly basis, called for leak investigations into news reports about his administration. And former Attorney General Jeff Sessions indicated that the DOJ wanted to increase the prosecution of journalists' sources. "We are going to step up our efforts and already are stepping up our efforts on all leaks,"

Sessions said in April 2017, adding that he wants to put "some people in jail" for disclosing

classified information. Tom Porter, *U.S. 'Prepares Charges' Against WikiLeaks Founder

Julian Assange*, Newsweek, Apr. 21, 2017, *available at* https://tinyurl.com/y6y2pye4.

To be sure, the government has a compelling interest in protecting national security. But

§ 793 is not the least restrictive means of achieving that purpose. Far from it. For example,

by its terms, the statute can be used to prosecute both covert disclosures of secret information

by a government official to a foreign power—traditional "espionage"—and disclosures to the

public at large through media outlets. Congress could have prohibited only the former—not

disclosures by private citizens to media outlets such as the New York Times (or WikiLeaks)

so that they can be made available to the public at large. The public nature of such

disclosures increases their First Amendment value, while at the same time decreasing their

potential for harm to national security. Thus, removing public disclosures by private citizens

from the reach of § 793 would make the statute serve as a less restrictive means of achieving

the compelling government interest in preventing disclosures that would do real harm

to national security.

Further, the law is overinclusive. On its face, the Espionage Act brings under threat of

criminal liability a tremendous amount of newsworthy reporting that does not threaten

national security (or at least where the risks to national security are far outweighed by the

public interest). Two examples highlight the dangerous reach of the law:

   • On January 12, 2017, the Washington Post reported that Retired Lt. Gen. Michael T.

   Flynn, the incoming national security advisor, had spoken on the phone with Russian

   Ambassador, Sergey Kislyak several times, after telling Vice President-elect Pence and

   others that he had not. David Ignatius, *Why did Obama Dawdle on Russia's Hacking?*

Wash. Post (Jan. 12, 2017), https://tinyurl.com/gmqce67. Presumably, Post columnist

David Ignatius had "unauthorized possession" of this information which might be

broadly interpreted as pertaining to the national defense, and had reason to believe that

revealing the information could be used to embarrass or otherwise harm the United

States. Ignatius would therefore be liable for criminal prosecution under § 793(e), even

though the public interest in reporting this news far outweighs any concerns about

protecting the national defense.

• In May 2017, the Washington Post reported that President Trump revealed highly

classified information—shared with the United States by a close ally—to the Russian

foreign minister and ambassador. Greg Miller & Greg Jaffe, *Trump Revealed Highly*

*Classified Information to Russian Foreign Minister and Ambassador*, Wash. Post (May

15, 2017), https://tinyurl.com/y3qc5tmo. Again, under the broad language of § 793(e),

the journalists could be criminally liable, even though the information is a matter of

critical public interest.

These examples highlight the important public-interest values—and the substantial

amount of protected speech—threatened by the Espionage Act. These journalists—and their

sources—must either jeopardize their own liberty to publicize newsworthy facts or, very

possibly, the facts never make their way into the public sphere. The First Amendment is

supposed to protect journalists and their sources from deciding between those two choices.

Similarly, the law is overbroad because it contains no narrowly drawn scienter

requirement sufficient to avoid constitutional problems. For example, the various subsections

of § 793 require only that the defendant have "reason to believe" that the information "is to

be used," § 793(b), or "could be used," § 793(d)–(e), to harm the United States or benefit a

13

foreign nation. The statute thus appears to cover just about every act of newsgathering, including those made for or by the press. After all, anyone who transmits or collects national security information with the aim of disseminating it to the public has an objective "reason to believe" a foreign government could get that information and use it to its benefit.

