UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        - v. -

JOSHUA ADAM SCHULTE,

                    Defendant.

S2 17 Cr. 548 (PAC)

 

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT
JOSHUA ADAM SCHULTE'S MOTION _IN LIMINE_**

 

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

David W. Denton, Jr.
Sidhardha Kamaraju
Matthew Laroche
Assistant United States Attorneys
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| - v. - | S2 17 Cr. 548 (PAC) |
| JOSHUA ADAM SCHULTE, | |
| Defendant. | |

The Government respectfully submits this memorandum in opposition to the defendant's motion *in limine* seeking to preclude the testimony of one of the Government's proposed experts, Paul Rosenzweig, about the organization WikiLeaks.org ("WikiLeaks").

## PRELIMINARY STATEMENT

In its motions *in limine* (the "Government Motions *in Limine*"), the Government moved to admit Mr. Rosenzweig's testimony.  There, the Government explained how Mr. Rosenzweig's testimony about WikiLeaks and specific leaks that the organization had publicly disclosed in the past would provide important context for specific aspects of the charged offenses, including Schulte's intent to harm the United States and tradecraft and his reason to believe such harm would occur by transmitting classified information (the "Classified Information") he stole from the Central Intelligence Agency (the "CIA") to WikiLeaks.  The Government further described how this testimony fits squarely within the types of expert testimony admitted in other cases in this District, and how Mr. Rosenzweig was qualified to provide such testimony.  In sum, the Government Motions *in Limine* made clear why the Government should be permitted to call Mr. Rosenzweig as an expert on WikiLeaks.

The defendant's cross-motion, on the other hand, provides no valid basis to preclude Mr. Rosenzweig's testimony.  The defendant's claim of insufficient notice is without merit—the Government's expert disclosure with respect to Mr. Rosenzweig's testimony sets forth specifically what opinions the Government anticipates he will testify to and the bases for those opinions. Similarly, the defendant's substantive attack on Mr. Rosenzweig's testimony is unavailing because it is based on a misrepresentation of his anticipated testimony and red herrings.  Mr. Rosenzweig will not be offering an academic lecture on WikiLeaks—the particular aspects about WikiLeaks' history and practices about which Mr. Rosenzweig will testify relate specifically to Schulte's actions that the Government expects to prove at trial, including: (1) Schulte's knowledge of prior WikiLeaks' disclosures; (2) Schulte's heightened interest in WikiLeaks after he illegally transmitted the Classified Information to the organization; (3) Schulte's claim to have been part of a group of online hackers ("Anonymous") that previously worked with WikiLeaks; and (4) Schulte's avowed intention to destroy the United States' diplomatic relationships (relationships that were publicly affected by prior WikiLeaks disclosures).  Moreover, contrary to Schulte's argument, Mr. Rosenzweig's testimony will not require a trial within a trial about WikiLeaks' intentions—what is relevant at trial are Schulte's actions and intent when he transmitted the Classified Information to WikiLeaks, not WikiLeaks' intentions in disclosing classified information.  Whatever WikiLeaks' intentions, the fact that WikiLeaks disclosures have been harmful to the United States and that those harms were widely known is directly relevant to the question of what Schulte had reason to believe would occur when he transmitted the Classified Information to WikiLeaks.  Mr. Rosenzweig's testimony is tailored to information bearing on Schulte's conduct and *mens rea*, and thus, is both relevant and highly probative of Schulte's guilt.

Accordingly, the Government respectfully submits that the Court should grant the Government's motion to admit Mr. Rosenzweig's testimony and deny the defendant's motion to preclude his testimony.

