UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
UNITED STATES OF AMERICA         :

                                 S2 17 Cr. 548 (PAC)

        -v-                                 :

JOSHUA ADAM SCHULTE,              :

               *Defendant.*         :
----------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO THE
## GOVERNMENT'S MOTIONS IN LIMINE

<div style="margin-left:40%">

Edward S. Zas
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

Sabrina P. Shroff
233 Broadway
New York, New York 10007
Tel: (646) 763-1490

*Counsel for Defendant Joshua Adam Schulte*

</div>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

ARGUMENT .................................................................................................. 1

I.   Evidence about Mr. Schulte's alleged office disputes is not admissible ................. 1

   A. Mr. Schulte's alleged "feud" with a co-worker is not admissible ........................ 3

   B. Mr. Schulte's disputes with his supervisor are not admissible ............................ 5

   C. The Court should preclude the government from introducing evidence
      concerning the SanDisk removable thumb drive because it is irrelevant,
      confusing, and unfairly prejudicial .......................................................... 8

   D. The Court should exclude evidence recovered from the ESXi server to redress
      the government's spoliation of electronically store information ........................ 9

II.  The government's general request to introduce a host of MCC evidence
    against Mr. Schulte for a variety of purposes should be denied ............................ 11

   A. The Court should not countenance the government's hasty
      dismissal of Mr. Schulte's due process right to have the jury not
      know he has been detained pretrial ......................................................... 13

   B. The government should be ordered to provide the defense with the
      specific documents it seeks to introduce ............................................... 15

   C. The evidence the government does state it wishes to introduce should be
      excluded. ......................................................................................... 19

      1.The government has provided no justification to introduce
        comments about Anonymous, which must be excluded under
        Rule 404(b) ............................................................................ 19

      2. The government cannot just substitute different words for
        "child  pornography" and introduce statements relating to child
        pornography .......................................................................... 20

D. MCC evidence may not be used as proof of "identity" or
   *"modus operandi"* under Rule 404(b) for the WikiLeaks charges. ...................... 21

E. Mr. Schulte's MCC notebooks and the "malware" article are privileged and
   therefore inadmissible. .......................................................................................... 23

F. Due to a conflict, counsel is unable to raise a potentially viable
   argument that the MCC notebooks should be excluded because Mr. Schulte
   was provided constitutionally ineffective advice related to them. ................. 24

III. The government's WikiLeaks expert should be excluded ........................................ 27

A. The government has not even attempted to meet the standard
   of Rule 702. .............................................................................................................. 28

B. Testimony about four past WikiLeaks disclosures would be irrelevant,
   confusing, and prejudicial ...................................................................................... 31

C. The proposed testimony will not provide relevant "context." ........................... 34

D. The public statements by WikiLeaks must be excluded as hearsay.................. 37

IV. The government should be prohibited from introducing irrelevant
    and confusing proffer statements about a subway ride. ........................................... 38

V. The government should be prohibited from introducing videos that
   attempt to recreate the crime. ...................................................................................... 40

VI. There is no justification to limit the defense cross-examination of the
    government's classification expert................................................................................ 42

VII. There is no legal authority for the government's self-serving jury
     instruction, which should be rejected. ...................................................................... 45

VIII. The government may not argue Mr. Schulte has "opened the door"
      to prior, specific bad acts by making general arguments. ..................................... 46

CONCLUSION ................................................................................................................ 48

# TABLE OF AUTHORITIES

*Adams v. State,*
  380 So. 2d 421 (Fla. 1980) ............................................................... 26

*Am. Nat'l Red Cross v. Vinton Roofing Co,*
  629 F. Supp. 2d 5 (D.D.C. 2009) ...................................................... 23

*Anderson v. United States,*
  417 U.S. 211 (1974) .......................................................................... 38

*Brown v. United States,*
  656 A.2d 1133 (D.C. 1995) ............................................................... 25

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ............................................................................... 9

*Christeson v. Roper,*
  545 U.S. 373 (2015) .............................................................. 25, 26, 27

*Clevenger v. CNH Am., LLC,*
  340 F. App'x 821 (3d Cir. 2009) ...................................................... 40

*Daubert v. Merrell Dow Pharm.,*
  509 U.S. 579 (1993) .......................................................................... 31

*Davis v. Alaska,*
  415 U.S. 308 (1974) .......................................................................... 43

*Deck v. Missouri,*
  544 U.S. 622 (2005) .......................................................................... 14

*Estelle v. Williams,*
  425 U.S. 501 (1976) .......................................................................... 13

*Evitts v. Lucey,*
  469 U.S. 387 (1985) .......................................................................... 26

*Frazier v. Berghuis,*
  2003 WL 25195212 (E.D. Mich. Aug. 6, 2003) .......................... 25

*Hill v. Lockhart,*
  474 U.S. 52 (1985) ............................................................................ 24

*Holland v. Fla.*,
   560 U.S. 631 (2010) ......................................................................... 27

*Huddleston v. United States*,
   485 U.S. 681 (1988) ........................................................................... 3

*Humphrey v. Com.*,
   962 S.W.2d 870 (Ky. 1998) ........................................................... 25

*Keats v. State*,
   115 P.3d 1110 (Wyo. 2005) ........................................................... 25

*Lafler v. Coooper*,
   566 U.S. 156 (2012) ....................................................................... 24

*Old Chief v. United States*,
   519 U.S. 172 (1997) .............................................................. 5, 7, 20

*Padilla v. Kentucky*,
   559 U.S. 356 (2010) ....................................................................... 24

*People v. Peters*,
   66 N.Y.S.3d 238 (N.Y. App. Div. 1st Dep't 2017) ................... 25

*People v. Quintero-Amador*,
   357 P.3d 844 ................................................................................... 25

*Perkins v. State*,
   487 S.E.2d 365 (Ga. Ct. App. 1997) ........................................... 26

*Szeliga v. Gen. Motors Corp.*,
   728 F.2d 566 (1st Cir. 1984) ........................................................ 41

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) ....................................................... 23

*United States v. Beverly*,
   5 F.3d 633 (2d Cir. 1993) .............................................................. 46

*United States v. Carmichael*,
   216 F.3d 224 (2d Cir. 2000) ......................................................... 24

*United States v. Colon*,
   880 F.2d 650 (2d Cir. 1989) ................................................. 3, 4, 7

v

*United States v. Deandrade,*
    600 F.3d 115 (2d Cir. 2010) ................................................................ 14

*United States v. Del Muro,*
    87 F.3d 1078 (9th Cir. 1996) .............................................................. 25

*United States v. Dupree,*
    706 F.3d 131 (2d Cir. 2013) ................................................................ 37

*United States v. Elfgeeh,*
    515 F.3d 100 (2d Cir. 2008) ................................................................ 46

*United States v. Garcia,*
    936 F.2d 648 (2d Cir. 1991) ................................................................ 46

*United States v. Haynes,*
    729 F.3d 178 (2d Cir. 2013) ................................................................ 14

*United States v. Marin,*
    669 F.2d 73 (2d Cir. 1982) .................................................................. 16

*United States v. Nektalov,*
    325 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................... 2

*United States v. Nobles,*
    422 U.S. 225 (1975) ........................................................................... 23

*United States v. Ortiz,*
    857 F.2d 900 (2d Cir. 1988) ......................................................... 2, 4, 7

*United States v. Payton,*
    159 F.3d 49 (2d Cir. 1998) ................................................................. 44

*United States v. Scott,*
    677 F.3d 72 (2d Cir. 2012) ................................................................... 3

*United States v. Stein,*
    541 F.3d 130 (2d Cir. 2008) ................................................................ 24

*United States v. Towne,*
    870 F.2d 880 (2d Cir. 1989) ................................................................. 2

*United States v. Williams,*
    585 F.3d 703 (2d Cir. 2009) ......................................................... 4, 7, 13

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir.1999) ............................................................................ 9

*Veliz v. Crown Lift Trucks*,
    714 F. Supp. 49 (E.D.N.Y. 1989) ............................................................... 41

## Statues and Other Authorities

18 U.S.C. § 401 .................................................................................................... 1

18 U.S.C. § 641 .................................................................................................... 1

18 U.S.C. § 793 .................................................................................................... 1

Mr. Schulte is charged with exceeding his authorized access to a CIA computer and thereby gathering, possessing, and stealing national defense information for the purpose of providing it to WikiLeaks for public dissemination, in violation of several federal laws, to wit, 18 U.S.C. §§ 641, 793, and 1030 (counts one through three and five through eight). He then allegedly lied to FBI agents about his conduct, in violation of other federal laws, to wit, 18 U.S.C. §§ 1001, 1503 (counts nine and ten). Lastly, Mr. Schulte is charged with the disclosure (and attempted disclosure) of national defense information from the Metropolitan Correctional Center (MCC), in violation of 18 U.S.C. § 793(e) (count four), and criminal contempt for a willful violation of a protective order governing non-dissemination of discovery in violation of 18 U.S.C. § 401(3) (count eleven).

