

**U.S. Department of Justice**
*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 23, 2020

**By ECF**
The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   <u>United States v. Joshua Adam Schulte</u>, S2 17 Cr. 548 (PAC)

Dear Judge Crotty:

    The Government writes in response to the Court's order (the "Order"), dated January 21, 2020, in which the Court directed the Government to "file a public version of the proposed specific courtroom closure measures." (Dkt. 260 at 2). The Government's proposed measures are described below, as well as the Government's basis for seeking partial courtroom closure for these witnesses' testimony. The specific witnesses' identities and the factual bases for the Government's argument are classified and are described in the Government's October 26, 2019 classified witness protection motion and supporting declaration (together, the "Witness Protection Motion").

**I.   THE PROPOSED PROTECTIVE MEASURES**

    For certain witnesses from the Central Intelligence Agency (the "CIA"), the Government is seeking the following protections (the "Protective Measures"), including partial courtroom closure:

- Partial closure of the courtroom during their testimony, with only the parties, the jury, the defendant's family, and one pool reporter permitted in the courtroom during the testimony;
- Witnesses to use a non-public entrance to enter and exit the courtroom, defense precluded from cross-examination that would reveal any aspect of the witnesses' true identities, no sketching or other recordings of their faces, and pixelation of any publicly-released images of their faces;
- A live feed of the testimony to another courtroom that does not reveal the witness's face;
- Transcripts of the testimony to be released publicly as soon as feasible, which would typically be on the evening after the day of testimony.

    As described in more detail in the Witness Protection Motion, the Government has not sought this relief for every CIA employee, and this request is based on the specific sensitive nature of each

of these witnesses' work. The Government is seeking this relief for 10 CIA witnesses (the "Government Witnesses") who served in sensitive positions within the CIA, including developers in the CIA's Center for Cyber Intelligence. Publicly revealing these witnesses' identities could result in grave harm to the national security and to these witnesses personally. Of these 10 employees, the Government has also proposed specific measures to protect their true names in the Witness Protection Motion.

Furthermore, the defendant has subpoenaed seven witnesses from the CIA who also served in similarly sensitive positions (the "Defense Witnesses," and together with the Government Witnesses, the "Closure Witnesses") as the Government Witnesses. As a result, public revelation of these defense witnesses' identities could similarly threaten the safety of these witnesses personally and the national security more broadly. Accordingly, if the defense does call any of the Defense Witnesses, the Government would also request that the Court adopt the Protective Measures with respect to those witnesses' testimony as well.

## II.   APPLICABLE LAW

### A.   (U) CIPA Section 6

Upon the Government's request, "the court shall conduct . . . a hearing [pursuant to Section 6(a)]" to "make all determinations concerning the use, relevance or admissibility of classified information" at trial, including any information identified in a defendant's Section 5 notice. *See* 18 U.S.C. App. 3 § 6(a). At the hearing, which must be held *in camera*, the defendant must proffer why the classified information that he seeks to disclose is relevant and admissible, while the Government is given an opportunity to challenge the request on the standard evidentiary grounds, such as relevance and hearsay. To prevail on his application, a defendant has the burden of (1) specifying what classified information he might cause to be publicly disclosed at trial, and (2) demonstrating the relevance and admissibility of the information. Vague assertions regarding classified information are insufficient. *See, e.g.*, *United States v. Collins*, 720 F.2d 1195, 1197-98 (11th Cir. 1983) (holding that defendant's request to reveal general information about the maintenance of secret bank accounts and other overseas operations was insufficiently specific to merit relief under CIPA); *United States v. Wilson*, 721 F.2d 967, 975 (4th Cir. 1983) (quashing subpoena seeking classified information "for lack of specificity").

