UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNITED STATES OF AMERICA

    -v-

JOSHUA ADAM SCHULTE

       Defendant.

17 Cr. 548 (PAC)

Classified Filing

-----------------------------------------------------------------X

**JOSHUA SCHULTE'S RESPONSE TO GOVERNMENT'S *IN CAMERA*
SEALED MOTION FOR WITNESS PROTECTIVE MEASURES PURSUANT TO
SECTION 6 OF THE CLASSIFIED INFORMATION PROCEDURES ACT**

       Defendant Joshua A. Schulte submits this opposition to the Government's motion to close a significant portion of the trial in this case, dated November 26, 2019 ("Gvt. Mot."). The motion should be denied for several reasons, including, first and foremost, that the Government has failed to provide public notice of its request to close the trial—notice that would allow interested members of the press and public to intervene on the issue of the propriety of the closures.

## PRELIMINARY STATEMENT

       The Government contends that Mr. Schulte is responsible for "stealing, disclosing, and attempting to disclose a massive amount of classified information, and his actions have caused catastrophic harm to national security." Gvt. Motion *in Limine* at 2 (ECF No. 195). Indeed, the Government alleges that Schulte is responsible for stealing certain CIA cyber tools and disclosing them to Wikileaks, which former CIA Director and current Secretary of State Mike Pompeo has deemed "a non-state hostile intelligence service often abetted by state actors like Russia,"[1] causing one of the most extensive, damaging leaks of sensitive intelligence information in U.S. history. *See* Gvt. Mot. at 1. The Government claims that Mr. Schulte committed these acts because he became disgruntled while working at the CIA and wanted to obtain "revenge against those who dared to cross him." Gvt. Motion *in Limine* at 2. It also alleges that these acts were the culmination

---

[1] Director Pompeo Delivers Remarks at CSIS (Apr. 13, 2017), *available at* https://www.cia.gov/news-information/speeches-testimony/2017-speeches-testimony/pompeo-delivers-remarks-at-csis.html.

of "an escalating series of retaliatory acts targeting his co-workers and supervisors at the CIA, agents with the Federal Bureau of Investigation ("FBI"), and, most recently, the United States writ large." *Id.*

The Government further contends that Schulte has continued to engage in an "information war" against the United States since the time of his arrest, which has involved the publication of additional information in *The Washington Post* and *The New York Times*, and which continues to attract significant media interest. *See, e.g.,* Gvt. Motion Pursuant to Section 6(a) of the Classified Information Procedures Act at 5-8 (redacted for public filing) (ECF No. 158-1). Schulte thus has been charged with various offenses, including multiple counts of violating the Espionage Act, 18 U.S.C. § 793.

This case is presently scheduled to proceed to trial next month. The Government's direct case against Mr. Schulte will largely consist of circumstantial evidence. Indeed, as explained in Schulte's response to the Government's motion pursuant to Section 6(a) of Classified Information Procedures Act, the Government, despite years of investigation, still does not know the full scope or quantity of information that was stolen from the CIA, when the information was stolen, from precisely where or how some or all of the information was stolen or transmitted to Wikileaks, or, most importantly, who stole the information from the CIA. Rather, in an attempt to establish Schulte's guilt beyond a reasonable doubt, the Government intends to call at least 27 witnesses affiliated with the CIA. These witnesses include approximately 16 individuals who worked at or recently retired from the CIA to develop its theory that Schulte stole the information and provided it to Wikileaks because he had become disgruntled at the CIA due to a series of interpersonal conflicts with these same witnesses. *See* Gvt. Mot. at 4 & n.4. The Government contends that they are necessary fact witnesses at trial because they interacted with Schulte directly during the time period that the Government contends is relevant to the charged offenses. *See id.* at 2-3.

For example, among the 25 CIA witnesses who are central to the Government's circumstantial case against Schulte are nine CIA officers ▮▮▮▮▮▮ who worked to develop the classified CIA cyber tools, and will testify about highly-technical aspects of the case such as the structure of DEVLAN and Schulte's access to and use of that system and other CIA computer systems, as well as interpersonal conflicts with Schulte that included allegations of threats and harassment. *See id.* at 5-12. The witnesses also include one covert CIA officer who investigated Mr. Schulte's claim that death threats were made against him by another one of the Government's

witnesses, *see id.* at 12-14, and six other current or former CIA employees or contractors, who will also testify to matters including interpersonal conflicts with Schulte and how he allegedly became disgruntled, *see id.* at 14-18.

Despite the Government's often hyperbolic claims about the nature and significance of Schulte's alleged offenses—causing "catastrophic harm" to the CIA and the national security of the United States by leaking classified information to a "non-state hostile intelligence service" as "revenge" undertaken in retaliation for certain interpersonal conflicts—and despite the central importance of these 16 CIA fact witnesses to the Government's case-in-chief, the Government has filed a motion requesting closure of the courtroom and implementation of other "Security Measures" during the testimony of these witnesses. *See id.* at 1, 13.[2] The Government specifically requests that the Court limit public and press access to Schulte's trial by imposing to varying degrees for each witness the following restrictions for the duration of their testimony: (1) closure of the courtroom to all but the Court, the parties, the jury, Schulte's family, and one "pool" reporter; (2) permission for the witnesses to testify using pseudonyms; (3) preclusion of cross-examination that would reveal the witnesses' true identities; (4) prohibition on sketching or recording of the witnesses' faces; (5) pixilation of any publicly released images of the witnesses' faces; and (6) permission for the witnesses to use a non-public entrance to the courtroom. *See id.* at 18. The Government claims that these measures are needed to maintain secrecy about the witnesses' work, and their identities and affiliations with the CIA, much of which is classified. *See id.* at 2-3, 28.

