USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-31-2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,     :
                                         :

     -v-                          :             S2 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,      :         ~~PRESUMPTIVELY~~

                *Defendant.*      :         ~~CLASSIFIED, PENDING~~
                                     :         ~~CLASSIFICATION REVIEW~~

                                     :        **OPINION & ORDER**
-----------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

    Defendant Joshua Schulte ("Defendant" or "Schulte") is charged in a fifteen-count superseding indictment with, *inter alia*, (1) three counts of violating 18 U.S.C. § 793, for theft of classified information from the Central Intelligence Agency ("CIA") and transmission of that information to WikiLeaks (Counts One through Three); (2) another count of violating § 793, for unlawful disclosure and attempted disclosure of classified information from the MCC (Count Four); (3) four counts of violating 18 U.S.C. §§ 641 and 1030, for unauthorized accessing of CIA computer systems and theft of classified information (Counts Five through Eight); (4) two counts of violating 18 U.S.C. §§ 1001 and 1503, for false statements made to the FBI during its investigation (Counts Nine and Ten); and (5) one count of violating 18 U.S.C. § 401(3), for violating the protective order (Count Eleven).

    The Government moves for partial closure of the courtroom during the testimony of certain CIA witnesses who are expected to testify at trial and for additional witness security measures aimed at protecting these individuals' identities from public disclosure. (*See* Dkts.

1

199, 263.)  The motion is granted.

## BACKGROUND

### I.      Relevant Factual Allegations[1]

Defendant Joshua Schulte, a former CIA employee, has been indicted for stealing

national defense information and transmitting it to Wikileaks.  At the CIA, Schulte worked

within the Center for Cyber Intelligence ("CCI"), Engineering Development Group ("EDG").

His responsibilities included developing classified cyber tools, including tools that were designed

to, among other things, covertly exfiltrate data from computers.  While at the CIA, Schulte was a

systems administrator of DEVLAN, the computer network used by EDG.  DEVLAN included a

suite of software known as Atlassian, which included programs: Confluence (EDG's Wikipedia-

like page in which users could comment on work), Stash (the repository for, among other things,

source code), Jira, Bamboo, and Crowd.

Beginning in the summer of 2015, Schulte began having significant problems at the CIA

arising out of certain management actions and a feud with another EDG employee ("Employee-

1").  The problems escalated in the fall of 2015 when Employee-1 emailed his Branch Supervisor

complaining about Schulte's behavior at the CIA.  Later that day, Schulte sent an email to the

Branch Supervisor claiming that Employee-1 was abusive towards others in the workplace, and

that Employee-1 had made a death threat against Schulte.

For Schulte, problems at the CIA workplace continued into 2016.  He disagreed with

actions taken by CIA management, such as the decision to enlist a contractor to build a tool that

was similar to one Schulte was attempting to develop.  Schulte raised concerns about the

---

[1] The following factual allegations come from the Government's Motion *in limine*. (Dkt. 195.)  The facts set forth focus on Schulte's dealing with, *inter alia*, certain protected witnesses.

contractor potentially jeopardizing other tools and operations.

At the same time, Schulte's interpersonal issues with Employee-1 further deteriorated. Schulte complained to CCI security about the incidents with Employee-1. Eventually on March 23, 2016, Schulte sought a protective order against Employee-1 in state court. As a result of the feud, Schulte and Employee-1 were reassigned to new branches within EDG to separate them. Schulte complained that CIA management was retaliating against him because he had made a security complaint against Employee-1.

In April 2016, after changing branches, Schulte's administrative privileges to two projects overseen by the previous branch, Project-1 and Project-2, were revoked. Schulte confronted a server administrator ("Server Administrator-1") about Schulte's administrative privileges to Project-1. Server Administrator-1 informed Schulte that because Schulte had been moved to a different branch, Schulte no longer needed administrative privileges. Schulte disagreed, and claimed he was still supposed to work on projects that he had worked on in his prior branch and should have administrative privileges.

Schulte then falsely told Server Administrator-1 that the Branch Supervisor had approved reinstating Schulte's administrative privileges for Project-1. Server Administrator-1 reported that he would discuss Schulte's privileges with the Branch Supervisor. Unbeknownst to anyone in EDG, however, Schulte reinstated his own administrative privileges. Schulte's actions caused significant concern within CCI because they violated CIA policy and called into question whether Schulte could be trusted with classified information.

