```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,                New York, N.Y.

 4            v.                              17 Cr. 548 (PAC)

 5   JOSHUA ADAM SCHULTE,

 6                 Defendant.

 7   ------------------------------x

 8                                            January 27, 2020
                                              2:20 p.m.
 9

10   Before:

11                      HON. PAUL A. CROTTY,

12                                            District Judge

13

14                          APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  DAVID W. DENTON, JR.
17        SIDHARDHA KAMARAJU
          MATTHEW J. LAROCHE
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
20   BY: SABRINA P. SHROFF
     BY: EDWARD S. ZAS
21
     LAW OFFICES OF JAMES M. BRANDEN
22        Attorney for Defendant
     BY: JAMES M. BRANDEN
23

24

25
```

             (Case called)
             THE DEPUTY CLERK:  Counsel for the government, please state your appearance.
             MR. LAROCHE:  Good afternoon, your Honor.  Matt La Roche, Sid Kamaraju, and William Denton for the government.  And with us is Morgan Hurst, a paralegal at the U.S. Attorney's office.
             THE COURT:  Good afternoon.
             MS. SHROFF:  Good afternoon, your Honor.  For Mr. Schulte, Sabrina Shroff, Edward Zas, and James Branden.  Mr. Schulte is at counsel table.
             THE COURT:  Good afternoon.
             MS. SHROFF:  Good afternoon.
             THE COURT:  The purpose of today's proceeding is to provide the public and the press with an opportunity to comment on the government's proposed partial courtroom closure at trial.  On November 26 of 2019, the government filed an *in camera* classified motion for witness protection measures pursuant to Section 6 of the Classified Information Procedure Act concerning witnesses from the CIA that are going to testify.  The motion was supported by an affidavit from the CIA which states that a number of witnesses called to testify also participate or have participated in clandestine and covert intelligence activities.  The government filed a letter publicly the same day stating that it had filed a motion

1    seeking limited courtroom closure for certain CIA witnesses.
2    This was docketed at Docket 199.
3            Briefly stated, the government proposed a partial
4    closure of the courtroom but would prevent a live feed of the
5    testimony to an adjoining courtroom that does not reveal the
6    witness' face; transcripts of the testimony to be released
7    publicly, as soon as feasible, which would typically be the
8    evening after the day of testimony; and one pool reporter
9    permitted in the courtroom during testimony.
10           Additionally, the government's *in camera* motion seeks
11   the following for protected witnesses:  Testify using
12   pseudonyms, using a non-public entrance to enter and exit the
13   courtroom, preclude cross-examination that would reveal any
14   aspect of their true identity, and prohibit sketching or other
15   recordings of their face, and pixilation of any
16   publicly-released images of their face.
17           On January 21st I issued an order in Docket 260.  In
18   brief, the order outlines the measures the government seeks in
19   this motion for limited courtroom closure and witness
20   protection measures designed to protect from disclosure the
21   true identities of certain CIA employees expected to testify in
22   Mr. Schulte's trial.  The Court directed the government to file
23   a public version of its motion on the docket.  The government
24   publicly filed a letter on January 23rd of this year with
25   specific proposed security measures detailing the proposed

1  restrictions on public access.  That's at Docket 263.  The
2  motion is under the Court's consideration.
3            I have invited comments from a number of members of
4  the press and public to the government's proposed measures.
5  This is the purpose of today's proceeding.
6            Let me see.  There is a number of people in the
7  courtroom.  Can I have a show of hands as to whether you want
8  to be heard on this matter?  Two.  Anybody else?  Okay.
9            I also note for the record that I have received three
10 letters from Inner City Press, all of which have been docketed.
11           Here, first, I will ask the government to summarize
12 the proposed security measures and courtroom closure, if the
13 defense wants to be heard they may also state their position,
14 then I will call up those members of the press here today for
15 their comments.
16           Mr. Laroche or somebody from the government's team,
17 could you please summarize the government's proposal for the
18 record?  I will ask you to address what restrictions, if any,
19 you seek to impose on pool reporters permitted in the courtroom
20 during the testimony of the protected witnesses.
21           MR. LAROCHE:  Yes, your Honor.
22           THE COURT:  And, Ms. Shroff, do you want to be heard?
23           MS. SHROFF:  I'm not sure.  I have to hear what
24 Mr. Laroche has to say.
25           THE COURT:  Okay.  We will call on you after

