K243SCH1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          S2 17 Cr. 548 (PAC)

5   JOSHUA ADAM SCHULTE,

6              Defendant.                  Trial

7   ------------------------------x
                                          New York, N.Y.
8                                          February 4, 2020
                                          10:15 a.m.
9   Before:

10                   HON. PAUL A. CROTTY,

11                                         District Judge
                                            -and a Jury-
12                        APPEARANCES

13

    GEOFFREY S. BERMAN
14       United States Attorney for the
         Southern District of New York
15  BY:  MATTHEW J. LAROCHE
         SIDHARDHA KAMARAJU
16       DAVID W. DENTON JR.
         Assistant United States Attorneys
17
    SABRINA P. SHROFF
18  JAMES M. BRANDEN
         Attorneys for Defendant
19       -and-
    DAVID E. PATTON
20       Federal Defenders of New York, Inc.
    BY:  EDWARD S. ZAS
21       Assistant Federal Defender

22  Also Present:  Colleen Geier
                   Morgan Hurst, Paralegal Specialists
23                 Achal Formando-Peiris
                   John Lee, Paralegals
24                 Daniel Hartenstine
                   Daniella Medel, CISOs, Department of Justice
25

K243SCH1

1            THE COURT:  Swear in the jury panel, please.

2            (A jury of 12 and two alternates were impaneled and

3     sworn)

4            THE COURT:  Here's how we are going to proceed.  I am

5     going to read some preliminary instructions which will guide

6     you through the trial.  We'll then take a short recess, and the

7     parties will make their opening statements, and then we'll

8     start calling witnesses.

9            So, after I give you the instructions, we'll take a

10    short break, and you'll go to the jury room.  You can hang up

11    your coats and you give Mr. Gonzalez your contact information

12    and we'll give you our contact information, so we can stay in

13    touch with one another, if anything happens that you want to

14    call to our attention.

15           But ladies and gentlemen, I want to take a few minutes

16    now to give you some initial instructions about this case and

17    about your duties as jurors.  After all the evidence is in and

18    the lawyers have summed up, I will give you final instructions

19    and then you can begin your deliberations.  I may also give you

20    instructions during the trial, but unless I specifically tell

21    you otherwise, all such instructions, both those I give you now

22    and those I give you later, are equally binding on you and must

23    be followed.

24           Your duty is to find from the evidence what the facts

25    are.  You and you alone are the judges of those facts, and then

K243SCH1

1    you apply the law as I give it to you to the facts as you find

2    them to reach your verdict.  You have to follow the law,

3    whether or not you agree with it.

4         Now, please remember that nothing I say or do during

5    the course of the trial is intended to indicate or should be

6    taken by you as indicating what your verdict should be.  What

7    your verdict should be will be strictly up to you.

8         I've already told you about the charges alleged in

9    this case.  The defendant, Joshua Schulte, is charged in 11

10   counts in an indictment that has been filed by a grand jury

11   sitting in this district.  The indictment charges that in or

12   about 2016, the defendant allegedly took national defense

13   information from the CIA computer system without authorization,

14   and transmitted that information to WikiLeaks, which posted the

15   information online in 2017.  Those charges, the WikiLeaks

16   charges, account for seven of the counts in the indictment.

17   The indictment further charges Mr. Schulte with one count of

18   unlawful disclosure and attempted disclosure of national

19   defense information while he was in the Metropolitan Correction

20   Center, or MCC, a federal detention center.  Finally, the

21   indictment charges Mr. Schulte with two counts relating to

22   false statements he made allegedly made to the FBI during its

23   investigation, and one count related to his alleged violation

24   of a protective order entered by the Court in 2017.  The

25   government must prove these charges in the indictment beyond a

K243SCH1

1    reasonable doubt.

2            The evidence from which you are going to find the

3    facts will consist of the testimony of witnesses from this

4    witness seat right here, documents and other things that will

5    be received in evidence, and occasionally facts that the

6    parties may agree to, which we call "stipulations."

7            Now, certain things are not evidence, and you should

8    not consider them.  I am going to list them for you.  First of

9    all, attorneys' arguments are not evidence.  The attorneys are

10   not sworn as witnesses, they are not under oath and do not

11   testify.  Attorneys' statements and questions are not evidence

12   either.

13           Let me emphasize this again:  It is not the question

14   that the lawyer asks.  What is important is the witness's

15   answer to the question.

16           Secondly, objections to questions are also not

17   evidence.  It is the duty of the attorney for each side of a

18   case to object to the other side's offers of testimony or other

19   evidence that the attorney believes is not properly admissible.

20   You should not be influenced by the objection, or by my ruling

21   on it.  If the objection is sustained, you will hear me say

22   "sustained," then you should ignore the question.  If I

23   overrule the objection, then you should treat the answer just

24   like any other answer.

25           My job is to rule on what evidence comes in at the

K243SCH1

1    trial, but I have no view on what your verdict should be,

2    because that is strictly up to you, the jury, to decide.

3          If I instruct you that some items of evidence are

4    being received for a limited purpose only, you must follow that

5    instruction, as you must follow all of my instructions.  Now,

6    you don't have to worry about this right now, there may not be

7    any limiting instructions in this case.  But if there is, I

8    will explain it to you at the time and will give you

9    instructions as clear as I possibly can on what the limitations

10   are.

11         I may well tell you that I'm excluding testimony or

12   tell you to disregard testimony.  When I do that, it means you

13   have to follow my instructions and ignore the testimony as it's

14   not in evidence.

15         In addition, anything you may see or hear outside this

16   courtroom is not evidence, and should be disregarded.  You are

17   to decide the case solely on the admissible evidence that is

18   presented here in the courtroom.

19         There are two kinds of evidence that I want to review

20   with you, direct evidence and circumstantial evidence.  Direct

21   evidence is the direct proof of a fact.  An example of that

22   would be testimony of an eyewitness, somebody who actually saw

23   the event as it occurred.  Circumstantial evidence is proof of

24   a fact or facts from which you may infer or conclude that other

25   facts exist.  Obviously I am going to give you further

K243SCH1

instructions on this and in more details on these and other

matters at the end of the case, but just keep in mind that you

can consider both kinds of evidence, both direct and

circumstantial.

An important task for you or for every jury is to

determine the credibility of the witnesses.  And it is going to

be up to you to decide which testimony, which witnesses to

believe, which witnesses not to believe, and how much of any

witness's testimony to accept or reject.  Again, in my

instructions to you at the end of the trial I will give you

some guidelines which I hope will be helpful to you in

determining witness credibility.

Remember what we discussed earlier.  First, law

enforcement witnesses' testimony gets no greater or lesser

weight because of their law enforcement status.  Second,

cooperating witnesses can be considered, but as I will instruct

you, you should consider their testimony with great care.

This is a criminal case.  You must keep in mind that

there are three basic rules about criminal law that you always

have to have in the forefront of your mind.  First of all, the

defendant is presumed innocent.  Secondly, the government has

the burden of proof.  Thirdly, the government must prove its

case beyond a reasonable doubt.  Let me go through each of

these three important factors.

First, as I mentioned to you, the defendant is

K243SCH1

1    presumed innocent until proven guilty.  The indictment against
2    the defendant brought by the government is only an accusation
3    and nothing more.  It is not proof of guilt or anything else.
4    The defendant, therefore, starts out with an absolutely clean
5    slate.

6           Second, the burden of proof is on the government.  The
7    defendant has no burden to prove his innocence or to present
8    any evidence or to testify.  Since he has right to remain
9    silent, the law prohibits you from arriving at your verdict by
10   considering that the defendant may not have testified.

11          Third, the government must prove the defendant's guilt
12   beyond a reasonable doubt.  Again, I will give you further
13   detailed instructions on this point later in the case.  But
14   bear in mind that in this respect, a criminal case is different
15   from a civil case.  The criminal standard of proof is beyond a
16   reasonable doubt.  In a civil case we use preponderance of the
17   evidence.  But here, there is a higher burden, and it's called
18   the burden of beyond a reasonable doubt.

19          From time to time during the trial it may become
20   necessary for me to talk with the lawyers out of the hearing of
21   the jury, either by having a conference at the bench when the
22   jury is present in the courtroom -- that's called a sidebar,
23   you have seen some of that already -- or calling a recess.
24   Please understand that while you are waiting, we are working.
25   The purpose of any conference outside your viewing is not to

keep relevant information from you, but to decide certain
procedural issues and how certain evidence is to be treated
under the federal rules of evidence and to avoid confusion.

Now just a few words about your own conduct as jurors.
First of all, do not discuss the case with anyone or permit
anyone to discuss it with you.  Most of you probably use
computers, but do not use your computers to do any
investigation in this case.  My instructions to not discuss the
case includes discussing the case in person, in writing, by
phone or electronic means, via text message, e-mail, Facebook,
Twitter, blogging or any other form of social media.  This even
includes discussing the case with your fellow jurors in the
jury room while the trial is going on.  You cannot deliberate
on what your verdict is until after you've been charged by me,
and that takes place at the end of the trial.  Until then, you
simply cannot talk about the case.  So you can talk to each
other about almost anything, but don't talk about the case.

This probably seems a little bit strange to you.
Here's the reason.  Obviously, the evidence can be only be
presented one witness at a time and one exhibit at a time.  We
don't want you to start talking to each other and reaching
conclusions before you had the opportunity to see and hear all
of the evidence in the case, listen to the lawyers' summations,
and hear my instructions on the law.  So that is why we direct
you to begin your deliberations at the end, and until that time

K243SCH1

1    not to have any discussions about this case.

2            Think of the case as something like a painting when

3    you cannot tell from one stroke or one color what the painting

4    will look like.  You have to wait until it's finished to make a

5    judgment, and that's what we ask you to do.

6            If at any time during the course of the trial any

7    person attempts to talk to you or communicate with you about

8    the case, either inside or outside the courthouse -- and I

9    certainly hope that doesn't happen -- you should immediately

10   report such an attempt to me.  Don't bring the matter to the

11   attention of any other jurors, just send me a note directly.

12   In the same way, if anything should happen involving any of you

13   that is of an unusual nature, when you think of something the

14   Court should be told about, do not discuss it with any other

15   juror.  Simply give my deputy, Mr. David Gonzalez, a note to

16   that effect that you want to speak to me about it, and I can

17   hear what it is and what you have to say.  Of course, I do not

18   expect anything unusual or improper to happen.  But if it does,

19   bring it to my attention.

20           Also, lawyers and other participants at the counsel

21   table have been instructed not to have any communication with

22   you as jurors.  That's the rule.  You may not say hello or even

23   wave.  That goes for you, the lawyers and the witnesses.  In

24   this courthouse you may see people in the elevators, so if you

25   run into one another, please don't acknowledge them or expect

K243SCH1

1   them to acknowledge you.  They are under instructions not to

2   have any communication, and they are going to observe that

3   rule.

4          If at any point in the trial you recognize someone in

5   the courtroom, including a friend or family member, please let

6   me know immediately.  If this occurs while the trial is in

7   session, please simply raise your hand.

8          Please don't read or listen to anything touching upon

9   this case in any way.  That means don't read any newspaper

10  publicity, TV news.  If you see it, ignore it.  Don't try to do

11  any research on your own or conduct your own investigation.

12  This means, for example, that you should not consult a

13  dictionary, search the internet, website or blogs or use any

14  electronic tools to obtain information about this case.  If you

15  see something about the case in the newspaper, you must not

16  read it.  You must avoid watching television discussions about

17  this case or issues involved in this case.  Your sworn duty is

18  to decide this case solely and wholly on the evidence presented

19  in this courtroom.

20         If you wish, you may take notes while the evidence is

21  being presented to you.  This is permitted because some people

22  find that taking notes helps them focus on the testimony being

23  given.  You should not try to summarize the testimony.  We have

24  excellent court reporters who take down everything said

25  throughout the trial.  Your job is to listen to the testimony,

K243SCH1

1   and assess the credibility of the witnesses.  If do you take

2   notes, do not let it distract you from your task.  Moreover,

3   your notes are for your private use only as a way to help you

4   recall the testimony when you begin your deliberations.  Your

5   notes are not entitled to any greater weight than the

6   recollection of a juror who did not take notes.  Finally, you

7   may not take your notes away from the courtroom.  Please leave

8   them in the jury room at the end of each court day.

9          Let me tell you again how important your service is

10  and how much we appreciate it.  During a trial, all of us have

11  to be here before any work can be done.  That includes the

12  attorneys, the witnesses, the court reporters, the judge, and

13  you the jury.  If one person is missing, everything stops.

14  That's what makes it a little bit different than work.  This is

15  not a situation where you can simply call in sick.  There are

16  of course extraordinary circumstances that may excuse you from

17  serving on this jury.  But in all other circumstances, we need

18  you to be here every day, and as best you can on time.  I

19  understand that this may impose a burden, but as I have said,

20  this is an important public service and one that is greatly

21  appreciated.

22         I start my trial day at 9 o'clock in the morning

23  except for Fridays when we'll not sit for trial.  About a half

24  an hour before we start, we'll open up the jury room and

25  provide you with a light breakfast.  We also provide you an

K243SCH1

1    afternoon snack when we take our afternoon break.  We cannot

2    provide you with lunch.

3           On Monday through Thursday, our first session will go

4    from 9 in the morning until 11:15, at which point we'll take a

5    10 or 15 minute break.  We'll take a longer break of about 30

6    minutes around 1 p.m., and finish the day at 3 o'clock.  The

7    court will not sit for trial on Fridays.

8           Now, here's how we're going to proceed.  The

9    government will make an opening statement, which is an outline

10   of what it hopes to prove and to help you understand the

11   evidence as it comes in.  Next, the defendant may make an

12   opening statement, but he does not have to.  And please

13   remember, as you listen to the opening statements by the

14   lawyers, that these statements are not evidence.  Then the

15   government will start presenting witnesses and the defense may

16   cross-examine those witnesses.  Following the government's

17   case, defendant may, if he wishes, present evidence, but he

18   does not have to do so.  After all the evidence is in, each

19   side has the opportunity to get up again, present their closing

20   arguments to you.  In these arguments they're going to

21   summarize and interpret the evidence for you, and then of

22   course I will instruct you on the law.  After all that is

23   completed, you'll retire to begin your deliberations on this

24   case.

25          Now for some housekeeping matters.  You probably

K243SCH1

1    already met David Gonzalez, my courtroom deputy.  You're going

2    to be working with Mr. Gonzalez who will greet you in the

3    morning and make sure you're escorted in and out of the

4    courtroom.  He will give you the notepads if you want to take

5    notes.  If you have any troubles or problems, please see

6    Mr. Gonzalez.

7            I am assisted by my two law clerks, Laura King and

8    Matthew DeLuca, and my court reporters are Rebecca Forman and

9    Carol Ganley.

10           That concludes my preliminary instructions.  We'll

11   take our morning recess now for about 15 minutes.  You can hang

12   up your coats and we'll give you notepads if you want notepads,

13   then we'll resume about quarter to 11.  Thank you very much.

14           (Jury excused)

15           THE COURT:  Who is opening for the government?

16           MR. DENTON:  I am, your Honor.

17           THE COURT:  How long are you going to be?

18           MR. DENTON:  15, 20 minutes tops.

19           THE COURT:  Ms. Shroff, who is opening for

20   Mr. Schulte?

21           MS. SHROFF:  I am, your Honor.

22           THE COURT:  How long will be you be?

23           MS. SHROFF:  I don't know.  It depends on what

24   Mr. Denton says, but between 7 and 10 minutes.

25           THE COURT:  See you in 15 minutes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K243SCH1                        Opening – Mr. Denton

1          (Recess)

2          (In open court; jury present)

3          THE COURT:  Mr. Denton.

4          MR. DENTON:  Thank you, your Honor.

5          Ladies and gentlemen, this case is about the single

6  biggest leak of classified national defense information in the

7  history of the CIA, the Central Intelligence Agency.  On

8  March 7, 2017, the website WikiLeaks began a catastrophic

9  public disclosure of sensitive national security secrets.

10  Secrets that this man, Joshua Schulte, the defendant, stole

11  from a top secret CIA network.  Files revealing the custom

12  built classified cyber tools that the CIA uses in our national

13  defense, tracking terrorists, collecting intelligence overseas

14  to protect the United States.

15          The leak was instantly devastating.  Critical

16  intelligence gathering operations all over the world came to a

17  crashing halt.  CIA officers overseas were exposed.  Allies

18  wondered if America could be trusted to safeguard intelligence

19  they shared with us.  Years of work and millions of dollars

20  developing those tools went up in smoke, because secret tools

21  to gather intelligence only work if the targets don't see them

22  coming.  And now those tools were all over the internet.

23  Digital weapons we had built, now out there for anyone to turn

24  against us.

25          For the CIA, it was the ultimate act of betrayal by

1    one of their own.  Joshua Schulte was a CIA officer.  He worked

2    for the very same part of the agency that created the national

3    security information he stole.  Joshua Schulte violated his

4    oath to protect our country and safeguard those secrets.  He

5    violated the law.

6         The defendant didn't do this out of any false

7    idealism.  He's not some kind of whistleblower.  He did it out

8    of spite.  He did it because he was angry and disgruntled at

9    work.  He did it to start what he in his own words called "an

10   information war," a war against the CIA he felt had wronged

11   him.

12        His information war didn't stop there.  He continued

13   to wage it even after the FBI arrested him for stealing those

14   top secret files.  From jail, he got an encrypted cell phone,

15   leaked more classified information, and plotted a campaign to

16   send even more CIA secrets to WikiLeaks.

17        What Joshua Schulte did wasn't just revenge, ladies

18   and gentlemen, it was a crime.  And that's why we're here

19   today.

20        The evidence in this trial will prove the defendant

21   create committed serious federal crimes, crimes of espionage,

22   stealing secrets from the CIA.  The evidence will prove that he

23   tried to commit more espionage by leaking even more secrets

24   from his jail cell.  It will prove crimes of computer hacking

25   when he broke into parts of the CIA's network.  It will prove

K243SCH1                         Opening – Mr. Denton

1    that the defendant obstructed justice, lied to the FBI, and

2    violated orders of this Court.

3            As Judge Crotty said, over the next few minutes I'll

4    give you a preview of what the evidence in this trial will

5    show.  Evidence that you will see in this man's own words, hear

6    from his co-workers, reading in logs of his computer hacking.

7    Evidence that will fit together to reveal the whole truth about

8    this man's crimes.

9            You'll learn that Joshua Schulte used to work as a

10   software developer, in an elite group at the CIA where

11   programmers built sophisticated cyber tools to support national

12   defense and intelligence operations overseas.  Schulte and his

13   fellow CIA officers in that group worked in a secret building,

14   protected by armed guards, accessed using special badges and

15   codes, inside offices that are literally vaults, combination

16   locks on the doors.  Everyone who worked there had a top secret

17   security clearance vetted by CIA investigators to be sure that

18   they could be trusted with the precious secrets of our national

19   defense.

20           Behind those armed guards, those combination locks,

21   those vault doors, Schulte's group used a secret CIA computer

22   network to develop their cyber tools.  It wasn't just a secret

23   network; it was a special one.  For Schulte and the other

24   developers to be able to perform their work, the network gave

25   them freedom to design cyber tools, to share information, to

work together.  Their work was to exploit vulnerabilities in

the computers of America's adversaries, so their network had to

be set up to let them do.  In order for the system to work, the

CIA had to be able to trust that group of elite programmers.

        In 2015, Joshua Schulte was given a special level of

trust within the CIA.  He was made a system administrator for

software on the CIA's developer's network.  As you'll hear him

say on tape, he had super access.  The kind of access normal

developers didn't have.  The kind of access that let him

control all of the sensitive intelligence projects on that

network, and even let him control who else had access to those

project.  As an administrator, Schulte helped make backups of

the systems that he and the other programmers worked on.

Backups that were saved every day in case of some catastrophe

that meant the system had to be restored.  But the real

catastrophe was Joshua Schulte, because he breached the special

trust the CIA placed in him.

        Why did he do it?  Why did Joshua Schulte start an

information war?  Because he was angry.  You'll learn that in

2015 and 2016, Schulte started having problems at work.  He got

into arguments, personal disputes with other people in his

branch.  And you will learn that when of those arguments got

out of hand, Schulte decided to retaliate against another

developer, by falsely accusing his co-worker of threatening to

kill Schulte.  Now, the CIA investigated that allegation

K243SCH1                           Opening – Mr. Denton

1    thoroughly and determined it was baseless.  But that just made

2    Schulte mad.  Even when the CIA decided to separate Schulte and

3    his co-worker by reassigning them to different branches, he

4    just became angry.  Angry at his bosses, angry at the whole

5    agency, angry that the CIA didn't take his side.  So he started

6    breaking the rules.  Critical rules that limit access to

7    sensitive national security secrets.  Rules that Joshua Schulte

8    didn't think should apply to him.  So he abused the trust that

9    he had been given as an administrator, secretly used his super

10   access to give himself control over sensitive projects he had

11   expressly been told he wasn't allowed to have.

12           Now, you won't be surprised to learn that his network

13   tampering set off alarm bells at the CIA.  The agency found out

14   what Schulte had done, and it was such a serious violation,

15   that the CIA decided they had to lock down the top secret

16   network that he had accessed.  So they changed passwords, they

17   tried to take away his super access, but they left a back door

18   unlocked.  A back door Schulte knew about.  Schulte got a

19   warning about what he had done from his supervisors at the CIA.

20   They told him they knew he had abused his access, and he

21   admitted it.  He signed a memo agreeing never to do it again.

22   They ordered Schulte to verify that he no longer had that super

23   access, and what did he do?  He lied.  You'll see that at the

24   very moment that he sent an e-mail saying that he had checked,

25   he had no more super access, he knew that back door was still

K243SCH1                         Opening – Mr. Denton

1    open.

2              Two days later, Schulte was told that parts of the top

3    secret system he worked on were going to be moved on to a new

4    server.  That was important news for Schulte.  Because when

5    those programs moved on to a new server, that back door to his

6    secret access was going to be shut.  And so the evidence will

7    show that that day, on the evening of April 20, 2016, Joshua

8    Schulte stole the preciously guarded national security secrets

9    that WikiLeaks later posted on the Internet.  On the evening of

10   April 20, Schulte used that back door, access he knew he wasn't

11   supposed to have, to do something called a reversion.  Kind of

12   like restoring a phone.  He used a backup copy to take the

13   system back in time to before the CIA tried to lock down the

14   system.  Back to a time when Schulte had total administrative

15   control.  For over an hour, from the computer sitting at his

16   desk at CIA, Schulte was in that system secretly restoring his

17   super access, giving himself back all the control he had before

18   it was taken away.  Restoring his access to the backups that

19   stored copies of the entire system.

