K253SCH1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              S2 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

          Defendant.                 Trial

------------------------------x
                                         New York, N.Y.
                                         February 5, 2020
                                         9:00 a.m.
Before:

                    HON. PAUL A. CROTTY,

                                         District Judge
                                         and a jury
                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW J. LAROCHE
     SIDHARDHA KAMARAJU
     DAVID W. DENTON JR.
     Assistant United States Attorneys

SABRINA P. SHROFF
JAMES M. BRANDEN
     Attorneys for Defendant
     –and–
DAVID E. PATTON
     Federal Defenders of New York, Inc.
BY:  EDWARD S. ZAS
     Assistant Federal Defender

Also Present:  Colleen Geier
               Morgan Hurst, Paralegal Specialists
               Achal Fernando-Peiris
               John Lee, Paralegals
               Daniel Hartenstine
               Daniella Medel, CISOs, Department of Justice

K253SCH1

1           (In open court; jury not present)

2           THE COURT:  Good morning.  We're missing a couple of

3    jurors.

4           MR. BRANDEN:  We're missing a couple lawyers, too, but

5    I thing they're just in the restroom and they'll be right here,

6    Judge.

7           THE COURT:  Okay.  Thank you.

8           THE DEPUTY CLERK:  Missing one still, Judge.

9    Ms. Thompson.

10          THE COURT:  Is Ms. Shroff here?

11          MR. ZAS:  She is, Judge.  She may have just stepped

12   out to go to the ladies' room.

13          THE COURT:  Do you want to take up the letter dated

14   February 4 about the production of a binder?  Can you talk

15   about that, Mr. Zas?

16          MR. ZAS:  Your Honor, I apologize.  It is out of my

17   realm of expertise.

18          THE COURT:  Okay.  We'll wait then.

19          Ms. Shroff, I want to talk about the letter you sent

20   last night about 3506-04.

21          MS. SHROFF:  Okay, I'm sorry, your Honor.  I had to

22   run back down to the SCIF.  I apologize for keeping you

23   waiting.

24          THE COURT:  All right.  I have the letter.  I

25   understand the letter.  Mr. Laroche or somebody from the

K253SCH1

| | |
|---|---|
| 1 | government, why can't you produce the binder? |
| 2 |      MR. LAROCHE:  May I just have one moment with |
| 3 | Ms. Shroff.  I just haven't seen the letter, I want to ask her |
| 4 | what the letter is. |
| 5 |      (Counsel conferring) |
| 6 |      MR. LAROCHE:  We're going to make the binder |
| 7 | available, your Honor. |
| 8 |      THE COURT:  That takes care of that, Ms. Shroff. |
| 9 | Anything else you want to take up? |
| 10 |      MS. SHROFF:  Nice to have that power, Judge. |
| 11 |      THE COURT:  302 kind of dictates that you get the |
| 12 | file, the binder as it was maintained at the time.  Anything |
| 13 | else to take up? |
| 14 |      MR. ZAS:  Your Honor, I did want to take something up |
| 15 | with the Court, just on outstanding motions we don't think |
| 16 | we've received a ruling on.  There was a motion we made by |
| 17 | letter dated January 17, it's the Smith v. Illinois issue about |
| 18 | our inability to do any investigation of the CIA witnesses. |
| 19 | And we moved for permission to conduct our usual background |
| 20 | investigation on the witnesses, or alternatively -- |
| 21 |      THE COURT:  I thought we took care of this at the |
| 22 | final pretrial conference, Mr. Zas. |
| 23 |      MR. ZAS:  No, your Honor.  I think at the final |
| 24 | pretrial conference you asked the government to respond by |
| 25 | letter, which they did.  And that was the government's letter |

K253SCH1

1    of January 24.  We responded on January 27, and then we gave

2    the Court a list of outstanding issues, including this one.  So

3    I just wanted to make sure we weren't waiving anything or the

4    issue didn't get lost in the shuffle.  It may have.

5           THE COURT:  All right.  We'll take a look.  The dates

6    of the -- give me the dates again.

7           MR. ZAS:  The initial motion is a letter dated

8    January 17, 2020.  The issue is mentioned again in a letter of

9    January 23.  The government responded on January 24.  We

10   replied to that on January 27.

11          THE COURT:  We didn't take it up at the pretrial

12   conference?  I have a vague recollection that you raised it

13   before.

14          MR. ZAS:  I raised it.

15          THE COURT:  And the government consented to a Google

16   search of the CIA witnesses.

17          MR. ZAS:  That's right.  We were advised that we had,

18   we were permitted to conduct a Google search or similar

19   Internet search of the witnesses' names, so long as we didn't

20   specifically tie the name to the agency.  We then objected to

21   that, because we were then given guidance by Mr. Hartenstine

22   that that meant we could not, for example, put the name in with

23   important terms like WikiLeaks or spying or leaks or other

24   items like that.

25          So, our problem is, as we sit here today with the

K253SCH1

1    first CIA witness about to testify, we've literally been able

2    to do no investigation at all into this witness, or any of the

3    15 witnesses or so from the CIA.  We're dependent entirely on

4    what the government has given us.  So I commend them for giving

5    that to us but, we're supposed to have the right to do our own

6    independent investigation.

7              THE COURT:  I'll take a look.  Thank you.

8              MR. ZAS:  Thank you, sir.

9              THE COURT:  Mr. Laroche, do you want the witness on

10   the stand before the jury comes in?

11             MR. LAROCHE:  That's fine, your Honor.

12             THE COURT:  Okay.  Do you want to bring in the

13   witness.  Is the next witness in the witness room?

14             MR. LAROCHE:  Yes, your Honor.

15             THE COURT:  The second witness today?

16             MR. LAROCHE:  Not yet, your Honor.  But this witness

17   is going to be on for most, if not all, of the day.

18             THE COURT:  Okay.

19             MR. LAROCHE:  We will have that witness prepared to

20   come up if it looks like he is going to finish.

21             THE COURT:  Thank you.

22             (Jury present)

23             THE COURT:  Before we start, let me confirm with the

24   jury that all of you were successful in adhering to my

25   instructions last night that you not discuss the matter, and

K253SCH1                         Weber - Direct

1   you avoid any research or investigation.  Okay.  Remember, the

2   case has to be decided based on the evidence that you hear in

3   this courtroom and only this courtroom and only the evidence

4   that you hear here.

5           Don't read any newspapers, don't watch any TV stories,

6   don't do any independent research.  Pay attention to what

7   happens in the courtroom because that's what's going to define

8   your task when you begin your deliberations.  All right.

9           David.

10          THE DEPUTY CLERK:  Please state your name for the

11  record.

12          THE WITNESS:  Jeremy Weber.

13          (Witness sworn)

14          THE COURT:  Please sit down.  Mr. Laroche.

15          MR. LAROCHE:  Thank you, your Honor.

16   JEREMY WEBER,

17      called as a witness by the Government,

18      having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MR. LAROCHE:

21  Q.  Good morning, Mr. Weber.

22  A.  Good morning.

23          I don't have the sheet you had mentioned up here.

24  Q.  Ah.  Understood.  We'll get you that sheet.  Let's get

25  started first.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              Are you employed?

2       A.   Yes, I am.

3       Q.   Where do you work?

4       A.   Central Intelligence Agency.

5       Q.   How long have you worked at the Central Intelligence

6       Agency?

7       A.   Coming up on 10 years now.

8       Q.   Does that also go by the CIA?

9       A.   Yes, it does.

10      Q.   What is the CIA?

11      A.   The CIA is one of the executive agencies, we are tasked

12      with collecting foreign intelligence.

13      Q.   Prior to working at the CIA, where did you work?

14      A.   I was active duty Marine Corps.

15      Q.   How long were you in the Marines?

16      A.   Almost six years.

17      Q.   What were your roles in the Marines?

18      A.   For the first half of my career in the Marine Corps, I was

19      a data systems specialist, an IT guy.  And then after that, I

20      became a Marine security guard, guarding the embassies.

21      Q.   I want to direct your attention to March 2017.

22      A.   Yes.

23      Q.   Were you employed by the CIA at that time?

24      A.   Yes, I was.

25      Q.   Are you familiar with a CIA group known as the Engineering

K253SCH1                            Weber – Direct

1  Development Group?

2  A.  Yes, I am.

3  Q.  In 2017, were you working in that group?

4  A.  Yes, I was.

5  Q.  Does the Engineering Development Group also go by EDG?

6  A.  Yes, it does.

7  Q.  Today I am going to refer to that as EDG or group.

8  A.  Okay.

9  Q.  Generally, speaking what did that group do?

10  A.  The EDG was tasked with creating cyber capabilities for use

11  in cyber operations.

12  Q.  By cyber capabilities, did that include developing cyber

13  tools?

14  A.  Yes, that would be correct.

15  Q.  What is a cyber tool?

16  A.  Cyber tool would be anything from a script to a program

17  that we created to collect information off of a computer

18  network.

19  Q.  You said that those tools were also used in operations; is

20  that correct?

21  A.  Yes, that's correct.

22  Q.  What types of operations?

23  A.  Cyber operations.

24  Q.  Can you explain some of the targets of those operations,

25  without identifying them specifically?

K253SCH1                           Weber - Direct

1   A.   So, our targets typically fell into two categories.

2   Foreign governments, or non-nation state actors.

3   Q.   What do you mean by non-nation state actors?

4   A.   Terrorists, typically.

5   Q.   I want to direct your attention to March 7 of 2017.

6   A.   Okay.

7   Q.   Were you working that day?

8   A.   Yes, I was.

9   Q.   Were you working at the CIA that day?

10  A.   Yes, I was.

11  Q.   On that day, did you learn about the public disclosure of

12  any of your group's work?

13  A.   Yes, I did.

14  Q.   Where was your group's work publicly disclosed?

15  A.   It was disclosed on the internet, by WikiLeaks.

16  Q.   Were there additional public disclosures of your group's

17  work by WikiLeaks?

18  A.   Yes, there was.

19  Q.   Approximately how many?

20  A.   I don't know the specific number.  I think it was around 20

21  or so, plus or minus.

22            MR. LAROCHE:  Your Honor, may I approach?

23            THE COURT:  Yes, you may.

24  Q.  Mr. Weber, I just handed you what's been entered into

25  evidence as Government Exhibit 1.  Do you recognize that?

1    A.  Yes, I do.

2    Q.  How do you recognize it?

3    A.  After reviewing the exhibit, I made a mark on it that I

4    would recognize.

5    Q.  Does that exhibit contain the information that was

6    disclosed by WikiLeaks from your group?

7    A.  Yes, it does.

8    Q.  Was the information disclosed by WikiLeaks from your group

9    classified or unclassified?

10   A.  It was mostly classified information.

11   Q.  Where was that information stored within the group?

12   A.  It was stored on our primary network called DevLAN.

13   Q.  Is that a computer network?

14   A.  Yes, it is.

15   Q.  Is that computer network classified?

16   A.  Yes, it is.

17   Q.  Did everyone who worked in the group have access to all of

18   the information contained on Government Exhibit 1?

19   A.  No.

20   Q.  I want you to look around the courtroom.  Do you see anyone

21   in the courtroom who worked in the group who had access to all

22   of the information on Government Exhibit 1?

23   A.  Yes.

24   Q.  Can you please identify where that person is sitting.

25   A.  He's sitting at the table there, looks like wearing a black

K253SCH1                              Weber - Direct

1   jacket.

2               MR. LAROCHE:  Your Honor, let the record reflect that

3   the witness has identified the defendant.

4               THE COURT:  Yes.

5   Q.  How long have you known the defendant?

6   A.  I knew him for the entirety of when I started at the

7   agency, until his departure from the agency.

8   Q.  While the defendant worked at the CIA, how often did you

9   interact with him?

10  A.  For most of the time, especially when he was a full-time

11  officer, I would say daily.

12  Q.  Can you describe what your relationship was like with him.

13  A.  We were close.  I would consider him a friend.  We worked

14  often together on projects.  He was somebody that I looked to

15  all the time to collaborate with.  We were close over all.

16  Q.  Did there come a time when your relationship changed?

17  A.  Yes.

18  Q.  When approximately did it change?

19  A.  It would have been late 2015, early 2016.  Josh became

20  increasingly belligerent to another employee, and eventually I

21  had had enough of the situation, and no longer considered him a

22  friend.

23  Q.  Are you aware of any time in which the defendant violated

24  CIA policy using the classified computer network used by your

25  group?

1    A.   Yes.

2    Q.   When approximately did that happen?

3    A.   April 2016.

4    Q.   How do you know it happened?

5    A.   I witnessed the modification in some log files that showed

6    that he modified some permissions, after explicitly being told

7    otherwise on how they should be set.

8    Q.   How did he modify those permissions?

9    A.   Josh was an administrator of the system, and he used those

10   administrative privileges to go against the orders of our

11   leadership.

12   Q.   Was he authorized to do that?

13   A.   No, he was not.

14   Q.   What, if any, steps did you take as a result of those

15   actions?

16   A.   I immediately informed management, and management had me

17   come in, I believe the following day, with some other system

18   administrators to remove his access to -- administrative access

19   to the system.

20   Q.   What are some of the reasons you took those steps?

21   A.   The main reason was we no longer trusted him to be an

22   administrator of the system.  He had demonstrated that he was

23   willing to do things other than what was explicitly told to him

24   by his leadership.

25   Q.   Why did you no longer trust him to be an administrator of

K253SCH1                          Weber - Direct

1   the system?

2   A.  The actions that he had taken to -- we had given him very

3   specific instructions on how, how things were going to be.  And

4   the system was set up in such a way, following those

5   instructions, Josh went and changed it to the way he wanted it

6   to be, without informing anybody.  And then, in addition to

7   that, like I said, his interactions with the other employee and

8   some statements he made about that employee were lies I felt.

9   Q.  Did you view that as a problem?

10  A.  Yes.

11  Q.  Why?

12  A.  The agency exists in a world of trust.  We are granted

13  access to classified information, and we are trusted to only

14  use that information for the expressed reasons we're given

15  access to it.  If you can't trust the person that you're

16  working with, you just aren't going to be able to do your daily

17  job.

18  Q.  Why is that a problem if you can't trust that person?

19  A.  If you can't trust that person, you can't, you're not going

20  to be able to work with them, because having access to some of

21  this classified information could lead to grave damage to the

22  U.S. government.  If you can't share it with that person

23  anymore, that's -- you're effectively worthless at the CIA.

24  Q.  Now, you said that Government Exhibit 1 contains the

25  group's work.  Is that correct?

1   A.  Yes.

2   Q.  Did the leaks come from any particular part of your group's

3   network?

4   A.  Yes, it did.

5   Q.  Which parts?

6   A.  We had a product called Confluence, that was the data that

7   was initially disclosed on the March 7.  And then another

8   product called Stash, later referred to as Bitbucket.  It was

9   renamed.  That's where the data came for the second set.

10  Q.  So let's start with Confluence.  When was the Confluence

11  information disclosed by WikiLeaks?

12  A.  March 7.

13  Q.  Approximately how much of Confluence was disclosed by

14  WikiLeaks during that first leak?

15          MS. SHROFF:  Objection, your Honor, as to personal

16  knowledge from this witness on these issues.

17          THE COURT:  Overruled.

18  Q.  How much of Confluence was disclosed by WikiLeaks in the

19  initial leak?

20  A.  It appeared to be everything up to a certain date.

21  Q.  You said that the subsequent leaks also had information

22  from Stash?

23  A.  That's correct.

24  Q.  What types of things were disclosed from Stash?

25  A.  The stuff that was disclosed from Stash was source code,

1   user guides; things of that nature.

2           MR. LAROCHE:  Ms. Hurst, can you please publish what's

3   been entered into evidence as Government Exhibit 13.

4   Q.  Do you see Government Exhibit 13 on the screen in front of

5   you, Mr. Weber?

6   A.  Yes, I do.

7   Q.  Do you recognize this?

8   A.  Yes, I do.

9   Q.  What is it?

10  A.  This is a user guide that we would often create to deliver

11  with our tools.

12          MR. LAROCHE:  Ms. Hurst, can you please zoom in on the

13  top banner.

14  A.  Yes.

15  Q.  Mr. Weber, do you see that banner?

16  A.  Yes, I do.

17  Q.  Do you recognize it?

18  A.  Yes, I do.

19  Q.  What is it?

20  A.  So this is a -- this is a banner that identifies both the

21  classification of the document, as well as dissemination

22  controls for said document.

23  Q.  Which portion of this is the classification?

24  A.  The first half.

25  Q.  And that's the "secret;" is that correct?

K253SCH1                          Weber - Direct

1    A.  Correct.

2    Q.  And you said the other part has dissemination control?

3    A.  That's correct.

4    Q.  What do you mean by dissemination control?

5    A.  So, in this scenario, "noforn" means no foreigners.  This

6    would -- this says who we could share the document with.  You

7    might have a scenario where this says "Rel To" and a country

8    name.  Which means we're willing to share this information with

9    a specific country.

10            MR. LAROCHE:  Could we zoom out again, Ms. Hurst.

11   Q.  Mr. Weber, was this one of the Stash documents that was

12   disclosed by WikiLeaks?

13   A.  That is correct.

14            MR. LAROCHE:  Could we, Ms. Hurst, can we please zoom

15   in on the logo at the top.

16   Q.  Do you recognize this logo?

17   A.  Yes.

18   Q.  What is it?

19   A.  This is logo for the Information Operations Center.

20   Q.  What is the Information Operations Center?

21   A.  The Information Operations Center is a portion of the

22   agency that's tasked with conducting cyber operations for the

23   agency.

24   Q.  I know you talked about the group which we've called EDG.

25   Was EDG within that operations center?

K253SCH1                         Weber - Direct

1    A.  Yes, it was.

2              MR. LAROCHE:  Ms. Hurst, can you please zoom out.  And

3    zoom in on the title below the logo, please.

4    Q.  Is this a reference to your group?

5    A.  Yes, it is.

6    Q.  You see the U next to it on the left?

7              MS. SHROFF:  Your Honor, could we have a sidebar for a

8    minute please?

9              THE COURT:  What's the problem.

10             MS. SHROFF:  I can't see my screen.

11             THE COURT:  I'll see you at the sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K253SCH1                           Weber - Direct

1                    (At the sidebar)

2                    THE COURT:  What's the problem?

3                    MS. SHROFF:  I can't see my screen.  Unbeknownst to

4     me, behind my back, somebody's put a screen protector on it.  I

5     don't know why.

6                    MR. LAROCHE:  The government did not put a screen

7     protector on it.  We have no objection to removing the screen

8     protector.

9                    MS. SHROFF:  Mr. Kamaraju's screen doesn't have a

10    screen protector.

11                   THE COURT:  Listen, apparently it was put on there not

12    on the government's intent.  Do you want it off?

13                   MS. SHROFF:  I do want it off.

14                   THE COURT:  David, how long will it take to take the

15    screen protector off?

16                   THE DEPUTY CLERK:  It takes seconds.

17                   (Continued on next page)

18

19

20

21

22

23

24

25

1             (In open court)

2             THE COURT:  Has the problem been corrected?

3             MS. SHROFF:  Yes, it has.

4             THE COURT:  Thank you.  Mr. Laroche.

5   Q.   The last question I asked was about the U on the left of

6   this title here.  What does that designate?

7   A.   That's what we refer to as a portion mark.  This sentence

8   is a non-classified sentence.  So the U is to help with

9   identifying that.

10  Q.   If we can just zoom out again.  What is the top

11  classification of this document?

12  A.   Secret.

13  Q.   How do you know that?

14  A.   So, the classification banner at the top, we are told and

15  we're trained that the classification contains the highest

16  level of information that's within the document.  So, in this

17  case it would have been secret.

18            MR. LAROCHE:  Ms. Hurst, can you please zoom in on

19  lines that start Brutal Kangaroo and the next three lines below

20  that.

21  Q.   Are you familiar with Brutal Kangaroo?

22  A.   Yes, I am.

23  Q.   How are you familiar with it?

24  A.   I advised Josh while he was writing it.  I don't think I

25  contributed anything of significance to this specific project.

1   But Brutal Kangaroo was also a successor to a tool that I had

2   created.

3   Q.  Is Brutal Kangaroo a cyber tool?

4   A.  Yes, it is.

5   Q.  Who developed Brutal Kangaroo?

6   A.  Primarily Josh Schulte.

7   Q.  Under Brutal Kangaroo there's Drifting Deadline?

8   A.  Yes.

9   Q.  What is Drifting Deadline?

10  A.  Drifting Deadline was a specific component of the Brutal

11  Kangaroo tool suite.

12  Q.  What do you mean a component of the tool suite?

13  A.  Brutal Kangaroo was meant to be a wide-ranging tool that

14  would be used in multiple scenarios.  So, it had different

15  pieces to do different things on the network.

16  Q.  And the bottom line of this says "user guide"?

17  A.  Yes.

18  Q.  What's a user guide?

19  A.  A user guide is something developers would create so that

20  our mission partners would know how to use the tool, what the

21  risks of using the tool are, and things like that.

22  Q.  You used the word mission partners.  What do you mean by

23  mission partners?

24  A.  Mission partner is the official term for our customers.

25  The people, we would make the tools and they would be used by

K253SCH1                          Weber - Direct

1    another group.  Those are our mission partners.

2    Q.  Were those mission partners using the tools against foreign

3    or domestic targets?

4    A.  Foreign targets.

5            MR. LAROCHE:  If we can zoom out again, please.  Go to

6    page four of this document.

7    Q.  Do you recognize this page?

8    A.  This appears to be page one still.

9    Q.  Sorry.  Page four of the PDF.  Page one of the document.

10   Do you recognize this page?

11   A.  Yes.

12           MR. LAROCHE:  Zoom in, Ms. Hurst, from scope --

13   perfect.

14   Q.  Could you read the scope.

15   A.  "This document establishes the user guide for Drifting

16   Deadline version 1.2."

17   Q.  And then also below 1.1, can you read the first sentence.

18   A.  "Brutal Kangaroo is a tool suite for targeting closed

19   networks by air gap jumping using thumb drives."

20   Q.  Just what is that portion marking?

21   A.  That is an S for secret.

22   Q.  Why is it secret?

23   A.  This is getting into the methods of how the tool works,

24   which would have been considered secret.

25   Q.  The first sentence refers to the tool suite that you

1    referenced earlier; is that correct?

2    A.   Yes.

3    Q.   Then it says "targeting closed networks."

4    A.   That's correct.

5    Q.   What does that mean?

6    A.   A closed network is a network that has limited connection

7    to other networks.  Typically, when we are referring to a

8    closed network, we are saying a network that is not connected

9    to the internet.

10   Q.   Then next part says "targeting closed networks by air gap

11   jumping."  What does air gap jumping mean?

12   A.   Air gap jumping was a trade craft term that we used.  That

13   referenced getting data off of a network without a network

14   connection.

15   Q.   Can you please read the second sentence.

16   A.   "Brutal Kangaroo components create a custom covert network

17   within the targeted closed network and provide functionality

18   for executing surveys, directory listings, and arbitrary

19   executables."

20   Q.   Can you summarize what that's saying?

21   A.   Brutal Kangaroo would -- created a custom file system on

22   the thumb drives it was using to carry commands between

23   machines on the network.

24            So in this specifically, they're talking about saying

25   what type of computer surveys you would want, so this could be

1    anything from what files are on a computer to what software is

2    installed on the computer.  Directory listings is one of those

3    surveys I just talked about.  And then arbitrary executables

4    would be secondary payloads that we might deploy on the system.

5    Q.  What do you mean by secondary payloads?

6    A.  So, often this would be additional tools to do other things

7    on the network, beyond just file collection.

8    Q.  Give us an example.

9    A.  Usually, the best example would be a back door, so that we

10   would have future access to the system.

11          MR. LAROCHE:  Ms. Hurst, can you please go to page

12   six, and zoom in on the paragraph that starts the first tab to

13   the bottom, the rest of the page.

14   Q.  Mr. Weber, do you see that paragraph starting first tab?

15   A.  Yes.

16   Q.  Can you summarize what that's addressing.

17   A.  So, these are the different execution vectors that Drifting

18   Deadlines would use to gain execution, which that's, that is

19   the official term for starting the program.  So, sometimes the

20   scenario would be a user would start the program for us,

21   sometimes it would be what's referred to as an exploit to gain

22   execution.  The EZCheese link files and the Lachesis link files

23   would be the exploits.

24   Q.  Are you familiar with the term attribution?

25   A.  Yes, I am.

K253SCH1                              Weber - Direct

1    Q.   What does it mean?

2    A.   Attribution is the identification of, it's tying an

3    activity to an actor.  In our scenario, it would be somebody

4    catching CIA tools in the wild and then being able to say we

5    know this is the CIA, because of these reasons.  That's

6    attribution.

7    Q.   Is attribution to the CIA problematic for your work?

8    A.   Yes, it is.

9    Q.   Why?

10   A.   So, we operate in secrecy.  Foreign governments do not want

11   us on their networks, and would complain, to put it lightly, if

12   they caught us doing this.  So, there is a wide gulf between

13   having a tool caught, and then having information in there

14   where a foreign government could publicly say the CIA was

15   hacking us, the U.S. government is not being a good player.

16   Q.   What, if any, impact did the disclosure of this have on

17   attribution of this tool?

18   A.   So --

19           MS. SHROFF:  Objection.

20           THE COURT:  Overruled.

21   A.   These -- the information that is listed here would be clues

22   to attribution.  So if Brutal Kangaroo or Drifting Deadlines

23   was caught on a foreign system somewhere, it might have been

24   sitting on somebody's desk, they knew this would be malware.

25   They wouldn't know necessarily whose malware it was.  Seeing a

K253SCH1                              Weber - Direct

1   document like this would allow them to start building a case

2   against the U.S. government saying, no, this was -- this was a

3   CIA tool that was used on our system.

4   Q.  What, if any, impact would that attribution have on the use

5   of these terms in the future?

6   A.  If we were concerned about the attribution of a tool to the

7   CIA, we would stop using it.

8          MR. LAROCHE:  Ms. Hurst, you can pull that down.

9   Q.  Mr. Weber, I just showed you one document that's contained

10  on Government Exhibit 1.  Is that correct?

11  A.  Yes.

12  Q.  Approximately how many documents were disclosed by

13  WikiLeaks in Government Exhibit 1?

14  A.  I don't know the exact number, but it would be thousands.

15  More than hundreds.  It took a team of -- I was on a team of

16  about 10 people.  It took us about a week of very long days to

17  just go through the initial disclosure.

18  Q.  Generally, what impact did the public disclosure of your

19  group's information have on CIA's work?

20  A.  It was crippling.  We -- we were shut down for a

21  significant amount of time.  There was a significant amount of

22  review about the operations that were ongoing to see what risk

23  there was.  And we had to recreate a significant number of

24  capabilities.

25  Q.  Why was there risk to operations?

K253SCH1                          Weber - Direct

1    A.  It goes back to both the attribution piece as well as the

2    information that was disclosed in WikiLeaks could be used by

3    the defensive community to potentially identify and find out

4    malware on foreign systems.

5    Q.  What do you mean by malware?

6    A.  Malware is the -- the industry term for cyber tools.  I'm

7    sorry.

8    Q.  We're going to come back to the leak later.  I want to

9    switch gears just a little.

10            You said you started at the CIA, you've been at the

11   CIA for about 10 years?

12   A.  That's correct.

13   Q.  Are you familiar with the phrase "security clearance"?

14   A.  Yes.

15   Q.  What is a security clearance?

16   A.  Security clearance is the U.S. government's trust in us as

17   individuals to have access to classified information.

18   Q.  Do CIA employees need a security clearance to work there?

19   A.  Yes, they do.

20   Q.  Are there different levels of security clearance?

21   A.  Yes, there are.

22   Q.  What level?

23   A.  There are three levels:  Confidential, secret, and top

24   secret.

25   Q.  Can you describe some of the differences between those

K253SCH1                          Weber - Direct

1    levels.

2    A.   The difference in levels means the level of information

3    that you would have access to, and it is graded by the amount

4    of potential damage that could be done to the U.S. government.

5    Confidential information, the official term is it would cause

6    damage.   Secret level, the official term is serious damage.

7    And top secret is grave damage.

8    Q.   What level security clearance do you need to work within

9    the group?

10   A.   Top secret.

11   Q.   When did you first obtain your security clearance?

12   A.   I first obtained a security clearance shortly after joining

13   the Marine Corps.

14   Q.   How do you obtain one?

15   A.   At that time, it was a secret clearance, which involved me

16   filling out a lot of paperwork that explained everything from

17   where I've lived, who my friends were, who my family was, what

18   my financial status was.   So you would submit this paperwork,

19   and then it's followed up by a background investigation where I

20   would talk with an investigator essentially about the paperwork

21   I had submitted.

22   Q.   When you started at the agency, the CIA, did you obtain

23   your top secret clearance?

24   A.   I had obtained a top secret clearance prior to the CIA.

25   Q.   When you started with the CIA, were you required to take an

1   oath?

2   A.  Yes, I was.

3   Q.  Can you explain what oath you were required to take.

4   A.  We take an oath to support and defend the Constitution of

5   the United States.

6   Q.  Where did you take that oath?

7   A.  The oath is taken at the headquarters building of the CIA

8   on the CIA's seal in the front lobby.

9   Q.  Does that seal have any significance to the CIA?

10  A.  That seal along with -- there's a memorial right next to

11  the seal, it has a significant amount of significance.  It's

12  meant to represent everything that we are doing.

13  Q.  Are all employees required to take that oath before they

14  work at the CIA?

