K263SCH1 REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                         S2 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

            Defendant.          Trial

------------------------------x

                            New York, N.Y.
                            February 6, 2020
                            9:00 a.m.

Before:

                 HON. PAUL A. CROTTY,

                            District Judge
                              and a jury
                  APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW J. LAROCHE
     SIDHARDHA KAMARAJU
     DAVID W. DENTON JR.
     Assistant United States Attorneys

SABRINA P. SHROFF
JAMES M. BRANDEN
     Attorneys for Defendant
     -and-
DAVID E. PATTON
     Federal Defenders of New York, Inc.
BY:  EDWARD S. ZAS
     Assistant Federal Defender

Also Present:  Colleen Geier
                Morgan Hurst, Paralegal Specialists
                Achal Fernando-Peiris
                John Lee, Paralegals
                Daniel Hartenstine
                Daniella Medel, CISOs, Department of Justice

K263SHC1

```
 1              (In open court; jury not present)
 2              THE COURT:  The jurors aren't here yet.
 3              THE DEPUTY CLERK:  We're missing one.
 4              THE COURT:  Bring Mr. Schulte out.  Is he here?
 5              MR. BRANDEN:  He is present, Judge, I've asked for him
 6      to be presented.
 7              (Defendant present)
 8              THE COURT:  While we're waiting for the jury to
 9      arrive, can we discuss Mr. Schulte's letter of January 17, the
10      government's response of the 24th, and the Federal Defenders'
11      response of January 27.  This is the material that Mr. Zas
12      raised yesterday and asked me to take a look at, which I've
13      done.  I understand Mr. Schulte's request.
14              What's the government's response?
15              MR. LAROCHE:  Our position remains, your Honor, that
16      the defense is able to conduct an investigation, that they can
17      do so with the names they've been provided.  But what they
18      cannot do is connect their affiliation to the agency in
19      circumstances where that affiliation is classified.
20              THE COURT:  What does that mean?
21              MR. LAROCHE:  So, for example, they can't Google
22      someone by putting in that person's name and CIA officer.
23      That's classified information.
24              THE COURT:  Can they put in their home address, for
25      example?
```

K263SHC1

1          MR. LAROCHE:  Yes.

2          THE COURT:  They could identify them by home address.

3          MR. LAROCHE:  They could, your Honor.

4          MR. ZAS:  Your Honor, the problem is the government

5     has refused to give us the home addresses of any of these

6     witnesses, they are redacted on all of these 302 reports that

7     we've gotten.  We haven't had them.  That's been part of the

8     problem.  It's as if we were never given the names or the

9     addresses, because we've had to keep it all in the SCIF.

10         We're totally blind here.  We're only relying on what

11    the government told us.  We are on day three of the trial, and

12    we have not had what the Sixth Amendment gives Mr. Schulte,

13    which is the chance to investigate before you come to trial.

14    That's why we were pushing it.

15         MR. LAROCHE:  Your Honor, it is not our practice in

16    any case to provide witness addresses to the defense.  But

17    putting that aside, the --

18         THE COURT:  It is in all the arrest records in which

19    you produce.

20         MR. LAROCHE:  If there are arrest records, but there

21    are no arrest records.

22         THE COURT:  It's in the pretrial services reports.

23         MR. LAROCHE:  There are no pretrial services reports

24    related to any of our witnesses.

25         THE COURT:  I understand that, but, I mean, normally,

K263SHC1

1    in a normal case, the defendant has access to identifying

2    information for all the witnesses.

3        MR. LAROCHE:  They've had identifying information as

4    to all of our witnesses since we produced 302s in December of

5    2018.  They've decided not to raise this issue, your Honor,

6    until a week before trial.  They've had our witness list since

7    August of 2019.  They still have not raised this issue until a

8    week before trial.

9        We're not objecting to them being able to conduct an

10   investigation.  But they've had ample time to raise this issue,

11   and they failed until now.

12       THE COURT:  How can they conduct an investigation if

13   they don't know where the person is located that they want to

14   investigate?

15       MR. LAROCHE:  They've known a plethora of information

16   about these people based on what we've disclosed to them.

17       THE COURT:  Tell me again what you have disclosed.

18       MR. LAROCHE:  We've disclosed all witness interviews

19   with anyone that's been interviewed in connection with this

20   investigation.  That includes all 302s all of our witnesses.

21   To the extent that there is anything in the security files of

22   these witnesses that is subject to disclosure, we've disclosed

23   that as well.

24       MR. ZAS:  Your Honor, Mr. Laroche said a number of

25   remarkable things.  That it is the government's practice not to

K263SHC1

divulge home addresses of witnesses.  <u>Smith v. Illinois</u> holds,

it's the holding of the case that the defense is entitled to

the names and addresses of a witness.

            We're not doing what defendants sometimes do which is

trying to air it in open court.  We're just trying to get it so

we can do the investigation.

            I personally, as soon as Mr. Hartenstine told me for

the first time that I could investigate these witnesses, so

long as I didn't specifically tie it to the CIA, I personally

immediately typed in the name, for example, of this witness,

whose initials are ███.  It is a name that probably thousands

and thousands of Americans have.  I Googled him.  I got

absolutely nothing.  I got 10,000 ███.  I couldn't put it in

an address, I don't know where he lives.  They refused.

            Now they're telling us in the middle of trial that

somehow we've waived this issue.  This is not a discovery

issue; this is a trial issue.  It's outrageous.  These are

shadows to us.  We have relied on only what the government has

given us.  The cases hold we don't have to rely on what they

gave us, we're supposed to have our investigator finding who

these people are.  Talk to a neighbor.  Talk to a friend.  We

are completely blind.  And how can I investigate this witness,

Ms. Shroff is almost done with her cross.

            MR. HARTENSTINE:  I'd like to remind the parties

quickly this is not a closed courtroom or a venue for

K263SHC1

1    classified discussion.

2             MR. ZAS:  I don't think I mentioned anything

3    classified.

4             THE COURT:  You did.

5             MR. ZAS:  The passion --

6             THE COURT:  You mentioned a name.

7             MR. ZAS:  I'm sorry?

8             THE COURT:  You mentioned a name.

9             MR. ZAS:  I just mentioned the initials.

10            THE COURT:  You mentioned the name.

11            MR. ZAS:  It was a total slip.  I apologize, your

12   Honor.

13            THE COURT:  All right.

14            MR. ZAS:  Just one additional point.  Mr. Laroche is

15   suggesting it is our fault.  This is something that came from

16   these rules.  The CIA is the equity holder.  They are the ones

17   who say that this is classified.  The government has said the

18   Court doesn't have the power to make it unclassified.  Even the

19   government says they have to go back to the CIA.  This is what

20   the CIA did.  We had no power to fix it.  We had to go to you

21   eventually, Judge, to say do something.

22            So now Mr. Laroche is saying it's our fault.  But if

23   it is our fault due to the government's conduct, the important

24   point is Mr. Schulte was supposed to get effective

25   representation.  I'm telling you as an officer of the court,

K263SHC1

1    not only was our investigation not reasonable, it was nothing.

2    I could only talk to Ms. Shroff and members of the cleared team

3    in the SCIF.  That's the investigation.  That's not what the

4    Constitution guarantees.

5                THE COURT:  Right.

6                MR. ZAS:  I'm sorry.  Thank you.

7                THE COURT:  Thank you.  Mr. Laroche, if you want to

8    submit anything further, I'll give you a decision tomorrow

9    morning.

10               MR. LAROCHE:  Thank you, your Honor.

11               THE COURT:  Is the jury here?

12               MR. LAROCHE:  Your Honor, may we raise one other

13   issue?

14               THE COURT:  Yes.

15               MR. LAROCHE:  Ms. Shroff has been, I believe intends

16   to introduce the task force report which has been the subject

17   of some litigation among the parties.  And I know the Court has

18   made a ruling as to portions of that report that may come in.

19               We just want to flag for the Court, and we are not

20   objecting to her cross-examining anybody about the report.  But

21   to the extent Ms. Shroff does go down that path, we think that

22   opens the door to have some of our witnesses testify as to what

23   some of the assessments in the report are based on.  To be

24   clear, some of the assessments in the report are based on an

25   assessment that he was the one responsible for stealing the

K263SHC1

1    materials.

2            So for example, some of the assessments are the amount

3    of materials that were potentially taken from the agency.  We

4    expect that there would be testimony that that is based on an

5    assessment of how much information that Mr. Schulte had access

6    to.  So we flagged that, because to the extent the defense

7    wants to suggest that this report has some value to it, we

8    should be able to elicit from our witnesses what the basis for

9    those assessments are.

10           THE COURT:  Has that been disclosed in the report?

11           MS. SHROFF:  No.

12           MR. LAROCHE:  The report very clearly refers to a CIA

13   employee.  My point is simply that to the extent they want to

14   introduce that report, we would elicit who that CIA employee is

15   based on.  And some of the things in the report are based on

16   things that happened with respect --

17           THE COURT:  This is information you haven't previously

18   disclosed?

19           MR. LAROCHE:  We haven't.  Because we have no

20   intention of relying on it.

21           THE COURT:  All right.  Is the jury here, David?

22           MS. SHROFF:  May I just respond?

23           THE COURT:  Yes.

24           MS. SHROFF:  So, I want to understand something.  They

25   have known since our CIPA notice that we intend to rely on this

K263SHC1

1   document.  We have repeatedly briefed for this Court,

2   repeatedly, that this entire document should be produced to us

3   so that we can properly assess how to use it at trial.  The

4   government fought and fought and fought us at every step over

5   every word, over every number, and gave us a miniscule amount

6   of information.  We litigated this matter months ago.

7           Now, in the middle of a cross is when Mr. Laroche

8   stands up and heeds a warning, gives a warning telling me that

9   if I rely on or introduce or publish to the jury this document,

10  they will then rely on parts of the document that remain

11  redacted now.

12          MR. LAROCHE:  That's not what I said.

13          MS. SHROFF:  That is exactly what he said.

14  Mr. Schulte's name does not appear at all in that, in the

15  unredacted portion of the report that I have.  His name is not

16  mentioned once.  Not once.

17          It is very difficult to try this case.  It is very

18  difficult to try the case when I've told this Court repeatedly

19  we are not ready.  And then to have this come up in the middle

20  of a cross, a cross we were not even anticipating having to do

21  now until last week, because last week the government gave us a

22  list of witnesses that do not correspond to the list of

23  witnesses they are now calling this week.  Their next witness

24  is a witness I'm utterly unprepared to cross, because he was

25  changed at the last minute from an FBI agent.

K263SHC1

1              THE COURT:  Is the jury here?

2              THE DEPUTY CLERK:  Yes, Judge.

3              THE COURT:  Call the jury in.

4              MS. SHROFF:  What am I supposed to do about the

5    report?

6              THE COURT:  You should do what you want to do,

7    Ms. Shroff.

8              MS. SHROFF:  I don't have the unredacted report, your

9    Honor.  If Mr. Laroche is going to be able to elicit

10   information about that report, we should get an unredacted copy

11   of it.  Mr. Laroche cannot possibly be allowed to rely on

12   portions of a report that I have not seen.

13             THE COURT:  Mr. Laroche, what about that?

14             MR. LAROCHE:  My point had nothing do with the

15   redacted portions.  My point had to do with the assessments

16   that are being relied on by the defense to make points on

17   cross-examination.  I have no intention of eliciting anything

18   related to the unredacted portions.

19             MS. SHROFF:  That is unredacted.  Could the Court just

20   take a look at the document, please.

21             THE COURT:  This is what, the task force report?

22             MS. SHROFF:  Yes, please.

23             THE COURT:  This Exhibit Number 1?

24             MS. SHROFF:  Well, it was originally Exhibit Number 1.

25   I think it is now renumbered as 500.

K263SHC1

1          MR. LAROCHE:  It's 5001.

2          MS. SHROFF:  Could you just take a look at the report.

3          THE COURT:  Yes.

4          MS. SHROFF:  If the Court just could take a look at

5     the --

6          THE COURT:  Just a minute, please.  All right,

7     Ms. Shroff.

8          MS. SHROFF:  So, I just ask you to take a look and

9     note here that the one references that the "CIA assessed that

10    in the spring of 2016, a CIA employee stole at least --"

11         THE COURT:  Where are you reading from?

12         MS. SHROFF:  I'm reading from the executive summary.

13    Which says "we assess that."

14         THE COURT:  Yes, all right.

15         MS. SHROFF:  So that is the only line which references

16    that a CIA employee stole.

17         THE COURT:  Yes.

18         MS. SHROFF:  Right?  The next page talks about the

19    system failures and the weaknesses in the system.

20         THE COURT:  Yes.

21         MS. SHROFF:  The next page is redacted but for a

22    paragraph.

23         THE COURT:  The wake-up call.

24         MS. SHROFF:  Right.  The wake-up call.  The next

25    paragraph talks about recommendations.

K263SHC1

1              THE COURT:  Yes.

2              MS. SHROFF:  The next -- I mean, let me just be clear

3    so the record is clear.  But, page seven, it jumps to page

4    seven.

5              THE COURT:  Yes.

6              MS. SHROFF:  Then the next page produced to us is page

7    12.

8              THE COURT:  Yes.

9              MS. SHROFF:  Which is redacted almost entirely but for

10   a paragraph that says "Recommendation A5."

11             THE COURT:  Correct.

12             MS. SHROFF:  Right.  This talks about nothing on the

13   basis for which these assessments are made.  It doesn't rely on

14   the fact that the CIA concluded Mr. Schulte or a single person

15   was responsible for this.  The next page focuses clearly and

16   fully on the first paragraph about what the WikiLeaks

17   disclosure shows.

18             THE COURT:  What page is this?

19             MS. SHROFF:  They then jump to 14.  They would not

20   give us 13.

21             THE COURT:  Yes.

22             MS. SHROFF:  So then they have a recommendation

23   section.  The next page talks about data in Confluence and

24   that's page 45.  So the government has pages 14 to 44, I mean

25   15 to 44.  I have no idea what's written on them.

K263SHC1

1          THE COURT:  All right.

2          MS. SHROFF:  This paragraph deals with data in

3    Confluence, and of course there is the beautiful page 46 that

4    has only two lines and completely redacted after that.  And

5    this is what it says:  "We are making educated assumptions

6    about the scope and timing of the loss, in part because we

7    lacked effective monitoring and auditing of this mission

8    system."  Then it jumps from 46 to 49.

9          THE COURT:  Okay.  What's the point here, Ms. Shroff?

10         MS. SHROFF:  My point is this.  Look, they knew

11   yesterday that I was going to rely on this document.  They

12   could have brought, they could have flagged this yesterday

13   evening.

14         THE COURT:  Mr. Laroche, what are you going to do?

15         MS. SHROFF:  Why am I waiting until the Court is

16   seated for me to be told this by the government?

17         THE COURT:  All right.  Mr. Laroche, what are you

18   proposing to do?

19         MR. LAROCHE:  I'm simply flagging the fact that we

20   would potentially ask a witness with knowledge of this report

21   what these assessments were based on.  So for example, on page

22   one of the report.

23         THE COURT:  Is this the witness on the stand?

24         MR. LAROCHE:  No, this is not the witness on the

25   stand.  This.witness I expect would say he's never seen this

K263SHC1

1    document.  I had no intention of showing him this document.

2    I've never shown him this document.

3         My point is simply, to the extent the defense wants to

4    rely on assessments that are in the unredacted portions of the

5    report to support their defense, that the government should be

6    entitled to call a witness with knowledge of the matter who

7    would say what those assessments were based on.

8         So, for example, on the first page, in the second

9    paragraph, "We assess that in the spring of 2016, a CIA

10   employee stole at least 180 gigabytes to as much as 34

11   terabytes of information."  We may potentially call a witness

12   with knowledge of the matter to talk about what that assessment

13   is based on.

14        MS. SHROFF:  Okay.  What is that assessment based on?

15   Can they make a disclosure now so I can make an informed

16   decision?

17        MR. LAROCHE:  My point simply is that we will make

18   those disclosures to the extent we decide to call such a

19   witness.  But that by pursuing this line of cross-examination,

20   and relying on this report, it may open the door to that.

21   That's all, that's the only reason I'm flagging it.

22        MS. SHROFF:  Right.  And the normal trial, I wouldn't

23   have to worry about some prosecutor standing up and flagging

24   something when I'm in the middle of a cross, because I would

25   have the basis on which a report is written.  I would know who

K263SHC1

1    wrote the report.

2          You know how many times we have asked the United

3    States attorney's office who wrote this report?  How was it

4    compiled, who compiled it, when was it compiled, what did it

5    rely on?  We received nothing.

6          THE COURT:  We're keeping the jury waiting now.  I'll

7    rule on this later.  Call the jury.  Mr. Weber.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Good morning.  Let me just ask the jury

3    before we get started this morning, did you follow my

4    instructions not to discuss the case and not to do any

5    research?  Thank you very much.  All right.

6              Is the witness available?

7              MR. LAROCHE:  Yes, your Honor.

8              THE COURT:  Mr. Weber, let me remind you, you're still

9    under oath.

10              THE WITNESS:  Yes, your Honor.

11              THE COURT:  Ms. Shroff.

12    JEREMY WEBER,

13    CROSS-EXAMINATION

14    BY MS. SHROFF:

15    Q.  Good morning, Mr. Weber.

16    A.  Good morning.

17    Q.  Mr. Weber, all told, how many years have you known

18    Mr. Schulte?

19    A.  I think it was about six, five or six years.

20    Q.  And in the five or six years that you knew Mr. Schulte, it

21    was all through your affiliation with him at the CIA; is that

22    correct?

23    A.  We occasionally would hang out outside of work.

24    Q.  No, what I meant is, you'd never met him before he started

25    work at the CIA, correct?

K263SCH1                         Weber - Cross

1    A.  That is correct.

2    Q.  And while you and he worked at the CIA together, you worked

3    in the same physical location, correct?

4    A.  That is correct.

5    Q.  And would it be fair to say that at no time in those six

6    years did you ever see Mr. Schulte leave the CIA with anything

7    physical?

8    A.  Can you say the last part again?

9             THE COURT:  Could you speak into the microphone?

10            MS. SHROFF:  I thought I was.  I'm sorry.  Am I not?

11   Is that better?

12            THE COURT:  That's better.  Thank you.

13   Q.  You never saw him leave with a computer, correct?

14   A.  That is correct.

15   Q.  Never saw him leave with a hard drive, correct?

16   A.  That is correct.

17   Q.  And you never saw him leave with anything that concerned

18   you to call security, correct?

19   A.  That is correct.

20   Q.  Now, you reminded me yesterday, you have been at the CIA

21   for almost 10 years; am I right?

22   A.  That's correct.

23   Q.  And in those 10 years, have you seen other people leave the

24   CIA building with computers?

25   A.  For official purposes, yes.  But never for unofficial

K263SCH1                          Weber - Cross

1    reasons.

2    Q.  How would you know if they were official reasons?

3    A.  That's a good point.  I don't know, I wouldn't know if it

4    was for official reasons.

5    Q.  Right.  So you've seen people carry a computer, walk across

6    the compound, and leave, correct?

7    A.  Usually the computer would be locked up.

8    Q.  Again, you don't know, right?

9    A.  The --

10   Q.  It's just a simple question.  Do you know?

11   A.  No.

12   Q.  Just an assumption you're making here because you are a CIA

13   employee, correct?

14   A.  Locked bags are pretty obvious when they're locked.

15   Q.  You couldn't see inside a locked bag, right?

16   A.  No.

17   Q.  Right.  So it could be a locked bag with an unlocked

18   computer, correct?

19   A.  Yes.

20   Q.  It could be a locked bag with a hard disc that had

21   everything on it, correct?

22   A.  Yes.

23   Q.  In fact, a locked bag would be the best way to take

24   something that's unlocked, correct?

25   A.  Possibly.

K263SCH1                         Weber - Cross

1   Q.  Do you know somebody named Justin Nichols, by the way?

2   A.  Justin Nichols, yes.

3   Q.  Do you recall a time when Justin Nichols was just rolling a

4   computer along the CIA open compound?

5   A.  No.

6   Q.  You don't, okay.

7          Let me talk about the physical space at the CIA.  You

8   testified yesterday that you work in what is called a vault?

9   A.  Yes.

10  Q.  When you say a vault, it's just a room, right?

11  A.  We would often be referring to what's referred to as a

12  SCIF.

13  Q.  Right.  But, the CIA does a lot of things, as you said, the

14  the same thing 10 different ways or one thing in a more

15  complicated way.  But it's just a room like any other room?

16  A.  That's not correct.

17  Q.  You don't badge in?

18  A.  You badge in to a SCIF, correct.

19  Q.  So let's just stick to the room.  You badge in, correct?

20  A.  Yes.

21  Q.  It's a wide-open area, correct?

22  A.  Yes.

23  Q.  It has cubicles, correct?

24  A.  Yes.

25  Q.  It has offices, correct?

K263SCH1                          Weber - Cross

1   A.   Yes.

2   Q.   And much like any other offices, the cubicles tend to be in

3   the middle, and the offices tend to be around the perimeter,

4   correct?

5   A.   Yes.

6   Q.   And the only thing that makes it all this special is

7   because it's called a SCIF, meaning that's where the CIA keeps

8   documents that it considers classified, correct?

9   A.   That is not correct.

10  Q.   What's not correct about that?

11  A.   I don't know the specific details, but SCIFs have

12  significant security features.

13  Q.   Like what?

14  A.   I don't know the details.

15  Q.   So all you know is you badge in and you go in, correct?

16  A.   I -- I know that I have looked for other areas that my

17  branch could do work.  And the facilities, some of the

18  facilities we have looked at have not been approved by

19  security.

20  Q.   Okay.  But basically, at the end of the day, where you go

21  to work is just a large room with cubicles and offices,

22  correct?

23  A.   No.

24  Q.   Let's keep going with this no.  On your desk, how many

25  computers do you have?

K263SCH1                         Weber - Cross

1    A.  At the time?

2    Q.  Sure.

3    A.  I believe I had two computers.

4    Q.  Okay.

5    A.  Three.

6    Q.  Three?

7    A.  Yes.

8    Q.  Tell us what they are.

9    A.  So, one was a machine for DevLAN.  One was for internet

10   research.  And the other was for corporate e-mail.

11   Q.  So, are these three in proximity to each other?

12   A.  Yes.

13   Q.  And you used to sit in a cubicle, correct?

14   A.  Correct.

15   Q.  And you already testified to this, but just because it's a

16   new day and I haven't gotten much sleep, you, Amol, and

17   Mr. Schulte sat basically close to each other, right?

18   A.  That is correct.

19   Q.  So you had three computers, right?

20   A.  Yes.

21   Q.  How many did Mr. Schulte have?

22   A.  I believe he had three as well.  Plus an additional one in

23   a secondary location.

24   Q.  Okay.  And how about Amol?

25   A.  I believe he had three.

1    Q.  So right in that cubicle that's three plus three plus

2    three, that's nine, correct?

3    A.  Yes.

4    Q.  Each one of those nine had at least one that had internet

5    access?

6    A.  Yes.

7    Q.  You and Mr. Laroche talked a great deal about these

8    computers being air gapped.  One of them had internet access,

9    correct?

10   A.  Yes.

11   Q.  That sat right next to DevLAN, correct?

12   A.  It would have sat in the same cubicle, but there are rules

13   that couldn't --

14   Q.  I didn't ask you anything about rules.  Just stick to my

15   question.  It will go a lot faster.

16   A.  Understood.

17   Q.  There's a computer, right?

18   A.  Yes.

19   Q.  In your cubicle?

20   A.  Yes.

21   Q.  Has internet access, right?

22   A.  Yes.

23   Q.  Okay.  You can sit at the computer to do internet access,

24   correct?

25   A.  Yes.

K263SCH1                         Weber - Cross

1    Q.  Swivel your chair?

2    A.  Yes.

3    Q.  You get on to the classified computer?

4    A.  Yes.

5    Q.  Right?  Do your classified work, correct?

6    A.  Yes.

7    Q.  Swivel back, yes?

8    A.  Yes.

9    Q.  Go to the internet?

10   A.  Yes.

11   Q.  Right?  Swivel right.  Right?

12   A.  Yes.

13   Q.  Go to the unclassified computer, correct?

14   A.  Yes.

15   Q.  And all three in your cubicle?

16   A.  Correct.

17   Q.  Right.  And all three have wires connecting to allow them

18   to do all kinds of things, correct?

19   A.  Correct.

20   Q.  You testified that DevLAN is air gapped, right?

21   A.  Yes.

22   Q.  That means it can't access the internet?

23   A.  Yes.

24   Q.  Let's see if I can figure this out for you.  You're

25   connected to the internet by an internet cable from the back,

K263SCH1                          Weber - Cross

1    correct?

2    A.   Yes.

3    Q.   You take out the internet cable from the back, and you plug

4    that internet cable into your DevLAN computer, and DevLAN has

5    internet, correct?

6    A.   I don't know, actually.

7    Q.   You worked at the CIA for 10 years?

8    A.   Yes.

9    Q.   This is simple, right?  If I can do it, you can do it.

10   A.   There are security --

11   Q.   No, no, I didn't ask you that.  I didn't ask you if

12   security forbade you to do it.  I'm not asking if there are

13   rules that forbid you to do it.  I'm simply asking if it can be

14   done.  That's it.

15   A.   I don't know.  If I had set up the internet network, the

16   answer would be no.  I don't know how the internet network was

17   set up.

18   Q.   Fair enough.  You didn't set up the internet network?

19   A.   That's correct.

20   Q.   You do know there is an internet cable, right?

21   A.   Yes.

22   Q.   And you know that that cable can be plugged into the DevLAN

23   machine, correct?

24   A.   Yes.

25   Q.   Okay.  And if you plug in an internet cable, from the

K263SCH1                        Weber – Cross

1   internet, into the DevLAN machine, DevLAN has cable -- I mean,

2   internet, correct?

3   A.  No.

4   Q.  You never tried it?

5   A.  No.

6   Q.  You remember a contractor doing that and getting into

7   trouble at the CIA?

8   A.  No, I do not.

9   Q.  Do you know what an ethernet cable is?

10  A.  Yes, I do.

11  Q.  What is that?

12  A.  Ethernet is networking technology.

13  Q.  What does that mean, it's network and technology?

14  A.  The internet cable that you've been referencing, that would

15  probably been an ethernet cable.

16  Q.  Did the CIA have ethernet cables on its internet computer?

17  A.  I don't remember.

18  Q.  You don't remember?

19  A.  No.

20  Q.  Do you know how the CIA got internet?

21  A.  No.

22  Q.  All told, how many employees had internet at the CIA?

23  A.  At CIA, I have no idea.

24  Q.  How about in your group?

25  A.  In my group, I don't know.  The division, if you go to

1    that, almost every developer in the division had internet.

2    Q.  How many developers?

3    A.  The division had about 100 developers.

4    Q.  It's fair to say, right, Mr. Weber, that there are no

5    cameras on you when you're working in your vault?

6    A.  I don't know that.

7    Q.  You don't know if the CIA has cameras watching its

8    employees?

9    A.  No.

10   Q.  Do you know if the CIA records you while you're at work?

11   A.  I know of specific instances where I've been recorded.  But

12   I don't know if there have been instances where I am not aware

13   of.

14   Q.  So you think it's possible that the CIA has video recording

15   or monitoring of its employees?

16   A.  I have no idea.

17   Q.  You don't know one way or another?

18   A.  No.

19   Q.  So you have no way of knowing that if somebody did in fact

20   take the ethernet cable and plug it into DevLAN, whether or not

21   there would be somebody monitoring them.  You just don't know,

22   right?

23   A.  I have no idea.

24   Q.  Okay.  You talked a little bit about what DevLAN is,

25   correct?

K263SCH1                        Weber - Cross

1    A.  Yes.

2    Q.  And you mentioned DevLAN stands for development local area

3    network; is that right?

4    A.  Yes.

5    Q.  And this is in 2015 and 2016, right?

6    A.  Yes.

7    Q.  And during that time, even though it was called DevLAN,

8    DevLAN was not a local area network, right?

9    A.  I would consider it a local area network.

10   Q.  You would?

11   A.  Yes.

12   Q.  You wouldn't consider it a WAN instead of a LAN?

13   A.  No, I would not.

14   Q.  You would not consider it a wide area network?

15   A.  No, I would not.

16   Q.  Why not?

17   A.  I, to me, the definition of a WAN is connection to a

18   network that you do not control.  "You" being the owners of the

19   network.

20   Q.  That's what you would consider a WAN?

21   A.  Yes.

22   Q.  So, you would not consider, that means that if you -- you

23   controlled the network, it's always a LAN?

24   A.  I -- I am not that much of a network engineer to be able to

25   split the hairs of this.  But I would consider it, yes.

K263SCH1                         Weber - Cross

1   Q.  So then nobody ever has a WAN, because everybody controls

2   their own network, right?  I mean, it's not like somebody

3   else --

4            Does that make sense what I'm asking you?

5   A.  The best example I can give is at home, the WAN on my home

6   network is the internet.

7   Q.  Well, I mean, by that definition, then there is no such

8   thing as a WAN, because you're putting the WAN on the same

9   level as the internet, right?

10           Let me make this easier for you.  Who had access to

11  DevLAN other than the on-site location?

12  A.  The two foreign offices.

13  Q.  Where were the foreign offices, generally speaking?

14  Foreign Office East and Foreign Office West, right?

15  A.  Yes.

16  Q.  That's quite a distance from your physical location in the

17  Washington, D.C. Metropolitan area, correct?

18  A.  Yes.

19  Q.  And who maintained their access, by the way?

20  A.  I don't know.

21  Q.  You don't know at all, right?

22  A.  No.

23  Q.  You don't know how many system administrators Foreign

24  Office East had?

25  A.  No.

K263SCH1                         Weber - Cross

1    Q.  You don't know how many employees in the Foreign Office

2    East had access to DevLAN?

3    A.  No.

4    Q.  You don't know how many employees are in the Foreign Office

5    East, correct?

6    A.  Correct.

7    Q.  In fact, you know nothing about Foreign Office East,

8    correct?

