K2C3SCH1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        S2 17 Cr. 548 (PAC)

5    JOSHUA ADAM SCHULTE,

6              Defendant.                Trial

7    ------------------------------x
                                         New York, N.Y.
8                                        February 12, 2020
                                         9:15 a.m.
9    Before:

10                      HON. PAUL A. CROTTY,

11                                       District Judge
                                           -and a jury-
12                      APPEARANCES

13   GEOFFREY S. BERMAN
          United States Attorney for the
14        Southern District of New York
     BY:  MATTHEW J. LAROCHE
15        SIDHARDHA KAMARAJU
          DAVID W. DENTON JR.
16        Assistant United States Attorneys

17   SABRINA P. SHROFF
     JAMES M. BRANDEN
18        Attorneys for Defendant
          -and-
19   DAVID E. PATTON
          Federal Defenders of New York, Inc.
20   BY:  EDWARD S. ZAS
          Assistant Federal Defender
21
     Also Present:  Colleen Geier
22                   Morgan Hurst, Paralegal Specialists
                     Achal Formando-Peiris, Paralegal
23                   John Lee, Litigation Support
                     Daniel Hartenstine
24                   Matthew Mullery, CISOs, Department of Justice

25

K2C3SCH1                          Leedom - Direct

 1              (In open court; jury present)

 2              THE COURT:  Good morning.  Happy Lincoln's birthday.

 3     Please be seated.  Mr. Laroche.

 4              MR. LAROCHE:  Thank you, your Honor.

 5              THE COURT:  Mr. Leedom, I want to remind you, you're

 6     still under oath.

 7              THE WITNESS:  Yes, sir.

 8              MR. LAROCHE:  Ms. Hurst, can you please bring up

 9     Government Exhibit 1703 and go to slide 66, please.

10      PATRICK LEEDOM,

11          called as a witness by the Government,

12          having been previously sworn, testified as follows:

13     DIRECT EXAMINATION (Continued)

14     BY MR. LAROCHE:

15     Q.  Mr. Leedom, yesterday you testified as to some of the

16     changes on the DevLAN network that occurred on April 16, 2016.

17     A.  That's correct.

18     Q.  What were some of the changes that were made to Confluence

19     that day?

20     A.  On Confluence, the SSH public keys that were on the server

21     were all deleted and replaced with a single key.  And the

22     administrative password was changed.

23     Q.  Confluence was running on a server; is that correct?

24     A.  That's correct.

25     Q.  Was that an ESXi server?

K2C3SCH1                          Leedom - Direct

1   A.  Yes, it was.

2   Q.  Who did that server belong to?

3   A.  It was OSB's ESXi server.

4   Q.  On April 16, 2016, were certain changes made to that server

5   itself?

6   A.  Yes, they were.

7   Q.  Please summarize those changes.

8   A.  On the ESXi server, the administrative password was

9   changed.

10  Q.  There is a sub-bullet down at the bottom that says "Schulte

11  SSH key not removed."

12  A.  That's correct.

13  Q.  What is that meant to convey?

14  A.  That the defendant's public key that was on the ESXi server

15  was not removed.  So he still had access to that server over

16  SSH after 4/16.

17  Q.  Prior to making these changes on April 16, did the

18  administrators do anything to the system?

19  A.  To the ESXi server?

20  Q.  Let's start with Confluence.  Did they do anything with

21  Confluence?

22  A.  The server was migrated on the 25th, but after the

23  passwords were changed on 4/16, they made a snapshot before

24  making the changes, but they just changed the passwords after

25  that.

K2C3SCH1                        Leedom - Direct

1    Q.  What do you mean they made a snapshot before making the

2    changes?

3    A.  A snapshot was made before they changed any of the

4    passwords, just in case there were any issues that arose from

5    the passwords that they changed or the keys they deleted.

6    Q.  You also testified that the SSH key on the ESXi server was

7    used by the defendant on April 15 to log into that server; is

8    that correct?

9    A.  That's correct.

10   Q.  Let's go to slide 84, please.  We looked at this file

11   yesterday, correct?

12   A.  Yes, we did.

13   Q.  You testified that this is from the auth. log of the ESXi

14   server; is that correct?

15   A.  That's correct.

16   Q.  Can you show us where the administrative session was

17   started on April 15 by the defendant?

18   A.  The session started here.  And then the session was opened

19   here.

20   Q.  In that number there is a -- in that circle there is a 766

21   number?

22   A.  Yes, there is.

23   Q.  What is that up?

24   A.  That's the work ID for the defendant's session that will be

25   logged with commands that the defendant ran in the shell log.

K2C3SCH1                         Leedom - Direct

1   Q.  How do you know this was the defendant's administrative

2   session?

3   A.  We can tell from two places, primarily.  We have the IP

4   address from the defendant's DevLAN workstation, the Ubuntu

5   virtual machine on his workstation, and we have a fingerprint

6   from his private key which was encrypted.

7   Q.  What's a fingerprint from his private key?

8   A.  It's just the unique identifier that matches the public key

9   that was on the server, with the private key that he had on his

10  virtual machine.

11  Q.  Let's go to slide 76, please.  You left off yesterday

12  talking about some of the activities on April 18, 2016.  Is

13  that correct?

14  A.  That's correct.

15  Q.  I think you left off talking about certain administrative

16  logins to the server itself by the defendant.  Is that correct?

17  A.  Yes, that's correct.

18  Q.  Does this page reflect such a login?

19  A.  Yes, it does.

20  Q.  Starting with the top exhibit, what time did the defendant

21  login as an administrator to the ESXi server?

22  A.  He logged in at 11:12:08 in the morning, and the time stamp

23  is right here.

24  Q.  Then did he log out of the session at some point that day?

25  A.  Yes, he did.

K2C3SCH1                    Leedom - Direct

1  Q.  When did he log out?

2  A.  He logged out at 1:47.

3  Q.  As an administrator of the ESXi server, what types of

4  things could the defendant do on the system?

5  A.  Primarily, manage the virtual machines, things like create

6  snapshots, delete snapshots, list snapshots, power machines on

7  and off; things like that.

8  Q.  Let's go to the next slide, please.  We also looked at this

9  slide yesterday.  Isn't that correct?

10  A.  I believe so, yes.

11  Q.  Where is this slide from?

12  A.  This is from the ESXi server, it's from the hostd log.

13  Q.  What does it reflect?

14  A.  This is a login by the defendant using his DevLAN user

15  credentials, so non-administrative credentials.

16  Q.  A login to what?

17  A.  To the ESXi server through vSphere.

18  Q.  So different than the type of login on the previous slide?

19  A.  That's correct.

20  Q.  Let's go to the next slide, please.  This slide has

21  Government Exhibit 1209-3.  Where is this exhibit from?

22  A.  This was from the ESXi server recovered from unallocated

23  space.  It is a fragment of a log file.

24  Q.  What does it show?

25  A.  It shows a connection over vSphere from the defendant's

K2C3SCH1                        Leedom - Direct

1    workstation at about 11:12 a.m. on 4/18.

2    Q.  Let's go to the next slide, please.  This slide at the top

3    has Government Exhibit 1209-18.  Where is this log file from?

4    A.  This is also from the ESXi server.  This is from the hostd

5    log file.

6    Q.  What's that top slide show?

7    A.  This is showing a login from the defendant's workstation as

8    the root administrator user.

9    Q.  A few slides ago we saw root login at approximately

10   11:12 a.m.; is that correct?

11   A.  That's correct.

12   Q.  Is this the same login?

13   A.  Yes.

14   Q.  Were there two logins or one login at 11:12 a.m.?

15   A.  There were two logins; one was shortly after the other.

16   Q.  Is this the second login?

17   A.  Yeah, that's correct.

18   Q.  How do you know this is a different login?

19   A.  We can match up the login and log out, like time stamps for

20   the sessions, and determine that there were two separate

21   logins.

22   Q.  At what time did he log out of this session?

23   A.  Is it just me or it's flashing here?

24   Q.  Did you lose the screen?

25   A.  Yes.  It's flashing in and out.  Okay.  Maybe it's just me.

K2C3SCH1                    Leedom - Direct

1    Now I have nothing.  Oh.

2              THE COURT:  Do you have a hard copy for him?

3              MR. LAROCHE:  Yes, your Honor.

4    A.  Let me see if I can move it.  Now it's gone completely.

5              THE COURT:  Does the jury have the same problem?

6              A JUROR:  No.

7              THE COURT:  You can see?

8              A JUROR:  Yes.

9    Q.  Mr. Leedom, we're on slide 79.

10   A.  Give me just a second.  I can draw but there's no -- just a

11   second.

12             THE DEPUTY CLERK:  Mr. Leedom, anything?

13             THE WITNESS:  No.

14   A.  I've got slide 79.

15   Q.  We'll go through the hard copy, that's fine.  I think the

16   jurors still have it.

17   A.  Okay.  I'll try and explain geographically what I'm talking

18   about.

19   Q.  So, we're on slide 79 and we see another login at

20   11:12 a.m. as root.  Is that correct?

21   A.  That's correct.

22   Q.  You just testified that there were two logins at

23   11:12 a.m.; is that correct?

24   A.  Yes, that's correct.

25   Q.  At what time approximately did the defendant log out of

K2C3SCH1                          Leedom - Direct

1    this session?

2    A.  About 11:43 a.m.

3    Q.  Let's go to the next slide, please.  Now we're on slide 80.

4    This shows Exhibit 1209-3 again.

5            Where is this exhibit from?

6    A.  This is from the ESXi server recovered from unallocated

7    space.

8    Q.  Again, what is this showing?

9    A.  This is showing a connection from the defendant's

10   workstation to the ESXi server over vSphere and we can see --

11   Q.  For what login does this show?

12   A.  I'm sorry.  Could you repeat the the question?

13   Q.  Sure.  What login does this show?

14   A.  This shows the login at 11:12 a.m.

15   Q.  This is a server-side log; is that correct?

16   A.  That's correct.

17   Q.  On the previous slide, that was also a server-side log; is

18   that correct?

19   A.  That's correct.

20   Q.  Let's go to slide 81.  This is showing Government Exhibit

21   1202-3.  Where is this exhibit from?

22   A.  This is from the defendant's DevLAN workstation in his

23   downloads folder.

24   Q.  What does this exhibit show?

25   A.  This shows that a web page was downloaded of a specific

K2C3SCH1                       Leedom – Direct

1    page on Confluence at -- on April 18, at 2:01 p.m.

2    Q.  What page was downloaded by the defendant?

3    A.  The page name was the OSB's ESXi server page.

4    Q.  Let's go to the next slide, please.  Is this the exhibit

5    that the defendant downloaded, this page?

6    A.  Yes, this is part of it.

7    Q.  Where is this from?

8    A.  This is, this is a picture of, if you open that file, this

9    is what you get.

10   Q.  If we can zoom in on the infrastructure VMs at the bottom.

11   As of -- before April 16, 2016, what was the root password for

12   the ESXi server?

13   A.  Before April 16, the root password was My Sweet Summer.

14   Q.  Did that change?

15   A.  Yes, it did.

16   Q.  When did it change?

17   A.  It changed on April 16, when they reset the passwords.

18   Q.  Did it remain My Sweet Summer?

19   A.  No, it did not.

20   Q.  Let's go to the next slide, please.  This is showing

21   Government Exhibits 1209-21 and 22.  Where are these exhibits

22   from?

23   A.  This is from the ESXi server.

24   Q.  What is this showing?

25   A.  This is showing a login as the root account to the ESXi

1   server through vSphere.

2   Q.  Whose login is it showing?

3   A.  It is the root login, so the administrator login.

4   Q.  By who?

5   A.  From the defendant's workstation.

6   Q.  How do you know that?

7   A.  We have his IP address, if you look in the top-right-hand

8   corner.

9   Q.  At what time did he log in?

10  A.  About 7:17 p.m.

11  Q.  At what time did he log out?

12  A.  About 7:47 p.m.

13  Q.  If we go to the next slide, please.  We've seen this slide

14  come up several times; is that correct?

15  A.  That's correct.

16  Q.  We just talked about several administrative logins to the

17  server on the last few slides, correct?

18  A.  That's correct.

19  Q.  Does this slide reflect a different kind of administrative

20  login?

21  A.  Yes.  This slide only shows logins with the password for

22  the server itself.  Or the SSH key to the actual server itself.

23  Q.  This a session that was given an ID 766; is that right?

24  A.  That's correct.

25  Q.  Did you see any evidence of the defendant using this

K2C3SCH1                        Leedom – Direct

1   administrative session on April 18, 2016?

2   A.  Yes, I did.

3   Q.  Let's go to the next slide and take a look at that.  This

4   slide has Government Exhibit 1203-43.  There is some

5   highlighted text there.

6   A.  Yes.

7   Q.  First, where is this exhibit from?

8   A.  This is from the defendant's DevLAN workstation in his

9   Ubuntu virtual machine recovered from unallocated space.

10  Q.  Let's zoom in on the highlighted section, please.  What do

11  these lines show?

12  A.  These lines show commands that were entered on the ESXi

13  server by the defendant, and we know that from this session ID,

14  the 766 number, on April 18, which we know from the time stamp

15  on the left.

16  Q.  Do these reflect commands that were run using the ESXi

17  server administrative session?

18  A.  Yes, over SSH.

19  Q.  What are some of the reasons these commands were recorded

20  in the unallocated space of the defendant's computer?

21  A.  Since we have a record of the actual text output that was

22  output to the defendant's screen, that we were able to recover,

23  at some point, he viewed the contents of the shell.log file and

24  we have those here.

25  Q.  If we can zoom out again.  At approximately what time did

K2C3SCH1                        Leedom - Direct

1   the defendant run these commands?

2   A.  About 6:08 p.m.

3   Q.  So let's go to the next slide.  I want to walk through how

4   we know it was that defendant's administrative session that was

5   being used.  So let's start with the first point.

6           What is that point meant to convey?

7   A.  On April 15, there was a login to the ESXi server which

8   we've seen multiple times from the auth. log file, which used

9   his encrypted private key.  The password to that key was

10  KingJosh3000.

11  Q.  The second bullet says "Work ID assigned to that session

12  was 11130766."

13          What's the significance of a work ID for that session?

14  A.  So, work IDs are assigned to a session when the session is

15  open.  I'll cover a couple in the next points.  They're unique

16  IDs, so two users would never have the same work ID.  They

17  don't change while the session is active, so for the entire

18  time the session is active the work ID will remain the same.

19  And they're saved in that shell.log file, of which a piece we

20  were just currently viewing, to attribute commands to a

21  particular session.  So you can know who was running what

22  commands on the server.

23  Q.  You've mentioned shell.log several times.  What is

24  shell.log?

25  A.  Shell.log is a log file on ESXi that keeps command history

1   for commands that were run on the server.

2   Q.  Is that type of log file important to auditing user

3   activity?

4   A.  Oh, it's extremely important.

5   Q.  Why?

6   A.  It's one of the few places where you can actually see what

7   commands a certain user was running on a system.

8   Q.  And the last point says "The work ID session ending in 766

9   never ended."

10  A.  That's correct.

11  Q.  How do you know that?

12  A.  We never have a log in the auth. log file that says the

13  session was closed and that the session disconnected.

14  Q.  So let's go to the next slide, please.  We're now in slide

15  87 which is Government Exhibit 1209-8.  Where is this exhibit

16  from?

17  A.  This exhibit is from the ESXi server in a recovered file

18  location for the shell.log file called file slack.

19  Q.  If we can zoom in on that exhibit, please.  You said it's

20  file slack?

21  A.  That's correct.

22  Q.  What's file slack?

23  A.  So, file slack in most modern file systems, when the

24  computer allocates space for a file, the -- there is a certain

25  minimum amount of space that has to be allocated for that file

K2C3SCH1                    Leedom – Direct

1  to be stored.  You'll hear them referred to as blocks or

2  clusters.  When a file is modified, the parts of the file kind

3  of change, they get larger and smaller inside that cluster.

4  And when things are deleted from that file, you can go to the

5  cluster where that file was stored, and look after the file is

6  supposed to end, and find additional data in that cluster.

7          A good analogy is if you have like a shoebox with

8  shoes in it.  The shoes are like the resident part of the file

9  that you would see if you opened it on your computer, and the

10  file slack would be the space that's the empty space in the box

11  around the shoes.

12  Q.  So what did each of the lines on this exhibit show?

13  A.  Each of these lines is a different command that was entered

14  on the ESXi server.  And all of these lines belong to the

15  defendant.

16  Q.  How do you know that?

17  A.  All of these lines are tagged with the work ID from the

18  session that the defendant initiated.

19  Q.  This isn't the actual shell.log, is it?

20  A.  It's not the shell.log that appears on the server to this

21  day.

22  Q.  Is there a shell.log that appears on the server today?

23  A.  Yes, there is.

24  Q.  Does that shell.log reflect these entries?

25  A.  No, these entries are not in that file.

1    Q.  Do you have an opinion as to why that is the case?

2    A.  Yes, I do.  If you can look at the, there is, I don't know

3    exactly what you guys have blown up.  But there is a bit of

4    white space towards the top corner.  The last command before

5    that white space is VIshell.log.  Now, VI command on most Linux

6    systems is a, it is a command for a text editor.  So this would

7    allow you to edit the contents of a file.  And it's very

8    telling, seeing it especially as the last entry in this case

9    and not seeing these entries in the original file.  It is

10   indicative that they were deleted.

11   Q.  Is it standard practice to delete command history from

12   shell.log?

13   A.  No, it's not.

14   Q.  Why not?

15   A.  It's, like I mentioned before, it's one of the only ways

16   you can attribute commands that a certain user was running on

17   the server.  And you would never delete those commands.

18   Q.  Let's go to the next slide, please.  Let's just zoom in on

19   this.  So, showing you a portion of the last exhibit, one of

20   the command lines.

21   A.  That's correct.

22   Q.  When was this command run?

23   A.  This command was run at 6:37 p.m. on April 18.

24   Q.  By whom was it run?

25   A.  By the defendant.

K2C3SCH1                          Leedom - Direct

1    Q.  Did you see evidence of this command on the defendant's

2    DevLAN computer?

3    A.  Yes, we did.

4    Q.  Let's go to the next slide and take a look.  So the top of

5    this slide shows that same command from Government Exhibit

6    1209-8.  Is that correct?

7    A.  That's correct.

8    Q.  At the bottom there is Government Exhibit 1203-44.  You see

9    that?

10   A.  Yes, I do.

11   Q.  Where is that exhibit from?

12   A.  The bottom exhibit is from the defendant's DevLAN

13   workstation from his Ubuntu virtual machine recovered from

14   unallocated space.

15   Q.  Just focusing on that exhibit.  How do you know this is a

16   command run on the OSB ESXi server?

17   A.  If you see the front of that bottom exhibit, it says

18   root@OSB.  That's how we know it was the OSB server.

19   Q.  What command was run?

20   A.  This is a file listing command.  It's similar to the ones

21   we've seen before.  It is essentially just telling the computer

22   to show me all the files in this specific folder, the folder is

23   /var/run/log.

24   Q.  Let's go to the next slide.  On slide 90.  You see at the

25   top of the page that command line?

1   A.  Yes, I do.

2   Q.  What's the rest of the exhibit showing here?

3   A.  This is showing part of the output from that command.

4   Q.  Let's go to the next slide, slide 91.  Again at the top we

5   have Government Exhibit 1209-8, that command line.  What's the

6   bottom exhibit showing?

7   A.  This is the completion, so the last couple rows of that LS

8   command.

9   Q.  At what time approximately was that LS command run?

10  A.  The command was run in about 6:37 p.m.

11  Q.  How do you know that?

12  A.  If you look at the third line up from the bottom, you can

13  see the VPXA.log file in the file listing, and just to the left

14  of it there is a time stamp for the last time that file was

15  modified.  And as I testified earlier, some of the log files

16  inside of the log folder on the ESXi server are updated every

17  second, if not faster than that, which updated this modify

18  time.  So it gives us a fairly accurate time stamp as to when

19  the LS command was run.

20  Q.  So, let's focus on the top exhibit for a moment.  You

21  testified earlier that that was in UTC time; is that correct?

22  A.  That's correct.

23  Q.  How do you know that?

24  A.  When the time stamp's displayed this way in kind of an

25  extended format, the Z is appended to show that it's in UTC

K2C3SCH1                       Leedom - Direct

1   time.

2   Q.   Then just look at the bottom exhibit for a second.   There

3   is the 22:37 three lines from the bottom.   Do you see that?

4   A.   Yes.

5   Q.   There's no Z next to that.

6   A.   No, it's not.

7   Q.   What time zone is that?

8   A.   It's in UTC time.

9   Q.   How do you know that?

10  A.   So the LS command is meant to display things in a

11  convenient and easily readable way.   With the flag that's been

12  provided here, it just displays like the simple time and it

13  doesn't give, like, the time zone information.   But all the log

14  files on the ESXi server were -- the time stamps are going to

15  be displayed in UTC.

16  Q.   Let's look at one more example of some of the commands that

17  were run on April 18.   We can go to the next slide, please.

18  Again, is this another command line from that shell file slack?

19  A.   Yes, it is.

20  Q.   Is this the next command that was run after the command we

21  just saw?

22  A.   Yes, it is.

23  Q.   If we can just focus on that bottom command.   It's

24  LS-AL//VAR.

25  A.   That's correct.

K2C3SCH1                          Leedom - Direct

1   Q.  What are the two back slashes there?

2   A.  The two -- they're actually forward slashes, but the two

3   forward slashes, it could just be a typo.  You would, to list

4   the files at slash var, you just have to give one slash.

5   Q.  So you wouldn't need to do two forward slashes to run the

6   command; is that correct?

7   A.  Not to my knowledge, no.

8   Q.  Did you see evidence of this command being run on the

9   DevLAN land's computer?

10  A.  Yes, I did.

11  Q.  Let's take a look at that.  Go to the next slide, slide 93.

12  What is the bottom exhibit showing?

13  A.  So the bottom exhibit is showing the end of the command

14  that we just reviewed two slides ago, and the command

15  immediately following that.

16  Q.  At approximately what time was that second command run?

17  A.  I don't believe the time stamp's on this slide, but it

18  would be some time after 6:37 p.m., the output of this list

19  command should list the exact time.

20  Q.  Do you see the bottom slide also has the two forward

21  slashes?

22  A.  Yes, it does.

23  Q.  Is that the same command that appears in the file slack?

24  A.  Yes, it is.

25  Q.  Let's go to the next slide.  This slide is titled "Recap,

1   April 18, 2016."  If you could just walk us through, starting

2   with the top bullet, some of the things that happened on DevLAN

3   that day.

4   A.  Sure.  So, at the beginning of April 18, at about 11:12:08

5   and 11:12:18 in the morning, the defendant logged in as root to

6   the ESXi server.

7         At 11:43 a.m., the defendant logs out as root to one

8   of those sessions.

9         Around 12:59 p.m. the defendant e-mails Anthony

10  stating that "It seems like overnight all my permissions on the

11  servers themselves revoked."

12        At 1:47 p.m., the defendant logs out as root to the

13  other session on the ESXi server.

14        At 2:01 p.m., the defendant downloads the old ESXi

15  server page from Confluence.

16        At 7:17 p.m., the defendant logs in as root to the

17  ESXi server again.

18        Between 6 and 7:44 p.m., the defendant used his

19  administrative session, that's the SSH session from the shell

20  log that we've been viewing for the last few slides, to view

21  various log files on the server.

22  Q.  Let's go to the next slide.  I'd like to talk about some of

23  the activities on April 20, 2016.  Go to slide 96.  This slide

24  is titled "Overview."

25        Generally, what is this slide meant to convey?

K2C3SCH1                          Leedom - Direct

1    A.  This is just a simple overview of the activities that

2    occurred on April 20.

3    Q.  Let's start with the first bullet.  What does the first

4    bullet reflect?

5    A.  So, at 5:35 p.m., the defendant used administrative

6    privileges on the ESXi server to revert the Confluence virtual

7    machine to a snapshot that was created on April 16, 2016.

8    Q.  In its reverted state, what accesses would the defendant

9    have had to Confluence?

10   A.  All of the administrative accesses, since this snapshot was

11   taken before the passwords were changed.

12   Q.  Why is that?

13   A.  All the passwords were still in place on the server,

14   because they hadn't been changed or deleted yet.

15   Q.  In Confluence's reverted state, would the defendant have

16   had access to the mount points for the Altabackups?

17   A.  Yes.

18   Q.  How would he have gotten to the mount points at that point?

19   A.  He could have simply navigated to the /mount/Altabackup

20   folder on the server.

21   Q.  The second bullet, sorry.  What does the second bullet

22   reflect?

23   A.  So, the Confluence virtual machine remained in the reverted

24   state for a little over an hour until approximately 6:51 p.m.

25   Q.  Would that have been enough time for the defendant to copy

K2C3SCH1                        Leedom - Direct

1   a backup of Confluence?

2   A.  Yes, it would have.

3   Q.  What about a backup copy of Stash?

4   A.  Yes, it would have.

5   Q.  Let's go to the third bullet.  What's that meant to convey?

6   A.  At about 5:43 p.m., the March 3, 2016 Confluence backup

7   file was accessed in the Altabackups folder on the NetApp

8   server.

9   Q.  How do you know that that file was accessed around that

10  time?

11  A.  The access time for the file was updated on the server.

12  Q.  What computer actions would update the accessed folder?

13  A.  File reads and copies in this case.

14  Q.  Do you have an opinion as to what computer action caused

15  the date accessed to update at that time?

16  A.  Yes, I do.

17  Q.  What is your opinion?

18  A.  It was a file copy.

19  Q.  By whom?

20  A.  By the defendant.

21  Q.  What are some of the reasons for that opinion?

22  A.  The defendant was in a location that had access to those

23  backups.  And then shortly after, we see the file accessed.  We

24  see all the log files related to things that would tell us how

25  those accesses happened from that server being deleted, as well

K2C3SCH1                          Leedom - Direct

1    as all of the -- well, not "all," but many log files from the

2    ESXi server also being deleted.

3    Q.  So let's talk about that for a second.  What is the fourth

4    bullet meant to convey?

5    A.  Between about 5:50 and 6:58, so this encompasses the

6    duration of that reversion and shortly after, the defendant

7    deleted logs of his activities.

8    Q.  Let's walk through April 20.  Let's go to the next slide,

9    please.  This slide has Government Exhibit 1067 which is an

10   e-mail sent on April 20, 2016, at 12:06 p.m. From Mr. Weber to

11   EDG staff.

12           Can you please read the text of that e-mail.

13   A.  Yes, I can.  "All, on Monday, April 25, at 6 a.m., ISB will

14   be migrating the Bamboo and Confluence servers to new hardware

15   and will need to power them down for a limited amount of time.

16   To ensure no work is lost, please log out of Confluence and

17   Bamboo when you depart on Friday.  If this maintenance window

18   will cause any issues for you, feel free to contact me."

19   Signed Jeremy Weber.

20   Q.  Let's go to the next slide, slide 98.  This slide has

21   Government Exhibit 1069, an e-mail sent on April 20, 2016, at

22   3:58 p.m.

23           Can you please read the first two sentences of this

24   e-mail.

25   A.  Yes, I can.  "On Monday, 25 April, from 0600 to 1000 hours,

K2C3SCH1                          Leedom - Direct

1    the Atlassian suite (in particular the Bamboo and Confluence

2    servers) will be unavailable due to maintenance.  SED/ISB will

3    be transferring the data to new servers/hardware to bring the

4    DevLAN Atlassian suite under SED/ISB configuration management

5    in accordance with EDG best practices."

6    Q.  Now, what impact would the transfer of Confluence and

7    Bamboo off the ESXi server that OSB was running have on

8    somebody's ability to use Confluence and Bamboo on that server?

9    A.  Well, they wouldn't be on that server anymore.  They were

10   migrated to a different server.

11   Q.  If someone had administrative privileges to OSB's ESXi

12   server, and Confluence and Bamboo were no longer there, could

13   they do anything to those virtual machines anymore?

14   A.  No, they would not be able to.

15   Q.  Let's go to the next slide, please.  So this slide contains

16   Government Exhibit 1202-13.

17   A.  Yes.

18   Q.  Where is this exhibit from?

19   A.  This is from the defendant's DevLAN workstation from a log

20   file that logged chat logs from a protocol chat application

21   called IRC.

22   Q.  What is IRC?

23   A.  It stands for Internet Relay Chat.  It's just a text based

24   chat application where you can talk to users between different

25   computers.

K2C3SCH1                          Leedom - Direct

1  Q.  Where were these chats found?

2  A.  These chats were found on the defendant's workstation in a

3  log file that was logging records of the chat messages sent on

4  various channels.

5  Q.  Let's look at the top portion of this slide, please.

6  A.  Yes.

7  Q.  What does this show?

8  A.  This shows some administrative type commands being run for

9  the IRC server.  The first command AOP, and AOP is like an

10  administrative operator on IRC, so it's just a user that has

11  permissions to modify the channel, set like message of the day,

12  things like that.  The list command shows the list of all of

13  the people who have those permissions.  And this is just the

14  output from that, showing those users.

15          After the list command, there's an attempt to remove

16  the user Jeremy Weber from the OSB channel operator's list.

17  And then an error from the server saying that the syntax is

18  wrong.  Essentially, the word "remove" is not the correct way

19  to delete someone from that list.

20  Q.  Let's go to the bottom part of this slide, please.

21  A.  So at the first part of this bottom slide, and we can see

22  it from the end of the top slide, where it gives the correct

23  version of the command.  Essentially instead of the word

24  "remove," you need to use the word "DEL" for delete instead.

25  We have a operator for channel OSB delete Weber, so it will

1  delete this user from OSB as an administrator, and then the

2  server says "permission denied."

3         After that -- "permission denied" just means the user

4  who tried to do the delete didn't have permission to make the

5  deletion.  After that, we see the defendant set permissions to

6  himself, give him all the permissions required to perform this

7  deletion action, and you can see that it's successful.  You are

8  now an IRC operator.  Global from operator server Schuljo is

9  now an IRC operator.  Then we see the user Jeremy Weber is

10 deleted from four or five different channels.

11 Q.  At what time approximately did these actions occur on

12 April 20?

13 A.  They were about 4:06 p.m.

14 Q.  Let's go to the next slide, please.  Is this just a zoom in

15 on the previous slide?

16 A.  Yes, it is.

17 Q.  Let's go to the next slide.  This is Government Exhibit

18 1202-12.  Where is this exhibit from?

19 A.  This is from the same place as the last exhibit, it is a

20 log from IRC from the defendant's DevLAN workstation.

21 Q.  What does this show?

22 A.  This is showing another channel that the defendant deleted

23 Jeremy Weber from.  The Bamboo channel, specifically, and then

24 listing of the access to that channel and a list of the users

25 who have admin access.

1  Q.  Okay.  Let's go to the next slide, please.  This is titled

2  "April 20, 2016, Recap Before 5 p.m."

3          Does this just reflect the e-mails and the chat

4  deletions we just viewed?

5  A.  Yes, it does.

6  Q.  Let's go to the next slide.  Still on April 20, 2016, and

7  we're talking about activities between 5 and 5:30 p.m., is that

8  right?

