K2I3SCH1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          S2 17 Cr. 548 (PAC)

5    JOSHUA ADAM SCHULTE,

6              Defendant.                  Trial

7    ------------------------------x
                                          New York, N.Y.
8                                         February 18, 2020
                                          9:20 a.m.
9    Before:

10                    HON. PAUL A. CROTTY,
                                          District Judge
11                                        -and a jury-
                         APPEARANCES
12
     GEOFFREY S. BERMAN
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW J. LAROCHE
          SIDHARDHA KAMARAJU
15        DAVID W. DENTON JR.
          Assistant United States Attorneys
16
     SABRINA P. SHROFF
17        Attorney for Defendant
          -and-
18   DAVID E. PATTON
          Federal Defenders of New York, Inc.
19   BY:  EDWARD S. ZAS
          Assistant Federal Defender
20
     Also Present:  Colleen Geier
21                  Morgan Hurst, Paralegal Specialists
                    Achal Fernando-Peiris, Paralegal
22                  John Lee, Litigation Support
                    Daniel Hartenstine
23                  Matthew Mullery, CISOs, Department of Justice

24

25

K2I3SCH1

|     |                                                          |
| --- | -------------------------------------------------------- |
|  1  | (In open court; jury not present)                        |
|  2  | THE COURT:  I received the defendant's motion for a      |
|  3  | mistrial.  It's the 12-page letter which we received this |
|  4  | morning.  It is dated February 18.                       |
|  5  | How much time does the government want to respond?       |
|  6  | MR. LAROCHE:  Your Honor, we'll respond by tomorrow at   |
|  7  | the end of the day, if that works for the Court.         |
|  8  | THE COURT:  Okay.  I gather with regard to the           |
|  9  | witnesses, the parties are in agreement with the exception of |
| 10  | the subpoena addressed to Secretary of State Pompeo?     |
| 11  | Is that correct, Ms. Shroff?                             |
| 12  | MS. SHROFF:  I think we're in agreement as to one, for  |
| 13  | sure.  We're not in agreement as to Mr. Pompeo, given his |
| 14  | waffling position on WikiLeaks.                          |
| 15  | THE COURT:  I'm referring to the last sentence of the   |
| 16  | letter:  "As to the remaining subpoenaed witnesses at issue |
| 17  | from the government's February 12 letter, the parties have |
| 18  | conferred and reached agreement on how to proceed."  That's |
| 19  | what Mr. Branden says.                                   |
| 20  | MS. SHROFF:  I think there seems to be some slip        |
| 21  | between the cup and the lip.  There is one -- we're going to |
| 22  | work it out.  I think Mr. Laroche and I will talk some more, |
| 23  | but I'm pretty sure we won't need judicial intervention on it. |
| 24  | THE COURT:  Except for Secretary Pompeo.                |
| 25  | MS. SHROFF:  That's right.                              |

K2I3SCH1

1          THE COURT:  Okay.

2          MS. SHROFF:  And good morning, your Honor.  I'm sorry

3   I was not here when you came in.

4          THE COURT:  I'm glad you're here.  Anything else to

5   take up before we call the jury in?

6          MR. LAROCHE:  Not from the government, your Honor.

7          MS. SHROFF:  No, your Honor.  Thank you.

8          THE COURT:  Next witness.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2I3SCH1                        Stedman - Direct

1              (Jury present)

2              THE DEPUTY CLERK:  Please rise.  Please state your

3    name.

4              THE WITNESS:  Frank Stedman.

5              THE COURT:  Please sit down.  Okay, Mr. Laroche.

6              MR. LAROCHE:  Thank you, your Honor.

7     FRANK STEDMAN,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. LAROCHE:

12   Q.  Good morning, Mr. Stedman.

13   A.  Good morning.

14   Q.  Are you employed?

15   A.  Yes.

16   Q.  Where do you work?

17   A.  The Central Intelligence Agency.

18   Q.  How long have you worked at the CIA?

19   A.  About 10 years now.

20   Q.  I want to direct your attention to March 2017.  Were you

21   employed by the CIA at that time?

22   A.  Yes.

23   Q.  Were you working for the CIA in the United States at that

24   time?

25   A.  No.

1   Q.  Were you working overseas at a CIA base?

2   A.  Yes.

3   Q.  I'm going to refer to that location as Foreign Office West.

4   Okay?

5   A.  Okay.

6   Q.  To your knowledge, has the CIA ever publicly acknowledged

7   the existence of Foreign Office West?

8   A.  No.

9   Q.  Generally, what were you doing in Foreign Office West at

10  that time?

11  A.  So, I was there in a role similar to what I did back in our

12  main office, but I was supporting field operations, field

13  sites.

14  Q.  Did that include developing cyber tools?

15  A.  Yes.

16  Q.  I want to direct your attention to March 7, 2017.  Did you

17  learn about the disclosure of CIA information that day?

18  A.  Yes.

19  Q.  Generally, what impact did that have on your work at

20  Foreign Office West?

21  A.  So, we found out in the afternoon.  I was the first one to

22  be notified at that location from somebody back at our main

23  building.  And we kind of stopped all operations.  We stood

24  down and we started triaging what actually had happened, and

25  try to decide next steps.  How it would affect us near term,

K2I3SCH1                        Stedman - Direct

1   both personally and operationally.

2   Q.  I want to come back to Foreign Office West a little later.

3   A.  Okay.

4   Q.  Were you working in Foreign Office West in January 2016?

5   A.  No.

6   Q.  Where were you working within the CIA at that time?

7   A.  I was at the CCI main office.  I was in the Engineering

8   Development Group, Applied Engineering Division, Operations

9   Support Branch.

10  Q.  That's the CCI office in the United States; is that

11  correct?

12  A.  Correct.

13  Q.  Do you see anyone else in the courtroom today who worked

14  with you in your branch?

15  A.  Yes.

16  Q.  Who?

17  A.  Josh Schulte.

18  Q.  How long did you work in the branch OSB?

19  A.  Up until I left in fall 2016.  So, approximately six years

20  maybe.  Five, six years.

21  Q.  What was the culture like of that branch?

22  A.  It was casual, often unprofessional, especially if you're

23  focusing on kind of our verbal communication internal to the

24  branch.  We were kind of known as the social branch.  We were

25  definitely known as the younger branch, so younger in age and

1    in experience developing these sorts of capabilities.  And I

2    think there was probably some level of thought that we didn't

3    do as much kind of like deep technical things.

4    Q.  How often did you interact with the defendant while you

5    were working in the branch?

6    A.  So, early on, we were in the branch near the same time or

7    came into the branch near the same time.  So, he used to sit an

8    aisle to the side of me, and I didn't interact with him a ton

9    then first coming on.  But in the last maybe two to three

10   years, I sat right across from him.

11   Q.  Generally, what were those interactions like?

12   A.  So we were work colleagues, he sat right across from me,

13   talked to him every day that we were both there, anyway.  About

14   technical things, about work things, about politics, etc.

15   Q.  Did you observe the defendant interact with the other

16   people in the branch?

17   A.  Yes.

18   Q.  Generally, what were those interactions like?

19   A.  I think as I mentioned before, it's definitely a relaxed or

20   casual environment, pretty unprofessional.  So depending upon

21   who Josh was interacting with, it would be different, right.

22   If it was somebody who would joke around more, there would be

23   more back and forth.  If it was somebody who was quieter, it

24   would be more work-related discussions, technical discussions.

25   Q.  Did the defendant have a nickname at the CIA?

1  A.  Yeah.  So, we did call him "The Nuclear Option."  We also I

2  think at one point in time, he printed off a nameplate, the

3  nameplates that were in front of our cube or desks, printed off

4  the name "Bad Ass" and stuck it on the cube.  So kind of

5  between those two were the main ones.

6  Q.  Why did you call him The Nuclear Option?

7  A.  So, I think when it first came about is kind of, a lot of

8  the joking around was about shock value.  And we talked about

9  him as a nuclear option because of kind of this talk about

10  disproportionate response.  So, a lot of it was talk, we'd joke

11  about bringing him into a meeting, especially if it was

12  something we didn't want to do or didn't like to do, he'd skip

13  past 1 and 2 and go straight to 10.  So I think that's kind of

14  why we called him that to start.

15  Q.  Are you familiar with some of the tools defendant worked

16  on?

17  A.  Yes.

18  Q.  At the CIA?

19  A.  Yup.

20  Q.  Have you heard of a tool called Drifting Deadline?

21  A.  Yes.

22  Q.  Who was primarily responsible for that tool?

23  A.  Josh was.

24  Q.  Why was it called Drifting Deadline?

25  A.  So, it was called Brutal Kangaroo to start, and then it

1   became kind of a subcomponent of that tool or that program.

2   And the joke was that I think the deadline kept moving.  So, it

3   wasn't continually getting done.  One of the jokes was he said

4   it would be done in November, but we didn't say what year.  So

5   that was kind of why it was called that.

6   Q.  In early 2016, did the defendant become upset about

7   anything related to Drifting Deadline?

8   A.  Yeah.

9   Q.  What happened?

10  A.  So, it probably started before then, but kind of came to a

11  head in early 2016.

12          So, probably late 2015, some of the customers for the

13  Brutal Kangaroo Drifting Deadline tool decided to contract out

14  a similar capability.  The reason they gave was they were going

15  to use it for a single operation and they didn't want that

16  operation to impact any of the other ones.  I think both Josh

17  and myself didn't see that as the real reason.  We saw it as

18  that they either didn't want to wait for him to finish the

19  tool, it was taking too long, or they didn't expect the quality

20  to be where they wanted it to be.  So they kind of put that

21  label or that reason why they did this separate effort.  And

22  like I said, it came to a more contentious point in the

23  beginning of 2016.

24  Q.  What was the separate effort that you're referring to?

25  A.  So the project was called Almost Meat.

K2I3SCH1                        Stedman - Direct

1  Q.  What was Almost Meat?

2  A.  It was basically, so I mentioned Drifting Deadline being a

3  subcomponent of the Brutal kangaroo program.  Almost Meat was

4  basically another version of Brutal kangaroo or was going to

5  be.

6  Q.  Have you heard the term "access vector"?

7  A.  Yes.

8  Q.  Just generally, what is an access vector?

9  A.  So access vector or we might call it an exploit sometimes,

10  depending upon the nature of it.  But it's basically how we

11  gain access to a target system, usually taking advantage of a

12  flaw in -- either an application or the operating system.

13  Q.  In this case, relating to Drifting Deadline, what was being

14  provided to the contractor?

15  A.  So, the access vector is the most important piece.  It is

16  the hardest to find.  It's probably the most valuable piece.

17  And so, what made Drifting Deadline and Brutal Kangaroo

18  special, and what would make Almost Meat special, was being

19  able to take advantage of this access vector.  So we shared the

20  access vector between the two tools.

21  Q.  Did the defendant have any involvement in creating that

22  access vector?

23  A.  No.  Not that I remember.

24  Q.  Who did?

25  A.  I wrote most of the access vector code.

1  Q.  Was the defendant upset about giving the access vector to
2  the contractor?
3  A.  Yeah, I think we were both frustrated to some degree, but
4  for different reasons.  My frustration was that they wouldn't
5  actually directly call out the issue.  They wanted to instead
6  come up with another reason to have a separate effort be made.
7  And I think he was frustrated because it is a competing effort,
8  and kind of the way we work, right, if one of those tools is
9  done first, and is used successfully, I think it becomes kind
10  of the flagship product that will be used, and the other one
11  won't.
12  Q.  Did you talk to the defendant about this issue when it came
13  up?
14  A.  Yeah, it wasn't a single instance, I think, right.  I think
15  we had heard about the separate effort, we probably discussed
16  it a little bit then.  But, we sit next to each other, daily,
17  right, throughout a lot of this process when I'm not in
18  training then.
19        So, yes, at different points in time we had different
20  discussions about it.
21  Q.  What were those conversations like?
22  A.  So, I think to start, we both disagreed with the reason why
23  the contracted effort was happening.  From my optic, I did want
24  to see it used, so there was some frustration on my part as
25  well with Drifting Deadline not being done, because I saw it as

1    a unique opportunity that we had this access vector and I

2    wanted it to be used.  I wanted to capitalize on that

3    opportunity.  So I had less issue with them having it and more

4    wanted to control how we split up the two efforts.

5            Josh, on the other hand, I think took it as a little

6    bit of a competition.  But I think in my mind, if the

7    contractor would have finished before, had the better

8    capability --

9            MS. SHROFF:  Objection as to what he thought

10   Mr. Schulte was thinking.

11           THE COURT:  Overruled.

12   A.  Okay.  So, the -- I think it would end up hurting

13   reputation.  I think it would appear to all of us as peers that

14   he wasn't able to complete it.

15           MS. SHROFF:  Objection.

16           THE COURT:  Overruled.

17   A.  So, I think that's kind where his frustration lied.

18   Q.  Did there come a time when there was a meeting about the

19   contractor getting the access vector?

20   A.  Yes.

21   Q.  Who participated in that meeting?

22   A.  It was myself, Sean, my direct supervisor or our direct

23   supervisor, and Josh.

24   Q.  Was the defendant invited to that meeting?

25   A.  He was not, no.

1    Q.  How do you know he was not invited to the meeting?

2    A.  So I remember this more clearly than most memories because

3    I thought it stood out.

4         I got up from my desk and met Sean, the meeting was

5    across the hall.  Josh got up with me, while we're walking

6    over, Sean said, You're not coming to this meeting.  And I

7    remember particularly Josh saying, Fuck you, I am coming to

8    this meeting.  Somewhat maybe jokingly, but it was assertive

9    enough that Sean didn't really know what to do or how to react

10   as we walked over.  To me, I thought that was crossing a line.

11        And so we walked to the meeting room, continued to

12   walk, and Sean said, All right, if you're going to come to the

13   meeting, you're sitting in the back and you're not saying

14   anything.

15   Q.  You said this interaction stood out to you?

16   A.  Yeah.

17   Q.  Why did it stand out to you?

18   A.  So, I think still at this time, when Josh came on to the

19   branch, Sean was a big part of his development as a young

20   officer.  Right.  He was a good mentor, he was a good friend to

21   Josh.  And they, they're able to joke with each other.  I don't

22   think profanity was the issue.  I thought Josh asserting

23   himself over Sean's kind of ruling in this was, was -- crossed

24   some line.  I think it was evident by the way Sean reacted.

25   Q.  What happened during the meeting?

K2I3SCH1                        Stedman - Direct

A.   So, it was the people running the contract for Almost Meat, it was the customers for Almost Meat, it was the contracting group as well as I remember.  We were talking about how to best, if we're going to share this access vector, how we're going to do it.

         I don't quite remember if I suggested it, but it would make sense if I suggested that I do the signature diversification between the tool sets.  So I wrote a different set of code for them to use than was in the Drifting Deadline.  But I assume I did since I was best fit to.

         So, once it came to that, once it was decided that we were going to do the diversification, the discussion kind of turned to timeline.  So the way the contracts were written, like, they wanted to know how quickly they can get it or how to integrate it best.  So we started talking about timelines of when we could provide it to them.  Josh from the back said that it would take, I don't remember the time, probably somewhere between -- I think it had to be somewhere between like six weeks a couple of months is what he estimated.  I, sitting at the table, kind of knew what he was getting at.  And I rebutted it a little bit and I said, well, if I just focus on it, I could probably get it done in a couple of weeks.

Q.   You said you knew what he was getting at.  What do you mean by that?

         MS. SHROFF:  Objection.

1            THE COURT:  Overruled.

2    A.  So, like I said, I think this ends up being a hit on his

3    reputation, if this moves forward, and I think he saw it as a

4    competition.  So, when in that meeting, basically, I think he

5    made efforts before and after to try not to get them to use the

6    best part of the tool, right, the part of the tool that would

7    have made them successful, and without it, would have made them

8    unsuccessful.  So I think he was trying to delay it enough so

9    that either Drifting Deadline could get ahead, or that they

10   would either kill the contract or steer it in a different

11   direction.

12   Q.  Was the access vector eventually provided to the

13   contractor?

14   A.  Yes.

15   Q.  How long did that take?

16   A.  I believe it was a week and a half to two weeks that I

17   delivered it.

18   Q.  After the meeting, did you talk to the defendant about the

19   timing of the access vector?

20   A.  Yeah.  I think, so, after the meeting we head back to our

21   desk, we're sitting across from each other.  It wasn't debated

22   much further.  I think he said to me again, hey, do you really

23   think you can get it done that quickly.  Don't you think it

24   will take a while longer.  I also, neither of us are stupid.  I

25   kind of saw where he was going, and I said, no, I think I can

1   do it if I focus on it.  And that was kind of the end of the

2   conversation.

3   Q.  What do you mean, you saw where he was going with it?

4   A.  Yeah, I think it was the same thing of he was trying to get

5   me to kind of be on this team against the other side.  Because

6   he knew I was frustrated a little bit with it as well.  So I

7   think he was trying, for lack of a better term, recruit me for

8   his side and kind of push off the other and focus on Drifting

9   Deadline.

10  Q.  Why were you frustrated with it?

11  A.  So, I think I mentioned before, it is a super unique and

12  rare opportunity.  I had spent time putting it all together.

13  Not all pieces that I created were being integrated into

14  Drifting Deadline, or the fact that it wasn't being delivered

15  as a full version, that people weren't using it and impact

16  wasn't coming from it.  So I wanted to get it to a place where

17  people were capitalizing on it.

18  Q.  Did the defendant send an e-mail about this issue after the

19  meeting?

20  A.  Yes.

21          MR. LAROCHE:  If we can publish, please, Government

22  Exhibit 1027.

23  Q.  Do you see that on your screen, Mr. Stedman?

24  A.  Yes.  Do you mind if I take a second to read it?

25  Q.  Sure.

1         (Pause)

2    A.  All right.

3    Q.  Do you recognize this e-mail?

4    A.  Yes.

5    Q.  Is this the e-mail you just referred to that was sent after

6    the meeting?

7    A.  Yes.

8    Q.  Who sent it?

9    A.  This is from Josh.

10   Q.  Who did he send it to?

11   A.  He sent it to the original customers of Drifting Deadline,

12   which are separate from kind of Brutal Kangaroo or Almost Meat

13   customers.  Then he cc'd Amol, Sean and myself.

14   Q.  You said the original customers of Drifting Deadline?

15   A.  Yes.

16   Q.  What do you mean by that?

17   A.  So, when we build capabilities, we're usually building them

18   for somebody or to a requirement.  Maybe somebody has an

19   operation in mind.  So, these customers listed here are ones

20   that had used Drifting Deadline before.

21   Q.  Can you please summarize what the defendant said in this

22   e-mail.

23   A.  So, he's telling the Almost Meat customers that Almost Meat

24   is a tool that's going to do the same thing and use some code

25   that is shared with Drifting Deadline.  And that if they don't

1    basically act, that their future use of Drifting Deadline will

2    be compromised.

3    Q.  Did you have a reaction to this e-mail?

4    A.  I thought it was more of the same effort, to kind of quash

5    Almost Meat's progress.  It was -- he didn't find a route

6    through myself or Sean to shut it down.  So I saw him -- the

7    customers or operators in the sense, they would have some level

8    of authority to kind of push back, right.  They can make a case

9    for their operations.

10            But the way this is worded is absolutist and dramatic,

11   and provides kind of an unnecessary sense of urgency to it.

12   He's saying if you don't act now, like, Almost Meat is almost

13   complete, they are going to highjack the Drifting Deadline

14   code.  This will potentially expose the code and risks all

15   future operations.

16            I think he is just trying to basically take advantage

17   of the customers' interest in Drifting Deadline to kind of

18   force multiply his side of the fight.

19   Q.  Did the defendant usually write e-mails like this?

20            MS. SHROFF:  Objection.

21            THE COURT:  Overruled.

22   A.  So, I won't say that he wrote them like this a lot.  I

23   think when he was trying to do something very specific, whether

24   he's angry, whether he's trying to push a goal, he would write

25   with this dramatic or dramatized version style.

1  Q.  Do you see on this e-mail Amol is copied?

2  A.  Yes.

3  Q.  Do you know why Amol was copied on this e-mail?

4  A.  Amol was also on the Drifting Deadline project.

5  Q.  Why was he on the Drifting Deadline project?

6  A.  So, Amol came on with not much experience in this realm

7  necessarily.  He took on a few, like, simpler projects to

8  start.

9       MS. SHROFF:  Your Honor, we have an objection.  There

10  is an objection.  The proper witness would be Amol.  The

11  government's free to call Amol.

12       THE COURT:  Objection is overruled.

13  A.  Yeah, like I said, Amol was a newer developer.  He had done

14  some kind of, like, simple projects to get him up to speed.

15  And then Drifting Deadline kind of being a flagship project or

16  project area, he paired him up with Josh who was one of the

17  more senior developers in the branch, to kind of get him used

18  to some of those tool sets.

19  Q.  During your time in OSB, did you observe interactions

20  between the defendant and Amol?

21  A.  Yes.

22  Q.  Generally, what were those interactions like?

23  A.  So, Josh sat to my right, Amol sat behind me in kind of a

24  bullpen area.  When Amol first got there, we used to make fun

25  of him for being maybe what we considered be too professional.

1    We made fun of the way he answered the phone and stuff like

2    that.  As he got comfortable with the culture of the branch, he

3    kind of loosened up a little bit.  I think that's -- that

4    opened the door for a little bit back and forth between Josh

5    and Amol, and then kind of as he was put on the Drifting

6    Deadline project, kind of got a little bit more pointed and a

7    little bit progressively worse over time.

8    Q.  What do you mean by "progressively worse over time"?

9    A.  So, as kind of issues arose around Almost Meat, but more so

10   around the kind of the length of Drifting Deadline.  Right.  It

11   wasn't being delivered yet.  We were going to do a couple more

12   things, that kind of stuff.  I think Amol was starting to feel

13   pressure a little bit from his side, right.  He's now also tied

14   to this project.  And so, from his career perspective or from

15   his professional perspective, right, this could also look bad

16   on him.  So I think he is getting more irritated and frustrated

17   with it as well.

18   Q.  Did you ever see any comments between them that you viewed

19   as threatening?

20   A.  No.

21   Q.  Did there come a time when the comments between them became

22   more personal in nature?

23   A.  Yes.

24   Q.  Can you explain that.

25   A.  Maybe more of the height of their back and forth, there

1  were a couple occasion that I can remember where I think the

2  bickering became more frequent in between them.  A little bit

3  more of "are we ever going to get this done" kind of stuff, and

4  I remember specifically Josh called out one time that Amol

5  doesn't do anything basically worthwhile.  Does more aesthetic

6  and less functional.  Then there was a second instance that was

7  more personal where he basically called him fat.

Q.  Did there come a time in late February 2016 when you saw a

9  disagreement escalate between Amol and the defendant?

10  A.  I think if we're referencing that second instance where --

11  this had been going on for a while, so I think we were all kind

12  of aware of the situation.  Jeremy and I had discussed it.

13  Jeremy said he would talk to Josh and Amol kind of separately,

14  try to get it back to a better place.  They can't be doing that

15  kind of stuff in the office kind of thing.

16         I know at some point during that conversation, I don't

17  know what led it to that, but Jeremy told Josh to be the bigger

18  person.  And Josh responded that Amol is the bigger person out

19  of all of us by far.

20  Q.  Did you have an understanding of what the defendant was

21  referring to?

22  A.  Amol's weight.

23  Q.  After that interaction, did you learn that the defendant

24  had made a complaint against Amol?

25  A.  After that, yeah.

K2I3SCH1                          Stedman - Direct

1  Q.  When approximately did he make that complaint?

2  A.  I would guess in the next couple of weeks.  I think in the

3  next couple of weeks.

4  Q.  Did you have an understanding of what the defendant had

5  accused Amol of doing?

6  A.  Yes.

7  Q.  What?

8  A.  Josh had stated that Amol had threatened to kill him.

9  Q.  Did you ever see or hear Amol do anything like that?

10 A.  No.

11 Q.  Have you ever seen Amol make any threats against anyone

12 else?

13 A.  No.

14 Q.  Did you believe the allegations?

15 A.  No.

16 Q.  Why not?

17 A.  I think the way everything was framed in the context

18 leading up to that event, like I mentioned before, there was

19 that instance where basically Josh called Amol fat.  And

20 talking with Jeremy and Amol, I knew Amol was planning on going

21 to the supervisor, our supervisor Sean, and maybe a level up,

22 to kind of talk about the situation, how he, like, how he

23 should handle it.  I know Amol talked to Sean about it.  And

24 from what I remember, Sean said let's not escalate this.

25          MS. SHROFF:  Objection, your Honor.  It's all hearsay.

K2I3SCH1                          Stedman - Direct

1          THE COURT:  Overruled.

2     A.  Sean had said that he would talk to Josh about it.  Let's

3     not escalate it further, we'll kind of figure it out kind of

4     thing.

5          The nature of the comments that Amol made was

6     basically that he didn't think he could work with Josh.  That

7     Josh was a problem for our branch, that he's unprofessional,

8     and wanted him separated, basically, from the branch.  So I

9     think that context leading up to the alleged death threat was

10    part of my evaluation that I didn't believe it.

11    Q.  Did it surprise you that the defendant made these

12    allegations against Amol?

13         MS. SHROFF:  Objection, your Honor.

14         THE COURT:  Overruled.

15    A.  I'm not -- so yes and no.  I'm not surprised about the

16    retaliation.  I am surprised or was surprised at the time about

17    the degree to which he went with the allegations.  Like, I

18    think that was well beyond what I thought he would retaliate.

19    Q.  Why were you not surprised about the retaliation?

20    A.  Like, similar to how he reacted to Almost Meat, and that

21    conflict with Almost Meat stuff, he threatened to go to the

22    Inspector General.  I don't know if he actually followed

23    through.  But he threatened to go to the Inspector General and

24    claim fraud, waste, and abuse on it.  And it wasn't necessarily

25    something that -- it affected his reputation more than it

1  affected anything else.  So, I saw, like, more of the same,

2  right.  This thing that Amol was saying to the supervisor --

3         MS. SHROFF:  Your Honor, we have an objection to the

4  ongoing narrative.  There is not even a question pending before

5  this witness.  And the witness is being led all throughout this

6  time.

7         THE COURT:  The objection is overruled, Ms. Shroff.

8  A.  The supervisor had some involvement in promotions, so I

9  think is a knock against his reputation, so retaliation didn't

10  surprise me.

11  Q.  After the fight -- or after the complaint was filed about

12  the alleged fight, were the defendant and Amol moved within the

13  branch OSB?

14  A.  Yes.

15  Q.  Where were they moved, generally, within the branch?

16  A.  I believe to separate aisles.

17  Q.  Did the defendant move to that separate aisle?

18  A.  No.

19  Q.  How do you know that?

20  A.  Because I sit right across from him.

21  Q.  Why didn't he move?

22         MS. SHROFF:  Objection.

23         THE COURT:  Overruled.

24  A.  To me, it's a similar theme.  I think Josh felt --

25         MS. SHROFF:  Objection.  The witness has no knowledge.

1          THE COURT:  The objection is overruled, Ms. Shroff.

2    A.  I think Josh felt that he was in the right.

3          MS. SHROFF:  Objection as to what Josh was thinking.

4          THE COURT:  You can have a continuing objection.

5    You're interrupting now, so stop it.

6          MS. SHROFF:  Yes, your Honor.  May we have a sidebar,

7    your Honor?

8          THE COURT:  No.  The objection is overruled.

9    A.  I think Josh felt that he was the victim in this situation,

10   and he felt that Amol should be the one who has to move.

11   Right.  That Amol was one who caused the problems, he should be

12   the one getting punished in a sense.

13   Q.  Did there come a time when you saw the complaint the

14   defendant made against Amol?

15   A.  Yes.

16   Q.  Where did you see it?

17   A.  He provided it to me typed up on a sheet of paper.

18   Q.  When you say he --

19   A.  Josh provided it to me.

20   Q.  Where did he provide it to you?

21   A.  I was sitting at my desk, and he came up to me and handed

22   me the sheet of paper.

23   Q.  Did he say anything to you when he handed you the sheet of

24   paper?

25   A.  He said that if you're wondering what's going on, here's

K2I3SCH1                        Stedman - Direct

1    what's going on, or something to that effect.

2                MR. LAROCHE:  Ms. Hurst, can you please go to

3    Government Exhibit 1038 and the fifth page of that exhibit.

4    Just zoom in on the text here, please.

5    Q.  Mr. Stedman do you recognize this?

6    A.  Yes.

7    Q.  What is it?

8    A.  This is the sheet of paper he handed me.

9    Q.  Did you review it when he handed it to you?

10   A.  Yes.

11   Q.  What was your reaction?

12   A.  So, when he handed it to me, I think there were other

13   people around.  But he handed it to me and he watched me read

14   through it.  I took my time to read through it.  I didn't

15   respond.  I think at the end I handed it back to him and said

16   okay.  And didn't say anything else.

17   Q.  Why did you respond in that way?

18   A.  Because -- I thought, one, he didn't really realize what he

19   was doing.  And two, I think it pissed me off a little bit.

20   Q.  Why did it upset you?

21   A.  Because I think the whole, the whole sheet, the whole

22   writeup is bullshit and exaggerated and framed in a certain way

23   and written like a fictional narrative.  I think it is a little

24   bit insulting, too.  If he expected me to believe this was a

25   real death threat, that the first two paragraphs were things

1    that I can't imagine he would believe that I didn't think was a

2    lie.

3            In particular, I think in that first paragraph, yes,

4    all those things and maybe even in variation were said, but at

5    no point in time did anybody indicate it was uncomfortable.

6    They were said for, like, shock value.  There was laughing

7    before or after.

8            And then in the next one, I think in the next

9    paragraph he mentions that usually people do not respond to his

10   bullying or attempt to fight back.  I don't think anybody, to

11   include myself, within OSB thought Amol was a bully.  That we

12   would believe that, that we would fear responding to him in any

13   sort of way.

14           And then I think that last paragraph, what stood out

15   to me was the towering over and the through gritted teeth and

16   stuff like that. I think he writes in that style when he's

17   trying to tell a story or he's trying to seriously provide

18   evidence to his side or something like that.

19   Q.  What do you mean by that?

20   A.  Similar, similar to the Almost Meat e-mail, he adds kind of

21   adjectives that make it seem more extreme or absolute.  Yeah.

22   I think that's basically it.

23   Q.  Were there parts of this document that you knew to be

24   false?

25   A.  As far as that second paragraph, like I mentioned, I don't

1    think -- I definitely didn't feel myself that Amol was a bully

2    or that he was scared to fight back against him.  I didn't see

3    him as threatening at all.  So that part.

4    Q.  Did there come a time when the defendant and Amol were

5    moved out of the OSB branch?

6    A.  Yes, I believe Josh moved first to a different branch and

7    then Amol later somewhere else.

8    Q.  After they were moved to different branches, did you learn

9    about an issue involving the defendant and OSB libraries?

10   A.  Yes.

11   Q.  Generally, what is OSB libraries?

12   A.  So, OSB libraries was an effort by our branch to kind of

13   create set of code techniques that anybody developing cyber

14   capability could pull from if they needed something, and it

15   would be tested and reliable.  So we created a bunch of

16   different -- we called them "modules" under each library that

17   covered a certain function of cyber tools.

18   Q.  Did you have a role with OSB libraries?

19   A.  Yes.

20   Q.  What was that role?

21   A.  So at the beginning, Josh, Jeremy, myself met to some

22   degree, we kind of were the ones who sketched out or framed how

23   they would be implemented.  We discussed kind of like the

24   interfaces for them.  And then I ended up writing quite a few.

25   Q.  What was your understanding of the issue involving the

K2I3SCH1                        Stedman - Direct

1    defendant and OSB libraries?

2    A.   So, I think the issue was when he was moved to a different

3    branch, the Remote Development Branch, we took him off the OSB

4    libraries, especially in that role as kind of the

5    administrator, co-administrator of the OSB libraries.  So, I

6    think the issue was that he wanted to be back on kind of doing

7    the same work that he was doing before.

8    Q.   Did you have a role in deciding whether he lost privileges

9    to OSB libraries?

10   A.   I don't remember, like, a specific meeting or anything

11   where we decided.  I remember talking to Jeremy about the

12   decision and agreeing with it.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. LAROCHE:

2   Q.  And what was your understanding of who made the final

3   decision?

4           MS. SHROFF:  Objection.

5           THE COURT:  Overruled.  Excuse me.  Overruled.

6   A.  Jeremy and myself probably had the most invested kind of in

7   the decision from the line level, so I know we agreed.  I

8   believe that Sean was -- Sean wasn't a strong voice in the

9   decision, probably, but I'm sure we notified him.

10          MR. LAROCHE:  Could we show Government Exhibit 1061,

11  please, and the second-to-last page.

12  Q.  Do you recognize this email?

13  A.  Yes.

14          MR. LAROCHE:  If we could go up one page to see who

15  sent it, at the bottom.

16  Q.  Who sent this email?

17  A.  Jeremy.

18          MR. LAROCHE:  If we could go to the next page, please.

19  Q.  When did he send it?

20  A.  April 14, 2016.

21  Q.  Who did he send it to?

22  A.  He sent it to Josh and cc'd myself and some of the

23  management chain.

24  Q.  And what part of the management chain did he copy?

25  A.  Our direct supervisor, Sean, and then the level above that,

K2iWsch2                         Stedman - Direct

1   Anthony.

2   Q.   Could you summarize what Mr. Weber said in this email?

3   A.   He said that he discussed this with Sean, our direct

4   supervisor, and that the OSB libraries will maintain -- will be

5   maintained by OSB and under our guidance, mine and -- mine and

6   Jeremy's, and that he could contribute to them and that we were

7   trying to move it to be a division-level resource at some point

8   in time.

9   Q.   After this email was sent, did you learn about any actions

10  the defendant took with respect to his access to OSB libraries?

11  A.   So, part of this discussion to start was we knew Josh was

12  unhappy with having been moved and having lost access to the

13  libraries and maybe some of the other projects he worked on.

14  We knew he also had administrative privileges to Stash, and so

15  Jeremy and I were talking in the afternoon, probably around

16  this time -- Thursday sounds right, because it was right before

17  the weekend -- and Jeremy said to me that if he uses his

18  administrator credentials to put himself back on the OSB

19  libraries, that Jeremy and a member of our infrastructure team

20  was going to come in over the weekend and drop every, like,

21  line-level employee from having administrator access within

22  Atlassian and that that was going to reside with the

23  infrastructure team, where it should have been the entire time.

