K2J3SCH1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                S2 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

          Defendant.              Trial

------------------------------x
                                   New York, N.Y.
                                   February 19, 2020
                                   9:15 a.m.
Before:

                    HON. PAUL A. CROTTY,

                                        District Judge
                                        -and a jury-
                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW J. LAROCHE
     SIDHARDHA KAMARAJU
     DAVID W. DENTON JR.
     Assistant United States Attorneys

SABRINA P. SHROFF
     Attorney for Defendant
     -and-
DAVID E. PATTON
     Federal Defenders of New York, Inc.
BY:  EDWARD S. ZAS
     Assistant Federal Defender

Also Present:  Colleen Geier
               Morgan Hurst, Paralegal Specialists
               Achal Fernando-Peiris, Paralegal
               John Lee, Litigation Support
               Daniel Hartenstine
               Matthew Mullery, CISOs, Department of Justice

K2J3SCH1

1        (In the robing room; counsel present)

2        THE COURT:  Okay.  I got a note from a juror, and it

3    deals with an incident that occurred on Thursday late in the

4    day.  He then left the courthouse.  We asked him to put the

5    report that he made to David on Thursday in writing, which he

6    did on Tuesday morning.

7        This is the note.  I'm going to mark it as Court

8    Exhibit 1.  I made copies.  So I don't think we can resolve

9    this now.  But I wanted to call it to your attention right

10   away.

11       (Pause)

12       MS. SHROFF:  It seems okay to me.

13       THE COURT:  There is a whole series of cases in the

14   Second Circuit that suggest it is okay.

15       MS. SHROFF:  It's her belief.  She's not saying she

16   can't be impartial.  She's not deliberated.  She's voicing an

17   opinion.  And she also notes that that was a different -- I

18   mean, she's saying she is a different kind of citizen.  That's

19   what we want.  A jury of peers.

20       MR. LAROCHE:  It strikes me, your Honor, that at a

21   minimum, there should be some -- it would make sense to me to

22   question the juror about her impartiality.  It seems like here,

23   the fact that she might think the criminal justice system is

24   racist.

25       THE COURT:  That's her husband's thought.

K2J3SCH1

1           MS. SHROFF:  You're right, your Honor.

2           THE COURT:  So, I don't want an answer now.  There are

3    a couple of cases I want to call to your attention U.S. v.

4    Abrams, 137 F.3d 704 (2d Cir. 1998); U.S. v. Viale, 312 F.2d

5    595, 602; U.S. v. Thai, 29 F.3d 783 (2d Cir. 1994); U.S. v.

6    Farhane, 634 F.3d 127 (2d Cir. 2011).

7           One of the cautions that they make in these cases --

8    that's not all the cases, but that's enough to get you going --

9    is that inquiry along the lines that Mr. Laroche suggests may

10   be counterproductive.  But I don't want to decide this without

11   hearing from you.

12          MR. LAROCHE:  Understood.

13          MR. ZAS:  My concern would be what those cases suggest

14   is just singling out a particular juror.  I don't think it

15   would be a problem to remind them that no one should be

16   discussing the case until the end.

17          MS. SHROFF:  You just did that yesterday.

18          THE COURT:  I did that yesterday and that's part of my

19   scenario.

20          MR. ZAS:  We're getting this juror's version of what

21   the other juror said, which also may be not entirely accurate.

22          THE COURT:  We've got time on this.  So if anybody

23   wants to submit anything or take a further position, that's

24   fine with me.  I'll set a deadline of tomorrow?

25          MR. LAROCHE:  Sure.

K2J3SCH1

1           THE COURT:  Friday?

2           MS. SHROFF:  Friday is better, your Honor.

3           THE COURT:  How much longer do you have on Karen?

4           MR. DENTON:  About a half hour, 40 minutes, your

5   Honor.

6           THE COURT:  Are you going to be longer?

7           MS. SHROFF:  I might be.  She answers so slowly.

8           THE COURT:  She's thinking.

9           MS. SHROFF:  Do you think we could give her a last

10  name?  It is very hard for me to call somebody "ma'am."

11          THE COURT:  Why don't you call her Karen?  She's your

12  good friend.

13          MR. ZAS:  I think this is the original.

14          THE COURT:  We are going to mark this Court Exhibit 1.

15  I'll give it to David Gonzalez and he'll keep custody.  Those

16  copies are for you.

17               (Continued on next page)

18

19

20

21

22

23

24

25

K2J3SCH1                    Karen - Direct

1              (In open court; jury present)

2              THE COURT:  I want to remind the witness, you're still

3    under oath.

4              THE WITNESS:  Yes.

5              THE COURT:  All right, Mr. Denton.

6              MR. DENTON:  Thank you, your Honor.

7     KAREN,

8          called as a witness by the Government,

9          having been previously sworn, testified as follows:

10   DIRECT EXAMINATION (Continued)

11   BY MR. DENTON:

12   Q.  Good morning, ma'am.

13   A.  Good morning.

14   Q.  When we broke yesterday, you were testifying generally

15   about some of the limitations that resulted from the fact that

16   the defendant had involved the threat management unit; do you

17   remember that?

18   A.  Correct.

19   Q.  So despite those limitations in the spring of 2016, did you

20   take any steps to address concerns raised by the defendant's

21   complaint about a death threat?

22   A.  I worked with my deputy, Mike, and then the acting division

23   chief below that worked for him, Anthony, to determine what the

24   best approach would be.  We consulted with HR, human resources,

25   we consulted with legal, we consulted with security, to

K2J3SCH1                        Karen - Direct

1   understand as best we could what it was that we should do or

2   what our options were.  We also consulted with my boss in the

3   front office, Bonnie, to figure out the best way for us to

4   handle the situation to try bring calm back to the

5   organization, and help everyone move forward.

6           MR. DENTON:  Ms. Hurst, can we put up Government

7   Exhibit 1042, please.  If we can go I guess to the carryover

8   e-mail that starts on this page and then goes to the next.

9   Thank you.

10  Q.  Just to orient us, who sent this e-mail?

11  A.  So, the officer that sent this e-mail was the division

12  chief that -- she was in the process of moving out to a new

13  assignment, so Debra was the division chief when the incident

14  first happened.

15  Q.  When was this e-mail sent?

16  A.  March 24, 2016.

17  Q.  Generally speaking, what is this e-mail talking about?

18  A.  So, this e-mail is talking about the fact that in consult

19  with, again, the resources I had just mentioned, HR, security,

20  etc., we understood that it was best to at least try to move

21  the officers within the spaces that the branch they were in

22  were, so OSB.

23          When this incident happened, both officers were

24  sitting extremely close to each other in cubicle desk settings,

25  where, really, they both couldn't walk out at the same time,

K2J3SCH1                        Karen - Direct

1   they would be so close.  We wanted to try to physically

2   separate them in the space as much as possible so they weren't

3   bumping into one another.

4            MR. DENTON:  Ms. Hurst, can we go up to the next

5   e-mail in the chain above this on the first page.

6   Q.  Did you send this e-mail?

7   A.  Yes, I did.

8   Q.  Who did you send it to?

9   A.  I sent it to the chief of security for CCI, the center.

10  Q.  Do you see where it says "CH/AED, upon verbal consultation

11  with CH/HR and myself, sent moving instructions to the officers

12  in the e-mail below."

13  A.  Yes.

14  Q.  Are those the consultations that you were just describing?

15  A.  Yes, that would be so chief slash AED was Debra at the

16  moment that this was going on.  So the discussions with her and

17  HR, we did exactly what this says, I had her send moving

18  instructions to the officers.

19  Q.  Can you read the last line of the e-mail.

20  A.  "This was precipitated by Mr. Schulte's refusal to move

21  until he received written direction."

22  Q.  What did you mean by that?

23  A.  What was relayed to me by Debra was that Josh refused to

24  move unless he was given something in writing.  So, I had her

25  do that.

K2J3SCH1                        Karen - Direct

1    Q.  As a general matter, had you decided that nothing would be

2    put in writing in connection with this incident?

3    A.  No, that's not true.

4    Q.  Going back to the specific move, were you involved in

5    deciding what actual cubicles the defendant and Amol would be

6    moved to?

7    A.  No.  We talked in general terms about making sure they were

8    as far apart as we could get them within the space.

9              MR. DENTON:  Ms. Hurst, can we bring up Government

10   Exhibit 1039, please.  And blow up I guess it is the paragraph

11   that starts "despite the security incident."

12   Q.  If you look at the sentence, ma'am, that starts at the end

13   of the third line and carries over on to the fourth, that

14   reads, "I was asked to move to an intern desk while Amol was

15   promoted to a better desk."

16   A.  Yes, I see that.

17   Q.  As far as you are aware, was the defendant asked to move to

18   an intern desk?

19   A.  There's really no such thing as an intern desk.  The spaces

20   are fairly standard.  The location near a window might be

21   considered to be better, people like that.  But there's no such

22   thing as an intern desk.

23   Q.  Were questions of punishment or promotion any part of the

24   decision to move the defendant and Amol?

25   A.  No.  It was a practical decision based on available space

1  in what room we had to work in.

2          MR. DENTON:  We can take that down.  Thank you.

3  Q.  Did there come a time after that when you decided to move

4  the defendant and Amol to different branches within EDG?

5  A.  So, there was a court ruling -- Josh had filed a

6  restraining order in the local county against Amol.  And when

7  that court ruling came out that the restraining order would be

8  granted or executed, we had instructions that we received that

9  those two could not interact or be near one another.  And we

10 needed to avoid them running into each other even in the

11 building.  So, that meant that we needed to move folks around.

12         We went through and discussed the situation -- this

13 would be my deputy and the chief or acting chief of AED -- and

14 decided that the appropriate thing to do, based on how human

15 resources really, again, as I said yesterday, wants and our

16 policies and approaches are to never disadvantage any

17 particular officer as we make decisions.  So, the most

18 appropriate thing to do would be to move both officers.

19         So then we had to consider which branches made the

20 most sense for mission, for the officer's skill set, and we

21 also looked at where those branches were located in the

22 different buildings.  In the building.

23         MR. DENTON:  Ms. Hurst, can we put up Government

24 Exhibit 1046, please.  And I think on the second page.  If we

25 can blow up the text in the first e-mail there.

1    Q.  Do you see where it says:  "Josh will be moving to AED/RDB

2    and Amol will be moving to AED/MDB."

3    A.  Yes.

4    Q.  How did you decide which branches they should be moved to?

5    A.  It was based on the officer's skill sets.  They have some

6    different things that they were good at.  And also, based on

7    the need of the different branches.  This is a very busy

8    mission, those particular branches had things going on, they

9    could use the extra help.  And these branches are located on

10   different floors in the building.  So, by moving them to those

11   branches, it also helped with the fact that they were not

12   supposed to be running into one another.

13   Q.  For the defendant in particular, how did you settle on RDB

14   as where he would be moved to?

15   A.  So, as we discussed, the type of work and things going on,

16   the feeling and the recommendation from the branch level

17   management and the division level management was it best

18   matched his skill set.  Plus, there was a senior engineer,

19   Duane, that he had worked with before.  And so the thought was

20   that would be a good place for him to go, a good place for him

21   to transition to.  He had somebody he had worked with before,

22   had a good understanding of his skill set that could guide him

23   in the new branch.

24          MR. DENTON:  Ms. Hurst, can we go up to the response

25   e-mail in this chain, please.  First page.  Can we blow that

K2J3SCH1                    Karen - Direct

1   up.

2   Q.  Who sent this, ma'am?

3   A.  Josh sent this.

4   Q.  Did you receive it?

5   A.  Yes.

6   Q.  Generally, who else as a group did he address this to?

7   A.  Let's see.  It looks like he sent it to HR, human

8   resources; security; Bonnie, so the head of the center; myself;

9   my deputy, Mike; Debra again, the division chief at that time,

10  who had just left the job; and then the acting division chief,

11  Anthony.  He also sent it to his branch chief, and it also

12  looks like he sent it to Michele who I think was in the

13  executive director position at the time.

14  Q.  You've been talking a little bit about why you moved the

15  defendant to RDB.  Was the defendant being punished for

16  reporting a security incident?

17  A.  Absolutely not.

18  Q.  Was he being punished for submitting a protective order?

19  A.  Absolutely not.

20          MR. DENTON:  If we can go up to the first e-mail in

21  Government Exhibit 1046, Ms. Hurst.

22  Q.  Do you see here in the end of the first line, start of the

23  second, where the defendant says, "I'm proceeding with my move

24  assuming it is directly due to my security report"?

25  A.  Yes, I see that.

K2J3SCH1                    Karen - Direct

1    Q.  Was the move due to his security report?

2    A.  The move was due to the fact that when the restraining

3    order was executed by the county, we had to physically move the

4    location of where both officers worked.

5    Q.  Why didn't you just move Amol, the officer he had obtained

6    an order against?

7    A.  Again, when we look at how officers are treated, we try to

8    be as fair and even and not disadvantage or advantage a

9    particular officer.  At this point in time, the investigation

10   of the incident in the office and the claim from our security

11   organization, the threat management unit, had not been

12   resolved.  So, everything that we had related to both officers

13   was that we should move forward and treat them both the same.

14   Q.  Did you respond to either of these two e-mails from the

15   defendant?

16   A.  No.

17   Q.  Why not?

18   A.  We were, one, trying to work things at the lowest level

19   within the organization.  So, the interactions were handled at

20   that point largely by Anthony, who was the acting division

21   chief and also the outgoing branch chief, he had been in RDB.

22   So we were handling those interactions.  There was a lot of

23   things going on, and actually, responding to all of these

24   e-mails got -- it gets to be too much after a while.

25              He had been told multiple times, it was documented, it

1   was time to move forward.

2           MR. DENTON:  We can take that down.  Thank you.

3   Q.  When the defendant moved branches, was there any discussion

4   about whether he would keep projects that had been assigned to

5   him while he was in OSB?

6   A.  When we made the decision or when we make the decision to

7   move any officer, the practice is that when they move to the

8   new assignment, they work on the things that are the work of

9   that new office.  They don't bring their work with them.

10  Q.  Is accesses to projects within EDG controlled?

11  A.  Yes.  In general, the code activities and things are

12  controlled based on the type of work that you are doing and

13  where you're working, what you're doing.

14          MR. DENTON:  Ms. Hurst, can we put up Government

15  Exhibit 1062, please.  And if we can blow up the section at the

16  bottom of the page, please.

17  Q.  Ma'am, did you receive this e-mail?

18  A.  Yes.

19  Q.  Do you see the subject line "EDG/AED security concern Re

20  OSB libraries"?

21  A.  Yes.

22  Q.  Do you remember this incident?

23  A.  Yes.

24  Q.  First of all, just generally, what was your reaction to

25  receiving an e-mail from Anthony about an AED security concern?

1    A.  So, prior to the e-mail, just prior to the e-mail, Anthony

2    had come to the front office.  He was in and out of the office,

3    especially talking to Mike quite a bit as we worked through

4    this.  But also me, if I was available.

5         He had come in, and talked to us and alerting that he

6    had some significant concerns based on what he had been looking

7    at.  And was upset, alarmed, at what he had found.

8    Q.  What was your reaction to what you had been told?

9    A.  I was also very concerned at what he was talking about.  So

10   he talked about a little bit more about what was found and then

11   how to proceed with addressing the situation.

12   Q.  Let's take a little closer look at this e-mail.

13        MR. DENTON:  If we can go to the next page, please,

14   Ms. Hurst, and blow up the first paragraph under the line of

15   asterisks there.

16   Q.  Do you see the first part of the paragraph where it says,

17   "At the end of March 2016, EDG/AED/OSB staff were directed by

18   EDG and CCI management to ensure that all OSB projects were

19   properly resourced."

20   A.  Yes.

21   Q.  What did you understand that to mean?

22   A.  They were directed by us, the management chain, to ensure

23   that the branch had its proper resources aligned for its code,

24   it tools, its configuration, and the appropriate people working

25   and having access to those things.

K2J3SCH1                    Karen - Direct

1    Q.  Do you see a little further on where it talks about making

2    sure things were accessed by the appropriate people in OSB, and

3    any projects that were not going to remain in OSB be moved to

4    the appropriate EDG branch immediately?

5    A.  Yes.

6    Q.  What is that a reference to?

7    A.  Going through and making sure, as they were essentially

8    tidying up and making sure things were organized, if there was

9    some code or in those libraries that more appropriately

10   belonged to another branch, they were also told to address that

11   and move it.

12   Q.  Were these the decisions that you were involved in?

13   A.  We talked about it with me at a high level.  I am four

14   levels removed from most of this activity.  So we talked about

15   it in general terms, and Anthony and Mike to a degree worked

16   through the details.

17   Q.  Then just following that where it says, "This move was made

18   following a personnel situation that occurred in March 2016."

19   Do you see that?

20   A.  Yes.

21   Q.  What is that referring to?

22   A.  This was referring to the fact that because of the

23   personnel situation where we had to separate the officers, and

24   assign them to new branches, this was essentially the rest of

25   making sure everything was implemented correctly.

1   Q.  When you say "the officers," are you talking about the

2   defendant and Amol?

3   A.  Yes, I am.

4           MS. SHROFF:  Objection to the leading.

5           MR. DENTON:  Just trying to clarify.

6           THE COURT:  Overruled.

7           MR. DENTON:  If we can zoom back out, Ms. Hurst, and

8   go down to the next page.  And blow up I guess it is marked as

9   number 3 there.

10  Q.  Could you read this for us, please?

11  A.  "After the discussion and e-mails sent on the topic

12  (reference the e-mails below) before the end of the day on 14

13  April 2016, Jeremy checked the accesses on the OSB code library

14  server and discovered that Joshua reinstituted his

15  administrative access to the server via other administrative

16  rights Joshua possessed on EDG's DevLAN system."

17  Q.  First, before we get into the specifics here, do you know

18  who Jeremy is?

19  A.  Yes, I do.  He's one of the other officers in the branch.

20  Q.  Had you dealt with him before all of this?

21  A.  Yes.

22  Q.  In what context?

23  A.  So as a developer, like any developers working on projects,

24  he would have come and briefed me or I would have seen him in a

25  board meeting, that type of interchange, or a demonstration.

1    Like any officer, if I pass by, I would talk to him.  He also

2    was very forward leaning and engaged as part of working on some

3    of those things like I talked yesterday about the TAC, the

4    Tactical Advisory Council, the group of officers that wanted to

5    be helpful and come up with and identify things that need to be

6    worked on.  So I interacted with him on a number of things.

7    Q.  So, with respect to the specific things described here in

8    paragraph 3, was it concerning to you that Joshua reinstituted

9    his administrative access to the server via other

10   administrative rights?

11   A.  Yes.

12   Q.  Why?

13   A.  One, it was pretty clear that, you know, everyone had been

14   talked to about what was going on, how to basically get

15   everything appropriately resourced as we discussed a few

16   minutes ago.  And this practice of going in, if your rights had

17   been changed, and then going in and figuring out another way to

18   come at things is not the way the organization works.  It is a

19   violation of trust, and not the normal practice for what was

20   expected of the officers.

21        MR. DENTON:  If we can zoom out again, Ms. Hurst.  And

22   then go down to the last paragraph, the last full paragraph.

23   Sorry.  The last paragraph on the page.

24   Q.  Could you read first sentence there, please.

25   A.  "As a result, Joshua's direct insistence that he maintain

1    access, using language indicating that he would find a way to

2    ensure this access is maintained regardless of management's

3    decision to remove his access, and willingness to act to

4    reinstitute his administrative access to a system that he

5    should not have these rights must be taken seriously."

6    Q.  Could you just continue, please.

7    A.  "This is in direct violation of agency policy, and raises

8    concerns whether Joshua should be permitted continued access

9    EDG's code bases in the future.  EDG's development model relies

10   on very talented individuals across the country coming up with

11   technical solutions to some of the toughest cyber problems...

12   but it also relies entirely on the fact that all individuals

13   can be trusted to protect EDG, CCI, agency and IC equities by

14   following the security models with the appropriate accesses in

15   place to protect us all.  Failure to do so puts our entire set

16   of cyber tools and those using them at risk for years to come."

17   Q.  Did you agree with this assessment of what the defendant

18   had done?

19   A.  I agree -- yes, I agree with what was written here.

20   Q.  Was this something that you thought should be taken

21   seriously?

22   A.  Yes.

23   Q.  After you were alerted to this problem in your conversation

24   and this e-mail, what steps did you take?

25   A.  Again, in consult with my deputy, with Anthony, in consult

K2J3SCH1                        Karen - Direct

with human resources, security, legal, and my management, we

discussed what would be the appropriate next step.  And what we

decided to do was, there was a memo written that was worked at

a lower level below me by Anthony, that basically laid out and

documented to reaffirm the policy, regulation and practices

related to how accesses are to be granted, removed, and not

worked around.

Q.  From the menu of options that were available to you, why

did you settle on the memo as the right way to deal with the

situation?

A.  So, this was a first -- the first time that this issue had

come up.  This was -- we really opted to take a -- we took a

measured approach, a careful approach, not to escalate it to

more serious types of personnel actions.  But to just make sure

the directions and the instructions were clear, and that we had

confirmed understanding that the policies had been communicated

and understood.

Q.  Why didn't you present this memorandum to the defendant?

A.  Again, we were trying to not escalate, and bring this

higher in the organization than we need to.  We reserved the

possibility that, if things continued, we might have to do

that.  But the best place to start, the normal way we go about

something like this is we worked these at the lowest level

possible, so we did that at the acting division chief level.

Q.  Other than being given this memorandum, was the defendant

1    punished in any way for what had happened?

2    A.  No.

3            MR. DENTON:  Ms. Hurst, can we put up Government

4    Exhibit 1616 again, please.  And if we can go to the next page.

5    And blow up the second full paragraph, yes, right there.  Thank

6    you.

7    Q.  Ma'am, were you concerned that the extra scrutiny from this

8    incident will reveal all the issues with the security of EDG's

9    systems?

10   A.  No.

11   Q.  Did you attempt to pin anything on the defendant?

12   A.  No.

13   Q.  Would you describe your relationship with Jeremy Weber as

14   him being a faithful pawn?

15   A.  I would never consider Jeremy Weber a pawn.  He is a good

16   officer, he's a veteran, and he has his strong opinions.  He is

17   not going to have somebody sway him or use him as a pawn.  He's

18   a smart man, and very focused on the mission.

19   Q.  Did this incident in fact reveal issues pertaining to the

20   security of EDG systems?

21   A.  It did.  We found that some of the practices needed to be

22   tightened up, and some of the way things were being managed

23   needed to be tightened up.  It is a challenge in that

24   environment because of the type of work that has to be done on

25   it.  You have to really work through how to implement some of

1    those controls in a way that still allows them to do the work

2    that they need to do.

3    Q.  What sort of practices needed to be tightened up?

4    A.  Exactly who and how the accesses were tracked.  But

5    honestly, it was multiple levels below me, so I'm not an expert

6    in that area.

7    Q.  As a result of this incident, were you aware of any steps

8    taken to increase security on DevLAN?

9    A.  Yes.  Again, Anthony and Mike and I had had multiple

10   conversations.  Anthony and Mike are both much more, had much

11   more detailed technical background in this area.  So Anthony

12   was working, and we engaged Jeremy to go through and really

13   take a look at this system.  And then we did make some

14   investments in some additional computer servers so that we

15   would have the ability to, again, manage code base, making sure

16   we had good backups and all that kind of stuff.

17         MR. DENTON:  You can take that down.  Thank you.

18   Q.  Did there come another time later in 2016 when you learned

19   that defendant had again altered accesses on DevLAN?

20   A.  Yes, a couple months later.

21   Q.  What had your interactions, if any, with the defendant been

22   like in the intervening time?

23   A.  I hadn't really seen him during that period of time.  There

24   hadn't been anything related to his projects that had come to

25   my office, which is not unusual.  He hadn't been in any of the

1  various board meetings and things when I've been in the room.

2  I do a lot of work outside the building, and also -- so a lot

3  of times I don't see a lot of people.  And then with him moving

4  to RDB, his location was now different, so I didn't see him

5  when I was walking to a conference room or things like I had in

6  the past when he was in OSB.

7  Q.  So, what did you learn about the defendant later in 2016

8  with respect to accesses on DevLAN?

9  A.  So, what I learned in I think it was June timeframe, late

10 May, that he had basically violated the memo that we had had

11 him sign, and gave himself access back again to things that he

12 had been -- had his access removed.

13 Q.  Again, was that concerning to you?

14 A.  Extremely.

15 Q.  Again, why?

16 A.  Again, policy, regulation, practice, all were a part of the

17 issue here.  The trust factor, and now at this point, just

18 willfully and clearly going against what he had been directed,

19 both verbally by his direct management, and then also in the

20 memo that was done in April.

21     MR. DENTON:  Ms. Hurst, can we go to Government

22 Exhibit 1085, please.  If we can just blow up the top matter

23 there, please.

24 Q.  Who sent this?

25 A.  This was from Anthony.

1  Q.  Did you receive it?

2  A.  Yes.

3  Q.  If we can zoom back out.  And what is Anthony relaying to

4  you in this e-mail?  Just generally, we'll talk about some of

5  the specifics in a moment.

6  A.  So, he was relaying his -- Anthony was relaying to Josh his

7  new planned work, a new capability for operations, and talked

8  about the updating permissions to this one set of code for one

9  of the tools.

10         MR. DENTON:  If we can go down to the next page,

11  please.  And if we can blow up the paragraph that starts

12  "first" just sort of through the end of that sequence, to the

13  end of the page.  Thank you.

14  Q.  Do you see here where in the middle of this first

15  paragraph, Anthony writes, "I told him that when changes were

16  made in early April they were directed by EDG management"?

17  A.  Yes, I see that.

18  Q.  Was that accurate?

19  A.  Yes.

20  Q.  Just continuing, he said, "He pressed on this issue

21  indicating that it was probably the C/EDG who he felt had a

22  problem with him."

23  A.  I see that.

24  Q.  What does C/EDG refer to?

25  A.  That refers to me.  Chief EDG.  That's often the way it's

K2J3SCH1                        Karen - Direct

1   shorthand.

2   Q.  Did you have a problem with the defendant?

3   A.  No.  I now had concerns based on the incident in April with

4   the accesses and the difficulty we had had with him to sign the

5   memo, and then proceeding to do other things, I was extremely

6   concerned about that.  But I had no personal issue with him.

7   Q.  And just in the last part of this comment where it says

8   "These changes were not just made to him but also Amol."  Do

9   you see that?

10  A.  Yes.

11  Q.  Was that part of the process that you were describing

12  earlier?

