K2P3SCH1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          S2 17 Cr. 548 (PAC)

5    JOSHUA ADAM SCHULTE,

6              Defendant.              Trial

7    ------------------------------x
                                      New York, N.Y.
8                                     February 25, 2020
                                      9:15 a.m.
9    Before:

10                    HON. PAUL A. CROTTY,
                                         District Judge
11                                      -and a jury-
                             APPEARANCES
12
     GEOFFREY S. BERMAN
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW J. LAROCHE
          SIDHARDHA KAMARAJU
15        DAVID W. DENTON JR.
          Assistant United States Attorneys
16
     SABRINA P. SHROFF
17        Attorney for Defendant
          -and-
18   DAVID E. PATTON
          Federal Defenders of New York, Inc.
19   BY:  EDWARD S. ZAS
          Assistant Federal Defender
20        -and-
     JAMES M. BRANDEN
21

22   Also Present:   Colleen Geier
                     Morgan Hurst, Paralegal Specialists
23                   Achal Fernando-Peiris, Paralegal
                     John Lee, Litigation Support
24                   Daniel Hartenstine
                     Matthew Mullery, CISOs, Department of Justice
25

1                    (Trial resumed; jury present)

2                    THE COURT:  Good morning.

3                    All right, Mr. Brendan.  Mr. Evanchec, you're still

4       under oath.

5                    THE WITNESS:  Yes, your Honor.

6        RICHARD JOHN EVANCHEC,

7       CROSS-EXAMINATION (Continued)

8       BY MR. BRANDEN:

9       Q.  Good morning, Mr. Evanchec.

10      A.  Good morning, Mr. Branden.

11      Q.  Yesterday we were talking about the defendant's apartment

12      in New York City.  Correct?

13      A.  That is correct.

14      Q.  And you understood that the defendant had recently moved to

15      New York City; is that correct?

16      A.  That's correct.

17      Q.  And do you know exactly when that happened?

18      A.  I believe it was some time in late 2016 that he had

19      relocated from Washington to New York City.

20      Q.  So, by the 15th, the day of your search in March, he had

21      been there for approximately three and a half months, something

22      to that effect?

23      A.  That sounds correct, yes, sir.

24      Q.  From the looks of things, did it appear he was somewhat

25      still moving in to you?

K2P3SCH1                         Evanchec - Cross

1   A.   No.

2   Q.   Okay.  It just looked like things were slightly in

3   disarray?

4   A.   Correct.

5   Q.   By the date of the search, the defendant had already known

6   that former colleagues of his thought that he was complicit in

7   some fashion; is that correct, according to your investigation?

8   A.   That's correct.

9   Q.   You spoke at some length about the paper shredder

10  yesterday.  Do you recall that testimony?

11  A.   I do.

12  Q.   And on Government Exhibit 1621, which is the --

13          MR. BRANDEN:  Can somebody pull that up for us.

14  Q.   -- which is the cover page of 1621, it shows that there is

15  a reference with regard to a warning as to top secret

16  information.  Is that correct?

17  A.   That is correct.

18  Q.   And that cover sheet is automatically generated whenever

19  anything is printed from those machines, correct?

20  A.   That's my understanding, sir.

21  Q.   Okay.  So, with regard to whatever may follow this cover

22  sheet, that could totally be unclassified information, correct?

23  A.   It could be.  That is correct.

24  Q.   And you yourself are not an expert in classifications, are

25  you?

K2P3SCH1                        Evanchec - Cross

1    A.  I'm not.

2    Q.  All the e-mails that are referenced in this exhibit, 1621,

3    and the other exhibits that were referenced as perhaps being

4    the same document -- do you recall those exhibits?

5    A.  I do, yes, sir.

6    Q.  All those documents were of unclassified material, correct?

7    A.  All of the documents from the shredder were unclassified

8    with caveats, in addition to the top secret cover sheet that

9    you see here.

10   Q.  What is the caveat?

11   A.  The caveat was agency internal use only.

12   Q.  And that's abbreviated AIUO, correct?

13   A.  That's correct, sir.

14   Q.  But other than that caveat, there was nothing classified in

15   those documents?

16   A.  That's my understanding.

17   Q.  So, there was nothing about code in any of those documents,

18   there was nothing about Bitbucket, nothing about Confluence or

19   Stash or Jira, nothing about the gold repository, correct?

20   A.  Not that was recreated, sir.

21   Q.  Okay.  And there were other documents in there that really

22   seemed to have nothing to do with CIA information whatsoever;

23   is that correct?

24   A.  That's my understanding.

25   Q.  You also testified that there were documents found in the

K2P3SCH1                          Evanchec - Cross

1   headboard of the defendant's bed, correct?

2   A.   That is correct.

3   Q.   In some instances, these documents really compromised a

4   series of e-mail chains; is that correct?

5   A.   That is correct.

6   Q.   Looking at document 1617.  Do you recall your testimony

7   about this document?  Is this one of the documents that you

8   found in the headboard?

9   A.   It appears to be.

10  Q.   And this appears to be an e-mail chain, does it not?

11  A.   It is.

12  Q.   And Mr. Schulte's part of this e-mail chain, correct?

13  A.   He is, sir.

14  Q.   And it appears to go in reverse chronological order,

15  correct?

16  A.   That is correct.

17  Q.   And it's six pages in total, correct?  This e-mail chain is

18  six pages in total, correct?

19  A.   I would have to see the entirety of the e-mail to make that

20  determination.

21         MR. BRANDEN:  Can you go to the sixth page and then

22  the seventh page.

23  Q.   That's six and there's the beginning of the seventh page.

24  A.   That what it appears to be, sir.

25  Q.   Let's start with the sixth page if we may.  We'll go in

K2P3SCH1                        Evanchec - Cross

1    chronological order.  There is an e-mail listed there dated

2    October 30, 2015, from Mr. Schulte, correct?

3    A.  That's correct, sir.

4    Q.  And the subject line indicates what?

5    A.  "Behavior in the workplace."

6    Q.  It's labeled unclassified, correct?

7    A.  It is.

8    Q.  Turning to page five.  In the middle of the page, there is

9    an e-mail from Burt to Mr. Schulte, correct?

10   A.  Correct.

11   Q.  Again, the subject line is "behavior in the workplace,"

12   correct?

13   A.  That is correct.

14   Q.  And it's unclassified, correct?

15   A.  That is incorrect.

16   Q.  Turning to page three.

17          That is correct?  You agreed it is unclassified?

18   A.  The classification of this document is unclassified//agency

19   internal use only.

20   Q.  But it is unclassified is the point I was trying to make.

21   A.  It is.

22   Q.  And moving to page three of the document.  Again, the

23   subject line is "behavior in the workplace," correct?

24   A.  It is.

25   Q.  And again it's unclassified?

K2P3SCH1                          Evanchec - Cross

1   A.  Correct.

2   Q.  And we could move through the whole exhibit, right above

3   that on page three, again, Mr. Schulte's a member of this

4   e-mail chain and it's unclassified, correct?

5   A.  That's correct, sir.

6   Q.  And it concerns behavior in the workplace?

7   A.  Correct.

8   Q.  Then on page two at the bottom of page two.  The same,

9   correct?  Unclassified, behavior in the workplace?

10  A.  Correct.

11  Q.  Turning to page one, both of the e-mails listed there,

12  behavior in the workplace, unclassified, correct?

13  A.  Unclassified with the caveat of --

14  Q.  Unclassified, right?

15  A.  Correct.

16  Q.  Turning to page seven of that exhibit, which is page one of

17  a new e-mail.  This is from Mr. Schulte, correct?

18  A.  It is, sir.

19  Q.  Slightly different time frame, we're now in June of 2016,

20  correct?

21  A.  That's correct, sir.

22  Q.  Classification is?

23  A.  It is marked unclassified.

24  Q.  Turning to the next document, which would be page 10.  This

25  document is from Shirley, correct?

K2P3SCH1                          Evanchec - Cross

1    A.  It is.

2    Q.  And it's dated March 1st, 2016?

3    A.  Yes, sir.

4    Q.  What's the subject line read, please?

5    A.  "Sean is out of the office today with his kids.  (N/T)"

6    Q.  That's unclassified, right?

7    A.  Yes.

8    Q.  The next document is from Mr. Schulte and it's dated

9    April 6, 2016.  Can we move forward one page.  One more page.

10   There we go.  Do you see that?

11   A.  I do.

12   Q.  And this is dated?

13   A.  Wednesday, April 6, 2016.

14   Q.  And this concerns confidential information that Mr. Schulte

15   thought was improperly leaked at his initial court proceeding

16   for a protective order.  Is that correct?

17   A.  That's my understanding generally, sir.

18   Q.  And what's the classification of that document?

19   A.  It is marked unclassified.

20   Q.  Turning then to the next document which is two pages

21   forward.  The date of this document is?

22   A.  Thursday, April 7, 2016.

23   Q.  And the first -- Mr. Schulte has written to Officer

24   William; is that correct?

25   A.  That appears to be the case.

K2P3SCH1                      Evanchec - Cross

1    Q.  And can you read the first paragraph of the e-mail.

2    A.  Yes, sir.  "Yesterday was the hearing for my protective

3    order against Amol.  The judge ruled in my favor and signed the

4    protective order for a period of one year."

5    Q.  So, that's consistent with the subject line of this

6    document, correct?  Well --

7    A.  I wouldn't be --

8    Q.  The subject line of the document is what?

9    A.  "Potential perjury and additional evidence."

10   Q.  And what's the classification of this document?

11   A.  It's marked unclassified, sir.

12   Q.  So this had to do with workplace behavior as well, correct?

13   A.  Generally that's my understanding, yes.

14   Q.  Yes.  Two pages forward.  This looks to be a short e-mail

15   chain, the first, moving to the bottom of the page, that's an

16   e-mail from Mr. Schulte, correct?

17   A.  It is, yes, sir.

18   Q.  Dated August 8 of 2016?

19   A.  That's correct.

20   Q.  And what's the subject line of this?

21   A.  "PAR competencies."

22   Q.  And the classification?

23   A.  Unclassified.

24   Q.  And then the document chronologically more recent right

25   above it is the same, correct?  It concerns PAR competencies?

1    A.  It does.

2    Q.  And it's also unclassified?

3    A.  That's what it's marked, correct.

4    Q.  Then the final document in this exhibit, this is from

5    Mr. Schulte on August 15, 2016, correct?

6    A.  Correct, sir.

7    Q.  And what's the subject line?

8    A.  "Concerns about fair treatment in my PAR."

9    Q.  And that, too, is unclassified, is it not?

10   A.  That's what the defendant marked it as, correct.

11   Q.  Turning to Exhibit 1034.  Was this another document that

12   you found in the headboard of the defendant's bed?

13   A.  I believe it is, yes.

14   Q.  Let's just go through them quickly and in their present

15   order.  The first e-mail -- I understand these are in somewhat

16   maybe reverse chronological order.

17   A.  No problem, sir.

18   Q.  The first e-mail is from March 3 of 2016, correct?

19   A.  That's correct, sir.

20   Q.  And the subject is?

21   A.  "RE:  Eyes only -- behavior in the workplace."

22   Q.  And this was sent from Dana to Mr. Schulte, correct?

23   A.  Among others, yes, sir.

24   Q.  And again it is unclassified, correct?

25   A.  It's marked unclassified/AIUO.

K2P3SCH1                        Evanchec - Cross

1   Q.  It is unclassified?

2   A.  The classification says unclassified//AIUO.

3   Q.  Very well.  The e-mail below that is from Mr. Schulte to

4   Dana.  Again, it's part of the same subject, the behavior in

5   the workplace, and again it's unclassified, correct?

6   A.  Again, the classification:  Unclassified//AIUO.

7   Q.  And that classification holds for the next two pages at

8   least, the next four pages, so I'm down to, that's correct --

9   Burt on March 2, correct?

10  A.  I believe that's correct, yes.

11  Q.  Turning to the next page, this is an e-mail from

12  Mr. Schulte, correct?  This is I'm looking at the one dated

13  Tuesday, March 1st, 2016, at the top of the page.

14  A.  I don't see that.

15  Q.  Down further.  That looked good.  Yes, that's it.

16  A.  I don't see an e-mail with Tuesday --

17  Q.  I agree with you.  I don't either.  Hold on one second.

18  It's page six of this exhibit.  That's Tuesday, March 1st,

19  2016, correct?

20  A.  Yes, sir, that's correct.

21  Q.  And the classification there?

22  A.  Unclassified.

23  Q.  Unclassified.  And that remains for the next e-mail as

24  well, correct?

25  A.  Yes, sir.

K2P3SCH1                        Evanchec - Cross

1    Q.  Okay.  Turning to Government Exhibit 1616.  This also was

2    found in the headboard, correct?

3    A.  Yes, sir, it was.

4    Q.  And this document is unclassified, correct?

5    A.  It is not.

6    Q.  On the top -- at the top it says unclassified, does it not?

7    A.  It might be helpful for me to explain.

8    Q.  No, I don't need an explanation.  It says unclassified,

9    correct?  That's what I'm asking you.

10   A.  This e-mail is not unclassified.

11   Q.  Okay.  Does it say it's unclassified?

12   A.  It says it is, but it is not.

13   Q.  It says it's unclassified, correct?

14   A.  That's what it says.

15   Q.  That's the question.  Okay.  Similarly, with regard to

16   Government Exhibit 1119.  This, too, is marked unclassified,

17   correct?

18   A.  It is marked unclassified.

19   Q.  Switching gears for a moment, I think that you testified

20   yesterday about a multitude of search warrant applications that

21   you had made and subpoena requests that you had made, correct?

22   A.  That's correct, sir.

23   Q.  Did you make a request of Amazon?

24   A.  We did, sir.

25   Q.  For a subpoena?

K2P3SCH1                     Evanchec - Cross

1        Okay.  Was this in part relevant to the home

2   electronics that the defendant had?

3   A.  It ultimately was, yes.

4        MR. BRANDEN:  For identification -- may I approach,

5   Judge?

6        THE COURT:  Yes, you may.

7        MR. BRANDEN:  Thank you.

8   Q.  I've presented you with three documents, correct?

9   A.  You have, sir, yes.

10  Q.  And the first document that is on eight-and-a-half-by-14

11  paper appears to be a spreadsheet, does it not?

12  A.  It does.

13  Q.  Does that appear to reflect the subpoena results

14  from Amazon?

15  A.  It does.

16  Q.  The second document that I gave you -- what are the dates

17  of those -- in the first entry is what?

18  A.  January 7, 2016.

19  Q.  And the last entry is item 210, something like that?

20  A.  Cell 212 shows April 12, 2017.

21  Q.  So that's the range that the returns covered, correct?

22  A.  On this spreadsheet, correct.

23  Q.  And then the second document that I gave you, does that

24  appear to be product descriptions of electronics?

25  A.  It appears to be product -- products listed on Amazon.Com.

K2P3SCH1                        Evanchec - Cross

1   Q.  And then the third document that I've presented you with.

2   In the lower-right-hand corner, Defendant's Exhibit H, correct?

3   A.  Correct, sir.

4           MR. BRANDEN:  Judge, I think without objection I'd

5   like to move this collectively into evidence as Defendant's H.

6           MR. LAROCHE:  No objection.

7           THE COURT:  H?  Just H or do you want Is.

8           MR. BRANDEN:  I just want it all to be H.

9           THE COURT:  All H.  Received in evidence.

10          (Defendant's Exhibit H received in evidence)

11  Q.  With regard to this final part of Exhibit H, this shows a

12  listing of approximately 11 purchases by Mr. Schulte, correct?

13  Approximately?

14  A.  Yes, sir.

15  Q.  And the first item purchased listed there is February 7,

16  2016?

17  A.  That's correct.

18  Q.  And the last item is the 12th of April, 2017; is that

19  correct?

20  A.  That's correct.

21  Q.  And noting item number 98, can you read what that product

22  is.

23  A.  Sure.  "Inatek USB 3.0 to SATA dual bay USB 3.0 hard drive

24  docking station with offline clone function for 2.5 inch and

25  3.5-inch HDD SSD SATA."

K2P3SCH1                        Evanchec - Cross

1   Q.  With regard to item number 137.  When was that purchased?

2   A.  I believe that it was ordered on September 21, 2016.

3   Q.  And that looks to be same item as the item previously

4   ordered, correct?

5   A.  It appears to be the same description, sir.

6            MR. BRANDEN:  May I approach just to grab the

7   documents from the witness.  We're done with these.

8   Q.  Yesterday you testified about and showed the jury a

9   Sandisk, correct?

10  A.  That's correct, yes.

11  Q.  And that was a thumb drive, correct?

12  A.  Correct.

13  Q.  Where was that recovered?

14  A.  I believe that was in the subject's residence.

15  Q.  Did you participate in the search of the defendant's work

16  space?

17  A.  At the CIA?  Yes, I helped collect evidence that was there.

18  Q.  How many thumb drives did you recover during that search?

19  A.  I don't recall off the top of my head, sir.

20  Q.  Were there a lot of thumb drives, sir?

21  A.  There were.  I don't recall specifically where that one was

22  found.  It could have been at his desk as well.

23  Q.  Was the defendant's work space at the CIA as he had left it

24  on his final day?

25  A.  I can't speak to that.

K2P3SCH1                         Evanchec - Cross

1   Q.  It had not been reassigned to another employee, correct?

2   A.  It had not, but I can't -- I can't speak to exact

3   preservation of that work space from the time that he left.

4   Q.  But it had thoroughly been searched, correct?

5   A.  Correct.

6   Q.  And as part of that search, was it ever determined that

7   Mr. Schulte had deleted any logs from his workstation?

8   A.  From his actual -- when you say "workstation," what are you

9   referring to?

10  Q.  From his desk computer.

11  A.  I am aware that we recovered signature forensic findings

12  from his DevLAN workstation.

13  Q.  But not deletion of logs from that station.

14  A.  I cannot recall off the top of my head, sir.  I know there

15  were significant logs that were found.

16  Q.  I'd like to look again at an exhibit that was introduced

17  yesterday, 1404-6.  Your attention had been drawn to the second

18  entry with regard to Brutal Kangaroo.  Do you recall that?

19  A.  I do, yes, sir.

20  Q.  And I think you testified that it appeared to you that

21  Brutal Kangaroo was on the chopping block with regard to this

22  eraser program, correct?

23  A.  So the image appears to show it in the queue to have been

24  deleted.  That's my understanding of this piece of evidence.

25  Q.  But you can't tell from this piece of evidence whether it

1    in fact had been deleted or whether it was in the queue, as I

2    said?

3    A.   I can tell from this that it was in the queue.

4    Q.   Do you know whether it was deleted?

5    A.   I can't speak to that specifically based on my involvement

6    with the case.

7    Q.   Do you know any of the contents of that document or file,

8    if you will?

9    A.   I don't.

10   Q.   Is it possible, to the extent that it has any relevance to

11   CIA work whatsoever, that this could be work that he did at

12   home and then brought into the CIA, correct?

13   A.   By the name it suggests that a tool from the CIA was there.

14   Q.   You don't know.  That's a suggestion.

15   A.   Correct.

16   Q.   But you don't know.  It could have been the other way

17   around as I'm suggesting?

18   A.   It is a possibility, yes, sir.

19   Q.   Now I would like to turn my attention and your attention

20   more importantly to Government Exhibit 1618.  With regard to

21   this exhibit, if it's not too lengthy maybe I can hand you a

22   hard copy of it.

23   A.   Whatever's easier, sir.

24   Q.   I've handed you that in part so you can flip through it

25   relatively quickly.  Do you see that the document is in any way

K2P3SCH1                          Evanchec - Cross

1   dated?  Does it tell you when it was written?

2   A.  It does not.

3   Q.  As part of your investigation, were you aware that the

4   defendant filed for an order of protection against Amol in

5   2016?

6   A.  I am, yes, sir.

7   Q.  Are you also aware that as a result of that filing there

8   were two court appearances?

9   A.  Yes, I am aware.

10  Q.  There was one in April, correct?

11  A.  Correct, the initial, correct.

12  Q.  And at that time, Mr. Schulte was awarded an order of

13  protection against Amol, correct?

14  A.  That's my understanding, sir, yes.

15  Q.  Then there was a second proceeding in August, correct?

16  A.  That's my understanding.

17  Q.  Did you understand that to be for a hearing on the matter

18  in some way?

19  A.  I don't recall the specifics of that hearing, sir.  I

20  apologize.

21  Q.  Did you understand that to perhaps be an appeal of the

22  original order of protection?

23  A.  I understand there was an issue with the jurisdictional

24  issuance of that, and I believe that may have been the subject

25  of that second hearing, sir.

K2P3SCH1                          Evanchec - Cross

1    Q.   Okay.  Looking -- do you know whether Amol had planned to

2    have witnesses at that hearing?

3    A.   I do not know.

4    Q.   Looking at document 1618, the first page references Jeremy

5    Weber, correct?

6    A.   It does, yes, sir.

7    Q.   And it indicates in the first line:  Establish poor

8    character, motives and something about strictly promotion.

9    Does not care about the people or the incident.  Correct?

10   A.   I see that, yes, sir.

11   Q.   And then down a little bit farther it indicates how long

12   have you worked for the CIA, correct?

13   A.   Yes.

14   Q.   And the next line:  How long have you worked with me?

15   A.   Yes.

16   Q.   So these are the types of questions that Mr. Schulte is

17   writing to himself, correct?

18   A.   It appears that way.

19   Q.   Do you know whether Mr. Schulte had a lawyer at the August

20   proceeding on the protective order?

21   A.   I'm unaware.

22   Q.   Let's go to the next page, please.  And next page.  And the

23   heading on this page?

24   A.   Matt OSB.

25   Q.   And then the next line indicates:  How long have you known

1    me.  Correct?

2    A.  Correct.

3    Q.  How many lies have I told, correct?

4    A.  Correct.

5    Q.  Ever known me to be dishonest?

6    A.  Correct.

7    Q.  And then there is a long list of proposed questions,

8    correct?

9    A.  That's correct.

10   Q.  So doesn't it look to you like this is proposed

11   cross-examination for Matt?

12   A.  I can't make that assessment.

13   Q.  Why can't you make that assessment?

14   A.  I observe questions with someone's name on it on an undated

15   document.  I'm unsure of what this is.

16   Q.  Let's go to the next page, please.  And what's the heading

17   on this?

18   A.  "Amol OSB."

19   Q.  And the first line?

20   A.  "You knew how many EAP appointments I had been on and told

21   the judge about a Friday appointment.  Do you recall?  How did

22   you ascertain this information?"

23   Q.  So in this instance, he's referencing the judge who ruled

24   on the protective order, correct?

25   A.  I'm not willing or able to make that determination without

K2P3SCH1                         Evanchec - Cross

1    additional context or dates.

2    Q.  And what's the next paragraph, please.  Read that for me.

3    A.  "You also told the judge that I failed a psychological exam

4    and had to continue seeing EAP and likely would not stay

5    employed.  Who told you this?"

6    Q.  Okay.  Again, referencing the judge who ruled on the

7    protective order, correct?

8    A.  There was a judge that ruled, correct.

9    Q.  And moving forward on the exhibit.  And this is headed?

10   A.  "Timeline."

11   Q.  "Timeline," correct?

12   A.  Yes, sir.

13   Q.  And under timeline it indicates Phase 1, correct?

14   A.  It does.

15   Q.  And then there is a subhead heading if you will "lead up to

16   the threat."  Correct?

17   A.  Yes, sir, that's correct.

18   Q.  And then there's several dated entries below that.

19   A.  Yes, sir.

20   Q.  And then Phase 2.  Lack of response, correct?

21   A.  Correct.

22   Q.  Phase 3, beginning of management blowback, correct?

23   A.  Correct.

24   Q.  And Phase 4 retaliation, correct?

25   A.  Correct.

K2P3SCH1                          Evanchec – Cross

1   Q.  It might be important for somebody appearing at a hearing

2   on a protective order to be able to establish a timeline for

3   the judge, correct?

4   A.  That's correct.

5   Q.  It might be important for Mr. Schulte to be able to explain

6   to the judge all the events that led up to the reasons why he

7   believed he needed an order of protection, correct?

8   A.  Some of these, on this page, may.

9   Q.  Let's move forward.  Is that the end?  Okay.  Then there is

10  a heading Sean, correct?

11  A.  Yes, sir, that's correct.

12  Q.  And again the first paragraph appears to be some sort of

13  reminder to establish poor character.  Correct?

14  A.  Correct.

15  Q.  Then back to questions like how long have you known me,

16  correct?

17  A.  Correct.

18  Q.  How many lies have I told.

19  A.  Correct.

20  Q.  And then down further maybe two more paragraphs there are

21  questions about the incident, correct?

22  A.  Yes, sir.

23  Q.  And something that was the catalyst for Amol's threats

24  against me, correct?

25  A.  Correct.

K2P3SCH1                        Evanchec - Cross

1   Q.  And the next page.  And the next page.

2               MR. BRANDEN:  Is that it?

3   Q.  Essentially, there are three or four named headings,

4   correct, in this document?

5   A.  Correct, sir.

6   Q.  Then there is a heading called timeline.

7   A.  Correct, sir.

8   Q.  And all of those headings and all of the questions and all

9   of the words contained in this document would be consistent

10  with somebody who was trying to either cross-examine witnesses

11  or explain to a judge the facts underlying a protective order,

12  correct?

13  A.  That could be someone's logical conclusion.

14  Q.  But we just don't have a date?

15  A.  Are you asking why I couldn't definitively say that?

16  Q.  No.  Well, is that the reason, because it's undated?

17  A.  I think it's undated, and also if you look at some of the

18  phases, I'm not quite sure how, for example, Phase 3, beginning

19  of management blowback.  Or Phase 4, retaliation.  I'm unsure

20  of how those would be placed in a filing for a protective

21  order.  They don't really relate to someone's safety.

22              But I can see how someone could make that assumption.

23  That's fair.

24  Q.  And with regard to those Phases 3 and 4, it could be part

25  of your summation to a judge, correct?

