K2qWsch1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                   v.                      S2 17 Cr. 548 (PAC)

5    JOSHUA ADAM SCHULTE,

6                   Defendant.              Trial

7    ------------------------------x
                                            New York, N.Y.
8                                           February 26, 2020
                                            9:45 a.m.
9    Before:

10                         HON. PAUL A. CROTTY,

11                                            District Judge
                                              -and a Jury-
                                   APPEARANCES
12
     GEOFFREY S. BERMAN
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW J. LAROCHE
          SIDHARDHA KAMARAJU
15        DAVID W. DENTON JR.
          Assistant United States Attorneys
16
     SABRINA P. SHROFF
17        Attorney for Defendant
          -and-
18   DAVID E. PATTON
          Federal Defenders of New York, Inc.
19   BY:  EDWARD S. ZAS
          Assistant Federal Defender
20        -and-
     JAMES M. BRANDEN
21

22   Also Present:  Colleen Geier
                    Morgan Hurst, Paralegal Specialists
23                  Achal Fernando-Peiris, Paralegal
                    John Lee, Litigation Support
24                  Daniel Hartenstine
                    Matthew Mullery, CISOs, Department of Justice
25
```

K2qWsch1

| | |
|---|---|
| 1 | (Trial resumed) |
| 2 | THE COURT:  Ms. Shroff, I would like to know, before |
| 3 | the jury comes in, what you want me to do about the letter I |
| 4 | received this morning dealing with the CIA witness who saw |
| 5 | Mr. Zas and then disappeared. |
| 6 | MS. SHROFF:  Well, your Honor, I wanted the Court to |
| 7 | know that that had happened. |
| 8 | THE COURT:  Yes.  What do you want me to do about it? |
| 9 | MS. SHROFF:  I don't know.  I honestly don't know. |
| 10 | THE COURT:  Do you want to put the witness on the |
| 11 | stand, assuming he shows up? |
| 12 | MS. SHROFF:  Not right now, no. |
| 13 | THE COURT:  No? |
| 14 | MS. SHROFF:  I didn't get to talk to him. |
| 15 | THE COURT:  Do you know anything about this, |
| 16 | Mr. Laroche? |
| 17 | MR. LAROCHE:  Yes, your Honor.  I do. |
| 18 | I'm a little surprised by the letter Ms. Shroff filed |
| 19 | last night after we had a very long conversation about this |
| 20 | very issue, and she did not say anything to the Court about our |
| 21 | conversation. |
| 22 | MS. SHROFF:  I didn't say anything to the Court about |
| 23 | it. |
| 24 | THE COURT:  I'm concerned if a witness shows up -- |
| 25 | he's been subpoenaed -- and all of a sudden, he disappears. |

K2qWsch1

1          MR. LAROCHE:  He did not disappear.  We told Ms.

2    Shroff he did not disappear.  He was moved down to the fifth

3    floor so he didn't have to sit outside the whole day when he

4    was not going to be called to testify.

5          Ms. Shroff called me that evening about where the

6    witness was.  I said he had left for the night.  I said he

7    would be back in the morning if she'd like to talk to him.  We

8    told the witness and had given Ms. Shroff the witness's number,

9    so this idea that he just disappeared and there was something

10   inappropriate that was done is incorrect.

11         MS. SHROFF:  Your Honor, it is absolutely correct, and

12   I want to make sure that I'm clear about this.

13         The witness was outside before 9 a.m. this morning --

14   yesterday morning.  I was informed by the court officer that

15   there was a witness outside.  My paralegal Achal and I noticed

16   the witness was sitting outside.  We went up to the witness.

17   Achal had come in and wheeled the cart in.  I talked to the

18   witness.  I reviewed the subpoena that he had received.  The

19   subpoena was in my name.  It had my phone number.  I looked at

20   him, and I said:  I wish you had called me.  I would have given

21   you a better estimate of the time.  Sit right here.  I will be

22   right back.

23         I told him that because normally I cut it close to

24   9:00; I didn't know if the Court was on the bench.  I came into

25   the courtroom.  You were not on the bench.  I ran back outside.

K2qWsch1

1          THE COURT:  He was gone.

2          MS. SHROFF:  And he was gone.

3          So, just so that the chronology is complete, OK, I

4    came back in, Mr. Hartenstine is sitting exactly where he

5    always sits, right near the door.  I went to him, and I think I

6    mumbled.  I agree.  I may not have been crystal clear, because

7    you know, it's a stressful day.  Every day here is a stressful

8    day.  I mumbled something to him about a witness disappearing.

9    I asked him if he knew from the CIA where the witness had gone.

10   I don't think I was particularly clear to Mr. Hartenstine, and

11   I never heard back at all.

12         I went back out in the break to try and find him.  I

13   went to the eighth floor to find him.  I found the man nowhere.

14   I did not bother to ask the government because my subpoena

15   brought him here.  Why should they know anything about him?

16         Wait.  Wait.  I'm not finished.

17         I never asked the government.  That is true.  It

18   slipped my mind.  For whatever reason, I never asked them where

19   the guy went.  I mentioned to my team I couldn't find this man,

20   he disappeared, and then -- we call the government in the

21   evening -- but they called us to coordinate the other

22   witnesses.

23         Never in my life as a defense lawyer have I ever had

24   to put up direct witnesses on my side of the case by

25   coordinating their travel with the government, asking them to

K2qWsch1

1  waste their time coordinating them getting here, without even

2  having an opportunity to ever speak to these witnesses.

3          THE COURT:  Ms. Shroff, I don't mean to cut you off,

4  but what do you want to do about it?

5          MS. SHROFF:  I don't know.  I want to first make sure

6  that I'm clear that I did nothing wrong, first of all.

7          THE COURT:  Nobody's suggesting you did anything

8  wrong.

9          MS. SHROFF:  Well, Mr. Laroche seems to suggest that I

10  left something out of the letter, so I want to make sure

11  everybody knows.

12          So when the government told me the witness had been

13  taken down to their office and had just left their office five

14  minutes before my phone call, I was upset because somebody

15  could have told me:  Hey, that witness he was sitting outside,

16  you know, we took him.

17          That's it.  That's all I ask.  Somebody tell me:  You

18  know what?  We thought he shouldn't have come here based on

19  your subpoena.  We whisked him off.

20          Nobody told me.  Not the CIA, seven of them sitting

21  there, or however many of them are here.  Frankly, I can't

22  blame the government because they didn't know.

23          I don't know what I want to do.  Honestly, I don't

24  know.  I haven't been able to talk to Mr. Zas about it so I did

25  not ask for relief in the letter as to what the next step

K2qWsch1

1   should be.

2           THE COURT:  All right.

3           MS. SHROFF:  But for sure that witness was disappeared

4   from this floor, and I definitely was never told.

5           MR. LAROCHE:  He was not disappeared.  He was down on

6   our floor.  I spoke to Ms. Shroff about it.

7           THE COURT:  What time did you speak to Ms. Shroff

8   about it?

9           MR. LAROCHE:  When she called and asked about it, your

10  Honor.

11          MS. SHROFF:  At what time?

12          THE COURT:  What time was that?

13          MR. LAROCHE:  It was after the court day, your Honor.

14          THE COURT:  Right.

15          MR. LAROCHE:  He was gone the whole day.  She saw he

16  was gone the whole day.  He wasn't outside anymore.  She could

17  have raised it with us.  She didn't.

18          MS. SHROFF:  I raised it with the CISO.

19          THE COURT:  Ms. Shroff.

20          MR. LAROCHE:  He's here, available to testify,

21  pursuant to the subpoena.  Nobody disappeared him.  He's

22  available to testify, which is what's required under the

23  subpoena.  He has her number.  He knows that he can reach out

24  to her.  That is all that's required.  There is no other relief

25  to be granted.

K2qWsch1

1          MS. SHROFF:  There is a witness that showed up.

2          THE COURT:  The witness shows up, and then he leaves.

3     I won't say he disappeared, but he leaves.  He leaves under the

4     guidance or under the tutelage of somebody from the CIA,

5     correct?

6          MR. LAROCHE:  It was under our guidance, your Honor.

7     We told them there was someone here from the CIA who understood

8     that his position was sensitive when he was there.  Having him

9     sit outside in a public location all day would not be the best

10    location for him to be.  He was moved downstairs during the

11    trial day.  During the trial day.

12         No one is hiding him from Ms. Shroff.  We told her

13    that last night.  We made him available this morning.  If she

14    wanted to talk to him this morning and he was willing, she

15    could have.

16         MS. SHROFF:  I still want to finish this.  OK?

17         THE COURT:  Yes.

18         MS. SHROFF:  I spoke to the man.  Not once did he

19    express any concern about waiting there for me for all of five

20    minutes just to make sure you had not taken the bench.  That's

21    the only reason I came in, to make sure I didn't keep you

22    waiting.  I went back out.  The man was gone.  Listen.  A man

23    is gone.

24         THE COURT:  You're going to talk to him and you'll let

25    me know then what you want to do.

K2qWsch1

1              MS. SHROFF:  I will, but I want to make sure -- that

2      he did disappear; he was taken to the U.S. Attorney's Office;

3      he wasn't put in the cafeteria; he no longer works for the CIA.

4      And the CIA never bothered to tell the defense.

5              THE COURT:  Right.

6              MS. SHROFF:  I need five minutes to go to the

7      bathroom.

8              THE COURT:  We're going to call the jury in then.

9              MS. SHROFF:  That's OK, your Honor.  I'll be very

10     quick.

11             THE COURT:  Do you want to call Mr. Schlessinger?

12             MR. KAMARAJU:  Yes, your Honor.  He's here.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

K2qWsch1

1              (Jury present)

2              THE COURT:  Good morning.  Please be seated.

3   EVAN JAMES SCHLESSINGER, resumed.

4              THE COURT:  You're still under oath.

5              THE WITNESS:  Understood, your Honor.

6              THE COURT:  Mr. Kamaraju.

7              MR. KAMARAJU:  Thank you, your Honor.

8   DIRECT EXAMINATION CONTINUED

9   K2qWsch1                     Schlessinger – Direct

10  BY MR. KAMARAJU:

11  Q.  Special Agent Schlessinger, I think when we left off

12  yesterday we were looking at Government Exhibit 809 at page 5.

13  A.  Yes.

14  Q.  And we were taking a look at the list at the top.  Remember

15  that?

16  A.  Yes, I do.

17  Q.  OK.  Let's just go through that list to refresh.

18  A.  "1.  Delete all Google Docs from John Smith.

19      "2.  Delete all emails from John Smith.

20      "3.  Delete suspicious emails from my Gmail.

21      "a. new log ons from phones.

22      "b.  PayPal.

23      "c.  WordPress.

24      "d.  PW changes.

25      "4.  Create new ProtonMail presumedguilty@protonmail.com.

K2qWsch1

```
 1        "5.  Migrate WordPress to ProtonMail."

 2             MR. KAMARAJU:  Could we zoom out.

 3    Q.  Do you see a section titled "research"?

 4    A.  Yes.

 5    Q.  What's listed under research?

 6    A.  "1.  Gmail keep deleted emails.

 7        "2.  Changing Samsung IMEI.

 8        "a.  Without rooting.

 9        "b.  Generate new IMEI."

10             MR. KAMARAJU:  Could we pull up Government Exhibit

11    820-435 next to this.

12             MS. SHROFF:  Your Honor, could the witness reread line

13    No. 2.

14             THE COURT:  Mr. Schlessinger.

15             THE WITNESS:  "Changing Samsung IMEI."

16    BY MR. KAMARAJU:

17    Q.  Sir, now, on Government Exhibit 820-435, do you see any

18    rooting software on the screen?

19    A.  Yes.

20    Q.  What software do you see?

21    A.  KingoRoot.

22             MR. KAMARAJU:  All right.  If we could take down 435,

23    please, and go back to 809.

24    Q.  Do you see six and seven listed there?

25    A.  Yes.
```

K2qWsch1

1  Q.  Could you read those for us, please?

2  A.  "6.  Clean off apps.

3      "7.  Reset factory phone."

4  Q.  Now, on the right side of the page, do you see the word

5  "subpoena"?

6  A.  Yes.

7  Q.  Could you read what's written there?

8  A.  "Subpoena for IMEI.  Worst case all three have compromised

9  IMEIs."

10          MR. KAMARAJU:  Ms. Hurst, could we show the witness

11  and the parties and the Court Government Exhibit 822-2.

12  Q.  Sir, do you recognize this?

13  A.  Yes, I do.

14  Q.  What is it?

15  A.  This is a report of all the searches that were conducted

16  from the Samsung phone itself.

17  Q.  And when you say searches conducted, how were those

18  searches conducted?

19  A.  On the phone.

20  Q.  And how do you recognize this document?

21  A.  I ran this report off the forensic software.

22          MR. KAMARAJU:  Your Honor, the government would offer

23  Government Exhibit 822-2.

24          THE COURT:  Any objection?

25          MS. SHROFF:  No, your Honor.

K2qWsch1

```
 1              THE COURT:  OK.  It's received in evidence.
 2              (Government Exhibit 822-2 received in evidence)
 3              MR. KAMARAJU:  Could we please publish it.
 4              Could we go to page 2 and blow up line 39.
 5   Q.  Now, sir, what's the date and time of this search?
 6   A.  August 22, 2018, 5:44 p.m. Eastern Time.
 7   Q.  And what was searched for at that time?
 8   A.  "Generate random password."
 9              MR. KAMARAJU:  Could we look at the next page on
10   GX809, please.
11   Q.  Do you see an email address listed at the top of the page?
12   A.  Yes.
13   Q.  What's that email address?
14   A.  Presumedguilty@protonmail.
15   Q.  And do you see the random series of numbers and letters to
16   the left of that email account?
17   A.  Yes, I do.
18   Q.  What happens if you try to log in to that ProtonMail
19   account with that string?
20   A.  You will successfully log on to that account.
21   Q.  And how do you know that?
22   A.  Because I was present when that happened.
23              MR. KAMARAJU:  Now, can we look down.
24   Q.  Do you see the phrase "Annon1204"?
25   A.  Yes.
```

K2qWsch1

1           MR. KAMARAJU:  Could we pull up Government Exhibit

2    820-412, please.

3    Q.  Now, is 412 one of the screenshots that Mr. Betances

4    provided to you?

5    A.  Yes, it is.

6    Q.  Do you see the Annon1204 ProtonMail account listed there?

7    A.  Yes, I do.

8    Q.  Looking back at Government Exhibit 809, do you see the

9    string of letters and numbers written next to the Annon1204

10   notation?

11   A.  Yes, I do.

12   Q.  What happens when you try to log in to that ProtonMail

13   account with that string of numbers?

14   A.  You will successfully log on to that account.

15   Q.  And how do you know that?

16   A.  Because I was also present when that happened.

17   Q.  And when you say you were present when that happened, was

18   there an FBI agent who did that?

19   A.  Yes, there was.

20           MR. KAMARAJU:  Now, could we look at the next entry

21   below on 809, please.

22   Q.  All right.  What's that entry?

23   A.  "Free Jason Bourne."

24   Q.  Have you seen a ProtonMail account with that handle during

25   this investigation?

K2qWsch1

1    A.  Yes, I have.

2    Q.  Do you see the string of letters and numbers to the right

3    there?

4    A.  Yes, I do.

5    Q.  What happens when you plug that string of numbers and

6    letters in to the freejasonbourne@protonmail account?

7    A.  You will successfully log on to that account.

8    Q.  And how do you know that?

9    A.  Because I was also present when that occurred.

10          MR. KAMARAJU:  Could we take a look at Government

11   Exhibit 822-2 and again look at page 2.

12          Can we blow up row 52, please.

13   Q.  What's the date and time of that search?

14   A.  August 22, 2018, 6:30 p.m. Eastern Time.

15   Q.  And what's the search?

16   A.  "Can't log in to ProtonMail through TOR."

17          MR. KAMARAJU:  Now, Ms. Hurst, can we go back to page

18   5 on Government Exhibit 809.

19   Q.  Can you read four and five on the list, please?

20   A.  "4.  Create new ProtonMail:  Presumedguilty@protonmail.com.

21       "5.  Migrate WordPress to ProtonMail."

22          MR. KAMARAJU:  Could we pull up Government Exhibit

23   1301-1, please.

24   Q.  Could you remind us, what is this, Special Agent?

25   A.  This is part of the search warrant return from Automattic.

K2qWsch1

1   Q.  Do you see the five entries at the bottom that occur

2   between 10:37 and 11 p.m. on August 22, 2018?

3   A.  Yes.

4   Q.  Do they all have the same event listed there?

5   A.  Yes, they do.

6   Q.  What's that event?

7   A.  "Change email address request."

8   Q.  Do they all have the same note listed?

9   A.  Yes, they do.

10  Q.  And what's that note?

11  A.  "Own email request from JoshSchulte1@gmail.com to

12  presumedguilty@protonmail.com."

13          MR. KAMARAJU:  Could we take that down and go back to

14  Government Exhibit 809 at page 7.

15  Q.  Now, is there a date listed on this page, sir?

16  A.  Yes.

17  Q.  What is it?

18  A.  Thursday, August 23.

19          MR. KAMARAJU:  All right.  Could we blow up the first

20  two sentences of the body.

21  Q.  Could you read those first two sentences, please?

22  A.  "Well, a lot has happened lately.  Yesterday I started

23  cleansing the phone and in the process set up a new ProtonMail,

24  which I transferred the WordPress to."

25          MR. KAMARAJU:  All right.  Could we blow up the rest

K2qWsch1

1    of the body, please.

2    Q.  Could you read the rest now?

3    A.  "I also noticed that no msgs were responded on WhatsApp, so

4    I asked my bro.  We went back and forth, but they decided for

5    me not to publish the articles -- well, rather, not to give me

6    my own fucking articles.  Isn't that incredible?  They fucked

7    up to begin with and published the wrong, old versions.  Then

8    they didn't publish the two most important parts, eight and

9    nine, and now they are withholding all of them."

10           MR. KAMARAJU:  Ms. Hurst, if we could zoom out again

11   and blow up the last line.

12   Q.  Could you read that?

13   A.  "Yesterday I started emailing Shane from the Washington

14   Post."

15   Q.  Now, do you remember testifying about a Washington Post

16   reporter writing a story about this case in May 2018?

17   A.  Yes, I do.

18   Q.  Who was that reporter?

19   A.  Shane Harris.

20           MR. KAMARAJU:  Ms. Hurst, could we bring up Government

21   Exhibit 822-2 at page 4.  Could we look at row 85.

22   Q.  Now, sir, what's the date and time of that search?

23   A.  August 22, 2018, 8:45 p.m. Eastern Time.

24   Q.  And is that the day before the entry we just looked at?

25   A.  Yes, it is.

K2qWsch1

1   Q.  And what's the search?

2   A.  "Shane Washington Post email."

3            MR. KAMARAJU:  Your Honor, may I approach?

4            THE COURT:  Yes.

5   Q.  I've handed you what's been marked for identification as

6   Government Exhibit 1303-1, which contains -- sorry.

7        I've handed you a disk containing Government Exhibits

8   1303-1 through 1303-70 and Government Exhibit 812.  Now, sir,

9   do you recognize that?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  This is a disk containing emails from that account.

13  Q.  From which accounts?

14  A.  All three ProtonMail accounts.

15  Q.  For the record, could you identify the ones that we're

16  talking about?

17  A.  Yes.  The Annon1204 account; the free Jason Bourne account,

18  and the presumed guilty ProtonMail account.

19  Q.  And how do you recognize those exhibits?

20  A.  I initialed this CD.

21           MR. KAMARAJU:  Your Honor, the government would offer

22  Government Exhibits 1303-1 through 1303-70 and Government

23  Exhibit 812.

24           MS. SHROFF:  Sure.  No objection, your Honor.

25           THE COURT:  They're received in evidence.

K2qWsch1

