K2R3SCH1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          S2 17 Cr. 548 (PAC)

5    JOSHUA ADAM SCHULTE,

6              Defendant.                  Trial

7    ------------------------------x
                                           New York, N.Y.
8                                          February 27, 2020
                                           10:00 a.m.
9    Before:

10                    HON. PAUL A. CROTTY,

11                                         District Judge
                                            -and a jury-
                        APPEARANCES
12
     GEOFFREY S. BERMAN
13        United States Attorney for the
          Southern District of New York
14   BY:  MATTHEW J. LAROCHE
          SIDHARDHA KAMARAJU
15        DAVID W. DENTON JR.
          Assistant United States Attorneys
16
     SABRINA P. SHROFF
17        Attorney for Defendant
          -and-
18   DAVID E. PATTON
          Federal Defenders of New York, Inc.
19   BY:  EDWARD S. ZAS
          Assistant Federal Defender
20        -and-
     JAMES M. BRANDEN
21

22   Also Present:  Colleen Geier
                    Morgan Hurst, Paralegal Specialists
23                  Achal Fernando-Peiris, Paralegal
                    John Lee, Litigation Support
24                  Daniel Hartenstine
                    Matthew Mullery, CISOs, Department of Justice
25

K2R3SCH1

1                    (Trial resumed; jury not present)

2                    THE COURT:  We all set?

3                    MS. SHROFF:  We think --

4                    MR. LAROCHE:  Yes, your Honor.  The government is

5     ready.

6                    MS. SHROFF:  Your Honor, should we inform the Court

7     what we're planning to do or do you want to just start?

8                    THE COURT:  The jury's been waiting now 20 minutes, so

9     I'd like to call the jury in and get started.  You'll do

10    whatever you think is appropriate.

11                   David, call in the jury.

12                   MS. SHROFF:  Your Honor, you've ruled the memo

13    admitted into evidence, right?

14                   THE COURT:  Yes.

15                   MS. SHROFF:  We're going to move formally to introduce

16    it, and have Mr. Fernando-Peiris read it to the jury.

17                   THE COURT:  All right.

18                   MS. SHROFF:  I am just letting you know.

19                   THE COURT:  Thank you.

20                   MS. SHROFF:  You're welcome.

21                   (Continued on next page)

22

23

24

25

K2R3SCH1

1              (Jury present)

2              THE COURT:  Ms. Shroff.

3              MS. SHROFF:  Thank you, your Honor.  The defense calls

4    Achal Fernando-Peiris.

5              THE COURT:  Good morning.  I understand he's not going

6    to testify.

7              MS. SHROFF:  He's not.

8              THE COURT:  He's just going to read?

9              MS. SHROFF:  Yes.

10             THE COURT:  He doesn't have to be sworn then?

11             MS. SHROFF:  I think it's best to swear him in.

12             Do you have the memo?

13             THE WITNESS:  It's going to be on the screen, right?

14             THE DEPUTY CLERK:  Please state your name for the

15   record.

16             THE WITNESS:  Achal Fernando-Peiris.

17             THE COURT:  Please sit down.  You all set?  Okay.

18             MS. SHROFF:  The defense moves Exhibit L into

19   evidence.

20             THE COURT:  That's received in evidence.

21             (Defendant's Exhibit L received in evidence)

22             MS. SHROFF:  May we publish it to the jury?

23             THE COURT:  Yes, you may.

24             MS. SHROFF:  Thank you.

25    ACHAL FERNANDO-PEIRIS,

K2R3SCH1                        Fernando-Peiris - Direct

1           called as a witness by the Defendant,

2           having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. SHROFF:

5    Q.  Could you read for me from the beginning and stop, when I

6    ask you to please, Achal.

7    A.  Yes.

8    Q.  Can you start with "memorandum for."

9    A.  "Memorandum For:  Director, Office of Security.  Via:

10   Chief, Special Activities Staff, Personnel Security Group,

11   Office of Security.  From:  Deputy Assistant Director of CIA

12   for Counterintelligence.  Subject:  Request for Administrative

13   Leave for Michael."

14   Q.  Could you continue, please.

15   A.  "1.  Action requested:  CIMC requests enforced

16   administrative leave for Michael, a current CCI/COG employee

17   who is associated with the investigation into the theft and

18   unauthorized disclosure of Center for Cyber Intelligence

19   classified information published by WikiLeaks beginning in

20   March 2017, also known as Vault 7."

21   Q.  Keep going.

22   A.  "2.  Justification:  Michael's lack of cooperation with

23   inquiries into his past activities with the primary person of

24   interest in the FBI investigation and his unexplained

25   activities on the computer system from which the CCI data was

1  stolen, known as the DevLAN, and raises significant concern

2  about his truthfulness, trustworthiness, and willingness to

3  cooperate with both routine OS reinvestigation processes and

4  the criminal investigation into the theft from his office."

5  Q.  Now, may I just interrupt and point out that the document

6  says "left."  Correct?

7  A.  That's correct.

8  Q.  Okay.  And you read it as "theft," correct?

9  A.  That's correct.

10  Q.  Okay, keep going.

11  A.  "CIMC believes curtailing his access to CIA spaces and data

12  systems is necessary to safeguard against potential future

13  losses of sensitive and classified information."

14  Q.  Keep going, please.  You can read this paragraph a little

15  bit faster if you may.

16  A.  "3.  Background:  Michael entered on duty in 2011 as a

17  student trainee in the Engineering Development Group (EDG) in

18  what is now the Center for Cyber Intelligence.  He converted to

19  staff status in 2013, and remained in EDG until moving to

20  CCI/COG in the summer 2016.  Michael is a software exploit

21  developer with highly sensitive accesses.  Michael was of

22  interest in early 2016 to OS/Special Investigations Branch

23  (SIB) in connection with an investigation involving two other

24  CCI/EDG employees, Joshua Schulte and Amol, who reportedly had

25  a physical altercation within EDG spaces.  Schulte alleged that

K2R3SCH1                    Fernando-Peiris - Direct

Amol had threatened his life, and Michael was interviewed as an
informant.  Michael reportedly also had a physical altercation
with Schulte in the workplace and SIB interviewed him and an
attempt to gain details."

Q.  Let me stop you there.  Is "and an" also correct in your
reading or is it "in an attempt"?

A.  In an attempt to gain details.

Q.  Okay.  Keep going.

A.  "Michael, however, was not cooperative and refused to
discuss his prior altercation with Schulte.  Ultimately the SIB
investigation did not substantiate the threat of physical harm
to Schulte and the case was closed when Schulte resigned from
CIA in November 2016.  At the time, Schulte perceived himself
to be victimized by Amol and was angered that CIA management
did not do more to protect him.  No action was taken against
Michael with respect to his lack of cooperation with SIB."

Q.  Keep going.

A.  "4.  In February 2016, OS initiated reinvestigation
processing, which remains open at this time.  Michael underwent
two sessions of polygraph testing in May 2017 but did not clear
all issues.  In the wake of the theft and unauthorized
disclosure of CCI's cyber toolkit on WikiLeaks, CIMC requested
that OS pause all ongoing security processing involving
individuals who had access to the stolen data pending further
investigation of the incident by CIMC and FBI.  Michael's

1    processing was paused as a part of that effort, as he held

2    systems administrator privileges on the DevLAN, the system from

3    which the toolkit was stolen, and was present in EDG spaces

4    during the timeframe of the theft."

5    Q.  Okay.  We can move to the next paragraph.

6    A.  "Investigation.  5.  In the support of the ongoing criminal

7    investigation, CIMC conducted comprehensive reviews of all

8    individuals who could have perpetrated the theft of the CCI

9    data, including Michael.  Several concerns about Michael have

10   emerged in this review, including his close proximity to the

11   theft of the data and his relationship with Joshua Schulte, the

12   individual charged with the theft of data.  Forensic analysis

13   of Michael's activity on the DevLAN suggests that Michael may

14   have additional knowledge of anomalies on the system at the

15   time of the theft.  Additionally, recent inquiries indicate

16   Michael is still withholding relevant information concerning

17   the circumstances surrounding the theft.

18        "Risk assessment.  6.  Given the magnitude of the

19   theft of the CCI toolkit and its concomitant damage to national

20   security, CIMC views Michael's lack of cooperation as a

21   significant and untenable risk to the security of the

22   operations on which he now works and any new tools he deploys

23   for CCI.  Michael, whatever his reasoning, has not complied

24   with routine inquiries by SIB and during polygraph, and has

25   failed to provide clear and verifiable information concerning

K2R3SCH1

1   his activities in the workplace around the time of the theft.

2   Michael's behavior suggests that his knowledge of details --"

3   Q.  I think you missed a word.

4   A.  "Michael's behavior suggests that he has knowledge of

5   details of the theft that he has not divulged.  Michael's

6   behavior suggests a lack of concern for the loss and a lack of

7   commitment to comply with the basic security agreements he

8   entered into upon hire.  For these reasons, CIMC assesses that

9   Michael's continued presence in the workplace is incompatible

10   with best practices for security and insider threat

11   mitigation."

12   Q.  Go ahead.

13   A.  "Next steps.  7.  CIMC requests that the Office of

14   Security:  Immediately deactivate or block Michael's badge so

15   that he may not gain access to CIA facilities; place Michael on

16   enforced administrative leave until the investigation into his

17   knowledge of the theft of the CCI cyber toolkit is resolved.

18          "Concur."  Under the first line it says:  Chief,

19   special activities staff and then date.  And then it says

20   approved:  Director, Office of Security, and then date.

21          MS. SHROFF:  Thank you.  You may step down.

22          (Witness excused)

23          MS. SHROFF:  Your Honor, the defense has one stip it

24   would like to read into evidence to the jury.

25          THE COURT:  Yes, go ahead.

K2R3SCH1

1          MS. SHROFF:  May I, your Honor?

2          THE COURT:  Yes, please.

3          MS. SHROFF:  It is hereby stipulated and agreed, by

4     and among the United States of America by Geoffrey S. Berman,

5     United States Attorney for the Southern District of New York,

6     David W. Denton, Jr., Sidhardha Kamaraju, and Matthew Laroche,

7     Assistant United States Attorneys, of counsel, and Joshua Adam

8     Schulte, the defendant, by and with the consent of his counsel,

9     Sabrina Shroff, Edward Zas, and James Branden that:

10         As of March and April 2016, the Confluence virtual

11    machine had a user account named Confluence.  The Confluence

12    user account password of 123ABCdef. was not changed on April 16

13    of 2016.

14         According to Government Exhibit 1207-24, no entry

15    shows that the Confluence user account was used to log into the

16    Confluence virtual machine in April or March or April of 2016.

17         It is further stipulated and agreed that this

18    stipulation as Defense Exhibit O may be received in evidence as

19    a defense exhibit at trial.  The stipulation is dated today,

20    February 27, 2020, and is signed by Mr. Laroche, and counsel

21    for the defendant, Mr. Zas, Ms. Shroff, and Mr. Branden.

22         May I just have one minute, your Honor.

23         (Defendant's Exhibit O received in evidence)

24         THE COURT:  Yes.

25         MS. SHROFF:  And your Honor, without objection from

K2R3SCH1

1    the government, the defense would move into evidence prison

2    records that would show, as Defense Exhibit P, that as of

3    October 1st of 2016, Mr. Schulte was not -- no.  I'm sorry.

4    I'm stuck in '16.  2018, that Mr. Schulte was not in general

5    population on October 1st, but was in fact in the SHU, which is

6    the Segregated Housing Unit at the MCC.

7                THE COURT:  What exhibit is that?

8                MS. SHROFF:  P as in parrot, your Honor.

9                THE COURT:  It's received in evidence.

10               (Defendant's Exhibit P received in evidence)

11               MS. SHROFF:  The defense on behalf of Joshua Schulte

12   rests, your Honor.  Thank you.

13               THE COURT:  I'm going to excuse the jury for a second.

14   There is a matter I want to take up.

15               (Jury excused)

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

K2R3SCH1

1        THE COURT:  I understand that Mr. Schulte is not going

2   to testify?

3        MS. SHROFF:  That's correct, your Honor.

4        THE COURT:  Mr. Schulte, I have to advise you that you

5   have the right to testify if you wish to do so.  You also have

6   the right not to testify.  It's a personal right that you have.

7   It is a Constitutional dimension.  It's not your attorneys'

8   right; it's your right.  You can waive it if you wish to do so.

9        If you testify, you can be cross-examined.  If you do

10  not testify, the jury will be advised that they can draw no

11  adverse inference from your not testifying.

12       I want to be sure that you've talked with your

13  attorneys and your consultants and your advisors in making your

14  decision not to testify.

15       Is that correct?

16       THE DEFENDANT:  Yes.

17       THE COURT:  Okay.  So it's your decision not to

18  testify; is that correct?

19       THE DEFENDANT:  Yes, sir.

20       THE COURT:  Okay.  Anything else the government or

21  Ms. Shroff want me to ask?

22       MS. SHROFF:  I think you go first, Mr. Denton.

23       MR. DENTON:  Nothing with respect to this issue, your

24  Honor.

25       MS. SHROFF:  No.

K2R3SCH1

| | |
|---|---|
| 1 | THE COURT:  Thank you.  Please be seated. |
| 2 | You rest now.  I'm going to call the jury now so you |
| 3 | can rest in front of the jury.  Correct? |
| 4 | MS. SHROFF:  We rested, your Honor.  I am pretty sure |
| 5 | we rested in front of the jury. |
| 6 | THE COURT:  All right.  Mr. Denton? |
| 7 | MR. DENTON:  Then I think as Mr. Laroche indicated |
| 8 | yesterday, we just have one short rebuttal witness on the memo, |
| 9 | your Honor. |
| 10 | THE COURT:  Okay.  You ready to proceed on that? |
| 11 | MR. DENTON:  We are. |
| 12 | THE COURT:  Call the jury back. |
| 13 | MS. SHROFF:  I'm just curious, do you explain to them |
| 14 | rebuttal witnesses or you just put him on and then we cross? |
| 15 | THE COURT:  I'm going to say that the government has a |
| 16 | right to make a rebuttal.  They are going to make the rebuttal, |
| 17 | that's what this witness is going to do. |
| 18 | MS. SHROFF:  Okay.  Thank you. |
| 19 | THE COURT:  You're welcome. |
| 20 | (Continued on next page) |

K2R3SCH1                    Hall - Direct

1                (Jury present)

2                THE COURT:  As you heard, the government has rested,

3     the defense has rested.  The government now has an opportunity

4     to make a short rebuttal, which they're going to do by calling

5     a witness.

6                Mr. Denton.

7                MR. DENTON:  The government calls Carter Hall.

8                THE DEPUTY CLERK:  Please state your name for the

9     record.

10               THE WITNESS:  Carter Hall.

11               THE DEPUTY CLERK:  Witness sworn.

12               THE COURT:  Please sit down, Mr. Hall.  Pull yourself

13    right up to the microphone.  Okay, Mr. Denton.

