K323SCH1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           S2 17 Cr. 548 (PAC)

5   JOSHUA ADAM SCHULTE,

6              Defendant.                   Trial

7   ------------------------------x
                                            New York, N.Y.
8                                           March 2, 2020
                                            9:00 a.m.
9   Before:

10                    HON. PAUL A. CROTTY,
                                            District Judge
11                                          -and a jury-
                           APPEARANCES
12
    GEOFFREY S. BERMAN
13       United States Attorney for the
         Southern District of New York
14  BY:  MATTHEW J. LAROCHE
         SIDHARDHA KAMARAJU
15       DAVID W. DENTON JR.
         Assistant United States Attorneys
16
    SABRINA P. SHROFF
17       Attorney for Defendant
         -and-
18  DAVID E. PATTON
         Federal Defenders of New York, Inc.
19  BY:  EDWARD S. ZAS
         Assistant Federal Defender
20       -and-
    JAMES M. BRANDEN
21

22  Also Present:  Colleen Geier
                   Morgan Hurst, Paralegal Specialists
23                 Achal Fernando-Peiris, Paralegal
                   John Lee, Litigation Support
24                 Daniel Hartenstine
                   Matthew Mullery, CISOs, Department of Justice
25

1          (Trial resumed)

2          THE COURT:  The jury is here.  You ready, Mr. Laroche?

3          MR. LAROCHE:  Yes, your Honor.

4          THE COURT:  Call the jury.

5          (Jury present)

6          THE COURT:  Good morning.  We'll start with the

7     summations now.  Mr. Laroche.

8          MR. LAROCHE:  Thank you, your Honor.

9          Joshua Schulte is responsible for the largest leak of

10    classified information in the CIA's history.  These leaks were

11    devastating to national security.  The CIA's cyber tools were

12    gone in an instant.  Intelligence gathering operations around

13    the world stopped immediately.

14         The defendant did this because he was angry.  The

15    defendant did this because he wanted to punish the CIA.  The

16    defendant did this because he always has to win, no matter the

17    cost.

18         And after he got caught by the FBI, he tried to do it

19    all over again from prison, repeating that same pattern of

20    anger, escalation, retaliation, and lies.  This time, declaring

21    an information war.  An information war.  The defendant's war

22    was about punishing the FBI, the very same way he punished the

23    CIA when he didn't get his way there.

24         We have proven these things to you beyond a reasonable

25    doubt in this case.  These files on your screen, the March 3,

K323SCH1                    Summation - Mr. Laroche

2016, Confluence backup files that the defendant stole.  These
are the backup files the defendant sent to WikiLeaks.  These
are the backup files that WikiLeaks posted on the Internet for
the world to see.  And these files, these files are your
starting point.  Because from these files alone, you know the
exact date and time of the theft:  April 20, 2016 at 5:42 and
5:43 p.m.

         From that starting point you know it was the defendant
who stole these files.  You know it was the defendant because
he was the one -- the only one -- who had the motive, the
means, and the opportunity to steal these files.  You know it
was the defendant because the theft of these files followed
Josh Schulte's playbook.  Whenever the defendant feels wronged,
time and time again, he retaliates, he declares war, he
punishes.

         And by April 20, 2016, the defendant was a disgruntled
man, he was ready to retaliate, he was abusing his computer
privileges on a top secret security network, and he was lying
about it.  The defendant was ready to harm the CIA, and that's
exactly what he did on April 20, 2016.

         At 5:35 p.m. he broke into DevLAN.  Minutes later, he
stole these files.  And then he spent the next hour deleting
log after log after log of his activities, trying to cover his
tracks.  The defendant took those backup files home with him,
and he sent them to WikiLeaks.  Following WikiLeaks'

1    instructions to a T.  He downloaded Tails, a program to

2    secretly transmit data.  And then when he was done, he

3    literally nuked his computer.

4           And now, defendant didn't just pick random files to

5    give to WikiLeaks.  Those March 3, 2016 backup files meant

6    something to him, because March 3, 2016 was a really important

7    day in that man's life.  That's when he realized that the CIA

8    wasn't going to just take his side against Amol.  That's when

9    he realized the CIA was going to investigate, and they were not

10   going to tolerate unprofessional behavior, no matter who was

11   responsible, whether it was him or Amol.  And that infuriated

12   him.  So those March 3, 2016 backup files meant something to

13   him.  The same files that were posted by WikiLeaks, the same

14   files that he stole on April 20, 2016.

15          So, how did we get here?  Why did the defendant do all

16   these things?  We are here today because he is an angry and

17   vindictive man.  The evidence has shown in this case that the

18   defendant is someone who thinks the rules do not apply to him.

19   He thinks CIA's access rules don't apply to him.  He thinks

20   classification rules do not apply to him.  He thinks prison

21   rules do not apply to him.  He even thinks that this Court's

22   own orders don't apply to him.

23          The evidence has shown in this case that the defendant

24   is willing to lie over and over again to try to get his way.

25   Amol threatened to kill him and his colleagues, lie; Jeremy

K323SCH1                    Summation - Mr. Laroche

1    removed his privileges without authorization, lie; Karen

2    ignored his security concerns about DevLAN, lie; the defendant

3    never brought anything home from DevLAN to his home, lie; the

4    defendant had nothing to do with the Vault 7 and Vault 8

5    disclosures by WikiLeaks, lie.

6            The evidence has shown in this case that whenever the

7    defendant feels wronged, he retaliates disproportionately.

8    Time and time again at the CIA, you saw this pattern.  First it

9    was in response to Amol.  Then it was in response to security.

10   Then it was in response to OSB libraries.  Then it was in

11   response to losing his administrative privileges.  At every

12   step, this man escalates and retaliates.  And when his back was

13   against the wall, on April 20, 2016, he went nuclear, stealing

14   those backup files and sending them to WikiLeaks.

15           And that same pattern of escalation, retaliation, that

16   continued in prison when the defendant declared his information

17   war.  When the defendant was planning to literally encourage

18   others to send their government's secrets to WikiLeaks.  To

19   WikiLeaks.  The defendant who is charged with sending highly

20   classified information to WikiLeaks believes that it is okay to

21   send more government secrets to WikiLeaks, if you feel like

22   your service isn't being honored.  That's what he thinks.

23           But the defendant was caught redhanded again, this

24   time in prison, using an illegal cell phone, using encrypted

25   e-mail accounts, pretending to be a third person, sending

K323SCH1                    Summation - Mr. Laroche

1    classified information to a reporter, and planning to disclose

2    a whole lot more, including information about Bartender, a CIA

3    cyber tool.  Information that, had the defendant disclosed it,

4    could have literally gotten people killed.  The defendant

5    didn't care.  He was prepared to break up diplomatic

6    relationships, close U.S. embassies, anything to bully the

7    government into dismissing this case.  The defendant was

8    prepared to burn down the United States government, the very

9    same way he burned it down at the CIA when he didn't get his

10   way.

11          Josh Schulte is no patriot.  Far from it.  He's

12   vengeful and he's full of rage, and he's committed crimes that

13   have been devastating to our national security.

14          King Josh.  That's what the defendant thinks of

15   himself.  Well, King Josh got caught.  And all of his lies, all

16   of his deceptions have come crashing down in this case.

17          Before I go any further, I want to talk for a moment

18   about the charges.  Now, at the end of the closings you will

19   get instructions from Judge Crotty.  You should follow those

20   instructions about the very various charges, but I want to give

21   you an overview so you can understand the evidence as I talk

22   about it during my closing.

23          So there are two categories of charges in this case.

24   The first relate to the Vault 7 and Vault 8 disclosures, so

25   what WikiLeaks disclosed.  And, generally, what these charges

1    relate to are the theft of classified information, those backup

2    files, unauthorized computer access to get that information,

3    and the transmission of that information to WikiLeaks.  These

4    charges also include the defendant's efforts to lie to the FBI

5    and obstruct the investigation.  That's category one charges.

6         Category two charges are the prison charges.  And

7    these are two additional charges, one for transmitting and

8    attempting to transmit more national defense information, and

9    then the other charge is contempt of court for violating this

10   Court's orders by sending search warrants that were protected

11   by an order to the reporter.

12        So with that context, this is what I'm going to do for

13   the rest of the closing.  Part one of the closing we're going

14   to go over the evidence related to the Vault 7 and Vault 8

15   charges.  And, as you'll see, the defendant had a clear motive,

16   he had clear means and clear opportunity to steal this

17   information.  And that's exactly what he did on April 20, and

18   then he sent it to WikiLeaks after that.

19        In part two I'm going to talk about the prison

20   charges.  And there you will see the same pattern of

21   escalation, anger, retaliation, and lies.  When the defendant

22   was in prison, he wanted to send more classified information to

23   a reporter, and he did so.  And he was planning to disclose a

24   whole lot more using an anonymous Twitter account.

25        Finally, part three I'm going to talk about how the

K323SCH1                    Summation - Mr. Laroche

1   evidence fits together.  I'm going to talk a little bit more

2   about the charges, and how the evidence you've seen over the

3   course of this trial proves beyond a reasonable doubt the

4   defendant is guilty.

5          So let start with part one, the evidence showing that

6   he's guilty beyond a reasonable doubt of the Vault 7 and Vault

7   8 charges.  Here's a timeline.  The timeline is

8   straightforward.  Between October 2015 and early 2016, the

9   defendant becomes angry.  He becomes angry for multiple

10  reasons. One, he's upset with management that they've sent one

11  of his tools to be built by a contractor.  The defendant wanted

12  all the credit for that for himself.  The defendant's

13  interpersonal issues around this time are also getting worse

14  with Amol, and we'll go over some of the evidence relating to

15  that.  But he becomes furious with how security and management

16  responds to that situation.

17         By April 14, the defendant has said in his own words

18  that he's prepared to retaliate.  Then he starts abusing his

19  computer privileges.  Between the 14th and the 18th, he hacks

20  into DevLAN, he gives himself access back to OSB libraries.  He

21  also, later on the 18th and 20th, does inappropriate things on

22  DevLAN, including stealing those backup files on April 20.

23  Between April 21 and May 6, the defendant continues his cover

24  up.  He transmits the information to WikiLeaks, and again he

25  tries to cover his tracks, both at the office and at home.

1      So let's walk through it.  As I said before, e-mails

2  and witnesses have testified the defendant was becoming angry

3  between October 2015 and April 2016.  And this culminated in an

4  e-mail to security on March 1st, 2016.  An e-mail that was sent

5  just two days before those backup files were created, the

6  defendant stole.  And the defendant was angry.  And the

7  defendant accused Amol of threatening to kill him.  And the

8  defendant wanted something done about that.

9      Now, as you saw from the evidence, the defendant felt

10  like he was being punished for reporting the security incident.

11  He also felt like nobody was taking it seriously.  I submit to

12  you there is ample evidence that they took this seriously.  TMU

13  investigated, local security investigated, SIB investigated.

14  This was taken seriously.

15      There is a reason that no one substantiated the claim.

16  The reason is he was lying.  His claims made no sense on their

17  face.  According to the defendant, in October 2015, Amol is

18  threatening to kill people, including him, but apparently he is

19  the only one who reports it.  And then all of a sudden in

20  March, Amol threatens to kill him again.  His story changes

21  multiple times, it's not substantiated by anything, so it is

22  not surprising that no one found any evidence that this

23  actually happened.

24      But, none of that means anything because we are not

25  here today to determine whether Amol made a death threat or

1    not.  We're here today to determine whether he stole highly

2    classified information, and the Amol situation is highly

3    relevant to that because the defendant becomes furious.  He

4    becomes furious with how he is treated; he becomes furious that

5    people aren't taking his side.

6          And you know he was angry, because there are numerous

7    exhibits showing it.  There are numerous exhibits where he says

8    I feel like I'm being punished.  I feel like things aren't

9    being taken seriously.  That includes e-mails sent to his

10   supervisors, to security, to TMU, to EEO, to the head of CCI.

11   At every step, he is angry.  He is upset with how he's been

12   treated.

13         The defendant also sends an e-mail that he feels like

14   he was moved to an intern desk, whereas Amol was moved to the

15   more prestigious desk with a window.  The defendant sends an

16   e-mail asking about resignation.  And there is also testimony

17   from multiple witnesses that talk about his state of mind at

18   the time.  He was upset.  He was furious.  And you also know

19   this from what was recovered from his home.

20         So a year later, in March of 2017, the defendant's

21   home is searched, and what are some of the things that are

22   recovered?  Handwritten notes about this very specific

23   incident.  Notes like this one about Sean.  "After everything

24   was said and done, were you punished in any way for how you

25   handled the situation?"  There are pages upon pages of notes

1   just like this about Jeremy, about another individual Matt who

2   was in the branch, about Amol.  He was furious.  He was so mad

3   that he brought this stuff home and he kept it with him.  Not

4   just handwritten notes, he kept e-mails.  He shredded things

5   related to this incident, including that March 3 e-mail.

6        Not only did he just bring it home, he moved it with

7   him.  And then you saw pictures of his apartment in New York.

8   There were things that still were not unpacked at the time this

9   apartment was searched, but you know what was unpacked?  These

10  documents, these handwritten notes.  And where were they put?

11  In the headboard of his bed.  That's how focused, that's how

12  upset he was about this whole situation.

13       So by April 8, 2016, the defendant is ready to

14  retaliate.  We're going to play a clip here from this SIB

15  interview of the defendant right now.

16       (Audio played)

17       MR. LAROCHE:  "Whatever I have to do to shed light on

18  this and make this situation get resolved, I will do that."

19  That's his state of mind as of April 8, 2016.

20       And you also know that as of April 8, 2016, he is

21  still fixated on this high school counselor comment.  The same

22  comment that appeared in that March 3, 2016 e-mail.  He's

23  fixated on that day, he's fixated on the situation, and he's

24  ready to retaliate.  He's ready to take any steps necessary in

25  his mind to make this situation right.

1          What is the other thing he says during this interview?

2     He wants people to be punished.  Let's play this next clip,

3     please.

4          (Audio played)

5          MR. LAROCHE:  He's focused on punishment.  He's

6     focused on punishing Karen.  So by April 8, 2016, you've seen

7     escalation, you've seen more anger, you've seen him planning to

8     retaliate, and you've seen him wanting other people to be

9     punished, and that's just by April 8.

10         But things keep getting worse.  On April 14, 2016, the

11    defendant does something that sets off red flags across the

12    agency.  Remember, this is the day that the defendant learned

13    that he had lost certain privileges to a program, OSB

14    libraries, and he's upset about that.  So he approached Jeremy

15    about it, and Jeremy said your privileges have been removed.

16    You are in a different branch, so your privileges have been

17    changed on OSB libraries.  The defendant didn't take that

18    answer.  He went to Sean, and he came back to Jeremy and said

19    Sean said it's okay, you can give me my privileges back.  That

20    was a lie.  Sean did not say that.  Sean confirmed he did not

21    say that, it's confirmed in the e-mails.  But, just to be sure,

22    Jeremy sent him an e-mail that day, and that e-mail was very

23    clear.  It said you are no longer going to be an administrator

24    of OSB libraries.  The defendant here responded to that e-mail.

25    He knew that he was no longer going to be an administrator of

K323SCH1                    Summation - Mr. Laroche

1   OSB libraries.  On this e-mail are his supervisors.  The branch
2   supervisors are on this e-mail.  He knows he is no longer
3   supposed to be an admin of OSB libraries.
4            What does he do?  Not to be stopped, because he wants
5   to win, after sending that e-mail, 20 minutes later at
6   4:05 p.m., he gives himself privileges back without
7   authorization, unilaterally, on a top secret, classified
8   security network.  Defendant wanted something, so he took it,
9   because that's his playbook.
10           Here's the timeline.  It's straightforward.  On
11   April 4, he lose his privileges.  On April 14, he e-mailed
12   Anthony, his supervisor, asking to continue administering the
13   libraries.  At 3:59 p.m. Anthony says that JoJo would manage
14   the libraries.  He never gives him authorization to
15   unilaterally reinstate his privileges.  Six minutes later he
16   does it anyway.  The evidence shows that.  The testimony
17   supports it.  But the clear documentary evidence shows that he
18   was lying, and he did what he wanted.
19           Now, this, as I said, was a huge red flag.  We
20   often -- we've been doing this trial for four weeks and you can
21   lose sight of some context here.  But remember where we are.
22   This is the CIA.  This is a top secret computer network that is
23   available to about 200 people in the United States government.
24   200.  Every single one of those people has a top secret
25   security clearance.  This computer network is in a building

K323SCH1                       Summation - Mr. Laroche

1    that's guarded by armed guards.  You need to badge into the

2    building, and then you need to badge into rooms that are

3    literally vaults to get to the computer network, because this

4    computer network stores some of the most sensitive information

5    that our country has.  Information about cyber tools that are

6    used to target our adversaries, like terrorist organizations.

7    And the defendant decided that it could be up to him whether or

8    not he had access to certain programs.  And that was a huge

9    deal.

10           As multiple witnesses told you, this was a huge red

11   flag, they had lost trust in him, and they were concerned that

12   he was going to misuse his administrative privileges, so they

13   took action immediately.  On a Saturday, three individuals went

14   in for the explicit purpose of changing the administrative

15   rights on DevLAN.  Their purpose was to take away his

16   administrative rights, so that he could no longer act as an

17   administrator on the system to any parts of the Atlassian

18   programs or any of the servers.  They were trying to remove all

19   of his rights, but they missed some things.  They tried, but

20   they missed some things.

21           One of the things they missed was a key, his key, on

22   OSB server.  And this is a key that has a password on it which

23   is KingJosh3000.  It's his key.  It is the key he will use on

24   April 20 to help him steal this information, and so they missed

25   that.  That was one of the back doors he would use on April 20

K323SCH1                    Summation - Mr. Laroche

1    to steal those backup files.

2            Remember, this is the network diagram.  So just to

3    talk for a moment about the defendant's privileges prior to

4    these changes.  Prior to that, he was an administrator of all

5    the Atlassian services.  So he is an administrator of

6    Confluence, of Bamboo, of Stash, of Crowd, and of Jira.  After

7    April 16, when the changes are made, he has none of those

8    privileges.  He is not supposed to be an administrator of those

9    things.  And that's important, because remember, the backups

10   are accessed by points on those virtual machines, so each one

11   of those services has a pathway to the backups.  And the way

12   you get to that pathway is to log into those things as an

13   administrator.  When he loses his administrative rights, he can

14   no longer do that.

15           And you know that, too, because on April 15, he had

16   tried to create a different pathway to the backups but he

17   failed.  So this is the way he knows how to get there.

18   Remember, the defendant was the one who set up those mount

19   points, those pathways to get to the backups.  After those

20   changes are made, he can't use those pathways anymore.  He's

21   lost them.

22           As we go through this, this is what you have to be

23   focused on, this part of the network infrastructure as we go

24   forward, because this is what matters.  He uses his

25   administrative privileges that are left over on this server,

1    the OSB server here, to get back into Confluence on April 20.

2    We are going to walk through how he did this.  But this is the

3    pathway that matters going forward.  He reverts Confluence to a

4    time when he has access to those mount points again, and he

5    goes through that pathway to get back to the backups.

6         So April 18, 2016.  So this is the Monday following

7    the changes of his privileges.  Things continue to get worse.

8    In the morning, Mr. Stedman testified that the defendant was up

9    around OSB, up around that branch even though he was at a

10   different branch at the time.  When he's there, he's upset.

11   He's upset because he had lost all his administrative

12   privileges and he's still upset about OSB libraries.  Remember

13   Mr. Stedman told you that the defendant came up to him and

14   said, oh, it's okay, you can put me back in as an administrator

15   on OSB libraries.  That's fine.  It's been cleared.  He lied

16   again.  Because he was so focused on getting his privileges

17   back, he was willing to lie again.

18        That same morning, he meets with Anthony and he gets a

19   memo.  Anthony gives him a memo about the change of privileges

20   he had with OSB libraries.  And there's two portions of this

21   memo that I am going focus on.  One says, "Individuals are not

22   permitted to personally attempt and/or renew their previous

23   authorization to any particular system.  This is a direct

24   violation of trust, and a violation of agency policy."  The

25   second portion is, "Please do not attempt to restore or provide

1   yourself administrative rights to any project and/or system for

2   which they have been removed."

3          This is in direct response to his conduct with OSB

4   libraries.  He had reinstated his privileges without

5   authorization after being told not to, and so that was a big

6   deal.  They wanted to give him the memo to make sure loud and

7   clear that you cannot do these things.  This included things

8   like trying to get your administrative privileges back for

9   Confluence, which is exactly what he would do two days later.

10         The defendant signed this.  He understood this.  And

11  quite frankly, it's common sense.  You can't just go on a top

12  secret network and give yourself whatever privileges you want.

13  That's not how it works.

14         But on that same day, about 1 in the afternoon, the

15  defendant sends an e-mail to Anthony.  It says, "I verified

16  that all private keys with access have been destroyed/revoked.

17  I'm curious with how suddenly everything occurred and without

18  notice to me.  Since Patrick Schaeffer left a few years ago,

19  I've been the stuckie managing you all the resources and

20  ensuring the Atlassian products are updated, people have proper

21  access.  It seemed like overnight literally all my permissions

22  within the products were removed and all my permissions on the

23  servers themselves revoked and all without anyone informing me.

24  Is there a reason to this sudden turnover that occurred without

25  my knowledge?"

K323SCH1                     Summation - Mr. Laroche

 1              First, this e-mail reflects he is not happy about not
 2      being told, because he thinks that management needs to inform
 3      him before they take action.  But there is a more important
 4      part about this e-mail.  These are lies.  He is lying.  He
 5      knows when he sends this e-mail that he still has that back
 6      door access to the server.  He knows he still has access to OSB
 7      server.  He knows he still has the key that will allow him to
 8      delete log files.  But he sends this e-mail anyways, because he
 9      doesn't want Anthony to know that.
10              And you know he can still login as an administrator to
11      that server because that's what he's doing throughout the day.
12      At 11:12 a.m. he logs in as root.  At 1:47 p.m. he logs out as
13      root.  He's doing this throughout the day.  This is the
14      defendant.  Mr. Leedom told you this is his IP address and
15      these logs specifically show he was the one logging in.  He's
16      logging in.
17              There is another thing he's doing that day.  On the
18      evening he is using that key that was left over, he is using
19      that session to view log files.  He's doing reconnaissance.
20      Again, context here is important.  This is OSB server.  OSB
21      server.  The defendant has been in RDB for weeks.  He is not in
22      OSB.  He has absolutely no reason to be doing any
23      administrative functions at all on the OSB server.  But he's
24      doing it anyway, hours after he had lied to Anthony about his
25      accesses.  He's doing it anyway.

1          And we know that it was him doing those commands for

2     several reasons.  One is that this 766 number, this is the work

3     ID number that was specifically assigned to this session.  He

4     logged in, using his key, his private key that was left over

5     and password protected at the time.  It's his IP address with

6     the login.  This work ID is assigned to that, and it's

7     maintained on that work ID session throughout.  This is him

8     doing it.

9          The other reason you know is because his unallocated

10    space has evidence of these commands being run.  Remember

11    Mr. Leedom had told you about unallocated space, essentially

12    deleted space.  What is it showing.  Unallocated space is

13    showing essentially what he was looking at on his screen.  Not

14    someone else's screen, not someone else running it, but what he

15    was looking at on his screen.  That is recorded in the

16    unallocated space, and that's what's recorded here in the

17    unallocated space.  Him running these same commands that show

18    up on server side, they are showing up in his unallocated

19    space.

20         You know for a third reason it was him running these

21    commands.  On April 18, 2016, his badge records show that he

22    locked the eighth floor vault at 7:51 p.m.  Remember there was

23    testimony about locking vaults, that means you are the last

24    person in the vault that day.  Last person.  At 7:44 p.m., he

25    runs VI shell log command, a command to essentially view and

K323SCH1                     Summation - Mr. Laroche

1   edit logs on the system.  Minutes later he's locking the vault.

2   He ran these commands.  You know he ran these commands because

3   it's his work ID session on his unallocated space, and he was

4   the last one that night.

5           Let's recap what happened on the 18th.  In the morning

6   he is logging into that server as root, in other words as

7   administrator.  At about 1 in the afternoon, he lies to Anthony

8   that all his permissions had been revoked.  At 7:17 p.m. he

9   logged in again as root to the server.  And then in between 6

10  and 7:44 he's using that key, that key that was left over, to

11  view log files as an administrator with absolutely no reason to

12  do so.  He's not in OSB.  He's not an administrator.  He knew

13  that at the time.  He was doing it because he was planning to

14  steal the information.  He was looking at some of the very same

15  log files that he would delete two days later.

16          Let's talk about the day that he actually stole this

17  information.  Now, at the beginning I focused on these

18  exhibits, and said they were very important evidence in this

19  case because they are your starting point.  And I want to talk

20  through why they are the starting point for you.  There are

21  several reasons.

22          On March 7, 2017, WikiLeaks posted these files, these

23  specific Confluence backup files.  And you know that for

24  several reasons.  One is that Mr. Leedom explained that the

25  information WikiLeaks posted must have come from backup files,

1    because there was an error in the script at the CIA so certain

2    information that WikiLeaks got didn't include everything.  So

3    there was user information missing, there was other things

4    missing that was included on what they posted.  So you know

5    that what they got was backup files.  Not something else, not

6    some other part of the system.

7            You also know that those specific backup files that

8    they posted on March 7, 2017, you know the date of those files.

9    Mr. Berger explained to you they are dated March 3, 2016.

10           So, from that last slide, those specific backup files

11   were posted on March 7, 2017.  You know that.  That's the date

12   of the files.

13           The other thing you also know is that no other backup

14   files that were stored in that server had a different date

15   accessed time to date modified and date created.  Every other

16   one of those files had the same three, date created, date

17   accessed, date modified.  There is a reason why this file is

18   different.  The reason why this file is different is because on

19   April 20, 2016, he copied it.  That's the only one that looks

20   like this.  That's because that's the one that was stolen,

21   that's the one that was posted on the Internet.

22           There is another reason why April 20 is an important

23   day for him.  On April 20, 2016, the defendant gets two

24   e-mails.  Both e-mails essentially say the same thing, that

25   Confluence and Bamboo are going to be moved off OSB server.

1   And that's important.  Because once they're moved off the

2   server, the defendant can't use his admin privileges to that

3   server to manipulate those things, and that's what he uses on

4   the 20th to get back access.

5           Here is the first e-mail.  This is from Jeremy Weber.

6   It is explaining that Confluence and Bamboo are going to be

7   taken off of OSB server and put on ISB server.  And again, this

8   is important.  OSB server at the time had Confluence and Bamboo

9   running on it.  The defendant still had access as an

10  administrator to OSB server.  He was still logging in as an

11  administrator, and it was those privileges that he used on the

12  20th to access Confluence, to revert it, to get his accesses

13  back.  But if Confluence and Bamboo are moved, which they are

14  going to be on the 25th, then his server privileges mean

15  nothing anymore.  He can't do anything with Confluence if it's

16  not on the specific server.  So he knew he had to move fast,

17  and he did.

18          So here is an overview of what happens on the 20th.

19  Between 5:35 and 6:51 p.m., the defendant reverted Confluence

20  to April 16, 2016, to a time where he had complete

21  administrative control over all the Atlassian services,

22  including Confluence.  A time when he could log into that

23  Confluence virtual machine and get access to those mount

24  points, that pathway to get back to the backups.

25          Minutes later, he steals the backups.  You know that

K323SCH1                    Summation - Mr. Laroche

1   from those files that show that it was accessed literally

2   minutes later.  And multiple witnesses told you that access

3   times will be updated if you copy them.  If you copy them over,

4   they will be updated.  And you know that at 5:42 and 5:43 p.m.

5   those access times are updated.

6          Now, the remaining hour he spends deleting log files.

7   Any log file he can find that's dated after 5 p.m., he deletes.

8   One after the other after the other, because he was trying to

9   cover his tracks.

10         Let's walk through it.  What happens before the

11  reversion?  As I said, there's two e-mails that are sent out,

12  one at 12:06 and one at 3:58 p.m.  There are e-mails notifying

13  everyone, including the defendant, that Confluence will be

14  moved off that server.  So he is going to lose his access to

15  that server and to Confluence.

16         At 5:18 p.m., the defendant accessed Rufus's key.

17  This is Rufus's key that he could use prior to April 16 to

18  login as an administrator.  Rufus isn't in the building.  The

19  defendant accessed the key.  Why?  Because he knows he's going

20  to steal information, and anything he can do to try to make it

21  look like someone else did it, he will do.  So he accessed

22  Rufus's key which was stored, not in someone else's location,

23  not in someone else's home folder, but on the defendant's home

24  folder.  He kept Rufus's key on his home folder.

25         5:19 p.m., the defendant connected a USB device into

1    his workstation.  At 5:29 p.m., he listed log files, and he did

2    this using that key that was left over that he lied about.  At

3    5:29 p.m., the defendant created a snapshot of Confluence

4    titled bkup.  You know it was the defendant, again, that was

5    listing the log files on that night because this is that work

6    ID session.  The 766 number, this is his session, his IP

7    address, his key, his login.  This is him.

8            Again, the evidence of these logins that we are

9    looking at right here are in the unallocated space.  This is

10   what the defendant was looking at on his screen.  He ran this

11   command on the server, it showed up on his screen because he

12   ran it.  And it was stored in his unallocated space.  Not

13   someone else's unallocated space, not some other computer.  The

14   defendant's unallocated space.  His eighth floor computer,

15   that's where this is coming from.

16           Here is the creation of the snapshot at 5:29 p.m.

17   These logs are VI client logs.  This is not unallocated space.

18   These are logs from his workstation.  And you will see in a few

19   minutes the defendant searches over and over again for VI

20   client logs.  He's searching in the wrong place.  But the

21   reason he's searching for them is because he doesn't want these

22   to be found either.  He wants to try to delete these logs, but

23   he couldn't find them at the time.

24           5:30 to 6 p.m., at 5:35 p.m. the defendant reverted

25   Confluence to April 16, 2016.  He then steals the backup files

K323SCH1                    Summation - Mr. Laroche

1    minutes later.  He then begins deleting log files at 5:57 p.m.,

2    and after 5:57 p.m. he searches for the VI client logs.  Let's

3    walk through these.

4           This is the reversion to that 4/16 snapshot to a time

5    when he had full administrative control of the system.  Again,

6    these are VI client logs.  These are logs that are on his

7    workstation.  These are the logs that he is going to try to

8    find later on to delete.

9           Here is the evidence that he stole the backups.  These

10   files are accessed literally minutes after he reverts the

11   system.  So he reverts the system, he now has full access to

12   Confluence.  Now he's got his backup backing up the backups, he

13   steals the files almost immediately.

14          The defendant at this point starts listing log files,

15   and the total there is approximately file size.  But this is

16   from his unallocated space.  This is what he is looking at on

17   his screen at the time.

18          Then the defendant starts deleting things.  Over and

19   over again he starts deleting log files.  And he's looking

20   specifically for log files that were modified after 5 p.m.,

21   after he started to do things on a system that he knew he

22   wasn't supposed to.  After he started his plan to steal this

23   information.  He's trying to get rid of anything that would

24   show what he is doing.  This is in the unallocated space.

