**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

September 16, 2020

**By ECF**

Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States v. Joshua Adam Schulte*, 17 Cr. 548 (PAC)

Dear Judge Crotty:

      As ordered by the Court, Mr. Schulte notes below the motions he may need to consider and file prior to trial on the remaining espionage counts.

      The motions are as follows:

1. Motion to dismss the S3 indictment because the jury pool for the grand jury that indicted Mr. Schulte failed to include a fair cross section of grand jurors. Ms. Shroff attended the September 14, 2020 status conference in *United States v. Balde*, 20 Cr. 281, (KPF) which was by telephone due to the ongoing pandemic. Discovery and information is still being provided to the defense by the clerk of the Court. See, Ex. A (transcript of the 9/14 status conference). Mr. Schulte is following the schedule set by Judge Katherine P. Failla. He has preserved his objections by joining in the objections made by the defense in *Balde*.

2. Expert notice and litigation related to possible new defense witnesses including new fact and expert witnesses.

3. Motion for access to the same evidence that the government provided to its forensic expert, Mr. Leedom. If this motion is granted, Mr. Schulte may not have other motions. If the motion is granted in part, denied in part, or fully denied, Mr. Schulte will move to preclude the testimony of Mr. Leedom.

4. Depending on the government's additional motions under CIPA §§ 2 and 10, Mr. Shulte may have a CIPA § 6 motion.

5. Motion for the production of all Stash files released by WikiLeaks.

United States v. Joshua Schulte  September 16, 2020
Hon. Paul A. Crotty  Page 2 of 2

6. Motion for the production of information and material that was referenced in the testimony of the government's trial witnesses but that was never given to the defense.

7. Motion in limine to preclude introduction at trial of certain portions of Mr. Schulte's MCC notebooks. See, Govt Ex. (806. 809).

8. Motion in limine to introduce at trial certain portions of Mr. Schulte's MCC notebooks. See, Govt Ex. (806. 809).

9. Motion to preclude evidence of Mr. Schulte's two counts of conviction.

10. The issues and concerns raised at the August 14, 2020 *ex-parte* status conference remain unabated, and the limitations on the defense being able to proceed to trial on the timetable proposed by the government remain unchanged. See, Ex. B. Transcript of 8/14 *ex-parte* conference. Mr. Schulte reserves his right to file a motion (potentially) challenging the pretrial and trial procedures that may be implemented in light of the COVD-19 pandemic.

Mr. Schulte also reserves his right to file additional motions if circumstances warrant.

Respectfully submitted,

/s/ Edward Zas, Sabrina Shroff & Deborah Colson
Counsel for Joshua A. Schulte

CC:   All Counsel of Record
         (via ECF)

# Exhibit A

K9ELBALC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          20 Cr. 281 (KPF)

SOULEYMANE BALDE ,
                                        Teleconference
            Defendant.

------------------------------x
                                        New York, N.Y.
                                        September 14, 2020
                                        10:00 a.m.

Before:

            HON. KATHERINE POLK FAILLA,

                                        District Judge

                        APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
MARY CHRISTINE SLAVIK
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
JENNIFER ELAINE WILLIS
ANNALISA MIRON

