# Exhibit A

K9ELBALC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                         20 Cr. 281 (KPF)

SOULEYMANE BALDE ,
                                       Teleconference
            Defendant.

------------------------------x
                                       New York, N.Y.
                                       September 14, 2020
                                       10:00 a.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                       District Judge

                        APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
MARY CHRISTINE SLAVIK
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
JENNIFER ELAINE WILLIS
ANNALISA MIRON

Also Present:
Robert Rogers, S.D.N.Y. Clerk's Office
Gilbert Cardona, S.D.N.Y. Clerk's Office
```

1    DEPUTY CLERK:  Counsel, there a couple things to go
2  over before I bring in the Judge.
3    This is a public courtroom, even if it is remote, and
4  as such, members of the media and/or public have been known to
5  dial in to listen to proceedings.  And in this case, we do have
6  media on the line.  So we just want you to keep that in mind.
7    Also, I'm going to ask that you each introduce
8  yourself each time you speak so that way it's clear to the
9  court reporter on who is speaking, and that way the transcript
10  will be accurate.  I will be recording this conference on our
11  end as a backup only to the court reporter.  The court
12  reporter's transcript is the official transcript of this
13  conference.  Lastly, I'm going to ask that you keep your phones
14  on mute if you are not speaking at any given time and remember
15  to unmute yourself when it is time for you to speak.
16    Does anybody have any questions regarding the
17  instructions that were just given?
18    MS. SLAVIK:  Not from the government.  Thanks.
19    MS. WILLIS:  Not from the defense.  Thank you.
20    DEPUTY CLERK:  Thank you.
21    (Case called)
22    MS. SLAVIK:  Good morning, your Honor.
23    Christy Slavik, for the United States.
24    THE COURT:  Good morning.  Thank you, Ms. Slavik.
25    Is anyone else joining you?

1            MS. SLAVIK:  No.  Just me this morning, your Honor.
2            THE COURT:  That is fine.  Thank you.
3            Representing Mr. Balde?
4            MS. WILLIS:  Good morning, your Honor.
5            Jennifer Willis and Annalisa Miron, Federal Defenders
6    of New York, on behalf of Mr. Balde.
7            THE COURT:  I thank you very much.
8            I believe, as well, we have members of our court's
9    clerk's office joining us today.
10           Do I have Mr. Rogers on the line?
11           MR. ROGERS:  Yes.  Good morning, your Honor.
12           THE COURT:  Good morning as well.  And thank you, sir.
13           And do I have Mr. Cardona on the line?
14           MR. CARDONA:  Yes, I'm on the line, your Honor.  Good
15   morning.
16           THE COURT:  Good morning as well.
17           And could you let me know, please, Mr. Cardona, is
18   there anyone else from the clerk's office on this call?
19           MR. CARDONA:  I do not believe so.  I believe it was
20   Mr. Rogers and myself.
21           THE COURT:  That is fine.  Thank you.
22           All right.  Good morning to each of you.  And I wish
23   you well.  I wish you continued safety and good health in this
24   pandemic.
25           And to Ms. Slavik, to Ms. Willis, and to Ms. Miron, I

1    want to thank you for your patience during this time.  We've
2    been gathering this information for the last couple of days.
3    But what I noted from our last group telephone conference is
4    that I didn't have enough information to give you the proper
5    answers.  And that is why Ms. Miron sent us the letter that she
6    did with additional questions.  But as well, I was concerned
7    about there being something akin to a game of telephone, where
8    I would be giving information to you thinking that I understood
9    what was being said but not in fact understanding its import.
10   And so I wanted to have Mr. Rogers and Mr. Cardona on the line
11   to help me and to ugh make sure that I wasn't misstating
12   things.
13            I also want to say that I believe Mr. Rogers, and Mr.
14   Cardona, and Mr. Burgos as well from the clerk's office, have
15   done our level best to try and get to the bottom of these
16   issues.  But I will apologize in advance if there's something
17   else out there about which we are unfamiliar.
18            Ms. Miron, to your question about a discrepancy in the
19   numbers and how it is that the master wheel and the data that
20   was produced ended up being not quite correct, I understood
21   from Mr. Rogers that, in fact, there was incomplete datasets.
22   And I'm going to ask him please if he could to explain to you
23   how that came about.
