UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA,                          17 CR 548 (PAC)


          –against–


JOSHUA A. SCHULTE,

                        Defendant.
-----------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE THIRD SUPERSEDING INDICTMENT BECAUSE IT WAS OBTAINED IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS AND THE JURY SELECTION AND SERVICE ACT

During the COVID-19 pandemic, the United States Attorney's Office for the Southern District of New York pursued a third superseding indictment against Joshua A. Schulte in an improper manner: through a grand jury drawn from only the northern counties of the Southern District of New York, excluding residents from the county where the offenses allegedly occurred. In doing so, the government excluded large numbers of Black or African-American and Hispanic or Latino people from considering whether Mr. Schulte's indictment was sustained by probable cause. This memorandum of law is submitted in support of Mr. Schulte's motion to dismiss the indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, *et seq.* ("JSSA"), under the Sixth Amendment right to a grand jury drawn from a fair cross-section of the community, and under the Equal Protection Clause of the Fifth Amendment.

I.      **STATEMENT OF FACTS**

A.  Procedural History

Mr. Schulte was charged on a criminal complaint in the Southern District of New York on August 23, 2017. He was originally indicted on September 6, 2017, and a second superseding indictment issued on June 18, 2018.

He proceeded to trial by jury on February 2, 2020. The jury rendered a partial verdict on March 9, 2020, convicting Mr. Schulte on two of the ten counts charged in the second superseding indictment.[1] The jury was unable to reach a verdict on the remaining eight counts.

On or about June 8, 2020, the government chose to go to the grand jury and seek a third superseding indictment. At no point did the government aver that any part of the alleged crimes took place in White Plains; nor was the case designated to White Plains pursuant to Local Rule 18.

The indictment procedure deviated from the established, court-tested, and constitutional practice of indicting defendants in the division in which the offenses allegedly occurred and in which the case will be tried. In the wake of the COVID-19 pandemic, the U.S. Attorney's Office chose to stop using the Manhattan Master Wheel and to indict Mr. Schulte, a Manhattan defendant, in White Plains. No Manhattan grand jurors were summoned to duty and no Manhattan grand jurors heard Mr. Schulte's case.

Allowing a defendant to be indicted in one division and tried in another opens the door to prosecutorial gamesmanship where the government can forum-shop for the racial, gender, and economic demographics of their choice. Here, the government's decision to indict in White

---

[1] Mr. Schulte faced 11 counts at the beginning of trial. In the middle of trial, the government dismissed Count 2 of the second superseding indictment.

Plains led to a grand jury that had dramatically more white people and fewer Black or African-American and Hispanic or Latino people.

Assuming it was proper to indict Mr. Schulte in a division other than Manhattan, the wheel from which the grand jury was drawn did not represent a "fair cross section of the community" as guaranteed by the Sixth Amendment and the JSSA. It also violated the Equal Protection Clause of the Fifth Amendment by underrepresenting Black or African-American and Hispanic or Latino persons. Further, in significant respects, the White Plains jury wheels were not constructed in accordance with the Jury Plan, resulting in systematic exclusion of Black or African-American and Hispanic or Latino persons, and the arbitrary exclusion of over 400,000 persons total. This procedure harms our democracy and the legitimacy of our judicial system. That this practice was implemented in response to the COVID-19 pandemic does not change its unconstitutionality and illegitimacy.

B.  SDNY's Jury Plan

The JSSA mandates that each federal district court "devise and place in operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). In 2009, the Southern District of New York set forth its plan to determine the selection of petit and grand jurors in The Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York ("Jury Plan").[2] The Jury Plan uses voter registration lists as the exclusive source of names of prospective jurors. *Id.*, Art. III.A; *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) (examining previous jury plan). From these names, two master jury wheels are constructed: one for the Manhattan courthouse and one for the White Plains courthouse. The Plan states that to fill the master wheels, jurors are to be drawn

---

[2] *See* https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf.

from each county's voter registration list. For each county, the proportion of jurors drawn should be the same as the proportion as that county's number of registered voters bears to the total number of registered voters for all of the counties in the respective wheels. Jury Plan, III.A.1, III.B.

The Manhattan master wheel (also called the Foley Square Division) contains names drawn from New York County, Bronx County, Westchester County, Putnam County, and Rockland County. The White Plains master wheel contains names from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess Counties. For the three overlapping counties (Westchester, Putnam, and Rockland), the names are apportioned among the two master wheels so as to "reasonably reflect the relative number of registered voters of each county" within the respective wheels. Jury Plan, Art. IV.B. According to the Jury Plan, the "master jury wheels shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." *Id.*, Art. III.B; *see also United States v. Reyes,* 934 F. Supp. 553 (S.D.N.Y 1996).

At least once a year, names are drawn randomly from the master jury wheels in an amount sufficient to meet the anticipated demand for jurors for the next six months. Jury Plan, Art. III.D. These individuals are sent questionnaires to determine their qualifications to sit as jurors. *Id.* Potential jurors are instructed to complete the questionnaire and return it within ten days.  *Id.*, Art. III.E. The names of persons who complete and return the questionnaire (and who are found to be qualified as jurors) comprise the qualified jury wheels. *Id.*, Art. III.C. As with the master wheels, two separate qualified jury wheels are maintained: one for Foley Square and one for White Plains. When jurors are needed, names are drawn at random from these wheels. Summonses are sent to those whose names are drawn. *Id.*, Art. IV.C; *Reyes*, 934 F. Supp. at 556.

C. <u>The Analysis of the Demographic Composition in the Qualified Jury Wheels for the Southern District of New York: 2017 to Present</u>

Jury composition expert Jeffrey O'Neal Martin reviewed the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel utilized in this case and also analyzed the racial and ethnic composition those wheels. Mr. Martin's analysis is contained in the Declaration of Jeffrey Martin, attached as Exhibit A.

Mr. Martin concludes that there is significant underrepresentation of Black or African-American and Hispanic or Latino persons within the Qualified Jury Wheel for the White Plains Division. As illustrated in the Table below, the jury eligible population for the Southern District of New York is 18.09% Black or African-American and 23.41% Hispanic or Latino. Ex. A, ¶ 19. The jury eligible population for the Manhattan Division is 20.92% Black or African-American and 28.06% Hispanic or Latino. *Id*., ¶ 20. And the jury eligible population for the White Plains Division is 12.45% Black or African-American and 14.12% Hispanic or Latino. *Id*., ¶21.



The Qualified Jury Wheel from which Mr. Schulte's grand jury was picked was last refilled on February 17, 2017. The demographic data provided by the Form AO-12 reports indicates that the wheel was 8.76% Black or African- American and 10.48% Hispanic or Latino.

Ex. A., ¶ 55. As discussed more fully below, Black or African-American and Hispanic or Latino persons are significantly underrepresented within the White Plains wheel regardless of what method of statistical analysis is used.

