UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JOSHUA ADAM SCHULTE,

Defendant.

S3 17 Cr. 548 (PAC)

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT JOSHUA ADAM SCHULTE'S MOTION TO DISMISS THE INDICTMENT

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

David W. Denton, Jr.
Sidhardha Kamaraju
Matthew Laroche
Assistant United States Attorneys
*Of Counsel*

## TABLE OF CONTENTS

I.   BACKGROUND ................................................................................................ 1

    A.   Procedural History ................................................................................ 1

    B.   The SDNY and Local Rules for the Division of Business ............................ 3

    C.   The SDNY Jury Plan ............................................................................ 4

II.   APPLICABLE LAW ...................................................................................... 6

III.   ARGUMENT .................................................................................................. 8

    A.   The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains.......... 9

    B.   The Defendant's Fair Cross-Section Claim is Meritless............................... 15

        1.   The Defendant Has Not Established That Blacks or Hispanics are Unfairly
            Underrepresented .............................................................................. 15

            a.   Relevant Jury Pool ..................................................................... 15
            b.   Community Population ................................................................ 18
            c.   The Method of Statistical Comparison ......................................... 18
            d.   Calculation of the Absolute Disparity ......................................... 20

        2.   Any Potential Underrepresentation is Not Due to Systematic Exclusion.................. 21

    C.   The Defendant's Equal Protection Claim Is Meritless .............................. 26

    D.   The Defendant's Statutory Claims Are Meritless ..................................... 27

IV.   CONCLUSION.................................................................................................. 31

In June 2020, amidst a global pandemic that suspended grand juries across the country, the Government sought and obtained a superseding indictment from the *only* available federal grand jury in the District—a grand jury of the Southern District of New York (the "Southern District" or "SDNY") sitting in White Plains.  The defendant now challenges the pool from which that grand jury was drawn, alleging that it does not reflect a "fair cross-section of the community," and moves to dismiss the indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* (the "JSSA"), the Sixth Amendment, and the Equal Protection Clause of the Fifth Amendment.  As set forth below, the defendant's arguments rely on faulty premises, and at any rate fail to meet the elements of claims under the JSSA, the Sixth Amendment, or the Fifth Amendment.  Therefore, the defendant's motion must be denied.

I.      **BACKGROUND**

**A.  Procedural History**

As the Court is aware, the charges in this case stem from a long-term investigation into WikiLeaks's disclosure of classified information belonging to the Central Intelligence Agency ("CIA").  Between March 7 and November 17, 2017, WikiLeaks made 26 separate disclosures of classified CIA information (together, the "Leaks").  The Leaks contained, among other things, highly sensitive CIA information including detailed descriptions of certain tools used by CIA operators.  The Leaks' impact on the CIA's intelligence gathering activities and the national security of the United States was catastrophic.

On June 18, 2018, based on the information gathered as part of the investigation, the defendant was charged in a thirteen-count Indictment with espionage and other offenses related to the Leaks, as well as child pornography and copyright offenses.  *See* S1 17 Cr. 548.  While those charges were pending and the defendant was detained in prison, the Government learned

that the defendant and other inmates had cellphones illegally smuggled into prison for their use and that the defendant may have been using the contraband cellphones to further disclose classified information. Based on the defendant's conduct, on October 31, 2018, the Government filed a second superseding indictment charging him with, in addition to the charges contained in the S1 Indictment, one additional count of unlawfully disclosing and attempting to disclose classified information and one count of contempt of court for willfully violating a court order. *See* S2 17 Cr. 548 (PAC).

On February 2, 2020, trial began as to the eleven national security related counts in the S2 Indictment. On March 9, 2020, a jury found the defendant guilty of two of those counts: making false statements to law enforcement, in violation of 18 U.S.C. § 1001, and contempt of Court, in violation of 18 U.S.C. § 401(3). The jury was unable to reach a unanimous verdict as to the remaining eight counts and, as a result, the Court granted the defendant's motion for a mistrial as to those counts.[1]

On June 8, 2020, the Government sought and obtained a third superseding indictment from a Southern District grand jury sitting in White Plains. *See* S3 17 Cr. 548 (PAC). The S3 Indictment contains nine counts that are based on the same conduct that was at issue during the February 2020 trial, namely, the defendant's theft and transmission of the Leaked Information, his destruction of log files and other forensic data on CIA computer systems in the course of committing that theft, his obstruction of the investigation into the Leaks, and his transmission and attempted transmission of national defense information while detained in prison. Pursuant to Rule 6(e) of the Rules for the Division of Business Among District Judges for the Southern

---

[1] The Government voluntarily dismissed Count Two of the S2 Indictment in advance of juror deliberations. *See* Feb. 28, 2020 Transcript.

District of New York (the "SDNY Business Division Rules," or the "Rules"), the S3 Indictment was assigned to the same judge to whom the original indictment was assigned.

### B.  The SDNY and Local Rules for the Division of Business

The defendant's brief repeatedly uses the term "Division" to describe a "White Plains Division" and a "Manhattan Division."  (*See, e.g.*, Br. 5 (referring to the "White Plains Division"); Br. 8 (noting that "the case will be tried within the Manhattan Division.  The appropriate comparison here is therefore between the Manhattan Division and the qualified wheel for White Plains.")).  His use of the term "division" is imprecise and attributes legal significance where there is none.  *See infra* pp. 9-14.  Understanding how that is so requires some background.

District courts in each state in the United States are prescribed by statute.  United States district courts in New York State are divided between four districts:  Northern, Southern, Eastern and Western.  28 U.S.C. § 112.  While certain districts in other states are further divided into "divisions" by statute, *see, e.g.*, 28 U.S.C. § 81 (dividing Alabama into three "districts" and multiple "divisions" within each district), the federal districts in New York State are not so divided.  That is, in the Southern District, no "divisions" have been created by statute.  28 U.S.C. § 112(b).  The statute provides only that "Court for the Southern District shall be held at New York, White Plains, and in the Middletown-Wallkill area of Orange County or such nearby location as may be deemed appropriate."  *Id.*

In the Southern District, the only authority determining whether particular cases are heard in the Manhattan or White Plains courthouse is the SDNY Business Division Rules.  These rules begin with an important preface: they "shall not be deemed to vest any rights in litigants."  Moreover, the Rules do not describe—much less limit—what matters may be heard by what

grand jury.  *Cf.* SDNY Business Division Rule 6 (describing proceedings *after* an indictment has been returned).  Rather, the Rules provide only that *once an indictment is returned*, "[t]he U.S. attorney designates on the criminal cover sheet that the case is to be assigned to White Plains if the crime was allegedly committed in whole or in predominant part in the Northern Counties." SDNY Business Division Rule 18(b).  Furthermore, the Rules specifically contemplate that cases may be reassigned from one courthouse to another.  SDNY Business Division Rule 19. Consistent with these Rules, it is common for cases to be indicted by grand juries sitting in the White Plains courthouse and tried in the Manhattan courthouse.  *See, e.g.*, *United States v. Israel*, 05 Cr. 1039 (CM); *United States v. Cromitie, et al.*, 09 Cr. 558 (CM); *United States v. Annabi*, 10 Cr. 07 (CM); *United States v. Arici*, 12 Cr. 24 (LAP); *United States v. Reeves, et al.*, 16 Cr. 372 (VEC); *United States v. Turner*, 17 Cr. 549 (KMK); *United States v. Guerrier*, 18 Cr. 284 (JSR).

