# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

Southern District of New York
*Jennifer L. Brown*
*Attorney-in-Charge*

January 15, 2021

**BY ECF**

Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Joshua Adam Schulte*, 17 Cr. 548 (PAC)

Dear Judge Crotty:

On behalf of Mr. Schulte, we file with the Court, his pro se Petition for Writ of Habeas Corpus to Modify Conditions of Confinement Pursuant to 28 U. S. C. § 224.

Thank you for your time and consideration.

Respectfully submitted,

Sabrina P. Shroff, Deborah Colson, Edward S. Zas
*Counsel for Joshua A. Schulte*

CC:     All Counsel of Record
            (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

                    -v-                                    S2 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

                              *Defendant.*


## PETITION FOR WRIT OF HABEAS CORPUS TO MODIFY
## CONDITIONS OF CONFINEMENT PURSUANT TO 28 U.S.C. § 2241


Joshua Adam Schulte
# 79471-054
Metropolitan Correctional Center
10 South, Segregated Housing Unit
150 Park Row
New York, New York 10007

## TABLE OF CONTENTS

I.    TABLE OF AUTHORITIES ................................................................. ii

II.   PRELIMINARY STATEMENT .................................................... 1

III.  CURRENT CONDITIONS OF CONFINEMENT VIOLATE THE UNITED
STATES CONSTITUTION ..................................................................... 2

   A.   Applicable Law ................................................................... 3

   B.   Exhausted Administrative Remedies ........................................ 4

      1.   Most critical issues ......................................................... 4

      2.   Issues regarding discovery and attorney-client relationship .................... 11

      3.   Unreasonable, arbitrary punishment ........................................ 12

      4.   Other unresolved issues .................................................. 14

   C.   No Administrative Remedy Available: FBI mail interception .................. 14

IV.  MCC AND BOP VIOLATIONS OF THE PLRA ........................................ 15

   A.   MCC's perversion of the informal resolution process as defined by 28
C.F.R. § 542.13 ......................................................................... 15

   B.   MCC's failure to respond to BP-9s on time.................................. 16

   C.   BOP's use of antiquated, passé "technology" to undermine and prevent
administrative remedies ................................................................ 17

V.    CONCLUSION .......................................................................... 19

VI.   EXHIBITS................................................................................ 21

# I.    TABLE OF AUTHORITIES

## Cases

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) .................................................................. 9
*Bell v. Wolfish,*
    441 U.S. 520 (1979) .................................................................. 3
*Boudin v. Thomas,*
    732 F.2d 1107 (2d Cir. 1984) ................................................. 3
*Hess v. Indiana,*
    414 U.S. 105 (1973) .................................................................. 9
*Kingsley Int'l Pictures Corp v. Regents of Univ. of N.Y.,*
    360 U.S. 684 (1959) .................................................................. 9
*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) .................................................................. 3

## Statutes

28 U.S.C. § 2241 .................................................................. 1, 3
28 U.S.C. § 542 .................................................................. 4, 15
42 U.S.C. § 1997e .............................................................. 1, 14
5 U.S.C. § 552 .................................................................. 14

## Constitutional Provisions

U.S. Const. amend. I .......................................................... 9, 10
U.S. Const. amend. V ....................................................... passim
U.S. Const. amend. VI ......................................................... 11
U.S. Const. amend. VIII ................................................. passim

## II.    PRELIMINARY STATEMENT

Joshua Adam Schulte respectfully petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 to modify unconstitutional conditions of confinement imposed upon him.

Mr. Schulte was incarcerated pretrial at the Metropolitan Correctional Center (MCC-New York) in the general population until October 2018. In October 2018 the attorney general imposed Special Administrative Measures (SAMs) on Mr. Schulte, and he has been incarcerated in solitary confinement within a small concrete box ever since. MCC –NY then imposed arbitrary punishment that the SAMs did not authorize. Accordingly, Mr. Schulte filed administrative remedies pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, but the Bureau of Prisons (BOP) violated the provisions of this act by refusing to even consider the vast majority of remedies. After exhaustion of all administrative remedies, Mr. Schulte now asks this court to order relief.

