UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

Defendant.

S3 17 Cr. 548 (PAC)

# MOTION TO SUPPRESS EVIDENCE FROM WARRANTLESS SEIZURE OF CELL PHONE

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

# TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES.................................................................... ii

II.   PRELIMINARY STATEMENT ...................................................1

III.   STATEMENT OF FACTS.........................................................2

IV.   THE WARRANTLESS SEIZURE AND SEARCH OF MR. SCHULTE'S CELL PHONE VIOLATED THE FOURTH AMENDMENT ...............................4

   A.   A "forthwith" grand jury subpoena *duces tecum* executed immediately as a search warrant violates the Fourth Amendment ......................................4

   B.   The circumstances here mirror *In re Nwamu* ...............................................7

   C.   A warrantless seizure and search of a cell phone is unconstitutional .........10

   D.   Suppression is warranted to discourage lawless FBI conduct ...................11

V.   CONCLUSION .............................................................................12

i

# I.   TABLE OF AUTHORITIES

**Cases**

*Boyd v. United States,*
   116 US 616 (1886)..................................................................................5, 7

*Branzburg v. Hayes,*
   408 US 665 (1972)......................................................................................5

*Brower v. County of Inyo,*
   489 US 593 (1989)......................................................................................7

*Hale v. Henkel,*
   201 US 43 (1906)..................................................................................5, 6, 7

*In re Nwamu,*
   421 F. Supp. 1361 (S.D.N.Y. 1976) ...................................................... passim

*Johnson v. United States,*
   333 US 10 (1948)........................................................................................4

*Katz v. United States,*
   389 US 347 (1967)......................................................................................5

*Linkletter v. Walker,*
   381 US 618 (1965)....................................................................................11

*Mapp v. Ohio,*
   367 US 643, 655 (1961)............................................................................11

*Riley v. California,*
   573 US 373 (2014)...............................................................................10, 11

*Schwimmer v. United States,*
   232 F.2d 855 (8th Cir. 1956) .......................................................................5

*Terry v. Ohio,*
   392 US 1 (1968)....................................................................................5, 11

*Union Pac. R. Co. v. Botsford,*
   141 US 250 (1891)......................................................................................5

*United States v. Ban,*
   605 F. Supp. 114 (S.D.N.Y. 1985) ............................................................6

*United States v. Birrell,*
   242 F. Supp. 191 (S.D.N.Y. 1965) ............................................................8

*United States v. Camou,*
   773 F.3d 932 (9th Cir. 2014) ..................................................................11

*United States v. Crim. Triump Capital Group,*
   211 F.R.D. 31 (D. Conn. 2002) ................................................................5

*United States v. Dionisio,*
   410 US 1 (1973) ..................................................................................5, 6

*United States v. Doe (Schwartz),*
   457 F.2d 895 (2d Cir. 1972) ....................................................................6

*United States v. Guterma,*
   272 F.2d 344 (2d Cir. 1959) ....................................................................5

*United States v. Jacobsen,*
   466 US 109 (1984) ................................................................................6

*United States v. Kirk Tang Yuk,*
   885 F.3d 57 (2d Cir. 2018) ....................................................................11

*United States v. Lartey,*
   716 F.2d 955 (2d Cir. 1983) ....................................................................5

*United States v. Mandujano,*
   425 US 564 (1976) ................................................................................5

*United States v. Re,*
   313 F. Supp. 442 (S.D.N.Y. 1970) .........................................................6, 8

*United States v. Verdugo-Urquidez,*
   494 US 259 (1990) ................................................................................7

*United States v. Wilson,*
   614 F.2d 1224 (9th Cir. 1980) ..................................................................6

*Veronica School Dist. 47J v. Acton,*
   515 US 646 (1995)............................................................................4

*Weeks v. United States,*
   232 US 383 (1914)..........................................................................11

**Rules**

Fed. R. Crim. P. 17(c)......................................................................8, 9

**Constitutional Provisions**

U.S. Const. amend. IV ............................................................... passim

U.S. Const. amend. V.........................................................................9

## II.   PRELIMINARY STATEMENT

On March 15, 2017, FBI Special Agents Jeffrey David Donaldson, Richard John Evanchec, and John Hui, among others, executed a warrantless search and seizure of Mr. Schulte's cell phone under the guise of a "forthwith" grand jury subpoena *duces tecum*. After Mr. Schulte blatantly refused to turn over his cell phone to the FBI, they physically seized it under color of authority.

