UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                             :

UNITED STATES OF AMERICA             :

                                               :

     - v. -                          :          S3 17 Cr. 548 (PAC)

                                               :

JOSHUA ADAM SCHULTE,         :

                                             :

             Defendant.         :

                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S OMNIBUS OPPOSITION TO
## DEFENDANT'S *PRO SE* MOTIONS

AUDREY STRAUSS
United States Attorney
Southern District of New York

David W. Denton, Jr.
Michael D. Lockard
Assistant United States Attorneys
  *- Of Counsel -*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ....................................................................................................... 1

DISCUSSION ........................................................................................................... 3

    I.   The Motion to Suppress Should Be Denied Again ..................................... 3

        A.  Relevant Background ......................................................................... 3

        B.  Applicable Law ................................................................................. 6

        C.  Discussion ........................................................................................ 9

    II.  The Motion to Compel Should Be Denied ............................................... 19

        A.  Relevant Background ....................................................................... 20

        B.  Discussion ...................................................................................... 21

    III. The Motion for Sentencing Should Be Denied ........................................ 24

        A.  Relevant Background ....................................................................... 24

        B.  Discussion ...................................................................................... 25

    IV. The SAMs Motion Should Be Denied Again ......................................... 26

        A.  Relevant Background ....................................................................... 26

        B.  Applicable Law ............................................................................... 27

        C.  Discussion ...................................................................................... 29

    V.  The Legal Assistance Motion Should Be Denied .................................... 34

        A.  Relevant Background ....................................................................... 35

        B.  Applicable Law ............................................................................... 37

        C.  Discussion ...................................................................................... 38

    VI. The Legal Mail Motion Should Be Denied.............................................. 41

CONCLUSION........................................................................................................ 42

# TABLE OF AUTHORITIES

Page

## Cases

*Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942)......................................... 39

*Bell v. Wolfish*, 441 U.S. 520 (1979) ....................................................... 28, 30, 33

*Betterman v. Montana*, 578 U.S. 968 (2016) ........................................ 24

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ........................................ 37

*Cleveland Bd. Educ. v. Loudermill*, 470 U.S. 532 (1985) ................... 37, 38

*Davidson v. Scully*, 172 F. Supp. 2d 458 (S.D.N.Y. 2001) ............................ 7

*Davis v. United States*, 564 U.S. 229 (2011) ............................................... 9

*Faretta v. California*, 422 U.S. 806 (1975) ................................................ 36

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................... 13

*Herring v. United States*, 555 U.S. 135 (2009)............................................ 9

*Hewitt v. Helms*, 459 U.S. 460 (1983) ...................................................... 32

*Illinois v. Gates*, 462 U.S. 213 (1983) ............................................ 7, 8, 11

*In re Application of Madison*, 687 F. Supp. 2d 103 (E.D.N.Y. 2009).................... 11, 17

*Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973).......................................... 33

*Jones v. United States*, 362 U.S. 257 (1960) ............................................... 8

*Kaley v. United States*, 571 U.S. 320 (2014) ............................................. 12

*Lewis v. Casey*, 518 U.S. 343 (1996).................................................. 38, 39

*Marin-Marin v. Sessions*, 852 F.3d 192 (2d Cir. 2017)................................ 33

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................ 37

*McGee v. Dunn*, 940 F. Supp. 2d 93 (S.D.N.Y. 2013) ................................ 10

*McKaskle v. Wiggins*, 465 U.S. 168 (1984)................................................ 37

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ..................................... 19

*Schulte v. United States*, 21 Civ. 4800 (S.D.N.Y.) ..................................... 41

*Snepp v. United States*, 444 U.S. 507 (1980)............................................. 23

*Spates v. Manson*, 644 F.2d 80 (2d Cir. 1981) .......................................... 39

*Texas v. Brown*, 460 U.S. 730 (1983) ......................................................... 8

*United States v. Alexander*, 860 F.2d 508 (2d Cir. 1988)............................ 25

*United States v. Ali*, 396 F. Supp. 2d 703 (E.D. Va. 2005).............. 29, 30, 33

*United States v. Almonte*, 2014 WL 3702598 (S.D.N.Y. 2014) ............................................ 6

*United States v. Alvarez-Estevez*, 2014 WL 12681364 (S.D.N.Y. 2014) ..................... 7, 29

*United States v. Apker*, 705 F.2d 293 (8th Cir. 1983) ................................................ 12

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) ............................................ 13

*United States v. Bajakajian*, 524 U.S. 321 (1998) .................................................... 33

*United States v. Baldeo*, 2015 WL 252414 (S.D.N.Y. 2015) ............................... 6, 7, 10

*United States v. Baldeo*, 615 F. App'x 26 (2d Cir. 2015) ............................................ 6

*United States v. Bush*, 2021 WL 371782 (S.D.N.Y. 2021) ........................................ 7, 9

*United States v. Byrd*, 208 F.3d 592 (7th Cir. 2000) ................................................ 38

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) ............................................ 13

*United States v. Cioffi*, 668 F. Supp. 2d 385 (E.D.N.Y. 2009) .................................... 15

*United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990) ............................................ 13

*United States v. Donziger*, 2021 WL 1845104 (S.D.N.Y 2021) .................................... 7

*United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000) ........................................ 28, 30

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ...................................... 8, 18, 19

*United States v. Giampa*, 1992 WL 249885 (S.D.N.Y. 1992 ...................................... 11

*United States v. Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) .................................... 12

*United States v. Leon*, 468 U.S. 897 (1984) .............................................. 8, 9, 19

*United States v. Levy*, 2013 WL 664712 (S.D.N.Y. 2013) .......................................... 15

*United States v. Levy*, 803 F.3d 120 (2d Cir. 2015) ................................................ 15

*United States v. Lisi*, 2020 WL 1331955 (S.D.N.Y. 2020) ........................................ 6, 7

*United States v. Maxwell*, 510 F. Supp. 3d 165 (S.D.N.Y. 2020) .............................. 12

*United States v. Moreno*, 897 F.2d 26 (2d Cir. 1990) .............................................. 11

*United States v. Mouzon*, 2016 WL 7188150 (S.D.N.Y. 2016) .................................... 12

*United States v. Nero*, 2021 WL 1534392 (S.D.N.Y. 2021) ................................... 6, 10

*United States v. Prescott*, 920 F.2d 139 (2d Cir. 1990) ............................................ 25

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ...................................... 14

*United States v. Regan*, 706 F. Supp. 1102 (S.D.N.Y. 1989) .................................... 15

*United States v. Riley*, 906 F.2d 841 (2d Cir. 1990) ................................................ 15

*United States v. Rosa*, 626 F.3d 56 (2d Cir. 2010) .................................................... 7

*United States v. Rubio*, 727 F.2d 786 (9th Cir. 1983) .............................................. 17

iii

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998).................................................. 17

*United States v. Shakur*, 560 F. Supp. 337 (S.D.N.Y. 1983) ...................................... 17

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) ................................................... 8

*United States v. Smith*, 9 F.3d 1007 (2d Cir. 1993) ..................................................... 8

*United States v. Ventresca*, 380 U.S. 102 (1965)......................................................... 8

*United States v. Vilar*, 2007 WL 1075041 (S.D.N.Y. 2007) ...................................... 13

*United States v. Wagner*, 989 F.2d 69 (2d Cir.1993)................................................... 8

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967)....................................... 11

*Wilkinson v. Austin*, 545 U.S. 209 (2005)............................................................ 31, 32

*Wilson v. Central Intelligence Agency*, 586 F.3d 171 (2d Cir. 2009)..................... 22, 23

*Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000) ........................................................... 13

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ......................................................... 17, 31

*Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001)........................................................ 33

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ....................................................... 17

## Statutes

18 U.S.C. § 401 ............................................................................................................. 2

18 U.S.C. § 793 ........................................................................................................... 11

18 U.S.C. § 1001 ........................................................................................................... 2

18 U.S.C. § 1030 ......................................................................................................... 11

18 U.S.C. § 1343 ......................................................................................................... 11

18 U.S.C. § 2252 ......................................................................................................... 11

21 U.S.C. § 4042 ......................................................................................................... 33

28 U.S.C. § 4001 .................................................................................................... 32, 33

## Other Authorities

28 C.F.R. § 501 ..................................................................................................... passim

28 C.F.R. § 542 ............................................................................................ 28, 29, 30, 32

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to motions filed by the defendant, Joshua Adam Schulte ("Schulte" or "defendant") to: (1) suppress evidence seized from the defendant's cell at the New York Metropolitan Correctional Center ("MCC") (D.E. 455)[1] ("Motion to Suppress" or "MTS"); (2) compel the production of forensic images of certain electronics devices seized from the defendant's home (D.E. 472) (the "Motion to Compel" or "MTC");[2] (3) schedule sentencing on the offenses for which the defendant was found guilty after trial (D.E. 475) ("Motion for Sentencing" or "Sent. Mot."); (4) vacate the defendant's Special Administrative Measures ("SAMs") (D.E. 474) ("SAMs Motion"); (5) compel the MCC to provide the defendant various accommodations, including electrical outlets, charging cords, and continuous access to a printer, and to compel the Government to buy the defendant various electronic devices and components and legal research services (D.E. 490) ("Legal Assistance Motion" or "LAM"); and (6) compel the MCC to deliver legal mail (D.E. 491) ("Legal Mail Motion").

For the reasons discussed below, each of the motions should be denied.

