UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

-v-

S3 17 Cr. 548 (PAC)

JOSHUA ADAM SCHULTE,

*Defendant.*

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO VACATE SPECIAL ADMINISTRATIVE MEASURES AND INDEFINITE SOLITARY CONFINEMENT AS UNCONSTITUTIONAL

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

## TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES ................................................................. ii

II.   PRELIMINARY STATEMENT ......................................................... 1

III.   JURISDICTION AND LAW OF THE CASE ................................... 2

   A.   The Court should not consider the Opposition Motion ................ 2

   B.   The Court should consider the SAMs Motion ............................. 2

IV.   SAMS AND INDEFINITE SOLITARY CONFINEMENT VIOLATE THE UNITED STATES CONSTITUTION ........................................................ 3

   A.   SAMs violate Procedural Due Process ....................................... 3

      1.   SAMs are indefinite ............................................................. 4

      2.   SAMs violate *Wilkinson v. Austin* ...................................... 5

      3.   There are no administrative remedies available to SAMs inmates .............. 6

   B.   SAMs imposed upon pretrial detainees are unconstitutional if based entirely upon the indictment ....................................................... 7

   C.   Indefinite solitary confinement is unconstitutional..................... 10

      1.   Medical experts, authors, historians, politicians, and organizations condemn solitary confinement as cruel torture .................................... 11

      2.   The well-documented deleterious effects of long-term solitary confinement erode a person's sanity and constitute torture ................................ 16

      3.   Indefinite solitary confinement violates the Eighth Amendment .............. 18

      4.   Indefinite solitary confinement violates the Fifth Amendment ................. 25

      5.   Solitary confinement is the most vile, inhumane, and destructive punishment ever devised by mankind ........................................... 29

V.   CONCLUSION ........................................................................... 32

# I.   TABLE OF AUTHORITIES

**Cases**

*Apodaca v. Raemisch,*
  139 S. Ct. 5 (2018)........................................................................................18

*Booth v. Churner,*
  532 US 731 (1964).........................................................................................7

*Coffin v. United States,*
  156 US 432 (1895).........................................................................................8

*Colon v. Howard,*
  215 F.3d 227 (2d Cir. 2000) .......................................................................26

*C-Pod Inmates of Middlesex County v. Middlesex County,*
  No. 3:15-cv-07920-PGS-TJB (D. NJ 2018) ...............................................20

*Davis v. Ayala,*
  576 US 257 (2015)..................................................................................11, 19

*Estelle v. Gamble,*
  429 US 97 (1976)..........................................................................................18

*Giano v. Selsky,*
  238 F.3d 223 (2d Cir. 2001) .......................................................................25

*Glossip v. Gross,*
  576 US 863 (2015)........................................................................................19

*Gordon v. Measaka-Hirata,*
  431 P.3d 708 (Hawaii 2018)........................................................................20

*Grissom v. Roberts,*
  902 F.3d 1162 (10th Cir. 2018) ...................................................................23

*Hewitt v. Helms,*
  459 US 460 (1983)...................................................................................3, 4, 7

*In re Medley,*
  134 US 160 (1890)........................................................................................20

*McClary v. Kelly*,
    4 F. Supp. 2d 195 (W.D.N.Y. 1998) ........................................................................20

*Palakovic v. Wetzel*,
    854 F.3d 209 (3d Cir. 2017) ...................................................................................23

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ......................................................................13, 18, 24

*Reid v. Wetzel*,
    18-cv-0176 (M.D. Penn. 2019) ...............................................................................22

*Reyes v. Clarke*,
    3:18-cv-00611 (E.D. Va. 2019) ..............................................................................22

*Reynolds v. Arnone*,
    402 F. Supp. 3d 3 (D. Conn. 2019) ...................................................................15, 21

*Ross v. Blake*,
    136 S. Ct. 1850 (2016) .............................................................................................6

*Ruiz v. Texas*,
    137 S. Ct. 1246 (2017) ...........................................................................................19

*Sandin v. Conner*,
    515 U.S. 472 (1995) ..........................................................................3, 25, 27, 28

*Sealey v. Giltner*,
    197 F.3d 578 (2d Cir. 1999) ...................................................................................25

*Trop v. Dulles*,
    356 US 86 (1958) ....................................................................................................18

*Walker v. Farman*,
    138 S. Ct. 357 (2017) .............................................................................................23

*Walker v. Fischer*,
    523 F. App'x 43 (2d Cir. 2013) ...............................................................................25

*Welch v. Bartlett*,
    196 F.3d 389 (2d Cir. 1999) ...................................................................................26

*Wilkerson v. Stalder,*
  639 F. Supp. 2d 654 (M.D. La. 2007) ................................................................20

*Wilkinson v. Austin,*
  545 US 209 (2005)................................................................................... passim

*Williams v. Sec'y Pa. Dep't of Corr.,*
  848 F.3d 549 (3d Cir. 2017) ................................................................23, 24, 28

*Williams v. Wetzel,*
  138 S. Ct. 357 (2017)................................................................................23

## Rules

28 C.F.R. § 501.2 ................................................................................3, 6, 32

Local Crim. R. 49.1(b)................................................................................2

## Constitutional Provisions

U.S. Const. amend. V................................................................................ passim

U.S. Const. amend. VIII ................................................................................ passim

## Other Authorities

Craig Haney & Mona Lynch, *Regulating Prisons of the Future:*
  *A Psychological Analysis of Supermax and Solitary Confinement,*
  23 N.Y.U. Rev. L. & Soc. Change 477 (1997)......................................................16

Jesenia Pizarro & Vanja M. K. Stenius, *Supermax Prisons:*
  *Their Rise, Current Practices, and Effect on Inmates,*
  84 Prison J. 248 (2004)................................................................................16

Stuart Grassian, *Psychiatric Effects of Solitary Confinement,*
  22 Wash. U.J.L. & Pol'y 325 (2006) ................................................................17

## II.    PRELIMINARY STATEMENT

Mr. Schulte's opening memorandum demonstrated that Special Administrative Measures (SAMs) and indefinite solitary confinement are unconstitutional especially when applied to pretrial detainees. Mr. Schulte argued that there is no procedural due process for the imposition of SAMs, no way to meaningfully challenge them, and they are effectively indefinite. Mr. Schulte argued that indefinite solitary confinement violated the Due Process Clause of the Fifth Amendment and are cruel and unusual punishment in violation of the Eighth Amendment.

