UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

                *Defendant.*

S3 17 Cr. 548 (PAC)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE METROPOLITAN CORRECTIONAL CENTER

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
New York, New York 10007

# TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES.................................................................. iii

II.   PRELIMINARY STATEMENT ....................................................1

III.   JURISDICTION AND LAW OF THE CASE...................................2

   A.   The Court should not consider the Opposition Motion ...............2

   B.   The Court should consider the MCC Suppression Motion..........2

IV.   THE MCC SEARCH WARRANT VIOLATED THE FOURTH
AMENDMENT.................................................................................4

   A.   Donaldson fabricated evidence, falsified evidence, and perpetuated a fraud
on the Court to obtain the MCC search warrant................................4

     1.   The government asserts that neither falsely claiming something is
classified nor deceptively omitting the fact that documents are lawfully
produced discovery is misleading .......................................................5

     2.   NEW EVIDENCE: Agent Donaldson substituted Schulte Article 9 with an
unrelated attorney-client privileged email..........................................6

   B.   The MCC search warrant was so lacking in indicia of probable cause to
render reliance unreasonable .............................................................17

     1.   No probable cause for most alleged crimes ...............................17

     2.   No probable cause to search for classified information.............18

   C.   Corrected MCC search warrant..............................................21

   D.   MCC search warrant scope was unreasonably overbroad ..........22

     1.   Overbroad with regard to the types of information to search ....23

     2.   Overbroad in scope to search 200 residences ..........................24

V.   OTHER CONSTITUTIONAL VIOLATIONS................................26

   A.   The MCC Search Warrant violated the First Amendment..........26

   B.   Donaldson recklessly disregarded Attorney-Client Privilege.....26

   C.   Donaldson expanded the already overbroad MCC search to the 9th floor..27

   D.   Donaldson executed a general warrant .....................................27

VI.    THE MCC SEARCH WARRANT IS VOID UNDER *FRANKS* AND THE GOOD FAITH EXCEPTION IS INAPPLICABLE ................................................29

   A.    The issuing judge was knowingly and deliberately misled ........................29

   B.    The application was so lacking in indicia of probable cause as to render reliance upon it unreasonable ..................................................................................30

   C.    The warrant violated the First Amendment ................................................31

   D.    The warrant violated the Sixth Amendment ...............................................31

   E.    Donaldson violated the terms of the warrant during the search..................32

VII.    CONCLUSION ........................................................................................33

# I.   TABLE OF AUTHORITIES

**Cases**

*Ayeni v. Mottola,*
  35 F.3d 680 (2d Cir. 1994) ................................................................22

*Boyd v. United States,*
  116 US 616 (1886)............................................................................28

*Brigham City v. Stuart,*
  547 US 398 (2006)............................................................................24

*Camara v. Municipal Court of City and County of San Francisco,*
  387 US 523 (1967)..............................................................................4

*Carpenter v. United States,*
  138 S. Ct. 2206 (2017)........................................................................4

*Davis v. United States,*
  564 US 229 (2011)............................................................................32

*Franks v. Delaware,*
  438 US 154 (1978)................................................................29, 32, 33

*Groh v. Ramirez,*
  540 US 551 (2004)............................................................................18

*Herring v. United States,*
  555 US 135 (2009)......................................................................29, 31

*Illinois v. Gates,*
  462 US 213 (1983)............................................................................17

*Lauro v. Charles,*
  219 F.3d 202 (2d Cir. 2000) ............................................................22

*Marron v. United States,*
  275 US 192 (1927)............................................................................28

*McDonald v. United States,*
  335 US 451 (1948)............................................................................18

*Palko v. Connecticut,*
   302 US 319 (1937)...................................................................................26

*Reno v. Flores,*
   507 US 292 (1993)...................................................................................26

*Silverman v. United States,*
   365 US 505 (1961).....................................................................................4

*Steagald v. United States,*
   451 US 204 (1981)...................................................................................17

*United States v. Awadallah,*
   349 F.3d 42 (2d Cir. 2003) .....................................................................29

*United States v. Dzialak,*
   441 F.2d 212 (2d Cir. 1971) ...................................................................28

*United States v. Ganias,*
   755 F.3d 125 (2d Cir. 2014) ...................................................................32

*United States v. Griffith,*
   867 F.3d 1265 (D.C. Cir. 2017)..............................................................23

*United States v. Laury,*
   985 F.2d 1293 (5th Cir. 1993) ................................................................20

*United States v. Leary,*
   846 F.2d 592 (10th Cir. 1988) ................................................................30

*United States v. Leon,*
   468 US 897 (1984)..............................................................................30, 31

*United States v. Longo,*
   70 F. Supp. 2d 225 (W.D.N.Y. 1999).....................................................31

*United States v. Matias,*
   836 F.2d 744 (2d Cir. 1988) ..............................................................28, 32

*United States v. Medlin,*
   842 F.2d 1194 (10th Cir. 1988) ..............................................................32

*United States v. Moore,*
     968 F.2d 216 (2d Cir. 1992) ....................................................................29

*United States v. Pabon,*
     871 F.3d 164 (2d Cir. 2017) ....................................................................18

*United States v. Rajaratnam,*
     719 F.3d 139 (2d Cir. 2013) ....................................................................29

*United States v. Raymonda,*
     780 F.3d 105 (2d Cir. 2015) ....................................................................17

*United States v. Reilly,*
     76 F.3d 1271 (2d Cir. 1996) ..........................................................29, 31, 32

*United States v. Shi Yan Liu,*
     239 F.3d 138 (2d Cir. 2000) ....................................................................32

*United States v. Ulbricht,*
     858 F.3d 71 (2d Cir. 2017) ......................................................................20

*United States v. Valenzuela,*
     596 F.2d 824 (9th Cir. 1979) ...................................................................18

*United States v. Voustianiouk,*
     685 F.3d 206 (2d Cir. 2012) ....................................................................18

*United States v. West,*
     520 F.3d 604 (6th Cir. 2008) ...................................................................31

*United States v. Williams,*
     592 F.3d 511 (4th Cir. 2010) ...................................................................20

*Warden, Md. Penitentiary v. Hayden,*
     387 US 294 (1967)..................................................................................18

**Statutes**

18 U.S.C § 1030 ................................................................................25

18 U.S.C § 1343 ................................................................................25

18 U.S.C § 1503 ................................................................................25

18 U.S.C § 2252A ..............................................................................25

18 U.S.C § 401 ..................................................................................25

18 U.S.C. § 793 .................................................................................25

**Constitutional Provisions**

U.S. Const. amend. I ...........................................................1, 26, 31, 33

U.S. Const. amend. IV .................................................................. passim

U.S. Const. amend. V ................................................................26, 33

U.S. Const. amend. VI .........................................................26, 27, 31, 33

## II.   PRELIMINARY STATEMENT

Mr. Schulte's opening memorandum demonstrated that FBI Special Agent Jeffrey David Donaldson falsified evidence, fabricated evidence, and perpetuated a fraud on the Court when he sought a warrant to seize Mr. Schulte's lawfully produced discovery. Mr. Schulte also argued that the MCC search warrant was so lacking in indicia of probable cause to render reliance unreasonable and that it was unreasonably overbroad. Mr. Schulte further argued that the search warrant violated Mr. Schulte's First Amendment guarantee to free speech as Agent Donaldson sought to punish Mr. Schulte for disparaging the FBI and the corrupt American "justice" system. Finally, Mr. Schulte argued that Agent Donaldson's execution of the search warrant was unconstitutional since he recklessly disregarded attorney-client privilege, expanded the overbroad warrant, and executed a general warrant. Accordingly, Mr. Schulte argued that the warrant was unconstitutional and all evidence obtained from the search must be suppressed.

