**<u>EXHIBIT 1</u>**

AO 106 (SDNY Rev. 01/17) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>200 East 39th Street, Apartment 8C, New York, New<br>York 10016, as well as Any Closed Containers/Items | )<br>)<br>)   Case No.<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

200 East 39th Street, Apartment 8C, New York, New York 10016

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section(s)* | *Offense Description(s)* |
|---|---|
| 18 U.S.C. 793(d), 793(e),<br>1030(a)(1), 1030(a)(2)(B). | Offenses relating to unauthorized possession and distribution of<br>national defense information |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jeff D. Donaldson, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

S/Barbara Moses
_____

Date: ___03/13/2017___                               *Judge's signature*

City and state: New York, NY                    Honroable Barbara C. Moses
                                                             *Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

In the Matter of the Application of the United
States of America for a Search Warrant for the
Premises Known and Described as 200 East 39th
Street, Apartment 8C, New York, New York
10016, as well as Any Closed Containers/Items
Contained in the Premises

------------------------------------------------------

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

     JEFF D. DONALDSON, being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

    1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") assigned to the

New York Field Office, and have been employed by the FBI since 2010. I am currently assigned

to a squad responsible for counterespionage matters and have worked in the field of

counterintelligence from 2010 to present. In the course of my duties as a Special Agent, I am

responsible for investigating offenses involving espionage and related violations of law, including

unauthorized retention, gathering, transmitting or losing classified documents or materials;

unauthorized removal and retention of classified documents or materials; illegally acting in the

United States as a foreign agent; other national security offenses; and the making of false

statements. As a result of my involvement in espionage investigations and investigations involving

the unauthorized disclosure or retention of classified information, as well as my training in

counterintelligence operations, I am familiar with the tactics, methods, and techniques of United

States persons who possess, or have possessed a United States Government security clearance and

may choose to harm the United States by misusing their access to classified information.  I am also

familiar, though my training and experience with the use of computers in criminal activity and the forensic analysis of electronically stored information.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below ("Subject Premises") for the items and information described in Attachment A.  This Affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.      The Subject Premises**

3.      The Subject Premises is particularly described as apartment 8C in a residential apartment building located at 200 East 39th Street, New York, New York 10016 (the "Building"). The Building is located near the corner of 39th Street and Third Avenue in Manhattan.  The Building is nineteen stories high and contains approximately ninety-one apartment units.  The Subject Premises is a one-bedroom apartment located on the eighth floor of the Building, and it is clearly identifiable as Apartment 8C from the outside of the Subject Premises.

**C.      The Subject Offenses**

4.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of (i) the unauthorized possession and, *inter alia*, the communication of national defense information to someone not entitled to receive it, in violation of Title 18, United States Code, Section 793(d); (ii) the unlawful

2

retention of national defense information, in violation of Title 18, United States Code, Section 793(e); (iii) exceeding authorized access to a computer in order to obtain national defense information with reason to believe that information could be used to the injury of the United States and the advantage of a foreign nation and willfully transmitting that information to a person not entitled to receive it, in violation of Title 18, United States Code, Section 1030(a)(1); and (iv) intentionally exceeding authorized access to a computer and thereby obtaining information from a department or agency of the United States, in violation of Title 18, United States Code, Section 1030(a)(2)(B) (collectively the "Subject Offenses").

**D.   Terminology**

5.   The term "computer," as used herein, is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.   The terms "records," "documents," and "materials" include all information recorded in any form, visual or oral, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device), as well as the equipment needed to record such information (including but not limited to cameras and video recording and storage devices).

II.     **Probable Cause**

A.      **WikiLeaks Publication of Classified CIA Information**

7.      Based on my review of publicly available material on the Internet, including on the website wikileaks.org ("WikiLeaks"), I know that, on March 7, 2017, WikiLeaks published what it claimed were more than 8,000 documents and files that contained classified information (the "Classified Information") belonging to the Central Intelligence Agency ("CIA"). In its press release accompanying the Classified Information, WikiLeaks further claimed that:

a.      The public dissemination of the Classified Information was "the largest ever" unauthorized publication of classified CIA documents.

b.      The Classified Information constituted the "first full part" of a series—thus indicating that there would be subsequent publications of additional sensitive CIA information.

c.      The "collection" obtained by WikiLeaks amounted to "more than several hundred million lines of code" and revealed the "entire hacking capacity" of the CIA, including various malware, viruses, and other tools used by the CIA.

