UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-

JOSHUA ADAM SCHULTE,

        *Defendant.*

S3 17 Cr. 548 (PAC)

# MOTION FOR INTERNET ACCESS

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

**TABLE OF CONTENTS**

I.   TABLE OF AUTHORITIES ............................................................................ ii

II.  STATEMENT OF THE ISSUE ....................................................................1

III. SUMMARY OF ARGUMENTS ...................................................................1

IV.  INTERNET ACCESS AS A PRO SE CRIMINAL DEFENDANT ...............2

    A.   The Due Process Clause of the Fifth Amendment compels the Court to
provide internet access to the pro se criminal defendant.......................................2

       1.   The government utilizes unfettered internet access during its prosecution ..3

       2.   Every criminal defendant not detained pretrial can access the internet ........3

    B.   The Sixth Amendment compels the Court to provide internet access to the
pro se criminal defendant............................................................................................4

       1.   Every criminal defense attorney can access the internet ..............................4

       2.   Since Mr. Schulte is his own attorney, he must be granted equal access to
manage, prepare, and conduct his own defense ..................................................5

    C.   The internet is ubiquitous...........................................................................5

    D.   The internet is the critical equalizer for self-representation, without which
there can be no self-representation ...........................................................................6

V.   ALL PRETRIAL DETAINEES ARE ENTITLED INTERNET ACCESS...15

    A.   Pretrial detainees who are represented by counsel retain constitutional
protections guaranteeing the right to access the internet......................................15

    B.   Pretrial detainees maintain the First Amendment Freedom of Speech and
right of access to the internet..................................................................................16

       1.   An order of detention pending trial does not nullify the First Amendment16

       2.   Freedom of Speech is as necessary to pretrial detainees as the right to
record the police is for the general public ........................................................17

       3.   The government may not suppress lawful speech as the means to suppress
unlawful speech ................................................................................................22

VI.  CONCLUSION .........................................................................................24

# I.   TABLE OF AUTHORITIES

## Cases

*Adams v. United States ex rel. McCann,*
    317 US 269 (1942)...................................................................................3

*Ashcroft v. Free Speech Coalition,*
    535 US 234 (2002).................................................................................23

*Bell v. Wolfish,*
    441 US 520 (1979)............................................................................16, 17

*Broadrick v. Oklahoma,*
    413 US 601 (1973).................................................................................23

*Coffin v. United States,*
    156 US 432 (1895).................................................................................15

*Faretta v. California,*
    422 US 806 (1975)...................................................................................2

*Hess v. Indiana,*
    414 US 105 (1973).................................................................................22

*McCoy v. Louisiana,*
    138 S. Ct. 1500 ......................................................................................15

*McGinnis v. Royster,*
    410 US 263 (1973).................................................................................17

*McKaskle v. Wiggins,*
    465 US 168 (1984)...................................................................................4

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017)...........................................................................16

*Reno v. American Civil Liberties Union,*
    521 US 844 (1997).................................................................................16

*Riley v. California,*
    573 U.S. 373 (2014)...........................................................................16, 17

*Schall v. Martin*,
    467 US 253 (1984)........................................................................17

*United States v. Millan*,
    4 F.3d 1038 (2d Cir. 1993) ..........................................................16

*United States v. Plattner*,
    330 F.2d 271 (2d Cir. 1964) ...........................................................5

*United States v. Rosemond*,
    958 F.3d 111 (2d Cir. 2020) .........................................................15

*United States v. Salerno*,
    481 US 739 (1987).........................................................................16

*Ward v. Rock Against Racism*,
    491 US 781 (1989).........................................................................16


**Statutes**

18 U.S.C. § 3142(e)(3)..........................................................................4

28 U.S.C. § 1654....................................................................................2


**Constitutional Provisions**

U.S. Const. amend. I .................................................................. passim

U.S. Const. amend. V.................................................................. passim

U.S. Const. amend. VI ............................................................... passim


**Other Authorities**

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*,
    22 Wash. U.J.L. & Pol'y 325 (2006) .....................................20

## II.    STATEMENT OF THE ISSUE

Whether a criminal pro se defendant has a constitutional right to access the internet to assist in his own defense as the government, defense counsel, and all free criminal defendants have such access.

