UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

        *Defendant.*

---

S3 17 Cr. 548 (JMF)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND MOTION FOR BAIL PURSUANT TO 18 U.S.C. § 3142

Joshua Adam Schulte
Slave #79471054
Metropolitan Detention Center (MDC)
P.O. Box 329002
Brooklyn, NY 11232

# TABLE OF CONTENTS

I. CONTINTUTED PRETRIAL DETENTION VIOLATES DUE PROCESS .......1

   A. The length of pretrial detention is excessive..................................................1

   B. The government's case is so weak it is nearly non-existent..........................2

      1. The completely intact logs from Mr. Schulte's CIA workstation prove there were no Confluence (C-VM) logins or copies .......................................2

      2. There were no drives inserted into Mr. Schulte's computer during the timeframe to facilitate exfiltration................................................................4

      3. There was no evidence of transmission ........................................................5

      4. MCC Counts..................................................................................................6

      5. The government withheld the critical forensic crime scene .........................7

      6. The government's repeated *Brady* Violations ...............................................7

      7. Child Pornography charges ..........................................................................8

   C. The government is primarily responsible for the delay ................................8

   D. All allegations are non-violent, unlawful speech...........................................9

II. NEW INFORMATION COMPLETELY NEGATES FINDING OF "DANGER" ...................................................................................................................9

III. CONCLUSION .............................................................................................10

## I. CONTINUTED PRETRIAL DETENTION VIOLATES DUE PROCESS

"To determine whether the length of pretrial detention has become unconstitutionally excessive, a court must weigh: (1) its length, (2) the extent of the prosecution's responsibility for delay of the trial, (3) the gravity of the charges, and (4) the strength of the evidence upon which detention was based, i.e., the evidence of risk of flight and dangerousness." *United States v. El-Hage*, 213 F.3d 74, 79-80 (2d Cir. 2000). Mr. Schulte has already spent more time in federal prison and under far worse conditions of confinement than the average sentenced inmate. Considering the excessive length of pretrial detention and the fact that the government already took its extremely weak case to trial and failed to convince a jury beyond reasonable doubt of Mr. Schulte's guilt, there can be no question that each additional second Mr. Schulte spends locked in solitary confinement is incontrovertibly unconstitutional.

### A. The length of pretrial detention is excessive

The government incorrectly claims that the length of pretrial detention is not unconstitutionally excessive. Mr. Schulte's life was completely destroyed when he was arrested and presumed guilty on August 24, 2017. Mr. Schulte was forced to put his entire life on-hold when the government enslaved and incarcerated him against his will for the past 4 years and 2 months, or 1,522 days. Mr. Schulte has not lived a single day since August 23, 2017. He has been unable to enjoy a second of his life, abdicating the prime of his youth for no reason other than the government's proclamation that he is guilty and must be punished indefinitely, in solitary confinement, tortured worse than any sentenced inmate across the country. Mr. Schulte's 50-month pretrial prison sentence far exceeds the "extraordinary" 30-month threshold established in *United States v. El-Hage*, 213 F.3d at 76. Indeed, Mr. Schulte has already spent more time incarcerated as a pretrial detainee than the average punishment of 44 months for sentenced inmates.

1

### B.     The government's case is so weak it is nearly non-existent

The government's case is an extremely weak circumstantial case, whereby, after concealing from the defense the forensic crime scene and only providing it to its own experts such that the defense presented no case, called no witnesses, was unable to cross-examine the government's witnesses, and could not subject the government's case to any adversarial testing, the result was *still* a hung jury. At trial the government proffered no theory as to how the classified information was taken from the CIA, where it was stored, or how it was transferred to WikiLeaks. The government spent a month on witnesses who witnessed no crime—not a single government witness claimed any knowledge of the crime or proffered any evidence related to the crime. If Mr. Schulte is ever able to review the forensic evidence of the alleged crime scene that the government continues to hide, he can easily prove his innocence. The government's case is an extremely weak circumstantial case that a jury has already refused to accept, which weighs heavily in Mr. Schulte's favor; it literally could not be any weaker without ceasing to exist.

