UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Filed with Classified
Information Security Officer

CISO

Date

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

*Defendant.*

S3 17 Cr. 548 (PAC)

REDACTED / CLEARED FOR PUBLIC RELEASE

# MOTION TO DISMISS COUNTS THREE AND FOUR OF THE THIRD
# SUPERSEDING INDICTMENT FOR VIOLATION OF THE FIRST
# AMENDMENT AND ATTORNEY-CLIENT PRIVILEGE

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

## TABLE OF CONTENTS

I.      TABLE OF AUTHORITIES............................................................................. iii

II.     STATEMENT OF THE ISSUES ......................................................................1

III.    STATEMENT OF THE CASE ..........................................................................1

  A.     Overview .......................................................................................................1

  B.     Relevant Background ....................................................................................2

IV.    SUMMARY OF ARGUMENTS ......................................................................6

V.      THE MCC COUNTS VIOLATE THE FIRST AMENDMENT .....................7

  A.     Information available in the public domain cannot qualify as NDI .............8

  B.     Count Three must be dismissed .....................................................................9

    1.   Alleged NDI already available to the general public before transmission...9

    2.   Alleged NDI was provably communicated from the CIA to Mr. Schulte as
         unclassified, and therefore not valid NDI ................................................11

    3.   No reasonable person could possibly believe that the Hickok information
         could be used to the injury of the United States...................................... 12

    4.   Alleged NDI was NOT NDI ....................................................................... 12

  C.     Count Four must be dismissed ..................................................................... 15

    1.   Malware of the Mind.................................................................................. 16

    2.   Tweets ........................................................................................................ 28

    3.   The fact the government ultimately revealed information it alleged to be
         NDI when Mr. Schulte never did severely undercuts government's claim of
         NDI ............................................................................................................. 31

  D.     Selective Prosecution ................................................................................. 32

    1.   *They don't include COG who was connected to our DevLAN through
         Hickok, an intermediary network that connect both COG and EDG* ..............35

    2.   *I split data across files and file systems to conceal the crypto.* .................36

    3.   *Additionally, tool described in vender report is in fact Bartender. A CIA
         toolset for operators to configure for deployment.*............................................36

4.  Mr. Schulte knows REAL classified information that is NDI ....................37

VI.  "MALWARE OF THE MIND" IS PRIVILEGED AND MUST BE
SUPPRESSED .................................................................................................40

A.  Attorney-Client Privilege .............................................................................40

B.  Malware of the Mind: A History...................................................................41

C.  Malware of the Mind is Attorney-Client Privileged material and should be
suppressed......................................................................................................43

VII.  CONCLUSION ................................................................................................46

# I. TABLE OF AUTHORITIES

## Cases

*ACLU v. NSA*,
925 F.3d 576 (2d Cir. 2019) ..................................................................................40

*Bantam Books, Inc. v. Sullivan*,
372 US 58 (1963)......................................................................................................7

*Bernbach v. Timex Corp.*,
174 F.R.D. 9 (D. Conn. 1997) ................................................................................43

*Clark v. Buffalo Wire Works Co.*,
190 F.R.D. 93 (W.D.N.Y. 1999) ............................................................................43

*Davis v. Goora*,
320 F.3d 346 (2d Cir. 2003) ..................................................................................44

*Fisher v. United States*,
425 US 391 (1976)..................................................................................................43

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ..............................................................................40

*Gorin v. United States*,
312 US 19 (1941).................................................................................................7, 8

*In re Horowitz*,
482 F.2d 72 (2d Cir. 1973) ....................................................................................43

*Loughrin v. United States*,
134 S. Ct. 2384 (2014)............................................................................................44

*Massiah v. United States*,
377 US 201 (1964)..................................................................................................45

*Near v. Minnesota*,
283 US 697 (1931)....................................................................................................7

*New York Times Co. v. United States*,
403 U.S. 713 (1971)..................................................................................................7

iii

*Organization for a Better Austin v. Keete*,
  402 US 415 (1971).................................................................................................7

*Pritchard v. County of Erie (In re County of Erie)*,
  473 F.3d 413 (2d Cir. 2007) ...............................................................................40

*Sallier v. Brooks*,
  343 F.3d 868 (6th Cir. 2003) ...............................................................................44

*United States v. Allen*,
  31 M.J. 572 (N.C.M.R. 1987)................................................................................9

*United States v. Defonte*,
  441 F.3d 92 (2d Cir. 2006) .................................................................40, 43, 44

*United States v. Finazzo*,
  682 Fed. Appx. 6 (2d Cir. 2017)..........................................................................40

*United States v. Ginsberg*,
  758 F.2d 823 (2d Cir. 1985) ...............................................................................45

*United States v. Heine*,
  151 F.2d 813 (2d Cir. 1945) .................................................................................8

*United States v. Jacobs*,
  117 F.3d 82 (2d Cir. 1997) .................................................................................44

*United States v. Longo*,
  70 F. Supp. 2d 225 (W.D.N.Y. 1999)....................................................................45

*United States v. Mejia*,
  655 F.3d 126 (2d Cir. 2011) ..........................................................................40, 44

*United States v. Morison*,
  844 F.2d 1057 (4th Cir. 1988) ..............................................................................8

*United States v. Rosen*,
  445 F. Supp. 2d 605 (E.D. Va. 2006)..................................................................7, 8

*United States v. Truong Dinh Hung*,
  629 F.2d 908 (4th Cir. 1980) ................................................................................8

iv

*Upjohn Co. v. United States*,
449 US 383 (1981)..................................................................................................40

## Statutes

18 U.S.C. § 793....................................................................................................7, 31

18 U.S.C. § 793(b)....................................................................................................15

18 U.S.C. § 793(e)......................................................................................................9

## Rules

Fed. R. Crim. P. 29 .....................................................................................................5

Fed. R. Crim. P. 8(a).....................................................................................................5

## Other Authorities

Simon Singh, *The Code Book* (1999) .................................................................20, 21

## II.    STATEMENT OF THE ISSUES

Whether the First Amendment protects citizens from prosecution for discussing content publicly released on the internet; whether, once the government loses control over classified documents that are published publicly, access and discussion of those documents become protected speech guaranteed by the First Amendment.

Whether documents written for, and only ever transmitted to, attorneys, for the sole purpose of providing knowledge and information to the attorneys to better provide legal assistance, are protected under Attorney-Client privilege and work product.

## III.    STATEMENT OF THE CASE

### A.    Overview

Mr. Schulte previously filed a motion to dismiss all counts of the indictment charged pursuant to the Espionage Act on the grounds that the Espionage Act is facially unconstitutional. Dkt. 174. The instant motion does not withdraw, supersede, or alter that motion in any way, but rather, raises as-applied challenges to counts three and four (the "MCC Counts"). Specifically, the government charged Mr. Schulte with violations of the Espionage Act for allegedly writing about information that was already publicly available for nearly two years. Hence, even if all the accusations the government made at trial and in its Bill of Particulars are assumed to be true, the First Amendment clearly prohibits prosecution of citizens for discussing national news. The MCC counts are nothing more than a bad faith ploy from the government to introduce certain inflammatory statements and otherwise inadmissible information as typical dirty play to "win" at all costs.

