LB8ASCHCps

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        17-cr-548 (JMF)

JOSHUA ADAM SCHULTE,

            Defendant.                Conference

------------------------------x

                                 New York, N.Y.
                                 November 8, 2021
                                 2:30 p.m.


Before:

                 HON. JESSE M. FURMAN

                                 District Judge


                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DAVID DENTON, JR.
     MICHAEL D. LOCKARD
     Assistant United States Attorneys

JOSHUA ADAM SCHULTE
     Defendant Pro Se

SABRINA P. SHROFF
     Standby Attorney for Defendant
     -and-
COLSON LAW PLLC
     Standby Attorneys for Defendant
BY:  DEBORAH A. COLSON


Also Present:  Daniel Hartenstine
               Classified Information Security Officer
```

LB8ASCHCps

1              (Case called)

2              THE CLERK:  Counsel, please state your name for the

3      record.

4              MR. DENTON:  Good afternoon, your Honor.  David Denton

5      and Michael Lockard for the government.

6              THE COURT:  Good afternoon.

7              MR. SCHULTE:  Josh Schulte, appearing pro se.

8              THE COURT:  Good afternoon, Mr. Schulte.

9              MS. SHROFF:  Good afternoon, your Honor.  Sabrina

10     Shroff and Deborah Colson, standby counsel.

11             THE COURT:  Good afternoon to you as well.

12             Mr. Schulte, if you could please pull your mask up to

13     make sure it covers your nose and mouth, that would be great.

14             First of all, let me introduce myself.  I think

15     everybody other than Mr. Schulte certainly knows who I am.  But

16     I'm Jesse Furman, the new district judge assigned to this case,

17     which means that I will be the judge who would preside over any

18     future trials and, in the event that you are convicted or the

19     convictions in trial number one stand, I will be the judge who

20     would sentence you.

21             The purpose of today's proceeding is to just, really

22     for me, to get a handle on where things stand, possibly to rule

23     on some pending motions, and generally get things sort of more

24     organized, I suppose, and possibly even set a trial date for

25     the second trial.

LB8ASCHCps

1          Now, I want to remind everybody that we are in an

2     unclassified setting, so you should restrict anything you say

3     to unclassified matters.  The court information security

4     officer, Mr. Hartenstine, and his colleagues are present, and I

5     will consult them as needed.

6          Now, let me start with just a couple housekeeping

7     matters.  First, I think there are a number of lawyers that

8     appear on the docket.  Can I confirm with the government and

9     the standby counsel that you're the only lawyers who are

10    currently on this matter and that we can terminate everyone

11    else?

12          MR. DENTON:  That's true for the government, your

13    Honor.

14          THE COURT:  Ms. Shroff?

15          MS. SHROFF:  Your Honor, Ms. Colson and I are standby

16    counsel assigned by Judge Crotty.

17          THE COURT:  All right.  Can you maybe pull the

18    microphone closer to you, and I have found that if you remain

19    seated and speak directly into the microphone, that's more

20    effective with the masks.

21          But, Ms. Shroff, are there any additional -- are you

22    the only standby counsel; is that correct?

23          MS. SHROFF:  No.  Me and Ms. Colson are standby

24    counsel.

25          THE COURT:  I know.  Are you and Ms. Colson the only

LB8ASCHCps

1    standby counsel?

2              MS. SHROFF:  Yes.  Yes.

3              THE COURT:  Thank you.  I just wanted to clarify, so

4    we can terminate everyone else that appears on the docket.

5              Second, Mr. Denton, can you just tell me where the

6    speedy trial clock stands and how many days remain on the

7    clock?

8              MR. DENTON:  Your Honor, I don't think any time has

9    been run off the clock.  I think time has been consistently

10   excluded since the beginning of the case except for time

11   periods like the present from October 25th to the present when

12   time is tolled automatically by the pendency of motions in this

13   case.

14             THE COURT:  All right.  Mr. Schulte or standby

15   counsel, anybody have a different view of that or wish to be

16   heard?

17             MR. SCHULTE:  Yeah.  I disagree with that.  I think,

18   especially, initially after the first trial ended, the time,

19   from my understanding of the Speedy Trial Act, is that pretrial

20   motions are excluded but not post-trial motions, so there was

21   some attempt to exclude time due to post-trial motions that I

22   don't think was appropriate.  And in other issues where time

23   was excluded, my counsel had disagreed with those -- with -- at

24   the time for those.

25             THE COURT:  All right.  Well, duly noted, and if there

LB8ASCHCps

1   is any application or motion on that front I will certainly

2   take it under advisement.  At the moment I would be inclined to

3   agree with the government that time is automatically excluded

4   by virtue of the pending motions.  And I think a number of

5   those motions have been pending for a period of time or, you

6   know, over a course of time have been filed.  So in any event,

7   I will table that for some later date.

8          I did want to hear from the government in the first

9   instance regarding the current conditions in the MDC with

10  respect to Mr. Schulte's access to a law library, his access to

11  the laptop and other things that he needed to access discovery

12  and the like.  I don't know if you've had an opportunity to

13  contact anyone at MDC or find out what the situation is.  But I

14  obviously want to ensure that, notwithstanding his transfer,

15  that he is able to access and continue working in whatever

16  manner he needs to prepare for trial.

17         MR. DENTON:  Your Honor, we haven't had a chance to

18  consult with the Bureau of Prisons.  We've been advised that

19  the inmates who are under special administrative measures at

20  the MDC have had access to law library resources since last

21  Friday.

22         We also understand that, with the exception of a brief

23  period sort of immediately after the defendant's transfer, he

24  did have access to his laptop, which does require charging in

25  the unit manager's office, I think.  The unit manager has been

LB8ASCHCps

1    doing that.  And he's had access to it since that time.

2            THE COURT:  All right.  So your understanding is that

3    the issues raised by standby counsel in the letter at ECF

4    no. 571, that those issues have been resolved, at least for the

5    time being?

6            MR. DENTON:  Yes, your Honor.

7            THE COURT:  All right.  Mr. Schulte.

8            MR. SCHULTE:  So for the law library issue, ever since

9    I was moved to MDC on the 17th or 18th, I've not had access to

10   it.  So I still at this time have never been to any law library

11   or discovery review.

12           The laptop had been -- has been charged.  However,

13   I've been unable to review discovery due to the fact that the

14   hard drives require external power that I do not have and I've

15   not been to the law library, as well as issues with the DVD

16   drive that I still do not have.  And I would request -- I've

17   moved for this before, for the government, but this time I want

18   to make it clear that, in the past, I had a previous laptop in

19   which the government sent me multiple CDs and DVDs with

20   programs, such as forensic programs, video-viewing programs,

21   and other programs for being able to dissect and review the

22   discovery.

23           In addition, I have had multiple CDs sent to me both

24   by the government and by my attorneys that have had discovery,

25   as well as attorney-client confidential information.  The new

LB8ASCHCps

1    laptop that I purchased, most new laptops don't have DVD

2    drives, and so I have been requesting this external DVD drive

3    for a very long time now.  And I still, I still do not have it,

4    so I cannot review forensics and other important information.

5    So I just wanted to request this DVD drive.

6              And on the same topic for the DVD drive, Judge Crotty

7    previously -- I requested with him permission with the court

8    for me to file letters and motions by putting them on blank CDs

9    and mailing them to the court on PDFs.  Judge Crotty permitted

10   this.  But we were never able to actually do that because I

11   didn't have a DVD drive or CDs, and I was wondering if the

12   Court would be open to that, since at MDC I haven't have access

13   to a printer, and the easiest way for me would be to just burn

14   it to a CD, mail it to the Court.

15             THE COURT:  All right.  First of all, if you could

16   please put your mask over your nose, I would appreciate it.

17             MR. SCHULTE:  I think it's falling off.

18             MS. COLSON:  The mask is too large on you.

19             MR. SCHULTE:  I might need another one.

20             THE COURT:  All right.  Well, I don't know if there's

21   another one available.  But given that we have a mask rule, it

22   does need to be on.

23             I take it the marshals don't have another one; is that

24   correct?

25             A MARSHAL:  Sorry, your Honor.

LB8ASCHCps

1          THE COURT:  My deputy is going to go look for

2     something.

3          Mr. Denton, I don't know if you can respond to any of

4     that.  Obviously, some of these issues are coming up for the

5     first time for my purposes, so I need to familiarize myself

6     with them.  But can you tell me what the story is with this DVD

7     drive, with filing things in that manner, so on and so forth?

8          MR. DENTON:  In part, your Honor.  We'll have to

9     follow up on the DVD drive.  Defense counsel had previously

10    provided us with an external disc reader, which we in turn

11    provided to the MDC.  They confirmed that they had received it,

12    and it was our impression that it had been delivered to the

13    defendant, but we can certainly follow up and find out why that

14    isn't the case.

15          With respect to filing things, I think one of the

16    issues is going to be that, as a matter of BOP policy, the

17    defendant is not allowed to have blank CDs or unmarked CDs.  He

18    can have marked discovery CDs, things like that.  So I'm not

19    sure whether it's going to be possible for him to have the

20    blank CDs.  I think it's a matter of the efficiency or the

21    mechanics.  We don't have a dog in that fight and we defer to

22    the Court on whatever the Court believes to be the most

23    effective way for the defendant to make his filings going

24    forward.

25          THE COURT:  And do you know -- Mr. Schulte indicated

LB8ASCHCps

1     that Judge Crotty had indicated that he would be OK with

2     proceeding in that manner.  Do you know if that's accurate or

3     where that appears on the docket?

4               MR. SCHULTE:  So --

5               THE COURT:  Hold on, Mr. Schulte.  I'm just asking

6     Mr. Denton.

7               MR. SCHULTE:  Oh, I'm sorry.

8               MR. DENTON:  Your Honor, I know that was discussed.

9     I'm not sure we ever got to an implementation point, and I

10    don't think an order was ever entered to that effect.

11              THE COURT:  Mr. Schulte, can you point me to something

12    on the docket?

13              MR. SCHULTE:  I'm sorry.  I just had an email from the

14    district court, from his deputy, discuss -- basically saying

15    that the court allows that to proceed.

16              As far as the blank CDs, from my understanding with

17    the BOP, they returned most of those, and when I inquired about

18    that, they didn't seem to be opposed.  I received other CDs and

19    DVDs from standby counsel that have been blank that they

20    haven't objected to.  So I don't know if that's the policy at

21    the BOP or not.

22              THE COURT:  All right.  So let me say a couple things.

23    First of all, Mr. Denton, I want you to look into the issues

24    that Mr. Schulte has mentioned with respect to the DVD, with

25    respect to the need to charge and the external hard drive.  I

LB8ASCHCps

1    do not want those sorts of things to be delaying this

2    litigation.  I want to resolve those issues.  I want to ensure

3    that Mr. Schulte has access to whatever he's entitled to and

4    that there are no technology or, you know, logistical hurdles

5    that prevent him from preparing for trial.  So I'm going to

6    request that you look into that, speak to folks at the MDC.

7    You can tell them that if it's not resolved soon, that they'll

8    hear from me and either will have to come here or I'll be in

9    touch.  But hopefully you can get to the bottom of it and

10   ensure that he has whatever he needs to have.

11        Now, I want a letter from you on that score, let's say

12   by next Monday, filling me in on where that stands and what he

13   does have, what he doesn't have.  And to the extent that he has

14   raised anything in particular, you know, if there are any

15   restrictions and he can't have that, I want to know what those

16   are.  All right?

17        MR. DENTON:  Yes, your Honor.

18        THE COURT:  All right.  Thank you.

19        MR. DENTON:  Just briefly with respect to the external

20   hard drives, we also discuss at one point when this came up in

21   the past that the government would be willing to reproduce the

22   contents of those hard drives on new hard drives that do not

23   require external power.  So if the defendant or standby counsel

24   would prefer to go that route, we're still happy to do that.

