UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

        *Defendant.*

---

S3 17 Cr. 548 (JMF)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS COUNTS THREE AND FOUR OF THE THIRD SUPERSEDING INDICTMENT FOR VIOLATION OF THE FIRST AMENDMENT AND ATTORNEY-CLIENT PRIVILEGE

Joshua Adam Schulte
Slave #79471054
Metropolitan Detention Center (MDC)
P.O. Box 329002
Brooklyn, NY 11232

## TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES ................................................................................. ii

II.  THE MCC COUNTS VIOLATE THE FIRST AMENDMENT ...................... 1

  A.  Motion to Dismiss is NOT premature ........................................... 1

  B.  As-Applied Challenge is appropriate ............................................. 1

  C.  As a matter of law, public documents on the internet cannot qualify as NDI 2

    1.  Public documents on the internet are not "closely held" .............................. 2

    2.  Republication of public documents cannot endanger national security ....... 4

  D.  Count Three must be dismissed ..................................................... 6

    1.  Alleged NDI already available to the general public before transmission ... 6

    2.  Alleged NDI was provably communicated from the CIA to Mr. Schulte as unclassified, and therefore not valid NDI; No reasonable person could possibly believe that the Hickok information could be used to the injury of the United States; Alleged NDI was NOT NDI ............................................................. 6

  E.  Count Four must be dismissed ....................................................... 7

    1.  Malware of the Mind ................................................................................... 7

    2.  Tweets ......................................................................................................... 8

    3.  The fact the government ultimately revealed information it alleged to be NDI when Mr. Schulte never did severely undercuts the government's claim of NDI ............................................................................................................ 9

III. MALWARE OF THE MIND IS PRIVILEGED AND MUST BE SUPPRESSED ............................................................................................................ 9

IV.  CONCLUSION ...................................................................................... 10

# I.   TABLE OF AUTHORITIES

**Cases**

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998) .................................................................................1

*United States v. Allen,*
   31 M.J. 572 (N.C.M.R. 1987) ...............................................................................2

*United States v. Heine,*
   151 F.2d 813 (2d Cir. 1945) .................................................................................2

*United States v. Morison,*
   844 F.2d 1057 (4th Cir. 1988) ..............................................................................2

*United States v. Rosen,*
   445 F. Supp. 2d 602 (E.D. V.A. 2006),
   aff'd, 557 F.3d 192 (4th Cir. 2009) ...................................................................3, 4

*United States v. Sampson,*
   898 F.3d 270 (2d Cir. 2018) .................................................................................1

*United States v. Squillacote,*
   221 F.3d 542 (4th Cir. 2000) ................................................................................3

*United States v. Truong Dinh Hung,*
   629 F.2d 908 (4th Cir. 1980) ................................................................................2

**Statutes**

18 U.S.C. § 793 ............................................................................................................1

**Rules**

Fed. R. Crim. P. 12(b)(1) .............................................................................................1

Fed. R. Crim. P. 29 ......................................................................................................6

**Constitutional Provisions**

U.S. Const. amend. I .........................................................................................1, 2, 4, 10

## II. THE MCC COUNTS VIOLATE THE FIRST AMENDMENT

The government argues that the court should not dismiss the MCC counts because a pretrial dismissal motion is premature, Opp. at 4-5, 8-9; that Mr. Schulte cannot raise an as-applied challenge, Opp. at 5-6, 10-12; and national defense information (NDI) can include public documents from the internet and must be put before a jury, Opp. at 6-8, 13-16. The government also argues that there is no basis to "reconsider" the court's prior rulings regarding suppressing Malware of the Mind, Opp. at 17-18. The government is incorrect on all issues.

