LckWschC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

          Defendant.
                              Conference
------------------------------x

                              New York, N.Y.
                              December 20, 2021
                              2:30 p.m.

Before:

                 HON. JESSE M. FURMAN,

                              District Judge

                   APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DAVID W. DENTON JR.
     Assistant United States Attorney

SABRINA P. SHROFF
DEBORAH A. COLSON
     Standby Counsel

Also Present:  Daniel Hartenstine, CISO

LckWschC

1          (Case called)

2          MR. DENTON:  Good afternoon, your Honor.  David

3    Denton, for the government.

4          THE COURT:  Good afternoon, Mr. Denton.

5          THE DEFENDANT:  Josh Schulte, appearing *pro se*.

6          MS. SHROFF:  Good afternoon, your Honor.  Sabrina

7    Shroff and Debra Colson, standby counsel.

8          THE COURT:  Good afternoon to all of you.  Welcome

9    back.

10          Thanks for adjusting to the new courtroom.  I thought

11   a larger courtroom would allow everybody to socially distance,

12   as prudent, given the alarming rise in the new variant around

13   us.

14          A reminder.  We are in an unclassified setting, so

15   please restrict yourself and ensure that you don't say anything

16   revealing classified information.  A heads-up, going forward,

17   you should let me know in advance of a conference if you

18   anticipate that there would be a discussion or need to be a

19   discussion of anything classified that would allow us to make

20   the necessary arrangements both for a court reporter who is

21   cleared and also a courtroom in which we can have such

22   discussions.  So just a reminder about that, but for today's

23   purposes, please make sure that you restrict your comments.

24          Mr. Schulte's preconference letter at ECF-644

25   requested an audio call-in line for his family to listen.  I'm

LckWschC

1    certainly sympathetic to that request, but I'm constrained to

2    deny it.  Under Rule 53, the Court is not permitted to allow

3    live broadcasting from the courtroom.  Courts were authorized

4    to basically provide for an exception to that when access to

5    the courthouse was limited during Covid, but we've been advised

6    that that is no longer the case, and so the rule must be

7    complied with, and therefore, I can't provide for live

8    broadcasting.

9            There have been a lot of filings, suffice it to say,

10   and I plan to cover a lot of ground today, so I'm going to

11   start with some case management-related matters, then turn to

12   conditions of confinement issues and then the substantive

13   motions.  We'll take breaks as needed, and certainly if the

14   court reporter needs me to take a break for her sake, I will

15   certainly do so.

16           I will make one request, and this is more directed to

17   you, Mr. Schulte, than anyone else.  I don't begrudge you

18   filing things.  You obviously should file whatever you think is

19   appropriate, but there's a lot of repetition in your filings.

20   For instance, some of the things related to discovery issues or

21   conditions of confinement are not just repeated but often

22   repeated verbatim from one filing to another.  I assure you I

23   will read everything you file.  I will deal with everything you

24   file.  You don't need to repeat it.  You can incorporate it by

25   reference.  You can make reference to a prior filing, but it's

LckWschC

1    burdensome enough without doing that to make me read things

2    two, three, four times.  It will simply make my job more

3    difficult and make it more difficult for me to give you rulings

4    in a timely fashion, so I would ask you to try and refrain from

5    doing that and be as concise as you can.

6              One preliminary matter.

7              Mr. Denton, unless you tell me that Judge Crotty

8    complied with the Due Process Protections Act previously, I

9    didn't see anything on the docket that reflected that, I

10   thought I should just address that.

11             MR. DENTON:  Yes, your Honor.

12             We saw the Court's order today.  I've reviewed it.

13   I'm sure Mr. Lockard has as well.  He's not here today.

14             THE COURT:  All right.

15             The Due Process Protections Act was an act passed last

16   year that requires me to remind the prosecution of its

17   obligations, under *Brady v. Maryland* and its progeny, to

18   disclose to the defense all information, whether admissible or

19   not, that is favorable to the defendant, material either to

20   guilt or to punishment and known to the prosecution.  The

21   prosecution must make good faith efforts to disclose such

22   information to the defense as soon as reasonably possible.

23   Failure to do so may result in any number of consequences,

24   including a continuance, sanctions, dismissal, or vacatur of a

25   conviction.

LckWschC

1          As Mr. Denton just noted, I've entered a written order

2     in compliance with the law, which is codified at Rule 5(f), and

3     that describes more fully the government's obligations and the

4     possible consequences of violating it.  So, Mr. Denton, thank

5     you for confirming that you've read it.  Please ensure that

6     Mr. Lockard does as well.  We will be discussing some related

7     issues today, but I trust that you will comply with the

8     obligations and have done so to date.

9          With that, let's get started.  Again, we'll start with

10    case management issues.

11         Mr. Schulte filed a motion for quote/unquote missing

12    discovery, and the government has responded to that.  Based on

13    the government's response, I'm persuaded that most of the

14    issues raised by Mr. Schulte in his letter are without merit

15    and don't require further discussion.  In particular, the

16    issues relating to Google emails, the Verizon subpoenas and

17    returns, discovery indexes and the AFD reports and analyses.

18         There are a couple of things as to which the

19    government said it would follow up.  One is lost drives with

20    forensic productions 6, 9 and 12.  Second is the extracted copy

21    of the so-called root volume.

22         Mr. Denton, as to those, I would be inclined to have

23    you provide an update to me and obviously Mr. Schulte as well

24    within a couple weeks.

25         Does that seem reasonable?

LckWschC

                    MR. DENTON:  Yes, your Honor.

 1                    THE COURT:  All right.  Why don't you do that, let's

 2   say, by January 5.

 3                    Mr. Schulte, anything you wish to say about any of

 4   those items?

 5                    THE DEFENDANT:  I guess I never received anything from

 6   the government in response to the Verizon, Google or any of

 7   those issues yet, so I don't know what the -- if I should just

 8   wait and then review those and then respond to the Court, or --

 9                    THE COURT:  Meaning, you haven't gotten the

10   government's response, which is ECF No. 647, is that correct?

11                    THE DEFENDANT:  That's correct.  I haven't been

12   receiving government responses.  It takes, like, two to three

13   weeks.

14                    THE COURT:  All right.  That's one of the items on my

15   agenda.

16                    You'll get it in due course, but quick summary,

17   apparently with respect to the Google search warrant returns,

18   some of them were provided in unclassified discovery and some

19   was in classified discovery, and that may explain why you

20   haven't located all of it; there are no further records with

21   respect to Verizon to be produced; and the other items that are

22   also addressed here, the government takes the position that it

23   has no obligation to provide you with an index, but it is going

24   to do so anyway; it is exploring the matter of the root volume

LckWschC

1    with the FBI and also looking into the three missing drives at

2    the MDC, and those are the two issues that I want the

3    government to provide an update on no later than January 5; and

4    reiterates that the items that you have raised several times

5    with respect to purported discovery, as a matter of fact, *Brady*

6    material -- namely, the AFD reports or analyses -- no such

7    documents exist.

8            I accept that representation.  Obviously, if it turns

9    out to be otherwise, then the government will have some

10   answering to do, but I have no reason to question that

11   representation.  Again, I assume you'll get that in due course.

12           Mr. Denton.

13           MR. DENTON:  Your Honor, if I may, could we ask until

14   January 7 to provide that update?  I think with the holidays

15   and everything it may help to have the benefit of that week.

16   If there is an opportunity to provide a response sooner, we

17   certainly will.

18           THE COURT:  Sure.  I'll give you until the 7th.

19           One related matter, in Mr. Schulte's preconference

20   letter at ECF-644, he requests an updated version of the

21   electronic version of the docket basically on a month-by-month

22   basis.  Mr. Denton, that seems reasonable enough, since

23   presumably it's the most recent things that are most relevant.

24   Any objection to making provision to do that?

25           MR. DENTON:  So, your Honor, I'm not entirely sure.

LckWschC

1    When we did this the last time, we had to work with Judge

2    Crotty's deputy and the clerk's office because there's not a

3    batch way to download an entire electronic docket.  To the

4    extent that what the defendant wants is just PDF copies of

5    things, we can certainly do that relatively easily, but there

6    was just a little bit of a delta with how we did it the last

7    time that made it a little more complicated.

8            THE COURT:  All right.  You guys are regularly

9    communicating about case management-type things, is that

10   correct?

11           MR. DENTON:  We have been, your Honor, and we have

12   another call scheduled for next week, so we should be able to

13   work that out.

14           THE COURT:  Great.  Why don't you put that on the

15   agenda as long as -- I think Mr. Schulte is certainly entitled

16   to have in some usable fashion what has been filed in the case,

17   and whether that is -- I'm not sure I care what form it takes,

18   but I think if his desires on that front can be accommodated,

19   then we should try to do that.  OK?

20           Mr. Schulte.

21           THE DEFENDANT:  Yes.  I just wanted to respond to that

22   there is no more communications between the parties due to the

23   government's insistence on recording and using --

24           THE COURT:  I'm going to get to that in short order.

25           THE DEFENDANT:  OK.

LckWschC

1          THE COURT:  All right.  Also on discovery, one quick

2     word on the government's letter regarding the search warrant --

3     that is, the March 2017 search warrant, ECF No. 625 --

4     Mr. Denton, suffice it to say I'm not happy about the apparent

5     failure to produce that document and others earlier, but I fail

6     to see that any prejudice resulted given that that search was

7     not executed, meaning the search was not executed in response

8     to that warrant and so, too, with respect to the other

9     documents.

10          That being said, I don't know if you have any update.

11     You said that you expected to have an update within a week or

12     two.  I think it's been more than a week or two, so any update

13     on that front?

14          MR. DENTON:  Your Honor, we are planning, consistent

15     with the Court's order, to provide an update in writing later

16     this week.  The bottom line is that we believe that everything

17     is there, that we have complied with providing the returns that

18     are there.  Again, these are warrants for which there were not

19     returns to be produced, but we are mindful of the Court's

20     concern and of our obligations and are reviewing carefully to

21     make sure that nothing was missed.  That's a little bit complex

22     in this case because of the technical nature of some of the

23     data, so making an accurate comparison with what's in the file

24     with what was produced in discovery takes a little more work

25     than just looking at a few things side by side.  We're

LckWschC

1    optimistic to be able to provide a positive report to the Court

2    as scheduled.

3              THE COURT:  All right.  Very good.

4              With respect to mailing delays and filing issues,

5    Mr. Schulte has mentioned in a couple of filings I just

6    mentioned a moment ago that there are significant delays in his

7    receipt of orders and government filings, and I gather that is

8    since the MDC has stopped delivering the mail, and he requests

9    that I order the government to revert to that practice and

10   ensure delivery within one to two days.

11             Mr. Denton, I don't know if you have any thoughts on

12   this front, but I do think that ensuring timely delivery of

13   things to Mr. Schulte is really essential to keeping this case

14   on track and proceeding in an orderly fashion.

15             MR. DENTON:  Your Honor, we certainly understand that.

16             As far as what the U.S. Attorney's Office has been

17   doing, whenever there is a government filing or a court order,

18   we have ensured that it is mailed to Mr. Schulte either the

19   same day or no later than the following day.  I gather that

20   there is a bit of a discrepancy between what Mr. Schulte is

21   reporting about how frequently mail is either delivered to him

22   or picked up from him and what the Bureau of Prisons mail logs

23   and records show.  It certainly does take him time to receive

24   orders and filings through the U.S. mail.  There's no question

25   about that.  It has to be transported, delivered, inspected,

LckWschC

1   etc., but I'm not sure that there is a more efficient way to go

2   about it, given that it is, in some respects, equally

3   problematic to be ordering BOP legal personnel to make personal

4   deliveries for him and not for other defendant.  So this is the

5   solution that had been come to.

6           THE COURT:  I'm not sure I understand what the

7   solution you're referring to is.

8           MR. DENTON:  Well, your Honor, I think it is that both

9   the government and standby counsel assumed responsibility for

10  delivery within their power.  In the government's case, that is

11  to mail it to him.  We have talked extensively with the Bureau

12  of Prisons about making sure things are marked appropriately so

13  that they are delivered as legal mail as quickly as possible.

14  Again, I'm not entirely sure from the government's side what

15  more there is that we can do here.

16          THE COURT:  Can I ask you a question first, and then

17  I'll hear from standby counsel and Mr. Schulte.

18          Given that Mr. Schulte is coming to the SCIF on a

19  regular basis, is there not a means by which to essentially

20  ensure that he receives whatever has been filed in the prior

21  few days or prior week when he's here?  In other words, that

22  should seemingly ensure that he receives things no later than

23  seven days and presumably less than the period of seven days

24  after they've been filed.  Is that not an option?

25          MR. DENTON:  That's certainly an option, your Honor.

LckWschC

1    I think to the extent that's an option the Court would pursue,

2    the appropriate course would be for standby counsel to print

3    those things and provide them to him.  We can't mail things to

4    the courthouse SCIF, so that would otherwise require us to make

5    a weekly delivery from the government.  I'm not sure that

6    that's any more efficient than simply having standby counsel

7    perform that task.

