M2eWschC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6              Defendant.
                                        Conference
7   ------------------------------x

8                                       New York, N.Y.
                                        February 14, 2022
9                                       2:30 p.m.

10  Before:

11
                       HON. JESSE M. FURMAN,
12
                                        District Judge
13
                          APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DAVID W. DENTON JR.
         MICHAEL D. LOCKARD
17       Assistant United States Attorneys

18  JOSHUA A. SCHULTE, Defendant *Pro Se*

19  SABRINA P. SHROFF
    DEBORAH A. COLSON
20       Standby Attorneys for Defendant

21  Also Present:  Daniel Hartenstine, CISO

22

23

24

25

M2eWschC

1          (Case called)

2          MR. DENTON:  Good afternoon, your Honor.  David Denton

3    and Michael Lockard for the government.

4          MR. LOCKARD:  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          THE DEFENDANT:  Josh Schulte, appearing *pro se*.

7          THE COURT:  Good afternoon.

8          MS. SHROFF:  Good afternoon, your Honor.  Sabrina

9    Shroff and Deborah Colson.  We are standby counsel for

10   Mr. Schulte.

11         THE COURT:  Good afternoon to you as well.

12         All right.  My standard reminder that we're in an

13   unclassified setting.  I don't anticipate the need to discuss

14   any classified information today, but if there is a need, then

15   we'll need to reconvene elsewhere.  So try to restrict

16   yourselves.

17         Earlier today, Mr. Schulte filed a letter motion that

18   is totally illegible to me.  It seemed to be written in pencil,

19   at least the scanned version that was docketed on ECF.  I have

20   trouble making out more than a few of the words, so

21   Mr. Schulte, do you want to tell me what --

22         THE DEFENDANT:  Yeah, so --

23         THE COURT:  -- that says?  I'm not sure what to do

24   with it.  I can't rule on it because I can't read it.

25         THE DEFENDANT:  Yeah, so the issue -- the underlying

M2eWschC

1    issue, I guess, is the laptop issue that we can discuss later.

2    But the issue is that MDC does not allow me to use a pen.  I

3    have a -- I have a little -- they have little flexible pencils

4    that we can use.

5           THE COURT:  Can you just speak directly into the

6    microphone, please.

7           Hold on, Mr. Schulte.

8           Can you just speak directly into the microphone,

9    please, and start over.  So I understand the MDC doesn't allow

10   you to use a pen and they gave you some sort of --

11          THE DEFENDANT:  Yeah.  They give us a little flexible

12   pencil that doesn't -- you can't really read it.

13          THE COURT:  I definitely can't really read it.  So I

14   don't know if you have the original with you or if you want to

15   just tell me orally what the issue is, but certainly I can't

16   rule on this motion because I can't read it.

17          THE DEFENDANT:  Yes.  It's -- I mean we can go ahead

18   and start discussing the issue.  It's the laptop issue.

19   Essentially without the ability to use the laptop to type

20   information, then that's the only mechanism I have left to use,

21   is the pencil, and the document is essentially saying just that

22   the, that without the laptop, without the laptop, I can only

23   use the pencil, and that's what it would look like, and it's

24   hard to write, it's hard to read, and so --

25          THE COURT:  And this is the laptop in the MDC?  You

M2eWschC

1    obviously have access to all sorts of things in the SCIF, but

2    we're talking about the MDC.

3              THE DEFENDANT:  That's correct.  So, and

4    Mr. Hartenstine can talk about this, but the SCIF is just used

5    for classified information, so any classified motions or

6    anything like that I'll write at the SCIF.  The SCIF doesn't

7    have unclassified motions or access to law library, case law,

8    anything like that.  So all the unclassified motions that

9    involve case law and stuff like that I've all been writing,

10   typing on my laptop and then transferring that information to

11   my attorneys, not just that information, but I also have

12   exhibits planned, cross-examination, video demonstratives.  I

13   also write things for my expert to do, to communicate with.  So

14   I use a laptop for all these things.  So the issue now is -- I

15   guess the underlying question is whether or not I have a right

16   to utilize a laptop in this way, to prepare my defense, both

17   pretrial motions and for trial.

18             THE COURT:  OK.  I'm a little confused because I think

19   you have a laptop.  I have received any number of letters from

20   you that were obviously prepared on a laptop, so why is it that

21   this letter you couldn't prepare on the laptop only?

22             THE DEFENDANT:  Because now, without the DVD drive,

23   that's what I've been using to transfer the documents from the

24   laptop.  And so there's essentially three different ways pretty

25   much that you can transfer things from the laptop -- the first

M2eWschC

1    would be the network, like the internet.  The Court has already

2    denied that.  And the other two -- one would be USB drive,

3    removal of media, and then the third one is the DVD drive.

4         The Court will recall last time I tried to streamline

5    that process by involving the government directly and asked if

6    I could write to the DVDs and transfer them to BOP and then

7    have someone from the government -- not from the prosecution

8    team, obviously -- to also review it.  The Court denied that

9    request, and so I continued to use the DVD writer.  I've

10   always -- to this point I've just used the DVD writer, but now

11   that I no longer have that option, I essentially don't have the

12   ability to use the laptop anymore.  So --

13        THE COURT:  OK.  Well, you do have the ability to use

14   the laptop.  The issue is getting things off the laptop.

15        THE DEFENDANT:  Correct, correct.

16        THE COURT:  Mr. Denton, any thoughts here?  I mean I

17   denied the request for a burner drive because it seemed to be a

18   violation of BOP's policy, but obviously this is not a tenable

19   situation if I can't read what he filed, so I don't know if

20   there's disingenuity going on here or what the story is, but I

21   certainly think there's an issue.

22        MR. DENTON:  Your Honor, first of all, I would just

23   note, as we noted in our letter, the government is not aware of

24   the defendant having used this to transfer things to counsel

25   previously, but we're not aware of how he's transferring things

M2eWschC

1    to counsel, so I honestly can't speak to the historical

2    practice.  Obviously it is a violation of BOP policy for him to

3    have a DVD writer.

4            We spoke with the Bureau of Prisons Friday to find out

5    if there was an opportunity for them to essentially take the

6    laptop and print things off of it for him there.  However, I

7    think as an alternative, the defendant also has access to a

8    unit computer and in some way has been able to print things and

9    make typed submissions during the various periods in this case,

10   including recently, when he did not have access to a DVD

11   writer.  So again, we're happy to try and explore alternatives

12   here to try and make this feasible.  We agree that this is not

13   a tenable solution, but we've got a little bit of an

14   information gap on our side about what else the defendant has

15   used and is available to him.

16           THE COURT:  OK.  My inclination is to have you contact

17   the MDC and figure out a solution to this problem.  I'm not

18   interested in violating BOP policy, but at the same time, it

19   does seem to me if he can use a laptop to draft things, we need

20   to have some sort of viable means to enable him to transfer

21   that to counsel and/or file it.  What that is I'm happy to

22   leave to the MDC in the first instance to try and figure out a

23   creative solution that complies with their policies, but I

24   think that we need something.  I mean this doesn't work.

25           So does that make sense?

M2eWschC

1          MR. DENTON:  Yes, your Honor.

2          Like I said, we're happy to explore that option with

3   them.  Again, we would note that something has worked for the

4   defendant during time periods when he did not have a DVD

5   writer.  We don't know what that is, whether that was typing

6   things on a unit computer and printing them out from there or

7   whether there was some other solution that he was using, but

8   something else has worked other than just this in the past.

9          THE COURT:  OK.  Mr. Schulte, do you want to --

10          THE DEFENDANT:  Yeah, I can speak to that.

11          So I've always had a DVD writer in the past.  The only

12   time I didn't was -- I refer the Court to Dkt. 621.  The Court

13   will recall that it received several letters from me that were

14   handwritten.  Obviously I had a pen at this time, but whenever

15   I was moved from MCC to MDC -- let me back up.

16          While I was at MCC, they had a computer there that I

17   could use the DVD burner there, so their discovery computer

18   allowed me to use a DVD burner because my laptop didn't have an

19   internal one.  So while I was at the MCC, I could just use the

20   MCC's computer to burn things to the DVD.  When I was

21   transferred to MDC, I no longer had that, and so I wrote a

22   bunch of letters.  I still had a pen at that point because MCC

23   did allow me to have a pen.  So that -- this is the only time

24   in which I did not have a DVD writer, and during that time I

25   had to handwrite things that the Court didn't receive for,

M2eWschC

```
 1     like, two months or something.

 2               THE COURT:  All right.

 3               MS. SHROFF:  But aside from that, I always have just

 4     used the DVD burner.

 5               THE COURT:  Mr. Denton, please contact the MDC

 6     promptly.  Report back within a week to figure out a solution

 7     for this.  I mean if the MCC had a computer that had a burner

 8     drive available, one would think that there's a means by which

 9     BOP could make that happen at MDC as well that is not a

10     violation of their policy.  I also question why he can't have a

11     pen.  Maybe there are good reasons for that, but I certainly

12     have received any number of communications from prisoners with

13     pens, so I'm not aware of a general policy prohibiting pens for

14     people in custody.

15               MR. DENTON:  Yes, your Honor.

16               We will certainly look at that.  I will just note that

17     the defendant's two letters filed in the first week of February

18     complaining about the lack of a DVD drive were typed, and so --

19               THE COURT:  I understand.  I don't know what's going

20     on here, and maybe there is a readily available explanation or

21     solution, in which case, MDC can perhaps provide information on

22     that, but certainly there needs to be a means for him to both

23     write his submissions and also file them in a manner that is

24     legible to everyone.  So whether that solution is already

25     available to him and he's not availing himself of it or whether
```

M2eWschC

1    it needs to be made available, I want to know one way or

2    another.

3              MR. DENTON:  Understood, your Honor.

4              THE COURT:  OK.  Dkt. 709 is denied without prejudice

5    to renewal because I can't read it, and hopefully, this will

6    sort it out and moot the issue.  But in any event, I obviously

7    can't rule on a motion that I can't read.

8              Let me turn to the main item on our agenda today, the

9    protective order.  I want to discuss various issues relating to

10   it, but before I get to that, let me cover two other issues or

11   areas.

12             One is open discovery issues, in particular, the three

13   items that Mr. Schulte discusses in his letter of January 24,

14   Dkt. No. 682.  First is the missing discovery production, 6, 9,

15   and 12.  Once again, I don't quite know.  It seems like there

16   are ships passing in the night with his submissions and the

17   government's explanation, but just comparing his letter with

18   the government's letter of January 19, ECF No. 676, I guess my

19   best surmise is that he's referring to the hard drive that was

20   produced with discovery production 6 on November 8, 2017.

21             Mr. Schulte, is that accurate?  Do you suggest that

22   it's the first of the two hard drives that were produced?  And

23   looking at the government's letter, that would seem to be the

24   hard drive you're referring to.  Do you have any idea if that's

25   accurate?

1          THE DEFENDANT:  So, yeah, the problem is, I think, the

2     government's referring to when they produced discovery No. 6,

3     and what I'm referring to is the first large hard drive that

4     they presented, that they gave to me contained all the

5     discovery up to that point, which included 6, 9, and 12.  And

6     so I'm just saying that the very first large hard drive that

7     the government produced to me that can't be -- that requires

8     external power and so the MDC has to store that, that is

9     missing, and that's the only one I've ever received that has

10    those three productions, 6, 9, and 12.  It contained a whole

11    lot of other discovery besides 6, 9, and 12, but that's the

12    only place where I ever had the full production of 6, 9, and

13    12.

