Filed with the Classified
Information Security Officer
CISO
Date 5/24/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-                                                          S3 17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

                            *Defendant.*

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
## (1) TO SUPPRESS EVIDENCE SEIZED FROM GOOGLE, GITHUB, AND REDDIT;
## (2) FOR SEVERANCE / BIFURCATION OF TRIAL;
## (3) TO PRECLUDE THE GOVERNMENT FROM INTRODUCING TESTIMONY OR EXHIBITS DERIVED FROM THE FORENSIC CRIME SCENE DENIED TO THE DEFENSE;
## (4) TO COMPEL CLASSIFIED DISCOVERY;
## (5) TO SUPPRESS NON-RESPONSIVE AND ATTORNEY-CLIENT PRIVILEGED DOCUMENTS SEIZED FROM MCC

Joshua Adam Schulte
Slave #79471054
Metropolitan Detention Center (MDC)
P.O. Box 329002
Brooklyn, NY 11232

## TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES...................................................................... ii

II.   MOTION TO SUPPRESS GOOGLE/REDDIT/GITHUB SEARCH
WARRANT ......................................................................................................1

  A.   Nexus .......................................................................................................1

    1.   Nexus to search Google..........................................................................1

    2.   Agent Donaldson's purported "training and experience"............................3

    3.   Nexus to search GitHub and Reddit...........................................................3

    4.   Staleness ................................................................................................4

    5.   Totality of the circumstances ...................................................................5

  B.   Particularity and Overbreadth .................................................................5

  C.   The Good-Faith Exception .......................................................................6

III.   MOTION FOR SEVERANCE / BIFURCATION ...........................................6

  A.   The MCC and WikiLeaks Counts are improperly joined ..........................7

  B.   Speedy Trial and Special Administrative Measures (SAMs) ......................8

IV.   MOTION TO PRECLUDE .........................................................................9

V.   MOTION TO COMPEL CLASSIFIED DISCOVERY...................................12

VI.   MOTION TO SUPPRESS NON-RESPONSIVE / PRIVILEGED DOCS....15

  A.   Non-responsiveness.................................................................................16

  B.   Attorney-Client Privilege .........................................................................17

    1.   Malware of the Mind................................................................................17

    2.   $50 Billion..............................................................................................19

    3.   Passwords page is protected by attorney-client privilege...........................19

    4.   "Information War" and GX 806 p.2-3 .......................................................20

    5.   GX 806 p. 1 ...........................................................................................20

# I. TABLE OF AUTHORITIES

## Cases

*Boyd v. United States*,
116 U.S. 616 (1886).............................................................................................16

*Bullcoming v. New Mexico*,
564 U.S. 647 (2011).............................................................................................10

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009).............................................................................................10

*Stuart v. Alabama*,
139 S. Ct. 36 (2018).............................................................................................10

*United States v. Defonte*,
441 F.3d 92 (2d Cir. 2006) ..................................................................................19

*United States v. Ganias,*
824 F.3d 199 (2d Cir. 2016) ...........................................................................9, 11

*United States v. Ortiz*,
857 F.2d 900 (2d Cir. 1988) ..................................................................................7

## Rules

Fed. R. Crim. P. 16 ..............................................................................................13

## Constitutional Provisions

U.S. Const. amend. I ...............................................................................................7

U.S. Const. amend. IV ..........................................................................................16

## II.   MOTION TO SUPPRESS GOOGLE/REDDIT/GITHUB SEARCH WARRANT

The government claims Mr. Schulte previously moved to suppress the online accounts warrants, Opp. at 9, but as explained in the Opening Mem. at 1, the July 3rd motion sought suppression of the apartment warrant based on the underlying probable cause—which was *shared* by many search warrants. The arguments presented in the instant motion accept the Court's original decision, and instead, specifically challenge whether the online accounts warrants establish the requisite nexus between the established probable cause and the accounts to seize; *this issue was never previously litigated.* Indeed, the government acknowledges that Judge Crotty's "Suppression Decision did not expressly address the defendant's challenges to the electronic accounts search," Opp. at 15, as prior counsel never specifically raised the challenges herein. Accordingly, this court should find that the instant motion has never before been briefed, or at the very least, that reconsideration is warranted as it would be a manifest injustice to merely ignore the entire suppression motion, of which there is no official judicial ruling.

