UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

              *Defendant.*

S3 17 Cr. 548 (JMF)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS SEIZED ATTORNEY-CLIENT PRIVILEGED EMAIL

Joshua Adam Schulte
Slave #79471054
Metropolitan Detention Center (MDC)
P.O. Box 329002
Brooklyn, NY 11232

## TABLE OF CONTENTS

I. THE EMAIL IS ATTORNEY-CLIENT PRIVILEGED AND MUST BE SUPPRESSED ...................................................................................................... 1

    A.    The Email was written at direction from counsel .......................................... 1

    B.    The Email is not a "Schulte Article" and was never publicly disclosed ....... 1

        1.    The government tries to conflate the "Schulte Articles" with The Email to confuse the Court ................................................................................................ 2

        2.    Mr. Schulte never sent The Email to anyone other than counsel ................. 3

    C.    The Email was forwarded by Mr. Schulte's attorney to Mr. Presnall unbeknownst to Mr. Schulte ................................................................................... 4

        1.    Mr. Presnall worked as a party to the defense ............................................. 4

        2.    Mr. Schulte never directed his attorney to send The Email to Mr. Presnall . 6

        3.    Even if Mr. Presnall is not considered a party to the defense, the reliance on him as a conduit for communication does not waive privilege ...................... 6

        4.    Even if the Court finds that Mr. Presnall was neither a party to the defense nor a conduit for communication, it cannot punish Mr. Schulte for a mistake of his counsel .............................................................................................................. 7

    D.    Counsel previously raised the privilege argument ........................................ 7

I. **THE EMAIL IS ATTORNEY-CLIENT PRIVILEGED AND MUST BE SUPPRESSED**

The government argues that Mr. "Schulte's arguments rely on his own unsworn, conclusory, self-serving and self-evidently untrue assertions." Government's Opposition ("Opp.") at 9. Mr. Schulte provides an affidavit sworn under penalty of perjury, Ex. A ("Schulte Decl."); he provides The Email and its chain, Opening Memorandum ("Opening Mem.") at Ex. A; he references the seized privileged notebooks that the government relied on at trial and intends to introduce at the re-trial; and finally, he provides standby counsel's statements to the Court on the record, 2/14/22 Tr. at 22-25, Ex. B.

A. **The Email was written at direction from counsel**

There can be no question that The Email was drafted at direction of counsel for the sole purpose of assisting in Mr. Schulte's defense. See Opening Mem. at Ex. A; see Schulte Decl. ¶ 1-2. The government claims this is "unsupported by anything other than Schulte's unsworn and uncorroborated statement." Opp. at 12. The Email corroborates Mr. Schulte's *sworn* declaration.

B. **The Email is not a "Schulte Article" and was never publicly disclosed**

After Mr. Schulte was introduced to the American criminal justice system—his arrest, presumption of guilt, and immediate incarceration—he realized for the first time in his life that the idealization of the American justice system is grotesquely undeserved. The American justice system is inherently unjust, a despicable ruse that government propaganda, reinforced by indoctrination and the mainstream media, has pulled over the eyes of the American people—only those who have experienced it know the truth, but the public refuses to believe them since they were accused by the government of crimes. Accordingly, Mr. Schulte's righteous indignation would not allow him to remain silent. After release on bail, Mr. Schulte immediately began writing a Redress of Grievances (dubbed "The Schulte Articles") critical of the justice system.

1

1. **The government tries to conflate the "Schulte Articles" with The Email to confuse the Court**

Since Mr. Schulte wrote and disclosed his redress of grievances publicly, the government unconscionably tries to conflate the "Schulte Articles" with The Email in a desperate attempt to claim The Email was written with the intention of public dissemination. The government even refers to The Email as "The Schulte Article," Opp. at 3-6. The Court should not be fooled; the timeline from the Opening Mem. at 1-5 clearly matches the exhibits and testimony introduced in the government's opposition—The Email is not a Schulte Article. See Schulte Decl. ¶ 9.

The Email was clearly written and emailed to counsel on March 20, 2017. See Opening Mem. at Ex. A; see also Schulte Decl. ¶ 1-2. The Schulte Articles were written by Mr. Schulte after he was arrested and released on bail—which was the catalyst for writing about the criminal justice system—the government even confirms this with its interview of Mr. Presnall, Opp. at 5 ("Presnall stated that he moved in with Schulte in late 2017..." at which point "Schulte started writing a number of articles about his situation in order to get them to the press to publicize Schulte's claims about the prosecution."); see also Opp. at 4 n. 2 ("Presnall lived with the defendant... after August 2017"). It is therefore impossible for The Email to be a Schulte Article as it predates the Schulte Articles by over 6 months; see also Opp. at Ex. 6 (noting beginning of Schulte Articles after Mr. Schulte's release on bail).

