UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -                                 S3 17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

                      Defendant.


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York

David W. Denton, Jr.
Michael D. Lockard
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 2

BACKGROUND ...................................................................................................... 4

    I.     The Leaks ................................................................................................ 4

    II.    Schulte's Work at the CIA ...................................................................... 6

    III.   The Revocation of Schulte's Administrative Privileges ......................... 7

    IV.   Schulte's Unauthorized Accessing and Theft of Classified Information ............... 9

    V.    Schulte's Cover-up and Transfer of the Classified Information .......................... 10

    VI.   Schulte Lied to Law Enforcement After the Leaks ............................... 11

    VII.  Schulte Violated the Court's Protective Order and Attempted to Start an
          "Information War" From Prison ............................................................. 12

ARGUMENT .......................................................................................................... 16

    I.     The Government's Prior Motions *in Limine* ....................................... 16

    II.    Schulte's Stipulations Are Binding and Admissible .............................. 18

    III.   Schulte's Proposed Purported "State-of-Mind" Defense Implicitly
          Asserts His Waived Advice-of-Counsel Defense and Should Be Precluded ....... 20

          A.    Relevant Law ............................................................................. 21

          B.    Discussion ................................................................................. 22

    IV.   Schulte Should Be Precluded from Arguing That His Conduct Was
          Protected by the First Amendment or That WikiLeaks' Unauthorized
          Publication Deprived National Defense Information of Its Protections,
          or Otherwise Seeking Jury Nullification ............................................... 24

          A.    Relevant Background ................................................................. 24

          B.    Relevant Law ............................................................................. 25

          C.    Discussion ................................................................................. 27

    V.    A CIA Memorandum Recommending Administrative Leave for a
          Co-Worker of Schulte's Is Inadmissible ............................................... 29

i

A.      Relevant Background ........................................................................ 29

B.      Relevant Law .................................................................................... 30

C.      Discussion ........................................................................................ 32

VI.     Schulte's Convictions for Making False Statements, 18 U.S.C. § 1001,
        and Contempt of Court, 18 U.S.C. § 401(3), Are Admissible in the
        Event Schulte Testifies ............................................................................. 33

A.      Relevant Law .................................................................................... 33

B.      Discussion ........................................................................................ 33

VII.    The Government May Move to Preclude Testimony from Cumulative
        Witnesses ................................................................................................... 35

A.      Relevant Background ........................................................................ 35

B.      Applicable Law ................................................................................. 36

C.      Discussion ........................................................................................ 38

CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

## CASES

*Arista Records LLC v. Lime Group LLC*, WL 1642434 (S.D.N.Y. 2011) ............................ 21, 23

*Burstein v. United States*, 232 F.2d 19 (8th Cir. 1956) .................................................. 19

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ........................................................... 36

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .......................................................... 36

*Favors v. Cuomo*, 285 F.R.D. 187 (E.D.N.Y. 2012) .................................................... 22

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ...................................................... 26

*Gorin v. United States*, 312 U.S. 19 (1941) ............................................................. 25

*In re United States*, 945 F.3d 616 (2d Cir. 2019) ....................................................... 25

*Leviton Mfg. Co. Inc. v. Greenberg Traurig LLP*, 2010 WL 4983183 (S.D.N.Y. 2010) ....... 21, 23

*S.E.C. v. Ripple Labs, Inc.*, 2021 WL 2323089 (S.D.N.Y. 2021) .................................... 22

*See Bourjaily v. United States*, 483 U.S. 171 (1987) .................................................... 37

*Sheng v. Time Warner Cable of New York City*, 2010 WL 3292680 (S.D.N.Y. 2010) ........... 19

*Sparf v. United States*, 156 U.S. 51 (1895) ........................................................... 25, 28

*Taylor v. Illinois*, 484 U.S. 400 (1988) ................................................................... 36

*United States v. Abu-Jihaad*, 600 F. Supp. 2d 362 (D. Conn. 2009) ............................ 25, 26

*United States v. Battiste*, 24 F. Cas. 1042 (C.C.D. Mass. 1835) ..................................... 25

*United States v. Bifield*, 702 F.2d 342 (2d Cir. 1983) .................................................. 27

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................... 21, 23

*United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) ................................................... 34

*United States v. Camacho*, 353 F. Supp. 2d 524 (S.D.N.Y. 2005) ................................... 37

*United States v. Desena*, 287 F.3d 170 (2d Cir. 2002) ................................................. 37

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ............................................... 34

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005) .................................................. 30

*United States v. Ginsberg*, 758 F.2d 823 (2d Cir. 1985) ............................................... 37

*United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004) ................................................ 31

*United States v. Heine*, 151 F.2d 813 (2d Cir. 1945) ................................................ 26, 27

*United States v. Hendricks*, 921 F.3d 320 (2d Cir. 2019) .......................................... 31, 32

*United States v. Holmes,* 44 F.3d 1150 (2d Cir. 1995) .................................................. 36

i

*United States v. Husayn*, 142 S. Ct. 959 (2022) ................................................................ 26

*United States v. Kanu*, 695 F.3d 74 (D.C. Cir. 2012) ......................................................... 18

*United States v. Kim*, 808 F. Supp. 2d 44 (D.D.C. 2011) .................................................. 28

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) ............................................... 31

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ......................................... 26, 27

*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) ...................................................... 25

*United States v. Villegas*, 899 F.2d 1324 (2d Cir. 1990) .................................................. 27

*United States v. Wingate*, 128 F.3d 1157 (7th Cir. 1997) .................................................. 19

*Wade v. Mantello*, 333 F.3d 51 (2d Cir. 2003) ................................................................. 31

*Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991) ............................................. 20

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) ..................................................................... 26

## STATUTES

18 U.S.C. § 401 ...................................................................................................... 2, 3, 33, 34

18 U.S.C. § 793 .................................................................................................... 3, 25, 27, 28

18 U.S.C. § 1001 .................................................................................................... 2, 3, 33, 34

18 U.S.C. § 1030 ............................................................................................................... 3

18 U.S.C. § 1503 ............................................................................................................... 4

28 U.S.C. § 1782 ............................................................................................................. 26

## OTHER AUTHORITIES

73 Am. Jur. 2d Stipulations § 10 (2022) ........................................................................ 19

Classified Information Procedures Act ...................................................................... 24, 28

Weinstein's Federal Evidence § 103 ............................................................................... 39

Weinstein's Federal Evidence § 401 ............................................................................... 37

## RULES

Federal Rule of Evidence 103 ................................................................................... 38, 39

Federal Rule of Evidence 104 ................................................................................... 38, 39

Federal Rule of Evidence 401 ............................................................................. 17, 36, 37

Federal Rule of Evidence 402 ............................................................................. 17, 27, 37

Federal Rule of Evidence 403 ................................................................................................ 33, 36, 37

Federal Rule of Evidence 404 ................................................................................................ 1, 4, 16

Federal Rule of Evidence 602 ................................................................................................ 36

Federal Rule of Evidence 609 ................................................................................................ 33, 34

Federal Rule of Evidence 701 ................................................................................................ 32

Federal Rule of Evidence 801 ................................................................................................ 19

Federal Rule of Evidence 802 ................................................................................................ 32

The Government respectfully submits this memorandum in support of motions *in limine* with respect to the upcoming trial of the defendant Joshua Adam Schulte. The Government renews the following motions *in limine*, which the Court previously granted in whole or in part:

1. Evidence of Schulte's disgruntlement at the Central Intelligence Agency ("CIA") and his inappropriate actions on CIA computer systems is admissible as both direct evidence and Rule 404(b) evidence of the charged offenses. The Court previously ruled that this evidence is admissible. *See* D.E. 256 at 2.

2. Evidence of Schulte's conduct in prison is admissible as both direct evidence and Rule 404(b) evidence of the charged offenses. The Court previously ruled that this evidence is admissible. *See id.* at 2-3; *see also* D.E. 288.

3. Expert testimony about the online organization WikiLeaks.org ("WikiLeaks") is admissible. The Court previously ruled that this evidence is admissible. *See* D.E. 256 at 3-4.

4. Schulte's statements during a proffer with the Government are admissible. The Court previously ruled that this evidence is admissible. *See id.* at 5.

5. Video demonstrations of computer commands or actions taken by Schulte on CIA computer systems are admissible. The Court previously ruled that this evidence is admissible, subject to the defendant's reciprocal ability to create demonstratives. *See id.* at 5.

6. Schulte is precluded from eliciting testimony concerning whether documents are properly classified in this case, or whether the CIA conducted an appropriate classification review. The Court previously ruled that this evidence is inadmissible in part. *See id.* at 5-6.

The Government also moves *in limine* for rulings that:

7. Facts and evidence stipulated by Schulte are admissible.

8. Schulte is precluded from offering testimony, evidence, or argument asserting expressly or implicitly that he relied on the advice of counsel. The Court previously precluded Schulte from offering an advice-of-counsel defense unless he disclosed documents and communications related to that purported defense, *see* D.E. 248, which Schulte has not done. *See* D.E. 767. Schulte's recently proffered "state of mind" defense, D.E. 764, represents an attempt to assert an advice-of-counsel defense without complying with the Court's disclosure order and should be precluded.