True, subsections 793(d) and (e) require that the defendant communicate (or retain) the information "willfully." But this term does not cure the overbreadth and vagueness problems that plague the statute. The Supreme Court has noted that "willfully" can have "many meanings." *Bryan v. United States*, 524 U.S. 184, 191–92 (1998); *see also* Edgar & Schmidt, *supra*, at 1038 ("'Willful' is one of the law's chameleons, taking on different meanings in different contexts."). In general, "willful" means that the defendant knew his conduct was unlawful. *Bryan*, 524 U.S. at 192. But knowledge that one's conduct is unlawful—in the case of § 793, that one's speech is prohibited—is not the same thing as having an evil motive or an intent to harm the United States. Indeed, courts interpreting "willfully" in the context of § 793 have held that the government does not have to prove that the defendant acted with the intent to harm the United States or give advantage to a foreign interest. *See*, *e.g.*, *United States v. Miller*, 874 F.2d 1255, 1277–78 (9th Cir. 1989) (holding that the government does not have to demonstrate that the defendant knew he was breaking the law but instead simply that he "voluntarily and intentionally committed the acts charged"); *Morison*, 844 F.2d at 1073 (holding that "proof of the most laudable motives, or any motive at all, is irrelevant under the statute") (internal quotations omitted); *United States v. Truong Dinh Hung*, 629 F.2d 908, 919 (4th Cir. 1980) (upholding conviction when the jury was instructed that a defendant must act "voluntarily and intentionally and with a specific intent to do something the law forbids"); *United States v. Drake*, 818 F. Supp. 2d 909, 918 (D. Md. 2011) (rejecting

the argument that the "willfully" requirement means the government has to show that the defendant acted with a bad motive); *United States v. Kim*, 808 F. Supp. 2d 44, 53–54 (D.D.C. 2011) (ruling that the government must prove only that defendant knew what he was doing was unlawful).

In summary, because § 793 restricts substantial amounts of protected speech based on its content, and is not narrowly tailored to accomplish its laudable objective, it fails First Amendment scrutiny. Thus, this Court should declare the statute unconstitutional and dismiss Counts One through Four.

<u>**POINT II**</u>

**SECTION 793 IS VOID FOR VAGUENESS ON ITS FACE AND
AS APPLIED TO MR. SCHULTE.**

Section 793 is not only overbroad—it is also hopelessly vague on its face and as applied to Mr. Schulte's alleged conduct. This vagueness, combined with the statute's overbreadth, further undermines the freedom of speech guaranteed by the First Amendment. It also violates the due process guaranteed by the Fifth Amendment.

**A. Applicable vagueness principles**

The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). In other words, a statute is unconstitutionally vague if people "of common intelligence must guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997). As the

15

Supreme Court explained in *Williams*, 553 U.S. at 306, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."

As with his overbreadth challenge, *see* Point I, *supra*, Mr. Schulte's particular conduct is irrelevant to his facial vagueness challenge. In most vagueness challenges, the challenger must prove that the law is vague as applied to his or her own conduct. But this standard is relaxed where, as here, the statute implicates First Amendment rights. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1250 (2018) ("This Court's precedents likewise recognize that, *outside the First Amendment context*, a challenger must prove that the statute is vague as applied to him.") (emphasis added) ; *United States v. Coppola*, 671 F.3d 220, 235 (2d Cir. 2012) ("Vagueness challenges to statutes *not threatening First Amendment interests* are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.") (emphasis added) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). As the Supreme Court has declared, "[a]lthough ordinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Williams*, 553 U.S. at 303.

Moreover, criminal laws that restrict speech are subject to especially exacting vagueness standards. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman*

*Estates, Inc.*, 455 U.S. 489, 499 (1982). When a law implicates the First Amendment, facial

invalidation is appropriate if the law reaches a substantial amount of protected conduct, even

if the law is not vague in all its applications. *Id.* at 495–96; *see also Johnson*, 135 S. Ct. at

2561–62 (holding that, even outside the First Amendment context, a statute can be

unconstitutionally vague even if there is "some conduct that clearly falls within the

provision's grasp").

**B. Section 793 is vague on its face and as applied to Mr. Schulte.**

Section 793 is void for vagueness, both on its face and as applied to Mr. Schulte. Simply

put, despite over a century of debate, no one understands what the Espionage Act really

means or how it should be applied, particularly with respect to journalists and their sources,

and its vagueness affords the government "too much enforcement discretion." *Holder v.*