## BACKGROUND

The Government has described the facts that it anticipates proving at trial in the Government Motions *in Limine*. The Government does not repeat that recitation here, but incorporates it by reference herein.[1]

## ARGUMENT

### I.   Applicable Law

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow*, 509 U.S. 579 (1993), the Supreme Court explained that Rule 702 assigns trial courts "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," *id*. at 597. In considering the reliability of proffered expert testimony, a trial court must determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can

---

[1] The defined terms in the Government Motions *in Limine* are also incorporated herein.

be applied to the facts in issue." *Id.* at 592-93; *see also United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995). Although *Daubert* itself dealt exclusively with "scientific" evidence, *Daubert*, 509 U.S. at 589 n.8, the Supreme Court has held that "the basic gatekeeping obligation" of *Daubert* applies to all expert testimony, including from fields other than the physical or natural sciences. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

"'The fact that the subject matter is not "scientific" is no bar to admissibility of expert testimony.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *United States v. Kayne*, 90 F.3d 7, 11 (1st Cir. 1996)). As the Second Circuit has observed, "Rule 702 itself refers to 'other specialized knowledge,' . . . and 'there are many different kinds of experts, and many different kinds of expertise . . . .'" *Id.* (quoting *Kumho Tire*, 526 U.S. at 150). For example, in *Romano*, the Second Circuit upheld a district court's decision to admit expert testimony about "coin grading and valuation processes," and explained that the fact that the expert's "methods [we]re not entirely replicable" because they were "based in part on his personal experience as a coin dealer for several decades" did not require preclusion of the testimony under *Daubert*, but rather "went to the weight of the evidence, not to its admissibility, and were matters for cross-examination and argument to the jury." *Id.* at 333.

*Daubert* identified factors that a trial court could consider in evaluating the reliability of testimony: (i) whether the theory or technique used by the expert can be, and has been, tested; (ii) whether the theory or technique has been subjected to peer review or publication; (iii) the known or potential rate of error of the method used; (iv) whether there are standards controlling the technique's operation; and (v) whether the theory or method has been generally accepted within the relevant scientific community. 509 U.S. at 593-94. "But the Rule 702 inquiry [i]s a flexible

one, and *Daubert* makes clear that the factors it mentions do not constitute a definitive checklist or test." *Romano*, 794 F.3d at 330 (citations and internal quotation marks omitted; emphasis in original). "And *Daubert* adds that the gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (citations and internal quotation marks omitted). Accordingly, "in some 'cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* (quoting *Kumho Tire*, 526 U.S. at 150).

"The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995); *see also Williams*, 506 F.3d at 160 (trial court's decision to admit expert evidence "'is not an abuse of discretion unless it is manifestly erroneous'" (quoting *United States v. Salameh*, 152 F.3d 88, 129 (2d Cir. 1998)). Moreover, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142. A district court may therefore properly exercise its gatekeeping function without the "formality of a separate hearing . . . ." *Williams*, 506 F.3d at 161; *see also United States v. Barnes*, 411 F. App'x 365, 370 (2d Cir. Jan. 11, 2011). "This is particularly true if, at the time that the expert testimony is presented to the jury, a sufficient basis for allowing the testimony is on the record." *Williams*, 506 F.3d at 161 (citing 4 Weinstein's Federal Evidence § 702.02).

## II.     Discussion

The Government comprehensively addressed the admissibility of Mr. Rosezweig's testimony in its Motions *in Limine* at pages 49-55, and incorporates those arguments by reference

herein.   In this opposition, the Government specifically addresses the arguments raised by the defendant in his motion, none of which have merit.[2]

*First*,[3] Mr. Rosenzweig's anticipated testimony about WikiLeaks is an appropriate area for expert testimony.   Schulte transmitted the Classified Information to WikiLeaks; the organization is therefore necessarily part of this case, and the jury needs to understand what it is and how it operates.   As set forth in more detail in the Government's Motions *in Limine* (*see* Govt. Mot. in Limine pp. 50-51), courts in this District and Circuit repeatedly have "approved the use of expert testimony to provide juries with background on criminal organizations," *United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011), in particular "to help explain the operation, structure, membership, and terminology" of such organizations.   *United States v. Mustafa*, 406 F. App'x 526, 528 (2d Cir. 2011); *see also United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (expert testimony about the structure and workings of a group engaged in criminal activities is permissible either "as background for an offense [or] to assist in proving one or more elements of the offense").