## ARGUMENT

### I.   Evidence about Mr. Schulte's alleged office disputes is not admissible.

The government seeks to admit evidence of Mr. Schulte's purported "anger" with supervisors at the CIA and "inappropriate actions on DEVLAN," the computer system on which he and other members of his group sought to develop classified cyber tools, including those designed to covertly acquire or "exfiltrate" computer data. Gov. Mot. 21-22. It argues that facts underlying these instances are admissible as direct evidence of the charged offenses or are inextricably intertwined with them and show the background and context of "why, when and how" the classified information

1

was stolen. Alternatively, the government contends that the facts are admissible to show motive, intent, knowledge, and absence of mistake under Rule 404(b). *Id.* at 24-26. The government's request should be denied.

The admissibility of uncharged conduct as direct evidence of the offenses charged depends on whether it arose out of the same transaction or series of transactions as the charged offense, is inextricably intertwined with the evidence regarding the charged offense, or is necessary to complete the story of the crime on trial. *See United States v. Towne*, 870 F.2d 880 (2d Cir. 1989). It must be "manifestly clear," however, "that the evidence in question is intrinsic proof of the crime charged," or the evidence should be analyzed under the standards for admitting evidence under Rule 404(b). *See United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004).

Rule 404(b) renders inadmissible evidence "of other crimes, wrongs or acts . . . to prove the character of a person in order to show action in conformity therewith." Under the Rule, however, a court may admit other-act evidence to show, among other things, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

In determining admissibility under the Rule, a court must first determine whether the evidence is offered for a proper purpose, namely, to prove specified matters other than a defendant's criminal propensity. *See United States v. Ortiz*, 857 F.2d

2

900, 903 (2d Cir. 1988); *see also United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012)

(Second Circuit's inclusionary approach does not allow "carte blanche" admission of

prejudicial extrinsic act evidence to prove propensity). If the evidence is offered for a

proper purpose, the district court must then determine if it is relevant to an issue in

the case pursuant to Rules 401 and 402 and whether the probative value of the

similar-act evidence is substantially outweighed by its potential for unfair prejudice or

confusion of the issues under the balancing test of Rule 403. *See Huddleston v. United

States*, 485 U.S. 681 (1988). If the evidence is admitted, and "if requested to do so, the

court must give an appropriate limiting instruction to the jury." *See United States v.

Colon*, 880 F.2d 650, 656 (2d Cir. 1989).

### A. Mr. Schulte's alleged "feud" with a co-worker is not admissible.

Although the government's motion does not explain exactly what details about

Mr. Schulte's dispute with a co-worker it wishes to introduce, instead noting five

broad categories of information in its argument section, *see* Gov. Mot. 22, the fact

section in the government's motion strongly suggests that it intends to detail the

minutiae of this co-worker dispute. *See, e.g.,* Gov. Mot. 5-8. The fact section details

complaints, from both Mr. Schulte and his co-worker; that Mr. Schulte called his co-

worker "abusive" and said the co-worker had made a death threat against him; that

Mr. Schulte's supervisor reassigned his work and that this allegedly "angered" Mr.

Schulte, particularly because management appeared indifferent to his complaints

about his co-worker. Gov. Mot. 6. The government apparently wishes to get deep into the office politics of this issue, including even that Mr. Schulte complained that he was moved to an "intern" desk while his co-worker was moved to a "prestigious desk with a window." *Id.* None of this inter-office spectacle is relevant or admissible. That Mr. Schulte may have had a "feud" with a co-worker nearly a year before the classified information was released by WikiLeaks is not direct evidence of the charged crimes and is clearly not inextricably linked with them. *See* Gov. Mot. 5. The evidence may explain why Mr. Schulte quit his job, but is not related to the leak of classified information.

The government also seeks to introduce the "feud" with his co-worker under Rule 404(b). Here, too, the link is too tenuous. While such a dispute might establish a state of mind to harm his co-worker or supervisor, it simply does not follow that the alleged dispute with a co-worker and displeasure at management's reaction to that dispute shows a motive to hurt someone else, namely the CIA by stealing its secrets.

In addition, Mr. Schulte will claim at trial that he did not commit the charged offense at all. As set forth above, 404(b) evidence bearing on intent is therefore inadmissible. *See Ortiz*, 857 F.2d at 904; *Colon*, 880 F.2d at 657. That such a dispute somehow bears on knowledge (of what the government does not specify) or absence of mistake, is yet a further stretch. And, in any event, those concepts are irrelevant to the instant prosecution. *See United States v. Williams*, 585 F.3d 703, 708 (2d Cir. 2009)

(whether [defendant] had the opportunity or motive to possess a gun was not put in issue during the trial; conviction reversed for erroneous admission of extrinsic proof under Rule 404(b)).

This is a wholly circumstantial case and Mr. Schulte is expected to testify in his own defense. Under the circumstances, evidence that he had a completely unrelated dispute with a co-worker or lied about a death threat, will be especially prejudicial. Further, even if the jury finds that the government did not prove beyond a reasonable doubt that Mr. Schulte stole the Classified Information, it may convict him to punish him for being a difficult and distrustful employee in a position of national security. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("'unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). As such, the proffered evidence is unfairly prejudicial under Rule 403.

**B. Mr. Schulte's disputes with his supervisor are not admissible.**

Similarly, Mr. Schulte's disputes with his supervisor are not admissible. According to the government,

> [i]n February 2016, Schulte strongly disagreed with a management decision to enlist a contractor to build a tool that was similar to one that Schulte was attempting to develop, and forced his way into a meeting with the contractor over the objection of the Branch Supervisor. During the meeting, Schulte complained about the contractor potentially jeopardizing other tools and operations. After the meeting, Schulte sent emails

complaining about the situation, and he told others that he
was going to cause problems because of it, including by filing
a complaint with the CIA's Inspector General.

Gov. Mot. 5-6.

The government also apparently seeks to introduce that in late March 2016, Mr.

Schulte obtained a protective order against his co-worker in state court and that, as a

result of the protective order, CCI management "reassigned" Mr. Schulte and his co-

worker to different branches, which Mr. Schulte deemed unfair retaliation.

That Mr. Schulte may have expressed dissatisfaction with management's

decision to hire a contractor to build a tool distinct from one Mr. Schulte was building

and with how management handled a co-worker dispute does not tend in any way to

show why, when, or how the classified information was stolen. The lack of

connection is palpable. Any expression of dissatisfaction did not arise out of the

alleged theft at issue nor is it inextricably intertwined with it.

As such, the conduct is admissible only if it establishes one of the 404(b)

exceptions, which it does not. The government reads too much into Mr. Schulte's

expression of dissatisfaction, which is, on its face, simply a normal and appropriate

response to a manager's sidelining of an employee. There was no special edge to the

expressed dissatisfaction which made it in any way remarkable or suggested a motive

or intent, for example, to take the drastic step of stealing a trove of classified

information.

Furthermore, Mr. Schulte will claim at trial that he did not commit the charged offense at all. He will not claim that he did so mistakenly, for example. Under the circumstances, 404(b) evidence bearing on intent is inadmissible. *See United States v. Colon*, 880 F.2d 650, 657 (2d Cir. 1989) ("Our cases have recognized a distinction between defense theories that claim that the defendant did not do the charged act at all, and those that claim that the defendant did not act innocently or mistakenly with only the latter truly raising a disputed issue of intent"); *United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir. 1988) ("Moreover, intent is not placed in issue by a defense that the defendant did not do the charged act at all. When a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent").

As to motive, evidence as to Mr. Schulte's filing of a state court action, threats of further litigation, office relocation, and project reassignment will likely confuse the jury, as it would seek to determine what employee conduct and management job actions were appropriate or inappropriate. There would be numerous sub-trials within this one, already highly complex, trial. The evidence would surely confuse the issues and unnecessarily prolong the trial. *See* Fed. R. Evid. 403; *Williams,* 585 F.3d at 708 ("We think the evidence more likely confused the jury than assisted its understanding of the case"). Finally, to the extent any of this proffered evidence bears on motive, it is unfairly prejudicial. *See Old Chief*, 519 U.S. at 180.

Put simply, the expression of dissatisfaction with the hiring of a contractor is irrelevant; even if there were some remote probative value, it is outweighed by its strong potential for unfair prejudice, confusion, and wasting time.

### C. The Court should preclude the government from introducing evidence concerning the SanDisk removable thumb drive because it is irrelevant, confusing, and unfairly prejudicial.