CIPA does not change "the generally applicable evidentiary rules of admissibility." *United States v. Wilson*, 750 F.2d 7, 9 (2d Cir. 1984). Accordingly, as with any piece of evidence, the Court should consider the admissibility of a piece of classified information first pursuant to the Federal Rules of Evidence. Thus, the proffered evidence must be relevant under Federal Rules of Evidence 401 and 402 or admissible as impeachment under Federal Rules of Evidence 601 through 615. The evidence must also not be inadmissible hearsay under the Rules. Finally, even assuming that the evidence satisfies these requirements, then the evidence may still be excluded if it is barred by Federal Rule of Evidence 403 because the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see, e.g.*, *Wilson*, 750 F.2d at 9; *United States v. Libby*, 453 F. Supp. 2d 35, 44 n.8 (D.D.C. 2006) ("There is no question that Rule 403, as a standard rule of evidence, impacts the admissibility of the classified information referenced in the defendant's CIPA § 5 notice."). Courts have routinely precluded evidence concerning the CIA's intelligence-gathering activities pursuant to Rule 403. *See Wilson*, 750 F.2d at 9 (upholding district court ruling to preclude defendant from testifying about details of

particular intelligence operations in which he participated because that testimony would be "prejudicial, confusing, or misleading"); *see also United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997) ("The trial court was well within its proper authority to decide either that Doyle's past cooperation with army intelligence had no bearing on the crimes charges, or that that any probative value was substantially outweighed by the risk of confusing the jury with extraneous matters, or of wasting the court's and jury's time."); *United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989) (excluding evidence pursuant to Rule 403, because evidence regarding the details of the defendant's participation in "prior covert operation. . . would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment"); *United States v. Sampol*, 636 F.2d 621, 633 n.31 (D.C. Cir. 1980) ("In light of its dubious probative value, when the testimony began to stray too far afield, the trial court properly refused to 'put the CIA on trial in this case.'").

Before a defense request to cause disclosure of classified information can be granted, a court must find the information relevant and material to the defense. *See United States v. Smith*, 780 F.2d 1102, 1110 (4th Cir. 1985). In *Smith*, the Fourth Circuit reasoned that, because unnecessary disclosure of classified material risks chilling the future collection of such information, the principle enunciated by the Supreme Court in *United States v. Roviaro*, 353 U.S. 53 (1957), applies to the relevance of such information. *Smith*, 780 F.2d at 110 ("The *Roviaro* standard of *admissibility* is at the least more restrictive than the ordinary rules of *relevancy* would indicate."). The ruling in *Smith* is consistent with the Second Circuit's decision in *Aref*, which requires disclosure of classified information to the defense only insofar as the classified information is both material and helpful to the defense. *Aref*, 533 F.3d at 80; *see United States v. Stewart*, 590 F.3d 93, 131 (2d Cir. 2009).

### B. (U) Limitations on Cross-Examination

Under the Confrontation Clause of the Sixth Amendment, a defendant has a "right . . . to be confronted with the witnesses against him," which includes the right to conduct cross-examination. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). However, the Confrontation Clause "guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (internal quotation marks omitted). "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850 (1990). Thus, trial judges "'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The district court's latitude extends to excluding "even relevant evidence if it finds that the probative value of the testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Crowley*, 318 F.3d at 417 (internal quotation marks omitted); *see also United States v. Watson*, 599 F.2d 1149, 1157 (2d Cir. 1979) (affirming trial court's prohibition of cross-examination regarding witness's recent activities, employment, and other matters where disclosure of his occupation would endanger the witness).

### C. The Protection of Intelligence Agency Witnesses

Both the First and Sixth Amendment generally require that criminal court proceedings be open to the public. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984) (criminal defendant has Sixth Amendment right to public trial); *United States v. Smith*, 426 F.3d 567, 574-75 (2d Cir. 2005) ("[t]he First Amendment has consistently been read to provide the *public and press* a right of access to criminal trials") (emphasis in original). "Th[e] right to be tried in open court is not absolute," *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001), and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the Government's interest in inhibiting disclosure of sensitive information," *Waller*, 467 U.S. at 45. Measures that limit these rights are appropriate when: (1) the party seeking the limitation advances an overriding interest that is likely to be prejudiced; (2) the limitation is no broader than necessary; (3) the court considers reasonable alternatives; and (4) the court makes findings adequate to support the limitation. *Waller*, 467 U.S. at 48. *United States v. Alcantara*, 396 F.3d 189, 199-200 (2d Cir. 2005) (setting forth procedural protections generally applicable to closure motions). "The same test applies whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995).