The Government purports to mitigate these restrictions by permitting Schulte's family and one "pool" reporter to observe the witnesses' testimony in the courtroom, establishing a live feed of the witnesses' testimony to another courtroom without revealing the witnesses' faces, and making transcripts of the testimony available as soon as feasible, typically on a same-day basis. Citing the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. III, the Government contends that its requested Security Measures must be implemented to protect its vital national security interest in preventing the disclosure of classified information, are narrowly tailored, and

---

[2] The Government concedes that its requested Security Measures would affect a closure of Schulte's trial. *See* Gvt. Mot. at 27, 35-36, 40; *see also United States v. Rosen*, 487 F. Supp. 2d 703, 720 (E.D.V.A. 2007) ("[W]holesale use" of silent witness rule, codes, and redactions "effectively closes the trial.").

strike a reasonable balance between its interest in protecting the information and the rights of Schulte and the public to an open trial. *See id.* at 3, 19. The Government is incorrect.

The Security Measures requested by the Government are not authorized by CIPA. To the contrary, CIPA should be interpreted to bar such closure or denial of public access to Schulte's trial. The Security Measures requested by the Government in this case are also constitutionally impermissible. They would violate Schulte's explicit Sixth Amendment right to an open, public trial, and the qualified First Amendment and common law rights of the public and the press to access criminal trials. The Government's purported common law privilege to protect classified information is also overcome where, as here, the information that it seeks to withhold is material to the defense. Indeed, once the Court determines that classified information is relevant and admissible, pursuant to CIPA, the only balancing of interests that may occur is a consideration of whether the evidence is material. At that point, the decision of whether to comply with the Court's evidentiary rulings rests with the Government—it can comply, abandon the prosecution, or face dismissal of charges. *See United States v. Moussaoui*, 382 F.3d 453, 474-76 (4th Cir. 2004).

What the Government cannot do is undertake Schulte's prosecution and then invoke its classified information privilege and undermine his right to a fair and open trial. *See Jencks v. United States,* 353 U.S. 657, 670-71 (1957) ("'[S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.'") (quoting *United States v. Reynolds,* 345 U.S. 1, 12 (1953)).

## ARGUMENT

I.  **SCHULTE AND THE PUBLIC HAVE FUNDAMENTAL CONSTITUTIONAL RIGHTS TO A PUBLIC TRIAL THAT ARE NOT OVERCOME HERE**

"The Sixth Amendment guarantees every person accused in a criminal prosecution the right to a 'public' trial." *Ayala v. Speckard*, 131 F.3d 62, 68-69 (2d Cir. 1997) (en banc) (citing U.S. Const. amend. VI). "That basic right has a long and distinguished history." *See id.* (citing *In re Oliver,* 333 U.S. 257, 266–73 (1948)). The Supreme Court has also recognized that the public and press have a qualified First Amendment right to attend criminal trials. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580 (1980). "Underlying the First Amendment right of access to criminal trials is the common understanding that a major purpose of that Amendment was to protect the free discussion of governmental affairs," and ensure that this discussion "is an informed

4

one." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 604-05 (1982) (internal quotation marks omitted).

> [T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole.  Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole.  Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.  And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.

*Id.* at 606 (footnotes omitted); *see also Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*") ("The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known.  Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."); *Richmond Newspapers,* 448 U.S. at 569 (tracing common law origins of public access to trials, which "gave assurance that the proceedings were conducted fairly to all concerned, and [ ] discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality"); *In re Oliver,* 333 U.S. at 270 ("[T]he [public trial] guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution.  The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

As the Court explained in *Richmond Newspapers*, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." 448 U.S. at 572.

Supreme Court precedent establishes that the effect of public access to criminal trials is tangible, not speculative: it not only promotes public confidence in the criminal process, but also improves the truth-determining function of trials, increasing accuracy in factfinding and affecting ultimate outcomes. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) ("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, [and] cause all trial participants to perform their duties more

conscientiously"); *Richmond Newspapers*, 448 U.S. at 596 (open trials promote "true and accurate factfinding") (Brennan, J., concurring); *Globe Newspaper*, 457 U.S. at 606 ("[P]ublic scrutiny enhances the quality and safeguards the integrity of the factfinding process.").

Accordingly, if the Government attempts to restrict or deny the right of access to a criminal trial, it bears the strictest of burdens: it must show that the limitation is necessary to protect a compelling government interest and is narrowly tailored to serve that interest. The Court also must consider whether there are any reasonable alternatives to closure that would adequately protect the defendant's fair trial rights and must make factual findings on the record adequate to support the closure (and facilitate appellate review). *See Ayala*, 131 F.3d at 68-72; *Press-Enterprise I*, 464 U.S. at 510. The standards governing closure of a criminal trial are the same whether the right of public access is asserted by the defendant under the Sixth Amendment, or by the public and the press under the First Amendment. *See Waller v. Georgia*, 46 U.S. 39, 44-45, 47 (1984); *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995).

In applying this strict standard to a request for closure of a criminal trial, the Second Circuit has explained that "the sensible course is for the trial judge to recognize that open trials are strongly favored, to require persuasive evidence of serious risk to an important interest in ordering any closure, and to realize that the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Ayala*, 131 F.3d at 70. Ultimately, "'[t]he power to close a courtroom where proceedings are being conducted during the course of a criminal prosecution . . . is one to be very seldom exercised, and even then only with the greatest of caution, under urgent circumstances, and for very clear and apparent reasons.'" *United States v. Alcantara*, 396 F.3d 189, 192 (2d Cir. 2005) (quoting *United States v. Cojab*, 996 F.2d 1404, 1405 (2d Cir. 1993)).