Following Schulte's reinstatement of his own privileges, CCI management tasked Server Administrator-1 and two other server administrators ("Server Administrator-2" and "Server Administrator-3") with removing all of Schulte's administrative privileges to DEVLAN. As part

3

of their work, the Server Administrators changed the administrator passwords and removed administrative secure shell ("SSH") keys, which were a method that administrators used to access DEVLAN. In the process of deleting these keys, the Server Administrators inadvertently missed a key that Schulte possessed, which allowed Schulte to continue to access DEVLAN as an administrator and specifically, to access the Atlassian suite programs.

Schulte met with his Division Supervisor about reinstating his own administrative rights and he received a memo warning that stated "do not attempt to restore or provide yourself with administrative rights to any project and/or system for which they have been removed." Schulte signed the memo, acknowledging he understood its prohibitions. Immediately following this meeting with the Division Supervisor, Schulte began attempting to access various parts of DEVLAN as a system administrator, despite knowing he was prohibited from doing so. Schulte was able to access the DEVLAN system using the specific secure key that was inadvertently not deleted. Nevertheless, Schulte emailed his Division Supervisor and confirmed that all of his private keys with access had been destroyed or revoked.

On April 20, 2016, Schulte used this key to access DEVLAN without permission and steal repositories of CIA cyber tools and source code. Schulte subsequently transferred the information to Wikileaks. Schulte resigned from the CIA in November 2016.

On March 7, 2017, Wikileaks published the first installment in a series of leaks containing information from the CIA's system ("Vault 7 Leaks"). The leaks disclosed by Wikileaks contained information from Confluence and Stash, two programs housed on DEVLAN. The Vault 7 Leaks are the largest illegal disclosure of CIA information in the agency's history and have caused catastrophic damage to national security. The information published includes, *inter alia*, information about EDG tools that had been stored in Stash and

4

information from Confluence. The leaks were accompanied by a press release, in which Wikileaks claimed that the information had been given to Wikileaks by "a source who wished to raise policy questions that need to be debated in public, including whether the CIA's hacking capabilities exceeded its mandate powers and the problem of public oversight of the agency." The press release indicated that the source wanted to "initiate a public debate about the security, creation, use, proliferation, and democratic control of cyberweapons."

## II. Procedural Background

(S//NF)   On November 26, 2019, the Government filed an *in camera* classified motion for witness protection measures pursuant to Section 6 of the Classified Information Procedures Act concerning witnesses from the CIA that will testify at trial. The motion was supported by an affidavit from the CIA ███████████████████████████████████████████

███████████████████████████████. The Government filed a letter publicly the same day stating that it had filed a motion seeking limited courtroom closure for certain CIA witnesses. (*See* Gov. Nov. 26, 2019 Letter, Dkt. 199.)

The Government seeks an order imposing protective measures aimed at preventing disclosure of the identities of certain CIA employees expected to testify at trial. The Government seeks different witness protection measures for different employees.[2] The Government is seeking partial closure of the courtroom for ten witnesses (together "Protected Witnesses"). (*See* Gov. Classified Witness Protection Mot., Nov. 26, 2019; Gov. Jan. 23, 2020 Letter, Dkt. 263.) Specifically, the Government seeks:

> (1) *Limited courtroom closure* during protected witnesses' testimony, with only the parties, the jury, the defendant's family, and one pool reporter permitted in the

---

[2] The Government represents that the Department of Justice and CIA have made determinations to carefully distinguish the different protections each category of witnesses should receive. *See* Gov. Classified Witness Protection Mot., ███ Dec. ¶ 55.

courtroom.  During this partial closure of the courtroom (1) a live feed of the testimony would be broadcast simultaneously to an adjoining courtroom, and (2) transcripts of the testimony to be released publicly as soon as feasible, which would typically be on the evening after the day of testimony,[3]

(2)  Protected witnesses to use a non-public entrance to enter and exit the courtroom

(3)  Certain CIA employees to testify under pseudonyms[4]

(4)  Prohibition on sketching or other recording of their faces, and pixilation of any publicly released images of their faces

(5)  Precluding cross-examination that would reveal aspects of the witnesses' true identities

In seeking closure, the Government filed supporting declarations ██████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████.  Certain employees are covert meaning their

identities are classified.  Other overt employees, whose affiliation with the CIA is not itself

classified, may be classified when associated with specific intelligence activities ███████████

███████████████. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

On December 6, 2019, Schulte filed a classified opposition to this motion.