1   Mr. Laroche finishes.

2            After we hear from Ms. Shroff, if she wants to speak,
3   then I will hear from members of the press.

4            Mr. Laroche?

5            MR. LAROCHE:  Yes, your Honor.  Thank you.

6            As set forth in our letter of January 23rd, we are
7   seeking the following protections for certain CIA witnesses:

8            First, partial courtroom closure during their
9   testimony with only the parties, the jury, and the defendant's
10  family and one pool reporter permitted in the courtroom during
11  the testimony.

12           Second, witnesses to use a non-public entrance to
13  enter and exit the courtroom.  The defense would be precluded
14  from cross-examination that would reveal any aspect of the
15  witnesses' true identities, no sketching or other recording of
16  their faces, the witnesses' faces, and pixilation of any
17  publicly-released images of their faces.

18           Third, a live feed of their testimony would be sent to
19  another courtroom that does not reveal the witness' face.

20           And finally, transcripts of the testimony --

21           THE COURT:  There would be video and audio?

22           MR. LAROCHE:  Just audio, your Honor; just audio, so
23  that you could not see the witness' face in the other room.

24           THE COURT:  What about a live focus on somebody other
25  than the witness?

1           MR. LAROCHE:  That would be fine, your Honor.  As long
2    as the witness' face is not on the video feed we have no
3    objection, for example, to the questioning attorney's face.
4           THE COURT:  All right.
5           MR. LAROCHE:  Finally, transcripts of the testimony to
6    be released publicly as soon as feasible which would typically
7    be on the evening after the day of testimony.
8           I think the other question would be limitations on the
9    pool reporter.  We would not impose any limitations other than
10   that the pool reporter could not describe the likeness or
11   characteristics of the agency witness who is testifying.
12          THE COURT:  Height, weight, color of hair, color of
13   eyes?
14          MR. LAROCHE:  Exactly, your Honor.
15          Thank you.
16          THE COURT:  Ms. Shroff?
17          MS. SHROFF:  Your Honor, our objections have been
18   memorialized and filed with the Court.
19          THE COURT:  Yes.
20          MS. SHROFF:  Beyond that, we have nothing to add.
21          Thank you.
22          THE COURT:  Who wants to go first from the press?
23   Come on up.
24          Speak right from the podium, identify yourself for the
25   record, please.

1           MR. BROWN:  Hi, Judge.

2           THE COURT:  Hi.

3           MR. BROWN:  Steven Brown, New York Daily News and a

4  proud member of the in-house press corps.

5           Thank you for having this hearing.  I would just say,

6  after speaking with my colleagues, some of my colleagues, we

7  don't all totally agree on this, but I would just say that the

8  security measures as far as CIA witnesses using a pseudonym and

9  not being drawn by the sketch artists would be sufficient as

10 far as addressing any security concerns.  I don't really see

11 the need to clear the courtroom with the exception of a pool

12 reporter.  I would note that in the trial of El Chapo in the

13 Eastern District, the courtroom was never cleared for any

14 witnesses, to my knowledge, and there were sketch artists

15 present who released sketches with the witnesses' faces blurred

16 and I see that as being sufficient.  I can't really imagine a

17 situation in which we would describe the witness in such a way

18 as to put him or her at risk of being identified.

19          I would also just request that the same feed that is

20 broadcast to the adjoining courtroom also be allowed to be

21 broadcast in the press room on the fourth floor if we request

22 it.