20             Remember that every day the CIA backed up all the

21   critical work that Schulte and the other developers were doing,

22   so that if something happened, it won't be lost forever.  Same

23   way you back up a hard drive in case your computer crashes.

24             And the evidence will show that shortly after Schulte

25   had broken back into the system, he stole an entire backup, a

1    copy of all those secrets.  And not just any backup, actually

2    one that meant something to him.  He stole the backup from

3    March 3, 2016, the very day that Schulte felt the CIA had

4    wronged him, by dismissing his false accusations against his

5    co-worker.  The exact backup, the exact secrets, put out by

6    WikiLeaks.

7            After stealing the backup, Schulte tried to cover his

8    tracks.  During that hour on April 20, when he took the system

9    back in time, Schulte started carefully deleting every log file

10   that kept track of what he had done while he was in the system.

11   After destroying that evidence, he unwound the reversion.

12   Schulte restored the system to how it had been just before he

13   hacked in, erasing that hour of time as if it hadn't existed.

14   Trying to cover his tracks, that proved how he stole our

15   nation's secrets.

16           The evidence will prove that Schulte sent that stolen

17   classified backup, a copy of all the sensitive projects of the

18   CIA's programming group, to WikiLeaks.  Because the very same

19   backup that he stole that day, was exactly what WikiLeaks

20   posted on the internet.

21           And in the days that followed April 20, Schulte

22   started doing everything he needed to do to send that stolen

23   backup to WikiLeaks.  He downloaded programs on his home

24   computer that let him hide his identity on the internet.  He

25   bought computer equipment to copy hard drives and transfer data

K243SCH1                          Opening - Mr. Denton

1   without leaving a record on a computer.  He researched how to

2   verify if huge files had transferred successfully over the

3   internet, and how to destroy evidence at home, the same way he

4   did at the CIA, like when he downloaded a program to nuke his

5   hard drive.

6          And you will see that when all was said and done, two

7   weeks after his digital break in at the CIA, after he had sent

8   that precious trove of national defense information to

9   WikiLeaks, Schulte tried to completely reformat his entire home

10  computer.  He did it in another attempt to wipe the computer

11  clean of any remaining evidence.

12         And you'll learn that those things Schulte did on his

13  home computer are exactly what WikiLeaks tells people to do

14  when transmitting stolen secrets.

15         A few unhappy months later, Schulte finally resigned

16  from the CIA.  He took a job here in New York.  And he was here

17  on March 7, 2017, when WikiLeaks started to post the sensitive

18  national security information that he stole.

19         After the leak went public, the FBI immediately

20  started to investigate.  Agents interviewed hundreds of people,

21  including Schulte.

22                (Continued on next page)

23

24

25

1           MR. DENTON:  And Joshua Schulte thought he could do
2      the same thing that he tried to do at the CIA, talk his way out
3      of it.  And so he lied again.  Lied to the FBI.  Tried to
4      obstruct the investigation by sending them down false paths.
5      But the evidence will show that when that didn't work and
6      Schulte was arrested and put in jail to stand trial, he decided
7      to escalate his information war.  He got an encrypted cell
8      phone in jail, started writing a report, promising to give them
9      classified information.  He created accounts on social media to
10     post articles he had written that had more secrets in them.
11          The evidence will show that Joshua Schulte was so
12     desperate to wage his information war that he even violated a
13     court order to conduct it.  Twice.  And after this judge
14     specifically told him not to, he sent more sensitive material
15     from the government to a reporter.  In notebooks he kept in
16     jail, he wrote a detailed battle plan for the next campaign in
17     his information war.  But before Schulte could launch that new
18     campaign, the FBI caught him in the act.  They searched the
19     prison.  They found his secret phone.  They found his written
20     plan to destroy evidence and leak secrets, and they put a stop
21     to it, preventing Schulte from spilling even more of our most
22     preciously guarded intelligence.
23          Now, ladies and gentlemen, that is just an overview of
24     what the evidence in this trial is going to prove.  Let me say
25     a little bit about how we're going to prove it, because the

evidence is going to come in many forms.  You'll hear testimony

from several different kinds of witnesses, like Schulte's

coworkers at the CIA, covert officers responsible for

developing those cyber tools.  They'll tell you about their

group and its important work for our national defense and about

that secret network they used to do that work.  They'll talk

about Schulte's arguments in the workplace, his spiral out of

control, his quest for revenge.  They'll talk about how they

found Schulte's abuses of his administrative control on their

secret network, his violations of the trust necessary to do

their vital work, and how they tried to keep him from doing it

again.

        You're also going to hear from agents, experts, from

the FBI who investigated Schulte's crimes, specialists in cyber

crimes, digital forensics, counterintelligence.  They'll tell

you about the investigation.  You'll learn from these witnesses

that the FBI analyzed the classified information that was

posted on WikiLeaks and they compared it to what was on that

CIA network, and you'll see how they determined that the stolen

information posted by WikiLeaks came from one spot, that same

specific March 3 backup of the system, the very backup that

Schulte stole, a backup that very few people knew where it was

or even that it existed.  But you'll learn that Joshua Schulte

knew exactly about it because he helped create it and so he

knew exactly how to steal it.

1          Those forensic experts will also walk you through what

2      Schulte did on April 20, 2016, the day he stole those secrets.

3      Even though Schulte tried to delete any trace of his theft of

4      sensitive, classified information, his footprints were left

5      behind.  The FBI's experts found them in the recesses of the

6      computer memory of Schulte's own desktop at the CIA, in spaces

7      where bits of data stayed behind even when Schulte tried to

8      erase them.

9          You're also going to see a lot of exhibits, things

10     like documents and physical evidence.  For example, you'll see

11     emails and all the records of Schulte's personnel disputes at

12     the CIA and the things the CIA did to try and address them.

13     You'll see the log files from Schulte's own computer showing

14     him sending the commands to take their classified system back

15     in time to get his access back, to delete evidence of what he

16     had done, to undo his reversion to make it seem like it never

17     happened.  You'll see data about that March 3 backup for the

18     exact source of the national-security secrets posted on the

19     internet, showing that the last time anyone accessed that file

20     on the CIA's network was the evening of April 20, 2016, right

21     in the middle of Schulte's digital break-in.

22          You'll see video of Schulte when he was in jail using

23     that secret, smuggled cell phone.  You'll read encrypted emails

24     he wrote to a reporter attaching classified information and

25     documents that Schulte had been ordered by the Court not to

1  disclose.

2          And finally, you're going to see and hear Joshua

3  Schulte's own words.  You'll watch the defendant admit on video

4  to having abused his administrative access, and you'll see him

5  declare to a CIA investigator that he wanted his supervisors to

6  be punished for the ways that he thought they had wronged him.

7  You'll read notebooks that the defendant wrote in jail, his

8  plans for disclosing even more sensitive national-defense

9  information and long drafts he wrote of what he was planning to

10  disclose, drafts he wrote revealing secret CIA bases and

11  operations conducted by the CIA overseas, precious technical

12  details about the way the CIA collects intelligence on

13  America's adversaries, all written by Schulte as part of his

14  plan for leaking to the world.

15          And you'll read in his own words his plan for

16  information war, things he wrote, like "I will look to break up

17  diplomatic relationships, close embassies"; things he wrote,

18  like, "Top secret?  Fuck your top secret"; and things like,

19  "Send all your government secrets here, WikiLeaks."

20          Now, as I said, and Judge Crotty told you as well,

21  this is just a preview to give you some context for what you're

22  going to see and hear over the next few weeks.  At the end of

23  this trial, after all the testimony is in and the exhibits have

24  been received, we'll get another opportunity to talk to you

25  about how the evidence specifically proves the defendant's

K24Wsch2                          Opening - Ms. Shroff

1   guilt.  And after that Judge Crotty's going to instruct you on

2   the law.  For now, I'm just going to ask you to do three

3   things.

4            First, pay close attention to all the evidence.

5            Second, carefully follow any instructions Judge Crotty

6   gives you on the law.

7            And finally, just use your common sense, the same

8   common sense you use every day to size people up, make

9   decisions.  Apply that common sense when you assess the

10  evidence that you're going to see and hear here.  If you do

11  those three things, you will give Joshua Schulte a fair and a

12  just trial.  And if you do those three things, you will reach

13  the only conclusion that is supported by all that evidence,

14  that the defendant is guilty.

15           Thank you.

16           THE COURT:  Thank you, Mr. Denton.

17           Ms. Shroff.

18           MS. SHROFF:  The evidence does not fit.  There is no

19  battle plan.  There is no information war.  The prosecution

20  here simply has it wrong.  Mr. Schulte has not committed these

21  crimes, and at the end of the day, you will see that he is not

22  guilty.

23           Good morning, ladies and gentlemen.  Along with

24  Mr. Zas and Mr. Branden, we represent Mr. Schulte, and I'm here

25  to tell you what really happened on March 7 of 2017, and the

K24Wsch2                         Opening - Ms. Shroff

1    time frame before that.

2              On March 7, 2017, a trove -- literally thousands and

3    thousands -- of documents, CIA documents, CIA information,

4    showed up on WikiLeaks.  As you just heard the prosecutor say,

5    these documents were important to the CIA.  These documents

6    were about the CIA's secret electronic surveillance programs,

7    documents that the CIA never wanted the world to know about and

8    certainly not documents that they would want published on

9    WikiLeaks.

10             This was front-page news.  It was front-page news all

11   over the world, and it was news to the CIA.  The CIA had no

12   idea -- no idea at all -- how these documents were leaked.

13   They did not know how, they did not know when, they did not

14   know why, and they certainly did not know who had done it.

15   Just bear in mind the first time they find out is on March 7,

16   2017.  And the reality is, today, the CIA still doesn't know

17   these things, and nor does the government.

18             At the time of the leak and ever since, there was

19   tremendous pressure, nothing but heat and pressure, to hold

20   someone responsible, someone responsible for this leak, someone

21   to blame, someone to whom the government can point the finger,

22   to take the heat off the CIA for not knowing how these

23   documents ended up on WikiLeaks.  So the CIA blamed Josh

24   Schulte.  He's an easy lay-up for them, you will see.  The

25   evidence will show he's an easy target and an easy lay-up for

K24Wsch2                        Opening - Ms. Shroff

1   the CIA.  But they're wrong.  Mr. Schulte is innocent, and

2   throughout this trial, you will come to that same conclusion.

3           I remind you now, as Judge Crotty will remind you

4   again, Mr. Schulte does not bear any burden of proof.  He does

5   not have to prove to you that he's innocent.  It is the

6   government's burden to prove to you, beyond all reasonable

7   doubt, that he is guilty of each one of the 11 counts he is

8   charged with, and they will never be able to do it because

9   Mr. Schulte is simply not guilty.  After almost three years,

10  this massive CIA leak still remains a mystery, a mystery of who

11  did it, how it was done, when it was done.

12          You see, the CIA had to work backwards to go back and

13  try to explain, try to figure out exactly how these documents

14  were copied, how they were taken, how they were taken out of

15  the CIA's system without anyone knowing how they got to

16  WikiLeaks and when and why it happened.  You will hear the

17  government try to piece together a string of facts, and you

18  will see that they will not be able to give you credible

19  evidence that Mr. Schulte is the one who did this.

20          So let's start with how.  The first question is how.

21          You're going to learn that the CIA and the FBI still

22  don't know how.  You've heard now Mr. Denton say that these

23  documents were kept under lock and key; they were so secure

24  that the CIA's computer system and the CIA's building were

25  guarded, and its system, which is called the DEVLAN system, was

K24Wsch2                    Opening - Ms. Shroff

1   super secret.

2            It wasn't.  It simply wasn't.  The CIA's DEVLAN system

3   was not adequately protected.  In fact, it's quite the

4   opposite.  It was wide open, wide as the Sargasso Sea, and when

5   you hear from the CIA witnesses, you will hear it was called

6   the wide, wide west.  People who worked at the CIA knew it

7   wasn't a protected system.  It was a system that allowed

8   hundreds of CIA employees to have access, not just CIA

9   employees but third parties and individuals who contracted with

10  the CIA, who contracted with the CIA to do work for the CIA.

11  And this is not even to mention the many foreign countries and

12  the many foreign agents who all vie with each other -- and we

13  all know this, they all vie with each other to try and get each

14  others' information.

15           And it isn't just that the system was unprotected,

16  that it wasn't super secure or even adequately secure; it's

17  that everybody knew that it wasn't secure.  People at the CIA

18  knew that the computer system was wide open; it lacked

19  controls, and any one of these people -- literally hundreds of

20  people, any one of these people could have and did have the

21  opportunity to take that information.  And remember again that

22  information had been gone for almost a year before the CIA even

23  realized that it had been gone, that it had been taken.  For

24  God's sakes, a whole year.  They went a whole year without

25  knowing that their super-secure system had been hacked.

1          In the prosecution's opening, they gave you a theory.

2     They told you this is how they think Josh Schulte took it.

3     This is how they think Josh Schulte stole the information, and

4     that is what it is.  It's their theory.  It does not come with

5     proof beyond a reasonable doubt.  And more than that, you will

6     see as the evidence unfolds that this is pure speculation on

7     their part.

8          Let's talk about when this happened.

9          Does the government even know when this happened?

10    They claim to, but let's just examine that.  All they know is

11    WikiLeaks published the information on March 7, 2017.  The

12    government's theory is that the information was stolen almost a

13    year before that, leaked to WikiLeaks, and for a whole year,

14    WikiLeaks just sat on the information.  The government wants

15    you to believe that this information -- this is national

16    defense information that everybody wanted, that the CIA worked

17    so very hard to keep secret -- was released to WikiLeaks and

18    WikiLeaks sat on that information -- sensational, mind-blowing,

19    news-creating information -- for a year.  Does that make any

20    sense to you?  An organization that wants to spread

21    information, give out the news, sits on information for a whole

22    year.

23         When you have an explosive story, think about The New

24    York Times or The Wall Street Journal, they have a mind-blowing

25    story, do they sit on it for a year?  It makes no sense.  You

K24Wsch2                         Opening - Ms. Shroff

1   do not sit on information to go stale for a year.  You release

2   the information you have.

3           Not only is the government's story implausible, it

4   keeps changing.  And you will hear about this.  You will hear

5   that the government and the FBI agents first said that the data

6   was taken from the CIA in March of 2016.  They identify for you

7   a very specific time period of when they think this data was

8   stolen, March 7th or 8th of 2016.  But now they will tell you,

9   and now they have told you, in fact, that their first theory

10  was wrong.

11          You just heard the prosecutor say that the

12  information, according to him, was stolen in April.  In fact,

13  he gives you a very specific date: April 20 of 2016.  So which

14  one is right?  Was it March?  Was it April?  They don't know.

15  They do not know, and you will learn that the CIA actually has

16  no idea when this information, when this data was taken from

17  the CIA.  And I remind you yet again that but for WikiLeaks's

18  publication of this data, it is likely that the CIA even today

19  would not know that their data was taken.

20          So that brings us to the last questions, the questions

21  at the heart of this case: who and why?  Lots of people -- lots

22  of people -- at the CIA, very sophisticated, clever, smart

23  computer nerds just like Mr. Schulte have all the skill set to

24  do exactly what the government tells you to believe Mr. Schulte

25  did.  I want to remind you again and again that the CIA itself

1  has no sense of what exactly was taken.  So do they tell you

2  who and why?  No.  They work backwards and they find someone to

3  blame, and they need to blame someone quickly because they've

4  sat on this, looked foolish for not having realized for over a

5  year that their crown jewels were stolen.

6        You think the CIA can just say a year later:  "Oops.

7  Sorry.  We messed up.  We don't know how this got out there.

8  Forgive us, and let's all move on"?  No.  Obviously they

9  cannot.  So what do they say?  They say it was Josh Schulte,

10  because as I've already mentioned to you, he is an easy target.

11        Why?  He's an easy target because when he worked for

12  the CIA, he antagonized almost every single person there.  He

13  antagonized his colleagues.  He antagonized management.  He was

14  a difficult employee.  He really was a difficult employee, but

15  being a difficult employee does not make you a criminal.  A

16  difficult employee does not translate to being a traitor.  A

17  difficult employee does not translate to somebody who would

18  sell out their country.  Josh Schulte's not a traitor.

19        So, for a minute, let me just talk to you about who

20  Josh Schulte is.  Mr. Schulte was born in September of 1988.

21  He was born in Lubbock, Texas.  He's 30 years old.  He's one of

22  four boys born to Roger and Deanna Schulte.

23        From a young age, Mr. Schulte showed a strong interest

24  in math and computers.  He was a smart kid, and he really

25  wanted to serve his country.  He went to University of Texas,

1    applied for an internship and was an intern at the NSA, the

2    National Security Agency.  His dream was to be hired by the

3    CIA, and in 2010, his dream came true.  He was hired by the

4    CIA.  He worked on developing programs in counterterrorism.  He

5    did important work, tracking down terrorists; wrote programs

6    and tools to enable the United States to get rid of terrorists.

7    By all accounts, he was talented.  He was a talented,

8    hardworking employee, and he worked on some important CIA

9    projects.

10            He was also a pain in the ass to everybody at the CIA,

11   and by the middle of 2016, Mr. Schulte became very dissatisfied

12   with his job and his colleagues and his management at the CIA.

13   He had disputes with his colleagues.  He didn't like the

14   disputes.  He didn't like the colleague.  He complained to

15   management.  Management took the colleague's side, and yes,

16   Mr. Schulte was unhappy about that, so unhappy that he

17   eventually decided he was going to leave his dream job and move

18   on.  And he moved on.  He found a job with Bloomberg.  He left

19   the CIA, moved to New York, and that was in November of 2016,

20   November 10, 2016, four months before there's any leak of this

21   information onto WikiLeaks.

22            Unlike the CIA, Mr. Schulte had moved on from them.

23   At his new job, he made $200,000 a year, lived on 39th Street

24   and was doing fine.  This is the person that the CIA wants you

25   to believe, that the government wants you to believe, a man who

1   worked for government his entire life and who dedicated his

2   time and his energy to furthering the goals of the United

3   States, this is the man that they want you to believe was so

4   upset about fights at the CIA that he would literally throw

5   everything under the bus -- not just everything in terms of the

6   United States but everything that he now had in November of

7   2016 -- a new job, a new life, a new city; he would throw it

8   all under the bus because management had not supported him over

9   a year ago.

10          Look, they know that they have problems with the

11   WikiLeaks counts, as the judge has identified them, and you

12   will see those problems, and you will reach the only verdict

13   you can, which will be a verdict of not guilty, which is why

14   the government will focus a large part of its evidence on what

15   they will call the MCC counts.  You will see that they have no

16   evidence that Mr. Schulte was ever in contact with WikiLeaks.

17          You will see that they have no evidence that WikiLeaks

18   was the first entity, person, government, foreign agency to get

19   that information.  They will be able to give you no such

20   evidence, so they will shift.  And they will shift to what they

21   call his quote/unquote information war.  They are going to try

22   and convince you that Mr. Schulte is that person because that

23   is all that they have, and they will give you evidence in the

24   hope that it will make you think of Mr. Schulte as a bad

25   person.

1              Now, I've said this before and I'll say it again.

2       Mr. Schulte is a difficult man.  You will hear that after

3       Mr. Schulte was incarcerated at the MCC, he was desperate.  He

4       really was desperate, desperate to prove that he was innocent.

5       He wanted the world to know he wasn't this person, he was not

6       the man who stole the information, he was not the man who

7       released the information to WikiLeaks, he had nothing to do

8       with that theft.

9              So what does Mr. Schulte do?

10             Mr. Schulte tries to go around and show the world that

11      he is innocent.  And yes, he gets a cell phone, he keeps a

12      journal, he contacts the media to tell them, Look, I'm wrongly

13      arrested; I did not do this.  That is what Mr. Schulte does

14      while sitting in the MCC.  Does that mean that he stole the

15      information from the CIA?  No.

16             Think about this.  Think if you were Mr. Schulte,

17      wrongly accused, if you were in his shoes, sitting at the MCC

18      day after day hearing people say, This is the man, this is the

19      traitor, this is the guy who stole, would you be so desperate?

20      Would you be so upset?  Would you be the person who reaches out

21      and says I did not do this?  That is what Mr. Schulte did.

22             You may not like what Mr. Schulte did from the MCC,

23      but this case really isn't about whether or not you like

24      Mr. Schulte.  It really isn't about whether or not Mr. Schulte

25      is a difficult person.  It really isn't about whether or not

K24Wsch2                         Opening - Ms. Shroff

1     Mr. Schulte was liked or disliked.  If you pay attention to the

2     evidence, if you listen to the evidence on the WikiLeaks

3     counts, you will be no different than me.  You will see that

4     the evidence simply does not show that Mr. Schulte had anything

5     to do with taking the information from the CIA and releasing it

6     to WikiLeaks.

7              The CIA still does not know, and as you hear the

8     government put in evidence after evidence, you will see that

9     they will never be able to tell you how the evidence was taken,

10    whether, in fact, WikiLeaks was the only entity that got it.

11    They will certainly never be able to show any relationship

12    between Mr. Schulte and WikiLeaks.  And for all of those

13    reasons, if you do as the government said -- just use your

14    common sense -- you will reach the only verdict that is proper

15    in this case, a verdict of not guilty.

16             Thank you for listening to me.

17             THE COURT:  Thank you, Ms. Shroff.

18             Call the first witness.

19             MR. DENTON:  Your Honor, the government calls Paul

20    Rosenzweig.

21     PAUL ROSENZWEIG,

22         called as a witness by the government,

23         having been duly sworn, testified as follows:

24             THE COURT:  Please sit down, Mr. Rosenzweig.  Pull

25    yourself right up to the microphone.

K24Wsch2                         Rosenzweig - Direct

1                THE WITNESS:  Thank you.  Can I get a glass of water?

2           Thank you very much.

3                THE COURT:  Mr. Denton.

4      DIRECT EXAMINATION

5      BY MR. DENTON:

6      Q.  Good morning.

7      A.  Good morning.

8      Q.  Mr. Rosenzweig, where do you work?

9      A.  I work in Washington, D.C.

10     Q.  And what do you do?

11     A.  I principally have three jobs right now.  The main one is

12     I'm a principal in my own private consultancy and law firm,

13     where I practice national security, cyber-security law as well

14     as some criminal defense law.

15     Q.  And what are your other positions?

16     A.  I'm also a senior fellow at the R Street Institute, which

17     is a think tank in Washington, D.C.  We spend our time trying

18     to propose new policies for consideration by the government.

19          And my third job is as an adjunct professor -- professorial

20     lecturing was the official title -- at the George Washington

21     University School of Law.

22     Q.  Is your current work in any particular field or specialty?

23     A.  About 95 percent of what I do these days is in the broad --

24     broadly defined area of cyber-security law and policy, issues

25     relating to the security of systems and the policy rules

1    relating to how we might better protect them.