15  A.  All staff employees.

16  Q.  Let's talk for a moment about the structure of your group.

17  The Engineering Development Group.

18  A.  Okay.

19          MR. LAROCHE:  Ms. Hurst, can you please publish to the

20  witness, the parties and the Court what's marked as Government

21  Exhibit 89.

22  Q.  Do you see Government Exhibit 89 on your screen, Mr. Weber?

23  A.  Yes, I do.

24  Q.  What is it?

25  A.  This is a portion of the org chart for CCI, the portion

K253SCH1                        Weber - Direct

1  that EDG was.

2  Q.  Does this exhibit fairly and accurately represent that

3  portion of the org chart as it existed in 2015 and 2016?

4  A.  Yes, it does.

5          MR. LAROCHE:  The government would offer Government

6  Exhibit 89 into evidence.

7          MS. SHROFF:  No objection, your Honor.

8          THE COURT:  89 is in evidence.

9          (Government's Exhibit 89 received in evidence)

10          MR. LAROCHE:  Ms. Hurst, can you please publish it for

11  the jury.

12  Q.  Mr. Weber, can we just start at the top.  You referenced

13  Center for Cyber Intelligence?

14  A.  Yes.

15  Q.  Where does that appear on this exhibit?

16  A.  That's at the top here.  CCI.

17  Q.  What is CCI?

18  A.  CCI -- I forget when exactly, it was a few years ago.  We

19  referenced IOC earlier.  CCI was IOC renamed.

20  Q.  IOC was the Information Operations Center; is that correct?

21  A.  Yes.

22  Q.  That was renamed as CCI?

23  A.  That's correct.

24  Q.  Below CCI there is a box for Engineering Development Group.

25  Is that correct?

K253SCH1                        Weber - Direct

1   A.  Yes.

2   Q.  Is that the group you've been talking about today?

3   A.  Yes.

4   Q.  Below EDG, your group, what appears next?

5   A.  Applied Engineering Division.

6   Q.  Does that also go by AED?

7   A.  Yes, it does.

8   Q.  What is AED?

9   A.  AED was a division in EDG.  Our primary job was to create

10  cyber tools for the group.  We were in-house developers.

11  Q.  What do you mean by in-house developers?

12  A.  So, we worked in the same building that our mission

13  partners worked in.  The cyber operations are extremely

14  tailored.  It involves a lot of back and forth with our mission

15  partners.  So the in-house developers were closely tied into

16  the operations so we can create the best capability possible.

17  Q.  Below AED are five boxes.  What do each those boxes

18  reflect?

19  A.  The different branches within AED.

20  Q.  How many developers work within each of those branches?

21  A.  Roughly, usually between 10 and 20 developers, depending on

22  the branch.

23  Q.  Focusing on the branch at the left, the Operations Support

24  Branch.  Are you familiar with that branch?

25  A.  Yes.

K253SCH1                       Weber - Direct

Q.  How are you familiar with it?

A.  I spent approximately six years as a developer within OSB.

Q.  Approximately what time frame?

A.  From when I was hired all the way until 2016.

Q.  Did the defendant also work in that branch?

A.  Sorry, correction.  It's 2017 is when I stopped working

there.

     And yes, the defendant did work in that branch.

Q.  From approximately when?

A.  The -- from the -- even before he was hired full-time, he

was an intern in OSB.  And then for almost the entirety of his

career he was in OSB.

Q.  What was the purpose of that branch, OSB?

A.  OSB was focused on what we referred to as physical access

operations.

Q.  What is that?

A.  Physical access operation is a scenario where we, the

agency, had the capability to effectively touch a computer, be

it through an agency officer or an agency asset.

Q.  What do you mean by touch a computer?

A.  It could be anything.  It could be somebody who was willing

to type on a keyboard for us.  It often was somebody who was

willing to plug a thumb drive into the machine.  Or it could be

a scenario where somebody was willing to literally pick a

machine up and walk off with it.

1    Q.  You used the word "asset" a second ago.

2    A.  Yes.

3    Q.  What were you referring to?

4    A.  An asset is a term in the CIA for a -- for a foreigner who

5    has been recruited to work for the CIA.

6    Q.  What was the culture of OSB like when you worked there?

7    A.  We were very mission focused.  We, we work closely with

8    each other.  We got along with each other.  We were, I would

9    say, mostly friends.  It was, the -- working at the agency, you

10   always kind of have the finish line in your sights and the

11   exact mission that you're working on, and that's what drives

12   us.

13   Q.  What do you mean by mission?

14   A.  So, our mission is to, again, it's to support and defend

15   the Constitution.  So, we are tasked with getting information

16   to policy makers so that they can effectively chart the

17   direction the United States should go.

18   Q.  Did OSB have a professional atmosphere while you were

19   there?

20   A.  It was mostly professional.  I would say no more or less

21   professional than any other software development shop.

22   Q.  What do you mean by that?

23   A.  You know, again, our primary focus was on the mission.

24   But, you know, we had fun at work, too.  We would occasionally

25   poke fun at each other.  We were all friends.

K253SCH1                         Weber - Direct

1   Q.  How often did you interact with the defendant while he was

2   in the branch?

3   A.  I would say daily.

4   Q.  Generally, what were those interactions like?

5   A.  I, I considered him a friend.  Again, I worked closely with

6   him.  I liked working with him.  Josh, you know, I would say

7   mostly positive, although Josh, Josh sometimes would exhaust

8   you a little bit in those interactions.

9   Q.  What do you mean by that?

10  A.  You know, Josh was very opinionated on the way things

11  should be done.  And wasn't somebody that could often be swayed

12  of said opinion.  So, he had some rough edges that you would

13  have to deal with.  You kind of took the good with the bad.

14  Q.  Did you observe the defendant interact with other

15  developers in the branch?

16  A.  Yes.

17  Q.  What were those interactions like?

18  A.  Mostly positive outside of one developer.  I think most

19  developers within the branch would have the same opinion.

20          MS. SHROFF:  Objection as to what opinion anyone else

21  had.

22          THE COURT:  Yes.  Sustained.

23  Q.  You said one, as to one developer there was a different

24  relationship; is that correct?

25  A.  Yes.

K253SCH1                          Weber - Direct

1   Q.   What was that developer's name?

2   A.   Amol.

3   Q.   We'll come back to Amol and the defendant later.

4        Looking back at the chart that's in front of you.

5   A.   Okay.

6   Q.   The top of the chart has CCI; is that correct?

7   A.   That's correct.

8   Q.   While you worked within CCI, where was it physically

9   located?

10  A.   CCI was in an office building that was west of Washington,

11  D.C.

12  Q.   Just going to refer to that as the CCI building or the

13  office.  Okay?

14  A.   Okay.

15  Q.   Was anyone free to walk into that office?

16  A.   No.

17  Q.   What stopped them?

18  A.   There was a fence around the entire compound, and to get

19  past that fence and enter the compound, you had to get past

20  armed security.

21  Q.   How was that security armed?

22  A.   Military grade weapons.

23  Q.   How did you get past that security?

24  A.   To get past that security, you had to present your

25  identification.  For full-time employees, that would be your

K253SCH1                        Weber - Direct

1    I.C. badge, and then they would let you on to the compound.

2    Q.  You said I.C. badge.  What's the I.C. stand for?

3    A.  Intelligence community.

4    Q.  Is the CIA part of the intelligence community?

5    A.  Yes, it is.

6    Q.  Once you got through the armed guards, could you just walk

7    into the office building?

8    A.  No.

9    Q.  What stopped you?

10   A.  There were -- the way I would typically go in, were what we

11   referred to as full-height turnstiles.  To get past those, you

12   would need to, you would need to badge in, which would be, you

13   would tap your badge against like a receiver.  And then you

14   would have to put in a private code.  The other way that you

15   could go in were also turnstiles that had armed security by

16   them.

17   Q.  Could you hop over those turnstiles?

18   A.  The ones with the armed security, you could hop over, I

19   would not recommend it.  The turnstiles that I typically went

20   through there was no way to hop over.  It was essentially a

21   wall.

22   Q.  Did the CIA store classified information at this office?

23   A.  Yes, it did.

24   Q.  Generally speaking, in what kinds of places did it store

25   that classified information?

K253SCH1                        Weber - Direct

1   A.  What we referred to as a SCIF.  A secure compartmented

2   information facility.  It is, it is a large vault.

3   Q.  What do you mean by that?

4   A.  So, SCIFs have very strict rules on how they are set up,

5   access controls, things like that.  They have heavy metal doors

6   that the first person that comes in for day has to put in a

7   combination to unlock the door.  And then anybody after that

8   would have to badge in to gain access to the room.

9   Q.  Were there any restrictions on what you could bring into

10  that office building?

11  A.  Yes, significant.

12  Q.  What types of restrictions?

13  A.  There's, pretty much any personal electronics were not

14  allowed.  Weapons, photography equipment, cell phones.  When

15  you come into any agency building, there's always a sign that

16  says these are the prohibited items.  It is a pretty lengthy

17  sign.

18  Q.  Why are you not permitted to bring electronic devices into

19  the office?

20  A.  They would introduce a risk to the classified information

21  that's stored there.

22  Q.  What do you mean by that?

23  A.  The best example would be if you brought in a cell phone.

24  You, an adversary might be able to leverage that cell phone to

25  listen to conversations that were ongoing in there.  Or

K253SCH1                          Weber -- Direct

1    something like that.

2    Q.  When you badged into the building through the turnstiles,

3    were you in a SCIF?

4    A.  No.

5    Q.  Where were the SCIFs located within the building?

6    A.  They -- they were all -- they were all individual rooms

7    that you had to enter after badging through.

8            MR. LAROCHE:  Your Honor, with the Court's permission,

9    I'd like to read a stipulation.

10           THE COURT:  Yes.

11           MR. LAROCHE:  It is hereby stipulated and agreed by

12   and among the United States of America by Geoffrey S. Berman,

13   United States Attorney for the Southern District of New York,

14   David W. Denton, Jr., Sidhardha Kamaraju, and Matthew Laroche,

15   Assistant United States Attorneys, of counsel, and Joshua Adam

16   Schulte, the defendant, by and with the consent of his counsel,

17   Sabrina Shroff, Esq,. Edward Zas, Esq., and James Branden,

18   Esq., that:

19           Government Exhibit 100 is a compact disc containing

20   true and accurate CIA badge records for (i) Joshua Adam Schulte

21   identified as Government Exhibits 105, 107, 108 and 109; (ii)

22   Rufus, identified as Government Exhibits 101 and 112; (iii)

23   David, identified as Government Exhibits 102 and 113; (iv)

24   Timothy identified as Government Exhibits 103 and 114; (v)

25   Andrew identified as Government Exhibit 104; (vi) Jeremy Weber

K253SCH1                        Weber - Direct

1    identified as Government Exhibits 106 and 117; (vii) Michael

2    identified as Government Exhibit 115; and (viii) Amol

3    identified as Government Exhibit 116.  Government Exhibits 101

4    through 109 and 112 through 117 were made at or near the time

5    by, or from information transmitted by, a person with knowledge

6    of the matters set forth in the records; they were kept in the

7    course of the regularly conducted business activity; and it was

8    the regular practice of that business activity to maintain the

9    records.  The time stamps on Government Exhibits 101 through

10   109 and 112 through 117 reflect local time in 24-hour format.

11             Government Exhibit 111 is a true and accurate copy of

12   floor plans for the eighth and ninth floor for the CIA's Center

13   for Cyber Intelligence office in which the defendant worked.

14             Government Exhibit 200 is a compact disc containing

15   true and correct copies of portions of the defendant's CIA

16   personnel file, including Government Exhibit 201, which is a

17   training the defendant took while employed at the CIA;

18   Government Exhibit 202, which is a portion of the defendant's

19   CIA employee bio; government Exhibits 401 through 405, which is

20   various non-disclosure agreements and security paperwork signed

21   by the defendant prior to resigning from the CIA; Government

22   Exhibits 406 and 408, which are various of the defendant's

23   performance activity reports at the CIA; Government Exhibit 409

24   is a letter of warning provided to the defendant on or about

25   June 22, 2016; and Government Exhibit 411 is a complaint filed

1   by the defendant to the Office of Equal Employment Opportunity

2   Commission.

3         Government Exhibit 300 is a compact disc containing

4   true and accurate copies of documents marked as Government

5   Exhibits 301 through 304, recovered from the defendant's desk

6   area following his resignation from the CIA.

7         Government Exhibit 500 is a compact disc containing

8   true and correct copies of portions of the defendant's CIA

9   security file, including Government Exhibits 506 through 507,

10  which are outside activities reports completed by the defendant

11  while employed at the CIA; Government Exhibit 505, which is a

12  complainant statement signed by the defendant while employed at

13  the CIA; Government Exhibit 508 is excerpts of a recording of

14  an April 8, 2016, interview of the defendant while at the CIA;

15  and Government Exhibit 509 is excerpts of a recording of a

16  July 19, 2016 interview of the defendant while at the CIA.

17        Government Exhibits 601 through 616 are true and

18  accurate copies of network documentation for certain CIA

19  computer systems.

20        Government Exhibits 701, 702, 704 through 708, 712

21  through 714, 716, 718, 719 and 720 are true and accurate copies

22  of electronic communications that were transmitted over CIA

23  messaging systems.  The time stamps on the foregoing exhibits

24  reflect local time in 24-hour format.

25        And Government Exhibits 1001 through 1012, 1015

K253SCH1                          Weber - Direct

1   through 1056, 1058 through 1098, 1100 through 1103, 1105, 1107,

2   1108, 1110 through 1116, 1118, 19, 21, 24, 1128 through 1130000

3   are true and accurate copies of e-mail communications sent and

4   received using CIA computer systems.

5           And finally, Government Exhibit 5001 is a true and

6   accurate copy of portions of the CIA's October 17, 2017

7   WikiLeaks Task Force Final Report.

8           It is further stipulated and agreed that this

9   stipulation, Government Exhibit 3004, and all of the exhibits

10  identified in this stipulation, may be received in evidence as

11  government exhibits at trial.

12          THE COURT:  They're received in evidence.

13          MR. LAROCHE:  Thank you, your Honor.

14          (Government's Exhibit 3004, 100, 111, 200, 300, 500

15  received in evidence)

16          (Government's Exhibit 601-616, 701, 702, 704-708

17  received in evidence)

18          (Government's Exhibit 712-714, 716, 718, 719, 720

19  received in evidence)

20          (Government's Exhibit 1001-1012, 1015-1056, 1058-1098

21  received in evidence)

22          (Government's Exhibit 1100-1103, 1105, 1107, 1108

23  received in evidence)

24          (Government's Exhibit 1110-1116, 1118, 1119, 1121

25  received in evidence)

1          (Government's Exhibit 1124, 1128-1130, 1132-1137, 5001

2     received in evidence)

3          MR. LAROCHE:  Ms. Hurst, can you please publish what's

4     marked as Government Exhibit 1011.  Sorry.  111.  And go to the

5     second page of this exhibit.

6     Q.  Mr. Weber, do you recognize this?

7     A.  Yes, I do.

8     Q.  What is this?

9     A.  This is a floor plan for the ninth floor of our office

10    building.

11    Q.  Just to orient us a bit, was OSB located on the ninth floor

12    as of 2015 and 2016?

13    A.  Yes, it was.

14          MR. LAROCHE:  Ms. Hurst, can you just zoom in on the

15    middle portion of this.  Right in the middle of the document.

16    Q.  Just in the middle there, Mr. Weber, what are we looking

17    at?

18    A.  The middle is the elevators to get to the ninth floor.

19    Q.  Can you just circle on the screen where the elevators are.

20    A.  So this was the primary bank of elevators.  And then this

21    one over here is a freight elevator.

22    Q.  The portions you just circled, is that within a SCIF area?

23    A.  No, it is not.

24    Q.  We can zoom back out, please.

25          MS. SHROFF:  Mr. Laroche, are we looking at the

K253SCH1                         Weber – Direct

1   circling?

2            MR. BRANDEN:  The circle is not showing up.

3            THE DEPUTY CLERK:  Mr. Laroche, I think now it's

4   working.

5            MR. LAROCHE:  Thank you, David.

6   Q.  If we could clear the screen, please.

7            THE COURT:  The yellow circle is the elevators and the

8   purple circle is the freight elevators?

9            THE WITNESS:  I don't know where the yellow line came

10  from, your Honor.  The larger circle is the regular elevators.

11  And actually, the circles that were just shown were off.

12           MR. LAROCHE:  Maybe we could zoom in again so we can

13  have the record clear for everyone.

14  Q.  Can you please just circle, once this is zoomed in, the

15  elevators again, please.  Thank you.

16  A.  Yes.  So, these are the regular use elevators, and then

17  this right here is a freight elevator.

18           MR. LAROCHE:  If we can zoom out again, please.

19  Q.  Mr. Weber, can you please circle where OSB sat as of 2015

20  and 2016.

21  A.  Yes.  That would be this area right over here.

22           MR. LAROCHE:  Can we zoom in on that area, please,

23  Ms. Hurst.

24  Q.  Can you circle that area again where OSB sat.

25  A.  Yes.  This area.

1   Q.  I think OSB appears on this zoomed in version.  Could you

2   just circle it?

3   A.  Yes.

4   Q.  What do these reflect?  I know they're a little blurry.

5   A.  The area that I circled would have been cubicles.

6   Q.  Is this area within a SCIF?

7   A.  Yes, it is.

8   Q.  How do you get into this SCIF?

9   A.  There were multiple entrances to this SCIF, but it was all

10  through, again, you would badge into the SCIF through one of

11  the many doors.

12  Q.  As of 2015, can you circle where you sat within OSB?

13  A.  Yes.

14  Q.  What about the defendant?

15          MR. LAROCHE:  Thank you.  We can pull that exhibit

16  down.

17  Q.  We've been talking about the office that CCI worked in.

18  A.  Yes.

19  Q.  Were you allowed take classified information out of that

20  building?

21  A.  Only with specific authorization.

22  Q.  How would you obtain that authorization?

23  A.  You would request it.  There was a form you would, or like

24  a web page you would go to, to say what you were taking, where

25  you were taking it to, and what the purpose was for traveling

K253SCH1                        Weber - Direct

1    with classified information.

2    Q.  Were you allowed to take classified information home?

3    A.  No.

4    Q.  Why not?

5    A.  Your home is not a secure place to store classified

6    information.

7    Q.  Was there any procedure in place if you did take classified

8    information to a place you weren't supposed to?

9    A.  Yes, there was.

10   Q.  Can you describe that procedure.

11   A.  If you mistakenly took classified information to a location

12   you weren't supposed to, you were instructed to immediately

13   return to whatever closest facility there was, and then report

14   to both the agency security officer as well as your leadership.

15   Q.  Did you ever have to follow that procedure?

16   A.  Yes, I did.

17   Q.  Can you explain what happened?

18   A.  So, early in my career, it was tax time.  We are, we are

19   sent our tax documents electronically.  I printed off the tax

20   documents which are unclassified, but, whenever you print

21   something, you have what is referred to as a cover page.  And

22   that cover page says treat this information as classified.  I

23   accidently brought that cover page home one day.

24   Q.  Can you describe what that cover page looks like?

25   A.  It just has your user name and says the information

1  following this might contain classified information.  And that

2  it was U.S. government.

3  Q.  What did you do with the cover page after you found it at

4  home?

5  A.  Brought it back into work.

6  Q.  What happened as a result of that?

7  A.  I reported it to management and the ASO, but there was no

8  further action.  They told me not to do it again.

9  Q.  Did you use a classified e-mail system at the CIA?

10  A.  Yes, I did.

11  Q.  Did you ever send unclassified e-mails on that system?

12  A.  Yes, I did.

13  Q.  Why would you do that?

14  A.  The -- the classification of an e-mail has nothing to do

15  with the system that it's on.  It is the information that's

16  contained in that e-mail.  So, an unclassified e-mail might be

17  something as simple as, let's meet at, you know, 3 p.m. in this

18  room number.  Nothing in there is damaging to the U.S.

19  government.  That would be an unclassified e-mail.

20  Q.  How would you notify someone if you were sending an

21  unclassified e-mail?

22  A.  Every single e-mail that we sent, you were required to

23  classify before sending it.  So, the e-mail would carry a

24  classification banner as well as a classification block.

25  Q.  Just want to show you one example.

1        MR. LAROCHE:  Ms. Hurst, if we can publish Government

2   Exhibit 1023.  If we can go to the second page of this exhibit.

3   Just zoom in on the to from line here.

4   Q.  Do you recognize this to be a CIA e-mail?

5   A.  Yes, I do.

6   Q.  Who sent this e-mail?

7   A.  This would have been sent by Joshua Schulte.

8   Q.  When did he send it?

9   A.  January 6, 2016, at 3:06 p.m.

10  Q.  Who did he send it to?

11  A.  Rufus.

12  Q.  Did he copy anyone on the e-mail?

13  A.  He copied myself and Sean.

14  Q.  What was the subject of this e-mail?

15  A.  "Migration of Atlassian servers and support back to ISB."

16        MR. LAROCHE:  If we can zoom from classification down.

17  Q.  Just starting at the top of the screen, there is a

18  classification secret/noforn with a cross through.  What does

19  that reflect?

20  A.  So, this would have been the overall classification of the

21  e-mail.

22  Q.  Who classified the e-mail?

23  A.  The e-mail is classified by the sender, so in this case

24  Josh.

25  Q.  How would the sender classify the e-mail?

K253SCH1                          Weber - Direct

1    A.   There was a tool tied into our e-mail system that you would

2    select what the classification was, as well as what reason you

3    were classifying the document.

4    Q.   Okay.  We'll come back to the substance of this e-mail

5    later.

6              MR. LAROCHE:  Ms. Hurst, you can pull that down.

7    Thank you.

8    Q.   You stated and you talked a little bit about the

9    development of cyber tools by the group.

10   A.   Yes.

11   Q.   Generally speaking -- strike that.

12             Who tasked you to create cyber tools?

13   A.   Our mission partners would.

14   Q.   Who were your mission partners?

15   A.   In -- typically, it's COG, which was another group within

16   CCI.  Like I mentioned earlier, EDG made the tools, COG would

17   deploy them in operations.

18   Q.   What does COG stand for?

19   A.   Computer Operations Group.

20   Q.   After you were tasked to create a cyber tool, how would you

21   go about creating it?

22   A.   So, there was significant back and forth when you are

23   creating a tool.  You would interact closely with COG to make

24   sure you were creating the right thing.  Once you understood

25   the mission parameters, the AED, we would write the source code

1   that would eventually in turn create the capability.

2   Q.  You used the term "source code."

3   A.  Yes.

4   Q.  What is source code?

5   A.  So, source code is what software developers create.  It is

6   human readable computer instructions that eventually will be

7   compiled into a computer readable program.

8   Q.  How did you go about developing source code?

9   A.  We would write it.  This is what we're trained to do.

10  Q.  Are you familiar with a cyber tool called Marble or

11  Marbler?

12  A.  Yes, I am.

13  Q.  Generally speaking, what does that tool do?

14  A.  It was an internal tool, meant -- it was used by developers

15  in AED to aid in the development of capabilities.  Its job was

16  to, one of our pieces of trade craft was to obfuscate strings

17  which could be identifying information in a binary.  So,

18  Marbler would obfuscate the strings for us.

19  Q.  You used the term "trade craft."  What does that mean?

20  A.  Trade craft is the lessons learned, the rules, everything

21  like -- you're taught how to be a software developer in

22  college.  The agency then takes that raw material and trains

23  you on how to be somebody who creates cyber tools.  The trade

24  craft is the training that you get for this is how you, you

25  know, do X, Y and Z.  These are best practices, things like

1    that.

2              MR. LAROCHE:  Ms. Hurst, can you please publish

3    Government Exhibit 12-2.

4    Q.  Mr. Weber, do you recognize this?

5    A.  Yes, I do.

6    Q.  What is it?

7    A.  This is source code.

8    Q.  Was this source code disclosed by WikiLeaks?

9    A.  Yes, it was.

10   Q.  What is this source code for?

11   A.  This was a portion of Marbler.

12   Q.  How do you recognize this to be source code?

13   A.  I wrote stuff very similar to this.  This is C++ code which

14   is a computer language.  And a lot of the words and things in

15   here are what are referred to as key words.  So, anybody who is

16   a C++ developer would recognize this.

17   Q.  So I want to go to one page of this and see if you can help

18   us understand it.  If we go to page five.  Then if we can just

19   zoom in on the top all the way down to "go to reset."  That's

20   fine.  Just want to focus you on the middle where it starts

21   "generate modified files."

22              Do you see that?

23   A.  Yes.

24   Q.  Could you summarize what that's saying.

25   A.  So, this is generate modified files is a function call.

1  So, this is the -- what's done in generate modified files is

2  defined elsewhere in the source.  But, this function is called,

3  and then immediately after this function, we check to see if

4  there was any error during the running of this.  And if there

5  was an error, we print to the user that there was a problem and

6  that you're resetting the files before proceeding on.

7  Q.  What do you mean by print to the user?

8  A.  So, Marbler was what we referred to as a command line tool.

9  Think your old DOS prompt where you've got just text on the

10 screen.  So, this would, this would write to that screen error

11 in modifying files resetting to original files.

12 Q.  Is this source code classified?

13 A.  Yes, it is.

14 Q.  Why?

15 A.  The techniques in here are part of our trade craft.  And

16 having access to this information and the tie to the CIA would

17 help an adversary with the attribution aspect of the

18 identification.

19        MR. LAROCHE:  Ms. Hurst, we can pull that down.

20 Q.  When source code is complete for a tool that you're

21 developing, what happens to it?

22 A.  It's, in the case of C++, it's compiled, which is a tool

23 that is used to convert that human readable files into machine

24 readable code.

25 Q.  What is that machine readable code then called?

1   A.  We typically refer to that as a binary or a program.

2   Q.  Why do you create binary from the source code?

3   A.  So, in compiled languages, computers can't execute source

4   code.  So, it doesn't understand, it doesn't understand the

5   documents that we write, so it's converted to a language the

6   computer understands.

7   Q.  Other than the source code and the binary, do developers

8   create any documentation for their cyber tools?

9   A.  Yes.

10  Q.  What are some of the types of documentation they create?

11  A.  The main type of documentation you would see would be a

12  user guide, which explains how to use the tool, why you would

13  use the tool, and what scenarios you would use the tool.  We

14  also were a bureaucracy at heart, so there would also be

15  delivery records with everything that we did and there would be

16  a paper trail.  We would help in the creation of those

17  documents as well.

18  Q.  When the source code, the binary and those documents are

19  complete, what happens to the tool?

20  A.  We, it would go through what we referred to as the delivery

21  process.  That information would be handed over to our SIs,

22  system integrators, who would then take it to the configuration

23  management team who would store the information, as well as

24  hand it over to COG so that they could use the tool.

25  Q.  Earlier in your testimony you talked about a computer

1   network that was used by the group; is that correct?

2   A.  Yes.

3   Q.  From which the information on Government Exhibit 1 came

4   from.  Is that right?

5   A.  Yes.

6   Q.  I want to focus you on 2015 and 2016.

7   A.  Okay.

8   Q.  Was that computer network used to develop cyber tools?

9   A.  Yes, it was.

10  Q.  What was that computer network called?

11  A.  DevLAN.

12  Q.  What does DevLAN mean?

13  A.  It was, it was abbreviation for dev, which short for

14  development, and LAN was short for local area network.  So, it

15  was just a shortened term to reference that.

16  Q.  What's local area network mean?

17  A.  Local area network is an industry term for a network that

18  is controlled by a company or something like that.

19  Q.  Were you familiar with the DevLAN network?

20  A.  Portions of it.

21  Q.  How did you become familiar with portions of that network?

22  A.  One, my day-to-day job was leveraging the resources that

23  were on DevLAN.  And secondly, I was an administrator for a

24  portion of the network.

25  Q.  What do you mean by administrator?

1   A.  I had additional privileges on some of the services that

2   were run on the network, to ensure that those services stayed

3   up and running, granting access to who needed access to those

4   services, things like that.

5   Q.  Did any other developers share in those administrative

6   privileges?

7   A.  Yes.

8   Q.  Who?

9   A.  At the time you referenced, it would have been Joshua

10  Schulte.  Just before that, it would have been Patrick.

11  Q.  Who is Patrick?

12  A.  Patrick was a developer within AED as well.  He originally

13  brought the Atlassian products in house and helped set them up.

14  But he was selected for a new assignment, and passed those

15  responsibilities off to me.

16  Q.  What was the classification level of the DevLAN network?

17  A.  Top secret.

18  Q.  Why did it have that classification level?

19  A.  The information that was on the network would often be up

20  to top secret in nature.

21  Q.  Was DevLAN connected to any unclassified network?

22  A.  No, it was not.

23  Q.  Was DevLAN connected to the internet?

24  A.  No, it was not.

25  Q.  Why not?

1    A.  Being connected to the internet would pose a serious risk

2    to the security of that network.  It would give essentially the

3    adversaries a front door into accessing it.

4    Q.  I'd like to focus on how the DevLAN network was set up or

5    its infrastructure.  Generally speaking, what is network

6    infrastructure?

7    A.  Network infrastructure is anything that's needed for a

8    computer network to run.  Generally speaking, you've got three

9    categories of stuff.  The end user's machines, think the laptop

10   or desktop that you would use on a daily basis.  The servers,

11   which are powerful machines that sit in the back that contain a

12   lot of the information.  And then intermediary devices on the

13   network whose job is to transfer the data back and forth.