9    A.  Correct.

10   Q.  All you know is that it's connected to DevLAN, correct?

11   A.  Yes.

12   Q.  And you do not even know how that connection works, right?

13   A.  Correct.

14   Q.  You don't know how many people have access to it, correct?

15   A.  Correct.

16   Q.  You don't know what kind of employees there are, correct?

17   A.  Correct.

18   Q.  You don't know if the CIA in the Foreign Office East

19   employs only Americans or if it employs Americans and

20   foreigners; you just don't know, right?

21   A.  The agency does not employ foreigners.

22   Q.  The agency does not employ foreigners?

23   A.  No.

24   Q.  So there is one thing you know.  Great.

25              Do you know anything else about the persons who work

K263SCH1                        Weber - Cross

1   in the Foreign Office East?

2   A.  No.

3   Q.  Okay.  But, you think that even though Foreign Office East

4   connects all the way to DevLAN, DevLAN is still a local area

5   network?

6   A.  Yes.

7   Q.  Okay.  By the way, let me ask you this.  When the foreign

8   office connects to DevLAN, do you know if it is a direct

9   connect?

10  A.  No.

11  Q.  You don't know, or, no, it's not a direct connect?

12  A.  I don't know, sorry.

13  Q.  You don't know?

14  A.  Correct.

15  Q.  And in your definition, if a foreign office is connecting

16  to another office, even if it's not a direct connect, it's

17  still not a WAN, correct?

18  A.  Correct.

19  Q.  And if it connects through intermediaries, it's still not a

20  WAN, correct?

21  A.  Correct.

22  Q.  In your definition, the only thing that makes for a WAN is

23  the internet?

24  A.  It's broader than that.  But, in the scenario you described

25  is still a LAN.

K263SCH1                        Weber - Cross

1    Q.   Okay.  Now, when Mr. Laroche was asking you direct

2    questions, remember he talked to you a lot about the latency of

3    access from the foreign office to the Altabackup on site,

4    right?

5    A.   Sorry, the latency of the --

6    Q.   The access time?

7    A.   From the foreign office to -- we spoke specifically about

8    DevLAN, not --

9    Q.   Let's just stick to DevLAN.

10   A.   Okay.

11   Q.   You remember that testimony?

12   A.   Yes.

13   Q.   And you said that it took a long time, correct?

14   A.   Yes.

15   Q.   And you said that based on what experience?

16   A.   From complaints that Frank and Patrick made to me.

17   Q.   Right.  But that's it, right?

18   A.   That's correct.

19   Q.   Just complaints from what Frank and Patrick made to you?

20   A.   Yes.

21   Q.   You did nothing about those complaints, right?

22   A.   I informed ISB and asked them to try and fix it, but

23   nothing beyond that.

24   Q.   You told ISB to fix what, the length of time it took to

25   connect?

K263SCH1                          Weber - Cross

1   A.  It was the speed of the connection.

2   Q.  Right.  And you made sure ISB addressed the speed of

3   connection, right?

4   A.  No, I did not.

5   Q.  You didn't follow up with ISB?

6   A.  No.

7   Q.  But you're like a semi boss, right?

8   A.  No.

9   Q.  Oh.  So, when you complained to ISB, what is ISB's

10  obligation to you to follow through?

11  A.  There was no obligation.

12  Q.  So you can tell ISB to do nothing, and ISB doesn't have to

13  listen to you at all?

14  A.  This is just somebody informing ISB of a problem that was

15  under their purview.

16  Q.  Right.  But you are the one informing them, right?

17  A.  Correct.

18  Q.  And they received your complaint, correct?

19  A.  Yes.

20  Q.  And ISB is there to fix the problem, correct?

21  A.  I don't know.  I didn't follow up.

22  Q.  You just left your compatriots in Foreign Office East or

23  Foreign Office West hanging?

24  A.  Yes.

25  Q.  You never followed up?

K263SCH1                        Weber - Cross

1              MR. LAROCHE:  Objection.

2              THE COURT:  Overruled.

3    Q.  What time frame was this in?

4    A.  I don't remember.

5    Q.  Was it 2015?

6    A.  Probably around then.

7    Q.  So you just don't know what the latency was in 2016,

8    correct?

9    A.  No, I don't.

10   Q.  For all you know, ISB improved it and you just don't know,

11   correct?

12   A.  No, I've heard --

13   Q.  No, no, I didn't ask if you heard.  I asked if you followed

14   up and know.  Do you know?

15   A.  Frank and Patrick --

16   Q.  I didn't ask you about Frank and Patrick.

17             MR. LAROCHE:  Objection.  He's answering the question.

18             THE COURT:  You can't interrupt him.  You can move to

19   strike.

20             MS. SHROFF:  I move to strike.

21   Q.  The question is did ISB ever inform you that they had fixed

22   the problem?

23             MR. LAROCHE:  That was not question she asked.

24             THE COURT:  It was a new question.

25             MS. SHROFF:  I changed my mind.

K263SCH1                          Weber - Cross

1          THE COURT:  New question.

2    A.  No, ISB never informed me they had fixed the problem.

3    Q.  They didn't inform you that they did not fix the problem,

4    correct?

5    A.  That is also correct.

6    Q.  By the way, how many system administrators are there in

7    Foreign Office East?

8    A.  I don't know.

9    Q.  How about in Foreign Office West?

10   A.  I don't know.

11   Q.  You did not monitor their access of DevLAN, correct?

12   A.  No, I did not.

13   Q.  You don't know who monitors their access of DevLAN,

14   correct?

15   A.  Correct.

16   Q.  And that goes for Foreign Office East, correct?

17   A.  Correct.

18   Q.  And that also goes for Foreign Office West, correct?

19   A.  Correct.

20   Q.  Now, you testified yesterday that, according to you, DevLAN

21   was secure enough, correct?

22   A.  Yes.

23   Q.  And it is now, let's just move forward to 2016 or let's go

24   to 2017 at the CIA, okay?

25   A.  Yes.

K263SCH1                          Weber - Cross

1    Q.  Does the CIA use DevLAN in 2017?

2    A.  No, it does not.

3    Q.  2018?

4    A.  No, it does not.

5    Q.  And when they moved off of DevLAN in 2017 and 2018, do you

6    think the CIA was concerned with its lack of security?

7    A.  I'm sorry.  Could you repeat --

8    Q.  Sure.  Do you think that the CIA was concerned with the

9    lack of security on DevLAN when it moved off of DevLAN in

10   2016/'17?

11   A.  I believe in a situation like this, there would be a review

12   of what practices were in place.

13   Q.  You know, I'm going to really try and have you see if --

14   maybe I'll try and be more clear.  Let's try it again.

15           Do you know?

16   A.  No.

17   Q.  Okay.  Do you know -- by the way, in 2016, what was your

18   job title, sir?

19   A.  The beginning of 2016, I would still have been a developer.

20   Towards the end of 2016, I was a branch chief.

21   Q.  Okay.  And you were a branch chief by the end of 2016,

22   right?

23   A.  That is correct.

24   Q.  So, as the branch chief, did you know that the CIA

25   considered DevLAN an insecure system?

K263SCH1                        Weber - Cross

1   A.  No.

2   Q.  Did you know that the CIA considered that the DevLAN system

3   as it existed in 2016 was not secure?

4   A.  No.

5   Q.  Did you know that the CIA considered the lack of monitoring

6   problematic on DevLAN?

7   A.  No.

8   Q.  Did you know that the CIA considered not having log review

9   problematic on DevLAN?

10  A.  No.

11  Q.  Did you know that the CIA had problems that DevLAN allowed

12  for shared passwords?

13  A.  No.

14  Q.  Did you know that the CIA had concerns about developers

15  working on a system and creating both protection tools and

16  malware on the same platform?

17  A.  No.

18  Q.  You did not know that?

19  A.  I don't know of any protection tools that we were creating.

20  Q.  You don't know of CIA creating any protection tools at all?

21  A.  Not on DevLAN.

22  Q.  Not on DevLAN?

23  A.  No.

24  Q.  You ever heard the phrase "the wild wild west" while you

25  were working at the CIA?

K263SCH1                          Weber - Cross

1    A.  Yes.

2    Q.  And tell us, please, in what context, tell the jury, if you

3    would, in what context you heard that phrase.

4              By the way, do you need some water?

5    A.  I have some, thank you.

6    Q.  Okay.

7    A.  The DevLAN allowed for the connection of exemplar machines.

8    We never knew what these exemplar machines would be, because

9    our adversaries can use all manners of equipment.  So, from a

10   security plan, you could not write a security plan that said

11   these are the types of pieces of equipment that can be

12   connected to DevLAN and these aren't.  Because of the, like I

13   said, we weren't in control of what our adversary decides to

14   put on their networks.

15   Q.  Okay.  But how does that get to wild wild west?

16   A.  The fact that there was no, like, there was no definition

17   of these types of devices are allowed and these types aren't.

18   Q.  On DevLAN?

19   A.  On DevLAN.

20   Q.  So let's talk about that.  Which are these foreign

21   adversaries -- these are foreign government, right?

22   A.  Yes.

23   Q.  And you are following -- what did you call them?  Exemplar

24   systems?

25   A.  Exemplars.

K263SCH1                          Weber - Cross

1    Q.  Could you explain that?  Because I don't know what that is.

2    A.  As much as I would love to be able to access and test

3    against the exact device we were going to deploy against, an

4    exemplar device would be our best -- our best attempt to get

5    either identical hardware, or close enough hardware so that we

6    could try and create a capability against it.

7    Q.  Okay.  So let me see if I understand this correctly.  Let's

8    just take a foreign nation.  I'm just going to pick my own.

9    Okay.  Pakistan.

10   A.  Okay.

11   Q.  And Pakistan has this hardware or whatever it is that the

12   CIA wants to crack.  Correct?

13   A.  Correct.

14   Q.  So, somebody places an order, one of your customers.

15   Generally that's COG, correct?

16   A.  Sometimes COG, sometimes us.

17   Q.  Okay.  So let's just say it's COG.  COG places an order.

18   Right?

19   A.  Yes.

20   Q.  So you take what it is that they want to crack into that

21   Pakistan has, correct?  That's the exemplar?

22   A.  Correct.

23   Q.  You don't have what Pakistan has, so you make it and call

24   it an exemplar, right?

25   A.  We buy.

K263SCH1                         Weber - Cross

1    Q.  You buy it?

2    A.  Yes.

3    Q.  You buy it and then you put it on DevLAN, correct?

4    A.  Correct.

5    Q.  Then you load it up, the thing you want to crack, correct?

6    A.  Correct.

7    Q.  And then the people who are working on DevLAN then start to

8    see if they can write some kind of malware that will crack what

9    Pakistan has?

10   A.  Correct.

11   Q.  Right.  And that allows us, meaning America, to then go and

12   see what Pakistan has, and see if we can steal what Pakistan

13   has and bring it back here, correct?

14   A.  Correct.

15   Q.  And it's about fair to say Pakistan is doing the same thing

16   to us, just to even it out here?

17   A.  It's fair to say.

18   Q.  Okay.  So, basically, that's what is loaded up on DevLAN,

19   correct?

20   A.  Correct.

21   Q.  And that is why DevLAN is called the wild wild west,

22   because anything could happen on DevLAN, correct?

23   A.  Any piece of equipment could be found on DevLAN.

24   Q.  Exactly.  Any equipment could be found on DevLAN, right?

25   A.  Correct.

K263SCH1                          Weber - Cross

1    Q.  With every insertion of equipment comes insecurity,

2    correct?

3    A.  I would --

4    Q.  That's basic, right?

5    A.  I would say that's unfair.

6    Q.  Really?

7    A.  Yes.

8    Q.  The more stuff you put in, the more insecure a system

9    becomes, right?

10   A.  The devices that were plugged in were paid very close

11   attention to.  We are working on them.

12   Q.  Undoubtedly the CIA pays very close attention.  I know.

13            MR. LAROCHE:  Objection, your Honor.  She's not

14   testifying.

15            THE COURT:  Those remarks are stricken.

16            MS. SHROFF:  Okay.

17   Q.  It's fair to say, right, that the more you put into a

18   system, the more the risk of insecurity, right?

19   A.  That's fair.

20   Q.  That is fair.  I'm glad.

21            So let's just stick to this.  The people that are

22   developing these programs, they're developing malware, right?

23   A.  Yes.

24   Q.  Okay.  And I know you explained this before, but what

25   exactly is this malware?  Just a way to crack into something

K263SCH1                         Weber - Cross

1   else, right?

2   A.   Malware, the best, like, the simplest definition is malware

3   is programs that are created to do things that the system --

4   the system owners would not intend for it to do.

5   Q.   You mean the target system owners do not intend?

6   A.   Correct.

7   Q.   Okay.  So, when these, these new systems or hardwares are

8   plugged into DevLAN, right?

9   A.   Yes.

10  Q.   You also heard the phrase called "dirty network," by the

11  way?

12  A.   Yes.

13  Q.   What is a dirty network?

14  A.   Dirty network is a network that has, it has all sorts of

15  information on it.  And it's not, it's not information solely

16  created by the owners of that network.

17  Q.   Okay.  And it's fair to say DevLAN was referred to as the

18  dirty network, right?

19  A.   Yes, correct.

20  Q.   And that was a phrase commonly used at the CIA, that DevLAN

21  was a dirty network, right?

22  A.   Correct.

23  Q.   In fact, there was a lot of talk about how this dirty

24  network should be addressed, correct?

25            I'm not talking about from Mr. Schulte, mind you.  I'm

K263SCH1                           Weber - Cross

1   just talking about generally, because I'm asking about your

2   general knowledge about the CIA system.

3   A.  I don't know any conversations about that.

4   Q.  You don't recall any such conversations?

5   A.  No.

6   Q.  Is it fair to say, sir, that on the DevLAN system, there

7   was a lot of sharing amongst developers, coders, of code

8   itself?

9   A.  Yes.

10  Q.  And this code that they shared was malware code, correct?

11  A.  Typically, yes.

12  Q.  Right.  And so, you said there were about 100 developers,

13  right?

14  A.  Yes.

15  Q.  And 100 developers could be sharing malware code with each

16  other at any given time, correct?

17  A.  Yes.

18  Q.  And they also shared with each other information about the

19  malware code, right?

20  A.  Yes.

21  Q.  And that was also shared on DevLAN, correct?

22  A.  Correct.

23  Q.  And as part of the development, you developed hacking

24  tools, correct?

25  A.  Correct.

K263SCH1                          Weber - Cross

1    Q.  And this process of development, it crossed more than one

2    group within -- more than one group within a division, correct?

3             Do I have your nomenclature correctly?

4    A.  You're backwards.

5    Q.  It was shared with more than one division in the group?

6    A.  The group is higher than the division.  So it would be

7    sometimes shared across divisions.

8    Q.  So, help me out here.  I'm sorry.  There's at least five

9    divisions, correct?

10   A.  No.  You're talking about the branches now.

11   Q.  Okay.  Five branches?

12   A.  Correct.

13   Q.  Did branches all share this information also?

14   A.  Some of the branches had different focuses.  So it would be

15   unlikely for some of the branches to share with each other.

16   Other branches, yes.

17   Q.  Okay.  So the some of the branches shared with each other,

18   correct?

19   A.  Yes.

20   Q.  And then it was shared at a level above branches, correct?

21   A.  It would be shared like in between the branch.

22   Q.  In between branches?

23   A.  Yes.

24   Q.  And it was definitively shared with the customer, correct?

25   A.  The final product, yes.

K263SCH1                          Weber - Cross

1    Q.   Right.  And then if the final product was sent to the

2    customer, the customer then had what is called a trial run?

3    Did they have like a trial run to make sure it worked?

4    A.   They -- they would often do testing of their own, yes.

5    Q.   And they would test out the hacking tool, correct, make

6    sure it was to their liking, like any normal customer, correct?

7    A.   I would hope so, but I don't know.

8    Q.   Okay.  Fair enough.  And then, after they tried it, if they

9    had glitches in it or they had problems in it, they would come

10   back to the developer and say, hey, fix this glitch?

11   A.   Yes.

12   Q.   Okay.  We'll get to that a little bit later because it's a

13   little complicated for my head.  But that was also routine on

14   the DevLAN system, correct?

15   A.   Sorry.  The which -- which portion are you talking about?

16   Q.   The talking back and forth.  You sent me this tool, I'm

17   having trouble with this tool, can you fix this, can you fix

18   that; that went back and forth, right?

19   A.   Not on DevLAN though.

20   Q.   Okay.  On what server would that be?

21   A.   So, that conversation would usually be in person, talking

22   to each other.  Or more often on our corporate network.

23   Q.   Would it not be on Jira?

24   A.   Very few people in COG actually utilized Jira.  So, most

25   likely not.

K263SCH1                        Weber - Cross

1    Q.  But it was on -- that's what Jira was there for.  But I'll

2    he get to Jira in a minute.  Let's stick to where I am right

3    now.

4            So the DevLAN system itself, it was called the wild

5    wild west and also called the dirty network, correct?

6    A.  Those are two terms that were applied to it, yes.

7    Q.  Those terms were applied during 2015, correct?

8    A.  Yes.

9    Q.  2016, correct?

10   A.  Yes.

11   Q.  2017, until DevLAN was gone from the CIA, correct?

12   A.  Yes.

13   Q.  Now, let's shift gears just a little bit off of DevLAN and

14   talk about your relationship with Mr. Schulte here.

15   A.  Okay.

16   Q.  There was a time, and you testified to this on direct,

17   right, that you had, you had as you put it, you had lost

18   positive feelings towards Mr. Schulte.  Is that fair to say?

19   A.  That is correct.

20   Q.  And when there was a fight between Mr. Schulte and Amol,

21   you felt or you championed Amol; is that fair to say?

22   A.  I was on Amol's side for the legal proceedings, yes.

23   Q.  Well, not just for the legal proceedings, right?  You were

24   just on Amol's side.  It's okay.

25            MR. LAROCHE:  Objection, your Honor.

K263SCH1                          Weber - Cross

1          THE COURT:  Overruled sustained.

2   Q.  Were you not on Amol's side?

3          THE COURT:  "It's okay."

4          MS. SHROFF:  I'm sorry.  I take that back.

5          THE COURT:  Your comments that you make in response to

6   the questions.

7          MS. SHROFF:  I didn't realize I made it, your Honor.

8   Q.  Go ahead, sir.  You were on Amol's side, right?

9   A.  I was mostly on Amol's side.  I do not think that Amol was

10  at zero fault.

11  Q.  Oh.  I'm sorry.  I was confused after the direct yesterday.

12  Okay.  So you did not think now that Amol was at zero fault.

13  A.  Amol should have, he should not have had, you know, got

14  into arguments with Josh.  He should have just walked away from

15  situations.  But, along those lines.  I think Amol could have

16  been more professional as well.

17  Q.  Well, Amol liked to troll people, no?

18  A.  Sorry.  Can you repeat the question?

19  Q.  Sure.  Amol liked to troll people, right?

20  A.  Yes.

21  Q.  I mean, tell the jury so you and I have the same

22  understanding of "troll."  What does troll mean?

23  A.  Amol would poke fun at people, but in a good nature.

24  Q.  Kind of in like a non-abrasive way, right?  Poke fun of

25  somebody, but you're kind of sticking it to them, right?

K263SCH1                         Weber - Cross

1   That's trolling?

2   A.  Like I said, it was in good nature.

3   Q.  You thought it was in good nature, right?

4   A.  Yes.

5   Q.  That was your personal subjective opinion, right?

6   A.  Yes.

7   Q.  You were not the recipient of being called a bald asshole,

8   right?

9   A.  Correct.

10  Q.  Right.  So, what appeared to you as good natured trolling

11  might not appear as good natured trolling to someone else,

12  correct?

13  A.  Correct.

14  Q.  And Mr. Amol's trolling took many forms, correct?

15  A.  Correct.

16  Q.  He would send out e-mails in the morning trolling people?

17  A.  Not regularly.

18  Q.  I don't know what "regularly" is at the CIA.  But certainly

19  sent out e-mails, right?  He would send out e-mails like Amol's

20  least favorite things.  Number one would be Schulte, number two

21  would be par, number three would be Schulte, number four would

22  be Schulte, and number five would also perhaps be Schulte?

23  A.  I don't remember an e-mail like this.

24  Q.  You don't remember e-mails like that?

25  A.  I --

K263SCH1                        Weber - Cross

1    Q.  Fair enough.  Amol regularly mocked Mr. Schulte; is that

2    fair to say?

3    A.  No.

4    Q.  He didn't tell Mr. Schulte you're going to fail?

5    A.  Sorry?

6    Q.  You are going to fail?

7    A.  I don't remember that specific comment.

8    Q.  Do you remember a comment that he made that he said you

9    just suck at being a coder?

10   A.  Not that specific comment.

11   Q.  How about not that specific, but a comment close enough?

12   A.  It would not surprise me that he said something like that,

13   no.

14   Q.  Okay.  Do you remember a time when Mr. Schulte talked about

15   something unfortunate happening in his life, and Amol saying,

16   well, I hope it does happen that way?

17   A.  No.

18   Q.  Do you recall Amol ever telling Mr. Schulte I hope nothing

19   works out for you?

20   A.  No.

21   Q.  I'm not talking just my specific words, right, because I

22   wasn't there.  But comments to that effect.  Your testimony is

23   you never heard him say any such thing?

24   A.  I don't know what this is referencing and it -- I don't

25   recall anything like that.

K263SCH1                         Weber - Cross

1   Q.  Okay.  Now, you were never Amol's boss, correct?

2   A.  Amol -- Amol worked on a project with me that I was a lead

3   on, but I was never Amol's official boss, no.

4   Q.  Right.  So you were the lead and Amol worked with you,

5   correct?

6   A.  In a specific project, correct.

7   Q.  And on that specific project, you and Amol got along,

8   correct?

9   A.  Yes.

10  Q.  You like him, right?

11  A.  Yes.

12  Q.  And he liked you?

13  A.  I would like to think so, but I don't know.

14  Q.  Right.  You gave him directions, he followed directions,

15  correct?

16  A.  Yes.

17  Q.  And in February of 2016, when Amol and Mr. Schulte got into

18  a fight, you had a predisposition that Amol would be right,

19  correct?

20  A.  No.

21  Q.  So you had no predisposition, but you felt strongly at the

22  conclusion of the events that Amol was right?

23  A.  Yes.

24  Q.  And then there came a time when Mr. Schulte decided that he

25  was going to go to court because of the fight with Amol,

K263SCH1                          Weber - Cross

1    correct?

2    A.   Yes.

3    Q.   And he went to a county court, correct?

4    A.   I believe so, a court of some type.

5    Q.   And he filed a request for a protective order.  Were you

6    aware of that?

7    A.   Yes.

8    Q.   And the judge granted the protective order, correct?

9    A.   Yes.

10   Q.   Were you in court that day, by the way?

11   A.   No, I was not.

12   Q.   You didn't go?

13   A.   No.

14   Q.   You just offered to go?

15   A.   When Amol appealed the court order, that is when I went to

16   court with him.

17   Q.   Okay.  So, when the initial protective order was granted

18   you didn't go, correct?

19   A.   Correct.

20   Q.   And when Amol appealed and the judge dismissed it because

21   Mr. Schulte had filed the complaint in the wrong county, you

22   were there, correct?

23   A.   That is correct.

24   Q.   Right.  And the judge dismissed it because he filed it in

25   Loudoun County when in fact he should have -- I've never been

K263SCH1                         Weber - Cross

1   to Virginia, but in some other county in Virginia, correct?

2   A.   That is correct.

3   Q.   You did go, though, to court, to support Amol, correct?

4   A.   I went there to tell the portion of the story that I knew.

5   Q.   Well, yeah, but your portion of the story supported Amol,

6   correct?

7   A.   That's correct.

8   Q.   So you went there to support Amol?

9   A.   That's fair.

10  Q.   You were aware, right, that Mr. Schulte also filed an EEO

11  complaint?

12  A.   Eventually I was made aware of that, yes.

13  Q.   Yeah.  So, can you just tell us, what is an EEO complaint?

14  A.   Equal employment opportunity.  It's an office that makes

15  sure that everybody has -- has an equal chance at a job or

16  whatever.  So an EEO complaint is a complaint saying that

17  somebody is interfering with equal employment options.

18  Q.   Okay.  So, Mr. Schulte filed one against Mr. Amol, correct?

19  A.   Yes.

20  Q.   And then Amol filed one against Mr. Schulte, correct?

21  A.   I don't recall, no.

22  Q.   You don't recall that?

23  A.   I don't remember that, no.

24  Q.   You don't recall Amol filing an EEO complaint against

25  Mr. Schulte?

K263SCH1                        Weber - Cross

1   A.   No.

2   Q.   And is it your testimony today that you never learned that

3   the EEO complaint Amol filed was dismissed?

4   A.   I don't remember an EEO complaint from Amol.

5   Q.   You don't recall Amol ever telling you that his harassment

6   complaint against Mr. Schulte was dismissed?

7   A.   His harass -- no.

8   Q.   By the way, you're still friends with Amol now, right?

9   A.   I -- I wouldn't consider him a friend.  I occasionally run

10  into him.  But over the past years I think I've seen him once

11  or twice.

12  Q.   Right.  And that's because he moved, correct?

13  A.   He -- he went to a new office.

14  Q.   Right.

15  A.   So.

16  Q.   And he no longer codes, right?

17  A.   I don't know what his current job duties are.

18  Q.   Do you know if he is a developer anymore?

19  A.   No, I don't.

20  Q.   Now, just going back to the same time period, 2016 to 2017.

21  Right.  You testified yesterday that you had a collegial

22  atmosphere in your group, correct?

23  A.   From 2016 to 2017, yes.

24  Q.   I got it wrong again, it's a group, right?  The division?

25  A.   It goes group is the --

K263SCH1                        Weber - Cross

```
 1    Q.  Your division?
 2    A.  Division is the one I'm most comfortable answering to.
 3    Q.  So within your division, that's what you testified, right?
 4    A.  Yes.
 5    Q.  And it's fair to say that people play pranks on each other
 6    in that division?
 7    A.  Yes.
 8    Q.  In fact, Mr. Schulte here logged on to your DevLAN on
 9    March 2 of 2016, and used your DevLAN machine to send out a
10    message to everyone in your name, correct?
11    A.  He did not log on to my machine.
12    Q.  You left it open?
13    A.  Yes.
14    Q.  So, he just, your machine was open, he walked on to it, and
15    sent an e-mail pre -- is it an e-mail or is it a chat?
16    A.  It was either an e-mail or chat; I can't remember what it
17    was.
18    Q.  So, he sent it out in your name, correct?
19    A.  Correct.
20    Q.  And he sent an e-mail saying "I am an asshole" or something
21    like that?
22    A.  Something like that.
23    Q.  Everybody thought you sent it, correct?
24    A.  No.  Nobody would have thought that.
25    Q.  Everybody knew it was a prank, right?
```

1    A.  Everybody would have known what would have happened, yes.

2    Q.  He never denied sending that prank, right?

3    A.  No.

4    Q.  And in all the time that he played all these pranks, he

5    never really denied ever doing them, right?

6    A.  No.

7    Q.  He used your unlocked machine to do that.  Correct?

8    A.  Correct.

9    Q.  Others used his unlocked machine to do it, because he was

10   notorious for not locking his computer, correct?

11   A.  I wouldn't say he was notorious for it.

12   Q.  Really?  Is that not the word you used when you were

13   interviewed by the FBI?

14   A.  I don't remember.

15   Q.  You don't remember the FBI asking you specifically about

16   this March 2, 2016, IRC chat at 4:16:18 p.m., and you telling

17   them in response that not only did Josh not deny it, he himself

18   was the subject of these pranks because he was, quote,

19   notorious for leaving his machine on?

20   A.  I don't remember making that statement.

21   Q.  Okay.

22            MS. SHROFF:  Could I just have a minute, your Honor?

23            THE COURT:  You may.

24            MS. SHROFF:  May I just have a second with the

25   government?

K263SCH1                          Weber - Cross

1              THE COURT:  Yes.

2              (Counsel conferring)

3              MS. SHROFF:  I'm having trouble finding the document

4    but I'll come back to it.

5    Q.  Is it your testimony that Mr. Schulte was in fact notorious

6    for not locking his computer?

7    A.  I remember several occasions where he left his computer

8    unlocked.  It's been a few years; I don't remember how often it

9    was.

10   Q.  Well, you admonished him about it, right?  In one of the

11   many chats you had about how he should be better at the CIA?

12   A.  Possibly, I don't remember.

13   Q.  You don't remember admonishing him about locking his

14   computer which is a security issue?

15   A.  No.

16   Q.  Now, aside from this collegial environment, there was also

17   a lot of name calling, right, within your division?

18   A.  I wouldn't say it was a lot, no.

19   Q.  Who was metal mouth?

20   A.  It would have been Michael.

21   Q.  Who called him metal mouth, by the way?

22   A.  I don't remember.

23   Q.  You don't remember Amol calling him metal mouth?

24   A.  It could have been him, I don't remember.

25

K26Wsch2                          Weber - Cross

1    BY MS. SHROFF:

2    Q.  And that's because a grown man had braces, he called him

3    metal mouth, right?

4    A.  That would have been why he was called metal mouth.

5    Q.  But you, sitting here today, don't remember Amol calling

6    him metal mouth?

7    A.  I remember the name.  I don't remember who was calling him

8    that.

9    Q.  Let me just switch gears for a minute.  OK?

10       There came a time when the situation between Amol and

11   Mr. Schulte led to Mr. Schulte and Amol being physically

12   separated, correct?

13   A.  That's correct.

14   Q.  And Amol was moved to one place and Mr. Schulte to another,

15   correct?

16   A.  That is correct.

17   Q.  They were now in different divisions, correct?

18   A.  Different --

19   Q.  Huh?

20   A.  Different branches, same division still.

21   Q.  OK.  And Mr. Schulte was moved out of OSB, is that right?

22   A.  That's correct.

23   Q.  And where was Amol sent?

24   A.  He was also moved out of OSB into MDB.

25   Q.  Into what?

K26Wsch2                         Weber - Cross

1    A.   MDB.

2    Q.   MBB?

3    A.   MDB.

4    Q.   MDB.   OK.

5              And you testified yesterday, right, that because

6    Mr. Schulte was being moved out of OSB, you decided that you

7    were going to knock off his privileges to the OSB libraries --

8    A.   That's not correct.

9    Q.   -- right?

10        That's not correct?

11   A.   No.

12   Q.   OK.

13   A.   I -- I was not the one that decided this.  This was -- this

14   was the policy.