9  A.  That's correct.

10  Q.  What does this slide summarize?

11  A.  At about 5:18 p.m., Rufus's key was accessed.  At 5:19,

12  defendant connected a Sandisk USB device to his Ubuntu virtual

13  machine.  And at 5:29 p.m. the defendant created a snapshot

14  titled bkup for the Confluence virtual machine.

15  Q.  So let's walk through each of those.  We go to the next

16  slide, slide 104.  This is Government Exhibit 1207-1.  Where is

17  this exhibit from?

18  A.  This is a file on the NetApp server in the home folder,

19  specifically the defendant's home folder.

20  Q.  What is this file showing?

21  A.  This is a private key file for like an SSH public private

22  key pair for a different user on the DevLAN network called

23  Rufus.

24  Q.  You see there is an accessed down near the bottom?

25  A.  Yes, I do.

K2C3SCH1                          Leedom - Direct

1    Q.  What does that reflect?

2    A.  This reflects the last time that this file was accessed.

3    Q.  What types of computer actions will update the accessed?

4    A.  Quite a few.  You could, if you right clicked on the file

5    to view the properties, if you used this file with an

6    application, things like that would update the accessed time.

7    If you copied the file to somewhere else.

8    Q.  Let's go to the next slide.

9         MS. SHROFF:  Your Honor, may I just have one minute

10   with Mr. Laroche?

11        THE COURT:  Yes, if Mr. Laroche wants to talk to you.

12        MR. LAROCHE:  Sure, your Honor.

13        (Counsel conferring)

14        MS. SHROFF:  Thank you, your Honor.

15        MR. LAROCHE:  We're all set, your Honor.

16        THE COURT:  We're trying to make some technical

17   corrections here on the fly.

18        MR. LAROCHE:  Sure.  Understood.

19   A.  Are we on slide 105?

20   Q.  Yes, we are thank you.  This slide has Government Exhibit

21   1203-54.  Do you see that?

22   A.  Yes, I do.

23   Q.  Where is this exhibit from?

24   A.  This exhibit is from the defendant's DevLAN workstation

25   from a log file that comes from that Ubuntu virtual machine

K2C3SCH1                         Leedom - Direct

1    that we've been discussing on his workstation.

2              MR. LAROCHE:  If we can just zoom in on the log file,

3    Ms. Hurst.

4    Q.  What is this log file showing?

5    A.  So this, the VMware log file will show when external

6    devices are connected to virtual machines.  In this case, this

7    is showing that some USB devices were passed through from the

8    host computer to the virtual machine on that computer.

9    Q.  I think the title of this slide has a Sandisk USB device;

10   is that correct?

11   A.  That's correct.

12   Q.  Can you point out that Sandisk USB device in this exhibit?

13   A.  Yes.  It's right in the middle.  You see USB found device,

14   name, Sandisk Extreme.  Then some serial number information.

15   Q.  You see next to found device there is a T8R2?

16   A.  Yes, right above it.

17   Q.  What does that mean?

18   A.  That's a separate device.  This log is showing three

19   devices in total.  The first device, T8R2, to my knowledge is a

20   Tableau, Tableau is a company that makes forensic hardware

21   devices.  It is a write blocker.

22             So I'll explain a write blocker quickly.  You use a

23   write blocker when you want to prevent a computer from making

24   changes to external media.  So, if you plug like a USB drive

25   into the write blocker and you try to write changes to the USB

1   drive, it won't let you do that.  It keeps it forensically

2   pure.

3           The third entry here you see virtual Bluetooth

4   adapter.  That is just a VMware stock Bluetooth adapter.  It's

5   not really of consequence in this log for what we're looking

6   at.

7   Q.  What significance, if any, is there to a write blocker

8   being on the USB device?

9   A.  If the write blocker is connected to the USB, it means data

10  couldn't be written to the USB device.  Only read from it.

11  Q.  Let's go to the next slide.  This is showing Government

12  Exhibit 1202-16.  Where is this exhibit from?

13  A.  This exhibit comes from the defendant's DevLAN workstation.

14  This is one of those VI client logs, so this is a log related

15  to activities taken in that vSphere application.

16  Q.  Where are VI client logs stored?

17  A.  They're stored on the client.  So in this case the

18  DevLAN -- the defendant's DevLAN workstation.

19  Q.  Are they also stored on the server?

20  A.  VI client logs are not stored on the server.

21  Q.  What does this log show?

22  A.  This log shows, so the way that the vSphere application

23  works, if you click a button on the UI, it makes a request to

24  the server and the server has to send back a response.  So in

25  this case, we're looking at a list of snapshots, so if you

1  clicked the button on vSphere to show available snapshots or

2  manage snapshots for the Confluence virtual machine, this is

3  the data that server is sending back.  So, when that button was

4  clicked, the server sent back that there were two snapshots

5  available for that virtual machine at 5:29 p.m. on April 20.

6  Q.  Who ran these commands?

7  A.  The defendant.

8  Q.  How do you know that?

9  A.  This is a VI client log from the defendant's workstation,

10 from his vSphere.  So they wouldn't be from, like, another

11 machine or something like that.

12 Q.  How many available snapshots were there at 5:29 p.m.?

13 A.  Only two snapshots.

14 Q.  You see where it says "virtual machine snapshot: 57"?

15 A.  Yes, it's in that bottom third of the image.

16 Q.  What does the 57 refer to?

17 A.  57 is the machine identifier for the Confluence virtual

18 machine on the ESXi server.

19 Q.  Let's go to the next slide.  This has Government Exhibit

20 1202-17.  Where is this exhibit from?

21 A.  This exhibit comes from a VI client log file on the

22 defendant's DevLAN workstation.

23 Q.  If we can just zoom in on the text there, please.  What is

24 this log file showing?

25 A.  So this is showing when a snapshot is created on the

1    virtual machine through the vSphere application.

2    Q.  At what time was a snapshot created?

3    A.  At 5:29 p.m.

4    Q.  On what day?

5    A.  April 20, 2016.

6    Q.  What was the title of that snapshot?

7    A.  The name of the snapshot was bkup.  If you look at the

8    fourth line of the log, you can see name, bkup, name just in

9    the element.

10   Q.  Who names the snapshot?

11   A.  The user that makes the snapshot names the snapshot.

12   Q.  Let's go to the next slide, please.  This is Government

13   Exhibit 1203-25.  Where is this exhibit from?

14   A.  This exhibit is from the defendant's DevLAN workstation in

15   the Ubuntu virtual machine recovered from unallocated space.

16   Q.  If we could zoom in on the text, please.  What is it

17   showing?

18   A.  So since we have the activity that was displayed on the

19   screen, when from the defendant's administrative SSH session on

20   the ESXi server, at some point, he viewed the contents of one

21   of the server logs on the server that was eventually deleted,

22   and we're just seeing the contents of that server log file

23   here.  Specifically, if you look at the top line, you can see

24   "initiated lazy snapshot, bkup:3."  This is just the

25   server-side confirmation that a snapshot was being created.

K2C3SCH1                          Leedom - Direct

1  Q.  You said it reflects a server-side log.  Is that correct?

2  A.  That's correct.

3  Q.  You also referenced that those logs were deleted?

4  A.  Yes.

5  Q.  Who deleted those logs?

6  A.  The defendant deleted the logs.

7  Q.  Let's go to the next slide, please.  This is Government

8  Exhibit 1209-7.  Where is this exhibit from?

9  A.  This is from the ESXi server itself, recovered from

10 unallocated space.

11 Q.  What is it showing?

12 A.  This is showing another, just another server-side

13 confirmation that a snapshot was requested and created by the

14 root user.  If you see the second line about halfway in, you

15 see user equals root.  That just says the root user requested

16 the snapshot to be created.  Then it shows some of the state

17 transitions that the machine has to go through to create the

18 snapshot.  It also shows that this is the Confluence virtual

19 machine.  And then at the bottom, I don't know if -- at the

20 bottom in part two, it shows that the snapshot was completed.

21 Q.  What permissions did the defendant use to create the

22 snapshot titled bkup?

23 A.  Administrative permissions.

24 Q.  How do you know that?

25 A.  If you see, look at the second line about halfway in, you

K2C3SCH1                      Leedom - Direct

1    can see user equals root, and that's how we know it was the

2    root user who made these actions.

3    Q.  You stated that this exhibit comes from the unallocated

4    space of the ESXi server.  Is that correct?

5    A.  That's correct.

6    Q.  Do those logs come from any particular type of file on the

7    ESXi server?

8    A.  Yes.  We can see about a third of the way in on the first

9    line, it says "info hostd."  The log file this would have been

10   in is log file called hostd.log.

11   Q.  Does the hostd log file exist on the current state of the

12   ESXi server?

13   A.  No, it does not.

14   Q.  Why not?

15   A.  It was deleted by the defendant.

16   Q.  Let's go to the next slide, please.  This slide just has a

17   recap of 5 p.m. to 5:30 p.m., is that correct?

18   A.  We're almost there.  Now I just can't draw.

19            Yes, it does.

20   Q.  This is slide 110 that you're on; is that correct?

21   A.  That's correct, yes.

22   Q.  Let's go to the next slide, which is titled "Overview of

23   5:30 p.m. to 6:55 p.m."

24            What are some of the things that happened during that

25   time frame?

K2C3SCH1                      Leedom - Direct

1   A.   During that time frame, the defendant, at 5:35 p.m.,

2   reverted the Confluence VM to that 4-16-2016 snapshot.

3            Between 5:35, after that snapshot was reverted, and

4   about 6:51 p.m., Confluence remained reverted in that reverted

5   state for a little over an hour.

6            At 6:51 p.m., the defendant reverted back to this bkup

7   snapshot that we saw he just created.

8            At 6:51 p.m., we see the defendant listing all of the

9   available snapshots for the Confluence virtual machine.

10           And then at 6:55 p.m., the defendant deletes that bkup

11  snapshot by erasing all the activity on the server for that

12  last hour.

13  Q.   So let's walk through each of those steps.  We can go to

14  slide 112.  It has Exhibit 1202-18.  Is this another VI client

15  log?

16  A.   Yes, it is.

17  Q.   What does this show?

18  A.   This is showing the snapshot reversion to the first

19  snapshot, the BK 4-16-2016 snapshot.

20           MR. LAROCHE:  If we can just zoom in, Ms. Hurst, on

21  the top three lines, please.

22  Q.   How do you know that from the top three lines?

23  A.   At the end here, this is the name of the snapshot.  And

24  then this "show warn" here, the way the -- this server client

25  interact works with vSphere, this likely popped up some kind of

K2C3SCH1                     Leedom - Direct

1    visual warning and the message for that warning was "Confirm:

2    Current state of the virtual machine will be lost unless it has

3    been saved in a snapshot.  Revert to snapshot BK 4-16-2016."

4    Q.  If we can zoom out, please.  At what time did the defendant

5    revert to the snapshot BK 4-16-2016?

6    A.  5:35 p.m. on April 20.

7    Q.  Let's go to the next slide, please.  This is 1202-19.  Is

8    this another closer version of the same slide from before?

9    A.  No.  This is the reversion about an hour later to the bkup

10   snapshot.

11   Q.  So it is a different reversion?

12   A.  Yes, it is.

13   Q.  What reversion does this show?

14   A.  This is showing the reversion to that bkup snapshot,

15   otherwise known as snapshot 3 at the end of that hour period.

16   Q.  You see at the top it says "Current state of the virtual

17   machine will be lost unless it has been saved in a snapshot."

18   A.  Yes, I do.

19   Q.  What's that mean?

20   A.  The way running a virtual machine works, if you ever go

21   from one saved state to another saved state, you lose all of

22   the current activity that has been occurring on the server

23   since the last snapshot was taken.

24          So, at a high level what happened was the defendant

25   created a snapshot like as things are right now.  And then so

that saves the state of how things were at that point.  That's
the bkup snapshot.  And then reverted to an earlier time, back
on 4/16 when accesses were available, and then stayed on that
chain for a while, for a little over an hour.  And then
reverted everything back to where they were at the beginning,
when the bkup snapshot was made.  And then deleted that
snapshot to show there was like no evidence of that snapshot
being made.

Q.  So, what impact would the reversion back to bkup have on
evidence of things that happened during the reversion?

A.  It would erase all evidence of everything that happened
during the reversion.

          (Continued on next page)

K2cWsch2                        Leedom - Direct

1    BY MR. LAROCHE:

2    Q.  And why is that?

3    A.  Since there's no -- and it tells you.  It says unless it

4    has been saved in a snapshot.  If you wanted to save activity

5    of what happened there, you would have to take an additional

6    snapshot to save that period of activity.  But since that

7    didn't happen, there's -- there's -- all that activity's lost.

8            MR. LAROCHE:  Let's go to the next slide, please.

9    Q.  This is showing Government Exhibit 1202-20.  Is this

10   another VI client log from the defendant's computer?

11   A.  Yes, it is.

12   Q.  What does this log show?

13   A.  So, similar to before when we saw a listing of snapshots,

14   this is when the defendant clicked the button on vSphere that

15   said, like, manage snapshots, and this is the server response

16   just saying: Hey.  I've got three snapshots available.  Which

17   one do you want to work with?

18   Q.  At this point, at 6:51 p.m. on April 20, how many snapshots

19   were available?

20   A.  There's three snapshots.

21   Q.  Which snapshot was the snapshot titled "BKUP"?

22   A.  It's snapshot 3, which we can see right here.

23           MR. LAROCHE:  Let's go to the next slide, please.

24   Q.  This has Government Exhibit 1202-21.  Is this another VI

25   client log?

K2cWsch2                         Leedom - Direct

1   A.  That's correct.

2           MR. LAROCHE:  Let's zoom in on this, please.

3   Q.  What is this log showing?

4   A.  This is another warning message from vSphere that says:

5   "Confirm delete.  Are you sure you want to delete this

6   snapshot?"  And then this snapshot is in reference to snapshot

7   3.

8       And then at the bottom end of this, we see that the

9   snapshot deletion was completed at 6:55 p.m.

10  Q.  And snapshot 3 was the BKUP snapshot, is that correct?

11  A.  That's correct.

12  Q.  And does this reflect that it was successfully deleted?

13  A.  Yes, it does.

14          MR. LAROCHE:  OK.  Let's go to the next slide, please.

15  Q.  And we looked at this slide yesterday, is that correct?

16  A.  Yes, we did.

17  Q.  And this is from Confluence, is that right?

18  A.  Yes.  This is a configuration file for the Confluence

19  virtual machine.

20  Q.  I think you stated yesterday this shows the available

21  snapshots.  Is that right?

22  A.  Yes, it does.

23  Q.  Where is the snapshot 3?

24  A.  It is not on this list.

25  Q.  Why not?

K2cWsch2                          Leedom - Direct

1   A.  It was deleted as a snapshot on the system so it's not

2   tracked in the available snapshot list.

3           MR. LAROCHE:  Let's go to the next slide, please.

4   Q.  And this slide just has a recap of the things that you

5   testified about, about some of the things that happened during

6   that time frame, is that correct?

7   A.  That's correct.

8           MR. LAROCHE:  Let's go to the next slide.

9   Q.  This is titled "April 20, 2016, activities between 5:29

10  p.m. and 7:00 p.m."  Now, we just talked about some activities

11  during that time frame, is that correct?

12  A.  Yes, we did.

13  Q.  Were you able to identify other activities that occurred

14  during that time frame?

15  A.  Yes, I was.

16  Q.  And how were you able to do that?

17  A.  Primarily through the unallocated space from the Ubuntu

18  virt. machine on the defendant's DevLAN workstation that

19  recorded history of his SSH session to the ESXi server on April

20  20.

21  Q.  Let's look at the first bullet here, at 5:29 p.m.  What is

22  that meant to convey?

23  A.  This is saying the defendant's -- the defendant used that

24  SSH session to run the list command for log files, and the size

25  total of those files was about 28,030.

K2cWsch2                          Leedom - Direct

1    Q.   Let's look at that list command.

2              MR. LAROCHE:   Let's go to the next slide, please.

3    Q.   This is showing Government Exhibit 1203-1.  And where is

4    this exhibit from?

5    A.   This is from the unallocated space in the Ubuntu virtual

6    machine on the defendant's DevLAN workstation.

7    Q.   And what is it showing?

8    A.   This is showing a list command with the flags ALTR.

9    Q.   And what privileges were used to run this list command?

10   A.   This was the root administrative session on the server

11   through the SSH connection.

12   Q.   How do you know that?

13   A.   We know that from the prompt; we see root@OSB.

14   Q.   And where is the defendant listing log files?

15   A.   The folder here is quite long.  I'll circle it.

16       This is the main log file location for the ESXi server.

17   This "VMFS/volume/" big number "/log" is the path to that

18   location.

19   Q.   And you said main log file location, is that right?

20   A.   Correct.

21   Q.   What do you mean by that?

22   A.   So, by main log files, I just mean the ESXi server logs.

23       The server also keeps log files for individual virtual

24   machines that it operates, but those are going to be stored

25   specific to those virtual machines.

K2cWsch2                     Leedom - Direct

```
 1              MR. LAROCHE:  Let's go to the next slide please.
 2   Q.  What is this slide showing?
 3   A.  This is showing a, just a continuation of the output from
 4   that LS command.
 5              MR. LAROCHE:  Let's go to the next slide, please.
 6   Q.  What is this showing?
 7   A.  This is showing the end, so at the very bottom, the
 8   completion of that LS command.
 9   Q.  And approximately when was that list command run?
10   A.  That list command was run at 5:29 p.m.
11   Q.  How do you know that?
12   A.  We can see that from the time stamps of the modified times
13   of these files.  And like I said earlier, these files get
14   updated very, very frequently.  And you can see that all of
15   them are updating -- actually, they're all updating pretty
16   frequently.
17   Q.  Do you see at the bottom the bottom row has shell.log?
18   A.  Yes, I do.
19   Q.  What significance do you take from the 5:29 p.m. attached
20   to the shell.log?
21   A.  That means that the shell.log file was updated at 5:29 p.m.
22   And we know the shell.log file stores command history
23   information for commands that were entered into the server.  So
24   this says that, like, the current, most, like, recent entry on
25   that file will be from a command run at 5:29 p.m.
```

K2cWsch2                         Leedom - Direct

1    Q.  And what was the total log files that came from this list

2    command?

3    A.  It was 28,030.  It's the number -- that number's not like

4    kilobytes or megabytes.  It's the count, number of individual

5    512-byte blocks that the files inside it occupy.  It's just a

6    way that LS kind of gives you a rough file-size estimate of

7    what's in the folder.

8           MR. LAROCHE:  If we can just go back one slide -- or

9    two slides, please.

10   Q.  What was the actual command that was run, the LS command?

11   What was it?

12   A.  Yeah.  So, it's LS, and then the flags, which I described,

13   I believe, the first two earlier.  LS-ALTR.

14          MR. LAROCHE:  Sorry.  We'll come back to that in a

15   second.

16   Q.  LS/ALTR, is that correct?

17   A.  That's correct.

18          MR. LAROCHE:  Let's go to slide 123.

19   Q.  Exhibit 1203-2, where is this from?

20   A.  This is from unallocated space in the Ubuntu virtual

21   machine on the defendant's DevLAN workstation.

22   Q.  What is this showing?

23   A.  This is showing an entry for the shell.log file -- well, an

24   entry from the shell.log file from April 20.

25   Q.  And do you see the 11130766?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2cWsch2                         Leedom - Direct

1    A.  Yes, I do.

2    Q.  What is that number?

3    A.  This is the identifier that we've been referring to.

4    That's the defendant's SSH session to the ESXi server that was

5    initiated on April 15.

6    Q.  At what time does this log file reflect activity being run?

7    A.  This time is 5:29 p.m. on April 20.

8    Q.  And what command does it reflect being run at 5:29 p.m.?

9    A.  The LS-ALTR command.

10   Q.  What is the significance of this exhibit to your opinions?

11   A.  This shows us that the defendant was on the ESXi server in

12   that same session that he created on 4/15 on April 20.  And we

13   know from the time stamp on the previous slide that this is the

14   command that was entered that updated the modified time of that

15   shell.log file.

16            MR. LAROCHE:  Let's go to the next slide.

17   Q.  And this is the auth.log that you've talked about several

18   times, is that right?

19   A.  Yes, it is.

20   Q.  And again, can you circle the 766 session that you just

21   referred to?

22   A.  Yes, I can.

23   Q.  Can you circle the defendant's IP address connected to that

24   session?

25   A.  Yes, I can.

1       MR. LAROCHE:  OK.  Let's go to the next slide.

2       And let's go to the next one, 125.

3  Q.  This is also titled "activities between 5:29 p.m. and 7:00

4  p.m."  And you see at the bottom there there's a bolded bullet

5  point.  Do you see that?

6  A.  Yes, I do.

7  Q.  What is that meant to convey?

8  A.  This is showing the time that that Confluence backup file,

9  both the database file and the home directory, were accessed in

10  Altabackups.

11      MR. LAROCHE:  Before we go to that, let's go to the

12  next slide.

13  Q.  This is titled "The defendant's reversion to the April 16,

14  2016, snapshot."  What effect would that have on his accesses

15  to the system?

16  A.  It essentially resets the access to the Confluence virtual

17  machine to everything it was before they changed the passwords

18  on 4/16.

19  Q.  And so what are some of those privileges that would have

20  been reset?

21  A.  All of the SSH keys were still available to be logged in

22  with; the original password to the server.  The Altabackup

23  mount point was still there, and it stayed throughout the whole

24  time.  It never got removed.  It was still there as of April 25

25  as well.

K2cWsch2                         Leedom - Direct

1          And, yeah, just essentially the credentials and everything

2     that you would need to access it is what you would have needed

3     on April 16 or before that.

4     Q.   And without administrative access to the Confluence virtual

5     machine, could a regular user access the mount point to the

6     backups?

7     A.   No, they could not.

8     Q.   Why not?

9     A.   Because the mount points can only be accessed by an

10    administrative user in a, like, terminal or shell session with

11    the server.  Someone browsing to the Confluence web page to

12    view an article wouldn't be able to access those files.

13              MR. LAROCHE:  Let's go to the next exhibit, please.

14    Q.   Showing you portions of 1207-27 and 1207-30, and I want to

15    focus on the top exhibit.

16              MR. LAROCHE:  If we could zoom in on that.

17    Q.   Looking at the March 3, 2016, SQL file for Confluence, what

18    is the date-accessed time?

19    A.   The date-accessed time is April 20, 2016, at 5:42 p.m.

20              MR. LAROCHE:  If we could go to the bottom exhibit.

21    Q.   Same question for the TGZ file; at what time was it

22    accessed?

23    A.   The March 3 TGZ file was accessed at 4/20, 2016, at 5:43

24    p.m.

25    Q.   And at what time did the defendant revert Confluence to the

K2cWsch2                          Leedom - Direct

1    4/16, 2017, snapshot?

2    A.   About seven or so minutes prior, at 5:35 p.m.

3    Q.   Now, as part of your review in this case, have you reviewed

4    the Altabackups folder for Confluence?

5    A.   Yes, I have.

6    Q.   Other than the March 3, 2016, backup file, have you

7    identified any other backup file that had an access time that

8    did not match the date-modified time and date-created time?

9    A.   No, I did not.

10         MR. LAROCHE:  Let's go to the next slide.

11   Q.   I want to talk about some more activities that happened

12   during the reversion.  See the third sub-bullet there?

13   A.   Yes, I do.

14   Q.   What does that convey?

15   A.   This is talking about some more activities that the

16   defendant performed on the ESXi server using that SSH session

17   from the 15th.

18         MR. LAROCHE:  Let's take a look at that.

19         Let's go to the next slide, please.

20   Q.   What is this exhibit from?

21   A.   This is from unallocated space from the Ubuntu virtual

22   machine on the defendant's DevLAN workstation.

23   Q.   And what command was run by the defendant?

24   A.   This is another LS-ALTR command.

25   Q.   Is this the same log folder that he listed files before?

K2cWsch2                          Leedom - Direct

1    A.   Yes, it is.

2    Q.   And when he listed files before, what was the total log

3    files, approximately?

4    A.   I believe it was 28,000.

5    Q.   And what is the total log files from this list command?

6    A.   It's 30,000.

7    Q.   Were you able to determine at the approximate time this

8    list command was run?

9    A.   Yes, I was.

10            MR. LAROCHE:  Let's go to the next slide.

11   Q.   What is this showing?

12   A.   This is showing the end, the bottom of that list command.

13   I'll explain --

14            THE WITNESS:  Can we go back to the previous slide?

15            MR. LAROCHE:  Sure.  Let's go back to the previous

16   slide.

17   A.   So, the -- I just want to explain the last two flags for

18   those commands.  We haven't discussed them yet.

19       So, we discussed previously that when you use the list

20   command with the A flag it shows you all the files in the

21   directory.  The L flag shows you details for those files,

22   things like time stamps, permissions, things like that.  The T

23   flag sorts those in time order by modified time.  And the R

24   flag just reverses that sort.  So when you run the command in

25   this way, everything at the bottom of that command is going to

1   be the most recently modified files kind of all lumped

2   together.

3        OK.  You can go to the next slide.

4        So, this is showing the end of that command with all of the

5   most recently modified files.  And we can see from, like, VPXA

6   log specifically, the time stamp that this LS command was run,

7   based on the modified time, is at 5:55 p.m. on April 20.

8   Q.  Now, you see that there's a number of log files that are

9   listed on the right, VPXA, syslog, storagerm, RHTTP proxy, host

10  D, hostd-probe, is that correct?

11  A.  Yes.

12            MR. LAROCHE:  Let's take a look at what happens next

13  on the system, if we can go to the next slide.

14  Q.  So, he had just conducted the list command at approximately

15  5:55 p.m., is that correct?

16  A.  That's correct.

17  Q.  Let's take a look at what happens next.  Is this another

18  log file from the unallocated space?

19  A.  Yes, it is.

20  Q.  And is this a continuation of the unallocated space from

21  the previous slide?

22  A.  Yes, it is.

23  Q.  And how do you know that?

24  A.  Well, we can see here, right above -- it's been cropped.

25       Oh, OK.  Sorry.  Oh, it's doing it again.

K2cWsch2                          Leedom - Direct

1    Q.  That's all right.  We're fine.

2    A.  Go ahead.

3    Q.  Just look at your hard copy.

4    A.  Well, what slide is this?

5    Q.  It's 132.

6    A.  OK.  Just a second.

7        OK.  Apologies.

8        If you look at the host D probe, what we can see, that that

9    file modified time is 5:55 p.m., so the command was run

10   sometime after this.

11   Q.  And what's the next command that was run after the list

12   command?

13   A.  This command that you can see it on the far right, it's

14   this RM space vpxa.log.

15   Q.  What is the RM command?

16   A.  The RM command, in Linux, is essentially the delete

17   command.  So this just says delete the file named vpxa.log.

18            MR. LAROCHE:  Look at the commands immediately after

19   the RM vpxa.log command, if we can go to the next slide.

20   Q.  What are the next set of commands run by the defendant?

21   A.  These are more file-deletion commands.

22   Q.  Can you walk through these?

23   A.  Yes, I can.

24       Here, we have the first six:  RM vmauthd, syslog, storage

25   RM, RHTTP proxy, host D.  And then the sixth one is host-probe.

K2cWsch2                              Leedom - Direct

1      Immediately after host-probe, we get an error from the RM
2    command.  If you remember from a slide ago, there's -- there's
3    not a file in that folder actually called host-probe.  This is
4    likely a typo.  It should be hostd-probe.
5      And then there's three more deletions after for SDRS
6    injector, VMK warning and VM kernel.
7    Q.  Generally speaking, what are some of the things that these
8    log files would show?
9    A.  So, as we can see, especially from the frequency that these
10   files are updated, these files contain pretty much all the core
11   system logs for the ESXi server.  So this would show you things
12   like activities that are happening to virtual machines, whether
13   they're turned on and off; maybe some, like, hardware-level
14   networking information; devices connected to the server.  We've
15   seen a lot of events from the host D log, when we look at
16   log-in events from the vSphere or vCenter services.  This is
17   the bulk of all of the auditing for the ESXi server.
18   Q.  Would those types of logs be of assistance to you in
19   reviewing forensic materials?
20   A.  Yes, it would be very helpful.
21   Q.  Why?
22   A.  'cause it contains a lot of -- well, almost all of the
23   auditing information that we have for what happened on the
24   server.  And without that, we have to try and recover fragments
25   of these log files from places like unallocated space.

K2cWsch2                          Leedom - Direct

1  Q.  Do you see on the bottom there's a deletion for

2  vmkernel.log?

3  A.  That's correct.

4        MR. LAROCHE:  Let's go to the next command that's run.

5  Slide 134.

6  Q.  Do you see that VM kernel deletion at the top of this

7  slide?

8  A.  Yes, I do.

9  Q.  What's the next command that's run?

10 A.  Another list command with the same flags we discussed

11 earlier, the ALTR flags.

12 Q.  What is the total for this list command?

13 A.  The total is 17,413.

14 Q.  Is that different from the total from the previous list

15 command?

16 A.  Yes.  It's a little over half as much.

17 Q.  Why?

18 A.  Because, as we can see from the previous two commands, a

19 lot of files were deleted from this folder, so when LS is

20 reporting the estimated file size for the folder, it's going to

21 be significantly lower since a lot of files were deleted.

22        MR. LAROCHE:  Let's go to the next slide and look at

23 some of the command output for that list.

24 Q.  Did this command, list command, complete?

25 A.  It did not complete.  The portion of unallocated space had,

1    one of the blocks that was contiguous in this piece of space

2    that was recovered had been reassigned to a different part of

3    the operating system or a file.  So, you can see all the

4    strange characters at the very bottom; it's just showing that

5    part of this command is missing.

6              MR. LAROCHE:  And let's go to the next slide.

7    Q.  Is this another portion of the unallocated space?

8    A.  Yes.

9    Q.  And is this a similar list command to the one we just saw?

10   A.  Yeah.  It's not the exact same command.  It's a command

11   that was run shortly after the last command.

12   Q.  And does this command complete?

13   A.  Yes, it does.

14             MR. LAROCHE:  Let's go to the next slide.

15   Q.  And what is this showing?

16   A.  This is just showing the end of the output of that list

17   command.

18   Q.  So the end of the output shows the most recent logs

19   created, correct?

20   A.  That's correct.

21   Q.  Where are the log files that the defendant deleted several

22   slides ago?

23   A.  They're not here.

24   Q.  Why not?

25   A.  They were deleted.

K2cWsch2                           Leedom - Direct

1    Q.  At what time, approximately, was this list command run?

2    A.  About 5:57 p.m.

3    Q.  Do you see in the highlighted text the third line from the

4    bottom has hostd-probe?

5    A.  Yes.

6    Q.  Why is that there?

7    A.  That's there because as we saw in the list of deletion

8    commands, the defendant attempted to delete host-probe, where

9    the correct file name was hostd-probe.

10            MR. LAROCHE:  Let's go to the next slide, slide 138.

11   Q.  Does this slide summarize some of the activities during the

12   reversion?

13   A.  Yes, it does.

14   Q.  And the bottom bullet, does that reflect the last list

15   command we just saw that you spoke about?