24  Q.   And did that happen?

25  A.   Yes.

K2iWsch2                          Stedman - Direct

1   Q.  Why did it happen?

2   A.  Because Josh came in and put himself back on the OSB

3   libraries.

4   Q.  Now, did there come a time after this email when you had a

5   conversation with the defendant about his privileges on DevLAN?

6   A.  Yes.

7   Q.  When, approximately, did that happen?

8   A.  It was the Monday after the weekend that he lost access

9   again.

10  Q.  Approximately what time did it happen on that day?

11  A.  Around 10 or 11.

12  Q.  Where did this conversation happen?

13  A.  At my desk.

14  Q.  And at the time you were still in OSB?

15  A.  Yes.

16  Q.  Where was OSB located at the time?

17  A.  On the ninth floor.

18  Q.  Where was the defendant's new branch located?

19  A.  On the eighth floor.

20  Q.  Can you describe what happened during this conversation

21  with the defendant?

22  A.  So, he basically came in and said that he had talked to

23  Sean, our direct supervisor, and that he was supposed to be put

24  back onto the OSB libraries and that if I could go ahead and do

25  it.

1    Q.  Did you do that?

2    A.  No.

3    Q.  Why not?

4    A.  I knew the situation.  I was talking to Jeremy about this

5    before the weekend.  I had assumed Jeremy had come in over the

6    weekend.  I said I'd have to hear it from Sean, I think is what

7    I said, whether I was going to put him back on or not.

8    Q.  What was the defendant's demeanor like during this

9    interaction?

10   A.  Uh, so, I don't think he appeared to be angry, but his

11   demeanor was serious.  I think he was trying to say everything

12   very casually to me as if I just didn't know that Sean had said

13   he could be back on.

14   Q.  Why did you have that take from the interaction?

15   A.  I -- I think he was -- I don't really know why.  Like, I

16   knew what was going on.  I think he was just trying to recover

17   lost ground again.

18   Q.  Did there come a time after this interaction when you

19   transferred to Foreign Office West?

20   A.  Yes.

21   Q.  When, approximately, did that happen?

22   A.  Fall 2016.

23   Q.  Did Foreign Office West have access to DevLAN?

24   A.  Yes.

25   Q.  How did you access DevLAN from Foreign Office West?

K2iWsch2                          Stedman - Direct

1   A.   I had a workstation that had network connectivity back to

2   the main office and all the services being run there.

3   Q.   Just generally, what does network connectivity mean?

4   A.   So, there's a cable in the back that connects to a network

5   that's routed back to our main office, which means that I can

6   log on to that machine and access all the services people that

7   can at the main office.

8   Q.   What was the connectivity like to DevLAN at Foreign Office

9   West?

10  A.   Abysmal.

11  Q.   Why?

12  A.   Very poor.

13  Q.   Why was it?

14  A.   The one instance I can remember -- and I believe I sent

15  multiple emails on this to our infrastructure team -- I was

16  transferring a PowerPoint file to our file share.  It wasn't

17  that big of a file.  Said it was going to take six hours the

18  rate was about 40 kilobytes a second, which is bad.

19  Q.   Did that ever improve?

20  A.   No.

21  Q.   Earlier, we started to talk about March 7, 2017, and I want

22  to focus on that now.

23  A.   Sure.

24  Q.   You stated earlier that you were working at Foreign Office

25  West that day?

1   A.   Yes.

2   Q.   Just generally describe what happened at Foreign Office

3   West after you learned about the disclosure of the CIA's

4   information.

5   A.   So, I think I mentioned before I was the first one to be

6   notified.  I had been working on a project for a couple years

7   that had never been used operationally, but it was listed in

8   the press.  So, a friend from the main office chatted with me

9   directly and said, Hey, like, the tool you're working on is out

10  there.

11       I notified my colleague who sits next to me and the rest of

12  the office, so we kind of stopped all operations, kind of stood

13  down.  We all reached back to different people back home to try

14  to see what all had been compromised, what it all means.

15       I remember we had a big meeting a couple hours after we

16  were notified, where we talked about near-term things that we

17  should do or think about, personal security being at the top of

18  the list, with us not knowing how the host government would

19  react, how the public would react, how it would affect all of

20  the operations we had.

21  Q.   And just generally, why was personal security an issue?

22  A.   So, revealing the location we were in narrows the pool of

23  people who are there and, I think, puts risk on persons that

24  could be exposed, to include myself, as well as anybody we're

25  working with or around and risk to operations.

1    Q.  Let's talk about DevLAN for a moment.

2    A.  Sure.

3    Q.  After the leak, did you continue using DevLAN?

4    A.  No.

5    Q.  Why not?

6    A.  I think once we were notified of the leak, we kind of got

7    some informal guidance, Don't touch everything.  Like I

8    mentioned before, the tool that I'd been working on wasn't

9    anywhere else besides DevLAN, really, so we knew that there was

10   some compromise of that system or network.  And so the guidance

11   was informal first and then became formal maybe the next day.

12   Q.  At the time of the leak, how long, approximately, had you

13   been at the CIA?

14   A.  Right around seven years.  Yeah, seven years.

15   Q.  And over that time did you work almost exclusively on cyber

16   tool development?

17   A.  Yes.

18   Q.  What impact did the disclosures have on your work over the

19   years?

20   A.  It destroyed it.  I don't think we could use anything that

21   I'd ever worked on before again.

22        MR. LAROCHE:  Could we show Government Exhibit 13,

23   please.

24   Q.  Do you recognize this?

25   A.  Yes.

1  Q.  What is it?

2  A.  It's a user guide for Brutal Kangaroo, mainly the

3  subcomponent Drifting Deadline.

4  Q.  Did you work on Brutal Kangaroo at all at the CIA?

5  A.  Just the access vector components, yes.

6  Q.  What, if any, impact did the disclosure by WikiLeaks have

7  on this project?

8  A.  It made it unusable and any code that was shared between it

9  and other tools made those tools unusable, and particularly it

10  made the access vector unusable.

11  Q.  Why is that?

12  A.  Because now an adversary could attribute the cyber tool,

13  they could understand the concepts of being able to identify it

14  out in the wild.  Yeah.

15  Q.  Other than testifying today, have you ever talked about

16  Brutal Kangaroo publicly?

17  A.  No.

18  Q.  Why not?

19  A.  Because it's a classified capability, and it could hurt

20  operations, historic and future.

21  Q.  Are you familiar with a tool called Bartender?

22  A.  Yes.

23  Q.  What is Bartender, generally?

24  A.  Similar to Drifting Deadline, it's kind of a flagship

25  product of OSB.  It was a tool set that we used kind of

K2iWsch2                         Stedman - Direct

1    broadly.

2    Q.   Did you work on Bartender at all at the CIA?

3    A.   Not much.  I knew kind of all the components.  I think

4    there was maybe only one instance where I either added some

5    small feature or fixed a bug or something, but I didn't really

6    work on it, no.

7    Q.   And other than testifying today, have you ever talked about

8    your work on Bartender publicly?

9    A.   No.

10   Q.   Why not?

11   A.   Because it's a classified program and capability and could

12   pose kind of a national security risk to previous operations

13   and future operations.

14   Q.   What about Foreign Office West; other than testifying

15   today, have you ever talked about Foreign Office West publicly?

16   A.   No.

17   Q.   Why not?

18   A.   It's classified information as well.  There's also a big

19   personal security risk that comes with identifying people and

20   places associated with the CIA.

21   Q.   And did your approach to discussing Foreign Office West

22   change at all after WikiLeaks posted CIA material?

23   A.   Could you repeat the question, sir?

24   Q.   Sure.  Did your approach to discussing Foreign Office West

25   change at all after WikiLeaks posted CIA material?

K2iWsch2                         Stedman - Cross

1   A.   No.

2   Q.   Why not?

3   A.   Because it's still classified information, and there still

4   is a security risk to people there then and throughout the

5   future.

6            MR. LAROCHE:   Thank you.

7            No further questions, your Honor.

8            THE COURT:   Ms. Shroff.

9   CROSS-EXAMINATION

10  BY MS. SHROFF:

11  Q.   Do you remember Amol asking you to come to court and

12  testify on his behalf?

13  A.   I do remember him asking me, yes.

14  Q.   Do you recall saying no?

15  A.   Yes.

16  Q.   Do you remember why you said no?

17  A.   Yes.

18  Q.   And the reason you said no is because you never witnessed

19  anything, correct?

20  A.   That is not --

21  Q.   Yes or no.

22  A.   That is not the reason, no.

23  Q.   Were you there on the day that this alleged threat took

24  place?  Were you in the office?

25  A.   Not at the time.  Maybe a day --

K2iWsch2                          Stedman – Cross

1   Q.  Sir, yes or no.

2   A.  Can you repeat the question, ma'am?

3   Q.  Sure.  When Amol asked you to come and testify for him in

4   state court, you could not go because you were physically not

5   there at the time of the alleged incident, correct?

6   A.  No, not correct.

7   Q.  Were you there?

8   A.  I was not there --

9   Q.  Right.

10  A.  But the other --

11  Q.  Sir, sir, sir.

12  A.  -- part of your question.

13  Q.  Try listening to the question.

14  A.  Sorry.  What's that?  Could you repeat the question?

15          MS. SHROFF:  Your Honor, could you instruct the

16  witness to answer my question as opposed to what he wants to

17  answer?

18          THE COURT:  I think we're having trouble hearing it

19  why don't you try stating your question again.

20          MS. SHROFF:  Sure.

21  Q.  You were not in the office, anywhere close to Amol or

22  Mr. Schulte, at the time of what Mr. Laroche characterized as

23  the alleged threat incident.  Right?

24  A.  Correct.

25  Q.  OK.  Did you tell Mr. Laroche, by the way, Hey, I wasn't

1    even there?

2    A.   No, I don't think so.

3    Q.   Do you remember being interviewed by TMU?

4    A.   Yes.

5    Q.   Do you remember being videotaped for TMU?

6    A.   Yes.

7    Q.   And you remember telling TMU I have no recollection of what

8    happened on Monday or Tuesday?

9    A.   I don't remember saying that.

10   Q.   Really?

11   A.   Yeah.

12   Q.   Do you remember sitting here today being interviewed by

13   TMU?

14   A.   Do I remember -- do I remember being interviewed by TMU,

15   yes.

16   Q.   Do you remember saying:  Do I really have to go back and

17   think about all of this?  I've spent hours thinking about

18   something that I do not remember.  Do you remember saying that?

19   A.   I do not remember saying that.

20   Q.   All right.  We'll get you that clip in a minute.

21   A.   OK.

22   Q.   But I'm 100 percent correct, right, that you were not

23   anywhere close to Amol or Mr. Schulte at the time of this

24   alleged incident?  Correct?

25   A.   I don't believe I was.  Yeah.

K2iWsch2                           Stedman - Cross

1  Q.  No, no.  Not you don't believe you were.  You met with

2  Mr. Laroche yesterday, right?

3  A.  No, I did not meet Mr. -- are you talking about the first

4  time, or are you talking about --

5  Q.  No, no.  Not the first time.  It could be the 50th time.  I

6  don't know.  Did you meet with him yesterday?

7  A.  Yes.

8  Q.  Did you prepare for this testimony?

9  A.  Yes.

10  Q.  Did you go over these questions?

11  A.  Go over what questions?

12  Q.  The questions you're being asked in court today.

13  A.  I responded to all questions that he asked, yes.

14  Q.  He asked you questions, right, one by one, just like he

15  asked you today; yes?

16  A.  Sure, yeah.

17  Q.  And then you answered, correct?

18  A.  Correct.

19  Q.  Did somebody prepare you for cross-examination?

20  A.  No.

21  Q.  Did they tell you what a cross-examination was?

22  A.  Yes.

23  Q.  They told you that there would be a defense lawyer?

24  A.  Yes.

25  Q.  They told the defense lawyer would ask you questions?

K2iWsch2                          Stedman - Cross

1    A.  Yes.

2    Q.  And did you, by any chance, during this prep session, say,

3    Hey, I wasn't even there during this incident, so why are you

4    examination me about it?

5    A.  I did not.  If they didn't ask the question, I didn't tell

6    them that, probably.

7    Q.  So you only told them what they asked you?

8    A.  I only responded to their questions truthfully.

9    Q.  OK.  Is it fair to say that you did not go as a witness to

10   that state court proceeding?

11   A.  Correct.  Yeah, that's fair.

12   Q.  Let me ask you something.  Have you heard of a tool called

13   Vortex?

14   A.  Yeah.

15   Q.  What is it?

16   A.  It's an offensive cyber tool.  If we need to go into more

17   detail, I'm not really sure.  The sensitivity of that we'd have

18   to discuss.

19   Q.  Really?  Was it a tool that was compromised?

20   A.  It was a tool that was compromised.

21   Q.  Compromised by whom?

22   A.  I'm not sure.

23   Q.  What does the tool do?

24   A.  I don't know if that's been --

25   Q.  It siphons data, correct?

K2iWsch2                        Stedman - Cross

1   A.  It collects data, yes.

2   Q.  Right.  Collects data from a thumb drive, correct?

3   A.  I don't know if --

4   Q.  You don't know?

5   A.  That's not my issue with the question.  I'm saying I don't

6   know if this is getting into a sensitive area that I'm allowed

7   to talk about.

8   Q.  Don't worry about that.  That's what the prosecutor's for.

9   Just answer my question.

10              MR. LAROCHE:  Judge, could we approach on that?

11              MS. SHROFF:  There's been a ruling, your Honor.

12  There's no reason to approach.

13              THE COURT:  Go ahead, Ms. Shroff.

14  A.  OK.  So to answer your question --

15  Q.  Siphons data, correct?

16  A.  Yes.

17  Q.  OK.  It was compromised, right?

18  A.  Yes.

19  Q.  You built a brand-new tool after that, correct?

20  A.  Uh --

21  Q.  Yes?

22  A.  There was an effort to build another tool, yes.

23  Q.  Nader?

24  A.  Yes.

25  Q.  You built the tool to make up for the fact that Vortex was

K2iWsch2                          Stedman - Cross

1    compromised, right?

2    A.   Correct.

3    Q.   Right.

4    A.   To replace it, yes.

5    Q.   And you had to replace it because the CIA didn't want the

6    attribution coming back to the CIA?

7    A.   Yes.

8    Q.   Right?

9    A.   Yes.

10   Q.   With a brand-new tool?

11   A.   Sure.

12   Q.   Right.

13   A.   Yes.

14   Q.   And when they built that brand-new tool, they wanted to

15   make sure that nothing from the old tool matched up to the new

16   tool, correct?

17   A.   Correct.

18   Q.   No vectors, correct?

19   A.   No vectors apply to Vortex and Nader.

20   Q.   Apply or don't apply, that's one of the things you wouldn't

21   want matched up, right?

22   A.   Yes, that would be part of the theory.

23   Q.   No codes would match up, correct?

24   A.   Yes.

25   Q.   OK.

K2iWsch2                    Stedman - Cross

1    A.  It's a little more gray than that, but yeah.

2    Q.  Don't worry about it.  We'll talk about it at a high level

3    over here.  OK?

4    A.  Sure.

5            MS. SHROFF:  Now let's pull up 1027.

6    A.  Sorry.  What was that?

7    Q.  Take a look.  You call this document dramatic, right?

8    A.  Yes.

9    Q.  Absolutist, correct?

10   A.  Correct.

11   Q.  Let's read it.  Are you with me?

12   A.  Yup.

13   Q.  OK.  "I just attended a meeting with EDG, ESD and COG" --

14   COG team -- "Kenneth and Ross regarding the program of

15   AlmostMeat, which is a similar tool to Drifting Deadline."  Is

16   that accurate?

17   A.  Yes.

18   Q.  OK.  Is it dramatic?

19   A.  That section, no.

20   Q.  OK.  "Originally, AlmostMeat was intended to be deployed in

21   an operation," correct?

22   A.  Correct.

23   Q.  All tools have to be deployed in an operation, right?

24   A.  That's the intent, yeah.

25   Q.  Yeah.  "But they have expanded it to be a general-purpose

K2iWsch2                          Stedman - Cross

1  tool"; still accurate?

2  A.  Yeah.

3  Q.  Inflammatory?

4  A.  No.

5  Q.  Straightforward?

6  A.  Straightforward.

7  Q.  Who is the customer here?

8  A.  Who is the customer what?

9  Q.  Who is the customer?

10  A.  Drifting Deadline or AlmostMeat?

11  Q.  AlmostMeat.  Who's the customer?

12  A.  They're a separate entity from the customers of Drifting

13  Deadline.

14  Q.  There's a different customer for AlmostMeat and a different

15  customer for Drifting Deadline?

16  A.  Correct.  I think Drifting Deadline, when it was Brutal

17  Kangaroo at the start, had almost the same customers as

18  AlmostMeat --

19  Q.  Right.

20  A.  -- in the beginning.

21  Q.  They did have the same customers, right?

22  A.  At the beginning, yes.

23  Q.  Right.  I'm only talking about at that time.

24  A.  OK.

25  Q.  They had the same customer, correct?

K2iWsch2                          Stedman - Cross

1    A.   Sure.

2    Q.   OK.   So, "Additionally, the COG customer has requested the

3    Drifting Deadline code to be integrated with AlmostMeat."

4    Seems straightforward to me --

5    A.   Yup.

6    Q.   -- right?

7         No exclamation marks, no emojis, no burning fire signs,

8    correct?

9    A.   Correct.

10   Q.   "Although both tools were developed independently so that

11   the code would not be shared, they now wish to hijack the

12   Drifting Deadline code to use directly with AlmostMeat, thereby

13   coupling the tools."   You don't want tools coupled, right?

14   A.   Uh --

15   Q.   Just yes or no.

16   A.   Not in all cases, no.

17   Q.   In no case do you want a tool coupled, right, because if

18   one tool is compromised, then the next one is compromised?

19   A.   I disagree with that.

20   Q.   You disagree with that?

21   A.   Uh-huh.

22   Q.   Sometimes you want a tool coupled so that anybody using it

23   would know that they're coupled; that's your testimony?

24   A.   I think we make that decision balancing a lot of variables.

25   Q.   Uh-huh.

K2iWsch2                          Stedman - Cross

1    A.  So yes, we may choose to couple it because the operational

2    impact is greater than the risk of them being attributed

3    together.

4    Q.  Right.  If the operational impact is greater than the risk,

5    correct?

6    A.  Sure, yeah.

7    Q.  Right.  You have no idea whether or not the operational

8    impact is greater yet because there's no operational impact

9    being tested, right?

10   A.  Uh, yeah.

11   Q.  Right.

12   A.  In absence of --

13   Q.  No, no.

14   A.  In absence of operational impact --

15   Q.  No.

16   A.  -- there's perceived potential operational impact.

17   Q.  Right.  You don't know at this point, when this email is

18   sent, whether there's any operational impact, right?

19   A.  From AlmostMeat?

20   Q.  From either of the tools, sir.

21   A.  There was operational impact, I believe, at the time for

22   Drifting Deadline.

23   Q.  No, no.  No, no.  I'm not asking -- every tool has

24   operational impact.

25   A.  That's not true.

K2iWsch2                          Stedman – Cross

1    Q.  My question is at the time of this email was there any

2    evaluation of the risk of operational impact given the coupling

3    or the decoupling of the two tools?  The answer is no, isn't it

4    true?

5    A.  I think that evaluation is ongoing at this time.

6    Q.  Exactly.  There is no -- there is no -- no definitive

7    answer on that at all at the time of this email, correct?

8    A.  There's no determination at that time.

9    Q.  Right.

10   A.  That's correct.

11   Q.  Right.  There's no determination, correct?

12       Let me ask you something.  When you say operational impact,

13   you mean this tool is going to be inserted in some foreign

14   nation's computer, correct?

15   A.  Inserted, maybe not, but deployed to a foreign nation's

16   computer, yes.

17   Q.  It's going to be deployed.  It could be deployed to a

18   hostile foreign nation, correct?

19   A.  Correct.

20   Q.  It could be deployed to a friendly foreign nation, correct?

21   A.  Correct.

22   Q.  Either way, you don't want it coming back to the United

23   States, correct?

24   A.  We don't want it coming back to the United States, and I'll

25   caveat how I responded to the previous question.  We don't

K2iWsch2                         Stedman - Cross

 1    typically deploy tools against friendly foreign countries.

 2    Q.  We're not even going to go there because I'm sure Angela

 3    Merkel would disagree, but let's put that aside.

 4              MR. LAROCHE:  Objection.

 5              THE COURT:  We'll strike that.

 6    BY MS. SHROFF:

 7    Q.  Let's just focus here, shall we?  You do not want

 8    attribution ever coming back to the CIA, correct?

 9    A.  That is the intent, yes.

10    Q.  Is it your testimony, sir, that the CIA does not create

11    tools to use against friendly foreign nations?  Is that your

12    testimony today under oath?

13    A.  Can --

14              MR. LAROCHE:  Objection.

15              THE COURT:  Sustained.

16              MS. SHROFF:  Your Honor, may we have a sidebar?

17              THE COURT:  No.

18              MS. SHROFF:  OK.

19    Q.  When AlmostMeat and Drifting Deadline are discussed here,

20    and this line is on your screen, right?  Let me see if I can

21    highlight for you:  "Although both tools were developed

22    independently so that code would not be shared, they now wish

23    to hijack the Drifting Deadline code to use directly with

24    AlmostMeat, thereby coupling the tools," correct?

25    A.  That's the sentence, yes.

K2iWsch2                          Stedman - Cross

1    Q.  Right.  And standing on its own, the entire sentence is

2    factually accurate, correct?

3    A.  I disagree.

4    Q.  OK.  What part do you disagree with?

5    A.  I disagree with the term "hijack."  I disagree with kind of

6    absolute insofar as coupling the tools.

7    Q.  Well, let's try that again.  My question was whether the

8    statement was accurate.  Is it accurate?  Whether or not you

9    would have used the same syntax was not my question.

10   A.  Then, no.  With the syntax that is used, no, I don't

11   believe it's accurate.

12   Q.  OK.  So you think it's accurate that the COG customers had

13   requested the Drifting Deadline code; is that accurate?

14   A.  They did request the Drifting Deadline code, correct.

15   Q.  They wanted it integrated with AlmostMeat, is that correct?

16   A.  That is correct.

17   Q.  "Both tools were developed independently," is that correct?

18   A.  Depending upon what point in time we're talking about.

19   Q.  Well, I don't know.  There's a date on the email.  Look up.

20   A.  So, at that point in time, yeah, I think everything would

21   have been independent by that point in time.

22   Q.  So it's still correct, right?  Like a tick box, you can

23   tick it off.  "Both tools were developed independently"; still

24   correct?

25   A.  Not still correct today, but --

K2iWsch2                         Stedman - Cross

1    Q.  I'm only talking, sir --

2    A.  About this day in question.

3    Q.  Right.

4    A.  OK.

5    Q.  That's all that matters for now.

6    A.  OK.

7    Q.  "So that the code would not be shared"; still accurate?

8    A.  Yeah.

9    Q.  "And they now wish to hijack the Drifting Deadline code."

10   You're saying that that word "hijack" is inaccurate, correct?

11   A.  Correct.

12   Q.  OK.  Let me ask you something.  If he had said they now

13   wish to take the Drifting Deadline code to use directly with

14   AlmostMeat, thereby coupling the tools, would that statement be

15   accurate?

16   A.  I also don't think that would be an accurate statement.

17   Q.  OK.  Let's start, and tell me now.  They now wish to take

18   the Drifting Deadline code.  Did they want to take the Drifting

19   Deadline code?

20   A.  I don't think they're taking it.  Right?

21   Q.  Sir --

22   A.  They're asking to use it.

23   Q.  OK.  So let's try it your way.  If he had said they now

24   wish to use the Drifting Deadline code, right --

25   A.  Yeah.

K2iWsch2                        Stedman - Cross

1    Q.   -- that would have been OK by you?

2    A.   Yeah.

3    Q.   That would have been factually accurate?

4    A.   Yeah.

5    Q.   So just because he used the word "they now wish to hijack,"

6    it made it factually inaccurate for you?

7    A.   Yes.

8    Q.   Factually inaccurate?

9    A.   Yes.

10   Q.   OK.  So you see a difference between somebody taking your

11   code, using your code and hijacking your code so that the

12   statement is inaccurate?

13   A.   I think the difference between asking to use and taking,

14   hijack are different.

15   Q.   OK.  Let's try that one more time.

16   A.   Sure.

17   Q.   Did you work on the code for Drifting Deadline?

18   A.   I worked on portions of Drifting Deadline, yes.

19   Q.   I didn't ask you if you worked on portions.  I'm asking if

20   you worked on this code.

21   A.   The code that's shared?

22   Q.   The code that they wanted to use --

23   A.   Yes.

24   Q.   -- as you call it and hijack, as he called it.

25   A.   I worked on the access vectors, yes.

K2iWsch2                        Stedman - Cross

1    Q.  OK.

2    A.  That was shared.

3    Q.  Right.  And it's just not your personality to use the word

4    "hijack," correct; you would use the word "use"?

5    A.  I think "use" is a more accurate description.

6    Q.  For you.

7    A.  I mean, for everybody, I think it is the more accurate

8    description.

9    Q.  OK.  Let me ask you something.  Are you on this email?

10   A.  Yes.

11   Q.  Did you reply and say:  Hey, Josh, I don't think they're

12   trying to hijack the Drifting Deadline code; I think they're

13   just trying to use it?

14   A.  I did not respond to the email  no.

15   Q.  Did you forward the email to Sean or to Frank Stedman or to

16   Robert or to Julie or to Sean and say:  Hey, you know, I'm

17   sorry about my colleague.  It's his code so he feels like his

18   code is being hijacked.  I understand you just wanted to use

19   it?

20   A.  Sorry.  What was the question?

21             THE COURT:  Did you say that?

22             THE WITNESS:  Did I say that?

23             THE COURT:  Did you say that?

24   A.  I did not respond in an email to any of those people or say

25   that to them directly.

K2iWsch2                    Stedman - Cross

1    Q.  OK.  Let's move to the last line:  "To use directly with

2    AlmostMeat, thereby coupling the tools"; that's accurate,

3    right?

4    A.  Sorry.  I think it's still got to come up here on my

5    screen.

6    Q.  OK.

7    A.  Oh, you're talking about the last line.  Sorry.

8    Q.  Yes.

9    A.  Of that same paragraph.

10   Q.  Right.

11   A.  Never mind.

12       "To use directly with AlmostMeat, thereby coupling the

13   tools."  I think that's accurate.

14   Q.  OK.

15   A.  It warrants further description, but --

16   Q.  Oh, so it's inaccurate but incomplete as well as --

17   A.  I think it's accurate but also incomplete.

18   Q.  By the way, can I ask you, how much was that contractor

19   going to get paid to do this contract?

20   A.  I believe about 8 million is the number that we both saw.

21   Q.  $8 million, right?

22   A.  Correct.

23   Q.  Taxpayer money?

24   A.  Sure, yeah.

25   Q.  And they wanted to use the very code that was written by

K2iWsch2                         Stedman - Cross

```
 1   you and Mr. Schulte and everybody else and still get paid 8
 2   million, right?
 3   A.  I --
 4   Q.  Just yes or no.  He'll clean it up for you when he gets
 5   back up.
 6   A.  No.
 7   Q.  Yes?
 8   A.  No.
 9   Q.  No?
10   A.  Because the code was written by me.
11   Q.  Right.
12   A.  The shared code was written by me only.
13   Q.  Only you?
14   A.  Correct.
15   Q.  OK.  So it's your code, right?
16   A.  It's the government's code or the CIA's code.
17   Q.  OK.
18   A.  Sure.
19   Q.  And it's going to be used by a contractor?
20   A.  Yes.
21   Q.  Correct?
22   A.  Correct.
23   Q.  The contractor is going to use the code that was written by
24   you, a CIA employee, for the CIA, right?
25   A.  Yup.
```

K2iWsch2                          Stedman - Cross

1   Q.   And charge still $8 million, correct?

2   A.   Yes.

3   Q.   OK.  Let's put that paragraph aside.

4   A.   OK.

5   Q.   And then let's look at the next paragraph:  "COG indicated

6   that you would be fine with this and there would be no issue

7   with deploying the same code base in two countries or

8   potentially anywhere else, but I thought that I would share

9   this with you just to be sure."  Did you find that

10  inflammatory?

11  A.   Somewhat subtly, yes.

12  Q.   Somewhat subtly?

13  A.   Yes.

14  Q.   There's a subtle way to be inflammatory, according to you?

15  A.   Basically, he's trying to --

16  Q.   Just yes or no, sir.

17  A.   Yes.

18  Q.   OK.  So it's subtly inflammatory?

19  A.   Yes.

20  Q.   Would you agree that it's hard to be inflammatory and

21  subtle at the same time?

22  A.   No.

23  Q.   OK.  Let's keep going:  "But I thought that I would share

24  this with you just to be sure."  Who is he sharing this with,

25  by the way?

K2iWsch2                          Stedman – Cross

1    A.  He's telling the customers that use Drifting Deadline

2    operationally.

3    Q.  Right.  So Drifting Deadline belongs to these customers,

4    correct?

5    A.  I don't think it belongs to them.

6    Q.  Well, it's their tool, right?

7    A.  No.  It's the CIA's tool first and then amongst COG they

8    decide how it's used and who uses it.

9    Q.  Sir, who is the customer for Drifting Deadline?

10   A.  A section under COG.

11   Q.  COG belongs to whom?

12   A.  The CIA.

13   Q.  OK.  So CIA's the customer and CIA's the creator of the

14   tool, right?

15   A.  Sure, yeah.

16   Q.  Right.  So it's all in-house, right?

17   A.  For Drifting Deadline, yes.

18   Q.  Yeah.  So he's telling somebody in-house, within the CIA,

19   Hey, buddy, I'm giving you a heads-up, correct?

20   A.  He's telling this to a group inside the CIA.

21   Q.  Right.  Not somebody outside, correct?

22   A.  Correct.

23   Q.  He's not inflaming somebody outside of the CIA, right?

24   A.  He's not.

25   Q.  OK.  You're all on the same mission, right?  COG, EDG, RDB,

1    AED, same mission, right?

2    A.   Same overall mission, yeah.

3    Q.   Yeah.  OK. Let's keep going:  "In my mind, this risks all

4    future operations of Drifting Deadline by potentially exposing

5    the code."  He's voicing his opinion, right?

6    A.   Yes, he's voicing his opinion.

7    Q.   Yeah.  He doesn't say in my, Mr. Stedman's mind, correct?

8    A.   He does not say that.

9    Q.   He does not speak for you, correct?

10   A.   Does not speak for me.

11   Q.   He leaves you the opportunity to reply all and disagree,

12   correct?

13   A.   Yes.

14   Q.   OK.  "If AlmostMeat is caught, best case scenario is no

15   further Drifting Deadline operations would commence."  I take

16   it you disagree with that?

17   A.   I disagree with that.

18   Q.   OK.  "Worst case is they link the two tools due to the

19   shared code."  Right?  Do you disagree with that as well?

20   A.   There's probably some other things that could make it

21   worse, but yes, that's a very bad part of it.

22   Q.   That's what?

23   A.   I said that would be one of the worst cases.  There's

24   probably a few things that would make it worse, but.

25   Q.   So you disagree with the first clause, the first clause

1    before the comma, but the second clause is OK.  Is that your

2    testimony?

3    A.  I'll reread it real quick.

4    Q.  You disagree with this section?

5    A.  I disagree with that first section.

6    Q.  All right.

7    A.  Correct.

8    Q.  Now, then it says --

9        I'm just going to see if I can move this part up.

10   A.  Yeah, no worries.

11   Q.  -- "since this is an operational matter," it is an

12   operational matter, correct?

13   A.  Uh, what facet of it?  It's not very clear.

14   Q.  Here, look.  I don't know.

15   A.  Oh, yeah, yeah.  Sorry.  That last paragraph, yes.

16   Q.  "Ultimately, it is COG's choice."  Is that true?

17   A.  Yes.

18   Q.  COG's choice, right?  Drifting Deadline is COG's, correct?

19   A.  They -- they don't own it, but they decide how to use it,

20   yeah.

21   Q.  "However, the AlmostMeat contract is currently in the

22   process of obtaining our code."  Correct?

23   A.  Yes.

24   Q.  OK.  And by our code he means code that belongs to the CIA,

25   correct?

K2iWsch2                    Stedman – Cross

1    A.  Correct, probably.

2    Q.  He doesn't say my code, right?

3    A.  He doesn't say my code.

4    Q.  He doesn't say -- what did you say his nickname was?

5         MS. SHROFF:  Never mind.  I'll withdraw that.

6    Q.  "If there is issue, then I would talk directly with COG,"

7    correct?  He's offering to talk directly with COG, right?  Yes?

8    A.  Yes, but the person he's talking to is also in COG.

9    Q.  Yeah, OK.  "Or other leadership before this process is

10   completed," correct?

11   A.  Correct.

12        MS. SHROFF:  And can you take that off now, John,

13   please.

14   Q.  And then he says, "Thanks, Josh Schulte," correct?

15   A.  Correct.

16   Q.  Can you tell me in the last paragraph if you disagree with

17   anything in there?

18   A.  I don't disagree with anything in there.

19   Q.  Right.  And he says, right, so if there is issue, then I

20   would talk?  If there is issue, right?

21   A.  Yeah.

22   Q.  He doesn't say absolutely or dramatically:  Here is this

23   gigantic issue:  I should go to COG and talk to them or to

24   leadership, right?

25   A.  Can you rephrase the last part?

K2iWsch2                          Stedman - Cross

1    Q.  No.

2              MS. SHROFF:  I'll just have it reread, if you don't

3    mind.

4              Could you reread it to him, please?

5              (Record read)

6    A.  He does not say that, right.  Correct.

7    Q.  Do you reply to him and say, Hey, don't go to talk to COG?

8    A.  Reply to the customers, no, I did not.

9    Q.  To Mr. Schulte.

10   A.  No.  He -- he would not be the one that's, I think, being

11   referenced here.  He's telling one COG customer to either talk

12   to the other COG customer or call leadership.

13   Q.  Right, but my question is different.  Do you reply to

14   Mr. Schulte and say, Hey, don't do anything more here?  Do you

15   tell him?