13  A.  Again, we went through, and I'm not as familiar with all

14  the details, but the instructions were to go through and make

15  sure the accesses lined up with the officers.  And if they were

16  moving to another branch, those accesses should be changed to

17  what was appropriate for the new branch.  And it should be done

18  equally to everybody.

19  Q.  So, could you then read the paragraph marked "second" for

20  us, please.

21  A.  Yes.  "Second, during this part of the conversation, Josh

22  said the following:  In this case, where he felt that his

23  privileges were being removed unfairly, he wasn't going to just

24  allow it to happen and he would 'fight back.'  These two words

25  caught me a little off guard, and I feel they are worth

K2J3SCH1                        Karen - Direct

1    mentioning.  Josh feels that he is being wronged in this

2    situation -- that his projects have been unfairly removed from

3    him, and that he's being punished unfairly."

4    Q.  Again, I'm sorry if we covered this before.  But why were

5    his projects removed from him?

6    A.  He moved from one branch to another.  His assignment was

7    changed.  He was going to work on requirements that were

8    specific to his new branch RDB.  His work was different.  His

9    assignment was different.

10   Q.  Was he being punished in any way?

11   A.  No.

12   Q.  What was your reaction to this paragraph?

13   A.  It's -- it was extremely odd that someone would try to hold

14   on so strongly to a tool and some code, and drag it with them

15   to their new assignment.  It was behavior that I hadn't really

16   observed before.

17           MR. DENTON:  We can take that down.  Thank you,

18   Ms. Hurst.

19   Q.  After you learned about this issue, what did you decide to

20   do?

21   A.  Well, in June, we made the decision to escalate the

22   direction, instruction, and issue what's known as a letter of

23   warning.

24   Q.  In general, in CIA practice, is a letter of warning a

25   significant event?

1   A.  Yes, it's very significant.

2   Q.  Why is that?

3   A.  It is one that is officially taken as an action that you

4   are putting an employee on notice that there are some

5   significant issues.  It's documented, it's coordinated with all

6   the personnel, HR, security, legal, and it becomes and is added

7   to their file.  It basically puts someone on notice that, hey,

8   you better correct your behavior, you have a problem.

9           MR. DENTON:  Ms. Hurst, can we put up Government

10  Exhibit 1094, please.

11  Q.  Ma'am, what is this?

12  A.  This is, this is the letter of warning.

13  Q.  Did you prepare this letter?

14  A.  It was written and drafted by a number of us, actually.  So

15  there were a lot of inputs, including Anthony, Mike my deputy

16  to a degree, HR, security, and legal.  So there were a lot of

17  inputs in writing this letter.  I was very involved in it, yes.

18  Q.  Was this memo given to the defendant?

19  A.  The memo was presented to him in a meeting.

20          (Continued on next page)

21

22

23

24

25

K2jWsch2                    Karen - Direct

 1  BY MR. DENTON:

 2  Q.  Generally speaking, in terms of that meeting, what was the

 3  defendant's demeanor like?

 4  A.  He was quiet, and he did not make eye contact at all with

 5  me.  And he stared at the memo, and basically we walked through

 6  it and talked about it.  And he took issue with a number of

 7  points in the letter.

 8          MR. DENTON:  Ms. Hurst, could we blow up the paragraph

 9  marked No. 2.

10  Q.  Now, do you see where it says, "Your email to Susan dated 3

11  June 2016 identified your concern that on 4 April your admin

12  privileges to EDG/AED/OSB project Brutal Kangaroo were changed

13  by Jeremy Weber without authorization"?

14  A.  Yes.

15  Q.  Had his privileges been changed without authorization?

16  A.  No, that's not correct.  Jeremy was working under direction

17  of his management.

18  Q.  Was that something you confirmed before preparing this

19  letter?

20  A.  Yes.

21          MR. DENTON:  If we can zoom back out and go down to

22  paragraph 3.

23  Q.  Just as a process matter, there's a couple of lines here

24  that are marked out and then something handwritten there.

25  A.  Yes.

K2jWsch2                              Karen - Direct

1   Q.  Do you recognize the handwriting?

2   A.  Yes.  The handwriting's mine.

3   Q.  And did you also make those strikeouts?

4   A.  I did.

5   Q.  Why did you do that?

6   A.  As we walked through and discussed the memo, the letter of

7   warning with Joshua, he took issue with many lines in the

8   document, and I was really looking for a place where we could

9   come to some agreement.  And in this particular paragraph, I

10  was willing to accept these as the edits to that, or changes to

11  that paragraph.  So we deleted the two sentences and then added

12  in its place the sentence I wrote in by hand.

13  Q.  Now, during the course of this meeting, did you consider

14  seriously the things the defendant said to you?

15  A.  Certainly.

16  Q.  Why did you do that?

17  A.  Because that's the way I always operate, going through and

18  hearing a person out and trying to understand where they're

19  coming from, and if -- this is a complex business.  If there's

20  something that I didn't understand or had been communicated to

21  me differently, to hear and -- hear him out and make sure that

22  I had considered everything that was involved.

23          MR. DENTON:  Ms. Hurst, could we go to the next page

24  of this exhibit, please, and if we could just blow up the

25  printed text portions.

1  Q.  Now, there's a couple of points here where you've marked

2  things with an asterisk.  Do you see that?

3  A.  Yes.

4  Q.  Why did you do that?

5  A.  Those two points, there's a note at the bottom of the page

6  I wrote in that Joshua disagreed with those points.

7  Q.  Why didn't you strike these lines out?

8  A.  Because I noted that he disagreed, but this was my

9  statement and this, I felt, was true.

10  Q.  And what was the first statement the defendant disagreed

11  with?  Could you read that, please?

12  A.  "These actions violated the policy stated and instructions

13  given in the memorandum you signed on 18 April 2016, referenced

14  above."

15  Q.  How did the defendant violate the memorandum that he had

16  signed?

17  A.  So, the memorandum basically gave him specific instructions

18  on not giving himself access when he had not been granted

19  access; he couldn't independently take that action.  And that

20  was in the memo.

21  Q.  Now, going down to the bottom paragraph here, what was the

22  second portion that the defendant disagreed with?

23  A.  "You were aware of the policy for access and your

24  management's lack of support for you to retain administrative

25  privileges, but nonetheless, you took steps to deliberately

1    violate that policy and gain those privileges."

2    Q.  We've talked about policies in general.  Are there policies

3    with respect to administrative privileges?

4    A.  Yes.

5    Q.  Are those important policies?

6    A.  Yes.

7    Q.  Why?

8    A.  Having administrative privileges, depending on the

9    different levels, gives someone additional access to be able to

10   get into, in this case, code or whatever data, etc., and do

11   things with it.  And that -- this is really important

12   technology, capability, so people have access when they need

13   it, and they don't have access when they don't need it.

14            MR. DENTON:  If we can zoom out on this page, please,

15   Ms. Hurst.

16   Q.  Did you sign this letter?

17   A.  I did.

18   Q.  Did the defendant sign it?

19   A.  He did not.

20   Q.  Why not?

21   A.  He -- as we briefed it and walked through, he had his

22   disagreement points, as I mentioned, and at the end, it is also

23   our practice and policy that the officer is -- has the option

24   not to sign the letter of warning.  So he opted not to sign it.

25   Q.  And who else was present at this meeting?

1   A.  Our head of HR, Susan, and my deputy Mike were in the room.

2   Q.  Why were all of you there?

3   A.  One, as resource people and experts for the policies'

4   communication; also, for continuity of the conversation because

5   as we had worked through the issues of the moving of personnel

6   in the branches earlier in the year and the first refer -- the

7   first memo, etc., they had been involved in the conversation

8   along the way.

9   Q.  Following this meeting, did you have any other interactions

10  with the defendant?

11  A.  No.

12  Q.  Did there come a time when you left EDG?

13  A.  Yes, in -- even in June there was already work underway for

14  me to move to a new assignment, so I officially left later that

15  summer to a new assignment.

16  Q.  And roughly when was that?

17  A.  About August.

18  Q.  I want to ask you to think a little bit forward in time to

19  March of 2017.  Did there come a time in March of 2017 when you

20  heard the term "Vault 7"?

21  A.  Yes.

22  Q.  What does Vault 7 refer to?

23  A.  That refers to the information that was leaked.

24  Q.  And where did that information come from?

25  A.  I had been told it came from EDG.

K2jWsch2                         Karen - Cross

1    Q.  And where was it leaked to?

2    A.  WikiLeaks.

3    Q.  What was your reaction when you learned the type of

4    information that had been published by WikiLeaks as Vault 7?

5    A.  I was sick to my stomach.

6    Q.  Why?

7    A.  For many reasons.  That is a -- those capabilities, any of

8    that information getting out into a forum like that can hurt

9    people and impact our mission.  It's a huge loss to the

10   organization and puts, potentially puts people at risk.

11              MR. DENTON:  Ms. Hurst, could we pull up page 9 of

12   Government Exhibit 809.  Can we blow up the paragraph that

13   starts "The@Department of Justice."

14   Q.  Now, do you see where it says, "Jeremy Weber and Karen at

15   the CIA set up Joshua Schulte"?

16   A.  Yes, I can read that.

17   Q.  Did you and Jeremy Weber set up the defendant for the Vault

18   7 leak?

19   A.  No, I did not.

20              MR. DENTON:  No further questions, your Honor.

21              THE COURT:  Ms. Shroff.

22              MS. SHROFF:  Thank you, your Honor.

23   CROSS-EXAMINATION

24   BY MS. SHROFF:

25   Q.  EDG told you that the information in Vault 7 came from EDG?

1   A.   No, I did not hear that from EDG directly.

2   Q.   I'm sorry.  Did I miss that on direct?  Is that not what

3   you said?

4   A.   EDG did not tell me that.

5   Q.   Who told you?

6   A.   I read it in the headlines.

7   Q.   You read it in the headlines?

8   A.   Newspaper.

9   Q.   That's how you learned about where --

10  A.   I was not involved or assigned at EDG or CCI at the time

11  this happened, so I had no direct information.

12  Q.   Could you let me finish my question before you answer it?

13  Yes?

14  A.   Certainly.

15           THE COURT:  Yes.

16  Q.   Thank you.

17           THE COURT:  And you should do the same.

18           MS. SHROFF:  I was trying, your Honor.  Thank you.

19           THE COURT:  As a matter of courtesy.

20  BY MS. SHROFF:

21  Q.   Let's try it again.  Who told you that the information that

22  was leaked in Vault 7 came from EDG?

23  A.   I heard about it, read about it in the headlines.

24  Q.   OK.  Now, you also testified that you learnt that the

25  information was leaked to WikiLeaks, correct?

K2jWsch2                        Karen - Cross

1    A.  Later, yes.

2    Q.  You don't know that to be true, correct?

3    A.  I have not been personally involved in that.

4    Q.  In fact, nobody knows who it was leaked to; all you know is

5    that it was released by WikiLeaks?

6    A.  Is there a question there?

7    Q.  Yes.  That was the question.

8    A.  Could you repeat the question?

9    Q.  Sure.  Sitting here today, do you know who the information

10   was leaked to?

11   A.  I do not.

12   Q.  Does the CIA, in your opinion, know who the information was

13   leaked to?

14           MR. DENTON:  Objection.

15           THE COURT:  Sustained.

16   Q.  What's your present position?

17   A.  I'm the assistant director of national intelligence for

18   systems and resource analysis at the office of the director of

19   national intelligence.

20   Q.  And that's part of the CIA, right?

21   A.  It is not.

22   Q.  It is not.  What's the highest position you ever held at

23   the CIA?

24   A.  That would -- at the CIA?

25   Q.  Yes.

K2jWsch2                        Karen - Cross

1   A.  Office director, director of the office of acquisition

2   management in the digital directorate for innovation.

3   Q.  And in 2017, March of 2017, what was your position?

4   A.  I was the director of the office of acquisition management.

5   Q.  And it is your testimony today that you do not know who the

6   information was leaked to; that is, the Vault 7 information?

7   A.  That is correct.

8   Q.  Right.  Am I correct, ma'am, that, in fact, nobody at the

9   CIA knows who the information --

10              MR. DENTON:  Objection.

11  Q.  -- was leaked to?

12              THE COURT:  Sustained.

13  Q.  Did you talk to management about the Vault 7 leak?

14  A.  I did.

15  Q.  Did you talk to Mr. Roche about the Vault 7 leak?

16  A.  I did.

17  Q.  Did you talk to Mike S. about the Vault 7 leak?

18  A.  Uh, no.

19  Q.  Let's start with the first two that you talked to.  You

20  talked to Mr. Roche, correct?

21      Did Mr. Roche ever inform you that he knew who the

22  information was leaked to?

23              MR. DENTON:  Objection.

24              THE COURT:  Sustained.

25  Q.  Do you know when WikiLeaks leaked the information?

1   A.  I know that the headline in the paper was in March of 2017.

2   Q.  Do you know when the CIA assumes that information was

3   taken?

4             MR. DENTON:  Objection.

5             THE COURT:  Overruled.

6   A.  Again, I have not been involved and I do not know.

7   Q.  You don't know that they think it was taken in April of

8   2016?

9   A.  I do not.  I have not had any insight since I left the

10  position.

11  Q.  OK.  In April -- let's start with March.  In March of 2016,

12  you were head of EDG, right?

13  A.  That's correct.

14  Q.  And before March of 2016, did you have any personal

15  knowledge of what was going on in OSB?

16  A.  I was aware of the work going on in all the branches to --

17  at least at a top level.

18  Q.  What does that mean, at least at a top level?

19  A.  There are many, many projects, programs, efforts going on

20  across what is a large organization.  I'm multiple layers

21  removed from the very detailed of what's going on, but I would

22  be aware at a top level of the list of projects, of any

23  projects or programs that were particularly important or -- or

24  were having problems.

25  Q.  OK.  So is it fair to say that your knowledge of what was

K2jWsch2                          Karen - Cross

1  going on at the developer level in OSB was the information you

2  got from your immediate deputy?  Correct?

3  A.  From my deputy and my division chief below that, and on

4  occasion, the branch chief, but much less frequent.

5  Q.  So who was your deputy in March?  Was that Debra?

6  A.  The deputy in March of 2016 was Debra.

7  Q.  Right.  And Debra was on her way out, correct?

8  A.  She was in the process of transitioning to a new

9  assignment.

10  Q.  And Mike S. was on his way in?

11  A.  Different jobs.  Mike S. was my deputy.

12  Q.  OK.

13  A.  Debra worked below that as a division chief, below Mike and

14  I.

15  Q.  So who took over Debra's job?

16  A.  The position was vacant.  The new deputy division chief was

17  Anthony.

18  Q.  OK.

19  A.  So he, as she moved on, became the acting division chief.

20  Q.  So Debra moved on, there's a slight vacancy, and then

21  Anthony comes in, correct?

22  A.  There was -- yes, that's true.

23  Q.  Right.  And right below, also, there is a transition,

24  correct?

25  A.  The branch chief, Sean --

K2jWsch2                         Karen - Cross

1   Q.  Right.

2   A.  -- he was in the process of working to move to a new

3   assignment.

4   Q.  Well, he wasn't in the process of working to move to a new

5   assignment, right?  By March, he'd already had a new

6   assignment.  He had an end date in OSB of April 15, or did you

7   not know that?

8   A.  So, I said in March he was working to transition to a new

9   assignment.  That's true.

10  Q.  Right.  By March he had received a new job within the CIA,

11  correct?

12  A.  Yes.

13  Q.  He was for sure leaving OSB, correct?

14  A.  Yes.

15  Q.  He had an end date of April 15, correct?

16  A.  I'm not aware of the specific date.

17  Q.  OK.  And is it fair to say that part of the reason he was

18  leaving was because of the concerns of his management style of

19  OSB?

20  A.  I do not know that.

21  Q.  You don't know that?

22  A.  I do not know that.

23  Q.  Now, when was the first time you became aware of a physical

24  fight between two developers in OSB?

25  A.  Not until the incident with the threat management unit

K2jWsch2                        Karen - Cross

1   brought all that to my attention.

2   Q.  OK.  And that was in end of February, March of 2016, right?

3   A.  Yes.

4   Q.  Do you know when that physical fight was?

5   A.  No.

6   Q.  Sitting here today, you still don't know when that physical

7   fight was?

8   A.  No.

9   Q.  Would it surprise you to know that it was in October of

10  2015?

11  A.  OK.

12  Q.  No, that wasn't the question.  The question was would that

13  surprise you to know?

14  A.  It does not surprise me.

15  Q.  OK.  Now, do you remember that document Mr. Denton showed

16  you, the pop-up email about your one-on-one?  Remember that?

17  A.  Yesterday, yes.

18          MS. SHROFF:  Yes.  Could we pull that up.

19  Q.  Is that the entirety of the email that is sent out?

20  A.  This would be a scheduling appointment, so it's just a

21  calendar appointment, yes.

22  Q.  Right.  So it's not like an invitation that says, Dear

23  so-and-so, it's time for our annual one-on-one, right?

24  A.  No.

25  Q.  It's just a calendar; it goes out to everyone, correct?

1   A.   As the -- as my secretary was working this, she would have

2   set those schedules up.

3   Q.   Right.  So it goes out to all the developers, and then they

4   just schedule this one-on-one with you, correct?

5   A.   She works each of them separately.

6   Q.   Well, of course.

7   A.   Yes.

8   Q.   She sends them out, correct?

9   A.   Yes.

10  Q.   And the date on this is November of 2015?

11  A.   Correct.

12  Q.   After October, correct?

13  A.   Correct.

14  Q.   And did you, by any chance, meet with all the developers in

15  this one-on-one?

16  A.   I -- during the course of a calendar --

17  Q.   No.  I'm just asking you if you recall meeting with all of

18  the developers in November of 2015.

19  A.   Then, no, I did not do them all in November.

20  Q.   OK.  Do you remember if you met with all of the developers

21  sometime after November 30 of 2015?

22  A.   I would not have met with all of them in the time period

23  from this November to the end of the calendar year.

24  Q.   OK.  How about until January?

25  A.   The cycle for these was calendar year, so I would have met

K2jWsch2                    Karen - Cross

1    with them through the course of 2016.  By this time, I would

2    have been finishing up the list of whoever I had not had a

3    chance to meet with during the course of the year.

4    Q.  Oh.  So you are coming towards the end of 2015, so you're

5    trying to meet up with everybody you have not met up with yet?

6    A.  Correct.

7    Q.  And sitting here today, you do not know who else you met up

8    with in November of 2015, correct?

9    A.  Correct.

10   Q.  And is it fair to say that sitting here you would not even

11   be able to tell me, for example, if you met with Justin

12   Nichols?  For example, right?

13   A.  I don't know.

14   Q.  OK.  How about Michael K.?

15   A.  I don't know.

16   Q.  Did you have a one-on-one with Sean F.?

17   A.  I would have possibly earlier in the year.

18   Q.  You would have had one with him earlier in the year?

19   A.  Uh-huh.

20   Q.  To get a status report of what's going on in OSB?

21   A.  The one-on-one conversations, like I indicated yesterday,

22   were -- there was no set agenda, so we would have talked about

23   whatever the officer had on their mind as to how things were

24   going or what they wanted to talk about.  Sometimes it was very

25   social, but purposefully, on my end, it was whatever they

1    wanted to talk about, whatever they had in mind.

2    Q.   Whatever they wanted to talk about?

3    A.   Uh-huh.

4    Q.   And you didn't prepare for the one-on-one?

5    A.   Correct.

6    Q.   You didn't say I'm going to ask my --

7         Did you call her your secretary?  Is it secretary?  You had

8    a secretary?

9    A.   Uh-huh.

10   Q.   -- your secretary to get a cheat file on each person --

11   A.   No.

12   Q.   -- whatever their interests were?

13        You didn't know anything about the person, correct?

14   A.   Correct.

15   Q.   This was all left up to them, correct?

16   A.   It was a meet-and-greet social kind of meeting.

17   Q.   How long did they last, by the way?

18   A.   Generally about a half an hour.

19   Q.   Half an hour.  And how far is your office from OSB?

20   A.   Well, it was in -- same floor --

21   Q.   Uh-huh.

22   A.   -- across the hall from the vault we worked in --

23   Q.   Uh-huh.

24   A.   -- and then down towards the end of the building.  I don't

25   know -- I don't know exactly how far that is.

K2jWsch2                         Karen - Cross

1    Q.  OK.  And after these one-on-ones, you didn't really do any

2    follow-up, right?

3    A.  No.  In general, not.  Sometimes I would learn about a

4    project or something that might come up that might get me to

5    think about something I should, you know, learn more about.

6    But in general, no.  They were just very -- again, they were

7    designed to just open up a line of communication with the

8    officers.

9    Q.  So your thinking was that you were pretty good at creating

10   rapport; that's what you said yesterday, right?

11   A.  Yes.

12   Q.  You thought you had a skill set that built rapport with the

13   people that were having these 30-minute one-on-ones with you,

14   right?

15   A.  Yes.

16   Q.  The one-on-ones were in your office, right?

17   A.  Yes.

18   Q.  Set up by your secretary, correct?

19   A.  Yes.

20   Q.  The people walked in, sat down and had a little chat with

21   you for 30 minutes, correct?

22        And you testified, on direct, did you not, that the chat

23   you had with Mr. Schulte stood out for you because he didn't

24   make eye contact, is that right?

25   A.  That is correct.

K2jWsch2                          Karen - Cross

1    Q.  So you had a person come in for 30 minutes and make no eye

2    contact with you, correct?

3    A.  Uh-huh.  Yes.

4    Q.  That was in November, sometime in November of 2015,

5    correct?

6    A.  Uh-huh.  Yes.

7    Q.  And you thought that was odd, correct?

8    A.  Correct.

9    Q.  And you did nothing to follow up on that oddity, is that

10   correct?

11   A.  I --

12   Q.  No, right?

13   A.  No, I didn't.

14   Q.  You didn't say to his boss:  Hey, you know, I had a meeting

15   with Mr. Schulte.  He made no eye contact.  What's going on

16   with him?  No?

17   A.  I don't recall.

18   Q.  Right.  Did you ask any of the other developers how things

19   were going in OSB as part of this one-on-one?

20   A.  As part of Josh's one-on-one?

21   Q.  Well, not specifically him, but just generally.

22   A.  I don't know if I had any other meetings with OSB officers

23   during that time.

24   Q.  Let's fast forward a little bit and ask you this.  Did

25   there come a time when you were talking to Bonnie and Bonnie

K2jWsch2                        Karen - Cross

1  told you that perhaps he didn't make eye contact because she

2  thought he had Aspberger's?  Do you recall that?

3  A.  We had that conversation when we were trying to figure out

4  how to handle the situation.

5  Q.  Right.  And it never occurred to you back then, in October

6  of 2015, that that might be the reason for the no eye contact,

7  correct?

8  A.  It was the first time --

9  Q.  Just yes or no.

10  A.  No, it had not occurred to me.

11  Q.  And you never, ever asked anybody anything about the

12  failure to make eye contact, correct?

13  A.  Correct.

14  Q.  OK.  Now, let's talk about information flow, about the

15  information that came to you.  OK?  You've already testified

16  that you had no idea about the October 2015 physical fight,

17  correct?

18  A.  Correct.

19  Q.  And when you learnt that there had been a physical fight,

20  you were very concerned, were you not?

21  A.  Certainly.

22  Q.  Right.  And what did you do to assuage that concern that

23  you had?

24  A.  So, as I indicated yesterday, by the time I became aware of

25  all of this, the threat management unit had already been

K2jWsch2                         Karen - Cross

1   contacted.

2   Q.  Right.  But the threat management unit had been contacted

3   because of Mr. Schulte and Amol, right?

4   A.  Correct.

5   Q.  Right.  But the physical fight was between whom?

6   A.  I don't know.

7   Q.  You don't know?

8   A.  I don't know.

9   Q.  But it was a physical fight that you were concerned about?

10  A.  By the time I found out about this, the threat management

11  unit investigation was already ongoing, so --

12  Q.  Right.  But the threat management investigation unit did

13  not involve that October 2015 physical fight, did it?

14  A.  I do not know.

15  Q.  You're concerned, correct?

16  A.  Yes.

17  Q.  You're upper management, correct?

18  A.  Yes.

19  Q.  This is a serious mission, correct?

20  A.  Yes.

21  Q.  You know of two grown men who have a physical fight,

22  correct?

23  A.  I learned it at that time, yes.

24  Q.  Right.  Whenever you learnt it, ma'am, the moment you

25  learnt of it, you were concerned, correct?

K2jWsch2                          Karen - Cross

1   A.  Yes.

2   Q.  And there was only one physical common denominator that

3   precluded you from talking to Mr. Schulte and Amol; that was

4   TMU, correct?

5   A.  Correct.

6   Q.  You took no steps at all to talk to the person, other

7   person involved in the physical fight, correct?

8   A.  Correct.

9   Q.  You directed no one to talk to that other person, correct?

10  A.  Correct.

11  Q.  You never checked to see if that person was OK, correct?

12  A.  By the time I learned about this --

13  Q.  Ma'am --

14  A.  -- it was months afterwards.

15  Q.  Months or years afterwards, did you check?

16  A.  No.

17  Q.  Did you assign someone to check?  Yes or no.

18  A.  No.

19  Q.  Did there come a point, ma'am, when you were told by either

20  Debra or someone else that there had been an incident on

21  February 29?

22  A.  February 29, I'm not familiar with the exact date.

23  Q.  OK.  And when Debra came to your office, your instruction

24  to her was, Get to the bottom of this, correct?

25  A.  I told her she needed to meet with all the off -- the

K2jWsch2                         Karen - Cross

1   officers involved and speak with the branch chief to figure out

2   what's going on.

3   Q.  Tell me, please, what was the conclusion Debra reached

4   after she spoke to Sean?

5   A.  So, to my memory, after Debra and I spoke about meeting

6   with everyone and engaging HR, etc., it was the end of the day.

7   By the time she was able to get back, the threat management

8   unit had already been engaged, so we were not able -- she was

9   not able to really implement the plan as we had talked about,

10  because when threat unit, management unit engaged, we had to

11  back off so that they could do their investigation.

12  Q.  You keep saying that, but my question was different, ma'am.

13  My question wasn't whether or not Debra engaged with

14  Mr. Schulte.  My question was not whether Debra engaged with

15  Amol.  My question was whether Debra engaged with their boss at

16  that time, who was Sean F.

17          MR. DENTON:  Objection, your Honor.

18          THE COURT:  Overruled.

19  BY MS. SHROFF:

20  Q.  Did she?

21  A.  I don't recall.

22  Q.  Did you ever say:  Hey, Sean, come up to my office so we

23  can talk about this.  I'm very concerned?