1    A.   Again, I don't know how that would relate to the issuance

2    of a protective order, but it's -- likely based on someone's

3    mindset, potentially.

4    Q.   Okay.  Changing gears yet again.

5    A.   Yes, sir.

6    Q.   I want to talk about the diplomatic passport for a moment.

7    I expect that you know something about this topic, correct?

8    A.   I don't have a diplomatic passport.

9    Q.   Okay.  Who issues a diplomatic passport?

10   A.   The Department of State issues all passports.

11   Q.   And do they have a certain period of validity, a certain

12   number of years, a time period?

13   A.   That's my understanding.

14   Q.   They either fall into latency because they've expired or

15   can they be revoked?

16   A.   All passports can be revoked, yes.

17   Q.   Who would revoke a diplomatic passport?

18   A.   I believe that function would lie with the State

19   Department.

20   Q.   Does such a passport grant you immunity?

21   A.   My understanding is that diplomatic passports specifically

22   given to U.S. diplomats abroad can provide some legal

23   protections.

24   Q.   But a diplomatic passport held by Mr. Schulte could not

25   provide immunity, correct?

K2P3SCH1                    Evanchec - Cross

1   A.  I don't believe -- my testimony will remain.  I am aware

2   that people under diplomatic protections are afforded some

3   legal protections overseas.

4   Q.  But not immunity?

5   A.  I would be splitting hairs.  I'm not quite sure what that

6   means for U.S. government employees overseas, but my testimony

7   is it affords protections.

8   Q.  And also yesterday we spoke about the defendant's regular

9   old passport, correct?

10  A.  Correct, we did.

11  Q.  And in investigating that passport, you learned that he had

12  traveled out of the country on one prior occasion, correct?

13  A.  I'm not sure that was from an examination of the passport.

14  I believe we looked at his previous travel records through our

15  systems to find that.

16  Q.  Where did he go on his previous out of country trip?

17  A.  My understanding is it was a cruise that he went to.

18  Q.  Do you know if he went alone or he went with family?

19  A.  I don't recall sitting here today, sir.  I'm sorry.

20  Q.  Yesterday we spoke about the fact that the defendant had

21  consented to give you his backpack, correct -- not his

22  backpack.  I'm sorry.  His passport.

23  A.  Correct.  He ultimately consented to give us both passports

24  at Bloomberg on the evening, I think it was the wee early

25  morning of the 16th.

K2P3SCH1                              Evanchec - Cross

1    Q.  But you said that the passport was not in the backpack,

2    correct?

3    A.  I believe that -- I recall our agents taking possession of

4    both passports at the Bloomberg offices.  I'm not -- I don't

5    recall specifically where the passports were.  I know I was at

6    his workstation when we took possession of those.  I just can't

7    recall whether one was in his book bag at the time he gave it

8    to us or they were in his desk drawer.  I recall taking

9    possession of both at the Bloomberg offices from the defendant.

10            MR. BRANDEN:  Excuse me one moment, Judge.

11   Q.  Did the defendant mention to you during the discussions

12   about the passport that he had already spent the money on his

13   trip?

14   A.  He did.  I believe he mentioned that it had cost him $1,200

15   or something to that effect.  I do recall that.

16   Q.  And that's why he didn't want to give you the passport?

17   A.  That's what he said, that's correct.

18   Q.  And did you tell him that he would be arrested if he didn't

19   turn over those passports?

20   A.  He was advised that, yes.

21   Q.  He was advised of that.  Just to round this out.

22   A.  Sure.

23   Q.  Did he say that he would like you to give him the $1,200 to

24   cover the costs of his already prepaid trip?

25   A.  I believe his comment, if my memory serves me correctly, is

1    if the government reimbursed him, he would be willing to do

2    that.  It's been a while.

3    Q.  And the government said?

4    A.  No.

5    Q.  The government said no.

6    A.  Correct.

7    Q.  But the defendant nonetheless gave over his passports; is

8    that correct?

9    A.  When confronted with the option of arrest, he did.

10   Q.  You said also yesterday that the Washington field office

11   was sort of more generally in the business of eliminating

12   perhaps foreign nations or outside hackers; is that correct?

13   A.  No, sir.

14   Q.  Okay.  That was both your office and the Washington office?

15   A.  No, sir.

16   Q.  Who was in charge of to making those determinations?

17   A.  The FBI's cyber division and our computer scientists

18   assigned there were leading that effort.

19   Q.  And do FBI agents generally have the capabilities to know

20   what foreign nations' capabilities are?

21   A.  I sure hope so.

22   Q.  You hope so but you don't necessarily know so, correct?

23   A.  I've seen evidence that we do, sir.

24   Q.  And also, does an FBI agent know the capabilities of a

25   coder who works at the CIA?

K2P3SCH1                    Evanchec – Cross

1   A.   Certainly I can't speak to every FBI agent, and that's why

2   we rely on our computer scientists for that expertise.  So as I

3   mentioned in my previous testimony, as a case agent, some of my

4   responsibility is ensuring we have that expertise in place.

5   Q.   So the FBI does not necessarily have it, but you might be

6   able to reach out to some others.  Is that what you are

7   suggesting?

8   A.   The FBI certainly has that.  In instances when we need

9   additional help to understand evidence, we routinely solicit a

10  number of entities, individuals, to make sure that we

11  understand evidence.  So we'll stop at nothing to ensure that

12  we understand what we are working on.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K2pWsch2                          Evanchec - Cross

1   BY MR. BRANDEN:

2   Q.  OK.  Yesterday you also indicated that you made various

3   interviews of employees, correct?

4   A.  That's correct, sir.

5   Q.  OK.  And one of those employees was a gentleman named Dave,

6   correct?

7   A.  Correct.  Dave was interviewed multiple occasions.

8   Q.  And you learned, during your investigations, or your

9   interviews of him that Dave had a hard drive of Stash in his

10  desk drawer, correct?

11  A.  Correct, we did.

12  Q.  And you learned that from Dave himself?

13  A.  I can't recall specifically where that came from.  It may

14  have come from Dave himself.  I just can't recall sitting here

15  today, sir.

16  Q.  Did the FBI ever find that hard drive?

17  A.  I can't recall.  That was more of Washington field office's

18  domain.  I can't specifically recall where any they ended up

19  with that.

20  Q.  Did anybody ever end up finding that hard drive of Stash?

21  A.  I can't speak to that myself, sir.

22  Q.  Dave himself, did he find the hard drive?

23  A.  Again, I can't speak to that sitting here.

24  Q.  OK.  And with regard to that hard drive, were you present

25  in court when Mr. Leonis testified about that?

1  A.  I was here for portions of his testimony.  I'm not, I'm not

2  sure of that specific piece.

3  Q.  Do you recall him testifying that he would be very worried

4  if someone saved Stash on his hard drive, for example?

5  A.  I don't recall that testimony, but it's a fair assessment.

6  Q.  Also, you interviewed a gentleman named Michael, correct?

7  A.  On several occasions, yes, sir.

8  Q.  How many times did you interview Michael?

9  A.  By the time I left this investigation in December of '17, I

10  think he had been interviewed four or five times.  I was part

11  of most of those.  There may have been one or two that I wasn't

12  part of.

13  Q.  OK.  Were you part of the first such interview?

14  A.  I don't believe so.

15  Q.  OK.  During your first interview of Michael, how did he

16  appear to you?

17  A.  Uh, he appeared, frankly, nervous.

18  Q.  OK.  Did you ask him about an in-office fight that he had

19  with the defendant?

20  A.  I don't recall the sequence of, of, of asking that.  I'm

21  aware that became a topic of our discussion during one of the

22  interviews.

23  Q.  And during that interview, as to that topic, did he respond

24  fully?

25  A.  I don't believe so.

1   Q.  Did he invoke his right to not respond?

2   A.  He hesitated in answering the question fully.

3   Q.  I'm sorry.  I didn't hear the whole answer.

4   A.  He hesitated in answering the question fully.  I recall

5   that.

6   Q.  Did you find that unusual for a CIA employee?

7   A.  I did.

8   Q.  Did you find it, in fact, suspicious?

9   A.  I found it curious as to why that was something that was

10  so -- why he would not want to fully disclose, disclose that.

11  Q.  What was your understanding generally of the relationship

12  between Michael and Mr. Schulte?

13  A.  I understand from multiple interviews that they were very

14  close friends.  They worked out together at the CIA, spent time

15  together.  They were gamers together.  They were very close.

16  Q.  Did you ever think that Michael might be able to help you

17  in your investigative measures?

18  A.  We did.

19  Q.  Did you think he might be a cooperator?

20  A.  He certainly would have been in a position to present

21  helpful information given his relationship with the defendant,

22  yes.

23  Q.  And did he ever suggest that perhaps he would become a

24  cooperator for you?

25  A.  I don't recall that specific offer.  I know that he wasn't.

1    I don't recall that specific offering.

2    Q.  And did you talk to him about the leak?

3    A.  We did.

4    Q.  And with regard to the leak, did you ask him whether he

5    would be willing to take a polygraph?

6    A.  At the conclusion of one of the interviews, an agent from

7    the Washington field did ask him that.

8    Q.  And what was his answer to that?

9    A.  He declined.

10   Q.  In any of these interviews with Michael, did he ever

11   suggest that the defendant had in some way confessed or showed

12   some complicity in the leak?

13   A.  Yes.

14   Q.  How was that?

15   A.  There was one occasion where, when he was confronted with

16   the screenshot that we showed him, he indicated that he was

17   concerned that the defendant was acting crazy at that time in

18   April and was afraid that he was going to do something crazy.

19   That concerned me about the defendant.

20   Q.  So he said he was concerned because of the relevant time

21   frame the defendant was acting unusually?

22   A.  Specifically -- no, sir.  Specifically, when we were

23   confronted with that screenshot, he indicated to us that he was

24   concerned that the defendant had done something crazy, in

25   summary.

K2pWsch2                          Evanchec - Cross

1    Q.  Are you familiar that Mike has also stated for the record

2    that he did not think that Mr. Schulte did the reversion?

3    A.  That's correct.  In our interviews with him, just to be

4    clear, he at times also said that he did not think that

5    Mr. Schulte was, was responsible for it, prior, to answer your

6    question.

7    Q.  And as a result -- and this happened, do you know, on

8    August 19 of 2019?

9    A.  I'm -- I was not present in the interview in August 2019,

10   sir.

11   Q.  OK.  And are you aware that Mike was put on administrative

12   leave shortly after that?

13   A.  I became aware of that a couple of weeks ago.

14   Q.  I want to ask you about some of the interviews that you had

15   with the defendant.  How many did you participate in after the

16   15th?

17   A.  Three in the U.S. Attorney's Offices after the 15th, sir.

18   Q.  OK.  And are you suggesting that you had meetings with the

19   defendant outside of the U.S. Attorney's Office?

20   A.  No.

21   Q.  OK.  And I think you testified that you first met with him,

22   after the 15th, on the 20th of March.  Is that correct?

23   A.  Yes, sir, that is correct.

24   Q.  And that was a lengthy interview, correct?

25   A.  I think it was about three and a half hours, sir.

K2pWsch2                          Evanchec - Cross

1    Q.  Well, you would think that's lengthy, would you not?

2    A.  Not particularly.

3    Q.  I think you testified that the defendant was present

4    voluntarily.  Correct?

5    A.  He arrived to the U.S. Attorney's Office on his own.

6    Q.  OK.  And he was present with two lawyers, correct?

7    A.  That's correct, sir.

8    Q.  OK.  And who were those lawyers?

9    A.  They were private counsel that the, that the defendant had

10   obtained.  I don't investigate people's relationships with

11   attorneys, so I wasn't aware much more about them.

12   Q.  I was not one of those lawyers, correct?

13   A.  You were not, sir.

14   Q.  Ms. Shroff was not one of those lawyers, was she?

15   A.  She was definitely not.

16   Q.  Nobody at defense table presently was one of Mr. Schulte's

17   lawyers --

18   A.  No, sir.

19   Q.  And on that occasion, you had the lawyers sign

20   nondisclosure agreements, is that correct?

21   A.  That's correct.

22   Q.  Did they both sign those documents?

23   A.  They did.

24   Q.  And at that meeting, did you ask the defendant about the

25   leak?

1    A.  On the 20th?

2    Q.  Yes.

3    A.  That was one of the topics that came up, yes.

4    Q.  OK.  And did he answer your questions with regard to that

5    leak?

6    A.  He did.

7    Q.  OK.  And did he invoke his right to remain silent at any

8    point?

9    A.  He did not.

10   Q.  OK.  And he agreed to meet with you the following day,

11   correct?

12   A.  Yes, sir, he did.

13   Q.  Is there some reason that everybody wanted to meet so

14   quickly?

15   A.  We were faced with the largest theft of information in the

16   U.S., in the history of the CIA.  It was an obligation and

17   interest of the FBI to get to the bottom of this as soon as we

18   could.

19   Q.  So it was in the FBI's interest to --

20   A.  Yes, and me myself personally.  Yes.

21   Q.  So the defendant was accommodating your interests in

22   meeting the next day, correct?

23   A.  He was.

24   Q.  How long was that meeting, if you recall?

25   A.  I believe that was about four hours.

K2pWsch2                         Evanchec - Cross

1    Q.  So that meeting was even longer than the first one?

2    A.  I believe so.

3    Q.  So he spent seven hours, seven-plus hours of those 24 hours

4    with you?

5    A.  I believe so.

6    Q.  And did he answer your questions about the leak?

7    A.  He did.

8    Q.  And he answered all your questions?

9    A.  He did.

10   Q.  He did not invoke his right to remain silent at any time?

11   A.  He did not.

12   Q.  And again, did those lawyers who represented him at the

13   time sign the nondisclosure agreement?

14   A.  My recollection is they initialed the same document they

15   had signed the day before.

16   Q.  Both of them did that?

17   A.  That's what I recall, sir, yes.

18   Q.  And did you ask the defendant at that meeting whether he

19   would unlock his phone so you could look at that?

20   A.  We did.

21   Q.  And he said yes, right?

22   A.  He did.

23   Q.  Then you met with him again in June --

24   A.  That's correct.

25   Q.  -- at the end of June --

K2pWsch2                              Evanchec - Cross

1    A.   2016.

2              THE COURT:   What year?

3              THE WITNESS:   2017.   Sorry, your Honor.

4              MR. BRANDEN:   2017.   Correct.

5    Q.   And at this meeting, who was present?

6    A.   The same parties that were present in the previous two

7    meetings.

8    Q.   Those same lawyers, correct?

9    A.   Correct.

10   Q.   Both of them?

11   A.   That's my recollection.

12   Q.   OK.   And did they renew again the nondisclosure agreement?

13   A.   I -- I recall the U.S. attorney -- assistant United States

14   attorneys talking about it again.   I don't recall specifically

15   if they were asked to initial or not.   I just don't recall,

16   sir.   I'm sorry.

17   Q.   So you don't know whether they signed a new nondisclosure

18   agreement or whether they put their initials on the original

19   nondisclosure agreement or whether it was in some other way --

20   A.   I recall -- I'm sorry.

21        I recall the issue coming up.   I'm just not sure what

22   documentation was involved, involved in that interview.

23   Q.   And at the start of that meeting, the defendant raised, on

24   his own, the issue about whether you should have that meeting

25   in an open setting or whether the meeting should, in fact, be

1    in a SCIF, correct?

2    A.   That's correct.

3    Q.   That was not brought up by the U.S. attorneys that were in

4    the room originally, correct?

5    A.   Correct.

6    Q.   The defendant had the sensitivity to realize that perhaps

7    this should be in a more secure setting, correct?

8    A.   He did.

9    Q.   And with regard to that, he was told two things.  First, he

10   was told that his lawyers had already signed a nondisclosure

11   agreement, so that was OK.  Correct?

12   A.   Correct.

13   Q.   OK.  But those lawyers, were they cleared?  Do you know

14   whether they were cleared to receive classified information?

15   A.   I don't believe at that time they possessed security

16   clearances.

17   Q.   But that's a relevant concern, isn't it?

18   A.   The FBI routinely uses nondisclosure agreements in

19   instances when we have to discuss classified information with

20   those who don't hold security clearances.  So it's very

21   routine.  As a street agent, I did that routinely.

22   Q.   But they had learned information they were not supposed to

23   learn?

24   A.   I wouldn't agree with that.

25   Q.   Well, that's why lawyers have to be cleared from time to

K2pWsch2                          Evanchec - Cross

1    time to receive, to hear, in the first instance, classified

2    information, correct?

3    A.   That is a process that the government sometimes ventures

4    down.   I think that's been the case in this case, actually.

5    But in the absence of that, in order to ensure that the

6    defendant had the counsel he needed, we took the measures to

7    provide nondisclosure agreements, which permitted them to hear

8    potentially classified information that could have been

9    discussed in those meetings.   That's a very routine thing for

10   the FBI to do.

11   Q.   Do you know whether there's a lawyer exception to receiving

12   classified information?

13   A.   I'm unaware of that.

14   Q.   And secondly, the prosecution, the prosecutors in this

15   case, told the defendant that simply if he had a concern about

16   the SCIF, he should raise that concern, correct, going forward?

17   A.   I believe the actual comment, from my recollection is, is

18   that the point of the meeting was not to elicit sensitive,

19   classified information, but in the event the defendant felt the

20   need to in order to tell his story, the interview could be

21   stopped and additional accommodations could be made.

22   Q.   I'm going to show you -- do you recall that exactly, or do

23   you recall that the defendant was told that he can raise it if

24   there's a concern, period?

25   A.   It was something to the effect of what you and I have both

K2pWsch2                        Evanchec - Cross

1    said.  I don't recall the exact quote, but I'm happy to look at

2    a document if you had something.

3    Q.  So my question is it was not that the defendant was told

4    they will go to a SCIF if he has a concern; he was simply told

5    to raise it if he has a concern?

6    A.  That's fair.  That's correct.  Yup.

7    Q.  Was that meeting with the defendant your last meeting with

8    the defendant?  That was the June 29 meeting.  Or did you have

9    another meeting, on August 17, with the defendant?

10   A.  I was not present at that meeting.

11   Q.  OK.  Are you aware that there was such a meeting, however?

12   A.  I'm aware that other agents from the New York field office

13   had met with the defendant at that time.

14   Q.  And with regard to your investigation and speaking to the

15   other agents, did you learn that that meeting was more or less

16   consistent with the meetings you had had in the sense that the

17   defendant answered all the questions?

18   A.  That was my understanding.

19   Q.  He didn't invoke in any sense?

20   A.  I -- I'm not aware of him invoking, no.

21   Q.  OK.  Switching gears yet again, part of your investigation

22   in this matter involved talking to members of the defendant's

23   family.  Is that correct?

24   A.  Correct.

25   Q.  Did you personally speak with these members, or was it just

K2pWsch2                    Evanchec - Cross

1    other agents that spoke with these --

2    A.  It was other agents.  My, my time in the case was mostly at

3    the CCI, so many of those other interviews occurred, were done

4    by other agents in the FBI.

5    Q.  So agents interviewed the defendant's mother, is that

6    correct?

7    A.  I specifically don't recall that, but I believe I remember

8    that.

9    Q.  And father?

10   A.  Same.

11   Q.  And the defendant has several siblings, correct?

12   A.  That's correct.

13   Q.  And they are younger brothers, are they not?

14   A.  He has brothers, yes.

15   Q.  And were they interviewed?

16   A.  I believe that effort was under way at one point, yes.

17   Q.  And what about cousins; does the defendant have cousins

18   that were interviewed?

19   A.  He does.

20   Q.  And to your knowledge, were these family members asked

21   about the leak also?

22   A.  I don't -- I was unaware of the specific nature of the

23   questioning.

24   Q.  OK.  But at that point that would have been the nature of

25   the questioning, correct?

K2pWsch2                          Evanchec - Cross

A.  It could have been a number of things; for instance, travel

plans, how the defendant was doing, his involvement, his

activities.  Any of those things could have been topics that

agents would, would normally bring up in certain situations.

Q.  And did you learn general background information about the

defendant?

A.  I'm assuming so, yes.

Q.  And did you learn that he's always had an interest in

computers?

A.  I can't speak to that.

Q.  And he has a history of building his own computers; can you

speak to that?

A.  Not specific words in interviews, I'm not sure if that

information was elicited from family or not.

Q.  OK.  And certainly none of those family members suggested

that Mr. Schulte had any role in the leak if they were asked

that, correct?

A.  I can't speak to that.

Q.  Also as part of your investigation, and relatively early

on, the defendant was placed under surveillance, is that true?

A.  That's correct.

Q.  OK.  Tell me what that surveillance was like.

A.  So, surveillance in the FBI essentially boils down to teams

of -- of FBI agents or our professional support persons who

make an effort to understand the daily routine, activities,

1    places that he visit -- places that he goes, things that he

2    does any one time.  So that's generally what surveillance is,

3    is physically observing someone's activities when they're --

4    when they're in the open.

5    Q.  OK.  And was this a 24-hour-a-day type of surveillance?

6    A.  I believe at times it was.  I can't speak to the length of

7    time that there was such an enhanced coverage, but there were

8    significant periods of time that, that the FBI had him under

9    surveillance.

10   Q.  OK.  And did they surveil him in other places beside New

11   York City?

12   A.  I believe so.

13   Q.  For example, did they surveil him in San Diego?

14   A.  I believe agents were part of that effort, yes.

15   Q.  And what was he doing in San Diego, if you know?

16   A.  I believe that was a family vacation, if memory serves me.

17   Q.  And during all the periods of surveillance of the

18   defendant, did anybody report any illegal conduct by the

19   defendant?

20   A.  Not that I can recall.

21   Q.  Any bad conduct by the defendant?

22   A.  Not that I can recall, sir.

23   Q.  OK.  Tell me what a UCE is.

24   A.  A UCE is an undercover employee, someone who works in an

25   undercover capacity and represents themselves as an ordinary

1    person not affiliated with the FBI, and we use these people to

2    further investigations, often.

3    Q.  And did you use a UCE in this investigation?

4    A.  We did.

5    Q.  In what way did you use that UCE?

6    A.  There was a UCE that was involved in encountering the

7    subject during a trip, I believe, to Denver.

8    Q.  And did you call that a bump?

9    A.  That's what it would be called, yes, in the FBI.

10   Q.  What's a bump?

11   A.  A bump is essentially an opportunity that the undercover

12   employee will take to -- to get to, the chance of speaking to a

13   subject, so it's called a bump.  You strike up a conversation,

14   essentially, with the person.

15   Q.  Kind of bump into the person?

16   A.  That's correct.

17   Q.  Nonchalantly?

18   A.  Correct.

19   Q.  And did that happen, to your knowledge?

20   A.  It did, to my knowledge, yes.

21   Q.  And what was the purpose of this bump?

22   A.  The purpose of any bump is to elicit information from

23   someone, to find out any number -- to answer any number of

24   investigative goals that the FBI would have at that time.

25        You know, again, being so close to a border, if there was

1   travel to a border area, someone would bump someone to do that.

2   In Denver, you're outside of your normal comfort zone,

3   potentially you don't think you're under surveillance, you're a

4   little more casual.  That bump would be to elicit potentially

5   information, potentially more comfortable, from the defendant.

6   Q.  I'm not sure I understood.  The bump is to have a

7   comfortable conversation with --

8   A.  It is, absolutely.

9   Q.  OK.

10  A.  For any number of reasons.

11  Q.  Was there a comfortable conversation between the UCE and

12  the defendant?

13  A.  I wasn't present, but I understood that there was.

14  Q.  Did that conversation further your investigation in any

15  way?

16  A.  It did.

17  Q.  OK.  In what way?

18  A.  My recollection was I believe the defendant was part of a

19  bachelor party at the time on his trip to Denver, and part of

20  the conversation that he had as part of a bachelor party in

21  Denver was to speak of the frustrations that he had at the CIA.

22  Q.  But he didn't provide you with any inculpatory evidence

23  during the bump, correct; he mentioned he was frustrated at the

24  CIA?

25  A.  He didn't admit to WikiLeaks's leak, if that's what you're

K2pWsch2                         Evanchec - Cross

1     asking.

2     Q.   What is a confidential human source?

3     A.   A confidential human source we refer to as a CHS in the

4     bureau.  These are individuals that the FBI works with.

5     They're often friends and family, coworkers of our subjects,

6     and they volunteer to provide assistance to us.  In some cases

7     they wear listening devices to record conversations, but they

8     are individuals that we use, we recruit and they volunteer to

9     provide assistance from their -- from the public.

10    Q.   Did you use confidential human sources in this

11    investigation?

12    A.   Yes, sir, we did.

13    Q.   How many did you use?

14    A.   At a point where I left the investigation, I believe that

15    we had three individuals that were, that were, that were used.

16    Q.   In order to go through those three, I'm just going to use a

17    name, and you can tell me if that's --

18    A.   Sure.

19    Q.   Was Tandeep a confidential human source?

20    A.   She was, yes, sir.

21    Q.   And who is she?

22    A.   She was an individual who had, had previously worked with

23    the defendant.

24    Q.   I'm very sorry.  Could you repeat that?

25    A.   Yes.  Someone who previously worked with the defendant.

K2pWsch2                         Evanchec - Cross

Q.  Someone who agreed to work with the defendant?

A.  Someone who previously worked with the defendant.

Q.  Oh, who had previously worked with the defendant?

A.  Yes.

Q.  Was she still at that time at the CIA when you were doing

your investigation?

A.  My understanding was she continued to support the

government in some capacity at the time.

Q.  Was she handled, for example, by the FBI?  I don't mean for

example, but for lack of a better phrase --

A.  If I may just explain for the jury what that means --

Q.  Sure.

A.  -- when the FBI does work with a confidential human source,

that individual is responsible for the activities that that,

that that source does: want to make sure that they're operating

within the law, want to make sure that they know where the

meetings are going, make sure they have the equipment for that

specific assignment.  So there is a single agent -- it's always

an FBI agent -- who becomes that person's point of contact to

further the investigation.