```
 1              (Government Exhibits 812 and 1303-1 through 1303-70
 2     received in evidence)
 3              MR. KAMARAJU:  Thank you, your Honor.
 4              Now, could we publish Government Exhibit 1303-6,
 5     please.  All right.
 6              Let's blow up the bottom email first.
 7     Q.  All right.  Now, what is this?
 8     A.  This is an email from the Annon1204 ProtonMail account.
 9     Q.  Could you read the top paragraph in the bottom email?
10     A.  "Shane, sorry to bother you with this request, but if you
11     could please forward the nine articles that Shane Presnall sent
12     you on behalf of Josh Schulte, we would greatly appreciate it.
13     Shane Presnall is under subpoena as they wrongly claim he
14     assisted Josh in violation of a protective order, so we don't
15     want to go to him for this request."
16     Q.  Do you know who Shane Presnall is?
17     A.  Yes, I do.
18     Q.  Who is Shane Presnall?
19     A.  He's the cousin of the defendant.
20     Q.  Now, could you read the second paragraph, please?
21     A.  "We are family and friends of Josh and are looking to
22     further post these articles and new ones that he has written.
23     The current ones on Facebook are old rough drafts, but we have
24     lost the newest versions that we believe were forwarded to you.
25     Thanks."
```

K2qWsch1

1          MR. KAMARAJU:  Now, could we pull up Government

2     Exhibits 812-412 and 413.

3     Q.  Are these some of the screenshots that Mr. Betances gave

4     you?

5     A.  Yes, they are.

6     Q.  Looking at the bottom of 412 and 413, are these the same

7     email as Government Exhibit 1303-6?

8     A.  Yes, they are the same.

9          MR. KAMARAJU:  Could we pull up Government Exhibit

10    809, pages 6 and 7, please.

11    Q.  All right.  Now, just remind us, next to the Annon1204

12    account there, what happens when you plug in that string into

13    that email account?

14    A.  You will successfully log on to that account.

15         MR. KAMARAJU:  We can take down page 6.  And we can

16    pull up the bottom email of 1303-6.

17    Q.  What's the date written at the top of page 7, Government

18    Exhibit 809?

19    A.  Thursday, August 23.

20    Q.  Could you read the last line on this page?

21    A.  "Yesterday I started emailing Shane from the Washington

22    Post."

23    Q.  And now on 1303-6, who is that email addressed to?

24    A.  Shane Harris.

25    Q.  And could you tell us the date on that email there?

K2qWsch1

1    A.  August 22, 2018.

2            MR. KAMARAJU:  Now, let's take a look at the top

3    email.

4    Q.  All right.  What's the date of this email?

5    A.  Thursday, August 23, 2018.

6    Q.  And who is it from?

7    A.  Shane Harris.

8    Q.  And which account was it sent to?

9    A.  The Annon1204 ProtonMail account.

10   Q.  And what's the subject line?

11   A.  "Re Schulte articles."

12   Q.  Could you read the email, please?

13   A.  "I'm sorry.  I don't know who you are and I'm not at

14   liberty to share with you anything that may have been shared

15   with me without direct permission.  Why do you feel this would

16   help Shane Presnall?"

17           MR. KAMARAJU:  Now could we pull up Government Exhibit

18   809 at page 8, please.  All right.  Could we blow up the top

19   section of the page.

20   Q.  All right.  Do you see where it says "Shane Harris or spoof

21   email"?

22   A.  Yes.

23           MR. KAMARAJU:  Actually, can we include one line below

24   it.  All right.

25   Q.  Do you recognize the telephone numbers written there?

K2qWsch1

1     A.  Yes, I do.

2     Q.  Whose numbers are those?

3     A.  The top number is Shane Presnall's phone number.

4     Q.  That's the 940 number?

5     A.  Correct.  And the number next to Shane Harris is Shane

6     Harris's phone number.

7     Q.  And that's the 202 phone number?

8     A.  Correct.

9     Q.  And how do you know that's Shane Harris's phone number?

10    A.  I believe it's publicly available.

11          MR. KAMARAJU:  OK.  Let's take a look at the body.

12    Q.  Could you read the part starting, "I'm hoping" through the

13    first redaction, please?

14    A.  "I'm hoping to write/edit my nine articles.  I don't know

15    how I can get them -- oh, I may text Shane Harris from Shane

16    Presnall's number.  Omar claims that some service exists to do

17    this.  I'm dubious."

18          MR. KAMARAJU:  All right.  Now can we zoom out,

19    please.

20          Can we blow up the part that says "secondly."

21    Q.  Can you read that sentence?

22    A.  "Secondly, I want to rewrite article No. 10, Malware of the

23    Mind."

24          MR. KAMARAJU:  All right.  Could we pull up Government

25    Exhibits 1301-4 and 825, please.

K2qWsch1

1    Q.  And just remind us, what's 1301-4?

2    A.  1301-4 is part of the search warrant return from

3    Automattic.

4    Q.  Do you see where it says "base blog URL"?

5    A.  Yes.

6    Q.  Is that the URL for the presumption of innocence blog?

7    A.  Yes, it is.

8    Q.  On 825, what's the URL there?

9    A.  Presumptionofinnocence.net.

10             MR. KAMARAJU:  We can take down 825 and put up page 2

11   of 1301-4.

12   Q.  Do you see where it says "title"?

13   A.  Yes.

14   Q.  What's listed there?

15   A.  "10.  Malware of the Mind."

16   Q.  And do you see where it says "link"?

17   A.  Yes.

18   Q.  What's listed there?

19   A.  The presumptionofinnocence.net site.

20   Q.  And do you see the pub date?

21   A.  Yes.

22   Q.  When was this post posted on the defendant's blog?

23   A.  August 25, 2018.

24   Q.  Now, do you see the content?

25   A.  Yes.

K2qWsch1

1   Q.  Could you read that, please?

2   A.  "Today, we are facing a stealth constitutional crisis.  A

3   malware of the mind has entered and corrupted the justice

4   system.  Technology has advanced so rapidly that the law and

5   law enforcement are decades behind and are unable to catch up.

6   Into this chasm, defendant, defense attorneys, judges and

7   juries are increasingly blindsided by the evolution of

8   innovative prosecutorial techniques based on faux forensics,

9   manipulation, and intentional misrepresentation, which are, in

10  turn, nothing more than long-shot theories and in some cases

11  blatant fabrications analogous to accusations of witchcraft and

12  wizardry."

13          MR. KAMARAJU:  Could we highlight the contents of that

14  section.

15          Sorry.  The next two lines.  Thank you, Ms. Hurst.

16  Q.  Could you just finish reading this section?

17  A.  "This final article is incomplete as it was written by

18  Mr. Schulte entirely from prison, and he is unable to get it

19  out."

20          MR. KAMARAJU:  Could we pull up Government Exhibit 809

21  at page 8 again.

22  Q.  And could you read where it says "secondly"?

23  A.  "Secondly, I want to rewrite article No. 10, Malware of the

24  Mind."

25          MR. KAMARAJU:  Could we put up Government Exhibit 801,

K2qWsch1

1    please and 1301-4 at 2.

2    Q.  Now, is the title listed on Government Exhibit 801 the same

3    title as the blog described on 1301-4 at 2?

4    A.  Pretty much.

5             MR. KAMARAJU:  Could we flip to the next page on

6    Government Exhibit 801.

7    Q.  Could you compare the first paragraph there to the content

8    in 1301-4-2?

9    A.  Yes.  They appear to be identical.

10            MR. KAMARAJU:  All right.  Now, if we could look at

11   page 3 of Government Exhibit 801.

12   Q.  Do you see the top paragraph there?

13   A.  Yes.

14            MR. KAMARAJU:  Could we blow up the last sentence.

15   Q.  And could you read that?

16   A.  "I can guarantee you that there are multiple encrypted

17   volumes on my server that the FBI never decrypted, or even

18   found."

19   Q.  All right.  Could you read the next paragraph, please?

20   A.  "Which brings me to my next point.  Do you know what my

21   specialty was at the CIA?  Do you know what I did for fun?

22   Data hiding and crypto.  I designed and wrote software to

23   conceal data in a custom-designed file system contained within

24   the drive slack space, or hidden partitions.  I disguised data.

25   I split data across files and file systems to conceal the

K2qWsch1

1    crypto.  Analysis tools would never detect random or

2    pseudorandom data indicative of potential crypto.  I designed

3    and wrote my own crypto.  How better to fool buffoons like

4    forensic examiners and the FBI than to have custom software

5    that doesn't fit into their two-week class where they become

6    forensic experts?  Make no mistake.  I am an expert in data

7    hiding and cryptography with thousands of hours of experience

8    and among the top specialists in the world, or was."

9            MR. KAMARAJU:  Could we bring up Government Exhibit

10   1303-8.  Could we go all the way to the bottom email, please.

11   Q.  Have we reviewed this email before?

12   A.  Yes.

13   Q.  Which email is this?

14   A.  This is the email from the Annon1204 account to Shane

15   Presnall.

16   Q.  OK.  The date is August 22?

17   A.  Yes.

18           MR. KAMARAJU:  Could we scroll up one more.

19   Q.  All right.  Do you recognize this email?

20   A.  Yes, I do.

21           MR. KAMARAJU:  Could we go up one more, please.

22   Q.  All right.  What's the date of this email?

23   A.  August 23, 2018.

24   Q.  And who sent it?

25   A.  The Annon1204 account.

K2qWsch1

1   Q.  All right.  Now, can you read the top snippet there that's

2   on the first page?

3   A.  "I can send snippets of text of the two articles, eight and

4   nine, that weren't released publicly to verify my identity with

5   access to Josh and Shane."

6   Q.  Can you keep reading on to the next section?

7   A.  "This will assist Shane as he is under intense scrutiny now

8   and cannot risk sending anything, so he gave me your contact to

9   retrieve the articles.  We have other information to share

10  regarding *reiderstvo*, Russian attacks on U.S. political and

11  judicial systems, articles with multiple sources, as well as

12  links between Putin and his oligarchs to Trump via Marc

13  Kasowitz -- emails, secure communications -- and examples of

14  other people targeted and arrested on behalf of the oligarchs

15  for financial reasons."

16          MR. KAMARAJU:  Could we pull up Government Exhibit 806

17  at page 4, please.  And can you blow up the right side of that.

18  Q.  All right.  Now, on Government Exhibit 1303-8, do you see

19  the sentence that says, "We have other information to share

20  regarding"?

21  A.  Yes.

22  Q.  OK.  Now, on Government Exhibit 806 -- I'm sorry.

23          MR. KAMARAJU:  Ms. Hurst, could we take a look at the

24  last page please.

25  Q.  What's the date listed there?

K2qWsch1

1   A.   7/14/18.

2   Q.   Is that before the email from the Annon1204 account?

3   A.   Yes, it is.

4           MR. KAMARAJU:   All right.   Now could we blow up the

5   right side of that page.

6   Q.   Could you read 1b on Government Exhibit 806?

7   A.   "Sell documents to make" dollar signs.

8   Q.   Could you read four?

9   A.   "If I were Russia, I would.

10      "a. attack judiciary.

11      "b. U.S. destroy itself."

12          MR. KAMARAJU:   Could we bring up Government Exhibit

13  1303-17, please.   Could we blow up the top.

14  Q.   What's the email account that sends this message?

15  A.   The Annon1204 ProtonMail account.

16  Q.   And what's the date?

17  A.   September 7, 2018.

18  Q.   Are there any attachments?

19  A.   Yes, there are.

20  Q.   What's the name of the attachment?

21  A.   Schulte_handwritten_ notes.pdf.

22  Q.   Could you read the body of the message?

23  A.   "Yo, you there?  Do you want to send me the Russia pieces

24  to email the reporter."

25          MR. KAMARAJU:   We can take that down.

K2qWsch1

1         Let's pull up Government Exhibit 1303-8 again, and if
2    we could go back to the email we were looking at.
3    Q.   Now, could you read the first sentence of the third
4    paragraph of this email?
5    A.   "I also have direct access to Josh that I can route
6    communication."
7         MR. KAMARAJU:  Please scroll up to the next email up.
8    Q.   All right.  Who sent this?
9    A.   Shane Harris.
10   Q.   And when did he send it?
11   A.   August 23.
12   Q.   Could you read the email, please?
13   A.   "I understand that you want to help him.  I would be a lot
14   more comfortable if Shane asked me directly to do this.  You
15   appear to be in contact with him, although I realize he doesn't
16   want to be the one to send you any information.  Can you have
17   him contact me to verify this is what he wants?  And please do
18   send over those snippets you mentioned.  Thank you."
19        MR. KAMARAJU:  All right.  Let's scroll up, please.
20   Now let's blow up the top there.
21   Q.   All right.  Who sent this?
22   A.   The Annon1204 account.
23   Q.   And what's the date?
24   A.   August 23.
25   Q.   All right.  Do you see at the top where it says, "They've

K2qWsch1

1    just confiscated Shane's laptop"?

2    A.   Yes.

3    Q.   Did the FBI ever obtain Shane Presnall's laptop?

4    A.   Yes, we did.

5    Q.   Have you reviewed the contents of that laptop?

6    A.   Yes, we did.

7    Q.   Did you find anything relevant to the investigation?

8    A.   Yes.

9    Q.   What did you find; can you give us some examples?

10   A.   We found articles that were written by the defendant.

11   Q.   Do you see the last sentence of this paragraph that starts

12   with "the purpose"?

13   A.   Yes.

14   Q.   Could you read that?

15   A.   "The purpose of the articles was always to publish them,

16   and Schulte has arranged WordPress sites where he will be

17   directing posts soon, considering his one-year anniversary

18   since arrest."

19   Q.   Now, do you recognize either of the links listed there?

20   A.   Yes.

21   Q.   Which one?

22   A.   The presumptionofinnocence.net.

23   Q.   All right.  Now, looking at the next paragraph, could you

24   read that, please?

25   A.   "We just need nine articles.  We have pieces of the tenth

1    and last to finalize the site, but since Shane Presnall is

2    under intense pressure -- and all for what?  It's incredible

3    how they are targeting all his family -- I'm hopeful you can

4    help complete" this -- excuse me, "complete his and Schulte's

5    goals for publication, even though a lot of it has already been

6    posted."

7    Q.  Now, in the first paragraph, do you see where there's a

8    sentence that starts, "The FBI actually raided an attorney

9    Schulte was conferring in Texas"?

10   A.  Yes.

11   Q.  Now, are you one of the case agents in this investigation?

12   A.  Yes.

13   Q.  Are you aware of any instance in which the FBI raided an

14   attorney's office in connection with this case?

15   A.  No.  That never happened.

16   Q.  Are you aware of any occasion on which the FBI visited the

17   defendant's parents' house?

18   A.  Yes.

19   Q.  How many agents visited the defendant's parents' house?

20   A.  Two.

21   Q.  How many agents -- are you aware of any instance in which

22   the FBI visited an attorney in Texas's office?

23   A.  No.

24   Q.  Now, looking down, do you see where it says, "Snippets

25   below"?

K2qWsch1

1    A.  Yes.

2    Q.  All right.  Do you see where it says, "My case involves

3    WikiLeaks and the Vault 7/8 release"?

4    A.  Yes.

5            MR. KAMARAJU:  Can we bring up Government Exhibit

6    820-419.

7    Q.  Do you see at the top of 419; what's it say there?

8    A.  "Presumption of innocence:  Origins."

9    Q.  What's the next sentence?

10   A.  "My case involves WikiLeaks and the Vault 7/8 release."

11   Q.  And remind us, was this one of the screenshots that you got

12   from Mr. Betances?

13   A.  Yes.

14           MR. KAMARAJU:  We can pull that down.

15           Scroll down, please.

16   Q.  All right.  Do you see the sentence that says, "Finally"?

17   A.  Yes.

18   Q.  Could you read that?

19   A.  "Finally, I think I can set up a direct line over Signal

20   with Schulte in the coming days or weeks if you'd be

21   interested."

22           MR. KAMARAJU:  Could we pull up Government Exhibit

23   820-434.

24   Q.  Do you know what Signal is?

25   A.  Yes, I do.

K2qWsch1

1    Q.  Do you see a Signal icon on Government Exhibit 820-434?

2    A.  Yes.

3    Q.  What's Signal?

4    A.  Signal is an encrypted messaging app.

5            MR. KAMARAJU:  Can we go to the top of Government

6    Exhibit 1303-8, the top email, please.

7    Q.  All right.  Who sent this?

8    A.  Shane Harris.

9    Q.  And to whom was it sent?

10   A.  Annon1204.

11   Q.  And what's the date of the email?

12   A.  August 28, 2018.

13   Q.  Could you read it, please?

14   A.  "You clearly know a lot about Josh's case, including things

15   that haven't been made public.  I hope you understand that my

16   only hesitation here is that I don't know you, and I'm not in a

17   position to do something for which I don't have explicit

18   permission.  If there were a way for Shane to contact me,

19   things could probably be resolved quickly."

20           MR. KAMARAJU:  Could we pull up 809 again at page 8.

21           All right.  Let's just blow up quickly the top

22   paragraph.

23   Q.  All right.  Could you just read the first two sentences

24   there?

25   A.  "I'm hoping to write/edit my nine articles.  I don't know

K2qWsch1

1    how I can get them -- oh, I may text Shane Harris from Shane

2    Presnall's number."

3              MR. KAMARAJU:  Can we zoom out.

4    Q.  And do you see a line drawn near the bottom of the page?

5    A.  Yes.

6              MR. KAMARAJU:  Could we blow that section up, please.

7    Q.  What's the word written at the top?

8    A.  "Anonymous."

9    Q.  And do you see below where it says, "Classified

10   information"?

11   A.  Yes.

12   Q.  Could you read the information above that?

13   A.  "Attila, Turkey, U.S.G. acknowledges coup attempt."

14   Q.  Do you see where it says, "Reality winner"?

15   A.  Yes.

16   Q.  Could you read below that?

17   A.  "Tool from vendor report, Bartender for vendor."

18             MR. KAMARAJU:  Could we pull up Government Exhibit

19   1303-10.  All right.  Let's start at page 2.

20   Q.  Was this the email that we were looking at?

21   A.  Yes.

22             MR. KAMARAJU:  All right.  Let's move up to the next

23   email in the chain.

24   Q.  All right.  Could you read the first two lines, please?

25   A.  "Separate from your request about Josh -- and I do believe

K2qWsch1

1   you want to help him -- the other information that you claim to

2   know about could be in the public interest."

3       Continue?

4   Q.  Go ahead.

5   A.  "If it's as important as you say, I hope you'd be willing

6   to talk to me about it, because we at the Post have been the

7   leaders on the Trump-Russia story and are the best positioned

8   to evaluate what you know and possibly publish something about

9   it."

10          MR. KAMARAJU:  Could we pull up Government Exhibit

11  809-14.

12  Q.  Is there a date on this page?

13  A.  Yes.

14  Q.  What's the date?

15  A.  September 2, 2018.

16          MR. KAMARAJU:  And could we blow up the body.

17  Q.  Could you read it, please?

18  A.  "Well, it's September now.  Locked in all day.  Hopefully

19  tonight I can set up Signal from my cell and message Harris to

20  confirm Annon's permission and get my fucking articles.  I also

21  need to confirm my Twitter."

22          (Continued on next page)

23

24

25

1    Q.  Can we publish Government Exhibit 822-1, please.

2            What is 822-1?

3    A.  These are the Signal messages that were extracted from the

4    Samsung phone.

5    Q.  Can we scroll over to column W, please.

6            What time was this message sent?

7    A.  At 22:35 on September 2, 2018.

8    Q.  Let's take a look at column U.  Do you see the 806 number?

9    A.  Yes, I do.

10   Q.  Do you recognize that number?

11   A.  Yes.

12   Q.  Whose number is that?

13   A.  That is the defendant's phone number.

14   Q.  How do you know that?

15   A.  I've seen it in various legal returns.

16   Q.  Can we take a look at column Q.  Whose number is this?

17   A.  That's Shane Harris's number.

18   Q.  Let's keep moving.  Do you see the section on this, the

19   column titled "content"?

20   A.  Yes.

21   Q.  Could you read what's in this content section.