14     CARTER HALL,

15         called as a witness by the Government,

16         having been duly sworn, testified as follows:

17    DIRECT EXAMINATION

18    BY MR. DENTON:

19    Q.  Good morning, sir.

20    A.  Good morning.

21    Q.  Are you employed?

22    A.  I am.

23    Q.  Where do you work?

24    A.  At the CIA.

25    Q.  How long have you worked for the CIA?

K2R3SCH1                         Hall - Direct

1    A.   About 15 years.

2    Q.   What is your current position at the CIA?

3    A.   I'm currently the deputy chief of the Counterespionage

4    Department within the Counterintelligence Mission Center.

5    Q.   Is that sometimes known as CIMC?

6    A.   It is.

7    Q.   How long have you been in that position?

8    A.   Since January of 2019.

9    Q.   Generally speaking, what are your duties and

10   responsibilities as the deputy chief of the Counterespionage

11   Department?

12   A.   It's to oversee the investigators within the department who

13   are conducting counterintelligence and counterespionage

14   investigations of CIA officers, contractors, and former

15   affiliated personnel.

16   Q.   Sir, I'd like to direct your attention to the summer of

17   2019.  During that time period, did you become familiar with a

18   CIA officer known as Michael?

19   A.   Yes, I did.

20   Q.   During that time period, did there come a time when you

21   participated in a decision to place Michael on administrative

22   leave from the CIA?

23   A.   Yes, I did.

24          MR. DENTON:  Ms. Hurst, can we put up Defense Exhibit

25   L, please.

K2R3SCH1                          Hall - Direct

1    Q.  Sir, do you recognize this?

2    A.  I do.

3    Q.  What is it?

4    A.  It is the formal memo from CIMC to the director of the

5    Office of Security requesting to place Michael on enforced

6    administrative leave.

7    Q.  Did you play a role in the preparation of this memo?

8    A.  I did.

9    Q.  What was your role?

10   A.  I directed the senior investigator who drafted it to draft

11   it, and I oversaw its finalization, and approved its forwarding

12   to the director of security.

13   Q.  We're going to talk about this, the specifics of the memo

14   in a moment.  But just generally, why did you recommend that

15   Michael be placed on administrative leave?

16   A.  He had been uncooperative through the security process,

17   both into a couple of incidents involving the defendant, as

18   well as his own security reinvestigation processing.

19            MR. DENTON:  So, let's take a look at some parts of

20   this memo.  Starting with the first paragraph, paragraph 1, can

21   we blow that up, Ms. Hurst.

22   Q.  Sir, do you see in this paragraph where it says that

23   "Michael is an employee who is associated with the

24   investigation into the theft and unauthorized disclosure of

25   Center for Cyber Intelligence classified information published

1   by WikiLeaks beginning in March 2017, also known as Vault 7."

2   A.  Yes.

3   Q.  So, what agency was principally responsible for conducting

4   the investigation into that theft and unauthorized disclosure?

5   A.  The FBI.

6   Q.  How was Michael associated with the investigation?

7   A.  So, he was an employee in the same component in the CIA as

8   the defendant.  He was also physically present at the facility

9   where the theft took place.

10  Q.  At the time that you prepared this memo, was Michael a

11  suspect in that theft and unauthorized disclosure?

12  A.  No.

13          MR. DENTON:  You can zoom out, Ms. Hurst, and look at

14  paragraph 2, please.

15  Q.  So, sir, just starting with the first sentence, do you see

16  where it refers to "Michael's lack of cooperation with

17  inquiries into his past activities with the primary person of

18  interest in the FBI investigation."

19  A.  I do.

20  Q.  Who does the primary person of interest in the FBI

21  investigation refer to?

22  A.  Mr. Schulte.

23  Q.  What of Michael's past activities with Mr. Schulte are you

24  referring to in the memo?

25  A.  So, they had had a long personal and professional

1    relationship, and at one point had had a physical altercation

2    in the workplace.

3    Q.  Then, just continuing in that sentence, where it refers to

4    "his unexplained activities on the computer system from which

5    the CCI data was stolen."  What unexplained activities are you

6    referring to?

7    A.  He had taken a screenshot on the day of the theft on the

8    network in question.  And he was not cooperative with

9    investigative personnel in discussing why he had done that.

10   Q.  So, when it says "unexplained activities on the computer

11   system," did you mean to indicate that Michael might have been

12   responsible for the theft of the CIA information?

13          MS. SHROFF:  I'm going to object to the leading.  He's

14   leading the witness.

15          THE COURT:  Mr. Denton, don't lead.

16          MR. DENTON:  Understood, your Honor.

17   Q.  When you said "his unexplained activities on the computer

18   system," did you mean to indicate --

19          MS. SHROFF:  Again, he's leading.

20          MR. DENTON:  I'm asking him what he meant.

21          MS. SHROFF:  Ask him what he meant.

22          THE COURT:  Go ahead, Mr. Denton.  The objection is

23   overruled.

24   Q.  When you referred to his unexplained activities, did you

25   mean to indicate that Michael was responsible for the theft of

1   the Vault 7 information?

2           MS. SHROFF:  That's leading.  He could ask "what did

3   you mean."

4           THE COURT:  Overruled.

5   A.  No.

6   Q.  So, just continuing here.  The rest of that sentence

7   indicates that the past activities with the defendant and

8   screenshot that you described raise significant concern about

9   Michael's truthfulness, trustworthiness, and so on.

10          Why did those two things that you described raise

11  concern about his truthfulness or trustworthiness?

12  A.  Because at the agency, in order to hold a security

13  clearance, to retain employment, we have to be confident that

14  you are trustworthy and you're candid about your activities and

15  those of your co-workers, your knowledge of them.

16          The fact that he had taken the screenshot would

17  suggest that he knew something had taken place that was --

18  wrong.  And the fact that he did not cooperate with

19  investigators into that as well as the altercation with the

20  defendant, led us to believe that he was not trustworthy.

21  Q.  Just starting at the top of this paragraph again, just

22  globally where you refer to his cooperation with inquiries,

23  what inquiries are you talking about?

24  A.  So, there were two separate investigations by the Office of

25  Security into the altercation between Michael and Mr. Schulte

1    as well as Mr. Schulte and another employee.  And Michael

2    refused to talk to our investigators about those incidents.

3            MR. DENTON:  Ms. Hurst, if we can go to the second

4    page, please, and blow up paragraph 3.

5    Q.  Do you see the sentence that's about three-quarters of the

6    way down, I'll try to draw a little blue line here, that starts

7    "Ultimately the SIB investigation did not substantiate the

8    threat of physical harm to Schulte."

9    A.  Yes.

10   Q.  Is that one of the inquiries that you were just referring

11   to?

12   A.  It is.

13           MR. DENTON:  Ms. Hurst, if we can move on and go to

14   paragraph 4, please.

15   Q.  So, starting about a third of the way down, you see the

16   sentence that reads, "In the wake of the theft and unauthorized

17   disclosure of CCI's cyber toolkit on WikiLeaks, CIMC requested

18   that OS pause all ongoing security processing involving

19   individuals who had access to the stolen data pending further

20   investigation of the incident by CIMC and FBI."

21   A.  Yes.

22   Q.  How did the fact that an FBI investigation was ongoing

23   affect the security process?

24   A.  So there are two separate investigative tracks, and our

25   standard practice when there is an open criminal investigation

1    is to pause any sort of administrative or security

2    investigation in order to protect the integrity of the criminal

3    investigation.

4    Q.  Just looking down at the next sentence, it talks about how

5    Michael's processing was paused as a part of that effort.  What

6    does that mean?

7    A.  It meant that although his security reinvestigation was

8    open, that we were not going to proceed with resolving that

9    reinvestigation process or conducting any other interviews with

10   him until the FBI investigation had run its course.

11   Q.  Then the next sentence continues "as he held systems

12   administrator privileges on the DevLAN."  Do you see that?

13   A.  I do.

14   Q.  First of all, let me ask you, are you a technical person,

15   sir?

16   A.  I'm not.

17   Q.  Do you know what system administrator privileges Michael

18   held?

19   A.  I do not.

20   Q.  Do you know how they compared to the defendant's system

21   administrator privileges?

22   A.  I do not.

23   Q.  Finally, it talks about how Michael was present in EDG

24   spaces during the timeframe of the theft.

25            What does that refer to?

1    A.  He was physically present in the same CCI office facility

2    that Mr. Schulte was.

3          MR. DENTON:  So then, Ms. Hurst, if we can zoom out

4    and if there a way to grab the bottom of page two and the top

5    of page three, that would be perfect.  Thank you.

6    Q.  Now, sir, can you read the first sentence of number 5.

7    A.  Yes.  "In support of the ongoing criminal investigation,

8    CIMC conducted comprehensive reviews of all individuals who

9    could have perpetrated the theft of the CCI data, including

10   Michael."

11   Q.  Were you working in CIMC when those reviews were conducted?

12   A.  I was not.

13   Q.  So, just continuing on, the paragraph identifies several

14   concerns about Michael.  I'm going to ask you about each of

15   them.  The first one refers to his close proximity to the theft

16   of the data.  Do you see that?

17   A.  I do.

18   Q.  What does that refer to?

19   A.  Again, his physical proximity in the same CCI office

20   facility that the theft took place in.

21   Q.  Then that sentence continues to refer to his relationship

22   with Joshua Schulte, the individual charged with the theft of

23   data.  Do you see that?

24   A.  Yes.

25   Q.  What about his relationship with Joshua Schulte was

K2R3SCH1                              Hall - Direct

1    concerning?

2    A.   Again, he had had a personal and professional relationship

3    with Mr. Schulte, they had had an altercation, and he had

4    refused to discuss what the status of his relationship was with

5    Mr. Schulte, what led to that altercation, and what -- you

6    know, details of the altercation between Mr. Schulte and the

7    other CCI employee.

8    Q.   Why is that relationship relevant to whether Michael posed

9    a security concern?

10            MS. SHROFF:   Which relationship?

11   Q.   Why was Michael's relationship with the defendant relevant

12   to whether Michael posed a security concern?

13   A.   Because we knew that Michael and others knew that

14   Mr. Schulte had previously had incidents where he had been

15   removed from privileges on the network and given them back to

16   himself.  So, we suspected that Michael had taken the

17   screenshot because he thought that Mr. Schulte had done

18   something similar, and the fact that he was unwilling to talk

19   to us about it was a concern for us.

20   Q.   Why was it a concern that he wasn't willing to talk about

21   it?

22   A.   Because we suspected that he knew that Mr. Schulte had done

23   something wrong, manipulated the network in an unauthorized

24   fashion.  So as a matter of security principle, we expect our

25   employees to discuss either with their management or security

1    when a co-worker does something that's unauthorized.

2    Q.  Moving on, the next sentence refers to "forensic analysis

3    of Michael's activity on the DevLAN suggests that Michael may

4    have additional knowledge of anomalies on the system at the

5    time of the theft."  You see that?

6    A.  I do.

7    Q.  First of all, what agency was responsible for conducting

8    that forensic analysis?

9    A.  The FBI.

10   Q.  When you refer to his activity on DevLAN, what in

11   particular are you referring to?

12   A.  Specifically the screenshot he took of the network status

13   the day of the theft.

14   Q.  Then a little later on in that sentence, it refers to

15   anomalies on the system.  What anomalies are you referring to?

16   A.  Again, we knew that Michael knew that Mr. Schulte had

17   previously given himself unauthorized access to EDG network

18   data that he had been removed from, and we suspected that

19   Michael had taken the screenshot because he thought that

20   Mr. Schulte had done the same thing again in this instance.

21   Q.  Just finally, I think you may have answered this in part

22   there.  But, what are you referring to when you say that

23   Michael may have additional knowledge about those anomalies?

24   A.  That he knew that Mr. Schulte had manipulated the network

25   in some way, taken data off of it and then had manipulated it

1    to look as though it hadn't happened.

2    Q.  So then just more briefly on the final sentence.  Is that

3    the same thing that the "relevant information concerning the

4    circumstances" refers to?

5    A.  It is.

6    Q.  Where it says "recent inquiries indicate that Michael is

7    still withholding that information," what recent inquiries are

8    you referring to?

9    A.  He had had an interview with the Department of Justice in

10   the summer of 2019 where he again was non-cooperative with

11   questioning about that particular incident, and others

12   surrounding his interaction with Mr. Schulte.

13            MR. DENTON:  Ms. Hurst, can we zoom out and go to

14   paragraph 6 on page three, please.

15   Q.  Sir, could you do me a favor and read the first sentence

16   here.

17   A.  "Given the magnitude of the theft of the CCI toolkit and

18   its concomitant damage to national security, CIMC views

19   Michael's lack of cooperation as a significant and untenable

20   risk to the security of the operations on which he now works

21   and any new tools he deploys for CCI."

22   Q.  Does that sentence indicate that you believe Michael was

23   responsible for that theft?

24   A.  No, it does not.

25   Q.  Why was his lack of cooperation a concern with respect to

1    the security of the operations on which he now works?

2    A.  One of the fundamental principles of holding a clearance at

3    CIA is that we trust that you are going to be a good steward of

4    classified information.  And the fact that Michael was

5    unwilling to cooperate with the security process, coupled with

6    his access to sensitive data, led us to feel that we could not

7    trust him in access.

8            MR. DENTON:  If we can just zoom out and go back to

9    page one, Ms. Hurst.

10   Q.  Do you see where it says "Memorandum for Director, Office

11   of Security"?

12   A.  I do.

13   Q.  After this memo was drafted, was it sent to the director of

14   the Office of Security?

15   A.  It was.

16   Q.  Did you speak with the director about it?

17   A.  I did.

18   Q.  Why did you speak with the director about this memo?

19   A.  He was not in his office and on the computer system at the

20   time.  So in the interest of time, I spoke with him on the

21   secure line about the content of the memo.

22   Q.  Tell us what you spoke about with him.

23   A.  We talked about the reasons for our request to place

24   Michael on enforced admin leave, and I read to him portions of

25   the memo over the secure line.

K2R3SCH1                          Hall - Cross

1    Q.  At any point during your conversation with the director did

2    you indicate that Michael was a suspect in the Vault 7 leak?

3    A.  No.

4    Q.  Why didn't you indicate that?

5    A.  Because he wasn't.

6    Q.  Did the director ultimately agree with the recommendation

7    in the memo?

8    A.  He did.

9    Q.  As far as you know, were any of these reasons why Michael

10   was placed on administrative leave ever communicated to

11   Michael?

12   A.  No.

13   Q.  Why not?

14   A.  It's not our standard practice at the agency to communicate

15   the reason for placing somebody on enforced admin leave.  We

16   simply tell them that they are going to be placed on enforced

17   admin leave, and walk them through the process for their

18   interaction with the agency during that time.

19            MR. DENTON:  No further questions, your Honor.

20            THE COURT:  Ms. Shroff?

21   CROSS-EXAMINATION

22   BY MS. SHROFF:

23   Q.  Let's start at the very beginning, okay?

24   A.  Okay.

25   Q.  Let's pull up the memo.  In preparation of writing this

1   memo, Mr. Hall, did you review Michael's investigative file?

2   A.  I didn't personally review his investigative file, no.

3   Q.  You told Mr. Denton in one of your conversations with him

4   that you had a staffer -- that's the word you used -- write the

5   memo, correct?

6   A.  It was a senior investigator within our department, yes.

7   Q.  Do you know if you told him to review Michael's

8   investigative file before writing this memo?

9   A.  She -- I did not tell her to review his investigative file.

10  But she was familiar with it, having been an investigator on

11  this particular matter.

12  Q.  How about, did you tell her -- what's her first name, by

13  the way?

14  A.  Tracy.

15  Q.  Okay.  And did you tell Tracy to review Michael's bio file?

16  A.  I did not.

17  Q.  You did not.

18  A.  No.

19  Q.  Did you tell her to review any other documents before

20  assigning her the task of drafting this memo?