25   These are commands he ran that he was looking at on his screen.

K323SCH1                    Summation - Mr. Laroche

1          Here is the defendant after 5:57 searching for those

2     VI client logs, the logs that showed him creating the snapshot,

3     the logs showing him reverting the snapshot.  He is looking for

4     those VI client logs.  The reason he's looking for them is

5     because he knows they are really bad evidence for him.  He

6     knows they are going to show exactly what he did.  But he can't

7     find them because the way he's running commands right now, he

8     is looking in the wrong spot.  He is looking on the server.

9     Those logs don't exist on the server.  They exist on his

10    workstation.  So he was trying to find them, he just couldn't.

11    That's part of the reason we have evidence left over, is

12    because he missed them.  He couldn't delete them.

13         6 to 6:30, he continues listing log files, searching

14    for newer logs, deleting logs, and then listing again.  You can

15    see the file size drops as he is doing this.  The file size is

16    dropping because he's deleting things, things that would have

17    shown his activity on the system.

18         Here is 6:16 p.m. he is listing again log files.  This

19    is, again, in the unallocated space.  This is what is happening

20    on his screen in front of him.

21         At 6:16 he is searching for files that are newer than

22    VMK summary log.  you can see just at the top of this exhibit

23    VMK summary was last modified at 2100 which is 5 p.m.  He is

24    looking for logs that are newer than 5 p.m. because that's when

25    his activity started to steal this information.  he wants to

1  get rid of everything he can.

2           Then at 6:16 p.m. he deletes another log file,

3  hostd-probe.log.  You can see that file was modified at

4  5:55 p.m., so that file had been modified during the reversion

5  while he was stealing things.  He wanted to make sure he got

6  rid of it.  Again, this is deleted space.  It is unallocated

7  space.  It is what is on his screen as he's doing these things.

8           After he deletes that, he lists more log files.  You

9  can see the file size has gone down again.  It went down

10  because he's deleting things.

11          From 6:30 to 7:00 he continues more deletions, more

12  listings.  At 6:38 he deletes the VMware.logs.  At this point

13  he's looking for log files in a different part of the server.

14  He is looking for log files specific to Confluence, because

15  that's the virtual machine he was manipulating, that's the one

16  he used to get back to the backup files to steal them.

17          At 6:51 p.m., the defendant reverts to that bkup

18  snapshot.  Now, think about what the defendant had just done

19  here.  Multiple administrators told you about the use of

20  snapshots.  You use a snapshot if you're concerned that you are

21  going to make changes to the system, and if something gets

22  screwed up, you're going to go back in time.  The defendant did

23  the exact opposite.  The defendant created a snapshot titled

24  bkup, he then went back in time to April 16, 2016, to when he

25  had full administrative control over system.  Then when he was

K323SCH1                    Summation - Mr. Laroche

1      done, an hour and a half later, he essentially went back to the

2      future, to bkup, that snapshot he created at the beginning.

3      Why did he do that?  Because he wanted to cover his tracks, and

4      by doing it that way, he essentially deleted all of the

5      information on the virtual machine that he was doing at the

6      time.  There is no reason to do that.  There is no

7      administrative reason to do that.  There is certainly no reason

8      for the defendant to do it after he had lost his administrative

9      privileges.  There is simply no basis to do that, other than

10     him stealing something.  And that's exactly what he was doing

11     at the time.

12            After he reverts to that bkup snapshot, he deletes the

13     snapshot.  Then he lists log files again.  There is a drop in

14     file size.  The reason there is a drop in file size is he's

15     just deleted a very big snapshot of Confluence.  Then he lists

16     more log files, then he deletes more log files from 6:56 to

17     6:58 p.m.

18            So let's walk through this for a second.  By the end

19     of the reversion, and the end of all the log deletions, this is

20     what the defendant has done.  Commands that would have shown a

21     copy command, deleted.  Devices connected, logs showing what

22     would have been connected, like a USB device or a hard drive or

23     something like that, deleted.  Auditing data, deleted.

24     Snapshot activity, deleted.  Login information, deleted.  All

25     logs after 5 p.m. have been deleted.

1          The reason the defendant was so careful is because he

2     had just stolen highly classified information, and he didn't

3     want to be caught.  But he didn't get everything.  He didn't

4     get the unallocated space on his own workstation, and he didn't

5     get those VI client logs, and that's why we know what was left

6     over.

7          How do we know that this was the defendant?  Well,

8     numerous reasons.  Numerous reasons.  At the most basic level,

9     as I've been talking about throughout the closing, these logs

10    were from his workstation.  They are forensic files from his

11    workstation, from his unallocated space.  The things he was

12    looking at on his screen, on his computer, on the eighth floor

13    at the agency, at the time.  They're his files.

14         You also have some forensic files from the server that

15    match up to what he was doing.  The example being like on

16    April 18 where you saw some things from the server, some

17    commands that were run.  That match up to what's in his

18    unallocated space.  But you have a lot more than that, too.

19    You have his password protected key that he used on the 18th

20    and 20th to view and delete log files.  But you also have other

21    things that put him at his desk as these things are happening.

22    You have e-mails, you have Same Time chats, you have chats from

23    his actual DevLAN computer and you have his badge records.

24         Let's go through some of those.  What about Same Time

25    chats.  At 5:42 and 5:43 p.m., the defendant had copied the

K323SCH1                    Summation - Mr. Laroche

1    Confluence backup files.  Three minutes later, he sends a Same

2    Time chat --"When's gym."  He misspelled when's -- to Michael.

3    Now, remember that individuals at the agency who were DevLAN

4    users had a DevLAN computer, and they had another computer that

5    had Same Time chats and e-mails.  So the defendant is sitting

6    at his chair, using that Same Time chat to send a message to

7    Michael at the time.  He is literally sitting in his chair to

8    do this.

9            But there's more.  At 5:52 p.m., the defendant sends

10   an e-mail to Anthony.  In this e-mail he's asking about

11   training.  The defendant is doing this because he wants to act

12   like things are normal.  Things are not normal.  He is at his

13   desk, he's stealing files, and minutes after he steals those

14   files and sends this e-mail, he's listing log files and he is

15   deleting log files.  He is at his desk at the time.  He is at

16   his desk at the time.

17           But there's more.  There's IRC chats.  DevLAN IRC

18   chats are actually on his DevLAN machine.  It means you know he

19   is looking at his DevLAN computer screen at the time he's

20   sending these chats.  We have chats from 6:37 p.m. where he

21   messaged Michael.  A minute later he deleted log files.  At

22   6:51 he messaged Michael, a minute later he deletes the bkup

23   snapshot.  He's sitting at his desk as these things are

24   happening.

25           Here's just one example.  On the top here is a DevLAN

1    IRC chat.  This chat was taken -- was found on his workstation.

2    This is a forensic file taken from his workstation.  And it

3    shows at 6:51 p.m., at 07 seconds, he says "I shall be" to

4    Michael.  Ten seconds later, he reverts the snapshot to bkup.

5    Ten seconds after he sends that chat, he is reverting the

6    snapshot.  He is at his desk.  Not someone else, it's the

7    defendant.

8         And what about this LOL, sorry, Shane talked to me for

9    like 30 minutes, that's a lie.  We just went through what he

10   did between 6:30 and 7.   He is deleting log files, he is

11   listing log files, he is being very careful.  He is not talking

12   to somebody else.  He is taking his time to systemically delete

13   things.  The defendant's at his desk.

14        You also know from badge records.  So again, just like

15   on the 18th, at 6:58 p.m., the defendant deleted log files, and

16   then nine minutes later, he locks the eighth floor vault.  Yet

17   again, the defendant is the last person in the vault, just like

18   April 18.  The last person in the vault.  He's in there because

19   he wants to do this at night, he wants to do this when few

20   people are there, and you know it was him doing these things

21   because he locked the vault that night.

22        What about the defendant locking vaults?  Well,

23   interesting, the defendant locked the eighth floor vault two

24   times in 2016.  Two times.  April 18, and April 20.  Because he

25   was stealing things.  He was doing reconnaissance on the 18th,

K323SCH1                    Summation – Mr. Laroche

1    and he stole files on the 20th.

2              What about everybody else?  Rufus, his badge records

3    show he's not even in the building.  David, Tim and Jeremy,

4    other individuals who were administrators at times, left the

5    office before the reversion.

6              What about Michael?  Michael, Michael's desk is on the

7    ninth floor.  His computer, his DevLAN computer is on the ninth

8    floor.  The defendant's computer is on the eighth floor.  All

9    of those unallocated space logs we saw were on the eighth floor

10   computer.  The defendant's computer.  Between 6 and 6:28 p.m.,

11   Michael's not even on the ninth floor.  He's not even at his

12   computer.  He is on a completely different floor.  It is

13   physically impossible for him to have done this.  While he is

14   on the fifth floor, logs are being deleted.  They are being

15   deleted by him.  They are not being deleted by Michael.

16   Michael had nothing to do with this.  Michael is never on the

17   eighth floor the whole time during the reversion, is never near

18   the defendant's desk.  And during a key portion of the

19   reversion, he's on the fifth floor.  He is not even near his

20   own desk, let alone the defendant's.

21             And now there's been, obviously, stuff about Michael.

22   He went on administrative leave.  You've read the memo.  You

23   saw them testify about it.  You saw why he went on

24   administrative leave.  He didn't go on administrative leave

25   because he was a suspect.  The memo is pretty clear.  He was

1    the suspect.   The CIA thinks he did it.

2              But all of that is a sideshow, because the CIA was not

3    in charge of the investigation.   They were not the ones

4    investigating the case.   The FBI was.   You heard directly from

5    the case agents, Richard Evanchec, Evan Schlessinger.   You

6    heard directly from the experts, Michael Leedom and Michael

7    Berger.   Those individuals testified at length about the

8    investigation, about all the steps they took, about the things

9    they found out about Michael or David or other people, about

10   how they ran it down.   Those individuals were in charge of the

11   case.   Those individuals were in charge of reviewing things.

12   They talked about reviewing administrators' computers at the

13   agency.   They talked about reviewing regular users' computers

14   at the agency.   They were in charge of the investigation.   Not

15   the CIA.

16             This Michael thing is a sideshow.   These records prove

17   to you it could not have been him.   It couldn't have been him

18   because he was not on the floor.   Simple as that.

19             You also know it wasn't Michael or somebody else

20   because of what the defendant does in the following weeks.   So

21   between the 21st and May 6, he sends the information to

22   WikiLeaks and he continues his coverup.

23             Now, the first thing he does on the 21st, so the day

24   after, the defendant gets to the office, he goes to the eighth

25   floor at 10:48 a.m.   The first thing he does, minutes later, is

1   to e-mail Anthony.  He's e-mailing Anthony about the OSB

2   server.  He wants to wash his hands of that server.  The first

3   e-mail he sends the next day, we are going to look at it, is to

4   Anthony because he wants to try to cover his tracks.  He is

5   concerned what he had just done the night before.  So he

6   e-mails Anthony about it.

7           About an hour later, less than an hour later, that USB

8   device that had been logged in, he reformats it.  Why?  Because

9   he wants to make sure anything that was connected to his system

10  at the time is wiped.  That there is no evidence on anything.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. LAROCHE:  Let's look at that email to Anthony.

2          Again, this is minutes after he gets to the office on

3     the 21st, minutes after he gets there.  The subject is

4     "transfer of equipment, especially OSB server to OSB."  He

5     says:  "Not sure if this has been done already with my move to

6     RDB, but I had equipment that was registered under my name for

7     OSB -- notably, our $30,000-plus server that I was custodian.

8     Probably low on your totem pole, but what is the process for

9     transferring this equipment to OSB and removing me from the CMR

10    and my access?"

11         The day before the defendant had used administrative

12    privileges on that server that he lied about to get access to

13    Confluence, to revert the system, to steal the files.  And the

14    first thing he does the next day is to email his supervisor and

15    try to wash his hands of the server, because he's concerned.

16    He doesn't want his name associated with it.  He's trying to

17    cover his tracks.  And less than an hour after he sends this

18    email, he reformats that drive.

19         But the preparation continued over the following

20    weekend.  Now, at this point, on the 22nd, the defendant had

21    learned a couple of things.  He learned that Amol was appealing

22    his protective order, and he also learned that TMU had closed

23    its case against him.  So on the 23rd he starts his preparation

24    to send this information.

25         On the 23rd, he prepares to delete Brutal Kangaroo

1    with the Eraser Portable program, a secure program to delete

2    things.  Remember, Brutal Kangaroo was a folder that was

3    located on his computer that was put in a queue to be deleted.

4            On the 24th, he ordered a SATA adapter for same-day

5    delivery, something that would assist him in transferring

6    information from hard drive to hard drive for transmission that

7    would not be connected to his computer.  On the 24th, he also

8    downloaded Tails.  This is the program we talked about earlier,

9    the program that WikiLeaks encourages individuals to download

10   to secretly transmit data.  And the other thing he did between

11   the 23rd and the 28th was he added some encrypted files to the

12   queue for Eraser Portable: data2.bkp through data6.bkp.  You'll

13   remember the defendant had encrypted files on his computer that

14   he named as data.bkp.  These folders, these files, data2.bkp

15   through data6.bkp, were added to the queue for Eraser Portable.

16   You also know that these encrypted files were located on his D

17   drive, and we're going to come back to that in a moment.

18           Again, the defendant was following WikiLeaks's

19   instructions.  He already had TOR.  He already had that on his

20   home computer, but on the 24th, he got Tails.  So TOR, there is

21   testimony that that allows you to visit websites anonymously,

22   and Tails is a way to secretly transmit data over the internet

23   anonymously.  And WikiLeaks instructs folks to use TOR and

24   Tails in conjunction to make sure that you are not identified

25   when you send information to WikiLeaks.  And that's exactly

K32Wsch2                    Summation - Mr. Laroche

1    what he did on the 24th -- he downloaded Tails.

2            So the next weekend, the weekend of the 30th, more

3    transmission, more cover-up.  First, he downloads Darik's Boot

4    and Nuke on the 30th.  This is a program that irrevocably

5    destroys data, because he's preparing to wipe all of his

6    information.  And on the 30th and into May 1 is when he

7    transmits this information, and you know that from his activity

8    on the home computer.

9            Just as a general matter, you know this information

10   was transmitted to WikiLeaks because they posted it on the

11   internet.  They obviously got it, and the question is when did

12   he send it?  And that's answered by what he did on the 30th and

13   May 1.

14           Let's look at the evening of the 30th.

15           At 6:47 p.m., he is searching for Google history and

16   Google view browsing history.  He is concerned about what he's

17   been searching for.  On the evening, that night, he is

18   searching for digital disk-wipe utility on several occasions,

19   and at 10:52 p.m., he visits a website Kill Your Data Dead With

20   These Tips and Tools.  The defendant is interested in finding

21   out how to securely delete information that might connect him

22   to the leak, anything that he might've brought home with the

23   leak on it, anything that he might've used to transfer it.

24           And at 10:55 p.m., he runs a similar search for SSD

25   wipe utility.  And you'll remember all those hard drives that

1    were recovered from his home.  He was wondering how to wipe

2    them to make sure that there was no evidence of his activities.

3            Now, overnight, he continues working.

4            At 12:19 a.m., the defendant mounted his D drive onto

5    his virtual machine, the same D drive that had those encrypted

6    files, data2.bkp through data6.bkp.  They're in his D drive.

7    He mounts his D drive.

8            Then, overnight, he is constantly looking at his

9    computer.  On at least four occasions, he is unlocking his

10   virtual machine in the middle of the night:  1:57 a.m.; 2:34

11   a.m.; 2:56 a.m.; 3:18 a.m.  He is doing that because he is

12   transferring data and he wants to make sure it's happened

13   correctly.  And you know that is the case because of the Google

14   searches he runs at of the end the night and the early morning.

15           At 3:18 a.m., just after he unlocks his screen saver,

16   the defendant searches for How Long Does It Take to Calculate

17   MD5?

18           Remember, calculating an MD5 is a way to confirm that

19   what you transferred from one place to another is the same,

20   that it went correctly, that there were no errors.  You

21   calculate an MD5 to confirm that what you transferred

22   transferred correctly, and that's what he's looking for at 3:18

23   a.m.

24           Then at 3:21 a.m., the defendant visits a website, How

25   Can I verify That a 1TB File -- one terabyte file --

K32Wsch2                    Summation - Mr. Laroche

1   transferred correctly?

2           Remember, there was testimony about how big the

3   Confluence backups and Stash backups would have been, the files

4   he stole on April 20th.

5           How big would they have been unzipped?

6           Close to a terabyte.  Several hundred gigabytes of

7   information was the testimony.  He's looking to see whether

8   that much information was transferred overnight into the wee

9   hours of May 1, 2016, less than two weeks after he stole the

10  information on April 20, 2016.  That's what he's doing, because

11  he just transferred it.

12          What's the defendant do next?

13          Several days later, he reformats his computer.  He

14  does that because he wants to hide any evidence of what might

15  be on the computer.  He reformats it completely, which has the

16  effect of essentially making data unrecoverable from prior to

17  that time.  And here again, these are WikiLeaks's instructions:

18  If you're going to send us data, you should remove any traces

19  of your submission.  You should wipe your drives.  You should

20  get rid of them.  He is doing everything that WikiLeaks tells

21  folks to do.

22          Remember another thing about the defendant.  When Mr.

23  Evanchec testified, he said that he asked the defendant about

24  rebuilding computers, and the defendant said, essentially:

25  Well, any time I rebuild a computer, I always wipe everything.

K32Wsch2                    Summation - Mr. Laroche

1    I wipe it clean, and then I rebuild it that way.

2            There's a problem with that.  Going back to 2006, the

3    only time the defendant searches for wiping utilities --

4    anything related to wiping hard drives -- the only time he does

5    that is late April and early May 2016; the only time, because

6    that's the only time that he transmitted highly classified

7    information to WikiLeaks.  It wasn't about rebuilding

8    computers.  It was about trying to cover his tracks.

9            And another thing.  If he's reformatting his computer,

10   why is he transferring all that data before he does the

11   reformatting, if he was just reformatting it and not doing

12   anything else?  Why, several days before, is he transferring

13   all this data?  If he actually was just reformatting the

14   computer, he would have reformatted it and then transferred

15   data back onto it.  He did the opposite because what he did

16   first was transmit the data to WikiLeaks, and then he wanted to

17   cover his tracks.  And that's exactly what he did.

18           You also know that he sent this information to

19   WikiLeaks because of his web searches.  The defendant sends it

20   in May, and it becomes clear that he's wondering where it is,

21   why it hasn't been posted.  Remember, there was testimony about

22   the defendant's Google searches relating to WikiLeaks.  Between

23   2006 and July 2016, he conducts three WikiLeaks-related

24   searches and visits nine pages.  So over ten years, three

25   searches, nine pages.  Between August and January, all of a

sudden, he wants to search for WikiLeaks a lot:  39 searches;

115 pages visited.  And the reason he's searching for WikiLeaks

is he's wondering where his stuff is.  It's been several

months.  It hasn't been posted, and he wants to know where it

is, and you see that from some of the searches he's running.

          Let's look at a few of these.

          One is WikiLeaks code.  Now, around this time there

are other things being posted by WikiLeaks.  Hillary Clinton's

emails are being posted by WikiLeaks.  But there's something

that Hillary Clinton's emails don't have: source code.  There

is no source code.  He is searching for code because he's

wondering if WikiLeaks is going to produce some source code

because he has provided them source code, and he's wondering if

it's going to come out.

          He also searches, on January 4, 2017, for "WikiLeaks

2017" and he visits a website:  WikiLeaks Vows to Blow You Away

in 2017 Showdown.  He wants to see what's coming out because

he's waiting.  He had sent the information to WikiLeaks, and

he's waiting to see what comes out.  Again, no searches prior

to July 2016.  All of a sudden, in August to January, he is

obsessed with looking at WikiLeaks.  The reason he is is

because he sent them the information and he's waiting for it to

come out.

          Now, on this point, at the beginning of the trial, Ms.

Shroff said the timeline's not going to make sense, the

1    government's timeline is not going to make sense.  And the

2    defendant has no burden.  We have the burden, and we accept

3    that burden.  But when they do make arguments, you can

4    scrutinize them.

5         The timeline does make sense.  You know why the

6    timeline makes sense?  Well, first, because WikiLeaks is

7    publishing some things in August; through the summer, they're

8    dealing with Hillary Clinton's emails.  But you also know, from

9    Mr. Leedom, that it would have taken them some time to get this

10   information published.  Mr. Leedom told you that there was an

11   error in the script of the backups that were provided to

12   WikiLeaks, and so they couldn't just simply take those backups

13   and put them in commercial software and just see everything.

14   They would have to figure out how the data worked together.

15   They would have to figure out a script to get that data to be

16   published again, so it would have taken them some time.

17        Mr. Leedom said that he alone, in a lab, with computer

18   scientists helping him, with CIA officials who knew the data,

19   it took him -- him alone -- a week just to figure out how the

20   data worked together.  That's just the starting point.  They

21   would have needed to figure out a script.  They would have need

22   to figure out how to get it put back together again.  That

23   would have taken time, and that's why it wasn't published

24   immediately.  Mr. Leedom explained that to you.

25        Another reason you know the defendant knew that this

K32Wsch2                    Summation - Mr. Laroche

1    information was going to be coming out, and that's what he sent

2    on his last day at the agency.

3            Here's his email to OIG that he sent on November 10,

4    2016, and just to focus on a few portions of this, some of the

5    things he said:

6            Management ignored security concerns, his security

7    concerns, for two full years related to DevLAN;

8            It would have been easy to download and upload DevLAN

9    or the server in its entirety to the internet;

10           This illustrates the lack of security and pure

11   ineptitude of Karen;

12           Karen attempted to blame the insecure environment on

13   me.

14           More lies here by Mr. Schulte.

15           The defendant did not report security concerns for two

16   full years.  You want to know how you know that?  Well, Special

17   Agent Evanchec testified that he reviewed his emails and Same

18   Time chats, and there are no such communications.  But

19   Mr. Schulte is also an individual who wants everything in

20   writing.  Over the course of months, between October and early

21   2016, he is sending email after email after email about the

22   Amol incident, page after page of emails, writing down his

23   thoughts on the Amol incident.  You know what's not in those

24   emails?  Reports about security concerns, because he didn't

25   make them.  He was lying.

K32Wsch2                     Summation - Mr. Laroche

1          The defendant also claimed at the time, before his

2     resignation, that his punishment was based on the Amol

3     incident.  It had nothing to do with him reporting security

4     concerns.

5          And another thing.  The security concerns that the

6     defendant is reporting at the time are that developers are

7     acting as administrators.  You know when that security concern

8     was fixed?  April 16, 2016.  They tried to fix the problem.

9     You know why that problem was fixed, what got it to be fixed?

10    Him.  He was the security concern that they were trying to fix,

11    not something else, not something he reported.  The idea that

12    the developers were administrators and that was a problem, that

13    came to a head because of what he did.  That was fixed because

14    of what he did.  He was the security concern.

15         So what is the defendant doing here?

16         He knows this information at some point is going to

17    come out, and he wants to try to cover himself by saying I was

18    the one; I was the whistleblower.  He was not a whistleblower.

19    He was lying.

20         So the leak does come out.

21         March 7, 2017.  Here is the Twitter post on that day

22    from WikiLeaks announcing the leak.  What does the defendant

23    do?  He immediately starts searching for things about the leak,

24    and not just anything about the leak; he is interested in the

25    investigation.  So he searches, over a seven-day period, six

1     times for the FBI -- six times for the FBI.

2              What types of things is he visiting?  This is just on

3     March 7 alone, the day the leak comes out.  The first thing he

4     is interested in is what is the FBI doing.  He visits websites:

5     FBI Prepares Hunt for the Source of CIA's Documents; WikiLeaks

6     Reveals CIA Hacking Trove has Feds on Mole Hunt; FBI Joins CIA

7     in Hunt for Leaker.

8              Why is he interested in the FBI?  Because he is

9     worried.  He is worried that they're going to find him.  He's

10    worried that they're going to figure out he did it.  So the

11    first thing he's interested in finding is what is the FBI

12    doing?

13             Then he meets with the FBI, and he tries to do exactly

14    what he did at the CIA: lie.  Because when he gets caught, he

15    lies without remorse, without hesitation.  He did it over and

16    over again at the CIA, and he did it over and over again at the

17    FBI.

18             The things he lied about:

19             Deny being responsible for the leaks.  He denied

20    having that classified OIG email.  Remember, when he was asked

21    that question, Do you have that OIG email, that was before he

22    knew they were going to search his home.  He lied.  Why did he

23    lie?  Because that email contains classified information, and

24    he knew he wasn't supposed to have it.

25             He denied taking information from DevLAN to his home.

1   There is a chat that we read during Mr. Evanchec's testimony

2   where he says to someone he's talking to on his chats, I take

3   stuff from DevLAN and bring it home.  I put it on CDs, and I

4   bring it home, and the individual that he's talking to responds

5   and says:  I don't understand.  We would get in trouble for

6   that.  And he tries to clarify:  You mean from an unclass

7   network?  The defendant corrected him.  He said:  Nope.  It's

8   from a class network.  I put it on CDs and I bring it home,

9   because when the defendant wants to do something, he does it.

10  He doesn't care about the rules.  He doesn't care about the

11  classification issues.  He does it.  But he lied to the FBI

12  about it.

13          The defendant denied working on Brutal Kangaroo at his

14  home, even though there's evidence that he securely deleted the

15  Brutal Kangaroo folder from his computer.

16          The defendant denied ever making DevLAN vulnerable to

17  a theft.  But of course, he didn't mention that he bulk deleted

18  log files on April 20, 2016.  He mentioned none of those

19  activities.  The reason he didn't mention them is because

20  they're devastating evidence of his guilt.  He didn't mention

21  any of that stuff.

22          But the defendant's lies didn't work, and the

23  defendant was caught.  And after he was caught, he repeated

24  that same pattern.  He got angry.  He escalated.  He

25  retaliated, and he lied some more, and he tried to cover up

K32Wsch2                    Summation - Mr. Laroche

1    some more.

2            Again, at the beginning of this trial, Ms. Shroff said

3    that the prison conduct is going to show someone who was trying

4    to clear his name, that he was just trying to clear his name.

5            Again, we have the burden, but you can scrutinize

6    those arguments, and when you do, that argument does not add

7    up.  Apparently, the defendant's idea of clearing his name is

8    to smuggle an illegal cell phone into prison; to use that

9    illegal cell phone to set up encrypted email accounts and

10   anonymous social media accounts; to pretend to be a third

11   person using those accounts; to accuse his CIA coworkers of

12   setting him up; to violate this Court's orders; to delete

13   activities of what he's doing in prison, activities that are

14   apparently supposed to exonerate him; to communicate with a

15   reporter as a third person; to tell that reporter that he is a

16   member of Anonymous or was a member of Anonymous -- Anonymous,

17   a group that has sent information to WikiLeaks in the past; to

18   send that information, to send that reporter classified

19   information about the CIA's network; to promise that reporter

20   that he will give him more information if the reporter

21   publishes things on a timeline that is OK with Mr. Schulte; and

22   then plans to disclose more classified information using an

23   anonymous Twitter account, including information about

24   Bartender, information that witnesses told you hadn't been

25   disclosed and could have put people's lives in danger.

1              That is not someone trying to clear their name, ladies

2       and gentlemen.  That is Mr. Schulte's playbook.  Anger,

3       escalation, retaliation and lies.  That's what that was.

4              Let's walk through the prison evidence.

5              Much like what happened at the agency, the timeline is

6       similar.  Anger grows.  He escalates.  He retaliates.  He lies.

7              The timeline here is in May.  There's a court

8       appearance in this case, and the defendant is instructed very

9       specifically that he cannot modify the terms of the protective

10      order.  And that protective order is clear: if something is

11      marked, pursuant to the protective order, as confidential, you

12      can't just disclose it to third parties.  You can't do that.

13      The Court has issued an order saying you cannot do that on your

14      own, and the Court instructs the defendant about that and says,

15      Do you understand?  And the defendant's response is, "I do

16      now."  I do now.  That's what he said to the judge.

17             By July, his anger had grown.  You've seen a bunch of

18      prison-notebook writings where the defendant is very frustrated

19      with his family.  He's frustrated that they're not doing what

20      he wants, which is to publish his articles.  They are trying to

21      hold him back, but he does not want to be held back.  He wants

22      to get his word out, and so he's furious with his family at

23      this time for not helping him.

24             By August, he gets that encrypted cell phone, the

25      Samsung cell phone.  He declares his information war.

1        By September, he has set up his Twitter account, and

2   near the end of the month, he emails the reporter classified

3   information about the network infrastructure, and he was also

4   planning to post tweets that contained more classified

5   information and an article that he wrote that contained more

6   classified information.  And the only thing that stopped him

7   from doing that was the FBI.  The FBI searched the MCC on

8   October 3 and stopped his plans.

9        Again, by August -- August 8, 2018 -- you know from

10  the prison notebooks that the defendant is furious.  He's

11  furious with his family about his articles not getting out, and

12  he says that he is prepared to break up diplomatic

13  relationships, close embassies and end U.S. occupation across

14  the world unless his case gets dismissed.  That's what he

15  wants.  He wants his case to get dismissed.

16        And these aren't idle musings by somebody who couldn't

17  possibly cause harm to the agency or to the United States.  The

18  defendant worked for years developing cyber tools.  He was

19  involved in operations against foreign adversaries, against

20  terrorist organizations.  The defendant knows information that

21  could be harmful, and you know that because just some of the

22  tweets he drafted about Bartender, witnesses told you that they

23  would never disclose that information, and that information, if

24  disclosed, could put people's lives at risk.  So these were not

25  idle musings by him.  He could do this, and his mind-set as of

1    August 8 was I will do anything I can to get out of this case.

2    Anything I can to bully the government to dismiss my case, I

3    will do it.

4            By August 14, the defendant is prepared and has

5    declared his information war.

6            Now, the timing of this is not coincidental.

7            On the 13th, August 13, that's when the defendant gets

8    that Samsung cell phone, and Carlos Betances told you that he

9    wanted that specific cell phone because of the encryption on

10   it, because he felt like he could do certain things on that

11   cell phone that he wasn't comfortable doing on the other cell

12   phones.  So the next day, after he gets this cell phone, he

13   declares his information war.  This is, again, more evidence

14   that he was not trying to clear his name.  It's more evidence

15   that he was trying to harm.  He was prepared to harm the

16   government.  He's prepared to do that by, in his own words, an

17   information war.

18           A week later, the defendant had already taken a number

19   of steps to set up anonymous social media accounts, to set up

20   encrypted email accounts, and the defendant has a checklist by

21   the 21st, August 21, that talks about the various things that

22   he plans to do, that he wants to do, and it is all more

23   devastating evidence that he was doing illegal things from

24   prison.  He is trying to delete things from these accounts.  He

25   is trying to, in his own words, "delete suspicious emails from

1   my Gmail."

2          You don't need to delete suspicious emails if those

3   emails exonerate you, if those emails are about clearing your

4   name.  You need to delete suspicious emails because they are

5   criminal, because they are illegal.  That's what he was doing.