Also Present:
Robert Rogers, S.D.N.Y. Clerk's Office
Gilbert Cardona, S.D.N.Y. Clerk's Office
```

1     DEPUTY CLERK:  Counsel, there a couple things to go
2 over before I bring in the Judge.
3     This is a public courtroom, even if it is remote, and
4 as such, members of the media and/or public have been known to
5 dial in to listen to proceedings.  And in this case, we do have
6 media on the line.  So we just want you to keep that in mind.
7     Also, I'm going to ask that you each introduce
8 yourself each time you speak so that way it's clear to the
9 court reporter on who is speaking, and that way the transcript
10 will be accurate.  I will be recording this conference on our
11 end as a backup only to the court reporter.  The court
12 reporter's transcript is the official transcript of this
13 conference.  Lastly, I'm going to ask that you keep your phones
14 on mute if you are not speaking at any given time and remember
15 to unmute yourself when it is time for you to speak.
16     Does anybody have any questions regarding the
17 instructions that were just given?
18     MS. SLAVIK:  Not from the government.  Thanks.
19     MS. WILLIS:  Not from the defense.  Thank you.
20     DEPUTY CLERK:  Thank you.
21     (Case called)
22     MS. SLAVIK:  Good morning, your Honor.
23     Christy Slavik, for the United States.
24     THE COURT:  Good morning.  Thank you, Ms. Slavik.
25     Is anyone else joining you?

1                MS. SLAVIK:  No.  Just me this morning, your Honor.
2                THE COURT:  That is fine.  Thank you.
3                Representing Mr. Balde?
4                MS. WILLIS:  Good morning, your Honor.
5                Jennifer Willis and Annalisa Miron, Federal Defenders
6     of New York, on behalf of Mr. Balde.
7                THE COURT:  I thank you very much.
8                I believe, as well, we have members of our court's
9     clerk's office joining us today.
10               Do I have Mr. Rogers on the line?
11               MR. ROGERS:  Yes.  Good morning, your Honor.
12               THE COURT:  Good morning as well.  And thank you, sir.
13               And do I have Mr. Cardona on the line?
14               MR. CARDONA:  Yes, I'm on the line, your Honor.  Good
15    morning.
16               THE COURT:  Good morning as well.
17               And could you let me know, please, Mr. Cardona, is
18    there anyone else from the clerk's office on this call?
19               MR. CARDONA:  I do not believe so.  I believe it was
20    Mr. Rogers and myself.
21               THE COURT:  That is fine.  Thank you.
22               All right.  Good morning to each of you.  And I wish
23    you well.  I wish you continued safety and good health in this
24    pandemic.
25               And to Ms. Slavik, to Ms. Willis, and to Ms. Miron, I

1     want to thank you for your patience during this time.  We've
2     been gathering this information for the last couple of days.
3     But what I noted from our last group telephone conference is
4     that I didn't have enough information to give you the proper
5     answers.  And that is why Ms. Miron sent us the letter that she
6     did with additional questions.  But as well, I was concerned
7     about there being something akin to a game of telephone, where
8     I would be giving information to you thinking that I understood
9     what was being said but not in fact understanding its import.
10    And so I wanted to have Mr. Rogers and Mr. Cardona on the line
11    to help me and to ugh make sure that I wasn't misstating
12    things.
13             I also want to say that I believe Mr. Rogers, and Mr.
14    Cardona, and Mr. Burgos as well from the clerk's office, have
15    done our level best to try and get to the bottom of these
16    issues.  But I will apologize in advance if there's something
17    else out there about which we are unfamiliar.
18             Ms. Miron, to your question about a discrepancy in the
19    numbers and how it is that the master wheel and the data that
20    was produced ended up being not quite correct, I understood
21    from Mr. Rogers that, in fact, there was incomplete datasets.
22    And I'm going to ask him please if he could to explain to you
23    how that came about.
24             Mr. Rogers, if you could please.
25             MR. ROGERS:  Thank you, your Honor.

1           The jury department turned to the computer systems
2   folks that support the data for our jury records to gather
3   those records.  The master wheel records for the Manhattan
4   wheel and the White Plains divisional wheel were combined into
5   one single Excel spreadsheet.  It was not known at the time,
6   but Excel spreadsheets have a maximum number of rows, just over
7   one million rows.  1,048,576 rows is the maximum number of rows