24            Mr. Rogers, if you could please.
25            MR. ROGERS:  Thank you, your Honor.

1           The jury department turned to the computer systems
2    folks that support the data for our jury records to gather
3    those records.  The master wheel records for the Manhattan
4    wheel and the White Plains divisional wheel were combined into
5    one single Excel spreadsheet.  It was not known at the time,
6    but Excel spreadsheets have a maximum number of rows, just over
7    one million rows.  1,048,576 rows is the maximum number of rows
8    can you put in a single Excel spreadsheet report.  The combined
9    data for the Manhattan and White Plains wheels exceeded that
10   number.  This was not noticed at the time.  So when the report
11   was run, it finished, the folks who ran the report thought it
12   was complete and delivered it, the jury office sent it on
13   further to the Court and the parties.  That problem has now
14   been recognized as a simple problem to fix.  And the wheels
15   have now been separated into two Excel spreadsheets, each under
16   that maximum number.  So the clerk's office now has in its
17   possession an Excel spreadsheet reflecting the Manhattan master
18   wheel and a second Excel spreadsheet reflecting the White
19   Plains master wheel.
20           I will note that there is a slight discrepancy in the
21   numbers, if you wish, we can go into that, your Honor.
22           THE COURT:  I would be happy if you did so.  Thank
23   you.  Yes.
24           MR. ROGERS:  Okay.  Wasn't sure you were ready for
25   that.

K9ELBALC

1       THE COURT:  No.  That's fine.

2       MR. ROGERS:  When people return a jury qualification
3   questionnaire, it sometimes becomes evident to the Court that
4   they have moved from one division to another.  Perhaps they
5   moved from Duchess County to Manhattan or vice versa.  At that
6   point in time, if they're otherwise qualified, they would be
7   qualified for future jury service and moved from one wheel to
8   another.  So there are a small number of jurors -- I think it's
9   in the neighborhood of 16, I believe, plus or minus -- that
10  were transferred between master wheels.

11      So when comparing the numbers in the cover letter from
12  Cetera data systems, the contactor that created the original
13  master wheels and delivered them to the court for our use, a
14  cover letter was included reflecting totals in the master
15  wheels from Manhattan and White Plains.  Those totals are off,
16  but if you add them together, they come very close to the grand
17  total.  I am afraid I do have to report though there are four
18  records that appear in the Sutera Data Systems report that
19  we've been unable to locate in the court records.  I don't have
20  an explanation for that.  We're continuing to look at that.
21  But over 1 million-some records combined, they do add up to the
22  grand total in the Sutera Data Systems letter, minus those four
23  records that we're still continuing to determine where they're
24  located.  And that is my report.

25      THE COURT:  Okay.  And, Mr. Cardona, do I understand

1    that you now have in your possession DVDs containing the
2    revised Excel spreadsheets that have the Manhattan and the
3    White Plains master jury wheels that were created basically
4    because we didn't know Excel had a maximum, and you have those
5    rode to go to the parties, sir?
6              MR. CARDONA:  I have sets of those DVDs that were
7    created.  And it was believed that we were going to -- and
8    again, I would defer, of course, to your Honor as to when we
9    would provide these, as there are still some questions that
10   remain.  So I didn't know that I can provide these at any time,
11   but I was still waiting for the green light on mailing them.
12             THE COURT:  Absolutely, sir.  And I understand that.
13             And in terms of the remaining issue, do you mean the
14   issue regarding the qualified jury wheels?
15             MR. CARDONA:  That is correct.
16             THE COURT:  Okay.  Thank you.
17             Ms. Slavik, still on the line?
18             MS. SLAVIK:  I am, your Honor.
19             THE COURT:  Okay.  And I hope that what Mr. Rogers
20   just explained, at least from the government's perspective, the
21   discrepancy that was identified in Ms. Miron's letter.  I going
22   to ask Ms. Miron in a moment, but I wanted to ask you first.
23             MS. SLAVIK:  Yes, your Honor.  That appears to make
24   sense.
25             THE COURT:  Okay.  And, Ms. Miron, I want to thank

1   you, and I want to thank your jury consultant, for bringing the
2   issue to our attention, because in my own mind I didn't realize
3   there were a maximum number of rows for Excel -- at least the
4   government's version of it, that's what we have.
5          Does that answer for you, at least temporarily, the
6   issue of the master jury wheel discrepancy?
7          MS. MIRON:  Yes, your Honor.  It's a simple
8   explanation that makes sense.  I mean, we'll have to review
9   just to make sure that the grand jurors are present in the two
10  datasets.  But I think that that will resolve this issue.