Mr. Martin discovered that the structure of the Jury Plan systematically leads to underrepresentation for several reasons. First, the Jury Plan draws exclusively from voter registration rolls, which underrepresent the total jury eligible population of Black and Hispanic persons. Ex. A, ¶ 79. Additionally, by replenishing the Master wheels only once every four years, younger eligible jurors and those who move within the division are excluded towards the end of the life of the wheel. Ex. A, ¶¶ 12-13. Black or African-American and Hispanic or Latino persons are disproportionately represented in age groups 18, 19, and 20. *Id.*, ¶¶ 48-51. The four-year replenishment also disproportionately excludes persons who may have changed addresses within those four years. Black or African-American and Hispanic or Latino persons move at a higher rate and are therefore disproportionately affected. *Id*., ¶ 52.

Mr. Martin also found several substantial failures to comply with the Jury Plan. Some of these failures, such as improper apportionment among counties and exclusion of inactive voters, result in further underrepresentation of Black or African-American and Hispanic or Latino persons in the wheel; others arbitrarily exclude eligible people from jury service. In total, 459,796 persons were wrongly excluded because of a failure to properly implement and follow the Jury Plan. Ex. A, ¶ 45.

## II.    LEGAL BASIS FOR GRAND JURY CHALLENGE

Mr. Schulte's challenge is based on interconnected legal violations. Because the same definitions and the same statistical analysis of the jury data are utilized for all of our arguments,

the legal basis for each challenge will be explained first. Then the data will be discussed in the context of these challenges.

### A. Sixth Amendment Challenge

The Sixth Amendment guarantees a criminal defendant a grand jury selected from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, (1975). Mr. Schulte's right under the Sixth Amendment to a grand jury drawn from a fair cross-section of the community applies to the grand jury that indicted him. *See, e.g., United States v. Osorio*, 801 F. Supp. 966, 973-74 (D. Conn. 1992).

In *Duren v. Missouri,* the Supreme Court set forth the three elements that must be shown to establish a *prima facie* violation of the fair-cross-section requirement: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.  439 U.S. 357, 364 (1979).

 "[A] jury selection system yielding a significant underrepresentation of a minority group in jury venires can violate the 'fair cross-section' requirement of the Sixth Amendment, even if proof of discriminatory intent necessary for a Fifth Amendment violation is absent." *United States v. Biaggi,* 909 F.2d 662, 677 (2d Cir. 1990) (citing *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986); *Duren*, 439 U.S. at 368 n.26).

First prong of *Duren* – distinctive group

Blacks or African-Americans and Hispanics or Latinos are "distinctive" groups in the community, and a claim of underrepresentation of those groups meets the first prong of a fair-cross section claim. *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

a. <u>Second Prong of *Duren* – significant underrepresentation</u>

In considering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process." *Id.* (*citing Biaggi*, 909 F.2d at 677). The relevant comparison, for purposes of assessing the representativeness of the system, is between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool. *Id.* (citing *Duren*, 439 U.S. at 365-66). As constituted, the qualified jury wheels are a proper measure for evaluating the degree of underrepresentation as compared to the relevant community. *United States v. Rioux*, 97 F.3d 648, 655-56 (2d Cir. 1996)

While *Duren* itself did not define what community is relevant for a fair cross-section analysis, it is widely understood to mean "the district or division where the trial will be held." *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998); *see also United States v. Kenny,* 883 F. Supp. 869, 874 (E.D.N.Y. 1995). The offenses in this case (except for those relating to Virginia conduct) are alleged to have occurred in the Manhattan Division. Mr. Schulte and witnesses are within the Manhattan Division; the case was previously indicted in the Manhattan Division; and the case will be tried within the Manhattan Division. The appropriate comparison here is therefore between the Manhattan Division and the qualified wheel for White Plains.

Over the years, the Second Circuit has utilized various statistical models for evaluating claims of "significant underrepresentation." In *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996), the Circuit reviewed the three most common models. Statistical decision theory ("SDT") calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that

the jury pool resulted from random selection, then there is imperfection in the jury selection system. "The intellectual core of SDT is random selection." *Id*.

The absolute disparity method measures the difference between the group's representation in the general population and the group's representation in the qualified wheel. For example, if Blacks or African-Americans compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%. The "absolute numbers" approach is the average difference in the number of jurors per venire due to the underrepresentation. *Rioux*, 97 F.3d at 655.

Finally, the comparative disparity method, which the Second Circuit has rejected, "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Id*. at 655 (internal citations omitted). "Comparative disparity is calculated by dividing the 'absolute disparity' of a group … by the group's percentage of the population, and then multiplying by 100%." *Id*.

In this case, there is significant underrepresentation of both Black or African-American and Hispanic or Latino persons, regardless of the method of comparison utilized.

Turning first to the absolute disparity analysis, Black or African-American persons are 20.92% of the eligible juror population in Manhattan, but only 8.76% of the White Plains qualified wheel. That is an absolute disparity of 12.16%. Ex. A, ¶ 61. Hispanic or Latino persons are 28.06% of the eligible juror population in Manhattan, but only 10.48% of the White Plains qualified wheel. That is an absolute disparity of 17.58%. Ex. A, ¶ 62.



A comparative analysis of the data puts the disparity in context. Using the jury eligible population of the Manhattan Division again as the appropriate community, the comparative disparity of Black or African American persons is 58.13% and the comparative disparity of Hispanic or Latino persons is 62.66%.  Ex. A, ¶¶ 69, 70. These numbers mean that well over half of the Black or African-Americans and Hispanic or Latino persons who would be expected to be in the wheel were absent.

While the Manhattan Division is the appropriate community for comparison, significant underrepresentation is still present even if the White Plains qualified wheel is compared to the entire Southern District of New York. Compared to the eligible population of the entire Southern District, Black or African-American persons are underrepresented in absolute terms by 9.33%. Ex. A, ¶ 59. Hispanic or Latino persons are underrepresented by 12.93%. *Id.*, ¶ 60. Utilizing a comparative analysis, Black or African-American persons are underrepresented by 51.58%. *Id.*, ¶ 67. Hispanic or Latino persons are comparatively underrepresented by 55.23%. *Id.*, ¶ 68.

Even if one were to compare the White Plains qualified wheel to only the eligible jury population within the White Plains Division, the underrepresentation is significant. Absolute

underrepresentation of Black or African-American persons is 3.69%. Ex. A., ¶ 63. Comparative underrepresentation of Black or African-American persons is 29.63%. *Id.*, ¶ 71. Essentially, somewhere between a quarter and a third of the Black of African-American persons who should be in the qualified wheel are missing. Absolute underrepresentation of Hispanic of Latino persons is 3.64%. *Id.*, ¶ 64. Comparative underrepresentation is 25.80%. *Id.*, ¶ 72. This means one quarter of the Hispanic of Latino persons who would be expected to be in the qualified wheel are missing.

Notably, the absolute disparity reflected in the data is similar to the disparity that the Second Circuit found troubling in *Biaggi*, 909 F.2d at 677. There, the absolute disparity for Black or African-American persons was 3.6% and for Hispanic or Latino persons was 4.7%. In affirming the district court's denial of a Sixth Amendment challenge, the Circuit noted: "We think the facts of this case press the …. 'absolute numbers' approach to its limit, and would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id*. As explained below, here there are several other errors present in the formation of the White Plains Qualified Wheel, which exacerbate the problem of exclusively relying on voter lists.