### C.  The SDNY Jury Plan

The JSSA provides the structure for the selection of juries in federal district courts.  The JSSA requires each district to devise and place into operation a written plan for random selection of grand and petit jurors.  28 U.S.C. § 1863(a).  Each district in New York selects grand and petit juries pursuant to a plan adopted by the judges of the district and approved by the Judicial Conference of the Second Circuit.  *Id.*; *see also United States v. Bahna*, 68 F.3d 19, 23 (2d Cir. 1995).  The plan for the Southern District has been in place since February 2009.  *See* Amended Plan for the Random Selection of Grand and Petit Jurors in the Southern District of New York (the "SDNY Jury Plan," or the "Plan").

Under the terms of the SDNY Jury Plan, the initial selection of persons to be considered for service as grand and petit jurors are made at random from voter registration lists.  SDNY Jury

Plan at Art. III.A.  Two Master Jury Wheels are constructed from these lists: one for the

Manhattan courthouse and one for the White Plains courthouse.  *Id.* at Art. III.B.  The Manhattan

Master Jury Wheel draws from voter lists from the following counties: New York, Bronx,

Westchester, Putnam, and Rockland.  *See id.* at Art. III.C.  The White Plains Master Jury Wheel

draws from voter lists from the following counties:  Westchester, Putnam, Rockland, Orange,

Sullivan, and Dutchess.  *See id.*  Both Master Jury Wheels are emptied and refilled no later than

September 1 following the date of each Presidential Election.  *Id.* at Art. III.B.

　　　　To meet anticipated demand for jurors, names are drawn randomly from the Master Jury

Wheels.  *Id.* at Art. III.D.  These individuals are sent a questionnaire to examine their

qualifications and availability for jury service.  *Id.*  Pursuant to 28 U.S.C. § 1865(b), all persons

are qualified for jury service unless he or she:

> (1) Is not a citizen of the United States at least eighteen years old who has resided for a period of one year within the judicial district;
>
> (2) Is unable to read, write, and understand English with a degree of proficiency sufficient to fill out the juror qualification questionnaire;
>
> (3) Is unable to speak English;
>
> (4) Is incapable, by mental or physical infirmity, to render satisfactory jury service; or
>
> (5) Has a charge pending for the commission of, or has been convicted in a State or Federal court, of a felony and his or her civil rights have not been restored.

*Id.* at Art. VII.  Additionally, certain persons are declared exempt from jury service, including

active service members in the Armed Forces of the United States, members of fire or police

departments, and public officers in the executive, legislative, or judicial branches of the State or

Federal Government who are actively engaged in the performance of official duties.  *Id.* at Art.

V; 28 U.S.C. § 1863(b)(6).  Finally, because jury service for certain groups of individuals would

"entail undue hardship or extreme inconvenience," those individuals are excused or deferred

upon individual request.  SDNY Jury Plan at Art. VI.  These groups include:

(1) Persons over 70 years of age;

(2) Persons having legal custody and active daily care of a child under the age of 12, or who are essential to the daily care of aged or infirm persons;

(3) Persons who have satisfactorily served as grand or petit jurors in a State or Federal court within the last four years;

(4) Volunteer safety personnel; and

(5) Persons as to whom a judge finds, for any other reason, that jury service would constitute an undue hardship and extreme inconvenience.

*Id.*

The names of individuals who are determined to be qualified to serve as jurors, and are

not "exempt, excused, or deferred," comprise the Qualified Jury Wheels—one for service at the

Manhattan courthouse and one for service at the White Plains courthouse.  *Id.*, Art. IV.A-B.

When jurors are needed, names are drawn randomly from the Qualified Jury Wheels, and

summonses are sent to those whose names are drawn.  *Id.*, Art. IV.C.  After being summoned,

these individuals are randomly assigned to jury panels as needed, for individual trials and grand

juries at the courthouse corresponding to the Qualified Wheel from which they were drawn.  *Id.*

## II.     APPLICABLE LAW

"The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross

section of the community."  *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996).  In *Duren v.*

*Missouri*, the Supreme Court articulated a three part test that defendants must meet in order to

establish a prima facie violation of the fair cross-section requirement: (1) the excluded group is

"distinctive"; (2) representation of this group in "venires from which juries are selected is not

fair and reasonable in relation to the number of such persons in the community;" and (3) the

6

underrepresentation is due to "systematic exclusion of the group in the jury-selection process." 439 U.S. 357, 364 (1979).

Similarly, the JSSA sets forth a policy that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," and prohibits discrimination on certain bases in jury selection. 28 U.S.C. §§ 1861, 1862. The JSSA further requires each district court to devise and place into operation a plan for the random selection of juries that is designed to achieve the objectives of the foregoing sections, and sets forth certain other requirements for jury selection. 28 U.S.C. §§ 1863-66. Finally, the JSSA provides a statutory mechanism by which a defendant may challenge failure to comply with the foregoing:

> In criminal cases, before voir dire begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a). Where such a motion is made and supported by "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title," the district court may conduct a hearing. 28 U.S.C. § 1867(d); *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987). As relevant here, "[i]f the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate." 28 U.S.C. § 1867(d). Fair cross-section claims under the Sixth Amendment and the JSSA are evaluated using the same framework. *See Rioux*, 97 F.3d at 660; *United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986).

7

Finally, to succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that "(1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, *i.e.*, is the result of intentional discrimination by the District." *Rioux*, 97 F.3d at 659.  An equal protection claim can only prevail if the claimant proves that underrepresentation is the result of intentional discrimination.  *United States v. Ramnath*, 131 F.3d 132, 132, 1997 WL738584 (2d Cir. 1997) (summary order); *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir. 1986).

## III.    ARGUMENT

The Government's decision to seek an indictment of the defendant from a grand jury sitting in White Plains was entirely appropriate and consistent with the Constitution, the JSSA, and the SDNY local rules.  Most of the defendant's claims to the contrary rest on a faulty premise:  That a defendant who is likely to be tried in the Manhattan courthouse must be indicted by a grand jury sitting in that same courthouse.  That is not the law.  *See* Part III.A, *infra*.