Additionally, Mr. Schulte asks this court to order the BOP to update its administrative remedy process to an electronic format consistent with the PLRA. The vast majority of remedies filed were denied in bad faith without consideration of the merits due to either perceived formatting issues or because the MCC had not properly added the remedies into the BOP electronic system; Indeed, the BOP uses an electronic system to track and respond to administrative remedies, but forces inmates to use an archaic form designed in 1982 despite the BOP's modernized computer systems that allow inmates to send electronic messages to staff, send emails to family and friends, review account balances, review prison bulletin boards, access legal materials, and countless other electronic access. The BOP has effectively eliminated the administrative remedy process and must be reined in.

### III.   CURRENT CONDITIONS OF CONFINEMENT VIOLATE THE UNITED STATES CONSTITUTION

As Supreme Court Justice Sonia Sotomayer concluded, "a punishment need not leave scars to be cruel and unusual." *Apodaca v. Raemisch*, 139 S.Ct. 5, 6 (2018). MCC's treatment of pretrial detainees is truly abhorrent, unconscionable, cruel and unusual punishment. SAMs inmates are locked in concrete boxes the size of parking spaces with purposefully obstructed views of outside, the cages are filthy and infested with rodents, rodent droppings, cockroaches and mold; there is no heating or air conditioning in the cages, there is no functioning plumbing, the lights burn brightly 24 hours per day, and the inmates are denied outside recreation, normal commissary, normal visitation, access to books and legal material, medical care, and dental care. All attorney-client privilege is also void to SAMs inmates as the prison confiscates, opens, and reads all legal mail; inmates are forbidden from transferring legal material to and from their attorneys. The process imposed is arbitrary and not tailored to any legitimate government interest, especially where the SAMs inmates are represented by institutional lawyers from the Criminal Justice Act Panel and the Federal Defenders of New York .

There can be no question that the standard of living for SAMs inmates is below that of impoverished persons living in third world countries. It is barbaric and inhumane to lock human beings into boxes for years and years—it is a punishment worse than death and there is no wonder that MCC inmates would rather kill themselves than continue to live in absolute oppression. No matter what crime an individual is alleged to have committed, the United States Constitution grants all a presumption of innocence—indeed, no American wants to be treated like a caged animal if accused of a crime—dependent, deserted, dehumanized, demoralized, and detained.

The following issues have been appealed all the way to the BOP Central Office and have been denied. Mr. Schulte requests this court review the issues and grant Mr. Schulte's relief from barbaric torture.

## A.      Applicable Law

As an initial matter, a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 is the appropriate vehicle to challenge conditions of confinement. See *Preiser v. Rodriguez*, 411 U.S. 475 (1973); *Bell v. Wolfish,* 441 U.S. 520 (1979); *Boudin v. Thomas*, 732 F.2d 1107 (2d Cir. 1984). In *Wolfish*, the Supreme Court held that since a pre-trial detainee has not been convicted, the Due Process Clause does not permit prison officials to subject him to "punishment." *Id.* at 537, n. 16. In considering whether prison officials impermissibly are subjecting a prisoner to "punishment":

> *A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment". Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees.*

*Id.* at 538-39. Conditions of confinement that are imposed arbitrarily without any legitimate governmental objective violate substantive due process guaranteed

by the Fifth Amendment. The Constitution also bars imposition of cruel and unusual punishment as ratified in the Eighth Amendment.

## B.    Exhausted Administrative Remedies

Mr. Schulte filed for administrative remedy pursuant to 28 C.F.R. § 542.10 to challenge the inhumane conditions of confinement. The MCC failed to reply in a timely manner pursuant to 28 C.F.R. § 542.18 (sometimes taking over 5 months to respond when the statute identifies only 20 calendar days) so Mr. Schulte appealed to the Northeast Regional Office. The Northeast Regional Office then denied Mr. Schulte's administrative remedies due to his "failure to file at the institution level" (despite Mr. Schulte's clearly written designation that the institution did not respond within 20 days) and/or because Mr. Schulte did not use a ballpoint pen to appropriately allow the carbon copies to be readable (despite Mr. Schulte's ban from pens in 10 South). Mr. Schulte subsequently appealed to the Central Office and received similar denials. Accordingly, all administrative remedies have been exhausted. Mr. Schulte and all SAMs inmates are held in unit 10 South (10S).