This seizure and subsequent search are despicable acts of tyranny and oppression reprehensible to the United States Constitution. The Federal Bureau of Investigation acted as the Nazi's Gestapo, committing armed robbery in broad daylight. Accordingly, the seizure of the cell phone is void, as are all fruits of the poisonous tree.

1

## III.  STATEMENT OF FACTS

On March 7, 2017 Wikileaks published CIA information derived from the same unit Mr. Schulte once worked. A week later, on March 15, 2017, Special Agents Jeffrey David Donaldson and Richard John Evanchec initiated contact with Mr. Schulte in the lobby of Bloomberg L.P. at 120 Park Avenue, New York, New York. The agents asked Mr. Schulte if he would agree to be interviewed regarding the leaks; he agreed, and they relocated to the Pershing Square Diner at 90 East 42nd street. See Ex. A (FBI 302 of events).

Agent Donaldson asked Mr. Schulte to consent to his phone being imaged. Mr. Schulte declined, but told Agent Donaldson he could look over Mr. Schulte's shoulder at the phone as Mr. Schulte pulled up specific documents. Agent Donaldson asked Mr. Schulte to surrender his passport, to which Mr. Schulte declined. Agent Donaldson then repeatedly asked Mr. Schulte for consent to image his phone and to relinquish his passport. Mr. Schulte repeatedly declined both. See Ex. A at 3 ("KP was asked by the interviewing Agents if he consented to his phone being imaged. KP said the interviewing Agents could look at his phone, but he did not consent to it being imaged. The interviewing Agents asked if KP would voluntarily relinquish his passport, thereby not traveling to Cancun. KP refused to surrender his passport and stated he would turn it over if the government reimbursed him for the cost of his trip. At this point, SSA John HUI entered PERSHING SQUARE and informed KP the government would not reimburse him for the cost of his trip. KP again stated he would not consent to his phone being imaged or surrendering his passport.").

At this point, several more FBI agents appeared. One of these agents, SSA John Hui, then served Mr. Schulte a "forthwith" grand jury subpoena *duces tecum*

2

and told him it authorized the FBI to seize Mr. Schulte's cell phone. Mr. Schulte further declined to relinquish his cell phone and repeatedly stated that he did not understand the documents, but as the FBI did not have a search warrant he adamantly declined to relinquish his cell phone. The FBI then physically seized Mr. Schulte's cell phone anyway. See Ex. A at 1 ("KP was also served with a subpoena, authorizing the FBI to seize KP's phone."); Ex. A at 3 ("At this point, SSA John HUI entered PERSHING SQUARE… SSA HUI thereafter served KP with a subpoena to appear at a grand jury hearing on Friday, March 17, 2017 and a subpoena that authorized the FBI to seize KP's phone… KP read the documents and stated he did not know what it all meant.").

## IV.    THE WARRANTLESS SEIZURE AND SEARCH OF MR. SCHULTE'S CELL PHONE VIOLATED THE FOURTH AMENDMENT

The Fourth Amendment provides:

> *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.*

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing… reasonableness generally requires the obtaining of a judicial warrant." *Veronica School Dist. 47J v. Acton*, 515 US 646, 653 (1995). Such a warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 US 10, 14 (1948).

The FBI served Mr. Schulte a "forthwith" subpoena (Ex. B), but treated it as a search warrant and immediately seized his cell phone. However, a subpoena is not a substitute for a search warrant, and the ensuing warrantless seizure and subsequent search of Mr. Schulte's cell phone was clearly unconstitutional.

### A.    A "forthwith" grand jury subpoena *duces tecum* executed immediately as a search warrant violates the Fourth Amendment

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and

4

unquestionable authority of law." *Terry v. Ohio*, 392 US 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 US 250, 251 (1891)). The Supreme Court holds that "the Fourth Amendment protects people, no places," *Katz v. United States*, 389 US 347, 351 (1967), and wherever an individual may harbor a reasonable "expectation of privacy," *Id.*, at 361 (Harlan, J., concurring), he is entitled to be free from unreasonable governmental intrusion. Here, Mr. Schulte clearly had an expectation of privacy with his cell phone at the public diner. The next question is whether the resulting governmental intrusion was reasonable.