## BACKGROUND[3]

The charges in this case stem from the defendant's theft of classified documents and records (the "Classified Information") from the Central Intelligence Agency ("CIA") and his transmission of that classified information to WikiLeaks for publication. Between March 7 and

---

[1] In this Memorandum, "D.E." refers to entries in the electronic docket in this case, "Tr." refers to the trial transcript, "GX" refers to Government Exhibits received in evidence at trial, and "[Date] Tr." refers to the transcript of proceedings on the identified date.

[2] The Motion to Compel was filed in duplicate form as D.E. 473.

[3] Additional background relevant to each of the defendant's motions is set forth below in connection with the discussion of the individual motions.

November 17, 2017, WikiLeaks made 26 separate disclosures of classified CIA information (together, the "Leaks"). The Leaks contained, among other things, highly sensitive CIA information including detailed descriptions of certain tools used by CIA operators. The Leaks' impact on the CIA's intelligence gathering activities and the national security of the United States was catastrophic.

On June 18, 2018, based on the information gathered as part of the investigation, the defendant was charged in a thirteen-count Indictment with espionage and other offenses related to the Leaks, as well as child pornography and copyright offenses. *See* D.E. 47. While those charges were pending and the defendant was detained in prison, the Government learned that the defendant and other inmates had cellphones illegally smuggled into prison for their use and that the defendant may have been using the contraband cellphones to further disclose classified information. Based on the defendant's conduct, on October 31, 2018, the Government filed a second superseding indictment charging him with, in addition to the charges contained in the S1 Indictment, one additional count of unlawfully disclosing and attempting to disclose classified information and one count of contempt of court for willfully violating a court order. *See* D.E. 68.

On February 2, 2020, trial began as to the eleven national security related counts in the S2 Indictment. On March 9, 2020, a jury found the defendant guilty of two of those counts: making false statements to law enforcement, in violation of 18 U.S.C. § 1001, and contempt of Court, in violation of 18 U.S.C. § 401(3). The jury was unable to reach a unanimous verdict as to the remaining eight counts and, as a result, the Court granted the defendant's motion for a mistrial as to those counts.

On June 8, 2020, the Government sought and obtained a third superseding indictment from a Southern District grand jury sitting in White Plains. *See* D.E. 405. The S3 Indictment

contains nine counts that are based on the same conduct that was at issue during the February 2020 trial, namely, the defendant's theft and transmission of the Classified Information, his destruction of log files and other forensic data on CIA computer systems in the course of committing that theft, his obstruction of the investigation into the Leaks, and his transmission and attempted transmission of national defense information while detained in prison.

## DISCUSSION

### I.     The Motion to Suppress Should Be Denied Again

The Motion to Suppress asks the Court to suppress evidence seized pursuant to two search warrants authorizing the search of portions of the MCC as part of the Government's investigation of Schulte and other inmates regarding cellphones (the "Contraband Cellphones") illegally smuggled into the prison and used, among other things, by Schulte to disclose classified information.  On October 2, 2018, a warrant authorizing the search of the MCC for the Contraband Cellphones and other classified documents (the "MCC Premises Warrant") was issued by the Court, and on the next day the Court issued a warrant authorizing the review by a wall team of certain of the documents seized during the search of the MCC (the "MCC Wall Warrant," and collectively, the "MCC Warrants").  The Court has already denied Schulte's prior motion to suppress evidence seized pursuant to these warrants, and the grab-bag of inapposite arguments contained in the Motion to Suppress provides no basis to revisit that ruling. Moreover, even if the Court were to consider those arguments in the first instance, they are meritless—the MCC Warrants are amply supported by probable cause and do not violate the defendant's constitutional rights.

### A.     Relevant Background

On October 2, 2018, the Government applied for the MCC Premises Warrant, which sought authorization to search two units at the MCC (including the one in which Schulte was

housed) and the MCC's law library (the "MCC Premises"). The affiant, FBI Special Agent Jeff Donaldson, first described the circumstances of Schulte' s detention at the MCC (including his theft of the Classified Information) (MTS Ex. A ¶ 8), and that Schulte was housed in the same unit as another inmate, Omar Amanat, who had been convicted of fraud offenses and who had fabricated evidence at trial (*id.* ¶¶ 9-10). Agent Donaldson went on to state that, in or about April 2018, Schulte sent at least one search warrant application produced in discovery to a reporter in violation of the Court's discovery protective order, resulting in the Court's reprimand on May 21, 2018. (*Id.* ¶ 11(a)-(d)). Finally, Agent Donaldson described information that the FBI had received from another inmate (the "CS"), who had informed the FBI that, among other things, Schulte and Amanat were using Contraband Cellphones in the MCC, and that the CS recalled at least one conversation over one of the Contraband Cellphones in which "Vault 7," the name for some of the 2017 WikiLeaks Leaks, had been discussed. (*Id.* ¶ 13). The CS also provided the FBI with screenshots and videos of Schulte and Amanat using the Contraband Cellphones to, among other things, disseminate documents they had drafted. (*Id.* ¶ 15). Based on this application, the Court authorized the search of the MCC Premises, including for the Contraband Cellphones and any documents and records pertaining to the illegal gathering, retention, removal, and transmission of classified information, including in particular nine "articles" Schulte had drafted (the "Schulte Articles").

On October 3, 2018, the FBI began to search the MCC Premises. During the search, MCC officials gave the FBI documents from the cell Schulte inhabited before his transfer to a secure housing unit on October 1, 2018 (the "Schulte Cell Documents"), including loose files, as well as several notebooks and notepads. The investigating agents flipped briefly through the Schulte Cell Documents and confirmed that they appeared to contain handwritten text potentially

4

written by Schulte. The agents opened to a small subset of pages in each notebook at random, and made a cursory examination of the legible text on those pages. During that review, the agents identified some writings that appeared to be potentially classified. Among some of the loose files, the agents also saw, among other things, cover pages marked with Trulincs, which the agents understood might relate to Schulte's defense. Based on these findings, the agents immediately informed the prosecutors about the discovery of the Schulte Cell Documents. The prosecutors told the agents to stop reviewing the Schulte Cell Documents until the prosecutors had given the FBI further instruction. *See generally* D.E. 120 at 60. The Government then sought the MCC Wall Warrant for authorization to search the Schulte Cell Documents for evidence of the same crimes as those identified in the MCC Premises Warrant.  Because the agents had noticed potentially privileged documents, the Government sought authorization to implement a wall review process for searching the Schulte Cell Documents. (MTS Ex. B ¶ 3 & Attachment A at 2).

On June 18, 2019, the defendant filed a motion to suppress evidence seized pursuant to the MCC Warrants, arguing principally that the search violated the defendant's Sixth Amendment rights by seizing potentially attorney-client privileged information (D.E. 97).  The Government responded on August 2, 2019 (D.E. 120), and the defendant filed a reply on August 29, 2019 (D.E. 130).  On October 18, 2019, the Court denied the defendant's motion (D.E. 159). In that order, the Court concluded that "[t]he Government had probable cause to execute the search warrant, and the Defendant does not challenge that," (*id.* at 3), that the procedures for conducting the search were sufficient and did not warrant suppression, (*id.* at 5-6), and that "the steps taken the day of the initial search do not show bad faith." (*Id.* at 6).

After the defendant indicated that he wished to discharge his appointed legal counsel and proceed to defend himself *pro se* in this matter, the Court held a hearing on July 14, 2021, to advise the defendant about the relevant considerations in representing himself.  As part of that colloquy, the Court reminded the defendant that its prior rulings would continue to govern:

> Do you understand that if you do choose to represent yourself, that does not automatically entitle you to revisit rulings that I've already made in this case? Do you understand that?

The defendant affirmed, "Yes." (July 14, 2021 Tr. at 21).

### B.    Applicable Law

"Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources," *United States v. Almonte*, No. 14 Cr. 86 (KPF), 2014 WL 3702598, at *1 (S.D.N.Y. July 24, 2014) (internal quotation marks omitted); and it is "not intended as a vehicle for relitigating old issues, presenting the case under new theories or otherwise taking a second bite at the apple." *United States v. Nero*, No. 13 Cr. 271 (LTS), 2021 WL 1534392, at *1 (S.D.N.Y. Apr. 19, 2021) (internal quotation marks and alteration omitted).   "While the Federal Rules of Criminal Procedure do not provide for reconsideration motions, such motions are tacitly accepted in criminal cases in this District by virtue of Local Crim. R. 49.1(d), which requires a movant to submit a 'memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked' within 'fourteen (14) days after the Court's determination of the original motion.'  Courts generally supplement Local Criminal Rule 49.1(d) with the standard for civil reconsideration motions under Local Civ. R. 6.3." *United States v. Baldeo*, S1 13 Cr. 125 (PAC), 2015 WL 252414, at *1 (S.D.N.Y. Jan. 20, 2015), *aff'd*, 615 F. App'x 26 (2d Cir. 2015).  The untimeliness of a defendant's motion "is itself a sufficient basis

for denial," although "courts retain the discretion to excuse an untimely filing." *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 1331955, at *1 (S.D.N.Y. Mar. 23, 2020).