In response, the government argued that SAMs are necessary to prevent Mr. Schulte from releasing classified information from prison, that there is proper due process, and that they are not indefinite. The government also argued that indefinite solitary confinement is not cruel and unusual because it is not imposed as a punishment.

1

## III.   JURISDICTION AND LAW OF THE CASE

### A.   The Court should not consider the Opposition Motion

Mr. Schulte filed the SAMs Motion on June 24, 2021. Dkt. 474. In accordance with Local Crim. R. 49.1(b), "[a]ny opposing papers shall be filed and served within 14 days after service of the motion papers." The government finally filed its opposition on September 3, 2021; 2 months, 1 week, and 3 days, or 71 total days later. Thus, their opposition is 57 days late. The government offers no excuse for the untimeliness of their opposition motion except, it seems, that they are the government, and may do as they please. This untimeliness is unprecedented and should not be excused simply because the government is lazy.

### B.   The Court should consider the SAMs Motion

The government argues in its Opposition Motion that the standard for reconsideration is unmet. The government is wrong for numerous reasons. As an initial matter, the imposition of SAMs and indefinite solitary confinement have significant collateral consequences similar to bail. Hence, the length of time exposed to such incredible barbaric torture like solitary confinement necessitates periodic reviews as is the case with bail. Furthermore, as the government noted in its Opposition, Mr. Schulte's SAMs are re-imposed each year; therefore, each imposition of SAMs is technically a new order subject to collateral challenge. This motion is also different in that it argues indefinite solitary confinement is unconstitutional regardless of SAMs—and especially for pretrial detainees. Finally, this motion references recent precedential cases regarding solitary confinement as well as *new research* in the field of psychology that condemns this practice as barbaric, savage, and uncivilized. Accordingly, this Court should consider the SAMs motion.

2

## IV.   SAMS AND INDEFINITE SOLITARY CONFINEMENT VIOLATE THE UNITED STATES CONSTITUTION

SAMs, codified in the Code of Federal Regulations (CFR), Chapter 28, as § 501.2 and § 501.3, are facially unconstitutional as violative of the Due Process Clause of the Fifth Amendment.

### A.   SAMs violate Procedural Due Process

In *Hewitt v. Helms*, the Supreme Court held that prison officials must provide an inmate with at least an informal hearing "within a reasonable time after confining him to administrative segregation." 459 US 460, 472 (1983), *overruled in part on other grounds* by *Sandin v. Conner*, 515 U.S. 472 (1995). In addition, an inmate must at least "receive some notice of the charges against him and an opportunity to present his views [orally or in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476. So long as those two requirements are met "and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Id.* In *Wilkinson v. Austin*, 545 US 209 (2005), the Court noted the "informal, nonadversary procedures set forth in... [*Hewitt*]" are the appropriate procedural safeguards for inmates faced with indefinite confinement. *Id.* at 229.

The government argues that "the defendant's assertion that there is no process involved in the imposition of SAMs, […] is wrong." Opp. at 29. However, instead of challenging Mr. Schulte's argument, the government simply moves on to the next issue. Mr. Schulte clearly explains the difference between Due Process in normal prison violations and the lack of Due Process at all in SAMs determinations (See. Opening Mem. at 3):

3

Normally, when an inmate—either pretrial or sentenced—violates prison rules or regulations, there is a Disciplinary Hearing (DH) scheduled where the accused can call witnesses and present evidence. The Disciplinary Hearing Officer (DHO) or committee, as arbiter, then weighs the evidence and pronounces a sentence; this sentence depends upon the level of offense and can vary between loss of good-time credit, loss of commissary, loss of visitation or phone calls, and "timeout" in the SHU for a specific period of time. This process ensures due process and allows the accused to appeal any sentences through administrative remedy and then through the courts. This process clearly adheres to *Hewitt* and *Wilkinson* and provides due process for the accused.

In contrast, SAMs are imposed through no process—there is no hearing, no presentment of evidence, no calling of witnesses, no arbiter—only the executive branch directing itself to execute a sentence—whatever sentence it desires—for however long it desires—to whomever it so desires. To impose the harshest punishment in the land, the United States Federal Government does not need a jury conviction or even a federal judge's concurrence—it need only issue a memorandum and direct the BOP to torture.

## 1.    SAMs are indefinite

The government first argues that SAMs are not imposed indefinitely, because SAMs must be renewed each year. However, this does not mean that SAMs are not indefinite—if SAMs are simply renewed year after year with no clear indication of an end, as is the case for Mr. Schulte, then that is *by definition indefinite*. Additionally, SAMs do not require any *new information* for renewal. The government can simply state the same reasons for renewal each year.

Accordingly, since SAMs do not limit how many times it can be renewed nor does it require new information each year for the renewal, SAMs are effectively indefinite, and therefore unlawful punishment.

### 2.    SAMs violate *Wilkinson v. Austin*

The government argues that SAMs do not violate *Wilkinson* because "the defendant has not identified a protected liberty interest." Opp. at 31. The absurdity of this statement is made comical by the government's next statement implying that an interest in avoiding solitary confinement is not a liberty interest, because solitary confinement does not "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* To the contrary, it is quite obvious that solitary confinement is a significant hardship especially for pretrial inmates who have never been convicted of any crime.