In response, the government argues "the grab-bag of inapposite arguments contained in the Motion to Suppress provides no basis to revisit that ruling. Moreover, even if the court were to consider those arguments in the first instance, they are meritless—the MCC Warrants are amply supported by probable cause and do not violate the defendant's constitutional rights." (Opp.[1] At 3). Tellingly, the government completely ignores the crux of Mr. Schulte's argument—that Special Agent Donaldson falsified evidence, fabricated evidence, and perpetuated a fraud on the Court to seize *lawfully produced discovery from Mr. Schulte.* This appears to be a case of first impression as no court has ever heard such a case.

---

[1] "Opp." refers to the Government's Omnibus Opposition to the Defendant's *Pro Se* Motions. "Opening Mem." refers to Mr. Schulte's Opening Motion, Dkt. 455.

## III.   JURISDICTION AND LAW OF THE CASE

### A.      The Court should not consider the Opposition Motion

Mr. Schulte filed the suppression motion on February 24, 2021. Dkt. 455. In accordance with Local Crim. R. 49.1(b), "[a]ny opposing papers shall be filed and served within 14 days after service of the motion papers." The government finally filed its opposition on September 3, 2021; 6 months, 1 week, and 3 days, or 190 total days later. Thus, their opposition is *176 days late*. The government offers no excuse for the untimeliness of their opposition motion except, it seems, that they are the government, and may do as they please. This untimeliness is unprecedented and should not be excused simply because the government is lazy.

### B.      The Court should consider the MCC Suppression Motion

The government argues that the standard for reconsideration is unmet. However, Mr. Schulte plainly stated reconsideration was necessary because "it would be a ***manifest injustice*** to permit a search warrant that authorized the seizure of official, unclassified discovery to stand" (Opening Mem. at 1). Mr. Schulte's attorney's ineffective assistance of counsel for failing to make such an argument in its original motion (despite Mr. Schulte's repeated requests to do so) should not be counted against Mr. Schulte especially since they no longer represent him. This is not a "second bite" of the apple or a minor change in argument—Mr. Schulte's claims of the FBI deceiving this Court into signing a warrant to seize lawfully produced discovery merits this Court's attention and discretion for reconsideration.

Regardless, the government gifted Mr. Schulte <u>new information previously concealed from the defense (See IV.A.2)</u> in its opposition. One of the reasons defense counsel originally failed to argue against probable cause was simply that the government refused to identify what documents Agent Donaldson supposedly

2

relied on for his affidavit. As Donaldson made vague references in his affidavit to "at least one" classified article, the defense had *no idea* which "article" Agent Donaldson found to be "classified," nor was any such article ever specifically identified to the defense. It was not until the government's opposition motion that the "article" became apparent. This knowledge did not exist before the first MCC Suppression Motion, and it is a monumental disclosure because it exposes Agent Donaldson and his affidavit as even *more deceptive* than the defense originally thought. This deception is the primary reason for the confusion, because although Agent Donaldson received all 9 of the Schulte Articles from his CS, and all articles were deemed unclassified, Agent Donaldson deviously masqueraded an unrelated attorney-client privileged email as Schulte Article 9. This email was sent 5 months *before Mr. Schulte's arrest,* and a full 18 months before Agent Donaldson drafted the MCC search warrant; it obviously predated the Schulte Articles and never could have existed at the MCC. In fact, the defense previously identified the allegedly classified email as attorney-client privileged since it was sent to Mr. Schulte's counsel at their request for a full accounting of the FBI's initial raid of his New York City Apartment. This email was *never* provided by the CS to Agent Donaldson, it was *never* found on the contraband cellphones, and it was *never* found on any of the online accounts attributable to the cellphones. Donaldson's deceptive masquerade of this email as "Schulte Article 9" is an outrageous fraud.

Accordingly, this Court has proper jurisdiction to hear this successive motion, and should exercise its discretion to do so as these newly discovered facts and related arguments are otherwise *unpreserved on appeal.* The MCC Search Warrant is not only a manifest injustice, but it is a case of first impression as the government has never before claimed seizing lawfully produced discovery to be legal—the government's reluctance to litigate this issue is unsurprising.

## IV.    THE MCC SEARCH WARRANT VIOLATED THE FOURTH AMENDMENT

"The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2017) (quoting *Camara v. Municipal Court of City and County of San Francisco*, 387 US 523, 528 (1967)). At "the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 US 505, 511 (1961).

### A.    Donaldson fabricated evidence, falsified evidence, and perpetuated a fraud on the Court to obtain the MCC search warrant

The government cannot escape the simple truth that Agent Donaldson applied for a search warrant to seize lawfully produced discovery. In the Opening Mem., Mr. Schulte discussed in great detail and provided numerous exhibits that clearly showed Agent Donaldson's deliberate deception and willful manipulation of this Court—to which the government ***never once responded.***

First, Agent Donaldson falsified the content, purpose, and status of the Schulte Articles as if they were somehow illegal, feigning ignorance of them and falsely claiming that the articles "discussed his case" and that "at least some of the Schulte Articles may have been provided to one or more members of the media." Opening Mem. at 8. Agent Donaldson did not inform the Court that the Schulte Articles were a Redress of Grievances critical of the criminal justice system, that they did not specifically discuss his case, and that they were *already filed publicly*. See Opening Mem. at Ex. D-J. Agent Donaldson knew that if this Court saw and read these documents, it would not have issued a search warrant to seize them.

4

Next, Agent Donaldson deliberately fabricated evidence to claim that *"[t]he CIA has reviewed the [...] Schulte Articles and has determined [...] at least one of the Schulte Articles contain classified information."* Opening Mem. at 11. In his deliberate deception, Agent Donaldson did not identify which article was classified as none were. In truth, Special Agent Jeffrey David Donaldson found the Schulte Articles on Facebook in 2018. He then issued a subpoena to Facebook to obtain the Schulte Articles on May 15, 2018. See Opening Mem. at Ex. C. The subpoena directs all returns to *Special Agent Jeff D. Donaldson.*

Agent Donaldson then provided the Schulte Articles to the CIA, who cleared them as unclassified—the United States Attorney's Office then produced these unclassified documents in unclassified discovery on July 17, 2018. See Opening Mem. at Ex. K. Three months *after these documents were produced to Mr. Schulte at the MCC*, in October of 2018, Agent Donaldson falsified these documents, fabricated that they were classified, and then asked this Court for a search warrant to seize them—**knowing full well that they were unclassified and clearly produced to Mr. Schulte in unclassified discovery by the government.**

> ### 1. The government asserts that neither falsely claiming something is classified nor deceptively omitting the fact that documents are lawfully produced discovery is misleading