8.      Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I know that:

a.      The information that WikiLeaks claimed was classified CIA information—that is, the Classified Information—was at the time of its disclosure, in fact, classified CIA information.

b.      Specifically, the Classified Information was created and maintained by one specific group within the CIA which is responsible for various computer engineering activities, including the development of computer code (the "CIA Group"). That CIA Group exists within a larger CIA component (the "CIA Component"). In March 2016, less than 200 employees were assigned to the CIA Group. And only employees of the CIA Group had access to the computer

4

network on which the Classified Information that was stolen from the CIA Group's computer network was stored. (Moreover, as described in detail below, only three of those approximately 200 people who worked for the CIA Group had access to the specific portion of the Group's computer network on which the Classified Information was likely stored.)

        c.      The Classified Information appears to have been stolen from the CIA Component sometime between the night of March 7, 2016 and the night of March 8, 2016.

           i.      This is based on preliminary analysis of the timestamps associated with the Classified Information which indicates that March 7, 2016 was the latest (or most recent) creation or modification date associated with the Classified Information.

           ii.      Because, for the reasons described below (*see infra* Part C.10), the Classified Information was apparently copied from an automated daily back-up file, it is likely that the Classified Information was copied either late on March 7, 2016 (after the March 7 nightly back-up was completed) or on March 8, 2016 (before the March 8 nightly back-up was completed).

           iii.      This is so because if the Classified Information was copied before the March 7 back-up, one would *not* expect to see in the Classified Information documents dated as late as March 7. And if the Classified Information was copied after the March 8 back-up, one *would* expect to see documents dated on or after March 8 because the "back-ups" occur approximately each day.[1]

_____

[1] It is of course possible that the Classified Information was copied later than March 8, 2016 even though the creation/modification dates associated with it appear to end on March 7, 2016. For example, the individual who copied and removed the data could have limited his or her copying to data that was modified or created on or before March 7, 2016. (Conversely, however, the Classified Information is unlikely to have been copied before March 7, 2016, because it contains data that was created as recently as March 7, 2016.) Because the most recent timestamp on the Classified Information reflects a date of March 7, 2016, preliminary analysis indicates that the Classified Information was likely copied between the end of the day on March 7 and the end of the day on March 8.

d.     The Classified Information was publicly released by WikiLeaks exactly one year to the day (March 7, 2017) from the latest date associated with the Classified Information (March 7, 2016).

e.     The duplication and removal from the CIA Group's computer network of the Classified Information and its subsequent public dissemination via WikiLeaks was not authorized by the United States government.

f.     The unauthorized disclosure of the Classified Information could—at a minimum—reasonably be expected to cause serious damage to the national security of the United States. *See* Executive Order 13526; 18 C.F.R. § 3a.11(a)(2).

g.     The Classified Information is national defense information and its disclosure could reasonably be expected to be used to the injury to the United States and to the advantage of a foreign nation. *See* 18 U.S.C. § 793(d) & (e).

**B.     The CIA Group's Local Area Computer Network (LAN) and Back-Up Server**

9.     Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I know that the Classified Information originated in a specific isolated local area computer network ("LAN") used exclusively by the CIA Group.[2] As described above, in and around March 2016, in total less than 200 people had access to the CIA Group's LAN on which the Classified Information was stored.

a.     An isolated network, such as the CIA Group's LAN, is a network-security structure by which the isolated network is physically separated (or "air-gapped") from unsecured networks, such as the public Internet.

---

[2] In its press release announcing the publication of the Classified Information, WikiLeaks stated that the Classified Information originated from "an isolated, high-security network."

b. Accordingly, such isolated networks, like the LAN, cannot be accessed from the public Internet, but rather only through those computers which are physically connected to the isolated network.

c. The CIA Group's LAN, and each of its component parts, was maintained in heavily physically secured governmental facilities, which include multiple access controls and various other security measures.

d. The isolated LAN used by the CIA Group was comprised of multiple networked computers and servers. (Each of these component computers and servers were, by definition, inside the electronically isolated LAN.)

i. In order to preserve and protect the CIA Group employees' day-to-day computer engineering work, that work was backed up, on an approximately daily basis, to another server on the CIA Group's LAN that was used to store back-up data (the "Back-Up Server").

ii. Back-ups of the sort stored on the Back-Up Server are designed to ensure that, should the original data be corrupted or deleted, the stored data is not lost, but rather—because of the daily back-ups—is maintained via the daily copies stored on the Back-Up Server.

**C.    The Publicly Disclosed Classified Information Likely Originated on the CIA Group's Back-Up Server**

10. Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I understand that the Classified Information that was publicly released by WikiLeaks appears likely to have been copied—specifically—from the CIA Group's Back-Up Server.

a. As described above, the Back-Up Server served as a secondary storage location for data that principally resided on the primary computer network used for CIA Group

employees' day-to-day work writing computer code.   Approximately each day, an automated process would back-up that data to the Back-Up Server.   Each of those daily back-ups was akin to an electronic "snapshot" of the data on that particular date.   In that way, the Back-Up Server simultaneously acquired and stored, on a rolling basis, daily snapshots of the original data.

        b.      As such, if the data contained on the Back-Up Server was copied *en masse* directly from that Server, the copy would contain numerous iterations (or snapshots) of the similar or same data which had been backed up from the original data, distinguished by date.

        c.      The publicly released Classified Information does in fact contain numerous iterations (or snapshots) of the similar or same data, distinguished by date.

        d.      Accordingly, the fact that the Classified Information contains numerous iterations (or snapshots) of the similar or same data, distinguished by date, is strongly supportive of the fact that the Classified Information was taken from the CIA Group's Back-Up Server.[3]

        e.      As described above *(see supra* Part II.A.8.c), because the most recent timestamp associated with the Classified Information appears to be March 7, 2016, it is likely that the Classified Information was copied from the Back-Up Server after the daily back-up on March 7, 2016, and before the daily back-up on March 8, 2016.