## III.    SUMMARY OF ARGUMENTS

Mr. Schulte must be granted access to the internet to assist in his own defense. The government utilizes the internet to help prosecute Mr. Schulte, and in accordance with the Due Process Clause of the Fifth Amendment, Mr. Schulte is entitled equal access. Additionally, defendants who are not detained pretrial would normally have access to the internet to assist in their own defense; to deny Mr. Schulte equal access to the internet would be arbitrary punishment imposed without due process.

The Sixth Amendment right to put forth a complete defense and Mr. Schulte's right to represent himself also compels this Court to grant Mr. Schulte access to the internet—Mr. Schulte's defense team had access to the internet, and in modern times no lawyer tries a case without access to the internet. Since Mr. Schulte is representing himself, he is entitled to equal access that other attorneys and defendants would normally possess. Denial of the critical resource that is the internet would eviscerate Mr. Schulte's ability to represent himself and to put forth a complete defense.

Finally, all pretrial detainees, who by definition are merely detained to protect the community, must be granted internet access in accordance to the First and Fifth Amendments.

1

## IV.   INTERNET ACCESS AS A PRO SE CRIMINAL DEFENDANT

"In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. Section 35 of the Judiciary Act of 1789, 1 Stat 73, 92, enacted by the First Congress and signed by President Washington on day before the Sixth Amendment was proposed, provided that 'in all courts of the United States, the parties may plead and manage their own causes personally or by the assistance of... counsel. ...' The right is currently codified in 28 U.S.C. § 1654." *Faretta v. California*, 422 US 806, 812-13 (1975). "This right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id*. at 819-20.

Mr. Schulte has elected to represent himself. It is often said that "he who is his own lawyer has a fool for a client," and indeed the pro se defendant is usually the clear underdog as his adversary has years of law school and experience practicing law over the novice. Therefore, the denial of a critical resource such as the internet, the sum of all human knowledge for free at the user's fingertips, is debilitating to the defendant. The internet is the Great Equalizer, the equivalent of the gun in a knife fight—it provides the user with indispensable knowledge that is critical to the case both at the pretrial and trial phase. To prevent a *pro se* defendant from accessing the internet is to prevent him from self-representation altogether.

### A.   The Due Process Clause of the Fifth Amendment compels the Court to provide internet access to the pro se criminal defendant

"The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. The public conscience must be satisfied that fairness dominates the administration of justice. An accused must

2

have the means of presenting his best defense. He must have time and facilities for investigation and for the production of evidence. But evidence and truth are of no avail unless they can be adequately presented. Essential fairness is lacking if an accused cannot put his case effectively in court." *Adams v. United States ex rel. McCann*, 317 US 269, 279 (1942).

### 1.   The government utilizes unfettered internet access during its prosecution

The government has unfettered internet access, and undoubtedly uses this access in every case it tries. The modern-day trial is absolutely dependent upon technology and the internet. In accordance with the Due Process Clause of the Fifth Amendment, since the government is provided internet access, the defendant must also have equal access to the internet. Otherwise, the resulting pretrial and trial are fundamentally unfair.

### 2.   Every criminal defendant not detained pretrial can access the internet

Every other criminal defendant can use the internet to prepare for trial— except defendants deemed a "flight risk" or a "danger to the community"—these defendants, who are typically facing the longest prison sentences, are arbitrarily denied equal access to the internet in violation of the Due Process Clause of the Fifth Amendment. How can it possibly be fair and proper, that a defendant charged with a 0-6 month misdemeanor is granted the ability to access the internet to defend himself, but the defendant charged with life or even the death sentence is denied equal access? Indeed, no innocent person chooses to be wrongfully accused of a crime, let alone accused of a crime that "shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person

as required and the safety of the community." 18 U.S.C. § 3142(e)(3). A criminal defendant incarcerated pretrial is already facing staggering odds at winning trial in addition to the oppressive conditions of confinement that are no different from those found guilty and sentenced to prison. Indeed, it seems that in America there is no presumption of innocence at all—upon indictment, the United States Federal Government can incarcerate and torture anyone it so desires and deny that person his humanity and his ability to defend himself. This is not justice—the Fifth Amendment prohibits the government from treating people unequally, and it must provide equal access to the internet to those detained pretrial just as it does to those released pending trial; otherwise, the denial of internet access is punishment imposed arbitrarily to prevent a fair trial.

**B.**     **The Sixth Amendment compels the Court to provide internet access to the pro se criminal defendant**

"A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law... and to address the court... at appropriate points..." *McKaskle v. Wiggins*, 465 US 168, 174 (1984).