### 1.     The completely intact logs from Mr. Schulte's CIA workstation prove there were no Confluence (C-VM) logins or copies

There were no logs deleted from Mr. Schulte's CIA workstation, and therefore the government relied upon these logs as its primary source and timeline for the alleged crime on April 20, 2016 (Tr. Leedom – Recross 1201):

> *Q. Am I correct, Mr. Leedom, that there was not a single log file deleted from Mr. Schulte's workstation?*
>
> *A. From his actual -- the host, the Windows workstation?*
>
> *Q. Right. The workstation that he used, not a single file was deleted, correct?*
>
> *A. I believe that's accurate.*

2

These log files from Mr. Schulte's CIA Workstation are how the government discovered the deletion of log files from the ESXi server and other activity that they attribute to Mr. Schulte. The government has a perfectly intact detailed picture of all the activity from Mr. Schulte's CIA Workstation during the 75-minute window of the alleged copy (including the before and after). The government details all of these commands through its exhibits GX 1203-XX and on Leedom's slideshow, GX 1703, from p. 95-168. **_There was no command to log into C-VM nor and commands to copy any file as required for the theft_** (Tr. Leedom – Cross 1176-1177):

> *Q. They asked you to look to see if there was a copy command during the reversion period, correct?*
>
> *A. Correct.*
>
> *Q. You wanted to find a copy command during the reversion period, correct?*
>
> *A. Yes.*
>
> *Q. And you did not find one, correct?*
>
> *A. That's correct.*
>
> *Q. How long, according to you, was the reversion period?*
>
> *A. Uh, it was over an hour. Maybe like an hour and 20 minutes, I think.*
>
> *Q. And for that hour and 20 minutes, the time before and the time after, there's no forensic indication of any copy command, correct?*
>
> *A. Do you mean during?*
>
> *Q. Just the reversion period.*
>
> *A. OK. No.*

The government sought to confuse the jury by eliciting testimony about deleted log files from the ESXi server while ignoring the blatant fact that these deleted logs never would have

3

showed the login and copy necessary to steal the backup—if this had occurred it would have been logged on Mr. Schulte's Workstation. The government discovered all commands that were executed during that day, but when they found no login to C-VM or copy command—instead of seeing Mr. Schulte's innocence clear as day—the government simply lied and claimed that deleted log files *from the ESXi server* somehow explain the absence of incriminating evidence from Mr. Schulte's *completely intact CIA Workstation logs*. This makes no sense.

## 2. There were no drives inserted into Mr. Schulte's computer during the timeframe to facilitate exfiltration

The forensics show that during the 75-minute reversion window, there were no storage devices connected to Mr. Schulte's CIA Workstation, and therefore, no storage for any copied backups to be exfiltrated from the CIA (Tr. Leedom – 1180-1181):

> *Q. Now, sir, before we broke for lunch, you testified, did you not, that you found no evidence of a copy command on Mr. Schulte's desk top for the reversion period. Correct?*
> *A. That's correct.*
>
> *Q. Is it also true, and forensically accurate, that during the reversion period you found no forensic evidence of any storage device connected or being connected to Mr. Schulte's workstation, correct?*
> *A. That's correct.*
>
> *Q. And when we're talking about a storage device, we mean something that would allow a person to exfiltrate data from one place to another; is that correct?*
> *A. Correct.*
>
> *Q. To exfiltrate data, just so we're all clear, is to take data or information out of a network or a computer, correct?*

4

*A. That's correct.*

*Q. So to exfiltrate data, you would actually need removable media, correct?*

*A. Not necessarily.*

*Q. If it was an air gapped network, you would need removable media, right?*

*A. Yes.*

*Q. Okay. Just want to be crystal clear. Between the time period of 5:35 p.m. and 6:51 p.m., sir, you did not see any evidence whatsoever of any removable media connected to Mr. Schulte's workstation, correct?*

*A. Correct; yes.*

### 3. There was no evidence of transmission

The government additionally failed to show transmission (Tr. Berger – Cross 1427-28):

*Q. Throughout -- you see we're getting near the end of these slides, so I have some general followup questions for you.*