1

## B.   Relevant Background

Between September and December 2017, while out on bail, Mr. Schulte wrote a redress of grievances titled "The Presumption of Innocence" (AKA the "Schulte Articles") about the corrupt and oppressive American "justice" system.

Mr. Schulte was remanded into indefinite federal prison in December 2017 after he was arrested for allegedly sexually assaulting his girlfriend two years before the indictment, in 2015. This court also found that Mr. Schulte "violated the terms of the release conditions by engaging in having his roommate access the computers using very sophisticated methodology".

On April 20, 2018, Mr. Schulte's family and friends published his redress of grievances, the "Schulte Articles", on Facebook under the pseudonym John Galt.

On May 15, 2018, FBI Special Agent Jeffrey David Donaldson subpoenaed Facebook for the "Schulte Articles" and submitted them for classification review.

On June 18, 2018, Mr. Schulte was superseded on the espionage and copyright infringement charges.

On July 17, 2018, the United States Attorney's Office produced the "Schulte Articles" from the Facebook account in unclassified discovery as production #13 after the classification review determined they were *unclassified*.

In September 2018, jailhouse snitch Carlos Luna Betance began taking pictures from his illegal cell phone of other illegal cell phones, and sent them to FBI Special Agent Jeffrey David Donaldson. None of the pictures, documents, and other information gathered by Betance were classified or in any way illegal, and were produced in unclassified discovery on November 1, 2018 as production #15.

2

In September 2018, the MCC searched Mr. Schulte's cell along with several others for contraband cell phones, but found none—except Betance's illegal cell phone; Betance was moved to 9 South pending a disciplinary hearing.

FBI Special Agent Jeffrey David Donaldson then decided to fabricated evidence, falsify evidence, and perpetuate a fraud upon the Court. He drafted a search warrant for the MCC feigning ignorance of the "Schulte Articles", yet claiming that the CIA determined "at least one" was classified notwithstanding the CIA's actual determination that all the "Schulte Articles" were unclassified. Agent Donaldson deviously masqueraded an attorney-client privileged email Mr. Schulte sent to his attorneys on March 20, 2017 about his encounter with the FBI as "Schulte Article 9" despite the overwhelming evidence provided by his snitch, Betance, of the real "Schulte Article 9." By this deception, Donaldson claimed "at least one" of the "Schulte Articles" was classified, and sought to search the MCC to seize *ALL* of the "Schulte Articles" withholding the critical evidence from Judge Crotty that the real "Schulte Articles" were already published on the internet and possessed by Mr. Schulte by virtue of the government's own unclassified discovery production and the fabricated "Article 9" did not and could not even exist at the MCC since it was sent *before* Mr. Schulte was ever arrested and snitch Betance found absolutely no traces of it on any of the illegal cell phones. See *MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE METROPOLITAN CORRECTIONAL CENTER,* Dkt. 455.

Unaware of Agent Donaldson's treachery, Judge Crotty signed the MCC search warrant on October 1, 2018 to seize lawfully produced unclassified discovery along with an attorney-client privileged email that did not exist at the MCC.

3

Following the search of the MCC, no contraband cell phones were discovered in Mr. Schulte's possessions or in his cell. The FBI did identify and discover the unclassified "Schulte Articles" as produced to Mr. Schulte in unclassified discovery along with the real Article 9. The fraudulent Article 9, the attorney-client privileged email, was never found as it never existed at the MCC.

The FBI then executed a general warrant, and although the search warrant did not identify notebooks or any material besides the 9 "Schulte Articles", the FBI seized all of Mr. Schulte's legal notebooks, clearly marked in all-caps as "ATTORNEY-CLIENT PRIVILEGED" on the outside cover, and "ATTORNEY-CLIENT CONFIDENTIAL" on the inside cover. In executing the general warrant, the FBI read every page of his attorney-client privileged notebooks, found what they claimed to be thought-crime, and applied for additional search warrants based on what they recovered from their general rummaging through all of Mr. Schulte's belongings.

After no-less-than 11 subsequent search warrants and mounds of electronic and physical evidence reviewed, the government claimed to find additional disclosures of national defense information from the MCC—completely *new* and entirely different from the documents and allegations in the fraudulent MCC search warrant application.

On October 31, 2018, Mr. Schulte was superseded for allegedly transmitting national defense information from MCC. The basis for this new charge was (1) a privileged narrative document written at the MCC and only ever shared with Counsel, (2) writings in privileged notebooks that were not shared outside counsel, and (3) an email allegedly transmitted (the only alleged transmission of anything) detailing the illegalities of the government's initial search warrants that briefly

4

mentions Hickock[1] in which the government asserts, erroneously, that this *single* unclassified word *already published by WikiLeaks* is somehow NATIONAL DEFENSE INFORMATION ("NDI") harmful to the United States of America.

On April 29, 2019, the government specified in its Bill of Particulars the three specified incidents (related above) for Count Four.

The government tried Mr. Schulte for espionage in a 10-count indictment in the Southern District of New York during the month of February 2020. The result was a hung jury and mistrial (excepting convictions for contempt of court and making false statements that are pending Fed. R. Crim. P. 29 dismissal).

Recognizing that Count Four was duplicitous in violation of Fed. R. Crim. P. 8(a), when the government superseded Mr. Schulte for a third time "to clarify what conduct is covered by each specific count," Dkt. 401, it separated out the previous Count Four of the second superseding indictment into Counts Three and Four of the third superseding indictment (the current indictment).

All of the alleged NDI was already public knowledge two years before Mr. Schulte allegedly transmitted and "attempted" to transmit it. Furthermore, for the first time in recorded history, the government actually "declassified" material that it claimed to be harmful to the national security of the United States just so it could prosecute Mr. Schulte for allegedly *attempting,* but never actually transmitting, that information. Finally, although Hickock was unclassified during Mr. Schulte's time at the CIA, the CIA literally *reclassified* Hickock after finding Mr. Schulte's email just so they could charge him with an additional count of NDI.

---

[1] This word is spelled many different ways and with different casing styles, including HICKOC, HICKOK, and Hickock. This motion refers to it as the latter since this is the spelling used in official CIA documents.

## IV.   SUMMARY OF ARGUMENTS

The MCC Counts of the indictment must be dismissed as unconstitutional. The government charged Mr. Schulte with allegedly writing and discussing information that was in the public domain for nearly two years. Restating the same information already publicly published is clearly protected speech; there is no reading of the Espionage Act, even in its most liberal form, that grants the government the authority to charge private citizens with a crime for discussing information already on the internet. Additionally, when the government loses control of national defense information to the point where it is published on the internet and in every major newspaper in the country—the information, while potentially still "classified" pursuant to Executive Order, can no longer be claimed as privileged or as national defense information.

Additionally, one specific instance alleged in Count Four of the indictment must be dismissed and the associated document suppressed as the information alleged is protected by attorney-client privilege. Mr. Schulte wrote a document titled "Malware of the Mind" to further his defense and mailed the document to his attorneys for review. His attorneys eventually kept the original and mailed a photocopy back to Mr. Schulte to retain for his records—which Mr. Schulte did not even touch for nearly a year before Special Agent Jeffrey David Donaldson executed a general warrant and literally removed the document from the envelope marked "Attorney-Client Privilege" addressed from his attorneys, read the entire document, and turned it over to prosecute Mr. Schulte. This flagrant violation of Attorney-Client privilege requires suppression and dismissal of the instance from Count Four.