25   But we will nevertheless make appropriate inquiries at BOP.

LB8ASCHCps

1          THE COURT:  All right.  I'm agnostic as to whether

2     it's better to do that or fix whatever the problem is, but

3     whatever it is, I want to make sure that we have a path forward

4     and this isn't hindering Mr. Schulte's preparations for trial.

5     And to the extent that issues in this -- this is a general

6     proposition -- to the extent that issues of this sort have been

7     litigated before and there are relevant orders or prior

8     submissions that are relevant, definitely make a point of

9     pointing them out to me.  Don't presume that I will know or

10    remember or be able to find them.  So if Judge Crotty has

11    issued any rulings that are relevant to these or any other

12    issues, definitely make sure you educate me about that.

13         On that score, Mr. Schulte, I'll leave it to you and

14    standby counsel.  If you wish to renew the request to submit

15    things by DVD or CD and you have the capacity to do that, you

16    can make a new request.  If there is any prior correspondence

17    or ruling from Judge Crotty that is relevant to that, you

18    should certainly bring it to my attention.  But I'll give you

19    an opportunity to make that request.  And I will certainly

20    consider it in due course.  But talk to your standby counsel,

21    and then you can make whatever request you think is appropriate

22    on that score.

23         All right.  Any other sort of practical issues of that

24    sort to address before we turn to the pending motions?

25    Mr. Schulte?

LB8ASCHCps

1          MR. SCHULTE:  Yes.  There were, I think, two other or

2     three other discovery-related issues I just wanted to -- two or

3     three other discovery-related issues, and then I had some

4     additional MDC issues as well.  Do you want me to --

5          THE COURT:  Go ahead.

6          MR. SCHULTE:  Do you want me to discuss -- so the

7     discovery -- for the discovery, Judge Crotty entered an order

8     September 23, 2021, docket 513.  He ordered the government to

9     produce the forensics from server Serve-02 and desktop SC01 to

10    me by October 6.

11         So what these -- these computers were seized pursuant

12    to a search warrant five years ago and were never produced to

13    the defense for five years.  And so now the government is

14    saying that they have to be produced in the SCIF for review,

15    due to the fact that one of them has documents from the

16    internet on it, from the Snowden document, so the whole server

17    is tainted.  And then the desktop as well.

18         So Judge Crotty ordered the government to produce

19    those October 6.  The government never did.  And to my

20    knowledge, to this day, they still have not produced those.

21         THE COURT:  All right.  Stop there.

22         Mr. Denton?

23         MR. DENTON:  So that's not accurate, your Honor.  The

24    government previously produced both of them on a single hard

25    drive.  One server contains classified information.  The other

LB8ASCHCps

1    server contains child pornography, which is subject to certain

2    handling restrictions.  As a result, that hard drive was

3    maintained in a special safe in the SCIF consistent with those

4    handling restrictions.  At some point, there was an error, or a

5    fault, with the safe.  And so the hard drive had to be removed.

6    And for a period of time I think it was maintained by the

7    classified information security officer.  My understanding was

8    that it had since been returned, there was a new safe, and that

9    they -- that the hard drive had been returned to where it was

10    previously.

11           THE COURT:  OK.  So, Mr. Schulte?

12           MR. SCHULTE:  Yes.  So this was discussed before in

13    front of Judge Crotty, and my -- my standby counsel can talk to

14    this issue, but the government basically produced it, to my

15    standby counsel.  He didn't have a combination, didn't know

16    about it.  And the whole time they never opened the safe.  They

17    never took it out.  I never reviewed it.  They never reviewed

18    it.  So the fact that the government says it was produced,

19    maybe it was, but my standby counsel didn't have the

20    combination, never opened it, and that's actually what ended

21    up -- how the safe ended up breaking is because it was never

22    opened.

23           THE COURT:  Mr. Schulte, I'm not so interested in the

24    past.  It sounds like Mr. Denton said that they have complied

25    with Judge Crotty's order and that you now have access to it.

LB8ASCHCps

1    Do you have any reason to disagree or --

2              MR. SCHULTE:  Yes.  Just, unless the CISO knows that

3    it's been produced.  But to my knowledge, since I've been in

4    this, obviously the last few weeks I haven't been to the SCIF,

5    but since October 6 at least two other SCIF times I went and I

6    did not find it there.  My standby counsel didn't see it

7    either.  And I asked the CISO, and to my knowledge it's still

8    not --

9              THE COURT:  All right.  Mr. Hartenstine?

10             MR. HARTENSTINE:  Your Honor, the drive is currently

11   in a small two-door safe, distinguishable from the other safes

12   inside of the SCIF in the type, and the combination to that

13   SCIF is set to a combination that's been shared with the FBI,

14   so that an agent, in consistence with my understanding of the

15   policy for child-pornography-related material, that the FBI can

16   open the safe for Mr. Schulte during his SCIF sessions.

17             THE COURT:  All right.  Very good.

18             Well, Mr. Schulte, it sounds like that issue has been

19   resolved.  I trust that you and through your standby counsel

20   will coordinate with the CISO and the FBI to make sure that you

21   can access this.  But it certainly sounds like it has been

22   produced and it is in the SCIF.  Obviously let me know if that

23   turns out not to be the case, but --

24             MR. SCHULTE:  So the -- I thought only one -- my

25   understanding from the Court's previous order is that the

LB8ASCHCps

1      server itself, there is no need for it to be produced -- or to

2      be locked into the cabinet, because there's no -- no reason for

3      that.  It's the Snowden documents.  Right?  So that one should

4      not be in the safe.  Correct?

5              MR. HARTENSTINE:  That's correct.

6              THE COURT:  Mr. Schulte, you speak to me.

7              MR. SCHULTE:  Oh, I'm sorry.

8              THE COURT:  If I choose to direct a question to

9      Mr. Hartenstine I will, but speak to me and not to him.

10             Mr. Hartenstine.

11             MR. HARTENSTINE:  I apologize, your Honor.  That is

12     correct.  There are two separate drives that were contained on

13     one hard drive previously, and one of those drives, in my

14     understanding, contains the child-pornography material.  The

15     other drive, which has been referred to as the Snowden drive,

16     does not.  However, because they were both combined onto one

17     drive, I think they have both been subject to the storage

18     requirements.

19             THE COURT:  All right.  Well, I don't know if

20     that's -- I guess that would have to be -- see if that's

21     necessary.  If there are undue restrictions, so to speak, on

22     the child-pornography drive, for lack of a better way of

23     describing it, that wouldn't necessarily have to provide to the

24     other and there's a means of providing those to Mr. Schulte so

25     that he can use them more readily, I think we should get that

LB8ASCHCps

1   done.  But --

2           MR. DENTON:  If I may, your Honor, when the drive was

3   returned to the SCIF, we did that.  We split the two servers

4   onto two different hard drives.  So there is one that is

5   classified and has to remain in the SCIF and one that has to

6   remain in the SCIF subject to the child-pornography handling

7   requirements, but they should now be separated onto two

8   different drives.

9           THE COURT:  And your belief is that the first one is

10  classified, though?

11          MR. DENTON:  Yes, your Honor.

12          MS. SHROFF:  I apologize, your Honor.  Did Mr. Denton

13  say should be split or should not be split?

14          THE COURT:  I believe he at least was intending to say

15  or communicate that they have been split and that they are now

16  on two different drives.

17          MS. SHROFF:  OK.  Thank you.

18          THE COURT:  So it sounds like this may be a non-issue.

19  Why don't you and standby counsel try to get to the bottom of

20  it, try and work with the CISO he and/or the government, but it

21  sounds like it should be available to you and hopefully that

22  issue is resolved.

23          What's next, Mr. Schulte?

24          MR. SCHULTE:  The other issue -- two -- the SCIF, it

25  sounds like, may be resolved.  And then the other issue --

LB8ASCHCps

1    well, we can come back to discuss that.  The other issue is,

2    Judge Crotty, one of his last orders was an electronic copy of

3    the docket to be produced, basically the whole docket

4    downloaded with all the different attachments and stuff so that

5    I could access that material.  And I don't have that yet.

6             THE COURT:  So could be wrong because I'm reading a

7    lot and trying to get up to speed on everything, but I was

8    under the impression that the government had filed a letter

9    indicating that that had been provided.  Is that incorrect,

10   Mr. Denton?

11            MR. DENTON:  So, your Honor, I think that goes with

12   the DVD drive.  We provided both of those together, and, again,

13   it was our impression that those had been provided by the MDC

14   to Mr. Schulte.  We'll follow up on that as well.

15            THE COURT:  All right.  So why don't you address that

16   in your letter to me by next Monday.

17            Mr. Schulte, anything else?

18            MR. SCHULTE:  So the SCIF, so I know the Court has

19   issued several orders, and I received them all today.  You

20   know, it takes me a long time to actually -- before I receive

21   mail, but my standby counsel provided a lot of it to me today.

22   I wasn't able to go through all of this, but they read some of

23   this, the things, to me.

24            But before, in the SCIF, I was having issues where I

25   was missing over 50 percent of the SCIF days, not being able to

LB8ASCHCps

1    be produced there.

2              And I also wanted to let the Court know that, two

3    weeks ago, I sent several letters to the Court.  And I didn't

4    know yet -- your order dated October 28, I did not see that

5    yet.  So there is potentially four or five letters from me

6    coming in at some time to the Court that addresses the SCIF and

7    some other issues.  But from my understanding, there's been

8    some rulings that you issued about the SCIF.  So some of this

9    may be resolved.  But the issue was, just before I was supposed

10   to go, at least two times --

11             THE COURT:  Let me interrupt for a second, because let

12   me tell you where things stand and perhaps that will moot some

13   of what you have to say.

14             MR. SCHULTE:  OK.

15             THE COURT:  I certainly understand that access to the

16   SCIF has been an ongoing issue and I am hoping that we can and

17   will resolve it.  To that end I called the U.S. marshals

18   themselves to discuss this, and underscored the importance of

19   ensuring that you have an adequate amount of time in the SCIF

20   and its necessity to get this case to trial.  He looked into

21   it, got back to me, and basically committed to providing two

22   SCIF days, eight hours per day, so I guess double per what was

23   the baseline to date, going forward, and provided a contact in

24   the marshal service for counsel to coordinate with, and a

25   schedule of days for the next month.  And my understanding is

LB8ASCHCps

1    that that will then be done on a month-by-month basis going

2    forward, that they will basically provide the days in advance

3    and it should be two days per week, eight hours per day, and

4    that way, you know, substantially more than you've had to date.

5         Having said that, I also know that Judge Crotty

6    entered an order indicating that when a trial date is set --

7    and, again, my intention is to do that today -- that the

8    parties should confer and try and figure out appropriate terms

9    for increased SCIF time as the trial approaches to ensure that

10   you have an adequate amount of time to prepare.  And I'm

11   certainly prepared to do what I need to do to ensure that that

12   happens as well.

13        So, again, without needing to necessarily dwell on

14   things in the past, my hope is that that puts things on a

15   better path going forward.  But I don't know if, having heard

16   that, you have anything you wish to say, but hopefully that

17   will work.

18        MR. SCHULTE:  Yes.  So thanks, Judge.  That additional

19   time, especially in the missed SCIF days, would be great.  One

20   of the issues too -- it sounds like maybe they would -- my

21   standby counsel and the marshals and everyone would discuss,

22   because one of the other issues too was the timing.  But it

23   sounds like we could probably discuss that without your

24   intervention.  But I know that since the marshals had to take

25   me separately before, what they had to do was, the marshals had

LB8ASCHCps

1    to wake up at like 2 a.m., pick me up at 4 a.m., for me to sit

2    over here for like seven hours before it started.  So it ended

3    up wasting a whole bunch of time for all that.  But the

4    eight-hour day is, I think, if we can just optimize -- my

5    standby counsel can optimize with the marshals and the time,

6    setting up the time, so, you know, the timing is OK.  And if it

7    ends up cutting into the time or a little bit later, something,

8    it's not a big -- not a big deal.