### A. Motion to Dismiss is NOT premature

Although the government insists the motion to dismiss is premature, it directly cites the case to the contrary, noting that a pretrial motion to dismiss requires that "the government must make a 'detailed presentation of the entirety of the evidence' before a district court can dismiss an indictment on sufficiency grounds." *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)). The court and the defense have this detailed presentation of the entirety of the evidence—the month-long trial that failed on a hung jury in February 2020. Indeed, a mistrial from a hung jury is a rare and unique scenario by which the court can effectively decide a motion for summary judgement. However, regardless of this unique scenario and the trial record, Mr. Schulte's motion to dismiss is predicated primarily on the fact that public information *can never be NDI*, a motion based entirely upon the law, and which, this court can "determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Accordingly, the motion to dismiss is not premature.

### B. As-Applied Challenge is appropriate

Next, the government claims that Mr. Schulte cannot make an as-applied challenge because his former counsel previously raised a facial challenge to 18 U.S.C. § 793. The two challenges are not related, and Mr. Schulte's facial challenge is preserved on appeal—he does

1

not seek reconsideration of that motion. The government then argues that Mr. Schulte's as-applied challenge is meritless due to his signed CIA non-disclosure agreements; however, Mr. Schulte is not charged in civil court with violating a non-disclosure agreement, but rather, with the disclosure of NDI. And finally, the government argues that the Bartender information Mr. Schulte "attempted" to disclose was not already public. This argument is defeated in E.2.a. Accordingly, the First Amendment as-applied challenge is appropriate.

### C.      As a matter of law, public documents on the internet cannot qualify as NDI

Onto the merits, it is clearly established law that public documents on the internet cannot qualify as NDI. Both parties agree that NDI is extraordinarily broad, but limited in that the information must be "closely held" and disclosure would "potentially damage national security." While this determination is largely left to a jury, material readily accessible from the public domain necessarily fails both these limitations, and therefore, can never be considered NDI.

#### 1.      Public documents on the internet are not "closely held"

"[T]he Fourth Circuit's rejection of a vagueness challenge to the term 'information relating to the national defense' in *Morison*, was based, in part, on the district judge's instruction to the jury that 'the government must prove that the documents or the photographs are closely held in that they have not been made public ***and are not available to the general public***.'" *United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945) (quoting *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988) ) (emphasis added). See also *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 n. 9 (4th Cir. 1980) (noting that district court's instruction to the jury that "the defendants would not be guilty of transmitting national defense information if the information were available in the public domain" was proper); *United States v. Allen*, 31 M.J. 572, 627-28 (N.C.M.R. 1987) (stating that the term includes only "information that is not generally accessible to the public, i.e., it must be non-public information."). Thus, clear evidence

2

that information is publicly accessible, such as on the internet, would negate any possible finding by a jury of NDI and require pretrial dismissal.

The government's only argument to the substance of Mr. Schulte's motion is to misquote and misapply the Fourth Circuit in *United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000). The government misinterprets *Squillacote*, claiming that "courts have rejected the much broader proposition that 'information that is available to the public can never be considered national defense information.'" Opp. at 7 (quoting *Squillacote* at 575). However, the Fourth Circuit itself has condemned this misinterpretation as false: "Contrary to the government's assertion, the Fourth Circuit's decision in *United States v. Squillacote* **_does not compel the conclusion that information not officially disclosed, but in the public domain, retains its status as 'information relating to the national defense.'_** In that case, the Fourth Circuit held that the government's assessment of the reliability of publicly available information--as opposed to the information itself--might itself be information relating to the national defense." *United States v. Rosen*, 445 F. Supp. 2d 602, 620 (E.D. V.A. 2006), aff'd, 557 F.3d 192 (4th Cir. 2009) (referencing *Squillacote* at 578-79). "As the Fourth Circuit put it: 'That our government believes the estimates to be correct in and of itself is a fact that would be highly valuable to other countries.'" *Id.* "Because the disclosure of classified documents discloses the 'government's implicit stamp of correctness and accuracy,' the disclosure of official documents may violate the statute even if the information contained within the documents is publicly available." *Id.* "**Thus, it is the confirmation of the accuracy (or presumably also the inaccuracy) of material in the public domain, _and not the public domain material itself_, that a jury may consider to be 'information relating to the national defense.'**" *Id.* at 621 (emphasis added). The

3

government's argument is plainly false: neither the Fourth Circuit nor any circuit or district court has ever held that public information from the internet qualifies as NDI.