8              THE COURT:  OK.

9              Ms. Shroff or Ms. Colson, I don't know if you have any

10   thoughts or suggestions here.

11             MS. SHROFF:  Your Honor, may I?

12             THE COURT:  Can you put the microphone closer.

13             MS. SHROFF:  Sure.

14             Your Honor, as far as Ms. Colson and I are concerned,

15   when Mr. Schulte is produced in the SCIF, he is given an

16   updated printout of the ECF and the documents that are

17   attached.

18             I just want to take a minute and note for the Court

19   that the MDC getting mail from the United States Attorney's

20   Office is a wholly different thing than the MDC getting mail

21   from either Ms. Colson or my office.  I think it's far more

22   expeditiously received and processed when it is coming from the

23   United States, so I think there is a real difference between

24   who the sender is and how quickly that mail is processed.

25             Also, I don't think Mr. Denton needs to be concerned

LckWschC

1    about there being a caveat or a different way that Mr. Schulte

2    is getting his mail as opposed to everybody else in the MDC's

3    getting mail.  Mr. Schulte is not like everybody else in the

4    MDC.  He is representing himself *pro se*, so the same rules

5    should not apply to him that apply to all of the other people

6    who are not going *pro se*.

7         Now, of course, at that time people going *pro se* at

8    the MDC, all ten of them, should be treated the same way

9    Mr. Schulte's being treated because, after all, he is the

10   lawyer, and we are in a really big bind here, your Honor,

11   because Mr. Schulte's quite adamant that we are merely standby.

12   And according to Mr. Schulte, the definition of standby is that

13   we stand by until he directs otherwise.

14        So to the extent we're able to send him mail, and we

15   do every single time a memorandum or an order is issued or a

16   filing is done, he gets the mail.  We give him the mail both by

17   snail mail, where we mail it, and we give it to him in the

18   SCIF.  That is what we have been doing.

19        Of course, if the government is willing, they can

20   certainly print out their filings and leave them for us, let us

21   know, or even leave them outside the SCIF, because they are

22   certainly not classified or anything other than on the docket.

23   That's all I can tell you about the mailing.  We do it, as you

24   have ordered us, within 24 hours of something hitting the

25   docket.

LckWschC

1    THE COURT:  OK.  But what about my suggestion of just

2  ensuring that he receives whatever was filed in the prior X

3  days each time he comes to the SCIF; wouldn't that be a

4  backstop and ensure that he gets thing in a timely fashion?

5    MS. SHROFF:  We absolutely do it every single time.

6  Every single time there is a filing, unless it's he who has

7  done the filing, we give it to him.  We also give him an

8  updated docket.  If he came to the SCIF, for example, on

9  December 1 and the next time he comes is on December 7, then we

10  give him the printout of the docket from December 1 to December

11  7.  If one of us is not there in the SCIF -- so if Ms. Colson

12  and I are not the people on SCIF duty, so to speak -- we let

13  him know what has been filed, and we ensure that the filing is

14  delivered to him by whoever's at the SCIF.

15    THE COURT:  OK.  But how do I reconcile that with his

16  claim that he sometimes doesn't get things for a couple weeks?

17  That doesn't seem reconcilable.

18    (Counsel and defendant conferred)

19    MS. SHROFF:  So, Mr. Schulte, I think -- I don't think

20  this is correct, but I think that it's possible that there are

21  days that the person who is at the SCIF is not somebody that is

22  with either my office or Ms. Colson's office; he's simply a

23  cleared person, and he doesn't have any access, as we have

24  repeatedly told the government, to an office, ability to scan,

25  ability to email.  But there might be an off chance where that

LckWschC

1   person is doing SCIF duty, so to speak, and there is a lag of

2   some sort.  But as far as I know, that is not a frequent

3   occurrence, because one of us tries to come down and give the

4   paperwork and then go back and leave.

5          THE COURT:  And you're representing that you print out

6   both the docket record of what has been filed since the last

7   SCIF session as well as a copy of any order or filing other

8   than Mr. Schulte's own filings.  Is that correct?

9          MS. SHROFF:  Yes.  But may I just confirm with

10  Ms. Colson?

11         THE COURT:  Yes.

12         MS. SHROFF:  Your Honor, thank you.

13         I did confirm with Ms. Colson, and that is correct,

14  the date hypothetical I gave you.  If the last time I printed

15  out the docket for him was December 10, then I would print out

16  the docket from December 10 until today, which is December 20.

17         THE COURT:  Just the docket or also the documents?

18         MS. SHROFF:  No, no.  The docket and the documents.

19  Both certainly, your Honor.  And also, Ms. Colson and I think

20  that, we also print out -- we have parrot records.  So if he

21  has filings in the Court of Appeals, we print out the actual

22  docket and the document.  But there may be a time, like what

23  happened, I think, a week ago, when Mr. Schulte wasn't brought

24  to the SCIF because of the problems with, I think it was the

25  Maxwell trial, or for whatever reason, there could be a time

LckWschC

1   where there is a filing on a Tuesday, but he's not brought to

2   the SCIF until the following week, the Tuesday, in which case

3   he would have more than a week where he gets nothing.

4           THE COURT:  OK.  But it seems to me that if you both

5   are complying with the direction to mail things within 24 hours

6   and he's being provided with copies each time that he comes to

7   the SCIF, that more or less ensures that he will get things

8   within a couple of days of them being filed in every instance.

9   Am I missing something?

10          MS. SHROFF:  I don't think -- I'm not sure whether the

11  Court is missing something or there is a disconnect.  But I do

12  say this to the Court.  There seems to be a significant delay

13  with MDC giving mail to those people in the SHU.  To the extent

14  that he's coming to the SCIF, we update him and I again have

15  confirmed with Ms. Colson that we print out and we give him

16  whatever filing has been made.  But if there's a filing, for

17  example, that hits the docket at 4:45 and he's been in the SCIF

18  on that Tuesday and he's gone, then he doesn't get that until

19  the next time he shows up in the SCIF, which could be a week

20  from that Tuesday.

21          That is why I think it would be very helpful if the

22  government had some kind of mechanism by which the MDC actually

23  processes the mail that the government sends him.  There is a

24  distinction between their mailing address and our mailing

25  address, and I'm sure the Court knows that.

LckWschC

1          THE COURT:  All right.

2          Mr. Denton, I'm going to ask you to look a little bit

3     into this and to include it in the January 7 letter, and by

4     this I mean I certainly agree with you that Mr. Schulte

5     shouldn't get any special treatment, but I think Ms. Shroff is

6     not wrong in saying that a defendant who is representing

7     himself or herself has a different need to receive things in a

8     timely fashion than another inmate, because the fact of the

9     matter is it's not just his interest, it's also my interest in

10    ensuring that this case proceeds in a timely and efficient

11    manner, and if he's not receiving things in a timely and

12    efficient matter, it makes it very difficult for the case to

13    proceed in that way.

14         What I would ask is for you check with MDC legal and

15    figure out if there is an efficient means to deliver things

16    more quickly to defendants who represent themselves and for you

17    to report back to me about that, and in connection with that

18    report, I'd actually like a number of how many defendants are

19    similarly situated in the MDC, how many are representing

20    themselves for whom this would be an issue, so I have a sense

21    of what the burden would be on the MDC.  All right?

22         MR. DENTON:  We understand, your Honor.

23         I will say we have communicated about this extensively

24    with the MDC and we have conveyed the Court's concerns about it

25    and noted this particular concern about the defendant's *pro se*

LckWschC

1    status.  To Ms. Shroff's point, we have been marking mail as

2    legal mail from the U.S. Attorney's Office to try and expedite

3    that.  We'll see what else we can do.

4                THE COURT:  OK.  And you should tell them that if they

5    want to avoid a more burdensome order, they may want to come up

6    with a practical solution themselves.

7                Yes, Ms. Shroff.

8                MS. SHROFF:  Your Honor, I believe I could be wrong,

9    because I don't remember if this was fully out there, but as I

10   understood it, I think Judge Crotty kind of tried to help us

11   all out and said that perhaps MDC legal would just receive the

12   filings via email, print it out and give it to Mr. Schulte.

13   Ms. Colson reminds me of that, but I think that's what Judge

14   Crotty may have ordered, but I'm not really sure whether MDC

15   would agree with it or not, but that's another solution.

16               THE COURT:  Sure.

17               MS. SHROFF:  I finally want to note one thing.

18               I'm not able to give Mr. Schulte something.  Right?

19   So I go to the SHU.  I can sit down and talk to Mr. Schulte,

20   but even if I represent to them -- and I've tried this with

21   another client; I think that client was before you,

22   Mr. Mercado -- I'm not able to hand up any legal paperwork to

23   somebody who's in the SHU, no matter -- even if it's just the

24   docket.  So the best I can do is go to the SHU, tell him

25   there's a 40-page filing, and then come back downstairs and

LckWschC

1    just throw it in the legal mailbox.  I'm not able to

2    hand-deliver; I just wanted you to know that.  If that were an

3    option, I suppose we would undertake it.

4               THE COURT:  Is that true in the SCIF as well?  Can he

5    receive something in the SCIF and then take it back to the MDC?

6               MS. SHROFF:  He can take it back to the MDC only if

7    it's unclassified.

8               THE COURT:  Obviously.

9               MS. SHROFF:  Well, I know.  I'm just trying to answer

10   you completely.  If it's just a filing, then he can take it

11   back, yes.

12              THE COURT:  OK.  So, again, it doesn't seem like this

13   should be a problem, and I'm not quite sure I understand why it

14   is a problem, given the various backstops that we have.  That

15   being said, I do want Mr. Denton to discuss it with MDC and try

16   and figure out if there is a more efficient means of delivering

17   it to him than the current system.  So I'll expect to hear back

18   from the government on that.

19              Mr. Schulte, anything you wish to say?

20              THE DEFENDANT:  Yes.  There's been a bunch said.

21              For the first thing, so about the standby counsel and

22   delivering things to the SCIF, so, for example, last week, I

23   didn't get anything, so the last thing I got from them was

24   December 8, and that's because the specific person who was

25   there that last week was not able to bring me things.  And so

LckWschC

1    that's the biggest issue.  So whenever that happens, it could

2    be several weeks before I get something from them, and they've

3    been basically providing things to me as a nice to-do, but it

4    hasn't been, as far as they are concerned, it's not an order

5    from the Court, so I've been primarily relying upon the

6    government.  And the government says that the mail delays

7    aren't like I claim them to be because of some logbook.  I

8    haven't seen that, but I do have here -- envelope that was

9    marked November 15.  It was received by MDC November 23, and it

10   was delivered to me November 29.  And this is the quickest I've

11   gotten things, so that's 14 days there.  That's just on the

12   envelope.  It's clearly signed by the person.

13           THE COURT:  All right.  Mr. Schulte, Mr. Denton is

14   going to look into it.  I think if we can come up with a more

15   efficient delivery system to the MDC, we should.  And I

16   recognize there will be occasions where things don't work in a

17   well-oiled manner, but it sounds like, with various backstops,

18   we have a system in place that should ensure you get things in

19   a timely fashion, and we'll go from there.

20           Anything else on this?

21           THE DEFENDANT:  Yeah.  I think that's -- I guess I

22   just wanted to -- they mentioned something about Judge Crotty's

23   orders before, so I just wanted to clarify that, that in Dkt.

24   515, Judge Crotty denied my motion to compel the MDC to deliver

25   mail promptly, and it was on the condition that the government

LckWschC

1   followed the old procedures, that it delivers -- it mails stuff

2   to the MDC, then they give it to me within one to two days.

3   That was Judge Crotty's ruling from Dkt. 515.

4           THE COURT:  All right.  Thanks for alerting me to

5   that.

6           The next item has to do with Mr. Schulte's request to

7   file things via CD, which I guess he would deliver to the MDC.

8   I'm not quite sure how it would work, but Mr. Denton, anything

9   you wish to say on that front?  As far as I can tell,

10  Mr. Schulte's not having any problem filing things, since he

11  seems to file things on a nearly-daily basis, but be that as it

12  may, what's your thought.

13          MR. DENTON:  Your Honor, we share that impression.

14  I'm not entirely sure what the plan would be for a CD after it

15  gets delivered to the MDC whether it would be mailed to the

16  Court or whatnot.  But I will say, I think, fundamentally we do

17  not have an issue with however the Court prefers to receive

18  filings from the defendant.

19          THE COURT:  Mr. Schulte, do you want to explain

20  exactly what you're proposing?