14         As to what the government's saying about when, and

15    stuff like that, I don't know.  That's the thing.  I don't know

16    when or anything else.  All I know is it's the very first large

17    hard drive that requires external power.

18         THE COURT:  Again, I don't know how to make heads nor

19    tails of this because the government seems to suggest that

20    there was no single production with 6, 9, and 12 on it.

21         Mr. Denton, is that correct?  Am I reading your letter

22    correctly?

23         MR. DENTON:  Yes, your Honor.  That's correct.

24         To the extent that what the defendant is looking for,

25    though, however, is the physical, single external hard drive

M2eWschC

1   set that requires external power, as we advised him by letter

2   and in our January 19 letter to the Court, we've confirmed that

3   the MDC has that.  It just needs a new power cord, so if the

4   defendant or standby counsel gets us a new power cord for it,

5   we can make it available to him again.

6          THE COURT:  All right.

7          Standby counsel, is it possible to get a new power

8   cord to solve this problem?

9          Please speak into the microphone.

10          MS. SHROFF:  Certainly, your Honor.

11          THE COURT:  Great.  So why don't you do that as

12   quickly as possible so hopefully we can work through that

13   issue.

14          The second item is the Verizon records.  The

15   government has previously represented that there are no such

16   records, and any records have been produced.  Mr. Schulte, in

17   his January 24 letter, suggests that there might be others

18   relating to his, quote/unquote, Virginia records, and the like.

19          Mr. Denton, can you shed any light on that?

20          MR. DENTON:  So, your Honor, again, having completed

21   the discovery review that we described in our status letters to

22   the Court, we are not aware of any additional Fios records

23   provided in response to subpoena.  There were Fios records

24   produced in response to 2703(d) orders, which have been

25   provided to the defendant.  We also explained in a letter to

M2eWschC

1    the defendant, dated February 1, that what he characterizes as

2    Fios records in the government's most recent or supplementary

3    production were not, in fact, Fios records but were, in fact,

4    Verizon telephone subscriber records for other phone numbers.

5            So again, we don't think that there's anything else to

6    provide to him in that regard.

7            THE COURT:  All right.  I accept the government's

8    representation on that, and that should put that issue to rest.

9            Mr. Schulte, if that means you need to take other

10   steps -- you referenced subpoenaing Verizon -- then you should

11   do whatever you're permitted to do under the rules, but it

12   doesn't sound like there's anything further to discuss.

13           The last issue is the SC1 drive.  Candidly, I'm not

14   sure I understand what the issue is here, but Mr. Schulte

15   suggests that it's missing several forensic images and requests

16   that I order the government to either identify all alleged

17   illicit files on the two different logical drives or if there

18   are none to explain why it wasn't produced in unclassified

19   discovery.

20           Mr. Denton, any response, thoughts, comments on that?

21           MR. DENTON:  So, your Honor, I think there's two

22   different components to that request.  The first deals with

23   portions that the defendant believes that were not produced

24   previously, SC49, SC50, and SC51.  That was an issue that we

25   had hoped to discuss with the defendant, because our

M2eWschC

1   understanding is that those were, in fact, produced as part of

2   the images of SC48, the underlying item, and then also as part

3   of the SC1, not SC01 -- I realize it's getting confusing --

4   production.  However, we did also tell the defendant that,

5   again, if he wants additional copies of any of this, if he

6   provides us with a hard drive, we will make copies of these

7   things for him again, happily.

8           With respect to the second request, requesting the

9   government to identify particular illicit files on the hard

10  drive that contains the child pornography stored in the SCIF,

11  in the SCIF's safe, essentially, as a way of complying with the

12  Adam Walsh Act, we also informed the defendant that our

13  position is that that is relief that was already denied by

14  Judge Crotty, and so we are not planning to provide the data in

15  any different form at this time.

16          THE COURT:  All right.  I think I may have ruled on it

17  myself, but in any event, Mr. Schulte.

18          THE DEFENDANT:  Just to clarify that point, because

19  that wasn't what I was requesting.  The point is that there's

20  this -- there's four different hard drives that were produced

21  and three of those hard drives are form 1 logical drives, and

22  that's the RAID5 drive that the government -- that's where the

23  government alleges the child pornography resides.

24          There's a second entire hard drive, 500 gigabytes, and

25  the government does not allege that it contains any CP or

M2eWschC

1    classified information.  So the request is simply to identify

2    whether or not that -- because if that hard drive doesn't

3    contain either of those, then they should be just produced in

4    unclassified discovery.  I'm not saying to identify specific

5    files or anything like that.  I'm asking whether or not this

6    contains classified information or CP, and if it doesn't, why

7    is it not produced in unclassified discovery.  It's a

8    completely separate drive.

9              THE COURT:  All right.  Again, this is ringing a bell

10   as something we discussed.

11             Mr. Denton.

12             MR. DENTON:  Your Honor, again, that's our position,

13   that this is an issue we've covered the ground on -- that we

14   separated out from one hard drive that was previously provided

15   the classified hard drive containing classified information and

16   the unclassified but still secured drive that has to be handled

17   in accordance with the Adam Walsh Act and that the material

18   that is on that hard drive should be maintained as such and

19   that no further no further subdivision is appropriate.

20             THE COURT:  Is Mr. Schulte just incorrect that there

21   is a hard drive that doesn't contain either category of

22   information, either Adam Walsh-type materials or classified

23   materials?

24             MR. DENTON:  So, to the extent that I'm following

25   correctly, your Honor, there is one single physical hard drive

M2eWschC

that contains Adam Walsh materials and one single physical hard

drive that contains classified materials from his home

computer.  If I understand correctly, he is saying that the

physical hard drive that contains the Adam Walsh Act-protected=

materials contains multiple different logical images and that

some subdivision to remove some amount of that so that he can

have it outside of the currently available form is what he's

asking for, and we think that falls within the relief that the

Court has previously denied.

    THE COURT:  I certainly agree with that, but I want to

make sure I understand whether it is that or not.

    Mr. Schulte.

    THE DEFENDANT:  No, it is not.  That's what makes this

a different request, is that there's actually a third hard

drive.  It's not a different logical partition, which is -- the

previous request was to take the unrelated stuff off of the

same hard drive, but this is a different request because

there's actually a third hard drive, a third physical hard

drive and not just two.  And that third physical hard drive is

not related to anything, and I specifically identified what

that drive is called, and I contained -- I think I put an

exhibit with it.  It's a 500-gigabyte hard drive.  The other

hard drive is very large, like four to five terabytes, or

something like this.  They're not different logical, they're

completely different physical drives.

M2eWschC

1          THE COURT:  Mr. Denton.

2          MR. DENTON:  I'm at a bit of a loss, your Honor.  I

3     know that there previously was one physical hard drive, which

4     was then removed and kept by Mr. Hartenstine for a period of

5     time.  We replaced it with two physical hard drives.  I'm not

6     entirely sure what the third one that he's referring to is.

7          THE COURT:  What's your suggestion for how we handle

8     this?

9          MR. DENTON:  I guess, your Honor, I think we can talk

10     to Mr. Hartenstine and try and confirm with the FBI exactly

11     what the defendant has under these circumstances, but as far as

12     I know, there is no third hard drive.

13          THE COURT:  All right.  Why don't you do some due

14     diligence on that with Mr. Hartenstine and with the FBI, or

15     whomever.  And can you report back to me in a week on that

16     issue too?

17          MR. DENTON:  Yes, your Honor.

18          THE COURT:  All right.

19          As for the SC49, '50 and '51, I'll ask standby counsel

20     to provide a hard drive to the government to make a

21     reproduction of those in the event that Mr. Schulte doesn't

22     have them or can't find them, but then that should put that to

23     rest.

24          All right.  I think that exhausts the open discovery

25     issues.  Let me just comment -- I'm turning to the telephone

M2eWschC

1  conference question -- by saying that these are the types of

2  issues that, in my view, can and should be worked out through

3  conversation and good faith meet-and-confers between the

4  parties, including standby counsel, but principally Mr. Schulte

5  and the government.  I certainly understand Mr. Schulte objects

6  to that.  I understand that he has sought a stay of my order

7  requiring him to participate in those regular phone

8  conversations.

9         But Mr. Schulte, you should understand that as of this

10 time, my understanding is that there is no stay in place; that

11 is to say, I denied a stay of that order.  You sought a stay

12 from the Court of Appeals, and to my knowledge, they have not

13 yet stayed it, all of which is to say that those orders remain

14 in effect at this time.  If you continue to refuse to

15 participate, I will consider what action, if any, to take and

16 would invite the government to alert me and make whatever

17 application it thinks appropriate to rectify the situation.

18 But my strongly held view is that if Mr. Schulte wants to

19 represent himself, then he has to participate.

20        Mr. Schulte, are you paying attention?

21        THE DEFENDANT:  Yes.  I'm confering with counsel

22 about the issue.

23        THE COURT:  OK.  My view is that if you want to

24 represent yourself, then you have to participate in good faith

25 communications with the government; that that is essential to

M2eWschC

ensuring that you have what you need and can access it and so

forth, the sorts of issues that we just discussed.  If you fail

to do so, I think it becomes much harder to complain that you

don't have access to things like hard drives or the SC1 drive

or so on and so forth.  Those are issues that can much more

easily be sorted out through a simple conversation, and those

sorts of conversations do not bear in any way, shape, or form

on your Fifth Amendment interests or rights.

        The bottom line is, I think, if you don't participate,

it may well be that you just forgo some of these things and

they don't get remedied because that's not what these regular

conferences are intended for.  That is for you guys to try and

work out, and at the extreme, it may be that you forfeit your

right to represent yourself because it just is impossible to

proceed in this manner.  So that's obviously something that I

would only approach with some care and if things got

significantly worse, but the bottom line is I expect you to

participate and comply with my orders.  And if you don't, I

would again invite the government to let me know and to make

whatever applications it thinks appropriate.

        All right.  With that, the third item on my agenda is

Mr. Schulte's request to file a pretrial motion regarding

quote/unquote seized email.  That's Dkt. No. 695.  The

government filed a response at Dkt. No. 708.

        It filed it the other day, so Mr. Schulte, I don't

M2eWschC

1   know if you've seen a copy of the response.  Have you received

2   it?

3           THE DEFENDANT:  They provided a copy to me.  I've read

4   it, and I can respond if you wish.

5           THE COURT:  Sure.  The first thing I'd like you to

6   tell me is they attach a document that they believe is the

7   document you're referring to.  Is that correct?

8           THE DEFENDANT:  Yes, I believe so.

9           THE COURT:  OK.  Do you wish to respond?

10          THE DEFENDANT:  Yes, I do.

11          MS. SHROFF:  Your Honor, may I just have one second

12   with Mr. Schulte?

13          THE COURT:  Sure.

14          MS. SHROFF:  Thank you, your Honor.

15          THE DEFENDANT:  Standby counsel thinks it's wise to

16   request the -- whether the discussion that I have today about

17   this in court potentially can be used against me in

18   cross-examination at trial before I proceed.

19          THE COURT:  I would think so.

20          Mr. Denton.

21          MR. DENTON:  I would think so as well, your Honor.

22          THE COURT:  That is one of the problems of

23   representing yourself.  I think when you speak, what you say is

24   potentially useable against you in that sort of way.  So I'm

25   not sure where that leaves you.  You should certainly proceed

M2eWschC

1    with caution.