### A.   Nexus

#### 1.   Nexus to search Google

The government criticizes Mr. Schulte's characterization of probable cause, but merely reiterates his position. Opp. at 18. Indeed, the government's sole deviation is its claim that Mr. Schulte "discuss[ed] uploading stolen classified information to the internet in October 2016." Opp. at 17. In reality, he sent an email detailing security vulnerabilities; this does not contribute to probable cause as it simply states the data could be downloaded and uploaded to the internet *from within the CIA*—not through *online accounts*. See Ex. A (GX 1616).

Thus, the government's theory is that since Mr. Schulte discussed the Leak with former colleagues then there must be probable cause to believe his email/phone accounts contain NDI.

1

This is absurd—commiserating the loss of the group's work over text messaging hardly establishes probable cause to believe the Google account was involved in the leak; the government fails to establish that the online accounts even existed at the time of the leak, let alone that they were somehow used in commission of the crime. Additionally, these messages with colleagues that he regularly communicated in no way demonstrates a guilty conscience. Tellingly, the government does not even highlight these "suspicious" communications. As the Court can see from Exhibit B, Mr. Schulte's communication with his former colleagues is neither suspicious nor demonstrative of a guilty conscience. Mr. Schulte opens communications about the Vault 7 release with people he regularly communicated; obviously this is big news since the leaked information derives from shared work. The conversations all quickly shift from the Vault 7 news to typical conversations. Not once does Mr. Schulte believe he is a suspect—not until he is asked by government confidential source Tandeep███ who calls him and *tells him everyone at work suspects him*—which is the point that upsets Mr. Schulte and finally triggers his requests to coworkers if they actually believe he could be responsible. Ex. B at 3. These are not "innocent interpretations," Opp. at 18, but there is simply no sincere examination or interpretation of these communications that could possibly "demonstrate a guilty conscience." *Id. Notably, the government never introduced these text messages nor argued guilty conscience at trial*.

Next, the government makes absurd and baseless assertions that the affidavit "establishes probable cause that geolocation information…, identity of the user(s) of the account…, other computers or online accounts…, and of passwords or other information needed to access such computers and accounts would be found in the Google account." *Id.* The affidavit does not establish this at all—it does not reference a single iota of probable cause for any of these searches. The government continues this absurd argument when it claims that the affidavit

establishes "substantial evidence that internet-based accounts were used to commit the Subject

Offenses and would contain evidence relating to the commission of the Subject Offenses." *Id.*

Once again, *no* such evidence exists, let alone "substantial evidence." The government never

established with any probability how the data was taken nor how it was transmitted to

WikiLeaks—be it through the internet, dead drop, or in person. That WikiLeaks ultimately

published the data on the internet has no bearing on how it received it—and thus does not

contribute to probable cause as the government erroneously asserts. Opp. at 17. There was no

nexus between the alleged crime and the Google Account, rendering the search warrant

unconstitutional. See Opening Mem. at 4-5.

## 2. Agent Donaldson's purported "training and experience"

Next, the government attempts to rebut Mr. Schulte's argument that Agent Donaldson's

assertions about his training and experience are simply boilerplate conclusory statements not

based upon any facts. Tellingly, the government does not reference a single case Agent

Donaldson worked nor a single training that would provide insight based on the circumstances

and characteristics of this case. The government simply reiterates that Agent Donaldson's arcane

training and experience lead him to the ultimate conclusion, *ipse dixit*, that Mr. Schulte must

have used his online accounts to commit the alleged offenses. Opp. at 19-20. As Mr. Schulte

explained in his Opening Mem. at 7-10, even if the purported training and experience were

factual, this sole clause does not magically transform an arrest warrant into a search warrant—it

is simply insufficient to establish probable cause for a search. See Opening Mem. at 7-10.

## 3. Nexus to search GitHub and Reddit

The government simply ignored Mr. Schulte's arguments relative to GitHub and Reddit.

That someone posted a link to Mr. Schulte's GitHub account on Reddit and suggested Mr.

3

Schulte as a possible suspect simply does not establish probable cause—the FBI or a cooperator could have posted the link; that some random person on the internet accuses someone else of a crime cannot possibly be probable cause in and of itself—the government should actually conduct an *investigation*. Furthermore, the fact that Mr. Schulte used Atlassian software, such as Confluence, *outside* of the CIA cannot possibly establish probable cause that Mr. Schulte must have leaked the internal Confluence data *inside* the CIA. See Opening Mem. at 6:

> This would be like asking a judge for a search warrant to seize the account because it mentioned "toasters, microwaves, and cookies" and people who worked at the CIA also used them. Absurd.