Indeed, the government refutes its own argument. "Presnall recalled that Schulte started writing a number of articles about his situation... Schulte drafted these articles by hand..." Opp. at 12. This obviously cannot apply to The Email, not only because The Email predates Mr. Presnall's move and involvement in Mr. Schulte's case by 6 months, but also because The Email was not drafted by hand since it was emailed directly from Mr. Schulte to his attorneys. Mr.

Schulte wrote drafts by hand when he was out on bail because he was not authorized to use a computer; the only documents that were "drafted by hand" while Mr. Schulte was out on bail were the Schulte Articles—his unclassified redress of grievances.

Moreover, the Schulte Articles are easily distinguishable as they contain the title "Presumption of Innocence" and an appropriate subtitle. See Opening Mem. at 3. None of these documents contained classified information, and they were all produced in unclassified discovery on July 17, 2018 as production #13 (See Dkt. 455 at Ex. D-M). The Email was not titled, and the CIA determined The Email contained "classified" information; once again, this "classified" information is a verbatim conversation with the FBI—the FBI *openly discussed information disseminated by WikiLeaks as Vault 7 to Mr. Schulte*, who merely responded to FBI questions.

Accordingly, the Schulte Articles consist solely of the unclassified Redress of Grievances—the only documents Mr. Schulte ever intended, and eventually did, publish.

2. **Mr. Schulte never sent The Email to anyone other than counsel**

The government does not dispute the fact that The Email was never published online (until they published it, multiple times). Indeed, Mr. Schulte never intended nor actually sent The Email to anyone outside counsel. See Schulte Decl. ¶ 5-6. The government purports, however, that Mr. Schulte somehow "intend[ed] to publish [The Email] in whole or in part." Opp. at 13. The government's fantasy is not only false, but *impossible*. As stated in the Opening Mem. at 5, "[t]he Email was not on any of the cell phones nor was it ever mentioned or discussed in the prison notebooks." The Email was not mentioned in the prison notebooks. The Email was not on the MCC cellphones. The Email was not discussed in recorded prison calls. **Mr. Schulte did not even possess The Email at the MCC**—he not only never planned any public dissemination of The Email, but completely forgot about its trivial existence.

3

The government offers no rebuttal except to cling to their fabricated fantasy; they proffer no evidence that Mr. Schulte acknowledged The Email even existed, much less that he intended to disseminate it, *or that he even knew or believed The Email contained classified information.*

### C. The Email was forwarded by Mr. Schulte's attorney to Mr. Presnall unbeknownst to Mr. Schulte

Unbeknownst to Mr. Schulte, his attorney forwarded The Email to Mr. Presnall on October 25, 2017. Mr. Schulte did not direct his attorney to do so. See Schulte Decl. ¶ 3-4.

#### 1. Mr. Presnall worked as a party to the defense

The government claims Mr. Presnall provided The Email to the government pursuant to a subpoena for unprivileged documents. Opp. at 4. Mr. Schulte and his counsel were unaware of the subpoena, nor were they contacted by Mr. Presnall's attorneys. Indeed, Mr. Presnall's attorneys and even Mr. Presnall himself were not in any position to determine which of Mr. Schulte's documents were protected by attorney-client privilege. The government clearly knew that Mr. Presnall lived with Mr. Schulte when he was out on bail, assisted Mr. Schulte's communication with his attorneys, and retained many privileged documents after Mr. Schulte's re-arrest—they should have screened all documents through Mr. Schulte's counsel.

The government first claims that "[n]either Presnall nor his counsel have ever claimed he was a paralegal. Schulte's former counsel, similarly, have not claimed that Presnall was a paralegal under their supervision." Opp. at 11. But of course, The Email was never a point of contention when Mr. Schulte was represented by Mr. Koss and Mr. Smith—the question was simply never raised. However, the record does support Mr. Schulte's claim that Mr. Presnall worked as a party to the defense. Mr. Koss and Mr. Smith emailed multiple privileged documents, including documents protected by the protective order, to Mr. Presnall. See Schulte

4

Decl. ¶ 8. The FBI were also alerted to this in their May 24, 2018 interview predating the subpoena, Opp. at Ex. 5 ("PRESNALL possessed, or may currently possess, KP's handwritten notes related to his case"). After Mr. Schulte was re-arrested, he failed to pay his rent, and was ultimately evicted; Mr. Presnall then took possession of Mr. Schulte's legal work so it would not be lost—including The Email. Mr. Schulte had no control over these events.