9. Schulte is precluded from offering testimony, evidence, or argument that his conduct was protected by the First Amendment or that any national defense information lost its protected status through its unauthorized publication on WikiLeaks.

10. Schulte is precluded from offering into evidence a CIA memorandum recommending administrative leave for a co-worker. The Court previously ruled this document admissible, Tr. 2671 & DX L, but for the reasons stated below, that ruling appears principally to have been a disclosure remedy that is now moot.

11. In the event that Schulte elicits testimony that certain information was withheld from the defense, the Court will give an instruction indicating that the Court authorized the Government to withhold that material.

12. Schulte's convictions for making false statements, 18 U.S.C. § 1001, and contempt of court, 18 U.S.C. § 401(3), are admissible in the event Schulte testifies.

Finally, the Government also provides notice as to certain areas of cross-examination and extrinsic evidence that may be implicated by Schulte's decision to testify in this case or by arguments made by his counsel.

## PRELIMINARY STATEMENT

Schulte is responsible for stealing, disclosing, and attempting to disclose a massive amount of classified information, and his actions have caused catastrophic harm to national security. Based on his own words, Schulte's motivation for doing so is clear—revenge against those who dared to cross him. As part of an "information war" that began at the CIA and continued through his detention at the Metropolitan Correctional Center ("MCC"), Schulte has engaged in an escalating series of retaliatory acts targeting his co-workers and supervisors at the CIA, agents with the Federal Bureau of Investigation ("FBI"), and, most recently, the United States writ large.

Schulte's conduct began during his time with the CIA. Furious with his management's response to a personal dispute between Schulte and another CIA employee, which resulted in both individuals being reassigned to different branches, Schulte responded by breaking into CIA computer systems, stealing classified information (the "Classified Information") about the CIA's closely guarded cyber-tool arsenal, and transmitting it to WikiLeaks. WikiLekas later publicly disclosed a large volume of the Classified Information between March and November 2017 (the "Leaks"). After he was detained in this case, Schulte enlisted his family and other inmates to help

him brazenly violate a protective order entered by the Court, and then, even after the Court admonished him, he doubled down and did it again, this time also illegally disclosing classified information. From prison, Schulte declared the aforementioned "information war" against the United States, threatening to reveal all of the classified information he knew unless he was released and directing others to "send all your govt's secrets [to] WikiLeaks." In furtherance of this so-called war, Schulte smuggled contraband cellphones into the MCC, created encrypted email accounts and secret social media accounts, and drafted misleading "articles" for public dissemination that were not only filled with lies, including allegations that the FBI planted evidence against Schulte in this case, but also contained classified information.

On February 2, 2020, trial began as to the national security-related counts charged in a Second Superseding Indictment, S2 17 Cr. 548 (JMF). On March 9, 2020, a jury found the defendant guilty of making false statements to law enforcement, 18 U.S.C. § 1001, and contempt of court, 18 U.S.C. § 401(3). The jury did not reach a unanimous verdict on the remaining counts and the Court granted the defendant's motion for a mistrial as to those counts.

A Third Superseding Indictment, S3 17 Cr. 548 (JMF), based on the conduct described above, was returned on June 8, 2020, charging Schulte in nine counts: (1) two counts of illegally gathering and transmitting materials relating to the national defense, 18 U.S.C. § 793(b) and (e), in connection with his unlawful theft and transmittal of classified information from the Central Intelligence Agency (the "CIA") (the "WikiLeaks Charges"); (2) two counts of illegally transmitting and attempting to transmit materials relating to the national defense, 18 U.S.C. § 793(e), in connection with his unlawful disclosure and attempted disclosure of classified information after being charged in this case, including from the Metropolitan Correctional Center (the "MCC") (the "MCC Leak Charges"); (3) four counts of unauthorized access to computers and

transmission of harmful computer commands, 18 U.S.C. § 1030(a), in connection with Schulte's unauthorized access and manipulation of CIA computer systems and theft of classified information (the "Computer Fraud Charges"); and (4) one count of obstructing justice, 18 U.S.C. § 1503, in connection with false statements Schulte made to the Federal Bureau of Investigation (the "FBI") during its investigation (the "Obstruction Charge").

## BACKGROUND[1]

### I.     The Leaks

Between March and November 2017, WikiLeaks made 26 separate online disclosures of classified information from the CIA. The Leaks' impact on the CIA's intelligence gathering activities and the national security of the United States was catastrophic.

Immediately after the first Leak, the FBI began to investigate. The FBI determined that the Classified Information originated with the Engineering Development Group ("EDG") of the CIA's Center for Cyber Intelligence ("CCI"), which was responsible for developing classified cybertools. To develop those tools, EDG maintained classified information on an isolated local-area computer network known as "DEVLAN." The CIA protected DEVLAN by restricting outside access to it; sequestering it from the Internet; limiting access to approximately 200 individuals, each of whom possessed a Top Secret security clearance; requiring badges to enter the locked rooms secured by vault doors in which DEVLAN terminals were stored; and protecting the CIA building in which

---

[1] The Government respectfully submits that all of the testimony and other evidence described in this brief is admissible as direct evidence of the crimes charged. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b), and it addresses much of that evidence independently in Part I below. The Government plans to continue to meet with potential witnesses between now and the trial, and will supplement this notice as necessary should the Government learn of additional information involving the defendant or other Rule 404(b) evidence.

the system was housed with armed guards and perimeter fencing. (*See* Tr. 187, 194-96, 213, 552, 779, 900-01, 907).[2]

The CIA stored much of the sensitive and highly classified information on DEVLAN within a commercially-available suite of software known as Atlassian, which included programs named Confluence (EDG's Wikipedia-like page in which users could comment about the group's work) and Stash (the repository for, among other things, source code). (Tr. 174, 215-18). The data stored in the Atlassian programs was backed up daily in files stored on another server (the "Backup Files").

The FBI conducted a detailed analysis of the Leaks, and compared the substance and form of the Classified Information with information from DEVLAN to determine the specific origin of the Classified Information. Due to a specific flaw in the computer code used to create the Backup Files (the "Backup Script"), which introduced a particular error into the Backup Files—an error that was conspicuously present in the Leaks—the FBI was able to determine that the only possible source of the Classified Information was the Backup Files. (Tr. 1113-33). The FBI also examined the timing of the Classified Information by using the version control of the daily Backup Files of Stash and Confluence, that is, by "looking at the data that was both present in the database and present on WikiLeaks, and present in the database and not present on the WikiLeaks . . . to determine at what point the data sort of stopped that WikiLeaks has." (Tr. 1352, 1357). The FBI determined that the Classified Information came from Backup Files for Stash and Confluence that were created on March 3, 2016. (Tr. 1113-33, 1351-66).

---

[2] "GX" refers to Government Exhibit, "DX" refers to a defense trial exhibit, "Tr." refers to the transcript of the prior trial in this case, and "[Date] Tr." refers to the transcript of proceedings held on the identified date.

## II.     Schulte's Work at the CIA

In 2015 and 2016, Schulte worked in the Operations Support Branch ("OSB") within EDG. Through his work, Schulte had access to, and knowledge of, specific cyber tools the CIA employed, CIA operations that employed such tools, and identities of CIA officers. Schulte not only had access to the DEVLAN but also was part of a small group of CIA employees who had certain administrative rights on the system. These rights allowed Schulte to manipulate DEVLAN in specific ways, including by controlling access to various parts of the system.

In particular, Schulte had administrative privileges to the Atlassian services on DEVLAN. (Tr. 172, 237-38). While logged in as an administrator of any of the Atlassian services, Schulte could, among other things, access and copy the Backup Files, whereas a regular user would be unable to access those Backup Files. (Tr. 252-56, 950-54). Schulte also was uniquely familiar with the Backup Files because he wrote the Backup Script and managed the Backup Files including, for example, deleting old Backup Files when those files took up too much space. (Tr. 223-26, 238, 252-57).

Two of the Atlassian programs, Confluence and Bamboo, a program for building and testing code, were hosted on a physical server operated by OSB. OSB employees, including Schulte, could log in to the OSB server as administrators using either the administrative password, which allowed them to create, delete, or revert virtual servers such as Confluence and Bamboo; or login credentials called "SSH keys", which allowed them to view, edit, and delete administrative log files, such as files showing who accessed the server and when. (Tr. 804, 937, 945-46, 966, 989-96).

In the fall of 2015, Schulte began having significant problems at the CIA stemming from a dispute with another CIA employee. In October 2015, Schulte and the other employee each complained to their supervisor about each other, with Schulte falsely claiming that the other

employee made a death threat. (GX 1029, 1030; Tr. 277-80, 1502-03, 1633-35). Schulte was upset

by what he perceived to be management's indifference to his claim (GX 1038; 1039; 1044; 1046;

1048; 1052), and he later filed a motion for a protective order against the co-worker in state court,

which was initially granted. (Tr. 282-84; GX 1619). As a result of the interim protective order,

which was later dismissed, CIA reassigned both Schulte and the co-worker to different branches

within EDG.