*Humanitarian Law Project*, 561 U.S. 1, 20 (2010). Indeed, no court has held that the statute,

as written, provides either fair notice of what it prohibits or sufficient standards to avoid

arbitrary and discriminatory enforcement. *See Morison*, 844 F.2d at 1086 (Phillips, J.,

concurring) (concluding that the statute is both overbroad and vague, but reluctantly

agreeing, despite "grave doubts," that limiting instructions could save the statute). Instead,

these courts have impermissibly attempted to save the statute from its constitutional fate by

rewriting it to include limiting terms that Congress did not enact. *See Jennings v. Rodriquez*,

138 S. Ct. 830, 843 (2018) ("Spotting a constitutional issue does not give a court the

authority to rewrite a statute as it pleases."); *Crowell v. Benson*, 285 U.S. 22, 76 (1932)

(Brandeis, J., dissenting) ("The court may not, in order to avoid holding a statute unconstitutional, engraft upon it an exception or other provision.").

Several aspects of the statute conspire to make it unconstitutionally vague. First, the statute provides no clue as to what does or does not constitute information "relating to the national defense"—the statute's key phrase. *See Morison*, 844 F.2d at 1086 (Phillips, J., concurring) (concluding that the phrase "relating to the national defense," on its face, is "both constitutionally overbroad and vague"); *Constitutional Law—Due Process and Free Speech—District Court Holds That Recipients of Government Leaks Who Disclose Information "Related to the National Defense" May Be Prosecuted Under the Espionage Act*, 120 Harv. L. Rev. 821, 823–24 (2007) (concluding that *United States v. Rosen*, 445 F. Supp. 2d 602, 643 (D. Md. 2006), is incorrect because the Espionage Act is unconstitutionally vague as applied to situations where the First Amendment is implicated); Edgar & Schmidt, *supra*, at 1000 (concluding that "the broad literal meaning of [§ 793(d) and (e)] is almost certainly unconstitutionally vague and overbroad," and that courts may have to declare them unconstitutional since neither legislative history nor the language of the statute provides authority for a particular narrow reading).

The statute also leaves hopelessly unclear (1) whether or how it applies to the gathering and dissemination of important, valuable, and accurate information by the media and their sources; (2) what "willfully" means in this context, *see* pp. 14-15, *supra*; (3) what Congress meant by a "person not entitled to receive" national defense information, § 793(d)-(e); and (4) what constitutes "unauthorized" possession of national defense information, § 793(d). *See generally* Edgar and Schmidt, *supra*, at 1076, 1087.

Even if Mr. Schulte, as a government employee entrusted with sensitive information, had fair notice that his own alleged conduct was prohibited, the statute is still so vague and standardless that it authorizes—and may even encourage—arbitrary and discriminatory enforcement. This defect, standing alone, is sufficient to require invalidating the statute. *See United States v. Rybicki*, 354 F.3d 124, 160–63 (2d Cir. 2003) (en banc) (Jacobs, J., joined by Walker, Cabranes, and Parker, JJ., dissenting).

**POINT III**

**SOME COURTS HAVE INCORRECTLY HELD THAT
SECTION 793 IS CONSTITUTIONAL.**

While neither the Supreme Court nor the Second Circuit has decided whether § 793 is constitutional, a few courts—all in the Fourth Circuit—have upheld the statute against various overbreadth and vagueness challenges. *See Morison*, 844 F.2d at 1060; *Drake*, 818 F. Supp. 2d at 911, 915–22; *Rosen*, 445 F. Supp. 2d at 611–43.[2] But these decisions are not persuasive and should not be followed.

The leading case is *Morison*. Morison was a navy intelligence officer who provided *Jane's Defence Weekly*, a British magazine, with classified satellite imagery of a new Soviet aircraft carrier in 1984. 844 F.2d at 1061. Morison later claimed that he leaked the photographs to alert the public to alarming Soviet military capabilities and prod Congress to boost the Navy's budget. *Id.* at 1062. Charged with violating § 793(d) along with several

---

[2] In 1941, before Congress amended the statute in 1950, the Supreme Court did hold that Sections 1 and 2 of the former Espionage Act—the precursors to today's Sections 793–798—were not vague. *Gorin v. United States*, 312 U.S. 19, 27 (1941). Because Section 793(e) did not exist in its current form at the time *Gorin* was decided, because the defendants there did not even raise a First Amendment challenge, and because the statute was challenged only as applied to the defendants in that case (a Russian-born government contractor and a foreign agent), that case is not binding here.

other laws, Morison's primary defense was that the Espionage Act "was intended to punish only 'espionage' in the classic sense of divulging information to agents of a hostile foreign government and not to punish the 'leaking' of classified information to the press." *United States v. Morison*, 604 F. Supp. 655, 657 (D. Md. 1985). The district court rejected Morison's argument, he was found guilty, and the Fourth Circuit affirmed his conviction. (Years later Morison received a presidential pardon. *See* Vernon Loeb, *Clinton Ignored CIA in Pardoning Intelligence Analyst*, Wash. Post (Feb. 17, 2001).)