---

[2] The parties agree, however, that WikiLeaks' statements are hearsay, and thus cannot be admitted for the truth.  As described in the Government Motions *in Limine*, these statements can be introduced to show that WikiLeaks made those statements, when, and how, which is a non-hearsay use.  Although the defendant does not specifically address that point in his motion, he appears to concede that the jury can consider these statements at least for that purpose because he argues that the jury can assess these statements without the need for expert testimony.

[3] Although the defense motion first argues that the Government's expert notice with respect to Mr. Rosenzweig's testimony was deficient, because the level of notice required necessarily turns on the substance of the proposed testimony, and can be supplemented through subsequent disclosures, such as in the Government Motions *in Limine*, or this opposition, the Government addresses the defendant's notice arguments last.  *See*, *e.g.*, *United States v. Baker*, No. 14 Cr. 356 (ENV), 2016 WL 7176588, at *4-5 (E.D.N.Y. Dec. 6, 2016) (finding that Government's description of expert testimony at oral argument rendered Government's expert disclosure sufficient and considering scope of expert testimony in assessing the necessary disclosure).

Mr. Rosenzweig's testimony is precisely that—he will supply the jury with background of WikiLeaks, including information about its operations, such as the way in which it solicits submissions of leaked information and discloses that information.

The defendant's principal contention appears to be that Mr. Rosenzweig's testimony is not scientific, data-driven, or based on his personal experiences with WikiLeaks.  (*See* Def. Mot. pp. 4-5 (arguing that Mr. Rosenzweig's testimony would not be expert testimony because allegedly "[h]e has not tested or examined any evidence," "his testimony will [not] be based on <u>any</u> specific facts or data, or any particular principles and methods," "[t]here is no indication that he has some relevant personal experience in how WikiLeaks typically practices," and he "will testify about things he has read in newspapers or magazines")).  Expert testimony, however, does not need to be scientific to be admissible.  *See Romano*, 794 F.3d at 330 ("[t]he fact that the subject matter is not 'scientific' is no bar to admissibility of expert testimony") (internal quotation and citation omitted).  Testimony based on scholarly study and expertise about relevant organizations is equally admissible, and is in fact routine.  *See*, *e.g.*, *United States v. Akayed Ullah*, 18 Cr. 16 (RJS) (S.D.N.Y. 2018) (allowing expert testimony based on scholarly study concerning ISIS's structure, leadership, and recruitment and propaganda techniques); *United States v. Atilla,* 15 Cr. 867 (RMB) (S.D.N.Y. 2017) (permitting testimony about the structure and operations of the government of Iran and the Islamic Revolutionary Guard Corps); *United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y. 2017) (permitting expert testimony about history, structure, and operations of terrorist organizations and leaders); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 327 (E.D.N.Y. 2013) (allowing expert testimony about "the role of charitable and non-governmental aid organizations

in the Palestinian Territories, including their origins, their organization, governance, operations, and the needs to which they typically respond").

Moreover, the fact that Mr. Rosenzweig's testimony will not be based any personal interaction with WikiLeaks is no bar to admitting his testimony. Courts regularly admit expert testimony about criminal organizations from experts who were not themselves part of those organizations. *See*, *e.g.*, *United States v. Flores*, 15 Cr. 765 (PAC) (S.D.N.Y. 2016) (permitting expert testimony from a DEA agent at a cocaine-importation trial regarding drug trafficking patterns and methodologies); *United States v. Gentile*, 233 F. App'x 86, 88 (2d Cir. 2007) (courts have upheld the admissibility of expert testimony "(a) to help explain the operation, structure, membership, and terminology of organized crime families, (b) to explain the operations of drug dealers, and (c) to explain the structure of minority construction coalitions") (collecting cases) (internal quotation marks and citations omitted); *United States v. Ullah*, 18 Cr. 16 (RJS) (S.D.N.Y. 2018) (expert testimony about ISIS); *United States v. El Gammal*, 15 Cr. 588 (ER) (S.D.N.Y. 2017) (same); *United States v. Rahimi*, 16 Cr. 760 (RMB) (S.D.N.Y. 2017) (same). Indeed, Schulte's purported "personal experience" requirement would essentially necessitate that expert witnesses about criminal organizations also be cooperators.