The government seeks to introduce evidence concerning a SanDisk removable thumb drive that, it claims, Mr. Schulte used for some unidentified purpose "during" the alleged theft of classified information on April 20, 2016. But the government has already admitted that the drive was not used—and, given its small capacity, could not have been used—to steal the information. And while the government claims that the drive was erased or "re-purposed" sometime after the alleged theft, the government's expert notice does not indicate that any expert witness has examined the thumb drive and will testify to this conclusion.

Accordingly, especially absent any expert witness who will testify to the drive's significance, evidence about the drive has no relevance to this prosecution and, indeed, would only cause the jury to speculate about what purpose it may or may not have served. In other words, evidence that the drive was inserted into Mr. Schulte's CIA work station around the time of the alleged theft—but admittedly not used to steal anything—does not make the existence of any material fact "more or less probable than it would be without the evidence." Fed. R. Evid. 401. As the

government knows, thumb drives were ubiquitous at the CIA and were routinely used for legitimate CIA work. Thus, unless the government can tie the SanDisk drive to some nefarious conduct—which would require as-yet undisclosed expert testimony on the subject—the drive has no relevance, and would only lead the jury to speculate, without any evidentiary basis, that it had something to do with stealing classified information. Accordingly, evidence concerning the thumb drive is inadmissible.

**D.    The Court should exclude evidence recovered from the ESXi server to redress the government's spoliation of electronically stored information.**

"Spoliation" refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) (citing *Black's Law Dictionary* 1401 (6th ed. 1990)). The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, and to redress conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process).

Here, the government intends to offer certain log files or other electronic information recovered from an ESXi server maintained by the CIA. The Court should preclude this evidence, however, because the government intentionally or recklessly

altered, destroyed, or failed to preserve potentially exculpatory information on the ESXi server in the course of its investigation.

In particular, the government, over the defendant's repeated objections, has produced to the defense only a small subset of the files that were housed on the ESXi server. That small group of files was apparently examined and tested by the government on various dates, including November 2, November 6, and November 8, 2018. But, in the course of conducting those examination and tests, the government permanently and intentionally altered or destroyed important and potentially exculpatory files and related computer data—making it impossible for Mr. Schulte and his computer experts to examine the files as they originally existed or to recover the destroyed or altered information.[1] The process used by the FBI during its investigation is in clear violation of the DOJ's rules and normal industry standards. *See Dep't of Justice Manual on Prosecuting Computer Crimes* at 180; Orin S. Kerr, *Search and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 539–41 (2005).

Given this conduct, the resulting unfairness to Mr. Schulte, and the impairment of the jury's truth-seeking function, the Court should preclude the government from introducing evidence relating to the information recovered from the ESXi server. *See, e.g., Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005) (noting that

---

[1] A forensic review of the log files makes clear that the FBI used a live system when preparing the evidence that they produced to the defendant. Thus, we have no way to determine how other files or other metadata were modified or altered. The defense has previously raised this concern. The government has ignored it.

sanctions for spoliation include, among other things, dismissal of the case or exclusion of evidence). At a minimum, the Court should require the government to demonstrate that the spoliation occurred as a result of good-faith mistakes or ordinary negligence, rather than intentional or willful misconduct.

## II. The government's general request to introduce a host of MCC evidence against Mr. Schulte for a variety of purposes should be denied.

The government seeks to admit a variety of evidence from MCC, including testimony about the alleged use and storage of contraband cell phones; results from the search of one of the cell phones, a Samsung phone; statements made on encrypted email and social media accounts; Mr. Schulte's notebooks and articles; and calls made from the MCC. Gov. Mot. 37. The government argues that this evidence is either direct evidence of the charges or is admissible under Rule 404(b), although the government fails to specifically distinguish between what pieces of evidence it believes to be admissible for what purpose.[2]

In requesting to introduce this host of evidence related to Mr. Schulte's conduct at the MCC, the government plucks two words—"information war"—from Mr. Schulte's hundreds of pages of writings, and acts as if those two words were some sort of a broad "declar[ation]" of war "against the United States." Gov. Mot. 27, 29.

---

[2] Mr. Schulte renews his request for a particularized disclosure of the MCC evidence the government seeks to introduce at trial. As the government knows, more than one person at the MCC used (and still uses) contraband cell phones. And more than one individual used the particular cell phone at issue.

11

The government uses this phrase at least 25 times in its motion, making it the centerpiece of their inflammatory argument, which exaggerates Mr. Schulte's writings, most of which were in hard-paper notebooks in his cell at MCC, by repeatedly taking small phrases out of context to argue that Mr. Schulte a) tried to "coerce" the government to "abandon" his prosecution by disclosing classified information and b) spread "misinformation" intended to "portray" himself "as the victim." Gov. Mot. 27, 37.[3] These conclusions distort the proposed evidence. Indeed the government should be precluded at trial from using the phrase "information war"—which was written one time, in a hard-paper notebook, and never disseminated—in the repetitive, overblown way it uses it in its motion.

The government's requests should be rejected. First, the government's requests improperly ignore Mr. Schulte's due process rights to a fair trial and the presumption of innocence by unfairly emphasizing the fact of his pre-trial incarceration. Second, the government's requests are too general and do not pinpoint what statements they actually seek to introduce. Third, the information that the government does specifically request to introduce should be excluded. Fourth, because of counsel's

---

[3] To the extent the Court allows the government to argue that Mr. Schulte undertook a campaign to thwart the government's prosecution, it should also allow Mr. Schulte to introduce testimony that he, through his lawyers, repeatedly inquired in open court why the government was dragging its feet in bringing the espionage charges that it had threatened to lodge against Mr. Schulte.

conflict of interest related to the MCC notebooks, the Court should appoint conflict-free counsel.

### A. The Court should not countenance the government's hasty dismissal of Mr. Schulte's due process right to have the jury not know he has been detained pretrial.

The government's motion proposes that the jury learn repeatedly about Mr. Schulte's incarceration, including by showing pictures of him in his prison cell, and by having someone testify about his general "conduct" while in prison.[4] It essentially ignores that courts have repeatedly recognized the prejudicial effect of allowing the jury to learn that the defendant has been in pretrial detention, treating this issue cavalierly in a footnote. Gov. Mot. 47 n.13. Courts normally go to great lengths to ensure the jury does not learn that fact, including by making sure defendants are dressed in civilian court attire, preventing the jury from seeing them in handcuffs or shackles, and allowing defendants to be seated at the defense table before the jury enters the courtroom. These measures are taken because "presumption of innocence … is a basic component of a fair trial under our system of criminal justice"

---

[4] The government states that it "anticipates calling at least one other witness at trial who will testify about [Mr.] Schulte's conduct" at MCC. Gov. Mot. 32 n.7. The government does not explain what "conduct" this person would testify about or why it would be admissible. The Court should order the government to move *in limine* if it wishes to introduce additional information about Mr. Schulte's conduct at MCC. The government simply alluding to an unidentified witness, who will testify about unexplained jailhouse conduct is not a sufficient motion to introduce what it suggests will be additional prejudicial information that will only further call the jury's attention to the fact that Mr. Schulte has been incarcerated while his case is pending.

and allowing the jury to learn that a defendant is incarcerated undermines that presumption. *Estelle v. Williams*, 425 U.S. 501, 503 (1976) ("courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt" and finding it unconstitutional to "compel[ ] an accused to stand trial before a jury while dressed in identifiable prison clothes"); *Deck v. Missouri*, 544 U.S. 622, 629 (2005) (due process similarly "prohibit[s] the use of physical restraints visible to the jury" absent a specific state interest); *United States v. Haynes*, 729 F.3d 178, 189 (2d Cir. 2013) (finding "clear error and a violation of the defendant's constitutional right to due process of law to have required the defendant [who had no prior criminal history] to stand trial in shackles without a specific finding of necessity on the record"); *United States v. Deandrade*, 600 F.3d 115, 118 (2d Cir. 2010) (noting that a "constant reminder" or "extended comment" on the accused's pretrial detention would be impermissible).

The government notes that its motion is not about Mr. Schulte wearing prison garb at trial. Gov. Mot. 47 n.13. That is true. Instead, the government's requests go way beyond having the jury simply see Mr. Schulte in prison garb – photos of Mr. Schulte in his prison uniform are just one of numerous pieces of evidence the government seeks to use that will repeatedly reveal to the jury that he was incarcerated pending trial.

14

This Court should decline the government's invitation to so casually ignore Mr. Schulte's due process right to a fair trial and presumption of innocence. Instead, the Court should be scrutinizing each piece of prison-related evidence the government seeks to introduce.

As yet, the government has failed to sufficiently specify what evidence it seeks to introduce from MCC, making the Court's task in balancing any probative value of this evidence against Mr. Schulte's constitutional rights exceedingly more difficult. As explained below, the government should, therefore, be required to provide more specific information about the evidence and documents it seeks to introduce.