The qualified right of public access may yield to, among other things, the need to protect the safety of witnesses and to avoid "the danger of impairing law enforcement." *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (internal quotation marks omitted); *accord, e.g.*, *United States v. Lugosch*, 435 F.3d 110, 120 (2d Cir. 2006). Courts have routinely approved courtroom closures and other protective measures to protect law enforcement witnesses whose safety or job functions could be compromised by public disclosure of their identities. *See Carson v. Fischer*, 421 F.3d 83, 89 (2d Cir. 2005) (closure of courtroom to general public for confidential informant's testimony was warranted in light of "substantial interest in protecting [the informant] and his family's safety"); *United States v. Abuhamra*, 389 F.3d 309, 324 (2d Cir. 2004) ("The government's strong and legitimate interest in protecting confidential sources from premature identification is undeniable. Identification not only compromises the government's ability to use such sources in other investigations, it may expose them to retaliation by those against whom they have cooperated."); *Brown v. Artuz*, 283 F.3d 492, 501-02 (2d Cir. 2002) (finding that the "safety of a police officer working undercover surely constitutes an overriding interest" necessary for courtroom closure, and noting with approval that an undercover detective was permitted to testify in a closed courtroom using his badge number instead of his true name); *Nieblas v. Smith*, 204 F.3d 29, 33 (2d Cir. 1999) ("important interest" necessary for closure of courtroom includes the need to protect undercover agent's anonymity and safety); *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) (en banc) (holding that "[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest," and that this interest can be "seriously prejudiced" when an undercover agent is required to testify in open court); *Doe*, 63 F.3d at 128 (overriding interests that can warrant courtroom closure include preserving "the integrity of significant [government] activities entitled to confidentiality, such as ongoing undercover investigations" (quoting *In re Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1984)); *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1274-75 (2d Cir. 1975) (upholding closure of trial during testimony of undercover agent to "preserve his future usefulness[] and safeguard[] his life"); *see, e.g.*, *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490 (S.D.N.Y. 2018) (granting Government request, in terrorism prosecution, that four FBI undercover employees be permitted to testify under pseudonyms in courtroom closed to the general public); *United States v. Sharpe*, No. 15 Cr. 288 (RMB) (S.D.N.Y. Jan. 30, 2017) (permitting undercover agent to testify without using true name); Memorandum & Order, *United States v. Pugh*,

No. 15 Cr. 116 (NGG) (E.D.N.Y. Feb. 24, 2016) (granting Government request, in terrorism prosecution, that FBI undercover employee be permitted to testify under a pseudonym in a courtroom closed to the general public); *United States v. Urena*, 8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) ("The Government's interest in protecting UCE-188's safety and his viability as an undercover asset overwhelmingly outweighs the defendants' interest in public disclosure of his true name."); *United States v. Hernandez*, No. 12 Cr. 809 (PKC), 2013 WL 3936185, at *3 (S.D.N.Y. July 29, 2013) (permitting undercover agent to testify using alias where the "risk that the Agent's safety and efficacy might be compromised is heightened if the Agent's real name is publicly disclosed" and "the defendant will not be prejudiced by the use of an alias"); *United States v. Grant*, No. 04 Cr. 207 (BSJ) (S.D.N.Y. May 5, 2005) (permitting undercover agent to testify without using true name).

Furthermore, to carry its burden of demonstrating the need to protect the identity of a witness, "[t]here is no requirement that the prosecution . . . prove that particular individuals likely to attend the trial will disclose the officer's identity." *Ayala*, 131 F.3d at 72. Likewise, the Government need not establish any particular risk to the safety of a witness, as the protection of the witness's true identity and ability to act effectively in an undercover capacity are sufficiently compelling to justify remedial measures, including closure of the courtroom. *See id.* ("Since the state interest in maintaining the secrecy of the undercover officer's identity warranted the limited closure, we need not consider the respondents' additional point that the closure was also justified by the risk to the officer's safety."); *see also Smith v. Hollins*, 448 F.3d 533, 539 (2d Cir. 2006) ("[P]rosecutory powers often have an overriding interest in protecting the safety and efficacy of undercover officers."); *Gonzalez v. Quinones*, 211 F.3d 735, 738 (2d Cir. 2000) ("We have repeatedly held that, under appropriate circumstances, courts may properly order courtrooms closed during the testimony of undercover police officers, in order to protect both the officers' safety and their future effectiveness.").