"An erroneous denial of a public trial is a structural error not amenable to harmless error analysis." *United States v. Rosen*, 487 F. Supp. 2d 703, 716 (E.D.V.A. 2007) (citing *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000), and denying request to close substantial portion of trial).

**II.     THE GOVERNMENT'S MOTION SHOULD BE DENIED FOR FAILURE TO PROVIDE THE PUBLIC WITH NOTICE OR A MEANINGFUL OPPORTUNITY TO MOVE TO INTERVENE AND OPPOSE THE SECURITY MEASURES THAT WOULD AFFECT A SUBSTANTIAL CLOSURE OF MR. SCHULTE'S TRIAL**

Closure of the courtroom in this case by implementing the Government's requested Security Measures would violate the public's First Amendment right of access to Schulte's trial for one straightforward reason: the Government has failed to provide any notice of the requested closure to the public. Indeed, the Government has declined to provide such notice despite requests by the defense to file an unclassified version of its motion on the Court's public CM/ECF docket. Nor does it appear that the Government has obtained leave of the Court to seal an unclassified version of its motion. At this point, there would not be sufficient time to permit intervention by interested members of the press and public to oppose the Government's motion. The motion should be denied on that basis alone. *See In re The Herald Co.*, 734 F.2d 93, 102-03 (2d Cir. 1984) (requiring that a motion for closure, or notice of such a motion where a court has granted leave to seal the motion, must be docketed "promptly" and in "detail[]" sufficient to afford the general public notice and an opportunity to challenge the requested closure); *see also United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008); *Alcantara*, 396 F.3d at 199-200 (motion should be docketed "sufficiently in advance of a hearing" to permit intervention).

**III.    CIPA DOES NOT AUTHORIZE CLOSURE OF MR. SCHULTE'S TRIAL AND SHOULD BE INTERPRETED TO PROHIBIT CLOSURE**

In support of its motion to close a significant portion of the trial in this case, the Government invokes Section 6 of CIPA. See Gvt. Mot. at 19. But CIPA does not authorize the closure of a criminal trial. The fundamental purpose of CIPA is to protect and limit the discovery of classified information in a way that does not impair a defendant's right to a fair trial. It does not create a privilege against disclosure of classified information, or alter the standards for admissibility under the Federal Rules of Evidence. *See United States v. Wilson*, 750 F.2d 7, 9 (2d Cir. 1984). It is a procedural tool that requires a district court to rule on the relevance, use, and admissibility of classified information before it may be introduced at trial. Neither the text nor the legislative history of the statute authorizes closure of a courtroom or denial of public access to a criminal trial. *See, e.g., Rosen*, 487 F. Supp. 2d at 710; *see also United States v. Pappas*, 94 F.3d 795 (2d Cir. 1996) (discussing legislative history of CIPA); *United States v. Fernandez*, 913 F.2d

7

148, 154 (4th Cir. 1990) (explaining that CIPA involves "very narrow, fact-specific evidentiary determinations and [ ] the question whether the defendant could receive a fair trial without the aid of certain evidence.").

To the contrary, this Court should interpret CIPA to bar closure or denial of public access to Schulte's trial. This is so for several reasons. First, by specifically providing for the introduction of classified evidence at trial, whether in the form of documents or testimony, and without specifically providing for closure to protect the classified information, Section 8 of CIPA plainly contemplates that trials will proceed without the need for closure even where classified information might be disclosed. Similarly, because CIPA is comprehensive in its provisions for handling classified information at trial, the absence of specific provisions providing for closure to protect the classified information manifests an intent by Congress to forbid the use of any procedures—including the Government's requested Security Measures—unless specifically authorized by CIPA. CIPA also must be read to avoid any tension with a defendant's constitutional right to a fair trial, including the rights to a public trial and to present a complete defense. *See Fernandez*, 913 F.2d at 154 ("Although CIPA contemplates that the use of classified information be streamlined, courts must not be remiss in protecting a defendant's right to a full and meaningful presentation of his claim to innocence."); *United States v. Libby*, 467 F. Supp. 2d 20, 26 (D.D.C. 2006) (CIPA must be construed in a manner consistent with Sixth Amendment protections, including a defendant's fundamental right to present a defense to charges he is facing; *see also* Fed. R. Crim. P. 26 ("testimony" must occur in "open court" unless otherwise provided for by statute or rule). *But see United States v. Rosen*, 520 F. Supp. 2d 786, 795-97 & n.20 (E.D.V.A. 2007) (holding that CIPA does not bar application of silent witness rule for 4:06 minutes at trial).

## IV.     THE GOVERNMENT'S PROPOSED SECURITY MEASURES VIOLATE THE UNITED STATES CONSTITUTION

The Government contends that its requested Security Measures are constitutional because they are necessary to protect its vital national security interest, are narrowly tailored, and strike a reasonable balance between its interest in protecting classified information and the rights of Schulte and the public to an open trial. *See* Gvt. Mot. at 3, 35-39. The Government is incorrect. Implementation of the Security Measures would violate Schulte's explicit Sixth Amendment rights to a public trial, to confront witnesses against him, and to present a compete defense. The measures

8

would also violate the public's First Amendment and common law rights of access to Schulte's trial, and undermine the integrity of these proceedings.

Far from offering a necessary, modest or otherwise reasonable means of protecting a vital national security interest, the Government's proposed Security Measures would be both extraordinary and unprecedented in a case of this purported nature and magnitude. To be clear, what the Government is proposing in practical terms is to conceal or obscure broadly from public view the testimony of about twelve fact witnesses—that is, about half of the Government's witnesses—which the Defense estimates could continue for approximately three weeks including cross-examination. Equally important is the fact that the testimony of these twelve witnesses will go right to the core of this case and the jury's determination of whether Schulte is guilty beyond a reasonable doubt of the charged offenses. Indeed, given the largely circumstantial nature of this case, the testimony of these witnesses is likely to be among the most important evidence presented by the Government in its direct case to try to establish Schulte's guilt.