---

(S//NF)   [3] According to the Government's Classified Letter dated January 17, 2020, partial closure of the courtroom would apply to the following Government witnesses: ███████████████████████████ David ██ Sean ██ Michael ██ Amo██ and Matthew ██. The Government represents that should the defense call the following witnesses they would also be subject to partial closure of the courtroom: ████████████████ Jack ██, Elizabeth ██ Christopher ██, Duane██ Tandeep ██

(S//NF)   [4] According to the Government's Classified Letter dated January 17, 2020, the following witnesses will testify under pseudonyms: ████████████████████████████ The Government represents that should the defense call the following witnesses they would also testify via pseudonym: ██████████████

### III.   Public Hearing on January 27, 2020

The Court held a public hearing on the Government's motion. *See United States v. Alcantara*, 396 F.3d 189 (2d Cir. 2005). Four members of the press objected to the partial closure of the courtroom.[5] The press members represented that courthouse reporters could be trusted not to disclose the testifying witnesses' physical characteristics (e.g., height, build, eye color, etc.) and that they would not jeopardize the safety of witnesses in reporting on the trial. The press members also proposed alternative methods and modifications, including, among others, a live feed to the courthouse pressroom in addition to an overflow courtroom and that two pool reporters be permitted to attend the testimony of Protected Witnesses. Press members also emphasized the importance of prompt access to trial transcripts.

The Court asked the Government about the requests from the press. The Government did not oppose the request that two pool reporters be permitted to attend the testimony of Protected Witnesses or the request for a live feed to be transmitted to the courthouse pressroom. The Court asked the Government about the possibility of a video feed that would display the courtroom, but not the Protected Witnesses, instead of an audio feed. The Government did not oppose this alternative.

Finally, the Court asked the Government to estimate the length of testimony for Protected Witnesses. The Government estimates that the testimony requiring partial closure of the courtroom would be approximately one-third of the trial. The Court confirmed that the Government would seek to impose similar measures for similarly situated CIA witness that are called by the defense.

---

[5] The following members of the press spoke at the public hearing: Steven Brown, New York Daily News; Emily Saul, New York Post; Matthew Russell Lee, Inner City Press; and Larry Neumeister, Associated Press.

## DISCUSSION

I.    **Limited Courtroom Closure**

A.    **Legal Standard**

The First and Sixth Amendment generally require that criminal proceedings be open to the public and press. *Waller v. Georgia*, 467 U.S. 39, 44 (1984); *United States v. Smith*, 426 F.3d 567, 574–75 (2d Cir. 2005). Nevertheless, courts have made clear that the right to open trial "may give way in certain cases to other rights or interests such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. Given the presumption of openness, "proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* (quoting *Press-Enterprise I*, 464 U.S. 501, 510 (1984)). Under *Waller*, a courtroom closure is justified if: (1) closing the hearing would advance an overriding interest that is likely to be prejudiced; (2) the closure is no broader than necessary to protect that interest; (3) the trial court considers reasonable alternatives to closing the proceeding; and (4) the trial court makes findings adequate to support the closure. *Id.* at 48.

The Second Circuit has recognized that the qualified right of public access may yield to, among other things, the need to protect the safety of witnesses and to avoid "the danger of impairing law enforcement." *Carson v. Fischer*, 421 F.3d 83, 89 (2d Cir. 2005); *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995). *See Brown v. Artuz*, 283 F.3d 492, 501 (2d Cir. 2002) (holding "safety" of undercover officer constituted an "overriding interest" under *Waller*); *Nieblas v. Smith*, 204 F.3d 29, 33 (2d Cir. 1999) (same); *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) ("The gravity of the state interest in protecting the secrecy of the officer's identity

8

from casual observers and the likelihood that this interest will be prejudiced by the officer's testifying in open court are both sufficiently substantial to justify the limited closure of the courtroom during the officer's testimony.").

**B.   Application to Proposed Partial Closure**

The Court determines that the four *Waller* factors have been satisfied. The instant case— in this Court's view—is largely unprecedented in terms of the amount of sensitive classified information stolen, and the number of CIA officers who are key witnesses to the alleged criminal conduct, which occurred at the CIA. As the Government notes, the Leak at issue is "the largest illegal disclosure of CIA information in the agency's history." (Gov. Mot. *in limine* at 18, Dkt. 195.) *See Waller*, 467 U.S. at 46 (noting that the circumstances overcoming openness will be "rare" and that "the balance of interests must be struck with special care.").