23          THE COURT:  Okay.

24          MR. BROWN:  That's all I have.  Thank you, Judge.

25          THE COURT:  Yes, ma'am.

1          MS. SAUL:  Hello, your Honor.  I'm Emily Saul, with

2     the New York Post, also in-house and thank you, again, for the

3     opportunity to have this hearing.

4          I just wanted to join in the application of my

5     colleague, Mr. Brown.  I had the opportunity to cover Joaquin

6     El Chapo Guzman's trial and I know that there are differences

7     here in terms of security and that there is information that we

8     don't have, but I will say that in that proceeding where you

9     had witnesses where safety was a concern who testified under

10    pseudonyms, the only secretive measures that were in place

11    there were that the witnesses testified under pseudonyms, used

12    the non-public entrances and exits, and were not allowed to be

13    drawn and that, at least in that instance, felt sufficient in

14    order to assure their security.

15         To sort of continue on what my colleague Mr. Brown was

16    saying.  Barring, obviously, facial scarring or something,

17    something more credible, I don't know that there is an ability

18    that we would have to describe a witness in an article that

19    could put them in danger.

20         I think that in terms of limiting sort of -- in

21    limiting our roles as surrogates for the public in this

22    proceeding, to not be able to say whether someone is bald or

23    has blond hair is not ultimately, I think, going to be the

24    difference, is not going to make a difference in that person's

25    safety.

                    And, I would join my colleague in his request as well
that we have a feed to the in-house press room on the fourth
floor.
                    THE COURT:  Thank you.
                    MS. SAUL:  Thank you very much for your time.  I
appreciate it.
                    THE COURT:  Anybody else?
                    MR. LEE:  Sure.  Thanks a lot.  Matthew Russell Lee,
Inner City Press.
                    I guess I definitely join in this idea of a live feed
but I want to go a little bit further back and say in trying to
cover this case, since I have been with the in-house press,
very happily, for about the last year and trying to cover this
case, it has been difficult.  It has been more difficult than
other cases in the sense that there have been a number of times
that proceedings have been scheduled and I have come up here
and found the door locked.  I go into the docket and find a
number of -- there are obviously always some sealed documents
but in this docket, 217, 207, 188, 126, 51, 41, and 40.  Now, I
understand, obviously, there are unique issues in the case but
feel I want to highlight -- and thank you for the opportunity
to raise this publicly -- I feel like it's important that that
feed be provided.  It is important, for example, the government
in the letter that you asked them to put in that they did put
in, first they say that they are going do everything possible

1   to preserve access as much as possible.  So, that would clearly

2   involve the feed because we receive feeds even today; the

3   Avenatti proceeding, the Tony Hernandez proceedings.  So, many

4   cases in the court house are fed in that way and there is no

5   reason that this one, particularly when you suggest a camera be

6   elsewhere, shouldn't be.  But they also say that the press and

7   public won't be prejudiced because exhibits will be available.

8   And I guess I want to say without -- this may be more of a U.S.

9   Attorney's office issue, but that's not really the case.  I

10  have found in many of the trials that take place the trial

11  exhibits don't go onto pacer.  For a time the U.S. Attorney's

12  office had an uploading site where they would put exhibits

13  either the night of or days after but it has been weeks or

14  months that they haven't put any up.  So, maybe you could help

15  the press corps, your Honor, if you directed them in this case

16  to make sure to make these exhibits, as they say in their own

17  letter on page 8, they say that the exhibits will be made

18  available to the public, to make sure that this actually takes

19  place relatively in real-time.

20          It may seek like a small thing but the transcripts

21  are, they're not put in Pacer, certainly, the night of.

22  They're available at some cost that some media can afford and

23  others not.  Maybe in this case, because they've made such a

24  point of saying that the transcripts will somehow replace being

25  able to be present or for the public to see, maybe there is a

1   way to, I don't know how it would work out, I don't want to

2   undermine the court reporters, but to be sure that those

3   transcripts are available the evening of.