2    Q.  Could you tell us a little more about your professional

3    background?

4    A.  Well, I graduated law school in 1986, and after a

5    clerkship, I spent the first seven years of my career as a

6    prosecutor in the Department of Justice in Washington, D.C.

7    Since then, I've been in and out of government and private

8    practice, back and forth.  I did a stint as an investigative

9    counsel at a -- with a committee of Congress and the House of

10   Representatives.  I was part of the independent counsel

11   investigation that looked at President Bill Clinton's conduct.

12   Most recently, in government, from 2005 to 2009, I was a deputy

13   assistant secretary for policy at the then brand-new Department

14   of Homeland Security.

15   Q.  Mr. Rosenzweig, are you familiar with the website

16   WikiLeaks?

17   A.  Yes, I am.

18   Q.  How have you come to know about WikiLeaks?

19   A.  Well, WikiLeaks has fed into my professional activity and

20   interests in three sorts of ways.

21        First, because I study and work in the national-security

22   field, I have been interested in and studied WikiLeaks because

23   of the effect that certain leaks of classified information on

24   WikiLeaks have affected national security of the United States.

25        Second, as a teacher of cyber security, I've been

K24Wsch2                        Rosenzweig - Direct

1    interested in the ways in which information has been passed on

2    to WikiLeaks, I guess is the best way to say it, from where,

3    from what sources it came and how it gets to WikiLeaks and then

4    what they do with it.

5         Third, I've also had a position for a number of years as an

6    adjunct lecturer at the Northwestern University School of

7    Journalism, the McGill School of Journalism.  And so, I've been

8    interested in WikiLeaks as a journalism phenomenon in terms of

9    how the disclosure of classified information in that forum has

10   kind of changed the nature of journalism, or is trying to

11   change the nature of journalism, today.

12   Q.  Have you done research on WikiLeaks?

13   A.  Yes, I have.

14   Q.  How do you conduct research on WikiLeaks?

15   A.  Well, because WikiLeaks is a relatively closed organization

16   with only a few known public members, most of the information

17   that you study about WikiLeaks to try and understand what it's

18   doing and how it operates comes from public sources.  The most

19   prominent of them, of course, is WikiLeaks itself.  They

20   operate a website, WikiLeaks.org, and a Twitter that they said

21   are their public statement sources, so anything that's on

22   either of those is official.  You can listen to their founder,

23   Julian Assange, who frequently speaks in public about WikiLeaks

24   and his intent with respect to that organization.

25        Then, of course, there are lots of other areas in which

K24Wsch2                      Rosenzweig - Direct

1    people have written about WikiLeaks and analyzed it, ranging

2    from reviews of certain of their prior large-scale disclosures,

3    publications that are related to national security, assessments

4    of what those mean and how they've affected the United States.

5    And then there's lots of secondary literature, people who

6    write, have written, about what they think WikiLeaks's intent

7    and meaning is and how it's going to do, why it does what it

8    does.

9    Q.   Have you published any work related to WikiLeaks?

10   A.   I have.

11   Q.   Generally speaking, what have you published?

12   A.   Back in 2010, 2011, when WikiLeaks first came to

13   prominence, I published a few articles about the application of

14   criminal law to WikiLeaks and potentially to Julian Assange and

15   how that might interact with First Amendment considerations.

16       In 2014, along with two of my teach -- co-faculty members

17   at the McGill School of Journalism, I co-edited a book that was

18   published by the McGill School of Journalism and the American

19   Bar Association, the title of which was Whistleblowers, Leaks,

20   and the Media, which was principally about WikiLeaks and also

21   about Edward Snowden and the phenomenon of those two events.

22   Q.   Have you conducted additional research specifically to

23   prepare for testifying in this case?

24   A.   Yes, I have.

25   Q.   Have you ever testified in court before?

1   A.  No, I haven't.

2   Q.  Have you ever testified before Congress?

3   A.  Yes, I have.

4   Q.  Again, generally speaking, what did you testify about?

5   A.  When I have testified before Congress in my personal

6   capacity, it's almost always been about cyber security-related

7   issues.  When I was a deputy assistant secretary for policy at

8   DHS, I probably testified a half dozen times, and there, the

9   topic matter ranged across all of the issues that are within

10  the Department of Homeland Security's portfolio.

11  Q.  Are you being paid by the government for your time here

12  today and preparing to testify?

13  A.  Yes.

14          MR. DENTON:  Your Honor, the government offers Paul

15  Rosenzweig as an expert on WikiLeaks.

16          THE COURT:  Ms. Shroff.

17          MS. SHROFF:  Your Honor, we object, and we'd like to

18  voir dire.

19          THE COURT:  You can have a short voir dire.  I've

20  already ruled on this, but go ahead.  You can have a short voir

21  dire.

22  VOIR DIRE EXAMINATION

23  BY MS. SHROFF:

24  Q.  Sir, you testified that you've testified before Congress,

25  correct?

K24Wsch2                        Rosenzweig - Direct

1   A.  Yes.

2   Q.  You've never testified as a WikiLeaks expert before

3   Congress, correct?

4   A.  No.  I have, however, testified about whistleblowers

5   generally, not about WikiLeaks specifically.

6          MS. SHROFF:  Your Honor, could you instruct the

7   witness to answer my question, please.

8          THE COURT:  It will move along a lot faster if you

9   listen to the question and just answer it.

10          THE WITNESS:  Sure.

11  BY MS. SHROFF:

12  Q.  So the answer is no, you've never testified as a WikiLeaks

13  expert before Congress?

14  A.  No.

15  Q.  And you've never been qualified as an expert on WikiLeaks,

16  correct?

17  A.  No.

18  Q.  And in fact, you know no one in WikiLeaks, correct?

19  A.  I don't know.

20  Q.  And you've never talked to Mr. Assange, correct?

21  A.  No.

22  Q.  And you've never talked to anybody who represents

23  Mr. Assange, correct?

24  A.  That's wrong.

25  Q.  OK.  Who have you talked to that represents Mr. Assange?

1    A.  I believe I've spoken with Mr. Ratner on a couple of

2    occasions in the past.

3    Q.  You mean his lawyer?

4    A.  Yeah.

5    Q.  OK.  But certainly you're not suggesting to this jury that

6    a lawyer would divulge any private information about

7    Mr. Assange to you, correct?

8    A.  No, I didn't say that.

9    Q.  Right.  So you've never had -- I'll leave it alone.

10       Dr. Rosenzweig, is it fair to say that all of your

11   knowledge about WikiLeaks is derivative of public sources?

12   A.  Yes, I think that is.

13   Q.  Right.  So you read what somebody else has written about

14   WikiLeaks, churn it in your head and write about it, correct?

15   A.  Analyze it, yes.  Yeah.

16   Q.  Same thing.  But that's it, right?

17   A.  Correct.

18           MS. SHROFF:  Your Honor, we object to Mr. Rosenzweig.

19   He has no --

20           THE COURT:  The objection's overruled.

21           MS. SHROFF:  OK.

22           MR. DENTON:  Your Honor, may I approach?

23           THE COURT:  Yes, you may.

24   BY MR. DENTON:

25   Q.  Mr. Rosenzweig, I've handed you what's been marked for

K24Wsch2                          Rosenzweig - Direct

1    identification as Government Exhibit 1702.  Do you recognize

2    that?

3    A.  Yes, I do.  I prepared it.

4    Q.  What is it?

5    A.  It's a summary demonstrative exhibit that contains

6    information and pictures that will help me explain what I know

7    about WikiLeaks.

8    Q.  Did you have help in preparing it?

9    A.  I did.

10          MR. DENTON:  Your Honor, the government offers

11   Government Exhibit 1702 as a demonstrative.

12          MS. SHROFF:  We object, your Honor.

13          THE COURT:  Overruled.

14          MR. DENTON:  May we publish it to the jury, your

15   Honor?

16          THE COURT:  Yes, you may.

17   BY MR. DENTON:

18   Q.  Mr. Rosenzweig, at a very high level, what is WikiLeaks?

19   A.  Well, WikiLeaks is a self-described organization dedicated

20   to the publication and disclosure of confidential, classified

21   information.  It's been described by Julian Assange as

22   uncensorable, untraceable, as a source of mass data sets.

23   Q.  How does WikiLeaks disseminate its information?

24   A.  Well, the principal method that it uses is a website,

25   WikiLeaks.org.

K24Wsch2                          Rosenzweig - Direct

1    Q.   What are we looking at on the screen here?

2    A.   This is a screenshot of the front page of WikiLeaks.org as

3    it appears today.

4    Q.   You said a moment ago that WikiLeaks publishes classified

5    information.   What is classified information?

6              MS. SHROFF:   Objection.

7              THE COURT:   Overruled.

8    A.   Classified information is information that the United

9    States government has classified because its disclosure would

10   cause some form of harm to the national security interests of

11   the United States.

12   Q.   I want to talk a little bit about the background on

13   WikiLeaks.

14             MR. DENTON:   Ms. Hurst, if we could go to the next

15   page, please.

16   Q.   When was WikiLeaks founded?

17   A.   WikiLeaks was founded in 2006 by Julian Assange.

18   Q.   Who is Julian Assange?

19   A.   Julian Assange is an Australian, a self-described

20   transparency advocate, who founded WikiLeaks for the public --

21   for the purpose of providing a forum for the disclosure of

22   information he thought the public needed to know.

23   Q.   When did WikiLeaks first post material?

24   A.   Its first known public disclosure was in December of 20 --

25   of 2006, when it disclosed information relating to Sheikh Ali's

1    decision or order to execute certain Somali government

2    officials.

3    Q.  Now, Mr. Rosenzweig, just looking at the screen here, in

4    the corner there's an image and then text that says WikiLeaks.

5    Do you see that?

6    A.  Yes.

7    Q.  What is that?

8    A.  That's their symbol, but we put it on there just to

9    identify this as relating to WikiLeaks.

10   Q.  Just to be clear, WikiLeaks did not prepare this --

11   A.  Oh, absolutely not.  I prepared this.

12   Q.  After the first disclosure, in 2006, how would you

13   characterize the volume of material posted by WikiLeaks?

14   A.  Well, from 2006 until today, they have disclosed tens of

15   millions of pages of information of various sorts and types.

16   It's impossible to get a precise number, but in the tens of

17   millions, for sure.

18   Q.  Based on your research, are there particular groups of

19   WikiLeaks disclosures that you consider especially notable?

20   A.  There are certainly some that are especially notable in the

21   context of American national security, yes.

22   Q.  Why are they notable?

23   A.  In part, because of their volume; in part, because of their

24   large-scale effect on American national security and politics;

25   in part, because of the sensitivity of some of the things

K24Wsch2                          Rosenzweig - Direct

1    they've disclosed.

2    Q.  Let's talk about some of those.

3              MR. DENTON:  If we could go to the next page, please.

4    Q.  Let's start at the top here, April 5, 2010.  What did

5    WikiLeaks post then?

6    A.  On April 5, 2010, WikiLeaks disclosed a video that had been

7    sourced to the American military in Iraq, a U.S. helicopter.

8    What the video disclosed was, as the title that WikiLeaks gave

9    it, collateral murder, suggests, the accidental killing of a

10   number of Iraqi civilians as well as, it turns out later, two

11   journalists from Reuters who were also killed in the attack.

12   Q.  And then next, July and October of 2010, what was that?

13   A.  In July and October 2010, WikiLeaks published two groups of

14   documents known respectively as the Afghanistan and Iraq war

15   logs.  There were, in total, about 450,000 of them, and these

16   were essentially internal U.S. military logs and reports of

17   activity during the war in Iraq, everything ranging from

18   reports on patrols to reports on casualties to discussions with

19   Iraqis about assistance to the United States government.

20   Basically, the sum and substance of a lot of tactical-level

21   military activity on the ground.

22   Q.  Now, I want to ask you about the other ones on this page in

23   a little more detail.  Looking at November 28, 2018, which

24   you've labeled Cablegate, what was Cablegate?

25   A.  2010, Cablegate.

K24Wsch2                    Rosenzweig - Direct

1   Q.   Sorry.

2   A.   That was the disclosure of approximately a quarter million,

3   250,000, cables from the United States State Department.  The

4   United States -- a cable is really just a message, an email.

5   They call them cables because back in the old days they sent

6   them by trans-Atlantic cable, but it's essentially a message

7   from, say, the U.S. embassy in Germany to the secretary of

8   state saying, I just met with the minister of interior, and

9   this is what he said.  It's a report of that sort of

10  transaction.

11  Q.   Where did the name Cablegate come from?

12  A.   WikiLeaks gave the release that name.

13  Q.   Where did the materials that were posted as part of

14  Cablegate come from?

15  A.   They came from a U.S. Army private, who at the time was

16  known as Bradley Manning and is today known as Chelsea Manning.

17  Q.   How do you know that?

18  A.   Ms. Manning admitted it.

19  Q.   Did WikiLeaks's posting of these cables have an effect on

20  the United States?

21  A.   It did.

22  Q.   What effect did it have?

23            MS. SHROFF:  Objection.

24            THE COURT:  Overruled.

25  A.   Well, at the highest level, disclosure of confidential

K24Wsch2                          Rosenzweig - Direct

1   communications within the State Department makes people less

2   willing to trust us, less willing to talk candidly to the

3   Department of State, since they don't know whether or not what

4   they are telling us in confidence is going to be held in

5   confidence by the government, or can be held in confidence by

6   the government.

7        More particularly, specific releases of information could

8   have individualized effect on the people mentioned in the

9   cables, their -- and their relationships with other people, who

10  would then know about their discussions with the United States.

11              MR. DENTON:  Ms. Hurst, can I ask you to go to the

12  next page, please.

13  Q.  Have you identified a couple of particular examples of some

14  of the consequences you've described?

15  A.  Yeah.  Simply as a way of picking out a couple that are

16  pretty famous and well-known to describe how these leaks had

17  adverse consequences, I picked two out.

18       The first is an effect that was had on our relationships

19  with Mexico.  The U.S. ambassador to Mexico, a man named Carlos

20  Pascual, had sent back to the State Department a fairly

21  critical cable that suggested that there were very serious

22  weaknesses in the Mexican government; that we couldn't rely

23  upon them, that sort of thing, exactly the sort of candid

24  information you would want an ambassador to convey.

25       When that cable became public, the Mexican government was

K24Wsch2                    Rosenzweig - Direct

1   upset.  The Mexican president, Felipe Calderón, said that there

2   was severe damage to the relationship, and in the end, the U.S.

3   was obliged to re-call the ambassador to Mexico and replace him

4   with another in order to try and repair the relationship with

5   Mexico.

6   Q.  Is re-calling an ambassador a significant event?

7               MS. SHROFF:  Objection.

8               THE COURT:  Overruled.

9   A.  It is generally considered the most serious sort of

10  diplomatic event that can happen between two nations.

11  Q.  And then you've got another example here.  Can you tell us

12  about that, please?

13  A.  Yes.  Helmut Metzner was a member of the German FDP; that's

14  the Free Democratic Party.  Germany has a parliamentary

15  government.  The FDP is, was at the time the third or fourth

16  largest, and so when Germany -- when one party doesn't get a

17  majority in a parliamentary government, they have to negotiate

18  a coalition with one of the smaller party members.

19      Mr. Metzner was with the FDP, and he was providing the U.S.

20  embassy in Berlin with some insight into the ongoing

21  negotiations in the forming of a government in Germany at the

22  time.  When his work with the U.S. government, his candor with

23  the U.S. government was disclosed, he was fired from the FDP;

24  he'd been a rising star.  He lost his job.  And the FDP,

25  likewise, had said that it had significant difficulties and

K24Wsch2                          Rosenzweig - Direct

1   challenges working with the then U.S. ambassador, Ambassador
2   Murphy.  And so there was a significant effect on our ability
3   to work with that particular party especially.
4   Q.  I want to talk about another WikiLeaks post you've
5   identified before, but first, just as a matter of background,
6   are you familiar with the group Anonymous?
7   A.  I am.
8   Q.  What is Anonymous?
9   A.  Anonymous is a decentralized, amorphous group of what --
10  self-described hacktivists -- that's two words, "hackers" and
11  "activists," together -- who say that they do hacking for
12  political purposes, to make a political point.  Their very
13  first attack, hacking attack was on the Church of Scientology,
14  for example, because of its practices.
15  Q.  Has Anonymous worked with WikiLeaks before?
16  A.  It has.
17  Q.  How do you know that?
18  A.  Well, again, some Anonymous members have admitted so and
19  have said so publicly.
20  Q.  Let's start with 2010.  What happened between WikiLeaks and
21  Anonymous in 2010?
22  A.  Well, as we -- there are three parts to that, I think.  The
23  first part we've sort of already described.  In 2010, WikiLeaks
24  became quite famous through a number of disclosures of public
25  information about the United States and really rose to

K24Wsch2                         Rosenzweig - Direct

1    prominence from its early beginnings.  That, naturally,

2    generated a lot of attention, some of it positive and some of

3    it negative.  A lot of American citizens didn't feel that

4    WikiLeaks had American -- America's best interests at heart.

5         One of the effects of that, the second part of this, is

6    that at the time, in 2010, WikiLeaks was using companies for

7    its services.  It used PayPal and it used Amazon and it used

8    MasterCard; PayPal and MasterCard to get donations, Amazon for

9    web services, that sort of thing.  Because of the adverse

10   reaction to WikiLeaks in the American public, Amazon,

11   MasterCard and PayPal all suspended their services to

12   WikiLeaks, pulled their services.  PayPal wouldn't process

13   payments.

14             MS. SHROFF:  Your Honor, we have an objection.

15             THE COURT:  What's the objection?

16             MS. SHROFF:  Well, first of all, your Honor, we ask

17   for a limiting instruction on these statements not being

18   admitted for the truth of the statements themselves.

19             Secondly, I think that the testimony being elicited is

20   far beyond any expertise the witness has.

21             THE COURT:  I'll grant the instruction.  Much of your

22   objection deals with the offering of statements to prove the

23   truth.  It's not offered for that purpose but only to establish

24   that WikiLeaks made these statements, when they did so and how

25   the classified information was published.  That's the limiting

1    instruction I'll provide.

2                    After that, your objection is overruled.

3                    Go ahead, Mr. Denton.

4                    THE WITNESS:  So, the third part of this story is

5    where Anonymous and WikiLeaks come together.

6                    After the companies had stopped serving WikiLeaks

7    because of -- because of their activity, Anonymous, this group

8    of hacktivists, announced an operation.  They called it

9    Operation Payback or also sometimes known as Operation Avenge

10   Assange, in which the hacktivists launched cyber attacks

11   against MasterCard, PayPal, and -- and they announced one at

12   Amazon, but then they didn't carry it out.  The attacks were

13   generally not successful, but they were part of a process by

14   which Anonymous offered support for WikiLeaks.

15   Q.  And again, how do you know that?

16   A.  Again, it's a matter of public record.  The -- 14 of the

17   participants in Operation Payback have admitted to the

18   substance of what I've just described.

19   Q.  Has Anonymous ever served as a source of information for

20   WikiLeaks?

21   A.  Yes, it has.

22       In 2012, a WikiLeak -- an Anonymous hacktivist named Jeremy

23   Hammond stole a series of emails from a private intelligence

24   research company called Stratfor.  Stratfor basically provides

25   companies with the same type of intelligence gathering and

K24Wsch2                         Rosenzweig - Direct

1   collection that they think national-security people provide.

2   They tell them what's coming, who is going to win elections,

3   that sort of thing.  Hammond stole these emails and provided

4   them to WikiLeaks, which then published them.

5   Q.  And again, how do you know that?

6   A.  Hammond has admitted to that.

7   Q.  So then let's move to a little more recently, if we can.

8   Was WikiLeaks doing anything in the summer and fall of 2016?

9   A.  WikiLeaks was involved in two instances of publication of

10  information that were related to the 2016 national election.

11  Q.  Was there substantial press coverage of these leaks?

12          MS. SHROFF:  Objection.

13          THE COURT:  Overruled.

14  A.  Yes.

15  Q.  Starting with the top, what came first?

16  A.  Well, the first such release of information came from data

17  that had been stolen from the Democratic National Committee,

18  the committee that runs the democratic party and that runs the

19  nomination process for candidates of the democratic party.

20  The -- 19,000-plus emails were released in July, just on the

21  eve of the national convention, and another 8,000 were released

22  on November 6, just on the eve of the national election.

23  Q.  And what next, down below that?

24  A.  John Podesta was the chairman or manager of Hillary

25  Clinton's election campaign.  He, too, was hacked, and over

K24Wsch2                    Rosenzweig - Direct

1    200,000 pages of his files, all relating to the campaign, were

2    subsequently published by WikiLeaks, almost daily, beginning in

3    October and running right up to the Election Day in early

4    November of 2016.

5    Q.   I think you've highlighted a couple of dates, but as a

6    general matter, did these leaks happen over time?

7    A.   Yes.   The -- certainly the ones with respect to Mr. Podesta

8    happened essentially daily over that time frame.

9    Q.   Mr. Rosenzweig, what do you know about how those emails

10   were provided to WikiLeaks?

11   A.   I have reviewed public reports about those from

12   private-sector cyber security firms.   I have reviewed reports

13   from the Senate intelligence committee.   I've reviewed reports,

14   insofar as they're public, from the intelligence community and

15   FROM the special counsel who investigated these matters.   And

16   so, on that basis, I -- I guess the question was what do I

17   know?

18        I know that all of these are in --

19             MS. SHROFF:   Your Honor, we have an objection based on

20   hearsay.

21             THE COURT:   Overruled.

22   A.   All of these are of the view that the information was

23   stolen from both the DNC and the Clinton campaign by elements

24   of the Russian government and passed to WikiLeaks through

25   various sources, notably one called Guccifer 2.0, which is a

K24Wsch2                          Rosenzweig - Direct

1    hacker name for what appears to be a fictitious, nonexistent

2    person.

3    Q.   Does WikiLeaks provide any guidance on how people in

4    possession of sensitive information can get it to WikiLeaks?

5    A.   Yeah, they have a whole page on how to do that.

6              MR. DENTON:   Let's take a look at that, Ms. Hurst,

7    please.

8    Q.   Mr. Rosenzweig, where does this page come from?

9    A.   This is a screenshot from the "submit documents to

10   WikiLeaks" web page as it appears today.

11   Q.   Were you able to determine whether this page has changed

12   over time?

13   A.   I was.

14   Q.   How were you able to do that?

15   A.   Well, as you know, the internet -- web pages on the

16   internet change daily sometimes, and so, there is a function,

17   an archive organization that takes old screenshots -- or takes

18   screenshots of web pages periodically and keeps them in an

19   archive.  It goes by the name of the Wayback Machine so that

20   you can search in the archive and ask it whether or not it has

21   a snapshot of, say, how the U.S. Attorney's Office's web page

22   looked in 2012 or how my personal website looks in 2015.