14   Q.  Are you familiar with the term "closed network"?

15   A.  Yes, I am.

16   Q.  What is a closed network?

17   A.  A closed network is a network that has limited access, if

18   any access to other networks.  And traditionally speaking, when

19   we refer to a closed network, we are saying it is a network

20   that is not connected to the internet.

21   Q.  Was DevLAN a closed network?

22   A.  Yes, it was.

23   Q.  Why was it a closed network?

24   A.  It was a top secret network, which meant that there were,

25   there was a lot of security procedures that we had to follow.

K253SCH1                          Weber - Direct

1   And one of the easier ways to defend a network is by making

2   sure that it does not have access to the internet.

3             MR. LAROCHE:  Ms. Hurst, can you please publish to the

4   Court, the parties, and the witness what's marked as Government

5   Exhibit 1251.

6   Q.  Mr. Weber, do you recognize this?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  It is a high level, it is a high-level view of portions of

10  DevLAN, as well as COG's network and Hickok.

11  Q.  Does it fairly and accurately represent those portions of

12  the network you just described and in about 2015 and 2016?

13  A.  Yes, it does.

14            MR. LAROCHE:  The government offers 1251 into

15  evidence.

16            MS. SHROFF:  Your Honor, we have an objection.

17            THE COURT:  You have no objection?

18            MS. SHROFF:  We do have an objection.

19            THE COURT:  It's overruled.

20            MR. LAROCHE:  Can we publish that for the jury?

21            THE COURT:  1251 is received in evidence.

22            (Government's Exhibit 1251 received in evidence)

23            MR. LAROCHE:  Thank you, your Honor.

24  Q.  There is a lot on this screen.  We're going to walk through

25  it, Mr. Weber.  First, did DevLAN run computer software?

K253SCH1                         Weber - Direct

1   A.  Yes, it did.

2   Q.  Are you familiar with the term Atlassian?

3   A.  Yes, I am.

4   Q.  What is Atlassian?

5   A.  Atlassian is a commercial company that creates products for

6   software development.

7   Q.  Did DevLAN include certain Atlassian services?

8   A.  Yes, it did.

9   Q.  What services?

10  A.  There were five of them:  Confluence, Bamboo, Crowd, Jira,

11  and at the time, it was called Stash, that product has been now

12  renamed to Bitbucket.

13  Q.  If we can focus on the top left.  You see some of the

14  Atlassian services here?

15  A.  Yes.

16  Q.  Can we circle Confluence, please.  What is Confluence?

17  A.  Confluence is a product for generating or presenting

18  user-generated content.  It's similar to something like

19  Wikipedia where multiple users can edit the same page, and it's

20  a collaborative work environment.

21  Q.  Can you please circle Bamboo on the screen.  This is

22  another one of the Atlassian services run on DevLAN?

23  A.  Yes, it is.

24  Q.  What did Bamboo do?

25  A.  Bamboo, to use an industry term, was used for continuous

1    integration.  Which meant whenever source code was changed,

2    Bamboo would detect that change, compile the code, and test the

3    code.  It was meant to make it so that if you introduced an

4    error in your code, you discovered it early and can correct it

5    right away.

6               MR. LAROCHE:  Ms. Hurst, if you can zoom out, please.

7    Then zoom in on the box with the Stash server.

8    Q.  Can you please circle Stash on this.  What was Stash?

9    A.  Stash was meant to, to back up the source code that we

10   wrote on a daily basis, as well as provide an area for us to

11   collaborate and discuss that source code.

12   Q.  Can you please circle Crowd.  What did Crowd do?

13   A.  Crowd's job was to translate the user permissions that

14   were -- like the user authentication was handled by an external

15   service called Active Directory.  So, all of the user

16   authentication, things like that, would be handled by Active

17   Directory.  Crowd's job was to interface with Active Directory

18   and then let the Atlassian products know who an authorized user

19   was and what groups they belonged to.

20              MR. LAROCHE:  Just zoom out one more time, please.

21   Zoom in on the box with Hickok.

22   Q.  What is Jira?

23   A.  Jira is a tool for issue tracking.  Which, that's

24   everything that we need to do when we are developing a tool.

25   It could be anything from the background of this web page needs

1   to be blue and not green, to something like in this scenario,

2   the program crashes, and we need to fix this.  Jira was meant

3   to track all of those work items.  So that you can report the

4   status of how far you've progressed in your development.

5   Q.  If we can zoom out again, please.  Did DevLAN also have

6   hardware?

7   A.  Yes, it did.

8   Q.  What types of hardware did it have?

9   A.  It had, all, all types of hardware.  For the most part, the

10  users had desktops as their work machines.  It had computer

11  servers.  It had switches, routers, everything that you would

12  find on a traditional network.

13  Q.  Let's focus on the servers.

14        MR. LAROCHE:  Ms. Hurst, if you can zoom in on the top

15  left, the ESXi server.

16  Q.  What is an ESXi server?

17  A.  ESXi is another commercial tool that its job is to -- it's

18  referred to as a hypervisor.  It's meant to enable running what

19  we refer to as virtual machines.  It allows you to run multiple

20  virtual machines on a single set of hardware.  Something like

21  that.

22  Q.  In 2015, what branch did the ESXi server belong to?

23  A.  This specific one belonged to OSB.

24  Q.  What programs were being run on that ESXi server?

25  A.  It was running a Confluence virtual machine, a Bamboo

1   virtual machine, as well as a collection of development VMs for

2   different purposes.

3   Q.  You used the term "virtual machine."

4   A.  Yes.

5   Q.  Is that the same thing as a VM?

6   A.  Yes.

7   Q.  What is a virtual machine?

8   A.  A virtual machine is technology that we use in the IT

9   world.  It is a way to try and separate the operating system

10  and any services from the hardware it's running on.

11         Hardware ages and eventually fails.  So, virtual

12  machines are supposed to make it so that you're agnostic to the

13  hardware you're running on.  So when a server begins to fail,

14  you can quickly migrate that service to something new.

15  Q.  What's the purpose of that?

16  A.  It's, in the IT world, you are pretty much judged based

17  solely on what we refer to as uptime, meaning, is a user able

18  to use the service that you're responsible for.  So, having a

19  server fail would cause significant impact on your uptime.  And

20  this is a way of just making sure that that wouldn't happen.

21         MR. LAROCHE:  Ms. Hurst, can you please zoom out then

22  zoom in on the Stash server.

23  Q.  Was there a separate server that was running Stash?

24  A.  That's correct.

25  Q.  Can you explain that?

K253SCH1                          Weber - Direct

1   A.   Stash, the server was owned and operated by ISB.  Stash was

2   not a virtual machine, because there is a cost to running

3   virtual machines.  It's not as efficient as running on a

4   straight hardware.  And we wanted to make sure Stash, which was

5   the most used of the services, had enough power to, you know,

6   meet the division's needs.

7   Q.   You used the term ISB.

8   A.   Yes.

9   Q.   What is ISB?

10  A.   ISB was the branch within EDG whose focus was on system

11  administration of DevLAN.

12  Q.   What does ISB stand for?

13  A.   Infrastructure Support Branch.

14           MR. LAROCHE:  Ms. Hurst, can you please zoom out.  Can

15  we please publish again Government Exhibit 111.

16  Q.   You just talked about the OSB's ESXi server.  Is that

17  correct?

18  A.   Yes.

19  Q.   And a Stash server?

20  A.   Yes.

21  Q.   Where were those located?

22  A.   They were located in server rooms.

23  Q.   On what floor?

24  A.   The ninth floor.

25  Q.   Let's start with the OSB ESXi server.

1    A.   Okay.

2    Q.   Do you see the server room in which the OSB ESXi server was

3    located as of 2015 and 2016?

4    A.   Yes, I do.

5    Q.   Can you please circle that server room.

6    A.   This one right here.

7    Q.   Is that server room within a vault?

8    A.   Yes, it is.

9    Q.   Can you please circle the server room in which the Stash

10   server was located in 2015 and 2016.

11   A.   That would be this one right here.

12   Q.   Who did that server room belong to?

13   A.   ISB.

14   Q.   Thank you.

15           MR. LAROCHE:   We can take that down, please.

16   Q.   You stated that COG, the Computer Operations Group, used

17   the tools that were developed by some of the branches within

18   EDG; is that right?

19   A.   That's correct.

20   Q.   Did COG users have their own computer network?

21   A.   Yes, they did.

22   Q.   I am going to refer to as the COG network.

23           MR. LAROCHE:   Ms. Hurst, can you please publish

24   Government Exhibit 1251 again.

25   Q.   Did COG users have access to the cyber tools on DevLAN?

1   A.  Not directly, no.

2   Q.  What do you mean by that?

3   A.  Any tools that we created on DevLAN would be delivered to

4   COG, usually by CD, and then stored on COG's network.

5   Q.  Did COG users have access to Confluence on DevLAN?

6   A.  No, they did not.

7   Q.  Did COG users have access to any of the Atlassian services?

8   A.  Yes, they did.

9   Q.  Which one?

10  A.  Jira.

11  Q.  How did COG users have access to Jira?

12  A.  Jira existed on an intermediary network in between DevLAN

13  and COG called Hickok.

14  Q.  Could COG users access other Atlassian services through

15  Hickok?

16  A.  No.

17  Q.  How do you know that?

18  A.  COG users did not have credentials to DevLAN.  And all of

19  the other Atlassian products would require DevLAN credentials.

20  And also, COG users, there wasn't a network, direct network

21  connection that they could travel over.

22          MR. LAROCHE:  We can pull that down for a second,

23  Ms. Hurst.

24  Q.  Let's talk for a moment about how the Atlassian services

25  were backed up.

1    A.   Okay.

2    Q.   Are you familiar with the term "data backup"?

3    A.   Yes, I am.

4    Q.   What does that mean?

5    A.   So, the data we created on DevLAN was our day-to-day work.

6    Losing that would mean that we would have to recreate it and

7    would take a significant amount of time.

8         To defend against this, you would create a data

9    backup, which was a copy of the data done usually daily or

10   something of that frequency.  So that if there was an incident,

11   disaster, something like that, we could get back without losing

12   much work.

13   Q.   Focusing on 2015, were the Atlassian services backed up?

14   A.   Yes, they were.

15   Q.   How?

16   A.   So, in 2015, the data backups were to the -- originally to

17   the local drives that they were -- the local machines that they

18   existed on.  So Confluence wrote to the Confluence machine,

19   Stash back up its data to the Stash machine.

20        MR. LAROCHE:  Ms. Hurst, can you please publish

21   Government Exhibit 1251 again.  Just zoom in on the ESXi server

22   for a moment.

23   Q.   Can you explain what you mean by there being a time where

24   the backups were stored on the machines themselves?

25   A.   Yes.  So, in this case, Confluence, all of the data that

K253SCH1                          Weber - Direct

```
1    was generated, was on Confluence VM.  So on a hard drive that

2    belonged to Confluence.  The backups would write to the same

3    hard drive, just a different folder location.

4    Q.  Was that problematic?

5    A.  Very.

6    Q.  Why?

7    A.  Two reasons.  One, the backups took up a significant amount

8    of space.  And it caused a problems with Stash, where one day

9    Stash would no longer turn on, because we literally used up

10   every, every bit of hard drive space for that machine.

11             But more importantly, a backup to the local machine is

12   just a bad idea.  Because most likely, your reason for needing

13   a backup is the computer that the service was running on

14   failed.  And so your backup failed in that scenario too.

15   Q.  Did there come a time when the backups were not stored

16   locally?

17   A.  Yes.

18   Q.  Where were they stored after that?

19   A.  They were stored on a NetApp on DevLAN.  And then to an

20   offsite location as well.

21             MR. LAROCHE:  Ms. Hurst, can you zoom out for a

22   second.  Then zoom in on the middle bottom box, the NetApp

23   server.

24   Q.  Is this the NetApp you were referring to?

25   A.  Yes.
```

K253SCH1                         Weber - Direct

1   Q.   What is a NetApp server, generally?

2   A.   NetApp is another commercial technology.  They are focused

3   on what is referred to as network attached storage, which is

4   meant to be file systems that are accessed over a network

5   drive.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. LAROCHE:

2    Q.   Where were the backups stored on NetApp?

3    A.   There was a folder created on the NetApp called Altabackup.

4    Q.   How often were the Atlassian services backed up to the

5    Altabackup?

6    A.   I believe it was daily.

7    Q.   How were the data backups moved to the Altabackup from the

8    Atlassian services?

9    A.   So, when Altabackup was created, each of the Atlassian

10   products was modified as well as the VMs or machines they were

11   running on.  The Altabackup folder was what we refer to as

12   mounted in the Linux drive, so for general purposes, that

13   meant -- it looked like any other folder on your system.

14   Q.   Were the backups stored within any other location other

15   than the Altabackup?

16   A.   Yes.

17   Q.   Where?

18   A.   They were in an offsite location also in the WMA area.

19   Q.   Other than the Alta backups, was there anything else stored

20   on the NetApp server?

21   A.   Yes, there was.

22   Q.   What else was stored on the NetApp server?

23   A.   A significant amount of information.  Some examples would

24   be users' home directories, which, for every DevLAN user, they

25   would get a folder on the NetApp that they controlled who had

1    access to what on that folder.  And then there was also just a

2    general file share, so if we had software that we had

3    downloaded or something like that, it could be stored there.

4    Q.  Are you familiar with the term Gold source copies?

5    A.  Yes, I am.

6    Q.  What are those?

7    A.  When we would finish a tool and deliver it to COG, there

8    would be an official record made.  So the final version of the

9    binary that we were delivering, any documentation and any

10   source code would be given to the configuration management

11   team, and that information would then be stored as an official

12   record.

13   Q.  Did you store the information in the Gold source copies?

14   A.  No, I did not.

15   Q.  Why not?

16   A.  That wasn't my job, and I don't believe I had access to

17   that folder.

18   Q.  Generally speaking, who had access to the DevLAN network?

19   A.  Users in EDG.

20   Q.  As of 2015 and 2016, approximately how many people had

21   DevLAN access?

22   A.  Probably around a hundred, give or take.  It was almost

23   exclusively AED, so the -- most of the -- all of the developers

24   and then a few other individuals.

25   Q.  How did users access DevLAN?

1  A.  So, when you -- when you join the group, you would check in

2  with ISB.  ISB would create a user name and password for you,

3  in Active Directory, and those credentials, which were unique

4  to you, were leverage to access those resources on DevLAN.

5  Q.  Did individual users have their own DevLAN computers?

6  A.  Yes, they did.

7  Q.  Where were those computers located?

8  A.  Typically, at the desk that they worked at on a daily

9  basis.

10  Q.  Were those desks within the vaults you described earlier?

11  A.  Yes.

12          MR. LAROCHE:  Ms. Hurst, can you zoom out on 1251,

13  please.

14  Q.  Are the DevLAN users reflected on this diagram?

15  A.  Yes.

16  Q.  Where are they?

17  A.  Right over here.

18  Q.  Is that the bottom left corner of 1251?

19  A.  Yes.  Sorry.

20  Q.  How were users' accesses controlled?

21  A.  The main way was through Active Directory permissions.

22  Again, you would be given an Active Directory username and

23  password, and your account would be assigned to different

24  Active Directory groups.

25  Q.  You've said Active Directory a few times.  What is Active

K25Wsch2                          Weber - Direct

1   Directory?

2   A.   Active Directory is a Microsoft product.  Its job is user

3   authentication and permissions.

4   Q.   Once a user had a DevLAN account, how would they log in to

5   DevLAN?

6   A.   So, Typically, it would be with your Active Directory

7   credentials.

8           MR. LAROCHE:  Ms. Hurst, you can pull down exhibit

9   1251.  Thanks.

10  Q.   Were there DevLAN computers in any other CIA facilities?

11  A.   Yes, there were.

12  Q.   Were those facilities located overseas in foreign

13  countries?

14  A.   Yes, they were.

15  Q.   How many overseas CIA facilities had access to DevLAN?

16  A.   Two.

17  Q.   I'm going to refer to them as Foreign Office East and

18  Foreign Office West.  OK?

19  A.   OK.

20  Q.   How were the computers in those offices connected to the

21  DevLAN network?

22  A.   They were routed over an agency network to access -- access

23  the portions of DevLAN, and while routed over the agency

24  portion of the network, we used what was referred to as

25  end-to-end encryption so that any traffic over the portion of

1    the network that we didn't control nobody else would be able to

2    access.

3    Q.   What do you mean by agency network?

4    A.   So, EDG is a very small portion of the agency.  We owned

5    and maintained DevLAN, which was our network.  The agency has

6    other portion -- or other networks for other purposes that are

7    run by, you know, somewhere -- other people in the agency.

8    Q.   Is that the internet?

9    A.   No, it's not.

10   Q.   I think you also said end-to-end encryption.  Is that

11   right?

12   A.   Yes, I did.

13   Q.   What is that?

14   A.   End-to-end encryption is an industry term for when you --

15   when you are departing your one end point, so leaving your

16   segment of a local area network, and traveling to another end

17   point, every -- all of the communication in between those two

18   points is fully encrypted.

19   Q.   Are you familiar with the term "network connectivity"?

20   A.   Yes, I am.

21   Q.   What does that term mean?

22   A.   Network connectivity is the status of a machine's access to

23   network resources.

24   Q.   What was the network connectivity like between the DevLAN

25   network in the CCI office and the DevLAN network located in

1   Foreign Office East and Foreign Office West?

2   A.   The network connectivity within CCI's office was extremely

3   good.  It was a very fast network.

4        Our connection to the field sites was extremely slow and

5   caused a lot of problems for our developers overseas.

6   Q.   What do you mean by extremely slow?

7   A.   The transferring of files that were not necessarily that

8   large in size sometimes could take longer than a day, and

9   that -- that caused issues because the -- our foreign offices

10  had to shut everything down at the end of the day and store it.

11  So if your transfer didn't complete in time, you had to start

12  it the next day and try again.

13  Q.   And how big a transfer would take about a day for the

14  foreign office?

15  A.   I don't remember the specifics.  I remember working with

16  Frank, where Frank was trying to transfer a file that was only

17  a few megabytes in size and it taking hours.

18            MR. LAROCHE:  Ms. Hurst, can you please publish

19  Government Exhibit 1026.  If we could go to the first email on

20  this chain.  Please just zoom in on the to-from line.

21  Q.   I'm showing you another email.  Do you see it on the screen

22  there, Mr. Weber?

23  A.   Yes, I do.

24  Q.   Who sent this email?

25  A.   I did.

1   Q.  Who did you send it to?

2   A.  Patrick.

3   Q.  When did you send it?

4   A.  This would have been January 27, 2016, 9:07 p.m.

5   Q.  And the subject is Bitbucket.  What is Bitbucket?

6   A.  Bitbucket was an Atlassian product.  We've been referring

7   to it as Stash up at this point.  Atlassian changed its name.

8          MR. LAROCHE:  Ms. Hurst, can you just zoom in on the

9   text and the classification of this email.

10  Q.  Did you classify this email?

11  A.  Yes, I did.

12  Q.  What did you classify it as?

13  A.  Unclassified.

14  Q.  Why?

15  A.  So, the contents of this email, where I'm talking about a

16  blog post that Atlassian put on the internet, there's nothing

17  damaging in this email.

18          MR. LAROCHE:  Ms. Hurst, can you zoom out and then go

19  to the next email in the chain, the response.  Just go up one

20  more slide.  I think at the bottom of this slide, if you can

21  zoom in on the "from."

22  Q.  Did Patrick respond to you?

23  A.  Yes, he did.

24  Q.  And is this the response here?

25  A.  Yes, it is.

1    Q.  And when did he send the response?

2    A.  January 28 at 4:57 a.m.

3    Q.  Who did he send that to?

4    A.  Myself and Josh Schulte.

5              MR. LAROCHE:  We can zoom out.  Go to the next page

6    and zoom in, at the top, including the classification.  Sorry.

7    Just zoom out again, Ms. Hurst.  I'm sorry.  Just from the top

8    down through the classification.  Thank you.

9    Q.  And at the top here, is this additional people that Patrick

10   copied?  Is that right?

11   A.  Yes, it is.

12   Q.  One of them is Frank.  I think you referred to a Frank

13   earlier?

14   A.  Yes, I did.

15   Q.  Is it the same Frank?

16   A.  Yes, it is.

17   Q.  Who is Frank?

18   A.  Frank was a developer in OSB that I worked closely with.

19   He eventually was selected for an overseas position.

20   Q.  Did the classification level on the response by Patrick

21   change?

22   A.  Yes, it did.

23   Q.  How did it change?

24   A.  It was up to secret.

25   Q.  Is it possible to reclassify emails when you respond to

1   them?

2   A.  Yes, it is.

3   Q.  In what circumstances would that happen?

4   A.  So, the scenario that you would up the classification of an

5   email is when your response contained classification -- or

6   classified information that was higher than the original

7   sending of that email.

8   Q.  And this has a cross-through through the classification, is

9   that right?

10  A.  Yes, it does.

11  Q.  When you received this email communication, did it have

12  that cross-through?

13  A.  No, it did not.

14          MR. LAROCHE:  Ms. Hurst, can you zoom out, please, and

15  zoom in on the paragraph starting "additionally."

16  Q.  Just read the first sentence, please, Mr. Weber.

17  A.  "Additionally, could also get them to do some maintenance

18  on the DevLAN field connectivity."

19  Q.  Do you understand what he's referring to there?

20  A.  Yes.

21  Q.  What was he referring to?

22  A.  This -- there was both the speed of the connection as well

23  as they were not able to access all of the resources on DevLAN

24  that they were supposed to be able to access.

25  Q.  Where was Patrick working at the time he sent this email?

1   A.  He was in Foreign Office West.

2           MR. LAROCHE:  Ms. Hurst, we can pull that email down.

3   Q.  Now, you talked a little bit before about administrators of

4   the DevLAN network, is that correct?

5   A.  That's correct.

6   Q.  And you were also a user of that network?

7   A.  That's correct.

8   Q.  Generally speaking, what's the difference between a user

9   and an administrator?

10  A.  The administrators provide access to the services.  The

11  users are the ones that leverage the services for day-to-day

12  activities.

13  Q.  Generally, do administrators have broader access to the

14  system?

15  A.  Yes, they do.

16  Q.  In what way?

17  A.  They -- being administrators is a privileged position.  You

18  have the keys to the kingdom for the services that you control.

19  You're able to modify who has access to what.  You're able to

20  turn the service on, turn it off, all sorts of things like

21  that.

22  Q.  Were there different types of DevLAN administrators?

23  A.  Yes, there were.

24  Q.  What were some of those types?

25  A.  The DevLAN administrators kind of fell into three

1   categories.  There were your true DevLAN administrators, who

2   were in ISB.  Their job was specifically focused on the

3   administration of DevLAN, most specifically, Active Directory

4   and the network connectivity.

5       There were the Atlassian administrators, who were focused

6   solely on the Atlassian set of products.  And then you would

7   have administrators for some of the software development

8   resources.

9   Q.  What do you mean by that, that last piece?

10  A.  So, a specific example was the OSB ESXi server was meant to

11  be a tool by developers for developers for development

12  activities, so there were some people that could maintain the

13  ESXi server.

14  Q.  Let's start with the first group you mentioned, I think,

15  network-wide administrators, correct?

16  A.  Yes.

17  Q.  Who were the network-wide administrators as of 2015?

18  A.  ISB.

19          MR. LAROCHE:  Ms. Hurst, could you please publish to

20  the parties, the Court and the witness Government Exhibit 90.

21  Q.  Do you recognize this?

22  A.  Yes, I do.

23  Q.  What is this?

24  A.  This is another portion of the org structure of EDG.

25  Q.  Does this fairly and accurately represent that portion of

K25Wsch2                        Weber - Direct

1   the org structure of EDG?

2   A.  Yes, it does.

3           MR. LAROCHE:  Your Honor, we'd offer Government

4   Exhibit 90 in evidence.

5           MS. SHROFF:  No objection, your Honor.

6           THE COURT:  90 is in evidence.

7           MR. LAROCHE:  Thank you.

8           (Government Exhibit 90 received in evidence)

9           MR. LAROCHE:  Please publish that to the jury, Ms.

10  Hurst.

11  Q.  You've mentioned ISB a few times.  Where was ISB within the

12  organizational structure of the group?

13  A.  They were within SED.

14  Q.  What was their role?

15  A.  Their role was system administration.

16  Q.  Did they have any development role?

17  A.  No, they did not.

18          MR. LAROCHE:  OK.  We can pull that down, please.

19  Q.  I think the second group of administrators you identified

20  on DevLAN were those who were in charge of the Atlassian

21  services.  Is that correct?

22  A.  That's correct.

23  Q.  Was ISB in charge of the Atlassian services in 2015?

24  A.  No, they weren't.

25  Q.  Who were in charge of the Atlassian services as

1  administrators in 2015?

2  A.  Originally, I believe it was Patrick.  I think in early

3  2015 he had still an administrative role.  Eventually that

4  transitioned to me, and I very quickly brought Josh on as an

5  administrator.

6  Q.  As an administrator of the Atlassian services, what types

7  of things could you do?

8  A.  The -- our roles and responsibilities were to keep the

9  service up and running, to ensure the backups of the service,

10 to provide user access to different portions of it, upgrade the

11 system, things like that.

12 Q.  Now, you also said, I think, the third group was certain

13 hardware that there were administrators of.  Is that correct?

14 A.  Yes.

15 Q.  And the example you gave was the ESXi server, is that

16 correct?

17 A.  That is correct.

18       MR. LAROCHE:  Ms. Hurst, can you please publish again

19 Government Exhibit 1290 and then just zoom in on ESXi server on

20 the top left.

21 Q.  As of 2015 who were the administrators of the ESXi server?

22 A.  I believe it was myself and Josh, for sure.  I think Frank

23 was also an administrator, and Matt was also an administrator.

24 Q.  And were all the individuals you just mentioned working

25 within OSB?

K25Wsch2                          Weber - Direct

1    A.   That is correct.

2    Q.   As an ESXi administrator, what types of things could you

3    do?

4    A.   As an ESXi administrator, your job was to be able to create

5    new virtual machines, power them on, power them off, back them

6    up, revert them to snapshots, things like that.

7    Q.   You used the term "snapshot"?

8    A.   That's correct.

9    Q.   What does snapshot mean?

10   A.   Snapshot is a term used with virtual machines.  It is

11   creating -- creating a backup for the running state of a

12   machine at a given time.  It's -- it's a tool that you can use

13   to back up your data.

14   Q.   Did you ever crate snapshots of virtual machines?

15   A.   Yes, I did.

16   Q.   Why?

17   A.   The most traditional-use scenario was if we were going to

18   upgrade the machine, you would create a backup right before

19   upgrading.  That way, if there was a problem during the

20   upgrade, you could just revert to the snapshot and it was as if

21   it never happened.

22   Q.   You also used the term "revert"?

23   A.   Yes.

24   Q.   What does that mean?

25   A.   Revert is a term for saying discarding the current

1    machine's running state and returning it to a snapshot.

2    Q.  In 2015, did ISB have a role as the ESXi server

3    administrator or Atlassian administrator?

4    A.  I'm sorry.  What was the date again?

5    Q.  As of 2015.

6    A.  As of 2015, they were not -- ISB was not the administrator

7    of the ESXi server.

8    Q.  And what about the Atlassian services?

9    A.  No, they were not.

10   Q.  Why were they not acting in that administrative role?

11   A.  ISB did not have the capacity.  They didn't have enough

12   people to handle all of their responsibilities.  Nor did they

13   have somebody that was qualified to handle the Atlassian

14   services.

15   Q.  Let's talk for a moment about how you would log in as

16   administrator to the system.

17   A.  OK.

18   Q.  I first want to focus on the Atlassian-level administrator.

19   A.  OK.

20   Q.  How would you log in as an Atlassian-level administrator?

21   A.  When you were interacting with the Atlassian service, that

22   was typically through the Atlassian -- like the web pages that

23   Atlassian presented, so you would navigate to

24   confluence.devlan.net, and you would be presented with a log-in

25   screen.  You would give your Active Directory username and

1    credential to gain access to the system, and then if you were

2    going to do administrative activities, you would click on a

3    portion of the web page and get prompted for a username and

4    password again to validate that you were still the same

5    individual.

6    Q.  Are you familiar with the term "SSH keys"?

7    A.  Yes.

8    Q.  What are those?

9    A.  SSH keys are -- it is an alternative means of

10   authentication beyond a username and password that is more

11   secure.

12   Q.  Why is it more secure?

13   A.  So, most humans have a password that is going to be, you

14   know, between six and 12 characters, most likely.  It's not --

15   it's not something that has that much random information in it.

16       An SSH key usually is around 4,096 bytes, so the amount of

17   random information in that key allowed for a much more secure

18   authentication.

19   Q.  Were SSH keys used to log in as an Atlassian-level

20   administrator?

21   A.  Through the website, no.  But to access the servers that

22   they were running on, yes.

23   Q.  And would that give you a different type of access?

24   A.  Yes, it would.

25   Q.  In what way?

K25Wsch2                        Weber - Direct

1   A.  So, the -- having access to the computer would allow us to

2   start and stop the Atlassian service.  It would allow us to

3   upgrade it as well as access the file system, things like the

4   backups, stuff like that.

5   Q.  And I know you said access to the server.  Is that right?

6   A.  Yes.

7   Q.  In this context, are you referring to a virtual server?

8   A.  I'm -- both, depending on the product.  For Confluence and

9   Bamboo, I'd be referring to a virtual server.  For Stash and

10  Jira, I'd be referring to a physical machine.

11  Q.  Let's just talk about that for a moment.  Looking at this

12  diagram, Confluence and Bamboo are running on virtual machines,

13  is that correct?