15   Q.   OK.  It was your decision to implement the policy, correct?

16   A.   It was my decision to follow the directions that I had been

17   given, yes.

18   Q.   By the policy?

19   A.   Yes.

20   Q.   So is this a written policy?

21   A.   No.

22   Q.   It's not a written policy?

23   A.   Not that I'm aware of.

24   Q.   Tell us about this policy that you have, because it's not a

25   written policy, so I'm confused about the policy.

K26Wsch2                          Weber - Cross

```
 1   A.  The policy is the branches, the branches are in control of
 2   their own projects and that when you go to a different branch,
 3   you no longer need access to those old projects.
 4   Q.  OK.  So there's no written policy; this is just a policy
 5   you assume was in place, correct?
 6   A.  No, it's not correct.
 7   Q.  How is it not correct?
 8   A.  There had been other, there had been other, similar
 9   situations in the past where we followed the same rules.
10   Q.  Right.  So you assumed it was a policy, correct?
11   A.  Yes, but there might have also been conversations with my
12   leadership regarding it as well.
13   Q.  There might have been?  I understand that there might have
14   been, but let's stick to what was.  So there's no written
15   policy on this, correct?
16   A.  Correct.
17   Q.  This is a policy that you thought existed, correct?
18   A.  Correct.
19   Q.  And you implemented the policy, correct?
20   A.  Correct.
21           MS. SHROFF:  Oh, actually, could I just go back for a
22   minute, your Honor?
23   Q.  Let me just show you 3507-39.
24           MS. SHROFF:  I should have asked, your Honor.
25           THE COURT:  Yes.  All right.
```

K26Wsch2                          Weber - Cross

1            MS. SHROFF:  I apologize.

2            THE COURT:  All right.

3            What's the question?

4     BY MS. SHROFF:

5     Q.  Does that refresh your recollection, sir, that you told the

6     FBI that Mr. Schulte was notorious for leaving his computer

7     unlocked?

8     A.  Yes, it does.

9            MS. SHROFF:  Thank you.

10           May I, your Honor?

11           THE COURT:  Yes, you may.

12    BY MS. SHROFF:

13    Q.  OK.  So going back to this OSB libraries, is it fair to say

14    that the CIA has a set of written policies about many things?

15    A.  Yes.

16    Q.  And when Mr. Schulte was moved out of OSB, you went into

17    the OSB libraries and removed his admin access, correct?

18    A.  Yes.  Yeah, that's correct.

19    Q.  OK.  Just so that the jury understands what I was trying to

20    say -- and you correct me if I'm wrong.  OK?  Because I don't

21    do that for a living -- what you did is basically, you took

22    away Mr. Schulte's ability to merge a code into the master

23    branch within the OSB libraries?

24    A.  That's correct.

25    Q.  And these OSB libraries, it's basically like a library on a

K26Wsch2                         Weber - Cross

1   computer, right?

2   A.  Yes.

3   Q.  OK.  So you have all of these different pieces of code and

4   you don't want to keep reinventing the wheel, so you put all

5   this information there and people can access it and work on it,

6   correct?

7   A.  Correct.

8   Q.  And when this library started, it was started by

9   essentially three people, although you do not agree that it was

10  Mr. Schulte's idea?

11  A.  I --

12  Q.  You testified to that?

13  A.  I agree.  Yes, that's correct.

14  Q.  OK.  So you don't believe the OSB libraries was

15  Mr. Schulte's idea, correct?

16  A.  That's correct.

17  Q.  But you do agree that the three of you basically

18  jump-started it?

19  A.  Correct.

20  Q.  Correct?

21  A.  That is correct.

22  Q.  OK.  So it's you, right, Mr. Schulte?

23  A.  Correct.

24  Q.  And I forget the third person's name.

25  A.  Frank.

1   Q.  OK.  So these OSB libraries, anybody could access it, but

2   only three of you could merge the code into the master and

3   develop, right?

4   A.  That's correct.

5   Q.  Now, do you remember when it is that you removed his admin

6   privileges?

7   A.  No, not the specific date.

8       I'm sorry.  Are you talking to the libraries or the bigger

9   thing that I testified to?

10  Q.  No, no.  I'm just talking about the libraries right now.

11  A.  I don't remember the specific date.

12  Q.  OK.  And you testified on direct that you did this only

13  because he was leaving OSB, right?

14  A.  That's -- that was the main reason, yes.

15  Q.  That wasn't really the reason why, right?

16  A.  The -- no.  It was the main reason.  There were --

17  Q.  Yesterday you said there was only one reason, right;

18  yesterday, when Mr. Laroche was asking you about all these OSB

19  libraries, you didn't say there was a main reason and a

20  sub-reason and a quasi reason?

21  A.  The reason I did it, I took the action is because he was no

22  longer in OSB.

23  Q.  OK.  So is it now your testimony that it's the only reason,

24  the main reason or some other reason?

25  A.  I would say it is the only reason.  There were people that

K26Wsch2                          Weber - Cross

1   were happy that his accesses were removed, though.

2   Q.  We're not talking about any people, just you.

3   A.  Right.

4   Q.  You can only testify about what you know.

5   A.  I know that there was another person that was happy to have

6   his accesses removed.

7   Q.  No doubt, but let's just stick to your testimony today.

8   Your testimony is that the main reason is you -- is it your

9   main reason or the only reason?  That's all my question was.

10  A.  The only reason.

11  Q.  OK.  And you remember that when you took off his admin

12  access to OSB libraries, Mr. Schulte came to talk to you about

13  it, right?

14  A.  Yes.

15  Q.  And when he came to talk to you about it, he told you --

16  well, first he just asked you, right, why his admin privileges

17  were gone?

18  A.  Yes.

19  Q.  And it's fair to say that when he was allowed to have admin

20  privileges, you yourself were annoyed with the way he executed

21  those privileges, right?

22  A.  I'm sure I was annoyed on occasion, but for the most part,

23  he was doing good work with the libraries.

24  Q.  Really?

25  A.  Yes.

K26Wsch2                          Weber - Cross

1   Q.  You didn't write complaining emails about how he was

2   creating more work for Frank by not following the pull-request

3   methodology?

4   A.  Yes, I remember complaining about that, but it was not --

5   like I said, for the most part, he did a great job with the

6   work.  But occasionally he would frustrate Frank or myself.

7   Q.  It is your testimony, sitting here today, that you were not

8   frustrated by Mr. Schulte's failure to comply with the rules of

9   loading the code onto the master and develop branches of the

10  OSB libraries?

11  A.  I wasn't using the libraries all that often at that point,

12  so I would not be frustrated specifically.

13  Q.  So you did not send emails after the fact to your superiors

14  saying that Mr. Schulte's failure to follow the rules was an

15  additional reason why you took off his admin access to OSB

16  libraries, correct; that's your testimony today?

17  A.  I don't remember sending something like that.  I probably

18  would have said something like that to argue against giving him

19  access to it again.

20  Q.  I see.  So your testimony is that somebody then asked you

21  to give him back his privileges, and then you argued against

22  it?

23  A.  I don't --

24          MR. LAROCHE:  Objection.  Misstates his testimony.

25          THE COURT:  Overruled.

K26Wsch2                          Weber - Cross

1              MS. SHROFF:  It was a question.

2              THE COURT:  Overruled.

3              Can you answer the question?

4              THE WITNESS:  Can you repeat the question?  I'm sorry.

5              THE COURT:  We'll have the reporter read the question

6    back.

7              We're going to have the question read back.

8              MS. SHROFF:  OK.  Thank you.

9              (Record read)

10   A.  I don't remember being asked to give back privileges to

11   Josh at any point for the libraries.

12   Q.  OK.  So you took off his admin privileges, he came to talk

13   to you, right?

14   A.  Yes.

15   Q.  You told him, and correct me if I'm wrong.  You told him

16   that you're not in OSB libraries anymore so I took off your

17   privileges, is that correct?

18   A.  You're not in OSB anymore.

19   Q.  You're not in OSB anymore so I took off your privileges;

20   that's what you told him?

21   A.  That's correct.

22   Q.  Your testimony, sitting here today, is you did not tell him

23   that Sean told me you could do this; that's your testimony?

24   A.  I had a conversation with Sean --

25   Q.  That's not my what I asked you.

1    A.  I don't remember exactly what I told him, no.

2    Q.  You don't remember, sitting here today, telling Mr. Schulte

3    that his boss --

4        Sean was his boss, right?

5    A.  Yes.

6    Q.  Your boss?

7    A.  Yes.

8    Q.  -- that your and his boss had told you to take away his

9    administrative access to the OSB libraries?

10   A.  I don't remember using Sean's name.  I didn't often invoke

11   leadership to justify --

12   Q.  I'm sorry?

13   A.  I didn't invoke leadership's name to justify a company

14   decision often, so --

15   Q.  So your testimony is that you simply relied on an unwritten

16   policy and told him to comply, correct?

17   A.  I told him that he could take it up with Sean if he

18   disagreed.

19   Q.  OK, but that wasn't my question.  My question was, when you

20   were justifying your actions, all you -- according to you

21   today -- all you told him was you're no longer in OSB so I took

22   you off; that's your testimony?

23   A.  I don't remember what I told him.

24   Q.  You don't remember what you told him?

25   A.  No, I do not.

K26Wsch2                        Weber - Cross

1    Q.  Let me ask you something, Mr. Weber.  Taking away

2    someone's -- you were in the marines, right?

3    A.  That's correct.

4    Q.  And you're used to having a lockstep chain of command,

5    correct?

6    A.  Correct.

7    Q.  Your supervisor tells you something, you comply, correct?

8    A.  Correct.

9    Q.  And if somebody who is your equal and not your supervisor

10   tells you something, you don't have to comply, right; that's

11   the marines?

12   A.  That's not quite accurate.

13   Q.  Really?

14   A.  No.

15   Q.  In the marines you have to obey somebody who is just

16   standing right next to you?

17   A.  You would -- if somebody was of equal rank to you and gave

18   you an order, you would probably assume that they had orders on

19   that.

20   Q.  You'd probably assume that they had ordered on that, that's

21   what you're saying?  So you wanted to probably assume something

22   while you unilaterally took off his access and did not tell

23   him; you wanted him to assume that; that was your thinking?

24   A.  I didn't think -- I didn't think he would be accessing the

25   projects anymore so it was a nonissue.

K26Wsch2                          Weber - Cross

1    Q.  Well, you didn't think that, right, but you took away an

2    equal's access and did not tell him?  Right?

3    A.  I would not consider him an equal at that point.

4    Q.  Well, you were not his boss, right?

5    A.  No.

6    Q.  You couldn't fire him, right?

7    A.  No.

8    Q.  You couldn't move him to another group, division, branch,

9    anywhere, correct?

10   A.  Correct.

11   Q.  You couldn't even tell him what kind of pants to wear,

12   right?

13   A.  Correct.

14   Q.  OK.  So you were not his boss, right?

15   A.  Correct.

16   Q.  So you wanted him to assume that if you told him something

17   he should then assume that it came to you from his superior

18   and, therefore, he should follow what you're saying; that was

19   your assumption?

20   A.  I don't recall this conversation that you're, like,

21   mentioning.

22   Q.  OK.  So Mr. Schulte comes to ask you about his access being

23   removed, right?

24   A.  Correct.

25   Q.  And you testified on direct, did you not, that there was

K26Wsch2                         Weber - Cross

1   nothing untoward about his tone or the way he asked the

2   question, right?

3   A.  Yes, correct.

4   Q.  He asked you the question, right?

5   A.  Correct.

6   Q.  And you answered him?

7   A.  Yes.

8   Q.  And then he left?

9   A.  No, I don't believe that was the case.

10  Q.  He stayed in the office?

11  A.  He went to talk to Sean.

12  Q.  Right.  Then he left the office, is what I meant.  I'm

13  sorry.

14  A.  Yes, he left me.

15  Q.  OK.  He left you, right?

16  A.  Correct.

17  Q.  And after he left your office, it is your testimony that he

18  went and talked to Sean, correct?

19  A.  That is correct.

20  Q.  And at that time, Sean had not told you to take away his

21  privileges, right?

22  A.  I don't remember.

23  Q.  Well, you just said before that the reason you took away

24  his access was because he was no longer in OSB and you were

25  following the unwritten policy, right?

K26Wsch2                          Weber - Cross

1    A.   That's what I remember doing.

2    Q.   Right.

3    A.   I don't remember if Sean told me to also follow that

4    policy.

5    Q.   You don't remember if Sean, your boss, told you to follow

6    policy?

7    A.   No.

8    Q.   I see.

9         Sean never asked you to do anything with OSB libraries,

10   correct, when Josh and Amol were leaving?

11   A.   I don't remember.

12   Q.   So you don't remember if Sean told you, but you do remember

13   doing the access removal?

14   A.   Yes.

15   Q.   OK.

16   A.   I do remember that, and I remember specific guidance on

17   other projects.

18   Q.   I'm not asking about any other projects, sir.

19   A.   All I'm saying is --

20            MS. SHROFF:  Your Honor --

21   A.   -- the guidance might have came at the same time.

22            MS. SHROFF:  Your Honor --

23            THE COURT:  OK.  We'll strike out the last portion.

24            Just listen to the question and answer the question.

25            THE WITNESS:  I apologize, your Honor.

K26Wsch2                         Weber - Cross

1    BY MS. SHROFF:

2    Q.  Now, when Mr. Schulte moved out of OSB, right, he was still

3    working on Shattered Assurance?  Is that correct?

4    A.  Not initially.

5    Q.  You don't know what he was working on because he was no

6    longer in your group, right, or in your division, whatever it

7    is?

8    A.  He was no longer in my branch.

9    Q.  Right.  He was no longer in your branch, so you didn't know

10   what he was working on, right?

11   A.  That's not correct.

12   Q.  How would you know what he was working on?

13   A.  Because I was told to reassign the Brutal Kangaroo project,

14   which Shattered Assurance was part to, to another developer in

15   OSB.

16   Q.  Right.  Reassign, according to you, Brutal Kangaroo but not

17   Shattered Assurance, right?

18   A.  But Shattered Assurance was within Brutal Kangaroo.

19   Q.  So your testimony is -- I want to make sure I understand

20   you correctly; all right -- Shattered Assurance is within

21   Brutal Kangaroo?

22   A.  That's correct.

23   Q.  It's part and parcel of the same thing?

24   A.  It's a component of Brutal Kangaroo.

25   Q.  Right.  So it's part and parcel.  You just said Shattered

1  Assurance is part of Brutal Kangaroo, correct?

2  A.  Correct.

3  Q.  OK.  I'm going to leave that there, and I'm going to go

4  back to the OSB libraries.  OK?

5  A.  OK.

6  Q.  After Mr. Schulte went to talk to Sean, he came back to

7  you, correct?

8  A.  That is correct.

9  Q.  And according to your direct testimony, he told you, right,

10 that Sean had told him he could have his access, administrative

11 access back?  Correct?

12 A.  That's -- something along those lines, correct.

13 Q.  And in the -- when he came and told you that, it was your

14 testimony that he was lying to you, correct?

15 A.  I wouldn't say he was lying.  He might have misunderstood

16 Sean.

17 Q.  Well, let's talk about that.

18      Sean didn't like to tell people directly anything, correct?

19 A.  I wouldn't say that, no.  That's not correct.

20 Q.  Really?

21 A.  No.

22 Q.  He didn't hem and haw because he didn't ever want to take a

23 position as a boss?

24 A.  No.

25 Q.  Do you recall a time when Josh Schulte and Michael got into

1    a rolling fight, physical fight, and Sean never brought that to

2    the attention of his supervisor?

3    A.  I don't know what Sean's actions were.

4    Q.  Well, in fact, you do know about them, because you

5    complained about them, right?

6    A.  I don't think I did.

7    Q.  You don't remember expressing a concern that Sean really

8    should have discussed all of these matters with his superior?

9    You don't remember expressing that concern?

10   A.  I might have expressed a concern like that.  I don't know

11   if Sean did or not.

12   Q.  OK.  But you had a concern that Sean did not like to deal

13   with these issues, correct?

14   A.  Possibly.  I don't know.  So -- concern would be -- I don't

15   think it would raise to the level of concern.

16   Q.  OK.  What would it raise to?

17   A.  It might have been a comment I made, but I very much liked

18   Sean as a boss, and I thought he was a great boss.

19   Q.  There's no doubt that you very much like Sean.  You can

20   very much like a person who has a limitation.  My question to

21   you is, in your opinion, isn't it true, Mr. Weber, that Sean

22   did not like to directly take a position?

23   A.  No.

24   Q.  So your testimony is you think Sean was clear with

25   Mr. Schulte and Mr. Schulte just came and lied to you?

K26Wsch2                        Weber - Cross

1   A.  I don't know.

2   Q.  In fact, you know that's not true, right; you know that

3   Sean waffled on what he told Mr. Schulte?

4   A.  No, I don't know that either.

5   Q.  You don't know that?

6   A.  No.

7   Q.  OK.  So Mr. Schulte came back to you, and even though you

8   just testified you don't think Mr. Schulte lied, but

9   nevertheless, he told you Sean said give me my permissions

10  back, is that right?

11  A.  That's correct.

12  Q.  And you said that -- what did you say in reply to him, by

13  the way?

14  A.  I don't recall specifically, but I told him that I would

15  talk to Sean to make sure that I understood what Sean wanted.

16  Q.  OK.  And what did Mr. Schulte say back to you?

17  A.  It was along the lines of, You might as well give me --

18  give me the access; I'm going to get it one way or another.

19  Q.  One way or another?

20  A.  Yes.

21  Q.  Well, that's not what Mr. Schulte said to you, right?

22  A.  I -- it was years ago.  I don't remember the exact

23  language.

24  Q.  Let me see if I can refresh your recollection here.

25          I highlighted it for you.

K26Wsch2                        Weber - Cross

1   A.  Yes.

2   Q.  By the way, yesterday you said that you took his words to

3   mean a threat, right?

4   A.  Yes.

5   Q.  OK.  Let's see what he said to you.

6           MR. LAROCHE:  Objection, your Honor.

7           MS. SHROFF:  He said he couldn't recall.  I gave him a

8   document to refresh his recollection.

9           THE COURT:  You have to ask him if it refreshes his

10  recollection.

11          MS. SHROFF:  OK.

12  A.  This is -- I still don't remember the conversation

13  verbatim, but this is a closer, a closer time to when it

14  happened.

15  Q.  Right.  So it refreshes your recollection, right?

16  A.  I don't recall the specific verbiage, so --

17  Q.  I know you don't recall.  That's why I'm asking you whether

18  that piece of paper, your statement to the FBI, refreshes your

19  recollection of what Mr. Schulte said to you far, far closer to

20  the date when Mr. Schulte actually did say it to you.

21  A.  This -- yes.

22  Q.  Great.  So now tell me.  What is it that you told the FBI

23  back then that Mr. Schulte said to you?

24  A.  "Schulte then finished the conversation by stating that he

25  will eventually get access back to the libraries and that

1    access should just be enabled now."

2    Q.  And what was your perception of that statement back then?

3    A.  I took this statement as him just saying that he was going

4    to win the argument and I shouldn't bother pushing back.  After

5    he departed, I discussed --

6    Q.  OK.  That's fine.  Thank you.

7    A.  OK.

8    Q.  So back then you didn't perceive it as a threat, correct?

9    A.  I -- I still think I would have seen that as a threat that

10   he was going to continue doing what he was doing.

11   Q.  You still think that now?

12   A.  Yes.  I never thought this was a threat that he was going

13   to steal information or anything.

14   Q.  Oh, that I know for sure.  That's not what I'm asking.  I'm

15   only asking about the OSB libraries, sir --

16   A.  Yes.

17   Q.  -- OK?

18       All right.  So your testimony now is that on direct you

19   thought it was a threat, even though the words were completely

20   different, correct?

21   A.  Yes.

22   Q.  He never said one way or another, which does sound like a

23   threat, right?

24   A.  I don't remember the specific verbiage.

25   Q.  Well, you were very specific yesterday when you were

K26Wsch2                        Weber - Cross

1    answering these questions on direct; no?

2    A.  I don't remember.  I feel like I also would have

3    caveated --

4    Q.  I'm sorry.  I can't hear you at all.

5    A.  Sorry.

6            I feel like I would have also mentioned that I don't

7    remember; it's been a while.

8    Q.  OK.  It has been a while.  But fair to say --

9        May I just have that document back?

10   A.  Yes.

11   Q.  So the text portion that you read -- right?

12   A.  Yes.

13   Q.  -- you recognize that to be part of a text that you sent in

14   an email, correct?

15   A.  Oh, I'm sorry.  I didn't actually look at the content

16   outside of what was highlighted.

17           MS. SHROFF:  The government would prefer I use their

18   exhibit number, your Honor, 1062.  Government Exhibit 1062.

19           THE COURT:  Are you offering it in evidence?

20           MS. SHROFF:  I think it is in evidence, your Honor.

21           MR. LAROCHE:  It is in evidence.

22           MS. SHROFF:  My problem is, Judge, I'm too short to

23   see into the screen.

24           THE COURT:  Well, we can't do much about that.

25           MS. SHROFF:  I know.  It's my mother's fault.

K26Wsch2                          Weber - Cross

1            OK.  If you could pull up the part where it reads:

2            "Schulte then finished the conversation by stating

3    that he will eventually get access back to the libraries and

4    that access should just be enabled now."  Right?

5            And then it says, "I took this statement as him just

6    saying" --

7            (Counsel conferred)

8            MS. SHROFF:  It's OK.  You've interrupted me already.

9            (Counsel conferred)

10   Q.  -- "to win the argument and I shouldn't bother pushing

11   back," right?

12   A.  That's correct.

13   Q.  OK.  So when this language was written, you didn't put in

14   any statement that you perceived there to be a threat of him

15   getting OSB libraries back, right?

16   A.  That's correct.

17   Q.  OK.  And you didn't say anything about he was going to get

18   this back one way or another, right?

19   A.  That's correct.

20   Q.  And you didn't say at any point to Mr. Schulte Sean told me

21   to do this to you in the first meeting that you had with him,

22   correct?

23   A.  Do you mind if I read --

24   Q.  This is not going to help you.  This doesn't -- you can,

25   for sure, but your first meeting is not reflected here.

1  A.  OK.  I don't remember the last portion.

2         MS. SHROFF:  Fair enough.

3         OK.  You can take that down.

4  Q.  Now, Mr. Schulte went and talked to Sean, correct?

5  A.  Correct.

6  Q.  And then you talked to Sean, correct?

7  A.  Correct.

8  Q.  And then you told Sean about how you didn't want him in the

9  OSB libraries anyway because he did not do the pull-and-review

10 process properly and created more work for other people who

11 were working on the OSB libraries?

12 A.  I might have used that language.  I don't know.

13 Q.  Well, that's how you felt, right?

14 A.  Sorry?

15 Q.  That is how you felt, right?

16 A.  It would have been -- if it was an argument to give Josh

17 access back, I would have used that as a reason not to allow

18 it.

19 Q.  OK.  But you didn't tell him that, right?

20 A.  I don't remember.

21 Q.  You didn't tell him, Hey, if Sean even wants to give it

22 back to you, I'm going to advocate against it because I don't

23 like the way you're running my libraries, right?

24 A.  I wouldn't have had a conversation like that, that's

25 correct.

1   Q.  Right.  And you thought that the libraries were your

2   invention, right?

3   A.  Yes.

4   Q.  OK.  And when Mr. Schulte sent the follow-up email, I think

5   it was introduced into evidence yesterday, where he called the

6   OSB libraries his idea --

7        MS. SHROFF:  Can somebody pull that email up.

8   Q.  -- you disagreed with his characterization of the OSB

9   libraries being his idea, right?

10  A.  That's correct.

11  Q.  But you never told him that, right?

12  A.  I don't -- I don't think I would have, no.

13  Q.  Well, it's in an email chain, right; you can reply and say

14  I don't agree, I think this was my idea?

15       MS. SHROFF:  1061.

16       Thank you, Mr. Laroche.

17       THE WITNESS:  Sorry.  Can you repeat the question?

18       MS. SHROFF:  Sure.  Let's just see if we can pull it

19  up.  I'm sorry.

20  Q.  OK.  Do you see it?

21  A.  No, I do not.

22       MS. SHROFF:  Oh, can he see it, please.

23       Does the jury have it?

24       THE WITNESS:  I have it now.  Sorry.

25       MS. SHROFF:  OK.  How about the jurors?

K26Wsch2                          Weber - Cross

```
 1              OK.
 2   Q.   So you're on this email chain, right?
 3   A.   Yes, I am.
 4   Q.   OK.  He doesn't leave you off of it, right?
 5   A.   That's correct.
 6   Q.   He says:  "Hey guys.  Thanks for the email."  Correct?
 7   A.   That's correct.
 8   Q.   And then he makes a reference that says that Sean is moving
 9   out of that job, is that right?
10   A.   That's correct.
11   Q.   And somebody else is going to take Sean's job, correct?
12   A.   That is correct.
13   Q.   And I'm going to come back to this, but you applied for
14   Sean's job, correct.
15   A.   No, I never applied for Sean's job.
16   Q.   You didn't apply?  You applied for a different job?
17   A.   I applied for a different job, yes.
18   Q.   OK.  We'll get back to that later.
19              And then he says:  "I have talked with Anthony and Sean,"
20   correct?
21   A.   Yes.
22   Q.   "A bit about working on transitioning some of my old
23   projects but haven't specifically talked about the OSB
24   libraries until now," right?
25   A.   That is correct.
```

K26Wsch2                          Weber - Cross

1    Q.  OK.  And then he says:  "Since the OSB libraries" -- thank

2    you -- "were initially my idea that stemmed from Brutal

3    Kangaroo and I've spent a lot of time and effort managing and

4    helping administer them, I'd like to stay on along with Frank

5    Stedman and Jeremy Weber and help with administering them."

6    Correct?

7    A.  Correct.

8    Q.  OK.  So let's just take that sentence for a minute, "as the

9    OSB libraries were initially my idea," your testimony is,

10   according to your direct, that that is incorrect?

11   A.  That is -- that is correct that that's an incorrect

12   statement.  Sorry.

13   Q.  OK.  You thought it was your idea?

14   A.  Yes.

15   Q.  OK.  And how about the next sentence after the "Brutal

16   Kangaroo" clause, "and I spent a lot of time and effort

17   managing and helping administer them; is that a true statement,

18   or that's a false statement also, according to you?

19   A.  The "I spent a lot of time helping and managing administer

20   them," that is a true statement.

21   Q.  OK.  So on April 14, 2016, according to you, that was a

22   true statement, right?

23   A.  Yes.

24   Q.  And also according to you it was a true statement that he

25   didn't really follow the rules you wanted him to follow while

1   helping to manage and administer the OSB libraries?

2   A.  He mostly followed the rules.

3   Q.  He mostly followed the rules?

4   A.  Yes.

5   Q.  But he didn't follow them enough that it irked you?

6   A.  It would occasionally annoy me.

7   Q.  And then he said I'd like to stay on along with Mr. Stedman

8   and Mr. Weber, correct?

9   A.  Correct.

10  Q.  And help administer them?

11  A.  Correct.

12  Q.  And you didn't want that?

13  A.  I didn't think that he should be part of the OSB libraries,

14  no.

15  Q.  OK.  So you didn't want that, right?

16  A.  Yes.

17  Q.  You wanted him out?

18  A.  Correct.

19  Q.  And then he says, "especially considering that the goal is

20  to move this to AED and allow Kevin to administer them," right?

21  A.  That's correct.

22  Q.  So they were going to be moved from division?

23  A.  Branch to division.

24  Q.  Branch to division, correct?

25  A.  That's correct.

1    Q.   AED is division?

2    A.   Yes.

3    Q.   And it was going to be moved from branch to division so as

4    to make it accessible to more branches?

5    A.   That was our goal, yes.

6    Q.   Right.  So for him it made sense, right, because now he's

7    going to be in a different place than OSB?  Right?  And you

8    wanted to expand the use of the OSB libraries, right?

9    A.   That's correct.

10   Q.   Seems like a reasonable request, correct?

11   A.   It could be, yes.

12   Q.   OK.  And then he tells you, in an explanation, as to why.

13   He says, "I feel my intimate knowledge with the libraries would

14   be beneficial to the process," correct?

15   A.   Correct.

16   Q.   True statement, right?

17   A.   Yes.

18   Q.   "I feel I should still have sufficient time to help with

19   the libraries."  Nice of him, right?

20   A.   Yes.

21   Q.   "And it would help propagate the libraries by having people

22   on other branches working together on them."  Collaborative,

23   would you say?

24   A.   Yes.

25   Q.   "I think these libraries would be an excellent source of

1    cross-branch collaboration within the division"?

2    A.   That -- yes.

3    Q.   Nice, collegial sentiment, right?

4    A.   Yes.

5    Q.   OK.  "So if OSB and RDB would be OK with this, I would like

6    to continue my active role with the libraries," correct?

7    A.   Yes.

8    Q.   He included you on the email chain?

9    A.   Yes.

10   Q.   Do you reply?

11   A.   I believe so.  I --

12   Q.   No.  Do you reply to him?  Not to the others; I'm asking

13   you if you replied toe him, Mr. Schulte, the sender of the

14   email.

15   A.   I believe I did.  I don't remember specifically if I

16   responded to this email.

17   Q.   What would you have said; no, thanks?

18   A.   I would have said that, and I believe I referenced this

19   later, this was something for Kevin to decide when AED -- when

20   he took him over as a division-wide project, and --

21   Q.   Right, right.

22   A.   -- until it was decided that this would actually be a

23   thing, and there were a lot of steps that we had to consider

24   before making it, they were still OSB's -- they were still

25   OSB's code and directly affected OSB's work.

1   Q.  But you didn't reply to the issues he raises in the email,

2   right?  You basically tell him in your email response that

3   these are OSB libraries, you're going to stay out, if Kevin

4   decides to locate you join, Kevin will decide that.  That's

5   your response, right?

6   A.  I --

7            MR. LAROCHE:  Objection.  Misstates the document, your

8   Honor.  The response --

9            MS. SHROFF:  OK.

10           MR. LAROCHE:  He sends an email first, so we should go

11  through the email correctly.