16   A.  Yes, it does.

17   Q.  Let's look at some additional commands that were run that

18   night.  Is this another file from unallocated space?

19   A.  Yes, it is.

20   Q.  And what is this showing?

21   A.  This is showing three more file deletions on the ESXi

22   server.

23   Q.  What files were deleted?

24   A.  The VPXA.0, VPXA.1 and VPXA.2.

25            MR. LAROCHE:  And let's go back to 137 for a moment.

K2cWsch2                         Leedom - Direct

1    Q.  This is the list command that we just saw that was run at

2    approximately 5:57 p.m.  Is that right?

3    A.  That's correct.

4    Q.  Are those VPXA logs on this list?

5    A.  Yes, they are.

6            MR. LAROCHE:  Let's go back to slide 139.

7    Q.  At approximately what time did the defendant delete these

8    VPXA logs?

9    A.  Sometime after 5:57 p.m.

10   Q.  How do you know it was after 5:57 p.m.?

11   A.  If we look at the top line of this snip here, we can see

12   that the shell.log from that last list command was last edited

13   at 5:57 p.m.

14           MR. LAROCHE:  Let's go to the next slide.

15   Q.  We talked earlier about VI client logs.  Do you remember

16   that?

17   A.  Yes, I do.

18   Q.  What were some of the things we saw from the VI client logs

19   on April 20?

20   A.  The VI client logs had snapshot-reversion history, snapshot

21   deletion, listing of snapshots, log-ins, things like that.

22   Q.  And whose VI client logs were they?

23   A.  They were the defendant's VI client logs.

24   Q.  Now, is this a portion of the VI client logs?

25   A.  This here?  No, this is not.

K2cWsch2                          Leedom - Direct

1    Q.   What is this?

2    A.   This is from unallocated space from the defendant's virtual

3    machine on his DevLAN workstation, and this specifically is the

4    recovered session from his SSH session from April 15.

5              MR. LAROCHE:   Let's take a look at the top of the

6    highlighted text, if we could zoom in on that.

7    Q.   You said this was recovered from the administrative session

8    on the server, correct?

9    A.   That's correct.

10   Q.   What does this command reflect?

11   A.   So, this is a command that we haven't seen yet, so I'll

12   explain it.

13        So, this is the find command.  It's a command in Linux

14   that's used to search for files.  In this case we're searching

15   for files by the name of the file.

16        This little slash here after the find command is just

17   specifying the directory on which you want to search for files,

18   and a single forward slash with nothing after it, in Linux,

19   just says, like, search the root of the file system.  So, on,

20   like, your Windows machine, you might be familiar with the C

21   drive.  Slash on a Linux machine is essentially like the C

22   drive of a Linux machine.

23        The argument that's given to the name flag is the file name

24   you want to search for, and you're able to use things like

25   wildcards if you may not know the entire name of the file.  So

K2cWsch2                       Leedom - Direct

1    we see VI client dash star, the little asterisk.  That star is

2    a wildcard, meaning if you find a file that's called, like, VI

3    client-1 or VI client-2, those would all be captured with that

4    wildcard command.

5    Q.  And where was the defendant searching for the VI client

6    log?

7    A.  At the root of the file system.  Another way to say that

8    would be search everywhere on the whole server for things that

9    are called this.

10   Q.  On the server itself, is that correct?

11   A.  Yeah, on the ESXi server.

12   Q.  What was the output of this command?

13   A.  We can see directly below it didn't return any results, so

14   it wasn't able to find any files.

15   Q.  Why wouldn't it return any results?

16   A.  Well, if it was unable to find any files with that name, it

17   would return no results.

18   Q.  And are there VI client logs on the server itself?

19   A.  No, there's not client logs on the server.  You'll only

20   find client logs, especially client logs that are named VI

21   client, on a client machine, like the defendant's workstation.

22            MR. LAROCHE:  Let's look at the next command that's

23   run.  If we could just zoom in on the bottom.  Yup.  From there

24   down, please.

25   Q.  What's the next command that's run?

K2cWsch2                              Leedom - Direct

1    A.  So, the next command that's run is the same command as

2    before, except instead of searching on the whole file system,

3    we're only going to search in, like, this specific folder for

4    VI client logs.

5    Q.  And again, were there any results to this command?

6    A.  No, there were not.

7    Q.  Why not?

8    A.  Because there weren't any VI client logs found in that

9    folder.

10             MR. LAROCHE:  Let's go to the next slide.

11             I'm sorry.  Let's just go back up one slide for a

12   moment and just zoom in on the bottom few lines there.

13             THE WITNESS:  That would slide 140.  OK.

14   Q.  Just focusing you on the bottom where it has an LS command,

15   do you see that on the bottom on 140?

16   A.  Yes, I do.

17   Q.  Where is that command being run?

18   A.  That command's being run on the ESXi server.

19   Q.  And where particularly is the defendant trying to list

20   files?

21   A.  Oh, a directory called /var/log/VMware/journal.

22             MR. LAROCHE:  Let's go back to the next slide.

23   Q.  Do you see that same list command at the top of this

24   exhibit?

25   A.  Yes, I do.

K2cWsch2                          Leedom - Direct

1    Q.  And what's the next command that's run by the defendant?

2    A.  This is another find command, searching on slash, which is

3    the root of the server.

4        In this case, if you look at the name flag and then the

5    actual file name that's given, in parentheses, it's exactly the

6    same except for the dash is omitted, so this just says is

7    anything -- look for any files starting with VI client.

8    Q.  And what's the next command after that VI client search?

9    A.  It's the same command run again.

10             MR. LAROCHE:  Let's go to the next slide, please.

11   Q.  What is this exhibit showing?

12   A.  This is showing another LS ALTR list command.

13   Q.  And where was this list command run?

14   A.  On the ESXi server.

15   Q.  And what is the total from this list command?

16   A.  16,529.

17   Q.  And we just looked at a list command several slides ago

18   that had log files in the range of 17,000, is that right?

19   A.  That's correct.

20   Q.  Why is this list total lower?

21   A.  More of those vpxa.0, dot 1, dot 2 files were removed, so

22   this is reflecting that.

23             MR. LAROCHE:  Let's go to the next slide.

24   Q.  What is this showing?

25   A.  This is showing the output from that command, the LS

K2cWsch2                          Leedom - Direct

1   command on the previous slide.

2   Q.  And where do those VPXA 0, VPXA 1 and VPXA 2 logs appear on

3   this output?

4   A.  They're not on the output.

5   Q.  Why not?

6   A.  Because they were deleted.

7   Q.  At what time, approximately, was this list command run?

8   A.  About 6:16 p.m.

9   Q.  How do you know that?

10  A.  If you look at the very bottom, you'll see this dot.  We

11  discussed it briefly yesterday.  The dot, like a period, in

12  Linux, in the folder structure, represents the current

13  directory.  And the modification time stamp of that directory

14  is updated when files are added or removed from the directory.

15  So that dot was updated the last time a file was removed, which

16  was when those VPXA 0, 1, 2s were deleted.

17  Q.  And what's the next command that's run on this slide?

18  A.  So, this is another find command.  This is a different

19  thing that we're searching for.  Instead of, like, looking for

20  files of a certain name, this dash-newer flag says look at a

21  specific file and find me all files that are -- that have been

22  modified more recently than that file, so find me newer files

23  than this one.

24      The file that's given to this is this vmksummary.log file,

25  and if you look at the time stamp for the modified time for

1    that log file, you'll see it's UTC 2100 hours, which is 5 p.m.

2    EST.  So this just says show me all files on the server that

3    have been modified since 5 p.m. April 20, EST.

4    Q.  At what time did the defendant revert the system?

5    A.  The system was reverted about 5:35 p.m.

6            MR. LAROCHE:  Go to the next slide, please.

7    Q.  What is this exhibit showing?

8    A.  This is showing another list command and a file deletion

9    after that list command.

10   Q.  Let's start with the list command.  What is the total log

11   files from that list command?

12   A.  It's 16,529.

13   Q.  And at what time was this list command run, approximately?

14   A.  About 6:16 p.m.

15           MR. LAROCHE:  Let's zoom in on the bottom part of this

16   exhibit.

17   Q.  After the list command was run, what was the next thing the

18   defendant did?

19   A.  The defendant deleted the hostd-probe log.

20   Q.  How do you know that?

21   A.  We see an RM, a remove command, for that log file.

22           MR. LAROCHE:  Let's go to the next slide.

23   Q.  Do you  see the top highlighted text there?

24   A.  Yes, I do.

25   Q.  And that shows the removal that you just testified about,

K2cWsch2                         Leedom - Direct

1   is that correct?

2   A.   That's correct.

3   Q.   What's the next command the defendant runs?

4   A.   Another list command, sorted by time.

5   Q.   And what's the total now for log files?

6   A.   It's a little lower.  It's 15,891.

7   Q.   And why is it lower?

8   A.   It's lower because that hostd-probe file was deleted.

9           MR. LAROCHE:  Let's go to the next slide.

10          And the next slide, please, 147.

11  Q.   What is this slide meant to convey?

12  A.   This is just an overview of what we've been talking about,

13  about the defendant deleting different log files and some of

14  the file-size changes for the directory in which he deleted

15  those logs.

16  Q.   Now, the log files that he's been deleting, where have they

17  been located?

18  A.   So, all of these log files have been on the ESXi server in

19  that main log folder for the server itself, not specific to any

20  of the virtual machines on the server.

21  Q.   You talked about different logs being created for virtual

22  machines, is that right?

23  A.   That's correct.

24          MR. LAROCHE:  Let's go to the next slide.

25  Q.   Let's start on the top command here.  First, where is this

K2cWsch2                          Leedom - Direct

1    exhibit from?

2    A.   This exhibit is from the unallocated space from the Ubuntu

3    virtual machine on the defendant's workstation, the same spot

4    we've been getting all the rest of this activity.

5    Q.   And at the top there's a root@OSB and at the end an RM

6    vmware.log?

7    A.   That's correct.

8    Q.   What is that showing?

9    A.   This is just showing that a log filed called vmware.log is

10   being deleted.

11         There's an important thing to note here.  If you look just

12   to the left of the RM command, you'll see that our folder has

13   changed, so we're no longer in that main folder for ESXi.

14   We've moved to the folder for his Confluence virtual machine,

15   and inside that folder, that's where logs specific to that VM

16   are stored.

17   Q.   What is vmware.log?

18   A.   We've seen it previously in the presentation.  It stores

19   information related to activities on that virtual machine.  I

20   think the most recent example was when we looked at that USB

21   device activity from the defendant's virtual machine.  That's

22   the type of thing that's stored in the log file.

23   Q.   After the defendant deleted vmware.log, what's the next

24   command he ran?

25   A.   A list command that shows the contents of this Confluence

K2cWsch2                          Leedom - Direct

1    folder.

2    Q.  Approximately when were these commands run by the

3    defendant?

4    A.  We can't date them on this slide specifically.  Lower

5    down -- well, I take that back.

6         At the last line we can see the date for the time that that

7    deletion happened, which was 6:38 p.m.

8              MR. LAROCHE:  So let's focus on that, I guess, last

9    four lines.  If we could zoom in, please.

10   Q.  Is this another list command?

11   A.  Yes, it is.

12   Q.  And where is he running this list command?

13   A.  He's running the list command still inside the Confluence

14   virtual machine folder on the ESXi server.

15   Q.  And what's the total?

16   A.  So, the total is the estimated, like, approximate file size

17   for all the files in this folder.  You'll notice that the

18   number's a lot larger than it was in the previous slides for

19   the logs for the ESXi server, and that's because for the

20   Confluence virtual machine, this stores the actual -- the

21   actual machine.  So there's a virtual hard disk here.  There's

22   memory for the machine.  And then there's the snapshots, which

23   all have to have all of the state for their own snapshot about

24   what happens.  Those are quite large.  And then, of course, the

25   log files for the server.

1              MR. LAROCHE:  Let's go to the next slide.

2     Q.  Is this showing the output from that LS command?

3     A.  Yes, it is.

4     Q.  Now, the defendant appeared to run another list command on

5     this slide, is that correct?

6     A.  That's correct.

7     Q.  Now, what's the total from that list command?

8     A.  You'll notice it's -- it starts with 405 instead of the

9     previous total, which was 422, which we can see at the top

10    here.  It's been -- it's, you know, significantly reduced in

11    size.

12    Q.  What caused the large deletion of files?

13    A.  This is when that snapshot 3 was deleted.

14             MR. LAROCHE:  Let's take a look at that.  Go to the

15    next slide.

16    Q.  Now, we're back looking at the VI client log, is that

17    correct?

18    A.  That's correct.

19    Q.  Were these the types of VI client logs the defendant was

20    searching for on the server?

21    A.  Yes.  Yes, it was.

22    Q.  And remind us.  Where was this log recovered from?

23    A.  This was recovered from the defendant's DevLAN workstation.

24    Q.  And what does this log show?

25    A.  This is that -- I believe we looked at it earlier.  This is

K2cWsch2                          Leedom - Direct

1    showing the prompt that the defendant received when he was

2    going to delete that snapshot-3 snapshot, which was the BKUP

3    snapshot, at 6:55 p.m. on April 20.

4             MR. LAROCHE:  Let's go to the next slide.

5    Q.  Where is this exhibit from?

6    A.  This is from the unallocated space from the Ubuntu virtual

7    machine on the defendant's DevLAN workstation showing that

8    administrative session to the ESXi server itself.

9    Q.  And what command is run on this screen?

10   A.  Another list command.

11   Q.  And the total is still at 405, that long number, is that

12   correct?

13   A.  Yes.

14   Q.  What are some of the things that this list command shows?

15   A.  So, this shows all the files in that folder.  You'll notice

16   that the dot file, like we discussed when files are added or

17   removed from the folder gets the time stamps updated -- you'll

18   notice it said 6:55 p.m.  You'll also notice that there's no

19   snapshot 3.  There's just snapshot 1 and snapshot 2.  And then,

20   of course, the file size changed, so we know that this is just

21   confirming that that third snapshot was deleted.

22            MR. LAROCHE:  Let's go to the next slide, please.

23   Q.  What is this slide meant to convey, just focusing on the

24   bolded bullets there?

25   A.  Yeah, the first and last bolded bullets are just showing

1    that that snapshot was deleted, and we can just confirm it

2    based on the file size from the list commands that were run.

3              MR. LAROCHE:  Let's look at some of the more

4    unallocated space.  Can we go to the next slide.

5    Q.  What command is run at the top of this slide?

6    A.  It's another LS command.  I think it's the same one from

7    the last slide, just showing the full output.

8    Q.  At approximately what time was this command run?

9    A.  6:55 p.m.

10   Q.  After running this list command, what did the defendant do?

11   A.  If you look at the last two lines here -- I'll draw a line;

12   box them off -- he deleted two VMware log files.

13   Q.  And where did he delete those from?

14   A.  The Confluence virtual machine directory.

15   Q.  Now, I think you testified, several slides ago, the

16   defendant had already deleted vmware.log from Confluence, is

17   that right?

18   A.  Yes, he did.

19   Q.  Why did he do it again?

20   A.  Well, if you look at the file output, there's another

21   VMware log file there.

22   Q.  Why was there a regenerated vmware.log?

23   A.  So, you'll see all these in other cases too --

24   specifically, we'll look at the VMware logs.  You see how

25   they're labeled, like, five, six, seven, eight, nine?  That's a

K2cWsch2                          Leedom - Direct

1   feature of -- most Linux servers have something that's called

2   log rotation.  Now, what causes log rotation is different based

3   on the service that's performing it, but in this case, for the

4   VMware log specifically, the VMware log is rotated out and

5   archived as one of these numbered versions and then the

6   original, like, non-numbered version is there with the most

7   recent stuff.  It's rotated out any time a virtual machine

8   power state is changed, and when you revert to a snapshot, it

9   affects the power state of the virtual machine and causes this

10  log-rotation event to happen, which regenerates, in this case,

11  the vmware.log file.

12  Q.  If you could just circle the time stamps for the vmware-9

13  and vmware.log on this slide.

14  A.  Try again.

15      I think that's the best I can do.

16  Q.  And what are those approximate time stamps?

17  A.  That's the last time that log file is modified.  One's at

18  6:51 and one's at 6:38.

19  Q.  And are those the two log files the defendant deleted?

20  A.  That's correct.

21  Q.  If you go above vmware-9 log.  And just the next time stamp

22  above that?

23  A.  Yes.  This is the April 16 time stamp.

24  Q.  And so that's not even on April 20, is that correct?

25  A.  No.  It's from before.

K2cWsch2                         Leedom - Direct

1          MR. LAROCHE:  Understood.  Let's go to the next slide,

2     please.

3     Q.  At the top of this slide, you see the deletion for

4     vmware.log?

5     A.  That's correct.

6     Q.  What's the next command that's run?

7     A.  It's another list command.

8     Q.  And is that total different than from the previous slide?

9     A.  Yes, it is.

10    Q.  Is it lower?

11    A.  Yeah, it's lower.

12    Q.  Why?

13    A.  Because the vmware.log and vmware-9 log were deleted.

14          MR. LAROCHE:  Let's go to the next slide.

15    Q.  And is this just a summary of some of the things that you

16    just testified about?

17    A.  Yes, I did.

18    Q.  Let's keep going through the unallocated space.  At the top

19    of this, there's the removal for the hostd-probe.log.  Do you

20    remember testifying to that earlier?

21    A.  Yes, I do.

22    Q.  Did the defendant run a list command after that?

23    A.  Yes, he did.

24    Q.  And what was the total there?

25    A.  15,891.

K2cWsch2                          Leedom - Direct

1   Q.  And approximately when did he run that list command?

2   A.  At 6:58 p.m.  The time stamp for the file's probably on the

3   next slide.

4   Q.  Let's take a look at the next slide.

5   A.  You can see that here.

6   Q.  And where was this list command run?

7   A.  So, we're back in the log folder for the ESXi server, so

8   not the Confluence virtual machine.

9   Q.  And do you see the next log there?

10  A.  The vmware.log here?

11  Q.  Yes.

12  A.  Yes.

13  Q.  What's the next command the defendant ran?

14  A.  He deletes the vmware.log file for the ESXi server.

15  Q.  Is this a different VMware log than what the defendant

16  deleted earlier that night?

17  A.  Yes, it is.

18      Each virtual machine will have their own file called

19  vmware.log.  This is essentially, like, the master VMware for

20  the whole server.

21  Q.  After the defendant deleted the vmware.log, what is the

22  next command he ran?

23  A.  He ran another find command to look for files newer than

24  shell.log.

25  Q.  And again, what does shell.log show?

K2cWsch2                           Leedom - Direct

1    A.  Shell.log shows commands that were entered into the ESXi

2    server.

3    Q.  Did you see evidence that part of the shell.log were

4    deleted?

5    A.  Yes, I did.

6    Q.  What did you see?

7    A.  The activity from April 20 was deleted and all the activity

8    from the 18th was deleted.

9           MR. LAROCHE:  Let's go to the next slide, please.

10   Q.  The title of this slide is "Badge records."  What's the

11   first bullet conveying there?

12   A.  This is just the last time that VMware folder -- I'm sorry,

13   file that we just looked at was deleted, at 6:58 p.m.

14   Q.  Now, there's an excerpt at the bottom there.  Do you see

15   that?

16   A.  Yes, I do.

17   Q.  What's that from?

18   A.  This is an entry from the badge records from the CCI

19   office.

20   Q.  And what do those badge records reflect?

21   A.  They show when employee's badged into the building and left

22   the building through the turnstiles or one of the, like, guard

23   gates.  And it also shows when employees unlocked vaults for

24   the day.  So, you have to go in and put your PIN in and disarm

25   the alarm system, and then similarly, when you would arm the

K2cWsch2                        Leedom - Direct

1       alarm system and lock the vault at the end of the day.

2       Q.  At what point would you lock the vault?

3       A.  You'd lock the vault when you're the last employee to leave

4       that vault for the day.

5            MR. LAROCHE:  Let's take a look, if we can zoom in on

6       this portion of the badge records.

7       Q.  Who is this a badge record for?

8       A.  This is a badge record for the defendant.

9       Q.  And what does it show?

10      A.  This shows that -- this is a close action, meaning the

11      system was armed and that the PIN and, like, password to

12      perform the arming action was accepted.  So this, in layman's

13      terms, this says that the defendant closed the vault on April

14      20 at 7:07 p.m.

15           MR. LAROCHE:  Let's zoom out again.

16           OK.  Let's go to the next slide.

17      Q.  We've talked about a lot of activities on April 20.  I'd

18      like to review some of those with you.  What are some of the

19      things that happened before the defendant reverted Confluence?

20      A.  So, before Confluence was reverted, at 5:18, Rufus, another

21      employee, his project key, which was in defendant's home folder

22      on the file server, was accessed.

23          A minute after that the defendant connected a San Disk USB

24      to his Ubuntu VM on his workstation.  And at 5:29 p.m., the

25      defendant created a new snapshot for Confluence titled "BKUP."

K2cWsch2                          Leedom - Direct

1          MR. LAROCHE:  Now let's go to the next slide.

2   Q.  What are some of the things that happened between 5:30 and

3   7:00 p.m.?

4   A.  At 5:35 p.m., the defendant reverted the Confluence server

5   back to that 4/16 snapshot.

6          From 5:35 to 6:51, the Confluence VM remained reverted, so

7   that's a little over an hour.

8          Between 5:42 and '43, that backup was the Confluence SQL

9   file and the TAR.GZ file, were accessed from the Altabackup.

10          And from 5:55 to 6:58, the defendant also deleted various

11   log files from the ESXi server and the Confluence log folder.

12   Q.  And finally, slide 161.  What are some of the other things

13   that happened on April 20?

14   A.  So, towards the end of that hour period, the defendant

15   reverted back to that BKUP snapshot that he made.  He then

16   deleted that BKUP snapshot, which erases all the activity of

17   what happened on the machine.  And then he deleted the --

18          Lost my screen again.  Just a second.

19          OK.  It's back.

20          At 6:58, he deleted the vmware.log from the ESXi server log

21   folder, and then he locked and left the vault.

22          MR. LAROCHE:  Let's go to slide 162.

23   Q.  Now, you talked about various logs that were deleted by the

24   defendant on April 20, 2016?

25   A.  Yes, I did.

K2cWsch2                        Leedom - Direct

1   Q.  Now, the first bullet says "from the ESXi server folder,"

2   is that correct?

3   A.  That's correct.

4   Q.  Does that list out those various log files that were

5   deleted?

6   A.  Yes, it does.

7   Q.  And then down at the bottom there's a bullet, "from the

8   Confluence folder," is that right?

9   A.  That's correct.

10  Q.  Does that list the various files the defendant deleted from

11  the Confluence folder?

12  A.  Yes, it does.

13  Q.  Let's talk about some of those log files.  What types of

14  things would the VMware log show?

15  A.  So, the VMware log shows logs related to the operation of

16  virtual machines on the server, so if there were power-state

17  changes made to the VMs, like turned on or off or things

18  connected to them, that would be in the VMware log.

19  Q.  What about VM kernel?

20  A.  The kernel log shows, like, low-level information for the

21  server, like device discovery, storage information, networking

22  and driver information.  It also shows some information for

23  when virtual machines start and stop.

24  Q.  What does device discovery mean?

25  A.  So, device discovery, if you remember from the log file

1   that we were looking at, that showed the USB plugged in, that's

2   essentially like a device discovery.

3   Q.  Are those external devices; is that the type of thing?

4   A.  Typically, yes.

5   Q.  What about host D?

6   A.  Host D is -- it's a service log, showing communication

7   between that vSphere server and the VI client server, so this

8   shows when clients are logging in and out of the vSphere

9   application.

10  Q.  And Syslog?

11  A.  Syslog has more service logs, so these are, like, changes

12  that are made to the server.

13          MR. LAROCHE:  Let's go to the next slide.

14  Q.  What about storagerm logs; what would those show?

15  A.  The storagerm logs are just data-storage logs, so things

16  happening to the data storer's storage information server,

17  things like that.

18  Q.  What about the next bullet?

19  A.  The RHTTP proxy shows there's -- sorry.  My screen went out

20  for a second.

21      It shows if there's any HTTP, which is essentially, like,

22  web-traffic, connections that are proxied on behalf of other

23  services.  This is kind of, like, lower-level network jargon

24  just to say -- it's just some logging information about how the

25  web service is running.

K2cWsch2                        Leedom - Direct

1    Q.   And VPXA, what would those logs show?

2    A.   VPXA has vCenter-specific logs.

3         MR. LAROCHE:  And let's go to the next slide.

4    Q.   What about the first bullet; what would those logs show?

5    A.   The SDRS injector logs are more data storage-related logs.

6    Q.   And hostd-probe?

7    A.   That's more most host management logs.  This one's more of,

8    like, a heartbeat kind of responsiveness checker, so it just

9    kind of makes sure the service is up.

10   Q.   And VMK warning?

11   A.   The warning log shows, like, alert messages and warnings

12   for the server.

13        MR. LAROCHE:  And let's go to the next slide.

14   Q.   Let's talk about VMware for the Confluence folder that was

15   deleted.

16   A.   Sure.

17   Q.   What types of things would that log show?

18   A.   So, as we discussed several times previously, pretty much

19   anything that happens to the virtual machine itself gets stored

20   in the VMware log file.  So, when it gets turned on and off;

21   snapshots are made; some, like, data-transfer information

22   sometimes, based on how that was done; things connected to the

23   VM.

24        MR. LAROCHE:  Let's go to the next slide.

25   Q.   Now, earlier you testified that the defendant connected a

1  San Disk USB device on April 20, 2016, at around 5:19 p.m., is

2  that correct?

3  A.  Yes.  Give me a second.  I've got to --

4  Q.  Sure.  We're on slide 167.

5  A.  167?  167?

6  Q.  Yes.

7  A.  OK.  I'm here.

8  Q.  And this is the San Disk device that was connected on April

9  20, is that correct?

10 A.  Yes, it is.

11 Q.  And was that before the reversion?

12 A.  April 20?

13 Q.  Yes.

14 A.  It was connected right before, a few -- like, ten minutes

15 before.

16 Q.  Right.  Have you reviewed an image of that USB device?

17 A.  Yes, I have.

18 Q.  What, if anything, does that image of that USB device show?

19 A.  It shows that it was formatted on April 21.

20           (Continued on next page)

21

22

23

24

25

K2C3SCH3                           Leedom - Direct

1   Q.   Let's go to the next slide, please.  There is an excerpt I

2   think from this image; is that correct?

3   A.   That's correct.

4   Q.   Can we just zoom in on that.  What does to mean to be

5   formatted?

6   A.   So, formatted can be simply, you're essentially like

7   erasing data on the disc to use it with something else.  So, on

8   a Windows machine, you plug a flash drive in and you right

9   click on it in Windows Explorer and you can click "format."  It

10  just changes up and updates the file system on the disc.

11  Q.   At what time was this formatted?

12  A.   So, this device was formatted on April 21, 2016, at about

13  11:46 a.m.

14              MR. LAROCHE:  Your Honor, this would be a good time to

15  break if we can.

16              THE COURT:  We'll take our morning recess.

17              (Jury excused)

18              (Continued on next page)

19

20

21

22

23

24

25

K2C3SCH3                        Leedom - Direct

1              MR. ZAS:  Your Honor, can I make a request.  Can we

2       get an extra 10 minute on this break.  We didn't get a chance

3       to talk to Mr. Schulte about some of this testimony yesterday,

4       so we'd like to spend a few minutes in pens just before we

5       resume.

6              THE COURT:  All right.

7              MR. ZAS:  Thank you, sir.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2C3SCH3                          Leedom – Direct

1              (In open court; jury present)

2              THE COURT:  All right, Mr. Laroche.

3              MR. LAROCHE:  Thank you, your Honor.  Ms. Hurst, if we

4    could briefly go back to slide 26, please.

5              THE COURT:  What slide?

6              MR. LAROCHE:  26.

7    BY MR. LAROCHE:

8    Q.  We've obviously seen this slide several times; is that

9    correct?

10   A.  That's correct.

11   Q.  I just want to ask you a question about the tgz files.

12   A.  Sure.

13   Q.  Is that a type of zip file?

14   A.  Yes, it is.

15   Q.  Just generally, what does that mean?

16   A.  So, tgz stands for a G zip tarball file.  A G zip is a type

17   of zip compression, and a tarball is way to represent like

18   multiple files as one file.  It's a command that you run.  We

19   saw it when -- excuse me.  We saw it when we went over the

20   backup script.  It essentially like zips up the whole home

21   directory into a single file.

22   Q.  So the Confluence tgz file, fair to say Confluence would be

23   larger when unzipped?

24   A.  Yes, it would.

25   Q.  Let's look at the next slide, 27.  Is this reflecting Stash

K2C3SCH3                    Leedom - Direct

1   backups?

2   A.   That's correct.

3   Q.   We talked about this yesterday a little bit.

4   A.   Yes.

5   Q.   How big approximately is the tgz or tar file for a Stash

6   backup?

7   A.   The zipped backup is over 200 gigabytes.  It's quite large.

8   Q.   As an unzipped file, approximately how large would that be?

9   A.   It's bigger.  I don't remember exactly how large.  It's

10  been a while since I've unzipped one, but less than 500 gigs.

11  Q.   Thank you.  Let's go back up to slide 169, please.  I want

12  to switch gears a little bit to talk about the tool Brutal

13  Kangaroo.  So let's go to the next slide.

14       You remember yesterday we saw some of these audit log

15  files for Brutal Kangaroo?  Do you recall that?

16  A.   Yes, I do.

17  Q.   Are these the same types of audit log files?

18  A.   Yes, they are.

19  Q.   So let's just walk through these.  What is the top file

20  showing?

21  A.   This is showing a permission, project permission granted

22  event for project admin.  I'm sorry.  I'm drawing all over

23  myself.  For the defendant from Dave.

24  Q.   So Dave was giving the defendant admin access to Brutal

25  Kangaroo?

1  A.  Yes.

2  Q.  When approximately did that happen?

3  A.  This was at about 1:03 p.m. on May 26.

4  Q.  What about the bottom log file, what does that show?

5  A.  So, at 1:33 p.m., the defendant modified and removed

6  permissions for the user Christopher from Brutal Kangaroo.

7  Q.  1:33 p.m. on the same day?

8  A.  That's correct.

9  Q.  Let's go to the next slide, please.  Is this another audit

10  log file?

11  A.  Yes, it is.

12  Q.  What does this reflect?

13  A.  So this is showing that the defendant, and this is his IP

14  address, is making an update to the status of different

15  branches of the Brutal Kangaroo project.  Specifically, this

16  Brutal Kangaroo project had two branches, a develop branch and

17  a master branch.  I'll explain that briefly.

18         So in computer programming, like, software development

19  in a team of people, you'll have -- there's different ways you

20  can go about doing it, different kind of industry standard

21  practices.  But in the case we're going to talk about here,

22  you'll have two different branches of code.  So you'll have two

23  different places where your code will live.  You'll have the

24  master branch, where you only push like working solid versions,

25  so that's your version 1.2, your 1.3, version 2.0 software.