16   A.  No, I do not.

17             MS. SHROFF:  Can you go back -- take that off, please,

18   John, and let's just go back to the paragraph that says "they

19   now wish to hijack the Drifting Deadline code."

20   Q.  See the word that you found inflammatory and absolutist,

21   "they now wish to hijack," right?

22   A.  Sure.

23   Q.  Right.  He does not say they are now hijacking the Drifting

24   Deadline code, right?

25   A.  He's not -- yeah, he does not say that exactly.

K2iWsch2                        Stedman - Cross

1   Q.  Right.  In fact, he says what he thinks is their wish,

2   correct?

3   A.  I don't know if he believes it.  I don't know what he's

4   thinking.

5   Q.  But you've testified so much about what he's thinking, and

6   I'm going to get to all of those, but for here, he's actually

7   telling you what he thinks, right, because he thinks that they

8   now wish to hijack the Drifting Deadline code?  Right?

9   A.  I don't know that he believes that.  I wouldn't -- if I'm

10  going to my perspective, I don't think he actually believes

11  they're hijacking it.

12  Q.  You think he does not believe that the Drifting Deadline

13  code is being hijacked, right?

14  A.  Correct.

15  Q.  Right.  So you think what he's writing here is not just

16  absolutist or dramatic; you think he's writing something that

17  he does not even believe, correct?

18  A.  Correct.

19  Q.  OK.  Let me ask you this.  Did they want to use the

20  Drifting Deadline code?

21  A.  They wanted to use the access vectors, yes.

22  Q.  Right.  Did they ask to use the access vectors?

23  A.  Yes.

24  Q.  Did they want to use the access vectors?

25  A.  Yes.

K2iWsch2                        Stedman - Cross

1   Q.  Were they pushing to use the access vectors if you had said

2   no?

3   A.  I don't believe so.

4   Q.  You don't believe so?

5   A.  No.

6   Q.  There's a whole discussion, a whole meeting about what you

7   can and cannot use, and you think they would not push to use

8   the access vectors?

9   A.  No.  I think the meeting was about how we could integrate

10  and safely use it in both.

11  Q.  And he thinks you can't integrate using safely, correct?

12  A.  Sure.

13  Q.  OK.  And you still, sitting here today, believe that

14  exhibit 1027 was, as you put it, absolutist and dramatic

15  because he used the word "hijack."  Is that what you said?

16  A.  Amongst other framings, yeah.

17  Q.  Excuse me?

18  A.  Amongst other things, I think that word, yes, "hijack," the

19  way he framed the argument as well.

20  Q.  Well, it's not an argument, is it?  Where is the argument?

21  Show me where the argument is.

22  A.  The argument is whether the access vector should be shared

23  between the two.  He's taking one side, and he's trying to get

24  part of COG to also be on that side by framing it and using

25  language that's urgent, dramatic and absolutist, to some

1   degree.

2   Q.  What's wrong with that?

3   A.  Because I don't think that's a fair representation of the

4   true situation.

5   Q.  But you were there, right?

6   A.  Correct.

7   Q.  When this email was sent?

8   A.  Where, being --

9   Q.  This email was sent to you, right?

10  A.  Yes.

11  Q.  You are testifying under oath you did not think that was a

12  fair representation, correct?

13  A.  Correct.

14  Q.  Why don't you reply?

15  A.  I didn't.

16  Q.  Why?  It's such an unfair representation to COG, right?

17  A.  I --

18          MR. LAROCHE:  She should let him answer why, your

19  Honor.

20          MS. SHROFF:  Sure.

21          MR. LAROCHE:  She asked the question.

22  BY MS. SHROFF:

23  Q.  Go ahead.  Why?

24  A.  I didn't think he was going to be successful through that

25  route of trying to pit one side against the other.  I think

K2iWsch2                          Stedman - Cross

1    those customers don't really have a say in it or don't really

2    understand the situation, and it can be solved when it actually

3    comes to a head.

4    Q.  So you thought it was a stupid email that was not going to

5    accomplish anything?

6    A.  I didn't say stupid.

7    Q.  OK.

8    A.  I didn't think he was going to accomplish what I thought he

9    was trying to accomplish.

10   Q.  So you just ignored it, right; you didn't write back to an

11   email he sent?

12   A.  It annoyed me, but yes, I ignored it.

13   Q.  So you ignored it?

14   A.  Ignored it in that I didn't respond.

15   Q.  Right.  You thought it was inflammatory, dramatic,

16   absolutist, something that was not professional, but you

17   thought it wouldn't accomplish what it was sent to accomplish,

18   so you just ignored it?

19   A.  I didn't reply.

20   Q.  Tell me the difference between ignoring it and not

21   replying.

22            MS. SHROFF:  You know what?  I'll withdraw it.

23            MR. LAROCHE:  Objection, your Honor.

24            THE COURT:  The question's withdrawn.

25   BY MS. SHROFF:

K2iWsch2                        Stedman - Cross

1    Q.  Let's just stay on this email for a minute.  OK?

2    A.  Sure.

3    Q.  The customer for Drifting Deadline is COG, correct?

4    A.  A subcomponent of COG, yes.  Whichever level you want to

5    talk about it at, yes, COG is the customer.

6    Q.  OK.  AlmostMeat is a an $8 million contract to a

7    contractor, correct?

8    A.  Correct.

9    Q.  What is a contractor?  Tell the jury, would you?

10   A.  So, a contractor or contracted employees aren't actual

11   employees of the Central Intelligence Agency.  In this case,

12   they'll be employees at another company that we contract or

13   hire to do specific work.

14   Q.  And there's generally some tension between the CIA employee

15   and a contractor, correct?

16   A.  I can't speak for the entire agency, how they feel about

17   it.

18   Q.  OK.  Let's start with EDG.  There are times when there are

19   tensions between the contractor and the CIA employee, right?

20   A.  I can't speak for all of EDG.  I can speak for my, my

21   perspective.

22   Q.  OK.  Well, let's speak from Amol's perspective.  You've

23   spoken about Amol's perspective quite a bit.  From Amol's

24   perspective, do you remember any times when there were tensions

25   between him and a contractor?

1   A.  I'm not aware of any, no.

2   Q.  You are not aware of any.  Would you it be fair to say,

3   sir, that sometimes a CIA would feel umbrage at being asked or

4   having his work shipped out to a contractor?

5   A.  Sorry.  Can you repeat the question?

6   Q.  I'll try.

7   A.  Sure.

8   Q.  Let me try it this way.

9   A.  Yeah, yeah.  No.

10  Q.  You said you were annoyed that a contractor was coming on,

11  correct?

12  A.  I was annoyed at the reason for bringing a contract, for

13  writing a contract to do the same capability, correct.

14  Q.  Right.  You were annoyed that a contractor was going to do

15  what you should have been able to do, correct?

16  A.  I don't think that's the sole reason why I was annoyed, but

17  yeah.

18  Q.  But you were annoyed with him because he wasn't meeting

19  deadlines -- by him, I mean Mr. Schulte -- right?

20  A.  I was annoyed that the access vector wasn't reaching

21  potential that I thought it should.

22  Q.  Right.

23  A.  Because he missed the deadline.

24  Q.  Right.  And you were annoyed with him because he wasn't

25  reaching potential, correct?

K2iWsch2                         Stedman - Cross

1   A.  Somewhat.

2   Q.  Right.

3       Well, what do you mean somewhat?  You sound annoyed now.

4   A.  Yeah.  Yes, I'm some level of annoyed.

5   Q.  Right.

6   A.  With that.

7   Q.  Right.  And you were annoyed because you thought

8   Mr. Schulte was the one who had dragged his feet, correct?

9   A.  I think that's part of the equation, yes.

10  Q.  Is it your testimony, sir, that by Mr. Schulte sending this

11  email to the customers of Drifting Deadline, he was doing

12  something improper?

13  A.  With my definition of improper, I would say he shouldn't

14  have, yes.

15  Q.  He should not have sent this email?

16  A.  Yeah.  He should not have.

17  Q.  Why?

18  A.  I -- I think if he really had an issue and wanted to debate

19  the topic, there's better ways, better approaches to this that

20  are more natural too.

21  Q.  That's fine.  That's your definition of natural.  My

22  question is whether or not it was improper.

23  A.  Can you define improper?

24  Q.  No.  You said it was improper, so you tell me.  Other than

25  the tone --

1   A.   I think I did provide an answer of why I thought it was

2   improper.  I think trying to pit another part of the

3   organization against the other one is a wrong way about

4   resolving it for whatever he wants to, for the way he wants to

5   resolve, yeah.

6   Q.   Do you consider contractors a part of the CIA's

7   organization?

8   A.   Yeah.

9   Q.   You consider an outside contracting agency to be part of

10  the CIA's organization?

11  A.   I -- when they're --

12  Q.   Sir, yes or no.

13          THE COURT:  Maybe he can't answer yes or no.

14  A.   I think in some cases.

15  Q.   You think in some cases a third party contracting with the

16  CIA and being paid $8 million for a contract is part of the

17  CIA's organization?

18  A.   I think we treat them -- I treat them as such, depending

19  upon the contractor and the state, right.

20          MS. SHROFF:  I move to strike, your Honor, and ask the

21  witness to answer my question.

22          MR. LAROCHE:  He answered the question.

23          THE COURT:  He did answer the question.

24  BY MS. SHROFF:

25  Q.   Your testimony, sir, is that an outside contractor at some

1    times, when you think it's appropriate, is considered part of

2    the CIA?

3              MR. LAROCHE:  Asked and answered three times.

4              THE COURT:  Yes.  Sustained.

5    BY MS. SHROFF:

6    Q.  After this email did COG reply?

7    A.  I can't remember if they did.  I can't remember if they did

8    in email at least.

9    Q.  Well, after this email did COG reply in an email form that

10   you remember?

11   A.  Not that I'm aware of.  Not that I remember.

12   Q.  After this email did COG reply to you and say how

13   inappropriate an email did Mr. Schulte send?

14   A.  No, they did not.

15   Q.  Let me go back to Vortex and Nader.  OK?

16   A.  OK.

17   Q.  When one of the two tools was compromised, it was

18   compromised because it was discovered by the foreign nation,

19   right, that was using it?  Do you remember that?

20   A.  I -- yeah, I know what you're referencing.

21   Q.  OK.  And the directive then from COG was to build a whole

22   new tool that could not be attributed back to Vortex, correct?

23   A.  I believe so.  I wasn't there for that discussion, that

24   requirement.

25   Q.  So they built Nader, correct?

K2iWsch2                          Stedman - Cross

1    A.  I believe it got delivered, yeah.

2    Q.  Right.  Nader was delivered, correct?

3    A.  I don't know.

4    Q.  And Nader -- I'm sorry?

5    A.  I said I don't know.

6    Q.  You don't know?

7    A.  Or can't remember.

8    Q.  You can't remember?

9    A.  Whether Nader was officially delivered?  No.

10   Q.  OK.  Do you remember if Vortex was, in fact, compromised?

11   A.  Uh, so there's different ways of compromise, but yes, I do.

12   Q.  I didn't ask you that.

13   A.  I do know it was compromised, yes.

14   Q.  Right.  Let's take the next step.  Do you know if COG asked

15   for a new tool to replace Nader?

16   A.  Yes.

17   Q.  The new tool was called Vortex?

18   A.  It was --

19   Q.  Or do I have it backward?

20   A.  Yes.

21   Q.  OK.  So the new tool was called Nader, correct?

22   A.  Correct.

23   Q.  And the new tool was built in a way so that none of the

24   component parts could be matched up with the compromised tool,

25   correct?

K2iWsch2                              Stedman - Cross

1    A.  That was the intention, yes.

2    Q.  That was the intention, correct?

3    A.  Correct.

4    Q.  And that is almost always the intention with a compromised

5    tool, correct?

6    A.  Correct.  Almost always, correct.

7    Q.  Almost always?

8    A.  Yeah --

9    Q.  Can you think of a single instance when the CIA would say,

10   Build me a tool that matches the compromised tool in all

11   aspects so that I can reuse it and be discovered as a

12   compromised tool all over again?

13   A.  Uh --

14   Q.  No, right?

15             MR. LAROCHE:  Your Honor, if she could let him answer

16   the question.

17             THE COURT:  Yes.

18   A.  I think that's a little bit confusing, how you stated it.

19   I don't know if you can read it back or something.

20   Q.  Would the CIA ever ask you to build a tool that matched the

21   predecessor tool that had been compromised?

22   A.  There would -- I think the conflict there is that

23   there's -- what you're saying if it's going to be exactly the

24   same, then there's no building a new tool.  It's just going to

25   be the same exact thing.  Does that make sense?

K2iWsch2                          Stedman - Cross

1   Q.  No.  But that's OK.

2   A.  OK.

3   Q.  Let me just go back to 1027 for one last time.  OK?

4   A.  OK.

5           MS. SHROFF:  If somebody could pull it up, please.

6           Can you go back to that line "if AlmostMeat is

7   caught."

8   Q.  "If AlmostMeat is caught, best case scenario is no Drifting

9   Deadline operations could commence."  Do you see that right

10  there?

11  A.  Yup, I see it.

12  Q.  And "worst case is they link the two tools due to the

13  shared code," correct?

14  A.  That is what it says, correct.

15  Q.  Correct.  And you said that this clause was accurate,

16  "worst case is they link the two tools due to the shared code,"

17  right?

18  A.  I did say that.  I did say it is one of the worst cases.

19  Q.  I'm sorry?

20  A.  I did say it is one of the worst cases, yes.

21  Q.  Right.  And what is the shared stuff?

22  A.  The access --

23  Q.  You testified --

24  A.  Access vectors.

25  Q.  The access vectors, right?

K2iWsch2                        Stedman - Cross

1    A.  Yeah.

2    Q.  So the worst case would be if the foreign nation linked the

3    two tools due to the shared access vectors, correct?

4    A.  Yeah.

5    Q.  OK.  And you agree with me that this is an accurate

6    statement, correct?

7    A.  I -- once again, I think I said I think it's one of the

8    worst cases, yes.

9    Q.  And you agree with me, right -- I just want to make sure --

10   that that would be a legitimate reason to email COG and tell

11   them about this?  Right?

12   A.  I believe that's warranting a discussion with COG, yes.

13   Q.  That would warrant a discussion with COG, is that what you

14   said?

15   A.  Yeah.

16   Q.  OK.  And one way to have a discussion is to send an email,

17   right?

18   A.  Sure.

19         MS. SHROFF:  OK.  You can take that down now.

20   Q.  Let's talk about tools in general, could we?  Is it fair to

21   say, sir, that generally the request for a tool originates with

22   COG, or whoever the user's going to be?

23   A.  Yes.

24   Q.  OK.  And they send the request over, right?

25   A.  There's usually a meeting where they discuss their

K2iWsch2                         Stedman – Cross

1    requirements, yeah.  They request a meeting.

2    Q.  And when they request the tool, the tool work or the

3    project work is then assigned, correct?

4    A.  Yes.

5    Q.  And generally, somebody gives the tool a name, correct?

6    A.  Correct.

7    Q.  The tool name is not classified, correct?

8    A.  I don't know if that's true.

9    Q.  Really?

10   A.  Yeah.

11   Q.  Isn't it?

12   A.  I would consider it classified material.

13   Q.  I didn't ask you what you considered.  I asked you whether

14   or not a tool name is classified.  Do you know?

15   A.  I don't know for a fact.

16   Q.  Right.  In fact, a tool name is not classified so that

17   people can refer to the tool name without attributing to it

18   what the tool, in fact, does, correct?

19   A.  I don't know if that's everything.

20   Q.  Well, if the CIA named a tool called Brutal Kangaroo,

21   they're not going to deploy it as Brutal Kangaroo, are they?

22   A.  Uh -- what do you mean by that?  Like, actually put the

23   name on, on target?

24   Q.  Right.

25   A.  No, and I think it's because it's sensitive, the name is.

K2iWsch2                          Stedman – Cross

1   Q.  Well, they don't change the name when they deploy the tool,

2   do they?  They don't give it a new name, correct?

3   A.  We don't --

4   Q.  They just deploy the tool?

5   A.  It isn't called Brutal Kangaroo on the target system, if

6   that's what you're asking.

7   Q.  Exactly.  In fact, the word "Brutal Kangaroo" is made up so

8   people internally can refer to it, correct.

9   A.  It is created so we can refer to it, correct.

10  Q.  Right.  And if you said Brutal Kangaroo to somebody in

11  another branch, they would not know because they do not know

12  what Brutal Kangaroo does, right?

13  A.  Nearby branches probably know or people who -- like, we

14  have friends across branches so whoever gets the program will

15  get the reference.

16  Q.  Right.  But the tool name by itself will not tell anybody

17  what it does, correct?

18  A.  Correct.

19  Q.  So Drifting Deadline doesn't tell you anything, correct?

20  A.  Correct.

21  Q.  Easy Cheese doesn't tell you anything, correct?

22  A.  Correct.

23  Q.  NachoJoey doesn't tell you anything, correct?

24  A.  Correct.

25  Q.  Nobody would have any idea of what these tool names mean,

K2iWsch2                        Stedman - Cross

1   correct?

2   A.  Correct.

3   Q.  They're just ad hoc made up, correct?

4   A.  Correct.

5   Q.  Who makes them up, by the way?  Do you get to make them up,

6   or does somebody else make them?

7   A.  For projects that -- like, if I'm running a project I can

8   make the tool name, usually.

9   Q.  Right.  You get to pick whatever you want?

10  A.  Correct.

11  Q.  Nobody goes and changes your tool name, correct?

12  A.  Nobody changes it, no.

13  Q.  Right.  And Drifting Deadline was called Drifting Deadline

14  long before, as you put it, it fell behind in schedule,

15  correct?

16  A.  I don't know that I agree with that.

17  Q.  So Drifting Deadline had a different name before?

18  A.  I think it was called Brutal Kangaroo to start, and it was

19  intended to be the full program.  Drifting Deadline was that

20  subcomponent --

21  Q.  Right.

22  A.  -- after that was there.

23  Q.  That was a subcomponent, correct?

24  A.  Drifting Deadline was an subcomponent.

25  Q.  Right.  And it was always called Drifting Deadline?

K2iWsch2                         Stedman – Cross

1    A.  No.

2    Q.  No?  What was it called before?

3    A.  Brutal Kangaroo.

4    Q.  Oh, Drifting Deadline was called Brutal Kangaroo?

5    A.  Yes.

6    Q.  Oh, I see.  I'll take that.  That's OK.  Thank you.

7        Now, you testified --

8             MS. SHROFF:  Your Honor, it's actually 11:00.  Are we

9    going to break, or do you want me to keep going?

10            THE COURT:  How much longer do you have?

11            MS. SHROFF:  I have a lot longer.

12            THE COURT:  We'll take our morning recess now.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  You can step down, Mr. Stedman.

2        MS. SHROFF:  Your Honor, I have just one matter to

3   raise after the witness steps out.

4        THE COURT:  You can step out.

5        (Witness not present)

6        THE COURT:  Please be seated.

7        MS. SHROFF:  Your Honor, this is about Exhibit 1027.

8   I'm happy to take it up in open court or in a sidebar,

9   whichever way the Court thinks safer.  But if somebody could

10  pull up 1027.

11       Your Honor, during the CIPA 6 hearings we objected to

12  the substitution of "code."  The government insisted that it be

13  substituted.  The government then on direct elicited what was

14  substituted.  So we're going to ask for a replacement copy of

15  1027 be entered into evidence.

16       THE COURT:  What did the government do in its direct

17  examination?

18       MS. SHROFF:  You see the word "code"?

19       THE COURT:  Could you highlight it, please.  I am

20  having trouble seeing it on the screen.

21       MS. SHROFF:  After of all of these references to

22  "code," I'm pretty sure that the government substituted "access

23  vector" for "code" and elicited that on direct.

24       MR. LAROCHE:  It's not "access vector."  We can just

25  discuss it with defense.  I think we'll be able to work this

 1   out, your Honor.

 2            MS. SHROFF:  Let's work it out now while the Court is

 3   here.  Can you show me the original document.

 4            THE COURT:  Before you do this.  How much longer are

 5   you going to be?

 6            MS. SHROFF:  I think I'm going to be at least 45

 7   minutes, your Honor.

 8            THE COURT:  Your cross shouldn't be much longer than

 9   the direct.  The direct was an hour.

10            1027, I must say, I don't want to cut you off, but you

11   spent way too long on 1027.

12            MS. SHROFF:  Well, I'm sorry, your Honor.  I can move

13   on from 1027 but I do think the Court --

14            THE COURT:  I hope so.  I hope you don't go back to

15   it.

16            MS. SHROFF:  Well, could I please have the original

17   pulled up by the government?  I think that Ms. Hurst is a very

18   capable person.

19            THE COURT:  Mr. Laroche said he was going to talk to

20   you about that.  We'll resume a few minutes early and see where

21   we are.

22            MR. ZAS:  May I make a request before you go?

23            THE COURT:  Yes, Mr. Zas.

24            MR. ZAS:  The government submitted a classified

25   submission last night, it's dated February 17, that I just had

1    a chance to review this morning because it's classified.  On

2    page three, in the last paragraph of the document, the

3    government makes reference to certain results and two separate

4    files that it reviewed.

5                THE COURT:  Yes.

6                MR. ZAS:  The defense requests that those files be

7    turned over to us so we can review and assess whether the

8    government's description is correct.

9                THE COURT:  All right.  Mr. Laroche or Mr. Kamaraju?

10               MR. KAMARAJU:  Your Honor, we object, and we'd ask for

11   an opportunity to brief it.  The information contained in those

12   files includes personal information about the witness that has

13   nothing to do with the case.  It also includes sensitive

14   material.  And frankly, and we are going to address this in our

15   mistrial motion, your Honor, the defense does not have the

16   right to investigate every single file.  This is how discovery

17   works in many cases.  We have looked through it.  We're happy

18   if your Honor wants to see it.  But the idea that the defense

19   would look at very personal information on the witness that has

20   no relation to the case, we object.  We can brief it in our

21   response to the mistrial.

22               THE COURT:  That's tomorrow?

23               MR. KAMARAJU:  Yes, your Honor.  We'll include it in

24   our submission.

25               MR. ZAS:  The government didn't have to disclose this.

K2I3SCH3                          Stedman - Cross

1    But they went and reviewed it in order to litigate.  I think it

2    is unfair to keep that from us.  We can't respond and, frankly,

3    the Court has already found that there were documents relating

4    to that witness Michael that should have been disclosed in

5    August.  And so, seems to me these documents bear directly on

6    some of the information that was in that document.

7            THE COURT:  You want, Mr. Zas, what, Michael's

8    security file?

9            MR. ZAS:  There is two files the government references

10   and it looks like they're separate.  One is called a security

11   file, and the one is called a CIA investigative file.  There is

12   also the mention of certain test results that we'd like to see

13   those as well, questions and answers and results.

14           THE COURT:  Okay.  Your request is noted.  Government

15   will have until the close of business tomorrow to respond.

16   I'll rule on it promptly.

17           MR. ZAS:  Thank you, Judge.

18           MR. KAMARAJU:  Thank you, your Honor.

19           (Recess)

20           (In open court; jury not present)

21           THE COURT:  With respect to Mr. Zas's request made

22   just before the break, the morning break, I'm going to direct

23   the government provide the name of the author of the CIA

24   memorandum, this is in the February 17 letter, page three, and

25   also the security file and investigative file that are referred

K2I3SCH3                        Stedman - Cross

1    to on page three for the February 17, 2020, letter.  I'd like

2    those documents produced in my chambers by the close of

3    business today.

4              MR. LAROCHE:  Yes, your Honor, and I'm sorry.

5    Produced just to you or are we producing them to both --

6              THE COURT:  I'm going to review them.

7              MR. LAROCHE:  Understood.  Yes, your Honor.

8              MS. SHROFF:  Your Honor, may I just bring up the issue

9    of 1027 and the substitution?

10             THE COURT:  Yes.

11             MS. SHROFF:  Okay.  Thank you.  So, your Honor, the

12   words that were substituted.  "If Almost Meat is caught, the

13   best case scenario is no further Drifting Deadline operations

14   could commence, worst case is they link the two tools due to

15   the shared unique execution vector."

16             Okay?  That puts a whole different spin on this

17   e-mail, because it's not code.  Mr. Schulte actually knows that

18   it is a unique execution vector.  So, I have objected to this

19   being substituted in the CIPA 6.  The government brought out

20   through this witness and had him say it is an access vector,

21   which it's not.  It is actually a unique execution vector,

22   which makes Mr. Schulte's point that these two tools should not

23   be linked up far stronger.

24             So I would go back to this document, but very briefly,

25   just on that phrase.

K2I3SCH3                        Stedman – Cross

1            MR. LAROCHE:  That's what he's been talking about,

2    your Honor.

3            MS. SHROFF:  He has never used the word "unique," and

4    I have not been able to show the document in its proper form.

5            THE COURT:  You object to the clarification?

6            MR. LAROCHE:  I do not object.  She can ask him.

7            THE COURT:  I guess the only -- all right.  Go ahead.

8    You can ask.

9            MS. SHROFF:  How is the jury going to see this?

10            (Continued on next page)

K2I3SCH3                        Stedman - Cross

1              (Jury present)

2              THE COURT:  All right Ms. Shroff.

3              MS. SHROFF:  Thank you, your Honor.

4    BY MS. SHROFF:

5    Q.  Mr. Stedman, I'm just going to go back to 1027 for a

6    minute, okay?

7    A.  Okay.

8    Q.  Is it on your screen now?

9    A.  I believe so.

10   Q.  Could I just ask you to read for the jury, again, if you

11   don't mind, the line that starts with "If Almost Meat is

12   caught."

13   A.  Okay.  "If Almost Meat is caught, best case scenario is no

14   further Drifting Deadline operations could commence.  Worst

15   case is they link the two tools due to the shared execution

16   vector."

17   Q.  Right.  So it was a unique -- it's shared, number one.

18   Right?

19   A.  Yes.

20   Q.  Was that accurate?

21   A.  It is shared, yeah.

22   Q.  Is it unique?

23   A.  Portions of it are, yes.

24   Q.  So it's correct use of the word "unique," right?

25   A.  Yes.

K2I3SCH3                          Stedman - Cross

1    Q.  Execution, correct?

2    A.  Yes.

3    Q.  Vector, correct?

4    A.  Correct.

5    Q.  Right.  So he is saying that they would link the two tools

6    together, because there is something that is shared and unique

7    in the execution vector, right?

8    A.  That's what the last clause is saying, yes.

9    Q.  Thank you.

10             MS. SHROFF:  I have nothing further on 1027.

11   Q.  Now let's talk about your testimony on direct that

12   Mr. Schulte asked you to grant him back his privileges to the

13   OSB library.  That's your testimony on direct today, correct?

14   A.  Yes.

15   Q.  Let me just make sure that I have this correct.  It is your

16   testimony that Mr. Schulte asked you to give him back his own

17   OSB library access.  Is that your testimony?

18   A.  His own OSB access library access; is that what you said?

19   Q.  Yes.

20   A.  He didn't have one at that point in time.  So it's not his

21   to give back, if that makes sense.

22   Q.  No, it did not make sense.  Let me try it again.

23   A.  Sure.

24   Q.  Your direct testimony is that he asked you, right?

25   A.  He asked me.

1   Q.  To give him access that, according to you, had been taken

2   away, correct?

3   A.  Yes.

4   Q.  Okay.  Now let me just make sure I understand this, okay.

5   You spoke to the United States attorney's office on March 30 of

6   2017.  Do you remember that?

7   A.  I don't remember the exact day, but yeah, it was around

8   then at least.

9   Q.  At that time you never told them that Mr. Schulte asked you

10  for this access, correct?

11  A.  I don't remember if I did or didn't.

12  Q.  Do you remember never telling them that again when they

13  interviewed you on 9/26/2019?

14  A.  I did not remember whether I told them then or not.

15  Q.  Do you remember on December 12 of 2019 ever telling them

16  that Mr. Schulte asked you to give him back access?

17  A.  I don't remember ever telling them one way or another.

18  Q.  How about on January 14 of 2020; do you remember saying it

19  then?

20  A.  I don't know what day I would have said it.  It was in

21  January, I'm sure.

22  Q.  It was in January of 2020 is when you first remembered that

23  he asked you for this OSB library access back?

24  A.  Remembered -- my memory was refreshed by chat logs.

25  Q.  By chat logs?

K2I3SCH3                          Stedman - Cross

1    A.  Yeah.

2    Q.  Okay.  Let's take a look at your chat logs.

3            MS. SHROFF:  Can you pull them up for him?  May I

4    approach, your Honor?

5            THE COURT:  Yes, you may.

6    Q.  It's hard to read.

7    A.  Sure.

8            THE COURT:  Ms. Shroff, could you identify what you

9    gave the witness?

10           MS. SHROFF:  I gave him 3505-12.

11           THE COURT:  Thank you.

12   Q.  Are you referring to a chat log of April 18, 2016?

13   A.  Yes.

14   Q.  Is it the chat log between you and Sean?

15   A.  Yes.

16   Q.  Is it fair to say, sir, that nowhere in that chat log do

17   you say Schuljo came up to me and asked me for his access,

18   correct?

19   A.  I say Schuljo is up here now asking about OSB library

20   accesses.

21   Q.  Right.  But you're not talking about him talking to you.

22   Correct?

23   A.  I am talking about him talking to me.

24   Q.  You're not.  You're -- your statement today under oath is

25   that when you are talking to Sean, right, and you're saying

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2I3SCH3                        Stedman - Cross

1    Schuljo is up here now asking about OSB library accesses, that

2    is what you mean when you say that he is asking you,

3    Mr. Stedman, to revert his access back?

4    A.  I believe yes.

5    Q.  You believe?

6    A.  They are the same event, yes.

7    Q.  Okay.  Well, let's keep going.  You see right below that?

8    A.  Yes.

9    Q.  You say he is talking to Anthony now.  Same day?

10   A.  Okay.

11   Q.  Right?

12   A.  Yup, yeah.

13   Q.  You never once say he asked me and I said no, correct?

14   A.  I don't see it here.

15   Q.  Right?

16          MR. LAROCHE:  Objection.  Can she let him answer?

17          THE COURT:  You're interrupting, Ms. Shroff.

18          MS. SHROFF:  Okay.

19   A.  Do you mind if I read through?

20   Q.  Take your time.

21       (Pause)

22   A.  Okay.

23   Q.  Right?

24   A.  I've read through.

25   Q.  In fact, this whole chain starts when it is Sean that says

1   to you how did the libraries meeting go.  Correct?

2   A.  Correct.

3   Q.  Right.  And then you say Schuljo is up here now asking

4   about OSB library accesses, correct?

5   A.  Correct.

6   Q.  You never say he's asking you for accesses, correct?

7   A.  I don't say that in the chat, correct.

8   Q.  Right.  And you would agree with me that you are chatting,

9   right, on your computer, correct?

10  A.  Correct.

11  Q.  According to you, when you testified on direct, Mr. Schulte

12  doesn't phone you to ask for this access, right?

13  A.  He does not, no.

14  Q.  Right.  According to you, he asked you it in person,

15  correct?

16  A.  Correct.

17  Q.  So your testimony is while he's standing there right next

18  to you asking you this, you are texting Sean, correct?

19  A.  This would have been after he went back down.

20  Q.  Oh.  But you say he's up here now.

21  A.  He might have still been around.

22  Q.  That's not what you say.  You say he's up here now and then

23  you say -- right?

24  A.  Yeah.

25  Q.  Then you say --

K2I3SCH3                           Stedman - Cross

1    A.   Sorry.  I didn't know you were asking me to read.  I said

2    he had claimed that you said he could be admin.

3    Q.   Right.  He had claimed.  Right?

4    A.   Yup.

5    Q.   And then keep going.  Look down.  He is talking to Anthony

6    now.  Correct?

7    A.   Correct, correct.

8    Q.   Right.  Wasn't he in fact up there to talk to Anthony about

9    this?

10   A.   After he talked to me, he went to Anthony, yes.

11   Q.   Did you tell Sean -- by the way, who happens to be your

12   boss, right?

13   A.   Hmm-hmm.

14   Q.   He's your boss, correct?

15   A.   Sean is my direct supervisor, yes.

16   Q.   He is Mr. Schulte's direct supervisor, correct?

17   A.   At this time he would have been not Schulte's direct

18   supervisor.

19   Q.   Why?

20   A.   He was moved to a different -- Josh was moved to a

21   different branch at this point in time.

22   Q.   On this issue he was still his supervisor, correct?

23   A.   No.

24   Q.   No?

25   A.   His supervisor would have been in his new branch.

K2I3SCH3                        Stedman - Cross

1    Q.  Okay.

2    A.  Sean is still the supervisor of OSB at this time, and Josh

3    is not in OSB.  If you're talking about the supervisor on the

4    issue of OSB libraries, Sean is the supervisor for OSB and

5    therefore OSB libraries is part of OSB.

6    Q.  On this particular issue, Sean is still the supervisor?

7    A.  Yes.

8    Q.  You are gossipping with your supervisor about your

9    colleague, correct?

10   A.  Gossipping -- I wouldn't call it gossipping.

11   Q.  Really?

12   A.  I would call it telling him what is really going on,

13   keeping him informed.

14   Q.  Let's keep going.  And you say, right, you are relaying to

15   him what is going on on your floor, correct?

16   A.  Sure.

17   Q.  Right.  And you are telling Sean what you are observing,

18   correct?

19   A.  Yes.

20   Q.  You never say to him "He asked me for access and I told him

21   to ask you."  Correct?

22   A.  I did not see that in here, no.

23   Q.  Then you say he is talking to Anthony now, correct?

24   A.  Yup.

25   Q.  He lost all admin access to Atlassian over the weekend,

1   correct?

2   A.   Correct.

3          MR. LAROCHE:   Your Honor, can I just make a

4   suggestion.  This document is not in evidence.  The government

5   does not object to it being entered, this portion as an

6   exhibit, but I think the appropriate way to do that is to mark

7   it as an exhibit and then read from it directly.

8          THE COURT:   Do you have any objection to that?

9          MS. SHROFF:   No, your Honor.  That's fine.

10          THE COURT:   Do you want to mark it as a defendant's

11   exhibit?