24  A.  Uh --

25  Q.  Just yes or no.

K2jWsch2                         Karen - Cross

1   A.  No.

2   Q.  Did you learn at any point in time that on March 1, Amol,

3   who was a project leader, took Mr. Schulte off of a project and

4   put another developer named David on the project?  Did you ever

5   learn that?

6   A.  No, I did not.

7   Q.  Now, did there come a point when you actually learned that

8   Sean had neglected to tell his immediate supervisor -- I

9   believe her name was Sunny -- about any of the issues that were

10  going on in OSB?  Did you just learn that fact?

11  A.  At the time this all --

12  Q.  Just yes or no, ma'am.

13  A.  Yes.

14  Q.  And you learnt that Sunny was completely in the dark and

15  had no knowledge from Sean as to what was happening, correct?

16  A.  That's not accurate.

17  Q.  OK.  By the time you became involved, am I correct, as

18  you've pointed out many times, that TMU was involved so neither

19  you nor anyone else interacted with Amol or Mr. Schulte?

20  Correct?

21  A.  When this first happened, that is correct.

22  Q.  OK.  Now, you also testified on direct that as part of your

23  job description, for lack of a better phrase, you interacted

24  with many different levels and groups outside of the branches

25  that you supervised, correct?

K2jWsch2                          Karen - Cross

1   A.  Correct.

2   Q.  And one of the functions of your job was to make sure,

3   wasn't it, to keep in mind the security of the base, is what

4   you called it?  Correct?

5   A.  Yes.

6   Q.  OK.  In 2015, did you come to learn that the entire DevLAN

7   system had gone down?

8   A.  I do not recall that.

9   Q.  Do you recall that somebody had failed to update or keep

10  updated the certificate of accreditation on DevLAN?

11  A.  I don't recall that specifically.

12  Q.  Do you recall that Mr. Schulte discussed with you the fact

13  that he was at that time in Las Vegas and was called about the

14  entire system going down?

15  A.  Josh never told me that.

16  Q.  OK.  Did anyone ever tell you that they had to contact the

17  one developer, who was in Las Vegas at a conference, to figure

18  out why all of DevLAN had gone down because somebody did not

19  upgrade its certificate or keep it current?

20  A.  That is not accurate.

21  Q.  OK.  Well, correct me.

22  A.  There's not -- there was not one person that would have had

23  to be contacted to resolve that problem.

24  Q.  Did you ever come to learn that in 2015 there had been a

25  lapse of licensing on Stash?

K2jWsch2                          Karen - Cross

1    A.  No.

2    Q.  Did you ever come to learn that it affected the entire

3    office?

4    A.  It might have affected the developers, but that's not the

5    entire office.

6    Q.  You don't think that the lack of having an updated license

7    that impacts all of the developers in OSB is an important

8    security issue?

9    A.  I do think that's important; it's just not the entire

10   office.

11   Q.  OK.  Who does the most mission-focused work in OSB?

12   A.  In OSB?

13   Q.  Yes.

14   A.  The developers.

15   Q.  So the most important work to the CIA's mission is done by

16   OSB, correct?

17   A.  No, that's not correct.

18   Q.  Oh, it's not?  The developers in OSB, right?

19   A.  There are other branches that would do equally as important

20   work.

21   Q.  OK.  Did you learn that Stash had gone down because nobody,

22   in whatever group you want to call it, had failed to update the

23   license?  Did you ever learn that?

24   A.  No, I did not.

25   Q.  And did you ever learn or were you ever told that the

K2jWsch2                         Karen - Cross

1   developers were at a conference in Las Vegas and had to be

2   called to fix it?

3   A.  I don't recall that.

4   Q.  Do you recall an employee named Justin Nichols?

5   A.  Yes.

6   Q.  Did you ever have a one-on-one with him when he mentioned

7   that to you?

8   A.  He never mentioned that to me.

9   Q.  Do you recall at any point in late 2015 and 2016 being told

10  that because the system had gone down this way, they should

11  hire a new person to work and keep the programs running?

12  A.  I don't recall that.

13  Q.  Why was Rufus hired?

14      Let me help you out.  Do you know who Rufus is?

15  A.  I do not.

16  Q.  Now, in describing your job, you said that you worked with

17  other parts of the CIA, right?

18  A.  I did, yes.

19  Q.  What is CIMC, by the way?

20  A.  That is the Counterintelligence Mission Center.

21  Q.  OK.  And what exactly do they do?

22  A.  They work counterintelligence issues.

23  Q.  Right.  And you coordinate with them, correct?

24  A.  I did not personally coordinate with them.

25  Q.  I don't mean ever personally.  I just mean in your job

K2jWsch2                         Karen - Cross

1    description.  You do not coordinate with them?

2    A.  I did not, at the -- no.

3    Q.  By the way, did you ever use DevLAN?

4    A.  I did not.

5    Q.  Do you know anything about DevLAN?

6    A.  I knew that it would -- DevLAN existed; that it was the

7    development environment for the hands-on developers.

8    Q.  What does that mean, development environment?

9    A.  That's where they would -- most or a lot of the work was

10   done.

11   Q.  And when you had this very high-level knowledge of DevLAN,

12   did you ever hear the phrase "Wild West" being used to describe

13   it?

14   A.  What?  What was that?  I didn't hear the word.

15   Q.  Wild.

16   A.  No, I never heard that.

17   Q.  You never heard that, right?

18   A.  No.

19   Q.  Did you ever hear your developers or people in OSB talking

20   about the weakness or insecurity of DevLAN?

21   A.  No.

22   Q.  You never heard anyone discuss the insecurities of DevLAN

23   even after the Snowden leaks; is that your testimony?

24   A.  I never heard that.  They never told that to me.

25   Q.  OK.  So if developers were talking after the Snowden leak

K2jWsch2                          Karen - Cross

1   and mentioned that your system was at similar risk, you never

2   heard that, correct?

3   A.  I do not recall any of that.

4   Q.  Now, you testified on direct that you remained disengaged

5   from Mr. Schulte because you had received input that

6   Mr. Schulte did not like you?  Is that -- you phrase it,

7   because I don't want to put words in your mouth.

8   A.  The way I remember it is that it was relayed to me that he

9   was uncomfortable with me.

10  Q.  And when that was relayed to you, was that related -- was

11  that told to you by one of your deputies?

12  A.  It was told to me by Mike and by Anthony.

13  Q.  OK.  So Anthony had been -- when Anthony had told you that,

14  Anthony had been in the job for, what, two or three months?  Or

15  less?

16  A.  A couple of months.

17  Q.  A couple of months, right?  And you don't remember, sitting

18  here today, when Mike told you that, correct?

19  A.  I don't remember.

20  Q.  And by the way, did you ever have a discussion with Mr.

21  Roche about that?

22  A.  Any discussion about Josh with Mr. Roche happened long

23  after I had left the assignment.

24  Q.  After you left the assignment?

25  A.  Yes.

K2jWsch2                        Karen - Cross

1   Q.  OK.  So during the time that you were still head of EDG,

2   you never spoke to Sean Roche about it, correct?

3   A.  Not that I recall.

4           MS. SHROFF:  OK.  Now, let's take a look at, if I

5   could, the memo of warning.  OK?  Could somebody pull it up for

6   me.

7           No.  That's the letter.

8           THE COURT:  What's the exhibit number, Ms. Shroff?

9           MS. SHROFF:  It's 1095, your Honor.

10          THE COURT:  Thank you.

11          MS. SHROFF:  Sorry about that.

12  Q.  Could you just take a look at this document?

13          MS. SHROFF:  And let's focus on the to-from and the

14  first paragraph.

15  Q.  Am I correct that you -- did you get a copy of this

16  memorandum at the time it was sent?

17  A.  As I recall, I did re- -- I did see a copy.

18  Q.  Did you see a copy after it was fully drafted, or did you

19  participate in its draft?

20  A.  I don't remember.

21  Q.  You don't remember, correct?

22  A.  I don't remember.

23  Q.  OK.  Is it fair to say that you had no personal knowledge

24  of whether or not Mr. Weber removed Mr. Schulte's privileges on

25  the OSB library on his own?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2jWsch2                          Karen - Cross

1   A.  Mr. Weber was directed to go through and review and clean

2   up accesses, and so, yes, I know that he was directed to

3   basically make sure that people had the appropriate accesses,

4   based on their jobs.

5   Q.  Who told you that?

6       I'm sorry.  Have you finished?  Just finish.

7   A.  I'm done.

8   Q.  Are you finished?

9   A.  Yes.

10  Q.  Who told you that?

11  A.  It was part of the discussion that we had with Mike S. and

12  with -- with Anthony.

13  Q.  The question was who told you that?

14  A.  Who told me what?

15  Q.  Who told you that that is what the assignment was to

16  Mr. Weber?  Who told you that?

17  A.  Mike would have been the one to tell me that.

18  Q.  Mike would have been the one?

19  A.  Yes.

20  Q.  Do you know?

21  A.  I don't recall specifically.

22  Q.  OK.  So let's try it again.  You did not tell Mr. Weber to

23  remove any of Mr. Schulte's privileges, correct?

24  A.  Correct.

25  Q.  You did not directly know who told Mr. Weber, correct?

K2jWsch2                         Karen - Cross

1   A.  Anthony would have told him.

2   Q.  I didn't ask you who would have told him, ma'am.  Who knows

3   who may have told him?  I'm only asking you if you know.

4   A.  I don't --

5   Q.  Do you know?

6   A.  I don't recall.

7   Q.  OK.  So is it that you don't actually recall or that you

8   don't know?  Which one is it?

9   A.  I don't recall.

10  Q.  OK.  Do you, sitting here today, even recall when was the

11  first time that Mr. Weber removed these privileges?

12  A.  No.

13           MS. SHROFF:  OK.  So let's just move down in this

14  memo.  Let's go to the second paragraph.

15  Q.  "As part of this process on early April 2016," correct,

16  you, sitting here today, have no personal knowledge of those

17  facts, correct?

18  A.  Of which facts?

19  Q.  Well, that something happened on early April of 2016.  You

20  never learn about this until well after April, correct?

21  A.  I'm sorry.  I don't understand your question.

22  Q.  OK.  I'll try it again.  Early April, you were not aware at

23  all about what Jeremy Weber is doing about accesses, correct?

24  A.  That is not accurate.

25  Q.  OK.  Tell me how it's not accurate.

K2jWsch2                              Karen - Cross

1    A.  I know that he was directed by his supervisors to go

2    through and clean up the accesses.

3    Q.  You don't know that, though, correct?  Nobody -- all you --

4    you don't know that.  There's no memo to you saying that,

5    correct?

6    A.  I don't believe there's a memo.

7    Q.  There's no email to you saying that, correct?

8    A.  I don't believe there's an email.

9    Q.  There's no contemporaneous note, correct?

10   A.  No.

11   Q.  In fact, in early April, you have no involvement; you're

12   not engaged in the process at all, correct?

13   A.  I'm getting regular updates from my deputy and from

14   Anthony.

15   Q.  You are getting regular updates from your deputy about

16   somebody changing accesses on the OSB libraries?

17   A.  That they were in the process of going through and cleaning

18   up the accesses, I was made aware of that.

19   Q.  Just they were cleaning up accesses; that's the high-level

20   information you have?

21   A.  Yes.

22   Q.  OK.  So at that high-level information, you still don't

23   know if Jeremy Weber was ever authorized prior -- not supported

24   in his decision -- was authorized prior to the time to remove

25   access, correct?

K2jWsch2                          Karen - Cross

1    A.  I don't know.

2    Q.  Exactly.  Do you recall who Amol is?

3    A.  Yes.

4    Q.  Have you spoken to --

5              MS. SHROFF:  You can take that down for now.

6    Q.  Have you spoken to Amol during your time when you were head

7    of EDG?

8    A.  Yes.

9    Q.  Did you ever sit down and have a one-on-one with Amol?

10   A.  Yes.

11   Q.  Do you recall your one-on-one with Amol?

12   A.  No.

13   Q.  Do you recall if he told you what his goals were at the

14   CIA?

15   A.  I don't recall.

16   Q.  Do you recall whether or not he was interested and devoted

17   to being a coder?

18   A.  I know he had a number of interests and had done some --

19   some different types of coding things.  He had a different

20   background.  But I don't recall anything specific.

21   Q.  Do you recall that he was interested in management and not

22   coding?

23   A.  No.

24   Q.  Do you recall if he wanted to be part of the leadership and

25   not remain a coder?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2jWsch2                         Karen - Cross

1    A.  I do not recall that.

2    Q.  Do you recall ever saying to someone, Before I move them,

3    let me evaluate the skill sets of these two individuals?  You

4    testified to that, right?

5    A.  Yes.  We had to determine their skill sets to figure where

6    they would fit well.

7    Q.  OK.  And in determining their skill sets, did you ask Amol,

8    Where do you see yourself going so we can place you properly?

9    A.  No, we did not have a conversation.

10   Q.  And did you have a conversation with Sean about that as to

11   what Amol wanted to see for his future before you placed him?

12   A.  No, I don't recall doing that.

13   Q.  So how did you determine what his skill set was if you

14   didn't talk to Amol and you didn't talk to Sean?  Or was there

15   anybody I'm missing in this layer of hierarchy, because I don't

16   know your hierarchy well?

17   A.  So, again, my conversations were with my deputy and with

18   the acting division chief, Anthony, who was working with the

19   branch, and we did need to have them identify what skills the

20   officers had --

21   Q.  Let's go --

22   A.  So that was relayed.

23   Q.  Sorry.  That was what?

24   A.  That was relayed up the chain.

25   Q.  And Anthony was in that job for three months, at most --

K2jWsch2                              Karen - Cross

1    not even, correct?

2    A.  Anthony, yes.

3    Q.  Right.  So let's put him aside for a minute.  Your deputy

4    was Mike S.?

5    A.  Yes.

6    Q.  He didn't know what their skill sets were, correct?  He did

7    not work with them directly, right?

8    A.  He did not work with them directly.

9    Q.  OK.  Let's put them aside.  How did you -- let's back up.

10   How did you figure out what their skill sets were?

11   A.  So, identified by their branch manager as to what their

12   skill sets and possibilities were, that's how we would know.

13   Q.  Who was the branch manager?

14   A.  That was -- had been Sean, was Sean.

15   Q.  But you said you didn't talk to Sean?

16   A.  I did not directly.

17   Q.  You did not directly, but you participated and agreed that

18   the move should take place and that these were the correct

19   units to move them to?

20   A.  Yes.

21   Q.  Right.  So in essence, you made decisions based on the

22   information you were given, correct?

23   A.  Correct.

24   Q.  If the information was accurate, you made the correct

25   decision, correct?

K2jWsch2                         Karen - Cross

1    A.  If the information's accurate.

2    Q.  And if the information is inaccurate, you made the wrong

3    decision, correct?

4    A.  Could -- that's possible.

5    Q.  OK.  I'll take "that's possible."

6        And is it fair to say that these are subjective evaluations

7    of skill sets?

8    A.  No.  If somebody has no skill set to apply to a job, they

9    wouldn't be able to function, so it's not subjective.  If they

10   don't have the skills, they can't do the job.

11   Q.  Well, everybody in OSB has a base level of skill set,

12   right?

13   A.  Yes, but not -- this is a very complicated business, lots

14   of narrow, technical areas, so you may have somebody that is

15   very good at doing one particular type of thing, but they have

16   no experience or exposure doing another type of thing.  So --

17   and if you just move somebody over there, they -- if they don't

18   have any skill set in that area, they can't do the job and

19   they'd have to basically learn something new.

20   Q.  Are you finished?

21   A.  Yes.

22   Q.  OK.  So in determining these skill sets, your testimony --

23   I just want to make sure -- is you relied on Mike S., correct?

24   A.  Yes.

25   Q.  And Anthony, correct?

K2jWsch2                              Karen - Cross

1    A.  Yes.

2    Q.  And you did not have any personal knowledge about the skill

3    set of Amol, correct?

4    A.  Just at a high level.

5    Q.  Right.  And the same for Mr. Schulte, correct?

6    A.  Correct, at a high level.

7    Q.  Except that you knew that he couldn't make eye contact,

8    correct?

9    A.  Correct.

10          MS. SHROFF:  Now, let's go to the letter of warning.

11   Q.  Did you draft the letter of warning?

12   A.  I was one of the primary writers, yes.

13   Q.  OK.  And you testified that this is a serious step,

14   correct?

15   A.  Correct.

16   Q.  It is a serious thing to give to an employee of the CIA, or

17   for that matter, any employee, correct?

18   A.  Correct.

19   Q.  And you wanted to be accurate, correct?

20   A.  Correct.

21   Q.  You wanted the facts to be accurate, correct?

22   A.  Correct.

23   Q.  And you thought it was important for Mr. Schulte to know

24   that you had the facts correct, right?

25   A.  Correct.

K2jWsch2                          Karen - Cross

1   Q.  Because you wanted to appear objective, correct?

2   A.  Correct.

3   Q.  You wanted him to believe you were giving him a fair shake,

4   correct?

5   A.  We were trying to be as fair as we possibly could.

6          MS. SHROFF:  OK.  Well, let's start with the bottom of

7   page 1 of 2.

8   Q.  Just take a minute and let me know when you're done reading

9   it.  All right?

10  A.  OK.

11  Q.  Who wrote this line, "The ISB member did not implement a

12  privilege change at this time"?

13  A.  I don't know -- I don't recall who wrote each specific

14  sentence in this letter.

15  Q.  OK.  Who verified that each specific sentence was accurate?

16  A.  I would have had Anthony check.

17  Q.  You had Anthony check?

18  A.  I would --

19  Q.  Is Anthony --

20  A.  -- ask Anthony to go through, is this accurate.

21  Q.  So Anthony had reviewed this letter of warning, correct?

22  A.  Yes.

23  Q.  He had told you it was accurate, correct?

24  A.  Correct.

25  Q.  Because obviously if he had told you it was inaccurate, you

K2jWsch2                      Karen - Cross

1    would never have presented it to Mr. Schulte, correct?

2    A.  Correct.

3    Q.  And then you presented this to Mr. Schulte, correct?

4    A.  Correct.

5    Q.  Was Anthony at the meeting?

6    A.  No.

7    Q.  But he verified the facts in the memo, correct -- I mean in

8    the letter.  It's a letter, correct?

9    A.  Correct.

10   Q.  OK.  And you testified that you then scratched out "The ISB

11   team member did not implement a privilege change at this

12   point," correct?

13   A.  Correct.

14   Q.  Let me ask you something.  When do you make this

15   scratch-out, after the meeting is finished or --

16   A.  We did it in the meeting with Josh and our HR person and

17   Mike sitting in the room.  I did it right as the meeting was

18   happening.

19   Q.  OK.  And it wasn't like you had a choice in doing this,

20   right?

21   A.  A choice in scratching --

22   Q.  Yes.

23   A.  =This out?

24   Q.  Yes.

25   A.  I could have elected not to make that change.

K2jWsch2                        Karen - Cross

1    Q.  How?

2    A.  I wouldn't have done it.

3    Q.  How could you not change something that is wholly

4    inaccurate?

5    A.  It's not wholly inaccurate.

6    Q.  Really?  Let me show you.

7            MS. SHROFF:  Can I have an exhibit number for this?

8    Q.  I'm just going to ask that you take a look at this

9    document.  OK?  It's 3511-45.

10           MS. SHROFF:  Don't publish it yet.

11           I'm just going to mark it for now, your Honor --

12           THE COURT:  All right.

13           MS. SHROFF:  -- as Defense Exhibit I.

14           THE COURT:  All right.  Defense I.  Defense I is

15   3511 --

16           MS. SHROFF:  -- 45.

17           THE COURT:  -- 45.  OK.

18           MS. SHROFF:  Your Honor, would this be a good time to

19   break?  That way I could --

20           THE COURT:  Let's finish this line of questioning, and

21   then we'll take our break.

22           MS. SHROFF:  I need to admit this in, and I need a

23   break.

24           THE COURT:  All right.  We'll take our morning recess

25   now, ladies and gentlemen.  We'll resume at quarter after.

K2jWsch2                          Karen - Cross

1                    (Jury not present)

2                    THE WITNESS:  What do I do with this?

3                    THE COURT:  You can step down.

4                    THE WITNESS:  Do I leave this here?

5                    THE COURT:  Just leave it there.

6                    See you at 11:15.

7                    (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2J3SCH3

1                (In open court; jury not present)

2                THE COURT:  Yesterday, I reviewed the letter from the

3     government of February 17 dealing with Michael, and I asked

4     that the author of the CIA memorandum, which was attached to

5     the memo of February 12, that the author be identified and his

6     name be produced to the defendant.

7                I also received last night the files, the security

8     file and the investigative file, some 270 pages of materials.

9     I've read the files last night, and I direct that the security

10    file doesn't have to be produced, but the investigative file

11    should be produced to the defendant.

12               MR. LAROCHE:  Yes, your Honor.

13               THE COURT:  Yes?

14               MR. LAROCHE:  I just said yes, your Honor.

15               THE COURT:  Thank you.  Is Karen available?

16               MR. LAROCHE:  Yes, your Honor.

17               THE COURT:  Okay, David.

18               (Continued on next page)

19

20

21

22

23

24

25

K2J3SCH3                        Karen - Cross

1                (Jury present)

2                THE COURT:  Ms. Shroff.

3                MS. SHROFF:  Thank you, your Honor.

4     BY MS. SHROFF:

5     Q.  So when we broke you said -- and correct me if I'm wrong --

6     that you didn't have to cross that line out, correct?

7     A.  Correct, I didn't have to.

8     Q.  And I said why not.  It does not seem to be truthful or

9     accurate.  Correct?

10    A.  I didn't hear you -- I don't recall you saying that.

11    Q.  Okay.  I'm saying it now.  That statement, "The ISB team

12    member did not implement a privilege change at this point."  It

13    was incorrect, correct?

14    A.  That was what Josh told us in the meeting.

15    Q.  Well, he didn't just tell you that in a meeting, he then

16    told you that in an e-mail, correct?

17    A.  The e-mail that you provided me just now?  Yes.

18    Q.  So let's take a look at that e-mail, if we can pull that up

19    from bottom up.  Could you read that for me.

20    A.  "Could a Stash admin grant me admin privileges for the

21    project Brutal Kangaroo.  I seem to have lost access to this

22    project."

23    Q.  Who is it sent to?

24    A.  It was sent to the ISB, which is the folks that did our

25    support or IT support.

K2J3SCH3                        Karen - Cross

1    Q.  They did more than IT support, right?  They did more than

2    IT support, correct?

3    A.  Well, they managed the system.

4    Q.  Right.  They managed access, correct?

5    A.  Correct.

6    Q.  Okay.  So he's sending it to everyone in ISB, correct?

7    A.  Yes.

8    Q.  He's not sending it to one special friend that's going to

9    backdoor access to him, correct?

10   A.  Correct.

11   Q.  Okay.  And it's sent on which e-mail?  I don't know how

12   many e-mail systems CIA has.

13   A.  This is our primary e-mail system.

14   Q.  So it's not anything nefarious, no gmail, no backdoor

15   throwaway e-mail, correct?

16   A.  Correct.

17   Q.  Okay.  And what is the response?

18   A.  He received a response from David.

19   Q.  Uh-huh.

20   A.  That said "completed."

21   Q.  Okay.  And let's just move up.  And now he sends the

22   e-mail -- by "him" I mean Mr. Schulte, correct?

23   A.  Correct.

24   Q.  He sends it to you.  Correct?

25   A.  Correct.

K2J3SCH3                         Karen - Cross

1   Q.  Mike S., correct?

2   A.  Yes.

3   Q.  Susan?

4   A.  Yes.

5   Q.  And he says -- read it for us, would you.

6   A.  He says, "Here is proof that I didn't deliberately talk to

7   a separate ISB member after initially being refused access to

8   the BK tool."

9        You want me to keep going?

10       "I sent ISB the request on 5/26 at 12:39 p.m., Dave

11  promptly responded at 1:04 p.m. saying he had completed the

12  action... then Tim responded at 1:15 p.m. requested branch

13  chief approval, at which point I had already been given access

14  to BK."

15  Q.  Does he leave out anybody on the cc that was in the

16  meeting?

17  A.  That was in the -- which meeting?

18  Q.  In your letter of warning meeting.

19  A.  I think that was who was in the room, yes.

20  Q.  He includes everyone, right?

21  A.  I think so, yes.

22  Q.  If we can just move up on that e-mail chain.  And who sends

23  you an e-mail now?

24  A.  Anthony sent an e-mail to -- oh.  No.  Mike sent an e-mail

25  to Anthony.

K2J3SCH3                         Karen - Cross

```
 1    Q.  Okay.  And Mike is who?

 2    A.  Mike is my deputy.

 3    Q.  Right.  That's Mike S., right?

 4    A.  Correct.

 5    Q.  There's a lot of Mikes floating around.

 6    A.  Mike is my deputy, correct.

 7    Q.  And he says what?

 8    A.  He says, "Hmm.  This does indicate that what he is saying

 9    is true."

10    Q.  Okay.  So that's your deputy.  You rely on your deputy,

11    correct?

12    A.  Correct.

13    Q.  He is an honorable man, right, according to you?

14    A.  Correct.

15    Q.  Wouldn't get something wrong, correct?

16    A.  He would be -- he would work very hard not to get anything

17    wrong.

18    Q.  Right.  And so, going back to the letter of warning.

19    A.  Yes?

20    Q.  Tell me, what choice did you have in canceling that line?

21    A.  Can you go -- what's the date on the letter of warning?

22    Q.  What is the date?

23    A.  Yes.

24    Q.  6/22/2016.  Take a look at the back of -- if you flip the

25    page over.  There you go.
```

K2J3SCH3                          Karen - Cross

1   A.  6/22/2016.  Okay.  With that -- the discussion that we had

2   in the room, and getting that clarification, the right thing to

3   do was to edit the document.

4   Q.  That's not what I asked.  I asked you what choice did you

5   have in taking that out.  It was factually wrong, correct?

6   A.  Yes.

7   Q.  It was inaccurate, correct?

8   A.  Correct.

9   Q.  There was no reason that you had to not scratch it out.

10  A.  Correct.

11  Q.  It wasn't to placate Mr. Schulte, correct?

12  A.  It was to get the facts correct.

13  Q.  Right.  In fact, it had nothing to do, as you told

14  Mr. Denton on direct, to try to be moderate, correct?

15  A.  That's not correct.

16  Q.  Really?

17  A.  It was trying to listen and make sure that I took all that

18  feedback and input, and get his facts straight.

19  Q.  Feedback?

20  A.  That's part -- yes.  His comments, I listened to them, and

21  took it and made those edits.