    I think when Mr. Branden speaks of handler, that's what

he's referring to.

Q.  You are correct.

A.  Thank you.

Q.  Were you the handler for Tandeep?

1    A.   I was not the handler for Tandeep.

2    Q.   And how long was she a confidential human source?

3    A.   I can't speak to that, sir.  I don't know.

4    Q.   And did she meet with the defendant in person, to your

5    knowledge?

6    A.   To my knowledge, yes.

7    Q.   And did she speak to him telephonically?

8    A.   I believe so, yes.

9    Q.   And through email?

10   A.   I can't speak to email.

11   Q.   During all those communications with the defendant, was

12   Tandeep -- did Tandeep ever report back to the FBI that the

13   defendant had mentioned somehow that he was involved with the

14   leak?

15   A.   Yes.  The defendant, in one of their interactions, inquired

16   extensively about, about what was happening with the FBI and

17   the investigation overall, yes.

18   Q.   But he didn't say that he was responsible for the leak, did

19   he?

20   A.   He did not, no.  No, sir.

21   Q.   OK.  You had a second confidential human source, correct?

22   A.   The FBI did, yes.

23   Q.   And was his name Gordon, we'll say?

24   A.   Yes.

25   Q.   OK.  And tell me about Gordon.

K2pWsch2                          Evanchec - Cross

1    A.  Gordon was someone who had retired from the CIA and who

2    really saw the defendant almost as a son, took him under his

3    wing, was his mentor, and he was someone that the defendant had

4    reached out to immediately after the leaks.

5    Q.  And how did you reach out to Gordon initially?

6    A.  I --

7    Q.  How did it come to your mind that he might be somebody that

8    could further the investigation?

9    A.  Yeah.  During our interviews at the CIA, it became very

10   clear that this person was someone close to the defendant, and

11   that is someone who we would be interested in talking to.  And

12   in this case Gordon was asked and agreed to help us.

13   Q.  And did Gordon, to your knowledge, speak to the defendant

14   on the telephone?

15   A.  Yes.

16   Q.  And did he speak to him in person?

17   A.  Yes.

18   Q.  And he, too, was handled by somebody, correct?

19   A.  That's correct.

20   Q.  That was not you?

21   A.  That was not me.

22   Q.  OK.  Was Gordon ever asked to wear a wire while talking to

23   the defendant in person?

24   A.  He was.

25   Q.  What are some of the specifics of that event?  Was it a

1    singular event?

2    A.  I don't recall the number of times that he wore a wire, and

3    that's basically -- so the jury's aware, that's a device that

4    our cooperator would wear to basically record the conversation

5    of the audio that was present around them at the time, and I

6    did review -- he made recordings.

7    Q.  He made recordings; did he make those recordings in New

8    York?

9    A.  I believe so.

10   Q.  OK.  Does he live in New York?

11   A.  He does not.

12   Q.  So was he flown up to New York purposely so he could try

13   and tape the defendant into a confession?

14   A.  He traveled to New York at our request to talk to the

15   defendant, yes.

16   Q.  And was his travel paid for by the FBI?

17   A.  In a situation like that, normally the FBI would provide

18   that, that reimbursement.

19   Q.  And does he get paid separately for his services?

20   A.  I don't believe so.

21   Q.  And what about Tandeep; was she paid separately for her

22   services?

23   A.  I can't speak to the compensation that those two

24   individuals had.

25       It is routine for someone's time and efforts to compensate

1    them.  It is routine for the FBI.  I'm not sure in this case.

2    I just don't recall.

3    Q.  So Gordon wore a wire on at least one, maybe more

4    occasions, correct?

5    A.  That's my understanding.

6    Q.  And in any of those conversations he had wearing a wire,

7    were those two people out in the public?

8    A.  Yes.

9    Q.  They weren't in a SCIF, for example, correct?

10   A.  You are not permitted to record in a SCIF.

11   Q.  OK.  And was Gordon instructed to ask questions about the

12   leak?

13   A.  He was.

14   Q.  OK.  So in a sense, was Gordon eliciting classified

15   information?

16   A.  If that conversation occurred, it would have been

17   memorialized on the recording, yes.

18   Q.  And in the end, did the defendant confess to Gordon?

19   A.  He did not.

20   Q.  He did not.  And you said, I think, that this had been the

21   defendant's mentor and long-time friend, correct?

22   A.  That's correct.

23   Q.  OK.  And you had a third confidential human source,

24   correct?

25   A.  He did.

K2pWsch2                           Evanchec - Cross

1    Q.   Was his name Matthew?

2    A.   It was.

3    Q.   Tell me about, a little background about Matthew.

4    A.   Matthew is someone who had worked with the defendant at one

5    of the defendant's previous places of employment.  He was also

6    someone that was part of -- spoke yesterday about the IRC chat

7    that they're, the defendant maintained.  He was one of the

8    people that was a frequent user of that IRC chat.  I believe

9    the name he used was J.C. Denton in those exchanges.

10   Q.   So Matt was J.C. Denton?

11   A.   In the IRC chats, yes, sir.

12   Q.   And how long had Matt known the defendant?

13   A.   I believe at the time, from 2017, it was about seven years,

14   from what my recollection was.

15   Q.   OK.  And do you know how they initially had met?

16   A.   They were colleagues together.

17   Q.   Oh, OK.

18   A.   Yes.

19   Q.   And then they furthered their relationship during these

20   chat sessions?

21   A.   Yes.

22   Q.   And have you reviewed those chat sessions and others

23   involving the defendant?

24   A.   Referring to the IRC chats?

25   Q.   Yes.

K2pWsch2                          Evanchec - Cross

1   A.  I have.

2   Q.  OK.  And did you get the feeling that the defendant and

3   Matt were close?

4   A.  I did.

5   Q.  And did you, therefore, reach out to Matt so that he could

6   become a confidential human source?

7   A.  Yes.

8   Q.  And was he willing to do that?

9   A.  He was, ultimately, yes.

10  Q.  Why do you say ultimately?

11  A.  In the beginning -- so, I was Matt's handler in the

12  situation, and in the initial phone calls that I had with Matt,

13  he was very skeptical of, of an FBI agent calling him.  He

14  actually had called his employer asking for advice of how to

15  deal with me.  He didn't believe that I was an FBI agent and

16  struggled with the fact that, Hey, can I actually meet with

17  this guy?  He says he's an FBI agent.  Anyone can call on the

18  phone and say they're an FBI agent.

19      So in the beginning, there was some resistance, actually,

20  good on his part, actually.

21  Q.  Did you ask him to make contact with the defendant?

22  A.  We did.

23  Q.  Did you ask him to have continuing IRC chats?

24  A.  We did ask him to engage in IRC chats, yes.

25  Q.  Did he ever record conversations with the defendant?

1    A.  I don't believe so.

2    Q.  So he did not wear a wire?

3    A.  I don't believe so.

4    Q.  And during the chats and the telephone calls, were you

5    instructing Matt as to what your purpose was?

6    A.  So, Matt was broadly aware of, of our interest in the

7    defendant at that time.  I wasn't over his shoulder telling him

8    what to type in any way, but he broadly knew what we were

9    interested in -- in the activities, travel plans, involvement

10   at the CIA.  Those types of things are things that we asked

11   Matt to try to work in any conversation should he have the

12   opportunity.

13   Q.  And through Matt, you never learned of any confession by

14   the defendant, correct?

15   A.  No, sir.  No confession.

16   Q.  OK.  During your investigation did you ever use a

17   confidential human source with regard to any other employee at

18   the CIA?

19   A.  Not to my knowledge.

20   Q.  I wanted to talk briefly about Government Exhibit 1353.

21   These are searches for CIA, WikiLeaks, FBI, correct?

22   A.  Correct, sir.

23   Q.  And these are searches that you've created this grid for

24   and this exhibit for that list 28 relevant searches, correct?

25   A.  Correct, sir.

K2pWsch2                          Evanchec - Cross

Q.  And this is between the week of March 7 and March 14, 2017,
correct?  Third line on the top.

A.  Yes, sir.

Q.  And that's immediately after Vault 7 had been released on
WikiLeaks, correct?

A.  That's correct, sir, yes.

Q.  And you know Mr. Schulte to have previously worked at the
CIA, correct?

A.  He did.

Q.  It would be normal for him to be interested in all of
these, correct; anybody who worked at the CIA might have an
interest in the WikiLeaks leak?

A.  One could say that, yes.

         MR. BRANDEN:  I do have some more questions, but I
want to check with my cocounsel for --

         THE WITNESS:  Yes, sir.  Take your time.

         THE COURT:  All right.  Mr. Branden.

         MR. BRANDEN:  I apologize, Judge.

Q.  Going back to our discussion about Mike for a moment --

A.  Yes.

Q.  -- during your investigation of him, did you ever check his
badge records for April 20?

A.  I did.

Q.  Where was he at the start of the reversion?

A.  He was in the -- he was at work at -- at the CCI building.

K2pWsch2                        Evanchec - Cross

1    Q.  What floor was he on?

2    A.  I -- I don't recall specifically the floor.

3    Q.  And do you know where he was at the end of the reversion?

4    A.  He remained at work through the duration of that reversion.

5    Q.  And what floor was that?

6    A.  I don't recall specifically the floor that he was on.

7    Q.  By the way, do you know if Mike had virtual machines

8    running on April 20, 2016?

9    A.  I don't recall specifically.

10   Q.  And do you know how many monitors, for example, he had on

11   his desktop station?

12   A.  I believe two or more was the norm at, at the CCI.

13   Q.  And did he ever talk to anybody about the reversion on his

14   own?  Did he volunteer about the reversion?

15   A.  He indicated in his interview that he, I believe, recalled

16   speaking to someone at management.  He couldn't specifically

17   recall, if my recollection serves me correctly.

18   Q.  Wasn't it the FBI that confronted him with the fact of the

19   screenshot?

20   A.  We did, in August of 2017.

21   Q.  OK.  He had not raised it himself?

22   A.  He did not.

23   Q.  He didn't raise it with the CIA?

24   A.  He said he believed he had a discussion about it when we

25   interviewed him, without naming --

K2pWsch2                              Evanchec - Cross

 1  Q.  Not with you in the first instance, correct?

 2  A.  No, sir.

 3  Q.  And not with the Department of Justice, correct?

 4  A.  Not to my knowledge, sir.

 5          MR. BRANDEN:  Judge, I just want to check a few more

 6  matters.  I'll be quick.

 7          Just a few more questions that I appear to have

 8  overlooked.  I apologize for that.

 9          THE WITNESS:  Yes, sir.

10  BY MR. BRANDEN:

11  Q.  During your search of the residence you recovered an awful

12  lot of computer equipment, correct?

13  A.  That's correct, sir.

14  Q.  There was a CPU tower, correct?

15  A.  Several.

16  Q.  Several.  Several hard drives, correct?

17  A.  Eight to ten if what I remember serves me correctly.

18  Q.  OK.  And one of those ultimately you found to have an

19  encrypted container, correct?

20  A.  There was an encrypted container on his desktop, yes.

21  Q.  And the FBI was ultimately able to defeat the encryption?

22  A.  Some of the encryption.

23  Q.  And no national security information was found in there,

24  correct?

25  A.  Not in the layers that we were able to get into.

K2pWsch2                          Evanchec - Cross

 1    Q.   And was there a safe in the residence?

 2    A.   There was.

 3    Q.   Anything in the safe?

 4    A.   I can't recall specifically the contents of the safe.

 5    Q.   And there were Xbox machines?

 6    A.   There were.

 7    Q.   Were they seized as well?

 8    A.   They were searched and seized.

 9    Q.   And nothing of relevance was found in there?

10    A.   I don't believe so.

11    Q.   And I think I also asked you that the defendant was an

12    online member of Bitbucket and GitHub?

13    A.   Correct, yes.

14    Q.   And did you have somebody look into those sites and

15    evaluate whether the defendant had done anything wrong with

16    regard to his online use --

17    A.   I believe those were part of our investigation, yes.

18    Q.   And you found that he had done nothing wrong?

19    A.   I don't recall specifically standing out in my mind.

20    Q.   He shared --

21    A.   Not --

22    Q.   -- no source code?

23    A.   Not that I can recall from those entities, sir.

24    Q.   Right.  If you had found it, you would have told me,

25    correct?

K2pWsch2                        Evanchec - Redirect

1   A.  We would have.

2            MR. BRANDEN:  OK.  No more questions.

3            THE COURT:  Mr. Laroche.

4            MR. LAROCHE:  Thank you, your Honor.

5   REDIRECT EXAMINATION

6   BY MR. LAROCHE:

7   Q.  Mr. Branden asked you a number of questions about Michael.

8   Do you recall that?

9   A.  I'm sorry.  I didn't hear you.

10  Q.  Mr. Branden asked you a couple of questions about Michael.

11  Do you recall those?

12  A.  He did.

13  Q.  And activities that happened on April 20, 2016.  Do you

14  recall that?

15  A.  I'm sorry.  I can't hear you, sir.

16  Q.  And activities that happened on April 20, 2016.  Do you

17  recall that?

18  A.  That's correct, sir.

19  Q.  Now, did you investigate those activities?

20  A.  We did.

21  Q.  And upon investigating them, did you open an investigation

22  into Michael?

23  A.  We did not.

24  Q.  Why not?

25  A.  We looked at, at Michael with the assistance of the

K2pWsch2                    Evanchec - Redirect

1   Washington field office, and we looked -- that day, we looked

2   at the computer logs for the defendant, which showed him making

3   a snapshot of Confluence on that day, make -- going back to the

4   Confluence snapshot on 4/16, subsequently deleting the 4/20

5   snapshot.  We didn't find any of that activity with, with

6   Mr. -- with Mr. Michael.

7       Yes, they were together in the office together.  There were

8   times, when you look at their online instant-messaging chats,

9   where the defendant goes missing and unresponsive for up to 45

10  minutes at a time, and Michael was following up about wanting

11  to go to the gym.  So those factors were part of the

12  calculation that we didn't have the evidence to open an

13  investigation on Michael.

14  Q.  So at the time, on April 20, Michael was in OSB, is that

15  correct?

16  A.  That's my understanding.

17  Q.  And OSB was located at the ninth floor of the CCI building,

18  is that correct?

19  A.  That's my understanding as well, sir.

20  Q.  At this point, the defendant had moved to a different

21  branch, is that correct?

22  A.  He had.

23  Q.  And he moved to a branch that was located on the eighth

24  floor, correct?

25  A.  That's my understanding, sir.

K2pWsch2                          Evanchec - Redirect

1   Q.  So his DevLAN workstation was located on the eighth floor,

2   correct?

3   A.  That's my understanding --

4            MR. LAROCHE:  If we could pull up Government Exhibit.

5   A.  -- yes, sir.

6            MR. LAROCHE:  A file recovered from the defendant's

7   workstation, and if we could zoom in on the top three lines,

8   please.

9   Q.  Do you recall testimony about this exhibit, sir?

10  A.  I do.

11  Q.  About the reversion being conducted to BK 4-16-2016?

12  A.  I do, sir.

13  Q.  At what time did this occur?

14  A.  This occurred at 1735:37, which would be 5:35 p.m.

15           MR. LAROCHE:  Now, let's take a look --

16  Q.  And again, the defendant's workstation is on the eighth

17  floor, is that correct?

18  A.  That's correct, sir.

19           MR. LAROCHE:  Let's take a look at Government Exhibit

20  1265.

21  Q.  Do you recognize this exhibit, sir?

22  A.  I do.

23  Q.  Is this the screenshot that Michael took of his workstation

24  on the ninth floor?

25  A.  It is, sir.

K2pWsch2                        Evanchec - Redirect

1              MR. LAROCHE:  If we can zoom in on the left screen,

2     please.  If we can zoom in on the bottom there.

3              We can come off that.

4              THE WITNESS:  Thank you.

5              MR. LAROCHE:  A little blurry.

6              Let's take a look at Government Exhibit 107, at page

7     3, at the bottom.

8     Q.  You were asked some questions about badge records.  Do you

9     recall that?

10    A.  Yes, sir.

11             MR. LAROCHE:  Let's take a look at the bottom three

12    lines of the badge records for the defendant.

13    Q.  See that bottom line there, April 20, 2016, at 1710?

14    A.  Yes.

15    Q.  What time of day is that?

16    A.  5:10 p.m.

17    Q.  Do you see IWS3 down below?

18    A.  Yes, sir, I do.

19    Q.  Where is the defendant at?

20    A.  At his workstation.

21    Q.  You were also asked questions about Mr. Michael's badge

22    records.  Do you recall that?

23    A.  I was.

24             MR. LAROCHE:  Let's take a look at those, Government

25    Exhibit 115, please.  If we could just zoom in on the last five

K2pWsch2                    Evanchec - Redirect

1    lines at the bottom.

2    Q.   Starting at the top line, what time of day is that?

3    A.   4:53 p.m.

4    Q.   Where is the defendant entering at that time?

5    A.   His work vault.

6    Q.   And where is that?

7    A.   On the ninth floor.

8    Q.   Now, for the rest of the day, is the defendant ever on the

9    eighth floor?

10   A.   Not according to these records, sir.

11   Q.   For Michael, is that correct?

12   A.   For Michael.

13   Q.   And if we can look at the third line there, at 1802, what

14   time of day is that?

15   A.   6:02 p.m., sir.

16   Q.   And where is Michael at 6:02 p.m. on April 20, 2016?

17   A.   On the fifth floor.

18   Q.   Not at his desk, is that correct?

19   A.   Not at his desk.

20   Q.   Is that in the middle of the reversion?

21   A.   It is.

22   Q.   And when's the next time he comes back on the ninth floor?

23   A.   6:28 p.m.

24        MR. LAROCHE:   Thank you.  You can pull that down.

25   Q.   You were asked a number of questions about classification

K2pWsch2                          Evanchec - Redirect

1    of emails.  Do you recall those?

2    A.  Yes, sir.

3    Q.  You were asked who classified those various emails, is that

4    correct?

5    A.  The emails in each of those cases would have been

6    classified by the author of that specific email.

7    Q.  And did you see a number of emails that were authored by

8    the defendant?

9    A.  I did.

10   Q.  How would he classify those emails before sending them?

11   A.  He simply -- once you compose an email, it asks you for, to

12   enter your manual classification, so he chose to mark those

13   either unclassified, or the other designation we saw was

14   unclassified for internal agency use only.  He chose those

15   markings.

16          MR. LAROCHE:  If we could pull up Government Exhibit

17   1616, please.

18   Q.  Do you recall being asked questions about this email?

19   A.  I do.

20   Q.  And what was this email classified as by the defendant?

21   A.  The defendant chose to mark this email unclassified.

22   Q.  But you said this email was not unclassified, right?

23   A.  It is not unclassified.

24   Q.  Why did you say that?

25   A.  Because the CIA did a review of this document and found

K2pWsch2                          Evanchec - Redirect

1   that it contained classified information.

2   Q.  Now, there were a number of documents that were marked

3   unclassified, is that correct?

4   A.  That's correct, sir.

5   Q.  And there were emails that that were recovered from the

6   defendant's home that talked about disputes he had had --

7   A.  That's right, sir.

8   Q.  Disputes with management, is that right?

9   A.  Yes, sir.

10  Q.  Disputes with security, is that right?

11  A.  Yes, sir.

12  Q.  Disputes with Amol, is that right?

13  A.  Yes.  Yes, sir.

14  Q.  Whether or not those emails were classified, did they

15  impact your investigation?

16  A.  Absolutely.

17  Q.  Why?

18  A.  They spoke to the mind-set, potential motivation of this

19  subject.

20  Q.  When were they recovered?

21  A.  March of 2017.

22  Q.  When did the activities that were in the emails actually

23  happen?

24  A.  A year earlier.

25  Q.  Now, you were also asked about handwritten notes.  Do you

K2pWsch2                         Evanchec - Redirect

1    recall those handwritten notes?

2    A.  I do.

3    Q.  When were the handwritten notes recovered?

4    A.  On March 15, 2017.

5    Q.  And you were asked if they related to a hearing that might

6    have taken place with respect to a protective order.  Do you

7    recall those questions?

8    A.  I do.

9    Q.  When is the last hearing that you recall with respect to a

10   protective order involving Amol and the defendant?

11   A.  I believe it was sometime in the summer of 2016.

12   Q.  Now, you were also asked questions about whether certain

13   portions of those handwritten notes related to the protective

14   order.  Do you recall that?

15   A.  I do.

16   Q.  You talked about phase 3, retaliation, and you said you

17   didn't think the handwritten notes necessarily related to that,

18   is that right?

19   A.  I didn't think they would be pertinent to a protective

20   order issuance.

21   Q.  Why not?

22   A.  If I felt my life was in danger and I was applying for a

23   protective order, I would be focusing on the actual conduct

24   where someone was threatening my life, not on the activities of

25   the CIA.  Seemed like part of that was to put the CIA on trial

K2pWsch2                        Evanchec - Redirect

to me.

Q.   Whether or not these related to the protective order, did

they impact your investigation?

A.   They did.

Q.   Why?

A.   They, again, spoke to the mind-set, motivation of this

subject keeping such records in the headboard of his bed a year

after the incidents occurred.

Q.   You were also asked some questions about certain things in

the SCIF, is that correct?

A.   That's correct.

Q.   Why did you have those meetings outside of the SCIF?

A.   One, as I previously mentioned, it was a -- it was a place

to have a more open, frank discussion.

     I would say, second of all, on March 15, on March 20, on

March 21, and at the end of June, the subject was the only

known suspect of this leak.  Bringing him to a SCIF that houses

this nation's most sensitive secrets to protect the city is not

something I was willing to do.

Q.   During these meetings, did you tell the defendant he could

disclose classified information?

A.   No, but we advised him that if he thought he needed to, we

could make arrangements and we could do that.

Q.   Did you tell him that you would disclose the classified

information after he left the meeting?

K2pWsch2                         Evanchec - Redirect

1   A.  We did not.

2   Q.  Did you tell him that you would disclose classified

3   information about Hickok to a reporter after he left the

4   meeting?

5   A.  No, sir.

6   Q.  Did you tell him that he could tell that reporter about

7   DevLAN?

8   A.  No, sir.

9   Q.  Now, you were also asked a number of questions about

10  certain confidential sources you used as part of the

11  investigation.  Do you recall those?

12  A.  Yes, sir, I do.

13  Q.  And you were asked questions about whether the defendant

14  gave a confession to any of those sources.  Do you recall

15  those?

16  A.  Yes, sir.

17  Q.  And you were also asked about certain IRC chats that were

18  part of the investigation with the sources?  Do you recall

19  that?

20  A.  Correct, sir.

21  Q.  Remember we talked about some of the IRC chats that were

22  recovered from the defendant's server yesterday?

23  A.  Correct.

24          MR. LAROCHE:  I want to show you a couple of those.

25  If we could publish Government Exhibit 1405-2, please.  Zoom in

K2pWsch2                          Evanchec - Redirect

1   on those.

2          MR. BRANDEN:  Your Honor, I object.  This is beyond

3   the scope of the cross.

4          THE COURT:  The objection's overruled.

5          MR. LAROCHE:  Thank you, your Honor.

6   Q.  Let's just read this one.  I'll read Josh and you can read

7   Niall.

8   A.  Yes, sir.

9   Q.  Niall sends Josh an article "top ten secrets effective

10  liars"?

11  A.  "Yeah.

12      "I just read that.

13      "Surprisingly, I just recognized most of the 10 things in

14  the linked article.

15      "I'm a rather natural manipulator myself," wink smiley.

16  Q.  "I haven't gotten onto reading it myself yet.  Was reading

17  your other share.

18      "About coding.

19  A.  "I would always get my way when I was young.

20      "Whatever was necessary.

21  Q.  "Same.

22  A.  "Heh.

23  Q.  "Wait.

24      "Sometimes.

25  A.  "I could lie to anyone and get away with it.

1          "Like it said, the trick of it was to make parts of it

2    true.

3          "But it was all a natural process.

4          "Quite the interesting read."

5    Q.   "I think I'm pretty good at it.

6          "The trick is to lie about everything.

7          "Then people can't actually tell when you tell the truth.

8          "Which is far more hilarious.

9    A.   "Lol.

10         "Naw.  If you lie about everything, then people won't ever

11   believe anything you say.  I had a friend like that, and we

12   would always just laugh at him for his BS."

13                MR. LAROCHE:  Nothing further, your Honor.

14                THE COURT:  We'll take our morning recess now.  We'll

15   resume at quarter after 11.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

K2pWsch2                        Evanchec - Redirect

1              (Jury not present)

2              THE COURT:  You're excused.

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  Thank you.

5              (witness excused)

6              THE COURT:  See you at 11:15.

7              MR. LAROCHE:  Thank you, your Honor.

8              (Recess)

9              THE COURT:  Please be seated.

10             Are we all set now?

11             MR. KAMARAJU:  We are, your Honor.

12             THE COURT:  OK.  David, call in the jury.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K2pWsch2                          Betances - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Call your next witness.

4              MR. KAMARAJU:  Yes, your Honor.  The government calls

5    Carlos Betances Luna Mera.

6     CARLOS BETANCES LUNA MERA,

7          called as a witness by the government,

8          having been duly sworn, testified through the

9          Spanish-language interpreter as follows:

10             THE COURT:  Please sit down.  Pull yourself right up

11   to the microphone.

12             Mr. Kamaraju.

13             MR. KAMARAJU:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. KAMARAJU:

16   Q.  Good morning, sir.

17   A.  Good morning.

18   Q.  How old are you?

19   A.  41.

20   Q.  And where were you born?

21   A.  In the Dominican Republic.

22   Q.  Are you a citizen of the Dominican Republic?

23   A.  Yes.

24   Q.  How long did you live there?

25   A.  For 18 years.

K2pWsch2                          Betances - Direct

1    Q.  And where did you go after that?

2    A.  To Puerto Rico.

3    Q.  When did you arrive in Puerto Rico?

4    A.  In '96.  In 1996.

5    Q.  How long did you stay in Puerto Rico?

6    A.  For a month.

7    Q.  Where did you go after that?

8    A.  To Newark, New Jersey.

9    Q.  And how long did you stay in Newark?

10   A.  For about two months.

11   Q.  Where did you move after that?

12   A.  To New York.

13   Q.  Sir, do you speak English?

14   A.  I understand, and I can speak a little bit.

15   Q.  Are you more comfortable here testifying through a

16   translator?