22   A.  "Hi.  I got your number from Shane P.  I'm messaging from

23   Josh's phone.  I'm hoping to validate anonymous' legitimacy

24   helping our family and authorize release of Josh's articles to

25   them when you get the chance.  This group is apparently some

1    computer group Josh was part of before and they have agreed to

2    switch from NYT to talk to you instead to help us.  They claim

3    to have sent NYT some info on Russia and oligarchs already, but

4    will give you more info.  So far they have been trustworthy and

5    helpful for us.  We have never met any of them though."

6    Q.  Could we scroll down to rows eight and nine.  Let's move

7    over to column U.

8                So who sent these two messages?

9    A.  Shane Harris.

10   Q.  And column Q, who did he send them to?

11   A.  The defendant.

12   Q.  And column W, what's the date?

13   A.  September 7, 2018.

14   Q.  If we take a look at the content.  Could you read the

15   content there.

16   A.  "Hi.  Thanks for getting in touch.  I appreciate it.  Can

17   you tell me which family member this is?  Can you tell me your

18   name or your particular relationship to Josh?"

19   Q.  Can we move down.  Now for this message let's take a look

20   at column W.  When was it sent?

21   A.  September 7, 2018.

22   Q.  Who sent it?

23   A.  The defendant.

24   Q.  Who did he send it to?

25   A.  Shane Harris.

1   Q.  Can we move over to read the content of this.

2   A.  "Hi, sorry we don't check this phone very often.  This is

3   his brother Derek.  My parents have his cell here at their home

4   in Lubbock.  We can message from his number and e-mail from his

5   e-mail."

6   Q.  Remind us, these Signal messages, where were they found?

7   A.  They were found on the Samsung phone.

8   Q.  Where was that Samsung phone recovered?

9   A.  The MCC.

10  Q.  Let's look at row 13.  If we can scroll over to column W.

11  When was the message sent?

12  A.  September 7.

13  Q.  Who sent it?

14  A.  Shane Harris.

15  Q.  Who did he send it to?

16  A.  The defendant.

17  Q.  Let's take a look at the content.

18  A.  "I do know this is his number.  I have to tell you though

19  that I spoke to Roger a week or so ago and he advised me

20  against sharing any information.  So is he now on board with

21  this?"

22  Q.  Do you know if the defendant has any relatives named Roger?

23  A.  Yes, I do.

24  Q.  Who?

25  A.  His father.

1   Q.  Can we look at rows 14 and 17 together.  What day was these

2   messages sent?

3   A.  September 7.

4   Q.  Looking at column U, who sent them?

5   A.  The defendant.

6   Q.  And who received them?

7   A.  Shane Harris.

8   Q.  If we can look at content, please.

9   A.  "He is against posting articles 9 and 10, which Josh wants

10  to post, but he's fine with giving the info to the anonymous

11  group to review as well as Josh's lawyer.  Once Josh has edited

12  it and lawyer approves it they will post.  I guess you would

13  feel more comfortable with my dad giving his direct approval?

14  We don't mean to distract you or waste your time much with

15  this."

16  Q.  Let's take a look at row 18.  So when was this sent?

17  A.  September 7.

18  Q.  From who?

19  A.  Shane Harris.

20  Q.  Who was it sent to?

21  A.  The defendant.

22  Q.  Can we look at the content, please.

23  A.  "I would feel more comfortable if I heard from Roger

24  directly, yes.  And I know you don't mean to distract me.  I

25  appreciate that.  It's not a distraction.  I just want to

1   ensure that I'm maintaining my commitment to my sources.  If

2   Roger could call me that would get us over the hurdle."

3   Q.  Could we publish Government Exhibit 812, please.  Let's go

4   to the bottom of page one.

5           What's the date of this e-mail?

6   A.  September 22, 2018.

7   Q.  Who sent it?

8   A.  The Annon1204@protonmail account.

9   Q.  Who is it addressed to?

10  A.  Shane.

11  Q.  Who is this e-mail sent to?

12  A.  Shane Harris.

13  Q.  Let's take a look at the second sentence.  Do you see that

14  where it says "The FBI raided Josh's parents' house last week"?

15  A.  Yes.

16  Q.  Are you aware of any raid by the FBI of the parents' house?

17  A.  No, I'm not.

18  Q.  Next do you see the line that says "I am attaching the

19  search warrants"?

20  A.  Yes.

21  Q.  Could you read that.

22  A.  "I'm attaching the search warrants in Josh Schulte's case

23  along with his notes."

24  Q.  Let's take a look at page 15.  What's this?

25  A.  This is a search warrant affidavit.

1  Q.  What case was it in?

2  A.  This case.

3  Q.  Do you see a name listed at the top there?

4  A.  Yes, I do.

5  Q.  Who is that?

6  A.  Jeff D. Donaldson.  He's the other case agent.

7  Q.  Do you see at the bottom where it says "USG-confidential"?

8  A.  Yes.

9  Q.  Could we bring up Government Exhibit 828 alongside.

10      Remind us, what's Government Exhibit 828?

11  A.  This was a protective order.

12  Q.  Which case was this entered in?

13  A.  This case.

14  Q.  Can we go to page two, please.  And could you read

15  paragraph two.

16  A.  "The government will mark all items subject to this

17  protective order as USG-confidential."

18  Q.  Can we look at paragraph three, please.  Could you read the

19  first sentence there.

20  A.  "The protected materials and the information and identities

21  contained or disclosed therein."

22  Q.  Then could you read 3C.

23  A.  "May be disclosed only by defense counsel and only to the

24  following persons in connection with this action hereinafter

25  designated persons."

K2Q3SCH2                    Schlessinger - Direct

1  Q.  Looking at the list of designated persons, do you see

2  reporters anywhere on that list?

3  A.  No, I don't.

4  Q.  Can we pull down Government Exhibit 828 and pull up

5  Government Exhibit 829.

6          What's Government Exhibit 829?

7  A.  This is a transcript of a status conference.

8  Q.  Did this status conference occur before the e-mail that we

9  saw in Government Exhibit 812?

10  A.  Yes, it did.

11  Q.  Can we turn to page seven of 829, please.  Do you see where

12  the Court says "it contains various provisions"?

13  A.  Yes.

14  Q.  Could you read that paragraph.

15  A.  "It contains various provisions, including that the

16  material marked USG-confidential shall be used by the defendant

17  and his counsel only for purposes of this action.  It is not to

18  be disseminated to third parties, which apparently it was

19  disseminated to third parties."

20  Q.  Now can we look at page eight.  Do you see where the Court

21  asks Mr. Schulte, "Do you understand, yes?"

22  A.  Yes.

23  Q.  How does the defendant respond?

24  A.  "I do now."

25  Q.  We can put 829 away.  Can we go back up to page two of

1    Government Exhibit 812, please.

2              Could you read the last paragraph, please.

3    A.   "Let us know how much you are interested in the tech

4    components and Josh's case.  We have lots of his writings and

5    planned pro se motions and other info on his case, but most of

6    it is highly technical (including an expert report he did for

7    another inmate that will rock the tech world as it unveils

8    incredible FBI incompetence.)  We aren't sure how much of this

9    is of interest to you and the Post or if it's better off in

10   Wired or something?  Let us know if that's the case and we can

11   start to divert those aspects elsewhere."

12   Q.   Do you know what Wired is?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's a tech magazine, publication.

16   Q.   Can we bring up Government Exhibit 801 at page two, please.

17   Could you read the first sentence of the second paragraph.

18   A.   "To my fellow engineers and the tech industry.  The United

19   States of America has corrupted and perverted our creations to

20   serve their own manipulative purposes."

21   Q.   We can go back to Government Exhibit 812.  Let's look at

22   page two.  Could you read the top paragraph.

23   A.   "Attached are two of the search warrant applications in

24   Josh Schulte's case along with private notes Josh wrote

25   regarding the first warrant (couldn't attach due to size

K2Q3SCH2                        Schlessinger - Direct

1   limits, sent here.)"

2   Q.  Let's take a look at page three, now.  Blow up the top.  Do

3   you see at the top where it says "probable cause"?

4   A.  Yes.

5   Q.  Did you see a date there?

6   A.  Yes.

7   Q.  What's the date listed?

8   A.  September 10, 2018.

9   Q.  The search warrant affidavit that's attached to this

10  e-mail, does it have a probable cause section?

11  A.  Yes, it does.

12  Q.  Is that section of the search warrant numbered?

13  A.  Yes, I believe so.

14  Q.  Do the numbers that are listed in these notes roughly

15  correspond to that?

16  A.  Yes, they do.

17  Q.  Let's look at what's on the page as numbered eight.  Do you

18  see where it says "in reality"?

19  A.  Yes.

20  Q.  Could you read that sentence, those two sentences.

21  A.  "In reality, two groups, EDG and COG, and at least 400

22  people had access.  They don't include COG who was connected to

23  our DevLAN through Hickok, an intermediary network that connect

24  both COG and EDG."

25  Q.  Could you pull up Government Exhibit 1251, please.  Sir,

1    could you draw a circle around Hickok.

2             Could you draw a circle around the Altabackups.

3             Could we go back on 812 and look at page four.

4             Do you see where it says II A 8 C?

5    A.  Yes.

6    Q.  And where it says, "False.  Even if stolen backup file was

7    accurate"?

8    A.  Yes.

9    Q.  Could you read that.

10   A.  "False.  Even if stolen backup file was accurate, this

11   argument is still false.  The time stamp sets only a lower

12   bound on when data was stolen, not an upper bound.  Data could

13   have been stolen and transmitted literally any day after 3/7

14   since backup files are retained and kept for months.  So as a

15   very simple counterexample, someone could grab the 3/7 backup

16   file in July.  In fact, this is the most probable action as it

17   obfuscates the day the data was stolen."

18   Q.  Can we go to page 10.  Do you see the sentence at the top

19   that starts "in fact."

20   A.  Yes.

21   Q.  Could you read that.

22   A.  "In fact, in all actuality, the date of the backup is

23   almost certainly not the date the data was stolen as any

24   intelligent person would try to obfuscate the day the data was

25   stolen."

1    Q.  Can we pull up Government Exhibit 1207-27 and 1207-30,

2    please.

3            On 27, do you see a backup file listed for March 3,

4    2016?

5    A.  Yes.

6    Q.  And what's the date accessed for that file?

7    A.  4/20/2016.

8    Q.  Is 4/20/2016 after March 3, 2016?

9    A.  Yes, it is.

10   Q.  On Government Exhibit 1207-30, do you see a backup file for

11   March 3, 2016?

12   A.  Yes.

13   Q.  What's the date accessed there?

14   A.  4/20/2016.

15           MR. KAMARAJU:  Ms. Hurst, can we pull up Government

16   Exhibit 809 at page nine, please.

17   Q.  Do you see where it says FreeJasonBourne@protonmail.com?

18   A.  Yes.

19   Q.  Was that one of the accounts you were able to access?

20   A.  Yes, it was.

21   Q.  Below that, do you see where it says Twitter?

22   A.  Yes.

23   Q.  What's written next to that?

24   A.  Free Jason Bourne.

25   Q.  Can we pull up Government Exhibit 3002, the stipulation

1    between the parties and turn to page three.  Could you read

2    that, please.

3    A.   "If called as a witness, a representative of Twitter, Inc.

4    ("Twitter") with knowledge of the matter would testify that GX

5    1304-1 through 1304-3 are true and correct copies of documents

6    from the Twitter account @FreeJasonBourne and which were made

7    at or near the time by, or from information transmitted by, a

8    person with knowledge of the matters set forth in the records;

9    they were kept in the course of a regularly conducted business

10   activity; and it was the regular practice of that business

11   activity to maintain the records."

12   Q.   Could we bring up Government Exhibit 1304-1, please.  What

13   are we looking at here?

14   A.   This is part of the search warrant return we received from

15   Twitter.

16   Q.   What's the screen name?

17   A.   Free Jason Bourne.

18   Q.   What's the creation date for that account?

19   A.   September 1st, 2018.

20   Q.   What's the e-mail address listed?

21   A.   FreeJasonBourne@protonmail.com.

22   Q.   Do you know who Jason Bourne is?

23   A.   Yes.

24   Q.   Who is Jason Bourne?

25   A.   Jason Bourne is a fictional CIA operative that is featured

K2Q3SCH2                          Schlessinger - Direct

1    in the Jason Bourne movies.

2    Q.  Let's pull up Government Exhibit 1304-2.  Let's blow it up,

3    please.

4           What's this?

5    A.  This is also part of the search warrant return from

6    Twitter.  This was used as the header image on the Twitter

7    account.

8    Q.  What's the name listed there?

9    A.  Jason Bourne.

10   Q.  Do you recognize the man in the picture?

11   A.  Yes, I do.

12   Q.  Who is that?

13   A.  That's Matt Damon.

14   Q.  Who played Jason Bourne in the movies?

15   A.  Matt Damon.

16   Q.  Can we pull up Government Exhibit 1303-47.  Actually, I'm

17   sorry.  Let's go to 44.  What's the date of this e-mail?

18   A.  September 1st, 2018.

19   Q.  Who is it from?

20   A.  Twitter.

21   Q.  What account was it sent to?

22   A.  The Free Jason Bourne ProtonMail account.

23   Q.  Could you read the part that starts "we noticed a recent

24   login"?

25   A.  "We noticed a recent login for your account

K2Q3SCH2                        Schlessinger – Direct

1    @FreeJasonBourne.  Device Chrome on Android, location Moldova."

2    Q.  On September 1st, 2018, was the defendant being housed in

3    the MCC?

4    A.  Yes, he was.

5    Q.  Is the MCC in Moldova?

6    A.  No, it isn't.

7    Q.  Can we publish Government Exhibit 820-434, please.

8            Do you see where it says Turbo VPN?

9    A.  Yes, I do.

10   Q.  Do you know what Turbo VPN is?

11   A.  Yes.

12   Q.  What does Turbo VPN do?

13   A.  So VPN stands for virtual private network.  It describes a

14   general networking concept.  It has a wide range of uses.  One

15   use is to disguise your location.  And Turbo VPN is an app that

16   provides that service.

17   Q.  Do you see Orbot and Orfox?

18   A.  Yes.

19   Q.  What are those?

20   A.  Those provide similar services.

21   Q.  Let's pull up Government Exhibit 1303-48.  What's the date

22   of this?

23   A.  September 2, 2018.

24   Q.  Who sent it?

25   A.  Twitter.

K2Q3SCH2                          Schlessinger - Direct

1   Q.  And who is it sent to?

2   A.  The Free Jason Bourne ProtonMail account.

3   Q.  Again, could you read that language we noticed.

4   A.  "We notice a recent login for your account

5   @FreeJasonBourne.  Device Android, location Toulouse, France."

6   Q.  Was the defendant housed at the MCC on September 2?

7   A.  Yes, he was.

8   Q.  Let's pull up Government Exhibit 1303-49 and 48.

9           What's the date and time of Government Exhibit

10  1303-49?

11  A.  September 2, 2018, 8:07 p.m.

12  Q.  Do you see where it say "we noticed"?

13  A.  Yes.

14  Q.  Could you read that.

15  A.  "We noticed a recent login for your account

16  @FreeJasonBourne, device Chrome on Android, location Bucharest,

17  Romania.

18  Q.  What's the length of time between the e-mails in Government

19  Exhibit 1303-48 and 49?

20  A.  Approximately 15 minutes.

21  Q.  Are Bucharest and Toulouse in the same country?

22  A.  No, they're not.

23  Q.  Can you get from Bucharest to Toulouse in 15 minutes?

24  A.  Not that I know of.

25  Q.  Let's publish Government Exhibit 1303-47.  What's the date

K2Q3SCH2                         Schlessinger - Direct

1   here?

2   A.   September 1st, 2018.

3   Q.   Who sent this e-mail?

4   A.   Twitter.

5   Q.   To what e-mail account was it sent?

6   A.   FreeJasonBourne@protonmail.com.

7   Q.   Could you read what it says after "final step."

8   A.   "Confirm your e-mail address to complete your Twitter

9   account @FreeJasonBourne.  It's easy, just click the button

10  below."

11  Q.   Can we pull up Government Exhibit 809 at page 14.  And

12  actually can we also have 1303-47.

13          What's the date on 1303-47?

14  A.   September 1st, 2018.

15  Q.   What's the date on page 14 of Government Exhibit 809?

16  A.   September 2, 2018.

17  Q.   Could you read the last sentence in the top paragraph

18  there.

19  A.   "I also need to confirm my Twitter."

20  Q.   Let's take a look at the next page of Government Exhibit

21  809.  What's the date listed on this page?

22  A.   9/12.

23  Q.   Looking at the bottom, can we blow that up, please.  Could

24  you read what's listed there.

25  A.   "Finalize copy by Friday.  Edit during weekend, Sat, Sun,

1   finalize.  Monday 17th to Tuesday the 18th.  DL disc UL WL.

2   19, 20, 21.  Schedule tweets, 27th.  Send tech reports MCC

3   letter.  Russia pieces.  Rest 22-25."

4   Q.  Can we pull up Government Exhibit 822-7.  Sorry.  822-2 at

5   page seven.  Blow up row 180, please.

6           What's the date and time of this search?

7   A.  August 26, 2018.  12:27 a.m. Eastern time.

8   Q.  What was searched for?

9   A.  "Send WikiLeaks message."

10  Q.  Let's take a look at the next page of Government Exhibit

11  809.  What's the date here?

12  A.  9/17.

13  Q.  Do you see the paragraph that starts "I posted the FB"?

14  A.  Yes.

15  Q.  Could you read that.

16  A.  "I posted the FB thing on the John Galt page and changed

17  the PW.  We'll see what happens.  Maybe a little interest?  In

18  a week I'm going to dump all my stuff."

19  Q.  What's the date that's a week after September 17, 2018?

20  A.  September 24, 2018.

21  Q.  Can we publish Government Exhibit 1301-3.

22          Remind us, what's this?

23  A.  This is the search warrant return from Automattic.

24  Q.  Let's take a look at the bottom seven entries there.  Do

25  you see those?

1   A.  Yes.

2   Q.  What's the date of all of those entries?

3   A.  September 24, 2018.

4   Q.  What's the event for all of those entries?

5   A.  Trash_post.

6   Q.  What's listed in the note for all those entries?

7   A.  "Various pages of the presumption of innocence.net."

8   Q.  Can we take a look at Government Exhibit 809 at 16.  Could

9   you read the last paragraph.

10  A.  "My articles I'm working through with Joel.  He edited

11  articles one and two.  Hopefully I can perfect them soon.

12  Ideally for release on the 25th but maybe not?"

13          MR. KAMARAJU:  Can we show the witness and the parties

14  and the Court Government Exhibit 824.

15          I think there is no objection.  The government would

16  ask to admit Government Exhibit 824.

17          THE COURT:  Any objection, Ms. Shroff?

18          MS. SHROFF:  No, your Honor, none.

19          THE COURT:  They are admitted.

20          (Government's Exhibit 824 received in evidence)

21          MR. KAMARAJU:  If we can publish that.

22  Q.  What are we looking at?

23  A.  This is the John Galt Facebook page.

24  Q.  Do you see the section "posts"?

25  A.  Yes.

K2Q3SCH2                        Schlessinger - Direct

1    Q.  Can we blow that up.  What's the date of that?

2    A.  September 25, 2018.

3    Q.  Does September 25 have any relevance in the defendant's

4    life?

5    A.  Yes, it does.

6    Q.  What's that?

7    A.  It's his birthday.

8    Q.  Does September 25 have any independent significance to the

9    investigation?

10   A.  Yes, it does.

11   Q.  What's the significance of September 25, 2018?

12   A.  On that date we met with Carlos Betances and he provided us

13   the information regarding the Samsung phone.

14   Q.  Do you see the sentence that starts "what's up next"?

15   A.  Yes.

16   Q.  Could you read that.

17   A.  "What's next?  Set up of Twitter and tweets via snail mail

18   to Twitter?"

19   Q.  Could you publish Government Exhibit 1303-50.  What's this?

20   A.  This is an e-mail from Buffer.

21   Q.  What's Buffer?

22   A.  Buffer is an app for your phone that allows you to organize

23   and manage your social media accounts, and it also provides a

24   scheduling service to schedule tweets or posts in advance.

25   Q.  When you say posts, what kind of posts are you talking

K2Q3SCH2                    Schlessinger - Direct