21  A.  No, I did not.

22  Q.  Did you review Michael's investigative file in preparation

23  for your testimony today?

24  A.  I did.

25  Q.  You did, right?

1    A.  Yes.

2    Q.  You reviewed Michael's entire investigative file before you

3    testified today, correct?

4    A.  No, I did not, not his entire file.  I did not review his

5    security file.  I reviewed the CIMC assessment of Michael.

6    Q.  So you reviewed his investigative file; is that what it's

7    called?

8    A.  No.  I reviewed the CIMC assessment of Michael and his

9    association with this particular theft.

10   Q.  Right.  When did you review those documents?

11   A.  Over the course of the last week or two I would say.

12   Q.  Did you also review Michael's polygraphs?

13   A.  No, I did not review Michael's polygraph reports.

14   Q.  You did not review the polygraph reports which he did not

15   pass conclusively?

16   A.  Again, I reviewed the CIMC assessment that had summaries of

17   his polygraph in them.  I did not review the specific polygraph

18   reports from the Office of Security.

19   Q.  Did you provide that file that you reviewed to Mr. Denton

20   here?

21   A.  I'm sorry.  Say that again?

22   Q.  Sure.  The file that you reviewed to prepare for your

23   testimony here today, did you provide a copy to Mr. Denton?

24   A.  The agency provided a copy, yes.

25   Q.  By agency, do you mean like those lawyers that are sitting

K2R3SCH1                    Hall - Cross

1    in the courtroom here today?

2    A.   I don't know who -- I would assume the Office of General

3    Counsel, but I don't know specifically.

4    Q.   Okay.  Mr. Denton asked you about your work at the CIA,

5    correct?  You said you were employed by the CIA for 15 years,

6    right?

7    A.   Yes.

8    Q.   And you were the deputy chief at CIMC, correct?

9    A.   I'm the deputy chief of the Counterespionage Department,

10   which is one department within CIMC, yes.

11   Q.   You've been in that position for how long now, about a

12   year, not quite a year?

13   A.   Over a year, since January of 2019.

14   Q.   Before that, what was your position before that?

15   A.   Just prior to this position, I was the chief of the

16   security intelligence cell within the Office of Security.

17   Q.   It's fair to say, is it not, Mr. Hall, that you take your

18   work seriously?

19   A.   I take my work seriously, yes.

20   Q.   As part of your work at the CIA, you were responsible for

21   drafting memos such as this one, correct?

22   A.   No, I'm not usually the person who drafts these types of

23   memos.  As a senior manager within the department, I may review

24   them and approve them for official routing.

25   Q.   Okay.  Well, you drafted this memo in the sense that you

K2R3SCH1                         Hall - Cross

1   reviewed it with the person -- or as you called her, the

2   staffer -- who wrote the memo, correct?

3   A.   I reviewed it, and I approved her final draft, yes.

4   Q.   Right.  When you reviewed it, you reviewed it literally

5   contemporaneously with her, correct?

6   A.   Yes, that's correct.

7   Q.   So as she was typing it up, you were reviewing it, correct?

8   A.   Not as she was typing it up.  When she had completed her

9   final draft.

10  Q.   So let me direct your attention to a document here that

11  might refresh -- are you sure that you did not review it as it

12  was being drafted?

13  A.   I did not review it as she was drafting it.  She had a

14  final draft that I looked on her computer, did review the

15  language, and approved it for its routing to the director.

16  Q.   So, do you know what date the drafting of this memo

17  started?

18  A.   No, I don't recall.

19  Q.   Do you recall telling Mr. Denton that you spoke and

20  reviewed it with the person as it was being drafted and spoke

21  about it verbally?  Do you recall that?

22  A.   Yes, vaguely.

23  Q.   Vaguely?  This was only February 22.  That's not even a

24  week ago.

25  A.   Yes, I recall it.

K2R3SCH1                           Hall - Cross

1    Q.  Right.  You were on a phone call, correct, with Mr. Denton

2    here, right?

3    A.  Yes.

4    Q.  And on that phone call was a CIA lawyer whose initials are

5    C.G., correct?  Is there a CIA lawyer on the call?

6    A.  Yes, there was.

7    Q.  Okay.  And then there was the agent on the call?

8    A.  I believe so.  I'm not sure.

9    Q.  Well, you are the CIA, right?  Did you take notes of who

10   was on a telephone call with you?

11   A.  I did not personally take notes, no.

12   Q.  Do you know who the other participants were?

13   A.  I don't know specifically who was on the call other than

14   Mr. Denton.

15   Q.  Okay.  So, you spoke to Mr. Denton less than a week ago,

16   correct?

17   A.  Yes.

18   Q.  And you don't recall telling him that you were with the

19   person as the memo was being drafted, correct?

20   A.  I was with her as I directed her to draft the memo, and as

21   I cleared on the final language, the final draft.

22   Q.  But that wasn't the question I asked.  My question was do

23   you recall telling him that you were physically present as the

24   memo was being drafted?

25   A.  No, I don't recall that.

K2R3SCH1                          Hall - Cross

1    Q.  Okay.  When you reviewed this memo, you were careful in

2    your review, correct?

3    A.  Yes.

4    Q.  You knew it was an important memo to write, correct?

5    A.  No more so important than any other memo we draft.

6    Q.  No more important than any other memo you draft.  How close

7    to execution of this memo was this memo drafted?

8    A.  Within a matter of a day.

9    Q.  Within a matter of a day, right?

10   A.  Yeah.

11   Q.  You had urgency to this memo, correct, according to you?

12   A.  There was -- yes.

13   Q.  Right.  This memo involved your precious tools, correct?

14   A.  The memo involved our decision that Michael was an

15   unacceptable risk to leave in place, yes.

16   Q.  In August of 2019, correct?

17           He was an unacceptable risk to leave in place in

18   August of 2019, correct?

19   A.  Yes, yes.

20   Q.  When was this altercation with Mr. Schulte, the physical

21   one?

22   A.  I don't recall the exact date.

23   Q.  Did Mr. Denton not prepare you that question?

24   A.  We didn't discuss specific dates of the altercation.

25   Q.  Did you read it in his investigative file?

1  A.  I recall reading about the altercation.  I did not focus on

2  the specific date.

3  Q.  Ah.  Well, we'll get to that, because a lot of your memo is

4  based on your concern about Mr. Michael not discussing that

5  physical altercation, the date of which you do not remember.

6  Okay?

7  A.  Okay.

8  Q.  You do recall, Mr. Hall, that that altercation definitely

9  did not take place in 2019, right?

10  A.  It did not.

11  Q.  Not even 2018, correct?

12  A.  It did not.

13  Q.  Not even 2016, correct?

14  A.  I don't recall whether it was '16 or not.

15  Q.  Sitting here today, you did not recall that it happened in

16  October of 2015?

17  A.  No, I don't.

18  Q.  Sitting here today, sir, do you know when was the first

19  time Michael declined to talk to anyone at the CIA about this

20  physical altercation; do you remember?

21  A.  The specific date, I don't.

22  Q.  Forget about date.  Let's go with year.  Do you even

23  remember a year?

24  A.  It would have been --

25  Q.  No, no, not "would have been."  Do you remember a year?

K2R3SCH1                        Hall - Cross

1    A.  I do not.

2    Q.  Do you by any chance even know if management ever knew

3    about this altercation in 2015?

4    A.  No, I don't know.

5    Q.  Do you know if Sean F. even thought that altercation worthy

6    enough to escalate it to the next level of management?

7    A.  I don't know, but it wouldn't have been his responsibility

8    to do so.

9    Q.  It wouldn't have been --

10   A.  The Office of Security can independently investigate

11   incidents like that in the workplace.

12   Q.  Great.  My question wasn't that.  My question was, and

13   please try and listen to my question.  My question is, were you

14   aware that their immediate boss did not think that fight of any

15   consequence such that he escalated it to security?

16          Were you aware of even that?

17   A.  I was not aware of that.  But their immediate boss was not

18   a security officer.

19   Q.  Okay.  We'll go with that.  Let's put it this way.  Do you

20   know if the fight started over two grown men throwing rubber

21   bands at each other?

22   A.  I do.

23   Q.  Right.  And you know that after that fight, nobody thought

24   anything of it, correct?  Until 2019, when you wrote this memo,

25   correct?

K2R3SCH1                      Hall - Cross

1   A.  No --

2   Q.  No action was taken against Mike, right, based on the

3   fight?  Was any action taken?

4   A.  No, there wasn't.  But that does not mean there wasn't --

5   Q.  No, no.

6           MR. DENTON:  Your Honor, can he answer question?

7           THE COURT:  He can answer the question.

8   Q.  The question was, was any action taken.  That was the

9   question.

10  A.  No, no action was taken.

11  Q.  Was he moved out of his group?

12  A.  No.

13  Q.  Moved out of his branch?

14  A.  I don't recall.  I don't know.

15  Q.  They didn't even move his desk, correct?

16  A.  I don't know.

17  Q.  Okay.  Let's just go back to this memo, all right?  Would

18  you say, sir, that this memo is an important document for the

19  CIA itself to be accurate about?

20  A.  We always try to be accurate in our documentation.

21  Q.  So you tried to be accurate here, correct?

22  A.  Yes.

23  Q.  And you would agree with me that this memo has implications

24  for the employee himself, Michael, correct?

25  A.  It does.

1   Q.   Right.  It has implications for his future, correct?

2   A.   It does.

3   Q.   It has implications for your agency, correct?

4   A.   Somewhat, but it's more focused on Michael.

5   Q.   It's more focused on Michael and not the mission?  I

6   thought the whole thing about the CIA was mission before self,

7   correct?

8   A.   That's not what we're talking about when we're talking

9   about the memo, however.

10  Q.   Okay.  Now, in this memo, you requested rather urgently

11  that Michael be placed on administrative leave, correct?

12  A.   Correct.

13  Q.   And when a person is placed on administrative leave,

14  they're not allowed to come back to work, correct?

15  A.   That's correct.

16  Q.   And they're banned from every CIA facility, correct?

17  A.   That's correct.

18  Q.   It's a serious sanction, you'd agree with me, correct?

19  A.   It's a serious step, yes.

20  Q.   And you knew when you wrote this memo that people would

21  read this memo, did you not?

22  A.   I knew that a limited number of people at the agency would

23  read the memo, yes.

24  Q.   And you knew that people would rely on the facts in this

25  memo, correct?

1   A.  Yes, I did.

2   Q.  And you knew, sir, that important decisions were going to

3   be made based on this memo, correct?

4   A.  Correct.

5   Q.  You knew this memo would be read closely, correct?

6   A.  Yes.

7   Q.  Scrutinized, correct?

8   A.  It would be scrutinized for its approval, yes.

9   Q.  Well, no.  Michael could want to take action based on the

10  memo, correct?

11  A.  It could, but that's not part of my responsibility.  It's

12  simply processing the request.

13  Q.  Okay.  It is fair to say that you wanted to make sure that

14  this memo was clear, correct?

15  A.  Yes.

16  Q.  You wanted it to be direct, correct?

17  A.  Yes.

18  Q.  And you didn't want to lie or color or bias this memo in

19  any way, correct?

20  A.  Correct.

21  Q.  Okay.  And when you take a look at the memo, let's start

22  with where you started.  Okay.  And then we'll compare the

23  answers you gave to the government today.  Okay?

24  A.  Okay.

25  Q.  All right.  So let's start with paragraph 1.  "CIMC

K2R3SCH1                          Hall - Cross

1   requests enforced administrative leave for Michael, a current

2   CCI/COG employee."

3            Let's just stop there for a minute.  What is COG?

4   A.  The Computer Operations Group within CCI.

5   Q.  Right.  And Michael had moved from OSB to COG, correct?

6   A.  I don't know.

7   Q.  You don't know?

8   A.  No.

9   Q.  You don't know Michael had been allowed to move from OSB to

10  COG after the physical altercation with Mr. Schulte?

11  A.  I don't know what the timeline was of his moving to COG.

12  Q.  At that time, I take it there were no concerns raised to

13  security about Michael, correct?

14  A.  I don't know.

15  Q.  COG is the unit that works with deployment of tools,

16  correct?

17  A.  Yes.

18  Q.  It is a coveted position to work in COG, correct?

19  A.  I don't know.

20  Q.  Okay.  But he was allowed to move to COG, correct?

21  A.  He was.

22  Q.  Okay.  And certainly you are not suggesting, are you, sir,

23  that there is no concern about unauthorized disclosure for any

24  employee working in COG, correct?

25  A.  No.

1   Q.  Okay.  In fact, you want to make sure that the people

2   working in COG are people you can trust, correct?

3   A.  I would say that the -- our interest is making sure that

4   people across the agency are people that we can trust.

5   Q.  Sure.  When we talk about people across the agency, you can

6   give that answer.  Right now I'm asking about COG.

7        Correct?  You want to make sure everyone in COG is

8   somebody you trust, right?

9   A.  Correct, the same as every other employee in the agency.

10  Q.  Great.  Let's go to paragraph 2.  Now, let's start with

11  this justification, right, that you give for putting this man

12  on administrative leave.  Let's start with the first sentence.

13  "Michael's lack of cooperation with inquiries into his past

14  activities with the person of interest in the FBI

15  investigation" and -- let's stop there.

16        That's your first sentence, right?  His lack of

17  cooperation.

18  A.  Yes.

19  Q.  When you wrote that memo, how many times had Mr. Michael

20  actually met with the FBI?

21  A.  I don't know the specific number.  It was more than one.

22  Q.  More than one?

23  A.  Yes.

24  Q.  But you are saying he didn't cooperate.  He lacked

25  cooperation with inquiries.

K2R3SCH1                    Hall - Cross

1   A.  Correct.

2   Q.  Right.  But he met with the FBI, correct?  He met with the

3   FBI on March 16, 2017, correct?

4   A.  I don't know the exact dates.

5   Q.  Okay.  Fair enough.  Let me ask you something.  In

6   preparation for your testimony here today, did you learn about

7   the fact that Michael had testified?

8   A.  Yes.

9   Q.  In this case?

10  A.  Yes.

11  Q.  Had you read his testimony?

12  A.  No.

13  Q.  No.  But you knew he had testified?

14  A.  Yes.

15  Q.  You knew that this United States attorney's office put him

16  in that witness stand, right?  Correct?

17  A.  Yes.

18  Q.  Called him as a witness, correct?

19  A.  Yes.

20  Q.  He swore, put his hand up to tell the truth, correct?

21  A.  I don't know, I wasn't here.

22  Q.  Okay.  Did you tell them, Hey, we don't consider this man

23  truthful?

24  A.  I didn't have that -- we --

25  Q.  No, no.  Did you tell these fine gentlemen here that you,

1    head of security for the CIA, did not consider this man

2    truthful?

3    A.  I'm not the head of security for the CIA.

4    Q.  Whatever you are.  Did you tell them that you did not think

5    Michael was truthful?

6    A.  We told them that he was uncooperative throughout the

7    security process.

8    Q.  Okay.  Let's go to the next line right here.  What is this

9    word?

10   A.  "Truthfulness."

11   Q.  Did you tell them you doubted his ability to be truthful?

12   A.  I didn't specifically state that.  But, would assume they

13   inferred it based on our memo.

14   Q.  You assumed that the United States Attorney's Office for

15   the Southern District of New York assumed that you did not

16   think Michael was truthful?