6   He's trying to protect himself:

7              "Create new ProtonMail presumedguilty@protonmail.com;

8              "Migrate WordPress to ProtonMail;

9              "Clean up apps;

10             "Reset factory phone" -- all steps he wants to take to

11  hide what he was doing, to prevent people from identifying him

12  as being the perpetrator:  Encrypted email accounts, cleaning

13  the phone, setting the phone up to have encrypted applications

14  so he won't get caught.

15         He also says, at the bottom, "Set up WhatsApp app,

16  Signal, Telegram, all with different numbers."  Why?  Again, he

17  wants to make it harder to catch him.  That's what he is doing.

18         On that same page he also has:

19             "Research.

20             "Gmail; delete deleted email."

21         He is concerned that Gmail might have those deleted

22  emails because they have evidence that he is committing crimes.

23         He also has "changing Samsung IMEI."  He wants to try

24  and change the number that can be associated with the phone so,

25  again, he can protect himself; he can hide his activities.

1        And he keeps escalating, just like he did at the CIA.
2   By the 22nd, the defendant reaches out to Shane Harris at the
3   Washington Post.  He doesn't say I'm Josh Schulte.  He pretends
4   to be a third person, and he asks for his nine articles.
5        The next day, he writes, in his notebook:
6        "My brother went back and forth, but they decided for
7   me not to publish the articles, my own fucking articles.  Isn't
8   that incredible?"
9        Then later, he writes, "Yesterday I started emailing
10  Shane from the Washington Post."
11       There is really no doubt that the defendant is the one
12  who is doing this.  He is admitting, in his prison notebook,
13  that I am the one emailing Shane Harris from the Washington
14  Post.  And you know the defendant's emailing in the third
15  person because he knows what he's doing is wrong; he knows he
16  can't be doing it.  But he's doing it anyways because he
17  doesn't care what his family says.  He doesn't care what the
18  rules are.  He doesn't care what the law is.  He is going to do
19  whatever he thinks he has to do to make the situation right,
20  just like he did at the CIA.
21       On August 31, he emails Shane Harris again.  This time
22  he says, "If you can consent to an embargo on disclosure of the
23  information for a limited time, we would give you an exclusive
24  to the information spanning several topics."
25       He's emailing a reporter, as a third person, enticing

1    that reporter to publish, on his time frame, how he wants it,

2    and saying I will give you more sensitive information if you

3    take my leak, as a third person.  That is not someone who is

4    trying to clear their name.  That is not someone who is trying

5    to clear their name.  That is someone who is doing something

6    illegal, who knows he is, and doesn't want to get caught.

7           The defendant also writes:  "Secondly, I want to

8    rewrite article 10, Malware of the Mind."  He also has

9    references to Anonymous.  And he also has references to

10   classified information under which he has "tool for vendor

11   report, Bartender for vendor."

12          There's no doubt the defendant knows what he is doing

13   is preparing to disclose classified information.  He wrote it

14   on the page.  He's also referencing Anonymous, which he will

15   tell the reporter that he was a member of.

16          And here's Malware of the Mind.  There's also no doubt

17   that this was intended for public dissemination.  It is titled

18   "To My Fellow Engineers and the Tech Industry.  That's on the

19   first page.  And then he discloses more classified information

20   about his work at the CIA.  He says:

21          "Do you know what my specialty was at the CIA?  Do you

22   know what I did for fun?  Data hiding and crypto.  I designed

23   and wrote software to conceal data in a custom-designed file

24   system contained within the drive slack space or hidden

25   partitions.

K32Wsch2                    Summation - Mr. Laroche

1              "I disguised data.  I split data across files to file

2     systems to conceal the crypto.  Analysis tools could never

3     detect random or pseudorandom data indicative of potential

4     crypto."

5              Witnesses told you that is classified tradecraft that

6     should not be disclosed.  It should not be disclosed because

7     that is a way to determine whether the CIA has done something

8     in an operation.  It's a way to attribute things to the CIA,

9     and that's dangerous.  You cannot do that.  The defendant

10    didn't care.  He was prepared to do it in his article 10.

11             By September 1, the escalation continues.  At this

12    point the defendant has set up an anonymous Twitter account

13    @freeJasonBourne, and the defendant starts drafting tweets.

14    And if you look at the evidence, the only tweets that appear

15    are under @freejasonbourne.  There are several pages of them.

16             And what are those tweets about?  Those tweets are

17    about accusing his coworkers about setting him up and hacking

18    the system.  Those tweets are about other classified

19    information, including a tweet like this:  "Just to

20    authenticate myself first."

21             What is the defendant planning to do?

22             The defendant wants to start an anonymous account that

23    is disclosing classified information, and he wants to

24    authenticate that account so that that person might know

25    something about what actually happened in this case.  That's

what the defendant thinks he can do to help himself, so he

starts drafting tweets about that:

I know Karen and Jeremy.  I know those people set this

person up, and you can authenticate me because I have

classified information.  I know about Bartender.  I know it was

a tool that was deployed.  I know it was by operators, and

that's how you can authenticate me.  That's how you know what I

say about the defendant is true.

That was his plan.  That's what he was drafting.

And you know that Bartender was a classified tool.

Multiple witnesses testified about it, that disclosing this

information could be harmful.  It could put people's lives at

risk.  Weber testified about that.  Stedman testified about

that.  And it makes sense.  You cannot simply just tell the

world that this tool is a CIA tool and identify it with a

specific report.  You are identifying a specific tool that had

been used.  You can put people's lives in danger by doing that.

Again, the defendant did not care.

By September 2, the escalation continues.  He sends a

Signal message, an encrypted message, to Shane Harris.  Now, at

this point Shane Harris had not agreed to give him those

articles that he wanted so desperately.

And so what did he do?

As he always does he escalates, and he sent him a

Signal message that says:

1          "Hi.  I got your name from Shane P.  I'm messaging

2     from Josh's phone.  I'm hoping to validate Anonymous

3     legitimacy, helping our family and authorize the release of

4     Josh's articles to them when you get the chance."

5          This group is apparently some computer group Josh was

6     a part of before.

7          "And they have agreed to switch from NYT, New York

8     Times, to talk to you instead to help us."

9          Again, he's trying to entice Shane Harris to do things

10    that he wants.  He's trying to entice him with more sensitive

11    information and he's telling Shane Harris that he was a member

12    of Anonymous, a group that sent information to WikiLeaks in the

13    past.  The defendant, charged with sending information to

14    WikiLeaks, is admitting that he was a member of a group that

15    sent information to WikiLeaks.

16         It's devastating evidence of his guilt.  It also shows

17    the lengths he will go to try to get what he wants with this

18    report.  He's promising more information if that reporter does

19    what he wants, which is to get his articles back, because he'll

20    do whatever it takes.

21         By September 12, he's already talking about disclosing

22    his tweets, scheduling his tweets.  He's talking about getting

23    them ready for publication, and these are the only tweets that

24    you have.  They're the tweets from the @freejasonbourne.

25         September 17, he is prepared to disclose more.  He

K32Wsch2                    Summation - Mr. Laroche

1   talks about posts he made on Facebook, and he says at the end,

2   "In a week I'm going to dump my stuff."  He is getting ready to

3   disclose what he has.

4          What does he do in a week?

5          September 22, so we're about ten days away from the

6   FBI stopping him, he starts.  He emails the reporter using

7   Annon ProtonMail account.  He's still pretending to be a third

8   person, not himself.  He says, "Attached are two of the search

9   warrant applications in Josh Schulte's case along with private

10  notes Josh wrote regarding the first warrant."

11         In that email he also says -- again, he's trying to

12  entice him to do what he wants by saying -- "I have more

13  sensitive information that we're ready to share with you.  Just

14  please help me."  Again, not the actions of a man who is

15  actually trying to clear his name:

16         "We've decided to share with you an initial exposé

17  involving Russian oligarchs, business ties and wire transfers."

18  He wants Shane Harris to do what he wants, and he's trying to

19  bribe him to do that by saying I'm going to give you more

20  sensitive information.

21         Now, on the 24th, he sends another email to Shane

22  Harris, and the reason he had to do that was because Shane

23  Harris couldn't access the search warrants and the notes.  So

24  he resends it and he attaches them as a PDF.  And in this email

25  he has now committed two crimes.  He has now violated the

1    protective order by sending this protected document to the

2    reporter, and he's also sent classified information to the

3    reporter about the CIA's network infrastructure.

4         He has done that in this email.  You know the first

5    part of that because this is the search warrant application

6    that was attached to the email.  It is clearly marked U.S.G.

7    confidential.  U.S.G. confidential is the designation that's

8    identified in the protective order, and the defendant stood

9    before this Court and he said:  I understand.  I understand I

10   cannot do that.

11        He said it here, in court.  He doesn't care.  He will

12   say whatever he has to do, he will do whatever he has to do

13   whenever he thinks it's right, and that's clear evidence of

14   that.

15        The other thing the defendant sent was information

16   about the CIA's network infrastructure.  He talks about EDG and

17   COG and at least 400 people with access, and he specifically

18   identifies Hickok.  He says, "They don't include COG who is

19   connected to DevLAN through our network," an intermediary

20   network that connected both COG and EDG.  He's sending this

21   information to a reporter.

22        To the extent the defendant thinks that he's got an

23   argument on that front, the way to air those arguments are in

24   this courtroom, not to send highly classified information about

25   the CIA's network infrastructure to a reporter so that he can

K32Wsch2                    Summation - Mr. Laroche

1    get some sort of favorable article written about him that he

2    thinks is going to help his case.  The way to deal with it is

3    in this courtroom.  The defendant didn't care because, in his

4    view, he will do whatever he has to do, whatever it takes.

5    Whatever he thinks will make the situation right, that's what

6    he will do.  And common sense will tell you that you can simply

7    not send information about network infrastructure to a reporter

8    or somebody outside the CIA.

9            Witnesses told you they would never talk about the

10   infrastructure of DevLAN, before the leaks or after.  And the

11   reason they wouldn't is because you are giving information to

12   the public that could be used by adversaries to target our

13   systems, a system that, again, is only used by about 200 people

14   in the government, a system that has highly sensitive

15   information about cyber tools, a system that we use, that we

16   rely on for our national security.  You can't just go tell

17   reporters about how that system is structured.  He knows he

18   couldn't do that.

19           Another reason he knew he couldn't do that is because

20   he's communicating with this reporter as a third person.  He's

21   not saying, Hey, my name is Josh Schulte and this is what's

22   happening.  He is doing it because he wants to hide the fact

23   that he is committing crimes.  That's why.

24           Now, at the beginning of this case, we talked about

25   this tweet, and this tweet specifically that he was preparing

1    to write, "Until your government protects you and honors your

2    service, send all your government secrets here:  WikiLeaks,"

3    and this is what the defendant really thinks.

4          This is what the defendant really thinks.  If the

5    government isn't honoring your service, it's OK; send your

6    government secrets to WikiLeaks.  This is in his notebook.

7    It's his handwriting.  It's his words.  They're his thoughts.

8    That's what he thinks.

9          And you know who else didn't think people were

10   honoring his service at the CIA?  The defendant.  He was

11   furious that they took away his admin rights, that they didn't

12   take his side with Amol.  He was furious.  The CIA wasn't

13   honoring his service, so what did he do?

14         He sent information to WikiLeaks.  This is a

15   devastating admission for him.  This shows exactly what he

16   thinks about WikiLeaks.  This shows exactly what he thinks,

17   that it is OK to send secrets there when you feel like you've

18   been wronged.  And if there is one thing that is abundantly

19   clear, it's that he felt like he was wronged.  He was ready to

20   retaliate, and he was ready to do anything -- anything -- to

21   make it right in his mind.  That's exactly what he did at the

22   CIA, and that's exactly what he tried to do again from prison,

23   repeating that same pattern of anger, escalation, retaliation

24   and lies.

25         Now, the last part of the closing is going to be going

1   back to the charges.  I want to talk about each of the charges

2   very briefly, and remember that Judge Crotty is going to give

3   you instructions on the law, and you should follow those

4   instructions, but I expect that his instructions will include

5   some of this information.  Let's go through the charges.

6          Count One.

7          Now, remember, at the beginning I told you that there

8   are essentially two categories.  There's the Vault 7-related

9   charges and Vault 8, which relate to the stuff that was stolen

10  at the CIA, and then there's the prison charges.  We're going

11  to start here with the first category, the Vault 7 charges.

12         Count One is illegal gathering of national defense

13  information.  I expect that Judge Crotty will tell you that

14  this has three elements:

15         The defendant took information;

16         That information was national defense information, and

17         He took it with the intent or reason to believe that

18  it would injure the U.S. or it could be used to help a foreign

19  country.  That's Count One.

20         Count Two is transmitting national defense

21  information.  I expect that you'll hear the following elements

22  for this crime:

23         That there was unlawful access to information;

24         That that information was national defense

25  information;

K32Wsch2                    Summation - Mr. Laroche

1          The defendant took that information with reason to

2    believe that it could injure the U.S. or help a foreign

3    country, and

4          That he willfully transmitted it, so he transmitted it

5    on purpose.

6          Count Four is unauthorized computer access to obtain

7    national defense information.  I expect you'll hear that it has

8    these elements:

9          One, that the defendant exceeded his authority, his

10   access on the computer;

11         He knowingly did it, knowingly accessed the computer;

12         Three, he knew the national defense information could

13   injure the U.S. or help a foreign country and

14         Four, that he willfully communicated information to an

15   unauthorized party.

16         Count Five is theft of government property.  I expect

17   you'll hear these elements:

18         One, that the property belonged to the United States;

19         Two, the defendant stole the property;

20         Three, that the defendant acted knowingly and

21   willfully; and

22         Four that that property was worth more than a thousand

23   dollars.

24         On that last point, you heard testimony from Sean

25   Roche about the millions and millions of dollars that's put

1    into operations for the CIA, and there's really no dispute

2    that, obviously, the information that was stolen was worth more

3    than a thousand dollars.

4            Count Six is unauthorized computer access to obtain

5    CIA information.  I expect you'll hear that the elements are:

6            That the defendant exceeded authority in accessing a

7    computer;

8            That he acted intentionally; and

9            He obtained information from the CIA.

10           Count 7 is the transmission of a harmful computer

11   command.  The elements are:

12           The defendant transmitted a harmful computer command;

13           He intended to damage a computer system;

14           He thereby caused damage; and

15           His actions resulted in damage to that system.

16           Judge Crotty, I expect, will instruct you that damage

17   can include damage like the unavailability of data so that

18   deletion of data would be damage to a computer system, and we

19   saw that with the log deletions over and over again by the

20   defendant.

21           So there are a lot of elements we just went over, but

22   I want to try to break them down for these counts.

23           The two elements we saw for several of the counts were

24   national defense information and injury to the United States or

25   advantage of a foreign country.  And here, we've just gone

K32Wsch2                    Summation - Mr. Laroche

through both of those and summarized some of the evidence.
Let's start with national defense information.

What is national defense information?

I expect that you'll being instructed that it includes
the intelligence-gathering capabilities for our country, and in
order to be national defense information, the information has
to be closely held.  It has to be protected.

What evidence do we have about that?

There really should be no dispute that cyber tools
used to target foreign adversaries, used to do
intelligence=gathering operations, used to collect intelligence
is national defense information.  It's information about our
capabilities.  It's highly classified information that should
be protected and, in fact, was protected.  So it was closely
held in this case.  You know it was closely held because it was
stored on a top-secret CIA computer system within a secret CIA
facility, protected by armed guards, accessed using special
badges and codes, inside offices there have vaults and only
about 200 people had access in the entire government to that
information.  So it was closely held.

Injury to the United States or advantage of a foreign
country, whether the defendant understood or had reason to
believe or had intent that this could harm or would harm the
United States, obviously he did.  The defendant here, in his
prison notebook, #fuckyourtopsecret, the defendant had a top

1    secret security clearance.  He knew the potential harm that

2    could come by disclosing this information.  He even says in his

3    prison notebook, Vault 7 could be used in devastating fashion.

4    It could be repurposed, redeployed by our enemies against us.

5    He knew that this would be harmful.

6           The defendant also signed nondisclosure agreements

7    when he started at the agency.  He signed those agreements

8    which said very clearly that disclosing classified information

9    could be harmful, could cause grave harm to the agency, could

10   cause grave harm to the United States.

11          You also know that there was real harm in this case.

12   The cyber tools were essentially gone instantly.  Operations

13   were stopped, and you know the defendant was willing to do

14   anything because he said so himself:  Whatever I have to do to

15   make this situation right.

16          When every step of his escalation didn't work, when

17   his back was against the wall, he was prepared to do anything

18   to make this situation right, including harming the United

19   States, including advantaging a foreign country.

20          So again, this slide shows several more of the

21   elements from left to right.  On the left there is the

22   gathering and theft element, so that the information was

23   gathered and stolen.

24          In the middle there is unauthorized access, exceeded

25   authority and harmful command, so that essentially the

1    defendant had unauthorized access to the computer and he did

2    things he wasn't allowed to do.

3            And the third is transmission.

4            Now, before we go through each of these, at a very

5    basic level, you know that the information was stolen, and you

6    know it was transmitted to WikiLeaks.  You know that because

7    WikiLeaks posted it.  There's no question about this stuff

8    being taken and transmitted to WikiLeaks, so let's go through

9    each of these.

10           First, on the gathering and the theft, on the left

11   side, the defendant had a clear motive to steal.  You know that

12   from all the emails.  You know that from the witness testimony.

13   You know that from his interview with SIB.  He was furious at

14   how he'd been treated.  He was willing to do anything he had to

15   do to try to make it right in his own mind.

16           He also had the capabilities to do it.  The defendant

17   was an administrator.  He knew how the system worked.  He had,

18   in his own words, "super access," and he also knew a lot about

19   the backups.  He knew a lot about the backups because he set

20   them up, because he was managing them.  He set up the pathways

21   that he would use.  And remember, there is testimony.  The

22   backups were not publicized at the CIA.  Very few people knew

23   about them.  He was one of the them.  He had the administrative

24   capabilities necessary to access them.

25           You also know it was him from the March 3, 2016,

1    backup files.  Those are the files that are posted on

2    WikiLeaks.  Those are the files from the worst day he had at

3    the agency, the day he became furious that the agency wasn't

4    going to take his side.  He picked those specific March 3,

5    2016, backup files.  You know it was those files from the

6    expert testimony.  You know it was those files from the

7    forensic evidence, which shows that they were accessed and

8    copied on April 20, 2016.  That is more powerful evidence that

9    he stole those specific files.

10        You also know from the April 20 forensics.  So you

11   have forensics showing, again, from his workstation, his

12   computer, the reversion, accessing the backups and log

13   deletions, all things you would do if you were stealing that

14   data.  And you know exactly when that data was stolen because

15   the last time it was accessed was April 20, 2016, at 5:42 and

16   5:43 p.m.

17        You also know it was him that gathered and took that

18   information because he immediately, the next day, tried to

19   cover his tracks.  He emailed Anthony about the OSB server.  He

20   wanted to try to wash his hands of that server.  He was

21   concerned that if somebody looked at it and his name was still

22   in charge of it, he would get in trouble.  The day after,

23   immediately, he tried to get rid of it.

24        What about unauthorized access and exceeding

25   authority?

1          Well, first, you have it is very clear that the

2     defendant knew what he was doing on the system from April 14 to

3     April 20 was wrong; that he was abusing his privileges.  We

4     went through the timeline of the reinstatement of privileges on

5     April 14.  He was specifically told he was no longer an

6     administrator of the OSB libraries.  It did not stop him.  He

7     went back in and reinstated his privileges anyways.

8          That led to April 18, 2016.  After he had lost all of

9     his administrative privileges, he gets that privileges memo

10    which says you cannot do that, you cannot reinstate your

11    accesses.  He also learns that day that he is no longer an

12    administrator of DevLAN, so he's not an administrator of the

13    Atlassian services, and he lied to Anthony about it because he

14    still had that back-door access, but he lied to Anthony because

15    he still wanted to use it.

16         And on April 20, 2016, he took advantage of that

17    access.  He reverted the system.  He accessed the backups, and

18    he did the log deletions.  So again, all of this is more

19    evidence of unauthorized access, exceeding his authority and

20    transmitting a harmful computer code.  He is deleting log after

21    log after log of his activities.  That is making data

22    unavailable.  That is damage to the system.  That's what he was

23    doing.

24         And finally, on the transmission point, again, you

25    know that the data was transmitted, and you know that he stole

1    it.  So what other evidence do we have on the transmission

2    itself?

3            You have all the steps he took concerning April 21 and

4    May 6 to transmit it and then to cover his tracks.  On the

5    24th, he downloaded Tails, a program to secretly transmit data.

6    He purchased that SATA adapter which would have helped him

7    transmit data between hard drives outside of his computer.

8    Between the 23rd and 28th, he's using Eraser Portable to delete

9    Brutal Kangaroo, and he's trying to figure out what to do with

10   the actual files that he brought home with the backups.  And on

11   the 30th, he downloads DBAN, something to nuke his computer,

12   which he will do after he is done sending the data.

13           And on the evening of the 30th into May 1, he is

14   taking all the steps to transmit the data, and that is exactly

15   what he's doing.  He's trying to figure out how to wipe his

16   drives after it's done, and overnight, into the morning, he's

17   searching to confirm that one terabyte of data, the size of the

18   data that he would have stolen and given to WikiLeaks, had

19   transferred correctly.  Multiple times overnight, through the

20   middle of the night, he is unlocking his virtual machine.  He

21   is checking what is happening, and then he's trying to figure

22   out if the data that he sent over transferred correctly.  He's

23   looking to see how can I calculate an MD5 to make sure that a

24   file has been transferred, large files like the backups.

25           And on May 5, days later, he reformats his computer,

K32Wsch2                    Summation - Mr. Laroche

 1   and the reason he does that is because he wants to try to make

 2   sure that there is nothing that can come back to him, nothing

 3   that he did during that time -- no evidence -- will be left

 4   over.  He wants to make sure that he has protected himself in

 5   every way possible.

 6          You also know that he sent this information to

 7   WikiLeaks because, all of a sudden, in August, through January,

 8   he becomes obsessed with searching for WikiLeaks.  For ten

 9   years before that, he'd never served for WikiLeaks -- just

10   three times over that time period -- and then, all of a sudden,

11   from August to January, he is searching repeatedly for

12   WikiLeaks and things related to what they would eventually

13   disclose; WikiLeaks code.  He wants to know what WikiLeaks is

14   coming out with because he knows they have it, and he's

15   wondering what time frame they will publish it.

16          Now, there are other counts related to the Vault 7 and

17   Vault 8 charges, and they are making false statements to the

18   FBI.  I expect that you will hear that the elements are:

19          That the defendant made a statement;

20          The statement was material;

21          The statement was false; he made it knowingly and

22   willfully; and

23          The statement was made in a matter within the

24   jurisdiction of the government, like this investigation.

25          Count Nine is obstruction of justice.  This has three

K32Wsch2                       Summation - Mr. Laroche

elements:

That there was a proceeding pending before a grand jury;

The defendant knew of that proceeding; and

He acted corruptly to obstruct or impede the proceeding.

What's the evidence you have on this?

Well, first, you know that the defendant knew there was a proceeding, a federal grand jury proceeding, because during that first interaction with law enforcement, on March 15, he's handed a grand jury subpoena.  So he knows that there is a grand jury investigation.  He's also searching for the FBI, so he knows that there is an investigation relating to the Vault 7 and Vault 8 disclosure.

So then what does he do when he meets with the FBI?

He lies over and over again.  He lies about being responsible for the leaks.  He lies about that OIG email that was found in his apartment.  He lies about making computers vulnerable to theft.  He lies about storing information on his home computer.  He lies about working on Brutal Kangaroo at his home.  And he lies about removing classified information and taking it home.  You have evidence that all of those things are lies.

The last two counts -- as I said, the last category -- are the prison charges.  There is another charge here, Count

K32Wsch2                    Summation - Mr. Laroche

Three, transmitting or attempting to transmit national defense

information.  We went through these counts before, or these

elements before:

          Unlawful access to information;

          National defense information;

          That information he had reason to believe could injure

the U.S. or help a foreign country; and

          There was willful transmission.

          This is also charged as an attempt, and to establish

an attempt, you have to show that the defendant intended to do

something -- so intended to transmit classified information --

and took a substantial step in doing so.  Let's go through a

summary of the evidence on this count.

          Here we have three columns -- national defense

information, transmission in the middle and attempted

transmission -- so let's walk through each of these.

          On the left we have national defense information and

intent to harm.  So again, the information that he was trying

to transmit or did transmit related was to CIA cyber tools.

They related to CIA tradecraft.  They related to CIA network

infrastructure, things that plainly qualify as national defense

information, and multiple witnesses told you why.

          (Continued on next page)

K323SCH3                    Summation - Mr. Laroche

1          MR. LAROCHE:  In terms of an intent to harm, the

2     defendant himself declared an information war.  The defendant

3     himself was prepared to destroy diplomatic relationships and

4     close embassies.  The defendant himself said fuck your top

5     secret.

6          He was ready to harm.  He knew that this information

7     could harm, and he was prepared to do so.

8          The defendant also signed, on his way out of the

9     agency, non-disclosure agreements.  Those agreements, much like

10    the ones he signed when he started at the agency, said if you

11    disclose classified information, it could harm.  It could harm

12    the United States, and that's what he knew when he left the

13    agency.

14          What about transmission?  What evidence do we have

15    that he sent this information to the reporter?  Well, you know

16    he was using the cell phone.  You know that from his own

17    statements in the prison notebooks.  You know that from the

18    video of him using the cell phone.  You know that from Carlos

19    Betances who told you he was using the cell phone.

20          You also know the defendant sent that e-mail to the

21    reporter.  He said in his notebooks, he was the one who was

22    e-mailing with that reporter.  You know that that specific

23    e-mail account, the Annon account, was the account he set up.

24    The password for that account is in his prison notebooks.  He

25    wrote it down.  He set it up.  It's his account.  And so

K323SCH3                    Summation - Mr. Laroche

1    there's really no question that he sent this information to the

2    reporter, and that it was him who actually did it.

3            What about attempted transmission?  So he attempted to

4    transmit two things:  Bartender and Malware of the Mind.

5    What's your evidence here?  You have the video of his using

6    that cell phone, so you knew he was using a cell phone.  On

7    September 1st he set up that Twitter account, the Free Jason

8    Bourne account.  He drafted numerous tweets under that Free

9    Jason Bourne account, tweets that he planned to submit.  He

10   talked about scheduling the tweets.  He talked about wanting to

11   get his articles published, including article 10, which is

12   malware.  Malware was addressed to the tech community.  It was

13   meant for the public.  And he talked about dumping all his

14   stuff.  He was planning to disclose this information.

15           He was doing it on a plan that made sense in his mind,

16   he was going to get the reporter to start publishing articles

17   about his case, and then there were going to be anonymous

18   tweets coming out and other information that would tend in his

19   mind to make him look like an innocent man.  That was his plan.

20   That's what he wanted to do.  That's what he was planning to

21   do.

22           Just days after, just days after sent to the

23   information to the reporter, he got caught.  The FBI stopped

24   him.  But had they not, he would have done it.  He had

25   everything ready to do it.  He had the Twitter account, he had

K323SCH3                    Summation - Mr. Laroche

1    the cell phone, he had the tweets.  He was ready.  He was

2    prepared.  He attempted to disclose that information.

3              Finally, last count:  Contempt of court.  The Court

4    issued a protective order that applied to the defendant.  There

5    was clearly a protective order regarding discovery in this

6    case.  Evan Schlessinger testified about that.

7              Two, that the defendant disobeyed that order.

8    September 24, the defendant sent an e-mail to the reporter

9    attaching the search warrant affidavits.  That is disobeying

10   that order.

11             And third, that he acted willfully and knowingly in

12   disobeying the order.  There can be no dispute here.  The

13   defendant was in this courtroom where the judge said these are

14   the terms of the order, you cannot modify it on your own, you

15   need to come to court.  He didn't care.  He was here, he said

16   he understood, he didn't care.  He sent it to the reporter, he

17   disobeyed that court order.  This is a ground ball.  He clearly

18   did these things.

19             Now, I'm getting ready to sit down.  But before I do,

20   we're grateful for your time.  This is now the fifth week of

21   trial.  You guys have been very attentive throughout and taking

22   notes throughout.  We're grateful for you sitting through five

23   weeks of what has been a long trial.

24             If you remember way back when to the beginning, when

25   Mr. Denton gave his opening statement, he asked you to do three

1    things.  He said please follow the judge's instructions, please

2    pay close attention to the evidence, and use your common sense.

3           And I expect that one of the instructions that the

4    judge is going to give you is not to speculate, and you

5    shouldn't, and you don't need to.  You don't need to speculate

6    about what happened in this case because you know exactly what

7    happened in this case.  It's common sense, ladies and

8    gentlemen.  Please use your common sense.  Think what makes

9    sense, and what doesn't.

10          And you don't need to be a CIA officer to tell the

11   difference between a truth and a lie.  And the truth in this

12   case is that the defendant lied repeatedly at the CIA.  And

13   then he lied repeatedly after that to the FBI.

14          The truth in this case is that the defendant was

15   furious at the CIA, that he was prepared to do anything to get

16   back at them, that he abused his privileges, and on April 20,

17   he stole that information and sent it to WikiLeaks.

18          And the truth in this case is the defendant tried to

19   do it all over again from prison, repeating that same pattern

20   of anger, escalation, retaliation, and lies.  Declaring an

21   information war.  Sending classified information to a reporter.

22   He was doing all those things over again.

23          Because that's the defendant's playbook.  That's who

24   the defendant is.

25          Now it's time to please use your common sense and come

1    to the only verdict that's supported by the evidence in this

2    case.  The defendant is guilty as charged.

3            THE COURT:  Thank you, Mr. Laroche.  Take a short

4    recess.  We'll resume at about 20 after 11 and we'll have the

5    summation by Ms. Shroff.

6            (Jury excused)

7            THE COURT:  See you in 15 minutes.

8            (Recess)

9            THE COURT:  You ready, Ms. Shroff?

10           MS. SHROFF:  Ready or not.

11           THE COURT:  Call the jury.

12           (Jury present)

13           THE COURT:  All right, Ms. Shroff.

14           MS. SHROFF:  Thank you, your Honor.

15           Mission above self.  Mission above self.  That's the

16   ethos of the CIA.  You remember way back when, when Anthony

17   Leonis took the stand and told you this.  Mission above self.

18           Throughout this trial, and way before, the CIA has

19   been on a mission and is on a mission here.  With the help and

20   support of its two mission partners, the FBI and the United

21   States attorney's office, their mission was, their mission is,

22   and their mission remains, to get the 12 of you to convict

23   Mr. Schulte of espionage and other federal crimes.

24           But as jurors, that is not your mission.  Your

25   mission, as Judge Crotty has told you, is to be impartial, to

1    decide only one thing:  Did the government meet its burden

2    under our Constitution of proving Mr. Schulte's guilt beyond

3    all reasonable doubt.  And the answer to that question is no.

4    No, they did not.  They did not prove to you Mr. Schulte's

5    guilt beyond any reasonable doubt.