8   can you put in a single Excel spreadsheet report.  The combined
9   data for the Manhattan and White Plains wheels exceeded that
10  number.  This was not noticed at the time.  So when the report
11  was run, it finished, the folks who ran the report thought it
12  was complete and delivered it, the jury office sent it on
13  further to the Court and the parties.  That problem has now
14  been recognized as a simple problem to fix.  And the wheels
15  have now been separated into two Excel spreadsheets, each under
16  that maximum number.  So the clerk's office now has in its
17  possession an Excel spreadsheet reflecting the Manhattan master
18  wheel and a second Excel spreadsheet reflecting the White
19  Plains master wheel.
20          I will note that there is a slight discrepancy in the
21  numbers, if you wish, we can go into that, your Honor.
22          THE COURT:  I would be happy if you did so.  Thank
23  you.  Yes.
24          MR. ROGERS:  Okay.  Wasn't sure you were ready for
25  that.

1           THE COURT:  No.  That's fine.

2           MR. ROGERS:  When people return a jury qualification

3   questionnaire, it sometimes becomes evident to the Court that

4   they have moved from one division to another.  Perhaps they

5   moved from Duchess County to Manhattan or vice versa.  At that

6   point in time, if they're otherwise qualified, they would be

7   qualified for future jury service and moved from one wheel to

8   another.  So there are a small number of jurors -- I think it's

9   in the neighborhood of 16, I believe, plus or minus -- that

10  were transferred between master wheels.

11          So when comparing the numbers in the cover letter from

12  Cetera data systems, the contactor that created the original

13  master wheels and delivered them to the court for our use, a

14  cover letter was included reflecting totals in the master

15  wheels from Manhattan and White Plains.  Those totals are off,

16  but if you add them together, they come very close to the grand

17  total.  I am afraid I do have to report though there are four

18  records that appear in the Sutera Data Systems report that

19  we've been unable to locate in the court records.  I don't have

20  an explanation for that.  We're continuing to look at that.

21  But over 1 million-some records combined, they do add up to the

22  grand total in the Sutera Data Systems letter, minus those four

23  records that we're still continuing to determine where they're

24  located.  And that is my report.

25          THE COURT:  Okay.  And, Mr. Cardona, do I understand

1   that you now have in your possession DVDs containing the
2   revised Excel spreadsheets that have the Manhattan and the
3   White Plains master jury wheels that were created basically
4   because we didn't know Excel had a maximum, and you have those
5   rode to go to the parties, sir?
6           MR. CARDONA:  I have sets of those DVDs that were
7   created.  And it was believed that we were going to -- and
8   again, I would defer, of course, to your Honor as to when we
9   would provide these, as there are still some questions that
10  remain.  So I didn't know that I can provide these at any time,
11  but I was still waiting for the green light on mailing them.
12          THE COURT:  Absolutely, sir.  And I understand that.
13          And in terms of the remaining issue, do you mean the
14  issue regarding the qualified jury wheels?
15          MR. CARDONA:  That is correct.
16          THE COURT:  Okay.  Thank you.
17          Ms. Slavik, still on the line?
18          MS. SLAVIK:  I am, your Honor.
19          THE COURT:  Okay.  And I hope that what Mr. Rogers
20  just explained, at least from the government's perspective, the
21  discrepancy that was identified in Ms. Miron's letter.  I going
22  to ask Ms. Miron in a moment, but I wanted to ask you first.
23          MS. SLAVIK:  Yes, your Honor.  That appears to make
24  sense.
25          THE COURT:  Okay.  And, Ms. Miron, I want to thank

1  you, and I want to thank your jury consultant, for bringing the
2  issue to our attention, because in my own mind I didn't realize
3  there were a maximum number of rows for Excel -- at least the
4  government's version of it, that's what we have.
5         Does that answer for you, at least temporarily, the
6  issue of the master jury wheel discrepancy?
7         MS. MIRON:  Yes, your Honor.  It's a simple
8  explanation that makes sense.  I mean, we'll have to review
9  just to make sure that the grand jurors are present in the two
10 datasets.  But I think that that will resolve this issue.
11        THE COURT:  I was advised by Mr. Cardona and
12 Mr. Rogers, that in fact the --
13        Is it 22 grand jurors, Ms. Miron?
14        MS. MIRON:  No.  We think there are 28.