11         THE COURT:  I was advised by Mr. Cardona and
12  Mr. Rogers, that in fact the --
13         Is it 22 grand jurors, Ms. Miron?
14         MS. MIRON:  No.  We think there are 28.
15         THE COURT:  I beg your pardon.  Thank you.  I must
16  have that confused.  I was advised -- and let me please confirm
17  with Mr. Rogers that they were able to locate all of the grand
18  jurors in the new set.
19         Is that correct, Mrs. Rogers?
20         MR. CARDONA:  Your Honor, if I can answer that.
21         THE COURT:  Yes, Mr. Cardona.  Thank you very much for
22  speaking.
23         MR. CARDONA:  Yes.  I was able to locate all 28 jurors
24  on the list.  And, of course, counsel will, of course, do their
25  own search and they will be able to locate every single one of

1  those jurors.

2           THE COURT:  Okay.  I appreciate that okay.  Thank you.

3           So, Ms. Miron, I'm attempted to believe that answers

4  that issue.  And there remains the issue of the qualified jury

5  wheel.  And I think from my own perspective in speaking with

6  Mr. Cardona and Mr. Rogers, I have a better understanding of

7  the qualified jury wheel itself.

8           Mr. Rogers, in speaking with me last week, you

9  mentioned the concept of a bucket, sort of a dynamic qualified

10 jury wheel.  And I'm wondering if you can explain that again to

11 the folks on this call.

12          MR. ROGERS:  Certainly.

13          A brief overview would include the fact that the Court

14 starts with the voter registration lists, as permitted by the

15 statute in the jury plan.  A contractor creates a master wheel

16 from those voter registration lists; that's Sutera Data

17 Systems, the contractor.  And that's where we start.  Once

18 every four years we are required to retire our old jury wheel

19 and create a new one so that we use fresh records and

20 up-to-date records.  When we start we have a master wheel

21 that's filled and a qualified wheel that's empty.  We randomly

22 select names off the master wheels and mail questionnaires in

23 large numbers to people, to determine if they're qualified to

24 serve under the rules of the statute and the Court's jury plan.

25 Those questionnaires come back -- they're mailed, for example,

for the Manhattan wheel in bulk mailings of around 40,000 at a time, several times a year.  Not everyone gets qualified.  Just because you're on the voter list doesn't mean you're qualified to serve.  You have to meet other criteria.  Questionnaires come back to indicate, for example, that perhaps the person is not fluent in English or is over the age of 70 and does not wish to serve.  Those sorts of excusals and exemptions are found in the statute and the jury plan and would cause a person not to be qualified to serve.

So if we mail out 40,000 questionnaires, we don't get 40,000 people filled into the qualified wheel.  We fill the qualified wheel at a fast rate at the beginning of the wheel because it's empty to start with.  We are required by the jury plan to bring that new list online by September the 1st, following a presidential election.  We gather the voter lists after the presidential election, and we have ten or eleven months to get that new wheel up and running.

The qualified wheel -- when you referred to buckets, that's the example I used.  The qualified wheel, I look at like buckets.  We have a master wheel bucket and a qualified wheel bucket.  We fill that qualified wheel bucket in the way I just described.  And then we need to summon people to court.  So, again, we randomly select names, this time from the qualified wheel, to mail a jury summons.  When we do that -- I think of this in my way of logically thinking of it, and it is, in fact,

1    the way a database works -- the person is tagged.  They are, in
2    effect, moved out of the qualified wheel.  They're no longer in
3    the qualified wheel.  They're in a different status.  They're
4    in a summoned status.  Still that qualified wheel gets drained
5    as we mail jury summonses for specific dates for people to
6    appear for their jury service.  So that qualified wheel and
7    that bucket, as I call it, is dynamic.  It gets filled and
8    emptied, filled and emptied.  The jury department mails those
9    bulk mailings of 40,000 questionnaires several times a year in
10   order to keep it filled.  At any one time if I have 6,000,
11   8,000, 10,000 names in the qualified wheel, and as a busy
12   couple of months go by and we summon lots of people to court,
13   it might drop down to five, four or 3,000, and another malling
14   goes out of questionnaires to fill it back up.  It's like a gas
15   tank.  We use it up.
16            And so we reported to you that we needed some help in
17   determining what qualified wheel data to produce for the
18   parties.  Since it's dynamic, it's different.  The names in the
19   wheel today are different than the names in the wheel six
20   months ago or 12 months ago.  And, therefore, we needed some
21   help -- some guidance from the Court and parties to help narrow
22   those choices down.