Lastly, utilizing the third analysis method discussed in *Rioux*, the Statistical Decision Theory ("SDT") or Standard Deviation analysis, reveals that the underrepresentation of Black or African-American persons and Hispanic of Latino persons is significant and systematic. When utilizing the Standard Deviation analysis, Mr. Martin found that regardless of whether the qualified wheel was compared to the Manhattan Division, the entire Southern District, or the White Plains Division, the underrepresentation of both Black or African-American persons and

11

Hispanic or Latino persons "is not the result of random factors, chance, or luck, but is the result of a systematic practice that underrepresents [those distinctive groups]." Ex. A, ¶¶ 74, 75.

b. Third prong of *Duren* - Systematic Exclusion

As it relates to the third *Duren* prong, proving "systematic exclusion," a party need only establish that the underrepresentation is due to the systematic exclusion of a cognizable group during the jury selection processes, not that the system intentionally discriminates against any particular group, as required by an Equal Protection claim. *Biaggi,* 909 F.2d at 677. As described above, no matter which population is used as the proper comparison, there is significant underrepresentation of Black or African-American and Hispanic or Latino people in violation of the Sixth Amendment.

The proper "community" to which the White Plains Qualified Wheel data should be compared is the community in which the trial will be held: the Manhattan Division, or barring that, the Southern District of New York. In both instances, the primary reason for the significant underrepresentation of Black and African-American and Hispanic or Latino people is the choice to pursue an indictment from a grand jury drawn from the White Plains Division, as opposed to the Manhattan Division or the district as a whole. This decision resulted in the systematic exclusion of eligible jurors residing in the southern counties of the Southern District of New York, including a much higher percentage of Black and Latino people as compared to the northern counties. The use of the White Plains Division systematically excluded Black and Latino people by an exceedingly significant margin, thereby violating Mr. Schulte Fifth and Sixth Amendment rights to a grand jury drawn from a fair cross-section of the community. *See United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995) (finding fair cross-section violation due to exclusion of Hartford and New Britain residents).

Even if the proper comparison "community" is the White Plains Division, there are still systematic reasons for the significant levels of underrepresentation of Black or African-American and Hispanic or Latino people. Indeed, there are several: the decision to refill the jury wheel only every four years (and the failure to update addresses or re-mail juror questionnaires following a lack of return), the exclusive reliance on voter registration lists as the sole source of jurors, the exclusion of inactive voters from Orange, Putnam, Rockland, Sullivan and Westchester counties, and the process of excluding thousands of people from Putnam, Rockland, and Westchester counties due to incorrect proration. Ex. A, ¶¶ 76-82, 85-89.

By refilling the wheels once every four years, people's addresses become stale, and more "undeliverable" questionnaires are created. "Undeliverable" questionnaires are questionnaires that are sent to potential jurors, but are returned by the post office as "undeliverable" because the address is incorrect or out-of-date. This rate could be reduced if the wheels were refilled more frequently. Similarly, the rate of nonresponses, *i.e.*, questionnaires that are simply not returned, possibly because they did not reach the recipient, could be reduced by a more up-to-date set of addresses. Registered voters who have moved but remain in the division should have a fair opportunity to receive a qualification questionnaire.

By excluding people on account of undeliverable and nonresponsive questionnaires, Black and Latino people are further underrepresented. Ex. A, ¶¶ 88-89. Because the addresses are not updated, and no new attempt to mail the questionnaires is made, the decision to refill the wheel every four years has a systematic effect of excluding potential Black and Latino jurors.

Other district courts in large urban areas around the country have jury plans that require re-filling the wheels more frequently than every four years: the Eastern District of New York,[3] the Northern District of Illinois,[4] the Southern District of Florida,[5] and the Eastern District of Pennsylvania[6] require their respective wheels to be re-filled every two years, and the Central District of California requires its wheels to be re-filled every year.[7]

The decision to refill the wheel so infrequently results in additional disparities as younger people are disproportionately Black or African-American and Hispanic or Latino. Thus, "[b]y the end of life of the Master Jury Wheel, persons who are 18, 19, and 20 years old are excluded from jury service." Ex. A, ¶ 48. The age groups of 18-, 19-, and 20-year-olds are disproportionately Black or African-American and Hispanic or Latino compared to the rest of the population in the district *Id*., ¶¶ 48-51. As to the source lists for potential jurors, courts have the option, pursuant to the JSSA, of supplementing source lists where the voter registration lists do not produce a representative jury lists. Here exclusive reliance on voter registration lists produces underrepresentation of Black or African-American and Hispanic or Latino people. Ex. A., ¶ 79. Notwithstanding this effect, and observations of underrepresentation in SDNY due to exclusive

---

[3]     Jury Selection Plan (amended Oct. 30, 2006),
https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf
[4]     Plan for Random Selection of Jurors (Jan. 8, 2020),
https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_press/ILNDJuryPlan.pdf
[5]     Plan for the Random Selection of Grand and Petit Jurors of the United States District Court for the Southern District of Florida (May 5, 2010),
https://www.flsd.uscourts.gov/sites/flsd/files/JuryPlan.pdf
[6]     Plan for the Random Selection of Grand and Petit Jurors (July 18, 2017),
https://www.paed.uscourts.gov/documents/jury/Jury%20Plan.pdf

[7]     The Plan of  the United States District Court, Central District of California, for the Random Selection of Grand and Petit Jurors (July 15, 2019),
https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2019-07.pdf

reliance on voter lists nearly 25 years ago, *see United States v. Reyes,* 934 F. Supp. 553 (S.D.N.Y 1996), the current Jury Plan maintains voter lists as its single source for potential jurors. The Southern District of New York is alone in the circuit in this regard. The Eastern District of New York, in contrast, supplements registered voter lists with lists from the Department of Motor Vehicles.[8]

The problem goes further. Even some registered voters are arbitrarily excluded from consideration for jury service. As Mr. Martin describes, "inactive voters," who, by definition, are still registered to vote because their registration has not been cancelled, *see Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 291 (S.D.N.Y. 2020), are excluded from the Master Wheel in five of the six counties within the White Plains Division. While definite conclusions cannot be drawn regarding their race and ethnicity because that information is not recorded in the data provided, there is reason to believe that the inactive voters are disproportionately Black or African-American and Hispanic or Latino.  As detailed in an unrelated civil suit challenging New York State's treatment of inactive voters, a voter expert found that inactive voters in the 2016 presidential election were disproportionately Black and Hispanic:

**Racial identification of 2016 presidential election voters by registration status in NYS database**

| Which Group? | # Obs. | % of Group By Race | | | | |
|---|---|---|---|---|---|---|
| | | White | Black | Hispanic | Asian | Other |
| Active Voters in 2016 | 7,377,924 | 69.6% | 11.8% | 12.5% | 5.3% | 2.1% |
| Inactive Voters in 2016 | 96,680 | 59.4% | 16.7% | 16.5% | 4.9% | 2.4% |

---

[8] https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf

Table 4, page 12. See, e.g., Declaration of Marc N. Meredith, ECF No. 135-1, *Common Cause/New York v. Brehm*, 17 CV 6770 (AJN).