That foundational error is fatal to the defendant's fair cross-section claim.  When the proper comparators are considered—the White Plain Master (or Qualified) Wheels to the voting age population of the counties from which juries in White Plains are drawn, rather than the defendant's apples-to-oranges comparison of the White Plains Qualified Jury Wheel to the population of the Manhattan "Division"—the defendant fails to establish unfair underrepresentation under the second prong of the *Duren* test.  *See* Part III.B.1, *infra*.  Moreover, the defendant's fair cross-section claim fails for two additional reasons: (1) the factors cited by the defendant have only minimal effect on the disparity that he alleges; and (2) any underrepresentation is the product of "external factors" affecting the jury-selection process that

the Second Circuit and other courts have repeatedly found do not meet the third prong of *Duren*,

and not of "systematic exclusion."  *See* Part III.B.2, *infra*.

Finally, the defendant's equal protection and statutory claims are meritless for these and

other reasons.  *See* Parts III.C & D, *infra*.

### A.  The Defendant Was Properly Indicted by a Grand Jury Sitting in White Plains

At the heart of the defendant's fair cross-section claim is his contention that the

Government seeking an indictment from a grand jury sitting in White Plains—which was the

only readily available grand jury at the time, due to the global pandemic[2]—"deviated from the

established, court-tested, and constitutional practice of indicting defendants in the division in

which the offenses allegedly occurred and in which the case will be tried."  (Br. 2).  Because

some of the offenses are alleged to have occurred in the "Manhattan Division" and the

defendant's retrial will occur there too, he argues that the "appropriate comparator," for the

purpose of his fair cross-section claim, "is therefore between the Manhattan Division and the

qualified wheel for White Plains."  (Br. 8).  This premise is faulty.

"It is well-settled that neither the jury selection statute nor the Constitution requires that

jurors be drawn from an entire district."  *Bahna*, 68 F.3d at 24 (collecting cases); *see also United*

*States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013) ("[O]ur precedent makes clear that

---

[2] The superseding indictment in this case was filed on June 8, 2020, at which time the grand jury sitting in White Plains was the only readily available grand jury in the District.  Over time, grand jury quorums returned in Manhattan, but with substantially less availability than before the pandemic.  As a result, the Government has sought indictments from grand juries sitting in White Plains and Manhattan, as availability permits.  The global pandemic's effect on grand jury availability continues to evolve, but at no point have grand juries in White Plains or Manhattan resumed normal activity.  Given the Chief Judge's order dated November 30, 2020, which suspended additional empanelment of grand juries through at least January 19, 2021, the Government expects that grand jury availability will continue to be an issue in the months to come.  *See* 20 Misc. 622 (CM).

the Sixth Amendment does not entitle a defendant to be tried in a geographic location any more specific than the District where the offense was allegedly committed."). Rather, "[c]ourts have broad latitude in defining the geographic area from which juries will be selected." *United States v. Yonkers Contracting Co.*, 682 F. Supp. 757, 768 (S.D.N.Y. 1988). Consistent with the foregoing, the SDNY Jury Plan creates two separate Master Wheels—one for the White Plains courthouse and one for the Manhattan courthouse, each of which draws from certain counties, with some overlapping counties. SDNY Jury Plan Art. III.B. This is perfectly consistent with the JSSA, *see* 28 U.S.C. § 1869(e), and with longstanding precedent, as Judge Hand has explained:

> [T]he district and circuit courts have had power since the first Judicial Act of 1789 to divide a district territorially in the interest of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of the statute; the courts have again and again recognized its validity. Furthermore, it would be impossible in practice to administer it, if it were a condition that that divisions made must be so homogeneous that they showed an equal percentage of all possible groups. There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages. To demand that they shall not, would be a fantastic pedantry which would serve no purpose and would put an end to the statute.

*United States v. Gottfried*, 165 F.2d 360, 364 (2d Cir. 1948); *accord Bahna*, 68 F.3d at 24-25.

There is accordingly no constitutional or statutory basis for the defendant's claimed entitlement to a grand jury drawn from the population of the same "division" in which at least some of the offenses occurred and where he will likely be retried. To the contrary, the Second Circuit has rejected a similar claim. In *Bahna*, a defendant in the Eastern District of New York was initially convicted at a trial held at the Brooklyn courthouse; after that conviction was vacated, he was again convicted, this time at a trial held at the Uniondale courthouse. 68 F.3d at 20. Under the relevant jury plan, jurors for trials held in Brooklyn were drawn from the entire Eastern District, while jurors for trials held in the "Long Island Division," which included the

Uniondale courthouse, were drawn from Nassau and Suffolk Counties.  *Id.* at 24.  The defendant argued that the district court erred by selecting the jury from the "Long Island Division" wheel because there was under-representation of Blacks and Hispanics in that "division" as compared to the Eastern District as a whole.  *Id.* at 23-24.  The Second Circuit rejected the argument, finding that it "[wa]s based on an improper premise."  *Id.* at 24.  Contrary to the defendant's claims, "[w]here a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities."  *Id.* (emphasis added).

Consistent with *Bahna*, courts have repeatedly found that defendants in criminal cases have no constitutional or statutory right to a jury drawn from the entire district or from a particular geographic area within a district, such as the county or "division" where the offense was committed.  *See, e.g.*, *Rutenberg v. United States*, 245 U.S. 480, 482 (1918) (rejecting claim that defendant had Sixth Amendment right to jury drawn from entire district); *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997) ("Th[e] [Sixth] Amendment's guarantees of an impartial jury 'of the State and district' in which the crime was committed does not require a narrower geographical focus than the district itself."); *United States v. Richardson*, 537 F.3d 951, 959 (8th Cir. 2008) (a criminal defendant "does not have a right to have his trial in or jurors summoned from a particular division of the state and district where the crime was committed"); *United States v. Herbert*, 698 F.2d 981, 984 (9th Cir. 1983) (finding that "[a] petit jury may be drawn constitutionally from only one division and not the whole district"); *Zicarelli v. Dietz*, 633 F.2d 312, 316-18 (3d Cir. 1980) (finding "there is no constitutional right to a jury chosen from the division where the offense was committed or from the entire district which includes that division"); *United States v. Florence*, 456 F.2d 46, 49-50 (4th Cir. 1972) (holding that a

defendant has no constitutional or statutory right to a jury selected from the entire district or from a particular division).

Because the defendant has no right to insist that either the grand or petit jury be drawn from any particular geographic area within the Southern District, he is wrong to assert that his fair cross-section claim must be analyzed against the geographic location in which some of the offenses were committed or the trial is expected to occur. Rather, "[w]here a jury venire is drawn from a properly designated division, we look to *that division* to see whether there has been any unlawful or unconstitutional treatment of minorities." *Bahna*, 68 F.3d at 24 (emphasis added). Here, consistent with the SDNY Grand Jury Plan, the venire for the grand jury that indicted the defendant was drawn from the voter lists of the following counties: Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess. That is undoubtedly a "properly designated division" pursuant to the JSSA. As noted, the Southern District is not divided into "divisions" by statute. *See* 28 U.S.C. § 112(b). For purposes of the JSSA, district courts in such undivided districts have the authority to determine "divisions" comprised of "counties, parishes, or similar political subdivisions surrounding the places where court is held." 28 U.S.C. § 1869(e). Accordingly, while the SDNY Jury Plan neither creates nor ever uses the term "White Plains Division" or "Manhattan Division," it contemplates Master Jury Wheels drawn from two geographic areas that satisfy the definition of "division" under the JSSA. Thus, in evaluating the defendant's fair cross-section claim, this Court must "look to *that division*"—the counties from which the White Plains Master Wheel is drawn—"to see whether there has been any unlawful or unconstitutional treatment of minorities." *Bahna*, 68 F.3d at 24 (emphasis added).