### 1.    Most critical issues

#### a)    *Sleep deprivation through 24-7 cage lighting (Ex. B)*

The 10S cages have two sets of lights: one set of lights that can only be turned on or off from outside the cage by the Corrections Officer; the second set of lights that cannot be turned off—by anyone. Every cell in general population permits the inmate the ability to toggle the lights—only SAMs inmates in 10S must bang on their cage door like an animal to ask the lights be toggled, and only for one set of lights.

There is no "legitimate governmental objective" to subject a pre-trial detainee to sleep deprivation. Keeping the light on so that a person can't get a

single moment of restful sleep does not go to any aim of the SAMs; if it does, the government has never been able to articulate it. This court should rule sleep deprivation as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to modify 10S lighting so that it is the SAME as the rest of the institution—switches in the cell for the inmates to toggle. If MCC wishes to install a master switch outside the cages that enable the Corrections Officers to override the switch inside the cage, then they can do so but until they do, the inmate should not be left deprived of sleep.

### b)  *No hot water in sinks and dysfunctional toilets (Ex. C)*

The 10S cages do not share the same type of sink, toilet, or shower as the rest of general population. The 10S cages replace dials with push-buttons that dispense water for several seconds at a time. Additionally, the sinks do not have any hot water, the toilets have no toilet seats and require the inmate to wait until the feces has partially dissolved before flushing, and the showers barely drip water that is either freezing cold or boiling hot. General population have normal sinks, toilets, and showers: real sinks/showers with dials that allow mixture of hot and cold water and normal water pressure; real toilets separated from the sinks with toilet seats and normal flushing power.

There is no "legitimate governmental objective" to deny a pre-trial detainee temperate water or use of the same type of dials for hot/cold water as every other inmate. This court should rule denial of temperate water and functional plumbing as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and as cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to modify 10S plumbing so that it is the SAME as the rest of

the institution—dials that adjust hot and cold water, showers with water pressure, and toilets that flush.

### c)      No heating or air conditioning in the cages (No administrative remedy ever returned)

The 10S cages do not share the same type of heating and air conditioning as the rest of MCC. The cages lack proper insulation from the outside and have no air circulation. As a result, the cage temperature is subject to outside weather; in the winter the cages reach the freezing level and in the summer the heat is unbearable. Currently, Mr. Schulte wears 4 sets of clothing, 5 sets of socks, a sweatshirt and sweatpants, two blankets, 3 sets of socks on his hands, and still freezes when the temperature in his cell plummets below freezing and water *literally freezes* in his cell. The warden and MCC staff are aware and indifferent to this barbaric torture.

There is no "legitimate governmental objective" to denying a pre-trial detainee heat and AC like every other inmate. This court should rule denial of heat in the winter and AC in the summer as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and as cruel and unusual punishment in violation of the Eighth Amendment, and to force the MCC to modify 10S cages so that they are the SAME as the rest of the institution—adequate heat and AC.

Note that, despite numerous BP-8s and BP-9s requesting redress of this grievance, the MCC never responded. See section IV for more information.

### d)      Inmates wallow in the filth of others and live with rodents and insects in cages without any cleaning (No administrative remedy ever returned)

The MCC rotates 10S inmates every 20 days into new cages. There is never any cleaning performed by the MCC prior to moving inmates, the MCC does not

provide proper cleaning supplies to the inmates, and the MCC is infested with rats, cockroaches, and other undesirable roommates—as well as mold.

There is no "legitimate governmental objective" to denying a pre-trial detainee clean cages that are rat-free. Surely the government is not saying that rats are roam around the cage and make their way onto the inmate are serving some legitimate governmental function. This court should rule denial of clean cages and cleaning supplies as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to clean 10S cages between rotations, perform pest removal, and mold removal.

Note that, despite numerous BP-8s and BP-9s requesting redress of this grievance, the MCC never responded. See section IV for more information.

### e) *The ban of books and use of the institution's library (Ex. D)*

MCC bans all 10S inmates from the institution library. Alternatively, the MCC refuses to purchase books or provide electronic access to books for 10S inmates. All other inmates in general population can access the library and check-out books.

There is no "legitimate governmental objective" to denying a pre-trial detainee books. This court should rule denial of books as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to provide books to 10S inmates either through the library or electronically.

7

### f)      The ban of outside recreation (Ex. E)

MCC bans all 10S inmates from outside recreation. Every other person in general population can go outside for fresh air every other day. Mr. Schulte has not been outside or even seen the outside in over two years.