The power of the grand jury to inquire into the existence of possible criminal conduct is firmly established, *Branzburg v. Hayes*, 408 US 665, 688 (1972), and a key element of that power is the authority to require the production of evidence. *United States v. Mandujano*, 425 US 564, 571 (1976). However, while the Supreme Court establishes that a grand jury subpoena is not a "seizure" within the meaning of the Fourth Amendment, that "is not to say that a grand jury subpoena is some talisman that dissolves all constitutional protections." *United States v. Dionisio*, 410 US 1, 11 (1973).

The rule has long been established that a subpoena *duces tecum* may not be used in such a way as to impinge upon Fourth Amendment rights. *Boyd v. United States*, 116 US 616 (1886); *Hale v. Henkel*, 201 US 43 (1906); *United States v. Guterma*, 272 F.2d 344 (2d Cir. 1959); *Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956), *cert.* denied, 352 US 833 (1956). "To determine if a subpoena impinges on a defendant's Fourth Amendment rights, the focus is on the level of compulsion used when the subpoena was served, and whether the government's actions constitute an abuse of process." *United States v. Crim. Trump Capital Group*, 211 F.R.D. 31, 54 (D. Conn. 2002). See *United States v. Lartey*, 716 F.2d 955, 966 (2d Cir. 1983) (upholding the use of a forthwith subpoena where there

5

was no threat or compulsion); *United States v. Ban*, 605 F. Supp. 114, 117 (S.D.N.Y. 1985); *United States v. Re*, 313 F. Supp. 442, 449 (S.D.N.Y. 1970); *United States v. Wilson*, 614 F.2d 1224 (9th Cir. 1980) (upholding use of forthwith subpoena in the absence of evidence of abuse of process or that it was used as a ploy to facilitate office interrogation by U.S. attorneys). Cf. *In re Nwamu*, 421 F. Supp. 1361, 1365-66 (S.D.N.Y. 1976) (ordering the return of evidence obtained through forthwith subpoena where executing agents used coercive methods that constituted an unlawful search and seizure).

"The compulsion exerted by a grand jury subpoena differs from the seizure effected by an arrest or even an investigative 'stop' in more than civic obligation. For, as Judge Friendly wrote for the Court of Appeals for the Second Circuit: 'The latter is abrupt, is effected with force or the threat of it and often in demeaning circumstances, and, in the case of arrest, results in a record involving social stigma. A subpoena is served in the same manner as other legal process; it involves no stigma whatever; if the time for appearance is inconvenient, this can generally be altered; and it remains at all times under the control and supervision of a court.'" *United States v. Dionisio*, 410 US at 10 (quoting *United States v. Doe (Schwartz)*, 457 F.2d 895, 898 (2d Cir. 1972)). That is to say, the vital distinction between a search warrant and a subpoena is that "a search ordinarily implies a quest by an officer of the law, and a seizure contemplates a forcible dispossession of the owner." *Hale v. Henkel*, 201 US at 76.

Here, the FBI precisely executed the seizure; abruptly, at physical threat, and in demeaning circumstances, the FBI forcefully *stole* Mr. Schulte's cell phone from his hands. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 US 109, 113 (1984).

6

Once the government treats the subpoena like a search warrant to "seize" and search items, then it clearly violates the Fourth Amendment when there is no warrant; See *Brower v. County of Inyo*, 489 US 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."); *United States v. Verdugo-Urquidez*, 494 US 259, 264 (1990) ("[A] violation of the [Fourth] Amendment is fully accomplished at the time of an unreasonable governmental intrusion.") (internal quotation marks omitted).

## B.   The circumstances here mirror *In re Nwamu*

There is almost no difference between the instant case and *In re Nwamu*, 421 F. Supp. 1361 (S.D.N.Y. 1976). In *In re Nwamu*, the Court found that when government agents compel "forthwith" surrender of subpoenaed items, without court order, by threats of contempt and under color of authority, the result is an unlawful search—not a lawful grand jury subpoena.

"Even if we accept the government's contention that a grand jury has power to compel a witness to appear before it and produce certain documents and things 'forthwith' upon the return of the subpoena, it by no means follows that an agent of the FBI has power, when armed with such a subpoena, either to seize the items sought or to demand their immediate surrender to him on the spot under threats of contempt. It is clear, moreover, that however broad the investigatory powers of a grand jury, it may not use a subpoena *duces tecum* in such a way as to infringe upon the Fourth Amendment 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Id.* at 1364 (referencing *Hale v. Henkel*, 201 US 43 (1906); *Boyd v. United States*, *supra*).