"The standard governing reconsideration motions is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *United States v. Donziger*, No. 19 Cr. 561 (LAP), 2021 WL 1845104, at *3 (S.D.N.Y. May 7, 2021). "Compelling reasons for granting a motion for reconsideration are limited to an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Bush*, No. 18 Cr. 907 (PAC), 2021 WL 371782, at *1 (S.D.N.Y. Feb. 3, 2021) (cleaned up). Motions for reconsideration "may not advance new facts, issues or arguments not previously presented to the Court, nor may [they] be used as vehicle[s] for relitigating issues already decided by the Court." *Baldeo*, 2015 WL 252414, at *1 (quoting *Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001)). Thus, although ultimately "[t]he decision to grant or deny a motion for reconsideration is within the sound discretion of the district court," *Lisi*, 2020 WL 1331955, at *1, "[w]here a motion restates arguments already presented or attempts to advance new facts . . . the motion for reconsideration must be denied." *United States v. Alvarez-Estevez*, No. 13 Cr. 380 (JFK), 2014 WL 12681364, at *1 (S.D.N.Y. Nov. 6, 2014).

Consistent with the Fourth Amendment, a search warrant must "describe with particularity the place to be searched and the persons or things to be seized." *United States v. Rosa*, 626 F.3d 56, 61 (2d Cir. 2010). In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or

evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238

(1983).  Such determinations must be approached in a practical way, *id.* at 231-32, because

"probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742

(1983).

Once a search warrant has issued, the issuing judge's "determination of probable cause

should be paid great deference by reviewing courts."  *Gates*, 462 U.S. at 236 (internal quotation

marks omitted).  "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not

take the form of *de novo* review."  *Id.*  Thus, "'[a]lthough in a particular case it may not be easy

to determine when an affidavit demonstrates the existence of probable cause, the resolution of

doubtful or marginal cases in this area should be largely determined by the preference to be

accorded to warrants.'"  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting

*United States v. Ventresca*, 380 U.S. 102, 109 (1965)).  "[S]o long as the magistrate had a

'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the

Fourth Amendment requires no more."  *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*,

362 U.S. 257, 271 (1960)) (ellipsis and second alteration in original); *see also United States v.

Singh*, 390 F.3d 168, 181 (2d Cir. 2004) ("In reviewing a magistrate's probable cause

determination, we accord substantial deference to the magistrate's finding and limit our review

'to whether the issuing judicial officer had a substantial basis for the finding of probable cause.'"

(quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

Even if a warrant is defective, the seized evidence may still be admitted under certain

circumstances, including the good faith exception.  The Supreme Court, in *United States v. Leon*,

468 U.S. 897 (1984), held that the exclusionary rule "does not apply to evidence seized 'in

objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge,

even where the warrant is subsequently deemed invalid." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Leon*, 468 U.S. at 922).  The Supreme Court has made clear that "the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal quotation marks and citations omitted).  Thus the central question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23.  If the reviewing court finds that the officer's reliance on the warrant was objectively reasonable, suppression is not warranted. *See id.* at 922; *Davis v. United States*, 564 U.S. 229, 238-39 (2011) ("*Leon* itself, for example, held that the exclusionary rule does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid.").  To trigger the exclusionary rule, law enforcement "conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

C.     **Discussion**

1.   *The Defendant Fails to Meet the Standard for Reconsideration of the Court's Prior Ruling*

The Motion to Suppress—in addition to being clearly untimely, filed more than a year after the Court's order denying Schulte's previous motion addressed at the same warrants— plainly fails to meet the strict standard necessary to warrant reconsideration of the Court's prior order.  The Motion to Suppress identifies no "intervening change of controlling law," no "availability of new evidence," and identifies no "clear error" in the Court's prior ruling. *Bush*, 2021 WL 371782, at *1.  All of the facts cited in the Motion to Suppress were known to the defendant at the time of the original motion, and no law has changed that warrants revisiting the Court's reasoned conclusions.  Although the defendant claims that reconsideration is necessary

to prevent "manifest injustice," (MTS at 1), the Motion to Suppress on its face seeks to do exactly what the law forbids: the defendant expressly acknowledges that he "raises issues that the original motion did not, and which this court did not consider." (*Id.*).  The defendant's acknowledgment that he now wishes to "advance[e] new facts, issues or arguments not previously presented to the Court" in order to "relitigate[e] issues already decided by the Court," *Baldeo*, 2015 WL 252414, at \*1, is alone a sufficient basis to deny the Motion to Suppress. Indeed, the defendant's attempt to revisit the Court's ruling serves to illustrate why the standard for motions for reconsideration sets a high bar: "the purpose of the rule is to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters."  *McGee v. Dunn*, 940 F. Supp. 2d 93, 100 (S.D.N.Y. 2013) (cleaned up).  Despite the Court's warning to the defendant that, should he "choose to represent [him]self, that does not automatically entitle [him] to revisit rulings that [the Court has] already made in this case," an admonition that the defendant affirmed he understood, (July 14, 2021 Tr. at 21), the defendant nevertheless seeks to "tak[e] a second bite at the apple," *Nero*, 2021 WL 1534392, at \*1.  The Court has already concluded that "[t]he Government had probable cause to execute the search warrant," (D.E. 159 at 3), and the defendant's motion does not meet the threshold for reconsideration of that ruling.

## 2. *The MCC Warrants Were Supported by Probable Cause*

In any event, even if the Court were to consider the defendant's motion, it is meritless. The defendant advances a scattershot assortment of arguments intended to cast doubt on the validity of the MCC Premises Warrant, none of which undermines the Court's conclusion that "[t]he Government had probable cause to execute the search warrant." (D.E. 159 at 3).  The defendant primarily relies on his lengthy recitation of a description of several articles that were particularized as items to be seized in the MCC Premises Warrant, repeating that certain of the

articles (though not all) were determined to be unclassified.  (MTS at 8-14).  But it is irrelevant

that certain of the articles themselves may not have been classified—and thus were legal for the

defendant to possess—and the defendant is flatly wrong that "a warrant cannot seek to seize

documents that violate no criminal statute" (MTS at 17).  On the contrary, Federal Rule of

Criminal Procedure 41(c) authorizes the issuance of a search warrant for not only "contraband,

fruits of crime, or other items illegally possessed," but also for "evidence of a crime" or

"property designed for use, intended for use, or used in committing a crime."  As the Supreme

Court has acknowledged, "[n]othing in the language of the Fourth Amendment supports the

distinction between 'mere evidence' and instrumentalities, fruits of crime, or contraband."

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967).  "[T]he mere fact that seized

items have legitimate purposes does not eliminate the possibility that they may also be evidence

of a crime."  *In re Application of Madison*, 687 F. Supp. 2d 103, 116 (E.D.N.Y. 2009). "The

Second Circuit has also emphasized that 'the evidentiary significance of an item viewed must be

assessed from the perspective of a law enforcement officer.'" *United States v. Giampa*, No. 92

Cr. 437 (PKL), 1992 WL 249885, at *5 (S.D.N.Y. Sept. 23, 1992) (quoting *United States v.

Moreno*, 897 F.2d 26, 32 (2d Cir. 1990)).  To support a conclusion that evidence of a crime will

be found in a particular place, "only the probability, and not a *prima facie* showing, of criminal

activity is the standard of probable cause." *Gates*, 462 U.S. at 235**.**

Here, the affidavit sets forth the fact that Schulte and Amanat had been charged by

indictment with violations of 18 U.S.C. §§ 793, 1030, 1343, and 2252A, and that Amanat had

been convicted of, among other offenses, violations of 18 U.S.C. § 1343.  (MTS Ex. A ¶¶ 8(f),

8(h), 9(a), 9(c)).  The defendant disparages the significance of these facts and cites generally to

the presumption of innocence that he enjoys, (*see* MTS at 15-16), but ignores the import of the

grand jury's determination.  Because "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime," *Kaley v. United States*, 571 U.S. 320, 328 (2014), "[t]he Defendant's indictment by a grand jury suffices to establish that there is probable cause to believe that [h]e committed the offenses charged in the indictment."  *United States v. Maxwell*, 510 F. Supp. 3d 165, 170–71 (S.D.N.Y. 2020).  "If an indictment can be used to establish the probability of criminal activity for an arrest warrant we see no reason why an indictment should not be able to establish probability of criminal activity for a search warrant."  *United States v. Apker*, 705 F.2d 293, 303 (8th Cir. 1983); *see also United States v. Mouzon*, No. 16 Cr. 284 (CM), 2016 WL 7188150, at *4 (S.D.N.Y. Dec. 2, 2016) (court reviewing a search warrant "would have been all but justified in concluding, based solely on the facts alleged in the Indictment, that there was probable cause existed to believe that [the defendant] had engaged in criminal activity"); *United States v. Lahey*, 967 F. Supp. 2d 698, 726 n.33 (S.D.N.Y. 2013) (case law "suggest[s] that the fact that the Grand Jury had already returned [an] [i]ndictment against [the defendant] ..., without more, supports probable cause to search his residence").

The affidavit not only incorporates the offenses described in the indictment, but also sets forth (1) that the defendant had spoken with members of the media and disseminated information that he knew to be covered by the protective order entered in this case (MTS Ex. A ¶ 11(b)), (2) that at least one of the defendant's articles contained classified information (*id.* ¶ 11(h)), (3) that the defendant possessed and used contraband cellphones while detained (*id.* ¶ 13),[4]

---

[4] The defendant attempts to minimize the evidence related to his use of the Contraband Cellphones by asserting that the affidavit specifies only "legal use of an illegal cellphone." (MTS at 23).  But there is no such thing.  Evidence of the defendant's use of contraband cellphones in prison is evidence of a crime, whatever his purpose for that use.