Next the government claims that even if solitary confinement were an atypical significant hardship, SAMs provide all the necessary due process as required by Wilkinson. The government then lists the requirements of Wilkinson, stating that inmates must receive "notice of the factual basis leading to consideration for placement," "a fair opportunity for rebuttal," "offer any pertinent information, explanation, and/or objections to placement," and "submit a written statement." *Id.* at 31-32. The government then claims "[t]hose procedures are comparable to those for the imposition of SAMs: SAMs inmates are entitled to 'written notification of the restrictions imposed and the basis for these restrictions.'" *Id.* Noticeably absent are the other requirements under Wilkinson that the government just listed and then blatantly ignored. SAMs offers no opportunity for rebuttal, let alone a "fair opportunity," SAMs offers no ability for the accused to "offer any information and/or objection to placement," and SAMs do not allow the accused to submit any written statement. Furthermore, as to the

5

only condition that the government claims *Wilkinson* provides, the notice of the factual basis leading to consideration for placement, SAMs actually *do not require this*. "Designated staff shall provide to the affected inmate, as soon as practicable, written notification of the restrictions imposed and the basis for these restrictions. The notice's statement as to the basis may be *limited in the interest of prison security or safety or national security*." 28 C.F.R. § 501.2(b) (emphasis added). So, not only is there no hearing and no opportunity for the accused to present evidence in his favor, but he does not even have the opportunity to know the full accusations and evidence against him!

There is no due process here. There is no *procedural* due process—the executive branch issues a declaration of torture, and the executive branch commences that torture.

### 3.   There are no administrative remedies available to SAMs inmates

Finally, although the regulations state that "[t]he affected inmate may seek review of any special restrictions imposed in accordance with paragraph (a) of this section through the Administrative Remedy Program," 28 C.F.R § 501.2(d), any such attempt is futile considering the inmate need not be notified of the full reasons for the decision or given the evidence against him. Additionally, the administrative remedy is essentially unavailable since only the Attorney General or Director of the Bureau of Prisons can remove the SAMs designation—not any administrative remedy panel. The Supreme Court recently declared in *Ross v. Blake*, 136 S. Ct. 1850 (2016), that an administrative remedy is "unavailable" when officers are incapable of providing relief. *Ross* at 1859. "Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office--but in practice that office disclaims the capacity to consider those petitions.

6

The procedure is not then 'capable of use' for the pertinent purpose." *Id.* (quoting *Booth v. Churner*, 532 US 731, 738 (1964)). This is precisely what SAMs does. In fact, *no SAMs inmate has ever successfully appealed and obtained relief through the administrative remedy process.*

Furthermore, Mr. Schulte has made many attempts to appeal his SAMs designation through the administrative remedy process. Each attempt was denied without giving any reason. See *Petition for Writ of Habeas Corpus to Modify Conditions of Confinement Pursuant to 28 U.S.C. § 2241*. Dkt. 447.

*** 

There can be no question that SAMs violate *Hewitt* and *Wilkinson* by failing to provide the accused with an opportunity to present evidence to the decision maker, failing to hold any hearing at all, and by failing to require any meaningful review; "Kangaroo executives" simply rubber stamp and renew the SAMs each year for the same reasons without review. This due process violation is especially malicious when applied to pretrial inmates who supposedly enjoy special protections—yet there is no differentiation between pretrial and sentenced inmates. No matter what crime an individual is alleged to have committed, the United States Constitution grants all a presumption of innocence—indeed, no American wants to be treated like a caged animal if accused of a crime—dependent, deserted, dehumanized, demoralized, and detained.

### B.    SAMs imposed upon pretrial detainees are unconstitutional if based entirely upon the indictment

Any condition of confinement imposed upon pretrial detainees, even if the purported goal is a legitimate penological interest, is unconstitutional if predicated on the same alleged conduct as the indictment. And the reason for this is the

foundation of this criminal justice system—that all defendants are innocent until proven guilty. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 US 432, 453 (1895).

Mr. Schulte was incarcerated at the MCC in general population until the government superseded him and charged him with disclosing classified information from prison. That indictment standing alone was the sole basis for the Attorney General's imposition of SAMs. The government argued that "SAMs are reasonably related to legitimate penological objectives." Opp. at 30. Specifically, the government cites the Court's order that "SAMs undoubtedly are restrictive, but generally they are reasonably necessary to avoid further disclosure of classified information." *Id.* However, as already stated above, Mr. Schulte is granted the presumption of innocence no matter how many crimes the government charges him or how many times they supersede him. It is simply inconsistent with the Due Process Clause of the Fifth Amendment to rely upon an indictment to punish.

The government claims SAMs are not imposed to punish, but for legitimate penological objectives. Yet, this legitimate penological objective only materializes if Mr. Schulte is guilty; if Mr. Schulte did not disclose any classified information from the MCC, as is the reality, there would be no "legitimate penological objective." Why would the government need to impose SAMs if Mr. Schulte never disclosed classified information from the MCC? It is clear they did not believe SAMs were a "legitimate penological objective" while Mr. Schulte was in general population *before* the superseding indictment. It is also clear that the government similarly could no longer impose SAMs once Mr. Schulte is acquitted. So what changed? What is the common link? The charging instrument. It is the mere

8

accusation of a crime that led directly to the imposition of SAMs. Accordingly, SAMs imposed upon pretrial detainees for the same reasons as the allegations cited in the indictment is unconstitutional.

It is easy to see that SAMs were originally intended only for sentenced inmates. If, for example, a defendant was convicted for disclosing classified information from prison, the "legitimate penological objective" becomes quite clear. It is in the prison's best interests to impose additional sanctions on that individual. But if a defendant is merely accused of this crime? What if the defendant was actually innocent? Then clearly there is no legitimate penological interest for imposing SAMs or other additional conditions of confinement. The logic is simple enough for even lawyers to comprehend: (1) SAMs are unnecessary for a defendant facing charges of disclosing classified information. (2) If a defendant discloses classified information from prison, then SAMs are necessary. (3) By law, the accused are presumed to be innocent. Accordingly, an individual accused of disclosing classified information from prison is presumed innocent by law (3), and must be treated as if the allegations are false—that is, instance (1)— and therefore no SAMs are necessary.