The government claims that Agent Donaldson is not a liar and fraudster, but simply that "[a]ll storytelling involves an element of selectivity." (Opp. at 13). Indeed, the government says, Agent Donaldson did not lie at all, because his affidavit makes clear that it "does not include all the facts that [Donaldson] ha[d] learned during the course of [the] investigation." (Opp at 14). Ah, so the fact that the Schulte Articles were all unclassified was deliberately omitted so Donaldson

could push his "story" that they were classified to obtain a search warrant? This argument is ludicrous. The affidavit clearly deceived the Court as to the content, purpose, and status of the articles. If the Court read any of the articles, no search warrant would have been issued—so, Agent Donaldson did not incorporate any of the articles for the Court to read. **Additionally, if the Court knew that the CIA cleared the Schulte Articles as unclassified and produced them to Mr. Schulte in unclassified discovery AT THE MCC, it *NEVER* would have issued such a warrant!**

### 2.    NEW EVIDENCE: Agent Donaldson substituted Schulte Article 9 with an unrelated attorney-client privileged email

The government claims that "[t]he defendant is incorrect in his repeated assertion that all of his articles are unclassified. One of the defendant's articles does in fact contain classified information, and has been produced to the defendant in classified discovery" (Opp. at 14 n. 5). The government then, for the very first time, specifically revealed which "article" Donaldson claimed as classified and its relation to the affidavit: "In fact, the Government specifically identified that classified information in its notice pursuant to Section 10 of the Classified Information Procedures Act. He attempts to obfuscate the issue by attaching different exhibits to his motion than what is referenced in Attachment A to the warrant. Compare e.g., MTS Ex. M with MTS Ex. A at 28." However, the government's Section 10 notice was produced on July 29, 2019—*over one month after the original MCC motion was filed on June 18, 2019*. Furthermore, the government's Section 10 notice did not in any way identify the document as Schulte Article 9 or that it was the document Donaldson relied upon in his MCC search warrant. Instead, the Section 10 notice merely stated that "[s]ince being arrested in this case, Schulte has written a series of essays (which he describes as

'articles') discussing, among other things, his case and employment at the CIA. In one of those 'articles'…" This obscure reference provided the defense with absolutely *zero insight*. It had no idea that this document was supposedly Schulte Article 9, especially since the actual Schulte Article 9 was clearly produced to Donaldson by his CS, and the government obviously knew the referenced document was not a Schulte Article, but an attorney-client privileged email that long predated the Schulte Articles. Accordingly, the information provided by the government in its Opp. Motion is precisely the new and relevant information that the courts permit defendants to rely upon in subsequent motions.

>    *a)       The exhibits provided by Mr. Schulte in his Opening Memorandum were the true 9 Schulte Articles and were provided to Agent Donaldson by his CS and produced by the government in unclassified discovery*

In reality it was not Mr. Schulte who attempted to "obfuscate the issue" by attaching "different exhibits" to his motion. The attached exhibits in the original motion were literally from the government's discovery production. They were not "modified" in any way. See Opening Mem. at Ex. D-J, L-M. As stated in the Opening Mem., these exhibits were attached *as-is* from the unclassified discovery productions (Opening Mem. at 12-13):

> All 9 articles were also posted on WordPress in October 2018. The search warrants to seize the articles from WordPress and the John Smith Google Drive account resulted in the second and third full confiscation of all 9 articles (the government did not shutdown the accounts or demand the published articles to be taken down—and they remain on the internet to this day). These articles were then, once again, produced to Mr. Schulte in

**unclassified discovery**—on December 10, 2018 as production #16 (See [Opening Mem. at] Exhibit O). It is from this *unclassified* discovery production that these articles have been attached as exhibits here.

Moreover, the MCC search warrant could not be based on anything except what Agent Donaldson knew at the time of its writing. The only information he had about the articles came from his jailhouse snitch Carlos Luna Betance:

"The CS Account contains approximately 450 electronic files (including videos and photographs) of the Contraband Cellphones." Indeed, Betance took 449 pictures and videos; within these 449 items includes all of the Schulte Articles in full including articles 8 and 9 (See [Opening Mem. at] Exhibit N). These 449 pictures are the same items that Donaldson referenced in his affidavit—there can be no question that he saw them. He also had plenty of time for the CIA to conduct a classification review—which they did. The results? All 449 items—including all 9 Schulte Articles were unclassified and produced in **unclassified discovery** on November 1, 2018 as production #15.

All the photographs this CS took directly match all the articles Mr. Schulte produced as exhibits. All of these photographs and videos were determined to be unclassified.

As noted by the CS, Schulte Article 9 was titled "Presumption of Innocence: The Devil's Dishonest, Deplorable, Diabolically Demented Demons." See Opening Mem. at Ex. M for the true Schulte Article 9. However, instead of stating this title in his affidavit, Agent Donaldson claimed Article 9 was titled "… unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness" (Opening Mem. at Ex. A), which is clearly unlike the other 8 named Schulte Articles.

8

### b)      The REAL Schulte Article 9

Mr. Schulte's Article 9, as discussed by Mr. Schulte over the recorded MCC phone calls reviewed by Donaldson, and ultimately produced to Donaldson by his jailhouse snitch was titled "Presumption of Innocence: The Devil's Dishonest, Deplorable, Diabolically Demented Demons."



**PHOTO FROM CS TO SPECIAL AGENT DONALDSON**

### c)  *Special Agent Jeffrey David Donaldson substituted Schulte Article 9 with content he knew was unrelated to the Schulte Articles*

Instead of properly naming Schulte Article 9 as identified by his CS, Agent Donaldson decided to perpetuate a fraud upon this Court and replace Schulte Article 9 with a completely unrelated attorney-client privileged email. See this email in *ex parte*, classified Exhibit A.

During the night that the FBI raided his apartment, Mr. Schulte hired two attorneys to represent him. After the initial discussion with his attorneys, they asked him to recount exactly what happened on that night, in as much detail as possible and as soon as possible to ensure they had all the information necessary to properly defend him. They also joked not to make it too boring. Mr. Schulte then drafted and sent this email on March 20, 2017, written in a narrative format, but clearly protected by attorney-client privilege. In the email, Mr. Schulte states "I attached the write up I did about my awful experience… It was mostly just a way for me to write down what happened, but there may be some useful stuff in there… or stuff we could even use?" The attached document is untitled (Donaldson simply created his own title for it in his affidavit), and broken down into 4 "chapters": The confrontation; my last experience at the CIA and my reason(s) for resigning; Hell; The Red Pill. Mr. Schulte describes in detail how the FBI asked to interrogate him about the WikiLeaks Vault 7 leaks; however, instead of interviewing him in a SCIF, they interviewed him in public. During the course of this lengthy interview, the FBI agents extracted incidental classified information from Mr. Schulte. Mr. Schulte narrates this exchange in detail. After illegally seizing this attorney-client privileged email, the government and the CIA believed that Mr. Schulte's narrated exchange with the FBI agents involved the disclosure of classified information.

Agent Donaldson and the FBI recovered this attorney-client privileged email from two places: (1) From Mr. Schulte's Gmail account and (2) from Mr. Schulte's cousin's laptop—who was essentially hired as Mr. Schulte's paralegal and to maintain Mr. Schulte's email account to tend to his affairs in accordance with pretrial services. Prior to turning over this evidence to the FBI, Mr. Schulte's cousin's attorneys made it clear to the FBI that there were attorney-client privileged documents on his laptop due to his assistance as Mr. Schulte's paralegal and the mere fact of logging into Mr. Schulte's email account. See Ex. B. Other documents found on the laptop were tax returns, a rental lease, credit card statements, bank statements, an electric bill, and other various legal documents that are a direct result of the handling or Mr. Schulte's email account and/or other paralegal activities. After discovering that the government illegally obtained this attorney-client privileged email, Mr. Schulte's defense objected and made it abundantly clear to the government that this email was privileged. Accordingly, this clearly privileged email was never publicly disclosed or introduced at trial.