**D.**      **TARGET SUBJECT JOSHUA ADAM SCHULTE Was One of Only Three Employees Across the Entire CIA Who, in March 2016, Had Been Given System Administrator Access To the Back-Up Server**

11.      Based on my conversations with other law enforcement agents and others, my

---

[3] I understand, based on my conversations with others familiar with the CIA Group's LAN that it would be difficult, if not impossible, to copy from the data (not on the Back-Up Server) the multiple different date-distinguished iterations of the same data that are included in the publicly released Classified Information.   In contrast, a single copy of the Back-Up Server would likely include each of the prior iterations (or snapshots) of the same data—which is exactly what is reflected in the publicly released Classified Information.

review of documents, and my training and experience, I know that the CIA Group's LAN was designed such that only those employees who were specifically given a particular type of systems-administrator access ("Systems Administrators") could access the Back-Up Server.

      a.    Systems Administrators were given a particular username and password in order to log on to and access the Back-Up Server.

      b.    Conversely, CIA employees who were not designated Systems Administrators were not given access to the Back-Up Server.[4]

12.    I know, based on my conversations with other law enforcement agents and others, in approximately March 2016—the month when the Classified Information is assessed to have been copied—only three CIA employees were designated Systems Administrators with access to the CIA Group's Back-Up Server.

      a.    TARGET SUBJECT JOSHUA ADAM SCHULTE ("SCHULTE") was one of those three Systems Administrators.

          i.    SCHULTE was employed as a computer engineer by the CIA—specifically in the CIA Group—from in or about May 2010 through on or about November 10, 2016, when he resigned from the CIA.

          ii.    During SCHULTE's more than six years working in the CIA Group, his responsibilities included, among other things, developing computer code for specific projects, including projects explicitly described in the Classified Information.

---

[4] It is, of course, possible that an employee who was not a designated Systems Administrator could find a way to gain access to the Back-Up Server. For example, such an employee could steal and use—without legitimate authorization—the username and password of a designated Systems Administrator. Or an employee lacking Systems Administrator access could, at least theoretically, gain access to the Back-Up Server by finding a "back- door" into the Back-Up Server.

iii.     SCHULTE had a skill set that enabled him to write computer code designed to clandestinely copy data from computers.

b.     As described above, in March 2016, SCHULTE was one of only three CIA employees throughout the entire CIA who had authorized access to the CIA Group's Back-Up Server from which the Classified Information was likely copied.  The publicly released Classified Information published by WikiLeaks, based on a preliminary review, appears to contain the names and/or pseudonyms of, *inter alia,* multiple CIA employees—including two of the three aforementioned individuals with designated Systems Administrator privileges.

i.     Names used by the other two CIA Group Systems Administrators were, in fact, published in the publicly released Classified Information.

ii.     SCHULTE's name, on the other hand, was not apparently published in the Classified Information.

iii.     Thus, SCHULTE was the only one of the three Systems Administrators with access to the Classified Information on the Back-Up Server who was not publicly identified via WikiLeaks's publication of the Classified Information.

c.     The other two individuals who served in March 2016 as Systems Administrators for the CIA Group's LAN remain employed by the CIA.  SCHULTE resigned from the CIA in November 2016, as described in detail below.

**E.     SCHULTE Had Access to the Back-Up Server on March 7 and 8, 2016—The Likely Dates of the Copying of the Classified Information**

13.     As described above (see *supra* Part II.C.10), it appears likely that the Classified Information was copied between March 7 and March 8, 2016.

a.     Based on my conversations with other law enforcement agents and others, and my review of documents, including access records of the CIA Component facility in which

SCHULTE worked, I know that he was present at work from approximately:

      i.    10:01 a.m. until 7:16 p.m. on March 7, 2016; and

      ii.    10:19 a.m. until 7:40 p.m. on March 8, 2016.

      b.    Based on my conversations with other law enforcement agents and others, and my review of documents, I know that on March 8, 2016, the CIA Group held an offsite management retreat for many of its senior and midlevel managers.  Accordingly, on March 8th, much of the CIA Group's management, including some to whom SCHULTE reported, were not present in the CIA Component building where SCHULTE and other CIA Group employees worked.