**1.**     **Every criminal defense attorney can access the internet**

Mr. Schulte's defense team had unfettered access to the internet during its defense—they used the internet throughout pretrial and trial as does every modern-day defense attorney.

**2.      Since Mr. Schulte is his own attorney, he must be granted equal access to manage, prepare, and conduct his own defense**

"Under the Fifth Amendment, no person may be deprived of liberty without due process of law. Minimum requirements of due process in federal criminal trials are set forth in the Sixth Amendment. They include the right of the accused to be informed personally of the accusation, to be confronted by witnesses against him, and to have compulsory process for obtaining witnesses in his favor. Implicit in both amendments is the right of the accused personally to manage and conduct his own defense in a criminal case." *United States v. Plattner*, 330 F.2d 271, 273-74 (2d Cir. 1964).

As a *pro se* defendant, Mr. Schulte has the right to personally manage and conduct his own defense in a criminal case. This right extends to the use of the internet in the management and preparation for trial, and the right to put forth a complete defense—otherwise, the defense is incomplete, and the right to self-representation is entirely eviscerated.

**C.      The internet is ubiquitous**

Internet access is ubiquitous in the modern era. At some point in history, access to books and legal materials became ubiquitous and necessary for incarcerated defendants. At some point in history, access to an electronic law library became ubiquitous and necessary for incarcerated defendants. Now, internet access is ubiquitous and necessary for incarcerated defendants. As of 2017, 87.27% of the entire United States population used the internet.[1] And on average, users spent 22.5 hours online per week.[2] Pretrial detainees must have web access.

---

[1] International Telecommunication Union
[2] The 2018 Digital Future Report, Center for the Digital Future at USC Annenberg

### D.     The internet is the critical equalizer for self-representation, without which there can be no self-representation

To deny a *pro se* defendant access to the internet is to deny knowledge and effectively deny the right to self-representation. *Pro se* defendants begin at a disadvantage, and to deny access to the internet only widens that handicap.

First and foremost, since the internet became ubiquitous, court-related processes are all online now. Through PACER, attorneys can easily file motions, letters, and other documents as well as view previous and new filings. Right now, Mr. Schulte cannot easily access previous court filings in his case nor can he easily file new documents. In fact, Mr. Schulte has asked his attorneys for an electronic copy of his entire docket and all filings for the past four years—to which they always refuse to provide it. Since proceeding *pro se* Mr. Schulte has asked his standby counsel for access to the docket—and still they refuse to provide it. Mr. Schulte has even asked this court for an electronic copy of the docket and all filings—to no avail. If Mr. Schulte could access PACER, then he could easily access all previous filings. Additionally, the court uses email almost exclusively for correspondence. Internet access is a necessity for any lawyer, and due to its prominent role in the criminal procedure and process, to exclude *pro se* defendants from such access would be extremely prejudicial and unfair.

The internet provides vast troves of legal data for *pro se* defendants to process and learn from. The user can readily determine the form of proper motions, cross-examinations, and other legal skills; the user can review and determine what differentiates the winning motions and the winning trial strategy from the losers.

The internet also provides open commentary from the entire world—resources where lawyers across the country can comment about why a certain

strategy failed, or how it should have been done—online communities of experts that the *pro se* defendant can contact through email or direct message for assistance. The internet is literally a bridge that connects the *pro se* defendant to the entire legal community, and from which he can solicit assistance—whether it free or even legal advice for small fees that he could afford. The *pro se* defendant could solicit assistance from individuals or could post questions to large, online forums pooling vast resources and experience from across the country to hone and perfect his trial strategy. This community may also be able to connect the *pro se* defendant with an attorney that could take over the case *pro bono* or for low fees that he may never have encountered from prison.

The internet also provides the *pro se* defendant with direct access to experts. Many cases, such as the instant case, require experts. The internet is not only a bridge to the legal community, but also a bridge to the expert community. The *pro se* defendant can review experts from other cases, find relevant experts, and best of all—communicate directly with them over email or direct message. The *pro se* defendant can solicit assistance from individuals or could post questions to large, online forums pooling vast resources and experience from across the country to hone and perfect his trial strategy.

The internet provides not only easy access to find and select experts, but for collaboration with experts as well. Through email and cloud-based collaboration software such as Google Docs, the expert and attorney can work hand-in-hand: emailing correspondence about strategy, emailing articles and research, and editing documents together in real-time. Without such access, collaboration is not only inefficient, but ineffective—and an incredible disadvantage.