*Throughout your investigation, have you found any evidence that the defendant copied the Vault 7 or 8 data on to his home computer?*

*A. Not directly, no.*

*Q. Okay. Have you found any evidence that the defendant brought hard drives home from the CIA?*

*A. No.*

*Q. Have you found any evidence that the defendant plugged any hard drives from the CIA into his home computer?*

*A. No.*

*Q. Do you have any evidence that the defendant ever took data from the CIA home to put*

5

*it into his home computer? Essentially the same question, again.*

*A. No.*

*Q. Do you have any evidence that the defendant stored Confluence on his home computer?*

*A. No.*

*Q. How about Stash?*

*A. No.*

*Q. Or the Atlassian suite, for example?*

*A. No.*

*Q. Do you have any evidence that Altabackups was stored on his home computer?*

*A. No.*

*Q. Do you have any evidence that the Confluence backup accessed allegedly on 4/20 was ever stored on the defendant's home computer?*

*A. No.*

Mr. Schulte never possessed any national defense information and never transmitted any national defense information.

### 4.   MCC Counts

Mr. Schulte is not guilty of the MCC Counts because the information that the government alleged Mr. Schulte transmitted or "attempted" to transmit were all public knowledge disclosed by WikiLeaks 18 months before it was allegedly disclosed by Mr. Schulte. It is therefore ineligible as NDI. See *Motion to Dismiss MCC Counts for Violation of the First Amendment* (pending classification review and docketing).

6

### 5. The government withheld the critical forensic crime scene

The government argued a very complicated, confusing, and convoluted theory at trial—that Mr. Schulte used his CIA Workstation to gain unauthorized access to the ESXi server to gain unauthorized access to the Confluence Virtual Machine to gain unauthorized access to the Atlassian backups from the FS01 server. Mr. Schulte's expert was denied access to the three servers to conduct his own independent analysis despite obtaining a security clearance. Instead, the government merely presented the defense with its own forensic reports and analysis—suggesting the defense had no need to conduct an independent analysis of the data, and must instead, trust the government. The government's adamant refusal to produce legitimate discovery of the alleged digital crime scene is a case of first impression; in no other case has the government acknowledged the materiality of evidence, relied exclusively upon that evidence at trial, and refused to permit the defense equal access to conduct its own independent analysis and adversarial testing.

### 6. The government's repeated *Brady* Violations

The government violated its *Brady* obligation when it failed to disclose an internal August 2019 memorandum from the Deputy Director of the CIA for Counterintelligence to the Director of Security requesting that Michael be placed on enforced administrative leave because of suspicion, *inter alia*, that he was involved in the theft and disclosure of the Vault 7 and Vault 8 information (the "CIA Memorandum"). See *Brady* Violation letter, dated February 18, 2020 (Dkt. 328) and February 22, 2020 (Dkt. 331).

Mr. Schulte discovered an additional *Brady* Violation after trial and wrote to the Court on September 14, 2021, Dkt 504. The question of who had access to the information released by WikiLeaks was a major point of contention at trial. The government claimed that only a few individuals had access to the information that was ultimately leaked by WikiLeaks while Mr.

7

Schulte maintained that everyone had such access. If Mr. Schulte had access to the digital forensic crime scene, he could easily prove that all individuals had access to the information, but since the government deprived him of this access, he was unable to support his argument with any facts. Thus, Mr. Schulte was forced to sit back as the government forensic experts explained that access was restricted to only a few people. After trial, it was discovered that the CIA Advanced Forensics Division (AFD) conducted multiple forensic examinations of the digital forensic crime scene and found that all CIA personnel had access to the information that was released by WikiLeaks—confirming Mr. Schulte's argument and rebutting the government's own forensic experts. This information was not discovered through the CIA's forensic analysis and forensic reports, which the government continues to deny to the defense, but rather, through 18 U.S.C. § 3500 materials of the FBI. To date the AFD reports have yet to be disclosed.