## V.    THE MCC COUNTS VIOLATE THE FIRST AMENDMENT

The First Amendment guarantees that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Thus, "[a]ny system of prior restraints of expression … bear[] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 US 58, 70 (1963); see also *Near v. Minnesota*, 283 US 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keete*, 402 US 415, 419 (1971). Indeed, "[t]he dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information. It is common knowledge that the First Amendment was adopted against the widespread use of the common law of seditious libel to punish the dissemination of material that is embarrassing to the powers-that-be." *New York Times Co. v. United States*, 403 U.S. 713 (1971) (Douglas, J., concurring).

One exception to the First Amendment is the restriction of communicating national defense information ("NDI") to persons unauthorized to receive it. 18 U.S.C. § 793. "Rather than limiting the subject matter scope of the phrase 'information relating to the national defense,' or restricting it to tangible material, courts have carefully cabined the phrase's scope in two ways." *United States v. Rosen*, 445 F. Supp. 2d 605, 620 (E.D. Va. 2006).

"First, courts have limited the term by requiring that the information be closely held by the government. This requirement was recognized by the Supreme Court in *Gorin v. United States*, 312 US 19, 28 (1941), and served as the basis for

7

Judge Hand's decision in *United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945), in which he reversed Heine's conviction under the predecessor to § 794 because the information about airplane production Heine delivered to the Germans was publicly available." *Id.*

"The second judicially imposed limitation on the phrase 'information relating to the national defense' is the requirement that its 'disclosure would be potentially damaging to the United States or useful to an enemy of the United States.'" *Id.* at 621 (quoting *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988)). "This important requirement is implicit in the purpose of the statute and assures that the government cannot abuse the statute by penalizing citizens for discussing information the government has no compelling reason to keep confidential. As the Supreme Court has instructed, the statute only applies to information for which there is an 'occasion for secrecy,' and there is no 'occasion for secrecy' unless disclosure of the information the government seeks to protect implicates an important government interest such as the national security." *Id.* See *Gorin*, 342 US at 28.

## A.   Information available in the public domain cannot qualify as NDI

"Similarly, the Fourth Circuit's rejection of a vagueness challenge to the term 'information relating to the national defense' in *Morison*, was based, in part, on the district judge's instruction to the jury that 'the government must prove that the documents or the photographs are closely held in that they have not been made public ***and are not available to the general public*.'" *United States v. Heine*, 151 F.2d at 817 (quoting *Morison*, 844 F.2d at 1071-72) (emphasis added). See also *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 n. 9 (4th Cir. 1980) (noting that district court's instruction to the jury that "the defendants would not be guilty

8

of transmitting national defense information if the information were available in the public domain" was proper); *United States v. Allen*, 31 M.J. 572, 627-28 (N.C.M.R. 1987) (stating that the term includes only "information that is not generally accessible to the public, i.e., it must be non-public information.").

## B.   Count Three must be dismissed

Count Three, Illegal Transmission of Unlawfully Possessed National Defense Information in violation of 18 U.S.C. § 793(e), alleges that Mr. Schulte transmitted NDI to a reporter in a September 24, 2018 email, the subject of which were the illegal search warrants executed by the government. See Ex. A (Trial Exhibit 812). Specifically, the email stated "Attached are two of the search warrant applications in Josh Schulte's case along with private notes Josh wrote regarding the first warrant (couldn't attach due to size limits, sent here.)" Tr. 2544-45. The government claims that the following statement in the email's attachment, on page one of eleven contained NDI:

> *In reality, two groups, EDG and COG, and at least 400 people had access.*
> *They don't include COG who was connected to our DevLAN through*
> *Hickok, an intermediary network that connect both COG and EDG.*

### 1.   Alleged NDI already available to the general public before transmission

Hickock was first published by WikiLeaks on March 7, 2017. There were at least ▮▮▮▮▮▮▮ documents published on March 7th that mentioned Hickock:



...

***(S) HICKOK* TS**

- *(S) Used for transferring tools and their associated documentation between DEVLAN and OSN*
- *(U) Consists of two firewalls, a datastore that houses the files to be transferred, and the JIRA instance for discrepancy reporting*



Accordingly, since the alleged NDI regarding Hickock and its location was publicly published, then reported in all the major national newspapers, and

10

distributed all over the internet 18 months before the e-mail was sent to the reporter, this information was not closely held by the United States Government as required in element 2, and is ineligible to be considered national defense information. Therefore, the content was protected speech and Count Three must be dismissed in violation of the First Amendment.

### 2. Alleged NDI was provably communicated from the CIA to Mr. Schulte as unclassified, and therefore not valid NDI

The CIA informed Mr. Schulte that Hickok was classified as *unclassified*, and therefore its communication and discussion could not harm the national security of the United States—precluding any possible prosecution. This is a fact that the government itself acknowledges, accepts to be true, and for which this Court has already ruled. See Ex. E (Trial Exhibit 616) (Hickok General USER's guide marked as unclassified). See also Dkt. 300 (Ordering Trial Exhibit 616 to be admitted with the "UNCLASSIFIED" markings to reflect the document as it was distributed from the CIA to Mr. Schulte). Since the CIA distributed the Hickok General USER's guide to its workforce, including Mr. Schulte, classifying Hickok and all information about Hickok as "unclassified," that information is accordingly ineligible as NDI by the very definition of 'unclassified' as information that cannot harm the national security of the United States, regardless of the government's subsequent reclassification of the document *after the government decided to prosecute Mr. Schulte*. Therefore, Count Three must be dismissed in violation of the First Amendment.

11

### 3.   No reasonable person could possibly believe that the Hickok information could be used to the injury of the United States

Additionally, due to the two previous sections whereby the NDI was publicly disseminated and the CIA literally told Mr. Schulte the information was *unclassified*, Mr. Schulte did not ever believe that information could be used to the injury of the United States—nor could any reasonable person. Furthermore, the purpose of the e-mail to the reporter was not Hickok, or anything at all to do with classified information, but rather, the government's illegal searches of Mr. Schulte's home predicated on deliberate lies by FBI Agent Donaldson. The Hickok comment was a very brief aside constituting a single sentence and approximately 0.1% of the eleven-page document. Thus, taken as a whole, and in the context and purpose of the transmission, Mr. Schulte clearly had no reason to believe the information could possibly harm the United States. Accordingly, the government can never establish element 3, prejudice to the United States, and Count Three must be dismissed.

### 4.   Alleged NDI was NOT NDI

Finally, the information itself could not possibly be NDI. As an initial matter, Mr. Schulte knew that  Hence, immediately following the WikiLeaks disclosure in 2016, Hickok and every other exposed CIA network from 2016 was completely shut down.