9            THE COURT:  Very good.  Needless to say, I would like

10   to avoid having to be personally involved in the, you know,

11   actual mechanics of it.  But I will make sure that you have an

12   adequate amount of time and that generally speaking there

13   aren't big-picture issues.  But I certainly expect that counsel

14   will coordinate with one another and with the marshals to

15   actually get it done, whatever that may mean.

16           All right.  So hopefully that will help going forward.

17           Any other issues of that nature, Mr. Schulte?

18           MR. SCHULTE:  I think that was the last issue with the

19   discovery.  My next issues, whenever the Court -- or with the

20   Court's permission would be discussing some issues, some MDC

21   issues related to confinement.

22           THE COURT:  All right.  Why don't we talk about that

23   now and get those out of the way, and then we can talk about

24   the pending motions.  So go ahead.  Tell me about that.

25           MR. SCHULTE:  All right.  So the first thing regarding

LB8ASCHCps

1   the MDC issues I wanted to bring to the Court's attention is,

2   there's three major issues going on at the MDC that we've been

3   trying to resolve for the last two to three weeks, and it's

4   about sleep deprivation, not being fed, and issues with the

5   temperatures.  So those are the three major issues.

6          And the first one, for the sleep deprivation, is, the

7   most units in general population have lights that turn off and

8   turn off.  The MDC spent taxpayer dollars to modify our unit,

9   which was a general population unit, to install bright lights

10  that burn 24/7.  And these lights prevent, prevent sleep.  And

11  it's -- they're arbitrarily imposed.  There's no reason to

12  install these 24/7 bright lights.

13         In addition to the lights, the MDC has mandated that

14  the corrections officers at MDC make rounds at night five times

15  more than general population.  So every ten minutes they come

16  by.  There's a little window to the -- to -- on our door that

17  they open to look in and then they slam it shut.  So it's

18  always (gesturing) -- every ten minutes, you're hearing this

19  banging.  And so I wanted to request that the Court basically

20  order the 24/7 bright lights to be removed back to the situ --

21  the way it was before.

22         And then for the, the doors that are being slammed, at

23  MCC they have rubber around these doors so that if it slams it

24  would just swing back at the officer.  So I would ask that the

25  MDC just implement this same policy, not have them slam it.

LB8ASCHCps

1    And then for the rounds that the officers are making, there's

2    no reason that they shouldn't make the same number of rounds as

3    everyone else through general population.

4            THE COURT:  All right.  The food issue?

5            MR. SCHULTE:  So the food issue is, we're no longer

6    receiving three regular meals a day.  Actually on Saturday we

7    didn't get breakfast.  When they fed us at 12:30 for lunch I

8    got a -- I only got a piece of bread.  And I didn't get dinner.

9    And this isn't the first time that I only had one meal a day.

10           The other times when we are receiving the food, it's

11   about 10 percent of what we had at MCC.  They are little

12   bite-size trays that are half a piece of paper, not including

13   the margins, split up, and barely any food in them.  And I

14   know, I was at MDC before so I know the trays and the food that

15   they gave to general population, and we're not -- we're not

16   getting the same trays, the same amount of food as general

17   population is getting.

18           So I wanted to ask the Court to compel the MDC to feed

19   us three times a day, same as general population, at the same

20   times they feed general population, which is generally 7 a.m.,

21   11 a.m., 5 p.m., and to provide us the exact same food as

22   general population and the exact same trays, the same amount.

23           And also double trays.  When we were at MCC this was

24   what they did, because general population has the ability to

25   get seconds.  So while we were at MCC they provided us two

LB8ASCHCps

1    standard trays, the same trays --

2           THE COURT:  All right.  Mr. Schulte, I'm not going to

3    get into the business of ordering the MDC to give you seconds

4    of meals on that level of detail.  That's just not what my job

5    entails.  They run the jail and I'm not going to run it for

6    them.

7           Having said, I certainly want to ensure that you're,

8    you know, not, again, having trouble preparing for trial and

9    generally being treated in a civilized manner.  But if it gets

10   into that level of, you know, micromanagement of their

11   business, that's not what I'm here for.

12          So what's the third issue, is temperature regulation,

13   you said?

14          MR. SCHULTE:  Yeah.  So when we were at MCC they

15   didn't provide heat in the winter.  The officers wore like

16   three different ski jackets.  And when they first took us to

17   MDC we were on the SHU and there was heat flowing in.  You

18   know, we are just wore regular -- I just wore a regular shirt.

19   But then they moved us to the special area that they had for

20   us, there's no heat, and I'm constantly wearing like three,

21   three pairs of thermals, multiple sweatshirt and pants and like

22   four blankets, just to keep warm.  Now the last few days it's

23   been a little warmer outside.  But I just wanted to ask that

24   the MDC just provided the same amount of heat as they're

25   providing general population.

LB8ASCHCps

| | |
|---|---|
| 1 | THE COURT:  All right.  Mr. Denton, any reactions, |
| 2 | thoughts?  Do you want to check with the MDC about some of |
| 3 | these issues and include it in your letter next Monday?  Again |
| 4 | mindful that I'm not going to involve myself in micromanaging |
| 5 | what BOP is doing, but I do want to make sure that Mr. Schulte |
| 6 | is being treated in a human manner and able to prepare for |
| 7 | trial. |
| 8 | MR. DENTON:  Yes, your Honor.  This is the first we're |
| 9 | hearing of most of this at the MDC.  We'll inquire and report |
| 10 | back to the Court. |
| 11 | THE COURT:  All right.  Thank you.  So I'll look for |
| 12 | that in a letter next Monday and we'll take it up as needed. |
| 13 | Now, is that it, Mr. Schulte? |
| 14 | MR. SCHULTE:  So those are the major issues.  Now, for |
| 15 | the other issues, I don't know if the Court would prefer me to |
| 16 | write a letter or a motion to address them instead of |
| 17 | addressing them here?  Most of it is essentially arbitrary |
| 18 | things that they've done.  For example, everyone at MDC, when |
| 19 | they go to recreation outside, they have basketball courts. |
| 20 | For us, when we go outside, they literally took the basketball |
| 21 | goals down and took our balls away so we couldn't, you know. |
| 22 | So it's arbitrary things like this that's not really -- it's |
| 23 | just petty kind of things that -- it's arbitrary.  It shouldn't |
| 24 | be applied. |
| 25 | THE COURT:  All right.  Mr. Schulte, you're welcome to |

LB8ASCHCps

1    submit it in writing if you wish.  I just would ask you to make

2    sure that, if it doesn't rise to the level of something that

3    involves basically humane treatment, you know, minimum

4    civilized humane treatment, or interfere with your ability to

5    prepare for trial, I'm not really going to be interested in it

6    and you're not likely to get anything from me on it.  If it's a

7    question of how many basketballs you're getting or whether

8    you're entitled to seconds of a meal, it's just not something

9    that I'm concerned with.  If it pertains to your, you know,

10   civilized treatment, I'm concerned with it.  If it pertains to

11   your ability to prepare for trial in this case, I'm concerned

12   with it.

13          So with that proviso, you're certainly welcome to put

14   anything you want in the letter to me and I will take it under

15   advisement and we'll deal with whatever we need to deal with.

16   All right?

17          MR. SCHULTE:  OK.

18          THE COURT:  All right.  One practical question.  Given

19   that Mr. Schulte is representing himself, I don't know; do I

20   need to, in my orders, indicate -- I guess the question is, how

21   do orders get to him?  Is that standby counsel's

22   responsibility?  Do I need to direct that the government serve

23   him?  How does that work?

24          MR. DENTON:  So, your Honor, that's actually something

25   that is a little bit in flux right now.  The defendant had been

LB8ASCHCps

1    having issues with receiving court orders and other legal

2    correspondence in general at the MCC.  As an interim solution,

3    what we were doing was, the government was providing copies of

4    court orders and government filings to the MCC legal

5    department, who were in turn hand-delivering it to the

6    defendant.  As of today, the MDC advised us that they now

7    believe that they're in a position to handle those things

8    through the regular mailroom delivery process, that they have

9    significantly more staff than they did at the MCC, and who are

10   better trained, and so they're no longer going to provide the

11   kind of hand-delivery that we were doing before.  We obviously

12   stressed to them that, particularly given that Mr. Schulte is

13   representing himself, it is essential that he receive court

14   orders in a timely fashion and that the 14-day specification in

15   the special administrative measures for delivery of mail really

16   was not going to work, for things like court orders.  They

17   advised us that they understood that and would convey the

18   seriousness of it, and we explained we would let the Court know

19   about the change in process.

20           THE COURT:  OK.  I will say I've heard, in cases with

21   fewer complications than this, about referring complaints about

22   the delays in the delivery of mail and legal mail in particular

23   that we see.  I certainly understand that they are screening

24   for certain things and trying to make sure that things don't

25   get to prisoners.  I get that.  But I do want you to underscore

LB8ASCHCps

1   to them that I don't want there to be any undue delays in the

2   delivery of legal mail for Mr. Schulte, let alone of any orders

3   that I issue, to keep this case on track.  You know, it's just

4   not going to be feasible if there are multi-day or multi-week

5   delays between issuing things and actually getting them to him.

6          MR. DENTON:  We have done that and will continue to,

7   your Honor.

8          We also reiterated to them that it was entirely

9   possible that the Court would order us to continue the

10  hand-delivery process.  So if for whatever reason the MDC's

11  preferred regular mail delivery is not working, they're upon

12  notice that the Court may intervene.

13         THE COURT:  All right.  Well, why don't we see if it

14  works.  If there's a problem, then I'm not averse to entering

15  an order directing them to do something different.  But see if

16  it works in the normal course first.

17         Ms. Shroff, did you have something you wanted to say

18  on that?

19         MS. SHROFF:  Yes, your Honor.  So I think the part --

20  your docket entry -- this is 570.

21         THE COURT:  Can you speak into the microphone.

22         MS. SHROFF:  Sorry.  So it's docket entry no. 570.

23  The Court on October 28th ordered defense counsel and the

24  government to mail the order that the Court had issued to

25  Mr. Schulte.  So I sent a copy.  I know Ms. Colson, I believe,

LB8ASCHCps

1   sent a separate copy.  And I believe the government must have,

2   because I'm just assuming they complied with the order.

3   Mr. Schulte has still never received that order.  Right.  So

4   I'm just -- I'm sure Mr. Denton will do all he can.  I have no

5   reason to doubt it.  But I just wanted the Court to know that

6   he has to date not received that order.  Ms. Colson and I read

7   it to him word for word.  That's one problem that we have.

8          The second problem that Mr. Schulte continues to have

9   is that, despite many requests, he does not get a legal call.

10  So, for example, on the week that the SCIF was canceled, we

11  were not able to get a legal call put into place because we

12  don't have the same amount of notice.  He couldn't get a legal

13  call out to us.  And Mr. Schulte can speak to that more

14  directly if he wants.

15         But if the Court would just help us on these two

16  matters, because we are at a huge disadvantage on this

17  otherwise.  We just can't get work to him.

18         And also, if he is pro se and we are mailing him

19  things and he's simply not getting them, that is contributing

20  to his, I would say, rightful dismay at how we're handling our

21  mailing obligations.  So I'm just putting it out there for the

22  Court because I worry that it's going to become a bigger and

23  bigger issue.

24         THE COURT:  Well, I worry that it's going to become a

25  bigger and bigger issue too.  So for that reason I will

LB8ASCHCps

1    certainly stay on top of it.  Let's see how things go with the

2    new procedures.  But it doesn't bode well that he has yet to

3    receive a mailed copy of the OK 28th order.  Assuming that was

4    mailed promptly after it was entered, it's been, I think, 11

5    days, and that doesn't make me optimistic.