To the contrary, the courts have held the reverse: "**In sum, information related to the national defense typically cannot qualify as such if it is in the public domain; it must be closely held by the government.**" *Id.* (emphasis added). If this were not the case, then the implications would be staggering—the government could arrest and charge any person who comments about leaked classified information on the internet; if a person downloads the material, tweets it, facebooks it, or otherwise transmits it then they would be liable under the Espionage Act. Both the stipulation that NDI must be "closely held" and the First Amendment prohibit this. Accordingly, the pretrial test of whether the alleged NDI was already disclosed publicly is an applicable test to determine if the charges must be dismissed for violation of the First Amendment and facial insufficiency as no jury could ever find public information disclosed on the internet to be NDI *as a matter of law*.

    **2.    Republication of public documents cannot endanger national security**

The republication of public documents accessible from the internet also fails the second NDI test: it cannot possibly harm the national security of the United States. The number of times a person retweets a *New York Times* story about published NDI has no bearing on the initial disclosure and harm to the United States; reproducing the same information cannot endanger the national security of the United States a second time. The government attempts to rebut this argument in its Opposition at 15-16, claiming that "[t]he defendant's contention ignores a variety of ways in which the disclosures and attempted disclosures charged in Counts Three and Four could harm national security." The government first argues that the fact harm may have been mitigated does not mean that harm has been eliminated. This argument falls flat because the

4

harm occurs from the first disclosure—subsequent disclosures of the *same* data have absolutely no effect, because the initial disclosure exists whether or not someone decides to retweet the *same* information. Second, the government argues that the shuttering of CIA tools and networks in response to the leaks was not public information; the government essentially argues that since the public does not know the information is no longer NDI then re-disclosures must be considered NDI. This makes absolutely no sense. Regardless, the government is wrong—mitigating leaks by shuttering networks and tools is literally common best practice, and Mr. Schulte clearly knew that the CIA would do this even though he did not have direct knowledge. Finally, the government argues that "the defendant relies solely on a forward-looking concept of harm—he ignores the significant harms that can occur from retrospective disclosures." *Id.* This is simply a rehash of the government's first argument; regardless of the harms to national security, whether they are "forward-looking" or "retrospective," the harms only occur by virtue of the first disclosure. Subsequent disclosures of the same information in no way endanger the national security, because the information has already been disclosed—as soon as the information hits the internet for the first time and is publicly accessible by the world, *ALL* the harm occurs in that very instant. Accordingly, public information from the internet can never be considered NDI.

Finally, the government's claims that the information retains its classification status even though it is on the internet is entirely irrelevant; classified information and NDI are not the same, and the government chose to charge Mr. Schulte with NDI. So, while the government can classify the internet if it so desires, it cannot proclaim public internet documents to be NDI.

**D.     Count Three must be dismissed**

   **1.     Alleged NDI already available to the general public before transmission**

As discussed in the Opening Mem., section V.B.1. at 9-11, Hickok and the alleged NDI was already on the internet 18 months before the government alleged Mr. Schulte "republished" the same information. It therefore cannot qualify as NDI and Count Three must be dismissed.