21          THE DEFENDANT:  Yes, and just to be 100 percent clear

22  on this, most of the times I can have standby counsel file

23  things when I move to the SCIF, and the biggest problem here is

24  when the Court has deadlines, so if the deadline's on a

25  Thursday, but I don't -- I only have a SCIF day on Monday,

LckWschC

1    Tuesday, there's no way -- unless I file it early, there's no

2    way to specifically meet the court deadline.  And so the DVD/CD

3    filing was basically proposed simply to go the opposite way of

4    the way the government had been delivering things to me.  It's

5    simply I have the DVDs, blank DVDs that I simply put the PDF on

6    to be filed.  I give it to MDC, one of the corrections

7    officers.  They simply give it to unit, unit team there, and

8    then legal either mails it, sends it by email and just attaches

9    an email to send it to either standby counsel or the

10   government, or whoever, and then it gets ECF-filed from there.

11   That way, I can meet court deadlines on specific dates, and

12   things like that.

13          THE COURT:  All right.  Gotcha.  OK.  I am not going

14   to go that route.  That seems like a recipe for disaster and

15   creating more problems than solutions.

16          I think, instead, what would make sense is if you know

17   what days you have things due -- first of all, my hope is that

18   there will be fewer deadlines going forward in the sense that

19   there will be fewer filings going forward.  But be that as it

20   may, if you think that there's a disjuncture between the days

21   you'll be in the SCIF and a deadline for filing is a couple

22   days after you'll be in the SCIF, if you want to file a letter

23   just requesting permission to file two days later, when you

24   anticipate you'll be in the SCIF, I'm certainly happy to make

25   that accommodation for you to make things easier.  That seems

LckWschC

1        like an easier system than the one that you're proposing.

2                Next on my list is handling of filings by standby

3        counsel.  I really don't quite understand.  This is an issue

4        that the government raised in its preconference letter.  I also

5        think that there have been issues over time with respect to

6        filings that may contain classified information.  I'm going to

7        be deliberately vague on that front.  Honestly, I do not

8        understand why I need to be involved in this.  This seems like

9        something that counsel should be able to deal with

10       professionally and in good faith.

11               I have reviewed Judge Crotty's September 23 order at

12       ECF No. 518, and it seems pretty clear to me what standby

13       counsels' responsibilities are with respect to filings, and

14       also it's very clear to me that that order does not apply to

15       filings that may contain classified information which are

16       governed by the protective order, which, at present, is at ECF

17       No. 61, though there may be one that supersedes that order in

18       due course, all of which is to say I don't quite understand

19       what the issue is.  It seems like the duties and

20       responsibilities of standby counsel are pretty clear and don't

21       require any clarification.

22               But, Ms. Shroff or Ms. Colson, is there something I'm

23       missing here?  Is there some reason that I need to even be

24       discussing this?

25               MS. SHROFF:  Well, your Honor, I don't know.  We went

LckWschC

1    through an entire trial and managed to survive it, and I'm not

2    sure exactly what has changed.  Judge Crotty's order gives us

3    the option of informing the government that they have mail and

4    they should pick it up, and that is what we do.  And that is

5    largely because, and I reiterate again, that there are SCIF

6    days during which neither Ms. Colson nor I are physically here.

7    We simply have a cleared paralegal, who is required to stay

8    alongside Mr. Schulte.  So when Mr. Schulte informs him that

9    there is a missive or a letter or a filing, they call the U.S.

10   Attorney's Office and leave a message, and the U.S. Attorney's

11   Office, who has quite, I would say triple, at least, the number

12   of employees that Mr. Schulte has, we ask them to come pick it

13   up.  I don't see the issue, honestly.

14         THE COURT:  If you look at Dkt. No. 518, it provides

15   for correspondence to be scanned and emailed, to be delivered

16   to the U.S. Attorney's Office space on the fifth floor as long

17   as staff is present to accept it and the government is to

18   arrange for staff to be present during the regularly scheduled

19   SCIF hours, and if staff is not present, then the burden shifts

20   on to the government, upon notice from standby counsel, to

21   promptly collect it.  So if what you're suggesting to me is

22   that you're relying on that, that is only if the first three

23   options are not readily available.

24         MS. SHROFF:  Right, and the first option is that we

25   call and let them know that they have a letter and they can

LckWschC

1    come pick it up.  That's what Judge Crotty ordered.

2              The reason we asked for that to be included, your

3    Honor, is because lawyers are not -- we are not there at the

4    SCIF.  He's at the SCIF for, like, hours at a time.  Neither

5    Ms. Colson nor I are there.  We had to advertise for somebody

6    to come fill that slot.  We barely managed to find one person

7    who was willing to do it, and that is why we asked specifically

8    Judge Crotty to shift the burden, so to speak, on to the

9    government, and that is one of the options that the judge gives

10   us.  And frankly, we're kind of worried about this scanning and

11   emailing.  It's really worked to our detriment.

12             We are not classification experts.  When they first

13   asked us to undertake that responsibility, we contacted the

14   CISO and expressed our deep concern that we do not have -- we

15   simply do not have -- the correct level of knowledge to decide

16   these issues, and we would rather do what we have always done

17   in this case, which was give the filings to the U.S. Attorney's

18   Office, who had different lawyers at that time and managed to

19   help us out so that there wasn't a mishap or a spill or a wrong

20   filing, and that prophylactic was extremely helpful.

21             We would prefer very much to stick to that process

22   because I think it reduces error, because nothing is hitting

23   the docket, and we've discussed this several times with the

24   CISO who is present in court today.

25             THE COURT:  All right.  As a general matter, my

LckWschC

1    understanding, I recognize that you're not a classification

2    expert and you're certainly not a classification authority, but

3    it seems to me that filings can certainly be divided, at a

4    minimum, into two buckets, one that make reference to things

5    that Mr. Schulte may or may not have learned from his

6    employment at the CIA, which I would think you should operate

7    with the presumption that they may contain classified

8    information, versus things that don't relate to that at all,

9    relate to his conditions of confinement, relate to filing

10   issues, relate to those sorts of things, which clearly do not,

11   presumably, involve any classified information.  I would think

12   that it makes sense to err on the side of caution and submit

13   the former -- anything that references information that he may

14   have gained from his time at the CIA or information that may or

15   may not be on the WikiLeaks leaks -- and submit those in a

16   fashion that ensures that they're reviewed.

17          But beyond that, Mr. Denton, again, I find it a little

18   ridiculous that I need to involve myself in this, and I would

19   think that counsel should be able to figure this out in a way

20   that makes sense for everybody, recognizing that you have day

21   jobs and they involve things that are more weighty than

22   delivering mail, but be that as it may, what are your thoughts

23   on this?

24          MR. DENTON:  Your Honor, I generally tend to agree

25   with you in that the order from the court, from Judge Crotty,

LckWschC

1    previously was quite clear about sort of what the sequence of

2    options was.

3           We have generally been able to retrieve mail from the

4    SCIF when Ms. Shroff has asked.  That's not something that

5    we've always been able to do.  Part of the problem is not the

6    actual sort of transmission of mail but communication about it.

7    So, for example, the defendant, in one of his filings, claimed

8    that he had sent a letter to the government regarding the

9    proposed protective order changes.  We never got that.  It was

10   not in any of the sort of batches of mail that were picked up

11   from the SCIF.  We asked defense counsel, Is there a letter we

12   need to pick up?  And the response that we got from standby

13   counsel was, You should call the MDC and talk to the lawyer on

14   the case, Mr. Schulte.

15          I think in dealing with each other professionally

16   here, it's entirely appropriate for us to just work out basic

17   questions and for standby counsel to help perform some of these

18   functions.  If there are paralegals who can't do, I understand,

19   but we've got to work around that somehow.

20          MS. SHROFF:  Your Honor, that's really -- to further

21   involve the Court in something, and I just ask you to indulge

22   us here for a minute, that's not really what happened.  The

23   government asked us about a specific filing.  I cannot stress

24   this enough.  Mr. Schulte insists that we remain standby unless

25   he says otherwise.

LckWschC

1          THE COURT:  OK, but the fact of the matter is that's

2     not actually up to Mr. Schulte.  This order, among others,

3     specifies what your duties and responsibilities are as standby

4     counsel.  The law specifies your duties and responsibilities as

5     standby counsel, and I hate to break it to Mr. Schulte, but

6     those duties and responsibilities are more substantial than he

7     may think.  All right?  And we'll get to this in some of the

8     issues that we have to discuss today.  But the fact of the

9     matter is some of the things that Mr. Schulte would like he

10     doesn't get because he has standby counsel who are available to

11     him to perform certain functions that are more substantial than

12     he may want you to perform.  So he's going to have to make some

13     choices going forward, but making you potted plants is not

14     among the choices that he has.

15          MS. SHROFF:  I appreciate the Court letting him know

16     that.

17          As to that particular letter the government describes,

18     we informed the government we didn't know.  Mr. Schulte was

19     brought to the SCIF the next day.  By 10:00 that morning, we

20     had contacted Mr. Schulte.  Both of us were unavailable to

21     physically be in the SCIF, but we immediately contacted

22     Mr. Schulte.  We told him there was a letter that the

23     government wanted that they didn't have and that he should

24     contact the government.  We asked the paralegal to place a call

25     to Mr. Lockard, and I believe I literally told Mr. Schulte,

LckWschC

1    Hang up on me now, call the government, answer their question,

2    and then I will call you back at 1:00.  And that's exactly what

3    we did.  That was the very next day after the government

4    informed us of this missing letter of which neither Ms. Colson

5    nor I had any information substantively.

6         So we did exactly what we were told to do.  We

7    communicated that to the man who had the answer and told him to

8    call Mr. Lockard.  Really, there isn't any reason for the Court

9    to be involved.  The procedures worked well before.  The

10   problem right now is that the government and Mr. Schulte do not

11   want to speak to each other, and that's where there is a gap,

12   and they, unfortunately, have to speak to each other, because

13   they're opposing counsel.

14        THE COURT:  All right.  And we will get to that, but

15   can I ask standby counsel and counsel for the government, let's

16   try to do this better.  I don't understand why you can't manage

17   without court intervention to deal with just exchanging

18   documents in an orderly fashion that minimizes the burdens on

19   everybody.  It just seems like that is something that you

20   should be able to accomplish.  It seems like it worked for a

21   long time in this case, and I don't know why it has broken down

22   recently, but this seems like something that everybody should

23   be able to get past and do better.  OK?

24        I don't have a better solution than that.  It doesn't

25   seem to me that the answer is to prescribe an ever more

LckWschC

1   detailed procedure in an order that governs who does what and

2   when.  They're fairly specific.  They're fairly clear.  It

3   seems like it's much more a function of everybody presuming

4   good faith and trying to do right by the other side than it is

5   about any orders that I can enter.  OK?

6           Mr. Denton.

7           MR. DENTON:  Understood, your Honor.

8           THE COURT:  Ms. Shroff.

9           MS. SHROFF:  Yes, your Honor.

10          THE COURT:  In terms of filing of classified

11  information or not, again, the orders on that are very clear.

12  I reread the protective order that's currently in place.  It's

13  very clear.  If standby counsel or Mr. Schulte have reason to

14  believe that something contains classified information, they

15  have certain obligations with respect to the handling of that

16  and need to take care that it not get publicly docketed.  By

17  the same token, I would expect the government, if there is a

18  problem, to bring it to my attention promptly and not to wait

19  six, seven, eight days after something has been filed to alert

20  me, let alone on a Friday evening, that there's a problem.

21          So again, I'm not sure if there's -- it doesn't strike

22  me that there's a need for clearer or more specific orders.  I

23  think everybody just needs to try harder to comply with the

24  orders that exist and do better.  And again, to me, it seems

25  like dividing the filings into buckets -- those that pertain to

LckWschC

1    Mr. Schulte's knowledge as a CIA employee versus things that

2    don't relate to that at all and erring on the side of caution

3    with respect to the first bucket -- seems like a prudent way to

4    approach it.

5              Any questions about that?

6              Mr. Denton.

7              MR. DENTON:  No, your Honor.  We understand.

8              THE COURT:  Ms. Shroff.

9              MS. SHROFF:  No, your Honor.

10             THE COURT:  All right.

11             Mr. Hartenstine, do you have anything you want to add

12   on that?

13             MR. HARTENSTINE:  Thanks for asking, your Honor, but

14   no.

15             THE COURT:  All right.  Let me also say what I said to

16   Mr. Hartenstine earlier.  I think part of the problem, and this

17   goes back to what I said earlier about my hope that there will

18   be fewer filings going forward, I think it would make sense for

19   Mr. Hartenstine or one of his colleagues to be available on

20   days where we can anticipate and do anticipate that Mr. Schulte

21   will have substantive filings going forward, and my hope is

22   that that will be clear from the schedule that we set today,

23   and in that regard some of these issues will be less

24   problematic if there's somebody here and available on those

25   days when we anticipate substantive filings being made.  But

LckWschC

1   again, at the end of the day, I think it's as much everybody

2   just trying to handle these things in good faith.

3        All right.  Next on my list of case management things

4   is Mr. Schulte has raised, in several filings -- ECF Nos. 582,

5   591, and 605 -- an issue with respect to the forensic image of

6   what he refers to or parties refer to as SC01.  If I understand

7   correctly, I think the gravamen of his complaint is that he's

8   required to review the forensic image in the presence of an FBI

9   agent and that he considers that to be unfair or an

10  infringement on his right to prepare a defense.