2            THE DEFENDANT:  OK.

3            (Counsel and defendant conferred)

4            THE DEFENDANT:  Some part of this Ms. Shroff may be

5    able to discuss in further detail, but I'll just begin.

6            So, the document that the government refers to was

7    initially an email that I sent to my first counsel, like,

8    March, right after the initial search warrant.  It was emailed

9    to my counsel and specifically stated it was in response to

10   their request from me, so it was only used for my defense.

11           Later on, my attorney emailed that to my cousin, who

12   was effectively working as my paralegal whenever he left the

13   case.  And at that point the government subpoenaed and

14   retrieved that email from them.  And then proceeding up to

15   trial, Sabrina Shroff spoke with the government's lawyers and

16   showed them the initial email and the clear chain showing that

17   this was privileged, and the government eventually agreed with

18   her that it was, and then it -- that's why it wasn't used at

19   trial.  So there was no litigation about this ever because the

20   prosecutors agreed that it was privileged.  So like I said, we

21   have a copy of the initial email that was only sent to my

22   email -- that was only sent to my attorney.  It was my attorney

23   that eventually emailed it to my cousin, who was functioning as

24   my paralegal at the time with all -- a bunch of other

25   information that he clearly says in the email attorney-client

M2eWschC

1    privilege; it's all the documents I have about this case while

2    I was in between attorneys because I could no longer afford him

3    so that was -- that's the issue, so --

4              THE COURT:  And is there a reason that you didn't

5    raise this issue when I asked about any additional motions or

6    new motions that you wished to file?

7              THE DEFENDANT:  Yes, because the -- the only reason

8    I'm raising it now is because the government raised it in their

9    CIPA filings.  So you said anything new.  So before it was

10   never raised because the former prosecutors from the last trial

11   agree that it was privileged and it wasn't used at trial so we

12   thought it was no longer being used.  Now that the government

13   raised it in their CIPA letter, claiming that they intend to

14   use it now at trial, so this is in relation to that.  So now

15   that they're trying -- now that the government is now saying

16   that they want to use it again, now I'm raising it.

17             THE COURT:  And when did you get that?

18             (Counsel and defendant conferred)

19             THE DEFENDANT:  Whenever they filed the CIPA 10.  CISO

20   knows.

21             When was it filed?

22             THE COURT:  January 28.

23             MS. SHROFF:  January 28.

24             MR. HARTENSTINE:  I believe that's correct, your

25   Honor.

M2eWschC

1          THE COURT:  OK.

2          Mr. Denton, I guess one question is your letter

3    suggested that this exhibit was not used but not because the

4    government agreed it was privileged but just decided not to use

5    it for some reason.  What Mr. Schulte is representing, and I'm

6    presuming comes in part from Ms. Shroff, sounds a little

7    different.  Can you educate me?

8          MR. DENTON:  So, your Honor, the government never

9    agreed that the message was privileged.  I know Ms. Shroff had

10   a conversation with one of the prosecutors that previously

11   represented the government in this matter about it prior to the

12   trial.  Again, I don't think there was any agreement that it

13   was privileged.  Certainly there were other reasons why the

14   government decided not to use it at trial in the first matter.

15         THE COURT:  And is it accurate to say that this was

16   included in the notice that you served on or about January 28?

17         MR. DENTON:  Yes, it was, your Honor.

18         THE COURT:  All right.

19         Ms. Shroff, do you want to shed any light on this,

20   tell me about whatever communications you had with the

21   government at the last trial?

22         MS. SHROFF:  Your Honor, can I just consult with

23   Ms. Colson?

24         THE COURT:  Yes.

25         MS. SHROFF:  Your Honor, essentially, I believe that

M2eWschC

there might be just one small contradiction.  I think

Mr. Schulte's recitation of the facts is, as I recall it, I

would not be able to say to the Court that the government

confirmed that it was my argument that led them not to use this

evidence that is being discussed here.  I think the more

correct thing would be to say I made the argument to the United

States Attorney who was prosecuting the case then, and then the

next thing I was told is that they weren't going to use the

exhibit.  So perhaps it's a logical conclusion for Mr. Schulte

to surmise that because my argument was based on privilege and

the chronology of that particular email, that the government

had accepted my argument and therefore he now concludes that

the government had conceded the privilege.  It would be a

logical inference for him to draw, but I do not believe that I

ever communicated that because it's seldom that a prosecutor

says this is why I decided to do X.

THE COURT:  And can you speak to whether and what

opportunity you had to raise this with Judge Crotty before the

last trial?  Or did it never get litigated because the

government told you that it didn't intend to use it?

MS. SHROFF:  That's my recollection, your Honor.  The

government told us they weren't going to use it, and I think we

had so much on our plate that there wasn't any reason to raise

it with Judge Crotty.  That's my recollection.

We have one overlapping AUSA, and I'm sure Mr. Denton

M2eWschC

1    can correct me, but we did not litigate it before Judge Crotty.

2              THE COURT:  All right.

3              Mr. Denton, anything else on this front?

4              MR. DENTON:  No, your Honor.  I would just note as far

5    as the time line goes, in front of Judge Crotty, we litigated

6    this document extensively.  There was a lot of discussion about

7    how it would be redacted for use at trial, what the exhibit

8    form of it would be.  It was ruled on in the Court's Section 6

9    ruling.  It was then brought up again in the government's

10   response to the defendant's motions with respect to the MCC

11   notebooks, and it was only after all of that that I recall Ms.

12   Shroff having a conversation with one of the prior prosecutors

13   on the case.  So I think there was ample opportunity for it to

14   have been brought up before, but again, as far as the sort of

15   sequence of events goes, I think that's about the sum of it.

16             MS. SHROFF:  Your Honor, may I just add something?

17             THE COURT:  Yes.

18             MS. SHROFF:  Of course, there was litigation under

19   CIPA 6.  There's no doubt that there was.  At that time, the

20   privilege issue wasn't raised because it wasn't a CIPA 6 issue.

21   When we raised the privilege issue and then they withdrew

22   introducing it as an exhibit, there wasn't any need to litigate

23   the privilege aspect of it because they agreed to the rest of

24   the relief we sought.

25             It would seem kind of odd for me to go to Judge Crotty

M2eWschC

1    and say Mr. X has decided not to use this exhibit, but I'd like

2    to raise it anyway.  So if they weren't going to use it, I

3    didn't raise it.

4              THE COURT:  All right.  So, I'm not sure I need to get

5    to the bottom of this to resolve the question I'm presented at

6    the moment, which is just whether Mr. Schulte should be given

7    an opportunity to raise it.  I am persuaded that there's enough

8    ambiguity about what happened in the last proceeding, combined

9    with the fact that he -- well, at least gave him some reason to

10   believe that this was off the table until the notice that he

11   received on January 28, that he should be given an opportunity

12   to be heard.  So I will let him file a motion on this.  I will

13   give him until March 7 to file a motion.  I'm going to limit it

14   to 15 pages, because this doesn't seem like an especially

15   complicated area of law or issue.  The government is to respond

16   by March 18, and then any reply by March 25.  The government's

17   reply is also 15 pages.  Any reply is limited to seven pages.

18             All right.  That brings me to the main item on the

19   agenda, which is the protective order.  Mr. Schulte has had, I

20   think, three months' notice, an opportunity to weigh in, and

21   I'm not entirely sure why he hasn't yet availed himself of

22   that, but I did say that he'd have an opportunity to be heard

23   today.

24             So I don't know if you want to be heard at the outset

25   or just on each of the issues that I was planning to discuss or

M2eWschC

 1      what you would like.

 2              Mr. Schulte.

 3              THE DEFENDANT:  Yes.  So the issue comes back to the

 4      DVD drive.  I had prepared a response, but I could not have it

 5      printed.  And then I also want to raise to the Court's

 6      attention that the last week the MDC seized the laptop so I've

 7      been unable -- they recently returned it, but due to the DVD

 8      drive issue, they were investigating -- whatever they were

 9      doing.  So they seized the laptop for a week, so I was unable

10      to copy my 15-page thing by hand as well.  That's the reason I

11      didn't raise it, but there's two main issues that I want to

12      discuss with the Court regarding the protective order.

13              THE COURT:  Go ahead.

14              THE DEFENDANT:  OK.  One of them was the language

15      regarding certain classified documents that could only be

16      produced to standby counsel and could not be produced to me.

17      Talking with the CISO, it appears that there are no documents

18      like this currently.  I don't think the language should include

19      that going forward, since I am representing myself; there's no

20      reason that I shouldn't have access to all the materials.

21              THE COURT:  OK.

22              THE DEFENDANT:  And then the second issue is if the

23      Court decides to include the restraints in the protective

24      order, this is where -- in my letter, I reference -- this was

25      initially brought before Judge Crotty in the last conference

M2eWschC

1    before he left, and Judge Crotty ordered the government to

2    discuss with the marshals about the chains to decide and

3    whether or not the marshals would, based on the fact that for

4    three years there's been no issues, if they would just, if they

5    could forgo the chains and what the issue with the chains were.

6    And so I want to bring that up, that there's essentially no

7    reason.

8           I mean I just have these same leg restraints that I

9    have here.  There's even more people at the SCIF watching than

10   there are here, and they're right outside the hall.  So there's

11   no -- and like I argued, I've never been ruled a flight risk.

12   There's just no reason.  There's no legitimate government

13   objective for having me chained to the floor and I can't just

14   move about the SCIF normally.

15          So I just wanted to raise that to your attention, that

16   it was brought before Crotty before and Crotty did ask the

17   government to confer with the marshals, but I don't believe

18   anything ever happened from that.

19          THE COURT:  I read the pretrial conference transcript

20   discussion of that, and I think essentially Judge Crotty said

21   he was going to speak with the marshals.

22          THE DEFENDANT:  Oh, OK.  My mistake.

23          THE COURT:  That's OK.

24          So I don't know what, if anything, came of that, but

25   obviously, it hasn't changed.  And what I was going to say is

M2eWschC

1    that I plan to do the same.  We'll get to that provision in due

2    course.  I don't know if it's necessary to even address that in

3    the protective order, which I think more pertains to the

4    handling of classified information, and I suspect that perhaps

5    that should just be left to the marshals.  And I can weigh in

6    as needed, but I will tell you that, for the most part, I will

7    defer to the marshals when it comes to decisions regarding

8    security and their security protocols.  But again, why don't we

9    cover that one when we get to it.  Both of those were on my

10   agenda of issues to discuss.

11        Before I get into the particulars, I'm going to go

12   through the redline, and I'm not planning to discuss each and

13   everything flagged in the government's letter, which is Dkt.

14   670, and standby counsel's response, which is 689.  Some of

15   those issues, I think, I can just resolve on my own, but I

16   wanted to discuss some of them.  But before I get there, let me

17   raise as a question, I think some of the issues in these

18   letters pertain to the role of standby counsel and also, dare I

19   say, I think arise from -- my sense is that relationships, in

20   all different directions, but they've gotten a little bit more

21   complicated in this case -- between standby counsel and the

22   government, standby counsel and Mr. Schulte, as reflected in

23   the recent motions on that front.  And one of the things that

24   standby counsel referenced in their letter is a specific

25   reference to the possibility or the question of whether I would

M2eWschC

require that they accompany Mr. Schulte at all times in the

SCIF.  But I wanted to raise it as a broader question of

whether to appoint, as a third standby counsel, Mr. Kadidal.  I

don't know Mr. Kadidal.  I've spoken to Mr. Hartenstine about

him, and again, if he knows him well and has worked with him

and worked well with him -- I'm thinking out loud here, but the

thought occurred to me that perhaps adding him to the mix as

sort of fresh blood, as the case may be, might -- could

potentially be productive in all different directions and

facilitate communications, some of which have gotten a little

more complicated here than I would have thought they should or

would like, but we are where we are.