### 4. Staleness

Contrary to the government's assertions, the staleness argument here is completely different from that argued in the July 3, 2019 suppression motion—there Mr. Schulte argued the evidence was too stale to justify searching Mr. Schulte's home—whereas here, Mr. Schulte argues staleness principally because the government failed to establish when Mr. Schulte created the electronic accounts; they must exist at the time of the alleged crime if they can possibly contain any evidence of the crime. The fact that WikiLeaks published the Leaked information in 2017 has absolute no bearing on the staleness since the government does not establish when WikiLeaks obtained it, let alone that Mr. Schulte's online accounts were involved in any way whatsoever with the transfer to WikiLeaks. Indeed, the only evidence the government presents is that the online accounts existed *after* the leaked classified information was published on WikiLeaks. See Opening Mem. at 10-11.

The government's assertions that "deletion attempts are often unsuccessful," Opp. at 22, contrast significantly with the government's search warrant, Opening Mem. at 11-12, and Mr.

4

Schulte's expertise as a malware developer for the CIA specializing in data hiding, cryptography, and digital forensics; Mr. Schulte wrote forensic utilities for the CIA. Based on this sophistication and expertise, it is highly unlikely if not impossible for Mr. Schulte's deletion attempts to be "unsuccessful."

### 5. Totality of the circumstances

Given the totality of the circumstances, the online accounts warrants failed to establish the requisite minimal nexus between the crime and online accounts. See Opening Mem. at 13:

In summary, given (1) no factual basis linking Mr. Schulte's online accounts to the alleged theft in 2016 and (2) no establishment that the online accounts even existed in 2016, the affidavit provided no factual basis to conclude incriminating evidence would be found on Mr. Schulte's online accounts in 2017. Additionally, considering (3) Donaldson's conclusory statements about "training and experience" are patently false, (4) the year-long period between the alleged theft of the national defense information (March 2016) and the application for the search warrant (March 2017), (5) Mr. Schulte's acknowledged expertise in computers and covert operations, and (6) no incentive to retain the national defense information after transfer, it is almost a certainty that, even if Mr. Schulte were guilty, his online accounts in 2017 would contain absolutely no evidence of the alleged crime.

### B. Particularity and Overbreadth

The government's particularity rebuttal is erroneous; the government relies extensively upon case law regarding searches of electronic devices, from which defendants can manipulate and store data in any format or location. However, this is not the case when seizing data from the online accounts—the data is already segregated by the provider, and the defendant cannot manipulate the types of data stored. Google stores emails as emails—the defendant cannot dictate to Google or manipulate Google to store non-email content as emails. The same is true for GPS data, pictures, etc. Since Google already segregated the data into different categories,

5

the government cannot seek a general warrant to seize all the data and re-categorize the data.

Accordingly, the government must present probable cause for each distinct type of data it seeks.

The government additionally failed to ever segregate non-responsive data, but rather, seized the

entire account and considered the entire account and all content "responsive." Finally, "part III of

Attachment A," Opp. at 25 does not cure particularity, because it does not provide a limited

scope *in relation to the established probable cause.* Particularity fails.

### C.    The Good-Faith Exception

As explained in the Opening Mem. at 25-29, the online accounts search warrant was so

lacking in indicia of probable cause, and the face of the warrant was so plainly overbroad, no

reasonably well-trained officer could have possibly believed it to be valid. Mr. Schulte did not,

as the government suggests, "mischaracterize" the affidavit, Opp. at 26. Agent Donaldson simply

supplied no evidence linking the target accounts to the alleged crime, and his conclusory

statements based upon his purported training and experience is a textbook example of a "bare

bones" affidavit; it lacks the facts and circumstances from which a magistrate can independently

determine probable cause. Accordingly, the good faith exception does not apply, and all fruits of

the online accounts searches must be suppressed.

### III.    MOTION FOR SEVERANCE / BIFURCATION

The government argues that the Court's previous Order denying a *Curcio* hearing or

severance based upon a conflict-of-interest is relevant to the instant motion, Opp. at 29; however,

the previous motion sought a solution to the conflict-of-interest—it is not related at all to the

instant motion. Furthermore, the government claims that Mr. Schulte does not point to a single

instance of prejudice in the entire trial record. *Id.* The obvious prejudice of the jury's notification

that Mr. Schulte was incarcerated and presumed guilty aside, due to the conflict-of-interest, the

new trial will be completely different from the previous trial; Mr. Schulte intends to introduce evidence that he (i) wrote attorney-client privileged notes in notebooks based upon advice from counsel, (ii) that the documents the government allege contained NDI were only shown to counsel, (iii) that the alleged NDI was not "closely held" and therefore protected by the First Amendment, and (iv) that Mr. Schulte never intended to release the information. Thus, the previous trial record is not relevant to prejudice for the new trial.