Moreover, the government never responds to Mr. Schulte's argument regarding conditions requiring Mr. Presnall's services. It must first be noted that Judge Crotty's release conditions did not ban the use of third parties—this release condition was only added *ex post facto*. The conditions banned Mr. Schulte from computers—how was he to examine forensic images? How was he to review thousands of pages of discovery, search those documents, and assist in his own defense? The government claims Mr. Schulte could have used "mail." This is incorrect—there is no way to print forensic images, and the only way to review them is electronically. Additionally, it was not feasible to print thousands of pages of chats and other documents—it is impossible to conduct searches and Mr. Schulte simply could not afford to print his discovery or pay his attorneys to babysit him and display his discovery for him. Mr. Schulte required the services of a paralegal to effectively assist in his own defense. <u>Thus, Mr. Schulte sought and received approval from pretrial services for Mr. Presnall to use his laptop to assist Mr. Schulte in communication and discovery review.</u> See 1/8/2018 Tr. 7 ("at least two conversations between pretrial services, John Moscato, Josh Schulte and Shane Presnall, it was Shane's understanding that pretrial services allowed him to check Mr. Schulte's e-mail and to do searches for him on the Internet…"). Mr. Schulte literally discussed this paralegal role with his attorneys, and in lieu of paying some unknown outside paralegal, he hired Mr. Presnall and paid him for his services through free rent and food. See Schulte Decl. ¶ 7.

### 2. Mr. Schulte never directed his attorney to send The Email to Mr. Presnall

The government argues that Mr. Schulte's attorney's email to Mr. Presnall nullifies the privilege. Opp. at 11. The government incorrectly claims that "Presnall, a third party, had it because Schulte wanted him to have it." Opp. at 13. As stated in the Opening Mem. at 7, "[s]ince Mr. Schulte could not use electronic media, he was unaware how The Email was electronically transferred and printed for him: Mr. Schulte's attorney, maintaining privilege over The Email, sent it to Mr. Presnall, who was acting as a paralegal for Mr. Schulte, to be printed and provided to Mr. Schulte." Mr. Schulte did not request The Email sent to Mr. Presnall, nor did he "want him to have it." Mr. Schulte merely "requested a copy of The Email from his attorney as he was assisting in reviewing the search warrants and preparing the Franks Suppression Motion." *Id.*

Indeed, Mr. Presnall never claimed Mr. Schulte directed counsel to send him The Email, that he ever remembered seeing or reading The Email, or that he was either directed or intended to publicly disclose it. The facts simply do not match the government's fabricated fantasy.

### 3. Even if Mr. Presnall is not considered a party to the defense, the reliance on him as a conduit for communication does not waive privilege

The government does not respond to Mr. Schulte's argument that Mr. Presnall was used as a conduit to facilitate communication and legal advice from his attorneys, which is recognized by the Second Circuit as preserving privilege. Opening Mem. at 7-8. The "disclosure" to Mr. Presnall is like the "disclosure" at an internet café used to access privileged material or like the "disclosure" of using Kinkos or some other business to print the documents. Surely, the government does not allege these constitute true "disclosures." Thus, how is using Mr. Presnall as a conduit for communication, to obtain legal advice and send legal materials, any different?

> 4. **Even if the Court finds that Mr. Presnall was neither a party to the defense nor a conduit for communication, it cannot punish Mr. Schulte for a mistake of his counsel**

Finally, it must be noted that Mr. Schulte did not send The Email—his attorneys did. This is not the typical waiver of privilege where the defendant discloses the privileged document. This Court cannot punish Mr. Schulte for the actions of his counsel. Indeed, if Mr. Schulte had been released on reasonable conditions of confinement so he did not need a paralegal, if he were rich and could pay for a paralegal, if his counsel had not relied upon Mr. Presnall as a conduit for communication, if he had not been re-arrested, or if all the attorney-client privileged materials he left in his apartment had been properly transferred to his new counsel or shredded—we would not be here today. But Mr. Schulte cannot be blamed for any of this—Mr. Schulte did not even know The Email was sent to Mr. Presnall. This Court cannot hold Mr. Schulte accountable when he did everything within his power to ensure his privileged documents were treated properly.

> D. **Counsel previously raised the privilege argument**

Finally, the government's assertion that "Schulte did not assert that [The Email] was privileged in any of his prior motions to suppress or to exclude purported attorney-client privileged materials," Opp. at 8, is disingenuous. Mr. Schulte's counsel *did* assert privilege of The Email in direct conversations with the prosecutors, and the only reason there was no official suppression motion filed was because <u>the government informed the defense it would not introduce The Email at trial</u>. Standby counsel directly informed the Court about these disclosures at the February 14, 2022 pretrial conference, 2/14/22 Tr. at 22-25. See Ex. B. Accordingly, the government's argument is wholly without merit as Mr. Schulte did alert the government that The Email was protected by attorney-client privilege. See also Schulte Decl. ¶ 10-15.