## III.    The Revocation of Schulte's Administrative Privileges

On April 4, 2016, after Schulte had been moved to a the Remote Development Branch

("RDB"), different branch in EDG, Schulte's administrative privileges to two particular OSB

projects were revoked. (GX 1202-1, 1207-53; Tr. 976-80). Schulte complained vociferously about

the removal of these administrative privileges and falsely told another developer, Jeremy Weber,[3]

that Schulte's former supervisor, Sean, had approved the reinstatement of Schulte's administrative

privileges. (GX 1062; Tr. 290-91). Weber confirmed with Sean that Schulte had lied, and Weber

emailed Schulte to inform him that, in fact, Schulte's administrative privileges would not be

restored. (GX 1061).

Unbeknownst to anyone at EDG, however, on April 14, 2016, Schulte secretly used his

administrative privileges to the Atlassian system to restore his access to one of the projects. (GX

1207-97). Weber discovered that Schulte had restored his privileges later that evening and reported

the incident to his management, who in turn raised the issue with Security. (GX 1062; Tr. 528).

---

[3] A number of CIA officers whose employment with the agency remains classified testified at
trial under pseudonyms or their first names only, and pursuant to a variety of security measures
approved by the Court to protect their identities. *See generally* D.E. 293. The Government refers
to these individuals in this motion by the names under which they testified at trial, rather than
their true names.

Schulte's actions caused significant concern at the CIA because they were in direct violation of CIA policy and called into question whether Schulte could be trusted with classified information. (Tr. 297-99, 577-601; GX 1062).

In response to Schulte's actions, CIA management directed Weber and two other system administrators to remove all developers', including Schulte's, administrative privileges to the Atlassian services. (Tr. 300-02, 792-804). Going forward, dedicated system administrators rather than developers like Schulte would be responsible for system administration. Weber and the administrators came to the EDG office on Saturday, April 16, 2016, to make these changes. They first created a "snapshot" of the Confluence database—a copy of the database as it then-existed, *i.e.*, while Schulte still had administrative privileges (the "April 16 Snapshot")—so that if any of the changes made to the system went awry, they could restore the system and start over. (*Id.*; *see also* GX 1207-92, 1703 at 51-66). As a result of the changes made on April 16, Schulte could no longer access the Atlassian programs as a system administrator and, thus, no longer had access to the Backup Files. (*Id.*). Although Schulte's administrative access to Atlassian had been removed, Schulte could still access the OSB server that hosted the Confluence program: despite his transfer from OSB to RDB, Schulte secretly continued to login to the OSB server using the administrative password and his SSH key. (Tr. 989-96).

On April 18, 2016, a division supervisor within EDG, Anthony Leonis, confronted Schulte about the fact that he had improperly restored his access to the OSB project four days earlier. Leonis provided Schulte with a memorandum titled "Self-Granting Previously Revoked Admin Privileges on an Agency Computer Network." (Tr. 609-14; GX 1095). The memorandum described Schulte's unauthorized restoration of his administrative privileges and stated: "do not attempt to restore or provide yourself with administrative rights to any project and/or system for

which they have been removed." (GX 1095). Schulte signed the memorandum, acknowledging that he understood its prohibitions. (*Id.*).

## IV.   Schulte's Unauthorized Accessing and Theft of Classified Information

On April 20, 2016, an email was sent to the EDG staff, including Schulte, that Confluence would be moved from the OSB server to a new server on April 25, 2016. (GX 1067, 1069). This was a significant change to DEVLAN and for Schulte: once the change took effect, Schulte would no longer be able access Confluence through the OSB server using the SSH key he secretly retained to the OSB server.

On April 20 at 5:30 p.m., Schulte used the OSB server administrative account and his SSH key to create a new snapshot of Confluence named "bkup." (GX 1202-17, 1209-7). A few minutes later, at 5:35 p.m., Schulte reverted Confluence to the April 16 Snapshot. (GX 1202-18; Tr. 1063-65). The effect of that reversion was to restore Schulte's Atlassian administrative privileges and the access those privileges provided to the Backup Files. (Tr. 1073-75). While Confluence was reverted, Schulte copied the March 3 Backup Files (Tr. 953-58; GX 1207-27, 1207-30), the files from which Classified Information was stolen. After a little more than an hour, Schulte then re-reverted Confluence back to its April 20, 2016 state by restoring the "bkup" snapshot he created earlier, thereby also deleting records of his conduct between the creation and restoration of the "bkup" snapshot. (GX 1202-19, 1202-21; Tr. 1064-66). To further cover his tracks, Schulte deleted the "bkup" snapshot and systematically deleted thousands of system log files that recorded his conduct. (Tr. 1068-99; GX 1203-1, 1203-2, 1203-66, 1203-29, 1203-64, 1203-65, 1203-61). Schulte failed, however, to delete log files from his workstation that had recorded evidence of his reversions and deletions. Badge records show that Schulte locked the vault on the evening of April 20, meaning he was the only person in his work area around the time he was stealing the Classified Information (GX 105).

9

**V.      Schulte's Cover-up and Transfer of the Classified Information**

After Schulte stole the Classified Information, he prepared to send it to WikiLeaks. (*See* GX 1404-6; Tr. 1372-75, 1389-93). On April 24, Schulte placed a same-day home delivery order for equipment to transfer data from external hard drives (GX 1305-6; Tr. 1377-78), like the hard drives recovered from Schulte's apartment by the FBI following the Leaks (GX 1603, 1609, 1610; Tr. 1378-79). That same day, Schulte downloaded Tails, a self-contained anonymous operating system recommended by WikiLeaks for transmitting sensitive information in conjunction with TOR, "The Onion Router" network of anonymizing internet access nodes, which was also installed on Schulte's home computer. (GX 1403-7, 1702; Tr. 1382-83).

Schulte transferred the Classified Information overnight on April 30 into May 1, 2016. On April 30 at 11:28 a.m., Schulte downloaded a program to securely delete data so that it is impossible to recover (GX 1402-10; Tr. 1393-96) and searched online for secure wiping utilities and visited related websites. (GX 1305-9; Tr. 1408-09). At 12:19 a.m. on May 1, 2016, Schulte mounted his "D drive"—making it accessible through the computer's file system—where a series of encrypted files were located, into a virtual machine running on Schulte's home computer to transfer the Classified Information. (GX 1401-1). Over the next several hours through the middle of the night and early morning, Schulte repeatedly unlocked his computer to check on the status of that transfer. (GX 1401-1). At approximately 3:18 a.m., Schulte searched several times for information about "hashing" large files and visited related websites, including websites titled "What is the fastest way to hash md5 large files" and "how can I verify that a 1tb file transferred correctly." (*Id.*). On May 5, 2016, Schulte reformatted his home computer, including the drive that contained the encrypted files, permanently erasing it. (Tr. 1409).

Schulte ultimately resigned from the CIA on November 10, 2016.

## VI.    Schulte Lied to Law Enforcement After the Leaks

On March 7, 2017, WikiLeaks posted the first of the Leaks online. The first Leak contained information from Confluence obtained from the March 3, 2016 Backup Files, which were the same files Schulte copied on April 20, 2016. (GX 1; Tr. 174, 1113-33; 1350-66). In several subsequent releases, the last of which occurred on or about November 17, 2017, WikiLeaks posted data about several tools from Stash, including source code. (GX 1; Tr. 174-76). From the day of the initial Leak until March 14, 2017, Schulte conducted 28 searches related to the Leaks and visited 91 webpages, including a search for "WikiLeaks public opinion." (GX 1353). Schulte also searched on at least six occasions for the "FBI" and visited webpages titled "FBI Prepares Hunt for the Source of CIA Documents," "WikiLeaks Reveal CIA Hacking Trove, Has Feds on Mole Hunt," and "FBI Joins CIA in Hunt for Leaker." (*Id.*).

As part of its investigation, the FBI executed a search warrant on Schulte's apartment in New York and recovered, among other things, multiple computers, servers, and other portable electronic storage devices, including Schulte's personal desktop computer. On the desktop computer, FBI agents found an encrypted container with over 10,000 images and videos of child pornography. The FBI also interviewed Schulte on several occasions, and he repeatedly lied about his conduct. For example, Schulte falsely (i) denied being responsible for the Leaks; (ii) denied having a copy of a classified email in which Schulte levied false claims about DEVLAN security and that Schulte had sent immediately before his resignation from the CIA (the FBI recovered a copy of the email from his apartment (GX 1616)); (iii) denied taking information from DEVLAN to his home (though he explicitly told friends that he took information from DEVLAN home and knew it was wrong (GX 1405-5; Tr. 2238-39, 2242-46)); and (iv) denied ever making DEVLAN vulnerable to theft and, despite being asked repeatedly about his DEVLAN activities, never

mentioned anything related to his activities on April 20, 2016. (GX 1062; Tr. 291-301, 576-601, 2178).

On August 24, 2017, the FBI arrested Schulte in connection with his possession of child pornography. Schulte was initially released on bail but was subsequently remanded in December 2017 for violating the conditions of his bail.