According to the Fourth Circuit, the plain language of the Espionage Act shows that it applies to leakers. "[T]he statutes themselves, in their literal phrasing, ... plainly apply" to leaks. The statutory language "includes no limitation to spies or to an agent of a foreign government," and it "declare[s] no exemption in favor of one who leaks to the press. It covers 'anyone.'" 844 F.2d at 1063. The Fourth Circuit also emphasized the Act's structure. Unlike § 794(a)—a related provision that specifically prohibits disclosures "to any foreign government"—§ 793(d) more broadly prohibits revealing national defense information "to any *person* not entitled to receive it." § 793(d) (emphasis added). The Fourth Circuit inferred that Congress meant for these provisions to cover two "separate and distinct" crimes. "[S]ection 793(d) was not intended to apply narrowly to 'spying' but was intended to apply to disclosure of the secret defense material to anyone 'not entitled to receive' it, whereas section 794 was to apply narrowly to classic spying." 844 F.2d at 1065. Finally, the Fourth Circuit ruled that leakers can be held liable under the Espionage Act because of Congress's purpose in enacting the statute. According to the district court in *Morison*, Congress's goal was to prevent the nation's most sensitive secrets from falling into the hands of hostile foreign powers. 604 F. Supp. at 660. And that harm materializes whether a foreign power

20

learns of a secret directly from a spy or indirectly by reading about it in the newspaper. "[T]he danger to the United States is just as great when this information is released to the press as when it is released to an agent of a foreign government." *Id.*

What about the Constitution? The Fourth Circuit rejected Morison's claim that the First Amendment barred the government from applying the Espionage Act to him. But it did not resolve whether the statute is facially overbroad. And, even as applied to Morison, two of the panel members believed that the case raised significant constitutional issues, not so much because of a leaker's interest in speaking but the public's corresponding interest in hearing. 844 F.2d at 1081, 1083 (Wilkinson, J., concurring); *id.* at 1085 (Phillips, J., concurring). According to Judge Wilkinson, "[c]riminal restraints on the disclosure of information threaten the ability of the press to scrutinize and report on government activity," and public debate "is diminished without access to unfiltered facts." *Id.* at 1081 (Wilkinson, J., concurring). Judge Phillips went even further, arguing that the First Amendment requires the government show that the leaked information was both classified and "in fact 'potentially damaging ... or useful'" to an adversary, a question on which "the fact of classification is merely probative, not conclusive." *Id.* at 1086 (Phillips, J., concurring). Nevertheless, the court squarely (albeit in a conclusory way) held that a government employee who reveals classified information "is not entitled to invoke the First Amendment as a shield to immunize his act of thievery." *Id.* at 1069 (Russell, J., for the court).

The central problem with the Fourth Circuit's analysis is that it impermissibly reads words into the Espionage Act that do not appear there. For example, the court held that the statute's constitutional problems were mitigated because the government must prove at trial that the stolen documents were "classified" or "closely held in that [they] … have not been

made public and are not available to the general public," and that unauthorized disclosure would be "potentially damaging to the United States or useful to an enemy of the United States." 844 F.2d at 1071–72 (quoting jury instructions). But these requirements are not present in the statute.

Moreover, the judicially engrafted requirements are themselves extraordinarily broad and vague. The first requirement—that the documents are "closely held" by the government—serves to limit "relating to the national defense," but it is itself an expansive category. Documents are "closely held" if they are not available to the general public, 844 F.2d at 1071–72, and the reality is that intelligence agencies do not release much information to the public. Furthermore, since this requirement does not directly relate to government agency classifications such as "Secret," "Top Secret," and so on, it would encompass all levels of intelligence agencies' classified documentation, which is overbroad. This requirement, therefore, does little to limit the statutory language.