*Second*, the fact that Mr. Rosenzweig's testimony will be based on, in part, his review of WikiLeaks' own public statements (not, as the defendant suggests, solely a review of what was written in "newspapers and magazines") does not render it unhelpful to the jury. Courts regularly admit expert testimony that is based on an academic's review of publicly-available material. *See*, *e.g.*, *United States v. Kassir*, S2 04 Cr. 356 (JFK), 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009) (expert testimony about background of al Qaeda was permissible where expert relied upon

secondary sources); *United States v. Sabir*, S4 05 Cr. 673 (LAP), 2007 WL 1373184, at *10-11 (S.D.N.Y. May 10, 2007) (same); *United States v. Paracha*, 03 CR. 1197 (SHS), 2006 WL 12768, at *21 (S.D.N.Y. Jan. 3, 2006) (finding it appropriate that expert witness "also necessarily relies on secondary sources to form his opinions about secretive terrorist organizations") *aff'd*, 313 F. App'x 347 (2d Cir. 2008).   The same is true of Mr. Rosenzweig—as part of his extensive scholarship about issues of cyber- and national security, he has studied WikiLeaks through the prism of both its public statements and actions and secondary sources, and has thus gained expert knowledge about the organization's background.   Indeed, given that WikiLeaks—like criminal and terrorist organizations—does not give free rein to the public to examine or dissect its internal workings, it is difficult to imagine what scholars and experts about WikiLeaks would rely upon to study the organization if not its public statements and actions.  *See*, *e.g*., *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (upholding admission of terrorism expert's testimony that was based on, among other things, expert's review of hearsay statements from a terrorist organization and quoting with approval district court's observation that "'[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon'").

Moreover, the fact that the jury may have read about WikiLeaks in the media does not render Mr. Rosenzweig's testimony unhelpful—"[d]espite the prevalence of [WikiLeaks] stories in the news and popular media . . . the fact remains that the operational methods of [the organization] are still beyond the knowledge of the average citizen."  *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994) (admitting expert testimony regarding the Mafia); *Farhane*, 634 F.3d at 159 (same with respect to al Qaeda).  For example, while members of the jury may have

read an article about WikiLeaks' public disclosure of classified information provided by Chelsea Manning, that does not mean that they appreciate all of the relevant information about the leak, such as, for example, the form in which WikiLeaks released the Manning information or foreign nations' public reactions to that leak.  Those topics, however, are significant in this case because they help to explain aspects of both Schulte's and WikiLeaks' conduct with respect to the theft and transmission of the Classified Information.

*Third*, contrary to Schulte's argument, Mr. Rosenzweig's testimony is relevant because it provides context for Schulte's actions or statements, all of which form the bases for the charges in this case.  *See United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (affirming admission of expert testimony where "probative of the intent element" and "supported the government's allegations against the defendants and was not unfairly prejudicial").  Thus, as described also in the Government Motions *in Limine*, this testimony is directly relevant to the charged offenses, including in the following ways:

- <u>Schulte's Tradecraft</u>:  The Government will introduce at trial evidence of Schulte's use of the combination of TOR and Tails, computer software and browsers that permit anonymous accessing of the Internet, during the time period in which the Government alleges he secretly transmitted the Classified Information to WikiLeaks.  Mr. Rosenzweig will testify about how WikiLeaks advocates the use of TOR and Tails to transmit information for disclosure to the organization—a concept with which an average juror is likely not familiar. Thus, by aiding the jury in understanding how WikiLeaks encourages leakers to transmit information, Mr. Rosenzweig's testimony will help establish that

Schulte—who used the transmission method about which Mr. Rosenzweig will testify—was the perpetrator of the theft and transmission of the Classified Information.