## B. The government should be ordered to provide the defense with the specific documents it seeks to introduce.

Thus far, the government has quoted in its motion snippets of the writings that it seeks to introduce, but has not provided a copy of the full texts it believes to be relevant and will seek to introduce. *See, e.g.*, Gov. Mot. 30. It must do so. Without knowing what statements, in full, the government seeks to introduce, it is impossible for the defense to litigate whether those statements include some relevant and some irrelevant information, or conversely, if the rule of completeness would require the government to introduce more context for a particular statement. *See, e.g.*, Fed. R. Evid. 106, 611(a). "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the

same time." Fed. R. Evid. 106, 611(a). As interpreted by the Second Circuit, the doctrine "require[s] that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact, or to ensure a 'fair and impartial understanding of the admitted portion.'" *United States v. Marin*, 669 F.2d 73, 85 (2d Cir. 1982) (citations omitted). Because the government has not noticed the precise contours of the statements it seeks to introduce, the defense is unable to assess whether those statements sweep in too much or not enough surrounding context.

It is similarly impossible to rebut some of the government's arguments without seeing the actual statements it is seeking to introduce. For example, the government asserts that the notebooks have statements that "WikiLeaks is in possession of source code for a specific tool" "that is contained in the back-up file that was stolen, even though WikiLeaks has not publicly disclosed that it possesses any course code for that tool." Gov. Mot. 41. The government does not quote these statements, even in part, and does not provide a discovery bates stamp record number for where these statements appear. Whether the government's representation of what these statements show is fair depends completely on exactly what the statements are and the context in which they appear. As the government describes the statements, however, it does not appear to be a fair conclusion that they prove that Mr. Schulte knew "details about the theft" that were not "publicly disclosed." Gov Mot. 41. Mr. Schulte surely possessed a

16

great deal of information about what the government was charging him with leaking at the time he was writing in his MCC notebooks, including much information that was not "publicly disclosed." He also, of course, knew what projects would likely have been included in the stolen files; it is not disputed that he worked on the projects that were leaked to WikiLeaks. Unless there is something more specific in the statements that the government seeks to introduce that somehow shows that only the real leaker would know the information, these statements cannot be admitted.

The government states that there are five categories of information that it seeks to introduce, describing the "Use Evidence," the "MCC Classified Information Evidence," "Intent Evidence," "Nonpublic Information Evidence," and "Guilty Conscience Evidence." Gov. Mot. 37-38. It does not actually pinpoint what evidence falls into each category, which does not match up to the different categories the government uses in the factual section of Point II, Gov. Mot. 32-35, making it exceedingly difficult to respond to its arguments.

For example, the government defines the "Intent Evidence" with the circular definition that it is evidence of his "intent in his 'information war.'" Gov. Mot. 38. This category does not appear to match a corresponding category in the factual section. After defining the phrase "Intent Evidence," the government does not use the phrase again, instead later stating that the "Intent Information"—presumably the same evidence, despite the different name—should be admitted because it

17

"conclusively establishes" that Mr. Schulte's goal was to transmit National Defense I with "reason to believe that the information could be used to injury the United States or for the benefit of a foreign nation." Gov. Mot. 39. This goal is different than the "two goals" the government articulated at the outset of Point II: to get the government to abandon his prosecution and to portray himself as the victim. Gov. Mot. 27. The government does not address, or seem to recognize, the contradiction between these goals: the former, to exonerate Mr. Schulte, and the latter to harm the United States. In any event, though asserting that "Intent Information" should be admitted, the only actual statements that the government points to are the phrases "information war" and "govt's secrets," and the partial sentence that the "United States government has done the job of a foreign adversary to exploit its own intelligence officers." Gov. Mot. 39.

Similarly, the government does not define what specific evidence it believes is the "Guilty Conscience Evidence," or for what crime the government believes each piece of evidence shows a guilty conscience. Gov. Mot. 40. For example, the government argues that using a "false identity" and encrypted accounts "rebuts an innocent explanation" for Mr. Schulte's actions at MCC. Gov. Mot. 40. Using an encrypted account from MCC may show a consciousness of guilt of using a cell phone while in prison, but does not show a consciousness of guilt of any other crime. Using encrypted email accounts from MCC certainly does not "*conclusively*" establish

his "guilty purpose" and "knowledge of his guilty of the WikiLeaks Charges" Gov.

Mot. 40-41 (emphasis added). Despite the use of the word "conclusively" the

government does not even attempt to explain why using an encrypted email account

from MCC shows a consciousness of guilty of the WikiLeaks Charges. It does not.

The government should, therefore, be required to provide notice forthwith of

what specific statements it seeks to introduce so that the defense may have a further

opportunity to object to their introduction.[5]

## C. The evidence the government does state it wishes to introduce should be excluded.

1. The government has provided no justification to introduce comments about Anonymous, which must be excluded under Rule 404(b).

The government offers no support why it should be allowed to introduce

"additional communications with the Reporter, including encrypted communications

in which [Mr.] Schulte claims to have been [a] member of the group Anonymous,

which is a group known for conducting cyber-attacks that has provided documents to

WikiLeaks in the past." Gov. Mot. 33. This "additional" evidence is clearly not part of

the charged offenses nor is it inextricably intertwined with them. The jury will discern

---

[5] Additionally, the government notes that the wall review team redacted the information that the  team believed to be privileged from the government. Gov. Mot. 35 n.10. The government ignores that the MCC provided to the FBI agents who are also the case agents, Mr. Schulte's notebooks and it was the FBI agents who read them despite them being clearly marked as "Attorney-Client Privilege"; "Privileged & Confidential."

no gaps in the government's case if it is not included in the proof. Instead, it is just classic "bad act" evidence that would be purely prejudicial. The evidence of claimed participation in a shadowy, underground group infamous for cyber-attacks and dumping on WikiLeaks is unduly prejudicial as it suggests concerted activity of a type even more disturbing than what is charged.

> 2. The government cannot just substitute different words for "child pornography" and introduce statements relating to child pornography.

All mention of child pornography should be precluded. Indeed, to allow otherwise would undermine the Court's severance order. The government agrees but makes the bizarre suggestion that all mention of "child pornography" found on Mr. Schulte's personal computer be "redacted and substituted" with "a different crime." Gov. Mot. 48. The government does not explain what crime it plans to substitute. The government has provided no authority for this type of redaction and substitution and there is none. The jury will obviously be left wondering about what crime may have been found on a defendant's computer, especially one that cannot be named. The risk is they may conclude it is child pornography, or indeed, something even worse, is overwhelming and the potential harm too devastating. As such, the proposed substitution is ineffectual and all allusions to child pornography should be precluded. *See* Fed. R. Evid. 403; *Old Chief*, 519 U.S. at 180.

### D. MCC evidence may not be used as proof of "identity" or *"modus operandi"* under Rule 404(b) for the WikiLeaks charges.

The government also asserts that the MCC evidence should be admissible as to the WikiLeaks counts under Rule 404(b). Gov. Mot. 42-44. This must be rejected.[6]

First the government asserts that the two crimes are similar because both required "technologically savvy means." Gov. Mot. 43. Everyone at the CIA who had access to the material leaked to WikiLeaks was "technologically savvy." Mr. Schulte will not dispute in defense to any of the charges that he is technologically savvy. But, that Mr. Schulte – like all his colleagues – was technologically savvy was does not make the MCC evidence at all relevant to the WikiLeaks counts.[7]

Second, the government argues that evidence that Mr. Schulte was disgruntled with the CIA's response to a dispute with a colleague and evidence that he was angry

---

[6] The government also says that the "MCC Evidence" is admissible of Mr. Schulte's "motive, intent, preparation, and planning" with respect to the MCC counts. Gov. Mot. 45. The government does not define which pieces of evidence fall under this category, a phrase it uses for the first time at Gov. Mot. 38, and may refer to <u>all</u> information that was collected at MCC without limit. For example, the government says his notebooks are a "carefully crafted plan," for an "information war." Gov. Mot. 45. It is far from clear what evidence the government believes is part of this "careful[ ]" plan," or why the government believes that messy, ranting, handwritten notes in notebooks labeled privileged could be part of any carefully crafted plan. In any event, the cases it cites, about an uncharged bomb threat being introduced to show intent to threaten a victim, and the planting of bombs in one location to be introduced to prove planning to plant bombs in another case, are nothing like this one. *Id.* This broad request should be denied.

[7] Moreover, it does not take a technological wizard to smuggle a cellphone into the MCC and send emails using applications that are readily available on any Android or other smart phone.

at the government for prosecuting him shows a "remarkably similar" pattern. Gov.

Mot. 43-44. It does not. The two things are not related. Just as it is unsurprising that

the person who leaked information to WikiLeaks was tech savvy, it is unsurprising

that Mr. Schulte was angry at the government for prosecuting him.