As with undercover officers and confidential informants, "[t]here can be no doubt that the identity of CIA operatives is sensitive information." *United States v. Sterling*, 724 F.3d 482, 516 (4th Cir. 2013). "To disclose the identities of CIA operatives, even if not to every spectator in the courtroom, subjects the operatives to targeting by hostile foreign intelligence services and terrorist organizations, and creates a grave danger to the operatives, their families, and the operations in which they are engaged." *Id.* Moreover, in many cases, the identity of CIA officers is classified information, which the Government has a significant and compelling interest in protecting. *See Dept. of Navy v. Egan*, 484 U.S. 518, 527 (1988) (government has "compelling interest" in withholding national security information from unauthorized persons). As a result, courts have regularly adopted protective measures for intelligence agency witnesses who testify at trial. *See Sterling*, 724 F.3d at 516-517 (approving CIA witnesses testifying under pseudonyms and either behind screens or in light disguise); *see also United States v. Holy Land Foundation for Relief and Development*, No. 04 Cr. 240 (AJF) (N.D. Tex. May 4, 2007) (permitting intelligence agents to testify using pseudonyms in a courtroom closed to the public); *United States v. Salah*, No. 03 Cr. 978 (AJSE) (N.D. Ill. Aug. 29, 2006) (permitting intelligence agents to testify under pseudonyms, in light disguise, in a courtroom closed to the public, as "an overriding interest in preserving the safety of [the] witnesses justifies imposing certain limited Protective Measures").

### III.   DISCUSSION

Partial courtroom closure is the most reasonable alternative because it properly balances the need to protect the Closure Witnesses' identities against the public's and the defendant's rights. *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) (court should consider whether courtroom closure is

the most reasonable alternative). Protecting CIA employees' identities who are involved in the Agency's intelligence-gathering is critical. *See Sterling*, 724 F.3d at 516 ("The identity of CIA operatives is, and always has been, subject to rigorous protection."). Protecting these employees' identities requires that their faces be shielded from public disclosure—the partial courtroom closure proposed by the Government does that while also ensuring the both the public and the press are afforded access to every other part of these witnesses' testimony. Thus, the Government respectfully submits that, under the *Waller* factors, the partial courtroom closure included in the Protective Measures is appropriate with respect to the testimony of the Closure Witnesses.

*First*, the Government has proffered an "overriding interest" that will be impaired if the Closure Witnesses' identities are publicly revealed. As described in the Witness Protection Motion, public disclosure of the true identities of these witnesses, particularly when coupled with the subject of their testimony (such as, for example, where they worked and in what development efforts they were involved), would implicate classified information. The Government has a "compelling interest" in protecting classified information from disclosure to those without a need to know it, *see Egan*, 484 U.S. at 527. Moreover, as described in more detail in the Witness Protection Motion, the protection of these officers' identities makes sense—they serve in critical intelligence-gathering functions that necessitate secrecy. *See Sterling*, 724 F.3d at 516 ("[t]here can be no doubt that the identity of CIA operatives is sensitive information"). The protection of these witnesses' identities thus serves two related critical national interests: (1) to ensure that the CIA can continue to use these highly-trained officers to collect intelligence, *see Ayala*, 131 F.3d at 72 ("[t]he state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest," and this interest can be "seriously prejudiced" when an undercover agent is required to testify in open court); *Doe*, 63 F.3d at 128 (overriding interests that can warrant courtroom closure include preserving "the integrity of significant [government] activities entitled to confidentiality, such as ongoing undercover investigations"); and (2) to protect these individuals from retaliation for their role in the CIA's efforts, *see Sterling*, 724 F.3d at 516 ("To disclose the identities of CIA operatives, even if not to every spectator in the courtroom, subjects the operatives to targeting by hostile foreign intelligence services and terrorist organizations, and creates a grave danger to the operatives, their families, and the operations in which they are engaged."); *see also Carson*, 421 F.3d at 89 (closure of courtroom to general public for confidential informant's testimony was warranted in light of the "substantial interest in protecting [the informant] and his family's safety"); *Abuhamra*, 389 F.3d at 324 (describing how government's "strong and legitimate interest in protecting confidential sources" is "undeniable" and that premature exposure "may expose them to retaliation by those against whom they have cooperated"); *Brown*, 283 F.3d at 501-02 (the "safety of a police officer working undercover surely constitutes an overriding interest"); *Nieblas*, 204 F.3d at 33 ("important interest" necessary for closure of courtroom includes the need to protect undercover agent's anonymity and safety). Accordingly, "[t]he identity of CIA operatives is, and always has been, subject to rigorous protection." *Id*.