The nature and duration of closure are critically important factors in determining whether it is constitutionally permissible to close a criminal trial. The burden to obtain closure of a trial "'increases the more extensive the closure sought.'" *See Ayala v. Speckard*, 131 F.3d 62, 70 (2d Cir. 1997) (en banc) (quoting *United States v. Doe*, 63 F.3d 121, 129 (2d Cir. 1995)). Whether closure of a trial is broad or narrow depends on a number of factors, including duration of the closure, whether the public can learn what transpired, whether the evidence presented during the closure is essential, and whether selected members of the public were barred from the courtroom, or rather whether all spectators were precluded from observing the proceedings. *See Bowden v. Keane*, 237 F.3d 125, 129-30 (2d Cir. 2001). Where the closure is broad, as here, the party seeking closure must demonstrate that the interest that the closure would purportedly serve is "especially grave," and the risk posed by not closing the courtroom is "more than 'serious.'" *Id.* at 129 (quoting *Ayala*, 131 F.3d at 70). Indeed, to the our knowledge, no prior judicial decision has authorized the closure of a criminal trial for as long as the closure in his case would be likely to occur, particularly where the testimony to be closed goes right to the core of the Government's direct case against Schulte. *Compare, e.g., Ayala*, 131 F.3d at 72 (permitting closure "because it -lasts only for the testimony of one witness" and transcript will be made available); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 487-88 (S.D.N.Y. 2018) (characterizing length of courtroom closure for four witnesses as "more significant than in other cases" and "relatively substantial");

*United States v. Pelton*, 696 F. Supp. 156, 159 (D. Md. 1986) (permitting closure for less than five minutes, and recognizing outcome might be different if government sought to close significant periods of trial). *Compare also United States v. Rosen*, 487 F. Supp. 2d 703, 716-20 (E.D.V.A. 2007) (denying request to close substantial portion of trial), *with United States v. Rosen*, 520 F. Supp. 2d 786, 795-97 & n.20 (E.D.V.A. 2007) (permitting closure for 4:06 minutes).

If the Government's proposed measures were adopted here, the jury would essentially be confronted with a closed, nearly empty courtroom for a substantial, critically important portion of the trial — one that will surely otherwise be well-attended by journalists and members of the public—as well as witnesses using fake names and cross-examination that might not be fully developed or driven home, as it were, by obvious limitations imposed on defense counsel. In addition to impairing Schulte's Sixth Amendment confrontation rights, which could be chilled by the Government's requested order not to elicit the CIA witnesses' identifies or details about their work at the CIA, all of this would undoubtedly create a likelihood of jury confusion, and prejudice the jury by conveying to its members the distinct impression that Schulte is dangerous or that the evidence is so sensitive that it requires special protections—an issue that is solely for the jury to decide in connection with its verdict on whether Schulte unlawfully mishandled classified information or other National Defense Information. Human nature being what it is, common sense also dictates that no jury instruction would be sufficient to overcome the unfair prejudice caused by the restrictive environment that would surround a jury of laypersons potentially for weeks during some of the most critical aspects of the trial. *See Rosen*, 487 F. Supp. 2d at 718-19.

There is surely no "especially grave" or compelling need for the Government's proposed Security Measures. As an initial matter, unlike other cases that permit restrictions such as the use of pseudonyms, there is plainly no need to assign pseudonyms to those CIA witnesses who would be subject to the Security Measure because many of the witnesses that the Government intends to call in its direct case already have pseudonyms that they use in connection with their work at the CIA. There is no good reason to assign them new, additional pseudonyms. *Compare, e.g., United States v. Abu Marzook*, 412 F. Supp. 2d 913, 923-24 (N.D. Ill. 2006) (two Israeli intelligence agents, whose true identities are unknown to the Government or the defendant, permitted to testify in closed courtroom using the pseudonyms under which they conduct all of their intelligence affairs); Statement, *United States v. Saleh*, No. 03-Cr-978 (N.D. Ill. Aug. 29, 2006) (ECF No. 652) (same); Mem. Op. & Order, *United States v. Holy Land Foundation*, No. 04-Cr-240-G (N.D. Tex.

May 4, 2007) (ECF No. 628) (same).[3]  Rather, the use of trial pseudonyms in the unique context of this case would create unavoidable confusion as the Court, the parties, and the jury—and likely the witnesses themselves, who might testify about their interactions not only with Schulte but with one another—would surely struggle to keep straight who is who among the multiple layers of pseudonyms. This would indisputably constitute "an unwieldy inconvenience fraught with potential for confusion.  At worst, it [might] unfairly shackle[ ] [Schulte] to a script written by the prosecution, bewilder[ ] the jury and all but the most well-coached government witnesses, and undermine[ ] the right to a public trial." *Rosen*, 487 F. Supp. 2d at 714 (rejecting broad use of silent witness rule). It surely would threaten to disrupt the course and fluidity of the trial, including cross-examination, which would impair Schulte's Sixth Amendment right to confront some of the Government's principal witnesses against him.