The "overriding interest" in closure advanced by the Government is to protect the identities and safety of CIA officers, and to protect foreign intelligence collection that is vital to national security. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) (explaining that "[m]easures to protect the secrecy of our Government's foreign intelligence operations plainly serve" national security interests); *United States v. Sterling*, 724 F.3d 482, 516 (4th Cir. 2013) ("The identity of CIA operatives is, and always has been, subject to rigorous protection."). As with undercover officers, "[t]here can be no doubt that the identity of CIA operatives is sensitive information." *Sterling*, 724 F.3d at 516. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████

████████████████████████ The Government has a compelling interest in

protecting secrecy of [identities and] information important to our national security and the

appearance of confidentiality so essential to the effective operation of our foreign intelligence

service." *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980).

Next, the partial courtroom closure sought by the Government for the Protected

Witnesses is "no broader than necessary." *See Waller*, 467 U.S. at 48 (discussing the second

factor). In analyzing the extent of infringement, courts consider the testimony to be rendered

during closure, the duration of the anticipated closure, the availability of transcripts, and the

relationship of those excluded to the objecting defendant. *See Bobb v. Senkowski*, 196 F.3d 350,

353 (2d Cir. 1999). The Court is mindful that the length of the Government's proposed closure

is not insubstantial (approximately one-third of the trial), but the Government's interest—

██████████████████████████████████

████████████████████████—is especially grave and its serious interest will be

advanced by closure.[6] *See United States v. Alimehmeti*, 284 F. Supp. 3d 477, 488 (S.D.N.Y.

2018) (granting request for partial closure of the courtroom in terrorism prosecution during

testimony of four undercover FBI employees, which comprised approximately one-third of the

---

[6]
      Every major nation in the world has an intelligence service. Whatever fairly may be said about some of its
past activities, the CIA…is an agency thought by every President since Franklin D. Roosevelt to be
essential to the security of the United States and—in a sense—the free world. It is impossible for a
government wisely to make critical decisions about foreign policy and national defense without the benefit
of dependable foreign intelligence.

*Snepp v. United States*, 444 U.S. at 5 n.7.

trial and permitting the undercover officers to testify using pseudonyms).   Further, the Government proposes other measures to assure immediate public access to the testimony notwithstanding the partial closure.  The Government proposed a live feed to a different courtroom within the courthouse during the period of partial closure.  The Government also proposed that one pool reporter would be permitted in the courtroom during the partial closure. Lastly, the Government will make the transcripts accessible to the public as soon as feasible, which would typically be no later than the evening after the day of testimony.  The Court adopts these recommendations and further ameliorative measures, which will reduce any undue burden arising out of these protective measures.

The Court directs that the following measures be implemented.  First, the live feed will be a video feed (not simply an audio feed); the feed will not show the Protected Witnesses.  The Court will permit this live stream to be transmitted directly to the District's pressroom in addition to the broadcast to an adjoining courtroom.  Finally, the Court will permit two representatives from the District's press pool to be present for each Protected Witnesses' testimony to assure access to visual observations (e.g., of witness demeanor) that only a person in the courtroom can make.  With these modifications, the closure is narrowly tailored.  The public and press will be able to view most of the trial in the courtroom and hear all of the testimony contemporaneously as it occurs.  The closure is as limited as can be given the need to protect the identity and safety of certain CIA witnesses.

The third factor, identified by the Supreme Court in *Waller*, requires that the Court consider reasonable alternatives to closing the proceeding during the Protected Witnesses' testimony.  Schulte's opposition does not offer alternatives.  Nevertheless, the Court has considered, *sua sponte*, other options, such as disguising the witnesses or placing a screen

11

between the witness and the courtroom observers. Such methods have been disfavored by courts in this Circuit. *See e.g., United States v. Urena*, 8 F. Supp. 3d 568, 572 (S.D.N.Y. 2014). As the Second Circuit has recognized, "disguising the witness risks lessening the jury's opportunity to observe the witness's demeanor and assess credibility, and a screen risks implying to the jury that the family or friends of the defendant in attendance are likely to be dangerous." *Ayala,* 131 F.3d at 71–72. By contrast, the proposed partial courtroom closure does not impede the jury's ability to assess witnesses' credibility, nor convey to the jury any risk of danger. The Court finds that the Government's proposal is the best option while limiting, to the extent possible, any infringement on the defendant's right to an open trial. For the same reasons, the Court grants the Government's request to prohibit sketching or other recording of CIA witnesses' faces, and pixilation of any publicly released images of the CIA witnesses' faces.