4       I mean, I think that there is obviously an opportunity

5   here, given their extraordinary request to seal the courtroom

6   to make some improvements across the board in terms of how, in

7   real-time, for the public's benefit, the information from this

8   trial is made available.

9       That's all I have to say.  Thanks a lot.

10       THE COURT:  Anybody else?  Yes.

11       MR. NEUMEISTER:  Just a quick comment.  Larry

12   Neumeister from the Associated Press.

13       THE COURT:  Larry, how are you.

14       MR. NEUMEISTER:  I just want to say that if we are

15   limited to one reporter in the courtroom could we, at the very

16   least, please have two?  It seems that any time, whether it's

17   terrorism trials or anywhere else where we have been limited in

18   the number of reporters we have had, it has always been at

19   least two people.  That's the main request.

20       The other thing is, just on behalf of the press, I

21   have covered many sensitive trials over many years and I can't

22   recall any press person ever wanting to do anything that would

23   harm an individual or lead to some individual being harmed for

24   testifying at a trial or anything else in that way.  So, the

25   press carries your concern of wanting everyone to be safe and

1    secure but we also would like to have the best access we can to
2    describe the goings on in court as best we can.
3            Thanks.
4            THE COURT:  Thank you very much.  Is there anybody
5    else?
6            Mr. Laroche, let me ask you about some of the points
7    that the members of press have raised.  What about two
8    representatives of the press as opposed to one?
9            MR. LAROCHE:  We have no objection, your Honor.
10           THE COURT:  And what about the exhibits being made
11   available?
12           MR. LAROCHE:  We will make those available as quickly
13   as possible after the day of testimony.  We expect that that
14   would probably be the next day.  We can also work with our
15   press office to ensure that they are made available.  We
16   understand in cases they were posted on some sort of drop site
17   so we will explore is that as well.
18           THE COURT:  And the transcripts?
19           MR. LAROCHE:  The same goes with the transcripts with
20   the exception being transcripts are typically not released
21   immediately to allow for potential redactions, as in any case,
22   not just this one, but in all cases generally they're not made
23   available to allow the parties to potentially make redactions.
24   We don't expect that will take a long time and we will make
25   every effort to get those up as quickly as possible.

1       THE COURT:  What about the live feed for the press
2  office on the fourth floor?
3       MR. LAROCHE:  No objection to that, your Honor.
4       THE COURT:  And by live feed you mean video and audio
5  so long as the video is not focused on the testifying witness.
6       MR. LAROCHE:  That's correct, your Honor.
7       THE COURT:  Okay.
8       And, I don't know if it was clear from your
9  presentation but it is clear to me that these protective
10 measures are applicable only to certain of the witnesses that
11 will testify at trial.  Is that correct?
12      MR. LAROCHE:  That is correct, your Honor.  We expect
13 that it will apply to about a third or so of the witnesses at
14 trial with particular circumstances that we have identified in
15 other filings to the Court and defense counsel that require
16 those protections -- we believe require those protections.  We
17 are attempting to balance the need to protect those
18 individuals' identities with the public's right of access.
19      THE COURT:  Now, if a CIA employee testifies at the
20 request of Mr. Schulte, the same procedures will apply?
21      MR. LAROCHE:  Yes, your Honor.
22      We have proposed that to the extent the defense would
23 like to call, for example, an Agency employee who is acting in
24 a covert capacity, that the same protections would apply to
25 that individual.  We have identified those groups of people in

K1R5schC                        conference

1   a letter under seal to the Court and defense counsel.
2           THE COURT:  I will have a decision for you shortly on
3   this matter of protected witnesses and the courtroom closure.
4           Anything else to take up today?
5           MR. LAROCHE:  No, your Honor.  Thank you.
6           THE COURT:  Ms. Shroff?
7           MS. SHROFF:  No, thank you.
8           THE COURT:  Thank you.
9                             o0o