23             MR. DENTON:   We can go to the next page, Ms. Hurst.

24   Q.   Mr. Rosenzweig, what are we looking at here?

25   A.   This is the Wayback Machine-archived picture of the

K24Wsch2                          Rosenzweig - Direct

1    WikiLeaks.org "submit documents to WikiLeaks" page in April of

2    2016.

3    Q.  How has it changed from April of 2016 to today?

4    A.  Well, insofar as I can tell, the only difference is that

5    the website address that you are asked to use to submit a leak

6    to WikiLeaks through has changed.

7    Q.  Is that a normal website address?

8              MS. SHROFF:  Objection.

9              THE COURT:  Overruled.

10   A.  It's different from the ones that most people commonly see.

11   It is what's known as a dot-onion address.

12   Q.  What is a dot-onion address?

13   A.  Well, it's a reference to a type of web browser called TOR,

14   which stands for The Onion Router.  A dot-onion address is one

15   that is anonymized and, therefore, difficult, if not

16   impossible, to trace connections to.

17   Q.  Generally speaking, looking at this page, how does

18   WikiLeaks tell people to submit information to it?

19   A.  Well, they tell people to use this browser, TOR, The Onion

20   Router, which -- it looks just like any other browser, like

21   your Safari browser or your Firefox browser or something like

22   that, but it has this anonymizing function built into it.  So

23   it tells people to first install TOR, The Onion Router, browser

24   on their computer, and then use this address, copy it into the

25   TOR browser in order to access the secure, untraceable upload

K24Wsch2                         Rosenzweig - Direct

1   site.

2   Q.  Mr. Rosenzweig, do you see these boxes down at the bottom

3   about how to contact WikiLeaks and what is TOR, and so on?

4   A.  Yeah, I do.

5   Q.  What are those?

6   A.  Those are click -- boxes where you click on them and it

7   answers the question.

8   Q.  Let's take a look at some of those.

9            MR. DENTON:  Ms. Hurst, let's go to the next page.

10  Q.  What does WikiLeaks say about TOR?

11  A.  Well, it describes it, as I just described it, as an

12  encrypted anonymizing network that makes it hard to intercept

13  internet communications.  Today, if you go to a web page, as

14  you probably know, people track you.  You get cookies, and they

15  can track you, and that's how Google sells you ads, for

16  example.  TOR eliminates that possibility, to the maximum

17  extent possible, and attempts to make it difficult to trace

18  who's accessing a website so that you can do so in an anonymous

19  way.

20  Q.  How does TOR do that?

21  A.  This is a graphic that was put together by the Electronic

22  Frontier Foundation, which is a pro-privacy organization that

23  advocates for all citizens to use TOR.

24      What it does, what TOR does is essentially create a random

25  network for each transmission to bounce your information from

K24Wsch2                         Rosenzweig - Direct

1    your computer to the web -- to the server that's hosting the

2    website that you want to go to.  It does so in an encrypted

3    form so each of the steps is encrypted, and it goes through a

4    series of hops that make it difficult, along with the

5    encryption, to bait -- backward trace it.  So in this diagram,

6    Bob, the ultimate recipient of the information from Alice,

7    could not know that it was Alice who was sending him the

8    information.

9              MR. DENTON:  If we can go to the next page, I want to

10   look at the other thing that WikiLeaks talked about.

11   Q.  What is Tails?

12   A.  Well, Tails is a -- when you boot up your computer, it runs

13   an operating system inside your laptop that starts it.  If

14   you're a Microsoft person, it's Windows.  If you're an Apple

15   person, it's the macOS.

16        Tails is an operating system that resides in a thumb drive,

17   and when you boot up your computer with Tails in the -- stuck

18   in the USB port, instead of running your Microsoft Windows or

19   your Apple OS, it will run the operating system from your thumb

20   drive.

21        The reason people use Tails is that even if you use the

22   anonymizing connection of TOR, you can still leave evidence of

23   your communication on your personal laptop.  If I type in

24   something on my keyboard today, it will -- it could reside in

25   some forms of memory for quite some time.  If I use Tails

K24Wsch2                        Rosenzweig - Direct

1  instead, if I run the operating system just from the thumb

2  drive instead of from what's in my laptop, then there is no

3  memory, or there's much less memory, of what happened on my

4  laptop in the laptop itself.  And so it's another way of

5  creating anonymity, by removing the evidence from my laptop in

6  the same way that TOR eliminates it from my transmission across

7  the network.

8  Q.   Just for the record, can you read what WikiLeaks says about

9  Tails?

10  A.   Sure.  It says, "If you are at high risk and you have the

11  capacity to do so, you can also access the submission system

12  through a secure operating system called Tails.  Tails is an

13  operating system launched from a UBS stick or a DVD that aims

14  to leave no traces when the computer is shut down after use and

15  automatically routes your internet traffic from TOR.  Tails

16  will require you to have either a USB stick or a DVD and at

17  least 4GB" -- that's gigabytes -- "big and a laptop or desktop

18  computer."

19              MR. DENTON:  If we can go to the next page.

20  Q.   Does Tails stand for anything?

21  A.   Oh, sorry.

22       Yes, it stands for The Amnesic Incognito Live System.

23  That's because it forgets what it is.  There's no memory of

24  what it does, and it allows you to act incognito, anonymously.

25  Q.   What is this page here that we're looking at?

K24Wsch2                          Rosenzweig - Direct

1    A.  This is the download page from which you can download the

2    latest version of Tails.

3    Q.  And where it says Tails 2.2.1, what does that mean?

4    A.  That's a version control, like, like Tails 2.1, Tails 2.2,

5    Tails -- it's just the most recent revision or release of the

6    system.

7    Q.  And what's the date for that revision?

8    A.  That revision is March 18, 2016.  So that's the date of

9    that particular version of Tails.

10            MR. DENTON:  If we could go to the next page, please,

11   Ms. Hurst.

12   Q.  How does someone get Tails, Mr. Rosenzweig?

13   A.  Pretty much the same way that one gets any application for

14   one's system.  You go to one of the download pages.  You click

15   on the link and the files download and then they get installed,

16   in this case on a USB rather than on your computer, but, in

17   effect, the operation is the same.

18   Q.  Do you see on the left where it says "download Tails

19   torrent file"?

20   A.  Yes.

21   Q.  Sorry.  On the right.

22   A.  Yeah.  OK.  Thank you.

23        Yes, I do see the torrent, bit torrent download, yes.

24   Q.  What is a bit torrent download?

25   A.  Bit torrent is another way of downloading information.

1    It's what's known as a peer-to-peer system, so instead of

2    downloading from a server, you download directly from another

3    host who can transmit it to you directly.  It's just a

4    different way of downloading, really.

5            MR. DENTON:  If we could go back to WikiLeaks for a

6    moment.

7    Q.  Mr. Rosenzweig, what are we looking at here?

8    A.  Well, this is another pop-up from the buttons below.  This

9    is further information that WikiLeaks provides to people who

10   are contemplating sending it information on how to avoid being

11   discovered and preserve their anonymity.

12   Q.  Can you read what WikiLeaks says at the top, just under

13   tips, generally?

14   A.  Sure.  It says, I think accurately:  "Our submission system

15   works hard to preserve your anonymity, but we recommend you

16   also take some of your own precautions.  Please review these

17   basic guidelines."

18   Q.  Can you focus on No. 2.  What does it say under No. 2?

19   A.  It recommends, under "what computer to use," that "if the

20   computer you are uploading from could subsequently be audited

21   in an investigation, consider using a computer that is not

22   easily tied to you.  Technical users can also use Tails to help

23   ensure you do not leave any reference of your submission on the

24   computer."

25   Q.  Finally, if we could talk about the last part of

K24Wsch2                         Rosenzweig - Direct

1    WikiLeaks's page here, what are we looking at?

2    A.  Well, this is what to do afterwards.  It's not technical,

3    but it's recommendations on behavior.

4    Q.  I'm going to ask you to focus on Nos. 2 and 3.

5              MR. DENTON:  If we could go to the next, page, please,

6    and try and blow those up.

7    Q.  Can you read No. 2t for us?

8    A.  Yes.  It says: "Act normal.  If you are a high-risk

9    source, avoid saying anything or doing anything after

10   submitting which might promote suspicion.  In particular, you

11   should try to stick to your normal routine and behavior."

12   Q.  And then No. 3, please.

13   A.  "Remove traces of your submission.  If you are a high-risk

14   source and the computer you prepared your submission on or

15   uploaded it from could subsequently be audited in an

16   investigation, we recommend that you format and dispose of the

17   computer hard drive and any other storage media you used.  In

18   particular, hard drives retain data after formatting which may

19   be visible to a digital forensic team.  And flash media -- USB

20   sticks, memory cards and SSD drives -- retain daft even after a

21   secure erasure.  If you use flash media to store sensitive

22   data, it is important to destroy the media.  If you do this and

23   are a high-risk source, you should make sure there are no

24   traces of the cleanup, since such traces themselves may draw

25   suspicion."

1    Q.  Now I want to put aside some of this technical stuff for a

2    moment, Mr. Rosenzweig.

3                MR. DENTON:  If we could go to the next page.

4    Q.  Has WikiLeaks actively solicited any particular type of

5    information?

6    A.  Yes.  They are -- they have in the past actively solicited

7    the leak of classified U.S. government information.

8    Q.  Are there particular examples of that?

9    A.  Well, I've noted two, a couple, here.  They have had, from

10   the beginning, a most-wanted list of leaks that they would like

11   to have.  They have a crowd -- and they also have a

12   Crowdfunding page on which you can pledge money to pay for the

13   work that might go into securing a leak.

14   Q.  These two quotes at the bottom here, who said those things?

15   A.  Both of them are from Julian Assange.

16   Q.  I want to ask you in particular about the bottom one, and

17   in particular, I guess it's the end of the second and most of

18   the third line.  It says, "It is possible now for even a single

19   system administrator to have a very significant change."

20       Are you familiar with the term "system administrator"?

21   A.  Yes.

22   Q.  Is that a technical term?

23   A.  Yes.

24   Q.  What does it mean?

25   A.  Well, it is, generally speaking, the person who is in

K24Wsch2                    Rosenzweig - Direct

1    charge of a computer IT system.  He's the person who you go to

2    to recover your password.  He's the person that you go to to

3    change access rules so that you can get access to different

4    parts of the system.  He's the guy in charge.

5    Q.  Now, based on your research, Mr. Rosenzweig, have you been

6    able to determine any sort of patterns or consistent practices

7    with respect to WikiLeaks's posts of sensitive information?

8    A.  Yes, I -- I've studied, to some degree, the -- well, I've

9    studied the ways in which WikiLeaks redacts and does not redact

10   information that it hosts on the page.

11   Q.  Let's talk a little bit about that.  Let's start at the

12   top.  What do you mean by redacting information?

13   A.  Well, redaction is essentially a black box on a piece of

14   paper, at its simplest form, that deletes, say, personal

15   information or the name of a person who sent a piece of

16   information.  It is a restriction on the data that you get that

17   cuts out a piece of it.

18   Q.  And what have you been able to determine about WikiLeaks's

19   practices with respect to redactions?

20   A.  Well, they're inconsistent.  They've changed over time.  It

21   started -- WikiLeaks started out with almost no redaction

22   practices at all.  They were actually just operating a Wiki

23   that almost anybody could upload to.  Over time, their

24   redaction practices have changed.  They've curated some of

25   their releases so that they are -- how shall I say?

K24Wsch2                    Rosenzweig - Direct

1     They've curated some of the releases so that they have

2     attempted to remove some personal information from them, often

3     incompletely.  Sometimes they make releases and then they

4     realize that they've released something that, maybe, could hurt

5     an individual, and they apply redactions later.  It's quite

6     variable, I would say.

7  Q.  Does WikiLeaks generate any original material?

8  A.  Not that I know of.

9  Q.  What do they post when they post classified information or

10    other leaks that they're disclosing?

11 A.  WikiLeaks posts the raw information, so if they have a --

12    450,000 logs, they post the logs themselves, the actual texts

13    of the communication, the pictures of the communique that were

14    accompanying it.  If they have cables, they post the texts of

15    the cables in their original form.

16 Q.  Has WikiLeaks made any statements about whether they review

17    all of that material?

18 A.  WikiLeaks has said that it doesn't traditionally --

19    typically conduct any real analysis.  Its goal, in fact, is to

20    let the people decide, to provide them with the full

21    information that they can.

22 Q.  In connection with some of these disclosures we've been

23    talking about, has WikiLeaks ever worked with, like, The New

24    York Times, Wall Street Journal --

25 A.  Yes.

1  Q.  -- entities like that?

2  A.  Yes, they have.

3  Q.  Tell us a little about that, please.

4  A.  Well, at times, WikiLeaks has partnered with traditional

5  media organizations in order to provide those media

6  organizations with advance looks at the material that they're

7  going to release.  Those media organizations, in turn, then

8  publish at the -- simultaneously along with their analysis and

9  their own reporting about the leaks, what they mean, what they

10 think, you know, who it might have come from, why it's coming

11 out now, that sort of thing.

12 Q.  When WikiLeaks posts information, do they say where it

13 comes from?

14 A.  No, they don't.

15 Q.  What, if anything, has WikiLeaks said about steps they take

16 with regard to sources of information?

17 A.  In fact, they've said that they do their best to protect

18 their sources of information both through the anonymizing steps

19 that we've already talked about and by giving inaccurate,

20 incomplete or incorrect information about their sources in

21 their public disclosures as a way of obscuring or assisting in

22 obscuring the identity of their sources.  In short, they've

23 said that they public -- they've publicly said that they

24 publish inaccurate information about their sources on purpose.

25 Q.  As a general matter, across the body of WikiLeaks

K24Wsch2                    Rosenzweig - Direct

1   disclosures, has WikiLeaks focused on any particular target?

2   A.  Well, it is statistically true that the overwhelming

3   majority of the information that they've published is about the

4   United States.  There are other countries in a number -- which

5   have had a number of leaks, but the overwhelming majority is

6   American.

7   Q.  Mr. Rosenzweig, have you become familiar with a WikiLeaks

8   disclosure known as Vault 7?

9   A.  I have.

10  Q.  When did WikiLeaks first mention Vault 7?

11  A.  February of 2017, February 4, to be particular.

12  Q.  And what are we looking at here, Mr. Rosenzweig?

13  A.  Well, as we said at the beginning, WikiLeaks has two

14  sources of putting information out.  One is its web page that

15  we've been focusing on.  The other's its Twitter account.

16      This is a screenshot of the February 4, 2017, Twitter feed

17  from WikiLeaks.

18  Q.  Did WikiLeaks release any material at the same time as this

19  tweet?

20  A.  No.  This was a teaser tweet.

21  Q.  And there is a question here, "What is Vault 7?"  Did

22  WikiLeaks answer that question?

23  A.  Not at this time, no.

24  Q.  You called this a teaser.  Did those teasers continue?

25  A.  Yes, they did, for a number of days.

1              MR. DENTON:  Let's take a look at those, if we could,

2    Ms. Hurst.

3    Q.  What came next?

4    A.  Well, this is the next day:  "Where is Vault 7?"  With a

5    kind of spooky picture.

6    Q.  And again, where do these pictures come from?

7    A.  I don't know.

8    Q.  Who posted those --

9    A.  Oh, I'm sorry.  WikiLeaks.  WikiLeaks posted them.  I don't

10   know what the source, original source of this is.

11   Q.  What next?

12   A.  "When is Vault 7?"  That was the next day, February 6.

13   Q.  And if we could keep going, please.

14   A.  "Who is Vault 7?"  And this is, again, a picture of --

15   that's Mr. Assange in the middle.

16   Q.  Again, who posted that particular picture?

17   A.  WikiLeaks posted it on February 7, 2017.

18   Q.  If we could go to the next one, please?

19   A.  This is the WikiLeaks post from February 8, "Why is Vault

20   7?"

21   Q.  And one more, please.

22   A.  And this is the February 9 post:  "How did Vault 7 make its

23   way to WikiLeaks?"

24   Q.  Again, we've been talking about a lot of questions.  When

25   WikiLeaks posted these tweets, did it provide answers to these

K24Wsch2                      Rosenzweig - Direct

1   questions?

2   A.  It did not.

3          MR. DENTON:  Then one more, please.

4   Q.  When did WikiLeaks first release substantive material

5   related to Vault 7?

6   A.  That would be this, this picture here, on March 7, 2017,

7   "The release of Vault 7, part 1, year zero, inside the CIA's

8   global hacking force."

9   Q.  And then down below that, do you see where it says "CIA

10  Vault 7 year zero decryption pass phrase"?

11  A.  Yes.

12  Q.  What is the pass phrase?

13  A.  Well, the pass phrase is the decryption phrase that you

14  have to type in to unencrypt the release, and the phrase they

15  used is "splinter it into a thousand pieces and scatter it into

16  the winds."

17  Q.  Do you recognize that phrase?

18  A.  Yes.

19  Q.  Where does it come from?

20  A.  It's attributed to JFK, John Kennedy, who said it after the

21  Bay of Pigs failure in Cuba when he said that he was -- he said

22  that he was so angry at the CIA that he was going to splinter

23  it into a thousand pieces and scatter it into the wind.

24  Q.  Was there more than one disclosure tied to Vault 7 by

25  WikiLeaks?

K24Wsch2                    Rosenzweig - Direct

1    A.  Yes, there was.

2    Q.  Now, in terms of your testimony today, Mr. Rosenzweig, did

3    you review any of the actual material released by WikiLeaks

4    under Vault 7?

5    A.  No, I did not.

6    Q.  Why not?

7    A.  Well, two reasons.  First, that wasn't my area of

8    expertise.  And the second is that I continued to have an

9    inactive security clearance, and my understanding is it's not

10   appropriate for me to look at things I'm not cleared to know

11   about.

12   Q.  What material related to Vault 7 did you review?

13   A.  I reviewed the WikiLeaks posts that released them and

14   announced them to the world.

15           MR. DENTON:  Let's take a look at those, if we could.

16   Q.  What did WikiLeaks release from Vault 7 in March of 2017?

17   A.  There were three releases in March of 2017:  The first one

18   that we've just discussed, which was the very first, "CIA

19   hacking tools revealed" announcement; and then the first of a

20   series of releases of particular, I guess, groups of

21   material -- on March 23, one known as Project Dark Matter, and

22   on March 31, one known as Marble Framework.

23   Q.  If you could for a moment, Mr. Rosenzweig, could you just

24   read what WikiLeaks described the Vault 7 release as on March

25   7?

K24Wsch2                          Rosenzweig - Direct

1    A.  "The WikiLeaks releases Vault 7 Marble," which is --

2    Q.  I'm sorry.  I meant March 7, on the left.

3    A.  Oh, I'm sorry.  I apologize.  I probably misheard you.

4        "A series of leaks on the U.S. Central Intelligence Agency

5    code named Vault 7 by WikiLeaks.  It is the largest-ever

6    publication of confidential documents on the agency."

7    Q.  I didn't mean to cut you off.

8    A.  Sorry.

9    Q.  If we can go back to the Marble Framework, please.

10   A.  I misheard you.

11       "Today, March 31, WikiLeaks released Vault 7, Marble, 676

12   source code files with the CIA's secret, antiforensic Marble

13   Framework."

14   Q.  Are you familiar with the term "source code"?

15   A.  Yes.

16   Q.  What is source code?

17   A.  Source code are the lines of computer code that a computer

18   programmer will use to design, to create a program.

19   Q.  Did WikiLeaks release more information from Vault 7 after

20   March 31, 2017?

21   A.  Yes.

22   Q.  About how many Vault 7 releases were there in total?

23   A.  I think there were 26 in total.

24   Q.  Let's take a look at the next set of them.  What did

25   WikiLeaks release from Vault 7 in April of 2017?

K24Wsch2                          Rosenzweig - Direct

1    A.   Weekly.   On April 7, they released something known as the

2    Grasshopper Framework.   On April 14, they released something

3    known as HIVE.   On April 21, 2017, it was Weeping Angel, and on

4    April 28 it was something called Scribbles.

5    Q.   What about in May, Mr. Rosenzweig?

6    A.   Only three in May.   May 5 was Archimedes.   May 12 was After

7    Midnight along with one called Assassin that didn't make it

8    into the title.   And on May 19, a project known as Athena.

9    Q.   Did the leaks continue into June?

10   A.   Yes.   Five in June.   June 1 was Pandemic.   June 15 was

11   Cherry Blossom.   June 22 was Brutal Kangaroo.   June 28 was

12   Elsa, and June 29 was one known as Outlaw Country.

13   Q.   If we could then talk about July.

14   A.   They -- these are -- they continued on a more or less

15   weekly basis.   July 6 was Bothan Spy and another project called

16   Dear Falcon.   July 13 was High Rise.   July 19 was UCL/Raytheon,

17   UCL standing for Umbrage Component Library.   July 27 was a

18   project known as Imperial.

19   Q.   Now, these titles that you're reading, Mr. Rosenzweig,

20   where do these titles come from?

21   A.   I don't know.   I assume that they are the CIA titles for

22   the --

23             THE COURT:  Don't assume.

24             THE WITNESS:  Huh.

25             THE COURT:  If you don't know, that's the answer.

1          THE WITNESS:  I don't know.

2     BY MR. DENTON:

3     Q.  What you're reading here, where did that come from?

4     A.  Oh, I'm sorry.  These are from WikiLeaks.  They're from

5     their Twitter feed.

6          THE COURT:  Members of the jury, let me remind you

7     these are offered not for the truth but for the fact that Wiki

8     made these statements.  Not for the truth.

9          MR. DENTON:  Thank you, your Honor.

10          Could we then talk about August, Ms. Hurst.

11     Q.  What came in August?

12     A.  August 3 was a release of a project called Dumbo.  August

13     10 was the release of a project called CouchPotato.  August 24

14     was the release of a project called Express Lane.  And August

15     31 was one that the CIA called Angel Fire.

16          MR. DENTON:  And then September, Ms. Hurst, please.

17     A.  Just one in September.  Protego was released on September

18     7, 2017.

19     Q.  After Vault 7, did WikiLeaks release any more information,

20     Mr. Rosenzweig?

21     A.  There was another release that they called Vault 8.

22     Q.  Talk about that then, please.

23     A.  This is the last in the series.  It was called Hive, and

24     it's the source code repository.  It was styled as the source

25     code repository for the CIA Hive project, and it was released

K24Wsch2                        Rosenzweig - Cross

1   on November 29, 2017.

2               MR. DENTON:  If I could just have a moment, your

3   Honor.

4   Q.  Mr. Rosenzweig, you just read this here about the source

5   code repository.  Is that the same thing that we were talking

6   about in connection with the earlier release?