14  A.  That's correct.

15  Q.  Is that the same thing as a virtual server?

16  A.  Yes.

17  Q.  Why is that?

18  A.  "Virtual server" is not an official term, so a server is

19  just a very powerful machine that has a specific purpose in

20  life.

21  Q.  So you talked about logging in through the web with a

22  username and password as administrators, is that right?

23  A.  Yes.

24  Q.  And you talked about logging in to the virtual server using

25  SSH keys?

K25Wsch2                          Weber - Direct

1    A.  Yes.

2    Q.  Now, there's also on this page an ESXi server, is that

3    correct?

4    A.  That is correct.

5    Q.  Were those different administrative privileges?

6    A.  Yes, they were.

7    Q.  How would you log in as an ESXi administrator?

8    A.  There were multiple ways.  The typical way was using a

9    product called vCenter or vSphere to log in via what was

10   effectively a web interface.

11   Q.  How would you log in that way?

12   A.  You would use your Active Directory credentials there as

13   well.

14   Q.  And was there a specific route or administrative password

15   used to log in?

16   A.  There was a backup route password that could be used.

17   Q.  Was there another way to log into the server as an

18   administrator?

19   A.  You could SSH into the server as well as physically access

20   the server as well; plug a keyboard into it and type a username

21   and password.

22            MR. LAROCHE:  Ms. Hurst, could you please --

23            THE COURT:  Mr. Laroche, would this be a convenient

24   time to take our morning break?

25            MR. LAROCHE:  Yes, your Honor.

1          THE COURT:  We'll take a 15-minute break.

2          (Jury not present)

3          THE COURT:  See you in 15 minutes.

4          (Recess)

5          THE COURT:  Please be seated.

6          (Jury present)

7          THE COURT:  Please be seated.

8          Mr. Laroche.

9          MR. LAROCHE:  Thank you, your Honor.

10   Q.  Mr. Weber, we were talking before the break about logging

11   in as an administrator?

12   A.  Yes.

13   Q.  And one of the things we were talking about was logging in

14   to the OSB ESXi server.

15   A.  Yes.

16   Q.  I think you referred at one point to the word

17   "credentials"?

18   A.  That's correct.

19   Q.  What were you referring to there?

20   A.  The credentials would be a username-and-password

21   combination.  Typically, I'm referring to Active Directory

22   credentials.

23   Q.  Just focusing on that server for a moment, the OSB ESXi

24   server --

25   A.  Yes.

1   Q.   -- how would you log in as administrator to that server?

2   A.   Logging in to the OSB ESXi server, you would typically go

3   through vSphere to log in and do most of the administrative

4   functions, and you would log in using your Active Directory

5   credentials.

6   Q.   You said vSphere?

7   A.   Yes.

8   Q.   What's vSphere?

9   A.   It was -- it's a portion -- it's a product within the ESXi

10  tool suite that was meant to interface with an ESXi server.

11  Q.   You also said earlier that you could log in using SSH keys,

12  is that correct?

13  A.   That's correct.

14  Q.   How would you do that?

15  A.   You would use a -- any service that ran SSH, either a Linux

16  machine, or Windows had a tool like PuTTy installed on it, you

17  would leverage that to create an SSH access.

18  Q.   What's PuTTY?

19  A.   PuTTY's just a tool on windows that does communication like

20  SSH.

21  Q.   And if you logged in using the SSH keys to the server, is

22  that different than logging in using the password?

23  A.   It's -- the SSH key was set up for root, so you would be

24  logging in as the root user versus your admin credentials.

25  Q.   What is the root user?

1   A.   The root user, in this situation, "root" was kind of Linux

2   term for the administrative account on the machine, like the

3   default administrator account.

4   Q.   You also mentioned there was a password for the ESXi

5   server?

6   A.   That's correct.

7   Q.   Was that password stored anywhere?

8   A.   Yes, it was.

9   Q.   Where?

10  A.   It was stored on OSB's passwords page for some of our

11  services.

12  Q.   What do you mean by OSB's passwords page?

13  A.   OSB had a lot of virtual machines outside of the Atlassian

14  products that had passwords on them solely because the

15  technology required to have a password and not for security

16  practices, so that -- these were often like test machines, and

17  these passwords we kept on a page so that if somebody was

18  leveraging that VM they would have the credentials they needed

19  to log in to it.

20  Q.   Where was that passwords page located?

21  A.   Confluence.

22  Q.   Was it restricted in any way?

23  A.   It was.

24  Q.   How?

25  A.   It was to OSB.

1           MR. LAROCHE:  Ms. Hurst, can you please publish

2   Government Exhibit 1003, and please just zoom in on the top of

3   the email, the to-from.

4   Q.  Is this another email from the CIA, Mr. Weber?

5   A.  Yes, it is.

6   Q.  When was this email sent?

7   A.  It was sent on March 31, 2015, at 8:20 p.m.

8   Q.  Who sent it?

9   A.  It was sent by Josh Schulte.

10  Q.  Who was it sent to?

11  A.  It was sent to the OSB email group.

12  Q.  How do you know that?

13  A.  The string NCS-IOC-EDG-AED-OSB is a user group and it's

14  explicit in its naming.  NCS was in the org chart above IOC,

15  the rest of those are the groups that we have previously talked

16  about.

17  Q.  It's a lot of acronyms.

18  A.  It is.

19  Q.  Below that, what's the subject line?

20  A.  OSB.DevLAN.net VM credentials.

21  Q.  What's OSB.DevLAN.net?

22  A.  That was the OSB ESXi server.

23          MR. LAROCHE:  Ms. Hurst, if you could please zoom out

24  and then on to the text of the email.

25  Q.  Can you read the first sentence, please?

1   A.   "I've modified the OSB's ESXi server page to contain the

2   passwords and other information directly instead of through the

3   OSB's passwords page; also updated the permissions to be

4   restricted to everyone outside of OSB."

5   Q.   Do you understand what he's referring to by OSB's ESXi

6   server page?

7   A.   Yes.

8   Q.   What's he referring to?

9   A.   It was a second page created later to contain information

10  specifically to the ESXi server and the administration of that.

11  Q.   And do you understand what he means by updated the

12  permissions to be restricted to everyone outside of OSB?

13  A.   This was him saying that only people within the OSB --

14  within OSB would have access to read this page.

15  Q.   Now, is this the same ESXi server that as of 2015 was

16  running Confluence and Bamboo?

17  A.   Yes, it was.

18          MR. LAROCHE:   We can take that down.   Thank you,

19  Ms. Hurst.

20  Q.   Now, you've been testifying for quite a while now about

21  DevLAN, is that correct?

22  A.   Yes.

23  Q.   About its infrastructure and hardware and accesses, is that

24  right?

25  A.   Yes.

1        MR. LAROCHE:  Ms. Hurst, can you please publish

2   Government Exhibit 1251.

3   Q.  Other than testifying today, have you ever spoken publicly

4   about DevLAN?

5   A.  No, I have not.

6   Q.  Why not?

7   A.  The DevLAN -- the setup of DevLAN was classified, and

8   testimony about it or any discussion about it would give an

9   adversary, if they overheard that discussion, an adversary

10   insight into how the network was set up, what type of

11   technology it was running, things like that.  This would create

12   a risk for the system because that's the first information you

13   need to effectively attack a target system.

14   Q.  One of the parts of DevLAN you talked about was Hickok.  Do

15   you recall that?

16   A.  Yes.

17   Q.  Other than testifying today, have you ever spoken publicly

18   about Hickok?

19   A.  No.

20   Q.  Why not?

21   A.  The same reason.

22   Q.  Is the DevLAN network still being used today?

23   A.  No, it is not.

24   Q.  When did DevLAN stop being used?

25   A.  March 7.

K25Wsch2                        Weber - Direct

1    Q.  Of what year?

2    A.  2017.

3    Q.  Why did it stop being used?

4    A.  The disclosure of the WikiLeaks led to DevLAN essentially

5    being seen as a crime scene.  We all stopped touching our

6    computers.  The FBI came in and began confiscating all of the

7    equipment, and DevLAN ceased to exist.

8    Q.  After the CIA stopped using the DevLAN network, did you

9    talk about it publicly?

10   A.  No, I did not.

11   Q.  Why not?

12   A.  The -- even though DevLAN was eventually replaced by

13   another network, talking about DevLAN would still give an

14   adversary insight into the capabilities that the system

15   administration team had, and assuming you had the same system

16   admin team in place, an adversary would have the knowledge that

17   they would use the same technologies that they've used in the

18   past, because that's what they know.

19   Q.  You've used the word "adversary" several times?

20   A.  Yes.

21   Q.  Who are you referring to?

22   A.  I would most likely be referring to foreign entities that

23   are similar to CCI who are targeting the U.S. government.

24          MR. LAROCHE:  You can take that down, please.  Thank

25   you, Ms. Hurst.

K25Wsch2                         Weber - Direct

1    Q.  You testified earlier that the defendant became an

2    administrator Atlassian server, is that right?

3    A.  Yes.

4    Q.  When did that happen?

5    A.  I believe it was summer of 2015.

6    Q.  And you talked earlier about the various types of DevLAN

7    administrators?

8    A.  Yes.

9    Q.  What type of administrator did he become?

10   A.  An Atlassian administrator.

11   Q.  Did he also have a role with the ESXi server?

12   A.  He did.

13   Q.  What was that role?

14   A.  He was an administrator of that.  That would have been

15   before the summer of 2015, though.

16   Q.  I want to focus you on the Atlassian administrative

17   privileges that he had.

18   A.  Yes.

19   Q.  How did it come about that he became an administrator?

20   A.  Andrew -- I'm sorry.  Patrick asked me to become an

21   administrator of the Atlassian products, and I -- I knew a

22   portion of what was needed for that.  However, I was not a

23   Linux administrator by background, so I asked Josh to assist me

24   with this.

25   Q.  What's Linux?

1  A.   Linux is an operating system.  Specifically, it was the

2  operating system that was running the Atlassian services.

3  Q.   What's an operating system?

4  A.   An operating system is -- that is the software that is used

5  for most of your operations.  So, most people would recognize

6  windows.  Windows is an operating system.  Linux is another --

7  a competitor.

8  Q.   Did the defendant have familiarity with that operating

9  system, Linux?

10  A.   Yes, he did.

11  Q.   At the point you asked him to help you with the

12  administration of the Atlassian services, approximately how

13  long had you worked with him?

14  A.   That would have been about four, four or five years at that

15  point.

16  Q.   At that point what was your relationship like?

17  A.   I was close to him.  I considered him a friend.  We worked

18  closely on numerous products -- projects together.  I trusted

19  him.  I specifically reached out to him for this.

20  Q.   What was the defendant's role as an Atlassian

21  administrator?

22  A.   So, his main focus was on the Linux pieces of it, which

23  typically meant keeping the system up to date, start -- like

24  updating the Atlassian products.  He set up the backups for us,

25  things like that.  But generally, he -- he covered everything

K25Wsch2                        Weber - Direct

1   when there was a time or a need.

2   Q.  Who defined his role as an administrator?

3   A.  I did.

4         MR. LAROCHE:  Ms. Hurst, can you please publish

5   Government Exhibit 1251 again.

6   Q.  At the time the defendant became an Atlassian

7   administrator, were the Atlassian services being backed up to

8   the Altabackups?

9   A.  No, they were not.

10  Q.  Where were they being backed up at that point?

11  A.  They were being backed up locally.

12        MR. LAROCHE:  If we could just zoom in again on the

13  ESXi server.

14  Q.  Just to focus on Confluence, what do you mean that the

15  backups were being backed up locally at that point?

16  A.  Confluence had a hard drive assigned to it, and the same --

17  the same location.  Different file path, but essentially the

18  same location the original data was being written to the backup

19  data was being written to.

20        MR. LAROCHE:  Ms. Hurst, if we could zoom out again.

21  Thank you.

22  Q.  Did the defendant have a role in changing where the backups

23  were stored?

24  A.  Yes.

25  Q.  What was his role?

K25Wsch2                    Weber - Direct

1    A.  After the Altabackup folder was created, Josh was the one

2    that modified the Linux machines to be able to access that

3    folder and modified the Atlassian scripts that executed the

4    backup to write to the new location.

5    Q.  Let's start with the scripts.

6    A.  OK.

7    Q.  What is a script?

8    A.  It's a series of commands that a computer would execute.

9    Q.  Why did he need to modify the script?

10   A.  The scripts were set up to write in one location, the local

11   location.  It needed to be changed to the remote location.

12   Q.  The other thing you said he did was modify the machines, is

13   that right?

14   A.  That is correct.

15   Q.  How did he modify the Linux machines?

16   A.  The Linux machines needed to have access to the remote

17   storage location, so he ran a command called mount that would

18   allow, allow that network location to be accessed like any

19   other folder on the system.

20   Q.  Are you familiar with the term "mount point"?

21   A.  That's correct -- yes, I am.

22   Q.  What's a mount point?

23   A.  A mount point is essentially the -- like the information

24   needed to say, you know, this either hard drive, remote

25   location, whatever, is connected to this computer and this is

1   how you access it.

2   Q.  Did the defendant help create mount points for the

3   Altabackups?

4   A.  Yes.

5   Q.  What did he do?

6   A.  He ran the mount command, which is what's used to create a

7   mount point.

8   Q.  What was the purpose of those mount points?

9   A.  To ensure that the VMs had access to the NetApp location.

10  Q.  You said VMs.  What do you mean by that?

11  A.  The Confluence VM, Bamboo VM or the Stash server or the

12  Jira server.

13  Q.  Where were those mount points located?

14  A.  The mount points were located within the operating system

15  on its file system.

16  Q.  Did each Atlassian service have its own mount point?

17  A.  Yes, that's correct.

18  Q.  Why would they each need their own mount point?

19  A.  They were each running on their own operating system.

20  Q.  Could regular DevLAN users access those mount points?

21  A.  No.

22  Q.  Why not?

23  A.  They didn't have access to them, and they didn't -- we

24  didn't publish the location of them.

25  Q.  Could regular DevLAN users access the backups in any other

K25Wsch2                         Weber - Direct

1    way?

2    A.  No, I don't believe so.

3    Q.  Could an Atlassian administrator access the Altabackups

4    using those mount points?

5    A.  That is correct.

6    Q.  How?

7    A.  You -- if you log in to the virtual machine itself or the

8    physical machine and -- you'd be able to navigate to the mount

9    point just like you would navigate to any other folder on the

10   system.

11   Q.  And once you went to the mount point, where would that take

12   you?

13   A.  The NetApp storage location.

14   Q.  For the Altabackups?

15   A.  Correct.

16   Q.  After the defendant helped set up the mount points for the

17   Altabackups, did you tell the other developers about the

18   Altabackups?

19   A.  No, I did not.

20   Q.  Why not?

21   A.  There was no reason to publish that information.  The other

22   developers wouldn't care.

23        MR. LAROCHE:  Ms. Hurst, we can put pull that down.

24   Thank you.

25   Q.  Now, you said in 2015 the infrastructure support, ISB was

1    not acting as the administrator of the Atlassian services, is

2    that right?

3    A.  Yes, that is correct.

4    Q.  Did you have discussions with the defendant about that?

5    A.  Yes.

6    Q.  When, approximately, did those discussions occur?

7    A.  I would -- it's safe to say that it was pretty much the

8    extent, every single day that we were doing administrative

9    activities via Atlassian.

10   Q.  Could you describe those discussions?

11   A.  The Atlassian administration duties were an additional duty

12   as assigned.  It was not our day-to-day job, and it distracted

13   us from our day-to-day job, so it was, you know, not something

14   that we looked forward to doing and did not want to be doing

15   it.

16   Q.  Did the defendant complain about the fact that ISB was not

17   acting as the Atlassian administrator?

18   A.  Yes.

19   Q.  What types of things would he say?

20   A.  It would be along the lines of, you know, we would be

21   complaining about the fact that we would have deadlines on

22   other projects but we're focused on fixing something in the

23   Atlassian product or doing something.  It was an significant

24   amount of additional work, so the complaints were along those

25   lines.

1    Q.  Other than the defendant's complaints about ISB's roles,

2    did the defendant make any other complaints about the Atlassian

3    services on DevLAN?

4    A.  No.

5    Q.  Did the defendant ever complain that the Atlassian services

6    were vulnerable to theft?

7    A.  No.

8    Q.  Are you sure about that?

9            MS. SHROFF:  Objection, your Honor.

10           THE COURT:  Overruled.

11           MS. SHROFF:  It's hearsay.

12           THE COURT:  Overruled.

13   BY MR. LAROCHE:

14   Q.  Are you sure that the defendant never made any complaints

15   that DevLAN was vulnerable to theft?

16   A.  Yes.

17   Q.  Why?

18           MS. SHROFF:  Objection.

19           THE COURT:  Overruled.

20   A.  If he had complained to me about the Atlassian products

21   being vulnerable to theft, I would have told him to fix it.

22   The Atlassian products were our responsibility, and if he had

23   highlighted an issue with that, I would have made it our

24   primary focus to fix that.

25           MR. LAROCHE:  Ms. Hurst, can we please publish

K25Wsch2                        Weber - Direct

1    Government Exhibit 1012, please.  If we could just focus on the

2    bottom to-from line.

3    Q.  Is this another email sent from the CIA, Mr. Weber?

4    A.  Yes, it is.

5    Q.  Who sent this email?

6    A.  Josh.

7    Q.  And when did he send it?

8    A.  This would have been August 11, 2015, at 7:37 p.m.

9    Q.  Who did he send it to?

10   A.  This would have been sent to the email group for AED, and

11   he also copied the email group for ISB.

12   Q.  What's the subject line?

13   A.  Complete Atlassian server outage.

14   Q.  This was 2015, is that correct?

15   A.  Yes.

16   Q.  Was he acting as the Atlassian administrator at this time?

17   A.  Yes, he was.

18            MR. LAROCHE:  Could you zoom out to the text of the

19   email, please.

20   Q.  Could you summarize what he's saying in this email?

21   A.  Yes.  So, at this time if a user tried to log in to any of

22   the Atlassian products, they would not have been able to, so

23   essentially the Atlassian products were down for use.  This was

24   due to an issue connecting to the Active Directory server that

25   Crowd needed to be able to provide access to the products.

K25Wsch2                          Weber - Direct

1   Q.  Why did you need ISB's help to resolve this issue?

2   A.  ISB was the ones who ran the Atlassian products -- sorry,

3   Active Directory.  And this was an issue querying the Active

4   Directory platform.

5           MR. LAROCHE:  Could we zoom out for a second,

6   Ms. Hurst.

7   Q.  Was this problem resolved?

8   A.  Yes, it was.

9   Q.  How do you know that?

10  A.  The next email, which I sent, says the log-in issue has

11  been resolved.

12          MR. LAROCHE:  We can pull that down.  Thank you.

13  Q.  Were there discussions about transitioning Atlassian

14  administration to ISB?

15  A.  From the day we brought it into -- into EDG.

16  Q.  How often did you have those discussions?

17  A.  Numerous.  I would say monthly, most likely.

18  Q.  Did that transition happen quickly?

19  A.  No, it did not.

20          MR. LAROCHE:  Let's look at Government Exhibit 1017.

21  Could we just focus on the top, to-from line.

22  Q.  Is this another email from the CIA?

23  A.  Yes.

24  Q.  Who sent it?

25  A.  I did.

K25Wsch2                          Weber - Direct

```
1    Q.  When did you send it?

2    A.  This would have been October 2015, October 6, 2015.

3    Q.  Who did you send it to?

4    A.  José.

5    Q.  Where did José work at the time?

6    A.  He was in ISB.

7    Q.  Did you copy anyone on this email?

8    A.  Yes, I did.

9    Q.  Who did you copy?

10   A.  Robert, Sean and Josh.

11   Q.  Who's Sean?

12   A.  Sean was my branch chief.

13   Q.  Which branch?

14   A.  He was chief of OSB.

15   Q.  And the subject is infrastructure running on OSB's server,

16   is that right?

17   A.  Yes.

18   Q.  Is this the ESXi server you referred to earlier?

19   A.  Yes, it is.

20           MR. LAROCHE:  If we could just zoom out for a second

21   and then zoom in on the first paragraph.

22   Q.  Read the first sentence, please.

23   A.  "Below is a list of what we have running on our server, all

24   of which we are looking to migrate to you guys when you have

25   the horsepower."
```

1    Q.   What did you mean by that?

2    A.   If I recall correctly, ISB was standing up some new ESXi

3    server infrastructure.   Once they had that server

4    infrastructure in place, that's what I mean in terms of

5    horsepower.

6    Q.   And can you read the second sentence, please?

7    A.   "The list is in priority order, but the three in red should

8    be considered high priority since they contain data needed for

9    day-to-day operations (*i.e.*, the pitchforks come out when they

10   go down)."

11             MR. LAROCHE:   Could we zoom out, Ms. Hurst, and could

12   we zoom in on the three in red.   Thank you.

13   Q.   Starting at the top, it says machine at the top left?

14   A.   Yes.

15   Q.   What's that referring to?

16   A.   In this case it was the virtual machine running Confluence.

17   Q.   And then below that there's another machine?

18   A.   Yes.

19   Q.   What's that?

20   A.   Bamboo.

21   Q.   Were these the virtual machines running on the ESXi server?

22   A.   Yes, they were.

23   Q.   When you talked about being an Atlassian administrator, did

24   you have Atlassian administrative services for these virtual

25   machines?

1    A.   Administrative access to these machines?

2    Q.   Yes.

3    A.   Yes, that is correct.

4              MR. LAROCHE:  We can zoom out.

5              We can pull this email down.

6    Q.   After you sent this email, did ISB move Confluence and

7    Bamboo to their infrastructure?

8    A.   Not immediately.  It took a significant amount of time.

9              MR. LAROCHE:  Let's look at Government Exhibit 1024

10   and just zoom in on the to-from at the top.

11   Q.   When was this email sent?

12   A.   January 14, 2016.

13   Q.   Who sent it?

14   A.   Josh Schulte.

15   Q.   And who did he send it to?

16   A.   This was sent to the AED group as well as the ISB group.

17   Q.   And what was the subject of this email?

18   A.   Atlassian support transition to ISB.

19             MR. LAROCHE:  If we can zoom out for a second and then

20   zoom in on the text of the email.

21   Q.   Could you read the first sentence, please?

22   A.   "We are currently transitioning the Atlassian product

23   support from OSB to ISB (POC Rufus)."

24   Q.   Who is Rufus?

25   A.   Rufus was somebody hired by ISB to specifically manage the

1  Atlassian products.

2  Q.  Did that transition happen in January of 2016?

3  A.  No, it did not.

4  Q.  Why not?

5  A.  Rufus departed after a couple of weeks working with EDG.

6         MR. LAROCHE:  You can pull that down.

7  Q.  Now, in addition to helping to design and run the Atlassian

8  services, did the defendant also develop cyber tools?

9  A.  Yes, that is correct.

10  Q.  Generally speaking, what types of cyber tools did the

11  defendant work on?

12  A.  Josh's main focus was on tools for operations when we had

13  physical access to a target machine.

14  Q.  What do you mean by physical access?

15  A.  Physical access would be when an agency officer or asset

16  was willing to touch a machine for us, maybe type on a

17  keyboard, maybe plug in a thumb drive into it, or walk off with

18  the machine.

19  Q.  Did the defendant work with other developers on some of his

20  projects?

21  A.  Yes.

22  Q.  Do you know a developer named Amol?

23  A.  Yes, I do.

24  Q.  What branch within the group did Amol work in?

25  A.  For the majority of his time with EDG, it was OSB.

K25Wsch2                        Weber - Direct

1   Q.  How often did you interact with Amol while he was with OSB?

2   A.  Pretty much daily.

3   Q.  Would you describe those interactions?

4   A.  I would consider Amol a friend.  We talked often.  We -- we

5   collaborated together.  At the time Amol was hired, I had a

6   project that a significant portion of my career had been spent

7   on but I was transitioning off of, and I selected Amol to take

8   over that project.

9   Q.  Did Amol start working with the defendant on projects?

10  A.  Yes, he did.

11  Q.  Approximately when did he start doing that?

12  A.  I believe it was almost immediately.

13  Q.  Was there a specific project that he assisted the defendant

14  with?

15  A.  Yes.

16  Q.  What was that project called?

17  A.  Brutal Kangaroo and Drifting Deadlines.

18  Q.  Did you observe the defendant and Amol interact?

19  A.  Yes.

20  Q.  How often, roughly?

21  A.  I sat next to Josh and Amol, so any time I was at my desk

22  and they were interacting, I would witness it.

23  Q.  Could you describe those interactions.

24  A.  They -- they ran the gamut.  Sometimes they were completely

25  professional, back and forth on how to approach a problem, but

1    oftentimes, they were less than professional.  And Josh and

2    Amol did not get along personally.

3    Q.  Did those interactions change over time?

4    A.  It was a continuous downhill relationship.

5    Q.  What do you mean by downhill relationship?

6    A.  So, Josh and Amol rubbed each other the wrong way.  That

7    was obvious early on, and there was increasing animosity

8    between the two of them as long as they were working together.

9    Q.  Did you attempt to intervene between them?

10   A.  Numerous times.

11   Q.  How did you attempt to do that?

12   A.  I would often talk to either Amol or Josh after a

13   less-than-professional interaction and try and tell them to,

14   you know, knock it off or calm down.

15   Q.  Now, you said one of the tools that they were working on

16   together was Drifting Deadlines, is that correct?

17   A.  Yes.

18   Q.  In early 2016, did an issue arise regarding Drifting

19   Deadlines?

20   A.  Yes.

21   Q.  What happened?

22   A.  Drifting Deadlines was supposed to meet a specific

23   operational need.  COG needed it as soon as possible.  The tool

24   was aptly named because it was constantly missing delivery

25   milestones and deadlines, so COG requested that EDG create

1    another, similar capability through an external contractor.

2    Q.  What do you mean by that?

3    A.  We paid a external company to create a tool for us.

4    Q.  Did you talk to the defendant about that?

5    A.  Yes.

6    Q.  What did he say?

7    A.  Josh was offended by this, for multiple reasons.  One, he

8    saw it as a, like he saw it as a lack of trust in him as a

9    developer, that he would not be able to deliver the capability

10   in time.  But he also thought that the government was going to

11   be defrauded because his and Frank's hard work, he thought, was

12   going to be given to this contractor to be, in turn, sold back

13   to the U.S. government.

14   Q.  Was that true?

15   A.  No, it was not.

16   Q.  How do you know that?

17   A.  That's not the way the contract was set up.  The contractor

18   was going to get capability that they would incorporate into

19   their tool, but that was not going to be charged to the U.S.

20   government.  We have --

21            MS. SHROFF:  Your Honor, we object to this testimony.

22            THE COURT:  Overruled.

23            MS. SHROFF:  It's not from something he personal his

24   knowledge.

25            THE COURT:  Don't interrupt.  It's overruled.

1    A.  We also have people in the agency whose job is to manage

2    these interactions with contracts on a daily basis, and their

3    job is to make sure that everything is in the best interests of

4    the government.

5    Q.  Did there come a time when there was a meeting about this

6    contractor issue?

7    A.  Yes.

8    Q.  When, approximately?

9    A.  It was, I believe, in April of 2016, early 2016.

10   Q.  Who participated in that meeting?

11   A.  The meeting was intended to be between the contractor,

12   the -- my branch chief, Sean, Frank, as well as that government

13   POC that I referenced earlier.

14   Q.  Did the defendant participate in this meeting?

15   A.  Yes, he did.

16   Q.  Was he invited to the meeting?

17   A.  No, he was not.

18   Q.  How do you know he was not invited to the meeting?

19   A.  I was -- again, I sat next to Josh.  I also sat next to

20   Frank.  I was there when Sean came to get Frank to go to this

21   meeting.  Josh requested to attend.  He was told not to go, and

22   Josh said that he was going to go anyway.

23   Q.  Did he say anything else to Sean at that time?

24   A.  I remember it being along the lines of fuck you, I'm going

25   anyway.

K25Wsch2                          Weber - Direct

1   Q.  After the meeting, did you speak with the defendant?

2   A.  Yes.

3   Q.  Did you talk about this issue again?

4   A.  Yes.

5   Q.  What was his demeanor like during those interactions?

6   A.  So, I had a conversation with him, talking about how -- I

7   was trying to get him to realize that the actions he took were

8   a slap in the face to Frank and Sean, somebody that I respected

9   greatly, and that he needed to trust in them, that this was

10  doing the right thing and that, furthermore, his actions

11  were -- you know -- he was burning bridges.  He was making it

12  hard so that people would not want to work with him in the

13  future, things like that.

14  Q.  Why did you say it was a slap in the face to Frank and

15  Sean?

16  A.  So, Frank and Sean, numerous times, explained to Josh was

17  going on and that it was OK, and Josh was telling them that

18  they were wrong.

19  Q.  How did he react to your conversations with him about this?

20  A.  Sort of a lot of similar conversations like this with Josh,

21  he -- he would often acknowledge my viewpoint, and then we

22  would move on.

23  Q.  Around this time, did you also talk to the defendant about

24  someone named Karen?