12           MS. SHROFF:  OK.

13  Q.  I show you 3507-50.

14           THE COURT:  Do you have a question now, Ms. Shroff?

15           MS. SHROFF:  Yes, your Honor.

16  Q.  Does that refresh your recollection as to your response?

17  A.  So, this --

18  Q.  You know what?  Why don't you take a look at your

19  Government Exhibit 1062, if you want, if that's easier, and

20  it's the last page.  That way you can pull it up on the screen.

21       Is this the reply that you sent?  I'm asking you the

22  question because --

23           THE COURT:  Is this in evidence?

24           MS. SHROFF:  It's the same document, your Honor.  I'm

25  just trying to make it easier so we don't use a 3500 document.

1              THE COURT:  It's in evidence.

2              MR. LAROCHE:  Yes.

3              THE COURT:  Thank you.

4    A.  So, I recall sending this email.  I don't know if this was

5    before or after the email we've been talking about.

6    Q.  Well, you tell me.  You said you email-replied, so I'm

7    asking if this is the reply.

8    A.  There's no time information on this email.  I don't know if

9    this was something that I sent to him and he replied to me or

10   if he sent it to me and I replied to him.

11   Q.  Well, it says:  "Josh, I discussed things with Sean and

12   this is the situation."

13   A.  Yes.

14   Q.  Right?

15   A.  This is definitely an email that I sent.

16   Q.  Right.  But it must have been after you discussed the

17   situation with Sean, correct?

18   A.  That is correct.

19   Q.  Right.

20   A.  I --

21   Q.  And you discussed the situation with Sean, but you cut him

22   out of the discussion, correct?

23   A.  That's correct.

24   Q.  Right.  You went to Sean, you cut him out, right?

25   A.  I wouldn't say I cut him out.

K26Wsch2                        Weber - Cross

1  Q.  Well, you could have just said, Hey, let's go talk to Sean

2  together, right?

3  A.  He didn't ask to go talk to Sean together.

4  Q.  No, no.  But you said you're the superior to him, right?

5  A.  No, I would not say I was superior to him.

6  Q.  Well, you said he wasn't your equal but you weren't his

7  boss, so you thought of yourself above his pay grade?

8  A.  No.  I thought of him outside of my branch at this point.

9  Q.  Right, but when you took away his access before, you

10 testified that, as the person who had your job, you could tell

11 him what to do, right?

12 A.  No.

13 Q.  OK.  Let's put it aside.  Go back to the email.

14         You don't say to Josh one way or another let's go talk

15 to Sean together, right?

16 A.  That's --

17 Q.  Fair to say?

18 A.  Correct.

19 Q.  And you go talk to Sean, correct?

20 A.  That's correct.

21 Q.  And then you invoke Sean in your email, correct?

22 A.  That's correct.

23 Q.  You don't tell Sean to send him the email because Sean is

24 his boss, correct?

25 A.  I believe Sean asked me to send this email.

1   Q.  You believe?  Let's put aside all of your beliefs.  Let's

2   just stick to what you remember.

3       You don't have Sean send the email, correct?

4   A.  No.

5   Q.  OK.

6   A.  Sean did not send this email.

7   Q.  And you sent an email saying -- let's see what you say --

8   "I discussed things with Sean and this is the situation,"

9   right?

10  A.  Yes.

11  Q.  "In the short time OSB libraries remain an OSB project"?

12  A.  Yes.

13  Q.  Right.  "And under Frank Stedman and my guidance," correct?

14  A.  Correct.

15  Q.  "You are free to contribute to the libraries, creating a

16  branch and following the pull-request model that's in place,"

17  correct?

18  A.  Correct.

19  Q.  "We are hoping to move the libraries to Kevin's authority,"

20  right?

21  A.  Correct.

22  Q.  "Make them officially an AED-level resource," right?

23  A.  Correct.

24  Q.  OK.  "When Kevin takes over and if he desires you to have

25  direct authority for the two long-lived branches, then," you

K26Wsch2                          Weber - Cross

1   say "we" -- we, not he; we -- "will give you commit access to

2   Master and Develop," correct?

3   A.   Correct.

4   Q.   But according to your rule, by the time it gets to AED,

5   it's no longer OSB libraries, right?

6   A.   That would be a fair statement.

7   Q.   Right.  You would be out of it, right?

8   A.   Possibly.  It would be up to Kevin.

9   Q.   Why?  You said there's an unwritten policy; once you're out

10  of OSB, you're out of OSB.

11  A.   AED encompasses OSB.

12  Q.   OK.  And where was he going?

13  A.   He was in RDB, which also would have been encompassed in

14  AED.

15  Q.   Right.  So you would all be encompassed under the same AED,

16  right?

17  A.   Correct.

18  Q.   Right.  But it would be OK for you to say "we" here, but

19  because he was leaving OSB libraries, he was not part of the

20  "we"; is that your testimony?

21  A.   The -- at the time of this email, yes.

22  Q.   Oh, OK.  When you say, "then we will give you commit access

23  to Master and Develop," basically you've elevated yourself to

24  Kevin's position?

25  A.   No.  I am referring -- the "we" I'm referring to is me and

K26Wsch2                          Weber - Cross

1   Frank, who were controlling the libraries at that point.

2   Q.  But you're not.  You're saying when -- this is a whole new

3   paragraph.  Look at the email.  There's a break between you and

4   Frank and what you and Frank are going to do, right?

5   A.  Yes.

6   Q.  You and Frank don't run AED, right?

7   A.  That's correct.

8   Q.  Who is going to run AED?

9   A.  Who's going to run AED?

10  Q.  Yeah.  Kevin, right?

11  A.  Kevin was not running AED.

12  Q.  No.  Whatever decision, it was going to be Kevin who was

13  going to make this decision, right?

14  A.  Yes.

15  Q.  OK.  So you don't say then it will be up to Kevin to give

16  you commit access and develop; you say "we"?

17  A.  No.  I actually specifically say if he wants -- if Kevin

18  makes this decision.

19  Q.  No.  You say, "when Kevin takes over and if he desires for

20  you to have direct authority over the two long-lived branches,

21  then we will give you commit access to Master and Develop."

22  You're still leaving yourself in the loop to give him access to

23  Master and Develop, right?

24  A.  This would have been an administrative action.

25  Q.  Whatever it is, you say "we."  You're part of the "we"?

K26Wsch2                          Weber - Cross

1    A.  Yes.

2    Q.  OK.  And you agree with me, right, that the OSB libraries

3    are then going to be, at least the plan is, at an AED level,

4    correct?

5    A.  That's correct.

6    Q.  By the way, do they ever make it to the AED level?

7    A.  No, they did not.

8    Q.  They never make it there, right?

9    A.  That's correct.

10   Q.  They never progressed to being an interbranch library

11   accessible to all, correct?

12   A.  Some of the branches leverage --

13   Q.  No, no.  Just yes or no.

14   A.  It was not to the division that we had, no.

15   Q.  It was not what?

16              THE COURT:  Division.

17              THE WITNESS:  Division.

18   Q.  It never made it to AED?

19   A.  No.

20              MS. SHROFF:  Is this a good time to take our break,

21   your Honor.

22              THE COURT:  Yes.  We'll take our midmorning recess.

23   We'll resume at 11:15.

24              (Jury not present)

25              THE COURT:  See you in 15 minutes.    (Recess)

K263sch3                          Weber - Cross

```
1                (In open court; jury not present)
2                THE COURT:  Ms. Shroff, how much longer do you have?
3                MS. SHROFF:  At least an hour.
4                THE COURT:  Okay.
5                MS. SHROFF:  I'm sorry?
6                THE COURT:  I said okay.
7                MS. SHROFF:  Oh, okay.  Thank you.
8                THE COURT:  Where's our witness?
9                MR. LAROCHE:  We'll get him, your Honor.
10               (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

K263sch3                          Weber – Cross

1              (Jury present)

2      BY MS. SHROFF:

3      Q.  It is still morning.  Good morning again, Mr. Weber.

4      A.  Good morning.

5      Q.  Mr. Weber, you testified on cross just now that you don't

6      think you applied for Sean's job, correct?

7      A.  I did not apply for Sean's job.

8      Q.  Is it fair to say that you were actually thinking about

9      applying for Sean's job?

10     A.  Yes, that is correct.

11     Q.  And you thought about applying for Sean's job, this was

12     about April of 2016, right?

13     A.  That is also correct.

14     Q.  And that's early on in April, April 7 or 8, about early

15     part of April that you were thinking of applying for it,

16     correct?

17     A.  That's correct.

18     Q.  And one of the things that got into the way of you getting

19     Sean's job was the CIA has this rule that you have to go to

20     more than one division before you can move up to that level; is

21     that one of the things?

22     A.  No, that is not correct.

23     Q.  Okay.  Do you not have to do a three-year rotation in more

24     than one division or branch or group?

25     A.  No.

K263sch3                          Weber - Cross

1    Q.  No.  Okay.  And is it fair to say that one of the reasons

2    you ended up not getting a promotion during that year was the

3    stupidity, quote unquote, between Amol and Mr. Schulte?

4    A.  No, I don't think that's fair.

5    Q.  You don't think that's correct?

6    A.  No.

7    Q.  You don't remember sending an e-mail saying that the

8    stupidity between Amol and Schulte did not help?

9    A.  I -- I sent that e-mail probably.  But, I do not -- I was

10   talked to and that was not -- I got career guidance, and that

11   did not -- it was not involving that.

12   Q.  Okay.  So, you got career guidance from Sean, correct?

13   A.  No.

14   Q.  Who did you get career guidance from?

15   A.  Karen and Anthony.

16   Q.  So, Anthony is above Sean, correct?

17   A.  That's correct.

18   Q.  So you wanted to apply for a promotion, you decided to get

19   career guidance, you went to Anthony, and Anthony told you this

20   wasn't the right time?

21   A.  No.  Karen, I talked to Karen first.

22   Q.  Okay.  What did Karen say?

23   A.  Karen felt that the position I was interested in would not

24   be the right career move for me.

25   Q.  Okay.  And what was the right career move for you?

1   A.  I -- in hindsight, I am much happier in my current branch.

2   Q.  I should have been more clear.  What did she think was the

3   right career move for you?  Sorry about that.

4   A.  She, she, I don't know if she gave me any advice on the

5   direction I should go.  Just she felt that chief of OSB was not

6   a good move for me.

7   Q.  Okay.  So you wanted to apply for chief of OSB, but then

8   you were talked out of it and you didn't apply, correct?

9   A.  That is correct.

10  Q.  Let me go back to you and Mr. Schulte.  Over the time that

11  you knew Mr. Schulte, did he ever talk to you about WikiLeaks?

12  A.  I don't believe so, no.

13  Q.  You don't remember him ever discussing leakers with you?

14  A.  I, I do remember talking about leakers.

15  Q.  Okay.  What do you recall?

16  A.  There was discussion around Snowden.

17  Q.  Okay.  And?

18  A.  Schulte felt that Snowden was a -- had betrayed his

19  country.

20  Q.  That doesn't, you know, he seems to have strong opinions on

21  everything.  You sure he didn't say more?

22  A.  He probably would have call him a traitor.  Said he should

23  be executed for sure.  I don't remember specific verbiage, but

24  he did express his typical strong opinions.

25  Q.  Right.  Then he had those same opinions about Chelsea

K263sch3                         Weber - Cross

1   Manning, correct?

2   A.  Possibly.  I don't remember conversations about Chelsea

3   Manning.

4   Q.  And when he was talking about Snowden, it was clear to you

5   that he strongly believed in the mission of the CIA, correct?

6   A.  Yes.

7   Q.  And he strongly believed that you should do nothing against

8   America, correct?

9   A.  Yes.

10  Q.  And he thought Snowden should be executed, correct?

11  A.  I believe I recall specifically him saying that.

12  Q.  Now, let me move gears completely and talk to you about

13  Government Exhibit 1251.  Okay.

14          Now, did you participate in putting this together?

15  A.  No, I didn't.

16  Q.  Okay.  So, you were shown this document, correct?

17  A.  Yes.

18  Q.  And you reviewed it with Mr. Laroche?

19  A.  Yes.

20  Q.  And did you review it for accuracy, by the way, or not?  Or

21  you just took it as it was given to you?

22  A.  I did give some advice on some of the -- some of the

23  diagram.

24  Q.  Okay.  After you gave advice, did the diagram change or not

25  change?

K263sch3                          Weber - Cross

1   A.  It changed.

2   Q.  It did change, right?

3   A.  Yes.

4   Q.  Sitting here today, do you recall what you told them to

5   change?

6   A.  Yes.

7   Q.  Could you tell us?

8   A.  Yes.  The -- can I circle on this?

9   Q.  Sure.

10  A.  There was, in these two areas --

11  Q.  Right.

12  A.  -- there was a different picture for what they referred to

13  as a one-way throw.  I knew there was not a one-way throw

14  there, and I felt that was inaccurate.

15  Q.  So are these firewalls?

16  A.  I believe so, yes.

17  Q.  So, I don't know what a one-way throw is, but let's go with

18  the easy one because it's accurate.  It's a firewall, correct?

19  A.  In this diagram, yes.

20  Q.  Okay.  And what is a firewall?

21  A.  A firewall controls access on the network.

22  Q.  So, according to this photo, right, COG cannot turn left

23  and go to DevLAN that way?

24  A.  I -- I don't know how the firewalls were set up.

25  Q.  No, no, I'm just asking you according to your and

1   Mr. Laroche's diagram here.  Is that correct?

2   A.  The diagram just talks about there being access controls in

3   between.  I don't know how that system was set up, no.

4   Q.  Okay.  So you don't know if these firewalls truly work as

5   firewalls, correct?

6   A.  That is correct.

7   Q.  In fact, you don't even know if they, if anybody can bypass

8   a firewall, correct?

9   A.  Correct.

10  Q.  And would it be fair to say that the CIA does employ people

11  who are smart enough to bypass a firewall, or is that giving

12  them too much credit?

13  A.  That is a fair statement.

14  Q.  Okay.  So, I'm going to do this slowly, okay.  If I'm

15  wrong, please correct me.

16          You start at the top of the exhibit, correct, and we

17  start with the COG network.  Correct?

18  A.  Yes.

19  Q.  And COG stands for Computer Operations Group; is that

20  right?

21  A.  Yes, that is correct.

22  Q.  And am I correct that COG is like the customer?  That in

23  fact when you were testifying, you called it the customer?

24  A.  Yes, they were, they were our primary customer.

25  Q.  Okay.  That's a little confusing to me, I have to honestly

K263sch3                              Weber - Cross

 1   tell you.  Because it's odd that the customer is within the

 2   agent.  Normally you think of a customer as outside, but you

 3   are saying the customer is in-house?

 4   A.  That's why we're told to refer to them as mission partners.

 5   Q.  Mission partners.

 6   A.  Yes.

 7   Q.  So, you're all in one mission, which is to hack some

 8   foreign country, and you want to all be together and be

 9   partnershipped?

10   A.  Yes.

11   Q.  So COG is the one that wants the tool.  Correct?

12   A.  Yes.

13   Q.  And they're going to eventually deploy that tool, correct?

14   A.  Yes.

15   Q.  The deployment of that tool can be in more than one way,

16   right?

17   A.  Not typically, no.

18   Q.  Well, I mean, it could be a physical deployment, meaning

19   like somebody's going to get a tool like a thumb drive or hard

20   drive and go insert it into the consulate while they're in

21   Pakistan, let's say.  Right?

22   A.  Yes, that's --

23   Q.  One way, right?

24   A.  Yes.

25   Q.  And another way is just to do it over the internet or not

K263sch3                         Weber - Cross

1    with any physical access, correct?

2    A.  Yes, but it would be different tools to do that.

3    Q.  Right.  Of course.  You're just developing different types

4    of tools.

5    A.  Yes.

6    Q.  So, COG is like a customer, right?

7    A.  Yes.

8    Q.  They place the order?

9    A.  Yes.

10   Q.  The order goes to EDG, correct?

11   A.  Yes.

12   Q.  EDG is like the manufacturer?

13   A.  Yes.

14   Q.  They build the thing for COG?

15   A.  Yes.

16   Q.  COG decides whether the thing is working or not and talks

17   to EDG if there are problems?

18   A.  Yes.

19   Q.  So once EDG has built -- where is EDG on the diagram or is

20   it just not there?

21   A.  This diagram is the networks, not the org chart.

22   Q.  Right.  So that's just a group that works on this network

23   to develop the tool, right?

24   A.  EDG worked on the blue portion of this diagram.

25   Q.  Great.  Okay.  So once EDG is done building the tool, they

K263sch3                          Weber - Cross

1   send it to COG.  Do I have that right?

2   A.  Yes.

3   Q.  Right?

4   A.  Yes.

5   Q.  And COG is the entity that -- the division under COG that's

6   going to use the tool, correct?

7   A.  Sorry.  Could you say the first part again?

8   Q.  Somebody in COG is going to use the tool?

9   A.  Yes.

10  Q.  Do I have that right?

11  A.  Yes.

12  Q.  And if they, before they use their tool, they make sure it

13  works.  They test the tool, right?

14  A.  Hopefully.

15  Q.  Okay.  And if there is a problem with the tool, or a

16  feature on the tool, COG logs into Jira, which is that pretty

17  little sphere at the bottom, right?  And creates or requests a

18  ticket about the problem they're experiencing, correct?

19  A.  We wanted it to be that way.  There was maybe --

20  Q.  I was just asking --

21  A.  There was maybe one or two projects that actually had that.

22  But for the most part, COG would use a different process.  Jira

23  was not widely adopted.

24  Q.  I am just following your chart here.  You have Jira on the

25  chart.  Right?

K263sch3                        Weber - Cross