1    And you'll have another branch where you do development in the

2    meantime.

3           The reason you do that is so that no one pushes code

4    to the master branch that could potentially break what users

5    down the line are using.

6           In previous testimony, we've heard the, like, follow

7    the pull request model.  That's how you would push code into

8    these branches, and it gets usually peer reviewed to make sure

9    that those kind of changes wouldn't happen.

10   Q.  So what is this log file showing?

11   A.  This is showing these two branches are having their status

12   updated to read only from like a read write state.  Just

13   meaning that the project's kind of frozen so no one can

14   contribute to it.

15   Q.  Let's go to the next slide, please.  Is this more log files

16   relating to Brutal Kangaroo?

17   A.  Yes, it is.

18   Q.  What does this activity show?

19   A.  This is showing the defendant from his IP address removing

20   permissions, specifically write permissions from a specific

21   group, and that group is the sg-OSB group.

22   Q.  So this is showing a removal of permissions; is that

23   correct?

24   A.  Yeah, the permissions being removed.

25   Q.  Did you see any audit logs reflecting the defendant giving

K2C3SCH3                          Leedom - Direct

1   anyone else access to Brutal Kangaroo?

2   A.   Giving access?  No, he removed access for these projects.

3   Q.   Did you see any evidence of him giving access back?

4   A.   I don't believe so.

5   Q.   Let's go to the next slide.  The last part of your

6   testimony is about the leak itself.

7   A.   That's correct.

8   Q.   You stated earlier as part of your investigation you

9   reviewed the Vault 7 and Vault 8 disclosures by WikiLeaks; is

10  that right?

11  A.   Yes, I have.

12  Q.   I want to focus on March 7, 2017.  That disclosure.  Do you

13  have an understanding about where that information came from on

14  DevLAN network?

15  A.   Yes, I do.

16  Q.   How do you know that?

17  A.   I've reviewed both the content of the leak and content from

18  backups on the DevLAN network.

19  Q.   Where did that content come from?

20  A.   It came from Confluence.

21  Q.   How much of Confluence, approximately, was disclosed on

22  March 7, 2017?

23  A.   All of the page contents and attachments, things like that.

24  Q.   Let's go to the next slide, please.  Based on your

25  investigation in this case, have you identified potential ways

K2C3SCH3                    Leedom - Direct

1  in which an individual could obtain all of Confluence from

2  DevLAN?

3  A.   Yes, I have.

4  Q.   What are some of those ways?

5  A.   So there's three main ways that you can go about taking

6  data from Confluence if you wanted to walk out with it.

7       The first is what we call a web scrape.  The second

8  would be taking the whole Confluence virtual machine from the

9  server.  And the third would be to take the backup files from

10 Altabackup.

11 Q.   Let's walk through each of those.  What do you mean by a

12 web scrape of Confluence?

13 A.   So, in computer science and computer security terms,

14 scraping a website can mean anything from like taking the

15 screenshot of it to making a, like, lower-level request, like

16 from the command line to retrieve like the source of the page.

17      And what we mean by this method would be someone would

18 over time, either by manually going to every single page, they

19 would take a screenshot, or Confluence actually has a page

20 export function where you could make like a PDF of the page.

21 Either doing that for every single page on the whole server or

22 writing a script to automate that process.

23 Q.   What privileges would you have needed to take a web scrape

24 of all of Confluence on DevLAN?

25 A.   So, for all of Confluence, you would have needed some level

1    of administrative privileges, because you're doing this from,

2    like, your user session through the web browser.  And certain

3    pages are restricted to certain users.  So you wouldn't be able

4    to view all the pages, unless you had all those permissions.

5    Q.   How long approximately would this method have taken?

6    A.   It's going to vary wildly, depending on what type of

7    method's used.  If you are going through every single page,

8    like one at a time, making PDFs, this would be a significant

9    amount of time, because there's thousands of pages.

10            If you write a script to do the process, it could be

11   completed in any number of days, it just depends on how fast

12   you make requests to the server and how fast it can respond.

13   Q.   Is it your opinion that a web scrape was the way that all

14   of Confluence was taken?

15   A.   No, it's not.

16   Q.   What are some of the reasons for that opinion?

17   A.   Primarily, and we'll see towards the end of this

18   presentation, there's content that was posted on WikiLeaks that

19   appears like on the page that would never appear on the pages

20   as it was displayed to a user on DevLAN.

21   Q.   Let's talk about the second method, copying a virtual

22   machine.

23   A.   Yes, through vSphere, or conversely by copying files

24   directly off of the ESXi server, you can make an export of the

25   Confluence virtual machine.  So, you basically, you log into

K2C3SCH3                         Leedom – Direct

1   vSphere and you click on the Confluence VM, you right click on

2   it and there's an option that's called something that's usually

3   like export to OVA or OVH.  Those are just VMware's name for

4   their appliance export file.

5          The problem with this is you have to turn the machine

6   off and stop it before you can make this kind of an export.

7   So, for that reason, primarily, and for some other reasons

8   we'll discuss later about page content that was disclosed, I

9   don't think it was taken from the virtual machine like that.

10  Q.  And approximately how large is the Confluence virtual

11  machine?

12  A.  I believe it's about 200 gigabytes.

13  Q.  Is that larger than the backup files?

14  A.  Significantly.

15  Q.  How large was the Confluence backup file approximately?

16  A.  I believe the database was about 400 megs, and I think the

17  home folder was maybe like two and a half gigabyte, something

18  like that.

19  Q.  Let's talk about the third method on the screen.  Copying

20  the Confluence backup files.

21  A.  Yes.

22  Q.  How would someone do that?

23  A.  So the Confluence back up files were in two places.  They

24  were on the Confluence server itself in this dot, hidden dot

25  backup folder, and they were also on the file share on the

K2C3SCH3                    Leedom - Direct

1   NetApp in the Altabackups folder.

2   Q.  How would someone copy it from those folders?

3   A.  You would need a location that had the Altabackup server

4   mounted, or it would be inside in this case for Confluence,

5   inside the Confluence server itself, to copy off of those

6   backup files.

7   Q.  You mentioned two files that were in the Altabackup

8   folders, the SQL file and the tarball file?

9   A.  That's correct.

10  Q.  Would you need both of those files?

11  A.  Yes, would you need.

12  Q.  Why?

13  A.  So, as we'll see later on, there's content -- the SQL

14  database contains a lot of the page content information for the

15  Confluence service.  But, the home folder zipped file has

16  things like all the attachments for the pages, server

17  configuration, information, things like that.

18  Q.  Is it your opinion that taking these Confluence backup

19  files was the way that all of Confluence was stolen from

20  DevLAN?

21  A.  Yes, it is.

22  Q.  What are some of the reasons for that opinion?

23  A.  Namely, they mostly pertain to elements that we can see in

24  the pages on WikiLeaks, and some of the issues that were

25  surrounding the SQL database backup file itself.

K2C3SCH3                      Leedom – Direct

1    Q.  Let's talk about that for a second.  Issues with the SQL

2    backup file?

3    A.  Yes.

4    Q.  Can we go to the next slide.  This is titled "Backup

5    Scripts."  Remind us what is a backup script.

6    A.  So a script on Linux is essentially plain text file with a

7    list of commands for the computer to run.  So a backup script

8    is a file that's just used to back up data from the Confluence

9    server.  These scripts were set up in a fashion on the computer

10   that they would run daily.  I believe it was at like 6:25 a.m.

11   every day, the script would run, and would back up the files

12   and push them off to Altabackup.

13   Q.  So let's take a look at one of those scripts.  We can go to

14   the next slide.  What is this?

15   A.  This is the shell script that does the heavy lifting of

16   creating that zipped up home folder and doing the export from

17   the database.

18   Q.  Where was it located?

19   A.  This is on the Confluence server itself.

20   Q.  Generally, what did this script do?

21   A.  This script takes a few arguments and navigates to the

22   place where Confluence stores its data.  And then it names the

23   backup file with the date and the name of the service, in this

24   case Confluence, and it zips up -- I can circle it here.  It

25   uses the tar command to create a zip file for the whole home

1    folder for the Confluence service.  And then it makes a dump of

2    the SQL database, the MySql database that's storing the rest of

3    the information for the service.

4    Q.  Was there an error in this script?

5    A.  There was.

6    Q.  Let's go to the next slide, please.  What was the error?

7    A.  So it has to do with the MySql dump command.  If you take a

8    look at one of the SQL backups from the Confluence folder on

9    Altabackup, you'll notice in the middle of one of the tables --

10   so databases are organized into tables and rows inside those

11   tables.  So, one of the tables, you'll notice it kind of just

12   stops halfway through, and there's nothing else after it.  The

13   reason that happens is there's what we call a character and

14   coding error.  Character and coding in computer systems is just

15   a way that the computer translates -- like, if you see, like,

16   if you type the letter A on the screen, the way it translates

17   that letter into binary that the computer can read, there's

18   various different ways it can do that.  And if you don't have

19   the data in the database synced up to be storing that data in

20   the same way as, for example, like how you're viewing the

21   system when you're using it, when you do exports such as this

22   and you don't set it to a specific encoding, you can run into

23   certain errors.

24            And that's just a long way of saying that these backup

25   files all had this error, which meant that about, you know,

1    three-quarters of the way through the process of backing up the

2    database, it hit this error and then stopped.  And any tables

3    after that point were not included in the backup.  But it still

4    saved the backup up to that point.

5    Q.  What types of tables were missing?

6    A.  The tables that were missing were actually very important

7    tables.  They have to do with the user mapping info for user

8    names for different users that were in Confluence to internal

9    database values, which are essentially these long strings of

10   user identifier numbers.  So, any, like, it's the main way you

11   would attribute certain users to certain pages and comments,

12   things like that.

13   Q.  Let's go to the next slide.  This is titled "Building

14   Confluence Pages from the Altabackup Files."  So I'd like to

15   talk about that process for a moment.

16        What types of things would you have to do to

17   reconstruct the Confluence Altabackup files?

18   A.  Sure.  So if you got, if you got these two backup files and

19   they like landed on your desk, the first thing you'd do is

20   you'd look and see what the file name is.  So, the backup files

21   were named, they had the word "Confluence" in the name.  So a

22   quick Google search of that, you could see it was an Atlassian

23   product.  They actually offer like a free trial.  And they have

24   instructions on how to restore from backups.  Reading that, you

25   would see that these appear to be like the backup files you

1   would need to restore it.  And if you put them in and go

2   through the restore process, through like the recommended

3   method from Atlassian, it would fail.  And that's because that

4   database is incomplete.  So it's unable to completely restore

5   everything.

6   Q.  What do you mean by fail?  Like, how would it not complete?

7   A.  It would -- you would try to restore from the backup, and

8   it would -- it just wouldn't work.

9   Q.  So, if that method did not work, how would you reconstruct

10  the database?

11  A.  You would manually have to go into that database file, and

12  the associated home folder, and start reconstructing the data

13  manually.

14  Q.  Let's go to the next slide and talk through that process.

15  How you go about doing it manually.  What's one of the first

16  things you would need to know to reconstruct the database

17  manually?

18  A.  First thing you have to know is how data is stored in these

19  backup files.  We have two backup files, one is a database and

20  another's, you know, essentially just a zip file of some files

21  and folders.

22          So, the first thing we'll do is take a look at that

23  database file.  The database file has all of the page content

24  that you'd find on a Confluence page.  You'd have the order

25  those pages were in, user names, comments on pages, locations

1    on disc to where attachments for pages were.

2            So if you put a picture on a page, you'd have, like,

3    the path to where that picture is stored.  Confluence pages

4    have a concept of page revision history.  So you could have, if

5    you have a page that a lot of people are editing over the

6    course of a couple years, it could have like 20 different page

7    revisions.  So this is just to go back, if you wanted to view

8    an earlier version or restore if someone deleted something

9    accidently.  There's ownership of pages, so certain users might

10   own pages.  There is a concept of a space in Confluence which

11   is essentially like a, you think of maybe a project or

12   something like that.  Those can own different pages.  You have

13   to look through the database and figure out how all these

14   relationships work.  Some are easy and some are not.

15   Q.  As part of your work in this case, did you conduct that

16   analysis to figure out how the database stores information?

17   A.  I did.

18   Q.  How long did just that process take for you?

19   A.  Just the process of reviewing the database and figuring out

20   how it worked, I probably spent about a week on it, and I had

21   the benefit of kind of knowing what to look for.  Because we

22   had some other analysts who had looked into this in the past.

23   Q.  After you determined how Confluence stored data, what would

24   be the next step in actually constructing the database?

25   A.  Once you know how everything works, and what you want to

1    use out of it, you'd have had to figure out a way to get that

2    into some kind of web page for people to view.  Because

3    normally, on a Confluence server, it is going to do all that

4    for you.  So you're going to have to figure out how to pull

5    that information out and display it in a useful way.

6    Q.  Would this process have been made more difficult by the

7    fact that the user related tables were not included?

8    A.  Significantly more difficult.

9    Q.  Why?

10   A.  The way that Confluence stores page reference information,

11   it changes some of the values between some of the different

12   tables.  And without knowing -- being able to directly map the

13   user identifier numbers back to their space IDs, the page IDs

14   for pages that they created, it can be very difficult to figure

15   out who might have owned a certain page, or, you know,

16   something as simple as what a user's name might have been.

17   Q.  How would you actually reconstruct it after determining all

18   those relationships?

19   A.  The most expedient way and way to do it would be to write a

20   script to parse that database file and create some kind of -- a

21   bunch of HTML pages off that.

22   Q.  Would this process have restored Confluence to the way it

23   appeared on DevLAN?

24   A.  No.

25   Q.  What would be different?

A.   There would be significant differences in formatting.
There's a lot of dynamic content that Confluence provides.
There are a lot of what I'm calling, like, template macro
objects in the database on the page.  These are like kind of
little bits of computer code that the Confluence server sees,
and says, oh, okay, this says I need to make a pretty table
graphic here and then fill it with this information.  So, if
you're unable to ascertain how that works, then that's going to
be missing.  Things like that.

Q.   So let's look at some of those differences on the next
slide.

Now, the first bullet says "User names are not
available."  What is that meant to convey?

A.   So, this is for talking about things that are missing from
the database.  Since the user mapping tables with the names of
users aren't there, the only way you can glean what a user's
name would have really been is from the title of a page.  So if
a user named their page like "Pat's Home Page," then you could
probably assume that Pat was the one who wrote the page.

I think there have been maybe one or two other tables
that had a couple of bits and pieces of user information.  But
the main table where that were stored were not included in the
backup.

Q.   Did some of the posts by WikiLeaks on March 7 include
individuals' names from the agency?

1  A.  Some posts in the body content had names.  Most of the

2  names were redacted though.

3  Q.  What do you mean by included it in the content?

4  A.  There were a few pages in the actual, like, main body of

5  the page that had names in it that missed the redaction pass

6  that WikiLeaks ran over it.

7  Q.  Why would those names be available in a SQL database if

8  there was an error in that script?

9  A.  So that would have been something someone would have just

10 manually typed in.  And didn't use one of the features to,

11 like, embed a link to that user's page when they referenced the

12 user name.

13 Q.  When you say the content, was the content included in the

14 SQL database?

15 A.  Yes, it was.

16 Q.  So that was not a table that was missing?

17 A.  No, it was not.

18 Q.  So, the third bullet says "No Confluence images, pictures,

19 or other features."  What does that refer to?

20 A.  So, we'll see some pictures in some following slides, but,

21 you know the pretty, like, Confluence web page with the title

22 bars and all their pictures, none of that would be available

23 from the database because that's all built by the server.

24 Q.  What about dynamic elements, what is that referring to?

25 A.  So dynamic elements can mean anything from, like, the code

1    that I mentioned that's stored on the page, it has to get

2    executed by the server, to things like, you know, clicking the

3    drop down and changing permissions for pages, or, you know,

4    adding new pages.  Things like that.

5    Q.  And page formatting?

6    A.  So, the page formatting itself is going to be drastically

7    different.  To some extent, the HTML, like the program language

8    used to design web pages, that's actually stored in the

9    database.  So you can pull that content out, and kind of put it

10   in as is, and it will keep the basic structure of how the body

11   content of the page was stored.

12          We have an example of this.  Anything beyond that,

13   like, what color the text should be, how big it should be, what

14   font it should be, how wide should the margins be, things like

15   that, that's not going to be stored there.

16   Q.  Let's take a look at a regular Confluence page from the

17   internet.  To be clear, this is not from DevLAN, correct?

18   A.  Yeah, that's correct.  This is a picture off of Google.

19   Q.  What's this showing?

20   A.  This is what Confluence looks like when it's running.  This

21   kind of shows all of the different buttons you can click, how

22   it -- how like body content for pages looks.  When I mentioned

23   those little code elements, so, little boxes like this and

24   this.  Tables like this.  Those are types of things that you'd

25   have to manually account for when you were reconstructing the

1  database, and it might be very difficult to do.

2            When I say like dynamic elements, I mean things like

3  what I just showed you as well as obviously, like, buttons to

4  operate on the page, and things like that are not going to be

5  available in your reconstructed version.

6  Q.  Let's take a look at an example from DevLAN itself.  Let's

7  look at the next slide.  What is this showing?

8  A.  This is a screenshot from one of the Confluence pages on

9  DevLAN.  And you can see it's very similar in form factor and

10 layout to the page we were just looking at.

11 Q.  Let's look at some examples of what actually posted to

12 WikiLeaks.  What is this exhibit showing?

13 A.  This is showing a page from WikiLeaks that just contains

14 some -- it's a basic page.  There is not a whole lot of

15 information on it.  I just wanted to show how easy it would

16 have been to pull the basic body content out of the database

17 and make a page of it.

18 Q.  Why would that have been easy with the Confluence backup

19 file?

20 A.  All these things, like the indentation here and the

21 numbers, this little kind of quote block, even some of the

22 spacing some of the, like, title information, things like that.

23 That's stored in the page formatting in the database.  So, all

24 you really have to do is copy it out and put it in an HTML file

25 and open it in a web browser, and it will do the rest for you.

1  Q.  Is this an example of where WikiLeaks formatted the body

2  content correctly?

3  A.  To some extent, yes.  There -- we call it a style sheet.

4  It essentially is what determines, like, what a web page makes

5  certain colors of text on the page, what font it is.  This has

6  the WikiLeaks style sheet applied.  That's why this is the same

7  color green as this and this.  The text is the same font.

8  Things like that.  So they applied their style sheet to it to

9  make it look a little nicer.

10        But I'll show you as far as formatting perspective

11  that it's pretty much exactly as it was in the database.

12  Q.  Let's look at the next slide.  What is this showing?

13  A.  This is just a very simple example.  I literally copied the

14  row out of the database that has the body content data for this

15  page and just pasted it into a text file and opened it with a

16  web browser.  And it, you can see it formats everything almost

17  in the exact same manner that it's formatted on WikiLeaks.

18  Q.  Sorry.  You copied this out of where?

19  A.  Out of the Confluence database backup file.

20  Q.  So the actual backup file that was on DevLAN?

21  A.  Yes.

22  Q.  Let's look at the next slide.  Let's compare these two.

23  What is this showing?

24  A.  This is just a side-by-side comparison.  You can see that

25  it's, it's identical except for the one I made, I didn't apply

K2C3SCH3                      Leedom - Direct

1    any kind of style sheet to it.  And the one on WikiLeaks has

2    the WikiLeaks style sheet.  So...

3    Q.  Let's go to the next slide.  Did other pages posted by

4    WikiLeaks omit information that would have been contained in a

5    full Confluence virtual machine?

6    A.  Yes, they did.

7    Q.  I'm showing you a slide with Government Exhibit 10.  Do you

8    see that?

9    A.  Yes.

10   Q.  The title of the slide is "User ID in WikiLeaks Page

11   Contents."  Do you see that?

12   A.  Yes, I do.

13   Q.  In what ways is this slide different than how it would have

14   been displayed on DevLAN?

15   A.  This big ff808 number is not something that Confluence

16   would ever like display to a user or even an administrator in

17   the web view, to be honest.  This is a number that's used

18   internally in the database to reference other parts of the

19   database and different values.

20           When WikiLeaks, just having the database was parsing

21   through it, since they couldn't map these numbers back to

22   actual user names, there are pages for certain users who they

23   can only reference by this value.  If you searched for this in

24   the Confluence, like, the Confluence web server on DevLAN, you

25   would never see this ff808 number.

K2C3SCH3                          Leedom - Direct

1    Q.  Are there different ff808 numbers for different users on

2    Confluence?

3    A.  Yeah, each user has its own unique user identifier number.

4    Q.  Does this page also omit anything else that would have

5    appeared on DevLAN?

6    A.  I think this page specifically, especially the way it's

7    formatted, I don't think this is a page that existed at all.

8    You see how they kind of have a placeholder for assigned

9    spaces?  There's, like, no data in it, and assigned pages. This

10   is more like a list of all things that have to do with this

11   user name and less of a construction for that user

12   specifically.

13   Q.  What conclusions, if any, have you drawn from this page as

14   posted on WikiLeaks?

15   A.  I've drawn that they rebuilt this page and the other pages

16   from that Confluence database, SQL database backup file.

17   Q.  Let's go to the next slide, please.  This is titled

18   "Incorrect Page Number Association."  And it has Government

19   Exhibit 7-1.

20   A.  Yes.

21   Q.  Is this another page from WikiLeaks?

22   A.  Yes, it is.

23   Q.  Is this also from the March 7, 2017, posting?

24   A.  It is.

25   Q.  In what ways is this page different from how it would have

1   been displayed on DevLAN?

2   A.  So, on DevLAN, there's actually no page called MacOS X.

3   That page doesn't exist.  What happened, at least my opinion,

4   what I think happened was, when WikiLeaks was going through the

5   database, since they don't have user information, it can be

6   pretty difficult to pin exactly, you know, what page belonged

7   to a specific user.  There was a user who happened to work on a

8   lot of Mac related tools.  So, naturally, their user space page

9   has a bunch of pages that have to do with MacOS tools.  These

10  tools didn't ever belong to like a top-level page called MacOS

11  X.  The page they belonged to was the name of the user who made

12  these pages.

13         So, when WikiLeaks was going through and looking at

14  what was here, they just assumed incorrectly that this was a

15  page that was made for MacOS X notes, not a user's page on

16  notes.

17  Q.  Let's go to the next slide.  This is titled

18  "Missing/Deleted Pages."  The top exhibit is still Exhibit 7-1.

19  There is a red box around Ghidra; do you see that?

20  A.  Yes.

21  Q.  Why is there a red box around Ghidra?

22  A.  This page is a deleted page.  If you browse to the

23  Confluence page for this user on DevLAN, you wouldn't see this

24  Ghidra page.  You'd actually have to go as that user into the

25  page, go into the trash can, and, you know, manually restore

K2C3SCH3                            Leedom - Direct

1    that page for it to show up.

2              So, this shows that either on purpose or by accident,

3    WikiLeaks restored deleted pages that were found in the

4    database when they made the dump.  Or made the post, excuse me.

5    This page was created on, like, September 16, 2015.  I'm sorry.

6    It was created on the 15th and deleted on the 16th, shortly

7    afterwards.

8    Q.  At the bottom there, there is a Government Exhibit 1207-94

9    that you've been circling.

10   A.  Yes.

11   Q.  Where is that from?

12   A.  So, this is an actual entry from the Confluence, like --

13   excuse me, that March 3 Confluence SQL database backup file.

14   This is one of the tables.  This is specifically a table called

15   "content."  This is the SQL query I ran to generate this, by

16   the way.  And I was basically searching all pages in the

17   content table for names that were something like Ghidra 6.0.10,

18   and this is the results of that.

19   Q.  Why were you looking at the March 3, 2016 backup file?

20   A.  Because that's the backup file that I believe was posted on

21   WikiLeaks.

22   Q.  Let's go to the next slide, please.  This is titled

23   "Missing Template and Design Elements."  And it's showing

24   Government Exhibit 8-1.  What is this showing?

25   A.  So, I believe this is the last example.  Remember when I

1  circled some of those pretty looking tables and, like, colorful

2  entries inside the tables on the site from Google.  So, the

3  script that they wrote to rebuild this didn't really account

4  for all of that.  Some were accounted for, but others were not.

5          If we circle this top part here, you see we have the

6  title of this page, and then this detail is missing.  The first

7  time I saw, like, a note like that in the page, that's usually

8  kind of indicative of a script having had kind of parsed

9  through this and it was either unable to figure out what was

10  there, or what seems like here, hey, the details for this

11  object aren't there.

12          But, after taking a look at the SQL database itself,

13  it was clear that the script was just unable to parse this --

14  "parse" meaning process -- this template macro code thing.

15  Q.  Let's look at that.  Let's go to the next slide, please.

16  Now there is an overlay of Government Exhibit 1207-93.

17  A.  Yes.

18  Q.  What's that showing?

19  A.  So, this is from the body content of this page.  Like I

20  said before, it is essentially all HTML web page code.  And

21  this is what's missing from this details missing section.

22          Why is it called details?  Well the name of this

23  template is called "details," so that's why that's there.  And

24  then for whatever reason they couldn't process everything

25  inside here, which is just a small little table.  So this would

1    have been a table, kind of similar to this table below, except

2    it just has a date column, and like a participants column.  And

3    a date, time and some user names.

4            This is another good example of this is how a user

5    name is stored in the database.  So, even if this were to be

6    reconstructed, they'd have to go and figure out what this ff808

7    number belonged to, and then either replace it with a user name

8    if they were able to find one, or just leave it as is.  This

9    is, this link, when you see this link, that's when Confluence

10   sees that, it says, oh, okay, I need to go resolve this to

11   something that a human can understand.

12   Q.  Let's go to the next slide, please.  This is the Confluence

13   Altabackup files; is that correct?

14   A.  Yes, it is.

15   Q.  What impact, if any, did these exhibits have on your

16   opinion that the data provided to WikiLeaks was from backups?

17   A.  So, we know that the date accessed was from 4/20 at

18   5:42 p.m. and 5:43 p.m. for the two files specifically.  And we

19   know that that falls into the activity that we have from the

20   defendant, that was, you know, purposefully reverting to the

21   Confluence virtual machine to a time when he had access to it,

22   doing something for over an hour.  These files are accessed

23   during that time.  And then shortly after that, all the log

24   files on the ESXi server itself were deleted, the log files for

25   the Confluence server were deleted, and all the activity of

K2C3SCH3                          Leedom - Cross

1    that session are gone.

2                MR. LAROCHE:  No further questions.  Thank you.

3                THE COURT:  Ms. Shroff.

4                MS. SHROFF:  Thank you, your Honor.

5                THE COURT:  You're welcome.

6    CROSS-EXAMINATION

7    BY MS. SHROFF:

8    Q.  Could we pull up, please, Government Exhibit 1203-54.

9                So you see that line, sir, that starts

10   2016-04-20T17:19:23.  You see that line?

11   A.  Yes.

12   Q.  Okay.

13   A.  The first line here, right?

14   Q.  I don't know if it is the first line.  It is the line where

15   I'm starting.

16   A.  Okay.

17   Q.  So, that line, sir, says, if you keep following, right, it

18   says "USB:  Found device."  Correct?

19   A.  Yes.

20   Q.  And then it has a little bracket.  You with me?

21   A.  I believe so, yes.

22   Q.  Okay.  Good.  Name:  And then it says Sandisk.  Correct?

23   A.  Yes.

24   Q.  Okay.  Then there is a backslash.  Extreme vid colon, bunch

25   of numbers, super family storage.

K2C3SCH3                          Leedom - Cross

1           You with me there?

2    A.  Yes, ma'am.

3    Q.  And then there is a whole continued line of numbers, right?

4    A.  That's correct.

5    Q.  And then it says "found device."  Right?

6    A.  Correct.

7    Q.  "Found device" means that that's when the USB is found,

8    right?

9    A.  Correct.

10   Q.  Okay.  So, then, you see that line that says right above

11   it -- and I think John or Achal will get it for you -- 206-04,

12   you see that?

13   A.  Yes, ma'am.

14   Q.  It keeps going, correct?

15   A.  Hmm-hmm.

16   Q.  You see that line, it still says "USB found device."  You

17   with me?

18   A.  Yes.

19   Q.  Okay.  I don't do this very often, so just be patient,

20   okay.  Then there is a bracket.  It says "name," correct?

21   A.  Yes, ma'am.

22   Q.  Then it has this number.  T8R2, right?

23   A.  Yes.

24   Q.  You with me?

25   A.  Yes.

K2C3SCH3                          Leedom - Cross

1    Q.   Okay.  Then it continues, right?

2    A.   Correct.

3    Q.   Okay.  So, could you just do me a favor and look at the two

4    numbers.  The date, you agree with me, both say 2016?

5    A.   Yes.

6    Q.   And you agree with me both say 04.

7    A.   Yes.

8    Q.   April?

9    A.   Yes.

10   Q.   Okay.  Then it says dash, both of them say the same thing,

11   right?

12   A.   Yes.

13   Q.   And then there is a number 20T17:19 on both sides, right?

14   A.   Yes.

15   Q.   And then both sides also say colon 23, correct?

16   A.   Yes.

17   Q.   And then there is a dot.  Correct?

18   A.   Yes.

19   Q.   And then there is 441, correct?

20   A.   Yes.

21   Q.   And there is another dot.

22   A.   Yes.

23   Q.   No, no, there is a dash.  Don't say yes.  That's a dash.

24   A.   Yes, it's a dash.

25   Q.   Dash 04, right?

K2C3SCH3                        Leedom - Cross

```
 1    A.  Yes.

 2    Q.  And then colon?

 3    A.  Yes.

 4    Q.  00?

 5    A.  Correct.

 6    Q.  Same time to the nanosecond.

 7    A.  Yes.

 8    Q.  I keep getting this wrong.  It's Sandisk, right?

 9    A.  Correct.

10    Q.  I keep calling it San.  Sandisk, and the right block

11    exactly at the same time to the nanosecond.  Correct?

12    A.  Yes.

13    Q.  Okay.  Let's just see if we can go down.  You with me?

14    A.  Hmm-hmm.

15    Q.  They are going to pull this up for you.  2016-04-20T1722.

16    You with me?

17    A.  Yes, ma'am.

18    Q.  20907-4?

19    A.  Yes.

20    Q.  What time is that, by the way?

21    A.  5:22 EST.  It has the minus four at the end so you know

22    it's EST.

23    Q.  Keep going.  You see that says "USB:found device"?

24    A.  Yes.

25    Q.  You keep following that line it ends with "speed super"?
```

K2C3SCH3                    Leedom - Cross

1    A.  Yes.

2    Q.  Go down, keep continuing.  And then it says on the

3    right-hand bottom -- you with me?

4    A.  Yes.

5    Q.  What does it say there?

6    A.  "Disconnected."

7    Q.  "Disconnected:1"?

8    A.  Correct.

9    Q.  Okay.  And then gives you a bunch of keys below?

10   A.  That's correct.

11   Q.  This is my exhibit, 1203-54, in its bigger form.

12   A.  Correct.

13   Q.  You showed the jury on your slide deck the same thing, and

14   then you cut off the "disconnected" part.