12          MS. SHROFF:   Sure.  Defense Exhibit F.

13          THE COURT:   What's the letter?

14          MS. SHROFF:   F.

15          THE COURT:   S?

16          MS. SHROFF:   Frank.

17          THE COURT:   Oh, Frank F.

18          THE DEPUTY CLERK:   Judge, we have F.  It has to be G.

19          MS. SHROFF:   Then G.  Thank you, Mr. Gonzalez.

20          THE COURT:   Defendant's Exhibit G is received in

21   evidence.

22          (Defendant's Exhibit G received in evidence)

23   BY MS. SHROFF:

24   Q.   Getting back to that before the interruption.  You're

25   relaying to him as things are happening, right?

K2I3SCH3                        Stedman - Cross

1    A.   Yeah.

2    Q.   Okay.  And then you say something -- then Sean replies to

3    you, correct?

4    A.   Yes, I think I'm where you're at.

5    Q.   He says, "Wow, he just doesn't give up ever."  Correct?

6    A.   Correct.

7    Q.   Okay.  You are saying this is not gossipy, correct?  This

8    is all very formal and work related?

9    A.   It's informative.

10   Q.   Informative?

11   A.   Yes.

12   Q.   Okay.  And is it informative when there is the phrase that

13   says "That boy needs to learn how to take his medicine every

14   now and then."

15          Is that informative, sir?

16   A.   I think that line is not as informative, no.

17   Q.   Okay.  Now, we're still at the point where you've read up

18   until then, right where I ended, correct?

19   A.   Yeah, I read up until then.

20   Q.   I'm going to end my exhibit right there, correct?

21   A.   I think that's up to you, right?

22   Q.   Right.  It is up to me.  Just stay with me until there.

23   A.   Sure.

24   Q.   At no point during that exchange do you say "he's standing

25   right next to me," correct?

1    A.  I do not say he's standing right next to me, correct.

2    Q.  You do not say "he asked me and I said no," correct?

3    A.  I did not say that phrase, no.

4    Q.  You made no note of it anyplace else that somebody asked

5    you for access and you declined, correct?

6    A.  I don't -- yeah, I don't think in here.

7    Q.  Right.  And you're actually taking to Sean in Same Time.

8    Is this in Same Time?

9    A.  Yeah.

10   Q.  You are actually talking to Sean?

11   A.  I'm chatting with Sean.

12   Q.  Okay.  You and Mr. Schulte were colleagues in OSB, correct?

13   A.  Correct.

14   Q.  And is it fair to say that when you worked with him in OSB,

15   both of you worked on development of tools, correct?

16   A.  Correct.

17   Q.  You've already testified, but I just want to make sure I

18   understand this correctly.  At times, according to you, it is

19   important not to link the components of tools, correct?

20   A.  Correct.

21   Q.  Because there is operational risk, correct?

22   A.  It creates more risk, yes, operational.

23   Q.  Who determines operational risk?  Is that you or is that a

24   separate group?

25   A.  It depends at which level.  I think there's some decisions

1   that have to be made at the development level.  There's some

2   decisions that have to be made at the operational level.  And

3   it's separated based on that.

4   Q.   Okay.  Is it fair to say that, I think you mentioned this

5   in direct, that what started off as a tool call Brutal

6   kangaroo, correct?

7   A.   Hmm-hmm.

8   Q.   Brutal Kangaroo developed, as it grew bigger, became

9   components to Brutal Kangaroo, correct?

10  A.   I don't think it grew bigger.  I think at some point the

11  decision was made to start naming the subcomponents as they

12  were going to be delivered separately.

13  Q.   As they became subcomponents, you started to develop them

14  differently, correct?

15  A.   They got names at that time, yeah.

16  Q.   So they all got different names, correct?

17  A.   Correct.

18  Q.   So, one subcomponent was named Drifting Deadline, correct?

19  A.   Yes.

20  Q.   And there were other subcomponents that all got names,

21  correct?

22  A.   I don't know that any other of them got names.  Brutal

23  Kangaroo was the overarching, Drifting Deadline was the first

24  part of it.  There was an instance that got delivered that I

25  think was called Nacho Joey.  I don't know anything past

Drifting Deadline got a name to it.

Q.  When Drifting Deadline and Nacho Joey were named, they both

got named as components, so they were under Brutal Kangaroo,

correct?

A.  Yeah.

Q.  And Nacho Joey was always Nacho Joey, correct?

A.  Yes.

Q.  And Drifting Deadline was always Drifting Deadline?

A.  Once it became Drifting Deadline, it stayed Drifting

Deadline.

Q.  There was no change in the name because the project was

slow, correct?

A.  It's -- there was no change in the name once we set it at

Drifting Deadline.

Q.  Who named it Drifting Deadline, was it Mr. Schulte or was

it you, according to you?

A.  It was not me.  It was Josh.

Q.  Right.  He named it Drifting Deadline, correct?

A.  Yes.

Q.  By the way, who's Christopher?

A.  Christopher is another employee in the Operations Support

Branch.

Q.  He is in your group, correct?

A.  Correct.

Q.  Good friend of yours, correct?

1   A.  Yes.

2   Q.  What component did he work on?

3   A.  I don't know that he worked on a component of Brutal

4   Kangaroo or Drifting Deadline.

5   Q.  You don't remember what he worked on?

6   A.  I don't know what involvement he would have had with that

7   tool.

8   Q.  Is fair say that you and he were good friends?

9   A.  Probably better friends since.  But yeah, beginning

10  friendship then, yeah.

11  Q.  It was a beginning friendship, and you're still to this day

12  and now very good friends, correct?

13  A.  We're fairly good friends to this day.

14  Q.  Amol picked Christopher to work on a project, correct?

15  A.  He picked Christopher to work on -- do you have a project?

16  It may help refresh the memory.

17  Q.  No.

18  A.  I'm not sure what project you're referencing then.

19  Q.  Do you remember Amol and Christopher working on a project

20  together from OSB?

21  A.  Not off the top of my head.  None of the flagship ones,

22  anyway.  Yeah, I don't remember.

23  Q.  I'm sorry.  Your voice drops and then I think you finish.

24  A.  Sorry.  I was just saying I don't remember definitely if it

25  was -- it was probably like a one-off tool.  I don't think it

1    was any of the flagship ones.

2    Q.  Do you recall a time when Amol bumped Mr. Schulte and

3    substituted Christopher on a project?

4    A.  I don't remember that, no.

5    Q.  Fair enough.  Is it fair to say that during the time you

6    worked at OSB essentially your work focused on thumb drives,

7    correct?

8    A.  Mine in particular or OSB's --

9    Q.  OSB's?

10   A.  OSB's, a large part of the work was thumb-drive related.

11   Q.  Do you remember a gentleman named Fred?

12   A.  A gentleman named Fred.  The customer for Drifting Deadline

13   Fred?

14   Q.  Yes.  Do you remember?

15   A.  Yes.

16   Q.  Do you remember him telling you all in an e-mail that he

17   was going to be working on the project, and that he was going

18   to go buy a few thumb drives over the weekend and bring them to

19   all of you on Monday?  Do you recall that?

20   A.  It doesn't stand out as anything unique.  I'm not surprised

21   he did if that's --

22   Q.  Let me just show you what I'm going to mark as Defense

23   Exhibit H.

24            MS. SHROFF:  May I, your Honor?

25            THE COURT:  Yes.

K2I3SCH3                          Stedman - Cross

1  Q.  You said that would not surprise you because it wasn't

2  unusual, correct?

3  A.  That Fred went and purchased USBs and brought them in the

4  Monday, after, no.

5  Q.  It's normal, right?

6  A.  That's normal.

7  Q.  And if you could just take a look, he tells you that around

8  April 1st of 2016, correct?

9  A.  This e-mail is from April 1st, 2016, correct.

10  Q.  Right.  And Amol is on that list, correct?

11  A.  Yes.

12  Q.  Your friend Christopher is on that list, is he?

13  A.  Yes.

14  Q.  Okay.  Fred is on that list also, correct?

15  A.  Yes.

16  Q.  Of course Mr. Schulte is on that list, right?

17  A.  It's from him, correct.

18  Q.  No, it's not from him.

19  A.  The top of the e-mail thread.

20  Q.  It's from Fred.  Take a look.

21  A.  There there's two here.  The top one is from Josh.  The

22  second one is from Fred in the thread.

23        Do you want to just focus on the bottom one?

24  Q.  I'm only talking about the e-mail where Fred says --

25  A.  Okay.

K2I3SCH3                         Stedman - Cross

1    Q.  That he's going to bring in the thumb drives; that's from

2    Fred, correct?

3    A.  Okay, yes, from Fred.

4    Q.  Okay.  And Fred is telling all of you that he is going to

5    bring in these thumb drives on Monday, correct?

6    A.  Can I read through this real quick?

7    Q.  Sure.

8         (Pause)

9    A.  Okay, yeah.

10   Q.  Then, as you pointed out, Mr. Schulte replies, correct?

11   A.  Correct.

12   Q.  And he talks about something having to do with the delivery

13   of Drifting Deadline, right?

14   A.  Correct.

15   Q.  And then he talks about something or using that product

16   with the DII Hijack, correct?

17   A.  DLL.

18   Q.  Hijack, correct?

19   A.  It's DLL Hijack.

20   Q.  Yeah.  It's there, right?

21   A.  It is there.

22        MS. SHROFF:  You can put that aside.

23   Q.  Am I correct, sir, that Drifting Deadline, did it

24   eventually get finished?

25   A.  So when you're talking kind of like the family suite, Nacho

1    Joey being one of them, you can consider that being finished at

2    a certain state.  Drifting Deadline did get a delivery and was

3    used.  Then I don't know where the ultimate -- the original

4    requirement, I don't know if that was ultimately met or not.

5    Q.  So let me ask my question again.  Was Drifting Deadline

6    eventually used or not?

7    A.  Yes.

8    Q.  Another topic that you and Mr. Laroche discussed in your

9    direct, right, was this meeting that Mr. Sean and you planned

10   to attend, and Mr. Schulte insisted on coming along, correct?

11   A.  Yeah, he came along.

12   Q.  Right.  At that time, sir, was Mr. Schulte part of OSB?

13   A.  He was part of OSB.

14   Q.  Sean was both your supervisor and Schulte's supervisor,

15   correct?

16   A.  Correct.

17   Q.  And it is your testimony that Mr. Schulte half jokingly or

18   was he serious when he told Sean to fuck off I'm coming to the

19   meeting?

20   A.  Serious enough that he didn't go back to his desk

21   afterward.  He came to the meeting.

22   Q.  Okay.  And your testimony is that Sean was his supervisor

23   at that time, right?

24   A.  Correct.

25   Q.  And is it your testimony that as a supervisor, Sean could

1   not say no to Mr. Schulte?

2   A.  I don't know that he couldn't say no.  He didn't say no.

3   Q.  Okay.  So, a supervisor is able to say no, right?

4   A.  Correct.

5   Q.  Okay.  And there's no doubt that he was the supervisor

6   there, right?

7   A.  Correct.

8   Q.  Okay.  You talked also about nicknames, correct?

9   A.  Yeah.

10  Q.  Amol's nickname was, what, Playmaker?

11  A.  Yes.  I think so.

12  Q.  Right.  What was the nickname Amol called Mr. Schulte?

13  A.  I think he probably used Nuclear Option as well.  He did

14  call him -- I think what you're referencing is Bald Asshole

15  he's used before.  I don't know that I would consider it a

16  nickname or just kind of an ongoing --

17  Q.  Term of endearment?

18  A.  What's that?

19  Q.  He called him Bald Asshole all the time?

20  A.  I wouldn't say all the time, but more frequently as things

21  got more -- pointed between the two.

22  Q.  How about Voldemort?

23  A.  Yeah.

24  Q.  What is that?

25  A.  The villain in Harry Potter.

K2I3SCH3                         Stedman - Cross

1    Q.   Say it again?

2    A.   The villain in Harry Potter.

3    Q.   The villain in Harry Potter?

4    A.   Yes.

5    Q.   Did he just call him plain old "asshole" at times?

6    A.   I can't remember a specific instance, but I wouldn't be

7    surprised.

8    Q.   You wouldn't be surprised, right?

9    A.   Right.

10   Q.   And did Mr. Schulte ever tell you he got tired of being

11   called asshole so he renamed himself "badass" so it would stop?

12   A.   He never said that.

13   Q.   He never said that to you?

14   A.   Not that I can recollect.

15   Q.   Do you know who he called pretty boy?  By "he" I mean Amol,

16   the pretty one?

17   A.   I think it wasn't just Amol, but yes, I know who you're

18   referencing.  Michael.

19   Q.   Who?  He called Michael that?

20   A.   Michael, the pretty one, yeah.

21   Q.   Yeah.  Who did he call train tracks?

22   A.   Train tracks.

23   Q.   By he --

24   A.   Oh, I think it was -- you're meaning Amol in particular?

25   Q.   Yes.

```
 1   A.  I can't remember a specific instance, but I know train

 2   tracks was also used for Michael I believe as well.

 3   Q.  By Amol, right?

 4   A.  I don't remember a specific instance.  I know by the

 5   branch.

 6   Q.  You only remember what the branch called him, you don't

 7   remember what Amol called him?  Okay, I'll take that.

 8   A.  Sure.

 9   Q.  You testified, right, that these were not infrequent name

10   callings, correct?

11   A.  No, I think it was part of the banter and culture.  I had a

12   nickname as well.

13   Q.  What was the nickname Amol called you?

14   A.  I don't know that Amol necessarily is the one calling me

15   it.  But for a long time, I was called by the branch Dick Move,

16   because I brought in food after somebody had left for the day

17   or something like that.  So they called me Dick Move.

18   Q.  I see.  And did there ever come a time when you heard

19   Mr. Schulte tell Amol to stop calling him asshole or you were

20   never privy to that either?

21   A.  I can't remember that time.

22   Q.  Do you remember creating, not you particularly, but OSB

23   creating a drawing board on which either Amol or somebody else

24   drew a timeline by which Mr. Schulte, he hoped, would get fired

25   or would get fired?
```

1    A.  Yes, I know what you're referencing.  I don't know if Amol

2    was the one who had any input into that.

3    Q.  I see.  Is it your testimony today, sir, that you never

4    heard Amol say to Mr. Schulte "I hope you get fired"?

5    A.  Can you say that question again?

6    Q.  Sure.  Is it your testimony today under oath that you never

7    heard Amol say to Mr. Schulte "I hope you get fired"?

8    A.  No.  I'm sure I heard him say that to Josh at some point in

9    time.

10   Q.  And did you ever overhear Amol say to Mr. Schulte "I hope

11   nothing in your personal life works out"?

12   A.  I don't remember that one in particular.  I'm sure there

13   were paraphrased versions around that.

14   Q.  Well, you don't remember an incident where Mr. Schulte was

15   talking about something personal and seeking advice from

16   someone and Amol interrupted to say that to them?

17   A.  I do not remember that, no.

18   Q.  Okay.  Do you remember talking to the FBI about

19   Mr. Schulte?

20   A.  Yes.

21   Q.  Do you remember the FBI asking you about Mr. Schulte

22   working at Bloomberg?

23   A.  I don't remember.

24   Q.  Do you remember telling the FBI when you heard that he had

25   a job at Bloomberg that paid over $200,000, I quote:  "Good

1   things happen to bad people"?

2   A.   That I said that?

3   Q.   Yes.

4   A.   I don't remember saying that.

5   Q.   Okay.  Let's see if 3505-05 refreshes his recollection.  I

6   highlighted it for you on page two.

7   A.   Top section or bottom section?  I've read it.

8   Q.   Does that refresh your recollection that you said that

9   about Mr. Schulte?

10  A.   I still don't remember saying that about him.  And I think

11  in my mind --

12  Q.   It's okay.  I wasn't asking you what you thought.

13  A.   Okay.

14  Q.   You don't remember, right?

15  A.   I don't remember saying that, no.

16  Q.   During that same interview, do you remember telling the FBI

17  that you thought that Mr. Schulte was not anti-American,

18  correct?

19  A.   I don't remember saying it.

20  Q.   Do you think he was anti-American?

21  A.   I do not.

22  Q.   You told the FBI, did you not, when they asked you about

23  his foreign travel, that you never thought Mr. Schulte had left

24  the United States, correct?

25  A.   I don't remember saying that to them.  But --

K2I3SCH3                         Stedman - Cross

1   Q.  Okay.  Do you remember saying he would not know how to

2   navigate streets and you couldn't imagine him living in a

3   foreign country?

4   A.  Yeah, I don't remember telling them that.

5   Q.  Take a look at page three.

6   A.  Three?

7   Q.  Yes, please.

8   A.  Okay.

9   Q.  Remember that now or no?

10  A.  I don't really remember it.  I could see me saying it.

11  Q.  Okay.  Let's shift gears, shall we?  You testified, did you

12  not, about the time when you were in Foreign Office West; am I

13  correct?

14  A.  I did testify about Foreign Office West, yes.

15  Q.  You testified that's where you were when you learned about

16  the leaks, correct?

17  A.  Correct.

18  Q.  Is the Foreign Office West, the office, in the same place

19  now as it was before?

20  A.  I think to answer that I would be talking about something

21  sensitive.

22          MR. LAROCHE:  Your Honor, can we approach?

23          THE COURT:  Yes.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2I3SCH3                         Stedman – Cross

1           (At the sidebar)

2           THE COURT:  Why is this important?

3           MS. SHROFF:  Because he said there was so much trauma

4    and there was so much, you know, his life was at risk.  They

5    didn't even move offices.  I'm not asking what the address is.

6    I'm just asking if they moved.  I don't care where it is.

7           MR. LAROCHE:  He's confirming the same location.  He

8    was testifying about what happened immediately after at the

9    base, and whether he would talk about it in the future.  He

10   said he would not because it could potentially present risks to

11   people who were there.

12          THE COURT:  The objection is sustained.

13          MS. SHROFF:  Your Honor, they brought it out.  They

14   brought up the harm.  They brought out the harm and they said

15   that his life was harmed.  Because the Foreign Office West,

16   right, they brought out actual harm about that fact.

17          THE COURT:  The objection is sustained.

18          (Continued on next page)

19

20

21

22

23

24

25

K2I3SCH3                          Stedman - Cross

1                    (In open court)

2    BY MS. SHROFF:

3    Q.  Sir, you testified, did you not, about access from Foreign

4    Office West on DevLAN, correct?

5    A.  Correct.

6    Q.  You testified that access, according to you was -- what did

7    you call it?

8    A.  Abysmal, slow.

9    Q.  Abysmal?

10   A.  And bad.  Really bad.

11   Q.  How long -- would you agree with me it is at least more

12   than a decade that that office has been there?

13   A.  I don't know, but probably close.

14   Q.  For at least five years, there was access from Foreign

15   Office West to DevLAN, correct?

16   A.  I can't comment about before my time out there.  I don't

17   know what their connection was like then.

18   Q.  You don't recall what your connection was like before,

19   correct?

20   A.  I know when I was there what the connection was like.  I

21   don't know for the people before me.

22   Q.  I see.  Let me show you what is marked as 3512-46, okay.

23          Is it your testimony, sir, that you were there in

24   March of 2016?

25   A.  That I was where?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2I3SCH3                          Stedman - Cross

1  Q.  Foreign Office West.

2  A.  In March of 2016, I was not, no.

3  Q.  You were not there, right?

4  A.  I was not there.

5  Q.  You would, silting here today, would have no idea what the

6  connectivity was during March of 2016?

7  A.  To the Foreign Office West, yeah, I wouldn't really

8  understand.

9  Q.  Right.  How about in April of 2016?

10  A.  I was still not there.

11  Q.  Right.  So you have no idea as to what the connectivity

12  level was back then, correct?

13  A.  Correct.

14  Q.  And you didn't say that on direct, right?  You just said it

15  was abysmal?

16  A.  Yes.

17  Q.  So -- I'll take that back.

18          So sitting here today, now, your testimony is that you

19  have no idea what the connectivity was in 2016, specifically

20  March, correct?

21  A.  I do not, yeah.

22  Q.  April, correct?

23  A.  Correct.

24  Q.  Right.  Okay.  So, since you do not have any personal

25  knowledge of connectivity problems between DevLAN and Foreign

1   Office West, you had no personal way of knowing what the

2   connections were at that time, correct?

3   A.  I had no personal way of knowing at that time.

4   Q.  Right.  So, when you testified on direct that it was

5   abysmal, you didn't caveat it, did you?

6            MR. LAROCHE:  Objection.

7            THE COURT:  Sustained.

8   Q.  By the way, when you were told about the WikiLeaks

9   disclosure, were you provided by a friend with an actual

10  article about WikiLeaks?

11  A.  Yes, I believe so.

12  Q.  You got an article that detailed what WikiLeaks had posted

13  on the WikiLeaks website, correct?

14  A.  It was a summary article, correct.

15  Q.  You read the summary article, correct?

16  A.  Correct.

17  Q.  You listened to the news, correct?

18  A.  I listened to the news.

19  Q.  You listened to radio, correct?

20  A.  Not as much there.

21  Q.  So, all of your information about WikiLeaks was derivative

22  from what the newspapers told you, correct?

23  A.  Correct.  Most -- sorry.  Are you talking about the initial

24  day of?  Or are you talking about from then on out?

25  Q.  I'm assuming it was all the same, so if it wasn't, you can

K2I3SCH3                         Stedman - Cross

1   break it up.

2   A.  So the first information we had about the compromise was

3   all media derived.  And then after time went on, they kind of

4   tried internally to define the scope of what could have been

5   compromised.

6           So yes, we received some information internally as

7   time went on.

8   Q.  I was only talking about the media.

9   A.  Okay.  I thought you said "all."

10  Q.  So when you were listening to the media, you listened to

11  the news reports, correct?

12  A.  Sure, yeah.

13  Q.  You read the newspaper articles, correct?

14  A.  Yes, I read articles.

15  Q.  Right.  And the only thing you didn't read about the leak

16  is what WikiLeaks itself said, correct?

17  A.  No.  I don't think so.

18  Q.  No?

19  A.  Yeah, if I heard your question correctly, I did read the

20  WikiLeaks version or summary of the leak.

21  Q.  Right, but that was only in your official capacity,

22  correct?

23  A.  Sorry, I can't hear you.

24  Q.  That was only in your official capacity, correct?

25  A.  Correct.

K2I3SCH3                        Stedman - Cross

1    Q.  Okay.  I was just asking you when you heard the news.

2    A.  Right, okay, yeah.

3    Q.  I am going to try it again.

4    A.  Okay.

5    Q.  You read everything that the newspapers reported about the

6    leaks, correct?

7    A.  Not everything that every newspaper wrote.

8    Q.  Some newspapers?

9    A.  Yes.

10   Q.  You testified that one of the things that -- one of the

11   names that Mr. Schulte was called was Nuclear Option; is that

12   correct?

13   A.  Yes.

14   Q.  And you said that that was because you thought Mr. Schulte

15   had disproportionate reactions, correct?

16   A.  Yeah, I think so.

17   Q.  That was your personal subjective opinion, that he had

18   disproportionate reactions?

19   A.  Yes.

20   Q.  It's just because you wouldn't react that way, correct?

21   A.  I don't think the normal way to react is that way.

22   Q.  You don't think the normal way to re --

23   A.  Or the average, yes.

24   Q.  The normal?

25   A.  The normal, yes.

K2I3SCH3                         Stedman - Cross

1    Q.  You think complaining via e-mail to OIG is not normal?

2    A.  I think it's rare, if that's what you mean by normal.

3    Q.  I don't know.  You said normal.  I didn't say it.

4    A.  Yeah, I don't think complaining to OIG is the normal path.

5    Q.  What is OIG?

6    A.  The Office of the Inspector General.

7    Q.  What's it made for?

8    A.  To receive complaints that relate to fraud, waste, and

9    abuse.

10   Q.  So there is a bureau?

11   A.  That's one of the functions.

12   Q.  It's set up, correct?

13   A.  Yeah.

14   Q.  To receive complaints?

15   A.  Correct.

16   Q.  About fraud, waste, and abuse.  Right?

17   A.  Correct.

18   Q.  And you think if somebody e-mails about fraud, waste, and

19   abuse, if it doesn't fit a particular definition, it's

20   abnormal?

21   A.  I think in this situation it's abnormal to jump to the

22   Inspector General.

23   Q.  Okay.  You think that about an $8 million contract?

24   A.  I think about -- I think that about this situation as a

25   whole.

K2I3SCH3                      Stedman - Cross

1   Q.  Right.  But this situation, let's just define it as an $8

2   million contract?

3   A.  That is part of it, yes.

4   Q.  Yes.  You also said, did you not, in your direct testimony,

5   that Mr. Schulte made every effort to recover -- you could see

6   what he was doing, correct, that was the phrase you used?

7   A.  Yes.

8   Q.  Right.  And according to you, what he was doing was trying

9   to recover lost ground, correct?

10  A.  That was the phrase I used, yeah.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2iWsch4                         Stedman - Cross

1    BY MS. SHROFF:

2    Q.  Right.  And when you say recover lost ground, you just mean

3    that he was, in your opinion -- he was about to lose a project

4    to a contractor, correct?

5    A.  I think when I said that, I'm talking in terms of the

6    conflict, that he seemed to be losing the conflict and was

7    trying to regain ground in that conflict.

8    Q.  Right.  He wanted to keep the project himself, correct?

9    A.  He did not want the competitor project to proceed.

10   Q.  Right.  He wanted his project to succeed, correct?

11   A.  Correct.

12   Q.  And he didn't want his competitor's project to get ahead of

13   him, correct?

14   A.  Correct.

15   Q.  OK.  Is that it?

16   A.  Yeah.

17   Q.  OK.  Did you want the competitor's project to proceed ahead

18   of yours?

19   A.  Yes and no.

20   Q.  Yes and no?

21   A.  Yes and no.

22   Q.  I see.

23   A.  I can explain further if you would like.

24   Q.  I'm sure.  Would your explanation be that it would be good

25   for the mission?

K2iWsch4                           Stedman - Cross

1    A.  It would be capitalizing on the opportunity.

2    Q.  Right.  Let me ask you something.  Did you, did the CIA

3    ever tell you that Mr. Schulte's lawyers wanted to talk to you

4    about your testimony?

5    A.  Yes.

6    Q.  Did they ask you to meet with us voluntarily?

7    A.  They asked me if I would like to meet with them

8    voluntarily, yes.

9    Q.  Right.  And you said no, right?

10   A.  Correct.

11   Q.  And that was just a choice on your part, correct?

12   A.  That was my choice, yes.

13   Q.  You talked to these prosecutors, correct?

14   A.  Correct.

15   Q.  You didn't talk to us, correct?

16   A.  Correct.

17   Q.  In all the time that you worked at the CIA along with

18   Mr. Schulte, did you know Mr. Schulte to have a Plex server?

19   A.  Yes.

20   Q.  What is a Plex server?

21   A.  So, a file share, upload, download, media shared server.

22   Q.  And is it a server that he had at his home?

23   A.  I believe so.  I never saw it.

24   Q.  And was it a server that housed movies?

25   A.  Yes.

K2iWsch4                         Stedman - Cross

1    Q.  And did he routinely share or stream movies to whoever in

2    that group wanted to stream movies?

3    A.  I think towards, like, 2015, 2016, maybe 2014, yes, he

4    would -- whoever wanted to stream videos from there had to ask,

5    all they had to do was ask.

6    Q.  All they had to do was ask, right?

7    A.  Correct, yeah.

8    Q.  And he shared, right?

9    A.  Correct.

10   Q.  And during this time frame before this explosion with Amol,

11   he watched movies through that file share, correct?

12   A.  Did he use his own file share to watch movies?

13   Q.  Yes.

14   A.  Is that what you're asking?

15   Q.  Yes.

16   A.  I believe so.

17   Q.  He did, right?

18   A.  I believe so.

19          MS. SHROFF:  May I have a minute, your Honor?

20          THE COURT:  You may.

21   Q.  Have you ever heard of a project called Project Wiz, w-I-Z?

22   A.  Yes.

23          MS. SHROFF:  May I just approach, your Honor?  It

24   might just make things go faster.

25          THE COURT:  Yes.

K2iWsch4                          Stedman - Cross

 1  BY MS. SHROFF:

 2  Q.  Just in case you need to, OK, I'm going to leave it here.

 3  A.  Yup.

 4  Q.  Was that a project that was worked on outside of the CIA?

 5  A.  I believe so, yeah.

 6  Q.  And it was a project worked on outside of the CIA by

 7  Mr. Schulte and Mr. Weber, is that correct?

 8  A.  Yes, I believe so.

 9  Q.  And there came a point, did there not, when that project

10  became uploaded, or whatever the phrase is, on the CIA

11  computer, correct?

12  A.  On to DevLAN?

13  Q.  Yes.

14  A.  Yes.

15  Q.  Right?

16  A.  Yup.

17  Q.  And when it was uploaded into the DevLAN, it was an OSB

18  project, correct?

19  A.  Sure, yeah.

20  Q.  And did there come a time when Mr. Schulte left OSB --

21  right -- and retained access to Project Wiz?

22          MS. SHROFF:  Bless you.

23          THE COURT:  Thank you.

24  Q.  Is that correct?

25  A.  I assume so.

K2iWsch4                          Stedman - Cross

```
 1   Q.  Well, take a look at that document I left you.  Maybe that
 2   will help you refresh your recollection.
 3   A.  Sure.  Is there a certain portion of this, since it's five
 4   pages?
 5            THE COURT:  Do you have a portion you can direct him
 6   to?
 7            MS. SHROFF:  Oh, I'm sorry.
 8   Q.  Do you want me to direct you to a portion?
 9   A.  Yeah, if you could.  Otherwise it's going to take me a
10   while.
11   Q.  OK.  Why don't you go to the last page and look at the page
12   that's, at the bottom, numbered 30.
13   A.  So, page 30, the bottom email?
14   Q.  Right.  Just take a look at paragraph No. 3.
15   A.  OK.
16       OK.
17   Q.  OK?
18   A.  Yup.
19   Q.  So is it fair to say that that project, Project Wiz, was a
20   project that was Mr. Schulte's and Weber's correct?
21   A.  Correct.  They worked on it together.
22   Q.  I'm sorry?
23   A.  They worked on it together.
24   Q.  And OSB was heavily invested in that tool or that project,
25   correct?
```

K2iWsch4                    Stedman - Cross

1   A.  Yes.

2   Q.  And even though Mr. Schulte had been moved out of OSB, the

3   project had gone with him, correct?

4   A.  Correct.

5   Q.  And there was no standard operating procedure by which

6   Mr. Weber had taken away his access to Project Wiz, correct?

7   A.  I think I'm confused by that statement.

8   Q.  Really?

9   A.  You're saying that he did keep Project Wizard after he

10  moved branches, but at the same time you're saying there was --

11  that he lost access to it and there was no policy or process

12  for Mr. Weber to remove it.

13  Q.  I really didn't say that, but --

14          THE COURT:  Why don't you rephrase the question.

15          THE WITNESS:  Sorry.  That's how I heard it.

16          THE COURT:  That's not what I heard you say.

17  BY MS. SHROFF:

18  Q.  It was an OSB project, correct?

19  A.  It was, yes, a project by two OSBers.

20  Q.  Mr. Schulte moved?

21  A.  Correct.

22  Q.  From OSB to RDB, correct?

23  A.  Correct.

24  Q.  The project moved with him?

25  A.  Yes.

K2iWsch4                          Stedman - Cross

1   Q.  The project was known to Mr. Weber?

2   A.  Yes.

3   Q.  According to this document and your recollection, there was

4   no standard operating procedure that removed Mr. Schulte's

5   access to Project Wiz, correct?

6              MR. LAROCHE:  Objection.

7              THE COURT:  Overruled.

8   A.  To -- there was no standard operating procedure to remove

9   his access from Project Wizard?  Is that --

10  Q.  That removed his access to Project Wiz.

11  A.  Yes.  There is no standard operating procedure.

12  Q.  That removed his access to Project Wiz, correct?

13  A.  I'm still --

14  Q.  Take a look at the document.

15  A.  I'm still confused by the phrasing of your question,

16  because it doesn't sound, based on my recollection and this

17  evidence, that he was removed.

18  Q.  Right.  He was never removed, right?

19  A.  Not that I'm aware of.

20  Q.  Right.  And there was no standard operating procedure in

21  place, according to you, that would require the removal of

22  access when the project moved from OSB to RDB, correct?

23  A.  This -- this was the standard operating procedure --

24  Q.  Not --

25  A.  -- talking to our -- this is our management chain, this

K2iWsch4                          Stedman - Cross

1    email.

2    Q.  I didn't --

3    A.  Informing them of the plan was the operating procedure.

4    Q.  Right.  And according to that --

5    A.  Plan, yes.

6    Q.  -- thing that you're just circulating, right?

7    A.  He was --

8    Q.  No longer --

9    A.  He was supposed to keep it.

10   Q.  He was supposed to keep it, right?

11   A.  Correct.

12   Q.  And there was no standard operating procedure that required

13   him to be pulled off, correct?

14   A.  Correct.

15   Q.  And I just want to make sure that this document that

16   refreshed your recollection is dated September 9, 2016.  Right?

17   A.  It is.

18   Q.  Project Wizard was a solution project to any problem that

19   came from the OSB libraries, correct?

20   A.  It was a, the template or the project creator, yes.

21   Q.  Right.  So if it was -- if there was a problem on OSB

22   libraries, Project Wizard would come into play, correct,

23   something like that at a high level?  I don't do tools, so I

24   don't know.

25   A.  If there was a project with OSB libraries, Project

K2iWsch4                         Stedman - Cross

1   Wizard -- there was some integration, but it wasn't OSB
2   libraries were dependent upon Project Wizard.
3   Q.  No.  Correct.  There was just some inter-correlation to
4   them, correct?
5   A.  Sure.  Yeah, they integrated.
6   Q.  Right.  And is it fair to say that Project Wizard went with
7   him to RDB?  Correct?
8   A.  I -- I believe so.
9   Q.  Right.
10  A.  I'm not certain.
11  Q.  Right.  And when it went with him to RDB, access by OSB
12  people would no longer be needed, correct, because it had now
13  moved to RDB?
14  A.  Would no longer be needed?  I think it would still be not
15  necessarily needed but wanted by OSB, yeah.
16  Q.  Right.  So a project could move from one branch to another,
17  correct?
18  A.  Correct.
19  Q.  There could be access by both branches to the project,
20  correct?
21  A.  Correct.
22  Q.  There could be access at branch level, correct?
23  A.  Access at branch level, like when defining the access
24  controls?
25  Q.  Right.