22  Q.  Do you consider somebody correcting a factually inaccurate

23  statement a comment?

24          THE COURT:  Was that a question?

25          MS. SHROFF:  Yes.

K2J3SCH3                          Karen - Cross

```
 1              THE COURT:  Okay.  Do your best to answer.
 2   A.  Yes, it is a comment.
 3   Q.  It is a comment according to you.  This is a letter of
 4   warning, correct?
 5   A.  Correct.
 6   Q.  You are going to put it in someone's personnel file,
 7   correct?
 8   A.  Correct.
 9   Q.  It is going to remain there for a year, correct?
10   A.  Correct.
11   Q.  It's going to have repercussions for him, correct?
12   A.  If there is no further problems, it would just take -- come
13   out of his file and that would be the end of it.
14   Q.  No.  For a year there would be a repercussion of having a
15   letter in his file, correct?
16   A.  Correct.
17   Q.  A person gets a letter of warning might quit their job,
18   correct?
19   A.  I can't make that conclusion.
20   Q.  I said "could."
21   A.  It's possible.
22   Q.  A person who gets that letter of warning could get
23   depressed, correct?
24   A.  It's possible.
25   Q.  Right.  So, a factual inaccuracy, according to you, is
```

K2J3SCH3                        Karen - Cross

1   simply a comment.  Is that your testimony?

2   A.  Yes.

3   Q.  Okay.  Let's keep going.  The next sentence that you

4   changed on the same day, "You subsequently repeated the request

5   for administrative privileges to Brutal Kangaroo, this time in

6   person to a different ISB team member, and the change was

7   made."

8          Is that Mr. Schulte just commenting to you that, hey,

9   my comment is, like, you know, this is wrong?

10  A.  His comment was that it was wrong, so I took action and

11  modified the paragraph.

12  Q.  And your position is that that's merely a comment, correct?

13  A.  I'm not sure -- of your use of the word, but he's made a

14  statement, I acted on his statement.

15  Q.  Well, he didn't just make a statement.  He came to the

16  meeting, correct?

17  A.  Correct.

18  Q.  He told you you were wrong, correct?

19  A.  Correct.

20  Q.  He told you that something was factually inaccurate in the

21  letter of warning, correct?

22  A.  Correct.

23  Q.  Then he went back to his desk, correct?

24  A.  I don't know what he did after he left the room.

25  Q.  Well, you do know at some point he fished out the e-mail

1    and sent it to all of you to make sure you knew that he had

2    taken the issue seriously, correct?

3    A.  Yes, he provided this information after the meeting.

4    Q.  Right.  And it was obviously, if he provided the

5    information to you, it was more than merely a comment, correct?

6    A.  It was still -- it was a comment.  It was a statement he

7    made.

8    Q.  Okay.  Let's turn to paragraph 4.  You see the two

9    asterisks that you testified to before?

10   A.  There is one on paragraph 4.  Yes.

11   Q.  Right, and one on paragraph 6, correct?

12   A.  Yes.

13   Q.  Right.  And you testified, and I won't belabor this, that a

14   letter of warning is a serious document, right?

15   A.  Yes.

16   Q.  Did you write down why Mr. Schulte believed those

17   statements to be inaccurate?

18   A.  Can we go to the bottom of the document?

19   Q.  Sure.

20   A.  No.

21          MS. SHROFF:  You can take that down.

22   Q.  You testified on direct that you disagreed -- you know

23   what.  I withdraw that.

24          Let me ask you this:  You spoke to the FBI about this

25   case, correct?

K2J3SCH3                          Karen - Cross

1     A.  Yes.

2     Q.  Right.  And were you ever told that the lawyers from

3     Mr. Schulte's team wanted to speak with you?

4     A.  Yes.  Much later.

5     Q.  Okay.  And much later, did you say, yes, I will talk to

6     them, or no, I don't want to talk to them?

7     A.  I said no, I don't want to talk to them.

8     Q.  But you talked to the FBI, correct?

9     A.  I did.

10    Q.  And as part of your conversations with the FBI -- did they

11    take place at the CIA offices, by the way?

12    A.  The meetings with the FBI?  Yes.

13    Q.  When you talked to the FBI, you discussed with them the

14    facts of this case, correct?

15    A.  I told them everything that I knew.

16    Q.  Right.  And they asked you questions about Mr. Schulte,

17    correct?

18    A.  Correct.

19    Q.  And there were some questions that you could not answer,

20    correct?

21    A.  I don't recall, but that's probably true.

22    Q.  And you directed them, did you not, and I can show you the

23    302 if you want, 3510-01.

24            MR. DENTON:  Is there a question?

25            THE COURT:  We'll building to it.

K2J3SCH3                         Karen - Cross

1   Q.  You told them, did you not, in response to certain

2   questions that they had, that you couldn't answer them but that

3   maybe Anthony could.  Correct?

4   A.  I don't recall the specifics that you're referring to, but

5   that's possible.

6   Q.  Let me see if I can refresh your recollection.

7              MS. SHROFF:  3510-01.

8              THE COURT:  Thank you.

9   Q.  If you could just take a look at the last page, that might

10  be quicker.

11  A.  Okay.

12  Q.  Okay?  You recommended a whole slew of people that the FBI

13  could talk to, correct?

14  A.  Where are you?

15  Q.  The third paragraph from the bottom.

16  A.  Yes.

17  Q.  Okay.  And you suggested that they talk to Liz, correct?

18  A.  Correct.

19  Q.  And Anthony, correct?

20  A.  Correct.

21  Q.  And Sean F., correct?

22  A.  Correct.

23  Q.  And Mr. Weber, correct?

24  A.  Correct.

25  Q.  And to the FBI, you only described Mr. Weber, correct?

K2J3SCH3                    Karen - Cross

1    A.  Only described Mr. Weber?

2    Q.  Right.

3    A.  I don't recall.

4    Q.  It's right there.  Take a look if the next line refreshes

5    your recollection.

6    A.  Okay.

7    Q.  You didn't describe the positives of Liz, correct?

8    A.  I did not discuss the managers, no.

9    Q.  You did not discuss Anthony, correct?

10   A.  Correct.

11   Q.  And you did not discuss Sean F., correct?

12   A.  Correct.

13   Q.  But you did discuss Mr. Weber, correct?

14   A.  Correct.

15   Q.  And you described him as very strong technically -- not

16   "very," I take that back.

17          You said strong technically, correct?

18   A.  Hmm-hmm.

19   Q.  You described him as very mature, correct?

20   A.  Correct.

21   Q.  Then you said, and could provide the FBI with a good optic,

22   correct?

23   A.  I don't remember the choice of words, but that's accurate.

24   Q.  Okay.  And by good optic, what did you mean?

25   A.  Again, I don't remember the specific choice of words, but

1   my -- I knew that Jeremy had been working on the accesses and

2   setting up a lot of the control base and the structure of how

3   we were managing the code libraries, so he was hands on and

4   down in the details in a way that the management chain would

5   not be.

6   Q.  Management chain?  You're saying that Sean F. would not be

7   involved in an issue about access?

8           Isn't access the most important thing for the CIA?

9   A.  He would certainly be involved.

10  Q.  Right.  And he would be hands on because he is the

11  immediate boss, correct?

12  A.  He would not have the same amount of time in the actual

13  code on the computer that Jeremy would have.

14  Q.  He is the supervisor of Jeremy, correct?

15  A.  Correct.

16  Q.  He is the person in management, correct?

17  A.  Correct.

18  Q.  Mr. Weber is certainly not management, correct?

19  A.  Correct.

20  Q.  And you would want management involved in an issue of

21  access, correct?

22  A.  I would --

23  Q.  Correct?

24  A.  Yes.

25  Q.  Okay.  Now let me direct your attention to January 13.

K2J3SCH3                          Karen - Cross

1    This is a little bit more recent for you.

2    A.   January 13?

3    Q.   2020.

4    A.   Okay.

5    Q.   Did you recall meeting with the FBI then?

6    A.   They were in the room, yes, I think.

7    Q.   Do you recall telling them about Mr. Weber again, that in

8    your opinion, Mr. Weber was one of the go-to guys in OSB;

9    that's your opinion, correct?

10   A.   I don't recall the statement at that time.  But, that is

11   something I would say.

12   Q.   Okay.  And you told that to the FBI, correct?

13   A.   Like I said, I don't recall that exact statement.

14   Q.   And do you recall singling Mr. Weber out as the only other

15   employee about whom you spoke positively?

16   A.   I don't recall that.

17   Q.   Do you recall telling the FBI that you considered Mr. Weber

18   to be a proactive employee, correct?

19   A.   I have used those words to describe him in the past.

20   Q.   Right.  And he certainly was one of the people on your TAC

21   team, correct?

22   A.   Yes.

23   Q.   Right.  And you told the FBI that you considered him one of

24   the go-to people in OSB, correct?

25   A.   That's true.

K2J3SCH3                          Karen - Cross

1    Q.  Right.  That's your opinion, correct?

2    A.  Correct.

3    Q.  Right.  And isn't it fair to say that in describing or

4    talking about the developers, the only developer you singled

5    out to the FBI was Mr. Weber, correct?

6    A.  I don't recall.

7    Q.  Okay.  Well, let me show you 3510-11.

8         (Pause)

9    A.  Okay.

10   Q.  Does that refresh your recollection at all?

11   A.  Yes.

12   Q.  Okay.  And I'm correct, right?  He's the only one whose

13   praise you sing to the FBI, correct?

14   A.  He's the only officer mentioned here.

15   Q.  And he's mentioned in a positive way, correct?

16   A.  Correct.

17   Q.  You describe him as I alluded to before, correct?

18   A.  Correct.

19   Q.  You can put that aside if you want.

20        Now, I'm not going to spend a lot of time on this.  Do you

21   remember with Mr. Denton talking about desk moves?

22   A.  Yes.

23   Q.  Right.  You said there was no such thing as an intern desk

24   at the CIA?

25   A.  Correct.

K2J3SCH3                        Karen - Cross

1    Q.   There are desks on which interns are seated, correct?

2    A.   We have summer students.

3    Q.   Right.

4    A.   That will, when they're there for the summer, will sit in a

5    desk.

6    Q.   Right.  And that's generally what they refer to as the

7    intern desk, right?

8    A.   Well, there's no specific desk for that purpose.

9    Q.   Of course not.  True that.  But the question is when an

10   intern sits at a desk in an office, you would generally call

11   that the intern desk, right?

12   A.   When they're sitting there.

13   Q.   Only when they're sitting there?

14   A.   Another time an officer can use that as their desk.

15   Q.   But you just don't know, right?

16   A.   Don't know what?

17   Q.   That that's what happens.  You don't know if the intern

18   desk is used or not used or left empty, correct?

19   A.   Any particular desk could be used for any officer or any

20   summer student.

21   Q.   Okay.  Now, do you know at the time that when Mr. Schulte

22   was moved to that desk, people who walked by said to him, "Hey,

23   heard you got demoted to be an intern sitting on the intern

24   desk."  Did anybody tell you that?

25   A.   No.

K2J3SCH3                          Karen - Cross

1   Q.   Okay.  By the way, you talked about the timetable for the

2   move, correct?

3   A.   Which timetable?  For which move?

4   Q.   For moving desks, right?  You were shown all of those

5   e-mails of Mr. Schulte asking for his desk move situation to be

6   put in writing, correct?

7   A.   Yes.

8   Q.   And you then sent out an e-mail or somebody sent out an

9   e-mail, I've forgotten who, saying these are the official desk

10  moves, correct?

11  A.   Yes.

12  Q.   Before that e-mail was sent out, did anyone tell you that

13  there had been a confusion as to when Mr. Schulte was supposed

14  to be moved?

15  A.   No.  I don't recall that.

16  Q.   Do you recall at all finding out that on the dates of the

17  move, or the purported move, Mr. Sean F. was in and out of the

18  office?  Do you recall that?

19  A.   No, I don't recall that.

20  Q.   Do you recall being told that Sean F. had told Mr. Schulte

21  that he had to move, but that he had left the timetable open?

22  Do you recall that?

23  A.   I don't recall that.

24  Q.   Did Mr. Weber not tell you that?

25  A.   I don't remember speaking with Mr. Weber about desk moves.

K2J3SCH3                      Karen - Cross

1    Q.  Okay.  And do you recall knowing or learning at any point

2    that because Mr. Sean F. had not set a date for Mr. Schulte,

3    there was no rush to move?

4    A.  I remember that they were told to move.  I don't remember a

5    discussion on the timetable.

6    Q.  Right.  And everybody knew he didn't want to move anyway,

7    right?

8    A.  I did not know that firsthand.

9    Q.  You didn't know that firsthand, that he didn't want to move

10   out of OSB?  I mean, you didn't know that?

11   A.  This move was not out of OSB.  Which move are we talking

12   about?

13   Q.  I'll get to the OSB move first.  Let's just talk about the

14   separation of the desks.

15           You never heard that he didn't want to move desks?

16   A.  I eventually did, yes.

17   Q.  You eventually heard, right?

18   A.  Yes.

19   Q.  He didn't want to move, correct?

20   A.  That was my understanding yes.

21   Q.  He felt he had lodged a complaint, correct?

22   A.  Thought he had lost what?

23   Q.  Lodged a complaint, correct?  He had complained, correct?

24   A.  Complained about Amol?  Is that what you are talking about?

25   Q.  Yes.

K2J3SCH3                          Karen - Cross

1    A.  Yes.

2    Q.  Right.  And he didn't want to move because he thought he

3    was in the right, correct?

4    A.  That was my understanding.

5    Q.  Right.  And he told people that I don't want to move,

6    correct?

7    A.  That was my understanding.

8    Q.  Right.  And then he said -- do you know if he was even told

9    a date by which to move?

10   A.  I do not recall.

11   Q.  Okay.  And did there come a time eventually when there was

12   an e-mail sent about the move?

13   A.  Yes, yes.

14   Q.  And why was that e-mail sent, by the way?

15   A.  Because the move -- the moves needed to happen.  They

16   hadn't been done.  We needed to make sure they were done.

17   Q.  Okay.  And tell me, is there something wrong with somebody

18   asking you to put a move in an e-mail?

19   A.  No.  There's nothing wrong.

20   Q.  There's nothing wrong.  You want to do something official

21   to me in a job, put it in writing.  Nothing odd about that,

22   right?

23   A.  Correct.

24   Q.  Even if you'd never seen that before in your career, it was

25   still fine to ask somebody to put something in writing.

1    A.  It was unusual, but fine.

2    Q.  What's so unusual about asking someone to send you an

3    e-mail confirming something that is being done to you?

4    A.  Usually it doesn't take an e-mail to have somebody move

5    their desk.

6    Q.  Well, that's not what he was saying, right?  He wasn't

7    saying that is the only way he could move the desk.  He wanted

8    something in writing, correct?

9    A.  Right.

10   Q.  Right.  What's so unusual about that?  That's what I'm

11   asking you.

12   A.  Just doesn't happen very often.  But he asked for it, so an

13   e-mail was sent.

14   Q.  Right.  But the e-mail was only sent after there was a

15   consensus amongst all of you that that was highly unusual,

16   correct?

17   A.  I don't recall the specific conversation.

18   Q.  Okay.  Is it fair to say that after you learned of the

19   WikiLeaks leak, you did not engage with anyone at OSB, correct?

20   A.  Correct.

21   Q.  You didn't reach out to anyone, correct?

22   A.  Correct.

23   Q.  You were out of town at that time, correct?

24   A.  I was out of town when the news hit.

25   Q.  Right.

1  A.  Correct.

2  Q.  Right.  And then you just waited until somebody contacted

3  you, correct?

4  A.  Correct.

5          MS. SHROFF:  I have nothing further.

6          THE COURT:  Mr. Denton.

7          MR. DENTON:  Just very briefly, your Honor.

8  REDIRECT EXAMINATION

9  BY MR. DENTON:

10  Q.  Ma'am, do you remember Ms. Shroff asking you some questions

11  about a physical fight you learned about in the office?

12  A.  Yes.

13  Q.  You said something about learning about it while TMU had an

14  investigation ongoing; is that right?

15  A.  Correct.

16  Q.  Why was it significant that TMU had an investigation

17  ongoing?

18  A.  Well, one, it's -- I never had an incident that involved

19  TMU in my career.  So it was -- it was a first time I had

20  encountered it or anybody in my management team had

21  encountered.  It's very serious.  It's, like I said, one of the

22  more extreme actions.  And there are rules about how to engage

23  or not to engage at that time.

24          So, we were doing our best to the figure out and how

25  to handle all that.

K2J3SCH3                    Karen - Redirect

1   Q.   Does TMU investigate concerns about physical violence with

2   respect to employees?

3   A.   Yes, that's one of the things they look at.

4   Q.   Would that include a fight in the office?

5   A.   Yes, it would.

6   Q.   Did you learn about the fight from the unit that

7   investigates that kind of thing?

8   A.   No.  I don't recall learning it from them.  I heard about

9   it as the management team was relaying information to me about

10  that.

11  Q.   Do you remember Ms. Shroff asked you some questions about

12  things like software licenses expiring and things like that?

13  Do you remember there was a whole series of questions?

14  A.   Yes.

15  Q.   Did the defendant ever e-mail you about issues like that?

16  A.   I don't recall ever seeing an e-mail to me from Josh

17  regarding anything like that.

18  Q.   What about a phone call; did he ever call you to raise

19  those kinds of issues?

20  A.   No.

21  Q.   Ever swing by your office to talk about them?

22  A.   No.

23  Q.   Ever raise a security concern with you in any form

24  whatsoever?

25  A.   No.

K2J3SCH3                      Karen - Redirect

1   Q.  I think you testified also about the access changes that

2   were part of this whole process; is that right?

3   A.  Correct.

4   Q.  Were those a security concern?

5   A.  Yes.

6   Q.  When you learned about that security concern, did you take

7   steps to increase security?

8   A.  Yes.  We talked with -- I talked with my deputy, with the

9   acting division chief, Anthony, and we said, look, we need to

10  really take an assessment of what the situation is, and figure

11  out what we should do in order to make sure things are

12  tightened up and as controlled as we could make them.

13  Q.  Is it fair to say you try to address security concerns when

14  they're raised to you?

15  A.  Yes, that would be accurate.

16          MR. DENTON:  Ms. Hurst, can we put up Government

17  Exhibit 1094 for a moment, please.

18  Q.  Do you remember Ms. Shroff asked you a whole series of

19  questions about this here?

20  A.  Yes.

21  Q.  And the changes that you made at the bottom; is that right?

22  A.  Yes.

23  Q.  Was the only issue related to this the fact that the

24  defendant had requested access to the project?

25  A.  It's -- the policy and the approach for requesting access,

K2J3SCH3                         Karen - Redirect

1   and the approvals that needed to happen, if things were -- as I

2   understood them a little bit out of order.  And plus, we had

3   already, you know, talked about this so much that, yes, it was

4   not consistent with what the directions had been.

5            MR. DENTON:  So, if we can look at the next page,

6   Ms. Hurst, and put up paragraph 4.

7   Q.  Do you remember Ms. Shroff blowing this paragraph up for

8   you?

9   A.  Yes.

10  Q.  And she asked you some questions about it?

11  A.  Yes.

12  Q.  And do you see where it describes "You revoked the

13  administrative privileges of the EDG/AED/OSB officer assigned

14  responsibility for Brutal Kangaroo"?

15  A.  Right.

16  Q.  Do you remember Ms. Shroff showed you some e-mails that the

17  defendant had forwarded you?

18  A.  Hmm-hmm.

19  Q.  Did he ever show you an e-mail showing he was authorized to

20  do that?

21  A.  Not to my knowledge or recollection.

22  Q.  Is it a problem when one person revokes administrative

23  privileges for another officer?

24  A.  Yes, if they don't have management direction to do so.

25           MR. DENTON:  No further questions, your Honor.

K2J3SCH3                    Roche – Direct

1          THE COURT:  You are excused.  Thank you.

2          (Witness excused)

3          THE COURT:  Call the next witness.

4          MR. DENTON:  The government calls Sean Roche, your

5   Honor.

6          THE DEPUTY CLERK:  Please state your name for the

7   record.

8          THE WITNESS:  Sean Roche.

9          THE DEPUTY CLERK:  Witness sworn.

10         THE COURT:  Please sit down, Mr. Roche.  All right

11  Mr. Denton.

12         MR. DENTON:  Thank you, your Honor.

13   SEAN ROCHE,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MR. DENTON:

18  Q.  Good morning, sir.

19  A.  Good morning.

20  Q.  Are you currently employed?

21  A.  I'm currently an independent contractor who advises,

22  consults, and does public speaking.

23  Q.  About how long have you been doing that?

24  A.  Since 31 October of 2019.

25  Q.  Where did you work before that?

K2J3SCH3                    Roche - Direct

1   A.  I worked at the Central Intelligence Agency.

2   Q.  How long did you work for the Central Intelligence Agency?

3   A.  More than 26 years.

4   Q.  Generally speaking, did you work in any particular field or

5   specialty during your time at the CIA?

6   A.  Yes.  I worked in the fields of project program management,

7   and leadership of organizations that built collection systems

8   for covert and clandestine collection.

9   Q.  Can you tell us some of the positions that you've held

10  during your career at the CIA.

11  A.  Yes.  I was a division director, large program manager,

12  group manager managing an entire mission area, and then a

13  deputy office director that managed multiple missionaries, then

14  an office director, and then the deputy director of the

15  Directorate of Science and Technology, and then the deputy

16  director of the Directorate for Digital Innovation.

17  Q.  What is the Directorate for Digital Innovation?

18  A.  Directorate of Digital Innovation is one of five

19  directorates at the CIA.  It is composed of the Center for

20  Cyber Intelligence, that conducts cyber operations and cyber

21  intelligence gathering missions across the world.  It is

22  responsible for CIA's worldwide secure communications, and IT

23  infrastructure -- information technology infrastructure that's

24  responsible for all of the open source collection worldwide,

25  and the curation of agency data.

1   Q.  When was the Directorate of Digital Innovation created?

2   A.  It was announced on March 6 of 2015, and started to stand

3   up about two to three weeks later, and was formally open for

4   business on one October of 2019.

5   Q.  Is that sometimes referred to as DDI?

6   A.  Yes.

7   Q.  Were you part of the process of standing up the Directorate

8   of Digital Innovation?

9   A.  Yes, I was.

10  Q.  Why was it created?

11  A.  It was created to accelerate the agency's ability to bring

12  digital technologies into the agency, incorporate them into the

13  missions, to inform HUMINT operations, and as well as all sorts

14  analysis and covert action.

15          It was also brought in, it was also created to ensure

16  that the agency was aware of the challenges associated with

17  these digital technologies, to ensure that our operations were

18  secure.

19  Q.  You referred to HUMINT operations.  What is HUMINT?

20  A.  Human intelligence operations are conducted by the agency

21  where officers from the agency overseas have contact with

22  foreign nationals to get information from them, to inform our

23  national security.

24  Q.  What was your role in the creation of DDI?

25  A.  I was appointed the first deputy director of the new

K2J3SCH3                        Roche - Direct

1    directorate.

2    Q.  Was that your position in the spring of 2016?

3    A.  Yes.

4    Q.  In your capacity as the deputy director of DDI, did you

5    have occasion to interact with line officers within the

6    directorate?

7    A.  On a constant basis.

8    Q.  Tell us about that level of interaction.

9    A.  I had the opportunity to speak to every incoming class of

10   new officers across the CIA for many years while I was in DDI.

11   We had forums in DDI, informal forum.  One was called

12   "breakfast with the bosses" where officers went by to sit down

13   with supervisors for two to three hours, and the supervisors

14   would bring breakfast, and they would talk to us about what

15   their experience was.

16        I had a program personally that I was recognized for

17   to take the newest officers we had on trips, whether they were

18   domestic or overseas, we called these ride alongs.  And I spent

19   a considerable amount of time in the field at some of our most

20   remote locations talking to officers about what we needed to do

21   for them and what their experience was at CIA.

22   Q.  So, sir, I'd like to ask you to look around the courtroom

23   and tell us if you recognize anyone who was a line officer in

24   the Directorate of Digital Innovation in the spring of 2016.

25   A.  Yes, I do.

K2J3SCH3                         Roche - Direct

1    Q.  Who do you recognize?

2    A.  I recognize a gentleman sitting at the back table with the

3    beard, Mr. Schulte.

4    Q.  Have you met personally with the defendant?

5    A.  Yes, I have.

6    Q.  So, just before we get to that, on a day-to-day basis, what

7    was your duties and responsibilities as the deputy director of

8    DDI?

9    A.  The type of responsibilities were resource allocation, and

10   that was personnel and budgets.  A lot of time spent designing

11   a new culture for a new directorate, working to design a new

12   pay system, a new recruiting system, a new promotion system.

13   All for these digital specialties that we needed.

14           I would attend meetings at the White House frequently,

15   they were known as Deputies Councils.  They were held in the

16   West Wing.

17           I would have frequent meetings with the leadership of

18   the agency, particularly the executive director, who is the

19   number three officer at the agency.

20   Q.  You mentioned the number three officer in the agency.  As

21   the deputy director of DDI, help orient us, where were you in

22   the hierarchy of the agency?

23   A.  There is the director, the deputy director, the executive

24   director is number three.  The director chief, my boss is the

25   director chief, Andrew Hallman, and myself were both basically

K2J3SCH3                         Roche - Direct

1  reporting to the executive director.  It was the executive

2  director that determined what our ratings were for the year,

3  our performance, whether or not we changed jobs or advanced,

4  etc.

5  Q.  Did there come a time when you received an e-mail from the

6  defendant?

7  A.  Yes.

8  Q.  Had you had any interaction with him that you can recall

9  prior to that?

10  A.  Not that I can recall.

11          MR. DENTON:  Ms. Hurst, can we put up Government

12  Exhibit 1093, please.  If we can just blow up the addressing

13  information, please.

14  Q.  Do you recognize this, sir?

15  A.  Yes, I do.

16  Q.  Who sent it?

17  A.  Joshua Schulte.

18  Q.  Who did he send it to?

19  A.  He sent it to my direct supervisor, Andrew Hallman who was

20  the director of DDI, the executive director of the agency,

21  Meroe Park, and myself.

22  Q.  What is the subject line?

23  A.  "Resignation over retaliatory management."

24  Q.  Let's take a look at some parts of this e-mail, sir.  If we

25  can blow up the first two paragraphs.  Just before we talk

1    about some of the things that are said here, do you see in the

2    middle where the black box is where the defendant refers to "my

3    group chief Karen"?