17   A.  Yes.

18   Q.  Now, when you moved to New York, what did you do for work

19   at that time?

20   A.  In a restaurant.

21   Q.  And did you make money any other way?

22   A.  Yes.

23   Q.  What was that?

24   A.  I had a radio, and I would notify my brother-in-law when

25   the police were on their way down, because they would sell

1   drugs out of a building.

2   Q.  Now, were you ever deported from the United States?

3   A.  Yes.

4   Q.  When did that happen?

5   A.  2001.

6   Q.  Did you ever come back?

7   A.  Yes.

8   Q.  Did you enter the country illegally at that time?

9   A.  Illegally, yes.

10  Q.  Where did you enter the country?

11  A.  Through Texas.

12  Q.  And how long did you stay in Texas?

13  A.  Just for a few weeks.

14  Q.  Where did you move to then?

15  A.  To New York.

16  Q.  And when you first got to New York, how did you make money?

17  A.  I worked in construction, making closets, and being a

18  mechanic.

19  Q.  Did there come a time when you were making additional

20  money?

21  A.  Yes.

22  Q.  Could you tell us what happened?

23  A.  I ran into a friend, and he asked me to install some GPSes

24  in some cars that were coming from Texas to here.

25  Q.  And what was the purpose of the GPSes?

K2pWsch2                        Betances - Direct

1  A.  To locate them when they arrived at their destination to

2  know exactly the time and the place that they had arrived at

3  and to.

4  Q.  And what would be loaded in those cars?

5  A.  There would be drugs.

6  Q.  Now, sir, I'd like to direct your attention to March of

7  2018.  Were you arrested at that time?

8  A.  Yes.

9  Q.  Could you please describe for us what happened?

10  A.  I was in front of a building with a friend of mine, and the

11  police arrested he and I.

12  Q.  And did there come a time when you were charged with any

13  crimes?

14  A.  Yes.

15  Q.  What crimes were you first charged with?

16  A.  Conspiracy and drug possession.

17  Q.  Now, after your arrest, did you choose to speak with U.S.

18  law enforcement agents?

19  A.  Yes.

20  Q.  And since that time, have you pled guilty to any crimes in

21  the United States?

22  A.  Yes.

23  Q.  What crimes are those?

24  A.  I was -- I pled guilty to possession, conspiracy, illegal

25  entry into the United States, fraud and bringing a device into

K2pWsch2                         Betances - Direct

1   a federal jail.

2   Q.  OK.  We'll talk about that last one in a second.

3       When you say possession and conspiracy, was that with

4   respect to drug trafficking?

5   A.  Yes.

6   Q.  Now, in connection with your guilty plea, did you enter

7   into a cooperation agreement with the United States?

8   A.  Yes.

9   Q.  With respect to testifying, what's your primary obligation

10  pursuant to that agreement?

11  A.  To tell the whole truth.

12  Q.  Now, you testified that you pled guilty to bringing a

13  device into a federal facility, is that right?

14  A.  Yes.

15  Q.  What device are you referring to?

16  A.  To a cell phone.

17  Q.  And what federal facility are you referring to?

18  A.  To the MCC.

19  Q.  What's the MCC?

20  A.  It's the Metropolitan Correctional facility.

21  Q.  Where is it located?

22  A.  I think it's around, right across this building.

23  Q.  Now, sir, looking around the courtroom, do you recognize

24  anyone else who used a cell phone that was smuggled into the

25  MCC?

K2pWsch2                         Betances - Direct

```
 1    A.  Yes.

 2    Q.  Could you tell us where he's sitting?

 3    A.  Over there.

 4    Q.  And could you tell us --

 5          MS. SHROFF:  Your Honor, we'll stipulate he's pointing

 6    to Mr. Schulte.

 7          THE COURT:  All right.  The witness has identified

 8    Mr. Schulte.

 9          MR. KAMARAJU:  Thank you, your Honor.

10    Q.  Now, Mr. Betances, where did you first meet the defendant?

11    A.  At the MCC.

12    Q.  And when was that?

13    A.  Approximately in the summer of 2018.

14    Q.  And where within the MCC did you meet him?

15    A.  In our tier, the tier where we primarily stayed at and

16    chatted.

17    Q.  Which tier was that?

18    A.  If I remember correctly, it's tier 11.

19    Q.  Now, did you share a cell with the defendant?

20    A.  No.

21    Q.  Were you friends with him?

22    A.  We used to -- we were friends.  We used to talk a lot.

23    Q.  Did you guys hang out with anyone else?

24    A.  Yes.

25    Q.  Who else did you typically hang out with?
```

K2pWsch2                        Betances - Direct

1   A.  With Omar and Chino.

2   Q.  Now, how often would you see the defendant?

3   A.  Every day.

4   Q.  We'll come back to your interactions with the defendant,

5   but I want to ask you, at the MCC, were you allowed to make

6   phone calls?

7   A.  Yes, you could.

8   Q.  Which phones did you have to use to make those calls?

9   A.  Some phones in the front that all inmates were allowed to

10  use and call.

11  Q.  Were those phones that were provided by the MCC?

12  A.  Yes.

13  Q.  And calls over those MCC phones, are those recorded?

14  A.  Yes.

15  Q.  How do you know that?

16  A.  Because before you dial, it says that all calls are

17  monitored and recorded.

18  Q.  Now, how about email; are you able to send and receive

19  emails in the MCC?

20  A.  Yes.

21  Q.  Which computers do you have to use to send and receive

22  emails from the MCC?

23  A.  Some that were on top of where the counter was.

24  Q.  And were those computers that were provided by the MCC?

25  A.  Yes.

K2pWsch2                          Betances – Direct

1    Q.  And were emails sent and received using those computers

2    monitored in any way?

3    A.  Yes.

4    Q.  How do you know that?

5    A.  Because when you signed in, it said that it was also being

6    monitored.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Under rules of the jail, were you allowed to use cell

2    phones in the MCC?

3    A.  No.

4    Q.  But you testified that you and the defendant were able to

5    use cell phones in the MCC, right?

6    A.  Yes.

7    Q.  Was anyone else able to use cell phones in the MCC?

8    A.  Only we, the people who had them.

9    Q.  Was Omar one of the people who had a cell phone?

10   A.  Yes.

11   Q.  How did you get the cell phones into the MCC?

12   A.  Well, you would have to bring them in through the visiting

13   hour, and in the visiting hour, there was some special lockers

14   that were located there, and you had to put a magnet on the

15   phone, and then place the phone in there, and you would have to

16   notify someone by the name of Junior who was located on 11

17   South.  And then he would go downstairs and retrieve it, and he

18   would bring it up to our floor, because he worked as a plumber

19   on our floor.

20   Q.  How did you learn about that system?

21   A.  Well, because Omar, Josh and Chino were together, and they

22   explained this to me, and they said that they had been

23   previously tricked and cheated, and they wanted me to know what

24   the whole system was, because they were looking for someone who

25   was trustworthy, so that they wouldn't be cheated and tricked

1    again.

2    Q.  What do you mean by cheated and tricked?

3    A.  Well, they bought three telephones, and none of them were

4    ever delivered to them.

5    Q.  Approximately when was this conversation?

6    A.  Approximately between July and August.

7            MR. KAMARAJU:  Your Honor, may I approach?

8            THE COURT:  Yes.

9            MR. KAMARAJU:  Thank you.

10   Q.  Sir, I'm showing you what's been marked for identification

11   as Government Exhibit 820, which contains Government Exhibits

12   820-1 through 820-449.

13           Do you recognize Government Exhibit 820?

14   A.  Yes.

15   Q.  What is it?

16   A.  Inside there, there is a CD.

17   Q.  How do you recognize that CD?

18   A.  Because when we were looking at it, it contains all the

19   photographs and all the videos that I took.

20   Q.  Are your initials on Government Exhibit 820?

21   A.  Yes.

22   Q.  And the photographs that you referred to, are those

23   Government Exhibits 820-1 through 820-449?

24   A.  Yes.

25   Q.  Are those images that you took with one of the cell phones

K2P3SCH3                        Betances - Direct

1    from within the MCC?

2    A.  Yes.

3              MR. KAMARAJU:  Your Honor, the government would offer

4    Government Exhibit 820 and 820-1 through 820-449.

5              MS. SHROFF:  We have no objection.

6              THE COURT:  They're received in evidence.

7              (Government's Exhibit 820, 820-1 through 820-449

8    received in evidence)

9              MR. KAMARAJU:  Ms. Hurst, if we can publish Government

10   Exhibit 820-224, please.  If we can pause it at about

11   10 seconds.

12             (Video played)

13             MR. KAMARAJU:  Right there is great.

14   Q.  Mr. Betances, do you recognize the man who is sitting down?

15   A.  Yes.

16   Q.  Who is that?

17   A.  Omar.

18             MR. KAMARAJU:  Can we play a little further.

19             (Video played)

20             MR. KAMARAJU:  Can we pause it there.

21   Q.  Did you recognize the man speaking?

22   A.  Yes.

23   Q.  Whose voice was that?

24   A.  Mine.

25             MR. KAMARAJU:  Keep playing a little bit further.

K2P3SCH3                        Betances - Direct

 1              (Video played)

 2              MR. KAMARAJU:  Pause right there.

 3    Q.  Do you recognize that man?

 4    A.  Yes.

 5    Q.  Who's that?

 6    A.  Chino.

 7              MR. KAMARAJU:  If we can keep running, please.

 8              (Video played)

 9              MR. KAMARAJU:  Can we pause it there.

10    Q.  Do you see the man on the right there, all the way at the

11    top of the screen?

12    A.  Yes.

13    Q.  Who's that?

14    A.  Josh.

15    Q.  Where were you when you took this video?

16    A.  In my cell.

17              MR. KAMARAJU:  Ms. Hurst, can we publish Government

18    Exhibit 820-402, please.

19              (Video played)

20    Q.  Do you recognize the man here?

21    A.  Yes.

22    Q.  Who is it?

23    A.  Josh.

24    Q.  What's the defendant doing in this video?

25    A.  Using the Samsung telephone.

K2P3SCH3                        Betances - Direct

1   Q.   Where was this video taken?

2   A.   In Chino's cell.

3            MR. KAMARAJU:  Take that down.

4   Q.   How many cell phones did the defendant use in the MCC?

5   A.   Four in total.

6   Q.   What kind of cell phones did he initially get?

7            MS. SHROFF:  Objection to the question as framed.

8            THE COURT:  Try again, Mr. Kamaraju.

9            MR. KAMARAJU:  Certainly, your Honor.

10  Q.   What type of cell phones did the defendant initially use?

11  A.   IPhones.

12           MR. KAMARAJU:  Can we publish Government Exhibit

13  820-65, please.

14  Q.   Sir, what is this?

15  A.   An iPhone.

16  Q.   Is this one of the photos you took?

17  A.   Yes.

18  Q.   Do you see where it says "Schulte Analytics"?

19  A.   Yes.

20  Q.   Do you see an address under there?

21  A.   Yes.

22  Q.   What's that address?

23  A.   It's the address of the MCC.

24  Q.   Do you see where it says "by"?

25  A.   Yes.

K2P3SCH3                          Betances - Direct

1    Q.  What name is listed there?

2    A.  Josh's.

3    Q.  Was the defendant happy with the iPhones he got?

4    A.  No.

5    Q.  How do you know that?

6    A.  Because he wanted a different phone, something that was not

7    an iPhone.

8    Q.  Did he tell you why he didn't want an iPhone?

9    A.  Because he wasn't able to install the programs he wanted to

10   install in the iPhones.

11   Q.  Was he ever able to get a different kind of cell phone?

12   A.  Yes.

13   Q.  What kind of cell phone was he able to get?

14   A.  A Samsung.

15   Q.  How did he get the Samsung?

16   A.  He exchanged his iPhone with somebody by the name of Jimmy.

17   Q.  Was Jimmy another inmate at the MCC?

18   A.  Yes.

19        MR. KAMARAJU:  Can we publish Government Exhibit

20   820-447.  If we can just blow up the top there.  Well, hold on,

21   before we do that.

22   Q.  What is this?

23   A.  It's an iPhone.

24        MR. KAMARAJU:  Can we blow up the top there.

25   Q.  Do you see where it says "Presumption of innocence:

1    Origins.  My case involves WikiLeaks and the Vault 7/8 release.

2    I worked for the National Security Agency and then the Central

3    Intelligence Agency up through the end of 2016."

4    A.  Yes.

5    Q.  The defendant ever tell you where he worked before coming

6    to the MCC?

7    A.  Yes.

8    Q.  What did he tell you?

9    A.  At the CIA.

10   Q.  Did he ever talk about what he did for the CIA?

11   A.  Programs.  He was an engineer.  He made programs.

12   Q.  Did you ever hear him mention Vault 7?

13   A.  Yes.

14   Q.  What did you hear him say Vault 7 was?

15   A.  I just heard him say it was Vault 7.

16          MR. KAMARAJU:  Can we publish Government Exhibit

17   820-431, please.

18   Q.  What is this a picture of?

19   A.  It's a Samsung telephone that Josh used.

20   Q.  Do you see the part that says:  "The United States

21   government has a vital interest in safeguarding national

22   security and especially the names of those who risk their lives

23   to spy on their own countries for the U.S.  Does it seem like a

24   good idea, then, to directly compromise and jeopardize these

25   people?  I don't think in the history of intelligence something

K2P3SCH3                        Betances - Direct

1   so idiotic has ever been done, but leave it to the U.S. to be

2   the first to do it.  Let's take our own people with hundreds of

3   millions of dollars' worth of intelligence and let's illegally

4   throw them in prison and start fucking with them until they are

5   bankrupt and completely compromised and vulnerable.

6   Essentially it is the same as taking a soldier in the military,

7   handing him a rifle, and then begin beating him senseless to

8   test his loyalty and see if you end up getting shot in the foot

9   or not.  It just isn't smart."

10          Did you ever hear the defendant express any anger at

11  the CIA?

12  A.  Sometimes, yes.

13  Q.  How did you know he was angry at the CIA?

14  A.  Because he would speak angrily.

15  Q.  What kinds of things would he say?

16  A.  Well, for example, that they had betrayed him, things like

17  that.

18          MR. KAMARAJU:  Can we publish Government Exhibit

19  820-437, please.

20  Q.  What's this a photo of?

21  A.  That's the Samsung telephone that Josh uses.

22  Q.  Do you see various messages referring to something called

23  "Schulte Articles"?

24  A.  Yes.

25  Q.  Did you ever hear the defendant talk about his articles?

1   A.  Yes.

2   Q.  What did you hear him say?

3   A.  There was this one time when he was using a different

4   iPhone, and this was the iPhone that they had gotten because it

5   was somewhere up on top in our cell, which was 12.  He was

6   worried, because he had sent the article via text message.  But

7   then at the same time he said to us he was not worried, because

8   he said that he published the article.  It was now public.

9   Q.  Did you ever hear the defendant say anything else about his

10  articles?

11  A.  No.

12          MR. KAMARAJU:  Can we publish Government Exhibit

13  820-433.

14  Q.  What is this a photograph of?

15  A.  It is a photograph of the Samsung phone that Josh uses, but

16  it is the back of it.

17  Q.  Do you see something listed there as an IMEI number?

18  A.  Yes.

19  Q.  That's the number that ends 5432; is that right?

20  A.  Yes.

21  Q.  Did you ever talk with the defendant about what an IM --

22  did you ever speak with the defendant about an IMEI number?

23  A.  Yes.

24  Q.  What did you two talk about?

25  A.  I asked him, well, he had this program that he could use to

K2P3SCH3                         Betances - Direct

 1    change the IMEI in the Samsung which made it brand new.  And I

 2    asked him if he could do that with the iPhones too, and he said

 3    he was only able to do that with the Samsungs.

 4    Q.  What do you mean when you say like brand new?

 5    A.  As if they had just come from the factory.  New, brand new.

 6    Q.  Approximately when did the defendant get the Samsung phone?

 7    A.  Approximately in August.

 8    Q.  Was that 2018?

 9    A.  Yes.

10         MR. KAMARAJU:  Could we publish Government Exhibit

11    820-434, please.

12    Q.  What's this a photo of?

13    A.  It is a photograph of the home screen of the Samsung

14    telephone that Josh uses.

15    Q.  Do you see a date on the screen?

16    A.  Yes.

17    Q.  What's the date reflected on the screen?

18    A.  Saturday, September 1st.

19    Q.  What year did you take this picture?

20    A.  2018.

21    Q.  Do you see the various icons that are listed there?

22    A.  Yes.

23    Q.  What are those?

24    A.  They're apps.

25    Q.  Let's talk about a couple of those.  Do you see the app at

K2P3SCH3                          Betances - Direct

1   the top left, WhatsApp?

2   A.  Yes.

3   Q.  What's WhatsApp?

4   A.  It's an app that lets you send videos, text messages, and

5   you can call on it, too.

6   Q.  Who told you about WhatsApp?

7   A.  It was the group, Josh and Omar, they told us about

8   WhatsApp.

9   Q.  What did they tell you about WhatsApp?

10  A.  That we should use this app because the text messages that

11  we would send were encrypted, and the calls and the video calls

12  also.

13              MR. KAMARAJU:  We can skip Facebook and Docs for now.

14  Q.  Do you see the icon Orbot?

15  A.  Yes.

16  Q.  What's Orbot?

17  A.  It is an app that changes the IP address, the location of

18  where the telephone is being used.

19  Q.  What do you mean by that?

20  A.  Well, if you're using the telephone, say, for example at

21  the MCC, it can appear that you are using it in Texas, Paris,

22  or any other part of the world.

23  Q.  How did you learn about Orbot?

24  A.  Because before you installed -- well, before you -- sorry.

25  Before you used the telephone, Josh always had to install these

1   apps.  I asked him why and he explained why.

2   Q.  Did he tell you why he had to install those apps?

3   A.  Yes.

4   Q.  What did he tell you?

5   A.  It was to make the telephones more secure, and that so

6   nobody could detect where the calls were coming from.

7   Q.  When you say nobody could detect where the calls were

8   coming from, who were you trying to keep from detecting the

9   calls?

10  A.  Well, that's the situation.  I would make calls but the

11  idea was for nobody to know where these calls were being made

12  from.

13  Q.  Going down to the next row.  Do you see the app Signal?

14  A.  Yes.

15  Q.  What's Signal?

16  A.  It is an app similar to WhatsApp.  You can use it also to

17  make calls, video calls, text messages.  And the text messages

18  are very hard to detect.

19  Q.  Are those communications encrypted as well?

20  A.  Yes.

21  Q.  How did you learn about Signal?

22  A.  Because we were told once the phones came, we got them,

23  that we, any time we wanted to use our phones we should not use

24  the regular text messaging on them, but to use these apps.

25  Q.  Who told you that?

K2P3SCH3                      Betances - Direct

1    A.  Omar and Josh.

2    Q.  Let's skip WordPress for now.  Do you see Proton Mail?

3    A.  Yes, I do.

4    Q.  What's Proton Mail?

5    A.  It is an app, an application similar to gmail, but it's

6    more secure.  It is -- you can send messages, you can send

7    e-mails which are more secure and they're encrypted.

8    Q.  How do you know what Proton Mail is?

9    A.  Because Josh told me about that.

10   Q.  Okay.  Moving on, you see Turbo VPN?

11   A.  Yes.

12   Q.  What's Turbo VPN?

13   A.  It's an app that changes the IP address from the location

14   from where the phones are being used.

15   Q.  How did you learn about Turbo VPN?

16   A.  Because when the phones were installed, Josh and Omar would

17   check to make sure that that application was on, because that

18   way, as I explained before, the phones would not be able --

19   when making a phone call, no one would be able to detect where

20   the phone call is coming from.

21   Q.  How often would you use Turbo VPN when using the phones?

22   A.  It always had to be activated from the minute that the

23   phone was turned on.

24          MR. KAMARAJU:  Can we publish Government Exhibit

25   820-435, please.

1  Q.  What's this a photo of?

2  A.  That's the front part of the Samsung phone that Josh used.

3  Q.  Do you see in the bottom row --

4  A.  Yes.

5  Q.  Do you see something there called Secure Delete?

6  A.  Yes.

7  Q.  What's Secure Delete?

8  A.  It is an app that allows you to delete anything from the

9  phone.

10 Q.  How do you know about Secure Delete?

11 A.  Because I also asked Josh, and Josh explained to me what it

12 was used for.

13 Q.  What did he tell you it was used for?

14 A.  To delete or destroy any document or anything inside a

15 phone.

16       MR. KAMARAJU:  You can take that down.

17 Q.  Mr. Betances, could you tell us why you started taking the

18 photographs that we looked at.

19 A.  Because one time --

20       MS. SHROFF:  Your Honor, I am going to object to the

21 double hearsay that is about to be translated for the Court.

22 That's my objection.

23       THE COURT:  It's overruled.

24 A.  Because one time we were in Chino's cell, and I heard Josh

25 saying that Russia had to help him in the things that he was

1   doing.

2   Q.  We're going to come back to that.

3          MR. KAMARAJU:  Can we publish Government Exhibit 809,

4   the cover.

5   Q.  Do you see at the front there where it says 7/25-9/?

6   A.  Yes.

7   Q.  Can we turn to the next page.  Do you see a date written at

8   the top there?

9   A.  Yes.

10  Q.  What's the date?

11  A.  8/8/2018.

12  Q.  Was this around the time that you grew concerned about what

13  the defendant and Omar were doing?

14         MS. SHROFF:  Objection.  It assumes facts not in

15  evidence.  And the witness has not any ability to read this

16  document.

17         THE COURT:  Objection is overruled.

18         THE INTERPRETER:  Counselor, please repeat the

19  question.

20  Q.  Was this around the time that you grew concerned about what

21  the defendant and Omar were doing?

22  A.  Yes.

23  Q.  Do you see the handwriting here?

24  A.  Yes.

25  Q.  Do you recognize this handwriting?

1   A.   Yes.

2   Q.   Whose handwriting is it?

3   A.   Josh's.

4   Q.   How do you recognize his handwriting?

5   A.   Because one time he was in my cell, and he was writing a

6   code on his notebook.

7   Q.   These notebooks, how did the defendant store them?

8   A.   He always carried them with him wherever he went.

9   Q.   The top of the document, do you see where it says:  "If the

10  government doesn't pay me 50 billion in restitution and

11  prosecute the criminals who lied to the judge and presented

12  this B.S. case, then I will visit every country in the world

13  and bear witness to the treachery that is the USG.  I will look

14  to break up diplomatic relationship, close embassies, and U.S.

15  occupation around the world and finally reverse U.S. jingoism.

16  If this is the way the U.S. government treats one of their own,

17  how do you think they treat their allies."

18            THE INTERPRETER:  I'm sorry, counselor.  I have to go

19  on top of the stand, because I can't see what was read from a

20  distance.

21            MR. KAMARAJU:  I can ask the next question also.

22            THE COURT:  That's okay.  You can step down.

23            THE INTERPRETER:  Sorry.

24  Q.   Mr. Betances, in August of 2018, was the defendant angry at

25  the U.S. government?

1    A.  Yes.

2    Q.  How do you know that?

3    A.  Because he spoke with an angry face and he said bad things

4    about them.

5    Q.  What kind of things would he say?

6    A.  That he felt that he had been betrayed, and that he was,

7    felt very badly, and that he was insulted and hurt at all the

8    things that had been done to him.

9            MR. KAMARAJU:  Can we turn to page three, please.

10   Q.  Do you see a date written at the top there?

11   A.  Yes.

12           MR. KAMARAJU:  If we can blow up the top paragraph.

13   Q.  Do you see where the defendant writes:  "The way is clear.

14   I will set up a WordPress of JoshSchulte.WordPress.com and

15   Presumptionofinnocence.WordPress.com"?

16   A.  Yes, I see it.

17   Q.  And do you see where it says:  "From here, I will stage my

18   information war"?

19           MS. SHROFF:  Your Honor, several jurors --

20           A JUROR:  We can't see it.

21           THE COURT:  All right.

22           MR. KAMARAJU:  Thank you.  We'll grab -- can any of

23   you see it?

24           A JUROR:  All screens.

25           THE COURT:  David.

1           MR. KAMARAJU:  I'm sorry, everybody.

2           THE COURT:  Hold on for just a second.

3           THE DEPUTY CLERK:  Nothing?

4           A JUROR:  Nothing.

5           MR. KAMARAJU:  Your Honor, if you want to take the

6    lunch break early, we can try to fix the problem.

7           THE COURT:  Let's see how long it's going to be before

8    they come up here.

9           Why don't we break early for lunch and we'll resume at

10   1 o'clock.

11          (Jury excused)

12          THE COURT:  1 o'clock.

13          (Recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                         AFTERNOON SESSION

2                              1 p.m.

3              (In the robing room; counsel present)

4              THE COURT:  We got a note from the juror and it deals

5    with translation.

6              (Pause)

7              THE COURT:  Some of the jurors are bilingual.  So

8    they're listening.  We noticed they've been taking notes while

9    Mr. Betances has been speaking in Spanish.

10             So what do you want to do?

11             MR. KAMARAJU:  I can ask that question again.  And I

12   think that unless anybody disagrees, I think that addresses at

13   least that part of it.

14             THE COURT:  Did you look, Ms. Shroff?

15             MS. SHROFF:  I did.  I was thinking.  Sorry.  I'm not

16   sure.