1   about?

2   A.  It could be posts on Facebook or tweets on Twitter.

3   Q.  Can you also schedule WordPress posts?

4   A.  WordPress you can schedule through the WordPress site

5   itself.

6   Q.  What's the date of this?

7   A.  September 2, 2018.

8          MR. KAMARAJU:  Can we publish Government Exhibit 822-2

9   at page eight, and blow up row 217.

10  Q.  What's the date and time of this?

11  A.  September 2, 2018, 7:43 p.m. Eastern time.

12  Q.  What is searched for?

13  A.  TweetDeck.

14  Q.  What's TweetDeck?

15  A.  TweetDeck is a similar application, allows you to schedule

16  tweets for Twitter.

17  Q.  Can we pull up Government Exhibit 809 at page 15, first.

18  And do you see the line that starts "19, 20"?

19  A.  Yes.

20  Q.  Could you read that.

21  A.  "19, 20, 21, schedule tweets 27th.  Send tech reports MCC

22  letter."

23  Q.  Now, can we go to page nine, please.  You see where it says

24  "Twitter-Free Jason Bourne"?

25  A.  Yes.

K2Q3SCH2                        Schlessinger – Direct

1   Q.  Do you see the first line under that looks, like it says

2   the bracket @Dept of Justice?

3   A.  Yes.

4   Q.  On Twitter, when you use the @ symbol, what does that mean?

5   A.  It identifies a specific user.

6   Q.  Could you read that first paragraph, please.

7   A.  "The @Department of Justice arrested the wrong man for

8   Vault 7.  I personally know exactly what happened as do many

9   others.  Why are they covering it up?  Meet the CIA's struck X.

10  Jeremy Weber and Karen at the CIA set up Joshua Schulte, Jeremy

11  Weber hacked Atlassian's Crowd and when Schulte, the admin,

12  found out, Karen issued him a memo/letter of warning for

13  self-granting admin privileges.  The system administrator.

14  Self-granting admin privileges.  Hmm.  Right over the FBI's

15  head too.  Or was it?"

16  Q.  Can we look to the next page, please.  Just blow up the top

17  there.  Could you start reading from that section.

18  A.  "Just to authenticate me first.  The @CIA was involved in

19  the code for the initially planned cyber operation is on

20  Vault 7.  Additionally, tool described in vendor report is in

21  fact Bartender.  A CIA tool set for operators to configure for

22  deployment."

23  Q.  We can zoom back out.  Let's keep reading.  Could you

24  scroll to the top of the page there at the top right.

25          Now, are you familiar with the hashtag marking there?

1   A.  Yes, I am.

2   Q.  On Twitter, when you use the hashtag mark, what does that

3   mean?

4   A.  It indexes a particular topic or theme.  It is a way of

5   categorizing certain tweets.

6   Q.  Could you read what's written there.

7   A.  "#top secret #fuck your top secret."

8   Q.  You could keep going.

9   A.  "Or dump the secrets here."

10  Q.  If we can zoom out and blow up that first paragraph, from

11  the top of the page.  Could you read that.

12  A.  "Let me first authenticate" slashed through "establish

13  credibility myself.  The USG was involved in the source code

14  for the planned cyber espionage component is in the Vault 7

15  release."

16  Q.  Let's go on to the next paragraph.

17  A.  "The @CIA conducted numerous operations against and source

18  code is available in the Vault 7 release."

19  Q.  Let's move on to the next paragraph.

20  A.  "At vendor discovered tool in 2016, which is really the

21  CIA's Bartender tool suite.  Bartender was written to deploy

22  against various targets.  This source code is available in the

23  Vault 7 release."

24  Q.  Let's look at the last paragraph there.

25  A.  "Vault 7 contains numerous zero days and malware that could

1   easily be deployed, repurposed, and released on to the world in

2   a devastating fashion that would make NotPetya look like

3   child's play."

4   Q.  Do you know what NotPetya is?

5   A.  Yes, generally.

6   Q.  What is it?

7   A.  It is a version of Russian malware.

8   Q.  Let's look at the next page.  Do you see the paragraph that

9   starts "The @Department of Justice"?

10  A.  Yes.

11  Q.  Could you read that paragraph.

12  A.  "The @Department of Justice arrested the wrong man for

13  Vault 7.  I personally know exactly what happened as do many

14  others -- why are they covering it up."

15  Q.  Let's go to the last page, please.  Could you read the top

16  paragraph.

17  A.  "Your service, intense security investigations and pristine

18  criminal history can't even get you bail.  As Josh Schulte has

19  said, you are denied a presumption of innocence.  Ironic, you

20  do your country's dirty work but when your country accuses you

21  of a crime, you are arrested and presumed guilty.  Until your

22  country protects you and honors your service, send all your

23  government's secrets here.  WikiLeaks."

24          MR. KAMARAJU:  No further questions at this time, your

25  Honor.

K2Q3SCH2                    Schlessinger – Direct

1          THE COURT:  We'll take our morning recess.  We'll

2   resume at 20 after 11.

3               (Jury excused)

4               (Continued on next page)

K2Q3SCH2

1          THE COURT:  We also have a request -- please be

2    seated.  A letter from Mr. Schulte's team dealing with the

3    documents that were produced late at the time of Michael's

4    testimony on the stand.

5          I read the letter this morning.  Does the government

6    want to respond?

7          MR. KAMARAJU:  We would like an opportunity, your

8    Honor.

9          THE COURT:  When will you respond?

10          MR. KAMARAJU:  If we can try to respond by the end of

11    the day or tomorrow morning.

12          THE COURT:  That would be fine.

13          MR. KAMARAJU:  Thank you.

14          THE COURT:  Yes, Ms. Shroff.

15          MS. SHROFF:  Your Honor, I have just a matter to raise

16    about the testimony that was elicited on direct.  But may I ask

17    the witness to step out?

18          THE COURT:  Yes.  Step down, Mr. Schlessinger.

19          (Witness not present)

20          THE COURT:  All right.

21          MS. SHROFF:  Your Honor, the government elicited

22    evidence about a gentleman named Dan Hurley on direct

23    testimony.  Dan Hurley was a lawyer or is a lawyer in Lubbock,

24    Texas, that I believe Mr. Schulte's family was consulting with

25    during the time that Mr. Schulte -- how should I say it -- was

1    not quite happy about my being on trial on another case.  And

2    his family was trying to see if they should retain a lawyer.

3              At that time, Mr. Schulte had written a pro se bail

4    application, which as the Court is aware, the bail application

5    was given to the Court.  Unfortunately, it was put on ECF for a

6    minute, not by Mr. Schulte.  Immediately taken down.  But, a

7    copy of that bail application was in fact given to Mr. Hurley.

8              Now, I know how Mr. Hurley got that bail application.

9    I received several calls from Mr. Hurley when the government's

10   representatives -- I don't know if it was the FBI or who --

11   tried to get the document back.  I have knowledge that the

12   testimony from Special Agent Schlessinger is not fully

13   accurate.  I'm not calling him a liar at all.  I am just saying

14   that is -- it's not accurate, at least from my conversations

15   with Mr. Hurley.

16             Now, either this makes me a witness, makes Mr. Hurley

17   a witness.  At the very least, I would have to cross-examine

18   him with personal knowledge of the facts.

19             I also tell the Court now that I believe the court

20   information security officers have information about all of the

21   steps that the CIA insisted be taken to get that bail

22   application back from a lawyer's office.

23             So, I think I need a little bit more of a longer

24   break.  I don't know if the Court wants to talk to the CISO.

25   But, all of this is something that I'm just really not sure

K2Q3SCH2

1    what to do with on cross.

2            The second point is that the government also elicited

3    facts to the effect that Mr. Schulte's parents' house was not

4    raided.  It was in fact raided.  People did show up, demanded

5    that they give documents back.  People showed up at our office

6    and demanded documents were given back.  People insisted that

7    we delete the bail application in its entirety from every one

8    of our e-mails, files, and remove all of those documents.

9            So, if a person is writing these things down in a

10   notebook, and uses the word "raided" to talk about FBI agents

11   or CISOs showing up at their doorstep, that's not inaccurate.

12           So, I'm not sure where to go with this Dan Hurley

13   thing.  But I did want to point out to the Court that we had

14   not anticipated that being part of this testimony.  But,

15   essentially, I do have personal knowledge about how Mr. Hurley

16   reacted because he called me.  I'm the one he called.

17           THE COURT:  Mr. Kamaraju.

18           MR. KAMARAJU:  The question was simply whether there

19   was an FBI raid.  I asked the FBI witness if there was a raid

20   of an attorney's office.  He said no.  To the extent Ms. Shroff

21   wants on cross-examination to elicit all of the things she

22   thinks supports Mr. Schulte's view of it as a raid, she can do

23   that. I don't think Mr. Hurley's perspective of what happened

24   is really relevant.  It is the defendant's perspective.  And

25   the question was very specific to the use of the word "raid."

K2Q3SCH2

1     It was not was there any information collected.  I asked him

2     whether the FBI actually visited the house.  He said yes.  So I

3     think she has the opportunity on cross-examination to ask.

4             MS. SHROFF:  He elicited testimony about Mr. Schulte's

5     state of mind by asking this agent if he thought he had raided.

6     The question isn't whether or not he actually raided, right.

7     If Mr. Kamaraju's argument, as I understand it now, his

8     argument is all that matters is Mr. Schulte's state of mind.

9     So then why did he ask the question.  Now I have to -- I would

10    actually say to Mr. Schlessinger here that Mr. Hurley was under

11    the impression that he was raided, and I think the CISO would

12    back him up.  I think.  I am not sure, because who knows.  I

13    may be remembering something incorrectly.

14            But Mr. Hurley was entirely upset that anybody would

15    want back a document that was sent to him by a client for legal

16    advice.  And I gave Mr. Schulte the legal advice.  I told

17    Mr. Schulte I'm not going to file this bail application.  No

18    judge is going to read 159 pages.  If you don't believe it, go

19    send it to your private lawyer, and he did.

20            MR. KAMARAJU:  Earlier in this trial Ms. Shroff did an

21    extensive cross about an e-mail that the defendant wrote in

22    which she said your perception of this is different than his

23    perception of this, and he's not angry about it.  And she went

24    through -- I believe the witness was Frank Stedman.  And she

25    went through it and elicited several facts about Mr. Schulte's

1    state of mind, and the facts that Mr. Schulte knew.  It was

2    just fine.  She can do the exact same thing now.

3         MS. SHROFF:  Right.  But I have knowledge of the real

4    state of mind of Mr. Hurley.

5         THE COURT:  We've been through that, haven't we?

6    Isn't this your attempt to be excused so you can testify?

7         MS. SHROFF:  No, no.  I didn't know anything about

8    Mr. Hurley -- that's not true.  Mr. Hurley was never raised in

9    any part of this.  That's what this notebook, I had no idea

10   about anything -- in fact, the bail application, if you

11   remember, your Honor, was never an issue in any of the attorney

12   advice things.  Not at all.  It was never briefed.

13        MR. KAMARAJU:  If Ms. Shroff wants to call him, she

14   can call him.  We'll offer a stipulation to the fact that the

15   CISO went to collect it.  This does not seem like anything

16   beyond the use of the word "raid."  And if Ms. Shroff wants to

17   elicit facts that suggest, no, his use of the word "raid" was

18   reasonable as opposed to a substantial overstatement, she can

19   do that.

20        THE COURT:  I think the government is right,

21   Ms. Shroff.  You focus on the word "raid."  There's three

22   people who showed up.  I don't know if that's a raid, but if

23   Mr. Schulte says that's a raid, you can certainly cross-examine

24   on it.

25        MS. SHROFF:  I think the testimony should be stricken.

K2Q3SCH2

1          THE COURT:  Okay.  That's the application?

2          MS. SHROFF:  Yes.

3          THE COURT:  It's denied.  See you in five minutes.

4          MR. KAMARAJU:  Thank you, your Honor.

5          (Recess)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2Q3SCH2                              Schlessinger – Cross

1          (Jury present)

2          THE COURT:  All set, Ms. Shroff?

3          MS. SHROFF:  Yes, your Honor.  Thank you.

4    CROSS-EXAMINATION

5    BY MS. SHROFF:

6    Q.  Let me just take care of this before I forget, okay.  You

7    testified, the last part of your testimony was about Twitter,

8    correct?

9    A.  Yes.

10   Q.  Okay.  And there's all of that stuff about Jason Bourne; is

11   that right?

12   A.  That's right.

13   Q.  And you testified about Toulouse and Moldova and all of

14   those different places?

15   A.  Correct.

16   Q.  Right.  You looked at the handle for Twitter, correct?

17   A.  Yes.

18   Q.  @JasonBourne, correct?

19   A.  Yes.

20   Q.  Was there anything posted under that handle?

21   A.  No.

22   Q.  Okay.  So let's just review all of those things that

23   Mr. Kamaraju went through with you.

24         MS. SHROFF:  Can somebody put up the documents with

25   the Twitter stuff.  I think it's 809, page 14.  So, can you

1    blow -- 809, the screen you had before.  Right up there.

2    Q.  "I also need to confirm my Twitter," you see all that was

3    stuff that Mr. Kamaraju reviewed with you?

4    A.  Yes.

5    Q.  Okay.  So, nothing on Twitter?

6    A.  I mean there were the images, Jason Bourne.

7    Q.  You mean the photo of Matt Damon?

8    A.  Yes.

9    Q.  Nobody thought Matt Damon was Mr. Schulte, right?

10   A.  Well, it appeared to be his account.

11   Q.  Okay.  That's your opinion.  Sure.  But what I am saying is

12   nobody really walked around thinking that Matt Damon was Josh

13   Schulte, right?

14   A.  Not that I am aware of.

15   Q.  And there was nothing posted on that Twitter account?

16   A.  There were no tweets.

17   Q.  All of this stuff that he wrote -- take that off.

18           And then all the dates and the juxtapositions that

19   Mr. Kamaraju did and have you read all of those texts, do you

20   remember those texts?  Can we pull up one of those texts,

21   whatever it is that you were hoping to find on Twitter.  This

22   thing.

23           Let's read it together again.  Actually, I'm tired of

24   listening to Jason Bourne.

25           None of this shows up, right, on Twitter anywhere?

K2Q3SCH2                    Schlessinger - Cross

1   A.  It wasn't posted on the Twitter account.

2   Q.  It's not posted anywhere, correct?

3   A.  Not that I am aware of.

4   Q.  Right.  He doesn't post it on the account you say is his

5   John Galt account, right?

6   A.  Not this particular language, no.

7   Q.  No, no, I'm only asking about this particular language.

8   A.  There were posts on the John Galt.

9   Q.  No, no, listen, listen.  Look at the exhibit.  It is the

10  only thing I'm asking about.  Okay?  Was this posted on the

11  John Galt account?

12  A.  No.

13  Q.  Jason free Bourne, whatever it is?

14  A.  No.

15  Q.  Okay.  Was it printed anywhere in all of the nine articles

16  that Mr. Schulte wrote?

17  A.  No.

18  Q.  Okay.  We can take that down.

19          Let me ask you this.  When Mr. Schulte was writing all

20  of these things down in his notebook, do you know how long he

21  had been in prison?

22  A.  I'm not sure exactly.

23  Q.  Well, you're testifying today on behalf of the United

24  States, correct?

25  A.  Yes.

K2Q3SCH2                    Schlessinger - Cross

1    Q.  You prepared for your testimony?

2    A.  Yes.

3    Q.  Did you know how long he had been sitting in jail when he

4    started writing these accounts?

5    A.  It was close to a year, I think.

6    Q.  You don't know if it was more than a year?

7    A.  I don't know exactly when he started writing the articles.

8    Q.  Okay.  I'm going to come back to the articles in a minute,

9    okay.  But I'm going to revert back for a minute to your

10   investigation of the MCC cells, okay?

11   A.  Okay.

12   Q.  All right.  So let's start with what prompted you to get

13   involved with the MCC, which was you talking to Mr. Betances,

14   correct?

15   A.  That's right.

16   Q.  And sir, I'm correct, am I not that -- can somebody find

17   that.

18        You were physically present, were you not, when

19   Mr. Betances was being proffered, correct?

20   A.  Yes, I was.

21   Q.  And you were the special agent who participated in

22   Mr. Betances' proffer sessions, correct?

23   A.  Yes, I was.

24   Q.  And you took notes when he was testifying, correct?

25   A.  No, I don't think I did.

K2Q3SCH2                       Schlessinger – Cross

1    Q.  Okay.  Did you file a search warrant affidavit based on

2    your conversation with Mr. Betances?

3    A.  No, I didn't.

4    Q.  You didn't file a search warrant affidavit?

5    A.  No, I was not the affiant.

6    Q.  No, no, I know you were not the affiant.  For sure.  Who

7    was the affiant by the way?

8    A.  I believe it was Agent Donaldson.

9    Q.  Agent Donaldson was the affiant, right?  That's Agent

10   Donaldson sitting right there, right?

11   A.  Yes.

12   Q.  You would agree with me, would you not, that he is a very

13   careful special agent?

14   A.  Yes, I would.

15   Q.  And you are a very careful special agent, correct?

16   A.  I'd like to think so.

17   Q.  Right.  And you and Special Agent Donaldson reviewed the

18   MCC affidavit, correct?

19   A.  I don't remember if I reviewed it.

20   Q.  Let's have you take a look.

21           MS. SHROFF:  May I, your Honor?

22           THE COURT:  Yes, you may.

23   Q.  Here you go, sir.  One of these prosecutors drafted the

24   affidavit, correct?

25   A.  Yes.

1    Q.  You testified this was of monumental importance because you

2    had 50 agents going into the MCC.

3    A.  That's right.

4    Q.  You wanted to make sure that whatever information was given

5    to the magistrate judge that was going to issue this affidavit

6    was accurate, correct?

7    A.  Yes.

8    Q.  In that affidavit, would you agree with me that there is a

9    section that talks about Mr. Schulte and Mr. Amanat arranging

10   to have the cell phones smuggled to the MCC, correct?  Take a

11   look at page 10.

12             THE COURT:  What page, Ms. Shroff?

13             MS. SHROFF:  10, please.

14             THE COURT:  Thank you.

15   Q.  So let's review that what you remember Mr. Betances telling

16   you, okay?

17   A.  Okay.

18   Q.  And again, this is the affidavit that was submitted, right?

19   Because I gave you the cover page.

20   A.  Yes.

21   Q.  Okay.  And you have no doubt that that's the affidavit

22   submitted, right?

23   A.  No, I don't.

24             MS. SHROFF:  And does the government have an objection

25   to me moving it in subject to some redactions?

K2Q3SCH2                         Schlessinger - Cross

1              MR. KAMARAJU:  Yes, we would object.

2              MS. SHROFF:  Your Honor, we ask that the affidavit be

3     admitted as was protective order in the case, as was the

4     transcript --

5              THE COURT:  The document will be admitted subject to

6     review for classification.

7              MS. SHROFF:  Thank you.

8              THE COURT:  It is admitted.

9              (Defendant's Exhibit J received in evidence)

10    Q.  Let's take a look now that it's in evidence.  I just want

11    you to to take a look at paragraph 13, okay.  I'm going to read

12    it and you stop me wherever you want, where the affidavit is

13    false.  Okay?  You with me?

14    A.  Yes.

15    Q.  "I have participated in an interview of an inmate at the

16    MCC who was housed in Unit 1 with Amanat and Schulte until