17   A.  We said that he was non-cooperative.

18   Q.  Read your words here.  Why don't you read it for me, I'm

19   sorry.  You read it for me as Mr. Denton asked you to read it.

20   Just read the word for me.  Unexplained activities on the

21   computer system, blah, blah, blah, raises significant concerns

22   about his -- what is the first adjective you used?

23   A.  "About his truthfulness."

24   Q.  Right.  First, you chose your adjectives, correct?

25   A.  I didn't choose this adjective.  I was not the one who

1    drafted the memo.

2    Q.  You reviewed the memo, you signed off on the memo.

3    Correct?  You are not sitting here blaming your staffer, are

4    you?

5    A.  I'm not blaming anybody.

6    Q.  All right.  Let's stay with this paragraph, okay, for a

7    minute because I'm not going to shift it.

8           Let me ask you a question here.  You finalized this

9    memo when?

10   A.  In August of 2019.

11   Q.  When did you give it to the United States attorney's

12   office?

13   A.  I don't recall the specific date.

14   Q.  You don't recall when the United States attorney's office

15   was first given this memo?

16   A.  It was at some point this year.  I don't recall the

17   specific date, I think.

18   Q.  What year are we in now?

19   A.  2020.

20   Q.  Were you ever told that the United States attorney's office

21   was given this memo literally after Michael took the witness

22   stand?

23          Did these lawyers tell you that, by the way?

24   A.  I don't recall.

25   Q.  You can talk to the lawyers, right?  They're employees of

K2R3SCH1                          Hall - Cross

1    the CIA, right?

2    A.   They are.

3    Q.   Right.  They were with you when you testified, correct?

4    They're with you now.  They're sitting in court, right?

5    A.   They are.

6    Q.   Right.  You talked to them this morning, correct?

7    A.   I did.

8    Q.   They badged you into the United States attorney's office,

9    sat you down on the fifth floor, and said Wait here until we

10   take you up, correct?

11   A.   Correct.

12   Q.   They had a badge to get into their office, correct?  You

13   just walked on in, right?

14   A.   I don't know.  I wasn't focused on who had a badge.

15   Q.   Okay.  But you knew that the lawyers from the CIA were with

16   you, right?

17   A.   They're physically here, yes.

18   Q.   Did you ask them, Hey, when did you give this memo to these

19   people?

20   A.   No, I didn't.

21   Q.   You didn't ask them?

22   A.   No.

23   Q.   When did you first find out Michael testified in this case?

24   A.   I don't recall the specific date.  It was within the last

25   month.

1   Q.  You found out within the last month that Michael testified

2   in this case.  Did you reach out to them and say, Hey, you

3   know, I wrote a memo where I found this man to not be truthful?

4   A.  No, I did not.

5   Q.  Okay.  Do you know when the CIA gave this memo to the FBI?

6   A.  I don't know the specific date.

7   Q.  You only know it was in 2020?

8   A.  Yes.

9   Q.  Okay.  Let's go to the next word.  You had concerns about

10  his trustworthiness, correct?

11  A.  Yes, that's correct.

12  Q.  And you had concerns about his willingness to cooperate

13  with both routine OS investigation processes and the criminal

14  investigation into the theft from his office.

15  A.  That's correct.

16  Q.  His office.  Not the office.  His office.  Right?

17  A.  From CCI, yes.

18  Q.  No, no.  Please.  The document is in evidence.  In the

19  document, you have written "his office."  Right?

20  A.  Are you suggesting his physical office?

21  Q.  I'm not suggesting anything.  I didn't write it.  I didn't

22  write it, I didn't review it, I didn't sign off on it.

23  A.  It's referring to CCI.

24  Q.  So you consider CCI to be Mr. Michael's office.

25  A.  That's correct.

K2R3SCH1                         Hall - Cross

1    Q.   Okay.  You didn't say CCI, correct?

2    A.   No.

3    Q.   Okay.  Let's just stay with this.  When you wrote this

4    statement, right, you said your concern was that "he had not

5    been truthful, trustworthy or willing to talk about the

6    unexplained activities on the computer system from which CCI

7    data was stolen known as the DevLAN," correct?

8    A.   Correct.

9    Q.   Right?

10   A.   That's what it says.

11   Q.   Okay.  And when Mr. Denton was talking to you, he asked you

12   several times whether your concern was that he also didn't want

13   to talk about a fight in 2015, correct?

14   A.   Correct.

15   Q.   So let me just ask you this.  Had Michael told you that he

16   had never participated in a fight at all, would you have

17   believed him?

18   A.   I don't know.

19   Q.   Exactly.  Who knows.  If he had told you he had nothing to

20   do with the unexplained activities on the computer system,

21   given the fact that you had concerns about his truthfulness,

22   trustworthiness and willingness, would you have believed him?

23   A.   He didn't discuss any of it with us.

24   Q.   Exactly.

25   A.   So I don't know.

K2R3SCH1                         Hall - Cross

1    Q.  Exactly.  Exactly.  But, your testimony, and I want to be

2    sure I understood it correctly, okay, is that you left the

3    criminal investigation to the FBI?

4    A.  That's correct.

5    Q.  Right?

6    A.  Yes.

7    Q.  You don't know if Mr. Michael spoke to the FBI about the

8    screenshot, do you?

9    A.  I don't know.

10   Q.  You don't know if he told them that he took a screenshot,

11   do you?

12   A.  I don't know.

13   Q.  You don't know if he told them I checked the screenshot, do

14   you?

15   A.  I don't know the specifics of his discussions with the FBI.

16   Q.  For all you know, he told them everything he knew about the

17   screenshot, correct?

18   A.  I don't know.

19   Q.  Then why did you write it?

20   A.  Because we were talking about our internal security

21   processes --

22   Q.  But --

23   A.  -- which he was uncooperative with.

24   Q.  Your internal security processes?

25   A.  That's correct.

K2R3SCH1                    Hall – Cross

1   Q.   Why would you put him on administrative leave the very day

2   after which he ended his interview with the FBI in New York

3   City, August of 2019?

4   A.   Because it was a continuing pattern of not cooperating with

5   investigators.

6   Q.   Really?  So you are suggesting to this jury that the fact

7   that he didn't cooperate with the CIA in 2015 didn't bother

8   you, 2016 didn't bother you, 2017 didn't bother you, 2018

9   didn't bother you, but all of a sudden, boom, something

10  happened on August 19 that you decided he immediately had to be

11  put on administrative leave.  That's your testimony?

12  A.   Yes.

13  Q.   How?  Tell me, what concern was there on August 19 that did

14  not exist on August 1st?

15  A.   Again, he had been uncooperative throughout the process,

16  and the informal feedback we received from his interview with

17  the Justice Department was that -- that he was additionally,

18  again uncooperative, and that led us to believe that he could

19  be facing potential legal jeopardy because of his

20  non-cooperation.

21  Q.   So the FBI's telling you prompted you to put on him on

22  administrative leave.  It didn't have to do with the CIA at

23  all?

24  A.   No.

25  Q.   Oh.

K2R3SCH1                          Hall – Cross

1           THE COURT:  Ms. Shroff, would this be a convenient

2    place to take our morning recess?

3           MS. SHROFF:  Sure.  I can take a recess whenever you

4    want.

5           THE COURT:  Pardon me?

6           MS. SHROFF:  This is fine.  You want to do it now?

7           THE COURT:  Yes.

8           (Jury excused)

9           THE COURT:  See you in 15 minutes.

10           (Recess)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated.

3              Ms. Shroff.

4    BY MS. SHROFF:

5    Q.  Mr. Hall, before you made the decision or before whoever

6    signed off on placing Mr. Michael on administrative leave, did

7    you call the U.S. Attorney's Office and inform them or ask them

8    about their view on the decision?

9    A.  No.

10   Q.  Did you not participate in a phone call with the United

11   States Attorney's Office where somebody asked them whether or

12   not they should put Michael on administrative leave?

13   A.  I participated in a phone call with them, but I don't

14   recall specifically asking them whether we should place Michael

15   on administrative leave.

16   Q.  So what is your recollection of the point of that phone

17   call to the United States Attorney's Office?

18   A.  It was to be in receive mode from -- to receive informal

19   feedback on how his interview had gone with the Justice

20   Department.

21   Q.  Why did you want to know about how his interview had gone

22   with the Justice Department given the fact that you were trying

23   to, as you put it on direct, keep the criminal investigation

24   separate from the CIA inquiry?

25   A.  Because it still had a bearing on Michael's individual

1    security processing and his clearance, and even though we

2    didn't intend to necessarily take any action, we would welcome

3    that type of feedback or information about any of our

4    employees.

5    Q.  You'd welcome feedback or information from the agency that

6    is prosecuting another individual?

7    A.  No.  We would welcome factual feedback on our employee's

8    engagement with other government agencies.

9    Q.  So you wanted the FBI's feedback as to whether or not the

10   FBI was receiving the type of information that they wanted

11   because that would impact your decision on whether or not to

12   put him on administrative leave?

13   A.  No.

14   Q.  OK.  So, the CIA wanted to put him on administrative leave,

15   correct?  Is that your testimony?

16   A.  No, we didn't want to put him on administrative leave.  It

17   was a decision based on a risk analysis.

18   Q.  OK.  Let's stay with that -- you did a risk analysis.  It's

19   your testimony now that you did your risk analysis for the

20   first time in August of 2019?

21   A.  Not for the first time.  It was -- it was done -- it's done

22   just like for any other employee throughout the course of their

23   career.

24   Q.  But he had spoken -- by he, I mean Michael -- had spoken to

25   the U.S. Attorney's Office several times before August of 2019,

1    right?

2    A.  I don't recall how many times he had spoken to them.

3    Q.  Did you check each time that he spoke with the FBI as to

4    how it had gone?

5    A.  No.

6    Q.  Did you check in 2018 with the FBI, Hey, should we put him

7    on administrative leave?

8    A.  No.

9    Q.  How about in 2019, before August; did you check with them,

10   Hey, should we put him on administrative leave?

11   A.  I'm sorry.  On what date?

12   Q.  Before August of 2019.

13   A.  No.

14   Q.  So in August of 2019, you learned that Mr. Michael had

15   invoked, correct; he had asked for a lawyer?  Correct?

16   A.  Correct.

17   Q.  And you had also heard, had you not, that he had told the

18   FBI that he did not believe that Mr. Schulte had done the

19   reversion?  Correct?

20   A.  I -- I don't recall specifically hearing that, no.

21   Q.  Did you ask?

22   A.  No.

23   Q.  You never asked?

24   A.  I didn't personally, no.

25   Q.  OK.  How many people were on this phone call when the CIA

K2rWsch2                        Hall - Cross

1   informed the agency that is prosecuting another individual

2   whether or not they should put a person at the CIA on

3   administrative leave?

4   A.  Again, that wasn't the purpose of the phone call.

5   Q.  What was the purpose of the phone call?

6   A.  It was to receive the facts about how Michael's interview

7   had gone with the Department of Justice.

8   Q.  But the Department of Justice is a separate agency from

9   you, right?

10  A.  That's correct.

11  Q.  You don't want to taint their investigation, correct?

12  A.  It's not about taking their investigation.  It's about

13  receive --

14  Q.  No.  I said -- I'm sorry.

15  A.  -- receiving the facts surrounding the interview.

16  Q.  No.  I said taint, not take.  I didn't think you could take

17  their investigation.  I said taint.

18      Did you want to taint their investigation?

19  A.  No.

20  Q.  So why involve them in what is purely an employee decision?

21  A.  Because, again, it had a direct bearing, his

22  noncooperation, on his security clearance and his security

23  processing.

24  Q.  How did you determine that he was noncooperative?  Let me

25  ask that.

K2rWsch2                         Hall - Cross

1    A.  He was afforded multiple interviews with Office of Security

2    investigators for CIA in which he refused to discuss the

3    altercations or his actions taking the screenshot.

4    Q.  OK.  But he had refused that in 2016, correct?

5    A.  That's correct.

6    Q.  '17, correct?

7    A.  I believe so.  Correct.

8    Q.  You didn't place him on administrative leave then, right?

9    A.  No.

10   Q.  OK.  How about 2018?

11   A.  No.

12   Q.  You didn't call the DOJ at that time, right, saying:  He's

13   not talking about this altercation.  What is your view on us

14   putting him on administrative leave?

15   A.  No.  That's correct.

16   Q.  OK.  Now, you said he was uncooperative, correct?

17   A.  Yes.

18   Q.  On August 19, he had flown to New York, correct, or taken a

19   train or taken a bus, whichever way?

20   A.  I don't know the specific date.

21   Q.  OK.  Well, he had met with the FBI, correct?

22   A.  With the Justice Department, yes.

23   Q.  OK.  And do you, by any chance, know if the Justice

24   Department had told every CIA employee that meeting with them

25   was voluntary?  Correct?

K2rWsch2                        Hall - Cross

1    A.  I don't know.

2    Q.  OK.  Well, did they tell you that meeting with them was

3    voluntary?

4    A.  Me personally?

5    Q.  Yes, you.

6    A.  Yes.

7    Q.  OK.  Did they have you sign a nondisclosure that they had

8    every other employee sign?

9    A.  No.

10   Q.  OK.  Have you seen their nondisclosure?

11   A.  I have not.

12          MS. SHROFF:  What am I up to, Q?

13   Q.  I'm just going to show this only to you.  OK?

14   A.  OK.

15   Q.  I don't need you to look at who signed it or whose name it

16   is.  I just want you to read the text.  OK?

17       Does that refresh your recollection, by any chance, about a

18   nondisclosure agreement that the FBI had CIA employees sign?

19   A.  Again, this is the first time I'm seeing a nondisclosure

20   agreement from the FBI to any CIA employees in this matter.

21   Q.  OK.  You can put it on aside.  Just flip it over.  Thank

22   you.

23       And they didn't have you sign one, right?

24   A.  No, they did not.

25   Q.  And do you, by any chance, know if every CIA employee was

K2rWsch2                         Hall - Cross

 1   told that the interview was voluntary?

 2   A.  I do not know that.

 3   Q.  Do you know that the FBI could not compel somebody to talk

 4   to them?

 5   A.  I don't know.

 6   Q.  But you do know that Michael met with the FBI, nonetheless,

 7   in August of 2019, correct?

 8   A.  Yes.

 9   Q.  Right.  And he sat down and he spoke to them, correct?

10   A.  Yes.

11   Q.  And you also know that subsequent to them speaking to him,

12   he was called as a witness for the government, correct?

13   A.  Yes.

14   Q.  And throughout the time, you never disclosed, did you, this

15   memorandum?  Correct?

16   A.  No, I don't think so.  No.

17   Q.  OK.  Now, I'm not going to go through this entire document,

18   but let's just go to page 2, please.  And let me go back to

19   background section where you are at Joshua Schulte.  Here,

20   right?

21   A.  OK.

22   Q.  Do you see that language, where you're talking about

23   "Joshua Schulte and Amol, who reportedly had a physical

24   altercation within EDG spaces," correct?

25   A.  Correct.

K2rWsch2                          Hall - Cross

1    Q.  That's not factually correct, right?

2    A.  I'm sorry?

3    Q.  That's not factually correct, right?

4    A.  No.  It's factually correct, to my knowledge.

5    Q.  OK.  So it's your understanding that Mr. Schulte and Amol

6    had a physical altercation?  You think that's accurate?