6           It's still morning, so good morning, ladies and

7    gentlemen of the jury.  The last time I spoke to you directly

8    was almost a month ago, I think it was about a month ago.  And

9    I said to you then, and I say to you now, the government has

10   simply not been able to answer even the most basic question in

11   this case.  The most basic questions, ask yourselves, how,

12   when, why, where, and most importantly, who, masterminded and

13   perpetrated the biggest theft of data in the history of the

14   CIA.

15          And you know I was right to say that to you a month

16   ago.  The government, hand-in-hand with the CIA, has

17   investigated this case for three years.  Three years they

18   investigated this case.  We've had four weeks of testimony, 18

19   witnesses, 1,200 exhibits, videos, audios, and -- let us not

20   ever forget -- a very, very long slide show.  And what does all

21   of this add up to?  I'll tell you what it does not add up to.

22   The government still is not able to answer for you the very

23   basic questions.  In fact, quite weirdly, I tell you that there

24   are more questions now than when this trial first began.

25          So for the next hour or so I'm going to talk to you.

1    I'm going to try to be shorter here than the government has

2    been.  I'm going to review the evidence for you.  I'm going to

3    try and cut to the chase, get in, get out, because it's been a

4    long four weeks.

5            First, I'm going to look at how the CIA and the FBI

6    together decided almost immediately that the person to look at,

7    the person to focus on, the person to talk about, the only

8    person to present to you, was Mr. Josh Schulte.

9            Then I'm going to talk to you very briefly about the

10   DevLAN computer network.  How it was the farthest thing from

11   being secure.  Meaning that hundreds of people had access to

12   it.  Hundreds of people could have stolen it, and we know of at

13   least one person, at least one person, Michael, the man the CIA

14   placed on administrative leave because of concerns about his

15   behavior and his truthfulness.

16           I'm then going to discuss the government's forensic

17   evidence, it's motive theory, what Mr. Schulte did and said

18   when he was locked up at the MCC, and finally we'll look at the

19   legal charges against Mr. Schulte and why the proof fails to

20   support them.

21           When we're finished, you will see that the only

22   correct, proper, and fair verdict is a verdict of not guilty.

23           So let's begin with the crime.  The crime on March 7,

24   2017, thousands of CIA documents show up on WikiLeaks.  This

25   was front page news as you've heard.  And until then, until

1    that date, in 2017, the CIA had no idea that its crown jewels

2    had been stolen.  All they knew was that WikiLeaks had started

3    releasing that information, and that more information was yet

4    to come.  The CIA was under some pressure.  I will say

5    tremendous pressure to find out what was leaked, how it was

6    leaked, and who leaked it.

7           They wanted to hold someone responsible for the leak.

8    And so they began immediately an investigation, an

9    investigation that focused on Mr. Schulte.  The CIA joined up

10   with the FBI and started to work on their mission.  And they

11   focused, literally, within days, they focused on the one man,

12   Josh Schulte, the man who had left the CIA in November of 2016,

13   on bad terms, and who was disliked at the CIA.  So let's look

14   at what the investigation uncovered.

15          The FBI learned from working with the CIA day in and

16   day out over a period of three years that the CIA's DevLAN

17   network was highly insecure.  You heard this from almost every

18   witness who took the stand, starting with the government's

19   first CIA witness, which was Jeremy Weber, until their last

20   main witness, which was Leonard Small.  Each one of them told

21   you that DevLAN was wide open.  There were no controls, there

22   were no user controls, users shared passwords, passwords were

23   weak, passwords were stored openly.  There were no audit logs.

24   there was no login activity checks.  Anyone could connect to

25   the DevLAN workstation computer to the internet just by taking

1    the ethernet cable from one computer and plugging it into the

2    other.

3              Almost every witness told that you DevLAN -- in fact,

4    almost all of them described it to you the same way.  DevLAN

5    was the wild, wild west.  Why?  Why use that phrase?  Because

6    it tells you the system is not locked down.  And you don't have

7    to take my word for it.  there are transcript, ask for them.

8    Their witnesses tell you DevLAN was far too open, it left the

9    CIA at risk, and literally every witness admitted that on

10   cross-examination.

11             Mr. Weber called it both the wild west and a dirty

12   network.  Their next witness, or I don't know where in that

13   order he was, Dave, Dave told you the same thing and confirmed

14   that DevLAN was pretty open.  You know that people on DevLAN

15   shared passwords.  And not only did they share passwords, they

16   were extremely weak and simple passwords.  What did that do?

17   It made it impossible to account for who was using the

18   password, and again, it left the system vulnerable.  Because of

19   the openness of the system, anyone could have copied and

20   downloaded the data that was on Confluence by something called

21   vSphere.  And simply carrying the data out the door on a hard

22   drive would not have been difficult.  I didn't tell you that.

23   The CIA's witness tells you that, Dave.

24             Take a look at the transcript.  The CIA admits this

25   over and over again and puts in its official WikiLeaks task

force report.  They tell you, they confess and they say:  We

cannot determine the precise scope of the loss because DevLAN

did not require user activity monitoring or other safeguards

that exist on our enterprise system.

These are not the defense's words.  These are words

out of the CIA.  "Day-to-day security practice had become

woefully lax.  Most of our sensitive cyber weapons were not

compartmented, the CIA admits users shared system administrator

level passwords, there were no effective removable media

controls, and historical data was available to users

indefinitely."  This is all in the exhibit.  It goes on to tell

you, "The stolen data resided on a mission system that lacked

user activity monitoring, it lacked a robust server audit

capability," and then it says "The CIA did not realize the loss

had occurred until a year later, when WikiLeaks publicly

announced it in March of 2017.  Had the data been stolen for

the benefit of a state adversary and not published, we" -- the

CIA -- "would still be unaware of the loss.

So why is it important here that Mr. Laroche went on

and on about DevLAN being so secure, and here you have a report

that tells you DevLAN was insecure.  The bottom line is this,

right, bottom line is because the system was insecure, because

the system was poorly monitored, the government cannot know,

and it certainly cannot prove to you which of the many people

with access to this information committed this crime, when they

1    committed it, or how they did it.  And they haven't even

2    touched upon foreign adversaries, nation states, non-state

3    actors, terrorists, they haven't even touched upon that.

4          Just think about it this way.  It's like your home.

5    If hundreds of people have a key to your home, if you leave the

6    door open, if you leave your windows open, you always leave

7    your door and your windows open, you leave them unlocked, can't

8    anyone just come in at any time they want?  Take your stuff,

9    walk out with it, and you'd never know it was gone until you

10   needed to use it again.  You wouldn't know who stole something

11   from your house if you left your house that unlocked.  And you

12   know who else doesn't know?  The CIA didn't know, and they

13   don't know.

14         And it wasn't just DevLAN in general that we're

15   talking about that was insecure.  You also know, and you heard

16   testimony about this, that the Altabackup, the Altabackup files

17   in particular were insecure.  Remember that Mr. Laroche and the

18   government said over and over again, that this is the place

19   from which the information was taken.  Well, you heard

20   testimony and the witnesses told you that the Altabackups were

21   not locked down.

22         Take a look at Dave's testimony.  He tells you the

23   Altabackups were wide open.

24   "And in fact, you just testified that Altabackup was wide open,

25   correct?

1    "A.  Yes."

2           And there were many ways to get to that Altabackup.

3    So if DevLAN and the Altabackups are not properly protected,

4    what does that mean to you?  You already know this because

5    you've been here with me for four weeks.  You know what it

6    means, it means that Mr. Schulte isn't the only person who

7    could have committed this crime.  Others could have done it.

8    And if others could have done it, that is reasonable doubt.

9           Now first, remember who we're talking about, okay.

10   We're talking about people who work at the CIA.  These are all

11   trained spies we are talking about.  Witness after witness told

12   you that the CIA coders and developers are trained.  What are

13   they trained to do?  They're trained to gather, steal data from

14   air gapped networks without leaving any trace.  That's their

15   expertise.

16          There are spies working for other countries who are

17   trained to do exactly the same thing.  We are not the only

18   people who have a monopoly on this.  Mr. Weber told you, the

19   CIA has two categories targets: foreign governments and

20   non-state actors.  And they could do to the CIA exactly what

21   the CIA does to them.  And he tells you that.

22          Take a look at the transcript at 169.  Mr. Weber tells

23   you that the CIA creates malware that allows the CIA to steal

24   information, and he told you on cross-examination that other

25   countries are doing the same thing to us.

1          CIA contractors are another group.  They are also

2     suspects.  And you don't have to take my word.  Think back to

3     Dave who testified here.  He was a contractor.  He was a

4     contractor for the CIA and what did he do?  Just think about

5     what he did.  He took a portable hard drive.  Onto this

6     portable hard drive, he copied the entire backup of Stash.  Ask

7     yourself, where is that hard drive?  No one knows.  Literally

8     no one knows.  It has never been accounted for.  Nobody knows

9     where that hard drive went.  Ask yourself, is that how

10    WikiLeaks got the Stash information?  I don't know.  You don't

11    know.  And that's reasonable doubt.

12          Mr. Leonis told you, when I told him or asked him if

13    he would be concerned to learn of such a sloppy security

14    practice, he said yes, he would be.  He would be concerned if

15    someone put the backup of Stash on a hard drive.

16          But the FBI didn't seem particularly concerned about

17    it, and when I asked Special Agent Evanchec, what did he say?

18    He punted, and he said ask the Washington FBI office.

19    Actually, it wasn't me who cross-examined Mr. Evanchec, it was

20    Mr. Branden.  When Mr. Branden asked Special Agent Evanchec did

21    the FBI ever find that hard drive, what did Special Agent

22    Evanchec say?  He said, "I cannot recall.  That was more of

23    Washington field office's domain.  I can't specifically recall

24    where they ended up with that."

25          Let's flip over and go back to what Dave says about

K323SCH3                    Summation - Ms. Shroff

1    this hard drive where he has the entire Stash backup.  Okay.

2    What does Dave say about the hard drive?  First he says that he

3    put it in a safe.  Now, he never said that ever before, when

4    the FBI interviewed him in 2017.  But he tells us now from that

5    witness stand that he put it in a safe.  And he got rid of the

6    safe.  And then he moved the hard drive from the safe to his

7    desk cabinet.  And from where in the desk cabinet it went, no

8    one knows.  The entire Stash backup, according to Dave, the

9    contractor, is kept on a hard drive in a safe, then he gets rid

10   of the safe, moves it to his desk.

11         Can you imagine not keeping track of a hard drive that

12   has the backup of Stash on it?  As though that's not bad

13   enough, as though the FBI has no answer for that, as though

14   that is not enough, what more does Dave tell you?  He tells

15   that you not only did he put the backup of Stash on a hard

16   drive, he also put it in his home directory on the computer.

17   But he tells you, don't worry, you shouldn't be worried about

18   the home drive, because my home directory, he says to you, was

19   password protected.

20         So, Dave asks you to believe him, the man who could

21   not remember what he did with the hard drive of the entire

22   Stash backup.  Is this what the CIA calls a secure system?

23         And just while I'm talking about Stash, I just want to

24   ask you one thing to think about.  Where is the evidence that

25   Mr. Schulte took Stash?  In all of the two-hour presentation,

1   where is that evidence?

2        Now, you know that Michael here, Michael is a key suspect.

3   We are going to talk about Michael some more in a few minutes,

4   but for now, let me just remind you, he's present at his desk

5   in EDG at the very time the CIA information was stolen, and

6   that's according to the government's timeline.  Not only that,

7   he's logged into vSphere, and the CIA itself found that he,

8   Michael, was too much of a security risk to be trusted around

9   classified information.  That alone is reasonable doubt.

10       The government knows, the government knows that DevLAN and

11  Altabackups were not secure, and that many people, besides

12  Mr. Schulte, could be the real criminal.  So what does the

13  government have to do to try and convince you about this

14  supposed science, the technical computer evidence that they

15  claim points to Mr. Schulte and Mr. Schulte alone.  If you look

16  at the evidence, you'll see that it fails to support the

17  government's case, and in fact, it supports the defense.

18       And the key witness on this point, as you remember, was the

19  government's expert Mr. Leedom.  Remember, he was the man who

20  said that he was an expert on DevLAN before he even started

21  working on the case.  And you can look at that testimony,

22  because that's when he's trying to qualify himself as an

23  expert, and I asked him, hey, how could you be an expert on

24  DevLAN, when DevLAN was such a secure top secret system that

25  nobody ever had access to?  And he told you he had worked on a

1   system like DevLAN before, before he ever started working on

2   this case.  He showed you a very long slide show about SSH

3   keys, computer reversions, passwords, and many other things.

4   But none of his testimony told you why it was so easy for Dave

5   to put Stash on a hard drive, and not inventory that drive

6   properly.  Why not erase the hard drive, after migration of the

7   Stash is complete?  Did Mr. Leedom tell you why?  They have no

8   answer for that at all.

9        So let's look at what Mr. Leedom says, okay.  He

10  claimed as an expert that the theft took place on a very

11  specific date.  April 20, 2016.  And also gave you a very

12  specific time.  He said that Mr. Schulte reverted Confluence

13  back to April 16, and stole the March 3, 2016 Confluence

14  backup, and then he reverts back to April 20.

15  This is when I asked him to define or think about the

16  reversion period, and Mr. Leedom admitted, if you recall, that

17  according to the government's own theory, and you can check the

18  math here.  This period, this reversion period, is about an

19  hour and 15 minutes, and that's when they want you to believe

20  that the theft took place.  This is the moment of the heist so

21  to speak, right?

22       Look at what Mr. Leedom says on cross-examination,

23  because that theory, I tell you, does not hold up.  I ask

24  Mr. Leedom a series of questions about whether he found any

25  evidence of a copy command during the reversion period.  And he

1    said he admitted that he searched high and low for a copy

2    command.  I mean, how else are you going to copy data without a

3    copy command.  I asked him, you really looked, you looked for

4    one, right?  And he said, yes, I looked.  And then he admitted

5    that the government had asked him to look.  The government

6    wanted to find a copy command.  He looked and he looked and he

7    never found any evidence of any copy command whatsoever.

8              And then what else does he tell you?  He also told you

9    that he found no storage device.  No thumb drive, no removable

10   hard drive, no drive.  Nothing, nothing that was ever connected

11   to Mr. Schulte's workstation computer during the reversion

12   period.  Nothing is plugged in.

13             That testimony is devastating to the government's

14   case.  If Mr. Schulte never copied the March 3 backup file

15   during the reversion period, and if he had no device connected

16   to his workstation during the reversion period, and he never

17   took any device out of the CIA, he couldn't have stolen that

18   information.  And if he couldn't have stolen that information,

19   he certainly couldn't have sent it to anyone, let alone

20   WikiLeaks.

21             And do not for a minute believe that they have any

22   evidence that this information went directly from the CIA to

23   WikiLeaks.  They have never proven that to you.  Now, you know

24   this is a giant hole in their case.  And after I sit down, you

25   know Mr. Kamaraju gets to speak again and maybe he will answer

1    it for you, but let's see.

2            Let's see if Mr. Kamaraju is able to tell you how did

3    Mr. Schulte copy the Altabackup files without leaving a copy

4    command anywhere?  How did he download all those files without

5    connecting any device, any thumb drive, hard drive, anything to

6    his computer?  How does he take this device out of the CIA

7    without anybody noticing?  Mr. Laroche just told you there were

8    armed guards, you have to badge in, badge out, sit in a vault,

9    sit in a safe.  How does he get it out?  And maybe Mr. Kamaraju

10   will also explain to you why WikiLeaks waited almost a year,

11   not a week, like Mr. Leedom took to discombobulate the

12   information that Mr. Laroche would have you believe.  A year.

13   Why would WikiLeaks wait a whole year to release this

14   information?

15           You know that they know.  They know there is a problem

16   with their case.  They know they have a problem here.  And that

17   is why they have Mr. Leedom talk to you ad nauseam about that

18   thumb drive.  He talks and talks and talks about that thumb

19   drive being connected to Mr. Schulte's workstation on April 20,

20   2016.

21           And you remember this.  You remember the slide that he

22   showed you, slide 105, indicating that a Sandisk thumb drive

23   was connected to Mr. Schulte's workstation.  You remember this

24   slide.  I remember this slide because I had to read those long

25   numbers.  And remember on cross-examination what we learned

K323SCH3                    Summation - Ms. Shroff

1    about this slide when I showed it to Mr. Leedom?  The part that

2    he had cut off.  He had cut off the bottom part.  The bottom

3    that he cut off and that he never showed you.  The part that

4    shows that Mr. Schulte pulled that thumb drive out of his

5    computer before -- I cannot emphasize this enough -- before the

6    reversion period started.

7            Take it back with you, take a look, the thumb drive is

8    disconnected at 5:22 p.m.  Three minutes after it's connected,

9    26 minutes before the reversion starts.  The reversion started

10   at 5:48 p.m.  The thumb drive has nothing to do with anything.

11   Okay.  You know it and I know it.  Take a look.  It's

12   disconnected, and I am repeating myself now, before the

13   reversion period ever starts.

14           Not only that, take a look at the thumb drive.  It's

15   only 64 gigabytes in size.  That's way too small.  That's too

16   small to hold Stash and Confluence backup files.  Which even

17   Mr. Laroche told you are literally hundreds of gigabytes of

18   data.

19           And lest we forget, because Mr. Laroche certainly did

20   not present that slide to you, the thumb drives has a write

21   blocker, something I also reviewed with Mr. Leedom, connected

22   to this.

23           All of this means what?  All of this means that

24   Mr. Schulte couldn't have used that thumb drive to steal the

25   data.  It had to be someone else, and maybe -- just maybe -- it

K323SCH3                    Summation - Ms. Shroff

1   is that someone who is home right now enjoying his paid

2   administrative leave.

3            Ask yourself this question.  Ask yourself.  If the

4   thumb drive has nothing to do with this crime, why did

5   Mr. Leedom talk about it so much?  Why did Mr. Laroche talk

6   about it again today in his summation?  Why did they not tell

7   you that the thumb drive is disconnected before the reversion

8   period?  The answer is really very simple.  It's not part of

9   the mission.  That kind of testimony destroys the mission that

10  they are on.  It might lead you, you, the jury of 12, to acquit

11  Mr. Schulte.

12           So Mr. Leedom never gives this to you in direct, and

13  he doesn't give it up until cross-examination.  The testimony

14  about the thumb drive is to lead you to think that somehow or

15  the other this thumb drive has something to do and somehow

16  makes Mr. Schulte guilty.  It does not.  It does the opposite.

17  It should lead you to acquit.

18           Now, if Mr. Leedom were truly an objective expert and

19  did not have a three-year relationship helping the CIA with its

20  mission, would he not have just come here on this witness stand

21  and told you, hey, listen, I looked, I looked at all of this

22  evidence, I found this, this, and this, but you know what I

23  didn't find?  I didn't find any evidence of any storage device

24  being connected to Schulte's workstation during the reversion

25  period.  It's obvious.  Why didn't he just tell you?

1            And lest we forget, they've had Mr. Schulte's

2    workstation for years.  His entire workstation, they had it.

3    What do they find?  They look over his entire workstation and

4    they find nothing that is incriminatory.  He's he deleted no

5    logs from his workstation, inserted no storage devices during

6    the reversion period.

7            I remember this testimony because it is only one of

8    two times that I got to ask a question on recross.  And here's

9    the question that I put:  The workstation that he used, not a

10   single file was deleted, correct?  And look at his answer.  Why

11   can't he just say yes.  "I believe that's accurate."  Supposed

12   to be an objective expert.  Just answer yes.  "I believe that's

13   accurate."

14           I also want to talk to you just a few seconds about

15   the document that the government keeps showing you, okay.

16   1207-27.  The document that indicates that somebody accessed a

17   March 3 Confluence backup on April 20, 2016.  I don't know how

18   many times they showed it to you.  I think they showed it to

19   every witness they could find.

20           Let's just look at 1207-27.  Because what this

21   document does not tell you, it simply does not tell you who or

22   which workstation is doing the accessing.  It doesn't tell you

23   that.  And you know why it doesn't tell you that.  And you know

24   they tried to fill that gap, because David Denton in his

25   opening statement tried to get you to think that March 3

1  somehow had some significance to Mr. Schulte, and that is why

2  March 3 was picked.

3          Now, remember Mr. Denton told you in his opening

4  statement that March 3, and I quote, "was the very day that

5  Schulte felt the CIA had wronged him, and that's why he decided

6  to access the March 3 backup file."

7          But I don't see anything in the evidence, and there is

8  nothing in the evidence to support this claim.  Okay?  There's

9  nothing at all to suggest that Mr. Schulte viewed March 3,

10 2016, as particularly significant, because Mr. Schulte never

11 mentions that date.  The only people who somehow think March 3

12 is an important date are the prosecutors because it fits their

13 mission.

14         Second, I want you to remember that access is not the

15 same thing as copying.  Just remember what the witnesses told

16 you.  That the April 20 time stamp -- remember, they all told

17 you this -- that it stood out like a giant red flag.  Because

18 it's the only entry where the numbers in the right column do

19 not match the numbers in the left column.  Right?  Can we pull

20 it back up.

21         So think about it.  Mr. Schulte is a trained expert in

22 stealing computer information without leaving a trace, right?

23 That's literally his job.  That's a job for which he won

24 awards.  Why would he leave such an obvious red flag?  Why

25 would he do that?  You know he wouldn't.  And how do you know

1    that?  Well, I want to show you and review with you a small

2    piece of testimony that nobody really focused on, but I think

3    is quite important.

4         Go back to Mr. Leedom again.  Remember when I asked

5    him if he ever heard of something call a touch command.  And he

6    said a touch command is a command in Linux that you can use to

7    create new files.  You heard Mr. Leedom say:  You can also use

8    the touch command to edit time stamps for files as well.  And

9    what does that mean to you?  It simply means by using a touch

10   command you can change or modify the access time.  That's his

11   answer.  The government's expert.

12        And you know from all the testimony in this case that

13   Mr. Schulte certainly was an expert in Linux.  So if he's

14   really going to be stealing the data on April 20, and all he

15   has to do is use a simple touch command to change the April 20

16   access time back to March 3, 2016, he could have.  It would

17   have looked just like this.  That's your touch command.  Look

18   at the date now.  That's a simple touch command.  It would have

19   looked just like this.  The time stamp on the right column

20   would match the time stamp on the left column, with a simple

21   touch command.

22        So why would Mr. Schulte leave such a giant red flag

23   like this for investigators to find?  You know he wouldn't

24   have.  And that's how you know it wasn't Mr. Schulte.  It

25   wasn't Mr. Schulte who did this.

K323SCH3                    Summation - Ms. Shroff

1          And I want to take a minute here to point out a

2     fundamental contradiction in the government's theory when it

3     suits them.  When it suits them, they want you to think of

4     Mr. Schulte as this genius cyber criminal who can cover his

5     tracks up at will.  And then there are other times when he's so

6     inept and such a bumbling data stealer that he's hunting on his

7     workstation and looking in the wrong place and that is why he

8     cannot find and delete VI client files.

9          So which one is he?  Which one is it?  Because you

10    can't be both, right?

11         Now, the government introduced for you a lot of

12    information about his home system.  Mr. Berger testified

13    extensively about his home system and about

14    Mr. Schulte's Amazon purchases.  Look, these are not Amazon

15    purchases that you and I would make.  But for a computer geek

16    who is all into computers, all into movies, all into Plex

17    servers, those are very normal purchases, okay.

18         Now, think about the testimony you got from Mr. Berger

19    who tried to insinuate that the encrypted containers on

20    Mr. Schulte's home computer had something nefarious.  It was

21    only later that when Special Agent Evanchec finally conceded

22    that you learned that none of the files on his home computer,

23    including the encrypted containers, had any classified

24    information in them.  Mr. Berger didn't tell you that.  It only

25    came out in Special Agent Evanchec's cross-examination.

1          And go back to this point about Brutal Kangaroo.
2    There was nothing improper.  There is nothing improper at all
3    about Mr. Schulte having a folder called Brutal Kangaroo on his
4    home desktop.  And why do you know that?  Because other people
5    from the CIA, other witnesses told you that people work on
6    unclassified portions of a project, of a tool at home, and take
7    it into the CIA.  Is there any evidence, is there any record
8    evidence that shows you that anything in that Brutal Kangaroo
9    folder on his home computer has anything classified?  No.
10         So you might be asking yourself now, Ms. Shroff, if it
11   wasn't Mr. Schulte, then who was it?  And I just want to take a
12   minute to remind you, it is not our job to solve this puzzle.
13   It is not our job to solve this crime.  It is not my job and
14   it's certainly not your job.  That's the government's job.  We
15   are not the FBI.  We're not in the business of accusing.
16         But after all that you have heard, you have to ask
17   yourself, do you not, couldn't Michael have done this?  And if
18   the answer is yes, isn't that reasonable doubt?
19         So let's talk about Michael just for a few minutes and
20   let's remember, first, who is Michael?  Michael is the guy who
21   worked in EDG, he has the same skill set as Mr. Schulte.  He
22   also knew, as did every other developer and coder in EDG, how
23   to covertly steal information without leaving any trace at all.
24   What else do we know?  We know that Michael was present at the
25   CIA workstation on April 20, 2016, at 5:42 p.m., the very

1    moment that the government says that the Altabackups were

2    accessed.  And that's when the theft was committed, according

3    to them.  That's called the criminal opportunity.  And third,

4    Michael had a very easy way to copy the data by using vSphere.

5    As Dave told you, the easiest way to copy that data was to use

6    vSphere.  Fourth, what program does Michael happen to have open

7    on his computer when the theft supposedly occurs?  He has

8    vSphere open.  And Michael is present at his desk at the

9    beginning and at the end of the reversion.  No matter where he

10   is in the middle, at the beginning and the end he's at his

11   desk.  At 6:51, Michael is back at his desk.  Take a look at

12   the badge records.

13           And now things get a little bit even more weird, more

14   suspicious.  Michael tells you that on April 20, he actually

15   sees the reversion taking place, right?  You remember that he

16   came over and he said I saw the reversion taking place on the

17   computer screen.  Not only does he see the reversion, he takes

18   a screenshot of the reversion, of what's going on, because he

19   says he found it suspicious.  That's Government Exhibit 1255.

20   You find something suspicious, but you tell no one.  And that

21   is not suspicious, according to the government.  Okay, let's

22   just keep going.

23           Michael never tells anyone about this screenshot that

24   he takes.  Never shows that screenshot to anyone.  That

25   screenshot is never heard about again until the FBI finds the

K323SCH3                    Summation - Ms. Shroff

1    screenshot all on their own when it searches Michael's computer

2    in 2017.  And then, when the FBI asks Michael what about the

3    screenshot, he just says I forgot.

4         Really?  Do you really forget that screenshot?  Is

5    that believable to you?  Or is that somebody who has something

6    to hide, something they don't want to talk about.

7         So let's look a little bit more closely at the

8    screenshot, because you are going to find even more reasons to

9    suspect Michael.  I know you've been here all morning, but I

10   ask you, I'll be fast, okay.

11        Remember the screenshot here, it has three screens.

12   Because Michael, no differently than anyone else at the CIA,

13   had three computer monitors.  Look at the right screen of the

14   screenshot.  This is the Confluence web page.  And if you look

15   closely, at the right-hand side, you will see something kind of

16   curious, right.  It is a whole bunch of passwords over there.

17   One of them is the password for the Confluence user account.

18   123ABCdef.  That's like the weakest password.  But you know

19   what?  There it is.  How do you know that's the password?

20   Well, the prosecutors stipulated to that in Defense Exhibit O.

21        Why in the world, just ask yourselves when you go

22   back.  Why in the world does Michael have the Confluence user

23   password up on his screen at the very moment the government

24   tells you that the theft is taking place?  Could it be that he

25   was logging into the Confluence to access the Altabackup?  I

1    don't know, they don't know, you don't know, but we all know

2    that's reasonable doubt.

3            Mr. Laroche told you that Michael couldn't have

4    accessed the Altabackups that way, right, this is what he told

5    you.  Because Government Exhibit 1207-24 does not have any

6    record of any Confluence user logging into the Confluence VM at

7    any point in April of 2016.  Right?  This is what he wants you

8    to believe.

9            But look, you know this forensic fact to be true.  The

10   reversion would have erased any such record.  And Michael is no

11   more and no less a talented developer than all the others who

12   worked at EDG, and he would have known that.  Mr. Leedom's

13   testimony tells you that, and he of course is the government's

14   witness.  He told you in his testimony all the activity during

15   the one-hour reversion period was erased.

16      And that's different from the logs on Mr. Schulte's own

17   computer.  They would not have been erased by the reversion,

18   only the logs on the Confluence VM are erased.  So Michael, not

19   Mr. Schulte, could easily be the person who accessed and copied

20   the Confluence backup file, and leaked it.  He could have,

21   that's reasonable doubt.  You cannot convict Mr. Schulte for

22   something Michael had the capability, the ability, the

23   opportunity, to do.

24           And now you know what?  It's not just me and you.  It

25   is also the CIA who knows that Michael's behavior was highly

1    suspicious, off the wall, off the charts, and you know that.

2    You know that by looking at Defense Exhibit L.  This is the

3    official CIA memorandum, you remember this?  Explaining why

4    Michael was placed on forced or enforced administrative leave.

5        Now this is a document, just take a minute, okay.

6    Remember?  This is a document that the CIA never, ever, ever

7    wanted you to see.  In fact, their mission partners, the United

8    States government, the FBI, all of these people at this table,

9    all of these men, never told you about this document, ever.

10   We're the ones who showed it to you.  We are the ones who gave

11   you the document well after the government rested.

12       Judge Crotty will give you an instruction about this

13   document.  It is called an adverse inference instruction.  It

14   is about the government's behavior.  Please, pay careful

15   attention to that instruction.  It will tell you, the judge

16   will tell you, that the government did not disclose this

17   document to the defense until the middle of trial, in the

18   middle of their criminal trial.  That it should have been

19   disclosed to the defense earlier.  And that it is up to you,

20   you 12 jurors, to decide what weight to give to the

21   government's failure to disclose to you this document.  It's

22   not just any document.  It is an important document and you

23   should give the government's conduct that they withheld this

24   document a lot of weight.

25       The government, its mission partners, the CIA, the

1    FBI, the United States attorney's office, kept this information

2    about Michael to themselves.  Why?  It shows their doubt.  It

3    shows their doubt about the case against Mr. Schulte.  And you

4    know this, I don't even have to belabor it.  You know this just

5    by looking at this document, okay.  I'm not going to go through

6    the whole thing again.  But remember just in parts what it

7    says.  It talks about Michael's lack of cooperation.  His

8    unexplained activities on the computer system from which the

9    CCI data was stolen known as the DevLAN.  It notes that it

10   raises significant concerns about Michael's truthfulness, his

11   trustworthiness, and his willingness to cooperate with both

12   routine OS reinvestigative processes and the criminal

13   investigation into the theft from his office.

14         The document goes on to say:  Michael may have

15   additional knowledge of anomalies on the system at the time of

16   the theft.

17         Yeah, he had that vSphere running with the passwords

18   right there.

19         Additionally, recent inquiries indicate Michael is

20   still withholding relevant information concerning the

21   circumstances surrounding the theft.