15        THE COURT:  I beg your pardon.  Thank you.  I must
16 have that confused.  I was advised -- and let me please confirm
17 with Mr. Rogers that they were able to locate all of the grand
18 jurors in the new set.
19        Is that correct, Mrs. Rogers?
20        MR. CARDONA:  Your Honor, if I can answer that.
21        THE COURT:  Yes, Mr. Cardona.  Thank you very much for
22 speaking.
23        MR. CARDONA:  Yes.  I was able to locate all 28 jurors
24 on the list.  And, of course, counsel will, of course, do their
25 own search and they will be able to locate every single one of

1    those jurors.

2            THE COURT:  Okay.  I appreciate that okay.  Thank you.

3            So, Ms. Miron, I'm attempted to believe that answers

4    that issue.  And there remains the issue of the qualified jury

5    wheel.  And I think from my own perspective in speaking with

6    Mr. Cardona and Mr. Rogers, I have a better understanding of

7    the qualified jury wheel itself.

8            Mr. Rogers, in speaking with me last week, you

9    mentioned the concept of a bucket, sort of a dynamic qualified

10   jury wheel.  And I'm wondering if you can explain that again to

11   the folks on this call.

12           MR. ROGERS:  Certainly.

13           A brief overview would include the fact that the Court

14   starts with the voter registration lists, as permitted by the

15   statute in the jury plan.  A contractor creates a master wheel

16   from those voter registration lists; that's Sutera Data

17   Systems, the contractor.  And that's where we start.  Once

18   every four years we are required to retire our old jury wheel

19   and create a new one so that we use fresh records and

20   up-to-date records.  When we start we have a master wheel

21   that's filled and a qualified wheel that's empty.  We randomly

22   select names off the master wheels and mail questionnaires in

23   large numbers to people, to determine if they're qualified to

24   serve under the rules of the statute and the Court's jury plan.

25   Those questionnaires come back -- they're mailed, for example,

for the Manhattan wheel in bulk mailings of around 40,000 at a time, several times a year. Not everyone gets qualified. Just because you're on the voter list doesn't mean you're qualified to serve. You have to meet other criteria. Questionnaires come back to indicate, for example, that perhaps the person is not fluent in English or is over the age of 70 and does not wish to serve. Those sorts of excusals and exemptions are found in the statute and the jury plan and would cause a person not to be qualified to serve.

So if we mail out 40,000 questionnaires, we don't get 40,000 people filled into the qualified wheel. We fill the qualified wheel at a fast rate at the beginning of the wheel because it's empty to start with. We are required by the jury plan to bring that new list online by September the 1st, following a presidential election. We gather the voter lists after the presidential election, and we have ten or eleven months to get that new wheel up and running.

The qualified wheel -- when you referred to buckets, that's the example I used. The qualified wheel, I look at like buckets. We have a master wheel bucket and a qualified wheel bucket. We fill that qualified wheel bucket in the way I just described. And then we need to summon people to court. So, again, we randomly select names, this time from the qualified wheel, to mail a jury summons. When we do that -- I think of this in my way of logically thinking of it, and it is, in fact,

the way a database works -- the person is tagged. They are, in effect, moved out of the qualified wheel. They're no longer in the qualified wheel. They're in a different status. They're in a summoned status. Still that qualified wheel gets drained as we mail jury summonses for specific dates for people to appear for their jury service. So that qualified wheel and that bucket, as I call it, is dynamic. It gets filled and emptied, filled and emptied. The jury department mails those bulk mailings of 40,000 questionnaires several times a year in order to keep it filled. At any one time if I have 6,000, 8,000, 10,000 names in the qualified wheel, and as a busy couple of months go by and we summon lots of people to court, it might drop down to five, four or 3,000, and another malling goes out of questionnaires to fill it back up. It's like a gas tank. We use it up.

And so we reported to you that we needed some help in determining what qualified wheel data to produce for the parties. Since it's dynamic, it's different. The names in the wheel today are different than the names in the wheel six months ago or 12 months ago. And, therefore, we needed some help -- some guidance from the Court and parties to help narrow those choices down.