23            THE COURT:  All right.  Mr. Rogers, as I understand
24   it, the options include the following:  If the defense wanted,
25   you could give them the qualified wheel information as it

1    exists right now, today.  You could give them the qualified

2    wheel information for every one who was ever qualified from the

3    inception of this wheel in 2017 to today.  You could also

4    perhaps gear it towards the qualified wheel as of the date that

5    the grand jurors were summoned to White Plains for the

6    particular grand jury that returned the indictment in my case.

7    I'm not sure if there are other options, but those are the

8    three that I'm aware of.

9             Is that correct, sir?

10            MR. ROGERS:  That is correct.  And we are still trying

11   to determine if option number three is possible.

12            THE COURT:  I see.  I see.

13            So by that you mean you could give me -- what it is

14   today, you could give me the entire history of the wheel, but

15   isolating a particular date it's not clear, sir?

16            MR. ROGERS:  Correct.  I'm not a computer programmer,

17   your Honor, and it's not clear to us that we can generate a

18   report that reflects a date certain of the qualified wheel.

19            THE COURT:  I appreciate that.

20            Ms. Miron, turning to you.  Again, I'm asking for your

21   indulgence.  If my answers in these prior discussions have

22   misled you as to what's in the qualified jury wheel, in

23   speaking with Mr. Rogers, I think I have a better sense of what

24   it is now.

25            Given that information, is there a particular time

1    frame at which you and your expert were focused, or do you want

2    to speak with your expert about that issue?

3              MS. MIRON:  I think it makes sense for us to be able

4    to consult with our expert before reporting on that issue.  I

5    understand it may be impossible to narrow the data to one

6    certain date.  I anticipate that we would want all of the data

7    from when the qualified wheel began, but I would love the

8    opportunity to consult first.

9              THE COURT:  Okay.  Given that -- I don't want to do

10   too many things by accretion.  But would it be your preference,

11   Ms. Miron that I authorize Mr. Cardona to send to you and to

12   Ms. Slavik the information regarding the master jury wheel that

13   has just been identified now that we've figured out the

14   shortcomings of the Excel spreadsheet?

15             MS. MIRON:  Yes, your Honor.

16             THE COURT:  Okay.  Mr. Cardona, I am authorizing you

17   to send to Ms. Slavik and to Ms. Miron or Ms. Willis that

18   information, sir.  And I thank you very much for holding it at

19   my request.

20             Ms. Miron, on that point, how much time -- because I

21   think we still have a question about whether there's going to

22   be motion practice in this regard.  Tell me please the time

23   frame that you're looking at.

24             Or do you wish to speak with your expert and propose a

25   revised schedule for us?

|   |   |
|---|---|
| 1 | MS. MIRON: Let us consult with him on that point as |
| 2 | well. We could submit a letter addressing both issues by |
| 3 | Wednesday, if that's acceptable. |
| 4 | THE COURT: It is acceptable. |
| 5 | What I'm hoping to do, for your sake as much as for my |
| 6 | own, is -- again, to be sure that the calls that we do have are |
| 7 | informative, and I think today's was -- as we're speaking now, |
| 8 | are there additional issues that I haven't clarified? |
| 9 | MS. MIRON: No. I believe that all of the issues |
| 10 | we've raised have been clarified. |
| 11 | THE COURT: Okay. So then I will hear from you by |
| 12 | Wednesday as to what you're looking for and what you're |
| 13 | thinking about in terms of the schedule. |
| 14 | And, Ms. Willis, from your specific perspective, is |
| 15 | there anything else we should be addressing in this call? |
| 16 | MS. WILLIS: No, your Honor. That's all. Thank you. |
| 17 | THE COURT: Okay. Thank you so much. |
| 18 | And, Ms. Slavik, from your perspective, is there |
| 19 | anything else we should be addressing in this call? |
| 20 | MS. SLAVIK: Not at this moment, your Honor. Thank |
| 21 | you. |
| 22 | THE COURT: Okay. To Mr. Rogers and Mr. Cardona, I |
| 23 | thank you, first of all, for accepting this responsibility |
| 24 | after Ms. Thomas retired after many years of service, but also |
| 25 | for being so informative. With that, you are all released. We |

K9ELBALC

1  are adjourned, and you, in particular, have my thanks.
2            So thank you all very much.  And we await word from
3  the defense.  Thank you.
4            MR. ROGERS:  Thank you, your Honor.
5            MR. CARDONA:  Thank you.
6            MS. MIRON:  Thank you, your Honor.
7                              ******