The racial makeup of the inactive voters in Dutchess County provides further support for this conclusion. In that county, Black or African-American people are 8.85% of the active voters and 10.38% of the inactive voters; Hispanic or Latino people are 7.97% active and 8.23% inactive. Ex. A, ¶ 29.

Finally, due to a miscalculation in the proration of counties for the White Plains Division, "285,347 registered voters who should have been considered for the White Plains Division Master Jury Wheel were excluded." Ex. A, ¶ 38. This mathematical error systematically excludes Black or African-American and Hispanic or Latino persons. *Id.*, ¶ 83.

## B. Equal Protection Challenge

The Equal Protection Clause of the Fifth Amendment also prohibits underrepresentation of minorities in both grand and petit juries. To prove a prima facie case of discrimination in grand jury selection in violation of the Equal Protection Clause: (1) the group alleged to be discriminated against must be a recognizable, distinct class; (2) the degree of underrepresentation must be proved over a significant time period; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. *Castaneda v. Partida,* 430 U.S. 482, 494-95 (1977). The Equal Protection claim requires animus, while the Sixth Amendment claim does not. *See United States v. Gelb*, 881 F.2d 1155, 1161 (2d Cir. 1989) ("While the equal protection clause of the Fourteenth Amendment prohibits underrepresentation of minorities in juries by reason of intentional discrimination, [t]he Sixth Amendment is stricter because it forbids any substantial underrepresentation of minorities, regardless of … motive."). An Equal Protection claim can only prevail if "it is the product of intentional discrimination." *Alston*, 791 F.2d at 257; *see also Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) ("To prove an equal protection

violation, claimants must prove purposeful discrimination...."). Absent intentional discrimination, a jury selection plan does not violate the Equal Protection Clause. *United States v. Rioux*, 97 F.3d 648, 659 (2d Cir. 1996).

As with our Sixth Amendment challenge, it is indisputable that Black or African-American and Hispanic or Latino people are recognizable and distinct classes. Thus, the first prong of this test is satisfied.

As to the second prong, for the reasons stated above, Black or African-American and Hispanic or Latino residents are underrepresented in the White Plains grand jury pool. In an Equal Protection challenge, defendants may submit alternative statistical analyses as evidence of improper underrepresentation. *United States v. Johnson*, 21 F. Supp. 2d 329, 334–35 (S.D.N.Y. 1998). One such method is comparative disparity, where a court looks to the differences between "a jury venire and community population" and use "standard deviation calculations to determine if the disparities could be the result of chance." *Id.* at 338. If a defendant shows that a disparity *cannot* be the result of chance, he has made a prima facie case for an equal protection violation. The burden then shifts to the government to supply a "plausible justification for the method of selecting jurors." *Id. See also Castaneda,* 430 U.S. at 496, n. 17; *Alston v. Manson,* 791 F.2d 255, 258 (2d Cir. 1986).

The comparative analysis and the Standard Deviation analysis, discussed in the argument regarding the second *Duren* prong, make clear that the level of underrepresentation presented here, regardless of what community the qualified wheel is compared to, "could not have been the result of random factors, chance, or luck, but is the result of a systematic process." Ex. A, ¶¶ 74, 75. That analysis alone is sufficient to shift the burden to the government to provide a "plausible justification" for the methods used to populate the wheel.

**C. JSSA Challenge**

Litigants in federal court have a statutory right under the JSSA to "grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861 (1994). Title 28 U.S.C. § 1867(a) and (d) provide that in criminal cases a defendant may move to dismiss an indictment and to stay any further proceedings against him if there has been a "substantial failure to comply" with the provisions of the JSSA in selecting the grand jury which indicted him or the petit jury to try his case, until such time as the failures have been corrected.

The JSSA sets out procedures for each federal district to randomly select jurors from a "fair cross section of the community in the district or division wherein the court convenes," 28 U.S.C. § 1861, and that no person is to be excluded from service as a juror for any invidious reason. *See id*. §§ 1862; 1863(a). The JSSA's "aim is to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. Rep. No. 90–1076 (1968) ("House Report"), reprinted in 1968 U.S.C.C.A.N. 1792, 1792.

The JSSA forbids the exclusion of jurors based on their race or national origin. 28 U.S.C. § 1862 (1994). The JSSA also mandates that the procedures for selecting grand jurors "shall ensure that each county ... within the ... division is substantially proportionally represented in the master wheel for that judicial district, division or combination of divisions." 28 U.S.C. § 1863(b)(3). Finally, the Act authorizes the use of voter registration lists, 28 U.S.C. § 1863(b)(2), as long as they produce representative juries. It also mandates that all citizens have the opportunity to be considered for service on juries. The Act requires

> that all litigants in Federal courts entitled to trial by jury shall have
> the right to grand and petit juries selected at random from a fair

> cross section of the community in the district or division wherein
> the court convenes. It is further the policy of the United States that
> all citizens shall have the opportunity to be considered for service
> on grand and petit juries in the district courts of the United States.

28 U.S.C. § 1861.

In order to prevail on a JSSA challenge, a defendant must show a "substantial failure to comply" with the JSSA. 28 U.S.C. § 1867(a). "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986). To establish a violation based on group underrepresentation, a defendant must show that the representation of a distinctive group in the community is not fair and reasonable in relation to the number of such persons in the community, and that that underrepresentation is the result of systematic exclusion. *See*, *e.g.*, *United States v. Rioux*, 97 F.3d 648, 654, 660 (2d Cir.1996). In short, "[t]he *Duren* test 'governs fair cross section challenges under both the [JSSA] and the sixth amendment.'" *Id.* (internal citations omitted). Thus for the reasons described above, the systematic exclusion of Black or African-American and Hispanic or Latino people from grand jury service violated Mr. Schulte's rights under the JSSA.

Beyond underrepresentation of Black and Latino persons, the exclusion of southern counties from consideration for jury service for the Schulte indictment violates the JSSA's requirement that counties be proportionally represented in the master jury wheel:

> These procedures shall be designed to ensure the random selection
> of a fair cross section of the persons residing in the community in
> the district or division wherein the court convenes. **They shall
> ensure that names of persons residing in each of the counties,
> parishes, or similar political subdivisions within the judicial
> district or division are placed in a master jury wheel**; and shall
> ensure that each county, parish, or similar political subdivision
> within the district or division is substantially proportionally

19

> represented in the master jury wheel for that judicial district,
> division, or combination of divisions....