In the face of this authority, the defendant cites only two district court cases for the proposition that "community" for purposes of a fair cross-section claim is "widely understood to

mean 'the district or division where *the trial* will be held.'"  (Br. 8 (quoting *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998) (emphasis added) and citing *United States v. Kenny*, 883 F. Supp. 869, 874 (E.D.N.Y. 1995))).  Not only is the authority cited non-binding, but it is inapposite as well:  Both cases appear to concern instances in which the grand jury and trial jury sat in the same courthouse, and thus there was no cause to consider whether the same "community" was relevant to separate challenges to the grand and petit juries.  *See Johnson*, 21 F. Supp. at 334-35; *Kenny*, 883 F. Supp. at 874.  As such, neither case supports the proposition that where a defendant is challenging the selection of the *grand* jury, the relevant "community" is the population of the location in which his *trial* will be held.  Such a comparison is unjustified, as *Bahna* makes clear:  That case appears to involve conduct that occurred in Brooklyn, appears to have been indicted in Brooklyn, was originally tried in Brooklyn, and was later transferred to Uniondale, where it was tried with a jury drawn from the "Long Island Division."  Yet the Second Circuit rejected the defendant's claimed entitlement to a jury drawn from Kings, Queens and Richmond counties, or the entire Eastern District, because that argument—like the defendant's here—was based on a flawed premise.

The defendant's proposed rule—comparing the composition of the *grand jury* venire to the population of the expected *trial* location—makes little legal or practical sense.  Where, as here, the defendant's challenge is to the indictment, the proceeding for which the defendant is entitled to expect a jury drawn from a fair cross-section of the community is not the trial, but the grand jury proceeding itself.  Indeed, in the Southern District, cases are commonly transferred from one courthouse to another, including cases that are indicted in White Plains but tried in Manhattan.  *See supra* p. 4 (collecting examples).  That is entirely consistent not just with the foregoing authority, but also with the Southern District's Local Rules for the Division of

Business.  *See* SDNY Business Division Rules 18, 19.  Under the defendant's approach, it would be impossible for prosecutors to determine *ex ante* that that they were seeking an indictment from a grand jury drawn from a representative cross-section of the relevant community, because they would not yet know with certainty in which community the case will be tried.

The defendant's argument therefore boils down to an unfounded accusation that it is "most unusual" to seek an indictment in a courthouse other than the one in which the case will likely be tried and that such a practice opens the door to "prosecutorial gamesmanship where the government can forum shop for the racial, gender and economic demographics of their choice." (Br. 1, 3).  This argument is inconsistent with the foregoing law that the defendant has no right to jurors drawn from any particular geographic area within the district.  *See also Rosencrans v. United States*, 165 U.S. 257, 260-63 (1897) (finding no error in grand jury returning indictment in a division different from the division in which the trial proceeded).  It also finds no support in the SDNY Business Division Rules, which vest no rights in any parties and, in any event, contemplate that judges may reassign cases from one courthouse to another.  And it falls exceedingly flat on the facts of this case.  The Government did not "forum shop" to achieve some perceived advantage.  Rather, it sought a superseding indictment from a grand jury in White Plains because it was the *only* grand jury with a quorum sitting in the Southern District at the time (a relatively rare situation created by an unprecedented public health crisis).

In sum, the decision to indict the defendant in White Plains was entirely proper, and the lack of any constitutional or statutory basis for the defendant's contrary argument is fatal to his fair cross-section claims, as described below.

### B.  The Defendant's Fair Cross-Section Claim is Meritless

The defendant's fair cross-section claim is based on the assertion that Black or African-American and Hispanic or Latino individuals are unfairly underrepresented in the relevant jury pool.  (Br. 8-9).  While these are "distinctive" groups, satisfying *Duren*'s first prong, the defendant's claim fails on each of the other two prongs.

### 1.  The Defendant Has Not Established That Blacks or Hispanics are Unfairly Underrepresented

The second prong of the *Duren* test requires the Court to determine whether representation of either or both of the "distinctive" groups in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community. *Duren*, 439 U.S. at 364.  This requires determining the relevant comparators—*i.e.*, what is the "relevant jury pool" and what is the "community" population against which it is compared—as well as the appropriate method of statistical comparison.  *See Rioux*, 97 F.3d at 656.

### a.  Relevant Jury Pool

Here, the defendant contends that the "relevant jury pool" is the White Plains Qualified Wheel.  (Br. 8).  The Government believes that the "relevant jury pool" is the White Plains *Master* Wheel, but, as set forth below, the defendant's claim fails even using the White Plains Qualified Wheel.

"Neither the Supreme Court nor the Second Circuit has defined the 'relevant jury pool' with any specificity." *United States v. Rioux* 930 F. Supp. 1558, 1565 (D. Conn. 1995).  In a detailed survey of the case law, the district court in *Rioux* found that cases have examined different relevant pools, including the master wheel, the qualified wheel over a period of time, the venires appearing around the time of the defendant's trial, or some combination thereof.  *Id.* Ultimately, the district court in *Rioux* found that the teaching of *Duren* and the Second Circuit's

subsequent cases is that "the court must assess representativeness in the context of the systematic defect identified by the defendant." *Rioux*, 930 F. Supp. at 1566-68.  In that case, the claimed defects were in the construction of the qualified wheel and, therefore, the "relevant jury pool" was the "qualified wheel over the life of the wheel." *Id.* at 1575.

Affirming that decision, the Second Circuit did not hold that the qualified wheel is necessarily the "relevant jury pool," as the defendant's cursory treatment of the issue suggests. (*See* Br. 8 (citing *Rioux*, 97 F.3d at 655-56)).  Rather, after stating that the relevant jury pool "may be defined by: (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three," the Circuit noted that the parties had agreed that the district court properly used the qualified wheel over the life of the wheel as the "relevant jury pool." *Rioux*, 97 F.3d at 657.  The court's acceptance of the qualified jury wheel as the "relevant jury pool" for that case—an issue which was not in dispute—does not mean it necessarily must be applied in all cases. *Id.*  Indeed, in other cases where the claim of error was *not* focused on the construction of the qualified wheel, different "relevant jury pools" have been used by the Second Circuit.  Most notably, in *Biaggi*, the main thrust of the defendant's fair cross-section claim was that reliance on voter registration lists systemically excluded African-Americans and Hispanics from jury service—a claim which is directed at the composition of the master wheel—and the Second Circuit identified the district's *master* wheel as the "relevant jury pool." *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990).