There is no "legitimate governmental objective" to denying a pre-trial detainee outside recreation. This court should rule denial of outside recreation as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to provide outside recreation to 10S inmates as it does for ALL OTHER inmates.

Supreme Court Justice Sotomayor concluded that "to deprive a prisoner of any outdoor exercise for an extended period of time in the absence of an especially strong basis for doing so is deeply troubling—and has been recognized as such for many years." *Raemisch,* 139 S.Ct. at 8.

### g)      Blacked out windows in the cages (Ex. E)

MCC bans all 10S inmates from looking outside by blacking out the windows. Every other inmate in general population can look outside.

There is no "legitimate governmental objective" to denying a pre-trial detainee the ability to peer outside at freedom. This court should rule blacked out windows as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment, and should force the MCC to unblock all the 10S windows so that inmates can look outside as ALL OTHER inmates can.

### h)   *Limited, monitored family contact (Ex. F)*

MCC restricts all 10S inmates to one phone call and two social visits per month. All contact is subject to 24/7 monitoring and termination if the FBI dislikes anything that is said. The phone calls are limited to 30 minutes whereas normal inmates receive 300 minutes per month. The social visits are limited to 2 hours maximum, one visit per hour. Inmates cannot see multiple visits at once and all visits are non-contact whereas all other inmates have unmonitored contact visits weekly with multiple individuals simultaneously.

There is no "legitimate governmental objective" to denying a pre-trial detainee the ability to see both his parents at once, to have a contact visit with them, to visit with them in private, or to contact them as often as other inmates. The government has never charged Mr. Schulte with disclosure of classified information through social visits or phone calls. Regardless, the government cannot take a preventative measure of limiting free speech to stop future potential crimes. The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." *Hess v. Indiana*, 414 U.S. 105, 108 (1973). See *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001) ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it."); *Kingsley Int'l Pictures Corp v. Regents of Univ. of N.Y.*, 360 U.S. 684, 689 (1959) ("Among free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law, not abridgment of the rights of free speech.").

This court should rule that limited, monitored family contact is arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment, cruel and unusual punishment in violation of the Eighth Amendment, and violates free speech in violation of the First Amendment. This court should force the MCC to

provide 10S inmates with the same social calls and visits as all other MCC inmates.

### i)      Denial of access to religious services (No administrative remedy ever returned)

MCC prohibits 10S inmates from exercising their freedom of religion by denying religious services offered to the general population.

There is no "legitimate governmental objective" to denying a pre-trial detainee the ability to attend religious services. This court should rule banning religious services as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and freedom of religion in violation of the First Amendment, and should force the MCC to permit all 10S inmates to attend religious services.

### j)      No medical or dental treatment for any pretrial inmates (Ex. N)

MCC prohibits preventative health screenings, access to healthcare, and access to dental care. Despite Mr. Schulte's  congenital heart issues and ongoing cardiologist appointments, he has not seen a doctor since his trial in February 2020. . Additionally, Mr. Schulte has been not once seen a dentist at MCC.

There is no "legitimate governmental objective" to denying a pre-trial detainee access to health and dental care. This court should rule denial of medical and dental care to pretrial inmates as arbitrarily imposed in violation of the Fifth Amendment and cruel and unusual punishment in violation of the Eighth Amendment. This court should require all pre-trial detainees to receive proper medical treatment including regular doctor and dental visits (and other specialists). Since the United States Federal Government chooses to lock those legally presumed innocent in cages indefinitely and deny them the ability to work and earn

money to purchase insurance, the government must be required to properly treat and care for those indefinitely detained. The government's responsibility and obligation require it to provide legitimate medical and dental treatment—including critical preventative care—to ALL pretrial inmates.

### 2.    Issues regarding discovery and attorney-client relationship

#### a)    *Inadequate discovery review (Ex. J)*

MCC significantly limits discovery review for 10S inmates to one hour per day, 5 days a week. General population has 24-hour access to discovery.

There is no "legitimate governmental objective" to denying a pre-trial detainee access to his legal work and discovery. This court should rule denial of discovery review as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and as denial to a complete defense in violation of the Sixth Amendment. This court should force the MCC to give equal access to 10S inmates by either providing them with power outlets or high battery performance laptops.

#### b)    *Denial of full-contact legal visits (Ex. K)*

MCC denies full-contact legal visits for 10S inmates including passing legal documents. General population has access to both.