7

"[T]he explicit command of the subpoena to produce the items 'forthwith' was never waived by the government. Nor did the agents explain that the persons served were not required to surrender the items to them, then and there. Rather, **they treated the subpoena as though it was a search warrant** calling for the immediate production and surrender of the documents to the agents on the spot and proceeded to enforce it with threats of contempt. They then took it upon themselves to excuse personal appearance in exchange for immediate surrender of the subpoenaed items." *Id.* at 1365 (emphasis added).

"**The subpoena was not a warrant.** It gave the agents **no authority** to arrest or otherwise compel the movants' employees either to accompany them to the offices of the FBI or to the grand jury. **Nor did it authorize the agents to seize subpoenaed items,** nor to get and take the items with them if the employees chose to 'ride the subway.' Such courses of action required a warrant, issued by an objective magistrate, based on a showing of probable cause. Lacking either type of warrant, **the agents derived no authority from the 'forthwith' subpoena to 'execute' the subpoena by demanding** that the employees either accompany them to the grand jury immediately or hand over the subpoenaed items unless they did. The explicit command of the subpoena was not to go with the agents or give them the items, but simply to appear forthwith before the grand jury to testify and there produce the subpoenaed items." *Id.* (emphasis added).

"The agents' function here was neither to enforce, nor to waive, nor to limit either the terms of, or compliance with, the subpoena **but simply to serve it.** Clearly, the power to quash, alter or enforce the subpoena lies not with the government agents but with the court. Fed. R. Crim. P. 17(c); See *United States v. Re*, 313 F. Supp. at 450; *United States v. Birrell*, 242 F. Supp. 191, 204 (S.D.N.Y. 1965)." *Id.* (emphasis added).

8

"Moreover, when the agents 'excused' personal appearances and took immediate possession of the documents [] on the spot, as if the subpoena were a search warrant, the government gained an unfair advantage. Taking possession of the items denied movants their right to independent judicial determination of the existence of probable cause as the basis for a search warrant, required by the Fourth Amendment. Excusing personal appearance before the grand jury foreclosed any opportunity movants had to raise and litigate that issue before the judge attending the grand jury proceedings. In this district, a witness appearing before a grand jury always has a meaningful opportunity under Rule 17(c), Fed. R. Crim. P., to challenge the constitutionality or other invalidity of a subpoena before the judge presiding in Part I. **The very existence of a right to challenge presupposes an opportunity to make it. That opportunity was circumvented, frustrated and effectively foreclosed by the methods employed here.**" *Id.* (emphasis added). Indeed, Mr. Schulte was not afforded the right to move to quash the subpoena, a clearly established right—especially since the point of seizing the cell phone was to use it against Mr. Schulte in a criminal prosecution. Mr. Schulte has a Fifth Amendment right against self-incrimination, and could have exercised his Fifth Amendment right not to turn over his cell phone.

"The methods used here allowed the government to obtain possession of subpoenaed documents not by the appearance of the witness 'forthwith' before the grand jury, where the witness is clothed with rights protected by the court, including the right to challenge the subpoena by refusing to comply until the court ruled on its validity and ordered compliance, **but by compelling instant surrender of the subpoenaed items to the agents, without court order, by threats of contempt and claim, or color, of authority.**" *Id.* at 1365-66 (emphasis added).

9

Accordingly, the district court found that the perversion of a subpoena into a covert search warrant "constitutes an unlawful search and seizure, in violation of the Fourth Amendment, however broad the subpoena power of the grand jury." *Id.*

The only differences between the instant case and *In re Nwamu* is that Mr. Schulte repeatedly *refused* to give the FBI his cell phone—he even told them there was no search warrant to seize it, and he did not understand how a subpoena could possibly be a search warrant. The FBI ignored him, and physically seized it, robbing him as any criminal organization. This is an even more egregious assault on the Fourth Amendment. **In effect, the FBI were no different from armed thieves.** Cloaked in the King's Power to do no wrong, and at the point of a gun, these **Federal Terrorists** stole Mr. Schulte's cell phone—without any legal authorization to do so. **The FBI's actions were no different than the Nazi's Gestapo.**