(4) that the contraband cellphones were used to send communications "in connection with Schulte's and Amanat's intended fabrication of evidence and/or dissemination of materials protected by the Protective Order or that appear classified" (*id.* ¶ 15(a), and (5) that one of those cellphones contained what appears to be an email transmitting an excerpt from one of the defendant's articles. (*Id.* ¶ 15(c)(ii)).  There was thus an ample basis for the Court to conclude that there was probable cause to believe the defendant was engaged in illicitly transmitting protected material through covert means while in jail, and that there was a fair probability that this included protected or classified information, and was in violation of the Court's orders prohibiting such disclosure.

### 3.   *The Affidavits Were Not Misleading and Did Not Contain Material Omissions*

To the extent that Schulte avers that the Warrant omitted information regarding the content of his Articles or the affiant's awareness of that content, and that the omission rendered the warrant misleading (MTS at 8-14), he still misses the mark.  A search warrant affidavit is presumed reliable.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Under *Franks*, "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.'" *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) (citing *Franks*, 438 U.S. at 164-72).

Because "[a]ll storytelling involves an element of selectivity," *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000), "an affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Awadallah*, 349 F.3d 42, 67-68 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)). Thus, "*Franks* claims based on omissions are less likely to justify suppression than claims of

intentionally or recklessly false assertions." *United States v. Vilar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. April 4, 2007).

Here, the Affidavit neither concealed nor omitted relevant facts. The Affidavit makes clear that it "does not include all the facts that [Special Agent Donaldson] ha[d] learned during the course of [the] investigation." (MTS Ex. A ¶ 2). The Affidavit sets forth that it was the defendant's own characterization of his writings that "discussed his case" and that he wished to disseminate to the media (*id.* ¶ 11(a)), and that "at least one of the Schulte Articles contain[s] classified information" (*id.* ¶ 11(h)).[5]  The Affidavit neither misled the Court as to the nature of the articles, nor misrepresented their classification status. The defendant's attempt to cherry-pick particular details that he believes should have been included (MTS at 36-37), is again derivative of his erroneous view that the fact that certain of his writings may not in and of themselves have constituted crimes somehow means that they cannot be evidence of criminal conduct. The affidavit makes clear, however, that his notes and other writings—and his attempts to transmit them to others—are relevant evidence of the defendant's continued attempts to disseminate protected and/or classified information, and to use contraband cellphones to do so.

Instead, the defendant resorts to repeated *ad hominem* attacks on the affiant, attempting to substitute invective for fact. (*See, e.g.*, MTS at 41). But the defendant's vitriol does not support a conclusion that the affidavit was misleading, much less that it was intentionally so. *See United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (defendant must show affiant had the

---

[5] The defendant is incorrect in his repeated assertion that all of his articles are unclassified. One of the defendant's articles does in fact contain classified information, and has been produced to the defendant in classified discovery. In fact, the Government specifically identified that classified information in its notice pursuant to Section 10 of the Classified Information Procedures Act. He attempts to obfuscate the issue by attaching different exhibits to his motion than what is referenced in Attachment A to the warrant. *Compare, e.g.*, MTS Ex. M *with* MTS Ex. A at 28.

subjective intent to mislead and not simply that affiant omitted "critical" information or information that a reasonable person would have included).

### 4. The Warrants Were Not Overbroad

The defendant's vague assertions that the warrant was overbroad both with respect to the items to be seized and the area to be searched (MTS at 18-21) represent nothing more than a disagreement with the Court's determination about the nature of the search supported by probable cause. "The Fourth Amendment does not require that every item or document to be seized be specifically identified in the warrant; generic terms may be used to describe the materials to be seized." *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015). In determining the level of specificity required, "the complexity of the defendants' activities and suspected crimes diminishes the requisite threshold of particularity for satisfying the Fourth Amendment. The degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated." *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989). Here, the warrant specified highly complex crimes under investigation, including espionage, committed through sophisticated technological means. "The type of evidence sought is also relevant; in particular, courts have recognized that documentary evidence may be difficult to describe *ex ante* with the same particularity as a murder weapon or stolen property." *United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009). "Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990). The warrant here adheres to the Second Circuit's instructions in *Riley*. The authorization to seize

15

records from the defendant was cabined by the requirement that they pertain to delineated subject offenses, and "delineated in part by an illustrative list of seizable items." *Id.*; MTS Ex. A at 28. The Fourth Amendment requires no more.

The defendant's attack on the scope of the area to be searched fares no better. He does no more than disagree with the Court's conclusion about where the sought evidence was likely to be found. The affidavit sets forth that (1) the defendant had possessed the Contraband Cellphones in his unit, and that the cellphones had been stored in multiple inmates' cells (MTS Ex. A ¶¶ 13(c)-(d)); (2) the defendant had made statements about taking the contraband cellphones to the law library (*id.* ¶ 13(g)); (3) the defendant and other inmates in his unit had the ability to interact across a hallway with inmates in an adjoining unit (*id.* ¶ 14(a)-(b)); and (4) the Contraband Cellphones had not been recovered from multiple searches conducted by the Bureau of Prisons of cells in the defendant's unit (*id.* ¶ 14(c)-(d)). The Court was well justified in concluding that a search of the MCC Premises was necessary to locate the cellphones, which constituted both contraband and evidence of the other crimes specified in the warrant. The defendant's unsupported disagreement with that conclusion is no basis for suppression.[6]

### 5.  *The Warrants Did Not Violate the First Amendment*

The defendant also cites general case law regarding the freedom of expression protected by the First Amendment to suggest that the MCC Warrants are somehow invalid. The Supreme Court has long recognized, however, that consistent with the First Amendment, "valid warrants may be issued to search any property, whether or not occupied by a third party, at which there is

---

[6] The defendant's assertion that the seizing agents impermissibly searched areas outside the scope of the warrant is also factually incorrect. As the MCC Wall Warrant makes clear, "[p]rior to the search, MCC officials had removed [documents], among other things, from Schulte's former cell and stored them in an official office at the MCC." (MTS Ex. B ¶ 6(a)); *see also* D.E. 120 at 60 ("During the search, MCC officials gave the FBI documents from the cell Schulte inhabited before his transfer to a secure housing unit on October 1, 2018.").

probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found."

*Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978).  "Properly administered, the preconditions

for a warrant—probable cause, specificity with respect to the place to be searched and the things

to be seized, and overall reasonableness—should afford sufficient protection" for the interests

safeguarded by the First Amendment.  *Id.* at 565; *see also United States v. Rubio*, 727 F.2d 786,

791 (9th Cir. 1983) ("When activity protected by the First Amendment becomes the subject of a

criminal investigation, the protections afforded by the Fourth Amendment come into play.").

The mere fact that items have some First Amendment value in the abstract does not, however,

insulate them from seizure.  Rather, a search warrant for a defendant's papers can "pass

constitutional muster" when "[t]he papers were not seized for their political content or their

expression of ideas but instead for their connection to specifically enumerated criminal

activities."  *United States v. Shakur*, 560 F. Supp. 337, 346 (S.D.N.Y. 1983); *see also In re*

*Application of Madison*, 687 F. Supp. 2d 103, 110–11 (E.D.N.Y. 2009) (drawing a distinction

between "searches for, and seizures of, materials because of the materials' expressive content

(*i.e.*, to stifle the particular expression)" and "searches and seizures [that] were not undertaken to

stifle any type of expression" but were "undertaken to further an investigation into possible

violations of the federal anti-rioting statute").  The fact that the items seized from the defendant

may reflect his views or opinions do not deprive them of the evidentiary value that makes them

subject to seizure—indeed quite the opposite.  "[I]t is beyond cavil that '[t]he First

Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a

crime or to prove motive or intent.'" *United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998)

(quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)) (alterations in original). "Evidence of

a defendant's previous declarations or statements is commonly admitted in criminal trials subject

to evidentiary rules dealing with relevancy, reliability, and the like." *Mitchell*, 508 U.S. at 489.

Accordingly, the MCC Warrants complied with the requirements of the Fourth Amendment, and

the First Amendment provides no additional basis for the suppression of the fruits of the duly

authorized search.

> 6.  *The Defendant's Claims Regarding Attorney-Client Privilege Do Not Warrant Suppression*

The defendant merely regurgitates the same arguments that the Court has already rejected

regarding the potentially privileged status of documents seized pursuant to the MCC Warrants.

(MTS at 30-33).  The Court correctly recognized that "it does not follow in these

circumstances—where agents conducted a cursory review to determine relevance—that the

search is invalid, and all evidence must be suppressed."  (D.E. 159 at 6).  The defendant offers

no basis to reject that reasoned conclusion, and the Court should adhere to its prior opinion.

Moreover, prior to the previous trial in this matter, the parties extensively addressed with the

Court the privilege status of the specific materials seized pursuant to the MCC Warrants that the

Government sought to introduce, and the Court concluded that three exhibits—GX 801, 806, and

809—were not privileged were admitted into evidence as redacted.  The Government does not

seek to offer additional material seized from the defendant's notebooks, so the Court's prior

rulings fully resolve this issue.

> 7.  *The Good Faith Exception Should Apply*

Even assuming *arguendo* that the purported defects the defendant identifies cast doubt on

the sufficiency of the MCC Warrants, which is not the case, the Court still should not suppress

the results of the search or any derivative evidence because the FBI acted in good faith by

relying on those warrants.  *See Falso*, 544 F.3d at 125 (exclusionary rule does not apply to

evidence seized in good faith reliance on an issued warrant).  In this case, "the fact that a neutral

magistrate has issued [the MCC Warrants] is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Leon*, 468 U.S. at 922-23).