The correct course of action is for the government to immediately sever the new allegations and proceed to a speedy trial. If convicted, the government can impose sanctions—but only if convicted. The government cannot short-circuit a jury trial, declare a defendant guilty, and impose sanctions against him. Mr. Schulte has already proposed severing the SAMs charges and proceeding to trial. The government refuses to do so because it knows Mr. Schulte will be acquitted. The government therefore appears to exert more power *through allegations* than through achieving a conviction. This is absurd.

9

**C.    Indefinite solitary confinement is unconstitutional**

SAMs also violate substantive due process when imposing indefinite solitary confinement as indefinite solitary confinement is an undeniably despicable form of torture abhorrent to the United States Constitution. Indeed, it truly shocks the conscience that such evil can be imposed upon human beings.

The government's only argument is that "[t]he Eighth Amendment applies, however, only to punishments," Opp. at 33, and since Mr. Schulte is tortured for "a legitimate penological interest" instead of officially for punishment of a crime, then his torture is acceptable. The government's assertion that sentenced inmates have more rights than pretrial detainees merely because the former are officially punished while the latter are "administratively detained" is unconscionable. Any condition of confinement that is cruel and unusual cannot be applied to pretrial detainees no matter what "legitimate reason" the government invents for its application.

Mr. Schulte believes the Court will undoubtedly reach the same conclusion as Psychology; that solitary confinement is barbaric, savage, and uncivilized. It is immoral and a human rights violation to subject a person to indefinite solitary confinement—none who have a conscience would ever impose it. Even if there are no international tribunals convened (yet), any and all persons responsible for subjecting a human to this savage form of torture will answer to God for their *crimes against humanity*.

Since the government refused to respond to Mr. Schulte's mounds of evidence and arguments against indefinite solitary confinement, as if ignoring the elephant in the room would make it disappear, he merely restates these same arguments here.

10

"[The prisoner] is led to the cell from which he never again comes forth, until his whole term of imprisonment has expired. He never hears of wife and children; home or friends; the life or death of any single creature. He sees the prison-officers, but with that exception he never looks upon a human countenance, or hears a human voice. He is a man buried alive; to be dug out in the slow round of years; and in the meantime dead to everything but torturing anxieties and horrible despair." Charles Dickens, American Notes for General Circulation 148 (J. Whitley and A. Goldman eds. 1972).

### 1.    Medical experts, authors, historians, politicians, and organizations condemn solitary confinement as cruel torture

"The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators." *Davis v. Ayala*, 576 US 257, 287 (2015) (Kennedy, J., concurring).

"[V]ery few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers... I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torture of the body... because its wounds are not upon the surface, and it extorts few cries that human ears can hear." Charles Dickens, American Notes for General Circulation 123-24. French historian Alexis de Tocqueville added that solitary "devours the victims incessantly and unmercifully; it does not reform, it kills."[1]

There are many organizations that have called for an end to this inhumane torture. Indeed, the United Nations' Nelson Mandela Rules states that anything

---

[1] Zoukis, Christopher (2018, October). Solitary Confinement Reforms Sweeping the Nation but Still Not Enough. *Prison Legal News,* p. 26-27

11

over 15 consecutive days in isolation is torture. The American Bar Association concurs, and passed a resolution in early 2018 that called on state officials to limit the use of solitary confinement, and allow it "only in exceptional cases as a measure of last resort, where less restrictive settings are insufficient, and for no longer than is necessary to address the specific reason for placement, typically not to exceed 15 consecutive days." Additionally, the National Commission on Correctional Health Care (NCCHC) adopted new standards for solitary confinement in April 2016, while the year before the ASCA issued a report critical of long-term segregation. The NCCHC states that "[p]rolonged (greater than 15 consecutive days) solitary confinement is cruel, inhuman and degrading treatment, and harmful to an individual's health."[2]

Many experts from the legal and medical field have come forward calling for an end to this inhumane torture. President Barack Obama ended the use of solitary confinement for juveniles in 2016, citing segregation's "devastating, lasting psychological consequences." David Fathi, director of the ACLU's National Prison Project, said "Solitary confinement is one of the most damaging things that you can do to a human being. People lose their ability to interact with humans, because they've been deprived" of social contact.[3]

Dr. Brie Williams, criminal justice and health program director and professor at the University of California at San Francisco Medical School, said solitary confinement creates "ubiquitously unhealthy" conditions and causes or worsens chronic mental health issues, especially dementia—common among older

---

[2] ibid
[3] ibid

12

prisoners—which leads them to violate rules that land them back in solitary in a recurring cycle.[4]

Dr. Mark Cunningham, an expert in clinical and forensic psychology, notes "That the associated adverse psychological reactions to solitary confinement detailed in th[e] literature includes psychotic-spectrum symptoms of paranoia and hallucinations; mood-spectrum symptoms of depression, withdrawal, appetite and sleep disturbance, fatigue and lethargy, and suicidal ideation; anxiety spectrum symptoms of subjective distress, feelings of impending doom, somatic complaints, dissociative experience, and ruminative thoughts; effective liability characterized by irritability, rage, and aggressive impulses; and behavioral self-control symptoms of aggression, assaults, and self-mutilation." *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019).

Dr. Michael Hendricks, expert in forensic and clinical psychology, reports that "common adverse psychological effects of isolation housing in prison and jail settings (i.e., typically found to have been experienced by at least half of inmates in these settings) include anxiety, headaches and other psychosomatic symptoms, lethargy, insomnia, decreased appetite, and nightmares." *Id.*

New Mexico's Center on Law and Poverty's legal director Gail Evans stated "Holding people for months in solitary confinement is contrary to any notion of rehabilitation or reintegration. The evidence is clear that isolation results in cognitive deterioration, which can be irreversible, meaning that our prisons and jails are inflecting brain damage on our citizens."[5]

---

[4] ibid
[5] Bliss, Kevin W. (2019, July). New Bill Restricts Use of Solitary Confinement in New Mexico. *Prison Legal News*, p. 48.