Regardless of the email's privilege, it clearly had nothing to do with the Schulte Articles. This email was written days after the initial FBI raid in March of 2017, was focused primarily on the events that took place during the raid, was literally written for Mr. Schulte's attorneys, was untitled, and any alleged classified information (it's quite a stretch) was clearly incidental in the FBI's interview of Mr. Schulte. Contrast this with the Schulte Articles which were motivated entirely by Mr. Schulte's arrest in August of 2017, concerned the criminal justice system, and were consistently formatted with: (1) The title "Presumption of Innocence," (2) the subtitle, and (3) each was relatively short. Furthermore, the real Article 9 was produced by the CS to Agent Donaldson with all three of these clear designations and clearly marked as Article 9.

11

> **d)** **The attorney-client privileged email could not have possibly been one of the Schulte Articles, and it was clearly never at the MCC**

Since Mr. Schulte wrote and emailed the attorney-client privileged email 6 months before he was ever arrested, there was clearly no reason to believe that Mr. Schulte somehow possessed it at the MCC or that he intended to release it to the public. Through the CS' meticulous collection of 450 pictures of all content on the illegal cellphones, this email was not mentioned once. There was no reason to suspect it was at the MCC. And in fact, *it was never at the MCC*. After the FBI's seizure of the cellphones, the online accounts, and Mr. Schulte's notebooks—there was not a single instance of this document or even a single *reference* to it.

> **e)** **Deception: Agent Donaldson conflated the Schulte Articles that were publicly released with the privileged email that was never intended for release or even at the MCC to deceive the Court and manufacture artificial probable cause**

Special Agent Jeffrey David Donaldson wanted to execute a general warrant and rummage through all of Mr. Schulte's possessions (again). But there was a *small* problem: he needed probable cause. Agent Donaldson had an email written in March of 2017 that the CIA claimed was classified—he hoped he could use this even though the defense told him it was privileged. Agent Donaldson tasked his CS to take screenshots and videos of all the information on the cellphones in hopes of finding a copy of it. Unfortunately, there was not a *single shred* of evidence it was at the MCC. So how could Donaldson get his general warrant? If he requested a warrant to search for the privileged email, he would have to inform the judge that there was no evidence it existed at the MCC. Oh! The Schulte Articles! Agent

Donaldson recalled Mr. Schulte telling his family he wanted to release his Schulte Articles—but they were already released and unclassified. Was there still a way he could use them to manipulate the Court into granting a warrant?

Ah; but of course. He could "tell a story." What if he conflated the two? If he pretended the email was really a Schulte Article? Then he could claim in his affidavit that "at least one" of the Schulte Articles was classified to deceive the judge into believing that some of the real, unclassified articles may also be classified. He could also use the fact that Mr. Schulte wanted to release his articles as additional evidence for probable cause, because while in reality the true Schulte Articles were protected speech, by claiming they were classified, this desire to release becomes evidence of a crime. Furthermore, he need not tell the judge that the classified email he's pretending is Schulte Article 9 is not at the MCC—instead he can attach in his affidavit screenshots of a couple of the real Schulte Articles from his CS, thereby implying to the judge that they are all at the MCC without actually falsely claiming so. And hence, Special Agent Jeffrey David Donaldson spun his web of lies, omissions, and deceit to perpetuate a fraud upon this Court.

This fraud was intentional and well-planned. Agent Donaldson knew from listening to Mr. Schulte's MCC calls that only 9 articles were defined to be the Schulte Articles; thus, he knew that simply adding the privileged email as a 10th article would be an obvious red flag. So, instead he opted for masquerading the privileged email as the last article. Agent Donaldson also employed very subtle deception with his word choice, such as claiming "at least one" of the Schulte Articles was classified, thereby implying that multiple articles were classified. His blatant omission of the fact that the articles were <u>already public</u> and <u>produced in unclassified discovery</u> was also necessary, because if he stated these truths then a contradiction would clearly exist. Through his very meticulous and conniving

13

treachery, Agent Donaldson crafted the optimal path to fabricated probable cause with the bare minimum of lies and dishonesty required.

***

To summarize Donaldson's lies, first and foremost he deliberately substituted the unclassified Schulte Article 9 with the classified attorney-client privileged email. This is obviously an intentional deception because Donaldson's CS provided him with the true Article 9, Donaldson himself heard Mr. Schulte discussing this Article 9 over the MCC phone with his family, *and* Donaldson also knew the email was written *before* Mr. Schulte was ever arrested. This is a very clever deception on the part of Donaldson, because he then claims that "at least one" of the Schulte Articles is classified, contorting Mr. Schulte's desire to publish the true unclassified articles into a malicious act leading to probable cause.

Next, Donaldson critically omits the fact that the privileged email was not only written before Mr. Schulte was arrested and <u>unlikely</u> to exist at the MCC, but also that his CS *found absolutely no trace of this document at the MCC*. This is absolutely critical, because by masquerading the email as a Schulte Article, he then implies it exists at the MCC with the real articles, when in fact, it never did.

Third, Donaldson critically omits the fact that the real Schulte Articles were published on Facebook, subpoenaed by him, reviewed by the CIA, cleared as unclassified, and provided to Mr. Schulte *in unclassified discovery*. This is obviously critical because it is clearly inconsistent with Donaldson's Article 9 masquerade—it illustrates that none of the Schulte Articles are classified, and that they exist at the MCC solely because *the government provided them.*

Fourth, Donaldson critically omits the content and background of the classified attorney-client privileged email. He does not provide it so the Court can

14

see that the alleged classified material is merely Mr. Schulte's recollection of the FBI's interrogation of him in public, and that it does not appear at all to be intentional. Minor disclosures such as these, referred to as "spills," routinely occur as a byproduct of working with classified information, and the CIA never actually files charges against people for such actions (books released with improper prepublication review board approval, security violations that regularly occur in work spaces and SCIFs, other accidental unauthorized disclosures by former employees, and even disclosures by lawyers and judges as have occurred in this very case). Additionally, the fact that the email was sent to his attorney and that the defense reprimanded the government for violating privilege were all critical.

This is what Donaldson knew, and should have stated in his affidavit:

- Mr. Schulte wrote 9 unclassified articles about the criminal justice system; 2 of those 9 discussed his case, but were very carefully written to contain no classified information

It was absolutely critical to mention that the subject of Mr. Schulte's articles was the criminal justice system (protected speech), that only two of the nine even mentioned Mr. Schulte or his case, and that these two were carefully written to be *unclassified* because this clearly shows there is no malice or intention to disclose *classified information*. Any omission of these facts cannot be taken as good faith as they are the critical difference between lawful, free speech activities, and unlawful classified disclosures. Additionally, Donaldson identifies the Schulte Articles in his affidavit—this designation *specifically refers to Mr. Schulte's redress of grievances*, and does not encompass all of Mr. Schulte's writings. Agent Donaldson knew this because he claimed in his affidavit that he listened to Mr. Schulte's MCC calls with his family where Mr. Schulte specifically identified *only*

15

*9 articles*, their content, and his desire to post them. It is not only disingenuous, but also deceptive to carefully define the Schulte Articles as articles Mr. Schulte desires to publish, but then redefine this term to encompass other writings that Mr. Schulte never identified nor expressed a desire to publish.