      c.    I further understand that SCHULTE's workspace (*i.e.,* his desk and computer workstation) was set up such that only three other CIA Group Employees had direct line-of-sight to SCHULTE's desk and computer—that is, only three other employees could see what he was doing at his desk.  At least two of those three employees were at the offsite management retreat on March 8, 2016.

      d.    As described above, in March 2016, only two CIA employees in addition to SCHULTE were designated Systems Administrators with access to the CIA Group's Back-Up Server from which the Classified Information was likely copied.  On March 8, 2016, one of those two other designated Systems Administrators was at the offsite management retreat. (The retreat was held at a location that did not have any access to the CIA Group's LAN, including the Back-up Server, and therefore afforded no access to the Classified Information.)[5]

---

[5] On March 7 and 8, 2016, the third of the three CIA employees with Systems Administrator access was located at a CIA facility that did, in fact, have access to the Back-Up Server from which the Classified Information was likely copied.

**F.      SCHULTE's   Unauthorized   Unilateral   Reinstatement   of   His   Own Administrative Privileges**

14.    Based on my conversations with other law enforcement agents and others, and my review of documents, I understand that, on or about April 4, 2016, around the time of his reassignment to another branch within the CIA Group, many of SCHULTE's administrator privileges on the LAN were revoked, and he was no longer permitted to serve as a Systems Administrator in the CIA Group's LAN.

a.      At the same time, on or about April 4, 2016, SCHULTE's computer access to a specific developmental project ("Project-1") was also revoked.   Until his reassignment, SCHULTE had been the CIA Group employee with principal responsibility for Project-1.

b.      Upon that transfer, principal responsibility for Project-1 was transferred to another CIA Group employee, who received computer access to Project-1.[6]

c.      I know from my review of publicly available material on the Internet, including WikiLeaks.org, that Project-1 was one of a small group of CIA projects and capabilities that WikiLeaks highlighted explicitly by name in its March 7, 2017 press release that accompanied the online publication of the Classified Information.

15.    Based on my conversations with other law enforcement agents and others, and my review of documents, I understand that, less than two weeks later, on or about April 11, 2016, SCHULTE unilaterally, and without authorization, logged onto the CIA Group's LAN and reinstated his own administrator privileges.

a.      On or about April 14, 2016, CIA Group management discovered that

---

[6] SCHULTE retained read-only access to Project-1 (but not the ability to alter the code) and the ability to copy the computer code associated with it in order to support another project for which he had responsibility.

SCHULTE had personally re-instituted his administrator privileges without permission.

        b.     On or about April 18, 2016, SCHULTE received notice regarding CIA policies against personnel restoring their own access to privileges or computer networks after those accesses have been revoked. SCHULTE signed an acknowledgment that he understood that "individuals are not permitted to personally attempt and/or renew their previous authorizations [including administrator privileges] to any particular [computer] system." That notice further instructed SCHULTE: "do not attempt to restore or provide yourself administrative rights to any project and/or system for which they have been removed."

        c.     A little more than one month later, on May 26, 2016, and notwithstanding the warnings described above, SCHULTE made an official request that he again be given full access to Project-1. Before receiving a response to that request, SCHULTE requested access from another employee who, apparently without proper vetting, granted SCHULTE the requested full access to Project-1.

        i.     On the same day, SCHULTE used that newly obtained access to, unilaterally and without authorization, revoke the computer access permissions of all other CIA Group employees to work on Project-1.

        ii.     Once this conduct was discovered, SCHULTE was issued a letter of warning that stated, "You were aware of the policy for access and your management's lack of support for you to retain administrative privileges, but nonetheless you took steps to deliberately violate that policy and gain those privileges." It continued by warning SCHULTE that any future violations would result in "further administrative action of a more severe nature."

        iii.     After receiving the letter of warning, SCHULTE disagreed with some of its conclusions and consequently refused to sign the form.

16.     Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I know that the unauthorized duplication, retention and removal of the Classified Information from the CIA Group's computer network, and its placement on the publicly available Internet, exceeds the authorized access to those government-owned and controlled computer networks of any user. *See* 18 U.S.C. § 1030.

### G.     Internal CIA Investigation of SCHULTE and a CIA Colleague

17.     Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I know that, in or around March 2016, SCHULTE came to the attention of CIA security after SCHULTE alleged that another CIA Group co-worker had made a threat against him. SCHULTE expressed deep unhappiness about the way that CIA responded to the alleged threat. He threatened legal action against the CIA for its handling of the situation, and repeatedly stated that he felt that he was being punished by CIA management for reporting the alleged threat incident. SCHULTE informed CIA security that, if "forced into a corner" he would proceed with a lawsuit against the CIA. He also repeatedly threatened that he or his lawyer would go to the media. In addition, CIA security learned that SCHULTE had removed an internal CIA document from CIA facilities that regarded his complaints to the CIA concerning its handling of the alleged threat, despite being told multiple times by CIA security officials not to do so.