The internet is also a powerful research tool. A *pro se* defendant who is an expert himself, such as the instant case, can perform technical queries that no lawyer could possibly perform. This technical research would directly assist the defendant prepare for trial and refine cross-examination questions or even discovery requests. No technical expert exists apart from Google—none could rely upon their knowledge alone without access to the sum of all knowledge provided by search engines. Even for non-technical people, the internet as a research guide can assist in finding diagrams, datasets, figures, and other potentially useful exhibits. The internet provides direct access to visual aids that can help better explain complex concepts or otherwise simplify datasets for a jury to easily comprehend.

The internet can also provide powerful training and coursework for the *pro se* defendant. Many colleges provide resources directly for free—Massachusetts Institute of Technology (MIT) and other colleges provide free technical coursework online. There are also law schools that provide free tutorials, trainings, virtual seminars, and even full classes as well as legal aide societies that provide free services. While the *pro se* defendant can never actually attend a law school and earn a degree, with the internet he can obtain knowledge for free to greatly reduce the difference between himself and the adversary.

The internet is also paramount for pretrial motions. A *pro se* defendant is not exempt from judicial requirements on appeal—he cannot justify his self-representation as a reason why he failed to file a proper motion. Indeed, most motions must be made before trial, and any failure to do so constitutes a waiver of the issue. Hence, it is absolutely critical that he perform pretrial perfectly. Defense lawyers, on the other hand, essentially provide the defendant with a mulligan if they make a mistake. A defendant can file for ineffective assistance of counsel and

receive a new trial—a *pro se* defendant cannot; therefore, it is paramount that the *pro se* defendant perform perfectly. And in order to do so, he must have access to every possible resource and all possible knowledge—the internet.

As an example, Mr. Schulte wrote a motion to the court to Vacate Special Administrative Measures and Indefinite Solitary Confinement as Unconstitutional. He wanted to include scientific literature, research, and recent studies in the motion. However, he had no access to the internet. Instead, he relied heavily on Criminal Legal News and Prisoner Legal News publications, but lacked the ability to completely perfect the motion—the result was a product artificially diminished in quality due entirely to this Court's refusal to provide Mr. Schulte access to the resources and knowledge available to all others. For example, on page 14 of the motion Mr. Schulte mentions a study published in The Lancet. Yet, he does not know the name of the study or have access to it—all he can do is copy and paste the assessment of the study by a journalist from Prison Legal News. Mr. Schulte has no ability to research the study further or even to find more recent studies that would improve the motion. If the motion were drafted by the government, they could have filled in the gaps and produced a better product because they have access to the superior resource that is the internet. Furthermore, there are many psychological studies pertaining to the COVID-19 lockdown and mental health; the limited "solitary" confinement most Americans experienced due to the lockdown contributed to many mental health issues and new studies about the harmful effects of solitary. This research would have been critical to include in this motion, but without access to the internet there is no way for Mr. Schulte to search, find, read, and include these studies.

In another example, Mr. Schulte wrote a motion to the Court for a petition for writ of habeas corpus and a motion for bail. Mr. Schulte argued that (1)

9

possession of child pornography is a non-violent, victimless crime; and (2) that there was no connection between possession of child pornography and actual child molestation. These arguments would have been so much stronger if he had access to the internet to cite recent publications, encyclopedias, medical journals, etc. Instead, Mr. Schulte was forced to forego writing an effective motion and presenting a complete and effective defense.

Some motions cannot be made at all without access to the internet. For example, Mr. Schulte intends to file a motion to dismiss the MCC counts of the indictment based on the fact that the alleged classified information allegedly disseminated by Mr. Schulte was in fact already on the internet—and it is clearly established law that the government cannot indict an individual for espionage based on published public knowledge; how can public knowledge possibly be protected national defense information? Alas, Mr. Schulte cannot file such a motion without access to the internet to obtain the websites and posts of the information. Many similar motions cannot be made at all without access to the internet.