### 7. Child Pornography charges

Tellingly, the government does not even respond to Mr. Schulte's arguments regarding the child pornography case. To recap, Mr. Schulte ran multiple public servers offering a multitude of services to over a hundred unique users; there is clear forensic evidence for what user created the child pornography, when it was created, and how it was transferred to Mr. Schulte's computer. The child pornography is self-contained in a single file; a file that, forensically, was not created on the computer it was found or even on any of Mr. Schulte's devices or even on his private network; ***it was forensically impossible for Mr. Schulte to ever download or even view the child pornography***.

### C.   The government is primarily responsible for the delay

The government shifts the blame for delay to Mr. Schulte. This is absurd. The government initially indicted Mr. Schulte for possession of child pornography, but dragged its feet waiting for the CIA to authorize the espionage charges; the government produced almost no

8

discovery until after the first superseding indictment. The government failed to produce its first *Brady* letter until September 2018—although it possessed the information at Mr. Schulte's initial indictment a year before. Additionally, devices seized from Mr. Schulte's apartment in 2017, SC01, SRV01, and SRV02, were not produced until November 2021. The government additionally wasted 17 months from the end of the first trial until August 3, 2021 as it failed to produce Mr. Schulte to the SCIF. The majority of the delay is attributable to the government.

### D. All allegations are non-violent, unlawful speech

The government asserts that Mr. Schulte is plainly incorrect about the gravity of the charges. See Opp. at 22. The government completely misses the point. The Court is to evaluate the "gravity of the charges" in relation to pretrial detention. The whole purpose of this four-factor evaluation is to determine the legality of Mr. Schulte's *pretrial detention*—detention that is predicated on danger to the community or risk of flight—not based solely on the allegations standing alone. Thus, the Court is to evaluate whether the charges against Mr. Schulte pose a threat to the community. Allegations of espionage are not even eligible for pretrial detention, and Mr. Schulte argues that allegations of possessing child pornography are additionally ineligible to detain defendants pretrial. Indeed, all of the charges against Mr. Schulte are allegations of unlawful speech—the vast majority are victimless and *ALL* are non-violent crimes.

### II. NEW INFORMATION COMPLETELY NEGATES FINDING OF "DANGER"

The government sidesteps the new information that negates Judge Crotty's initial determination of "danger." See Opp. at 16-18. It should be noted for the Court that Mr. Schulte never violated his conditions for bail. Judge Crotty's order banning Mr. Schulte from all computers and the internet did not additionally ban third parties from accessing the internet. Mr. Schulte therefore sought clarification through pretrial services, who, in any case, was authorized

9

to modify Judge Crotty's conditions, and who also consented to Mr. Schulte's cousin accessing and using the internet on Mr. Schulte's behalf. The new information shows that the government intended to violate Mr. Schulte the day he was granted bail—the government contacted Virginia and told them to prosecute Mr. Schulte for sexual assault (they withheld the alleged "evidence" until the day Mr. Schulte was granted bail and 3500 materials show the Virginia detectives doubted any crime was actually committed) and then planned to falsely claim Mr. Schulte accessed the internet. The standard for violation is *clear and convincing* evidence; this standard was unmet as the government presented no such evidence. The new information combined with the presumption of innocence clearly negate any finding of "danger" of an indictment outside the Court's jurisdiction for a crime outside the Court's jurisdiction allegedly committed *before* the federal charges were ever filed against Mr. Schulte. Mr. Schulte should be returned to bail.

### III.  CONCLUSION

This court should find that Mr. Schulte's 50 months of pretrial detention far exceed the legal limit, and should order him released pending trial. Alternatively, the new information pertaining to the Virginia sexual assault charges should nullify the initial remand because the underlying charges are fabricated merely to detain Mr. Schulte pretrial, but could never hold up in an actual trial. Mr. Schulte has also been tortured in a concentration camp, held in conditions of confinement worse than every death row inmate held in the United States—his continued torture will only cause debilitating and permanent psychological damage. Finally, Mr. Schulte is not a flight risk nor is he a danger to the community—he should be granted the presumption of innocence guaranteed by the United States Constitution he spent his life to defend.

Dated: New York, New York  
November 12, 2021

Respectfully submitted,

Joshua Adam Schulte

10