David – direct 834-836):

12

*Q. Did there come a time in that period when you learned that information from EDG had been posted on WikiLeaks?*

*A. Yes.*

*Q. Were you working that day when you learned that?*

*A. I was.*

*Q. What happened?*

*A. We were notified some time midmorning that a lot of the tools and things that we did were posted to WikiLeaks under a project called Vault 7. There was a lot of confusion as to what to do. Eventually throughout the course of the day, we ended up shutting down access to the network by disabling all the user accounts and shutting off the internet as well.*

*Q. When you say "the network," what do you mean?*

*A. The DevLAN network was -- we turned off all the user accounts so no one could log in.*

*Q. Why did you do that?*

*A. That was at the request of our management to try and preserve what was left on the system so that the FBI and folks could come and we could start figuring out what happened.*

*Q. What effect did disabling all of the user access to DevLAN have on the work of EDG?*

*A. It shut EDG down. No one could do anything for a long period of time.*

*Q. Are the servers and various components that made up DevLAN still in your server room at the CCI office?*

*A. No, everything has been removed and is either in FBI custody or in secure storage.*

13

Finally, since DEVLAN and Hickok were closed networks that did not connect to the internet, it would be absurd to claim that knowledge of their names alone somehow constitutes a danger to the national security of the United States. Undoubtedly, the CIA, NSA, and other intelligence agencies across the world have closed networks that are not connected to the internet—so how could knowing the names of these networks harm the United States or benefit any foreign nation? Knowing that the CIA has a network called "DEVLAN" does nothing for Russia because they cannot access the network anyway, and have no idea where it is even physically located or how to electronically attack it. It's like telling the Russians the CIA have computers—no shit? What are the Russians going to do with that knowledge? Telling the Russians there's a hotdog stand in the middle of the Pentagon is closer to NDI than the statement that two isolated networks connect in some unknown way, with unknown security measures, at an unknown place.

***

Count Three of the MCC Counts charges Mr. Schulte with transmitting information that was already public information and not closely held by the government, information that was provably communicated to Mr. Schulte from the CIA as unclassified, information that was cherry-picked from an eleven-page document discussing the search warrants and therefore not intentionally related to classified information at all, and information that is provable NOT NDI nor is it classified as the information was extremely generic AND it related to an exposed,

network                                                    Accordingly,

Count Three of the MCC Counts must be dismissed.

14

## C. Count Four must be dismissed

Count Four, Attempted Illegal Transmission of Unlawfully Possessed National Defense Information in violation of 18 U.S.C. § 793(b), alleges that Mr. Schulte committed thought-crime against the United States. Count Four, unlike Count Three, does not allege any NDI was transmitted, but simply that Mr. Schulte "attempted" to transmit NDI, but somehow failed or was miraculously thwarted by the heroic FBI. These allegations of thought-crime are interesting in that they appear to be a form of selective prosecution of information that no person could ever conceive to be damaging to national security. In fact, since Mr. Schulte never actually transmitted this alleged NDI, it was ultimately the *government who transmitted it* when it decided to "declassify" the material to use at trial, and is unlike any prosecution of Espionage in the history of the United States; the government literally chose to *endanger its own national security for the sake of prosecuting Mr. Schulte*. This fact strongly undermines the government's contention that this information was critical to national defense. If it were truly national defense information—think troop movements, nuclear secrets, asset names and identities, United States vulnerabilities and weaknesses—the government would NEVER compromise it for a prosecution that already contained an alleged transmission—let alone the additional WikiLeaks transmission charge itself. Would the CIA sacrifice information critical to the national defense of the United States for vengeance? No, the information the government pretends is national defense information isn't even classified—it is generic, publicly available information that in no way endangers the United States. This charge is wholly fraudulent.

15

### 1.   Malware of the Mind

Mr. Schulte wrote Malware of the Mind after he was assigned new attorneys in March of 2018, specifically to summarize the charges against him and discuss defense strategy. This document was only ever given to his attorneys. See Ex. F (Trial Exhibit 801). The document's table of contents consisted of:

Introduction

Transcripts

The Search Warrant

The Complaint

Ethics and a LOGICAL look at the charges

Tyranny

Conspiracy

Conclusion

The government cherry-picked the second paragraph on page 84 out of the 146-page document as NDI (Tr. 2526-2527):

*Which brings me to my next point. Do you know what my specialty was at the CIA? Do you know what I did for fun? Data hiding and crypto. I designed and wrote software to conceal data in a custom-designed file system contained within the drive slack space, or hidden partitions. I disguised data. I split data across files and file systems to conceal the crypto. Analysis tools would never detect random or pseudorandom data indicative of potential crypto. I designed and wrote my own crypto. How better to fool buffoons like forensic examiners and the FBI than to have custom software that doesn't fit into their two-week class where they become forensic experts? Make no mistake. I am an expert in data hiding and*

16

*cryptography with thousands of hours of experience and among the top
specialists in the world, or was.*

On August 25, 2018, an excerpt from page one of Malware of the Mind was
*drafted* but never posted on http://presumptionofinnocence.net as "[Article] 10.
Malware of the Mind". See Ex. G (Trial Exhibit 1301-4; Tr. 2525) at 2:

*Today, we are facing a stealth constitutional crisis—A malware of the mind
has entered and corrupted the justice system. Technology has advanced so
rapidly that the law and law enforcement are decades behind and are unable
to catch-up. Into this chasm, defendant, defense attorneys, judges, and juries
are increasingly blind-sided by the evolution of innovative prosecutorial
techniques based on faux forensics, manipulation, and intentional
misrepresentation which are in turn nothing more than long shot theories
and in some cases blatant fabrications analogous to accusations of
witchcraft and wizardry....*

*.... this final article is incomplete as it was written by Mr. Schulte entirely
from prison and he is unable to get it out.*

The government alleges this excerpt directly ties the Attorney-Client
Privileged Malware of the Mind to this *draft* online post; however, this excerpt did
not originate in Malware of the Mind, but was first drafted three months before in
Mr. Schulte's expert technical report for Omar Omanat. See Ex. H at 5:

*Today, the FBI has shifted towards "pseudo expertise" in which they
embrace technology but manipulate it for their own purposes—the FBI learn
just enough to become dangerous. Literally, the FBI's ignorance of
technology has cost civil liberty for innocent people as they spread
disinformation as 'expertise'. **We are facing a stealth constitutional***

17

*crises—a malware of the mind has entered and corrupted the justice system. Technology has advanced so rapidly that the law and law enforcement are 5-10 years behind and unable to catch up. Into this chasm, defendants, defense lawyers, judges, and juries are increasingly blindsided by the evolution of innovative prosecutorial techniques based on faux forensics which are in turn nothing more than speculative theories and in some cases blatant fabrications analogous to accusations of witchcraft and wizardry.* It is incredibly easy to google concepts and feign expertise to judges, who themselves know nothing of technology. It is common in the FBI for an agent to enroll in a rudimentary 2 week class on a topic and then be labeled the resident subject matter expert (SME) on that topic. Indeed, that is exactly what happened in this case.

Furthermore, this precise language was communicated over the MCC's phone to Mr. Schulte's parents. See Recorded MCC Calls, January 16, 2018, 8:23 PM.

Accordingly, this excerpt does not implicate the Attorney-Client privileged Malware of the Mind at all, as it was publicly shared and written in a public expert report long before it was ever included in the Attorney-Client privileged Malware of the Mind.