6             So, Mr. Denton, you're welcome to convey that when you

7    speak to folks there this week and say that, you know, I'm not

8    going to let that go on.  And if it does continue to happen

9    we'll come up with a different plan, but hopefully they can

10   make it work.

11            Ms. Shroff, as for the second issue, is there

12   something in particular that you would propose or request?

13   Obviously I don't know what's been going on to date, in terms

14   of attorney calls, but --

15            MS. SHROFF:  Just so that if he -- if Mr. Schulte

16   requests a legal call, we just ask that the MDC provide him

17   one.  Apparently he was told that there wasn't adequate staff

18   or whatever it is that Mr. Schulte was told, that he couldn't

19   get a call in several times, not this week, but the week

20   before, to even get a call.  He got one call.  And last week

21   apparently he tried to call us because he wasn't taken to the

22   SCIF.  He didn't get a call at all.

23            So to the extent that somebody could actually give him

24   a legal call when he requests one, that would be appreciated.

25   Thank you.

LB8ASCHCps

1          THE COURT:  Mr. Denton, you could certainly convey

2     that as well.  I think we need to give MDC a little bit of time

3     to see if they can sort things out between the influx of new

4     inmates from the MCC, additional security issues pertaining to

5     Mr. Schulte, COVID, you know.  There are a lot of issues going

6     on that certainly don't make it easy to comply with each and

7     every request.  That being said, I certainly agree that

8     Mr. Schulte needs to have the means to communicate with standby

9     counsel, and that's essential to ensure that he understands

10    what's going on, that he understands when I have entered an

11    order and so forth.  So let's keep our fingers crossed if there

12    are ongoing issues, and if there are I will address them.

13          All right.  Let's talk about more substantive things.

14    In my order of October 28th that Ms. Shroff indicates she's --

15    they've read to Mr. Schulte, I had listed what I understand to

16    be the pending motions, and asked the parties to indicate if

17    there were any that were omitted.  The government in its

18    November 5th letter confirmed that that is the universe of

19    pending motions, some of which are fully submitted, some of

20    which are not yet fully submitted.  But, Mr. Schulte, I wanted

21    to check with you, since I know you didn't have a chance to

22    submit a preconference letter, if there are other motions that

23    you believe are pending and I should be aware of.

24          MR. SCHULTE:  I don't think that there are any

25    additional motions pending.  There was a *Brady* violation letter

LB8ASCHCps

1   that was filed, I believe September 14th, that I was waiting

2   for the Court to read and consider and order relief.

3        THE COURT:  All right.  Mr. Denton, do you know what

4   that refers to?  I'm not sure I know what he's talking about.

5        MR. DENTON:  Yes, your Honor.  I think our

6   understanding is that that order -- that letter was addressed

7   by Judge Crotty's order denying the defendant's request for

8   production of additional server data from the CIA.  Ultimately

9   that was what it pertained to.  I'm not sure off the top of my

10  head whether that was one of the docket entries that was

11  specifically listed in Judge Crotty's order.  But we can

12  double-check and confirm on that.

13       THE COURT:  All right.  Why don't you fill in by

14  letter next Monday.  And obviously Mr. Schulte will get a copy

15  of that.

16       If, Mr. Schulte, you think there's anything that

17  remains open or any new issue that remains on that score, you

18  should let me know thereafter.

19       All right.  Let's talk about the motions, then, that

20  are pending.  There are three that are for the most part fully

21  submitted, aside from the Rule 29 motion, which I will bracket

22  for today's purposes.  Let me talk about those three, beginning

23  first with the motion to suppress evidence seized from the MCC.

24  That is ECF no. 455.  The government's opposition is at 499.

25  And the defendant's reply is at 521.

LB8ASCHCps

1          First, let me say that, to the extent that Mr. Schulte

2     asks me to disregard the government's opposition, and he does

3     at page 2 of his reply, that request is denied.  There's no

4     prejudice to him, since he was able to file a reply.  And as

5     far as I can tell, it seems like both sides have taken some

6     liberties with respect to prior filings in this case, and I'll

7     have more to say on that in due course.  But otherwise I will

8     consider the government's opposition and Mr. Schulte's reply.

9          I had a couple questions and then I may be able to

10    rule on the issue.  Mr. Denton, let me pose a couple questions

11    to you in the first instance.  First, I'm having a little

12    trouble understanding -- and, again, I want to emphasize that

13    we're in an unclassified setting -- precisely the relationship

14    between the so-called Schulte articles and email and what is or

15    was or wasn't classified.  And I guess I have two questions.

16    First is, does that matter to the legal issues that I need to

17    decide in this motion?  The subject defenses included not only

18    the disclosure of classified information but also violation of

19    the Court's protective order, possession of contraband in a

20    federal facility, and forth.  So it's not clear to me whether

21    something that is or isn't classified, whether that matters.

22    And second, to the extent it does matter, can you just, again,

23    to the extent you can in an unclassified setting, set me

24    straight as to what you see the relationship between these two

25    things as being.

LB8ASCHCps

1          MR. DENTON:  So I think, fundamentally, your Honor, it

2     doesn't matter.  I think a large part of the reason why it

3     mattered was that the defendant made much in his motion of a --

4     the purported fact that what he described as his tenth article

5     was something that had been provided to him in unclassified

6     discovery.  There was a difference between what he was calling

7     his tenth article and item no. 10 on the list of articles

8     specified in the search warrant affidavit and warrant itself.

9     And so it was the article specified in the warrant affidavit

10    and the warrant appendix that did include classified

11    information that has only ever been produced in a classified

12    setting.  So I think we're just correcting the record with

13    respect to that.  But fundamentally, I don't think it matters,

14    your Honor.

15          THE COURT:  All right.  And number two, in your

16    opposition you relied on the fact of the indictment to support

17    probable cause.  Can you elaborate on that.  What's the

18    relationship between the indictment and the probable cause on

19    the day of the search to believe that there would be evidence

20    or fruits of the crime in Mr. Schulte's cell or in the MCC?

21          MR. DENTON:  So, your Honor, I think, again, when

22    evaluating the search warrant affidavit under the totality of

23    the circumstances set forth therein, the indictment is one fact

24    that Judge Crotty was entitled to consider.  Certainly standing

25    alone, it probably would not be sufficient.  But when

LB8ASCHCps

1    confronted with someone who has been indicted by a grand jury

2    for the transmission of unlawfully possessed classified

3    information, coupled with a variety of other facts set forth in

4    the affidavit, that indicate the defendant's intention to

5    continue surreptitiously transmitting information, the fact of

6    the indictment is something that bears on what Judge Crotty was

7    entitled to consider.

8              THE COURT:  All right.  But you were not suggesting

9    that that, standing alone, provided probable cause to justify a

10   search on October 3rd or 2nd of 2018.

11             MR. DENTON:  No, your Honor.

12             THE COURT:  And lastly, let me just clarify, I don't

13   know if there's a factual dispute or what, but I think

14   Mr. Schulte indicated that some materials were seized from his

15   cell on the 9th floor, that he has moved, I guess, from the 7th

16   to the 9th floor, and that some materials were seized from the

17   9th floor, and that the 9th-floor cell was not within the scope

18   of the warrant.  I think you indicated in your submission that,

19   I think, that some materials were taken or recovered from the

20   MCC that had been moved from the cell on the 7th floor but not

21   that they were from the cell on the 9th floor.  Is that --

22             MR. DENTON:  That's correct, your Honor.  There were a

23   set of materials that MCC officials had taken that were in an

24   office at the MCC that were provided directly from the office

25   to the FBI, not from the cell on the 9th floor.

LB8ASCHCps

1          THE COURT:  And what's your view -- to the extent that

2     there is a factual dispute on that issue, what's your view of

3     its materiality or relevance to me?

4          MR. DENTON:  Your Honor, I don't think it's material

5     or relevant, particularly in light of the fact that there was a

6     second search warrant that was obtained for the materials that

7     were obtained from the office.  Those are the notebooks and

8     other material that were described as privileged.  So in this

9     instance, the material came from the cell, it was in the scope

10    of the warrant, was lawfully taken from the cell by the MCC

11    officials, not pursuant to a warrant but simply pursuant to

12    their administrative exercise of moving the defendant.  They

13    then gave it to the FBI and got a second search warrant for

14    that set of materials after identifying that there was

15    potentially privileged information therein.

16         THE COURT:  All right.  Mr. Schulte, let me, I guess,

17    hear from you on a couple of those issues, first with respect

18    to the 9th floor cell issue versus the 7th floor.  What's the

19    basis for your claim that these were recovered from the 9th

20    floor and why does that matter?

21         MR. SCHULTE:  Yes, so for that argument it was

22    simply -- the government's saying that the search warrants

23    after the fact would have included that, but the search

24    warrants after the fact were based on the stuff that was

25    recovered.  So essentially the search warrant only specified

LB8ASCHCps

1  the second and seventh floor, so -- to search.  And so all my

2  legal material was with me on the 9th floor.  So the search

3  warrant does not -- it's outside the scope.  I mean, if they

4  went to the third floor, to the fourth floor, the fifth floor,

5  that's outside the scope of the warrant.  They can't do that.

6  So my legal materials were all with me on the 9th floor.  Then

7  they came in and seized it while I was there.  And then, from

8  that material, then they say, oh, well now we want additional

9  search warrants to see the stuff we already seized.  It's just

10 crazy.

11        THE COURT:  My question for you is, what's the basis

12 for you to say that they were with you on the 9th floor as

13 opposed to being in the MCC office, which is where Mr. Denton

14 suggests they were?

15        MR. SCHULTE:  I mean, the only thing would be the

16 cameras there or the fact that I had a property receipt that

17 was given to me for my attorney-client notebooks and I attached

18 that has an exhibit.  So whenever you receive property, they

19 took all my properly except, I think it said, 11

20 attorney-client notebooks.  There's a property receipt of the

21 officer giving that to me before the search.  And so I have

22 that.  And then that is conclusive evidence that that stuff was

23 clearly with me on the 9th floor and not where the government

24 claims it was.

25        THE COURT:  Mr. Denton, is there something in the

LB8ASCHCps

1    record that supports the proposition that these were recovered

2    from the office?

3            MR. DENTON:  Your Honor, I think attached to the

4    defendant's prior motion to suppress on this were the

5    affidavits in support of both search warrants, and the second

6    search warrant describes the circumstances of their retrieval

7    from the MCC office.

8            THE COURT:  Mr. Schulte, did you have something else

9    on that?

10           MR. SCHULTE:  I guess on that, you know, I believe --

11   an evidentiary hearing about this specific issue.

12           THE COURT:  Can you just point me to where in the

13   record you think there is evidence that these things were

14   recover from the 9th floor cell?

15           MR. SCHULTE:  Yes.  In my -- in the initial motion --

16   I don't have it in front of me -- there's an exhibit that -- I

17   think it's near the end.  It's one of the last exhibits.  And I

18   can go back and try and look for it.  But it's a property

19   receipt that I received from the MCC that shows my

20   attorney-client notebooks as being given to me.  It's just like

21   a one-page exhibit, but it's near the end.  I think it's the

22   second-to-last one or the third-to-last exhibit, something like

23   that.

24           THE COURT:  And when you say your prior motion,

25   meaning?

LB8ASCHCps

1          MR. SCHULTE:  The original -- the initial, or the

2     original motion.

3          THE COURT:  Filed by counsel or the one that you --

4          MR. SCHULTE:  No, no, by me.

5          They're saying at docket 455.

6          THE COURT:  Yes.  It's 455-17, Exhibit Q.  But that

7     doesn't specify what the items were or necessarily show that

8     it's inconsistent with the October 3rd affidavit, does it?