   **2.     Alleged NDI was provably communicated from the CIA to Mr. Schulte as unclassified, and therefore not valid NDI; No reasonable person could possibly believe that the Hickok information could be used to the injury of the United States; Alleged NDI was NOT NDI**

The CIA told Mr. Schulte that Hickok and the related network was all unclassified. Judge Crotty acknowledged this in his Fed. R. Crim. P. 29 Order, Dkt. 581, when he found "that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that the Hickok information (i.e., that Hickok connected DEVLAN to another group's network) was national defense information. The [g]overnment elicited no testimony establishing how this information related to national defense or explaining the utility of such information. See GX 616 (Hickok User Guide marked unclassified)." *Id.* at 25. "Nor was there any evidence showing Schulte had reason to believe that the Hickok disclosure could harm the United States. At trial, the [g]overnment offered only vague testimony that if someone learned of Hickok 'it could be used for other folks to subvert a system, to move information between two networks that does not need to get moved.' Dave Tr. 786-87. There was no explanation of how Schulte's September 2018 disclosure, of DEVLAN's bridge to another group's network, could be used to the injury of the United States when the CIA had ceased using DEVLAN over a year earlier on March 7, 2017. See Weber Tr. 249-50." *Id.* at 25 n. 11. This is precisely what Mr. Schulte argued in his Opening Mem., V.B.2. at 11. Accordingly, Count Three must be dismissed.

6

### E. Count Four must be dismissed

#### 1. Malware of the Mind

##### *a) Alleged NDI already available to the general public before alleged attempted transmission; Alleged NDI was NOT NDI*

As discussed in the Opening Mem., V.C.1.a. at 20-25, steganography and the alleged NDI was already on the internet 18 months before the government alleged Mr. Schulte "attempted" to "republish" the same information. It therefore cannot qualify as NDI. Additionally, as discussed in the Opening Mem., V.C.1.e. at 27-28, the information contained in Malware of the Mind was not only *NOT* NDI due to the information already existing on the internet (and therefore failing to be "closely held"), but it also failed the second test as well—it could not possibly be NDI since the CIA stopped using the tools and capabilities that Mr. Schulte worked on at the CIA. This is best summed up in Weber's and Stedman's testimony that, immediately following the WikiLeaks disclosures in March of 2017 (18 months before the *Malware* charge), the CIA shutdown, stopped all development, and all their previous work and tools were destroyed. Thus, relying on Judge Crotty's same arguments for his dismissal of Count Three, "[t]here was no explanation of how Schulte's… disclosure… could be used to the injury of the United States when the CIA had ceased using DEVLAN over a year earlier on March 7, 2017."

##### *b) The purpose of Malware of the Mind clearly was not to transmit NDI; Mr. Schulte never intended to transmit Malware of the Mind; Mr. Schulte provably took no substantial step to transmit Malware of the Mind*

Finally, separate from the NDI issue itself, the substantial trial evidence that counts as a "detailed presentation of the entirety of the evidence," indicates that Malware of the Mind was

7

written for the sole purpose of contributing to Mr. Schulte's defense (Opening Mem. at 25); Mr. Schulte clearly never intended to disclose Malware of the Mind as he had a copy in his possession for 8 months and indicated no plans to ever disclose outside counsel (*Id.*); and finally, Mr. Schulte clearly took no substantial step to transmit Malware—he did not upload it to a cellphone, to the internet, or otherwise even write down plans to transmit the document. (*Id.*)

### 2. Tweets

#### a) *Alleged NDI already available to the general public before alleged attempted transmission; Alleged NDI was NOT NDI*

As discussed in the Opening Mem., section V.C.2.a. at 29-30, the Bartender CIA tool and the alleged NDI was already on the internet 18 months before the government alleged Mr. Schulte "attempted" to "republish" the same information. The government rebuts this in its opposition, claiming that the exact sentence "tool described in vendor report is in fact Bartender" was never released by WikiLeaks. Opp. at 12-13. This argument is absurd. Bartender was completely released by WikiLeaks. The fact that Bartender was not used in the precise sentence with the words "tool described in vendor report" is irrelevant because "tool described in vendor report" is way too generic to ever endanger the national security. Regardless, it does not matter, because, as with Malware, the "re-disclosure" of Bartender could not have endangered the national security because the CIA literally shutdown Bartender and the tool was no longer used.