11       Mr. Schulte, is that correct?  Is there anything else

12  you wish to say on that front?

13       THE DEFENDANT:  Well, I think the primary issue Judge

14  Crotty already ruled on, and there's an interlocutory appeal

15  about this.

16       The issue that I raised here is a different issue.

17  It's, in the forensic discovery that I received from the

18  government, they gave me two -- there are two hard drives.  One

19  of them they allege has CP on it and the other one was

20  encrypted that I cannot even access, and they don't allege it

21  has classified information or CP, and so I'm trying to figure

22  out what that drive is or why that's even not been produced to

23  me in unclassified discovery outside of the SCIF, if it doesn't

24  have any of those materials.  So that's what my request was

25  specifically in my December 16 letter.

LckWschC

1      THE COURT:  Again, maybe I'm missing something, but I

2  think you had made a request with respect to the form of the

3  items, and Judge Crotty rejected that and I'm not going to

4  revisit that ruling.  I thought that the gravamen of your

5  current, remaining complaint had to do with whether you could

6  review these materials in the presence of an FBI agent or not.

7      THE DEFENDANT:  No.  That's -- no, no.  That's been

8  resolved already.  So the FBI, what they do is they take the

9  drives out.

10      THE COURT:  Let me stop you.  Is there any remaining

11  issue to be resolved?

12      THE DEFENDANT:  Yeah, the issue isn't -- it's not a

13  recurring issue.  It's the fact that there is a second drive

14  that's been produced that's part of the CP drives, but the

15  government hasn't, isn't alleging there's any CP on it, so I'm

16  trying to figure out what the second drive is, why it's

17  included with the CP drives if there's no CP on it, and it's

18  encrypted too, so I can't access the data.  So there's

19  basically two requests.  One is for the government to decrypt

20  it and give it to me in a decrypted format, and two, to either

21  identify to me where the alleged CP material is, or if there's

22  not anything, to explain why it's in restricted format.

23      THE COURT:  All right.

24      THE DEFENDANT:  Does that make sense?

25      THE COURT:  Mr. Denton.

LckWschC

1              MR. DENTON:  Your Honor, I'm honestly a bit confused.

2          There were two discovery drives that were provided to

3    the defendant that were recopied.  One contains the SC01

4    server, which has the child pornography on it, which is covered

5    by the Adam Walsh Act provisions, which I understand does

6    contain an encrypted partition that was encrypted by the

7    defendant.  There is a separate hard drive, which is the server

8    02 hard drive, which does contain classified information.  That

9    does not have to be handled consistent with the Adam Walsh Act

10   restrictions, and to the extent it is, we can clarify with the

11   FBI or otherwise that it does not need to be.

12             THE COURT:  Great.

13             MR. DENTON:  Beyond that, I'm not sure what else there

14   is to do.

15             THE COURT:  Great.  Why don't you clarify that with

16   the FBI, and hopefully, that will resolve the issue.

17             All right, Mr. Schulte?

18             THE DEFENDANT:  I think the confusion is that the SC1

19   drive actually is including two -- it includes two separate

20   drives, so I don't know how we can work this out.  But SC1

21   drive is actually two drives.  There's SC1-1 and SC1 re 5.

22   Those are two different, completely different hard drives that

23   have completely different sets of data.

24             THE COURT:  All right.  Look --

25             THE DEFENDANT:  I guess we just need to work it out.

LckWschC

1          THE COURT:  -- why don't you discuss that with

2    Mr. Denton in your next call, but it seems like something that

3    you should be able to sort out on your own.

4          Next item is SCIF time.

5          Mr. Schulte's preconference letter -- again,

6    ECF-644 -- complains about the late arrivals to and from the

7    SCIF on certain days.  I certainly understand the frustration,

8    but those seem like more isolated problems than systemic ones,

9    and so I don't think there's any cause for me to intervene and

10   deal with it.  Otherwise, I haven't heard any complaints, so I

11   assume that the system of increase in SCIF time is working.

12   But I was advised by the marshals that Mr. Schulte is not even

13   using all of his time and on a regular basis asks to leave the

14   SCIF early, which is certainly fine by me, but will make it a

15   little bit hard to complain at a later time about insufficient

16   time in the SCIF.  So again, given that I haven't heard larger

17   complaints, I'm hoping and assuming that that is not an issue

18   that we need to spend more time on.

19          THE DEFENDANT:  So --

20          THE COURT:  Yes, ms. Shroff.

21          MS. SHROFF:  Your Honor, I just wanted to take a

22   minute and say that I am eternally grateful to the United

23   States Marshals Service for working with us, especially Gary,

24   whose last name I do not know.  They actually do take the time

25   to even email us and tell us at times when Mr. Schulte is going

LckWschC

1    to be brought literally hours late.  It sometimes helps.  It

2    sometimes doesn't.  But I do raise this one point, and I also

3    raise this on behalf of the marshals service itself.

4          I am informed that when Mr. Schulte is taken back,

5    because he is a SAMs inmate, he and the marshal are made to sit

6    in their car for hours at a time before Mr. Schulte is

7    processed back into the MDC.  So we tried to help out both --

8    and I want to be clear, both -- the marshals and Mr. Schulte so

9    they didn't spend hours in their car sitting there, that maybe

10   if Mr. Schulte went back a little bit earlier, then he could

11   slide in before the regular detainees are taken back to the

12   jail.

13         Sometimes Mr. Schulte just wants to go back earlier,

14   but sometimes we do say it's better for him to go back faster

15   so that they don't all sit in their car, and I think that I've

16   encouraged the marshals service to speak to you about this so

17   that they don't expend the time sitting in the car just waiting

18   there with Mr. Schulte.  I just wanted to flag that for you

19   because I think they might approach you at some point.

20         THE COURT:  Because what?

21         MS. SHROFF:  Because I think the marshals may approach

22   you with that problem at some point.

23         THE COURT:  OK.

24         MS. SHROFF:  OK.

25         THE COURT:  Thank you.

LckWschC

1       Mr. Schulte.

2          THE DEFENDANT:  Yeah.  So two, two issues on that, for

3   the arrival and the departure.  So yeah, the marshal to my

4   right, he was there one evening where we waited five and a half

5   hours, but essentially, according to MDC, since I'm SAMs, we

6   always have to go back to the end of the line.  So even though

7   we arrive at MDC first, we end up waiting six hours because new

8   cars, as they come in, they keep passing us because they say I

9   have to go last.  So that is consistent, and that is the reason

10  why I try to leave a couple hours early, at two, simply so --

11  to hope to try and avoid that issue.

12         So on the arrival issue, the Court's order was very

13  helpful, and it was working great, but the last three weeks

14  have been consistent in that MDC, due to this new trial, hasn't

15  produced me to the marshals until 11.  So the marshals show up

16  at 7 a.m. and tell me --

17         THE COURT:  All right.  Mr. Schulte, that trial has

18  summations going on today, so it's not going to be lasting much

19  longer.  That's a temporary problem.

20         THE DEFENDANT:  Oh, so we think that's going to be

21  resolved?  OK.

22         THE COURT:  I'll talk to the marshals about the return

23  issue, since it sounds like that has some compounding effects,

24  but I obviously don't know if that's something that I can fix

25  or not.  But I'll certainly raise it with them and see what can

LckWschC

1   be done.

2          The next item I said we'd talk about earlier is the

3   recording of phone calls.  The defendant's request for an order

4   directing the government to stop recording calls with him is

5   denied.  The government provides good reasons for recording the

6   calls.  In fact, it seems to me that it's in the defendant's

7   interests for there to be a record of such communications, and

8   his argument that recording the calls violates his Fifth and

9   Sixth Amendment rights is without merit, indeed probably

10  frivolous.  Whether or to what extent the government may use

11  those recordings at trial is an entirely separate matter that

12  is not ripe for me to decide today and may never become an

13  issue, particularly if Mr. Schulte is as careful as he should

14  be in those communications.  But this is a problem and

15  complication that is inherent in representing oneself in a

16  criminal case and one of the many reasons that most judges

17  would tell defendants not to go down that path.

18          I also want to be clear, Mr. Schulte, you do not have

19  the option to refuse to speak to the government.  So Ms. Shroff

20  mentioned earlier or you mentioned earlier that those

21  communications were not going to be occurring.  That is not an

22  option.  There are prior orders of the court and Judge Crotty

23  that require that communication.  It is absolutely necessary

24  for the orderly and efficient management of this case, and

25  there is no alternative given that you are representing

LckWschC

```
 1   yourself.  You are acting as your own lawyer.  It is necessary

 2   for you to converse with the government about the sorts of

 3   issues that we're discussing today and many other issues.  And

 4   that is particularly true given your objections -- objections

 5   that are without basis, by the way -- to more than minimal

 6   involvement on the part of standby counsel.

 7        The bottom line is that this case cannot proceed

 8   without orderly and regular communications between you and the

 9   government, and if you refuse to communicate with the

10   government, notwithstanding the fact that they may record those

11   calls, you risk forfeiture or revocation of your *pro se* status.

12   I don't know how to put it any more bluntly than that.

13        Any questions about that, Mr. Schulte?

14        (Defendant and counsel conferred)

15        THE COURT:  Forgive me, but we have a lot of ground to

16   cover today.

17        THE DEFENDANT:  Is there any way that we could just

18   revert to letters and assuring that the government is

19   delivering the letter within a day and I am in the SCIF and I

20   can send a letter within a day of the SCIF instead of doing the

21   phone calls.

22        THE COURT:  No.

23        THE DEFENDANT:  Because I want to do this quicker.

24        THE COURT:  No.  It think it is clear to me that the

25   issues that we're discussing are issues that require
```

LckWschC

communication.  Doing it by letter is inefficient and not

likely to resolve many of these issues.  It requires more

efficient communication than that.  I'm happy to say the

telephone calls should, in general, be restricted to

logistical, nonsubstantive issues.  I think that makes sense,

but I think that those conversations have to occur.  So if

they're limited to logistical, nonsubstantive issues, then I

can't imagine that any recording would ever be used against

you, and as I said, I think it's in everybody's interests that

there is a record of those communications.  So the bottom line

is no.  All right?

            Let's move on.

            The next item on my list is the modifications to the

protective order.  I got a letter proposing some relatively

minor modifications from the government on Friday.  It did not

appear to be a joint submission, so I don't know what that

means about standby counsels' views or Mr. Schulte's views.  I

would also note that I had contemplated, and I apologize if my

order wasn't clear on this point, was that it would pay to have

a single supplemental -- not supplemental, really a superseding

protective order that supersedes all the existing protective

orders, so there's a single order and things are clear and

updated and so forth.

            The government's letter makes reference to a

supplemental protective order at ECF-75, but that's not

LckWschC

1    incorporated into the proposal, so at a minimum, I'd be

2    inclined to send it back, if you will, and have you guys take

3    another stab at it.  But I also want to know what Mr. Schulte's

4    and standby counsels' thoughts are.

5            Mr. Denton.

6            MR. DENTON:  Your Honor, just with respect to that

7    last point, I think our view is that given the discussions that

8    have occurred with respect to the security measures in the SCIF

9    and, frankly, the government's view that we defer entirely to

10   what the CISO and the marshals believe is necessary, that's not

11   something that would necessarily need to be addressed, and so a

12   protective order that addressed the handling of classified

13   information would supersede the other orders.  But to the

14   extent the Court wants us to make that clearer, we're happy to,

15   as you said, take another stab at it.

16           THE COURT:  All right.  I certainly think you should

17   make clear that it supersedes all prior protective orders, and

18   you know the record better than I do, if there's any out there

19   that it should not supersede, then you should make that clear.

20           But, Ms. Shroff, any comments on the government's

21   proposed modification?

22           MS. SHROFF:  Your Honor, we did discuss with the CISO

23   this morning a proposal.  We think that that proposal, if

24   accepted by the government and implemented, it would really

25   reduce any risk of a spill, and it would be hopefully more

LckWschC

1    efficient.  Perhaps in a show of good faith, the CISO, the

2    government, myself, and Mr. Schulte could meet.  I think we

3    could meet in a SCIF or in the Court's SCIF so that we could

4    hash out the new proposal and see if we could submit a final

5    CIPA protective order for the Court's consideration where the

6    defendant is going *pro se*.  And of course, it can be limited to

7    this particular set of facts, which is very much an anomaly,

8    where Mr. Schulte is *pro se* in a classified litigation.  It's

9    just a thought.

10           THE COURT:  OK.

11           Mr. Schulte, anything you wish to say?  Again, I'm

12   happy to take that up.  That was sort of the idea that was

13   supposed to have happened before last Friday's deadline, but be

14   that as it may, I'm happy to give you another stab at it.