        So I'm not suggesting I'm doing that.  I'm just

looking for thoughts.

        Mr. Denton.

        MR. DENTON:  So, your Honor, I think we have no

position on that.  I think whatever the Court views as most

efficient here and consistent with the interplay of the various

Federal Defenders and CJA appointments is fine with us.  I

assume given that Mr. Hartenstine has spoken up on this that

access to the SCIF and all that is not going to be an issue.

So we don't see a security issue there, as far as I know.

        THE COURT:  All right.

        Ms. Shroff, do you wish to say anything on this?

        MS. SHROFF:  I don't think so, your Honor, unless the

1   Court has questions.  I can speak to Mr. Kadidal's role and how

2   I know him.

3             THE COURT:  Sure.  Why don't you do that.

4             MS. SHROFF:  So, Mr. Kadidal and I are both part of

5   the South Asian Bar, and I've worked with him on other matters.

6   He's a lawyer at CCR, and we're colleagues.  I might say we're

7   friends.  He has assisted me before in issues relating to cases

8   that involve national security.  He has clearance, and he would

9   be available as a third person with a limited role because --

10   and I just say this in case the Court wants to know his skill

11   set.  He's not a criminal defense lawyer but is able to assist

12   in matters regarding this case, and of course, he's somebody

13   known to Mr. Schulte.

14             I think actually the Court might know him from law

15   school.  I'm not sure.  You seem to have overlapped somewhere

16   or went to the same law school; I don't know.  But he would be

17   an addition to the team that would help us specifically with

18   CIPA 10 matters to the extent we need to consult with him and

19   also help us with the SCIF.

20             I would note for your Honor that our objections to us

21   being made hall monitors in the SCIF is not impacted by Mr.

22   Kadidal.

23             THE COURT:  I understand that.  I think you raised him

24   in connection with that, but I was broadening it and wondering

25   whether it might be useful, if it's permissible, to include him

M2eWschC

1    for other reasons.

2              Mr. Schulte, do you have a view?  I don't know if you

3    know Mr. --

4              THE DEFENDANT:  No, I do not.

5              THE COURT:  Have you met Mr. Kadidal?

6              (Defendant conferred with counsel)

7              THE DEFENDANT:  Yes.  Yes, I have.

8              THE COURT:  All right.  And do you want to speak to

9    your ability to work with him, since that may have some bearing

10   on this?

11             THE DEFENDANT:  Yeah -- no.  Like she said, he worked

12   on some of the CIPA stuff, and I think we have a good

13   relationship.  He's a unique guy to talk to, has a lot of

14   knowledge, so --

15             THE COURT:  All right.  And to the extent that he

16   previously worked on this matter, Ms. Shroff, was that *pro*

17   *bono*, or was that through CJA?  How does that work?  Since he's

18   not part of the panel, I would need to look into what the rules

19   and regulations are there.

20             MS. SHROFF:  Well, your Honor, I was with the Federal

21   Defenders at that time when I retained him.

22             THE COURT:  OK.

23             MS. SHROFF:  I just wanted to note, your Honor, one

24   other thing.  I'm assuming that Mr. Schulte is still going *pro*

25   *se*.  To the extent Mr. Schulte decides at some point not to go

M2eWschC

1   *pro se* and he asks standby counsel to assume representation,

2   Mr. Kadidal would not be able to assist us at trial.  I just

3   wanted to be as candid with the Court as possible.

4           THE COURT:  I appreciate that.  Candor's always

5   welcome.

6           Let me say a few things.  First of all, I don't know

7   if Mr. Schulte would have the right to just go in that

8   direction if he wanted to.  If he does, we'll take that up if

9   and when it arises.  What I'm contemplating here is, I think,

10  separate and apart from that.  It doesn't sound like it would

11  be appropriate to have Mr. Kadidal at counsel table during

12  trial.  Not being a criminal defense lawyer, I just don't think

13  he would bring anything to bear in that setting, but what I'm

14  pondering and I think I'll discuss with the powers that be with

15  respect to CJA is perhaps it makes sense to bring him on board

16  for the pretrial portion of this case to facilitate and assist

17  with classified filings and the classifications and CIPA

18  process but wouldn't contemplate that he would be at counsel

19  table for trial.  I think that would be overkill and

20  unnecessary on top of him not having a skill set that makes

21  sense in that setting.

22          Does that make sense?

23          MS. SHROFF:  Yes, your Honor.

24          THE COURT:  All right.

25          Mr. Denton, I assume you have nothing further to add

M2eWschC

1     on that.

2            MR. DENTON:  Fundamentally, your Honor, I think our

3     view on this is that the purpose is to facilitate the

4     defendant's access to the SCIF.  So whatever does that I think

5     we're fine with.

6            THE COURT:  All right.  Well, I think it's that and

7     facilitates the litigation process with respect to classified

8     information more broadly, and I guess what I'm suggesting is

9     that perhaps bringing in Mr. Kadidal would assist in that

10    regard and make it easier for me, among others.  So I will

11    ponder that and look into it.

12           All right.  Getting into the more particulars of the

13    proposed order, this is going off of the redline version

14    submitted by the government, which is Dkt. 670-1.

15           First of all, starting on paragraph 2, 2(b)(iv) and

16    (v), I think standby counsel have raised an objection to this,

17    at least reflected on the government's letter, objected to

18    these paragraphs.  I think the objection is misplaced in the

19    sense that -- and this gets to the larger issue of standby

20    counsels' role in terms of screening things for classified

21    information.  But I think elsewhere in the order, paragraphs 5

22    and 20, for example, it discusses the defendant and standby

23    counsel have obligations not to file things publicly if they

24    know or reasonably should know contain classified information.

25    So I think that is elsewhere in the order, and appropriately

M2eWschC

1      elsewhere in the order, and I'm not prepared to take it out all

2      together.  That being said, it seems to me that paragraphs but

3      2(b)(iv) and (v) are not -- are misplaced in the sense that

4      paragraph 2(b) is a definition of what is classified

5      information, and it seems odd to define classified information

6      as information that counsel knows or reasonably should know

7      contains classified information.  That seems tautological and

8      not really responsive to what the paragraph is meant to do.

9             So I'm inclined to just strike those two paragraphs

10     since I think those documents and information are encompassed

11     within the definition of classified information more broadly as

12     set forth in 2(b).  And as I said, there are other provisions

13     in the order that govern the filing and handling of classified

14     information and turn on what counsel knows or reasonably should

15     know.  So it just doesn't seem like these paragraphs belong

16     here.

17            Mr. Denton.

18            MR. DENTON:  Your Honor, I'm sympathetic to the view

19     on the tautological definition there.  I think the only things

20     I just want to make sure of are paragraph 4 makes clear that

21     the classified status is regardless of the origin of the

22     information, and paragraph 5 also specifies sort of different

23     ways in which the defense can be made aware of the classified

24     nature of information, both of which seem like relevant things

25     to include.  So I'm just trying to see if there's a different

M2eWschC

1    point in the order where those would make sense to go.

2              THE COURT:  All right.  I'll tell you what.  Maybe

3    rather than drafting on the fly, it might make sense for me to

4    flag some of these things, and then anyone who wishes to submit

5    something after the conference with suggestions, with further

6    thoughts can do that.  Let's flag that.

7              I'm just looking.  Paragraphs 8 and 9 do seem to cover

8    some of what you were describing; namely, making clear that,

9    for instance, classified information that also appears in the

10   public domain is not thereby automatically declassified, etc,

11   So it may be that those points are covered elsewhere.  It just

12   doesn't seem to make sense to me to define classified

13   information as information that counsel should know is

14   classified.  That doesn't bear on the definition of classified

15   information.  So my proposal would be to strike 2(b)(iv) and

16   (v), and if you think there's something in there that needs to

17   be somewhere else in the order, I'm certainly open to your

18   suggestions on that front.

19             Turning to paragraph 9, in the government's letter,

20   there's an indication that standby counsel wants to replace

21   "government counsel" with "the CISO" at the end of paragraph 9.

22   I guess my inclination was why not make it "unless government

23   counsel or the CISO confirms that it is not classified."

24             Wouldn't that suffice and cover our bases?

25             Mr. Denton.

M2eWschC

1      MR. DENTON:  Sorry, your Honor.  I'm just reading the

2      carryover language here.

3           I think, your Honor, and I'll let Mr. Hartenstine

4      speak to this, I don't think we have an objection to that

5      except for the fact that, as far as I know, Mr. Hartenstine is

6      not able to make classification determinations independent of

7      consultation either with us or with the classifying authority.

8      And so again, to the extent that we view incorporating Mr.

9      Hartenstine's role here as also incorporating the downstream

10     consultation people who are able to make those representations,

11     I don't think we have an issue with him being the person who

12     says it to defense counsel.

13          THE COURT:  OK.  I mean to be clear, aren't you in the

14     same boat?  You don't have declassification or classification

15     authority either, right; you're just a conduit?

16          MR. DENTON:  That is also true.

17          THE COURT:  OK.  My impression from Mr. Hartenstine

18     when we talked earlier is that he is happy to play an

19     intermediary role, and indeed, that's something I'll get to in

20     due course.

21          Mr. Hartenstine, is that correct?

22          MR. HARTENSTINE:  Yes, your Honor.  I think the

23     government -- right.  Long story short, I'd be happy to play an

24     intermediary role and take any questions that need to be

25     addressed to the government as well as the classifying

M2eWschC

1     authority, the classification authority.

2              THE COURT:  All right.  So I'll add the words "the

3     CISO" in that line.

4              And then standby counsel, in their letter, raise a

5     broader objection with respect to paragraph 9 that I confess I

6     didn't really understand.  So Ms. Colson or Ms. Shroff, did you

7     want to speak to what your issue was there?

8              MS. SHROFF:  May I, your Honor?

9              So, paragraph 9 was to seek from the equity holder

10    some more guidance, so to speak, on what now is still

11    classified in this case.  There have been years of litigation

12    about certain information, and some of the classified

13    information has since been declassified.  Some of the

14    classified information still remains classified.  At times

15    we're under the impression that something has been declassified

16    and the government takes a different stand.  So we discussed it

17    with the CISO, and we sought basically for them to give us some

18    kind of -- I don't know.  I guess the American version is

19    called a quicksheet, or something like that, some kind of broad

20    guidance document, especially on matters that we have

21    repeatedly raised with the equity holder.  And I put in the

22    footnote an illustration of why we continue to struggle with

23    what now remains classified.