### A.   The MCC and WikiLeaks Counts are improperly joined

The government first claims it can introduce evidence of the defendant's motive and intent of one to the other; however, it is clearly established law that, where the Defendant relies upon a defense of mistaken identity, "evidence of other acts is not admissible for proving intent*." United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir. 1988).

The government's next claims related to the "manner" in which the crimes were committed is equally without merit. The government argues that Mr. Schulte somehow stole the NDI from the CIA and then somehow transmitted it to WikiLeaks, using some unknown sophisticated means. This is substantially different from writing information by hand in an attorney-client privileged notebook at the advice of counsel. While the government alleges Mr. Schulte used "contraband cellphones, unattributed email and social media accounts, and encrypted email facilities to communicate about and disseminate national defense information from the MCC." Opp. at 30, in reality the MCC counts are accusations of "attempt." And indeed, none of the cellphones, unattributed email, or social media accounts contained NDI—nor plans or communications regarding disseminating NDI. Accordingly, writing attorney-client privileged notes to attorneys and transmitting information by some unknown mechanism are simply as dissimilar as two things can possibly be.

7

As for "logically linked," the government simply argues that "[t]he defendant's knowledge relating to national defense information gained from his time at the CIA is relevant." However, the government's own admission that the "attempted" transmissions from the MCC contain information previously disseminated by WikiLeaks, harm, rather than support the government's argument. Mr. Schulte did not need any knowledge or information from the CIA, as anyone could (and ultimately did) discuss the documents *publicly released by WikiLeaks*. The two charges are simply not logically linked at all.

## B. Speedy Trial and Special Administrative Measures (SAMs)

One of the primary reasons this Court should issue severance is due to the indefinite solitary confinement and other conditions imposed through SAMs—as a result of the false MCC allegations; this Court previously refused to intervene in Mr. Schulte's confinement conditions— including indefinite solitary. Thus, Mr. Schulte has a very strong reason for severance—once acquitted of the MCC counts, as is required by law since the alleged NDI was on the internet and not "closely held," the attorney-general will have no reason to continue Mr. Schulte's barbaric torture in an American concentration camp.

The government posits that severance will "delay, rather than speed, the resolution of the charges." Opp. at 31. This is absolutely preposterous. Mr. Schulte is prepared for a trial on the MCC counts immediately. The trial would be one day, and would not impact the next trial.

\*\*\*

There is simply no reason to combine the WikiLeaks and MCC charges into a single trial; it not only fails to advance justice, but rather, hinders it. Moreover, the government does not even respond to the compromise of a **bifurcated** trial. How could it possibly hinder justice or the public to bifurcate the two completely separate allegations?

8

## IV.   MOTION TO PRECLUDE

The government claims that the Court's denial of Mr. Schulte's request for access to the digital forensic crime scene somehow prevents Mr. Schulte from moving to preclude the government's reliance on the same information. Opp. at 34. Mr. Schulte never sought the relief requested in the instant motion, and thus, it cannot be considered a motion for "reconsideration." The sole basis for the instant motion is that Mr. Schulte's forensic expert cannot verify or reproduce the government's expert's test results, assist in cross-examination, conduct independent analysis, and ultimately, the defense cannot subject the government's case to adversarial testing; therefore, the government must be precluded from relying upon this data.

The primary point of contention is the fact that digital forensics is a science that depends upon interpretation by experts. Lawyers, the Court, and the jury cannot competently and independently review computer forensics as if it were a simple stack of papers to read; experts are required to conduct forensic examinations, interpret and analyze the data, and form *testable* expert opinions based upon the complete forensic record. Accordingly, the government's repeated assertions equating the forensic crime scene to mere "government records," Opp. at 38, and reliance on cases from the 1980s involving hardcopy documents is inapposite and irrelevant. Moreover, the government itself argued the critical importance of obtaining the *complete* forensic image of digital devices for experts to conduct *full forensic examinations*—which this circuit acknowledged. See *United States v. Ganias,* 824 F.3d 199 (2d Cir. 2016). Indeed, forensic images *of the alleged crime scene* are not mere "government records" any more than DNA, hair samples, or clothing fibers found at the scene of the crime. Could the government argue the DNA discovered at a murder scene are "government records" that the defense cannot access or review? Could the government claim its own experts can review the DNA, and testify at trial that the

9

DNA belongs to the defendant while simultaneously refusing to allow defense experts equal access to analyze the DNA and present its own conclusions? Thus why is it acceptable to do so for digital forensics?