Respectfully Submitted,

4/15/22 Josh Schulte

/s/ Schulte

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

          *Defendant.*

S3 17 Cr. 548 (JMF)

# DECLARATION OF JOSHUA ADAM SCHULTE IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS THE EMAIL

Joshua Adam Schulte declares under penalty of perjury:

1. I wrote The Email between March 16, 2017 and March 20, 2017 at the direction of counsel Kenneth Smith.
2. I sent The Email to attorneys Kenneth Smith and Taylor Koss on March 20, 2017 at 9:59 PM as evident in The Email, attached as *ex parte* Exhibit A in the Opening Memorandum.
3. I never asked Kenneth Smith, Taylor Koss, or any other attorney to forward or share The Email with anyone.
4. I had no knowledge that attorney Taylor Koss sent The Email to my cousin on October 25, 2017 at 9:44 PM.
5. I never provided The Email to anyone other than counsel.
6. I never intended to provide The Email to anyone other than counsel.
7. In lieu of paying for an outside paralegal, I hired Mr. Presnall as my paralegal in exchange for free rent and food while I was out on bail ("paralegal" was not mentioned, but the paralegal tasks were discussed).

1

8. My then-defense-team recognized Mr. Presnall as part of the defense, regularly conversed with him over text and email, and even transmitted documents directly to him that were part of a protective order.
9. The Email was *not* a "Schulte Article" (the redress of grievances I titled "The Presumption of Innocence").
10. The day the government provided The Email in discovery, I informed my now-standby-counsel that The Email was protected by the attorney-client privilege, promptly showed them the email chain proving this, and asked them to file a suppression motion.
11. The defense did not know the government intended to use The Email against me until it produced its Bill of Particulars on April 29, 2019.
12. Defense counsel began preparing a motion to suppress The Email based on the attorney-client privilege in May 2019.
13. Before completing the suppression motion based on privilege, my attorneys spoke with the prosecutors about The Email.
14. Soon after, the government alerted my attorneys that it would not use The Email at trial.
15. As there was no need to litigate suppression of a document the government did not seek to introduce at trial, there was no motion filed before the first trial to suppress The Email, though the prosecutors clearly knew the defense viewed The Email as protected by attorney-client privilege.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
April 15, 2022

Joshua Adam Schulte, *pro se*

# EXHIBIT B

February 14, 2022 Pretrial Conference

At 20:

DEFENDANT: So, the document that the government refers to was initially an email that I sent to my first counsel, like, March, right after the initial search warrant. It was emailed to my counsel and specifically stated it was in response to their request from me, so it was only used for my defense.

Later on, my attorney emailed that to my cousin, who was effectively working as my paralegal whenever he left the case. And at that point the government subpoenaed and retrieved that email from them. And then proceeding up to trial, Sabrina Shroff spoke with the government's lawyers and showed them the initial email and the clear chain showing that this was privileged, and the government eventually agreed with her that it was, and then it—that's why it wasn't used at trial. So there was no litigation about this ever because the prosecutor agreed that it was privileged. So like I said, we have a copy of the initial email that was only sent to my email—that was only sent to my attorney. It was my attorney that eventually emailed it to my cousin, who was functioning as my paralegal at the time with all—a bunch of other information that he clearly says in the email attorney-client privilege; it's all the documents I have about this case while I was in between attorneys because I could no longer afford him so that was—that's the issue, so—

[…]

At 22-23:

THE COURT: All right. Ms. Shroff, do you want to shed any light on this, tell me about whatever communications you had with the government at the last trial?

1

MS. SHROFF: Your Honor, can I just consult with Ms. Colson?

THE COURT: Yes.

MS. SHROFF: Your Honor, essentially, I believe that there might be just one small contradiction. I think Mr. Schulte's recitation of the facts is, as I recall it, I would not be able to say to the Court that the government confirmed that it was my argument that led them not to use this evidence that is being discussed here. I think the more correct thing would be to say I made the argument to the United States Attorney who was prosecuting the case then, and then the next thing I was told is that they weren't going to use the exhibit. So perhaps it's a logical conclusion for Mr. Schulte to surmise that because my argument was based on privilege and the chronology of that particular email, that the government had accepted my argument and therefore he now concludes that the government had conceded the privilege. It would be a logical inference for him to draw, but I do not believe that I ever communicated that because it's seldom that a prosecutor says this is why I decided to do X.

THE COURT: And can you speak to whether and what opportunity you had to raise this with Judge Crotty before the last trial? Or did it never get litigated because the government told you that it didn't intend to use it?

MS. SHROFF: That's my recollection, your Honor. The government told us they weren't going to use it, and I think we had so much on our plate that there wasn't any reason to raise it with Judge Crotty. That's my recollection.