## VII.   Schulte Violated the Court's Protective Order and Attempted to Start an "Information War" From Prison

After being charged in this case, Schulte continued to violate the law by blatantly violating a Court-entered protective order (the "Protective Order") and continuing to disclose and attempt to disclose classified information to others. In particular, Schulte (i) emailed a reporter a copy of a search warrant affidavit, thereby violating the Protective Order, and a document containing classified national defense information about Hickok, a classified CIA computer network (GX 812); (ii) drafted and prepared for dissemination the Schulte Article (*infra* at 13); and (iii) attempted to transmit tweets about a classified CIA cyber tool (GX 809) and an article titled "Malware of the Mind" containing classified information about CIA tradecraft (the "Malware Article") (GX 801). As multiple CIA witnesses testified at the first trial, the information that Schulte disclosed and attempted to disclose following his arrest contained classified and highly sensitive national defense information that they never had disclosed publicly and doing so could have, among other things, jeopardized the safety of CIA operators in the field and the CIA's foreign intelligence gathering operations. (*See* Tr. 342:22-343:2 (testifying that the draft tweets "would put CIA officers' lives at risk"); 337:12-17 (testifying that Weber would not disclose the CIA tradecraft that Schulte wrote in the Malware Article because doing so "would damage our potential operations"); Tr. 1514-1515:7-5 (disclosing CIA tool referenced in draft tweets publicly could jeopardize CIA operations to gather foreign intelligence).

On September 18, 2017, the Court entered the Protective Order, which provides that Schulte and his defense team can use certain designated materials only to prepare his defense, and can disseminate protected materials only to specified individuals. The Government produced several search warrant affidavits in discovery that were subject to restrictions in the Protective Order (the "Protected Search Warrants"). Despite the terms of the Protective Order, Schulte disclosed at least one of the Protected Search Warrants to reporters with *The Washington Post* and *The New York Times*. On May 15, 2018, both newspapers published articles that discussed the content of at least one of the Protected Search Warrants. In a recorded telephone conversation from jail, Schulte also described the contents of one of the Protected Search Warrants to a reporter. When asked by the reporter whether the material was classified, Schulte responded that it was not, but stated that it was subject to the Protective Order. In recorded prison calls, Schulte also enlisted members of his family, including his cousin, to disseminate the Protected Search Warrants, as well as what Schulte described as his "articles." The Government subsequently recovered copies of these "articles" from Schulte's family, including at least one "article" that included classified information identifying the location of a covert CIA base overseas (the "Schulte Article").

In July 2018, Schulte's frustration about his case and his relatives' failure to publicly post his "articles" grew. (GX 801, 809). In one entry in a series of notebooks kept by Schulte at the MCC (the "Prison Notebooks") from July 2018, Schulte wrote, "ugh talked to my parents today & found out that my fucking articles that were uploaded to [Facebook] . . . were the wrong fucking articles." (GX 806). In an entry dated August 8, 2018, Schulte wrote that he was prepared to "breakup diplomatic relationships, close embassies, end U.S. occupation across the world" unless the Government paid him $50 billion for charging him in this case. (GX 809).

A few days after declaring that he planned to break up the United States' diplomatic relationships, on August 13, 2018, Schulte got a contraband Samsung cellphone. (GX 821, 5003). Although by that time Schulte had access to other contraband cellphones, he specifically wanted a Samsung cellphone because of its encryption capabilities. (Tr. 2389). In a Prison Notebooks entry dated the following day, Schulte wrote, "The way is clear. I will set up [two blogs]. From here, I will stage my information war: . . . The [blog] will contain my 10 articles." (GX 809 at 3). Schulte intended to disclose classified and highly sensitive information as part of his information war to punish the United States, which he referred to as "the most corrupt, tyrannical government on the planet." (*Id.*). On at least two other occasions in the summer of 2018, Schulte talked about his "information war" with another inmate. (Tr. 2408-09). In the same entry of the Prison Notebooks declaring his "information war," Schulte also explicitly wrote about setting up anonymous social media accounts and blogs that he would use in furtherance of his so-called "war," including a blog that "will contain my 10 articles." (GX 809 at 3).

Just one week later, Schulte had already taken significant steps in his "information war." In a Prison Notebooks entry dated August 21, 2018, Schulte wrote about systematically deleting evidence from social media accounts and from the contraband Samsung phone. Schulte wrote, for example: "Delete all Google Docs from johnsmith," "Delete all emails from johnsmith," and "Delete all suspicious emails from my gmail." (GX 809). Schulte also wrote about setting up encrypted email and messaging accounts, "all with different numbers!", including a accounts that he later used to communicate with a reporter. (*Id.*; *see also* GX 822).

The next day, on August 22, Schulte (pretending to be another person) used the Samsung cellphone and an encrypted email account to send an email to the reporter asking for copies of his articles. (GX 1303-2). Schulte confirmed in his Prison Notebooks that it was, in fact, him who sent

14

the August 22 email to the reporter, writing in an entry dated August 23, 2018, "Yesterday I started emailing [the reporter] from the Washington Post," and Schulte also separately wrote down the password for the encrypted email account. (GX 809; Tr. 2645-46). In that same August 23 entry, Schulte expressed frustration that his brother had not published his articles, writing, "[my brother] went back and forth but they decided for me not to publish the articles . . . my own fucking articles. Isnt that incredible?" (GX 809). On August 31, Schulte tried to entice the reporter to publish material on a timeframe dictated by Schulte: "If you can consent to an embargo on disclosure of the information for a limited time we would give you an exclusive to the information spanning several topics." (GX 1303-11).

Schulte's conduct continued to escalate in September and culminated with him sending classified national defense information to the reporter. On September 1, 2018, Schulte set up the Twitter account "@FreeJasonBourne," and drafted Tweets in his Prison Notebooks that he intended to post using that account, including specific information about a classified CIA tool named Bartender, and other tweets encouraging others to "send all your govts secrets here: Wikileaks." (GX 809 at 9-12). On September 2, 2018, Schulte (pretending to be another person) sent encrypted Signal messages on the Samsung phone to the reporter, in which Schulte said that he used to be a member of Anonymous, a hacking group that had provided information to WikiLeaks, and asked the reporter for help, including by "releasing" Schulte's articles. (GX 822-1; *see also* GX 1702; GX 809 at 13 (Prison Notebooks entry dated September 2, 2018, "Hopefully tonight I can setup Signal from my cell & msg [the reporter] to . . . get my fucking articles. I also need to confirm my twitter.")). In a Prison Notebooks entry dated September 12, 2018, Schulte wrote that he planned to "Schedule tweets 27th," and in another entry dated September 17, 2018, he wrote "In a week I'm going to dump all my stuff." (GX 809 at 15-16).

15

On September 24, 2018, Schulte began transmitting documents containing national defense information to the reporter. Using the Samsung phone, Schulte sent an encrypted email to the reporter that attached one of the Protected Search Warrants, along with Schulte's notes containing sensitive information about Hickok, including details about the groups that had access to the network and the number of employees there. (GX 1303-34). Schulte also promised the reporter additional sensitive information regarding government officials. (*Id.*). On October 3, 2018, Schulte's "information war" was stopped before he could transmit additional national defense information, when the FBI searched the MCC, seizing his Prison Notebooks and eventually recovering Schulte's contraband cellphone. (Tr. 2471, 2644).

<u>**ARGUMENT**</u>

## I.   The Government's Prior Motions *in Limine*

In connection with the February 2020 trial on the charges in the Second Superseding Indictment, the Government moved *in limine*, *see* D.E. 195, for rulings that, *inter alia*, (i) evidence of Schulte's disgruntlement at the CIA and his inappropriate actions on CIA computer systems is admissible as both direct evidence and Rule 404(b) evidence of the charged offenses, *id*. at 21-27; (ii) evidence of Schulte's conduct in prison is admissible as both direct evidence and Rule 404(b) evidence of the charged offenses, *id*. at 27-48; (iii) expert testimony about the online organization WikiLeaks is admissible, *id*. at 49-55; (iv) Schulte's statements during a proffer with the Government are admissible, *id*. at 55-59; (v) video demonstrations of computer commands or actions taken by Schulte on CIA computer systems are admissible, *id*. at 59-61; and (vi) Schulte is precluded from eliciting testimony concerning whether documents are properly classified in this case, or whether the CIA conducted an appropriate classification review. *Id*. at 61-69.

The Court granted these requests in whole or in part, *see* D.E. 256; and the Government respectfully submits that these rulings apply in the upcoming trial on the charges in the Third

Superseding Indictment. The Court ruled that (i) "Schulte's unauthorized actions on DEVLAN is direct evidence of the WikiLeaks [Charges] and is inextricably intertwined," and "[e]vidence of Schulte's anger at the CIA and the dispute with his co-worker is proper under FRE 404(b) to show motive," *id*. at 2; (ii) "[t]he Defendant's incarceration is necessary background information for the MCC [Leak Charges]" and that direct evidence and testimony about Schulte's conduct at the MCC "will not make sense without eliciting Schulte's incarceration," *id*. at 2-3;[4] (iii) expert testimony regarding "the WikiLeaks organization and how it operates" and "WikiLeaks public statements accompanying the Vault 7 leak" is admissible, *id*. at 3-4;[5] (iv) "statements from [Schulte's] proffer that relate directly to the charges" of making false statements and obstruction of justice are admissible, *id.* at 4-5; (v) video demonstratives are admissible "provided that the defense has

---

[4] The Government does not object to an appropriate limiting instruction advising the jury that the fact of the defendant's incarceration may not be considered as evidence of his guilt of the crimes for which he was detained, but is offered only as necessary contextual information for the defendant's conduct while incarcerated.