For the second requirement—that, if disclosed, the documents would be potentially damaging to the United States or might be useful to an enemy of the United States—courts generally defer to the executive and base their determination on the classification system. *E.g.*, 844 F.2d at 1071. Courts have noted that this requirement is "implicit" in the purpose of the statute; the requirement assures that the government will use the statute to defend national security and not as an occasion for abuse. *Rosen*, 445 F. Supp. 2d at 621 ("[T]he statute only applies to information for which there is an 'occasion for secrecy,' and there is no 'occasion for secrecy' unless disclosure of the information the government seeks to protect implicates an important government interest such as the national security."); *see also Morison*, 844 F.2d at 1086 (Phillips, J., concurring) ("Without such a limitation on the

22

statute's apparent reach, leaks of information which, though undoubtedly 'related to defense' in some marginal way, threaten only embarrassment to the official guardians of government 'defense' secrets, could lead to criminal convictions.").There is some indication in *Morison* that courts should only consider classified documents as potentially damaging. *See id.* at 1084 (Wilkinson, J., concurring) ("The district court's limiting instructions properly confine prosecution under the statute to disclosures of *classified information potentially damaging to the military security of the United States*.") (emphasis added). But it is now widely recognized that the government classifies many documents for which there is no occasion for secrecy, thus rendering the "potentially damaging" category very broad. *See, e.g.*, Steven Aftergood, *Reducing Government Secrecy: Finding What Works*, 27 Yale L. & Pol'y Rev. 399, 399 (2009). Therefore, the problem with this requirement is that it simply substitutes one overbroad and vague phrase for another, and defers to the executive branch's classification system, which is known to be overly cautious. *Id.*

Thus, while the Fourth Circuit and a few district courts have understandably sought to narrow the expansive and vague phrase "relating to the national defense," they have done so in unjustified deference to the executive branch's judgment. Even with a limiting construction, the law remains vague, overbroad, and susceptible to prosecutorial abuse. Although these courts have applied the Espionage Act to protect the government's national security interest, their limiting construction is an improper attempt to rewrite the statute and, in any event, does not sufficiently cure the law's overbreadth or check the executive's power. Specifically, it remains possible to charge someone under the Espionage Act for willfully retaining or transmitting documents that may be classified but unnecessarily so—in other

23

words, for willfully retaining documents that do no actual harm to national security—and

that provide valuable information to the public at large about what the government is doing.

<u>POINT IV</u>

**THE FEDERAL LARCENY STATUTE, 18 U.S.C. § 641, IS
UNCONSTITUTIONALLY OVERBROAD AND VAGUE
ON ITS FACE AND AS APPLIED TO MR. SCHULTE.**

Finally, the Court should hold that 18 U.S.C. § 641, the predicate for Count Six, is

unconstitutionally overbroad and unduly vague. Accordingly, Count Six should be

dismissed.

**A. Section 641 is overbroad.**

By its terms, § 641, entitled "Public money, property or records," does not apply to

speech. It covers the conversion of tangible items only: "any record, voucher, money, or

thing of value of the United States." But courts have broadly construed "thing of value" to

include information, even intangible information. *See, e.g.*, *United States v. Jeter*, 775 F.2d

670 (6th Cir. 1985) (affirming conviction for stealing secret grand jury information); *United

States v. Girard*, 601 F.2d 69 (2d Cir. 1979) (rejecting as-applied constitutional arguments

and affirming conviction for selling names of DEA agents).

Thus construed, the statute criminalizes speech. It is also overbroad. The government

has used the statute to prosecute government employees*, e.g., Morison*, 844 F.2d at 1060;

*United States v. Nichols*, 820 F.2d 508, 509 (1st Cir. 1987); 601 F.2d at 70; government

contractors, *e.g.*, *United States v. Fowler*, 932 F.2d 306, 309 (4th Cir. 1991); *United States v.

Vicenzi*, No. 87-222-N, 1988 WL 98634, at *1 (D. Mass. Feb 16, 1988); and private citizens.