- <u>WikiLeaks' Redaction of the Classified Information</u>: Mr. Rosenzweig will testify that WikiLeaks does not typically redact the information that it publicly discloses (even when that information may reveal confidential sources). The Government will introduce evidence, however, that the Classified Information was purportedly redacted when posted online. Mr. Rosenzweig's testimony will help the jury understand the significance of WikiLeaks' unique claim to have redacted the Classified Information, including, for example, the period of delay between when Schulte disclosed the Classified Information to WikiLeaks (in or about the spring of 2016) and when WikiLeaks first announced that it would begin to disclose the Classified Information (in or about the spring of 2017).

- <u>Schulte's Intent in Disclosing the Classified Information and in Engaging in an "Information War"</u>: The Government intends to introduce evidence (including his statements) of Schulte's knowledge of Manning's leak and the need for the U.S. government to maintain secrecy over certain information. Furthermore, the Government also plans to introduce evidence of how Schulte, from the Metropolitan Correctional Center (the "MCC"), declared an "information war" against the United States, pursuant to which he intended to publicly disclose classified information and misinformation, including through WikiLeaks (such

11

as the Fake FBI Document), for the purpose of destroying the United States' "diplomatic relationships," and encouraged other U.S. government employees to disclose confidential information to WikiLeaks.  Mr. Rosenzweig will explain to the jury generally information other leakers have transmitted to WikiLeaks that the organization published and how foreign governments reacted negatively to WikiLeaks' disclosure of that information—leading, for example, to the highly-publicized resignation of the U.S. Ambassador to Mexico.  Accordingly, this testimony will aid the jury in understanding why Schulte transmitted the Classified Information to WikiLeaks—which bears directly on how Schulte intended or had reason to believe the Classified Information he disclosed would be used to the injury of the United States or to the advantage of a foreign nation—an element of the violation of 18 U.S.C. § 793(b) as pled in the Indictment in Count One—or reason to believe that disclosure of the Classified Information or disclosure of classified information from the MCC could be used to the injury of the United States or to the advantage a foreign nation— an element of the violations of 18 U.S.C. §§ 793(d) & (e) as those violations are pled in the Indictment in Counts Two through Four.

- Schulte's Google Searches: The Government intends to introduce evidence that Schulte transmitted the Classified Information to WikiLeaks in the spring of 2016, that WikiLeaks did not begin to disclose the Classified Information until March 2017, that Schulte was angry with CIA management in August 2016

over a performance review he received, that Schulte's protective order against Employee-1 was vacated in August 2016, and that, around that same time (*i.e.*, in August 2016), Schulte began to conduct extensive research online about WikiLeaks.   The Government intends to offer evidence relating to those searches, including the specific queries Schulte conducted.   Schulte has argued in his writings that his August 2016 research was related to WikiLeaks' August 2016 disclosure of information stolen from a Democratic National Committee server (the "DNC Leak").   Mr. Rosenzweig will testify about the DNC Leak, including the type of information that WikiLeaks actually disclosed in connection with that leak, which will demonstrate why Schulte's WikiLeaks-related searches include queries that had nothing to do with the DNC Leak.

- <u>Schulte's Membership in Anonymous</u>: As described in the Government Motions *in Limine*, in encrypted communications from one of the Contraband Cellphones, Schulte (posing as a third person) stated that he had previously been a member of Anonymous, a group of online hacker activists.   Mr. Rosenzweig will testify about how, in 2012, Anonymous and WikiLeaks worked together to release information from a private U.S. intelligence firm.   This testimony will aid the jury in understanding the hacking group's relationship with WikiLeaks, as well as the relevance of Schulte's statements concerning his membership in Anonymous—*i.e.*, that Schulte had contacts with private access to WikiLeaks and thus had the ability to transmit the Classified Information or the MCC Classified Information to WikiLeaks.