Instead, the two sets of charges are completely different. The WikiLeaks

charges and the MCC charges are "similar" only in the broad sense that Mr. Schulte is

accused of violating rules and impermissibly sharing protected information with third

parties. The underlying purposes and methods for sharing that information are

drastically different. The cases cited by the government highlight this difference. In

each of those cases, the court found that the person had committed a pattern of

robberies, or abuse that involved the same type of actions: use of a toy gun, threating

to use a bomb, or assaulting the same person. *See* Gov. Mot. 44. None of them

address the unusual circumstance here: evidence of a defendant's reaction to being

prosecuted and detained as proof that he was correctly identified. This is not a pattern

and does not go to his identity. There is nothing "idiosyncratic", Govt. Mot. 44, about

an individual reacting to unfair accusations by wanting to clear his name by engaging

the press in his defense. Public relations and managing and using the press are part

and parcel of a defense.

22

**E.     Mr. Schulte's MCC notebooks and the "malware" article are privileged and therefore inadmissible.**

Mr. Schulte renews his prior objections to the introduction of the MCC notebooks and the "Malware of the Mind" article based on the attorney-client privilege, which protects communications between counsel and client for the purpose of providing or obtaining legal advice. Additionally, these documents are independently protected by the related, but distinct, work-product privilege. *See United States v. Nobles*, 422 U.S. 225, 237–38 (1975) (observing that the work-product doctrine is vital to "assuring the proper functioning of the criminal justice system"). According to the work-product doctrine (*see* Fed. R. Civ. P. 26(b)(3)(A)) evidence is protected (and therefore not discoverable and not admissible at trial, *see Am. Nat'l Red Cross v. Vinton Roofing Co*, 629 F. Supp. 2d 5, 8 (D.D.C. 2009)) if: 1) it is a document, 2) that was prepared "in anticipation of litigation," and 3) was created by a party (or the party's representative). Substantial portions of Mr. Schulte's prison writings, including portions the government seeks to admit, meet this definition. Mr. Schulte is a party, his notebooks and the "malware" article are documents, and they were prepared by him while facing indictment and in anticipation of further litigation. Mr. Schulte believed that his writings—which "tend[] to reveal [his] mental impressions, conclusions, opinions, or theories concerning th[is] litigation," *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998)—had a legitimate purpose relating to his case and would be protected from compelled disclosure. The documents "would not have been

23

prepared in substantially similar form but for the prospect of litigation." *Id.*

Accordingly, they were created "because of" existing or expected litigation, and

therefore enjoy full work-product protection. *See id. at* 1198 (work-product protection

applies if document was prepared "because of" existing or expected litigation, even if

document also may have had other purposes and was not intended primarily to "assist

in" litigation).

     **F.**    **Due to a conflict, counsel is unable to raise a potentially viable argument that the MCC notebooks should be excluded because Mr. Schulte was provided constitutionally ineffective advice related to them.**

It is well-settled that incorrect legal advice can constitute ineffective assistance

of counsel warranting a remedy. *See, e.g., Lafler v. Coooper*, 566 U.S. 156 (2012)

(erroneous legal advice to reject plea offer was ineffectiveness); *Padilla v. Kentucky*, 559

U.S. 356 (2010) (failure to advise defendant about guilty plea's adverse immigration

consequences was ineffectiveness); *Hill v. Lockhart*, 474 U.S. 52 (1985) (incorrect

advice as to potential sentence could constitute ineffectiveness warranting withdrawal

of guilty plea). Typically, the remedy is to return the defendant to the status he

enjoyed prior to the error. *See e.g. United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008)

(dismissal can be appropriate remedy for finding of ineffective counsel under the

Sixth Amendment where necessary to restore the defendant to the circumstances that

would have existed had there been no constitutional error); *United States v. Carmichael*,

216 F.3d 224, 227 (2d Cir. 2000) (same). This is true even when the violation occurs

because of defense counsel's ineffectiveness rather than government misconduct. *See Frazier v. Berghuis*, 2003 WL 25195212, at *7 (E.D. Mich. Aug. 6, 2003) (granting habeas relief and ordering suppression of statements made by defendant to police after his counsel abandoned him during interrogation); *People v. Quintero-Amador*, 357 P.3d 844, 848 (Col. 2015) (noting that "a number of courts across the country have suppressed a defendant's prior testimony based on counsel's ineffective assistance, even absent state action . . .") (collecting cases); *People v. Peters*, 66 N.Y.S.3d 238, 243-44 (N.Y. App. Div. 1st Dep't 2017) (ordering exclusion of testimony as remedy "to dissipate the taint of counsel's conflicted and ineffective representation" in "violation of the State and Federal right to effective assistance of counsel").

It is equally well-settled that counsel may not call itself ineffective. *See, e.g., Christeson v. Roper,* 545 U.S. 373, __, 135 S. Ct. 891, 894 (2015) (holding that the "court's principal error was its failure to acknowledge" the lawyers' "conflict of interest"); *United States v. Del Muro*, 87 F.3d 1078 (9th Cir. 1996) (reversible error to require trial counsel to represent defendant in presenting a new-trial motion alleging counsel's own ineffectiveness); *Keats v. State*, 115 P.3d 1110 (Wyo. 2005) (collecting cases); *Brown v. United States*, 656 A.2d 1133 (D.C. 1995) (counsel placed in conflict situation where required to represent defendant in evidentiary hearing on counsel's own ineffectiveness); *Humphrey v. Com.*, 962 S.W.2d 870 (Ky. 1998) ("unethical for counsel to assert his or her own ineffectiveness"). The conflict exists not only in the

counsel raising a challenge questioning his own professional standing, but also in the likelihood that he will be a key witness on the issue. *See Adams v. State,* 380 So. 2d 421 (Fla. 1980); P*erkins v. State*, 487 S.E.2d 365 (Ga. Ct. App. 1997). Indeed, in *Evitts v. Lucey*, 469 U.S. 387, 391 n.3 (1985), the Supreme Court noted that appellate counsel had been referred to the State Bar Association "for disciplinary proceedings 'for attacking his own work product.'"

As set forth in, *inter alia*, the Federal Defenders' December 13, 2019 (Dkt. No. 220) and January 2, 2020 (Dkt. No. 231) letters, lawyers from that Office provided Mr. Schulte advice that makes them potential fact witnesses and also may render them ineffective under the Sixth Amendment to the Constitution.

The defense is flagging this issue once again for the Court as it is directly relevant to the conflict that Mr. Schulte's current lawyers face. Defense counsel cannot brief this issue because counsel is prohibited from calling their own conduct ineffective. *See Christeson*, 135 S. Ct. at 894–95. In *Christeson*, the Supreme Court held that counsel "cannot reasonably be expected to make" an argument that "denigrate[s] their own performance," because that would "threaten[] their professional reputation and livelihood." *Id.* at 894. The Supreme Court continued, saying that "a 'significant conflict of interest' arises when an attorney's 'interest in avoiding damage to [his] own reputation' is at odds with his client's 'strongest argument—*i.e.*, that his attorneys had abandoned him.'" *Id.* (citing *Maples v. Thomas*, 565 U.S. 266, 285–86 n.8 (2012)). The

26

Supreme Court noted that "to their credit," the lawyers "acknowledged the nature of their conflict," stating to the court that: "Because counsel herein would be essential witnesses to factual questions indispensable to a *Holland* inquiry [*see Holland v. Fla.,* 560 U.S. 631 (2010)], there may be ethical and legal conflicts that would arise that would prohibit counsel from litigating issues that would support a *Holland* claim. Unwaivable ethical and legal conflicts prohibit undersigned counsel from litigating these issues in any way." *Christeson*, 135 S. Ct. at 894 (citing *Holloway v. Arkansas,* 435 U.S. 475, 485–86 (1978)). Counsel faces the same conflict here.

Accordingly, as Mr. Schulte may have a viable argument to exclude the MCC notebooks—which his current lawyers cannot ethically raise for him—the Court should appoint new counsel.

## III.   The government's WikiLeaks expert should be excluded.

In a motion in limine, the defense objected to the government's proposed WikiLeaks expert because the expert notice was insufficient, the proposed expert did not have sufficient expertise in the noticed topics, the testimony did not meet admissibility standards under Rule 702, and the testimony would be irrelevant, prejudicial, and confusing. The government responds, saying that Mr. Rosenzweig will provide "important context for specific aspects of the charged offenses, including" the "intent to harm the United States and tradecraft and his reason to believe such harm would occur." Dkt. No. 210 ("Gov. Res."), at 1. Despite reasserting that the

expert will testify about specific past harms caused by WikiLeaks disclosures, the government still cites no facts, data, or principles that the expert will rely on. Instead, the government cites inapplicable cases allowing expert testimony related to criminal organizations, Gov. Res. 7-9; only briefly expands on its original expert notice, providing "examples" of four prior WikiLeaks disclosures that it proposes that Mr. Rosenzweig will testify about. Gov. Mot. 53; and states that it believes Mr. Rosenzweig's testimony will "provide context" for other topics that do not need expert testimony. Gov. Res. 10.