The specific factual bases supporting the Government's "compelling" interest in this case to protect theses witnesses' identities is set forth in the Witness Protection Motion. The Government notes here, however, that the harms described in that motion are particularly acute in this case because of the defendant's prior conduct during this prosecution. Schulte has demonstrated his willingness to flout the Court's order and harm the CIA through disclosure of classified information through his "information war" and deliberate violation of the Protective Order, *see* Motions *in Limine* pp. 28-31, and thus, may very well try to disclose these witnesses' true identities during trial (as he did in some of the draft classified material he wrote for publication, *see id*. pp. 34-35). A partial courtroom closure is the only means to ensure the protection of these witnesses' identities.

*Second*, the partial courtroom closure sought by the Government for the Closure Witnesses "is no broader than necessary." *Waller*, 467 U.S. at 48 (identifying breadth of limitation as second factor for courts to consider). In determining the breadth of the proposed courtroom closure, the Court is to consider several factors, including the following:

> its duration; whether the public can learn (through transcripts, for example) what transpired while the trial was closed; whether the evidence presented during the courtroom closure was essential, or whether it was merely cumulative or ancillary; and whether selected members of the public were barred from the courtroom, or whether all spectators were precluded from observing the proceedings.

*See Bowden*, 237 F.3d at 129-30 (internal citations omitted).

With respect to the duration of the closure, while the Government is seeking a partial closure of the courtroom for the testimony of 10 witnesses, that is entirely reasonable given the need to protect the identity of CIA personnel in sensitive positions and the total length of the trial. *See Sterling*, 724 F.3d at 516 (10 CIA witnesses testified behind a screen). And even for these witnesses, the closure does not prevent anyone from hearing these witnesses' testimony, because it will be broadcast in real-time to another courtroom and the transcripts will be publicly released. Moreover, the Government is tailoring its closure request to the specific harms at issue. While the Government is calling several witnesses from the CIA, the Government is only seeking partial closure of the courtroom for witnesses for whom public disclosure of their identities would impact the CIA's ongoing activities. Furthermore, at trial, the Government anticipates that, if there are no factual stipulations between the parties, then the Government may call nearly fifty witnesses.[1] The Government is not seeking any protections for the overwhelming majority of these witnesses. Thus, with respect to just the Government Witnesses, the Government is seeking closure for approximately one-fifth of the witnesses; indeed, even if the defendant called all of the Defense Witnesses, that ratio would only shift to approximately one-third. By seeking protections only for witnesses whose public testimony could compromise ongoing intelligence-gathering activities, the Government's request is narrowly tailored to meet the potential harm.

Moreover, with respect to whether the testimony of the Government Witnesses is "essential," *see Bowden*, 237 F.3d at 129-30, the Government readily concedes that their testimony focuses on key issues in the trial, including the structure and accesses for DEVLAN, Schulte's actions on the system, and Schulte's allegations of death threats by one of his colleagues.[2] But any concern about implementing the Protective Measures with respect to such important testimony is ameliorated through two aspects of the Measures being sought. First, with respect to the Government Witnesses (as well as the Defense Witnesses), Schulte is not being denied any information—he, his attorneys, and the jury will be able to see the witnesses and their reactions without any impediment. Furthermore, members of the public—who also have a right to an open trial—are only being denied a very limited quantum of information about the trial: the faces and true names of the Government

---

[1] The parties are negotiating in good faith regarding potential stipulations and are working to significantly limit the need for custodial witnesses in advance of trial.

[2] The defendant has not identified the reasons why he would call any particular Defense Witness, but assuming that he would seek to elicit testimony about these same subjects, the Government would agree that such testimony is germane to the issues at trial (though, at least in some cases, likely cumulative).

Witnesses, which is the precise type of information that can lead to the public exposure of their identities and related national security harms.