The Government's purported need for the measures is also undermined by the substance of the proposed procedures.  For example, the Government's proposal to allow Schulte's family—whom the Government accuses of assisting Schulte with his "information war" against the United States, *see* Gvt. Motion *in Limine* at 2, 29—and a "pool" reporter remain in the closed courtroom for the duration of the CIA witnesses' testimony undermines the need to exclude other members of the press and general public who would be no more or less obligated not to disclose information about the witnesses. *See Rosen*, 487 F. Supp. 2d at 718 (noting it is difficult to credit government's assertion of overriding interest in trial closure where classified information at issue is revealed to uncleared individuals); *cf. United States v. Sterling*, 724 F.3d 481, 516 (4th Cir. 2013) ("To disclose the identities of CIA operatives [to anyone not cleared], even if not to every spectator in the courtroom, subjects the operatives to targeting by hostile foreign intelligence services and terrorist organizations...").

For the same reasons as well, there is no compelling need to prohibit sketches or otherwise obscure the CIA witnesses' faces from public view given that the witnesses' faces will be seen by uncleared members of the public, including Schulte's family and at least one journalist, who would

---

[3] In *Saleh*, the district court notably closed the courtroom to the public, except for the defendants' families, in part in reliance on the court's anticipation based on prior hearings that the trial would not attract many spectators.  Schulte's trial, by contrast, is likely to attract significant attention from the media and the general public given the high-profile nature of the case.

be unconstrained in their ability to disclose their observations including descriptions of the CIA witnesses and their demeanors.

Moreover, there is no compelling need for these restrictions because unlike other cases in which certain witnesses for the Government continued to act undercover or investigations were ongoing, *see, e.g.*, *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 483, 490-91 (S.D.N.Y. 2018), here, there does not appear to be any ongoing investigation of Schulte's alleged conduct as illustrated by the unsealing of the search warrants.[4] In addition, while the Government contends that the CIA witnesses' future work with the CIA could be compromised if they testified in open court, *see* Gvt. Mot. at 28-30, that concern, even if warranted, which the Defense does not concede, would not be implicated here for several reasons. First, the Government concedes that some of the witnesses' identities are not classified. Second, others have retired from working with the CIA. Third, as to those who remain and whose identities may be classified, including the one covert witness, their testimony is likely to be limited to past events rather than the nature of their current or future work. The Government's concern that Schulte knows their identities and may reveal them improperly is also meritless for the simple reason that the Government's requested Security Measures do not apply to him or his family. *See id.* at 30.

The Government's proposed Security Measures also are not narrowly tailored to address the Government's alleged compelling need to protect classified information. As an initial matter, much of the information at issue here, including certain CIA witnesses' identities, are by the Government's own admission not classified. In addition, the proposed measures plainly sweep too broadly. The Government offers no justification as to why Schulte's family may remain in the courtroom during the CIA witnesses' testimony, but other members of the public may not,

---

[4] In *Alimehmeti*, the defendant objected only to use of witness disguises and a screen, which were not ordered, in a case involving agents who continued to work undercover. In other cases where similar procedures have been adopted, the defendants have not objected to certain aspects of closure. *See, e.g.*, *United States v. George*, Crim. No. 91-521 (RCL), 1992 WL 200027 (D.D.C. July 29, 1992); *Abu Mazrook*, 412 F. Supp. 2d at 928. *See also Sterling*, 724 F.3d at 414 & n.17 (noting defendant did not seek reconsideration of ruling permitting CIA operatives to testify using partial names or pseudonyms, and did not cross-appeal from ruling authorizing screen between trial participants and public seating section of courtroom). Here, by contrast, Mr. Schulte objects to the proposed Security Measures with the limited exception of the request for CIA witnesses to use a non-public entrance to the courtroom. However, Mr. Schulte's non-opposition to this request is explicitly premised on his own witnesses' ability to use the same non-public entrance in such a way as to avoid any distinction in their treatment which might prejudice the jury.

including, as one example, other uncleared lawyers who practice regularly before the Court and are subject to its ethical rules and those of their state bar authorities, who may wish to observe the CIA witnesses' testimony.

Nor does the Government offer any justification for allowing one "pool" reporter to attend and cover the closed proceedings, and then share his or her observations with other journalists, while not actually allowing other journalists to attend the proceedings. Indeed, in this respect the Government appears not to try to prevent direct access to the CIA witnesses' testimony, but rather to prevent *certain journalists* from enjoying such access. For example, while the Government does not clearly define what is meant by a "pool" reporter, it appears that the definition is intended to mean a member of the press who regularly covers the courthouse. *See Alimehmeti*, 284 F. Supp. 3d at 484. While such members of the press may be familiar with this Court, and perhaps may be credentialed in some fashion by the Court, and would surely carry out their journalistic responsibilities to report their observations of the proceedings fairly and impartially, the fact is that such reporters may not be the journalists who are best suited to reporting fully and adequately on complex, technical and national security matters of the sort that will be at issue in this trial. In addition, other journalists may be experienced in covering national security prosecutions in other districts, including the District of Columbia District and the Eastern District of Virginia.

In this sense, too, the Government's proposal to permit only one "pool" report to attend the closed proceedings would be effectively to choose who can and cannot fully cover the closed proceedings, which, again, could last for three weeks, placing the non-"pool" reporters who might cover the balance of the trial at a significant disadvantage in understanding and reporting on the trial as a whole. This invariably would shape the media narrative and consequently the public's understanding of the proceedings in a way that broader journalistic access would not. Such a result would be completely improper and effectively undermine the very principles that open, public access to judicial proceedings is meant to safeguard, including the fair administration of justice and the truth-seeking function of open trials. If open access affects outcomes, shaping media coverage of the trial surely could be prejudicial to Schulte.