(S//NF)     Finally, the Government has made specific representations to the Court detailing the need to protect the safety and efficacy of the Protected Witnesses, none of which have been challenged. ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████   █  ████████████████████

██████████████████████████████████████

---

(S//NF)    [7] The Government submitted *in camera* a declaration from █████████████ the CIA, detailing the need for witness protection. *See* Gov. Classified Witness Protection Mot., ████ Dec. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████      The Court finds the specific representations are credible and adequate to support partial courtroom closure and other proposed security measures (e.g., testifying using pseudonyms or by first name only).



The Court finds that these specific representations are credible and sufficient to support partial closure of the courtroom during the testimony of the Protected Witnesses.

Accordingly, the Court grants the Government's motion for partial closure of the courtroom during the testimony of the Protected Witnesses.

## II.    Other Proposed Security Measures

### A.    Cross-examination of Protected Witnesses & Pseudonyms

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine adverse witnesses. *See Smith v. Illinois*, 390 U.S. 129, 129–31 (1968). That right, however, is not absolute. "[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)) (alteration in original) (emphasis in original). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley*, 318 F.3d

401, 417 (2d Cir. 2003) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (alteration in original)).

The Government seeks leave for certain Protected Witnesses to testify under pseudonym and an order precluding cross-examination that would reveal aspects of the witnesses' true identities. The Court approves the use of pseudonyms to protect the safety and efficacy of the Protected Witnesses. The defendant is, of course, aware of the witnesses' true names. As set forth in the Court's Section 6(c) order, the covert protected witnesses will testify via pseudonym.[8] The overt protected witnesses will testify by true first name only.[9] Permitting certain witnesses to testify using a pseudonym and certain witnesses to testify by first name only protects the safety and efficacy of the CIA officers. Additionally, the Defendant does not oppose the Government's request to preclude cross-examination that would reveal aspects of the witnesses' true identities; nor does the Defendant suggest that the personal identifying information is relevant.[10] The Court adopts these restrictions. *See e.g., United States v. Hernandez*, No. S1 12 CR 809 PKC, 2013 WL 3936185, at *3 (S.D.N.Y. July 29, 2013); *Alimehmeti*, 284 F. Supp. 3d at 490.

---

(S//NF)   [8] For clarity, the Court lists those employees here, as per the Government's Classified Letter of January 17, 2020, which the Court adopts. The following Government witnesses will testify under pseudonyms: ███████████ ████████████ The Government represents that should defense call the following witnesses they would also testify via pseudonym: ████████████ As per the Section 6(c) order, if other covert employees, not listed here, are called to testify they will testify with a pseudonym.

(S//NF)   [9] For clarity, the Court lists those employees here, as per the Government's Classified Letter of January 17, 2020, which the Court adopts. The following Government witnesses will testify by true first name only: David    , Sean    , Michael    , Amol    , Matthew    , Timothy    , Bonnie    , Michael    , Karen    . The Government represents that should defense call the following witnesses they would also testify by true first name only: Jack    , Elizabeth    , Christopher    , Duane    , Tandeep    ., Rufus    , Thomas    ., Marcus    , Gordon    ., Stephen    .

[10] For the same reasons, the defendant is prohibited from disclosing the true names or personal identifying information of the Protected Witnesses' during his own testimony should he testify.

**B.     Entering and Exiting**

The CIA witnesses (including witnesses called by the defense) will be permitted to use the nonpublic entrances and exits in the building, including by entering court via a nonpublic entrance.[11]  Absent court authorization, there would be a substantial risk that a testifying CIA witness would be observed by members of the public, undermining the efficacy and purpose of the abovementioned security measures and partial closure of the courtroom.  *See Alimehmeti*, 284 F. Supp. 3d at 495.

**CONCLUSION**

For the foregoing reasons, the Government's motion is GRANTED.  The courtroom will be closed during the Protected Witnesses' testimony, with the exception of essential courtroom personnel, the parties, the defendant's family, and two pool reporters.  There will be a video feed (that will not show the protected witnesses) transmitted to an adjoining courtroom and the courthouse pressroom.  The Government is directed to make transcripts and exhibits available to the public no later than the evening after the day of testimony.

The Court prohibits sketching or other recording of CIA witnesses faces, and permits pixilation of any publicly released images of their faces.  The defense may not inquire in open court about the Protected Witnesses' true names or topics that would reveal the witnesses' identities.

Dated: New York, New York
         January 29, 2020

SO ORDERED

PAUL A. CROTTY
United States District Judge

---

[11] This includes all CIA witnesses not just the "Protected Witnesses."