7   A.  The word -- yeah, it's -- source code is the same thing,

8   yes.

9   Q.  Based on your research on WikiLeaks's publications, prior

10  to the Vault 7 and Vault 8 disclosures, did WikiLeaks ever

11  publish any source code?

12  A.  As far as I know, they have not.

13              MR. DENTON:  Nothing further, your Honor.

14              THE COURT:  Ms. Shroff.

15  CROSS-EXAMINATION

16  BY MS. SHROFF:

17  Q.  Mr. Rosenzweig, you've never personally spoken to anyone at

18  WikiLeaks, correct?

19  A.  At where?  I'm sorry.  I didn't catch --

20              THE COURT:  WikiLeaks.

21              THE WITNESS:  WikiLeaks.

22  A.  No, not that I know of.

23  Q.  Well, you'd know who you've talked to, correct?

24  A.  Right, but I don't know who WikiLeaks members are.  They

25  don't announce themselves.

K24Wsch2                         Rosenzweig - Cross

1   Q.  So your testimony today is you could have talked to

2   somebody from WikiLeaks --

3   A.  I don't --

4   Q.  -- but you just don't know?

5   A.  Nobody has ever told me that they are a member of

6   WikiLeaks.

7   Q.  So as far as you know, you have spoken to no one who works

8   at WikiLeaks?

9   A.  As far as I know, I've never spoken to anyone who's told me

10  that they are from WikiLeaks.

11  Q.  And you've never, obviously, worked at WikiLeaks, correct?

12  A.  That's correct.

13  Q.  You have no personal interaction with WikiLeaks, correct?

14  A.  Correct.

15  Q.  And all of the information that you have about WikiLeaks

16  comes from reading what other people tell you about WikiLeaks,

17  correct?

18  A.  What WikiLeaks tells me about WikiLeaks, but yes.

19  Q.  Well, not just what WikiLeaks tells you, right?  What other

20  people tell you about WikiLeaks, correct?

21  A.  Correct.

22  Q.  And you've never had any personal interviews or any

23  interactions with United States officials regarding WikiLeaks

24  before, correct?

25  A.  Before this interaction here?

1    Q.  Right.

2    A.  That's correct.

3    Q.  Right.  So the FBI's never consulted with you about

4    WikiLeaks, correct?

5    A.  That's correct.

6    Q.  The CIA's never consulted with you about WikiLeaks,

7    correct?

8    A.  That's correct.

9    Q.  Foreign nations have never consulted with you about

10   WikiLeaks, correct?

11   A.  That's correct.

12   Q.  The State Department's never hired you as their expert on

13   WikiLeaks, correct?

14   A.  Correct.

15   Q.  And it's fair to say that you personally, as you testified,

16   do not know the contents of WikiLeaks's disclosures, correct?

17   A.  That's correct.

18   Q.  And you testified that that's because you have an inactive

19   clearance, correct?

20   A.  And because it was outside my area of expertise, but yes.

21   Q.  So what WikiLeaks releases is outside your expertise,

22   correct?

23   A.  No.  The substance of this release is outside my area of

24   expertise.  I'm not a computer scientist.  I don't know the

25   forensics.

K24Wsch2                         Rosenzweig - Cross

1          MS. SHROFF:  Could you just pull up for me, please,

2     the various names the government had on the readout to each

3     program.  Let me see, starting on the Vault 7.

4     Q.  Your testimony was you have an inactive clearance, which

5     precluded you from reading anything about these leaks, correct?

6     A.  That's one of the two reasons why I haven't read these --

7     Q.  Let's just focus on the first reason, the inactive

8     clearance.  Correct?

9     A.  Actually, that's the second reason, but yes.

10    Q.  Then let's start with the second reason.  Are you with me?

11    A.  Yeah.

12    Q.  So who grants you clearance?

13    A.  The U.S. government.

14    Q.  Who in the U.S. government?

15    A.  My clearance is held by the Department of Homeland Security

16    at the moment.

17    Q.  Right.  And when the Department of Homeland Security holds

18    your clearance, you worked for somebody in the Department of

19    Homeland Security, right?  Michael Chertoff, correct?

20    A.  I did.

21    Q.  Right.  And Michael Chertoff and you started a company

22    together after that, correct?

23    A.  No.

24    Q.  You didn't start a company together?

25    A.  No.

K24Wsch2                          Rosenzweig - Cross

1    Q.   Did you work for him?

2    A.   I'm a senior adviser to a company that he started.

3    Q.   Right.

4    A.   He started it with his chief of staff, Chad Sweet.  I work

5    for them now and then on projects.

6    Q.   OK.

7    A.   But I didn't start a company with him, and I'm not an

8    employee of his company.

9    Q.   Are you a consultant to his company?

10   A.   I'm an senior adviser to his company.

11   Q.   What does that mean?

12   A.   It means that at times if there are projects to which I can

13   add value, they will retain me as an additional participant,

14   independent of them.  If I get cases, matters that are too

15   large for me, I will refer it to them, because they're a big

16   company.  I'm a small, one-man shop.

17   Q.   It's basically you give them business, they give you

18   business, correct?

19   A.   It's a cooperative business relationship, yes.

20   Q.   And how much do they pay you, by the way?

21   A.   Who?

22   Q.   The Michael Chertoff company.  How much do they pay you an

23   hour?

24              MR. DENTON:  Objection.

25              THE COURT:  Overruled.

K24Wsch2                        Rosenzweig - Cross

1   A.  They don't pay me by the hour.

2   Q.  OK.  What's the flat fee?

3   A.  Depends on the size of the project.

4   Q.  Give us a range.

5   A.  The current project I'm working on right now will pay me

6   $25,000 this year.

7   Q.  Now, going back to the clearance that you said is held by

8   homeland security, you are an expert for the Department of

9   Justice here, correct?

10  A.  I've been retained by the Department of Justice, yes.

11  Q.  Right.  And that's the United States Attorney's Office,

12  correct?

13  A.  That's correct.

14  Q.  That's under the umbrella of the Department of Justice,

15  correct?

16  A.  Yes.

17  Q.  And they could certainly give you clearance to look at

18  these disclosures, correct?

19  A.  I don't know.

20  Q.  You don't know?

21  A.  I don't know who would be authorized to grant me a

22  clearance to look at these matters.

23  Q.  I didn't ask you if you know who.  I just asked you if they

24  would be one of the people who could give you permission to

25  look at them.

K24Wsch2                          Rosenzweig - Cross

1    A.  I don't know if they have that authority.

2    Q.  You're a national security expert, right?

3    A.  I don't know who controls the security clearance for this

4    particular piece.  My experience is, actually, that

5    authorization is typically quite limited.  I suspect, since

6    you're asking, that they -- the gentlemen there -- do not have

7    the authority to grant me that clearance.

8    Q.  I didn't ask you if the gentlemen there have the authority,

9    sir.  I asked you if the Department of Justice had authority.

10   A.  I don't know.

11   Q.  OK.  Let's just go with that.  You don't know if you could

12   get access to read any one of these disclosures, correct?

13   A.  That's what I just said.

14   Q.  OK.  Let's start with Vault 7 that he had you read, CIA

15   hacking tools revealed.  All you saw is this particular

16   disclosure, correct?

17   A.  Correct.

18   Q.  You don't know anything about what it disclosed, correct?

19   A.  I -- nothing beyond what is on this -- what is -- what is

20   here, no.

21   Q.  So you don't even know if, in fact, the CIA hacking tools

22   were revealed, correct?

23   A.  I do not know from this, no.

24   Q.  Right.  And you do not know if Project Dark Matter was

25   released, correct?

K24Wsch2                        Rosenzweig - Cross

1   A.  There have been --

2   Q.  No, no.  Do you know or do you not know if anything about

3   Project Dark Matter was actually released by WikiLeaks?  That's

4   the question.

5   A.  I have read public reports to that effect, yes.

6   Q.  But you do not know?

7   A.  I do not know personally, no.

8   Q.  Right.  This is only about what you know, sir, not about

9   what the world knows.

10          MS. SHROFF:  Let's turn to the next one, Marble

11  Framework.

12  Q.  Again, you do not know, correct?

13  A.  Only from public reports.

14  Q.  It's a question about --

15  A.  No, because -- I mean, I'm sorry, but as an academic, I

16  rely exclusively on public reports.  I have read public reports

17  that these did include hacking tools.  I have not examined the

18  tools themselves, no, but --

19  Q.  So if the --

20  A.  But that, that is -- when you say you do not know, the

21  sources from which I normally gain information have told me so.

22  I have no reason to doubt them, but I have not verified them

23  any more than I know the results of the Iowa election tomorrow.

24  Q.  But that's not really true, correct?  Because if you wanted

25  to know the results of the Iowa election, you could actually

K24Wsch2                        Rosenzweig - Cross

1    look at the tally of the Iowa elections, correct?

2    A.  I don't think so.  I don't have them.

3    Q.  You couldn't?

4    A.  I don't have them.  I would rely on public reports.

5    Q.  OK.  So let's just keep going with your reliance on public

6    reports.  If The New York Post told you that Project Dark

7    Matter was, in fact, released by WikiLeaks, you would believe

8    The New York Post?

9    A.  Not necessarily.

10   Q.  So then you would make a decision as to whether or not you

11   would actually believe the secondary source about the leak that

12   is titled Project Dark Matter?

13   A.  That's the function that I'm supposed to function at.

14   Q.  Well, so --

15   A.  Evaluation of secondary sources.  Primary sources reach

16   conclusions.

17   Q.  Well, you didn't check the primary source, correct?

18   A.  I was asked -- I was told I cannot check this primary

19   source.

20   Q.  No.  You did not check the primary source, correct?

21   A.  I did not.

22   Q.  Right.  And you did not check the primary source for Marble

23   Framework, correct?

24   A.  Correct.

25   Q.  And you did not check the primary source for --

1              MS. SHROFF:  Next screen, please.

2    Q.  -- Grasshopper Framework, correct?

3    A.  Yes.

4    Q.  In fact, all you know is that might just tell you about the

5    different kinds of grasshoppers there are in the government,

6    correct; you just don't know?

7    A.  I only know what is on the screen.

8    Q.  Right.

9    A.  WikiLeaks has said that's not what it is.

10   Q.  But you are basically reading a screen from WikiLeaks, and

11   that's it, correct?

12   A.  That's correct.

13   Q.  OK.  Now, you testified that you rely on secondary sources

14   only, correct?

15   A.  Correct.

16   Q.  Right.  So if the secondary source is wrong, you are wrong,

17   correct?

18   A.  Correct.

19   Q.  And if the secondary source is right, you are right,

20   correct?

21   A.  Correct.

22   Q.  And you decide which secondary source you are going to rely

23   on, correct?

24   A.  In general, yes.

25   Q.  Right.  And you, it would be fair to say, have a specific

K24Wsch2                      Rosenzweig - Cross

1    bias when you read a secondary source; all of us do, but

2    certainly you admit you do, right?

3    A.  I don't know what you mean by bias.

4    Q.  All right.

5    A.  I have sources that I trust more than others based on prior

6    experience.

7    Q.  Thank you.

8    A.  Yes.

9    Q.  All right.  Let's start with your prior experience.

10        You're a lawyer, you testified, correct?

11   A.  Yes.

12   Q.  Right.  And you started your career, much like the

13   prosecutors here, by being a federal prosecutor, correct?

14   A.  Yes.

15   Q.  You worked for the United States Attorney's Office,

16   correct?

17   A.  No.  The Department of Justice environmental crimes

18   section.  Environment and natural resources division.

19   Q.  Right.  You worked for the United States, correct?

20   A.  Yes.

21   Q.  And you worked for them as a prosecutor for about seven

22   years, correct?

23   A.  Yes.

24   Q.  OK.  And after that, you went and got a job at something

25   called the Heritage Foundation, correct?

K24Wsch2                              Rosenzweig - Cross

1   A.  That was many years later.

2   Q.  As many years later as it was, you got a job at the

3   Heritage Foundation, correct?

4   A.  That's correct.

5   Q.  Tell the jury what is the Heritage Foundation?

6   A.  It's a think tank in Washington, D.C.

7   Q.  What kind of think tank?

8   A.  I'm not sure what you mean.  It is a think tank that

9   advances generally conservative views on issues relating to

10  everything from tax policy to education to national security.

11  Q.  Right.  It's called, you would say, a conservative,

12  right-wing think tank, correct?

13  A.  I would call it a conservative think tank.

14  Q.  Not a right-wing think tank?

15  A.  Not when I worked there.

16  Q.  I didn't ask you when you worked there or not.  My question

17  to you is, is the Heritage Foundation known as a conservative,

18  right-wing organization?

19  A.  I don't know.

20  Q.  You don't know?

21  A.  It is a conservative think tank.  It's a self-described

22  conservative think tank, yes.

23  Q.  Let's talk about what agenda the Heritage Foundation

24  promoted.  OK right?

25          MR. DENTON:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MS. SHROFF:  Your Honor, it shows bias.

3          THE COURT:  Sustained.

4     BY MS. SHROFF:

5     Q.  Is it fair to say, sir, that your bias includes minimizing

6     the risk of gun violence?

7          MR. DENTON:  Objection.

8          THE COURT:  Sustained.

9     BY MS. SHROFF:

10    Q.  It minimizes climate change, correct?

11         THE COURT:  Sustained.  Try to stay to something

12    relevant, please.

13         MS. SHROFF:  Your Honor, it is.  Bias is always

14    relevant.

15         THE COURT:  The objection has been sustained.

16    BY MS. SHROFF:

17    Q.  When you worked for the Department of Homeland Security,

18    that was from 2005 to 2009, correct?

19    A.  Yes.

20    Q.  And that was under President George W. Bush, correct?

21    A.  Yes.

22    Q.  And when you worked for George W. Bush, you worked on

23    issues about border security and immigration, correct?

24    A.  Amongst many others, yes.

25    Q.  OK.  And when President Obama got the job after George

K24Wsch2                          Rosenzweig - Cross

1    Bush, you were fired from that administration, correct?

2    A.  All political appointees leave their job at the end of a

3    presidential term, yes.

4            MS. SHROFF:  I move to strike, your Honor, and I ask

5    that the witness be instructed to answer the question asked.

6            THE COURT:  That was a good answer.  The application

7    is denied.

8    BY MS. SHROFF:

9    Q.  You were fired, correct?

10   A.  No, I wasn't fired.

11   Q.  You weren't fired by the Obama administration; you

12   continued to work for them?

13   A.  Well, since you ask, I was asked to resign by the chief of

14   staff to President George W. Bush who told all political

15   appointees to submit letters of resignation that the Obama

16   administration was free to accept or reject, as they saw fit.

17   Q.  They did accept yours, right?

18   A.  A number of my colleagues continued on.

19   Q.  Did they accept yours, sir?

20   A.  Yes.

21   Q.  Thank you.

22       Now, after you were let go by the Obama administration, you

23   then worked for Michael Chertoff or with Michael Chertoff;

24   that's when your relationship with Mr. Chertoff started,

25   correct?

1    A.  Not immediately, no.

2    Q.  Shortly thereafter?

3    A.  It was about a year later that I took a senior adviser

4    position with them.

5    Q.  OK.  And is it fair to say, sir, that throughout 2007,

6    while you were working for the Bush administration, WikiLeaks

7    published many a material that was personally and

8    professionally embarrassing to the Bush administration?

9    A.  I don't know about personally, but professionally for sure.

10   Q.  Right.  So WikiLeaks embarrassed the Bush administration by

11   publishing a copy of the standard operating procedures for the

12   Bush detention center, which is called Guantanamo Bay, correct?

13   A.  That's correct.

14   Q.  And George Bush wanted nothing more than to keep the

15   torture at Guantanamo Bay secret, correct?

16           MR. DENTON:  Objection.

17           THE COURT:  Sustained.

18   BY MS. SHROFF:

19   Q.  Is it fair to say, sir, that for all the years you worked

20   for the Bush administration, WikiLeaks was nothing but a thorn

21   in their side?

22   A.  I wouldn't know how they would characterize it.  I wouldn't

23   characterize it that way.

24   Q.  I see.  Did you not personally believe that it was

25   important to keep Guantanamo Bay open and any information about

K24Wsch2                         Rosenzweig - Cross

1   it should not be shared with the American public?

2              MR. DENTON:  Objection.

3              THE COURT:  Sustained.

4              MS. SHROFF:  Your Honor, may we have a sidebar?

5              THE COURT:  No.

6              MS. SHROFF:  It's time for our lunch break anyway.

7              THE COURT:  No.  No.  No.  Go ahead.

8   BY MS. SHROFF:

9   Q.  You worked for Lawfare, correct?

10  A.  I still do, yes.

11  Q.  And in 2005, you wrote a blog or an article for Lawfare,

12  correct?

13  A.  I write for them all the time.  I don't know which one

14  you're referring to.  Yes.

15  Q.  I'm referring to the one where you talked about the

16  hysterical claims of prisoner abuse.  Does that ring a bell for

17  you?

18  A.  Actually, no.

19  Q.  OK.

20  A.  But I certainly won't deny it if it's got my name on it.

21  Q.  I see.  So you remember writing an article.  I'm going to

22  put it up for you so perhaps your recollection can be

23  refreshed.

24             MR. DENTON:  Your Honor, I'm going to object to this

25  line of questioning.

K24Wsch2                           Rosenzweig - Cross

1          MS. SHROFF:  It goes to his bias, your Honor.

2          THE COURT:  The objection is overruled.

3          We'll go a little bit longer.  What's the question,

4    Ms. Shroff?

5    BY MS. SHROFF:

6    Q.  The question is during the Bush administration, when

7    WikiLeaks released information about the conditions at

8    Guantanamo Bay, you objected, correct?

9    A.  To what?

10   Q.  I'm sorry.

11   A.  I'm sorry.  I objected to what?

12   Q.  The release of the information.  Right?

13   A.  No.

14   Q.  You didn't?  You did not object to the release of

15   information and say that there was little evidence to back it

16   up and the information should not be made public?

17   A.  In this article?

18   Q.  No.  I'm just asking generally.  During that time frame, is

19   that not what your position was through the Bush

20   administration?

21   A.  I'm sorry.  What is the quote that you're reading?  Or

22   could you read the quote again?

23   Q.  You characterized, did you not, the claims about Guantanamo

24   Bay abuse as frequent and hysterical claims with little

25   evidence to back them up.  Isn't that correct?

K24Wsch2                          Rosenzweig – Cross

1    A.  This is from 2005, which is before I was in the Bush

2    administration.  You confused me by saying that.

3    Q.  OK.  Could you take a look at the highlighted section that

4    I put up for you?

5    A.  Yes.

6    Q.  You wrote that, right?

7    A.  Yes.

8    Q.  In the face of public information that WikiLeaks released

9    about the abuse at Guantanamo Bay, you wrote and called those

10   claims frequent and often hysterical, correct?

11   A.  No.  This article predates WikiLeaks's release of the

12   Guantanamo Bay information that you're talking about.

13   Q.    OK.

14   A.  So you've got the timing mixed up.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K243SCH3                              Rosenzweig - Cross

1    Q.  Right.  Let's try and see if you can help me out.  The Bush

2    administration took great umbrage at the release by WikiLeaks

3    of any information about Guantanamo Bay, correct?

4    A.  I didn't participate in that.

5    Q.  You worked for the Bush administration, right?

6    A.  It's 300,000 political appointees in every political

7    administration.  WikiLeaks was not, during the administration,

8    that wasn't my issue.

9    Q.  You are a WikiLeaks expert, sir.

10   A.  I've been -- what do you want me to say?  The judge has --

11   I've been qualified as one, yes.

12   Q.  Right.  And to qualify as an expert, you went back and

13   looked at all of the WikiLeaks posts, correct?

14   A.  Correct.

15   Q.  You read about their Twitter feed, correct?

16   A.  Yes.

17   Q.  You read about all of their exploits, correct?

18   A.  Yeah.

19   Q.  You put together charts, correct?

20   A.  Yes.

21   Q.  Right.  And you're telling this jury that in all of that

22   work that you did, you did not go back and check to see if

23   WikiLeaks released information about Guantanamo Bay during the

24   Bush administration.

25   A.  I did not say that.

K243SCH3                         Rosenzweig - Cross

1   Q.  I'm asking you the question.  Did you or did you not, as

2   the WikiLeaks expert, for the United States of America, review

3   that information?

4   A.  WikiLeaks released information about Guantanamo Bay during

5   the Bush administration.  Correct.

6   Q.  Okay.  Let's --

7   A.  That's correct.

8   Q.  Throughout your time studying WikiLeaks, you personally

9   have advocated, have you not, for stringent criminal laws to

10  prosecute Assange, correct?

11  A.  I have advocated for the application of the espionage laws

12  in this context, yes.

13  Q.  And the context is to prosecute Julian Assange, correct?

14  A.  That's the possibility that was being discussed, yes.

15  Q.  And you advocated for that, correct?

16  A.  Correct.

17  Q.  Right.  And you wrote an online publication about that,

18  correct?

19  A.  I wrote several publications, yes.

20  Q.  Right.  In 2010, you argued that the laws should be

21  updated, correct?

22          THE COURT:  The law being?

23          MS. SHROFF:  The law to prosecute Julian Assange.

24  Q.  You advocated for that, correct?

25  A.  The Espionage Act.

K243SCH3                          Rosenzweig – Cross

1    Q.  Yes.

2    A.  The Espionage Act is out of date.

3    Q.  That's your personal opinion, correct?

4    A.  It's mine and many others; but yes, it is mine.

5    Q.  We're only talking about you, sir, today.

6    A.  That's right.

7    Q.  Okay.  It's yours, right?

8    A.  Yes.

9    Q.  Okay.  Congress hasn't listened to you and updated right

10   now, correct?

11   A.  Not yet, no.

12   Q.  So, in 2013, correct, you wrote an article about it,

13   correct?

14   A.  I think it was 2010, but --

15   Q.  Okay.  In 2010, you wrote about it, and you thought that

16   the American government should shut down WikiLeaks, correct?

17   A.  I don't remember what I -- what precisely I said in the

18   article.

19   Q.  All right.  Well, you're here now.  Do you think the

20   American government should shut down WikiLeaks?

21   A.  No.

22   Q.  You do not now think that the American government should

23   shut down WikiLeaks?