25  A.  Yes.

K25Wsch2                        Weber - Direct

```
 1   Q.  Who is Karen?

 2   A.  Karen was our group chief, chief of EDG.

 3            MR. LAROCHE:  If we could just publish Government

 4   Exhibit 89 again.

 5   Q.  So where did Karen fall within this organizational chart?

 6   A.  She would have been in charge of EDG.

 7   Q.  How many levels of management were between you as a

 8   developer and Karen as chief of EDG?

 9   A.  So, it would have went my branch chief, the division chief

10   and deputy division chief and then deputy group chief and then

11   Karen, the group chief.

12   Q.  What types of things would the defendant say about Karen?

13   A.  He --

14            MS. SHROFF:  Objection as to hearsay.

15            THE COURT:  Overruled.

16   A.  He often was derogatory to her.  He did not -- he did not

17   agree with the direction of her leadership AND would often

18   vocally state that.

19   Q.  What do you mean by derogatory towards her?

20   A.  Comments like dumb bitch would occasionally be thrown

21   around.

22   Q.  Did you respond to him about that?

23   A.  Yes.

24   Q.  What did you say?

25   A.  I -- again, I would counsel him often on his actions.  I
```

1   respected Karen a great deal, and I thought she was one of the

2   better group chiefs we had had, so I was trying to get him to

3   understand the realities.

4   Q.  How, if at all, did the defendant respond to that?

5   A.  Very similar to other conversations I had with him.  You

6   know, he would acknowledge my viewpoint, not necessarily change

7   his actions after the conversation.

8           MR. LAROCHE:  Ms. Hurst, we can pull that exhibit

9   down.  Thank you.

10  Q.  We just talked for a minute about an issue with Drifting

11  Deadlines?

12  A.  Yes.

13  Q.  That occurred in early 2016, is that right?

14  A.  Yes.

15  Q.  Around the time of this issue, was the defendant still

16  working with Amol?

17  A.  Yes, I believe so.

18  Q.  Did you observe any changes in their relationship?

19  A.  It -- it was extremely strained at this point in their

20  relationship.

21  Q.  Did there come a time when you observed an argument between

22  them?

23  A.  Yes.

24  Q.  When, approximately, did that happen?

25  A.  I believe it was if not immediately following the meeting

1    that we just talked about or the next day.  Josh and Amol got

2    into an argument about Josh's actions during -- during that

3    meeting and the fact that he forced himself into that meeting,

4    and it got heated.

5    Q.  Did you attempt to intervene in the dispute?

6    A.  Yes.

7    Q.  How did you attempt to intervene?

8    A.  I told them both to stop it.  Specifically, I told Josh to

9    be the bigger man and walk away from the argument.

10   Q.  What, if anything, did he say in response to that?

11   A.  Josh said, We all know who the bigger man is, in reference

12   to Amol's weight.

13   Q.  What did you understand the defendant to mean by that?

14   A.  He was calling Amol fat.

15   Q.  What, if anything, did you do in response to this

16   interaction?

17   A.  I had a very long discussion with Josh immediately after,

18   trying to get him to realize that he was doing everything in

19   his power to make sure any relationships he had within the

20   agency were burnt, and that this was going to make it hard for

21   people to work with him in the future and it's going to make

22   him hard to be promoted.

23   Q.  How did he react to that conversation?

24   A.  Same as always, like he was still a little bit heated, he

25   acknowledged my viewpoint, and we moved on.

1   Q.  Did you tell anyone else about the interaction you observed

2   between Amol and the defendant?

3   A.  The conversation we had was not in a private location, so

4   some people overheard it.  We -- we talked about the

5   interaction in general as well the next day.

6   Q.  Did there come a time when you talked to Sean, the branch

7   chief, about it?

8   A.  Yes.

9   Q.  When, approximately?

10  A.  I believe it was the next day.

11  Q.  And what happened?

12  A.  I went into Sean's office, and I wanted to know if he

13  wanted me to take a more active role in trying to get Amol and

14  Josh to play well together.  And at that point Sean told me

15  that it was beyond us now.

16          MS. SHROFF:  Objection, your Honor.  Continued

17  hearsay.

18          THE COURT:  Overruled.

19  Q.  After that conversation with Sean, did you learn that the

20  defendant had made a complaint against Amol?

21  A.  Yes.

22  Q.  How did you learn that?

23  A.  I don't remember how I first learned it, if it was just

24  through talking to the other developers who had already

25  discovered it, if I was officially told about it from

K25Wsch2                          Weber - Direct

1    management, or if I saw Josh's complaint.

2         (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K253SCH3                          Weber - Direct

1    Q.  Did you ever review the defendant's complaint against Amol?

2    A.  Yes, I did.

3    Q.  Did the defendant try to show it to you?

4    A.  He did, yes.

5    Q.  Did the defendant try to show it to others in the branch?

6    A.  Yes.

7    Q.  What, if anything, did you see in terms of how others in

8    the branch reacted to that?

9    A.  The other -- the other members of the branch were annoyed

10   by the situation.

11   Q.  Why?

12   A.  They --

13           MS. SHROFF:  Objection.

14           THE COURT:  Overruled.

15   A.  They felt like they were getting --

16           MS. SHROFF:  Objection.

17           THE COURT:  Overruled.

18   A.  They felt that they were being pulled into a personal issue

19   between Josh and Amol.  Furthermore, Josh's complaint

20   specifically --

21           MS. SHROFF:  Objection, your Honor.

22           THE COURT:  Overruled, Ms. Shroff.

23   A.  Josh's complaint specifically called out some of us as

24   being targets of Amol as well, which was false.

25   Q.  Did there come a time when you actually saw that complaint?

1    A.  Yes.

2              MR. LAROCHE:  Ms. Hurst, can you please publish

3    Government Exhibit 1038 and page four of that exhibit.

4    Q.  Mr. Weber, do you recognize this?

5    A.  Yes, I do.

6    Q.  Do you recognize the handwriting?

7    A.  Yes, I do.

8    Q.  Whose handwriting is it?

9    A.  Josh Schulte's.

10   Q.  Is this the complaint you were referring to earlier?

11   A.  Yes, it is.

12   Q.  If we can go to the next page.  Mr. Weber, have you seen

13   this next page?

14   A.  Yes, I have.

15   Q.  Is this, from your view, a typed up version of the

16   handwritten complaint?

17   A.  Yes, it is.

18   Q.  So let's focus on this one.  It is a little easier to read.

19   A.  Okay.

20   Q.  If we can focus on the first paragraph, please.

21   A.  Do you want me to read it?

22             MS. SHROFF:  Your Honor, could the government clarify

23   who typed this up, and when it was typed and when it was

24   created?

25             THE COURT:  Mr. Laroche?

1       MR. LAROCHE:  It is attached to the e-mail that's been

2   entered into evidence.

3       MS. SHROFF:  That does not clarify the issue, your

4   Honor.

5       THE COURT:  That's the best we can do.

6   Q.  Please read the first sentence.

7   A.  "Dating back to August of 2015, Amol has made very

8   derogatory and abusive comments to myself and my colleagues."

9   Q.  You ever observe Amol make very derogatory or abusive

10  comments to his co-workers?

11  A.  No.

12  Q.  Did you ever observe the defendant make derogatory or

13  abusive comments to his co-workers?

14  A.  Yes.

15  Q.  Without discussing the substance of those comments, how

16  often did he do so?

17  A.  It was not a regular occurrence.  But, Josh, Josh's poking

18  of fun at other developers would occasionally cross a line.

19  Q.  Please read the second sentence.

20  A.  "These dark and disparaging comments include 'I wish you

21  were dead,' 'I want to piss on your grave,' 'I want to dance on

22  your grave,' 'I wish you'd die in a fiery crash and burn, oh I

23  would be so happy.'  'I only say I wish you'd die because I

24  really wish it were true.'"

25  Q.  Did you ever observe Amol make these kind of comments?

1    A.  Similar comments.

2    Q.  Can you give some context to how these comments were made?

3    A.  They --

4            MS. SHROFF:  Objection.

5            THE COURT:  Overruled.

6    A.  It was usually after Josh had been having a long

7    conversation with Amol about anything from the way a project

8    could go, or things like that.  It would usually be, like I

9    said earlier, when Josh -- when Josh had set a path on

10   something, it was hard to sway him.  And the conversations

11   could go for an extensive time, it would often exhaust you.

12   So, Amol, after being in one of these conversations with Josh,

13   would often, like, sigh, lean up against a wall, and just say

14   something like this.

15   Q.  Did the defendant ever tell you he was fearful of Amol

16   based on those comments?

17   A.  No, he did not.

18   Q.  Did you ever talk to Amol about those comments?

19   A.  No.

20   Q.  Why not?

21   A.  It's -- Josh never expressed a concern over it.  Often Josh

22   would actually laugh following comments like this.  So, it was,

23   just never felt a need to bring it up.

24   Q.  If we can go to the second paragraph, please.  Can you read

25   this paragraph, please.

K253SCH3                        Weber - Direct

1  A.  "Specifically, on Monday, February 29, 2016, during the

2  midmorning, I walked into work to Amol berating me with

3  comments such as 'bald asshole,' insulting my work, and stating

4  that I will never get promoted past a 12 due to my poor work

5  quality and work ethic.  I responded stating that at least I

6  can program.  This infuriated Amol because usually people do

7  not respond to his bullying or attempt to fight back."

8  Q.  Did you observe this interaction?

9  A.  No, I did not.

10  Q.  The last sentence says "usually people do not respond to

11  his bullying or attempt to fight back."

12        Did you ever observe Amol bully anyone?

13  A.  No, I did not.

14  Q.  If we can go to the third paragraph, please.  Can you

15  please read that.

16  A.  "For the remainder of Monday and into Tuesday, Amol was

17  very visibly distraught and upset.  His behavior was out of the

18  ordinary, and he was unusually quiet.  On Tuesday, March 1st,

19  2016, during the midmorning, I noticed Amol about to leave his

20  work station.  I turned, facing away from him, and inquired

21  about a project we were working on.  The next thing I knew,

22  Amol was directly behind me, unusually close, towering over me.

23  I was caught offguard and afraid.  He then, through gritted

24  teeth, angrily said, 'I wish you were dead, and that's not a

25  threat, it's a fucking promise.'  I was afraid that he might

1   stab me or assault me in some way.  I was frightened and very

2   concerned especially based on his behavior.  I thought he may

3   harm myself or others, so I contacted security at the end of

4   the day to report these events."

5   Q.  Did you ever see Amol do any these things?

6   A.  No.

7   Q.  We can pull that down.

8          After the defendant made these allegations against

9   Amol, did you talk to the defendant about them?

10  A.  No, I did not.

11  Q.  Why not?

12  A.  After seeing these allegations, I felt that Josh was lying,

13  which I felt crossed a line, and I just was done with him.  I

14  didn't consider him a friend anymore.  And I didn't want to

15  deal with him or the drama around him.

16  Q.  Why did you think he was lying?

17  A.  I work closely with Amol.  I didn't believe the comments, I

18  had never seen an interaction like that, and the interactions

19  that I did reference, or did see, I felt like Josh took

20  significantly out of context to try and support his viewpoint.

21  Q.  After the defendant made these allegations, were Amol and

22  the defendant physically separated within the branch?

23  A.  Yes, they were.

24  Q.  How were they separated?

25  A.  Amol was asked to move desks, and then shortly after, Josh

1    was asked to change desks as well.

2               MR. LAROCHE:  Ms. Hurst, can you please publish

3    Government Exhibit 111.  If we can just zoom in on the lower

4    left of the screen maybe to about the middle.  It's over just a

5    little bit to the right as well.

6    Q.  Do you see OSB on Government Exhibit 111?

7    A.  Yes, I do.

8    Q.  Just remind us, before they were moved, where were you

9    sitting in OSB?

10   A.  Wait, I'm sorry.  I believe this is the eighth floor.

11              MR. LAROCHE:  We need the next page.  Sorry.

12   Q.  Do you see OSB on this page?

13   A.  Yes, I do.

14   Q.  This is the ninth floor, for orientation?

15   A.  Yes, it is.

16   Q.  Can you just circle where you sat in OSB as of 2015 and

17   2016.

18              And before the move happened, please circle first

19   where Josh sat.  And that's next to you; is that correct?

20   A.  That is correct.

21   Q.  Then where did Amol sit?  Okay.

22              Can you now circle or just mark with an X first where

23   Josh was moved to within branch.

24              And then with another X, where was Amol moved to

25   within branch.

1            How did the defendant react to having to move desks?

2   A.   He was offended.

3   Q.   Why do you say that?

4   A.   He stated that this was a retaliation against him, and it

5   was unfair.

6   Q.   Did he actually move desks?

7   A.   No.

8   Q.   Why do you say that?

9   A.   He, he would move a couple personal items, and then return

10  to his desk, to do his day-to-day work, until -- until Sean

11  came and asked him again to move.  And he would repeat the

12  process.  He never completed the move.

13            MR. LAROCHE:  We can pull that down, please, thank

14  you.

15  Q.   The complaint that we just reviewed, was that an internal

16  complaint to the CIA?

17  A.   Yes, it was.

18  Q.   Other than making that internal complaint to the CIA, did

19  the defendant make any other complaints outside the CIA against

20  Amol?

21  A.   Yes.

22  Q.   What did he do?

23  A.   He filed a restraining order.

24  Q.   When approximately did he do that?

25  A.   I believe it was shortly after the incident.

K253SCH3                          Weber - Direct

1    Q.   Where did he file that restraining order?

2    A.   In Loudoun County.

3    Q.   After the defendant filed that restraining order, did he

4    and Amol remain in OSB?

5    A.   No.

6    Q.   What happened?

7    A.   Amol was moved to MSB, and Josh was moved to RDB.

8    Q.   What does RDB stand for?

9    A.   Remote Development Branch.

10   Q.   If we can pull up Government Exhibit 89.  You see RDB on

11   this organizational chart?

12   A.   Yes, I do.

13   Q.   Generally speaking, what type of work does RDB do?

14   A.   RDB was focused on remote operations.  These would have

15   been scenarios where we had somebody communicating with a -- a

16   target machine over the internet.

17   Q.   Is moving to RDB from OSB a demotion?

18   A.   No, it's not.

19   Q.   Why not?

20   A.   It's a sister branch.  It's, it's a different focus for

21   type of work, but it was -- it was not a junior branch in any

22   way.

23   Q.   How did the defendant react to being moved to RDB?

24   A.   He -- I don't actually know.  I wasn't interacting too much

25   with him about -- I don't know how he reacted to going to RDB

K253SCH3                    Weber - Direct

1    specifically.

2    Q.  At the time, where was RDB located?

3    A.  They were on the eighth floor.

4    Q.  We can pull that down, please.

5            So other than reporting the incident to internal

6    security and filing a protective order, did the defendant take

7    any other action against Amol?

8    A.  Yes.

9    Q.  What did he do?

10   A.  He filed an EEO complaint.

11   Q.  What is EEO?

12   A.  Equal employment opportunity.

13   Q.  How did you learn that the defendant filed an EEO

14   complaint?

15   A.  I, I don't remember specifically how I was first told about

16   it.  But, eventually, I was asked to make an official statement

17   regarding it.

18   Q.  Why were you asked to make an official statement?

19   A.  He referenced me in the EEO complaint.

20   Q.  Were you asked to respond to any specific allegations?

21   A.  All of the allegations.

22   Q.  What do you remember responding to?

23   A.  So, the specific ones that I remember responding to were,

24   one, that Amol would often call my wife dumb, and secondly that

25   Amol would make racist comments frequently.

1   Q.  Were either of those things true?

2   A.  No.

3   Q.  You said that the defendant moved to RDB after filing the

4   protective order; is that right?

5   A.  Yes.

6   Q.  When the defendant moved to a different branch, did he

7   continue working on his old branch projects?

8   A.  Not initially.

9   Q.  Why not?

10  A.  He was in a different branch now.  He was supposed to focus

11  on that branch's work.

12  Q.  Did the defendant lose privileges on DevLAN to his old

13  branch's projects?

14  A.  Yes.

15  Q.  What, if anything, was done to do that?

16  A.  He was removed.  If he was a project lead on projects, he

17  was removed from that position.  And in another situation, the

18  OSB libraries, his ability to commit directly to the main

19  branches was removed.

20  Q.  When approximately were these changes made?

21  A.  It would have been around the time that he changed

22  branches.

23  Q.  Who made them?

24  A.  I did.

25  Q.  Why did you make them?

1   A.  Josh checked out of OSB, and I was following standard

2   practices.  He no longer needed access to OSB's projects.

3   Q.  How did you make these changes?

4   A.  I logged into the Atlassian system and changed them.  I

5   don't know if I used my administrative credentials for this or

6   the fact that I was an admin for the projects themselves,

7   because I was a lead for a significant portion of them.  But

8   most likely it was my administrative credentials.

9   Q.  Did you tell the defendant before you changed his

10  privileges to these projects?

11  A.  No.

12  Q.  Why not?

13  A.  I felt it didn't need to be communicated.  He was going to

14  be working on new projects, I didn't think he would even access

15  the old ones.

16  Q.  I want to talk about one of OSB's projects in particular.

17  A.  Okay.

18  Q.  Are you familiar with a project called OSB libraries?

19  A.  Yes.

20  Q.  What is OSB libraries?

21  A.  OSB was often tasked with projects that had a very short

22  deadline to meet.  Days, sometimes weeks.  And to ensure that

23  we were able to meet these deadlines, we wanted to have some of

24  the basic components that we often wrote in a state that can be

25  readily used.

K253SCH3                    Weber - Direct

1   Q.  What does that mean?

2   A.  So, I often like to say that EDG did eight things, we just

3   did it a thousand different ways.  So, if we needed to collect

4   a file from a computer, we had code that would do that.  And if

5   you needed to collect a file, you could just incorporate that

6   code.  It was already tested.  It was already, you know, well

7   written.

8   Q.  Who created OSB libraries?

9   A.  It was a branch effort.

10  Q.  Were there some developers in particular who were more

11  involved?

12  A.  Yes.

13  Q.  Who?

14  A.  Myself, Frank, and Josh were some of the major contributors

15  early on.  Matt as well.

16  Q.  When the defendant was a member of OSB, what were his

17  privileges on OSB libraries?

18  A.  So, as one of the senior members of that project, he had

19  the ability to merge code into the main branch.  And by that I

20  mean, anybody had the ability to contribute to the libraries.

21  But before that code could be used by others, you would have to

22  have it signed off by a certain number of developers, show it

23  was well tested.  Once those check boxes were hit, myself,

24  Brett, Josh, or Matt would be able to click a button on the

25  Atlassian web page and merge it in.

1  Q.  Was the merging aspect of OSB libraries important to OSB

2  libraries?

3  A.  Yes.

4  Q.  Why?

5  A.  Once it was merged into the master branch, anybody in OSB

6  would inherently trust that code.

7  Q.  After the defendant left the branch OSB, did his privileges

8  change to OSB libraries?

9  A.  Yes.

10  Q.  How did they change?

11  A.  He was no longer granted access to merge in, into the

12  master branch, but was allowed to contribute just the same as

13  anybody else in the rest of the division.

14  Q.  How could he still contribute to OSB libraries?

15  A.  There was a process that we had officially outlined.  You

16  would create a separate branch of the code, you would make your

17  modifications, and then you would submit it to review.

18  Everybody followed this process, regardless of if you were in

19  OSB or not.

20  Q.  After the defendant left OSB and went to RDB, his new

21  branch, did he maintain those privileges?

22  A.  Yes, he did.

23  Q.  Who changed the defendant's privileges to OSB libraries?

24  A.  I did.

25  Q.  After you changed the defendant's privileges to OSB

1    libraries, did he approach you about it?

2    A.  Yes, he did.

3    Q.  When approximately did he approach you?

4    A.  I believe it was shortly after the change.  I don't

5    remember the date, though.

6    Q.  What happened during that interaction?

7    A.  He came up to me, asked what was going on.  I informed him

8    since he was no longer a member of OSB, that it had been

9    decided that he would not have the ability to merge stuff into

10   master.  He disagreed with that.  At which point I directed him

11   to talk to Sean, my branch chief, his former branch chief.

12   Q.  What was his demeanor like during this interaction?

13   A.  During the first interaction, it -- it wasn't anything

14   special.  Very normal.

15   Q.  You said you told him to talk to Sean?

16   A.  Yes.

17   Q.  Again, who is Sean?

18   A.  Sean was my branch chief, chief of OSB.

19   Q.  Why did you tell him to talk to Sean?

20   A.  As chief of OSB, all of the projects were owned by him, and

21   he was the one that had the say on what -- how things should be

22   set up.

23   Q.  Did the defendant talk to Sean?

24   A.  Yes, he did.

25   Q.  How do you know that?

1  A.  I directed him to go talk to Sean.  I saw him go into

2  Sean's office.  And then he came back afterwards to talk to me

3  again.

4  Q.  Could you hear the conversation he had with Sean?

5  A.  No.

6  Q.  After the defendant talked to Sean, did he come back to

7  you?

8  A.  Yes.

9  Q.  Did you talk to him again?

10 A.  Yes.

11 Q.  What did he say?

12 A.  He told me that Sean had said that his access should be

13 returned, and that I should go and do it.

14 Q.  How did you respond?

15 A.  I told him that I would talk to Sean, because that was not

16 my understanding of the situation.

17 Q.  Did he respond to that?

18 A.  Yes.  He told me that I might as well go and do it, because

19 it was going to happen one way or another.

20 Q.  What did you understand the defendant to mean by that?

21 A.  I took it as a threat.

22 Q.  Why?

23 A.  The "one way or another" seem very much like an ultimatum

24 that he was going to do things his way, regardless of what was

25 said.

1   Q.  Did you talk to Sean after speaking with the defendant?

2   A.  Yes.

3   Q.  After speaking with Sean, did you give the defendant his

4   administrative accesses back to OSB libraries?

5   A.  No.

6   Q.  Why not?

7   A.  Sean disagreed with Josh's recollection of the

8   conversation, and said that Josh was not supposed to have those

9   accesses.  He asked that I e-mail Josh explaining exactly how

10  things are meant to be.

11  Q.  After you spoke to Sean, did you e-mail the defendant?

12  A.  Yes, I did.

13          MR. LAROCHE:  Ms. Hurst, can you please publish

14  Government Exhibit 1061.  Then go to the first e-mail in this

15  chain.  Just go up one more page first for a second.  The from

16  line is at the bottom.

17  Q.  Is that the e-mail you sent?

18  A.  Yes, it is.

19          MR. LAROCHE:  We can zoom out and go to the next page.

20  Q.  When did you send this e-mail?

21  A.  This would have been April 14, 2016.

22  Q.  Was that on the same day that you had the conversation you

23  were just discussing?

24  A.  Yes, it was.

25  Q.  What time did you send it?

1    A.  3:30 p.m.

2    Q.  Who did you send it to?

3    A.  I sent it to Josh.

4    Q.  Who did you copy?

5    A.  I copied Sean, chief of OSB, Tony, who was deputy division

6    chief for AED, Richard, and Frank.

7    Q.  Who is Richard?

8    A.  I don't know who Richard is.

9    Q.  Who is Frank?

10   A.  Frank was one of the main developers of the libraries.

11   Q.  What was the subject line?

12   A.  OSB libraries.

13           MR. LAROCHE:  If we can zoom out.  And then zoom in on

14   the text of the e-mail.

15   Q.  If can you read the first line and the first bullet.

16   A.  "Josh, I discussed things with Sean and this is the

17   situation."

18   Q.  Then just the next bullet.

19   A.  "In the short term, the OSB libraries remain an OSB project

20   and are under Frank Stedman and my guidance."

21   Q.  What did you mean by under Frank Stedman and my guidance?

22   A.  We would continue to lead the OSB libraries.

23   Q.  Can you please read the next bullet.

24   A.  "You are free to contribute to the libraries by creating a

25   branch and following the pull request model that is in place."

K253SCH3                        Weber - Direct

1  Q.  What did you mean by that?

2  A.  This is the process that everybody followed to contribute

3  code to the libraries.

4  Q.  Can you please read the next bullet.

5  A.  "We are hoping to move the libraries to Kevin's authority

6  to make them officially an AED level resource."

7  Q.  Who is Kevin?

8  A.  He was the, he was the tech director for AED.

9  Q.  What did you mean by "make them officially an AED level

10 resource"?

11 A.  We felt that the libraries were a very good idea and could

12 be leveraged by other people in the division.  And we wanted to

13 see it grow.

14 Q.  Then please read the next bullet down.

15 A.  "When Kevin takes over, and if he desires for you to have

16 direct authority for the two long lived branches, then we will

17 give you commit access to master and develop."

18 Q.  What type of access were you talking about potentially

19 giving back?

20 A.  This would be his ability to merge code into the master and

21 develop branches.

22 Q.  What did you mean by "when Kevin takes over"?

23 A.  We wanted to, again, make this Kevin's responsibility to

24 chart the direction of the libraries as well as maintain the

25 authenticity of the code.  And so, we wanted -- it was in the

1   works to have him become lead of the project.

2   Q.  Please read the last sentence of the e-mail.

3   A.  "Until something officially changed, you must follow the

4   pull request model and leave it to either Frank or me to

5   complete the merge."

6   Q.  What did you mean by "you must follow the pull request

7   model"?

8   A.  Again, we had a well-laid out process that anybody,

9   including Frank and myself, would follow for contributing code

10   to the main branches.  You would write what you wanted to

11   change, and then you would put it up for review.  Once enough

12   people reviewed it and felt it met quality thresholds, it would

13   be merged into the main branch.

14   Q.  Just zoom out again.  This e-mail was sent at 3:30 p.m., is

15   that correct?

16   A.  That is correct.

17          MR. LAROCHE:  Ms. Hurst, if you can go to the next

18   e-mail in this chain.  Just zoom in on the to from.

19   Q.  Who sent this e-mail?

20   A.  Josh did.

21   Q.  When did he send it?

22   A.  He sent it on the same date, April 14, 2016, at 3:39 p.m.

23   Q.  Did he copy all the same people that were on other e-mail?

24   A.  Yes, he did.  I don't know if Kevin was on the first

25   e-mail, technically.

1   Q.  If we can go to the text of this e-mail.  Read the first

2   sentence, please.

3   A.  "Hey guys, thanks for the e-mail.  I know soon Richard will

4   relieve Sean of his official duties."

5           Now I remember who Richard is.

6   Q.  Who is Richard?

7   A.  Richard was a senior developer in OSB.  Sean was moving on,

8   he accepted a new position, and Richard was going to take over

9   temporarily as chief of OSB.

10  Q.  Can you read the next sentence.

11  A.  "I've talked with Anthony and Sean a bit about working on

12  transitioning some of my old projects, but haven't specifically

13  talked about the OSB libraries until now."

14  Q.  And the next sentence, please.

15  A.  "Since the OSB libraries were initially my idea that

16  stemmed from Brutal Kangaroo, and I've spent a lot of time and

17  effort managing and helping administer them, I'd like to stay

18  on along with Frank and Jeremy as helping administering them."

19  Q.  Were the OSB libraries the defendant's idea?

20  A.  No.

21  Q.  Whose idea were they?

22  A.  It was primarily mine and Frank's.

23  Q.  At the time he sent this e-mail, had you already had a

24  conversation with him about OSB libraries?

25  A.  Yes.  It was the conversation we just talked about.

K253SCH3                    Weber - Direct

1   Q.  Had he already had a conversation with Sean about OSB

2   libraries?

3   A.  Yes.

4   Q.  Can you read the next sentence, please.

5   A.  "Especially considering that the goal is to move these to

6   AED and allow Kevin to admin them, I feel like my intimate

7   knowledge with the libraries would be beneficial to this

8   process."

9   Q.  And next sentence.

10  A.  "I believe I should still have sufficient time to help with

11  the libraries, and it would help propagate the libraries by

12  having people on other branches working together on them."

13  Q.  And just skip to the last sentence that starts "so" at the

14  bottom.

15  A.  "So if OSB and RDB would be okay with this, I would like to

16  continue my active role with the libraries."

17  Q.  At the time he sent this e-mail, had you spoken to Sean

18  about the libraries?

19  A.  Yes.

20  Q.  What did Sean say about his accesses to the libraries?

21          MS. SHROFF:  Objection as to hearsay.

22          THE COURT:  Overruled.

23  A.  Sean was completely okay with Josh contributing to the

24  libraries following the official process, but wanted Frank and

25  I to be the ones that managed merging stuff into master and

1  develop until Kevin took over and made a decision on that.

2  Q.  Had you communicated that with the defendant?

3  A.  Yes.

4        MR. LAROCHE:  You can pull this e-mail down.

5  Q.  After the defendant sent this e-mail, what, if anything,

6  did you do with respect to OSB libraries?

7  A.  I went back in and looked at the audit logs on the

8  libraries.

9  Q.  What are audit logs?

10 A.  Audit logs can be anything that contain information.

11 Specifically in this scenario, it was logs that said when

12 permissions were assigned, removed, changed; things like that.

13 Q.  What, if anything, did you see in the audit logs with

14 respect to OSB libraries?

15 A.  Following this e-mail, Josh changed the permissions to give

16 him access to the master and develop branches again.

17 Q.  How do you know it was the defendant who changed the

18 project permissions to OSB libraries?

19 A.  The change was done by Josh's Active Directory account,

20 which only he would have known the user name and password to.

21 Q.  What privileges did the defendant use to change his

22 accesses to OSB libraries?

23 A.  He used his administrative privileges on the Atlassian

24 products.

25 Q.  Were the defendant's actions consistent with CIA policy?

K253SCH3                          Weber - Direct

1    A.  No, they were not.

2               MS. SHROFF:  Objection.

3               THE COURT:  Overruled.

4    Q.  You can answer again.

5    A.  No they were not.

6    Q.  Was the defendant allowed to do this as an administrator of

7    the Atlassian services?