```
 1   A.  Yes.
 2   Q.  COG sends the ticket to Jira?
 3   A.  Yes, that is one way they could do it.
 4   Q.  And just so the jury also understands, because I had a hard
 5   time understanding it.  Basically when you call Verizon and you
 6   say you have a problem, Verizon opens a ticket and keep track
 7   of all your complaints about your problem?
 8   A.  Basically.
 9   Q.  Jira is just like a web server, right?
10   A.  Yes.
11   Q.  Anybody can have Jira.  There can be a Jira at Federal
12   Defenders?
13   A.  Yes.
14   Q.  And there could be Jira at, let's say, the District Court,
15   right?
16   A.  Yes.
17   Q.  Just a way to keep track of all your problems on a tool?
18   A.  Yes.
19   Q.  So, what Jira allows -- and that's connected to Hickok here
20   on your diagram, correct?
21   A.  Yes.
22   Q.  What Jira allows you to do is it allows EDG and folks in
23   EDG to keep track of the tickets that COG is sending their way,
24   correct?
25   A.  Yes.
```

K263sch3                          Weber - Cross

1    Q.  So, EDG can receive the information from COG?

2    A.  Yes.

3    Q.  And work on whatever it is that they want to be done better

4    on the tool?

5    A.  Yes.

6    Q.  Okay.  According to you, is it fair to say that having Jira

7    there introduces a vulnerability into the system, right?

8    A.  Any technology introduces vulnerabilities.

9    Q.  Right.  And the vulnerability here is, that COG, which is

10   up there, can access Jira through Hickok.

11   A.  That's not a vulnerability.

12   Q.  Say it again?

13   A.  That's not a vulnerability.

14   Q.  I didn't ask you if it was a vulnerability.  Maybe I

15   should -- it was a separate question.  That was the next

16   question.

17          COG can access Jira through Hickok, correct?

18   A.  Yes.

19   Q.  And Hickok is like a bridge, right?  Like a bridge network?

20   A.  Yes.

21   Q.  Now, it's called a bridge network because a DevLAN user can

22   also access Jira through Hickok, right?

23   A.  Yes.

24   Q.  And we need that, or you need that, or the CIA needs that,

25   because it's important for the DevLAN user, which includes EDG,

K263sch3                          Weber - Cross

1    because they're the ones that have to work on answering the

2    ticket, or the request, that comes from COG.

3    A.  Yes.

4    Q.  So, in that sense, COG, and the folks in COG, and the folks

5    who are in DevLAN, are both sharing Jira.

6    A.  Yes.

7    Q.  Assume for a moment that somebody in COG is a bad actor,

8    correct?  Rogue.

9    A.  Yes.

10   Q.  For whatever reason, they want to access an EDG tool.

11   Right?

12   A.  Yes.

13   Q.  They want to walk off with an EDG tool, right?

14   A.  Yes.

15   Q.  They could malware into Jira, infect Jira, which would then

16   infect any visitor from DevLAN that also comes to Jira?

17   A.  It is technically possible.

18   Q.  Okay.  Well, this case is all about the technology.  So,

19   you tell me if it's technically possible, according to you.

20          By doing that, Jira can be infected, malware can

21   infect Jira, that would in fact infect DevLAN.  Correct?

22   A.  That's not really a correct statement.  No.

23   Q.  Well, a user from DevLAN goes to Jira, correct?

24   A.  Yes.

25   Q.  User from COG goes to Jira, correct?

K263sch3                              Weber - Cross

1    A.  Yes.

2    Q.  If I were in COG and I wanted to mess with DevLAN, I could

3    by infecting Jira, so when a DevLAN user visits it is also

4    infected, and takes the infection back to DevLAN.

5    A.  I am following now.  That is a technical possibility, yes.

6    Q.  Okay.  The DevLAN user who is infected, because the CIA's

7    full of smart hackers, would not know, correct?

8    A.  There is a possibility they would not know.

9    Q.  And the COG user would or could gain control of DevLAN that

10   way, correct?

11   A.  They would have access to DevLAN that way.

12   Q.  Okay.  So, I just want to make sure I understand this.  The

13   COG user can infect Jira, infect DevLAN, and have access to

14   DevLAN, right?

15   A.  That's technically possible.

16   Q.  And through DevLAN, can access Confluence, correct?

17   A.  Potentially.

18   Q.  What do you mean, "potentially"?  Of course.

19   A.  This is a very oversimplified and unrealistic scenario.

20   Q.  You can tell Mr. Laroche all about that, because I'm sure

21   he will explore the unrealistic scenario with you in great

22   detail.

23   A.  Understood.

24   Q.  My question to you right now is that way COG can access

25   Confluence through DevLAN, correct?

K263sch3                          Weber - Cross

1    A.   There is a possibility.

2    Q.   Right.  And also access Stash, correct?

3    A.   Yes.

4    Q.   And how many people in COG?

5    A.   I don't know that number.

6    Q.   Okay.  How many divisions under COG, or branches or leaves

7    or whatever it is?

8    A.   I actually don't know that either.

9    Q.   You testified on direct, did you not, that you had asked

10   Mr. Schulte to mount the backups, correct?

11   A.   Yes.

12   Q.   You directed him to do that?

13   A.   I believe so.

14   Q.   Can anyone run the command or a command to mount the

15   backup?

16   A.   In what scenario?  I'm sorry.

17   Q.   What do you mean in what scenario?  If you told somebody

18   else, they can go mount the backup, right?

19   A.   If they had access to the -- the Confluence or Bamboo or

20   Stash server.

21   Q.   Right?

22   A.   Then yes.

23   Q.   They can mount the backup, right?

24   A.   Yes.

25   Q.   How many people had that access?

1    A.  I believe it was just me and Josh.

2    Q.  Back then or forever?

3    A.  Back then, at the time.

4    Q.  Back then.

5    A.  Yes.

6    Q.  That's what your recollection is?

7    A.  Yes.

8    Q.  Can any server mount the backup?

9    A.  I don't know.

10   Q.  You don't know if any server can mount the backup?

11   A.  I didn't set up the way the backup was controlled.  I don't

12   know, I don't know what access controls they had on it.

13   Q.  But you testified about all kinds of access control when

14   Mr. Laroche was showing you this diagram, correct?

15   A.  I can talk to the access controls in the Atlassian

16   products.  I don't know about the access controls about the

17   greater DevLAN system.

18   Q.  Okay.  Do you think that there is any restriction on the

19   backups?

20   A.  Yes, I do.

21   Q.  You do think there are restrictions?

22   A.  Yes.

23   Q.  What are the restrictions?

24   A.  I have no idea what they are.

25   Q.  But you just believe that there are?

K263sch3                          Weber - Cross

1    A.  I do.

2    Q.  You do?

3    A.  Yes.

4    Q.  You don't know, but you believe there are?

5    A.  Yes.

6    Q.  Okay.  And did you know, by any chance, if there is a mount

7    on the Atlassian backup from something called Doxygen?

8    A.  There was a mount for Doxygen.

9    Q.  You know of the mount, right?

10   A.  No, I don't.

11   Q.  You don't know of the mount?

12   A.  No.

13   Q.  Oh.  I thought it sounded like you knew.

14   A.  I know that we use Doxygen.  I didn't know that it was

15   connected to the Altabackup.

16   Q.  You didn't know it was connected to the Altabackup?

17   A.  No.

18   Q.  You didn't know that Doxygen was connected to the

19   Altabackup.  But did you know that if Doxygen was in fact

20   connected to the Altabackup, that would bypass all access

21   controls?

22   A.  It wouldn't bypass all access controls.

23   Q.  You sure?

24   A.  I don't know what access controls would have been in place.

25   Q.  So you don't know what access control would be in place,

K263sch3                          Weber - Cross

1   you don't know about Doxygen, but you do know they couldn't
2   bypass.  I withdraw the question.  That's okay.
3           There came a time, right, and you testified to this,
4   that you learned about the WikiLeaks disclosure, correct?
5   A.  Yes.
6   Q.  And the disclosures were called Vault 7 and Vault 8.  Is
7   that right?
8   A.  Yes.
9   Q.  Nobody at the CIA ever called anything Vault 7, right?
10  A.  Not to my knowledge.
11  Q.  Nobody ever called it Vault 8, correct?
12  A.  Correct.
13  Q.  And those were just words that were made up by somebody
14  outside of the CIA?
15  A.  I assume.
16  Q.  And you testified, did you not, that you were part of an
17  assessment team?
18  A.  Yes.
19  Q.  As part of that assessment team, there were people that
20  were under you in the assessment team?
21  A.  Yes.
22  Q.  And do you remember how many people were under your team on
23  your assessment team?
24  A.  I believe it was around 10.  It was one or two people from
25  each branch.

K263sch3                          Weber - Cross

1    Q.  One or two people from each branch?

2    A.  Yes.

3    Q.  You testified that you were trying to assess, correct me if

4    I'm wrong, you were trying to assess what tools were released.

5    Is that fair to say?

6    A.  That was a portion of what we were trying to assess.

7    Q.  There came a time that you were given a key to use as part

8    of your assessment of which tools were released and what harm

9    that could cause.  Correct?

10           Do you remember that?

11   A.  A key?

12   Q.  Yes.

13   A.  Like, one of the other teams made an assessment that sounds

14   like that.  I was probably given that, yes.

15   Q.  So you remember you were given a key?

16   A.  I remember the key.

17           MS. SHROFF:  3507-01.

18   Q.  I'm sorry.  I shouldn't have spoken to the government while

19   you were testifying.  You remember the key?

20   A.  I remember something that sounds like what you're

21   describing.  Is there any chance I could see what we're --

22   Q.  Sure, sure.

23           MS. SHROFF:  May I just approach, your Honor?

24           THE COURT:  Yes.

25   A.  Yes.  I --

K263sch3                          Weber - Cross

1           MS. SHROFF:  3507-01, page 4.

2           THE COURT:  The witness has answered yes, Ms. Shroff.

3    Q.  You remember the key, right?

4    A.  Yes.

5    Q.  Okay.  And did you consult with that key while doing your

6    assessment?

7    A.  Yes, I believe I actually was the one that came up with

8    this key.

9    Q.  Okay.  And you were given a list of hundreds of tools that

10   were in use at that time, right?

11   A.  I don't remember -- I remember giving, being given a list

12   of the tools.  I don't remember what, like, what that list was

13   that generated it.

14   Q.  Can you take a look at the document I have given you?

15          MS. SHROFF:  I could put it on computer if you want.

16   I have the secondary version.

17   Q.  Take a look.  Could you take a look and see if that

18   document refreshes your recollection as to the number of tools.

19          (Pause)

20   A.  Do you mind if I look at the other pages on this?

21   Q.  No, no.  Take your time.  You can review the document in

22   its entirety.

23          (Pause)

24          THE COURT:  Can you identify what the document is,

25   Ms. Shroff?

K263sch3                        Weber - Cross

1          MS. SHROFF:  Sure.  It's 3507-01.

2          THE COURT:  Thank you.

3          MS. SHROFF:  The government has a copy.

4          THE COURT:  All right, Ms. Shroff.

5          MS. SHROFF:  Your Honor, may we just have a minute?

6          THE COURT:  You've taken a minute already.

7          (Counsel conferring)

8          THE COURT:  What is the problem?

9          MR. LAROCHE:  Your Honor, may we approach at the

10   sidebar, please.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K263sch3                          Weber - Cross

1               (At the sidebar)

2               MS. SHROFF:  Your Honor, I used this document,

3       3507-01, because there was no ruling on how I would open the

4       door through the WikiLeaks report.  The 3500 that I had says

5       that, as part of the assessment conducted of the loss or the

6       damage, there were X number, let's make up a number.  1,000

7       tools in use.  Right.  The government says that I cannot tell

8       him that there were 1,000 tools in use because that information

9       is classified.  That that was the number back then in 2016 that

10      was determined to be in use.  So if I can't talk about how many

11      were in use --

12              THE COURT:  Can she use a number, like say more than

13      100, more than 500?

14              MR. LAROCHE:  I think more than 500 is fine.  The

15      reason I raised --

16              MS. SHROFF:  I can say more than 700.  I'll say more

17      than 700.

18              The point I was trying to make is, that he conducted

19      an assessment, and by his own assessment, out of the -- out of

20      the hundreds of tools that were in use, right, only 91 tools

21      were thought to be tools that a competent researcher could find

22      based on information in the release that revealed a tool or

23      source code.  That the number was 91 compared to the hundreds

24      of tools.  And, of those 91, according to this witness, there

25      was a subset, the number of which he does not know, of those

K263sch3                              Weber - Cross

1    tools that were going to be retired, and had other issues, so

2    that their disclosure had no impact anyway or lesser impact.

3    And, he told the FBI --

4            THE COURT:  What do you want to ask him?

5            MS. SHROFF:  I want to ask him all of this.  I want to

6    ask about the number of tools.

7            THE COURT:  And you're objecting to the specific --

8            MR. LAROCHE:  Just the big number.  I don't disagree

9    with that line of cross.

10           THE COURT:  Why don't you say it's more than 500.  A

11   smaller subset.

12           MS. SHROFF:  As long as he can't argue it is a bigger

13   subset then.

14           MR. BRANDEN:  Can she use a fraction?  That the 91 is

15   one in seven?

16           MS. SHROFF:  I'm just going to use 500.

17           (Continued on next page)

18

19

20

21

22

23

24

25

K263sch3                          Weber - Cross

1              (In open court)

2     BY MS. SHROFF:

3     Q.  You have it there, Mr. Weber?

4     A.  Yes, I do.

5     Q.  So, according to you, right, there were far more, there

6     were more than seven -- more than 500 tools in use at that

7     time, correct?

8     A.  Yes.

9     Q.  Okay.  And you were part of the team that was conducting

10    this, quote unquote, damage assessment, correct?

11    A.  The initial damage assessment, yes.

12    Q.  Right.  And you determined, did you not, that out of that

13    larger number, 500, that 91 tools were such that a competent

14    security researcher could research and find the leaks, right?

15    A.  That's correct.

16    Q.  Only 91?

17    A.  Yes.

18    Q.  Okay.  And then you told the FBI, did you not, that in your

19    assessment, a subset of the 91, right, you didn't mention how

20    many of the 91, were tools that were about to be retired by the

21    CIA anyway.  Correct?

22    A.  Yes.

23    Q.  And then you told the FBI, did you not, that in your damage

24    assessment, there were also a subset of tools that were on

25    WikiLeaks that had issues with the tools, and the CIA would

K263sch3                          Weber - Cross

1   never use them anyway, correct?

2   A.   Possibly.  Do you mind if I review?

3   Q.   Review all you want.

4           (Pause)

5   A.   Sorry.  I don't see that in the document.  It is -- that

6   sounds like a correct statement, though.

7   Q.   Okay.  If you could just look at the last page, all the way

8   at the bottom, it might help you out.  The last paragraph on

9   four of four.

10  A.   Yes, I see that.

11  Q.   Okay.  And then -- did I cut you off or did you want to say

12  more?

13  A.   I was just saying in that paragraph, I don't see a

14  reference to tools that had a problem.

15  Q.   "Or had other issues."  Do you see that phrase, "or had

16  other issues"?

17  A.   Oh.  Yes, I do.  I'm sorry.

18  Q.   That's okay.  So you see that that sounds like tools that

19  would have a problem, right?

20  A.   Yes.

21  Q.   Okay.  And then you told the FBI, and correct me if you

22  told the FBI the wrong thing, okay, that these tools or at

23  least the CIA plans for its tools to have a shelf life or a use

24  life of approximately six months.

25  A.   That's a fair statement.  There's no math behind it, but

1    that's -- that's my opinion.  I think that's correct.

2    Q.  Okay.  And you thought, and it was your opinion also, that

3    these tools would eventually be found out anyway, based on the

4    nature of computer security, correct?

5    A.  Yes.

6    Q.  Okay.  And when you were doing damage assessment of this

7    WikiLeaks disclosure, you also were of the impression, were you

8    not, that the WikiLeaks disclosure landed with a thud.

9         Does that ring a bell for you?

10   A.  Yes, it does.

11   Q.  Okay.  What do you mean by it landed with a thud?

12   A.  The media did not express significant interest in the

13   disclosure.

14   Q.  And the media didn't seem to care that much about it,

15   correct?

16   A.  That is correct.

17   Q.  You thought it wasn't that big a deal, because people

18   expect that of the CIA anyway, right?

19   A.  I don't feel that's a correct statement.

20   Q.  Okay.  Let me just grab your statement here.

21        Do you recall telling them that it landed with a thud

22   because that's what they expect the CIA to be doing anyway, and

23   it wasn't like it was used against Americans; do you remember

24   that?

25   A.  Yes, I remember, I probably made a statement like that, and

1    it was my opinion that that was what the media's perception

2    was.

3    Q.   Okay.  You told the FBI that, in your opinion, the

4    WikiLeaks story added nothing, because -- or didn't add much,

5    because people expect the CIA to develop tools like those in

6    the WikiLeaks release, correct?

7    A.   I possibly said something like that, yes.

8    Q.   Okay.  And you also told -- I'm going to withdraw that.

9         When you talked to the FBI about this, right, this was

10   in 2017, correct?

11   A.   That probably is right.  I don't remember the dates of when

12   I talked.

13   Q.   Okay.  Would you agree with me, sir, that you did tell them

14   that the CIA's tools have a shelf life of six months, right?

15   A.   Yes.

16   Q.   And the release by WikiLeaks was more than a year from the

17   day that the information, at least according to these

18   prosecutors, the information was taken, correct?

19   A.   Yes.

20   Q.   Now, we talked a little bit about backups, but I wanted to

21   ask you one quick question.  Is it correct to say that

22   Confluence can be copied using a vSphere or a vCenter?

23   A.   Yes.

24   Q.   And you told that to the FBI, did you not, in one of your

25   interviews?

K263sch3                         Weber - Cross

1   A.   Possibly.  I'm not -- I know that we had problems with some

2   of the migration at one point, so, I'm not a strong vSphere

3   vCenter -- like, I'm not that knowledgeable of the technology.

4   Q.   That's fine.  Would you agree with me that I'm correct,

5   right, that Confluence could be copied through a vSphere?

6   A.   Yes.

7   Q.   Or a vCenter?

8   A.   Yes.

9   Q.   Now, when you looked at the information in the actual

10  WikiLeaks release, right?

11  A.   Yes.

12  Q.   Were you one of the people that sat and did a comparison?

13  A.   Yes, I was.

14  Q.   Okay.  By the way, how did you get the WikiLeaks release?

15  A.   The --

16  Q.   If you remember.

17  A.   Initially, literal printout was put in front of me.  And

18  then later, another, another group within the center was tasked

19  with downloading from the internet and then providing that to

20  us.

21  Q.   While you were at the CIA in 2016 and 2017, do you recall

22  being given a copy of any type of damage assessment report?

23  A.   Yes, probably.  Like, it depends what your definition of

24  report is.  I had access to and saw the assessment data.  I

25  don't know if I ever saw, like, a final report or something, if

K263sch3                          Weber - Cross

1    that's what you're referencing.

2    Q.  Does the CIA do a damage assessment report every time there

3    is a spill or a leak?  Do you know?

4    A.  I don't know.

5    Q.  You don't know?

6    A.  No.

7    Q.  There came a time in November of 2016 when Mr. Schulte left

8    the CIA, correct?

9    A.  Yes.

10   Q.  And at that time, after he left, you looked at his

11   computers, correct?

12   A.  I don't believe so, no.

13   Q.  You don't recall being asked to look at his computer,

14   Mr. Schulte's computers?

15   A.  No, I don't.

16   Q.  Okay.  Let me see if I can help you out.

17            THE COURT:  What are you showing him?

18            MS. SHROFF:  I gave the number to Mr. Laroche and I

19   promptly forgot.  I'm sorry.

20            THE COURT:  Just for the record.

21            MS. SHROFF:  Oh.  I'm showing him 3507-513, and I'm

22   showing him specifically page 15 of 27.  Thank you, your Honor.

23            THE COURT:  Okay, Ms. Shroff.

24   Q.  Does that refresh your recollection?

25   A.  I don't recall what I was reviewing.  I think this might

1  have just been log files that I was given.  I don't remember

2  what I used to generate this information.

3  Q.  Okay.  But you looked at his log files, you remember,

4  right?

5  A.  I looked at log files.  The ones I specifically remember

6  were log files of the Atlassian products.  And it sounds like

7  here I had access to some other log files.  I don't remember

8  what those were.

9  Q.  Fair enough.  It's been a long time.  But you remember

10 looking at Mr. Schulte's log files, correct?

11 A.  I remember looking at log files for the Atlassian products.

12 Q.  Then you wrote an e-mail about your review of them, right?

13 A.  Yes.

14 Q.  You sent the e-mail on November 10, and then you sent the

15 e-mail to Anthony -- I can never pronounce -- Leonis.  Is that

16 right?

17 A.  Yes.

18 Q.  And to David, correct?

19 A.  Yes.

20 Q.  And you said that you had looked through the logs, right?

21 A.  Yes.

22 Q.  And that there were four machines authenticated against it,

23 correct?

24 A.  Yes.

25 Q.  And then you listed the four machines, correct?

K263sch3                          Weber - Cross

1    A.  Yes.

2    Q.  And then you said you saw nothing worrisome or suspicious

3    about it, correct?

4    A.  Yes.

5    Q.  And then you sent that e-mail, correct?

6    A.  Yes.

7    Q.  Now, let me just ask you.  You see how it says

8    classification, quote, unclassified?

9    A.  Yes.

10   Q.  Is it fair to say that you are the one who decides how to

11   classify your own e-mails?

12   A.  No.

13   Q.  Oh.  So when you write e-mail, what happens?

14   A.  We, we are given specific guidance on what is classified

15   and what isn't.  We follow that guidance.

16   Q.  Right.  You have follow the guidance, but you decide,

17   right?

18   A.  I decide what information is in there, based on the

19   classification manual that we are given.

20   Q.  Okay.  So, when you start work at the CIA, before they

21   onboard you, they give you a little training on classification,

22   correct?

23   A.  Yes.

24   Q.  How long is that training, like a week, two weeks?

25   A.  A day at most.

K263sch3                          Weber - Cross

1    Q.  A day, right?

2    A.  Yes.

3    Q.  Then they give you like a little guide, correct?

4    A.  Yes.

5    Q.  And then you decide whether you're sending the e-mail with

6    a notation that says classified, unclassified, secret/noforn,

7    secret, top secret, right?

8    A.  Yes.

9    Q.  Okay.  I just want to make sure I understood the process.

10   You can take that down.

11           Now, you also testified yesterday, did you not, about

12   Exhibit 801.  And that's, you said you recognized Mr. Schulte's

13   handwriting.  Right?

14   A.  Yes.

15   Q.  And this is a document that's titled "malware of the mind."

16   Right?

17   A.  Yes.

18   Q.  Okay.  And it says introduction, page one?

19   A.  Yes.

20   Q.  Transcripts page five.  The search warrant page 43.  The

21   complaint page 59.  Ethics and logical look at the charges 87.

22   Right?

23   A.  Yes.

24   Q.  You with me?  Tyranny, conspiracy, and conclusion, right?

25   A.  Yes.

K263sch3                           Weber - Cross

1    Q.   Okay.  Now, you were asked to read -- you can take that

2    down.

3              You were asked to read a portion of that book or

4    article or whatever it is that the government claims it is,

5    right?

6    A.   Yes.

7    Q.   And you authenticated Mr. Schulte's handwriting, correct?

8    A.   Yes.

9    Q.   And you said you were sure that was Mr. Schulte's

10   handwriting, because you'd had trouble reading it before?

11   A.   Yes.

12   Q.   And I can empathize.  It's not the easiest to read.  And

13   then you said you read a subparagraph that you considered trade

14   craft, is that right?  Did I have the right terminology?

15   A.   Yes.

16   Q.   And trade craft is just training, right?

17   A.   Can you repeat that last word?

18   Q.   Trade craft is just another way of saying training, right?

19   A.   It goes beyond that, but --

20   Q.   Tell me how it goes beyond.

21   A.   Trade craft is, we're trained on trade craft.  And trade

22   craft is best practices, tools, techniques.  It covers the

23   gamut.

24   Q.   So it's training on a bunch of different topics and that's

25   called trade craft?

K263sch3                         Weber - Cross

1    A.  Okay, yes.

2    Q.  Right.  Okay.  So, and you said that whatever it is that

3    you read, right?

4    A.  Yes.

5    Q.  And I'm going to have Mr. Lee over there help me bring it

6    up.  Was not anything you would ever talk about in public?

7    A.  Yes.

8    Q.  Okay.  By the way, do you by any chance --

9             MR. LAROCHE:  May I have just one moment?

10            MS. SHROFF:  Sure.

11            (Counsel conferring)

12            MS. SHROFF:  I'm trying to address Mr. Laroche's

13   concern but I don't think, I don't think you're right.  Is that

14   okay, Mr. Laroche?

15            MR. LAROCHE:  Yes.  Thanks.

16            MS. SHROFF:  Great.

17   Q.  Mr. Weber, do you by any chance know if Vault 7 and Vault 8

18   is still up on the internet right now?

19   A.  I don't know, actually.

20   Q.  You don't know, right?

21   A.  No.

22   Q.  And just for a moment assume it's on the internet.  That

23   makes it up on the internet for how long?

24   A.  Usually when something is on the internet, it's on the

25   internet forever.

1    Q.  So it's been up there for at least two years, right?

2    A.  Yes.

3    Q.  And can I go back to the exhibit.  You testified that all

4    you recognize about the exhibit is the handwriting, right?

5    A.  Yes, and I recognize the techniques that is being

6    referenced as well.

7    Q.  Okay.  Well, we'll get to the techniques in a minute.  But

8    you recognize the handwriting, right?

9    A.  Yes.

10   Q.  You wouldn't have to read the techniques.  You would just

11   say that's Josh Schulte's handwriting?

12   A.  Okay.

13            MS. SHROFF:  Can I have it up?

14   Q.  And you don't know when this document was written, correct?

15   A.  No, I do not know.

16   Q.  You don't know what year it was written.

17   A.  That is also correct.

18   Q.  So if you don't know what year, you don't know what month

19   or what day, correct?

20   A.  That's correct.

21   Q.  Now, you testified -- could I have the language that the

22   government had him read up.  Let me just see if we can

23   highlight that section for you, okay.  This one.

24   A.  Yes.

25   Q.  Okay.  Is it fair to say that after you leave the CIA, you

K263sch3                    Weber - Cross

1    are allowed, if you go through certain protocols, to tell

2    people you worked at the CIA once in your life?

3    A.  I believe so, yes.

4    Q.  In fact, you have colleagues, right, that are now in

5    private practice or running their own boutiques, and they say

6    on their bio page "I used to work for CIA."

7    A.  I tend not to engage with people that leave the CIA for

8    protection of my identity.

9    Q.  Well, you described yesterday your daily job, right, for us

10   at the CIA?

11   A.  Yes.

12   Q.  You said you go to the office 9 to 5?

13   A.  Yes.

14   Q.  Some days you work later?

15   A.  Yes.

16   Q.  You work in the D.C. area?

17   A.  Yes.

18   Q.  You live around that area?

19            MR. LAROCHE:  Objection, your Honor.

20            MS. SHROFF:  He opened the door.

21            THE COURT:  Overruled.

22   Q.  Right?

23   A.  Yes.

24   Q.  That's where you work, right?

25   A.  Yes.

K263sch3                           Weber - Cross

1    Q.  Washington, D.C.?

2    A.  Yes.

3    Q.  Capital of the nation?

4    A.  Yes.

5    Q.  You go home?

6    A.  Yes.

7    Q.  You use the car or the subway?

8    A.  I use a car.

9    Q.  Excellent.  Then you come back to work, same car, correct?

10   A.  Yes.

11   Q.  And how long have you been doing that?

12   A.  For about 10 years now.

13   Q.  Getting back to this.  "Do you know what my specialty was

14   at the CIA," and he talks to you about data hiding and crypto,

15   correct?

16   A.  Yes.

17   Q.  Okay.  Is that just a different word for steganography?

18   A.  Steganography would be a subset of data hiding.

19   Q.  That is like something that people have been doing since

20   what, 2003 at least, correct?

21   A.  Yes.

22   Q.  And it's taught at a course at Columbia University that you

23   can hide data and crypto, correct?

24   A.  I wouldn't know who was first to, like, publish something

25   like that.  But --

1    Q.  But there are articles upon articles, right?

2    A.  Yes.

3    Q.  About this, right?

4    A.  Yes.

5    Q.  This is nothing new.  People design and write software to

6    conceal data in a custom designed file system, correct?

7    A.  Yes.

8    Q.  And they put that file system in a slack space, correct?

9    A.  I'm sure it is not a unique technique.

10   Q.  Exactly.  Apple phone does it, right?

11   A.  I don't know that.

12   Q.  Well, you should check.  They definitely do it, I checked.

13            But moving on, it says "or hidden partitions."  Isn't

14   slack space just hidden partition?

15   A.  No.  There are two different, those are two different

16   definitions.

17   Q.  Okay.  Slack space is a little bit more highfalutin, but

18   essentially it is just space, right?

19   A.  It's different definitions of different types of spaces.

20   Q.  Okay.  But again, nothing unique here, right?

21   A.  No.

22   Q.  Okay.  "I disguised data."  Nothing unique about that

23   either, right?

24   A.  No.

25   Q.  "I split data across files and file systems to conceal the

K263sch3                         Weber - Cross

1   crypto."  Nothing unique about it?

2   A.  No.

3   Q.  Exactly.  "I had analysis tools that and could --" I can't

4   read his handwriting, you're right, "and could never detect

5   random or pseudorandom data indicative of potential crypto."

6          All of it very normal, taught by professors in

7   colleges, NYU, Fordham, CUNY; wherever you want to go, right?

8   A.  Yes.

9   Q.  Now, it's no secret that he designed and wrote his own

10  crypto.  In fact, he talked to you about his own crypto a

11  million times and you were fed up with that conversation,

12  right?

13  A.  Yes.

14  Q.  And then he says, you know, he calls some forensic

15  examiners buffoons, correct?

16  A.  Yes.

17  Q.  I'm sure there is a forensic examiner out there who is a

18  buffoon, but let's move to the next one.

19          MR. LAROCHE:  Objection, your Honor.

20          MS. SHROFF:  Sorry.  I withdraw it.

21          THE COURT:  The jury will ignore that remark.

22  Q.  And "the FBI then to have custom software that doesn't fit

23  into their two-week class where they become forensic experts."

24  There is nothing classified about that statement, right?

25  A.  No.

K263sch3                          Weber - Cross

1    Q.  Nothing trade crafty about it?

2    A.  No.

3    Q.  Okay.  And then the rest of it really doesn't have anything

4    to do with it, but let's just finish.  "Make no mistake, I'm an

5    expert in data hiding," right?

6    A.  Yes, he states that.

7    Q.  Would it surprise you to know that a simple Google search

8    of data hiding would tell you every single thing that is noted

9    here?

10   A.  No, it would not surprise me.

11         MS. SHROFF:  You can take that down.

12   Q.  You testified about folks engaging in malware, correct?

13   A.  Yes.

14   Q.  And you would agree that there are other foreign nations

15   and foreign powers that engage in malware, correct?

16   A.  Yes.

17   Q.  Everybody is in the business of making malware.  A lot of

18   people in the business of making malware?

19   A.  I don't know the amount of people, but, there is a

20   significant number.

21   Q.  Right.  So, just as we do, other countries engage in the

22   same thing, correct?

23   A.  Yes.

24   Q.  Just like we design thumb drives, let's pick three

25   countries.  France, Iran, and Portugal also design thumb drive

K263sch3                         Weber - Cross

1   tools, correct?

2   A.   I haven't seen any reports that would show that.

3   Q.   I'm really not asking for reports, I am just asking you if

4   you agree with me that foreign nations also create such thumb

5   drives?

6   A.   Foreign nations, probably, yes.

7   Q.   And just like we recruit people to access other countries'

8   computers, other countries recruit people to access our

9   computers, correct?

10   A.   Yes.

11   Q.   So, just like our agencies want to uphold the Constitution

12   and design these tools to infect the computer systems of other

13   countries, other countries are equally invested in upholding

14   their Constitution, and infecting our computer systems with the

15   same thumb drives and malware, correct?

16   A.   I would assume.

17   Q.   Let me ask you something.  You ever heard of something

18   called Operation Buckshot Yankee?

19   A.   No, I don't believe I have.

20   Q.   You don't, you don't as a CIA employee, you never heard

21   that it was an investigation into Russia for designing thumb

22   drive tools that were eventually used against the U.S.?

23   A.   No, I did not hear of that.

24   Q.   Okay.  Now, Mr. Weber, is it fair to say that you prepared

25   for your testimony here today, correct?

K263sch3                          Weber - Cross

1    A.  Yes.

2    Q.  And before you testified here today, were you ever told

3    that Mr. Schulte's defense team wanted to talk to you?

4    A.  I received a subpoena.  But I was never -- nobody ever told

5    me that you guys were reaching out specifically to talk to me

6    outside of that subpoena.

7    Q.  So outside of the subpoena, you never had a reach out,

8    either by e-mail, in person, or by any other means, that

9    Mr. Schulte's lawyers just wanted to sit down and talk to you,

10   just like you had sat down and talked to these individuals?

11   A.  I don't believe so, no.

12   Q.  You met with each one of these prosecutors, correct?

13   A.  I don't know if I talked to all of them, but, yes.

14   Q.  You've talked to them somewhere between 11 and 15 times?

15   A.  I have no idea what the number was.

16   Q.  March 22, 2017, March 27, April 5, May 8th, May 22,

17   June 1st, August 31.  This was all in 2017.

18   A.  Okay.

19   Q.  Do you have any idea how many hours you spent with them in

20   2017?

21   A.  No, I don't.

22   Q.  2018, you met with them on January 12, June 1st, June 11,

23   August 6, November 12, December 12, Any idea how many hours you

24   spent with them?

25            MR. LAROCHE:  Objection.

K263sch3                          Weber - Cross

1   A.  No.

2              THE COURT:  Overruled.

3   Q.  Then you met with them in January.  Correct?

4   A.  Yes.

5   Q.  January 14, January 21, and January 29.  Correct?

6   A.  Possibly, yes.

7   Q.  No idea how many hours you spent with them?

8   A.  No.

9   Q.  How many hours did you spend with me?

10  A.  Zero.

11  Q.  Mr. Zas?

12  A.  Zero.

13  Q.  Mr. Branden?

14  A.  Zero.

15  Q.  And your testimony today is nobody told you that lawyers

16  from the Schulte defense team wanted to talk to you until we

17  served you with a subpoena?

18  A.  Yes.

19  Q.  Well, you've testified, so you can disregard that subpoena

20  that we served on you.

21  A.  Thank you.  That was going to be one of my questions.

22             MS. SHROFF:  I have nothing further.

23             THE COURT:  Mr. Laroche.

24             MR. LAROCHE:  Thank you, your Honor.

25  REDIRECT EXAMINATION

1   BY MR. LAROCHE:

2   Q.  Mr. Weber, I want to start I think essentially where

3   Ms. Shroff left off which was Government Exhibit 801.  On that

4   exhibit, if we can zoom back in on the paragraph we were just

5   talking about.

6          You were asked a number of questions about whether

7   these techniques generally are in the public domain.  That they

8   are techniques that are known in the public.

9   A.  Yes.

10  Q.  Yesterday you testified that you as a CIA officer had never

11  talked about these types of techniques publicly.

12  A.  Yes.

13  Q.  Why as a CIA officer had you never talked about these types

14  of techniques publicly?

15  A.  Because tying these techniques to CIA operations can lead

16  to attribution to the CIA.

17  Q.  Have you ever read a statement by a CIA officer confirming

18  the CIA's use of these techniques?

19  A.  No, I haven't.

20  Q.  Would that be problematic?

21  A.  Yes, it would.

22  Q.  Why?

23  A.  The, again, the -- if malware was captured on a target

24  system, and that adversary knew that they had been hacked,

25  confirming that you used a technique like that might lead them

K263sch3                          Weber - Redirect

1    to understanding that they had been hacked by the CIA.

2              MR. LAROCHE:  Thank you.  We can pull that down.

3    Q.  You were also asked about log files that you reviewed

4    around the time that the defendant resigned from the agency.

5    Do you remember that?

6    A.  Yes.

7    Q.  That was in late 2016 that you reviewed those log files?

8    A.  Yes.