15   A.  Correct.

16   Q.  What time is that USB disconnected?

17   A.  It was disconnected at 5:22, about three minutes after it

18   was connected.

19   Q.  Let's show them again then, why don't we, the timings of

20   your reversion.

21   A.  Sure.

22   Q.  And then tell me if that USB disc, Sandisk, disconnected

23   before the reversion or not.

24   A.  Oh.  Before.

25   Q.  Before the reversion, right?

K2C3SCH3                        Leedom - Cross

1    A.  Yes, ma'am.

2    Q.  So it's out?

3    A.  Correct.

4    Q.  Not inserted?

5    A.  Correct.

6    Q.  Taken out?

7    A.  Yes.

8    Q.  You didn't show it to them.

9    A.  It was not --

10   Q.  No, no, no.  Right here on the left?

11   A.  Correct.

12   Q.  You showed it to them?

13   A.  Correct.

14   Q.  No.

15   A.  Not the removal, no.

16            I'm sorry, could you repeat?

17   Q.  You cut it off, did you not, sir, on the left side?

18   A.  Yes.  But not intentionally cut off to remove the

19   disconnect.

20   Q.  It's not intentional?

21   A.  No.

22   Q.  Okay.  Well, let's talk about that.  It's slide 105.

23   Right.  Let's put the whole slide in.

24            Who made the slide?

25   A.  I made the slide.

K2C3SCH3                          Leedom - Cross

1    Q.  How many hours did you spend making the slide deck?  I'm

2    not talking just about 105.  Okay, take your time.  Think about

3    it.  All of these slide decks.

4    A.  A lot.

5    Q.  Well, you are going have to quantify a lot.  A lot means

6    nothing to me.  Quantify it.

7    A.  Maybe, let's say, 40 hours over the course of a few months.

8    Q.  40 hours?

9    A.  Maybe more.

10   Q.  Come on.  Really?

11   A.  Probably more?

12   Q.  Let's try it this way.

13   A.  I don't remember specifically.

14   Q.  It's okay, it's okay, we have all day.  Don't worry about

15   it.  Let's start with when you started work on this case.

16   Remind us, would you?

17   A.  Around March or April 2017.

18   Q.  March or April 2017, right?

19   A.  Correct.

20   Q.  And when you first started, sir, you used the word

21   "deployed."  To me that just meant you go somewhere, right?  In

22   your case?

23   A.  Correct.

24   Q.  Right.  It's not like you are going to the Army, right?

25   A.  No.

K2C3SCH3                        Leedom - Cross

1   Q.  Okay.  So, you start off and you go to work and you are

2   sent to help the CIA out, correct?

3   A.  That's correct.

4   Q.  You are a contractor for a company?

5   A.  Yes.

6   Q.  I'm sorry.  I'm a little confused about that.  Are you an

7   employee of the company and contracted to the FBI, or are you

8   an employee of the FBI and contracted to the company?

9   A.  The first one.

10  Q.  So you work for a company?

11  A.  Correct.

12  Q.  The company has a contract with the FBI, correct?

13  A.  Yes, we do.

14  Q.  And then you were sent out to work on this case, and then

15  you presented this unintentionally cut off slide 105?

16  A.  Correct.

17  Q.  Okay.  And when you first went there to help them out, you

18  were just sent there not in an expert capacity, right?

19  A.  I disagree.

20  Q.  You were sent there knowing you were going to be hired as

21  an expert to testify in this case?

22  A.  No.

23  Q.  Oh.  Okay.  So, you were just sent there to work on the

24  case, correct?

25  A.  Correct.

K2C3SCH3                        Leedom - Cross

1    Q.  And when you got there in March of 2017, did you realize

2    that the CIA had been unaware of this data given to WikiLeaks

3    for almost a year or did you learn that a year later?

4    A.  I learned it during the investigation.

5    Q.  Okay.  And when you were sent off to help these people,

6    were you sent to help the FBI or were you sent to help the CIA

7    or are they the same?

8    A.  I support the FBI.  But we were there to help the -- assist

9    the CIA just to determine what happened.

10   Q.  You support the FBI, but you were -- okay.  So, you were

11   sent -- did you actually physically go to the CIA?

12   A.  Yes.

13   Q.  And you met with the people at the CIA, correct?

14   A.  Correct.

15   Q.  And when you went there, were you sent along with the FBI

16   agents in this case?

17   A.  No, not the -- well, some of them.

18   Q.  Some of them.  How about Special Agent Donaldson over there

19   on the left-hand corner?

20   A.  Not at the beginning.

21   Q.  Not at the beginning?

22   A.  No, ma'am.

23   Q.  How about Special Agent Schlesinger; was he there?

24   A.  Not at the beginning, no.

25   Q.  And how about Special Agent Evanchec; was he there?

1  A.  Yeah, I believe Rick was the first one I'd seen.  One of

2  the agents prosecuting the case.

3  Q.  How about somebody named Mr. Berger; was he there?

4  A.  Mr. who?

5  Q.  Mr. Berger?

6  A.  Yes, he was.

7  Q.  He was there, right?

8  A.  Correct.

9  Q.  You started in March of 2017 working with all of these

10  folks from the FBI and the CIA, correct?

11  A.  Not all.

12  Q.  I mean, you know, as the judge said before, it's a phrase.

13  Folks from the FBI?

14  A.  Correct.

15  Q.  Folks from the CIA?

16  A.  Correct.

17  Q.  Okay.  Is it fair to say, sir, that from the time of March

18  of 2017, until now, you've never consulted with the defense,

19  correct?

20  A.  That's incorrect.

21  Q.  You've consulted with us or you've given us discovery?

22  Those are two different things.  "Consulted" meaning you work

23  with us.

24  A.  Oh, I'm sorry.

25  Q.  Okay.

1    A.   I meant from like a discovery perspective.

2    Q.   No, you never consulted with me, right?

3    A.   No.

4    Q.   I've never sat down, helped you make these slide decks that

5    were inadvertently cut off?

6    A.   No, ma'am.

7    Q.   So, you worked exclusively with the FBI, right, and the

8    CIA?

9    A.   Yes.

10   Q.   You met with them almost weekly for a while, correct?

11   A.   Correct.

12   Q.   You generated weekly reports for them, correct?

13   A.   I did not generate a weekly report for them specifically.

14   But we did as a team gave weekly reports.

15   Q.   Let's talk about this team.  Who's on this team?

16   A.   FBI employees and the CIA analysts.

17   Q.   Okay.  So all told they're like how many of you, eight,

18   nine, 10?  How many were on that e-mail chain; do you remember?

19   A.   E-mail chain?

20   Q.   Hmm-hmm.

21   A.   I'm sorry?

22   Q.   The e-mail chains where you talk about when to meet, how to

23   meet, what we should do next, how we should get ready for the

24   case?

25   A.   We had maybe, I think maybe at its high point 30 different

K2C3SCH3                          Leedom - Cross

1    people working in the lab.

2    Q.   Okay.  And is it fair to say, sir, that for your company,

3    you generated what is called a monthly report?

4    A.   That's correct.

5    Q.   So every month you would tell them, hey, I'm still working

6    on the CIA case, and this is what I'm doing, right?

7    A.   That's correct.

8    Q.   And there came a point, did there not in this -- it's been

9    two years, right?  More?

10   A.   Almost three.

11   Q.   Almost three.  So for three years, you've been sending

12   monthly reports telling them you are doing all of this stuff

13   for the CIA on this case?

14   A.   I'm sorry.  Could you repeat the question?

15   Q.   Sure.  Maybe I'll try and go slower.

16          You wrote monthly reports each month, yes?  And you

17   sent these monthly reports to your company, correct?

18   A.   Hmm-hmm.

19   Q.   Detailing the work you were doing for the CIA.  Correct?

20   A.   Correct.

21   Q.   Okay.  And you got paid, right?

22   A.   Yes.

23   Q.   And the CIA paid you -- not you directly, but your company,

24   correct?

25   A.   No.

1    Q.  Oh.  Then who did the CIA pay?

2    A.  The CIA didn't pay me.  I don't work for the CIA.

3    Q.  No, no, I know you don't work for the CIA.  You testified

4    you don't work for the CIA.  My question is how did your

5    company -- what is your company's name, MITRE?

6    A.  MITRE.

7    Q.  How did MITRE get paid?

8    A.  Well, we're paid from the contract.  Specifically in this

9    instance, our contract with the FBI.

10   Q.  Okay.  So MITRE is a private company, you provide services

11   to the FBI, and the FBI's working with the CIA.  Correct?

12   A.  That's correct.

13   Q.  Do you know by any chance for three years how much MITRE

14   got paid for all of this work?

15   A.  I don't know.

16   Q.  500,000?

17   A.  I don't work in contracts.  I really don't know much about

18   our budget.

19   Q.  Oh, I'm not talking about your budget.  I'm talking about

20   how much you got paid.  That's not a budget, that's what

21   money's coming in.  I'm not asking about money you spent.

22            THE COURT:  You want to know how much MITRE got paid?

23            MS. SHROFF:  Yes.

24            THE COURT:  Do you know?

25            THE WITNESS:  I don't know.

K2C3SCH3                         Leedom - Cross

```
 1            THE COURT:  He doesn't know.
 2   Q.  MITRE didn't have a contract with the FBI or the United
 3   States attorney's office that you know of?
 4   A.  We had a contract with the FBI.  I don't know the dollar
 5   value attached to it.
 6   Q.  Okay.  And it's fair to say MITRE gets a lot of business
 7   from the FBI, right?
 8   A.  That's fair.
 9   Q.  In fact, would you say that more than 60 percent of the
10   work for that company comes from the FBI?
11   A.  I don't believe that's accurate.
12   Q.  Okay.  Now, in addition to the monthly reports, you met
13   with people from the FBI and the CIA on a very regular basis,
14   correct?
15   A.  Correct.
16   Q.  And when you met with them, you had team meetings; is that
17   correct?
18   A.  That's correct.
19   Q.  And you had team meetings in person, team meetings over
20   Skype, and team meetings by phone, correct?
21   A.  That's accurate.
22   Q.  They gave you an office at the CIA, or a room to work in?
23   A.  I worked in a lab.
24   Q.  You worked in their lab, right?
25   A.  Yes.
```

K2C3SCH3                         Leedom - Cross

```
 1   Q.  And when you worked in their lab, did they give you full
 2   access to what is a full image of the FSO1 server?
 3   A.  Yes.
 4   Q.  And they gave you, did they not, access to the full image
 5   of the Atlassian server, correct?
 6   A.  That's correct.
 7   Q.  They gave you full access, did they not, to Mr. Schulte's
 8   workstation, correct?
 9   A.  Correct.
10   Q.  You reviewed all of these -- I don't know, devices let's
11   just call it.  It's not precise, but you reviewed all of these
12   devices and wrote up your reports on each one of them, correct?
13   A.  I didn't specifically write a report for each one, but I
14   did review all of the devices, yes.
15   Q.  Okay.  And you e-mailed each other about what you called
16   were your sync-up efforts, correct?
17   A.  To some extent, yes.
18   Q.  You sent a lot of e-mails saying re sync-up effort.
19           What is that; what is a sync-up effort?
20   A.  I don't recall writing an e-mail with that title.
21   Q.  Okay.  Do you know what a sync-up effort is when you would
22   write it in your e-mail?
23   A.  I don't know specifically what a sync-up effort is.  I can
24   tell you that we had sync meetings together.
25   Q.  Okay.  Tell us about these sync meetings.
```

K2C3SCH3                          Leedom – Cross

1   A.  Sure.

2   Q.  How many times did you have them in a month?

3   A.  It was more frequent toward the beginning of the case.  I

4   think they started daily, may have moved to weekly, and then

5   eventually just scheduled individually.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2cWsch4                            Leedom - Cross

1    BY MS. SHROFF:

2    Q.  Right.  And then they peaked again, correct?

3    A.  I believe so.

4    Q.  Right.  When you were preparing all these slides there, it

5    picked up and peaked again, right?

6    A.  Oh, more recently, yes.

7    Q.  Now, in preparation for your testimony, the CIA set you up

8    with the Atlassian Confluence server, correct?

9    A.  Correct.

10   Q.  And then you and FBI personnel together reviewed it,

11   correct?

12   A.  That's correct.

13   Q.  And each time you reviewed it, you had a theory of

14   prosecution in mind, correct?

15   A.  Uh, I was aware, yes.

16   Q.  What do you mean you were aware?

17   A.  Uh --

18   Q.  What does that mean?

19   A.  I'm just saying that I was aware that the case was being

20   criminally prosecuted.

21   Q.  Well, you were aware of more than that, sir, right?

22   A.  Yes.

23   Q.  I mean, they had a theory of prosecution that they shared

24   with you; you weren't kept in the dark.  You're their expert,

25   right?

1  A.  Yes, but I didn't meet the attorneys here, I think, for a

2  while in this case.

3  Q.  Oh, yeah, yeah.  There were many of them.  All of them --

4  don't worry.

5      My question is whoever it is that told you, they told you

6  what their theory of prosecution was, correct?

7  A.  I believe so.

8  Q.  Right.  They didn't say to you:  Hey, we don't know who did

9  it.  They came to you and said, We think Josh Schulte did it

10  and this is how we're going to prove it, and you're going to

11  work with us.  Correct?

12  A.  That's an unfair characterization of what happened.

13  Q.  OK.  Unfair or not, that's basically what happened, right?

14  A.  I disagree.

15  Q.  OK.  Well, tell me how you disagree.  Did they randomly,

16  open-endedly tell you go find out who did it?  No, right?

17  A.  Yes, actually.

18  Q.  Really?

19  A.  Yes.

20  Q.  OK.  So tell us who else you looked at.

21  A.  So, like I mentioned earlier, when I initially showed up,

22  it was from an incident-response perspective, so --

23  Q.  Could you answer my question?

24  A.  Yes, ma'am.

25          MR. LAROCHE:  He is answering the question.

K2cWsch4                        Leedom - Cross

1          THE COURT:  Yes.

2     Q.  Could you tell me --

3          THE COURT:  Could we have the last question read back,

4     please.

5          (Record read)

6          MS. SHROFF:  No.  Who else you looked at.

7          MR. LAROCHE:  And he's answering it.

8          THE COURT:  Tell us who else you looked at.

9          THE WITNESS:  I remember the question.  It's fine.

10         So, when I initially showed up, it was from an

11    incident-response perspective, so we were looking at the every,

12    the entire network in its entirety --

13    BY MS. SHROFF:

14    Q.  Sir, I asked you which person you looked at as a suspect

15    other than Mr. Schulte.  That's my question.

16    A.  I think suspect's a -- we looked at all of the other

17    administrators; other -- all the other user workstations on

18    DevLAN.  We looked --

19    Q.  That's not what I asked you, sir.  I'm sure you looked at

20    every workstation.

21         My question is did the government not tell you that they

22    were prosecuting one person, and that was Mr. Schulte?  Isn't

23    that what they told you?

24    A.  I think that's an unfair characterization of how the

25    process worked.

Q.  Sir, whether it's fair or unfair, could you answer my
question?

A.  Yes.

Q.  OK.  Did they tell you they were prosecuting Mr. Schulte?

A.  I learned at a point he was being prosecuted, yes.

Q.  Right.  And they identified him as the suspect, correct?

A.  Correct.

Q.  And the CIA identified him as the suspect, correct?

A.  Correct.

Q.  They did not tell you:  We don't know who the suspect is,
take a wild guess or go investigate, correct?

A.  Not in those specific terms.

Q.  In fact, in no terms did they ever tell you that, correct?

A.  I disagree.

Q.  You disagree?  Tell me one other person's name that you
investigated as a possible suspect.  Not a network, not a
workstation, an individual that they told you to look at other
than Josh Schulte.

A.  Any of the other admins, for example.

Q.  So they gave you a list of admins and they said all of
these people are possible suspects and we might prosecute any
one of them?  Is that what they told you?

A.  No, not in those specific words, but --

Q.  In fact, in no words did they ever tell you that, correct?

A.  I disagree.

K2cWsch4                           Leedom - Cross

1    Q.   OK.  So tell me one other name they told you.

2    A.   I don't know the, like, the list of all the admin names

3    offhand, but there's --

4    Q.   You're the one who is telling me my characterization is

5    unfair, correct?  So tell me, which other -- let me make it

6    easy for you.

7         Did they ever tell you an employee who took a screenshot of

8    what happened on April 20 and said, Hey, he's possible suspect;

9    take a look?

10   A.   That's a fair characterization.

11   Q.   They didn't tell you that, right?

12   A.   That's a -- I would say that's a fair, like,

13   characterization of the investigation.

14   Q.   Put aside fair or not.  Just answer my question, sir.

15   A.   Yes.

16   Q.   Other than Mr. Schulte -- I'll try it another way.

17        Are you aware that the government had a theory that this

18   information was stolen in March rather than April of 2017 -- I

19   mean '16?

20   A.   Yes.

21   Q.   You're aware of that, right?

22   A.   Yes.

23   Q.   First, they had this whole theory that the information had

24   to have been stolen in March of 2016, correct?

25   A.   I don't remember the specific details.

1  Q.  You don't remember the details?

2  A.  No.

3  Q.  Do you remember if they filled out any search warrants with

4  that date?

5  A.  I don't remember.

6  Q.  Did they tell you that they filled out search warrants with

7  that date?

8  A.  I don't remember to that specific date, no.  I don't

9  believe I've reviewed the contents of the search warrants,

10  like, in their entirety.

11  Q.  I'm not asking you if you reviewed the contents of any

12  search warrants.  I'm asking you very simple questions here,

13  sir.

14      Did the FBI ever tell you that they were sure -- they were

15  so sure that they signed an affidavit and gave it to a sitting

16  federal judge -- that this information had been stolen not

17  during a reversion on April 20 but in March of 2016?  Did they

18  tell you that?

19  A.  I don't remember.

20  Q.  You don't remember?

21  A.  No.

22  Q.  Your testimony here is that from the moment you started on

23  this case, the only date you focused on as the date the

24  information was taken is April 20; is that your testimony?

25  A.  No.  That's incorrect.

1  Q.  OK.  So you didn't know about the March 2016 date, correct?

2  A.  Correct.

3  Q.  You didn't know about the search warrants, correct?

4  A.  No.

5  Q.  You didn't know how many search warrants the FBI filed with

6  that date telling a judge that's the date it was stolen,

7  correct?

8  A.  No.

9  Q.  So as the forensic investigator, you never, ever

10  investigated that date, correct?

11  A.  I don't believe so.

12  Q.  They never told you:  Hey, eliminate this date for us.

13  You're the forensic analyst working independently.  Correct?

14  A.  I don't remember.

15  Q.  You'd remember that now, wouldn't you?  I mean, you're an

16  expert.

17  A.  Yes.

18  Q.  OK.  So is it possible that you don't remember because they

19  never told you that they had the wrong date?

20  A.  Yes.

21  Q.  OK.  How many months have you worked with Mr. Laroche here

22  who did your direct?

23  A.  Maybe the last six months or so.  Maybe --

24  Q.  Six months?

25  A.  Maybe not quite that long.  Like, directly, yeah.  It's

1   been kind of on and off.

2   Q.  For six months you've been talking to Mr. Laroche, right?

3   A.  I believe that's accurate.

4   Q.  Right.  And let's just stay focused -- we're in February

5   now.  Let's just stick with January of 2020.  All told, how

6   many hours did you spend with him?

7   A.  In January?

8   Q.  Right.

9   A.  Uh, maybe 80.  80 hours, maybe.

10  Q.  80 hours?

11  A.  Maybe less than that.

12  Q.  OK.  How about the man next to him; Mr. Denton?

13  A.  Significantly less.  I mostly interacted with Mr. Laroche.

14  Q.  And how about Mr. Kamaraju?

15  A.  Same as Mr. Denton.

16  Q.  And it's fair to say that your primary contact was with

17  Mr. Laroche and the other two stepped in and stepped out?

18  Correct?

19  A.  That's accurate.

20  Q.  And your testimony is, sitting here today, Mr. Laroche

21  never told you about any possible March 2016 date as the date

22  that table had identified as a date of theft, correct?

23  A.  No.  No.  That's incorrect.

24  Q.  That is correct, right?

25  A.  It's incorrect.  So, I do remember now the date, but just

K2cWsch4                          Leedom - Cross

1    not from the beginning of the investigation when you were

2    referring to earlier.  I've heard about it, especially

3    recently, as we were preparing for trial.

4    Q.  So you didn't hear about it through all of your

5    investigation, but then you only heard about it when you were

6    preparing for trial; that's your testimony?

7    A.  That's what I remember.

8    Q.  That's what you remember?

9    A.  Yes, ma'am.

10   Q.  Hey, did you tell them --

11   A.  Did I tell them?

12   Q.  -- should I go back and check the March 16 date?  Did you

13   tell them that?

14   A.  No.

15   Q.  OK.  Now, in terms of your investigation -- let's just

16   stick to your investigation -- right, you looked at various

17   networks?  Correct?

18   A.  Yes, ma'am.

19   Q.  You looked at various workstations, correct?

20   A.  Correct.

21   Q.  You looked at various software programs, correct?

22   A.  Correct.

23   Q.  And you looked at various databases, correct?

24   A.  Correct.

25   Q.  Could you tell me, what is a TOU-DNS database?

K2cWsch4                        Leedom - Cross

1    A.  OK.  Could you say that again a little slower, please?

2    Q.  Sure.  Do you know what a TOU-DNS database is?

3    A.  I'm not, like, familiar with the T-O-U, but a DNS database

4    would mean to me, like, domain name service, so essentially a

5    database of host names, mapping to IP addresses.

6    Q.  And if you looked at it and you sent an email back to the

7    prosecution team here that said that your search did not return

8    any useful results, what would be a useful result for you?

9    A.  It would really depend on the situation.

10   Q.  OK.  Now, you also testified, did you not, that you were

11   told about what the CIA's system was, but you were kind of

12   familiar with it because you're an expert in this field?

13   Correct?

14   A.  In networks, yes.

15   Q.  Yes.

16       And when you were given access to DevLAN, were you given a

17   mirror image to work with at the CIA?

18   A.  Could you be more specific?

19   Q.  No.

20   A.  So, by mirror image, what does that encompass?

21   Q.  Let me make it easy for you.  You tell me what you were

22   given.

23   A.  Sure.  We were given images of all of the DevLAN

24   machines -- computers, servers -- that were available at the

25   time that we showed up to analyze.

1   Q.  All of them, correct?

2   A.  Yes.

3   Q.  Now, you testified that you were also given access to the

4   Atlassian server, right?

5   A.  Uh, yes.

6   Q.  OK.  And do you recall that you worked with an FBI agent

7   named Berger to restore the Atlassian server?  Do you remember

8   that?

9   A.  Yes.  I don't remember which server specifically you're

10  referring to.

11  Q.  OK.

12  A.  But we did restore a server together.

13  Q.  And is it fair to say that the CIA gave you access all

14  throughout the three years you worked with them on this case?

15  Correct?

16  A.  Yes.

17  Q.  And working on this case itself, is it fair to say, because

18  I know you like that phrase, is a good professional opportunity

19  for you?

20  A.  Yes.

21  Q.  Right.  Furthers your career, correct?

22  A.  Yes, it does.

23  Q.  It allows you to get more work from the FBI, correct?

24  A.  Uh, I disagree with that.

25  Q.  You do?

K2cWsch4                        Leedom - Cross

1   A.  Yeah.  I don't do our contracting, so I don't choose what
2   work we get or don't get.
3   Q.  No, no.  I'm not asking you what work you choose.  I'm just
4   asking you if it was a step toward getting more work from the
5   FBI for your company?
6   A.  Uh, yes.
7   Q.  And is it fair to say, sir, that you have attended as a
8   spectator, sitting in that block over there, the entire trial
9   up until this point?  Correct?
10  A.  That's correct.
11  Q.  You've sat through all of the testimony, is that correct?
12  A.  That's correct.
13  Q.  You've heard every single piece of testimony that came into
14  this trial through the people who work or worked at the CIA,
15  correct?
16  A.  That's correct.
17  Q.  And these are the people you come to court with every day,
18  yes?
19  A.  Some of them, yes.
20  Q.  You sit with them in that block, correct?
21  A.  Correct.
22  Q.  You have lunch with them, correct?
23  A.  Correct.
24  Q.  You talk with them on the break, correct?
25  A.  Yes.

K2cWsch4                          Leedom - Cross

1   Q.   In fact, on the break, Special Agent Evanchec gave you a
2   nice pat on the back after had left, correct?
3   A.   Yes.
4   Q.   And with them, you know exactly what testimony has come in
5   about Mr. Schulte, correct?
6   A.   Correct.
7   Q.   About the Atlassian servers, correct?
8   A.   Correct.
9   Q.   About DevLAN, correct?
10  A.   Correct.
11  Q.   About April 16 snapshot, correct?
12  A.   Correct.
13  Q.   April 20 snapshot, correct?
14  A.   I don't believe there's a 20th snapshot.  Aside from the
15  defendant's snapshot, yes.
16  Q.   It's not the defendant's snapshot.  It's an April 20
17  snapshot that you think is the defendant's snapshot, correct?
18  A.   Correct.
19  Q.   You weren't there on April 20, correct?
20  A.   Correct.
21  Q.   Right.  You know all of those facts, correct?
22  A.   Yes.
23  Q.   Right.  And knowing all of those facts, you made this slide
24  that's 105, correct?
25  A.   Correct.

K2cWsch4                              Leedom - Cross

1    Q.  Right.  And the slide that is cut off to not show the jury

2    that the San Disk was disconnected at 5:22 p.m., your testimony

3    was that that slide presentation was inadvertent?

4    A.  My --

5    Q.  I just want a yes or no.

6    A.  Yes.

7    Q.  OK.  Let me move on to a different topic, if I may.

8         Sitting here today, you are in agreement with me, are you

9    not, sir, that it is the government's theory that Mr. Schulte

10   created a snapshot of Confluence on April 20 at 5:29 p.m.?

11   Correct?

12   A.  I believe that's accurate.

13   Q.  Well, you tell me.  You're the expert.

14   A.  Well, I'd want to see a time stamp to confirm that that's

15   accurate.

16   Q.  Take your time.  Go ahead.  Check the time stamp.

17   A.  I don't have the snapshot.  It was reverted 5:35, so before

18   that it's accurate.

19   Q.  Do you have your slide deck there, or should I give you

20   mine?

21   A.  No.  It's up.

22        That's correct, 5:29 p.m.

23   Q.  And according to them, and you, Mr. Schulte created that

24   April 20 snapshot and called it backup, correct?

25             MS. SHROFF:  If you could pull up slide 107.

K2cWsch4                          Leedom - Cross

1        Oh, there it is.  Sorry about that.  He's ahead of me.

2    Q.  Slide 107 shows you that, correct?

3    A.  Incorrect.

4    Q.  Oh.  OK.  It doesn't show you the name there, backup?

5    A.  Well, it's not backup.  It's BKUP.

6    Q.  My bad.  It shows you a slide that is the backup.  It's

7    called B-K-U up.  Is that how you want me to refer to it, or

8    should I call it BKUP; which one?

9    A.  BKUP's fine.

10   Q.  OK.  So on April 20, according to you, Mr. Schulte took an

11   April 20 snapshot and called it B-K-U up, correct?

12   A.  Correct.

13   Q.  And according to all of you, Mr. Schulte then reverted, did

14   he not, to an earlier state, and that earlier state is

15   BK-4-16-16?  Correct?

16   A.  That's correct.

17   Q.  I just want to get the timings down here.

18       And according to you and the government, this is around

19   5:35 p.m. on April 20?

20   A.  That's correct.

21   Q.  OK.  And then, according to all of you, at about 6:51 p.m.,

22   Mr. Schulte's workstation was used to revert back to the April

23   20 snapshot of Confluence, correct?

24   A.  That's correct.

25   Q.  And that is the snapshot called BKUP, correct?

1  A.  Correct.

2  Q.  OK.  Now, let's see if we can focus your testimony to the

3  time period on April 20 between 5:35 p.m. and 6:51 p.m.  OK?

4  A.  OK.

5  Q.  And just to make it easy on you, me and everyone else,

6  let's just call that the reversion period.  OK?

7  A.  OK.

8  Q.  And just to be sure you and I understand reversion the same

9  way, that is roughly the time when Mr. Schulte, according to

10 you, went to the April 16 snapshot and then returned back to

11 the 4/20 snapshot?

12 A.  That's correct.

13 Q.  OK?

14 A.  That is the time, yes.

15 Q.  Now, you and I agree, right, that Mr. Schulte did not

16 create the April 16 snapshot?  Right?

17 A.  That's correct.

18 Q.  The April 16 snapshot was created by a team of CIA

19 employees who came in to the CIA on that Saturday, April 16,

20 and created the snapshot, correct?

21 A.  Correct.

22 Q.  That was Jeremy Weber, is that right?

23 A.  Yes.

24 Q.  Mr. Tim, right?

25 A.  Uh-huh.

K2cWsch4                        Leedom - Cross

1    Q.   And David?

2    A.   Correct.

3    Q.   By the way, have you met Mr. Weber?

4    A.   I have, yes.

5    Q.   And have you met Mr. Tim?

6    A.   I don't believe I've met Tim.

7    Q.   And how about Mr. Dave?

8    A.   I have met Dave.

9    Q.   And to stay focused, and back to this issue, this reversion

10   is the time that the government claims that Mr. Schulte

11   accessed the Confluence backup file, correct?

12   A.   That's correct.

13   Q.   And this Confluence backup file was on the Altabackup,

14   correct?

15   A.   Correct.

16   Q.   And according to you and the government, shortly afterward,

17   during this reversion period, the theory is that he also

18   accessed the Stash backup file, correct?

19   A.   That would be correct.

20   Q.   And both of you -- or all of you claim that he did this,

21   right, also by accessing the Altabackup?  Right?

22   A.   Correct.

23   Q.   So in essence, all of you agree that this period of time is

24   basically your crime-scene time, correct; this is the time of

25   the crime?

1   A.   Correct.

2   Q.   This is when, according to all of you, he's stealing the

3   data; this is the heist period -- you go to a bank, you heist

4   it, heist period -- he's heisting it, correct?

5   A.   Correct.

6   Q.   And I'm assuming that you don't disagree with their theory.

7   Correct?

8   A.   Correct.

9   Q.   Let me see if I can pull up for you Government Exhibit

10  1207-27 and Government Exhibit 1207-30.  I apologize if I'm

11  going slower than normal, but this is not my bailiwick.  OK?

12  So just bear with me.

13  A.   No.  You're fine.

14  Q.   There are many columns here, and the government has shown

15  you these two exhibits several times, is that correct?

16  A.   That's correct.

17  Q.   And you see that column that's titled "name"?

18  A.   Yes.

19  Q.   OK.  Just tell me, what exactly do these names mean to you?

20  A.   So, this is the name of the backup file.  If -- when we

21  looked at the script, this name is generated based on that.  So

22  there's the time the file was made.  There's the name of the

23  service and then whether it's the database or the home folder.

24  Q.   OK.  So it's fair to say that you don't know who gave these

25  files these names, correct?  They're just names to you; right?