K2iWsch4                          Stedman - Cross

```
 1    A.   Yeah, I believe so.

 2    Q.   Sometimes there could be access moved up to division

 3    levels, correct?

 4    A.   I think you would choose either groups of branches or

 5    individuals outside the branch.

 6    Q.   Right.

 7    A.   Depending upon the number.

 8    Q.   Right.  So who and what had access was sort of fluid,

 9    correct?

10    A.   "Fluid" wouldn't be the term I would use, but undermanaged,

11    yeah.

12    Q.   I'm sorry?

13    A.   Undermanaged, yes.

14    Q.   It was undermanaged?

15    A.   Correct.

16    Q.   Undermanaged by whom?

17    A.   That being the point, right?  There wasn't much policy

18    really dictating how to do it or requiring that it be done.

19    Q.   OK.  So there was no policy about how to do it, correct?

20    A.   Uh, there's no policy stating on how it should be done,

21    correct.

22    Q.   Who should do it?

23    A.   Who should do it, I think, was known.  It was the

24    infrastructure team and branch supervisors.

25    Q.   OK.  So it was known but undermanaged?
```

1 A. Sure.

2 Q. Known but underenforced?

3 A. Sorry. Underenforced?

4 Q. Right.

5 A. Correct.

6 Q. *Ad hoc*?

7 A. Yeah. Changed over time, but yeah.

8 Q. OK. It changed over time; at one point it was *ad hoc*?

9 A. Correct.

10 Q. And it was still *ad hoc* in September of 2016?

11 A. I think -- I don't want to say the majority of branches,

12 but at least two or three were pretty good about managing their

13 own access controls to their projects.

14 Q. That's your personal opinion, right?

15 A. I know our branch's setup, and so yes, I can say for them.

16 The opinion would just be from what I heard from the other

17 branches.

18 Q. So just what you heard?

19 A. For the other branches. For my own branch, for OSB, yes, I

20 knew how the access controls were implemented.

21 Q. You do know how they ran?

22 A. Correct.

23 Q. And your knowledge tells you that you were undermanaged,

24 correct?

25 A. I think the division-wide was undermanaged.

K2iWsch4                    Stedman - Cross

1   Q.  You keep shifting it.  Branch, division.  I'm only talking

2   about your branch.  OK?

3   A.  I'm trying to describe it accurately.

4   Q.  Right.  Let's stick with OSB, which is not a branch.

5   A.  Yeah, stick with OSB.

6   Q.  OK.  OSB.

7   A.  Yes.

8   Q.  Undermanaged?  Yes or no.

9   A.  At different points in time, yes.  Early on undermanaged.

10  By September 2016, we were doing a lot better management.

11  Q.  OK.  Let's just stick to 2016.

12  A.  OK.

13  Q.  Undermanaged?  Yes or no.

14  A.  Probably still, yes.

15  Q.  *Ad hoc*?  Yes or no.

16  A.  No.

17  Q.  No?

18  A.  No.

19  Q.  OK.  So tell me, if it wasn't *ad hoc*, why Project Wiz went

20  to RDB?

21  A.  I think that was a deliberate decision.  It's not an *ad hoc*

22  decision.

23  Q.  By whom do you think it was a deliberate decision?

24          MR. LAROCHE:  Objection.  She keeps cutting him off,

25  your Honor.

1          MS. SHROFF:  Your Honor, I apologize.  I just think

2     his voice drops.  I just can't hear him.

3          THE WITNESS:  Sorry.  I'll stick closer to the

4     microphone.

5          MS. SHROFF:  Sure.

6          THE COURT:  Do you want to finish your answer?

7          THE WITNESS:  Yes.

8     A.  I think it was deliberate how OSB decided to enforce the

9     access controls, and when it was decided to move -- this is

10    also evidence to that decision -- that Project Wizard should

11    move with Josh.

12    Q.  That OSB what?

13    A.  That OSB Project Wizard, or Project Wiz, as referred to

14    here, should move with Josh.

15    Q.  Should move with Josh?

16    A.  That was a deliberate decision, yes.

17    Q.  OK.  So sitting here today, you think it was a deliberate

18    decision to move Project Wiz?

19    A.  Yes.

20    Q.  And with Josh, right?

21    A.  Yes.

22    Q.  And you think it was a deliberate decision not to move OSB

23    libraries with Josh, correct?

24    A.  Correct.

25    Q.  And you know that because of what?

K2iWsch4                    Stedman - Cross

1    A.  So, this is part of the discussion of the Project Wiz,

2    evidence that you're referencing, OSB libraries, I know from my

3    recollection of talking to Jeremy.

4    Q.  OK.  So what you know about OSB libraries comes to you from

5    talking to Mr. Weber, correct?

6    A.  Yes, and my own knowledge.

7    Q.  Right.  And your knowledge comes from where?  Other than

8    talking to Mr. Weber is what I'm trying to figure out.

9    A.  Because I'm part of the conversation as co-administrator of

10   the OSB libraries of whether they should be moved or not.

11   Q.  OK.  Were you co-administrator also of Project Wiz?

12   A.  I was not.

13   Q.  Right.  So you don't know what decisions were made on

14   Project Wiz, correct?

15   A.  Other than what's stated here, no.

16   Q.  Right.  And other than what's stated here, you never talked

17   about it with Mr. Weber, correct?

18   A.  Never talked about it with who?

19   Q.  Mr. Weber.

20   A.  No, I did not.

21   Q.  And when Project Wiz was moved from OSB with Mr. Schulte,

22   right --

23   A.  Yes.

24   Q.  -- is it your testimony today that Mr. Weber was aware of

25   that?

K2iWsch4                        Stedman - Cross

1    A.  Yes.  Based on --

2    Q.  And is it your testimony that Mr. Weber was aware that

3    Mr. Schulte had removed his access to Project Wiz?

4    A.  I don't know if he knew that.

5    Q.  You don't know, right?

6              MR. LAROCHE:  Objection, your Honor.

7    A.  I don't know.

8              MR. LAROCHE:  She continually is cutting off the

9    witness on subjects that were not covered at all on direct

10   examination.

11             THE COURT:  You have to let the witness finish, as you

12   know, Ms. Shroff.

13             MS. SHROFF:  Please finish.

14   A.  I am not aware of how the access controls were applied or

15   transferred from Project Wiz.

16   Q.  You don't know?

17   A.  I do not.

18   Q.  OK.  Is it fair to say, Mr. Stedman, that you and Mr. Weber

19   discussed OSB libraries?  Correct?

20   A.  We discussed OSB libraries, generally, yeah.

21   Q.  And is it fair to say that you -- could you just keep your

22   voice up because I really think you're finished and then

23   apparently you're not finished.

24   A.  Sorry.

25   Q.  OK.  So you talked to Mr. Weber about Mr. Schulte, correct?

1   A.  Yeah.  Can you be more specific at an event?

2   Q.  No.  Just in general.  Correct?

3   A.  OK.

4   Q.  You discussed Mr. Schulte with Mr. Weber, correct?

5   A.  Yes.

6   Q.  And is it fair to say that Mr. Weber was not Mr. Schulte's

7   boss?  Is that right?

8   A.  Correct.

9   Q.  And Mr. Weber, there came a point, right, did not like

10  Mr. Schulte?  Correct?

11  A.  I can't speak for him.

12  Q.  Well, you spoke to Mr. Weber frequently, correct?

13  A.  Correct.  I don't -- I don't have any reason to believe

14  that he didn't like Josh.

15  Q.  You don't have any reason to believe he didn't like Josh

16  Schulte?  That's your testimony?

17  A.  That is my testimony.

18  Q.  OK.  Now, you testified on direct, did you not, sir, that

19  you thought Mr. Schulte's complaints about Mr. Amol and the

20  threat that he reported was fabrication, correct?

21  A.  Yes.

22  Q.  And you testified on direct that you did not believe it to

23  be true, correct?

24  A.  I did not believe it to be true.

25  Q.  Right.  And you told that to Amol, correct?

K2iWsch4                         Stedman - Cross

1  A.  Uh, I don't know if I told him directly that, but I think

2  he understood that I did not believe Josh.

3  Q.  Right.  And you told that to Mr. Weber, correct?

4  A.  I believe it was evident amongst most of the branch

5  members.

6  Q.  What?

7  A.  I believe it is evident amongst both -- most of the branch

8  members.

9  Q.  OK.  I'm going to try this again.

10 A.  OK.

11 Q.  Did you tell Mr. Weber that you didn't believe it or not?

12 A.  I don't remember saying it specifically.

13 Q.  How about to Sean; did you tell it to Sean?

14 A.  I don't remember saying it specifically to anyone.

15 Q.  Right.  So you don't remember saying something

16 specifically, but that's your general belief, correct?

17 A.  My general belief that I understood that they didn't

18 believe them, yes.

19 Q.  Right.  OK.  And it is your testimony that Mr. Schulte came

20 and showed you his handwritten complaint, correct, or was it

21 typed up by then?

22 A.  It was typed up.

23 Q.  Right.  And you read it, right?

24 A.  I read it.

25 Q.  And you gave it back to him, correct?

1  A.  Correct.

2  Q.  And you just said OK, correct?

3  A.  Correct.

4  Q.  You didn't tell him that you didn't believe him, correct?

5  A.  Correct.

6  Q.  And you didn't engage with him?

7  A.  Correct.

8            THE COURT:  This is all 1207, isn't it?

9            MS. SHROFF:  I'm sorry?

10           THE COURT:  Is this all 1207, the document you're

11  referring to?

12           MS. SHROFF:  Yes.

13           THE COURT:  All right.  Go ahead.

14  BY MS. SHROFF:

15  Q.  You didn't tell him that you didn't believe his complaint,

16  correct?

17  A.  I didn't tell Josh directly, no.

18  Q.  Right.  And you did not -- you were not physically --

19           MS. SHROFF:  I'll withdraw that.

20  Q.  After he showed you the complaint, you gave it back to him

21  and you continued on your way, correct?

22  A.  I believe so.

23  Q.  OK.  And then there came a point in time when you were

24  asked questions by security about this incident, correct?

25  A.  OK.  Yeah.  Yes.  Yes, I was.  Yes.

1  Q.  And you were asked questions by the threat management unit

2  about this, correct?

3  A.  Correct.

4  Q.  And you were asked questions by the government about this,

5  right?

6  A.  Yes.

7  Q.  Right.  And to each one of these three you said I was never

8  there at that time, correct?

9  A.  I don't believe I said that to all three.  I don't think I

10  would remember if I said it or not.

11  Q.  You didn't tell them that you didn't witness an incident

12  that you didn't believe happened?

13  A.  I'm pretty sure I told the threat management unit, the

14  unit, who, I think, were the first ones I spoke to, that I

15  wasn't there at the time that the alleged incident occurred.

16  Q.  And you never told that to the government?

17  A.  I -- if they asked I did, yeah.

18  Q.  And if they didn't ask, you didn't tell?

19  A.  If they didn't ask me, I didn't bring it up, no.

20         MS. SHROFF:  OK.  Thank you.  I have nothing further.

21         THE COURT:  Mr. Laroche.

22  REDIRECT EXAMINATION

23  BY MR. LAROCHE:

24  Q.  In advance of your testimony today, you've met with the

25  government several times, correct?

K2iWsch4                          Stedman - Direct

1    A.  Correct.

2    Q.  And you've met with me several times, correct?

3    A.  Correct.

4    Q.  Did I ask you to review something in advance of your

5    testimony?

6    A.  Yes.

7    Q.  Did that include the threat management unit video that Ms.

8    Shroff just referenced?

9    A.  Yes.

10   Q.  Have you ever told anybody that you witnessed an event that

11   you didn't think happened?

12   A.  Not that I'm aware of.

13   Q.  Ms. Shroff asked you about the complaint and why you didn't

14   say anything to the defendant at the time, is that right?

15   A.  Yeah.  This is the alleged death threat?

16   Q.  The alleged death threat complaint.

17   A.  Yeah.

18   Q.  Why didn't you say anything to the defendant at the time?

19   A.  I felt like he was looking for a reaction from me.  I -- in

20   my mind, it meant more to just not respond to him at all as

21   kind of showing that I was pissed off about it.

22   Q.  Why did it mean more to you to do that?

23   A.  Because I think he was looking for some level of reaction.

24   I think me not responding kind of felt, made it feel more

25   serious to me.  Right?  I wanted to show that this was beyond

kind of this playing around game, that he just made a big deal

for all of us.

Q.  Do you remember you were asked a number of questions about

Project Wiz?  Do you recall those?

A.  Yes.

Q.  And you were asked a lot of questions about standard

operating procedures, is that right?

A.  Yes.

Q.  I think one of the things you said was that a standard

operating procedure was to talk to management about project

permissions?

A.  Yeah.  I don't think any of the procedures are written

down, but it's known that, like, yeah, that that would be the

procedure for --

Q.  Why is it known that you should talk to management about

your project permissions?

A.  Uh, because they're ultimately responsible for the branch,

and so the branch decisions, at least we keep our supervisors

informed.  Depending upon the supervisor they may want to make

those decisions seeing things from a higher level.

Q.  And you were asked a number of questions about whether

access permissions were fluid.  Do you remember that?

A.  Yes.

Q.  Was there a policy in place about reinstating your accesses

to programs without authorization?

1   A.  Agency-wide, using your accesses to get access to things

2   you were explicitly denied is against policy.

3   Q.  Why?

4   A.  I think -- there's a lot of reasons, right?  But explicitly

5   denied means that you weren't supposed to have that

6   information.  The fact that you use a privileged account or a

7   privilege to get reinstated to something that you were told not

8   to have is -- is a red flag for us and could damage kind of the

9   security of operations without compartmentation.

10  Q.  Is that what the defendant did with OSB libraries?

11  A.  I believe so, yes.

12  Q.  And why was that a red flag?

13  A.  Because everybody, to include him, knows that that's a red

14  line and that he was explicitly denied that privilege level in

15  those libraries.

16  Q.  You were asked a number of questions about email 1027 about

17  AlmostMeat --

18  A.  Yes.

19  Q.  -- remember that?

20      One of the things Ms. Shroff asked you was about jumping or

21  going to OIG and reporting something.  Do you remember that?

22  A.  Yes.

23  Q.  And your response was that it was abnormal?

24  A.  Yes.

25  Q.  Why did you think it was abnormal in these circumstances?

1   A.  So, uh, I think there was, uh, some things that I agreed

2   with him on relative to issues regarding AlmostMeat and

3   Drifting Deadline and the two requirements.  I think the

4   natural progression of these things is to kind of have the

5   debate, like make your case to the people who are in charge of

6   that decision.  If you still don't feel like the right thing's

7   being done, then you can look at going to the inspector

8   general.

9       I think I have a problem with that as a normal route.

10  Like, I think it would be more normal if it felt like more of a

11  real discussion than a real side choosing, and it seemed more

12  that Josh felt like his side wasn't getting represented at all;

13  that we weren't listening to it, or whatever.  And so he just

14  jumped right over the discussion points that we had been having

15  on it.

16          MR. LAROCHE:  Let's take a look, very briefly, at

17  Government Exhibit 1027 and if we can zoom in on the second

18  paragraph.

19  Q.  You were asked about a dozen questions about the word

20  "hijack"?

21  A.  Yes.

22  Q.  Does hijack mean something different than use?

23  A.  To me, yes.  I think "they wish to use" means that they're

24  asking.  Hijacking means they're taking.

25  Q.  And did you have problems with that language in this email?

1    A.  Yes, I did.

2    Q.  What did you disagree with?

3    A.  I think I mentioned before that I think phrases like that

4    or words like that were used intentionally to provide a sense

5    of urgency or direness, I guess, in the situation to make

6    people kind of act on it.  And so I think it was just being

7    used for that and not a good characterization of the situation.

8    Q.  And I think you were asked a question about, at the end, it

9    says, "they now wish to hijack the Drifting Deadline execution

10   vectors to use directly with AlmostMeat, thereby coupling the

11   tools."  You were asked about that last portion "use directly

12   AlmostMeat."  I think you said that that warranted further

13   discussion in terms of whether you agreed with it or not?

14   A.  Yeah.

15   Q.  What did you mean by that?

16   A.  As I mentioned earlier, after that meeting with AlmostMeat

17   contractors, we did create a separate version of that same

18   code.  There's still some pieces that were tied together,

19   right?  The same access vector, the underlying piece was the

20   same, but we did as much as we could to separate the two.  So I

21   don't think it's directly one to the other, just taking and

22   transplanting.

23   Q.  And you were asked about execution vectors?

24   A.  Yeah.

25   Q.  Is that right?

1  A.  Yes.

2  Q.  I think on direct you were referring to an access vector?

3  A.  The equivalent, yeah.

4  Q.  Are those the same thing or similar things?

5  A.  In the context of our discussion, yeah.

6        MR. LAROCHE:  Could we go to the next paragraph.

7  Q.  You were asked a lot of questions about "if AlmostMeat is

8  caught," that sentence, "best case scenario"?

9  A.  Yes.

10  Q.  You said you thought this paragraph was slightly

11  inflammatory or subtly inflammatory.  Remember that?

12  A.  Yes.

13  Q.  Why do you say that?

14  A.  Because I don't think that that's the best case at all, and

15  I think that that, that phrase is designed to fire up the

16  people who have a stake in Drifting Deadline to act without

17  really understanding the entire situation.

18        MR. LAROCHE:  We can pull that down.

19  Q.  You were shown a chat -- do you recall that -- about OSB

20  libraries access?  Do you remember that?

21  A.  Yes.

22  Q.  Do you still have that chat in front of you?

23  A.  Yes, I think so.

24        MR. LAROCHE:  I think there was a lot of jumping

25  around with the back-and-forth of that chat.  What I'd like to

1    do, with the Court's permission, is read the full chat -- it's

2    not very long -- into the record so that we can have the full

3    context of the chat.

4              THE COURT:  Go ahead.

5    Q.  Then I'll ask you a few questions.

6    A.  OK.

7    Q.  I'd like I to read for yourself, and I will read Sean, and

8    I'm starting on April 18 at 10:58:12.  Do you see that?

9    A.  10:58:12.  Yes.

10   Q.  I will read Sean.  You can read yourself.

11   A.  OK.

12   Q.  "How did the libraries meeting go?"

13   A.  "Schuljo is up here now asking about OSB library accesses.

14   He had claimed that you said he could be admin.  He's talking

15   to Anthony now.  He lost all admin accesses to Atlassian over

16   the weekend.  He wasn't happy about that either."

17   Q.  "Wow.  He just doesn't give up ever.  I said he could

18   contribute to the libraries, that he just needed to work with

19   you and Jeremy.  Never discussed accesses of any kind to the

20   database."

21   A.  "Right" -- oh, sorry.  "Right, that's what I iterated, but

22   he'll have to hear from Anthony now."

23   Q.  "The boy needs to learn how to take his medicine every now

24   and then."

25        Now, you were asked a series of questions about whether you

1   said in this exchange anything about him asking for accesses

2   back.  Do you remember that?

3   A.  Yes.

4   Q.  And there's a line here where you say, "that's what I,"

5   then it says iterated, but he'll have to hear it from Anthony

6   now"?

7   A.  Yes.

8   Q.  What did you mean by that?

9   A.  Basically, that's what I had told him, that he couldn't

10  have -- that he would have to go to the management if he wanted

11  to receive accesses back, that he'd have to hear it from the

12  management.

13  Q.  And that's reflected in the chat logs we just went through?

14  A.  I believe so.

15          MR. LAROCHE:  No further questions.

16          THE COURT:  You're excused.  Watch your step there.

17          (Witness excused)

18          THE COURT:  Who is the next witness?

19          MR. DENTON:  Your Honor, the government calls Sean.

20          THE COURT:  Right.

21   SEAN,

22       called as a witness by the government,

23       having been duly sworn, testified as follows:

24          THE COURT:  Please sit down, Sean.  Pull yourself

25  right up to the microphone.

K2iWsch4                          Sean – Direct

1          All right.  Mr. Denton.

2          MR. DENTON:  Thank you, your Honor.

3   DIRECT EXAMINATION

4   BY MR. DENTON:

5   Q.  Good morning, sir.

6   A.  Good morning.

7   Q.  Where do you work?

8   A.  I work at the Central Intelligence Agency.

9   Q.  How long have you worked at the CIA?

10  A.  Over 25 years now.

11  Q.  Generally speaking, have you worked in any particular field

12  or specialty during your time at the CIA?

13  A.  I've always been an engineer.  I started in security and

14  InfoSec.  I moved to doing forensics in CIMC, and then I was a

15  developer for most of my career.

16  Q.  I want to go through all the acronyms, but when you say an

17  engineer, what type of engineer?

18  A.  So, again, most much my time was spent developing software,

19  but I did spend a lot of time doing forensics investigations.

20  Q.  And you've talked about some of the subject areas.  Can you

21  describe some of the positions you've held during your career

22  at the CIA?

23  A.  Sure, yeah.  As a security officer in InfoSec, we basically

24  reviewed the, the system for malware and things like that.

25  When I moved over to CIMC, we actually supported security

K2iWsch4                              Sean - Direct

1   investigations, so whenever there was a computer involved, my

2   team would get called in to do some of the forensics.  Most of

3   my career was spent in CCI and EDG developing software for

4   operations.

5   Q.  And is that the Center for Cyber Intelligence?

6   A.  It is.

7   Q.  And the Engineering Development Group?

8   A.  It is.

9   Q.  I'd like you to focus on early 2016.

10  A.  OK.

11  Q.  Sir, what was your position then?

12  A.  At that point I was the branch chief for the Operations

13  Support Branch.

14  Q.  And when did you start in that role?

15  A.  It was late 2013, I believe.

16  Q.  Is the Operations Support Branch sometimes known as OSB?

17  A.  Yes, sir.

18  Q.  What did you do before becoming branch chief of OSB?

19  A.  I was actually a developer in OSB probably for the seven

20  years prior to that, seven or eight years.

21  Q.  What were some of your duties and responsibilities as

22  branch chief of OSB?

23  A.  Well, as branch chief, I needed to make sure that, one, the

24  work got done; two, that the folks had what they needed to get

25  the work done; and three, that I was good at building people

1    and making sure that they were moving forward in their careers.

2    Q.  Sir, I'd like to ask you to look around the courtroom and

3    see if you recognize anyone that you supervised while you were

4    branch chief at OSB.

5    A.  I do.

6    Q.  Who do you recognize?

7    A.  Josh Schulte.

8    Q.  How did you first meet the defendant?

9    A.  We were on the same team when I was a developer in OSB.  He

10   started as an intern.  I don't remember the specific year, but

11   we were -- we were coworkers.

12   Q.  What were your interactions with him like?

13   A.  They were fine.  We were friends.

14   Q.  Generally speaking, how would you describe his demeanor in

15   the workplace?

16   A.  Uh, he was at times not professional, but at times he

17   worked fine.  He was -- he, he could be a hard worker, but like

18   I said, at times he would get a little off the hinge and get a

19   little unprofessional.

20   Q.  What do you mean by off the hinge?

21   A.  So, he would -- the language was a little stiff for the

22   office, I thought, and he used it quite frequently.  But for

23   the most part, I thought he was a good guy.  I thought we were

24   friends.

25   Q.  More generally, what was the own environment like in OSB

1    when you were the branch chief there?

2    A.  So, OSB, I'm not sure if everybody has the background, but

3    our branch was responsible for quick-reaction projects, so

4    things that could last a couple of days to a couple of weeks,

5    so it was a high stress -- a high-stress environment.  People,

6    for the most part, would work on projects individually.

7    Sometimes we would get them on teams, but for the most part it

8    was individually.  And, you know, at times, when they weren't

9    working, they were relieving some stress.  So it was -- they

10   were all cordial for the most part.  They laughed.  They had a

11   good time.

12   Q.  Did any of that relieving stress ever get out of hand?

13   A.  I don't think it did.  It would get loud.  It would

14   definitely get loud, and I'd have to tell them to turn the

15   volume down a bit.

16   Q.  And when you say it got loud, was anyone in particular

17   responsible for that?

18   A.  Yeah, usually when it got loud, it would be, it would be

19   one of the aisles and Josh was usually involved, yeah.

20   Q.  I'm not asking you to do math, but how did the average age

21   of developers in OSB compare to other branches within EDG?

22   A.  We were definitely one of the more junior branches in the

23   division.  When I started at OSB, it was more senior-heavy.  A

24   lot of those folks had moved on, so I would say for the most

25   part, of the ten folks, probably eight or so of them were

1    either right out of school or just at the beginning of their

2    careers.

3    Q.  We're going to spend some time talking about those folks in

4    a minute, but I want to talk a little more about the hierarchy.

5    A.  Uh-huh.

6            MR. DENTON:  Ms. Hurst, could you put up Government

7    Exhibit 89, please.

8    Q.  Focusing on the time period in the spring of 2016, who was

9    your supervisor in EDG?

10   A.  So, I reported to the chief and the deputy chief of AED.

11   Q.  Did you have interactions with the management at the group

12   level as well?

13   A.  Yes.

14   Q.  Who was the group chief at that time?

15   A.  Karen.

16   Q.  What was Karen like as a manager?

17   A.  I liked Karen.  She was one of the better group chiefs we

18   had in EDG.  I was there for a long time and saw several faces

19   come and go.  She was one of the reasons that -- that I tried

20   my hand at management.

21   Q.  And within EDG, would you describe it as a hierarchical

22   place?

23   A.  Yeah.

24   Q.  Let's just go back to the branch level.

25           MR. DENTON:  We can take that down, Ms. Hurst.

1   Q.  I think you started talking about this, but generally, did

2   you observe the defendant's interactions with other developers

3   in OSB?

4   A.  Yes.

5   Q.  And again, generally, what were those like?

6   A.  For the most part, they were, they were fine.  A lot of

7   times they were just joking.  A lot of people in the branch did

8   that.  Sometimes he would get -- he would definitely get

9   carried away and take the jokes too far.

10  Q.  Did you ever observe the defendant interacting with another

11  developer named Amol?

12  A.  I did.

13  Q.  Who was Amol?

14  A.  Amol was another one of the developers on the team.

15  Q.  Relative to the defendant, when did Amol come to OSB?

16  A.  Oh, well, Josh was definitely there before.  I don't really

17  remember when Amol started, but it was after I had become

18  branch chief.

19  Q.  But in terms of age or seniority, I guess, how would you

20  compare Amol and the defendant?

21  A.  I mean as far as age, Amol was older.  As far as seniority,

22  we didn't really have that there.  It was everybody that was a

23  developer was a developer.  There weren't levels.

24  Q.  Did the defendant and Amol work together?

25  A.  They did.

1    MR. DENTON:  Ms. Hurst, if we could put up Government

2    Exhibit 1008, please, and blow you mean the top portion, that

3    would be great.  Or we can blow up all the text, I think.

4    Q.  Who sent this email, sir?

5    A.  Josh did.

6    Q.  And did you receive it?

7    A.  I did.

8    Q.  Who was it sent to?

9    A.  That was to Amol.

10   Q.  And when was it sent?

11   A.  That would have been June 5, 2015.

12   Q.  Do you see in the subject where it says BK status?

13   A.  I do.

14   Q.  What did you understand BK to refer to?

15   A.  BK is the project they were working on together.  It was --

16   it's short for Brutal Kangaroo.

17   Q.  Was Brutal Kangaroo just one tool, or did it refer to more

18   than one?

19   A.  Well, Brutal Kangaroo was one project that consisted of a

20   bunch of different tools.  It was more of a, instead of one

21   thing that just, that just was for one operation, this was

22   actually kind of like a building block kind of thing, so there

23   were a lot of pieces to it.

24   Q.  And was the defendant the only person working on Brutal

25   Kangaroo?

1    A.   No.

2    Q.   Did Amol and the defendant work well together?

3    A.   At times they did, uh-huh.

4    Q.   What sort of things did they work on?

5    A.   So, for Brutal Kangaroo, they, they split up -- I'm not

6    sure how they split it up, but they split up the workload.  I

7    think Amol did a lot of the back-end stuff and Josh did a lot

8    of the other things.

9              MR. DENTON:  We can take that down, Ms. Hurst.  Thank

10   you.

11   Q.   In terms of their personal interactions, did you observe

12   interactions between the defendant and Amol?

13   A.   I did.

14   Q.   What were those interactions like?

15   A.   They joked around a lot.  And at times they would get under

16   each other's skin.

17   Q.   Did either of them ever complain to you about that?

18   A.   Mostly Amol would come to me every now and then and say,

19   Hey, he's getting out of line.

20   Q.   And what would you do when Amol complained?

21   A.   I would talk to both Amol and Josh.

22   Q.   Generally speaking, tell us about those conversations.

23   A.   Well, those conversations were -- it was more along the

24   frame of that's how I always dealt with them since I've worked

25   with them, and it was basically just, Hey, you need to calm

1   down a little bit, getting under each other's skin.

2   Q.  How did the defendant reaction to those conversations?

3   A.  He didn't really.  He seemed fine.

4   Q.  What about Amol?

5   A.  Amol was the same.  Amol would calm down, and things would

6   be fine for days or weeks, and then they would flare back up.

7   Q.  At some point did those interactions get worse?

8   A.  Yes.

9           MR. DENTON:  Ms. Hurst, could we bring up Government

10  Exhibit 1019, please.

11  Q.  Sir, who sent this email?

12  A.  That was Amol.

13  Q.  And did you receive it?

14  A.  I did.

15  Q.  When did he send it?

16  A.  That was October 30, 2015.

17  Q.  And what time of day?

18  A.  That was 9:44.

19  Q.  Do you see where he says:  "I've had enough of Schulte and

20  his childish behavior.  Last night he shot me in the face with

21  his Nerf gun"?

22  A.  I do.

23  Q.  Did you know people in OSB had Nerf guns?

24  A.  I did.

25  Q.  Had that been a problem in the past?

K2iWsch4                          Sean - Direct

1    A.  No.

2    Q.  Do you see where it says "please address this situation"?

3    A.  Yes.

4    Q.  After receiving this email, did you try to address the

5    situation?

6    A.  I did.

7    Q.  Did you talk to Amol about this email?

8    A.  I talked to Amol a little bit about it, but then I talked

9    to Josh.

10   Q.  Let's start with your conversation with Amol.  What was

11   that conversation like?

12   A.  That conversation, he was just basically going over his

13   letter and telling me what had happened the night before, and

14   he said that, you know, I needed to take it seriously, that he

15   was considering filing a complaint.

16   Q.  And what did you understand him to mean by a complaint?

17   A.  An EEO complaint.

18   Q.  And again, generally speaking, what is EEO?

19   A.  That's the equal employment opportunity, so whenever

20   there's something like this in the workplace, or -- or things

21   like that, they get called and an investigation starts.

22   Q.  And I think you said you spoke with both Amol and Josh?

23   A.  I did.

24   Q.  Is that right?

25   A.  Uh-huh.

K2iWsch4                          Sean - Direct

1    Q.  Which one did you speak with first?

2    A.  I think it was Amol, but I can't remember.

3    Q.  If you could tell us then about your conversation with Josh

4    about this email --

5    A.  Yeah.  And I -- so I had called Josh in the office and then

6    told him about, you know, that Amol had sent a note and that

7    really needed to tone things down.  He responded that Amol

8    could dish things out but couldn't take it.  But I did tell him

9    that, like, Look, this one's serious, that he's thinking about

10   filing a complaint.

11   Q.  And did you have those conversations the same day that Amol

12   sent this email?

13   A.  I believe I did.

14            MR. DENTON:  Then I want to take a look at another

15   email.  Ms. Hurst, if we could put up Government Exhibit 1020.

16   Q.  Sir, do you remember this email?

17   A.  I do.

18   Q.  Who sent it?

19   A.  That was Josh.

20   Q.  And who did he send it to?

21   A.  He sent it to me.

22   Q.  When did he send it?

23   A.  The same day, October 30.

24   Q.  About what time of day?

25   A.  It was 5:30 at night.

1    Q.  Did you receive this email after you had already spoken to

2    him in the conversation you described?

3    A.  Yes.

4    Q.  I want to look at some specifics, but just generally, in

5    terms of the language of this email, is this email written in a

6    way consistent with how the defendant normally talked?

7    A.  No.

8    Q.  How is it different?

9    A.  Well, this one was more accusatory, I think.  I -- when I

10   read this, I wasn't, I wasn't really sure what he was -- what

11   he was trying to do.

12          MR. DENTON:  Let's take a look at a couple of

13   different parts of this.  Ms. Hurst, could we just blow up the

14   first paragraph there.

15   Q.  Do you see where he refers to "alarming concerns regarding

16   office or Amol," and then says at the bottom, "things are now

17   reaching a breaking point for me and my colleagues"?

18   A.  I do.

19   Q.  Had any of the defendant's colleagues ever complained to

20   you about Amol?

21   A.  No.

22   Q.  Had anyone raised any alarming concerns about Amol?

23   A.  No.

24          MR. DENTON:  If we could zoom back out, please, and

25   then zoom in on the next paragraph, below.

1  Q.  Do you see where the defendant writes, "Amol is very

2  derogatory and abusive to everyone around him"?

3  A.  I do.

4  Q.  Had you ever seen Amol be very derogatory and abusive to

5  everyone around him?

6  A.  Other than a joking way, no.

7  Q.  And then down at the bottom of this paragraph, where it

8  says "despite many attempts by myself and others to ask him

9  politely to stop, this abusive language continues daily," do

10  you see that?

11  A.  I do.

12  Q.  Had you ever seen anyone ask Amol to stop?

13  A.  No.

14          MR. DENTON:  If we could then zoom out again,

15  Ms. Hurst, please, and if we could blow up, I guess it's the

16  paragraph that carries over at the bottom of the page.  That's

17  perfect.  Thank you.

18  Q.  Sir, do you see here where the defendant writes, "Besides

19  insulting his colleagues, Amol directly insults IV&V and ISB"?

20  A.  I do.

21  Q.  First of all, just generally, what is IV&V?

22  A.  So, IV&V is our testing room, so once we were done with a

23  tool, it would go over to them for independent verification and

24  validation.

25  Q.  And what is ISB?

1   A.   ISB was our infrastructure services branch, so those were

2   the folks that were in charge of keeping the networks up and

3   running.

4   Q.   Had you ever heard Amol directly insult IV&V and ISB?

5   A.   I've heard lots of people insult IV&V before, yes.

6   Q.   And do you see where it says "Amol consistently berates

7   them both personally and professionally"?