4    A.  Yes.

5    Q.  Do you know who that refers to?

6    A.  Yes, I do.

7    Q.  Have you worked with Karen at the CIA before?

8    A.  For more than 15 years.

9    Q.  What is Karen like as a manager?

10   A.  Karen is one of the most soft spoken, polite, congenial,

11   agreeable people that I've ever worked with at senior levels.

12   Q.  Would it surprise you to learn that someone had incurred

13   her wrath as described here?

14   A.  Yes, very much.  I can't imagine Karen having wrath.

15   Q.  You see at the start of that paragraph, sir, where it says,

16   "Unfortunately, in 3/2016, an employee threatened to kill me

17   which resulted in my subsequent report to security and

18   escalation to TMU."

19   A.  Yes, I do.

20   Q.  Would you describe that as a serious incident?

21   A.  Very serious.

22   Q.  Have you worked with TMU in the past?

23   A.  Extensively.

24   Q.  What does TMU stand for?

25   A.  TMU is part of our security team.  It's known as Threat

K2J3SCH3                         Roche - Direct

1    Management Unit.

2    Q.   What do they do?

3    A.   They're called in any time we believe that there is any

4    possibility of an escalation that could lead to an employee

5    harming themselves, harming others, and they have expertise

6    working with other parts of the agency to immediately get on

7    the problem and do an assessment of what the situation is, and

8    they have authority to intervene and take necessary steps.

9            MR. DENTON:   You can zoom out, Ms. Hurst.  And if we

10   can go to the next page, and zoom in on the paragraph that

11   starts "the next week."

12   Q.   Could you read that first sentence, sir.

13   A.   "The next week I noticed my permissions as administrator

14   had been revoked entirely, and I was hit with a memorandum on

15   'self-granting previously revoked admin privileges on an agency

16   computer network,' which I have attached."

17            (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. DENTON:

2   Q.   Did you review that memorandum that he had attached?

3   A.   Yes.

4   Q.   What was your reaction to it?

5   A.   My reaction to it was that this was a very serious breach

6   of agency rules.  In the post-Snowden environment, and that's

7   referring to Edward Snowden, a traitor who is now in Russia,

8   any officer taking an action like this on an agency computer

9   system was a very, very serious red flag.

10  Q.   Now, going down to the bottom of this blown-up section, do

11  you see where it says, "Karen used her royal pawn Weber to

12  execute her will of removing me from the OSB libraries, not

13  inform me and wait for me to logically add my permissions back

14  to a project I thought was still mine"?  Do you see that?

15  A.   Yes, I do.

16  Q.   In your work in DDI, are access to permissions to projects

17  important?

18  A.   Yes, they are.

19  Q.   Why are they important?

20  A.   They're important because they are part of a system that's

21  known as need to know and compartmentalization, the idea being

22  that with all of the different activities across the agency,

23  you would only want access to the people you know needed that

24  information, first and foremost; and then have the right

25  disposition and -- and ability to protect that information.

1          MR. DENTON:  If we could zoom out here, Ms. Hurst,

2    please.  And if we could go to, I think it's the next page, and

3    zoom in on the bottom five or six lines of the full paragraph.

4    Sorry.  Above that.  No.  Sorry.  One more up.

5          Thank you.

6    Q.  Now, I don't want to go through all of this, but do you see

7    at the bottom where, in the last full line, the line, "I feel

8    wronged and continually mistreated by the system"?

9    A.  Yes.

10   Q.  What was your reaction to that?

11   A.  My reaction was that this was something that I needed to

12   get with this officer right away.  It was very concerning.

13   This was, again, a very strong red flag.  It was an officer

14   that was disgruntled, an officer that was angry, and -- and

15   this was something -- this was a very, very strong statement

16   that demanded a response.

17         MR. DENTON:  If you can zoom out and go back to the

18   first page, Ms. Hurst.

19   Q.  Just as a general matter, was it typical for you to receive

20   multipage emails from line officers in DDI?

21   A.  No.

22   Q.  As a general matter, what was your reaction to this email

23   as a whole?

24   A.  My reaction, immediate reaction, was we have a problem.  We

25   have an officer that is displaying, in a vitriolic message,

1    that, in my experience, contained a number of warning flags

2    that this officer was going to do something, and that this

3    officer was -- had a motivation that may include harming the

4    agency or harming agency personnel.

5         MR. DENTON:  Ms. Hurst, if we could put up Government

6    Exhibit 1096, please, and just blow up the email at the top.

7    Q.  Did you reply to the defendant's email, sir?

8    A.  Yes.  I replied in less than five minutes.

9    Q.  And what did you say?

10   A.  I said:  "Josh, I spend hours a day on issues associated

11   with personnel.  It's one of the most important obligations I

12   have to the agency.  Would you like to come see me tonight --

13   about this tonight?  I have a meeting with the director of the

14   CIA that will be over at 1745, and I will stay as long as it

15   takes.  Please let me know if you would like to speak to me.  I

16   certainly hope that you will.  This is important, and it is now

17   the No. 1 issue on my plate.  Very respectfully, Sean."

18       The note:  "There are no cc's," that meaning copies, "or

19   bcc," blind copies, "on this message."

20   Q.  When you say that this is now the No. 1 issue on your

21   plate, how many employees did you oversee in the directorate of

22   digital innovation?

23   A.  The number of government employees was more than 3,000.

24   Q.  Was the defendant's email something that you, in fact, took

25   seriously?

1    A.  Very seriously.

2    Q.  Was it something that you believed should be addressed?

3    A.  Yes.

4           MR. DENTON:  Ms. Hurst, if we could put up Government

5    Exhibit 1097.

6    Q.  Were you the only person who replied to the defendant's

7    email, sir?

8    A.  No.  My boss, Andrew Hallman, replied before meeting the

9    next day.

10   Q.  And what did he say?

11   A.  He said:  "Josh, just getting to my email, and to the

12   contrary, Sean and I spend most," italicized, "of our time on

13   personnel issues and I know Sean is in touch.  I'll sit down

14   with him to discuss where we're at.  Regards Andrew."

15   Q.  Where he says that you and he spend most of your time on

16   personnel issues, was that true?

17   A.  Absolutely.

18   Q.  Why were personnel issues such a focus for you?

19   A.  In the end, it is people that deliver the mission of the

20   agency, we ask people to do sometimes incredibly difficult,

21   always challenging and most often in a very compressed time

22   frame, and so spending time with the workforce, developing ways

23   for the workforce to maximize their creativity and their

24   ability to deliver a mission is the obligation that senior

25   managers have.

1    And as I mentioned, there's a number of things we were

2    working on as a new directorate to establish a culture for

3    digital innovation and to establish a culture that accelerated

4    digital capability.  And there was an awful lot of work that

5    was being done.  We were changing -- we changed people's pay.

6    We changed the way we hired people, how we paid them, how we

7    promoted them, how we moved them around, how we developed their

8    careers.  So it was every day.  It was the No. 1 thing we had

9    to work.

10        MR. DENTON:  Ms. Hurst, if we could go back to 1096

11   for a moment and again just blow up the top email.

12   Q.  Did the defendant take you up on your offer to meet with

13   him that day in response to his email?

14   A.  No, he didn't.

15   Q.  After you received this email, did you take any steps to

16   gather more information about what the defendant had claimed?

17   A.  Yes.  I reached out to my front-office team to get with the

18   human resources team to pull his agency biography.  And in

19   parallel, I reached out to my direct reports in the CCI front

20   office.  The first question I had, given the nature of the

21   email, and the tone, was tell me exactly where this person is.

22   Someone put eyes on him right now.  Someone's very upset.  What

23   actions is he taking, was he going to take?

24        The team looked into his status on the agency computer that

25   sent me this note and saw that he had logged off almost

1    immediately after sending it.  I received communication back in

2    a short while later saying that people had confirmed he had

3    left the CCI building.

4    Q.  Did there, in fact, come a time when you met with the

5    defendant to discuss the issues raised in his email?

6    A.  Yes.  I believe the date was 30 June, and it was in the

7    morning of 30 June at the CCI building.

8    Q.  And during the couple of days intervening, did you take any

9    other steps with regard to the defendant?

10   A.  Yes, I did.  I asked my direct report at the CCI front

11   office to get background on what was happening with this

12   officer and had the officer, in fact, resigned -- was the

13   officer gone from the agency -- as we tried to arrange a time

14   to meet, and they gave me a briefing on several incidents of

15   concern, some of which are raised in the note that Mr. Schulte

16   sent me.

17   Q.  Now, you say you were trying to arrange a meeting.  Did he

18   ever actually respond to you?

19   A.  No.

20   Q.  How did the meeting get arranged?

21   A.  I believe, to the best of recollection, the CCI

22   front-office team worked with my scheduling team to arrange a

23   time, and, from memory, what happened was I was supposed to be

24   on leave, annual leave.  I was supposed to be on vacation.  I

25   was headed overseas, but instead, we scheduled the meeting so

1   that I could meet with Mr. Schulte before I headed to the

2   airport to fly overseas.

3   Q.  And was that a memorable meeting for you?

4   A.  Yes, it was.

5   Q.  Why was it memorable?

6   A.  It was very memorable because I wanted to engage the

7   employee and find out had he, in fact, resigned; try and

8   de-escalate what I saw was a lot of anger and vitriol;

9   understand what was happening from his perspective, with just

10  him in the room and no one else, and go over some of these

11  points he had made and some of the issues that had arisen

12  during his time as an agency employee.

13      What I encountered was an employee that did not buy into

14  any part of any action that was his; that explained to me that

15  there were managers at all level that had conspired to deny him

16  the ability to work on what he wanted to work on; and that, he

17  explained to me that these people were terrible people; that

18  TMU had not done anything for him.  And I found the meeting to

19  be extremely alerting, to the point where, afterwards, I spoke

20  to the deputy director of CCI and gave him some actions.

21  Q.  Let's stay focused on the meeting for a moment.  Did you

22  discuss issues pertaining to the defendant's report to TMU that

23  he wrote to you about?

24  A.  Yes, I did.

25  Q.  What did you talk about?

A.  My recollection, the -- I had a discussion with him about

the TMU unit, which he described, his terms, he felt they were

not responsive to him.  He felt that his life had been

threatened, and they just did -- didn't do enough for him.

    I explained my experience, working with them over many

years, was that if they investigated and found a single shred

that indicated that there was behavior or someone who was going

to take an action against another officer, to harm them, even

threaten them, that they always took action in those cases.

And they took very prompt action and they had the authority to

do that.  So I basically explained that my experience with TMU,

which was very extensive, did not match what he said to me,

which was basically, Hey, I had a real problem here and they

didn't do anything and they didn't care.

Q.  I think you said you talked about the defendant saying that

multiple layers of management were conspiring against him.  Is

that right?

A.  Yes.  And he mentioned some of the managers by name.  I

knew and had worked with, sometimes for years, some of those

managers.  And I explained to him -- Gee, that's not my

experience.  I know these people.  Why would they do this -- to

which he could not provide an answer.

    I asked him about some of his behaviors.  Did you do these

things?  Did you change permissions?  Did you -- there was a

thumb-drive incident, and he didn't have an explanation nor

1   really acknowledge that he had done them.

2   Q.  What did you mean when you say you asked him about

3   permissions?

4   A.  On the system that he was working on, an agency network,

5   his -- he had -- his permissions had been changed, and when his

6   management explained to him, he went back in and changed his

7   permissions back to get access again, and they had issued a

8   letter of warning to him explaining how serious that was and

9   that that behavior is not acceptable.

10  Q.  Why was that something you discussed with him?

11  A.  Because of how serious the nature of that is.  Activity on

12  any system that holds agency data, agency tools, things that we

13  call sources and methods, is -- is -- it is very, very

14  important that we not have a doubt about what people have

15  access to and maintain the integrity and the protection of that

16  information.

17  Q.  What did you discuss with him about his permission changes?

18  A.  I said to him something to the effect of in the post-Edward

19  Snowden era, you don't do something like that.  That's going to

20  draw attention that you certainly don't want.  It's really

21  serious, and you cannot be taking that kind of action.

22  Q.  And how did he respond?

23  A.  He talked a little bit about the project that he had been

24  working on and some new work that he had been given, and he was

25  not pleased with it.  But at one point, he stopped and he

1  looked at me and said, You know, I could get back on it if I

2  wanted to, something to -- that's not -- I won't say that's the

3  exact quote, but it's pretty darn close.

4  Q.  Now, when he said that, did you understand him to be

5  raising a security concern about the network?

6  A.  No.  What I, what I realized -- it was a striking comment

7  because, to me, it illustrated that after everything that had

8  happened, all the warnings, all of this formal process, that he

9  was determined to undermine the controls on the network.

10 Q.  As a general matter, what was the defendant's demeanor like

11 during your meeting with him?

12 A.  His demeanor was reasonable.  He -- he -- we had what I'd

13 call a level-set conversation.  I made some suggestions about

14 trying to work another place at the agency.  He expressed great

15 frustration with every level of management.

16     I talked about first-level managers and how they struggle

17 to sometimes learn what it is to manage, but what I didn't see

18 was, is there -- he asked about his chance for promotion.  He

19 said, Would this affect my chance for promotion?  I said yes,

20 most likely, although I told him -- I informed him, I don't

21 make your promotion decision.  A panel, a panel by CCI, would

22 do that.

23 Q.  Why did you think this would affect his chances for

24 promotion?

25 A.  Because key criteria for promotion is judgment, judgment

1    ability to follow the agency rules and follow the directives we

2    have to protect the mission.  That's an inviolate part of being

3    promoted, is having that judgment.  And he had demonstrated a

4    very poor judgment at the minimum.

5    Q.  Again, stepping back, just at a general level, what was

6    your reaction to the defendant?

7    A.  So, my reaction was that we -- I had to ensure -- I saw a

8    lot of risk.  I saw a lot of risk at a lot of levels and a lot

9    of different possibilities that had to be mitigated and

10   addressed accurately.  It's my job to get in front of that risk

11   and try and understand and then mitigate it.  I took -- met

12   immediately afterwards with the deputy director of CCI and said

13   I believe you have somebody here who is going to do something

14   on the networks or is determined to do something to get back at

15   people or get back at the system.  And I said he needs to be

16   monitored very, very closely.  And the deputy director of CCI

17   said, We're on it.  We're -- exact quote, We're all over it.

18   Q.  After that meeting, did you have any further interactions

19   with the defendant?

20   A.  Not that I can ever recall, no.

21   Q.  I'd like to go forward in time, sir, and ask you to think

22   about March 7, 2017.  Do you remember that day?

23   A.  Very well.

24   Q.  Why do you remember that day very well?

25   A.  I received a frantic call from the director of CCI, who was

1    out of breath, and said something very big has happened.

2    Our -- our information is out in the public on WikiLeaks.

3    We're going to have to get over there and -- and get your full

4    brief.  And the day very quickly -- and this happened in the

5    morning.  It was the equivalent of a digital Pearl Harbor.

6    Q.  What do you mean by that?

7    A.  Our capabilities were revealed, and hence, we were not able

8    to operate and our -- the capabilities we had been developing

9    for years that were now described in public were decimated.

10   Our operations were immediately at risk, and we began

11   terminating operations; that is, operations that were enabled

12   with tools that were now described and out there and

13   capabilities that were described, information about operations

14   where we're providing streams of information.  It immediately

15   undermined the relationships we had with other parts of the

16   government as well as with vital foreign partners, who had

17   often put themselves at risk to assist the agency.  And it put

18   our officers and our facilities, both domestically and

19   overseas, at risk.

20   Q.  Just staying at a very general level, what steps did you

21   take in the immediate aftermath of those disclosures to address

22   those concerns?

23   A.  A task force was formed.  Because operations were involved

24   we had to get a team together that did nothing but focus on

25   three things, in this priority order.  In an emergency, and

1  that's what we had, it was operate, navigate, communicate, in

2  that order.  So the first job was to assess the risk posture

3  for all of these operations across the world and figure out how

4  to mitigate that risk, and most often, the vast, vast majority

5  we had to back out of those operations, shut them down and

6  create a situation where the agency's activities would not be

7  revealed, because we are a clandestine agency.

8      The next part of that was to navigate across all the people

9  affected.  It was not just the CIA.  There were equities for

10  other government agencies.  There were, of course, equities at

11  places and bases across the world, where we had relationships

12  with foreign partners.  People heeded immediately, were calling

13  and asking what do I do, what do I say?

14      And the third part of that was to communicate, which was --

15  in the course of looking at this as a what systemic issues led

16  to the ability to have our information out there -- was to

17  document that and write a report that would serve as a lessons

18  learned with the idea of preventing it from ever happening

19  again.

20  Q.  Did there come a time when the CIA made a formal criminal

21  referral in connection with the disclosure of that information?

22  A.  Yes.

23  Q.  And who was that referred to?

24  A.  It was referred to the Department of Justice.

25  Q.  What was the relationship between that criminal

investigation and the task force that you described?

A.   Both were aware that those activities were going on, but they were kept separate.  They were kept separate and isolated.  Again, it was operate, navigate, communicate.  It was not to investigate.

Investigation needed to be kept separate, and from the beginning, there were steps taken to make sure that it was the Department of Justice that was handling anything that could later serve as evidence, and that they would protect the evidentiary chain; and that if there came a time to de-conflict something, that the task force would talk to them before possibly getting even near that line.

Q.   You talk about the work of the task force.  Was their work limited to evaluating CCI?

A.   No.  No.

Q.   Generally speaking, what were they looking at?

A.   They were looking at the systemic issues associated with agency technology networks.

The agency has two general classes of networks.  One is the agency's worldwide secured network that every employee has access to, and then a much, much smaller subset of networks that were created because the very special functions of them could not run on the main network.  The information on them had not been sanitized and quarantined and, therefore, contained things like malware; or the information that would be held on a

1   network was so extremely sensitive that -- and handled in a

2   different way than the work flow from the network that it

3   needed a mission network.  So they were to look at all IT

4   networks and to look at systemic issues associated with how

5   those networks were run, the data curation, etc.

6   Q.  Did the task force make recommendations?

7   A.  Yes, they did.

8   Q.  Without getting into the specifics of what they were, what

9   was the standard those recommendations were trying to meet?

10  A.  So, the agency -- the main standard was to ensure that as

11  fast as possible, that we accelerate ensuring that all of the

12  mission networks got to what is, what was referred to by the

13  White House as the gold standard for audit on the systems; the

14  ability to understand what people were doing on the systems and

15  to get ahead of behaviors that might indicate someone was

16  taking nefarious action on any IT agency platform.

17       Those capabilities are in place for the large, worldwide

18  network that everyone has access to.  The much smaller

19  footprint of mission networks represents very unique problems

20  in each one of those mission networks, and the main part of the

21  task force was that that work needed to be accelerated across

22  the board.

23  Q.  And remind me, sir, when did you leave the CIA?

24  A.  October 31, 2019.

25  Q.  At that time were you still dealing with issues resulting

K2jWsch4

1    from the Vault 7 disclosures?

2    A.   Yes.

3              MR. DENTON:  No further questions, your Honor.

4              THE COURT:  Ms. Shroff.

5              MS. SHROFF:  Your Honor, I need a sidebar before I can

6    cross.

7              THE COURT:  All right.

8              MS. SHROFF:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (At sidebar)

2      THE COURT:  Yes.

3      MS. SHROFF:  Your Honor, look, I don't take great

4   notes, but Mr. Denton has elicited from him what a HUMINT is.

5   He talked about what line officers do.  He talked about

6   ride-alongs and the work he does in remote locations.  He has

7   now testified about the WikiLeaks task force report, their

8   recommendations.  He's testified about clandestine efforts, how

9   the repercussions of the leaks involved foreign nations calling

10  him.  He's talked about how foreign officers were at risk.  And

11  yesterday, the Court ruled that I couldn't even ask the witness

12  if, because of the leak, the foreign office itself had to be

13  shut down, moved or in any way curtailed.  Right?

14      THE COURT:  Where is this going?

15      MS. SHROFF:  Either strike his testimony or allow me

16  to cross.  But to have them just elicit all of this stuff and

17  say it's at a high level, high level and I can't get to cross

18  seems to be rather wrong here.  I don't know.

19      THE COURT:  Has there been an objection on cross?  You

20  haven't even started cross.

21      MS. SHROFF:  Well, I know, but yesterday when I tried

22  to cross on the foreign offices --

23      THE COURT:  If he testified to it on direct, you can

24  cross on it.

25      MS. SHROFF:  Well, yesterday they objected and you

K2jWsch4

1    sustained the objection.  I just don't want to do what the

2    Court had already ruled on, and I think this is improper.  They

3    elicited this.

4                THE COURT:  Mr. Denton.

5                MR. DENTON:  I think it's clear, your Honor, he did

6    not testify about the specifics of operations or where these

7    bases were located.  He testified about the concept, that the

8    operations existed, that there were foreign bases.  If she

9    wants to cross-examine him about that, that's fine.

10               MS. SHROFF:  What concepts?  What I can cross-examine?

11   Is there a foreign location?

12               That's improper.  He knows it's improper.  He elicited

13   information about HUMINT.  He didn't need to do that.

14               MR. DENTON:  I asked him to define the term.

15               MS. SHROFF:  Why?  It's a term that I can't cross on.

16   It's a term that I can't cross on.  I can't cross on the

17   foreign repercussions.  I can't, for example, ask this man, By

18   the way, are there other issues that the CIA has to have dealt

19   with when your biggest problem is that you did this to friendly

20   nations?  Your problem wasn't that there was a leak.  Your

21   problem was that you got caught doing this to friendly nations.

22   This is all proper cross because he brought it out at a high

23   level.

24               THE COURT:  Mr. Denton.

25               MS. SHROFF:  He can move to strike if he wants.  I'll

K2jWsch4

1     give him that option.

2              MR. DENTON:  I didn't ask any of those questions, your

3     Honor.

4              MS. SHROFF:  Yes, but I need to ask them.

5              THE COURT:  I don't know about that.

6              MS. SHROFF:  Why?  How else am I going to show that

7     the foreign nations were upset with the CIA for a thousand

8     different things; that this leak was no more harmful than any

9     of the other leaks that the CIA has been caught with?  Why am I

10    not able to show that?  He elicited it.

11             Look, they can take a break.  They can go back and

12    move to strike, but I think to leave me in this position of not

13    crossing this man is improper.

14             THE COURT:  I suggest you start cross-examination, and

15    we'll see where the objections go.

16             MS. SHROFF:  OK.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2    CROSS−EXAMINATION

3    BY MS. SHROFF:

4    Q.   Good afternoon, sir.

5    A.   Good afternoon.

6    Q.   Sir, is it fair to say that one of the repercussions of

7    this leak was that friendly nations that had been the subject

8    of CIA intervention, siphoning of data and theft of their

9    information, were upset with the CIA?

10   A.   That's not my experience, no, ma'am.

11   Q.   What do you mean by that's not your experience?

12   A.   Ma'am, if I understand the question, you said friendly

13   nations were upset over these releases that the CIA was

14   siphoning their data.

15   Q.   Right.

16   A.   In my experience, as the deputy director of DDI and senior

17   staff officer who had to speak to many nations about this, I

18   would offer the concern was cooperating foreign partners were

19   concerned that their helping us would be revealed.  But I'm not

20   aware, ma'am, of any country −− and I'm not sure what the

21   definition of a friendly country is −− but I'm −− I'm not aware

22   of any country that approached CIA or approached CCI or our

23   officers and expressed that concern for this leak.

24   Q.   OK.  Let me try it again.

25   A.   Yes, ma'am.

1  Q.  Do you know what a friendly nation is?

2  A.  Ma'am, there -- we have -- I would define friendly nation

3  as ones that help facilitate the collection and sharing of

4  information in a way that matches our mission pace.  There is a

5  wide spectrum of longstanding partners that we have that work

6  with us very well and other partners that would only work on

7  selected issues and other partners that won't work with us at

8  all and everywhere in between.  So I would -- an example of a

9  friendly nation would be our commonwealth partners.

10  Q.  OK.  Let me try it again.  A friendly nation is a nation

11  that believes that working with the United States is fine, at a

12  simple level.  Is that accurate?

13  A.  Ma'am, I would amend that to say it has to be on

14  intelligence matters.

15  Q.  Right.  I'm only -- we're all about intelligence at this

16  trial.  Nothing else.  I mean, it's the CIA.  Only

17  intelligence, right?  We're not talking about anything else.

18  A.  Yes, ma'am.

19  Q.  OK.  So you share intelligence, correct?

20  A.  Yes, ma'am.

21  Q.  And the nations with which you share intelligence in a

22  friendly manner is what the CIA calls the friendly nations,

23  right?

24  A.  That's not a term that we use, ma'am, but for purposes of

25  this discussion, I understand.

K2jWsch4                          Roche - Cross

```
 1    Q.  OK.  And is it fair to say that the CIA uses covert means
 2    to extract data from friendly nations?
 3              MR. DENTON:  Objection.
 4              THE COURT:  Overruled.
 5    A.  Uh --
 6    Q.  You know, just a very simple yes or no would be fine.
 7    A.  As pertains to this leak --
 8    Q.  No, no.
 9              THE COURT:  Read the question back, please.
10              (Record read)
11    A.  The CIA collects publicly available information from all
12    over the world.  I would, ma'am, may I ask your definition,
13    what do you mean by covert means?
14    Q.  Well, let me put it to you this way.  When you're trying to
15    read Angela Merkel's emails, are you reading it in the
16    newspaper?
17              MR. DENTON:  Objection.
18              THE COURT:  Sustained.
19    Q.  Do you recall a time when the CIA covertly tried to read
20    Angela Merkel's emails?
21              MR. DENTON:  Objection.
22              THE COURT:  Sustained.
23              MS. SHROFF:  Your Honor --
24    Q.  OK.  Let me try it this way.  Do you consider Germany to be
25    a friendly nation?
```

K2jWsch4                         Roche - Cross

1    A.  I know that we don't consider Germany to be an adversary.

2    We're not at war with Germany.

3    Q.  OK.  So Germany is not an adversary nation, but it's not a

4    friendly nation?

5    A.  We have -- the United States has a good relationship with

6    Germany.

7    Q.  OK.  And as part of these good relationships with Germany,

8    does the CIA still use covert methods to gain intelligence from

9    Germany?

10            MR. DENTON:  Objection.

11            THE COURT:  Sustained.

12            MS. SHROFF:  Your Honor, this was all part of their

13   direct.  If you want to take a lunch break, I'm happy to take a

14   lunch break at this point.

15            THE COURT:  I think we'll take our luncheon recess

16   now.

17            MS. SHROFF:  Thank you.

18            THE COURT:  And resume at 1:30.

19            You can step down, Mr. Roche.  Let the jury go out.

20            (Continued on next page)

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  OK.  You're excused.  Thank you.