17             MR. KAMARAJU:  I'm trying to remember -- I don't know

18   it's proper now, but there are cases I believe in which courts

19   give instructions about following the interpreters who were

20   there in court regardless of foreign language experience.  I

21   don't know that we need to do that here.  But I am aware of

22   those cases existing.

23             MS. SHROFF:  I know this came up with a case before

24   Judge Buchwald.  And Judge Buchwald just substituted

25   translators.

1          THE COURT:  She did what?

2          MS. SHROFF:  She substituted the interpreter.

3          THE COURT:  For the --

4          MS. SHROFF:  For the remainder.  I don't know.  I'm

5     not sure.

6          MR. LAROCHE:  I think -- sorry.

7          MS. SHROFF:  Go ahead.

8          MR. LAROCHE:  I believe that it was Ms. Iliakostas who

9     did this part of the translation.  Ms. Caruso I think we can

10    ask to do the remaining portion.  My understanding is it is

11    only about 15 more minutes on direct.

12         THE COURT:  Which one is Ms. Caruso, the tall one?

13         MR. LAROCHE:  The taller one.

14         MR. KAMARAJU:  I think that to the extent the juror is

15    asking for clarification of the point, I think reasking the

16    question and whatever Mr. Betances's answer will be, will be.

17         THE COURT:  We didn't swear the interpreters.

18         MR. BRANDEN:  I think you're right.

19         MR. KAMARAJU:  We can certainly swear them in for the

20    cross-examination so they're sworn.  We don't have to do that

21    before the jury or we could, if your Honor wanted to.

22         MS. SHROFF:  I'm more concerned about Mr. Kamaraju

23    asking the question on direct again.  Because, I'm not really

24    sure.

25         MR. KAMARAJU:  I'm happy not to do that.

1          MS. SHROFF:  No, I know.  It's not --

2          THE COURT:  I'm satisfied with having Mr. Kamaraju ask

3     the question again.

4          MS. SHROFF:  What would the question be, your Honor?

5     What is the question he would ask?

6          MR. KAMARAJU:  I could just say, sir, I previously

7     asked you whether you were friends with the defendant at MCC.

8     Were you friends with the defendant at the MCC?  And we

9     wouldn't get into what his answer was before.

10         MS. SHROFF:  Would you normally have asked that

11    question without the note?

12         MR. KAMARAJU:  No.

13         THE COURT:  No, it is the note that occasions the

14    inquiry.

15         MS. SHROFF:  My only concern is you're flagging for

16    the witness, right, that somehow or the other the question is

17    being repeated for the witness.  If I was the witness and the

18    question is repeated to me, that sends a signal to me.  Do I

19    want a different answer?  Do I have a better answer?

20         THE COURT:  Do you want it straightened out or do you

21    want us to leave the record the way it is?

22         MS. SHROFF:  The only concern I have, your Honor, is

23    asking the question again may not really clarify the note.

24    Right?  He could just give a different answer.

25         What she's saying is the translation is wrong.  The

1    man said we talked, and the translator said we are friends.

2    The issue isn't, there isn't an issue with how he described it.

3    Right?

4              THE COURT:  The issue is, are they in fact friends.

5    Right?

6              MS. SHROFF:  No.  The issue is they're not friends, he

7    said we talked, according to this juror.

8              THE COURT:  Right.  Well, the way to straighten it out

9    is did you talk to him or are you friends.  How would you

10   characterize your relationship.  Jailhouse acquaintances?

11             MR. KAMARAJU:  I could ask that question.  It is a

12   different question, right, but it gets at the same information.

13   If his response is we talked, then that's the answer.  And if

14   the response is we're friends --

15             MR. BRANDEN:  The juror could be wrong.

16             MS. SHROFF:  The juror wasn't wrong.  The juror

17   definitely was not wrong.  It would be something I would cross

18   on.

19             THE COURT:  That's why they call it translation.

20   There's many a slip between cup and lip.

21             MS. SHROFF:  He clearly said "*yo hablar*," meaning we

22   spoke.  It was a point I have for cross so I just want to --

23   it's okay.  It's not a big deal.

24             MR. KAMARAJU:  If you want to, I think we're giving

25   you the option.  If you want to retain the point for

1    cross-examination, I won't ask the question.

2           THE COURT:  It's up to you.  What do you want to do?

3    We can correct it or leave it uncorrected and have you correct

4    it on your cross.

5           MS. SHROFF:  I could just correct it on my cross.

6           MR. BRANDEN:  I think that's best.

7           MS. SHROFF:  Okay.

8           MR. KAMARAJU:  Sure.

9           THE COURT:  We'll mark that as Court Exhibit 3.

10          How much left?

11          MR. KAMARAJU:  15, 20 minutes.

12          THE COURT:  How long will you be?

13          MS. SHROFF:  Hopefully no more than 30.

14          THE COURT:  You have Mr. Schlesinger on and off today?

15          MS. SHROFF:  There's no way he's getting off.

16          THE COURT:  Thanks for the answer.

17          MR. KAMARAJU:  He will definitely be off by early

18   tomorrow.

19          (In open court; jury not present)

20          THE COURT:  We neglected to swear the interpreters, so

21   we're going to swear you in.

22          THE INTERPRETERS:  Yes, sir.

23          (Interpreters sworn)

24          THE COURT:  Call the jurors in, please.

25          (Continued on next page)

K2P3SCH3                        Betances - Direct

1          (Jury present)

2          THE COURT:  Mr. Kamaraju.

3          MR. KAMARAJU:  Thank you, your Honor.  Let me first

4    check.  Is everyone's screen working?

5          A JUROR:  Yes.

6          THE COURT:  One of our cables had overheated.

7    BY MR. KAMARAJU:

8    Q.  I think we left off at page three of Government Exhibit

9    809.  I just want to clear something up, sir.  You're

10   translating through an interpreter.  Are you able to read any

11   English?

12   A.  Correct.

13   Q.  I'm sorry, sir.  You said correct.  Are you able to read in

14   English?

15   A.  Yes.

16         MR. KAMARAJU:  Can we blow up the top paragraph,

17   please.

18   Q.  Do you see here where it says:  "The way is clear.  I will

19   set up a WordPress of JoshSchulte.WordPress.com and

20   Presumptionofinnocence.WordPress.com.  From here, I will stage

21   my information war."

22   A.  Yes, correct.

23   Q.  Now, have you ever heard the defendant use the phrase

24   "information war"?

25   A.  Yes, on two occasions.

1   Q.  Let's talk about the first time.  When was that?

2   A.  In the summer of 2018.

3   Q.  Where were you at that time?

4   A.  Sitting at my table on my tier.

5   Q.  Who else was with you?

6   A.  Chino was with me, and Josh as well.

7   Q.  What were you able to hear the defendant say?

8   A.  All I heard him say was WikiLeaks.  That's all.

9   Q.  And were you able to hear any other words?

10  A.  No.

11  Q.  On that occasion, did the defendant use the phrase

12  "information war"?

13  A.  Yes.

14  Q.  Were you able to understand how he used that phrase?

15  A.  Yes.

16  Q.  What did you understand him to say?

17  A.  Based on the translation, something about information with

18  respect to war.

19  Q.  Could you tell what the defendant's mood was when he used

20  that phrase?

21  A.  Angry.

22  Q.  Let's turn to the second time.  Where were you when you

23  heard the defendant say it the second time?

24  A.  I was going into Chino's cell to let them know that a guard

25  was coming.

 1   Q.  We'll talk about that in a second.  Approximately when was

 2   that?

 3   A.  In the summer of 2018.

 4   Q.  You said you were going into Chino's cell.  Where were you

 5   before that?

 6   A.  I was on the tier in the hallway.

 7   Q.  What were you doing in the hallway?

 8   A.  Looking out to let them know when a guard was coming.

 9   Q.  Why were you supposed to let them know that a guard was

10   coming?

11   A.  Because they were inside the cell, using the phones.

12   Q.  Why did you walk into the cell?

13   A.  To let them know that there was a guard on the way.

14   Q.  What did you hear when you first walked into the cell?

15   A.  The words that I heard were that the Russians had to help

16   him with what he was doing.

17   Q.  Who said that?

18   A.  Josh did.

19   Q.  Did the defendant notice you walk into the room?

20   A.  Yes, correct.

21   Q.  What did he do when you walked in?

22   A.  Can you repeat the question, please?

23   Q.  Sure.  What did he do when he notice you walk in?

24   A.  He didn't speak anymore.  He remained quiet.

25           MR. KAMARAJU:  Let's look at Government Exhibit 809,

1  again.  And can we zoom out a little bit.  And include the line

2  that starts "Facebook."

3  Q.  Do you see below the paragraph we were just reading where

4  it says:  "Facebook I will rename simply who is John Galt or

5  who is Josh Schulte"?

6  A.  Yes.

7          MR. KAMARAJU:  Ms. Hurst, can we bring up Government

8  Exhibit 820-434 alongside this.

9  Q.  Mr. Betances, what is Government Exhibit 820-434 a picture

10  of?

11  A.  The Samsung phone that Josh used.

12  Q.  Do you see WordPress and Facebook apps on the screen?

13  A.  Yes.

14          MR. KAMARAJU:  Take that down.  Can we now go to page

15  six of Government Exhibit 809, please.  Can we blow up the top

16  of the screen.

17  Q.  Do you see that string of numbers and letters and symbols

18  there?

19  A.  Yes.

20  Q.  Have you seen that string before?

21  A.  Yes.

22  Q.  When did you see it?

23  A.  Once when Josh was in my cell, and he was writing it down.

24  Q.  Did you ever have a conversation with the defendant about

25  passwords?

1  A.  Yes.

2  Q.  The Samsung that the defendant used, was it password

3  protected?

4  A.  Yes.

5  Q.  How do you know that?

6  A.  Well, because at the beginning what I used to charge his

7  phones, I had access to it.  And then, in mid-August or

8  September, I didn't have access to it anymore, and I said to

9  him if he could give me the password, and he said no, that he

10  could not give it to me anymore.

11  Q.  Did you talk with the defendant about the password for the

12  Samsung phone?

13  A.  Yes.

14  Q.  Did he say anything to you about what happened if you

15  entered the wrong password into the phone?

16  A.  Yes.

17  Q.  What did he say?

18  A.  That if a password was entered more than three times, it

19  would automatically delete and erase everything that was on the

20  phone.

21          MR. KAMARAJU:  Can we blow it back up a little bit.

22  Q.  About in the middle of the page there, do you see where it

23  is written Annon1204?

24  A.  Yes.

25          MR. KAMARAJU:  Ms. Hurst, can we bring up Government

K2P3SCH3                         Betances - Direct

1    Exhibit 820-436 alongside this.

2    Q.  Mr. Betances, what is 436 a photo of?

3    A.  That's the home screen for the Samsung that Josh used.

4    Q.  Do you see an e-mail account Annon1204@Protonmail.com

5    written at the top there?

6    A.  Yes.

7            MR. KAMARAJU:  We can take down 436, please.

8    Q.  Let's move to the next page of 809.  Do you see a date

9    written at the top there?

10   A.  Yes.

11   Q.  Do you see at the bottom where it says:  "Yesterday I

12   started e-mailing Shane from the Washington Post"?

13   A.  Yes.

14           MR. KAMARAJU:  Can we pull up Government Exhibit

15   820-412 and 413 next to each other.

16   Q.  And what are these exhibits photographs of?

17   A.  This is the home screen for Josh's phone.  And the e-mails

18   and there is letters written on them.

19   Q.  On 412 on the left, do you see the date August 22, 2018?

20   A.  Yes.

21   Q.  Is that the day before August 23, 2018?

22   A.  Yes.

23   Q.  Do you see where it says "Annon1204@Protonmail.com" wrote?

24   A.  Yes.

25   Q.  Let's look at 413 now on the right.  Do you see at the top

1    where it says:  "Shane, sorry to bother you with this request,

2    but if you could please forward the nine articles that Shane

3    Presnall sent you on behalf of Josh Schulte, we would greatly

4    appreciate it."

5    A.  Yes.

6    Q.  Have you ever heard the defendant refer to an individual

7    named Shane Presnall?

8    A.  Yes.

9    Q.  Who is Shane Presnall?

10   A.  Josh's cousin.

11   Q.  Do you remember the defendant ever saying anything about

12   his cousin?

13   A.  Yes, on one occasion.

14          MS. SHROFF:  Your Honor, I am going to object to the

15   hearsay.  If they want to call Mr. Presnall, they can.

16          THE COURT:  Overruled.

17   Q.  What did the defendant say about Shane Presnall?

18   A.  That the FBI had gone to his house, and they had seized his

19   computer, and he was very scared about that.

20   Q.  And how did the defendant appear when he said that?

21   A.  Very scared.

22   Q.  Do you see in the next paragraph where it says:  "We are

23   friends and family of Josh."

24   A.  Yes.

25   Q.  Who stored the Samsung phone in the MCC?

K2P3SCH3                        Betances - Direct

1   A.  I, you know, stashed it and another person did as well.

2   Q.  Where would you stash it?

3   A.  Behind the locker in my cell.

4   Q.  Did you ever give that Samsung phone to any members of the

5   defendant's family in the MCC?

6   A.  No.

7   Q.  Are you aware of any occasions on which the Samsung phone

8   was used by the defendant's family in the MCC?

9   A.  No.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2pWsch4                          Betances - Direct.

1          MR. KAMARAJU:  Now, could we pull up Government

2    Exhibit 820-162.  And could we pull up 163 also, please.

3    Q.  All right.  Do you see on 162, the email on the left?

4    A.  Yes.

5    Q.  Do you see a date there?

6    A.  Yes.

7    Q.  What's the date listed there?

8    A.  9/1, 2018.

9    Q.  And what's the email -- what's the date on the email that

10   the Annon 1204 account sends?

11   A.  9/7, 2018.

12   Q.  Do you see where that email says:  Yo.  Are you there?  Do

13   you want me to send the Russia pieces to email the reporter?"

14   A.  Yes.

15   Q.  Now, do you remember you testified before that there came a

16   point that you decided to cooperate with the government?

17   A.  Yes.

18   Q.  What was it that made you decide at that time to cooperate

19   with the government?

20   A.  Because I heard him talking about Russia.

21   Q.  And was there anything the defendant was doing at that time

22   that gave you concern?

23   A.  Yes.

24   Q.  What was that?

25   A.  He didn't come out of his cell that much, and he would

K2pWsch4                          Betances - Direct.

1   primarily spend the entire weekend with the phone inside his

2   cell.

3   Q.   And did you ever talk to the defendant about what he was

4   doing?

5   A.   No.

6   Q.   Did you ever talk to the defendant about what actions he

7   was about to take?

8   A.   No.

9   Q.   Now, other than contacting your lawyer, did you take any

10  other actions with respect to the defendant at that time?

11  A.   Yes.

12  Q.   What did you do?

13  A.   Mid-September something happened that wasn't normal.  They

14  were paying $200 to someone else to bring the phone down to the

15  library, and I realized what was going on.  So I wrote down on

16  a piece of paper, and I gave it to one of the correction guards

17  underneath the door.  And I wrote very clearly on the piece of

18  paper, Something is going to happen in the library, you have --

19  you guys have to check out what it is.

20       And they went and they checked it out downstairs.  I

21  realized that because when Josh came back upstairs, he said

22  something was going on in the library; there was too much

23  searching going on.  And he never thought that it had been me

24  who did what I did.

25  Q.   Now, you said you did that because you realized what was

1    going on.  What did you think was going on?

2    A.   In the month of September, he was spending a lot of time in

3    his cell.  They were getting something ready.  So, when I

4    realized that he wanted to go down, when Josh wanted to go down

5    to the library --

6              MR. BRANDEN:  Excuse me, Judge.  We have a question

7    from a juror.

8              JUROR:  Could she just speak into the mike so we can

9    hear her a little bit better?

10             THE COURT:  Yes.

11             JUROR:  Thank you.

12   A.   Well, the way I'm going to put it, he was about to send --

13   Josh was going to send something.  He was actually ready to

14   send what he was getting ready.

15   Q.   Why did you think he was going to send it at that time?

16   A.   Because he was paying $200 so that he himself would not

17   have to take his phone down to the library.

18   Q.   Now, sir, before today, when's the last time that you saw

19   the defendant?

20   A.   The last time I saw him was when they found the cell in

21   my --

22             THE INTERPRETER:  Correction.

23   A.   -- when they found the phone in my cell, and then I was

24   taken out of my tier, out of 7-south.

25             MR. KAMARAJU:  No further questions at this time, your

K2pWsch4                          Betances - Cross

1     Honor.

2               THE COURT:  Ms. Shroff.

3     CROSS-EXAMINATION

4     BY MS. SHROFF:

5     Q.  Mr. Betances, when you first came to this country, did you

6     come legally or illegally?

7     A.  Illegally.

8     Q.  OK.  And when you came here illegally, did you then find

9     work?

10    A.  Correct, yes.

11    Q.  You worked at a restaurant, correct?

12    A.  Yes.

13    Q.  You worked construction, correct?

14    A.  After the restaurant, yes.

15    Q.  Right.  And you tried to earn money that way, correct?

16    A.  Yes, correct.

17    Q.  And when that money wasn't enough, you decided to sell

18    drugs?

19    A.  Yes.

20    Q.  Now, let's talk about how many different places you sold

21    drugs.  Why don't you tell me.  Where is the first place in the

22    United States that you sold drugs?

23    A.  In New York.

24    Q.  And how many times in New York did you sell drugs?

25    A.  Several times.

K2pWsch4                         Betances - Cross

```
1    Q.  OK.  Well, let's try what several means.  More than 10,
2    more than 20?  How many times?
3    A.  About six or seven times.
4    Q.  And it's not like, you know, you're not doing a
5    hand-to-hand sale on the street, right?
6    A.  No.
7    Q.  You're moving kilos, right?
8    A.  Not at the beginning.
9    Q.  Right.  You graduated to kilos?
10   A.  Not that either.
11   Q.  OK.  Well, why don't you tell us about your drug history.
12            THE INTERPRETER:  The interpreter did not hear the
13   last part of the question.
14   Q.  Why don't you tell us how your drug selling started.
15   A.  When you asked me the question at the beginning, and may I
16   remind you that at the beginning, I was using a radio to let
17   the people who were selling drugs in the building know that the
18   police were about to arrive.
19   Q.  OK.  Did you consider that drug dealing?
20   A.  Yes.
21   Q.  OK.  And that was in what year?
22   A.  1996, 1997, around that time.
23   Q.  OK.  And then after that, you continued to sell drugs,
24   right?
25   A.  Yes.
```

K2pWsch4                      Betances - Cross

1    Q.   2000, correct, you sold drugs?

2    A.   Yes, between 1999 and 2000.  Correct, yes.

3    Q.   Right.  And you sold drugs all the way up until 2018,

4    correct?

5    A.   I -- may I correct your question?

6         No.  I was deported back to my country after 2001, and I

7    spent seven years in my country.

8    Q.   I didn't ask you that.  We'll get back to your illegal

9    reentry.  Put that on hold for a minute.  You came back

10   illegally, right?

11   A.   Correct.

12   Q.   They told you not to come back because you had sold drugs

13   in this country?

14   A.   I wasn't told that exactly.

15   Q.   You weren't told that you shouldn't come back?

16   A.   Yes, I was told I couldn't come back.

17   Q.   Because you sold drugs?

18   A.   Not because I had sold drugs.

19   Q.   Then what was the reason, in your mind, that you were told

20   that you could not reenter the United States illegally?

21   A.   Because I had a felony, but they didn't say I couldn't come

22   back into the country to sell drugs again.

23   Q.   OK.  Let's just stick to the time frame over which you sold

24   drugs.  Correct?  And we're only interested in what you did in

25   the United States, not what you did when you were in the

K2pWsch4                           Betances - Cross

1    Dominican Republic.  OK?

2    A.  OK.  Yes.

3    Q.  So in October of 2000, you sold more than 500 grams of

4    cocaine, correct?

5    A.  Yes.

6    Q.  And then you sold more than five kilograms of cocaine in

7    August of 2000, correct?

8    A.  Yes.

9    Q.  All right.  Let me just go back to this first time of the

10   known sale.  OK?  The August sale.  Let's talk about August.

11   OK?

12   A.  OK.

13   Q.  You pled guilty to it, correct?

14   A.  Yes.

15   Q.  You went before a judge, right?

16   A.  Yes.

17   Q.  They put you under oath?

18   A.  Yes.

19   Q.  You had your lawyer next to you, right?

20   A.  Yes.

21   Q.  You had a private lawyer, correct?

22   A.  The first time or the other time?  Could you repeat your

23   question?

24   Q.  I'm only talking about the times you pled guilty to all

25   these offenses.  You had a lawyer with you, right?

1   A.  Yes.

2   Q.  He was a private lawyer, correct?

3   A.  Yes.

4   Q.  You paid him, correct?

5   A.  My wife did, yes.

6   Q.  OK.  Jorge Guttlein was his name, right?

7          THE INTERPRETER:  The interpreter did not hear that.

8   Q.  His name was Jorge Guttlein, correct?

9   A.  Yes.

10  Q.  He spoke Spanish, correct?

11  A.  Yes.

12  Q.  When you met him, you spoke to him in Spanish and he spoke

13  to you in Spanish, correct?

14  A.  We both spoke Spanish and English also.

15  Q.  OK.  When you pled guilty -- do you remember that time,

16  when you pled guilty?

17  A.  I don't remember when it was, but I did plead guilty.

18  Q.  Do you remember how many charges you pled guilty to, by the

19  way?

20  A.  Yes.

21  Q.  How many?

22  A.  Nine.

23  Q.  OK.  We'll get to all nine, but let me just ask you again,

24  when you pled guilty, your lawyer was next to you.  Right?

25  A.  Yes.

K2pWsch4                        Betances - Cross

1    Q.  And there was an interpreter in court for you, correct?

2    A.  Yes.

3    Q.  And when you spoke to the judge and accepted guilt, the

4    interpreter was translating for you, just like an interpreter's

5    translating for you today?

6    A.  Yes.

7    Q.  In fact, there were two translators, just like today,

8    correct?

9    A.  No.

10   Q.  All right.  Well, let me show you -- you read English,

11   right?

12   A.  A little, yes.

13   Q.  All right.  Well, does that page --

14           MS. SHROFF:  I'm just asking only him.

15   Q.  Does that page refresh your recollection that there were

16   two interpreters?

17   A.  I just saw one.  There was just one interpreting for me, as

18   far as I can remember.

19   Q.  Does that document refresh your recollection that there

20   were two?

21   A.  If there were, but I'm saying I don't remember.  I just saw

22   a woman.

23   Q.  OK.  Let's keep going with your guilty plea that day.  OK?

24   A.  OK.

25   Q.  You then pled guilty to five kilograms being sold August 13

K2pWsch4                        Betances - Cross

1   of 2000, correct?

2   A.  Yes.

3   Q.  And for that you faced a maximum sentence of life?

4   A.  Yes.

5   Q.  A mandatory minimum sentence of ten?

6   A.  Yes.

7   Q.  And for the first time that you pled guilty, for the 2000

8   offense, you faced a five-year mandatory minimum, correct?

9   A.  I believe so, yes.

10  Q.  And the maximum is 40, correct?

11  A.  That I don't remember.  I don't remember that.

12  Q.  OK.  Then you also pled guilty for the drug dealing in

13  December of 1999, correct?

14  A.  Yes.

15  Q.  Again, you were selling cocaine, correct?

16  A.  Yes.

17  Q.  You were again facing a ten-year mandatory minimum on that

18  charge, correct?

19  A.  Yes, I believe so.

20  Q.  And a maximum of life?

21  A.  Yes.

22  Q.  Then, we're still on December of 1999, you still have

23  another drug charge, distributing more than five kilos of

24  cocaine, right?

25  A.  Yes.

K2pWsch4                          Betances – Cross

1   Q.  Ten-year mandatory minimum?

2   A.  I believe so, yes.

3   Q.  Maximum of life?

4   A.  Yes, I believe that is correct also.

5   Q.  Then, of course, the government had you plead guilty to

6   having the phones in MCC, correct?

7   A.  Yes, correct.

8   Q.  And for that you faced the least amount of time, correct?

9   A.  Yes, correct.

10  Q.  But that information was the most valuable to the

11  government, right?

12  A.  Well, may I remind you that I had been cooperating before I

13  talked to them?

14  Q.  You were cooperating before you talked to them?

15  A.  Yes.

16  Q.  You were cooperating with the government, right?

17  A.  Yes.

18  Q.  Right.  And you were cooperating to get less time, correct?

19  A.  Not -- no, not less time, because they're not the ones who

20  decide how long I'm going to get.

21  Q.  You think that you're not going to get less time because

22  you cooperated?

23  A.  Only the judge knows if I'm going to get more time or less

24  time.

25  Q.  Oh, I know that story.  That's not what I'm asking you.

K2pWsch4                          Betances - Cross

1   A.  Could you repeat your question then?

2   Q.  Sure.  My question is the reason you cooperate is you have

3   a hope of getting less time.  Correct?

4   A.  According to what the contract said, yes.

5   Q.  Right.  And it's a contract between you, right?

6   A.  Yes.

7   Q.  And the prosecutor, correct?

8   A.  Yes.

9   Q.  I mean, I can't give you that kind of contract, right?

10  A.  I don't think so.

11  Q.  OK.  And they can give you that contract because they're

12  the prosecutors?

13      That's OK.

14  A.  Well, yes.

15  Q.  No, no.

16  A.  I just wanted to correct something.

17  Q.  It's OK.  When I want you to correct something, you can.

18  A.  OK.

19  Q.  Let's just talk about this contract.  OK?

20  A.  OK.

21  Q.  This contract is called a 5K contract, right?  That's how

22  you --

23  A.  Correct.

24  Q.  Everybody in the MCC talks about it, right?

25  A.  Mostly.

K2pWsch4                          Betances - Cross

1    Q.   OK.  And the contract says, right, that you will do certain

2    things and then they will do certain things?  Right?