17    recently the CS, footnote 5."  Correct?

18    A.  Yeah, Unit 1 may not be accurate.  I don't know if that's a

19    reference to another -- that's just being referred to as Unit

20    1?

21    Q.  It is.

22    A.  Okay.

23    Q.  And the footnote says -- stay with me.  "The CS is facing

24    immigration and narcotics trafficking charges," correct?

25    Q.  Your confidential source is Mr. Betances, right?

1    A.  Yes, that's right.

2    Q.  So that clause is correct.

3    A.  Yes.

4    Q.  Okay.  "And is cooperating in the hopes of receiving a more

5    lenient sentence and potential immigration benefits."  Also

6    correct?

7    A.  I don't know his motivation.

8    Q.  You were there, weren't you, when he was proffering?

9    A.  Yes.

10   Q.  Okay.  It is in an affidavit to a federal judge, correct?

11   A.  Yes.  I don't recall him saying that was his motivation.

12   Q.  Sir, whether you recall it or not, sitting here today, do

13   you have reason to believe that Mr. Donaldson falsely wrote

14   something in a federal affidavit?

15   A.  No, I don't.

16   Q.  Okay.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MS. SHROFF:

2    Q.   OK.  "As described in this affidavit, the CS's information

3    has at least partly been corroborated by, among other things, a

4    seizure of at least one contraband cell phone," right?

5    A.   That's what it says.

6    Q.   Right.  Do you agree with it, or no?

7    A.   I'm not sure what it's referring to.

8            MS. SHROFF:  OK.  Now let's go back up.  13-8.

9    Q.   "For the past several months, the CS has been paid by

10   Amanat to store and charge the contraband cell phone."

11   A.   Yes, I remember Mr. Betances saying that.

12   Q.   No, no.  Mr. Betances said he was never paid.  I'm asking

13   you if the affidavit says he was paid.

14   A.   That's what it says.

15   Q.   Right.  The next sentence I don't care about, but just for

16   continuity, let's keep going:  "The contraband cell phone was

17   smuggled into the MCC" --

18       You have no doubt that they were smuggled in by

19   Mr. Betances's wife, right?

20   A.   I wasn't sure how they smuggled the cell phones in.

21   Q.   Right.

22   A.   He didn't explain that.

23   Q.   Let's take a minute.  Let's step back, go two sentences

24   back.

25       You had Mr. Betances in a proffer session, right?

1   A.  Yes.

2   Q.  You had ample opportunity to ask him, right?

3   A.  We did.

4   Q.  Correct.  And you asked him, right, who smuggled the phones

5   in?  Correct?

6   A.  Yes.

7   Q.  He told you his wife, right?

8   A.  He did not.

9   Q.  He did not tell you his wife?

10  A.  Not at that proffer.

11  Q.  At any proffer?

12  A.  Not that I recall.

13  Q.  So the first time you heard him admit that it was his wife

14  that brought the phone into the MCC was when he took the

15  witness stand?

16  A.  Yes.

17  Q.  OK.  Remember when Mr. Betances said that it was his

18  obligation to tell the truth and the complete truth, he hadn't

19  told the complete truth from the witness stand then, correct,

20  according to you?

21          MR. KAMARAJU:  Objection, your Honor.

22          THE COURT:  Sustained.

23          MS. SHROFF:  Well, he was in court, your Honor.

24          MR. KAMARAJU:  She can't ask the witness to comment on

25  another witness's credibility.

K2qWsch3                          Schlessinger - Cross

1           THE COURT:  That's the basis for the objection.  It's

2    sustained on that basis.

3    BY MS. SHROFF:

4    Q.  Had he told you that before?

5    A.  Had he told me what before?

6    Q.  That his wife smuggled the phones into the MCC.

7    A.  I don't recall him ever telling me that before.

8    Q.  OK.  And as an FBI agent, you would ask that question,

9    correct, How did the phones get into the MCC?

10   A.  We did ask that question, yes.

11   Q.  OK.  Let's take a look at paragraph C.  "For a time the CS

12   was tasked with storing and charging the contraband cell phones

13   in the CS's cell," correct?

14   A.  Yes.

15   Q.  And according to this affidavit, it goes on to state that

16   the CS also knew the passwords for the devices, correct?

17   A.  Yes.

18   Q.  And the rest of it is not important to me, but Mr. Kamaraju

19   may well bring it up when he calls you back on redirect, but

20   this affidavit section -- right -- is certainly about

21   Mr. Betances; there's no doubt in your mind?  Right?

22   A.  Yes.

23   Q.  OK.  And it's your colleague Mr. Donaldson who swore out

24   this affidavit, correct?

25   A.  Yes.

1   Q.  Under oath, correct?

2   A.  Yes.

3   Q.  Put his hand up just like a witness does here, right?

4   A.  Presumably.

5   Q.  Right.  And said I promise to tell the truth, correct?

6   A.  I wasn't there, but presumably.

7   Q.  OK.  Well, you've sworn out affidavits before, right?

8   A.  I haven't.

9   Q.  I've seen you in mag court.  You've never sworn out an

10  affidavit?

11  A.  No, I haven't.

12  Q.  OK.  Let's move to the next spot, OK, staying still with

13  Mr. Betances?  Did you ever talk to Mr. Betances's wife?

14  A.  No, we didn't.

15  Q.  Did you ever ask her -- you haven't talked to her so I

16  withdraw that.

17      Did you check Mr. Betances's commissary account?

18  A.  No, we didn't.

19  Q.  Did you know how much money he had in his commissary

20  account at any given time?

21  A.  No.

22  Q.  Did you map out for the government at any point how much

23  money he had in his commissary account before the influx of the

24  cell phones versus after the influx of the cell phones?

25  A.  No, we didn't.

1   Q.  Did you know for how long Mr. Betances had been holding

2   cell phones in the MCC?

3   A.  No, not exactly.

4   Q.  OK.  Let's talk about Mr. Shane Harris.  OK?

5       You testified that Mr. Shane Harris is the reporter for the

6   Washington Post, is that correct?

7   A.  Yes.

8   Q.  In light of your investigation of all of the articles that

9   Mr. Harris received, did you review all of them?

10  A.  I don't know if I reviewed all of them.  I've reviewed some

11  of them for sure.

12  Q.  Why don't you tell us the ones you've reviewed.

13  A.  The articles that were published in May of 2018.

14  Q.  Do you remember a title?

15  A.  No.

16  Q.  Did you review -- how about the Presumption of Innocence;

17  did you review that one?

18  A.  I did.

19  Q.  And what was it about, by the way?

20  A.  I don't recall specifically.

21  Q.  You don't recall it was all about his own case, that it had

22  all of the court proceedings here?  Do you recall if it was

23  about that?

24  A.  It was about this case, yes.

25  Q.  It was about his own case, right?

1    A.  Yes.

2    Q.  He wrote pages and pages about how his bail was reviewed,

3    correct?

4    A.  Yes.

5    Q.  He wrote out, he took quotes from transcripts and wrote

6    them out, correct?

7    A.  Yes.

8    Q.  And he wrote out his views, so to speak, on the criminal

9    justice system, correct?

10   A.  That's correct.

11   Q.  There was nothing about Russia in that article, correct?

12   A.  Not in that article, no.

13   Q.  Nothing about the oligarch -- I don't even know what that

14   is, but let's just talk about that.  Nothing about that in that

15   article, correct?

16   A.  Not in that specific article, no.

17   Q.  I'm only talking about that one specific article and I'm

18   talking about that specific article.  OK?

19   A.  OK.

20   Q.  Do you remember, sitting here today, how long that article

21   was?

22   A.  I don't remember.

23   Q.  Do you ever remember Mr. Schulte writing anything shorter

24   than a hundred pages?

25   A.  Uh --

 1   Q.  No, right?

 2   A.  I seem to recall some articles that were less than a

 3   hundred pages.

 4   Q.  OK.  Sitting here today, you do not know which --

 5           MS. SHROFF:  Let's just show you any one of those

 6   screenshots from that ProtonMail thing.

 7   Q.  Do you remember all of those snapshots -- not snapshots,

 8   screenshots that Mr. Betances took?

 9   A.  Yes.

10   Q.  Can you tell me if any one of those -- where it says

11   article 8, subtitle origins, do you remember that?

12   A.  I do.

13   Q.  Nothing to do with Russia?

14   A.  No.

15   Q.  Had all to do with his case, correct?

16   A.  Yes.

17   Q.  And this one is the Presumption of Innocence.  Do you see

18   that?

19   A.  Yes.

20   Q.  OK.  We do have a presumption of innocence, right?

21   A.  Yes.

22           MS. SHROFF:  OK.  Let's look at the next one.  Any

23   one.  Just randomly pick one.  This has nothing to do with it.

24   You can move on.  I'm just trying to show him his articles.

25   Q.  But you agree that you saw these articles and you read

1    them, correct?

2    A.  Yes.

3           MS. SHROFF:  We're on the wrong series.

4    Q.  And you took a look at them, right?

5    A.  Yes.

6    Q.  And when you took a look at them, did you read and point

7    out any sections for the government?

8    A.  I don't remember doing that.

9    Q.  OK.  Let's look at this one that is up here now, talking

10   about -- I think you read parts of this one.  Right?

11   A.  Yes.

12   Q.  Talking about, I don't know, some Fortune 500 company, how

13   people tend to get promoted, how some people are incompetent

14   and have an idiotic nature, correct?

15   A.  Yes.

16   Q.  OK.  Nothing to do with Russia?

17   A.  No.

18          MS. SHROFF:  OK.  We can move that one aside also.

19   Q.  And by the way, do you know if Mr. Harris received all

20   these articles?

21   A.  I don't know, sitting here.

22   Q.  Do you, by any chance, know if the Washington Post

23   published all of these articles?

24   A.  I don't believe they did.

25   Q.  Right?  They didn't publish any of them, right?

1    A.  No.

2    Q.  Nothing to do with Russia did they publish from these

3    Proton emails, correct?

4    A.  I don't know.

5    Q.  Really?  You didn't follow up as the case agent or one of

6    the co-case agents to see if the Washington Post published

7    anything about Russia and its oligarchs or Marc Kasowitz that

8    was found in there?

9    A.  They may have published things related to that.  I don't

10   know if the source of that information was from the defendant

11   or not.

12   Q.  OK.  Well, sitting here today, sir, had they published

13   something like that, would you not mark that into evidence?

14   A.  Uh --

15   Q.  I mean, wouldn't you want that marked into evidence?

16   A.  Yeah.

17   Q.  OK.  By the way, these articles, they were uploaded to

18   WordPress -- I keep calling it world press, but it's not world.

19   It's WordPress, right?

20   A.  Yes, that's right.

21   Q.  OK.  They're still up on WordPress now, correct?

22   A.  I think so.

23   Q.  Right.  In fact, all nine of those articles are up.  Nine,

24   ten, I don't know how many.  I never read them, but --

25   A.  Yes.

K2qWsch3                          Schlessinger - Cross

1   Q.  -- they're up there, right?

2   A.  Yes.

3   Q.  Today, February -- where are we, 24th, 25th?

4   A.  I didn't check today, but presumably.

5   Q.  OK.  They were still up the last time you checked, right?

6   A.  Yes.

7              THE COURT:  It's the 26th.

8              MS. SHROFF:  Thank you, your Honor.

9   Q.  Presumption of Innocence is still up there, correct?

10  A.  I don't know.

11  Q.  OK.  He's talking about asking humbly the American people

12  to stand up and challenge our government and fix the problems,

13  correct?

14  A.  He says a lot of things in those articles.

15  Q.  For sure.  Absolutely.  He says a lot of things, but you

16  and the United States Attorney's Office only cherry-picked

17  some, right?

18  A.  No, I don't think that's accurate.

19  Q.  OK.  Then tell me what else did the article say if that was

20  not accurate --

21  A.  I don't recall.

22  Q.  -- if it wasn't cherry-picked.

23  A.  I don't recall exactly what the article said.

24  Q.  OK.  So you only recall what you cherry-picked and focused

25  on, correct?

K2qWsch3                        Schlessinger - Cross

1   A.  We reviewed all of the articles.

2   Q.  OK.  I trust you.  Tell me.  What else did the articles

3   say?

4   A.  I know it revealed in one of the articles a location of a

5   CIA offsite.

6   Q.  Very nice.  Thank you.  That's not what I'm asking.  You

7   know it, right?  So let me try again.  What else did the

8   articles say?

9   A.  I don't recall.

10  Q.  You don't recall, right?

11      OK.  Let's talk about that cell search, OK, at the MCC?

12  Are you with me?

13  A.  Yes.

14  Q.  OK.  Now, in that cell search in the MCC, did you know what

15  cell Mr. Schulte was in?

16  A.  Yes, we did.

17  Q.  Right.  Because you coordinated with the MCC, right?

18  A.  That's right.

19  Q.  MCC told you which cell he was on, correct -- in, correct?

20  A.  Yes.

21  Q.  They told you who his bunkee was, correct?

22  A.  Yes.

23  Q.  His bunkee was Omar Amanat, correct?

24  A.  That's right.

25  Q.  And the further you went along, you researched Omar Amanat,

1  criminal detainee, correct?

2  A.  Yes.

3  Q.  You saw that he had a criminal case, correct?

4  A.  Yes.

5  Q.  He had a case before Judge Paul Gardephe, correct?

6  A.  I didn't know the specific judge, but yes.

7  Q.  You pulled his docket sheet, correct?

8  A.  I don't know if we did that.

9        MS. SHROFF:  OK.  Could we have the docket sheet.

10  Q.  And you tried to figure out what Omar Amanat was charged

11  with, correct?

12  A.  Generally, yes.

13  Q.  Right.  And Omar Amanat was charged with something having

14  to do with Russia, correct?

15  A.  I don't know.  I'm not familiar with his case.

16  Q.  You're not familiar with his case.  OK.  Are you familiar

17  with his codefendant's name?

18  A.  No.

19  Q.  Do you know his codefendant's name was K-A-L-I-E-L Isaza

20  Tuzman, T-U-Z-M-A-N?

21  A.  I did not know that.

22  Q.  You did not know that?

23  A.  No.

24  Q.  Did you know Omar Amanat was Huma's -- who was Hillary

25  Clinton's -- cousin?  Did you know that?

1    A.  Yes, I do.

2    Q.  OK.  So he's pretty well-heeled, correct?

3    A.  That's my understanding.

4    Q.  Right.  You understand him to have money, correct?

5    A.  Yes, I do.

6    Q.  He had several retained lawyers, correct?

7    A.  I don't know that.

8    Q.  And when you went and searched their cell -- right?  It's

9    one cell, correct?

10   A.  They are in one cell.

11   Q.  Right.

12   A.  Yes.

13   Q.  Were you able to distinguish Mr. Amanat's stuff from

14   Mr. Schulte's stuff?

15   A.  Yeah, we could -- to some extent, yes.

16   Q.  Right.  And to some extent not, right?

17   A.  Yes.

18   Q.  Right.  They're two men living in a very close cell, right?

19   A.  Yes.

20   Q.  The cell has a toilet in it, correct?

21   A.  Yes.

22   Q.  A sink in it, correct?

23   A.  Yes.

24   Q.  Two beds in it, correct?

25   A.  Correct.

K2qWsch3                          Schlessinger - Cross

1   Q.  And about the size of a very small space, right, tight

2   space?

3   A.  Yes.

4   Q.  OK.  And you found stuff in there that was either, that you

5   could separate -- I'll take your word for it -- that you

6   thought was definitely Mr. Schulte's, correct?

7   A.  Yes.

8   Q.  And you thought there was stuff that definitely was

9   Mr. Amanat's, correct?

10  A.  Yes.

11  Q.  OK.  Did you find anything from Mr. Schulte to anyone in

12  Russia?

13  A.  Not in his cell, no.

14  Q.  Anywhere.  Did you find anything at all that Mr. Schulte

15  sent to anyone in Russia?

16  A.  Not that I'm aware of, no.

17  Q.  Right.  He had no emails to anyone at all in all of the

18  different countries that you talked about, Tuluz and Moldova

19  and everything else, nothing to Russia, right?

20  A.  No.

21  Q.  OK.  Did you find anything at all linking Mr. Schulte by

22  email to an entity in Russia?

23  A.  No.

24  Q.  When you searched the cells, correct, did you find any cell

25  phones in the Amanat or Schulte cell itself?

1    A.   No, we didn't.

2    Q.   Right.  And when you searched the MCC, you found only one

3    cell phone, correct?

4    A.   No.

5    Q.   No, no.  On the first day.

6    A.   We didn't find any cell phones.

7    Q.   You didn't find any cell phones at all, right?

8    A.   No.

9    Q.   And when was the first time you found a cell phone?

10   A.   So, we were contacted by the Bureau of Prisons.  I think it

11   was a day or two after our search, and they had found the

12   Samsung cell phone and they alerted us.

13   Q.   OK.  So 50 Federal Bureau of Investigation agents went in

14   and didn't find it themselves?

15   A.   That's right.

16   Q.   So the prison gave you the cell phone that they found, the

17   Samsung?

18   A.   Correct.

19   Q.   Where did they find it?

20   A.   I don't know.

21   Q.   Special Agent Schlessinger, you're in charge of the MCC

22   investigation, right?  You do know where you found that cell

23   phone, right?  You just don't remember, maybe?

24   A.   It was at the MCC.  I don't know specifically where they

25   found it.

1  Q.  Didn't you have any inkling where it was found?

2  A.  We were confident it was the same phone based on the IMEI,

3  the serial number.

4  Q.  I know you were confident, sir.  My question to you is

5  didn't you want to know where it was found?

6  A.  They may have mentioned it to me.  I just don't remember

7  where.

8  Q.  OK.  How long was it before the second cell phone was

9  found?

10  A.  I don't remember.

11  Q.  OK.  Let's talk about the Samsung phone.  OK?

12  A.  OK.

13  Q.  All right.  How many days went by between your first

14  attempt to find the phone and the Bureau of Prisons telling you

15  that they had found the phone?

16  A.  I believe it was a few days, at the most.

17  Q.  It was a few days, right?

18  A.  At the most.

19  Q.  At the most.

20      And when you went in to search for that phone and you

21  didn't find it, you and the Bureau of Prisons made sure that

22  Mr. Schulte was moved, correct?

23  A.  We had no role in that decision.

24  Q.  I didn't ask you if you had a role.  My only question was,

25  you know that Mr. Schulte was moved, correct?

1   A.  Yes.

2   Q.  Right.  And you were surely told, were you not -- or

3   learned -- that Mr. Schulte was no longer left in a place where

4   he could access a phone, correct?

5   A.  I don't know if that's the case.

6   Q.  You don't know if that's the case?

7   A.  No.

8   Q.  So you don't know if he was moved to the SHU?  It's your

9   testimony, under oath, that you don't know and you didn't want

10  to find out if this man, who had a cell phone and was so

11  dangerous that you had 50 people go in, that he had not been

12  moved in the MCC to a spot where he could no longer use a

13  phone?

14  A.  I was aware he was moving.  I'm not sure that means he had

15  no access to a phone there.

16  Q.  Didn't you want to make sure of that?

17  A.  Yes.

18  Q.  You were concerned, right?

19  A.  Yes.

20  Q.  You were very concerned; you had 50 agents?

21  A.  Yes.

22  Q.  And you made sure to tell the Bureau of Prisons make sure

23  he doesn't have access to a phone, right?

24  A.  We didn't say that, no.

25  Q.  You didn't say that?

K2qWsch3                          Schlessinger - Cross

1   A.  No.

2   Q.  How about the government?

3   A.  I don't know.

4   Q.  OK.  Isn't it fair to say, sir, that during your

5   investigation you learned that Mr. Amanat was still in general

6   population?

7   A.  I was aware of that, yes.

8   Q.  Right.  And then you're also aware, are you not, sir, that

9   between the time of the first day that you go into the MCC and

10  the time you get the phone, that phone is still in use?  Right?

11  A.  No.  I don't think I understand your question.

12  Q.  There are a couple of days when that Samsung phone is in

13  the MCC; you can't find it, right?

14  A.  Right.

15  Q.  OK.  Do you check, sir, as part of your investigation here,

16  to see if during the time that Mr. Schulte's moved out of that

17  cell but Amanat is still in general population, whether that

18  same Samsung phone is in use?

19  A.  I don't know.

20          MS. SHROFF:  Can I have that spreadsheet.

21  Q.  Take a look.  Is it in use?

22          MS. SHROFF:  Please highlight.

23  A.  I don't know the date that Mr. Schulte was moved to another

24  cell, so I can't say whether the phone was active after he

25  moved.