7    A.  Uh --

8    Q.  OK.  I'll take that.

9            MS. SHROFF:  You can move that.

10   Q.  Did you want to change your answer?

11   A.  No.

12   Q.  And then you talked some more, ultimately, right?

13           MS. SHROFF:  Could you focus on ultimately, please.

14   Q.  Sitting here today, sir, do you know that Mr. Michael had,

15   in fact, answered all of the questions provided to him by

16   Leonard Small about the physical altercation; or do you not

17   know?

18   A.  I don't know.  I don't know who that is.

19   Q.  OK.  Do you know somebody in SIB named Mr. Small?

20   A.  I don't.

21   Q.  So when you said that Mr. Michael had been uncooperative

22   with the internal investigation, you don't know if that's

23   accurate?  I mean actually accurate.

24           MS. SHROFF:  You can take this paragraph down.

25   Q.  Do you know?

1    A.  No.  It was accurate.  He was asked about it several times

2    from several investigators, and he, on a number of occasions,

3    refused to talk about it.

4    Q.  Right.  His altercation with Mr. Schulte he refused to talk

5    about, according to you, correct?

6    A.  Correct.

7    Q.  Right.  I'm asking you if you're aware that Mr. Michael had

8    answered all of the questions about Amol's altercation with

9    Mr. Schulte.

10   A.  I don't know.

11   Q.  You don't know, right?

12   A.  No.

13   Q.  So you don't know if he had been cooperative, correct?

14   A.  I don't know.  I think initially he was not cooperative.

15   Q.  Your testimony is it was your impression that Michael was

16   not cooperative about what he knew of the altercation between

17   Amol and Mr. Schulte?  That's your testimony?

18   A.  I -- I don't recall.

19   Q.  OK.  I'll take your word for it that you don't recall.

20        Now, you also talked about, on direct with Mr. Denton --

21   right -- you talked about the fact that Mr. Schulte and

22   Michael, according to you, had both a personal and a

23   professional relationship?  Correct?

24   A.  That's correct.

25   Q.  Right.  Were you aware that Mr. Michael told the FBI that

K2rWsch2                        Hall - Cross

1    he had stopped hanging out with Mr. Schulte after he had

2    transferred out of OSB and gone to COG?

3    A.  No, I was not.

4    Q.  Were you aware that Michael had told the FBI that he had

5    been on a TDY; when he returned, he then started at COG and had

6    not been as friendly with Mr. Schulte?

7    A.  No, I was not.

8    Q.  Were you informed that he had tried to distance himself

9    from Mr. Schulte because of all the hoopla going on with

10   Mr. Schulte?

11   A.  No.

12   Q.  Do you recall if, after January of two thousand and --

13   let's just be safe, seventeen or February of 2017, was there

14   any contact between Mr. Schulte and Michael?

15   A.  I don't know.

16   Q.  You don't know if they were friends anymore even in 2017,

17   correct?

18   A.  Correct.  I don't know.

19   Q.  You don't know if they were friends in 2018, correct?

20   A.  Correct.

21   Q.  So you didn't know what their personal relationship was

22   when you wrote this memo, right?

23   A.  Correct.

24   Q.  Now, let's talk about their professional relationship.

25   They were colleagues, correct --

K2rWsch2                          Hall - Cross

1    A.   Yes.

2    Q.   -- according to you?  Right?

3         And what else did you know about their professional

4    relationship?

5    A.   That's it, basically.  That and that they had had a

6    physical altercation in the workplace.

7    Q.   That's all you knew, right?

8    A.   Yes.

9    Q.   So when you said close relationship, you didn't know what

10   the close-relationship phrase was based on other than they were

11   colleagues?

12   A.   They were colleagues in the same component, in the same

13   office, yes.

14   Q.   OK.  Now, in paragraph 4 -- correct -- you noted that

15   Mr. Michael had undergone two sessions, two polygraph sessions,

16   correct?

17   A.   Yes.

18   Q.   In May of 2017, correct?

19   A.   Yes.

20   Q.   Did not clear all issues, correct?

21   A.   Correct.

22   Q.   He's not placed on admin leave, is he?

23   A.   No.

24   Q.   OK.  And then you have this language where you go on to

25   say, "In wake of the theft of unauthorized disclosure of CCI's

K2rWsch2                        Hall - Cross

1    cyber tool kit on WikiLeaks."  Do you see all of that?

2    A.  Yes.

3    Q.  And all of this had long happened before May of 2017,

4    right?

5    A.  Correct.

6    Q.  OK.  So he had not cleared the poly after the CIA had

7    learned of the WikiLeaks, correct?

8    A.  Correct.

9    Q.  And you had still not placed him on admin leave, correct?

10   A.  Correct.

11   Q.  OK.  And then you go on to say that Michael's processing

12   was paused as a part of that effort, right?  Do you see that

13   language?

14   A.  I do.

15   Q.  "As he held systems admin privileges on the DevLAN" --

16   right -- "the system from which the tool kit was stolen and was

17   present in EDG spaces during the time frame of the theft?

18   Correct?

19   A.  Correct.

20   Q.  And even though you had that information way before 2019,

21   you took no steps to put him on admin leave, correct?

22   A.  That's correct.

23         MS. SHROFF:  Now, let's look at five.

24   Q.  "In support of the ongoing criminal investigation," right?

25   A.  Yes.

K2rWsch2                          Hall - Cross

1    Q.  "CIMC conducted comprehensive reviews of all individuals

2    who could have perpetrated the theft of the CCI data, including

3    Michael," correct?

4    A.  Correct.

5    Q.  You had no idea what comprehensive review was undertaken,

6    correct?

7    A.  I wouldn't say I have no idea.

8    Q.  OK.  Well, tell me.  Specific to Michael, what

9    comprehensive reviews did you undertake?

10   A.  It's standard practice to review their security background,

11   security file, the accesses that they have, and then try to

12   piece together whether that individual is potentially

13   responsible for an incident.

14   Q.  So your testimony is you think CIMC did all of that?

15   A.  Uh --

16   Q.  You know, sitting here today, that CIMC undertook that

17   review?  You know that personally?

18   A.  When I arrived at my job, I was briefed on the

19   investigative process, which included that methodology for

20   everyone in the subject pool.

21   Q.  My only question was, do you know that specifically as to

22   this gentleman?

23   A.  Yes.

24   Q.  OK.  So you knew at the time that they had done it

25   specifically as to Michael, correct?

K2rWsch2                              Hall - Cross

1    A.  Yes.

2    Q.  You knew that Michael had more information than the

3    run-of-the-mill CIA employee, according to you, correct?

4    A.  I'm sorry?

5    Q.  Well, nobody else had a screenshot, right?

6    A.  No, not to my knowledge.

7    Q.  Right.  Nobody else had a running vSphere at the same time,

8    correct?

9    A.  I'm sorry?

10   Q.  Nobody -- oh, did you know that Michael's vSphere was

11   running at the same time?

12   A.  I -- I don't know.  Again, I'm not a technical

13   professional.  I don't know the details of the forensic

14   analysis of the investigation.

15   Q.  OK.  But you said that he was eliminated, correct, as a

16   suspect?

17   A.  That's correct.

18   Q.  So you don't know based on what he was eliminated?

19   A.  He was eliminated based --

20   Q.  Do you know specifically based on what he was eliminated,

21   or do you just have a general idea?

22   A.  I have a general idea that he was eliminated based on the

23   forensic investigation conducted by the FBI.

24   Q.  Oh, it was a forensic investigation conducted by the FBI,

25   not --

K2rWsch2                         Hall - Cross

1   A.   The FBI as well as our own technical professionals looking

2   at our network.

3   Q.   OK.  But it doesn't mention FBI in this paragraph, does it?

4   A.   No, it doesn't.

5   Q.   OK.  So it's not based on the FBI in this paragraph,

6   correct?

7   A.   No.

8   Q.   OK.

9   A.   I'm not suggesting it is.

10   Q.   So somebody told you it was based on something when they

11   briefed you?

12   A.   That's correct.

13   Q.   OK.  And you had no idea if on the date of the theft, which

14   is the date picked by the FBI, whether Michael's vSpheres were

15   running on Confluence, correct?

16   A.   I don't know.

17   Q.   You don't know where he was logged in, correct?

18   A.   I don't know.

19   Q.   You don't know what his badge records showed, correct?

20   A.   I know his badge records showed that he left the facility

21   with Mr. Schulte.

22   Q.   OK.  Do you know what his badge records showed at the time,

23   where he was at the time the reversion started?

24   A.   I don't recall.

25   Q.   Where he was during the reversion?

K2rWsch2                          Hall - Cross

1    A.  I don't recall.

2    Q.  Do you know where he was at the end of the reversion?

3    A.  I don't know.

4    Q.  Sitting here today, do you even know if you need to be at

5    your desk, in the middle, while a reversion is taking place?

6    A.  I don't know.

7    Q.  Fair enough.  All right.

8       OK.  And let's keep going.  You now have this testimony of

9    risk assessment, right?  I'm going to skip over this part and

10   just go to six.

11      "Given the magnitude of the theft of the CCI tool kit,"

12   correct?  Right?

13   A.  Yes.

14   Q.  "And its concomitant damage to national security, CIMC

15   views Michael's lack of cooperation as a significant and

16   untenable risk to the security of the operations on which he

17   now works and any new tools he deploys for CCI," correct?

18   A.  Yes.

19   Q.  You had a significant concern about him, correct?

20   A.  About his lack of cooperation, yes.

21   Q.  And the "lack of cooperation," the phrase that you use in

22   paragraph 6, refers to the magnitude of the theft, correct?

23   Right?

24   A.  Yes.

25   Q.  Nothing about a physical altercation in here, correct?

K2rWsch2                          Hall - Cross

1   A.  No.

2   Q.  Nothing about Amol or Mr. Schulte, correct?

3   A.  No.

4   Q.  OK.  Then, after you talk about the theft, you note, in the

5   next line, whatever Mr. Michael's reasoning, he has not

6   complied with routine inquiries by SIB, correct?

7   A.  Correct.

8   Q.  By the way, did you know that Mr. Schulte had, in fact,

9   complied with all routine inquiries by SIB?

10  A.  I didn't know that, no.

11  Q.  OK.  And that during the polygraph he had failed to provide

12  clear and verifiable information concerning his activities in

13  the workplace, correct, around the time of the theft?  Right?

14  A.  Correct.

15  Q.  Not around the time of the fight, correct?

16  A.  Correct.

17  Q.  Not around the time of the Amol threat, correct?

18  A.  Correct.

19  Q.  OK.  Now, you also note in this memo, do you not, that you

20  have several concerns now, at the time of the writing of the

21  memo?  Correct?

22  A.  Correct.

23        MS. SHROFF:  And if you could go back to page 1, at

24  the bottom.  No, just at CIMC.  Right there.  Yes.

25  Q.  Just read the last line for me, would you?

K2rWsch2                          Hall - Cross

1    A.  "CIMC believes curtailing his access to CIA spaces and data

2    systems is necessary to safeguard against potential future

3    losses of sensitive and classified information."

4    Q.  So the concern was with computer security, correct?

5    A.  I'm sorry?

6    Q.  Your concern was to safeguard against future losses of

7    sensitive and classified information, correct?

8    A.  The concern was --

9    Q.  I'm just asking you to read this.  Is that what you said

10   your concern was?

11   A.  Correct.

12   Q.  Right.  You didn't say that my concern is that he's not

13   talking about a fight now, so three and a half years later,

14   let's put him on administrative leave, right?

15   A.  No, but that's part of the context of the memo.

16   Q.  That's not any part of the context of this line, is it?

17   A.  Not that line, no.

18   Q.  Right.  And you don't say, do you, that the fact that he

19   has refused to talk about a fight that happened in 2015 leads

20   me to believe that he will no longer be trustworthy on tools in

21   COG, correct?

22   A.  No.

23   Q.  Right.  You could have said that if you wanted, right?

24   A.  I suppose we could have.

25            MS. SHROFF:  Right.  So let's just go back to the very

K2rWsch2                         Hall - Cross

1    end, to the assessments, again.  I'm almost done.  And the last

2    page -- you know what?  Actually, could you just go one page

3    back.  OK.  There you go.  Risk assessment.  Right.

4    Q.  Michael's behavior suggests a lack of concern for the loss,

5    correct?

6    A.  Yes.

7    Q.  What loss are you talking about?

8    A.  The theft of the Vault 7 data.

9    Q.  OK.  And a "lack of commitment to comply with the basic

10   security agreements he entered into upon hire," correct?

11   A.  Correct.

12   Q.  Security agreements, correct?

13   A.  Correct.

14   Q.  Would you say that a fight about rubber bands does not have

15   to do with security agreements?

16   A.  I didn't say it did.

17   Q.  OK.  Now, let me ask you this.  We are now in February of

18   2020, right?  Mr. Michael's still on administrative leave,

19   correct?

20   A.  That's correct.

21   Q.  OK.  So is the CIA planning on bringing him back as a

22   full-time employee?

23   A.  I don't know.  I can't answer that.

24   Q.  You're going to fire him at the end of this case, right?

25   A.  I didn't say that.

K2rWsch2                        Hall - Redirect

1    Q.  I know you didn't.  I'm asking you the question.

2    A.  It's not my judgment to make.

3    Q.  I understand.  I didn't ask you if you were personally

4    going to fire him.  I asked you if you knew whether the CIA was

5    going to fire him.

6    A.  I don't speak on behalf of the entire CIA.

7    Q.  OK.  On behalf of what part of the CIA do you speak, sir?

8    A.  I'm an Office of Security careerist who is assigned to

9    CIMC.

10   Q.  OK.  And sitting here today as that officer, would you

11   recommend that Mr. Michael be fired from the CIA?

12   A.  I --

13   Q.  Would you recommend?  I'm just asking what you would

14   recommend.

15   A.  No, personally I would not at this time.

16   Q.  You would not at this time, right?

17   A.  Yes.

18   Q.  You'd wait until the trial was over, correct?

19   A.  I --

20          MS. SHROFF:  It's OK.  I'll withdraw that one.  Thank

21   you.

22          THE COURT:  Mr. Denton.

23   REDIRECT EXAMINATION

24   BY MR. DENTON:

25   Q.  Sir, could you answer Ms. Shroff's question:  What impact

K2rWsch2                          Hall - Redirect

1    does the trial have on your recommendation there?

2    A.  None.

3          MR. DENTON:  Could we put up the memo just briefly.

4    Q.  Ms. Shroff asked you a series of questions about your

5    communications with the Department of Justice.  Do you remember

6    that?

7    A.  Yes.

8    Q.  Did anyone from the Department of Justice ask you to place

9    Michael on administrative leave?

10   A.  No.

11         MR. DENTON:  Now, if we could just blow up paragraph

12   2, Ms. Hurst.

13   Q.  We talked about this before, where it refers to Michael's

14   past activities with the primary person of interest in the FBI

15   investigation.  Do you see that?

16   A.  Yes.

17   Q.  Again, who does that refer to?

18   A.  Mr. Schulte.

19   Q.  Is anything at all in this memo intended to convey that

20   Michael, and not Mr. Schulte, is responsible for the Vault 7

21   theft?

22   A.  No.

23   Q.  When Ms. Shroff was asking you questions, she used the term

24   "reversion."  Do you remember that?

25   A.  Yes.

K2rWsch2                          Hall - Redirect

1   Q.  Have you heard that term in connection with this

2   investigation before?