22         You don't have to take my word for it.  They tell

23   themselves, they don't tell us, but internally at the CIA.

24   They're in line with their mission, they know Michael is a

25   security risk.

1         So what does the memo go on to say:  "Given the

2    magnitude of the theft of the CCI toolkit and its concomitant

3    damage to national security."

4         This wasn't in Mr. Laroche's column.  In the one, two,

5    three column, in any of those columns, did you see anything

6    about this memo?  No.

7         "Views Michael's lack of cooperation as a significant

8    and untenable risk to the security of the operations on which

9    he now works and any new tools he deploys for CCI."

10        The government told you, and it's going to tell you

11   again, because this is in line with their mission, that it

12   could not have been Michael.

13        Let me just ask you something very simple.  If it

14   couldn't have been Michael, and it wasn't Michael and Michael

15   isn't a person for you to worry about, why not just turn over

16   that memo?  They didn't turn over that memo because it hurts

17   their mission and it gives you reasonable doubt.

18        So, if DevLAN is not secure, and there are other

19   people who could have done it, the forensic evidence is not a

20   smack down for them.  It does not prove Mr. Schulte's guilt.

21   Michael's behavior is weird at best and suspicious.

22        What does the government do to further its mission to

23   convict Mr. Schulte?  Well, you know.  The government has a

24   special motive attributed to him.  Deep anger.  Over and over

25   again the government tells you Mr. Schulte stole the

1    information and gave it to WikiLeaks to harm America.  And

2    basically they spent four weeks trying to show you that

3    Mr. Schulte was so angry with the CIA, so angry with

4    management, that he decided to risk everything, everything, not

5    only himself but everybody else, he decided to risk the one

6    country that he loves, by leaking this information.

7           So let's look at Mr. Schulte, not for too long because

8    I know you look exhausted, but just for a minute.  Let's just

9    talk about Mr. Schulte.  He's devoted his entire life, entire

10   adult life, his work life to service.  He started as an intern

11   at the NSA, he worked at the CIA.  He went there as an intern,

12   loved it so much he decided to graduate in four years instead

13   of three.  He was an award-winning developer.

14          And even when he was being interviewed by Mr. Small of

15   TMU, under all of that stress, when the government wants you to

16   think he is seeped in anger, what did he say.  He described his

17   job as a lot of fun.  Even then, he says his job is fun.  He

18   cared deeply about his work, and he cared deeply about his

19   project.  I don't see what's so bad about that.

20          You know he is a patriot.  Mr. Laroche went on and on

21   about that.  But think about what Mr. Schulte said at a time

22   when he was asked about Edward Snowden.  He thought Edward

23   Snowden was a traitor who should be executed.

24          Jeremy Weber who is the last person, the smallest fan

25   of Josh Schulte that ever existed, what did he tell you?  He

1    told you that Mr. Schulte believed in the CIA's mission, and

2    that he thought he, meaning Mr. Schulte, that nothing ever

3    should be done against America, ever.

4              So they have to come up with some motive, right?  So

5    what do they come up with?  They come up with this story that

6    they want you to think that as of April and May of 2016,

7    Mr. Schulte was so angry, and now we have the anger portion of

8    their evidence.  Now think back.  Think back to every witness

9    that the government has called, and think about all the times

10   they've paused in the middle of their direct to say, And did

11   Mr. Schulte sound angry to you?  How did he sound?  Did he

12   sound angry?  How many times of each witness did they ask that

13   question?  You will have the transcript.  Search for that

14   question over and over again.  At one point the prosecutor even

15   changes the words.  Take a look at this.  Remember Michael

16   testified, "How did the defendant feel about Jeremy Weber after

17   he moved to RDB?

18   "He was unhappy with him.

19   "Generally speaking, what was the reason for that unhappiness?

20   "He -- there was an argument over a project.  Josh wanted to

21   bring the project with him to the new branch, Jeremy did not

22   want him to bring that project.

23   "How do you know that the defendant was angry at Mr. Weber?"

24             He never says he was angry.  Look back at line 7.  He

25   says he is unhappy.  When does unhappiness turn to anger?  Only

1    when Mr. Kamaraju changes the adjective.  Is it an adjective or

2    word?  Whatever it is.  It is only when he changes it.  It is

3    not from the witness, it is from the government.  The mission.

4    Remember the mission.  The mission is to make sure you think

5    he's an angry, angry man.

6          Now, look, you have the testimony, you have the audio

7    recordings.  Go ahead and play them.  He doesn't sound angry to

8    me, okay.  You can play the recordings.  You can parse out

9    whether the man sounds angry, or he's recounting what is

10   troublesome to him.  Clearly they want you to think that he's

11   angry, right.  They focus on every part, every place that they

12   can find some way to convince you.  They even tried to convince

13   you that the password phrase, which is chosen by WikiLeaks,

14   something about a Bay of Pigs, Splintering into 1,000 Pieces,

15   somehow or the other, that was chosen by Mr. Schulte because he

16   was angry, just as John Kennedy or Robert Kennedy was angry

17   during something having to do with Cuba.  Okay.  I don't think

18   so.

19         Go back, go back and look at that testimony and see if

20   your logical minds actually find any evidence that Mr. Schulte

21   was so angry in 2016, and that his anger continued unabated and

22   could only be satiated, only be satisfied by betraying the

23   United States.

24         Now, look go back to March 16, okay.  March 16 he

25   files a complaint.  Says Amol threatened to kill him.  By

1    March 16 you know and I know that nobody is on his side.

2    Right.  That's the evidence.  Nobody supported him.  Weber took

3    away his access.  And according to the prosecutors, Mr. Laroche

4    here told you that Jeremy made him more angry.  They went

5    through this with you with Exhibit 1060.  I'm not, I promise

6    you, I will not go through that e-mail chain with you again.

7    But you take a look when deciding whether it's anger or just

8    Mr. Schulte who is fighting to keep what he thinks he should be

9    entitled to keep.

10         He's moved after that.  Remember?  He's moved.  He's

11   moved out of OSB.  He's moved to RDB.  What does he do at RDB?

12   You know that he works on a new tool.  He works on Nader.

13   Vortex is compromised.  Remember, we had that whole testimony

14   about the uniqueness of the tool.  Mr. Laroche wanted you to

15   think that Mr. Schulte didn't want to share any information

16   with the contractors, because he wanted to get the glory.  And

17   we tried to tell you that that wasn't in fact the case.  It was

18   a fair worry that the CIA's predecessor tool not share any

19   unique quantities with later tools.  You know that.

20         They want you to think even those he's moved on, even

21   though he's happy working on Nader, there is still a lot of

22   anger and that is why he is a traitor.

23         Listen to the conversation he had with Mr. Small.  I

24   think Mr. Small is far more of a liar than Mr. Schulte is

25   angry.  Just take a look at the way Mr. Small answers

K323SCH3                    Summation - Ms. Shroff

1    questions.  Look at the way he answers questions on direct.  He

2    never has a pause.  It's like a seamless strain of question

3    answer, question answer, question answer.  I ask him a

4    question, he couldn't recall, he didn't know, and then he kept

5    using that word, remember?  I cannot answer yes or no because

6    it's too nuanced.  Nothing was nuanced on direct.  It was only

7    nuanced on cross-examination.

8            So, Leonard Small.  Is he credible to you?  Ask

9    yourself, read that question-and-answer series back.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. SHROFF:  Anyway, let me go back just for a minute

2     to Mr. Schulte's suppressed anger or nonsuppressed anger,

3     because although Mr. Laroche would like you to think that the

4     timeline makes sense, it actually does not.  So listen, go back

5     and look at the timeline and ask yourself, if, according to

6     them, the theft is in April and May, what does it matter

7     whether he's angry or not in June, July, August, September,

8     October, November?  What does it matter?  According to them,

9     it's all over by then anyway, right?  So why do they keep

10    talking about anger all of these months from then?

11         And you know.  You know that he's not angry in

12    November of 2016 because he's at Bloomberg by then.  He's

13    moved.  He's moved from Virginia.  For God's sake, he lives now

14    in the best city ever, New York City.  He's here.  He's making

15    twice as much money as he ever made at CIA.  He has a new

16    apartment.  Yes, he's not fully unpacked, but he's a single

17    man.  You know how that goes.  And he's over it.  He's moved.

18    He's moved on with life.  The only person who hasn't moved on,

19    in fact, is the CIA and its mission partners over here.  OK?

20         So let's fast forward because I know you're getting a

21    little tired.  I can sense this from you.  But let's move.

22    Let's move to the day that the FBI shows up at Mr. Schulte's

23    door.  OK?  That's March 15, 2017, and that's the day he's

24    stopped by the FBI agents and he's whisked off.  Where do they

25    take him?  To Pershing Square diner, right in the middle of

1   42nd Street.

2          The agents sit him down, and remember you have

3   testimony about how orchestrated it is.  On the one hand, they

4   want you to believe that he's free to leave, but then they also

5   tell you that they have agents at the front of the diner, that

6   they have agents pretending to be eating within the diner, and

7   then, of course, they have a table all the way in the back, and

8   that's OK to talk about national classified information at

9   Pershing Square diner.  It's OK to do it then, because it's on

10  their terms, so that then it's just all all right, because it's

11  part of their mission.  Don't forget.

12         And what does the special agent tell you?  Is he

13  angry?  Does Mr. Schulte answer their questions?  Does he throw

14  a fit?  No.  He sits down, they ask him questions and he

15  answers questions.

16         And what does the agent tell you he remembers about

17  Mr. Schulte on that day?  He remembers that his hands trembled.

18  Well, wouldn't your hands tremble too?  Imagine you think that

19  that whole week that you're going to take your younger brother

20  for spring break to someplace in Mexico.  I forget whether it

21  was Cancun or someplace else.  And instead you're sitting in

22  Pershing Square diner being interrogated by the FBI.  Of

23  course, they're going to tremble, but even that agent does not

24  tell you that Mr. Schulte was angry.

25         You know when there is some anger?  The anger is after

K32Wsch4                    Summation - Ms. Shroff

1    he's locked up at the MCC for a crime he did not commit.  And

2    that's what the defense is.  They have nothing.  They do not

3    have any proof of these espionage charges.  So what do they

4    give you?  They focus over and over and over again on the MCC

5    evidence.  OK?  And they focus on his writings.  And they seem

6    to think that his writings will take the place of actual proof

7    of theft.  So let's look at these writings, because I think

8    that they prove Mr. Schulte's innocence.  You have them in

9    evidence.

10         I know you're tired.  You read them and you will

11   remember the circumstances under which Mr. Schulte writes them.

12   OK?  For by this time, he's been in prison for a while.  Right?

13   He's deteriorating.  It's clear.  I mean, Mr. Betances might

14   think that prison is a nice place, but you know it's not.  He

15   tells you about the rats.  He tells you about the flooding.  He

16   tells you about the water being backed up with sewage.  It is

17   not a place that anybody wants to be.

18         So compare.  Compare his prison writings to the way he

19   writes at the CIA, and you can see he's falling apart.  But

20   what does the government want you to believe about these

21   writings?

22         The government wants you to believe this is some kind

23   of planned army-like information war against the United States.

24   Just compare what the United States wants you to think about as

25   this information war and what the information war actually is.

1   So I promise no articles other than the titles.  Just take a

2   look at the titles of these articles.  OK?

3            Presumption of Innocence.

4            A Petition for a Redress of Grievances and the Loss of

5   Citizenship.

6            Do You Want to Play a Game?

7            Detention is Not Punishment.

8            Guilty Until Proven Wealthy.

9            Presumption of Innocence:  Its Origins.

10            Does this sound like a battle plan?  Is that what he

11   called it, a battle plan?  Does this sound like a battle plan

12   to you?  That's not a battle plan.  This is what Mr. Denton

13   called it in his opening, a battle plan.  If our battle plan is

14   talking about the United States Constitution and presumption of

15   innocence, then we're all in big trouble.

16            Mr. Schulte's focus here is not about anything other

17   than trying to prove that he is an innocent man sitting in

18   jail.  That's what his plan is.  Right?  He wants to get out

19   because he's innocent.  So what does he do?  Yeah, he uses a

20   cell phone, a cell phone that was smuggled in, and he uses it

21   to try and get his story of innocence out to the Washington

22   Post.  He tries to get it out to the Washington Post and to

23   anybody else who will listen to him.  And that is what he does

24   with the search warrants.  He writes out why he thinks the

25   search warrants are false, and that is what he's trying to get

K32Wsch4                    Summation - Ms. Shroff

1    out.

2         Look, I'm not going to stand here and tell you that

3    using a cell phone in a prison is right.  It's not.  It's

4    against the rules.  It's not in keeping with the prison rules.

5    Did he use a cell phone?  Yes, he used a cell phone, but that's

6    not what he's charged with.  If he was charged with using a

7    cell phone, sure, find him guilty of that.  But that is not

8    what he's charged with.  He's charged with far more serious

9    crimes here, and they have no proof he committed those crimes,

10   which is why they are so focused on MCC conduct.  They want you

11   to focus on MCC conduct because that is the only way they can

12   get you to think that he did the other crime.

13        They want you to think that this guy -- Mr. Laroche

14   told you this.  He told you that they want you to think of this

15   man as a man in perpetual trouble, who broke the rules at the

16   MCC, and therefore, because he broke the rules at the MCC, he's

17   the kind of guy who would leak national defense information.

18        Just for a minute take a look at what he says.  Take a

19   look at what he says in these articles.  And just for a second,

20   take a look at the first paragraph of Malware of the Mind.  OK?

21   See if this is what you would have in your head if you're

22   trying to betray your country.

23        What is he talking about?

24        "Today we are facing a stealth constitutional crisis.

25   A malware of the mind has entered and corrupted the justice

1    system."

2              What is he talking about?  He's talking about the

3    justice system.  From there, Mr. Schulte goes on to talk about

4    the justice system in the context of technology, how the law

5    does or does not progress with technology and how these

6    prosecutors and the FBI agents, with very little knowledge of

7    forensics, are deemed experts.  He is talking about how wrong

8    this is, how somebody who has no real expertise is so trusted

9    to defeat the presumption of innocence, and it is in this

10   context -- it is in this context -- that he talks about his

11   work at the CIA.

12             So go back to exhibit 801.  Take a look at the

13   contents of this.  Take a look.  Just take a look at the

14   contents.  OK?  Look at the contents.  You can't read this

15   whole thing.  It's 133 pages long:

16             Introduction; transcripts -- certainly not part of a

17   battle plan, right?

18             Search warrant, not part of a battle plan.

19             The complaint, not a battle plan.

20             Ethics and a logical look at the charges; tyranny;

21   conspiracy; and conclusion.

22             It's not a battle plan.  This is a man talking about

23   the constitutional system and how it works; how it works and

24   how it hurts an innocent person if you are sitting in jail.

25             And I'm telling you Mr. Betances adds nothing to this

K32Wsch4                         Summation - Ms. Shroff

1   testimony.  OK?  I want you to just think about Mr. Betances

2   for two seconds.  He wanted you to believe that he took those

3   videos and those photos in the MCC for no good reason.  He took

4   them and he just kept them aside and he wasn't going to

5   cooperate and he wasn't going to get any benefit from the

6   United States until he hears the words "Russia" and

7   "information war."  OK?  Just go back.  Go back for a minute

8   and look at how he talks about information war, because

9   seriously, it's a phrase used once.

10                  Can somebody pull it up.

11                  There you go.

12                  "From here I will stage my information war," colon,

13   and then form tells you everything he will do:

14                  "Facebook.  I will rename simply who is John Galt or

15   who is Josh Schulte?"

16                  That does not seem like a battle plan to me.  And then

17   he tells you he's going to put this up on WordPress.  OK?

18   Well, when he puts it up on WordPress, what's he going to talk

19   about?  He's talking about his innocence.  Is he talking about

20   anything other than his innocence?  Presumption of Innocence:

21   Origins.  Do you think anybody would want to know about his

22   opinions about the presumption of innocence?  But that's what

23   he's focused on.  It has nothing to do with destroying America

24   or having a battle plan of any sort.

25                  This is what they've given you because they have no

1  evidence that he stole anything from the CIA.  Go back and look

2  at his words.  These are the words.  These are his thoughts,

3  his thoughts about a criminal justice system that have nothing

4  to do with anything else.

5          Now, look, Mr. Laroche spent a lot of time talking to

6  you about the legal elements, and I'm not going to be that

7  long.  I want to spend just a few minutes talking to you about

8  the indictment.  Just a very few minutes.  OK?

9          The indictment has ten charges, ten crimes.  Most of

10  them have to do with accessing a CIA computer to steal

11  information and give it to WikiLeaks.  Your verdict on those

12  counts should be not guilty.  I've shown you over and over

13  again and I've tried really hard to cut to the chase here, but

14  I've shown you over and over again, I hope, that the government

15  simply has not proven these counts beyond a reasonable doubt.

16          Counts Three and Ten -- they fall into a different

17  category -- these are what they call the MCC counts.  Those are

18  the allegations that Mr. Schulte committed the crimes in late

19  2017 and '18 after he was arrested and after he's at the MCC.

20  Those are the attempts, that he attempted to send national

21  defense information.

22          Count Ten charges that he committed attempt.  When you

23  look at the counts, the contempt and the other charges, focus

24  on the jury instruction that Judge Crotty will give you.  You

25  will see that Mr. Schulte does not willfully transmit or

1   attempt to transmit any national defense information from the

2   MCC.  Think about all of these things that they're telling you

3   about those tweets, OK, this long paragraph?  First of all, he

4   has a Twitter handle that nobody's following.  Nobody even

5   knows who the hell Jason Bourne is.  It has zero followers in

6   there.  Nobody's reading it, and his diatribe exceeds Twitter's

7   140-character cutoff.  There's no way this man can upload

8   anything onto Twitter at the rate he rambles on and on.  It's

9   impossible.  You know this.  If you take a look at the

10  evidence, you will know that that is impossible.

11          The information he sends out is about his search

12  warrants.  He wants to show that the government is wrong in the

13  search warrants, and you know that the government was, in fact,

14  wrong in these search warrants.  You know this because the

15  agent testified that in the search warrants, the United States

16  Attorney's Office had the wrong date, in these initial

17  warrants.  You know this.  You know this because the United

18  States Attorney's Office not only had the wrong date but also

19  tried to come up with the relationship.  They first said that

20  it was March 6 or March 7, and it had to be March 6 or March 7.

21  You know why?  Because that's the date everybody else was out

22  of the cube and he was alone in the office.

23          They draw all kinds of diagrams and arrows and make up

24  all kinds of theories.  No, it's not correct.  Look at the

25  evidence.  Don't listen to the arguments that come simply off

1   of Mr. Leedom's 151- $60,000 custom chart.  Look at the

2   elements and look at the charge.  Just listen to the charge

3   that Judge Crotty gives you on the issue of willfulness and

4   corrupt.

5          That leaves you with Counts Eight and Nine, which

6   allege that Mr. Schulte lied to the FBI.  Both these counts

7   require the government to prove to you beyond a reasonable

8   doubt that Mr. Schulte acted willfully, corruptly, not by

9   mistake, not by accident.  And you will see they will not be

10  able to prove those to you.

11         Mr. Schulte did not act with any bad purpose.  Just

12  think about what the government wants you to believe.  OK?  The

13  government is saying to you that Mr. Schulte, the man who knew

14  that everybody at the CIA hated him, the man who knew that if

15  anything ever went wrong, he would be suspect No. 1 -- I mean,

16  think.  Can you think of a single person at the CIA who did not

17  dislike him?  That's a double negative, but you know what I'm

18  saying.  Right?

19         I mean, he knows, by the time he hears of the leak he

20  knows the first person they're going to come after is him.  I

21  mean, which one is he?  Is he completely stupid, or is he

22  extremely smart?  Because they really can't have it both ways.

23  So this man obviously knows that they are coming after him.

24  And who cares that he's searching?  Imagine if you worked at

25  the CIA and information was stolen and you had left a long time

1    ago.  What would you Google?  You'd want to find out what the

2    hell's going on.  Yeah, it's normal.  It's normal.  There's

3    nothing wrong with that.

4          Just go back, when Judge Crotty is instructing you on

5    the jury charge, to the facts as they have come out, and you

6    will see that the government has failed to prove guilt beyond a

7    reasonable doubt.

8          Look, I'm going to sit down now.  My work is almost

9    done.  It's been four weeks of trial and a lot of evidence.  My

10   work is almost done, and your work is just about beginning.  So

11   as you undertake this work, I ask you to ask yourself -- ask

12   yourself about these witnesses -- do I trust these witnesses?

13   Do I trust these people?  Do I trust the information that they

14   gave me?  Is this the kind of proof that I can depend on?  Is

15   this the kind of proof that would be enough, if Mr. Schulte

16   were my relative or my friend; would I trust that evidence?

17         If you ask yourself those questions, if you ask

18   yourself those questions, can I trust these witnesses, you will

19   know that the answer is no.  Just for a moment think back to

20   Jeremy Weber.  Just for a minute.  Just go back to Jeremy

21   Weber's testimony.  OK?  And he tells you that he changed

22   accesses on April 4 of 2016.  He tells you over and over again,

23   and the government told you over and over again, that the

24   accesses were changed on April 4, 2016.  And the reason the

25   access was changed, Mr. Weber told everyone, including you, was

K32Wsch4                    Summation - Ms. Shroff

1    because it was standard operating procedure.  You leave OSB,

2    your access is taken out.

3           OK.  Take a look at the evidence.  Take a look at all

4    of those charts.  Think back to all of those wonderful charts

5    Mr. Laroche showed you.  And in all of that evidence, is there

6    a single email, a single conversation, a single note, anything

7    that tells you that on March 4, when they -- by they, I mean

8    Jeremy Weber -- changed Mr. Schulte's access he had

9    authorization from anyone.  Because remember, they gloss over

10   this.  Mr. Schulte doesn't realize that his access has been

11   taken away for ten full days.  He is not working on that

12   project, so he doesn't try to access anything until April 14.

13   So if management really did authorize Mr. Weber, and management

14   did say go ahead and remove his OSB access, why is there no

15   email?  Why is there no testimony?  Why is there no document?

16   Why is there nothing that supports what Mr. Weber wants you to

17   believe?  That he did this with management's backing.

18          I'm not talking about what you see after April 14,

19   because by then it's CIA mission time and everybody lines up

20   and supports Mr. Weber.  I'm talking about the day that

21   Mr. Weber revoked access.  April 4 to April 10, there's

22   nothing.

23          Can you trust a person who skips over that time period

24   and then tells you to just believe that these are the real

25   reasons why he removed Mr. Schulte's access?  When you go back

1   to deliberate, I ask you to please think of all of the gaps

2   that the government is asking you to fill.  Ask yourself why

3   are there so many gaps that they want me to say it has to be

4   this and it has to be that?  It's not your job to fill these

5   gaps.  It's not your job to take the assumptions that Mr.

6   Laroche has given you.  He's given them to you very nicely, by

7   the way, but they are still assumptions.  They are not

8   evidence.  Do not do what he's asking you to do.  Do not fill

9   those gaps.

10          Your job as jurors is to put the government to the

11  task of proving guilt beyond all reasonable doubt, and that is

12  all I ask you to do.

13          So after this, I won't be able to speak to you again.

14  This is my one shot of telling you about all of the evidence

15  that proves Mr. Schulte's not guilty.  The government gets to

16  give a rebuttal.  The government gets to stand up and answer

17  everything that I have just said.  Mr. Kamaraju gets up after

18  me, and I won't be able to answer back.  I just won't have that

19  opportunity.

20          But you will.  You know everything that I know, and no

21  matter what Mr. Kamaraju says, you will be able to answer that.

22  All you have to do is say what would Ms. Shroff say in response

23  to this argument, and you will have the answer, because in four

24  weeks, you know all of it.  So I ask you, no matter what

25  Mr. Kamaraju says, ask yourself the four questions I asked you

1    at the beginning:

2         What is the proof that Mr. Schulte stole this

3    evidence?  There isn't proof of that.  They have given you

4    proof of other things.  And I told you this in the beginning.

5    And what I said to you in the beginning, I think, has borne

6    out.  I told you truthfully.  I told you that Mr. Schulte was a

7    difficult man.  He was a difficult employee, and I told you

8    that there was no doubt about that.  I told you that the

9    evidence would show that, and that's what the government showed

10   you.  For four weeks that's what they showed you.  They proved

11   to you that, yes, you can properly call him Voldemort or Vault

12   Asshole or Asshole or Jason Bourne or John Galt.  They have

13   given you evidence of all of that.  But one thing that you

14   cannot call him, after four full weeks, because the evidence

15   isn't there, you cannot call him guilty.  Please acquit.

16        Thank you.

17        THE COURT:  We'll take a short recess, and then we'll

18   hear the government's rebuttal.  We'll take about a ten-minute

19   recess.

20        (Recess)

21        THE COURT:  Are you all set, Mr. Kamaraju?

22        MR. KAMARAJU:  Yes, your Honor.

23        THE COURT:  Call the jury, David.

24        Hold on a second, David.  Where is Mr. Schulte?

25        Are we all set now?  OK.

 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              All right.  Mr. Kamaraju.

 4              MR. KAMARAJU:  Thank you, your Honor.

 5              Well, I'm the last one up.  And I'd like to start with

 6      something Ms. Shroff said.  Ms. Shroff talked to you about

 7      reasonable doubt.  Reasonable doubt is an important standard in

 8      our criminal justice system.  It's an important safeguard.

 9      Reasonable doubt is part of why we're here.

10              Now, the other thing reasonable doubt is is something

11      that we are not afraid of.  It is our burden.  We embrace it,

12      and we have met it.  Now, I'm not going to walk through all of

13      the evidence that Mr. Laroche put before you, but over two

14      hours, he described to you all of the evidence that shows that

15      this man is responsible for Vault 7; that this man is

16      responsible for breaking into the CIA computer systems; that

17      this man tried to conduct an information war from the MCC.

18      That's the evidence that you have.

19              What they gave you are conspiracy theories,

20      speculation and guesses.

21              MS. SHROFF:  Objection, your Honor.

22              THE COURT:  Overruled.

23              MR. KAMARAJU:  Now, they have no obligation.  You'll

24      hear that from Judge Crotty.  They could have sat there and

25      said nothing.  But when they do offer something to you, when

K32Wsch4                         Rebuttal - Mr. Kamaraju

they do give you a theory, you should look at it.  You should

consider it.  You should think, does it make any sense?  You

should think, is it supported by any evidence?  And if you do

that, you're going to see that nothing Ms. Shroff said to you

is supported by evidence or common sense.

So let's just start with her big other suspect,

Michael, the man who took the stand here in New York.

Now, Ms. Shroff said that Michael was a coder who had

all the same skills that he did, the skills necessary to steal

the information.  She said he was there on April 20, 2016, just

like he was.  They said he was logged in to vSphere, and then

they tried to tell you that because he was logged in to

vSphere, he could have used this one password and that password

could have been the thing that was used to copy the

information.

Do you remember that?

But it's impossible for that to be the case because as

Defense Exhibit O said -- she put it up for you -- it said that

password was never used to log in to the Confluence VM in March

or April of 2016.  It wasn't used.  It's a pure fantasy.

Now, they tried to recover from that by saying, Well,

if it had been used, that data would have been deleted during

the reversion.  And that's where this all falls apart.  Because

who did the reversion?  Over the course of almost two hours,

Ms. Shroff talked about everything from targeting to the length

1    of tweets but did not address the critical time period in this

2    case: when the system was reverted and who did it.  And you

3    know why?  Because there's no disputing that he did it.

4            And you know why there's no disputing that?  Because

5    all of the evidence is on his workstation.  They found it on

6    his computer.  These FBI buffoons, these forensic experts that

7    couldn't find their way out of a paper bag found it on his

8    workstation.  They found evidence that he reverted the system.

9    They found evidence that he deleted all those logs.  They found

10   evidence that he reverted back, something that makes no sense.

11   All of that they found on his box, not Michael's, not David's,

12   not anybody else.  His.

13           Now, what does that mean?

14           What that means is that during the reversion, this man

15   had access to the exact data that's up on WikiLeaks.  There's

16   no serious dispute that that's the data.  It's sitting on the

17   internet now because he copied it.  And Ms. Shroff said, Well,

18   maybe Mr. Kamaraju will come up here and answer some of those

19   questions.  I'm here to answer some of those questions.

20           You know how you don't know that there's a copy

21   command, why Mr. Leedom couldn't find it?  Because he deleted

22   it.  That's what happens when you delete logs.  He deleted the

23   very logs that would show a copy command.  You know how she

24   said there was no device connected, you couldn't find any

25   device?  That's because everything he was doing was in the

K32Wsch4                    Rebuttal - Mr. Kamaraju

1    virtual machine.

2            Remember those things?  We've talked a lot about

3    virtual machines, but it's that weird computer within a

4    computer.  And guess what?  He deleted those logs too, every

5    log that would have showed the storage device in that virtual

6    machine.  He deleted those too.  And then, if it wasn't good

7    enough, as if that wasn't enough, he brought everything, as Mr.

8    Laroche said, back to the future, and he wiped away all the

9    indications of what he was doing before.  It was him, not

10   Michael, not anyone else.

11           Now, Ms. Shroff spent a lot of time talking about this

12   thumb drive.  Ms. Shroff spent more time talking about that

13   thumb drive than we did.  We never told you that the thumb

14   drive was the way he took it out.  We told you that he was so

15   nervous about what he was doing on April 20, 2016, that he

16   wiped that thumb drive clean the next day even though it wasn't

17   plugged in at the time of the reversion.  That's how nervous he

18   was about what he was doing.

19           But you know what you also saw that the defendant

20   took?  When she talked about, Well, how did it walk out on the

21   hard drive?  You saw hard drives in this case.  They were about

22   this big.  Do you remember them?  We showed them to you during

23   the testimony of Mr. Berger.  Those were hard drives recovered

24   from his apartment.  Those were hard drives that had been wiped

25   clean.  Those were hard drives that had been securely deleted

K32Wsch4                    Rebuttal - Mr. Kamaraju

1    after he researched how to nuke data, after he researched how

2    to securely wipe a hard drive.  Those hard drives were one

3    terabyte big, each one of them.  Those hard drives are sitting

4    in his apartment, where he googled how do I guarantee that one

5    terabyte of data transferred correctly?  That's how he got it

6    out, and that's how he sent it out.

7            Ms. Shroff also spent a lot of time saying, Well, why

8    did it take WikiLeaks so long?  Why was that a year later?

9            Well, let me put it this way.  What WikiLeaks did,

10   when WikiLeaks sent it out, that's for a trial of WikiLeaks.

11   That's their choice, because what's relevant is when he sent it

12   out, and when he sent it out was May 1, 2016, just about ten

13   days after stealing it the first time.  That's what's relevant.

14           And the fact that WikiLeaks took some time to put it

15   out doesn't undercut that in the slightest because you heard,

16   for example, from Mr. Leedom.  You heard him talk about how

17   long that would take.  You also heard that WikiLeaks had some

18   other stuff going on.  There are reasons, but you are not

19   called upon to look into the mind of WikiLeaks.  That's not

20   what your job is.