THE COURT: All right. Mr. Rogers, as I understand it, the options include the following: If the defense wanted, you could give them the qualified wheel information as it

1    exists right now, today.  You could give them the qualified
2    wheel information for every one who was ever qualified from the
3    inception of this wheel in 2017 to today.  You could also
4    perhaps gear it towards the qualified wheel as of the date that
5    the grand jurors were summoned to White Plains for the
6    particular grand jury that returned the indictment in my case.
7    I'm not sure if there are other options, but those are the
8    three that I'm aware of.
9             Is that correct, sir?
10            MR. ROGERS:  That is correct.  And we are still trying
11   to determine if option number three is possible.
12            THE COURT:  I see.  I see.
13            So by that you mean you could give me -- what it is
14   today, you could give me the entire history of the wheel, but
15   isolating a particular date it's not clear, sir?
16            MR. ROGERS:  Correct.  I'm not a computer programmer,
17   your Honor, and it's not clear to us that we can generate a
18   report that reflects a date certain of the qualified wheel.
19            THE COURT:  I appreciate that.
20            Ms. Miron, turning to you.  Again, I'm asking for your
21   indulgence.  If my answers in these prior discussions have
22   misled you as to what's in the qualified jury wheel, in
23   speaking with Mr. Rogers, I think I have a better sense of what
24   it is now.
25            Given that information, is there a particular time

K9ELBALC

1  frame at which you and your expert were focused, or do you want
2  to speak with your expert about that issue?
3              MS. MIRON:  I think it makes sense for us to be able
4  to consult with our expert before reporting on that issue.  I
5  understand it may be impossible to narrow the data to one
6  certain date.  I anticipate that we would want all of the data
7  from when the qualified wheel began, but I would love the
8  opportunity to consult first.
9              THE COURT:  Okay.  Given that -- I don't want to do
10 too many things by accretion.  But would it be your preference,
11 Ms. Miron that I authorize Mr. Cardona to send to you and to
12 Ms. Slavik the information regarding the master jury wheel that
13 has just been identified now that we've figured out the
14 shortcomings of the Excel spreadsheet?
15             MS. MIRON:  Yes, your Honor.
16             THE COURT:  Okay.  Mr. Cardona, I am authorizing you
17 to send to Ms. Slavik and to Ms. Miron or Ms. Willis that
18 information, sir.  And I thank you very much for holding it at
19 my request.
20             Ms. Miron, on that point, how much time -- because I
21 think we still have a question about whether there's going to
22 be motion practice in this regard.  Tell me please the time
23 frame that you're looking at.
24             Or do you wish to speak with your expert and propose a
25 revised schedule for us?

1          MS. MIRON:  Let us consult with him on that point as
2     well.  We could submit a letter addressing both issues by
3     Wednesday, if that's acceptable.
4          THE COURT:  It is acceptable.
5          What I'm hoping to do, for your sake as much as for my
6     own, is -- again, to be sure that the calls that we do have are
7     informative, and I think today's was -- as we're speaking now,
8     are there additional issues that I haven't clarified?
9          MS. MIRON:  No.  I believe that all of the issues
10    we've raised have been clarified.
11         THE COURT:  Okay.  So then I will hear from you by
12    Wednesday as to what you're looking for and what you're
13    thinking about in terms of the schedule.
14         And, Ms. Willis, from your specific perspective, is
15    there anything else we should be addressing in this call?
16         MS. WILLIS:  No, your Honor.  That's all.  Thank you.
17         THE COURT:  Okay.  Thank you so much.
18         And, Ms. Slavik, from your perspective, is there
19    anything else we should be addressing in this call?
20         MS. SLAVIK:  Not at this moment, your Honor.  Thank
21    you.
22         THE COURT:  Okay.  To Mr. Rogers and Mr. Cardona, I
23    thank you, first of all, for accepting this responsibility
24    after Ms. Thomas retired after many years of service, but also
25    for being so informative.  With that, you are all released.  We

K9ELBALC

1   are adjourned, and you, in particular, have my thanks.
2            So thank you all very much.  And we await word from
3   the defense.  Thank you.
4            MR. ROGERS:  Thank you, your Honor.
5            MR. CARDONA:  Thank you.
6            MS. MIRON:  Thank you, your Honor.
7                              ******

# Exhibit B – Ex Parte