28 U.S.C. § 1863(b)(3) (emphasis added).

On its face, the choice to indict a Manhattan case in the White Plains Division violates the JSSA. A district court must ensure that *all* "counties, parishes, or similar political subdivisions" each contribute names to the "district or division" to ensure a fair cross section of the community. *Id.* That standard is not met with these facts. Two counties— New York and Bronx—were not allowed to contribute any names to the pool of potential grand jurors for a Manhattan Division case. This by definition does not ensure that "names of persons residing in *each* of the counties" are utilized and that the counties are proportionally represented. *Id. See, e.g.*, *United States v. Jackman*, 46 F.3d 1240, 1250 (2d Cir. 1995) (Walker, J., dissenting) ("In my view, the patent, non-random exclusion of Hartford and New Britain residents by the jury clerk's use of a defective wheel would have sufficed to prove a violation of § 1863(b)(3), independent of the effect on the representation of racial minorities.").

There is another reason that Mr. Schulte rights under the JSSA were violated: through the exclusion of inactive voters. Such exclusion violates the JSSA in a more basic manner – these individuals (in total 97,875 people) are registered voters and therefore should be eligible for inclusion in the Master Wheel, and potentially sent a qualification questionnaire to determine whether they have moved out of district or are otherwise ineligible. While certain of the inactive voters have moved outside of the Southern District, not all have. Indeed, in *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 289 (S.D.N.Y. 2020), another court in this district found that tens of thousands of New York voters have been marked "inactive" even though they continue to reside at their address of registration. Judge Nathan attributed this problem to flaws

20

in the databases used: that of the United States Postal Service and the National Change of Address registry. *Id*.[9]

The fact that "inactive voters" from Dutchess County are considered for jury service highlights the arbitrariness of this practice. There is no justification for including those individuals and not the inactive voters in the other northern five counties. This practice finds no justification in the jury plan or JSSA. To the contrary, because "inactive voters" are still registered voters, the practice violates both. And because the Jury Plan relies exclusively on voter registration lists, as opposed to drawing from other sources such as the DMV, individuals who are considered "inactive voters," but are otherwise eligible to serve, have no chance of receiving a qualification questionnaire despite their potential eligibility.

The erroneous proration of counties, which results in the exclusion of nearly 300,000 registered voters in certain northern counties, also violates the JSSA. Although the Jury Plan (Section III.A) dictates that the "number of names to be drawn from each county shall reasonably reflect the relative number of registered voters in each county within respective Master Jury Wheels," the counties are only fully prorated by registered voters in the Manhattan Division, not the White Plains Division. Therefore, although one out of every three persons is selected for the Manhattan Division, the same is not true for registered voters in certain counties in White Plains. Instead, "1 out of every 4.5 registered voters from Putnam, Rockland, and Westchester counties" are selected for inclusion in the White Plains Master Wheel. *Id*., ¶ 37. This implementation violates both the Jury Plan and the JSSA's requirements that counties be proportionally represented in the wheel. Finally, even though they are on the registered voter lists for the

---

[9] Further to this point, some inactive voters from Dutchess County made it to the Qualified Wheel because they returned their qualification questionnaires (presumably at their registered address) and qualified to serve. Ex. A, ¶ 27.

respective counties, individuals who included an alternate mailing address when registering to vote in Dutchess, Orange, Putnam, and Sullivan counties are arbitrarily excluded from potentially serving on the Master Jury Wheel due to a technical glitch.  Ex. A, ¶ 42. All told, 76,574 people are excluded this way. *Id.*, ¶ 44. Notably, this technical glitch masks the severity of the underrepresentation caused by other factors. In other words, unless the other causes of underrepresentation are remedied (*e.g.*, refilling the wheel more frequently, fixing the proration error, including inactive voters, and including other source lists), fixing this technical glitch will only reveal more underrepresentation of the distinctive groups identified in this motion. *Id.*, ¶ 84.

## III.    CONCLUSION

For the above reasons, Mr. Schulte's rights, under the Fifth and Sixth Amendments and the JSSA, to a grand jury drawn from a fair cross-section of the community were violated. The third superseding indictment should therefore be dismissed.

Respectfully submitted,

/s/ Sabrina Shroff/Edward S. Zas/Deborah Colson
Counsel for Joshua A. Schulte

cc: Counsel of Record

*Exhibit A*

## DECLARATION OF JEFFREY MARTIN

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.
2. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.
3. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts.
4. I have been asked by counsel to review the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel that were used to select Grand Jurors in this case.

### SUMMARY OF FINDINGS

5. It is my understanding from counsel that all of the Grand Jurors in this case were selected from the Qualified Jury Wheel for the White Plains Division of the Southern District of New York.
6. My understanding is that the trial jurors will be selected from the Qualified Jury Wheel for the Manhattan Division of the Southern District of New York.
7. In my experience of over 50 federal jury challenges and since 1997, the Grand Jury was selected from the same division as that of the trial or the Grand Jury was selected district wide while the trial was from a division in that district. Either way, the Grand Jury was selected from a community that included the community of the trial division. Until recent cases in the Southern District of New York, I have not been involved in any jury challenge where the Grand Jury came from one division and the trial jury came from a different division.
8. For the purposes of this analysis, I have included census comparisons for the entire Southern District of New York as well as its two divisions of the Manhattan Division and the White Plains Division.
9. The racial, gender, and ethnicity demographics of the White Plains Division are substantially different from the demographics of the Manhattan Division.
10. The sole source of jurors for the Southern District of New York is the voter registration lists in the counties of the district as described in the Jury Plan Section IIIA (Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York dated February 13, 2009).
11. There are three large groups of registered voters that are systematically excluded by the Southern District of New York White Plains Division for reasons other than the statutory eligibility requirements or excusals from jury service despite Section IIIA of the Jury Plan.

12. Because the Master Jury Wheel is updated only every four years, persons who are 18 years old, 19 years old, or 20 years old could not serve on the Grand Jury in this case.
13. Because the Master Jury Wheel is updated only every four years, the effect of persons moving addresses, and potentially not receiving qualification forms or summons, is substantial.  Black or African-American persons and Hispanic or Latino persons in the White Plains Division disproportionately move more frequently than the rest of the population.
14. The Qualified Jury Wheel under represent Black or African-American persons and Hispanic or Latino persons.  The under representation is statistically significant.
15. There are systematic reasons for the under representation of Black or African-American persons and Hispanic or Latino persons.