Here, the defendant claims that the alleged underrepresentation is based on the following factors:  (1) the SDNY Jury Plan draws exclusively from voter registration lists; (2) by replenishing the Master Jury Wheels only once every four years, younger eligible jurors and those who move into the White Plains counties are excluded toward the end of the life of the

16

Master Jury Wheel; and (3) failures to comply with the SDNY Jury Plan, including (a) improper apportionment among counties and exclusion of inactive voters; (b) incorrect "proration" of jurors between Manhattan and White Plains; and (c) exclusion of individuals who included an alternate mailing address when registering to vote in certain counties . (*See* Br. 12-16; Martin Aff. ¶¶ 79-89). All but one of these claims[3] is directed at the composition of the *master* wheel, not the qualified wheel. Because the "systematic defect[s] identified by the defendant" relate to the Master Jury Wheel, consistent with *Biaggi*, the White Plains Master Jury Wheel is the appropriate "relevant jury pool."[4]  *Rioux*, 930 F. Supp. at 1566-68.

Although the Master Jury Wheel does not include reliable information regarding the race and ethnicity of the individuals selected from voter registration lists, the racial and ethnic makeup of the White Plains Master Jury Wheel can be estimated using geocoding and Bayesian Improved Surname Geocoding ("BISG").[5]  Taking into account those estimates, the White Plains Master Wheel is 11.20% Black or African-American and 12.97% Hispanic or Latino. (Siskin

---

[3] Due to a technical error, the zip codes for individuals who provided an alternative address when they registered to vote were not included on the Master Jury Wheel. (*See* Martin Aff. ¶ 42). Because those individuals likely did not receive questionnaires, none of them were moved from the Master Jury Wheel to the Qualified Jury Wheel. As discussed below, if this issue were corrected, the representation of Black or African-American and Hispanic or Latino individuals on the White Plains Qualified Jury Wheel would actually *decrease*.  *See* Part III.D, *infra*.

[4] The difference between the White Plains Master Jury Wheel and the White Plains Qualified Jury Wheel is that the Qualified Jury Wheel does not include those individuals from the Master Jury Wheel who were determined to be unqualified or exempt, or whose service was deferred or excused for undue hardship. The defendant makes no allegation that the qualifying and exemption criteria or bases for excusal and deferment are discriminatory or unconstitutional.

[5] As detailed in the expert report of Dr. Bernard R. Siskin, geocoding is based on estimating the proportion of persons who are of a given race or ethnicity based on the racial and ethnic area in which they live. (*See* Affidavit of Dr. Bernard R. Siskin ("Siskin Aff."), attached hereto as Exhibit A, at ¶ 26). BISG enhances the accuracy of geocoding for Hispanic or Latino persons by using information about persons' last names. (*Id.*).

Aff. at ¶ 28).  By contrast, the White Plains Qualified Wheel is 8.76% Black or African-American and 10.48% Hispanic or Latino.  (*Id.* at ¶ 17).

b.  *Community Population*

The "community population" for purposes of assessing representativeness is the population eligible for jury service in the community.  *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 524 (1975) (focusing on population eligible for jury service); *Rioux*, 97 F.3d at 657 ("appropriate measure in this case is the eighteen and older subset of the population").  But how should the relevant "community" be defined?  The defendant contends that it is the jury eligible population of the "Manhattan Division," because that is where the offense occurred and where he assumes he will be tried.  (Br. 8, 10).  As set forth above, he is wrong.  The relevant comparator is the jury eligible population of the five counties from which the White Plains Master Wheel is drawn.  *See* Part I, *supra*.

The American Community Survey ("ACS") 2018 data indicate that the jury eligible population for the White Plains counties in 2018 was 12.45% Black or African-American and 14.12% Hispanic or Latino.[6]  (*See* Siskin Aff. at ¶ 19; *see also* Martin Aff. at ¶ 21).

c.  *The Method of Statistical Comparison*

Once the relevant comparators are defined, an additional threshold question is the statistical method by which to compare them.  Courts have applied different approaches over time, such as the statistical decision theory, the comparative disparity theory, and the absolute disparity theory.  *See Rioux*, 97 F.3d at 655.  Although no method is perfect, *see Berghuis v.*

---

[6] The American Community Survey gathers demographic information in between the decennial census, and is published by the United States Census Bureau.  (*See* Siskin Aff. at ¶ 18).  The latest available data is the 2018 five-year survey combining the 2014, 2015, 2016, 2017, and 2018 survey data.  (*Id.*).

*Smith*, 559 U.S. 314, 329 (2010), the Second Circuit has made clear that the comparative disparity theory is disfavored and strongly suggested that the absolute disparity theory is generally appropriate, *see Rioux*, 97 F.3d at 655-56; *see also United States v. Barnes*, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007) ("[T]he absolute disparity approach is the primary approach used in this Circuit.").

The "absolute disparity" approach measures the absolute numerical difference between the distinctive group's representation in the "community population" and the group's representation in the "relevant jury pool."  *See Rioux*, 97 F.3d at 655; *United States v. Barlow*, 732 F. Supp. 2d 1, 30-31 (E.D.N.Y. 2010), *aff'd* 479 F. App'x 372, 373 (2d Cir. 2012).  For example, if Blacks represented 10% of the community population but only 2% of the relevant jury pool, the "absolute disparity" would be 8%.

There is no specific numerical threshold that constitutes unacceptable disparity under the "absolute disparity" method.  Perfectly proportional representation is not required, since no source list will be an exact statistical mirror of the community.  *United States v. Guzman*, 337 F. Supp. 140, 143 (S.D.N.Y. 1972); *see also Taylor*, 419 U.S. at 538.  The mere fact that a jury selection system is imperfect does not make it invalid.  *Swain v. Alabama*, 380 U.S. 2020, 209 (1965) (overruled on other grounds).  Accordingly, the Second Circuit has found that absolute disparities as high as nearly 5% fail to establish a prima facie case of underrepresentation.  *See, e.g.*, *Biaggi*, 909 F.2d at 677-78 (3.6% for Blacks and 4.7% for Hispanics); *Ramnath*, 131 F.3d at 132 (3.45% for African-Americans and 4.87% for Hispanics); *see also Barlow*, 732 F. Supp. 2d

at 34-35 (collecting out-of-circuit cases rejecting claims presenting similar and even higher disparities).[7]

  d. *Calculation of the Absolute Disparity*

Properly calculated, the "absolute disparity" in this case falls comfortably within the range deemed acceptable by the Second Circuit and other courts.

As noted, the "relevant jury pool" is the White Plains Master Wheel, which is comprised of 11.20% Black or African-American persons and 12.97% Latino or Hispanic persons.  (Siskin Aff. at ¶ 28).  The "community population" is the jury eligible population for the five counties from which the White Plains Master Wheel is drawn, which was comprised of 12.45% Black or African-American persons and 14.12% Hispanic or Latino persons in 2018.  (*Id*. at ¶ 19).  This yields an "absolute disparity" of 1.25% for Black or African-American persons and 1.15% for Latino or Hispanic persons.  (*Id.* at 28).  That disparity does not rise to the level of satisfying the second prong of the *Duren* test.