There is no "legitimate governmental objective" to denying a pre-trial detainee access to his attorney. This court should rule denial of full-contact legal visits and transfer of legal documents as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and as denial to a complete defense in violation of the Sixth Amendment, and should force the MCC to provide 10S inmates with full-contact, unmonitored legal visits.

### c) *Denial of email access with attorneys (through TRULINCS) (Ex. L)*

Although the MCC permits inmates to contact their attorneys through the prison's TRULINCS email system, MCC denies this system to 10S inmates.

There is no "legitimate governmental objective" to denying a pre-trial detainee access to his attorney. This court should rule denial of TRULINCS email access as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment and as denial to a complete defense in violation of the Sixth Amendment, and to force the MCC to provide 10S inmates access to TRULINCS email with their attorneys.

### 3.    Unreasonable, arbitrary punishment

### a) *Arbitrary denial of commissary (Ex. G)*

The MCC bans 10S inmates from equal commissary. These randomly banned items include mouthwash, vitamin E, a book light, a bowl, a radio, earbuds, composition notebooks, reading glasses, honey, A&D ointment, artificial tears, gas relief tabs, prilosec tabs, Tylenol, mirrors, dish soap, pens, albums, Sudoku puzzles, mugs, socks, shorts, V05 body soap, suave lotion, herbal essence shampoo, bagels, BBQ sauce, grits, salt and pepper, honey buns, jolly ranchers, shabangs, combs, sharp cheddar cheese, crackers, soy sauce, wheat thins, assorted tea, and coffee, among many, many more items. It's so random that "raisin brand" cereal is allowed, but "cheerios" cereal is banned (sold in same bag).

There is no "legitimate governmental objective" to denying a pre-trial detainee access to commissary. This court should rule denial of equal commissary to 10S inmates as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment, and should force the MCC to provide 10S inmates equal commissary.

### b)   Arbitrary denial of TVs and all forms of entertainment (Ex. H)

All 10S inmates are denied access to TVs (except during the 1-hour "recreation" hour during the 5-day work week). Every other pretrial inmate in BOP custody has access to at least 12 hours of television and movies. Purchase of radios is even denied in commissary to 10S inmates (see above).

There is no "legitimate governmental objective" to denying pretrial inmates access to television and other forms of entertainment. In fact, most sentenced solitary confinement inmates have access to television in their cages, including death row inmates. The MCC even provides TVs in the cells of snitches on the third floor. This court should rule the denial of televisions to 10S inmates as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment, and should force the MCC to provide 10S inmates televisions in their cells. Solitary confinement with no forms of entertainment is cruel and unusual punishment when inflicted upon pretrial inmates, in violation of the Eighth Amendment.

### c)   Arbitrary increased security for 10S inmates (Ex. I)

All 10S inmates require increased chains and security for movement. When 10S inmates are moved, they must be shackled from head-to-toe like Hannibal; they are handcuffed, belly-chained, and foot-cuffed. Additionally, only a single lieutenant holds the keys to their cages, and can only move inmates with at least two additional officers. Mr. Schulte is not accused of any violence and has never been written up for any discipline infractions. This extra security is absurdly arbitrary overkill. General population inmates are never handcuffed at all, and require no measurements for movement.

13

There is no "legitimate governmental objective" to requiring such restrictions on liberty. Specifically, there is no reason that an inmate detained for "national security" reasons—not for violence—to be chained and restricted in this manner. This court should rule that the increased security and liberty restrictions as arbitrarily imposed upon SAMs inmates in violation of the Fifth Amendment, and should force the MCC to provide 10S inmates equal treatment under the law.

Other unresolved issues10S inmates are not given any cups or silverware to drink or eat with; these are arbitrarily banned from all 10S inmates. As a result, 10S inmates are forced to eat and drink with their hands like the caged animals that they are. 10S inmates are often forced to urinate and defecate in plastic bags; during visitation, inmates are moved to a 6x6 ft. cage. Instead of taking the inmate back to his cage after visitation, as would be logical, SHU lieutenants take the visitors back first—and then don't come back to move the inmate for 5,6, sometimes 7 hours. During those 7 hours sitting in the 6x6 ft. empty cage, inmates need to defecate and urinate—and are given a plastic bag to do this in.