## C.    A warrantless seizure and search of a cell phone is unconstitutional

In *Riley v. California*, 573 US 373 (2014), the Supreme Court considered the authority of the police to conduct a search of a person's cell phone when seized incident to the arrest of the person. As the Supreme Court recognized, the prevailing rule was that the police could conduct a search of ordinary personal effects that were found on an arrestee's person without the need to apply for a search warrant. *Id.* at 382-385. But the Court observed that "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393. The Court went on to describe the immense storage capacity of modern cell phones and how people commonly use them to store vast amounts of highly personal information. *Id.* at 393-397.

10

## V.    CONCLUSION

For these reasons, this Court should find the warrantless seizure of Mr. Schulte's cell phone unconstitutional, and order all evidence derived from the cell phone suppressed. Indeed, the FBI acted as the Gestapo, a domestic terrorist organization oppressing a citizen at the point of a gun—and robbing him point blank. These ***Federal Terrorists*** are no better than common crooks, but even worse so, acting under the color of authority on behalf of the United States Federal Government. There is no greater example of tyranny, oppression, and proof that the United States Constitution exists today in name only, raped by all those charged to protect it.

Dated: New York, New York

    September 3, 2021

Respectfully submitted,

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

12

# EXHIBIT A

FD-302 (Rev. 5-8-10)

- 1 of 4 -



SECRET//NOFORN

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    03/27/2017

(S//NF) KINETIC PANDA (KP) was interviewed by FBI New York Special Agents Jeff D. DONALDSON and Richard J. EVANCHEC at different locations in New York City between March 15, 2017 and March 16, 2017. The interviewing Agents made initial contact with KP in the lobby of 120 Park Avenue, New York, New York (BLOOMBERG). The interviewing Agents identified themselves as FBI Special Agents from the New York Office and asked if KP was willing to be interviewed concerning the March 7, 2017 publication of CIA information on Wikileaks ("leak"). KP agreed to be interviewed, and the interviewing Agents and KP walked to the nearby restaurant PERSHING SQUARE, 90 East 42nd Street, New York, New York. The interviewing Agents and KP sat in the front dining section of the restaurant. KP·sat with his back to the door and had an unobstructed path to the front door. KP was offered food/drink, and KP·ordered water. KP used the restroom in the restaurant on one occasion. KP was presented with a subpoena to appear at a grand jury hearing, scheduled to occur on March 17, 2017. KP was also served with a subpoena, authorizing the FBI to seize KP's phone. From PERSHING SQUARE, the interviewing Agents and KP walked to KP's residence, 200 East 39th Street, Apartment 8C, New York, New York, where FBI personnel executed a search warrant. KP remained on the 8th floor for some time while the search was being conducted and later opted to voluntarily leave the building. Subsequent interactions with KP occurred in the lobby of the residence, the lobby of 120 Park Avenue (BLOOMBERG), while walking from BLOOMBERG to the residence, and while walking from the residence to the HAMPTON INN Hotel located at 231 East 43rd Street, New York, New York. After being advised of the identities of the interviewing Agents and the nature of the interview, KP provided the following information:

(S//NF) KP advised he learned of the leak from a BLOOMBERG colleague who showed KP an online news article while they were in training earlier in the week. KP did not believe the leak to be too severe, stating the leak contained information from Confluence, which KP described as the "wiki" of the CIA Engineering Development Group (EDG) projects. KP stated

Reason: 1.4(b)
Derived From: FBI NSISC-
20090615
Declassify On: 20421231

SECRET//NOFORN

| Investigation on | 03/15 | at | New York City, New York, United States (In Person) |
|---|---|---|---|
| | 7/2017 | | |

File #

Date drafted    03/16/2017

by  DONALDSON JEFF D, Richard John Evanchec

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

JAS_020909

FD-302a (Rev. 05-08-10)

SECRET//NOFORN

the leak did not include the "binary" or "source code" of the tools. KP
advised he had communicated with several of his former colleagues
regarding the leak.