The defendant contends that the supposed defects that he recites are so egregious as to preclude application of the good-faith exception.  Under the good-faith exception, evidence collected pursuant to an invalid search warrant will be suppressed only if (i) the issuing judge was knowingly misled; (ii) the issuing judge wholly abandoned his or her judicial role; (iii) the application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (iv) the warrant is so facially deficient that reliance upon it is unreasonable. *Falso*, 544 F.3d at 125.  But as set forth above, the defendant fails to show that the affidavit was either misleading or unreasonably lacking in indicia of probable cause, and he makes no argument that the Court abandoned the judicial role or that the warrant itself was facially deficient.  The Motion to Suppress fails for the myriad of reasons discussed above, and should be denied.

## II.    The Motion to Compel Should Be Denied

The Motion to Compel seeks an order compelling the Government to produce (1) a Hyper-V Windows Server QNY_56_SC48_SRV02 ("SRV02 Server"), (2) desktop QNY09-SC01_desktop ("SC01 Desktop"), and (3) the WikiLeaks Vault 7 publication in declassified format. (MTC at 1). All of this data already has been produced in discovery and is available for the defendant's review in the courthouse Sensitive Compartmented Information Facility ("SCIF") that was set up for the defendant's and his counsel's use. The data includes classified information as well as child pornography, and can only be reviewed in a secure setting.

What the Motion to Compel really seeks is to require the Government to produce these records in an unclassified setting, arguing that classified records have lost their classified status

by virtue of publication by WikiLeaks and that child pornography can be removed from hard drives in order to provide the remainder in unclassified, non-secure form. The law is clear, however, that the unlawful publication of classified records does not deprive them of their classified status. In addition, the defendant's proposal to segregate classified or sensitive information is both unnecessary and, as a practical matter, untenable. The motion should be denied.

### A.      Relevant Background

The SRV02 Server and SC01 Desktop. On or about March 13 and 14, 2017, the FBI executed search warrants at the defendant's residence in New York, New York. During the search, the FBI recovered a desktop computer (the SC01 Desktop) and servers, including the SRV02 Server, among other evidence.

The data on the SC01 Desktop is protected by multiple layers of encryption. (Tr. 1366-73; D.E. 121). This data includes an extraordinary volume of illegal child pornography stored in deeper layers of encryption. ( D.E. 121 at ¶¶ 3-10). The data on the SRV02 Server includes at least nine classified files. *See* Exhibit 1.

By letter dated March 15, 2018, the Government advised the defendant's former counsel that the contents of the SC01 Desktop and SRV02 Server could be reviewed at the FBI's offices. *See* Exhibit 2 at 2; *see also* Exhibits 1 & 3. By letter dated April 3, 2018, the Government advised the defendant's former counsel that the contents of the SC01 Desktop and SRV02 Server were being moved to the courthouse SCIF for review by the defendant and his counsel. *See* Exhibit 3 at 2. In addition to providing complete copies of the contents of these two devices in classified discovery, a file directory listing of the contents of the SC01 Desktop has been produced in unclassified discovery. *See* Exhibit 4.

20

The WikiLeaks Vault 7 Release. Between approximately March and November 2017, WikiLeaks published portions of the materials stolen by the defendant on its website—the Leaks. (Tr. 135-46; GX 1-16). WikiLeaks referred to these published records as "Vault 7" and "Vault 8." (Tr. 68-75, 135-36).

The WikiLeaks Vault 7 and Vault 8 releases were also produced in classified discovery. Certain records of those releases have been declassified (*see* GX 2-16) and produced in unclassified discovery.

On August 19, 2018, the Court entered a protective order governing classified discovery. (D.E. 61 (the "Classified Information Protective Order")). The Order was entered with the consent of the defendant's counsel. (D.E. 59; Classified Information Protective Order at 18). On or about August 28, 2018, the defendant signed a Memorandum of Understanding in which he "agree[d] to comply with the provisions of" the Classified Information Protective Order. (Exhibit 5). The Classified Information Protective Order sets forth various provisions to protect classified discovery from disclosure to unauthorized persons or for unauthorized purposes. (*Id*. at 4-15). As noted in the Order, the defendant "has a continuing contractual obligation to the Government not to disclose to any unauthorized person classified information known to him or in his possession." (*Id*. at 7).

In addition to the defendant's prior SCIF visits, beginning on or about August 3, 2021, the defendant has resumed production to the courthouse SCIF approximately two days per week in order to review classified discovery, including the contents of the SRV02 Server, SC01 Desktop, and the WikiLeaks Vault 7 release.

## B.    Discussion

The defendant has access to the discovery he seeks, all of which is available for review in the SCIF. The defendant asserts, with no support, that "the government never produced the

[SRV02 Server] in the SCIF." (MTC at 2).[7] The defendant also asserts, again with no support, that "[a] forensic image [of the SC01 Desktop] was provided to the defense in a controlled setting, but not to Mr. Schulte . . . ." (MTC at 5). As described above and documented in contemporaneous discovery letters attached as exhibits, these assertions are false. The SRV02 Server and SC01 Desktop both were produced in March 2018 when they were made available for review at the FBI, and were moved to the courthouse SCIF shortly thereafter. *See* Exhibits 1-3. The defendant does not contest that the WikiLeaks Vault 7 release has been produced in classified discovery. (MTC at 5). The defendant currently visits the SCIF twice each week and, accordingly, has reasonable access to review this discovery.

The defendant's request that the Court compel the Government to declassify classified records on the SRV02 Server or the WikiLeaks Vault 7 Release, or to treat classified information as unclassified (MTC 3, 4), must be denied. The sole purported basis of the defendant's request is the contention that classified records are no longer classified if made publicly available on the internet. (MTC at 3-4, 5). The Second Circuit has held, however, that when the classifying agency does not consent to the public disclosure of classified information or documents, "public disclosure does not deprive information of classified status." *Wilson v. Central Intelligence Agency*, 586 F.3d 171, 174 (2d Cir. 2009). The defendant cannot force the Government to treat the WikiLeaks Vault 7 release as unclassified as a result of his own illegal theft and transmission of that data. The information remains classified and must be handled pursuant to applicable law and the Classified Information Protective Order.

---

[7] The defendant makes various assertions about defense access to safes inside the SCIF. (MTC at 2). The Government understands based on discussions with the CISO that, to the extent counsel forgot safe combinations or had difficulty opening any safes, those issues have been resolved through the CISO.

The Second Circuit's decision in *Wilson* also flatly contradicts the defendant's argument that classified discovery is an unconstitutional prior restraint on speech. (MTC at 3-4). In *Wilson*, a CIA employee argued that the government's efforts to prevent that employee from publishing classified information was an unlawful prior restraint. *Wilson*, 486 F.3d at 183-84. The Second Circuit held that the employee had signed an enforceable non-disclosure agreement precluding the publication, *id*. at 183-84; and that, even absent an agreement, the government has a compelling interest in preventing the disclosure of properly classified information. *Id*. at 184. The defendant's argument is even weaker than the argument rejected in *Wilson*. As in *Wilson*, the defendant is subject to contractual prohibitions against disclosing classified information to unauthorized persons. Classified Information Protective Order at 7. The defendant also agreed to be bound by the procedures in the Classified Information Protective Order. (Exhibit 5). Moreover, the Government has "a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Id.* (cleaned up, quoting *Snepp v. United States*, 444 U.S. 507, 510 (1980)). Accordingly, the defendant's contention that he is subject to an unlawful prior restraint on free speech is meritless.

The defendant's suggestion that the Government should remove classified records or contraband from the SRV02 Server and SC01 Desktop and produce the rest in unclassified discovery (MTC at 4-6) is untenable and without legal support. As a practical matter, it is impossible to ensure the deletion of all classified and contraband records from the devices without a complete review of all of the data, including deleted files and slack space. Given the data volume of the devices (*see, e.g.*, MTC at 4 (SRV02 Server contains over 5 trillion bytes of data) & 5 (SC01 Desktop contains over 300,000 files and over 2 trillion bytes of data)), such a

review would be extremely lengthy and resource-intensive, and is not warranted especially given that the defendant already has access to these materials in the SCIF.

The defendant's motion to compel the production of discovery that already has been produced should be denied.

## III.     The Motion for Sentencing Should Be Denied

The defendant's Motion for Sentencing asks the Court to schedule a sentencing hearing on the two counts for which the jury returned a verdict of guilty, Counts 8 (transmission of harmful computer code) and 10 (obstruction of justice) of the Second Superseding Indictment, S2 17 Cr. 548 (PAC).[8] The defendant argues that these two counts are effectively severed from the other charges against him (Mot. Sent. at 1) and that he has a due process interest in preventing "exorbitant delay." *Id.* at 2 (quoting *Betterman v. Montana*, 578 U.S. 968 (2016)).

The Court should exercise its broad discretion to schedule sentencing after the conclusion of the trial on the remaining espionage counts.

### A.     Relevant Background

On March 9, 2020, the Court accepted the jury's verdict as to Counts 8 and 10, and declared a mistrial as to the remaining counts in the Second Superseding Indictment. (D.E. 351). On June 8, 2020, a third Superseding Indictment was returned by the grand jury, containing nine counts that are based on the same conduct that was at issue during the trial. Trial on the charges in the third Superseding Indictment is scheduled to begin October 25, 2021.  Trial on the severed child pornography charges has not been scheduled.