Dr. Bianca McDermott, former head of the New Mexico Corrections Department's Behavioral Health Bureau stated "I have personally seen inmates kept in solitary confinement in New Mexico prisons for years. The worst outcome, of course, is suicide. Other inmates seem to manifest extreme rage, paranoia and impulsivity. Others become lethargic, passive, and seem to have lost social skills and coping mechanisms."[6]

Harvard psychiatrist Dr. Stuart Grassian is a renowned expert and academic who has published several papers illustrating the ill effects of solitary confinement. In 1982, Dr. Grassian was asked to evaluate prisoners who'd spent time in solitary confinement at Massachusetts's infamous Walpole State Prison. Dr. Grassian, who didn't have much experience with prisoners at that time, was skeptical of their claims of psychological damage. He went into the interviews believing that his subjects were probably trying to con him. He soon changed his mind. The men displayed unmistakable signs of paranoia, delirium and extreme agitation, including acute sensitivity to noise and light. They were prone to revenge fantasies and random violence, much of it self-directed. At the same time, they minimized their symptoms, even rationalizing away suicide attempts, not wanting to admit that the isolation was "getting" to them. To his astonishment, Dr. Grassian soon learned that there was a substantial body of research stretching back over decades about the harmful effects of solitary confinement, including studies of astronauts and the use of solitary to break political prisoners. He soon published his own paper about what he called "SHU (Special Housing Unit) Syndrome." Dr. Grassian concludes "[i]t's unassailable that solitary confinement causes psychiatric harm."[7]

---

[6] ibid
[7] Prendergast, Alan (2018, September). At the Federal Supermax, When Does Isolation Become Torture? *Prison Legal News*, p. 4-5. Originally published by Westword (www.westword.com)

Dr. Grassian described similar conditions to Mr. Schulte's as "psychologically toxic, cruel, ineffective and counterproductive." *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 17 (D. Conn. 2019). Dr. Grassian noted that inmates like Mr. Schulte, who do not have a pre-exiting mental illness, are placed at great risk of psychiatric decompensation in solitary confinement, leading to self-harm and suicidal tendencies. "Although it has become widely accepted that mentally ill individuals are at severe risk of psychiatric decompensation in solitary, such decompensation is not limited to those with pre-existent mental illness. After controlling for the presence of mental illness, there remains overwhelming evidence that solitary confinement causes many inmates to become suicidal and self-destructive, on average demonstrating that such acts are about seven times as prevalent among those housed in solitary as they are among those housed in general population." *Id.*

As the mental effects of solitary confinement garner national attention, calls to abolish or reform its use are increasingly nationwide. See, e.g., Editorial Board, *Solitary confinement is torture. Will the Bureau of Prisons finally stop using it?*, Wash. Post, July 15, 2017; Joe Hernandez, *New Jersey considers restricting the use of solitary confinement*, The Pila. Tribune, June 7, 2019. "As of the spring of 2018, legislation to eliminate or to limit restrictive housing for subpopulations had been enacted in California, Colorado, Washington, D.C., and Tennessee, and proposed in several other jurisdictions, including Connecticut, Hawaii, Nebraska, New Jersey, New York, and Virginia." *Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell*, Yale Law School 2018, at 88. In fact, the state of New York recently passed legislation banning indefinite solitary confinement beginning 2022.

15

2.     **The well-documented deleterious effects of long-term solitary confinement erode a person's sanity and constitute torture**

In recent years, advances in our understanding of psychology and new empirical methods have allowed researchers to characterize and quantify the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions materially indistinguishable from the challenged conditions implement through SAMs.

"Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilations, and suicidal impulses… There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement,* 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997).

Numerous studies reveal that prolonged detention of inmates in conditions akin to those Mr. Schulte faces also leads to "psychological deterioration," including "declines in mental functioning, difficulties in thinking, concentration and memory problems, and problems with impulse control.'" Jesenia Pizarro & Vanja M. K. Stenius, *Supermax Prisons: Their Rise, Current Practices, and Effect on Inmates*, 84 Prison J. 248, 256 (2004). Based on the extensive body of research,

16

scholars have concluded that "solitary confinement has potentially serious psychiatric risks." *Id.* at 256.

The confinement of a "prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction—can cause severe psychiatric harm." Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325, 327 (2006). "[E]ven a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." *Id.* at 331. Dr. Grassian confirms that common side effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors. An abundance of clinical literature regarding the psychiatric effects of solitary confinement supports a near-universal conclusion: "The restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental-functioning." *Id.* at 354.

A new study published February 1, 2020 in *The Lancet* public health journal by Cornell professor Christopher Wildeman and Lars Andersen of Denmark's ROCK-WOOL Foundation has documented a link between being placed in solitary confinement and a significant increase in prisoner death rates within five years of release. The study showed two troubling trends; the first, that people who are released from prison are 10 times likelier to die than those who had not been incarcerated; the second, that prisoners who had been placed in solitary confinement for as little as 72 hours were 15 times likelier to die. The connection between solitary confinement and mortality was not invisible before the study. As far back as the 1840s, colonial officials in Tasmania had noted elevated mortality rates among transported male convicts kept in solitary as opposed to the rest of those transported to the colony. More recently, a 2010 North Carolina study found

17

a high mortality rate among released prisoners who had been in solitary confinement, especially from homicide, suicide, and opioid overdose. What these studies suggested, however, was shown conclusively in the Danish study.[8]

In summary, "[s]cientific research, regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms." *Porter* at 356.

### 3.   Indefinite solitary confinement violates the Eighth Amendment

Mr. Schulte contends that indefinite solitary confinement violates the Eighth Amendment. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. U.S. Const. amend. VIII. Whether an inmate's conditions of confinement amount to "cruel and unusual punishment" must be measured against "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 US 97, 102 (1976) (quoting *Trop v. Dulles*, 356 US 86, 101 (1958)).