- Mr. Schulte wanted to disclose these articles, and they were published on Facebook and later obtained by the FBI, reviewed by the CIA, and produced to Mr. Schulte in unclassified discovery

This is critical to show that they were already disclosed, cleared by the CIA, and produced in unclassified discovery—negating any claims the Schulte Articles were illicit and severely undermining probable cause.

- Prior to ever writing those articles, Mr. Schulte wrote an email to his first attorneys in March of 2017 that incidentally mentioned classified information during the FBI's interrogation of Mr. Schulte

It is critical to mark the distinction between the Schulte Articles, which Donaldson carefully defined to be the articles that Mr. Schulte discussed in recorded calls from the MCC, and the privileged email, as the Schulte Articles were intended for public release whereas the email was never even mentioned.

- There is no indication that Mr. Schulte knew this material in his email was classified or that he intended to disclose the email outside counsel

This is critical as the true content of the email was obviously to communicate information to his attorney, and there is a major difference between intentional leaks and unintentional "spills."

- There is no evidence this email exists at the MCC; after review of 450 items provided by the CS, there is no mention or copy of this email

This is critical to clearly differentiate the Schulte Articles from the email, and to indicate to the judge there is absolutely no evidence that Mr. Schulte even possesses this email, let alone the likelihood that he would publicly disseminate it.

## B.   The MCC search warrant was so lacking in indicia of probable cause to render reliance unreasonable

For a warrant to issue, a magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 US 213, 238 (1983); See also *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015). The MCC search warrant failed to establish probable cause to search and seize evidence for 6 of the 7 alleged crimes. In response, the government claims that the defendant's arguments to suppress are a "meritless... scattershot assortment of arguments." (Opp. at 10).

### 1.   No probable cause for most alleged crimes

The MCC search warrant authorized a search based on probable cause for 7 offenses, yet failed to list criminal activity at all for 5 of the 7. The government claims that Agent Donaldson need not establish any probable cause to search, because a grand jury previously indicted Mr. Schulte. Essentially, the government argues that a grand jury indictment authorizes the government to seize any and all property of the defendant at any point in time merely because he was indicted. However, it is clearly established law that probable cause to arrest does not automatically grant probable cause to search, or vice versa.

The Supreme Court has long distinguished between arrest warrants and search warrants. See *Steagald v. United States*, 451 US 204, 212-13 (1981). An arrest warrant rests on probable cause to believe that the suspect committed an offense; it

17

thus primarily serves to protect an individual's liberty interest against an unreasonable seizure of his person. *Id.* at 213. A search warrant, by contrast, is grounded in "probable cause to believe that the legitimate object of a search is located in a particular place." *Id.* Rather than protect an individual's person, a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police. *Id.* "The Fourth Amendment's requirements regarding search warrants are not 'formalities.'" *United States v. Voustianiouk*, 685 F.3d 206, 210 (2d Cir. 2012) (quoting *McDonald v. United States*, 335 US 451, 455 (1948)).

In light of the distinctness of the inquiries, probable cause to arrest a person will not itself justify a warrant to search his property. "[A] determination of probable cause to search is not the same as a determination that there is, at the same time, probable cause to arrest, or vice versa." *United States v. Pabon*, 871 F.3d 164, 181 (2d Cir. 2017). In other words, "it cannot follow... simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." *United States v. Valenzuela*, 596 F.2d 824, 828 (9th Cir. 1979) . Regardless of whether an individual is validly suspected of committing a crime, an application for a search warrant concerning his property or possessions must demonstrate cause to believe that "evidence is likely to be found at the place to be searched." *Groh v. Ramirez*, 540 US 551, 568 (2004). "There must, of course, be a nexus... between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 US 294, 307 (1967).

### 2.    No probable cause to search for classified information

The government claims that it does not matter whether or not the Schulte Articles were classified. But of course if the Schulte Articles were unclassified

then there would be no probable cause to seize them or to search for classified information! The *ONLY* items Agent Donaldson identified for seizure were the 9 unclassified Schulte Articles. Thus, if those articles were unclassified, as is clearly the case, then there is no probable cause. The government prattles on about the distinction between contraband, fruits of a crime, or other items illegally possessed—claiming that it does not matter if the Schulte Articles violate no criminal statute because they may adhere to some other category. But the affiant must make that distinction in the warrant. Agent Donaldson explicitly sought the seizure of the Schulte Articles because he claimed they were classified—he did not claim anything else about the articles, nor did they fall into any category for lawful seizure. Thus, once Agent Donaldson's deception is revealed, and the Court recognizes that the Schulte Articles were cleared by the CIA as unclassified and lawfully produced to Mr. Schulte in unclassified discovery, there is no reason left to seize them—or to search for classified information.

Furthermore, the failure to specifically *identify* the alleged classified document(s), the probable cause *for believing them to be at the MCC*, and an attachment or at least *reference* to a classified exhibit for the judge and agents executing the search to review render the affidavit facially defective. There can be no finding of probable cause without these bare essentials. The government completely ignores this argument and offers no rebuttal. See Opening Mem. at 17:

> Although we have already established that these statements are outright perjury, if we assume them to be true Donaldson still fails to establish probable cause. Donaldson's affidavit states that "at least one" article "contains classified information"—but *which* one? The document(s) are either classified or they are not—they either violate a statute or they do not; *a warrant cannot seek to seize documents that violate no criminal statute.*

The particularity requirement of the Fourth Amendment requires that a warrant must "specify the items to be seized by their relation to the designated crimes." *United States v. Ulbricht,* 858 F.3d 71, 99 (2d Cir. 2017). Donaldson particularizes the 9 Schulte Articles in the warrant, but fails to establish probable cause in the affidavit; Donaldson does not define the relationship between the 9 Schulte Articles and the crime of disclosure of classified information—he does not claim that any particular article is classified. This failure results in a failure to establish probable cause to seize *all 9* articles or *any* specific article; *a warrant cannot authorize the carte blanche seizure of documents that violate no law.*

Additionally, because Donaldson fails to specify *which* article is classified, he also fails to establish that this unknown document would reasonably be found at MCC. When and where was this article written—was it while Mr. Schulte was detained at MCC or before? If it was before, then it is unlikely he possesses it at MCC and therefore not objectively reasonable to execute a search of MCC.

Finally, without an explicit statement from the CIA *at least naming* or attaching the classified document, there can be no finding of probable cause—the allegations by Donaldson are "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Laury*, 985 F.2d 1293, 1311 n.23 (5th Cir. 1993).

This distinction is even more profound in light of Agent Donaldson's substitution and masquerade of Article 9 as the privileged email. If Agent Donaldson properly disclosed that this email, even if it were classified and

20

unprivileged, predated the true Schulte Articles *and* Mr. Schulte's arrest, then it is entirely unreasonable to expect it to be found at the MCC—*especially considering Donaldson's CS discovered no traces of this email in all of his 450 screenshots and videos of information on the cellphones.*

### C.    Corrected MCC search warrant

When offering a corrected MCC search warrant, the government restates the false probable cause and pretends it is still valid. The government erroneously reasserts "that at least one of the defendant's articles contained classified information"—once again, all the Schulte Articles were unclassified and produced to Mr. Schulte in unclassified discovery. The government erroneously reasserts that the contraband cellphones were used to send communications "in connection with Schulte's and Amanat's intended fabrication of evidence"—once again, this is absurdly false. The warrant identifies no fabrication of evidence, the intent to fabricate evidence, or the engagement of *any crime whatsoever* (besides the contraband cellphone itself). Mr. Schulte provided an exhibit in the Opening Mem. of his assistance with Mr. Amanat's case—assistance that he provided in the way of a technical report *published in his own name* about the technical aspects of Mr. Amanat's criminal case and the *FBI's fabrication of evidence at trial.* There is absolutely nothing illegal with an inmate writing a technical report for another inmate, and in fact, Mr. Schulte fully stands behind his technical analysis and dares the government to provide technical evidence to refute his analysis or otherwise explain its baseless allegations of "fabrication." See Opening Mem. at Ex. P.