18.     In approximately August 2016, as part of a standard background reinvestigation of SCHULTE for purposes of renewing his security clearances, the CIA conducted interviews of multiple CIA Group colleagues. Among other things:

a.     Some (but not all) colleagues independently reported that SCHULTE's demeanor with his management and colleagues, and his commitment to his work, changed markedly for the worse in or around February 2016.

14

b.    Multiple colleagues stated that SCHULTE had indicated that he felt aggrieved by the CIA in a number of respects. Some also reported that they believed SCHULTE to be untrustworthy and potentially subject to outside coercion. (Other colleagues made no such report and, indeed affirmatively reported that they believed that SCHULTE was, in fact, trustworthy.)

c.    Some (but not all) colleagues also reported that SCHULTE's security practices were lax, and that SCHULTE tended not to abide by security guidelines he deemed inconvenient—particularly guidelines concerning when and what kinds of media or data (such as external drives) could be connected or uploaded to CIA computer systems.[7]

**H.    SCHULTE's November 2016 Resignation from the CIA**

19.    Based on my conversations with other law enforcement agents and others, my review of documents, and my training and experience, I know that, in connection with and preceding SCHULTE's November 2016 resignation from the CIA, he sent the following communications, among others:

a.    Approximately one month prior to his resignation, on October 12, 2016, SCHULTE, using his CIA email account, sent an email to another CIA Group employee at that employee's official email account. The subject line of the email stated, "ROUGH DRAFT of Resignation Letter *EYES ONLY*." The email contained a letter entitled "Letter of Resignation 10/12/16" and addressed to "To whomever it may concern" ("Draft Resignation Letter"). I know from reviewing the Draft Resignation Letter, which spanned approximately three single-spaced pages, the following:

---

[7] External drives can be connected to computers and files in order to allow users to move files from the computers onto the portable external drives.

    i.  SCHULTE began the letter by stating, in substance and in part, that he had "always been a patriot" and would "obviously continue to support and defend this country until the day that I die," but that "from this day forward" he would "no longer do so as a public servant."

    ii.  SCHULTE claimed that he believed that the CIA Group management had unfairly "veiled" CIA leadership from various of SCHULTE' s previously expressed concerns, including concerns about the network security of the CIA Group's LAN. SCHULTE continued: "That ends now. From this moment forward you can no longer claim ignorance; you can no longer pretend that you were not involved."

    iii.  SCHULTE explained that he was resigning from the CIA because CIA Group management had, among other things, "ignored" issues he had raised about "security concerns" and had attempted to "conceal these practices from senior leadership," including that the CIA Group's LAN was "incredibly vulnerable" to the theft of sensitive data. He claimed that one named CIA Group manager had ignored his security concerns and "later attempt[ed] to evade responsibility and blame the decentralized and insecure [CIA Group computing] environment entirely on me."[8]

    iv.  Specifically, SCHULTE wrote that inadequate CIA security measures had "left [the CIA Group's LAN] open and easy for anyone to gain access and easily download [from the LAN] and upload [sensitive CIA Group computer code] in its entirety to the [public] internet."

    b.  It appears that SCHULTE did not, in fact, submit the Draft Resignation

---

[8] SCHULTE went on to describe other complaints he had about managers at the CIA. Among other things, SCHULTE described his complaints about the way in which CIA Group management had handled various personnel and disciplinary issues (*see supra* at Part II.G.16).

Letter.

        c.      On his last day with the CIA (November 10, 2016), SCHULTE did, however, send an internal email to the CIA Office of the Inspector General (OIG) advising that office that he had been in contact with the United States House of Representatives' Permanent Select Committee on Intelligence regarding his complaints about the CIA ("OIG Email").

        i.      In the OIG Email, which SCHULTE labeled "Unclassified," SCHULTE raised many of the same complaints included in the draft "Letter of Resignation 10/12/16," described above, including the CIA's treatment of him and its failure to address the "security concerns" he had repeatedly raised in the past.

        ii.      Shortly thereafter, CIA security learned that one of SCHULTE's colleagues had witnessed SCHULTE printing the OIG Email, placing it in a folder, and exiting the CIA Component facility where SCHULTE worked.

        iii.      Notwithstanding SCHULTE's labeling of the email as "Unclassified," the CIA subsequently determined that the OIG Email which SCHULTE removed from the CIA without authorization did, in fact, contain classified information.