Other motions are less effective without access to the internet to supply critical background information, explanations, or other technical information. For example, the precedential *Riley v. California*, 573 U.S. 373 (2014), relied heavily on technical information, technical statistics, and other information supplied to the Court through references in the briefs—information indispensable to the Court's decision. The Court mentions Kerr, Foreward: *Accounting for Technological Change*, 36 Harv. J. L. & Pub. Pol'y 403 (2013); Harris Interactive, *2013 Mobile Consumer Habits Study* (June 2013); WebMD.com; among countless others in the briefs and amicus curiae briefs. See also *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2015) (en bance): Josh Goldfoot, *The Physical Computer and the Fourth*

*Amendment*, 16 Berkeley J. Crim. K. 112 (2011); Daniel B. Garrie & Francis M. Allegra, Fed. Jurdicial Ctr., *Understanding Software, the Internet, Mobile Computing, and the Cloud: A Guide for Judges* (2015); *The Public Domain* 107 (2018); Wayne Jekot, *Computer Forensics, Search Strategies, and the Particularity Requirement*, 7 U. Pitt. J. Tech. L. & Pol'y, art 5 (2007); Michael W. Graves, *Digital Archaeology, The Art and Science of Digital Forensics* (2014); Eoghan Casey, *Digital Evidence and Computer Crime* (3d ed. 2011); Bill Nelson et al., *Guide to Computer Forensics and Investigations* (5th ed. 2015); Jonathan L. Moore, *Time for an Upgrade: Amending the Federal Rules of Evidence to Address the Challenges of Electronically Stored Information in Civil Litigation*, 50 Jurimetrics J. 147 (2010); Int'l Org. for Standardization & Int'l Electrotechnical Comm'n, *Guidelines for Identification, Collection, Acquisition, and Preservation of Digital Evidence* 17 (2012); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531 (2005); Orin S. Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Tex. Tech L. Rev. 1 (2015); Alastair Nisbet et al., *A Forensic Analysis and Comparison of Solid State Drive Data Retention with TRIM Enabled File Systems*, Proceedings of the 11th Australian Digital Forensics Conference 103 (2013); among countless others. This knowledge would be crucial not only in the motions, but in presentation to a jury and in planning a defense strategy. Mr. Schulte could easily access this knowledge through the internet, but otherwise cannot. How could Mr. Schulte possibly complete and effectively manage his criminal case when indispensable materials such as this are all denied to him, but permitted to his adversary?

The internet is crucial for trial preparation. There is not a single lawyer in the United States in 2021 who does not depend upon the internet for trial preparation. The internet is not only necessary for communication with experts,

witnesses, expert testimony, investigations, exhibits, and cross-examination preparation, but it is also paramount in actual trial preparation itself. As an example, in the instant case the government intends to accuse Mr. Schulte of sending information to WikiLeaks within a very specific window. Mr. Schulte could not effectively prepare for trial or assist in his own defense if he could not access the internet to investigate all the internet connections during the government's specific window and prove that, not only were all the connections inert, but none were established to WikiLeaks. Mr. Schulte could easily prove his innocence with access to the internet to engage in this exhaustive search and investigation.

The internet could also be leveraged for crowd funding. There are many organizations and non-profits that raise money through the internet. *Pro se* defendants can setup GoFundMe pages to help fund legal defense funds, contact non-profits for monetary assistance, or even raise money themselves. The internet could be utilized for other novel purposes as well. Perhaps Mr. Schulte can hire a different attorney to assist him with each motion he writes—at a reduced rate or even free so the attorney can get some experience or try to get noticed by firms? Perhaps there's some new profitable startup through a legal app? Perhaps Mr. Schulte can leverage his computer engineering skills to create new networks of lawyers to assist *pro se* defendants? To deny internet access is to deny endless possibilities of acquiring knowledge and efficient representation.

The internet is necessary to contact witnesses and conduct investigations. There are few ways in which an incarcerated man can conduct his Constitutionally-protected right to investigate; the internet is not only the best and most effective, but his sole tool. Without the internet, it would be impossible to conduct investigations and contact witnesses.

The internet is necessary to obtain information to assist in cross-examination. As an example, the government contends that Mr. Schulte deleted certain log files that otherwise would have demonstrated guilt. To rebut this, Mr. Schulte needs access to the internet to obtain public information about ESXi and the log files it produces, log file examples, and other public information that would further elucidate the facts to the contrary. Without the internet, Mr. Schulte cannot properly cross-examine witnesses or rebut testimony.

The internet is also necessary to contact, create exhibits, leverage cloud-based software solutions and data analytics to prepare and execute a defense at trial, to contact advocacy groups and organize potential amicus briefs, find useful quotes from literature and popular culture for use with the jury, spell-correct, thesaurus, and reviewing/editing documents, among countless other uses.