It is also clear from the notebooks that Mr. Schulte intended to merely reuse the title "Malware of the Mind," and draft an entirely different document; a short, 4-5 page summary of Mr. Schulte's Presumption of Innocence Redress of Grievances:

On August 27, 2018, Mr. Schulte allegedly wrote in "Red_Notebook_-_Gen_7.25-9 – UNCLASSIFIED" (2019.05.29 production): "1-9, 10: Rewrite

Malware of the Mind into 4-5 pgs.... 10: needs to be written." See Ex. I (p. 125 of "Red Notebook"). This intention to reuse the title "Malware of the Mind," and write a new document approximately 4-5 pages was, of course, never exhibited at trial. A few days later Mr. Schulte again allegedly wrote "Secondly, I want to rewrite article #10: Malware of the Mind!" See Ex. J (Trial Exhibit 809 p. 8; Tr. 2525).

The government alleged that Mr. Schulte "attempted" to transmit Malware of the Mind (GX 801) to unknown individuals at some unspecified time, and that this document he only ever shared with his attorneys and which discussed his case, somehow contained "national defense information" he believed would "injure" the United States. As with Hickock, the government's argument is laughably absurd.

Malware of the Mind is 146 pages long. It is a document that Mr. Schulte mailed to his attorneys, who made a photocopy of it, and mailed the photocopy back to Mr. Schulte—retaining the original, which they still possess. During the MCC search, Donaldson confiscated the envelope marked "legal mail" from Mr. Schulte's possessions on the 9th floor of the MCC despite the warrant's limitation to the 7th and 2nd floors, then removed the document despite no specification in the MCC warrant to seize legal mail, and finally he delivered the entire 146 pages to the CIA to conduct a classification review despite the MCC warrant's limitation to search only for 9 titles and no authorization to seize every document to give to the CIA. The government cherry-picked one page out of the 146-page document to show to the jury, page 84, and they pretended this page contained "national defense information" that Mr. Schulte intended to transmit to some unknown individuals at some unknown time in order to somehow harm the United States.

The Malware of the Mind written in March of 2018 was never transmitted to anyone except Mr. Schulte's attorneys. An excerpt from page one of the document appears in a *draft*, but this precise language was used many times before it was ever included in Malware of the Mind, and the draft was never actually published online anyway. Additionally, Mr. Schulte clearly intended to rewrite the document.

### a)   *Alleged NDI already available to the general public before alleged attempted transmission*

Malware of the Mind contained only generic information about a two-thousand-year-old data-hiding technique. The government alleged that data-hiding is a super-secret technique ███ ██████████, and that the disclosure of this technique somehow injured the United States. ████████████





Revealing that ███████████████ is like revealing the CIA has computers, encrypts data, or uses spies. It is both obvious and publicly known. Furthermore, page 84 of 146 is written too generically to even be classified. If Mr. Schulte revealed ████████████████████████████████████████████ ████████████████████████████████████████████, then that could potentially be classified (though not necessarily NDI). Instead, Mr. Schulte specifically kept it generic to protect classified information. If someone presented this to the CIA for classification review in a book, it would have been deemed unclassified.

21



This paragraph simply demonstrates how a programmer should consult with another programmer to use shared code. Note that the specifics mentioned here of

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████  Accordingly, it is clear to see that the information specified in Malware of the Mind is public, unclassified information.

████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████



24

████████████████████████████████████

Overall, this page discusses ████████ with much more specificity than Mr. Schulte's generalized ramblings in Malware of the Mind. Furthermore, this specific information is still not detailed enough to define, specifically, how each tool works in a manner that would permit an antivirus company or a foreign adversary to detect and thwart ████████

### b) *The purpose of Malware of the Mind clearly was not to transmit NDI*

Malware of the Mind was one hundred and forty-six pages long. The entire document is provided to the Court under seal as it is a privileged document. See Sealed Ex. L. However, as the court can see, clearly the point of the document is to explain and discuss Mr. Schulte's criminal case: the illegal search warrants (once again), the charges, and the defense. This document is not intended for anyone except Mr. Schulte's attorneys. The purpose of the document, clearly, has nothing to do with classified information—and in fact, at the time of the writing of the document, *Mr. Schulte was not even indicted for NDI crimes*.

### c) *Mr. Schulte never intended to transmit Malware of the Mind*

Mr. Schulte never intended to transmit Malware of the Mind to anyone except his attorneys. From the original creation of the document in March of 2018 through its illegal seizure by the FBI in October of 2018, Mr. Schulte only ever transmitted the document to his attorneys, during the March/April timeframe of

2018. It is also clear from the notebooks the FBI illegally seized that Mr. Schulte intended to "rewrite Malware of the Mind." Nowhere in any documents or notebooks does Mr. Schulte ever write an intention to disclose Malware of the Mind. The idea that Mr. Schulte intended to transmit this document is pure fiction, a fantasy concocted by the government without a shred of evidence.

### d)    Mr. Schulte provably took no substantial step to transmit Malware of the Mind

Mr. Schulte took no substantial step to transmit Malware of the Mind. Provably, only an excerpt from the first paragraph of Malware of the Mind was found in a *draft* posting (NOT publicly available on the internet)—a paragraph that predates Malware of the Mind itself, and which was already publicly disclosed. However, even if this were considered a waiver of privilege for Malware of the Mind, the remaining 145 pages were never uploaded even in draft format. Any substantial step would require, at the least, a planning to upload Malware of the Mind. But there was no plan, no intention whatsoever. And even if we assume there was an intention, Mr. Schulte would first have to write pages 1-83 in draft format—or at least copy the document to the phone for the transmission. However, there was no electronic copy—no uploaded version to the phone at all. Furthermore, the government cannot ignore Mr. Schulte's clearly written intention to first rewrite Malware of the Mind. But since this first task was never even performed, there cannot possibly be a substantial step to attempt the transmission of a document that was never even written.

### e)     Alleged NDI was NOT NDI

As discussed in part (a), the information in Malware of the Mind was far too generic to be classified let alone NDI. It revealed no specific methodology that could be used to identify CIA tools, it revealed no CIA tools, etc.

Additionally, as discussed in (V)(B)(4), all CIA tools and networks Mr. Schulte worked on were dismantled following the WikiLeaks publication on March 7, 2017. See Tr. 352-53 (Weber-Direct):

*Q. During that time that you were at the CIA, what impact, if any, did the public disclosure by WikiLeaks have on your past work?*

*A. So, the public disclosure of my past work pretty much meant **all of that work was now no longer operationally useable. It was dead.***

*Q. Why?*

*A. The risk of attribution to the CIA as well as the amount of information that adversaries would have for detecting our operations was too high, and we needed to rewrite that work.*

See also Tr. 185:

*Q. Generally, what impact did the public disclosure of your group's information have on CIA's work?*

*A. It was crippling. We -- we were shut down for a significant amount of time. There was a significant amount of review about the operations that were ongoing to see what risk there was. And we had to recreate a significant number of capabilities.*

See also Tr. 1512 (Stedman-Direct):

27

*Q. What impact did the disclosures have on your work over the years?*

*A. **It destroyed it. I don't think we could use anything that I'd ever worked on before again.***

Accordingly, it was impossible for any statements about CIA tools or techniques developed pre-WikiLeaks to cause any harm to national security post-WikiLeaks, as those tools and techniques were all exposed or assumed to have been exposed, and ultimately no longer used by the CIA. Hence, the information was not NDI as it was not only public and generic, but it also concerned shuttered and deprecated capabilities no longer used by the government.