9          MR. SCHULTE:  I'm sorry?  What was the --

10         THE COURT:  It describes in generic terms ten books --

11         MR. SCHULTE:  Right.

12         THE COURT:  -- legal materials, 11 notebooks.  But I'm

13    not sure if -- first of all, it says unit 7F.  It doesn't say

14    anything about where it was taken from.

15         MR. SCHULTE:  Yes.  The property receipt is showing

16    where it's taken from and when it's given to me.  Then that

17    means it's moved with me to the 9th floor.  And you're right;

18    it doesn't say anything more specific except for the 11

19    notebooks, but those are the only notebooks that I have and

20    those are the only ones.  There's no other -- there's no other

21    notebooks that I had except for those 11 notebooks, which

22    were --

23         THE COURT:  What is the evidence in the record to

24    support the proposition that they were actually transferred to

25    you on the 9th floor?

LB8ASCHCps

1          MR. SCHULTE:  I guess it would be BOP procedure

2     describing what that document is, because what you're seeing --

3     you're right.  You don't see that.  But the way the BOP

4     procedure is, whenever you get a property receipt, that's when

5     you're going somewhere.  So they give that property receipt to

6     me.  And those are the documents that I took with me to the 9th

7     floor.  All the remaining documents, they were seized and given

8     to the FBI.

9          THE COURT:  All right.  So let me give you my ruling

10    on this motion.

11          The motion is denied.  First, I agree with the

12    government that at bottom the motion is an untimely and

13    impermissible motion for reconsideration.  Mr. Schulte

14    previously filed a motion to suppress the fruits of the search

15    of the MCC, and Judge Crotty denied that motion on October 18,

16    2019, explicitly finding, contrary to one of Mr. Schulte's main

17    arguments here, that there was probable cause to support the

18    search.  *See* ECF no. 159.  There is no basis to seek

19    reconsideration of that ruling almost a year and a half after

20    the fact.  The only thing that has changed as far as I can tell

21    is the fact that Mr. Schulte is now representing himself.  But

22    that is obviously not a basis to seek, let alone grant,

23    reconsideration.  To the contrary, Mr. Schulte was explicitly

24    warned by Judge Crotty that if he chose to represent himself he

25    would not be entitled to revisit rulings that the court had

LB8ASCHCps

1    made, and he represented that he understood that.

2              That is enough to deny the motion.  But separate and

3    apart from that, the variety of arguments Mr. Schulte makes are

4    without merit.  First, there was plainly probable cause to

5    search the search, particularly given the deference owed to the

6    issuing judge's determination on that score.  *See Illinois v.*

7    *Gates*, 462 U.S. 213, 236 (1983).  The fact that some of the

8    items sought were not in and of themselves contraband, let

9    alone classified, does not undermine the validity of the

10   search.  *See, e.g.*, *In re Application of Madison*, 687 F. Supp.

11   2d 103 at 116 (E.D.N.Y. 2019).  Indeed, separate and apart from

12   any issues relating to classification, there was plainly

13   probable cause to believe that Mr. Schulte was engaged in some

14   of the subject offenses, including but not limited to contempt

15   of Court, obstruction of justice, and smuggling contraband into

16   a federal facility.  *See* paragraph 4 of the October 2nd, 2018

17   affidavit attached as Exhibit A to Mr. Schulte's motion.

18             The argument that the affidavits are false and

19   misleading is unsupported and largely for the same reasons

20   immaterial.  That is, there is no basis for Mr. Schulte's

21   at-bottom ad hominem attacks on the affiant.  But, again, even

22   without anything relating to the issue of classification, there

23   would have been probable cause.  And in light of that,

24   Mr. Schulte satisfies neither prong of the *Franks* test.

25   There's no showing of deliberate falsehood or reckless

LB8ASCHCps

1    disregard of the truth and no showing that any falsehoods or

2    omissions were necessary or material to the issuing judge's

3    determinations.  *See*, *e.g.*, *United States v. Canfield*, 212 F.3d

4    713, 717-18 (2d Cir. 2000).

5         Mr. Schulte's arguments about attorney-client

6    privilege were previously rejected by Judge Crotty, and I see

7    no basis or need to revisit those rulings.  Moreover, the

8    government represents that it has no intention to offer

9    anything at a retrial beyond the exhibits previously admitted

10   which were found not to be privileged, and therefore that issue

11   is effectively moot.

12        I reject Mr. Schulte's remaining arguments about

13   overbreadth and the First Amendment substantially for the

14   reasons provided by the government at pages 15-18 of its

15   opposition.  In addition and in any event, I agree with the

16   government that if there were any merit to defendant's

17   arguments, and there isn't, suppression would not be

18   appropriate in light of the good-faith exception.  Pages 18-19

19   of the government's opposition.

20        With respect to the issue that we have just been

21   discussing, where the items were seized, Mr. Schulte has

22   provided no evidentiary basis to dispute the representation

23   made in the October 3rd affidavit that the relevant documents

24   were taken from the MCC's office.  Accordingly, that motion is

25   denied.

LB8ASCHCps

1        Moving to the second motion that is fully submitted,

2   namely, the motion to suppress evidence from the warrantless

3   seizure of Mr. Schulte's cellphone -- that is ECF no. 497; the

4   government's opposition is at ECF no. 525; and the reply is at

5   560.  Once again, to the extent that Mr. Schulte asks me to

6   disregard the government's opposition -- that is also at page

7   26 his reply -- that request is denied for the same reasons --

8   which is not to say, by the way, that I'm thrilled with how

9   long it's taken the government to file its opposition on these

10  motions, and, again, going forward, I do not anticipate that

11  that will happen, let alone be tolerated.

12       On the substance, Mr. Denton, let me ask you a couple

13  questions.  First, in Mr. Schulte's reply, he claims that the

14  government's opposition was the first time that one of the

15  search warrants, I guess the March 16th search warrant signed

16  by Judge Moses, the first time that he's seen it or it was

17  produced.  Can you respond to that?

18       MR. DENTON:  Your Honor, that's incorrect.  All the

19  search warrant affidavits were previously produced.

20       Also, if I may, I think Mr. Lockard is going to be in

21  a better position to respond to the Court's questions on this

22  motion.

23       THE COURT:  All right.  Mr. Lockard.

24       MR. LOCKARD:  Yes, your Honor.

25       THE COURT:  So is that correct?  Was that search

LB8ASCHCps

1    warrant previously produced?

2                    MR. LOCKARD:  I don't know.  I believe it was.  Yes.

3                    THE COURT:  All right.

4                    MR. LOCKARD:  Yes.

5                    THE COURT:  As for the legal issues, let me ask you, I

6    guess, if I could ask you to focus on the delay between the

7    seizure and the ultimately successful search -- that is to say,

8    I think there's, for reasons that I'll articulate, there's very

9    little question in my mind that if the phone had been searched

10   on March 16th, pursuant to Magistrate Judge Moses's warrant,

11   that the government would have the better of it.  My question

12   is what impact if any there is from the fact that the search

13   didn't actually take place on March 16th, that the government

14   wasn't able to get into the phone and then kept the phone for,

15   you know, something in the nature of two years?  What relevance

16   if any does that have to the issue?

17                   Let me put it more bluntly.  There are certainly cases

18   that say unless there's independent evidentiary value to a

19   cellphone or a computer or the like, the government is obliged

20   to return it within a reasonable amount of time.  Here, the

21   March 16th warrant authorized the government to conduct a

22   search through, I think it was March 30th, but having failed to

23   do that, was the government not obligated to return the

24   cellphone to Mr. Schulte, and was its failure to do that and

25   decision to keep it in the government's possession for close to

LB8ASCHCps

1   two years, does that not give rise to a challenge to the

2   propriety of the later search?

3            MR. LOCKARD:  Yes, your Honor.  It doesn't here,

4   because the failure to execute the search wasn't for lack of an

5   attempt.

6            THE COURT:  Could you pull the microphone a little

7   closer to you.

8            MR. LOCKARD:  Yes, your Honor.  The failure to execute

9   the search promptly after the initial search warrant wasn't for

10  lack of an attempt to execute the search.  The execution was

11  unsuccessful because of password protection and encryption of

12  the data.  It doesn't mean that the data doesn't have an

13  evidentiary value.  It means that the FBI was unable to access

14  it.  I think they were certainly entitled to continue to

15  attempt to overcome that encryption and password protection,

16  and at such time that they actually were able to, a new warrant

17  was applied for and a new warrant was issued with a full

18  description of the preceding history.

19           THE COURT:  And you have authority for the proposition

20  that the government can just hang onto it if it tries and fails

21  to gain access?

22           MR. LOCKARD:  I don't have a cite handy for the Court.

23           THE COURT:  All right.  Mr. Schulte, do you care to

24  respond to either of the issues that I've raised?

25           MR. SCHULTE:  Yes.  The first issue, I just want to

LB8ASCHCps

1   say that the search warrant was definitely never presented.  I

2   think the government should provide a discovery production

3   number if they're trying to argue that it was produced.  But

4   this is the first time I've ever seen the search warrant.  My

5   attorneys have never seen it.  They've never been -- it's never

6   been produced.

7           The next issue about keeping the cellphone, yeah, you

8   know, if they -- well, the first issue, I think, is the fact

9   that the initial seizure of the cellphone was due to the fact

10  of the subpoena.  And so that -- any subsequent search warrant

11  is fruit of the poisonous tree because you can't just use a

12  subpoena to seize a search warrant -- I mean, you can't just

13  use subpoena as a search warrant to seize a device.  So that

14  March 16th search warrant is already invalid because they

15  already executed the seizure and they executed the search or

16  they attempted to execute the search of the cellphone just by

17  virtue of using the subpoena.

18          And then I also agree that keeping the cellphone,

19  which they just kept for two years, due to that seizure,

20  there's no basis at all for such a long-term seizure like that.

21          THE COURT:  All right.  So, first of all, Mr. Denton,

22  Mr. Lockard, let me be clear.  Even if the search warrant

23  hadn't been produced previously, it wouldn't give grounds to

24  the grant the motion, because obviously it has now been

25  produced and Mr. Schulte has had an opportunity to respond to

LB8ASCHCps

1   it.

2           That being said, I do want to ensure that everything

3   that should have been produced was produced and that there's a

4   clear record.  So to that end I'll add to your Monday homework:

5   If you can identify when that was produced and point

6   Mr. Schulte to it in the prior productions and let me know that

7   you've confirmed that, I would be grateful.

8           With respect to the merits, I am actually going to ask

9   the government to brief the issue that I raised, and I'll get

10  to more of that in a moment.  But with respect to the argument

11  Mr. Schulte makes, because I'm not sure that that is really the

12  argument he's making here, I find that those arguments are

13  without merit.  The search itself -- excuse me.  The argument

14  that he is making is that the cellphone was unlawfully seized

15  in the first instance pursuant to the forthwith subpoena and

16  that the search must be suppressed as a fruit of that unlawful

17  procedure.  But the Supreme Court and the Second Circuit have

18  held that "where law enforcement authorities have probable

19  cause to believe that a container holds contraband or evidence

20  of a crime but have not secured a warrant," the Fourth

21  Amendment allows them to seize the property "pending issuance

22  of a warrant to examine its contents if the exigencies of the

23  circumstances demand it."  That is *United States v. Place*, 462

24  U.S. 696 at 601 (1983).  *See also United States v. Martin*, 157

25  F.3d 46, 53 (2d Cir. 1998).  That doctrine squarely applies

LB8ASCHCps

here, at least would if the cellphone had been successfully

searched on March 16.  On March 15, 2017 law enforcement knew

among other things that Mr. Schulte had international travel

plans the next day and that he had previously conducted

multiple Google searches relating to the deletion of data.  *See*

ECF no. 527-7 at paragraphs 28 and 30 and ECF no. 525-1 at

paragraph 21.