#### b) *Mr. Schulte never intended to transmit any tweets; Mr. Schulte provably took no substantial step to transmit any "tweets"*

Finally, as with Malware, Mr. Schulte never intended and took no substantial step to transmit any tweets. According to the government, Mr. Schulte had access to a cellphone for months, yet, did not take the time to write the single tweet the government alleges endangers the national security of the United States—not even in a draft or somewhere on the cellphone.

8

### 3. The fact the government ultimately revealed information it alleged to be NDI when Mr. Schulte never did severely undercuts the government's claim of NDI

As noted in the Opening Mem., "[t]here has never been a prosecution in the history of the United States for 'attempted transmission' of NDI where the government actually 'declassifies' what it claims to be NDI for the sole purpose of prosecution." *Id.* at 31. The government responds in a footnote that the "subsequent declassification does not retroactively immunize his crimes." Opp. at 16 n. 3. The government completely misses the point. The fact that the government chose to "declassify" NDI just so it could prosecute Mr. Schulte severely undermines the idea that the information was NDI to begin with. Indeed, the government would *never* declassify NDI and harm its own national security just to prosecute someone; it would, however, falsely claim public information is NDI to prosecute someone. Thus, the government's own actions severely undermine its assertions that the material is NDI at all.

## III. MALWARE OF THE MIND IS PRIVILEGED AND MUST BE SUPPRESSED

The government claims that the Court already concluded that Malware of the Mind is not protected by attorney-client privilege and should not be reconsidered. Opp. at 17. This assessment is simply false. The government moved in *limine* for introduction of excerpts from Malware of the Mind at trial, Dkt. 195 at 27, and the Court eventually determined that they were admissible in accordance with the Federal Rules of Evidence, Dkt. 288. The defense did not bring the attorney-client privilege argument before the Court due to a conflict-of-interest. Dkt. 128, 150, 154, 157, 164, 166, 181 (appointment of *Curcio* counsel), 218 (re: *Curcio* hearing), 220 (ineffective assistance of counsel), 221, 232 (purported waiver of attorney-client privilege), 233 (disqualification recommendation from *Curcio* counsel), 241, 244, 245, 248, 249, 253. A *Curcio* hearing was held on December 18, 2021, in which Mr. Schulte did not waive the conflict.

9

Judge Crotty overruled Mr. Schulte's *Curcio* counsel and ordered the defense to disclose attorney-client privilege to the government. Dkt. 248. The defense did not do so due to the conflict-of-interest, so Judge Crotty ordered preclusion of the advice-of-counsel defense. Dkt. 259. Now that he is representing himself, Mr. Schulte decided to raise the advice-of-counsel defense at trial, call his attorneys as fact witnesses, and introduce evidence that several documents are protected by attorney-client privilege—including Malware of the Mind. So, there is no "reconsideration" requested, but even if it were interpreted as a "reconsideration," the fact that Mr. Schulte intends to raise a new defense and introduce new evidence at this new trial is clearly new information material to the consideration.

The government does not even address the merits of Mr. Schulte's arguments. Mr. Schulte wrote Malware of the Mind for, and only ever transmitted it to, his attorneys, for the express purpose of assisting in his own defense. He will call his attorneys and paralegals as fact witnesses and also testify to these facts. See Opening Mem. Schulte Declaration. Given these facts, combined with the fact that Malware of the Mind was seized from a Federal Defenders envelope marked attorney-client privilege, and was never transmitted or even uploaded to the internet, the Court should order the entire document suppressed.

## IV.   CONCLUSION

For the foregoing reasons, the Court should reaffirm that public documents from the internet can never be NDI, and dismiss Counts Three and Four for insufficiency as a matter of law and as violation of the First Amendment. Alternatively, the Court should order Malware of the Mind suppressed as attorney-client privileged.

Dated: New York, New York                                    Respectfully submitted,

      December 9, 2021                                              Joshua Adam Schulte