15           THE DEFENDANT:  Yeah.  So like the proposed schedule,

16   I didn't receive it until after the deadline, and so after I

17   received it and I spoke with standby counsel about the

18   government's proposal just today, so we just barely --

19           THE COURT:  OK.  So why don't we do this.  I'll give

20   you all until January 7 as well to try and make a joint

21   submission and any tweaks or further modifications that you

22   think are appropriate; I will definitely include the CISO in

23   that discussion.  I plan to consult him separately with respect

24   to any modifications that he might suggest.  I think it should

25   make reference -- among other things he and I discussed, right

LckWschC

1   now he's named in it, but none of his colleagues are, and I

2   think it should either name them as well or provide for his

3   associates, without specification, in some way that makes

4   sense.  But the bottom line is why don't you guys try again,

5   and in the meantime, the existing protective orders will remain

6   in effect, as they have been.

7          The next item is the motion regarding the

8   classification review process.  I meant to discuss this with

9   Mr. Hartenstine before, and we didn't get to it, but the

10  government submitted a proposal.  This is at ECF No. 559.

11  Mr. Schulte responded at ECF No. 604.

12         I do have two concerns about the government's

13  proposal.  One is it seems to be a step backwards.  My

14  understanding is that at least with respect to some documents,

15  maybe court orders, that the current expectation is that a

16  review process would be done within two weeks.  I think the

17  government is now proposing that everything be done within

18  three, and the idea wasn't to make things worse; it was to make

19  things better.

20         No. 2, I think Mr. Schulte's point is well-taken that

21  not all filings are created equal; that is to say, there's a

22  huge difference between a two-page letter and a 50-page brief.

23  The former could be reviewed much more swiftly than the latter,

24  and I think that having a single deadline of three weeks

25  without regard for the length or nature of the submission is

LckWschC

1    not necessarily appropriate, and some sort of either scaled

2    system or the like would make sense.

3          Mr. Denton, any thoughts about either of those?

4          MR. DENTON:  Your Honor, I think we were honestly just

5    going for ease of administrability on a deadline that we were

6    assured by the classification authority we could hit without

7    fail and have it be something across the board with an

8    understanding that court orders would be prioritized and

9    anything specified to be cleared within a shorter period of

10   time.  But that said, we're happy to sort of work with the

11   constraints that the Court sees appropriate here.

12         THE COURT:  All right.  Why don't you take those

13   comments under advisement and maybe submit another proposal by

14   January 7.  And since you'll be discussing things with Mr.

15   Hartenstine and Mr. Schulte, you can include that in your

16   discussions as well.  I think it probably would make sense to

17   have -- I understand the argument for the ease of

18   administrability, but it doesn't seem like it will be

19   impossible -- and I want to make clear I don't think

20   Mr. Schulte's proposal of having it be proportional to the

21   length is the necessarily the way to go, but it seems like

22   having a few different categories -- court orders, defense

23   submissions of X length, defense submissions of greater than X

24   length.  But it might make sense to put it into those

25   categories and have different lengths or presumptive lengths

LckWschC

1    for those.  But again, it seems like there's a big difference

2    between a two-page letter and a 25-, or 50-page brief.

3              MR. DENTON:  Your Honor, I will say I think that is,

4    by and large, true, but I would note that obviously a 25-page

5    brief that addresses a single issue whether there's classified

6    information in a limited different portion of it is a different

7    matter than, for example, some of the ten-page letters that

8    address almost entirely classified content.  But we understand

9    the Court's concern, and we'll talk with the classifying

10   authorities and Mr. Hartenstine about a reasonable way to

11   divide these up into buckets.

12             THE COURT:  All right.  And I'm not saying that my

13   suggestion is the right one; I just think something that

14   acknowledges that there is a bit of a sliding scale.

15             I'm not going to order the government to record all

16   research, communication, and documentation with respect to the

17   classification review process.  Mr. Schulte cites no authority

18   to support that request, and I'm aware of none.

19             As to the sealed *ex parte* or *in camera* documents, I'm

20   not quite sure I understand, Mr. Schulte, what the issue is

21   there or why I shouldn't require portion marking if they're

22   going to be under seal or *ex parte* or *in camera* in their

23   entirety.  That seems like a gratuitous burden, but am I

24   missing something?

25             THE DEFENDANT:  I guess I'm a little confused.  The

LckWschC

1    portion marking, obviously, when the government does its

2    classification review that it should portion mark the material

3    so I know what level it's classified at.  That was the portion

4    marking.  And what specifically -- yeah, just to specifically

5    note, maybe -- for example, if it's a long paragraph, it should

6    note what parts are unclassified and which parts are classified

7    and at what level they're classified as, so then I would know.

8    Because basically depending on people's security clearance or

9    something like that, you're just always supposed to know at

10   what level something's classified as so you know how to

11   communicate that and who you can communicate that to.

12           THE COURT:  Mr. Denton, do you have any thoughts on

13   that item?

14           MR. DENTON:  Again, your Honor, I think our plan was

15   to do exactly that for anything that would be filed publicly,

16   but we were only saying, as your Honor noted, it seems like an

17   unnecessary burden for documents filed either under seal or *ex*

18   *parte*.

19           THE COURT:  All right.  What about Mr. Schulte's

20   point, which is well-taken, that he needs to know with whom he

21   can share those documents.

22           MR. DENTON:  So, we can certainly identify the level

23   of classification for the documents.  That's not an issue, your

24   Honor.

25           THE COURT:  All right.  Why don't you do that, and the

LckWschC

1    hope is that that would suffice, and I agree that it seems like

2    an unnecessary burden to portion mark those documents.  But to

3    the extent that there's a particular document that Mr. Schulte

4    has an issue with, either because he wants to share it with

5    someone or otherwise, then perhaps you can confer about that

6    and you can provide more detailed information, as appropriate.

7    But as a default, I don't think that should be required.

8            Mr. Denton, Mr. Schulte requests disclosure of what he

9    refers to as the classification block that I guess has some

10   information regarding who created it, who the classifying

11   authority is, and so on.  I confess I don't know enough about

12   this to know what that refers to, but any issues there?

13           Or maybe Mr. Hartenstine can shed some light on that.

14           MR. DENTON:  Your Honor, honestly, I think that's a

15   conversation, a question we'd have to discuss a little more

16   extensively with Mr. Hartenstine and with the classifying

17   authorities.  I'm not entirely sure what the sensitivities, if

18   any, about that some of that are.  So I know that when material

19   is produced in classified discovery, that commonly is something

20   that is redacted, so it may be that it's not an issue.  I'm

21   just not sure what the answer is.

22           THE COURT:  All right.  So why don't you take up, and

23   since you'll be submitting a more refined proposal anyway, you

24   can address that at the same time.

25           Mr. Schulte's reply renews the question of whether I

LckWschC

1  have authority and should exercise it to review the

2  government's classification decisions.  I will address that

3  issue later in connection with Mr. Schulte's motion for

4  reconsideration of my December 3 order, so I'll table that for

5  the moment.

6      The next item is Mr. Schulte's desire to file

7  additional motions.  I had taken his prior letter, at ECF No.

8  587, to mean that he was listing the motions, the universe of

9  motions that he sought to bring, but obviously that wasn't the

10  case, and if I misunderstood, I apologize for that.

11      Let me start by saying I don't know if, and this is at

12  ECF No. 630, Mr. Schulte is suggesting that the cases he cites,

13  including, for instance, *Palmer* and *Todd*, stand for the

14  proposition that a defendant is free to remake the same motions

15  before a retrial, but I don't read those decisions that way.

16      I read them to stand for the proposition that law of

17  the case does generally apply where, as here, there has been a

18  mistrial and that the Court has discretion to decide whether

19  and to what extent to revisit issues that were decided before

20  the first trial.  *See, e.g., United States v. Todd*, 920 F.2d

21  399, 403-04 (6th Cir. 1990).  The cases also point to a

22  distinction between rulings made by a court on formal motions

23  versus rulings made on objections during trial, suggesting that

24  trial courts should have ample flexibility to revisit

25  objections during the heat of trial without regard to rulings

LckWschC

in an earlier proceeding.  *See, e.g.*, *U.S. v. Palmer*, 122 F.3d

215, 221 (5th Cir. 1997); *United States v. Mann*, 590 F.2d 361,

371 (1st Cir. 1978).  *Palmer*, on which defendant relies most

heavily, is not to the contrary.  There, the Court of Appeals

found waiver for failure to renew objections before a retrial,

but only because "the trial court expressed in unambiguous

terms that it would not automatically revive any of Palmer's

pretrial motions.  122 F.3d at 221; see also *United States v.*

*Hoffecker*, 530 F.3d 137, 166 (3d Cir. 2008), which reads *Palmer*

in precisely that way.  Thus, the cases stand for the

proposition that I have discretion to adhere to Judge Crotty's

rulings or to revisit them, as I wish, basically.

As an exercise of that discretion, I do not intend to

revisit rulings that Judge Crotty made before the first trial

and since the first trial.  And I'm not saying that if I

encounter an issue that if I think I should deal with

differently I won't revisit it, but as a general matter, I

adhere to his rulings with respect to substantive motions

before the first trial and since that trial.  The burdens

imposed by the issues in this case are great enough without

reconsidering *de novo* every decision that Judge Crotty made in

this case.  The interests in finality and narrowing the issues

for retrial support adhering to these rulings.  Thus,

Mr. Schulte need not renew those motions to preserve them for

appeal.  By contrast, I will not necessarily adhere to any

LckWschC

rulings on simple objections during trial or with respect to

things like jury instructions, which is to say that the parties

should and, to preserve them for appeal, must make any such

objections that they think are appropriate without regard for

rulings in the first trial.

Having said that, I'm inclined to let Mr. Schulte make

the three new motions that he discusses in his letters.  This

is ECF Nos. 630 and 644 -- another example of sort of

repetitive filings, Mr. Schulte -- first, there's a new CIPA 4

motion for basic access to backups; second is a new motion to

preclude the government from introducing evidence from the

digital forensic crime scene, and third is a motion to suppress

specific documents seized from the MCC on the basis of attorney

client privilege -- with the understanding that one of the

issues that the parties may and indeed should brief in

connection with those motions is whether Judge Crotty

previously ruled on the issue.  If I conclude that he did, I

may deny the motion on that basis alone.

Any objections to that, Mr. Denton?

MR. DENTON:  Your Honor, I think the only concern in

particular is with respect to the first one, which is

ostensibly styled as a CIPA Section 4 motion.  Insofar as CIPA

Section 4 authorizes the government to make an application to

delete or withhold items from discovery, I think what this is

is just a repackaging of the motion to compel that the

LckWschC

1   defendant has filed many times, that has been denied many

2   times, and that is currently the subject of one appeal and one

3   mandamus petition.  So I think that one may stand in a little

4   bit of a different category, but to the extent that those are

5   points the Court wishes us to make in response to a submission,

6   we're certainly happy to do it that way.

7           THE COURT:  I guess to put it another way, I'm

8   inclined to let Mr. Schulte raise the issues that he now

9   identifies he wants to raise, and if I'm persuaded that Judge

10  Crotty has ruled on them, I probably won't revisit them, and if

11  I realize or discover that he has raised the issues on appeal,

12  I may conclude that I don't have jurisdiction to address them

13  at all.  But it seems to me that the best thing is to develop

14  the record on those issues and allow you to raise those issues

15  in your opposition.

16          Mr. Schulte, any questions on your end?  To be clear,

17  I will, I think, adjust the deadlines for the filing of motions

18  in light of that ruling.  But any questions?  That is to say,

19  I'm granting your request to file those three motions, but I

20  assume nothing further.

21          THE DEFENDANT:  Thank you, Judge.

22          Just to be clear, the very first thing, regarding the

23  *Palmer* case, I just wanted to put on the record I think

24  everything's good there.  And yeah, the CIPA 4, though, I'm

25  pretty sure he miscited what that CIPA 4 is.

LckWschC

1          THE COURT:  Mr. Schulte, you'll be able to raise it in

2     your motion.

3          THE DEFENDANT:  OK.

4          THE COURT:  It doesn't sound like we have to discuss

5     that further at this time, and again, I'll discuss the

6     deadlines and page limits shortly.

7          Let me be clear, I said this in the endorsement

8     authorizing you to file the other two motions, the time is

9     coming to narrow the issues for retrial, not expand them.  You

10    have permission to file these five motions.  As far as I'm

11    concerned, that's basically it as to anything that is

12    retrospective.  If there are issues going forward, obviously

13    that's a different story; that is to say, you're going to have

14    to demonstrate good cause to raise any other motions, and good

15    cause would be because they're dealing with ongoing issues or

16    things that you should not have known about before.  But you've

17    now requested leave to file these five motions.  I've granted

18    that request, and that's it in terms of things that are

19    backward-looking.

20         Do you understand that?

21         THE DEFENDANT:  Yes.  Should we -- in my -- I did a

22    proposal, too, of setting pretrial motion deadlines.