24             I'm not getting into the why it remains classified,

25    because I understand the Court would say that's not my concern,

M2eWschC

```
1    and if the equity holder says it's classified, our due course

2    is to litigate it.  But I've given an example of why one would

3    get easily lost in what remains classified.

4               THE COURT:  I guess I don't know what you're asking

5    for.  It does seem to me that this points to a broader issue,

6    which is just a little bit more open communication and

7    consultation would probably go a long way to avoiding some

8    misunderstandings and mistakes.  And to that, one of the

9    suggestions I'm going to make in due course when we get there

10   is that essentially when you receive any filing that even

11   plausibly includes something classified, that you literally

12   just pick up the phone and talk to Mr. Hartenstine before

13   sending it anywhere or filing it or doing anything that would

14   be inconsistent with the handling of classified information.

15   But it seems like this is just something that you could talk

16   through.

17              The one example you've given here, it's not my

18   understanding, from my experience with these matters, that

19   first names are never classified.  I think it depends on the

20   circumstances and the contexts, and there are certainly

21   circumstances in which a first name may well be classified

22   information.  So I wouldn't think that that's a categorical

23   rule, and whether you agree with it in a particular instance is

24   a different story, but it just underscores that I don't know if

25   you can deal in categoricals here.  But I'm not sure what
```

M2eWschC

1   you're asking or proposing with respect to paragraph 9 or

2   otherwise.  But you raised it with respect to paragraph 9.

3          MS. SHROFF:  That's all we said, and we don't have an

4   issue with communicating with the CISO.  We've done so

5   frequently.  It would help if the SCIF could go back to having

6   a working secure line, which we don't have right now, but

7   that's an aside.  But we also do get guidance from the equity

8   holder, and we got guidance during the trial last year and we

9   just thought it would be helpful to get some.  That's all.

10         THE COURT:  All right.  And I firmly agree.

11         And Mr. Hartenstine, I don't know.  Is there no

12  working phone in the SCIF now?

13         MR. HARTENSTINE:  Your Honor, as of last week, the

14  situation with regard to the secure line has been remedied, and

15  we are now able to connect securely and have classified

16  discussions.

17         THE COURT:  OK.  That issue's been fixed.

18         Let me just encourage everybody to have more

19  communications about these things.  And again, we'll get to the

20  filing in particular.

21         But Mr. Hartenstine, I would certainly invite you to

22  discuss these with standby counsel, and if it's possible to

23  facilitate direct communications with the classifying authority

24  about it, great.  At the end of the day, you know, I think not

25  inviting a debate about whether something should or shouldn't

M2eWschC

1    be classified, but I certainly think that standby counsel and

2    Mr. Schulte are entitled to as much transparency as possible so

3    that they know what they need to do and there's no ambiguity.

4              All right.

5              MR. DENTON:  Your Honor, if I may, just on that point?

6              THE COURT:  Sure.

7              MR. DENTON:  I think we are happy to also play a role

8    providing that information.  I think that to the extent that

9    there's going to be a position from the United States in this

10   matter with respect to classification or something like that,

11   Mr. Lockard and I obviously have to rely on the classifying

12   authorities, but we don't think that it would be appropriate

13   for the defense to be having sort of *ex parte* conversations

14   with the classifying authority, who is also the victim agency

15   here.

16             Again, we are happy to help facilitate this process.

17   We are happy for Mr. Hartenstine to be involved and to play a

18   role in sort of submitting things for classification review.  I

19   think that once we get into sort of communications with an

20   entity of the United States, that entity's represented by

21   Mr. Lockard and I.

22             MR. HARTENSTINE:  Your Honor, if I might?

23             MS. SHROFF:  Well --

24             THE COURT:  Hold on.

25             Yes, Mr. Hartenstine.

M2eWschC

```
 1              MR. HARTENSTINE:  I think I would agree with
 2    Mr. Denton that they are --
 3              THE COURT:  Just keep your voice up.
 4              MR. HARTENSTINE:  Excuse me, your Honor.
 5         I would agree with Mr. Denton that I am not a proper
 6    representative of any intelligence community component in the
 7    courtroom or in terms of taking a position in this case and
 8    that the government certainly has its role to play, a role to
 9    play there.  And I would -- there are, you know, facilitating
10    questions about classification or the issues that I can
11    directly handle with standby counsel is one thing, but in terms
12    of seeking information through official channels from the
13    intelligence community, that may be more appropriately done
14    with the government as part of the conversation.
15              THE COURT:  All right.
16         Ms. Shroff, I guess putting aside whether there's any
17    legal issue with respect to you speaking with the intelligence
18    community representatives without counsel for the government in
19    the spirit of just promoting better communication, I also don't
20    see any harm in having them participate in that so everybody's
21    on the same page with respect to what is and isn't classified.
22    That's all we're talking about here, not debating whether it
23    should be, just understanding what the lines are.
24              MS. SHROFF:  Well, your Honor, I wanted to say two
25    things.
```

M2eWschC

 1          I would like to take Mr. Hartenstine off the hot seat

 2     and say that I cannot recall, in the five years I've worked on

 3     this case, ever having any contact with the CIA directly.  In

 4     fact, at every juncture we have been stopped from talking with

 5     the CIA directly, and we have never done that.  So I think

 6     there is zero possibility that we are in some way having,

 7     quote/unquote, *ex parte* conversations with that agency, and I

 8     wanted to put that out there.

 9          I think actually Judge Crotty was not part of the

10     government's side on that point, but I won't belabor that point

11     at all.

12          Secondly, your Honor, sometimes we consult with the

13     CISO on matters that we wouldn't want to consult with the

14     government.  I think that's the whole reason the CISO is

15     provided to us.  We have, I believe, a very healthy

16     communication line with Mr. Hartenstine, Mr. Rucker, and we use

17     them as a resource so that, in the first instance, we are able

18     to ask them a question and if they give us an answer we might

19     want to modify our filing in a certain way so as not to give

20     the government a heads-up.  I don't believe, and of course, I

21     speak for Mr. Schulte here; he can interrupt me because he's

22     the lawyer on the case.  But I may not want the government to

23     know something and I may just decide that depending on what Mr.

24     Hartenstine tells me I'll make my argument a different way.  I

25     don't need to front that to the government.  If Mr. Hartenstine

M2eWschC

1    wants to get feedback from the United States or the CIA, of

2    course, he's free to do so.  But I don't think I should have to

3    ask Mr. Denton about something that I don't want to ask him

4    about.

5              THE COURT:  All right.  I don't think anyone was

6    suggesting that you can't talk to Mr. Hartenstine without

7    Mr. Denton or Mr. Lockard participating.

8              MS. SHROFF:  OK.

9              THE COURT:  I think the question was if it went beyond

10   that and you spoke directly to the CIA or other members of the

11   intelligence community.  But I think if that were to happen,

12   it's fair to include members of the government to, again, just

13   ensure everybody's on the same page.  But in the absence of

14   that, I think more open communication with Mr. Hartenstine and,

15   for that matter, with the government could resolve a lot of

16   these issues.

17             MS. SHROFF:  Your Honor, actually, most respectfully,

18   I don't think that's correct.  I think what the government is

19   trying to do in a sense here is if we were, for example, to

20   contact witnesses of the CIA, I don't believe that the

21   government should be part of that discussion.

22             THE COURT:  And we will get to that.  That's paragraph

23   26.

24             MS. SHROFF:  OK.

25             THE COURT:  But we're not there yet.

M2eWschC

1          Turning to paragraph 20, No. 1, to the extent that

2     there are disputes about the last sentences of 20(a) and (b),

3     which pertain to the role of standby counsel in making filings

4     and determining if they have classified information, I'll talk

5     more broadly about that in a moment.  Again, I think they're

6     not really properly placed in these paragraphs, which paragraph

7     20 pertains to the filing of documents that the defendant or

8     standby counsel know or reasonably should know contain

9     classified information.  In that sense, you know, having

10    content that pertains to the obligations to review it doesn't

11    make sense in a paragraph that already presumes that it is

12    classified or known to be classified.  So I'm inclined to pull

13    those out and make a separate paragraph that governs the

14    obligations to review things before they are filed separate

15    from how they're handled once a determination is made that they

16    contain classified information, or might.

17          As for the broader question -- that, again, sort of

18    goes to whose responsibility it is and communications, and what

19    have you -- I'm open to suggestions and thoughts here.  It

20    doesn't seem like it's that onerous to discuss with standby

21    counsel that play this role with respect to filings that the

22    defendant would make, and I spoke about this back in December;

23    it seems to me that filings pertaining, for instance, to things

24    like the laptop or the hard drive, very unlikely, if not

25    clearly, not classified; things pertaining to Mr. Schulte, his

M2eWschC

1    experiences as an employee of the CIA and knowledge he gained

2    at the CIA, very likely classified.  The latter should

3    presumably go through the review process, the former probably

4    don't.  But it seems to me that maybe one solution or option

5    here is that if anything is even remotely close to the gray

6    area, that standby counsel should pick up the phone and call

7    Mr. Hartenstine and have a conversation, describing in general

8    terms what the filing is about, and then discuss whether it

9    should go through the classification review process or it's not

10   necessary.  That seems like it might solve a lot of these

11   problems instead of -- I don't quite know what the

12   counterproposals are here, but it seems to suggest sort of just

13   putting that all on the government.

14           Ms. Shroff.

15           MS. SHROFF:  That's what we've always done, your

16   Honor.  I think we've done that even recently.  We called Mr.

17   Hartenstine and said we'd flagged something, and he said go

18   ahead and file it or don't go ahead and file it, and that

19   works.

20           THE COURT:  My understanding is one of the recent

21   incidents involved you did that but only after sharing it

22   internally amongst yourselves on a computer and putting it on

23   Dropbox, which obviously, if there's something that involves

24   classified information is not the way it should be handled.  So

25   reach out to Mr. Hartenstine earlier in the process before you

M2eWschC

1    share it with him in any manner like that.

2            MS. SHROFF:  I understand that about the document the

3    Court is referring to, but we did not, as standby counsel,

4    think that the information that was in that document was

5    properly classified anymore given the rulings at trial and

6    given the rulings by Judge Crotty.  So that's precisely the

7    problem that I'm trying to articulate, which we've articulated

8    to the CISO.  It was our not just good faith belief but our

9    checked belief that that was not classified.  So if this was a

10   closed session, I could elaborate some more, but obviously, we

11   did not believe that that topic or the words were classified

12   anymore.

13           As an alternative, once that happens, we suggested, if

14   there is something that sort of hit the bell, even if we had

15   determined that it had been declassified subsequent to the

16   trial or during the trial, the best way might be, instead of us

17   handing the documents to the CISO, Mr. Schulte, who is in the

18   SCIF, informs the CISO and the CISO gets it from the SCIF

19   because we have now decided that there is something to be

20   worried about.

21           The CISO has a secure email.  They can email it to the

22   government, who wishes to look at it, discuss it with the CIA,

23   and then get back to us.  That way we are not part of the

24   equation.  It's not that we don't want to do it.  It's that we

25   have zero ability there.

M2eWschC

1          Of course, we can always do what we used to do before,

2     which is take a classified filing, print it out, walk it up to

3     Judge Crotty's chambers, drop it off there, meet the AUSA's

4     representative.  I think Mr. Kamaraju and I met at the MCC in

5     that alleyway all the time because it was halfway between the

6     U.S. Attorney's Office and the SCIF and handed it over to each

7     other.  It worked for the entire trial, and we're happy to do

8     it again.  There's zero issue there.  What we don't know is if

9     the filing comes from Mr. Schulte.  And then there's a step

10    that the Court, I hope, gets, which is Mr. Schulte and standby

11    counsel may not always be on the same page.  There's a balance

12    there too.  Who trumps on that issue?  Does Mr. Schulte win or

13    does standby counsel win?

14          THE COURT:  On the issue of whether it contains

15    classified information?