The most important and distinguishing characteristic of both forensic science and digital forensics is that the prosecutors cannot determine whether *Brady* material exists—instead, they rely upon the analysis of their forensic experts—**analysis that could be wrong, biased, or intentionally fabricated**. Indeed, independent analysis is as necessary for digital forensics as it is for other forensic sciences or any field of expertise. "More and more, forensic evidence plays a decisive role in criminal trials today. But it is hardly 'immune from the risk of manipulation.'" *Stuart v. Alabama*, 139 S. Ct. 36 (2018) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318 (2009)). "A forensic analyst 'may feel pressure-or have an incentive-to alter the evidence in a manner favorable to the prosecution.'" *Ibid.* "Even the most well-meaning analyst may lack essential training, contaminate a sample, or err during the testing process." See *ibid*; see also *Bullcoming v. New Mexico*, 564 U.S. 647, 654 n.1 (2011) (documenting laboratory problems). "To guard against such mischief and mistake and the risk of false convictions they invite, our criminal justice system depends on *adversarial testing and cross-examination.*" (emphasis added). *Ibid.* Accordingly, Mr. Schulte is entitled to adversarial testing and independent analysis—he need not put his faith entirely into the hands of government experts, who are clearly not incentivized to "find" holes in their theories, evidence outside their bias, or exculpatory evidence helpful to Mr. Schulte. Only by subjecting the government's case-in-chief to adversarial testing can Mr. Schulte receive a fair trial and justice be done.

The government's argument focuses on "particular forensic artifacts" and the fact that their experts will not testify regarding "any information from the complete images beyond what

10

was produced to the defense." Opp. at 37. However, the government experts could not form their opinions or discover the specific documents the government intends to introduce at trial *without conducting a full forensic examination of the complete forensic images*. Furthermore, the expert's determinations to use or exclude evidence cannot be reviewed—not even the prosecutors are involved in the expert's decisions and interpretations of data. Moreover, as the Second Circuit firmly established in *United States v. Ganias,* 824 F.3d at 212, reviewing complete forensic images is necessary since digital data is interspersed throughout the medium, and therefore requires analysis of the *whole* to examine any *particular* file or data. **No forensic expert can verify another's conclusions and observations based solely on individual files pulled from the complete forensic image.** Accordingly, as it stands, Mr. Schulte's expert cannot opine to the government expert's claims without similar access—he cannot verify nor reproduce the government's results—as required by the scientific method.

Furthermore, the defense cannot even authenticate the forensic images. Upon the scant discovery provided by the government, the defense found several instances that indicated the forensic images were tampered with—potentially introducing fabricated evidence or even destroying exculpatory evidence. Yet, without a full forensic examination, the defense cannot make a motion to preclude based on taint, nor can it state whether the taint was deliberate.

This is an adversarial justice system. The government must allow the defense to put their theory to the test; the government must allow independent analysis and adversarial testing. The government cannot tell a defendant he has no right to conduct an independent review of the DNA from the crime scene. The government cannot tell a defendant that he has no right to hire an expert to evaluate the DNA. The government cannot tell a defendant he must accept the government's expert's findings as absolute truth.

11

Accordingly, since the government asserts the digital forensic crime scene is too classified to provide to the defense, and since the defense expert cannot subject the government's expert's opinions and analysis to adversarial testing—he cannot verify the test results, replicate the tests, conduct his own analysis, or even help the defense in cross-examination, but rather, must accept the government's conclusions—then the government cannot rely upon any of this evidence and related testimony at trial.

Finally, if the Court declines to grant the motion to preclude, this time Mr. Schulte will not merely file a letter with the Court that his expert cannot testify, Dkt. 335, but he intends to bring the issue out on direct. Mr. Schulte's expert will testify at trial the significance of reviewing the complete forensic image, that he was not authorized to conduct a similar forensic examination, that he cannot testify as to the validity of the government's expert's reports, and that exculpatory evidence may exist on the complete forensic images that the government experts missed or deliberately hid from the defense. Mr. Schulte will then argue that the jury should interpret the government's refusal to turn over the complete forensic images as hiding exculpatory evidence from the defense; Mr. Schulte will pose a hypothetical to the jury—how would they like to be on trial for their life where the government refuses to turn over the evidence for their expert to conduct a full forensic examination that may prove their innocence? If they would not like to be treated thus, then they must acquit. Mr. Schulte has a right to this defense, because it is the official testimony of his expert witness with decades of experience.