The defendant has also averred that he may seek to introduce evidence regarding various disputes he has had with staff at the Metropolitan Detention Center at which he is currently housed. *See, e.g.*, D.E. 752 at 8 ("I ask the Court to order the government to provide the audio of the recorded conversation, which may be introduced at trial depending on the government's case."). Evidence regarding the defendant's conditions of confinement has no bearing on his guilt or innocence of the conduct charged in the Third Superseding Indictment, particularly evidence regarding the defendant's confinement post-dating the charged conduct, which ends in or about October 2018. *See* Fed. R. Evid. 401 (evidence must be "of consequence in determining the action" to be relevant); 402 ("Irrelevant evidence is not admissible.").

[5] At the upcoming trial, the Government expects a lay witness will testify about WikiLeaks' public statements, including public statements regarding Vault 7 and instructions for transmitting information and data to WikiLeaks, as co-conspirator statements and as statements not offered for their truth. The Court previously gave a limiting instruction that these materials were offered "only to establish that WikiLeaks made these statements, when they did so, and how the classified information was published" (Tr. 52), and the Government has no objection to a similar limiting instruction in this trial. The Government does not expect to offer testimony concerning WikiLeaks' publication of other WikiLeaks disclosures of stolen data, such as the 2010 Chelsea Manning disclosure, 2010 United States diplomatic cables disclosure, the 2012 Stratfor disclosure, or the 2016 Democratic National Convention disclosure.

access to the files used to create the demonstrative and are able to make their own demonstrative," *id.* at 5; and (vi) Schulte is precluded from offering "testimony concerning deliberate misclassification of documents to hinder Schulte's ability to defend himself," but is "permitted to address classification practice and procedure through his own expert or on cross-examination and is permitted to elicit testimony concerning opinions on over-classification" as relevant to the weight to be given to a document's classification as evidence that the information is closely held, *id*. at 5-6. The Court also ruled that to the extent that Schulte opens the door, the Government may seek to impeach him concerning his history of being law abiding and his past mishandling of classified information. *Id*. at 6-7.

The Government also asked for a jury instruction in the event the defense argued that material had been withheld by the Government. D.E. 195 at 70-71. The Court reserved decision on this request pending developments at trial, and no ruling was issued. D.E. 256 at 6.

## II.    Schulte's Stipulations Are Binding and Admissible

At the February 2020 trial, Schulte entered into a number of factual and testimonial stipulations through counsel. (*See* GX 3001 (fact stipulation regarding prison calls and admissibility of exhibits), GX 3002 (testimonial stipulation regarding document custodians and admissibility of exhibits), 3003 (testimonial stipulation regarding law enforcement officers and corrections officer and admissibility of exhibits), 3004 (stipulation regarding records obtained from the CIA and admissibility of exhibits), 3005 (testimonial stipulation regarding FBI Computer Analysis Response Team members and admissibility of exhibits) (the "Stipulations") (attached hereto as Exhibit A)).

These Stipulations, entered into by Schulte through counsel, remain binding on him and are admissible at trial, as are the exhibits referred to in the Stipulations. The D.C. Circuit squarely approved the enforcement of evidentiary stipulations at a retrial in *United States v. Kanu*, 695 F.3d

74 (D.C. Cir. 2012). In *Kanu*, the court noted that "the general rule on stipulations"—*i.e.*, that "[s]tipulations, like admissions in the pleadings, are generally binding on the parties and the court—has long been applied . . . in criminal prosecutions as well." *Id.* at 78-79. Applying that principle, the D.C. Circuit concluded that "a formal, written stipulation of the parties that [certain] evidence need not be presented through live testimony at trial" should "properly be regarded as a factual evidentiary stipulation, and not limited in time," and thus was enforceable at a retrial even over the defendant's newfound objection to the stipulation. *Id.* at 80–81; *see also United States v. Wingate*, 128 F.3d 1157, 1160 (7th Cir. 1997) (same). These stipulations will also have the effect, as they did at the February 2020 trial, of avoiding the need for the testimony of over a dozen witnesses and substantially streamlining the trial. "Stipulations fairly entered into are favored" because, among other things, factual stipulations "expedite a trial and eliminate the necessity of much tedious proof." *Burstein v. United States*, 232 F.2d 19, 23 (8th Cir. 1956); 73 Am. Jur. 2d Stipulations § 10 (2022) ("It is generally considered that stipulations which tend to expedite the trial should be enforced unless good cause is shown to the contrary."); *see also Wingate*, 128 F.3d at 1161 ("Additionally, the government stated that it relied on the stipulation in preparing its case; the trial court could properly take into account that reliance.").

That Schulte is now *pro se* does not relieve him from his stipulations, in the event he sought to contest them. *See, e.g.*, *Wingate*, 128 F.3d at 1160 (defendant bound by stipulation at retrial with new counsel); *Sheng v. Time Warner Cable of New York City*, 09 Civ. 10397 (JSR), 2010 WL 3292680 (S.D.N.Y. Aug. 18, 2010) (*pro se* plaintiff bound by stipulation of discontinuance entered into through prior counsel). In the alternative, the Stipulations should be admissible as statements by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(C) & (D); *Wheeler v. John Deere Co.*, 935 F.2d

1090, 1097 (10th Cir. 1991) ("A stipulation is an admission which cannot be disregarded or set aside at will.") (internal quotation marks omitted).[6]

### III.    Schulte's Proposed Purported "State-of-Mind" Defense Implicitly Asserts His Waived Advice-of-Counsel Defense and Should Be Precluded

Since approximately August 2019, the defendant has repeatedly argued that he intended to assert an advice-of-counsel defense with respect to the MCC Leak Charge and Contempt Charge and the corresponding charges in the Second Superseding Indictment. *See, e.g.*, D.E. 128 (asserting a potential conflict based on defense counsel's allegedly favorable testimony regarding discussions with the defendant relating to the MCC Notebooks); Sept. 18, 2019 Tr. at 17-18; D.E. 150 at 2-3; Dec. 18, 2019 Tr. at 3-4, 17; D.E. 231 at 2-3; *see also* D.E. 597 at 40-45; D.E. 677; D.E. 765 at 56. The defendant has repeatedly refused to disclose the purported advice of counsel or documents and communications related to the same subject matter. *See, e.g.*, D.E. 232; D.E. 233; and the Court ordered that the defense would be precluded if the relevant documents and communications were not disclosed. D.E. 248. The defendant's deadline to comply with that order, *see* D.E. 754, has passed, and the defense is therefore waived. *See* Apr. 12, 2022 Tr. at 24.

By letter dated April 11, 2022, the defendant described to the Court evidence and argument that he intends to present at trial, arguing that it is relevant to his state of mind but is not "related to the advice-of-counsel." *See* D.E. 764. Schulte represents that he intends to present evidence that (i) Schulte wrote "Malware of the Mind" for his attorneys; (ii) Schulte believed that writing "Attorney-Client Privilege" on the MCC Notebooks made them privileged and "know[s] specifically who told me this information"; and (iii) the Schulte Article (*see* D.E. 758) "was written

---

[6] The Government is prepared to propose redactions to the Stipulations to avoid any confusion regarding the counsel named therein.

and transmitted to my attorneys for the sole purpose of my defense." D.E. 764. Schulte intends to

introduce his own testimony, the testimony of a Federal Defenders paralegal, and an email chain

involving himself and his former counsel to support these contentions. *Id.*

### A.    Relevant Law

"[T]he attorney-client privilege cannot at once be used as a shield and a sword" and "may

be implicitly waived when [a] defendant asserts a claim that in fairness requires examination of

protected communications." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). "[A]

party cannot be permitted, on the one hand, to argue that it acted in good faith and without an

improper motive and then, on the other hand to deny access to the advice given by counsel where

that advice played a substantial and significant role in formulating actions taken by the defendant."

*Arista Records LLC v. Lime Group LLC*, 06 Civ. 5936 (KMW), 2011 WL 1642434, at *2

(S.D.N.Y. Apr. 20, 2011) (cleaned up).

> [A] party need not explicitly rely upon advice of counsel to
> implicate privileged communications. Instead, advice of counsel
> may be placed in issue where, for example, a party's state of mind,
> such as his good faith belief in the lawfulness of his conduct, is
> relied upon in support of a claim of defense. Because legal advice
> that a party received may well demonstrate the falsity of its claim
> of good faith belief, waiver in these instances arises as a matter of
> fairness. . . .

*Leviton Mfg. Co. Inc. v. Greenberg Traurig LLP*, 09 Civ. 8083 (GBD) (THK), 2010 WL 4983183,

at *3 (S.D.N.Y. Dec. 6, 2010).

A defendant's proposed "testimony that he thought his actions were legal would have put

his knowledge of the law and the basis for his understanding of what the law required in issue. His

conversations with counsel regarding the legality of his schemes would have been directly relevant

in determining the extent of his knowledge and, as a result, his intent." *Bilzerian*, 926 F.2d at 1292.