*E.g.*, *United States v. Matzkin*, 14 F.3d 1014, 1016 (4th Cir. 1994); *Jeter*, 775 F.2d at 673;

*United States v. Friedman*, 445 F.2d 1076, 1078–79 (9th Cir. 1971). The government has

applied criminal sanctions to disclosure of information related to procurement, *see*, *e.g.*, *Matzkin*, 14 F.3d at 1016 (prosecuting disclosure of pricing information of competitor bidder); *United States v. McAusland*, 979 F.2d 970, 971–73 (4th Cir. 1992) (prosecuting disclosure of bid information and government evaluations); *Vicenzi*, 1988 WL 98634, at *2 (prosecuting disclosure of government cost estimates and other procurement information); grand jury proceedings, *e.g.*, *Jeter*, 775 F.2d at 673; *Friedman*, 445 F.2d at 1078–79; criminal investigations, *e.g.*, *United States v. Jones*, 677 F. Supp. 238, 239 (S.D.N.Y. 1988); customs impoundments, *e.g.*, *Nichols*, 820 F.2d at 509; and DEA agent identities, *Girard*, 601 F.2d at 70. This statute thus criminalizes many different dispositions of information, including disclosure, transmission, acquisition, and retention. Those who receive improperly disclosed information are also criminally liable. *E.g.*, *Matzkin*, 14 F.3d at 1016 (upholding conviction of defense-contractor consultant who received information from government employee).

The government could also use the statute to prosecute a journalist or media organization for gathering or publishing any information that constitutes a "thing of value of the United States." § 641. And even if such a prosecution is never brought, the statute threatens to chill speakers who fear that the law could be used to target them. As Justice Marshall famously noted, "the value of a sword of Damocles is that it hangs—not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting). Further, leak prosecutions may indirectly affect journalists; for example, leak prosecutions may involve the subpoena of the journalist who published the information in an attempt to force that journalist to reveal her source. This may turn prosecutions of non-media figures into tangential attacks on media freedoms. *See* Jesselyn Radack & Kathleen McClellan, *The*

*Criminalization of Whistleblowing*, 2 Am. U. Lab. & Emp. L.F. 57, 73–74 (2011) (discussing government's attempts to subpoena journalist James Risen in Jeffery Sterling leak case and potential chilling effect on press freedoms). Finally, § 641 allows prosecution of those who obtain and disclose government information without any intent to harm the United States or its interests.

This breadth of potential criminality serves no legitimate prosecutorial interest that is not already covered by other federal statutes that specifically criminalize information disclosure. Disclosure of information related to national defense, where the discloser knows or has reason to know that the information could hurt the United States, is already prohibited. *See, e.g.*, 18 U.S.C. § 793(d)-(e). Disclosure of particularly sensitive information, such as defense installations, cryptographic activity, or diplomatic correspondence, is also already prohibited. *See* 18 U.S.C. §§ 795, 797, 798, 952; *see also* 42 U.S.C. § 2277 (prohibiting government employees from unauthorized communication of classified information relating to atomic weapons and nuclear material); 50 U.S.C. §§ 3121-22 (banning disclosure of covert intelligence officers' identities by anyone with authorized access to that information). Allowing the government to prosecute "leakers" using § 641—an unbounded, catchall provision—adds little or nothing to the statutory scheme besides drawing in conduct that Congress has not considered to be damaging to national security. Thus, § 641 sweeps in far more speech than necessary to protect national security. It is therefore unconstitutionally overbroad.

**B. Section 641 is impermissibly vague.**

For similar reasons, § 641 is also unconstitutionally vague, both facially and as applied. Nothing in the statute gives a person of ordinary intelligence fair notice that he or she can be

prosecuted for obtaining and disclosing truthful government information to a news organization so that the public can be fully informed about what its government is up to. And the statute provides no standards to guard against arbitrary and discriminatory enforcement.

## CONCLUSION

For these reasons, this Court should dismiss Counts One, Two, Three, Four, and Six of the Second Superseding Indictment and grant any other relief that may be appropriate.

Dated: New York, New York
November 4, 2019

Respectfully submitted,

/s/ Edward S. Zas

Edward S. Zas
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

Sabrina P. Shroff
233 Broadway
New York, New York 10007

*Counsel for Defendant Joshua Adam Schulte*