13

*Fourth*, Mr. Rosenzweig's testimony is not "unfairly prejudicial" to Schulte and thus subject to preclusion under Federal Rule of Evidence 403.  To be sure, as set forth above, Mr. Rosezweig's testimony is "highly probative" of Schulte's guilt, but that does not mean that it is "unfairly prejudicial."  *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995).  For evidence to be "unfairly prejudicial," it must "tend[] to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).  In this case, the only "adverse effect" the defendant cites to is a purported need to examine WikiLeaks' motivation for its action if Mr. Rosenzweig's testimony is allowed.  That argument is a pure red herring.  Mr. Rosenzweig's testimony will be focused entirely on what WikiLeaks does and the results that ensue, not why the organization does it, and the Government's case will be focused entirely on Schulte's state of mind, not that of WikiLeaks.  Why WikiLeaks discloses classified information—and the related academic debate about that question—is simply irrelevant to the trial of a leaker who breaches his duty to protect classified information.

*Fifth*, Mr. Rosenzweig—a reputable expert in the fields of cyber- and national security—is more than qualified to testify about WikiLeaks and its activities.  While acknowledging that Mr. Rosenzweig has published articles specifically about WikiLeaks, the defendant omitted other relevant features of his expertise.  For example, Mr. Rosenzweig was the lead editor of *Whistleblowers, Leaks and the Media: The First Amendment and National Security*, a book published jointly by the American Bar Association and the Medill School of Journalism at Northwestern University in 2014, which included substantial discussion of WikiLeaks.  Mr. Rosenzweig has also served since 2012 as a lecturer at the Medill School of Journalism, where he

taught courses that included extensive lecturing on WikiLeaks and the treatment of leaks of classified information by the press.  The defendant's dismissive treatment of Mr. Rosenzweig's publications also ignores a number of his publications about the DNC Leak, apparently because they did not include "WikiLeaks" in the title.

Moreover, the defendant incorrectly suggests that only WikiLeaks-related expertise is relevant in judging Mr. Rosenzweig's qualifications as an expert.  On the contrary, "'[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'"  *Arista Records LLC v. Lime Grp. LLC*, 06 CV. 5936 (KMW), 2011 WL 1674796, at \*3 (S.D.N.Y. May 2, 2011) (quoting *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)).  Among many roles in his distinguished career, Mr. Rosenzweig currently serves as a Special Advisor to the American Bar Association's Standing Committee on Law and National Security, having previously been a member of that Committee.  Mr. Rosenzweig is a well-recognized expert on cybersecurity, national security, leaks and whistleblowers, and the interaction of those subject areas with the press and publishing.  He has published and taught widely in this area, including publications and courses from 2012 to the present on "The Surveillance State: Big Data, Freedom, and You," "Thinking About Cybersecurity: From Cyber Crime to Cyber Warfare," "Cyber Warfare: How Conflicts in Cyberspace are Challenging America and Changing the World," and "National Security Law in the News: A Guide for Journalists, Scholars and Policymakers."

*Sixth*, the defendant's complaints about the Government's expert notice are entirely without merit.  Federal Rule of Criminal Procedure 16(a)(1)(G)—which governs expert

disclosures in criminal prosecutions—is intended to "to minimize [the] surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Cruz*, 363 F.3d 187, 196 n.2 (2d Cir. 2004) (alteration in original) (quoting *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).  Here, Schulte cannot fairly claim surprise—the Government's expert notice describes each aspect of Mr. Rosenzweig's testimony, including his testimony about the operations and structure of WikiLeaks and his testimony about earlier WikiLeaks disclosures (of which there are a limited number).  Moreover, to the extent Schulte complains that he does not know as to which leaks or harms Mr. Rosenzweig will testify, the Government has given notice of that information to Schulte through the Government Motions *in Limine* and this opposition, which is sufficient.  *See*, *e.g.*, *Baker*, 2016 WL 7176588, at *4 (finding that Government's description of expert testimony at oral argument rendered Government's expert disclosure sufficient).

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
December 6, 2019

Respectfully Submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:        _____/s/_____
David W. Denton, Jr.
Sidhardha Kamaraju
Matthew Laroche
Assistant United States Attorneys
212-637-2744/6523/2420

Cc:     Defense Counsel
(Via ECF)

17