Because the government's disclosure remains deficient, does not rebut the defense arguments that this testimony does not meet the standards of Rule 702, and the proposed testimony remains irrelevant and confusing, this expert should be excluded.

### A. The government has not even attempted to meet the standard of Rule 702.

While taking umbrage that the defense did not sufficiently highlight Mr. Rosenzweig's "reputable" career in cyber and national security in criticizing his lack of any specific focus on WikiLeaks, the government still does not explain what specific facts or data, or principles and methods, he will be relying on in his testimony, as required under Rule 702 (b) & (c).[8] On the contrary, the government still proposes

---

[8] The government also makes odd attacks on the defense saying that it "misrepresent[s] [the] anticipated testimony" with "red herrings." Gov. Res. 2. The

28

that he will testify about purportedly "well-known"—but unspecified—harms from prior leaks. As described in the government's response, Mr. Rosenzweig's testimony still does not meet any of the prongs of Rule 702.

Instead of explaining how their expert might meet the legal standard, the government simply acts as if WikiLeaks is a criminal organization and cites cases solely relating to expert testimony about "criminal organizations," including drug trafficking organizations, terrorist groups, and organized crime families. Gov. Mot. 50-51, 53-54; Gov. Res. 6-9. These are not appropriate comparisons. WikiLeaks is not a criminal organization but a non-profit organization aimed at providing transparency of government conduct. The cases cited by the government allowed experts to testify about criminal organization when the defendants were charged with being part of that criminal organization. That is nothing like Mr. Schulte's case: Mr. Schulte is not charged with being part of a criminal organization and WikiLeaks is not one. The government makes no effort to explain to the Court why cases about criminal organizations are relevant authorities here. They are not.

After citing only cases about terrorist and other criminal organizations, the government says that the WikiLeaks testimony will be "far less" "inflammatory" than testimony about "plots perpetrated by al Qaeda," such as September 11th. Gov. Mot. 53. Surely. That is because testimony about WikiLeaks bears no relationship to

---

defense motion was directly based on the exceedingly limited government expert disclosure and was accurate based on that information.

testimony about al Qaeda and September 11th. WikiLeaks is a non-profit that

publishes information; September 11th was a massive terrorist attack that killed

thousands of people. That the government even thinks that al Qaeda and September

11th and WikiLeaks and information disclosures are in the same ballpark strongly

suggests that it plans to have Mr. Rosenzweig testify as if WikiLeaks were a criminal

organization. There is simply no justification to allow that.

Additionally, the government's invitation that the Court view WikiLeaks as in

the same category as indisputably criminal organizations only highlights the defense

argument that the expert's testimony would be exceedingly prejudicial, would

necessarily require rebuttal by a defense expert, and result in a trial-within-a-trial about

the morality and legality of WikiLeaks. Throughout its response, the government

casually compares WikiLeaks and criminal groups, for example, saying that WikiLeaks

is "like criminal and terrorist organizations" in that it "does not give free rein to the

public to examine or dissect its internal workings." Gov. Res. 9.[9] This comparison is

---

[9] The government also misleadingly suggests that the U.S. Senate had concluded that WikiLeaks was somehow criminal, saying that the "Senate Select Committee on Intelligence has explicitly stated 'that WikiLeaks and its senior leadership resemble a non-state hostile intelligence service.'" Gov. Mot. 52, citing S. Rep. 115-151, p. 10. This citation is to a lengthy report that includes one line that there is a "sense of Congress" that "WikiLeaks and its senior leadership resemble a non-state hostile intelligence service." S. Rep. 115-151. The report includes dissenting viewpoints specifically related to WikiLeaks, the lack of any explanation as to what "hostile intelligence service" means, and the concern that the phrase could include legitimate journalistic organizations. *Id.*

wildly unfair: Criminal and terrorist organizations are, of course, far from the only organizations that do not give "free rein to the public" to "examine or dissect its internal workings." Indeed, surely very few legal organizations give the "public" "free rein" into their internal workings; many private, legal companies have confidential internal procedures. This type of inaccurate, but inflammatory, comparison between WikiLeaks to terrorist and other criminal groups underscores the inappropriateness of the proposed testimony.

As explained in the defense motion in limine, the government's proposed testimony simply does not meet the expert standard under Rule 702.[10] Indeed, the government has still declined to explain any specific facts or data the expert will be relying on. The expert should, therefore, be excluded.

### B. Testimony about four past WikiLeaks disclosures would be irrelevant, confusing, and prejudicial.

In its response, the government also indicates that its expert will testify about purported "widely known" "harms" from past disclosures by WikiLeaks. *See* Gov. Res. 2; Gov. Mot. 52. The government plans to "link[ ] specific harms caused by WikiLeaks in the past to [Mr.] Schulte's own statements of his intent to cause similar harms." Gov. Mot. 52-53. The government, however, does not articulate what these

---

[10] In the alternative, and to the extent that the government proffers any facts, data, or principles, this Court should order a *Daubert* hearing to determine whether the facts, data, and principles were used reliably. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

"specific harms" were. Instead it lists four prior disclosures by WikiLeaks, simply ignoring that the effect of these leaks is far from undisputed. Gov. Mot. 53.

First, it cites to disclosures by Chelsea Manning. Ms. Manning is fairly viewed by many as a whistleblower who exposed government abuses. Indeed, President Obama commuted Ms. Manning's 35-year sentence. As the *New York Times* explained it, "Her leaks brought to light numerous hidden facts, including previously unknown civilian bystander killings in the Iraq war, back-room diplomatic dealings and discussion of local corruption around the world, and intelligence assessments about Guantánamo Bay detainees." Charles Savage, "Chelsea Manning Leaves Prison, Closing an Extraordinary Leak Case," *N.Y. Times*, May 16, 2017, *available at* https://tinyurl.com/yfe2h2cf.

Second, it cites a 2010 WikiLeaks disclosure of diplomatic cables, which was carried out in conjunction with major news outlets, including *The Guardian*, *The New York Times*, and *Der Spiegel*. *See e.g.,* Editor's note: publishing the cables, *The Guardian*, Nov. 28, 2010, *available at* https://tinyurl.com/yf86ef9a. This disclosure raises directly the tension between the government's suggestion that WikiLeaks is like a criminal organization and the reality that it is similar to a news organization.

Third, the government cites a WikiLeaks disclosure of documents from Stratfor, a private intelligence firm. *See* stratfor.com ("Globally engaged individuals, professionals, Fortune 500 companies, universities and organizations across an array

of industries turn to Stratfor for accurate, actionable geopolitical intelligence"). The government does not detail the harm the government asserts was caused to the United States by the release of a private firm's intelligence, or why the release of this private firm's information is relevant to Mr. Schulte's case.

Fourth, it cites the hacking of the DNC server and subsequent release of documents. It states that Mr. Rosenzweig will "testify about the DNC Leak, including the type of information" disclosed in that leak, which will "demonstrate why [Mr.] Schulte's WikiLeaks-related searches include inquires that had nothing to do with the DNC Leak." Gov. Res. 13. That Mr. Schulte's interest in WikiLeaks was piqued in August 2016, the same month that WikiLeaks was discussed in every newspaper across the country because of the DNC Leak, is relevant. The specifics of the DNC leak and the "type of information released" are not.

Each of these topics will require a defense rebuttal, including by highlighting the newsworthiness of much of the information, contradicting, if necessary, the government's as-of-yet undetailed assertion of specific harms, and distinguishing each leak as not like the one charged here. As explained in the defense motion, the government cannot deal with their lack of relevant evidence about how WikiLeaks received the CIA documents here, and what type of harm – if any – was caused,[11] by

---

[11] Indeed, despite discovery and *Brady* requests, the government has provided no information to the defense to support its assertion that the harm caused here was "catastrophic." *E.g.,* Gov. Mot. 2 ("his actions have caused catastrophic harm"). The government has also not noticed any expert who would testify about the level or type

introducing evidence from *other cases* about how much information was leaked or how information as leaked in unrelated contexts.

The real reason for this expert testimony is clear – the government has no other way to prove damages to the CIA. The defense has made repeated requests for damages evidence and has received none. The government has not provided any evidence of financial, reputational or any other harm to the United States. Why? Because it has none. To allow them to substitute "expert" testimony for damages information would be improper. The Court should preclude the government from calling Mr. Rosenzweig at trial.