Under the Government's proposal, the public will be able to hear the testimony in real-time through the live feed to another courtroom, and will receive transcripts of the testimony to review. Even to the extent some members of the public are denied the opportunity to observe these witnesses, the public will still have access to all of the substance of these witnesses' testimony. And much of this information will also be captured in (1) documentary exhibits (like emails, log files, and documents from the leaks at issue) that will be available to the public; (2) testimony from witnesses who will testify in an open courtroom, including other CIA witnesses; and (3) the observations of the pool reporter who will be present even during the testimony of the Closure Witnesses, *see Alimehmeti*, 284 F. Supp. 3d at 487 (discussing how the fact that during the testimony in a closed courtroom, the Government would also be introducing publicly available exhibits and the presence of a pool reporter ameliorated concerns about the breadth of the closure). The breadth of information that will be available to the public despite the partial courtroom closure is substantial and weighs in favor of the Government's request. *See Bowden*, 237 F.3d at 129-30 (listing as a relevant factor "whether the public can learn (through transcripts, for example) what transpired while the trial was closed").

Furthermore, the Government is not seeking to bar "selected members of the public" from entering, *Bowden*, 237 F.3d at 129-30, and the Government's request for partial courtroom closure is tailored to preserve overall access as much as possible. The Government is not seeking to exclude, for example, the defendant's family—indeed, the Government's proposal specifically allows for Schulte's family to be allowed in the courtroom at all times. *See, e.g.*, *Yung v. Walker*, 341 F.3d 104, 110-11 (2d Cir. 2003) (finding that it would be error under *Waller* to exclude the defendant's family from the courtroom absent a specific reason to bar the family); *see also Moss v. Colvin,* No. 14 Civ. 2331 (PAC), 2015 WL 3824749, at *4 (S.D.N.Y. June 18, 2015) ("The Court notes, however, that courts in this Circuit have found that closures that allow family members constitute partial closures are examined under a less stringent standard"), *aff'd* 845 F.3d 516 (2d Cir. 2017). Similarly, while the Government's requested partial closure would exclude members of the press (assuming multiple press officers would try to be present), it does not bar the press entirely—a pool reporter would still be permitted to report on the proceedings, with the exception of the witness's appearance, and others could watch the live feed. While certainly the Government Witnesses are anticipated to provide significant testimony, the proposed closure "is no broader than necessary," *see Waller*, 467 U.S. at 48, given that (i) the defendant and his family will have full access to these witnesses; (ii) the public and the press will be able to hear their testimony in real-time (even if the public cannot see them) and review transcripts; (iii) other witnesses will also testify to similar information without the courtroom closure; and (iv) the Government is only seeking closure for witnesses for whom testimony in open court could compromise ongoing intelligence-gathering activities or compromise the safety of the officers, and the Government's proposal is a general exclusion.[3]

---

[3] In some circumstances, courts have gone further with protective measures than the Government is requesting here, such as by authorizing light disguise or screens to protect witnesses' faces. *See id.*; *United States v. Martinez*, 06 Cr. 591, 2007 WL 2710430, at *3 (S.D.N.Y. Sept. 14, 2007) (denying request for undercover to testify behind a screen, but permitting light disguise). The Second Circuit has criticized both of those methods in *Ayala*. With respect to the use of light disguise noted the Second Circuit stated that "[d]isguising the witness risks lessening the jury's opportunity to observe the witness's demeanor and assess credibility." *See* 131 F.3d at 71-72; *see also United States v. Jesus-Casteneda*, 705 F.3d 1117, 1119-21 (9th Cir. 2013) (deciding that particular form of disguise used did not violate Confrontation Clause, but noting that permitting witness to testify in disguise "might

In sum, for the reasons set forth above and in the Witness Protection Motion, the Government's requested limited partial closure of the courtroom during the testimony of the Closure Witnesses should be adopted because it appropriately balances the critical national security interests at play with the rights of the defendant and the public to an open trial.

>Respectfully submitted,
>
>GEOFFREY S. BERMAN
>United States Attorney
>
>By:  _____/s/_____
>David W. Denton Jr. / Sidhardha Kamaraju / Matthew Laroche
>Assistant United States Attorneys
>(212) 637-2744 / 6523 / 2420

---

give rise to a due process violation in certain circumstances by prejudicing the jury against the defendant"). Similarly, the *Ayala* panel also noted that "a screen risks implying to the jury that the family or friends of the defendant in attendance are likely to be dangerous." *Id*. at 72.