The alternative measures proposed by the Government are insufficient to cure the foregoing problems with its proposed Security Measures. Apart from allowing Schulte's family and the "pool" reporter to attend the closed sessions, addressed above, arranging for a live-feed of the CIA witnesses' testimony to a separate courtroom and the availability of same-day trial

transcripts of the testimony are a constitutionally inadequate substitute for in-person public observation of the witnesses' testimony. This is so, again, because of the likely weeks-long length of the anticipated closure and the central, critical importance of the witnesses' testimony to the Government's case against Schulte. *See United States v. Alcantara*, 396 F.3d 189, 199 (2d Cir. 2005) ("There is no doubt that witnessing [trial proceedings] in person is a more powerful experience than reading a transcript of the proceeding. . . . A transcript of the proceeding does not convey the impact…"). Observing the proceedings "in person is important to an informed public debate over these laws." *Id.*; *see also In re Oliver*, 333 U.S. 257, 270 (1948) (emphasis added) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.").

In addition, the proposal to remove members of the press and other spectators from the courtroom during the CIA witnesses' testimony and relocate them to another courtroom away from the jury is not likely to go unnoticed by the jury in a case such as this, which is likely to be well-attended on a regular basis. In that sense, relocating the press and members of the public would be tantamount to a screen that separates the trial participants from the public gallery, thus implying to the jury a sense of dangerousness or reinforcing a perception that the information disclosed during the witnesses' testimony requires close protection—which, again, is an issue for the jury alone to decide in reaching a verdict.

No alternative procedures could properly cure the jury prejudice or other infringements on Schulte's and the public's constitutional rights to an open, public trial. Closing the courtroom during the CIA witnesses' testimony would alleviate the pressure that a broader public audience would assert on the witnesses to testify with complete honesty about their own interpersonal conflicts with Mr. Schulte, and would compromise the public appearance of fairness and jeopardize public confidence in the judicial system, particularly here, where Mr. Schulte is accused of waging an "information war" against the United States as part of his effort to obtain "revenge" against the CIA, including against some of the CIA witnesses whose testimony the Government wants to conceal or broadly obscure from public view. Indeed, public access is especially important to ensure that the CIA witnesses testify truthfully about central issues such as their own negative personal interactions with Mr. Schulte, and the lax security and dysfunctional work environment at the CIA that would allow any number of the nearly 200 individuals who had access to the CIA cyber tools to steal them. "The requirement of a public trial is for the benefit of the

accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *In re Oliver*, 333 U.S. at 270 n.25 (1948) (citation and quotation marks omitted). "Free access of the press and public to criminal proceedings informs the populace of the workings of government and fosters more robust democratic debate." *United States v. Doe*, 63 F.3d 121, 126 (2d Cir. 1995). But it is essentially unavoidable that these fundamental values guaranteed by the Constitution would be compromised if the Government's requested Security Measures were implemented and Mr. Schulte's trial were closed potentially for weeks during the presentation of some of the Government's most important evidence against him.

## V.     THE GOVERNMENT'S CLASSIFIED INFORMATION PRIVILEGE CANNOT DEPRIVE SCHULTE OF A FAIR TRIAL

In its motion, the Government relies on several cases involving the so-called informant's privilege, which requires a balancing of the Government's interest in protecting the disclosure of confidential informants or undercover agents against a defendant's right to prepare his defense. *See* Gvt. Mot. at 21-26. However, the law is well-settled that such privileges, including the Government's privilege to protect classified information that the Second Circuit has held arises from the common-law privilege against disclosure of state secrets, is overcome where, as here, the information that the Government seeks to withhold is material to the defense. *See United States v. Aref*, 533 F.3d 72, 78-80 (2d Cir. 2008). Indeed, as noted above, once the Court determines that classified information is relevant and admissible, pursuant to CIPA, the only balancing of interests that may occur is a consideration of whether the evidence is material. *See United States v. Smith*, 780 F.2d 1102, 1107-08 (4th Cir. 1985) (en banc). At that point, the decision of whether to comply with the Court's evidentiary rulings rests with the Government—it can comply, abandon the prosecution, or face dismissal of charges. *See United States v. Moussaoui*, 382 F.3d 453, 474-76 (4th Cir. 2004). "[T]he Supreme Court has held that the defendant's right to a fair trial that comports with the Fifth and Sixth Amendments prevails over the governmental privilege." *United States v. Abu Ali*, 528 F.3d 210, 248 (4th Cir. 2008).

Accordingly, in no event can the Government invoke the informant's privilege or the state secrets privilege as a basis for implementing its requested Security Measure that would otherwise deprive Schulte of his constitutional right to a fair trial, including the right to an open, public trial.

15

## CONCLUSION

The Government has aggressively pursued prosecution of Mr. Schulte without direct evidence of what CIA information was stolen, how and when it was stolen, and who stole it. Instead, it intends to present a largely circumstantial case against him that is based on the testimony of certain CIA witnesses, including about twelve fact witnesses whose testimony the Government claims is necessary to its case, but whose testimony it wants to conceal or obscure broadly from public view. In these circumstances, the credibility of those witnesses is potentially vital to the outcome of the trial. The Defense respectfully submits that the Government cannot have it both ways. What the Government cannot do is deliberately decide to undertake Mr. Schulte's prosecution and then invoke its classified information privilege and undermine his right to a fair and open trial. *See Jencks v. United States,* 353 U.S. 657, 670-71 (1957) ("[S]ince the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.") (quoting *United States v. Reynolds,* 345 U.S. 1, 12 (1953)). As this is precisely what the proposed Security Measures would do, the Government's motion should be denied.

Dated:  New York, New York
       December 6, 2019

                                        Respectfully submitted,

                                        /s/ _____
                                        Sabrina P. Shroff & Edward S. Zas
                                        Counsel for Defendant Joshua Adam Schulte

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

January 7, 2020

By Hand – ~~Classified Pending Review~~

Hon. Paul A. Crotty
Judge, United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Your Honor:

We write regarding the government's letters of December 20, 2019 and January 3, 2020, setting forth various new or amended proposals for substitutions pursuant to CIPA Section 6(c). We object to those proposals for the reasons set forth below.