24   A.  No.

25   Q.  So as the WikiLeaks expert who just testified about all the

K243SCH3                          Rosenzweig - Cross

1    harm to the United States, your position is that the United
2    States government should not shut down WikiLeaks?
3    A.  No.
4    Q.  Okay.  "No" meaning that's not your opinion?
5    A.  No meaning that the -- no, meaning you're correct.  I do
6    not think today that the U.S. government should shut down
7    WikiLeaks.
8    Q.  So according to your expertise, WikiLeaks website should
9    remain up, correct?
10   A.  If that's the consequence of not shutting them down, yes.
11   Q.  It should allow for the dissemination of information,
12   correct?
13   A.  Some, yes.
14   Q.  Well, only some?
15   A.  I do not think that the U.S. government should be in the
16   business of shutting down a private organization.  I do think,
17   however, that individuals in that private organization should
18   be responsible for what they publish, and if in doing so they
19   violate the law, then they should suffer those legal
20   consequences.
21            So what I've come to conclude is that there is a
22   balance between freedom and transparency on one hand and the
23   criminal law on the other.  So case-by-case basis is my best
24   answer for you.
25   Q.  I see.  So, your testimony today is that WikiLeaks is a

K243SCH3                              Rosenzweig - Cross

1   private organization.  Correct?

2   A.  It's not a governmental organization.

3   Q.  Just a simple yes or no will do the job and will go faster

4   for you, sir, okay?

5   A.  Yes.

6   Q.  So it is a private organization?

7             THE COURT:  He said it's a private organization.

8   Q.  Right?

9   A.  Yes.

10  Q.  It releases information, correct?

11  A.  Correct.

12  Q.  And as you testified on direct, it works with other

13  newspapers at times to properly publish this information,

14  correct?

15  A.  It has in the past, yes.

16  Q.  So it's worked with The New York Times, correct?

17  A.  In the past, yes.

18  Q.  Right.  You don't know what it's going to do in the future?

19  A.  That's right.

20  Q.  So it's worked with The Wall Street Journal, correct?

21  A.  I don't remember that one.

22  Q.  Okay.  Well, let's try, since you are the expert, tell us

23  what are the newspapers it's worked with.

24  A.  I know it's worked with The Times, The Washington Post, it

25  has work in the past with The Guardian in the U.K.

K243SCH3                           Rosenzweig - Cross

1   Q.  And you agree then now that WikiLeaks serves a purpose,
2   correct?
3   A.  Yes.
4   Q.  Now, at times, when these other newspapers such as the ones
5   you just mentioned, for example, Washington Post, when The
6   Washington Post published information that you did not like,
7   you also wrote an editorial and called it "Stop Leaking,"
8   correct?
9   A.  Correct.
10  Q.  Right.  And that was The Washington Post that published a
11  transcript of President Donald Trump's phone calls with foreign
12  leaders, correct?
13  A.  Correct.
14  Q.  And you wrote with great umbrage and told The Washington
15  Post and others to stop publishing this information, correct?
16  A.  Incorrect.
17  Q.  Okay.
18  A.  I said that the people who were releasing it to The Post
19  should stop doing so.  The Post as a news organization is not
20  who I was talking to.  It was to the members of the NSC who
21  were leaking the transcripts of the president's calls.
22  Q.  Right.  And --
23          THE COURT:  Ms. Shroff, would this be a convenient
24  place to break for lunch?
25          MS. SHROFF:  Whenever the Court wants.

K243SCH3                        Rosenzweig – Cross

1              THE COURT:  We're going to take a break now.  We'll

2     resume around 1:30.

3              (Jury excused)

4              THE COURT:  Mr. Rosenzweig, don't talk to the

5     government's attorneys.

6              THE WITNESS:  Wouldn't think of it, your Honor.

7              THE COURT:  Thank you.  See you at 1:30.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K243SCH3

<pre>
 1                         AFTERNOON SESSION

 2                            1:40 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  Before we bring the jury in, Ms. Shroff,

 5    is there something that happened at lunchtime that you want to

 6    call to my attention?

 7              MS. SHROFF:  Oh yes, your Honor.  I did call

 8    Mr. Gonzalez.  Should I put it on the record now?

 9              THE COURT:  Do you want to put it on the record?  Put

10    it on the record now, yes.

11              MS. SHROFF:  Your Honor, we had thought everybody, all

12    of the jurors had left the courtroom.

13              THE COURT:  Yes.

14              MS. SHROFF:  I was speaking to I believe my colleagues

15    and my expert.

16              THE COURT:  Yes.

17              MS. SHROFF:  When I turned around, I saw that one of

18    the jurors had walked back in.

19              THE COURT:  Yes.

20              MS. SHROFF:  I told my expert to stop talking.  And I,

21    we all stopped talking, and then we called Mr. Gonzalez.

22              THE COURT:  What do you want me to do?

23              MS. SHROFF:  I don't want you to do anything.  I'm

24    letting you know.  I forgot to let the government know.  I just

25    wanted to let you know.
</pre>

K243SCH3

```
 1            THE COURT:  Do you know which juror it was?

 2            MS. SHROFF:  I think so.  I think it was the juror

 3    with the cane, because it took a while for the person to leave.

 4    But I really was freaked out, so I didn't pay a lot of

 5    attention to who it was, to be honest.

 6            THE COURT:  That's Ms. Gallo I think.

 7            MS. SHROFF:  I think it was the last alternate.

 8    Somehow or other she had returned back to the courtroom for

 9    some reason.

10            THE COURT:  Do you think she heard anything?

11            MS. SHROFF:  I don't know.  Honestly, I was talking

12    toward my expert and when I turned is when I saw her.

13            THE COURT:  Which voice were you using, your low

14    voice, your medium voice?

15            MS. SHROFF:  I don't have a low voice, your Honor.  It

16    is the one voice, the voice that my mother gave me.  That's all

17    I got.  I'm pretty sure she heard me, whatever I was saying.

18            THE COURT:  What were you talking about?

19            MS. SHROFF:  I think I might have been asking how did

20    I do on cross.  I don't know.  I mean, you know.  I really

21    don't remember.

22            THE COURT:  I'm being serious now.  If you were

23    transmitting confidential information or legal requirements,

24    legal information, I'd go one way.  If you were just saying how

25    am I doing, and trying to be Ed Koch, how am I doing.
```

K243SCH3

 1              MS. SHROFF:  I don't know who Ed Koch is, but I don't

 2     think I was transmitting.  I don't think -- I think we were

 3     just making general convo, normal stuff, like oh my God, I

 4     can't believe I have to do this.

 5              THE COURT:  Okay.  Well, you put it on the record.

 6     I'm not going to do anything.

 7              MS. SHROFF:  Thank you, your Honor.  It was truly

 8     inadvertent, obviously.

 9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K243SCH3                      Rosenzweig - Cross

```
 1              (Jury present)
 2              THE COURT:  Ms. Shroff.
 3              MS. SHROFF:  Thank you, your Honor.
 4    BY MS. SHROFF:
 5    Q.  Mr. Rosenzweig, I am going to turn to Government Exhibit
 6    1702 that you helped prepare, okay?
 7    A.  Yes.
 8    Q.  If you could just take a look at the first page of the
 9    demonstrative.
10    A.  Yes.
11    Q.  This is the compilation that you put together along with
12    the prosecutors, correct?
13    A.  They assisted me in putting it together, yes.
14    Q.  Okay.  And the logo on the top-left side, is that your logo
15    or the WikiLeaks logo?
16    A.  The WikiLeaks logo.
17    Q.  So you took WikiLeaks' logo and implanted it on your
18    demonstrative; is that correct?
19    A.  It's, yes.
20    Q.  If you could, who chose these, OPCW Douma, Fishrot, Popes
21    Orders.  Did you pick it?
22    A.  WikiLeaks did.
23    Q.  Who picked it?
24    A.  That's a screen shot of the first page as it existed on the
25    day I screen shot it.  So that, whatever was on the front page
```

K243SCH3                          Rosenzweig - Cross

1   from WikiLeaks is what I depicted here.

2   Q.  And is it fair to say that you put this compilation

3   together and sent it to the prosecutors, correct?

4   A.  I gave them some ideas, they sent back a draft, I fixed it,

5   yes.

6   Q.  You and the prosecutors e-mailed each other back and forth

7   about this, yes?

8   A.  We spoke about it.  I must have sent them an e-mail as

9   well, yes.

10  Q.  If you could just take a look at the page that's titled

11  "notable leaks before 2017."

12  A.  Yes.

13  Q.  That's your compilation, correct?

14  A.  That's correct.

15  Q.  WikiLeaks has never put it together this way, correct?

16  A.  That's correct.

17  Q.  So the WikiLeaks logo on the left side is not really the

18  WikiLeaks logo.  It's you putting the logo on there, correct?

19  A.  That's correct.

20  Q.  And you decided which one of these topics to highlight,

21  correct?

22  A.  Yes.

23  Q.  You could have picked any of them, correct?

24  A.  I picked the most notable ones.

25  Q.  Right.  That you thought were most notable?

K243SCH3                          Rosenzweig - Cross

1    A.   That's correct.

2    Q.   Okay.  It's the same for almost every one of the pages

3    where the WikiLeaks logo is on the left side, correct?

4    A.   That's correct.

5    Q.   So let's go to the one where it says WikiLeaks and

6    Anonymous.  You don't know anything about anonymous either,

7    correct?

8    A.   I'm sorry, I don't understand.

9    Q.   Okay.  You ever met anybody who is in the Anonymous hacker

10   group?

11   A.   Yes.

12   Q.   Did you talk to them about putting this demonstrative

13   together?

14   A.   No.

15   Q.   So when you picked out this quote, "We Anonymous just

16   happen" blah, blah, blah, you decided to put that quote on,

17   correct?

18   A.   That's correct.

19   Q.   And nobody told you to have a different quote or put

20   something different on your demonstrative, because you only

21   discussed it with the government, right?

22   A.   The government didn't tell me what to put on either.  But

23   yes, nobody told me what to put on.

24   Q.   Now, let's go to this page where it says "Instruction to

25   leakers: overview."

K243SCH3                          Rosenzweig - Cross

1    A.  There are two of those.  Which one do you want?

2    Q.  Let's start with the first one.  Do you see it says "submit

3    documents to WikiLeaks"?

4    A.  Yes.

5    Q.  That's on the WikiLeaks website, correct?

6    A.  Correct.

7    Q.  You never tried to upload a document to WikiLeaks, correct?

8    A.  That's correct.

9    Q.  And so you don't know if this actually works out properly,

10   right?

11   A.  Oh, no.  I did go to the web page.

12   Q.  I didn't ask you if you went to the web page.  I am asking

13   if you know how to upload a document to WikiLeaks.

14   A.  You asked me if I uploaded documents, the answer is no, but

15   the web page address does work.

16   Q.  I didn't ask you if the address worked.  I am asking if the

17   actual process of uploading works.  You've never tried it,

18   correct?

19   A.  That's correct.

20   Q.  You don't know if it works, correct?

21   A.  That's correct.

22   Q.  Next one, "Instructions to leakers: overview."  Right?

23   A.  Yes.

24   Q.  When you talked about this IP address, you testified this

25   is an unusual IP address; is that right?

K243SCH3                           Rosenzweig - Cross

1    A.  I don't think I used the word "unusual."

2    Q.  Okay.  What word did you use?

3    A.  It's not the typical one that the average citizen would

4    see.

5    Q.  Okay.

6    A.  It is a specific address for the Tor Onion network.

7    Q.  So let's talk about this.  Tor and Onion network.  Where

8    does Tor come from?

9    A.  It was invented by the U.S. government.

10   Q.  The United States government invented Tor?

11   A.  Yes.

12   Q.  Okay.  Which part of the United States government?

13   A.  I think it was the Navy, but I'm not one -- I don't have

14   100 percent recollection.  I think it was the Navy.

15   Q.  Right.  So the Tor was invented by the U.S. Navy, correct?

16   A.  By the U.S. government.  I am not 100 percent sure it was

17   the Navy.

18   Q.  Who funds it now, Department of Defense?

19   A.  Tor now?  No, Tor is operated by the Tor Project, which is

20   an independent organization.

21   Q.  Who contributes to its activity?

22   A.  They take donations from people who use it.  You could give

23   them money if you wanted.

24   Q.  Do you know if the Department of Defense helps them out?

25   A.  I don't know.

1    Q.  Do you know if the State Department helps them out?

2    A.  I believe they do.  I believe I read reports that they do.

3    Q.  The State Department you know helps them out, correct?

4    A.  No, I believe I've read reports that they do.

5    Q.  Okay.  But you testified before that whatever reports you

6    read, you then make a decision whether to believe them or not,

7    correct?

8    A.  That's correct.

9    Q.  Right.  So do you believe that report or you don't?

10   A.  I've never actually formed an opinion about that.

11   Q.  You are testifying as the WikiLeaks expert today before

12   this jury.

13   A.  You are asking me about Tor and its funding.

14   Q.  Right.  But WikiLeaks is talking about Tor, right?

15   A.  Yes.

16   Q.  You testified all about Tor when Mr. Denton was asking you

17   these questions, correct?

18   A.  Yes.

19   Q.  Did they ask you who funds Tor?

20   A.  No, they didn't.

21   Q.  Okay.  How about Tails?

22   A.  What about it?

23   Q.  Who funds Tails?

24   A.  I don't know.

25   Q.  Did you ever try to find out, as the national security

1   expert that you are, who contributes money to Tails?

2   A.   No.

3   Q.   Okay.  I am assuming that in all of the times you testified

4   before Congress, you never asked them or they asked you who

5   funds Tor, correct?

6   A.   No.

7   Q.   Okay.  So let's talk about Tor.  Who else uses Tor,

8   according to you?

9   A.   Who else besides WikiLeaks?

10   Q.   Yeah.

11   A.   Wide range of institutions and organizations.  Some

12   malicious, like criminals and terrorists; some well meaning,

13   like journalists and protest groups.

14   Q.   So let's start with the well meaning.  How about The New

15   York Times?

16   A.   I don't know.

17   Q.   How about Wall Street Journal?

18   A.   I don't know.

19   Q.   How about the Department of Defense?

20   A.   I assume so, but I don't know.

21   Q.   How about the State Department?

22   A.   I don't know.

23   Q.   How about you?

24   A.   Yes.

25   Q.   You use Tor?

1    A.  Yes.

2    Q.  Okay.  Now, let's turn to this page that you see, "Tor the

3    Onion router."  You testified about how Tor works.  You put

4    this slide together?

5    A.  This one?

6    Q.  Right.

7    A.  The graphic is from the Electronic Freedom Foundation, and

8    the Tor logo is from Tor.

9    Q.  Right.  You put together this demonstrative, correct?

10   A.  Yes.

11   Q.  You had no idea if this is how Tor actually works, correct?

12   A.  No.

13   Q.  You don't know if Alice is really going through that plus,

14   plus, plus and getting to Bob or getting to Jane.  In fact, you

15   don't know anything about this demonstrative, correct?

16   A.  Literally thousands of articles have been written about how

17   Tor operates.  And this is a depiction of how every one of

18   those articles says it operates.  Including articles -- well.

19   So, no, I don't code Tor.  But yes, this is how it operates.

20   Q.  You don't know this is how it operates.

21   A.  Yes, this is how it operates.

22   Q.  You do know how Tor operates?

23   A.  As I said, every secondary source that I know of says that

24   this is how it operates.

25   Q.  Okay.  So if you were to read a secondary source on heart

1   surgery, you would know how heart surgery works, according to

2   you?

3   A.  No.

4   Q.  Okay.  Let's move on from Tor.  Let's move to Tails.  You

5   use Tails?

6   A.  I've tried it once, but no, I don't use it routinely.

7   Q.  How about The New York Times?

8   A.  Don't know.

9   Q.  Wall Street Journal?

10  A.  Don't know.

11  Q.  Law 360?

12  A.  Don't know.

13  Q.  Daily News?

14  A.  No, don't know.

15  Q.  Washington Post?

16  A.  Don't know.

17  Q.  United States attorney's office?

18  A.  I don't know.

19  Q.  Let's go to the screen that says "instructions to leakers:

20  tips."

21          By the way, do you know if the CIA uses Tor?

22  A.  I don't know.

23  Q.  You read this, you testified about this page, correct, on

24  direct?

25  A.  Yes.

1    Q.   And basically, you read what was written on the screen,

2    right?

3    A.   That was what I was asked to do, yes.

4    Q.   And then you said that this is WikiLeaks' explanation,

5    correct?

6    A.   I said this is what WikiLeaks has published.

7    Q.   Okay.

8    A.   Yes.

9    Q.   Right.  Beyond that, you don't really know much, right,

10   about this screen?

11   A.   Like what?  I'm sorry, I don't understand the question.

12   Q.   Well, you don't really know if it works, right?  That if a

13   person has a very large submission, with a complex format, this

14   is how you should move forward.  You don't know in if this

15   works, right?

16   A.   I know what's here.  I know they say contact us.

17   Q.   Right.  So if a juror read it, you basically know what a

18   juror knows by reading this screen?

19   A.   In this particular screen, it's self-explanatory, yes.

20   Q.   That's not what I asked you.  I asked you if you know

21   anything more than the average reader of this screen knows.

22   A.   For this screen?

23   Q.   Yes.

24   A.   No.

25   Q.   Okay.  Let's go to the screen that says "solicitation of

1    classified information."  The first line that you have there,

2    "WikiLeaks as a whole, and Assange in particular, has actively

3    promoted leaking of classified information."

4             You just wrote that sentence up, right?

5    A.  I wrote that sentence, yes.

6    Q.  Okay.  That's it, right, you wrote it?

7    A.  That's my summary, yes.

8    Q.  Right.  You put the WikiLeaks logo on there and then you

9    wrote that sentence?

10   A.  Yes.

11   Q.  Okay.  And then you pulled out two quotes, and you put

12   those in, correct?

13   A.  Correct.

14   Q.  Okay.  And you chose the quotes, right?

15   A.  Yes.

16   Q.  And one of the quotes you chose was specifically about this

17   language about the CIA, right?

18   A.  Correct.

19   Q.  And you knew this case was about the CIA, correct?

20   A.  Correct.

21   Q.  And you work for the United States attorney's office,

22   correct?

23   A.  I'm contracted to them as an expert witness, yes.

24   Q.  By the way, how much do they pay you per hour?

25   A.  $400 an hour.

K243SCH3                          Rosenzweig - Cross

1    Q.  $400 an hour to talk to them?

2    A.  Yes.

3    Q.  $400 every time you e-mail them?

4    A.  I don't charge for every minute I spend.

5    Q.  Okay.  $400 an hour to testify here today?

6    A.  Yes.

7    Q.  Who paid for you to come up?

8    A.  They'll pay, they'll reimburse me the expenses.

9    Q.  Who pays for you to stay over?

10   A.  The U.S. attorney's office will reimburse me for the

11   expenses.

12   Q.  Okay.  And they paid you for putting all of this together,

13   right?

14   A.  Yes.

15   Q.  They paid you for researching the quotes?

16   A.  Yes.

17   Q.  They paid you for the compilation?

18   A.  Yes.

19   Q.  Let's look at the next screen where it talks about leak

20   practices.  You said "WikiLeaks practices with respect to

21   redaction are inconsistent."  Right?

22   A.  Yes.

23   Q.  Your opinion, correct?

24   A.  Yes.

25   Q.  You're not a statistician, correct?

K243SCH3                         Rosenzweig - Cross

1    A.  Not a statistician, no.

2    Q.  And you didn't contract out a statistician to help you come

3    to that conclusion, correct?

4    A.  No.

5    Q.  So basically, you looked at WikiLeaks, you couldn't figure

6    out a pattern to the redactions, so you said the redactions are

7    inconsistent, right?

8    A.  No.

9    Q.  You didn't see a pattern, right?

10   A.  That's correct.

11   Q.  Okay.  So, when you didn't see a pattern, you didn't

12   contact a statistician.  You just concluded that they were

13   inconsistent?

14   A.  No.

15   Q.  Okay.  So tell us what you did.

16   A.  I reviewed all of them, and then I reviewed the other

17   people's analysis of them.  There is a longstanding series of

18   articles that have reviewed WikiLeaks' redaction patterns, and

19   most of those reach the same conclusion.  So I also relied on

20   secondary sources that support this summary.

21   Q.  Okay.  So you looked at other people's analysis of the

22   pattern of redactions, and then you decided that the pattern of

23   redaction was inconsistent?

24   A.  I looked at other people's analysis, I looked at the

25   historical materials myself, and both of those led me to the

1   conclusion that WikiLeaks has been inconsistent in its

2   application of redaction rules.

3   Q.  So if the underlying source is wrong, you are wrong.

4   A.  This isn't a -- well, that's always true.  But this isn't

5   an underlying source.  I read the original materials on

6   WikiLeaks' website as well as reading secondary sources, so

7   it's not exclusively the secondary sources.

8   Q.  So you looked at WikiLeaks' redaction pattern from 2006 all

9   way to 2020, you made a graph and a chart, and then you came to

10  this conclusion?

11  A.  No.

12  Q.  So, where is the math?

13  A.  I don't think it needs math to say that something is

14  inconsistent.

15  Q.  Exactly.  So you didn't have any math, you didn't have any

16  stats, and you just didn't find a pattern, so you call it

17  inconsistent.

18  A.  I think that anybody who reviews it would reach the same

19  conclusion.  But if they wanted to say there was a consistency,

20  we could have a discussion about that.

21  Q.  Okay.  All right.  Let's move on.  When you say "WikiLeaks

22  performs minimal, if any, analysis," again, your conclusion?

23  A.  My conclusion, that of the secondary sources, based upon

24  the review of what WikiLeaks has published, and what others

25  have written about what they've published, yes.

K243SCH3                          Rosenzweig - Cross

1    Q.   And you said "WikiLeaks does not review all leaked material
2    it posts."  You have no way to know that, right?
3    A.   That's what WikiLeaks has said.
4    Q.   Right.
5    A.   So I assumed that when they declare it -- perhaps they are
6    lying about that as well.
7    Q.   Okay.
8    A.   So perhaps it should say "WikiLeaks says it does not review
9    all leaked materials it posts."
10              But it seems to be consistent with their practices as
11   well.
12   Q.   You think it's consistent?
13   A.   What?
14   Q.   You think it's consistent?
15   A.   It appears as though they have not done that in the past.
16   Yes.
17   Q.   Okay.  The next sentence you have, you have "WikiLeaks
18   sometimes partners with traditional media organizations."
19   A.   Correct.
20   Q.   Right?  And then you have "WikiLeaks takes steps to protect
21   the identity of sources."  Correct?
22   A.   That's correct.
23   Q.   And then you have "The vast majority of WikiLeaks
24   disclosures target the United States."  Correct?
25   A.   Correct.

K243SCH3                          Rosenzweig - Cross

1    Q.  Okay.  Let's talk about that.  The first set of documents

2    that WikiLeaks ever released had to do with what nation?

3    A.  Somalia.

4    Q.  And not America?

5    A.  Somalia is not America, yes.

6    Q.  One thing we agree on.  It published information about a

7    Somali rebel leader's plans to assassinate Somali government

8    officials, correct?