8    A.  No, he was not.

9    Q.  Why not?

10   A.  You are given a lot of ability as an administrator, but

11   everything that we did would be at direction.

12   Q.  Had the defendant ever done anything like this before?

13   A.  No.

14   Q.  Did you tell anyone about the defendant using his

15   administrative privileges to reinstate his access to OSB

16   libraries?

17   A.  Yes.

18   Q.  Who did you tell?

19   A.  I immediately informed Sean.

20   Q.  Why did you tell Sean?

21   A.  He was my immediate leadership.

22   Q.  Why did you tell him immediately?

23   A.  Because I saw this as a breach of the security rules, and

24   that this was an abuse of Josh's administrative privileges.

25   Q.  Was this an urgent issue in your view?

1    A.  Yes, it was.

2    Q.  Why?

3    A.  Josh showed that he was no longer somebody that could be

4    trusted with his administrative credentials.  Because he was

5    willing to do what he wanted to, versus what he was told to do.

6    Q.  Was that problematic for someplace like the CIA?

7    A.  Yes.

8    Q.  Why is that problematic in the CIA?

9    A.  The CIA, we have access to a lot of very damaging

10   information.  And the only way we are able to work with this

11   type of information is by being trusted to handle it

12   appropriately.

13   Q.  After speaking with Sean, did you talk to anyone else about

14   this issue?

15   A.  Yes.

16   Q.  Who?

17   A.  Anthony and I believe Mike.

18   Q.  You said Anthony.  What was Anthony's position?

19   A.  Anthony was the deputy division chief, so he was Sean's

20   immediate supervisor.

21   Q.  Who was Mike?

22   A.  Mike was the deputy group chief.

23   Q.  Let's pull up Government Exhibit 89.  Let's start with

24   Mike.  What was Mike's role within this organizational chart?

25   A.  Mike was the deputy group chief for EDG.  So he was Karen's

K253SCH3                      Weber - Direct

1  second.

2  Q.  What about Anthony?

3  A.  Anthony was the deputy division chief for AED.

4  Q.  Again, what about Sean, where did he sit?

5  A.  Sean was chief of OSB.

6  Q.  How often did you have interactions with someone at Mike's

7  level?

8  A.  I was more often than others -- I would not interact with

9  him often on stuff like this.  I had other positions where I

10  would occasionally advise group level management about

11  technical topics.

12  Q.  On this issue in particular, can you describe your

13  conversations with those individuals?

14  A.  I relayed the facts of what happened.  And then I was asked

15  to leave.

16  Q.  After that conversation occurred, were you asked to do

17  anything in the days that followed?

18  A.  Yes.

19  Q.  What were you asked to do?

20  A.  I was asked to come in with MSB -- sorry.  ISB at the time.

21  They, it had been decided that ISB would take over the

22  administrative role of the Atlassian products, and I was there

23  to assist them in doing that.

24  Q.  What day of the week did you go in?

25  A.  Saturday.

1   Q.   Is Saturday a typical day to work within your group?

2   A.   No, it is not.

3   Q.   Why did you go in on a Saturday for this issue?

4   A.   Two reasons.  One, there was going to be a downtime of the

5   Atlassian products.  We did not want this downtime to interfere

6   with the daily activities of the software development team.

7   And two, we wanted to make sure that we could do this without

8   Josh's interference.

9   Q.   Why did you want to make sure you could do it without

10   Josh's interference?

11   A.   We didn't trust him to not interfere.

12   Q.   Did anyone else work with you on that Saturday?

13   A.   Yes.

14   Q.   Who?

15   A.   It would have been Dave and Tim.

16   Q.   Who is Dave and Tim?

17   A.   They were system administrators within ISB.

18   Q.   Did you have any instructions about what you were supposed

19   to do that day?

20   A.   Yes.

21   Q.   What were you supposed to do that day?

22   A.   I was there to answer questions that ISB might have, and

23   oversee the transfer of administrative privileges.  I was

24   explicitly told not to do any of the modifications to the

25   Atlassian products myself.  And then after ISB was finished, to

1   check that I did not have administrative access anymore.

2   Q.  What administrative privileges were being changed that day?

3   A.  The access to the Atlassian products.

4   Q.  Why were your privileges also being taken away that day?

5   A.  Mike and Anthony wanted to make it such that ISB was the

6   only administrators.

7   Q.  Why?

8   A.  They felt it was time for ISB to take it over.

9           MS. SHROFF:  Objection as to what they felt.

10          THE COURT:  Overruled.

11  A.  They felt that it was time ISB took this over.  It was

12  something that we requested numerous times.  And they wanted it

13  so that only ISB would be administration to make sure that

14  developers developed, and system administrators handled

15  administration.

16          MR. LAROCHE:  If we can pull that exhibit down and put

17  up Government Exhibit 1251, please.  Please zoom in on the ESXi

18  server.

19  Q.  At the time in 2016, an ESXi server was running Confluence

20  and Bamboo?

21  A.  Yes.

22  Q.  Who did that server belong to?

23  A.  OSB.

24  Q.  Who was administering that server as of April 2016?

25  A.  It would have been myself, Frank, Matt.  Those individuals.

K253SCH3                          Weber - Direct

```
 1   Q.  Was the plan on that Saturday to give ISB control over that
 2   server?
 3   A.  No.
 4   Q.  Why not?
 5   A.  The plan was for ISB to have control over the Atlassian
 6   services.  The ESXi server that we're talking about here was
 7   going to remain an OSB resource, so there was no reason for ISB
 8   to take it over.
 9   Q.  Who was going to remain as a server administrator of that
10   server after your weekend work on a Saturday?
11   A.  Members of OSB.
12   Q.  What, if any, role did the defendant have at that time as a
13   server administrator of the OSB server?
14   A.  None.
15   Q.  Why not?
16   A.  He was no longer a member of OSB.
17   Q.  Let's focus on what you did on that Saturday.  Do you
18   remember what day that was in April?
19   A.  I believe it was April 16.
20   Q.  So you said that part of what you were doing was making
21   changes to the administrative services of Atlassian, correct?
22   A.  Yes.
23   Q.  Before making those changes, did you do anything to the
24   system?
25   A.  Yes.
```

K253SCH3                    Weber - Direct

1    Q.   What did you do?

2    A.   MSB or ISB created a snapshot of the VMs before making the

3    changes.

4    Q.   So we're looking at Government Exhibit 1251 and we're still

5    zoomed in on the ESXi server.  What do you mean by create a

6    snapshot?

7    A.   Any time you're going to make like a major modification to

8    the running state of a service, taking a snapshot gives you a

9    safety net.  So, we created a backup of that state and time

10   before we made any modifications to it.

11   Q.   Just looking at this screen.  Was a snapshot created of

12   Confluence?

13   A.   Yes.

14   Q.   Was a separate snapshot created of Bamboo?

15   A.   Yes.

16   Q.   We can pull that down.

17        After the snapshots were created, how were the

18   administrative privileges of the Atlassian services actually

19   changed?

20   A.   MSB followed multiple -- they changed them in multiple

21   areas.  One, the primary ways that we had access, we, Josh and

22   I had access to the Atlassian products, was through our Active

23   Directory credentials.  That -- the group that our accounts

24   were part of was an Atlassian user group.  We were removed from

25   that and ISB added their members to that group.

1             In addition to that, we followed -- essentially, a

2   guide that said if you are resetting access to a Linux

3   operating system, do this, this and this.  It was reset the

4   route password, change out any SSH keys.  I can't remember

5   beyond that.

6   Q.  We talked about SSH keys earlier.

7   A.  Yes.

8   Q.  Was that one of the ways that you could log in as an

9   Atlassian administrator?

10  A.  Yes.

11  Q.  How did you change SSH keys?

12  A.  In this scenario, we deleted any known keys on the system,

13  MSB generated new keys, and then added those to the system.

14  Q.  And you said MSB.  Is MSB just another name for ISB?

15  A.  Yeah.  Sorry.  Around this time, they were renamed from ISB

16  to MSB.

17  Q.  After the passwords, new passwords were generated, were you

18  provided access to those passwords?

19  A.  No, I was not.

20  Q.  Why not?

21  A.  I was no longer an administrator of the Atlassian product,

22  so I was not authorized to have access to it.

23  Q.  What about the new SSH keys?

24  A.  The same.  Same thing.  I didn't have access and was not

25  allowed access.

1    Q.  Let's focus on the OSB ESXi server for a moment.

2    A.  Yes.

3    Q.  Did you take any steps on April 16 to change the privileges

4    on that server?

5    A.  Yes.

6    Q.  What did you do?

7    A.  The server had a route privilege, it was a shared password.

8    I reset that password to something else.

9    Q.  Why did you do that?

10   A.  In the -- I was doing my due diligence.  It was in OSB's

11   control.  Josh knew the old server password, so I felt it was

12   right to change that password.

13   Q.  After you changed that server password, what, if anything,

14   did you do to OSB's Confluence page?

15   A.  I updated the Confluence page to reflect the new password.

16   Q.  Who had access to that page?

17   A.  Only members of OSB.

18   Q.  Did the defendant at that time have access?

19   A.  I don't believe so.

20   Q.  If we can put up Government Exhibit 1251 just for a moment.

21   I just want to talk through what the end result of April 16

22   was.  So I just want to start with the Atlassian services.

23          After the changes on April 16, 2016, who had

24   administrative control over the Atlassian services?

25   A.  MSB, ISB.

1    Q.  Did you have control?

2    A.  No, I did not.

3    Q.  After April 16, 2016, did you have any administrative role

4    with respect to the Atlassian services?

5    A.  No.  Outside of technically there's things like project

6    admins, but that's outside of what would be traditionally

7    considered an administrator.

8    Q.  What about the defendant?  After April 16, 2016, did he

9    have any administrative role over the Atlassian services?

10   A.  No.

11   Q.  Let's talk about the ESXi server.  If we can zoom in on

12   that on top left, please.  After April 16, 2016, who had

13   administrative control over the ESXi server?

14   A.  It should have been members of OSB.

15   Q.  Did the defendant have any administrative role with respect

16   to that server?

17   A.  I don't believe so.

18   Q.  You stated that that server was used for things other than

19   running Confluence and Bamboo programs; is that right?

20   A.  That's correct.

21   Q.  Did that include work on other OSB projects?

22   A.  Yes.

23   Q.  After the defendant moved to RDB, are you aware of any need

24   for him to have access to that server for his projects?

25   A.  No.

1   Q.  Did his new branch, RDB, use the ESXi server for any of its

2   projects?

3   A.  I don't believe so.  They would not have interacted with

4   the ESXi server directly.  They might access a VM or two that

5   was on the system.  But, not the ESXi server itself.

6   Q.  We can pull that down.  Thank you.

7        After April 16, 2016, were developers notified about

8   the change in administrative privileges on the DevLAN network?

9   A.  I don't know.  I believe so.

10       MR. LAROCHE:  Let's look at Government Exhibit 1064.

11  Just zoom in on the top to from of this e-mail.

12  Q.  When was this e-mail sent?

13  A.  It would have been April 18, 2016.

14  Q.  Who sent this e-mail?

15  A.  Anthony.

16  Q.  Who did he send it to?

17  A.  All of AED, ISB, as well as James.

18  Q.  And you see there is a BCC line?

19  A.  Yes.

20  Q.  What does BCC mean?

21  A.  Blind carbon copy.  Anybody who received this e-mail would

22  not see that Anthony and Michael were also on this line.

23  Q.  Is that the same Michael you referred to as the deputy

24  chief of EDG?

25  A.  That's correct.

1    Q.  What was the subject of this e-mail?

2    A.  "Update to Atlassian products admins."

3            MR. LAROCHE:  If we can just zoom out and zoom in on

4    the second paragraph.

5    Q.  Can you just read the first sentence.

6    A.  "Following updates and changes to our -- blank -- internet

7    system, EDG has begun to take look at our other networks to get

8    a better understanding of our policies, etc.  After a brief

9    DevLAN audit, we realized we never quite finished transitioning

10   the Atlassian products to SED/ISB for administration updates,

11   etc.  Therefore, to ensure that everyone in EDG was not

12   affected while this transition was being made, SED/ISB

13   personnel transferred all system admin responsibilities across

14   all Atlassian products to SED/ISB removing local admin rights

15   for all local AED branch system admins this past weekend."

16   Q.  Was this summarizing the work you did on April 16?

17   A.  Yes.

18   Q.  If we can zoom in on the next paragraph, please.  Just read

19   the first sentence.

20   A.  "As a result of this change, there are now two people in

21   SED/ISB who will maintain and update the Atlassian suite

22   repository for EDG."

23   Q.  Was the defendant one of those two people?

24   A.  No, he was not.

25   Q.  Who were?

K253SCH3                         Weber - Direct

1    A.  It would have been Dave and Tim.

2    Q.  Can you read the next sentence, please.

3    A.  "This will ensure that our entire CNE library of tools,

4    code repository, etc. is backed up regularly.  Updates to the

5    Atlassian tool suite are scheduled and maintained, and the

6    library remains under a common source control authority in

7    ISB."

8    Q.  There a reference to being backed up regularly.

9    A.  Yes.

10   Q.  What's that a reference to?

11   A.  This is the backups that we discussed earlier.

12   Q.  After April 16, 2016, did the defendant have any role

13   administering the backups?

14   A.  No, he did not.

15   Q.  We can pull that down.  That e-mail was sent on April 18,

16   2016?

17   A.  Yes.

18   Q.  As of that date, was the ESXi server still running

19   Confluence and Bamboo?

20   A.  Yes, it was.

21   Q.  Did that change?

22   A.  Yes, it did.

23           MR. LAROCHE:  Can we publish Government Exhibit 1067,

24   please.  Just zoom in on the to from at the top, please.

25   Q.  What's the date of this e-mail?

1    A.  This would be April 20, 2016.

2    Q.  What time was this e-mail sent?

3    A.  12:06 p.m.

4    Q.  Who sent it?

5    A.  I did.

6    Q.  Who did you send it to?

7    A.  All of EDG, staff and contractors.

8    Q.  Would EDG staff include the defendant?

9    A.  Yes, it would.

10   Q.  What's subject of this?

11   A.  "Scheduled downtime for Bamboo and Confluence 4/25/2016."

12   Q.  If we can just zoom in on the text of the e-mail.  Just

13   read that into the record, please.

14   A.  "All, on Monday, April 25 at 6 a.m., ISB will be migrating

15   the Bamboo and Confluence servers to new hardware and will need

16   to power them down for a limited amount of time.  To ensure no

17   work is lost, please log out of Confluence and Bamboo when you

18   depart on Friday.  If this maintenance window will cause any

19   issues for you, feel free to contact me."

20   Q.  Can you summarize what you meant in this paragraph.

21   A.  So, I was asking everybody to log out of the system, so

22   that there wasn't any unsaved work before ISB powered off the

23   machines.

24   Q.  Why were they going to power off machines?

25   A.  They were going to be transitioned to new hardware off of

 1   OSB's ESXi server.

 2   Q.  So Confluence and Bamboo would no longer being running on

 3   the OSB server?

 4   A.  That's correct.

 5         MR. LAROCHE:  We can pull that e-mail down, please,

 6   and pull up Government Exhibit 1069.  Then just please zoom in

 7   on top, the to from.

 8   Q.  When was this e-mail sent?

 9   A.  This would have been April 20, 2016, at 3:58 p.m.

10   Q.  Who sent it?

11   A.  Robert.

12   Q.  Who did he send it to?

13   A.  To the EDG group, as well as ISB.

14   Q.  Would the defendant have received this e-mail?

15   A.  Yes, he would have.

16   Q.  What's the subject?

17   A.  "Atlassian suite maintenance, Monday, 25 April, 0600 to

18   1000 hours."

19   Q.  If we can now just zoom in on the text of the e-mail,

20   please.  Just read the first two paragraphs to start.

21   A.  Okay.  "Good afternoon.  On Monday, 25 April, from 0600 to

22   1000 hours, the Atlassian suite, in particular, the Bamboo and

23   Confluence servers, will be unavailable due to maintenance.

24   SED/ISB will be transferring data to new servers/hardware to

25   bring DevLAN Atlassian suite under SED/ISB configuration

1   management in accordance with EDG best practices."

2   Q.  Can you summarize what those two sentences are saying.

3   A.  That from 6 a.m. until 10 a.m., on 25 April, the Confluence

4   and Bamboo VMs were going to be transferred off of OSB's

5   infrastructure on to ISB's infrastructure.

6   Q.  Is that the same information you had communicated earlier

7   in the day?

8   A.  Yes, it was.  I think a little bit more detailed on the

9   times.

10  Q.  This is on April 20, 2016?

11  A.  Yes.

12          MR. LAROCHE:  If we can zoom in on the date, please.

13  A.  Yes, April 20.

14          MR. LAROCHE:  We can pull that down.

15          Your Honor, with the Court's permission can I read a

16  stipulation?

17          THE COURT:  Yes.

18          MR. LAROCHE:  It is hereby stipulated and agreed by

19  and among the United States of America, by Geoffrey S. Berman,

20  United States Attorney for the Southern District of New York,

21  David W. Denton Jr., Sidhardha Kamaraju, and Matthew Laroche,

22  Assistant United States Attorneys, of counsel, and Joshua Adam

23  Schulte, the defendant, by and with the consent of his counsel

24  Sabrina Shroff, Esq., Edward Zas, Esq., and James Branden,

25  Esq., that:

1           If called as a witness, a member of the Federal Bureau

2     of Investigation or FBI computer analysis response team, this

3     person known as CART Member-1, with knowledge of the matter

4     would testify that on or about March 10, 2017, CART Member-1

5     was present at the office building for the Central Intelligence

6     Agency or CIA Center for Cyber Intelligence, or CCI, located in

7     the Washington Metropolitan area, the building known as the CCI

8     building.  While CART Member-1 was present in room 9E79 of the

9     CCI building, CART Member-1 recovered (i) a Dell Precision

10    computer tower that was used by the defendant to access the CIA

11    computer network called DevLAN while the defendant was employed

12    at the CIA and that was logged into evidence as

13    E0001_RM9E79_FM014_tower.  Known as device E0001.  And (ii) a

14    Sandisk Extreme USB device that was logged into evidence as

15    E0003_RM9E79_FM014, known as device E0003_FM014.  Device E0001

16    contained four hard drives, Hard Drive-1 through Hard Drive-4.

17    Government Exhibit 1201 is a compact disc containing true and

18    accurate copies of photographs of device E0001; Government

19    Exhibit 1202 is a compact disc containing true and accurate

20    copies of forensic files data recovered from Hard Drive-1;

21    Government Exhibit 1203 is a CD containing true and accurate

22    copy of forensic files and data recovered from Hard Drive-3;

23    government Exhibit 1203-28 is a CD containing a true and

24    accurate copy of a log file recovered from Hard Drive-3.

25    Government Exhibit 1204 is a compact disc containing true and

accurate copies of photographs of device E0003_FM014; and

Government Exhibit 1205 is a compact disc containing true and

accurate copies of forensic files and data recovered from

device 0003_FM014.

         If called as a witness, another member of FBI CART

known as CART Member-2 with knowledge of the matter would

testify that on or about March 11, 2017, while CART Member-2

was present in room 9E79 of the CCI building, CART Member-2

recovered a NetApp server containing 24 hard drives that was

logged into evidence as E0018_RM9E79_24HDD, known as device

E0018.  Government Exhibit 1206 is a compact disc containing

true and accurate copies of photographs of device E0018, and

Government Exhibit 1207 is a compact disc containing true and

accurate copies of forensic files and data recovered from

device E0018.

         If called as a witness, another member of FBI CART

known as CART Member-3 with knowledge of this matter would

testify that on or about March 23, 2017, while CART Member-3

was present in room 9W89A of the CCI building, CART Member-3

recovered an ESXi server that was logged into evidence as

E022_RM9W89A_Dell known as device E0022.  Government Exhibit

1208 is a compact disc containing true and accurate copies of

photographs of device E0022, and Government Exhibit 1209 is a

compact disc containing true and accurate copies of forensic

files and data recovered from device E0022.

K253SCH3                        Weber - Direct

1          If called as a witness, another member of FBI CART,

2     Member-4, with knowledge of the matter would testify that on or

3     about June 9, 2017, while CART Member-4 was present in room

4     9E78 of the CCI building, CART Member-4 recovered a Dell

5     Precision tower 7910 containing two hard drives that was logged

6     into evidence as E0056_RM9E78_010, also known as device E0056.

7     Government Exhibit 1210 is a compact disc containing true and

8     accurate copies of photographs of device E0056, and Government

9     Exhibit 1211 is a compact disc containing true and accurate

10    copies of forensic files data recovered from device E0056.

11         Finally, if called as a witness, another member of FBI

12    CART, CART Member-5, with knowledge of the matter would testify

13    that on or about March 12, 2017, while CART Member-5 was

14    present at an offsite CIA facility located in the Washington

15    Metropolitan area, CART Member-5 recovered a NetApp server that

16    was logged into evidence as E0012_RMLE70E, also known as device

17    E00012.  Government Exhibit 1212 is a compact disc containing

18    true and accurate copies of forensic files data recovered from

19    device E0012.

20         It is further stipulated and agreed that this

21    stipulation, as Government Exhibit 3005, Government Exhibits

22    1201 through 1212, and all government exhibits identified on

23    this document may be received in evidence as government

24    exhibits at trial.  Signed by the parties.

25         THE COURT:  They're received in evidence.

1              MR. LAROCHE:  Thank you, your Honor.

2              (Government's Exhibit 3005, 1201-1212, and all

3    exhibits contained therein received in evidence)

4              MR. LAROCHE:  Your Honor, if the Court is close to a

5    break, this might be a good time to stop.

6              THE COURT:  All right.  We'll take a break now and

7    we'll resume at 1:30.

8              (Jury excused)

9              THE COURT:  See you at 1:30.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              1:35 p.m.

3           THE COURT:  Good afternoon.  Please be seated.

4           (Jury present)

5           THE COURT:  Please be seated.

6           Mr. Laroche.

7           MR. LAROCHE:  Thank you, your Honor.

8           Ms. Hurst, can you please publish Government Exhibit

9    1251.

10   Q.  Mr. Weber, before the break, we were talking about some of

11   the privilege changes that occurred on April 16, 2016.  Do you

12   recall that?

13   A.  Yes.

14   Q.  I think one of the privilege changes you recalled was the

15   Atlassian server administrators were changed after April 16,

16   2016, is that right?

17   A.  That's correct.

18   Q.  But just you and OSB remained in control of the ESXi

19   server, is that correct?

20   A.  That is correct.

21           MR. LAROCHE:  Ms. Hurst, can you just zoom in on the

22   ESXi server.

23   Q.  After those changes were made on April 16, 2016, were

24   Confluence and Bamboo still being run on the OSB ESXi server?

25   A.  Yes.

K25Wsch4                    Weber - Direct

1  Q.  Were they being run as virtual machines?

2  A.  Yes, they were.

3  Q.  As a server administrator of the ESXi server, what types of

4  things could you do with a virtual machine running on a server?

5  A.  You could power the machine on, power it off.  You could

6  delete it.  You could take a snapshot.  You can revert to a

7  snapshot, things like that.

8  Q.  And the snapshot is the same thing you were talking about

9  earlier, which is something you created on April 16, 2016, is

10 that right?

11 A.  That's correct.

12 Q.  And what did you create snapshots of that day?

13 A.  We created snapshots of Confluence and Bamboo.

14 Q.  What were the purposes of those April 16 snapshots of

15 Confluence and Bamboo?

16 A.  If we messed up the changes that we were making to the

17 system, we wanted a point in time that we could revert back to

18 to undo those changes.

19 Q.  And just focusing on what those snapshots would have

20 contained, what administrative privileges would have been

21 contained within those snapshots?

22 A.  So, the snapshot would have had the setup as it was before

23 we made the change.  So I would have had admin access, Josh

24 would have had admin access.  And we'd revert it back to that.

25 Q.  And you talked about earlier access to the backups, is that

1   correct?

2   A.   Yes.

3   Q.   And one of the things you talked about were the mount

4   points?

5   A.   Correct.

6   Q.   And the mount points the defendant set up?

7   A.   Yes.

8   Q.   Where would those mount points have been?

9   A.   They would have been in each of those VMs, the Confluence

10  VM, the Bamboo VM.

11  Q.   What access did you need to get to those mount points?

12  A.   You would have needed to log in to the host operating

13  system, which would have required access to the admin account

14  on the host operating system.

15  Q.   And were those accesses in place for the defendant prior to

16  the changes on April 16, 2016?

17  A.   Yes.

18          MR. LAROCHE:   Let's go back to Government Exhibit

19  1069.

20  Q.   We talked about this email also before the break, is that

21  correct?

22  A.   Yes, we did.

23  Q.   When was this email sent?

24  A.   This email was sent on April 20, 2016, at 3:58 p.m.

25  Q.   What changes were going to be made on April 25, 2016?

1  A.  The machines, Confluence and Bamboo, were going to be

2  transferred to the new infrastructure.

3  Q.  So the virtual machines that were running on the OSB server

4  were getting transferred to another server?

5  A.  That is correct.

6  Q.  I want to show you some log files that have been entered

7  into evidence from the defendant's computer.

8  A.  OK.

9         MR. LAROCHE:  Please publish Government Exhibit

10 1202-18, a log file from the defendant's DevLAN computer.

11 Q.  We're going to drill down on this, but do you recognize

12 what this is?

13 A.  Yes, I do.

14 Q.  What is it?

15 A.  This is a log file that would have been generated by

16 VMware.

17 Q.  And what is that?

18 A.  VMware was the company that -- they owned ESXi.  They did

19 vSphere.  They did vCenter.  So it's any one of those products.

20 Q.  Generally speaking, what's a log file?

21 A.  A log file is diagnostic information, historical

22 information.  There's different types of log files.

23 Q.  What do log files show?

24 A.  Depending on the log file, a security log file would show

25 when somebody accessed certain information.  You might have a

1  service log file that would aid you in diagnosing, like,

2  something was failing.  It could be any manner of information.

3  Q.  What does a VMware log file show?

4  A.  In this case, an action that occurred on a VM.

5          MR. LAROCHE:  Let's zoom in to the first three lines

6  of the highlighted text there.  That's fine.

7  Q.  Let's start on the first line.  There is a "ShowWarn:M."

8  Do you know what that means?

9  A.  That would have been the fact that it was showing a

10  warning, and I don't know what the colon M means.

11  Q.  What about what's next to that?

12  A.  That's a time stamp.

13  Q.  What is the time stamp of this log file?

14  A.  It's April 20, 2016, at 5:35 p.m.

15  Q.  And then let's go to the right of the time stamp.  There's

16  a confirm and then a colon.  Could you please read that?

17  A.  "Current state of the virtual machine will be lost unless

18  it has been saved in a snapshot.  Revert to snapshot

19  BK4-16-2016."

20  Q.  What is this log file showing?

21  A.  This is a warning that would have been presented saying

22  that if the virtual machine is reverted to this snapshot,

23  any -- any work that had been done since that time stamp -- or

24  that date would have been lost.

25  Q.  And then after the warning, it says revert to snapshot.  Do

K25Wsch4                    Weber - Direct

1    you see that?

2    A.   Yes.

3    Q.   What's that mean?

4    A.   The -- I'm sorry.  Could you repeat the question?

5    Q.   Sure.  On the first line, at the end, it says revert to

6    snapshot?

7    A.   Yes.

8    Q.   What does that mean?

9    A.   That is telling the virtual machine to restore its state to

10   the snapshot that was taken.

11   Q.   And then after that there's BK4-16-2016?

12   A.   Yes.

13   Q.   Do you know what that refers to?

14   A.   BK is just a, what was decided to just be used as the name.

15   And the 4-16-2016 was also included in that name.

16   Q.   Do you understand what's that referring to, though?

17   A.   We're saying backup 4-16-2016.  We're saying, just letting

18   anybody know who looked at the snapshot that this was taken at

19   this time.

20   Q.   Is that a specific snapshot?

21   A.   It is the one that we took the morning of 4/16 before going

22   and making the changes.

23   Q.   So while the old administrative changes were still in

24   place?

25   A.   That's correct.

1  Q.  Do you know what server this is from?

2  A.  Yes, I do.

3  Q.  How do you know that?

4  A.  The next line afterwards references OSB.DevLAN.net.

5  Q.  And where is that?

6  A.  It's on the second or third, depending on how you're

7  counting it, line, the one that starts with "VI client soap

8  tran:M."

9  Q.  And at the end there's OSB.DevLAN.net?

10  A.  That's correct.

11  Q.  Could you just circle that, please.

12     What server that is?

13  A.  That is OSB's ESXi server.

14  Q.  What activity is this log file reflecting?

15  A.  This is showing that the virtual machine that was sitting

16  on OSB's ESXi server was reverted to a snapshot at the time I

17  referenced earlier.

18  Q.  Which virtual machine?

19  A.  I don't know the specific virtual machine.  I believe it

20  is -- I think in this position that I see, I don't think I see

21  anything that references the specific virtual machine.  This

22  would have been Confluence or Bamboo, though.

23  Q.  And why do you say Confluence or Bamboo?

24  A.  Those were the two virtual machines that we worked with on

25  4/16.