9    Q.  I believe you testified on cross-examination that you

10   believed those log files were from the Atlassian services?

11   A.  Those are the ones that I remember reviewing.

12   Q.  So we showed you some log files yesterday.  Isn't that

13   correct?

14   A.  Yes.

15   Q.  If we can just pull up one of those log files.  We can

16   start with 1202-18.

17             Do you recall testifying about this yesterday?

18   A.  Yes.

19   Q.  Do you recall that this was one of the log files that was

20   taken from the defendant's DevLAN computer?

21   A.  Yes.

22   Q.  In late 2016, was this one of the log files that you

23   reviewed from the DevLAN -- from the government -- from the

24   Atlassian log files?

25   A.  What was the date you asked again?

K263sch3                      Weber - Redirect

1    Q.  In late 2016, when the defendant had resigned or around

2    that time, was this one of the log files that you reviewed from

3    the Atlassian services?

4    A.  No, it was not.

5    Q.  If we can zoom in on the top three lines again, please.

6    Just starting on the third line at the bottom right.  There is

7    a reference to osb.devlan.net.  Do you have an understanding of

8    where this log file is reflecting activity?

9    A.  On the ESXi server owned by OSB.

10   Q.  Can you remind us what date these activities occurred?

11   A.  April 20, 2016.

12   Q.  What was the activity that was reflected on the defendant's

13   DevLAN computer?

14   A.  Reverting to a snapshot.

15   Q.  Had you viewed this log file at or around the time of the

16   defendant's resignation, what, if any, steps would you have

17   taken as a result?

18   A.  I would have reported this.

19   Q.  Why?

20   A.  This is very suspicious that he would take an action like

21   this.

22   Q.  Can you focus again -- why is it suspicious?

23   A.  He had no administrative role in this, and there was no

24   reason that he should revert to a snapshot.

25   Q.  Can you remind us of the time of day that this occurred.

K263sch3                        Weber - Redirect

1    A.  This would have occurred at 5:35 p.m.

2    Q.  We can pull that down.  Can we please publish Government

3    Exhibit 1207-27.

4            Do you recall yesterday that I asked you a series of

5    questions about this log file?

6    A.  Yes.

7    Q.  Can you remind us again where this log file came from?

8    A.  From the Altabackup.

9    Q.  Was this one of the log files that you reviewed at or

10   around the time the defendant resigned?

11   A.  No, it was not.

12           MR. LAROCHE:  We can zoom in on the government exhibit

13   sticker and on those rows.

14           MS. SHROFF:  Your Honor, I don't think this exhibit is

15   a log file.  It's beyond the cross.

16           MR. LAROCHE:  They asked him questions about things he

17   reviewed related to defendant's devices.

18           THE COURT:  Objection is overruled.

19   Q.  Can you focus again on the March 3, 2016, backup.

20   A.  Yes.

21   Q.  I think you testified yesterday that one of the columns in

22   the middle showed date accessed?

23   A.  Yes.

24   Q.  Can you tell us what the date accessed is for the March 3,

25   2016, backup.

K263sch3                          Weber - Redirect

1    A.   April 20, 2016.

2    Q.   What types of activities would update the date accessed

3    field?

4    A.   Reading the file or copying the file.

5    Q.   Had you viewed this file at or around the time of the

6    defendant's resignation, what, if any, steps would you have

7    taken?

8              MS. SHROFF:   Your Honor, it's hypothetical.   What he

9    would have done is immaterial to this jury.

10             THE COURT:   Overruled.

11             What would you have done?

12             THE WITNESS:   I would have reported this to leadership

13   immediately.

14   Q.   Why?

15   A.   Because this was showing somebody accessing data, and it

16   would have been unusual.

17             MR. LAROCHE:   We can pull that down.

18   Q.   You were asked a series of questions about the damage

19   assessment of the leak and the potential harm that was caused.

20   Do you remember that?

21   A.   Yes.

22   Q.   You were asked a series of questions about tools that might

23   have been retired after the leak.   Do you remember that?

24   A.   Yes.

25             MS. SHROFF:   Objection.   That was not the question I

K263sch3                          Weber - Redirect

1     asked.

2            THE COURT:  Overruled.

3     Q.  When a tool is retired, at what point does the CIA issue a

4     press release that they are retiring the tool?

5            MS. SHROFF:  Objection.  It's beyond the scope.

6            THE COURT:  It's not.  Objection is overruled.

7     A.  We would never do that.

8     Q.  Why not?

9     A.  Because even though a tool was no longer used, there was --

10    it was most likely used in an operation, and it might have been

11    caught in that operation.  So again, disclosing that that was a

12    CIA tool would lead to attribution to CIA operations.

13    Q.  In what ways would that be problematic?

14    A.  It would be problematic for our diplomatic mission, any

15    engagement with that country.  They would not be happy to know

16    that they were targets of the CIA.

17    Q.  You were also asked about a series of statements you made

18    relating to it landing as a thud in the media.

19    A.  Yes.

20    Q.  Did the leak land as a thud for your work?

21    A.  No, it did not.

22    Q.  Why not?

23    A.  It was extremely damaging.  It caused not only us to devote

24    a lot of energy to assessing the damage, it caused us to have

25    to rewrite a significant number of tools, and it also led us to

K263sch3                      Weber - Redirect

1    have to review a significant number of operations to understand

2    what our risk exposure was.

3              MR. LAROCHE:  Can we please publish Government Exhibit

4    1251 again.

5    Q.  Ms. Shroff on cross-examination asked you a series of

6    questions about Jira.

7    A.  Yes.

8    Q.  And malware related to Jira.

9    A.  Yes.

10   Q.  At one point, she cut you off when you said something was

11   unrealistic.

12   A.  Yes.

13   Q.  She was correct to say I would ask you about it.

14             Why do you think her scenario was unrealistic?

15   A.  The scenario that she talked about would have involved

16   compromising a significant number of disparate technologies.

17   You have web services, you have different types of host OS,

18   possibly firewalls in the way.  You would need a tool, specific

19   for each one of those situations, and that would involve --

20   these, these are in the realm of possible, but when the CIA

21   does something like this, this is many, many developers and

22   many, many operators doing something like that.

23             (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1  BY MR. LAROCHE:

 2  Q.  And are you aware of any such tool that was developed in

 3  EDG?

 4  A.  No.

 5  Q.  Ms. Shroff also asked you about the backups.  Do you recall

 6  that?

 7  A.  Yes.

 8  Q.  And how the backups were set up.  Do you remember that?

 9  A.  Yes.

10  Q.  And she asked you about the mount points, right?

11  A.  Yes.

12  Q.  And how the mount points were set up.  Can you remind us,

13  where were the mount points for the Altabackup set up?

14  A.   Inside the virtual machine that was running Confluence or

15  Bamboo or inside, like, the physical server that Stash was

16  running.

17  Q.  And who had access to those mount points?

18  A.  It would have been Josh and myself.

19  Q.  And why only you and Josh would have had access to those

20  mount points?

21  A.  We were the only ones that had the credentials to log in to

22  those machines.

23  Q.  And what credentials are you referring to?

24  A.  The SSH keys.

25  Q.  What types of SSH keys?

K26Wsch4                         Weber - Redirect

1    A.  It would be an SSH key for Confluence and SSH key for

2    Bamboo.  They were specifically set up for logging in to those.

3    Q.  Are they Atlassian-level administrative privileges?

4    A.  No.

5    Q.  What are they?

6    A.  These would have been privileged to the host OS that was

7    running the Atlassian products.

8    Q.  And who had those keys?

9    A.  Josh and myself.

10   Q.  Could regular users access those mount points?

11   A.  No.

12   Q.  How do you know that?

13   A.  You would need to log in to the host OS to be able to do

14   that, and only Josh and I could log in to those.

15   Q.  Now, you were asked a series of questions about what

16   happened with the privileges on OSB libraries.  Do you remember

17   that?

18   A.  Yes.

19   Q.  I want to try to walk through step by step what happened

20   there.  One of the first things you were asked is whether you

21   thought you and Mr. Schulte at the time were equals.  Do you

22   remember that?

23   A.  Yes.

24   Q.  And you said you didn't think you were?

25   A.  No.

K26Wsch4                        Weber - Redirect

1   Q.   Can you just explain what you meant by that?

2   A.   So, Mr. Schulte was -- I had more experience than

3   Mr. Schulte, and in this scenario, it was comparing apples and

4   oranges.  We were talking about my role in OSB and then his

5   role in RDB.  There was no real comparison there.

6   Q.   Why not?

7   A.   Well, because there wasn't really any significant overlap

8   in the projects between OSB and RDB.

9            MR. LAROCHE:  Ms. Hurst, you can take that down.

10  Q.   Let's talk about what happened with OSB libraries.  Ms.

11  Shroff asked you a series of questions related to the timing of

12  when things happened?

13  A.   Yes.

14  Q.   When did you change the defendant's privileges to OSB

15  libraries?

16  A.   I believe it was shortly after him departing OSB.

17  Q.   And why did you do that?

18  A.   It would have been because he was departing OSB and he no

19  longer needed access to OSB projects.

20  Q.   Now, did there come a time when the defendant approached

21  you about that?

22  A.   Yes.

23  Q.   Do you remember Ms. Shroff asking you a series of questions

24  about what happened during that interaction?

25  A.   Yes.

1   Q.  What do you recall the defendant saying to you when he

2   approached you?

3   A.  I recall him wanting access back to it, and then I saw the

4   statement that I had written, so --

5   Q.  And so I think one of the things you said was that he,

6   after he talked to you, talked to Sean, correct?

7   A.  Yes.

8   Q.  And then he came back and talked to you?

9   A.  Yes, that's correct.

10  Q.  And the statement Ms. Shroff was showing you was related to

11  when he came back, right?

12  A.  Yes.

13          MR. LAROCHE:  Let me show you an email, Government

14  Exhibit 1062.  Actually, I'm sorry.  Government Exhibit 1061.

15  If we can go to the last page.  I just want to try to orient us

16  to where we're at.

17  Q.  What time was this email sent?

18  A.  This would have been at 3:30 p.m.

19  Q.  OK.  And this is the email you sent, correct?

20  A.  Yes, correct.

21  Q.  I believe it's on the previous page, at the bottom; it

22  shows your name?

23  A.  Yes.

24  Q.  So at this point you'd spoken to Sean, is that right?

25  A.  Yes, that's correct.

K26Wsch4                        Weber - Redirect

1   Q.  And this was after Mr. Schulte had made the statements to

2   you about "I'm going to get my accesses back"?

3   A.  Yes.

4   Q.  So after Mr. Schulte made this statement that -- he said I

5   was going to get my accesses back; Ms. Shroff asked you a lot

6   of questions -- you sent this email, is that correct?

7   A.  Yes.

8   Q.  Who is on this email?

9   A.  It's Sean, Anthony, Richard and Frank.

10  Q.  And just remind us, at the time, what position did Sean

11  have?

12  A.  He was my branch chief.

13  Q.  What position did Anthony have?

14  A.  He was my deputy division chief.

15  Q.  And why did you send this email?

16  A.  I was instructed to.

17  Q.  By who?

18  A.  By Sean.

19  Q.  You had already spoken to Sean about the privileges issue?

20  A.  Yes.

21  Q.  And Sean told you to send this email?

22  A.  Yes.

23  Q.  Can you summarize what you say in this email?

24  A.  I am giving very specific guidance on what Josh's role was

25  supposed to be in the libraries at that time.

1    Q.  And what was his role supposed to be?

2    A.  He was supposed to be a contributor like anybody else in

3    the division but not have direct access to the Master and

4    Develop branches.

5    Q.  And these were instructions you gave at the direction of

6    Sean?

7    A.  Yes.

8            MR. LAROCHE:  Let's go to the next email.

9    Q.  This is the response that you were asked about earlier,

10   isn't that correct?

11   A.  Yes.

12   Q.  And Ms. Shroff was asking you whether you sent that first

13   email after this or vice versa, is that right?

14   A.  Yes.

15   Q.  Does looking at these two emails in order refresh your

16   recollection about which one came first?

17   A.  Yes, it does.

18   Q.  Which one came first?

19   A.  My email came first.

20   Q.  OK.  So Mr. Schulte responds.  Do you see the timing on

21   that?

22   A.  Yes.

23   Q.  And what time is it?

24   A.  It is at 3:39 p.m.

25   Q.  Now, Ms. Shroff went through this email with you.  Do you

1    recall that?

2    A.  Yes.

3    Q.  But I think you testified yesterday that you did something

4    after this email?

5    A.  Yes.

6    Q.  What did you do?

7    A.  I checked the log files of the OSB libraries.

8    Q.  Why did you check the log files of OSB libraries after

9    seeing this email?

10   A.  I didn't trust Josh to play by the rules.

11   Q.  So you send this email, you check the logs files, what do

12   you see?

13   A.  I see that after he sent this email he modified his

14   permissions on the OSB libraries to what he wanted and not what

15   was described in the email.

16   Q.  So the modification came after you had sent the email, that

17   first email, is that right?

18   A.  Yes.

19   Q.  Telling him how his permissions had changed?

20   A.  Yes.

21   Q.  Is that right?

22   A.  Yes.

23   Q.  And it came after the two conversations you had with him

24   before that about his privileges changing, is that right?

25   A.  Yes.

1          MR. LAROCHE:  Let's go to 1062, another email Ms.

2     Shroff showed you.

3     Q.  Now, after you found out that he changed his privileges,

4     what, if any, steps did you take?

5     A.  I reported it to leadership.

6     Q.  And who did you report it to?

7     A.  Sean, and then I was directed to go talk to Anthony.

8     Q.  And did you end up emailing Anthony?

9     A.  I believe so, yes.

10         MR. LAROCHE:  Let's look at the second-to-last page of

11    this email string.  Stop right there.  OK.  Let's zoom in on

12    the to-from here.

13    Q.  Who sent this email?

14    A.  I did.

15    Q.  And what time did you send it?

16    A.  April 14 at 4:40 p.m.

17    Q.  So this is after of the email we just looked at with

18    Mr. Schulte, is that right?

19    A.  Yes.

20    Q.  And this is after you had determined that he changed his

21    privileges?

22    A.  Yes.

23    Q.  And who did you copy on this email?

24    A.  There was nobody copied, but there was multiple people on

25    the "to" line.

1   Q.  Thank you.

2       Who was in the "to" line?

3   A.  Anthony, Sean and Richard.

4   Q.  OK.  And the subject is OSB libraries?

5   A.  Yes.

6       MR. LAROCHE:  Why don't we zoom out again and then

7   zoom in on what you said to Anthony.

8   Q.  Can you read that, please?

9   A.  "Anthony, we have a situation with the libraries and the

10  Atlassian products in general.  After we talked with Josh, and

11  I sent the email saying that he doesn't have direct access to

12  our two main branches, he went and modified the permissions to

13  the project to return his previous rights.  He was able to do

14  this because he is one of the Atlassian administrators, and I

15  think we need to remove him from this group.  I can explain the

16  situation further, but this act has shown he believes that

17  access controls shouldn't apply to him."

18  Q.  One of the things you said in this email is "I think we

19  need to remove him from this group."  What group is that?

20  A.  This would have been the Atlassian administrators group.

21  Q.  Why do you think you needed to remove him from that group?

22  A.  He can no longer be trusted with the administrative

23  privileges.

24  Q.  And what about what he did with OSB libraries showed that

25  to you?

1   A.  He ignored the direction of leadership and set the

2   permissions that he wanted to have versus doing what he was

3   told.

4           MR. LAROCHE:  Let's look at the next email in this

5   chain.  Just zoom in on who sent this email in response.

6   Q.  Who sent this?

7   A.  Anthony did.

8   Q.  And when did he send this?

9   A.  April 15 at 7:29 a.m.

10  Q.  And he sent it back to you, Sean and Richard, is that

11  right?

12  A.  Yes.

13          MR. LAROCHE:  Let's look what he said to you.

14  Q.  Can you summarize what he's asking you in this email?

15  A.  So, he's asking for a few points of clarification:  1, if

16  the libraries were owned by OSB, what Josh's permissions were,

17  and how I spoke to Josh about this.

18      And then he explains that -- that there's two scenarios in

19  his mind:  One scenario where Josh was being denied access to

20  the OSB libraries and being able to use them, and the other

21  scenario is if he changed his permissions to enable him to be

22  able to administer the libraries.

23  Q.  Which scenario happened?

24  A.  The second.

25  Q.  Did you respond to this email?

1    A.  I would have followed up.  I don't know if it was via email

2    or sitting down and talking to him.

3              MR. LAROCHE:  Let's take a look on this exhibit.  Can

4    we go to the next email.  Just zoom in on the to-from here.

5    Q.  Who sent this email?

6    A.  I did.

7    Q.  When?

8    A.  April 15 at 12:12 p.m.

9    Q.  Did you respond to Anthony here?

10   A.  Yes.

11   Q.  And Sean and Richard?

12   A.  Yes.

13             MR. LAROCHE:  Let's look at the substance of this

14   email.

15   Q.  Now, first, can we just start at the top here, just read

16   the first sentence at the top.

17   A.  "Sorry for the spam.  Because of the below, the

18   classification on this email should be bumped up to secret."

19   Q.  Do you have on understanding of what you mean by that?

20   A.  Yes.

21   Q.  What do you mean?

22   A.  I believe the original email would have been unclassified,

23   something like that.  I responded to it with classified

24   information in it but didn't appropriately mark the document.

25   Q.  Did you reclassify it?

1    A.  Yes.

2    Q.  Let's look at this first paragraph that appears on the

3    screen.  Could you just summarize what you're saying in this

4    paragraph?

5    A.  So, I am explaining why we created the libraries and what

6    they were meant to do.

7    Q.  So responding to one of Anthony's questions, is that right?

8    A.  Yes.

9          MR. LAROCHE:  Let's go to the next page, please.  Just

10   zoom in the "we had three goals."

11   Q.  Summarize what those three goals were.

12   A.  We wanted to make sure that developers had code that they

13   could trust to use in tools that they were going to deploy; we

14   wanted to have a process in which all developers could

15   contribute; and we wanted a means for us to track what code was

16   being used and where.

17         MR. LAROCHE:  Let's zoom out again.

18         Then just zoom in on those bullets at the bottom.

19   Starting right there, yes.

20   Q.  Do you see there's a series of bullets that start CoreLib,

21   buffers, data transfers, execution vectors, and it goes down?

22   A.  Yes.

23   Q.  What are those?

24   A.  Those are -- I've said that we do eight things.  These are

25   essentially those eight things.

1    Q.  Are these parts of the libraries?

2    A.  Yes, they are.

3    Q.  And just generally speaking, in what way are they parts of

4    the libraries?

5    A.  They're individual components of the libraries, so if you

6    needed to use data transfer in the tool that you created, you

7    would use that library.

8    Q.  So at this point you're still explaining the libraries to

9    Anthony, is that right?

10   A.  Yes, that's correct.

11   Q.  In response to his question?

12   A.  Yes.

13           MR. LAROCHE:  Let's go to the next page, please.

14   Let's just zoom in on "hopefully that is enough background" and

15   then down through -- yes.  Right there is fine.

16   Q.  Why don't you start with No. 1.  Can you read No. 1,

17   please?

18   A.  "The libraries are currently an OSB-owned product.  We have

19   a desire to make them an AED and have begun talking with Kevin

20   to see if we can transfer ownership to him so that it can be an

21   AED-level product.  However, anyone is free to contribute and

22   use the libraries as they desire.  The only thing OSB controls

23   is the keys to Develop and Master."

24   Q.  At this point who is controlling OSB libraries?

25   A.  OSB.

K26Wsch4                         Weber - Redirect

1    Q.  And in particular, within OSB, who had direct control?

2    A.  I believe at this point it would have been myself, Frank

3    and Matt.

4    Q.  Let's read the second paragraph.

5    A.  "Josh used to have the ability to merge items into Develop

6    and Master.  He didn't always follow the process and ended up

7    making more work for Frank pretty often due to this disregard

8    to the pull-request model.  His defense was always they were

9    admin changes and not new code.  I want to make clear that we

10   did not limit his ability to contribute to the libraries.  That

11   is still something he can do.  All we did was remove his

12   ability to merge changes into the long-lived branches, thus

13   removing his ability to control what goes into the official

14   versions."

15   Q.  What did you mean "his ability to contribute to the

16   libraries"?

17   A.  We had designed the libraries such that anybody in the

18   division could follow a process to add -- add new techniques

19   and code to the libraries.

20   Q.  So in what way did his privileges change?

21   A.  It was the final step of that process.  After the code is

22   changed, after it is reviewed, one of the project leads would

23   just check to make sure all of the steps had been followed and

24   would literally click a button in the Atlassian page to say

25   merge.

1          MR. LAROCHE:  OK.  If we can zoom in on just paragraph

2     3.

3     Q.  Why don't we start with the first two sentences, please.

4     A.  "Josh and I did have a conversation yesterday (14 April

5     2016).  He came up after finding that he no longer had

6     permissions to merge into long-lived branches and wanted to

7     know why this was the case and whose decision it had been.  I

8     informed him that this was a decision that Sean had made, and

9     that I agreed with the decision."

10    Q.  Does this refresh your recollection as to who made the

11    decision as to his privileges?

12    A.  Yes, it does.

13    Q.  Who made that decision?

14    A.  Sean.

15    Q.  Can you read the next sentence, please?

16    A.  "I stated that since Josh was no longer a member of OSB and

17    since the libraries were still an OSB project, he should not

18    have the authority to merge into the long-lived branches."

19    Q.  And the next sentence, please.

20    A.  "He disagreed with this answer and stated that when he

21    agreed to move to RBD that it was with the understanding that

22    he would keep all his projects."

23    Q.  And next the few sentences, please.

24    A.  "In his view, the libraries were his idea, that he should

25    remain in charge of them.  I informed him that my understanding

1  of the situation was different and he could talk to Sean about

2  it, which he did."

3  Q.  Now, was this the first conversation you had with the

4  defendant about OSB libraries that day?

5  A.  Yes.

6  Q.  And then after this you went and talked to Sean, is that

7  right?

8  A.  Yes.

9  Q.  Let's continue with this paragraph that starts "after a

10  long discussion."

11  A.  "After a long discussion with Sean, he returned to my desk

12  and said that Sean stated that it was OK for him to have admin

13  access to the libraries and that I should re-enable his access,

14  to which I replied that I would discuss with Sean.  Schulte

15  then finished the conversation by stating that he will

16  eventually get access back to the libraries and that access

17  should just be enabled now."

18  Q.  You can keep going.

19  A.  "I took this statement as him just saying that he was going

20  win the argument and I shouldn't bother pushing back.  After he

21  departed, I discussed things with Sean, where it was confirmed

22  that the OK to give admin access to Schulte was not a thing and

23  that I should email Schulte the specifics of his role (see the

24  email sent last night).  Following sending the email and

25  reading his response, I took a look at audit logs and the

K26Wsch4                        Weber - Redirect

1    libraries themselves."
2    Q.  We'll stop there.  You can stop there, Mr. Weber.
3        The previous sentence says, "I discussed things with Sean,
4    where it was confirmed that the OK to give admin access to
5    Schulte was not a thing."  What did you mean by not a thing?
6    A.  Sean told me that Josh was not supposed to have admin
7    access and I should not re-enable it.
8    Q.  And then after that, you said "I should email Schulte the
9    specifics of his role."  Did you do that?
10   A.  Yes, I did.
11   Q.  Was that the email we looked at as the previous exhibit?
12   A.  Yes, it was.
13   Q.  And then after that, you said you looked at the audit logs,
14   is that right?
15   A.  Yes.
16   Q.  What, if anything, did those audit logs show?
17   A.  Those audit logs showed that following Schulte's emailed
18   response, he went and re-enabled his admin access to the
19   libraries.
20            MR. LAROCHE:  If we can just zoom out and then go to
21   the next page.
22   Q.  This is a continuation of the last page.  Can you just
23   finish reading this part of the paragraph?
24   A.  "His direct write access to Master and Develop shortly
25   after sending a response to my email detailing his

1   responsibilities.  Again, the only reason to have access to

2   Master and Develop is to control what is able to be merged into

3   the libraries.  Not having access to these branches in no way

4   limits the ability to contribute to or use the libraries."

5   Q.  Have you ever given yourself back administrative privileges

6   to any program without explicit authorization?

7   A.  No, I have not.

8   Q.  Are you aware of any employee ever at the CIA taking such

9   action?

10  A.  No, I'm not.

11  Q.  Is that type of action problematic for your line of work?

12  A.  Yes, it is.

13  Q.  Why?

14  A.  Because it shows that you cannot be trusted to follow the

15  rules and should not have access to classified information.

16          MR. LAROCHE:  You can pull that down.

17  Q.  Yesterday, and today a little bit, you were asked some

18  questions about auditing on the system?

19  A.  Yes.

20  Q.  Are you aware of any time where auditing was increased on

21  DevLAN?

22  A.  Yes.

23  Q.  When, approximately, did that happen?

24  A.  It would have happened shortly after this email chain.

25  Q.  And why was auditing increased?

K26Wsch4                           Weber - Redirect

1    A.  We wanted to have a better understanding of who was

2    accessing what within the Atlassian products.

3    Q.  Was it in response to any specific activities?

4    A.  I don't know specifically, but I would assume it was in

5    response to this.

6            MS. SHROFF:  Objection as to his assumptions, your

7    Honor.

8            THE COURT:  Strike the answer.

9    BY MR. LAROCHE:

10   Q.  Remember when you and Ms. Shroff were talking about latency

11   issues with some of the foreign offices?

12   A.  Yes.

13   Q.  And Ms. Shroff cut you off during one of your answers?

14   A.  Yes.

15   Q.  What were you trying to say then?

16   A.  The -- I never followed up with ISB, but Frank and

17   Patrick -- they, to this date even, continue to complain about

18   the transfer speeds out there.

19   Q.  What do you mean by transfer speeds?

20   A.  The --

21           MS. SHROFF:  Objection to the hearsay, your Honor.  He

22   has no personal knowledge.

23           THE COURT:  Overruled.

24   A.  The speed at which the developers in Foreign Office East

25   and Foreign Office West could download data that was stored in

K26Wsch4                      Weber - Redirect

1    the WMA area.

2    Q.  Does that include the DevLAN network when it was in

3    existence?

4    A.  Yes.

5    Q.  You were asked a number of questions about DevLAN being a

6    dirty network --

7    A.  Yes.

8    Q.  Do remember that?

9         And also being the wild Wild West?

10   A.  Yes.

11   Q.  Can you explain to us again what you mean by dirty network?

12   A.  So, DevLAN -- we would -- we would occasionally repurpose

13   malware or we would have collection from target networks on

14   DevLAN.  We couldn't trust what was in that, in that data, so

15   you -- you took precautions to understand that you couldn't

16   trust, like, the files that were on there.

17   Q.  And why did you need those files on your computer?

18   A.  To enable our operations.

19   Q.  And what do you mean by that?

20   A.  It could be targeting information.  It could be, like I

21   said, techniques that we were going to reuse.  Everything.

22   Q.  Were you able to do your work without those types of things

23   on your network?

24   A.  No.

25   Q.  And Ms. Shroff asked you about whether that created a

1   security vulnerability for your network?

2   A.   Yes.

3   Q.   Are you familiar with the term "insider threat"?

4   A.   Yes.

5   Q.   What does that term generally refer to?

6   A.   An insider threat would be a trusted individual that has

7   access to your company or network that is no longer behaving in

8   the company's best interests.

9   Q.   Would security vulnerabilities be made worse if you had an

10  insider threat?

11  A.   Yes.

12  Q.   Why?

13  A.   Because the insider threat might leverage those

14  vulnerabilities.

15  Q.   You were also asked a series of questions about Amol and

16  Josh and their issues at the agency.  Do you remember that?

17  A.   Yes.

18  Q.   And one of the things that you were asked about was

19  supporting, I think, supporting Amol at a legal proceeding?

20  A.   Yes.

21  Q.   What legal proceeding were you referring to there?

22  A.   Amol was -- sorry.  I don't know the right word.  He was

23  fighting back against the restraining order, and so I was there

24  to testify.

25  Q.   And why were you there to testify?

1    A.  The same, like, Josh made statements about what Amol did; I

2    did not believe those statements and I was there to testify

3    into that.

4    Q.  Did you have to testify at that proceeding?

5    A.  No, I did not.

6    Q.  Do you know what happened?

7    A.  The restraining order was withdrawn because of the

8    jurisdiction -- a jurisdiction issue.  And then I don't know

9    what happened after that.

10   Q.  Now, the fight between Amol and the defendant, did that

11   have anything to do with security issues on DevLAN?

12   A.  No.

13   Q.  Did it have anything to do with the Altabackups?

14   A.  No.

15   Q.  Was the fight about WikiLeaks?

16   A.  No.

17   Q.  Was the fight about stealing information from DevLAN?

18   A.  No.

19   Q.  Was the fight about any national security issues?

20   A.  No.

21   Q.  Was it about your mission at EDG?

22   A.  No.

23   Q.  Was it about how best to serve that mission?

24   A.  Maybe a little bit, but not specifically.

25   Q.  In what way?

1   A.   Again, a lot of Amol's complaints towards Josh was that he

2   could be a better employee, better support the mission through,

3   you know being just a better person to work with, but it wasn't

4   necessarily -- it wasn't necessarily about, like, a specific,

5   like, thing.

6   Q.   And you were asked about conversations that Mr. Schulte had

7   with you about Edward Snowden?

8   A.   Yes.

9   Q.   Who was Edward Snowden?

10  A.   He was an NSA employee.

11  Q.   And now we just talked about the OSB libraries issue that

12  happened in April 2016?

13  A.   Yes.

14  Q.   Did those conversations happen before that or after that?

15  A.   I don't remember the timing of Snowden.  It would have been

16  before because after those emails I wasn't talking to Schulte

17  anymore.

18  Q.   So the conversations about Snowden would have happened

19  before the OSB libraries situation?

20  A.   Yes.

21       MR. LAROCHE:   Could we bring up Government Exhibit

22  809, please.

23  Q.   Do you remember looking at this document yesterday?

24  A.   Yes.

25  Q.   And this contains the defendant's handwriting, is that

1   correct?

2   A.   Yes.

3           MR. LAROCHE:   Let's go to page 11 of that document and

4   just focus on the top quarter of that page.

5   Q.   Do you see, on the top right there, there's a hashtag and

6   then there's some text?

7   A.   Yes.

8   Q.   Can you read that?

9   A.   Hashtag "top secret."  Hashtag "fuck your top secret."

10  Q.   And then just below that, there's an arrow.  Do you see

11  that?  Can you just read what is next to that arrow?

12  A.   "Or dump the secrets here."

13          MR. LAROCHE:   Let's go to page 12, please, the next

14  page.

15          Sorry.  One more page, please.  And then let's focus,

16  first, on the below paragraph, the lower paragraph.

17  Q.   Is this the defendant's handwriting?

18  A.   Yes, I believe it is.

19  Q.   Can you please read what the defendant wrote here?

20  A.   "This is a huge wake-up call to U.S. intelligence officers.

21  The Constitution you fight to defend will be" --

22          MS. SHROFF:   Denied.

23  A.   -- "denied to you if, God forbid, you are ever accused of a

24  crime.  If your government has no allegiance in you, why do you

25  have any allegiance towards your government or associates,

K26Wsch4                        Weber - Redirect

1    provided info to the NYT."

2              MR. LAROCHE:  Can we go up to the next, to the top of

3    this page, please.

4    Q.  Again, is this the defendant's handwriting?

5    A.  Yes.

6    Q.  Can you please read what the defendant wrote?

7    A.  "Your service in" -- defense, maybe, "in" -- I don't

8    recognize that word -- "security investigations and pristine

9    criminal history can't even get you bail.  As Joshua Schulte

10   has said, you are denied a presumption of innocence.  Ironic,

11   you do your country's dirty work, but when you -- when your

12   country accuses you of a crime, you are arrested and presumed

13   guilty.  And" -- I don't -- "and" something, "your service.

14   Send all of your secrets here:  WikiLeaks."

15        And then I don't recognize the last word.

16             MR. LAROCHE:  No further questions.  Thank you.

17             THE COURT:  All right.  We'll take our luncheon break

18   now and resume at 1:30.

19                  (Continued on next page)

20

21

22

23

24

25

K26Wsch4

1              (Jury not present)

2              MS. SHROFF:  Your Honor, I know it was the Court's

3     ruling yesterday that it is the Court's practice to not allow

4     any recross.

5              THE COURT:  Yes.

6              MS. SHROFF:  Given the fact that Mr. Laroche covered

7     new material during his --

8              THE COURT:  Tell me what the new material is, Ms.

9     Shroff.

10             MS. SHROFF:  I'm sorry?

11             THE COURT:  Tell me what the new material is.

12             MS. SHROFF:  He covered new email material that I had

13    not covered with the witness.

14             The witness is still in the box, but I don't mind

15    speaking in his presence.  It's fine.

16             THE COURT:  Why don't we excuse the witness.

17             MS. SHROFF:  OK.

18             THE COURT:  Mr. Laroche.

19             (Witness not present)

20             THE COURT:  All right.

21             MS. SHROFF:  He also covered new portions of the MCC

22    notebook, and we think it would be proper recross.  I just

23    wanted a ruling from the Court so I don't violate any

24    procedures.

25             Also, the Court still hasn't ruled on the WikiLeaks

K26Wsch4

1     task force argument that we made in the morning.

2                THE COURT:  Yes.  I think I gave Mr. Laroche until

3     close of business today to respond.  I'll rule on that

4     tomorrow.

5                MS. SHROFF:  OK.

6                THE COURT:  The WikiLeaks.

7                Mr. Laroche, what do you say about recross?

8                MR. LAROCHE:  I addressed issues that were directly

9     addressed on cross.  The exhibits we looked at were exhibits

10    that Ms. Shroff selectively showed him.  She simply didn't show

11    him all portions of the exhibit.  For example, Government

12    Exhibit 1062, she didn't show his actual statements; I did.

13               With respect to the last document I showed, that was

14    in direct response to what was clearly a cross-examination

15    point that Mr. Schulte does not like leakers, and I just simply

16    showed a portion of his notebook where he said send your

17    secrets to WikiLeaks.  So it's a direct response to her

18    cross-examination topics.

19               MS. SHROFF:  That's true.  It is in direct response,

20    but it's new material.  He covered new ground.  He introduced

21    new text.

22               THE COURT:  I think I'll adhere to my practice:

23    direct, cross, redirect.  The redirect was very limited and

24    didn't open up new territory, so I deny your application, Ms.

25    Shroff, to do more recross.

 1                MS. SHROFF:  OK.

 2                THE COURT:  That means we need a witness.

 3                MR. LAROCHE:  He will be ready, your Honor.

 4                THE COURT:  Thank you.

 5                MR. LAROCHE:  You're welcome.

 6                THE COURT:  See you at 1:30.

 7                (Luncheon recess)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K26Wsch4                         Leonis - Direct