K2cWsch4                        Leedom - Cross

1    A.  No.  They were named by the backup script.

2    Q.  Right.  There's not a human being who gave them the names,

3    correct?

4    A.  Oh, correct.

5    Q.  OK.  That's what I meant.

6        Now, next to this column is a column that reads "date

7    modified," right?

8    A.  That's correct.

9    Q.  And there's a date modified on 1207-27 and there's a date

10   modified on 1207-30, correct?

11   A.  Yes.

12   Q.  And then next to that is a file type for each one of these

13   things, right?

14   A.  Correct.

15   Q.  There's a SQL file and a win -- I know you're particular,

16   so is it R-A-R or RAR?  How do you say that?

17   A.  WinRAR archive.

18   Q.  SO those are the TWO types of files on Government Exhibits

19   1207-27 and 1207-30, correct?

20   A.  That's correct.

21   Q.  And then the column after that tells you the date these

22   files were accessed, right?

23   A.  That's incorrect.

24   Q.  Oh, I skipped size.  It tells you the size of the files,

25   correct?

K2cWsch4                          Leedom - Cross

1    A.   Yes.

2    Q.   My bad.  Sorry.

3    A.   That's all right.

4    Q.   And then after that it tells you the date on which these

5    files were accessed, right?

6    A.   Correct.

7    Q.   And the last column tells you that these are the dates

8    these files were created, right?

9    A.   That's correct.

10   Q.   OK.  Now, I'm just going to see if I can simplify this to

11   understand it a little better.  Just imagine these two

12   documents are simple Word documents, like a list that I made at

13   home.  OK?

14   A.   Uh-huh.

15   Q.   I don't know, a list of food items I wanted to buy or shoes

16   I wanted to buy, or whatever it is, books, whatever.

17   A.   Uh-huh.

18   Q.   I make a list.  OK.  I put the Word document and I save it.

19   I save it to documents on my computer.  Correct?

20   A.   Correct.

21   Q.   And the date created is the date that I first made that

22   list, right?

23   A.   For the, like, date-created column?

24   Q.   Yeah.

25   A.   Uh, yes.

K2cWsch4                          Leedom - Cross

1    Q.  Right.  That's the date I first decided to make my shopping

2    list, correct?

3    A.  Correct.

4    Q.  Right.  OK.  And then the date modified is a day or date

5    that I either read my list or make a change to my list,

6    correct?

7    A.  That's correct.

8    Q.  That's the date modified, correct?

9    A.  Uh -- reading it may not update the modified time, but

10   changing the content of it will.

11   Q.  OK.  So you don't think that if I read it it will change

12   the time, but if I change it it will change the time; that's

13   your testimony?

14   A.  For the modified column?

15   Q.  Yes.

16   A.  It depends.

17   Q.  OK.  So you don't know?

18   A.  No.  It depends.

19   Q.  OK.  And then the date accessed would be the very last time

20   I read or saved that document, correct?

21   A.  That's accurate.

22   Q.  OK.  So the very last time that I go into the list and

23   check what items are on my list, that's the date accessed that

24   will save, correct?

25   A.  To some extent, yes.

K2cWsch4                              Leedom - Cross

1   Q.  What do you mean some extent?

2   A.  Well, so, the access time could be, like, the time it was

3   created if you were, like, putting the file on the server.

4   Q.  I don't have a server.  This is a simple Word document that

5   I have.  The date I access it, if I open it and I re-save it,

6   it saves with a new date as being accessed, correct?

7   A.  Correct.

8   Q.  And neither in your chart or my hypothetical is there a

9   column that says date copied, correct?

10  A.  Correct.

11  Q.  There is no column that says date copied on 1207-27,

12  correct?

13  A.  Correct.

14  Q.  And there is no date copied on 1207-30, correct?

15  A.  Correct.

16  Q.  And all that this tells you is that someone -- you've

17  identified for yourself who, but someone opened or read or

18  accessed that column, correct?

19  A.  Yes.

20  Q.  OK.  So the accessed time alone does not tell you at all if

21  anyone ever copied that file, correct?

22  A.  Uh, that's not entirely accurate.

23  Q.  Well, OK.  Tell me how it tells you that somebody copied

24  it.

25  A.  Well, the access --

1    Q.  Just listen to my question, please.  OK?

2    A.  Uh-huh.

3    Q.  My question is, looking at the two exhibits --

4    A.  Uh-huh.

5    Q.  -- putting aside the theory you all have floated for

6    yourselves --

7    A.  Uh-huh.

8    Q.  -- just looking at the column, looking at the log --

9    A.  Uh-huh.

10   Q.  -- does it tell you whether or not it was copied?

11   A.  It could.

12   Q.  Does it, sir?  If I showed this to you, ran into you on a

13   subway and I say Mr. Expert, can you tell me if any of these

14   files were copied, you couldn't tell me, right?

15   A.  That's inaccurate.

16   Q.  Looking at these logs you can tell me if it's copied?  Tell

17   me how.

18   A.  I can tell you that it could have been copied.  There's a

19   difference between can't say that it was copied at all or could

20   have been copied.  The access time can be updated from file

21   copying.

22   Q.  Really?

23   A.  Yes.

24   Q.  You think there's a difference in telling me it could have

25   been done, maybe it was done, perhaps it was done, and it was

K2cWsch4                                Leedom - Cross

1    done, right?

2    A.  Or it was not done.

3    Q.  Those are very different things, right?

4    A.  Correct.

5    Q.  Or not done, correct?

6    A.  Correct.

7    Q.  So you can't tell me it was done, correct?

8    A.  Correct.

9    Q.  You can't tell me it wasn't done, correct?

10   A.  That's correct.

11   Q.  Right.  You can't tell.  All you can tell is what that

12   document showed you.  It showed you -- let's just randomly pick

13   one -- Confluence blah, blah, blah-625 TGZ.  All you can tell

14   me is the date accessed that shows on the document, right?

15   A.  That is correct.

16   Q.  And if I could go back to the first two, 1203-54, if you

17   look at the timings here and you look at the timing of the

18   disconnected San Disk, the disconnected San Disk is at 5:22?

19   A.  Yes, that is correct.

20        MS. SHROFF:  OK.  Let's go back to the other one, to

21   the access log.

22   Q.  Do you see anything there before the disconnect on 5:22?

23   A.  Before?

24   Q.  No, right?

25   A.  No.

1   Q.  OK.  So the San Disk's already out?

2   A.  That is correct.

3   Q.  OK.  So now your theory about it being copied --

4          MS. SHROFF:  You know what?  I'll withdraw that.

5          OK.  You can take that one down.

6   Q.  Now, let me ask you something.  You testified about the

7   ways that a computer can copy a file, right?

8   A.  Uh, I believe so.

9   Q.  OK.  And as an expert, you would be able to agree with me

10  that one way to copy a file is to use what is called a copy

11  command, correct?

12  A.  That is -- that is correct.

13  Q.  Right.  And just for those of us who are not all that

14  computer savvy, a command is just telling the computer what you

15  want it to do, right?

16  A.  Yes, that's correct.

17  Q.  And the command is called an SCP command?

18  A.  That's a different type of command.

19  Q.  OK.  An SCP command is a command that's run on Linux,

20  correct?

21  A.  Yes, it is.

22  Q.  And we've already established for all of us that Linux is

23  just like Word, just some people use Linux, right?

24  A.  Yes.

25  Q.  OK.  So the SCP command is a command that allows you to

1   copy a file on Linux, right?

2   A.   It's a little more complicated than that, but yes.

3   Q.   Isn't it a command that lets you copy a file from Linux?

4   A.   Yes.

5   Q.   OK.  And you looked when you were doing your forensic

6   analysis -- for the last three years, right?  You looked to see

7   if there was any copy command, right?

8   A.   On the server, yes.

9   Q.   Everywhere.

10  A.   Yes.

11  Q.   You looked, right?

12  A.   Yes.

13  Q.   OK.  I mean, you really looked, right?

14  A.   Yes.

15  Q.   OK.  Did you find a copy command?

16  A.   Uh, I'm sure there were copy commands used all over the

17  network.

18  Q.   Come on.  Sir, I'm asking you if you found any copy command

19  that would allow you to sit here and testify that you have any

20  forensic indication of a file actually being sent a command to

21  copy.  You know that's my question, and if it wasn't clear,

22  it's clear now.  Did you find such a command?

23  A.   No, not in respect to the Altabackup, which I think you're

24  referring --

25  Q.   We're only talking about the Altabackups, right?

K2cWsch4                          Leedom - Cross

1    A.  Well --

2    Q.  Did you find --

3    A.  I'm sorry.

4    Q.  Did you find any --

5            (Counsel conferred)

6    Q.  Mr. Zas is kind enough to ask me to remind you that we're

7    still talking of that time period where I told you that we were

8    talking about that reversion period.  Right?

9    A.  Yes.

10   Q.  OK.

11   A.  The answer to your question's no.

12   Q.  You found no copy command, right?

13   A.  I believe so, yes.  That's correct.

14   Q.  No, no.  "I believe so" is a hard answer for me.

15   A.  I'm sorry.

16   Q.  Yes or no.  You found none, right?

17   A.  Yes.

18   Q.  Yes, you found none?

19   A.  Correct.

20   Q.  They asked you to look to see if there was a copy command

21   during the reversion period, correct?

22   A.  Correct.

23   Q.  You wanted to find a copy command during the reversion

24   period, correct?

25   A.  Yes.

K2cWsch4                         Leedom - Cross

1    Q.  And you did not find one, correct?

2    A.  That's correct.

3    Q.  How long, according to you, was the reversion period?

4    A.  Uh, it was over an hour.  Maybe like an hour and 20

5    minutes, I think.

6    Q.  And for that hour and 20 minutes, the time before and the

7    time after, there's no forensic indication of any copy command,

8    correct?

9    A.  Do you mean during?

10   Q.  Just the reversion period.

11   A.  OK.  No.

12            MS. SHROFF:  Your Honor, would this be a good time for

13   our lunch break?

14            THE COURT:  Yes.

15            MS. SHROFF:  Thank you.

16            THE COURT:  We'll take our luncheon break now and

17   resume at 1:30.

18            (Continued on next page)

19

20

21

22

23

24

25

K2cWsch4

1                (Jury not present)

2                THE COURT:  You're on cross-examination now, so don't

3    be talking to anybody on the government's trial team.

4                THE WITNESS:  Yes, sir.

5                THE COURT:  See you at 1:30.

6                (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                             1:30 p.m.

 3            (In open court; jury not present)

 4            MR. ZAS:  Your Honor, just one quick matter.  You

 5   remember yesterday we talked about a possible instruction on

 6   experts?

 7            THE COURT:  Yes.

 8            MR. ZAS:  At this point in the case rather than at the

 9   end?

10            THE COURT:  Yes.

11            MR. ZAS:  I conferred with the government.  I think

12   we're in agreement that a good time might be at the completion

13   of this witness's entire testimony.

14            THE COURT:  I'm reconsidering whether I've got to

15   issue an instruction at all, and save it for when I give the

16   instructions at the end of the case.

17            Bring in the jury.

18            MR. ZAS:  We prefer it now just because --

19            THE COURT:  Bring in the jury.

20            (Continued on next page)