8   A.   I do.

9   Q.   Had you ever witnessed Amol do that?

10  A.   No.

11  Q.   Had you ever heard the defendant talk about IV&V and ISB?

12  A.   Yes.

13  Q.   What did you hear him talk about?

14  A.   Well, the same.  I mean, IV&V had a reputation back then

15  for not being the most technical folks.  They would often need

16  some help when they, when it came to testing out tools.

17       As far as ISB, Josh specifically was not always happy that

18  he had to help them do their job.

19  Q.   After you got this email from the defendant complaining

20  about Amol, what did you do?

21  A.   I talked to him again.

22  Q.   To who?

23  A.   To Josh.

24  Q.   Tell us about that conversation.

25  A.   Well, I -- I don't remember the specifics of it, but I do

K2iWsch4                          Sean - Direct

1   remember calling him back in the office and kind of asking him

2   what was this all about?  I don't remember exact wording or

3   anything, but I got the indication that if Amol was going to

4   file something that Josh was also going to file something.

5   Q.  Did you talk to Amol after you received this email from the

6   defendant?

7   A.  I did not.

8   Q.  After this happened did you have any further discussions

9   with the defendant about his interactions with Amol?

10  A.  No.  As a matter of fact, after this day in October, things

11  kind of went back to normal.  I didn't really hear anything

12  more from him.

13  Q.  Did the defendant ever indicate that he thought you didn't

14  do enough in response to this email?

15  A.  No.

16          MR. DENTON:  I want to move a little forward in time,

17  if we can.

18          You can take that down, Ms. Hurst.

19  Q.  Did there come a time when you were contacted by the office

20  of security regarding the defendant?

21  A.  Yes.

22  Q.  Do you remember the particular date?

23  A.  I don't.  It was in March of 20 -- early March of 2016.

24  Q.  And did you end up meeting with people from security?

25  A.  I did, yes.

1  Q.  Do you remember who you met with?

2  A.  I don't remember names, but it was -- it was the chief and

3  the deputy security for CCI.

4  Q.  And did you meet with them at the CCI office building?

5  A.  I did, yes.

6  Q.  What did they tell you in that meeting?

7  A.  Well, they had -- as soon as I came in and logged in in the

8  morning, I got a note that popped up and said that I needed to

9  come down and see them right away.  Right when I went down

10  there, they had shown me a note that Josh had sent the night

11  before that basically had said that Amol had threatened to kill

12  him.

13  Q.  You said this was a note that the defendant had sent the

14  night before?

15  A.  Yes.

16  Q.  Is that right?

17  A.  Uh-huh.

18  Q.  Were you in the office the day before?

19  A.  No.  I was on leave that day, so this was all kind of a

20  surprise to me when I got back that morning.

21  Q.  Had the defendant included you in his complaint to

22  security?

23  A.  No.

24  Q.  What was your reaction when you learned of the defendant's

25  complaint?

K2iWsch4                        Sean - Direct

1    A.  I was -- I was taken aback, but I didn't really have much

2    time to react.  They told me to go back and then as soon as

3    those two got in to make sure that we came back down to see

4    them.

5    Q.  Did you do that?

6    A.  I did.

7    Q.  Did you end up having a second meeting that day?

8    A.  We did.

9    Q.  Again, who was there?

10   A.  At this one, it was the chief and deputy security for CCI,

11   myself, Amol and Josh.

12   Q.  Prior to that meeting, did you talk to security about the

13   content of the defendant's complaint?

14   A.  They kind of went over it before and had asked some general

15   questions about if I knew anything about it.

16   Q.  And generally speaking, what did you tell them?

17   A.  Well, I told them that there was a little bit of a dustup

18   in October and that Josh had sent me a note and it looked like

19   it may have included some of the similar complaints.

20   Q.  Tell us about your second meeting that day with security

21   that the defendant and Amol were also present for.

22   A.  So that meeting, I was just kind of a bystander.  There

23   weren't a lot of questions for me.  I do remember that they

24   were asking questions of both Amol and Josh.  I remember Amol

25   being very forthcoming and answering questions.

1    I remember Josh being very curt in his answers.

2    Q.  Did that surprise you?

3    A.  I don't know if it surprised me, but it did take me aback a

4    little just because of the severity of the situation.

5    Q.  What was the end result of that meeting?

6    A.  Well, the end result of that meeting was that the security

7    folks were kind of talking to the two of them and said, Well, I

8    think this is probably just two people getting out of hand, but

9    since it was a threat that they had to turn it over to the

10   threat management unit.

11   Q.  Had you ever been involved in something with the threat

12   management unit before this?

13   A.  No.

14   Q.  Now, after that meeting were you the person responsible for

15   making decisions about how the situation would be handled?

16   A.  No.

17   Q.  Why not?

18   A.  Well, at the time, I -- people knew I was looking for a new

19   position.  I had been in that one for a while, and I had

20   started to look.  And after the severity of getting the threat

21   management unit involved, Karen wanted to make sure that it was

22   handled at a higher level.

23   Q.  And Karen was the group chief, is that right?

24   A.  Yes, sir.

25   Q.  Did you speak with supervisors within EDG about the

K2iWsch4                         Sean - Direct

1   situation?

2   A.  I did.

3   Q.  Who did you talk to?

4   A.  I talked to the deputy chief and chief of AED, and I talked

5   to Karen and her DP.

6   Q.  What was management's reaction to learning of the

7   defendant's complaint?

8   A.  Well, they were -- they were understandably upset about it,

9   and they wanted to make sure that the two of them were

10  separated.

11  Q.  When you say they were upset about it, was anyone upset

12  that the defendant had made a complaint?

13  A.  No.

14  Q.  What were people upset about?

15  A.  They were upset that, that it had gone this far and that

16  they were not aware that things might be going on.

17  Q.  Was anybody upset with you?

18  A.  I think so, yeah.

19  Q.  Why were people upset with you?

20  A.  Nobody ever told me, but, I just got the feeling that since

21  I didn't reach out for help earlier --

22  Q.  Did you ever tell the defendant that EDG management was

23  upset that he had made the complaint?

24  A.  No.

25  Q.  Did you ever tell them that Karen thought it made her look

K2iWsch4                         Sean - Direct

1    bad?

2    A.   No.

3    Q.   When you talked to EDG management about how the situation

4    was going to be handled, did you discuss whether instructions

5    would be given, in writing or orally, or how they would be

6    communicated?

7    A.   No.

8                 (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2I3SCH5                          Sean – Direct

1  Q.  Did you ever tell the defendant that no instructions would

2  be given to him in writing?

3  A.  No.

4          THE COURT:  Mr. Denton, is this a convenient place to

5  break?

6          MR. DENTON:  Yes, it is, your Honor.

7          THE COURT:  We'll take our luncheon recess now.  We'll

8  resume at a quarter to 2.

9          (Jury excused)

10          THE COURT:  You can step down there.  Watch your step.

11          (Recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K2I3SCH5

                        AFTERNOON SESSION

                           1:45 p.m.

1          (At the sidebar)

2          THE COURT:  I'm told you have an objection to going to

3    4 o'clock?

4          MS. SHROFF:  I don't have an objection.  I was hoping

5    we wouldn't go to 4 o'clock, but if you insist.

6          THE COURT:  I don't insist.  I want to make sure we

7    get this trial done.

8          MS. SHROFF:  It's going faster than we thought.  But I

9    think that this witness is going to get crossed and then the

10   next witness I don't have any trouble with.  I can cross the

11   next witness.  It is the witness after that, that we have a

12   slight problem with.  So even if you want to get to that last

13   witness's direct, if I have overnight to cross, I think we'll

14   be fine.  But I explained to the government why we have issues

15   with crossing him today.

16         MR. LAROCHE:  We won't get to his cross today at this

17   pace.

18         THE COURT:  Okay.

19         MS. SHROFF:  While we're at the sidebar, I did inform

20   Mr. Laroche during the break that, given the Court's ruling and

21   precluding us from talking about the foreign office and that no

22   change had happened in the foreign office, that there was no

23   repercussions, no physical move of the foreign office, that I

K2I3SCH5

                        AFTERNOON SESSION

                           1:45 p.m.

           (At the sidebar)

           THE COURT:  I'm told you have an objection to going to

     4 o'clock?

           MS. SHROFF:  I don't have an objection.  I was hoping

     we wouldn't go to 4 o'clock, but if you insist.

           THE COURT:  I don't insist.  I want to make sure we

     get this trial done.

           MS. SHROFF:  It's going faster than we thought.  But I

     think that this witness is going to get crossed and then the

     next witness I don't have any trouble with.  I can cross the

     next witness.  It is the witness after that, that we have a

     slight problem with.  So even if you want to get to that last

     witness's direct, if I have overnight to cross, I think we'll

     be fine.  But I explained to the government why we have issues

     with crossing him today.

           MR. LAROCHE:  We won't get to his cross today at this

     pace.

           THE COURT:  Okay.

           MS. SHROFF:  While we're at the sidebar, I did inform

     Mr. Laroche during the break that, given the Court's ruling and

     precluding us from talking about the foreign office and that no

     change had happened in the foreign office, that there was no

     repercussions, no physical move of the foreign office, that I

K2I3SCH5

1    was going to seek relief from the Court that the testimony that

2    was elicited on direct from Mr. Stedman be stricken.

3          The government elicited from Mr. Stedman that the leak

4    caused problems in Foreign Office West, people were threatened,

5    people felt that their identities were at risk.  And I should

6    have been able to bring out on cross that they had ample

7    opportunity to move offices, change offices, and that the CIA

8    did nothing, and, therefore, that risk is subject to question.

9          THE COURT:  Okay.

10         MR. LAROCHE:  I disagree with the characterization.

11   But if Ms. Shroff is going to file something tonight, we'll

12   respond.

13         MS. SHROFF:  I don't know if I will file something

14   tonight, but I'm going to move to strike that testimony.

K2I3SCH5

1           (In open court; jury not present)

2           MS. SHROFF:  Your Honor, tomorrow we have a SCIF day

3    so tomorrow we're going to end at 3?

4           THE COURT:  I was hoping to go to 4 these three days,

5    Tuesday, Wednesday and Thursday.

6           MS. SHROFF:  I need him in the SCIF one day this week.

7           THE COURT:  I thought you had Friday.

8           MS. SHROFF:  But I have testimony on Thursday that I

9    need to talk to him about on Wednesday.

10          THE COURT:  Oh.  All right.  "All right" means we'll

11   break at 3.

12          MS. SHROFF:  Thank you, your Honor.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  All right, Mr. Denton.

3                MR. DENTON:  Thank you, your Honor.

4      BY MR. DENTON:

5      Q.  Good afternoon, sir.

6      A.  Good afternoon.

7      Q.  Before the break when we were talking about the defendant's

8      complaint with security, one of the things you talked about was

9      physically separating the defendant from Amol; do you remember

10     that?

11     A.  Yes.

12     Q.  So, who were you principally dealing with on these kinds of

13     decisions at this point?

14     A.  This was the upper management, so this was the division

15     level, deputy chief and chief.

16     Q.  Who was that at this point?

17     A.  It was Anthony was the deputy chief.

18     Q.  Did there come a time when the defendant and Amol moved to

19     different cubicles in OSB?

20     A.  They did.

21     Q.  Who decided where they would go?

22     A.  I'm not sure who made those decisions.

23     Q.  Was the defendant demoted when he was moved to a different

24     desk?

25     A.  No.

K2I3SCH5                        Sean - Direct

1   Q.  Was Amol promoted?

2   A.  No.

3   Q.  Briefly, how were the cubicles arranged in OSB?

4   A.  So we had two aisles of three or four desks each, I believe

5   it was three.  So we didn't have a large space.  And at the

6   time, I believe we only had two open desks.

7   Q.  Are the desks different sizes?

8   A.  No.

9   Q.  Was the defendant moved to punish him for making a security

10  complaint?

11  A.  No.

12  Q.  At some point after that, did you learn that the defendant

13  had gone to court in connection with all of this?

14  A.  I did.

15  Q.  How did you learn that?

16  A.  I don't remember who told me.  But, somebody did inform me

17  that that had happened.

18  Q.  What did you learn?

19  A.  I learned that he went to court to file a protective order

20  against Amol.

21  Q.  What effect did that protective order have on operations

22  within OSB?

23  A.  Well, it made a complicated situation even worse.  At that

24  point, I wasn't -- I wasn't in the middle of the management

25  decisions, but, I knew at that point that they were considering

1   moving them each out of OSB.

2   Q.  You said you weren't in the middle of making the management

3   decisions.  Is that right?

4   A.  Correct, hmm-hmm.

5   Q.  Were you still acting as chief of OSB at that point?

6   A.  I was chief of OSB.  I had somebody that was acting for me.

7   I had at that point accepted a new position, and was about to

8   move offices.

9   Q.  Roughly when in 2016 was that?

10  A.  When I moved?  My last day in the office was April 15.

11  Q.  Why did you move to a new job?

12  A.  It was just, it was time.  I had been in OSB for at that

13  point over 11 years, and was looking for other opportunities.

14  Q.  So let's talk about the branch situation.

15          MR. DENTON:  Ms. Hurst, if we can put up Government

16  Exhibit 1046.  Just go down to the second page, please.

17  Q.  Sir, I think you can tell from the text of the e-mail, who

18  sent this e-mail at the top here?

19  A.  Hard to see.  Oh.  Anthony did.

20  Q.  Did you receive it?

21  A.  Was I in there?  Yes, I was.

22  Q.  Who was it addressed to?

23  A.  It was to Amol and Josh and then there were a bunch of

24  people cc'd.

25  Q.  Do you see where it says "Josh will be moving to AED/RDB

1   and Amol will be moving to AED/MDB"?

2   A.  Yes.

3   Q.  Who made those decisions?

4   A.  I am not sure.  It was either at the division level or the

5   group level.

6            MR. DENTON:  If we can just scroll up a bit,

7   Ms. Hurst, to the e-mail up above here.

8   Q.  Who sent this e-mail at the top of the page?

9   A.  That was Josh.

10  Q.  Did you receive it?

11  A.  I did.

12  Q.  Who did he send it to?

13  A.  He sent it to Anthony.

14  Q.  You see where he said "I want to confirm this punishment of

15  removal from my current branch is for reporting to security an

16  incident in which my life was threatened"?

17  A.  I do.

18  Q.  Did anyone ever say anything to you to indicate that the

19  defendant was being punished for reporting to security?

20  A.  No.

21  Q.  Did this move actually take place, sir?

22  A.  It did.

23  Q.  When the defendant moved to a new branch, what was your

24  understanding of what would happen to his OSB projects?

25  A.  So, I had talked with Anthony about I knew Josh wanted to

1   continue working on some of the projects he had been.  And I

2   had a discussion with Anthony about actually moving those

3   projects from OSB to RDB so he could continue to do it.

4   Q.  Do you remember which projects in particular you were

5   talking about?

6   A.  I don't.

7   Q.  Are you familiar with OSB libraries?

8   A.  I am.

9   Q.  What were OSB libraries?

10  A.  So OSB libraries weren't necessarily a project in and of

11  themselves.  There were more of a code library that we could

12  use when we were doing projects.

13  Q.  Was the defendant involved with OSB libraries?

14  A.  He was.

15  Q.  Was that one of the things that you discussed moving to RDB

16  with Anthony?

17  A.  No.

18  Q.  When the defendant left OSB, what did you expect would

19  happen to his role with OSB libraries?

20  A.  Well, I didn't really think much about the OSB libraries

21  because it wasn't an official branch project.  But since he was

22  moving branches, we kind of knew that he wasn't going to be

23  working on those.

24  Q.  Had the defendant had any role in administering the OSB

25  libraries?

K2I3SCH5                         Sean - Direct

1   A.  I believe he did.

2   Q.  What did you expect to happen to his administrative control

3   over OSB libraries?

4   A.  Well, for administrative privileges, once you no longer

5   have the need for access, those will get removed.

6   Q.  Was that a formal policy?

7   A.  Not a formal policy from the division standpoint, but it is

8   an InfoSec security policy.

9   Q.  You've used this term InfoSec a couple of times.  What do

10  you mean by that?

11  A.  Information security.  It is a branch of security that

12  deals with the technical side of things.  They are actually the

13  ones that make sure all the system admins have the training and

14  know what to do.

15  Q.  Why was removing the defendant's access to OSB libraries

16  when he moved something relevant to information security?

17  A.  Well, I mean that's, that's just the security policy.  So

18  once you have admin access and you move out of the job that no

19  longer requires it, then you should be taken off.

20  Q.  Did there come a time when you had a conversation with the

21  defendant about his access to OSB libraries as an

22  administrator?

23  A.  Not as an administrator, but I did have a conversation with

24  him about it.

25          MR. DENTON:  Ms. Hurst, can we put up Government

K2I3SCH5                          Sean - Direct

1    Exhibit 1062, please, and go to page four.  We can just blow up

2    the e-mail at the bottom.

3    Q.  Did you send this e-mail?

4    A.  I did.

5    Q.  Do you see where you say, "I had a discussion with Josh

6    yesterday as to the status of his involvement in the OSB

7    libraries"?

8    A.  Yes.

9    Q.  Does that refer to the conversation that you were just

10   describing?

11   A.  Yes.

12   Q.  Does this e-mail accurately describe your conversation with

13   the defendant?

14   A.  It does.

15   Q.  When you say down here, "I told him we wanted to make sure

16   that OSB projects stayed in OSB and RDB projects remained in

17   RDB," what did you mean by that?

18   A.  What I was talking about before.  So, normally, what we

19   would do is each branch project, we didn't have a lot of cross

20   collaboration going on between the branches.  That was why I

21   started talking to Anthony about officially moving some of our

22   projects over to RDB, so he could continue to work on some of

23   those that he had been working on.

24   Q.  What do you mean by officially moving some of our projects?

25   A.  So, unofficially officially.  Under the requirements

1    section, usually a branch would accept a project.  So all the

2    OSB projects were accepted by me as the branch chief, and they

3    would be OSB responsible bios to get finished.  For a couple of

4    them that Josh was working, I talked to Anthony about moving

5    those over so they would be under RDB's purview.

6    Q.  Why did you decide to do that as opposed to keeping them

7    under OSB's purview?

8    A.  It would have just been easier.  Then he could report to

9    his management in RDB, they would have been responsible for

10   seeing the project through to the finish.

11   Q.  Can you read for us the last two sentences of the first

12   paragraph here.

13   A.  "At no/no time during the conversation did we discuss

14   administrator access or any access permissions for that matter

15   to the database.  It was a short conversation centered more

16   around the fact that Josh would still be able to use and

17   contribute to the library initiative."

18   Q.  What did you mean when you said that Josh would still be

19   able to use and contribute to the library?

20   A.  So it was a -- it was a code repository, and anybody could

21   submit code for it.  It just means that whoever is the

22   administrators would have to review the code, and if they were

23   okay with it, then make it part of the baseline.

24   Q.  Can you read the next paragraph for us, please.

25   A.  "After he left my office, he went to discuss the libraries

with Jeremy.  I was informed by Jeremy later that Josh had

stated that I said it would be fine to re-add him to the

administrator group.  I told Jeremy that was not accurate,

shared with him the gist of our conversation, and told him he

should send a note to Anthony and -- about the request.  At

some point soon after, Jeremy discovered that access

permissions had been altered, and included that information in

the note that was ultimately drafted last night."

Q.  When you learned that from Jeremy that "Josh had stated

that I said it would be fine to re-add him to the administrator

group," what was your reaction to that?

A.  I was taken aback by that.  I was not real happy with that.

Q.  Why?

A.  Well, one, I never said it.  We didn't even discuss

administrator access to the OSB libraries.  And two, this was,

when I sent this note, that was my last day in the office

and -- it was just, it was not good timing.

          MR. DENTON:  So, I want to talk about another account

of that meeting.  Ms. Hurst, can we put up Government Exhibit

1093, please.  Can we just blow up the top portion.

Q.  Who sent this e-mail?

A.  Josh did.

Q.  Who did he send it to?

A.  He sent it to Andrew Hallman.

Q.  Anyone else?

K2I3SCH5                          Sean - Direct

1    A.  He cc'd me row park and Sean Roche.

2    Q.  Who is Andrew Hallman?

3    A.  Andrew Hallman was the director of DDI which is the

4    directorate level that CCI falls under.

5    Q.  What about Ms. Park and Mr. Roche?

6    A.  Mr. Roche was Mr. Hallman's deputy, and Ms. Park was the

7    executive director of the Central Intelligence Agency.

8            MR. DENTON:  Can we go to page two of this please.

9    Can we blow up the top full paragraph.

10   Q.  First, ask you here, where the defendant says in this line,

11   "I found that my access to the OSB libraries, a library of code

12   that I had created and was responsible for maintaining."  Do

13   you see that?

14   A.  I do.

15   Q.  Did the defendant create the OSB libraries?

16   A.  He may have helped create them, but I don't he was the sole

17   creator.

18   Q.  Do you see down at the bottom where he says, "I inquired to

19   the branch chief if he had given Weber permission to revoke my

20   privileges to which he denied"?

21   A.  I do.

22   Q.  Were you the defendant's branch chief at the time?

23   A.  I don't believe -- I don't know if he was moved yet or not.

24   So if he was in RDB, I was not.

25   Q.  Did the defendant ever ask you if you had given Weber

K2I3SCH5                           Sean - Direct

1   permission to revoke his privileges to OSB libraries?

2   A.  No.

3   Q.  Did you ever deny giving Weber permission to revoke his

4   privileges?

5   A.  No.

6            MR. DENTON:  Ms. Hurst, if we can go back to page four

7   of Government Exhibit 1062, please.

8   Q.  Just down at the bottom here, you read us a line a moment

9   ago that you told Jeremy he should send a note to Anthony about

10  the request.

11  A.  Yes.

12  Q.  Did you discuss that note with Jeremy?

13  A.  I believe I talked to him and asked him to send that note,

14  yes.

15           MR. DENTON:  Ms. Hurst, if we can skip to Government

16  Exhibit 1061 and just put up the last page, please.  Could you

17  scroll up so we can see who sent it.

18  Q.  Who sent this e-mail, sir?

19  A.  Jeremy.

20  Q.  Who did he send it to?

21  A.  To Josh.

22  Q.  Were you copied on it?

23  A.  I was.

24  Q.  Is this the note that you were referring to in that earlier

25  e-mail?

1    A.  Yes.

2    Q.  Did this message give the defendant permission to change

3    his administrative privileges to the OSB libraries?

4    A.  No.

5    Q.  Why not?

6    A.  Well, that -- it's not written there.  And it's just not

7    something that we do.  If we're not given permission, then we

8    don't go and take it ourselves.

9    Q.  Did you learn at some point that the defendant had in fact

10   changed his administrative privileges to the OSB libraries?

11   A.  I did.

12   Q.  How did you learn that?

13   A.  I don't remember if it was Anthony or Jeremy that told me,

14   but somebody had informed me it had happened.

15   Q.  Did that concern you?

16   A.  It did.

17   Q.  Why?

18   A.  Again, that's -- where we were in the Central Intelligence

19   Agency, we take security seriously, and if we are removed from

20   access, we don't take it upon ourselves to give ourselves

21   access back.

22          MR. DENTON:  Ms. Hurst, if we can go to Government

23   Exhibit 1062, please.  And go to page 10.

24          THE COURT:  What's the exhibit number?

25          MR. DENTON:  1062, your Honor, sorry.

K2I3SCH5                          Sean - Direct

1              THE COURT:  Thank you.

2    Q.  Who sent this e-mail, sir?

3    A.  Jeremy did.

4    Q.  Did you receive it?

5    A.  I did.

6    Q.  Who else did he send it to?

7    A.  He sent it to Anthony and Richard.

8    Q.  Again, what was your role with respect to OSB at this

9    point?

10   A.  I was still technically the branch chief but I was on my

11   way out.  This note was sent my second-to-last day.

12   Q.  Did you discuss this issue with Jeremy?

13   A.  I did.

14   Q.  What was the issue?

15   A.  Well, the issue was that he had, Josh had apparently gone

16   in, and given himself permissions to which he shouldn't have.

17   Q.  You see on the first line where he says, "We have a

18   situation with the libraries and the Atlassian products in

19   general"?

20   A.  I do.

21   Q.  What did you understand this to mean by referring to the

22   Atlassian products in general as part of the situation?

23   A.  Well, the Atlassian products were used by OSB and some of

24   the other division branches basically as a code repository and

25   other things about the development network.

K2I3SCH5                        Sean - Direct

1    Q.  A little further down, where Jeremy writes, "He is able to

2    do this because he is one of the Atlassian administrators and I

3    think we need to remove him from this group."  Do you see that?

4    A.  I do.

5    Q.  What did you understand that to mean?

6    A.  Well, I think Jeremy was expressing concern that Josh had

7    administrative privileges to other systems.

8    Q.  Was the fact that the defendant was able to change his OSB

9    libraries privileges because he is one of the Atlassian

10   administrators a cause of concern for you?

11   A.  Yes.

12   Q.  Why?

13   A.  Again, since he was no longer in OSB, he shouldn't have had

14   admin access privileges to OSB resources.

15   Q.  After all of this happened, did you have discussions within

16   management at EDG about how to handle the situation?

17   A.  I was not involved in any.

18   Q.  I think you said this earlier, so I may have forgotten.

19   What was your last day as branch chief of OSB?

20   A.  April 15.

21         MR. DENTON:  So, Ms. Hurst, if we can pull up Defense

22   Exhibit G, please.  Just blow up the text.

23   Q.  Do you recognize what type of material this is, sir?

24   A.  This looks like a Same Time conversation.

25   Q.  What is Same Time?

K2I3SCH5                          Sean - Direct

1    A.  Same Time is our online chat system.

2    Q.  At the top line here, what is the date of the first

3    message?

4    A.  Looks like April 18, 2016.

5    Q.  Is that after all of the various communications we have

6    just been looking at?

7    A.  Yes.

8    Q.  Do you see the message that says "Schuljo is up here now

9    asking about OSB library accesses."  That's the second line.

10   A.  Second line.  Oh.  Yes, I do.

11   Q.  What did you understand that to mean?

12   A.  I understood it to mean that he was not taking the answer

13   as an answer.  That he was still looking to get his admin

14   privileges back.

15   Q.  We don't need to read the whole thing, but if you can look

16   at your response.  It's kind of the middle of the third box.

17   Can you read that for us.

18   A.  I said, "Wow, he just doesn't give up.  Ever.  I said he

19   could continue to contribute to the libraries, that he just

20   needed to work with you and Weber.  Never discussed access of

21   any kind to the database."

22   Q.  So, starting at the end, where Frank wrote to you that "He

23   had claimed that you said he could be admin."  Is that

24   accurate?

25   A.  That is not accurate.

1   Q.  What did you mean when you said, "Wow, he just doesn't give

2   up.  Ever."

3   A.  He's tenacious.  When he doesn't get an answer he doesn't

4   like, he keeps trying.

5   Q.  Down at the bottom, what is your last response in this

6   message?

7   A.  I said, "That boy needs to learn how to take his medicine

8   every now and then."

9   Q.  What did you mean by that?

10  A.  Again, it was -- he should respect the decision, and move

11  on and not try to fight it.

12          MR. DENTON:  We can take that down, Ms. Hurst.

13  Q.  By this point you had left as branch chief of OSB; is that

14  right?

15  A.  Correct.

16  Q.  Even though you left, were you still responsible for any

17  evaluations for the defendant?

18  A.  Yes, for the defendant and the entire branch.

19  Q.  Tell us about that process.

20  A.  So, we have a yearly review system.  It's called PAR, which

21  is a Performance Appraisal Report.  Usually it occurs every

22  fall.  But once either an employee leaves to a different job,

23  or a branch chief leaves, then we have to do a closeout PAR,

24  which is kind of an out of cycle one.

25  Q.  Why did you have to complete PARs for I think you said

1    everyone in the branch?

2    A.  I had to do Josh and Amol's because they were transferred

3    to different branches.  When I left, I had to do one for the

4    remaining OSB members.

5    Q.  Did you in fact complete one for the defendant?

6    A.  I did.

7    Q.  Do you remember what ratings you gave him?

8    A.  I don't specifically.

9    Q.  Generally speaking, do you remember your thought process in

10   that evaluation?

11   A.  Yes.

12   Q.  Tell us about that, please.

13   A.  In the back of my mind was the kind of last thing that I

14   dealt with, which was this OSB libraries and the administrative

15   access.

16   Q.  What effect did that have on the ratings that you gave?

17   A.  I pulled some of the ratings down a little bit because of

18   it.

19            MR. DENTON:  Ms. Hurst, can we bring up Government

20   Exhibit 1100, please.

21   Q.  Sir, who sent this e-mail?

22   A.  Josh did.

23   Q.  Did you receive it?

24   A.  I did.

25   Q.  What's the subject on this e-mail?

1    A.  "PAR competencies."

2    Q.  You see where the defendant writes, "I received my PAR

3    competencies, but don't believe they accurately reflect my work

4    during the rating period."

5    A.  Yes.

6    Q.  He continues, "I believe my accountability for results,

7    engagement and collaboration, and personal leadership and

8    integrity should be rated excellent."

9    A.  I do.

10   Q.  Was his accountability for results excellent during the

11   rating period?

12   A.  No.

13   Q.  Was his engagement and collaboration excellent during

14   rating period?

15   A.  No.

16   Q.  Was his personal leadership and integrity excellent?

17   A.  No.

18   Q.  Going down a little further here, he says, "This is the

19   worst PAR I've ever had, but this year resulted in some of my

20   best work including an EPA, McCone, and most highly rated

21   intelligence reports."  Do you see that?

22   A.  Yes.

23   Q.  What's an EPA?

24   A.  Exceptional Performance Award.

25   Q.  Is that an unusual thing?

1   A.  No.

2   Q.  Generally speaking, what is it?

3   A.  It's instead of a promotion, it is like a one-time monetary

4   award.

5   Q.  What is a McCone?

6   A.  That's a special award that's given out on a yearly basis.

7   I honestly don't remember if it's for trade craft or innovation

8   or whatnot, but it's usually given to teams of folks.

9   Q.  Did it strike you as extraordinary that the defendant had

10  won a McCone?

11  A.  No.

12  Q.  Why not?

13  A.  Well, it doesn't just got to one person usually.  At one

14  point I had won a McCone award and I couldn't tell even tell

15  you what it was for.

16  Q.  He continues in that sentence, "So clearly I believe it's a

17  direct result of my security report in March."  You see that?

18  A.  I do.

19  Q.  Were your ratings of the defendant a direct result of his

20  security report in March?

21  A.  No.

22  Q.  What were they a result of?

23  A.  Like I said, I had in my head the last interactions I had

24  with him back in OSB which was the libraries and the

25  administrative access.

1    Q.  I want to focus your attention on the last sentence where

2    he says, "If I feel retaliatory and retributive action is

3    continuously pursued against me, then I will not hesitate to

4    contact management up the chain for assistance."  Do you see

5    that?

6    A.  I do.

7    Q.  Were your ratings of the defendant retaliatory and

8    retributive?

9    A.  No.

10   Q.  Were they an accurate description of his work during that

11   time period?

12   A.  I believe so.

13   Q.  Did you ultimately change the original ratings you'd given

14   him?

15   A.  I did.

16   Q.  Why did you do that?

17   A.  Well, when, I got this note, I never wrote back to him.

18   But, we do have a responsibility as chiefs to review what we

19   wrote just to make sure everything is accurate.  When I went

20   back and looked again, I did realize that what I was -- that

21   incident I was basing some of my marks on happened after he had

22   moved to the new branch.

23   Q.  So, explain a little more about why that makes a

24   difference.

25   A.  That makes a difference, so the closing date for my part of

1  the PAR that I'm writing against would not have included that

2  whole episode.

3  Q.  What was the sort of triggering event for closing the

4  period you were responsible for?

5  A.  When he moved to a new branch.

6  Q.  Had he already moved to a new branch at the time of the OSB

7  library incident?

8  A.  Yes.

9          MR. DENTON:  Ms. Hurst, can we bring up Government

10 Exhibit 1108, please.  I think if we can blow up the e-mail,

11 that should be fine.

12 Q.  Who sent this e-mail?

13 A.  Josh did.

14 Q.  Did you receive it?

15 A.  I did.

16 Q.  You see where he says, "Thank you for acknowledging that

17 your previous behavior was unethical and unprofessional by

18 fixing my PAR competencies"?

19 A.  I do.

20 Q.  Did you change your ratings because your previous behavior

21 was unethical and unprofessional?

22 A.  No.

23 Q.  Then he continues to say, "Unfortunately, the PAR

24 competencies were still lackluster and far lower than I

25 deserved for this rating period."  You see that?

K2I3SCH5                              Sean - Direct

1    A.  I do.

2    Q.  Were the PAR competencies lackluster?

3    A.  I didn't think so.

4    Q.  Were they what you thought the defendant deserved for this

5    rating period?

6    A.  Yes.

7    Q.  He talks about retaliation against an employee.  You see

8    that?

9    A.  I do.

10   Q.  Were you retaliating against him when you rated him?

11   A.  No.

12   Q.  We're not going to go through every line of this but just

13   going down to the middle of the next paragraph where he says,

14   "All my competency ratings should be at least at this level if

15   not higher."  You see that?

16   A.  I do.

17   Q.  Did you agree with that?

18   A.  I did not.

19   Q.  Why not?

20   A.  Because he did not have a better period of performance than

21   he had the year before.

22   Q.  Down at the very bottom, it is the third full paragraph, he

23   says, "My sole intention is to ensure that I am treated fairly

24   throughout this PAR process, and if not, then I intend to take

25   legal action."

1    A.  Yes.

2    Q.  What was your reaction to that?

3    A.  I took that as a little threatening.

4    Q.  Why?

5    A.  Well, I never actually received any responses like that

6    before.  And I just assumed that he would in fact take legal

7    action.

8    Q.  You testified a little bit earlier about learning that the

9    defendant had gone to court to get a protective order.  Do you

10   remember that?

11   A.  Yes, yes.

12   Q.  Did there come a time when you went to a court proceeding

13   in connection with that?

14   A.  I did.

15   Q.  Why did you go to a court proceeding?

16   A.  Amol had reached out to me and asked if I would go speak in

17   his defense.