3           (Witness not present)

4           THE COURT:  Please be seated.

5           All right.  Ms. Shroff.

6           MS. SHROFF:  Your Honor, this witness testified on

7    direct about all the harm that came to the United States

8    because the information was leaked.  He talked about the harm

9    that destroyed relationships between foreign countries.  He

10   talked about the harm with nations.  He talked about the harm

11   with people and agents in remote locations.  He testified, and

12   although Mr. Denton kept prefacing his questioning with "at a

13   high level," all of that information is now before the jury.

14           This is information -- obviously, the government is

15   going to argue at summation -- that hurt the United States, No.

16   1.  And also, it goes to harm.  I should be allowed to explore

17   exactly what the harm came from because the harm doesn't flow

18   just from what the government says it flows from.  And it's

19   proper cross-examination.

20           If the government thinks that this level of

21   cross-examination is improper and they only should be allowed

22   to elicit facts that go to harm and the second table should

23   just sit in silence, then that's, I think, unfair to

24   Mr. Schulte SSH.  On a very basic level, let's just go

25   through -- I don't have his direct in front of me, because I

1    don't have the transcript, but I tried to take good notes.

2           He talked about the harm to the foreign offices, how

3    the foreign offices were down.  Yesterday, the witness on the

4    stand also testified about foreign offices.  I was not allowed

5    to cross on whether there was, in fact, any harm to the foreign

6    office.  The government objected and said that I should not be

7    able to cross for reasons that are clear at the sidebar, and I

8    disagreed.  But may I even now put my objection in open court,

9    or is that not even allowed?  I don't even know if I can put my

10   objection in open court.

11          THE COURT:  I thought you were putting your objections

12   now.

13          MS. SHROFF:  No.  I haven't told you why I feel --

14   they said it at sidebar.

15          MR. DENTON:  Mr. Denton.

16          MS. SHROFF:  That transcript wasn't released to me

17   yesterday.

18          THE COURT:  All right.

19          MR. DENTON:  Your Honor, the problem with what Ms.

20   Shroff said at the sidebar was that what she wanted to elicit

21   was classified information about the location of the CIA

22   facility.

23          MS. SHROFF:  That's not what I was seeking to elicit.

24   All I was seeking to elicit --

25          THE COURT:  I thought she was trying to elicit the

K2jWsch4                           Roche - Cross

1    fact that the location had to move.

2              MS. SHROFF:  Exactly.  That they had to take no steps.

3              Listen, if there was a bomb threat to the Federal

4    Defenders office, we might actually move or we may not move.

5    Right?  The response to the threat needs to be relevant.

6    They're saying there was a threat.  They're saying they were

7    worried about something, and I'm not allowed to cross about

8    whether or not they did anything in reaction to the threat?

9              MR. DENTON:  First of all, your Honor, to the extent

10   that Ms. Shroff is asking about the effect of the Vault 7

11   leaks, she did ask Mr. Roche that; she didn't get the answer

12   she wanted and so she started asking about Angela Merkel and

13   Germany totally out of context.

14             MS. SHROFF:  It's not out of context.  There is a

15   context.  The context --

16             THE COURT:  One at a time, please.

17             Go ahead.

18             MR. DENTON:  He was not asked about particular

19   operations, particular countries.  I didn't ask him about any

20   conversations he had in particular.  We didn't get into

21   particular details about the specifics of what was going on.

22   What he talked about were, at a general level, facts that are

23   not classified.

24             Ms. Shroff, as she tried to do in her CIPA filings and

25   the Court rejected, wants to get into the details of

1    operations, get into details of foreign relations, get into

2    matters that are classified.  Those are not relevant.

3              MS. SHROFF:  Let me ask you something.  Are you done?

4              MR. DENTON:  Yes, ma'am.

5              MS. SHROFF:  OK.  You know how they got it at a high

6    level?  Because they don't want to elicit anything on cross.

7    It's a very clever tactic, and that's what I'm calling out.

8    What I'm saying to the Court is, please, if I may, all I'm

9    saying to you is this, if you elicit facts at a high level, I'm

10   allowed to cross at any level to show that those facts don't

11   lead to an element of the offense.  I'm allowed to show that

12   the leaks did not cause the kind of harm that they're talking

13   about.  They want to talk about the harm to the Foreign Office

14   West and I want to show there was no harm to the Foreign Office

15   West.  Foreign Office West didn't move.  Foreign Office West

16   didn't shut down.  Foreign Office West didn't have anything

17   wrong done to it.  I'm allowed to show that.  Just because he

18   says he did the direct at a high level and I'm going at a low

19   level, that doesn't make my cross inappropriate.  I am giving

20   them the option -- you can move to withdraw those facts and not

21   sum up.  If this is so classified for them, they can move to

22   withdraw, but I don't think it's proper and constitutional to

23   elicit facts at a high level and then say to the defense

24   lawyer, Well, you simply can't cross because it's classified.

25             THE COURT:  Mr. Denton.

1           MR. DENTON:  Judge, we had days of CIPA proceedings on

2     precisely this point, that the level of generality is

3     significant to the question of what is classified and what's

4     national security.  The Court has already ruled on that.  Ms.

5     Shroff is now trying to say that because the government stayed

6     within the boundaries of what the Court said was acceptable she

7     should get to completely change the game.

8           MS. SHROFF:  No, the Court didn't rule on this issue

9     in that manner.  That's clearly incorrect.  I don't have

10    anything from a classified point of view about Angela Merkel.

11    Anything I know about Angela Merkel, trust me, comes from

12    nothing more than either talking to Mr. Zas or reading a

13    newspaper.  That is all I know.  The government has never once

14    given us any information.  We have repeatedly asked --

15    repeatedly asked.  We asked for documents related to harm.  We

16    asked for documents related to damages.  We asked for all of

17    these documents in discovery repeatedly.  They never gave us a

18    thing.

19          THE COURT:  In your view, Mr. Denton, what can the

20    defense ask?

21          MR. DENTON:  I think she's entitled to ask questions,

22    as any defense lawyer is, about the testimony that was elicited

23    on direct examination.  If she wants to ask questions about

24    whether it was true that it had an effect on their dealings

25    with foreign countries, she's entitled to do that, but she's

K2jWsch4                         Roche - Cross

1    not entitled to spin a hypothetical that's going to ask whether

2    certain operations were, in fact, conducted or not, none of

3    which was part of the direct.

4              MS. SHROFF:  What spin?  What operations?  I'm not

5    spinning an operation.  I'm asking him.  How can I possibly

6    cross?

7              THE COURT:  What about the Angela Merkel situation,

8    because there was publicity about that?

9              MR. DENTON:  First of all, and as we've discussed many

10   times, your Honor, whether or not there's publicity doesn't

11   change the classification on something, but more specifically,

12   it has nothing to do with this case.

13             MS. SHROFF:  It does.  It does have something to do

14   with it.

15             THE COURT:  Ms. Shroff, you've got to stop.  You can't

16   interrupt.

17             MR. DENTON:  If the question is whether there was harm

18   for the Vault 7 leaks, which, first of all, the question for

19   the jury is going to be whether the defendant should have known

20   that there was harm from it, not whether, objectively, Ms.

21   Shroff can prove that there wasn't harm from it.  The questions

22   before the witness pertained only to that, and so going into

23   what other operations may have been conducted at some other

24   time in history with respect to some other country by some

25   other part of the CIA or some other part of the U.S. government

 1    has no bearing whatsoever on whether the defendant should have

 2    known that the Vault 7 leaks that he disclosed would be harmful

 3    to the United States.

 4              MS. SHROFF:  You know what?  The Court should strike

 5    all of that testimony, have Mr. Denton ask this witness, Should

 6    Mr. Schulte have known that release of Vault 7 would harm the

 7    United States, whatever answer Mr. Roche gives, I will have no

 8    cross on that.  But that is not what he did.

 9              Had he done that, your Honor, I would not be seeking

10    to cross on Angela Merkel or harm.  He set the narrative, and

11    Mr. Denton can still fix that narrative.  All Mr. Denton has to

12    do is to agree to strike that testimony, ask the question that

13    he now clearly is telling the Court is the only relevant

14    question, put it to the witness, and we're done.  And you'll

15    have a shorter cross.

16              MR. DENTON:  Your Honor, that's obviously not

17    necessary.  Also, the question I asked him was simply what

18    happened when the leak happened, which is entirely proper for a

19    trial about a crime.

20              MS. SHROFF:  I'm sorry.  Am I missing something?

21    Mr. Denton said the only thing that's relevant is whether or

22    not Mr. Schulte knew that there was harm caused by the Vault 7

23    leak.  Nothing in his direct went to that point.  Move to

24    strike.  Strike all of that.  He can reask the question that is

25    actually relevant to this case, and then there is no need for

K2jWsch4                        Roche - Cross

1    this argument anymore.

2                THE COURT:  All right.  I think, Ms. Shroff, you're

3    going to have to continue with your questions.  I'll listen to

4    Mr. Denton's objections as you go along, and I'll rule on them.

5    I think that Mr. Roche testified at a very high level, and

6    there is room there for you to cross-examine.  If you want to

7    get down into the details, Mr. Denton will make his objections,

8    and I'll rule on them as they come across.

9                MS. SHROFF:  OK.  Or Mr. Denton could at least move to

10   strike and then ask the only relevant question.

11               THE COURT:  Mr. Denton can probably do a lot of

12   things.  It's up to Mr. Denton.

13               MS. SHROFF:  Well, I encourage Mr. Denton to think

14   about my proposal.

15               THE COURT:  All right.  We're done.  See you at 1:30.

16               (Luncheon recess)

17

18

19

20

21

22

23

24

25

K2J3SCH5

<pre>
 1                         AFTERNOON SESSION

 2                             1:30 p.m.

 3             (In open court; jury not present)

 4             THE COURT:  Some scheduling matters first.

 5   Ms. Shroff, you want to be finished by 3?

 6             MS. SHROFF:  I do, your Honor, because I did tell

 7   Dr. Bellovin to actually cancel his class at Columbia and come

 8   and meet Mr. Schulte at 3.

 9             THE COURT:  Okay.

10             MS. SHROFF:  I even have an e-mail to prove it.

11             THE COURT:  I'll take your word for it.

12             Tomorrow one of the jurors has a court appointment,

13   and so we'll be starting at 11:30 tomorrow.

14             Ms. Shroff, you'd do much better in your questions if

15   you'd confine yourself to what Mr. Roche said on direct.

16             MS. SHROFF:  I was trying to.

17             THE COURT:  He didn't say a word about Angela Merkel.

18             MS. SHROFF:  That's right.  He didn't.  Right --

19             THE COURT:  Confine yourself to the direct.

20             MS. SHROFF:  But the problem, your Honor, is the

21   direct was purposely at a high level.  Think about it as a

22   robbery.  If there is a robbery --

23             THE COURT:  I don't need an analogy.

24             MS. SHROFF:  But the analogy, if I could just put it

25   on the record for a minute.
</pre>

K2J3SCH5

1          THE COURT:  Yes.

2          MS. SHROFF:  If you want to prove that's not how the

3    robbery happened, you cross on the details.  That's all I'm

4    trying to do, cross on the details.  That's how you show

5    somebody's just making something up.

6          THE COURT:  If you confine yourself to the direct and

7    explore that, you won't have a problem.

8          Call in the jury.  Mr. Roche, too, please.  All right,

9    David.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Before we start this afternoon, we're

 3      going to break at 3 o'clock.  And I understand one of the

 4      jurors has a court appointment tomorrow, so we'll resume

 5      tomorrow morning at 11:30.  So 3 o'clock we're going to break

 6      and 11:30 we'll resume tomorrow.

 7              All right, Ms. Shroff.

 8              MS. SHROFF:  Thank you, your Honor.

 9      BY MS. SHROFF:

10      Q.  Sir, let me just ask you about -- could you let me start

11      over.

12          Tell me how to properly pronounce your name.

13      A.  My last name is pronounced "Roche."

14      Q.  Okay.  Mr. Roche, if I could have you take a look at

15      Exhibit 1093, please.

16      A.  Yes, ma'am.

17      Q.  And it's fair to say, right, that you received this

18      document via e-mail, you received this e-mail with attachments,

19      correct?

20      A.  Yes, that's correct.

21      Q.  And if you could just keep your voice up because I have a

22      hard time hearing, and then I think you're finished and then I

23      interrupt you.  So keep your voice up.

24      A.  Yes, ma'am.

25      Q.  Thank you.  Was it the first time that you had heard of

K2J3SCH5                          Roche - Cross

1   Mr. Schulte when you got this e-mail?

2   A.   Yes.

3   Q.   And before you got this e-mail, you had not had any

4   conversation with Karen about Mr. Schulte, correct?

5   A.   No, ma'am.

6   Q.   And you had not had any conversations with anyone else,

7   because this is the first time you heard of him, correct?

8   A.   Yes, to the best of my recollection.  Unless he was in a

9   large meeting I was in.  Again, no direct.

10   Q.   That's fine.  And when you got this e-mail, do you know, do

11   you remember where you were?

12   A.   Yes.

13   Q.   Where were you, sir?

14   A.   I was sitting at my desk at CIA headquarters.

15   Q.   You were in your office when you got the e-mail?

16   A.   Yes, ma'am.

17   Q.   And when you got this e-mail, you see that he has copied

18   three people on -- is it three people on it, correct?

19   A.   That's correct.

20   Q.   And before you replied, and I think your reply was marked

21   as 1096, right.  Do you have the hard copy there or do you need

22   it pulled up.

23        Take a look at Government Exhibit 1096, right?

24   A.   Yes, now I have it.

25   Q.   Correct?

K2J3SCH5                          Roche - Cross

1    A.   Yes.

2    Q.   When you reply, before you reply, do you talk to this

3    individual named Andrew Hallman?

4    A.   No.   To the best of my recollection, Andrew was out of the

5    office in a meeting or an appointment.   Andrew and I usually

6    tag up later at night.   My recollection is that around maybe

7    6:30 at night I spoke to Andrew and said, hey, there is

8    something going on, let me go through the issues with you.

9    This was one of them.

10   Q.   So your testimony is that you spoke to Mr. Hallman before

11   you replied to this e-mail, correct?

12   A.   No, ma'am.

13   Q.   You did not?

14   A.   No, ma'am.

15   Q.   So you just replied to the e-mail, even though the e-mail

16   is to Mr. Hallman, and you are copied, right?

17   A.   That's correct.

18   Q.   Okay.   And your e-mail states, and I won't belabor it too

19   much.   You basically say, look, this is part of my job, and

20   come, let's have a conversation, correct?

21   A.   Yes, basically.

22   Q.   Right.   And you figure out that Mr. Schulte has not replied

23   to your invitation to meet, right?

24        He doesn't reply, you testified on direct, correct?

25   A.   Yes.

K2J3SCH5                        Roche - Cross

1  Q.  And then you learn that he doesn't reply because he's

2  logged off the system and left for the day; is that correct?

3  A.  That is correct.  I sent this e-mail and then followed it

4  with a phone call trying to reach him by phone.

5  Q.  Okay.  So is it because you couldn't reach him by phone

6  that you figured out he left for the day or because you looked

7  at the system and saw he had logged out?

8  A.  Ma'am, I tried to get his contact information.  Made a

9  call, there was no answer.  So I called my counterpart, my

10  colleague, my direct report in CCI front office and said I need

11  you to go find where this employee is right now, and the system

12  will indicate if an employee is logged on or logged off.

13      I received information back, that the -- Mr. Schulte

14  had logged off.  And that his work team and work unit had

15  explained that he had said he had left for the day.  Left the

16  work spaces for the day.

17  Q.  Okay.  Well, you would know that just from looking at his

18  badge records, right?

19  A.  I personally did not look at his badge records.

20  Q.  Right.  But any one of the people that you had working for

21  you would have known just by looking at his badge records that

22  he had left for the day, correct?

23  A.  Well, ma'am, the people that I call --

24  Q.  I just wanted to know if you could have just looked at his

25  badge records?

K2J3SCH5                    Roche - Cross

1   A.  No, I could not have.  The people that work for me in CCI

2   front office do not have access to badge records nor do I.

3   Q.  So you're saying that you had no access to badge records

4   that would tell you where an employee was?

5   A.  The office of security has access to badge records.  You

6   have to make a request to the office of security.

7   Q.  Right.  And my question is did you make that request?

8   A.  No, ma'am, I didn't.

9   Q.  So, you found out by some other means that Mr. Schulte had

10  left the building for the day, correct?

11  A.  He had left his work spaces they said.  He appears to have

12  left for the day.  But he was not where anybody could find him

13  in the work spaces in the CCI building.

14          Their conclusion was that he had left for the day

15  because he was logged off and because he was no longer in the

16  work spaces.

17  Q.  When you say work space, do you just mean the office?

18  A.  His office, yes, ma'am.

19  Q.  Right.  So like a general office.  He left the office for

20  the day?

21  A.  Yes.

22  Q.  Okay.  And when you learned that, you tried to reach him

23  the next day.  Is that your testimony?

24  A.  I asked for a meeting to be arranged.  I have people in my

25  front office that schedule meetings, special assistants and

1    executive assistants, and I told the CCI front office that I

2    wanted a meeting arranged with him.

3    Q.  So you directed somebody else to set up a meeting between

4    you and Mr. Schulte?

5    A.  That is correct.

6    Q.  And then there came a time when somebody set up the meeting

7    between you and Mr. Schulte, correct?

8    A.  Yes.  It was not too long after, I believe, again, on the

9    30th of June.  This was sent on the 28th.

10   Q.  June -- is it 28 or 26?

11   A.  It was sent on the 28th, ma'am, in the afternoon.  Then my

12   recollection is meeting with him in CCI spaces on the 30th.

13   Q.  Okay.  So, when you scheduled -- not you, but your

14   administrative assistants scheduled the meeting for you, for

15   the 30th, Mr. Schulte showed up, correct?

16   A.  Yes, ma'am.

17   Q.  And when he showed up you said you thought his demeanor was

18   normal.  Was his demeanor normal to you?

19   A.  Yes.  It was not -- it was a conversational demeanor.

20   Q.  Conversational demeanor.  And it's fair to say, right, that

21   it is Mr. Schulte who sent you the memo of warning that he had

22   been given, correct?

23   A.  That is correct.

24   Q.  And it's also fair to say did he also send you the letter

25   of warning?

K2J3SCH5                          Roche - Cross

1    A.  Yes, the attachments.

2    Q.  Okay.  And let me just make sure I get this correctly.  You

3    see on 1096 where it says on top it says very/respectfully

4    Sean, correct?

5    A.  Yes, ma'am.

6    Q.  And then it says N?

7    A.  Yes.

8    Q.  There are no cc's or bcc's on this message, correct?

9    A.  Yes, correct.

10   Q.  What does that mean?

11   A.  So, in the system it is possible to take someone's note and

12   blind copy other people, and I wrote there are no cc's or bcc's

13   on this message.  I, in responding back to the way he sent the

14   note, there is a cc to Meroe Park.  But this was trying to say

15   to him --

16   Q.  I didn't ask what it is trying to say.  I just asked you

17   what it does say.

18   A.  It says N, for note, there are no cc's or bcc's on this

19   message.

20   Q.  That's inaccurate, right?

21   A.  That's inaccurate.

22   Q.  There is in fact a cc on it?

23   A.  There is a copy, yes.

24   Q.  In fact, you don't know if there is a bcc because we

25   wouldn't see the bcc?

1    A.  I know there wasn't a bcc.

2    Q.  I'm asking you to take a look at the document.

3    A.  I'm looking at the document, ma'am.

4    Q.  Right.  Shows no bcc, correct?

5    A.  Documents don't show bcc.

6    Q.  So that statement that you are telling Mr. Schulte, the man

7    with whom you want to build trust with, is wrong, right?  That

8    N note, correct?

9    A.  It is technically incorrect, yes.

10   Q.  What do you mean "technically incorrect"?

11   A.  Well, ma'am, no one could see a bcc, so what I was

12   trying --

13   Q.  I'm talking about the cc.

14   A.  The cc is incorrect.  I did a reply all and there was a cc.

15   I didn't add any more people or up the ante.

16   Q.  That really wasn't my question.  I just wanted to know that

17   statement there are no cc's is incorrect.

18   A.  Yes, ma'am.  That's incorrect.

19   Q.  So, Mr. Schulte sends you this attachment, correct?

20   A.  Yes.

21   Q.  And again, you've testified before that this is the first

22   time you read the attachment, correct?

23   A.  This is the first time I knew anything about these matters.

24   Q.  And it's normal for you to not be in the loop on this.

25   This is not out of the ordinary?

K2J3SCH5                         Roche - Cross

1    A.  It's not out of the ordinary.

2    Q.  Were you surprised that nobody in management below you had

3    looped you in?

4    A.  No, I was not.

5    Q.  You were not?

6    A.  Because at this level a letter of warning, in the CIA

7    procedures, a level of warning normally would not be brought to

8    directorate level.  It does not need directorate level

9    concurrence.  There are more -- there are down the road avenues

10   for disciplinary actions in the agency that require directorate

11   intervention, and I discussed some of those with the deputy

12   director of CCI.

13   Q.  I don't know what all of that means.  But all I wanted to

14   know is it's not unusual for you not to be in the loop at this

15   level, correct?

16   A.  That's correct.

17   Q.  Okay.  So, you get this memo of warning that's attached,

18   you read it, correct?  And I am assuming you read the e-mail in

19   great detail, correct?

20   A.  I read the e-mail very quickly and wanted to respond as

21   fast as I could.

22   Q.  No, no, I mean do you go back and then read it carefully

23   after you've immediately replied?

24   A.  Yes, ma'am.

25   Q.  Okay.  And you've read the entire e-mail before you meet

1   with Mr. Schulte, correct?

2   A.   That's correct.

3   Q.   And you have read the letter of warning, correct?

4   A.   Yes.

5   Q.   And you testified you had pulled his file, correct?

6   A.   I pulled his agency bio.

7   Q.   By "agency bio" do you just mean a folder that's on him?

8   A.   That is a summary document that shows when someone came on

9   board, where they went to school, if they have that, if they

10  went to school, where they've been assigned.

11  Q.   Where did he go to school?

12  A.   University of Texas at Austin.

13  Q.   Right.  And that was in there, and that was accurate,

14  correct?

15  A.   Yes, ma'am.

16  Q.   And was there any other information in that file other than

17  he had gone to UT Austin?

18  A.   There was information about the particular work units that

19  he had been assigned to in CIA.

20  Q.   What were those?

21  A.   I only remember the last one, because it was relevant.  The

22  unit in CCI.

23  Q.   The what?

24  A.   The unit that is located in CCI.

25  Q.   What unit was that?

K2J3SCH5                          Roche - Cross

1    A.  Group level unit in CCI.

2    Q.  What was the group level unit?

3    A.  I don't know -- in the instructions -- we normally don't

4    identify group names.

5    Q.  Go ahead.

6    A.  It was the Engineering Development Group.

7    Q.  Okay.  He was in the EDG group?

8    A.  Yes.

9    Q.  Where in EDG?

10   A.  I do not recall which part of EDG he was in.

11   Q.  Do you recall what he did?

12   A.  Yes.

13   Q.  What did he do?

14   A.  He was a -- he developed tools to support cyber

15   intelligence.

16   Q.  What does that mean, to develop tools to support cyber

17   intelligence?

18   A.  He developed capabilities, software-based capabilities that

19   allowed the United States to collect intelligence from computer

20   systems.

21   Q.  Collect intelligence how?

22   A.  Collect intelligence by exploiting weaknesses in those

23   systems that allow access and insight into how the systems are

24   used or what's being done with the systems.

25   Q.  Let's break that down.  He designed software you said?

K2J3SCH5                          Roche - Cross

1   A.  He developed, which in engineering we use to say you have a

2   requirement to have a capability, and he would be working with

3   others to develop a capability that then could be used later to

4   solve this requirement.

5   Q.  To solve what requirement?

6   A.  To solve a cyber requirement.  To solve a requirement that

7   allowed us to get access via cyber.

8   Q.  To allow you to get what kind of access via cyber?

9   A.  Access into a system that would be a clandestine access

10  into a computer network.

11  Q.  What is a clandestine access?

12  A.  Clandestine defined means that there was no signs that it

13  is going on.

14  Q.  There's no signs, meaning like hidden access?

15  A.  Yes.  Unrevealed access.

16  Q.  Unrevealed access?

17  A.  Yes.

18  Q.  Secret access?

19  A.  Yes.

20  Q.  Covert access?

21  A.  Covert, ma'am, is a different word than clandestine.  Has a

22  different meaning.

23  Q.  You'll explain it to me in a minute.  But the access that

24  these developers are developing is basically secret access,

25  correct?

1    A.  Access that would not be easily detected, yes.

2    Q.  Not just not easily detected, also not linked back to the

3    United States, correct?

4    A.  That's the objective of clandestine operations.

5    Q.  Tell us some more about this objective of clandestine

6    operations.

7    A.  Clandestine --

8            MR. DENTON:  Can we just get a specific question, your

9    Honor?

10           MS. SHROFF:  Okay.

11   Q.  Pick a specific project that the United States had as a

12   clandestine project and explain it to us.

13           MR. DENTON:  Objection.

14           THE COURT:  I think your first question is not

15   objectionable.  Why don't you ask that again.

16   Q.  So, tell us, please, what is a clandestine operation by the

17   United States?

18   A.  Something is clandestine when the signature of what's

19   happening, whether it's physical, digital, is managed in a way

20   that would not reveal that the activity is happening.

21   Q.  Well, not just that the activity is happening, but also who

22   is doing the activity, correct?

23   A.  Yes.

24   Q.  Right.  So you are not developing a tool and then sending

25   it out into the universe and then putting a signature that says

K2J3SCH5                         Roche - Cross

1    "made by the CIA," correct?

2    A.  No, you are not doing that.

3    Q.  Right.  In fact, you're taking great pains to make sure

4    that nobody can ever attribute it back to the CIA, correct?

5    A.  That's the goal.

6    Q.  That's the goal.

7    A.  Correct, that's the mission, correct.

8    Q.  That's your mission, correct?

9    A.  Yes.

10   Q.  Right.  And the CIA invests millions and millions of

11   dollars ensuring that that mission comes to fruition, correct?

12   A.  Yes.

13   Q.  Now, when these tools are designed and sent off into the

14   universe, those are the tools that are developed at this OSB

15   level, correct?

16   A.  Yes.

17   Q.  And when you checked Mr. Schulte's file, or the -- what did

18   you call it?  Bio something?

19   A.  Agency bio.

20   Q.  Agency bio.  Was there anything more that you remember

21   reading in that agency bio?