3    A.   Yes, but I have to tell the truth.

4    Q.   Yeah, yeah.

5    A.   I can't lie.

6    Q.   I got that.  Uh-huh.

7         Nobody's suggesting anything about what the contract says

8    other than what you're saying.  OK?

9    A.   OK.

10   Q.   They tell you over and over again, right, the

11   prosecutors --

12   A.   What did they repeat?

13   Q.   All you have to do is tell the truth, right?  That's what

14   they tell you, right?

15   A.   Correct, yes.

16   Q.   Right.  That's all they -- that's what they told you.

17   Every time you went to prepare, they said Mr. Betances, all you

18   have to do is tell the truth.  Right?

19   A.   Yes, of course, to tell the truth.

20   Q.   Of course.

21        Let's see how many times you talked to them.  September of

22   2018, correct?

23   A.   I think so, ma'am.

24   Q.   October of 2018?

25   A.   I think so.  I'm not sure.

K2pWsch4                        Betances - Cross

1    Q.  December of 2018?

2    A.  Yes.

3    Q.  January of 2019?

4    A.  Yes, I think I remember that.

5    Q.  March -- May.  Maybe May of 2019?

6    A.  Well, you're saying it because you have it jotted down in

7    front of you.  I just don't remember it exactly.

8    Q.  I know.  It's OK.

9    A.  OK.

10   Q.  Do you remember meeting with them January 2?

11   A.  I don't remember.

12   Q.  January 27?

13   A.  I don't remember.  Not that I remember.

14   Q.  This past month?

15   A.  I don't have a record as to how many times I met with them.

16   Q.  That's OK.

17       January 31?

18   A.  I'm -- I'm not keeping a record of it.

19   Q.  February 7?

20   A.  I'm not keeping a record of it.

21   Q.  February 14?

22   A.  I'm not keeping a record of it.

23   Q.  February 15?

24   A.  I don't have a record of that either.

25   Q.  OK.  And in all these meetings, right, you talked about

K2pWsch4                         Betances - Cross

1    Mr. Schulte?  Correct?

2    A.  Yes.

3    Q.  And a man named Omar Amanat, correct?

4    A.  Yes.

5    Q.  All right.  We're going to come back to Mr. Amanat, but for

6    now I'm going to go back to your guilty plea.  OK?

7    A.  OK.

8    Q.  Because I've only gotten up until Count Four, I think.  But

9    anyway, on the phone charge, you face a maximum sentence of

10   five years, correct?

11   A.  If that's what the paper says, that's correct.

12   Q.  OK.  And then you also pled guilty to something called

13   aggravated identity theft?

14   A.  Yes.

15   Q.  What is that?

16           THE INTERPRETER:  I'm sorry?

17           MS. SHROFF:  What is that?

18   A.  Identity theft.

19   Q.  What does that mean?  What did you do?

20   A.  Take someone else's identity on.

21   Q.  And what did you do with that person's identity?

22   A.  Well, what I used to do is to get documents so I could

23   travel with them.

24   Q.  OK.  So you used another person's name, right?

25   A.  Yes.

K2pWsch4                           Betances - Cross

1    Q.  That other person didn't know you used that person's name?

2    A.  No.

3    Q.  You used somebody's name and then you applied for papers,

4    correct?

5    A.  Yes, correct.

6    Q.  You filled out forms under his name, pretending to be him?

7    A.  Yes, correct.

8    Q.  Knowing that you were not that person?

9    A.  Yes.

10   Q.  And then you signed the form, right?

11   A.  Yes.

12   Q.  And the form said that you were signing the forms under

13   penalty of perjury?

14   A.  That's correct.  I believe it said.

15   Q.  Right.  So the form said you should tell the truth, and you

16   said yes, I'm telling the truth, and signed another man's name.

17       No, no, no.  No *peros*.  Yes or no.

18   A.  Yes.

19   Q.  OK.  You lied, right?

20   A.  That's why I'm here, because I lied, so I'm doing time for

21   my errors.

22   Q.  Sir, if you want to chime in and answer more to make

23   yourself look fine, it's OK.  Relax.  It's OK.

24   A.  I don't have to make myself look better.

25   Q.  OK.  So then let's just try if you can answer my questions.

1    OK?

2    A.   OK.

3    Q.   So you lied to get travel documents, correct?

4    A.   Yes.

5    Q.   I just asked yes, right?  I didn't say yes or no, so it was

6    an open-ended question on my part, right.

7         You lied to get benefits, correct?

8    A.   Benefits.  What are you referring to?

9    Q.   Well, it's a benefit, right, that allows you to travel;

10   it's a benefit.

11   A.   OK.  Yes.

12   Q.   Right.  It allowed you to come back to the United States

13   illegally?

14        THE INTERPRETER:  Counsel, did you say legally or

15   illegally?

16        MS. SHROFF:  Illegally.

17   A.   Yes.

18   Q.   Allowed you to work here illegally, correct?

19   A.   No.  I never used it to work legally.

20   Q.   Oh, you just sold drugs so you didn't need the ID to work?

21   A.   If that's what you're saying, then that's correct.

22   Q.   It's not my -- I don't know what you did.  I'm asking you,

23   sir.

24   A.   Yes.

25   Q.   OK.

1    A.  OK.

2    Q.  You sold drugs because you wanted to make money, right?

3    A.  Yes.

4    Q.  OK.  That's all right.

5        And then you pled guilty also to illegally reentering the

6    country, correct?

7    A.  Yes.

8    Q.  And when you came back illegally, you came like, through

9    illegal means, right?

10            THE INTERPRETER:  I'm sorry, counselor?

11            MS. SHROFF:  Sure.

12   Q.  When you came back illegally, you just crossed the border,

13   correct?

14   A.  Yes.

15   Q.  OK.  And then you pled guilty again to two more counts of

16   drug dealing, one for 2015 to 2018?

17   A.  Yes.

18   Q.  And then one time for mail fraud?

19   A.  Yes.

20   Q.  What was the mail fraud, by the way?

21   A.  To take someone else's correspondence or mail

22   inappropriately.

23   Q.  Why did you take somebody else's mail?

24   A.  Because other people's checks would arrive and I was paid

25   to pick up those checks.

K2pWsch4                          Betances - Cross

1    Q.  Well, you weren't paid to legally pick up the checks,

2    right?

3    A.  No.  I was paid for the, for me to pick them up illegally.

4    Q.  So kind of like stealing; you were stealing people's

5    checks?

6    A.  Well, yes, of course.  Yes, clearly.

7    Q.  So you don't know who those checks belonged to, right?

8    A.  No.

9    Q.  You don't know if it was a 60-year-old woman who was

10   getting a tax refund, correct?

11   A.  No.

12   Q.  You don't know if it was somebody's disability payment,

13   correct?

14   A.  No.

15   Q.  You just stole the checks, and you got a cut for stealing

16   the checks, right?

17   A.  Yes.

18   Q.  OK.  And it's fair to say that you did all of this because

19   you needed money, right?

20   A.  Yes.

21   Q.  OK.  Now, let's talk about the phones that you had at the

22   MCC.  OK?  You and Chino made an arrangement to have the phones

23   come into the MCC, right?

24   A.  No, not only Chino.

25   Q.  OK.  You and many others?

K2pWsch4                          Betances - Cross

1   A.  Omar and Josh were also included in that.

2   Q.  Oh, don't worry.  We'll get to them.  You can have all day

3   to tell me about Josh.  But the question for right now -- my

4   question right now is what you and Chino did to get the phones

5   into the jail.

6   A.  Yes, correct.

7   Q.  So who brought the phones to the jail?

8   A.  The first time it was given to my wife during the visiting

9   hour.

10  Q.  So your wife used to come visit you at the MCC?

11  A.  Yes.

12  Q.  And you had your wife bring phones to the MCC for you?

13  A.  Let me correct you.  It was handed to her right then and

14  there at the door to the MCC.

15  Q.  I understand.  So you had your wife carry the phone from

16  outside the MCC into the MCC?

17  A.  Yes.

18  Q.  Having a phone outside the MCC is legal?

19  A.  Could you repeat the question again?

20  Q.  Having a phone outside the MCC is legal?

21  A.  Yes.

22  Q.  Having a phone inside the MCC is not legal?

23  A.  Correct.

24  Q.  Yes.  So you had your wife take the risk of bringing that

25  phone into MCC?

1     No, no.

2               THE COURT:  Yes or no.

3   A.  Yes.

4   Q.  OK.  And you had -- was your wife alone when she came to

5   the MCC?

6   A.  Yes.

7   Q.  Your children were never with her?

8   A.  On occasion they came, but not when she was carrying a

9   phone.

10  Q.  OK.  So you decided to risk your wife but not your

11  children?

12  A.  Yes.

13  Q.  OK.  How much money did your wife get to bring the phone

14  into the MCC?

15  A.  She was paid $500.

16  Q.  And the $500 was sent to you or to her?

17  A.  They would have to give it to Chino.

18  Q.  Chino would share it with you?

19  A.  Correct, yes.

20  Q.  OK.  And how would Chino give it to you?

21  A.  It was deposited into the commissary account at the MCC.

22  Q.  Right.  Your commissary account?

23  A.  Yes.

24  Q.  And the commissary account allows you to buy things at the

25  MCC, right?

K2pWsch4                        Betances - Cross

```
 1   A.  Yes, food.

 2   Q.  Batteries?

 3   A.  Yes.

 4   Q.  Radios?

 5   A.  Yes.

 6   Q.  MP4 players?

 7   A.  Yes.

 8   Q.  Clothes?

 9   A.  Yes.

10   Q.  OK.  So not just food, right?

11   A.  Yes.  All of that.

12   Q.  Right.  And MCC already gives you food, right?

13   A.  Yes.

14   Q.  You can eat the food that MCC gives you, correct?

15   A.  Yes.

16   Q.  In fact, in all the time that you knew Mr. Schulte, didn't

17   he always just eat the food that the MCC gave him?

18   A.  Could you repeat the question again, please?

19   Q.  Sure.  In all the time that you saw Mr. Schulte at the MCC,

20   you always saw him eat the food that MCC gave him, right?

21   A.  On many occasions, yes.

22   Q.  Now, Chino gave you the money, correct?

23   A.  Yes.

24   Q.  And then you also charged people money for storing the

25   phones at MCC, correct?
```

1    A.  Could you repeat the question again?

2    Q.  Sure.  On direct testimony, you said that you stored the

3    phones, correct?

4    A.  Yes.

5    Q.  And you charged people for storing the phone, right?

6    A.  No.

7    Q.  You didn't charge people for keeping the phone?

8    A.  No, because we were the ones who used it.  Us.

9    Q.  No, no.  You had your own phone that you used, right?

10   A.  All of us who used the phone used the phone, the same

11   phone.

12   Q.  OK.  So your testimony is that you, Omar and Josh all used

13   the same phone?  Is that your testimony?

14   A.  No, that's not what I'm explaining to you.

15   Q.  Right.  Let's talk about the phone you used.

16   A.  OK.

17   Q.  What phone was that?

18   A.  An iPhone.

19   Q.  All right.  So let's put that iPhone aside, because that

20   was yours, correct?  Right?

21   A.  At the end, yes.

22   Q.  You always had your own iPhone, right?

23   A.  It was not -- it was not my own iPhone.  It was because I

24   was allowed to use it.

25   Q.  Who allowed you to use the iPhone?

1    A.  Omar.

2    Q.  Omar allowed you to use the iPhone?

3    A.  Correct, yes.

4    Q.  And you were charging Omar money to keep the iPhone instead

5    of having Omar keep it in his cell, correct?

6    A.  I did not charge Omar either.

7    Q.  Would you agree with me, Mr. Betances, that keeping a cell

8    phone in your cell at the MCC is dangerous?  Correct?

9    A.  Yes.

10   Q.  People don't want to do that, correct?

11   A.  Well, many don't do it, but if they allow the person to use

12   their phone, then they will do it.

13   Q.  OK.  Is it your testimony that you stored the cell phone

14   for Omar because Omar allowed you to use his phone?

15   A.  I stored all of the phones, and he allowed me to use one of

16   the phones.

17   Q.  I understand that.  And your testimony is that you did not

18   get paid by Omar to keep the phone.  Is that your testimony?

19          THE INTERPRETER:  I'm sorry.  Could the interpreter

20   have that back?

21          (Record read)

22   A.  Correct, yes.

23   Q.  So the only payment you received from Omar was Omar

24   allowing you to use a phone?

25   A.  Correct, yes.

```
 1    Q.  So you risked being put in the SHU just to use an iPhone?

 2    A.  Yes, I did that so I could talk to my family.

 3    Q.  But you have an MCC phone to talk to your family, right?

 4    A.  Yes, but that was limited.

 5    Q.  It's 300 full minutes every month, correct?

 6    A.  That would hardly even last a week.

 7    Q.  I see.  So -- and when you're talking to your family, is

 8    this the same wife that you are putting at risk and having her

 9    bring the cell phone in, or are you talking to somebody else?

10    A.  No.  With my wife.

11    Q.  OK.  So Omar has a phone with you, correct?

12    A.  Yes.

13    Q.  And the gentleman named that you're talking about, Omar,

14    his full name is Omar Amanat, correct?

15    A.  Yes, I believe so.  That's his first and last name.

16    Q.  OK.  And what was his case; do you remember?

17    A.  No, I don't remember.  We never talked about it.

18    Q.  So you never talked to Omar about his case, correct?

19    A.  No, I never talked to him.

20    Q.  You don't know if his case involved dealings with Russia,

21    correct?

22    A.  No, I don't remember that either.  I don't remember us

23    talking about it.

24    Q.  You don't know, sitting here today, if Omar was charged

25    with selling properties in Russia, correct?
```

K2pWsch4                          Betances - Cross

1   A.  No.

2           MS. SHROFF:  OK.  Let me show you what the government

3   showed me.  1303-39.  OK?

4   Q.  All right.  Let me show you a document that's marked

5   1303-39.  OK?  And I'm going to show you page 41 of 70.

6       Do you recognize that?

7   A.  Not that I've ever seen this.

8   Q.  You've never seen that document before?

9   A.  No.

10          MS. SHROFF:  Can you pull up for me, please -- I think

11  it's Government Exhibit 820-162.

12  Q.  Do you see that document, the screenshot?

13  A.  Yes, I do.

14  Q.  OK.  And you testified about this screenshot, right?

15  A.  Yes.

16  Q.  And who -- what's that name on top?  Could you read that

17  for me?

18  A.  Which one?  There are a number of them.  On the top?

19  Q.  See that arrow?

20  A.  I do.  I see it in blue.

21  Q.  What's the name?

22  A.  Well, Conj -- I'm going to spell it, because I can't really

23  understand it.

24  Q.  OK.  You don't have to spell it.  You can't pronounce it,

25  correct?

1    A.  I can't pronounce it.  Yes.

2    Q.  And you don't know who that is, do you?

3    A.  This email?  Yes, it's Omar's.

4    Q.  It's Omar's?

5    A.  I think I remember that it is.  I don't really remember.

6    Q.  You don't remember if it's Omar's?

7    A.  Yes.  I don't remember if it's Omar's.  I don't remember.

8    Q.  OK.  And this is the email that says "do you want to send

9    me the Russia pieces to email the reporter," correct?  Right?

10   A.  Yes, I see that there.

11   Q.  And I want to make sure I understand.  You don't remember,

12   correct?

13              THE INTERPRETER:  I --

14              MS. SHROFF:  You don't remember, correct?

15   A.  I don't remember whose email that is right there.

16   Q.  OK.  All right.  What's the attachment?

17      No, no.  I'm not asking you what it says.  I'm asking you,

18   do you know what the attachment is?

19   A.  Well, it's like a PDF document.

20   Q.  No.  I'm asking you, do you know what is in the PDF?

21   A.  I don't know what the contents are.

22   Q.  You don't know anything, in fact, about the contents,

23   correct?

24   A.  No.  I don't remember.  I don't know what it is.  I just

25   see Josh's last name there.

K2pWsch4                          Betances - Cross

1    Q.  Right.  And you told these prosecutors, did you not, that

2    Josh did a lot of work for Omar?  Correct?

3            MS. SHROFF:  You can take that down.

4    A.  Could you please repeat that question.

5    Q.  You told these prosecutors, did you not, that Josh did a

6    lot of work for Omar?  Correct?

7    A.  Both of them would spend time in their room, in their

8    cells, working together.

9    Q.  Let's try it again.  Let's see if I can help you understand

10   my question so that you can answer it.  OK?

11   A.  OK.

12   Q.  Did you tell these prosecutors that Mr. Schulte did work

13   for Omar?

14   A.  As I remember, I don't really remember that.

15   Q.  OK.  Let me show you --

16           MS. SHROFF:  What did you mark this as, Mr. Kamaraju?

17           You didn't mark it?

18           OK.  What is the last defense exhibit?

19           THE DEPUTY CLERK:  H.

20           MS. SHROFF:  Let me mark this as defense I.  It's OK.

21   Don't worry.

22   Q.  Have you ever seen this document before?

23   A.  Yes, correct.

24           MS. SHROFF:  OK.  Let's pull up whatever the

25   government marked the document as.  What did you mark it as,

1   Mr. Kamaraju?

2            Can you put up the screenshot that says expert report.

3   Q.  Do you see that?

4   A.  Yes, I do.

5            MS. SHROFF:  Let's see if I can have Ms. Hurst help me

6   here and highlight the case caption.

7   Q.  Do you see that?

8   A.  Yes, I do.

9   Q.  OK.  United States v. blah, blah, blah and Omar Amanat.

10  You can read that, right, because you said you read English?

11  Right?

12  A.  Yes, I see it.

13  Q.  And who wrote it?

14  A.  From what I see here, Josh wrote it.

15  Q.  OK.  And look.  What address does Josh put over there?

16  A.  The MCC one.

17  Q.  Right.  So he was doing work for Omar in the MCC, correct?

18  A.  That's what you're saying.

19  Q.  No, no.  I'm asking you.

20  A.  I was just asked about the address, and I'm explaining to

21  you as to what address it is.

22  Q.  So you only know about the address?

23  A.  I wasn't asked if he was working for Omar.  I was only

24  asked about that address.

25  Q.  OK.  But I'm asking you, because you read English, why

1    don't you take a look at the front page of this document.

2              THE COURT:  You're going to get to a question now,

3    aren't you?

4    Q.  And tell me, what is your understanding of an expert

5    report?

6    A.  I don't really understand.  I have no experience to, that

7    tells me what that means.

8              MS. SHROFF:  OK.  You can take that down, Ms. Hurst.

9    Thank you.

10   Q.  When you went and spoke to the prosecutors, correct, they

11   showed you, did they not, several exhibits?  Correct?

12   A.  Yes.

13             MS. SHROFF:  All right.  Let's look at 820-436.

14   Q.  They showed you this, right?

15   A.  Yes.

16             MS. SHROFF:  No, no.  Just the cover.  820-436.  Just

17   the first page.

18   Q.  Right?

19             MS. SHROFF:  Can you show the screen before this

20   screen.  That one.

21   Q.  When they showed you this screen -- they showed you this

22   screen, right?

23   A.  Yes.

24   Q.  Did you tell them you had no idea what this meant?

25   A.  They just asked me about the address and the name that was

1    at the bottom.

2    Q.  All right.  So you only answered their questions, correct?

3    A.  Yes.

4    Q.  You didn't explain to them any more than what they asked

5    you, correct?

6    A.  No.

7    Q.  OK.  On top it says "brochure."  Do you see that word?

8    A.  Yes.

9    Q.  Do you have an understanding of what that means?

10   A.  In English?  In English, I don't understand what that

11   means.

12   Q.  OK.  And you have no idea how many pages are in this

13   document, correct?

14   A.  No.

15   Q.  You don't know anything about what this case is about,

16   United States v. Kaliel Isaza Tuzman, correct?

17   A.  No.

18   Q.  You don't have any idea if that case involves Russia,

19   correct?

20              MR. KAMARAJU:  Your Honor, I think she's asked

21   multiple times if he knows anything about Omar Amanat's case.

22   Each time he said no.

23              THE COURT:  Hopefully it will get over soon.

24              MS. SHROFF:  Right.

25   Q.  You don't know if this case had anything to do with Russia,

K2pWsch4                        Betances - Cross

1   do you?

2               THE COURT:  That's the third time you've asked that

3   question.

4               MS. SHROFF:  I know.  I'm just aiming for a yes or no.

5   That will do it.

6   A.  I don't remember.  Not that I remember.

7   Q.  It's not that you don't remember; it's that you don't know,

8   correct?

9   A.  Yes.  I don't remember.  I don't remember.

10  Q.  *No sé* is different from *no recuerdo*.  *No sé* means I don't

11  know.

12              THE COURT:  Let's go on to something else, Ms. Shroff.

13  Q.  You don't know, right?

14              THE COURT:  You're badgering the witness.  Please stop

15  it and go on to something else.

16              MS. SHROFF:  Let me show you 824-12.

17  Q.  All you did is take a snapshot, correct?

18  A.  Yes.

19  Q.  Right.  You knew Mr. Schulte had a case, correct?

20  A.  Yes.

21  Q.  You wanted to cooperate, correct?

22  A.  Well, right then, that really wasn't what happened.

23  Q.  It wasn't?  That wasn't what happened?  You didn't want to

24  cooperate?

25  A.  You're asking me a question, and I'm answering.  I'm giving

1    you my answer.

2         It wasn't right then.  It was afterwards, when I heard what

3    I heard, that I decided to cooperate.

4    Q.  Right.  And before you decided to cooperate, you simply

5    decided to take photos, is your testimony?

6    A.  Just to be clear with the defense attorney's question in

7    deciding to cooperate, when they were working on sending

8    whatever they were going to send from the library, that's when

9    I decided to cooperate.

10   Q.  My only question was when did you take this photograph?

11   A.  In the summer of 2018.

12   Q.  Right.  Months before you're now saying that you decided to

13   cooperate, right?

14   A.  Could you repeat that question?  You confused me.

15   Q.  You took the photo before you decided to cooperate,

16   according to you, correct?

17   A.  Yes, yes.

18   Q.  Right.  And you're saying you just decided to take these

19   photos for no reason at all, right?

20   A.  May I remind you that the reason I took it was because I

21   heard the conversation that I heard?

22   Q.  You heard the conversation that you heard and then you took

23   the photo?

24   A.  It wasn't until after I heard that first conversation in

25   the cell that I started taking all of those pictures and making

1   the videos.

2           MS. SHROFF:  OK.  Let's take a look at the video.

3   Could somebody pull it up.

4           The MCC.  It doesn't matter.  Pick one.

5           The first one.

6           (Video played)

7           MS. SHROFF:  OK.  You can stop it now.

8   Q.  Is it fair to say, sir, that there's nothing about Russia

9   on this video?

10  A.  No.

11  Q.  And it's fair to say --

12  A.  You don't hear anything.

13  Q.  Right.

14      And I'm not going to play the second video, but on the

15  second video, there's nothing about Russia either, correct?

16  A.  Correct.  I didn't hear anything about Russia.

17  Q.  Right.  And in all these screenshots that you took about

18  Mr. Schulte, you don't see anything about Russia, correct?

19  A.  No, I didn't see anything there.

20  Q.  Right.  Do you know who Shane Harris is?

21  A.  No, I don't know that person.

22  Q.  OK.  So you testified about all the emails that you saw

23  going to Shane Harris, correct?  You don't know who that is,

24  right?

25  A.  I'm -- I think that I read one of the emails, and based on

K2pWsch4                          Betances - Cross

1   what I read, I believe she was a reporter.

2   Q.  She was a reporter?

3   A.  Or he.  Or she.  I don't know who he was.

4   Q.  OK.  And sitting here today, you know of no documents that

5   he sent to Shane Harris that have anything to do with Russia,

6   correct?

7   A.  No.

8   Q.  Now, you testified on direct here from Mr. Kamaraju that

9   you were a lookout at one point, correct?

10  A.  Correct.

11  Q.  And a lookout is somebody who stands outside his cell to

12  make sure to let the person know the guards are coming,

13  correct?

14  A.  Correct.

15  Q.  Right.  And when you were the lookout, they knew --

16  whoever's in the cell, including Mr. Schulte -- that you were

17  the lookout, correct?

18  A.  Well, there were two or three people who were lookouts,

19  including myself as well.

20  Q.  Right.  But everybody in the cell knows who the lookout is,

21  right?

22  A.  Of course.

23  Q.  Of course.  Otherwise, how would you know when the

24  lookout's coming, right?

25  A.  Yes.

K2pWsch4                          Betances - Cross

1   Q.  Right.  So he knew you were the lookout, you were one of
2   the lookouts?
3   A.  Well, but he didn't know it was me that was going to let
4   him know that the guard was coming.  Because there were several
5   of us who would look out inside the cell.
6   Q.  OK.  And how would he know when to look up if he didn't
7   know you were the lookout?
8   A.  Look up?  What do you mean look up?
9   Q.  You're the lookout, correct?
10  A.  But you're talking about look up.  Look up where?  Look up
11  to the ceiling?
12  Q.  All right.  I'll try it again.  Mr. Schulte's in the cell
13  with Chino, correct?
14  A.  Yes.
15  Q.  They're talking to each other about something, correct?
16  A.  No.  Chino wasn't there at that point.  It was he and Omar
17  who were in there.
18  Q.  OK.  So he and Omar were inside the cell, correct?
19  A.  Yes.
20  Q.  By the way, could you tell me, how long had Omar and
21  Mr. Schulte been bunkees in the MCC?
22  A.  I don't remember the exact time, but it was a substantial
23  time.
24  Q.  Right.  A long time, correct?
25  A.  Not a long time.

K2pWsch4                           Betances - Cross

1    Q.  OK.  So anyway, it's you who walks in when Mr. Schulte and

2    Omar are talking, correct?

3    A.  Yes, correct.

4    Q.  And you walk in to give them a heads-up that somebody's

5    coming, correct?

6    A.  Yes, correct.

7    Q.  And just as you walk in, you hear him say the word

8    "Russia," correct?