```
 1    Q.  OK.  You're the FBI agent in charge of MCC and cell phones,

 2    right?

 3              MS. SHROFF:  Mr. Kamaraju, I'm assuming that you won't

 4    object.  This is in, right?

 5              OK.

 6    Q.  Can you take a look at that highlighted box?  Take a look

 7    there.

 8        Hey, let me ask you something, Special Agent Schlessinger.

 9    If you asked the Bureau of Prisons to tell you where

10    Mr. Schulte was housed during that time, they would tell you,

11    right?

12    A.  Yes.

13    Q.  OK.  So you could easily tell where Mr. Schulte was in the

14    MCC, correct?

15    A.  Yes.

16              MS. SHROFF:  OK.  We can take that down.  It's OK.

17              Now, if we could just pull up Mr. Schulte writing

18    about Dan Hurley, that exhibit, the FBI going to raid his

19    lawyer's house.

20    Q.  Let me direct your attention, if I may, do you know who Dan

21    Hurley is?

22    A.  Yes, I do.

23    Q.  Who is Dan Hurley?

24    A.  I believe he was an attorney retained by the defendant's

25    parents.
```

K2qWsch3                              Schlessinger - Cross

1   Q.  OK.  And he was retained by Mr. and Mrs. Schulte over here?

2   A.  That's my understanding.

3   Q.  Right.  And you know that because you confirmed that,

4   right?

5   A.  Uh -- confirmed -- that was my understanding.  I don't

6   know.

7   Q.  OK.  Fair enough.  And is it fair to say that as part of

8   your understanding you also knew that his parents were

9   consulting with an attorney for Mr. Schulte at that time,

10  correct?

11  A.  Yes.

12  Q.  And Mr. Schulte had a bail application that was sent to

13  Mr. Hurley, correct?

14  A.  That was my understanding.

15  Q.  And Mr. Hurley is a lawyer, correct?

16  A.  Yes.

17  Q.  A criminal defense lawyer, correct?

18  A.  Yes.

19  Q.  In Lubbock, Texas, correct?

20  A.  I believe so.

21  Q.  OK.  And he was reviewing the bail application, correct?

22  A.  I don't know.

23  Q.  What do you mean you don't know?

24  A.  I don't know what Mr. Hurley was doing.

25  Q.  OK.  You saw this email, correct?

K2qWsch3                        Schlessinger - Cross

1    A.  Yes.

2    Q.  And it says, "The FBI actually raided an attorney Schulte

3    was conferring in Texas named Dan Hurley," correct?

4    A.  That's what it says.

5    Q.  And you said that there was no raid, correct?

6    A.  Correct.

7    Q.  And what is your definition of a raid?

8    A.  I think of a raid as involving a search warrant being

9    executed.

10   Q.  So if five FBI agents show up at Dan Hurley's office and

11   say, Hey, we don't have a warrant, but you have a bail

12   application and we want it, you would consider that not a raid?

13   A.  Uh --

14   Q.  Just yes or no.

15   A.  It would depend.

16   Q.  On what?

17   A.  If there was a search warrant being executed.

18   Q.  OK.  Say there's no search warrant being executed.

19   A.  No, I wouldn't consider that a raid.

20   Q.  So the only time there's a raid is when there's a search

21   warrant with it, correct?

22   A.  That would be my definition.

23   Q.  OK.  So it's fair to say that your definition of a raid

24   would be different than a layperson's definition of a raid,

25   correct?

K2qWsch3                         Schlessinger - Cross

1    A.  Potentially, yes.

2    Q.  What do you mean potentially?

3    A.  It could be.

4    Q.  It could be, right?

5    A.  Yes.

6    Q.  OK.  By the way, did you ever talk to Dan Hurley?

7    A.  No.

8    Q.  Do you know that the court security officers were sent to

9    Dan Hurley's office to get the bail application?

10   A.  I'm aware that the CISO was involved because they

11   considered the bail application --

12   Q.  No, no, no.

13   A.  -- to be classified and they had to recover it from

14   Mr. Hurley's office.

15   Q.  Mr. Hurley is an attorney, correct?

16   A.  Yes.

17   Q.  Let's just keep Mr. Hurley to the left.  Keep him in mind.

18   OK?

19   A.  OK.

20   Q.  And let's just talk about the other attorneys that

21   Mr. Schulte had when Mr. Schulte was proffering to your office.

22   OK?  Remember that time?

23   A.  I wasn't involved at that time.

24   Q.  I know.

25   A.  But I'm aware of that.

K2qWsch3                     Schlessinger - Cross

1    Q.  Right.  You're aware, though, right?

2    A.  Yes.

3    Q.  You're aware of an attorney named Taylor Koss, correct?

4    A.  Yes.

5    Q.  Not cleared, correct?

6    A.  I don't know.

7    Q.  Not cleared, no clearance whatsoever, correct?

8    A.  I don't know.

9    Q.  No, no.  You do know.  You do know that Ms. Koss, Mr. Koss,

10   whoever it is, had no clearance at all, correct?

11   A.  I don't know that.

12   Q.  You have been in every court appearance on this case, have

13   you not, sir?

14   A.  I don't know if that's true.

15   Q.  OK.  You've never heard me say that Koss has not been

16   cleared in an open court?

17              MR. KAMARAJU:  Objection.  She can't testify.

18              THE COURT:  Overruled.

19              MS. SHROFF:  I'm not testifying, your Honor.

20              THE COURT:  Did you ever hear that?

21   A.  Yes, I've heard that.

22   Q.  OK.  Koss was at the proffers, correct?

23   A.  Yes.

24   Q.  Outside of a SCIF, correct?

25   A.  Yes.

K2qWsch3                          Schlessinger - Cross

1    Q.  FBI has SCIFs, correct?

2    A.  Yes.

3    Q.  U.S. Attorney's Office has SCIFs, correct?

4    A.  Yes.

5    Q.  This building has SCIFs, correct?

6    A.  Yes.

7    Q.  CIA has SCIFs, correct?

8    A.  Yes.

9    Q.  In fact, you could even rent a SCIF if you wanted to,

10   correct?

11   A.  I didn't know that.

12   Q.  OK.

13   A.  No.

14   Q.  Not one of his proffers was in a SCIF, correct?

15   A.  As far as I know.

16   Q.  Right.

17   A.  No.

18   Q.  So he was being proffered on information about the CIA,

19   correct?

20   A.  Yes.

21   Q.  Outside of a SCIF, correct?

22   A.  Yes.

23   Q.  Uncleared lawyers, correct?

24   A.  That's my understanding.

25   Q.  Right.  And no FBI agent or CISO showed up knocking on that

1    door saying, There's classified information that could come up,

2    please give us all your notes, correct?

3    A.  Not that I'm aware of, no.

4    Q.  OK.  Do you remember on direct testimony Special Agent

5    Evanchec testifying yesterday?  You were here, right?

6    A.  Yes.

7    Q.  You remember him saying but those lawyers signed an NDA,

8    correct?

9    A.  Yes.

10   Q.  A nondisclosure agreement, correct?

11   A.  Yes.

12   Q.  You have thousands of sheets of paper here, correct?

13   A.  Yes.

14   Q.  On this case?

15   A.  Yes.

16   Q.  Do you have their NDA?

17   A.  I don't know.

18   Q.  OK.  So when the bail application gets to a lawyer --

19   right, a CISO is sent, a court security -- who sends the CISO,

20   by the way?

21   A.  I don't know who sent him specifically.

22   Q.  Who asked for him to be sent?

23   A.  I don't know.

24   Q.  Was it the FBI?

25   A.  I don't know.

1  Q.  Was it the CIA?

2  A.  I don't know.

3  Q.  It's certainly not the CISO on his own, right, because he

4  would never know that a bail application reached a lawyer?

5  Correct?

6  A.  Correct.

7  Q.  OK.  So some entity, law enforcement entity, sent the CISO,

8  correct?

9  A.  Yes.

10 Q.  And the CISO went all the way to Lubbock, Texas, to a

11 lawyer's office, correct?

12 A.  Yes.

13 Q.  And demanded that bail application, correct?

14 A.  I don't know if he demanded it or if he just explained the

15 situation and they came to an agreement.

16 Q.  OK.  Do you agree with me that sending a document from a

17 client to a lawyer would generally involve attorney-client

18 privilege issues?

19 A.  Generally, yes.

20 Q.  Right.  And you would assume that somebody's sending a bail

21 application for a lawyer to review, correct?

22 A.  I don't know what Mr. Hurley was doing in this regard.

23 Q.  You don't know?

24 A.  I don't know.

25 Q.  Right.  You don't know if he read the bail application,

K2qWsch3                    Schlessinger - Cross

1   correct?

2   A.  No, I don't.

3   Q.  OK.  You don't know if he kept it in an envelope, correct?

4   A.  I don't know.

5   Q.  You don't know if he felt that his office was raided,

6   correct?

7   A.  I don't know.

8   Q.  Right.  You don't know because you never checked, correct?

9   A.  I don't know, because I wasn't involved --

10  Q.  OK.

11  A.  -- with Mr. Hurley.

12  Q.  For sure you were not involved.  I understand that.  But as

13  Special Agent Evanchec said, there were thousands of FBI agents

14  working around the clock on this case all the time, right?

15  A.  I don't think it was thousands.

16  Q.  Well, that was an exaggeration.  I agree.  But you had the

17  manpower, right, to call up Mr. Hurley and ask?

18  A.  Yes, I believe he was contacted.

19  Q.  No, no.  I didn't ask you if he was contacted.  Of course,

20  he was contacted.  My question is did you ever ask Mr. Hurley

21  under what circumstances did you hand back his bail

22  application?

23  A.  I did not personally, no.

24          MS. SHROFF:  OK.  You can take that down.

25  Q.  Do you know if that bail application was ever uploaded to

1    the court system?

2    A.  I believe it was, briefly.

3    Q.  Was it Mr. Schulte who uploaded it to the court system?

4    A.  No.

5    Q.  OK.  And do you know if, when it was uploaded, it was done

6    by anybody involved at all on the defense team?

7    A.  I don't know.

8    Q.  You do know that, right?  You do know that it wasn't us,

9    right?

10   A.  Presumably it was not you.

11   Q.  OK.  By the way, did you make any effort to get that bail

12   application back from everyone?

13   A.  I believe it was pulled down immediately from Pacer.

14   Q.  No, no.  That's not what I asked.

15   A.  -- once we realized what was in it.

16   Q.  Excuse me?

17   A.  Once we realized what was contained in the bail

18   application, it was taken down from Pacer.

19   Q.  Sir, before it was taken down from Pacer, Larry Neumeister,

20   from Reuters, had it, correct?

21   A.  I don't know.

22   Q.  You don't know?

23   A.  No.

24   Q.  OK.  You do know, though, that the bail application was

25   only handed to the judge, correct?

1    A.   I remember it being handed to the judge.

2    Q.   Right.

3    A.   Yes.

4    Q.   And I want to be very clear.  You, as an FBI agent sitting

5    here today, say you do not know if the press got it off of

6    Pacer and read it, correct?

7    A.   I don't know.

8    Q.   And you don't know if you checked if the press talked about

9    it, correct?

10   A.   I don't know.

11   Q.   And you don't know if the press was ever contacted to get

12   it back, correct?

13   A.   I don't know.

14   Q.   But you do know about all of the Proton emails about the

15   Presumption of Innocence, correct?

16   A.   Yes.

17   Q.   When you checked the Proton emails, did you notice that

18   more than one person was, in fact, using the ProtonMail

19   account?

20   A.   No.

21   Q.   You did not think more than one person was accessing the

22   account?

23   A.   I don't know.

24   Q.   You don't know?

25   A.   I can't --

K2qWsch3                    Schlessinger - Cross

1    Q.  Right.  You just don't know, right?

2    A.  It appears to be used solely by the defendant.

3    Q.  Really?

4    A.  Yes.

5    Q.  OK.  So your testimony is it appears to be used solely by

6    the defendant, and you do not think Omar Amanat ever used it?

7    A.  The ProtonMail accounts?

8    Q.  Yes.

9    A.  No.

10   Q.  You don't think he used it?

11   A.  I don't think so.

12   Q.  Were there documents about Omar Amanat that were sent on

13   the ProtonMail account?

14   A.  Yes, there were.

15   Q.  Right.  There were documents about Omar Amanat's case that

16   were sent on the ProtonMail account --

17   A.  Yes.

18   Q.  -- correct?

19   A.  That the defendant had prepared, yes.

20   Q.  Absolutely.  He says it right there.  Look on the cover

21   sheet -- his name, Schulte Analytics, at the MCC; in fact, he

22   even gave his cell number, correct?

23   A.  That's right.

24   Q.  Right.  And he said he was, in fact, writing a tech report,

25   right?

1    A.  That's correct.

2    Q.  And he was writing it for Omar, correct?

3    A.  Yes.

4    Q.  And it's a tech report about Omar Amanat's case, correct?

5    A.  Yes.

6    Q.  OK.  So that tech report is written by him for Omar Amanat,

7    correct?

8    A.  That's my understanding.

9    Q.  Right.  And he's sending it on behalf of Omar Amanat,

10   correct, according to you?  Right?

11   A.  I don't know.

12   Q.  You tell me.  You're the one out there that's looking into

13   the ProtonMail account.

14   A.  Well, he was sending that to the reporters.  I don't know

15   if that was on his own or if that was for Mr. Omar Amanat.

16   Q.  Well, he's not part of Omar Amanat's case, right?

17   A.  No, he's not a part of it.

18   Q.  He's not a defendant in that case, right?

19   A.  No.

20   Q.  He's not charged with anything in that case, correct?

21   A.  No.

22   Q.  OK.  So you think it's an unfair assumption to say that if

23   the report is about Omar Amanat's criminal case, it's only

24   about Omar Amanat?

25   A.  The --

K2qWsch3                          Schlessinger - Cross

1           MS. SHROFF:  I'll withdraw that.  It's OK.

2    Q.  Let me ask you something.  When these emails are being sent

3    about Omar Amanat's case, do you read the whole report?

4    A.  Yes, I've read it.

5    Q.  You read the entire report, right?

6    A.  Yes.

7    Q.  Right.  And it's only about Omar's case, correct?

8    A.  The tech report is only about Omar Amanat's case, yes.

9    Q.  Right.

10          Was Mr. Schulte ever represented by anybody named Marc

11   Kasowitz?

12   A.  Not that I know of.

13   Q.  Did Omar Amanat have contact with Marc Kasowitz?

14   A.  I don't know.

15   Q.  Do you know who Omar Amanat contacted at Marc Kasowitz's

16   law firm?

17   A.  I don't know.

18   Q.  Do you know what law firm he was with?

19   A.  No.

20   Q.  Do you know if Omar Amanat contacted Greenberg Traurig?

21   A.  I don't know that, no.

22          MS. SHROFF:  I'm sorry, your Honor.  I need a minute.

23          Just give me one second.  OK?  I'm sorry about that.

24          You know what?  Let me just go for a minute to -- oh,

25   there you are.

1  Q.  You see that section up here --

2  A.  Yes.

3  Q.  -- that they had you read?  Are you with me there?

4  A.  I see it.

5  Q.  OK.  So do you know of any connection between Mr. Schulte

6  and Marc Kasowitz?

7  A.  Other than sending this email?

8  Q.  Well, I don't know who sent it.  You seem to think

9  Mr. Schulte sent it, but let's put that aside.  My question to

10 you is, is there any other connection between Marc Kasowitz and

11 Mr. Schulte?

12 A.  Not that I know of.

13 Q.  OK.  And how about Mr. Schulte and Giuliani's former law

14 firm; nothing, right?

15 A.  Not that I know of.

16 Q.  OK.  And you certainly agree with me that Mr. Schulte has

17 no connection at all to Putin, correct?

18 A.  Not that I know of.

19         MS. SHROFF:  OK.  You can take that down.

20 Q.  Right before you go up there, to this section, right, take

21 a look at this section.  You see that article that he has?  The

22 Devil's Dishonest, Deplorable and Diabolically Demented Demons

23 times 3, correct?

24 A.  I see that, yes.

25 Q.  That has to do with Mr. Schulte, correct?

K2qWsch3                        Schlessinger – Cross

 1    A.  Yes.

 2    Q.  OK.  This has only to do with Mr. Schulte's case, right?

 3    A.  Yes.

 4             MS. SHROFF:  OK.  You can take that down.  And let's

 5    go down here.

 6    Q.  I'm going to jump around a little bit, but let's just,

 7    while we're on here, take a look at this email.  Right?  Do you

 8    see this?

 9    A.  Yes.

10    Q.  You testified there are all these emails going between this

11    reporter Shane Harris, correct?

12    A.  Yes.

13    Q.  And Shane Presnall, correct?

14    A.  No.

15    Q.  I'm sorry.  It's mentioning Shane Presnall, correct?

16    A.  Yes.

17    Q.  OK.  And you talked to Shane Presnall, right?

18             MS. SHROFF:  You can take that down.

19    A.  Yes, I have.

20    Q.  That's Mr. Schulte's cousin, correct?

21    A.  Yes.

22    Q.  You went to his lawyer's office, correct?

23    A.  Yes.

24    Q.  Took her computer, correct?

25    A.  Yes.

1   Q.  Right.  You took her entire computer, right?

2   A.  We took Mr. Presnall's computer, yes.

3   Q.  No, no, no.  No, no, no.  You took Mr. Presnall's computer

4   for sure.  Then you wanted to check the lawyer's computer also,

5   correct?

6   A.  Yes.

7   Q.  OK.  And then Mr. Presnall was brought to your office with

8   the government, correct?

9   A.  Yes.

10  Q.  And you proffered him, correct?

11  A.  Yes.

12          MS. SHROFF:  OK.  We can take that down.

13          Let's look at Exhibit 801.

14  Q.  Malware of the Mind, correct?

15  A.  Yes.

16  Q.  He has introduction, correct?

17  A.  Yes.

18  Q.  Transcripts, correct?

19  A.  Yes.

20  Q.  When you read that section about transcripts, he's talking

21  about his court transcripts, correct?

22  A.  I believe so.

23  Q.  OK.  Search warrants, correct?

24  A.  Yes.

25  Q.  Complaint, correct?

K2qWsch3                          Schlessinger - Cross

1   A.  Yes.

2   Q.  Ethical and logical look at the charges, correct?

3   A.  Yes.

4   Q.  Tyranny, conspiracy and conclusion, correct?

5   A.  Yes.

6   Q.  How long is this article?

7   A.  It's at least 133 pages.

8   Q.  OK.  He starts out with his introduction -- you've read the

9   introduction?  Did you read it?

10  A.  I have.

11  Q.  You haven't read it?

12  A.  I have read it.

13  Q.  You have read it, right?

14      He's talking about the constitutional crisis that he thinks

15  is going on, correct?

16  A.  I don't recall.

17  Q.  You don't recall?

18  A.  No.

19  Q.  Is he talking about the criminal justice system in this

20  article?

21  A.  I seem to recall references to the criminal justice system,

22  yes.

23  Q.  OK.  He's talking about how trials are held, criminal

24  proceedings are going, and then he links it back to his own

25  criminal case, correct?

1   A.  That seems right, yes.

2   Q.  Right.  And he has been in jail at this point for over a

3   year, correct?

4   A.  I'm not sure.

5        MS. SHROFF:  OK.  Let's take a look now at 806.

6   Q.  Do you see the section where he says, "If you need help,

7   ask WikiLeaks for my code"?

8   A.  Yes.

9   Q.  How long has the WikiLeaks leak been up by the time he

10  writes this?

11  A.  Over a year, I believe.

12  Q.  Over a year?  More than that, right?

13  A.  I don't know.

14  Q.  OK.  His code is up on WikiLeaks, correct?

15  A.  Some of the things he's worked on, yes.

16  Q.  So his code is up on WikiLeaks.  "If you need help, ask

17  WikiLeaks for my code"; it's right there on WikiLeaks?

18  A.  I'm not sure if it was his code.  There was Confluence,

19  which was the Wiki page that was released on March 7.

20  Q.  Right.

21  A.  And then there was elements of Stash.

22  Q.  Right.  So you could read that as serious, "If you need

23  help, ask WikiLeaks for my code," right?

24  A.  Yeah.  I'm not sure if Stash contained source code.