3   A.  I believe I have.

4   Q.  Generally, what's your understanding of what it refers to?

5   A.  Means that something looks as though it did in the past.

6   Q.  What is your understanding of who executed the reversion

7   involved in this case?

8   A.  Mr. Schulte.

9           MR. DENTON:  No further questions, your Honor.

10          THE COURT:  You're excused, Mr. Hall.

11          THE WITNESS:  Thank you.

12          THE COURT:  Thank you very much.

13          (Witness excused)

14          THE COURT:  Mr. Laroche.

15          MR. LAROCHE:  The government rests, your Honor.

16          THE COURT:  All right.  The government has rested.

17  There are no more witnesses.

18          We have a lot of work to do.  The parties want to work

19  on their summations.  I want to work on the jury charge.  So

20  we're not going to meet tomorrow.  We'll meet again on Monday

21  and we'll have the summations to the jury, I'll give you my

22  instructions and then you can begin deliberations.

23          Remember my standard instructions.  Until

24  deliberations begin, don't discuss the case with anybody.

25  Don't do any independent research.  If there are any stories in

K2rWsch2                          Hall - Redirect

1    the newspaper or on TV or radio, please ignore them.  Keep open

2    minds.  You'll start your deliberations on Monday.

3              I hope you have a nice weekend.

4              Ms. Wiker, I hope your leg gets better.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2rWsch2

```
 1                (Jury not present)

 2                THE COURT:  Please be seated.

 3                We sent around the jury charge last night.  Everybody

 4     got it, didn't they?

 5                MR. LAROCHE:  Yes, your Honor.

 6                THE COURT:  When do you want to get together?

 7                MR. DENTON:  Could we say 3:00, your Honor?

 8                THE COURT:  How long do you think it's going to take?

 9                MR. DENTON:  I'm hopeful, after talking with Mr. Zas,

10     that we may actually be able to get together on a couple of

11     things, so hopefully not all that long.

12                THE COURT:  David, what do we have this afternoon?

13                THE DEPUTY CLERK:  We're clear until four, your Honor.

14                THE COURT:  Do you think we could start at 2:30?

15                MR. ZAS:  Fine with us.

16                MR. DENTON:  Fine, your Honor.

17                THE COURT:  We'll start at 2:30.

18                MR. ZAS:  I have one application, very quickly.

19                We just want to renew our Rule 29 motion in light of

20     all the evidence.

21                THE COURT:  I'll reserve decision.

22                How long do you think the summations are going to be?

23                MR. LAROCHE:  Your Honor, I'm going to try to stay

24     around two to two and a half hours for the government.

25                THE COURT:  Does that include rebuttal?
```

K2rWsch2

<div style="margin-left:2em">

1          MR. LAROCHE:  No, your Honor.  I think rebuttal we

2    would request about 30 minutes.

3          THE COURT:  Ms. Shroff.

4          MS. SHROFF:  I don't know.  Two hours seems like a

5    lot, but I don't think I'm going to go more than 45 minutes to

6    an hour.

7          THE COURT:  All right.

8          MS. SHROFF:  I promise to go half the time that Mr.

9    Laroche does.  No matter what he does, I'm going to cut it in

10   half.

11         THE COURT:  Well, OK.  I was hoping that we would do

12   summations on Monday.  It would be two hours for the

13   government, two hours for the defense, two hours for the jury

14   charge.  I timed out the jury charge last night.  I'm at two

15   hours.

16         MS. SHROFF:  OK.

17         THE COURT:  But I don't want to cut anybody off.

18   You've got important things to say.

19         MR. LAROCHE:  Your Honor, I will try to keep it as

20   short as possible.  I think what we request is two hours for my

21   summation and 30 minutes, if we could, for rebuttal.

22         THE COURT:  All right.

23         MS. SHROFF:  Your Honor, are you going to tell

24   Mr. Kamaraju to only rebut, not to -- I'm just kidding.

25         MR. KAMARAJU:  I'll take any advice your Honor has on

</div>

K2rWsch2

1    rebuttal.

2             THE COURT:  I received a letter yesterday from

3    Mr. Schulte.  I'm going to mark that as a court exhibit.

4             OK.  See you at 2:30.

5             (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2rWsch2

```
                          AFTERNOON SESSION

                              2:30 p.m.
```

1                                            AFTERNOON SESSION

2                                              2:30 p.m.

3           THE COURT:  Good afternoon.  Please be seated.

4           OK.  Where do you want to start?  What page?

5           MR. ZAS:  Your Honor, my first comment is on page 5.

6           THE COURT:  OK.

7           MR. ZAS:  On the first full paragraph at the top, the

8  last line is about "sympathy should play no role," and I think

9  you'd already said that on page 4, just before.  "Do not be

10  swayed by sympathy."  I don't think it needs to be said twice.

11         THE COURT:  Where do I say it on page 4, Mr. Zas?  Oh,

12  "do not be swayed by sympathy."  OK.

13         MR. ZAS:  Right.

14         THE COURT:  You want to strike that, I gather.

15         MR. ZAS:  Just one.

16         THE COURT:  We don't need repeated references.

17         OK.  Next.

18         MR. ZAS:  On page 7, just the last sentence on seven,

19  that says, "You are to give no weight to the fact that a grand

20  jury properly returned an indictment."  We would just object to

21  that as being unnecessary.  That seems to imply that the

22  Court's saying that the grand jury acted properly in the sense

23  of what basis, so I thought we'd just strike that sentence.

24         THE COURT:  Any objection, Mr. Denton?

25         MR. ZAS:  Or if you want to say "give no weight to the

K2rWsch2

1    fact that the grand jury returned an indictment," that would

2    solve our concern.

3              MR. DENTON:  Seems easier just to strike the sentence,

4    your Honor.

5              THE COURT:  I'll strike the sentence then.

6              OK.

7              MR. ZAS:  Your Honor, Mr. Branden reminds me, on the

8    same page we're on, page 7, the first full paragraph, at the

9    top, again, there's another sympathy reference.  In the second

10   sentence, "It is not an excuse to avoid the performance of an

11   unpleasant duty," we would just strike the "and it is not

12   sympathy."

13             THE COURT:  This is a pretty standard charge.

14             MR. ZAS:  Oh, it's just that I thought it's

15   repetitive.

16             THE COURT:  OK.  I'm going to leave this the way it

17   is.

18             MR. ZAS:  OK.

19             My next comment is on page 13.

20             THE COURT:  Anything before 13, Mr. Denton?

21             MR. DENTON:  No, your Honor.

22             THE COURT:  OK.  Mr. Zas, what do you have?

23             MR. ZAS:  The last full paragraph, the sentence that

24   talks about the pseudonyms, the potential danger to the

25   witnesses' safety.

K2rWsch2

1           THE COURT:  Yes.

2           MR. ZAS:  We would just object to that in a case where

3    the jury has to determine whether this was national security

4    information, we thought it's unnecessary, and we would propose

5    the following change:

6           "The disclosure of the witnesses' true names and what

7    they look like could potentially," and then just strike

8    everything up to compromise -- "could potentially compromise

9    their work at the CIA," rather than flagging the potential

10   safety issues.

11          THE COURT:  Mr. Denton.

12          MR. DENTON:  I don't grasp the implications about what

13   it means to compromise their work at the CIA, your Honor.  I

14   think that's probably fine to strike.  I think as long as the

15   jury has some explanation and doesn't think it's without basis,

16   I think that's fine.

17          THE COURT:  OK.  I'll make the change.

18          MR. ZAS:  On page 14, discussion of expert witnesses.

19          THE COURT:  Yes.

20          MR. DENTON:  Just before that, if I may, your Honor?

21          THE COURT:  Mr. Denton.

22          MR. DENTON:  I think with respect to a separate

23   instruction on bias and hostility, in your Honor's instruction

24   on witness credibility and in the last full paragraph on page

25   10, you already talk about how the jury can consider whether a

1   witness had any possible bias or relationship and that these

2   are factors that you may consider.  So I don't think we think a

3   separate instruction is necessary there.

4            MR. ZAS:  I think the difference seems to be this one

5   seems specifically aimed at any anger or resentment toward the

6   defendant, so we like that.  I don't think we care -- it could

7   be incorporated into the other one or it could be standing

8   alone, but I think that's an additional point worth making.

9            THE COURT:  Where is the reference to bias on page 10?

10           MR. DENTON:  Your Honor, I think it's the last full

11  paragraph on the page.  It starts, "In addition, you may

12  consider whether a witness had any possible bias or

13  relationship with a party."

14           THE COURT:  OK.  I'll integrate the language on page

15  14 with that clause on page 10.

16           OK.  We're up to expert witnesses, on page 14.

17           MR. ZAS:  Yes.  We have no problem up until, there's a

18  point in the middle of the instruction that sort of starts to

19  summarize what the expertise was about, and we just think

20  that's unnecessary.  In a way, it's incomplete.  It doesn't

21  really cover everything they said, and they don't need it.

22  Once they know that there -- I think it's three or four

23  individuals, that should suffice rather than having the Court

24  do a summary.

25           THE COURT:  I'm not trying to do a summary; I'm just

K2rWsch2

1    trying to identify what the expertise is, more than just the

2    name.

3              MR. ZAS:  Yes, we're fine up to, you identify in this

4    draft charge "the specialized areas were WikiLeaks, the system

5    of classifying national security materials, and the forensic

6    analysis of computers and other electronic devices."  And we

7    would just end the paragraph there.

8              THE COURT:  OK.  Before we come to that, who are the

9    experts?  Can we agree on who the experts are?  I have

10   Rosenzweig, Leedom, Berger and Bradley.

11             MR. DENTON:  That's what I have.

12             MR. BRANDEN:  That's correct, Judge.

13             MR. ZAS:  Yes, that's right.

14             THE COURT:  And you want to end it in the middle of

15   the paragraph, right, Mr. Zas?

16             MR. ZAS:  Yes, after the words "electronic devices."

17             MR. BRANDEN:  The end of the third sentence before

18   "the expert witnesses."

19             THE COURT:  Mr. Denton.

20             MR. DENTON:  I think that's fine, your Honor.  If

21   people are confused about the system of classifying national

22   security materials at this point, there's not much hope.

23             THE COURT:  OK.  So I strike out, "The expert

24   witnesses were allowed to testify," and that goes over --

25             MR. BRANDEN:  To the end of the paragraph.

K2rWsch2

1        MR. ZAS:  Yes.

2        THE COURT:  That ends on page 15, correct?

3        MR. ZAS:  Yes.

4        MR. DENTON:  Yes, your Honor.

5        THE COURT:  All right.  Anything else on 15?

6        MR. ZAS:  No.

7        THE COURT:  Do I have the name right on 15, Carlos

8   Betances?

9        MR. DENTON:  I think that is probably the best way to

10  refer to him.  His full name is Carlos Betances Luna Mera, but

11  I think since he was referred to by everyone as Mr. Betances,

12  it's probably best to just call him that.

13        THE COURT:  OK.

14        Pages 16 and 17.

15        MR. ZAS:  On 17, I think we would object to the

16  instruction, letter K, "evidence obtained from searches."

17        THE COURT:  Yes.

18        MR. ZAS:  I'm not sure there's been any argument that

19  there's an illegal search that occurred in the case, so if I'm

20  right about that, I thought it would be unnecessary to put in.

21        THE COURT:  Well, this is really just based on my

22  experience, which is I once had a note from a juror saying they

23  weren't sure about the evidence that had been obtained from the

24  searches, so since that time I've included it.  It's a standard

25  charge.

K2rWsch2

1              It's up to you, Mr. Denton.  Do you want it in or out?

2              MR. DENTON:  I think we should keep it, your Honor.

3              THE COURT:  Yes.

4              Mr. Zas, I'm not going to make that change.

5              MR. ZAS:  Understood, your Honor.

6              THE COURT:  What are we up to now?

7              MR. ZAS:  On page 19, the heading O, "all available

8    evidence need not be introduced."

9              THE COURT:  OK.

10             MR. ZAS:  I just object to that whole thing as

11   unnecessary.  I don't think anyone thinks that either side has

12   to call or present all the evidence that might exist.

13             THE COURT:  Mr. Denton.

14             MR. DENTON:  Your Honor, I think that's a pretty

15   standard instruction.

16             THE COURT:  It is standard.  Is it necessary, though?

17             MR. DENTON:  We think it's appropriate here, your

18   Honor.  I think there's been sort of a question about who

19   introduced what.  I think it's fair to inform the jury that

20   that's not a criterion for them to evaluate the case on.

21             THE COURT:  All right.  I'll leave it in.  It's a

22   standard charge.

23             Just above that, on stipulations, do you want to give

24   them exhibit numbers?

25             MR. DENTON:  Yes.  I think they are Government

K2rWsch2

1    Exhibits 3002, 3003, 3004, 3005 and Defense Exhibit O.

2              THE COURT:  3002, '3, '4, '5 and Defense Exhibit O.

3    Are you sure we have them all?

4              MR. DENTON:  I'm pretty sure, your Honor.

5              MR. ZAS:  Those are the testimonial stipulations or

6    the facts.

7              MR. DENTON:  O is a fact stipulation.  And '2, '3, and

8    '4 are testimonial.

9              THE COURT:  Why don't you go back to your offices and

10   check.  I want to make sure this is complete.

11             MR. DENTON:  OK.  I know we omitted 3001.

12             THE COURT:  Inferences.

13             MR. ZAS:  Your Honor, we think that's all covered by

14   your direct and circumstantial evidence charge.  It's basically

15   repeating the same point.

16             THE COURT:  You say that circumstantial evidence and

17   inferences are the same, Mr. Zas?

18             MR. ZAS:  Let me just go back and see how close they

19   are.

20             On your pages 8 and 9, in the direct and

21   circumstantial evidence instruction, you talk about what an

22   inference is and how they should be made.

23             THE COURT:  OK.  If there's anything critical in

24   inferences, I'll move it back and include it in direct and

25   circumstantial evidence.

K2rWsch2

1      MR. DENTON:  I think on that point, your Honor, the

2  main thing that we would ask that you keep is the confirmation

3  that "an inference is not a suspicion or a guess"; essentially,

4  the second paragraph of that instruction.

5      THE COURT:  OK.

6      MR. BRANDEN:  In the fourth paragraph of that

7  instruction, it says "the defendants," plural.  I know it's a

8  small, technical point, but it should be singular.

9      THE COURT:  The defendant.  OK.

10      The takeaway here is I'm going to consolidate letter

11  P, inferences, at page 20, with the language on page 8 dealing

12  with direct and circumstantial evidence.  The government wants

13  to include that an inference is not a suspicion or a guess and

14  the rest of the language in that paragraph.

15      Motive.

16      MR. ZAS:  We just have a small change.  In the very

17  last sentence of that instruction, "But the presence or absence

18  of motive is a circumstance that you may consider as bearing on

19  the intent of the defendant," we would just insert "or

20  actions," intent or actions of the defendant.

21      THE COURT:  All right.

22      I think on "defendant's testimony," this is the

23  language you suggested last night, Mr. Zas.

24      MR. ZAS:  Yes.  We have no objection to it.

25      THE COURT:  Mr. Denton.

K2rWsch2

1          MR. DENTON:  Your Honor, I think as a general matter

2     we're fine with it.  I think the main thing we would object to

3     is the language at the top of page 22 suggesting reasons why a

4     defendant may decide not to testify.