21           Because you know who was trying to look into the mind

22   of WikiLeaks?  This man.  This man was when he tried to Google

23   what's coming up next in 2017, when he tried to Google

24   WikiLeaks's code, because he didn't see it out there.  He was

25   trying to figure out why isn't my stuff out there?  I put it

K32Wsch4                        Rebuttal - Mr. Kamaraju

1   out there.  I gave it to you.  Why haven't you disclosed it

2   yet?

3           And then they did.  And then he started googling

4   again.

5           Now, Ms. Shroff said:  Oh, it's normal.  He's a former

6   CIA employee.  Of course, he'd be interested in what's going

7   on.

8           Sure.  I'm sure every CIA employee is interested in

9   what happened that day.  You know what they all weren't

10   googling?  The FBI.  They weren't googling about the FBI's

11   investigation into who the mole was.  Why would he be concerned

12   about that?  Because he's the mole.  That's why he's looking.

13   That's why he's trying to figure out what happened and what the

14   FBI was doing.

15           Now, they offered you any number of distractions to

16   try to take you off that message.  They talked about this memo

17   with Michael, and Judge Crotty's going to instruct you about

18   that memo.  And he's going to say we should have given it to

19   them earlier.  We apologize.  That's on us.

20           But he's also going to tell you that it's up to you to

21   decide how much weight to give that memo.  It's up to you to

22   decide whether it means anything at all.  And you know it

23   doesn't because they got it, and look what they did with it.

24   They put it up in front of you.  They cross-examined the guy

25   who helped write it, and at every turn, the memo said exactly

1    what it said from the beginning, which is the reason why

2    Michael is on administrative leave.  The reason why the CIA

3    forced him out is because of him.  It's because Michael

4    wouldn't talk about what he did with him.

5          Look at the memo.  The memo talks about his lack of

6    cooperation into the investigation with the primary person of

7    interest in the FBI investigation, his lack of cooperation into

8    the investigation, into who was charged with the Vault 7

9    disclosure.

10          Well, looking around the room, who was charged with

11    that?

12          He was, because that is what Michael was put on

13    administrative leave for, not telling on his friend, the same

14    friend who now sits here and tries to blame him for the largest

15    theft of classified information in the CIA's history, a theft

16    that he committed.

17          Now, Ms. Shroff tried to argue in some way that he

18    wasn't angry on March 3, 2016; the day of that backup wasn't a

19    significant thing.  She told you that's just in our minds.

20          Well, go back and listen to some of those recordings

21    that Mr. Small made.  You'll hear, you'll hear his words when

22    he says I was upset that they talked about not wanting to be a

23    guidance counselor, that that wasn't their job, not to be a

24    guidance counselor.

25          Look at the emails.  Look at the email chains.  You'll

1    see an email from Dana, when Dana says, It's not my job to play

2    guidance counselor.  You'll see the date of that email.  March

3    3, 2016.  He told you that he was angry about it.  Not us.

4    Him.

5            And Mr. Nuclear Option over here also told you what he

6    does when he gets angry.  He told you in that interview.  He

7    would look to punch.  He would do whatever he can.  He told you

8    in his emails that he would fight back.  He told you in those

9    prison notebooks, where he said that he would declare an

10   information war to destroy the United States's diplomatic

11   relationships.

12           Ms. Shroff kept saying there's no battle plan.  What's

13   the battle plan?

14           That's the battle plan.  He wrote it down, and he

15   methodically proceeded to carry it out.  You want to know how

16   you know that?  He had checklists.  One of the entries in the

17   checklist is delete suspicious emails.  It is impossible to

18   come up with a more incriminating piece of evidence than delete

19   suspicious emails.  And yet that's what he did.  That's what he

20   wrote down.

21           He also wrote down a set of tweets that captured

22   highly sensitive classified information about a CIA tool and

23   how it was going to be used.  And he prepared to send it out.

24   And he prepared to disseminate that to the world, all to try to

25   help himself.

1            Now, in the intelligence community, there's a phrase
2   called "false flags."  All right?  And false flags means
3   basically you try to convince everyone that somebody else did
4   it.  And that's all fine for spies.  Right?  But where I come
5   from, what's that called?  Throwing someone under the bus.  And
6   throwing someone under the bus is Josh Schulte's tradecraft.
7   That's what he does.  He's trying to do it with Michael here,
8   and if you look at those tweets, he tried to do it with Jeremy
9   and Karen there.  And we'll come back to Jeremy and Karen in a
10  second and the rest of their tinfoil-hat theories.

11           That's what he does, and he continued to do it in
12  prison, posing as his brother, posing as his family, all in an
13  effort to try to get out his tweets, his articles, his
14  description of what happened, his classified information.

15           Are those the acts of an innocent man?  Are those the
16  acts of a man who just wants to be heard about the Constitution
17  and the criminal justice system?  No.  That's a CIA operative
18  trying to use his training to fool the world and, in the
19  process, to conduct that information war.

20           Now, Ms. Shroff told you that we were going to focus
21  heavily on the prison conduct.  The prison conduct took two
22  days.  It took two days because it's pretty straightforward.
23  All you have to do is go look at Special Agent Schlessinger's
24  testimony, and you'll see how he turned words on a page into
25  action in the real world.  And I encourage you to do that.

1          What we spent the bulk of the time talking about was

2     all of the evidence, that this man is responsible for Vault 7.

3          Now, Ms. Shroff made a big deal about how the FBI

4     targeted him.  Remember that?  She said, Oh, he was a

5     disgruntled employee, and they went after him because they --

6     what the FBI did, what she calls targeting, is called following

7     clues.  It's a clue when a guy leaves on the terms that he left

8     with.  It's a clue when the guy illegally manipulates CIA

9     computer systems to give himself back access to projects.  It's

10    a clue when he sends an email on his way out saying:  Just you

11    wait.  You'll see.  I was right.  All this stuff's going to end

12    up on the internet one day.

13         And guess what?  It did.  Those are clues, and so the

14    FBI followed them and they investigated more and they developed

15    more evidence.

16         But they didn't just follow clues about him.  You saw

17    Special Agent Evanchec.  He took that stand.  You heard him

18    testify, and he testified that when they found out, for

19    example, about this Stash backup that David had taken, they

20    confronted him about it.  They asked him about it.  And guess

21    what?  That backup, that Stash backup, it's not even the day of

22    the stuff that's on the internet.  It's a totally different

23    date.  It's totally irrelevant.  That is just a distraction.

24    But nonetheless, it was something that the FBI ran down,

25    because that's how diligent they were.

1          They even did that with Michael, Michael, the big, bad

2     boogeyman.  When they found out Michael hadn't told them about

3     the screenshot, what did they do?  Special Agent Evanchec told

4     you they had a confrontational interview with him.  They

5     confronted him.  And now, yes, when Michael did not disclose

6     everything that he appears to know about what this man was

7     doing, the CIA put him on administrative leave.  He suffered

8     those consequences.

9          The FBI did not target anyone.

10         Now, Ms. Shroff uses an example of that, the testimony

11    by Mr. Berger, in which she said Mr. Berger tried to insinuate

12    that the data.bkp file had something classified in it and it

13    wasn't until we cross-examined Special Agent Evanchec that the

14    truth came out.  That is flat-out wrong.  There's a transcript.

15    You can read the transcript.  Go take a look at who asked that

16    question.  Mr. Laroche asked that question, because we're not

17    trying to hide anything from you.

18         Special Agent Evanchec, the lead case agent in this

19    group that's trying to target him, took that stand and said no,

20    there wasn't anything classified in that.  It's the ones that

21    he deleted that had the classified information, not the one

22    that he left on his computer.  Special Agent Evanchec, part of

23    this cadre of FBI agents who tried to target this man, he took

24    the stand and he told you, you know what, he was actually

25    pretty cooperative.

K32Wsch4                    Rebuttal - Mr. Kamaraju

1         It was just the two of them there.  He could have said
2    anything he wanted on that stand.  But he didn't.  He told the
3    truth.  Is that consistent with somebody who is targeting this
4    man, with somebody who is on a mission to put him away?  No,
5    it's not.
6         And that's true for every single witness that we
7    called.  Every witness that we called, if you go back and you
8    look at their testimony, if there was something that was
9    helpful for the defendant, they didn't shy away from it.  They
10   didn't back down.  In fact, if you remember, Ms. Shroff brought
11   up all this testimony about was he angry.  Go back and look.
12   Look at what Mr. Leonis said when asked that question.  He said
13   he didn't appear that angry to him.  He said it because he
14   believed it, because it was the truth, because he showed up
15   here to tell you the truth.
16        Now, part of the truth is that some of these witnesses
17   thought that DevLAN was not as secure as some other CIA
18   networks.  That's what their testimony actually is, not the
19   snippets that she cherry-picked, not the little sections that
20   she said, Let's just look at this one line.
21        Go look at their actual testimony.  It's the CIA.
22   Computer systems are locked down.  But a computer system that
23   allows for hacking tools to be developed, that allows for cyber
24   programs, cyber tools to be worked on, it can't be the same as
25   the one that's running your regular old email.  It's got to be

K32Wsch4                         Rebuttal - Mr. Kamaraju

1   dirty.  It's got to be a little open, because otherwise they

2   could never test what they were doing.  But the part of the

3   system, the part of the system from where this data was stolen,

4   the Altabackups, so there's no serious dispute about that

5   during this trial --

6              Bless you.

7              JUROR:  Thank you.

8              MR. KAMARAJU:  That part of the system, you'd better

9   believe it was locked down.  And you saw that evidence.  You

10  saw that evidence in David's testimony, and you also heard that

11  even though there were some people who knew about it, that was

12  a small number.  There were just a handful of folks who even

13  knew they existed.  You know who one of those people were?

14  This man, the guy who created them.  He knew where they were.

15  He knew how to get to them.  And that's what he did on April

16  20, 2016.

17             So as she tries to distract you with all this wild

18  Wild West talk, think again about what we're talking about.

19  We're talking about a CIA computer system, locked in a

20  building, behind armed guards, kept in a vault that can only be

21  accessed by people with top secret security clearance who had

22  undergone background checks.  And yes, admittedly, they missed

23  one.  That one.  He was the security flaw.  He was the security

24  danger.  He's the reason why we're here today.

25             Now, there have been a lot of forensics, and Ms.

1   Shroff has argued that, even today, we don't know what

2   happened.  That's simply false.  If you use your common sense,

3   you know exactly what happened.  I get it.  There's some dense

4   forensic evidence here, right?  There are some complicated log

5   files that took some expertise to dig through.  But common

6   sense tells you what happened here.  Common sense.

7          Now, Ms. Shroff has twice now used this phrase, and

8   thinking about it, I have to say it's a pretty good analogy.

9   She's called it the heist.  And even with this, right?  I think

10  Matt Damon's done a few heists movies.  This was a digital

11  heist.  That's what happened.

12         What do you do before?  Before you pull off the job,

13  you case the joint.  That's what he did on April 18, as he

14  reconnaissance, looking at where he could get into the system,

15  looking at what log files are generated.  Then you have to take

16  care of the log system.  Well, that's what he did on April 20,

17  when he reverted it, to a point where he had the codes; he

18  could unlock the alarm system.  That was the reversion.

19         And just like all those movies, he knew he had to move

20  right then because he had gotten an email saying that vault

21  that you have access to, that vault that's got all that

22  precious material, it's not going to be there anymore.  You're

23  not going to be able to get it, and so he acted.  And he crept

24  into that vault, and just like if it were jewelry or paintings

25  or gold bars, he took it.

K32Wsch4                         Rebuttal - Mr. Kamaraju

1          Now, these are files.  And Ms. Shroff keeps saying,

2    Well, the CIA had no idea that it was taken.

3          Well, it's not a painting on the lawn.  You can't walk

4    by and notice, Oh, it's gone, because what he did was he copied

5    it.  And you know he copied it because you saw that exhibit.

6    And yes, we put it up a lot.  You want to know why?  Because it

7    is devastating evidence of what he did.  It is confirmation

8    that he copied those files on that day.

9          And then, after he copied it, what did he do?  He

10   crept out of that vault, and he deleted all the surveillance

11   footage to make sure he didn't get caught, because that's what

12   deleting all those logs was.  It was absolutely a heist, and

13   he's the one who did it.

14         But it didn't end there, right?  Because now you have

15   the stuff.  Now what are you going to do with it?

16         Well, he wanted to get it out because he wanted to

17   punish.  Right?  It doesn't do any good burning a hole in his

18   pocket.  And so that's what he did.  He transmitted it.  Over

19   the next several days he transmitted it to WikiLeaks, but not

20   before first making sure that he could burn everything to the

21   ground in the end when he needed to.  That's what he did.

22         Go back and look at those Google searches.  The only

23   time since 2006 that he looked up some of that stuff was right

24   after April 20, 2016, right after he stole the material.

25         Now, you know that to be true.  You know that using

K323SCH5                        Rebuttal - Mr. Kamaraju

1     your common sense.  You know that reviewing the evidence.  And

2     truth be told, they know it too.

3            And so instead of taking that on, what did they do?

4     They come up with a story about a mission.  They tell you a

5     tale, a tale that this man, a random developer sitting in a

6     cubicle somewhere, is now the target of a massive conspiracy

7     run by the CIA, the FBI and these prosecutors, all to make sure

8     that instead of the real perpetrator, he goes away.

9            (Continued on next page)

10

11            MR. KAMARAJU:  It's never explained why that would be

12     the case.  It's never explained why, because he's a little

13     difficult, all of a sudden, the CIA and the FBI and the U.S.

14     attorney's office, that all of these organizations, would all

15     of a sudden decide, you know what?  He is a jerk, so let's

16     frame him for the biggest theft of classified in history in

17     America.  That doesn't make sense.

18            Just take a look at the coincidences that would have

19     to happen.  Just think about how unlucky this man would have to

20     be.  Just think about the chain of events.

21            So it all starts in the fall of 2015.  And in the fall

22     of 2015, he first raises death threats about a guy named Amol.

23     And he does it again in March.  But, the CIA security office,

24     who doesn't even report to Karen and all those other managers,

25     the CIA security office decides, we are so intent on screwing

Joshua Schulte, that we're going to let a potential murderer

run around this building.  They look at it.  They determine his

threats are credible, and say, nah, forget about it.  You know

what?  We're out to get him.  Then, they take his privileges

away.  Never mind that he moved groups and shouldn't be working

on the project anymore.  No, no, no, this was a vindictive act.

A vindictive act by Jeremy Weber.

          You saw Jeremy Weber testify.  You saw all of the

management employees testify behind him.  There was no

vindictive act.  But in his world, that's what happened.

Jeremy Weber takes his privileges away illegally.  And then he

takes them back, because that's what he does.  He told you that

in his own words.  He takes them back.

          So now, these CIA managers, they've got him over the

barrel.  Right?  He's violated all of these policies.  They

could do anything they want at that moment.  If they are going

to frame him right then and there, they could call the FBI.

They could lock him up.

          And they call him in at a meeting on Monday morning,

and what do they do?  They give him a strongly worded memo.

That's the frame job.  That's the persecution.  They give him a

memo.  And the memo says don't do it again.  But they are so

committed, they are so committed to persecuting him, that when

he raises a concern with the memo, they incorporate his

feedback.

1          How is that consistent with a mission to screw Joshua

2     Schulte?  And that happens not once, but twice.  You heard

3     Ms. Shroff spend all kinds of time talking about strikeouts.

4     You know what the impact of the strikeout was?  They took

5     language that he disagreed with, and they crossed it out and

6     said, fine, Mr. Schulte, you know what?  We're going to change

7     this.

8          If they were out to get him, why wouldn't they leave

9     the memo exactly like it was?  Why wouldn't they make it as

10    damning as possible?  Because there's no conspiracy.

11         But, marching on through his conspiracy theory, now,

12    he leaves the agency entirely.  And even though he's the one

13    that took these e-mails and these handwritten notes about this

14    dispute and kept them next to his pillow, no, no, he's not

15    angry, he's over it.  But even though he is the one who did

16    that, it's CIA that can't get over it.  It is the agency that

17    just can't let this go.

18         And so the leaks happen.  Instead of checking out

19    whether it was Turkey, or whether it was Dave, or whether it

20    was Michael, or whether it was any of the other people, a group

21    of middle managers at CIA decide that, because he's difficult,

22    because he -- to use Ms. Shroff's term and the term that came

23    out -- was a bald asshole, they're going to frame him.  Does

24    that make any sense?

25         Not only, though, does this group of middle managers

K323SCH5                    Rebuttal - Mr. Kamaraju

do it.  But they have to get the entire CIA on board.  Right?
You remember Ms. Shroff showed it to you, the task force
report.  They had to convince the entire CIA that instead of
pursuing these other angles, let's just settle on this guy.
Let's just go with this guy.  It doesn't matter to us to figure
out what actually happened.  It doesn't matter.  We don't care.
We are going to convene a task force, but all we really care
about is getting this guy.

          It doesn't make sense.  But it also doesn't end there.
Because not only does the CIA have to be on board, you heard
from the very beginning, the FBI took over the investigation.
The FBI, a group of folks who had never heard of Joshua Schulte
until this case started.

          And so somehow, CIA having itself concluded that the
best path is to screw this man, gets the FBI on board, too, and
gets the FBI to say, forget it.  We're not going to conduct a
real investigation.  We're going to screw this guy.

          And then all of those folks come here to testify at
this trial.  And at those moments, when they could put the
knife in the most, what do they do?  They tell the truth.

          Think about Michael.  Ms. Shroff said there wasn't a
single person at the agency who liked the defendant.  There was
one.  His name was Michael.  And he came here, and he
testified.  And what did he tell you?  If Michael was the
perpetrator, if Michael was the one who was going to do all

K323SCH5                         Rebuttal - Mr. Kamaraju

this, then when he took the stand and testified about a
conversation that these two men had on April 20, 2016, just the
two of them.  No one else around.  Perfect opportunity for him
to finish the job.  For him to put a nail in the coffin.  For
him to convince all of you, no, no, it's him.  For him to say,
he told me all about it.  For him to say, he slipped up.  The
moment that Michael could have ended this, he took the stand,
and he said, no, we didn't really talk about it.  Josh didn't
really say anything about it.  At that moment, Michael told the
truth.  And that is totally inconsistent with this mission,
this mission that they say we are on.

         The fact of the matter, ladies and gentlemen, is that
Joshua Schulte is not being persecuted.  He is being
prosecuted.  And he's being prosecuted as a result of
deliberate choices he made.  The choice to break into a
classified CIA computer system.  The choice to steal sensitive,
classified tools information from that system.  The choice to
obstruct and lie to the FBI.  The choice to conduct an
information war from the MCC.

         He's being prosecuted for his choice to abandon his
oath to defend this country against enemies, foreign and
domestic, and to protect its secrets.

         And now, ladies and gentlemen, it's time for you to
fulfill your oath, and it's time now for you to make a choice.
And we submit that when you look at all of the evidence, and

K323SCH5                          Rebuttal – Mr. Kamaraju

1    when you hear Judge Crotty's instructions on the law, there is

2    only one choice.  And that is that the defendant, Joshua

3    Schulte, is guilty as charged.  Thank you.

4               THE COURT:  Thank you Mr. Kamaraju.  We'll take a half

5    hour break now, and then I'll charge the jury and you can begin

6    your deliberations.  So half an hour, we'll start at 10 to 2.

7    Thank you.

8               (Recess)

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K323SCH5                     Charge

                         AFTERNOON SESSION

                            1:50 p.m.

         (Jury present)

         THE COURT:  I told you at the beginning how important
your service is to our country and our system of justice.  I
want to repeat that.  You have been most conscientious in your
attendance, your punctuality, and the complete attention you
have given during the trial.

         I am going to read these instructions to you now, but
I want you to know that I am going to send the instructions
into the jury room.  So you do not have to take notes, just
listen.

         Do not single out any particular instruction as alone
stating the law.  You should instead consider my instructions
as a whole.

         You are about to start your deliberations.  You've
heard all the evidence as well as the lawyers' final arguments.
Now it is my duty to instruct you as to the law that will
govern during your deliberations.  As I told you at the start
of this case, and as you agreed, it is your duty to accept my
instructions of law and to apply them to the facts as you
determine them.  Regardless of any opinion that you may have as
to what the law may be or --

         A JUROR:  Speak up a little bit, please.  We can't
hear you.

K323SCH5                        Charge

1            THE COURT:  Thank you.  Regardless of any opinion --

2      is that better?

3            A JUROR:  Yes.

4            THE COURT:  Regardless of any opinion that you may

5      have as to what the law may be or ought to be, it is your sworn

6      duty to follow the law as I give it to you.  Also, if any

7      attorney or other person has stated a legal principle different

8      from any that I state to you in my instructions, it is my

9      instructions that you must follow.  You will begin your

10     deliberations after these instructions.

11           Your duty is to decide the factual issues in the case

12     and arrive at a verdict.  The jury is the sole and exclusive

13     judges of the facts.  You decide the weight of the evidence;

14     you determine the credibility of witnesses; you resolve such

15     conflict as there may be in the testimony; and you draw

16     whatever reasonable inferences you decide to draw from the

17     facts as you determine them.

18           In determining the facts, you must rely upon your own

19     recollection of the evidence.  None of what the lawyers have

20     said in their opening statements, closing arguments, questions

21     or objections is evidence.  They are not sworn as witnesses;

22     they do not testify; they make arguments about what conclusions

23     you should draw from the evidence or lack of it.  But as I

24     said, that is argumentation, not evidence.  And the same

25     applies to me.  Anything I have said is not evidence.  I have

K323SCH5                    Charge

1    allowed you to take notes, but as I said earlier, your notes

2    are not evidence either.

3             The evidence before you consists of just two things:

4    The testimony given by witnesses from the witness stand right

5    here that we received in evidence, and the exhibits that were

6    received in evidence.

7             Testimony consists of the answers that were given by

8    the witnesses to the questions that were permitted.  The

9    questions themselves are not evidence.  It is the answers to

10   the questions that count.  Also, as I instructed you at the

11   beginning of this case, I'm sure you complied with my

12   instruction, anything you may have seen or heard about this

13   case outside the courtroom is not evidence and must be entirely

14   disregarded.

15            It is the duty of the attorney for each party to

16   object when the other party offers testimony or other evidence

17   that the attorney believes is not properly admissible.  Counsel

18   also have the right and the duty to ask the Court to make

19   rulings of law and to request conferences out of the hearing of

20   the jury.  All such questions of law must be decided by me.

21   You should not show any prejudice against any attorney or party

22   because the attorney objected to the admissibility of evidence

23   or asked for a conference out of your hearing or asked me for a

24   ruling on the law.

25            The testimony and the documents that have been

K323SCH5                    Charge

1    admitted into evidence are appropriate for your consideration.

2    You may consider all the evidence that has been admitted.

3          I also ask you to draw no inferences from my rulings

4    or the fact that upon occasion I asked a question or made

5    certain observations.  My rulings were no more than the

6    application of the law, and my questions were only intended for

7    clarification or to expedite matters.  You are expressly to

8    understand that I have no opinion as to the verdict that you

9    should render in this case.

10         You are to perform your duty of finding the facts

11   without bias or prejudice as to any party.  You are to perform

12   your duty with an attitude of complete fairness and

13   impartiality.  This case is important to the parties.

14   Mr. Schulte is charged with serious crimes.  He has pleaded not

15   guilty.  It is important for the government, too.  Enforcement

16   of the criminal laws is a prime concern of the government.

17         The fact that the prosecution is brought in the name

18   of the United States of America entitles the government to no

19   greater consideration than that accorded to any other party.

20   By the same token, it is not entitled to less consideration.

21   All parties, whether the government or individuals, stand as

22   equals before the Court.

23         It would be improper for you to consider, in reaching

24   your decision as to whether the government sustained its burden

25   of proof, any personal feelings you may have about

Mr. Schulte's race, religion, national origin, gender, sexual

orientation, or age.  Similarly, it would be improper for you

to consider any personal feelings you may have about the race,

religion, national origin, gender, sexual orientation, or age

of any witness or anyone else involved in this case.  The

defendant is entitled to the presumption of innocence, and the

government has the burden of proof, as I will discuss in more

detail in a moment.  It would be equally improper for you to

allow any feelings you might have about the nature of the

crimes charged to interfere with your decision-making process.

Do not be swayed by sympathy.  Rather, the crucial question

that you must ask yourselves as you review the evidence is:

Has the government proved the guilt of Mr. Schulte beyond a

reasonable doubt?

         You cannot let bias, prejudice, fear, disgust,

sympathy, or any other irrelevant consideration interfere with

your thinking.  That might interfere with your obligation to

arrive at a true and just verdict.  So do not be guided by

anything except clear thinking and calm analysis of the

evidence.

         You should also not consider any personal feelings you

may have about the attorneys who represented the parties in

this matter.  As I indicated at the beginning of this trial,

the lawyers and the other participants at counsel table have

been instructed not to have any communications with you as

K323SCH5                    Charge

jurors.  If due to the congestion in the courthouse you ran
into counsel and they ignored you, they did so because that's
what they're supposed to do.  That's the rule.  This should not
influence your decision regarding Mr. Schulte's innocence or
guilt in any way.

The potential punishment of the defendant is not a
jury concern and should not, in any sense, enter into or
influence your deliberations.  The duty of imposing a sentence
rests exclusively with the Court.  Your function is to weigh
the evidence or lack of evidence in the case, and to determine
whether or not the government has proved that Mr. Schulte is
guilty beyond a reasonable doubt.

I told you before -- and I am going to tell you
again -- Mr. Schulte is presumed innocent until proven guilty
beyond a reasonable doubt.  Mr. Schulte has pleaded not guilty
to the charges alleged in the indictment.  As a result, the
government has the burden to prove the defendant's guilt beyond
a reasonable doubt.  This burden never shifts from the
government to Mr. Schulte for the simple reason that the law
presumes the defendant innocent and never imposes upon any
defendant in a criminal case the burden or duty of calling any
witness or producing any evidence.

In other words, Mr. Schulte starts with a clean slate.
He is presumed innocent until such time that you, the jury, are
unanimously satisfied that the government has proved

K323SCH5                    Charge

1    Mr. Schulte guilty beyond a reasonable doubt.  If the

2    government fails to sustain this burden with respect to

3    Mr. Schulte, you must find him not guilty.

4            The government must prove the defendant guilty beyond

5    a reasonable doubt.  The question then is what is a reasonable

6    doubt?  The words almost define themselves.  It is a doubt

7    based upon reason.  It is a doubt that a reasonable person has

8    after carefully weighing all of the evidence.  Proof beyond a

9    reasonable doubt must, therefore, be proof of such a convincing

10   character that a reasonable person would not hesitate to rely

11   and act upon it in the most important of his or her own

12   affairs.

13           A reasonable doubt is not a guess or a whim.  It is

14   not speculation or suspicion.  It is not an excuse to avoid the

15   performance of an unpleasant duty.  And it is not sympathy.

16   The law does not require that the government prove guilt beyond

17   all possible doubt.  Proof beyond a reasonable doubt is

18   sufficient to convict.

19           If, after a fair and impartial consideration of all

20   the evidence, you have a reasonable doubt as to the guilt of

21   Mr. Schulte, it is your duty to find the defendant not guilty.

22   On the other hand, if, after a fair and impartial consideration

23   of all the evidence, you are satisfied that the government has

24   met its burden of proving Mr. Schulte guilty beyond a

25   reasonable doubt, it is your duty to find the defendant guilty.

K323SCH5                         Charge

1          Now I want to say a few words about evidence.  The

2     indictment is not evidence.  Mr. Schulte was formally charged

3     in an indictment.  He is entitled to know the charges against

4     him.  But as I instructed you when the trial started, the

5     indictment is not evidence.  It merely describes the charges

6     against Mr. Schulte and may not be considered by you as any

7     evidence of his guilt.

8          I'm not going to read the indictment to you because I

9     will send you copies of the indictment for your review in the

10     jury room.

11          In deciding whether Mr. Schulte is guilty or not

12     guilty, you may consider both direct evidence and

13     circumstantial evidence.  Direct evidence is evidence that

14     proves a disputed fact directly.  For example, where a witness

15     testifies to what he or she saw, heard or observed, that is

16     called direct evidence.

17          Circumstantial evidence is evidence that tends to

18     prove a disputed fact by proof of other facts.  To give a

19     simple example, suppose that when you came into the courthouse

20     today the sun was shining and it was a nice day.  But now the

21     courtroom blinds are drawn and you cannot look outside.  As you

22     are sitting here, someone walks in with a dripping wet

23     umbrella, and soon thereafter someone else walks in with a

24     dripping wet raincoat.  Now, on our assumed facts you cannot

25     look outside of the courtroom and see whether it is raining, so

1    you have no direct evidence of that fact.  But on the

2    combination of the facts about the umbrella and the raincoat,

3    it would be reasonable for you to conclude that it had started

4    to rain.  That is all there is to circumstantial evidence.

5    Using your reason and experience, you infer from established

6    facts the existence or the non-existence of some other fact.

7            An inference is the deduction or conclusion that

8    reason and common sense prompt a reasonable mind to draw from

9    facts that have been proven by the evidence.  Not all logically

10   possible conclusions are legitimate or fair inferences.  An

11   inference is not a suspicion or a guess.  It is a reasoned

12   logical decision to conclude that a disputed fact exists on the

13   basis of another fact which you know exists.  In drawing

14   inferences, you should exercise your common sense.  Only those

15   inferences to which the mind is reasonably led or directed are

16   fair inferences from direct or circumstantial evidence in this

17   case.  Whether or not to draw a particular inference is, of

18   course, a matter exclusively for you to decide, as are all

19   determinations of fact.

20           Many material facts, such as state of mind, are rarely

21   susceptible of proof by direct evidence.  There is no way for

22   us to look into people's minds, so those facts are established

23   by circumstantial evidence and the inferences the jury draws

24   from them.  The law makes no distinction between direct and

25   circumstantial evidence.  Circumstantial evidence is of no less

K323SCH5                        Charge

1    value than direct evidence, and you can consider either or both

2    and give them such weight as you conclude is warranted.

3           Now a word about witness credibility.  It must be

4    clear to you now that counsel for the parties are asking you to

5    draw very different conclusions about significant factual

6    issues in this case.  An important part of your decision will

7    involve making judgments about the testimony of the witnesses

8    you have listened to and observed.  In making these judgments,

9    you should carefully scrutinize all of the testimony of each

10   witness, the circumstances under which each witness testified,

11   and any other matter in evidence that may help you decide the

12   truth and the importance of each witness's testimony.  For

13   example, was the testimony of a witness corroborated by the

14   testimony of another witness or of another exhibit or a

15   recording which was received in evidence?

16          Your decision whether or not to believe a witness may

17   depend on how the witness impressed you.  Was the witness

18   candid, frank and forthright, or did the witness seem to be

19   evasive or suspect in some way?  How did the way the witness

20   testified on direct examination compare with how the witness

21   testified on cross-examination?  Was the witness consistent or

22   contradictory?  Did the witness appear to know what he or she

23   was talking about?  Did the witness strike you as someone who

24   was trying to report his knowledge accurately?  What was the

25   witness's demeanor like?  These are examples of the kinds of

K323SCH5                    Charge

1   common sense questions you should ask yourselves in deciding

2   whether a witness is or is not truthful.