JURY ELIGIBLE POPULATION IN THE SOUTHERN DISTRICT OF NEW YORK

16. The jury eligible population is defined as the population that is age 18 years and older who are citizens of the United States.  While there are other requirements to serve as a juror besides age and citizenship, this definition is standard for the analysis of jury lists and is the basis for census numbers on the Administrative Office of the U.S. Courts' Form AO-12 ("Report on the Operation of the Jury Selection Plan").
17. The most current census numbers for the jury eligible population are the American Community Survey 5 Year Average numbers for 2018.  These population figures will be used for this analysis.
18. The census numbers that have been used for Form AO-12 in the Southern District of New York are the same American Community Survey 5 Year Average numbers used in this analysis except that the supplied Form AO-12 in this case uses the year 2010 instead of 2018.  There is a slight rounding problem on the form used by the Southern District of New York resulting in the total population being 100.32% for the Manhattan Division and 99.73% for the White Plains Division.  Because the divisions work independently, there is not a district wide Form AO-12.
19. The jury eligible population for the entire Southern District of New York in 2018 is 62.14% White, 18.09% Black or African-American, 0.40% American Indian or Alaska Native, 5.53% Asian, 0.05% Native Hawaiian or Pacific Islander, 11.11% of some other race, and 2.68% multi-racial.  The jury eligible population is 23.41% Hispanic or Latino. The jury eligible population is 46.81% Male and 53.19% Female.
20. The jury eligible population for the Manhattan Division in 2018 is 55.16% White, 20.92% Black or African-American, 0.45% American Indian or Alaska Native, 6.32% Asian, 0.06% Native Hawaiian or Pacific Islander, 14.10% of some other race, and 2.99% multi-racial. The jury eligible population is 28.06% Hispanic or Latino.  The jury eligible population is 46.13% Male and 53.87% Female.
21. The jury eligible population for the White Plains Division in 2018 is 76.06% White, 12.45% Black or African-American, 0.29% American Indian or Alaska Native, 3.96%

Asian, 0.04% Native Hawaiian or Pacific Islander, 5.15% of some other race, and 2.06% multi-racial. The jury eligible population is 14.12% Hispanic or Latino. The jury eligible population is 48.17% Male and 51.83% Female.

GROUPS EXCLUDED FROM THE VOTER REGISTRATION LIST

22. There are three large groups of registered voters who are excluded from possible jury service in the White Plains Division. These groups are 1) inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester counties, 2) voters eliminated by the incorrect proration of Putnam, Rockland, and Westchester counties, and 3) voters in Dutchess, Orange, Putnam, and Sullivan counties with alternate mailing addresses in the voter registration lists.

23. The voter registration lists in New York identifies each voter as active or inactive. Inactive voters are registered voters and can vote on election day in their proper polling station. After a period of time inactive voters can be removed from the voter registration list.

24. Active and inactive voters were included from Dutchess county, but inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester counties were excluded.

25. The exclusion of inactive voters is inconsistent with using the voter registration lists of the counties as described in the Jury Plan Section IIIA.

26. The inclusion of inactive voters in Dutchess county is inconsistent with the exclusion of inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester counties.

27. Like active voters, some of the inactive voters in Dutchess county were selected for the Master Jury Wheel. Like active voters, some of the inactive voters in Dutchess county who were selected from the Master Jury Wheel were then sent a qualification questionnaire and returned the questionnaire indicating that they were eligible for jury service. These inactive voters were included in the Qualified Jury Wheel.

28. While the New York voter registration lists do not include a racial or ethnic designation for each voter, the standard statistical method of geocoding by Zip Code can be used to estimate the demographic characteristics of voters. Geocoding is the process of using the address or Zip Code of an individual to estimate their demographics using aggregate census numbers such as the 2018 American Community Survey 5 Year Average.

29. Using geocoding, the inactive voters in Dutchess county are disproportionately Black or African-American persons and Hispanic or Latino persons compared to the active voters in Dutchess county. Black or African-American persons are 8.85% of the active voters and 10.38% of the inactive voters. Hispanic or Latino persons are 7.97% of the active voters and 8.23% of the inactive voters.

30. Because the voter registration files received for Orange, Putnam, Rockland, Sullivan, and Westchester counties did not include inactive voters, geocoding of the inactive voters in these counties is not possible with the supplied data.

31. The New York State Board of Elections posts historical summaries of the voter registration lists for various dates including November 1st, 2016 corresponding to the time period for the voter registration lists used to construct the Master Jury Wheel in this case. This report is titled NYSVoter Enrollment by County, Party Affiliation and Status Voters Registered as of November 1, 2016.

32. The New York State Board of Elections states that as of November 1st, 2016 there were 18,712 inactive voters in Orange county, 5,357 inactive voters in Putnam county, 13,664 inactive voters in Rockland county, 7,141 inactive voters in Sullivan county, and 53,001 inactive voters in Westchester county. There were 97,875 inactive voters in total who were not included in the creation of the Master Jury Wheel for the White Plains Division.

33. The Jury Plan in Section IIIA states that "The number of names to be drawn from each county shall reasonably reflect the relative number of registered voters in each county within the respective Master Jury Wheels." The process to implement this requirement is shown in "Item 12 Calculation of the Div" supplied in the data.

34. The proration of counties in the Manhattan and White Plains Divisions is complicated by the fact that the divisions have three counties, Putnam, Rockland, and Westchester counties, which are in both divisions.

35. The proration of counties in the Manhattan Division is made according to the actual number of registered voters, but the proration of counties in the White Plains Division is made with the number of registered voters in Putnam, Rockland, and Westchester counties minus the number of registered voters selected in those counties for the Manhattan Division.

36. The process implemented prevents jurors in Putnam, Rockland, and Westchester counties from being selected for both the Manhattan Division Master Jury Wheel and the White Plains Division Master Jury Wheel. However, the process does not maintain the relative number of registered voters in each county for the White Plains Division. For example, Bronx county is 27.67% of the registered voters in the Manhattan Division and 27.51% of the Manhattan Division Master Jury Wheel. New York county is 39.07% (voters) and 39.85% (jury), Putnam county is 2.46% (voters) and 2.45% (jury), Rockland is 7.44% (voters) and 7.95% (jury), and Westchester county is 23.36% (voters) and 23.23% (jury). However, in the White Plains Division, Dutchess is 14.94% (voters) and 19.07% (jury), Orange is 16.60% (voters) and 21.19% (jury), Sullivan is 3.46% (voters) and 4.42% (jury), Putnam is 4.81% (voters) and 4.09% (jury), Rockland is 14.54% (voters) and 12.38% (jury), and Westchester is 45.64% (jury) and 38.84% (jury).

37. Put another way, the process selects 1 out of every 3 registered voters from each county in the Manhattan Division for the Manhattan Division Master Jury Wheel. The process selects 1 out of every 3 registered voters from Dutchess, Orange, and Sullivan counties in the White Plains Division for the White Plains Division Master Jury Wheel. However, the process implemented, as opposed to described in the Jury Plan, selects 1 out of every 4.5 registered voters from Putman, Rockland, and Westchester counties for the

White Plains Division Master Jury Wheel.  (The registered voters from Putnam, Rockland, and Westchester counties are picked in a pattern of the fourth registered voter and then the fifth registered voter and then repeating.)

38. The result for the White Plains Division is that effectively 285,347 registered voters who should have been considered for the White Plains Division Master Jury Wheel were excluded.  These excluded registered voters would not be the same voters as were selected in the Manhattan Division and so there would not be persons selected for both the Manhattan Division and the White Plains Division.

39. The selection could be implemented by selecting 1 out of every 3 registered voters in Putnam, Rockland, and Westchester counties as long as the initial person selected was either the first or the third person.  The selection for the Manhattan Division was 1 out of every 3 registered voters starting with the second person.  In this way the number chosen for each division will both match the relative size of the voter lists of the counties and no person will be selected for both divisions.