The result is the same even if the defendant's preferred "relevant jury pool" is used.  The White Plains Qualified Wheel is comprised of 8.76% Black or African-American persons and 10.48% Latino or Hispanic persons.  (*Id.* at ¶ 13; *see also* Martin Aff. at ¶ 55).  This results in absolute disparities of 3.69% and 3.64%, respectively.  These figures are also comfortably within

---

[7] In *United States v. Jackman*, the Second Circuit held that an absolute disparity of 2.5% for Black or African-American persons and 3.4% for Hispanic or Latino persons was sufficient to satisfy the second prong of the *Duren* test.  46 F.3d 1240 (2d Cir. 1995).  The unique facts of *Jackman* make it readily distinguishable.  The jury clerk in *Jackman* relied on a qualified jury wheel that was mostly drawn from a master jury wheel that *completely* excluded potential jurors from two cities in the Division—cities that accounted for 62.93% of the voting-age Black population and 68.09% of the voting-age Hispanic population in the division.  *Id.* at 1242-44.  This resulted in a venire comprised of no Black or African-American persons and one Hispanic or Latino person.  *Id.* at 1244; *see also id.* at 1252 (Walker, J., dissenting) (stating that the majority's decision was "at odds with every decision in every circuit applying the *Duren* test").

the range that the Second Circuit has determined does not satisfy the second prong of the *Duren* test.  Moreover, as explained in more detail below, the factors that cause the disparity between the White Plains Qualified Wheel and the White Plains Master Jury Wheel, as well as the voting age population, are not the result of the factors identified by the defense.

As these comparisons illustrate, it is only by employing an applies-and-oranges method of comparing the White Plains Qualified Wheel to the jury eligible populations of the "Manhattan Division" or the entire Southern District that the defendant is able to identify disparities that might arguably satisfy the second prong of *Duren*.  Because that method has no basis in the law, the defendant's claim fails at the second prong.

## 2. Any Potential Underrepresentation is Not Due to Systematic Exclusion

Even assuming the defendant had satisfied the second prong of the *Duren* test, he most certainly has not demonstrated that any underrepresentation is "due to *systematic exclusion* of the group *in the jury-selection process*."  *Rioux*, 97 F.3d at 654 (emphasis added).  That is, he cannot establish that the exclusion is the product of "jury selection itself, *rather than external forces*." *Id.* at 658 (emphasis added).  He therefore cannot satisfy the third prong of *Duren*.

As then-District Judge Bianco explained, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group."  *Barlow*, 732 F. Supp. 2d at 40; *see also United States v. Barlow*, 479 F. App'x 372, 373 (2d Cir. 2012) (affirming Judge Bianco's "thorough and well-reasoned" opinion).  Indeed, "[a] selection process that is facially neutral is unlikely to demonstrate systematic exclusion."  *United States v. Savage*, 970 F.3d 217, 259 (3d Cir. 2020).  Moreover, a defendant cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination,

*might* contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332 (emphasis in original).

Insofar as the underrepresentation is measured by a comparison of the White Plains Qualified Wheel to the jury eligible population of the "Manhattan Division" or entire Southern District, the defendant contends that the "primary reason" for the alleged underrepresentation is the prosecution's decision to pursue an indictment in White Plains rather than Manhattan. (Br. 12.) That decision was entirely proper, as set forth above. *See* Part III.A, *supra*. And even if it were the case that this decision resulted in substantial underrepresentation, it nevertheless does not amount to "systematic exclusion . . . *in the jury-selection process*." The prosecution's decision as to where to seek an indictment has nothing to do with the process by which the grand jury is selected. Thus, the remedy for any sort of forum shopping alleged by the defendant would not be a fair cross-section claim.

The defendant also contends that, even if the relevant "community" is the White Plains voting age population, "there are still systematic reasons for the significant levels of underrepresentation" of Blacks and Hispanics. (Br. 13.) However, none of the laundry list of factors cited by the defendant and his expert (*see* Br. 13-16; Martin Aff. ¶¶ 79-89), either in isolation or in combination, supports a finding of systematic exclusion in the jury-selection process.

First and foremost, the factors identified by the defendant—refilling the Master Jury Wheel every four years, exclusive reliance on voter registration lists, exclusion of inactive voters from certain counties, "incorrect proration" of jurors between the overlapping counties, and failure to update addresses (*see id.*)—affect the construction of the *Master* Jury Wheel, and not the *Qualified* Jury Wheel. By far, the primary factor affecting the construction of the Qualified

22

Jury Wheel was that Black or African-American persons and Hispanic or Latino persons were qualified at a significantly lower rate than other races or ethnicities, and were excused from jury service at a significantly higher rate than other races or ethnicities.  (*See* Siskin Aff. at ¶¶ 4, 37).  The defendant makes no accusation that any of the qualification questions or other steps between the formation of the Master and Qualified Jury Wheels are discriminatory.

Additionally, while the defendant identifies several factors that he claims results in the "significant levels of underrepresentation of Black or African-American and Hispanic or Latino people," the defendant never attempts to measure the extent to which those factors *actually* cause disparities.  (Br. 13).  In other words, the defendant never attempts to answer the relevant question:  what is causing the difference between the White Plains Qualified Jury Wheel and the White Plains voting age population?

The Government's expert did answer that question. As the following table illustrates, the factors relied upon by the defendant explain relatively little of the absolute disparity between the White Plains Qualified Jury Wheel and the White Plains voting age population.  (*See* Siskin Aff. at ¶ 38).

**ANALYSIS OF ABSOLUTE DISPARITY BETWEEN QUALIFIED JURY WHEEL AND COMMUNITY AND THE CAUSES AND IMPACT OF THE CAUSES ON THE ABSOLUTE DISPARITY**

| Entry | Percent of Entry | | Absolute Disparity: Difference in Percentage Points From Community | | Difference in Percentage Points Due to Cause | | Percent of Difference Qualified Jury Wheel to Community Due to this Cause | |
|---|---|---|---|---|---|---|---|---|
| | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino | African American or Black | Hispanic or Latino |
| *Cause of differences between entry demographics:* | | | | | | | | |
| Qualified Jury wheel | 8.76 | 10.48 | 3.69 | 3.64 | | | | |
| Due to differences in being found to be qualified as a juror or being excused | | | | | 2.58 | 2.59 | 69.9% | 71.2% |
| Due to clerical error in handling alternative mailing address | | | | | -0.14 | -0.10 | -3.8% | -2.7% |
| Master wheel | 11.20 | 12.97 | 1.25 | 1.15 | | | | |
| Failure to consider inactive voters except in Dutchess | | | | | 0.34 | 0.43 | 9.2% | 11.8% |
| Due to underrepresenting counties in both Manhattan and White Plains | | | | | 0.34 | 0.39 | 9.2% | 10.7% |
| Master wheel if simple random sample | 11.88 | 13.79 | 0.57 | 0.33 | | | | |
| Differences in U.S. citizens voting age and those registered to vote and/or disconnect in time between community benchmark and voter lists | | | | | 0.57 | 0.33 | 15.4% | 9.1% |
| Community | 12.45 | 14.12 | | | | | | |

In other words, by far the most significant factor affecting the absolute disparity between the White Plains Qualified Jury Wheel and the White Plains voting age population is the qualification, exemption, and excusal of potential jurors—which the defendant does not challenge as being discriminatory.  As the chart above shows, 69.9% of the reason for the difference between Black or African-American individuals on the White Plains Qualified Jury Wheel and the White Plains voting age population and 71.2% of the reason for the difference between Hispanic or Latino individuals on the White Plains Qualified Jury Wheel and the White Plains voting age population are the qualification, exemption, and excusal of those individuals. The defendant therefore fails to prove that the factors he cites are in fact responsible for the disparity he alleges.