Finally, the MCC and BOP have refused to honor Privacy Act Requests, 5 U.S.C. § 552, from Mr. Schulte to obtain SHU records, video/audio recordings from the cages and calls, and all other prison documents related to Mr. Schulte. The MCC has ignored all Privacy Act Requests sent via administrative remedy.

### C.    No Administrative Remedy Available: FBI mail interception

The SAMs designation gives the FBI the ability to read all incoming mail—including "court correspondence." However, this restriction is not reasonably related to the Government's purported reason for SAMs—the alleged dissemination of classified information. It is not possible for Mr. Schulte to transmit classified information by *receiving* mail—especially *court* mail.

14

There is no "legitimate governmental objective" to intercepting Mr. Schulte's mail; the mail interception is arbitrarily imposed in violation of the Fifth Amendment. This court should modify SAMs and issue an order preventing the FBI from intercepting or reading any incoming mail to Mr. Schulte.

## IV.   MCC AND BOP VIOLATIONS OF THE PLRA

The MCC continuously violates the PLRA by (1) formalizing the informal resolution process and never responding to the complaints, (2) never responding within 20 days as required by statute to BP-9s, and (3) deliberately utilizing antiquated technology to obstruct and chill administrative measures.

The BOP clearly acted in bad faith by denying administrative remedies

### A.   MCC's perversion of the informal resolution process as defined by 28 C.F.R. § 542.13

The MCC has turned the informal resolution process as defined by 28 C.F.R. § 542.13 into a formal process which itself requires an additional "informal-informal" process. Before any inmate can file for an Administrative Remedy (BP-9), the MCC requires an "informal" "BP-8" (see Exhibit A-1). Prior to filing this BP-8, the inmate must first file a "COP-OUT" form (see Exhibit O). Prior to filing this "COP-OUT" the inmate must "make an effort to informally resolve the issue". The BP-8, 9, 10, and 11 forms are kept under lock-and-key and are denied to inmates until a BOP counselor is satisfied that the inmate "met the requirements" to receive the specific form. This is in direct violation of  28 C.F.R. § 542.13 which states that "The Warden is responsible for ensuring that effective informal resolution procedures are in place and that good faith attempts at informal resolution are made in an orderly and timely manner by both inmates and staff.

*These procedures may not operate to limit inmate access to formal filling of a Request."* Yet, that is exactly what it accomplishes.

Additionally, since there are no time limits on the "informal" BP-8s, the MCC takes its time or simply does not reply to the BP-8 at all. For example, Mr. Schulte re-initiated the Administrative Remedy process to try to obtain access to the library (after Ex. D exhausted). After the BP-8 was never returned in 3 months, Mr. Schulte filed a BP-9 that was rejected because "YOU DID NOT ATTEMPT INFORMAL RESOLUTION…" (See Ex. P). This has the effect of chilling, and ultimately curtailing the administrative remedy process entirely; the BOP and warden wield bureaucracy aggressively to deny legitimate grievances.

Mr. Schulte currently has 17 outstanding BP-8s since October 2018. If you do not receive a reply to your BP-8, you cannot obtain a BP-9. If you cannot obtain a BP-9, you cannot access the administrative remedy process. Ergo, the PLRA is violated.

### B.   MCC's failure to respond to BP-9s on time

As the BP-9 responses show in exhibits A-L, the MCC managed to respond in a timely manner *once*. The average response was 89.25 days—nearly 5 times the 20 day deadline (Ex. A-2: 140, B-2: 28, C-2: 28, D-2: 104, E-2: 140, F-2: 16, G-2: 126, H-2: 118, I-2: 144, J-2: 141, K-2: 53, L-2: 33). The MCC does as it pleases with no repercussions—no consequences. Why respond to administrative remedies in a timely manner? What are your inmates going to do? If they appeal to the regional office, the regional office will simply deny it without consideration since MCC never reported the BP-9. Literally every single BP-10 (Ex. *-3) was denied because MCC did not record the BP-9 into their electronic "Sentry" system so the Northeast Regional Office simply assumed Mr. Schulte never filed a BP-9—

16

despite the fact that Mr. Schulte *clearly* filed a BP-9 as the exhibits illustrate. The BOP relies upon its electronic system for tracking and responding to administrative remedies so when they fail to input the petition on time their entire system fails— this issue would not exist if they simply integrated Sentry with the TRULINCS computer system so inmates could electronically submit administrative remedies. However, this would create efficiency and streamline the administrative remedy process which the BOP clearly opposes. The lack of an updated, electronic system enables the MCC and the BOP to obstruct and chill the administrative remedy process by making the process unavailable.