(S//NF) KP was asked his opinion as to how the leak occurred. KP
believed an investigator could check the DevLAN network to audit spikes in
computer activity around the time the leaked documents were exfiltrated.
KP further advised that an investigator should check the back-up server,
which was updated daily. KP said he never had "physical access" to the
back-up server, nor did he even know the location of the back-up server.
KP stated one of his focuses while working at the CIA was to



(S//NF) KP believed whoever committed the leak was guilty of espionage
and deserved to be executed. KP stated there was no detriment to prevent
people from leaking and referenced Chelsea MANNING's commuted sentence. KP
stated he reported deficiencies in DevLAN security to his supervisors. KP
was asked about his supervisor [          ] (protect identity). KP stated
he did not want to place blame on anyone in terms of being negligent, but
her approach to security was lax.

(S//NF) KP left the CIA in November 2016 because he was frustrated with
the way things were run. He started working at BLOOMBERG and now earned
much more money than previously. KP was asked if he believed the leak was
the result of a hack or if it was a person on the inside. KP said either
one would be surprising to him because the network was closed, and
secondly, he could not imagine any of his former colleagues who would
engage in this activity.

(S//NF) KP stated he reported various issues to CIA's Office of
Inspector General (OIG). KP was asked if he still had in his possession
any emails he sent to OIG. KP denied he still possessed his letter to OIG.
KP was asked about his elevation of access to CIA projects from which he
had been removed. KP stated the projects he worked on at that time
required him to have access, and he needed those accesses to do his job.

(S//NF) KP advised that he planned to travel to Cancun, Mexico on
Thursday, March 16, 2017 with his brother who lived in Dallas, Texas. KP
stated he has three younger brothers who all lived in Texas. KP had
discussed moving back to Texas at some point and running a business with
his brother in Dallas. KP stated the trip cost him approximately $1,200.00
and they planned to stay at a resort. KP stated he had no plans to meet up
with anyone other than his brother during the trip, and he planned to
return to the U.S. on March 20, 2017. KP stated he and his brother wanted
to take a trip to either Cancun or Denver, Colorado, but they ultimately
chose Cancun.

SECRET//NOFORN

FD-302a (Rev. 05-08-10)

SECRET//NOFORN

████████████

Continuation of FD-302 of (S//NF) Interview of KINETIC PIRANHA ,On 03/15/2017 ,Page 3 of 4

(S//NF) KP stated he returned to his residence during lunchtime earlier in the day to retrieve his passport so he could check-in online. KP said his passport was currently located inside his backpack, which was on the floor next to KP at PERSHING SQUARE. KP said he printed out his travel documents earlier. (Agent Note. KP reached inside his backpack and showed SA DONALDSON the documents he printed for the Cancun trip.)

(S//NF) KP said he understood how his potential travel abroad could cause angst at high levels of government; however, KP said if he was guilty, then he would have already left the country. KP stated he booked the Cancun trip prior to the WIKILEAKS publication.

(S//NF) KP was asked by the interviewing Agents if he was responsible for the leak. KP denied that he was responsible and that he had done more for his country than most people.

(S//NF) KP was asked by the interviewing Agents if he consented to his phone being imaged. KP said the interviewing Agents could look at his phone, but he did not consent to it being imaged. The interviewing Agents asked if KP would voluntarily relinquish his passport, thereby not traveling to Cancun. KP refused to surrender his passport and stated he would turn it over if the government reimbursed him for the cost of the trip. At this point, SSA John HUI entered PERSHING SQUARE and informed KP the government would not reimburse him for the cost of the trip. KP again stated he would not consent to his phone being imaged or surrendering his passport. SSA HUI thereafter served KP with a subpoena to appear at a grand jury hearing on Friday, March 17, 2017 and a subpoena that authorized the FBI to seize KP's phone. SSA HUI also stated the FBI would soon execute a search warrant at KP's residence. KP read the documents and stated he did not know what it all meant. KP was told by the interviewing Agents that he had every right to seek legal counsel. KP was also told by the interviewing Agents that he could return to the residence and be present during the search. KP voluntarily agreed to return to the residence and provide access to the search team.