---

[8] The *pro se* motion is dated December 25, 2020, but was not filed until June 24, 2021.

**B.      Discussion**

Rule 32(b)(1) of the Federal Rules of Criminal Procedure provides that "[t]he court must impose sentence without unnecessary delay," though "[t]he court may, for good cause, change any of the time limits prescribed in this rule." Fed. R. Crim. P. 32(b)(2). The Rule reflects long-standing law that "[a] sentencing court has broad discretion respecting the scheduling of sentencing proceedings." *United States v. Prescott*, 920 F.2d 139, 146-47 (2d Cir. 1990); *see also United States v. Alexander*, 860 F.2d 508, 512 (2d Cir. 1988) ("It is . . . beyond dispute that the sentencing court has discretion with regard to the scheduling of the sentencing proceeding.").

The circumstances here counsel in favor of the Court's exercising its discretion to schedule sentencing on Counts 8 and 10 of the Second Superseding Indictment after trial on the remaining counts. Holding the sentencing after trial, even if the upcoming trial were to be adjourned for some additional period (*see* D.E. 495 (defendant's adjournment request)), is appropriate for a number of reasons, including because the defendant is currently detained pending trial and will remain in custody regardless. Holding the sentencing after trial will promote efficiency and economy by having only one sentencing hearing, instead of potentially two or more sentencing hearings, and enable the Court to sentence the defendant with the full picture of his conduct and potential penalties before it. Moreover, the conduct underlying Counts 8 and 10 is relevant conduct for any counts in the Third Superseding Indictment for which the defendant may be convicted, and the conduct underlying the charges in the Third Superseding Indictment would be relevant conduct to sentencing on Counts 8 and 10. Thus, two sentencing hearings would be in large part duplicative, further militating in favor of holding a single sentencing hearing for the defendant in this case.

Accordingly, the Motion for Sentencing should be denied.

IV.    **The SAMs Motion Should Be Denied Again**

In the SAMs Motion, the defendant asks the Court to vacate the SAMs that have been in place since October 2018 in response to the defendant's disclosure and attempted disclosure of classified information in violation of criminal law, BOP rules, and the Court's orders. The defendant, through former counsel, previously sought to vacate or modify the SAMs and the Court denied that motion, with one modification. The Court's ruling was correct, and the defendant has not shown any reason for reconsideration.

A.    **Relevant Background**

The defendant was arrested on August 24, 2017, pursuant to a warrant issued based on a criminal Complaint and was initially ordered detained pending trial. (D.E. 4). An indictment was returned on September 6, 2017 (D.E. 6), and at his arraignment, the defendant was ordered released on conditions. (D.E. 8).

On December 14, 2017, the defendant's bail was revoked based on his arrest on state sexual assault charges in Virginia, without opposition by the defendant. (D.E. 22). The defendant later moved to reinstate his bail, and the Court denied the application. (D.E. 26). The Court found that the defendant violated his conditions of release while bailed, namely, he violated restrictions on internet access by having others access the internet on his behalf; and that the defendant posed a danger to the community based on the pending charges against him in this District and the sexual assault charges filed in Virginia. (Jan. 8, 2018 Tr. at 16). The defendant appealed the Court's detention order to the Second Circuit Court of Appeals, and the Court of Appeals affirmed the order. (D.E. 33).

On September 18, 2017, the Court entered a protective order governing discovery (D.E. 11), including prohibitions against disclosing protected materials outside the defense team. On August 16, 2018, the Court entered the Classified Information Protective Order governing the

defendant's use and disclosure of classified information in this case, including a prohibition against the defendant or defense counsel disclosing classified information to anyone except the Court and government personnel holding the appropriate clearances and a need-to-know. (D.E. 61 at 5).

Between approximately May and December 2018, the defendant disclosed search warrants whose disclosure was prohibited by the discovery protective order and classified information governed by federal law and the Classified Information Protective Order to family members, non-cleared counsel, and the press; and used contraband cellphones in the MCC to set up social media accounts and encrypted email accounts for the purpose of disclosing additional classified information. (D.E. 96 at 9-13; D.E. 127 ("SAMs Order") at 2-3). As a result of these unlawful disclosures, as well as those underlying the charges in this prosecution, the Attorney General authorized the implementation of SAMs pursuant to 28 C.F.R. Part 501. SAMs Order at 3-4. Pursuant to the implementation of the SAMs, the defendant is housed in a Special Housing Unit ("SHU") and has restricted and monitored communications. *Id*. at 4-5.

On May 10, 2019, the defendant moved for an order vacating the SAMs. (D.E. 92; *see also* D.E. 96). The defendant argued that the SAMs violated 28 C.F.R. § 501.2 and the First, Fifth, Sixth, and Eighth Amendments to the Constitution. (D.E. 92). By order dated August 14, 2019, this Court upheld the SAMs subject to minor modification of the attorney-client communication provision. (SAMs Order at 7-12).

The SAMs were renewed in October 2020.

### B.    Applicable Law

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v.*

*Wolfish*, 441 U.S. 520, 536 (1979). Where a defendant has been lawfully detained prior to trial following a bail hearing, "the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id*. at 536-37. The Second Circuit held that restrictive conditions of confinement do not violate due process where they are "'reasonably related' to legitimate penological objectives," as opposed to "an 'exaggerated response' to those concerns." *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000).

The Attorney General may authorize the BOP "to implement special administrative measures that are reasonably necessary to prevent disclosure of classified information." *See* 28 C.F.R. § 501.2(a). To do so, the Attorney General must receive a certification from a head of a U.S. intelligence agency (like the CIA) stating "that the unauthorized disclosure of such information would pose a threat to national security and that there is a danger that the inmate will disclose such information." *Id*. SAMs may be imposed for a maximum of one year and may then be successively renewed, or re-imposed, in increments of up to one year based on a finding that the inmate continues to pose a danger of disclosing classified information and that such disclosure poses a threat to national security. *Id*. § 501.2(c).

The defendant is entitled to notice of the SAMs and the basis for imposing them as soon as practicable. § 501.2(b). The defendant can seek review of the SAMs under the Administrative Remedy Program, 28 C.F.R. Part 542. *See* § 501.2(d).

> The Administrative Remedy Program establishes an appeals process for an inmate who wishes to challenge "an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a). To appeal, an inmate must first "present an issue of concern informally to staff;" if that fails to resolve the issue, the regulation permits the inmate to submit a "Request for Administrative

> Remedy" to the Warden. *Id*. § 542.13. If the inmate is not satisfied, he may appeal to the Regional Director of the Bureau of Prisons, and may subsequently appeal that official's ruling to the General Counsel of the Bureau of Prisons, which constitutes "the final administrative appeal." *Id*. § 542.15.

*United States v. Ali*, 396 F. Supp. 2d 703, 706 (E.D. Va. 2005).

The standards governing requests for reconsideration are set forth above, *supra* at 6-7.

### C.    Discussion

In his motion, the defendant argues that the SAMs violate the Fifth Amendment because they were imposed without a hearing, presentment of evidence, witnesses, or arbiter. (SAMs Mot. at 2-3). The Court already has rejected the defendant's claim that the SAMs violate due process, and should reject it again.

The defendant's prior motion to vacate the SAMs raised a Fifth Amendment due process claim. (D.E. 92 at 15-16) ("the SAMs are punitive in violation of the Due Process Clause because they are unrelated to the public-safety and penological interests underlying 28 C.F.R. § 501.2"). The Court correctly rejected that contention that "the SAMs are not reasonably necessary and violate his Fifth, Sixth, and First Amendment rights." (D.E. 7). The defendant's most recent motion fails to satisfy the standard for reconsideration. The defendant has not demonstrated "an intervening change in controlling law," he has not shown "the availability of new evidence," and he has not identified any "clear error" or "manifest injustice." *Alvarez-Estevez*, 2014 WL 12681364, at *1 (citation, quotation omitted).

First, the defendant's assertion that there is no process involved in the imposition of SAMs, *see* SAMs Mot. at 2 ("there is *literally no process* for the defendant"), is wrong. SAMs are imposed only with respect to defendants already incarcerated by virtue of a conviction or pretrial detention order issued following due process of law. 28 C.F.R. § 501.2(a) (SAMs may be implemented by the Bureau of Prisons). Thus, SAMs are a condition of confinement imposed

with respect to defendants already in custody following due process of law. SAMs are not imposed indefinitely (*contra* SAMs Mot. at 5 ("the conditions of confinement are essentially indefinite")); they may only be imposed for a period of one year. § 501.2(c). SAMs can be renewed, but again only in increments of one year. *Id*. The defendant is entitled to notice of the SAMs and the basis for imposing them as soon as practicable. § 501.2(b). The defendant can seek review of the SAMs under the Administrative Remedy Program, 28 C.F.R. Part 542. *See* § 501.2(d). Thus, the defendant's contention that SAMs are imposed without any process is incorrect.