"A punishment need not leave scars to be cruel and unusual." *Apodaca v. Raemisch*, 139 S. Ct. 5, 6 (2018) (Sotomayer, J., concurring in denial of certiorari. "Courts and corrections officials must accordingly remain alert to the clear constitutional problems raised by keeping prisoners... in near-total isolation from the living world in what comes perilously close to a penal tomb." *Id.* at 10 (internal citation and quotation marks omitted).

---

[8] Hawkins, Jayson (2020, September). Study Shows Solitary Confinement Poses Mortality Risk After Release. *Prison Legal News,* p. 52.

Indeed, as we have demonstrated it is well-documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee. Courts have taken note of this extensive-and growing-body of literature. In recent years, Justice Kennedy and Justice Breyer authored separate opinions highlighting the serious psychological and emotional harm caused by segregated or solitary confinement under conditions materially indistinguishable from those that Mr. Schulte endures. See *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution) (stating that evidence demonstrated that the petitioner, an inmate held on Texas's death row, "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Glossip v. Gross*, 576 US 863, 925-26 (2015) (Breyer, J., dissenting) (reviewing literature and noting the "dehumanizing conditions of [solitary] confinement" and that "it is well documented that... prolonged solitary confinement produces numerous deleterious harms"); *Davis v. Ayala*, 135 S. Ct. at 2210 (Kennedy, J., concurring) ("[R]search still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

More than a century ago, the Supreme Court recognized these adverse consequences to inmates' mental health posed by prolonged detention in conditions akin to solitary confinement. According to the court, "experience demonstrated" that, when placed in isolation "[a] considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition... and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover mental activity to

19

be of any subsequent service to the community." *In re Medley*, 134 US 160, 168 (1890).

### a)   Courts across the country have declared indefinite solitary confinement as cruel and unusual punishment

"[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science." *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998).

"It is obvious that being housed in isolation in a tiny cell for 23 hours a day for over three decades results in serious deprivations of basic human needs." *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678-79 (M.D. La. 2007).

The Hawaii Supreme Court held that long-term pretrial solitary confinement was unconstitutional in *Gordon v. Measaka-Hirata*, 431 P.3d 708 (Hawaii 2018).

In September 2018, Middlesex County, New Jersey agreed to settle a civil rights lawsuit and give prisoners held in a secure housing unit more freedom. See *C-Pod Inmates of Middlesex County v. Middlesex County*, No. 3:15-cv-07920-PGS-TJB, (D. NJ 2018). "It's no longer possible to lock someone in solitary confinement and throw away the key," Deputy Public Defender Fletcher Duddy said in response to the settlement agreement. Based on overwhelming evidence of the detrimental effects of solitary, such as a study from Vera Institute of Justice's Safe Alternatives to Segregation Initiative that found solitary confinement is "toxic to brain functioning and causes symptoms characteristic of stupor and delirium," Middlesex County agreed to limit solitary imposed for disciplinary purposes to 15

20

days for one offense or 30 days for multiple offenses, and agreed to adopt a "more robust mental health screening process" for prisoners placed in solitary.[9]

A Connecticut Federal District court held on August 27, 2019 that a former death row prisoner who was kept in solitary confinement had been subject to cruel and unusual punishment. See *Reynolds v. Arnone*, 402 F. Supp. 3d 3 (D. Conn. August 27, 2019). "Reynolds committed a heinous crime—he murdered a law enforcement officer… The fact that people commit inhumane crimes does not give the state the right to treat them inhumanely. Solitary confinement is an extreme form of punishment with a long history in American penal systems. Since its origins at Pennsylvania's Eastern State Penitentiary in the 1800s, the anguish of those held in complete isolation has been well-documented." *Id.* at 12. Reynolds was sentenced to death and awaited execution for over two decades before the state retroactively abolished the death penalty. The district court agreed with Reynolds that his conditions of confinement were inhumane. It found an "overwhelming body of scientific research supports the conclusion that prolonged isolation presents dangerous risks to an inmate's physical and mental health." *Id.* at 20. Dr. Stuart Grassian filed export reports for Reynolds and described his conditions of confinement as "psychologically toxic, cruel, ineffective, and counterproductive." In addition to finding an Eighth Amendment violation, the district court found Reynolds had a liberty interest in avoiding solitary confinement and his due process rights were violated because he was not given notice or a hearing—the same as Mr. Schulte. *Arnone* is so similar to Mr. Schulte's case that much of Judge Underhill's meticulous opinion is brazenly plagiarized in the instant motion.[10]

---

[9] Chappell, Dale (2019, April). Middlesex County, New Jersey Settles Solitary Confinement Suit. *Prison Legal News*, p. 47.
[10] Reutter, David M. (2019, December). Solitary Confinement for Former Death Row Prisoner Held Unconstitutional. *Prison Legal News,* p. 54.

21

Also on August 27, 2019, a Virginia district court allowed a prisoner's challenge to his continued placement in solitary confinement to proceed. See *Reyes v. Clarke*, 3:18-cv-00611 (E.D. Va. 2019). The district court held that in addition to his Eighth Amendment claims, the plaintiff had a due process claim by being denied a liberty interest. He was entitled to avoid prison conditions that impose an atypical and significant hardship in relation to the ordinary incidents of prison life. Reyes alleged that he did not receive due process when he was placed in, or asked to be removed from, solitary confinement.[11]

On November 18, 2019 the Pennsylvania Department of Corrections agreed to end long-term solitary confinement for its death row inmates after the ACLU filed a civil rights lawsuit. See *Reid v. Wetzel*, 18-cv-0176 (M.D. Penn. 2019). "The use of long-term solitary confinement on anyone is torture," said Amy Fettig, deputy director of the ACLU's National Prison Project. "The conditions Pennsylvania's DOC was subjecting people on death row to—spending their entire lives in a tiny, filthy cell without any normal human contact, congregate religious services, sufficient access to exercise, sunshine, the outdoors, or environmental and intellectual stimulation—weren't just deeply unconstitutional; they were horribly inhumane."[12]

### b)    *Federal appeals courts have declared indefinite solitary confinement as cruel and unusual punishment*

Several Federal Courts of Appeals have held similar conditions to Mr. Schulte's <u>inconsistent</u> with contemporary standards of human decency.