Moreover, Agent Donaldson also failed to inform the judge that his CS was caught with a cellphone at the MCC, leading to a disciplinary charge and removal from that unit to the 9 South disciplinary segregation. This taints not only the CS' testimony, but also introduces doubt as to the location of any other cellphones.

Removing the false testimony from Agent Donaldson about the classified Schulte Articles, the false testimony about "fabricated evidence," and the false claims of illegal use of the cellphone, the warrant does not establish probable cause: The affidavit stated (1) that Mr. Schulte was previously reprimanded in Court for disclosing the search warrants in his case to a reporter; (2) that he wrote 9 articles that were posted on Facebook; (3) that most articles discussed only the criminal justice system, but the two that also mentioned his case were carefully written to be unclassified as determined by the CIA; (4) a confidential source at the MCC informed the FBI that Mr. Schulte and others possess multiple cellphones in the prison, and provided pictures of Mr. Schulte and Mr. Amanat apparently using these cellphones; (5) the CS has full access to these cellphones and has taken 450 photos and videos of content on these cellphones; (6) the CIA has determined that none of that content is classified nor does any of the content appear to violate any federal law; and (7) the CS was caught by the MCC with a cellphone and removed to disciplinary segregation, thereby tainting his testimony and introducing doubt as to the whereabouts of the other cellphones—if there are any. Accordingly, this only establishes probable cause to believe that Mr. Schulte used a contraband cellphone in prison, *and at most*, to conduct a search for a contraband cellphone—provided such a search is reasonable and not overbroad.

### D.   MCC search warrant scope was unreasonably overbroad

"[T]he Fourth Amendment's proscription of unreasonable searches and seizures 'not only… prevent[s] searches and seizures that would be unreasonable if conducted at all, but also… ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out.'" *Lauro v. Cha*rles, 219 F.3d 202, 209 (2d Cir. 2000) (quoting *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994)).

Donaldson's search warrant sought a general warrant unlimited in scope—an overbroad warrant that was not narrowly tailored as required by law.

### 1.   Overbroad with regard to the types of information to search

The government offers no convincing argument for its general warrant. It claims only that "the complexity of the defendant's activities and suspected crimes diminishes the requisite threshold of particularity for satisfying the Fourth Amendment." (Opp. at 15). But the affidavit outlines no "complex" illicit activities. The government does not even attempt to address Mr. Schulte's arguments as to the overbroad types of information, particularly notebooks:

> From what probable cause does Donaldson seek to search "Any and all notes"? "Any and all documents"? "Any and all records"? "Any and all correspondence"? "Any and all materials"? Donaldson only provides electronic evidence in the affidavit; Donaldson does not even establish that there are any notes or documents possessed by Mr. Schulte at MCC—not even through his snitch. How can Donaldson request to search items that he doesn't even know exist? See *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017) (Warrant authorizing officers to search for and seize all cellphones and other electronic devices in defendant's residence was unsupported by probable cause as supporting affidavit offered almost no reason to suspect the defendant owned a cellphone, or that any phone or other device containing incriminating information would be found in apartment). Since Donaldson does not establish that Mr. Schulte even possesses notebooks, let alone that they are likely to contain classified information, Donaldson fails to establish probable cause to search notebooks.

23

### 2.   Overbroad in scope to search 200 residences

The government also offers no argument for the overbroad search of 200 private residences and all inmates' electronic discovery:

> The actual probable cause justifying this expansive search is so minimal to render the scope absurd and unreasonable: (i) "Unit-1 and Unit-2 are on the same floor of the MCC and are connected by a corridor," (ii) "Although inmate from the two units are prohibited from interacting with each other in the corridor between Unit-1 and Unit-2, inmates are, at times, able to meet briefly in that space," and (iii) "Amanat and Schulte also discussed their need to have the Contraband Cellphones with them when they accessed discovery at the Law Library" (Ex. A, p. 11). Do these statements support a search of not only 96 residences in Unit-1, but also 96 *additional* residences in Unit-2 *AND* the search of *every* inmate's electronic discovery? As the text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 US 398, 403 (2006).

Finally, the CS was never vetted. Testimony from confidential informants and sources is not as reliable as other testimony, as there exist external motivations and rewards for falsely testifying to what the government wants to hear. Furthermore, several of the procured items are suspicious. For instance, the photos and videos the CS apparently took of both Mr. Schulte and Mr. Amanat appear either staged or under peculiar circumstances. Why does the CS have both individuals cornered in a cell while he is clearly facing them and holding up a second cellphone to record them? Based on the MCC's failure to find the alleged cellphones after multiple raids of Mr. Schulte's cell as well as the CS' removal for possessing a contraband cellphone himself, there is no probable cause.

\*       \*       \*

The jailhouse snitch Betance provided Donaldson with nearly *four hundred and fifty documents*—yet there was absolutely *ZERO* evidence of any criminal activity in *ANY* of the documents (besides the contraband cellphone itself). However, Donaldson did not want a warrant merely to seize a contraband cellphone—he wanted to execute a general warrant to rummage through all of Mr. Schulte's documents and sniff around. So, Donaldson committed perjury. He simply lied. He sprinkled in crimes that Mr. Schulte and Mr. Amanat were previously convicted or accused without any actual probable cause, and then feigned ignorance of these Schulte Articles as if he had never seen any of them before—despite the plain fact that both Donaldson and the CIA already reviewed these documents 5 months before the warrant. Finally, as the coup de grace Donaldson simply fabricated that "at least one of the Schulte Articles was classified." There was no affidavit from the CIA, no specific indication of which article was classified, or about why it was classified—No, just a nice ambiguous touch to give the perception of legitimacy. Yet, none of the Schulte Articles were classified. Donaldson knew this, but he lied, he committed outright perjury and perpetrated a fraud on the court to obtain the MCC Search Warrant.

The MCC search warrant violated the Fourth Amendment to the United States Constitution: The affidavit failed to identify any probable cause authorizing a search related to contempt of court, unauthorized computer access, wire fraud, obstruction of justice, or illegal acts related to child pornography; the affidavit lacked sufficient probable cause relating to the unlawful disclosure of classified information and the affidavit contained deliberate falsehoods to bolster this insufficient probable cause; finally, the warrant sought an outrageously overbroad scope not narrowly tailored as required by law.

## V.    OTHER CONSTITUTIONAL VIOLATIONS

### A.    The MCC Search Warrant violated the First Amendment

The government's arguments addressing Mr. Schulte's First Amendment claim are baffling. They repeatedly mention that the First Amendment does not apply to evidentiary use of speech to establish the elements of a crime or to prove motive or intent. This completely misses the point. Mr. Schulte argues that the MCC Search warrant violated his First Amendment right to free speech because Agent Donaldson sought to seize his redress of grievances that literally violated no crime solely to deter future free speech. Since the Schulte Articles violated no crime, and furthermore, since they were lawfully produced unclassified discovery, Agent Donaldson's seizure of these documents irrefutably violated the First Amendment.