    **I.**    **SCHULTE' s Recent Inquiries About the Status of the Investigation**

    20.    Based on my conversations with other law enforcement agents and others, and my review of documents, I understand that, since the March 7, 2017 publication of the Classified Information on WikiLeaks, SCHULTE has repeatedly initiated contact, via telephone and text messages, with multiple of his former CIA Group colleagues.  Those colleagues have reported that contact to government and law enforcement officials.

        a.      In those communications with his former colleagues, SCHULTE has repeatedly asked about the status of the investigation into the disclosure of the Classified Information.

b.     SCHULTE has requested more details on the information that was disclosed.

c.     SCHULTE has inquired of his interlocutors' personal opinions regarding who, within the CIA Group, each believes is responsible for the disclosure of the Classified Information. SCHULTE has also asked what other former CIA Group colleagues are saying about the disclosure.

d.     SCHULTE has repeatedly denied any involvement in the disclosure of the Classified Information.

e.     SCHULTE has indicated the he believes that he is a suspect in the investigation of the leak of Classified Information.

f.     I am not aware of any other former CIA employee who has initiated any contact with former colleagues regarding the disclosure of the Classified Information.

**J.     SCHULTE' s Planned Travel**

21.     Based on my conversations with other law enforcement agents and others, and my review of documents, including information provided by the Department of Homeland Security, I understand that SCHULTE has booked an international flight departing in four days—Thursday, March 16, 2017. (Return travel to the United States is booked for a few days later.) The aforementioned records and conversations reflect that this is only SCHULTE's second trip reflected in in DHS records outside the United States.

**K.     Probable Cause Justifying Search of the Subject Premises**

22.     Thus, based on the above, I submit that there is probable cause to believe that SCHULTE has committed by the Subject Offenses by stealing a substantial amount of classified information from the CIA and has transmitting that information to individuals not authorized to receive it, thereby endangering the nation's national security. Based on my training and

18

experience, I know that individuals who are involved in the unauthorized retention, gathering, and transmission of classified documents or materials, and the unauthorized removal and retention of classified documents or materials use computers and other electronic devices in furtherance of their criminal activities. Based on my training and experience, I also know that individuals typically keep their computers and other electronic devices in their homes.

23. Based on my participation in this investigation, I believe that SCHULTE resides at the Subject Premises. Among other things, I have reviewed records provided by SCHULTE's employer in New York City, which indicate that SCHULTE resides at the Subject Premises. I have also reviewed SCHULTE's credit card records, which reflect that SCHULTE resides at the Subject Premises. I have also spoken with other law enforcement officers who have observed SCHULTE enter and exit the Building on several occasions since on or about March 8, 2017. Those law enforcement officers have also told me that the Building has an electronic directory that lists SCHULTE's name as the individual residing in the Subject Premises.

### L.      Probable Cause Justifying Search of ESI

24. As noted above, individuals who engage in the unauthorized retention, gathering, and transmission of classified documents or materials, and the unauthorized removal and retention of classified documents or materials often use computers and other electronic devices to store documents and records relating to their illegal activity. Individuals engaged in these activities use electronic devices to, among other things, store copies of classified documents or materials; engage in email correspondence relating to their illegal activity; store contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; and/or store records of illegal transactions involving classified documents.

25.     Individuals who engage in the criminal activity described herein, in the event that they change computers, will often back up or transfer files from their old computers' hard drives to that of their new computers, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.  In addition, individuals who engage in such criminal activity will often also store or transfer files on electronic storage media other than computer hard drives, including thumb drives, flash memory cards, CD-ROMs, or portable hard drives to, for example, facilitate the use of the information or to transfer it to co-conspirators in support of the criminal scheme.

26.     Individuals who engage in criminal activity involving computers and electronic devices also often maintain physical evidence of their criminal activity, including, among other things, printouts of documents and records that are also stored electronically, as described above, or handwritten notes of the same, for example as a backup in case of a failure of the electronic media on which they were stored or to facilitate use of the data.

27.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files can be stored on a hard drive for years at little or no cost.  Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools.  Specifically, when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Deleted files, or remnants of deleted files, may accordingly reside in "slack space" (space that is not being used for storage of a file) for long periods of time before they are overwritten. In addition, a computer's operating system may keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via

20

the Internet are generally automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

28.     Based on the foregoing, I respectfully submit that there is probable cause to believe that SCHULTE is committing or has committed the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers and electronic media found in the Subject Premises.

### III.    Items to Be Seized

29.     <u>Closed or Locked Containers</u>.  Based on my training, experience, participation in this and other investigations, I know that individuals who participate in criminal activities routinely secrete and store books, records, documents, currency and other items of the sort described in Attachment A in secure locations like safety deposit boxes, suitcases, safes, key-lock strong boxes, and other types of locked or closed containers in an effort to prevent the discovery or theft of said items.  The requested warrant and search procedure includes a search of any closed containers on the Subject Premises, including cabinets, vehicles, doors to rooms, sheds, outbuildings, and other appurtenances located on or within the Subject Premises whether they are locked or unlocked.