These are just a few examples of the disparities between the criminal defendant who can utilize the internet and the one who cannot. Truly, it is impossible to enumerate all the precise advantages the internet grants to the criminal defendant—especially without access to the internet to do so. Denying a criminal defendant access to the internet today is like denying a criminal defendant access to law books or a law library a decade ago—except the cost of internet access is miniscule relative to the cost of furnishing a library with books. In essence, a denial of internet access creates an insurmountable disadvantage that ultimately results in the inability for effective self-representation.

You cannot put a price on knowledge. The internet provides access to the sum of all human knowledge, and therefore is the Great Equalizer—the difference between a *pro se* defendant who can tap into this wealth of knowledge and the one who cannot is the difference between life and death; the internet can provide the

13

knowledge a criminal defendant needs to win his case and rebut the presumption of guilt that is the American "justice" system to regain his livelihood and ultimately his life.

# V.   ALL PRETRIAL DETAINEES ARE ENTITLED INTERNET ACCESS

The incredible resources and ubiquity of the internet compel the government to provide access to all incarcerated pretrial detainees—not just those who choose to represent themselves.

## A.   Pretrial detainees who are represented by counsel retain constitutional protections guaranteeing the right to access the internet

"Recently… the Supreme Court held that a defendant in a criminal case has a 'protected autonomy right'—that is, the 'Sixth Amendment-secured autonomy'—'to make fundamental choices about his own defense.'" *United States v. Rosemond*, 958 F.3d 111, 120 (2d Cir. 2020) (quoting *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508; 1511). Indeed, Argument IV.A. applies to pretrial detainees who are represented by counsel—why should they not retain the incredible resources of the internet to make informed decisions preserved under their purview?

*"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." Coffin v. United States,* 156 US 432, 453 (1895)*).* Although the American "justice" system has effectively nullified the presumption of innocence, it is still technically the law of the land. The government cannot arbitrarily grant the right to access the internet to some, and deny it to others—based solely on the crimes alleged in an indictment. The Due Process Clause of the Fifth Amendment compels equal treatment under the law. All pretrial detainees must be granted the right to access the internet—to search for attorneys, seek advice and knowledge, check that their attorneys are doing what they should, and ultimately to assist in one's own defense.

15

**B.      Pretrial detainees maintain the First Amendment Freedom of Speech and right of access to the internet**

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights. See *Ward v. Rock Against Racism*, 491 US 781, 796 (1989). Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protect others, or simply to learn and inquire.

"While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, *Reno v. American Civil Liberties Union*, 521 US 844, 868 (1997), and social media in particular." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

The Supreme Court forcefully identified the right to access the internet in *Packingham* and it suggested as much in *Riley v. California*, 573 U.S. 373 (2014).

**1.      An order of detention pending trial does not nullify the First Amendment**

It is well-settled that so long as pretrial detention is administrative rather than punitive, it is constitutional. See *United States v. Salerno*, 481 US 739, 746-51 (1987); *Bell v. Wolfish*, 441 US 520, 535-40 (1979); *United States v. Millan*, 4 F.3d 1038, 1042 (2d Cir. 1993). Whether detention is punitive rather than regulatory generally turns on "whether an alternative purpose to which [the defendant] may

16

rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose." *Wolfish*, 441 US at 538.

Where the regulation at issue imposes pretrial, rather than post-conviction restrictions on liberty, the "legitimate penological interests" served must go beyond the traditional objective of rehabilitation or punishment. See *McGinnis v. Royster*, 410 US 263, 273 (1973) ("It would hardly be appropriate for the State to undertake in the pretrial detention period programs to rehabilitate a man still clothed with a presumption of innocence."); cf. *Schall v. Martin*, 467 US 253, 263-64 (1984) (upholding pretrial detention of juvenile delinquents only after a finding of "serious risk" on the ground that it served a legitimate, non-punitive regulatory purpose).

Since pretrial detention was authorized 30 years ago in *Salerno*, the government has integrated pretrial detainees into federal prison; today, there is absolutely no difference between "punitive" federal prison for the convicted and "administrative" federal prison for the pretrial detainee. Federal prisons deny inmates access to the internet as punishment, so pretrial detention centers do the same. But this is not a reason to do so, and it certainly doesn't conform to the Constitution. There is absolutely no legitimate reason the government can deny a legally innocent person access to the internet. This court should differentiate federal prison from pretrial detention and order that those presumed innocent retain the First Amendment as required by law.