### 2. Tweets

The government claimed that Mr. Schulte thought about releasing tweets containing NDI to harm the United States. As with the first alleged "attempted transmission" there was no actual transmission of anything—once again it was the government that publicized the tweets they claim jeopardized the national security of the United States, thereby undermining that very argument. These alleged tweets were never planned nor did they contain national defense information. This alleged tweet that was so critically harmful to the United States See Ex. M (Trial Exhibit 809 at 10; Tr. 2257):

*The @CIA was involved in (redacted) the code for the initially—planned cyber operation is in vault 7. Additionally, (redacted, substituted to 'tool described in vender report') is in fact Bartender. A CIA toolset for (redacted, substituted to 'operators') to configure for deployment.*

28

### a)   *Alleged NDI already available to the general public before alleged attempted transmission*

Bartender was publicly released by WikiLeaks on March 7, 2017 with its Vault7 publication. Bartender appeared on the Vault7 home page (Ex. N):



As with Count Three, this information literally matches the exact information that Mr. Schulte allegedly attempted to transmit 18 months later.

Furthermore, Bartender was specifically explained in the



### *b)   Mr. Schulte never intended to transmit any tweets*

Mr. Schulte never intended to publish any tweets. Nowhere in any documents or notebooks does Mr. Schulte ever write an intention to publish the specified tweets. The idea that Mr. Schulte intended to transmit this data is pure fiction, a fantasy concocted by the government without a shred of evidence.

### c) *Mr. Schulte provably took no substantial step to transmit any "tweets*

No substantial step was ever taken to publish the alleged tweets. No draft was ever written on the internet. No tweets were ever scheduled despite the time and opportunity to do so. The government claims Mr. Schulte possessed a cell phone since at least August, yet do not explain why, if this were true, Mr. Schulte never transmitted any tweets from August through October.

### d) *Alleged NDI was NOT NDI*

The information regarding Bartender was generic and unclassified—not possibly NDI. Additionally, as discussed in (V)(B)(4) and (C)(1)(e), the CIA tools themselves were all shut down following the WikiLeaks exposure. ███████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

### 3. The fact the government ultimately revealed information it alleged to be NDI when Mr. Schulte never did severely undercuts government's claim of NDI

There has never been a prosecution in the history of the United States for "attempted transmission" of NDI where the government actually "declassifies" what it claims to be NDI for the sole purpose of prosecution. In this case, the government already accused Mr. Schulte of the Vault 7 WikiLeaks disclosures, including multiple counts of violating 18 U.S.C. § 793, and therefore, had no need to additionally charge Mr. Schulte with "attempted transmission."

\*\*\*

31

Count Four of the MCC Counts charges Mr. Schulte with "attempting" to transmit information that was already public information and not closely held by the government, information that was cherry-picked from a 146-page document discussing Mr. Schulte's case and therefore not intentionally related to classified information at all, information that was never transmitted by Mr. Schulte at all but rather exposed by the United States government in a case of first impression merely to retaliate and prosecute Mr. Schulte, and information that is provable NOT NDI nor is it classified as the information was extremely generic AND it related to exposed, ████████ CIA tools and techniques ████████████████

████████████ Accordingly, Count Four of the MCC Counts must be dismissed.

### D.  Selective Prosecution

The Espionage Act was intended to prohibit spying against the United States. These laws were not intended to be used as selective prosecution to punish legitimate First Amendment Free Speech nor as a ploy to build false narratives for prosecutors to bemoan in the court room. The federal government had absolutely no case against Mr. Schulte—no evidence whatsoever tying him to any leaks of classified information. In fact, the government knows Mr. Schulte is innocent, but they must prosecute someone; this is all an elaborate game to a prosecutor—a chance to perfect their lying and immorality for public office as well as to fulfill their creed: *"Guilty ones are easy to convict. It takes real effort to convict the innocent."* Indeed, the FBI even acknowledged that this prosecution against Mr. Schulte is not based on evidence, but a pure political witch hunt. Before even investigating Mr. Schulte, FBI case agent Evanchec remarked, "From my take at the agency, I think even if its just politically, we need to go after him with everything." See Evanchec unclassified Lync messages.

Without evidence against Mr. Schulte, the government concocted a scheme to build a fantasy about "information wars" and leaks of classified information from prison; a sensational fiction designed to rile up the jurors. The government's sensational fantasy started in its opening statements by Denton:

> *He did it to start what he in his own words called "an information war," a war against the CIA he felt had wronged him. His information war didn't stop there. He continued to wage it even after the FBI arrested him for stealing those top secret files. From jail, he got an encrypted cell phone, leaked more classified information, and plotted a campaign to send even more CIA secrets to WikiLeaks.* (Tr. Opening 15);

> *But the evidence will show that when that didn't work and Schulte was arrested and put in jail to stand trial, he decided to escalate his information war. He got an encrypted cell phone in jail, **started writing a report, promising to give them classified information**. He created accounts on social media **to post articles he had written that had more secrets in them**.* (Tr. Opening 22).

> *In notebooks he kept in jail, he wrote a detailed battle plan for the next campaign in his information war. But before Schulte could launch that new campaign, the FBI caught him in the act. They searched the prison. They found his secret phone. **They found his written plan to destroy evidence and leak secrets**, and they put a stop to it, **preventing Schulte from spilling even more of our most preciously guarded intelligence.*** (Tr. Opening 22).

The government started strong, weaving an intricate fantasy and promising much; but by the end of the trial, the jury was left wanting. There was no report written with classified information, there was no promise to reporters to give them

33

classified information, there was no "battle plan" to release classified information, there was no plan to destroy evidence and leak secrets—there was no intention or specific mention of classified information anywhere.

In the end, the government had to tamp down the jury's expectation in its summations as they did not prove anything they claimed in the opening. Instead, the government closed the trial with:

> *By August, he gets that encrypted cell phone, the Samsung cell phone. He declares his information war.* (Tr. 2835 Summation).

> *By September, he has set up his Twitter account, and near the end of the month, he emails the reporter classified information about the network infrastructure, and he was also planning to post tweets that contained more classified information and an article that he wrote that contained more classified information. And the only thing that stopped him from doing that was the FBI. The FBI searched the MCC on October 3 and stopped his plans.* (Tr. 2836 Summation).

> *And the truth in this case is the defendant tried to do it all over again from prison, repeating that same pattern of anger, escalation, retaliation, and lies. Declaring an information war. Sending classified information to a reporter. He was doing all those things over again.* (Tr. 2863 Summation).

The government plainly relied upon the MCC counts to lie and deceive the jury—there was no NDI transmitted from the MCC, but this makes a great story. The government went into the trial with the intent to fabricate and falsify evidence, knowing they could lie throughout opening arguments. But, while the law seemingly allows prosecutors to fabricate and falsify evidence in the opening, it does not allow this in the closing.

34

Let's carefully evaluate the government's "NDI"

1. *They don't include COG who was connected to our DevLAN through Hickok, an intermediary network that connect both COG and EDG.*
2. *I split data across files and file systems to conceal the crypto.*
3. *Additionally, tool described in vender report is in fact Bartender. A CIA toolset for operators to configure for deployment.*

Is this what the Espionage Act was designed to combat? Statements such as these that were written with no intention of malice or harm to the United States, statements taken out-of-context, cherry-picked amongst millions, and which, concerned information already publicly disseminated?