Additionally, law enforcement had probable cause to

believe that the cellphone contained evidence of criminal

activity under investigation, as evidenced by the fact that

Magistrate Judge Moses issued the warrant later that very

night.  *See* ECF no. 525-6, paragraphs 23 and 24.

And finally, upon being confronted by law enforcement,

Mr. Schulte knew that he was a suspect in the investigation and

that the FBI was searching his apartment and other electronic

devices, which was relevant to the probable-cause determination

and the existence of exigencies justifying the seizure.  *See*,

*e.g., United States v. Babcock*, 924 F.3d 1180, 1195-96 (11th

Cir. 2019), finding exigent circumstances because the defendant

had "the ability and incentive to, after learning of the

investigation" from law enforcement, "destroy damning

information contained on his phone."  And *United States v.*

*Bradley*, 488 F. App'x 99, 103-104 (6th Cir. 2012), relying in

part on the defendant's knowledge that he was under

investigation and that law enforcement would likely get a

LB8ASCHCps

warrant to search his computer to find that exigent

circumstances justified the initial seizure of the computer.

Contrary to Mr. Schulte's contentions, it doesn't

matter whether the agents who seized his cellphone did so on

the ground that there were exigent circumstances or if they

relied, rightly or wrongly, on the use of a forthwith subpoena.

After all, the Supreme Court has "repeatedly rejected a

subjective approach" to the Fourth Amendment.  That's *Fernandez*

*v. California*, 571 U.S. 292, 302 (2014).  *See also US v.*

*Schmidt*, 700 F.3d 934 (7th Cir. 2012) -- "We do not look at the

subjective motivations of an officer when examining the

objective basis for a finding of exigent circumstances" -- and

*United States v. Moreno*, 701 F.3d 64 (2d Cir. 2012), holding

the same.

Thus, the agents' initial seizure was justified by

exigent circumstances, and within hours the agents obtained a

warrant from Magistrate Judge Moses both ratifying the seizure

and authorizing the search.  In light of that, there would be

no basis if the search actually then occurred to invalidate the

result of the search as Mr. Schulte argues.  *See*, *e.g.,*

*Babcock*, 924 F.3d at 1192-95, approving the search of a

cellphone pursuant to a warrant obtained two days after the

initial warrantless seizure.  *Bradley*, 488 F. App'x at 106,

approving the search of a computer pursuant to a warrant

obtained approximately 26 hours after the initial seizure of

LB8ASCHCps

the defendant's computer, and citing cases upholding delays between seizure and search of 29 hours, 48 hours, and 11 days. *See also United States v. Smith*, 967 F.3d 198, 2006 (2d Cir. 2020), discussing the factors to be considered in evaluating whether law enforcement has waited an unreasonable amount of time between a warrantless seizure and seeking a search warrant.

          In short, again, assuming that the search had actually occurred in the wake of Magistrate Judge Moses's warrant, the seizure of the cellphone "pending issuance of a warrant to examine its contents does not require suppression of the evidence derived from its eventual search." *Martin*, 157 F.3d at 53.

          For those reasons, the motion as framed is denied.

          Having said that, I think there is a potential issue here with respect to the delay that followed the Magistrate Judge Moses warrant, namely, the fact that the government held the phone in its possession for close to two years before it ultimately conducted the search. And on that score I'm going to order the government to show cause why it shouldn't be suppressed on that basis due to that delay, which is a slightly different argument than the one that Mr. Schulte made. I would direct your attention to the *Smith* case that I cited, again 967 F.3d 198, which I think speaks to some of the relevant issues here, namely, the fact that the government does have an

LB8ASCHCps

1    obligation to return a phone or computer unless the phone or

2    computer has independent evidentiary value in connection with a

3    case.

4            So we'll talk about a briefing schedule on that.  I'll

5    give Mr. Schulte an opportunity to reply to whatever the

6    submission the government makes.  But let's table that until we

7    talk about the other motions that are not yet fully submitted.

8            The final motion that is ripe for consideration is the

9    motion for bail, which I think is still perhaps -- no, I think

10   the classification review has been completed but I'm not sure

11   it's been docketed.  But, Mr. Hartenstine, do you know the

12   answer to that.

13           MR. HARTENSTINE:  Sorry, your Honor.  Yes, it has been

14   docketed, I believe.

15           THE COURT:  All right.  On October 21st, the

16   government filed its opposition to that motion.  That is ECF

17   no. 562.  And I indicated in my October 28th order, which

18   standby counsel had read to Mr. Schulte, that I would give him

19   an opportunity to respond orally to the government's

20   submission.

21           So, Mr. Schulte, do you wish to be heard in response

22   to the government's opposition?

23           MR. SCHULTE:  Well, I had a couple -- a couple things

24   I wanted to discuss with the Court about this.  So prior to

25   your order on 10/28, I mailed to the Court a letter that

LB8ASCHCps

1    perhaps you'll receive sometime, requesting both the extension

2    to file the reply, and I had already drafted the reply, and it

3    would have been filed if I had been able to -- it would have

4    been filed before, I think, your 10/28 letter if I had been --

5    if I had access to -- if I hadn't been moved, if I had access

6    to my --

7            THE COURT:  Mr. Schulte, I understand that.  I'm

8    giving you an opportunity to respond orally.  So anything you

9    wish to say in response to the government's opposition, this is

10   your opportunity.

11           MR. SCHULTE:  I just haven't had the time to review it

12   since I haven't had my -- the discovery and I haven't had

13   access to the motion, I haven't had access to many of the terms

14   over the last three weeks.  So I was hoping to adjourn that so

15   that I can have an opportunity to, for example, the reply that

16   I wrote, to at least print it so I have this material and I can

17   bring it up orally with you if that's what you wish.

18           THE COURT:  I'm sorry.  I didn't understand that last

19   bit.  Can you say it again?

20           MR. SCHULTE:  Yes.  So if the Court doesn't permit me

21   to file the reply brief, then I at least -- that I have an

22   opportunity to print it and have all the material in front of

23   me so I can brief it to you orally and some of the other issues

24   that the government raises that I simply, in the last three

25   weeks, I haven't had access to, so that I can make a compelling

LB8ASCHCps

1   argument.  And I was going to ask the Court for an adjournment

2   on that, and until the discovery issues with the law library

3   and --

4          THE COURT:  I'm a little confused, Mr. Schulte.  You

5   told me that you already drafted a reply and it just hasn't

6   been docketed.  Does that necessitate any additional time in

7   the law library?

8          MR. SCHULTE:  No.  Because I don't have it -- I can't

9   get a copy of that here.  I, I -- there's no way -- it's

10  basically, it's on one -- it's on one of the hard drives that

11  has to be powered in.  And I haven't had access to that.  So I

12  don't have, I don't have it with me.  I don't have it at --

13  until I have access to the law library so I can get the hard

14  drive connected by power, and then I have access to this -- to

15  my reply motion and all the arguments that I made.

16         THE COURT:  All right.  Fine.  So I will defer ruling

17  on that to give you an opportunity to be heard.  Whether that

18  is in writing or orally remains to be seen, I suppose.  But why

19  don't we set a deadline for you to actually file your reply,

20  and then I'll take it under advisement.

21         So, in light of that, let's talk about the remaining

22  deadlines.  Why don't we start with that last issue that I just

23  discussed.  Mr. Lockard or Denton, how much time would you like

24  to file a brief in response to the question that I posed?

25         MR. DENTON:  Your Honor, could we have two weeks,

LB8ASCHCps

1    until November 22nd?

2              THE COURT:  All right.  That's fine.  Why don't you go

3    through the other issues that remain open, and then let's talk

4    about how much time Mr. Schulte needs.

5              First there's a motion for internet access.  That's

6    ECF no. 557.  Per my order, the government is to file any

7    opposition, not to exceed 25 pages, by November 12.  I assume

8    that opposition is forthcoming; is that correct?

9              MR. DENTON:  Yes, your Honor.

10             THE COURT:  All right.  So that's one item that

11   Mr. Schulte needs to respond to.  I guess let's call that 2.

12   And the first is the response to the government's response to

13   my order to show cause.  And lest it be left unclear, let's say

14   that that is a maximum of 25 pages as well.

15             Next is the motion regarding classification.  The

16   classification process, that was ECF no. 559, per Judge

17   Crotty's order of October 18th, which was ECF no. 561, the

18   government submitted its proposed procedures for future

19   classification review on November 2nd.  That's ECF no. 573.  At

20   the moment, Mr. Schulte is required to reply to that by

21   November 17th.

22             Mr. Schulte, let me confirm that you've gotten a copy

23   of the government's November 2nd submission?

24             MR. SCHULTE:  Yes.  I received that today.

25             THE COURT:  All right.  Very good.

LB8ASCHCps

1          And the fourth item is the motion to dismiss Counts

2     Three and four, which I think is also undergoing classification

3     review.  I don't know if that's been docketed.  I don't think

4     so, Mr. Hartenstine.  Is that correct?  Motion to dismiss

5     Counts Three and four, that's still undergoing review?

6          MR. HARTENSTINE:  Your Honor, now that you ask that

7     about document issues with regard to the redacted versions, I

8     provided those to defense -- or standby counsel for docketing.

9     I don't believe I've had an opportunity to verify that they

10    were indeed docketed, but I will do so today, and get back to

11    the Court.

12         THE COURT:  All right.  Thank you.

13         The government is due to respond to that in a brief,

14    not to exceed 25 pages, also by November 12th.  Mr. Denton, are

15    you on track to do that?

16         MR. DENTON:  Yes, your Honor.

17         THE COURT:  All right.  And currently the defendant,

18    Mr. Schulte, is entitled to file a reply, not to exceed ten

19    pages, by November 24th, but we'll discuss that in short order.

20         And finally, there's the CIPA Section 5 notice, also

21    undergoing classification review.  On October 26, the

22    government filed a letter opposing that notice and seeking to

23    form some additional relief, one of which I think I've already

24    addressed.  That's ECF no. 567.  And Mr. Schulte currently has

25    until November 10th technically to file a reply not to exceed

LB8ASCHCps

1   ten pages.

2           In light of the issues that we discussed earlier,

3   Mr. Schulte, I'm obviously prepared to give you additional time

4   to make all of those submissions.  It's not an insubstantial

5   amount of work under the best of circumstances.  Obviously it

6   hasn't been the best of circumstances.  So I guess the question

7   I have for you is what your thoughts are with respect to those

8   deadlines, if giving you an additional two weeks for each of

9   them would suffice, if you want to propose something, either

10  now or in writing, but I certainly think some clarity on when

11  those filings will be coming is in order.

12          MR. SCHULTE:  For the CIPA file, the fifth one that

13  you mentioned, I already -- I wrote, it's a handwritten

14  response that was mailed a couple weeks ago.  So I guess we'll

15  wait and see if the Court receives that or not.

16          For the remaining ones, I think, yes, I think just a

17  two-week extension and a pending -- hopefully I'm able to

18  review, go to the law library and go to the SCIF.  And that

19  should be all I require.  But if those issues continue, then

20  I'll raise it to the Court's attention.

21          THE COURT:  All right.  So that's fine with me.  Let's

22  say unless and until I say otherwise, the deadlines will be as

23  follows:  The government is to file its response to, for lack

24  of a better way of describing it, my order to show cause on the

25  delay of that cellphone search by November 22nd, not to exceed

LB8ASCHCps

25 pages.  The defendant is to respond, I'll give you three

weeks for the response, just given the intervening holiday

there, and your reply cannot exceed ten pages.

Then I'll grant the two-week extension on each of the

other submissions that we discussed.  So reply on the internet

access, motion not to exceed ten pages, is due on December 8th.

The response on the classification process, the response to the

government's submission of November 2nd is due by December 1st.