23         THE COURT:  I said I would address that --

24         THE DEFENDANT:  OK.

25         THE COURT:  -- in a minute.

LckWschC

```
 1              THE DEFENDANT:  All right.

 2              THE COURT:  All right.

 3              The government made a request in its preconference

 4    letter to clarify the rules or default rules for motions.  I

 5    certainly recognize -- and again, my hope is that this will

 6    begin to change going forward -- that there have been a lot of

 7    filings and that may be part of the cause of confusion or

 8    burden here, but I'm not sure I understand what the confusion

 9    is.  It seems like there's a default, and if I don't issue an

10    order specifying that an opposition should be filed in a

11    different manner or timing, that that default would apply to

12    anything filed as a motion or properly filed as a motion.  But

13    is there a need to clarify beyond that?

14              MR. DENTON:  Your Honor, I think the only confusion is

15    that some of the things that were being filed as motions seemed

16    to fall within the category of retrospective things that the

17    Court had indicated would not be considered, and so we're happy

18    to go ahead and just respond to everything.  But we were trying

19    to figure out a little bit better whether we should be drawing

20    a distinction between things that the Court should act on

21    before we file a response or, again, whether the Court just

22    wants us to respond to everything.

23              THE COURT:  Well, let me say I don't think there's any

24    confusion, and I think after today in particular, hopefully

25    there will be less of an issue still.  If there is, you're
```

LckWschC

1    welcome to file a letter and say, How would you like us to --

2    we're going to respond to it in this fashion, if you'd like me

3    to handle it differently, then tell us, and I'm happy to tell

4    you if I think it should be handled differently, but it seems

5    to me I'm trying to simplify things, and hopefully it will

6    work.

7            MR. DENTON:  I think, as your Honor suggested, it

8    sounds like we're going to end up in a pretty holistic

9    resolution today, but I think that should cover the

10   government's concern.

11           THE COURT:  All right.  Great.

12           So then let's talk about dates and deadlines.  By

13   order, I had adjusted the trial date in light of Mr. Schulte's

14   expert's conflict and moved it to June 13.  Everyone should

15   understand and treat that as a firm date.  Obviously, recent

16   events indicate that the pandemic is not quite behind us yet,

17   so I can't predict what pandemic-type situations are going to

18   be at that time, but barring the pandemic affecting things, you

19   should treat that date as the day on which this case is going

20   to trial.  So what that means is if there's any issue that

21   could affect our ability to start trial -- I think speaking

22   with a mask on for this long is definitely causing me to get

23   something stuck in my throat, but I assure you that I don't

24   have Covid.

25           In any event, what that means is that if there is any

LckWschC

1   issue that could affect our ability to start trial on June 13,

2   it is incumbent upon you to raise it in a timely fashion.  If

3   you fail to do so, if you fail to raise something that you

4   could have and should have raised at an earlier date that would

5   affect our ability to start trial on June 13, you're probably

6   not going to get whatever it is you think that you're entitled

7   to, and your application may be denied on that basis alone.  So

8   I want to make sure everyone understands that.

9           Mr. Denton.

10          MR. DENTON:  Understood, your Honor.

11          THE COURT:  Mr. Schulte.

12          THE DEFENDANT:  Understood.

13          THE COURT:  Ms. Shroff, I assume you and Ms. Colson

14  understand.

15          MS. SHROFF:  We understand, your Honor.

16          THE COURT:  All right.  Very good.

17          With respect to the pretrial schedule adopted by order

18  entered on December 6 at ECF No. 628, the defendant,

19  Mr. Schulte, makes a proposal to make January 28 a deadline for

20  the CIPA Section 4 notices and CIPA Section 10 notices.

21          Mr. Denton, do you have a response or view on that?

22          MR. DENTON:  Your Honor, with respect to the Section

23  10 notice, that's fine.  I'm not sure whether we're going to do

24  a supplemental one here or not.  But that's perfectly fine.

25          With respect to the CIPA Section 4, again, I think

LckWschC

1    that may just make sense to roll together with the motions

2    deadline, which is my understanding of what the defendant has

3    also proposed for January 28.

4            THE COURT:  All right.  I am prepared to adopt that

5    January 28 proposal for the CIPA Section 10 notices as well as

6    for the pretrial motions deadline.  That is what Mr. Schulte

7    requests, and I'm happy to give it to him.  By endorsement, I

8    had extended the deadline for the previous two motions to

9    January 7.

10           By the way, that endorsement contained a typo and

11   inadvertently reduced the pages that Mr. Schulte had to brief

12   on them.  That was a mistake that, in any event, will be mooted

13   by what I'm about to say.  I would prefer to get a single set

14   of motions rather than seriatim motions, so I'm going to extend

15   the deadline for all five of these motions to January 28 to be

16   supported by a single consolidated memorandum of law up to 55

17   pages; the government response by February 25, up to the same

18   55-page length, and any reply by March 11, not to exceed 20

19   pages.  I recognize if there are delays and the like, that may

20   require some adjustments of a couple days here and there, but

21   my intention is to stick to those deadlines.

22           Any requests questions or objections?

23           Mr. Denton.

24           MR. DENTON:  Not from the government, your Honor.

25           THE COURT:  Mr. Schulte.

LckWschC

1           THE DEFENDANT:  No objection.

2           THE COURT:  All right.  That concludes the case

3    management-related things that I wanted to address.

4           We still have a lot of ground to cover, but we've also

5    been going at this for a while.

6           Let me check with the court reporter.

7           All right.  We're good.  Let's carry on.

8           The next item on my agenda is the conditions of

9    confinement-related issues.  These are raised in a number of

10   filings, ECF Nos. 590, 591, 605, 617, and 631.

11          Mr. Schulte raises a host of different issues.  They

12   run the gamut from access to the law library to things like

13   removal of the basketball "goal," whatever that may be, from

14   the recreation yard.  Putting aside the merits of these

15   complaints, there's a threshold question of whether I have

16   authority even to entertain them.  The answer to that question

17   with respect to the vast majority of Mr. Schulte's complaints

18   is that I do not.  It is well established that, in general,

19   federal pretrial detainees, such as Mr. Schulte, may only

20   challenge their conditions of confinement in a civil action

21   brought pursuant to a *Bivens* order in a Section 2241 habeas

22   petition.  *See, e.g.*, *United States v. Moi*, 2021 WL 4048596, at

23   *8 (D. Alaska, June 7, 2021) (citing cases).  The one

24   "exception to this rule is an inmate's challenges to conditions

25   of confinement that impinge his or her ability to consult with

LckWschC

counsel or exercise other trial rights." *United States v.
Yandell*, 2020 WL 3858599, at *4 (E.D. Cal. Jul. 8, 2020)
(citing cases); *see also Moi*, 2021 WL 4048596, at *8.  To allow
a criminal defendant to "file grievances in his criminal
proceeding not directly related to his ability to exercise his
rights in that proceeding would circumvent his obligation to
exhaust administrative remedies before seeking redress in
court." *Moi*, 2021 WL 4048596, at *8.

          As Judge Crotty has noted repeatedly before, see ECF
Nos. 453 and 526, the cases on which Mr. Schulte relies, *see,
e.g.*, ECF No. 631, to suggest otherwise do not call for a
different conclusion.  To the contrary, they reaffirm that the
proper vehicle to challenge most conditions of confinement is a
habeas petition pursuant to Section 2241.  *See, e.g.*, *United
States v. McGriff*, 468 F.Supp.2d 445, 447 (E.D.N.Y. 2007);
*United States v. Bout*, 860 F.Supp.2d 303, 307 n. 12, (S.D.N.Y.
2012).  To be sure, the courts in those cases and others did
entertain challenges to the conditions of confinement in the
criminal cases -- treating them as petitions pursuant to
Section 2241.  I could do the same but for one fundamental
problem: the law is clear that a Section 2241 petition
challenging the conditions of confinement must be brought in
the district of confinement, which, here, is in the Eastern
District of New York.  *See Rumsfeld v. Padilla*, 542 U.S. 426,
447 (2004); *Goodall v. Von Blanckensee*, 2019 WL 8165002, at *4

LckWschC

(S.D.N.Y. Jul. 19, 2019) (citing cases).  The only case cited

by Mr. Schulte that arguably comes close to doing otherwise or

supporting his contention that I can exercise authority here is

*United States v. Khan*, 540 F.Supp.2d 344 (E.D.N.Y. 2007), in

which the district court dismissed a challenge to the

conditions of confinement at the MCC, which is in this

district, for lack of exhaustion without suggesting that, but

for the lack of exhaustion, the court would have lacked

authority to address it.  But in the face of the case law

holding that I do not have jurisdiction, that is hardly

compelling authority suggesting that I do, since it dismissed

the claims or the petition on other grounds.

          In short, I cannot and I will not entertain any

complaints with respect to the conditions of confinement unless

they materially infringe upon the ability to consult with

counsel, which doesn't really apply here, since Mr. Schulte is

proceeding *pro se*, or the exercise of his trial rights.  In

applying that rule here, the vast majority of Mr. Schulte's

complaints must be dismissed or disregarded, including the

lighting conditions, sound conditions, and temperature in his

cell; his solitary confinement; the monitoring of his cell by

camera; the lack of a rubber guard on the window lid to his

cell; his complaints about the quantity and quality of food and

meals in the commissary; the lack of a comfortable chair; the

lack of television in his cell; the lack of adequate access to

LckWschC

the regular -- that is, non-law -- library; restrictions on his

phone usage and social visits; the fact that he is shackled

when moved; the removal of the basketball goals, not to mention

his complaints about the sink, toilet, shower, windows, and

lockers.  It is quite clear that none of these things, even

together, rise to the level of infringing on Mr. Schulte's

trial-related rights.  They certainly have not inhibited him

from zealously representing himself, as the sheer number of

filings since the last conference that I held makes clear.

Accordingly, I do not have jurisdiction to entertain those

complaints, and I do not expect to see them in any future

applications to me.

        Now, there is, as far as I believe or can tell, only

one condition-of-confinement issue over which I think I do have

jurisdiction because it does relate to Mr. Schulte's trial

rights; namely, access to the law library.  The truth is that I

would be on firm ground denying any relief there too because

every court to consider the question, including the Second

Circuit, has held that "the right to represent oneself in

criminal proceedings, [though] protected by the Sixth

Amendment, does not carry with it a right to state-financed

library resources where state-financed legal assistance is

available.  *Spates v. Manson*, 644 F.2d 80, 84-85 (2d Cir.

1981); *see also Tellier v. Reish*, 164 F.3d 619 (2d Cir. 1998);

*Smith v. Hutchins*, 426 F.App'x 785, 790 (11th Cir. 2011);

LckWschC

*United States v. Byrd*, 208 F.3d 592, 593 (7th Cir. 2000); and

*Benjamin v. Kerik*, 102 F.Supp.2d 157, 163-64 (S.D.N.Y. 2000).

Instead, any right of access to legal resources owed to

pretrial detainees "is satisfied when the presiding courts

merely offer such detainees appointed counsel or standby

counsel." *Stanko v. Patton*, 2007 WL 1309701, at *2-3 (D. Neb.

Mar. 28, 2007) (citing cases).  Here, of course, the defendant

has not one but two dedicated and very skilled standby counsel.

That said, I do think it is appropriate to ensure that

Mr. Schulte has adequate time in the law library to prepare his

case.

At ECF No. 590, he initially claimed that he had only

one hour per day, but when the government responded, at ECF No.

591, that he actually has two hours per day, Mr. Schulte

admitted that that was the case if he forewent his recreation

time.  He may not like that, but it is what it is, and it

certainly doesn't rise to the level of a violation of his

rights.

That said, I'm a little unclear from the record if the

government's submission states that it will confer with the MDC

and arrange for him to have ten hours per week, but according

to Mr. Schulte, he only has time on the days when he is not

brought to the courthouse to work in the SCIF and that even

with the two hours per day, that doesn't come close to ten

hours.

LckWschC

1          So, Mr. Denton, I don't know if you can clarify that

2     or shed some light on, it but I wanted to ask you.

3          MR. DENTON:  Your Honor, I think, first of all, I

4     think it is correct that, as a general matter, he does not get

5     that time on days when he is brought to the SCIF.  That's

6     something we're working on addressing.  By and large, I think I

7     would say that the government's posture is that we are mindful

8     of the Court's orders that the defendant may need more of

9     various accommodations as we get closer to trial in order to

10    prepare, and we're working with the MDC on trying to figure out

11    the best ways to do that.  We don't have obvious answers yet

12    because of the constraints of the SCIF productions and the

13    defendant's status under SAMs, but it is something that we are

14    conferring with the MDC about notwithstanding the law that your

15    Honor cited.

16         THE COURT:  All right.  Why don't you plan to update

17    me in the letter of January 7 as well.  I think access to the

18    law library is important not only to prepare for trial but also

19    given the schedule that I just imposed with the motions that

20    are due by January 28, I think now is a critical time for that

21    purpose too.  If anything, he needs access to the law library

22    more in connection with the preparation of motions than he does

23    in preparation for the trial itself, so I think ensuring that

24    the MDC understands that and trying to figure out a means by

25    which he can get up to ten hours per week even with the SCIF

LckWschC

1    time probably makes sense.  So if you can update me by January

2    7, but get in touch with them even before that so as to not

3    lose the time between now and January 7, that would be great.