16          MS. SHROFF:  Not just whether it contains classified

17    information, whether there's even a remote possibility that it

18    contains classified information, whether it was classified and

19    is now declassified, whether it should be delayed by going to

20    the CISO, whether it should not be delayed by going to the

21    CISO.

22          You referred to some tension in terms of -- you know,

23    this is a new system, and I can't think of a single instance in

24    which a case like this has standby counsel in the mix.  It

25    complicates matters, right?  And the last thing we'd like to

M2eWschC

1    do, it would be my worst, the biggest nightmare to be a fact

2    witness against my own client.  That would be a horror.

3              THE COURT:  I don't envision that.

4              MS. SHROFF:  Right.

5              THE COURT:  Two problems.  First of all, it doesn't

6    cause a delay in the litigation in the sense that when

7    something goes through the classification review it's still

8    filed with the Court, with the government.  So in that sense

9    there's a delay in it being publicly docketed, but it shouldn't

10   be causing meaningful material delays in the litigation.

11             No. 2, I think my view is whoever has the more

12   conservative, cautious view of the filing should prevail.  If

13   Mr. Schulte happens to think "I don't think this has been

14   declassified, I think this is actually classified and we should

15   run it through," then he should prevail.  If he thinks this is

16   not classified because it was public or it was at the last

17   trial and you're not sure, I think you prevail.  In other

18   words, I think whoever is more cautious and conservative on

19   that front, that view should prevail, which is to say you

20   should always err on the side of caution.  And if Mr. Schulte

21   has a different view, that's tough.

22             The process requires you, as an independent actor in

23   the process, to ensure that if there is any doubt whatsoever

24   that it is confirmed through either the classifying agency or

25   the CISO, or whomever.  But that, to me, doesn't seem

M2eWschC

1    complicated.

2          MS. SHROFF:  So the Court and I are not in

3    disagreement.  We agree that the document in the court system

4    should get to the government and the Court, and how it gets to

5    them the preferable method would be what we did before, when we

6    were before Judge Crotty.  Because the CISO was not typically

7    here, we generally just called Mr. Gonzalez and said:  I have a

8    filing.  Should I bring it up?  He said yes or no, and we did.

9    We're happy to do it again, and the same for the government.

10   They can meet us halfway and we'd just hand it over.  And same

11   when they have a classified filing.  It worked for us before,

12   and we're happy to continue in that vein.

13         When Mr. Schulte went standby is when there was a

14   suggestion that he would be in touch directly with the CISO,

15   which is more efficient if the CISO is here.  So he lets Mr.

16   Hartenstine knows he has a filing.  Mr. Hartenstine gets the

17   filing.  He gives a copy to the Court, which the Court might

18   prefer rather than dealing with standby counsel, and then he

19   gives another copy to the government.  Either way is fine.

20   Honestly, we don't have much of an issue there.

21         THE COURT:  OK.  So I'm not sure why this is all so

22   complicated.

23         I also should say that my understanding is that the

24   CISO does plan to be here on a semiregular basis going forward

25   and particularly around the significant filing deadlines in our

M2eWschC

1     pretrial schedule, so that might facilitate things.

2               Mr. Denton, do you have thoughts here?

3               MR. DENTON:  I think as far as the logistics go, your

4     Honor, we're happy to do whatever makes this process as

5     efficient as possible.  I think with respect to the submission

6     of the classified filings, I think really the only concern we

7     have is that before something gets filed on ECF standby counsel

8     also play this role in taking a look at it.  If there is

9     concern, we have no issue with things being filed, as they were

10    frequently before, as Ms. Shroff noted, as

11    secret-pending-classification review.  Again, we're happy to do

12    it however's the easiest way.  The big issue is that once

13    something classified gets filed on ECF, even to the extent that

14    it gets taken down, it never really goes away.  And so we're

15    just trying to avoid that outcome.

16              MS. SHROFF:  Your Honor, may I suggest that the best

17    course would be for either Mr. Schulte or standby counsel to

18    notify the CISO and the CISO should take it from there?

19              THE COURT:  I'm not sure I disagree.  I think that

20    might make sense.  I think the question is what you notify them

21    about.  I think part of the problem that has arisen is filings

22    that the government or the CISO or the classifying authority

23    see on ECF for the first time and say, Oh, my God, that

24    contains classified information, and then that's the problem.

25    So we want to avoid that.

M2eWschC

1          MS. SHROFF:  And I believe that after that one

2     incident that the government claimed contained classified

3     information, we haven't had that issue, and we'd like the

4     process to be that the CISO is informed by Mr. Schulte or I or

5     Ms. Colson and the CISO takes it from there, because the

6     classified filing should preferably go to whoever the CISO is

7     here.

8          THE COURT:  Mr. Hartenstine.

9          MR. HARTENSTINE:  Your Honor, I think that is the

10    proper method of filing, is that CISO is responsible for

11    overseeing the security of the classified filing process and

12    we're happy to and responsible for playing that role.  In the

13    event that we're notified the day of and the CISO is not

14    physically in the Southern District -- as you know, we are in

15    Washington D.C. -- then we might ask the parties to coordinate

16    and facilitate the exchange of material and deliver it to the

17    Court.  But as you note, your Honor, my office is committed to

18    maintaining a presence throughout the major deadlines in this

19    case and anticipating the needs that exist.

20          THE COURT:  OK.  It sounds like everybody is at least

21    nominally on the same page.  I'm not quite sure why it can't

22    work smoothly, but I think what I'll do is, again, keep the

23    substance of the last sentences of 20(a) and (b) in here,

24    because I do think standby counsel has some independent

25    obligation to make sure that classified information is not

M2eWschC

1    publicly filed and that it goes through the classification

2    review process, but I want to make that a standalone paragraph,

3    to make clear that counsel and Mr. Schulte should err on the

4    side of caution and submit things to the CISO for consideration

5    before they are publicly filed to avoid any serious problem,

6    and I'll try to come up with some appropriate language there.

7         I think, thinking out loud, what I may do is actually

8    docket a draft revised version of this order and give all sides

9    a limited opportunity to just submit comments on any of my

10   changes, and that way, rather than drafting here, give you an

11   opportunity to be heard.

12        All right.  Relatedly, just so you know, as you

13   probably have figured out and seen, I tend to use electronics

14   more than some of my colleagues.  I'm largely paperless, which

15   is more complicated when it comes to classified documents, but

16   the CISO has kindly made available to me a device that I can

17   use to review things electronically that are submitted in

18   classified form to facilitate that, and to facilitate loading

19   things on it, I'm going to ask both sides, when you're making a

20   classified filing, to burn it on to a DVD or a CD to submit to

21   the Court along with the hard copy.

22        Ms. Shroff, I'll ask you to discuss with Mr.

23   Hartenstine the best way to do that.  I think he has some

24   thoughts with respect to facilitating that in the SCIF that

25   would make it easy enough for you to do.  But going forward, I

M2eWschC

1    would ask that you do that so that we have things in both paper

2    form, hard copy and electronic format available.

3            MS. SHROFF:  Your Honor, would it be possible for the

4    CISO to also give us what he gave you?  We've been asking for

5    that for quite some time, but Mr. Hartenstine wouldn't give it

6    to us.

7            THE COURT:  I tend to have more power in such things

8    than you, I imagine.

9            Mr. Hartenstine.

10           MS. SHROFF:  Judge, literally.

11           MR. HARTENSTINE:  Your Honor, the device that was

12   provided to the Court functions the same as the hardware that

13   we've given to the defense and standby counsel in that it, you

14   know, doesn't connect to the internet; it doesn't network, and

15   it just allows for the digital review of classified material in

16   a secure fashion.  It's just a different kind of device.

17           THE COURT:  Gotcha.  So they have a device that

18   performs the same function.  Is that what you're saying?

19           MR. HARTENSTINE:  They have multiple.

20           THE COURT:  OK.

21           Ms. Shroff, feel free to discuss it with Mr.

22   Hartenstine.  Feel free to discuss it.

23           Mr. Denton, you raised an issue in paragraph G of your

24   letter at Dkt. 676, 7(g), excuse me, that I'm not sure I

25   understood.

M2eWschC

1      MR. DENTON:  So, I think, your Honor, that this is the

2  result of sort of dueling edits from both the government and

3  standby counsel which essentially asks for the government to

4  review a document before it gets provided to the CISO.  I think

5  we've largely resolved that.  We are happy to facilitate

6  whatever review process needs to happen once documents are

7  submitted to the CISO.

8      THE COURT:  All right.  Again, I'll try my hand at a

9  paragraph that governs all of that.

10      All right.  Paragraph 23, which is the government's

11  proposed language on the classification review, I'm fine with

12  that, but I wonder if, Mr. Denton, as we get closer to trial,

13  it would make sense to revisit this and, perhaps, make the

14  timeline shorter on the theory that it is more significant at

15  that point.

16      MR. DENTON:  Yes, your Honor.

17      I think also, as was the experience the last time,

18  once we get through the Section 6 process, most of what we

19  should be talking about should be, at least in some form,

20  whether redacted or otherwise, available unclassified, so

21  hopefully also the volume of classified filings goes down.  But

22  we're happy to see where we are; we recognize that a lot of

23  these issues may need to get ramped up one way or another in

24  advance of trial.

25      THE COURT:  All right.  I may add a provision that

M2eWschC

just says we'll revisit it in a month or two before trial, but
you can also alert the classifying authority that as we get
closer, the expectation will be that those time frames will go
down.

Next is paragraph 25(j).  It's also paragraph 6.  This
pertains to the issue Mr. Schulte raised himself -- namely,
materials provided to standby counsel but not to him.  I am
going to leave those provisions in.  I'm not aware of any such
materials at the moment, but it certainly is possible that
there may be some in the future, and in any event, I think the
protective order should govern that possibility.  Obviously if
there is any such material and standby counsel think that
there's no reason that it shouldn't be provided to Mr. Schulte,
then that issue can be litigated.  But the Court did rule on
that in the *Moussaoui* case and found at least with certain
materials that that was an acceptable way of addressing the
defendant's Sixth Amendment rights.

I will say I will obviously look with or scrutinize
any production of that sort here given that Mr. Schulte is
representing himself, and in that regard, unless there's a very
good reason, he should have access to whatever discovery is
produced to the defense.  But since there certainly could be a
scenario in which there's a reason to withhold something from
him, I'll leave those provisions in here, which is not to say
that there will be a scenario of that sort.

M2eWschC

1          All right.  Paragraph 26 is the issue that we briefly

2   touched on earlier regarding contact with members of the

3   intelligence community.  I guess I don't quite understand the

4   issue here.  It doesn't seem unreasonable to have the CISO be

5   the conduit and point person to set up any communications with

6   such persons.

7          Ms. Shroff, why is that a problem or an issue?

8          MS. SHROFF:  Your Honor, Mr. Schulte wants to take

9   this one.

10         THE COURT:  Sure.  Go ahead.

11         THE DEFENDANT:  Yeah.  So, the issue, I think, is in

12  the past, even when I left the agency, I still contacted former

13  colleagues directly and that now that I'm *pro se*, I intend to

14  do that again.  There's no classification --

15         (Counsel conferred with defendant)

16         THE DEFENDANT:  Obviously, the conversations were not

17  classified when I was speaking with them, but anyway -- yeah,

18  so there's no, there's no regulation or law against someone who

19  was formerly colleagues or friends with someone who's -- even

20  if someone's undercover working for the agency, contacting them

21  and having an unclassified discussion with them.  And I

22  obviously did that long after I left the agency, and I don't

23  see any reason why I should not be able to do that for the

24  trial, to contact witnesses in this manner.