## V. MOTION TO COMPEL CLASSIFIED DISCOVERY

The government first asserts that it produced the March 3 and 4, 2016 Confluence backups; however, the government removed all the CIA material from these backups, so they are empty and utterly useless. The government then asserts it *temporarily* provided the unredacted

12

Confluence backups to the defense expert *via* the CIA two years ago; this is insufficient. First of all, it is inappropriate to provide proper Fed. R. Crim. P. 16 discovery at the CIA—the defense and defendant cannot review this discovery nor is it properly preserved on appeal (Mr. Schulte has never reviewed the data, and his expert has not had access since the small window provided him two years ago). There is no reading nor exception in Fed. R. Crim. P. 16 that allows the government to temporarily provide discovery in a severely restricted environment at the CIA (this is literally the point of the SCIF). The Court should order the government to produce the Confluence backups directly to the defense at the SCIF. Next, the government alleges Mr. Schulte stole and transferred both Confluence and Stash to WikiLeaks, but refuses to provide the Stash backups (the defense cannot even verify if the leaked WikiLeaks data originated from a Stash backup); accordingly, the Court should order the government to also produce the Stash backups, in their entirety, at the SCIF.

Finally, Mr. Berger's analysis depended upon access to *ALL* the Stash and Confluence backups. Mr. Berger looked at the published WikiLeaks data, and compared it with each and every backup until he found the closest match. The defense must have this same opportunity— the defense believes the backups were not from March 2 or March 3, 2016, and should have the ability to present evidence that the WikiLeaks data derived from a later backup, from which Mr. Schulte could not have possibly stolen since he did not even work at the CIA. Moreover, Mr. Schulte's expert cannot validate Mr. Berger's analysis without access to the same materials. The government compares this request with a search of a government DNA database so the expert can "search for a better match." Opp. at 42. This is not an accurate analogy, because in actuality the DNA database would not belong to the government, but the alleged victim, and indeed, was the very database allegedly pilfered; but also, the government's own expert relied upon this

13

database for his conclusions, and intends to testify at trial regarding his search of this database. A DNA analogy simply does not work here.

The best way to explain for the Court is that the CIA essentially took a picture of all its data each day. A subset of the CIA's data was eventually leaked, and thus the government seeks to compare the leaked data with all of the CIA's daily pictures until it finds the picture with the closest match without any new information that does not exist in the leaked data—and hence, establish a timeline as the data must have been taken on that day (e.g. "Doc1" was modified on 1/1, 1/2, 1/3, and 1/4; the leaked data represents edits from 1/3 and must have been leaked 1/3).[1]

Thus, particularly because the CIA does not know what data was taken, but relied entirely upon this timing analysis, the defense is entitled to the same analysis as the government—to compare each daily picture with the released content, and to put forth its own conclusions as well as challenge the government's expert's opinion. With access to only the government's purportedly stolen backup, the defense cannot conduct any adversarial testing. Accordingly, the Court should order the government to produce all the daily Stash and Confluence backups for the defense to conduct similar analysis, or, in the alternative, to preclude the government's reliance on these materials, and any fruits born thereof, including Berger's timing analysis.

As for the Email and Chat Messages, the government's primary argument at trial was Mr. Schulte's unhappiness with the CIA. Accordingly, it is necessary to review each and every email and chat message sent to and from Mr. Schulte—even those that may not be necessarily relevant

---

[1] Of course, the government ignores the obvious fact that WikiLeaks and the leaker would know the CIA would perform this analysis and thus would specifically disclose *older* documents so as to conceal the actual backup(s) or other data that was actually stolen; thus this analysis only provides a *lower bound* on the date

14

to the charged conduct—in order to review subtleties such as tone, word use, etc. to rebut the government's arguments for motive.

As for the polygraphs, the government continually claims it was never "adjudicated"; however, it is Mr. Schulte's *security reinvestigation* that was never adjudicated   not his polygraph. Indeed, the polygraph results are immediately available

███████████████████████. Additionally, the polygrapher's results are always immediately available   if someone fails a polygraph, which is actually fairly common, ██

███████████████████ Additionally, Mr. Schulte ████████████

█████████████████████████ and the polygrapher himself told Mr. Schulte

█████████████████████████████████. Thus, at the very least,

an evidentiary hearing is required to determine which party is correct.