"'[C]ourts within this Circuit, relying on *Bilzerian*, have reaffirmed the broader principle that

forfeiture of the privilege may result where the proponent asserts a good faith belief in the lawfulness of its actions, even without expressly invoking counsel's advice." *S.E.C. v. Ripple Labs, Inc.*, 20 Civ. 10832 (AT) (SN), 2021 WL 2323089, at *2 (S.D.N.Y. May 30, 2021) (quoting *Favors v. Cuomo*, 285 F.R.D. 187, 199 (E.D.N.Y. 2012) and collecting cases).

    **B.**    **Discussion**

Schulte's proposed "state of mind" defense is merely an attempt to assert the same advice-of-counsel defense he has repeatedly described in prior filings, but without complying with the Court's disclosure order. Schulte's proposed evidence and argument—that he intended the Schulte Article and the contents of the MCC Notebooks, including Malware of the Mind, as purely attorney-client communications and that they are not evidence of his plans to disclose national defense information—not only imply that such belief was derived from his discussions with counsel, but he intends specifically to introduce evidence of attorney-client communications in support of his argument in the form of (i) email communications involving former counsel regarding the Schulte Article, and testimony about those email communications; and (ii) testimony by Schulte and a Federal Defenders paralegal about Schulte's transmission of Malware of the Mind to former counsel. D.E. 764. Schulte's new attempt to recharacterize his advice-of-counsel defense as a state-of-mind defense does not excuse his obligation to comply with the Court's disclosure order, which he has failed to do.

Moreover, Schulte has repeatedly and expressly grounded his contentions about his state of mind in discussions with counsel, and has long maintained that he intended to testify and to call his attorneys to testify that the MCC Notebooks do not show his transmission and attempted transmission of national defense information. In defense counsel's letter dated August 26, 2019, counsel argued that "[t]he government has indicated that its evidence . . . will include portions of notebooks seized from Mr. Schulte's cell, in which he allegedly documented his plans to transmit

classified information," and that "[t]o defend against the government's allegations, Mr. Schulte would call two of his attorneys—Matthew B. Larsen and Sabrina P. Shroff—to present favorable testimony bearing on his state of mind." D.E. 128 at 2; *see also* D.E. 231 at 2 ("Counsel's advice evidently led Mr. Schulte to believe that what he wrote down in his notebooks had a legitimate purpose relating to the lawyer-client relationship and would be protected from compelled disclosure by the attorney-client or work-product privileges."). Since being granted permission to discharge his attorneys and proceed *pro se*, the defendant has continued to maintain that he relied on the advice of counsel in his writings in the MCC Notebooks and that he intends to introduce evidence of discussions with his counsel. *See* D.E. 677 at 1 ("I intend to call my attorneys as fact witnesses regarding Malware of the Mind that was drafted for, and only ever sent to, my attorneys, for the sole purpose of assisting my defense . . . ."); D.E. 765 at 56 ("Now that Mr. Schulte represents himself, he will raise the advice-of-counsel defense at trial, call his former attorneys as fact witnesses, and introduce evidence that several documents were protected by attorney-client-privilege—including Malware of the Mind."). Schulte's prior arguments make plain that his proposed state-of-mind defense is based on attorney-client communications that he has declined to disclose.

Schulte's proposed evidence and argument also directly implicate the doctrine of at-issue waiver. Schulte cannot propose to offer evidence of his state of mind about attorney-client communications but refuse to disclose the communications that purportedly gave rise to that state of mind and that are relevant to corroborating or contradicting his assertions. *Bilzerian*, 926 F.2d at 1292; *Arista Records*, 2011 WL 1642434, at *2; *Leviton Mfg. Co.*, 2010 WL 4983183, at *3. Because the defendant has elected not to disclose that information, under *Bilzerian* and its progeny, the proposed evidence and argument should be precluded.

23

**IV.    Schulte Should Be Precluded from Arguing That His Conduct Was Protected by the First Amendment or That WikiLeaks' Unauthorized Publication Deprived National Defense Information of Its Protections, or Otherwise Seeking Jury Nullification**

**A.    Relevant Background**

The defendant has repeatedly asserted that, in defense to the MCC Leak Charges, he intends to argue at trial that his actual and attempted disclosure of national defense information that had previously been disclosed by WikiLeaks in the Leaks is either protected by the First Amendment or that the information lost its protected status as a result of the unauthorized publications. *See, e.g.*, Defendant's Sept. 10, 2021 letter pursuant to Classified Information Procedures Act ("CIPA") § 5 (arguing that documents, writings, notes, and information that Schulte disclosed and attempted to disclose from prison were not classified because they had been publicly disseminated by WikiLeaks in 2017); D.E. 597 at 7-12, 20-25, 29-30, 36-37, 38-39 (arguing that information in the public domain cannot be national defense information); D.E. 669 at 3 (arguing that the First Amendment and separation-of-powers doctrine permits Schulte to contest classification determinations). The Court denied the defendant's motion to dismiss Counts Three and Four, *see* Dec. 20, 2021 Tr. at 70. The Court did not resolve the question of "whether information that is in the public domain can qualify as national defense information" indicating it would wait until addressing requests to charge and motions *in limine*. *Id*. The Government has separately opposed the introduction of certain classified information in support of these arguments in its March 18, 2022 motion pursuant to Section 6(a) of CIPA. In addition to granting the relief requested in that motion, the Court should also preclude the defendant from making arguments that his public disclosure of national defense information that was contained in the WikiLeaks Leaks is either protected by the First Amendment or that the information lost its protected status as a result of the unauthorized publications, or otherwise inviting the jury to reject the Court's instructions on the applicable law and acquit him on a basis other than the evidence or lack thereof.

24

### B.    Relevant Law

It is a fundamental axiom "that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence." *Sparf v. United States*, 156 U.S. 51, 102–03 (1895). The jury is "not to decide whether a statute of the United States produced to them is a law or not, or whether it is void, under an opinion that it is unconstitutional; that is, contrary to the constitution of the United States." *Id.* at 70. "Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it." *United States v. Battiste*, 24 F. Cas. 1042 (C.C.D. Mass. 1835) (Story, J.). Consistent with these principles, the Second Circuit has "explained in no uncertain terms that 'trial courts have the duty to forestall or prevent' jury nullification," *In re United States*, 945 F.3d 616, 626 (2d Cir. 2019) (quoting *United States v. Thomas*, 116 F.3d 606, 616 (2d Cir. 1997)); and "categorically reject[ed] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent," *Thomas*, 116 F.3d at 614.

The second element of the violation and attempted violation of Section 793(e) charged in the MCC Leak Charges requires the Government to prove that the documents, writings or notes at issue were "relat[ed] to the national defense." "Though the phrase 'information relating to the national defense' is quite broad, it is cabined" by the "judge-made" limitation that "the information must be 'closely held.'" *United States v. Abu-Jihaad*, 600 F. Supp. 2d 362, 386 (D. Conn. 2009). In *Gorin v. United States*, the Supreme Court recognized that "[w]here there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government." 312 U.S. 19, 28 (1941). The Second Circuit expanded on this

principle in *United States v. Heine*, holding that, since *Gorin* recognized that "it is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; . . . we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all." 151 F.2d 813, 816 (2d Cir. 1945).

Accordingly, the question of whether information related to the national defense is "closely held" turns not merely on whether it is, in some form, public, but also whether the Government, explicitly or implicitly, authorized it to become public. But courts have rejected the much broader proposition that "information that is available to the public can never be considered national defense information." *United States v. Squillacote*, 221 F.3d 542, 575 (4th Cir. 2000). It is axiomatic that "evidence of public disclosure does not deprive information of classified status where the classifying agency has demonstrated a reasonable basis for maintaining information as classified." D.E. 513 (Sept. 23, 2021 Order) at 3 (cleaned up, quoting *Wilson v. CIA*, 586 F.3d 171, 174 (2d Cir. 2009)). "[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990). *Cf. United States v. Husayn*, --- U.S. ----, 142 S. Ct. 959, 968 (2022) ("information that has entered the public domain may nonetheless fall within the scope of the state secrets privilege") (upholding the assertion of the state-secrets privilege in a 28 U.S.C. § 1782 proceeding with respect to the existence *vel non* of a CIA detention facility in Poland). It is only when both the "sources of information are *lawfully* available to the public *and the United States Government has made no effort to guard such information*, [that] the information itself is not 'closely held.'" *Abu-Jihaad*, 600 F. Supp. 2d at 387 (emphasis added); *see also Squillacote*, 221 F.3d at 579 (approving instruction that "information

made public by the government could not be considered national defense information, nor could publicly available information *that the government has never protected*") (emphasis added); D.E. 345 (jury charge) at 24 (same). The converse is also true: where material is made available to the public *unlawfully*, through illicit leaks to ones not entitled to receive it, and the Government *has* made efforts to guard the information, then the materials can still be "closely held." Thus as the Fourth Circuit explained, "under *Gorin* and *Heine*, the central issue [of] the secrecy of the information . . . is determined by the government's actions," and the instructions to be given to a jury on this point should "properly focus[] the jury's attention on the actions of the government when determining whether the documents were related to the national defense." *Squillacote*, 221 F.3d at 577.