### C. The proposed testimony will not provide relevant "context."

The government also says that the WikiLeaks testimony will provide relevant "context" for a few topics. Gov. Res. 10-12. As explained below, none of these topics make the expert's testimony admissible.

- *"Tradecraft" of using Tor and Tail.*

The government seeks to have the expert explain that WikiLeaks advises the use of "Tor" and "Tails" software programs and that the fact that Mr. Schulte had those programs indicates that he was using particular espionage "tradecraft." Gov. Res. 10. Tor and Tails are used by journalists, corporations, whistleblowers, law

---

of harm here, and should, therefore, be precluded from using extreme language like "catastrophic" without any evidentiary support.

enforcement,[12] and people that wish to protect their privacy. The Guardian, for example, advocates the use of Tor and Tails, explaining on its website that people can share stories with them "securely and confidentially" using Tor and Tails. *See* "The Guardian Secure Drop," *available at* https://www.theguardian.com/securedrop (instructing users how to install Tor and Tails and provide stories to the newspaper securely); *see also,* Lee Matthews, "What Tor Is, And Why You Should Use It To Protect Your Privacy," *Forbes,* Jan. 27, 2017, *available at* https://tinyurl.com/ydkuevna.

Surely an expert is not necessary to tell the jury that WikiLeaks – just like mainstream news organizations – advises people to transmit information to them confidentially. This is not beyond the ken of the average juror.

- *Redactions*

The government next says that the proposed expert will say that WikiLeaks "does not typically redact" information, but the information here was "purportedly redacted." Gov. Res. 11. The government concludes that the proposed expert's testimony will "help the jury understand the significance of" the "unique claim" to have redacted the information and the "period of delay" between the disclosure and redaction. Gov. Res. 11. The government does not explain how expert testimony that WikiLeaks *does not* redact information will help the jury understand why the information *was* redacted in this instance. In the same vein, the government says

---

[12] The government should be required to disclose if the CIA uses Tor.

without any explanation that the "expert testimony relating to WikiLeaks'
decentralized structure will help explain to the jury why the" information was
"disseminated over a long period of time in multiple phases." Gov. Mot. 53. This
assertion too is unexplained. If the expert has some type of opinion with respect to
these seeming contradictions, the government should be required to explain it to the
defense and the Court so that the reliability of that opinion can be assessed.

- *Mr. Schulte's "knowledge of" the leak of information by Ms. Manning*

Next, the government says that it intends to introduce evidence of Mr.
Schulte's "knowledge of [Ms.] Manning's leak." Gov. Res. 11. The release of
documents by Ms. Manning was front page news in every major news publication for
numerous days. Of course, Mr. Schulte knew about it; so did everyone else who
picked up a newspaper. It is not clear what the expert would have to add to this
information.

- *"Membership in Anonymous"*

The government also states that Mr. Rosenzweig will testify that in 2012
"Anonymous and WikiLeaks worked together to release information." Gov. Res. 13.
This testimony will "aid the jury in understanding the hacking group's relationship
with WikiLeaks" and that Mr. Schulte had "contact with access to WikiLeaks. Gov.
Res. 13. As explained above, *supra* Point II(C)(1), information about Anonymous
should be excluded from the trial.

36

**D. The public statements by WikiLeaks must be excluded as hearsay.**

The government agrees that the public statements of WikiLeaks are hearsay if offered to prove the truth of the statements. Gov. Mot. 54; Gov. Res. 6 n.2. The government attempts to get around this problem by saying that they are going to use the statements to "prove the fact that WikiLeaks made them, when [they] made them, and the form in which they were published," but will "not rely" on them for the "truth of the content they contain[e]d." Gov. Mot 55. For what purpose are they seeking to admit them but for the content they contain? The government does not say.

If the government wishes to introduce the fact that WikiLeaks made a statement on a specific day and using a particular "form," they are free to do so. What they may not do is introduce the content of those statements, unless it falls within a hearsay exception.[13] The government has identified no such exception. Instead it cites two cases out of context, in which statements were admitted for specific non-hearsay purposes: in *Dupree* a statement was admitted to "show its effect on the listener," and so was not hearsay, and in *Anderson*, a statement was admitted to show that it was not truthful. Gov. Mot. 55, citing *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013)

---

[13] The government inaccurately states that the defense "appears to concede that the jury can consider these statements" for the purpose of "when, and how" the statements were made. Gov. Res. 6 n.2. It is unclear why the government thought that was a fair interpretation, as the government also states the "defendant does not specifically address that point." *Id.*

37

and *Anderson v. United States*, 417 U.S. 211, 220 (1974). The government has identified no legitimate non-hearsay purpose here.

Accordingly, for all of the above reasons, the WikiLeak expert should be precluded.

## IV.   The government should be prohibited from introducing irrelevant and confusing proffer statements about a subway ride.

In its motion, the government identifies one proffer topic that it seeks to introduce, not as direct evidence of false statements, but as cross-examination: statements that the MTA told passengers to get off a subway train and that an unknown person, whom Mr. Schulte thought was a foreign intelligence officer, approached him. Gov. Mot. 55-56. The government may introduce statements from the proffer that relate directly to the charges for making a false statement during that proffer. Gov. Mot. 58. However, a proffer agreement is not a reason to introduce irrelevant proffer statements, unrelated to the charges. The MTA-related statements should be excluded as irrelevant.

The government calls these MTA-related statements "incredible claims about a mandatory disembarkation of all passengers" from the subway train. Gov. Mot. 55-56. The government seeks to use them as "proper rebuttal," Gov. Mot. 57, or "false exculpatory statements." Gov. Mot. 58. Mr. Schulte is not planning to introduce any information relating to this subway interaction. Therefore, he does not anticipate that he will be making any claims that would call for rebuttal with the proffer statement.

38

Nor are these statements about this subway ride "false exculpatory statements." Gov. Mot. 58. They recount an odd episode, but are not exculpatory at all.

Instead, this "fantastical narrative," as the government calls it, is completely irrelevant to the charges and the trial and likely to just sow confusion. As surely anyone who has taken an MTA subway is aware, the subway announcements frequently provide conflicting information about where the train is going and what passengers should do, and are often garbled or inaudible. *See, e.g.,* James Barron, "Subway Announcements Are Changing (Not That You Can Hear Them Anyway)," *N.Y. Times*, Nov. 8, 2018, *available at* https://tinyurl.com/ycsaw4w5; John Crudele, "Why don't conductors realize subway announcements are impossible to hear," *N.Y. Post*, Oct. 29, 2017, *available at* https://tinyurl.com/yh2q4z37; Chris Rovzar, "55 Percent of Subway Announcements Are Unintelligible," *New York Magazine*, Apr. 5, 2010, *available at* https://tinyurl.com/yeao7hdo.

Introducing "video evidence" about whether or not other people needed to disembark from the train and forcing conflicting narratives about the MTA and what happened with a subway train is an utter waste of the jury's time. Instead, statements about the MTA, Mr. Schulte's dreams, [14] or his apparent paranoia about the CIA or FBI targeting him in public are completely irrelevant and should be excluded.

---

[14] It is unclear from the government's motion whether it also plans to accuse Mr. Schulte of falsely claiming he had a "dream about the FBI monitoring how long it took him to report the incident," which it mentions in the factual section with

**V.    The government should be prohibited from introducing videos that attempt to recreate the crime.**

The government seeks to introduce several videos that computer science expert Patrick Leedom created, showing "what happens when [the expert] enters the same computer commands that [Mr.] Schulte entered on April 20, 2016, when [Mr.] Schulte deleted the log files." Gov. Mot. 59; *see also* at 60 (another video purports to show that Mr. Schulte "used his reversion of the Confluence database on April 20, 2016"). In other words, the government plans to offer a video version of what it believes is the actual crime. Nothing cited by the government would permit this type of crime reconstruction and it should be prohibited.

The government says that courts have allowed demonstrations to show the "use of machinery or tools that are not commercially available or familiar to the average juror." Gov. Mot. 60. In support the government cites three civil cases: an unpublished, out of circuit, summary order, *Clevenger v. CNH Am., LLC*, 340 F. App'x 821, 825 (3d Cir. 2009), which offers no explanation of what the video showed, or for what purpose it was introduced, other than that it was of a "skid steer loader" ; a case

---

respect to the November proffer. Gov. Mot. 20. Delving into a defendant's dreams would be an odd and confusing waste of time. *See, e.g.,* Jim Davies "Why You Shouldn't Tell People about Your Dreams," *Scientific American*, May 9, 2017, *available at* https://tinyurl.com/nxv66r2; NPR, This American Life, "511: The Seven Things You're Not Supposed to Talk About," *transcript available at* https://tinyurl.com/ygoousul (both articles discussing how other people are not interested in hearing about other people's dreams, which are only important to the individual).

from 1989 in which a "brief, live demonstration" was conducted in the courthouse to "familiarize the jury with the operations of lift trucks in general," *Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 51 (E.D.N.Y. 1989); and a product liability case from 1984 in which "films" were "not offered as a re-creation or representation of how the accident actually happened," but to show the expert's experiments. *Szeliga v. Gen. Motors Corp.*, 728 F.2d 566, 567 (1st Cir. 1984). The only criminal case the government mentions is a reference to the docket in *United States v. Rahimi*, and the statement that the government introduced a "video of the crime scene" to show the "dimensions" and "locations where evidence was found." Gov. Mot. 60.