In its December 20, 2019 letter, the government continues to propose to use full trial pseudonyms for a limited number of witnesses[1] for whom it is also seeking restrictions on public and media access to the courtroom. *See* Letter of Dec. 20, numbered paragraph 1. However, the government now proposes to "refer to other, non-public facing CIA officers by their first-name only, with covert officers using the first-name of their CIA pseudo[nym]." *Id.*, numbered paragraph 2. This latter, new proposal is problematic for a number of reasons.

To begin with, it risks conveying the same prejudice and creating the same sorts of confusion that the use of full trial pseudonyms would create. As we have consistently argued to this Court, the use of such pseudonyms will surely convey to the jury the impression that the defendant is dangerous and that the evidence is so sensitive that it re-

---

[1] These include eight witnesses named in its earlier motions and, potentially, others. *See* Letter of Dec. 20, at 2 (noting that if ▮▮▮▮ testifies, the government will seek "the same protections" for her as it is seeking for the eight other witnesses). Ms. ▮▮ name and relationship to Mr. Schulte is known to the public. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Honorable Paul A. Crotty                        January 7, 2020
United States District Judge                    Page 2

Re:   United States v. Joshua Schulte, 17 Cr. 548 (PAC)

quires special protections, regardless of whatever corrective jury instruction this Court is-
sues. *See United States v. Rosen*, 487 F. Supp. 2d 703, 709-10 (E.D. Va. 2007). Moreo-
ver, as other courts in this Circuit have noted, the use of pseudonyms also risks creating
chaos at trial. As Judge Cogan of the Eastern District recently noted:

> In fact, evidence submitted to the Court highlights the problems pseudo-
> nyms may pose at trial and the confusion it will undoubtedly produce, de-
> spite counsel's best efforts to adequately prepare their respective clients.
> This was apparent from the parties' depositions: "Moira Hathaway" could
> not recall her pseudonym's first name, and "Hillary Lawson" could not re-
> call her close friend and co-plaintiff's pseudonym. As one court in this cir-
> cuit has already recognized, "conducting a trial in such an atmosphere, all
> the while using pseudonyms, promise trouble and confusion." *Guerilla
> Girls, Inc. v. Kaz*, 224 F.R.D. 571, 575 (S.D.N.Y. 2004). In the event a
> witness inadvertently testified to a plaintiff's real name, the Court would
> have to immediately excuse the jury in the middle of crucial testimony,
> admonish the witness, and provide a limiting instruction, which may sig-
> nal to the jury that either the attorney or the witness acted improperly. Ac-
> cordingly, I find that the prejudice to defendants at trial outweighs the in-
> terests of plaintiffs in their anonymity.

*Lawson v. Rubin*, No. 17-CV-6404(BMC)(SMG), 2019 WL 5291205, at *3 (E.D.N.Y.
Oct. 18, 2019). The specific new proposal the government sets forth in its December 20th
letter with respect to all non-public facing CIA officers not testifying to a partially-closed
courtroom—using only the first names of their familiar CIA pseudonyms[2]—may perhaps
diminish the risk of confusion for the attorneys and other trial participants, but it will only
do so at the cost of flagging for the jury that these individuals and what they have to say
is particularly sensitive. The use of full trial pseudonyms might *theoretically* pass without
being noticed by the jury—assuming, implausibly, that no one has a lapse during trial.
But the use of only first names for a large group of (adult) witnesses will be glaringly ob-
vious to everyone on the jury, a constant, inescapable reminder of the purported danger to

---

[2] The government additionally states that it "will propose a minor modification" to any distinctive first-
name pseudonyms. Letter of Dec. 20, numbered paragraph 2 ("(e.g. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮)"). Such
proposed substitutions, whenever they are actually proposed by the government, will simply combine the
worst features of the two proposals for non-public facing CIA officers—confusing all participants while
also continually highlighting for the jury that the witnesses' identities are sensitive and are being concealed,
as we argue above.

Honorable Paul A. Crotty                     January 7, 2020
United States District Judge                 Page 3

Re:    United States v. Joshua Schulte, 17 Cr. 548 (PAC)

national security posed by the subject matter of the trial. In short, the government's new
proposal simply trades one form of poison for another.[3]

    The baseline risk of confusion inherent here will be amplified by the fact that
there will now be *three* different methodologies for identifying CIA witnesses at trial.
The multiplicity of schemes for concealing identities creates a heightened risk of error
that will have a natural tendency to inhibit defense counsel. Even the most zealous de-
fense counsel may appear hesitant before the jury as they attempt to figure out on the fly
which scheme applies and which name should be used to refer to past or present wit-
nesses in what the *Rosen* court appropriately termed a "trial by code." 487 F. Supp. 2d at
714. The risk of error is an asymmetrical one, as the most serious professional conse-
quences of such mistakes inure only to the harm of defense counsel.[4] The consequent
chilling effect will impair Defendant's Sixth Amendment rights. And surely the entire
scheme does not leave the defense in substantially the same position it would have been
in without the substitutions, as CIPA demands.

    The government's January 3d letter proposes to use "alternative, rather than ge-
neric" pseudonyms for undisclosed tools, as well as whatever redactions the government
proposes between now and the next hearing. We object to the use of such pseudonyms for
the same reasons already set forth with respect to the use of pseudonyms for the CIA wit-
nesses. The same risk of error exists with respect to the names of these tools. Jurors will
notice if defense counsel are fumbling over documents at trial; corrective actions that will
be required in response to the inevitable mistakes at trial will, as the *Lawson* court noted,
"signal to the jury that either the attorney or the witness acted improperly." Again, that
asymmetrical risk will invariably chill the zealous advocacy to which the Constitution en-
titles Mr. Schulte.