9    A.  That's right, yes.

10   Q.  It published information identifying a corrupt Kenyan

11   leader named Mwai, correct?

12   A.  That's correct.  That was in 2007 I think.

13   Q.  Right.  And you didn't include that in your presentation,

14   right?

15   A.  No.

16   Q.  Okay.  How about the fact that WikiLeaks published

17   documents revealing corruption in Peru around the management of

18   Peru's oil resources?

19   A.  That's correct.

20   Q.  You didn't put that in here either, right?

21   A.  No.

22   Q.  Published a report detailing a nuclear accident in Iran,

23   correct?

24   A.  I don't remember that one.  But I don't disagree with you.

25   Q.  You didn't put it in?

K243SCH3                      Rosenzweig – Cross

1    A.  No.

2    Q.  Okay.  Published documents related to arms deals between a

3    French company and the UAE, United Arab Emirates, correct?

4    A.  I believe that's correct, yes.

5    Q.  Of course it is.  You didn't put it in, right?

6    A.  No.

7    Q.  Okay.  How about all of those e-mails about the French

8    presidential campaign of Macron?

9           THE COURT:  Of what?

10          MS. SHROFF:  Emmanuel Macron.

11   Q.  Did you put them in?

12   A.  No.

13   Q.  Oh.  What country is that?

14   A.  The French president is France.

15   Q.  Right.  You didn't put that in either, right?

16   A.  No.

17   Q.  So you have France, Peru, Iran, Africa.  You didn't put any

18   of those in, right?

19   A.  No.

20   Q.  Let's keep going.  How about all of the information

21   WikiLeaks publishes about non-governmental entities.  Focus on

22   those at all, or no, skip those?

23   A.  Not for this case, no.

24   Q.  Not for this case?

25   A.  No.

K243SCH3                         Rosenzweig - Cross

1    Q.  You are the WikiLeaks expert, right?  You want to give a

2    fair and balanced opinion of WikiLeaks, right?  Or no, you want

3    to support the government here.  I'll take that back.  Let's

4    just focus on what you didn't focus on.

5            How about Apple.  How about Apple's restrictive

6    contracts with the iPhone application developer that WikiLeaks

7    released.  Did you talk about that?

8    A.  No.

9    Q.  How about documents that WikiLeaks released that relate to

10   the Church of Scientology?

11   A.  No.

12   Q.  By the way, did you do a harm analysis on those documents?

13   A.  Not for this case, no.

14   Q.  Ever?

15   A.  No.

16   Q.  Okay.  How about WikiLeaks' publishing of documents showing

17   the internal power struggle with the Catholic Church?

18   A.  I did not include them.  I assume there is a question.  But

19   no, I did not include them.

20   Q.  So, we have at least five or six governments, and I'm not a

21   WikiLeaks expert.  I mean, I just Googled it and found this.

22   But there could be a whole ton of other countries, right?

23            THE COURT:  Ms. Shroff, could you not testify, please.

24            MS. SHROFF:  Sure.

25   Q.  Sitting here today you are aware, right, that WikiLeaks

K243SCH3                        Rosenzweig - Cross

1    publishes information all over the world, right?

2    A.  It does.

3    Q.  Okay.  Let's turn to the WikiLeaks Twitter feed, shall we.

4    You testified about that, right?  You testified about the first

5    slide which looks like this one.

6    A.  Yup.

7    Q.  That started on February 4, correct?

8    A.  Yes.

9    Q.  As a WikiLeaks expert, do you know if the FBI follows the

10   WikiLeaks' Twitter?

11   A.  I do not know.

12   Q.  Do you know if the CIA follows the WikiLeaks' Twitter?

13   A.  I do not know.

14            MR. DENTON:  I am going to object to this, your Honor.

15            THE COURT:  Overruled.

16   Q.  You testified, sir, that you did not read Vault 7 because

17   it was code, correct?  You don't understand code?

18   A.  No, I testified I didn't read it because it was classified

19   and because that wasn't the subject of my expertise today.  As

20   it happens, I probably wouldn't understand the code if I did

21   read it, as I -- to the extent I understand what's in it, seems

22   it's beyond my understanding, yes.

23   Q.  He's charged with stealing Vault 7 information, correct?

24   A.  He who?

25   Q.  Mr. Schulte.

K243SCH3                          Rosenzweig - Cross

1    A.  I don't know which one Mr. Schulte is.

2    Q.  Okay.  I didn't ask if you knew who Mr. Schulte was.

3    A.  Oh, yeah.

4    Q.  I simply asked if you knew that's what you knew the charges

5    to be.

6    A.  That's what I understand the case is about, yes.

7    Q.  And you testified that you wouldn't understand Vault 7

8    anyway because it was code, right?

9    A.  I personally would probably not be able to understand it.

10   Q.  Did you know that there's no code in Vault 7?

11   A.  I don't know what's in Vault 7.

12   Q.  Did you read The New York Times articles about Vault 7?

13   A.  Probably did at the time they came out.

14   Q.  Okay.  Did you read The Wall Street Journal articles about

15   Vault 7?

16   A.  I don't read The Journal regularly, no.

17   Q.  Okay.  So, you read The New York Times articles about

18   Vault 7, right?

19   A.  Probably did when they came out, but I don't remember.

20   Q.  And when you were retained here on this case, you knew it

21   was about Vault 7 and Vault 8, right?

22   A.  Of course.

23   Q.  And you took no steps to find out whether or not you were

24   able to read the disclosure of Vault 7 and Vault 8?

25   A.  I wasn't asked to, no.

K243SCH3                          Rosenzweig - Cross

1   Q.  And you only did what you were asked to do, correct?

2   A.  That's correct.

3   Q.  Let's look at the slide where you have "How did Vault 7

4   make its way to WikiLeaks."  You included that slide, correct?

5   A.  Yes.

6   Q.  Okay.  You have no idea how Vault 7 made its way to

7   WikiLeaks, right?

8   A.  None.

9   Q.  None.  You don't know how it got to WikiLeaks, correct?

10  A.  No.

11  Q.  You don't know if Russia sent it to WikiLeaks, correct?

12  A.  No.

13  Q.  You just put the slide on there because you thought it

14  would make a nice presentation?

15  A.  No.

16  Q.  Oh.  Okay.  Let's look at the next one.  You see Vault 7,

17  the CIA logo there, and the Twitter feed up top?

18  A.  Yes.

19  Q.  You took a screen shot and put it as part of your

20  demonstrative, correct?

21  A.  Yes.

22  Q.  And you testified that you did not read any single

23  disclosure, correct?

24  A.  That's correct.

25  Q.  Okay.  So you had no idea whether there's code, language,

1    articles, or whatever else is in each one of these.

2            Can you move to the next screen, please.  Next one.

3            I am just going to ask you any one of these, right.

4    So Hive, Weeping Angel, Scribbles, After Midnight, Athena.  You

5    don't know what's in it at all.  Nobody asked you to verify?

6    A.  That's correct.

7    Q.  You don't know what's in them?

8    A.  I only know what the Twitter feed says is in them.

9    Q.  Right.  So as far as you know, there's no harm that you can

10   testify to from these leaks, correct?

11   A.  I have no idea.

12   Q.  Good to know.

13           MS. SHROFF:  You can take that down, thank you.

14   Q.  Let me ask you this.  As the WikiLeaks expert here today,

15   do you keep a list of all the awards and recognition that

16   WikiLeaks has received for its journalistic work?

17   A.  I have reviewed all that.  I keep a list, I don't keep a

18   record, but I am aware of that, yes.

19   Q.  You didn't put it in a slide show?

20   A.  No.

21   Q.  How many times was WikiLeaks nominated for the Nobel Peace

22   Prize?

23   A.  I don't know the number.

24   Q.  You are the WikiLeaks expert.  You don't know how many

25   times it was nominated for the Nobel Peace Prize?

1            THE COURT:  I guess not.

2            MS. SHROFF:  I withdraw that question, your Honor.

3            THE COURT:  Yes, I'm glad.

4    Q.  Do you know how many other awards WikiLeaks has won?

5    A.  Dozens.

6    Q.  Dozens.  Do you know it won the Amnesty International News

7    Media award?

8    A.  Yes.

9    Q.  How many times?

10   A.  I think twice, but I'm not sure.

11   Q.  And do you know what it won for?

12   A.  I'm sorry, what what was for?

13   Q.  What was the award for.  Which disclosure; do you know?

14   A.  I don't remember.

15   Q.  Didn't put it in the slide show?

16   A.  No.

17   Q.  2013, it won an award; do you remember that?

18   A.  Don't remember.

19   Q.  Okay.  Mr. Rosenzweig, you were contacted as an expert for

20   this case because your colleague was a professor of

21   Mr. Denton's, correct?

22   A.  That's my understanding.  I don't know for sure.  Yes.

23   Q.  So he asked his professor, and his professor sent him to

24   you, and you were delighted to make that introduction, correct?

25   A.  That's my understanding, yes.

K243SCH3                        Rosenzweig - Redirect

1    Q.  And you sitting here today have zero personal knowledge
2    about this case, correct?
3    A.  Except what I've read in the indictment, that's correct.
4    Q.  You've never met Mr. Schulte, correct?
5    A.  As I said, correct.
6    Q.  You've never spoken to Mr. Schulte, correct?
7    A.  I don't believe so, no.
8    Q.  Sitting here today, you have no idea if Mr. Schulte
9    accessed any information, let alone classified information,
10   correct?
11   A.  I have no knowledge of that.
12   Q.  And sitting here today, you have absolutely zero knowledge
13   about whether or not Mr. Schulte ever communicated with
14   WikiLeaks, correct?
15   A.  I have no information on that.
16   Q.  In fact, you have no idea how Vault 7 and Vault 8 got to
17   WikiLeaks, correct?
18   A.  I do not.
19             MS. SHROFF:  I have nothing further.
20             THE COURT:  Mr. Denton.
21             MR. DENTON:  Very briefly, your Honor.
22   REDIRECT EXAMINATION
23   BY MR. DENTON:
24   Q.  Mr. Rosenzweig, Ms. Shroff asked you a moment ago whether
25   you had conducted a harm analysis in this case.  Do you

K243SCH3                              Rosenzweig – Redirect

1    remember that?

2    A.  Yes.

3    Q.  Were you asked to do that?

4    A.  No.

5    Q.  I think you said you did what you were asked to do, right?

6    A.  That's correct.

7    Q.  What were you asked to do?

8    A.  I was asked to provide the United States and the jury with

9    an overview of WikiLeaks, its history, past instances in which

10   consequences had been identified, and a summary of the

11   assertions it had made through the public -- through the

12   posting of information to its Twitter feed.

13              MR. DENTON:  Ms. Hurst, can we put up Government

14   Exhibit 1702 and go to page five, please.

15   Q.  Mr. Rosenzweig, do you remember Ms. Shroff asking you a

16   series of questions about time you spent in the Heritage

17   Foundation?

18   A.  Correct.

19   Q.  And about potential biases that the Heritage Foundation

20   might have?

21   A.  Yes.

22   Q.  In 2010, when President Felipe Calderón said WikiLeaks

23   caused severe damage to diplomatic relations, was he a member

24   of the Heritage Foundation?

25   A.  No.

K243SCH3                        Rosenzweig - Redirect

1   Q.  You were asked a series of questions about your time in the

2   Bush administration.  Do you remember that?

3   A.  Yes.

4   Q.  Who was president when Cablegate happened?

5   A.  President Obama was president when that release happened.

6   Q.  Did the fact that Barack Obama was president when this

7   happened affect your view of the consequences of the

8   disclosure?

9   A.  No.

10  Q.  Do you remember Ms. Shroff asked you some questions about

11  an article you wrote about leaking of a transcript to The

12  Washington Post?

13  A.  Yes.

14  Q.  Why was that something you were concerned about?

15  A.  I was concerned because too many people were leaking

16  information to the press in response to perceived pressures,

17  what they perceived as necessity because of their disagreement

18  with President Trump's views.

19         My point was that even if you thought that you didn't

20  like President Trump's policy, leaking classified information

21  like confidential calls with -- like the transcripts of

22  confidential calls with governments, was not the way to redress

23  that.

24  Q.  What's problematic about leaking information like that?

25  A.  Well, it breaks -- it breaks the classification

K243SCH3                        Rosenzweig – Redirect

1   requirements, it's probably against the law, and in the end, if

2   we cannot, as I said with respect to the WikiLeaks leaks, that

3   we were talking earlier, if we cannot assure people we interact

4   with of the confidentiality of the discussions, people stop

5   talking to us.  It degrades the government's ability to act.

6           MR. DENTON:  Nothing further, your Honor.

7           MS. SHROFF:  May I, your Honor?

8           THE COURT:  No.  You are excused, Mr. Rosenzweig.

9           MS. SHROFF:  Your Honor, I have recross.

10          THE COURT:  Okay.  No.  Direct, cross, redirect.  Call

11  your next witness.

12          (Witness excused)

13          MR. LAROCHE:  Your Honor, the government calls Special

14  Agent Steven Deck.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K24Wsch4                          Deck - Direct

1    STEVEN DECK,

2           called as a witness by the government,

3           having been duly sworn, testified as follows:

4                 THE COURT:  Go ahead, Mr. Laroche.

5                 MR. LAROCHE:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. LAROCHE:

8    Q.  Special Agent Deck, where do you work?

9    A.  At the FBI office here in New York.

10   Q.  And how long have you worked at the FBI?

11   A.  Just a little over ten years.

12   Q.  What's your current title?

13   A.  My current title is special agent.

14   Q.  Do you work within a particular division of the FBI?

15   A.  I do.  I work within the counterintelligence division here

16   in New York.

17   Q.  And generally speaking, what does the counterintelligence

18   division do?

19   A.  So, we're charged with protecting the national interest of

20   the United States and then effecting investigations along those

21   lines.  So we essentially investigate foreign-intelligence

22   threats here in the U.S., which are agencies, other countries'

23   version of the CIA that may have a presence here.  So we

24   investigate them, arrest them if necessary, possibly expel them

25   from the country.

K24Wsch4                           Deck - Direct

1          And then we also investigate people who may have misused
2      their access to U.S. information, classified information, and
3      we call that espionage investigations.
4      Q.  Do you work on a particular squad within the
5      counterintelligence division?
6      A.  I do.  It's called CD-6.
7      Q.  Generally speaking, what is an FBI squad?
8      A.  It's a group of about anywhere from approximately six to
9      ten people.  We refer to them as squads.  Private sector, most
10     of the time call them teams.  Where we work, we address the
11     same threat, same type of investigations and normally have one
12     supervisor.
13     Q.  You said you work on the squad CD-6, is that right?
14     A.  Correct.
15     Q.  What does that squad do?
16     A.  So, we're tasked with investigating espionage-related
17     allegations, economic espionage, as well as unauthorized
18     disclosures.
19     Q.  The unauthorized disclosure of what?
20     A.  Classified information.
21     Q.  Where is the squad CD-6 physically located?
22     A.  We're at the federal building here in downtown Manhattan.
23     Q.  Is that within the New York field office of the FBI?
24     A.  It is.
25     Q.  What are your responsibilities on that squad?

1   A.  So, as an agent on that squad, we get leads and information

2   from our office in general and potentially other partners in

3   the U.S. intelligence agencies, and then we try to determine if

4   that information should be used to open an investigation, if it

5   rises to a certain threshold.  And then we'll take that

6   information and open an investigation, which could mean

7   conducting interviews, serving legal process, surveillance, to

8   determine whether or not the veracity of the initial allegation

9   was true.

10  Q.  One of the things I think you said your squad does is

11  investigate the disclosure of classified information, correct?

12  A.  Correct.

13  Q.  What is classified information?

14  A.  So, classified information is U.S. government information

15  that could -- if compromised, would be deemed damaging to U.S.

16  national-security interests.

17  Q.  Are there different levels of classified information?

18  A.  There are.

19  Q.  What are they?

20  A.  So, they're classified at different levels because the

21  contents of the information could damage U.S. national-security

22  interests differently.  So the three levels are confidential,

23  secret and top secret.

24      Confidential level, if disclosed, could cause damage to

25  U.S. interests.  Secret could -- is the next level up, could

1    cause serious damage to the U.S. national-security interests.

2    And then top secret information, if compromised, disclosed in

3    an unauthorized manner, would cause exceptionally great damage

4    to the U.S.

5    Q.  Generally, where is classified information stored?

6    A.  On either physical space if it's a hard-copy document, or

7    on computer systems that are rated or accredited for the nature

8    of that classification.

9    Q.  Let's start with the physical space.  What type of physical

10   space stores classified information?

11   A.  So, we can have secret-level information in FBI offices or

12   secure FBI space, so it can be there.  And then we also have

13   what's called our SCIF, so it's a sensitive compartmented

14   information facility where we process top secret information as

15   well as information at lower levels that are deemed more

16   sensitive.

17   Q.  And what about electronic classified information; where is

18   that stored generally?

19   A.  Those are stored on internal information systems -- they're

20   networks of computers -- at the appropriate level.

21   Q.  What do you mean at the appropriate level?

22   A.  So, classified -- confidential information would be stored

23   at a system that's rated for that.  Secret, on a secret system.

24   And a top secret information on a top-secret system.  But the

25   higher class -- so everything under top secret could be

1    processed on a top-secret system whereas top secret processed

2    on a secret system would be a spill and in violation of our

3    security policy as well as being a U.S. government clearance

4    holder.

5    Q.   I think you used the word "spill," is that correct?

6    A.   Yes.

7    Q.   What did you mean by spill?

8    A.   It's, in the government, what we describe as a mishandling,

9    misuse of -- or storage of classified information.  So it could

10   just be you taking classified documents out of a secured space.

11   It could be you accidentally putting top secret material on a

12   secret system.  It could also be secret or classified

13   information existing outside of our systems that aren't

14   accredited to hold them.

15   Q.   Generally, who is permitted to view classified information?

16   A.   People who have a clearance at the appropriate level as

17   well as a need to know.

18   Q.   Let's start with clearance.  What type of clearance do you

19   need?

20   A.   So, if you want to use secret information and you have a

21   need to know, you would need a secret-level clearance.  And

22   then top secret, top secret.

23   Q.   How do you get a security clearance?

24   A.   It's a variety of methods, but based on your job

25   qualification, job description, you'll undergo -- for my

K24Wsch4                              Deck - Direct

1   position, I need a top-secret SCI clearance, so I underwent a

2   background investigation, a polygraph, and then given where I

3   work, also a demonstrate a need to know to access that.

4   Q.  Do you hold a security clearance?

5   A.  I do.

6   Q.  At what level?

7   A.  Top-secret SCI.

8   Q.  What does the SCI mean?

9   A.  It's sensitive compartmented information, so it's a

10  controlled system within -- to further kind of contain more

11  sensitive information, whether it's at the secret or the

12  top-secret level.

13  Q.  You also said "a need to know"; you used that phrase?

14  A.  Correct.

15  Q.  What do you mean by need to know?

16  A.  Just because you have a security clearance at a certain

17  level doesn't mean you're just granted blanket access to all

18  information at that level, so it's just a way to further

19  restrict or kind of validate your ability to view the

20  information.

21  Q.  I want to switch gears a bit.

22      Special Agent derrick, are you familiar with the terms

23  "Vault 7" and "Vault 8"?

24  A.  I am.

25  Q.  What do those terms refer to?

K24Wsch4                          Deck - Direct

1    A.  Those refer to a series of leaks put out during the year of

2    2017 by WikiLeaks on their website.

3    Q.  Do you have an understanding of who the information that

4    was published by WikiLeaks belonged to?

5    A.  Yes, from the CIA.

6    Q.  To be clear, did WikiLeaks make public statements in

7    connection with those leaks?

8    A.  They did.

9    Q.  But did they actually disclose information with those

10   leaks?

11   A.  They did.

12   Q.  And how do you know that?

13   A.  Because I visited the website and downloaded the

14   information.

15   Q.  Approximately how many separate disclosures of CIA

16   classified information did WikiLeaks make on its website?

17   A.  Approximately 26.

18   Q.  Over what time period?

19   A.  From around March 2017 to November of 2017.

20   Q.  Did your squad, CD-6, participate in that investigation?

21   A.  Yes, we did.

22   Q.  What was the extent of your participation in the

23   investigation?

24   A.  So, my role in the investigation was to visit the WikiLeaks

25   website and download the information which they had released

K24Wsch4                              Deck - Direct

1    from the CIA to a computer so that we could document it for

2    evidentiary purposes.

3    Q.   Let's talk about how you downloaded that information.

4    A.   OK.

5    Q.   You said that Vault 7 and Vault 8 releases were posted on

6    WikiLeaks's website, is that correct?

7    A.   Correct.

8    Q.   Generally, are FBI agents permitted to visit WikiLeaks's

9    website?

10   A.   No.

11   Q.   Why not?

12   A.   Because it would be in violation of our security policy as

13   well as being a clearance holder, you're supposed to view

14   classified information, which the releases still were, still

15   are, on the correct system, which viewing it in the public

16   domain as a clearance holder would be in violation of that.

17   Q.   Why is that a violation of your security policy?

18   A.   FBI policy, because you need to view classified information

19   on a classified system and/or in a secure space.

20   Q.   Did you get permission to go to WikiLeaks's website as part

21   of this investigation?

22   A.   I did.

23   Q.   How did you get that permission?

24   A.   So, there was a conversation between my squad, my

25   supervisor, our security office and the attorney's office to

1    come up with a best method for the investigation to download

2    this information.

3    Q.   Why did you talk to your security office?

4    A.   Any time you're up against a security policy or need for an

5    investigative measure to kind of find a best practice for a way

6    to obtain information, you need to consult them.

7    Q.   And based on those discussions, was a plan put in place to

8    download the Vault 7 and Vault 8 leaks?

9    A.   It was.

10   Q.   What were some of the parts of that plan?

11   A.   So, one of the parts would be to obtain a separate computer

12   that wasn't connected, that wasn't a previous government

13   computer or connected to our network.

14        Another component was to just use public wi-fi and not a

15   government-attributable internet connection.  And the third

16   part would be to find the best way to store this unique piece

17   of evidence in the best way possible.

18   Q.   Let's talk about each of those steps.  I think you said

19   that you got a nongovernment computer, is that correct?

20   A.   Correct.

21   Q.   Why is that?

22   A.   Just so that when we entered it into evidence, we wouldn't

23   be taking something from the network and essentially putting it

24   aside indefinitely.  And then also, we did not want to download

25   information from the internet, which could potentially contain

1    viruses or malware, to an FBI system.

2    Q.  Do you have an understanding of what was contained within

3    the disclosures made by WikiLeaks?

4    A.  I do.

5    Q.  And what is that information?

6    A.  They were information about CIA hacking tools and

7    cyber-exploitation tools.