1    Q.  And what time did this activity occur?

2    A.  This occurred on April 20 at 5:35 p.m.

3    Q.  On April 20 at 5:35 p.m., did you revert a snapshot of

4    Confluence or Bamboo?

5    A.  No, I did not.

6    Q.  Is reverting a snapshot of Confluence or Bamboo an

7    administrative activity or a user activity?

8    A.  It's an administrative activity.

9    Q.  What privileges would be required to do that?

10   A.  You would need to have a specific administrative privilege

11   to revert to, revert to snapshot.

12   Q.  And is that server-level privileges?

13   A.  It would have been an ESXi set of privileges, so it's for

14   the ESXi server.

15           MR. LAROCHE:  You can take that down.

16   Q.  I want to show you a file that comes from the NetApp

17   server.

18           MR. LAROCHE:  Please publish Government Exhibit

19   1207-27.

20   Q.  Do you recognize this?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  This is a directory list of the Confluence directory and

24   the Altabackup.

25           MR. LAROCHE:  If we could just zoom in on maybe the

1    top five or six lines, including the title of the columns.

2    Q.  Let's just walk through the first few lines.  Just starting

3    with -- first, where are these files located?

4    A.  They're located in Altabackup.

5    Q.  And just starting with the first column, what's the name?

6    A.  The name is the -- it's Confluence_db20160201-0625.

7    Q.  What TYPE of file is that?

8    A.  It's a SQL file.

9    Q.  What is that?

10   A.  This -- SQL is a technology Confluence -- all of the data

11   that Confluence stored was in a SQL directory.

12   Q.  Do you see the next column that says date modified?

13   A.  Yes.

14   Q.  What does that reflect?

15   A.  Date modified is any time a file-write activity occurred,

16   so either the creation of this file the first time or a

17   modification to the file itself.

18   Q.  So just looking at these two files, when were they created?

19   A.  They were created on the 1st and the 2nd around 6:30 in the

20   morning.

21   Q.  And then the next column says type.  What is that?

22   A.  Type is just a friendly explanation of the extension.

23   Q.  And then the next column has size.  What's that?

24   A.  That is the size of the file on disk.

25   Q.  The next column has date accessed.  What does that reflect?

1    A.  So, date accessed is anytime there was a read operation.

2    This would be opening the file to view it or copying the file.

3    Q.  And the next column has date created.  What's that?

4    A.  So, date created is the date -- the first date that that

5    file was created on disk.

6              MR. LAROCHE:  Can we zoom out again, please.

7              Ms. Hurst, if you can, please zoom in on the rows that

8    encompass government exhibit and also keep the top rows, if we

9    can.  OK.

10   Q.  Just focusing on the bottom for a moment, what is the

11   bottom showing?

12   A.  Additional files in the directory, same information that we

13   just went over.

14   Q.  Then there's a date modified that seems to be daily making

15   new backups, is that right?

16   A.  Yes.

17   Q.  I want you to focus on the backup that was modified on

18   March 3, 2016.  Do you see that?

19   A.  Yes, I do.

20   Q.  Could you just circle that.

21       When was the backup that was created on March 3, 2016,

22   modified?

23   A.  It was modified at 6:29 a.m. on March 3, 2016.

24   Q.  Let's go to the date accessed.  When was the backup created

25   on March 3, 2016, last accessed?

1    A.   It would have been April 20, 2016, at 5:42 p.m.

2    Q.   What types of actions would change the date accessed?

3    A.   Opening the file to read it or copying the file.

4    Q.   On this page, do you see any other backups that have a

5    different date accessed than date modified?

6    A.   No, I do not.

7    Q.   Mr. Weber, did you access the March 3, 2016, backup on

8    April 20, 2016, at 5:43 p.m.?

9    A.   No, I did not.

10   Q.   Did you copy the March 3, 2016, backup on April 20, 2016,

11   at 5:43 p.m.?

12   A.   No, I did not.

13   Q.   Have you ever accessed any backup in the Altabackups?

14   A.   The most I would have accessed the files in the Altabackup

15   share would be to navigate to a folder like this, see that the

16   files are getting created and using that as "backup's good" and

17   then moving on.

18   Q.   Have you ever copied any of those files in the Altabackups?

19   A.   No, I have not.

20            MR. LAROCHE:   Could we go to Government Exhibit

21   1207-28, please.

22            I'm sorry.   1207-30.

23   Q.   Do you recognize what's on this screen?

24   A.   This also looks like a, the backup folder, the Confluence

25   directory.

1    Q.  And what types of files are on this screen?

2    A.  So, TGZ is a term for compressed, a compressed file a

3    lot -- most people recognize -- a dot-zip file is very similar

4    to what you see here.

5    Q.  And what are the purposes of these TGZ folders in the

6    backups?

7    A.  So, these TGZ files would be the compressed contents, so

8    everything that we just saw in the SQL stuff, or similar data,

9    would be compressed to save file space.

10        MR. LAROCHE:  Let's zoom in on maybe the first five or

11   six rows, please.

12   Q.  And again, can you circle the TGZ file that was modified on

13   March 3, 2016.

14        What was the date accessed of that file?

15   A.  The date accessed was April 20, 2016, at 5:43 p.m.

16   Q.  Did you access this file at that time?

17   A.  No, I did not.

18        MR. LAROCHE:  We can pull that down.

19        Ms. Hurst, can you please publish Government Exhibit

20   1203-29, another log file from the defendant's DevLAN computer.

21   Q.  Do you recognize this?

22   A.  Yes, I do.

23   Q.  What is it?

24   A.  This is the output of a command that was entered into a

25   terminal session.

K25Wsch4                        Weber - Direct

1    Q.  What's a command?

2    A.  So, a command would be calling a program to execute on the

3    computer.

4    Q.  And you said a terminal session?

5    A.  Yes.

6    Q.  What is a terminal session?

7    A.  The -- it's a -- it's a specific mode where you are typing

8    in commands, very similar to the old DOS days, where you type

9    something in, you get text back.  It is not a GUI interface

10   where you're clicking through.

11           MR. LAROCHE:  Ms. Hurst, can you zoom in on the first

12   three lines that are highlighted at the top, please.

13   Q.  Let's start with the first line.  It says root@OSB.  What

14   does that mean?

15   A.  That signifies that via SSH you logged in as the root user

16   on the OSB server.

17   Q.  And next to root@OSB, what is VMFS?

18   A.  In this case, it is a directory on the OSB server.  It's a

19   folder that's used for VMware.

20   Q.  What about volumes?

21   A.  Again, it's another folder that's just descriptive for the

22   information that's held in it.

23   Q.  And the long number and letters after that?

24   A.  This would have been a unique identifier for a specific VM,

25   I think.

1  Q.  And next to that there's an LS.  Do you see that at the end

2  of the line?

3  A.  Yes.

4  Q.  What is LS?

5  A.  LS is a command in Linux to list everything that is in a

6  directory.

7  Q.  And do you see the dash ALTR?

8  A.  Yes, I do.

9  Q.  Do you know what that means?

10 A.  I don't know all of the flags that are on this, but those

11 flags tell LS what information you are looking for.

12 Q.  And what does this command do, LS?

13 A.  It gives you a list of files in a folder.

14         MR. LAROCHE:  Let's zoom out again.

15 Q.  What does the rest of this page reflect?

16 A.  This is the output of LS.  It's -- these are the files that

17 were in that folder that was requested.

18         MR. LAROCHE:  Could we go to the next page.  And if we

19 can zoom in on the last quarter or so of the page, please.

20 Q.  Before the last line, what are you seeing on this page?

21 A.  A collection of log files.

22 Q.  And why were these log files displayed?

23 A.  They were requested by the LS command.

24 Q.  And do you see the last line of log file that is dash RW 1,

25 root, root and then a 653670 number?

1    A.  Yes.

2    Q.  What is that?

3    A.  So, the -- this is the permissions that are assigned to the

4    file, who has access to this file, as well as the size of the

5    file.

6    Q.  Is this file dated?

7    A.  Yes, it is.

8    Q.  What's the date?

9    A.  The date in this was April 20 at 9:55 p.m.

10   Q.  And do you see that some of the files before that have

11   different dates?

12   A.  Yes.

13   Q.  Why is that?

14   A.  So, it's the date -- I don't know if this is the created or

15   modified date that we're looking at, but their time stamps are

16   slightly different.

17            MR. LAROCHE:  Let's go to the last line of this log

18   file.

19   A.  OK.

20   Q.  There's another root@OSB.  Do you see that?

21   A.  Yes.

22   Q.  And at the end, there is an RM VPXA.log?  What does RM

23   mean?

24   A.  It deletes a file.

25   Q.  And what is VPXA.log?

K25Wsch4                          Weber - Direct

1   A.  It is a log file on this system.

2            MR. LAROCHE:  Let's go to the next page, please, and

3   then zoom in on the highlighted text.

4   Q.  What are you seeing here?

5   A.  More deletions of log files.

6   Q.  Is viewing log files an administrative activity or a user

7   activity?

8   A.  Administrator activity.

9   Q.  What privileges are required to do so?

10  A.  You would need access to the location the log files are

11  kept.

12  Q.  Would that be administrative access?

13  A.  Yes.

14  Q.  Did you delete any log files on April 20, 2016?

15  A.  No, I did not.

16  Q.  How long did you act as an administrator of the Atlassian

17  services?

18  A.  I believe about a year and a half.  I don't -- I don't know

19  for sure.

20  Q.  How long did you act as an administrator for the ESXi

21  server?

22  A.  Over the entire time we had that ESXi server.

23  Q.  Over any of those times, did you ever delete log files?

24  A.  No, I did not.

25  Q.  Why not?

1    A.  There was no good reason to.

2    Q.  What do you mean by that?

3    A.  Log files are there for a reason.  They're to help us

4    identify problems and be able to correct them.  They're

5    relatively small in size, so there's no reason to delete them.

6            MR. LAROCHE:  You can pull that down.

7    Q.  I want to switch gears a little bit and I'm going to show

8    you --

9            MR. LAROCHE:  And Ms. Hurst, just for the witness, the

10   parties and the Court.

11   Q.  -- what's been marked as Government Exhibit 801.

12           MR. LAROCHE:  If you could go to the next page,

13   please, for the witness, and the final page.

14   Q.  Do you recognize the handwriting in this document?

15   A.  Yes, I do.

16   Q.  Whose handwriting is it?

17   A.  Josh Schulte's.

18   Q.  How do you recognize that handwriting?

19   A.  I spent a lot of my career trying to understand Josh's

20   handwriting.

21           MR. LAROCHE:  Your Honor, the government offers

22   Exhibit 801 into evidence.

23           MS. SHROFF:  Your Honor, may I have a minute?

24           THE COURT:  Yes.

25           MS. SHROFF:  Your Honor, we object to this document

1   coming in through this witness.  The government has to connect

2   it, but this is not the appropriate witness for it to come in.

3           THE COURT:  Mr. Laroche.

4           MR. LAROCHE:  He recognized the document as his

5   handwriting.  I think that's sufficient for authentication

6   purposes.

7           THE COURT:  Overruled.

8           MS. SHROFF:  That's not sufficient, your Honor.

9           THE COURT:  The objection's overruled.

10          MR. LAROCHE:  I'm sorry, your Honor.  We were going to

11  offer this in evidence.

12          THE COURT:  Received in evidence.

13          MR. LAROCHE:  Thank you.

14          (Government Exhibit 801 received in evidence)

15          MR. LAROCHE:  Can you please publish that to the jury.

16  Q.  Now, do you have any idea when this document was created?

17  A.  No, I do not.

18          MR. LAROCHE:  Well, I just want to have you look at

19  some portions of the document.

20          First, at the top, please zoom in on the title.

21  Q.  Can you read that, please?

22  A.  Malware of the Mind.

23  Q.  Do you have any idea what that's referring to?

24  A.  No, I don't.

25          MR. LAROCHE:  We can pull that down.

1         Please go to the third page and zoom in on the second

2    paragraph, please.

3    Q.  Please take a moment and read that into the record.

4    A.  "Which brings me to my next point.  Do you know what my

5    specialty was at the CIA?  Do you know what I did for fun?

6    Data hiding and crypto.  I designed and wrote software to

7    conceal data in custom-designed file systems contained within

8    the drive's slack space or hidden partitions.  I despise data.

9    I split data across files and file systems daily to conceal the

10   crypto.  Analysis tools could never detect random or

11   pseudorandom data indicative of potential crypto.  I designed

12   and wrote my own crypto.  How better to fool buffoons like

13   forensic examiners and the FBI than to have custom software

14   that doesn't fit into their two-week class where they became

15   forensic experts.  Make no mistake.  I am an expert in data

16   hiding and cryptography with thousands of hours of experience

17   and among the top specialists in the world (or was).  I mean,

18   how many?"

19   Q.  You talked earlier about trade craft?

20   A.  Yes.

21   Q.  Do you see any trade craft in this paragraph?

22         MS. SHROFF:  Objection.

23   A.  Yes.

24         THE COURT:  Overruled.

25   Q.  What trade craft is contained in this paragraph?

1    A.  His discussion about crypto, hiding data in, like, slack

2    space and hidden partitions.  I believe that covers what was in

3    here.

4    Q.  Why is that considered trade craft?

5    A.  These are techniques that we use to hide data, exactly as

6    was stated in here.

7    Q.  Is that trade craft classified?

8    A.  Yes, it would be.

9    Q.  Why?

10   A.  In the giving -- acknowledging that this was a technique

11   that we used would help an adversary detect us on the system.

12   Q.  Other than testifying today, have you ever spoken publicly

13   about this trade craft?

14   A.  No, I have not.

15   Q.  Why not?

16   A.  It was classified information, and doing so would damage

17   our potential operations.

18           MR. LAROCHE:  You can pull that down.  Thank you.

19           Ms. Hurst, can you please publish just to the Court,

20   witness and parties Government Exhibit 806.  And just go

21   through the next few pages.

22   Q.  Mr. Weber, do you recognize the handwriting in this

23   document?

24   A.  Yes, I do.

25   Q.  Whose handwriting is it?

1    A.   Josh Schulte's.

2                MR. LAROCHE:  Your Honor, the government offers 806

3    into evidence.

4                MS. SHROFF:  Your Honor, we have the same objection.

5                THE COURT:  OK.  Same ruling.  Overruled.

6                Received in evidence.

7                MR. LAROCHE:  Thank you, your Honor.

8                (Government Exhibit 806 received in evidence)

9                MR. LAROCHE:  If we could go to the last page and then

10   publish it for the jury.  And please just zoom in on the top

11   left date.

12   Q.   Mr. Weber, can you please read that?

13   A.   7/14/18, Saturday.

14               MR. LAROCHE:  And if we can zoom out and zoom in on

15   the text on the right.

16   Q.   Can you please read that text, starting at the top?

17   A.   "New attack plan.

18        "(1) FBI not the only agency against Trump.  CIA too.

19        "(a) leak documents to make Trump look bad

20        "(b) sell documents to make money.

21        "(2) political dissent."  I don't, I don't know if I can

22   read that word.

23        "(3) incompetence at the CIA, government agencies.

24        "(4) if I were Russia, I would blank

25        "(a) attack judiciary

1     "(b) U.S. destroy itself."

2                MR. LAROCHE:  Thank you.  We can pull that down.

3                Ms. Hurst, can you please show the witness, the

4     parties and the Court Government Exhibit 809 and just flip

5     through a few of the pages on this document for the witness,

6     please.

7     Q.  Do you recognize this document?

8     A.  Yes, I do.

9     Q.  Do you recognize the handwriting in this document?

10    A.  Yes, I do.

11    Q.  Whose handwriting is it?

12    A.  Josh Schulte's.

13               MR. LAROCHE:  The government offers Government Exhibit

14    809 into evidence.

15               MS. SHROFF:  Same objection, your Honor.

16               THE COURT:  OK.  809's received in evidence.

17               (Government Exhibit 809 received in evidence)

18               MR. LAROCHE:  Ms. Hurst, can you please go to page 9

19    and then publish it for the jury.

20               Ms. Hurst, can you please zoom in on the line that

21    starts "Twitter," in the middle of the page.

22    Q.  Can you read that, Mr. Weber?

23    A.  "Twitter:  Free Jason Bourne."

24    Q.  Who is Jason Bourne?

25    A.  Jason Bourne was a fictional character in the Jason Bourne

K25Wsch4                        Weber - Direct

1   movies.

2   Q.  And what type of character was he?

3   A.  He was a superagent for the CIA.

4           MR. LAROCHE:  If we can zoom out, please.

5           Ms. Hurst, can you focus in on the next four lines

6   before free Jason Bourne -- or four lines below.  Sorry.

7   Q.  Can you read that, please?

8   A.  "The @Department of Justice arrested the wrong man for

9   Vault 7.  I personally know exactly what happened, as do many

10  others.  Why are they covering it up?"  And then "must be" or

11  "meet."

12      The bottom portion's cut off a little bit there.

13          MR. LAROCHE:  Let's look at the remaining portion of

14  that page.

15  Q.  Starting with the line that says "meet," in the middle

16  there, by your name --

17  A.  "Meet the CIA's stir sack or struck Jeremy Weber and Karen.

18  You can find his info in the Ashley Madison dump at the CIA.

19  Set up Joshua Schulte.  Jeremy Weber hacked Atlassian's Crowd

20  and when Schulte -- the admin found out, Karen issued him a

21  memo/letter of" -- the handwriting's difficult -- "a letter of

22  warning for self-granting admin privileges.  The system

23  administrator self-granting admin privileges.  Hmm.  Right over

24  the FBI's head too.  Or was it?"

25  Q.  Just stop there for a second.

1        One of the things that's written by the defendant here is
2    Jeremy Weber and Karen set up Joshua Schulte.  Did you set up
3    Joshua Schulte?
4    A.  No, I did not.
5    Q.  The defendant then writes, "Jeremy Weber hacked Atlassian's
6    Crowd."  Do you have any idea what he's referring to there?
7    A.  No.
8    Q.  Did you ever hack Atlassian's Crowd?
9    A.  No, I did not.
10   Q.  Please read the bottom portion of this page.
11   A.  "Schulte is the scapegoat because he routinely reported
12   security issues at the CIA, including infrastructure branches,
13   abysmal" -- management, maybe.  I don't know the last word
14   there.
15   Q.  Did the defendant routinely report security issues at the
16   CIA?
17   A.  No, he did not.
18        MR. LAROCHE:  Can we go to the next, page, please, and
19   just focus in on the top left quarter of this page.
20   A.  "At USG, just to authenticate me first, the @CIA was
21   involved in blank.  The code for initially planned cyber
22   operation is in Vault 7.  Tool described in vendor report is,
23   in fact, Bartender, CIA tool set for operators to configure for
24   deployment."
25   Q.  Are you familiar with Bartender?

K25Wsch4                         Weber - Direct

1    A.   Yes, I am.

2    Q.   What is Bartender?

3    A.   It is a tool that I worked on for an extent -- the majority

4    of my career in OSB.

5    Q.   Generally speaking, what does that tool do?

6    A.   The tool was meant to collect files from a computer via

7    thumb drive that an operator had access to.

8    Q.   The defendant wrote that Bartender was described in a

9    vendor report?

10   A.   Yes.

11   Q.   Is that right?

12   A.   Yes.

13   Q.   Did the vendor report attribute that tool to the CIA?

14   A.   No, it did not.

15   Q.   Has the CIA ever acknowledged that that's a CIA tool?

16   A.   No, it did not.

17   Q.   Why not?

18   A.   The attribution, especially in this scenario, would be very

19   concerning because operators were the ones that would start

20   this tool, and if it was caught, attribution could lead to the

21   capture of a CIA officer.

22   Q.   Other than testifying today, have you ever discussed

23   Bartender publicly?

24   A.   No, I have not.

25   Q.   Why not?

1   A.  It was classified information.  Discussing it would put CIA

2   officers' lives at risk.

3          MR. LAROCHE:  You can pull that down.

4   Q.  Early in your testimony today, you talked about the March 7

5   leak?

6   A.  Yes.

7   Q.  I want to turn your attention back to that.

8   A.  OK.

9   Q.  One of the things you said was that the first leak, on

10  March 7, 2017, contained Confluence data, is that right?

11  A.  That's correct.

12  Q.  And that's Confluence data from DevLAN?

13  A.  Yes.

14  Q.  How much of Confluence was disclosed on March 7, 2017?

15  A.  Everything up until a certain date.

16  Q.  In what locations on DevLAN was all of the Confluence data

17  available?

18  A.  It would have either been in the Confluence VM or in the

19  backups.

20  Q.  I want to talk about a few documents that were disclosed by

21  WikiLeaks from that first initial leak.

22  A.  OK.

23          MR. LAROCHE:  Ms. Hurst, can you please publish

24  Government Exhibit 6 and zoom in on the text.

25  Q.  Showing you a portion of the directory from the March 7

1    leak, do you recognize that?

2    A.  Yes, I do.

3    Q.  And what is this?  What are these lines?

4    A.  So, the first line, data transfer modules, was -- this was

5    a page on Confluence.  Everything below that is subpages to

6    that that talked about specific ways that we would store data

7    for transfer.

8    Q.  And can you read the third line?

9    A.  Yes.  "Transferring data using NTFS alternate data streams,

10   DG NTFS ADS BK Brutal Kangaroo."

11            MR. LAROCHE:  Let's go to Government Exhibit 6-1,

12   please.  If we could just zoom in on the middle, starting

13   "transferring data," including the banner.

14   Q.  What is this page showing?

15   A.  This page is a description of this specific technique.

16   Q.  And does that connect to the last exhibit we saw in any

17   way?

18   A.  Yes, it's -- if you had clicked that link, it would take

19   you to this page.

20   Q.  And you said a specific technique.  What were you referring

21   to there?

22   A.  I mentioned earlier that EDG does eight things a thousand

23   different ways.  One of those eight things is data --

24   transferring data.  This technique is a way of -- one of the

25   many ways that we would store data and transfer it between a

1     target machine to a CIA infrastructure.

2     Q.  Just focusing on the parentheses there, it starts DTN and

3     there's some more letters.  Do those letters have any

4     significance?

5     A.  Yes, they do.

6     Q.  What significance?

7     A.  The DT is an abbreviation for data transfer.  NTFS ADS is

8     for NTFS alternate data streams, which is the technique, the

9     specific technique that's being used here.  And BK is letting

10    other people know that this was originally designed for Brutal

11    Kangaroo.

12    Q.  What is Brutal Kangaroo?

13    A.  Brutal Kangaroo was a tool suite created by Josh Schulte.

14    Q.  And then underneath this title, there's a secret/noforn

15    banner?

16    A.  Yes.

17    Q.  Just remind us what that is.

18    A.  The classification of this document was secret and should

19    not be shared with any foreigners.

20    Q.  Was this one of the documents that was obtained from

21    Confluence?

22    A.  Yes, it was.

23    Q.  Was it common to post classification banners on Confluence?

24    A.  Yes, usually it was.  It wasn't a universal -- it wasn't a

25    universal thing, but it was something we often did.

1    Q.   And why?

2    A.   It helped so that we knew what type of page we are seeing.

3              MR. LAROCHE:   We can zoom out again.

4              And then if we could go to Government Exhibit 6-2.

5    Q.   Showing you another version of the previous exhibit, do you

6    see the same title there?

7    A.   Yes.

8              MR. LAROCHE:   If we could go down to page 2 and then

9    zoom in on the notes.

10   Q.   Can you summarize what these notes are showing?

11   A.   This explains how to use -- how to use the technique as

12   well as what information is in the technique so that you

13   could -- this is meant to help somebody implement this.

14   Q.   You've talked about attribution before, attributing tools

15   to the CIA?

16   A.   Yes.

17   Q.   What, if any, impact would the disclosure of this

18   information have on attributing a tool to the CIA?

19   A.   This is a pretty significant clue.

20   Q.   Why?

21   A.   It tells exactly how data at rest is stored.  So if

22   somebody was doing a forensic review and saw a structure like

23   this as well as these types of commands, they now have

24   something that says this was a CIA tool.

25             MR. LAROCHE:   We can pull that down.

1              Ms. Hurst, please publish Government Exhibit 11-2.

2      Q.  What is this?

3      A.  This is a, just a help page that was on Confluence.

4              MR. LAROCHE:  And if we can just zoom in on the "wait"

5      and the banner for a second.

6      Q.  Do you recognize this page at all?

7      A.  Yes, I do.

8      Q.  And why do you recognize it?

9      A.  It was something that was on our Confluence and was

10     something that I would have read at some point.

11             MR. LAROCHE:  And if we can go back out a second, just

12     to the wider one, and then zoom in on the first two paragraphs.

13     Q.  Summarize what these paragraphs are describing.

14     A.  So, the first paragraph is just talking about some history

15     of a previous, you know, previous deployment of a tool.

16         And the second part is talking about, talking about

17     attempting to overwrite a file that was written to obfuscate

18     our involvement and finding out that that file wasn't correctly

19     overwritten.

20     Q.  Have you ever talked about this type of information

21     publicly before?

22     A.  No, I have not.

23     Q.  Why not?

24     A.  This is all techniques and, in this scenario, would have

25     been a specific operation that we were supporting.

K25Wsch4                         Weber - Direct

 1                MR. LAROCHE:  If we can go to Government Exhibit 15.

 2   Q.  Earlier today we showed you a user guide for Brutal

 3   Kangaroo.  Do you recall that?

 4   A.  Yes, I do.

 5   Q.  What part of the WikiLeaks disclosure did that document

 6   come from?

 7   A.  I don't remember if that document was in Confluence or

 8   Stash or both.

 9   Q.  Do you remember subsequent disclosures from Stash?

10   A.  Yes.

11   Q.  Is this one of the documents, Government Exhibit 15, that

12   came from Stash?

13   A.  Yes.

14   Q.  And what is this document?

15   A.  This is a slide deck that was created for the delivery of

16   Emotional Simian version 2.0.

17   Q.  Are you familiar with it?

18   A.  Yes.

19   Q.  How are you familiar with it?

20   A.  I was the primary author.

21   Q.  Generally speaking, what is Emotional Simian?

22   A.  Emotional Simian was a thumb drive-collection tool that was

23   designed for a scenario where the owner of a thumb drive was

24   unwitting to the fact that he was spreading malware by moving

25   the thumb drive between machines.

K25Wsch4                      Weber - Direct

1   Q.   What do you mean by unwitting?

2   A.   The target did not know that they were a CIA target, nor

3   did they know that there was a CIA operation occurring.

4          MR. LAROCHE:   Let's go to page 3.

5   Q.   We're now on a page that's titled requirements.

6   A.   Yes.

7   Q.   What is a requirements page?

8   A.   Requirements -- this is a very high-level discussion of

9   what the tool is supposed to do.

10  Q.   And what was this tool supposed to do?

11  A.   In this case, provide access to downstream machines that

12  would otherwise be inaccessible via thumb drives inserted by

13  unwitting users.

14  Q.   You said downstream machines?

15  A.   Yes.

16  Q.   What does that mean?

17  A.   This is a term that we used in the agency.  You're -- you

18  would have a point of presence on the network somewhere, access

19  to a computer.  Downstream machines are further into the

20  network that we don't necessarily have access to yet.

21          MR. LAROCHE:   Let's go to the next page, please.

22  Q.   And this page is titled concept of operations?

23  A.   Correct.

24  Q.   What is a concept of operations?

25  A.   This is a high-level description of how we imagine the

1    deployment of the tool would go.

2    Q.  And do you recognize the page?

3    A.  Yes.

4    Q.  How do you recognize it?

5    A.  I created it.

6    Q.  If we could just look at the diagram there in the middle --

7    A.  OK.

8    Q.  -- can you summarize what that diagram is telling us?

9    A.  This takes you through the steps that the deployment of

10   this tool would go through.  It would start on a configuration

11   machine, something that the agency owned, to the primary host,

12   which is that initial foothold that I had mentioned earlier,

13   and then, via a USB drive, infect secondary targets downstream.

14           MR. LAROCHE:  If we can go to the next page, page 5.

15   Q.  This is titled capabilities and limitations?

16   A.  Yes.

17   Q.  What is this page showing?

18   A.  So, this is explaining -- like, there's no tool that does

19   everything.  So this was explaining what the tool did and

20   didn't do.

21   Q.  Other than testifying today, have you ever spoken publicly

22   about Emotional Simian?

23   A.  No.

24   Q.  Why not?

25   A.  There, again, it would expose our methods and allow for the

1  detection of this tool.

2          MR. LAROCHE:  We can pull that down, please.

3  Q.  Focusing you again on March 7, 2017, just to orient us a

4  bit, prior to that, what was your typical workday like?

5  A.  Nine to five.  You know, some days longer than others, but

6  it was traditionally an eight-hour day.

7  Q.  Did that change after the leak?

8  A.  Yes, it did.

9  Q.  How did it change?

10  A.  The most noticeable impact was in that first week I was

11  assigned to lead a team to assess what was in the leak and what

12  the damage was.  That was -- for that week I often would work

13  until about 2 a.m., go home for a few hours and then be back at

14  work around 6 a.m. to make sure that I could brief -- brief

15  senior leadership about the status of our work.

16  Q.  Why were you working those long hours?

17  A.  We were -- we were in damage mode, like the house was

18  burning down, and we were trying to figure out what was going

19  on.

20  Q.  You said you were working on a team?

21  A.  Yes.

22  Q.  How many people were working on that team with you?

23  A.  I think it was about ten.

24      We took one or two of the most senior developers in each of

25  the branches in AED, and they were assigned to me to make

1    assessments of what was in the leak.