```
 1                          AFTERNOON SESSION

 2                              1:40 p.m.

 3              THE COURT:  Please be seated.

 4              Are we all set to proceed?  Is everybody here?

 5              MR. KAMARAJU:  Yes, I believe so, your Honor.

 6              THE COURT:  All right.  Call in the jury.

 7              (Jury present)

 8              THE COURT:  Please be seated.

 9              Are you examining, Mr. Kamaraju?

10              MR. KAMARAJU:  Yes, your Honor.

11              THE COURT:  Would you call your next witness, please,

12    Mr. Kamaraju.

13              MR. KAMARAJU:  The government calls Anthony Leonis.

14     ANTHONY LEONIS,

15          called as a witness by the government,

16          having been duly sworn, testified as follows:

17              THE COURT:  Please sit down.

18              THE WITNESS:  Thank you.

19              THE COURT:  Make yourself comfortable.  Pull yourself

20    right up to the microphone.

21              All right.  Mr. Kamaraju.

22              MR. KAMARAJU:  Thank you, your Honor.

23              THE COURT:  You're welcome.

24    DIRECT EXAMINATION

25    BY MR. KAMARAJU:
```

1    Q.   Good afternoon, Mr. Leonis.

2    A.   Good afternoon.

3    Q.   Are you employed, sir?

4    A.   Yes.

5    Q.   Where do you currently work?

6    A.   For the CIA.

7    Q.   I'd like to direct your attention to the summer of 2015.

8    Were you employed by the CIA at that time?

9    A.   Yes, I was.

10   Q.   Were you working in any particular part of the agency then?

11   A.   Yes.

12   Q.   What part of the agency were you working for in the summer

13   of 2015?

14   A.   I was working in an organization called the Center for

15   Cyber Intelligence.

16   Q.   And within the Center for Cyber Intelligence, were you

17   working in any group?

18   A.   Yes.

19   Q.   What was that group called?

20   A.   That was the Engineering Development Group.

21   Q.   Is that sometimes referred to as EDG?

22   A.   EDG.

23   Q.   Generally speaking, was what EDG's function?

24   A.   EDG's job was to build tools and capabilities to collect

25   foreign intelligence.

1   Q.   And without getting into any specifics, what types of

2   entities did EDG target?

3   A.   Computer systems, things of that nature.

4   Q.   Were those computer systems used, for example, by foreign

5   actors?

6   A.   Foreign actors, correct.

7   Q.   Now, I'd like you to take a look around the courtroom.  Do

8   you see anyone with whom you worked at EDG?

9   A.   Yes.

10  Q.   Could you describe them by where they're sitting?

11  A.   They're in the second table, third in from this side.

12  Q.   And could you describe him generally by an article of

13  clothing?

14  A.   I can't really see his clothing, but he's got a shaved

15  head.

16         MR. KAMARAJU:  Your Honor, the government would ask

17  that the record reflect that the witness has identified the

18  defendant.

19         THE COURT:  Yes.

20         MR. KAMARAJU:  Thank you.

21  Q.   In the summer of 2015, were you working within any

22  particular group in EDG?

23  A.   I was working in RDB.

24  Q.   And what's RDB?

25  A.   RDB is the Remote Development Branch.

1   Q.  And what was your position at that time with RDB?

2   A.  I was the branch chief.

3   Q.  What were your responsibilities as branch chief?

4   A.  So last of my responsibilities as branch chief was, my job

5   was to make sure that everybody had what they needed to do

6   their job.  Right?  There were a number of developers that

7   worked for me, and those developers woo build the tools.  So as

8   branch chief, my goal was to make sure that they had whatever

9   they needed: whether it was computers; whether it was

10  requirements, working with the operations folks; making sure

11  that for staff officers, that I would do their performance

12  reviews.  You know, just generally taking care of the branch.

13  Q.  Now, you mentioned developers.  Are you familiar with

14  something called DevLAN?

15  A.  Yes, sir.

16  Q.  What's DevLAN?

17  A.  DevLAN was the network that the developers used to actually

18  build tools for the mission.

19  Q.  And was DevLAN a classified computer network?

20  A.  Yes, it was.

21  Q.  Did it hold top secret information?

22  A.  It did.

23  Q.  Now, did everyone who worked at CCI have access to DevLAN?

24  A.  No, they did not.

25  Q.  While you worked at EDG, did you have access to DevLAN?

1   A.   I did, actually.

2   Q.   How would you typically access DevLAN?

3   A.   So, usually you had a computer at your desk and it had --

4   it was connected directly to it.  Some developers actually had

5   multiple computers actually connected to the network, but I

6   only had one because of what I was using it for.

7   Q.   In 2015, you mentioned that you were a supervisor, is that

8   correct?

9   A.   That's correct.

10  Q.   Were you also an administrator for DevLAN?

11  A.   No.

12  Q.   Are you a tech guy?

13  A.   I know enough about technology, but I wouldn't put myself

14  in that kind of a role.

15  Q.   Were there any EDG employees who served as administrators

16  for DevLAN in 2015?

17  A.   Yes, there were.

18  Q.   Which employees were those?

19  A.   So, there was a branch called ISB -- it was in another

20  division -- and their job was to administer the network itself.

21  Q.   In addition to ISB, were there any other EDG employees that

22  were administrators for DevLAN?

23  A.   Yeah.  So, in addition to ISB, who -- they ran the network,

24  we had a code database or code repository on the network.  It

25  was called the Atlassian tool suite, and there were a number --

1    there were some developers that actually were managing that.

2    Q.   Why were those developers administering Atlassian?

3    A.   So, around that time, our ISB group, the branch that was in

4    charge of managing the network, they were undermanned, and so a

5    number of developers had an idea to use the Atlassian tool

6    suite to actually be used as a code repository.  And so the

7    developers -- Josh, Jeremy and Patrick, those three developers

8    actually were managing that on behalf of the division.

9              MR. KAMARAJU:  Thank you.

10             Now, Ms. Hurst, could we please publish Government

11   Exhibit 1011 that's already in evidence.  All right.  If we

12   could go to the first page, please.

13   Q.   Do you see where the email is signed Elliot?

14   A.   Yes.

15   Q.   Do you know who Elliot is?

16   A.   Elliot was a member of my branch.

17             MR. LAROCHE:  If we could just go back to the previous

18   page for a second, and down at the bottom.

19   Q.   Could you tell us the date and time that this email was

20   sent?

21   A.   It was Thursday, July 16, 2015.

22   Q.   Do you see who it was sent to?

23   A.   Yeah.  It was sent to ISB.

24   Q.   Were you copied on this email?

25   A.   I was cc'd.

K26Wsch4                        Leonis - Direct

1   Q.  Was there a reason why you were cc'd on this?

2   A.  Yeah.  I was the branch chief, so I think Elliot wanted to

3   make sure that ISB knew that this wasn't just like any request,

4   hey, I'd like to do this; it was a request with management's

5   backing.

6   Q.  Do you see in the subject line where it says Stash repo?

7   A.  Yeah.

8   Q.  What's your understanding of that?

9   A.  So, Panda's the tool name, and what Elliot was asking for

10  was to get access to that tool repository, the Panda tool

11  repository.

12  Q.  All right.  Let's take a look at the email up above.

13  A.  Sure.

14  Q.  Now, who is this email from?

15  A.  It's also from Elliot.

16  Q.  And what's the date of this email?

17  A.  It's Tuesday, July 21, 2015.

18  Q.  And who did Elliot send this email to?

19  A.  He sent the email to Jeremy and Josh.

20  Q.  And were you copied on this one also?

21  A.  I was.

22  Q.  Do you see where Elliot writes, "After talking with ISB,

23  the admin password to Stash was changed so they no longer have

24  access"?

25          MS. SHROFF:  Objection.

K26Wsch4                         Leonis - Direct

1    A.  Yes, I do.

2    Q.  What did you understand him to be saying there?

3    A.  Essentially they were saying -- ISB was saying that they

4    couldn't make the change to that specific repo, so they needed

5    some help.

6    Q.  Looking at this email chain, was anyone able to get Elliot

7    access to the Panda repo?

8    A.  Yes.  Josh was able to do that.

9    Q.  How do you know that?

10   A.  Because the email on top says -- was sent from Josh to

11   Elliot and Jeremy and myself and says, "Elliot now has access

12   to Panda."

13   Q.  You mentioned that Elliot cc'd you so that it was clear to

14   ISB that the request had management backing, is that right?

15   A.  Uh-huh.

16   Q.  Why is that important?

17   A.  For some tools -- Panda, maybe some others -- those tools

18   were special tools, or specialty tools, and so they weren't

19   just generally available to anybody on the team, on the

20   development team or any other division or parts of the

21   division, so he wanted to make sure that when he was asking ISB

22   that they knew that this was -- this was actually a request

23   that was legitimate.

24   Q.  And you made a reference to special tools.  The tools that

25   EDG was developing, were they classified?

1    A.  Yes, they were.

2    Q.  Now, I want to direct your attention to March of 2016.

3    A.  OK.

4    Q.  Were you still chief of RDB at that time?

5    A.  I was.

6           MR. KAMARAJU:  Ms. Hurst, could we pull up Government

7    Exhibit 89, please.

8    Q.  Did there come a time when you were given additional

9    responsibilities?

10   A.  Yes.

11   Q.  Could you explain what additional responsibilities you were

12   given at that time?

13   A.  Yeah.  So, in 2016, beginning of 2016, I told the chief of

14   the Applied Engineering Division, AED, that I was interested in

15   taking on more responsibility.  So there was possibility that

16   the deputy division chief was going to leave AED and I said,

17   Hey, if that happens, that would be something I'd be interested

18   in.  So in March 2016, the deputy division chief took on, took

19   a new job.  Shortly thereafter, the division chief also was

20   transferred to a new job, and I was made the acting division

21   chief, the acting deputy division chief, while still serving as

22   the branch chief at that time.

23   Q.  Let's be clear.  In March of 2016, how many different

24   positions were you filling in RDB?

25   A.  I was filling two -- two acting roles and the branch chief

1    role, so I had three.

2    Q.  Now, where within EDG did the defendant work in March of

3    2016?

4    A.  At the beginning of 2016 -- or March of 2016, the

5    Operations Support Branch, OSB.

6    Q.  What is OSB?

7    A.  It's a branch that built quick-reaction tools.  Those were

8    tools that when the operator said, Hey, we need a capability

9    for some -- some operation, they would go there first, and that

10   branch was really good at taking ideas and prototypes and

11   turning them into tools that could be used in the mission, very

12   quickly.

13   Q.  And how was OSB different than RDB?

14   A.  So, RDB was more focused on strategic tools, longer-term

15   tools.  While the branch could do quick-reaction capabilities,

16   it was more focused on doing more longer-term efforts, bigger

17   efforts, complex efforts.

18   Q.  Now, before March of 2016, had you ever interacted with the

19   defendant?

20   A.  Yes.

21   Q.  Could you describe those interactions, generally?

22   A.  So, when I became a branch chief of RDB, that was my first

23   real supervisory role, and the branch chief of our, of OSB, his

24   name was Sean.  Sean's this really good guy.  I would

25   frequently go up to his office.  We'd talk.  He kind of took me

1    under his wing a little bit, showed me how to write performance

2    reports and things of that nature.  So there'd be, you know,

3    over the years, I would go up to that branch and, you know,

4    look for him.

5        Many times he wasn't in his office.  He was actually

6    sitting at the end of the row in front of his office, and at

7    the end of that row, Jeremy and Josh were in that general area,

8    and it -- you know, it was just normal conversations.  You

9    know, nothing complicated or anything.  Just good

10   conversations.

11   Q.  During those visits, were you able to observe sort of the

12   culture of OSB?

13   A.  Yeah.  I mean, it was -- since they had a lot of QRCs, I

14   mean, they were always trying to -- they would have times where

15   they had, you know, some breaks and then they had times where

16   they were working hard on stuff.  And so it was -- it had

17   more-junior developers in the branch, but they seemed to get

18   along really well, and Sean was a good -- good branch chief.

19   Q.  And you mentioned they had more-junior developers in OSB,

20   is that right?

21   A.  Uh-huh.

22   Q.  How did the seniority compare to the seniority level at

23   RDB?

24   A.  SO, RDB had a lot of more-senior developers, and you know,

25   I just think over time, you know, some people moved throughout

1   the division.  In fact, you know, right around that time, there

2   was a developer from OSB -- his name was Duane -- and he

3   actually moved down to RDB to work on some more strategic

4   projects.

5   Q.  Before March of 2016, when you assumed the additional

6   duties at the division level --

7   A.  Yup.

8   Q.  -- were you the defendant's supervisor?

9   A.  No, I was not.

10  Q.  After you assumed those responsibilities, did you fall into

11  his supervisory chain?

12  A.  Yeah, I did.

13  Q.  And when that happened, did you receive any information

14  about the defendant?

15  A.  Very briefly, I was told that there was some sort of issue

16  between an individual named Amol and Josh, and it had something

17  to do outside of work, or --

18  Q.  Well, what was your understanding of what the issue was?

19  A.  I thought it was -- I seem to remember it was a restraining

20  order of some sort.

21  Q.  And did you have any understanding what the basis for

22  the --

23  A.  No.

24  Q.  -- restraining order was?

25  A.  No, I did not.

1    Q.  How did you learn about it?

2    A.  I was told by the chief of division at the time, or who was

3    leaving.

4    Q.  And did you talk to anybody else at that time about this

5    issue?

6    A.  Yeah.  So, as I was taking on those additional

7    responsibilities, Mike, who was the deputy group chief, he kind

8    of took me under his wing and really kind of helped me, walked

9    me through that, because I was balancing a lot of roles at the

10   same time.

11   Q.  Generally speaking, who did you meet with about the issue?

12   A.  So, I recall at one point I had to go to this meeting in

13   the CCI front office, and there were a lot of senior people

14   there.  I was the most junior person in the room, so I did a

15   lot of listening.  And the chief of the center was there.  The

16   deputy chief of the center was there.  Security was there.  HR

17   was there.  Mike was there.  There were some others.  I don't

18   recall those names, but --

19   Q.  Now, before this incident, you had been a supervisor

20   before, right?

21   A.  Correct.

22   Q.  Prior to the meeting you just described, had you ever had

23   such a high-level meeting about a personnel dispute?

24   A.  No.

25   Q.  Was there something about this situation that made it

1    unusual?

2    A.  Well, since it involved something that had to do between

3    the two developers and it involved outside stuff, it -- it was

4    at a different level.

5        I also remember, I think, the threat management unit for

6    the organization was called in to address it as well, so it

7    was -- it was a pretty serious matter.

8    Q.  Was any action taken as a result of the meetings you

9    attended?

10   A.  Yeah.  So, later in -- at the end of 2016 -- or March of

11   2016, it was decided by management that Josh would be moved to

12   RDB and Amol would be moved to MDB.  The idea was -- there, it

13   was kind of get them out of the environment that they were in,

14   get them back to work, doing things that they could do to

15   contribute.  Management believed that RDB was a good place

16   because the skill sets Josh had were congruent to what they

17   were doing in RDB at some level.  And Amol could use his skills

18   to work in MDB.

19   Q.  You mentioned getting back to work quickly.  Why was that

20   important?

21   A.  You know, I think it's really important that when you have

22   highly skilled developers, you want to get them actually back

23   to work and contributing to the mission.  So, originally they

24   were moved to different seats in their branch, and so the fact

25   of the matter was, management thought, Hey, let's make sure

K26Wsch4                              Leonis - Direct

1    that we can, you know, change the atmosphere, kind of give them

2    a reboot and help them get back to work so they can contribute.

3            MR. KAMARAJU:  Ms. Hurst, could we publish Government

     Exhibit 1046, which is in evidence.  And let's scroll down to

5    the last -- there we go.

6    Q.  Now, do you see an email at the bottom there, dated March

7    24, 2016?

8    A.  Yeah.

9    Q.  Who sent this email?

10   A.  Debra.

11   Q.  Who's Debra?

12   A.  Debra was the chief of the division at the time.

13   Q.  Are you on this email?

14   A.  No, I was not.

15   Q.  Had you assumed your additional responsibilities at this

16   point?

17   A.  Not -- not at that point.

18   Q.  Who was this email sent to?

19   A.  It was sent to Amol and Josh, and Debra cc'd herself.

20   Q.  And can you just read the first line of her email?

21   A.  Sure.  It says, "As discussed please move to your newly

22   assigned cubicle."

23            (Continued on next page)

24

25

1    Q.  What do you understand that to be a reference to?

2    A.  So, they had desks that were near one another, and Debra

3    was basically saying, hey, we've discussed you're going to move

4    to a new cubicle.

5    Q.  At this point, were they both still supposed to be within

6    OSB?

7    A.  Yeah, those cubicles were still in OSB.

8             MR. KAMARAJU:  We can move up to the next e-mail in

9    the chain, please.  Thank you.  Maybe let's get the preview.

10   So let's start with the date and time.

11   Q.  Who sent this e-mail?

12   A.  I did.

13   Q.  When did you send it?

14   A.  Tuesday, March 29, 2016.

15   Q.  Who did you send it to?

16   A.  I sent it to Amol and Josh, and cc'd a number of people.

17   Q.  People that you cc, where do they work?

18   A.  So, first two were HR related.  Dana was security.  Then

19   John and Bonnie were, you know chief, deputy chief of the

20   center.  Karen and Mike were the chief and deputy chief of EDG.

21   Then myself, Debra, the outgoing division chief, and Sean the

22   branch chief of OSB.

23   Q.  Now, are all those people on the typical distribution list

24   for an e-mail you would send to two developers?

25   A.  No.

1    Q.  Was there a reason you included them on this e-mail?

2    A.  Yeah, because there was a big meeting about it.

3    Q.  Do you see where you say "After further consultations with

4    HR, security and the CCI front office"?

5    A.  Correct.

6    Q.  Who were you referring to there?

7    A.  That's the meeting I was just talking about.  There was a

8    big meeting about, you know, Josh and Amol, and how to kind of

9    get them back, back integrated into the workforce.  So that's

10   what I'm referencing.

11   Q.  Do you see in the e-mail where you say, "Effective

12   immediately, Tuesday, 29 March 2016 the following adjustments

13   are being made"?

14   A.  Yes.

15   Q.  Why did you want the move to be effective immediately?

16   A.  That was what management had decided.

17   Q.  Was there a reason for that decision?

18   A.  Yeah, it was just to not let this linger any longer.  Like,

19   get people moved, get them back to work, get them working.

20   Q.  What were the adjustments that you were referring to?

21   A.  So, it was decided that Josh would move to RDB, and that

22   Amol would move to MDB.

23   Q.  At the time you sent this e-mail, were you still also

24   serving as branch chief of RDB?

25   A.  I was.

K263SCH5                          Leonis - Direct

1   Q.  Can we take a look at the next e-mail, please.  Who sent

2   this e-mail?

3   A.  Josh did.

4   Q.  When did he send it?

5   A.  Tuesday, March 29, at 1:12 p.m.

6   Q.  Who did he send it to?

7   A.  He sent it to me.

8   Q.  And who was on the copy line?

9   A.  Pretty much everybody but Amol that was on the previous

10  e-mail.

11  Q.  I'd like you to just read what he wrote, please.

12  A.  Okay.  "I just want to confirm this punishment of removal

13  from my current branch is for reporting to security an incident

14  in which my life was threatened and/or for submitting a

15  protective order against Amol."

16  Q.  Was reassigning the defendant to RDB a punishment for

17  reporting?

18  A.  No.  No, it was not.

19  Q.  Why did you move him?

20  A.  As I've said, it was to get him back integrated in so he

21  could use his skills to develop tools for the mission.

22  Q.  Was he the only one that was moved out of OSB?

23  A.  No.

24  Q.  Can we keep going up.  What's this?

25  A.  It's also an e-mail.

1  Q.  Who sent this one?

2  A.  Josh did.

3  Q.  Was this sent on the same day as the e-mail we just looked

4  at?

5  A.  I believe so.

6  Q.  Who did he send this one to?

7  A.  Basically the same list of people.

8  Q.  Do you see where he says, "I was told that there would be

9  no written response to my e-mail"?

10  A.  Yup.

11  Q.  Do you have any recollection of discussing with the

12  defendant whether there would be a written response?

13  A.  I really don't remember that, that part of it.

14  Q.  And do you see where he says, "So I'm proceeding with my

15  move, assuming it is directly due to my security report"?

16  A.  Yes.

17  Q.  I believe you testified before your understanding was there

18  was some sort of restraining order in place, correct?

19  A.  Yeah.

20  Q.  Was there any connection between this move and his security

21  report?

22  A.  I don't know.

23  Q.  Do you see where he says, "However, I'll be leaving early

24  today and will be unable to complete my move by the time I

25  leave."

1    A.  Yes.

2    Q.  Did he ever ultimately move to RDB?

3    A.  Yes, he did.

4    Q.  Once he moved to RDB, was he under your supervision for a

5    time?

6    A.  Yeah, and I also with all those acting roles I assigned

7    Duane as the acting chief as well.

8    Q.  When a developer is moved from one branch to another, do

9    they typically retain access to the projects that they were

10   working on in their old branch?

11   A.  Not all of them, no.

12   Q.  Is there a practice in place with respect to that?

13   A.  I mean, as people leave branches, typically there is a

14   reconsideration of what tools they need access to.  Maybe they

15   were working on something and they wanted to continue that

16   work, so they would keep working on that thing.  Otherwise, if

17   they -- if they had no need, they would be removed from

18   accessing certain tools.

19   Q.  Within each branch, who owned the projects themselves?

20   A.  I mean, developers did for the most part.

21   Q.  Who made the decision as to whether, for example, somebody

22   would keep their access to a project when they were moved?

23   A.  Some of it was developer based.  And when there were

24   disagreements, those disagreements could be resolved by

25   management.

1   Q.  At the time that the defendant moved from OSB to RDB, did

2   you have any discussions with him about projects that he would

3   maintain?

4   A.  Yeah, there were discussions.  I recall two tools, one was

5   called Shattered Assurance, and it was related to something

6   that he had built or was going to build.  And there was another

7   tool that was a thumb drive based tool as I understood it.

8   Q.  Was that called Nader?

9   A.  I believe so, yeah.

10  Q.  During that conversation, did a project called OSB

11  libraries come up?

12  A.  It came up later.

13  Q.  So at that time, did you talk about whether he could

14  keep --

15  A.  No, I don't believe it came up at that time.

16  Q.  What's your understanding of what OSB libraries is?

17  A.  So, OSB libraries is a -- it is a code repository that OSB

18  created.  Since they were doing a lot of quick reaction tools,

19  they built a library that had a bunch of code building blocks,

20  kind of like Legos.  If you're trying to build something,

21  you're trying to build a toy, you want to have Lego building

22  blocks.

23         In their case, they wanted to have these libraries

24  where they could pull code quickly to put them together to

25  build a quick prototype.  It was accessible to the entire

1   branch, as I understood it.  And you could add to it, you can

2   take code away.

3             But the whole idea was that developers could use it to

4   help them get the job done quicker.

5   Q.  Did there come a time when you became aware of a dispute

6   over the defendant's access to OSB libraries?

7   A.  Yes.

8             MR. KAMARAJU:  Let's publish Government Exhibit 1061.

9   We've looked at this e-mail before.  If we can go to the bottom

10  e-mail, please.

11  Q.  What's the date of this e-mail?

12  A.  It's Thursday, April 14, 2016.

13  Q.  What time was it sent?

14  A.  3:30 p.m.

15  Q.  I think we actually need to go to the page before to see

16  who sent it.

17            Who is Jeremy Weber?

18  A.  Jeremy was one of the developers in OSB.

19            MR. KAMARAJU:  Now, Ms. Hurst, we can go back, thanks.

20  Q.  Who did Mr. Weber send this e-mail to?

21  A.  It was sent to Josh and then there were a number of people

22  cc'd.

23  Q.  Do you see Sean cc'd on this?

24  A.  Hmm-hmm.

25  Q.  Who's Sean?

1    A.   Sean was, at that time, the current chief of OSB.

2    Q.   Do you see Richard cc'd on this?

3    A.   Correct.

4    Q.   Who is Richard?

5    A.   Richard was going to be the acting chief of OSB because

6    Sean was leaving the group.

7    Q.   You're also cc'd on this?

8    A.   I'm cc'd as well.

9    Q.   Do you know why you were cc'd on this?

10   A.   I think for two roles.  One, as in my acting role, but also

11   because I was the branch chief of RDB at that time.

12   Q.   Do you see where Mr. Weber says, "Josh, I discussed this

13   with Sean and this is the situation"?

14   A.   Yes.

15   Q.   And then he goes on to describe, I guess, the situation,

16   correct?

17   A.   Correct.

18   Q.   What's your understanding of his description there?

19   A.   So, my understanding, and just reading it too, essentially,

20   the OSB libraries, they were an OSB project.  But, and OSB

21   wanted to maintain control of that project.  So, since it was

22   the branch's project, they wanted to maintain control of it and

23   make sure whatever got added to it, they agreed with.  Whatever

24   was going to be removed, they agreed with.

25            Second, they said that Josh was able to continue to

1   contribute to those libraries and pull from it.  So, he wasn't

2   hindered necessarily from adding code to it or removing code

3   from it.

4          He -- Jeremy also references something we were

5   thinking about at that time, which was there are a number of

6   code libraries in other branches, so the idea was maybe we can

7   take all those code libraries from branches and move them up to

8   the division level, and everybody can have access to them so

9   everybody could gain benefits from being able to prototype

10  things quickly, etc.

11         And then he talks about Kevin here.  About if Kevin

12  decides something, then he will make that determination.

13  Q.  Do you see the last line, "Until something officially

14  changes"?

15  A.  Yeah.

16  Q.  "You must follow pull request model"?

17  A.  Yeah.

18  Q.  What do you understand by that phrase?

19  A.  So, not -- I'm not a developer very familiar with the

20  Atlassian tool suite.  But my high-level understanding is that

21  Josh could pull code from it, but if he wanted to put code back

22  into it, Frank and Jeremy had to agree that that code would be

23  merged into the OSB library.

24  Q.  When you first saw this e-mail, were you concerned by it?

25  A.  No.

1    Q.  Why not?

2    A.  It's just a conversation about, hey, you know, these are

3    the things that you are going to take with you, and these are

4    the things that you're not.

5    Q.  Let's move up to the next e-mail, please.  Who sent this

6    e-mail?

7    A.  Josh did.

8    Q.  When did he send it?

9    A.  Thursday, April 14, 2016, at 3:39 p.m.

10   Q.  Is that about nine minutes after the last e-mail we just

11   looked at?

12   A.  I can't see it, but --

13   Q.  We can take a look.  Who did he send this e-mail to?

14   A.  He sent it to approximately the same group of people.  And

15   Kevin was added.

16   Q.  Do you see where the defendant says, "I've talked with

17   Anthony and Sean a bit about working on transitioning some of

18   my old projects"?

19   A.  Yeah.

20   Q.  He goes on to say, "But I haven't specifically talked about

21   the OSB libraries until now."

22           What did you understand him to be saying there?

23   A.  So we had talked about some of the processes he was going

24   to take with him to RDB, and I guess this one hadn't come up at

25   that point.

1    Q.  And moving on to the next paragraph.  What's your

2    understanding of what the defendant was saying there?

3    A.  Since he developed it, he really wanted to continue to

4    admin that library, have control over what got added to it,

5    what remained in it.  So, he, you know, and then he wanted to

6    stay, be one of the admins alongside of Frank and Jeremy who

7    were in OSB.  So, and then, you know, since these libraries

8    were going to get moved to the division level, he thought it

9    would be helpful that he could help with that process as well.

10   Q.  Then the last line, could you read the last line, please.

11   A.  Sure.  "So, if OSB and RDB would be okay with this, I would

12   like to continue my active role with the libraries."

13   Q.  What did you understand him to be saying there?

14   A.  So, if basically, the way I understood it to be, was if OSB

15   management and RDB management were okay with him being an

16   admin, he wanted to continue to be an admin.

17   Q.  So at this time, who was OSB management?

18   A.  It was Sean particularly.

19   Q.  And who was RDB management?

20   A.  I was.

21   Q.  When you saw this e-mail, did it cause any concern for you?

22   A.  No.

23   Q.  Why not?

24   A.  It was a request.  He's asking if he can manage these

25   libraries as well.  Or these code libraries.  It is a

K263SCH5                        Leonis - Direct

1    reasonable request.

2    Q.  Can we go to the next one up.  All right.  Who sent this

3    e-mail?

4    A.  I did.

5    Q.  When did you send it?

6    A.  I sent it on Thursday, April 14, 2016, at 3:59 p.m.

7    Q.  Who did you send it to?

8    A.  So, I sent it to the same group of people in the previous

9    e-mail, and I added a few other people.

10   Q.  Do you see JoJo there?

11   A.  Correct.

12   Q.  Who is JoJo?

13   A.  So JoJo was a SETA.  He was basically an engineering

14   resource that the division brought in to help them with a

15   number of division-level projects.  So, JoJo was working for

16   the division level, so at that time he was working for me.  And

17   we wanted him to take over, you know, a few things, one of

18   which was an AED level code library.

19   Q.  When you say the AED level code library, what are you

20   referring to?

21   A.  So what we wanted to do was pull all those code libraries,

22   like OSB library, there were a few other libraries from other

23   branches, up to the division level, so that everybody could

24   take advantage of them.

25   Q.  Do you see where you write, "One of JoJo's major tasks is

K263SCH5                        Leonis - Direct

1    to make each branch's library a corporate resource"?

2    A.   Yeah.

3    Q.   So all branches contribute and all branches can pull?

4    A.   Yeah.

5    Q.   What did you mean by that?

6    A.   Precisely, I wanted -- so, in this case, let's just use

7    OSB, I wanted to take the OSB libraries, bring them up to

8    division level, and JoJo would admin it.  So, whatever changes

9    would go into it, he'd have vied a role in that.  But then

10   everybody could use what was in the OSB libraries.  They

11   weren't branch specific at that point if we made that change.

12   Q.   So if this change went into effect, who would be

13   administering the AED libraries?

14   A.   JoJo.

15   Q.   So would the defendant administer the libraries at that

16   point?

17   A.   That wasn't the plan.

18   Q.   So, is there anywhere in this e-mail where you acceded to

19   the defendant's request to continue to administer the OSB

20   libraries?

21   A.   No.

22        MR. KAMARAJU:  Ms. Hurst, can we please pull up

23   Government Exhibit 1062 which is in evidence alongside this

24   e-mail, and turn to page 10 of 1062, please.  If we can just

25   blow up the top there.

K263SCH5                        Leonis - Direct

1    Q.  The e-mail on the right, what's the date and time of that?

2    A.  It's Thursday, April 14, 2016, at 4:40 p.m.

3    Q.  Approximately how long is that after you sent your e-mail

4    about the AED libraries?

5    A.  Just over 50 minutes, it looks like.

6    Q.  And who sent this e-mail?

7    A.  Jeremy did.

8    Q.  Who did he send it to?

9    A.  He sent it to myself, Sean, and Richard.

10   Q.  Did he send it to the defendant?

11   A.  He did not.

12   Q.  What's the subject of the e-mail?

13   A.  OSB libraries.

14   Q.  Do you see where he says, "We have a situation with the

15   libraries and the Atlassian products in general"?

16   A.  Yes.

17   Q.  What did you understand him to be referring to there?

18   A.  So the libraries were the OSB libraries.  And the Atlassian

19   products in general was the Atlassian tool suite.

20   Q.  Could you read the next sentence, please.

21   A.  Sure.  "After we talked with Josh, and I sent the e-mail

22   saying that he doesn't have direct access to our two main

23   branches, he went and modified the permissions to the project

24   to return his previous rights."

25   Q.  So, in your 3:59 p.m. e-mail, did you give the defendant

K263SCH5                         Leonis - Direct

 1   permission to modify the permissions to the OSB libraries and
 2   return his previous rights?
 3   A.  No, I did not.
 4   Q.  Did you ever do that at any point on April 14?
 5   A.  No.
 6   Q.  Could you read the last line of Mr. Weber's e-mail.
 7   A.  Sure.  "I can explain the situation further, but this act
 8   has shown he believes access controls shouldn't apply to him."
 9   Q.  What did you understand that to mean?
10   A.  So, what Jeremy was saying was that -- so an administrator
11   has a very specific role.  And their role is to facilitate
12   people's ability to gain access to different parts of the
13   system, right.  And as we mentioned, the developers were put in
14   charge of maintaining that code library, that code database.
15        So, in this case, since Josh had the ability to, as an
16   administrator, to administer any changes to the Atlassian tool
17   suite, he also had the ability to give himself controls or make
18   changes to any code library inside of that, including the OSB
19   libraries.
20        So what Jeremy was saying is that he was very
21   concerned that in this specific case, Josh was told you're not
22   going to have admin rights to that OSB libraries.  And when
23   those privileges to that specific library was removed, he went
24   back into the system using his privileges on the bigger system,
25   and said, I'm -- and made himself an admin on that code

K263SCH5                         Leonis - Direct

1    library.  So he used his admin privileges for the bigger tool

2    suite to make a change to the smaller tool suite.

3    Q.  You just testified that Jeremy was concerned.  Were you

4    concerned when you read Jeremy's e-mail?

5    A.  Yeah, I was -- so, when you receive an e-mail like that,

6    that's a pretty big -- that's a pretty big accusation.  And I

7    kind -- I remember that time, because I had essentially been in

8    that role for about two and a half weeks.  So, when you get an

9    e-mail like this, you're, you know, that's a pretty big, that's

10   a pretty big deal.

11          So, my first reaction was, you know, pause.  I really

12   want to make sure that there wasn't a misunderstanding.  Right.

13   Because, people say things, people do things.  Sometimes they

14   say and do things that aren't the same.  This is -- sometimes

15   people see people do something and they misinterpret it.  And I

16   really wanted to make sure I understood what was -- what was

17   really going on there.  What did Jeremy actually -- what

18   actually really happened.

19   Q.  You said this was a big accusation.  What did you mean by

20   that?

21   A.  So, in our -- in our business, everybody that works with us

22   goes through a security process.  And that process is designed

23   to determine if you can have access to sensitive information.

24   It's to understand whether you can be trusted to have accesses

25   to that information.  That when it's given to you, or you have

1    access to it, that you're going to use it in an appropriate

2    manner.  So this accusation is essentially an accusation about

3    trust.  This admin position is something that you give to

4    people that you're -- that you trust, because they're doing

5    things on behalf of everybody else.  It's mission above self.

6    Right.  That's part of our ethos.

7              So, in this specific case, I was really concerned,

8    because it's not just a -- it's not just a -- let's say a

9    whoops, if you will.  There is a bigger accusation behind it,

10   which is, and it kind of goes to the bottom sentence, where

11   Jeremy's alluding to the effect that, you know, Josh can't be

12   trusted with this responsibility that he was given.  And from

13   my perspective, that's not something you throw around very

14   lightly.  And I really wanted to understand before going any

15   further, I really wanted to understand the situation.

16   Q.  So, what, if anything, did you do after receiving

17   Mr. Weber's e-mail?

18   A.  I sent him back an e-mail with a bunch of questions.

19             MR. KAMARAJU:  Could we scroll up to the next e-mail,

20   please, Ms. Hurst.  And we can take 1061 down now.

21   Q.  Is this the e-mail you were just referring to?

22   A.  Yes, it is.

23   Q.  What's the date and time on this e-mail?

24   A.  So it's Friday, April 15, 2016, at 7:29 in the morning.

25   Q.  You testified you were seeking information.  What

1    information were you seeking from Mr. Weber?

2    A.   I'm sorry, can you say that again?

3    Q.   What was the information you were seeking?

4    A.   So the information that I wanted to get from everybody

5    involved was I wanted to make sure that, again, it wasn't just

6    like a subtle disagreement or just a mistake or something like

7    that.  So I asked three questions.  The three questions were

8    this:

9         First was, okay.  This library, these OSB libraries,

10   is that just something that only the branch can use?  Is it

11   just specific to the branch or is it something that other

12   people can use?

13        Two, what were Josh's permissions?  And you know, was

14   this -- the change that was made, was it made as a result of

15   something where he, he was told he had access and it was

16   removed?  Like completely removed so he couldn't contribute as

17   we previously talked about?  Or is this a case of somebody

18   wanting further control, i.e., did he reassert his admin rights

19   on that library.

20        And then, three, I noted that he, he spoke to Josh

21   about it, and I wanted to know was it in person or was it via

22   e-mail.  Because, you know, if it was an e-mail, I could see

23   it.  Right.  Hey, send me the e-mail.  But if it was in person,

24   I really wanted to understand what was said.  Because a lot can

25   be missed in verbal communication, and I just really want to

1   understand what was -- what was -- what happened from his

2   perspective.

3   Q.  So, focusing on question one.  Why did you want to know if

4   the OSB libraries were entirely an OSB owned product?

5   A.  Well, because, you know, and I say it right after that, if

6   you're not in OSB, does that mean you can't provide input to

7   it?  Or is this one of those things where you, if you're only

8   in OSB you can provide input to it.  Because since Josh was

9   moved to RDB, and the previous e-mails you saw he wanted to

10  have access to the library, I wanted to make sure that there

11  was some congruence there.  If we had been saying, hey, you can

12  still contribute, and all of a sudden you can't contribute,

13  well, that need to be rectified.

14  Q.  So, do you see the line that starts "my concern here."

15  A.  Yes.

16  Q.  Could you just read that for us, please.

17  A.  "My concern here is that if Josh wants to use the libraries

18  and no longer has access to them, that's one thing."

19  Q.  What do you go on to say?

20  A.  "On the other hand, if he changed his permissions to enable

21  him to administer the libraries, that's another."

22  Q.  What's the distinction you're drawing there?

23  A.  So again, we previously said in the e-mails below, hey,

24  Josh, you can have access to the libraries and you can keep

25  contributing.  Right.  So, if the change was made where that

1   permissions were removed, like completely removed, I wanted to

2   understand that, because, you know, not saying it's okay, I

3   just, I understand maybe there was a mistake and he was just

4   trying to rectify it, right.

5          But on the other hand, if he used his admin

6   permissions to go and re-enable himself admin permissions after

7   he was told he couldn't, well, that was in violation of what we

8   had told him he could do.  So, that was a problem.

9   Q.  Do you see where you write "But in this matter I urge

10  caution"?

11  A.  Yes.

12  Q.  What did you mean there?

13  A.  Well, it is a pretty heavy accusation.  This is the kind of

14  thing that, there are policies, our organization has policies

15  about this very issue.  People using admin controls, you know,

16  to gain control over things that they're not supposed to have

17  access to.

18         And so, when somebody's making an accusation like

19  that, it has far, far reaching, it could have far reaching, it

20  could create far reaching problems.  And if it genuinely was

21  just a mistake, I didn't want people jumping to the conclusion

22  that -- that's a bridge too far.  Right.  Let's deal with the

23  problem, let's fix the mistake.

24         But if this was a matter where somebody really was

25  actually using their admin controls to re-enable something they

1    were told not to, that had to be addressed.

2    Q.  Did Mr. Weber ever give you the information you were

3    looking for?

4    A.  Yes.

5    Q.  Can we scroll up to the next e-mail, please.  That's a long

6    one.  Let's start at the top.  Who is this from?

7    A.  It's from Jeremy.

8    Q.  When did he send it?

9    A.  He sent it on Friday, April 15, 2016, 12:12 p.m.

10   Q.  Who did he send it to?

11   A.  He sent it to myself, Sean, and Richard.

12   Q.  Is this the response you were referring to before?

13   A.  Yes.

14   Q.  So, let's just start with where he writes "first."  Do you

15   see where he says, "This is an undertaking I started two years

16   ago because OSB, specifically myself, Frank Stedman, Matt and

17   Schulte, felt that it was fighting a losing battle in regards

18   to QRCs"?

19   A.  Yes.

20   Q.  What did you understand that to mean?

21   A.  So that gets back to the branch, and specifically those

22   four developers decided that they needed to build a code

23   library to address this issue that they were having with QRCs,

24   they weren't able to turn QRCs fast enough.  QRCs, quick

25   reaction capability.  If you can't react quickly, that's kind

K263SCH5                    Leonis - Direct

1    of a problem.  So they were trying to build a tool for

2    themselves that they could help themselves react quickly.

3    Q.  Could we go to the next page, please.  Do you see at the

4    top there where he writes "we had three goals"?

5    A.  Yes.

6    Q.  What did you understand the three goals to be?

7    A.  So, three goals, essentially, the first part is use the

8    libraries to put together tools quickly that could be ready to

9    go and meet a majority of the operational requirements.  So,

10   that way, when a requirement came to them, hey, we have

11   something we can pull from, maybe we can put something together

12   really quick.  This looks just about right, we are on the right

13   track.

14       Then a process where people could, you know,

15   contribute and learn.  So, that's important, because as the

16   world changes and there are software updates to systems up

17   there or new capabilities were required, you have to be able to

18   update those libraries, so you've got to put new code building

19   blocks in the libraries.  So they wanted to have a process

20   where they could add code back in and make sure that that code

21   was also good and ready to go for future requirements.

22       And then the last was to make sure that they had a

23   means to track what code was being used, where.  And that's

24   because if you're using these libraries, that could potentially

25   have ramifications if you are using the same code everywhere.

1    You want to make sure you know where that code's being used, so

2    you just understand the ramifications.

3    Q.  Can we move on to the next page, please.  Do you see the

4    third numbered paragraph there?

5    A.  Yes.

6    Q.  The one that starts "Josh and I did have a conversation

7    yesterday"?

8    A.  Yes.

9    Q.  Was this in response to the question you asked?

10   A.  That was in response to the third question.

11   Q.  What did you understand Mr. Weber to be saying here?

12   A.  So, he admitted to having a verbal conversation.  And I

13   guess Josh came up to visit them asking why he didn't have the

14   ability to merge code in to the libraries.  And Jeremy was

15   saying that Sean decided that Josh's admin privileges on that

16   project, OSB libraries, were to be removed.  So, he was, he was

17   providing that as reference.

18   Q.  Was there anything about Mr. Weber's description of the

19   conversation that struck you in particular?

20   A.  Yes.

21   Q.  What was that?

22   A.  So there was a quote close to the bottom here on the

23   screen, where Josh basically said, or Jeremy said that Josh

24   said that Josh stated he will get access back to the libraries,

25   and that access should just be enabled now.

1   Q.  Why did that strike you?

2   A.  That's just not the way we talk.  You don't expect to hear

3   that from a person with admin rights.

4   Q.  What do you mean?

5   A.  So, again, when you talk about an admin, this is somebody

6   that you're putting in control of a system so that they can,

7   they can help everybody else get the job done.  Every job's

8   important, and this job is one of those important jobs where,

9   you know, previously, you saw that Elliot had asked for access

10  back to a library that he didn't have access to.  So, admins

11  have the ability to go in and say okay, Elliot, you can have

12  access to those libraries.

13          So, when an admin says, hey, if you don't give me

14  access, or -- give me access to the libraries, because I'm

15  going to get it now, or I'm going to get it anyway, so give me

16  access now.  That's a bit concerning, because this is about

17  trust.  And you're entrusting somebody to use those admin

18  privileges not for a personal, you know, what they want

19  personally.  But you're expecting that they do what they're

20  told.

21          So if Sean said this is the way I want access to that

22  library, then that's the way it was supposed to be.  Those

23  libraries were in his branch, he decided how they were going to

24  be adminned.  And, this runs completely contrary to that.

25  Q.  I believe you testified that when you got Mr. Weber's

K263SCH5                          Leonis - Direct

1    initial e-mail, on April 14, you were concerned; is that right?

2    A.  I'm sorry, say it again?

3    Q.  You grew concerned when you got his original e-mail on

4    April 14?

5    A.  Yes.

6    Q.  Did this e-mail response assuage your concerns at all?

7    A.  No.

8    Q.  Why not?

9    A.  Because as you go to the bottom, it says the audit log

10   showed that Schulte re-enabled his access.

11   Q.  Why was that concerning?

12   A.  So, not only was it a conversation that occurred, but then

13   there was also logs that showed it.  So, it actually happened.

14   Q.  What, if anything, did you do after getting this e-mail?

15   A.  I needed another person to tell me whether this was for

16   real.  Because, I mean, again, this is, this is kind of a big

17   statement, right.  You know, I went, I went to the branch chief

18   and I said, hey, can you back this up, you know.  This is, this

19   is your code libraries.  Did this occur?

20   Q.  You said the branch chief.  Was that Sean?

21   A.  That was Sean.

22          MR. KAMARAJU:  Ms. Hurst, can we go up to the next

23   e-mail, please.

24   Q.  Who sent this e-mail?

25   A.  I did.

K263SCH5                        Leonis - Direct

1    Q.   When did you send it?

2    A.   Friday, April 15, 2016 at 1:15 p.m.

3    Q.   Who did you send it to?

4    A.   I sent it to Sean.

5    Q.   Was Mr. Weber still on this e-mail?

6    A.   No.

7    Q.   Why did you take Mr. Weber off?

8    A.   Well, because I wanted Sean to confirm it without -- at

9    this point I wanted a third party, basically, to say yeah, this

10   really happened.

11   Q.   And do you see where you said, "Hi, Sean.  Please confirm

12   the direction you provided to Joshua"?

13   A.   Yup.

14   Q.   What direction are you referring to there?

15   A.   It's -- right around the third, third line.  Where it says

16   "I informed him that this was a decision that Sean had made."

17   Q.   Now, did Sean ever confirm this for you?

18   A.   I believe he did.

19   Q.   Can we go up to the next e-mail, please.  Who sent this you

20   e-mail?

21   A.   Sean did.

22   Q.   When did he send it to you?

23   A.   Friday, April 15, 2016 at 1:50 p.m.

24   Q.   Can you summarize what Sean said in this e-mail.

25   A.   So, Sean said they had a discussion with Josh, and they had

1     a discussion about his abilities to contribute and what his

2     admin or lack thereof status was going to be, and he said -- or

3     I'm sorry.  It says "At no time did the conversation we discuss

4     administrator access."  So, they had a conversation about it.

5     And then he went to discuss libraries with Jeremy.  And

6     essentially he was stating that he actually did tell the branch

7     to remove, or to make it an OSB thing.

8     Q.  Now, did this e-mail from Sean ease your concern at all?

9     A.  No.

10    Q.  Why not?

11    A.  Well, so, essentially Sean was saying that he didn't agree

12    with -- essentially Sean was saying that -- he didn't agree

13    with Josh having admin access.  And so, you know, I had been

14    hoping for at that point, or up to this point, that there was a

15    mistake made.  And by this point, it wasn't looking like it was

16    a mistake.

17    Q.  Why were you hoping it was all a mistake?

18    A.  Because, I mean, there are policies in our organization

19    about how people have to admin systems.  This was, this was in

20    violation of some of those policies.  It was, it was also -- it

21    was directly flying in the face what was he was told.  So,

22    yeah.

23    Q.  What, if anything, did you do after reading Sean's e-mail?

24    A.  So, I was concerned, because essentially I had a security

25    issue on my hands.  So, I penned an e-mail that I sent to

1    management and security.

2    Q.  Why did you think it was important to notify management and

3    security?

4    A.  So, the Atlassian tool suite was where our code, those,

5    those capabilities that we have been talking about, that's

6    where all those code libraries were.  And I was very concerned

7    that here we had a situation where even though Josh, Josh

8    changed branches and we gave him, you know, some things to take

9    with him, he had used his admin rights to go into the system,

10   and change privileges on things that we didn't allow -- have

11   him or say that he could.  And that just, that's a trust issue.

12        We spend a lot of time working with people, you know,

13   they go through this -- this intense process to show that they

14   are trustworthy and they can be trusted.  And then admins are

15   given additional responsibilities to use that trust, not for

16   their own gain, but to help with the mission.  And since this

17   was, this was a little bit more than just a, you know, a

18   mistake, right.  This was, appeared to be a willful change to

19   the system.  So that he had access to something that he wasn't

20   told he could have access to.

21        MR. KAMARAJU:  Ms. Hurst, can we go to page one of the

22   exhibit.  And can we just blow up the bottom part of the from

23   line.

24   Q.  Who sent this e-mail?

25   A.  I did.

1   Q.  When did you send it?

2   A.  I sent it on Friday, April 15, 2016, at 2:06 p.m.

3   Q.  Who did you send it to?

4   A.  I sent it to security and HR, and then cc'd EDG management.

5   Q.  Who, could you identify who is EDG management on this?

6   A.  Mike S. is the deputy division chief -- I'm sorry.  Deputy

7   group chief, and Karen is the group chief.

8   Q.  Remind us who is Dana?

9   A.  Dana was security.  Chief of security.

10  Q.  What was your goal in sending this e-mail?

11  A.  Well, one, I wanted to make everybody aware that it

12  occurred.  And two, you know, I needed some help in figuring

13  out what to do next.  So, this wasn't something that, you know,

14  I felt like, that I could just handle at this point.  This was

15  something that I needed some help with.

16          And I -- I really wanted to make sure that I tried to

17  explain the situation to people that, you know, I'm not a coder

18  as good as, you know, some of the other guys.  Nowhere near as

19  good as those guys.  I wanted to give them an understanding of

20  what actually occurred in a way they could hopefully

21  understand.

22  Q.  What subject line did you put on this e-mail?

23  A.  EDG/AED security concern.

24  Q.  Can we take a look at your e-mail now.  I'd like to go

25  where you say you have included the e-mail below from Jeremy

1    Weber and a verification from Sean.

2              Why did you want to include those?

3    A.  Well, so, I didn't want people thinking that, you know,

4    again, this is literally like two and a half weeks, three weeks

5    into my new responsibilities, and I really wanted people to

6    understand that this was something that we at least looked into

7    first before bringing it up.  Not just something that was just

8    thrown out there as, hey, you know, because it was a pretty big

9    deal.

10   Q.  Going on to the next paragraph.  You see where you say at

11   the end of March 2016?

12   A.  Yes.

13   Q.  Why did you include that information in this e-mail?

14   A.  I wanted to give some background kind of on how we kind of

15   got to this point.  Because as part of the, moving some of the

16   developers, specifically Josh and Amol out of OSB to new

17   branches, one of the directions that was provided to OSB was to

18   say, hey, make sure that if you're keeping projects, that you

19   can actually do those projects.  That you have people that are

20   on staff that can work those projects, because if you don't,

21   you know, I don't want you to just keep projects because you're

22   just keeping projects.  We need to make sure that people can

23   actually do those projects, they're resourced, because there

24   are mission needs behind them.

25   Q.  Do you see where you say, "This move was made following a

1   personnel situation that occurred in March 2016"?

2   A.  Yes.

3   Q.  What personnel situation are you referring to?

4   A.  Between Josh and Amol.

5   Q.  Can we go to the next paragraph.  What are you describing

6   in this paragraph?

7   A.  So, I was trying to give some background about what -- the

8   situation specifically, that the OSB administrators had removed

9   Josh's administrative access to those specific code libraries

10  when he moved to RDB.  And in doing so, they removed his admin

11  access to the libraries, but they had allowed him to still use

12  the libraries or contribute code to the libraries through a

13  peer review process.

14  Q.  Do you see where you referred to or you write, sorry, "This

15  action was taken in direct response to the direction provided

16  by EDG and CCI management at the end of March 2016"?

17  A.  Yes.

18  Q.  What's that a reference to?

19  A.  So that goes back to the previous paragraph where we were

20  talking about making sure that projects were properly resourced

21  and so forth.

22          MR. KAMARAJU:  If we can blow back out and go to the

23  second paragraph, please.  We can blow up the numbered

24  paragraph one for right now.

25  Q.  What were you describing here?

A.   So, one of the things I was told by OSB was that there were
times when Josh would use his admin access to some of the code
libraries to check in and check out code without going through
the peer review process.  The peer review process they put in
place, as I understood it, was to ensure that any code that
went into the library was good code, quote unquote, and by
that, code that the developers could trust, and just, and know
that they could use as was.

        And what was explained to me is that when that -- when
people didn't go through that code peer review process, at
times there was code in the library that didn't compile.  What
that meant really was these Lego building blocks that were in
the code library, they were broken.  So if you tried to use
one, it would break basically whatever you were trying to
build.

        So they wanted to make sure that any code that got
delivered or put back into the library was something that could
be used, it was checked, it was good, it would compile, it
would work.  Because if it didn't, that would cause them to go
back and spend tons of manhours fixing.  You know, however many
manhours that could be.  And so, they were concerned about
that.
Q.   If we can go to the next paragraph, please.  So, did you
include here a description of Mr. Weber's description of his
conversation with the defendant?

K263SCH5                    Leonis - Direct

1    A.   Yeah.

2    Q.   Why did you want to include that information?

3    A.   Well, because I -- I was trying to explain how we got to

4    where we are, and then where we were.

5    Q.   Can we go to the next page, please.  You see at the top

6    there where it starts where "Jeremy explained to Joshua."

7    A.   Yes.

8    Q.   Why did you include that quote there?

9    A.   That quote was, it is just not how we talk.  I mean, that's

10   not something that you want to hear from an admin, let alone

11   really anybody, for that matter.  Because it's basically saying

12   this something I want, and if I don't get it, I'm going to get

13   it anyway.

14        So, in a professional environment, that's not

15   something you expect to hear.  And especially in an environment

16   like ours where you're trusting people to -- they have

17   sensitive materials, that's just not, that's not something

18   that's part of our, it's not part of our ethos, that's not the

19   way we talk.

20        MR. KAMARAJU:  Could we blow it up again, please.  Can

21   we blow up the paragraph that starts "first."

22   Q.   Mr. Leonis, what were you trying to convey in this

23   paragraph?

24   A.   So, I realized I was talking to HR and security.  And I

25   wanted to make sure that people understood what this meant on a

1     bigger scale.  Right.  We, there were a number of reasons why

2     this action was very concerning to myself and others.  And so,

3     what I wanted to do was start with something that I felt

4     everybody who works at our organization would understand.  And

5     I'm not just talking about CCI, I'm talking about the agency.

6              So there was a training that we take every year.

7     Every person that has access to our computer system you have to

8     take this training.  It's called AISC.  And in that training,

9     it talks about regulations on IT and user accounts.

10             And so, I wanted to make sure that I was trying to, as

11    I was trying to explain what this was, what this situation that

12    occurred was, I wanted to anchor it in something everybody

13    should at least be able to reference, if not already know.

14             MR. KAMARAJU:  Ms. Hurst, can we go to the next

15    paragraph.

16    Q.  What were you trying to convey here?

17    A.  So, now that, you know, we're talking about the DevLAN

18    system, and specifically the code databases on the DevLAN

19    system, that's where -- a number of our very sensitive

20    capabilities were that were being used to gather intelligence.

21    And so, having those, having access to those capabilities, you

22    know, you had to be trusted to begin with.  Having admin access

23    to those capabilities, you know, that was, that was another

24    level of trust.  So, and I even say it.  You know, the

25    understanding is that people not use their admin rights to act

K263SCH5                    Leonis - Direct

1   or accesses to promote having control over components that they

2   wanted to have.  Right.

3              This is a professional environment.  If you're told

4   no, that's no.  Right.  And there is a trust aspect that goes

5   along with that.

6              And so, I wanted to make it clear that, to the people

7   that I was talking to, that, you know, first, at the agency

8   level, there was, there was a, there was policies that

9   referenced this.  And second, we're talking about a system that

10  has a lot of code on it, that's very sensitive, and those tools

11  needed to be protected.

12  Q.  Do you see at the end of that paragraph where you say

13  "Violation of this trust is a serious matter."

14  A.  Yes.

15  Q.  What did you mean by that sentence?

16  A.  So, if somebody was using their admin privileges to access

17  things that they were not told they could have access to,

18  that's a breach of trust.  And mistakes happen.  But, when

19  people are deliberately taking action to gain access to things

20  that they're not supposed to have access to, that's not what

21  people were given their admin accesses for.

22             MR. KAMARAJU:  Can we look at the last paragraph, the

23  one that starts "as a result."  Actually I think it carries on

24  to the next page also, so maybe we can put them up together, if

25  that's possible.  Thank you.

K263SCH5                        Leonis - Direct

1   Q.  Do you see that, Mr. Leonis?

2   A.  Yes.

3   Q.  What were you trying to explain here?

4   A.  So I was trying to summarize, essentially, the situation

5   and summarize my e-mail and all e-mails that I received to that

6   point.  And it's just one of those things where, you know, even

7   reading it now, it's just -- I mean, the fact is that when

8   somebody takes and they use their admin access on a system that

9   has these capabilities that can be used to gather intelligence,

10   using those admin controls, you know, because you want

11   something, or you want to decide how it's being managed, or you

12   want to have admin rights on something, that's a serious

13   matter.  And frankly, it's just, it's not something that, it's

14   not something that was condoned at any level.

15        And I guess the big thing that I also wanted to point

16   out, when I wrote it, was that our developers were very, very,

17   very talented.  If you were working in our organization, you

18   were a talented developer.  You were -- we were, we brought you

19   in to work on our systems because we wanted people working on

20   the toughest problems.  And as a result, we conveyed a lot of

21   trust to people because we wanted them to have the ability to

22   innovate.

23        I mean, this is intelligence that helps keep us safe

24   as a country.  This is intelligence to get information on

25   people that could be doing stuff to hurt us.  And I want, I

K263SCH5                          Leonis - Direct

1    wanted, and I mean, even today I still want, I want people to

2    be able to innovate and come up with the best tools and

3    capabilities they can to ensure that we can remain safe.

4           And so, we put a lot of faith and ability in our

5    developers, but we also entrusted them with a lot of abilities,

6    and we didn't, we didn't try to micromanage those development

7    efforts.  So, in doing so, our model really relied on the fact

8    that everybody could be trusted to protect our equities with

9    the -- with the accesses that were put in place.  And if

10   anybody wasn't doing that, or wasn't following the rules, that

11   could, that could cause problems, you know, long term.

12          THE COURT:  Mr. Kamaraju, would this be a convenient

13   place to break?

14          MR. KAMARAJU:  I just had one more question.

15          THE COURT:  Go ahead.

16   Q.  Could you just read the last line of the paragraph and tell

17   us what you meant there.

18   A.  Sure.  "Failure to do so puts our entire set of cyber tools

19   and those using them at risk to come."

20          That sentence goes with the rest of the paragraph.  It

21   was never -- I never wrote it to be just by itself.  I wrote it

22   for the rest of the paragraph.

23          But, my thought process there was not only the cyber

24   tools, but those using them.  Because some of those tools are

25   used by people in the field to go get intelligence for us.  And

1    should anything bad happen with those tools, it could put

2    people in harm's way that are out there trying to protect us.

3    And so, I wanted people to understand the severity of a lack of

4    trust and using your admin controls for personal gain.

5              MR. KAMARAJU:  Okay, your Honor.  If that's a good

6    time to break.

7              THE COURT:  Thank you.  Ladies and gentlemen, we're

8    going to break now for the weekend.  Please be seated.

9    Remember my do's and don'ts.  Don't discuss the case with

10   anybody.  Don't read about it in the newspapers, ignore any

11   media reports that you may see.  Don't do any research on the

12   case.  Keep an open mind.  You have to remember at all times

13   that the decision that you have to make is going to be decided

14   solely on evidence you hear in the courtroom, not from anyplace

15   else.

16             So I hope you have a nice weekend.  We'll resume on

17   Monday at 9 o'clock in the morning.  Have a good weekend.  And

18   make sure you leave your notebooks here.  Don't take those home

19   with you.  Thank you very much.  Have a good weekend.

20             (Jury excused)

21             (Continued on next page)

22

23

24

25

K263SCH5