21

22

23

24

25
```

K2C3SCH5                          Leedom - Cross

1           (Jury present)

2           THE COURT:  All right, Ms. Shroff.

3           MS. SHROFF:  Thank you, your Honor.

4  BY MS. SHROFF:

5  Q.  Now, sir, before we broke for lunch, you testified, did you

6  not, that you found no evidence of a copy command on

7  Mr. Schulte's desk top for the reversion period.  Correct?

8  A.  That's correct.

9  Q.  Is it also true, and forensically accurate, that during the

10  reversion period you found no forensic evidence of any storage

11  device connected or being connected to Mr. Schulte's

12  workstation, correct?

13  A.  That's correct.

14  Q.  And when we're talking about a storage device, we mean

15  something that would allow a person to exfiltrate data from one

16  place to another; is that correct?

17  A.  Correct.

18  Q.  To exfiltrate data, just so we're all clear, is to take

19  data or information out of a network or a computer, correct?

20  A.  That's correct.

21  Q.  So to exfiltrate data, you would actually need removable

22  media, correct?

23  A.  Not necessarily.

24  Q.  If it was an air gapped network, you would need removable

25  media, right?

1    A.  Yes.

2    Q.  Okay.  Just want to be crystal clear.  Between the time

3    period of 5:35 p.m. and 6:51 p.m., sir, you did not see any

4    evidence whatsoever of any removable media connected to

5    Mr. Schulte's workstation, correct?

6    A.  Correct; yes.

7    Q.  Let me ask you a quick question.  When you were looking at

8    the April 20 dates and the logs, correct?

9    A.  Correct.

10   Q.  You looked and you focused on times and dates created and

11   times and dates accessed, correct?

12   A.  I believe so.

13   Q.  Right.  And then you looked at all the timings on a file,

14   correct?

15   A.  Yes.

16   Q.  And by the way, do you know what a touch command is?

17   A.  Yes, I do.

18   Q.  What's a touch command?

19   A.  The touch command is a command in Linux that you can use to

20   create new files.  You can also use it to edit time stamps for

21   files as well.

22   Q.  When you say "edit time stamps," you mean change time

23   stamps, correct?

24   A.  Yeah, I believe you can change them, modify and access

25   times, but not the see time.

K2C3SCH5                        Leedom - Cross

1  Q.  But when you say modify, change -- what was the other word

2  you used?

3  A.  I think that was it.

4  Q.  Okay.  So that means you can use a touch command, change

5  the time that a file shows at the time it was accessed, right?

6  A.  It can be used for that, yes.

7  Q.  Right.  By the way, you would agree with me, would you not,

8  that the CIA has, at least in the EDG group, at least 200

9  developer, correct?

10  A.  That's accurate.

11  Q.  Right?

12  A.  Yes.

13  Q.  Talented people, correct?

14  A.  Yes.

15  Q.  Smart people, correct?

16  A.  Yes.

17  Q.  All 200 know what a touch command is, right?

18  A.  I don't know about that.

19  Q.  Really?  You have doubts that somebody at the CIA knows

20  what a touch command is?  Okay.

21      Now, sir, you did not know Mr. Schulte on April 20,

22  correct?

23  A.  No, I did not.

24  Q.  And you were not at the CIA on April 20, correct?

25  A.  No.

K2C3SCH5                          Leedom - Cross

1    Q.  2016, 2017, at all, correct?

2    A.  No.

3    Q.  Never saw him walk out with a removable device, correct?

4    A.  No, I did not.

5    Q.  Never saw him with a thumb drive walking out of the CIA,

6    correct?

7    A.  No.

8    Q.  You have no idea what the physical security was at the CIA

9    on April 20, 2016, until November 10, 2016, correct?

10   A.  That's incorrect.

11   Q.  2016?  You were there in April of 2016?

12   A.  I was not, no.

13   Q.  So you have no personal knowledge of what it was like,

14   correct?

15   A.  From firsthand experience, no.

16   Q.  Right.  That's personal knowledge.

17   A.  Oh.

18   Q.  Do you have personal knowledge, sir?

19   A.  No.

20   Q.  All you know is what somebody told you, correct?

21   A.  That's correct.

22   Q.  Everything somebody told you either came from the FBI,

23   correct?

24   A.  Correct.

25   Q.  Or the CIA, correct?

K2C3SCH5                        Leedom - Cross

1   A.  That's correct.

2   Q.  Okay.  Now, you've talked a lot about all the work you did

3   at the CIA, correct?

4   A.  Correct.

5   Q.  And there are many removable media that people at the CIA

6   use, correct?

7   A.  Yes, that's correct.

8   Q.  They use thumb drives?

9   A.  Correct.

10  Q.  Over and over again, right?

11  A.  Yes.

12  Q.  Right.  You use the thumb drive to create malware, correct?

13  A.  In some cases, yes.

14  Q.  Right.  You test it out, correct?

15  A.  Correct.

16  Q.  And then if there is a problem, you start over, correct?

17  A.  Yes.

18  Q.  Okay.  Every time you create malware, you don't throw out

19  the thumb drive, right, if it doesn't work?

20  A.  I don't know.  I would assume not.

21  Q.  You assume not?

22  A.  Well, I didn't develop the tools myself.

23  Q.  Oh, God no, but you spent hours and hours talking to these

24  people about developing tools, correct?

25  A.  Yes.

1  Q.  Is it fair to say, sir, that one of the ways to erase a

2  thumb drive is what we call or you called zeroing a thumb

3  drive, correct?

4  A.  I didn't use that term specifically, but yes.

5  Q.  Zeroing a thumb drive means you delete every single file

6  from the thumb drive, right?

7  A.  It's more in depth than that, but yes.

8  Q.  It's not really more in depth than that.  It just means

9  there is zero file strokes on a disc.  That's it, right?

10 A.  Yes.

11 Q.  I think all the tech people -- never mind.  I'll withdraw

12 that.

13        It is a fancy way of saying that you want to make sure

14 that when you use that thumb drive again, there's nothing on

15 it, right?

16 A.  Correct.

17 Q.  Okay.  And let me ask you this.  How many times in a day

18 would a developer zero a thumb drive?

19 A.  I have no idea.

20 Q.  Okay.  That's because you're not a developer?

21 A.  Not on that network, no.

22 Q.  But -- on any network.

23 A.  I do software development.

24 Q.  Right, and you would zero a thumb drive before you reuse

25 it, right?  It's just common practice, correct?

1   A.  It depends.

2   Q.  Okay.  You would reuse a thumb drive in starting a brand

3   new project without zeroing it?

4   A.  Yes.

5   Q.  Why?

6   A.  Like I said, I don't develop USB tools.

7   Q.  Okay.  If you were developing a USB tool, you'd zero it?

8   A.  It really depends.

9   Q.  Say it again?

10  A.  It depends.

11  Q.  Okay.  When you examined -- did you by any chance actually

12  physically examine any thumb drives that Mr. Schulte used?

13  A.  I had images of those thumb drives.  I've seen pictures for

14  them, but I had forensic images of them.

15  Q.  You had a full forensic image, correct?

16  A.  That's correct.

17  Q.  How many thumb drives did you have a full forensic image

18  of?

19  A.  A lot.

20  Q.  A lot.  How many is a lot?

21  A.  Over the network, there were -- dozens.

22  Q.  Right, and you had physical -- I mean, you had access to

23  every one of those mirror images, correct?

24  A.  Yes.

25  Q.  In fact, you had access to the mirror images of almost

1   every network and every computer that you needed from the CIA,

2   correct?

3   A.   Yes.

4   Q.   And that very much informed your expert opinion here,

5   correct?

6   A.   Correct.

7   Q.   By the time you examined the -- let me call them the

8   Schulte thumb drives, okay?

9   A.   Hmm-hmm.

10  Q.   How many months had he been gone from the CIA?

11  A.   Who?

12  Q.   He had left the CIA by the time you examined them, correct?

13  A.   Oh, the defendant?

14  Q.   Yes.

15  A.   Yes.

16  Q.   I'm only talking about Mr. Schulte here.

17  A.   Hmm-hmm.

18  Q.   Okay.  And by the way, where did you find the thumb drives

19  in his desk drawer?

20  A.   I don't remember where they were found.  I didn't

21  physically see them myself.

22  Q.   You didn't see them yourself?

23  A.   No.

24  Q.   For all you know, he just left them in his desk and left,

25  right?

K2C3SCH5                    Leedom - Cross

1    A.  Yes.

2    Q.  You just don't know?

3    A.  Yeah, I don't know.

4    Q.  Let's see if we can move on to Government Exhibit 1203-18.

5    Let me know when you're ready.

6    A.  I'm ready.

7    Q.  Okay.  So you see that thing that says root@OSB colon

8    squiggly thingy closed brackets DF-H?

9    A.  Yes.

10   Q.  Okay.  And when you were testifying, you testified about

11   that highlighted portion, correct, on direct?

12   A.  I don't believe we covered the DF command.  But, oh, I'm

13   sorry.

14   Q.  You didn't cover it?

15   A.  The black highlighted portion.

16   Q.  You covered the portion that I'm not covering.

17   A.  That's correct.

18   Q.  I'm covering the portion you didn't cover.

19   A.  Sure.

20   Q.  Okay.  And this, this command, right, would you agree with

21   me that it is a simple command used to see how much disc space

22   is free?

23   A.  That's correct.

24   Q.  Okay.  And this is a very typical run-of-the-mill command,

25   correct?

K2C3SCH5                          Leedom - Cross

1    A.  Correct.

2    Q.  It is just a normal, regular run-of-the-mill command that

3    any system administrator would take, right?

4    A.  That's correct.

5    Q.  And this is just to see if there is free disc space, right?

6    A.  Correct.

7    Q.  And it has absolutely zero to do with copying of any data,

8    correct?

9    A.  That's correct.

10   Q.  Okay.  You can take that down.  Let's see if we can take a

11   look, if we may, to Government Exhibit 1063.  I must have the

12   wrong number.  Slide 70.  This is it?  Sorry.

13           You read that before, right?

14   A.  Yes, I did.

15   Q.  And you would agree, would you not, that a simple way to

16   test out if your keys are or are not working is to just try to

17   login somewhere, correct?

18   A.  Yes, that's correct.

19   Q.  Okay.  One of the ways to make sure that your keys are or

20   were revoked is to see if your keys are working again, correct?

21   A.  Yes, that's correct.

22   Q.  Okay.  Would it be proper to try to use your keys as an

23   adequate test for seeing whether or not your keys have been

24   removed?

25   A.  Yes, it would.

K2C3SCH5                         Leedom - Cross

1    Q.  Right.  And that is in fact -- you can take that one down.

2           That is in fact what your friend Mr. Weber did on

3    April 16, correct?

4    A.  Yes.

5    Q.  Okay.  Is it fair to say that computers or workstations

6    keep records of whatever removable device is inserted or

7    removed into them?

8    A.  Yes, that's true.

9    Q.  And you, not you, only you, but a computer would keep track

10   of when a foreign disc is inserted in, correct?

11   A.  Correct.

12   Q.  And when it's pulled out, correct?

13   A.  Correct.

14   Q.  Now, I am just going to go back for a minute -- I'm sorry

15   to jump around -- to that Sandisk that you testified to.

16   A.  Sure.

17   Q.  Okay.  Sitting here today, could you tell me, tell the

18   jury, do you know the size of that Sandisk?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  I believe it's 64 gigabytes.

22   Q.  You believe?

23   A.  Yes.

24   Q.  Okay.  Was there a 64 gigabyte in 2016?

25   A.  Yes.

K2C3SCH5                          Leedom - Cross

1    Q.  How much data do you think you could load on to that, if in

2    fact it was not disconnected, which it was, and didn't have a

3    write block?

4    A.  A little bit less than 64 gigabytes.

5    Q.  And 64 gigabytes is, what, a quarter of what the government

6    is alleging was stolen, correct?

7    A.  That's correct.

8    Q.  It's not even a quarter, it's less than a quarter, right?

9    A.  That's accurate.

10   Q.  Okay.  No way it would have fit on that little thumb drive,

11   right?

12   A.  No.

13   Q.  By the way, do you have any knowledge of how a tool gets

14   compromised?

15   A.  By a tool, do you mean like a tool from EDG?

16   Q.  Yeah.

17   A.  Like, academically, but not like first hand.

18   Q.  You don't know, right?

19   A.  No.

20   Q.  You don't know how many tools in the WikiLeaks disclosure

21   were or were not compromised, correct?

22   A.  That's correct.

23   Q.  Right.  And in fact, you don't know if anyone else knew

24   which of the CIA's tools were compromised, correct?  You

25   certainly don't know, right?

1   A.  That's accurate, yes.

2   Q.  Now, you testified and I think Mr. Laroche covered this

3   with you, this concept of unallocated space, right?

4   A.  Yes.

5   Q.  Unallocated space is just basically space that someone's

6   not using, correct?

7   A.  That's a fair statement, yes.

8   Q.  Right?  That's all it is?

9   A.  Hmm-hmm.

10  Q.  Right.  So on any given network, there is unallocated

11  space, right?

12  A.  Yes.

13  Q.  Any given workstation, there is unallocated space, correct?

14  A.  Correct.

15  Q.  In fact, if one of us went home tomorrow and decided to

16  find out if we had unallocated space on our computers, we would

17  be able to find that too, correct?

18  A.  Correct.

19  Q.  It is a person's job, if they are maintaining a system, to

20  make sure that there is ample unallocated space, correct?

21  A.  If you wanted free space to store your files, yes.

22  Q.  Well, don't you need free space to develop work?

23  A.  Yes.

24  Q.  You need free space to do work, correct?

25  A.  Correct.

1   Q.   And we're all in the business of doing work, right?

2   A.   Yes.

3   Q.   You need unallocated space, right?

4   A.   Yes.

5        MS. SHROFF:   I have nothing further, your Honor.

6   Thank you.

7        THE COURT:   Mr. Laroche.

8        MR. LAROCHE:   Thank you, your Honor.

9   REDIRECT EXAMINATION

10  BY MR. LAROCHE:

11  Q.   Mr. Leedom, you were asked a number of questions by

12  Ms. Shroff related to how this investigation was conducted.

13  A.   Yeah, that's correct.

14  Q.   Let me just ask you, was it a foregone conclusion that

15  Mr. Schulte was going to be charged in this case?

16  A.   No.  No, it wasn't.

17  Q.   Why don't we talk through what happened at the beginning of

18  this investigation.

19  A.   Sure.

20  Q.   Now, you said that you were deployed to CCI; is that

21  correct?

22  A.   That's correct.

23  Q.   Can you tell us, when you first got there, what were some

24  of the things you did at CCI?

25  A.   So, we first arrived on site and we were just kind of

1   trying to figure out how to -- we had a lot of people, so we

2   had to find a way to get them to work together and start

3   looking at the data.  The FBI has a group that actually does

4   the physical, like, imaging of computers.  So they came and had

5   started that process before I got there.  So, essentially,

6   like, taking the physical hard drives and turning it into an

7   image that analysts can look at.  So, they were still finishing

8   up that process, and we were trying to figure out a way to

9   tackle the large volume of data.

10          And myself, specifically, I was looking at it from an

11   incident response perspective.  So, I didn't know at the time,

12   like, who may or may not have done it or even honestly what had

13   happened.  So, my main concern was to look at the machines we

14   were given, and just see if there were any kinds of like

15   evidence of intrusion activity, or any kinds of like root kits

16   on the system, things like that.  That was kind of how the

17   first few weeks went for me.

18   Q.  What type of intrusion activity were you looking for?

19   A.  Specifically knowing it is the CIA, and like, obviously,

20   like, a nation state type activity.

21   Q.  Is Mr. Schulte a nation state?

22   A.  No, he's not.

23   Q.  Why were you looking for nation state activity?

24   A.  Because we, like I said, we didn't really know, at least I

25   wasn't like told initially, who or what they thought had

1    happened.  So I was just looking at it kind from an outsider's

2    perspective what could have happened to the network.

3    Q.  I think a few times you started to say reviewing the

4    administrators and you were cut off?

5    A.  That's correct.

6    Q.  Can you say what you were trying to say about the review of

7    the administrators' computers?

8    A.  Shortly after going into the investigation, when we started

9    to realize, like, what had been taken, and that it related to

10   some of what could have been the backup files or the stuff on

11   the ESXi server, we knew that those were kind of, like, since

12   they were servers, they were run by the administrators.  So

13   the, you know, first people on the list of people to see who

14   had access to it, of course, were these administrators.

15           So we tracked these people down.  Several of them have

16   testified already.  And those were the first machines that got

17   pulled to get looked at to start looking to see what happened.

18   Q.  Why were you looking at the administrators' computers?

19   A.  A normal user on the network wouldn't have the access

20   required to, you know, get in some of these different services.

21   Q.  Let's talk about the regular users.  Did the FBI look at

22   the regular users' computers as part of this investigation?

23   A.  Yes.

24   Q.  Was that beyond Mr. Schulte?

25   A.  Oh, yes.

1   Q.   How far beyond Mr. Schulte?

2   A.   A lot.  There were, there were a lot of machines, it was --

3   it was a very technically challenging problem to analyze and

4   review all of those machines thoroughly.

5   Q.   Why?

6   A.   When you have -- I don't remember the exact numbers, but it

7   was certainly -- like, we had over thousands and thousands of

8   terabytes worth of data from this network.  I mean, imagine,

9   you know, you have hundreds of workstations, some users had

10  more than one workstation, and you have to look at all to try

11  and figure out, you know, what's useful, what's not.

12  Q.   On those other machines, let's just focus on the

13  administrators.  How many of the other administrators deleted

14  log files as part of their work at CCI?

15  A.   None.

16  Q.   You were asked a number of questions about this USB device.

17  A.   Yes.

18  Q.   If I recall your presentation, that was activities that

19  happened before 5:30 p.m., is that correct?

20  A.   That's correct.

21  Q.   Which slide of your presentation says that the data was

22  stolen on that USB device?

23  A.   There's no slide that says that.

24  Q.   Why not?

25  A.   Because I don't believe that's what happened.

1    Q.  Why is that?

2    A.  I did a lot of USB forensics on the machine, and also

3    reviewed the logs that we showed, and you know, and as

4    Ms. Shroff pointed out, the drive itself is only 64 gigabytes.

5    It would not have held all the data.

6    Q.  I think Ms. Shroff started to ask you a question that she

7    withdrew, and I think I knew the question she was going to ask,

8    and I am going to ask it to you.

9               MS. SHROFF:  Objection.  How would he know?

10              THE COURT:  He is a good guesser.

11              MS. SHROFF:  I think you should sustain that

12   objection.

13              MR. LAROCHE:  I'll ask the question.

14   Q.  Does the fact that that USB device was removed before the

15   reversion change your opinion that the defendant copied those

16   backup files on April 20, 2016?

17   A.  No, it does not.

18   Q.  Why not?

19   A.  Because of all of the other surrounding evidence.  We have

20   the logged deletions, we have the access on the server, and

21   things like that.  That's much more telling.  There's many

22   other ways you can steal files from the network.

23   Q.  Now, you were asked a question about whether you consulted

24   with the defense; do you remember that?

25   A.  Yes.

K2C3SCH5                           Leedom - Redirect

1    Q.  You initially said yes?

2    A.  Yes.

3    Q.  Did there come a time when you agreed to meet with the

4    defendant's expert?

5    A.  Yes.

6    Q.  Do you see that individual in the courtroom today?

7    A.  Yes, I do.

8    Q.  Has he been here throughout the case?

9    A.  Yes, he has.

10   Q.  Who is that?

11   A.  Mr. Bellovin.

12   Q.  Why did you agree to meet with the defendant's expert in

13   this case?

14   A.  The discovery process was obviously difficult in the case.

15   So, I went to speak with him just to kind of come to common

16   ground and figure out what we had that defense had wanted, and

17   what we could provide and what was available.

18   Q.  Fair to say to try to assist him in this case; is that

19   right?

20           MS. SHROFF:  Objection.

21           THE COURT:  Overruled.

22   Q.  Fair to say you were trying to assist him in this case;

23   isn't that correct?

24   A.  That's correct.

25   Q.  You were asked a number of questions about a copy command.

K2C3SCH5                       Leedom - Redirect

1    Isn't that right?

2    A.  Yes.

3    Q.  And whether you found a copy command on the system during

4    the reversion; is that correct?

5    A.  That's correct.

6    Q.  You were also asked a number of questions about logs

7    relating to storage devices.  Correct?

8    A.  Yes.

9    Q.  And whether you found logs related to storage devices

10   during the reversion?

11   A.  Correct.

12   Q.  Can you just summarize for us the different types of logs

13   that the defendant deleted on April 20, 2016?

14   A.  Yes.  So, the defendant deleted from the server itself

15   pretty much all the core system logs for the server.  So it

16   would have shown all the things Mr. Laroche mentioned, and, of

17   course all, you know, basic system activities at the time.

18   It's hard to say what is there because it's all gone.  But,

19   that's the type of basic activity.

20           And then from the virtual machine itself, the same

21   types of logs, specifically, connections to the virtual

22   machine, things like that.

23   Q.  Would those types of logs have assisted you in identifying

24   a copy command.

25   A.  Yes, they would have.

1    Q.  Would those types of logs have assisted you in identifying

2    a storage device?

3    A.  Correct, they would have, yes.

4    Q.  The other thing that the defendant did on the 20th was,

5    after the reversion was over, he reverted back to the bkup

6    snapshot; is that correct?

7    A.  That's correct.

8    Q.  Did that have any effect on your ability to review his

9    activities during that time?

10   A.  It had a significant effect.

11   Q.  What effect did it have?

12   A.  All the activity during the one-hour reversion period was

13   erased.

14   Q.  You were also asked about an administrative command, DF-H

15   command.  Do you recall that?

16   A.  I do.

17   Q.  You were asked whether that was a regular command to be run

18   by a system administrator?

19   A.  Yes.

20   Q.  What about all the log deletions on April 20, 2016.  Is

21   that a regular command to run by an administrator?

22   A.  No.  In fact, it's highly irregular.

23   Q.  Why?

24   A.  The only time as an administrator that you would delete

25   logs is if they're too big to fit on the machine you're storing

K2C3SCH5                        Leedom - Recross

1    them on.  And from the, I mean, the DF command we saw, even

2    there, just there was plenty of space on the ESXi server, and

3    those logs aren't very big.  We saw even in comparison to the

4    file size of the files in the Confluence virtual machine

5    folder.  That log folder is very tiny.  So clearly, they

6    weren't deleted because of a size issue.  The only other reason

7    you would delete log files is to hide activity.

8              MR. LAROCHE:  No further questions.

9              MS. SHROFF:  Your Honor, may I just ask one question?

10             THE COURT:  Just this once.

11   RECROSS EXAMINATION

12   BY MS. SHROFF:

13   Q.  Am I correct, Mr. Leedom, that there was not a single log

14   file deleted from Mr. Schulte's workstation?

15   A.  From his actual -- the host, the Windows workstation?

16   Q.  Right.  The workstation that he used, not a single file was

17   deleted, correct?

18   A.  I believe that's accurate.

19             MS. SHROFF:  Thank you.

20             THE COURT:  You are excused, Mr. Leedom.

21             (Witness excused)

22             THE COURT:  Call your next witness.

23             MR. KAMARAJU:  The government calls Michael, your

24   Honor.

25             THE COURT:  Okay.

1          MS. SHROFF:  Thank you for the question, your Honor.

2          THE COURT:  You're welcome.

3          THE DEPUTY CLERK:  State your name for the record.

4          THE WITNESS:  Michael.

5          (Witness sworn)

6          THE COURT:  Please sit down.  Okay, Mr. Kamaraju.

7          MR. KAMARAJU:  Thank you, your Honor.

8     MICHAEL,

9          called as a witness by the Government,

10          having been duly sworn, testified as follows:

11     DIRECT EXAMINATION

12     BY MR. KAMARAJU:

13     Q.  Good afternoon.

14     A.  Hello.

15     Q.  Sir, are you currently employed?

16     A.  Yes.

17     Q.  Where do you work?

18     A.  The Central Intelligence Agency.

19     Q.  What's the current status of your employment with the CIA?

20     A.  I'm on paid administrative leave.

21     Q.  Do you know why you're on paid administrative leave?

22     A.  No.

23     Q.  In 2016, were you also employed by the CIA?

24     A.  Yes.

25     Q.  Were you on administrative leave at that time?

1   A.  I'm sorry, what was the question?

2   Q.  Were you on administrative leave at that time?

3   A.  No.

4   Q.  At that time, in 2016, were you employed in any particular

5   part of the CIA?

6   A.  Yes.

7   Q.  What part were you working in?

8   A.  I was working inside of IOC's Engineering Development

9   Group.

10  Q.  Looking around the courtroom, do you see anyone who worked

11  with you at EDG in 2016?

12  A.  Yes.  It is difficult, but yes.

13  Q.  Can you describe where he's sitting?

14  A.  He's in the back table, over there behind the computer

15  monitor.

16  Q.  Can you see an article of clothing he's wearing?

17  A.  Black jacket.

18          MR. KAMARAJU:  Your Honor, the government would ask

19  that the record reflect that the witness has identified the

20  defendant.

21          THE COURT:  Yes.

22          MR. KAMARAJU:  Thank you.

23  Q.  Sir, you mentioned you were in EDG at the time, right?

24  A.  Yes.

25  Q.  When did you first meet the defendant?

1    A.  In 2013.

2    Q.  How did you come to meet him?

3    A.  We worked together.

4    Q.  Within EDG, were you in a particular branch at that time?

5    A.  Yes.

6    Q.  What branch was that?

7    A.  The Operations Support Branch.

8    Q.  How would you describe your relationship with the

9    defendant?

10   A.  We were friends.  We were similar in age.  Probably the

11   only ones at that time that were similar to that age.

12   Q.  Did you guys socialize?

13   A.  Yeah, we would go to the gym after work, we would play

14   video games together.  We would hang out outside of work.

15   Q.  Did you ever go to his house?

16   A.  Yes.

17   Q.  I think you testified you hung out outside of work; is that

18   right?

19   A.  Yes.

20   Q.  Did you ever have arguments with him while at work?

21   A.  Yes.

22   Q.  Did those arguments ever result in any confrontations?

23   A.  Yes.

24   Q.  Did they ever turn physical?

25   A.  Yes.

K2C3SCH5                       Michael - Direct

1   Q.  Could you just describe generally what happened.

2   A.  Sure.  On that day, Josh hit me with a rubber band, I hit

3   him back with a rubber band.  This went back and forth until

4   late at night.  I hit him with a rubber band and then ran away

5   before he could hit me back.  He trashed my desk.  I trashed

6   his desk.  And then I was backed up against Jeremy's desk and

7   Josh was looking at me, kind of coming towards me.  And

8   something came over me and I just hit him.

9   Q.  That kind of atmosphere, playing pranks on each other, was

10  that common in OSB at the time?

11  A.  Yes.

12  Q.  Did there come a time when the defendant stopped working

13  with you in OSB?

14  A.  Yes.

15  Q.  Was he still working within EDG?

16  A.  Yes.

17  Q.  Where in EDG was he working?

18  A.  RDB.

19  Q.  Did you still see the defendant after he moved to RDB?

20  A.  Less so, but yes.

21  Q.  What was the defendant's reaction to his move to RDB?

22  A.  He was unhappy about it.

23  Q.  Do you know why he was unhappy?

24  A.  Because he felt like it was a punishment for reporting the

25  issue with Amol.

K2C3SCH5                        Michael - Direct

1   Q.  How do you know he felt unhappy about it?

2   A.  He told me.

3   Q.  Do you know a person named Jeremy Weber?

4   A.  Yes.

5   Q.  How did the defendant feel about Jeremy Weber after he

6   moved to RDB?

7   A.  He was unhappy with him.

8   Q.  Generally speaking, what was the reason for that

9   unhappiness?

10  A.  He -- there was an argument over a project.  Josh wanted to

11  bring this project with him to the new branch, and Jeremy did

12  not want him to bring that project.

13  Q.  How did you know that the defendant was angry at Mr. Weber?

14          MS. SHROFF:  Objection.

15  A.  He told me.

16          THE COURT:  Overruled.

17  A.  He told me.

18  Q.  Did you ever speak with Mr. Weber about the defendant's

19  anger?

20  A.  Yes.

21  Q.  What did you talk about?

22  A.  We didn't talk about his anger per se.  But, I told Jeremy

23  that he should remove all of Josh's admin accesses.

24  Q.  Why did you ask Mr. Weber to do that?

25  A.  I felt like Jeremy was kind of, like, setting him up.  I

1    knew that Josh was mad at Jeremy, and that he was putting him

2    in a position where Josh had the ability or the access to

3    change permissions on the project in question.  And that he

4    would do that because he didn't respect Jeremy's authority.

5    Q.  What do you mean when you say he didn't respect Jeremy's

6    authority?

7    A.  Jeremy was kind of looked at like a senior developer,

8    although he didn't have, like, an official title, he was just a

9    developer like any of us.  But he was -- he had been there

10   longer than us, and he led some of our development teams.

11   Q.  Did that bother the defendant?

12   A.  Yeah, he didn't think it was fair that this person without

13   an official title was getting to make calls about, you know,

14   who should take a project and those types of things.

15   Q.  I'd like to direct your attention to April 20, 2016.  Were

16   you working in OSB at that time?

17   A.  Yes.

18   Q.  And by that time, had the defendant been moved to RDB?

19   A.  Yes.

20   Q.  Generally speaking, how did you communicate with the

21   defendant at work?

22   A.  After the move?

23   Q.  Sure.  After the move.

24   A.  Via instant messaging systems.

25   Q.  Have you heard of something called Same Time?

1    A.  Yes.

2    Q.  What's Same Time?

3    A.  Same Time is the instant messaging system we use on our

4    high side system.

5    Q.  When you say high side, just for all of us, does that mean

6    the classified system?

7    A.  Yes.

8    Q.  Did you ever Same Time with the defendant?

9    A.  Yes.

10        MR. KAMARAJU:  Ms. Hurst, can we publish Government

11   Exhibit 719 which is already in evidence.

12   Q.  It should show up on your screen, sir.

13   A.  I see it.

14   Q.  All right.  What are we looking at here?

15   A.  This is a Same Time log between Josh and myself.

16   Q.  What's the date of this exchange?

17   A.  It is April 20, 2016.

18   Q.  You see the first message there?

19   A.  Yes.

20   Q.  What time was that message sent?

21   A.  17:46:52.

22   Q.  Who sent it?

23   A.  Josh.

24   Q.  What did he say?

25   A.  "When's gym."

1   Q.  Was that unusual for the defendant to ask you to go to the
2   gym?
3   A.  No.
4   Q.  How often did you go to the gym together?
5   A.  Four days a week.
6   Q.  How did you respond?
7   A.  I responded later with a -- oh, I said, "When do you want
8   to go."
9   Q.  You mentioned later.  What time did you send your response?
10  A.  17:47.
11  Q.  Did he respond to your question at that time?
12  A.  No.
13          MR. KAMARAJU:  Ms. Hurst, can we pull up just for the
14  witness and the parties and the Court Government Exhibit 1255.
15  Q.  I think it's on your screen now, sir.
16  A.  I can see it.
17  Q.  It is a little difficult, so let's blow up the left side of
18  the screen.  Do you recognize what we're looking at?
19  A.  Yes.
20  Q.  How do you recognize it?
21  A.  It is a screenshot I took.
22  Q.  What is it a screenshot of?
23  A.  It a screenshot of, in the bottom you can see a VM being
24  reverted and then a snapshot removed.
25  Q.  It is a screenshot of a computer screen?

1    A.   Yes, of my computer screen.

2    Q.   What date and time did you take this screenshot?

3    A.   The date was April 20, and time was 6:56 p.m.

4    Q.   What year was that?

5    A.   2016.

6         MR. KAMARAJU:  Your Honor, the government would offer

7    Government Exhibit 1255.

8         MS. SHROFF:  We have no objection.

9         THE COURT:  1255 is received in evidence.

10        (Government's Exhibit 1255 received in evidence)

11        MR. KAMARAJU:  If we can publish that, Ms. Hurst, and

12   let's just focus on that part of the screen.

13   Q.   Let's look at the bottom there.  Do you see under the title

14   "recent tasks"?

15   A.   Yes.

16   Q.   Maybe if we can, can we blow that section up.  Just

17   starting at the left.  What's the first entry there under

18   "name"?

19   A.   Remove snapshot.

20   Q.   What's next?

21   A.   Revert snapshot.

22   Q.   What does it list the status as?

23   A.   Completed.

24   Q.   And who is it initiated by?

25   A.   Root.

K2C3SCH5                          Michael - Direct

1    Q.  If we could scroll over a little bit.  What's the start

2    time listed there?

3    A.  Of which one?

4    Q.  The top one.

5    A.  The top one is 6:55 p.m.

6    Q.  Can we scroll back.  What's the second entry?

7    A.  Revert snapshot.

8    Q.  What's listed as the target?

9    A.  The INF Confluence.

10   Q.  What's the status?

11   A.  Completed.

12   Q.  And who initiated it?

13   A.  Root.

14   Q.  What's the requested start time?

15   A.  6:51 p.m.

16   Q.  Did the revert snapshot task happen before the remove

17   snapshot task?

18   A.  Yes.

19   Q.  Why did you take this screenshot?

20   A.  I was concerned that Josh was using his permissions to do

21   something wrong.

22   Q.  Did you try to figure out what was going on?

23   A.  Yes.

24   Q.  Did you try to look at any log files?

25   A.  Yes.

K2C3SCH5                      Michael - Direct

1              MR. KAMARAJU:  If we could zoom back out a little bit.

2    Q.  Were you able to look at any log files?

3    A.  No.

4    Q.  On this screenshot, where would the log files appear?

5    A.  Right in the middle where there is an entry at the top that

6    says "log entry."  This is where I believe the logs would be,

7    if there were any.

8    Q.  On the top-left corner, if we can blow up the phrase "log

9    entry."  Is that what you were referring to?

10   A.  Yes.

11   Q.  If you would be able to see log files, they would have

12   appeared here?

13   A.  I believe so.

14   Q.  Did that seem strange to you that there were no log files

15   there?

16   A.  Yes.  At first this was strange to me.

17   Q.  Why did you think it was strange at first?

18   A.  Just because, a system managing this many VMs should have

19   lots of logs.

20   Q.  Did you try to find out why there weren't any log files

21   there?

22   A.  I did some more digging, yes.

23   Q.  What did you think as a result of your digging?

24   A.  I remembered that this account that I was using was a

25   regular user account, and I couldn't remember if the regular

1    user accounts had administrative permissions to view logs.

2    Q.  Did you talk to anyone about this screenshot when you took

3    it?

4    A.  No.

5    Q.  Why not?

6    A.  I think there were a few reasons.  One being I had talked

7    with Jeremy, I had had that conversation with Jeremy about

8    removing Josh's accesses, and Jeremy at that point told me stay

9    out of it.  In addition, also, I didn't know for sure what

10   this, what this screenshot was 100 percent.  I wasn't

11   100 percent certain.  So I didn't want to -- to bring something

12   up that was just nothing and then add to the drama.

13            MR. KAMARAJU:  Ms. Hurst, can we go back to Government

14   Exhibit 719.

15   Q.  You remember we were looking at this exhibit before?

16   A.  Yes.

17   Q.  The time of the message where you said "when do you want to

18   go."

19   A.  Yes.

20   Q.  You told us it was 17:47; is that right?

21   A.  Correct.

22   Q.  Does that translate to 5:47?

23   A.  Yes.

24   Q.  You testified before that you didn't get a response.

25   What's the next message in this exchange?

K2C3SCH5                        Michael - Direct

1   A.  I messaged Josh.

2   Q.  And what time did you message him?

3   A.  At 18:32, 6:32.

4   Q.  Why did you send him this message?

5   A.  To ask if he was ready to go to the gym.

6   Q.  Did he respond to this message on this system?

7   A.  No.

8           MR. KAMARAJU:  Ms. Hurst, can we publish Government

9   Exhibit 726, please.  This is in evidence.

10  Q.  Do you recognize this?

11  A.  Yes.

12  Q.  Generally speaking, what is this?

13  A.  It is a chat log between myself and Josh on our DevLAN

14  system.

15          MR. KAMARAJU:  Can we go to page 10 of the exhibit,

16  please.

17  Q.  Do you see a message sent by the user account Schuljo at

18  17:34:18 or 5:34:18 on April 19, 2016?

19  A.  Yes.

20  Q.  Who is Schuljo?

21  A.  Josh.

22  Q.  Do you see it says "I wait for you on Same Time"?

23  A.  Yes.

24  Q.  Is this system the same as Same Time?

25  A.  No.

1   Q.  What's difference between the two?

2   A.  This is our chat system that's on DevLAN, which is a

3   completely different environment where we did all of our

4   coding.

5   Q.  So, let me try to make that clear.  You have to be logged

6   into your DevLAN system to use this chat system?

7   A.  Yes.

8   Q.  Can we turn to page 11.  Do you see a message sent on

9   April 20, at 18:35:39 or 6:35 p.m.?

10  A.  Yes.

11  Q.  Who sent that message?

12  A.  I did.

13          MR. KAMARAJU:  Maybe if we can blow it up, Ms. Hurst.

14  Q.  What did you say?

15  A.  "Gym?"

16  Q.  I think on Government Exhibit 719 you ask the same

17  question; is that right?

18  A.  Yes.

19  Q.  Why did you send this message?

20  A.  Because, like I said before, we do all of our work on the

21  DevLAN system.  So it's more likely you can get in contact with

22  somebody on the DevLAN system because everyone at their desk

23  can take it differently, but usually your classified system was

24  somewhat out of view.

25  Q.  Did he respond to this message?

K2C3SCH5                        Michael - Direct

1    A.   Yes.

2    Q.   When did he respond to this message?

3    A.   18:37, 6:37.

4    Q.   So, about how long after your first message?

5    A.   A minute-ish.

6    Q.   What did he say?

7    A.   He said, "Yo.  15?"

8    Q.   And what did you understand him to mean by that?

9    A.   Do you want to go to the gym in 15 minutes.

10   Q.   Did he explain why he didn't respond to your Same Time

11   message?

12   A.   He did.

13   Q.   Did you end up going to the gym with the defendant that

14   night?

15   A.   Yes.

16   Q.   Did you talk to him about what you had seen on DevLAN?

17   A.   No.

18   Q.   Why not?

19   A.   Because I was not 100 percent sure, so I didn't want to say

20   something and then Josh get upset that I was accusing him of

21   something wrong, and that create a whole bunch of drama.

22   Q.   Did the defendant ever stop working at the CIA?

23   A.   Yes.

24   Q.   When did that happen?

25   A.   Months after moving to RDB.

1    Q.  Did you talk to him after he left?

2    A.  Yes.

3    Q.  Did you ever visit him in New York?

4    A.  Yes.

5    Q.  After the defendant left the CIA, did you learn of -- did

6    there come a time when you learned that EDG projects had been

7    compromised publicly?

8    A.  Yes.

9    Q.  When was that?

10   A.  On the date of the leak.

11   Q.  How did you find that out?

12   A.  I was just at work and a news article came out, and then it

13   just got spread about really quickly.

14   Q.  What was your reaction when you heard about it?

15   A.  Kind of shock.  You just, like, can't believe this is real.

16   How -- concerned how much got leaked, how did this happen.

17   Q.  Did you ever talk to the defendant about it?

18   A.  Yes.

19   Q.  Can you tell us what happened.

20   A.  That night, when I got off work, I either had some text

21   messages or he sent me some text messages shortly after I got

22   off work, and he asked me, hey, man, you know, can't believe

23   that, what are you hearing about these leaks.

24   Q.  Other than text messages, did you ever speak with him?

25   A.  Yes.  I didn't reply to the text messages.  And so then he

1    called me.

2    Q.   What did you talk about?

3    A.   There was some light pleasantries in the beginning, how's

4    New York, whatever.  Then it was back to what are you hearing

5    about this leak.  You know, I'm hearing some thing I don't

6    like.

7    Q.   What did you understand him to mean?

8    A.   That he had heard something about these leaks, and from

9    someone, and he didn't like what he had heard about it.

10        MR. KAMARAJU:  Ms. Hurst, can we publish Government

11   Exhibit 809, please.  Can we go to page 10 of the exhibit.  If

12   we can blow up the top part.

13   Q.   Sir, do you see where this document says, "Additionally,

14   tool described in vendor report is in fact Bartender, a CIA

15   tool set for operators to configure for deployment"?

16   A.   Yes.

17   Q.   Is it true that Bartender is a CIA tool?

18   A.   Yes.

19   Q.   How do you know that?

20   A.   I worked on it.

21   Q.   How long did you work on it for?

22   A.   Many years.  I was brought on in 2013.  Jeremy described --

23   or said that he advocated for me to join the team because he

24   wanted me to work on this project.

25   Q.   Prior to your testimony today, have you ever confirmed

K2C3SCH5                          Michael - Cross

1   publicly that Bartender is a CIA cyber tool?

2   A.  No.

3   Q.  Why not?

4   A.  Confirming any CIA tool brings danger to our operators, and

5   it makes it difficult for us to collect foreign intelligence.

6   When I first saw this, I just can't believe whoever wrote this

7   would write that.  It's not something we do.  Putting these

8   types of things down in paper, especially if this letter was

9   not a classified document.

10          MR. KAMARAJU:  I have no further questions at this

11  time, your Honor.

12          MS. SHROFF:  May I, your Honor?

13          THE COURT:  Yes, you may.

14  CROSS-EXAMINATION

15  BY MS. SHROFF:

16  Q.  Good afternoon, sir.

17  A.  Hello.

18  Q.  So you testified when you took the stand that you are on

19  administrative leave.  Correct?

20  A.  Yes.

21  Q.  And you were put on administrative leave from the CIA; is

22  that right?

23  A.  Yes.

24  Q.  And how many years had you been working there when they put

25  you on administrative leave?

K2C3SCH5                          Michael - Cross

1   A.  Nine.

2   Q.  You had been an employee for them for nine years?

3   A.  Yes.

4   Q.  And is it your testimony today, sir, that after nine years

5   of working at the CIA, the CIA put you on administrative leave,

6   and did not tell you why?

7   A.  Yes.

8   Q.  They didn't give you a reason?

9   A.  No.

10  Q.  They didn't tell you orally why they were putting you on

11  administrative leave?

12  A.  No.

13  Q.  They didn't tell you in writing why they were putting you

14  on administrative leave?

15  A.  No.

16  Q.  They just gave you no explanation as to why you were being

17  put on administrative leave?

18  A.  Correct.

19  Q.  Did they just come up to you one day and say, You're out,

20  you're on administrative leave, bye?

21  A.  No.  They called -- my division chief called me, and said

22  Monday we'd like to meet you at a different entrance than you

23  normally come in.  And then on Monday when I went there, my

24  division chief was there followed by two other people.  And

25  they told me your status has changed to paid administrative

K2C3SCH5                        Michael – Cross

1   leave.

2   Q.  And how long did this meeting last?

3   A.  An hour, maybe two.

4   Q.  So, for two hours, they sat down and talked to you, and in

5   those two hours, you walked out of that meeting still not

6   knowing why you were put on administrative leave?

7   A.  They did not tell me.

8   Q.  Did you ask?

9   A.  Yes.

10  Q.  Was there any formal procedure at the CIA by which you

11  could ask in writing or orally as to why you were being treated

12  that way?

13  A.  I am not aware.

14  Q.  Did you hire a lawyer to ask?

15  A.  No.

16  Q.  It is your testimony, am I correct, that at no time did the

17  CIA tell you that it was because of your conduct during this

18  investigation that they put you on administrative leave?

19  A.  Correct.

20  Q.  You did not know that?

21  A.  They did not tell me that.

22  Q.  Now, how many people were at this meeting that you

23  attended, sir?

24  A.  Probably four or five.

25  Q.  And you said your division chief was there?

K2C3SCH5                        Michael - Cross

1    A.   Yes.

2    Q.   Which division were you in at that time?

3    A.   I was in the cyber operations group.   A division inside of

4    that.

5    Q.   And could you just tell me who was your division chief?

6    You can just give me his first name if you want.

7    A.   That's -- we're good with that?

8                MR. KAMARAJU:   Your Honor, can I have one quick moment

9    with Ms. Shroff.

10               THE COURT:   Yes.

11               (Counsel conferring)

12               MS. SHROFF:   Your Honor, may we just have a quick

13   sidebar?

14               THE COURT:   Yes.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K2cWsch6                          Michael - Cross

1          (At sidebar)

2          MS. SHROFF:  Mr. Kamaraju doesn't know if the person

3  is covert or overt, so I can just move on from that.  It's OK.

4          THE COURT:  Mr. Kamaraju.

5          MR. KAMARAJU:  I believe that's the witness's concern.

6          MS. SHROFF:  It's OK.  I can handle that.

7          THE COURT:  All right.

8          MS. SHROFF:  I do have another issue, your Honor.

9          Late last night, Mr. Kamaraju was kind enough to send

10 us a letter, telling us that this gentleman had been put on

11 administrative leave and that they were paying his airfare.  I

12 reached out immediately to the CISO, because we had subpoenaed

13 this witness and we had asked to speak to him.  And during the

14 time that we asked to speak to him, apparently he was not with

15 the CIA anymore; he was on administrative leave.  We contacted

16 the walled attorney, and nobody told us that he was on

17 administrative leave.

18         THE COURT:  It's news to me.

19         MS. SHROFF:  I know, but I think that's inappropriate.

20 I think we're entitled to find out from the walled CIA person

21 why they were not called, why it was not made clear to us.  I

22 attribute no bad faith to Mr. Kamaraju, but to tell us the

23 night before, especially when I hadn't known ahead of time,

24 it's prejudicial to Mr. Schulte.

25         THE COURT:  Let's take this up -- you have a half an

K2cWsch6                        Michael – Cross

1    hour.  Can you fill up a half an hour?

2              MS. SHROFF:  OK.  I'll fill it up.

3              THE COURT:  We can take this up at 3:00.

4              MS. SHROFF:  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2cWsch6                          Michael - Cross

1          (In open court)

2          THE COURT:  Ms. Shroff.

3          MS. SHROFF:  Sorry about that.

4    Q.  You said that the meeting lasted about two hours?

5    A.  Yeah.  I don't know the exact amount of time, but somewhere

6    between an hour and two hours.

7    Q.  And at the end of that meeting, did they just simply escort

8    you out after nine years of service?

9    A.  Yes.

10   Q.  OK.

11   A.  Well, no.  They asked for my badge, some other items that I

12   did not have on me, so I had to go home, grab those items and

13   then bring it back.

14   Q.  OK.  And you're working now, though, right?  Are you

15   working somewhere else now?

16   A.  No.

17   Q.  OK.  But is the CIA paying you?

18   A.  Yes.

19   Q.  OK.  Let me just take you back, setting aside this

20   administrative-leave issue, we may come back to it later on,

21   but for now I'd like you to just focus on the first time that

22   you spoke to the FBI.  OK?

23   A.  OK.

24   Q.  And is it fair to say, sir, that the FBI contacted you

25   while you were an employee of the CIA?

K2cWsch6                           Michael - Cross

1   A.  Yes.

2   Q.  And they asked to speak with you, correct?

3   A.  Yes.

4   Q.  And when they asked to speak with you, did they inform you

5   that talking to them was voluntary, or did they not tell you

6   that?

7   A.  They told me.

8   Q.  They told you it was voluntary, right?

9   A.  Yes.

10  Q.  And they told you your obligation was to tell them the

11  truth, correct?

12  A.  Yes.

13  Q.  And they also told you not to tell anyone that you were

14  talking to them, correct?

15  A.  Yes.

16  Q.  And in fact, they went a step beyond that; they told you

17  that they so didn't want you to tell anyone about you talking

18  to them that they made you sign what is called a nondisclosure

19  agreement, correct?

20  A.  Yes.

21  Q.  It's a typed-up form, correct?

22  A.  Yes.

23  Q.  And it tells you that you are voluntarily talking to the

24  FBI, right, but that you should tell no one?

25  A.  Yeah.  I don't remember what the form said, but yes.

K2cWsch6                          Michael - Cross

1    Q.  And even though you don't remember what the form said, you

2    generally agree that you were not allowed to tell anyone that

3    the FBI was asking you questions, correct?

4    A.  Yes.

5    Q.  And you signed that form, right?

6    A.  Yes.  I believe it was we could not discuss the contents of

7    the meeting.

8    Q.  It was just so that you didn't discuss the contents of the

9    meeting or that you'd met with the FBI; which one?

10   A.  I believe it was just the contents of the meeting.

11   Q.  Did you sign that form?

12   A.  Yes.

13   Q.  And when you signed that form, who was in the room with

14   you; do you remember?

15   A.  An FBI agent.

16   Q.  Who?

17   A.  I don't remember which one.

18   Q.  OK.  Was there more than one FBI agent; do you remember?

19   A.  I think so.

20   Q.  Did they set up that meeting with you, or no?

21   A.  Did the FBI set up the meeting?

22   Q.  Right.

23   A.  No.

24   Q.  They just sprung it on you and said, Hey, come on down?

25   A.  Yes.

K2cWsch6                         Michael - Cross

1    Q.  OK.  And you were not anticipating meeting with the FBI on
2    that particular day, right?
3    A.  I believe so.
4    Q.  OK.  And did you think you had a choice in talking to the
5    FBI when you went down?
6    A.  Uh --
7    Q.  I'll withdraw that.  Let me ask you a preliminary question.
8        Were you surprised that the FBI was there asking to speak
9    to you?
10   A.  No.
11   Q.  Huh?
12   A.  No.
13   Q.  You were not surprised?
14   A.  No.
15   Q.  And at that time, when the FBI first approached you, you
16   were not on administrative leave, correct?
17   A.  Correct.
18   Q.  You were a full-time CIA employee, correct?
19   A.  Correct.
20   Q.  And you were not surprised, but you were not expecting the
21   meeting, right?
22   A.  Correct.
23   Q.  So you went downstairs and you met with the FBI?
24   A.  Correct.
25   Q.  OK.

K2cWsch6                         Michael - Cross

1    A.  Went upstairs.

2    Q.  Say it again.

3    A.  Upstairs.

4    Q.  Upstairs.  OK.  I don't know.  I've never been there, but

5    sorry about that.

6        This was in March of 2017, right?

7    A.  I do not remember the date.

8    Q.  It's OK.  And you're right.  Let me show you what is

9    3550-02.  OK?

10       Is this the nondisclosure agreement that you signed?

11   A.  This is my signature.

12   Q.  It is, right?

13   A.  Yes.

14   Q.  OK.  May I just have it back.

15       Thank you.

16       Now, was it your understanding of signing this agreement

17   that you could tell people that the FBI had contacted you at

18   the CIA but that you couldn't talk about the contents of what

19   they asked you?

20   A.  Yes.

21   Q.  OK.  So you were free to tell people that the FBI was

22   interviewing you at the CIA?

23   A.  Yes.

24   Q.  Are you sure?

25   A.  I wouldn't, but yes.

K2cWsch6                       Michael - Cross

1   Q.  You wouldn't tell anybody that the FBI had come to

2   interview you?

3   A.  Yeah.  I wouldn't have a reason to tell anybody that.

4   Q.  OK.  And did you read this before you signed it?

5   A.  Uh, yes.

6   Q.  Did you agree with what it said, or did you just sign it

7   because it was easier to sign?

8   A.  I agreed with the principle of not discussing the contents

9   of the meeting.

10  Q.  OK.  And after you signed this document, you sat down and

11  were interviewed by the FBI, right?

12  A.  Yes.

13  Q.  And when they started to talk to you about the -- when they

14  started the interview, did they tell you that there was a

15  distinction between the FBI asking you questions and anything

16  that the CIA did to you as a result of the interview?

17  A.  Sorry.  Can you restate the question?

18  Q.  Sure.

19          THE COURT:  It's a little bit confusing.

20          MS. SHROFF:  It is confusing.

21  Q.  The FBI was there in an investigatory, criminal capacity,

22  correct?

23  A.  Correct.

24  Q.  And the FBI had literally the ability to arrest not just

25  you but anyone, correct?

K2cWsch6                          Michael - Cross

1    A.  Yes, with --

2    Q.  Right.

3    A.  -- some --

4    Q.  And you know that, right?

5    A.  Right.

6    Q.  From even just watching a movie, you know that the FBI can

7    arrest people, correct?

8    A.  Yes.

9    Q.  And there's a distinction, then, between that kind of

10   questioning and questioning that could come from within the

11   CIA, correct?

12   A.  Correct.

13   Q.  I mean, your boss could interview you, question you and not

14   like the answers, but he couldn't arrest you, correct?

15   A.  Correct.

16   Q.  So they're two separate inquiries, correct?

17   A.  Correct.

18   Q.  And when the FBI started to talk to you, did they make a

19   distinction between the two separate inquiries for you?

20   A.  I don't remember such a distinction.

21   Q.  OK.  Let me show you a document, and maybe that will help

22   you remember.  Is that OK?

23   A.  Yeah.

24              THE COURT:  Do you have a question?

25   BY MS. SHROFF:

K2cWsch6                         Michael - Cross

1    Q.   If you're ready, I can ask the question.

2    A.   Sorry.  I'm just reading all the bullet points.

3         OK.

4    Q.   OK.  Does this refresh your recollection that at least at

5    some point you learned that there was a distinction between the

6    FBI questioning you and the CIA questioning you?  Correct?

7    A.   Yes.

8    Q.   OK.

9    A.   This was not the first meeting, though.

10   Q.   I understand.

11   A.   OK.

12   Q.   So somewhere down the line, when you met with the FBI again

13   is when they explained to you that there is a distinction

14   between a CIA questioning and an FBI questioning, right?

15   A.   Yes.

16   Q.   Let's just stay with the first time that you met with them,

17   right, the FBI.

18   A.   OK.

19   Q.   And when you first met with the FBI, they asked you

20   questions about your relationship with Mr. Schulte, correct?

21   A.   Yes.

22   Q.   They asked you a whole series of questions, correct?

23   A.   Yes.

24   Q.   And you did your very best to answer them, correct?

25   A.   Yes.

K2cWsch6                         Michael - Cross

1    Q.  And how long did that interview last; do you remember?

2    A.  I do not remember.  A long time.

3    Q.  It was a long interview, correct?

4    A.  Yes.

5    Q.  They asked you a series of questions, almost all of which

6    were about Mr. Schulte, correct?

7    A.  Yes.

8    Q.  They asked you how you knew him, correct?

9    A.  I don't remember their questions.

10   Q.  You don't remember the questions at all?

11   A.  No.

12   Q.  OK.  Do you remember they asked you about Josh Schulte?

13   A.  Yes.

14   Q.  OK.  And did they ask you how you had known him?

15   A.  I don't remember the specific questions.

16   Q.  Did they ask you about your relationship with him prior to

17   you and him working at the CIA?

18   A.  Prior to us working?  I don't remember that question.

19   Before we came, before both of us started at the CIA?

20   Q.  Right.

21   A.  If we had known each other?

22   Q.  Right.  Did the FBI --

23   A.  Sorry.

24   Q.  I don't want to talk over you.  You go.

25   A.  Are you asking if they asked me if I had a relationship

K2cWsch6                           Michael - Cross

1    with Josh before we worked together at the CIA?

2    Q.  Right.

3    A.  I don't remember that question.

4    Q.  And do you remember if they asked you about your work at

5    the CIA and how you came to them as an intern?  Do you remember

6    that?

7    A.  No.  The very first meeting is much of a blur.

8    Q.  All right.  Let me give you 3550-01.  OK?

9    A.  Do you want me to read this whole thing?

10   Q.  Well, just take a look at the second paragraph, and I think

11   the word "intern" might just pop out at you, if we're lucky.

12   A.  I don't see the word "intern --"

13   Q.  OK.

14   A.  -- in the second paragraph.

15   Q.  It's all right.  You know what?  I'll move forward.

16       Do you recall the FBI asking you just general questions

17   about where you were working, and which -- where Mr. Schulte

18   was working while you two were friends at the CIA?

19   A.  Yeah.

20   Q.  And you gave them background information on yourself,

21   correct?

22   A.  Yes.

23   Q.  And you gave them background information on Mr. Schulte,

24   correct?

25   A.  Yes.

1    Q.  And you were asked what your opinion was as to how the

2    information was leaked to WikiLeaks, correct?

3    A.  I don't remember the specific question.

4    Q.  OK.  Well, why don't you take a look at the end of that

5    document.

6    A.  The last paragraph?

7    Q.  Yes, please.

8            MR. KAMARAJU:  Your Honor, I would to object to Ms.

9    Shroff eliciting an opinion of the witness.

10           THE COURT:  Overruled.

11   A.  I've read the last paragraph.

12   Q.  They asked you, and you just basically told them what your

13   opinion was, right; it wasn't complicated?

14   A.  Uh, the last paragraph states that I had nothing to do with

15   the release.  Is that what --

16   Q.  No.  I'm talking about the first page.  Are you still on

17   page 1?

18   A.  The first page?

19   Q.  Yes.  3550-01.

20   A.  3550-01.

21       Right here?

22   Q.  Yes.

23   A.  OK.  I've read the paragraph.

24   Q.  OK.  So they asked you an open-ended question, and you

25   tried your best to answer them, correct?

K2cWsch6                          Michael - Cross

1    A.  Yes.

2    Q.  And when you met with them, you had no idea, correct, how

3    this got to WikiLeaks?

4    A.  Correct.

5    Q.  And in fact, it is your position today that you really

6    don't know how the information got to WikiLeaks, correct?

7    A.  Correct.

8    Q.  And you told them it could be a technical penetration by a

9    foreign entity, correct?

10   A.  Correct.

11   Q.  And you told them it could be an inside job, correct?

12   A.  Correct.

13   Q.  It could be any person within the CIA, correct?

14   A.  I didn't say that.

15   Q.  How about by -- saying by a person or people?

16   A.  Yes, I said that it was not -- I don't think I meant

17   anyone.  I probably meant more someone closer to that data.

18   Q.  OK.  So you thought it could be a person or people.  People

19   is plural, correct?

20   A.  Correct.

21   Q.  So it could be one person or it could be many people,

22   correct?

23   A.  Correct.

24   Q.  And then you said, did you not, to the FBI that you thought

25   it could be a human exploit, correct?

K2cWsch6                         Michael - Cross

1    A.  Correct.

2    Q.  And that you thought, and then they asked you about the

3    information itself that was leaked, right?

4    A.  I -- it does say that here.

5    Q.  Right.  I understand, it's been a long time; you may not

6    remember.

7    A.  Right.

8    Q.  And then they asked you many, many questions, did they not,

9    about the physical security at the CIA, and then they also

10   asked you about the security on DevLAN, correct?

11   A.  I don't remember questions about security on DevLAN.  I

12   don't remember questions about physical security.

13   Q.  OK.  Well, do you recall telling the FBI during that

14   meeting that anyone could check out a hard drive, bring

15   backpacks or bags in and out of the CIA building without being

16   searched?

17   A.  That is true.  I don't know if I said that.  It does say

18   that here in this document, in the next page.

19   Q.  OK.  But it is true, correct?

20   A.  It is true, yes.

21   Q.  So even though there are all these armed guards standing

22   out with big guns, nobody really checks anybody coming in or

23   going out, correct?

24   A.  Provided you have the proper identification.

25   Q.  Right.  And the proper identification's just an ID, right?

K2cWsch6                          Michael - Cross

1    A.  Yes.

2    Q.  OK.  And how many people do you think have egress to that

3    building; do you know?

4    A.  No.

5    Q.  Hundreds?

6    A.  Yes.

7    Q.  Thousands?

8    A.  I'm really guessing here.  Yes?

9    Q.  OK.  Now, you told them, did you not, that when you thought

10   of the system itself, the DevLAN system -- right -- that you

11   thought that the DevLAN system was the wild, Wild West,

12   correct?

13   A.  I don't remember specifically saying that, but I do have an

14   opinion like that, yes.

15   Q.  OK.  And it wasn't just your opinion, right?  I mean, a lot

16   of people use the same phrase when describing DevLAN, correct?

17   A.  Yes, all these coworkers, if we talked about the security

18   of DevLAN.

19   Q.  And everybody called it the wild, Wild West, correct?

20   A.  I don't know, but, yes, they would --

21   Q.  Well, you know what, you're not even there, so how do you

22   know everybody said?

23   A.  Right.

24   Q.  When people talked about DevLAN, that's the phrase they

25   used, correct?

K2cWsch6                          Michael - Cross

1    A.  I don't know if they called it the wild, wild -- but yes,

2    the sentiment about it being the wild, Wild West, yes, people,

3    everyone, coworkers have that sentiment.

4    Q.  And the reason coworkers have that sentiment is because the

5    system wasn't locked down, correct?

6    A.  Correct.

7    Q.  And it's fair to say, is it not, that the system not being

8    locked down was partially a deliberate decision by the

9    management at the CIA?  Correct?

10   A.  I don't know.

11   Q.  You don't know?

12   A.  No.

13   Q.  OK.  Is it fair to say that there was some discussion or

14   some conversation about how people would want an open system so

15   that they could develop tools?

16   A.  Yes.

17   Q.  Right?

18       And then that some people thought the system was too open

19   and left you at risk, correct?

20   A.  Yes.

21   Q.  I don't mean you personally.  I mean the CIA.  Correct?

22   A.  Yeah.  In talks with other coworkers, people, we would

23   always weigh those, the benefits versus the cons of that.

24   Q.  Right.  And management knew about these discussions,

25   correct?

K2cWsch6                         Michael - Cross

1   A.  I don't know.

2   Q.  Well --

3   A.  Are we -- what level of management are we talking about?

4   Q.  Just your boss, your immediate boss.

5   A.  My immediate manager, yes.

6   Q.  And at that time, in 2016, who was your immediate boss?

7   Just give me a first name, or whatever name that --

8   A.  Sean.

9   Q.  Sean.  And is it fair to say that there was, like, an easy

10  kind of -- it was an easy relationship with your boss, correct?

11  A.  Yes.

12  Q.  I mean, you could tell him I think that the system is too

13  wide open, correct?  It wasn't like you were scared to tell him

14  something like that, right?

15  A.  Yes, it was easy to talk to Sean.

16  Q.  Right.  And it certainly wasn't something that Mr. Schulte

17  would be shy about sharing, correct?

18  A.  Correct.

19  Q.  And in fact, he wasn't shy about sharing anything; is that

20  fair to say?

21  A.  Yes.

22  Q.  And these are people that felt the system was not locked

23  down, correct?

24  A.  Correct.

25  Q.  In fact, as his close friend, or at least as a friend, he

1  complained to you nonstop about many things at the CIA,

2  correct?

3  A.   Nonstop is a bit strong, but yes, we did have discussions

4  about things that irked us at the CIA.

5  Q.   Right.  I mean, he told you about things that irritated him

6  about the CIA, correct?

7  A.   Yes.

8  Q.   And you told him things that irritated you about the CIA,

9  right?

10  A.   Yes.

11  Q.   It's a normal job thing, correct?

12  A.   Yeah.

13  Q.   And one of the things that he pointed out that he thought

14  was so silly or irritating is that it took forever to fill a

15  requisition form, correct?

16  A.   Yes.

17  Q.   And he also complained about the fact that he couldn't get

18  the system working as fast as he wanted it to work, correct?

19  A.   Yes.

20  Q.   And then he also complained to you about how he did not

21  think that the system was secure enough, correct?

22  A.   We -- are we talking about the specific system, or are we

23  just talking about in general?

24  Q.   I'm talking about DevLAN.

25  A.   DevLAN?  Yes.

K2cWsch6                          Michael - Cross

1   Q.  OK.  And you had basically what is called a DevLAN box,

2   correct?

3   A.  Yes.

4   Q.  And he also had a DevLAN box, correct?

5   A.  Yes.

6   Q.  Everybody had a DevLAN box that worked in your group at

7   that time, correct?

8   A.  No.

9   Q.  No?

10  A.  No.

11  Q.  Oh, I'm sorry.  Can you help me out?  Most developers had a

12  box?

13  A.  Yes.

14  Q.  Did all developers have a box?

15  A.  Yes.

16  Q.  And by box, you just mean -- that means something that

17  hooked you on to DevLAN, conversation?

18  A.  Yes.

19  Q.  And do you remember there being a conversation about how

20  developers were given free rein to use thumb drives at work?

21  A.  A conversation about it?

22  Q.  Yes.

23  A.  I don't remember a specific conversation.

24  Q.  But it's true, right?

25  A.  We were -- we were supposed to go out and go to another

K2cWsch6                         Michael - Cross

1   team, ISB, and check out our thumb drives.

2   Q.  Yes, but that's what you were supposed to do?

3   A.  Yes.

4   Q.  Nobody did that, right?

5   A.  Most people did that.

6   Q.  Most people did that; they checked out a thumb drive?

7   A.  Yes.

8   Q.  And what did they do after they used it?

9   A.  You'd keep it.

10  Q.  Did they check it back in?

11  A.  No.

12  Q.  OK.

13  A.  Once you checked it out, it was yours to keep until you no

14  longer wanted it one.

15  Q.  OK.  And if you lost that thumb drive, did you go get

16  another one?

17  A.  Yes.

18  Q.  If you misplaced it, you could go get another one?

19  A.  Yes.

20  Q.  There was no limit on how many thumb drives you could get?

21  A.  Not that I was aware of.

22  Q.  OK.  And is it fair to say that you told the FBI, when they

23  asked you specifically about thumb drives, that thumb drives

24  were in and out all the time?  Do you remember that?

25  A.  I don't specifically remember saying that.  Could you point

1    me to where you're at?

2    Q.  Take a look at page 3, maybe.

3    A.  I'm still not seeing it.

4    Q.  OK.

5    A.  Sorry.

6    Q.  Well, you do agree with me, though, that people could --

7    thumb drives were in and out of systems all the time?

8    A.  Yes.  We -- we used thumb drives on a daily basis.

9    Q.  OK.  And I'm correct, am I not, that the only training that

10   anybody at the CIA, or specifically within your group, received

11   on working or using thumb drives was a one-time training when

12   you started work there, correct?

13   A.  When I first started --

14   Q.  Yes.

15   A.  Yes.

16   Q.  Right.  And is it fair to say that it was also just a

17   one-time training that when a person, you included, started

18   work at the CIA, you got a class on how to classify something?

19   Correct?

20   A.  Yes.

21   Q.  And they told you this is how you do it, they gave you a

22   guide and then they send you on your way, correct?

23   A.  Yes.

24   Q.  And that's how you decided you would mark something

25   classified or unclassified in an email, correct?

K2cWsch6                         Michael - Cross

1   A.  Yes.

2   Q.  OK.  Now, when you were meeting with the FBI, they asked

3   you about Mr. Schulte, and you told them, did you not, that

4   Mr. Schulte was reliable?  Correct?

5   A.  Yes.

6   Q.  You told them he was hardworking, correct?

7   A.  Yes.

8   Q.  And you told them that he had good security practices,

9   correct?

10  A.  I don't remember specifically saying that, but --

11  Q.  All right.  Well, take a look at page 3.  It's the first

12  paragraph.

13  A.  OK.  Yes.

14  Q.  And in that paragraph, right, you say that he had good

15  security practices?  Right?

16  A.  Yes.

17  Q.  OK.  Now, let me just ask you something.  When the FBI came

18  to talk to you, did they ask you about anybody other than

19  Mr. Schulte?

20  A.  I don't remember.

21  Q.  OK.  And you told them that despite all of these positive

22  things, Mr. Schulte had filed several complaints to management

23  about a person named Amol, correct?

24  A.  Yes.

25  Q.  And that Amol and Mr. Schulte did not get along, correct?

K2cWsch6                          Michael - Cross

1    A.  Correct.

2    Q.  And then there were several FBI interviews asking you just

3    about Mr. Amol and Mr. Schulte, correct?

4    A.  Uh, I don't remember a whole interview dedicated to just

5    Josh and Amol.

6    Q.  OK.  Do you remember them asking you about it?

7    A.  In general, I remember, after I brought it up, they wanted

8    to know more about the situation.

9    Q.  OK.  Before I forget, let me just ask you something,

10   because I'd forgotten this question when I was talking to you

11   about thumb drives.  OK?  Did you reuse thumb drives?

12   A.  Like after you, like, reuse when you plug it out and then

13   the next day, just plug it back in?

14   Q.  Right.  Or if you finished project 1 and you're moving on

15   to project 2, did you reuse the thumb drive, or did you just --

16   A.  We reused it.

17   Q.  And before you would reuse it, would you reformat the thumb

18   drive?

19   A.  Not all the time.

20   Q.  Sometimes?

21   A.  Sometimes.

22   Q.  Would you clean out the project you were working on before

23   you get started?

24   A.  Clean out the thumb drive is what you're saying?

25   Q.  Right.

K2cWsch6                          Michael - Cross