18   Q.  Did you agree to do that?

19   A.  I did.

20   Q.  Why did you agree to speak in Amol's defense?

21   A.  I just thought he was not getting a fair shake in the whole

22   thing.  So, I was, I was willing to go and talk about their

23   relationship and how things were.

24   Q.  In what way did you not think he was getting a fair shake?

25   A.  Well, I feel like, he -- he was getting a bum deal on the

1  whole thing.  There was -- they had another court case earlier,

2  and I know he told me that they were asked not to bring things

3  from the office.  And I understood that Josh didn't conform to

4  that and actually showed up with some things he shouldn't have

5  had.

6  Q.  Did you believe the allegations against Amol?

7  A.  I did not.

8  Q.  Why not?

9  A.  I -- I knew both of them and I had seen their actions, and

10 I just, I didn't believe it.

11 Q.  Did you end up having to do anything at that court

12 appearance?

13 A.  No, I didn't.

14           MR. DENTON:  We can take that down, Ms. Hurst.  Thank

15 you.

16 Q.  Just skipping forward in time one last time, sir.  I want

17 to direct your attention to March 7, 2017.  Were you working

18 that day?

19 A.  I was.

20 Q.  Was there anything notable about that day?

21 A.  That was the day that, yeah, we saw the WikiLeaks had

22 published a bunch of EDG stuff.

23 Q.  What was your reaction when you learned about the type of

24 information that had been released?

25 A.  I was shocked.  I knew where it had come from.  I knew it

K2I3SCH5                          Sean - Cross

1    was from my old office, and I was just, like I said, I was just

2    in shock.

3    Q.  What effect did the disclosure have on the work that you

4    had previously done in OSB?

5    A.  Everything came to a screeching halt.  I wasn't over in the

6    office, but I did reach out to some folks who were over there,

7    and they were kind of sitting on their hands for a while.

8    There was nothing going on.

9              MR. DENTON:  If I may just have a moment, your Honor.

10             THE COURT:  Yes.

11             MR. DENTON:  No further questions, your Honor.

12             THE COURT:  Ms. Shroff.

13             MS. SHROFF:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MS. SHROFF:

16   Q.  Good afternoon, Sean.

17   A.  Good afternoon.

18   Q.  How are you?

19   A.  Good.

20   Q.  Now, let me just start if I may, please, at a time when you

21   were branch chief, okay, of OSB.  And is it fair to say that

22   that was around 2013?

23   A.  I started in -- it was probably the fall of 2013, yes.

24   Q.  What made you decide to move up in management?

25   A.  I had not been in management before.  And we had gone

1  through a period of it was a couple of years at least, where we

2  were kind of cycling through branch chiefs.  And I was getting

3  to the point in my career where I thought I would give it a

4  shot.  And I told some of the folks that if we lost another

5  branch chief, that I would throw my hat in the ring.

6  Q.  Okay.  Time for a change?

7  A.  It was time for a change.

8  Q.  Is it fair to say as branch chief, basically you're like

9  the liaison between the developers, who you testified in your

10  case were of a younger age, correct?

11  A.  Hmm-hmm.

12  Q.  And manage -- upper management?

13  A.  Correct.

14  Q.  You straddle upper management and developers, right?

15  A.  Yes.

16  Q.  You testified that your particular branch worked on what is

17  called a quick turnaround project?

18  A.  Quick reactions, yes, hmm-hmm.

19  Q.  High stress?

20  A.  Yes.

21  Q.  Spurts of work?

22  A.  Hmm-hmm.

23  Q.  And then downtime?

24  A.  Yes.

25  Q.  Correct me if I'm wrong, but you were at that time, from

K2I3SCH5                          Sean - Cross

1    2013 until you left in 2016, you moved somewhere else, right?

2    A.  I moved somewhere else in 2016, yes.

3    Q.  And at that time, you supervised Mr. Schulte, right?

4    A.  Yes.

5    Q.  You supervised Amol?

6    A.  Yes.

7    Q.  Mr. Weber?

8    A.  Yes.

9    Q.  Mr. Stedman?

10   A.  Yes.  I have to look.

11   Q.  I know.  You supervised Mike, correct?

12   A.  Yes.

13   Q.  And somebody named Justin Nichols, correct?

14   A.  Yes.

15   Q.  Then above you was Karen, correct?

16   A.  Well, way above me.

17   Q.  Way above you.

18   A.  Yes.  So she was at the group level.  I had, there was

19   management at the division level.  Between those two.

20   Q.  Okay.  Fair enough.  So, you stayed in this position and I

21   think that was until about March is when you -- March of 2016

22   is when you decided that you wanted to move someplace else?

23   A.  I had actually started looking for a new position in

24   February 2016.

25   Q.  Okay.  So by February you were looking, right?

1   A.  Correct.

2   Q.  And by March you were almost, you were well into the

3   process?

4   A.  Correct.

5   Q.  And by April, beginning of April you already knew you were

6   out of OSB anyway, correct?

7   A.  Yes.

8   Q.  And when you say you were beginning to look, you just mean

9   internally within the CIA?

10  A.  Correct.

11  Q.  While you supervised Mr. Schulte, you supervised his work

12  on specific projects and him as a whole, right?

13  A.  Correct.

14  Q.  Right.  And you testified on direct, did you not, that

15  sitting here today you don't recall which projects he was

16  working on that you discussed with Anthony that he would take

17  with him?

18  A.  That's correct.

19  Q.  Okay.  Sitting here today, do you by any chance recall any

20  projects or -- and projects or anything including non-projects

21  that were going to be elevated from the branch level to the

22  division level?

23  A.  So, toward the end of my time there, I know there was some

24  discussions about moving the OSB libraries from the branch

25  level to the division level.

K2I3SCH5                          Sean - Cross

1    Q.  I'm going to come back to the OSB libraries, but I want to

2    finish this thought.  You had heard that OSB libraries was

3    going to go from branch to the division level, correct?

4    A.  Correct.

5    Q.  So the division level is above branch, correct?

6    A.  Correct.

7    Q.  And the division level allows access from more than one

8    branch, right?

9    A.  So the division -- yes the division houses five branches.

10   Q.  Mr. Schulte was at one point in OSB under the same

11   division, correct?

12   A.  Correct.

13   Q.  AED; am I right?

14   A.  Correct.

15   Q.  And he was moved to another branch, correct?

16   A.  Hmm-hmm.

17   Q.  It was also going to go to AED?

18   A.  Yes.

19   Q.  So OSB libraries was going to be in this division level?

20   A.  I was under the impression that was the plan.

21   Q.  Right.  And then it definitely encompassed both OSB, where

22   he had been, and RDB, where he was going to be and had landed,

23   correct?

24   A.  If it was going to move to the division level, then yes.

25   Q.  Right.  And do you by any chance recall the kickoff party

K2I3SCH5                          Sean - Cross

1    for OSB libraries becoming an AED-level project?

2    A.  I don't.

3    Q.  Don't recall the kickoff?

4    A.  No.

5    Q.  Do you by any chance remember who JoJo was?

6    A.  I know JoJo.

7    Q.  Okay.  JoJo was supposed to run the OSB projects -- take a

8    look here.  1061.

9         MS. SHROFF:  No.  This isn't it.  It's okay.  It's all

10   right, you can take that one off.  It was all right.  It just

11   says kickoff.

12   Q.  And there came a time when JoJo left, correct?  Did JoJo

13   leave?

14   A.  I don't know.

15   Q.  You don't know?

16   A.  I don't know.

17   Q.  Fair enough.  And you don't know if when JoJo left, who

18   took over the OSB libraries?

19   A.  I don't.

20   Q.  You wouldn't even know when JoJo left, if he left, correct?

21   A.  No.

22   Q.  You talked with Mr. Denton here about the supervision of

23   OSB in and of itself, right?

24   A.  Correct.

25   Q.  You said it's a younger group?

K2I3SCH5                        Sean - Cross

```
 1    A.  It is.  It was.
 2    Q.  There were things that went on, some of which you were
 3    privy to, right?
 4    A.  Hmm-hmm.
 5    Q.  Some of which you were not, correct?
 6    A.  Correct.
 7    Q.  You had a lot of other things than just supervise the
 8    developers of the code?
 9    A.  Correct.
10    Q.  Is it fair to say that at some point you became aware of a
11    physical fight between Michael and Mr. Schulte?
12    A.  I became aware of an incident between the two of them, yes.
13    Q.  Did you become aware of that incident contemporaneously or
14    like a day later or like months later?
15    A.  I believe it was the same week.  I don't remember.
16    Q.  Same week, right?
17    A.  Correct.
18    Q.  Right.  Amol came and told you about it?
19    A.  I don't remember who told me about it.
20    Q.  You don't remember?
21    A.  No, I don't remember.
22    Q.  Is it fair to say that you did not go to Sunny and say,
23    hey, there was a physical altercation here?
24    A.  I did not, no.
25    Q.  Amol went to Sunny and told her, correct?
```

K2I3SCH5                          Sean - Cross

1    A.  I don't know.

2    Q.  You don't know?

3    A.  I don't.

4    Q.  Do you by any chance remember at what point Mr. Schulte was

5    moved from OSB to RDB?

6    A.  I don't remember the exact timing, but it was some time

7    around when the protective order was granted.

8    Q.  Okay.  So, is it fair to say some time in late March 2016?

9    A.  Probably, yeah.

10   Q.  And by then had you heard that you were already moving out

11   from OSB?

12   A.  I believe at that point I had already accepted a position.

13   Q.  You had already accepted a position, right?  Okay.  So,

14   it's fair to say that you were not really involved in all of

15   this OSB brouhaha until you were e-mailed and looped in,

16   correct?

17   A.  Well, I was involved.  I was still the branch chief.  But,

18   not quite sure what you're asking.

19   Q.  Let me try it more specifically.  Is it fair to say that

20   Mr. Weber never came to you and said, hey, it's standard

21   operating procedure, I'm going to take him off admin access?

22   A.  I don't remember if I ever had that conversation with

23   Jeremy or not.

24   Q.  Fair enough.  You don't really remember much of any of

25   these conversations until your memory was refreshed for this

1   trial, correct?  Is that a fair statement?

2   A.  It's been almost four years, so yeah, hmm-hmm.

3   Q.  Right?  And your memory's refreshed by the prosecutors

4   showing you these documents, correct?  I'm not suggesting it is

5   anything improper, just that they showed them to you, correct?

6   A.  I -- they did show me some things, yes.

7   Q.  And they showed you all of the e-mail chains, correct?

8   A.  Not all of them, but I've seen some.

9   Q.  Is it fair to say you saw all of the ones that they showed

10  you on the machine, on this computer thingy?

11  A.  Yes.

12  Q.  Did they show you your Same Time chats?

13  A.  Actually, I hadn't seen that one until -- or just recently.

14  Q.  When is that recently did they show you the Same Time chats

15  that he put up on the computer?

16  A.  Today.

17  Q.  He showed them to you today, right?

18  A.  Yes.

19  Q.  In fact, they showed it to you this morning, correct?

20  A.  Correct.

21  Q.  Right before you took the witness stand, right?

22  A.  Correct.

23  Q.  Let's pull it up.  Exhibit G.

24      You say to Mr. Stedman, right, that Mr. Schulte just

25  doesn't give up ever, right?

K2I3SCH5                          Sean - Cross

A.  Correct.

Q.  And you characterized that as him being tenacious, right?

A.  Correct.

Q.  You said that you told him he could continue to contribute to the libraries, right?

A.  Yes.

Q.  And that he needed to work with you and Weber, correct?

A.  Correct.

Q.  And by that, you just mean that the three colleagues -- they're all colleagues, correct?

A.  They were all colleagues, correct.

Q.  That they should all work together, correct?

A.  Hmm-hmm.

Q.  And that you said that you and -- with you and Weber, correct?  I think there should be a period there.  But and then it says never discussed access of any kind to the database, correct?

A.  True.

Q.  He says that's what I iterated, but he'll have to hear it from Anthony now.

A.  Correct.

Q.  Right?

A.  Hmm-hmm.

Q.  So you had told him, right, and now he is going to hear it from somebody above you, which is Anthony, correct?

K2I3SCH5                          Sean - Cross

1  A.  Correct.

2  Q.  Okay.  You can take that down.

3         Now, you testified that you went -- you knew that the

4  time had come when Amol was moved as was Mr. Schulte, correct?

5  A.  Yes.

6  Q.  Now, is it fair to say, sir, that as a supervisor, you

7  talked to the people you supervised, right?

8  A.  Correct.

9  Q.  I mean, you know what each person's goal was, correct?

10  A.  Hmm-hmm.

11  Q.  You knew their strengths, their weaknesses, correct?

12  A.  Yes.

13  Q.  You knew from talking to Amol that Amol wasn't all that

14  into writing code, correct?

15  A.  He never told me that.

16  Q.  Okay.  Well, let's see if I can ask you some more questions

17  about that.  Did Amol ever tell you that he thought writing

18  code was hard, and you had to be 100 percent in it and always

19  researching?

20  A.  I don't recall having that conversation with him.

21  Q.  3512-03.  I'm not sure if it will, but take a look at this

22  and see if it refreshes your recollection.  It may not or it

23  may.

24         THE COURT:  What are you showing him, Ms. Shroff?

25         MS. SHROFF:  I did give it to the government.

1          THE COURT:  What are you showing?

2          MS. SHROFF:  3512-03.

3   Q.  Let me know when you're ready, okay?

4          THE COURT:  Do you want him to just read the first

5   page?

6   Q.  Whenever you're ready, sir.

7   A.  I'll let you know if I'm not.

8   Q.  Does that refresh your recollection at all?

9   A.  I don't even know what I'm reading, honestly.

10  Q.  That's okay.  If it doesn't, it doesn't.  That's fine.

11  A.  I haven't seen this before, so I don't know what this is.

12  Q.  Just put it aside for a minute then.  Thank you.

13         When you supervised Amol, did Amol ever tell you that

14  he wanted to be involved in something bigger, he wanted to move

15  to management?

16  A.  We might have had some conversations about his future

17  plans.

18  Q.  As part of his discussing his future plans with you, did he

19  tell you he wanted a position in leadership?

20  A.  I honestly don't remember.  But, I had those conversations

21  with everyone about what they wanted to do, and I would give

22  them advice on maybe what classes to take or things like that.

23  Q.  Some people are more interested in being leadership than

24  others, right?

25  A.  Well, correct.

K2I3SCH5                        Sean - Cross

1    Q.  Is it fair to say that Amol told you that he thought he

2    wanted a position in leadership?

3    A.  I honestly don't remember if he said that or not.

4    Q.  Fair enough.  Did you ever remember him saying that coding

5    was hard because you had to be in it 100 percent?

6    A.  I don't recall him saying that.

7    Q.  You don't recall him saying that?

8    A.  No.

9    Q.  Is fair to say that you -- you already testified to this --

10   that you had these kinds of conversations with people, correct,

11   that you supervised, right?

12   A.  Hmm-hmm.

13   Q.  As part of your supervision, you also assigned tools to

14   people, correct?

15   A.  Yes.

16   Q.  You know, your style basically was that people could

17   informally staff things, and generally that wasn't bothersome

18   to you, right?

19   A.  Correct.

20   Q.  That's your --

21   A.  As long as people were getting the job done and working

22   together.

23   Q.  That was your style of management, correct?

24   A.  Yes.

25   Q.  You testified, did you not, about desk moves between

K2I3SCH5                              Sean - Cross

1    Mr. Schulte and -- for both Amol and Mr. Schulte, correct?

2    A.   Correct.

3    Q.   Before I get to that, let me ask you this.  To get promoted

4    at the CIA, is one of the criteria that you move around

5    different branches so you have a more global perspective before

6    getting promoted?

7    A.   It -- it depends on the office and it depends on the grade

8    level.  But, it can.  So once you get higher up in grade level,

9    they expect you to have a broader -- view of the agency and to

10   have more experiences in different offices.

11   Q.   So, it's possible that somebody who wants to move up into

12   leadership or into management would want to be in more than one

13   branch, right?  Have moved around between branches?

14   A.   Maybe not even branches, but even offices in the agency,

15   yes.

16   Q.   The desk moves were that Mr. Schulte -- Mr. Schulte was

17   going to RDB, but I forget, was Amol going to MSB, MBS?

18   A.   I believe it was the mobile branch, MBD.

19   Q.   Do you recall telling Mr. Schulte the timetable of the

20   move?  Sitting here today, do you recall?

21   A.   I don't recall.

22   Q.   Do you recall telling him that there was a deadline for him

23   to move?

24   A.   I don't recall.

25   Q.   Thank you.  Now, did there come a time, sir, that you went,

K2I3SCH5                          Sean - Cross

1    you said -- I'll come back to that one.

2        Let me ask you about a different question.  A different

3    topic, okay?

4        I'm trying to talk to you about the equipment that was at

5    OSB.

6    A.  Okay.

7    Q.  Is it fair to say that a common use was thumb drives?

8    Thumb drives were a common thing to use, correct?

9    A.  A lot of our projects involved thumb drives, yes.

10   Q.  Did you know of instances where people who were leaving

11   would have either personal computers or servers that they would

12   sell to each other before they left?

13   A.  I was aware of one.

14   Q.  And you were aware of one, and that was by some person

15   named Timmy?

16   A.  Correct.

17   Q.  And Timmy sold his -- was it a computer or something -- I

18   don't know --

19   A.  Yeah, I don't know what it was.  But I knew he had

20   something that he had sold.

21   Q.  You know he sold it to Mr. Schulte?

22   A.  Correct.

23   Q.  When the FBI interviewed you, I don't know the date, I

24   don't think it matters, but when the FBI interviewed you, they

25   showed you a chart of his Amazon purchases, correct?

1   A.  I recall something like that, yes.

2   Q.  Right.  And you told them, did you not, back then, that

3   some of the things that you saw Mr. Schulte purchase on Amazon

4   could be related to the server that he had bought from Timmy?

5   A.  I could have said that, yes.

6   Q.  You knew Mr. Schulte to have a Flex server at his house?

7   A.  Yes.

8   Q.  A person like me wouldn't have a Flex server at their home?

9   A.  Probably not.

10  Q.  Okay.  And is it something that requires a lot of

11  accoutrements for lack of a better word?  Thumb drives, disc

12  drives?

13  A.  I honestly don't know.

14  Q.  Fair enough.  Don't worry about it.

15          Now, around April of 2016, do you recall that OSB had

16  new computers in the group -- in the branch.  In the branch.

17  In the branch.  OSB was a branch.

18  A.  We may have, I don't recall.

19  Q.  Right.  Do you recall sitting here today that around

20  April 13, OSB ordered brand-new computers; do you recall that?

21  A.  I don't.

22  Q.  Let me show you 3508-04.  Okay.

23          MS. SHROFF:  Did you want a copy, Judge?

24          THE COURT:  No, thanks, I've got a copy.

25  Q.  Does that refresh your recollection a little bit?

K2I3SCH5                              Sean - Cross

1   A.  I mean, we had, we always tried to order new things every

2   so often.  I don't remember the specifics, but it doesn't

3   surprise me that we put in an order for new machines.

4   Q.  One of the new machines is called T7910 model of a new Dell

5   computer?

6   A.  I think that's just the model number of the computer, yes.

7   Q.  So, and that was around April, April 13, 14, 15, in that

8   area of 2016, correct?

9   A.  I don't know if that's when the order was put in or when it

10  showed up.  Like I said, I don't really remember.

11  Q.  Okay.  Well, do you recall having an interview with the FBI

12  in April of 2017?

13  A.  Vaguely.

14  Q.  Do you vaguely recall telling them that there were new

15  computers and that each person had to set up their own

16  computer?  Flip the page and see if that reminds you.

17  A.  Again, I don't really recall specific conversations I had.

18  But yeah, if we had new machines, it was usually up to the

19  individuals themselves to set it up the way they wanted it.

20  Q.  Right.  And you'd move your data from your old machine and

21  move it to the new machine, correct?

22  A.  That didn't always happen.  It was up to the officer.

23  Q.  Okay.  When you say "officer" you just mean the employee?

24  A.  Yes.  Correct.

25  Q.  Would you say that it's fair to say that not only did OSB

1    use thumb drives, but they used hard drives, correct?

2    A.  Yes, every machine had a hard drive in it.

3    Q.  They had adapters, correct?

4    A.  Yes, there were adapters.

5    Q.  There are external adapters and internal adapters?

6    A.  Yeah.

7    Q.  SATA, is that an adapter?

8    A.  Yes.

9    Q.  Is there an external SATA and internal SATA adapter?

10   A.  Yes.

11   Q.  Am I correct that an external SATA adapter allows you to

12   transfer data from one's computer internal disc drive to

13   another computer?  Do I have that right?

14   A.  So, the adapters were usually just for drives that normally

15   that go inside computers, so you can use them outside of

16   computers.  So you can hook them up externally.

17   Q.  Very normal to have an external SATA or an internal SATA?

18   A.  Yes, we had lots of those devices, yes.

19   Q.  Now, do you by any chance recall if Mr. Schulte worked on a

20   project or tool or whatever you want to call it named Vortex?

21   A.  He did, I believe, yes.

22   Q.  But you don't have any specific recollection of it, right?

23   A.  Vortex -- a little bit.  Because that was a tool that

24   had -- it wasn't just a quick turnaround tool.  That had been

25   around for a while.

K2I3SCH5                          Sean - Cross

1    Q.   It was a more complex tool?

2    A.   I couldn't tell you about the complexity of it.

3    Q.   Do you remember sitting here today if Vortex was ever

4    compromised?

5    A.   I don't remember if Vortex was compromised or not.

6    Q.   Do you remember if there was a tool called Nader?

7    A.   Excuse me?

8    Q.   Nader?

9    A.   Nader?  I do remember Nader, hmm-hmm.

10   Q.   Do you know Nader replaced Vortex?

11   A.   Yes.

12   Q.   And Nader replaced Vortex because Vortex was compromised?

13   A.   I don't remember.

14   Q.   Is it fair to say, sir, if a tool is compromised, your tool

15   should be such that can't be attributed to the compromised

16   tool?

17   A.   We try not to create signatures, yes.

18   Q.   Wow, I didn't know that.  Signatures, that's interesting.

19   Thank you.

20          When Mr. Schulte moved to RDB, do you recall if Nader

21   or Vortex or any one of those were the tools he took with him

22   or you still don't remember?

23   A.   Nader might have been one but I don't remember the

24   specifics.

25   Q.   I'm correct, am I not, that all of these tools, these thumb

K2I3SCH5                              Sean - Cross

1  drive tools, were used by the CIA, right, to syphon data from

2  foreign nations, correct?

3  A.   Correct.

4  Q.   There were how many developers who worked on similar tools

5  in OSB?

6  A.   Just about everybody in OSB had at one time or another

7  worked on a thumb drive based tool.

8  Q.   Thumb drive based tool that would be used to syphon data?

9  A.   Collect some sort of data, yes.

10  Q.   When you say collect some sort of data, you don't mean like

11  me walking over there and collecting data in front of

12  everybody's view, right?  You mean like non-detected?

13  A.   A little more clandestine, yes.

14  Q.   Fair enough.  When you said you did not want there to be

15  signatures between a compromised tool and the new tool, am I

16  correct that you would not want to have similar code in the two

17  tools?

18          It's a very hard thing to say, "two tools."

19  A.   To a degree.  There are certainly things that there is only

20  so many ways to do a couple of things.  But, yes, we would try

21  to make sure that they're different enough that if a tool was

22  caught somewhere else, it wouldn't lead to compromise.

23  Q.   If one tool, for example, had something unique about it and

24  that tool had been compromised, you would not want to see that

25  uniqueness in the new tool, correct?

1  A.  Correct.

2  Q.  You ever heard of something called WeLiveSecurity.com?

3  A.  No.

4  Q.  Just give me one second.

5      (Pause)

6  Q.  Is that just like a regular website?

7  A.  That, apparently, is just a website, yes.

8  Q.  It's not a CIA-owned website?

9  A.  It's not a CIA-owned Web site.

10  Q.  That's a website on which sometimes a CIA officer or

11  someone else monitoring the internet world or the InfoSec

12  world, as you called it, might notice there a discussion about

13  one of the CIA's tools or projects, correct?

14  A.  It may be that way, yes.

15  Q.  And when that happens, they contact either OSB or whoever

16  is working on that project, correct?

17  A.  I'm not sure what the chain is when whoever sees something

18  and then reports it.  I don't know how it's getting back down.

19  Q.  And you've heard of the phrase "reverse engineered,"

20  correct?

21  A.  Correct.

22  Q.  What does that mean, sir?

23  A.  Reverse engineering is when you take a tool, and you don't

24  know anything about it, and you run it through its paces and

25  try to break it out, find out exactly what it's doing, how it's

1   written, and things like that.

2   Q.  You work your way backwards to see how somebody made that

3   tool, right?

4   A.  Correct.

5   Q.  Is it uncommon that somebody would try and reverse engineer

6   one of the CIA's tools?

7   A.  I don't know if it would be common or not, but it does

8   happen with a lot of things on the internet.

9   Q.  Do you recall that happening some time in March of 2016 or

10  you don't recall?

11  A.  I don't recall.

12  Q.  Do you know what a worldwide standdown is?

13  A.  In terms of?

14  Q.  Just phrases that the CIA would use, like a standdown, what

15  is a standdown?

16  A.  So I do know the standdown that was just issued is

17  everything came to a complete stop.  And EDG was no longer

18  supporting our operational customers.

19  Q.  You want somebody to stop working on something that

20  somebody on the outside has learned of, correct?

21  A.  Hmm-hmm.

22  Q.  Okay.  Now, let me go back to this culture of OSB that

23  Mr. Denton alluded to.

24          Each one of these developers had nicknames for each

25  other.  I'm not going to go into it too much because I think

K2I3SCH5                              Sean - Cross

1  we've gone over it a lot.  But, is that fair to say?

2  A.  I -- there were probably some nicknames.

3  Q.  Okay.  And do you remember at any point while you were

4  supervising Amol you said to Amol that his comments were too

5  dark?

6  A.  I don't recall that.

7  Q.  Do you recall saying that if he continuously poked with his

8  comments, he should not be surprise when there was a reaction?

9  Do you recall that?

10  A.  I don't know if I had that conversation with him or not.

11  Q.  Is it your testimony, sir, that you did not ever hear Amol

12  say to Mr. Schulte that he would like to see him dead?

13  A.  No.  I never heard --

14  Q.  You never heard that?

15  A.  No, ma'am.

16  Q.  Did you ever hear Amol say to him "I hope you never amount

17  to anything"?

18  A.  No.

19  Q.  Did you ever see a board or a whiteboard where Amol or

20  anyone else charted out how long it would be before Mr. Schulte

21  was, quote unquote, fired from the CIA?

22  A.  I don't recall that.

23  Q.  Do you ever recall Amol calling Mr. Schulte an asshole or a

24  bald asshole or any kind of asshole?

25  A.  It wouldn't surprise me.

K2I3SCH5                          Sean - Cross

1    Q.  It wouldn't surprise you?

2    A.  Yes.

3    Q.  Okay.

4            THE COURT:  You just don't remember it?

5            THE WITNESS:  I don't remember any specific -- no.

6    Q.  You don't remember it, but it wouldn't surprise you?

7    A.  It wouldn't surprise me.

8    Q.  When you went to -- you testified that you went with Amol

9    to state court, correct?

10   A.  Yes.

11   Q.  For the protective order issue?

12   A.  Correct.

13   Q.  And you were in court at that time, correct?

14   A.  Yes.

15   Q.  And other people went with you or did you go alone?

16   A.  No, there were a couple of others.

17   Q.  Right.  So Mr. Weber was with you, correct?

18   A.  Yes.

19   Q.  And obviously Amol was with you, correct?

20   A.  Yes.

21   Q.  And the gentleman that is Mr. Stedman, he wasn't there,

22   right?

23            It's okay.

24   A.  No, no, I'm sorry.  No, he was not there.

25   Q.  Right.  And he wasn't there because he hadn't witnessed

1  anything, correct?  According to what he told you?

2  A.  I don't know why he wasn't there.

3  Q.  Okay.  And when you went to the courtroom, it became clear

4  at some point, did it not, to the judge that all of were you

5  CIA employees?

6  A.  I honestly don't remember.  I don't remember much about --

7  it never really got started, if I recall.

8  Q.  Okay.  Let me move to a different topic.  Okay?  We talked,

9  you talked a little bit about this with Mr. Denton on direct

10  about standard operating procedures at the CIA.  Correct?

11  A.  Hmm-hmm.

12  Q.  And you talked about access, right?

13  A.  Correct.

14  Q.  And is it fair to say that the CIA did not have a written

15  policy about how projects moved between branches, correct?

16  A.  Correct.  So the division did not have -- as far as I know,

17  did not have any written policies about projects moving.

18  Q.  And you already testified that no matter what there was in

19  writing or not, nobody granted themselves admin access back,

20  correct?

21  A.  Correct.

22  Q.  And admin access was an issue that was controlled by a

23  supervisor or a branch manager?

24  A.  No, it's usually up to the admin.  So there are security

25  procedures for when you are an administrator, and there are

1   guidelines you have to follow, and rules that you follow.

2   Q.  For each person who has admin, there is a guideline or

3   procedure that they follow?

4   A.  Correct, correct.

5   Q.  Sometimes there are people who have multiple admins,

6   correct?

7   A.  I would assume so, yes.

8   Q.  And are there any rules for when there are multiple admins,

9   how one admin can take away another person's admin or you don't

10  know?

11  A.  I'm not aware.

12  Q.  You're not aware?

13  A.  I don't know.

14  Q.  If you and I both had admin to something, there are no

15  rules that I could consult as to how you and I would deal with

16  each other, correct?

17  A.  There probably are.  Again, that's -- it's a security thing

18  and there's training and -- my guess is security does have

19  detailed rules for admins for those types of things, but I'm

20  not aware of them.

21  Q.  If the admin wanted to know, they would go to security,

22  correct?

23  A.  Correct.

24  Q.  Now, Mr. Denton did not ask you about this, but you are

25  familiar with DevLAN, right?

K2I3SCH5                        Sean - Cross

1    A.  I am.

2    Q.  And would you call DevLAN a LAN or a WAN?

3    A.  It was probably more LAN.  It was contained, it wasn't

4    connected to the Internet at all.

5    Q.  Was it connected to Foreign Office East?

6    A.  I believe so.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2iWsch6                          Sean - Cross

1    BY MS. SHROFF:

2    Q.   Foreign Office West?

3    A.   It may have been.

4    Q.   You just don't know, right?

5    A.   I don't know.

6    Q.   OK.   Now, you also talked about the PARs that Mr. Schulte

7    received, correct?

8    A.   Correct.

9            MS. SHROFF:   Could we just pull up that PAR

10   discussion, that email discussion.   I think it's 1100.

11   Q.   You received this email, you testified, from him, correct?

12   A.   I received it from Josh, yes.

13   Q.   Right.   And by -- this is, like, in August of 2016,

14   correct?

15   A.   Correct.

16   Q.   Right.   And he says to you that he does not believe that

17   the PAR accurately reflects his work during the rating period,

18   right?

19   A.   That's what it says, yes.

20   Q.   Right.   When you received this PAR request in the queue,

21   you knew what the rating period was?

22   A.   So, yes, I know what the dates are.

23   Q.   OK.

24   A.   Now, one of the things that happened with this one was that

25   he didn't do it right away.   So, there's a part that the

1  employee has to do before it comes to my queue, and instead of

2  doing it in March, it didn't happen until August.

3  Q.  OK.  So he, by August he's in a different place, correct?

4  He's not in RDB, correct?

5  A.  I don't know.

6  Q.  You don't even know where he is by this time --

7  A.  Correct.

8  Q.  -- right?

9  A.  In a different office, right.

10 Q.  And this is just something being dragged back to you; you'd

11 long past moved on, right?

12 A.  Well, I don't know about moved on, but, yes.

13 Q.  OK.  And you testified that you changed some of his PAR

14 ratings because you were rating him for the time period before

15 the OSB-libraries issue happened, correct?  Am I correct or

16 wrong?

17 A.  Well, I was -- I based my original ratings on that episode

18 with the OSB libraries, where he had said that I told him he

19 could have admin and then he gave himself admin.  When I went

20 back and looked --

21 Q.  Right.

22 A.  -- after I got this email, I just wanted to review

23 everything, I did realize that the end date for his PAR was

24 technically before that.

25 Q.  When was his end date?

K2iWsch6                          Sean – Cross

1   A.  I don't remember.

2   Q.  OK.

3   A.  It was whenever he moved up to the new branch.

4   Q.  Did he move to the new branch after the incident with the

5   OSB library?

6   A.  I believe he moved before.

7   Q.  So he moved before, and then he had the incident with the

8   OSB libraries?

9   A.  Correct.

10   Q.  And your last day in OSB was April 15, correct?

11   A.  Correct.

12   Q.  And April 15 is the date that he is up there with Anthony

13   trying to get his accesses back, correct?

14   A.  Correct.

15   Q.  And at that time the OSB libraries are a branch-level

16   project?

17   A.  They are still OSB, yeah.

18   Q.  They're still OSB; they're not AED by then?

19   A.  Correct.

20   Q.  That's your recollection?

21   A.  That's my recollection, correct.

22   Q.  OK.  And if they were, in fact, an AED-level project or

23   library, would that have changed anything for you?

24   A.  Uh, it -- no, it wouldn't have.

25   Q.  It wouldn't have, right?

K2iWsch6                          Sean - Cross

1    A.  No.

2    Q.  So it didn't really matter if they're an OSB project or AED

3    project, correct?

4    A.  Well, he was -- I based my ratings on his actions.

5    Q.  On his actions?

6    A.  Uh-huh.

7    Q.  And his actions until your last day at OSB?

8    A.  His actions from that specific incident, yes.

9    Q.  OK.  And then you decided that it wasn't within the right

10   time frame, so you changed them, correct?

11   A.  I did, uh-huh.

12   Q.  Right.  And then, after you changed them --

13          MS. SHROFF:  I'll withdraw that.

14   Q.  Do you see the second portion at the bottom, right, where

15   he's writing to you and says that this is the worst PAR he's

16   ever had?

17   A.  Uh-huh.

18   Q.  And that he believes it was some of his best work, correct?

19   A.  Correct.

20   Q.  And you said that an EPA is just kind of like a salary

21   bump-up that everyone gets, is that your testimony?

22   A.  No, not everyone.

23   Q.  OK.

24   A.  It's an award, but a lot of people get them throughout the

25   year.