22   A.  Not to the best of my recollection.  It was -- it does not

23   normally give a lot of description about the current

24   assignment.  It lists the assignments.

25   Q.  But I'm not talking just about assignments.  I'm talking

1    about anything else you learned from his agency bio about him.

2    A.  It's a very brief summary.

3    Q.  Okay.  So what else did you learn, other than the agency

4    bio, I mean?  What other documents did you pull, other than the

5    agency bio?

6    A.  In addition to the attachments he sent, I spoke to my

7    direct reports in the CCI front office asking them for

8    background on this employee.

9    Q.  So, translate that into things we would understand.  What

10   did you ask for?

11   A.  I asked them tell me what do you know about Mr. Schulte,

12   where is he assigned, what is this letter of warning, what is

13   the background behind this.

14   Q.  Just by using first names, tell us who did you speak with.

15   A.  I spoke with John.

16   Q.  John.

17   A.  Yes.

18   Q.  Okay.  Anybody other than John?

19   A.  No.  He is my direct, he was my direct report so he -- I

20   dealt with him.

21   Q.  And is that the time that you learned about what you said

22   on direct was something about thumb drives?

23   A.  Yes.

24   Q.  Okay.  In fact, you never learned anything about a thumb

25   drive incident that occurred in 2016, correct?

K2J3SCH5                          Roche - Cross

1    A.  When I spoke -- my recollection is when I spoke to John, he

2    relayed an incident where Mr. Schulte, it had been detected

3    that Mr. Schulte put a thumb drive into the agency's enterprise

4    IT system.

5    Q.  Right.  And when was that incident; do you remember?

6    A.  I don't remember the date, no, ma'am.

7    Q.  Do you remember that it happened when he was an intern?

8    A.  No, ma'am, I don't.

9    Q.  Do you remember that he self-reported it?

10   A.  No.

11   Q.  Do you remember that he was told that that was a rookie

12   mistake?

13   A.  No.

14   Q.  Did you ever follow up and say, hey, I'm reading something

15   about a thumb drive incident, let me follow up before I testify

16   in court about it?

17   A.  The thumb drive --

18   Q.  Yes or no?

19   A.  I did not read about it, I was told verbally.  And no,

20   ma'am, I did not follow up.

21   Q.  You did not follow up?

22   A.  No.

23   Q.  Sitting here today, you have no idea when that thumb drive

24   incident, as you call it, occurred, correct?

25   A.  That's correct.

K2J3SCH5                           Roche - Cross

1    Q.  Did you by any chance talk to his supervisor named -- hold
2    on a minute, please.
3         (Counsel conferring)
4    Q.  You spoke to a man named Gordon?
5    A.  No.
6    Q.  Why?
7    A.  As a very senior official, to reinforce the chain of
8    command in CCI, I dealt with my direct reports.
9    Q.  But this guy --
10   A.  And my direct reports in the CCI front office.  That was my
11   point of contact.
12   Q.  Right.  Okay.  So, if a direct report who was your point of
13   contact was not Mr. Schulte's supervisor, when he was an
14   intern, and had that thumb drive incident as an intern, you
15   spoke to no one else other than the direct office report,
16   correct?
17   A.  The CCI front office, yes, ma'am.
18   Q.  So you never went back and checked as to whether or not
19   this was an intern incident, correct?
20   A.  That's correct.
21   Q.  You never reached out to a man named Gordon, even though
22   you knew who he was, correct?
23   A.  I did not know who Gordon was.
24   Q.  Wasn't he listed as Mr. Schulte's supervisor when he was an
25   intern?  I mean, that's office-level knowledge, right?

1   A.  No, that's not something -- that's not something I would

2   know.  That would not be on an agency bio.

3   Q.  Certainly you would have access to information as to who

4   his supervisors were over the years, right?

5   A.  I could get access to that.

6   Q.  Right.

7   A.  But that is not something that I would readily have access

8   to.

9   Q.  Well, I mean, you had access to his immediate supervisor at

10  that time Sean, correct?  Sean F.

11  A.  I never met Sean.

12  Q.  Oh, I didn't ask you if you met Sean.  I just asked you if

13  you had access to him.

14  A.  Through the CCI front office, I would get access to any

15  officer using my direct reports who I hold accountable for that

16  organization.

17  Q.  You could have talked to Sean F., correct?

18  A.  That's correct.

19  Q.  You could have talked to Gordon?

20  A.  Correct.

21  Q.  You could have talked to Karen?

22  A.  Correct.

23  Q.  You could have talked to Mr. Weber, correct?

24  A.  Correct.

25  Q.  You could have talked to Justin Nichols?

K2J3SCH5                         Roche - Cross

1    A.  Correct.

2    Q.  You could have talked to Amol, correct?

3    A.  Correct.

4    Q.  You could have talked to Michael K., correct?

5    A.  Correct.

6    Q.  You could have talked to Michael S., correct?

7    A.  Correct.

8    Q.  In fact, you were so high up, you could talk to anyone you

9    wanted to about Josh Schulte, correct?

10   A.  If the arrangements were made for me to get to them, yes, I

11   could have.

12   Q.  Who would make those arrangements?  You, right?

13   A.  The CCI front office.  I would task the CCI front office.

14   I did in fact --

15   Q.  No, my question was you had the power to make the

16   arrangements, right?

17   A.  Yes.

18   Q.  That's all I wanted.  Thank you.

19            So you get this e-mail, and then you get ready for

20   your meeting with Mr. Schulte, correct?

21   A.  Correct.

22   Q.  And you testified on direct, did you not, that you were

23   concerned when you met with him, right?

24   A.  Yes.

25   Q.  Okay.  And you testified that you were concerned because

1    you saw a red flag, correct?

2    A.   Yes.

3    Q.   And the red flag you thought was partially because you read

4    phrases such as "incurred her wrath" in his e-mail, correct?

5    A.   Hmm-hmm.

6    Q.   And by the way, do you know what the phrase "incur

7    somebody's wrath" means?

8    A.   I believe so.

9    Q.   What does did mean?

10   A.   Wrath to me means retribution.

11   Q.   Is that what it means?  Meaning you don't want somebody to

12   get mad at you?  Is that the normal understanding of you incur

13   someone's wrath?

14   A.   In my vernacular, wrath means retribution.  More than

15   somebody just getting frustrated or angry with you.

16   Q.   You think that the phrase "incur somebody's wrath" is only

17   used when somebody's frustrated or angry, correct?

18   A.   Yes.

19   Q.   Okay.  And that was one of the things that caused the red

20   flag for you, right?

21   A.   Yes.

22   Q.   Okay.  And after this red flag was in the back of your

23   mind, you said you wanted to have somebody keep an eye on him,

24   correct?  Is that what you said?

25   A.   Following the meeting, and the full content of the meeting,

K2J3SCH5                    Roche - Cross

1   I spoke to deputy director of CCI and said make sure his

2   actions are being closely monitored.

3   Q.  Who is that person?  Just give me a first name.

4   A.  John.

5   Q.  John.  Right.  And you told John that, correct?

6   A.  That's correct.

7   Q.  And when you told John that you wanted Mr. Schulte closely

8   monitored, what exactly did you mean?

9   A.  That means that any time that he is on the agency network,

10  that means that the security team is aware of the cumulative

11  number of challenges he's had in following our rules, that

12  there is followup any time he's given a directive to make sure

13  that directive is followed, and to make sure that any further

14  incidents are fully documented.

15  Q.  Okay.  And this was in June, correct?

16  A.  Yes.

17  Q.  2016, correct?

18  A.  Yes.

19  Q.  And sitting here today, do you know what steps they took to

20  keep an eye on him?

21  A.  Yes, I do.

22  Q.  Okay.  So they monitored his use of DevLAN, correct?

23  A.  To the extent possible on DevLAN.

24  Q.  You are the CIA.  Isn't it possible?

25  A.  So, the network, the enterprise network has the gold

1    standard for audit.  The DevLAN was a system that was working

2    to try and achieve that standard, did not have that standard.

3    Q.  Your testimony is that you knew at that time that DevLAN

4    did not meet the gold standard?

5    A.  No, I did not know that at that time.

6    Q.  You did not know?

7    A.  No.  I did not know that at that time.

8    Q.  Let's figure out what you knew about DevLAN at that time.

9    Did you know that it was an open network?

10   A.  I'm sorry, I'm not familiar -- what do you mean by open

11   network?

12   Q.  Did you know it was a dirty network?

13   A.  I knew that it handled data that had needed quarantine.

14   Malware, etc.

15   Q.  Okay.

16   A.  That's what I believe you mean by "dirty network."

17   Q.  But, you knew that it wasn't a secure network, right?

18   A.  I believed it to be a secure network.

19   Q.  You believed it to be a secure network at that time?

20   A.  Yes, yes.

21   Q.  Post-Snowden it is your testimony today that you still

22   believe DevLAN to be a secure network?

23   A.  Yes.

24   Q.  Post-Snowden?

25   A.  Yes.

K2J3SCH5                        Roche - Cross

1    Q.  People at the CIA never expression any qualms to anyone at

2    the CIA management level, including to you, that what happened

3    with Snowden could happen at the CIA; that's your testimony?

4    A.  No.

5    Q.  That's not your testimony?

6    A.  No.

7    Q.  Okay.  So what is your testimony?

8    A.  My testimony is that the vast, vast majority of people who

9    come work at the CIA are on the CIA enterprise network, which

10   is the gold standard for audit.  And my testimony is that from

11   the first days of the creation of DDI, the mission networks

12   that represent a much smaller specialized footprint, that the

13   goal was to get those to the highest levels of audit as fast as

14   possible.

15   Q.  That really wasn't my question.  Let me try my question

16   again.

17   A.  Sure.

18   Q.  Snowden happened.

19   A.  Hmm-hmm.

20   Q.  Right?  You remember that?

21   A.  Yes, ma'am.

22   Q.  Okay.  People talked about it, right, because this was in

23   your industry, correct?

24   A.  Yes.

25   Q.  It was classified information, correct?

K2J3SCH5                         Roche - Cross

1   A.   Yes.

2   Q.   That had gotten out, correct?

3   A.   Yes.

4   Q.   Related to your field of work, correct?

5   A.   Related to intelligence.

6   Q.   Right.  Which is your field of work?

7   A.   Yes.

8   Q.   And you certainly didn't want it to happen to DevLAN,

9   correct?

10  A.   Ma'am, Snowden happened 2013.  DDI had not been created

11  yet.  I was not having discussions about DevLAN in 2013.

12  Q.   I didn't ask you if you were having discussions only in

13  2013.  I am just asking you after 2013, you had on your horizon

14  that whatever happened with Snowden you didn't want to happen

15  again, correct?

16  A.   Yes, ma'am.

17  Q.   Okay.  So, basically, you had somebody you had red flagged,

18  correct?

19  A.   Yes.

20  Q.   And you wanted to make sure he didn't access DevLAN

21  incorrectly, correct?

22  A.   Any computer system, ma'am.

23  Q.   Any computer system, right?

24  A.   That's right.

25  Q.   And you made sure that whatever he was doing on these

1  computer systems was being watched, correct?

2  A.  I directed that his activities be monitored.

3  Q.  Right.  You followed up, right, that his activities were in

4  fact monitored?

5  A.  I gave the directive --

6  Q.  Just can you try and answer my question?  It would really

7  help.

8  A.  Yes, ma'am.  I'm trying to answer your question.

9  Q.  So did you follow up and make sure that your directive was

10  followed?

11  A.  I was told that it was being followed.  I asked.

12  Q.  You asked?

13  A.  Yes, ma'am.

14  Q.  And you were told it was being followed?

15  A.  Yes, ma'am.

16  Q.  His activity on DevLAN was being monitored, correct?

17  A.  I asked that all his activities were being monitored.

18  Q.  You broke it down for them, correct?

19  A.  No, I did not.

20  Q.  This guy is a huge red flag you testified on direct.

21  Right?  I mean, you were so concerned about it, according to

22  you, you canceled a trip to Europe.  Is that what you said?

23  A.  No, that's not what I said.

24  Q.  Okay.  It was a big red flag for you, you said, right?

25  A.  Yes, it was.

K2J3SCH5                        Roche - Cross

1    Q.  So you followed up, right?  You had a checklist, you wrote

2    down each network, and you ticked off, right?

3    A.  No.

4    Q.  Oh, okay.

5           One of the other things you testified, did you not,

6    that he told you during this meeting that he was just -- he was

7    still able to get his access back.  Is that what you testified?

8    A.  Yes.  I'm paraphrasing.

9    Q.  Can you just paraphrase for me again, because I don't have

10   a transcript.  What the exactly do you recall being told?

11   A.  What I recall being told is after a conversation of why he

12   should never try to do something like that again, and him

13   explaining that he did not have access to this previous project

14   he had worked on, he paused and said, you know, I could get

15   back onto that if I wanted to.

16   Q.  He paused and he said, you know, I could get back onto that

17   if I want to?

18   A.  Yes.  Right after discussing --

19   Q.  I got that.  Huge red flag for you, right?

20   A.  Yes.

21   Q.  Okay.  And let me ask you this.  What is administrative

22   leave at the CIA?

23   A.  Administrative leave is one of several forms of time card

24   leave for allocating your pay and your hours worked.  You are

25   in pay status or you are in various aspects of leave status.

1   Administrative leave is one type of leave.

2   Q.  Okay.  And you can put an individual or an employee on

3   administrative leave if you see a red flag, correct?

4   A.  The office of security has to do that, ma'am.

5   Q.  You could make a referral to the office of security,

6   correct?

7   A.  That's correct.

8   Q.  Right.  Did you?

9   A.  No, I did not.

10  Q.  Okay.  So you didn't tell them to put him on administrative

11  leave.

12          Can you say that again for me -- what did you say he

13  said to you, according to you?

14  A.  Words to the effect of, you know, I could get back into

15  that if I wanted to.

16  Q.  Okay.  So you didn't tell security.  And did you send an

17  e-mail to John saying this guy said, you know, I can get back

18  onto that if I want to?

19  A.  I had a discussion --

20  Q.  No, no.  We'll get to the discussion.  I'm only asking you

21  if you sent an e-mail.  Did you send an e-mail?

22  A.  No.

23  Q.  Okay.  And your testimony is you didn't send an e-mail,

24  correct?

25  A.  Correct.

1    Q.  You did not memorialize it, correct?

2    A.  I'm sorry, ma'am.  Could you repeat that?

3    Q.  Sure.  Did you memorialize it?

4    A.  I don't recall.

5    Q.  You don't recall.

6    A.  I don't recall.

7    Q.  Okay.  But you recall telling John about it, correct?

8    A.  Absolutely.

9    Q.  Right.  And what did John do, by the way?

10   A.  John responded back to me, Sean, we're all over it, we're

11   monitoring him, security is all over it, CIA is all over it.

12   Q.  He told you CIA is all over him, right?

13   A.  Basically.

14   Q.  So from at least June, everybody was watching him?

15   A.  That's what I was told.

16   Q.  June, July, August, September, October, November is when he

17   leaves, correct?  November 10, 2016, correct?

18   A.  Correct.

19   Q.  Somebody's watching him the whole time, right?  Because you

20   are all over, it correct?

21   A.  Hmm-hmm.

22   Q.  Right?

23   A.  Yes.

24   Q.  Right.  By the way, sitting here today, do you have any

25   idea when the information was taken from the CIA that ended up

1    in Vault 7?

2    A.  I have the date that corresponds to the date of the data

3    which is March.

4    Q.  It's March, right?  According to you it's March?

5    A.  Yes.

6    Q.  Okay.  And you don't know sitting here today whether the

7    information went from the CIA to a third party, correct?

8    A.  I know a third party published it.

9    Q.  No, no.

10   A.  Okay.

11   Q.  I'm not asking who published it.  I'm asking you the

12   trajectory.  You have no idea, right?  You don't know if it

13   went to Russia first, correct?

14   A.  Correct.

15   Q.  You don't know if it went to Spain first, correct?

16   A.  Correct.

17   Q.  In fact, you don't even know it just went to Baltimore,

18   correct?

19   A.  Correct.

20   Q.  Right.  All you know is, in 2017, WikiLeaks published it,

21   correct?

22   A.  That's correct.

23   Q.  And did you by any chance learn that even after 2017

24   publication, the CIA still did not know whether or not

25   WikiLeaks had the information from the gold repository?

K2J3SCH5                          Roche - Cross

1          MR. DENTON:  Objection.

2          THE COURT:  Overruled.

3   A.  Could you repeat that, please, ma'am.

4   Q.  Sure.  Is it fair to say, sir, that the CIA slash you still

5   don't know if WikiLeaks has the gold repository?

6          THE COURT:  Rebecca, could you read the question back,

7   please.

8          (The record was read)

9   A.  I believe that represents the last conversation I had on

10  what is called the gold repository.

11  Q.  So I'm correct.

12  A.  Yes.

13  Q.  CIA still doesn't know?

14  A.  I don't know that, ma'am.  I don't work there anymore.

15  Q.  You know what the WikiLeaks task force report is?

16  A.  Yes, I do.

17  Q.  Could you pull that up for this gentleman, please.

18          Are you happier with a paper copy or the screen?

19  A.  We can do this.

20  Q.  Could we just go to page 45.  Could you just focus on the

21  actual text.  You see that line, "However we now assess with

22  moderate confidence"?

23  A.  Yes.

24  Q.  Right.  "Moderate confidence that WikiLeaks does not

25  possess the gold folder," correct?

K2J3SCH5                          Roche - Cross

1    A.  Correct.

2    Q.  We can take that down and show him the first page of the

3    document.  First page.  There you go.  And that's the date,

4    correct?

5    A.  Yes.

6    Q.  Were you at the CIA then?

7    A.  Yes, I was.

8    Q.  After you had the meeting with Mr. Schulte and after you

9    talked to John, you did not ever follow up about him, correct?

10   A.  I verbally asked about him several times.

11   Q.  You verbally asked about him several times?

12   A.  Yes.

13   Q.  So this is a person that you thought was a huge red flag

14   and you only followed up verbally, correct?

15   A.  No, ma'am.  We had formal biweekly meetings with CCI, I

16   did, where at the end of the meeting we would discuss personnel

17   issues.

18   Q.  And?

19   A.  And during that portion of the meeting I'd say where do we

20   stand on Mr. Schulte?  Has he resigned?  Is he going to resign?

21   Any latest problems?

22   Q.  Uh-huh.

23   A.  Words to that effect.

24   Q.  Right.

25   A.  On several occasions in these biweekly formal meetings.

K2J3SCH5                          Roche - Cross

1   Q.  And in these biweekly formal meetings you never made any

2   formal notation, correct?

3   A.  No.

4   Q.  You did not suggest at that at these biweekly meetings that

5   this person with this humungous red flag should be put on

6   administrative leave, correct?

7   A.  No.

8   Q.  You did not even say to these people revoke his clearance,

9   correct?

10  A.  No.

11  Q.  You didn't even say take away his top secret clearance,

12  correct?

13  A.  Correct.

14  Q.  You did not even ask them to reduce his level of clearance,

15  correct?

16  A.  That's correct.

17  Q.  You did not do anything at all that you memorialized

18  anywhere, correct?

19  A.  Correct.

20  Q.  Okay.  Let me ask you something.  Is there a reason why you

21  didn't take any of those steps?

22          I'm not asking for a discourse on management.  I am

23  asking you why you didn't take any of those steps.

24  A.  Yes.

25  Q.  What is the reason, sir?

K2J3SCH5                         Roche - Cross

1   A.   Because I trusted the leadership team at CCI.

2   Q.   Okay.  So you thought you had done what you were supposed

3   to do, and you had handed it over, correct?

4   A.   That's correct.

5   Q.   Okay.  You called this leak, did you not, a digital Pearl

6   Harbor, correct?

7   A.   Yes.

8   Q.   When did you come up with this phrase, by the way?

9   A.   I'm not sure.

10  Q.   Not sure.  That's okay.

11  A.   That to me is the most accurate analogy.

12  Q.   It is the -- I'm sorry?

13  A.   It was a surprise, it was devastating, left us with very

14  little capability.

15  Q.   Okay.  Let's talk about that.  How many people died in

16  Pearl Harbor, do you know?

17  A.   More than 3,000.

18  Q.   How many people died as a result of the Vault 7 and the

19  Vault 8 leaks?

20  A.   I don't have an answer for that.

21  Q.   Why not?

22  A.   Because, it -- it's not something someone's keeping a count

23  of.

24  Q.   You are not keeping an account of it, but you called it

25  Pearl Harbor.

1   A.  Yes, I called it a digital Pearl Harbor.

2   Q.  How many people died as a result, I mean, how many people

3   died as a result of Vault 7 and Vault 8?

4   A.  I don't know.

5   Q.  In fact, none, correct?

6   A.  I can't say that either.

7   Q.  You can't say that.  You don't know?

8   A.  No, ma'am.

9   Q.  Okay.  Did the CIA ever commission a report to find out how

10  many people died as a result of the Vault 7 and the Vault 8

11  leaks?

12  A.  Not that I am aware of.

13  Q.  Okay.  Was there ever a report commissioned by the CIA to

14  figure out what harm Vault 7 and you Vault 8 caused to

15  America's relationships with friendly nations?  Was there a

16  report ever commissioned?

17  A.  I'm not -- I do not know.

18  Q.  You do not know?

19  A.  I do not know.

20  Q.  No.  Do you know if anybody went and formally asked and

21  wrote down the harm that came?  You don't know, right?

22  A.  I do not know.

23  Q.  And you do not know if anybody ever wrote a report,

24  correct?

25  A.  The task force report.

K2J3SCH5                          Roche - Cross

1   Q.  No, no.  I didn't ask about a task force report.  We have

2   the task force report.  The task force report does not talk

3   about the repercussions on friendly foreign nations, correct?

4   A.  Correct.

5   Q.  Right.  So I'm only asking you if somebody commissioned a

6   report to find out what exactly the impact was of Vault 7 and

7   Vault 8 on America's relationships with other friendly nations.

8   There was no such report, correct?

9   A.  I'm not aware of one.

10  Q.  Okay.  Was there a report to find out what the impact was

11  of the Vault 7 and the Vault 8 leaks on America's relationships

12  with adversary nations?

13  A.  I am not aware.

14  Q.  How about with non-state foreign hostile actors; was there

15  a report done on that?

16  A.  On -- there was reporting.

17  Q.  No, no, I'm not asking about reporting, sir.  I am asking

18  you if the CIA commissioned a report to document the harm done

19  by the leak.  That's what I'm asking you.  Was there a written

20  report that you saw that said this is the harm that has come to

21  our relationship with adversary nations.

22          Yes or no?

23  A.  I'm not aware.

24  Q.  Sitting here today, do you know of any report that actually

25  created a statistical number of any CIA agents that were placed

K2J3SCH5                     Roche - Cross

1    at risk because of the release of Vault 7 or Vault 8?

2    A.  I am aware of assessments of operations.

3    Q.  Listen to my question carefully.  Okay?

4    A.  Yes.

5    Q.  Right.  So my question to you is, you can get to assessment

6    of operations in a minute.  My question to you is, did the CIA

7    say let's get a report and let's write down how many CIA agents

8    were left at risk because of Vault 7 and Vault 8?

9    A.  I'm not aware.

10   Q.  Did the CIA ever do a report to figure out how many CIA

11   officers were left at risk because of Vault 7 or Vault 8?

12   A.  That work was done.

13   Q.  That work was done.  Was there a report written?

14   A.  I'm not aware.

15   Q.  Well, there was work done but you are not aware if a report

16   was written?

17   A.  Yes, for all these issues.  Across the agency, there were

18   assessments.

19   Q.  No, no.  Are you changing your answer now that there was a

20   report written?

21   A.  In terms of report, I think you're looking for a summary

22   document.

23   Q.  I'm not -- don't think about what I'm looking for.  I'm

24   asking you the question, sir, and you are under oath now,

25   right?

K2J3SCH5                          Roche - Cross

1   A.  Yes, ma'am.

2   Q.  Okay.  Do you want to change any of your answers that a

3   report was written?

4           THE COURT:  Sustained.

5           MR. DENTON:  Thank you, your Honor.

6   Q.  Would you like to change your answer?

7   A.  No, ma'am.

8   Q.  So there were no reports that you received, correct?

9   A.  There was reporting.

10  Q.  No.  I'm not asking you about reporting, sir.

11  A.  Ma'am, I am trying to be responsive.  I'm honestly trying

12  to be responsive.  There were assessments by the various parts

13  of the agency on which officers could have been exposed, etc.

14  There was a team dedicated to doing that assessment.

15  Q.  There were written assessments.  Do you want to call them

16  assessments?

17  A.  Yes.

18  Q.  Okay.  Who wrote these assessments?

19  A.  Teams of CIA officers who had access to the information.

20  Q.  They wrote actual assessments, correct?

21  A.  They produced reporting.

22  Q.  Right.  They produced reporting.  And did you see this

23  reporting?

24  A.  No, I did not.

25  Q.  You did not.  Do you know if the reporting was ever given

K2J3SCH5                        Roche - Cross

1   to the United States attorney's office as part of this case?

2   A.  I do not know what form the reporting took.  I do not know.

3   Q.  So you don't know what form the reporting took, correct?

4   You don't know what form the assessments were written in,

5   correct?

6   A.  Correct.

7   Q.  You do not know if these assessments were written or

8   when -- you do know they were written, correct?  According to

9   you now?

10  A.  Yes.

11  Q.  You don't know when they were written, correct?

12  A.  The exact dates they're completed, no, I can't recall.

13  Q.  You don't know what the conclusions were, correct?

14  A.  Not in detail, no.

15  Q.  Well, in any form.  Do you know any of the conclusions at

16  all?  That's all I want to know.

17  A.  There were conclusions about CIA officers and programs

18  that -- that may have risked exposure via the information that

19  was released --

20  Q.  May have risked exposure is not what I am asking you.  I am

21  asking you if there was a report that somebody was actually at

22  risk.

23  A.  I'm not aware.

24  Q.  Okay.  You are not even aware of how that quote unquote

25  assessment was done, correct?

1   A.  I'm aware of the team that came in and did it.  I even

2   spoke to them while they were going through the Vault 7

3   material.

4   Q.  You spoke to a team, correct?

5   A.  Yes.

6   Q.  Who's the team?

7   A.  A team of analysts.

8   Q.  They were a team of analysts who were analyzing the Vault 7

9   and Vault 8 leak.  That's not what I am asking you about, sir.

10  I am asking you about a risk assessment.  Please.  I'm asking

11  you if you ever saw a risk assessment done that said these

12  analysts, officers, or agents are at risk.