9    A.  That's correct, yes.

10   Q.  And that's what prompts fear into you to go cooperate with

11   the United States Attorney's Office?

12   A.  It sounded interesting to me.

13              MS. SHROFF:  Right.

14              THE COURT:  Could we take our afternoon break now.

15   We'll resume at five of three.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

K2pWsch4                              Betances – Cross

1                    (Jury not present)

2                    (Witness not present)

3                    THE COURT:  Ms. Shroff, you've got to speed this up.

4                    MS. SHROFF:  OK.

5                    (Recess)

6                    THE COURT:  Please be seated.

7                    David, call the jury.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Please be seated.

3           We seem to have lost Ms. Shroff.

4           THE DEPUTY CLERK:  Judge, we're missing a juror.

5           MS. SHROFF:  No.  They're all here.

6           THE COURT:  OK.  Ms. Shroff.

7    BY MS. SHROFF:

8    Q.  Sir, let me show you 824-35.  OK?  You remember testifying

9    about this screenshot, right?

10   A.  Yes.

11   Q.  OK.  And you remember telling the jury, do you not, that

12   you asked Mr. Schulte about the various apps?  Correct?

13   A.  About some, yes.

14   Q.  You asked him about Signal, correct?

15   A.  Yes.

16   Q.  And he explained to you how Signal worked, correct?

17   A.  Yes.

18   Q.  And you asked him about SecureDelete, correct?

19   A.  Yes.

20   Q.  And he explained to you how SecureDelete worked?

21   A.  Yes.

22           MS. SHROFF:  Let's look at 824-34.

23   Q.  He explained to you, did he not, how WhatsApp worked?

24   A.  Yes.

25   Q.  And when you asked him questions about WordPress, he

K2pWsch4                         Betances - Cross

1    explained to you what WordPress was, right?

2    A.  I did not ask him any questions about WordPress.

3    Q.  OK.  How about Orbot; did you ask him about Orbot?

4    A.  Yes, that one I asked him.

5    Q.  And he explained, right?

6    A.  Yes.

7    Q.  How about Turbo VPN; did he explain that one?

8    A.  Yes.

9    Q.  And did you ask him about Orfox?

10   A.  No, not about that one.

11   Q.  OK.  And whichever apps you asked him about on this illegal

12   cell phone, he explained them to you, correct?

13   A.  Yes.

14   Q.  Right.  And when you heard him say the phrase "information

15   war" -- right --

16   A.  Yes.

17   Q.  -- you didn't ask him what he meant, correct?

18   A.  I did not ask him.  I did not.

19   Q.  Right.  You asked him about all of these apps, but you

20   didn't ask him about what information war meant?

21   A.  No.

22   Q.  OK.  How about when he said Russia?

23   A.  I didn't ask him either.

24   Q.  Right.  You asked him about everything else, but you never

25   asked him what he meant when he said Russia?

1    A.  No.

2    Q.  Now, you testified on direct, did you not, that --

3    Mr. Kamaraju asked you, I think he asked you this question,

4    Were you and Mr. Schulte friends?

5        And you said we talked?

6    A.  We were -- we were friends, and we talked many times in

7    conversations that we had at the table.

8    Q.  OK.  So you think you and Mr. Schulte were friends,

9    correct?

10   A.  Yes.

11   Q.  You talked many times at a table, correct?

12   A.  Yes.

13   Q.  You ate together, correct?

14   A.  Not on too many occasions.

15   Q.  OK.  And it is your testimony that even though you thought

16   he was your friend, you never asked him to explain to you what

17   he meant by information war?

18   A.  I did not ask him.

19   Q.  OK.  And sitting here today, you have no idea what he meant

20   when he said information war, right?

21   A.  Well, based on the translation, it's information about war.

22   Q.  Right.

23   A.  That's what I don't know.

24   Q.  Right.  And you thought that he had some information about

25   a war?

K2pWsch4                          Betances - Cross

1   A.  No, I did not think that.

2   Q.  So what did you think when he said an information war?

3   A.  I'm just giving you the translation into Spanish.

4   Q.  Right.  But I'm asking you what you thought information war

5   meant.

6   A.  Nothing -- nothing crossed my mind.

7   Q.  Nothing crossed your mind, right?

8   A.  No.

9   Q.  No?

10  A.  No.

11  Q.  And you never asked him?

12  A.  I never asked him.

13  Q.  And you never asked him about Russia?

14  A.  I didn't ask him about that either.

15  Q.  And you never asked Omar Amanat about Russia either?

16  A.  I never asked him.

17  Q.  OK.  Do you recall hearing about Mr. Schulte's case on

18  television?

19  A.  No, not that I remember.

20  Q.  How about in the news?

21  A.  Not that, not there either.

22  Q.  OK.  And do you recall being asked questions about all of

23  the emails that Omar and Mr. Schulte were sending?

24  A.  I was not asked those questions.

25  Q.  You were shown those screenshots, correct?

1   A.  Well, they were shown to me because I was the one who took

2   those pictures.

3   Q.  OK.  But do you know what the writing was all about?

4   A.  No, I didn't know.

5   Q.  OK.  So do you know if Mr. Schulte wrote an article called

6   Presumption of Innocence: Guilty Until Proven Wealthy?

7   A.  Not that I remember.

8   Q.  Do you remember him writing an article called A Petition

9   for a Redress of Grievances?

10              THE INTERPRETER:  Petition of what?

11              THE COURT:  Grievances.

12              MS. SHROFF:  For a redress of grievances.

13  A.  Not that I remember.

14  Q.  How about A Loss of Citizenship?

15  A.  Not that I remember.

16  Q.  How about Detention Is Not Punishment, Huh?

17  A.  Not that I remember.

18  Q.  How about Can You Afford to Be Accused?

19  A.  Not that I remember.

20  Q.  In fact, you don't know what he was writing, correct?

21  A.  I did not know what he was writing.

22  Q.  Mr. Betances, would you agree with me that MCC is not a

23  nice place to live?

24  A.  I can't agree with you because it all depends on which

25  person wants to live there.

1    Q.  OK.  How's the food at MCC?

2    A.  So-so, I would say.

3    Q.  OK.  How's the medical care?

4    A.  I never went to the doctor.  I can't say.

5    Q.  How's the flooding situation?

6    A.  Many times water gets in, yes.

7    Q.  And all the toilets back up, correct?

8    A.  Correct, yes.

9    Q.  You have very little phone time, as you already testified,

10   correct?

11   A.  Yes.

12   Q.  Only one visit a week with family, correct?

13   A.  Yes.

14           MS. SHROFF:  I have nothing further.

15           THE COURT:  Mr. Kamaraju.

16           MR. KAMARAJU:  Very briefly, your Honor.

17           THE WITNESS:  I need some water, please.

18           THE INTERPRETER:  That is the witness speaking.

19           THE COURT:  We'll take care of it.

20           THE WITNESS:  Thank you.

21   REDIRECT EXAMINATION

22   BY MR. KAMARAJU:

23   Q.  Just a few questions, sir.

24           THE INTERPRETER:  I'm sorry, Mr. Kamaraju?

25           MR. KAMARAJU:  Just a few questions.

K2pWsch4                         Betances - Redirect

1    Q.  Do you remember Ms. Shroff asked you a series of questions

2    about the crimes that you pled guilty to?

3    A.  Yes.

4    Q.  Did you plead guilty to illegally disclosing classified

5    information?

6    A.  No.

7    Q.  Did you plead guilty to illegally accessing CIA computer

8    systems?

9    A.  No.

10   Q.  Did you plead guilty to obstructing justice?

11   A.  No.

12         MR. KAMARAJU:  All right.  Now, could we pull up

13   Government Exhibit 820-65.

14   Q.  On the left is a screenshot that Ms. Shroff asked you

15   about, right?

16   A.  Yes.

17         MS. SHROFF:  Your Honor, if Mr. Kamaraju could just

18   make the record clear that the expert report is in Omar

19   Amanat's case.

20         MR. KAMARAJU:  I think Ms. Shroff spent a lot of time

21   on that.  I just have a few questions about this.

22   Q.  Do you see the date on this document?

23   A.  Excuse me.  The one on the left?

24   Q.  Yes.

25   A.  Yes.

K2pWsch4                         Betances - Redirect

1   Q.   What's the date?

2   A.   January 29, 2018.

3   Q.   All right.   On the right, I believe you testified on direct

4   that it was around this date that you grew concerned about what

5   the defendant was doing.   Do you remember that?

6   A.   Correct, yes.

7   Q.   And what's that date?

8   A.   8/8, 2018.

9   Q.   That's about seven months after the date on the expert

10  report?

11  A.   Yes.   Correct.

12  Q.   Do you remember Ms. Shroff asked you a series of questions

13  about how much you were risking by keeping a cell phone in the

14  MCC?

15  A.   Yes.

16          MR. KAMARAJU:   Could we bring up Government Exhibit

17  820-402, please.

18          Could we play that, quickly.

19          (Video played)

20          MR. KAMARAJU:   Pause it there.

21  Q.   Is this a video of the defendant using a cell phone in the

22  MCC?

23  A.   Yes.

24  Q.   Now, all of the photographs that you testified about, did

25  the government tell you to take any of those photographs?

1    A.   No.

2    Q.   And do you remember Ms. Shroff asked you about specific

3    dates that you met with the prosecutors?

4    A.   Yes, I remember.

5    Q.   Is it fair to say you met with prosecutors several times

6    during your preparation?

7    A.   Yes.

8    Q.   And each time, what did they ask you to do with respect to

9    your testimony?

10   A.   To only tell the truth.

11   Q.   Do you remember Ms. Shroff asked you some questions about

12   an aggravated identity theft charge that you pled guilty to?

13   A.   Yes.

14   Q.   And you testified that you used a false name, correct?

15   A.   Yes.

16   Q.   And that you were pretending to be somebody else, right?

17   A.   Yes.

18   Q.   And the reason you were pretending to be someone else was

19   so that you could do something you couldn't otherwise do,

20   right?

21   A.   Yes.

22   Q.   Something that was illegal, right?

23   A.   Yes.

24          MR. KAMARAJU:  Can we pull up Government Exhibits

25   820-412 and 413 and Government Exhibit 809, page 7.

1          All right.  Now, let's blow up the bottom of 412 with
2     the date there.
3     Q.  Now, you didn't send an email on August 22, 2018, using
4     this ProtonMail account, correct?
5     A.  No.
6          MR. KAMARAJU:  Blow up the body of the text on 413.
7     Q.  And you didn't send an email asking for nine articles that
8     Shane Presnall sent you on behalf of Josh Schulte, right?
9     A.  No.
10    Q.  And you didn't claim to be family and friends of Josh in
11    this email, right?
12    A.  No.
13         MR. KAMARAJU:  Now could we blow up the last line of
14    Government Exhibit 809.
15    Q.  And you didn't write on August 23, 2018, "Yesterday I
16    started emailing Shane from the Washington Post"?
17    A.  No.
18         MR. KAMARAJU:  No further questions.
19         THE COURT:  You're excused.  Thank you very much.
20         (Witness excused)
21         THE COURT:  Call your next witness.
22         MR. KAMARAJU:  The government calls Special Agent Evan
23    Schlessinger.
24    EVAN JAMES SCHLESSINGER,
25         called as a witness by the government,

K2pWsch4                        Schlessinger - Direct

1          having been duly sworn, testified as follows:

2                   MR. KAMARAJU:  May I proceed, your Honor?

3                   THE COURT:  Yes, please.

4     DIRECT EXAMINATION

5     BY MR. KAMARAJU:

6     Q.  Sir, are you employed?

7     A.  Yes, I am.

8     Q.  Where do you work?

9     A.  The FBI.

10    Q.  What's your position with the FBI?

11    A.  I'm a special agent.

12    Q.  And are you assigned to any particular squad within the

13    FBI?

14    A.  Yes, I am.

15    Q.  What squad is that?

16    A.  The counterespionage squad.

17    Q.  What kind of crimes does the counterespionage squad

18    investigate?

19    A.  Generally, we investigate crimes related to unauthorized

20    disclosure of classified information.  We also investigate

21    crimes of economic espionage.

22    Q.  Just to make sure everybody can hear you, could you move up

23    and talk into the mike a little bit?

24    A.  Yes.  Is that better?

25    Q.  Yes.  Thanks.

K2pWsch4                          Schlessinger - Direct

1      Have you been involved in the criminal investigation of

2  Joshua Schulte?

3  A.  Yes, I have.

4  Q.  How long have you been involved in that investigation?

5  A.  Since approximately April of 2017.

6  Q.  And did the FBI ever arrest Josh Schulte?

7  A.  Yes, we did.

8          MR. KAMARAJU:  Now, I'd like to show just the witness

9  and the parties and the Court Government Exhibit 828.

10 Q.  Sir, do you recognize Government Exhibit 828?

11 A.  Yes, I do.

12 Q.  What is it?

13 A.  This is a protective order.

14 Q.  In what case was this protective order entered into?

15 A.  This case.

16 Q.  How do you know that?

17 A.  From the name of the defendant at the top and also the 17

18 Cr. 548.

19 Q.  And how do you recognize this exhibit?

20 A.  I was present when it was downloaded from Pacer, and it was

21 also emailed to me.

22          MR. KAMARAJU:  Your Honor, the government would offer

23 Government Exhibit 828.

24          THE COURT:  Any objection?

25          MS. SHROFF:  No, your Honor.

1          THE COURT:  828's in evidence.

2          (Government Exhibit 828 received in evidence)

3          MR. KAMARAJU:  Could we pull that up for the jury,

4   please.

5          Could we just blow up the first paragraph.

6   Q.  Do you see where it says "Joshua Adam Schulte, the

7   defendant"?

8   A.  Yes.

9          MR. KAMARAJU:  Could we blow it back out, please.

10  Q.  Do you see where it says, at the bottom of the page there,

11  "whereas, the government desires," and it carries over?

12  A.  Yes.

13  Q.  Could you read that, please?

14  A.  "Whereas, the government desires to protect the protected

15  material it produces, it will mark materials containing such

16  information as U.S.G. confidential."

17         MR. KAMARAJU:  OK.  And if we can blow it back out

18  quickly.

19  Q.  Do you see where it says "it is hereby ordered"?

20  A.  Yes.

21  Q.  All right.  Could you read for us, please, from paragraph 1

22  through paragraph 3b, please?

23  A.  "1.  The protected materials shall be used by the

24  defendant, his counsel and his counsel's agents only for

25  purposes of defending the charges, in connection with

1   sentencing, and pursuing any appeals in this criminal action.

2   To the extent the protected materials are shown to additional

3   persons consistent with the terms set forth below, those

4   additional persons may only view protected materials in

5   connection with this criminal action.

6       "2.  The government will mark all items subject to this

7   protective order as U.S.G. confidential.

8       "3.  The protected materials and the information of

9   identities contained or disclosed therein:

10      "a.  Shall be used by the defendant and his counsel only

11  for purposes of this action;

12      "b.  Shall not be disclosed in any form by the defendant or

13  his counsel, except as set forth in paragraph 3c below."

14          MR. KAMARAJU:  Could we pull up 3c alongside, please.

15  Q.  All right.  Could you just read the top of 3c, before you

16  get to the list?

17  A.  "Only to the following persons in connection with this

18  action, hereinafter designated persons."

19  Q.  OK.  Looking at the list of designated persons, do you see

20  reporters identified there?

21  A.  No, I don't.

22          MR. KAMARAJU:  Could we go back to page 2, please.

23  Q.  Now, do you see where it says, "Whereas, in the interest of

24  expediting the discovery process"?

25  A.  Yes.

1    Q.   Could you read that paragraph, please?

2    A.   "Whereas, in the interest of expediting the discovery

3    process, the defendant, by his attorneys, Taylor Koff, Esq.,

4    Ken Smith, Esq., and Alex Spiro, Esq., consent to the entry of

5    this order."

6              MR. KAMARAJU:   Could we turn to the final page,

7    please.

8    Q.   Do you see any signatures here?

9    A.   Yes, I do.

10   Q.   Whose signatures are listed here?

11   A.   I see the defendant's attorneys' signature and the judge's

12   signature.

13   Q.   And what's the date next to the judge's signature?

14   A.   September 18, 2017.

15   Q.   Now, I'd like to direct your attention to April 2018.  Was

16   the defendant being housed at the MCC at that time?

17   A.   Yes, he was.

18   Q.   Around that time did you become aware of any news reporting

19   about this case?

20   A.   Yes, around that time.

21   Q.   Were there any articles written about the case at that

22   time?

23   A.   Yes, there was.

24   Q.   Which publications do you remember publishing articles

25   around that time?

K2pWsch4                        Schlessinger - Direct

1    A.   I remember articles being published in the New York Times

2    and the Washington Post.

3    Q.   Which reporter wrote the Post article?

4    A.   Shane Harris.

5    Q.   Do you remember who wrote the Times article?

6    A.   I don't remember.

7              MR. KAMARAJU:   Now, I'd like to show you what's been

8    marked as Government Exhibit 829.

9    Q.   Do you recognize this exhibit?

10   A.   Yes, I do.

11   Q.   What is this?

12   A.   This is a transcript from a status conference.

13   Q.   And what conference was that case held in?

14   A.   I'm sorry?

15   Q.   What conference was that case held in?

16   A.   This case.

17   Q.   How do you know that?

18   A.   The defendant's name is at the top.

19   Q.   What was the date of that conference?

20   A.   May 21, 2018.

21   Q.   How do you recognize the conference?

22   A.   I was there.

23             MR. KAMARAJU:   The government would offer Government

24   Exhibit 829, your Honor.

25             MS. SHROFF:   I have no objection.

1          THE COURT:  829 is in evidence.

2          (Government Exhibit 829 received in evidence).

3          MR. KAMARAJU:  May we publish it?

4          THE COURT:  Yes.

5    BY MR. KAMARAJU:

6    Q.  Now, what was the purpose of this conference?

7    A.  I don't recall.

8          MR. KAMARAJU:  Could we turn to page 7, please.

9    Q.  Do you see where the Court says, "This is a protective

10   order dated September 18, 2017"?

11   A.  Yes, I do.

12         MR. KAMARAJU:  Could we pull up next to it Government

13   Exhibit 828 and go to the last page.

14   Q.  All right.  What's the date of the signature -- what's the

15   date next to the Court's signature?

16   A.  September 18, 2017.

17         MR. KAMARAJU:  You can take down 828, please.

18         And we can blow 829 back up.  Zoom out a little bit.

19   Q.  See where the Court goes on to say it contains various

20   provisions?

21   A.  Yes.

22   Q.  Could you read that sentence and the following sentence?

23   A.  "It contains various provisions, including that the

24   material marked U.S.G. confidential shall be used by the

25   defendant and his counsel only for purposes of this action.  It

1      is not to be disseminated to third parties, which apparently it

2      was disseminated to third parties."

3                  MR. KAMARAJU:  Let's zoom out and zoom in on the next

4      two sentences, please.

5      Q.  All right.  Could you read that, please?

6      A.  "If you want to vary the terms of this protective order,

7      your relief is not to do it on your own, Mr. Schulte, but to

8      have your lawyer come into court and explain why there should

9      be a modification of the order.  It provides for that in the

10     order itself.  That is the only means and method for disclosing

11     information or using information that is subject to the

12     protective order."

13                 MR. KAMARAJU:  Could we go to the next page, please.

14     Q.  Sir, do you see where the Court asks Mr. Schulte:  "Do you

15     understand?  Yes?"

16     A.  Yes.

17     Q.  How did the defendant respond?

18     A.  "I do now."

19     Q.  You testified earlier that you focus on counterintelligence

20     investigations, is that right?

21     A.  That's right.

22     Q.  Does that work typically involve searching prisons?

23     A.  No, it doesn't.

24     Q.  Have you ever had to search a prison?

25     A.  Yes, I have.

K2pWsch4                          Schlessinger – Direct

1   Q.  How often have you had to search a prison?

2   A.  Just once.

3   Q.  What case involved you searching a prison?

4   A.  This one.

5   Q.  Which prison did you search?

6   A.  The MCC.

7   Q.  Approximately when was that?

8   A.  October of 2018.

9   Q.  Were you the only agent who conducted the search?

10  A.  No, I wasn't.

11  Q.  How many agents were with you?

12  A.  About 50.

13  Q.  Why did more than 50 FBI agents search the MCC in October

14  of 2018?

15  A.  Well, there was a great deal of urgency to find the phone.

16  There was a concern about the information that could be leaked

17  with the phone and that the leaks were ongoing at the time.

18       Also, given the relative ease with which a phone can be

19  hidden and the large area that was intended to be searched,

20  which was the entirety of 7-south and the law library, we

21  needed as many people as possible.

22  Q.  Which phone were you looking for?

23  A.  The Samsung phone.

24  Q.  And who did you believe was using the Samsung phone at that

25  time?

K2pWsch4                    Schlessinger - Direct

1    A.  Mr. Schulte.

2    Q.  Now, when did you first learn that the defendant was using

3    a Samsung phone at the MCC?

4    A.  So, we received information in September of 2018 that the

5    defendant was using a cell phone in prison.

6              MR. KAMARAJU:  Could we publish Government Exhibits

7    820-419 and 420 next to each other.

8    Q.  Do you recognize what these are?

9    A.  Yes, I do.

10   Q.  What are these?

11   A.  These are screenshots of the Samsung phone used by the

12   defendant at the MCC.

13   Q.  Now, did the FBI obtain these screenshots during its

14   investigation?

15   A.  Yes, we did.

16   Q.  How did you get them?

17   A.  We met with Carlos Betances, who provided them to us.

18   Q.  All right.  Now, on 419, could you read the first sentence

19   of the writing there?

20   A.  "My case involves WikiLeaks and the Vault 7/8 release."

21   Q.  Now, could you read the last sentence of 419 and then

22   carrying over to the first sentence on 420?

23   A.  "My fellow developers and operators were generally

24   successful, despite management's best efforts to derail and

25   disrupt order with meaningless process, nonsensical directives,

1  and a lack of leadership and incoherent babble and buzz words

2  that only confirmed our" -- it's cut off there.

3       "Had no idea or understanding of what we did and therefore

4  could not possible lead us."

5  Q.  Do you see on 420 where it says, "In fact, before I

6  transferred"?

7  A.  Yes.

8  Q.  Could you read that sentence?

9  A.  "In fact, before I transferred to the CIA, my NSA

10  colleagues would often criticize the CIA as the clowns in

11  action, the northern Virginia check dispensary, or even mocked

12  as the 23rd best intelligence agency in the WDC area."

13            MR. KAMARAJU:  Could we publish Government Exhibits

14  1113 and 1114.

15  Q.  And what's 1113?

16  A.  It's an email from Joshua Schulte.

17  Q.  And do you see where it says at the bottom there, "This is

18  my résumé"?

19  A.  Yes, I do.

20  Q.  And what's Government Exhibit 1114?

21  A.  That's the defendant's résumé.

22            MR. KAMARAJU:  Could we blow up the top through the

23  experience section.

24  Q.  What's the name listed at the top?

25  A.  Joshua Adam Schulte.

K2pWsch4                    Schlessinger - Direct

1   Q.  What's the telephone number?

2   A.  806-777-4841.

3   Q.  What's the email address?

4   A.  JoshSchulte1@gmail.com.

5   Q.  Do you see where it says experience?

6   A.  Yes.

7   Q.  Could you read the entry that says "systems engineer"?

8   A.  "Systems engineer, National Security Agency (NSA) January

9   2010 to May 2010."

10  Q.  What's the entry above that?

11  A.  "Software engineer, Central Intelligence Agency (CIA) May

12  2010 to present."

13          MR. KAMARAJU:  Could we pull up Government Exhibit

14  1305-10, please.

15  Q.  What are we looking at here?

16  A.  This is part of the search warrant return from Google.

17  Q.  All right.  Do you see where it says "Google subscriber

18  information"?

19  A.  Yes.

20  Q.  What's subscriber information?

21  A.  Generally, it's just information about an account.

22  Q.  What's the name listed for this account?

23  A.  Josh Schulte.

24  Q.  And what's the email listed for this account?

25  A.  JoshSchulte1@gmail.com.

1    Q.  Do you see the SMS listed there?

2    A.  Yes, I do.

3    Q.  What is the SMS number?

4    A.  18067774841.

5           MR. KAMARAJU:  Let's go back to the screenshots.

6    Could we pull up Government Exhibits 820-420 and 421 next to

7    each other.

8    Q.  Sir, could you read the last line of 420 and the first line

9    of 421?

10   A.  "I reported numerous security vulnerabilities that I

11   discovered within our network and particularly issues with

12   system administration backup and protection of some of our

13   prominent tool sets."

14   Q.  And do you see on 421 where it says, "I moved to the great

15   New York City to work for a prestigious software company"?

16   A.  Yes.

17   Q.  Did the defendant work while in New York?

18   A.  Yes, he did.

19   Q.  What company did he work for?

20   A.  Bloomberg.

21   Q.  Does Bloomberg, among other things, develop software?

22   A.  Yes.

23          MR. KAMARAJU:  Let's pull up Government Exhibits

24   820-421 and 422 next to each other.

25   Q.  Are these screenshots you received from Mr. Betances?

1    A.  Yes, they are.

2    Q.  Could you read the last line of 421 and then the first line

3    of 422?

4    A.  "How many companies have been victims of attacks that have

5    compromised client and customer data?"

6    Q.  And on 422, do you see where it says, I saw this need for

7    consulting"?

8    A.  Yes.

9          MR. KAMARAJU:  Could we publish Government Exhibits

10   820-65 and 820-404 next to each other.