25  Confluence had the Wikipedia --

1    Q.  All of these --

2    A.  -- references to things he'd worked on.

3    Q.  Right.

4    A.  Whether it's the actual code, I think some of it was

5    actually just referenced in Confluence.

6    Q.  OK.

7    A.  As far as the tools that Mr. Schulte was working on.

8    Q.  Right.  And some of it was reference to code, correct?

9    A.  References to code.

10   Q.  Right.  This could be read seriously, correct?  Yes?

11   A.  Yes.

12   Q.  It could be read as a flippant comment, right, "If you need

13   help, ask WikiLeaks for my code"?  Right?

14   A.  I don't know.

15   Q.  OK.  It could be read as sarcasm, correct?

16   A.  I don't know.

17   Q.  Well, he is sarcastic in his writings, isn't he?

18   A.  I don't know.

19        MS. SHROFF:  OK.  You can take that down.

20   Q.  Do you remember you showed the jury that John Galt thing?

21        MS. SHROFF:  Can we pull that up.  Here.  I have it

22   here.  Exhibit 823.  Let's pull that up.

23   Q.  Let's not get into who John Galt is, OK, but look at 825.

24        MS. SHROFF:  We can just put them next to each other.

25   If not, we can just put up 825.

K2qWsch3                        Schlessinger - Cross

1    Q.  This is one of his articles?

2    A.  On the right, yes.

3    Q.  Right.  What else does he post onto this Facebook page,

4    according to you?

5    A.  On the Facebook page?

6    Q.  Yeah.

7    A.  Well, his link to the presumptionofinnocence.net site.

8    Q.  OK.

9    A.  There's a link to a Go Fund Me.

10   Q.  Hey, let me ask you before I forget, is this still up?

11   A.  I don't know.

12   Q.  Don't know?  OK.

13       You have the power -- not you personally, but the FBI has

14   the power to tell Facebook to take something off, right?

15   A.  I'm not sure about that.

16   Q.  OK.  This is still up?

17   A.  I don't know.

18   Q.  OK.  How about the next document; what else does he post on

19   Facebook, according to you?

20   A.  I'm sorry?

21   Q.  What else does he post on Facebook; do you know?

22   A.  I don't remember.

23   Q.  OK.  Do you remember if he posts all nine of his articles

24   on there?

25   A.  I don't remember.

1           MS. SHROFF:  OK.  Let's take a look at what

2      Mr. Kamaraju had you read.  806 again; he says "Ugh, talked to

3      my parents"; that section.  If you could swirl that around.

4      Q.  And you read this many times.  I won't ask you to reread

5      it, but do you see that?

6      A.  "Ugh, talked to my parents today."

7      Q.  Right.

8      A.  And found out that my fucking articles that were uploaded

9      to FB, a fucking doc.docx fucking format, were the wrong

10     fucking articles.  They put up articles it's one through seven,

11     and only the old ones."

12     Q.  Let's stop there for a minute.  He rewrote articles all the

13     time?

14     A.  Yes.

15     Q.  Same article over and over again?

16     A.  Yes, different versions.

17     Q.  Different versions, right?

18     A.  Yes.

19     Q.  He just kind of edited it, correct?

20     A.  Correct.

21     Q.  And it's hard to edit in a prison because you're not typing

22     stuff up, correct?

23     A.  Yes.

24     Q.  So he has to rewrite the edits, correct?

25     A.  That's right.

1    Q.  And then he has to upload the new edits, according to you,

2    correct?

3    A.  That's what it says here.

4    Q.  OK.  And then he says he's disappointed, his mom got upset,

5    as moms do, and then he says, "I spent the entire" -- I don't

6    know what that word is, entire remainder of the call -- I don't

7    know what that word is -- trying to apologize to his mother,

8    correct?

9    A.  That's what it says.

10   Q.  Right.  Do you go back after you read this and see what

11   else he's uploaded to Facebook?

12          MS. SHROFF:  You can take that down.

13   A.  Yes, we definitely looked into --

14   Q.  What else he wrote?

15   A.  -- Facebook, yes.

16   Q.  What does he upload?

17   A.  I remember a post on September 25, 2018.

18   Q.  What does it say?

19   A.  I don't recall from memory exactly what it says.

20   Q.  Some next article?

21   A.  It references his birthday.

22   Q.  Right.

23   A.  And it mentions going to Twitter.

24   Q.  Right.

25   A.  Starting a Twitter account.

1   Q.  Right.  Which he never posts anything on, you already said,

2   correct?

3   A.  That's correct.

4   Q.  Right.  He writes and writes about how he's going to set up

5   a Twitter account, and according to you, even you, he never

6   puts anything up on the Twitter account, right?

7   A.  He set up the Twitter account.

8   Q.  No, no, no.  For sure, according to you.  I got that.

9   Don't worry.

10      He sets up a Twitter account Jason Bourne, never forget,

11  nothing posted, correct?

12  A.  No.

13          MS. SHROFF:  OK.  Jason Bourne left out.

14          Let's keep going, shall we?  809.  Let's look at that

15  first page.

16  Q.  Mr. Kamaraju had you read it.  He wants $50 billion in

17  restitution.  Oof, right?  See that up there?

18  A.  I see it.

19  Q.  OK.  And then Mr. Kamaraju had you read that Mr. Schulte

20  says he will visit every country in the world and bear witness

21  to the treachery that is the United States government, correct?

22  A.  Yes, I see that.

23  Q.  There's zero likelihood he's going to leave that MCC to go

24  visit any of those countries on that day he's writing it, 8/8,

25  right?

K2qWsch3                         Schlessinger - Cross

1    A.  That's correct.

2    Q.  OK.  And then he's talking more and more about what all the

3    other stuff he's going to do, correct?  And the government had

4    you read this, and he's saying he's going to break up

5    diplomatic relationships, correct?

6    A.  Yes.

7    Q.  He has no foreign job openings that he's been hired for,

8    correct?

9    A.  I'm sorry?

10   Q.  He's not in the foreign diplomatic service, is he, at this

11   time?

12   A.  No.

13   Q.  He's not working for anybody in the embassy, correct?

14   A.  No.

15   Q.  He's not working for any consulate, correct?

16   A.  Correct.

17   Q.  OK.  And he talks about occupation and finally something

18   about jingoism.  OK?  Right?

19   A.  That's right.

20   Q.  And do you find out, by the way, if he does anything to end

21   occupation, U.S. occupation around the world?

22   A.  Uh --

23   Q.  No, right?

24   A.  I think he was attempting to do that through the release of

25   his tweets.

1  Q.  Of his tweets?

2  A.  Yes.

3  Q.  The tweets that he never put up?

4  A.  The draft tweets.

5  Q.  Right.  And you think that a tweet from somebody is going

6  to end U.S. occupation across the world?

7  A.  I think he thinks that.

8  Q.  No, no, no.  I don't care what he thinks.  I'm asking what

9  you think.  You're the FBI agent reviewing this.

10  A.  I don't know the damage that it would have had.

11  Q.  Right.  You don't know the damage it would have.  Let's

12  talk about that.

13       So you don't know, as the sitting FBI agent, a special

14  agent in counterintelligence, what a tweet from a man's Twitter

15  handle that says @JasonBourne, which, as you testified, is a

16  fake CIA guy in a movie, would have in disrupting the United

17  States international and diplomatic relationships with

18  countries?

19       That's a very long question.  Take your time.

20  A.  The release of sensitive information --

21  Q.  No, no, no.

22  A.  -- that the defendant knew could very well harm the U.S.

23  government.

24  Q.  Sure.  We heard that from you a thousand times.  My

25  question was whether or not it would disrupt.  Read what he's

1    saying.

2    A.  I think it could very well disrupt.

3    Q.  OK.  So your testimony -- I just want to make sure I

4    understand it.  Right?  A Twitter handle in the name of

5    @JasonBourne?

6    A.  @freejasonbourne.

7    Q.  @freejasonbourne.

8        A fictitious character, right?  A fictitious character.

9    A.  Jason Bourne's a fictitious character.

10   Q.  Right.

11   A.  Yes.

12   Q.  And you think that tweets posted to a fictitious character

13   @JasonBourne could disrupt United States relationships with

14   foreign entities?

15   A.  It's possible, yes.

16   Q.  OK.  It never happened, though, right?

17   A.  No.

18   Q.  Let's keep going.  He talks about how he's called down at 6

19   a.m.  2 p.m., something or the other, right?  Right?  Are you

20   with me?

21   A.  Yes.  I see it.

22   Q.  And then I says, "I took my last piece," right?

23   A.  Yes.

24   Q.  "And I'm feeling great," right?

25   A.  Right.

1   Q.   "I envision my appointment as a cardinal and becoming a

2   young pope as I unify Christianity and the church," right?

3   A.   Yes.

4   Q.   OK.   Do you think that if he posted that on the Jason

5   Bourne Twitter handle he could actually be appointed cardinal

6   and become the young pope?

7   A.   No.

8             MS. SHROFF:   OK.   Let's take that down.

9             I'm not going to review the extraction report with

10  you.   I think we've had enough of ProtonMail.   Let's just take

11  a look at 1301 for a quick minute.   OK?

12  Q.   Do you remember going through all of these?

13  A.   Yes.

14            MS. SHROFF:   All right.   No.   1301-1.   I'm sorry.   I

15  have to emphasize.

16  Q.   Do you see all of this?   I don't know what -- magic log-in,

17  this, that and the other; these are all of his Presumption of

18  Innocence articles and all of that stuff, correct?

19  A.   Yes.

20            MS. SHROFF:   OK.   Let's take it down.

21            And Mr. Kamaraju spent a lot of time going over those

22  screenshots with you.   820-413, 820-412.   Let's take a look at

23  that.

24  Q.   And this is all so that the government can say, am I right,

25  that it's Mr. Schulte who is sending these emails to Shane

K2qWsch3                        Schlessinger - Cross

1   Harris, correct?

2   A.  It appears that it was Mr. Schulte sending these emails.

3   Q.  No, no.  I got that.  I got that, but I'm just making sure.

4   That's the point of showing these screenshots, right?

5   A.  It's to show that he's contacting the press --

6   Q.  Right.

7   A.  -- and attempting to leak information.

8   Q.  Really?  Attempting to leak information?

9   A.  Yes.

10  Q.  Presumption of Innocence, the article, is an attempt to

11  leak information?

12  A.  The --

13  Q.  Let's start with that.

14  A.  The search warrant affidavits were under protective order

15  and his notes.

16  Q.  Listen, I'm going to get the to search warrants and his

17  notes.  OK?

18      I'm asking you, sir, your testimony today is he's

19  contacting Shane Harris to leak information?

20  A.  Yes.

21  Q.  You don't think he's contacting Shane Harris because he

22  wants somebody to write about the case that he's under?

23  A.  Same thing.

24  Q.  It is the same thing for you?  OK.  Let's talk about that.

25  How about the search warrants?  Do you remember talking about

1    the search warrants?

2    A.   Yes.

3    Q.   OK.  The search warrants were under a protective order,

4    correct?

5    A.   Correct.

6         MS. SHROFF:  You can take that down.

7    Q.   A protective order is unclassified information, correct?

8    A.   It's unclassified, yes.

9    Q.   I want to be very clear, because generally people use the

10   word "leak" with classified, "spill" with classified.  So let's

11   just be clear.

12        When you say he was trying to leak the protective -- the

13   search warrants, which were under protective order, you agree

14   with me, right, that the protective order that they are talking

15   about in your testimony has to do only with unclassified

16   information?  Correct?

17   A.   Marked U.S.G. confidential.

18   Q.   Sure.  Absolutely.  It's marked confidential, right?

19   A.   Yes.

20   Q.   You have a stamp that says classified, correct?

21   A.   I'm sorry?

22   Q.   The FBI has a stamp, right, that says U.S.G. classified?

23   A.   I don't know what you mean.

24   Q.   You don't know what I mean?

25   A.   No.

K2qWsch3                    Schlessinger - Cross

1   Q.   OK.  Let's try it again.  You know how if you want to mark

2   a document classified, the FBI has the power to mark it

3   classified, right?

4   A.   So, I'm a derivative classifier, so I don't mark -- I don't

5   come up with the classification of documents.

6   Q.   Oh, that's not what I asked.

7   A.   I have to follow what's already been determined.

8   Q.   And it's determined by the CIA, sitting right there, right?

9   A.   It could be determined by any number of original

10  classifiers.

11  Q.   Sure.  But in this case, the original classifier is the

12  CIA, correct?

13  A.   I'm not sure.  In which case are you referring to?

14  Q.   This case --

15          THE COURT:  The one on trial.

16  Q.   -- United States v. Joshua Adam Schulte.  Who was the

17  original classifier?

18  A.   I would -- yes, most of the information would probably have

19  been originally classified by the CIA.

20  Q.   Right.  The CIA's classifying the documents, correct?

21  Right?

22  A.   Which documents?

23  Q.   All of the documents in this case.

24  A.   I can't speak to all of the documents in the case.

25  Q.   OK.  The CIA knows how to mark a document classified versus

1   confidential, correct?

2   A.   Yes.

3   Q.   You know how to mark a document classified versus

4   confidential, correct?

5   A.   Yes.

6   Q.   You know the difference between a classified document and a

7   confidential document, correct?

8   A.   Confidential is one of the classifications.

9   Q.   Really?

10   A.   Yes.

11   Q.   OK.  So can an uncleared person receive classified

12   information?

13   A.   In some cases, yes.

14   Q.   I'm sorry.  You're telling me, as an FBI agent, that an

15   uncleared person can receive information that is deemed

16   classified?

17   A.   Yes.

18   Q.   When?

19   A.   In certain situations.

20   Q.   Tell me one situation.

21   A.   Sometimes there's a serving of FISA orders on --

22   Q.   Of what?

23   A.   Serving of FISA orders on uncleared persons requires them

24   to sign an NDA because they're uncleared.

25   Q.   Was there a FISA warrant in this case?

1   A.  No.

2   Q.  So it's not this case, right?

3   A.  No.

4   Q.  So let's stick to this case again and tell me in this case

5   when would be the chance when the CIA would give an uncleared

6   person classified information.

7   A.  I don't know.

8   Q.  You don't know, right?

9   A.  No.

10  Q.  OK.  Do you really think that the CIA in this case would

11  give an uncleared person classified information?

12  A.  I don't know.

13  Q.  OK.  So the protective order --

14          MS. SHROFF:  Do you have the protective order?

15  Somebody show it to him.

16          Ms. Hurst, could you put it up for me?  Thank you.

17  Q.  Take a look.  Do you see where it says, "Whereas, the

18  government desires to protect the protected material"?

19  A.  Yes.

20  Q.  Protected material is not classified always, correct?

21  A.  No.  It's a different form of protection.

22          MS. SHROFF:  OK.  Let's look at the next page.

23  Q.  Protected material, correct?

24  A.  I see that.

25          MS. SHROFF:  OK.  Let's go to the next page.

1              Wait.  Let's just stay here.

2    Q.  The government will mark all documents U.S.G. confidential,

3    correct?

4    A.  Yes.

5    Q.  Not U.S.G. classified, correct?

6    A.  It doesn't say that, no.

7              MS. SHROFF:  OK let's go to the next page.  We'll do

8    this faster if we could go to four and five.  OK.

9    Q.  And again, nothing about classified here, right?

10   A.  On this page, I don't see anything about classified.

11   Q.  And you've reviewed all five pages, right?

12   A.  Yes.

13   Q.  And nothing in this protective order covers classified

14   information, correct?

15   A.  It does reference marking the documents subject to this

16   protective order as U.S.G. confidential.  I guess it's a

17   definitional issue if you want to consider that to be

18   classified or not.

19   Q.  You're an FBI agent?

20   A.  Yes.

21   Q.  Do you think that the penalties are different for

22   disclosing classified information versus confidential

23   information?

24   A.  So, confidential is a level of classification.

25   Q.  I'm just asking you a question that it would be great if

K2qWsch3                          Schlessinger – Cross

1    you could answer.

2        Are you telling me, as an FBI agent, that the penalties for

3    disclosing classified information are the same as for

4    disclosing confidential information?

5    A.  No.

6    Q.  OK.

7    A.  Confidential is a form -- is a level of classification.

8    Q.  Right.  It's a level of classification that deems the

9    confidential information unclassified.  Right?

10   A.  No.

11   Q.  No?  No?  Is that your testimony?  No?

12   A.  Yes.

13   Q.  I see.

14       Have you reviewed the search warrants in this case?

15   A.  Some of them.

16   Q.  Which ones?

17   A.  The ones involving the MCC.

18   Q.  OK.  How about the ones not involving the MCC?

19   A.  I've looked at them, yes.

20              (Continued on next page)

21

22

23

24

25

K2Q3SCH4                    Schlessinger - Cross

1    Q.  You've looked at them, right?

2    A.  Yes.

3    Q.  And none of them are marked classified, correct?

4    A.  I don't know.  As far as I know, no.

5    Q.  As far as you know, no, right?

6    A.  No.

7    Q.  Okay.  And it is your testimony that it is those search

8    warrants that Mr. Schulte sent to Shane Harris, correct?

9    A.  Yes.

10   Q.  You know how the FBI or the CIA or the CISO went to Dan

11   Hurley's office and got that bail application back, correct,

12   right?  You remember that testimony?

13   A.  Yes.

14   Q.  Did you send someone to Shane Harris's office and say, hey,

15   give me the search warrants back?

16   A.  No.

17   Q.  Okay.  Let me just move on.

18           Were you involved at all with the search of

19   Mr. Schulte's home?

20   A.  No, I was not.

21   Q.  Okay.  Did you ever review any of the orders Mr. Schulte

22   placed on Amazon?

23   A.  I've reviewed some of them, yes.

24   Q.  You have reviewed some of them?

25   A.  Yes.

K2Q3SCH4                    Schlessinger - Cross

1  Q.  Do you, sitting here today, could you tell the jury or the

2  Court how many times Mr. Schulte ordered a ethernet switch?

3  A.  I can't recall.

4  Q.  Do you recall how many times he ordered 15 terabytes of

5  disc, CDs, do you recall?

6  A.  I don't remember.

7  Q.  Do you recall how many times he ordered a RAID rack?

8  A.  No.

9  Q.  Do you recall how many times he ordered a supermicro

10  server?

11  A.  I don't remember.

12  Q.  Do you recall how many times he ordered Enterprise gear?

13  A.  I don't remember.

14  Q.  Do you know how many times he ordered a SATA adapter?

15  A.  At least once.

16  Q.  More than once, right?

17  A.  I believe that's right.

18  Q.  Right.  He ordered a SATA adapter several times, according

19  to Amazon, correct?

20  A.  I believe it was at least once.  I don't know how many

21  times.

22  Q.  Okay.  Do you know what a SATA adapter does?

23  A.  Yes, generally.

24  Q.  You know generally what it does.  Meaning it moves data,

25  correct?