5          I think it's sufficient to instruct the jury to not

6     speculate as to why he did not testify and to instruct them

7     that they cannot draw any inference, without suggesting a

8     number of innocent reasons.  We would propose deleting from

9     "there are many reasons" through "you are not to speculate as

10    to these things."

11         MR. BRANDEN:  I haven't looked recently, but I believe

12    that those explanations for why a defendant may not testify are

13    part of a standard Sand instruction.  I know I've requested

14    that previously.

15         MR. ZAS:  I think there is authority for it that I

16    think we gave to the Court when we proposed it.

17         MR. DENTON:  It is equally true that a defendant may

18    decide not to testify because he is concerned about the outcome

19    of cross-examination, so I think the more prudent course is

20    simply not to invite speculation either way, which is what your

21    Honor did in *Flores*, so we'd just suggest leaving it out

22    entirely.

23         THE COURT:  OK.  We're resuming on the final

24    paragraph, "You are not to attach any significance to the fact

25    that Mr. Schulte did not testify"?

K2rWsch2

1          MR. DENTON:  That's fine, your Honor.  We would also

2    have no objection to leaving in the last sentence and just

3    reiterating again that "you may not draw any inference

4    whatsoever from a defendant's decision not to take the stand."

5          THE COURT:  OK.  The summary of the indictment.

6          MR. DENTON:  If I may, your Honor?

7          Just before we move on to substantive instructions, we

8    had requested an instruction, I think it was government's

9    request No. 4, pertaining to false exculpatory statements by

10   the defendant.  We think in light of the testimony,

11   particularly from Special Agent Evanchec, about his interviews

12   with the defendant, I think it's appropriate to give that

13   instruction here.

14         THE COURT:  Mr. Zas.

15         MR. ZAS:  Your Honor, if I may?

16         On this one, I don't have the government's proposed

17   instruction in front of me.  Could we put this to the side, and

18   if I have a view, either let you know in writing later today or

19   tomorrow morning.

20         THE COURT:  That would be fine.

21         The summary of the indictment.

22         MR. ZAS:  Yes.  I have something on 26 too.

23         MR. DENTON:  I think we're all good until the third

24   element of Count One, your Honor.

25         THE COURT:  Let me ask you about what appears on page

K2rWsch2

24:

"First, that in or about 2016, the defendant copied, took, made, or obtained a sketch, photograph, photographic negative, blueprint, map model, instrument, appliance, document, writing, or note, to wit"; just saying "the defendant took information maintained by an intelligence agency of the United States."

MR. BRANDEN:  I'm sorry, Judge.  I'm not sure I understood.  Are you proposing to take out the sort of statutory language?

THE COURT:  Yes.

MR. BRANDEN:  And just get into the "to wit" part.

THE COURT:  Correct.

MR. ZAS:  I think I attempted to deal with it when we did our proposed instructions.  It seemed to me that what was really being alleged is a document, writing, or note in the sense that it's a kind of file.

THE COURT:  Well, I don't mind reducing it.  I just don't think we need all this photograph, photographic negative, blueprint, map, model, instrument, appliance, document.  If you want to say exactly what it was, I don't mind putting in the allegations.

MR. ZAS:  That's what I was trying to say.  If we took out the first, you know, sketch, photograph, photographic negative, blueprint, map, model, instrument, appliance, all

K2rWsch2

1    unnecessary.  I would keep "document, writing, or note, to wit,

2    the defendant took" -- I'm not sure information's the right

3    word because I think the statute distinguishes between

4    information and tangible things like documents.

5         Files, does that cover it?  Or a file?  Something like

6    that.

7         MR. DENTON:  The way it is charged in the indictment

8    is exactly how it reads.

9         THE COURT:  It's charged in the indictment using the

10   language of the statute.

11        MR. DENTON:  I wouldn't have a problem just going

12   straight to the "to wit" clause, which is also from the

13   indictment.

14        THE COURT:  What about that, Mr. Zas?

15        MR. ZAS:  I think we want, I think the statutory

16   language that was charged, I think it speaks of document,

17   writing, or note and maybe "or information," so I think we'd

18   like to leave that.

19        THE COURT:  I can say, "The defendant copied a

20   document, writing, or note or took information maintained by an

21   intelligence agency of the United States."

22        MR. ZAS:  I think so.

23        MR. DENTON:  I think that's fine, your Honor.

24        THE COURT:  OK.  And then in D, "Count One:  First

25   element -- taking information," I'd make the same change there.

K2rWsch2

1          MR. ZAS:  Yes.

2          THE COURT:  Now, somebody was up to the second element

3     or the third element.

4          Mr. Zas.

5          MR. ZAS:  I was up to the third element, on page 26.

6          THE COURT:  Do you have anything on page 25,

7     Mr. Denton?

8          MR. DENTON:  No, your Honor.

9          MR. ZAS:  Just on the last sentence of the last full

10    paragraph on 26.

11         THE COURT:  "I emphasize that for Count One"?

12         MR. ZAS:  Yes.  Just to make it a little more precise,

13    I'll just read to you the way I fix it:

14         "I emphasize that to convict the defendant of Count

15    One, you must find that the defendant had the intent that the

16    information would be used against the United States, not just

17    that it could be used.  So I'd just clarify that it's not

18    really whether or not; it's to convict, they have to find that

19    he had the intent that it would.

20         THE COURT:  Give me the language again, Mr. Zas.

21         MR. ZAS:  "I emphasize that to convict the defendant

22    of Count One, you must find that the defendant," and then

23    everything stays the same after that.

24         THE COURT:  "I emphasize that to convict the defendant

25    of Count One, you must find that the defendant had the intent

K2rWsch2

1      that the information would be used against the United States,

2      not just that it could be used."

3                  MR. ZAS:  Exactly right.

4                  THE COURT:  Mr. Denton.

5                  MR. DENTON:  I have no objection to Mr. Zas's

6      revisions to the start of the sentence.  I think the only thing

7      we would ask, your Honor, is that where it continues, where you

8      say that the defendant had the intent, it should be "had the

9      intent or reason to believe."

10                 THE COURT:  All right.  Is that from the statute?

11                 MR. DENTON:  Yes, your Honor.

12                 THE COURT:  All right:

13                 MR. DENTON:  I'll just note, this is purely a semantic

14     thing, your Honor, there's a couple of different formulations

15     in this instruction in which we talk about sort of information

16     being used "to the injury of the United States," "to injure the

17     United States," or "against the United States."  I realize that

18     it is probably quite stilted to say over and over again "to the

19     injury of the United States."  I only flag it just to the

20     extent the inconsistency causes any concern.

21                 THE COURT:  Does it cause you any concern?

22                 MR. DENTON:  It causes me a slight concern, but not

23     enough that if it doesn't cause your Honor concern I'm not

24     going to --

25                 THE COURT:  Mr. Zas.

K2rWsch2

1              MR. ZAS:  We're OK with it.

2              THE COURT:  OK.  I'll leave it the way it is.

3              OK.  What are we up to now?  Count Two?

4              MR. ZAS:  I have nothing until 35.

5              THE COURT:  Let me ask you a question on Count Two and

6     Count Three, where you talk about lawful possession, page 30.

7              MR. BRANDEN:  Are you talking paragraph H, Judge?

8     That might help me.  My pagination is slightly different from

9     yours.  I don't know why, but I'm trying to follow along.

10             THE COURT:  I'm at paragraph G on page 27 of the draft

11    I sent out last night.

12             MR. BRANDEN:  OK.  I'm with you.

13             THE COURT:  Count Two talks about "lawfully

14    possessed," and Count Three is "unauthorized possession."

15    That's at paragraph L, on page 30.

16             I guess the question I have is, are these

17    inconsistent, lawfully possessing and unauthorized possession;

18    if you have to select one or the other.  How do you convict on

19    both?  Or acquit on both?

20             MR. DENTON:  I think, your Honor, in terms of the

21    theory of convicting on both, what I expect we will argue is

22    that what the defendant stole was the entirety of the

23    information in Confluence and Stash; that there were portions

24    of that -- that there were projects he was assigned to, for

25    example -- to which he had lawful access.  But there were other

K2rWsch2

1   portions that he was not entitled to, to which he had unlawful

2   access.  So by stealing the entirety of it, he covered both

3   what he was allowed to have and everything else as well.

4          THE COURT:  Under your theory, Mr. Denton, this

5   language is perfectly fine?

6          MR. DENTON:  Yes, your Honor.

7          THE COURT:  All right.

8          MS. SHROFF:  Your Honor, could we just have a minute?

9          THE COURT:  Yes.

10          MR. ZAS:  Your Honor's point was so good that we're

11   confused ourselves now.  And I'm concerned the jury may be

12   confused because it seems, just on its face, without

13   clarification, that they are inconsistent.  Maybe this is

14   another area we could do a little research and see if we can

15   find something.

16          THE COURT:  All right.

17          MR. DENTON:  I'll just say, your Honor, to the extent

18   that something is necessary to clarify, I think the way to do

19   it may be to talk about the term of the statute.  The

20   provisions of 793(d) and (e) speak in terms of the information,

21   not the system or the data or anything like that.  And so

22   whether he obtained the information lawfully or unlawfully is

23   the subject of the computer counts.  His access to the

24   information is what the espionage counts deal with, and that's

25   a slightly different issue.

K2rWsch2

1           MS. SHROFF:  Isn't the government going to argue he

2     had no access, he had no lawful access?

3           MR. DENTON:  He did not have lawful access to the

4     system.  He had lawful access to the information through a

5     different system.

6           MS. SHROFF:  That's not what they've argued.  They

7     said he had no lawful access to any information.  Whatever

8     access he had was misgranted to himself.  That's what their

9     argument is, which is why I'm confused by what he's saying.

10    But maybe Mr. Zas could think about it and let the Court know.

11          MR. DENTON:  The point is that he was still a CIA

12    employee.  He still had access lawfully to some amount of

13    information, just not the whole corpus that he stole.

14          MS. SHROFF:  But not according to them.  According to

15    them, they moved him to AED.  They moved him to another

16    division.

17          Mr. Denton, you don't have to yell at me.  I'm just

18    trying to think about it.

19          THE COURT:  Mr. Denton, in your view, what did he have

20    lawful access to?  Altabackups?

21          MR. DENTON:  No.  He had lawful access to the projects

22    from RDB, to which he was assigned at the time he committed the

23    theft.

24          THE COURT:  I think I'm going to take up Mr. Zas's

25    suggestion, and maybe we can meet again Friday or you can

K2rWsch2

1    submit further information on Friday, Friday being tomorrow.

2              MR. ZAS:  Yes.

3              THE COURT:  What's your next comment, Mr. Denton?

4    What page are you up to?

5              MR. DENTON:  I'm on page 30.

6              THE COURT:  Anything before 30, Mr. Zas?

7              MR. ZAS:  No, your Honor.

8              THE COURT:  OK.  Mr. Denton, what do you have on 30?

9              MR. DENTON:  Just at the paragraph that carries over

10   from 29 to 30 regarding the definition of an act being done

11   willfully.  We would just ask that the Court include the

12   standard language from *Bryan*, that "it is not necessary for the

13   government to establish that the defendant was aware of the

14   specific law or rule that his conduct may be violating."

15             THE COURT:  What language do you want inserted?

16             MR. DENTON:  It is from request 41 of our original

17   proposed instructions, and it is simply, "However, in

18   determining whether a defendant has acted willfully, it is not

19   necessary for the government to establish that the defendant

20   was aware of the specific law or rule that his conduct may be

21   violating."

22             THE COURT:  All right.

23             What are you up to, Mr. Zas?

24             MR. ZAS:  On page 35 --

25             THE COURT:  Anything before 35, Mr. Denton?

K2rWsch2

1          MR. DENTON:  Just a stylistic point, your Honor.

2          On Count Three, the fourth element, on page 32,

3    regarding transmission of the information --

4          THE COURT:  Yes.

5          MR. DENTON:  -- for all three of the preceding

6    instructions, you simply direct the jury to your instructions

7    on Count Two, but this instruction you repeat in full.  We

8    don't have a problem with the Court repeating it.  Just

9    flagging that, in the interest of time, you might also here be

10   able to simply say that you've instructed them previously on

11   this and they should follow those instructions here as well.

12         THE COURT:  I think we threw this in for emphasis --

13   not for emphasis, but rather, it doesn't hurt to repeat every

14   once in a while.  I'll take a look at it again with your

15   suggestion in mind.

16         Page 35.

17         MR. ZAS:  This is the count, I think, that actually

18   alleges both a substantive crime and the attempt to transmit

19   information from MCC.

20         THE COURT:  Right.

21         MR. ZAS:  Mr. Denton and I discussed this.  I think

22   we're in agreement that since intent is being charged, the

23   Court should give the normal instruction on what intent

24   requires.  I think Mr. Denton has one from the government that

25   I've reviewed that's fine, very close to the Sand charge,

K2rWsch2

1   essentially saying there has to be a substantial step toward

2   the commission, but that mere intent or in preparation may not

3   suffice, something like that.

4           THE COURT:  OK.

5           Do you have a number on your request?

6           MR. DENTON:  It was request No. 42, your Honor.

7           THE COURT:  42.  I'll include that.

8           I'm up to Count Five.  I have a question.  It's kind

9   of like the question I had for Counts Two and Three.  The

10   indictment here says "knowingly accessed a computer without

11   authorization and exceeded authorized access."  How do we

12   explain that to the jury?

13          MR. DENTON:  I think, your Honor, like anything that's

14   charged in the alternative, I think the best course is for the

15   Court to just explain both to them.

16          THE COURT:  You don't have to pick?

17          MR. DENTON:  No, your Honor.

18          THE COURT:  Mr. Zas.

19          MR. ZAS:  I don't think that the Court has to pick,

20   but I just was looking to see, does the Court explain the

21   difference between accessing a computer without authorization

22   and accessing a computer in excess of authorization?  I think

23   that would be useful if you're going to say both.  My

24   understanding is a defendant accesses without authorization if

25   the defendant's not permitted to be on the device at all, but

K2rWsch2

1 that if the defendant is permitted to be on a device or certain

2 portions of a device that goes to other places, that would be

3 exceeding authorization.

4    I'm not sure if the Court makes that point, but I

5 think it might be helpful if the Court's going to keep both.

6    THE COURT:  I don't think I've made that point.  I

7 haven't made it yet, anyway.

8    MR. ZAS:  I know there are charges out there that do

9 make that point explicitly, so I can add that to my list.

10    THE COURT:  All right.

11    MR. DENTON:  I don't think we have any problem with

12 the clarification Mr. Zas is talking about, but, your Honor, I

13 do think, given that the indictment charges it in the

14 alternative, it's appropriate to instruct the jury on both

15 options.

16    THE COURT:  OK.

17    Next.  Mr. Denton, what do you have?

18    MR. DENTON:  I'll just say, your Honor, I think that

19 to the extent that you make that change and sort of discuss it

20 in the alternative, that may just require a few additional

21 tweaks to other places in Count Five stylistically.

22    THE COURT:  OK.

23    MR. DENTON:  But I don't have anything else

24 substantively until page 39.

25    THE COURT:  Mr. Zas, anything before page 39?

K2rWsch2

1          MR. ZAS:  No.  I also have something on 39, though.

2          THE COURT:  Why don't you go first.

3          MR. ZAS:  On page really 38 to 39, I think this is the

4    only place in the instruction that has a conscious avoidance

5    charge.