3          In addition, you may consider whether a witness had

4   any possible bias or relationship with a party or any possible

5   interest in the outcome of the case.  Such a bias,

6   relationship, or interest does not necessarily make the witness

7   unworthy of belief.  These are simply factors that you may

8   consider.

9          In making a determination of witness credibility, you

10  may consider whether the witness purposefully made a false

11  statement or whether it was an innocent mistake.  You may also

12  consider whether an inconsistency concerns an important fact or

13  merely a small detail, as well as whether the witness had an

14  explanation for the inconsistency, and if so, whether that

15  explanation appealed to your common sense.  If you find that a

16  witness has testified falsely as to any material fact, you may

17  reject the witness's testimony in its entirety or you may

18  accept those parts that you believe to be truthful or that are

19  corroborated by other independent evidence in the case.

20  Further, you may consider whether a witness has been previously

21  untruthful, including lying under oath in another proceeding,

22  in determining how much of his or her testimony, if any, you

23  wish to believe.

24         You should also consider whether the witness had an

25  opportunity to observe the facts that the witness testified

1   about, and whether the witness's recollection of the facts

2   stands up in light of the other evidence in this case.

3          In other words, what you must try to do in deciding

4   credibility is to size up a person just as you would in any

5   important matter where you are trying to decide if a person is

6   being truthful, straightforward, and accurate in his

7   recollection.

8          Now a word about the preparation of witnesses.  You

9   have heard testimony during the trial that witnesses --

10         A JUROR:  A little bit louder again, please.

11         THE COURT:  Okay.  Thank you.

12         Now a word about preparation of witnesses.  That

13  better?

14         You have heard testimony during the trial that the

15  witnesses have discussed the facts of the case and their

16  testimony with lawyers before the witnesses appeared in court.

17  You may consider that fact when you are evaluating a witness's

18  credibility.  But there is nothing either unusual or improper

19  about a witness meeting with lawyers before testifying so that

20  the witness can be aware of all of the subjects that will be

21  covered, focus on those subjects, and have the opportunity to

22  review the relevant exhibits and documents before being

23  questioned about them.  Such consultations help conserve your

24  time and the Court's time as well.  The weight you give to the

25  fact or the nature of the witness's preparation for his or her

1    testimony and what inferences you draw from such preparation

2    are matters completely within your discretion.

3            It is for you, the jury, and for you alone, not the

4    lawyers or the witnesses or me as the judge to decide the

5    credibility of witnesses who appear here and the weight that

6    their testimony deserves.  After making your own judgment or

7    assessment concerning the credibility of a witness, you can

8    then attach such importance or weight to his or her testimony,

9    if any, that you feel it deserves.  You will then be in a

10   position to decide whether the government has proved the

11   charges beyond a reasonable doubt.

12           Now this is an instruction on adverse inferences.

13   You've heard testimony from a government witness named Michael

14   who the CIA place on enforced administrative leave in

15   August 2019.  The government only disclosed this information to

16   the defendant in the course of the trial.  I instruct you that

17   the government should have disclosed the information regarding

18   Michael's enforced administrative leave to the defendant sooner

19   in time.

20           In evaluating the evidence, you can decide what

21   weight, if any, to give to the government's conduct on this

22   issue.  You may also consider whether Michael's appearance in

23   court and his testimony for the government was influenced by

24   his taking an enforced leave.

25           Law enforcement officials.  You have heard the

testimony from a number of law enforcement officials.  The

government's law enforcement witnesses do not deserve any more

or less consideration or greater or lesser weight than that of

any other witness.  In this context, it is appropriate for the

defense counsel to try to attack the credibility of such a

witness on the ground that his or her testimony may be colored

by a personal or professional interest in the outcome of the

case.

          It is up to you to accept or reject the testimony of

each law enforcement witness, and to give such witness the

weight, if any, it deserves.

          We've also heard from a number of witnesses who are

currently or were previously employed by the Central

Intelligence Agency, the CIA.  Some of these people work

directly as officers of the CIA, and some of them work as

contractors performing work for the CIA.

          I've allowed some of these witnesses to testify either

by using a made-up name, a pseudonym, or just their first name.

The disclosure of the witness's true names and what they look

like could potentially compromise their work at the CIA.

That's why those precautions were taken, but you should weigh

the testimony of those witnesses just as you would any other

witness, and not weigh it differently because they testified

using a pseudonym or used their first name only.  Moreover, you

should not consider the fact that I allowed these witnesses to

K323SCH5                    Charge

1    testify in this way as an expression of my opinion as to any of

2    the facts of this case.  Again, it is your job and your job

3    alone to decide the fats of the case.

4           Bias and hostility.  In connection with your

5    evaluation of the credibility of the witnesses, you should

6    specifically consider evidence of resentment or anger which

7    some government witnesses may have toward the defendant.

8    Evidence that a witness is biased, prejudiced, or hostile

9    toward the defendant requires you to view that witness's

10   testimony with caution, to weigh it with care, and subject it

11   to close and searching scrutiny.

12          In this case, you have heard testimony from

13   individuals who testified as experts in particular fields.  An

14   expert is someone who by education or experience has acquired

15   learning or experience in a science or a specialized area of

16   knowledge.  Here the specialized areas and corresponding

17   experts were:  WikiLeaks, that's Mr. Paul Rosenzweig; the

18   system of classifying national security materials, Mr. Mark

19   Bradley; and the forensic analysis of computers and other

20   electronic devices, Mr. Patrick Leedom and Mr. Michael Berger.

21          Your role in judging credibility applies to experts as

22   well as to other witnesses.  You should consider the expert

23   opinions that were received in evidence in this case and give

24   them as much or as little weight as you think it deserves.  If

25   you should decide that the opinion of an expert was not based

1    on sufficient education or experience or on sufficient data, or

2    if you should conclude that the trustworthiness or credibility

3    of an expert is questionable for any reason, or if the opinion

4    of the expert was outweighed in your judgment by other evidence

5    in the case, then you might disregard the opinion of the expert

6    entirely or in part.

7          If, however, you find that the opinion of the expert

8    is based on sufficient data, education and experience, and the

9    other evidence does not give you reason to doubt the expert's

10   conclusions, then you could be justified in relying on that

11   expert's testimony.

12         A word or two about the cooperating witness.  You

13   heard testimony from a witness, Carlos Betances, who testified

14   that he pled guilty to criminal conduct and is now cooperating

15   with the government.  The law permits the use of testimony from

16   a cooperating witness.  The government frequently must use such

17   testimony in criminal prosecution.  I instruct you that you are

18   to draw no conclusions or inferences of any kind about the

19   guilt of the defendant on trial from the fact that this

20   prosecution witness pled guilty to other charges.

21         Because of the possible interest a cooperating witness

22   may have in testifying, let me say a few things that you may

23   want to consider during your deliberations on the subject of

24   the cooperating witness.  Cooperating witness testimony must be

25   scrutinized with special care and caution.  The cooperating

K323SCH5                    Charge

1    witness is facing sentencing for his own crimes, and is hoping

2    for a reduced sentence.  For a cooperating witness, the

3    government decides whether or not to file a motion for a

4    reduced sentence, that is the 5K letter that was mentioned

5    here.  And the sentencing court, according to its own

6    determination, decides what sentence to ultimately impose.  It

7    does not follow, however, that simply because a person has

8    admitted participation in one or more crimes he is not capable

9    of giving a truthful version of what happened.  But the

10   cooperating witness might be motivated by reward or personal

11   gain.  Would the cooperator gain more by lying or telling the

12   truth?

13            I must caution you that it is of no concern of yours

14   why the government made an agreement with the witness.  Your

15   sole concern is to decide whether the witness has given

16   truthful testimony in this case before you.

17            A word about persons who are not on trial.  Some of

18   the people who may have been involved in the events leading up

19   to this trial are not on trial themselves.  This does not

20   matter.  You may not draw any inference, favorable or

21   unfavorable, toward the government or the defendant from the

22   fact that certain persons other than the defendant are not on

23   trial here.  Those matters are wholly outside your concern and

24   have no bearing on your function as jurors.

25            Particular investigative techniques are not required.

K323SCH5                    Charge

1   You may have heard references to the fact that certain

2   investigative techniques were used and that others were not

3   used by the government.  You may consider these facts in

4   deciding whether the government has met its burden of proof,

5   because, as I told you, you should look to all of the evidence

6   or lack of evidence in deciding whether the defendant is

7   guilty.  However, there is no legal requirement that the

8   government prove its case by any particular means, and you are

9   not to speculate as to why the government used the techniques

10  it did or why it did not use other techniques.  The government

11  is not on trial.  Law enforcement techniques are not your

12  concern.

13          Your concern is to determine whether or not, based on

14  the evidence or lack of evidence here in this case, the guilt

15  of Mr. Schulte has been proven beyond a reasonable doubt.

16          You heard some evidence from searches.  You heard

17  testimony in this case about the evidence seized in connection

18  with searches conducted by law enforcement officers, the FBI.

19  Evidence obtained from these searches was properly admitted in

20  this case and may be properly considered by you.  Whether you

21  approve or disapprove of how the evidence was obtained should

22  not enter into your deliberations, because I instruct you now

23  that the government's use of the evidence is entirely lawful.

24          You must, therefore, give this evidence full

25  consideration along with all the other evidence in the case, in

determining whether the government has proved the guilt of

Mr. Schulte beyond a reasonable doubt.

Redaction of evidentiary items.  We have, among the

exhibits received in evidence, some documents that are

redacted.  "Redacted" means that part of the document was taken

out.  You are to concern yourself only with the part of the

item that has been admitted into evidence.  You should not

consider any possible reason why the other parts have been

deleted.

Charts and summaries.  During the trial there were

charts and summaries shown to you.  These charts and summaries

were shown to you in order to make the other evidence more

meaningful and to aid you in considering the evidence.  They

are no better than the testimony or the documents upon which

they are based, and are not themselves independent evidence.

Therefore, you are to give no greater consideration to these

schedules or summaries than you would give to the evidence upon

which they are based.

It is for you to decide whether the charts, schedules

or summaries correctly present the information contained in the

testimony and in the exhibits on which they were based.  You

are entitled to consider the charts, schedules and summaries if

you find that they are of assistance to you in analyzing and

understanding the evidence.

Stipulations.  You have heard evidence in the form of

K323SCH5                    Charge

stipulations of testimony and stipulations of evidence read to

you from GX 3002, GX 3003, GX 3004, GX 3005, and Defense

Exhibit O.  A stipulation of testimony is an agreement among

the parties that, if called as a witness, the person would give

certain testimony.  You must accept as true the fact that the

witness would have given that testimony.  It is for you,

however, to determine the effect to be given to that testimony.

          You've also heard evidence the form of stipulations of

fact.  The stipulation of fact is an agreement among the

parties that a certain fact is true.  You should regard such

agreed facts as true.  It is for you to determine the effect to

be given to any stipulated fact.

          All the available evidence need not be introduced.

The law does not require any party to call as a witness all

persons who may have been present at any time or place involved

in the case, or who may appear to have some knowledge of the

matter in issue at this trial.  Nor does the law require any

party to the produce as exhibits all relevant papers and things

available to either party during the trial.  During summations

we learned there were over 18 or 19 witnesses who testified,

and thousands of documents.  You have to base your decision

based on what has been submitted in evidence.

          With regard to motive.  Proof of motive is not a

necessary element of the crimes for which the defendant is

charged.  Proof of motive does not establish guilt nor does a

K323SCH5                    Charge

1    lack of proof of motive establish that a defendant is not

2    guilty.  If the guilt of a defendant is shown beyond a

3    reasonable doubt, it is immaterial what the motive for the

4    crime may be or whether any motive is shown.  But the presence

5    or absence of motive is a circumstance that you may consider as

6    bearing on the intent or actions of the defendant.

7              The theory of the defense.  The defense contends that

8    Mr. Schulte did not improperly gather, steal, disclose or

9    attempt to disclose national defense information.  Nor did he

10   knowingly or intentionally exceed his authorized access to any

11   CIA computer system or files.  The defense further contends

12   that Mr. Schulte did not obstruct justice or willfully make any

13   material false statements to the FBI.  Finally, Mr. Schulte

14   maintains that he did not willfully violate any court order.

15             If the government fails to prove the defendant's guilt

16   beyond a reasonable doubt, you must acquit Mr. Schulte.

17             Mr. Schulte did not testify in this case.  Under our

18   Constitution, the defendant has no obligation to testify or to

19   present any evidence, because it is the government's burden to

20   prove the defendant guilty beyond a reasonable doubt.  The

21   right of a defendant not to testify is an important part of our

22   Constitution.

23             As I stated earlier, the government's burden to prove

24   the defendant guilty remains with the prosecution throughout

25   the entire trial and never shifts to Mr. Schulte.  He is never

K323SCH5                    Charge

1    required to prove that he is innocent.

2              You may not speculate as to why Mr. Schulte did not

3    testify.  There are many reasons why a defendant may decide not

4    to testify.  You are not to attach any significance to the fact

5    that Mr. Schulte did not testify.  No adverse inference against

6    him may be drawn by you because he did not take the witness

7    stand.  You may not consider this against Mr. Schulte in any

8    way in your deliberations in the jury room.

9              That takes care of the evidentiary portion of the jury

10   charge.  Now I'm going to turn to the substantive law.

11             The defendant, Joshua Schulte, has been charged in a

12   10-count indictment.  The indictment in this case is not

13   evidence, as I've already told you.  It merely describes the

14   charges made against the defendant.  It is a set of

15   accusations.  It may not be considered by you as evidence of

16   the guilt of Mr. Schulte.  Only the evidence or lack of

17   evidence decides that issue.

18             The indictment charges that in or about 2016, the

19   defendant allegedly took national defense information from the

20   CIA computer systems without authorization and transmitted that

21   information to WikiLeaks, which posted the information online

22   in 2017.  Specifically this is Counts One, Two, Four, Five, Six

23   and Seven.  Those charges, the WikiLeaks charges, account for

24   six of the counts in the indictment.  The indictment further

25   charges Mr. Schulte with one count, Count Three, of unlawful

1   disclosure and attempted disclosure of national defense

2   information while he was in the Metropolitan Correctional

3   Center, or MCC, a federal detention center.  Finally, the

4   indictment charges Mr. Schulte with two counts, Counts Eight

5   and Nine, relating to false statements he allegedly made to the

6   FBI during its investigation.  And one count, Count 10, related

7   to his alleged violation of a protective order entered by this

8   Court in 2017.  The government must prove all these charges in

9   the indictment beyond a reasonable doubt.

10          You will note that the indictment alleges that certain

11   acts occurred on or about various dates.  I instruct you that

12   it does not matter if the indictment charges that a specific

13   act occurred on or about a certain date or month and the

14   evidence indicates that in fact it was on another date.  The

15   law requires only a substantial similarity between the dates

16   alleged in the indictment and the dates established by the

17   evidence.

18          Count One charges illegal gathering of national

19   defense information.  Count One charges the defendant, in or

20   about 2016, with the illegal gathering of national defense

21   information in violation of Title 18, United States Code,

22   Section 793(b).  In order to convict the defendant of Count

23   One, the government must prove each of the following three

24   elements beyond a reasonable doubt:

25          First, that in or about 2016, the defendant copied,

K323SCH5                    Charge

took, made, or obtained a document, writing, or note, to wit,

the defendant took information maintained by an intelligence

agency of the United States.

Second, that the information was connected to the

national defense.

Third, that the defendant acted with the purpose of

obtaining information respecting the national defense and with

the intent or with the reason to believe that the information

was to be used to the injury of the United States or used to

the advantage of a foreign country.

The first element of Count One is taking information.

The first element of the offense that the government must prove

beyond a reasonable doubt is that the defendant copied, took,

made or obtained document, writing or note, to wit, the

defendant took information maintained by an intelligence agency

of the United States as charged in the indictment.

The second element is the national defense

information.  The second element of the offense that the

government must prove beyond a reasonable doubt is that the

information that the defendant is charged with taking is

connected with the national defense of the United States.

You must determine whether the information is directly

and reasonably connected with the national defense.  The term

"national defense" is a broad term that refers to the United

States military and naval establishments, intelligence, and to

K323SCH5                        Charge

1    all related activities of national preparedness.

2            To qualify as national defense information, the

3    government must prove that the material is closely held by the

4    United States government.  Where the information has been made

5    public by the United States government and is found in sources

6    lawfully available to the general public, it is not closely

7    held.  Similarly, where sources of information are lawfully

8    available to the public at the time of the claimed violation

9    and the United States has made no effort to guard such

10   information, the information itself is not closely held.  Only

11   information relating to our national defense that is not

12   lawfully available to the public at the time of the claimed

13   violation falls within the prohibition of this section.

14           In determining whether material is closely held, you

15   may consider whether it has been classified by appropriate

16   authorities and whether it remained classified on the dates

17   pertinent to the indictment.  Although you may consider whether

18   information has been classified in determining whether it has

19   been closely held, I caution you that the mere fact that

20   information is classified does not mean that information

21   qualifies as national defense information.  Whether the

22   information is connected with the national defense is a

23   question of fact that you, the jury, must determine following

24   the instructions that I have given you about what those terms

25   mean.

K323SCH5                    Charge

```
 1         The third element in Count One is knowledge and
 2    intent.   The third element of the offense that the government
 3    must establish beyond a reasonable doubt is that the defendant
 4    acted for purpose of obtaining information respecting the
 5    national defense.   The government must also prove beyond a
 6    reasonable doubt that the government acted with intent or with
 7    reason to believe that the information was to be used to the
 8    injury of the United States, or used to the advantage of a
 9    foreign country.   The government is required to prove that the
10    defendant acted with criminal intent, that is, he acted in bad
11    faith, and with a deliberate purpose either to disregard or
12    disobey the law.   In considering whether or not the defendant
13    had the intent or reason to believe that the information would
14    be used to the injury of the United States or to provide an
15    advantage to a foreign country, you may consider the nature of
16    the documents or the information involved.   I emphasize that to
17    convict the defendant of Count One, you must find that the
18    defendant had the intent or reason to believe that the
19    information would be used against the United States, not just
20    that it could be used.   The government --
21         MS. SHROFF:   Your Honor, I'm sorry to interrupt, but I
22    think the jury is having trouble hearing you again.
23         THE COURT:   Who's having trouble?   How is this?
24    Better, much better?   Okay.
25         The government does not have to prove that the intent
```

1    was both to injure the United States and to provide an

2    advantage to a foreign country.  The statute reads in the

3    alternative.  Further, the country to whose advantage the

4    information would be used need not necessarily be an enemy of

5    the United States.  The statute does not distinguish between

6    friend and enemy.

7           If you find beyond a reasonable doubt, therefore, that

8    the defendant acted with the intent or with the reason to

9    believe that the information would be used to injure the United

10   States or to provide an advantage to a foreign country, the

11   third element is satisfied.

12          Count Two.  Elements.  The illegal transmission of

13   unlawfully possessed national defense information.

14          Count Two charges the defendant, in or about 2016,

15   with unauthorized possession of information relating to

16   national defense and transmitting it to persons not entitled to

17   receive it in violation of 18 U.S. Code Section 793(e).  In

18   order to establish a violation of Section 793(e), the

19   government must prove each of the following four elements

20   beyond a reasonable doubt:

21          First, that in or about 2016, the defendant had

22   unauthorized possession of, access to, or control over the

23   document or information in question;

24          Second, that the defendant or information in question

25   was related to the national defense;

1    Third, that the defendant had reason to believe that

2    the document or information could be used to the injury of the

3    United States or to the advantage of a foreign nation; and

4    Fourth, that in or about 2016, the defendant willfully

5    communicated or delivered or transmitted or caused to be

6    communicated, delivered or transmitted the document or

7    information to a person who was not entitled to receive it.

8    Count Two, the first element dealing with possession.

9    The first element of Count Two that the government must prove

10   beyond a reasonable doubt is that the defendant had

11   unauthorized possession of or control over or access to the

12   document or information in question.

13   The word "possession" is a commonly used and commonly

14   understood word.  Basically it means the act of having or

15   holding property or the detention of property in one's power or

16   command.  Possession may mean actual physical possession or

17   constructive possession.  A person has constructive possession

18   of something if he knows where it is and can get it any time he

19   wants or otherwise can exercise control over it.  A person has

20   unauthorized possession of something if he is not entitled to

21   have it.

22   Count two, second element, the national defense

23   information.  The second element of Count Two that the

24   government must prove beyond a reasonable doubt is that the

25   document or information in question was connected with the

K323SCH5                    Charge

1    national defense of the United States.

2              I previously instructed you regarding the meaning of

3    national defense in Count One.  Those instructions apply here

4    as well.

5              Count two, the third element, prejudice to the United

6    States.  The third element of Count Two that the government

7    must prove beyond a reasonable doubt is that the defendant had

8    reason to believe that the information could be used to the

9    injury of the United States or to the advantage of a foreign

10   nation.

11             As instructed with Count One, with respect to reason

12   to believe, you may consider the nature of the documents or

13   information involved.  For this count, unlike Count One, you

14   need not determine that the defendant had reason to believe

15   that the information would be used against the United States,

16   only that it could be used.

17             The fourth element deals with willfully delivered

18   information.  The fourth element of Count Two that the

19   government must establish beyond a reasonable doubt is that the

20   defendant willfully communicated or transmitted the document in

21   question to a person not entitled to receive it.

22             In deciding whether a person was entitled to receive

23   information, you may consider all the evidence introduced at

24   the trial, including any evidence concerning the classification

25   status of the document or testimony concerning limitations on

K323SCH5                    Charge

1    access to the document.

2            An act is done willfully if it is done voluntarily and

3    intentionally and with the specific intent to do something the

4    law forbids, that is to say, with a bad purpose either to

5    disobey or disregard the law.

6            The government not need prove that the defendant

7    actually delivered the information himself -- it is enough to

8    prove that he caused the act to be done.

9            I remind you now, and will remind you again, that it

10   is the government's burden to establish each element of each of

11   these counts beyond a reasonable doubt.  The government must

12   prove each element of each count beyond a reasonable doubt.  If

13   you find the government has not proved each of the elements of

14   a count beyond a reasonable doubt, you must acquit the

15   defendant on that count.  Also, proof of guilt on one count

16   does not establish proof of guilt on any other count.  You must

17   consider each count and each element of each count

18   individually.

19           Count Three deals with illegal transmission and

20   attempted transmission of unlawfully possessed national defense

21   information.  Count Three charges that from at least in or

22   about December 2017, up to and including at least in or about

23   October 2018, the defendant having unauthorized possession of,

24   access to, or control over information relating to national

25   defense, willfully transmitted or communicated and attempted to

K323SCH5                      Charge

1    transmit or communicate information to persons not entitled to

2    receive it in violation of 18, United States Code, Section

3    793(e).

4            In order to establish a violation of Section 793(e),

5    the government must prove each of the following four elements

6    beyond a reasonable doubt:

7            First, that the defendant had unauthorized possession

8    of or access to or control over the document, writing, note or

9    information in question;

10           Second, that the document, writing, note or

11   information was related to the national defense;

12           Third, that the defendant had reason to believe that

13   the document, writing, note or information could be used to the

14   injury of the United States or to the advantage of a foreign

15   nation; and

16           Fourth, that the defendant willfully communicated,

17   delivered, transmitted, or caused to be communicated,

18   delivered, transmitted, or attempted to communicate, deliver,

19   transmit, or cause to be communicated, delivered, or

20   transmitted the same to a person not entitled to receive it.

21           Count Three.  The first element deals with possession.

22   The first element of Count Three that the government must prove

23   beyond a reasonable doubt is that the defendant had

24   unauthorized possession of, access to, or control over the

25   document, writing, note or information in question.

K323SCH5                    Charge

1          I have already instructed you on the meaning of the

2    word "possession" in connection with Count Two.  That

3    instruction applies here.

4          As instructed on Count Two, a person has unauthorized

5    possession of something if he is not entitled to have it.

6          The second element in Count Three is the national

7    defense information.  The second element of Count Three that

8    the government must prove beyond a reasonable doubt is that the

9    document, writing, note or information in question was

10   connected with the national defense of the United States.

11         You are reminded that you must determine whether the

12   information is directly and reasonably connected with the

13   national defense as I instructed you in Count One.

14         The third element deals with prejudice to the United

15   States.  The third element of Count Three that the government

16   must establish beyond a reasonable doubt is that the defendant

17   had reason to believe that the document, writing, note or

18   information could be used to the injury of the United States or

19   to the advantage of a foreign nation.

20         Count Three, the fourth element deals with willfully

21   delivered information.  The fourth element of Count Three that

22   the government must establish beyond a reasonable doubt is that

23   the defendant willfully communicated or transmitted the

24   document, writing, note or information in question to a person

25   not entitled to receive it.

K323SCH5                    Charge

1       In deciding whether a person was entitled to receive

2   the document or information, you may consider all the evidence

3   introduced at trial, including any evidence concerning the

4   classification status of the document or testimony concerning

5   limitations on the access to the document.

6       An act is done willfully if it is done voluntarily and

7   intentionally and with the specific intent to do something the

8   law forbids, that is to say, with a bad purpose either to

9   disobey or disregard the law.

10      For this count, the government not need prove that the

11  defendant actually delivered or transmitted the information.

12  It is enough to prove that the defendant merely attempted to do

13  so.  Further, the government need not prove that the defendant

14  did the act himself.  It is enough to prove that he caused the

15  act to be done.

16      Count Three also has an attempt charge.  Now, with

17  regard to Count Three, illegal transmission of national defense

18  information, in or about 2017, up to and including at least in

19  or about October 2018, if you find that the government has

20  proved the elements of this crime as I have described it, you

21  should find the defendant guilty on this count.  However, with

22  respect to Count Three only, even if you find that the

23  government has not proved beyond a reasonable doubt that the

24  defendant illegally transmitted national defense information,

25  you may find the defendant guilty of Count Three if you find

K323SCH5                          Charge

1    that the government has proven beyond a reasonable doubt that

2    the defendant attempted to illegally transmit national defense

3    information.

4            To prove the charge of attempted illegal transmission

5    of national defense information, the government must prove each

6    of the following two elements beyond a reasonable doubt:

7            First, the defendant intended to commit the crime of

8    illegally transmitting national defense information; and

9            Second, the defendant did some act that was a

10   substantial step in an effort to bring about or accomplish the

11   crime.

12           Mere intention to commit a specific crime does not

13   amount to an attempted crime.  In order to convict the

14   defendant of an attempt to illegally transmit national defense

15   information, you must find beyond a reasonable doubt that he

16   intended to commit the crime charged, and that he took some

17   action which was a substantial step toward the commission of

18   that crime.

19           In determining whether the defendant's actions

20   amounted to a substantial step toward the commission of the

21   crime, it is necessary to distinguish between mere preparation

22   on the one hand, and the actual doing of the criminal deed on

23   the other.  Mere preparation, which may consist of planning the

24   offense or of devising, obtaining or arranging a means for its

25   commission is not an attempt, although some preparation may

K323SCH5                    Charge

1    amount to an attempt.  The acts of a person who intends to

2    commit a crime will constitute an attempt when the acts

3    themselves clearly indicate an intent to commit the crime, and

4    the acts are a substantial step in the course of the conduct

5    planned to culminate in the commission of the crime.

6          Count Four, unauthorized access to computer to obtain

7    classified information.  Count Four charges that in or about

8    2016, the defendant knowingly accessed a computer and exceeded

9    his authorized access in order to obtain protected or

10   restricted information in violation of Title 18, United States

11   Code, Section 1030(a)(1).  In order to convict the defendant of

12   Count Four, the government must establish each of the following

13   four elements beyond a reasonable doubt:

14         First, the defendant accessed a computer with

15   authorization, but exceeded his authority in accessing the

16   information in question;

17         Second, that the defendant knowingly accessed the

18   computer;

19         Third, that the defendant obtained information

20   protected against unauthorized disclosure for reasons of

21   national defense or foreign relations, and that the defendant

22   had reason to believe that the information could be used

23   against the interests of the United States or to the advantage

24   of a foreign nation; and

25         Fourth, that the defendant willfully communicated,

1    delivered, transmitted, or caused to be communicated,

2    delivered, or transmitted, or attempted to communicate,

3    deliver, or transmit the information to a person who was not

4    entitled to receive it.

5          Now the first element in Count Four is unauthorized

6    access.  The first element that the government must prove

7    beyond a reasonable doubt is that the defendant accessed a

8    computer with authorization, but exceeded his authority in

9    accessing the information in question.

10         As defined in the statute, a computer means an

11   electronic, magnetic, optical, electromechanical, or other high

12   speed data processing device performing logical, arithmetic, or

13   storage functions, and includes any data storage facility or

14   communications facility directly related to or operating in

15   conjunction with such device.  The term "computer" does not

16   include an automated typewriter or typesetter, a portable

17   handheld calculator, or other similar devices.

18         In this case, the government charges that the

19   defendant, while authorized to access the computer, exceeded

20   his authority in accessing the information in question, here

21   the Altabackups.  This requires the government to prove beyond

22   a reasonable doubt that the defendant had access to the

23   computer, and used that access to obtain or alter information

24   in the computer that the defendant was not entitled to obtain

25   or alter.

K323SCH5                        Charge

1        An individual does not exceed authorized access when

2   he accesses a computer to obtain information that he is

3   authorized to access, even if he does so for an improper

4   purpose.

5        The second element in Count Four is knowledge.  The

6   second element that the government must prove beyond a

7   reasonable doubt is that the defendant acted knowingly in

8   accessing the computer outside the scope of his authority.

9        "Knowingly" means to act voluntarily and deliberately,

10  rather than mistakenly or inadvertently.  The question of

11  whether a person acted knowingly is a question of fact for you

12  to determine, like any other fact question.  The question

13  involves one's state of mind.

14        Direct proof of knowledge is almost never available.

15  It would be a rare case when it would be shown that a person

16  wrote or stated that as of a given time in the past, he

17  committed an act with knowledge.  Such proof is not required.

18  The ultimate fact of knowledge, though subjective, may be

19  established by circumstantial evidence, based upon a person's

20  outward manifestations, his words, his conduct, his acts and

21  all the surrounding circumstances disclosed by the evidence and

22  the rational or logical inferences that may be drawn from them.

23        Circumstantial evidence, if believed, is of no less

24  value than direct evidence.  In either case, the essential

25  elements of the crime charged must be established beyond a

K323SCH5                    Charge

reasonable doubt.

As a practical matter then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his accessing of a computer was outside the scope of the authorization granted.

The government can also meet its burden of showing that the defendant had actual knowledge of the accessing of a computer without authorization if it establishes beyond a reasonable doubt that he acted with deliberate disregard of whether he was so authorized.  Alternatively, the government may satisfy its burden of proving knowledge by establishing beyond a reasonable doubt that the government acted with an awareness of the high probability that he was acting without authorization, unless the defendant actually believed that he had authorization to access a computer in the manner described in the indictment.  This guilty knowledge, however, cannot be established by demonstrating that the defendant was merely negligent or foolish.

To conclude on this element, if you find that the defendant did not know he was acting without authorization, then you should find the defendant not guilty.

Count Four.  The third element deals with protected information.