40. Using the jury eligible population, the voters excluded in the overlapping counties of Putnam, Rockland, and Westchester counties by the incorrect proration are disproportionately Black or African-American persons and Hispanic or Latino persons compared to the voters in the rest of the White Plains Division.  The population in the overlapping counties is 13.71% Black or African-American persons while the population in the rest of the White Plains Division is 10.30% Black or African-American persons.  The population in the overlapping counties is 15.20% Hispanic or Latino persons while the population in the rest of the White Plains Division is 12.29% Hispanic or Latino persons.

41. The voter registration lists for Dutchess, Orange, Putnam, Rockland, and Sullivan counties include a registration address as well as for some voters, an alternate mailing address.  The voter registration list for Westchester county includes a registration address but not an alternate mailing address.

42. In the process of selecting persons from the voter registration list of Rockland county, the alternate mailing address, which is only supplied for some voters, was successfully transferred to the Master Jury Wheel as the address for communications from the Court.  Voters who did not have an alternate mailing address, were placed in the Master Jury Wheel with their primary address.   However, in the process of selecting persons from the voter registration lists of Dutchess, Orange, Putnam, and Sullivan counties, the alternate mailing address was not successfully transferred to the Master Jury Wheel.  Specifically, persons from Dutchess, Orange, Putnam, and Sullivan counties with an alternate mailing address, including a Zip Code, in the voter registration lists do not have a Zip Code in the Master Jury Wheel for the address used for qualification questionnaires and summons.  Many alternate mailing addresses are Post Office Boxes and so require a Zip Code for delivery.

43. None of the persons on the Master Jury Wheel for the White Plains Division from Dutchess, Orange, Putnam, and Sullivan counties who had an alternate mailing address were added to the Qualified Jury Wheel.

44. There were 76,574 persons from Dutchess (25,627 persons), Orange (30,445 persons), Putnam (3,333 persons), and Sullivan (17,169 persons) counties who had an alternate mailing address and whose address in the Master County Jury Wheel was unsuccessfully transferred.

45. Taken together, there were 459,796 registered voters in the White Plains Division who were excluded because they were inactive, affected by the county proration, or had their alternate mailing address unsuccessfully transferred. The 459,796 excluded registered voters would be added to the 955,204 registered voters who were included in the process or amount to an additional 48.14%.

46. The excluded registered voters are unevenly distributed across the White Plains Division. The excluded registered voters would add 14.97% to Dutchess county, 26.12% to Orange county, 81.23% to Putnam county, 54,19% to Rockland county, 108.36% to Sullivan county, and 63.22% to Westchester county.

47. The chances of being selected for the Master Jury Wheel from the full voter registration list in Dutchess county is 1 out of 3.45, for Orange county is 1 out of 3.78, for Putnam county is 1 out of 5.44, for Rockland county is 1 out of 4.63, for Sullivan county is 1 out of 6.25, and for Westchester county is 1 out of 4.90.

EXCLUDED 18, 19, AND 20 YEAR OLDS

48. The Master Jury Wheel is refilled every 4 years. By the end of life of the Master Jury Wheel, persons who are 18, 19, and 20 years old are excluded from jury service. The age groups of 18, 19, and 20 year olds is disproportionately Black or African-American persons and Hispanic or Latino persons compared to the rest of the population in the Manhattan Division.

49. To split the population down to single ages requires the use of the American Community Survey Public Use Microdata Sample (PUMS). The most current version of PUMS is the 2018 5 Year Average and is consistent with the American Community Survey 2018 5 Year Survey numbers used for the population statistics above. Because PUMS is collected on multiple clusters of counties, the PUMS related to the White Plains Division includes Ulster County.

50. The jury eligible population in the White Plains Division (plus Ulster county) that is 18, 19, or 20 years old is disproportionately Black or African-American persons and Hispanic or Latino persons. The jury eligible population is 12.67% Black or African-American persons compared to 11.67% for persons older than age 20. The jury eligible population is 20.04% Hispanic or Latino persons compared to 13.20% for persons older than age 20.

51. The youngest person on the Master Jury Wheel for the White Plains Division was born on December 26th, 1998. As of January 1st, 2020, the youngest possible Grand Juror would be at least 21 years old.

PERSONS MOVING IN THE WHITE PLAINS DIVISION

52. 9.28% of the jury eligible population in the White Plains Division (using the PUMS plus Ulster county) has moved in the last year.  Because the Master Jury Wheel is refilled every four years and because the indictment in this case comes at the end of the life of the Master Jury Wheel, the number of persons who have changed address and potentially might not receive qualification forms or summons is exacerbated beyond the yearly moving rate.  Black or African-American persons in the White Plains Division move at a higher annual rate of 11.70%.  Hispanic or Latino persons in the White Plains Division move at a higher annual rate of 12.70%.

STATISTICAL ANALYSIS OF UNDER REPRESNTATION OF BLACK OR AFRICAN-AMERICAN AND HISPANIC OR LATINO PERSONS

53. The Grand Jurors in this case came from the White Plains Division Qualified Jury Wheel. As stated above, this analysis will compare the demographic characteristics of the White Plains Division Qualified Jury Wheel with the population of the entire Southern District of New York, the Manhattan Division, and the White Plains Division.

54. Form AO-12 reflects the demographic data from the Qualified Jury Wheel of the White Plains Division of the Southern District of New York from which the Grand Jurors were selected.

55. For the Qualified Jury Wheel refilled February 7th, 2017, Form AO-12 reports that the demographics of the Qualified Jury Wheel were 78.70% White, 8.76% Black or African-American, 0.15% American Indian or Alaska Native, 5.22% Asian, 0.15% Native Hawaiian or Pacific Islander, 5.00% of some other race, and 2.02% multi-racial.  The Qualified Jury Wheel is 10.48% Hispanic or Latino.  The Qualified Jury Wheel is 46.10% Male and 53.90% Female.

56. The demographics on Form AO-12 for the Qualified Jury Wheel are consistent with the demographics of the Qualified Jury Wheel supplied in the data.

57. There are several standard statistical analyses used to analyze the under representation of a distinctive group.  The most common and easiest to calculate are Absolute Disparity and Comparative Disparity.  From a scientific perspective, the number of Standard Deviations from Expected shows whether the under representation of a group is systematic or merely the result of "luck of the draw."

58. Absolute Disparity is simply the arithmetic difference between the percentage of a distinctive group on the jury list and the percentage of the same distinctive group in the population.

59. Using the demographics of the entire Southern District of New York, the Absolute Disparity for Black or African-American persons on the Qualified Jury Wheel is 9.33% under representation (18.09% minus 8.76%).

60. Using the demographics of the entire Southern District of New York, the Absolute Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 12.93% under representation (23.41% minus 10.48%).

61. Using the demographics of the Manhattan Division, the Absolute Disparity for Black or African-American persons on the Qualified Jury Wheel is 12.16% under representation (20.92% minus 8.76%).

62. Using the demographics of the Manhattan Division, the Absolute Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 17.58% under representation (28.06% minus 10.48%).