The defendant's claim fails for a second, independent reason.  Each of the factors cited by the defendant is the sort of "external force" that does not amount to "systematic exclusion." For instance, the defendant criticizes the "exclusive reliance on voter registration lists."  (Br. 13-15).  But courts, including the Second Circuit, have repeatedly held that reliance on voter registration lists is proper, even if it results in underrepresentation of a particular group because that group votes in lower proportion than others.  *See, e.g.*, *Biaggi*, 909 F.2d at 676–78; *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir. 1996); *Savage*, 970 F.3d at 260; *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir. 1995).

The defendant also argues that by replenishing the Master Jury Wheels once every four years, rather than more often, the SDNY Jury Plan excludes younger voters and those who move towards the end of the life of the wheel, which in turn results in underrepresentation because minorities are disproportionately represented within these groups.  (Br. 13-15).  Even taking at

face value the assertions about these consequences,[8] they do not constitute "systematic exclusion."  As the Second Circuit explained in rejecting a similar claim in *Rioux*, "[t]he inability to serve juror questionnaires because they were returned as undeliverable is not due to the system [of jury selection] itself, but to outside forces, such as demographic change."  97 F.3d at 658. That the "external force" of "demographic change" may result in some underrepresentation does not constitute "systematic exclusion."  *Id.*; *see also United States v. Ross*, 468 F.2d 1213, 1218 (9th Cir. 1972) (rejecting challenge to jury plan that provided for refilling the master jury wheel every four years and noting that the JSSA "does not mention when the wheel is to be refilled" and "it . . . seems clear that Congress originally intended to allow the districts considerable flexibility in determining when the master jury wheel is to be refilled"); *Guzman*, 337 F. Supp. at 142 (rejecting challenge to jury plan that replenished master wheel every four years, which resulted in the exclusion of persons between the ages of 21 and 24).

Finally, the defendant identifies what he claims are certain "failures to comply" with the SDNY Jury Plan, such as the exclusion of inactive voters in certain counties, "incorrect proration" of jurors in Westchester, Putnam, and Rockland counties between Manhattan and White Plains, and exclusion of individuals who provided alternate mailing addresses when registering to vote.  However, such racially neutral processes are "unlikely to demonstrate systematic exclusion."  *Savage*, 970 F.3d at 259; *see also Plaza-Andrades*, 507 F. App'x at 26 (finding that random assignment of criminal cases based on a neutral case assignment plan does

---

[8] This factor identified by the defendant is of limited probative value because, again, it compares apples to oranges.  The defendant complains that individuals who were too young to register to vote in November 2016 are not included in the Master Jury Wheel.  However, those individuals are not necessarily included in the community benchmark used by the defendant—which is based on the 2018 ACS 5 year average (2014 through 2018)—either.  In other words, comparing a group at one point in time to a group over a different period of time, does not necessarily provide conclusive evidence of contemporaneous disparity.  (*See* Siskin Aff. at ¶ 43).

not constitute "systematic exclusion" of any group from jury service); *see also Berghuis*, 559 U.S. at 332–33 & n.6 (no clearly established precedent that social and economic factors can give rise to a fair cross-section claim).  In any event, the defendant offers only speculation that these alleged instances of non-compliance with the Jury Plan disproportionately affects Black or African-American and Hispanic or Latino persons.  (*See, e.g.*, Martin Aff. at 79-88). In fact, as described above, these factors account for an insignificant percentage of the disparity claimed. *See* pp. 25, *supra*.  This is plainly insufficient to establish systematic exclusion.  *See Bates v. United States*, 473 F. App'x 446, at *5 (6th Cir. 2012) ("[S]peculation that an issue might contribute to the underrepresentation of African-Americans is not enough to establish a prima facie Sixth Amendment violation."); *see also Berghuis*, 559 U.S. at 332 (speculation that factors "*might* contribute to a group's underrepresentation" is insufficient to make a prima facie case).

Accordingly, the defendant's claim also fails at the third prong of *Duren.*

### C.  The Defendant's Equal Protection Claim Is Meritless

It is well-established that a claimant under the Fifth Amendment must establish intentional discrimination.  *Ricketts v. City of Hartford*, 74 F.3d 1397, 1407 (2d Cir. 1996).  To succeed on a Fifth Amendment equal protection challenge to a criminal jury selection system, the defendant must establish that "(1) there is a cognizable group, (2) that is substantially underrepresented by reason of (3) a selection procedure that is not racially neutral, *i.e.*, is the result of intentional discrimination by the District."  *Rioux*, 97 F.3d at 659.  The defendant cannot satisfy this test, either.

Simply put, the defendant cannot establish "intentional discrimination," required to sustain a Fifth Amendment claim.  The defendant has not alleged any intentional discrimination by those who oversaw the jury selection system.  *Rioux*, 97 F.3d at 659; *see also Ricketts*, 74

F.3d at 1409 n.4 (noting that in successful Fifth Amendment challenges to jury selection process, "the engine of discrimination was a considered governmental policy, rather than the series of mishaps and botches").  Nor could he.  Indeed, absent "positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection."  *United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997); *see also Schanbarger v. Macy*, 77 F.3d 1424, 1424 (2d Cir. 1996) (per curiam); *Biaggi*, 909 F.2d at 676-78.  Accordingly, his claim must fail.  *See Reyes*, 934 F. Supp. at 556 ("It is clear from *Biaggi* that in this circuit, a Fifth Amendment challenge to the composition of a jury pool, based on the equal protection component of that amendment's due process clause, will not stand absent evidence that an underrepresented group has been hindered in registering to vote.").[9]

### D.  The Defendant's Statutory Claims Are Meritless

Fair cross-section claims under the JSSA are evaluated under the *Duren* test.  *Rioux*, 97 F.3d at 654.  Because the defendant fails to meet the second and third prongs of the *Duren* test, as discussed above, his fair cross-section claim under the JSSA fails.  Nevertheless, the