### C.    BOP's use of antiquated, passé "technology" to undermine and prevent administrative remedies

Within the BOP is a computer system that every BOP inmate can log into called TRULINCS, which allows inmates to email with outside individuals (except SAMs), check the upcoming meals and movies, check receipts, print documents, access legal materials, and send electronic messages/requests to staff. Despite all this updated technology, the BOP still requires inmates to fill out BP-9/10/11s using carbon-copy "technology" that was last updated in April of 1982 (the date on the form)—which is literally before Mr. Schulte was born. There is already a system in place for filing informal resolutions electronically—that sends emails to staff and properly records the conversations and content as required by law.

Additionally, the BOP uses its "Sentry" electronic system to handle administrative remedies internally. Literally, the BOP enters BP-9s, 10s, and 11s into an electronic system when they receive the forms. They then use this system to track and respond to the administrative remedies. In essence, the BOP uses technology to assist it in processing and denying administrative remedies, but

forces the inmates to use antiquated technology to initially file and mail the forms. Forcing antiquated, passé technology on inmates introduces numerous bureaucratic loopholes and technicalities that the BOP wields to deny legitimate remedies without good faith review of the underlying petitions.

It would take a high school student about 2 hours to update the BOP's current electronic system to add the administrative remedy process *from existing infrastructure*. It already provides for sending requests to staff!  It already uses an electronic system called "Sentry" to process administrative remedies! These two systems simply need to be integrated and the inmate can file administrative remedies electronically. If this electronic system were utilized, the BOP would have been forced to review the merits of Mr. Schulte's petitions: they could not deny the petition for failure to file a previous petition because they would be electronically visible on the system itself; the failure to respond in a timely manner would be self-evident within the system; they could not deny petitions for failure to use ballpoint pens; they could not deny the petition for eligibility; they could not keep the forms under lock and key and deny access to the forms itself; An electronic system would force the MCC and the BOP to follow the law as the PLRA intended—to address administrative remedies and relieve the courts of unnecessary burden.

The BOP has utilized technology to make its job easier, but suspiciously refuses to incorporate this technology with administrative remedies. The BOP is going to continue with its 40-year-old+ policy and process, stigmatizing and preventing legitimate grievances through bureaucracy and its unreachable system until this court orders the BOP to comply with the law, update its technology to incorporate the administrative remedy system electronically, and finally address the critical issues in its facilities. If left to its own cruel duplicity, it will continue to

stagnate the administrative remedy system from 1982 well past 3082. This is not compatible with the PLRA. The PLRA was established to force prisons to handle issues internally—not to create a bureaucratic weapon that prisons can wield to disguise all issues.

Finally, the BOP has clearly shown that there is no legitimate administrative remedy process—allowing inmates to flood the courts with issues that should have been resolved at the prison. This court should emphatically declare the BOP's process violative of the PLRA and force it to properly process issues at the prisons instead of permitting all issues to propagate to the district courts.

## V.    CONCLUSION

The Court should rule that Metropolitan Correctional Center – New York imposed unconstitutional conditions of confinement upon Mr. Schulte, and should order relief from all of the enumerated issues. This is especially the case where the conditions imposed by MCC-New York are not tailored to any articulated legitimate governmental interest or goal. The conditions imposed by MCC-New York are not tethered to any legitimate governmental interest and should not remain in place.

The Court should compel the MCC to abide by the Privacy Act and produce all prison documents to Mr. Schulte. The Court should order the FBI to stop intercepting legal mail sent to Mr. Schulte, particularly legal mail sent to him by his lawyers and those who are assisting his lawyers and providing valuable assistance; paralegal and other support. The Court should also order that MCC-New York from not opening and/reviewing correspondence Mr. Schulte receives from any Federal, State or Local Court. Finally, the Court should find the BOP in

violation of the Prisoner Litigation Reform Act, and order it to update its administrative remedy process to electronic format.

Dated: New York, New York

December 25, 2020


Respectfully submitted,

Joshua Adam Schulte
#79471-054
Metropolitan Correctional Center
10 South (the Segregated Housing Unit)
150 Park Row
New York, New York, 10007