(S//NF) The interviewing Agents and KP thereafter departed PERSHING SQUARE and walked to the residence. KP advised there were no safety hazards inside the apartment and there were no guns, although he admitted to owning guns located in Texas. KP provided the search team access by unlocking his door. KP estimated there to be 25 terabytes of data located within the apartment, to include multiple blank internal hard drives, a desktop, and a server. KP asked the interviewing Agents if the CART personnel planned to image his devices with tools he developed at the CIA. KP later stated he had been involved in the ████████████████████

SECRET//NOFORN

JAS_020911

FD-302a (Rev. 05-08-10)

SECRET//NOFORN

�rkrurururururururururururururururururu

Continuatio�brkrrn f (S//NF) Interview of KINETIC PIRANHA ▒▒▒▒▒▒ On 03/15/2017 , Page 4 of 4

~~KP stated he had a~~ ▒▒▒▒▒▒▒▒▒▒▒ ~~inside his apartment, which~~

he ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

(S//NF) (Agent Note. At 10:19 P.M., KP was told by SA EVANCHEC that he could leave the residence should he choose. KP left the search location and stated he would return at 11:30 P.M. to get an update on the progress of the search. At approximately 12:15 A.M., KP had not returned to the search location. The interviewing Agents were aware KP had returned to 120 Park Avenue. KP was observed riding the escalator to the lobby and using a cell phone. The interviewing Agents approached KP and asked if he had a moment to talk. KP was told the following: that his talking to the FBI was voluntary, that classified information was found inside his residence, that he was being investigated for retention of classified information, that he had every right to an attorney, and that he would be arrested should he not surrender his passports. KP was told the search team had not found his ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ KP agreed to provide his passports to the interviewing Agents and stated they were at his workstation upstairs. SAs EVANCHEC, John SOMERS, Garrett IGO, BLOOMBERG security, and KP returned to KP's desk to retrieve the passports. Upon returning to the lobby, KP consented to a search of his backpack. The interviewing Agents told KP that he was not currently charged with any crime and suggested KP find a hotel room, as the search would take at least 18 more hours to complete due to the large volume of electronics. The interviewing Agents advised KP there was a HAMPTON INN Hotel nearby. They accompanied KP to the residence to gather toiletries and KP's medication. The interviewing Agents thereafter walked with KP to the HAMPTON INN, where KP got a hotel room.)

(S//NF) During the walk to the hotel, KP asked the interviewing Agents: "So, do you think I did it?" (in reference to the leak). SA EVANCHEC responded: "If you were in our shoes, what would you think?" KP said that the FBI had conducted a search at his residence and now possessed his electronics, so it would be up to the FBI to find out, and that KP felt bad that the FBI would have to analyze all that data to find out he did not do it.

(S//NF) KP was once again asked if he was responsible for leaking information to Wikileaks. KP denied being responsible. KP was further asked if the FBI would find any classified CIA material on his devices. KP denied having any classified CIA material on his electronic storage devices. KP thereafter stated no traitors ever came from Texas.

SECRET//NOFORN

JAS_020912

# EXHIBIT B

Grand Jury Subpoena

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

TO:    Joshua Adam Schulte

GREETINGS:

WE COMMAND YOU that all and singular business and excuses being laid aside, you appear and attend before
the GRAND JURY of the people of the United States for the Southern District of New York, at the United States
Courthouse, 40 Foley Square, Room 220, in the Borough of Manhattan, City of New York, New York, in
the Southern District of New York, at the following date, time and place:

Appearance Date:    **Forthwith**              Appearance Time:    **Forthwith**

to testify and give evidence in regard to an alleged violation of federal criminal law.

# FORTHWITH SUBPOENA -- URGENT

and not to depart the Grand Jury without leave thereof, or of the United States Attorney, and that you
bring with you and produce at the above time and place the following:
Huawei Cellphone, Model Nexus 6P, IMEI 867980020596552
N.B.:   Personal appearance is not required if the requested documents and information is (1) produced prior to
the above return date to Special Agent Jeff D. Donaldson, Federal Bureau of Investigation, New York Field
Office, 26 Federal Plaza, New York, NY 10278, Tel: 917-270-4602, E-mail jeff.donaldson@ic.fbi.gov; and (2)
accompanied by an executed copy of the attached Declaration of Custodian of Records.

Failure to attend and produce any items hereby demanded will constitute contempt of court and will
subject you to civil sanctions and criminal penalties, in addition to other penalties of the Law.

DATED:   New York, New York
             March 18, 2017

JOON H. KIM
*Acting United States Attorney for the*
*Southern District of New York*

Nicholas J. Lewin
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone:   212-637-2337
Email: nicholas.lewin@usdoj.gov

rev. 02.01.12

008