Second, the relevant SAMs are consistent with due process because they are "'reasonably related' to legitimate penological objectives," as opposed to "an 'exaggerated response' to those concerns." *El-Hage*, 213 F.3d at 81. In *El-Hage*, the SAMs at issue were upheld against a due process challenge because they were "reasonably related to the government's asserted security concerns," namely, the risk of the defendant communicating with unconfined co-conspirators and facilitating terrorist attacks. *Id*. at 81-82. The *Ali* court, similarly, rejected a pretrial detainee's challenge to SAMs. That court held, among other things, that the SAMs "do not violate the Defendant's due process rights because they have not, and will not, restrict his ability to help prepare his own defense." 396 F. Supp. 2d at 711. As the Court already has held, the "SAMs undoubtedly are restrictive, but generally they are reasonably necessary to avoid further disclosure of classified information. Despite escalating restrictions on Schulte's freedom prior to his isolation in 10 South, Schulte continued to flout Court orders and his bail conditions, protective order, BOP rules, and procedures for handling classified information." (SAMs Order at 8). Thus, the SAMs are reasonably related to legitimate penological objectives and are consistent with due process under *Bell* and *El-Hage*.

The defendant also argues that the SAMs regulations fail to provide due process under *Wilkinson v. Austin*, 545 U.S. 209 (2005). (SAMs Mot. at 6-7). This argument fails for two reasons. First, under *Wilkinson*, the defendant has not identified a protected liberty interest. The due process clause "protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson*, 545 U.S. at 221. Conditions of confinement in a detention facility, however, do not infringe on a protected liberty interest unless they "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 223. The *Wilkinson* court found that inmates at a state Supermax facility had demonstrated the infringement of a protected liberty interest by solitary-confinement-like conditions for two reasons: they were subject only to annual review, and inmates assigned there lost their eligibility for parole. *Id*. at 223-24. The Court held that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id*. at 224. Pretrial detainees like the defendant are not eligible for parole and the SAMs have no effect on his eligibility, and so the SAMs do not satisfy one of the two conditions that the Court found necessary.

Even if the defendant showed a protected liberty interest, the SAMs provide due process under *Wilkinson*. Noting that "[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all," *id*. at 225, the Court found that the procedures at issue in that case provided due process. The inmates received "notice of the factual basis leading to consideration for [Supermax] placement," and "a fair opportunity for rebuttal." *Id*. at 225-26. The inmates could "offer any pertinent information,

31

explanation and/or objections to [Supermax] placement" and submit a written statement, but could not call witnesses. *Id*. at 216. Those procedures are comparable to those for the imposition of SAMs: SAMs inmates are entitled to "written notification of the restrictions imposed and the basis for these restrictions." 28 C.F.R. § 501.2(b). This provision satisfies any constitutional requirement of notice. SAMs inmates are also entitled to "seek review of any special restrictions . . . through the Administrative Remedy Program." § 501.2(d). The Administrative Remedy Program establishes an informal resolution process, 28 C.F.R. § 542.13; provides that inmates may submit a written complaint and accompanying exhibits, § 542.14(c); and provides for appeal of the Warden's decision to a Regional Director and may further appeal the Regional Director's decision to the General Counsel. § 542.15. An inmate may obtain assistance from another inmate, family member, or attorney. § 542.16. This satisfies any constitutional requirement of opportunity to be heard, as did the procedures in *Wilkinson*. An opportunity to be heard may be informal and nonadversarial, *Wilkinson*, 545 U.S. at 228-29; and need not permit witness testimony. *Id*. at 228; *see also Hewitt v. Helms*, 459 U.S. 460, 472 (1983) (The prison is "obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation.").

The defendant next argues that the SAMs violate constitutional separation of powers because there is "no directive from a legislative statute that can be scrutinized nor any order by a sentencing court." (SAMs Mot. at 7). This argument is legally and factually wrong. The SAMs are authorized by Congressionally enacted statute, 28 U.S.C. § 4001, which provides that "[t]he control and management of Federal penal and correctional institutions . . . shall be vested in the Attorney General" and the Attorney General may "classify the inmates; and provide for their

32

proper government, discipline, treatment, care, rehabilitation, and reformation." § 4001(b). In addition, "[t]he Bureau of Prisons, under the direction of the Attorney General, shall (1) have charge of the management and regulation of all Federal penal and correctional institutions; . . . [and] (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." § 4042(b). An inmate may administratively challenge the imposition of SAMs pursuant to 28 C.F.R. Part 542, and may seek judicial review thereafter. *See, e.g.*, *Yousef v. Reno*, 254 F.3d 1214 (10th Cir. 2001); *Ali*, 396 F. Supp. 3d 703. Thus, SAMs are an exercise of authority granted by an act of Congress and subject to judicial review. Moreover, the Executive's administration of entities created by statute and entrusted to the management of the Executive does not offend constitutional separation of powers, and the defendant points to no provision of the Constitution that supports his argument.

The defendant's final challenge to the SAMs is his contention that they amount to indefinite solitary confinement that is cruel and unusual punishment under the Eighth Amendment. (SAMs Mot. at 8-20). The Eighth Amendment applies, however, only to punishments. *See Marin-Marin v. Sessions*, 852 F.3d 192, 194 (2d Cir. 2017) ("deportation, being a civil procedure, is not punishment and the cruel and unusual punishment clause of the Eighth Amendment accordingly is not applicable"); *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973) (Friendly, J.) ("The thread common to all [Eighth Amendment prison cases] is that 'punishment' has been deliberately administered for a penal or disciplinary purpose."); *cf. United States v. Bajakajian*, 524 U.S. 321, 328-29 (1998) (Eighth Amendment excessive fines clause applies to financial penalties only if imposed as punishment); *Bell*, 441 U.S. at 536-37 (the Government "may subject [a pretrial detainee] to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment. . . . ."). The

SAMs are not imposed to punish the defendant's past unlawful disclosures of classified information, but because he continues to pose a danger of disclosing classified information threatening national security. 28 C.F.R. § 501.2(a), (c). This Court already has held that the SAMs "are reasonably necessary to avoid further disclosure of classified information. Despite escalating restrictions on Schulte's freedom prior to his isolation in 10 South, Schulte continued to flout Court orders and his bail conditions, protective order, BOP rules, and procedures for handling classified information." (SAMs Order at 8). Moreover, as discussed above, the defendant's SAMs restrictions are not indefinite. The SAMs restrictions can be imposed for periods of a maximum of one year, and can only be renewed upon a new certification that the defendant continues to pose a danger of disclosing classified information. 28 C.F.R. § 501.2(c). And the defendant may seek review of each SAMs renewal under the Administrative Remedy Program. § 501.2(d). Accordingly, the defendant's SAMs restrictions are not punishment and they are not indefinite. His Eighth Amendment claim must be rejected.

The SAMs Motion should be denied.

## V.   The Legal Assistance Motion Should Be Denied

In his Legal Assistance Motion, the defendant seeks an order compelling the MCC and the Government to provide him with a number of accommodations. But the discovery review and legal research resources available to the defendant already are sufficient for his trial preparation and participation. Moreover, the relief the defendant seeks would violate prison security protocols. The motion should be denied.

The defendant asserts, first, that the Due Process Clause of the Fifth Amendment and the Sixth Amendment require that he have equal access to trial preparation resources as an attorney, as a defendant who is released on bail, and as the Government. (LAM at 1-3, 5-6). The defendant proceeds from this premise to assert that this asserted equal right of access includes (1) "24-7

34

access to his unclassified discovery," (2) "24-7 access to a legal library such as the government utilizes[,]" and (3) "24-7 access to a printer to print motions and court filings." *Id*. at 2; *see also id*. at 5, 7, 8, 9-10, 11-14. Specifically with respect to the defendant's assertion of a right to "24-7 access" to unclassified discovery, he argues that this requires the MCC to provide him with "electrical outlets" in his cell, "a CD/DVD burner," and "all discovery drives" that have been provided to him by his former counsel. *Id*. at 13. With respect to the defendant's assertion of a right to "24-7 access to a legal library such as the government utilizes," he argues that this requires the Government to "provide Mr. Schulte access to the same virtual law library that they purchase for prosecuting Mr. Schulte, and they must do so through Mr. Schulte's laptop. The government should then mail Mr. Schulte the updates on a CD/DVD every month so Mr. Schulte has access to the latest rulings and cases." *Id*. at 14.

The defendant's contention that he enjoys a constitutional right to such resources is meritless and the motion should be denied.

### A.    Relevant Background

As described above, following the defendant's arrest on August 24, 2017, he violated his bail conditions and was ordered detained, which order was affirmed on appeal. *Supra* at 26. On or about September 18, 2017, the Court entered a protective order governing discovery (D.E. 11) and on August 16, 2018, the Court entered the Classified Information Protective Order. (D.E. 61). As also described above, between approximately May and December 2018, the defendant disclosed search warrants whose disclosure was prohibited by the discovery protective order and classified information governed by federal law and the Classified Information Protective Order to family members, non-cleared counsel, and the press; and used contraband cellphones in the MCC to set up social media accounts and encrypted email accounts for the purpose of disclosing additional classified information. *Supra* at 27. As a result of these unlawful disclosures, as well

as those underlying the charges in this prosecution, the Attorney General authorized the

implementation of SAMs pursuant to 28 C.F.R. Part 501. SAMs Order at 3-4. Pursuant to the

implementation of the SAMs, the defendant is housed in a SHU and has restricted and monitored

communications.