---

[11] Reutter, David M. (2020, January). Virginia Prisoner's Solitary Confinement Challenge Allowed to Proceed. *Prison Legal News*, p. 30-31.
[12] Reutter, David M. (2020, April). Precedential Settlement Eliminates Solitary Confinement on Pennsylvania's Death Row. *Prison Legal News*, p. 59.

The Third Circuit, in *Williams v. Sec'y Pa. Dep't of Corr.*, reached such a conclusion. 848 F.3d 549 (3d Cir. 2017), *cert. denied sub nom. Walker v. Farman*, 138 S. Ct. 357 (2017), and *cert. denied sub nom. Williams v. Wetzel*, 138 S. Ct. 357 (2017). In *Williams*, Pennsylvania death row inmates who were granted resentencing hearings challenged their placement in solitary confinement without meaningful review. *Id.* at 552. They argued that their indefinite detention in socially isolating conditions violated their Fourteenth Amendment rights to due process. *Id.* at 553. After reviewing the "robust body of scientific research on the effects of solitary confinement" the Third Circuit found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term... damage," and therefore held that "the deprivations of protracted solitary confinement so exceeds the typical deprivations of imprisonment as to be the kind of atypical, significant deprivation... which [can] create a liberty interest." *Id.* at 566-67 (internal quotation marks omitted); *Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement").

The Tenth Circuit found, after reviewing academic literature, that "solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill... These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement." *Grissom v. Roberts*, 902 F.3d 1162, 1176-77 (10th Cir. 2018) (Lucero, J., concurring)

On May 3, 2019, the Fourth Circuit Court of Appeals affirmed a district court's order that found the conditions of confinement on Virginia's death row

23

violated the Eighth Amendment. See *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019), *(rehearing and rehearing en banc denied)*. The Fourth Circuit began its analysis by pointing to the prisoners' "expert evidence establishing the risks and serious adverse psychological and emotional effects of prolonged solitary confinement [and] the surveys of the scholarly literature supporting that evidence." *Id.* at 356. It cited several recent cases, including two from the U.S. Supreme Court that recognized this empirical evidence. The Court of Appeals noted that its prior rulings upholding conditions of confinement similar to those challenged in this case "lacked the benefit of the recent academic literature" on the effects of prolonged solitary confinement. *Id.* at 358. The Fourth Circuit went on to state that the relevant factor under the Eighth Amendment is not the harm suffered, but the "substantial risk" of serious harm from their conditions of confinement; "The challenged conditions of confinement on Virginia's death row-under which Plaintiffs spent, for years, between 23 and 24 hours day alone, in a small... cell with no access to congregate religious, educational, or social programming-pose a substantial risk of serious psychological and emotional harm." *Id.* at 357. (internal quotation marks omitted).[13]

Mr. Schulte formally includes herein the scholarly literature used in the Third Circuit's *Williams* case and the Fourth Circuit's *Porter* case. Mr. Schulte urges this Court to read and adopt these findings. Also note that the conditions of confinement for Mr. Schulte, held under pretrial, are even worse than those imposed upon the death row inmates in both *Williams* and *Porter*. In *Williams* and *Porter*, inmates were permitted televisions in their cells, access to reading materials from the libraries, could speak to each other, and some could even leave

---

[13] Reutter, David M. (2019, November). Virginia Death Row Conditions Subjected Prisoners to Risk of Harm. *Prison Legal News*, p. 19.

their cells to perform prison jobs. Mr. Schulte has none of these beautiful and luxurious amenities permitted to death row inmates.

### 4.    Indefinite solitary confinement violates the Fifth Amendment

Mr. Schulte also argues that indefinite solitary confinement imposed through SAMs violates his rights under the Due Process Clause by depriving him of a protected liberty interest without any meaningful review.

To assert a due process claim in connection with a classification decision, Mr. Schulte must show that he had a protected liberty interest in remaining free from the classification and, if he had such an interest, that he was deprived of such an interest without affording him due process of law. See *Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (summary order) (citing *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court reexamined the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause. *Id.* at 474. The Court explained that for prisoners, a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484 (internal citations omitted).

Whether restraint constitutes an "atypical and significant hardship" depends on the totality of the circumstances, particularly the severity and the duration of the deprivation. See, e.g., *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

25

Hardship is atypical and significant in relation to the ordinary incidents of prison life based on a comparison of the frequency and duration of similar conditions of confinement. See, e.g., *Colon v. Howard*, 215 F.3d 227, 230-32 (2d Cir. 2000). Atypically should be measured against the conditions afforded to the general population within a given prison system, as well as those in routine administrative confinement. See *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). Whether conditions constitute an "atypical and significant hardship... in relation to the ordinary incidents of prison life" is a matter of law. *Colon*, 215 F.3d at 230.

### a)    *Liberty interest*

Mr. Schulte alleges that he has a protected liberty interest in freedom from the extreme social isolation imposed by SAMs' indefinite solitary confinement. Regarding atypicality, SAMs are a significant departure from the hardships normally attendant to incarceration at MCC and as a pretrial detainee. Mr. Schulte has a liberty interest in not being made to endure them indefinitely. Moreover, because of its indefinite duration and lack of meaningful review, Mr. Schulte argues that SAMs confinement is even more restrictive than administrative segregation. Mr. Schulte's conditions apply only to himself and four other inmates in the entire Bureau of Prisons. Finally, the Bureau of Prisons did not impose SAMs with regard to misconduct, but rather as an order from the Attorney General for allegations in his indictment—allegations that were never proven at trial beyond reasonable doubt. There is no better indicator of atypicality.