### B.    Donaldson recklessly disregarded Attorney-Client Privilege

The government likewise ignored Mr. Schulte's arguments regarding the seizure of documents marked attorney-client privilege:

> Donaldson's belief that the proper due process for determining privilege is for he himself to read it all and then make a determination is unconscionable—it flies in the face of not only the Sixth Amendment but the Due Process Clause of the Fifth Amendment; substantive due process includes those interests that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 US 319, 325 (1937), which are rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Reno v. Flores*, 507 US 292, 303 (1993). The encrypted channel of privilege between attorney and client is implicit in the concept of

ordered liberty, and dates back centuries. Donaldson's blatant disregard for this right is repugnant to the Due Process Clause and the Sixth Amendment.

In summary, the question posed is whether Agent Donaldson or other case agents can waltz into the MCC and seize Mr. Schulte's legal work marked as such, search it and further the government's case, and then acknowledge and redact privileged materials later. *That* is the question Mr. Schulte poses to the government and to the Court.

## C.   Donaldson expanded the already overbroad MCC search to the 9th floor

The government falsely claimed that the MCC retained Mr. Schulte's property to give the FBI on October 2, 2018. See Opp. at 16 n. 6. In reality, Mr. Schulte's property was seized *except for his legal materials.* Mr. Schulte's personal property was seized, but he was permitted to take his legal notebooks with him to 9S—as he is a pretrial detainee. It was only *after* the search began that the FBI discovered Mr. Schulte retained his legal materials and then seized it from his cell on the ninth floor. Regardless, the search warrant specifically stated that "[t]he Subject Premises is particularly described as the 7 South Unit, 7 North Unit, including the cells located in those units, and the Education Department's law library on the second floor of the building, located in Metropolitan Correctional Center, 150 Park Row, New York, New York." The warrant does not specify to seize items from Mr. Schulte's cell, to seize items previously moved from Mr. Schulte's cell, or items Mr. Schulte retained with him when he moved to 9 South.

## D.   Donaldson executed a general warrant

The government offers no excuse for Special Agent Donaldson's execution of a general warrant despite his non-existent probable cause particularly describing

nine articles that were neither attached nor described. How in the world were agents supposed to identify documents they themselves could not identify? In an oft-quoted passage, the Supreme Court has held that the particularity requirement "makes general searches... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 US 192, 196 (1927); "A search must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).

For example, although the MCC search warrant did not identify "Malware of the Mind" to seize, Donaldson removed it from Mr. Schulte's legal mail and gave it to the CIA to conduct a classification review; although the MCC search warrant did not identify Mr. Schulte's legal notebooks, Donaldson seized and searched them all, and then gave them to the CIA to conduct a classification review. "[T]he law in this area is quite clear... if something is not described in the warrant it cannot be seized." *United States v. Dzialak*, 441 F.2d 212, 216 (2d Cir. 1971).

Donaldson simply executed a general warrant to seize all documents and then search all documents for any crime. Donaldson went into Mr. Schulte's home with a warrant to seize 9 specific documents, but indiscriminately seized everything instead. "And enshrined in the Fourth Amendment is the fundamental principle that the Government cannot come into one's home looking for some papers and, without suspicion of broader criminal wrongdoing, indiscriminately take all papers instead." *Boyd v. United States*, 116 US 616, 626-27 (1886).

## VI.   THE MCC SEARCH WARRANT IS VOID UNDER *FRANKS* AND THE GOOD FAITH EXCEPTION IS INAPPLICABLE

The MCC search is void under *Franks v. Delaware*, 438 US 154 (1978), and all fruits from the search should be suppressed in accordance with the exclusionary rule. "The exclusionary rule serves to deter deliberate, reckless, or grossly negligent [police] conduct." *Herring v. United States*, 555 US 135, 144 (2009). Evidence obtained pursuant to a warrant must be excluded in any of the following circumstances: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

### A.   The issuing judge was knowingly and deliberately misled

Donaldson did not inform Judge Crotty that the Schulte Articles were already released, that the CIA reviewed and cleared them as unclassified, and that they were produced to Mr. Schulte in unclassified discovery. "Recklessness may be inferred" where false or omitted information was "clearly critical" to assessing the legality of a search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (inferring recklessness where affiants "fail[ed] to provide all potentially adverse information" in warrant application); an omission satisfies the *Franks* standard if it was "'designed to mislead,' or... was 'made in reckless disregard of whether [it] would mislead' the magistrate." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013)  (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)).

Donaldson also lied to the judge because all 9 articles were provided to Donaldson by the CS—from which Donaldson provided choice items in his search

29

warrant affidavit. All 9 articles were deemed unclassified and produced *thrice* to Mr. Schulte in unclassified discovery: once from the 450 items that Betance provided to Donaldson (which again, Donaldson possessed before drafting his affidavit, Opening Mem. at Ex. N), and then after obtaining them from WordPress where they were published in October 2018, and finally from the email accounts associated with the Contraband Cellphones (Opening Mem. at Ex. O). Donaldson perjured himself when he claimed "at least one" of the Schulte Articles were classified. He did not identify which article was classified as *NONE* were.

### B. The application was so lacking in indicia of probable cause as to render reliance upon it unreasonable

Donaldson's affidavit did not allege *any* criminal conduct for 5 of the 7 alleged crimes and did not establish probable cause to believe the Schulte Articles violated any crime. Donaldson did not identify a single classified document to seize nor did he establish that any classified documents would reasonably exist at the MCC. The Good Faith Exception does not apply if a warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existences unreasonable." *United States v. Leon*, 468 US 897, 923 (1984).

Additionally, the warrant was overbroad in its description to search "any and all documents" across nearly 200 private residences without citing any probable cause for such a sweeping search. See *United States v. Leary*, 846 F.2d 592, 606-610 (10th Cir. 1988) (declining to apply the good-faith exception where the warrant swept too broadly in describing the items subject to seizure and search).

Finally, Donaldson's "bare bones" affidavit was deceptively constructed to conceal the truth about the Schulte Articles while simultaneously preventing Judge Crotty from validating Donaldson's conclusory statements and ultimately

deceiving the judge. See *United States v. West*, 520 F.3d 604, 610 (6th Cir. 2008) (holding that good faith exception does not apply to bare bones affidavit based entirely on unsubstantiated conclusions). The concern is particularly acute when facts indicate that the "bare-bones description... was almost calculated to mislead." *United States v. Reilly*, 76 F.3d at 1280, *aff'd* on *reh'g*, 91 F.3d 331 (2d Cir. 1996). In such circumstances, one *Leon* concern, i.e., that "a reasonably well trained officer would have known" that the challenged warrant was not supported by probable cause, *United States v. Leon*, 468 US at 922 n.23, is reinforced by another, i.e., deception, or at least an apparent intent to deceive.

### C.   The warrant violated the First Amendment

Donaldson's application to seize unclassified documents, which he knew were not in violation of any crime, is an abhorrent assault on the Freedom of Speech guaranteed in the First Amendment. Accordingly, these documents and all fruits of the seizure are void. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 US at 144. Both are satisfied here.