30.     <u>Electronic Devices</u>.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the requested warrants would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  Based upon my training and experience and information related to me by agents and others involved in the forensic

21

examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, thumb drives, magnetic tapes and memory chips. I also know that during the search of the Subject Premises it may not be possible to fully search computer equipment and storage devices for data for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the Subject Premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high.

c.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files;

22

however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

31.    In light of these concerns, I hereby request the Court's permission to copy at the Subject Premises information stored on computer hardware (and associated peripherals) that may contain some or all of the evidence described in Attachment A hereto, and to conduct an off-site search of such copies for the evidence described, using the general procedures described in Attachment A. However, to the extent law enforcement is unable to copy electronic devices at the Subject Premises, I hereby request the Court's permission to seize those devices and search them off-site.

## IV.    Procedures for Searching ESI

### A.    Execution of Warrant for ESI

32.    Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to search and/or seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

**B.**     **Review of ESI**

33.     Following the search of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

24

34.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

35.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from searched devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

**C.     Return of ESI**

36.     If the Government seizes any electronic devices, later determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request.  Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the

offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## V.   Execution of the Search Warrant: Necessity of Covert Search and Delayed Notification

37.     I respectfully request that the search warrant permit law enforcement agents to execute the search at any time in the day or night.  I also respectfully request that the search warrant permit law enforcement agents to execute the search warrant covertly without advance or contemporaneous notice of the execution of the warrant, or if they deem covert execution impracticable to execute the search warrant overtly without further order of the Court.  Law enforcement agents will provide notice of the execution of the warrant, if it is executed covertly, within seven days of execution unless there is a new showing, made to the Court, that delayed notice is appropriate.  If the warrant is executed overtly, notice will be provided at or as soon as practicable after the execution.

a.     As described in greater detail above and below, there is probable cause to believe that SCHULTE has stolen a substantial amount of classified information and transmitted that information to those not authorized to receive it, thereby endangering the nation's national security.

b.     SCHULTE likely engaged in these activities by using sophisticated computer skills to exfiltrate a substantial amount of data onto a removable drive and then covertly removed that drive from the CIA.

c.     If SCHULTE is provided advance or contemporaneous notice of the execution of this search warrant, it may allow him to destroy evidence of his crimes on electronic devices by, for example, deleting drives or activating encryption programs that would make his devices virtually impossible to access.

     d.     Moreover, law enforcement agents will likely need some time to review and analyze any electronic devices identified at the Subject Premises.  If SCHULTE is provided advance or contemporaneous notice of the search of the Subject Premises, he may be able to destroy evidence that can be developed based on the search of electronic devices.

     38.     Pursuant to Title 18, United States Code, Section 3103a(b)(1), delayed notification may be provided for a search warrant obtained pursuant to Rule 41 of the Federal Rules of Criminal Procedure if "the court finds reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result."  Delayed notification pursuant to this provision may only be provided for a reasonable period not to exceed 30 days, although it may be extended by the court for good cause shown, pursuant to Title 18, United States Code, Sections 3103a(b)(3) and 3103(c).  A delayed notice warrant obtained pursuant to this provision prohibits "the seizure of tangible property, any wire electronic communication (as defined in section 2510), or, except as expressly provided in chapter 121, any stored wire or electronic information, *except where the court finds reasonable necessity for the seizure.*"  Title 18, United States Code, Section 3103(b)(2) (emphasis added).

     39.     The investigation of the Subject Offenses and SCHULTE is on-going, and remains extremely sensitive.  The FBI is continuing to review an enormous volume of electronic evidence, much of which remains highly classified and extremely sensitive.  In addition, based on *inter alia* the statements in WikiLeaks March 7, 2017 press release accompanying the Classified Information, it appears at least possible that additional CIA information may have been stolen and provided to WikiLeaks or others not authorized to receive it.  Accordingly, ensuring that the investigation remains covert for as long as possible is at its zenith. Public disclosure of the search prematurely could cause evidence to be destroyed or additional information to be hastily released

onto the Internet. In that context, I know, based on my review of the WikiLeaks press release, that they claimed to have refrained from publishing additional information they purport to possess such as "'armed' cyberweapons," which I understand based on my training, experience and involvement in this investigation to mean the specific computer code they claim could actually be used to perpetrate a cyber-attack or penetration). They also claim to have "anonymi[zed] some identifying information," which I understand, based on my training, experience, and involvement in this investigation, to include the names of covert CIA operatives and possibly covert United States Government locations. Finally, because SCHULTE has booked an overseas trip for this Thursday, it is critical that, to the extent possible, the search be conducted in such a way as to minimize the possibility that it causes him to flee or to destroy evidence. In light of the foregoing, it is reasonably necessary to conduct the search requested herein covertly.

40.    Consistent with Title 18, United States Code, Section 3103a(b)(2), this application requests that any notice otherwise required for the seizure and search of information be delayed for a period of 30 days in light of the reasonable necessity – comprising both the investigatory aims and mitigating goals of this investigation – for such a delay.