### 2.    Freedom of Speech is as necessary to pretrial detainees as the right to record the police is for the general public

Advances in technology and the media have altered the course of human history, not just in the advances in lifestyle, but also in the evolution of society and advancement of civil rights. The abolitionist movement did not begin in this

country until slaves began writing autobiographies and slave narratives—if the government efficiently suppressed the First Amendment right to these publications, who knows when or if the abolitionist movement ever would have gained strength and popularity. In the 19th century people began using photographs to depict the hardship and torture imposed upon slaves; there are shocking photographs of scar tissue on the backs of slaves, lynchings, grief and sorrow—demonstrated as clear human emotions—of women and children, and the confinement and quarters of slaves.

The Civil Rights Movement demonstrated the strength of visual aids and the First Amendment in advocating a particular cause. The murder of Emmet Till is often seen as the catalyst for the civil rights movement, and the decision for an open casket and publications of his brutal beating and murder subsequently shocked the people into a movement. In the 1950s, Dr. Martin Luther King, Jr. used television to show the American household what segregation looked like; the American people watched as dogs attacked women and children in the streets.

Over the past several years as cell phones and integrated cell phone cameras have become ubiquitous, there has been an explosion in citizens recording the police—often in illegal acts of oppression, barbarity, and murder. Videos of police murdering innocent black men in cold blood have gone viral, inciting police reform. But there's a vast difference between people reporting police violence and video proof of it occurring—especially since the police generally cover-up police brutality so it is the police officer's word versus the word of the citizen.

This same issue exists in the pretrial American prison system. Today, the United States Federal Government operates concentration camps, not pretrial "detention" centers, where it routinely tortures and murders the innocent without

remorse. To conceal its insidious crimes against humanity, it bans internet access and recording devices. And so, the American public remain largely ignorant of what it's like to be accused of a crime in this country—most people simply assume the legal system is just, because that's how the public schools indoctrinated us; without direct evidence to the contrary, few listen to the civil rights activists calling for drastic prison reform. The mainstream media helps the government conceal its crimes against humanity, and refuses to report on prison conditions— especially conditions imposed upon pretrial detainees. Most in America would be appalled to learn that there is no presumption of innocence and that the Constitution many fight to protect has long ago been raped and discarded. The United States Federal Government is relentless in its persecution of those it accuses of crimes—denying any who dare to be indicted not only the "inalienable" Constitutional guarantees but also simple humanity.

The Nazis concealed their crimes against humanity in similar ways—barring any recording devices or publication of its concentration camps. But once discovered, the images and videos of the horror are hard to behold. America learned from this mistake, and conceals its concentration camps within steel and concrete facilities—far from public scrutiny. Its concentration camps are built to blend into the urban environment where no one notices. Deprived of the First Amendment, pretrial detainees are unable to show the American public what it's like to be tortured in an American concentration camp.

Just downstairs from the very prison incarcerating Mr. Schulte, MCC officers murdered Jeffrey Epstein. Mr. Epstein did not have access to the internet or a video recorder to capture his murder and stream it live nor do the thousands of unnamed others who are murdered at other concentration camps across the United States—they are not billionaires so the media couldn't give a shit about them.

19

Mr. Schulte has the First Amendment right to record, document, and distribute across the internet his torture at the Metropolitan Concentration Camp—New York City's very own Auschwitz. Mr. Schulte has been subjected to conditions of confinement worse than those imposed upon death row inmates in every state in the union. These conditions of confinement are no different, and often times worse, then the *punishment* imposed upon those convicted of the most heinous crimes of mass murder and terrorism and held at the U.S. Penitentiary Administrative Maximum (ADX) federal prison. Mr. Schulte is held in indefinite solitary confinement that has been condemned by the United Nations as a form of torture and well-documented by psychiatrists as causing permanent psychological damage. Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325, 327 (2006).

Mr. Schulte is locked in a steel and concrete cage the size of a parking space. The small window is blacked out so he receives no outside light, and in fact has never seen the sun or the outside in over three years—he is not permitted outside recreation, he is not even permitted to turn off the light in his cage; instead, he is subjected to 24-7 bright lights and sleep deprivation. Mr. Schulte is not permitted heat in the winter, and exposed to the extreme cold without sufficient provisions. Mr. Schulte is denied access to books, television, and all forms of entertainment—he is forced into a state of constant "idleness," prohibited from assisting in his own defense or doing anything productive. He is subject to mental decay where his years of experience and training as a computer engineer become nothing, and his life becomes a living hell. Mr. Schulte is not permitted medical or dental care, denied the treatment for his defective heart, and treated less than a caged animal. Mr. Schulte is not permitted cleaning supplies, and his cage is infested with rodents and insects. And these are just a few of the hardships imposed upon a man the law

declares to be innocent. "Freedom" is the fatuous jingle of our civilization. But only those deprived of it have the barest inkling of what it really is.