### 1. ***They don't include COG who was connected to our DevLAN through Hickok, an intermediary network that connect both COG and EDG***

This statement was cherry-picked from an 11-page document, the subject of which was the illegal search warrants in this case. The email to the reporter mentioned nothing about classified information, and it is beyond obvious to any reasonable person that this statement was nothing more than an aside to provide brief background knowledge; it was not the focal point of some malicious plot to harm the national security of the United States. Furthermore, it was written with the clear understanding that it did NOT harm national security as Mr. Schulte knew

And if that wasn't enough, the exact statement was publicly available 18 months before this statement was written, foreclosing any claim of NDI:

*In EDG we use JIRA to track issues on projects. JIRA sits on Hickock which is shared between us and COG.*

35

### 2.    *I split data across files and file systems to conceal the crypto.*

This statement was cherry-picked from a 146-page document, the subject of which was Mr. Schulte's criminal case. The "Malware of the Mind" article mentioned nothing about classified information, and it is beyond obvious to any reasonable person that this statement was nothing more than an aside to provide brief background knowledge; it was not the focal point of some malicious plot to harm the national security of the United States. Furthermore, it was written with the clear intention of not harming national security as it was written so generically that it could not link the CIA to any tools, nor could it provide a signature or method for identifying CIA tools; it mentioned a two-thousand-year-old technique. And if that wasn't enough, the exact statement was publicly available 18 months before this statement was written, foreclosing any claim of NDI:

███████████████████████████████████████

And as if that wasn't enough, the document WAS NEVER TRANSMITTED! Mr. Schulte clearly wrote his intention to write a new 4-5 page document called "Malware of the Mind," but never did so, let alone transmit such a document. The only person who transmitted the document was the CIA when they decided to "declassify" the information to prosecute Mr. Schulte. But this was no real decision as the information was never even classified let alone NDI.

### 3.    *Additionally, tool described in vender report is in fact Bartender. A CIA toolset for operators to configure for deployment.*

How this statement could ever be considered classified is beyond baffling. Bartender was literally exposed at least 18 months before it was written:

*Bartender*

What are we doing here?

### 4.   Mr. Schulte knows REAL classified information that is NDI

Mr. Schulte retains highly classified NDI from the operations he worked on over six years at the CIA;

*this* is the information he intended to use to harm the United States? To declare an Information War? To jeopardize the national security of the United States? Does that sound right to you? If Mr. Schulte ever intended harm for the United States and the CIA, he could easily achieve this goal with all the highly classified information retained by his editic memory over his 6 year career as a Science and Technology malware developer in the Directorate of Operations

\*\*\*

The MCC Counts of the third superseding indictment, Counts Three and Four, charge Mr. Schulte with the transmission and attempted transmission of information that WikiLeaks released in its Vault7 and Vault8 publications 18 months before Mr. Schulte allegedly did. At the time of the alleged transmission and attempted transmission, all major national and international newspapers and journalists had already discussed, through numerous articles and publications, all the information Mr. Schulte allegedly disclosed, and therefore the information was in the public domain, not "closely held" by the United States Federal Government, and therefore not valid National Defense Information.

Finally, all the information was provably unclassified as it was generic, public information.

Accordingly, even assuming everything the government alleges to be true, this public information was clearly protected speech guaranteed by the First Amendment. Therefore, this Court must dismiss the MCC Counts, Three and Four, of the third superseding indictment, for a violation of the First Amendment.

Finally, the government's purpose in prosecuting Mr. Schulte for the MCC Counts was not the prosecution itself; the government knew that it will ultimately fail at trial and Mr. Schulte will be acquitted. However, the government never passes up the opportunity to twist the truth—to weave webs of lies and deception. The government ultimately uttered the phrase "information war" 41 times throughout trial, ruthlessly implying that this "war" was some intention to release classified information. The purpose of the MCC Counts is to introduce the fact that

Mr. Schulte was incarcerated and other inflammatory statements that the government deliberately and maliciously cherry-picked and took out of context. Mr. Schulte very clearly defined his "Information War" as a war for the *truth* against the government's *lies and corrupt justice system*—he specifically wrote that the manifestation of this "war" was his redress of grievances; the 9 "Schulte Articles" that contained no classified information, but were critiques of the criminal justice system. The government deliberately ignored this obvious fact, and did not even introduce the unclassified articles or show the jury the clearly written statements defining this "war." The MCC Counts are the sacrificial pawn, the bunt to advance the government's strategic manipulation of this trial and justice system to achieve a Victory at all costs—even the cost of truth and justice, which were the core of the justice system at one time, very, very long ago.

The government's selective prosecution is nothing less than an egregious assault on the First Amendment—it is a message from the United States of America to Joshua Adam Schulte: **DON'T YOU DARE EVEN THINK ABOUT EXERCISING YOUR FIRST AMENDMENT RIGHT! IF YOU DO, WE WILL READ EVERY WORD YOU WRITE, TAKE IT OUT OF CONTEXT, TWIST IT, CHERRY-PICK WHAT WE WANT, RECLASSIFY IT, CLAIM IT IS NATIONAL DEFENSE INFORMATION, WEAVE AN INTRICATE WEB OF LIES, AND THEN WE WILL PROSECUTE YOU. WE WILL MAKE YOU SORRY. WE WILL MAKE YOU PAY. WE WILL TORTURE YOU IN SOLITARY CONFINEMENT UNTIL YOU KILL YOURSELF OR CONCEDE DEFEAT. WE DO NOT EVEN NEED A JURY TO FIND YOU GUILTY AND IMPOSE WHATEVER PUNISHMENT WE SO DESIRE. WE WILL DESTROY YOU. FUCK YOU.**

## VI. "MALWARE OF THE MIND" IS PRIVILEGED AND MUST BE SUPPRESSED

Since Mr. Schulte wrote Malware of the Mind exclusively for his attorneys, and only ever shared it with them, for the sole purpose of his defense, the document is protected by Attorney-Client Privilege, and must be suppressed.

### A.  Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Finazzo*, 682 Fed. Appx. 6, 15 (2d Cir. 2017) (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)). "The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." *ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir. 2019) (quoting *Pritchard v. County of Erie (In re County of Erie)*, 473 F.3d 413, 418 (2d Cir. 2007)). The privilege functions to "encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." *Id.*; see also *Upjohn Co. v. United States*, 449 US 383, 389 (1981) (explaining that one purpose of the privilege is "to encourage clients to make full disclosure to their attorneys" (internal quotation marks omitted). It is "well settled that individuals retain their attorney-client privilege when incarcerated or detained." *United States v. Mejia, supra. See also United States v. Defonte*, 441 F.3d 92, 94 (2d Cir. 2006) (per curiam); *Gomez v. Vernon*, 255 F.3d 1118, 1133 (9th Cir. 2001) (finding that prisoners retain right to keep privileged documents confidential where not inconsistent with legitimate penological interests).

**B. Malware of the Mind: A History**

Mr. Schulte wrote Malware of the Mind in March of 2018 exclusively for his newly assigned attorneys. As is the case with all attorney-client work product and privileged information that Mr. Schulte wrote, Malware of the Mind was written in narrative format—the government previously seized several attorney-client privileged documents dating back to March of 2017 in which Mr. Schulte wrote information exclusively for his attorneys in a narrative format, but which was never published or ever intended to be published, thereby firmly establishing this practice.