The reply on the motion to dismiss Counts Three and Four, not

to exceed ten pages, is also due on December 8th.  And the CIPA

5 notice, it sounds like you already submitted your reply, so I

assume that that is moot and we don't need to address it

further.

Now, if those deadlines prove to be impractical for

some reason, I trust that you or standby counsel will let me

know and we'll adjust as needed.  But I certainly want to make

sure that we keep this thing moving on a forward trajectory.

With respect to future motions, let me say first and

foremost that, as stated in my October 28th order, that unless

and until I say otherwise, the following rules and procedures

that I set forth in that order will apply to any future

motions, whether filed by the government or by Mr. Schulte.

That is, absent prior leave by me, any memorandum of law

submitted in support of a motion or in opposition to a motion

shall not exceed 25 pages, double-spaced with at least a

LB8ASCHCps

1    12-point font, to avoid any confusion on that.  And any reply

2    is not to exceed ten pages.  And any opposition, unless and

3    until I say otherwise, is to be filed within three weeks of the

4    motion being filed.  And any reply must be filed within two

5    weeks of the opposition.

6         I will obviously allow some -- you know, with respect

7    to the mailing-type issues and those sorts of practical

8    problems, you know, I will be accommodating within reason.  But

9    the bottom line is that both sides need to comply with the

10   deadlines and page limits going forward, and I'm not going to

11   tolerate it from either side if you do otherwise.

12        I will make one, just, request to standby counsel.  I

13   think you're the ones who file things on ECF on Mr. Schulte's

14   behalf.  When filing a motion on his behalf, if you can make

15   sure that you enter into the docket text the substance of the

16   motion so it doesn't simply say "letter motion" or "motion" but

17   actually specifies what the relief you're seeking is, I think

18   that that would help ensure that the docket is more

19   intelligible and we can keep track of things.

20        My October 20th order raised the question about future

21   motion practice.  I certainly have seen Mr. Schulte's

22   representation, or claim, or whatever one might describe it as,

23   that he intends to file a slew of other motions.  The question

24   I have is what the basis for that would be.  As my ruling with

25   respect to the MCC-search motion made clear, the fact that he's

LB8ASCHCps

1    now pro se does not in my view give him the right or

2    entitlement to file motions that he previously had an

3    opportunity to file, and in that regard I think he would have

4    to demonstrate good cause before filing any motion that doesn't

5    pertain to something new, which would obviously constitute good

6    cause.

7           So I'm open to suggestions from both sides on this

8    front, but I think the bottom line is that, you know, I would

9    have to be persuaded that further motion practice is

10   appropriate.

11          Mr. Denton, do you have any views on this?

12          MR. DENTON:  Your Honor, I think the Court is accurate

13   as a matter of law that we're now in a place where the

14   defendant would need to demonstrate good cause for continued

15   motions.  I think from a practical perspective, as far as

16   submission and responses to motions, as a general matter, as

17   part of our explanation for why the defendant would not be

18   prejudiced by denial of the filing of an untimely motion, the

19   government is always going to respond on the merits, and so

20   address the defendant's motions.

21          I think what that means in terms of timing is that it

22   would probably be to the benefit of both sides if, once the

23   Court settles on a trial date on this matter, we set a motions

24   date and a response date, and the defendant is free to file

25   things whenever he wishes, but there will be sort of one

LB8ASCHCps

1    schedule and the government will respond in toto on a date

2    certain.

3            THE COURT:  All right.  Mr. Schulte, do you wish to be

4    heard on that?

5            MR. SCHULTE:  Yeah.  As far as the motions go, as I

6    began -- I think Judge Crotty's order granting my pro se status

7    was end of July or something like that, so I've only had a few

8    months so far.  And the whole reason I decided to represent

9    myself was so that I could file motions that my counsel wasn't

10   filing or so -- or due to what I perceived to be

11   ineffectiveness on their part on the other motions that they

12   had filed.

13           So, yeah.  So going forward, you know, I still, like I

14   said, there's still a bunch of discovery that I haven't been

15   able to review yet.  And then also, due to the SCIF limitations

16   and stuff like this, discovery -- I mean, law library review,

17   I've been hampered in going through all the different motions

18   and stuff that I wished to file.

19           THE COURT:  All right.  Well, I think what I will do

20   is, after we discuss and set a trial date, I think I will do

21   what Mr. Denton proposed, which is set a firm deadline for any

22   future motions to be filed, and recognizing that Mr. Schulte's

23   initial burden is to persuade me that he should be heard on a

24   new motion if it is something that he could have previously

25   made in the case.  But I think that makes the most sense to

LB8ASCHCps

1    sort of bring some order to this.

2           Let me just underscore something that I did put in the

3    October 28th order but just underscore orally, which is that

4    both sides are reminded that classified information, or

5    information that a party reasonably should know is classified,

6    cannot be publicly filed outside the procedures and without the

7    authorization set forth in CIPA, the Classified Information

8    Procedures Act, and the protective order entered by Judge

9    Crotty at ECF no. 61.  That includes information that is

10   classified even if it pertain -- if it appears in the public

11   domain.  That is to say, appearance in the public domain does

12   not automatically declassify information.  So I want to make

13   sure that everybody is aware of that and everybody heeds those

14   limitations.  And I don't want to have any problems on that

15   score going forward.  If there are, particularly with respect

16   to Mr. Schulte's filings, obviously that could give rise to

17   penalties, including but not limited to forfeiting the right to

18   represent himself.  So I trust that there won't be any issues

19   of that sort.

20          Let's talk about trial dates.  Mr. Denton, the

21   government indicated in its preconference letter, I think, that

22   you anticipate the trial would take about three weeks.  Is that

23   the government's case in chief, or a whole trial?  What's your

24   thought on that?

25          MR. DENTON:  Your Honor, that's a ballpark for the

LB8ASCHCps

1    whole trial.  I think the government's case in chief would take

2    ten to 15 trial days.  So assuming the Court is going to sit

3    five days a week, I think, assuming a couple of days for the

4    defense case, we think three weeks.  That's obviously an

5    estimate, your Honor.

6          THE COURT:  All right.  And can you just educate me

7    what your best guess or expectation would be with respect to

8    the need and extent of pretrial litigation, CIPA litigation --

9    that is to say, how long before trial that litigation would

10    occur, how many hearing days I would reasonably need to

11    anticipate, and so forth, since that has some bearing on

12    scheduling trial.

13          MR. DENTON:  Your Honor, I expect that it would be

14    comparatively few.  There was extensive Section 6 litigation

15    already in this case, and a wide variety of rulings on

16    essentially all of the evidence that either party wanted to

17    introduce at trial.  So I think, you know, it probably would be

18    safe to estimate a day for a hearing.  I would hope we were not

19    in the realm that we were before with five and six days.  Think

20    that is something that would make sense to plan to conduct at

21    least 30 days before trial, just to allow time for the

22    implementation of the Court's rulings, as we indicated, either

23    through declassification or, as there was last time, in a very

24    limited context, litigation over the interplay between the

25    *Waller* factors and Section 8 of CIPA.

LB8ASCHCps

1          THE COURT:  All right.  Last question for you and then

2     I'll turn to Mr. Schulte.  Can you advise what the status of

3     the severed charges is and tell me, is there any reason that

4     those should not be brought to trial in the first instance on

5     the theory that they may raise fewer classification issues?  Am

6     I missing something?

7          MR. DENTON:  So, your Honor.  Those charges obviously

8     do remain pending.  It had always been, at least I understand,

9     defense's preference to proceed first with the espionage

10    charges.  I think it is, given that that is what everyone has

11    been focused on preparing for, I think it's unlikely that we

12    could do a trial on the other charges much faster than the

13    current one.  It just simply hasn't been, I think, the focus

14    for either side.  But it is undoubtedly correct that it

15    presents dramatically fewer issues related to classified

16    information.

17         THE COURT:  All right.  Mr. Schulte, focusing then on

18    the espionage-related charges, do you wish to say anything with

19    respect to either the length of the trial or when you would

20    want to have trial scheduled for?

21         MR. SCHULTE:  Yeah.  So it would be -- setting the

22    trial date, it's difficult to come up with a date at this time,

23    especially because there are some additional unresolved issues

24    regarding how I'm able to conduct investigations and find and

25    hire experts, due to my limited capacity.  This was brought up

LB8ASCHCps

a little bit with Judge Crotty but hasn't really been fully
addressed.

         And then there was another issue I wanted to discuss
on this same topic, and that's the interlocutory appeals and
mandamus petitions that are currently outstanding, as I would
want to wait until these are resolved.  And one of my -- one of
my letters to the Court was simply to ask that the Court look
at some of these -- some of these decisions that were issued by
Crotty and -- mandamus petition and interlocutory appeal.  For
example, that habeas corpus petition, I filed a habeas corpus
petition in November 2020 in a separate civil case.  Judge
Oetken was assigned it, and he dismissed the petition, arguing
*Younger v. Harris*; he can't interfere in a criminal case and I
had to file it in a criminal case.  So when I filed it before
Judge Crotty, Judge Crotty also dismissed it and said, well,
you can't file this in a criminal case, you have to file it in
a civil case.  So I have no options available except mandamus
at that point.  And I don't think that the Court of Appeals --
I mean, is clearly not going to agree that I don't have any
right to a habeas petition.

         And so these issues like this, I think, you know, it's
up to the Court obviously, but I just wanted to raise some of
these issues that are, at least in my mind, pretty clear, and I
think if this Court reviews some of these issues, that it would
issue different opinions.

LB8ASCHCps

1          And I'm not -- I wasn't asking for additional motions,

2     arguments, or anything like that, but just simply, if the Court

3     would look at the filed mandamus petitions or the motions

4     already filed by both parties, if the order seems legitimate,

5     then not to do anything but, if, in this case, for example,

6     this habeas petition, I think, is a pretty clear example, as

7     well as the CIPA 4 discovery motion.  You know, the government

8     is claiming I hacked three servers and stole national defense

9     information from the servers.  But they're refusing to turn

10    those over, claiming state secrets privilege, even though the

11    law clearly states that, you know, if you're giving this to

12    your experts and you're relying on this in your case in chief

13    in trial, then my experts have to have an opportunity to rebut

14    this.  And at the first trial, the biggest issue was, my expert

15    could not testify because he did not have the same evidence and

16    so he couldn't -- he couldn't rebut the government's argument

17    or say anything.  So --

18          THE COURT:  All right.  Mr. Schulte, let me stop you

19    and say a few things.  One is, I am generally not going to go

20    backwards and start reconsidering rulings that Judge Crotty

21    made in this case.  My plan is to plow ahead and try to bring

22    this thing as speedily as possible to trial.  And part of that

23    entails not revisiting things just because a new judge has been

24    assigned to it.  And there's plenty of case law and doctrine to

25    support that approach.

LB8ASCHCps

1        Number two, to the extent that you have filed appeals

2   or mandamus petitions, there is a general proposition, which is

3   that I lack jurisdiction to address whatever issues you've

4   raised on appeal.  So if you want to withdraw your appeal and

5   raise something with me, you're certainly welcome to do it.

6   But if it's pending before the Second Circuit, I don't think I

7   have any authority to do anything about it.

8        Number three, separate and part from all that, my plan

9   is to set a trial date.  I think that is necessary.  I think

10  it's important.  I think it's important to get this case, you

11  know, moving and ensure that it proceeds at a deliberate pace,

12  to ensure that the MDC gets you what you need to ensure that

13  you can prepare for trial, that the marshals get you here and

14  give you SCIF time.  I think it's important for you.  I think

15  it's important for the public.  I think it's important for the

16  government.  And I intend to set a trial date and do everything

17  in my power to ensure that we keep that date.  So the issues

18  that you've raised don't strike me as inconsistent with my

19  doing that.