4    All right?

5                MR. DENTON:  Yes, your Honor.

6                THE COURT:  Separately, Mr. Schulte, at ECF No. 623,

7    raises issues with respect to problems with the computer and

8    the keyboard in the law library.  I assume that those issues

9    have been or will be worked out, but they're not the kinds of

10   things that I plan to involve myself in unless they rise to the

11   level of materially affecting his trial-related rights, which,

12   as far as I can tell, they plainly don't.

13               The bottom line is, Mr. Schulte, I'll try to ensure

14   that you do get more time in the law library in the coming

15   weeks as you prepare the motions that you wish to file.  Beyond

16   that, I don't intend to do anything with respect to the issues

17   that you've raised regarding your conditions of confinement.

18               Anything you wish to say?

19               THE DEFENDANT:  Yes.  On the four main issues that I

20   brought up regarding the sleep deprivation, the starvation, the

21   freezing cold, and the loudspeakers, I think these do greatly

22   affect my ability to assist at all in my case.  For example,

23   yesterday, I didn't get lunch at all.  When I'm not fed, I

24   don't have sustenance, I can't -- it's very difficult to work.

25   The same with sleep deprivation.  One of the reasons that I

LckWschC

1    leave early as well from the SCIF is that I'm so exhausted

2    during the day.  And these four issues are very, very critical

3    to me that I think if you're not going to address them, I can

4    no longer represent myself and I would be focusing my time on

5    resolving those four issues because, Judge, I mean, it's not a

6    joke.  This is very difficult place to work when I can't even

7    sleep.  I can hardly get enough food.  During the day, I'm

8    starving all the time.  I'm focusing all my time on these types

9    of things instead of being able to work on my case.  I think

10   the Court is well within its jurisdiction to resolve these four

11   issues, and like I said, if not, there's no way I can represent

12   myself, if I can't have these issues resolved.

13           THE COURT:  All right.  If it gets to that point, you

14   can certainly raise the issue and we'll address how to deal

15   with it in your case, but as far as I can tell, that's

16   demonstrably false.  Since the last conference you have

17   filed -- honestly, I have lost track of how many things you

18   have filed.  But I think you have filed ten standalone motions

19   alone.  Frankly, it's a staggering amount of work product for

20   anyone, but given the things that you're saying, it just defies

21   credibility to say that you're unable to meaningfully work on

22   your case, given the amount of things that you're producing and

23   filing.

24           THE DEFENDANT:  Just because I'm able to do these

25   things and push myself and persevere, I don't think that's a

LckWschC

```
1    reason to say that I'm not adversely affected by these issues.
2    I mean -- I mean honestly --
3            THE COURT:  Mr. Schulte.
4            THE DEFENDANT:  -- be able to eat and not have --
5            THE COURT:  Mr. Schulte, I understand.
6            THE DEFENDANT:  -- and not be deprived of sleep, I
7    don't see why the Court thinks that this is such a big deal
8    that it can't, it honestly can't address.  These are just
9    humane issues.  I mean I'm not asking for the moon on these
10   four issues.  I'm literally just asking for food, to sleep and
11   not be freezing all the time.
12           THE COURT:  Mr. Schulte, I have a filing from the
13   government which seems to take a different issue of the way in
14   which you've been treated.  My point is I see no evidence that
15   it is affecting your ability to prepare your case; that is my
16   only authority to address in this case.  Given that, I don't
17   think these are issues that I can or should address, and I
18   don't plan to address them, and I don't expect to see further
19   filings on them.  I think that you have other means by which to
20   address them.  As far as I can tell, you're able to and you may
21   avail yourself of that.  The government, for that reason it may
22   be in their interest to try and address them with the MDC and
23   try and ensure that some of these problems are addressed, and I
24   would urge them to do that, but the bottom line is these are
25   not issues that I have the authority to even address.  So
```

LckWschC

1   that's the final word on the matter and that's my ruling on the

2   matter.

3          With that, let's proceed to the next category.  These

4   are substantive motions, most of which I have rulings on, so

5   let me proceed one by one on that.

6          The first is Mr. Schulte's motion for bail.

7          On October 21, the government filed its opposition;

8   that's at ECF No. 562.  Mr. Schulte filed his reply on November

9   13; ECF No. 588.  The motion is denied substantially for the

10  reasons set forth in the government's opposition.

11         First, to the extent that Mr. Schulte seeks to reopen

12  the bail hearing, pursuant to Section 3142(f), he fails to

13  demonstrate that there is information that "was not known to"

14  him at the time of the earlier bail determination.  Moreover,

15  any such new information is not material, as there is

16  overwhelming evidence supporting Judge Crotty's prior findings,

17  made in the context of both the bail determination and his

18  denial of Mr. Schulte's motion to lift the SAMs, that

19  Mr. Schulte poses a danger to the community, including, but not

20  limited to, his commission of sexual assault, his receipt and

21  possession of child pornography, evidence of his involvement in

22  the sophisticated theft and dissemination of highly classified

23  information, his violations of protective orders, and his

24  continued disclosures and attempted disclosures of classified

25  information, even from jail.

LckWschC

1      Mr. Schulte's argument that the length of his

2  detention has become unconstitutionally excessive has more

3  force, if only because he has now been detained for almost four

4  years, which is indisputably a long time, and, absent bail,

5  that time is likely to be much longer come trial.  Again, as

6  the Second Circuit noted in *United States v. El-Hage*, "the

7  length of detention alone is not dispositive and will rarely by

8  itself offend due process." 213 F.3d 74, 79 (2d Cir. 2000).

9  Moreover, as in *El-Hage*, "the duration of the detention is not

10  wholly unprecedented, especially for a complex case" -- that is

11  from the same page, and this is certainly a complex case.

12  Indeed, given the nature of the charges, the nature of the

13  evidence, and the circumstances surrounding Mr. Schulte and his

14  detention, it is among the most complex criminal proceedings

15  that I am aware of.

16      In any event, the other three factors that a court

17  must weigh under *El-Hage* -- (1) the extent of the prosecution's

18  responsibility for delay of the trial, (2) the gravity of the

19  charges, and (3) the strength of the evidence upon which

20  detention was based -- *i.e.*, the evidence of risk of flight and

21  dangerousness; *see* 213 F.3d at 79 -- weigh against Mr. Schulte.

22      First, Mr. Schulte's assertions notwithstanding, the

23  government is not responsible for the length of his pretrial

24  detention.  That is largely due to the extraordinary complexity

25  of the case and the evidence and the procedures required by

LckWschC

CIPA; the pandemic, which not only delayed retrial but also

hindered Mr. Schulte's ability to prepare for retrial; and

Mr. Schulte's own perhaps inadvisable decision to go *pro se*.

          Second, Mr. Schulte's casual assertions aside, the

charges -- both the espionage charges, which involve the

alleged theft and dissemination of some of our nation's most

closely guarded secrets and the child pornography charges --

are exceptionally serious.

          And finally, as I previously discussed, the strength

of the evidence upon which detention was based -- that is, the

evidence of dangerousness -- is overwhelming.  And for what

it's worth, that factor is not concerned with the strength of

the evidence generally but with the strength of the evidence

upon which detention was based.  But even if the strength of

the evidence were a concern, in this context and with the

caveat that I'm just beginning to get my head around the full

record in this case, the evidence in this case seems strong,

even if it is largely circumstantial.

          Accordingly, the motion for bail is denied.

          Moving to the motion to dismiss Counts Three and Four,

at ECF Nos. 597 and 599, Mr. Schulte's protestations to the

contrary notwithstanding, his motion is a paradigmatic example

of a motion that "raises a factual dispute that is inextricably

intertwined with a defendant's potential culpability," which

cannot be resolved on a Rule 12(b) motion.  *United States v.*

LckWschC

*Sampson*, 898 F.3d270, 281 (2d Cir. 2018).  Yes, there is an

exception to that rule for when the government has made a full

proffer of the evidence that it plans to present at trial.  *See*

*Sampson* at 282.  But that exception is "extraordinarily

narrow," and it does not apply here.  That is from the same

page.  Contrary to Mr. Schulte's argument, the first trial does

not constitute a full proffer within the meaning of the *Sampson*

exception.  For one thing, the charges are not identical in

that they have been superseded and changed; for another, the

government represents that it anticipates introducing

additional evidence at the retrial.  *See Gov't Br.* (ECF No.

586, at 9 n. 2).

Mr. Schulte's as-applied First Amendment challenge,

meanwhile, is without merit.  For one thing, he is arguably

estopped from making the argument by his counsel's earlier

concession that the Espionage Act may constitutionally apply to

him.  *See* ECF No. 284, at 8.  But even without that concession,

the argument is without merit, substantially for the reasons

stated by the court in *United States v. Kim*, 808 F.Supp.2d 44,

57–57 (D.D.C. 2011).  As that court explained in addressing a

charge under Section 793(d):  "By virtue of his security

clearance, defendant was entrusted with access to classified

national security information and had a duty not to disclose

that information.  He cannot use the First Amendment to cloak

his breach of that duty."  *Id.* at 57 of the court's opinion.

LckWschC

1          Finally, the defendant's argument -- made in a

2    supplemental letter dated November 15, 2021, at ECF No. 599 --

3    that Count Three must be dismissed in light of Judge Crotty's

4    Rule 29 decision is without merit, substantially for the

5    reasons set forth in the government's reply at ECF No. 616.

6    Applying the *Blockburger* test, the relevant offense in the S2

7    indictment and Count Three in the S3 indictment do not qualify

8    as the "same offense" for purposes of double jeopardy since

9    each has an element that the other lacks.  Moreover, Judge

10   Crotty found that the evidence was insufficient only as to one

11   theory of conviction -- relating to Hickok, ECF No. 581, at 25.

12   He explicitly found that the evidence was sufficient to sustain

13   the government's other theories for conviction.

14          Accordingly, the motion to dismiss must be denied.

15          I recognize that that leaves unresolved some clear

16   disagreements between the parties -- most prominently, whether

17   information that is in the public domain can qualify as

18   national defense information.  I do not need to resolve that

19   disagreement today, and it is better left to motions *in limine*

20   and/or jury instructions when the record will be clear and the

21   issues more crystallized.

22          Finally, in light of the fact that I granted

23   Mr. Schulte authorization to file a motion with respect to the

24   alleged attorney-client privileged materials, I do not intend

25   to address his arguments with respect to the malware article

LckWschC

1    being privileged since that is within the scope of the motions
2    that he will be filing, and I'll defer it to that time.

3              In light of that decision, moving on to the next item,
4    which is the CIPA Section 5 notice, ECF No. 595, in light of my
5    denial of the motion to dismiss, Mr. Schulte's CIPA Section 5
6    notice is denied as moot in part and as premature in part.
7    That is, to the extent that he seeks to use certain exhibits in
8    connection with his motion to dismiss, the request is obviously
9    moot, the point of my prior ruling.  To the extent that he
10   seeks to use them at trial, I think it makes more sense to take
11   the issue up with Mr. Schulte's other CIPA Section 5 issues, at
12   which point the record will be clearer and more developed.

13             Accordingly, to the extent that Mr. Schulte seeks to
14   use the evidence at trial, the request is denied without
15   prejudice to renewal in conjunction with his comprehensive
16   omnibus Section 5 requests that are due by the deadline that I
17   previously set.

18             The next item is the order to show cause that I issued
19   with respect to the cell phone search evidence.  The
20   government's submission is at ECF No. 615.  Mr. Schulte's
21   response is at 640.  Upon review of those submissions, I
22   conclude that there is no basis to suppress the fruits of the
23   search of the cell phone.  I conclude that this case is unlike
24   *Smith*, the case that I had previously cited, for two
25   significant reasons.

LckWschC

1          First, given that the government sought and obtained

2     from Magistrate Judge Moses a warrant within hours of the

3     initial seizure, the seizure itself was ratified by a judicial

4     officer within a relatively short time.  That addresses the

5     *Smith* court's concern that delay "prevents the judiciary from

6     promptly evaluating and correcting improper seizures, 967 F.3d

7     at 205, and also reduces Mr. Schulte's legitimate possessory

8     interest.

9          Second, I am persuaded -- substantially for the

10    reasons set forth in the government's memorandum -- that the

11    cell phone had independent evidentiary value, and thus, the

12    government was entitled to retain it pending trial.  The fact

13    that, as Mr. Schulte argues in his reply, the government could

14    have obtained the information provided by the phone from other

15    sources or in other ways doesn't change the fact that it has

16    independent evidentiary value.  *Smith*'s holding is limited to

17    evidence that has no evidentiary value independent of the

18    search of its contents.  *See* 967 F.3d at 205, 209.