25         THE COURT:  And I'm not saying that you can't contact

M2eWschC

1   them, but what's the problem with funneling those through the

2   CISO and having him set up any communications?  Because there

3   certainly could be classified --

4           THE DEFENDANT:  Yeah.  So --

5           THE COURT:  -- information concerns inherent in who

6   these people are or what their roles were or are.

7           (Counsel conferred with defendant)

8           THE DEFENDANT:  Yeah.  So I think the issue is we're

9   concerned, obviously the CISO is not -- my lawyer can't

10  advocate for me, and we're concerned with how the requests are

11  being facilitated or communicated to the individuals, and I

12  would prefer to take that on myself instead of -- I mean, they

13  had issues before where witnesses came, and then the agency

14  found out about it and they started -- they talked to them and

15  got them to not talk to my attorney after that.  So the last

16  time, however, we were notifying who we were contacting, the

17  CIA was actually jumping in and making sure we were not able to

18  contact witnesses.  And so that was a major issue last time

19  that I seek to avoid this time.

20          THE COURT:  OK.  I'm sure that Mr. Hartenstine would

21  simply transmit in good faith that you wished to speak to

22  someone.  What happens from there is a different story.

23          Mr. Denton.

24          MR. DENTON:  Your Honor, first of all, just to be

25  clear, I'm not aware of any instance in which the government or

M2eWschC

1   any of the agencies involved in this case dissuaded witnesses

2   from speaking with the defendant or defense counsel.  We think

3   that, again, the right process here is simply for the

4   transmission of the request to Mr. Hartenstine.  It will go to

5   a person who's walled off from anyone involved in the

6   prosecution to transmit the request.  We think that's an

7   entirely reasonable way.  It worked well before.

8          MS. SHROFF:  Your Honor, may I?

9          THE COURT:  You may.

10         MS. SHROFF:  Actually, there was an incident when the

11  government intervened, and by government, I just mean widely

12  either -- who in the DOJ, we do not know.  It is a matter of

13  public record.  It was said so and put on the record before

14  Judge Crotty.  An individual was subpoenaed.  He showed up.  He

15  sat outside the courtroom.  He came in because Judge Crotty

16  called the case.  We told the person to sit there.  We went

17  out, and the person had disappeared.  He had, in fact, been

18  moved by the CIA.  The CIA did intervene, and we put this on

19  the record and it's part of the trial transcript.  And I

20  believe Mr. Denton was part of that trial team, so maybe he's

21  forgotten; it's been a while.  But it definitively was on

22  record.  The individual was subpoenaed.  He showed up, and then

23  he was whisked off the floor on which the trial was held.

24         Mr. Schulte has an absolute right to approach his

25  witnesses the way he would advocate for himself, to ask the

M2eWschC

witness in a manner that perhaps Mr. Hartenstine would not be

able to duplicate.  Perhaps they would be moved by

Mr. Schulte's voice.  Perhaps they would respond more kindly if

it was Mr. Schulte's standby counsel asking for them to meet or

speak.  We're cognizant that we're not to discuss any

classified information with that witness, and if we're deemed

capable of executing that responsibility with documents, I

don't see why we're not found equally capable of discharging

that responsibility when we contact a witness.

          I note here that there are certain witnesses that we

contacted during the first trial who indicated to us that they

would be happy to hear from us again.  I don't believe I need

to share that information with the United States or with the

CISO for that matter.  I think Mr. Schulte's entitled to reach

out to his friendly witnesses and see if he can get them on his

side or for them to testify without involving anybody who has

any connection with the CIA.  A witness is a witness.  Of

course, Mr. Schulte and standby counsel would not be able to

talk about anything classified.

          THE COURT:  Well, you say that, but Mr. Schulte is

obviously accused of leaking classified information not only in

the initial leaks but also from the jail and violating the

Court's protective orders, so there's a reason he's under same.

In that regard, unfettered communication is something that

Mr. Schulte doesn't have.  It just doesn't seem that onerous to

M2eWschC

1     require Mr. Hartenstine, the CISO, to basically be the

2     intermediary.  If Mr. Schulte wants to use his own words, he

3     can put it in writing and have Mr. Hartenstine deliver it in

4     writing.  I just don't see how that interferes with his ability

5     to present and put on a meaningful defense.

6              MS. SHROFF:  Ms. Colson and I are not on the SAMs, and

7     Ms. Colson and I are aware of our responsibilities, so at least

8     Ms. Colson and I should be able to contact the witnesses

9     directly without involving the United States or the CISO.

10             THE COURT:  All right.  I'll take it under advisement,

11    but my inclination is it's not an unreasonable precaution to

12    have the CISO be the intermediary, at least as to members of

13    the intelligence community, given the potential sensitivities.

14    But I'll take it under advisement.

15             With respect to paragraphs 29 through, I think, 32,

16    these govern the SCIF.

17             Mr. Denton, a couple things.  First of all, from

18    standby counsel's letter, I gather that earlier in this case

19    Mr. Schulte was in the SCIF alone and wasn't accompanied.  I'm

20    curious to know what has changed that requires him to be

21    accompanied now.  It certainly doesn't seem like it's a

22    productive use of taxpayer money to have Ms. Shroff or

23    Ms. Colson just, you know, babysitting him in the SCIF.  I'm

24    not sure it's necessary, and if there are particular reasons,

25    perhaps they could be addressed in some other fashion.

M2eWschC

1          Any thoughts on that?

2          MR. DENTON:  So I think, your Honor, first of all, if

3    I can just confirm, Mr. Hartenstine may be able to speak to

4    this, my understanding is that there were rules about the

5    courthouse SCIF that the defendant was not allowed to be

6    unaccompanied there.

7          Is that right?

8          MR. HARTENSTINE:  Your Honor, that is correct.

9          THE COURT:  OK.  But what is it about the courthouse

10   SCIF that differs from the 26 Federal Plaza SCIF?

11         MR. DENTON:  Your Honor, I think, first of all, it's

12   just different classifying authorities, different rules.  This

13   was something that came up when we were talking about the

14   courthouse SCIF.  I think we were taking our guidance about

15   what the requirements were and, frankly, didn't ask any more

16   than what was required for his maximum access to the SCIF here.

17         THE COURT:  OK.  Mr. Hartenstine and I talked about

18   this a little before the conference.  I guess I'm not sure

19   what's going on now, which is to say I'm not sure why

20   Mr. Schulte does need to be accompanied at all times.  My

21   impression also is that counsel's often just sitting outside

22   and in that sense not actually inside with him anyway.  I would

23   think, my understanding, and anyone can correct me if I'm

24   wrong, is there are several issues.  One is that the

25   combinations to the SCIF and the safe are themselves classified

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2eWschC

1  information and that's information that can't be provided to

2  Mr. Schulte.  So that's one thing, but I would think that as

3  long as those things are opened for him, then it follows that

4  somebody needs to stick around for the duration.

5      No. 2 is the phone, but I wonder whether that could be

6  changed or removed when he's not accompanied by someone.

7      No. 3 is his ability to take things out of the SCIF,

8  but I would assume that the marshals search him every time he

9  returns from the SCIF and I would think that that would provide

10  an adequate precaution for that concern.  I guess I'm trying to

11  understand whether it's actually necessary to have somebody

12  with him at all times.

13      MR. DENTON:  I think, your Honor, to the extent that

14  there is not a rule that requires there to be a physical second

15  human being just for purposes of having another body in the

16  room, all of the things that he requires assistance with -- and

17  there are a number of things that do require another person to

18  assist the defendant -- are things that, you know, could be

19  done at particular times, start and fixed points so we can

20  probably work out some sort of schedule or other arrangement

21  for that.

22      THE COURT:  OK.

23      Ms. Shroff.

24      MS. SHROFF:  Your Honor, I'm assuming you don't want

25  me to speak to the SCIF at the FBI, right?

M2eWschC

1          THE COURT:  I'm concerned about the one here.

2          MS. SHROFF:  The Court is direct.  We would not give

3   Mr. Schulte the pass codes to the door of the SCIF or the alarm

4   that is set to come in and out of the SCIF.  We would open the

5   cabinets and close the cabinets.  Of course, we are there at

6   eight.  One member of the team is there at eight to --

7   actually, we have a pretty decent system going.  The marshal

8   emails us or we email them, and they say Mr. Schulte's at X

9   point and come on up.  We let Mr. Schulte in, and we check in

10  with Mr. Schulte for all the things that he needs, and then we

11  come back to close up the SCIF.  And there's no reason for us

12  to be sitting in the SCIF with him because there is -- hours go

13  by where we're just sort of sitting there, when we used to

14  actually sit within the SCIF.  But we will actually step out so

15  that we can actually do some work.  We don't bug you for that,

16  the Schulte team.

17          There's really no reason for it because we accomplish

18  literally nothing.  We have no ability to search Mr. Schulte.

19  We have no ability to frisk him, and we certainly don't examine

20  what he brings in or takes out.  So if the Court would, most

21  respectfully, allow us to follow the procedure that we've

22  outlined, I think taxpayer money would be saved.  We would be

23  more efficient, and we'd continue to provide Mr. Schulte the

24  opportunity to confer with us.

25          With the phone, I think the easiest solution is to,

M2eWschC

1    perhaps, give it a new number and not tell Mr. Schulte what the

2    new number is -- I don't think Mr. Schulte knows the number

3    anyway -- and make the phone such that no outgoing calls are

4    allowed, only incoming calls are allowed, so the problem's

5    solved.  There's no issue then with regards to the phone.

6          I do know that the United States Marshals that sit

7    outside and watch Mr. Schulte are extremely, extremely

8    professional, extremely kind and extremely responsible, and are

9    actually watching him through the monitor, as is the FBI agent.

10   Each one of them has our cell phone number, and they call or

11   text us if there's any issue at all.  And we've had not a

12   single hiccup with anyone from the United States Marshals

13   Service, any of them.  It's smooth.  Even delays are

14   communicated.  They're kind enough to tell us that MDC's

15   running late so if one of us is running late, then we sort of

16   stop and take a breath.

17         We have no issues there at all.

18         THE DEFENDANT:  One thing I wanted to add, if I could,

19   is for the phone, it could be another simple thing where, for

20   example, phone numbers can be programmed in it that I can use,

21   for example, to attorneys, to Dan, or to the Court's office, or

22   whatever, and say whenever I come in they can swap the phones

23   out or just whatever this phone is that just has a restrictive

24   list of who I can call.  Or they can just monitor the call,

25   obviously, outgoing and incoming calls, and obviously there's

M2eWschC

1   not going to be any issues, but they can review it that way.  I

2   mean there's many ways to use the phone.  I rely on that phone,

3   obviously, to contact the government, let Dan know of things,

4   contact the attorneys.  And so it would be useful to keep that

5   in there, and there's many ways that it can be restricted if

6   the government sees it that way, so --

7          THE COURT:  All right.  Assuming that we can solve the

8   phone problem, Mr. Denton, anything you wish to say on this?

9   It seems like that might make more sense than having a

10  categorical "he must be accompanied at all times" rule.

11         MR. DENTON:  I think that's fine, your Honor.  I think

12  the only other thing I would note is that the Court's previous

13  order about transmission of mail between the parties was sort

14  of keyed to there being someone there on the defendant's SCIF

15  days.  That obviously does not require someone there all day as

16  long as someone is there at some point to play that role.