Moreover, Mr. Schulte intends to introduce the CIA polygraph at the upcoming trial. While normally polygraphs are inadmissible, the CIA made substantial scientific advancements on its polygraph, which the medical and scientific community would acknowledge, and which would be admissible at trial. Mr. Schulte has the right to present this evidence to the Court for its ultimate evaluation of the admissibility of the CIA's polygraph; however, Mr. Schulte cannot do so without all the polygraph data recorded and maintained by the CIA.

## VI.    MOTION TO SUPPRESS NON-RESPONSIVE / PRIVILEGED DOCS

Contrary to the government's assertions, the defense never before moved to suppress these specific documents due to privilege and non-responsiveness; the privilege of the documents was not waived, as erroneously argued by the government, since the defense argued they were privileged, and due to a conflict-of-interest refused to reveal the privilege (several items such as Malware of the Mind were specifically discussed in *ex parte* hearings). Dkt. 259. The

15

government even acknowledged that the defense did not previously argue privilege, but rather *relevance and prejudice*. Opp. at 50. The defense clearly informed the government that the conflict was not resolved, and that the issue of privilege remained. Dkt. 282 at 2. Thus, if the Court considers the instant motion a request for "reconsideration," the requirements are clearly met since there is no longer a conflict-of-interest, and Mr. Schulte freely asserts the privilege.

### A.    Non-responsiveness

Regarding non-responsive seizures of the documents, the government claims it had the authority of a general warrant to seize "[a]ny and all notes..." Opp. at 54; however, as argued in the Opening Mem., such a search is an insufficiently particular general warrant—which is why Agent Donaldson specifically added *"in particular, the documents bearing the following titles or descriptions."* This statement meets the particularity requirement, as it ties the alleged probable cause in the warrant to specific, related documents to seize. Yet, the FBI ignored this particularity statement, executed a general warrant, and indiscriminately seized all papers. "And enshrined in the Fourth Amendment is the fundamental principle that the Government cannot come into one's home looking for some papers and, without suspicion of broader criminal wrongdoing, indiscriminately take all papers instead." *Boyd v. United States*, 116 U.S. 616, 626-27 (1886). This Court should therefore find the government's search and seizure of any documents that were not related to the probable cause "established" by the MCC search warrant, specifically with titles and descriptions of the 9 unclassified Schulte Articles, unconstitutional.

Moreover, even if the Court agrees that the government can execute a general warrant, the warrant clearly specifies that the documents must pertain to NDI. Yet, the government never sorted the documents into responsive and non-responsive documents. Instead, the greedy government seized and read each and every word Mr. Schulte wrote, hoping to twist his words

16

into anything they could use against him. This is not what a search warrant authorizes. None of the documents mention NDI or are related to NDI whatsoever. Accordingly, the Court must find these documents, however much the government would love to twist them at trial, are not *responsive* to the MCC search warrant, and must be suppressed.

## B.    Attorney-Client Privilege

In addition to non-responsiveness, the following documents are also protected by attorney-client privilege. Mr. Schulte began using and writing in notebooks at the advice of counsel; he regularly shared the notebooks with counsel and turned them over completely after the notebooks were filled (eventually—at the next scheduled visit). Indeed, there are multiple filled notebooks that Mr. Schulte provided to his attorneys before the government's seizure (Defense counsel moved these notebooks into the SCIF out of an abundance of caution).

### 1.    Malware of the Mind

The government claims Malware of the Mind is not privileged because it was "addressed 'To my fellow engineers and the tech industry,'" it was continually "edited," and other articles were publicly published. Opp. at 54-55. However, Mr. Schulte irrefutably proved in his Opening Mem. that the document was (1) communicated only between him and his attorney, (2) was intended to be, and in fact were, kept confidential, and (3) was created solely to update his newly assigned attorneys to his case and request legal advice (discusses bail hearings 5-40, frustration with procedure 40-42, discusses illegal search warrants and requests for suppression 43-58, outlines government lies in initial complaint 59-86, etc.); regardless of the claimed recipient, the document was never publicly released nor intended for release. It should be noted that Mr. Schulte did write several other documents for public release, but provided them to counsel for approval—thereby rendering the document protected by privilege; counsel did not sign off, so

17

Mr. Schulte changed his mind based upon advice from counsel and did not release those documents (which were given over to counsel and never publicly released). Accordingly, even if Mr. Schulte intended to publicly release a document, the act of providing it to counsel for *review and advice* shields the document by attorney-client privilege as Mr. Schulte seeks legal advice— whether or not counsel approves the document for public dissemination. Accordingly, the relevant test is whether the document was communicated to counsel for legal advice (including approval for release) and whether it was ever publicly released. It is clear here that Mr. Schulte wrote and provided the document to counsel, and never intended nor released the document.