Although "[t]he question of the connection of the information with national defense is a question of fact to be determined by the jury," *Gorin*, 312 U.S. at 32, under Rule 402, evidence is properly excluded as irrelevant where it fails as a matter of law to negate an element of the offense or establish an affirmative defense. "Where the evidence to be presented would be insufficient as a matter of law, . . . no proper interest of the defendant would be served by permitting his legally insufficient evidence to be aired at trial, and interests of judicial economy suggest that the jury should not be burdened with the matter." *United States v. Villegas*, 899 F.2d 1324, 1343 (2d Cir. 1990). "[J]uries should not be burdened with testimony relating to [an asserted defense] in cases where the asserted defense fails as a matter of law." *United States v. Bifield*, 702 F.2d 342, 347 (2d Cir. 1983).

### C.     Discussion

The Court has twice rejected Schulte's contention that the MCC Leak Charges violate the First Amendment. First, the Court—like every other court to have considered the question— upheld the facial validity of Section 793 as consistent with the First Amendment. D.E. 284 at 9.

Second, the Court also rejected Schulte's as-applied First Amendment challenge, adopting the reasoning of *United States v. Kim*, 808 F. Supp. 2d 44 (D.D.C. 2011), and finding that, "By virtue of his security clearance, defendant was entrusted with access to classified national security information and had a duty not to disclose that information. He cannot use the First Amendment to cloak his breach of that duty." (Dec. 20, 2021 Tr. at 69 (quoting *id.* at 57)). In view of the Court's previous conclusions that Section 793 is constitutional both on its face and as applied to Schulte, any argument that Schulte's conduct is protected by the First Amendment fundamentally amounts to an effort to ask the jury to nullify. The Court has already determined that Schulte may, if convicted, be properly punished for the violations of Section 793(e) charged in the MCC Counts without running afoul of the First Amendment. Inviting the jury to reach a contrary conclusion of law is plainly prohibited. *See Sparf*, 156 U.S. at 103.

In addition, for the reasons set forth in the Government's opposition to the defendant's motions to dismiss Counts Three and Four and the Government's motion pursuant to Section 6(a) of CIPA, the defendant's contention that WikiLeaks' disclosures preclude any of the information contained therein from remaining "closely held" is also without merit. There is no reasonable dispute that the Classified Information was stolen from the CIA, the Classified Information was transmitted to WikiLeaks, and that the Leaks were publicly disclosed all without authorization from the U.S. Government. Though the defendant may argue that particular information from the Leaks or that he learned from his employment is not "connected to the national defense" or was not closely held for reasons other than its publication on WikiLeaks, there is no basis in the evidence or the law for the defendant to argue that his conduct at issue in the MCC Counts is protected First Amendment speech or that the Leaks are not national defense information because it was stolen and unlawfully published on WikiLeaks.

Accordingly, the defendant should be precluded from offering evidence or argument that his disclosures and attempted disclosures of information contained in the Leaks were protected First Amendment speech, or that the information in the Leaks lost its protected status, solely by reason of WikiLeaks' unlawful publication of the Classified Information contained in the Leaks. The Court should similarly preclude the defendant from advancing any other argument that would invite the jury to reach a verdict on any basis other than the application of the law as the Court instructs the jury to the facts proven at trial.

## V.   A CIA Memorandum Recommending Administrative Leave for a Co-Worker of Schulte's Is Inadmissible

### A.      Relevant Background

At the February 2020 trial, a CIA memorandum dated August 2019, requesting that another CIA employee referred to as "Michael," be placed on administrative leave (the "CIA Memorandum," DX L, attached hereto as Exhibit B) was received into evidence over the Government's objection. Tr. 1971, 2671-76. Michael worked in OSB with the defendant until the defendant was moved in April 2016 to a different EDG branch, RDB. (Tr. 1203-05). Michael testified at the prior trial, principally about the facts that he was in the OSB vault on April 20, 2016 (not the RDB space where Schulte worked at that time), he exchanged instant messages with Schulte that evening that confirmed Schulte was logged into DEVLAN, and the two later went to the gym together after work. (Tr. 1207-16). Michael also observed unusual behavior on DEVLAN during the time period when Schulte was manipulating the server to copy the Classified Information, including that the system was being reverted to a snapshot. (Tr. 1207-11).

Michael was placed on administrative leave in approximately 2019 based on an assessment that Michael had not been fully cooperative in an investigation into Schulte's possible role in the Leaks and had similarly been uncooperative in the CIA's 2016 investigation of the workplace

conflict between Schulte and Amol. (DX L at 1-3). Carter Hall, a CIA official who approved the CIA Memorandum, testified that Michael was not considered a suspect in the Leaks, but that his perceived lack of forthcomingness about Schulte and his perceived failure to alert the CIA to security concerns relating to Schulte raised questions about whether he should have access to sensitive CIA data and systems. (Tr. 2681-93). The Government does not presently anticipate calling Michael or Mr. Hall as witnesses during its case-in-chief, though the need may arise to call them in rebuttal.[7]

Information concerning Michael's paid-administrative-leave status was disclosed to the defense prior to trial. During trial, the Government learned of the existence of the CIA Memorandum, provided a copy to the Court on February 12, 2020, and at the Court's direction provided a copy to the defense on February 13, 2020. Tr. 1260-62, 1332-34. The Court granted the defense permission to recall Michael, *id.*, which the defense ultimately did not do. Instead, over the Government's objection (D.E. 336), Judge Crotty admitted the CIA Memorandum by memo endorsement. (D.E. 340).

### B.    Relevant Law

The law is clear that "a 'lay opinion' as to a person's culpable role in a charged crime . . . is not presenting the jury with the unique insights of an eyewitness's personal perceptions," and cannot be admitted into evidence. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). "[I]n such circumstances, the investigatory results reviewed by the agent—if admissible—can only be

---

[7] In addition to other discovery, the trial evidence included records from both the defendant's and Michael's badge-in/badge-out histories (GX 107, 115), instant message logs reflecting the events of April 20, 2016 (GX 719, 726), and a screenshot Michael took of his workstation screen on April 20, 2016 (GX 1255). Other witnesses were also examined and cross-examined about Michael. Tr. 2334-37, 2364-67, 2681-2738. Other discovery also included information about log files from Michael's CIA computer and instant messages from his CIA computer.

presented to the jury for it to reach its own conclusion." *Id.*; *see also United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (error to admit testimony that "not only [told the jury] what was in the evidence but [told] them what inferences to draw from it").

Where the purported relevance of evidence is based on the defendant's assertions that another person could have committed the charged offenses, the Second Circuit has admonished courts to "be sensitive to the special problems presented by 'alternative perpetrator' evidence." *Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998)). Before permitting the defendant to introduce evidence that someone else could have committed the crimes with which the defendant is charged, the Court "must ensure that the defendant shows a 'sufficient . . . nexus between the crime charged and the asserted 'alternative perpetrator.'" *United States v. Hendricks*, 921 F.3d 320, 331 (2d Cir. 2019) (quoting *Wade*, 333 F.3d at 61-62). "It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion." *McVeigh*, 153 F.3d at 1191 (precluding testimony that "would have forced the government to attempt to disprove the nebulous allegation that [another group] was involved in the bombing. This side trial would have led the jury astray, turning the focus away from whether McVeigh—the only person whose actions were on trial—bombed the Murrah Building."). In *United States v. Hendricks*, the Second Circuit affirmed the preclusion of evidence purportedly showing third-party culpability because the defendant's proffer was "insufficient to show the required nexus," noting that "[a]lthough the evidence [the defendant] cites might tend to show that [the third party] knew about the robbery, none of the evidence places [the third party] anywhere near the robbery scene or suggests that he was otherwise involved in the crime." 921 F.3d at 331.

### C.     Discussion

As noted above, the Government does not presently intend to call Michael as a witness in its case-in-chief at trial, and so the CIA Memorandum is not relevant or admissible to impeach a witness the Government does not intend to call. The defense's separate, previously articulated theory for the admissibility of the CIA Memorandum was that the memorandum suggested that Michael committed the theft of the Classified Information rather than Schulte. (D.E. 336). Because the CIA Memorandum is not direct evidence, but consists of hearsay statements reflecting opinions and assessments of its lay authors, it is inadmissible under Rules 701 and 802 of the Federal Rules of Evidence.

Moreover, neither the CIA Memorandum nor any of the other evidence offered at trial "shows a 'sufficient . . . nexus between the crime charged and the asserted 'alternative perpetrator.'" *Hendricks*, 921 F.3d at 331. There is no evidence that Michael could have accessed the March 3, 2016 Backup Files from which the Classified Information was stolen, that Michael engaged in any improper conduct on DEVLAN, or that Michael had any motive to steal the information or send it to WikiLeaks. The only purported evidence of Michael's culpability on which the defendant relied was the CIA Memorandum itself. Yet the CIA Memorandum's conclusions are not based on any assessment that Michael had any culpability in the theft, but rather were premised on "his relationship with Joshua Schulte, the individual charged with the theft of data." Merely repeating that the CIA Memorandum is evidence of third-party culpability does not make it so, and the defendant has introduced no other evidence to suggest Michael's responsibility—or even complicity—in the charged conduct that meets the threshold the Second Circuit has cautioned district courts to guard.

Similarly, because any suggestion by the defendant to the jury that the CIA Memorandum *is* evidence of an alternative perpetrator, even though that interpretation is inconsistent with the

plain terms of the memorandum and the explanation provided by the CIA official who approved it, any evidentiary value of the memorandum is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403.