None of these cases are anything like what the government proposes to do here. Here, the government plans to offer a video that purportedly shows the crime. It cites no authority allowing this and it should be prohibited from doing so. This is especially so in a case where the government has yet to articulate how the remainder of the crime was executed. The government has yet to articulate how data of the size leaked to WikiLeaks was exfiltrated, how and to what device it was saved and how it was taken from the CIA and sent to WikiLeaks. Allowing a demonstrative in a case as circumstantial as this one would be highly prejudicial to Mr. Schulte. The demonstration would do exactly what the government intends it to do – give the jury half a story (an incorrect one) and then invite it to make the leap to guilt.

41

Additionally, the government is wrong that Mr. Schulte could "do the same thing" as the government's expert and create his own demonstrative. Gov. Mot. 61. Mr. Schulte and his expert have never been provided a full mirror image of the ESXi and FSO1 servers and are, thus, unable to rebut the government's demonstrative with a defense demonstrative. The defense has repeatedly asked for this information and has repeatedly been blocked by the government.

Accordingly, the government's request should be denied.

## VI.  There is no justification to limit the defense cross-examination of the government's classification expert.

The government plans to have an expert testify with respect to classification. *See* Gov. Expert Notice. This expert will testify about the "classification system," the "different levels of classification," the "reasons for the differentiation," the "classification authority" and "how that authority is assigned." *Id.* He will also testify about the "methods" the U.S. government uses to protect classified information and through what processes someone can disclose classified information. *Id.* Despite this, the government argues that Mr. Schulte should not be allowed to cross-examine that expert about whether any piece of information is appropriately classified, elicit this information from its own expert, argue to the jury that any piece of information is misclassified, or argue that the CIA did not follow the correct classified review. Gov. Mot. 69. The government asserts the defense should be so limited because "classification determinations" are not for the jury to decide. Gov. Mot. 65.

42

The Court should reject the government's attempt to insulate its expert from proper cross-examination. The government is choosing to have a classification expert testify. Given that, the defense must be allowed to probe the accuracy of that expert's testimony, including by questioning that expert about appropriate classification procedures. Indeed, the cross-examination topics that the government seeks to exclude are directly relevant to the subject of the expert's testimony: how the classification system works.

The constitutional right to confront witnesses is "not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." *Davis v. Alaska*, 415 U.S. 308, 316 (1974) (citing 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940)). Indeed, cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* The government provides no reason why the defense should not be able to ask the government's expert in classification about the problems with the classification process. Instead, this is classic cross-examination.

The government cites numerous cases about the president's authority to classify documents, claiming it is "well-settled" that "courts nor defendants may challenge the Executive Branch's classification decisions." Gov. Mot. 62-64. These cases, however, all address "challenges to classification decisions in the discovery

43

context" relating to whether or not a court can *de-classify* a document. Gov. Mot. 63-64. But that a defendant is not entitled to force the government to de-classify documents during the discovery process has no bearing on the scope of a defense cross-examination of a government classification expert.

The government is simply wrong that cases prohibiting the court from declassifying documents during discovery mean that the defense cannot argue that the government overclassifies information. Indeed, it is widely known that, regardless of how information should be classified, in fact the government routinely overclassifies and misclassifies documents and that many classified documents include information reported in newspapers. *See, e.g.,* Abbe David Lowell, "The Broken System of Classifying Government Documents," *N.Y. Times*, Opinion, Feb. 29, 2019, *available at* https://tinyurl.com/ygy53fbq (opinion by former chief counsel to the House Democrats addressing how "dysfunctional, arbitrary and counterproductive the country's system of classifying information really is"); Dianne Feinstein, "How to rethink what's 'top secret' for the Internet age," *Washington Post*, Opinion, Dec. 16, 2016, *available at* https://tinyurl.com/yds3vv8r (explaining that the officer responsible for oversight of classification reported improper classification markings on half of all classified documents); Elizabeth Goitein and David M. Shapiro, "Reducing Overclassification Through Accountability," Brennan Center Report, 2011, *available at* https://tinyurl.com/yztft7bw (scholarly report about over classification and strategies

to reduce it); Eric Lipton, "Don't Look, Don't Read: Government Warns Its Workers Away From WikiLeaks Documents," *N.Y. Times*, Dec. 4, 2010, *available at* https://tinyurl.com/ydswbcmn (reporting on federal government directive that its employees could not look at documents published on news websites).

The government has provided no justification to limit the defense cross-examination. Accordingly, their request should be denied. Additionally, the defense has repeatedly requested additional information regarding what criteria the CIA used to classify the relevant documents. The government should be required to turn over this information as part of Rule 16 discovery or as part of its expert disclosure.

## VII.   There is no legal authority for the government's self-serving jury instruction, which should be rejected.

The government provides no citation whatsoever supporting its jury charge request that there was "nothing improper about the fact that certain materials were not available to the defendant's expert" and that the defense had "substantially the same ability to make his defense." Gov. Mot. 70-71. The government has moved, thus far successfully, to prevent the defense expert from having access to the same information as the government expert. The government may not have its cake and eat it too by also having the Court instruct the jury that the information the defense expert lacks is irrelevant to that expert's opinion. As the government admits, it is "entirely proper for a defendant's expert to testify to the limitations of his review" so that the jury can assess his opinion. Gov. Mot. 70. What is not proper is for the Court

to place a hand on the scale and tell the jury that the expert's materials were sufficient, regardless of whether the expert believes that to be the case.

## VIII.  The government may not argue Mr. Schulte has "opened the door" to prior, specific bad acts by making general arguments.

The government also seeks to introduce evidence of exceedingly prejudicial statements and actions if Mr. Schulte "opens the door" during his testimony. Gov. Mot. 74-75. None of the government's hypothetical examples of Mr. Schulte testifying in general terms about qualities that he was "law-abiding" or a "patriot," however, would open the door to specific bad acts.

A defendant may "open the door" to prior bad acts, but only by making a direct contradiction in his testimony. *See e.g., United States v. Elfgeeh*, 515 F.3d 100, 128 (2d Cir. 2008) (because defendant gave an innocent explanation for sending money abroad, "the government was allowed to ask [ ] whether he knew that the money he sent was being used to buy arms and ammunition"); *United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) (in "testifying he had nothing to hide on the night of the search" opened door to show that he was hiding something); *United States v. Beverly*, 5 F.3d 633, 640 (2d Cir. 1993) (testimony that he "had nothing to do with guns" opened door to "evidence of the shootings."); *United States v. Garcia*, 936 F.2d 648, 654 (2d Cir. 1991) (testifying that "he had no idea that the white powder was cocaine, he opened the door for the Government to impeach his testimony by establishing on

46

cross-examination that he was familiar with and indeed had used cocaine as recently as the day before his arrest").[15]

None of the government's examples in its motion are like these types of contradictions. For example, testimony that Mr. Schulte was a "patriot" before his arrest, is not contradicted by statements made after his arrest in anger at the government agencies prosecuting him. Arguments that Mr. Schulte had no prior criminal history are not contradicted by statements to "others" about doing things to benefit himself. Similarly, statements about his co-workers not liking him would not open the door to racist remarks that will inevitably excite the jury's passions.

Additionally, if the government intends to introduce the evidence it writes under the section of "bias," including instances of Mr. Schulte allegedly using racist language, the defense intends to introduce evidence that this type of language was commonplace within the CIA. Indeed, the culture of the CIA group in which Mr. Schulte worked included the frequent use of language that would be considered racist and inappropriate in any other workplace. This culture included many of his co-workers calling Arabic the language of terrorists and otherwise using racial slurs. This was ordinary at the CIA.

--------

[15] The government notes in a footnote that they "may [also] seek to introduce" some of these statements in their direct case. Gov. Mot. 75 n.17. Mr. Schulte would object to that and requests that, if the government does intend to make an argument that this would be appropriate, that it do so expeditiously so that Mr. Schulte may respond.

The government simply may not claim Mr. Schulte opens the door to specific bad acts based on generalized comments.

## CONCLUSION

For the reasons explained above, the Court should deny the government's motions in limine and grant any other relief that may be appropriate.

Respectfully submitted,

_____/s/_____
Edward S. Zas

_____/s/_____

Sabrina P. Shroff

48