---

[3] The same concerns apply to any exhibits to which the government would apply "[t]he foregoing naming
conventions," as it also proposes to do in its December 20th letter. *See* Letter of Dec. 20, numbered para-
graph 4.

[4] This harm is not theoretical. Criminal cases are wrought with stress and emotion, and it is natural to be in
the "zone" during cross-examination or oral argument. Not focused on substitutions, counsel could and has
had a spill of information. To elucidate, when representing another defendant in the Southern District of
New York, Ms. Shroff inadvertently used the *fake* name of an *online fake individual* instead of referring to
the individual as "CC-1." In response to the inadvertent spill, the equity holder of the information sought
administrative sanctions against Ms. Shroff. She had to retain counsel to represent her in an administrative
process relating to her security clearance. As punishment, she received a reprimand letter from the Depart-
ment of Justice and was informed that the letter would remain in her file for the next 5 years, and would be
removed only if she did not have another inadvertent spill. Should Ms. Shroff have another spill of classi-
fied information, her clearance would be at risk, and such risk would endanger her ability to work on such
cases in the future.

Honorable Paul A. Crotty
United States District Judge

January 7, 2020
Page 4

Re:    United States v. Joshua Schulte, 17 Cr. 548 (PAC)

As the *Rosen* court noted, the widespread use of pseudonyms for CIA witnesses and tools in this trial will, at best, constitute "an unwieldy inconvenience fraught with potential for confusion," and, at worst, "unfairly shackle[ Defendant] to a script written by the prosecution, bewildering the jury and all but the most well-coached government witnesses...." 487 F. Supp. 2d at 714. The Court should reject the government's proposals.

We are available to further discuss these matters at the next court appearance on January 10, 2020 at noon.

Respectfully submitted,

/s/

Edward Zas & Sabrina Shroff
Attorneys for Joshua A. Schulte

cc:    All counsel

# Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

January 21, 2020

By hand – ~~classified pending review~~
Hon. Paul A. Crotty
Judge, United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Dear Judge Crotty,

We write in response to the government's letters of January 16 and 17, 2020, proposing a third set of modifications to its prior proposals for restrictions on public and media access to the courtroom and use of trial pseudonyms.

In response to the Court's concern for potential confusion engendered by the use of trial pseudonyms for a large number of witnesses, the government has reduced the number of witnesses for whom it proposed to use full trial pseudonyms – from eight to five. Nothing in this proposal reduces in any significant fashion the potential for trial confusion, jury prejudice, and the risk of error asymmetrically falling upon defense counsel that we have already repeatedly objected to. Indeed, the government's own letters neatly illustrate the potential for chaos at trial. The letter of January 17th effectively serves as a chart setting out the appropriate treatment of different individual witness names. Not only does that chart list *ad hoc* exceptions to the generalized rules proposed in the January 16th letter (listing ▮▮▮▮▮▮ as subject to the same treatment as other "Overt Developers" even though he is not an "Overt Developer"), it flags an apparently-serious error in the government's January 16th letter. In the January 16th letter, the government had asked that "public facing" "Overt Employee" Bonnie ▮▮▮ testify using her "true full name" (January 16th letter, at 5), but in the next day's letter, the government noted (without explanation) that she should instead be referred to as "Bonnie▮▮" at trial. *See* Jan. 17 letter at 3, 3 n.2. If the government cannot keep its own witness naming codes straight while drafting a letter in the repose of their own offices, imagine how difficult that task will be under the pressures of trial for defense counsel (who, again, bear the greatest professional and personal consequences for any mistakes made at trial) or for that matter the Court.

                              *    *    *

       The government continues to demand that this Court impose restrictions on public and
media access to the trial courtroom. Nothing in the government's latest letters addresses the
many serious concerns raised in our December 6, 2019 response to the government's Nov. 26,
2019 *Motion for Witness Protective Measures*. The rules proposed by the prosecution were
already complex, with that complexity continuing to grow, requiring a chart to follow, *see, e.g.*,
Jan. 17 letter at 3 (noting that no "witness protections" need be applied for two public facing CIA
officials, but that one of them should "be allowed to use a non-public entrance" when entering or
exiting the courtroom).

       One particularly serious issue merits this Court's attention. As we noted in our response
brief, at page 7, "the Government has failed to provide any notice of [its] requested closure to the
public" and "declined to provide such notice despite requests by the defense to file an
unclassified version of its motion on the Court's public CM/ECF docket." It is black-letter law
that there must be public notice of any effort to close parts of a criminal trial sufficiently far in
advance of trial to permit intervention by interested members of the press and public. *See In re
The Herald Co.*, 734 F.2d 93, 102-03 (2d Cir. 1984) (requiring that a motion for closure, or
notice of such a motion where a court has granted leave to seal the motion, must be docketed
"promptly" and in "detail[]" sufficient to afford the general public notice and an opportunity to
challenge the requested closure); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008); *United
States v. Alcantara*, 396 F.3d 189, 199-200 (2d Cir. 2005) (motion should be docketed
"sufficiently in advance of a hearing" to permit intervention). There is no longer sufficient time
for the government to provide adequate notice to the press and public of its intended restrictions
on access prior to the start of trial on February 3, 2020. Today is January 21, 2020. For that
reason alone, the requests for proposed closures should be denied. The press' failure to receive
timely notice within which they intervene and challenge could constitute structural error.

                                          Respectfully submitted,

                                          /s/Sabrina Shroff & Edward Zas
                                          Attorneys for Joshua A. Schulte

                                          2