8    Q.  What, if any, impact did that have on your decision to use

9    a nongovernment computer?

10   A.  Anytime you download something from the internet, you take

11   a risk.  And then given what type of information we were going

12   to acquire, we wanted to take an extra -- many extra steps of

13   security to maintain the integrity of our systems as well as be

14   able to get the information and then store it properly.

15   Q.  I think the second part of the plan was using public space

16   to download the leak.  Is that correct?

17   A.  Correct.

18   Q.  Why didn't you download the leak from an FBI facility?

19   A.  So, anytime actions on the internet are traceable as well

20   as downloads, and we didn't want to use an FBI system.  And

21   given the type of information we were going to acquire, we

22   didn't want to use an FBI system to download the information

23   which could then be traced back to us and potentially implicate

24   the IP address and potentially other investigations.

25   Q.  And why would that be problematic for the FBI?

K24Wsch4                          Deck - Direct

1  A.  Because it would reveal a source's methods and potentially

2  negatively impact our ability to properly investigate things.

3  Q.  Did you identify a public location where you downloaded the

4  leak?

5  A.  I did.

6  Q.  And what location did you identify?

7  A.  Starbucks.

8  Q.  Why did you identify Starbucks?

9  A.  Ease of use, quick wi-fi and reliability given the nature

10  of what we were doing.

11  Q.  And I think the third aspect of the plan, you said, was

12  storing the computer in a certain location.  Is that correct?

13  A.  Correct.

14  Q.  Can you describe that part of the plan?

15  A.  So, we determined the best place would be the safe in my

16  supervisor's office, which is inside our SCIF, which is where

17  you would normally store top secret information.  Our evidence

18  locker, where we -- you know, you acquire anything related to

19  investigations, drugs, money, we store there.  But it's only

20  credited to the secret level, and this had some top secret and

21  SCI information in it, so we needed to find a solution to be

22  able to store it in the best manner possible.

23  Q.  When did you first go to Starbucks to download the leak?

24  A.  In March of 2018.

25  Q.  And how did you download the leak once you were there?

K24Wsch4                         Deck - Direct

1   A.  I went to the -- used an internet browser, went to the

2   WikiLeaks website first.  Didn't really see a quick way to

3   download all the -- the large volume of information, so

4   WikiLeaks had also provided a torrent website, which is

5   essentially just -- it was about 15 hyperlinks that connected

6   to zip files to download the bulk of the information that they

7   released.

8   Q.  What is a torrent website?

9   A.  It's a -- it looked -- just a blank website, but it had 15

10  hyperlinks, and each time you clicked on one of the links, it

11  asked if you wanted to save the associated zip file.  And then

12  I saw there were 15 of those, and then I just downloaded it

13  that way.

14  Q.  And what is a zip file?

15  A.  Zip file is just a way to compress information.  So if you

16  want to send a ton of files over an email or kind of website to

17  website, you can use software to compress that information in a

18  more easily storable format.

19  Q.  Why did you go to the torrent instead of downloading it

20  directly from the website?

21  A.  I did -- I tried -- I perused the website for a little and

22  didn't see -- given the volume of the information, there

23  wasn't, to my appearance, a good way to capture all of it.  And

24  I knew of this -- from our investigation I knew of this torrent

25  address, which had been provided by WikiLeaks too, if you

1   wanted to essentially bulk download all the information.

2   Q.  Did you download those zip files to the computer?

3   A.  I did.

4   Q.  And were you able to unzip those zip files?

5   A.  I was.

6   Q.  Were you able to download any of WikiLeaks's public

7   statements on that computer?

8   A.  I was.

9   Q.  And how did you do that?

10  A.  Via screenshots.

11  Q.  And you said you downloaded the zip files to the computer?

12  A.  Correct.

13  Q.  How long did that downloading process take?

14  A.  Around an hour.

15  Q.  And approximately how much data was found on those zip

16  files?

17  A.  Approximately 1.4 gigabytes.

18  Q.  After you downloaded the information on the computer that

19  day, did the classification level of that computer change?

20  A.  It did.

21  Q.  How did it change?

22  A.  So, the computer -- we had just obtained it from a store,

23  and it was just any other computer you would buy.  But as soon

24  as you store classification -- classified material on a device

25  like that, it immediately assumes the highest classification of

1   the material contained within it.

2   Q.  Did there come a time when you went back to Starbucks to

3   download additional materials?

4   A.  I did.

5   Q.  Approximately when did that happen?

6   A.  In May of 2018.

7   Q.  And why did you go back to download additional materials?

8   A.  Through the investigation, we determined that the zip files

9   which I had downloaded contained Vault 7, but it did not

10  contain the Vault 8 release, and we wanted to capture the

11  entirety of what WikiLeaks had put out there from March 2017 to

12  November of 2017.

13  Q.  Were you able to download Vault 8 when you went back?

14  A.  I was.

15  Q.  How did you do that?

16  A.  So, it was a lot less information.  I was able to just go

17  to the release that WikiLeaks specified as Vault 8 and download

18  the singular files in that way.  It's just -- it's a kind of

19  like right click, save as.

20  Q.  And did you download the Vault 8 leak on the same computer

21  that you downloaded the Vault 7 leaks?

22  A.  I did.

23  Q.  Did there come a time when you confirmed that you had

24  downloaded all of the Vault 7 and Vault 8 leaks onto that

25  computer?

K24Wsch4                          Deck - Direct

1    A.  I did.

2    Q.  How did you do that?

3    A.  So, I matched -- the first release on March 7 is a long web

4    page of about a few thousand embedded hyperlinks, so I went to

5    WikiLeaks's website.  I scrolled through that to see if what I

6    had downloaded appeared to be the same.  And it did.  And then

7    all of the subsequent leaks were essential -- like a one- to

8    two-page summary of what WikiLeaks was going to release in

9    addition to the provided original documents from the CIA.  So I

10   clicked through on WikiLeaks's website each of their press

11   releases, made sure I had those, and then also made sure that

12   in the downloads I had appeared each of the documents which

13   WikiLeaks had embedded.

14           MR. LAROCHE:  Your Honor, may I approach?

15           THE COURT:  Yes.

16   BY MR. LAROCHE:

17   Q.  Special Agent Deck, one of the things I've handed you is

18   marked Government Exhibit 1.  Do you recognize that?

19   A.  I do.

20   Q.  And what is it?

21   A.  That's the computer I used to download the Vault 7 and

22   Vault 8 releases.

23   Q.  And how do you know it's that computer?

24   A.  I purchased it.  I used it, and it had been stored in our

25   space.

K24Wsch4                          Deck - Direct

1          MR. LAROCHE:  Your Honor, the government offers

2    Government Exhibit 1 into evidence.

3          MR. BRANDEN:  No objection, Judge.

4          THE COURT:  No. 1 will be received in evidence.

5          MR. LAROCHE:  Thank you, your Honor.

6          (Government Exhibit 1 received in evidence)

7    BY MR. LAROCHE:

8    Q.  Special Agent Deck, can you just hold that up for the jury

9    to see.

10         Special Agent Deck, I've also handed you a binder that

11   contains Government Exhibits 2 through 16.  Do you recognize

12   that?

13   A.  I do.

14   Q.  And have you reviewed this binder?

15   A.  I have.

16   Q.  And how do you know you've reviewed it?

17   A.  Excuse -- sorry.  Sorry.

18   Q.  How do you know you've reviewed it?

19   A.  Oh.  Because I've reviewed the binder and also on the

20   material that I downloaded.

21   Q.  And what is contained in Government Exhibits 2 through 16?

22   A.  Information related to the Vault 7 release.

23   Q.  And is that contained within Government Exhibit 1?

24   A.  It is.

25         MR. LAROCHE:  Your Honor, the government would offer

K24Wsch4                      Deck - Direct

1  Government Exhibits 2 through 16 into evidence.

2           MR. BRANDEN:  No objection, Judge.

3           THE COURT:  They're received in evidence, 2 through

4  16.

5           MR. LAROCHE:  Thank you, your Honor.

6           (Government Exhibits 2-16 received in evidence)

7           MR. LAROCHE:  You can put that to the side for a

8  second.

9           Ms. Hurst, can you please publish to the parties, the

10  jury and the Court what is marked as Government Exhibit 2.

11  Q.  Special Agent Deck, do you recognize Government Exhibit 2

12  on your screen?

13  A.  I do.

14  Q.  What is this showing?

15  A.  This is a screenshot from the release on March 7.  It's

16  showing part of the Confluence software which was used, and

17  it's kind of a joint project, collaboration software.  So it

18  would appear -- this release was a very long web page with a

19  lot of links taking -- that would go to their associated

20  address.  And this is just a snippet of that.

21  Q.  And you said March 7.  March 7 of what year?

22  A.  2017.

23  Q.  And was this the first leak posted by WikiLeaks?

24  A.  It was.

25  Q.  And you said that there was a long list on this page, is

K24Wsch4                          Deck - Direct

1   that correct?

2   A.  Correct.

3   Q.  Where would that list appear if you were on the website?

4   A.  If you would just keep scrolling.

5   Q.  Scrolling in which direct?

6   A.  Down.

7   Q.  And where would that list appear?

8   A.  Under directory departments, branches and groups.

9   Q.  And could you click on parts of the list?

10  A.  You could.

11  Q.  What would happen if you clicked on parts of the list?

12  A.  It would take you to whatever associated page that was.

13  Q.  And did you download the information by clicking on those

14  parts?

15  A.  I did not.

16  Q.  Why not?

17  A.  It was too cumbersome and time-consuming, especially when

18  we had the torrent address provided, which had been provided by

19  WikiLeaks's Twitter, verified Twitter account.

20  Q.  And you said cumbersome.  Approximately how many links were

21  on this first March 7 leak?

22  A.  Over a few thousand.

23       MR. LAROCHE:  Ms. Hurst, can you publish Government

24  Exhibit 3.

25  Q.  Special Agent Deck, do you recognize Government Exhibit 3?

K24Wsch4                           Deck - Direct

1    A.  I do.

2    Q.  What is this showing?

3    A.  This is a continuation of the release on March 7 and the

4    Confluence page.  So just imagine you keep scrolling down like

5    a WikiLeaks -- or a Wikipedia page or any sort of very

6    hyperlinked, content-heavy web page, and this is what that

7    represents.

8    Q.  Did each of the lines on this page link to something else?

9    A.  They do.

10   Q.  What would happen if you clicked on one of these links?

11   A.  It would take you to whatever associated web page was

12   embedded there.

13   Q.  And again, this is from the March 7 leak, is that correct?

14   A.  Correct.

15        MR. LAROCHE:  Ms. Hurst, can you please publish

16   Government Exhibit 6.

17   Q.  And again, what is this showing?

18   A.  Continuation of the March 7 release, and what you would see

19   is in the Confluence software if you're on there for joint

20   project collaboration.

21        MR. LAROCHE:  Ms. Hurst, can you please publish

22   Government Exhibit 6-1.

23   Q.  What is this exhibit showing?

24   A.  So, this is a screenshot of -- continuing from Confluence

25   of the transferring data using NTFS viewed previously -- on the

K24Wsch4                         Deck - Direct

1    previous exhibit if you had clicked on that hyperlink.

2              MR. LAROCHE:  Ms. Hurst, if you can, could we please

3    put Government Exhibits 6 and 6-1 next to each other.

4    Q.  I'm sorry.  You said that if you clicked on one side of the

5    left link, it would bring you to the right, is that correct?

6    A.  Correct.  If you -- the third-from-the-top link, if you had

7    clicked on that, it would have taken you, depending how you had

8    it set up, either a new tab or the same web page, but it would

9    have the information which it described.

10             MR. LAROCHE:  Let's zoom in on that.  If we can go to

11   Government Exhibit 6 again and then zoom in on the third line

12   down, please.

13   Q.  Is that the link you're referring to?

14   A.  Correct.

15             MR. LAROCHE:  Now we can go back to Government Exhibit

16   6-1.  Let's first focus on, please zoom in on the line that

17   starts "transferring data."

18   Q.  And that's tied to the link from the previous page, is that

19   correct?

20   A.  Correct.

21             MR. LAROCHE:  If you can zoom out again, please.

22   Q.  Special Agent Deck, I want to focus you on the banner in

23   the middle that says secret/noforn.

24             MR. LAROCHE:  If we could zoom in on that, please.

25   Q.  Do you recognize that banner?

K24Wsch4                          Deck - Direct

1    A.  I do.

2    Q.  And what is it?

3    A.  It's a classification banner at the secret level, and it

4    has -- the noforn is a dissemination caveat.  Essentially --

5    there's a lot of those, but this one means that it is for U.S.

6    government personnel only, not to be disseminated outside the

7    government.

8    Q.  Did you put the banner on this page?

9    A.  I did not.

10   Q.  Was this banner present when you downloaded it from

11   WikiLeaks?

12   A.  It was.

13              MR. LAROCHE:  Ms. Hurst, you can take that exhibit

14   down.

15   Q.  Special Agent Deck, we talked about three exhibits from the

16   leak, I believe, Government Exhibits 2, 3 and 6.  Is that

17   correct?

18   A.  Uh-huh.

19   Q.  And all of those came from the March 7 leak, right?

20   A.  Correct.

21   Q.  And that was the first disclosure made by WikiLeaks?

22   A.  That's correct.

23   Q.  How, if at all, were the subsequent disclosures by

24   WikiLeaks different?

25   A.  So, I described that release as just a very long web page

1    of a kind of collaboration site, similar to how -- ton of links

2    to, like, a Wikipedia page.  All the other releases were a one-

3    to two-page summary by WikiLeaks of what they were going to

4    release.  And then next to the article -- next to their

5    summary, they would have all of the original CIA documents.

6              MR. LAROCHE:  Ms. Hurst, can you please publish

7    Government Exhibit 13.

8    Q.  Special Agent Deck, do you recognize this?

9    A.  I do.

10   Q.  And what is this?

11   A.  This is a, the Brutal Kangaroo user guide.

12   Q.  What leak was this from?

13   A.  This was on or about June 22, 2017.

14             MR. LAROCHE:  Let's start at the top of the page, if

15   we could zoom in on the secret/noforn.

16   Q.  What is that?

17   A.  That's the banner classification identifying this document

18   at the secret/noforn level.

19   Q.  And again, did you put the banner on this document?

20   A.  I did not.

21   Q.  Was this banner on the document when you downloaded it?

22   A.  It was.

23             MR. LAROCHE:  If you could zoom out again, please, and

24   then zoom in on the three lines starting "Brutal Kangaroo

25   program."

K24Wsch4                        Deck - Direct

1   Q.  Are you familiar with these terms?

2   A.  I am.

3   Q.  How are you familiar with them?

4   A.  From my knowledge on the investigation, I know that Brutal

5   Kangaroo was a cyber tool developed and used by the CIA.

6             MR. LAROCHE:  Put up page 4 of the PDF, please,

7   Ms. Hurst, and if we could just zoom in from the top down to

8   the paragraph that has an S, "the Brutal Kangaroo project

9   consists of."

10            Perfect.  Thank you.

11  Q.  First, let's just start with, there's a 1 and then U in

12  parentheses and scope.  What does that U in parentheses mean?

13  A.  That means unclassified.

14  Q.  Are you familiar with those markings on classified

15  documents?

16  A.  I am.

17  Q.  Just generally, what do they designate?

18  A.  So, if the overall classification of the document, which,

19  as you saw, was the banner line at the top and the bottom,

20  classifies it as secret or top secret, then even though -- if

21  there is unclassified information in the document, you must

22  delineate it as unclassified.  Or you must portion mark all

23  information regardless of what it's classified at.

24  Q.  There's a 1.1 that reads, "System overview and description

25  of Brutal Kangaroo tool suite."  Can you read the paragraph

K24Wsch4                    Deck - Cross

1  below that?

2  A.  "Brutal Kangaroo is a tool suite for targeting closed

3  networks by air gap jumping using thumb drives.  Brutal

4  Kangaroo components create a custom covert network within the

5  target closed network and provide a functionality for executing

6  surveys, directory listings and arbitrary executables."

7          MR. LAROCHE:  Thank you.  No further questions.

8          THE COURT:  Mr. Branden.

9  CROSS-EXAMINATION

10 BY MR. BRANDEN:

11 Q.  Special Agent Deck, I'm Jim Branden.  I'm a defense

12 attorney for Mr. Schulte.  I just have a few questions for you.

13 A.  OK.

14 Q.  First of all, in March and May of 2018, on two specific

15 dates, you were tasked with essentially downloading Vaults 7

16 and 8 from the WikiLeaks website, correct?

17 A.  Correct.

18 Q.  And then as a result of downloading those Vault 7 and Vault

19 8, you were able to produce to the government exhibits 1 and

20 then 2 through 16 which were introduced here today, correct?

21 A.  Correct.

22 Q.  OK.  And exhibit 1 is the computer that you bought and then

23 used at Starbucks, correct?

24 A.  Correct.

25 Q.  OK.  Nothing in the exhibits that were introduced on direct

K24Wsch4                         Deck - Cross

1   through you would show how that information, the Vaults 7 and 8

2   information, was originally provided to WikiLeaks, is that

3   correct?

4   A.  Correct.

5   Q.  Is it also true that nothing in those exhibits would show

6   when that information was provided to WikiLeaks?

7   A.  Not -- not to my knowledge.

8   Q.  And finally, nothing in those exhibits or through your

9   investigation would specifically show who provided the Vault 7

10  and Vault 8 information to WikiLeaks?

11  A.  Yeah.  Not to my knowledge.

12          MR. BRANDEN:  That's all I have, Judge.  Thank you

13  very much.

14          THE COURT:  All right.

15          MR. LAROCHE:  Nothing further for this witness, your

16  Honor.

17          THE COURT:  You're excused.  Thank you very much.

18          THE WITNESS:  Thank you, your Honor.

19          (Witness excused)

20          THE COURT:  Call your next witness.

21          MR. LAROCHE:  Your Honor, may we approach?

22          THE COURT:  Yes.

23          (Continued on next page)

24

25

K24Wsch4

1              (At sidebar)

2              THE COURT:  You're going to tell me that it's a

3     classified witness and you don't want to start at quarter to

4     three.

5              MR. LAROCHE:  It's not that we don't want to start.

6     It just takes some time to get him up here.  The problem is

7     with the marshals, it takes some time to get up here.

8              MS. SHROFF:  Your Honor, may I just ask why it's

9     necessary for the marshal to escort him to his seat?  It

10    doesn't seem needed.

11             THE COURT:  Access to the elevator is through the

12    marshal's office.

13             MS. SHROFF:  Yes, but the marshal doesn't have to walk

14    him into the courtroom.

15             MR. LAROCHE:  They have to bring him up through that

16    access route, which I think takes some time.

17             MS. SHROFF:  No, I don't care when you start.  I just

18    don't want the marshal, or whoever it is, walking him in.

19             THE COURT:  They're going to walk through the door.

20    The marshals aren't going to escort him through the courtroom.

21             MR. LAROCHE:  No.

22             THE COURT:  He's going to open the door for him.

23             MR. LAROCHE:  Yes.

24             MS. SHROFF:  This door, the marshal's door?  This one?

25             MR. LAROCHE:  We can confirm that, but that's our

K24Wsch4

```
 1    understanding.  I don't think he's going to walk him to the
 2    chair.
 3               THE COURT:  Why would he walk him to the chair?
 4               MR. LAROCHE:  I don't think so.
 5               MS. SHROFF:  So we're going to start him tomorrow?
 6               MR. LAROCHE:  I think it makes sense.  By the time he
 7    gets up here, it's going to be three.
 8               THE COURT:  Listen, you have to do a better job of
 9    getting your witnesses up here.  We're not going to waste 15
10    minutes every time you have a witness.  You can stick him in
11    the witness room.
12               MS. SHROFF:  You don't know who they are, right?  It's
13    kind of hard to accost somebody when you don't know who they
14    are.  Just saying.
15               MR. LAROCHE:  Well, you never know.
16               Understood, Judge.
17               (Continued on next page)
18
19
20
21
22
23
24
25
```

K24Wsch4

1          (In open court)

2          THE COURT:  All right.  The parties agreed to adjourn

3    for the day, so we're going to close.  Normally we'd end at

4    3:00.  We're going to end a little bit sooner.

5          You heard what I said.  Don't do any research on the

6    case.  Don't talk about the case.  Keep an open mind.

7          We'll resume tomorrow morning at 9:00.  Try to be on

8    time.  We'll have breakfast and a little snack, a reward for

9    coming early.  We'll get started at nine and we'll break at

10   3:00 for the day.

11         Thank you very much.  Safe home tonight.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K24Wsch4

```
 1              (Jury not present)
 2              THE COURT:  OK.  Please be seated.
 3              Anything you want to take up?
 4              Mr. Laroche.
 5              MR. LAROCHE:  No, your Honor.
 6              THE COURT:  Ms. Shroff.
 7              MS. SHROFF:  No, your Honor.
 8              THE COURT:  All right.  See you tomorrow morning at
 9    9:00.
10              Will the first witness tomorrow have protective
11    measures coming in?
12              MR. LAROCHE:  Yes, your Honor.
13              THE COURT:  Limit the attendance of the courtroom.
14              MR. LAROCHE:  Yes, your Honor.
15              THE COURT:  And you'll take care of that?
16              MR. LAROCHE:  Yes, your Honor.
17              THE COURT:  How are you going to do that?
18              MR. LAROCHE:  We'll consult with Mr. Gonzalez before
19    and make sure everybody's on the same page.
20              THE COURT:  Consult with the marshal's office as well.
21              MR. LAROCHE:  Yes, your Honor.
22              THE COURT:  And be mindful of what I say.
23              MR. LAROCHE:  Yes, your Honor.
24              THE COURT:  Get the witnesses subject to protection up
25    here so that we don't have to wait 15 minutes for the elevator.
```

K24Wsch4

1           MR. LAROCHE:  Yes, your Honor.  Understood.

2           THE COURT:  Thank you.

3           MR. LAROCHE:  Yes, your Honor.

4           (Adjourned to February 5, 2020, at 9:00 a.m.)

1                      INDEX OF EXAMINATION

2    Examination of:                        Page

3     PAUL ROSENZWEIG

4    Direct By Mr. Denton . . . . . . . . . . . . .37

5    Cross By Ms. Shroff  . . . . . . . . . . . . .75

6    Redirect By Mr. Denton . . . . . . . . . . . 126

7     STEVEN DECK

8    Direct By Mr. Laroche  . . . . . . . . . . . 130

9    Cross By Mr. Branden . . . . . . . . . . . . 153

10                    GOVERNMENT EXHIBITS

11   Exhibit No.                         Received

12    1   . . . . . . . . . . . . . . . . . . 145

13    2-16 . . . . . . . . . . . . . . . . . . 146

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300