2    Q.   What were some of the things you were doing on that team?

3    A.   There were three major focuses.

4         One was understanding what all had leaked out.

5         The second was looking for the biggest, like, "oh, crap"

6    disclosures, that if we saw this we need to inform people

7    immediately, because there's significant problems.

8         And third, we were looking for any information -- in

9    addition to the leak, WikiLeaks published an editorial.  We

10   were reading through that editorial and seeing if they

11   referenced any information that wasn't in the leak to see if

12   there was any proof that they had additional information.

13   Q.   Now, at the time of the leak, you had been at the agency

14   for how long?

15   A.   I think close to seven years at that point.

16   Q.   And during that time, you'd worked exclusively as a

17   developer developing cyber tools?

18   A.   No.

19   Q.   What else did you do?

20   A.   A few months prior to the leak, I had become a branch chief

21   for one of the other branches in the division.

22   Q.   Did that branch also develop cyber tools?

23   A.   Yes, it did.

24   Q.   During that time that you were at the CIA, what impact, if

25   any, did the public disclosure by WikiLeaks have on your past

1    work?

2    A.   So, the public disclosure of my past work pretty much meant

3    all of that work was now no longer operationally useable.   It

4    was dead.

5    Q.   Why?

6    A.   The risk of attribution to the CIA as well as the amount of

7    information that adversaries would have for detecting our

8    operations was too high, and we needed to rewrite that work.

9             MR. LAROCHE:   No further questions, your Honor.

10            THE COURT:   Ms. Shroff.

11   CROSS-EXAMINATION

12   BY MS. SHROFF:

13   Q.   Good afternoon, Mr. Weber.

14   A.   Good afternoon.

15   Q.   Mr. Weber, you testified that you've worked at the CIA for

16   about seven years, is that correct?

17   A.   No, that's not correct.

18   Q.   I'm sorry.   Could you correct me then?

19   A.   It was close to ten years.

20   Q.   You've been at the CIA for close to ten years?

21   A.   That's correct.

22   Q.   And I have it right, do I not, that you started at the CIA

23   before Mr. Schulte did?   Correct?

24   A.   I started full time before Joshua became a full-time

25   officer.   He did internship tours shortly before I started full

K25Wsch4                          Weber - Cross

1    time.

2    Q.  So when you and Mr. Schulte worked together, were you both

3    essentially at the same level?

4    A.  I was a little bit ahead of him in grade, but we were

5    close.

6    Q.  And what would your title be at that time?

7    A.  Developer would be the official title.

8    Q.  And Mr. Schulte was also a developer, correct?

9    A.  Yes.

10   Q.  And you worked, both of you worked in the same group.  Do I

11   have the nomenclature correct?

12   A.  Yes, same group.

13   Q.  And what was that group?  Remind me, please.

14   A.  Engineering Development Group.

15   Q.  And at that time, how many people worked in EDG?

16   A.  In EDG, maybe 200.  I don't know.  I don't know the number.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.   The supervisor for you and Mr. Schulte, your immediate

2    supervisor, was whom?

3    A.   During what time?

4    Q.   Well, let's stick with 2015 and 2016, the same time frame

5    that Mr. Laroche covered.

6    A.   Then that would have been Sean.

7    Q.   So, you were never Mr. Schulte's boss, correct?

8    A.   No.  Not in an official capacity.

9    Q.   There's only one capacity in which you can be someone's

10   boss, right?

11   A.   No, that's not correct.

12   Q.   So, the CIA had such a loosey-goosey structure that you

13   could be somebody's unofficial boss?

14   A.   There are two types of leadership positions in the agency.

15   Q.   So did you -- are you saying there are two types of formal

16   leadership positions in the agency?

17   A.   One is --

18   Q.   No, no.  Could you answer that question first?

19   A.   Could you repeat it?

20   Q.   Sure.  I just wanted to make sure if I understood you

21   correctly that there are two types of leadership positions.

22           What does that mean, by the way, "leadership

23   position"?

24   A.   Leadership position has a very broad, broad definition.

25   Q.   So, I don't understand what it means.  I have a boss.  I

1    don't know what a leadership thing is.  Can you explain that?

2    A.  So the agency, there's two types of leadership in the

3    agency.  Your official, like, leadership, the branch chiefs,

4    things of that nature, have what we refer to as -- you have a

5    responsibility to officially review an officer's work, and

6    document that for the record.

7        There are a significant additional amount of leadership

8    positions like team leads or project leads that you might, you

9    might provide feedback to the branch chief, but you would not

10   have an official say in the documentation of like how good or

11   bad an officer was doing.

12   Q.  Okay.  But when you were assigned to be a team lead or a

13   project lead -- not just you, in particular, but a person --

14   somebody assigns an individual to be a team lead, correct?

15   A.  Occasionally.  Sometimes it is just a natural formation.

16   It depends.

17   Q.  Okay.  Let's talk about a project lead, or is that the same

18   thing?

19   A.  A project lead is one of the categories, yes.

20   Q.  So when there is a project or a tool, a group of people

21   work on it in the CIA; is that how it works?

22   A.  Sometimes.  Sometimes people will work on things by

23   themselves, but yes.

24   Q.  All right. so let's talk about when there is a group

25   working on it, okay?

K253SCH5                         Weber - Cross

1    A.  Yes.

2    Q.  And when there is a group working on it, you said that

3    there is either a natural team leader, or some boss assigned

4    somebody and says "you are the team leader."  Correct?

5    A.  Yes.

6    Q.  And if somebody assigns a team leader, everybody knows that

7    that team leader is assigned, correct?

8    A.  Yes.

9    Q.  Okay.  And if it's just somebody who assumes a leadership,

10   the other people don't have to follow that leadership.  They

11   can say, well, you're not the the team leader.  Correct?

12   A.  No, that is not correct.

13   Q.  So anybody can just become a team leader on a project?

14   A.  We all had ownership of projects.  And whoever owned a

15   project would be the natural leader of it.

16   Q.  Right.  But I'm trying to figure out this natural leader

17   concept.  All I'm trying to figure out is if you didn't like

18   your natural leader, could you say, hey, you're not my natural

19   leader on a project or not?

20   A.  You could say you're not my leader and no longer work on

21   the project.

22   Q.  Or you could go to Sean and say, hey, this guy's not my

23   natural leader, correct?

24   A.  That's correct.

25   Q.  And then Sean would figure it out, correct?

K253SCH5                          Weber - Cross

1   A.  Yes.

2   Q.  Right.  And in your particular unit, Sean was the person

3   who would generally figure things out, right?

4   A.  At the time we're talking about, yes.

5   Q.  We're only going to talk about that time, so you don't have

6   to worry about that.  Okay?  If I pick a different time period,

7   I'll tell you, okay?

8   A.  All right.

9   Q.  So you testified about this time period and you said

10  basically EDG was a -- correct me if I'm wrong because I don't

11  have a transcript in front of me.  Was a friendly, collegial

12  place, correct?

13  A.  Yes.

14  Q.  And is it fair to say that most of the people who worked in

15  EDG were men, or is that not correct?  I don't know.

16  A.  I can speak more to AED.

17  Q.  I'm only talking about the group you worked with

18  Mr. Schulte, 2015 to 2016.

19  A.  AED was below that group.

20  Q.  Right.

21  A.  So, AED, that's a fair statement.  EDG as a whole, I don't

22  know.  I don't know what the layout would have been.

23  Q.  Okay.  Let's just focus on your subgroup then.  Mostly men

24  you would say?

25  A.  It was predominantly male.

1   Q.  And about how many -- you remember the diagram that

2   Ms. Hurst showed you of the ninth floor.  If you could just

3   pull it back up, please.

4           While she's pulling it up, you basically showed it was

5   cubicles in which all of you sat, correct?

6   A.  Yes, that is correct.

7   Q.  And you sat somewhere next to Amol, correct?

8   A.  That is correct.

9   Q.  And somewhere next to Mr. Schulte?

10  A.  That is correct.

11  Q.  And then who was the person in the fourth cubicle?

12  A.  Like at an angle from me?

13  Q.  Yeah.

14  A.  That would have been Frank.

15  Q.  Frank?

16  A.  Yes.

17  Q.  You testified basically that it was a collegial

18  environment?

19  A.  We were friendly with each other, yes.

20  Q.  Friendly with each other.  All right.  Part of this

21  friendliness included people playing with each other with Nerf

22  guns?

23  A.  Some developers did that.

24  Q.  And they weren't like these teeny little Nerf guns, right?

25  They were like real serious investment of big plastic Nerf

1    guns; is that correct?

2    A.   There were all manners, but yes, some of them were as you

3    described.

4    Q.   How many Nerf guns do you think all together were in this

5    little cubicle area?  Four, six, 10, 12?

6    A.   In our cubicle area, if I recall correctly, only Josh and

7    one other person had Nerf guns.

8    Q.   And then in the broader cubicle area, other people had Nerf

9    guns?

10   A.   Across the floor, yes.

11   Q.   Okay.  And they shot Nerf -- whatever comes out, I don't

12   know, I don't play with Nerf guns.  But whatever it is that

13   come out of the Nerf guns, they shot at each other?

14   A.   Occasionally.

15   Q.   It was more than occasionally, right?

16   A.   I didn't take part in it, so I don't know.

17   Q.   Amol took part in it in terms of being annoyed by it,

18   correct?

19   A.   I don't remember actually.

20   Q.   Really?

21   A.   Yes.

22   Q.   You don't remember Amol being annoyed by Mr. Schulte

23   shooting Nerf guns at him?

24   A.   I remember Amol being annoyed by Mr. Schulte on occasion.

25   Q.   That we know.

1   A.  I don't specifically -- if he ever expressed it about the

2   Nerf guns.

3   Q.  Okay.  Do you recall Amol being annoyed at the Nerf gun

4   darts coming at him, and he would take the darts and throw them

5   behind his own desk?

6   A.  Actually, yes.  I do remember that now.

7   Q.  Okay.  Do you recall Amol or Mr. Schulte taking stuff from

8   each other's desks and hiding it behind each other's back?

9   A.  No, I do not.

10  Q.  Do you recall a general sense of people teasing each other

11  about habits and appearances?

12  A.  Habits, yes.  Appearances, typically no.

13  Q.  You don't remember Amol calling him a bald asshole?

14  A.  I do recall that, yes.

15  Q.  He actually used to call him bald asshole, right?

16  A.  Yes.

17  Q.  And there was a gentleman in that unit that had some kind

18  of unfortunate autoimmune disease.  Do you recall that human

19  being?  The person -- I just, I don't want to personally out

20  someone's health issues.

21  A.  No, I don't remember an autoimmune disease, no.

22  Q.  Do you remember Amol telling somebody that he was going to

23  drop dead anyway, and stop complaining about the pain he was

24  feeling?

25  A.  No, I do not recall that.

K253SCH5                        Weber - Cross

1   Q.  You don't recall that.  Do you remember being asked about

2   Amol saying that your wife's investment in her work-related

3   401(k) was a financially stupid thing to do?

4   A.  No.

5   Q.  Do you remember being interviewed on video about this

6   particular allegation and saying to that individual --

7   A.  The allegation that you're referencing is incorrect.

8   Like --

9   Q.  Why don't you tell us what the allegation was.

10  A.  The allegation was that my wife was dumb.  And that a

11  decision she made was dumb.  I remember referencing an

12  allegation where Josh said that my wife was dumb.

13  Q.  Okay.  But Amol did call your wife's decision to invest in

14  a particular investment dumb, correct?

15  A.  Yes.

16  Q.  And he told you that he thought your wife's decision was

17  dumb.  Correct?

18  A.  Yes.

19  Q.  And you replied, "Better to have a dumb decision and a

20  happy wife.  I can live with that every single time," correct?

21  A.  Very much so.

22  Q.  Make sure you tell my husband that.

23          So, had Mr. Schulte just written that complaint more

24  carefully, you would have answered the complaint differently as

25  you did during your interview, correct?

1    A.  There is a wide difference in the allegation that he made

2    and what actually happened, so, if he had correctly stated what

3    had happened, I would have answered differently, correct.

4    Q.  And it's fair to say that by the time these allegations

5    were discussed with you, you had long stopped liking

6    Mr. Schulte, right?

7    A.  I can't remember -- yes, I think that is a fair statement.

8    Q.  Now, Mr. Schulte was friends with people in his group and

9    friends with people who worked at the CIA, correct?

10   A.  Yes.

11   Q.  One of those friends was a man named Michael; is that

12   correct?

13   A.  That's correct.

14   Q.  And you knew Michael as well, correct?

15   A.  Yes.

16   Q.  And was he part of your group or was he part of a separate

17   group?

18   A.  The Michael that was his friend was in our branch.

19   Q.  It was in your branch, right?

20   A.  Yes.

21   Q.  And Michael and Mr. Schulte also fought, correct?

22   A.  There was only one scenario that I recall of a fight

23   between the two of them.

24   Q.  Right.  When that fight occurred, the person who gossipped

25   the most about that fight was in fact Amol, correct?

K253SCH5                          Weber – Cross

1   A.  I don't know.

2   Q.  You don't remember Amol sending texts to everyone saying,

3   hey, you would not believe what happened between Michael and

4   Josh?

5   A.  No.

6   Q.  He didn't send you that text?

7   A.  I don't believe so.

8   Q.  Okay.  Suffice it to say that the saga between Amol and

9   Josh went on for quite some time, right?

10  A.  I'm sorry.  Can you repeat the question?

11  Q.  Is it fair to say that the saga between Amol and Josh went

12  on for quite some time?

13  A.  Yes.  As I stated earlier, they didn't get along and from

14  the getgo.  And it depends when you want to define a saga

15  beginning.

16  Q.  Okay.  Well there came a point when you defined when the

17  saga began, right?

18  A.  Yes.

19  Q.  Okay.  And you said that, for you at least, the breaking

20  point was that you thought Mr. Schulte had lied about Amol's

21  behavior towards him?

22  A.  Yes.

23  Q.  And you were aware that Mr. Schulte was so upset by Amol's

24  behavior that he went to court, correct?

25  A.  I was aware that he went to court.  I don't know why he

1    went to court.

2    Q.  He didn't tell you he was upset?

3    A.  I was not talking to him at this point.

4    Q.  Okay.  So, by then you had stopped talking to him?

5    A.  Yes.

6    Q.  Okay.  But you were talking to Amol?

7    A.  Yes.

8    Q.  And Amol had gone to court with you?

9    A.  Amol, I don't know -- at one point I went to court with

10   Amol.  I don't know Amol's court appearances prior to that.

11   Q.  Okay.  So Amol told you the version of what Mr. Schulte was

12   doing?

13   A.  Yes.

14   Q.  And you believed Amol?

15   A.  I saw what Amol had as well as the -- I read Mr. Schulte's

16   allegations.

17   Q.  But you weren't talking to him?

18   A.  No.

19   Q.  So you heard what Amol said, and then you continued to side

20   with Amol?

21   A.  Yes.

22   Q.  Okay.  Now, let me just move just very briefly for a second

23   from that to how the CIA maintained, as you called it, physical

24   security.  Right.

25   A.  Okay.

1   Q.  So you testified that to get into the CIA, physical

2   location, right, you had to have a badge, right?

3   A.  That is the way that I would have accessed it.  I had a

4   badge.  Other people might not and would present like a

5   driver's license, and if they were on an access list, they

6   could, you know, access the facility.

7   Q.  Okay.  So when you access the CIA facility, do you drive

8   into like a big compound and then go to a building?

9   A.  After you present your badge the first time, yes.

10  Q.  Right.  And then there's like a whole gigantic parking lot

11  or something like that where people park their cars?

12  A.  Yes.

13  Q.  Is there more than one physical building structure on that

14  lot?

15  A.  Yes.

16  Q.  How many physical structures are there?

17  A.  The, at that time, I believe there was two.  I don't know.

18  I don't know the status.

19  Q.  Now, to go from one physical structure to another physical

20  structure, you didn't have to go through any additional driving

21  or security, correct?

22  A.  Once you were inside the building, the two physical

23  structures I referenced were connected by a tunnel.

24  Q.  So, once you got inside the building, you had CIA employees

25  inside the building, correct?

K253SCH5                          Weber - Cross

1    A.  Yes.

2    Q.  You had people who contracted with the CIA and were

3    contractors, correct?

4    A.  Yes.

5    Q.  You had support staff and other staff who were part of the

6    CIA's workforce, correct?

7    A.  That would fall into the one of the first two categories

8    you described.

9    Q.  All told, how many people worked in that big area?

10   A.  I have no idea the number.  It was large.

11   Q.  It was large, right?

12   A.  Yes.  It was a nine-floor building.

13   Q.  So you would say over 1,000?

14   A.  I don't know.

15   Q.  You don't know.  When you went from one building to another

16   building, you could carry with you documents, correct?

17   A.  You were not leaving the secure portion of the facility, so

18   yes, that is correct.

19   Q.  You could carry with you computers, correct?

20   A.  Yes, that is correct.

21   Q.  You could carry with you laptops, correct?

22   A.  Yes.

23   Q.  In fact, there were times when somebody moved from one

24   building to another, just physically carried their stuff with

25   them, correct?

K253SCH5                    Weber - Cross

1   A.  Yes.  We were authorized to transport classified

2   information.

3   Q.  Okay.  When you worked at the CIA with Mr. Schulte, you

4   never saw Mr. Schulte walk off that garage or compound with a

5   hard drive, did you?

6   A.  No.

7   Q.  Did you ever see him walk off with a disc, did you?

8   A.  No.

9   Q.  How about a thumb drive?  Did you see him walk off with a

10  thumb drive?

11  A.  No.

12  Q.  How about a computer?  Did you see him walk off with a

13  computer?

14  A.  No.

15  Q.  When he worked at the CIA with you, did you ever see him

16  use a cell phone inside the facility?

17  A.  No.

18  Q.  And it's fair to say you would never do such a thing,

19  right?

20  A.  Yes.

21  Q.  Let's talk about systems security.  Right.  Because you

22  testified on direct with Mr. Laroche that you thought that the

23  DevLAN system was secure, right?

24  A.  Yes.

25  Q.  Is that still your testimony now?

K253SCH5                          Weber - Cross

1    A.  Yes.

2    Q.  Correct me if I'm wrong on any one of these, okay?

3            CCI work product properly resided on the DevLAN

4    network; is that correct?

5    A.  I'm sorry.  CCI work product?

6    Q.  Right.

7    A.  Properly resided on the network.  Yes?

8            I don't know if I fully understand the question.

9    Like, what's a work product?

10   Q.  It's not a trick.  I'm just asking if the work that group

11   did was on the DevLAN network?

12   A.  So, CCI is the largest portion of the umbrella.  There was

13   a subset of CCI's work product, the stuff that was made by AED,

14   that would have been on the network.  Maybe some other stuff

15   from other groups, but it was focused on EDG's product.  Not

16   necessarily CCI's.

17   Q.  Is it fair to say that CCI --

18           Let me take one step back.

19           What is CIMC; do you know?

20   A.  It is the group that is specifically focused on

21   investigating counterintelligence and counterespionage.

22   Q.  You've told us about every other acronym.  Tell us what

23   CIMC stands for.

24   A.  CIMC is the Counter Intelligence Mission Center.

25   Q.  And is it fair to say that the CCI did not work with CIMC

1    to properly develop or deploy user activity monitoring?

2    A.   That was outside my scope.

3    Q.   Okay.  Would you agree with me that the system lacked

4    robust server audit capability?

5    A.   I don't know what type of auditing was on the servers.

6    Q.   But you testified on direct that the servers were secure,

7    right?

8    A.   I can talk to the Atlassian products.  I can't talk to

9    every server that was on DevLAN.

10   Q.   How about the ESXi server?

11   A.   The OSB ESXi server, it had some level of auditing that we

12   felt there was a need for.

13   Q.   You have to say that again.

14   A.   The OSB ESXi server we had the default auditing enabled.

15   So, we felt that was good enough for the needs for that server.

16   Q.   Good enough?

17   A.   Yes.

18   Q.   What does that mean, "good enough"?

19   A.   There's different, different levels of information.  As I

20   had stated, most of what was on the OSB server was, it was

21   non-production data.  It was test VMs and things like that.

22   Q.   So you didn't think it was that secure or that secret, so

23   it didn't have to have a robust server audit capability?

24   A.   I -- we set it up to defend what we -- we set it up to a

25   point where I feel it was good enough.

1   Q.  I'm sorry.  Is that the place from which all of this stuff

2   was stolen?

3   A.  I don't know where all of this stuff was stolen from.

4   Q.  Oh.  Okay.  All right.  Let's try the next one.

5           Is it fair to say that the cyber weapons were not

6   compartmented?

7   A.  Generally correct.

8   Q.  What does that even mean?  Can you help me out here?

9   A.  There were cases where some of our cyber capabilities would

10  have been compartmented.

11  Q.  What does that mean though?  I'm sorry.

12  A.  I apologize.  Compartment is very strict handling for

13  specific scenarios.  Very limited need-to-know access.

14  Q.  Right.  And the cyber weapon is what?

15  A.  Sorry, say that again?

16  Q.  What's a cyber weapon?

17  A.  A cyber weapon would be a potential term for the type of

18  capabilities we make.

19  Q.  What does that mean, "type of capabilities we make"?

20  A.  We made cyber tools.

21  Q.  Right.

22  A.  If you want to refer to them as weapons, I would probably

23  disagree with that terminology.  But, other people might agree

24  with it.

25  Q.  Could you just give me one second?

1   A.  Sure.

2           (Counsel conferring)

3   Q.  Let me just stick to my question, okay.  I got distracted

4   for a minute.  I apologize.

5           By cyber weapon you mean the tools that your unit

6   created, right?

7   A.  Like I said, it could be a definition.  It's not how I

8   would describe them.

9   Q.  Well, let's just go with what you would describe it.  You

10  would call it some kind of malware, right, you said?

11  A.  That would be an industry term I think is accurate.

12  Q.  By malware, you basically mean it's something that the

13  United States creates so they can go spy on a foreign

14  government, correct?

15  A.  That's one of the scenarios that we created it for.

16  Q.  Right.  And basically, when we speak like this, like it's

17  the scenario we created for, just to simplify it because we

18  don't all work at the CIA.

19  A.  Yes.

20  Q.  Right.  So, you create a tool because you want to know what

21  some other countries, say Iran or France or Germany or some

22  other country, is up to, correct?

23  A.  Without identifying specific countries, that is a correct

24  statement.

25  Q.  So, the people who develop these tools, they make up a tool

1    so that it can be used to get information from a foreign

2    country that we want.  But we don't want anybody to know we're

3    doing it, so we try and hide it.

4            That's what all of these people are doing at EDG?

5    A.  Yes.

6    Q.  That is what you call a cyber tool, a cyber weapon, a

7    malware tool, all of these fancy words are just for what I

8    described, correct?

9    A.  Yes.

10   Q.  Okay.  Of course, nobody wants it to be tracked back to us,

11   because then nobody would talk to us, correct?

12   A.  That is correct.

13   Q.  Is it fair to say that the users on these servers that we

14   have, and that you talked about, shared system administrative

15   level passwords?

16   A.  For some servers.

17   Q.  Isn't that like a bad thing to do?

18   A.  Depends on the scenario.

19   Q.  Can you think of any good reason, from a security

20   perspective, I'm not talking about collaboration and getting

21   things done fast, which is why I think this was done.  I'm just

22   talking from a security perspective, can you think of any

23   reason you would ever have users share a system at an

24   administrative level where the passwords are shared?

25   A.  Yes.

1   Q.  From a security point of view?

2   A.  Yes.

3   Q.  Tell us why.

4   A.  Your typical scenario would tend to be a backup account in

5   case, in case your connection with Active Directory or

6   something like that broke.

7   Q.  If one person's connection broke, that means they could use

8   somebody's else's password?

9   A.  It was supposed to be a backup password for in case there

10  was no longer the traditional ways of logging in.

11  Q.  Okay.  So if you, for example, were logged out, or locked

12  out, you could go to this shared system admin level, because at

13  one point you were admin, and you could take one of those

14  passwords and log on in, correct?

15  A.  Yes.

16  Q.  Okay.  And could you just take any password?

17  A.  No.

18  Q.  So which password would you pick from all of these

19  passwords?

20  A.  What passwords are you referring to?

21  Q.  These shared system admin level password.

22  A.  The ones that we discussed earlier?

23  Q.  Yeah.

24  A.  I don't know.  What am I trying to do?

25  Q.  All I'm asking you is, it isn't the best way to keep a

1   network safe.  Correct?

2   A.  It is -- you want to ensure that people are logging in with

3   a unique user name and password as much as possible.

4   Q.  Right.  This defeats that, correct?

5   A.  This would circumvent that.

6   Q.  I'm sorry, he coughed.  I couldn't hear you.

7   A.  This would circumvent that.

8   Q.  Right.  There was another problem with the system in the

9   sense that there was no effective removable media control,

10  correct?

11  A.  I can't comment to that.

12  Q.  Well, let's see if we can try.  You testified with

13  Mr. Laroche here that you were part of this recovery effort

14  after the leak, correct?

15  A.  Yes.

16  Q.  When was the first leak in your mind?

17  A.  March 7.

18  Q.  March 7.  And when the March 7 leak came, did anybody at

19  the CIA say, hey, is this about it or is there more to come?

20  A.  I -- I was not part of any conversations like that.  It was

21  not my focus at the time.

22  Q.  It was not your focus to see what else could be coming down

23  the turnpike, considering this was like the CIA's most precious

24  hacking tools?

25  A.  My focus was on assessing what was in Confluence and what

1   information we could take from Confluence.

2   Q.  Okay.  So when you first discovered that this had been put

3   on WikiLeaks, how long did it take, not you personally -- or

4   let's start with you personally.

5           How long did it take you to figure out that the stuff

6   was like a year old?

7   A.  It would have been during that first week.

8   Q.  It took a whole week to figure out it was a year old?

9   A.  It wasn't something we were specifically trying to figure

10  out at the time.

11  Q.  How many people were on your team?

12  A.  Are you referencing the team during that first week?

13  Q.  Yeah.

14  A.  About 10 people.

15  Q.  10 people were on your team.  Right?

16  A.  Give or take.

17  Q.  How many teams were there, all told?

18  A.  During that first week, I think there might have been two

19  teams.  I don't recall.

20  Q.  On these two teams, it took a whole week to figure out that

21  the information you guys were talking about was a year old.

22  A.  We were not looking for that information.

23  Q.  You were trying to assess damage, right?

24  A.  Yes.

25  Q.  You were trying to assess damage of a leak, correct?

K253SCH5                        Weber - Cross

1   A.  Yes.

2   Q.  You wanted to know what was leaked, correct?

3   A.  Yes.

4   Q.  And you wanted to know if that leak was going to hurt,

5   correct?

6   A.  Yes.

7   Q.  So the first thing you want to know is what is leaked,

8   correct?

9   A.  What was leaked, yes.

10  Q.  Right.  What was leaked.  And how recent is the

11  information.  Right?

12  A.  No.

13  Q.  You didn't want to know how recent the information was?

14  A.  I didn't necessarily care.

15  Q.  You didn't care if the most recent tool had been leaked to

16  find out how recent the leak was?

17  A.  I cared about what information was leaked.  Not the date of

18  that information.

19  Q.  Right.  So when you were trying to figure out what

20  information was leaked, you learned a week later that the

21  information that was leaked was about a year old.

22  A.  I learned during that first week.

23          MS. SHROFF:  Would this be a good place to stop?

24          THE COURT:  I was just going to ask you if this was a

25  convenient place to break.

K253SCH5                          Weber - Cross

1              MS. SHROFF:  This is a good place to break.

2              THE COURT:  We are going to break now.  And we'll

3    resume at 9 o'clock tomorrow morning.

4              Please remember my instructions.  Don't do any

5    independent research, don't talk about the case.  If you see

6    anything in the newspaper, hear anything on the radio, ignore

7    it.  You've got to make up your minds when the case goes to

8    you, it's in your hands.  You have to consider only the

9    evidence that is brought out in this courtroom, and nothing

10   else.

11             So, safe home tonight.  See you tomorrow morning at

12   9 o'clock.  We'll have coffee and tea for you at 8:30.

13             Thanks very much.

14             (Jury excused)

15             THE COURT:  You're on cross-examination so don't talk

16   to the government's attorneys.

17             THE WITNESS:  Understood.

18             THE COURT:  See you tomorrow morning at 9 o'clock.

19             MR. LAROCHE:  Thank you, your Honor.

20             (Adjourned to February 6, 2020, at 9:00 a.m.)

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    JEREMY WEBER

 4   Direct By Mr. Laroche  . . . . . . . . . . . 166

 5   Cross By Ms. Shroff  . . . . . . . . . . . . 353

 6                     GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    89    . . . . . . . . . . . . . . . . . 189

 9    3004, 100, 111, 200, 300, 500   . . . . . . 200

10    601-616, 701, 702, 704-708    . . . . . . . 200

11    712-714, 716, 718, 719, 720   . . . . . . . 200

12    1001-1012, 1015-1056, 1058-1098   . . . . . 200

13    1100-1103, 1105, 1107, 1108   . . . . . . . 200

14    1110-1116, 1118, 1119, 1121   . . . . . . . 200

15    1124, 1128-1130, 1132-1137, 5001   . . . . . 201

16    1251    . . . . . . . . . . . . . . . . 215

17    90    . . . . . . . . . . . . . . . . . 237

18    3005, 1201-1212, and all exhibits contained therein  313

19    801    . . . . . . . . . . . . . . . . 335

20    806    . . . . . . . . . . . . . . . . 338

21    809    . . . . . . . . . . . . . . . . 339

22

23

24

25
```