```
 1              THE COURT:  You are excused, Mr. Leonis, thank you.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  Can I get a listing of the witnesses you
 4     intend to call next week?
 5              MR. LAROCHE:  Yes, your Honor.  We can provide it to
 6     you.
 7              THE COURT:  And a schedule?
 8              MR. LAROCHE:  Yes, your Honor.
 9              THE COURT:  Okay.  Do you want to discuss the letters
10     of January 17, the government's response of January 24, and the
11     Federal Defenders' letter of January 27?
12              Mr. Laroche, do you have anything to add to your
13     letter of January 24?
14              MR. LAROCHE:  Your Honor, with the Court's permission,
15     we would like to put in a brief letter tonight.
16              THE COURT:  Okay.  I'll have a decision for you then
17     first thing tomorrow morning.
18              MR. LAROCHE:  Thank you, your Honor.
19              THE COURT:  What about the WikiLeaks task force
20     document?
21              MR. LAROCHE:  Same request, your Honor.  A brief
22     letter tonight.
23              THE COURT:  Okay.  I must tell you, Mr. Laroche, if
24     you get into assessments, I don't see how you do that without
25     producing more information about the assessments when made and
```

K263SCH5

1   so forth.

2               MR. LAROCHE:  Understood, your Honor.

3               THE COURT:  Anything else to take up?

4               MR. LAROCHE:  No, your Honor.

5               THE COURT:  Ms. Shroff?

6               MS. SHROFF:  Your Honor, I think we're going to be

7   able to resolve this with the United States marshals service,

8   but since Mr. Schulte is on trial Monday through Thursday, we

9   have asked, I don't know Sully's last name, but I asked Sully.

10  He's worked with us tremendously throughout this whole period,

11  so I'm hopeful we'll be able to get some SCIF time with

12  Mr. Schulte tomorrow.  But if not, I may have to write to the

13  Court.

14              THE COURT:  All right.

15              MS. SHROFF:  I do want to stress here that --

16              THE COURT:  One of the reasons we took off on Fridays

17  was so he could have SCIF time.

18              MS. SHROFF:  It is hard for the marshals because it's

19  Friday.

20              THE COURT:  They'll do the best they can.

21              MS. SHROFF:  Okay.  I'm not complaining about them at

22  all.

23              THE COURT:  They've been cooperative all the way

24  through.

25              MS. SHROFF:  Amazingly so.  Okay.  Thank you, your

K263SCH5

1    Honor.  Have a good weekend.

2              THE COURT:  Same to you.

3              What time can I expect your brief?

4              MR. KAMARAJU:  We'll have it to you by 6:30.

5              (Adjourned until February 10, 2020, at 9 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                        Page
 3    JEREMY WEBER
 4   Cross By Ms. Shroff  . . . . . . . . . . . 395
 5   Redirect By Mr. Laroche  . . . . . . . . . 514
 6    ANTHONY LEONIS
 7   Direct By Mr. Kamaraju . . . . . . . . . . 549
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```