```
1    A.  No, that wasn't standard procedure.

2    Q.  So what did you do if the thumb drive had one project on it

3    and you wanted to start a second project on it?

4    A.  If I was done with the first project --

5    Q.  Right.

6    A.  -- depending on what that project did --

7    Q.  Right.

8    A.  -- I would either wipe it securely or just delete the files

9    logically.

10   Q.  Right.

11   A.  Or --

12   Q.  Let's talk about that.  What does it mean when you say wipe

13   it?

14   A.  Wipe it securely?

15   Q.  Right.

16   A.  That means to overwrite the data on the drive with new data

17   such that, so that now that old data can no longer be read.

18   Q.  OK.  So you get rid of the old data, correct?

19   A.  Correct.

20   Q.  And what was the second thing you said?

21   A.  Or if -- if I didn't care that the drive needed to be

22   secure, I would just logically delete the files.

23   Q.  OK.  And is that called zeroing a thumb drive?

24   A.  No.  That was the first thing.

25   Q.  The first thing is called zeroing a thumb drive, and then
```

K2cWsch6

1   the second thing is called just wiping?

2   A.   Just deleting.   Wipe means -- wipe implies a secure delete.

3   The second thing is just a normal, just how you would plug it

4   in and delete files.

5            THE COURT:  Ms. Shroff, is this a convenient place to

6   break?

7            MS. SHROFF:  Sure.

8            THE COURT:  Remember my instructions.

9            Please be seated.  Please be seated.

10            Remember my instructions.  Don't talk about the case.

11   Don't do any research.  If you hear anything about it on the

12   radio or the TV, ignore it.

13            Keep an open mind, and I'll see you tomorrow morning

14   at 9:00.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K2cWsch6

1           (Jury not present)

2           THE COURT:  Please be seated.

3           MS. SHROFF:  Your Honor, may we excuse the witness?

4           THE COURT:  Oh, yes.

5           You're excused.

6           THE WITNESS:  Leave all these documents here?

7           THE COURT:  Yes, leave all of it.  Don't talk to the

8    government now.  You're on cross-examination.

9           (Witness not present)

10          THE COURT:  OK.  Ms. Shroff, do you want to take up

11   what --

12          MS. SHROFF:  Your Honor, I --

13          THE COURT:  OK.  He's out of the courtroom.

14          MS. SHROFF:  I don't mean to belabor this point, and

15   I, again, want to be clear I was informed last evening that

16   this gentleman, this witness, had been put on administrative

17   leave at some point by the CIA.  I think it was June of --

18   August of 2019.  Right?

19          And the only, first reason I was given was that

20   somebody at the CIA told Mr. Kamaraju that that was because of

21   his conduct during the investigation.

22          One, I do not know why we were not told, because we

23   had subpoenaed this gentleman and asked if he would speak to

24   us, that he was in fact put on administrative leave.  I asked

25   the CISO, and I don't have an answer on that point.

K2cWsch6

1           Second, even if the CIA doesn't want to tell him why
2    they put him on administrative leave, I do think we are
3    entitled to know why because of the flag, so to speak, that
4    they've set out by saying that it was his conduct during this
5    investigation.
6           Now, unlike many of the 302s that I've read in this
7    case, where everybody said, Oh, it had to be Mr. Schulte, this
8    gentleman actually at one point, early on in the process, said
9    that it wasn't Mr. Schulte; he didn't think it was Mr. Schulte;
10   that Mr. Schulte was hotheaded but not a traitor, and then
11   slowly, slowly, slowly, his story started to morph a little,
12   but he never quite got to saying it was Mr. Schulte.
13          Now, I don't know -- I honestly don't know -- what the
14   thinking of the CIA is, but I do think it's fair for us to know
15   what their thinking was as to why they put him on
16   administrative leave.  I'd ask the Court, please, to order the
17   CIA or the government to produce to us those files, or at least
18   produce them to you for *in camera* reading so that you can
19   determine whether or not we should be entitled to them.
20          THE COURT:  Mr. Kamaraju.
21          MR. KAMARAJU:  Yes, your Honor.
22          THE COURT:  When was he placed on administrative
23   leave?
24          MR. KAMARAJU:  August 19, 2019.
25          THE COURT:  OK.

K2cWsch6

1          MR. KAMARAJU:  Which was three days after the meeting

2     that Ms. Shroff discussed.

3          I think one point we should make clear, he is still a

4     CIA employee.  The fact that he's an administrative leave does

5     not change that fact.  There are situations where people on

6     administrative leave come off administrative leave.  He's being

7     paid by the CIA, so he's a CIA employee.  Yes, currently he's

8     on leave.

9          The reasons for that leave -- actually, we produced

10    all of the underlying information to Ms. Shroff.  It is these

11    302s.  It's videos of security.  It's the interview notes.  And

12    as I said to Ms. Shroff, as reflected in the 302s, there was a

13    concern about candor.  The materials underlying that concern

14    about candor have been produced.

15         Everything Ms. Shroff just said that she'd like to do

16    on cross-examination she can do.  She's already spent a portion

17    of her time on cross-examination eliciting the fact that he

18    said positive things about Mr. Schulte during the first

19    interview.  I don't quite agree with her characterization that

20    he exonerated Mr. Schulte in any way, but still, to the extent

21    she wants to elicit the time line of events, she's able to do

22    that.  To the extent she wants to try and make the argument

23    that he was telling a positive story about Mr. Schulte until

24    events went a certain way and the CIA took action, she's able

25    to do that.

K2cWsch6

1          THE COURT:  Why was he put on administrative leave?

2          MR. KAMARAJU:  It's because exactly that, your Honor.

3   It's because, as I understand it, there were concerns about his

4   candor, which we disclosed in the letter that we sent.  The

5   actions were the result --

6          THE COURT:  What letter did you send?

7          MR. KAMARAJU:  I'm sorry, your Honor?

8          THE COURT:  What letter did you send?  I don't recall

9   getting a letter.

10         MR. KAMARAJU:  No, no, your Honor.  It's the letter

11  informing Ms. Shroff.

12         THE COURT:  Oh, Ms. Shroff.  OK.

13         MS. SHROFF:  I got it last night, your Honor.

14         MR. KAMARAJU:  Yes, but all of the materials that

15  underlie those concerns -- for example, there's a video of an

16  interview he did with the CIA investigator about the fight that

17  he testified about; he refused to talk about that fight.

18  That's an example of something that generated the security

19  video.  And she has those materials.  We produced everything in

20  our files with respect to anybody that had access to the DevLAN

21  system, any kind of security concerns that related to

22  mishandling of classified information with respect to that

23  system.  He doesn't have any of those.

24         THE COURT:  From your standpoint, Mr. Kamaraju, Ms.

25  Shroff can go into all this on her cross-examination?

K2cWsch6

1        MR. KAMARAJU:  She's certainly entitled to question

2  his credibility on cross-examination, and she's certainly

3  entitled to question whether he has a bias or feels pressured

4  to tell a story, so to speak, which is what I understand her to

5  want to say.  But I don't think she's entitled to the internal

6  decision-making of the CIA.

7        MS. SHROFF:  I'm not looking for the internal

8  decision-making of the CIA.  I'm just trying to tell this jury

9  that if you don't roll the way the CIA wants you to roll,

10  they're going to throw you out, and of course, that's relevant.

11  And I don't think anybody who has had a job would consider

12  being on administrative leave --

13        THE COURT:  As I understand it, Ms. Shroff, the

14  government doesn't object to you going into the

15  cross-examination.

16        MS. SHROFF:  No, I don't want to question about it on

17  cross-examination.  I want to be able to show the jury not that

18  he lacked candor; I want to show the jury that because of what

19  he said, that the CIA didn't like it and the CIA retaliated

20  against him.  That's my point, which is what they did.

21        MR. KAMARAJU:  Well --

22        MS. SHROFF:  They --

23        MR. KAMARAJU:  I'm sorry.  I apologize.

24        MS. SHROFF:  I don't know.  I could be right.  I could

25  be wrong.  But the only way I'm going to know is if either you

K2cWsch6

1    let me read it or you read it.  And since they never let me

2    read anything hardly in this case, I'll rely on you reading it.

3    I don't mind, but somebody's got to read it because the issue

4    here is the way the CIA reacts when they don't like something

5    somebody else does and that person is working for them.  It's a

6    different point, right?  It isn't about whether or not he had

7    candor.  This is about what the CIA does to a person who is

8    telling a story that they don't like.

9            MR. KAMARAJU:  Everything that Ms. Shroff said she

10   wants to be able to do she can do standing here right now.  She

11   can cross-examine the witness about:  You said to the FBI on

12   this day X; you said to the FBI on this day X.  Then on this

13   day, you said something different, isn't that right?  And then

14   on this day the CIA put you on administrative leave.

15           THE COURT:  Except what Ms. Shroff is saying is what

16   if there are documents where the CIA said:  Hey, we've had

17   enough of this guy; let's fire his ass out of here.

18           MR. KAMARAJU:  Sure.  I understand, your Honor, and we

19   double-check, but I do not believe there are any documents that

20   say that.  The documents do not say, It's time to get this guy;

21   he's telling the wrong story.  And we're happy to give them to

22   your Honor.

23           MS. SHROFF:  Well, of course it's not going to say

24   that.  They're not that silly.

25           MR. KAMARAJU:  Well, then I don't know what Ms.

K2cWsch6

1    Shroff's going to get from the documents.

2              MS. SHROFF:  I don't know what it is.  All I'm saying

3    is if he can read it, why can't I?  I don't understand this.

4    And if I can't read it, I'd just ask you to read it.

5              THE COURT:  I'll read it.

6              MS. SHROFF:  Thank you.

7              MR. KAMARAJU:  OK.

8              THE COURT:  Submit it for *in camera* review.

9              MR. KAMARAJU:  We will, your Honor.

10             THE COURT:  Now, with regard to the experts and giving

11   an instruction, I've decided not to do that.  I think the

12   appropriate time for the instruction is when we hear

13   instructions.

14             If you want a caution about the experts and how to

15   assess the testimony, you should have made a request to put it

16   in the preliminary instruction to give to the jury, but I think

17   any instructions now would put the thumb on the scale of

18   justice, so I'm not going to do it.  I will charge on experts

19   in the final charge to the jury.

20             MR. KAMARAJU:  We understand, your Honor.  That's fine

21   with us.

22             THE COURT:  Anything else?

23             MR. KAMARAJU:  No.

24             MR. ZAS:  Just for the record, we object to that

25   ruling.  Our concern is we didn't want, sometimes juries take

K2cWsch6

1    experts as gospel, which is really the point of the

2    instruction.  We just wanted them to know sooner rather than at

3    the very end, which could be another several weeks.  So we

4    object to the ruling.

5              THE COURT:  Several weeks?

6              MR. ZAS:  Well, when the trial's over.  Whenever we

7    get there.

8              THE COURT:  When are we getting there?

9              MR. ZAS:  I think you're going to have to ask them,

10   your Honor.

11             THE COURT:  I will.

12             MR. ZAS:  Thank you.

13             MR. KAMARAJU:  We're going as fast as possible, your

14   Honor, but we do not anticipate it being several weeks.

15   Obviously, Mr. Leedom's testimony, he was a significant

16   witness.  We've got a couple more, but I don't think anybody

17   who approaches his length, so I think we're hoping that --

18   we'll have a better idea by the start of next week, but I think

19   we're hoping to be able to rest soon.

20             THE COURT:  Let's talk about the start of next week.

21   Are we working on Monday?

22             MS. SHROFF:  No.  It's a holiday, your Honor.

23             THE COURT:  We can work on holidays, Ms. Shroff.

24             MS. SHROFF:  Oh, no, your Honor.  Look, I was so good.

25   I only crossed him for 30 minutes.

K2cWsch6

1              MR. KAMARAJU:  We'll be working on Monday, your Honor,

2       so we don't have an objection.  I don't know what the jury's

3       plans are.

4              THE COURT:  Do we know?

5              We know from our conversations that there's a number

6       of jurors who have got plans for taking a long weekend.

7              MS. SHROFF:  Oh, thank God.

8              MR. KAMARAJU:  I can imagine they want to get away

9       from us.

10             THE COURT:  Yes, they want to revert back to a

11      legitimate vacation schedule.

12             OK.  I'll see you tomorrow morning at 9:00.

13             MS. SHROFF:  Thank you, your Honor.

14             THE COURT:  When can I expect the package,

15      Mr. Kamaraju?

16             MR. KAMARAJU:  We'll consult, and we'll walk it over

17      this afternoon.

18             THE COURT:  Thank you.

19             (Adjourned to February 13, 2020, at 9:00 a.m.)

20

21

22

23

24

25

```
 1                           INDEX OF EXAMINATION

 2    Examination of:                               Page

 3     PATRICK LEEDOM

 4    Direct By Mr. Laroche  . . . . . . . . . . .1029

 5    Cross By Ms. Shroff  . . . . . . . . . . . .1134

 6    Redirect By Mr. Laroche  . . . . . . . . . .1193

 7    Recross By Ms. Shroff  . . . . . . . . . . .1201

 8     MICHAEL

 9    Direct By Mr. Kamaraju . . . . . . . . . . .1202

10    Cross By Ms. Shroff  . . . . . . . . . . . .1219

11                          GOVERNMENT EXHIBITS

12    Exhibit No.                               Received

13     1255    . . . . . . . . . . . . . . . . .1210

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300