K2iWsch6                          Sean - Cross

1    Q.  Right.

2    A.  Uh-huh.

3    Q.  And a lot of people don't get them or some people don't get

4    them?

5    A.  Some people don't get them.

6    Q.  Some people?

7    A.  Uh-huh.

8    Q.  And is the award given out willy-nilly or is it something

9    that's really --

10   A.  No.  They were -- there's thought that goes into, and

11   that's at the CCI level.  I don't know how many teams usually

12   get them, but every year they -- they consider teams of work

13   throughout the center and award them appropriately.

14   Q.  OK.  So what happened with OSB libraries didn't impact his

15   monetary award or him getting a McCombs, is that correct?

16   A.  Correct.

17   Q.  And do you know if, in fact, he did get the most highly

18   rated intelligence report?

19   A.  I have no idea.

20   Q.  You have no idea?

21   A.  No idea.

22   Q.  Do you, by any chance, know if --

23           MS. SHROFF:  You know what?  I'll withdraw that.

24   Q.  And then he says, right -- Mr. Denton went over this with

25   you.  Let me see if I understand it correctly.

1        He then says here that he believes that it was a bad PAR

2    because it was a direct result of my security report in March,

3    and you disagree with that, right?

4    A.  Right.  I disagree.

5    Q.  And then he said it's unfair to punish employees of a

6    security incident regardless of what you think you know,

7    correct?

8    A.  Correct.

9    Q.  And you'd agree with me that it is unfair to punish an

10   employee for reporting a security incident?

11   A.  Oh, absolutely.  Uh-huh.

12   Q.  And it's your testimony that that's not what happened with

13   him, correct?

14   A.  Correct.

15   Q.  And then he says, "If I think -- if I feel retaliatory or

16   retributive action is pursued against me," right?

17   A.  Uh-huh.

18   Q.  "Then I will not hesitate to contact management up the

19   chain for assistance," right?

20   A.  Correct.

21   Q.  He says that?

22   A.  Uh-huh.

23   Q.  Also proper, correct?

24   A.  Yes.

25   Q.  It's correct, right?

1  A.  It -- yes -- it's his -- he can do that if he, if he feels

2  he needs to.

3  Q.  In fact, according to the CIA's rules, it is proper to

4  report security concerns, right?

5  A.  Correct.

6  Q.  It is proper also to report if you feel that the agency is

7  engaged in what is called the agency's ideology of promoting

8  people out of the problem, correct?

9  A.  Yes, if that's what it says.

10  Q.  And also, it is proper to "escalate" -- that's the word; I

11  don't know why there's a negative connotation to that, but it's

12  proper to escalate if a CIA officer feels that a problem is

13  being ignored in the hopes that it will go away, correct?

14  A.  It's, it's his right, yes.

15  Q.  Not just his, every CIA --

16  A.  Every CIA officer's right, yes.  Uh-huh.

17  Q.  And that is, in fact, one of the agency's regulations,

18  correct?

19  A.  I -- I don't know.

20        MS. SHROFF:  OK.  Fair enough.  You can take that

21  down.

22  Q.  Now, as a supervisor, is it fair to say that there are

23  times when you have encountered projects that do not meet a

24  deadline?  Correct?

25  A.  Yes.

K2iWsch6                          Sean – Cross

1   Q.  It is not unusual, correct?

2   A.  It is not unusual.

3   Q.  It is something that you, as a supervisor, are trained to

4   fix, right?

5   A.  Correct.

6   Q.  Somebody's behind, you add support to the team, correct?

7   A.  You add support to the team or you work it out with the

8   customer.

9   Q.  Right.

10  A.  Uh-huh.

11  Q.  And by adding support to the team, you can add another

12  person, correct?

13  A.  Correct.

14  Q.  You can reassign the project, correct?

15  A.  I -- correct.

16  Q.  Right.  And one of the other things you can do also is just

17  try and see if you can fix it, correct?

18  A.  I -- I would normally let the experts do it, but yes.

19  Q.  Because they're the experts?

20  A.  The experts, yeah.  Yes.

21  Q.  OK.  Fine.

22  A.  Let them work on it.

23  Q.  OK.  So you just hope that if somebody's lagging behind,

24  you would give them additional resources, correct?

25  A.  Correct.

1    Q.  OK.

2    A.  Uh-huh.

3    Q.  And sitting here today, do you remember Drifting Deadline

4    lagging behind?

5    A.  I --

6    Q.  Or do you not remember?

7    A.  I don't remember much about that, no.

8    Q.  That's OK.

9        Do you recall any conversation with Michael coming to you

10   and discussing the relationship between Mr. Weber and

11   Mr. Schulte?

12   A.  Not that I recall, no.

13   Q.  Did Michael ever come and tell you that he was concerned

14   that Mr. Weber was setting Mr. Schulte up in the workplace to

15   fail?

16   A.  No.

17   Q.  Now, Mr. Denton asked you if OSB libraries was a project

18   that Mr. Schulte had created, correct?

19   A.  Correct.

20   Q.  And you said no, correct?

21   A.  I believe he helped create them.  I don't think he was the

22   sole creator of them.

23   Q.  Is it fair to say that you don't recall when OSB libraries

24   was started?

25   A.  I -- that's fair.

K2iWsch6                        Sean - Cross

1   Q.  Is it fair to say that you don't recall exactly who started

2   it?  Correct?

3   A.  No.  I've -- I know it was more than one person.

4   Q.  OK.

5   A.  In the branch.

6   Q.  It was more than one person?

7   A.  Uh-huh.

8   Q.  According to you, correct?

9   A.  Correct.

10  Q.  And you don't remember who the more than one person was, is

11  that correct?

12  A.  I --

13  Q.  Or do you?  You don't remember, right?

14  A.  Correct.

15  Q.  OK.

16  A.  Uh-huh.

17  Q.  Is it fair to say, sir, that after your move to, out of OSB

18  in April of 2015 --

19  A.  Uh-huh.

20  Q.  -- the people that you kept in touch with were Jeremy

21  Weber?  Is that fair to say?

22  A.  I tried to keep in touch with some of the folks, yes.

23  Q.  And who are some of the folks?

24  A.  Most of the people in the branch, actually.

25  Q.  In the branch?

K2iWsch6                              Sean - Cross

1    A.   Uh-huh.

2    Q.   OK.   That would include Mr. Weber?

3    A.   That would include Mr. Weber.

4    Q.   And that would include Mr. Stedman, is that correct?

5    A.   Yes, uh-huh.

6    Q.   And would that also include Mike, or no?

7    A.   I might have talked to Mike a couple of times.

8    Q.   But not really, right?

9    A.   Not much.   He was in a different office too.

10   Q.   And not really Justin Nichols either, right?

11   A.   I don't remember.

12   Q.   Right.

13   A.   Uh-huh.

14   Q.   So it's fair to say with some of the people?

15   A.   Yes.   Uh-huh.

16   Q.   And when was the last time you did, in fact, speak to

17   Mr. Weber?

18   A.   The last time I spoke -- recently to Mr. Weber?   I saw him

19   a couple weeks ago.

20   Q.   OK.   Socially?

21   A.   He's, he's in the office now.   I've moved back to -- I

22   moved back to CCI, so I'm back in EDG.

23   Q.   OK.   But you see him at work, correct?

24   A.   Every now and then.   Uh-huh.

25   Q.   Do you see him socially as well?

K2iWsch6                        Sean

1    A.  No.

2              MS. SHROFF:  I have nothing further, your Honor.

3    Thank you.

4              THE COURT:  Mr. Denton.

5              MR. DENTON:  Very briefly, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. DENTON:

8    Q.  Sir, do you remember Ms. Shroff asking you some questions

9    about new computers in OSB?

10   A.  Yes.

11   Q.  Where were those computers located physically?

12   A.  If they were the development boxes for DevLAN, they were

13   under each person's desk.

14   Q.  And are those desks in the OSB office?

15   A.  They are.

16   Q.  Is that in what's known as a SCIF?

17   A.  Yes.

18   Q.  What is a SCIF?

19   A.  So, the SCIF is the sensitive compartmented information

20   facility.  It's basically where we have to do all of our

21   sensitive work.

22   Q.  And Ms. Shroff asked you some questions about having lots

23   of devices there.  Do you remember that?

24   A.  I do.  Uh-huh.

25   Q.  Were you allowed to bring those devices home?

K2iWsch6                         Sean

1    A.  No.

2    Q.  Were you allowed to bring electronics from home into the

3    SCIF?

4    A.  No.

5    Q.  Why not?

6    A.  Well, that -- again, that's a security violation.  But that

7    was, that was definitely something that is frowned upon.  We

8    can't even bring -- leave our phones in the car kind of thing.

9    Q.  Now, Ms. Shroff asked you some questions about the move or

10    contemplated move of OSB libraries to a division-level thing?

11    A.  Uh-huh.

12    Q.  Do you remember that?

13    A.  I do.

14    Q.  I'm not going to go back through them, but in the emails in

15    which we talked about the defendant restoring his

16    administrative access --

17    A.  Correct.

18    Q.  -- did he say that someone from AED had given him

19    permission to do that?

20    A.  No.

21    Q.  Who does he claim had given him permission to do that?

22    A.  He claimed that I gave him permission to do that.

23    Q.  Is that true?

24    A.  No.

25    Q.  Ms. Shroff also asked you a number of questions about

1   agency policy.  Do you remember that?

2   A.   Yes.

3   Q.   She asked if it's proper to make a security report, is that

4   right?

5   A.   Correct.

6   Q.   And you said it was, right?

7   A.   In certain situations, certainly.

8   Q.   Is it proper to make a false report to security?

9   A.   No.

10  Q.   She also asked you about policies regarding access.  Do you

11  remember that?

12  A.   I do.

13  Q.   Was there a policy about self-granting access to something

14  without authorization?

15  A.   Not that I know of.

16  Q.   Were people allowed to give themselves access without

17  authorization?

18  A.   No.

19  Q.   Would that violate policy?

20  A.   That would violate security policy, yes.

21  Q.   When you said that you, just a moment ago about your

22  ratings of the defendant, took into account the OSB-library

23  situation, why did you do that?

24  A.   It's my obligation as a manager to -- he expressed a

25  concern, and I wanted to make sure that everything was accurate

K2iWsch6                          Sean - Recross

1    and that it was fair.

2    Q.  Is what the defendant had done, giving himself access to

3    OSB libraries, a violation of policy?

4    A.  I believe so, yes.

5            MR. DENTON:  No further questions, your Honor.

6            THE COURT:  Thank you.

7            MS. SHROFF:  Your Honor, may I just ask one question?

8            THE COURT:  One question.

9    RECROSS-EXAMINATION

10   BY MS. SHROFF:

11   Q.  Do you know if his complaint was substantiated or not?

12   A.  From what I understood it was not.

13   Q.  And was Amol --

14           THE COURT:  That's it.

15           MS. SHROFF:  Fair enough, your Honor.  Thank you.

16           THE COURT:  You're excused, Sean.  Thank you.

17           THE WITNESS:  Thank you.

18           (Witness excused)

19

20

21

22

23

24

25

K2iWsch6                          Karen - Direct

1            THE COURT:  Could we start on the next witness,

2     please.

3            MR. DENTON:  Yes, your Honor.  The government calls

4     Karen.

5      KAREN,

6          called as a witness by the government,

7          having been duly sworn, testified as follows:

8            THE COURT:  Please sit down.  Make yourself

9     comfortable.  Pull yourself right up to the microphone.

10           OK.  Mr. Denton.

11           MR. DENTON:  Thank you, your Honor.

12    DIRECT EXAMINATION

13    BY MR. DENTON:

14    Q.  Good afternoon, ma'am.

15    A.  Good afternoon.

16    Q.  Where do you work?

17    A.  I work at the CIA.

18    Q.  What is your current position?

19    A.  I am currently assigned to the direct -- the office of the

20    director of national intelligence.

21    Q.  And what is your position there?

22    A.  I'm the assistant director of national intelligence for

23    systems and resource analysis.

24    Q.  Generally speaking, what are your duties and

25    responsibilities in that job?

1   A.  As that director, I'm responsible for coordinating and

2   approving all the major requirements for all the major

3   intelligence systems across the intelligence community.  I'm

4   responsible for also determining and leading the analysis to

5   figure out exactly how much is it that we should be paying and

6   budgeting for those systems.

7   Q.  How long have you been in that position?

8   A.  This would be my fourth week.

9   Q.  Where did you work before that?

10  A.  Prior to that I was the director of the office of

11  acquisition management in the directorate of digital innovation

12  at the CIA.  I also served as the acting director of its office

13  of digital futures.

14  Q.  Before we talk about your career at the CIA, could you tell

15  us a little bit about your educational background?

16  A.  I went through college on a full scholarship for the Air

17  Force ROTC.  I received a bachelor's degree in physics at --

18  and then I was also commissioned at the same time.  And then I

19  later got my master's degree in systems management.

20  Q.  Where did you work after college?

21  A.  After college I served in the United States Air Force for a

22  little over four years, working as a systems engineer and a

23  program manager on the global positioning system.

24  Q.  Did you work anywhere else before joining the CIA?

25  A.  Yes.  After I left the Air Force and served my commitment,

1   I spent the next 14-plus -- between 14 and 15 years in

2   industry, working for a number of different companies.

3   Q.  Generally speaking, what field did you work in?

4   A.  All of these companies were responsible for designing,

5   building and supporting systems for the department of defense

6   or for the intelligence community.  They were software systems,

7   ground systems, computer systems.

8   Q.  And approximately when did you join the CIA?

9   A.  I joined the CIA in 2003.

10  Q.  Did you work in a particular directorate when you joined

11  the CIA?

12  A.  Yes.  I joined the directorate of science and technology.

13  Q.  Could you just generally describe some of the positions

14  that you held during your career at the CIA?

15  A.  I was -- my first job and subsequent jobs, I served in

16  multiple what's known as a group chief or director chief

17  position, managing groups of various sizes that were all

18  responsible for some aspect of developing, delivering,

19  deploying and supporting various types of technologies for the

20  mission.

21  Q.  I want to focus your attention, if I can, on the spring of

22  2016.  What was your position then?

23  A.  I was the chief of the Engineering Development Group in our

24  Center for Cyber Intelligence.

25  Q.  And when did you start as the chief of the Engineering

1   Development Group?

2   A.  I became the chief in the fall of 2013.

3   Q.  And what had you done just before that?

4   A.  Just prior to that I had served as the deputy chief for the

5   Engineering Development Group.

6   Q.  And is that group sometimes known as EDG?

7   A.  It is.

8   Q.  Generally speaking, what was EDG's mission?

9   A.  EDG's mission is to develop and support the tools that are

10  used for the offensive cyber mission.

11  Q.  Were you personally responsible for developing those tools?

12  A.  No, I did not build those tools myself.

13  Q.  Ma'am, I'd like to ask you to look around the courtroom and

14  let us know if you see anyone who worked in EDG in the spring

15  of 2016.

16  A.  Yes, I do.

17  Q.  Who do you recognize?

18  A.  Josh Schulte.

19  Q.  When you were the chief of EDG, did you supervise the

20  defendant directly?

21  A.  I did not supervise him directly.

22  Q.  What was the chain of command like?

23  A.  So, between Josh and myself there was a -- his immediate

24  supervisor was a branch chief, Sean.  And then above him were a

25  division, a deputy division chief and a division chief.  And

1   then above that division chief would have been my deputy, and

2   then me.

3   Q.  What was the division of responsibilities between you and

4   your deputy like?

5   A.  My deputy and I would work really as partners.  It's a very

6   busy place with a lot of things going on, so while for the most

7   part, the day-to-day decision boards and personnel processes

8   and budget decisions were given to him to do, we would

9   constantly talk and compare notes so that on any one day we

10  could decide, OK, based on what's going on, you cover these

11  things, I'll cover those things.  So it was a close

12  partnership, but he was responsible for the day-to-day boards,

13  working with the workforce.

14  Q.  Notwithstanding these layers of hierarchy that you've

15  described --

16          MS. SHROFF:  Objection to the testifying.

17          THE COURT:  Overruled.

18  Q.  When you were the group chief in EDG, did you try to get to

19  know the people who worked for you at the line level?

20  A.  Yes, I did.

21  Q.  How did you do that?

22  A.  I did it a number of different ways.  We would allow for

23  broader attendance at various meetings within the organization

24  so that folks could come in if they wanted to.  I also

25  established a practice, which I've used for years in different

1    positions, of having one-on-one meetings with members of the

2    workforce.  I would try -- my goal, and I usually achieved it,

3    was to at least have one sit-down session with each person

4    sometime during the course of the calendar year.

5    Q.  Did you have those types of meetings with the defendant?

6    A.  I did.

7            MR. DENTON:  Ms. Hurst, could we bring up Government

8    Exhibit 1021, please.  Blow up, I guess, the top part of that.

9    Q.  Who sent this?

10   A.  It would have come from my account, but most likely it was

11   actually mechanically done by my administrator, my secretary.

12   Q.  And who was this sent to?

13   A.  It was sent to Josh Schulte.

14   Q.  And when was it sent?

15   A.  It looks like November 30, 2015.

16   Q.  Do you see there the subject 1:1?

17   A.  Yes.

18   Q.  What does that refer to?

19   A.  That refers to a one-on-one meeting.

20   Q.  Did you, in fact, have a one-on-one meeting with the

21   defendant in the fall of 2015?

22   A.  Yes.

23   Q.  Do you remember that meeting?

24   A.  Yes, I do.

25   Q.  Tell us what you remember about it.

K2iWsch6                          Karen - Direct

1    A.  I -- there was nothing substantive from a conversational

2    point of view.  What I do remember is that Josh did not make

3    eye contact with me the entire time.  It was a very

4    uncomfortable kind of conversation.  I remember noting that

5    specifically because it's unusual for someone not to make eye

6    contact in a one on one in the office.  And also, I'm usually

7    pretty effective at creating a dialogue, and it was difficult.

8    Q.  When you had these meetings more generally, was there any

9    sort of agenda?

10   A.  No.  Purposefully not.  There were many opportunities for

11   folks to meet with management for official purposes, whether

12   that be me or somebody else on the chain, on a program or a

13   project or specific personnel things.  These were designed

14   specifically for an opportunity for the person to meet and talk

15   about whatever they might have on their mind.  It could be

16   entirely social, a discussion about plans for vacation or maybe

17   some interesting pictures or artifacts in my office.  Or it

18   could be that they had some specific questions or things that

19   they had on their mind, which then we would talk about.

20   Q.  Are those examples of things that came up in your meetings

21   with actual officers?

22   A.  Yes, they are.

23   Q.  Did the defendant raise any concerns with you about his

24   personal safety during this meeting in 2015?

25   A.  No.

K2iWsch6                         Karen - Direct

1    Q.   Did he raise any concerns about information security during

2    that meeting?

3    A.   No.

4    Q.   Was information security something you were concerned about

5    as the group chief in EDG?

6    A.   Certainly.

7    Q.   Why?

8    A.   Well, any number of reasons, but the type of work that we

9    do, we would be very interested in making sure that it was

10   protected so that it didn't get used inappropriately or didn't

11   get used in the wrong way and didn't end up someplace it wasn't

12   supposed to be.  We also wanted to make sure that we knew that

13   the co-base was properly controlled.

14   Q.   Were there ways that line developers in EDG could raise

15   concerns about information security?

16   A.   There were many different ways that somebody could do that.

17   They could certainly speak to their own direct supervisors.

18   They could speak to any of the other branch chiefs if for some

19   reason their boss wasn't around, or maybe they felt more

20   comfortable or had a history with somebody else.  They could

21   speak to the division level, the deputy or the chief of the

22   division.  They could speak to my deputy.

23       Every manager in the chain had an open-door policy.

24       I also had established, pretty much from the beginning of

25   my time in that position, that the chief of staff, another

1    person on staff but not in direct line, was available and made

2    available to be another open door for someone to come in if

3    they needed or wanted somebody to talk to or to air something.

4         And then, finally, based on some feedback that I had seen

5    in some of our employee health-happiness surveys, I had -- we'd

6    brought in some working groups to talk about some of the

7    things, and I determined that the more junior officers in

8    particular had really wanted another way to communicate ideas

9    and share different things about some of the things that they

10   thought we should be working on.  So I had established a, what

11   I called a technical advisory council.  It was a small group.

12   The officers would apply to be part of it, and they would serve

13   essentially for two years.  And they were -- that would be

14   another forum for anybody to either air an idea or raise a

15   concern.

16        Finally, we had a number across the organization of what we

17   call or referred to as subject-matter experts.  These are

18   officers that are well-known, well respected across the -- the

19   entire organization, and often those officers would serve as

20   mentors or another voice.

21   Q.  Did the defendant serve on your technical advisory council?

22   A.  No, he never applied to serve in the position.

23   Q.  Did you ever learn about him raising any concerns about

24   information security through any of the channels that you've

25   described?

K2iWsch6                        Karen - Direct

1   A.  Not through any of those channels, no.  First I ever heard

2   of it was in preparation for, in what I was learning about this

3   case.

4           MR. DENTON:  Ms. Hurst, can we bring up Government

5   Exhibit 1616, please, and if we could blow up the first half or

6   so of the third full paragraph.

7   Q.  Do you see the line here that says, "Specifically Karen

8   ignored my complaints that our development network and product

9   solution were incredibly vulnerable"?

10  A.  I see that.

11  Q.  Would you have been concerned if your development network

12  and product solution were incredibly vulnerable?

13  A.  Definitely.

14  Q.  Is that something you would have ignored?

15  A.  No.

16  Q.  Did the defendant ever make any complaints to you that your

17  development network and product solution were incredibly

18  vulnerable?

19  A.  No.

20          MR. DENTON:  We can take that down.  Thank you,

21  Ms. Hurst.

22  Q.  I'd like to talk a little bit about the branches that you

23  oversaw.  Which branch was the defendant in?

24  A.  He was in the branch known as OSB.

25  Q.  What did you know about the office environment in OSB

K2iWsch6                          Karen - Direct

1    during this time?

2               MS. SHROFF:  Your Honor, may we have a more specific

3    time frame?

4               MR. DENTON:  The spring of 2016.

5    A.  The spring of 2016.  OSB?

6    Q.  Yes, ma'am.

7    A.  The office environment was sometimes quiet, sometimes more

8    rowdy.  It depended on what was going on.  That particular

9    branch more than others did a lot of what we called

10   quick-reaction capabilities, so depending on what was going on,

11   it could be a little more lively than other times.

12   Q.  When you say rowdy, what do you mean?

13   A.  Just, you know, boisterous, so sometimes folks could get a

14   little loud, a little bit back and forth.

15   Q.  Did you know who was responsible for things being a little

16   loud sometimes?

17   A.  Not specifically.  I -- sometimes I would hear, one of the

18   common things I would hear is, maybe, somebody commenting about

19   Josh, saying, Oh, Josh said something or another.  But

20   honestly, when the group chief walks around, things tend to

21   settle down pretty quickly, so the environment would change if

22   I was walking around the halls.

23   Q.  Did you do anything at any point to address sort of

24   professionalism within the branch and the division?

25   A.  So, in the year prior, in 2015, based on some, again, some

other survey data and some different discussions, I had decided

that for the entire group, which is much larger than OSB, that

we would make sure that each officer attended some training so

that they understood some of the appropriate things related to

what's appropriate behavior, what's harassment, those types of

things; and then also, what were the resources available to

them if they felt that they needed to reach out to a resource

in any particular environment.  So we had done that in 2015.

Q.  I want to focus your attention in particular on early March

of 2016.  Did anything come to your attention about the

defendant during that time period?

A.  In early March of 2016, late one -- late in the workday one

day, my division chief at the time, Debra, knocked on my door

and said, We need to talk, and came in and closed the door.

And she was very concerned that she had become aware that there

was a great deal of tension between Josh and one of the other

members of that team, Amol.  She had just started to get a feel

and start to learn about some of this tension.  So we talked

for a little bit and I said, Well, you know what you need to

do.  Next opportunity when we're all in the office, which would

have been the next workday, you need to dive in and talk to the

branch chief, Sean; talk to the officers involved, and see if

you can get to the bottom of what's going on.  Make sure that

you bring in HR, if we think that's appropriate, or any of the

other resources that are available.

1  Q.  Did you get a chance to implement that plan?

2  A.  That plan did not get implemented.

3  Q.  Why not?

4  A.  Because before it could be implemented, Josh contacted the

5  threat management unit at CIA, and when the threat management

6  unit is contacted, that immediately changes our ability to move

7  forward on a plan like that.  Essentially, we needed to stand

8  down, not do -- not pursue what our game plan had been, because

9  it was then threaten management's team, unit's responsibility

10  to interview people, to talk to folks and to basically do an

11  investigation of the complaint.

12  Q.  During your tenure at the CIA, had you ever previously

13  encountered a situation in which an employee made a complaint

14  about a coworker to TMU?

15  A.  Never.

16  Q.  How did you learn that the defendant had made a complaint

17  to the threat management unit?

18  A.  I believe I found out, actually, from my division chief.

19  Q.  What happened next?

20  A.  The -- well, of course, we had a lot of questions, like

21  what is it we can do, what are we supposed to do?  We -- but

22  largely at that point, other than making sure that my boss,

23  Bonnie, knew and was aware of what was going on, so notifying,

24  make sure that they understood that this was going on and

25  checking in with HR and security, for the most part, we were in

1    a hold pattern, waiting to get some instructions from the

2    threat management unit as to how we could proceed.

3    Q.  Putting aside the process, what was your reaction to

4    learning that the defendant had made a complaint to TMU about

5    Amol?

6    A.  I was really surprised because how did something go from

7    just becoming aware that there was a problem to what was such

8    an -- what I would call a nuclear option, such a dramatic move,

9    when there were all these other avenues and steps that might

10   have been useful to resolve the problem before it got to

11   something like that.

12         MR. DENTON:  Ms. Hurst, could we go back to Government

13   Exhibit 1616, please.  And I think it's on the next page, if

14   you can blow up the second full paragraph.

15   Q.  Ma'am, were you furious with the defendant's report?

16   A.  No.

17   Q.  Why not?

18   A.  Uh, it's not something to get mad about.  It's something to

19   understand, if there is a threat, what needs to be done in

20   order to resolve the situation.  It was perfectly within his

21   right as an employee to make that contact.

22   Q.  And do you see here at the end of this sentence that reads,

23   "It made her look bad to the front office"?

24   A.  Uh-huh.

25   Q.  What do you understand the front office to refer to?

1   A.  That would be my direct leadership, to include Bonnie.

2   Q.  Were you concerned about looking bad to the front office?

3   A.  No.

4   Q.  Did you discuss this matter with Bonnie?

5   A.  Yes.

6   Q.  What were those discussions like?

7   A.  We met to discuss what we knew and make sure that we all

8   understood what -- what our roles, responsibilities were and

9   what we could and could not do.

10  Q.  Were you concerned that this was an issue you hadn't

11  learned about sooner?

12  A.  Certainly.

13  Q.  Was that something you were upset with the defendant about?

14  A.  No.

15  Q.  Were you concerned with anyone as a result of that?

16  A.  No.  I, I was worried.  I wondered if there had been some

17  concern that might have been, maybe, with Sean at that level,

18  if he had noticed something that had been concerning, maybe if

19  he had realized where it was going, he could have said

20  something to his division management or me sooner, but really

21  just wondering, you know, what could have been -- how could we

22  have been more proactive?

23          MR. DENTON:  We can take that down.  Thank you,

24  Ms. Hurst.

25  Q.  Prior to learning about this, had you met with Amol

K2iWsch6                    Karen - Direct

1  personally?

2  A.  Uh --

3  Q.  Just in general.

4  A.  I certainly had met him before.

5  Q.  Having met him, did the content of the defendant's

6  complaint surprise you?

7  A.  Yes.

8  Q.  Why?

9  A.  I've never seen him as being particularly boisterous or

10  certainly not aggressive.

11  Q.  As part of the initial reaction to the defendant's

12  complaint, did you have discussions among the EDG management

13  team about who would be responsible for handling this?

14  A.  Yes.  So, at the time we had, some managers were in the

15  process of moving to different jobs.  So, there was -- Anthony

16  Leonis was the new division chief, and he was stepping in to be

17  the acting division chief as Debra was moving to a new job.  So

18  he and my deputy, Mike, met multiple times, and we talked about

19  the best way to proceed.

20      There were a lot of things to consider in how to handle

21  this.  So, there are a lot of people in the organization.

22  There are -- it's a -- there are a lot of things going on.  We

23  had a lot of responsibilities -- I did in particular as the

24  group chief -- that had me working and meeting with other parts

25  of the center, with other parts of the CIA and with other parts

1   of the overall intelligence community, so other demands.  So we

2   took a look at what was the right thing to do in order to

3   ensure that whoever was involved was consistent, that we had

4   the same voices and the same folks involved so that

5   communication didn't get complicated because we would switch

6   between the two.  So we wanted some consistency.

7        And then the other thing that I heard voiced to me by both

8   Anthony and Mike was that Josh was not comfortable with me.  So

9   we felt that if there was this uncomfort -- discomfort in this

10  situation, and the fact there were so many things to be

11  covered, that the best way to do, handle this would be for

12  Mike, as my deputy and also the chair of all our personnel and

13  human resource activities, to be the primary person for Anthony

14  to work with on this.  And Anthony, as the division chief, was

15  the one down in the division working with the branch chief.

16  Q.  You talked a couple of times about being restricted in what

17  you could do because TMU was involved.  Do you remember that?

18  A.  Yes.

19  Q.  Were you getting guidance about that from somewhere?

20  A.  Our discussions were happening with HR and security and,

21  periodically, legal.

22  Q.  What was your understanding of why you had to be hands-off

23  while the TMU investigation was going on?

24  A.  So, the very reason to do that is to, one, make sure

25  that -- that there was nothing that interfered with the

1    investigation; that the people being interviewed by TMU were

2    able to have direct access without me or any of the other

3    management chain confusing the communication or the answers to

4    the questions or making people feel that they should feel

5    pressured to answer questions a certain way.  So we didn't --

6    we weren't supposed to do anything that would interfere with

7    that investigation.

8        And then the other thing is we were really careful to not

9    do anything that looked like we were taking some sort of action

10   that was punitive; that we were going after, because this

11   action had been taken.  So we were very careful in how we

12   responded.

13   Q.  You talk about not seeming punitive.  Who are you talking

14   about avoiding seeming punitive towards?

15   A.  Well, Josh, as the complainant, but then also Amol as the

16   person that had the complaint filed.

17   Q.  Why were you concerned about not seeming punitive against

18   the person who had the complaint filed against him?

19   A.  Because at this point there were no conclusions.  The

20   complaint had been filed, but the threat management unit needed

21   to do its investigation to determine what, and make a judgment

22   or a ruling as to what they thought the situation was.  And our

23   human resource training and policies are very clear across the

24   organization that when anything is going on, you don't do

25   anything to disadvantage any employee.  So we had to take a

1    very consistent and even approach with both officers.

2                MR. DENTON:  Ms. Hurst, could we put up Government

3    Exhibit 1093, please.  And if we could blow up the third

4    paragraph.

5    Q.  Do you see the line that starts, at the end of the first

6    line that says, "Karen specifically avoided me from this point

7    onward, no longer speaking to anyone in our branch, avoiding me

8    in the halls and made me feel alienated and ashamed for the

9    report"?

10   A.  I see the line.

11   Q.  Did you speak to anyone in OSB during this time?

12   A.  Most likely.  I don't remember.

13   Q.  Were you specifically avoiding the defendant at this point?

14   A.  No.

15   Q.  Were you doing that to punish him for his report?

16   A.  No.

17   Q.  Did you avoid him in the halls?

18   A.  No.

19   Q.  Were there times when you didn't see developers for a

20   period of time?

21   A.  Certainly.  The group has offices on three different floors

22   in the building plus in another entirely different location, so

23   there were many officers I rarely saw and others I would see

24   more frequently, either because of the projects they were

25   working on or because they happened to have their spaces that

K2iWsch6

1    were kind of on my path in the building to get to a conference

2    room or someplace where I needed to go.

3               THE COURT:  Mr. Denton, would this be a convenient

4    place to break?

5               MR. DENTON:  Sure, your Honor.

6               THE COURT:  Let me remind the jurors -- it's been

7    three or four days since we've been together -- don't read

8    anything in the newspapers about this case or listen to the

9    media.  Keep open minds.  Don't discuss the case.  Remember,

10   your deliberations start after the summations by the lawyers

11   and the instructions.  That's when you begin your

12   deliberations, but until that time, don't discuss the case.

13               See you tomorrow morning at 9:00.  Thank you.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

K2iWsch6

```
1              (Jury not present)

2              THE COURT:  Hang on for a second.

3              You're excused.  Thank you very much.

4              (Witness not present)

5              THE COURT:  Anything to take up?

6              MR. LAROCHE:  Not from the government, your Honor.

7              THE COURT:  Ms. Shroff.

8              MS. SHROFF:  No, your Honor.  Thank you, though.

9              THE COURT:  Can I ask you, what's your best estimate

10   of time now?

11             MR. LAROCHE:  I think our case will be closed, your

12   Honor, early next week.

13             THE COURT:  Tuesday, Wednesday?

14             MR. LAROCHE:  We're hoping Monday, but I think by

15   Tuesday is a fair bet.

16             THE COURT:  All right.  Thank you.  See you in the

17   morning.

18             MR. LAROCHE:  Thank you, your Honor.

19             MR. DENTON:  Thank you, your Honor.

20             (Adjourned to February 19, 2020,s at 9:00 a.m.)

21

22

23

24

25
```

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                           Page

 3     FRANK STEDMAN

 4    Direct By Mr. Laroche . . . . . . . . . . .1480

 5    Cross By Ms. Shroff . . . . . . . . . . . .1515

 6    Redirect By Mr. Laroche . . . . . . . . . .1613

 7     SEAN

 8    Direct By Mr. Denton . . . . . . . . . . . .1622

 9    Cross By Ms. Shroff . . . . . . . . . . . .1670

10    Redirect By Mr. Denton . . . . . . . . . . .1708

11    Recross By Ms. Shroff . . . . . . . . . . .1711

12     KAREN

13    Direct By Mr. Denton . . . . . . . . . . . .1712

14                     DEFENDANT EXHIBITS

15    Exhibit No.                           Received

16     G  . . . . . . . . . . . . . . . . . . . .1571

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300