13          MR. DENTON:  Asked and answered, your Honor.

14          MS. SHROFF:  I don't think so.

15  A.  I did not see such a report.

16  Q.  Thank you.  By the way, do you know how many CIA foreign

17  offices had to be closed as a result of this leak?  Isn't the

18  answer none?

19          MR. DENTON:  Objection.

20          THE COURT:  Overruled.

21  A.  I don't know of any offices that were closed.

22  Q.  That had to be closed.

23          THE COURT:  He is not aware of any that were closed.

24  Q.  Were there any that were closed because of the Vault 7 or

25  Vault 8 leak?

1   A.  I'm not aware.

2   Q.  You are not aware, right?

3   A.  No.

4   Q.  And you are aware, though, that the CIA's position is that

5   the information was taken in March and released more than a

6   year later, correct?

7               MR. DENTON:  Objection.

8               MS. SHROFF:  That's what he testified to.

9               MR. DENTON:  That's not what he testified to.

10              THE COURT:  I don't think that is what he testified

11  to.  It was the CIA's position.

12  Q.  When did the CIA think the information was taken?

13  A.  The -- based on what has been published, an assessment was

14  that the information was as -- the information was dated in the

15  March time frame.

16  Q.  March of what year?

17  A.  2016.

18  Q.  Okay.  When was it released?

19  A.  It was released in -- March 7, 2017.

20  Q.  A whole year went by, right, in the middle?

21  A.  Yes, ma'am.

22  Q.  CIA survived, correct?

23  A.  Yes, ma'am.

24  Q.  Business went on as usual, correct?

25  A.  No, ma'am.

1   Q.  You didn't even know about the leaks until 2017?

2   A.  I'm sorry, ma'am.  I misunderstood.  After the -- after the

3   leak, business did not go on.

4   Q.  I am only talking about that gap now.

5   A.  Yes, ma'am.

6   Q.  Work went on, correct?

7   A.  Yes, ma'am.

8   Q.  Field locations survived, correct?

9   A.  That's correct.

10  Q.  Foreign offices survived?

11  A.  Correct.

12  Q.  Agents continued to do whatever syphoning they were doing,

13  correct?

14  A.  As far as I know.

15  Q.  Officers continued to write code, develop, and move right

16  along, correct?

17  A.  Yes, ma'am.

18  Q.  In fact, had WikiLeaks not released that information, the

19  CIA would never even know it was gone.  Isn't that correct?

20  A.  I can't say that, actually, ma'am.

21  Q.  Okay, let's pull this up.  Take a look, would you.  Take a

22  look at page 4.  "We did not realize the loss had occurred

23  until a year later."  Page 4.

24          You with me?

25  A.  Yes, ma'am.

K2J3SCH5                              Roche - Cross

1   Q.  Do you read that?

2   A.  Yes.

3   Q.  Okay.  By the way, could you tell me what this report is?

4   A.  This is the WikiLeaks task force report.

5   Q.  What is the WikiLeaks task force report?

6   A.  It is the task force communicating findings from their

7   examination of systemic issues that led to the WikiLeaks

8   release.

9   Q.  Could you tell me that in, like, simpler English, and if

10  you could speak into that mic that would be most helpful to me.

11  A.  Okay.  This is the task force that was formed immediately

12  after the Vault 7 release that examined what we should do

13  operationally as a result, and looked at any systemic issues to

14  make recommendations for -- to prevent something like this from

15  ever occurring again.

16  Q.  Okay.  And this is the formal report, right?

17  A.  Yes.

18  Q.  And this report says that you didn't know until -- not you

19  personally, but the CIA didn't know until a whole year later,

20  right?

21  A.  Yes.

22  Q.  And by the way, do you see on page -- actually, do you see

23  on page 4 on the top, do you see where it says "Day-to-day

24  security practices had become woefully lax"?

25  A.  Yes.

K2J3SCH5                         Roche - Cross

1    Q.  You didn't know that at that time, did you?

2    A.  No.

3    Q.  Did you also know that CCI had not worked with CIMC to put

4    in any procedures in place?

5    A.  No, I was not aware.

6    Q.  You were not aware, right?

7    A.  No.

8    Q.  Okay.  And you were aware, though, right, at some point,

9    that there was some embarrassment, was there not -- can you

10   just take that down.  Thank you.

11       -- at the fact that the CIA didn't know that this

12   information had been gone for a whole year, right?  It was

13   embarrassing, wasn't it?

14   A.  I don't recall myself feeling embarrassed.

15   Q.  It wasn't embarrassing that the Central Intelligence Agency

16   of the United States of America had lost data that nobody

17   realized had been gone for a whole year?

18            MR. DENTON:  Asked and answered, your Honor.

19            THE COURT:  Sustained.

20   Q.  You do know that the WikiLeaks report blamed Mr. Schulte,

21   correct?

22   A.  I don't recall.  I read it quite a while ago.

23   Q.  Okay.  You saw the WikiLeaks report, right?  This report;

24   you'd seen it, right?

25   A.  Yes, ma'am.

K2J3SCH5                          Roche - Cross

1    Q.  And I'm correct, am I not, that you saw no damage

2    assessment report, correct?

3    A.  I saw damage assessment reports on operations, routinely.

4    Q.  No, no, I'm not talking about e-mail traffic.  I'm talking

5    about a report.

6    A.  Ma'am, I'm not talking about e-mail traffic.  I'm talking

7    about having the operations team describe the status of

8    operations, and what was happening on a periodic basis given

9    the status of operations after the Vault 7 disclosure.

10   Q.  Right.  That's what's happening on your status of

11   operations.  I am asking about a damage assessment report.

12   A.  The damage was to operations, ma'am.

13   Q.  The damage was to operations.  And you received a damage

14   assessment operations report?

15   A.  Periodically.

16   Q.  No, no, not reporting to you.  I am asking you if you

17   received an actual report.  A report on which you can examine

18   methodology, statistics, numbers, and facts.  Did you ever

19   receive such a report?

20               MR. DENTON:  Objection.

21               THE COURT:  Overruled.

22   A.  I received briefings and copies of those briefings.

23               (Continued on next page)

24

25

K2jWsch6                          Roche – Cross

1    BY MS. SHROFF:

2    Q.   OK.   Great.   Did you receive a report?

3    A.   The briefing was the report.

4    Q.   No, no.   I'm asking you if you received a document that

5    said WikiLeaks damage assessment task force report.   Did you

6    receive one?

7    A.   I received briefings.   That's reporting.   I received

8    briefings that damage --

9              THE COURT:   Listen to the question, Mr. Roche.

10             THE WITNESS:   Yes, sir.

11             THE COURT:   Did you get a report that said WikiLeaks

12   damage assessment task force report?

13   A.   No, ma'am.

14             MS. SHROFF:   Thank you.

15             MR. DENTON:   Nothing further, your Honor.

16             THE COURT:   Mr. Roche, you're excused.   Thank you very

17   much.

18             (Witness excused)

19             THE COURT:   Next witness.

20             MR. KAMARAJU:   Yes, your Honor.   The government calls

21   Mark Bradley.

22    MARK A. BRADLEY,

23        called as a witness by the government,

24        having been duly sworn, testified as follows:

25             THE COURT:   Please sit down, Mr. Bradley.

1           THE WITNESS:  Yes, sir.

2           THE COURT:  Pull yourself right up to the microphone.

3           MR. KAMARAJU:  May I proceed, your Honor?

4           THE COURT:  Yes, you may.

5           MR. KAMARAJU:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. KAMARAJU:

8    Q.  Good afternoon, sir.

9    A.  Good afternoon to you.

10   Q.  Sir, are you employed?

11   A.  I am.

12   Q.  Where do you currently work?

13   A.  I am the director of the information security oversight

14   office at the National Archives administration, Washington,

15   D.C.

16   Q.  We're going to talk a little bit more about that, but first

17   of all, what's the National Archives?

18   A.  We are the national memory.  We sit on more classified

19   information than any agency of the United States government.

20   All records of the U.S. government ultimately come to the

21   National Archives.

22   Q.  Before we dig into a little bit of your current duties, I'd

23   like to talk about your background.

24   A.  Sure.

25   Q.  Do you have any degrees?

 1   A.  I do.  I have a bachelor's of arts degree from university

 2   of Washington and Lee.  I graduated Phi Beta Kappa.  I have a

 3   master's degree in modern history from Oxford, where I was a

 4   Rhodes scholar.  And I have a law degree from the University of

 5   Virginia School of Law.  I'm a member of the District of

 6   Columbia bar.

 7   Q.  Thanks.  I'm just going to ask you to sit a little bit

 8   closer to the mike.

 9   A.  Sure.

10   Q.  And maybe slow down a little bit for the court reporter.

11   A.  Is that better?

12   Q.  Yes, that's better.

13       Now, you testified that you have a law degree --

14   A.  Yes, sir.

15   Q.  -- is that right?

16   A.  I do.

17   Q.  Have you ever actually practiced law?

18   A.  I have.

19   Q.  What was your practice?

20   A.  First practice was with a law firm in D.C., and then I went

21   out on my own and was a criminal defense for almost eight

22   years.  I defended everything from indecent exposure on the

23   Metro to first degree murder, even had an espionage case.

24       I later also, too, practiced law with the Department of

25   Justice from November of 2000 until December of 2016.

1   Q.  OK.  So let's just break that down.  You testified that you

2   were working at a law firm for a period of time --

3   A.  Uh-huh.

4   Q.  -- is that right?

5   A.  Right.

6   Q.  And then after that you moved on to doing criminal defense

7   work?

8   A.  Correct.

9   Q.  And could you just give us some general examples of the

10  kind of work you did as a criminal defense lawyer?

11  A.  Well, as I said, I did drug trials.  Started out with

12  solicitation.  First trial I ever had my client overdosed and

13  passed out in the courtroom.  I thought -- I was petrified.

14  I've done everything from serious felonies to misdemeanors, and

15  felonies included first degree murder.

16  Q.  And did you do any criminal cases that involved espionage?

17  A.  I did.

18  Q.  Now, I believe you testified that after that you moved on

19  to the Department of Justice, is that right?

20  A.  I did.

21      And we forgot one critical point.  I was at the Central

22  Intelligence Agency from 1985 until 1989.

23  Q.  We're coming to that.

24  A.  We're coming back to that.  OK.  I'm getting ahead of

25  myself.  Sorry.

K2jWsch6                    Bradley - Direct

1    Q.  At the Department of Justice, what positions did you hold?

2    A.  Started out as a line attorney, then promoted to assistant

3    counsel and then rose up to be the deputy counsel for

4    intelligence policy in a small office that was called then the

5    office of intelligence policy and review.  We were kind of the

6    legal counsel for the Department of Justice on intelligence

7    matters.  Also practiced in front of the Foreign Intelligence

8    Surveillance Court for almost eight years.

9    Q.  OK.  Let's talk about that.  The office that you mentioned,

10   what were its general responsibilities?

11   A.  Primary responsibility was to prepare applications for

12   covert searches and electronic surveillance for the

13   intelligence, United States intelligence surveillance court,

14   the FISA court?

15   Q.  And what is the FISA court?

16   A.  The Foreign Intelligence Surveillance Court is the

17   so-called secret court.  It's been in the news quite a bit as

18   of late, a lot more than some people would like.  It's --

19   again, it's the -- comes out of the Church Committee.

20              THE COURT:  Comes out of the Church Committee.

21              THE WITNESS:  Yes, sir.  Comes out of the Curch

22   Committee.

23   A.  So the idea was that the intelligence communities,

24   particularly the CIA and FBI, had run amok, illegally

25   surveilling American citizens in particular, and we needed a

1   more regulated way of doing that.  So Article III judges were

2   appointed by the Chief Justice of the Supreme Court to sit on

3   this court and hear these so-called secret cases.  They're held

4   in a SCIF, a sensitive compartmented information facility,

5   highly classified cases.  But they -- they, you know, regular

6   Article III judges, just like the judge sitting here today.

7   Q.  How long were you with the Department of Justice?

8   A.  Went over from November of -- November 22 of 2000 until

9   December 26 of 2016, when President Obama approved my

10  appointment of archivist of the United States to my current

11  position as the director of the information security oversight

12  office.

13  Q.  And that's your current position?

14  A.  Correct.

15  Q.  And we'll talk about those responsibilities in a second.

16      You mentioned that you were with the Central Intelligence

17  Agency for a period?

18  A.  Correct.

19  Q.  Generally speaking, what did you do at the CIA?

20  A.  I spent most of my career in what was called the office of

21  Near Asia and South Asian analysis.  I was one of the agency

22  experts on Pakistan, particularly its politics.  I served

23  mostly in Washington but did time out in Pakistan.

24  Q.  And did that job involve classified information?

25  A.  Highly classified information.  The Russians had invaded

1   Afghanistan in 1979 so we were running a war through there, so

2   we were doing a lot of very highly classified things.

3   Q.  Now, I want to turn to your current position.  You

4   mentioned that you were first appointed in November of 2016 --

5   A.  Right.

6   Q.  -- is that right?

7       And was that appointment ever approved?

8   A.  I'm sorry?

9   Q.  Was that appointment approved?

10  A.  It was.  President Obama approved my appointment.

11  Q.  And when was that?

12  A.  It would have been, first day on the job was December 26,

13  2016.  The approval happened sometime in late November.

14  Q.  In your current position, does that make you part of the

15  U.S. intelligence community?

16  A.  It does not.  In fact, we are explicitly not part of the

17  intelligence community for a reason.  We are kind of -- I think

18  of us as the umpires in the game.  We don't -- we're not

19  members of the IC itself, intelligence community, but we have

20  oversight over it.  And again, it's another one of the Church

21  Committee findings, that they needed a neutral overseer of what

22  they do.  So what we do is we oversee how they classify and

23  declassify national security information.

24  Q.  Let's talk about a little bit at a high level about what

25  your responsibilities are in your current position.  Can you

K2jWsch6                    Bradley - Direct

1  describe your day to day?

2  A.  No day is the same.  I oversee five executive orders.

3  These range from how U.S. government classifies and

4  declassifies national security information to how it handles

5  control of classified information.  I chair the national

6  industrial security policy advisory committee.  We have a big

7  role in the national industry security base.  As you might

8  guess, the U.S. government relies a lot on private contractors

9  to build things, like airplanes and submarines.  If you think

10  about that, we have to give a lot of classified information to

11  the private sector, so we're trying to oversee how they're

12  handling the information themselves, make sure they're doing it

13  properly.

14  Q.  Let's take that one at a time.

15  A.  Sure.

16  Q.  What's the first department that you mentioned?

17  A.  You mean the executive order?

18  Q.  Yes.

19  A.  Executive Order 13526.

20  Q.  OK.  What's an executive order?

21  A.  Executive order is an order signed by the President of the

22  United States that spells out how he wants certain things

23  carried out, and in this particular case, 13526, federal

24  government -- how we, we as the government, classify and

25  declassify state programs or national security information.

K2jWsch6                         Bradley - Direct

1   Q.  Let's take that a little bit slowly.  You mentioned that

2   the president issues an executive order --

3   A.  Right.

4   Q.  -- is that right?

5       And the executive order that you testified to, how did you

6   become familiar with it?

7   A.  I became familiar with it first when I was at the

8   Department of Justice.  I was the deputy counsel for

9   intelligence policy.  I was one of the DOJ's, for lack of

10  better way to say it, top experts on intelligence, and so I sat

11  on a variety of committees at the National Safety Council that

12  actually helped write that order.

13  Q.  And you mentioned that there were some other executive

14  orders --

15  A.  Right.

16  Q.  -- that you were also responsible for administering --

17  A.  Right.

18  Q.  -- is that right?

19  A.  There were.

20  Q.  Let's talk about those one at a time.

21  A.  12 --

22  Q.  What's the next one?

23  A.  12998, which governs the national industrial security

24  program; 12949, which is the state, local triable; 12956, which

25  is control of unclassified information, just a bevy of these,

K2jWsch6                        Bradley - Direct

1   these orders.  And again, they're governing different aspects
2   of how the government, U.S. government shares and protects
3   national security information.
4   Q.  Now, you mentioned that you were the umpire, you call balls
5   and strikes?
6   A.  Right.
7   Q.  What did you mean by that?
8   A.  I mean that we are seen as the neutral arbiter in disputes
9   and how things are supposed to be carried out.  I myself -- how
10  can I describe this?  I am kind of the information czar, a
11  better way -- the president is the true czar.  I'm kind of the
12  little czar.  But we make sure that the edicts of the executive
13  order are being carried out lawfully and correctly.  So again,
14  I don't have a dog in the fight.  I just want to see that it's
15  done properly.  So again, I think of myself sitting right at
16  home plate, strike or ball, I don't care which team wins, as
17  long as it's done correctly and lawfully.
18  Q.  And how is one of those provisions teed up for you?
19  A.  Well, it will often come as a -- we do a lot of oversight
20  over the intelligence community.  So we'll go out and we'll
21  make sure that they're marking the documents properly.  We'll
22  make sure that they're handling them properly, that they're
23  storing them properly, that their systems are up to snuff.  So
24  it's a wide variety of oversight that we look at when we look
25  at, you know, how a government agency is handling the

K2jWsch6                         Bradley - Direct

1    information.

2    Q.  How do you familiarize yourself with the executive orders

3    that you administer?

4    A.  Well, I helped write it, so that's one way.  Other way is

5    that we practice it almost daily.  I mean, we have -- I have

6    different groups in my office that go out.  I have a national

7    security team that's constantly reviewing self-inspection

8    enforcement gains here.  We're constantly meeting with senior

9    agency officials from the IC.  We have a real hands-on way of

10   doing oversight.

11   Q.  And do you receive any trainings with respect to the U.S.

12   classification system?

13   A.  I do.  I mean, I'm what they call an original

14   classification authority, an OCA, so I have to go through

15   yearly training, refresher training, really.  And my staff also

16   receives yearly training.

17   Q.  For approximately how many years of your career have you

18   been dealing with classified information?

19   A.  Sometimes I think too long.  About 26, going on 27.

20           MR. KAMARAJU:  Your Honor, the government would offer

21   Mr. Bradley as an expert on the United States government

22   classified national security information system.

23           MS. SHROFF:  Your Honor, we have no objection at all.

24           THE COURT:  OK.  He's recognized as an expert.

25           You've been recognized as an expert before, haven't

1    you?

2              THE WITNESS:  This is my first time testifying, but

3    yeah, I've been recognized as an expert before.

4              THE COURT:  OK.

5              MR. KAMARAJU:  Ms. Hurst, could you pull up for just

6    the witness and the parties Government Exhibit 1701, please.

7    Q.  Sir, could you take a look at that?

8    A.  Yes, sir.

9    Q.  Do you recognize it?

10   A.  I do.

11   Q.  What is it?

12   A.  It is a slide that my office, under my over-- oversight

13   prepared for this, this hearing, this trial.

14   Q.  Does it represent a summary of your testimony?

15   A.  It does.

16   Q.  And will it aid in your testimony?

17   A.  Yes, sir.

18             MR. KAMARAJU:  Your Honor, the government would offer

19   Government Exhibit 1701 as a demonstrative.

20             MS. SHROFF:  We have no objection, your Honor.

21             THE COURT:  1701 is in evidence.

22             (Government Exhibit 1701 received in evidence)

23             MR. KAMARAJU:  Ms. Hurst, could we go to the first

24   slide, please.

25   Q.  You're the director of the information security oversight

K2jWsch6                        Bradley - Direct

1  office, correct?

2  A.  Correct.

3  Q.  Let's talk a little bit about what that office is.  Could

4  you explain the first bullet point, please?

5  A.  OK.  We're authorized by the president to make sure that

6  the government's complying with Executive Order 13526, which

7  governs how the federal government classifies safeguards and

8  declassifies national security information.

9      Now, I want to add a --

10  Q.  I just want to ask you to keep your voice up.

11  A.  Yeah, sure.

12      I want to add one thing to this slide, which is that I

13  spent two years working for Senator Daniel Patrick Moynihan.  I

14  was his legislative director.  I worked for a little over two

15  years for Daniel Patrick Moynihan, who this courthouse is named

16  after.  And we -- he chaired something called the U.S. secrecy

17  commission that basically found that the U.S. government

18  classifies too much, doesn't declassify enough.  So one of the

19  things that 13526 tries to do is, again, strike this balance

20  that we are in a democracy.  We try to declassify as much

21  information as we can to keep the people's trust in the

22  government.

23      Same side, we face extraordinarily grave threats, and so

24  it's critical that we have classified information to be able to

25  protect this republic, so it's a balancing act that we're

1    constantly tasked with.

2    Q.  And I think you talked about this, but do you see the

3    bullet that talks about serving as an impartial broker?

4    A.  Yeah, that's it.

5    Q.  What did you mean by that?

6    A.  Means exactly just what I just said.  We are the umpires in

7    the game.  The president, when this office was stood up, it was

8    understood that we were going to be the neutral overseer of the

9    system.  We understand the IC -- in fact, I was even part of it

10   once, but we are not -- we are not, we don't work for the

11   intelligence community.  We don't take our orders from the

12   intelligence community.

13       My policy direction comes from two places.  It comes from

14   Archivist of the United States and also from the National

15   Security Council, but not from the IC.

16   Q.  You mentioned that you're not a member of the intelligence

17   community.  What are some of the entities that are in the

18   intelligence community?

19   A.  Well, you have Central Intelligence.  There are 17.  They

20   range from the FBI.  We have CIA.  We have DOD.  We have DIA.

21   We have NRO, the National Reconnaissance Office.  We have

22   national geospatial, and just a plethora of agencies.  It's

23   expanded dramatically.  It's expanded again after 9/11, since

24   we had the office of director of national intelligence, since

25   we had the Department of Homeland Security, things we didn't

1    have before 9/11.  So it's constantly evolving.

2    Q.  You mentioned the executive order, correct?

3    A.  Correct.

4            MR. KAMARAJU:  Your Honor, we're breaking at 3:00

5    today?

6            THE COURT:  Yes.

7    BY MR. KAMARAJU:

8    Q.  Let's just start talking generally about the executive

9    order.

10   A.  Sure.

11           MR. KAMARAJU:  Could we go to the next slide, please.

12   Q.  Would the executive order provide guidance on what types of

13   information can be classified?

14   A.  Right.

15   Q.  And this slide, does this slide summarize some of the

16   categories that can be classified?

17   A.  It summarizes such in 1.4 of Executive Order 13526.

18   Q.  Let's talk just about some of these first.  Do you see

19   where it says "information pertaining to military plans,

20   weapons systems or operations"?

21   A.  Correct.

22   Q.  Could you explain what that means, please?

23   A.  When this order was written -- back up just a little bit.

24       These executive orders, the way they started, back in the

25   early 1950s with Harry Truman, we had just come out of a war

1    and we were getting ready to go into another one called the

2    Cold War.  So debate raged about what to include as classified

3    information.  So intentionally the government made these orders

4    very broad because the threats are constantly evolving.

5         What you have here is something that would still be

6    applicable in the 1950s but also be applicable in 2020.  So

7    again, military plans are exactly that.  They would be the U.S.

8    plans, for instance, if the Iranians were to roll into Iraq

9    today, I mean, obviously we have plans for that.  Do we want

10   them out in the New York Times?  No.  Do we want our weapons

11   systems that we're going to use to counter the threats out in

12   the New York Times?  No.  Do we want our operational planning

13   out?  The answer's no, because that would cost lives, cost

14   American lives.

15   Q.  And I think you mentioned the need for flexibility there.

16   Why does there need to be flexibility in the --

17   A.  Because the threats are constantly evolving.  I mean, I've

18   been in this business a long time, and they're morphing all the

19   time.  I can't tell you how much -- when I first started out,

20   we were in the Cold War and the Russians were the problem.  In

21   some ways the Russians are still the problem.  Now we have to

22   worry about many other -- the nation state actors and also the

23   individual actors in a way we never had to do before.  So the

24   idea is to give us enough flexibility to be able to defend the

25   United States but have a system to be able to do it.  I mean

K2jWsch6

1    it's not just the Wild West.  It is a logical, planned system

2    here.

3            MR. KAMARAJU:  Your Honor, I think the next couple of

4    categories might take a little bit longer.

5            THE COURT:  All right.  We'll break now, ladies and

6    gentlemen.

7            Remember the common instructions.  Don't do any

8    research.  Keep open minds.  Don't talk to one another about

9    the case.

10           We'll see you tomorrow.  We're going to start at 11:30

11   tomorrow.  Safe home tonight.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

K2jWsch6

```
 1              (Jury not present)
 2              THE COURT:  Please be seated.
 3              You're excused, Mr. Bradley.
 4              THE WITNESS:  Yeah.  Thank you, Judge.
 5              THE COURT:  See you tomorrow.
 6              THE WITNESS:  Indeed.
 7              (Witness not present)
 8              THE COURT:  Where are we on witnesses now for the
 9    government?
10              MR. LAROCHE:  Your Honor, I believe we have about four
11    witnesses left, four to five witnesses.  I think that we will,
12    we have a short day tomorrow, but I think that we expect to be
13    done Monday or Tuesday at some point.
14              THE COURT:  Mr. Bradley was an added starter.
15              MR. LAROCHE:  I'm sorry, your Honor?
16              THE COURT:  He was an added starter.  He wasn't on my
17    list.
18              MR. LAROCHE:  Oh, I'm sorry, your Honor.  And that's
19    our fault.  We moved -- we had to adjust the schedule because
20    of some witness scheduling issues.
21              THE COURT:  I see.
22              MR. LAROCHE:  I apologize about that.
23              THE COURT:  OK.
24              Ms. Shroff, do you want to bring up anything?
25              MS. SHROFF:  No, your Honor.  Thank you.
```

K2jWsch6

1          THE COURT:  OK.  Thank you very much.  See you

2   tomorrow.

3          MR. LAROCHE:  Thank you, your Honor.

4          MR. DENTON:  Thank you, your Honor.

5          (Adjourned to February 20, 2020, at 11:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    KAREN

 4   Direct By Mr. Denton . . . . . . . . . . . .1738

 5   Cross By Ms. Shroff  . . . . . . . . . . . .1765

 6   Redirect By Mr. Denton . . . . . . . . . . .1821

 7    SEAN ROCHE

 8   Direct By Mr. Denton . . . . . . . . . . . .1825

 9   Cross By Ms. Shroff  . . . . . . . . . . . .1852

10    MARK A. BRADLEY

11   Direct By Mr. Kamaraju . . . . . . . . . . .1911

12                       GOVERNMENT EXHIBITS

13   Exhibit No.                              Received

14    1701    . . . . . . . . . . . . . . . . . .1921

15

16

17

18

19

20

21

22

23

24

25
```