11   Q.  Do you see on 65 where it says "Schulte Analytics LLC"?

12   A.  Yes.

13   Q.  Do you see the address listed there?

14   A.  Yes, I do.

15   Q.  What's that the address for?

16   A.  The MCC.

17   Q.  Do you see where it says "by"?

18   A.  Yes.

19   Q.  Whose name is listed there?

20   A.  Joshua Schulte.

21   Q.  And on 404, do you see a "by" there?

22   A.  Yes, I do.

23   Q.  Whose name is listed there?

24   A.  Joshua Schulte.

25   Q.  Could you read the first sentence under "introduction"?

K2pWsch4                         Schlessinger - Direct

1   A.  "I am the founder and CEO of my own consulting firm."

2              MR. KAMARAJU:  You can take those down.

3              Could we publish Government Exhibits 820-422 and 423

4   next to each other.

5   Q.  Could you read the last line of 422 and then the first line

6   of 423?

7   A.  "I already had a massive server that I ran to provide

8   services and share with other like-minded developers across the

9   world."

10  Q.  Could you read the line that starts, "I participated in

11  Folding@home"?

12  A.  "I participated in Folding@home, Storage@home, TOR, Bitcoin

13  mining and other distributed computing projects to contribute

14  what little I could for the hopes of a better world."

15             MR. KAMARAJU:  Could we publish Government Exhibit

16  1401-12.

17  Q.  Do you recognize this?

18  A.  Yes, I do.

19  Q.  What is it?

20  A.  It's the defendant's computer.

21  Q.  And do you see TOR here?

22  A.  Yes, I do.

23  Q.  Which icon is TOR?

24  A.  This one.

25             MR. KAMARAJU:  Could we pull up Government Exhibit

1    820-434.

2    Q.  Do you see Orbot there?

3    A.  Yes, I do.

4    Q.  Do you know what Orbot is?

5    A.  Yes, generally.

6    Q.  What is Orbot?

7    A.  It is an app that you can use on your phone that provides

8    the TOR service, and it's used in conjunction with Orfox, which

9    is the TOR browser.

10          MR. KAMARAJU:  Let's publish Government Exhibits

11   820-423 and 424 together.

12   Q.  Are these screenshots that you received from Mr. Betances?

13   A.  They are.

14   Q.  Could you read the last line of Government Exhibit 820-423

15   and the first line of 424?

16   A.  "The sky was the limit for my hopes, dreams and

17   aspirations.  Unfortunately, my life was totally destroyed my

18   government incompetence and malfeasance."

19   Q.  On 424, do you see on the screen where it says:  "I was the

20   only to have recently departed this group on poor terms while

21   disclosing vulnerabilities in the system, all the while

22   planning to visit Cancun with my brother during spring break in

23   the following week.  Due to these unfortunate coincidences, the

24   FBI ultimately made a snap judgment that I was guilty of the

25   leaks and targeted me"?

K2pWsch4                          Schlessinger – Direct

1    A.  Yes.

2    Q.  How long after first Vault 7 disclosure was the defendant

3    first approached by the FBI?

4    A.  About a week after.

5    Q.  Was he arrested at that time?

6    A.  No, he wasn't.

7    Q.  Was it several months before he was arrested?

8    A.  Yes, it was.

9              MR. KAMARAJU:  Could we pull up Government Exhibit

10   820-428, please.

11   Q.  Now, is this a continuation of the screenshots that we've

12   been looking at?

13   A.  Yes.

14   Q.  Now, do you see where it says, "This was their mistake"?

15   A.  Yes.

16   Q.  Could you read that sentence and the next two sentences,

17   please?

18   A.  "This was their mistake; they did not truly know their

19   enemy.  If the FBI had actually reviewed my security file at

20   the CIA, not only would they find successful background

21   investigations and polygraphs but also my psychological

22   evaluation, which consists of the following vices -- arrogance

23   and extreme self-confidence, unrelenting determination and

24   righteous indignation.  Should I be wronged, I will fight with

25   every ounce of strength that I can muster."

1           MR. KAMARAJU:  Can we pull up government exhibit --

2           MS. SHROFF:  Could you have him read the next line,

3     please, your Honor.

4           MR. KAMARAJU:  I'm happy to have him read the last,

5     second line.

6           THE COURT:  The witness will please read the next

7     line.

8           MR. KAMARAJU:  Can we put that back up, please.

9           THE WITNESS:  "I will see this through to the very end

10    and fight until the day a jury of my peers finds me guilty and

11    sentences me."

12          It's cut off.

13          MR. KAMARAJU:  Could we pull up Government Exhibit

14    1062 at page 1.

15    Q.  Was this one of the emails you remember seeing during your

16    investigation?

17    A.  Yes, it was.

18          MR. KAMARAJU:  Could we pull up page 2 and 3.

19          Sorry, Ms. Hurst.  2.

20    Q.  OK.  Do you see the numbers list up at the bottom of the

21    top page there that starts with two?

22    A.  Yes.

23    Q.  And carries over to the next page?

24    A.  Yes.

25    Q.  Could you read that up until the first parentheses?

1    A.  "Upon learning that he was removed as an administrator of

2    the OSB libraries on 14 April 2016, Joshua met with Jeremy

3    Weber."

4        Want me to keep going?

5    Q.  Yes, why don't you keep reading.

6    A.  "One of the OSB library admins, and Sean, AED/OSB branch

7    chief, to discuss the situation.  At the conclusion of the

8    final discussion with Jeremy Weber where Jeremy explained to

9    Joshua that Joshua remarked to Jeremy Joshua will eventually

10   get access back to the libraries and that access should be

11   enabled now."

12       MR. KAMARAJU:  Could we pull up Government Exhibit

13   1085 at page 1, please.

14   Q.  Do you remember reviewing this email during your

15   investigation?

16   A.  Yes, I do.

17       MR. KAMARAJU:  Could we turn to page 2.  Could we blow

18   up where it starts "second."

19   Q.  And could you read that first sentence?

20   A.  "Second, during this part of the conversation, Josh said

21   the following:  In this case, where he felt that his privileges

22   were being removed unfairly, he wasn't going to just allow it

23   to happen and he would fight back."

24       MR. KAMARAJU:  Now, could we pull up the cover pages

25   for Government Exhibits 801, 806 and 809.

1    Q.   Now, do you recognize these exhibits?

2    A.   Yes, I do.

3    Q.   What are they?

4    A.   They're documents we recovered from the MCC that belonged

5    to the defendant.

6    Q.   How do you know they belonged to the defendant?

7    A.   Well, they were recovered among his personal belongings at

8    the MCC.  It references conversations he's had with his

9    parents.  It has his name in it throughout.  It also has his

10   inmate number.  And it's his handwriting.

11   Q.   Now, when did you find these documents?

12   A.   In October of 2018.

13             MR. KAMARAJU:   OK.  Let's start with Government

14   Exhibit 806, please.

15   Q.   Now, it's kind of faint there, but if we could blow it up

16   next to the "80 sheets," do you see a date listed there?

17   A.   Yes.

18   Q.   What date's listed there?

19   A.   7/2018.

20             MR. KAMARAJU:   If we could move to the next page.  All

21   right.  And blow that up.

22   Q.   See where it says, "if you need help"?

23   A.   Yes.

24   Q.   Could you read that paragraph, please?

25   A.   "If you need help ask WikiLeaks for my code.  I developed

1   software to parse MSFT, NTFS and EXT3 partitions so that I --

2   for a operation."

3           MR. KAMARAJU:  Could we go to the next page, please,

4   and could we blow that up.

5   Q.  Could you read what's written there?

6   A.  "Ugh, talked to my parents today and found out that my

7   fucking articles that were uploaded to FB, a fucking docx

8   fucking format were the wrong fucking articles.  They put up

9   articles one through seven and only the old ones.  I said I was

10  disappointed, and my mom got all upset, like she does, and I

11  spent the entire phone call trying to apologize."

12          MR. KAMARAJU:  Could we move on to the next page,

13  please.  Blow up the page on the left, please.

14  Q.  Do you see a date listed there?

15  A.  Yes.

16  Q.  What's that date?

17  A.  7/14/18.

18          MR. KAMARAJU:  If we could move on to the right page,

19  please.

20  Q.  Could you read that page?

21  A.  "New article plan.

22          "1.  FBI not the only agency against Trump.  CIA too.

23          "A.  Leak documents to make Trump look bad.

24          "B, sell documents to make" dollar sign.

25          "2.  Political" -- I can't read that word.

1    "3.  Incompetence within CIA, government agencies.

2    "4, if I were Russia, I would

3    "(a) attack judiciary.

4    "(b) U.S. destroy itself."

5          MR. KAMARAJU:  Could we go on to Government Exhibit

6    809, please.

7    Q.  Remind us where this was found.

8    A.  This was found at the MCC.

9    Q.  Now, is there a date written on this cover?

10   A.  Yes.

11   Q.  What's that?

12   A.  7/25 to 9.

13         MR. KAMARAJU:  Could we move on to the next page,

14   please.

15   Q.  Do you see a date on this page?

16   A.  Yes.

17   Q.  What's the date here?

18   A.  8/8, 2018.

19   Q.  Do you see there's some text that kind of curls around the

20   date starting with "if"?

21   A.  Yes.

22   Q.  Would you mind reading that, please?

23   A.  "If government doesn't pay me $50 billion in restitution

24   and prosecute the criminals who lied to the judge and presented

25   this BS case, then I will visit every country in the world and

1    bear witness to the treachery that is the U.S.G.  I will look

2    to break up diplomatic relationships, close embassies and U.S.

3    occupations across the world, and finally, reverse U.S.

4    jingoism.  If this is the way the U.S. government treats one of

5    their own, how do you think they treat allies?"

6            MS. SHROFF:  Your Honor, may we ask that the

7    government also have the witness read what is below that

8    paragraph, please, from "they called."

9            MR. KAMARAJU:  If your Honor would like, we're happy

10   to.

11           THE COURT:  Yes, please.

12   BY MR. KAMARAJU:

13   Q.  Could you read the rest of that, please?

14   A.  "They called me down at 6 a.m. for my 2 p.m. court.  From 6

15   to 10 a.m., I did nothing down here -- there.  Finally brought

16   me back.  I took my last piece, and I'm feeling great.  I

17   envision my appointment as a cardinal and becoming neophyte

18   pope as I wield my Christianity around the church.  Took too

19   much, feel sick."

20   Q.  Now, the language that you read from the top of the page,

21   do you see the acronym U.S.G.?

22   A.  Yes, I do.

23   Q.  Are you familiar with that acronym?

24   A.  Yes.

25   Q.  What does it stand for?

1   A.  United States government.

2          MR. KAMARAJU:  Could we go on to the next page.

3   Q.  Is there a date listed there?

4   A.  Yes.

5   Q.  What's that?

6   A.  8/14.

7   Q.  Is there a name listed on this page?

8   A.  Yes.

9   Q.  Whose name is that?

10  A.  Joshua Schulte.

11         MR. KAMARAJU:  And if we could zoom out.

12  Q.  Do you see what it says underneath the date in the left

13  margin there?

14  A.  Yes.

15  Q.  Do you see that text?  Could you read that?

16  A.  "Give me a phone and a blog, and I will change the world."

17         MR. KAMARAJU:  All right.  If we can zoom back out and

18  blow up that first paragraph, please, at the top.

19  Q.  Now, can you read the first sentence there?

20  A.  "Got to use last night."

21         MR. KAMARAJU:  Pull up Government Exhibit 820-433,

22  please.

23  Q.  Was this one of the screenshots you received from

24  Mr. Betances?

25  A.  Yes, it was.

1    Q.  What brand of phone is identified in this photograph?

2    A.  A Samsung phone.

3    Q.  And do you see an IMEI listed here?

4    A.  Yes, I do.

5         MR. KAMARAJU:  Could we pull up next to that

6    Government Exhibit 3003 and go to page 3.

7    Q.  Could you read paragraph 4, please?

8    A.  "If called to testify, an officer with the federal Bureau

9    of Prisons would testify that on or about October 5, 2018,

10   Officer-1 recovered a Samsung cell phone with IMEI number

11   357073084445432, the Samsung phone, from unit 7-south within

12   the Metropolitan Correctional Center, 150 Park Row, New York,

13   New York 10007.  Government Exhibit 821 is a compact disc

14   containing true and accurate copies of forensic files and data

15   recovered from the Samsung phone.  Government Exhibit 822 is a

16   compact disc containing true and accurate copies of messages

17   sent and received using the messaging application Signal on the

18   Samsung phone."

19   Q.  Now, is the IMEI number identified in paragraph 4 of

20   Government Exhibit 3003 the same as the IMEI number displayed

21   in Government Exhibit 820-433?

22   A.  Yes, it is.

23   Q.  And what day was that Samsung phone activated?

24   A.  Forensic analysis on the phone indicated it was activated

25   on August 13, 2018.

K2pWsch4                          Schlessinger - Direct

1           MR. KAMARAJU:  Can we pull up Government Exhibit 809

2     at 3 again.

3     Q.  And what's the date listed here?

4     A.  August 14.

5           MR. KAMARAJU:  If we could blow up the first

6     paragraph.

7     Q.  What's the first line of that paragraph?

8     A.  "Got to use last night.  The way is clear."

9     Q.  Let's keep reading.

10    A.  "I will set up a WordPress of JoshSchulte.wordpress.com and

11    presumptionofinnocence.wordpress.com.  From here I will stage

12    my information war."

13          MR. KAMARAJU:  Could we pull up Government Exhibit

14    3002, please, and go to page 2.

15    Q.  And could you read paragraph 3, please.

16    A.  "If called as a witness, a representative of Automattic

17    Inc., Automattic, with knowledge of the matter would testify

18    that GX 1301-1 through 1301-4B are true and accurate copies of

19    documents from Automattic associated with Automattic profile

20    https://en.gravatar.com/JoshSchulte1, which includes the

21    WordPress website JoshSchulte.wordpress.com

22    presumptionofslavery.wordpress.com and

23    presumptionofinnocence.net, and which were made at or near the

24    time by, or from information transmitted by, a person with

25    knowledge of the matters set forth in the records.  They were

K2pWsch4                        Schlessinger – Direct

1    kept in the course of a regularly conducted business activity."

2              MR. KAMARAJU:  Can we publish Government Exhibit

3    1301-1, please.

4    Q.  What's this?

5    A.  This is part of the search warrant return from Automattic.

6    Q.  And what's the date and time of the first entry at the top?

7    A.  August 14, 2018.

8    Q.  Is that the same date as what we were looking at on

9    Government Exhibit 809 on page 3?

10   A.  Yes, it is.

11   Q.  All right.  Who is the user listed here?

12   A.  JoshSchulte1.

13   Q.  And the next entry down, does that have the same date and

14   time?

15   A.  Yes, it is.

16   Q.  Could you read the event listed there?

17   A.  "Magic log-in link logged in."

18   Q.  Could you read the note?

19   A.  "Magic log-in successful via link sent to

20   joshSchulte1@gmail.com."

21   Q.  Do you see an entry for August 18, 2018, at 7:36 p.m.?

22   A.  Yes, I do.

23   Q.  Who is the user listed there?

24   A.  JoshSchulte1.

25   Q.  Could you read the event?

1    A.   "Set user roll."

2    Q.   Could you read the note?

3    A.   "150375041 administrator."

4            MR. KAMARAJU:   Now, could we go back to Government

5    Exhibit 809.   Could we go back to page 3, please.

6    Q.   All right.   In the top paragraph, do you see where it says

7    presumptionofinnocence@wordpress.com?

8    A.   Yes.

9            MR. KAMARAJU:   Could we show the witness and the

10   parties and the Court Government Exhibit 823, please.

11   Q.   What's Government Exhibit 823?

12   A.   This is a screenshot of the John Galt legal defense fund

13   Facebook page.

14   Q.   How do you recognize it?

15   A.   I took this screenshot.

16   Q.   And did you take this screenshot after August 14, 2018?

17   A.   Yes, I did.

18           MR. KAMARAJU:   Your Honor, the government would offer

19   Government Exhibit 823.

20           MS. SHROFF:   We have no objection, your Honor.

21           THE COURT:   823 is in evidence.

22           (Government Exhibit 823 received in evidence)

23           MR. KAMARAJU:   Could we pull Government Exhibit 809 at

24   page 3 again alongside.

25           Could we blow up the section that says Facebook.

1          THE WITNESS:  Yes.

2     BY MR. KAMARAJU:

3     Q.  Could you read that?

4     A.  "Facebook I will rename simply who is John Galt or who is

5     Josh Schulte?"

6          MR. KAMARAJU:  OK.  We can put 809 away for a second.

7          Looking back at 823, could we blow up the "about"

8     section.

9     Q.  Do you see a link there?

10    A.  Yes.

11    Q.  What's that a link to?

12    A.  The presumption of innocence WordPress site.

13         MR. KAMARAJU:  If we could pull Government Exhibit 809

14    back up.

15    Q.  Do you see the paragraph that starts "from FB"?

16    A.  Yes.

17         MR. KAMARAJU:  If we could blow that up through the

18    second one.

19    Q.  Could you read that, please?

20    A.  "From FB I will post links to the articles and blogs as I

21    write them.  The presumption of innocence blog will only

22    contain my ten articles, 1-10, ending on the presumption of

23    innocence.  I will post each of them on the FB and delete the

24    previous articles."

25         MR. KAMARAJU:  Can we show the witness and the parties

K2pWsch4                        Schlessinger - Direct

1    Government Exhibits 825, please.

2    Q.   Do you recognize this?

3    A.   Yes, I do.

4    Q.   What is it?

5    A.   This is the presumptionofinnocence.net WordPress site.

6    Q.   How do you recognize it?

7    A.   I also took this screenshot.

8    Q.   Did you take it after --

9              MS. SHROFF:  Your Honor, we have no objection to it

10   coming in.

11             MR. KAMARAJU:  We'll offer it then, your Honor.

12             THE COURT:  It's received in evidence.

13             (Government Exhibit 825 received in evidence)

14             MR. KAMARAJU:  Could we publish Government Exhibit

15   825?

16             THE COURT:  Yes.

17   BY MR. KAMARAJU:

18   Q.   What's the title of the page?

19   A.   Presumption of Innocence:  Origins.

20   Q.   What's the date listed here?

21   A.   October 8, 2018.

22   Q.   And at that time was the defendant housed in the MCC?

23   A.   Yes, he was.

24   Q.   Do you see where it says, "My case involves WikiLeaks"?

25   A.   Yes.

1            MR. KAMARAJU:  Could we bring up Government Exhibit

2    820-419 alongside.

3    Q.  Now, does the same content appear in both of these

4    exhibits?

5    A.  Yes.  The website on the left is just cut off by the

6    formatting.

7            MR. KAMARAJU:  All right.  We can take down 419.

8            Could we pull up Government Exhibit 1301-4 alongside.

9    Q.  What is this?

10   A.  This is part of the search warrant return from Automattic.

11   Q.  And do you see, about three-quarters of the way down the

12   page, there's an entry for title?

13   A.  Yes.

14   Q.  What's the title listed there?

15   A.  Presumption of Innocence.

16   Q.  And what's the link listed there?

17   A.  It's presumptionofinnocence.net.

18   Q.  Was that the same link that we saw from Government Exhibits

19   823 and 825?

20   A.  Yes, it is.

21           MR. KAMARAJU:  Now, can we go to page 3.

22   Q.  Do you see something called "WP post date"?

23   A.  Yes.

24   Q.  When was this post posted on this blog?

25   A.  October 8, 2018.

K2pWsch4                        Schlessinger - Direct

 1    Q.   Is that the same date that's on Government Exhibit 825?

 2    A.   Yes, it is.

 3    Q.   Do you see a title listed here?

 4    A.   Yes.

 5    Q.   What's the title?

 6    A.   "8.  Presumption of Innocence:  Origins."

 7    Q.   Is that the same title that was listed on 825?

 8    A.   Yes, it is.

 9    Q.   Now, looking down at the content section --

10    A.   Yes.

11    Q.   -- is that the same content in the two exhibits?

12    A.   Yes, it is.

13         MR. KAMARAJU:  All right.  Could we scroll to page 9.

14    Q.   Do you see where it says, "This was their mistake"?

15    A.   Yes.

16    Q.   Could you read that, please?

17    A.   "This was their mistake.  They did not truly know their

18    enemy.  If the FBI had actually reviewed my security file at

19    the CIA, not only would they find successful background

20    investigations and polygraphs but also my psychological

21    evaluation, which consists of the following vices -- arrogance

22    and extreme self-confidence, unrelenting determination and

23    righteous indignation.  Should I be wronged, I will fight with

24    every ounce of strength that I can muster.  I will see this

25    through until the very end and fight until the day a jury of my

K2pWsch4                      Schlessinger - Direct

1    peers finds me guilty and sentences me to 20 years in BNS1 or

2    they find me with 22 self-inflicted gunshot wounds to the back

3    of the head."

4           MR. KAMARAJU:  Could we look at Government Exhibit

5    809, please.  Could we go to page 4.  Thank you.

6    Q.  Could you read the first five sentences through the word

7    "incredible"?

8    A.  "I text my dad from WhatsApp and Signal incessantly and

9    finally got a response at 1 percent battery.  I said please put

10   articles on drafts in Gmail.  Response:  My lawyer advised me

11   not to.  Fucking incredible.  Fucking incredible."

12   Q.  Do you know what Signal is?

13   A.  Yes.

14   Q.  What's Signal?

15   A.  It's a, an encrypted messaging app for your phone.

16          MR. KAMARAJU:  Could we pull up Government Exhibit

17   820-434.

18   Q.  And what is this a picture of?

19   A.  That's a picture of the defendant's Samsung phone from the

20   MCC.

21   Q.  And do you see the Signal app on there?

22   A.  Yes, I do.

23          MR. KAMARAJU:  OK.  If we can go back to 809, please.

24   Q.  Could you read the last sentence on this page?

25   A.  "I thought I convinced him to set up a ProtonMail email

1    account for me to upload the articles."

2    Q.  Do you know what ProtonMail is?

3    A.  Yes.

4    Q.  What's ProtonMail?

5    A.  It's an encrypted email service based in Switzerland.

6            MR. KAMARAJU:  Let's go to the next page, please.

7    Q.  Is there a date listed here?

8    A.  Yes.

9    Q.  What's that date?

10   A.  The 21st.

11   Q.  Now, do you see the text on the top right?

12   A.  Yes.

13   Q.  Could you read that?

14   A.  "They got IMEI of my phone via subpoena at phone number" --

15   excuse me, "of phone number."

16           MR. KAMARAJU:  If we could blow it back up.

17   Q.  Do you see there's that numbered list.

18   A.  Yes.

19   Q.  Could you read what's first?

20   A.  "1.  Delete all Google docks from John Smith."

21   Q.  Could you read what's next to No. 1?

22   A.  A check mark.

23   Q.  Could you read No. 2?

24   A.  "Delete all emails from John Smith."

25   Q.  What's next to that one?

K2pWsch4

1    A.   A check mark.

2    Q.   Could you read No. 3?

3    A.   "Delete suspicious emails from my Gmail.

4         "a.   New log-ons from phones.

5         "b.   PayPal.

6         "c.   WordPress

7         "d.   PW changes."

8    Q.   Could you read No. 4?

9    A.   "Create new ProtonMail presumedguilty@protonmail.com."

10   Q.   Could you read No. 5?

11   A.   "Migrate WordPress to ProtonMail."

12        MR. KAMARAJU:  Your Honor, I don't know when you want

13   to take a break.

14        THE COURT:  I think we'll come to a conclusion for

15   today.  We'll resume tomorrow morning.  Some of the jurors have

16   other business, so we'll start at 9:30 tomorrow morning.

17        Remember my standard instructions.  Don't do any

18   independent research.  Don't discuss the case among yourselves.

19   Keep open minds.  I'll see you tomorrow morning at 9:30.  Thank

20   you very much.

21        (Continued on next page)

22

23

24

25

K2pWsch4

1            (Jury not present)

2            THE COURT:  Please be seated.

3            THE COURT:  You can go.

4            THE WITNESS:  Thank you.

5            THE COURT:  Thank you very much.

6            (Witness not present)

7            THE COURT:  Mr. Kamaraju, how much more do you have

8    with Mr. Schlessinger.

9            MR. KAMARAJU:  Maybe a little bit over an hour.

10           THE COURT:  And he's your last witness?

11           MR. KAMARAJU:  Yes, your Honor.

12           THE COURT:  OK.  Ms. Shroff, can you enlighten us now

13   what your intentions are at the sidebar.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

K2pWsch4

1              (In open court)

2              THE COURT:  I think I'd like to do the review of the

3     jury instructions on Thursday.

4              MR. LAROCHE:  Yes, your Honor.

5              THE COURT:  At the close of business.

6              MR. KAMARAJU:  That's fine for us, your Honor.

7              THE COURT:  Ms. Shroff.

8              MS. SHROFF:  Sure.

9              THE COURT:  OK.  Anything else to take up?

10             MR. LAROCHE:  No, your Honor.

11             THE COURT:  OK.  We have another conference.

12             MR. LAROCHE:  Yes, your Honor.

13             THE COURT:  Thank you very much.

14             (Adjourned to February 26, 2020, at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    RICHARD JOHN EVANCHEC

 4   Cross By Mr. Branden . . . . . . . . . . . .2306

 5   Redirect By Mr. Laroche  . . . . . . . . . .2363

 6    CARLOS BETANCES LUNA MERA

 7   Direct By Mr. Kamaraju . . . . . . . . . . .2376

 8   Cross By Ms. Shroff  . . . . . . . . . . . .2418

 9   Redirect By Mr. Kamaraju . . . . . . . . . .2458

10   EVAN JAMES SCHLESSINGER

11   Direct By Mr. Kamaraju . . . . . . . . . . .2463

12                      GOVERNMENT EXHIBITS

13   Exhibit No.                              Received

14    820, 820-1 through 820-449   . . . . . . .2386

15    828  . . . . . . . . . . . . . . . . . . .2465

16    829  . . . . . . . . . . . . . . . . . . .2469

17    823  . . . . . . . . . . . . . . . . . . .2490

18    825  . . . . . . . . . . . . . . . . . . .2492

19                      DEFENDANT EXHIBITS

20   Exhibit No.                              Received

21    H  . . . . . . . . . . . . . . . . . . . .2318

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300