```
 1    A.  It allows for the transfer of data.

 2    Q.  From one computer to another computer, correct?

 3    A.  From one type of hard drive to another type of hard drive.

 4    Q.  And hard drives are found in a computer, correct?

 5    A.  They can be found inside or outside of a computer.

 6    Q.  Right.  But they can also be found inside a computer,

 7    correct?

 8    A.  Correct.

 9    Q.  How many computers do you remember Mr. Schulte's home

10    having?

11    A.  Well, he had his desktop computer and I recall two servers.

12    Q.  Okay.  You testified, did you not, that as part of being

13    the FBI agent, you interviewed Mr. Schulte's family, correct?

14    A.  I did not, no.

15    Q.  You did not interview them?  Other FBI agents interviewed

16    them?

17    A.  I don't know if they were interviewed.

18    Q.  You don't even know if they were interviewed?

19    A.  I know his brothers were interviewed.  I don't know if

20    Mr. and Mrs. Schulte were interviewed.

21    Q.  Who went to Mr. and Mrs. Schulte's house, do you know?

22    A.  I know Special Agent Donaldson, and two agents from the

23    Lubbock offices.

24    Q.  They went to Mr. Schulte's home and talked to his parents,

25    correct?
```

K2Q3SCH4                         Schlessinger - Cross

1    A.   That's right.

2    Q.   And by the way, did they ever ask the parents of

3    Mr. Schulte how old Mr. Schulte was when he first started to

4    build computers?

5    A.   I don't know.

6    Q.   Now, as part of your investigation here, sir, you

7    interviewed several people at the CIA, correct?

8    A.   That's right.

9    Q.   And you interviewed a person named Tandeep, correct?

10   A.   I believe that's right.

11   Q.   Right.  Do you recall ever learning that it was Tandeep who

12   called Mr. Schulte and said people at the CIA are talking about

13   you?

14   A.   I don't remember that specifically.

15   Q.   Do you remember the CIA -- I mean the -- I'm mixing you two

16   up.

17           Do you remember if the FBI ever asked Tandeep to

18   record conversations with Mr. Schulte?

19           MR. KAMARAJU:  A little far beyond the direct, your

20   Honor.

21           MS. SHROFF:  I can just recall him if you want.

22           THE COURT:  Overruled.

23   A.   I know that occurred.  I don't know when it was

24   communicated.

25   Q.   You do know that she got no incriminating response from

K2Q3SCH4                    Schlessinger – Cross

1    him, correct?

2    A.  It depends on your definition of "incriminating."

3    Q.  Oh, not my definition, sir.  I don't count.  I'm asking for

4    your definition.

5    A.  There was no confession.

6    Q.  Sir, you participated in the interviews of Tandeep, right?

7    A.  I don't recall if I participated in them.

8    Q.  And your testimony now is that after Tandeep recorded

9    Mr. Schulte, according to you, she got no confession, correct?

10   A.  My testimony is we reviewed the recordings, and there was

11   no confession.

12   Q.  Okay.  By the way, did you also interview Mike K.?

13   A.  I believe I was present for at least one interview with

14   Mike.

15   Q.  Do you know when he was placed on administrative leave by

16   the CIA?

17   A.  I don't know.

18   Q.  Do you know why he was placed on administrative leave by

19   the CIA?

20   A.  I don't know.

21   Q.  Do you know when he was placed on administrative leave by

22   the CIA?

23   A.  I don't know.

24   Q.  Do you know when the FBI first informed defense counsel

25   that Mr. Michael K. had been put on administrative leave?

1    A.  I don't recall specifically.

2    Q.  Do you remember reading on one of these handwritten

3    exhibits that Mr. Schulte's notebooks -- by the way, where did

4    you find those notebooks?

5    A.  At the MCC.

6    Q.  Did they read like diaries to you?

7    A.  Not exactly.

8    Q.  Not exactly?

9    A.  No.

10   Q.  What did they read like to you?

11   A.  Parts of it read to me like a checklist or a plan that he

12   was putting together.

13   Q.  Okay.

14   A.  And he was following through on.  Until we intervened in

15   the form of the search.

16   Q.  Are you finished?

17   A.  Yes.

18   Q.  Okay.  So your testimony is that you took those notebooks

19   to be a plan, correct?

20   A.  Parts of it, yes.

21   Q.  And you intervened, correct?

22   A.  Yes, a checklist.

23   Q.  Let's just go back and look at your checklist.

24           Can somebody pull up one of these things.  You tell me

25   what you consider a checklist, okay?  Let's look at the one

1   where he says write new article.  Any checklist.  Let's put it

2   up.

3          You ready?

4   A.  Yes.

5   Q.  Okay.  You see where it says "Delete all Google Docs from

6   John Smith."

7   A.  Yes.

8   Q.  What was in the John Smith account?

9   A.  I believe it's his articles.

10  Q.  Presumption of innocence and all of those articles?

11  A.  Yes.

12  Q.  "Delete all e-mails from John Smith."  That sounds

13  duplicative, but sure I'll take it.  Same thing?

14  A.  Yes, and he did, there were no e-mails prior to the 21st in

15  that account.

16  Q.  Then he writes "Delete suspicious e-mails from my Gmail,"

17  correct?

18  A.  Yes.

19  Q.  Okay.  And also about his articles?

20  A.  I don't know.

21  Q.  You have Gmail.  You can get deleted Gmail, right?

22  A.  I'm sorry?

23  Q.  You are the FBI.  You can get deleted Gmails, right?

24  A.  In some cases, yes.

25  Q.  Right.  Did you get them in this case?

K2Q3SCH4                    Schlessinger – Cross

1   A.  I'm not sure which ones you're referring to specifically.

2   Q.  You tell me.  You got this checklist.  I'm not an agent.

3   You said you saw a checklist, it's number 3, "delete suspicious

4   e-mails from my Gmail."

5          Did you confirm that he did that?

6   A.  In some cases it's difficult to tell whether it's been

7   deleted or not.  We don't always receive those.

8   Q.  I'm sure it is.  Just tell me, did you see if he had

9   deleted suspicious e-mails?

10  A.  I don't know.

11  Q.  And then he has a subsection of A, B, C, and D, right?

12  A.  Yes.

13  Q.  And WordPress obviously he did not, because WordPress is

14  still up, correct?

15  A.  WordPress he did not what?

16  Q.  I don't know.  Delete I guess.

17  A.  It's still up.

18  Q.  Right.  PayPal, is that still up?

19  A.  As far as I know.

20  Q.  Okay.  Password changes?

21  A.  I don't know.

22  Q.  You don't know, right?  But you would agree with me, right,

23  that all of this, again, has to do with his articles, correct?

24  A.  This is also an entry that doesn't have a checkmark next to

25  it.

1    Q.  Which one?

2    A.  Three.

3    Q.  Yeah.  Doesn't have a checkmark.  That means he didn't get

4    to do it, so you should be able to look at the Gmails?

5    A.  Presumably, yeah.

6    Q.  But you are the agent.  What do you mean "presumably."

7    This is so sensitive, according to you.  He's not checked it

8    off.  And you are telling us you didn't check his Gmails?

9    A.  Oh, we did, yes.

10   Q.  You do know if there were suspicious e-mails in his Gmail.

11          You know what?  It's not worth it.  Let's keep going

12   and work our way down.  Okay.

13          This is all about the phone that you find at the MCC,

14   correct?

15   A.  I think it's more about the broader strategy that the

16   defendant had.

17   Q.  Seems fairly specific.  What broader strategy -- is there a

18   subheading that's called strategy?

19   A.  No.

20   Q.  Okay.  He is a very punctilious writer.  He puts

21   subheadings everywhere he goes.  Show me a subheading that says

22   "strategy."

23   A.  I can't.

24          MS. SHROFF:  Let's just take it down.

25   Q.  Let's look at 820-413.  See how it says "Josh in violation

K2Q3SCH4                     Schlessinger - Cross

1    of a protective order."

2    A.  Yes.

3            MS. SHROFF:  Let's take that down.  Can we pull up the

4    part where it says something about Josh Dratel is going to come

5    see him.  Can we put that up.

6    Q.  You read all of these out loud to the jury before, right?

7    I'm not going to do it again.  I really am not.

8            Can you read that out loud.

9    A.  "Heard tonight from my parents that Josh Dratel is coming

10   tomorrow mid-morning, 9, 10 a.m."

11   Q.  Who is Josh Dratel?

12   A.  I believe he was one of the defendant's attorneys.

13   Q.  Which defendant's?

14   A.  This defendant.

15   Q.  Oh.  You thought Josh Dratel was his attorney?

16   A.  I believe that's right.

17   Q.  You believe that's right?

18   A.  Yes.

19           MS. SHROFF:  Okay.  Let's take that down.  Then let's

20   go to 809 because that's where he's talking about data hiding

21   and crypto, slack space, split data, something about pseudos.

22   Can we get that paragraph up.

23   Q.  Do you know what I'm talking about, sir?

24   A.  Yes.

25   Q.  Let me ask you something.  How many people -- where is that

1    language?  How many people at the CIA know how to do data

2    hiding and crypto?

3    A.  I don't know.

4    Q.  Five?

5    A.  I don't know.

6    Q.  10?

7    A.  I would be guessing.

8    Q.  Take a guess.

9    A.  More than 10.

10   Q.  More than 10?

11   A.  I really don't know.

12   Q.  They're a hacking agency.  They are a hacking intelligence

13   agency.  You are telling me only 10 of them know how to data

14   hide and crypto?

15           MR. KAMARAJU:  She's asking him to guess.

16   Q.  How many months have you been on this investigation?

17   A.  Many months.

18   Q.  How many is "many"?

19   A.  For about two-and-a-half years.

20   Q.  How many?

21   A.  Two-and-a-half years.

22   Q.  So for two-and-a-half years you've been working with the

23   CIA.  You sit with them right there every day, correct?

24   A.  Yes.

25   Q.  Okay.  And your testimony is that you think only 10 people

1    at the CIA knew how to data hide and crypto?

2    A.  I said more than 10.

3    Q.  Okay.  Let's just keep moving.  "I design and wrote

4    structure to conceal data in a custom designed file system

5    contained within the drive slack space."  Correct?

6    A.  Yes, that's what's written there.

7    Q.  Let's just say that only 10 people or at least 10 people

8    know that.  Correct?

9    A.  Okay.

10   Q.  Okay.  As a counterintelligence agent, tell me, sir,

11   doesn't even Apple know how to do this?

12   A.  I don't know.

13   Q.  You don't know?

14   A.  That seems like something Apple would not do.

15   Q.  Apple would not do.  Apple would not protect the privacy of

16   somebody using their phone?

17   A.  They could protect privacy.  But I don't know how this

18   relates to privacy directly.

19   Q.  So you don't know that whether or not Apple designs and

20   writes software to conceal data in a customized file system,

21   correct?

22   A.  I don't know.

23   Q.  But you do know that the CIA people know how to do that,

24   right?

25   A.  Yes.

K2Q3SCH4                         Schlessinger - Cross

1    Q.  And the CIA coders know how to do that, correct?

2    A.  Yes.

3    Q.  Developers know how to do that, correct?

4    A.  Yes.

5    Q.  And according to even your testimony, there are at least 10

6    of them, correct?

7    A.  I don't know.

8    Q.  Okay.  And how about slack space.  Do you think everybody

9    knows what slack space is?

10   A.  No.

11   Q.  You don't think everybody in the tech industry knows what

12   slack space is?

13   A.  I don't know.

14   Q.  Okay.  Let me be clear.  I mean, I didn't know what slack

15   space was before now.  But you are telling me everybody in the

16   tech industry knows what slack space is, right?

17   A.  I don't know what everyone in the tech industry knows or

18   doesn't know.

19   Q.  Fair enough.  Do you know what slack space is?

20   A.  I have a very basic understanding of it.

21   Q.  You know what hidden partitions are, right?

22   A.  Yes, generally.

23   Q.  You would agree with me that everybody knows what disguised

24   data means generally, correct?

25   A.  Generally.

K2Q3SCH4                    Schlessinger - Cross

1  Q.  And the CIA's in the habit of hiring people who know how to

2  disguise data, correct?

3  A.  I'm sorry?

4  Q.  The CIA --

5       MR. KAMARAJU:  He is an FBI agent.  She keeps talking

6  about the tech industry and CIA.

7       THE COURT:  Sustained.

8  Q.  Three-and-a-half years you worked with the CIA on this

9  case?

10       THE COURT:  Two-and-a-half years.

11  Q.  Two-and-a-half years, right?

12  A.  Yes.

13  Q.  Do you know if there are people who work at the CIA that

14  know how to disguise data?

15  A.  Yes.

16  Q.  How about splitting data across files.  Yes?

17  A.  The specific technical capabilities I'm not sure of.

18  Q.  I'll take that.  Let me ask you something.  Where on the

19  internet was this posted?

20  A.  Pacer.

21  Q.  No, no.  This was never on Pacer, sir.

22  A.  Excuse me, I don't know.

23  Q.  It was never he posted anywhere on the Internet; isn't that

24  correct?

25  A.  That's right.

1    Q.  Okay.  You checked his Gmail, his John Galt, Jason Bourne,

2    all of it.  Not posted anywhere, correct?

3    A.  Portions of it may have been posted.

4    Q.  I am not -- I am asking you about a very specific portion,

5    sir.

6    A.  Well, there were many versions and they are portions from

7    this that are used in various parts of his articles.  So it's

8    difficult to say, you know, whether or not this was posted

9    online.

10    Q.  He's accused of criminal charges here.

11    A.  Yes.

12    Q.  He is on trial.

13    A.  Yes.

14    Q.  You have an obligation to be specific in the accusations

15    you are making against him.

16    A.  Yes.

17    Q.  Tell me, sir, where is this portion that Mr. Kamaraju

18    highlighted for you in blue, that I am going to do the same

19    now.  Tell me, please, where on the internet does it appear?

20    A.  I don't know that that -- I am unaware of where that exists

21    online, that highlighted portion.

22          MS. SHROFF:  Thank you.  I'm done, your Honor.

23          MR. KAMARAJU:  Briefly, your Honor.

24    REDIRECT EXAMINATION

25    BY MR. KAMARAJU:

1    Q.  Special Agent Schlessinger, you remember you were asked

2    some questions about a search warrant affidavit?

3    A.  Yes.

4    Q.  You remember you were asked some questions about

5    Mr. Betances and how he was described in there?

6    A.  Yes.

7    Q.  Did Mr. Betances review the descriptions that were in that

8    search warrant?

9    A.  No, he didn't.

10   Q.  Did you ever give it to him to read?

11   A.  No.

12   Q.  You were also asked about some communications that

13   Ms. Shroff pulled down from the Signal application.  Do you

14   remember that?

15   A.  Yes.

16          MR. KAMARAJU:  Can we pull up Government Exhibit

17   822-1, please.  If we can scroll down to the communications

18   from October 10 that Ms. Shroff highlighted.  I'm sorry,

19   October 2.  My apologies.

20   Q.  Sir, she also gave you a search warrant affidavit; do you

21   remember that?

22   A.  Yes.

23   Q.  Do you have that in front of you?

24   A.  Yes, I do.

25   Q.  Could you turn to page 24 of that affidavit.

K2Q3SCH4                    Schlessinger - Redirect

1    A.  Okay.

2    Q.  Now, you didn't search the MCC until you got a search

3    warrant; is that right?

4    A.  That's right.

5    Q.  What's the date listed on that search warrant?

6    A.  2nd day of October, 2018.

7    Q.  So did you search the MCC the day after this?

8    A.  Yes.

9    Q.  So, what's the day you searched the MCC?

10   A.  October 3, 2018.

11   Q.  All the messages that Ms. Shroff asked you about, what were

12   the date of those?

13   A.  October 2, 2018.

14   Q.  So by the time these messages had been sent, you had not

15   yet searched the MCC; is that right?

16   A.  That's correct.

17   Q.  You were asked about blog pages from the presumption of

18   innocence.  Do you remember that?

19   A.  Yes.

20   Q.  You were asked a number of questions about Omar Amanat and

21   his case; do you remember?

22   A.  Yes.

23   Q.  Sir, are you the case agent for the Omar Amanat

24   prosecution?

25   A.  No, I'm not.

K2Q3SCH4                      Schlessinger - Redirect

1    Q.  The blog posts that she asked you about, those are

2    presumption of innocence, correct?

3    A.  Yes.

4            MR. KAMARAJU:  Could we show the witness and the

5    parties Government Exhibit 830, please.

6    Q.  What's this?

7    A.  That's the presumption of innocence page.

8    Q.  How do you recognize it?

9    A.  I recognize the URL and there is a picture of the defendant

10   at the top.

11           MR. KAMARAJU:  The government would offer Government

12   Exhibit 830.

13           MS. SHROFF:  We have no objection, your Honor.

14           THE COURT:  830 is in evidence.

15           (Government's Exhibit 830 received in evidence)

16           MR. KAMARAJU:  Could you blow up the top and publish

17   it for the jury.

18   Q.  Is that Omar Amanat?

19   A.  No, it isn't.

20   Q.  Who is it?

21   A.  That is Joshua Schulte.

22   Q.  Could we pull up page six of Government Exhibit 809.

23           You see where it says Annon1204?

24   A.  Yes.

25   Q.  Is that the password you used to log into that ProtonMail

K2Q3SCH4                        Schlessinger - Redirect

1   account?

2   A.  Yes, it is.

3   Q.  Was that password written down in the defendant's notebook

4   at the MCC?

5   A.  Yes, it was.

6           MR. KAMARAJU:  Now can we look at Government Exhibit

7   1303-8.

8   Q.  Do you see the section that says "snippets below"?

9   A.  Yes.

10  Q.  You remember Ms. Shroff asked you about this e-mail?

11  A.  Yes.

12  Q.  You see where it says "My case involves WikiLeaks and the

13  Vault 7/8 release"?

14  A.  Yes.

15  Q.  Were you aware of any charges against Omar Amanat related

16  to Vault 7 and Vault 8?

17  A.  No.

18  Q.  Are you aware of such charge against the defendant?

19  A.  Yes.

20          MR. KAMARAJU:  Now, can we pull up Government Exhibit

21  820-420, please.

22  Q.  This is a screenshot that you were provided by

23  Mr. Betances, right?

24  A.  That's right.

25  Q.  Do you see where it says "My NSA colleagues and I would

1   often criticize the CIA"?

2   A.   Yes.

3   Q.   Did Omar Amanat ever work at the NSA?

4   A.   Not that I am aware of.

5   Q.   Did Omar Amanat ever work at the CIA?

6   A.   Not that I am aware of.

7   Q.   Did the defendant work at both those places?

8   A.   Yes, he did.

9   Q.   You were also asked about a series of meetings or proffers

10  that you had with somebody named Tandeep; is that right?

11  A.   Yes.

12  Q.   And you were asked about whether things were incriminating,

13  right?

14  A.   Yes.

15  Q.   So let's start there.  You also asked about checklists; do

16  you remember that?

17  A.   Yes.

18          MR. KAMARAJU:  Let's look at Government Exhibit 809,

19  page four.  Can we go to the next page.

20  Q.   Ms. Shroff asked you about this.  Number three.

21  A.   Yes.

22  Q.   As an FBI agent, she asked you a lot of questions about

23  your training.

24  A.   Yes.

25  Q.   "Delete suspicious e-mails."  Does that strike you as

K2Q3SCH4                    Schlessinger - Redirect

1     incriminating?

2     A.  Yes, it does.

3     Q.  You remember she asked you whether you elicited a

4     confession or whether -- my apologies -- whether the recording

5     with Tandeep contained a confession?

6     A.  Yes.

7     Q.  You remember that?

8     A.  I do.

9            MR. KAMARAJU:  Could we pull up Government Exhibit

10    1405-2.

11    Q.  Could you read message that's May 5 at 14:17:49.

12    A.  "Josh work."

13           MS. SHROFF:  Your Honor, could we have the government

14    clarify that that is not Tandeep?  I just want to be clear.

15    Q.  Are these messages sent to Tandeep?

16    A.  No.

17    Q.  Now could you read the message, please.

18    A.  "I could lie to anyone and get away with it."

19    Q.  All right.  Now, you were asked a bunch of questions about

20    obtaining classified information from lawyers and people's

21    parents and all of that.  Do you remember that?

22    A.  Yes.

23    Q.  Are people without security clearances allowed to store

24    classified information in their offices?

25    A.  No.

K2Q3SCH4                    Schlessinger - Redirect

1  Q.  Are they allowed to store it on their computers?

2  A.  No.

3  Q.  And why did you go to Shane Presnall's lawyer's office and

4  ask to look at her computer?

5  A.  To make sure there was no classified information being

6  stored on the computer.

7  Q.  Why did you think that there might be classified

8  information stored on that computer?

9  A.  Because they had sent it to -- sent it to her.

10 Q.  When you say "they," who are you referring to?

11 A.  The defendant.

12 Q.  Now, with respect to Mr. Hurley, do you remember you were

13 asked some questions about that?

14 A.  Yes.

15 Q.  Same thing:  Were you concerned that there was classified

16 information on that computer?

17 A.  Yes.

18 Q.  The defendant worked at the CIA, correct?

19 A.  That's right.

20 Q.  For how long approximately was he at the CIA?

21 A.  I think it was approximately six years.

22 Q.  He had left before Vault 7 occurred, right?

23 A.  That's right.

24 Q.  You were asked a number of questions about harm and your

25 opinion about harm, correct?

1     A.  Yes.

2     Q.  Now, Vault 7 and Vault 8 involved the disclosure of

3     classified information online, right?

4     A.  That's right.

5     Q.  Was it harmful?

6     A.  Yes.

7     Q.  Let's take a look at page 11 of Government Exhibit 809.

8     Can we blow up the last paragraph.  Could you read the

9     defendant's words there.

10    A.  "Vault 7 contains numerous zero days and malware that could

11    be deployed, repurposed, and released on to the world in a

12    devastating fashion that would make NotPetya look like child's

13    play."

14    Q.  You were asked a bunch of questions about whether a tweet

15    could cause harm, right?

16    A.  Yes.

17    Q.  Look at Government Exhibit 809 at page three, please.  Blow

18    up the top paragraph there.

19          Could you read the last sentence.

20    A.  "From here I will stage my information war."

21    Q.  Now can we go to page two.  You remember you were asked

22    about this page also?

23    A.  Yes.

24    Q.  You remember Ms. Shroff asked you if you thought that the

25    defendant could become the Pope by sending this tweet, right?

1   A.  Yes.

2   Q.  Do you know if the defendant was ever a priest?

3   A.  No.

4   Q.  Was he ever a cardinal?

5   A.  No.

6   Q.  Where did the defendant work?

7   A.  The CIA.

8   Q.  When he worked there, was he responsible for developing

9   classified cyber tools?

10  A.  Yes, he was.

11  Q.  Were those the kind of tools that were supposed to be used

12  in operations against foreign adversaries?

13  A.  Yes.

14  Q.  Foreign adversaries like terrorists?

15  A.  Yes.

16          MR. KAMARAJU:  Let's take a look at Government Exhibit

17  809 at page six.  Sorry.  Can we keep scrolling.  A little

18  further.  Towards the end.  There we go.  Up at the top there.

19  Q.  Is this part of what you referred to before as the draft

20  tweets?

21  A.  Yes.

22  Q.  Could you read the part that starts with "Bartender."

23  A.  Bartender -- "Additionally tool described in vendor report

24  is in fact Bartender, a CIA tool set for operators to configure

25  for deployment."

K2Q3SCH4                        Schlessinger - Redirect

1    Q.  You had an exchange with defense counsel where you said you

2    thought the defendant could disrupt diplomatic relationships

3    through a tweet; do you recall that?

4    A.  Yes.

5    Q.  Can you explain what you meant.

6    A.  I meant that if these tools were discovered, they could

7    potentially harm international relations, depending on where

8    they were used.

9               MR. KAMARAJU:  No further questions, your Honor.

10              MS. SHROFF:  May I, your Honor?

11              THE COURT:  No.  We'll break now for lunch.  We'll

12   resume at 2 o'clock.

13              (Witness excused)

14              (Jury excused)

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K2Q3SCH4

1          THE COURT:  Is the government finished now?

2          MR. KAMARAJU:  Yes, your Honor.  We'll rest when the

3  jury is back.

4          THE COURT:  Okay.  What are you going to do about

5  Michael?

6          MR. KAMARAJU:  We told defense counsel if they wanted

7  to call him back, we would not have an objection, and to just

8  let us know.

9          THE COURT:  Ms. Shroff, what do you want to do?

10          MS. SHROFF:  Your Honor, Mr. Zas is going to handle

11  this.  I'm tired.

12          THE COURT:  Mr. Zas, okay.  All right.  Okay, Mr. Zas.

13          MR. ZAS:  Your Honor, I don't think we're planning on

14  calling Michael.  But, we did make motion to introduce the CIA

15  document.

16          THE COURT:  Yes, and I raised that with the government

17  this morning.  They are going to submit something by this

18  afternoon.  I'll give you my ruling promptly.

19          MR. ZAS:  Your Honor, having conferred with

20  Ms. Shroff, she reminds me that depending on the ruling on the

21  memo, it might affect whether we do in fact want to call

22  Michael.

23          I'm sorry.  I apologize.  If the memo does come in, I

24  think it would be unnecessary for us to call Michael.  If it

25  doesn't come in, we may have to change our strategy.

1         THE COURT:  Okay.  As I say, I am going to give the

2    government until the end of the day to submit their papers,

3    submit their view, I'll rule on it promptly.  So you can decide

4    the issue then.

5         MR. ZAS:  Thank you, your Honor.  We'll have a motion

6    after the government rests.  Should we do that now or should we

7    do that after the break?  How do you want to proceed?

8         THE COURT:  Well, they've got to rest first.

9         MR. ZAS:  I know.  I didn't want to have to get the

10   jury back and then we have to go out again.

11        THE COURT:  We're going to go until about 3 o'clock

12   today.  So you can make the motion then, I think.

13        MR. ZAS:  Okay.  Thank you, sir.

14        THE COURT:  You'll have witnesses, Ms. Shroff?

15        MS. SHROFF:  Well, your Honor, I wanted to let the

16   Court know that this morning we got a call from the government

17   saying that some of the witnesses wanted to talk to us.  We

18   didn't have time to go talk to them.  I thought that

19   Mr. Gonzalez said we could have a longer than normal lunch

20   break so we can in fact go talk to them.

21        THE COURT:  How much time do you want?  Because we are

22   taking a longer lunch break.

23        MS. SHROFF:  I have no idea what they have to say.

24   Apparently two of the witnesses said they would like to speak

25   to us.  That's the only information I got from Mr. Laroche via

K2Q3SCH4

1    e-mail.  I don't know anything about them.  I've never met them

2    before in my life.

3              MR. LAROCHE:  Your Honor, there are also other

4    witnesses available now beyond those that could be called this

5    afternoon.  And then the witnesses who indicated that they

6    would like to meet with the defense could meet with them after

7    the trial day, if that would be easier for schedule.

8              THE COURT:  Who is available, Mr. Laroche?

9              MR. LAROCHE:  There's two witnesses.  One, Tandeep.  I

10   believe there's six witnesses available.  Two of the witnesses

11   indicated they would like to speak to defense.  But I think

12   there are four other witnesses, at least, that would be

13   available for the afternoon.

14             MS. SHROFF:  But I'm not going to call four without

15   talking to the two.  That's just not good lawyering.  If they

16   would have made these witnesses available to us before, we

17   wouldn't be in this predicament.

18             THE COURT:  How long do you need, Ms. Shroff?

19             MS. SHROFF:  Why don't I just update you after I speak

20   to the first one.  I'll shoot the Court an e-mail or call.  Can

21   I at least meet with the first one?

22             THE COURT:  Yes.

23             MS. SHROFF:  Thank you.  I appreciate it.

24             MR. KAMARAJU:  Your Honor, just a minor housekeeping

25   matter.  I think the search warrant was admitted, so I think it

K2Q3SCH4

1   need a defense exhibit number.

2           MS. SHROFF:  I know, but I have to redact one line.  I

3   think we are up to K.

4           THE COURT:  We're up to J.

5           MS. SHROFF:  J was the analytics report.

6           THE COURT:  It was marked as I.  It was marked as J.

7   J is admitted.

8           I'll wait for your call, Ms. Shroff.

9           MS. SHROFF:  All right.  I'm going to go down now.

10          (Recess)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2Q3SCH4

                          AFTERNOON SESSION

                               2:15 p.m.

1

2

3          (Jury not present)

4          THE COURT:  Ms. Shroff, do you have any witnesses for

5   this afternoon?

6          MS. SHROFF:  No.

7          THE COURT:  What do you want to do?

8          MS. SHROFF:  I want to have a sidebar if I can.

9          THE COURT:  Okay.

10         (Continued on next page)

11         (In open court; jury not present)

12         MS. SHROFF:  There's just one witness whose name I

13  gave Mr. Laroche.  He's checking to see if that witness is

14  here.

15         THE COURT:  There is a housekeeping matter I want to

16  raise.  I got a letter from I think it's Mr. Lee of Inner City

17  Press.  I think one of the things we agreed to do, in order to

18  facilitate a closed court, was we would have transcripts

19  available by the close of business the following day and make

20  exhibits available.

21         Apparently we haven't made any of the exhibits

22  available.

23         MR. KAMARAJU:  We'll confirm, your Honor.  I believe

24  we have.  I'll just check with Ms. Hurst.  I think he may be

25  mistaken on that.  To the extent we have missed any exhibits,

K2Q3SCH4

1    we'll make sure they will go up right away.

2              My understanding is they have been going out.

3              THE COURT:  Maybe I'll ship you Mr. Lee's letter.

4              MR. KAMARAJU:  Your Honor, we just confirmed the U.S.

5    attorney's press office --

6              THE COURT:  It is the audio files.

7              MR. KAMARAJU:  We'll doublecheck.  To the extent they

8    are not up there, we'll make sure they get up there.

9              THE COURT:  Okay.  Hold on.  What, are you going to

10   rest now?

11             MR. LAROCHE:  Yes, your Honor.

12             THE COURT:  Okay.  I think Ms. Shroff doesn't have

13   witnesses for this afternoon.  So we'll excuse the jury after

14   you make your motion.

15             MR. LAROCHE:  Yes, your Honor.

16             THE COURT:  We'll have the Rule 29 application.  And

17   then we'll break for the day.

18             MR. LAROCHE:  Yes, your Honor.

19             THE COURT:  We'll have the jury charge for you by

20   tonight before we leave.  We'll send that around.  We'll work

21   on the jury charge.  I don't know how many witnesses Ms. Shroff

22   is going to have.  But we'll try to get those witnesses

23   tomorrow.

24             MS. SHROFF:  May I just ask.  If, just hypothetically

25   speaking, if the Court rules that the memo comes in, does the

K2Q3SCH4

1   government have a sense if they are going to call a rebuttal

2   case or not?

3        MR. LAROCHE:  I think to the extent the memo comes in,

4   and I believe we'll lay this out in our response, we would like

5   to call one witness who actually was involved in writing the

6   memo.

7        THE COURT:  Okay.

8        MR. LAROCHE:  But it would be a very brief witness,

9   your Honor.

10        MS. SHROFF:  So, I guess, I am assuming Mr. Denton is

11   not here, so he's writing the papers.  So, in some ways we can

12   figure out who the next witness is after Mr. Denton is done, I

13   guess.  And there's one particular witness that Mr. Laroche is

14   going to try and get it so that the witness and I can speak,

15   and then that will resolve a lot of issues for us also.

16        THE COURT:  All right.  Do you think you get your

17   witnesses on by Friday so we can sum up on Monday?

18        MS. SHROFF:  Yes.

19        THE COURT:  And charge the jury on Monday?

20        MS. SHROFF:  Yes.  I am going to speak to Mr. Schulte

21   in the SCIF today.  And at this point, as far as I can tell,

22   and you know how defendants work, but as far as I can tell

23   right now, Mr. Schulte is not going to testify.

24        THE COURT:  David, call in the jury.

25             (Continued on next page)

K2Q3SCH4

1              (Jury present)

2              THE COURT:  All right, Mr. Laroche.

3              MR. LAROCHE:  Your Honor, the government rests.

4              THE COURT:  Ladies and gentlemen of the jury, the

5    government has rested, and we've got to do some legal work now.

6    It will take us some time.  So rather than have you sit around

7    in the jury room, we're going to send you home, and we'll

8    resume tomorrow morning at 9:30.  And I think the case will be

9    in your hands by no later than Monday.  So, 9:30 tomorrow

10   morning.

11             Remember the standard instructions.  Don't do any

12   independent research.  Don't talk about the case.  Keep open

13   minds.  We'll see you tomorrow morning at 9:30.

14             Thank you very much.

15             (Jury excused)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

K2Q3SCH4

1        THE COURT:  The defendant want to make a motion?

2        MR. ZAS:  Thank you, your Honor.  Your Honor, at this

3    point the defense would move for a judgment of acquittal under

4    Rule 29.  We don't believe, even taking the evidence in the

5    light most favorable to the government, that it's presented

6    sufficient evidence to warrant a guilty verdict on the counts.

7        THE COURT:  All right.  I'll reserve on the decision.

8        I hope tomorrow the defendant will be ready to proceed

9    with whatever witnesses are available.  And when would you like

10   the jury charge conference?

11       MR. LAROCHE:  Any time in the afternoon would be fine

12   for the government, your Honor.

13       THE COURT:  Thursday afternoon, Mr. Zas?

14       MR. ZAS:  Yes, sir.

15       THE COURT:  Okay.

16       MS. SHROFF:  Your Honor, may I just impose upon the

17   Court to just say out loud that Mr. Schulte should be taken to

18   the SCIF after this?

19       THE COURT:  Yes.  Marshals?

20       THE MARSHAL:  That's not a problem with me, your

21   Honor.  I called down and let our supervisors know that that's

22   the request that was made.  He said he would let me know what's

23   going on.

24       THE COURT:  That's the request of the Court that

25   Mr. Schulte be allowed to use the SCIF.

K2Q3SCH4

1          THE MARSHAL:  Absolutely.

2          THE COURT:  What hours?

3          MS. SHROFF:  Generally, your Honor, during the trial

4     day, but letting us go from 3 to 5.  But that's about it.

5          THE COURT:  You can start a little bit earlier.

6     Anything else?

7          MR. LAROCHE:  No, your Honor.

8          THE COURT:  Okay.  Thank you very much.  See you

9     tomorrow morning at 9:30.

10          (Adjourned to

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    EVAN JAMES SCHLESSINGER

 4   Direct By Mr. Kamaraju . . . . . . . . . . .2511

 5   Cross By Ms. Shroff  . . . . . . . . . . . .2567

 6   Redirect By Mr. Kamaraju . . . . . . . . . .2642

 7                     GOVERNMENT EXHIBITS

 8   Exhibit No.                              Received

 9    822-2   . . . . . . . . . . . . . . . . . .2514

10    812 and 1303-1 through 1303-70  . . . . . .2520

11    824   . . . . . . . . . . . . . . . . . . .2554

12    830   . . . . . . . . . . . . . . . . . . .2645

13                     DEFENDANT EXHIBITS

14   Exhibit No.                              Received

15    J   . . . . . . . . . . . . . . . . . . . .2573
```