6          THE COURT:  Yes.

7          MR. ZAS:  And we would object to this.  I don't think

8    the government laid a sufficient predicate for conscious

9    avoidance in this case.  I don't recall any evidence of

10   Mr. Schulte deliberately closing his eyes to whether he had

11   access or exceeded access.  It seems to me that either you

12   accept that he was given lots of instructions and didn't have

13   access or that he didn't receive such instructions, but I don't

14   recall any evidence that he was deliberately closing his eyes

15   to whether he had access.  He seemed to be writing a lot of

16   memos on this subject, so it didn't seem like it was

17   deliberate.

18         THE COURT:  Mr. Denton.

19         MR. DENTON:  Your Honor, Mr. Schulte's own narrative

20   was that he was not told but simply discovered that he had been

21   barred from access and chose to enable it.  We think it is fair

22   to say that he chose not to discover why he had been barred,

23   the fact that he had been barred.  We think that's an

24   appropriate basis for a conscious avoidance instruction if the

25   defense version of what he did is credited.

K2rWsch2

1          MR. ZAS:  Not being told is not being told.  Being

2     told over and over again is knowing.  But I don't see the

3     middle area, which is, for example, he got this important

4     letter, open it right away, and decided never to open it.  That

5     would be a conscious avoidance situation.  This just seems

6     black and white.

7          THE COURT:  Black and white in what sense?

8          MR. ZAS:  In the sense that it's either knowledge or

9     no knowledge, but not deliberately deciding not to acquire

10    knowledge.  It's not like he didn't open these emails or he put

11    fingers in his ears or something.

12         MS. SHROFF:  He read the email and thought it was not

13    clear.

14         THE COURT:  All right.

15         What's next?

16         MR. ZAS:  Your Honor, can I just raise a general

17    concern that I just caught?

18         Some of the counts don't specify a time period here --

19    they do in the indictment, of course, but they don't here --

20    and some do.  It might just be clearer for the jury if there

21    was just a reference on "in or about."  I think it's usually in

22    or about a month or year that's charged.  That might help the

23    jury not get confused between which time periods.

24         THE COURT:  I do that the first time we mention each

25    of the separate counts.

K2rWsch2

1          MR. ZAS:  OK.  I saw some that didn't have it.

2          THE COURT:  OK.  That's a good stylistic suggestion,

3     so I'll do that.

4          What are you up to now, Mr. Zas?

5          MR. ZAS:  I think I'm done.

6          THE COURT:  You're done?

7          MR. ZAS:  I think so.

8          MR. DENTON:  My next was on page 50, your Honor.

9     "Count Nine, second element -- materiality," and this is not

10    something I feel strongly about.

11         In the last sentence of the instruction, your Honor

12    says "proof of actual reliance on the statement by the

13    government is not required."  That is a totally correct

14    instruction.  I just wondered whether it might be better to use

15    the somewhat more plain-language version that just says, "It is

16    not necessary for the government to prove that the government

17    agency was, in fact, misled as a result of the defendant's

18    actions" rather than introducing the concept of actual

19    reliance.

20         Maybe I spent too long in securities work.

21         THE COURT:  What's your language again?  It's longer,

22    which is going in the wrong direction.

23         MS. SHROFF:  It's too long.

24         THE COURT:  Your objection, Ms. Shroff, is it's too

25    long?

K2rWsch2

1              MS. SHROFF:  Yes.  This sentence is nice and short.

2              THE COURT:  What is it again, Mr. Denton?

3              MR. DENTON:  "It is not necessary for the government

4    to prove that the government agency was, in fact, misled as a

5    result of the defendant's action."

6              THE COURT:  OK.  I'll consider that.

7              What page are we up to?

8              MR. DENTON:  My next is on page 52, your Honor.

9              THE COURT:  OK.

10             MR. DENTON:  Count Ten, first element.

11             THE COURT:  Yes.

12             MR. DENTON:  Your Honor, I think here it would be

13   appropriate to include the portion from the Sand instruction

14   that advises that a grand jury proceeding commences once

15   subpoenas have been issued in furtherance of the grand jury

16   investigation.

17             THE COURT:  What's the evidence of that in the record?

18             MR. DENTON:  I think that Special Agent Evanchec

19   testified about giving the defendant a subpoena for his phone

20   when they first met with him.

21             MS. SHROFF:  That's not testimonial.

22             MR. DENTON:  He testified that he --

23             MS. SHROFF:  But you could get a grand jury subpoena

24   for a phone regardless of whether or not there's an

25   investigation open on you; it has to be an investigation of

K2rWsch2

1    Mr. Schulte.

2              MR. DENTON:  No, it doesn't.

3              THE COURT:  No.  I think the investigation has to have

4    been started.  Proof that the grand jury has issued a subpoena

5    is enough for the start.  It doesn't have to have a target.

6              But I have a question here.  What are the allegedly

7    false statements?  Should we tell the jury what the allegedly

8    false statements are?

9              MS. SHROFF:  Actually, we don't know what the false

10   statements are.

11             MR. BRANDEN:  I would leave it unstated for that

12   reason.

13             MS. SHROFF:  No, no, no, no, no.

14             MR. ZAS:  I thought, to weigh in on the confusion, I

15   think the government gave us a bill of particulars where we

16   asked for the false statements.  That may be the best place to

17   find out what they are.

18             THE COURT:  Do you want a reference to the bill of

19   particulars?  That's my recollection too, that the bill of

20   particulars does enumerate them.

21             Mr. Denton.

22             MR. DENTON:  It does, your Honor.  I'm not sure quite

23   what you're referring in terms of referencing the bill of

24   particulars.  It's fine to quote from it or take it.

25             THE COURT:  My recollection of the bill of

K2rWsch2

1    particulars, and when you're dealing with Count Ten that

2    specifies what the acts are, that you --

3              MR. DENTON:  Yes, your Honor.

4              I'm sorry.  I misunderstood.

5              I think it would be totally fine to take the

6    provisions of the bill of particulars and incorporate them

7    here.  I only thought, I didn't think we should reference the

8    bill of particulars separately.

9              THE COURT:  Right.

10             MR. DENTON:  The only thing I would note there is that

11   there is one false statement with respect to the subway

12   incident that was referenced in the bill of particulars but as

13   to which we sort of decided to forgo the evidence.

14             THE COURT:  There's no testimony about that.

15             MR. DENTON:  That's right.  So we would suggest just

16   leaving that one out.

17             THE COURT:  Right.  OK.

18             I'm up to 55, venue.

19             MR. DENTON:  I apologize, your Honor.  I have one on

20   53.

21             THE COURT:  OK.

22             MR. DENTON:  With respect to "acted to obstruct or

23   impede" and the definition of "corruptly" --

24             THE COURT:  Right.

25             MR. DENTON:  We think it's necessary to instruct the

K2rWsch2

1    jury that the government need not prove that the defendant's

2    sole or even primary intention was to obstruct justice, so long

3    as the government proves, beyond a reasonable doubt, that one

4    of the defendant's intentions was to obstruct justice.

5            THE COURT:  Have you got a request on that?

6            MR. DENTON:  Yes, your Honor.  It's request 75.

7            THE COURT:  Request 75.  OK.

8            Mr. Zas, how about you?  Do you have anything else?

9            MR. ZAS:  I don't.

10           THE COURT:  Did the parties stipulate on venue?  I

11   know that some of the charges deal with the Eastern District of

12   Virginia.

13           MR. DENTON:  I believe your Honor allocuted the

14   defendant as to a waiver of venue, I think, at the arraignment

15   on the indictment that first presented those charges.

16           THE COURT:  Do you want to check that, David?

17           Do you remember, Ms. Shroff?  I don't know if you were

18   counsel then.

19           MS. SHROFF:  I was counsel then.

20           THE COURT:  You were.

21           MS. SHROFF:  I was.

22           MR. ZAS:  Your Honor, I think the government's request

23   here is correct.

24           THE DEPUTY CLERK:  The defendant waived his venue

25   rights to Counts One through Seven of the superseding

K2rWsch2

1    indictment.  The Court accepted the waiver of venue.

2               MS. SHROFF:  That's right, your Honor.

3               THE COURT:  One through Seven.

4               MR. DENTON:  So it's One through Seven.

5               MR. ZAS:  It couldn't have been One through Seven

6    because four is MCC.

7               MS. SHROFF:  We did not stipulate to --

8               MR. DENTON:  I think the confusion is because the MCC

9    charges were superseded later, your Honor.  So it was, at the

10   time, Counts One through Seven of the S1 superseder, which

11   corresponds to One, Two, Three, Five through Eight of the S2

12   superseder.

13              THE DEPUTY CLERK:  That's true.

14              THE COURT:  That raises a question.  We're going to

15   send the indictment in to the jury, so we need a clean copy of

16   the indictment.

17              MR. ZAS:  The government gave me a redacted version

18   that takes out the child pornography counts.

19              THE COURT:  Yes.

20              MR. ZAS:  It takes off Twelve, Thirteen, whatever.

21              THE COURT:  Twelve, Thirteen, and Fourteen.

22              MR. ZAS:  Those are gone, so it will be a clean

23   indictment with nothing else.  The Court doesn't have to

24   renumber any charges.

25              THE COURT:  Then what I'd like to do with the venue

K2rWsch2

1    provisions is tailor those in One through Eleven the ones on

2    which he waived venue at the time of his arraignment.  All

3    right?

4              MR. BRANDEN:  Yes, Judge.

5              THE COURT:  OK.  Do we need a verdict sheet?  I've

6    requested that on several occasions now.

7              MR. DENTON:  Sorry, your Honor.  I think between us we

8    may have gotten that crossed up.

9              (Counsel conferred)

10             MR. DENTON:  Your Honor, I don't think we think

11   there's any findings they need to make other than guilty or not

12   guilty, so we can put something together and get it to you this

13   afternoon.

14             THE COURT:  Do you want the order to be guilty, not

15   guilty or not guilty, guilty.

16             MR. ZAS:  I'd prefer not guilty, not guilty side by

17   side.

18             THE COURT:  You're doubling up there, Mr. Zas.

19             MS. SHROFF:  In keeping with the presumption, your

20   Honor, I guess not guilty, guilty.

21             MR. ZAS:  Not sure it matters, but sure.

22             THE COURT:  Anything else to take up?

23             MR. ZAS:  We did give the Court, very late, just

24   before we started, a proposed charge on the theory of the

25   defense.

K2rWsch2

1              THE COURT:  Yes.

2              MR. ZAS:  And a proposed charge permitting the jury to

3     draw an adverse inference from the late disclosure of the

4     Michael issue.

5              THE COURT:  Where would they go?  The theory of the

6     case I don't have any problems with.

7              MR. ZAS:  I'm sorry?

8              THE COURT:  On the theory of the case, I think you're

9     entitled to that charge.  Where should I put it is the

10    question.

11             MR. ZAS:  Let me ask one of the trial lawyers.

12             Where do we normally put the theory of the defense

13    charge?

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  With respect to page 41 at the top,

2     dealing with Count Six, the elements, the value of the property

3     was greater than $1,000.

4          How do we describe that to the jury, and how do we

5     establish the value was $1,000?

6          MR. DENTON:  Your Honor, I think the instruction then

7     at 42-43 talks about the value of the property.

8          THE COURT:  Yes.

9          MR. DENTON:  And I think some of the testimony,

10    particularly from the early CIA witnesses, was that the effect

11    of the leak was such that millions of dollars' worth of effort

12    was essentially wasted.  So we would intend to rely on that.

13         THE COURT:  So it's no specific, it is the embedded

14    cost of the innovative work that they've done over time?

15         MR. DENTON:  That's correct, your Honor.

16         THE COURT:  Okay.  Count Eight deals with the causing

17    the transmission of a harmful computer program information code

18    or command in violation of Title 18, 1030.  What is the actual

19    conduct here that you have reference to?

20         MR. DENTON:  Your Honor, in terms of the charged time

21    frame, I think that encompasses essentially the various

22    activities that constitutes his unauthorized reinstitution of

23    access on at least three separate occasions from March through

24    July of 2016.

25         THE COURT:  That's when he lost access?

K2R3SCH3

<pre>
 1              MR. DENTON:  It covers essentially OSB libraries, the

 2    Altabackups and Brutal Kangaroo, your Honor.

 3              THE COURT:  Do you mind if the charge refers to those

 4    Altabackups and the Brutal Kangaroo charges?

 5              MR. DENTON:  I think it's probably better, your Honor,

 6    because it speaks in terms of a command, and I think there was

 7    evidence about a variety of commands.  The jury can choose to

 8    convict him on basis of a single log deletion.

 9              THE COURT:  Okay.  Mr. Zas, when do you think you'll

10    get your supplemental request in?

11              MR. ZAS:  Would first thing in the morning be okay?

12              THE COURT:  That would be fine.

13              MR. ZAS:  Thank you.

14              MR. DENTON:  With respect to the instructions that

15    Mr. Zas submitted this afternoon.

16              THE COURT:  Yes.

17              MR. DENTON:  We object to the adverse inference

18    instruction.

19              THE COURT:  You'll submit something on that?

20              MR. DENTON:  We can submit something, but as a general

21    matter we object to it in any form.  We don't think it's

22    appropriate here.

23              In terms of the theory of the defense charge, in terms

24    of what they want to say about their theory, I don't really

25    have a problem -- I'm not entirely familiar with the theory of
</pre>

K2R3SCH3

```
1    the defense charge where the theory is simply the defendant is

2    not guilty.  The more problematic sentence is the last one in

3    which the proposed charge says: "If the government fails to

4    disprove these contentions, you must acquit Mr. Schulte."

5             I think the correct formulation is what it always is,

6    that if the government fails to prove the defendant's guilt

7    beyond a reasonable doubt, then you must acquit Mr. Schulte.

8             THE COURT:  Okay.  We'll get the charge out, we'll get

9    your comments first thing in the morning.  We'll turn them

10   around as quickly as possible.  You'll probably have something

11   by the early afternoon on Friday, and that will be the charge I

12   intend to give on Monday.

13            MR. ZAS:  Great.  Thank you.

14            MR. DENTON:  Thank you, your Honor.

15            THE COURT:  Anything else?

16            MR. DENTON:  Not from the government, your Honor.

17            THE COURT:  I notice Mr. Schulte is not here today.

18   He doesn't have to be, but I assume that he was offered the

19   opportunity of participating?

20            MR. BRANDEN:  He was offered the opportunity and

21   decided not to avail himself of it.

22            THE COURT:  All right.  Thank you very much.

23            MR. ZAS:  Thank you.

24            MR. DENTON:  Thank you, your Honor.

25            (Adjourned to March 2, 2020, at 9:00 a.m.)
```

```
1                        INDEX OF EXAMINATION

2    Examination of:                          Page

3      ACHAL FERNANDO-PEIRIS

4    Direct By Ms. Shroff . . . . . . . . . . . . .2672

5      CARTER HALL

6    Direct By Mr. Denton . . . . . . . . . . . . .2681

7    Cross By Ms. Shroff  . . . . . . . . . . . .2694

8    Redirect By Mr. Denton . . . . . . . . . . .2736

9                        DEFENDANT EXHIBITS

10   Exhibit No.                            Received

11     L  . . . . . . . . . . . . . . . . . . .2671

12     O  . . . . . . . . . . . . . . . . . . .2677

13     P  . . . . . . . . . . . . . . . . . . .2678

14

15

16

17

18

19

20

21

22

23

24

25
```