The third element that the government must prove beyond a reasonable doubt is that the defendant obtained

1    information protected against unauthorized disclosure for

2    reasons of national defense or foreign relations.

3           The United States may determine that information

4    requires protection against unauthorized disclosure for reasons

5    of national defense or foreign relations either by Executive

6    Order or by statute.

7           This element requires that at the time he obtained the

8    protected information, the defendant must have had reason to

9    believe that the information could be used against the

10   interests of the United States or to the advantage of a foreign

11   nation.

12          The fourth element in Count Four deals with willful

13   communication.  The fourth element of Count Four that the

14   government must establish beyond a reasonable doubt is that the

15   defendant willfully communicated, delivered, transmitted or

16   caused to be communicated, delivered, or transmitted or

17   attempted to communicate, deliver, or transmit the protected

18   information obtained to a person who was not entitled to

19   receive it.  To act willfully means to act knowingly and

20   purposefully, with an intent to do something the law forbids,

21   that is to say, with a bad purpose either to disobey or

22   disregard the law.

23          Count Five deals with the theft of government

24   property.  Count Five charges the defendant with theft of

25   government property in or about 2016 in violation of Title 18,

K323SCH5                      Charge

United States Code, Section 641.  In order to convict the
defendant of Count Five, the government must prove each of the
following four elements beyond a reasonable doubt:

          First, that the property described in the indictment
belonged to the United States government;

          Second, that the defendant stole, embezzled or
knowingly converted that property;

          Third, that the defendant acted knowingly and
willfully with the intent to deprive the government of the
United States of the use and benefit of the property; and

          Fourth, that the value of the property was greater
than $1,000.

          The first element here of Count Five is the property
of the United States.  The first element the government must
prove beyond a reasonable doubt is that the property described
in the indictment belonged to the United States government.

          To satisfy this element, the government must prove
that the information contained in the Altabackups allegedly
stolen was a thing of value to the United States.  That means
that at the time the property was allegedly stolen, embezzled,
or knowingly converted, the United States government or an
agency of the United States government had either title to,
possession of, or control over the property.

          The second element that the government must prove
beyond a reasonable doubt is that the defendant stole,

1    embezzled, or knowingly converted the property.  To steal

2    property means to take someone else's property without the

3    owner's consent and with the intent to deprive the owner of the

4    value of that property.

5         To embezzle property means to voluntarily and

6    intentionally take or convert to one's own use money or

7    property of another after that money or property lawfully came

8    into the possession of the person taking it by virtue of some

9    office, employment or position of trust.

10        To knowingly convert property means to use the

11   property in an unauthorized manner in a way that seriously

12   interfered with the government's right to use and to control

13   its own property, knowing that the property belong to the

14   United States and knowing that such use was unauthorized.

15        The third element of Count Five deals with intent.

16   The third element of the government must prove beyond a

17   reasonable doubt is that the defendant acted knowingly and

18   willfully with the intent to deprive the government of the use

19   and benefit of its property.

20        To act knowingly means to act intentionally and

21   voluntarily and not because of ignorance, mistake, accident or

22   carelessness.  To act willfully means to act with knowledge

23   that one's conduct is unlawful and with the intent to do

24   something the law forbids, that is to say, with a bad purpose

25   or to disobey or disregard the law.  Whether the defendant

1   acted knowingly and willfully may be proved by the defendant's

2   conduct and by all the circumstances surrounding the case.

3          Count Five, the fourth element, the value of the

4   property.  The fourth and final element that the government

5   must prove beyond a reasonable doubt is that the value of the

6   property stolen, embezzled, or knowingly converted was greater

7   than $1,000.  The word "value" means face, par or market value,

8   or cost price, either wholesale or retail, whichever is

9   greater.  "Market value" means the price a willing buyer would

10  pay a willing seller at the time the property was stolen.  In

11  determining the value of the property stolen, you may consider

12  the aggregate or total value of the property referred to in the

13  indictment.  If you find that the aggregate value is $1,000 or

14  less, then you must find the defendant not guilty.  On the

15  other hand.  If you find the aggregate value to be greater than

16  $1,000, then this element is satisfied.

17         I remind you again, it is the government's burden to

18  establish every element of each of these counts beyond a

19  reasonable doubt.  The government must prove each element of

20  each count beyond a reasonable doubt.  If you find the

21  government has not proved each of the elements of a count

22  beyond a reasonable doubt, you must acquit the defendant on

23  that count.  Also, proof of guilt on one count does not

24  establish proof of guilt on another count.  You must consider

25  each count, and each element of each count, on its own.

K32Wsch6                    Charge

1         THE COURT:  Now, Count Six deals with unauthorized

2   access to a computer to obtain information from a department or

3   agency of the United States.

4         Count Six charges the defendant, in or about 2016,

5   intentionally accessed a computer and exceeded his authorized

6   access in order to obtain information from a department or

7   agency of the United States government, in violation of Title

8   18, United States Code Section 1030(a)(2)(B).  In order to

9   prove the defendant guilty of Count Six, the government must

10   prove each of the following three elements beyond a reasonable

11   doubt:

12         First, that the defendant accessed a computer with

13   authorization, but exceeded his authority in accessing the

14   information in question;

15         Second, that the defendant acted intentionally; and

16         Third, that the defendant obtained information from

17   any department or agency of the United States.

18         The first element deals with unauthorized access.

19         The first element that the government must prove

20   beyond a reasonable doubt is that the defendant accessed a

21   computer with authorization, but exceeded his authority in

22   accessing the information in question.

23         I have already instructed you with regard to the

24   definition of a "computer" in Count Four.  That same definition

25   applies here.

K32Wsch6                    Charge

1          In this case, the government charges that the

2     defendant, while authorized to access the computer, exceeded

3     his authority in accessing the information in question.  This

4     requires the government to prove beyond a reasonable doubt that

5     the defendant had access to the computer, and used that access

6     to obtain or alter the information in the computer that the

7     defendant was not entitled to obtain or alter.

8          An individual does not exceed authorized access when

9     he accesses a computer to obtain information that he is

10    authorized to access -- even if he does so for an improper

11    purpose.

12         The second element in Count Six deals with intentional

13    conduct.

14         The second element that the government must prove

15    beyond a reasonable doubt is that the defendant acted

16    intentionally in accessing a computer either without

17    authorization or outside the scope of authority.

18    "Intentionally" means to act deliberately and purposefully.

19    That is, the defendant's acts must have been the product of the

20    defendant's conscious objective, rather than the product of a

21    mistake or accident.  The question of whether a person acted

22    intentionally is a question of fact for you to determine, like

23    any other fact question.  The question involves one's state of

24    mind.  As I told you, direct proof of intent is almost never

25    available.  It would be a rare case when it could be shown that

a person wrote or stated that as of a given time in the past he

committed an act intentionally.  Such proof is not required.

The ultimate fact of intent, though subjective, may be

established by circumstantial evidence, based upon a person's

outward manifestations, his words, his conduct, his acts and

all the surrounding circumstances disclosed by the evidence and

the rational or logical inferences that may be drawn from them.

As a practical matter, then, in order to prove Count

Six, the government must establish beyond a reasonable doubt

that the defendant knew that his accessing of a computer was

unauthorized or that he knew that his accessing of a computer

was outside the scope of authority granted, but did so

anywhere.  To conclude on this element, if you find that the

defendant did not know he was acting without authority or

outside the scope of his authority, or if he did not

intentionally access the computer, then you should acquit the

defendant.

Count Six:  Third element -- U.S. government

information.

The third element that the government must prove

beyond a reasonable doubt is that the defendant obtained

information contained in a computer of any department or agency

of the United States.  The CIA is a department or agency of the

United States.  However, it is for you to determine if the

government has proven that, without authorization, the

1   defendant obtained information contained in a computer of the

2   CIA.

3          Count Seven:  Elements -- causing transmission of a

4   harmful computer program, information, code or command.

5          Count Seven charges the defendant, from at least in or

6   about March 2016, up to and including at least in or about June

7   2016, with causing the transmission of a harmful computer

8   program, information, code or command, in violation of Title

9   18, United States Code, Section 1030(a)(5)(A).  In order to

10  prove the defendant guilty of Count Seven, the government must

11  prove each of the following four elements beyond a reasonable

12  doubt;

13         First, that the defendant knowingly caused the

14  unauthorized transmission of a program, information, code or

15  command to a protected computer;

16         Second, that the defendant caused the transmission of

17  the program, information, code or command with the intent of

18  damaging or denying services to a computer or computer system;

19         Third, that the defendant thereby caused damage, as I

20  will define the term for you; and

21         Fourth, that the defendant's actions resulted in

22  damage to a computer system operated by the CIA.

23         The first element of Count Seven is unauthorized

24  access of a computer system.

25         The first element the government must prove beyond a

K32Wsch6                          Charge

1    reasonable doubt is that the defendant knowingly caused the

2    unauthorized transmission of a program, information, code or

3    command to a protected computer.

4             This element requires that the government prove that

5    the defendant's transmission of the computer program,

6    information, code or command was unauthorized.  Under the

7    statute, this means that the transmission occurred without the

8    permission of the person or entity who owns or is responsible

9    for the computer receiving the transmitted program,

10   information, code or command with.  I have instructed you on

11   the definition of a computer in Count Four, and you should

12   apply that definition here.

13            This element also requires that the government prove

14   that the defendant transmitted the program, information, code

15   or command knowingly.  A person acts knowingly if he acts

16   intentionally and voluntarily, and not because of ignorance,

17   mistake, accident or carelessness.  However, whether the

18   defendant acted knowingly may be proved by the defendant's

19   conduct and by all of the facts and circumstances surrounding

20   the case.

21            Finally, this element requires that the government

22   prove that the defendant transmitted the program, information,

23   code or command to a "protected computer."  As relevant to this

24   case, this means that the government must prove that the

25   computer was exclusively for the use of the United States

K32Wsch6                        Charge

government.

The second element of Count Seven is intent to cause damage.

The second element that the government must prove beyond a reasonable doubt is that the defendant caused the transmission of the program, information, code or command with the intent to cause damage, as I will define that term for you.

To act with "intent" means to act deliberately and purposefully. That is, the defendant's acts must have been the product of the defendant's conscious objective, rather than the product of a mistake or accident.

As a practical matter, then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that the defendant transmitted the computer program, information, code or command for the purpose of causing damage.

The third element is causing damage.

The third element the government must prove beyond a reasonable doubt is that by transmitting the program, information, code or command, the defendant caused damage.

As defined in the statute, "damage" means any impairment to the integrity or availability of data, a program, a system or information.

The fourth element in Count Seven deals with harmful consequences.

K32Wsch6                        Charge

1           The fourth element that the government must prove

2      beyond a reasonable doubt is that the defendant's actions

3      disrupted a computer system used by or for any government

4      agency in furtherance of the administration of justice,

5      national defense or national security.

6           Count Eight:  Making false statements.

7           In Count Eight, the defendant is charged with

8      knowingly and willfully making false statements to the FBI,

9      including statements such as (1) denied having any involvement

10     in leaking the classified information; (2) stated that he had

11     never worked on Brutal Kangaroo outside the CIA; (3) stated

12     that he had never removed any classified information from the

13     CIA and took it home.  In order to prove the defendant guilty

14     of Count Eight, the government must establish each of the

15     following five elements beyond a reasonable doubt:

16          First, from at least in or about March 2017, up to and

17     including at least in or about November 2017, the defendant

18     made a statement or representation;

19          Second, that this statement or representation was

20     material;

21          Third, the statement or representation was false,

22     fictitious or fraudulent;

23          Fourth, the false, fictitious or fraudulent statement

24     was made knowingly and willfully; and

25          Fifth, the statement or representation was made in a

K32Wsch6                    Charge

1   matter within the jurisdiction of the government of the United

2   States.

3           The first element is statement or representation.

4           The first element that the government must prove

5   beyond a reasonable doubt is that the defendant made a

6   statement or representation to the FBI.  There's no distinction

7   between written and oral statements.

8           The second element is materiality.

9           The second element that the government must prove

10  beyond a reasonable doubt is that the defendant's statement or

11  representation was material.

12          A fact is material if it was capable of influencing

13  the government's decisions or activities.  However, proof of

14  actual reliance on the statement by the government is not

15  required.

16          The third element is false, fictitious or fraudulent

17  statements.

18          The third element that the government must prove

19  beyond a reasonable doubt is that the statement or

20  representation was false, fictitious or fraudulent.  A

21  statement or representation is "false" or "fictitious" if it

22  was untrue when made, and known at the time to be untrue by the

23  person making it or causing it to be made.  A statement or

24  representation is "fraudulent" if it was untrue when made and

25  was made or caused to be made with the intent to deceive the

1   government agency to which it was submitted.

2           The fourth element in Count Eight is knowingly and

3   willfully.

4           The fourth element that the government must prove

5   beyond a reasonable doubt is that the defendant acted knowingly

6   and willfully.  An act is done knowingly and it is done

7   purposefully and voluntarily, as opposed to mistakenly or

8   accidentally.  An act is done willfully if it is done with the

9   intention of doing so the law forbids; that is, with a bad

10  purpose to disobey the law.

11          The fifth element is jurisdiction of the United States

12  government.

13          The fifth element of Count Eight is that the statement

14  or representation be made with regard to a matter within the

15  jurisdiction of the government of the United States.  The FBI

16  is a department of the United States government.

17          To be within the jurisdiction of a department or

18  agency of the United States government means that the statement

19  must concern an authorized function of that department or

20  agency.  In this regard, it is not necessary for the government

21  to prove that the defendant had actual knowledge that the false

22  statement was to be used in a matter that was within the

23  jurisdiction of the United States government.  It is sufficient

24  to satisfy this element if you find that the false statement

25  was made with regard to a matter within the jurisdiction of the

K32Wsch6                         Charge

United States government.

　　　　I remind you again it is the government's burden to
establish every element of each of these counts beyond a
reasonable doubt.  The government must prove each element of
each count beyond a reasonable doubt.  If you find that the
government has not proved each element of a count beyond a
reasonable doubt, you must acquit the defendant on that count.
Also, proof of guilt on one count does not establish proof of
guilt on another count.  You must consider each count, and each
element of each count, individually.

　　　　Count Nine deals with obstruction of justice.

　　　　Count Nine charges the defendant with obstruction of
justice.  I have instructed you about the statements allegedly
made by the defendant in Count Eight.  That instruction applies
here as well.

　　　　In order to prove the defendant guilty of Count Nine,
the government must prove each of the following three elements
beyond a reasonable doubt:

　　　　First, from in or about March 2017, up to and
including at least in or about November 2017, there was a
proceeding pending before a federal court or grand jury;

　　　　Second, that the defendant knew of the proceeding; and

　　　　Third, that the defendant corruptly acted to obstruct
or impede, or endeavored to obstruct or impede, the proceeding.

1        For the first element, there's got to be a pending

2   proceeding.

3        The first element that the government must prove

4   beyond a reasonable doubt is that in or about March 2017

5   through November 2017, the date set forth in the indictment,

6   there was a proceeding pending before a federal grand jury;

7        The second element that the government must prove

8   beyond a reasonable doubt is that the defendant knew that such

9   a proceeding was in progress.  In order to satisfy this

10  element, you need only determine that the defendant knew on or

11  about the date charged that a grand jury proceeding was in

12  progress.

13        The third element is acted to obstruct or impede.

14        The third element that the government must prove

15  beyond a reasonable doubt is that the defendant did corruptly

16  obstruct or impede, or corruptly endeavored to obstruct or

17  impede, the proceeding.

18        The word "corruptly" simply means having the improper

19  motive or purpose of obstructing justice.

20        Success of the endeavor is not an element of the

21  crime.  The term "endeavor" is designed to reach all conduct

22  that is aimed at influencing, intimidating and impeding the

23  jurors or judges or officers.  Thus, it is sufficient to

24  satisfy this element if you find that the defendant knowingly

25  acted in a way that obstructed or had the natural and probable

1    effect of obstructing justice from being duly administered.

2            Count Ten deals with contempt of court.

3            Count Ten charges the defendant, from at least in or

4    about April 2018, up to and including at least in or about

5    October 2018, with contempt of court.  In order to sustain its

6    burden of proving the charge of contempt, the government must

7    establish beyond a reasonable doubt each of the following three

8    elements:

9            First, that the Court issued a protective order that

10   applied to the defendant;

11           Second, that the defendant disobeyed or disregarded

12   that order; and

13           Third, that the defendant acted willfully and

14   knowingly in disobeying the Court's order.

15           The first element is specific court order.

16           The first element of the offense of contempt is that

17   the Court gave a certain order to the defendant.  The

18   government must prove beyond a reasonable doubt that the Court

19   ordered the defendant to use certain discovery materials only

20   for the purpose of defending against the charges in this case,

21   and not disclose them to third parties.  I instruct you as a

22   matter of law that this order was lawful and proper in every

23   respect; further, that it did not violate any constitutional or

24   other legal rights of the defendant.

25           The second element of Count Ten is knowledge.

1          The second element that the government must prove

2     beyond a reasonable doubt is that the defendant disobeyed or

3     disregarded the Court's order.  Court orders must be precisely

4     and promptly obeyed.  If you find, therefore, that the

5     defendant failed to comply with the Court's order to use

6     certain discovery materials only for defending against the

7     charges in this case, this element of the offense is satisfied.

8          The third element of Count Ten is intent.

9          The third element that the government must prove

10    beyond a reasonable doubt is that the defendant acted knowingly

11    and willfully.  "Contempt" is defined as willful disregard or

12    disobedience of public authority.  In order to be guilty of

13    criminal contempt, therefore, it is essential that the

14    government establish that the defendant acted knowingly and

15    with the specific intent to disobey or disregard the Court's

16    order.

17         To satisfy this element, the government must prove,

18    beyond a reasonable doubt, that the defendant understood this

19    Court's order and consciously refused to obey that order.

20         I remind you again it is the government's burden to

21    establish every element of each of these counts beyond a

22    reasonable doubt.  The government must prove each element of

23    each count beyond a reasonable doubt.  If you find the

24    government has not proved each of the elements of a count

25    beyond a reasonable doubt, you must acquit the defendant on

K32Wsch6                       Charge

1    that count.  Also, proof of guilt on one count does not

2    establish proof of guilt on another count.  You must consider

3    each count, and each element of each count, individually.

4           In addition to all the elements of each of the charges

5    that I have described for you, for Counts Three, Eight, Nine,

6    and Ten, you must also decide with respect to each of those

7    four elements whether any act in furtherance of the crimes

8    occurred within the Southern District of New York.  You do not

9    need to consider whether any act in furtherance of the

10   WikiLeaks counts -- that is, Counts One, Two, Four, Five, Six,

11   and Seven -- occurred in the Southern District of New York.

12   The government and the defendant have agreed to venue in the

13   Southern District of New York on those counts, even though the

14   government alleges that the conduct occurred in the Eastern

15   District of Virginia.  The Southern District of New York

16   includes, among other places, Manhattan, the Bronx,

17   Westchester, Dutchess, Putnam, Orange, Sullivan, and Rockland

18   counties.  In this regard, the government need not prove that

19   the crime was committed in this district, or that the defendant

20   himself was present here.  It is sufficient to satisfy this

21   element if any act in furtherance of the crimes charged in

22   Counts Three, Eight, Nine, and Ten occurred in the Southern

23   District of New York.

24           I should note that on this issue -- and this issue

25   alone -- the government need not prove venue beyond a

K32Wsch6                      Charge

1  reasonable doubt, but only by a preponderance of the evidence,

2  which is a lower standard of proof.  A "preponderance of the

3  evidence" means that the government must prove that it is more

4  likely than not that any act in furtherance of the charge you

5  are considering occurred in the Southern District of New York.

6  Thus, the government has satisfied its venue obligations if you

7  conclude that it is more likely than not that any act in

8  furtherance of the crimes charged in Counts Three, Eight, Nine,

9  and Ten occurred in the Southern District of New York.  If you

10 find that the government has failed to prove this venue

11 requirement with respect to any of Counts Three, Eight, Nine,

12 and Ten, then you must acquit the defendant on that count.

13          OK.  I'm coming now to my conclusion of the

14 instructions; you'll be happy to hear that.

15          You are about to go into the jury room and begin your

16 deliberations.  Your function now is to weigh the evidence in

17 this case and to determine whether the government has proved

18 beyond a reasonable doubt that Mr. Schulte is guilty of the

19 offenses charged in the indictment.

20          You must base your verdict solely on the evidence and

21 these instructions as to the law, and you are obliged under

22 your oath as jurors to follow the law as I have instructed you,

23 whether you agree or disagree with the particular law in

24 question.

25          The verdict must represent the considered judgment of

K32Wsch6                    Charge

each juror.  In order to return a verdict, it is necessary that

each juror agree to it.  Your verdict must be unanimous.  If

you are divided, please do not report how the vote stands, and

if you have reached a verdict, do not report that until you are

asked to do in open court.

        When you retire to the jury room, you must have a

foreperson.  That person will preside over the deliberations

and speak for you here in open court.  Other than these

functions, the foreperson will have no greater or lesser

authority than any other juror.

        It is my custom to select juror No. 1.  Ms. Wiker, you

are selected as the foreperson of the jury.

        A final word on your duty to deliberate.

        It is your duty as jurors to consult with one another

and to deliberate with a view toward reaching an agreement.

Each of you must decide the case for him or herself, but do so

only after impartial discussion and consideration of all of the

evidence in the case with your fellow jurors.  In the course of

your deliberations, do not hesitate to reexamine your own views

and change an opinion if you become convinced it is erroneous.

But do not surrender your honest convictions as to the weight

or effect of evidence solely because of the opinions of your

fellow jurors.

        It is essential that every juror consider all the

facts and arguments before reaching a decision.  All of you

K32Wsch6                        Charge

must be present in order to deliberate.  If any juror takes a

break during the course of your deliberations, you must stop

discussing the case until he or she returns.  Similarly, if any

juror arrives late in the morning, you may not commence your

deliberations until all twelve of you are present.

For your deliberations, you will be provided with

copies of these instructions that I'm currently giving you and

copies of the indictment you.  You will also be provided with

one verdict sheet on which you will record your verdict.

I'm going to send the exhibits received in evidence

into the jury room.  If you want any of the testimony read, you

may also request that.  Please remember that it is not always

to locate what you might want, so be as specific as you

possibly can in requesting testimony or portions of testimony.

If you want further explanation of the law as I have explained

it to you, you may also request that from the Court.  If there

is any doubt or question about the meaning of any part of this

charge, you may ask for clarification or further instruction.

Your requests and any other communications you make to

the Court should be made in writing, signed by your foreperson,

and given to one of the court security officers that will be

watching over you.  Bear in mind that you are never to reveal

to any person -- not even to me -- how you, the jury, stand,

numerically or otherwise, on the questions before you until

after you have reached a unanimous verdict.

1        Your decision must be unanimous, but you are not bound

2   to surrender your honest beliefs concerning the effect or

3   weight of the evidence for the mere purpose of returning a

4   verdict or solely because of the opinion of the other jurors.

5   Discuss and weigh your respective opinions dispassionately,

6   without regard for sympathy, prejudice or favor for either

7   party, and adopt the conclusion that in your good conscience

8   appears to be in accordance with the truth.

9        Now, some of you have taken notes during the trial.

10  As I told you at the beginning of the trial, this is permitted

11  because some people find that taking notes helps them focus on

12  the testimony being given.  But your notes are for your private

13  use only, as a way to help you recall the testimony as you

14  begin your deliberations.  A juror's notes are not entitled to

15  any greater weight than the recollection of a juror who did not

16  take notes.

17       Your function now is to weigh the evidence in this

18  case and determine whether the government has or has not

19  established Mr. Schulte's guilt beyond a reasonable doubt with

20  respect to the ten counts of the indictment.  You must base

21  your verdict solely on the evidence and these instructions as

22  to the law.  You are obliged by your oath as jurors to follow

23  the law as I'm instructing you regardless of whether you agree

24  or disagree with the particular law in question.  Remember at

25  all times that you are not partisan.  You are judges -- judges

K32Wsch6                      Charge

1   of the facts.  That's why we're standing up when you come into
2   the courtroom.  You are judges.  Your sole interest is to seek
3   the truth from the evidence in this case.

4            As to the alternate jurors, Mr. Goldberg and Ms.
5   Gallo, only twelve jurors can deliberate, so I'm going to
6   excuse you now.  You notice I said excuse and not dismiss.
7   There may be circumstances where one or more of you will have
8   to be recalled, such as if one of the twelve jurors becomes
9   suddenly unavailable.

10           I want to thank you for your punctuality and your
11  complete attention, your faithful attendance.  You paid close
12  attention, but I'm going to ask you not to read or discuss
13  anything.  Don't take any interviews with the press, and if we
14  need you, we have your contact numbers.  We'll call you and let
15  you know the results.

16           Is there anything else, David, we have to tell the
17  alternate jurors?

18           THE DEPUTY CLERK:  No.

19           You're excused now.  Just please leave your notes
20  behind.  Thank you again for your service.

21           (Alternate jurors excused)

22           THE COURT:  I'll see the counsel at sidebar.

23           (At sidebar)

24           THE COURT:  Yes.

25           MR. ZAS:  Your Honor, we would just renew the

K32Wsch6                     Charge

1   objections we raised at the charge conference.

2              THE COURT:  They're preserved.

3              MR. ZAS:  We have one more thing, just on the

4   conscious avoidance charge.  I'm sorry I didn't notice this

5   before, but I think legally it's not correct.  It reads, this

6   is on page 37 of my copy.  It says at one point that "the

7   government has to prove that the defendant acted with

8   deliberate disregard whether he was so authorized," authorized

9   to access the computer.  But then it has the word

10  "alternatively."  "The government may establish its

11  burden..."by proving that the defendant acted with an awareness

12  of a high probability that he was acting without authorization

13  unless the defendant actually believed that he had

14  authorization to access a computer in the manner described in

15  the indictment."

16             It's not really correct to say it's alternatively.

17  It's that the defendant was aware of a high probability and

18  consciously decided not to find out.  So we would just object

19  to the way it was phrased as well as the prior objection we

20  raised, which was that there was not a sufficient factual

21  predicate for it in this case.

22             THE COURT:  It's preserved.

23             Anything else?

24             MR. DENTON:  I think it's pretty clear that you're

25  simply saying put a different way, which is an accurate

1    description of what deliberate disregard means.  It's not an

2    alternative theory.

3              THE COURT:  I'm content to leave it the way it is.

4              MR. ZAS:  OK.  Our objection is noted.

5              Judge, on page 59, we'd also object to one line that

6    told the jury that its "sole interest is to seek the truth from

7    the evidence in this case," and we think that dilutes the

8    burden of proof to suggest that they're out to find out what

9    really happened rather than whether the government sustained

10   its burden.

11             THE COURT:  That's pretty much a standard charge.

12             MR. ZAS:  I take it you're overruling my objection.

13             THE COURT:  Yes, I am.  Overruled.

14             MR. ZAS:  I think that's all we have.

15             THE COURT:  OK.  Just so the record is clear, the

16   objections that you had to the charge set forth at the charge

17   conference are all preserved.

18             MS. SHROFF:  Thank you, your Honor.

19             MR. ZAS:  This a good time for the record to make sure

20   that we still seek the mistrial.  The motion is still pending

21   and hasn't been ruled on.  I want to make sure it's clear that

22   we are still requesting that relief.

23             THE COURT:  OK.

24             Anything from the government?

25             MR. DENTON:  Nothing from the government.

K32Wsch6

```
 1              THE COURT:  Mr. Branden.

 2              MR. BRANDEN:  Nothing, Judge.

 3              (In open court)

 4              THE COURT:  David, swear the CSO.

 5              (Court security officer sworn)

 6              THE COURT:  Before you start your deliberations --

 7      it's 3:20, and I don't know what you want to do today -- but

 8      I'd request on behalf of all the parties that you go in there

 9      and try to figure out what schedule you want to follow through

10      your deliberations, what time you want to start the day, what

11      time you want to go home at the end of the day, so we can be

12      around to serve any needs that you have.  We will be staying

13      here in the courtroom awaiting your verdict, or staying in the

14      courthouse awaiting your verdict.  So if you can go in there

15      now and try to agree upon a schedule, give the schedule to the

16      CSO, and then deliberate as long as you want or short as you

17      want.  It's up to you.  All right?  You're in the hands of the

18      CSO.

19              (At 3:21 p.m., the jury retired to deliberate upon a

20      verdict)

21              THE COURT:  We'll take care of submitting the jury

22      instructions and the verdict sheet and the indictment to the

23      jurors.

24              Do you have the exhibits ready?

25              MR. LAROCHE:  Yes, your Honor.
```

K32Wsch6

```
 1              THE COURT:  Are you ready too, Ms. Shroff?
 2              MS. SHROFF:  No.  I haven't seen the computer because
 3     we wanted to see if there were any markings of classification
 4     on the computer itself.
 5              THE COURT:  When I say exhibits, I mean hard copies of
 6     the documents.  I'm not going to send the computer in.
 7              MS. SHROFF:  OK.
 8              THE COURT:  I'm talking about the pieces of paper.
 9              MS. SHROFF:  Those we will agree to.
10              THE COURT:  Have you agreed on that?
11              MS. SHROFF:  Yes.
12              THE COURT:  OK.  You've seen it.
13              MS. SHROFF:  Yes.
14              THE COURT:  OK.  We'll send those in too.
15              MR. LAROCHE:  Yes, your Honor.
16              THE COURT:  Thanks.  Thank you very much.
17              MR. LAROCHE:  Thank you, your Honor.
18              MS. SHROFF:  Thank you, your Honor.
19              MR. LAROCHE:  Your Honor, one question.  Should the
20     parties report in the morning to the courtroom, or is it
21     sufficient that we're in the courthouse?
22              THE COURT:  Well, we'll get a note, and presumably
23     they'll let us know, but I've always felt that the U.S.
24     Attorney's Office -- you're staying in your offices on the
25     fifth floor?
```

K32Wsch6

1          MR. LAROCHE:  Yes, your Honor.

2          THE COURT:  Yes.

3          MR. LAROCHE:  Thank you.

4          THE COURT:  I don't know where Ms. Shroff is planning

5     on staying.

6          MS. SHROFF:  I don't know.  Just for old time's sake,

7     I thought I'd just sit in the SCIF.

8          THE COURT:  OK.  It's a strange place to hide.

9          MR. ZAS:  Thank you, your Honor.

10          THE COURT:  Thank you.

11          (Recess pending verdict)

12          THE DEPUTY CLERK:  Counsel, Ms. Shroff, we got a note

13     from the jury.  It says, "We have decided to work 9 a.m.

14     through 4 p.m., including Fridays."

15          This will be marked as Court Exhibit 5, and it's

16     received as of today, March 2.

17          The Court will be submitting to the jury 12 copies of

18     the jury charge, three to four copies of the indictment, one

19     verdict sheet with a yellow envelope, and a few extra jury

20     notes for the jury.

21          MR. LAROCHE:  Thank you.

22          THE DEPUTY CLERK:  And all the exhibits the parties

23     have stipulated to.  And the exhibits are to stay in the jury

24     room at all times.

25          (Adjourned to March 3, 2020, at 9:00 a.m.)