63. Using the demographics of the White Plains Division, the Absolute Disparity for Black or African-American persons on the Qualified Jury Wheel is 3.69% under representation (12.45% minus 8.76%).

64. Using the demographics of the White Plains Division, the Absolute Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 3.64% under representation (14.12% minus 10.48%).

## COMPARATIVE DISPARITY

65. Comparative Disparity by formula is the Absolute Disparity for a cognizable group divided by the population percentage of that cognizable group. Note that, mathematically, since the population percentage of a cognizable group can never be greater than 100% or 1.00, Comparative Disparity which is divided by something less than or equal to 1.00, will always be greater than Absolute Disparity.

66. Unlike Absolute Disparity, Comparative Disparity is mathematically a rate. That is, Comparative Disparity shows the rate at which a cognizable group is represented. In this way, Comparative Disparity means the same thing for a larger group that it does for a smaller group. A 50% Comparative Disparity means that half of the cognizable group expected is excluded whether that group is a larger part of the population such as White persons (55.16%) or a smaller part of the population such as Black or African-American persons (20.92%).

67. Using the demographics of the entire Southern District of New York, the Comparative Disparity for Black or African-American persons on the Qualified Jury Wheel is 51.58% under representation (9.33% divided by 18.09%). That is, over half the African-American persons that are expected are missing.

68. Using the demographics of the entire Southern District of New York, the Comparative Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 55.23% under representation (12.93% divided by 23.41%).

69. Using the demographics of the Manhattan Division, the Comparative Disparity for Black or African-American persons on the Jury Wheel is 58.13% under representation (12.16% divided by 20.92%).

70. Using the demographics of the Manhattan Division, the Comparative Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 62.66% under representation (17.58% divided by 28.06%).

71. Using the demographics of the White Plains Division, the Comparative Disparity for Black or African-American persons on the Qualified Jury Wheel is 29.63% under representation (3.69% divided by 12.45%).

72. Using the demographics of the White Plains Division, the Comparative Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is 25.80% under representation (3.64% divided by 14.12%).

## STANDARD DEVIATIONS FROM EXPECTED

73. Standard Deviation analysis is a widely accepted and fundamental tool used by statisticians to analyze data. Standard Deviation analysis allows statisticians to determine if the under representation of a distinctive group is statistically significant or not. That is, in any group drawn from the population such as a jury list, there are random factors that mean that the demographics of the jury list drawn from the population will not match the population demographics exactly because of "luck of the draw." However, standard deviations allow statisticians to scientifically determine whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic. Statisticians use a standard of 2 or 3 standard deviations to determine statistical significance. If there is no systematic under or over representation of a distinctive group, the divergence of demographics should exceed 2 standard deviations only approximately 5% of the time while the divergence of demographics should exceed 3 standard deviations only approximately 0.5% of the time.

74. Using the census population from the Southern District of New York, the Manhattan Division, or the White Plains Division, the percent of Black or African-American persons on the Qualified Jury Wheel differs from the percent of Black or African-American persons in the population by more than 3 standard deviations. In other words, the under representation of Black or African-American persons on the Qualified Jury Wheel is not the result of random factors, chance, or luck, but is the result of a systematic process that under represents Black or African-American persons.

75. Using the census population from the Southern District of New York, the Manhattan Division, or the White Plains Division, the percent of Hispanic or Latino persons on the Qualified Jury Wheel differs from the percent of Hispanic or Latino persons in the population by more than 3 standard deviations. In other words, the under representation of Hispanic or Latino persons on the Qualified Jury Wheel is not the result of random factors, chance, or luck, but is the result of a systematic process that under represents Hispanic or Latino persons.

SYTEMATIC FACTORS OF UNDER REPRESENTATION

76. The Qualified Jury Wheel that was created under represents Black or African-American persons and Hispanic or Latino persons.

77. There are several choices and procedures which lead to the under representation of Black or African-American persons and Hispanic or Latino persons. Some of the choices and procedures overlap, exacerbate, or counteract each other in terms of the under representation.

78. The choice of selecting the Grand Jury from the White Plains Division instead of the Manhattan Division or the entire Southern District of New York causes under representation of Black or African-American persons and Hispanic or Latino persons when compared to the jury eligible population of the Manhattan Division.

79. The choice to use the voter registration list as the sole source of names causes under representation of Black or African-American persons and Hispanic or Latino persons. The voter registration list does not include racial or ethnicity information and so the standard procedure of using zip codes to estimate individual demographic information from the 2018 American Community Survey 5 Year Average is used. Using estimated geocoded results by zip code, the voter registration list under represents Black or African-American persons and Hispanic or Latino persons as compared to the jury eligible population.

80. The exclusion of 18, 19, and 20 year olds as the jury list ages to 3 or more years causes under representation of Black or African-American persons and Hispanic or Latino persons.

81. The aging of the addresses used for qualification questionnaires and summons as the jury list ages to 3 or more years causes under representation of Black or African-American persons and Hispanic or Latino persons.

82. The exclusion of inactive voters from Orange, Putnam, Rockland, Sullivan, and Westchester counties causes under representation of Black or African-American persons and Hispanic or Latino persons.

83. The process of excluding persons from Putnam, Rockland, and Westchester counties because of the incorrect proration of counties causes under representation of Black or African-American persons and Hispanic or Latino persons.

84. The unsuccessful transferring of alternate mailing addresses for some voters from Dutchess, Orange, Putnam, and Sullivan counties causes under representation of White persons using geocoded results by zip code. Since this process counteracts the under representation of Black or African-American persons and Hispanic or Latino persons, correcting the computer process alone without addressing other choices and processes would exacerbate the under representation of Black or African-American persons and Hispanic or Latino persons.

85. The process of selecting every third person, except for Putnam, Rockland, and Westchester counties, from the county voter lists was used. Using geocoded results by

zip code and because the selection process is essentially random, the persons selected for the Master Jury Wheel mirrors the percentage of Black or African-American persons and of Hispanic or Latino persons as compared to the voter registration lists.

86. The mailing of qualification questionnaires is done from a random selection from the Master Jury Wheel. Using geocoded results by zip code and because the selection process is essentially random, the persons mailed a qualification questionnaire mirrors the percentage of Black or African-American persons and of Hispanic or Latino persons as compared to the Master Jury Wheel.

87. Some of the qualification questionnaires that are mailed are returned as undeliverable by the United States Post Office. Using geocoded results by zip code, the persons excluded by having their qualification questionnaire returned by the post office causes under representation of Black or African-American persons and Hispanic or Latino persons as compared to all persons mailed a qualification questionnaire.

88. Some of the qualification questionnaires that are mailed are not returned by the post office and no response is made. Using geocoded results by zip code, the persons excluded by not having a response to their qualification questionnaire causes under representation of Black or African-American persons and Hispanic or Latino persons as compared to all persons mailed a qualification questionnaire.

89. The response from the Jury Clerk about follow up with qualification forms where there is no response is "Persons who fail to respond to the qualification questionnaire are not currently re-mailed due to the volume of the summonses sent out."

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 13th day of November 2020

_____ Jeffrey Martin