---

[9] The defendant contends that Comparative and STD analysis "make clear that the level of underrepresentation here . . . 'is the result of a systematic process,'" which is sufficient to shift the burden to the Government to provide a "'plausible justification'" for the methods used to populate the Master Jury Wheel.  (Br. 17).  First, the defendant has not established that any underrepresentation is either "substantial" or the result of a "systematic process."  *See* Part III.C (refuting defendant's claim of "systematic exclusion"), *supra*; *see also Kenny*, 883 F. Supp. at 876 (dismissing Fifth Amendment claim when defendant failed to establish the second prong of the *Duren* test).  Assuming, arguendo, that the burden has shifted, as set forth below, the Government has demonstrated that the methods used to populate the Master Jury Wheel are justifiable and that the factors assailed by the defendant as causing underrepresentation have minimal effect on the representation of Black or African-American individuals and Hispanic or Latino individuals.  *See* Part III.D, *infra*.

defendant claims that "the choice to indict a Manhattan case in the White Plains Division" violates the JSSA. (Br. 20). The defendant also claims that the JSSA was also violated by (1) the exclusion of inactive voters from Westchester, Putnam, Rockland, Orange, and Sullivan counties; (2) the erroneous "proration" of counties; and (3) the exclusion of individuals who provided an alternative address when registering to vote in certain counties. (*Id.* at 20-22). The defendant is wrong on all counts.

While "substantial failures to comply" with the JSSA are actionable, "[m]ere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *LaChance*, 788 F.2d at 870. "Whether a violation is 'substantial' or merely 'technical' depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived." *Id.*; *see also United States v. Beardon*, 659 F.2d 590, 601 (5th Cir. 1981) ("The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself and its goals have been frustrated."). "A 'substantial failure' occurs when the violation of the Act frustrates the policy objectives of the Act, namely the random selection of jurors and the objective determination of juror disqualification, exemptions and excuses." *United States v. Purdy*, 946 F. Supp. 1094, 1104 (D. Conn. 1996); *accord United States v. Awadallah*, 457 F. Supp. 2d 239, 242-43 (S.D.N.Y. 2006).

As an initial matter, the defendant is wrong that the exclusion of potential jurors from New York and Bronx counties in the White Plains Master Jury Wheel violates the JSSA's requirements. As discussed above, it is clear that criminal defendants are not entitled to juries drawn from an entire district. *See, e.g.*, *Bahna*, 68 F.3d at 24 ("It is well-settled that neither the jury selection statute nor the Constitution requires that jurors be drawn from an entire district."); *see also* 28 U.S.C. § 1869(e) (authorizing courts in districts that are not divided by statute to

create divisions which may be composed of certain counties or other political subdivisions surrounding the courthouse).

Additionally, the alleged "failures" do not violate the JSSA.  For instance, the "proration" of jurors from the overlapping counties—*i.e.*, sending more individuals from the overlapping counties to Manhattan for jury service than White Plains—is entirely appropriate as not to overburden registered voters in those overlapping counties with jury service, while at the same time providing the busier courthouse (Manhattan) with sufficient potential jurors.  *See Yonkers Contracting Co.*, 682 F. Supp. at 768 (rejecting argument that it is improper to send nine-tenths of the jurors from the overlapping counties to Manhattan because "Manhattan gets a disproportionately high share of the nation's (and even the world's) litigation").  Additionally, there is no specific provision of the JSSA that prohibits the exclusion of inactive voters.

Moreover, the violations alleged by the defendant had minimal effect on the makeup of the White Plains Master Jury Wheel, which render his claims under the JSSA inactionable. Again, the defendant makes no attempt to measure the extent to which the alleged violations actually cause any disparity.  Had he done so, he would have found that correcting these "errors" would have almost no effect on the Master Jury Wheel.  For example, if the "overlapping counties"—Westchester, Putnam, and Rockland counties—were "pro-rated" such that each registered voter in those counties had a 1-in-3 chance of selection, instead of a 1-in-4.5 chance of selection, the percentage of Black or African-American persons would have been 11.54% of the White Plains Master Jury Wheel (which is 0.32 percentage points greater than the actual White Plains Master Jury Wheel), and the percentage of Hispanic or Latino persons would have been 13.36% of the White Plains Master Jury Wheel (which is 0.39 percentage points higher than the actual White Plains Master Jury Wheel).  (*See* Siskin Aff. at ¶ 32).  And if inactive voters from

29

the counties other than Dutchess county—*i.e.*, Westchester, Putnam, Rockland, Orange, and Sullivan counties—were added to the voter lists from which the Master Jury Wheel was drawn, it is estimated that Black or African-American persons would have made up 11.88% of the White Plains Master Jury Wheel (which is 0.34 percentage points higher than the actual White Plains Master Jury Wheel) and Hispanic or Latino persons would have made up 13.79% White Plains Master Jury Wheel (which is 0.43 percentage points higher than the actual White Plains Master Jury Wheel).  (*See id.*).

Finally, failing to include individuals who provided an alternate mailing address when registering to vote due to a technical glitch would have had almost no effect on the White Plains Qualified Jury Wheel, and does not violate the JSSA.  Had this error not been made, representation of Black or African-American individuals and Hispanic or Latino individuals on the White Plains Qualified Jury Wheel would actually have *decreased* by 0.14 percentage points and 0.10 percentage points, respectively (from 8.76% to 8.62% for Black or African-American persons and from 10.48% to 10.38% for Hispanic or Latino persons).  (Siskin Aff. at ¶ 36). Additionally, technical errors resulting in such minor differences do not violate the JSSA.  *See United States v. Huber*, 457 F. Supp. 1221, 1231 (S.D.N.Y. 1978) ("There is no substantial failure to comply with the Act because of the minor deviations occasioned by the use of electronic equipment . . .").

Ultimately, none of the violations alleged by the defendant frustrate the policy objectives of the JSSA.  The defendant does not allege that the determination of juror disqualification, exemptions and excuses under the SDNY Jury Plan was anything other than objective.  To the extent the selection of the Master Jury Wheel was not completely *statistically* random (*see* Siskin Aff. at ¶ 13), the law is clear that the "random selection" of jurors required by the JSSA is not the

same as "statistical randomness." *See Bearden*, 659 F.2d at 602 ("The legislative history makes clear that Congress did not intend for 'random selection' under the Act to be defined as 'statistical randomness[.]'").  Instead, "random selection" under the JSSA requires "the methods used [to select a jury] must not result or have the potential to result in discrimination among cognizable groups of prospective jurors." *Id.*  The defendant has failed to make such a showing, and accordingly, his statutory claims should be rejected as well.

## IV.    CONCLUSION

For the reasons stated above, the defendant's motion to dismiss the indictment should be denied.

Dated:  New York, New York
            December 16, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York

By:  /s/
            David W. Denton, Jr.
            Sidhardha Kamaraju
            Matthew Laroche
            Assistant United States Attorneys
            Tel.: (212) 637-2744/6523/2420