On July 14 and 22, 2021, the Court held a hearing pursuant to *Faretta v. California*, 422

U.S. 806 (1975), in connection with the defendant's request to waive his Sixth Amendment right

to counsel and proceed *pro se*. Though the defendant initially said that his desire to proceed *pro

se* depended on the Court's granting certain requests relating to his complaints about access to

classified and unclassified discovery and to legal research resources, among other things, the

defendant later acknowledged that he was waiving his right to counsel regardless of the Court's

resolution of those matters. (July 22, 2021 Tr. at 3-4). The Court cautioned:

> Let me give you one more word of caution here, Mr. Schulte. The
> fact of the matter is that a professional attorney would not face the
> problems you're facing because you're incarcerated. And we can
> try to modify those conditions as we go along, but the fact of the
> matter is that you're always going to be at a deficit vis-à-vis
> retained or appointed counsel, who does not carry the burden of
> being incarcerated. And you are incarcerated. That causes certain
> problems in the preparation. If you want to represent yourself,
> that's fine. But you can't modify all of the conditions that are
> inhibiting you right now.
>
> * * *
>
> You're entitled to your right of self-representation. That's clear.
> But the fact of the matter is acting as your self-representative,
> because you're incarcerated, you bear certain burdens that do not
> burden retained counsel and appointed counsel. That's the only
> point.

*Id*. at 8-9. The defendant then responded, "Right." *Id*. at 9. The Court found that the defendant

was competent to waive his right to the assistance of counsel and had knowingly, voluntarily,

and unequivocally waived that right. (D.E. 485).

**B.      Applicable Law**

The Due Process Clause provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." Const. Am. V. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' to insure that they are given a meaningful opportunity to present their case." *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976). "The essential requirements of due process . . .are notice and an opportunity to respond." *Cleveland Bd. Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

The Sixth Amendment guarantee of the right to representation provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." Const. Am. VI. Here, the defendant knowingly, voluntarily, and unequivocally waived his right to the assistance of counsel. (D.E. 485). He cannot now use that waiver to create a new right of Court assistance to make up for the assistance of counsel that he has chosen to forgo. "A defendant does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure. Nor does the Constitution require judges to take over chores for a *pro se* defendant that would normally be attended to by trained counsel as a matter of course." *McKaskle v. Wiggins*, 465 U.S. 168, 183-84 (1984). Similarly, the Sixth Amendment does not require the Government to provide a defendant resources so the defendant can pay for private counsel. "We therefore reject petitioner's claim of a Sixth Amendment right of criminal defendants to use assets that are the Government's . . . to pay attorneys' fees, merely because those assets are in their possession." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 632-33 (1989).  A defendant "has the right to legal help through appointed counsel, and

when he declines that help, other alternative rights, like access to a law library, do not spring

up." *United States v. Byrd*, 208 F.3d 592, 593 (7th Cir. 2000).

The Supreme Court has recognized, under the First Amendment, a "right of access" to the

courts that includes, for incarcerated, *pro se* parties, the right to be free from interference with

legal filings caused by some demonstrable inadequacy in a prison legal library. *Lewis v. Casey*,

518 U.S. 343, 351 (1996). Because there is no "freestanding right to a law library or legal

assistance, an inmate cannot establish relevant actual injury simply by establishing that his

prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* "[T]he

inmate therefore must go one step further and demonstrate that the alleged shortcomings in the

library or legal assistance program hindered his efforts to pursue a legal claim. He might show,

for example, that a complaint he prepared was dismissed for failure to satisfy some technical

requirement which, because of deficiencies in the prison's legal assistance facilities, he could not

have known. Or that he had suffered arguably actionable harm that he wished to bring before the

courts, but was so stymied by inadequacies of the law library that he was unable even to file a

complaint." *Id.* Beyond these essential baselines to ensure access to the courts, however, there is

no right to compel the government "to enable the prisoner . . . to *litigate effectively* once in

court." *Id.* at 354 (emphasis in original).

C.    **Discussion**

The defendant's claim of a "right of equal access" has no basis, and the Legal Assistance

Motion cites none. Rather, the Due Process Clause establishes that the defendant has a right to

notice and opportunity to be heard before he is deprived of life, liberty, or property, *Loudermill*,

470 U.S. at 546—process which he has been given, and to which he has availed himself. The

Sixth Amendment confers upon him the right to the assistance of counsel, which he has waived.

(D.E. 485). The First Amendment provides a right of access to the courts, but so long as the

prison law library and legal research services are sufficient to enable the defendant to make his filings and bring his claims before the Court, that right has been satisfied. *Lewis*, 518 U.S. at 351 & 354.

The defendant's reliance on *Adams v. United States ex rel. McCann*, 317 U.S. 269 (1942) (*see* LAM at 1-2) is misplaced. *Adams* held that a defendant who has knowingly and voluntarily waived his right to counsel may also knowingly and voluntarily waive his right to a jury trial, without requiring the defendant to first consult with an attorney. 317 U.S. at 278-79. The language that the defendant quotes, that "[a]n accused must have the means of presenting his best defense" and "[e]ssential fairness is lacking if an accused cannot put his case effectively before the court" (LAM at 2), describe the benefits of the assistance of counsel protected by the Sixth Amendment. The Court went on to observe that, notwithstanding the importance of counsel in allowing a defendant to present his best defense, "the Constitution does not force a lawyer upon the defendant. He may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes wide open." 317 U.S. at 279. The defendant, knowing what he was doing and with eyes wide open, chose to forego the assistance of counsel and the benefits that the assistance of counsel confers. (July 22, 2021 Tr. at 8-9; D.E. 485). That waiver does not require the Court, as the defendant wrongly asserts, to make up for those lost benefits by compelling the relief requested in his motion. *Cf. Spates v. Manson*, 644 F.2d 80, 84–85 (2d Cir. 1981) (recognizing that although "the right to represent oneself in criminal proceedings is protected by the Sixth Amendment, . . . this right does not carry with it a right to state-financed library resources where state-financed legal assistance is available" (citation omitted)).

The defendant's access to discovery, legal research, and printing facilities are reasonable and sufficient to satisfy due process. He has been provided discovery. He maintains a copy of the unclassified discovery in his cell on a laptop provided for him by former counsel. The defendant also has access to the classified discovery through the courthouse SCIF, which he visits twice a week. The fact that the defendant's discovery laptop battery must periodically be charged by prison staff does not make his access to the discovery unreasonable or insufficient. The defendant's request for an electrical outlet in his cell and charging cables violates prison security protocols, which are reasonable and appropriate and which do not impede the defendant's reasonable access, as opposed to "24-7" access, to his discovery. The defendant also claims that he requires a CD/DVD drive for "24-7" access to discovery, but has not substantiated that claim. Discovery that was previously provided to him on disc is duplicated on his laptop's hard drive.[9] And, in any event, to the extent that the defendant prefers other or additional computer equipment, he is free to buy that equipment and, so long as it complies with the SAMs and with prison safety and security protocols, he can use it in his cell.

With respect to the defendant's access to legal research, the Government is advised by MCC that the defendant has access to a LexisNexis legal research database provided by the MCC and available on a computer located in the defendant's unit. The defendant is not permitted access to the internet, and the unit computer is not connected to the internet. MCC uploads

---

[9] The defendant was given a discovery laptop by the Government in March 2018, which accessed discovery through external hard drives and an internal CD/DVD reader. Former defense counsel bought the defendant a more powerful laptop so that he could review large electronic discovery files faster. *See* D.E. 451 (authorizing CJA funds). That laptop apparently does not have an internal CD/DVD drive, and so the defendant cannot review the discovery produced in that format; however, the Government understands that any discovery produced by CD/DVD is duplicated on his current laptop's internal hard drive.

updates to the legal research database when they are provided by LexisNexis, generally monthly. This database provides the defendant with access to case law and secondary legal materials.

With respect to the defendant's access to printing, the defendant can print by making a request to his unit manager, who will print materials for him; or by using the printer in the SCIF. He has reasonable access to printing facilities, as amply demonstrated by the many printed letters and motions he has filed. (*See, e.g.*, D.E. 488, 489, 490, 491, 494, 495, 496, 497).

Accordingly, the motion should be denied.

## VI.     The Legal Mail Motion Should Be Denied

In the Legal Mail Motion, the defendant asserts that "the MCC has delayed all court correspondence and legal mail for months," thereby "obstructing Mr. Schulte's right of access to the courts." (LMM at 1). According to the defendant, "motions and letters fail to reach Mr. Schulte in a timely manner to allow him to meet court deadlines." *Id*.

Since the Court granted the defendant's motion to proceed *pro se*, the Government has made arrangements with the MCC Legal Department to have letters, motions, and Court orders in this case delivered to the defendant promptly. The Government emails Court orders, filings, and correspondence to the Legal Department, which in turn arranges for delivery to the defendant within approximately one to two days. Accordingly, the motion should be denied with respect to legal mail in this matter. The defendant's ability to conduct his defense is not affected by any delays in mail delivery.

The Court should also deny the motion with respect to mail relating to other cases, because the defendant has brought an independent civil action asserting claims relating to that subject matter. *See Schulte v. United States*, 21 Civ. 4800 (PAC) (S.D.N.Y.). The defendant's challenge to the conditions of his confinement that do not relate to his ability to defend himself in this matter are properly considered in the context of that separate civil action.

41

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court enter an

order denying the Motion to Suppress, the Motion to Compel, the Motion for Sentencing, the

SAMs Motion, the Legal Assistance Motion, and the Legal Mail Motion.

Dated: September 3, 2021
       New York, New York

AUDREY STRAUSS
United States Attorney

By: _____/s/_____
    David W. Denton, Jr. / Michael D. Lockard
    Assistant United States Attorneys
    (212) 637-2744 / -2193

To:   Joshua Adam Schulte (by hand, via MCC Legal Department)
      Standby Counsel of Record (by ECF)