*Wilkinson v. Austin*, 545 US 209 (2005) parallels Mr. Schulte's current situation. In *Wilkinson*, the Supreme Court considered a due process claim regarding the classification of Ohio inmates to the state's high security "Supermax" prison for non-disciplinary reasons. Conditions at the Ohio State Penitentiary

("OSP") were more restrictive than any other prison facility in Ohio, including its death row and administrative control units. See *Id.* at 214. Inmates were held in "extreme isolation" in 7 foot by 14 foot cells for twenty-three hours a day. *Id.* During the one hour per day that an inmate could leave his cell, access was limited to one of two indoor recreation cells. *Id.* Opportunities for social visits were rare and conducted through glass walls. *Id.* "Aside from the severity of the conditions, placement at OSP [was] for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there [was] no indication how long he may be incarcerated at OSP once assigned there." *Id.* at 214-15.

The Court applied the *Sandin* analysis to determine whether inmates had a liberty interest in avoiding indefinite confinement in the restrictive high-security prison. *Id.* at 223 ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest in avoiding restrictive conditions of confinement is not the language of the regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 US at 484).

Applying that analysis, the Court held that inmates had a liberty interest protected by the Fourteenth Amendment's Due Process Clause in avoiding assignment to OSP.

"For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day

placement in *Sandin*, placement at OSP is indefinite, and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration... While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP." *Id.* at 223-24 (internal citation omitted).

Mr. Schulte contends that his conditions of confinement are analogous to the "extreme" conditions imposed on inmates at OSP.

Additionally, Mr. Schulte received no administrative hearing prior to his placement on SAMs. He has an indefinite authorized length of confinement and is not eligible for release to the general population. "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Wilkinson*, 545 US at 224; see also *Williams*, 848 F.3d at 562 (internal citation and footnotes omitted) ("This indefiniteness contrasts sharply with other common forms of solitary confinement... The duration of the deprivations that follow from the seclusion is often predetermined and fixed unless the inmate's behavior is thought to require an additional period of segregation.").

Accordingly, Mr. Schulte has a protected liberty interest in remaining free from the conditions imposed due to his classification as a SAMs inmate.

### b)    *Procedural protections*

Mr. Schulte further argues that because he has a liberty interest in freedom from his conditions, his due process rights were violated when the Bureau of

Prisons failed to provide him procedural protections before placing him on SAMs. See III.A.1 for the argument that the SAMs procedural process is insufficient.

Accordingly, Mr. Schulte was deprived of his due process rights guaranteed under the Fifth Amendment.

### 5.    Solitary confinement is the most vile, inhumane, and destructive punishment ever devised by mankind

There are no words to truly describe the experience of complete and total isolation. For almost one thousand days now, Mr. Schulte has been locked in a small cage of metal and steel the size of a parking space. He has no view of the outside, and in fact, has not been outside in nearly one thousand days; he has not seen the sun in nearly one thousand days; he has not felt the wind in nearly one thousand days; he has not felt the rain in nearly one thousand days; he has not embraced his loved ones in nearly one thousand days. Mr. Schulte is tortured through constant sleep deprivation, denied access to a library to read books, and denied access to a television and every form of entertainment typically provided to *death row inmates*. Mr. Schulte is *not* on death row—he is a pretrial detainee. The United States Federal Government wants Mr. Schulte to sit in his cage for 24 hours a day, 7 days a week, in forced "idleness" until he finally kills himself or suffers a complete psychotic breakdown—the ultimate "timeout." He can do nothing. He is given nothing to do. Mr. Schulte has been tortured for nearly one thousand days in New York City's very own Auschwitz—deprived of all joy and happiness, and forced in indefinite solitary confinement without hope of ever seeing anyone or anything ever again. All this torture was imposed without a jury's conviction, without any sentence—and in fact, the very crimes the government claims as justification for his torture were not found to be true by a jury; the jury did not find

guilt beyond reasonable doubt, and yet—the United States Federal Government continues to torture him anyway, because the Constitution is a meaningless piece of trash that was raped and discarded decades ago.

It's illegal for anyone to lock an animal in a small cage 24/7—unless that animal is a human being and the torturer is the government, in which case it's called "justice". How truly barbaric and savage is this so-called pinnacle of society, this "Leader of the Free World?" No other country in the history of the world has ever caged and tortured people as the United States Federal Government has over the past 50 years. Slavery never ended in America—it was merely refactored; today, there are more black men enslaved then there ever were leading up to the Civil War—there is no attempt to rehabilitate, there is no Christian ethos of compassion or forgiveness in the United States—only a desire to torture, to exact an unequal punishment upon those the majority dislikes—the accused.

Justice is not simply the process of discovering guilt, but it is also in the punishment imposed; if the punishment exceeds the actual crime, then a grave and manifest injustice has been done. No human being, no animal, no life form deserves such vile treatment as indefinite solitary confinement.

Solitary confinement is cruel and unusual. There can be no question of the cruelty of solitary confinement. It is also unusual, especially long-term, indefinite solitary confinement—there are fewer than 50 individuals that the government has imposed SAMs and indefinite solitary confinement, and only about 5 pretrial. As to those confined to indefinite solitary confinement on death row, the states are rapidly abandoning this inhumane practice. There is absolutely no "legitimate governmental objective" that can authorize the use of torture—isn't it finally time the judiciary caught up?

Over 150 years ago, Dostoyevsky wrote, "The degree of civilization in a society can be judged by entering its prisons." *The Yale Book of Quotations* 210 (F. Shapiro ed. 2006). What do our prisons say about our unevolved savagery?

## V.   CONCLUSION

The use of psychological torture to strip a man of his mind and deprive him of any and all forms of joy and happiness is barbaric and insidious without equal. This Court should adopt the United Nations, Psychology, and the Fourth Circuit's findings that long-term, indefinite solitary confinement is cruel and unusual; it should also find that the process for imposing this cruel and unusual punishment, SAMs imposed through 28 C.F.R. § 501.2 and § 501.3, inherently violates the Due Process Clause of the Fifth Amendment and is facially unconstitutional. Accordingly, SAMs should be vacated for all and the practice of solitary confinement permanently ended.

Dated: New York, New York
        September 17, 2021

Respectfully submitted,

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007