### D.   The warrant violated the Sixth Amendment

Donaldson recklessly disregarded the Sixth Amendment when he penetrated Attorney-Client Privilege by reading Mr. Schulte's legal documents. Suppression is warranted when evidence is obtained in violation of the Sixth Amendment or the Attorney-Client privilege. See, e.g., *United States v. Longo*, 70 F. Supp. 2d 225, 264 (W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated, the remedy for such a violation is the suppression of evidence derived from the privileged communication."). Mr. Schulte explained why the violation here requires blanket suppression in his Opening Mem. at 38-40.

31

### E.    Donaldson violated the terms of the warrant during the search

Donaldson's expansion of the warrant to include the 9th floor requires suppression. "When items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items." *United States v. Matias*, 836 F.2d at 747. See also *United States v. Ganias*, 755 F.3d 125, 137 (2d Cir. 2014) (government may not retain documents outside scope of search warrant "[w]ithout some independent basis for its retention of those documents"). Additionally, Donaldson's widespread seizure of items outside the scope of the MCC warrant—which only outlined the titles of 9 unclassified articles—violated the Fourth Amendment and requires suppression. Wholesale suppression is required when government agents "(1)… effect a widespread seizure of the items that were not within the scope of the warrant and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

*    *    *

"Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d at 1280. The "sole purpose" of the exclusionary rule "is to deter future Forth Amendment violations." *Davis v. United States*, 564 US 229, 236-37 (2011).

FBI Special Agent Jeffrey David Donaldson falsified evidence, fabricated evidence, perpetrated a fraud on the court, and demonstrated malicious and malevolent intent devoid of any morality or respect for the Constitution and laws of the United States of America; he is a morally bankrupt depraved degenerate.

Donaldson's conduct is so reprehensible and contemptible that it easily surpasses the *Franks* threshold; accordingly, the good faith exception is inapplicable and the warrant void.

## VII.  CONCLUSION

For these reasons, this court should find that FBI Special Agent Jeffrey David Donaldson committed perjury in his affidavit to search the MCC on October 2, 2018; that he violated Joshua Adam Schulte's First, Fourth, Fifth, and Sixth Amendment Constitutional Rights; and that all items seized as a result of the illegal search must be suppressed in accordance with *Franks*.

Dated: New York, New York
        September 17, 2021

                                Respectfully Submitted,

                                /s/   **Joshua Adam Schulte**

                                Joshua Adam Schulte
                                Slave # 79471-054
                                Metropolitan Concentration Camp (MCC)
                                150 Park Row
                                New York, New York 10007

33

# EXHIBIT B

**From:** Schlessinger, Evan J. (NY) (FBI)
**To:** Kamaraju, Sidhardha (USANYS); Donaldson, Jeff D. (NY) (FBI)
**Subject:** RE: Presnall Subpoena – 18 Misc. 5017
**Date:** Tuesday, August 28, 2018 4:09:00 PM

Sid,

Since KP is coming over tomorrow, did you want to provide those documents Dave printed out?

Thanks,
Evan


Evan J. Schlessinger
Special Agent
FBI New York
212.384.4348
917.848.4991 (cell)


-----Original Message-----
From: Kamaraju, Sidhardha (USANYS) [mailto:Sidhardha.Kamaraju@usdoj.gov]
Sent: Tuesday, August 28, 2018 3:52 PM
To: Donaldson, Jeff D. (NY) (FBI) <jddonaldson@fbi.gov>; Schlessinger, Evan J. (NY) (FBI)
<ejschlessinger@fbi.gov>
Subject: Fwd: Presnall Subpoena – 18 Misc. 5017

FYI - want to reach out to set up a time for him to unlock the laptop?

Sent from my iPhone

Begin forwarded message:

From: Andrew Bernstein <bernstein@bcmlaw.com<mailto:bernstein@bcmlaw.com>>
Date: August 27, 2018 at 12:04:59 PM EDT
To: "Kamaraju, Sidhardha (USANYS)"
<Sidhardha.Kamaraju@usdoj.gov<mailto:Sidhardha.Kamaraju@usdoj.gov>>
Cc: "Laroche, Matthew (USANYS)" <Matthew.Laroche@usdoj.gov<mailto:Matthew.Laroche@usdoj.gov>>, Susan
Tipograph <stipograph@yahoo.com<mailto:stipograph@yahoo.com>>
Subject: Re: Presnall Subpoena – 18 Misc. 5017

Sid,

I hope you had a nice weekend. Susan and I appreciate your patience, we had a process we needed to go through
before responding. We have now finally concluded that process.

We will consent to a search of Mr. Presnall's laptop under the following parameters.

First, we understand that the FBI would image the laptop.  After imaging the laptop, the FBI would search the image
for communications involving the following attorneys:

1) Bernstein Clarke & Moskovitz, PLLC        (info@bcmlaw.com<mailto:info@bcmlaw.com>)
Including but not limited to:                Andrew Bernstein, Esq,
(bernstein@bcmlaw.com<mailto:bernstein@bcmlaw.com>)
                                             Lance Clarke, Esq.

3522-564

Page 1 of 13

(clarke@bcmlaw.com<mailto:clarke@bcmlaw.com>)
                                        Gladys Iturralde
(iturralde@bcmlaw.com<mailto:iturralde@bcmlaw.com>)
                                        Josh Moskovitz, Esq.
(Moskovitz@bcmlaw.com<mailto:Moskovitz@bcmlaw.com>)
                                        Katelyn Wasserman
(Wasserman@bcmlaw.com<mailto:Wasserman@bcmlaw.com>)

2) Susan Tipograph, Esq.                (stipograph@yahoo.com<mailto:stipograph@yahoo.com>)

3) Brafman & Associates, P.C.
Including but not limited to:           Benjamin Brafman, Esq.
                                        Jacob Kaplan, Esq.
                                        Alex Spiro, Esq.
4) Federal Defenders of New York
Including but not limited to:           Sabrina Shroff, Esq.
(Sabrina_Shroff@fd.org<mailto:Sabrina_Shroff@fd.org>)
                                        Matt Larsen, Esq.
(Mathew_Larsen@fd.org<mailto:Mathew_Larsen@fd.org>)
                                        Hannah Sotnick

5) Taylor Koss, Esq.
6) Kenny Smith, Esq.


Second, with respect to attorneys and employees at my firm and Susan Tipograph, the FBI would segregate those communications into one group (Group A). Those commutations would not be reviewed because the Government acknowledges that those communications are protected by attorney client privilege.

Third, as for all other attorneys and their employees, listed above (Group B), those communications would be segregated into another group. At this time, those communications would not be reviewed by the Government. We understand that there may come a time that Government seeks to review the Group B communications. If at some time in future, the Government does seek consent to review the Group B communications, further discussion will need to be held. The Government understands that the Federal Defenders would need to be included in those discussions before we given any further consent to search.

Fourth, it is our understanding that the searches for the names of the individuals or entities in Groups A and B will be conducted by some member of the FBI or other law enforcement officer and not a member of the prosecution team.

Finally, I would unlock the laptop and change the password to one that the Government can use.

Please let us know if everything included in this email is acceptable to you. Again, thank you for your patience and wiliness to work towards a resolution.

Best,

Andrew


--
Andrew M. J. Bernstein, Esq.
Partner
Bernstein Clarke & Moskovitz, PLLC
11 Park Place, Suite 914
New York, New York 10007
Tel. (212) 321-0087
Fax (917) 722-0930