## VI.     Conclusion and Ancillary Provisions

41.     Based on the foregoing, I respectfully request the court to issue a warrant to search and seize the items and information specified in Attachment A to this Affidavit and to the Search and Seizure Warrant.

42.     In light of the confidential nature of the continuing investigation, I respectfully request that this Affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

JEFF D. DONALDSON
Special Agent
Federal Bureau of Investigation

Sworn to before me on
this 13th day of March 2017

S/Barbara Moses

THE HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

29

**Attachment A**

## I.  Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") is described as follows, and includes

all locked and closed containers found therein:

> The Subject Premises is particularly described as apartment 8C in a building located at 200
> East 39th Street, New York, New York 10016 (the "Building"). The Building is located
> near the corner of 39th Street and Third Avenue. The Building is nineteen stories high and
> contains approximately ninety-one apartment units. The Subject Premises is a one-
> bedroom apartment located on the eighth floor of the Building, and it is clearly identifiable
> as apartment 8C from the outside of the Subject Premises.

## II.  Execution of the Warrant

Law enforcement agents are permitted to execute the search warrant at any time in the day

or night, and further to execute the search warrant covertly without advance or contemporaneous

notice of the execution of the search warrant. Law enforcement agents will provide notice of the

execution of the warrant within seven days of execution unless there is a new showing, made to

the Court, that delayed notice is appropriate.

## III.  Items to Be Searched and Seized

### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be searched and/or seized from the Subject Premises include the following

evidence, fruits, and instrumentalities of: (i) the unauthorized possession and, *inter alia*, the

communication of national defense information to someone not entitled to receive it, in violation

of Title 18, United States Code, Section 793(d); (ii) the unlawful retention of national defense

information, in violation of Title 18, United States Code, Section 793(e); (iii) exceeding authorized

access to a computer in order to obtain national defense information with reason to believe that

information could be used to the injury of the United States and the advantage of a foreign nation

and willfully transmitting that information to a person not entitled to receive it, in violation of Title

18, United States Code, Section 1030(a)(1); and (iv) intentionally exceeding authorized access and thereby obtaining information from a department or agency of the United States, in violation of Title 18, United States Code, Section 1030(a)(2)(B) (collectively, the "Subject Offenses"):

1.      Evidence concerning occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

2.      Evidence concerning the identity or location of, and communications with, any co-conspirators.

3.      Any and all notes, documents, records, correspondence, or materials, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information, and handwritten notes), pertaining to the unauthorized retention, gathering, and transmission of classified documents or materials, and the unauthorized removal and retention of classified documents or materials.

4.      Electronic devices (including but not limited to computers, tablets, smartphones, and cellular telephones) and storage media used in furtherance of the Subject Offenses, containing evidence of the Subject Offenses, or containing evidence authorized for seizure in paragraphs 1, 2 and 3 above.   The term "storage media" includes any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5.     Electronic forensic evidence relating to the Subject Offenses, including for any electronic device or storage media whose search and/or seizure is authorized by this warrant as described above in paragraph 4 (hereinafter, "Computers"[1]), including:

    a.   evidence of the times the Computers were used in furtherance of the Subject Offenses;

    b.   passwords, encryption keys, and other access devices that may be necessary to access the Computers;

    c.   documentation and manuals that may be necessary to access the Computers or to conduct a forensic examination of the Computers;

    d.   evidence of software that would allow others to control the Computers, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    e.   evidence indicating how and when the Computers were accessed or used in furtherance of the Subject Offenses;

    f.   evidence indicating the Computers' user's/users' state of mind as it relates to the Subject Offenses;

    g.   evidence of the attachment to the Computers of other storage devices or similar containers for electronic evidence in furtherance of the Subject Offenses;

---

[1] The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

    h.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computers;

    i.   records of or information about Internet Protocol addresses used by the Computers;

    j.   records of or information about the Computers' Internet activity in furtherance of the Subject Offenses, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

6.    If law enforcement personnel seize the computer(s) or other electronic device(s), the personnel will search the computer and/or device(s) within a reasonable amount of time, not to exceed 60 days from the date of execution of the warrant.  If, after such a search has been conducted, it is determined that a computer or device contains any data listed in paragraphs 1 through 3, the Government will retain the computer or device.  If it is determined that the computer(s) or device(s) are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), such materials and/or equipment will be returned within a reasonable time.  In any event, such materials and/or equipment shall be returned no later than 60 days from the execution of this warrant, unless further application is made to the Court.

**B.  Search and Seizure of Electronically Stored Information**

The items to be searched and seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section III.A of this Attachment above, including, but not limited to,

4

desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be searched and seized from the Subject Premises also include:

1.     Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.     Any evidence concerning the persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**C.  Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques, including but not limited to:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files;

- scanning storage areas for deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- making reasonable efforts to utilize computer search methodology to search only for files, documents, or other electronically stored information within the categories identified in Sections I.A and I.B of this Attachment.