If Adolf Hitler were shown a glimpse of the MCC in 1942, he would have thought the Nazis won World War II and continued evolving their torture to present day; once corrected that this was in fact the United States, Hitler would be proud of how America took up the mantle of the Nazis and continued its practices. Today, the United States Federal Government is a corrupt, fascist police state no different from the Nazis, and the American people no different from the German people who stood aside and allowed their government to commit genocide and human rights atrocities the like of which have never been seen in human history. Hitler was able to dupe the majority of the German people, and disguised his genocide that otherwise may have thwarted the Nazis from the beginning— likewise, too, have the American people been duped. Mr. Schulte has the First Amendment right to expose the United States of its hypocrisy—to expose the United States Federal Government as the greatest threat to the Constitution and truly, the greatest terrorist organization that this world has ever seen. If Mr. Schulte could record what it's like to freeze in the winter without heat, to live without the sun or outside, to show the world what it's like to live in perpetual punishment in an American concentration camp—to expose the last 30 years as what historians will come to name the ***Great American Holocaust***—then perhaps the people would call out for change or revolution to form a new, limited government with the constitutional guarantees that this one simply pretends to offer. Truly, if George Washington and the founding fathers could see the insidious, diabolical government that their experiment in democracy had become, they would call out for the second American Revolution to overthrow the tyranny and oppression that the British Crown never steeped so low to create. There has never been such a

monumental evil, cloaked in legitimacy, its hypocrisy shrouded in secrecy as it forever upholds a façade of "justice" and "democracy."

Mr. Schulte has the First Amendment right to levy these charges and redress of grievances to the government and for the American people to see, publicly, these charges. As long as the government is permitted to cover-up its human rights atrocities and bury the substantial evidence from ever seeing the light of day, free speech is thwarted and democracy undermined. For it is easy to permit free speech that the government desires, but difficult to allow free speech that condemns the government. It would be absurd to believe the founding fathers accepted the former, but not the latter. Indeed, the First Amendment was ratified to condone speaking out against the government. Mr. Schulte and all pre-trial inmates must be granted the First Amendment access to the internet that they may speak out, expose, and condemn this vile, treacherous government—the rest is left to the people to decide for themselves what course of action to take.

### 3.     The government may not suppress lawful speech as the means to suppress unlawful speech

The government cannot claim a legitimate penological interest in denying pretrial detainees access to the internet. The only claim that can be made is the pretrial detainees may use the internet in the furtherance of their crimes or for new crimes. But, the government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." *Hess v. Indiana*, 414 US 105, 108 (1973). "The government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The constitution requires the reverse. '[T]he possible harm to society in permitting some

22

unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted.' The Overbreadth doctrine prohibits the government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition*, 535 US 234, 255 (2002) (quoting *Broadrick v. Oklahoma*, 413 US 601, 612 (1973))

Finally, there is no reason to believe an innocent person would commit a crime by using the internet—and that is what the pretrial detainees are presumed to be. Only the guilty *could* "continue" their crimes or commit new crimes, but the pretrial detainees have not yet been sorted into the innocent and the guilty; hence, it is unconstitutional to presume them all guilty and punish them by denying all access to the internet.

## VI.   CONCLUSION

This court should find that Mr. Schulte, as a *pro se* pretrial defendant, is entitled access to the internet in accordance with the Fifth and Sixth Amendments to effectively manage, prepare, and conduct his own defense just as the government, defense attorneys, and all free *pro se* pretrial defendants have.

This court should also find that all pretrial detainees, regardless if they choose to represent themselves or not, are entitled internet access to assist in their own defense; and that the First Amendment guarantees pretrial detainees access to the internet to record and distribute, as free speech, their conditions of torture at the hands of this vile government, and that the government itself is prohibited from suppressing lawful speech as a means of suppressing unlawful speech.

Accordingly, Mr. Schulte should be provided internet access forthwith.

Dated: New York, New York

   October 8, 2021

Respectfully submitted,

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

24