After finishing with the document, Mr. Schulte mailed it to Hannah Sotnick, a paralegal with the Federal Defenders of New York, asking her to give it to counsel and to give him any advice about the document. She made copies and distributed it to Mr. Schulte's attorneys. She then mailed Mr. Schulte back both the original and a copy that contained hand-written commentary from either her or another representative from the Federal Defenders. The copy was incomplete, and Mr. Schulte sent her back the original and asked her if she could finish a complete copy. She then made a complete copy and mailed Mr. Schulte that copy while maintaining the original. That photocopy of Malware of the Mind remained inside the Federal Defenders envelope it was mailed in until FBI Agent Donaldson illegally opened it and seized the document although the search warrant did not identify Malware of the Mind to seize.

After the government falsely claimed Malware of the Mind was "classified," Mr. Schulte's attorneys brought the original to the SCIF in an abundance of caution, where it remains to this day. The government's seized photocopy would

41

perfectly match the original document that remained in Mr. Schulte's attorney's possession as it was written exclusively for them.

Half a year after Malware of the Mind was written, Mr. Schulte intended to write a tenth and final article in his redress of grievances criticizing the federal government and its corrupt criminal justice system. Mr. Schulte always liked the title "Malware of the Mind" and the associated introductory paragraph which was written long before "Malware of the Mind." Thus, Mr. Schulte decided to write a tenth article with this name, and beginning in the same way. However, as the articles are about the criminal "just us" system, the content would obviously differ completely. This is why page 125 of "Red_Notebook_-_Gen_7.25-9 – UNCLASSIFIED" (2019.05.29 production) *AND* Ex. J (Trial Exhibit 809 p. 8; Tr. 2525) specifically states "rewrite Malware of the Mind." Ultimately, Mr. Schulte scrapped the idea for a tenth article entirely as he felt the nine were sufficient for his purposes.

The FBI stopped nothing. In fact, Mr. Schulte's redress of grievances were published on the internet after they seized the cell phone allegedly belonging to Mr. Schulte (although it was found in another inmate's cell). Indeed, it was impossible for Mr. Schulte to have published anything on the internet as he was already in solitary confinement *before* it was published.

Regardless, the "Malware of the Mind" illegally seized and searched by Agent Donaldson was drafted for, and only ever transmitted to, Mr. Schulte's attorneys, for the express and sole purpose of aiding his criminal defense and preparing for trial.

See "Schulte Declaration."

42

**C.     Malware of the Mind is Attorney-Client Privileged material and
should be suppressed**

Malware of the Mind was written as a confidential document disclosed only
to Mr. Schulte's attorneys to assist in his legal defense. "Confidential disclosures
by a client to an attorney made in order to obtain legal assistance are privileged."
*Fisher v. United States*, 425 US 391, 403 (1976). See *United States v. Defonte*, 441
F.3d at 96 (finding attorney-client privilege would apply to writings from a journal
that has been taken from an inmate's cell at the MCC so long as those writings
were an outline of what the inmate wished to, and ultimately did, discuss with
counsel); *Clark v. Buffalo Wire Works Co.*, 190 F.R.D. 93, 96-97 (W.D.N.Y. 1999)
(notes client made "in order to inform an attorney about facts from his daily life
that he considered to be relevant to his potential legal remedies" were protected by
attorney-client privilege); *Bernbach v. Timex Corp.*, 174 F.R.D. 9, 9-10 (D. Conn.
1997) (notebooks written by client containing "almost daily notes of events and
conditions in her life which she felt were critical for her attorneys to know"
satisfied the elements of attorney-client privilege).

Additionally, Malware of the Mind remained completely confidential, and
was not shared with anyone outside counsel. "[I]t is vital to a claim of privilege
that the communications between client and attorney were made in confidence and
have been maintained in confidence." *In re Horowitz*, 482 F.2d 72, 81-82 (2d Cir.
1973). Moreover, the person invoking the privilege must have taken steps to ensure
that it was not waived—"[i]t is not asking too much to insist that if a client wishes
to preserve the privilege..., he must take some affirmative action to preserve
confidentiality." *Id.* at 82. Thus, "the question of whether the privilege applies...
involve[s] a determination of whether the claimant asserting the privilege treated
the communications in question in such a careless manner as to negate her or her

intent to keep them confidential." *Mejia*, 655 F. 3d at 132-33 (alterations and internal quotation marks omitted); see also *DeFonte*, *supra*, at 94-95 (noting that attorney-client privilege would be waived if the claimant treated documents as issue "in such a careless manner as to negate her intent to keep them confidential").

To the degree that the specific introductory paragraph of Malware of the Mind was privileged, it is clear that this paragraph was written before Malware of the Mind, was not written to Mr. Schulte's attorneys, was included in public documents, and therefore it was never privileged. However, including a public paragraph in Malware of the Mind does not nullify privilege of that document—at most, the public paragraph remains public, but that taint does not infect the Malware of the Mind document. "Public, even extrajudicial, disclosures constitute a waiver of the privilege for the communications or **portions of communications disclosed.**" *United States v. Jacobs*, 117 F.3d 82, 91 (2d Cir. 1997) (emphasis and internal quotation marks omitted), abrogated on other grounds by *Loughrin v. United States*, 134 S. Ct. 2384 (2014).

Finally, it's critical to note that the Malware of the Mind document was a photocopy created by Mr. Schulte's attorneys for him to maintain in his confidential records while his attorneys maintained his original document. That photocopy remained within the protected legal mail when FBI Agent Donaldson executed his illegal general warrant and seized it. See *Davis v. Goora*, 320 F.3d 346, 351 (2d Cir. 2003) (noting that "courts have consistently afforded greater protection to legal mail than to non-legal mail."); see also *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003) (recognizing "heightened concern" with allowing prison officials to open and read mail that "has import for... the attorney-client privilege").

Suppression is warranted when evidence is obtained in violation of the Sixth Amendment or the Attorney-Client privilege. See, e.g., *United States v. Longo*, 70 F. Supp. 2d 225, 264 (W.D.N.Y. 1999) ("Where a violation of the attorney-client privilege is demonstrated, the remedy for such a violation is the suppression of evidence derived from the privileged communication."). "Unquestionably, government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel." *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) (citing *Massiah v. United States*, 377 US 201 (1964)). Accordingly, FBI Agent Donaldson's seizure of Mr. Schulte's legal mail and subsequent search of documents clearly marked as Attorney-Client privileged was unconstitutional. The Malware of the Mind document must be suppressed.

45

## VII. CONCLUSION

For these reasons, this court should find that the MCC Counts violate the First Amendment as they involve the communication or alleged attempted communication of public knowledge published in the public domain and discussed nationally by newspapers, magazines, and blogs. Additionally, this court should find the MCC Counts are a form of selective prosecution, brought about in a case of first impression and targeting Mr. Schulte for engaging in protected speech. Finally, this court should find that Malware of the Mind is attorney-client privileged. Accordingly, the MCC Counts must be dismissed and Malware of the Mind suppressed.

Dated: New York, New York
October 8, 2021

Respectfully submitted,

Joshua Adam Schulte
Slave #79471054
Metropolitan Concentration Camp (MCC)
150 Park Row
NY, NY 10007

46