20        So the bottom line is, I hear you, but we're plowing

21  ahead, moving forward.  And an important part of that is that

22  I'm setting a trial date.

23        So, having said that, do you wish to be heard with

24  respect to when this case is set down for trial?  I would be

25  inclined to do it next May.  I think that would give you plenty

LB8ASCHCps

1    of time to sort through the things you need to sort through,

2    file whatever motions you think you should file, and for us to

3    deal with the sorts of things we've been discussing, but do you

4    wish to be heard on that?

5              Yes, Mr. Schulte.

6              MR. SCHULTE:  So, I mean, I agree with everything that

7    you're saying.  Obviously I have an interest in moving this

8    along as well.  And the May date does sound like that will

9    probably be a good date.  But just talking with standby

10   counsel, they inform me that I need to check with the expert.

11   And they said that you're a stickler on the date.  And so, you

12   know, instead of having to -- instead of requesting a delay or

13   a change of the date, they're saying essentially a self-commit

14   and -- to a May trial date and then deferring discussing our

15   expert to make sure that he can make that date and stuff like

16   this.

17             THE COURT:  And how long would it take for you to

18   check with and confirm with your expert?

19             MR. SCHULTE:  Ten days.

20             THE COURT:  All right.  I'm going to put it down to

21   begin on May 23rd.  I'll give you two weeks, Mr. Schulte, to

22   advise me if there is an irreconcilable conflict with that date

23   for your expert.  But it better be a truly irreconcilable

24   conflict for it to rise to the level that I would move it on

25   that basis.  And two weeks means two weeks.  So if I don't hear

LB8ASCHCps

1    from you in that time, then I assume that that issue is moot

2    and not a concern.

3              I will give you a heads up that we probably won't sit

4    on Monday, June 6th and June 7th, but other than that, we'll be

5    on trial until it concludes.  That is a firm date as far as I

6    am concerned.  I do not know right now whether we will still be

7    operating under COVID protocols for the second quarter of 2022.

8    If we are, then it's obviously subject to that date being

9    assigned to me in the centralized trial scheduling process that

10   we are currently living with, and in that one respect would be

11   contingent, but separate and apart from that and subject to

12   Mr. Schulte advising me if there is an irreconcilable conflict,

13   everybody should understand that that is a firm date and I will

14   do everything in my power to ensure that we stick with it.

15             What that means is, if there is anything that could

16   affect our ability to start trial on that date, whether it is

17   an issue pertaining to classified information, an issue with

18   standby counsel, an issue with discovery, anything, you better

19   raise it with me sooner rather than later.  The longer you

20   wait, the more likely it is that I would deny any request for

21   relief that would affect our ability to start trial on that May

22   23rd date.

23             Mr. Denton, do you understand that?

24             MR. DENTON:  Yes, your Honor.  If I may, just one

25   point with respect to that.  Obviously this does depend a

LB8ASCHCps

1    little bit on whether the sort of COVID protocols and trials in

2    particular courtrooms are still in effect.  For the last trial

3    in this matter, there were a whole variety of security

4    procedures that Judge Crotty approved, which were designed

5    around his courtroom and the fairly standard layout in the 500

6    Pearl Street courthouse.  Depending on when the trial is

7    assigned to a particular courtroom, we'll obviously be prepared

8    to do the same work.  To make sure those arrangements take

9    place, we just may have to start over, depending on where the

10   trial is going to be.

11           THE COURT:  Understood.  I will obviously stay in

12   touch with Mr. Hartenstine and his colleagues and make sure

13   that I do whatever we need to do.  But you should also make

14   sure that you educate me to the extent that there are any needs

15   or issues that I need to attend to and that you do that in a

16   timely fashion so that we can take care of whatever we need to

17   take care of whenever we need to take care of it.  All right?

18           MR. DENTON:  Yes, your Honor.

19           THE COURT:  All right.

20           Mr. Schulte, do you understand what I was saying about

21   that being a firm date?

22           MR. SCHULTE:  Yes, I do.

23           THE COURT:  All right.  And, Ms. Shroff, I assume you

24   understand as well?

25           MS. SHROFF:  I do, your Honor.

LB8ASCHCps

1        THE COURT:  All right.  Very good.

2        What I will ask is for the parties to confer.  In an

3   ideal world hopefully you can reach agreement.  But I'd like

4   you to submit a proposed pretrial schedule that works backwards

5   from that May 23rd date and includes, number one, a deadline

6   for the filing of any pretrial motions, again subject to the

7   proviso that if it's an issue that Mr. Schulte could have

8   raised earlier, he is going to have to first demonstrate why I

9   should even entertain the motion.  But I think a deadline for

10  any new motion is in order, in addition to deadlines for any

11  CIPA filings and the like, working backwards from the trial

12  date, to ensure that there's an adequate amount of time between

13  whatever hearings are required on that score and trial.

14       So why don't you confer with one another.  And,

15  Mr. Denton, I'll put the onus on you to submit a proposed

16  schedule.  If Mr. Schulte disagrees, you can either include his

17  position on it or I'll give him an opportunity to be heard.

18  But would a month from now be realistic to submit a proposed

19  schedule?

20       MR. DENTON:  Definitely, your Honor.

21       Just to give us something to anchor to, for filings

22  closer to trial like motions in limine, requests to charge and

23  so on, how far in advance of the actual trial date would your

24  Honor like those to be fully submitted?

25       THE COURT:  So I'm going to leave it to you to propose

LB8ASCHCps

1    something that you think makes sense, mindful that I need an

2    adequate amount of time to consider any of those submissions.

3    You know better than I what they're likely to look like, that

4    is, how substantial they're likely to be.  In the normal case,

5    I only, you know, I would usually set the deadline a few weeks

6    before trial because it doesn't take very long to go through

7    them.  But this is not a normal trial, and I anticipate that

8    between the number of issues that both sides may wish to brief

9    and my need to decide them, not to mention the classification

10   issues, that it would pay to pad it and provide for a lot more

11   time than a normal case.

12            So why don't you make a proposal.  If I think it's

13   reasonable, I will adopt it.  If not, I will adjust it as I see

14   fit.  Does that make sense?

15            MR. DENTON:  Understood, your Honor.

16            THE COURT:  All right.  And, Mr. Schulte, why don't

17   you consult with the prosecutors, and hopefully everybody can

18   reach agreement on a schedule that makes sense and is

19   reasonable for everyone, including me.  If there's any

20   disagreement, you can, again, either convey it to the

21   government to include in that letter, do it within a month, or,

22   if you wish to file your own response, you can file something,

23   let's say, one week after the government's letter would be due.

24            In connection with that, Judge Crotty had previously

25   ordered that the parties confer after a trial date was set with

LB8ASCHCps

1    respect to an increase in SCIF time and those sorts of

2    arrangements, and I would ask that you do that as well.  And,

3    Mr. Denton, why don't you speak with the marshals and the MDC

4    if needed, just to figure out what the issues are there, and

5    hopefully everybody can come up with a proposal that makes

6    sense, but certainly again I'll make sure that the defendant

7    has an adequate amount of time to prepare as trial approaches.

8            The third thing to include in there, as the government

9    proposed in its letter in ECF no. 567, is that essentially a

10   deadline be set for all CIPA Section 5 notices, or at least

11   that the single omnibus response to those notices be allowed.

12   I think that makes sense.  Indeed, I think it makes sense to

13   set a firm deadline for any Section 5 notices.  So I would ask

14   that you discuss that with one another and include that in your

15   proposed pretrial schedule.

16           Any questions, concerns, or the like?  Mr. Denton.

17           MR. DENTON:  Your Honor, just with respect to the SCIF

18   access, I think we certainly will confer, and I think we may

19   even be able to reach an agreement in principle.  I think one

20   of the issues that we had during the more recent difficulties

21   was pertaining to the Court's usage of the 9th floor for

22   various court purposes that may not be known to us so far in

23   advance.  I think we're certainly happy to, like I said, reach

24   an agreement in principle on what the parties are able to

25   accomplish and let your Honor know.  And hopefully we'll be

LB8ASCHCps

1    able to actually implement it.

2           THE COURT:  All right.  Understood.  Talk to the

3    marshals as well.  I understand that's an issue on their front.

4    That's one of the reasons I called the marshals, to discuss

5    those parameters with him.  I think for the next month he

6    sorted it out in a way that didn't require sort of creative

7    thinking about how to overcome that particular problem.  But

8    the bottom line is, I'll try to make sure that he gets access

9    to the SCIF even if there are things going on in that

10   courtroom.  And if we need to think creatively and do things

11   differently, that then I'm prepared to do that.  So hopefully

12   you all can sort it out, though.  Understood?

13           MR. DENTON:  Yes, your Honor.

14           THE COURT:  Mr. Schulte, any questions, problems about

15   any of that?

16           MS. SHROFF:  Your Honor, could we just have a minute?

17           THE COURT:  Sure.

18           And then I do need to wrap things up.

19           MR. SCHULTE:  No, nothing, more.

20           THE COURT:  All right.  The last two items are the

21   next status conference and speedy trial.  I would be inclined

22   to set another status conference just to make sure that things

23   are on track and try and nip things in the bud, particularly

24   given some of the communications and delay issues that

25   Mr. Schulte has had.  I just want to make sure that he has the

LB8ASCHCps

1    ability to be heard and we address things in a timely fashion.

2    So I would propose that we reconvene on, let's say, the

3    afternoon of Monday, December 20th.  Does that make sense?  At

4    2:30 as well, Mr. Denton?

5              MR. DENTON:  That's fine with the government, your

6    Honor.

7              THE COURT:  Mr. Schulte?

8              MR. SCHULTE:  No problem.

9              THE COURT:  All right.  So we'll reconvene on December

10   20th at 2:30 p.m.

11             I'll tell you what.  What I will ask is that both

12   sides submit a letter to me the Thursday prior to that

13   conference indicating any issues or items that you wish to

14   discuss at the conference.  But that will help me in setting an

15   agenda.  Again, Thursday before the conference, so by Thursday

16   the 16th, each side should submit a letter to me along the

17   lines of the status letter that I invited before this

18   conference and just telling me anything that you wish to

19   discuss.

20             The last item is speedy trial.  There are some pending

21   motions, so it may be that time is automatically excluded, but,

22   Mr. Denton, is there any application on that front?

23             MR. DENTON:  Yes, your Honor.  Although time is

24   automatically excluded in light of the defendant's stated need

25   to continue reviewing discovery in order to ensure his fair

LB8ASCHCps

1    preparation for trial and the unusual complexity of this

2    matter, including pretrial litigation, we would ask that time

3    be excluded until the trial date of May 23, 2022.

4               THE COURT:  Mr. Schulte?  Any objection?

5               MR. SCHULTE:  I would prefer to just exclude time

6    until the next pretrial conference and then move from there.

7    I, I -- I don't know how the Court usually does it, but I

8    prefer the smaller increments of time at a time.

9               THE COURT:  All right.  Very good.  That probably

10   makes sense in the first instance, which isn't to say that it

11   wouldn't be justified through the trial date.  But since we

12   will be reconvening, I'll exclude time between today and

13   December 20th.  To the extent that it's not automatically

14   excluded already by virtue of the motions, I find that the

15   interests of justice served by excluding that time outweigh the

16   interests of the defendant and the public in a speedy trial, to

17   allow the parties to continue briefing the issues that need to

18   be briefed, the defendant to continue reviewing discovery, and

19   making sure that he has access to all the discovery that he

20   needs, and for me to consider the issues that are still under

21   advisement.

22               Anything else, Mr. Denton?

23               MR. DENTON:  Not from the government, your Honor.

24               THE COURT:  Mr. Schulte?

25               MR. SCHULTE:  No.

LB8ASCHCps

1          THE COURT:  All right.  Then I thank everybody for

2     their patience and help today, and we are adjourned.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25