19         Accordingly, on both those grounds, *Smith* is

20    distinguished and distinguishable.

21         Second, and in any event I'm persuaded the good faith

22    exception would apply.  Under that exception, "evidence

23    obtained by officers in objectively reasonable reliance on a

24    warrant subsequently invalidated by a reviewing court is not

25    generally subject to exclusion."  *United States v. Leon*, 468

LckWschC

U.S. 897, 920-21 (1984) *United States v. Raymonda*, 780 F.3d
105, 118 (2d Cir. 2015).  There is no dispute that the relevant
facts were disclosed in the second warrant application that was
granted by Magistrate Judge Cott, and that warrant was not "so
facially deficient that reliance upon it [was] unreasonable."
*Raymonda*, 780 F.3d at 118.  Mr. Schulte does not cite, and I
have not found, any case prior to *Smith* that would even
plausibly suggest that the delayed search would be a basis for
suppression, and *Smith* was decided after the second search and,
by the way, also applied the good faith exception in its own
right.  Moreover, as discussed, even under *Smith*, it was
reasonable to believe that the government was entitled to
maintain the phone given its plausible independent evidentiary
value.

        The defendant's arguments pursuant to Rules 16 and 41
are without merit and rejected.  Mr. Schulte's request to file
a new motion to suppress the March 2017 search warrant is
denied.  That warrant was not executed, as I mentioned earlier,
and while it certainly provides support for my decision that
the fruits of the eventual search need not be suppressed, my
decision does not depend on it.  So any motion to suppress that
warrant would be academic.

        Ms. Colson, are you --

        MS. COLSON:  I'm sorry, your Honor.  I have another
application.  I didn't understand that this would go on for so

LckWschC

1    long.  My apologies.

2                THE COURT:  All right.

3                MS. COLSON:  Ms. Shroff is able to stay.

4                THE COURT:  All right.  Very good.

5                MS. COLSON:  Thank you.

6                THE COURT:  Why don't you step out, and I'll continue.

7           The next motion is the motion for internet access, ECF

8    No. 557.  That motion is denied.  I do not dispute the

9    importance of the internet in today's world or its desirability

10   in conducting litigation and preparing for trial, but put

11   simply, there is no authority for the proposition that pretrial

12   detainees generally, or those who make the decision to

13   represent themselves specifically, let alone those under SAMs,

14   are entitled to such resources.  To the contrary, the authority

15   I cited earlier -- *Spates*; *Byrd*; *Benjamin*; and so on -- stand

16   for the proposition that any right of access to legal resources

17   owed to pretrial detainees "is satisfied when the presiding

18   courts merely offer such detainees appointed counsel or standby

19   counsel."  *Stanko*, at *2-3, citing various cases.

20          Here, as I noted earlier, Mr. Schulte has been

21   provided with not one but two highly qualified and dedicated

22   standby counsel, who have full access to the internet and all

23   it has to offer.  Mr. Schulte's desire that they do nothing

24   other than handle logistics is irrelevant.  The fact of the

25   matter is that he has access to them, and they're available to

LckWschC

1    him and they satisfy whatever rights he may have in that

2    regard.

3            Moreover, as noted, he does have regular access to the

4    law library, even if it's not as much as he would like; two

5    full days of access to the SCIF per week, with expanded hours,

6    pursuant to my prior order; and other accommodations that are

7    not made for the average pretrial detainee.  I would note as

8    well that Judge Crotty clearly warned Mr. Schulte that going

9    *pro se* is not a back door way to undermine the SAMs order or of

10   obtaining access to information or resources to which he wasn't

11   entitled, and Mr. Schulte specifically affirmed that he wanted

12   to proceed *pro se* whether or not he was granted greater access

13   and resources.

14           Finally, I would note that even without access to the

15   internet, Mr. Schulte has, as I have said several times, been

16   able to file a veritable flood of motions and other

17   submissions, so many that I have lost count myself.  *See, e.g.*,

18   *United States v. Helbrans*, 2021 WL 4778525, at *14-15 (S.D.N.Y.

19   Oct. 12, 2021) (rejecting then *pro se* defendants' contentions

20   that they needed additional resources in order to prepare their

21   defense for similar reasons).

22           In short, there is no right, under the First, Fifth or

23   Sixth Amendments, to internet access for pretrial detainees

24   generally or for *pro se* defendants specifically.  And there are

25   particularly good reasons -- given the nature of the charges

LckWschC

1    here, the history of the case, and the SAMs -- set forth in

2    Judge Crotty's prior rulings on those issues not to allow

3    Mr. Schulte internet access.  So that motion is denied.

4          Next, I'll take up the motion for reconsideration in

5    my order at ECF No. 622 regarding essentially ordering the

6    government to declassify certain information.  I said earlier

7    that I would revisit that issue here, and I'll do that now.

8          I want to be clear, I'm not prepared to hold, at least

9    at this juncture, that courts have no authority to review

10   classification decisions of the executive branch.  To the

11   extent that some of the cases cited by the government in its

12   letter on this issue, at ECF No. 619, holds or suggests that

13   that is the case, it is hard to square with the fact that there

14   are at least two contexts in which courts do have authority to

15   review classification decisions; namely, cases challenging

16   pre-publication review such as *McGehee v. Casey*, 718 F.2d 1137,

17   1148-49 (D.C. Cir. 1983), and FOIA cases, *see, e.g., Halperin

18   v. FBI*, 181 F.2d 279, 289 (2d Cir. 1999); *Weberman v. Nat'l

19   Sec. Agency*, 490 F.Supp. 9, 13 (S.D.N.Y. 1980).

20         At the same time, I agree with the government that

21   these contexts are very different than the context of this

22   case, a criminal case governed by CIPA*.  See, e.g.,* ACLU v.

23   *Dep't of Just.*, 681 F.3d 61, 72 & n. 9 (2d Cir. 2012) (noting

24   that "procedures of CIPA contrast sharply with those of FOIA").

25   Moreover, I am inclined to agree with the government that CIPA

LckWschC

1    itself does not grant or contemplate judicial authority to

2    declassify information that the executive branch has deemed

3    classified.  Indeed, the text and instruction of the act

4    suggest to me pretty strongly that courts do not have that

5    authority, at least as a matter of statute.

6            In my view, therefore, defendant would likely have to

7    persuade me that declassification is necessary to protect his

8    constitutional rights, and on the present record, he has not

9    done so.  For starters, I'm inclined to think that the

10   comprehensive scheme established by CIPA adequately protects

11   his Fifth and Sixth Amendment rights, including the right to

12   due process and to present a defense, and of course, CIPA has

13   been upheld repeatedly by courts against challenges to its

14   constitutionality.

15           I suppose that could change as we get closer to trial

16   and it becomes clear what evidence Mr. Schulte wishes to use

17   and how he wishes to use it.  Not for nothing, by that point, I

18   will also have a better handle on what is classified and why

19   and, thus, a better ability to assess the parties' competing

20   arguments.  But certainly at this point in the litigation, I do

21   not think that Mr. Schulte has come close to making that

22   showing.

23           Nor has he demonstrated that the First Amendment calls

24   for reviewing the executive branch's classification

25   determinations.  He is not seeking to publish information that

LckWschC

the executive branch has deemed classified, in which case there

is an established administrative review process to challenge

classification decisions and the right to judicial review.

Instead, we are dealing here with court filings, and he cites,

and I have found, no authority for the proposition that a party

to litigation has a First Amendment right to file documents on

the public docket, let alone to do so over the government's

claim that they contain classified information.  There is, of

course, a First Amendment right of public access to judicial

documents, but Mr. Schulte does not invoke it, and in any

event, he himself has access to the classified information, so

he has no standing to invoke that right.

          In short, to the extent that I have authority to

review or second-guess the executive branch's determinations of

classification, on which I reserve judgment, I decline to

exercise it at this stage of the litigation.  That said, I do

want to say and/or reiterate two things.

          First, I agree with Mr. Schulte that some of the

government's classification determinations are, at least on

their face, a little hard to understand.  For instance,

information that the government has in prior filings portion

marked as unclassified and information that is generally

public, with some caveats, and I would strongly urge the

government to be careful in its determinations and to ensure

that information and filings are not being overclassified even

LckWschC

if there is no bad faith in the government's determinations.  I
trust that the government will press the classifying authority
on that point and make my views on it known.

I would also note that such overclassification does
come at a cost not only with respect to public access, of
course, but also it puts Mr. Schulte and standby counsel in an
unenviable position.  This reverts to the discussion we had
earlier, but it is hard to know in some instances what is and
isn't classified.  I'm not sure that's always the case, and I
reiterate that counsel and standby counsel and Mr. Schulte are
to take more care on that front, but it does seem to me that
there is occasionally a sort of trap -- not only for the
unwary, but even the wary -- and that's not fair.  It
undermines the force of the protective order and other orders
of the Court, and it's hard to insist that Mr. Schulte and
standby counsel take care not to file classified things
publicly if it's impossible to tell *ex ante* what is and isn't
classified.  Again, that doesn't necessarily apply to
everything that has been filed here, but I just want to
underscore that.

So the bottom line is that I will not reconsider my
prior order at this time.  I may, however, revisit the issue
later as we get closer to trial and I have a better
understanding myself of what is and isn't classified and why,
particularly if I conclude that it does infringe on

LckWschC

1   Mr. Schulte's right to a fair trial in some demonstrable way.

2          I believe that that resolves all of the outstanding

3   pending motions.  My intention is to issue a bottom-line order

4   memorializing all of these rulings as well as the new deadlines

5   and schedule and so forth so that everybody's on the same page

6   with respect to that.

7          Any other issues?

8          Mr. Denton.

9          MR. DENTON:  Your Honor, just for the record, with

10  respect to the last point you made about the classification

11  order, the government has shared the Court's previous order

12  with the classifying authority and discussed your Honor's

13  footnote in that, which made a number of these points at some

14  length.  We will also ensure that we also share the transcript

15  of this proceeding and convey those concerns to them as well.

16         THE COURT:  All right.  I don't think the footnote was

17  especially long, but I take your point nevertheless.

18         Mr. Schulte, anything else that you wish to raise?

19         I do want to discuss when we should reconvene, and

20  obviously, there may be an application under the Speedy Trial

21  Act, but anything aside from that?

22         THE DEFENDANT:  I don't think so, no.

23         THE COURT:  All right.  I'd be inclined to reconvene

24  in either mid-January or early February.

25         Mr. Denton, do you have a view on that?

LckWschC

1          MR. DENTON:  Not particularly, your Honor.  It might

2     make sense to do early February, after the defendant's motions

3     are filed, but I think the government's happy either way.

4          THE COURT:  All right.  I think that probably makes

5     sense.  Why don't we plan to reconvene at 2:30 on Valentine's

6     Day, February 14.

7          Does that work, Mr. Denton?

8          MR. DENTON:  Yes, your Honor.

9          THE COURT:  Mr. Hartenstine, does that work for you?

10         MR. HARTENSTINE:  Yes, your Honor.  That works for me.

11         THE COURT:  All right.

12         Mr. Schulte, I assume it works for you.

13         Ms. Shroff, does that work for you?

14         MS. SHROFF:  May I trouble you to just ask what day of

15     the week that is?

16         THE COURT:  Monday.

17         MS. SHROFF:  That's fine.

18         THE COURT:  All right.  Monday, February 14, at 2:30.

19         Mr. Denton, is there an application under the Speedy

20     Trial Act?

21         MR. DENTON:  Yes, your Honor.

22         In light of the complexity of the case and the need

23     for the defendant to prepare and file a variety of motions, the

24     government would move to exclude time under the Speedy Trial

25     Act until February 14.

LckWschC

1          THE COURT:  Mr. Schulte, any objections?

2          THE DEFENDANT:  No objection.

3          THE COURT:  I will exclude time under the Speedy Trial

4    Act between today and February 14, 2022.  I find that the ends

5    of justice served by excluding that time outweigh the interests

6    of the defendant and the public in a speedy trial in view of

7    the complexity of the case, the many different issues that

8    we've discussed today that require further discussion,

9    resolution, and the motions that Mr. Schulte is going to be

10   preparing and filing on January 28.

11          I am assuming, in light of my rulings today,

12   including, but not limited to, the conditions-of-confinement

13   issues, my ruling on the substantive motions, my permission to

14   Mr. Schulte to file additional motions and the setting of one

15   deadline for the filing of omnibus motions, that there will be

16   fewer filings between now and the next pretrial conference.

17          Obviously, Mr. Schulte, you're free to file things if

18   you think that there is something that you should file, but I

19   would just urge you to heed my admonition earlier and not

20   repeat things from one submission in another just to ease the

21   burden on counsel, standby counsel, the government, and me, and

22   also just begin to be able to focus on preparing for trial.

23          With that, everybody stay safe and healthy, and happy

24   holidays to everyone.  We are adjourned.  Thank you very much

25   for your patience.          (Adjourned)