17         THE COURT:  I think Ms. Shroff made clear they are

18  there at some point, so it's just a question of whether they

19  need to sit there for the entirety.

20         Mr. Hartenstine, you mentioned earlier to me that you

21  were going to look into whether there were means of restricting

22  the phone that would potentially address the phone concern.

23  Can you do that and see if some of these ideas are, perhaps,

24  viable ones?

25         MR. HARTENSTINE:  Yes, your Honor.  I'll do that

M2eWschC

1    promptly.

2            THE COURT:  OK.  Great.  In principle, I agree it

3    doesn't make a whole lot of sense to make Ms. Shroff or

4    Ms. Colson sit there all day.

5            Paragraph 30 calls for, standby counsel objects to the

6    requirement that they be screened for electronic devices.

7            Is there some reason that that is appropriate here,

8    Mr. Denton?  Because as officers of the Court, I can't imagine

9    that they would violate the rules or regulations there, I'm not

10   aware of any incident of that sort.  It seems unnecessary.

11           MR. DENTON:  Candidly, your Honor, this we cut and

12   pasted from the December 2018 supplemental order that was

13   entered on consent verbatim.  With respect to the substantive

14   question, I don't think we care as long as it specifies that,

15   you know, no electronic devices of any kind are permitted to be

16   brought into the SCIF.  The screening language was just a

17   holdover from the old version.

18           THE COURT:  OK.  I'll take out the screening language,

19   and I think that is a rule regarding the use of the SCIF in

20   general.  So in that sense it exists independent of any order

21   that I may enter.

22           Paragraph 32 is the bolt paragraph.  I will discuss

23   that with the marshals.  My inclination is probably to take it

24   out all together on the theory that I'll leave those

25   determinations to the marshals, but let me talk to them about

M2eWschC

1    what the issues are and look into it.

2              I'm not sure what the waiver of liability issue is.

3    Standby counsel doesn't seem to think it's necessary.

4              Mr. Denton, do you want to tell me where that comes

5    from and what the issue is there.

6              MR. DENTON:  Again, your Honor, that's from the

7    December 2018 order.  Again, to the extent that it's not

8    necessary now, again, we're happy to defer to Mr. Hartenstine

9    and to the marshals on what's appropriate for the security

10   arrangements here.

11             THE COURT:  All right.

12             Mr. Hartenstine, do you have any reason to think that

13   the liability waiver is necessary or appropriate?

14             MR. HARTENSTINE:  I don't, your Honor.

15             THE COURT:  All right.  Then I'll probably take that

16   out, but I'll confer with the marshals as well.

17             Paragraph 33 pertains to the use of the SCIF phone.

18   I'll note there's a line in here about the defendant only using

19   the phone to speak with standby counsel or counsel for the

20   government, but that's obviously not exhaustive in the sense

21   that I take it he uses it to speak with the CISO, and should

22   there be any communications with members of the intelligence

23   community about classified matters, it would also require that

24   phone.  So I don't think that this is an exhaustive list, and

25   I'll try and figure out some way to modify it accordingly.

M2eWschC

1          That's all that I wanted to cover on the proposed

2     order.  Again, I think what I'll do is enter a draft order and

3     give both sides an opportunity in a week or so to respond with

4     any additional comments regarding my proposed changes.

5          To the extent that Mr. Denton you have thoughts on

6     deleting 2(b), 4 and 5 and concerns about anything in there

7     being lost and not reflected elsewhere, you can make your

8     comments at that time.  So why don't you just wait for me to

9     enter a draft order in the first instance.  Obviously, until I

10    issue a new order, the existing orders remain in effect.  So

11    that we're not operating in a vacuum, those orders are still

12    the operative ones.

13         All right.  We're almost done.

14         Just talking about the schedule going forward, CIPA 4

15    and CIPA 10, Section 10 notices were due on the 28th, I take

16    it.

17         Mr. Denton, anything to say on that front?

18         MR. DENTON:  As the defendant noted, we provided him

19    with a supplemental Section 10 notice on that date.

20         THE COURT:  All right.  And CIPA 4, same thing?

21         MR. DENTON:  We do not -- we did not make and do not

22    anticipate making a supplemental Section 4 motion at this time.

23         THE COURT:  All right.  The defendant's CIPA Section 5

24    notices are due by the 18th, by later this week.  I think a

25    couple have already been filed, but whatever are going to be

M2eWschC

1    filed are due later this week.

2              The government's CIPA Section 6 notices are due by

3    March 18 and response by April 8.  Other dates are set forth in

4    the scheduling order, Dkt. No. 628.  And of course trial, is

5    June 13.

6              It does seem to me that it might make sense to enter

7    another, more detailed scheduling order with other pretrial

8    deadlines, including but perhaps not limited to, disclosure of

9    exhibit lists, 3500 material, 16(b) disclosures, and 26.2

10   disclosures by the defendant, and so forth.

11             Any thoughts?  My inclination would be to have the

12   government come up with a proposal and share it with

13   Mr. Schulte and standby counsel.  That can be submitted

14   hopefully as an agreed-upon schedule, but otherwise you can

15   submit your disagreements, and I'll resolve them.

16             Mr. Denton.

17             MR. DENTON:  Happy to do that, your Honor.

18             THE COURT:  OK.  So why don't you share think that

19   with Mr. Schulte and standby counsel within a week and then

20   submit something hopefully jointly within, let's say, three

21   weeks from now to give Mr. Schulte an opportunity to give you

22   his views, and then I'll enter something that I think is

23   appropriate.

24             In terms of the next conference --

25             THE DEFENDANT:  I have one.

M2eWschC

1                    THE COURT:  Yes.

2                    THE DEFENDANT:  I have one final issue I was going to

3      bring up if I might.

4                    THE COURT:  Go ahead.

5                    THE DEFENDANT:  It's regarding the law library issue

6      at MDC, that I spent the last few weeks trying to resolve this.

7      The MDC have been unable to do so, but previously when MDC is

8      on lockdown, they still would take us out to the law library

9      each day, but there's been a national lockdown by the BOP, and

10     the general population, they are still able to come out and do

11     their law library but not for us.  This is the third week that

12     they have refused to take me to the law library.

13                    And I also wanted to bring up that the government

14     previously said that I can use the law library on the weekend

15     or on SCIF days.  I've still been unable to do that as well,

16     and so, like I said, I filed administrative remedies.  I tried

17     to speak with MDC about this issue, but their stance is since

18     this is a national lockdown, I'm not allowed to view the law

19     library.  It's causing issues.

20                    THE COURT:  Mr. Denton, do you want to look into that

21     and report in your letter of next week?

22                    MR. DENTON:  Yes, your Honor.

23                    I can say we did hear from MDC today that the national

24     lockdown was affecting the defendant's law library access, but

25     other than that fact we have no other information about it.  We

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M2eWschC

```
 1   will get to the bottom of it and report back.

 2              THE COURT:  All right.  And if you could report back

 3   on the likelihood of the lockdown continuing and what other

 4   provisions can be made for access, that would be helpful since,

 5   you know, obviously it becomes more and more difficult for him

 6   to prepare what he needs to prepare if he doesn't have access

 7   to the law library.

 8              All right.  I'd be inclined to schedule another

 9   conference just to make sure that things are on track.  It

10   seems to me, my thought -- I'm open to suggestions -- would be

11   to do it in April, maybe after the April 8 deadline to respond

12   to the government's CIPA 6 motions on the theory that we'll

13   have some better sense of the landscape.  But if anyone thinks

14   an earlier conference is appropriate, I'm certainly open to

15   that.

16              Any thoughts, Mr. Denton?

17              MR. DENTON:  Sorry, your Honor.  I'm just checking on

18   some of the earlier, the other scheduling dates that we have on

19   the calendar.

20              I think that probably makes sense, your Honor.  I

21   would suggest that that may be a good opportunity for us to

22   talk about what would be required as far as any hearings at the

23   Section 6(c) stage and to think about the logistics and

24   scheduling of that.

25              THE COURT:  That's part of why I thought the timing
```

M2eWschC

1    made sense.

2                 Mr. Schulte, do you have a view on that?

3                 THE DEFENDANT:  What day is that, April 8?

4                 THE COURT:  April 8 is a Friday, but I think we would

5    have a conference, and I would propose the following week

6    sometime.

7                 THE DEFENDANT:  I just note for the Court Mondays I'm

8    always, I have phone calls scheduled and stuff like that, so --

9                 (Counsel conferred with defendant)

10                THE DEFENDANT:  Family calls, yeah.

11                THE COURT:  OK.

12                Mr. Hartenstine, do you have a thought on timing here?

13                MR. HARTENSTINE:  Your Honor, I'm available, and I

14    think it makes sense, perhaps, to get together and discuss what

15    Section 6 may look like.

16                THE COURT:  All right.  So how about Wednesday, April

17    13, at 3:30, as a date?

18                Any problems with that from you, Mr. Denton?

19                MR. DENTON:  Just a moment, your Honor.

20                That's fine with the government, your Honor.

21                THE COURT:  Hang on one second.

22                Right.  Mr. Schulte, I assume the 13th at 3:30 is fine

23    with you.

24                (Defendant conferred with counsel)

25                MS. SHROFF:  Yes, that's fine.

M2eWschC

1          THE COURT:  Ms. Shroff, I meant you as well, and

2   Ms. Colson.

3          MS. SHROFF:  It's fine with me.

4          THE COURT:  Ms. Colson.

5          MS. COLSON:  Fine, your Honor.

6          THE COURT:  Mr. Hartenstine.

7          MR. HARTENSTINE:  Yes, your Honor.

8          THE COURT:  All right.  Let's put it down for

9   Wednesday, April 13, at 3:30.

10          I will ask that both sides submit preconference

11   letters, let's say, by that Monday, the 11th, just flagging

12   anything that you think we ought to discuss and any proposals

13   that you have with respect to the schedule thereafter, just to

14   facilitate that conference.

15          Anything else other than speedy trial application from

16   the government, Mr. Denton?

17          MR. DENTON:  Just that, your Honor.

18          THE COURT:  Do you want to make the application?

19          MR. DENTON:  Yes, your Honor.

20          In view of the complexity of this case and the need

21   for the defendant to consider any potential additional motions,

22   including the ones he's been authorized to file, and in the

23   interest of justice, we would move to exclude time under the

24   Speedy Trial Act.

25          THE COURT:  Any objection, Mr. Schulte?

M2eWschC

1              THE DEFENDANT:  No objection.

2              THE COURT:  All right.  I will exclude time under the

3     Speedy Trial Act.  I think technically it's automatically

4     excluded by virtue of the motions that are filed and currently

5     being briefed, but in any event, I find that it is in the

6     interest of justice to exclude time between now and April 13,

7     the next conference, to allow Mr. Schulte to prepare the

8     additional filings that are coming down the pike, to allow him

9     to review the discovery, both classified and unclassified, and

10    prepare for trial, given the complexities of the case.

11             Anything else from you, Mr. Schulte?

12             THE DEFENDANT:  No.

13             THE COURT:  All right.  I will enter an order

14    memorializing what we've done here and likely attach to that

15    order the draft protective order for you guys to give me any

16    further thoughts on.

17             With that, thank you for your patience, and we are

18    adjourned.  Have a good day.

19             (Adjourned)

20

21

22

23

24

25