Next, the government's claims that Mr. Schulte was "editing" it for release are clearly refuted in the privileged notebooks; plans to completely rewrite something is not "editing." See Opening Mem. at 26 (noting plans to completely "rewrite Malware of the Mind"). Finally, the fact that Mr. Schulte published other documents—the nine unclassified Redress of Grievances— only hinders the government's position. Malware of the Mind was written in early 2018, and Mr. Schulte had plenty of opportunity to publish it if he so desired—as evident by the publication of his redress of grievances; yet, he did not do so. Malware of the Mind was not uploaded to the internet, it was not found on any of the phones, and the only references to it in his notebooks were about completely rewriting it. None of this is "self-serving"; Mr. Schulte filed a declaration under penalty of perjury, he referenced witnesses Sabrina Shroff and Hannah Sotnick, he referenced the very privileged notebooks the government introduced against him at trial that indicate his plans not to release the document, but to "rewrite it," and finally the government acknowledges that the document was kept confidential. The government's fantasy that Mr. Schulte committed thought crime and *intended* to release Malware of the Mind at some indeterminate time is simply not based on any facts.

18

## 2.   $50 Billion

The government claims this statement has nothing to do with legal advice. Opp. at 56. It should first be noted that this is a word-for-word verbatim conversation with his attorney. The government cannot review Mr. Schulte's privileged conversations and then pick out things it does not believe relate to Mr. Schulte's defense to use against him. "The memorializations of private conversations [defendant] had with her attorney are protected from disclosure by the attorney-client privilege." *United States v. DeFonte*, 441 F.3d 92, 95 (2d Cir. 2006). Moreover, the $50 Billion conversation *did* entail legal advice; Mr. Schulte asked how to file suit against the government, FTCA requirements, how to preserve challenges, if there was anything that must be done in the criminal case to preserve the challenges, and what lawful actions he could take against the United States once released. All of these are protected by attorney-client privilege. And based on his attorney's advice, Mr. Schulte *did* file FTCA grievances along with a civil suit against the government for *$50 billion* and preserved his claims for false arrest, false imprisonment, illegal search warrants, etc. See *Schulte v. Attorney General of the United States, et al.*, 19-CV 3346 (PAC, S.D.N.Y.), drafted shortly after the conversation in December 2018, and filed in March 2019. There simply is not a shred of evidence that this was some "extortionist" threat, especially considering it is literally a verbatim memorialization of a private conversation with his attorney (the government abandoned this claim in its summation at trial).

## 3.   Passwords page is protected by attorney-client privilege

Clients routinely give their attorneys passwords and access to online accounts. Indeed, what if a client actually is guilty of a crime and gives his attorneys passwords to accounts that prove his guilt? What if a client informs his attorney that he is guilty? Can the government claim these communications are not protected by privilege? Thus, the government's arguments regarding the passwords page is ludicrous. Mr. Schulte wrote down online accounts he thought

19

could be useful for his defense, and provided them to counsel—the government provided no evidence the accounts contained probable cause nor did they even seek to seize the accounts.

### 4. "Information War" and GX 806 p.2-3

A strategy to engage with the media is protected by attorney-client privilege even if the resultant disclosed data is not. Mr. Schulte is not arguing that his published unclassified articles should be protected by privilege; he asserts that his *discussions* with attorneys about engaging with the media, and his reference to this as an "information war" to win the "hearts and minds" is protected by attorney-client privilege. The privilege functions to "encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." Mr. Schulte had many conversations with his attorneys about engaging with the media—he even provided his redress of grievances to counsel for approval for publication; he sought advice from counsel, and began discussing his plans for the information war over the truth. Mr. Schulte believed this would be beneficial to his defense, and his *discussions* with his attorneys about the *strategy* to engage with the media—particularly whether it would be lawful or helpful—is protected by attorney-client privilege.

### 5. GX 806 p. 1

The government absurdly argues that Mr. Schulte's statements about "how he developed file partition tools for classified operations" and his statement to request WikiLeaks for assistance are not protected by privilege. Opp. at 55. Mr. Schulte's discussion with his attorneys and his request that they reach out to WikiLeaks for assistance—assuming WikiLeaks would assist an innocent man as much as possible without revealing their true source—is undoubtedly protected by privilege. Mr. Schulte's background, particularly as relates to forensics, is relevant and important to the case. This note was written for, and literally discussed directly with counsel.

20

Respectfully Submitted,
Josh Schulte