Finally, to the extent that the admission of the CIA Memorandum reflected a remedy for any potential prejudice that may have resulted from the timing of its disclosure (*see* D.E. 581 at 18 (noting the Court's conclusion that the Government "should have disclosed Michael's enforced leave . . . at or about the time that the decision was made and should not have withheld it until the witness took the stand")), at this point the defendant has had a copy of the memorandum for more than two years and has had ample opportunity to make use of it for trial preparation purposes. Accordingly, the CIA Memorandum should be precluded.

## VI. Schulte's Convictions for Making False Statements, 18 U.S.C. § 1001, and Contempt of Court, 18 U.S.C. § 401(3), Are Admissible in the Event Schulte Testifies

### A. Relevant Law

Rule 609 makes evidence of a witness's prior conviction admissible for impeachment purposes under specified circumstances. Under Rule 609(a)(1)(B), evidence of a prior conviction "must be admitted" where the witness is a defendant in a criminal trial and the prior conviction was for a crime punishable by imprisonment for more than one year, and the probative value of the evidence outweighs its prejudicial effect to that defendant. Under Rule 609(a)(2), evidence of a prior conviction "must be admitted" regardless of punishment if the crime required proving a dishonest act or false statement.

### B. Discussion

Schulte's convictions following the February 2020 trial for making false statements, 18 U.S.C. § 1001, and contempt of court, 18 U.S.C. § 401(3), must be admitted under Rule 609(a)(1)(B) and (a)(2). A violation of § 1001 is punishable by a term of imprisonment of up to

five years, 18 U.S.C. § 1001, and satisfies Rule 609(a)(1)(B). A conviction under § 1001 also requires proof that the defendant (1) falsified, concealed, or covered up by any trick, scheme, or device a material fact; (2) made a materially false, fictitious, or fraudulent statement or representation; or (3) made or used a false writing or document knowing it to contain any materially false, fictitious, or fraudulent statement or entry, 18 U.S.C. § 1001; and thus also satisfies Rule 609(a)(2). Similarly, a violation of § 401(3) is punishable by any term of imprisonment, 18 U.S.C. § 401, and satisfies Rule 609(a)(1)(B). Schulte's contempt conviction for violating the Protective Order also involved proof of the defendant's dishonest act, because the defendant (i) authorized his attorney to sign the Protective Order agreeing to be bound by its terms, GX 928; (ii) acknowledged the terms of the Protective Order to the Court at a May 28, 2018 conference, GX 829 at 7-8; and (iii) used various dishonest means to transmit materials protected under the Protective Order to reporters and the public. *Supra* at 12-16. Thus, the defendant's contempt conviction satisfies Rule 609(a)(2) as well.

In addition, although Rule 609(a)(2) mandates the admission of the defendant's prior convictions on cross-examination, under Rule 609(a)(1)(B), the probative value of the defendant's convictions for making false statements and contempt of court is not outweighed by any unfair prejudice to the defendant. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980); *see also United States v. Brand*, 467 F.3d 179, 195 n.1 (2d Cir. 2006) (same). Here, the nature of the defendant's conduct underlying the two convictions is no more sensational than the conduct for which he will stand trial, nor does it suggest to the jury any improper basis for assessing the defendant's proposed testimony or reaching an ultimate verdict in this case. And the evidence of

34

these convictions is highly probative both of Schulte's truthfulness and of his purported intent to behave only in a law-abiding way.

Thus, should the defendant testify, evidence of both convictions should be admitted to impeach Schulte.

## VII.    The Government May Move to Preclude Testimony from Cumulative Witnesses

### A.    Relevant Background

In advance of the February 2020 trial, the defendant served at least 69 current or former CIA employees with subpoenas to testify in this case. The Government moved to quash those subpoenas as to three particular individuals, and requested that the defendant make some proffer as to the relevant, non-cumulative testimony that such a large volume of witnesses might offer. (D.E. 323). The defense agreed to withdraw the subpoenas as to two of the three individuals named in the Government's opposition (D.E. 325), and the Court precluded the testimony of the third (D.E. 330 at 3). The defense ultimately did not call any of the subpoenaed witnesses at trial. At the conference in this matter on April 13, 2022, standby counsel represented that the defense has issued new subpoenas to "the CIA witnesses." (*See, e.g.*, Apr. 13, 2022 Tr. at 36).

Pursuant to the terms of the Amended Protective Order Pertaining to Classified Information, the defendant's requests to speak with CIA witnesses and issuance of subpoenas to CIA witnesses are handled by individuals who are walled off from the prosecution team. (D.E. 739 ¶ 28). The Government is therefore unaware of how many CIA witnesses the defendant has subpoenaed at this time, and will only learn of those witnesses who report receiving them, pursuant to applicable regulations, to the CIA's Office of General Counsel. In view of the extraordinary volume of subpoenas issued by the defendant in advance of the last trial, however, the Government respectfully notes for the Court that the Government may object to the defense calling witnesses if (i) their testimony would not meet the minimum thresholds of personal knowledge and relevance

required by Federal Rules of Evidence 401 and 602, or (ii) to the extent relevant and admissible, their testimony would be cumulative, confusing, or inflammatory, and should therefore be excluded under Rule 403, and sets forth applicable law and considerations for the Court's evaluation in advance of trial.

### B.    Applicable Law

The defendant's rights under the Sixth Amendment and Federal Rule of Criminal Procedure 17 to subpoena witnesses do not permit him to evade the generally applicable requirements of the Federal Rules of Evidence. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). As the Supreme Court has observed:

> [A] trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

*Id.* at 413-15; *see also United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir. 1995) ("While '[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense,' this right does not preclude a judge from placing reasonable restrictions on the admission of evidence based on the concerns as to 'prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), and *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

The most fundamental requirement for the admissibility of evidence is its relevance to proving a "fact [that] is of consequence in determining the action." Fed. R. Evid. 401. "The question to be asked in determining the relevance of evidence is whether a reasonable person might believe the probability of the truth of the consequential fact to be different if that person knew of the proffered evidence." 2 Weinstein's Federal Evidence § 401.04 (2019). "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

Even potentially relevant testimony from a competent defense witness should be precluded if it fails the balancing test of Rule 403 by introducing "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Although "the Sixth Amendment guarantees a defendant the right to have compulsory process for obtaining witnesses in his favor, at the same time a defendant . . . must show the witness would have provided favorable evidence which was neither cumulative nor irrelevant." *United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002) (internal quotation marks and citations omitted); *see also United States v. Ginsberg*, 758 F.2d 823, 831 (2d Cir. 1985) (defendant must show that witness's testimony is "not merely cumulative to the testimony of available witnesses").

With respect to each of these limitations, as the proponent of the testimony, the defendant "bear[s] the burden of demonstrating the admissibility" of the evidence. *United States v. Camacho*, 353 F. Supp. 2d 524, 535 (S.D.N.Y. 2005) (noting that "[t]his general principle applies to all questions of admissibility that arise under the Federal Rules of Evidence"). Before the Court can admit the disputed testimony, the defendant must demonstrate its admissibility by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not

that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration."). To make such a showing as to the proposed testimony, the defendant should "inform[] the court of its substance by an offer of proof," Fed. R. Evid. 103, so the Court can "decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible," Fed. R. Evid. 104(a).

### C.    Discussion

At this time, the Government is not aware of which witnesses the defendant has subpoenaed, and so merely notes that the issue of a large volume of cumulative witnesses has arisen previously, and the defendant ultimately elected not to call any of the at least 69 CIA witnesses that he subpoenaed for testimony at the last trial. Accordingly, the Government respectfully submits it would be prudent for the Court to consider issues relating to the admissibility of the testimony of proposed CIA defense witnesses in advance of trial. In order to arrange for testimony from a large number of witnesses serving in sensitive national security positions (including potentially from witnesses currently serving overseas), the Government must follow unique procedures necessary to ensure CIA officers' safe transportation to, and participation in, this public trial. Delaying adjudication of the admissibility of each individual witness's testimony until the time of their testimony would force the Government to impose upon dozens of serving officers the burden of being rapidly extracted from their sensitive positions only to have the Court potentially rule later that testimony from (at least some of) them is unnecessary, inadmissible, or both. Such a result would render the entire exercise unnecessary and needlessly harm national security.

In view of these considerations, and given that the defendant bears the burden of establishing the admissibility of testimony that he seeks to offer, the Government respectfully requests that the Court set a pretrial schedule for the defendant to make a proffer of each witness's

anticipated testimony and the basis for its admissibility, consistent with Federal Rules of Evidence 103 and 104, sufficient to allow the Government to make specific objections and for the Court to rule as soon as practicable. *See* 1 Weinstein's Federal Evidence § 103.22 (2019) ("In addition to making a sufficient offer of proof, the proponent of evidence must convince the trial court that the evidence is actually admissible. [The proponent] must be prepared to explain and substantiate the theory under which it is claimed that the evidence is admissible.").

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated: New York, New York
April 22, 2022

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____/s/_____
David W. Denton, Jr.
Michael D. Lockard
Assistant United States Attorneys
(212) 637-2744 / -2193

cc: Joshua Adam Schulte (by mail)
Standby counsel (by ECF)