M4D3SCHC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              17 CR 548 (JMF)

JOSHUA ADAM SCHULTE,

             Defendant.

------------------------------x     Conference

                             New York, N.Y.
                             April 13, 2022
                             2:15 p.m.

Before:

                HON. JESSE M. FURMAN,

                            District Judge

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
DAVID DENTON, JR.
MICHAEL D. LOCKARD
     Assistant United States Attorneys

JOSHUA ADAM SCHULTE, Pro Se Defendant

SABRINA P. SHROFF
DEBORAH A. COLSON
SHANE D. KADILAL
     Stand-by Counsel for Defendant


ALSO PRESENT:  DANIEL O. HARTENSTINE, CISO

M4D3SCHC

1          THE COURT:  Good afternoon.  We are here in the matter

2     of the United States v. Joshua Schulte.

3          Counsel, please state your names for the record.

4          MR. DENTON:  Good afternoon, your Honor.  David Denton

5     and Michael Lockard for the government.

6          THE COURT:  Good afternoon.

7          THE DEFENDANT:  Josh Schulte appearing pro se.

8          THE COURT:  Stand-by counsel, please.

9          MS. SHROFF:  Good afternoon, your Honor.  Sabrina

10    Shroff, Deborah Colson, and Shane Kadilal as stand-by counsel.

11         THE COURT:  Good afternoon to you.  And Mr. Kadilal,

12    nice to meet you and welcome.

13         MR. KADILAL:  Thank you.

14         THE COURT:  Let's kick things off.  There are a number

15    of things on my agenda.

16         As a reminder, we are obviously in an unclassified

17    setting, so please make sure you're careful with whatever you

18    say.

19         Let me start with items that remain open in

20    Mr. Schulte's letter of April, dated April 1st.  I think it was

21    docketed on April 4., but docket no. 752.  I have ruled on a

22    number of the items on that letter in my order on April 7 at

23    docket no. 757 and left a few open to discuss today.  So let me

24    run through them.

25         First, with respect to item E, namely, whether

M4D3SCHC

1    Mr. Schulte should be permitted to file a motion to suppress

2    the search warrant application that I had previously ruled he

3    could not, because it would be academic, the suggestion I had

4    made in my order was that he be deemed to have made it and have

5    it denied on the theory that is where the gravamen of why I

6    said he couldn't make it, and in that way, he could preserve

7    the issue for appeal, which seems to be his principal concern

8    at this point.

9            Yes, Ms. Shroff.

10           MS. SHROFF:  Your Honor, I apologize.  We are having

11   trouble understanding the Court.  I do apologize.  We're all

12   experiencing a little trouble understanding because of the

13   mask.  Maybe you could -- I'm sorry about that.

14           THE COURT:  You can't hear me?

15           MS. SHROFF:  We can hear you.  We're just having

16   trouble fully understanding exactly what the Court is saying.

17   I'm sorry.

18           THE COURT:  All right.  Well, our rules allow me to

19   take off my mask.  So I'll avail myself of that.

20           Does that help?

21           MS. SHROFF:  It does help.  Thank you, your Honor, and

22   I do apologize.  Sorry about that.

23           THE COURT:  Understanding me is an important part of

24   this proceeding.

25           What I am saying is item E in Mr. Schulte's letter of

M4D3SCHC

1    April 1st and 4th was a motion for reconsideration of my denial

2    of his request to file a motion to suppress the -- I think it

3    is March 2017 search warrant if I remember the date correctly.

4    I was asking the government's view on my proposal that I just

5    deem the motion to have been made and denied as a way of

6    ensuring that the issue was reserved for appeal.

7             So Mr. Denton?

8             MR. DENTON:  We have no objection to that approach,

9    your Honor.

10            THE COURT:  So, I will deem it to have been made and

11   denied and we can move on from that.

12            Item F is another request for the SC1 drive.  That

13   request is denied substantially for the reasons set forth in

14   the government's reply of the other day of Monday at docket no.

15   762, and I don't expect to hear anything further on that front.

16   We have gone over it way too many times already.

17            Item H1, the MDC's alleged refusal to provide

18   Mr. Schulte with legal calls.  I'm inclined, in light of the

19   government's response, to think that there is no issue here.

20   Namely that Mr. Schulte has not been denied any legal calls,

21   and that his one request for a video telephone conference on

22   March 16 was honored, and indeed he had close to a two-hour

23   conversation on that date.

24            But Mr. Schulte, is that incorrect?

25            THE DEFENDANT:  Yeah, I don't have the government's

M4D3SCHC

1    reply so I am not sure what they said.  But, ever since the

2    issue with the MDC filing their letter, I have not been able to

3    receive legal calls.  I've requested, I think I put the date,

4    but for two separate weeks I requested legal calls like every

5    day, Tuesday, Wednesday, Thursday, and each time, I was told by

6    Unit Manager Bullock I would get the legal call and I never

7    did.

8            So I still have been unable to -- so yeah, I don't

9    know what the -- that's the issue.  I've actually requested

10   legal calls for three or four straight days, from last week and

11   the week before, and I was never able to receive a legal call.

12   Before the incident, I was able to receive legal calls, but

13   then after the -- the declaration was made, and then I made --

14   I had made the allegations to the Court that was a fraud, ever

15   since then I've been unable to make legal calls.

16           THE COURT:  So, I'm going to print out the

17   government's letter just so you can look at it.

18           THE DEFENDANT:  Okay.

19           THE COURT:  That may facilitate this conversation.

20           MR. LOCKARD:  Your Honor, I have a copy I can hand

21   back.

22           THE COURT:  Great.  Please do.

23           Mr. Schulte, it is on page two.  I think there is one,

24   two or three paragraphs after legal calls and then additional

25   paragraphs under the VTC, which relate to these issues, too.

M4D3SCHC

1          THE DEFENDANT:  Yeah, so, what -- MDC has never

2    informed me that I have to put in a letter request.  So I just

3    verbally told, spoke with Unit Manager Bullock and made those

4    requests.  He never told me to submit a letter.  I've never

5    been told to submit a letter for a legal call.  And I have

6    filed multiple administrative remedies about it.  I haven't

7    received any administrative remedies I filed in like three

8    weeks.

9          THE COURT:  You say you have filed administrative

10   remedies?

11         THE DEFENDANT:  Yes.  So I'm able to file BP-8s, and I

12   have tons of those, I file those and I never receive any

13   response.  I have filed administrative remedies BP-8s about the

14   legal calls and not receiving them on the days that I

15   requested, and I never received any response from MDC about

16   those.

17         THE COURT:  Okay.  I'm not quite sure how to square

18   that with what the government is reporting to me according to

19   the MDC.  There seems to be a recurring pattern where

20   Mr. Schulte says one thing and the MDC reports another.

21         Mr. Denton, any thoughts?

22         MR. DENTON:  So, your Honor, I think all I can relay

23   here is what we have been told and what we've been able to

24   determine based on the records we've been able to review.

25   We've reviewed a summary of the defendant's history of filing

M4D3SCHC

1    of administrative remedies.  We've not looked at the individual

2    documents, but none of the records in that summary report

3    indicate any administrative remedies having been filed related

4    to the denial of legal calls.

5        We spoke -- Mr. Lockard and I personally spoke with

6    Unit Manager Bullock who explained that, as with many things at

7    the MDC, there is a form, it is not a letter but there is a

8    form that's available on the unit to request a legal call.

9    That while they do sometimes take oral requests, that the

10   actual practice is supposed to be by making the request by

11   form.  That's for an inmate.  There is a sort of obverse side

12   of that process where an attorney can request a legal call with

13   an inmate.  And that the defendant had not submitted those

14   forms or in the unit manager's recollection recently made an

15   oral request for a legal call.

16       As far as we can tell from speaking with Unit Manager

17   Bullock and the legal department, no one is seeking to deny him

18   legal calls.  And if there is some steps that need to be taken

19   to make sure that he receives a prompt response to requests

20   made in the appropriate way, we're happy to continue those

21   conversations with the MDC to make sure that happens.

22       THE COURT:  All right.  Ms. Shroff or your colleagues,

23   anything you want to add on this?

24       MS. SHROFF:  Your Honor, I have a slight suggestion

25   that hopefully also addresses it.  Perhaps we can all -- and I

M4D3SCHC

1    intend to have a conversation with the government after this

2    appearance.  I believe there is a BOP person here in court or

3    around the court today.

4              I was hoping that we could all hit the reset button.

5    This seems like not a good way to proceed from anybody's point

6    of view.  Since the MDC representative is here, I was hoping

7    that we could have a conversation and just see if there was an

8    easier way for Mr. Schulte to get what he needs out of the MDC.

9    It seems to be something that's limited in nature, he wants an

10   easy way to set up legal calls, continue with his family calls,

11   and use of the law library.  Maybe we can all get together and

12   try and come up -- sometimes it helps, you just hit the reset

13   button and start fresh.  Maybe we can do that here.

14             I confess that my clients in the SHU have not had this

15   issue.  But I have never known of anybody having to make a

16   written request for a legal call.  So, that is news to me.

17             THE COURT:  Well, I certainly would applaud hitting

18   the reset button and everybody trying to do a little bit better

19   to just get along and make this process easier, particularly as

20   we get closer to trial, and I'll discuss that in due course.  I

21   think having a slightly more collaborative approach to some of

22   these issues would certainly facilitate things.

23             Mr. Denton, is it correct there is a representative of

24   the BOP here today?

25             MR. DENTON:  Yes, your Honor.

M4D3SCHC

1          THE COURT:  Okay.

2          MS. CHAN:  Good afternoon.

3          THE COURT:  Do you mind stepping up and using the

4   podium here.  Can you state and spell your name into the

5   microphone there.

6          MS. CHAN:  My name is Irene Chan, I-R-E-N-E CH-A-N.

7          THE COURT:  I guess putting aside what may or may not

8   have happened to date.  Can I just ask that perhaps we try to

9   work together, hit the reset button.

10          MS. CHAN:  Sure, your Honor.

11          THE COURT:  As Ms. Shroff suggests.  Mr. Schulte, I

12   recognize, is a high maintenance inmate given the SAMs, given

13   his self-representation, given the nature of this case.  But it

14   is absolutely critical as we approach trial that these sorts of

15   issues don't impede the ability for him to prepare and the

16   ability for us to get done what needs to get done.  And if I

17   need to ultimately have a hearing and figure out whether what

18   he's telling me is true or what I'm hearing through the

19   government the MDC is reporting, then I'll have a hearing and

20   put somebody on the stand and figure out what's going on.  But

21   I would very much rather avoid that and focus our attention and

22   energies on the actual substance of the litigation, namely the

23   charges against Mr. Schulte, and not have to do that.

24          So, I am asking you directly, you can report back to

25   your people as well, to the extent you can work with

M4D3SCHC

1   Mr. Schulte, with stand-by counsel, and with the government and

2   everybody can work together, and try to put these sorts of

3   issues to rest so Mr. Schulte can prepare and focus on trial,

4   not on these sorts of things, I would be very grateful.  And it

5   would avoid the need for this to become time consuming and

6   annoying collateral litigation.

7          Is that okay, Ms. Chan?

8          MS. CHAN:  Yes, your Honor.  So MDC Brooklyn have been

9   accommodating the SAMs make legal calls.  This is the first

10  time I've heard this.  Other inmates in SAMs are granted legal

11  calls.  This the first time I heard of it, and just going

12  forward, I'll speak to his unit team and staff to ensure he

13  gets those granted.

14         THE COURT:  Okay.  Can you personally handle

15  Mr. Schulte's situation so that you can be a liaison and a

16  conduit in the staff attorney's office to deal with the

17  government, deal with stand-by counsel, and deal with

18  Mr. Schulte?

19         MS. CHAN:  Yes, your Honor.

20         THE COURT:  Hopefully that will assist in everybody

21  hitting the reset button and some of these issues will go away.

22  Thank you, Ms. Chan.

23         MS. CHAN:  You're welcome.

24         THE COURT:  All right.

25         Item H2 pertaining to the VTC system.  The government

M4D3SCHC

1    represents there was an issue but it has been resolved so I'll

2    assume that issue is moot and we can move on.

3           Item K was Mr. Schulte's request for a list of

4    documents subject to the unclassified protective order.  That

5    request is denied substantially for the reasons set forth in

6    the government's letter, namely, given the labeling of the

7    documents and files, and I'm persuaded he doesn't need a list

8    to know what is and isn't classified, and I am not aware of any

9    basis to compel the government to create a list that doesn't

10   otherwise exist.

11          Item L pertains to the allegedly I would say erroneous

12   affidavit declaration by Officer Santana and Mr. Schulte's

13   request for the audio recording relating to that.

14          Mr. Denton, do you wish to be heard on that?  I don't

15   know if there is such a recording, whether there is such a

16   recording, to the extent Mr. Schulte averts to an intention to

17   use it at trial, I don't know if that would be appropriate or

18   not.  But, what do you have to say about this?

19          MR. DENTON:  So the simple answer, your Honor, is

20   we've been informed there is no audio recording.  That to the

21   extent there is recording, it's video and not audio.

22          I struggle to see how that would be relevant to issues

23   at trial in any event.  But, the bottom line is, is there is no

24   audio to provide, even if the defendant were entitled to it.

25          THE COURT:  Can you give me any further explanation of

M4D3SCHC

1   what exactly happened here, why I received a sworn declaration

2   and it turned out to be erroneous?

3       MR. DENTON:  Yes, your Honor.  Our understanding is

4   that there was some miscommunication with Ms. Santana who has

5   worked at the MDC during the time preceding the transfer of all

6   the SAMs inmates from MCC to MDC.

7       And so, as we understand it, she was familiar with

8   what was available to inmates at the MDC in the normal course,

9   and not necessarily familiar with the fact that SAMs inmates do

10  not have access to those same resources by the same names due

11  to the limitations on the system.

12      And so, her explanation and understanding of what was

13  available to this defendant was not necessarily accurate,

14  because it diverged from her experience with typical MDC

15  inmates.

16      We recognize that that was erroneous, and that the

17  point of the letter and the declaration accompanying it was to

18  address the defendant's situation specifically.  As soon as we

19  heard from the defendant during our regularly scheduled phone

20  call on that Friday that he believed this was inaccurate, we

21  did not wait for him to submit his letter, much less for the

22  Court to order a response, before we reached out to Ms. Chan

23  and the MDC to try and figure out where this error could have

24  arisen.

25      And we understand that it was not responsive to the

M4D3SCHC

1    Court's desire for us to resolve the printing and computer

2    saving issue, which is why we worked during the following week

3    to resolve the issue and to discuss at high levels within the

4    MDC, including by having the chief of the criminal division

5    speak to the warden about the importance of our representations

6    to the Court and of making accommodations necessary for the

7    defendant's preparation for trial.

8           THE COURT:  Okay.  My concern is that, at least

9    according to Mr. Schulte, the inaccuracy didn't pertain to her

10   familiarity with what conditions applied to him, but with

11   respect to what occurred in a conversation she had with him,

12   which presumably she did have personal knowledge of.  So, can

13   you clarify that?

14          MR. DENTON:  I think, your Honor, again, Officer

15   Santana remembers things differently from Mr. Schulte.  That as

16   we understand it, her view is that the conversation did occur

17   and she did describe these things to Mr. Schulte, even though

18   they proved to be inaccurate.  As I said, there is no sort of

19   audio of that conversation.  There is no transcription of it

20   for to us resolve that issue, which is why we focused our

21   efforts on trying to address the substantive problem.

22          THE COURT:  All right.  Mr. Schulte, anything you wish

23   to say on this before I move on?

24          THE DEFENDANT:  Yes.  I think the first thing I want

25   to note is, where this conversation took place, right in the

M4D3SCHC

1   law library, right there, there is a camera and a giant sign

2   that says audio and video recording taking place here.  So

3   there is a giant sign that says that.  And I know that the MDC

4   has actually reviewed the video and audio before, because

5   they've told me, when I have filed administrative remedies

6   before, they told me, oh, this is what you said.  And they had

7   it exactly what the conversation was.  So they've -- so the

8   fact that there is no audio I find that very hard to believe,

9   because of the sign and because they've specifically told me

10  things that have been said before where it had been recorded.

11       So I don't know what's going on with that, if

12  something's being hidden from the government or what.  But the

13  sign says audio and video recording in progress, and I have had

14  them quote audio before to me.

15       The second thing is, is I don't think it is not really

16  a miscommunication at all, because what she says is, she told

17  me this and that I told her I understood and that I could

18  access the service.  I haven't had access to the service in

19  five years so I would never say that.  And the only

20  conversation that took place was mostly between me and Unit

21  Manager Bullock.  She said almost nothing the entire time.

22  Bullock actually said, I understand you don't have any other

23  service, there is nothing for you to do here, so I'll let the

24  government know that we don't have anything.  So it's literally

25  the exact opposite from what she's saying.  I don't see how

M4D3SCHC

1    there could be any miscommunication with that.

2              THE COURT:  All right.  Well, listen, I think this is

3    a little troubling.  I need to know I can rely on

4    representations made by the government and by representatives

5    of the MDC.  And particularly when they're put in sworn

6    declarations, I would hope and assume that care is taken to

7    ensure those statements are completely and entirely accurate.

8              Having said that, I take the government's

9    representation that there is no audio recording, I don't know

10   how to square that with the warning sign.  But I will ask

11   Ms. Chan and with Ms. Chan's assistance the government just to

12   confirm that and advise Mr. Schulte and me if they find out

13   anything otherwise.

14             In the absence of a recording, I don't really think

15   it's worth our time or my time to get to the bottom of this,

16   because I find it very hard to imagine how it would be

17   admissible at trial or relate to the charges at trial, and I

18   think that the government's focus on trying to solve the

19   substantive issues is ultimately more important.

20             But certainly let me say that I expect everybody to,

21   when they make representations to me, that those

22   representations can be relied upon and are 100 percent

23   accurate.

24             All right.  With that, item M is Mr. Schulte's request

25   for a DVD drive.  I think we have beat that horse to -- for

M4D3SCHC

1    lack of a better way of describing it -- a pulp.  And I'm not

2    inclined to spend much more time on it.

3              But Mr. Schulte does raise a new angle to it, namely

4    his need to prepare trial video demonstratives and to share

5    exhibits and electronic files with his expert.

6              Mr. Denton, I know we've been over this ground and I

7    am not sure there is much further to say.  But, is there some

8    means by which he could accomplish those ends, short of the

9    drive which I understand is not an option?

10             MR. DENTON:  I think it is difficult to imagine a way

11   he could accomplish that from the discovery laptop that is at

12   the MDC.  When we spoke about this with Mr. Schulte, I think

13   our first suggestion was that he have a conversation with

14   stand-by counsel and his expert who have access to the same

15   unclassified electronic materials, and may be able to assist

16   him if he can provide them with direction or provide them with

17   some written instructions which he can print.  There may be

18   workarounds for that.

19             Obviously with respect to trial, as always, the

20   government is happy to do whatever we need to do as far as

21   displaying materials in the courtroom or anything like that.

22   We're happy to provide whatever assistance we can on that

23   score.

24             THE COURT:  Mr. Schulte?

25             THE DEFENDANT:  Yeah, I mean, the government at trial,

M4D3SCHC

1    the last trial we went through, there was a computer that was

2    used to display exhibits to the jury.  And I'm not sure how the

3    exhibits that I am creating would be able to, you know, be

4    displayed to the jury.

5              And the other thing is, a lot of the documentation

6    that I'm creating, the video demonstratives and the PowerPoint

7    presentations, stuff like this, I mean, this is stuff that

8    I'm -- I intend to be using at trial.  No one else can create

9    these things.  So I'm not really fully understanding what the

10   government is trying to say.  How are these things going to be

11   displayed electronically, digitally for the jury.

12             THE COURT:  Ms. Shroff, is this not an area where you

13   could presumably provide whatever assistance Mr. Schulte needs

14   both in terms of preparing and also during trial displaying?

15             MS. SHROFF:  Your Honor, may I just have a word with

16   Mr. Schulte.

17             THE COURT:  Yes.

18             (Conferring)

19             THE DEFENDANT:  I think the issue is, I've already

20   completed the video demonstratives or the PowerPoints are

21   already created, so there is nothing really for them to do, if

22   that makes sense.  There is no way for me to -- if there is no

23   way for me to transfer that data, there is nothing for them to

24   do unless they would recreate what I've already done.

25             The whole point for me representing myself is I intend

M4D3SCHC

1   to do these things myself and videos can't be printed anyway.

2   So, I don't think there is anything for them to really do.

3   This information is already, or this is already finished.

4           THE COURT:  Meaning they're on the laptop?

5           THE DEFENDANT:  Yes.  And my -- my understanding from

6   the BOP policy was they provided the first DVD drive that had

7   write capability.  My understanding from them -- she's here, we

8   can check -- is the government was complaining about it, but

9   the MDC didn't have an issue with it because it's connected to

10  my laptop.  If that's not the case, I mean, that was my

11  understanding is the BOP policy does not ban me having the DVD

12  drive connected to my laptop.

13          THE COURT:  That is not what I've been told, and I

14  have no reason to doubt what I've been told.  Whether earlier

15  in this case you were permitted to have it or not.

16          Having said that, to the extent there are materials on

17  Mr. Schulte's computer that can't be printed, because they're

18  not of the nature to be printed, it does seem to me eminently

19  reasonable and possible to figure out some means by which those

20  are transmitted to stand-by counsel.

21          So I am going to ask in the vein of the reset button

22  for the government, Ms. Chan, stand-by counsel to try to put

23  their heads together and figure out an easy enough means to get

24  that done.  And I'll look to you to get it done and expect it

25  to be done, and expect I don't hear about this again.

M4D3SCHC

1          Having said that, Mr. Schulte, as I've said before, in

2     going pro se, doesn't mean you are entitled to all the

3     resources you would have if you were out of jail or not under

4     SAMs or if you were represented by counsel.  And you were

5     advised of that and you made that decision.  And in that

6     regard, you'll have to live with the conditions that you are

7     under.  And I'll certainly make sure you can prepare for trial

8     and largely do what you need to do, but it doesn't mean you'll

9     have unlimited resources or precisely what you would want in

10    preparing for trial.

11         But, again, my expectation is that this issue will be,

12    there is a solution and that you all will figure out that

13    solution.

14         Mr. Denton?

15         MR. DENTON:  If I may, I expect the solution will be

16    for the defendant to provide his laptop to stand-by counsel,

17    who will then be responsible for what is allowed to come off of

18    it.  I think the idea of providing him with removable media or

19    bringing removable media to attach to it is not going to be a

20    viable option.

21         The defendant has expressed reluctance about anything

22    that would separate him from his laptop.  To the extent we are

23    going to work out a solution to this, that's the way it will

24    have to happen.  And to the extent the defendant is prepared to

25    accept that, we will work to resolve that.

M4D3SCHC

1    THE COURT:  All right.  Well, that may well be the

2    case.  And again, hopefully you guys can put your heads

3    together and figure it out.

4    Yes, Ms. Shroff.

5    MS. SHROFF:  I will confess if the MDC is going to

6    allow Mr. Schulte to give me the laptop, I will be pleasantly

7    surprised.  But if they do, I'm happy to assume that

8    responsibility, get the videos off his computer and proceed

9    that way.

10    If not -- you know what?  I will coordinate with

11    Ms. Chan.  I think that she and I can try and find a solution

12    here.

13    THE COURT:  Great.  It would be helpful now that we

14    have a specific person in the MDC who has represented that they

15    are available to help and will take responsibility for this

16    situation.  Hopefully that will help facilitate these things.

17    Again, I hope you all can figure out what the solution will be,

18    even if it is not the most convenient to Mr. Schulte or someone

19    else, and I won't have to hear about this again.

20    Last open item from Mr. Schulte's earlier letter was

21    his request for adjournment of trial.  That request is denied.

22    This is a retrial.  We're not starting from scratch and the

23    case would have been tried long ago but for the limitations

24    imposed by COVID.  Mr. Schulte was warned by Judge Crotty when

25    he decided to represent himself nearly a year ago that he was

M4D3SCHC

1    "always going to be at a deficit vis-a-vis retained or

2    appointed counsel" because of his incarceration and the

3    conditions of his incarceration, and that going pro se would

4    not result in modification of those conditions.  ECF number 483

5    at pages 8-9.

6            Even so, Judge Crotty and I both made substantial

7    efforts to give him sufficient time and opportunity to prepare

8    for trial.  As you know, I arranged for the doubling of his

9    SCIF time back in November.  I also ordered the government to

10   ensure that he would have 10 hours of law library time per week

11   in addition to the SCIF time.  In February I appointed a third

12   stand-by counsel to assist.  And he has made ample use of those

13   resources since December.  By my count, Mr. Schulte has filed

14   more than 30 letters, motions, and memoranda of law, and in

15   that regard, clearly has devoted a substantial amount of time

16   to this case.  Whether preparing for trial or whether focusing

17   on what he should focus on is not my problem.  He's had plenty

18   of time.  Moreover, trial was already delayed once at

19   Mr. Schulte's request to accommodate the availability of his

20   expert, ECF number 628, and the trial date has been in place

21   since December, if not before.  I have repeatedly warned that

22   the trial date would not be moved.

23           So bottom line is, there is no basis to move the

24   trial, and it is not being moved.

25           With that, let me turn to Mr. Schulte's more recent

M4D3SCHC

1    letter concerning the law library at the MDC, an incident that

2    allegedly occurred there on April 6 where he was left in the

3    law library for what he describes as an inordinate amount of

4    time.  He asks that I order the MDC to return him to his cell

5    within 30 minutes of the time he requests and that they move

6    the printer outside his cell so he doesn't have to go to the

7    library.

8              The latter request is denied.  I I'm not going to get

9    into micromanaging the MDC at that level, and again, that

10   doesn't meaningfully impinge on his ability to prepare for this

11   case which is my only equity here.

12             For that matter, I'm not sure that the larger

13   complaint pertains to issues that are within my jurisdiction,

14   but certainly the allegations, if true, are somewhat troubling.

15   So, for that reason I will ask the government, Ms. Chan, to at

16   least respond and give me an explanation or response.

17             MR. DENTON:  I think this is going to be better

18   addressed by counsel for the MDC.  I will only say that I think

19   we remain willing to assist in any way that we can in making

20   sure that the defendant is able to prepare for trial.

21             THE COURT:  Okay.  Ms. Chan.

22             MS. CHAN:  Your Honor, the allegations --

23             THE COURT:  Can you move the microphone a little

24   closer.

25             MS. CHAN:  Sure, your Honor.

M4D3SCHC

1          I haven't had a chance to investigate.  But, I'm sure

2     this is something that is a mistake.  And I'll definitely talk

3     to my staff about what happened, and if the allegations are

4     true, make it known that's not a proper way to allow an inmate

5     law library time.  Because they have an understanding that

6     Mr. Schulte has access to the law library on the weekends and

7     he's been getting that.

8          In terms of this recent complaint, I apologize, your

9     Honor, I haven't gotten a chance to ask around and see what the

10    facts is about that incident.

11         THE COURT:  Okay.  Is there a reason you hadn't done

12    that before this conference since I entered an order indicating

13    that I intended to discuss it here?

14         MS. CHAN:  Your Honor, I just been busy trying to look

15    up the -- collecting the information about the law library

16    access and what paper to show that he was given law library

17    access in terms of his complaints about that and the policy

18    about the search, you know.  And I didn't really get a chance

19    to.  So I apologize for that, your Honor.

20         THE COURT:  Given that, why don't you look into it and

21    report back to Mr. Denton, and he can fill me in let's say

22    within the next week, just on what happened in that incident

23    and whatever assurances can be provided that it won't happen

24    again.

25         MS. CHAN:  Yes, your Honor.

M4D3SCHC

1          THE COURT:  And here, too, I hope the reset -- and I

2     hope there is a reset -- will enable us to avoid having to deal

3     with these sorts of things going forward.

4          MS. CHAN:  Yes.  Will do.

5          THE COURT:  Thank you.

6          MS. CHAN:  You're welcome.

7          THE COURT:  All right.

8          Next is Mr. Schulte's letters of the other day, docket

9     no. 763 and 764.  764 indicates he is not asserting an advice

10    of counsel defense.  In light of that, he, pursuant to Judge

11    Crotty's previous orders, does not need to disclose the

12    documents that Judge Crotty had ordered him to disclose.  But,

13    obviously, he will not be permitted to assert an advice of

14    counsel defense and that's the price of disclaiming it.

15         To the extent that his letter identifies categories of

16    testimony that he does intend to offer at trial, I think it's

17    premature to address whether it would be admissible or not.

18    Obviously to the extent that it does, without stating as much,

19    assert advice of counsel, he will not be permitted to do so,

20    having waived his right to assert that defense.

21         Now, beyond that, is there anything, Mr. Denton, that

22    needs to be said at this time on this issue?

23         MR. DENTON:  No, your Honor.  I expect we will address

24    this more in our upcoming motions in limine.  I think as your

25    Honor indicated, we have a concern that it does seek to assert

M4D3SCHC

1    an advice of counsel defense, without calling it as such.  But

2    obviously, we can address that in it writing and the defendant

3    can respond.

4              THE COURT:  All right.  I will reiterate this in due

5    course.  But it seems to me that various of Mr. Schulte's

6    filings have averted to things he may intend to offer or argue

7    at trial that the government may want to be heard on.  I would

8    think those would be appropriate subjects for in limine

9    briefing and trust that you're making a tally and will be heard

10   appropriately.

11             MR. DENTON:  If I may, your Honor, with respect to

12   that.  The one category I would add to that, that we may need

13   to address down the road, are the demonstratives and

14   PowerPoints and other things that the defendant has referred to

15   creating on the laptop.  I assume that once we are able to get

16   them off, we'll be given access to them at an appropriate time

17   and can address them at that point.

18             THE COURT:  Understood.  I think that does underscore

19   the need to figure out a solution to the practical problem of

20   getting them off the laptop sooner rather than later so they

21   can be disclosed to the government.

22             Docket no. 763, Mr. Schulte raises several issues he

23   wants to raise today, some of which we've already addressed or

24   I will address, upcoming deadlines and the like.  One is a

25   reference to newly produced discovery by the government.

M4D3SCHC

1           Mr. Denton, do you want to fill me in on that?

2           MR. DENTON:  Yes, your Honor.  Last week, we made a

3    production of discovery to the defendant that was partly

4    classified and partly unclassified but subject to the

5    unclassified protective order of material that had been

6    obtained through an unrelated investigation being conducted by

7    a different U.S. attorney's office.  It's not a particularly

8    large volume of material.  But we made it available to the

9    defendant in the SCIF.  Stand-by counsel has asked us to make a

10   separate copy for them, which we're happy to do once they give

11   us a drive to put it on.

12           THE COURT:  All right.  When did you come into

13   possession of this material?

14           MR. DENTON:  The unclassified portion of the material

15   we received in late February.  It was audio recordings of

16   interviews that were conducted overseas, which we then had

17   transcribed and we produced transcriptions of that.

18           The other material was originally received by the

19   other investigation being conducted by a different office in

20   July of last year -- sorry, your Honor.

21           I should correct that.  We learned of it in July of

22   last year.  We are not exactly sure when they received it.

23   It's computer data.  It is images of servers that were obtained

24   from overseas which then had to be processed so we could figure

25   out what was on them.  So the relevant portion of that material

M4D3SCHC

1    was produced to the defendant on Friday.  I think actually it

2    was produced on Thursday, but he didn't receive it in the SCIF

3    until Friday.

4              THE COURT:  When did you get the relevant portions of

5    those servers?

6              MR. DENTON:  I think, so the relevant portions of

7    those servers were extracted -- earlier this year.  I'm trying

8    to figure out exactly when it was that they were -- so, your

9    Honor, the reason I'm struggling a little bit is there is a

10   multistep process here.  Once the material was processed and

11   available for review, we had to determine first what was

12   relevant from a large trove of data on a server.  That then had

13   to be put through the review process that Judge Crotty

14   previously approved to protect certain classified information.

15   Once that review process was completed, the information was

16   exported, marked, made available for production, and delivered

17   to the defendant.  We delivered it to the defendant sort of

18   within a week of that process being completed.  But, each of

19   those different stages took a substantial period of time over

20   the course of this year.

21             THE COURT:  Do you anticipate any additional discovery

22   being produced or do you think that is it?

23             MR. DENTON:  We're still in the process of determining

24   that.  I expect there will be additional material, but that's

25   in that process of being reviewed to identify exactly what's

M4D3SCHC

1      relevant to turn over at this stage.

2               THE COURT:  Do you intend to offer any of this at

3      trial?

4               MR. DENTON:  We do not, your Honor, nor do we have any

5      reason to believe, based on our review of it, that it is

6      exculpatory in any way.

7               THE COURT:  All right.  Mr. Schulte, do you wish to be

8      heard?  Again, recognizing that there are limits as to what can

9      be discussed in this forum?

10              THE DEFENDANT:  I think there is two -- Ms. Shroff

11     discussed one of the issues, but, the other issue is this is

12     basically related to the first issue I raised in the letter

13     regarding due dates.  I don't know if you want to talk about

14     that now or talk about that later, about the due dates for the

15     two pending opposition for CIPA 6 and my reply for the

16     suppression motion.

17              THE COURT:  Well, the reply for the suppression motion

18     I think is due tomorrow if I'm not mistaken.

19              THE DEFENDANT:  Yeah, so, it's due tomorrow.  And I

20     wanted to bring up to the Court that due to the law library

21     issue, I haven't been back since that incident so I have not

22     been able to print that.  So I would not be able to file that

23     by tomorrow.

24              And the second issue is I'm waiting for transcripts

25     from the February proceeding.  And if there is any way the

M4D3SCHC

1    Court can give me time until we get that or the government can

2    provide that to us, to at least give me time to be able to

3    incorporate that in for that deadline.

4              THE COURT:  For the reply?

5              THE DEFENDANT:  The reply, yeah.

6              THE COURT:  Why do you need a transcript to prepare

7    your reply?

8              THE DEFENDANT:  I intend to -- we intend to review

9    what Ms. Shroff said on the record regarding her conversations

10   with the prosecutors and whether or not to file an additional

11   affidavit from her or if the transcript is enough to make my

12   argument in rebuttal to the government that they never knew

13   this was privileged.

14             THE COURT:  Explain the law library situation.  You

15   haven't been there since April 6?

16             THE DEFENDANT:  I haven't, so I was hoping -- I

17   haven't been there since, because two days in a row I was there

18   for eight, nine hours, so I didn't want to -- I couldn't handle

19   that.  So I -- I wrote to the Court and I was hoping we could

20   resolve that before I went back.  So I haven't been able to

21   print it yet.

22             So, there's two basically issues here.  One is an

23   issue with the transcripts, being able to get those, and two,

24   whether this law library is resolved and I can print it.  If

25   I'm able to go tomorrow, I can print it and file with the Court

M4D3SCHC

1    on Friday.  If the government is able to give us the

2    transcripts from February, if they have them.  Or if not, then

3    I ask for more time to get those transcripts.

4              THE COURT:  Okay.  Well, I'll give you until Friday to

5    file it.  I mean, you should have time in the library tomorrow.

6    You get 10 hours a week.  And Ms. Chan is here, she assured me

7    she'll look into it.

8              So print it tomorrow and file it Friday.

9              I don't see why you need the transcript for it.  If

10   you feel you need a declaration, you can file a declaration.

11   We are getting closer and closer to trial.  I need to resolve

12   these things, the extensions have to stop.  You have until

13   Friday.

14             THE DEFENDANT:  Okay.  And then the CIPA 6 issue.  Due

15   to the new discovery production, the Court essentially gave me

16   six days to file this.  And even though the Court increased the

17   government's page limit to 45 pages, I just, there is no way I

18   can do it in six days, especially considering the new

19   classified discovery production I have to go through.

20             So, you know, this was initially delayed by two weeks,

21   the government filed it, I didn't receive it for two weeks, we

22   lost two weeks there.  But, given how long the government's

23   motion is, and how limited time that I have, I really need more

24   time than just six days to complete that.  So I was hoping if

25   the Court could give me another couple weeks.  Hopefully I can

M4D3SCHC

1    finish it in one week.  But if not, then the next.

2             THE COURT:  So the problem, Mr. Schulte, is again, the

3    schedule is short, and one of the things we need to discuss are

4    any CIPA hearings that need to be held.  Strictly speaking

5    under the schedule, they are supposed to be held as early as

6    the week of May 2nd.  Giving you a couple of extra weeks pushes

7    it beyond that.  That is just not a viable option.

8             Maybe why don't we jump to the CIPA hearing question

9    and let me hear from the government what you anticipate on that

10   front in terms of what I need to plan for and what kind of time

11   we will need and when we should do it.

12            MR. DENTON:  So, your Honor, I think in the first

13   instance, to the extent that the Court wants to have a hearing

14   purely on the 6(a) motions, it's really just oral argument on

15   questions of law.  So I don't anticipate the Court needing to

16   set aside an unusually long period of time on that.

17            Without getting into the specifics, obviously, the

18   government has objected in large part to the defendant's

19   Section 5 notice.  If the Court ultimately does rule that the

20   defendant is entitled to use that material, that it is

21   admissible and relevant, then we may need to schedule a hearing

22   pursuant to 6(c) of CIPA, in order to review the particular

23   documents and assess the sort of appropriateness of any

24   substitutions or summaries that the government would propose in

25   response.  That's a sufficiently granular process that I think

M4D3SCHC

1   that could take some time.

2           The defendant has given notice of only a limited

3   number of particular documents, so I don't anticipate that

4   taking more than a day.  The defendant has, however, given

5   notice of many very broad categories of anticipated testimony

6   which could be more complicated, depending on what the Court's

7   rulings on admissibility are.  In the first instance, it's an

8   oral argument and whatever the Court would normally deem

9   sufficient for oral argument on questions of law is probably

10  going to be fine here.  And then, what 6(c) requires will

11  depend on the Court's rulings that follow.

12          THE COURT:  Okay.  And aside from that, is that the

13  full extent of it?

14          MR. DENTON:  I expect so, your Honor.  I think the

15  only other CIPA related hearing that may be required here is

16  that the government renewed its application for witness

17  protections which is in part an application under 6(c) of CIPA.

18  The *Waller* factors analysis requires a public hearing on those.

19  Judge Crotty did hold one initially.  To the extent the Court

20  thinks it is appropriate in an abundance of caution to hold

21  another one before adopting any similar restrictions for the

22  second trial, that would also be required.

23          THE COURT:  And those are fully submitted at this

24  point?  I confess I haven't gotten into all of this yet.  I've

25  been focusing on the motions for the moment.

M4D3SCHC

1          MR. DENTON:  Yes, your Honor.  The government's 6(a)

2     was submitted.  The defendant's response is due -- I don't

3     think there is a reply on the calendar.  To the extent that

4     there is anything we think merits one, we will seek the Court's

5     leave before filing anything.  But I think once the defendant

6     replies, the 6(a) stage will be fully submitted.

7          THE COURT:  Mr. Schulte, do you have anything you want

8     to add on this front?

9          THE DEFENDANT:  I think, yeah, my issue was just the

10    time.  If the Court is not able to give me at least another

11    week, I guess, potentially adding another SCIF day for the

12    remaining two weeks so I have the time to complete it.  It's

13    just such a long, it's so long and there is so much information

14    that I need to go through.  I haven't really had the chance to

15    do that.

16         THE COURT:  Okay.  But in terms of the hearings that

17    you would anticipate, do you have any reason to differ with

18    what Mr. Denton has shared?

19         THE DEFENDANT:  I agree for the most part with what he

20    said about the hearings and what is to be expected.  I have a

21    few things to basically relitigate some of the arguments that

22    were made before and then that's it.

23         THE COURT:  Okay.  But you have made those or you

24    intend to make those in your opposition?

25         THE DEFENDANT:  Correct.  Correct.  In opposition.  I

M4D3SCHC

1    intend to raise -- issues that counsel had raised before that

2    the Court previously denied.

3              THE COURT:  Okay.  So, Mr. Denton, let me see if I

4    understand this.  Your position is in the first instance, it

5    would just be a hearing and really oral argument.  One

6    possibility is that resolves the issues and there is no need

7    for further hearings.  If I were to rule Mr. Schulte is allowed

8    to use some of the things that he's seeking to use, it would

9    require additional more granular proceedings to get into what

10   he could use and in what form, etc.

11             Is that correct?

12             MR. DENTON:  That's correct, your Honor.

13             THE COURT:  So can we work backwards, and obviously we

14   need to build in enough time for the possibility that we have

15   to go the more time consuming route.  When would that process

16   need to play out by?

17             MR. DENTON:  I think realistically, your Honor, we

18   need to have that process done no later than the month of May

19   in order to have enough time to sort of finalize the proposals.

20   Once we receive the Court's order with respect to the Section

21   6(a) motions, to the extent that there is sort of material for

22   identified purposes deemed admissible, we will work as promptly

23   as we can to turn around proposals to the defendant and to the

24   Court.  What we did previously, and I think would be the most

25   appropriate course here, is then essentially to dispense with

M4D3SCHC

1    written briefing on those issues and simply to all gather and

2    put the proposed substitution up and have a discussion in a

3    classified setting about whether it, as the standard is, puts

4    the defendant in the same position to make the defense.

5              So, I would think that if we're talking about a

6    hearing in the first instance on the 6(a) motions for the week

7    of May 2nd, that probably something in the third week of May

8    for a 6(c) hearing would be the most appropriate.

9              MS. SHROFF:  Your Honor, I'm sorry.  Before the Court

10   schedules the 6(a) hearing, may I just be heard on the most

11   recent discovery that the government has given Mr. Schulte?

12             THE COURT:  Yes.  Can you use the microphone, please.

13             MS. SHROFF:  Sure.

14             Look, I'm very familiar with the Court's reluctance to

15   adjourn a trial date.  But I just want to note this for the

16   Court.  The government produced this discovery to Mr. Schulte I

17   believe on the 11th.  Am I correct?  That was this Monday.  Is

18   that right?

19             THE COURT:  I think they said on Friday.

20             MS. SHROFF:  On Friday, but he didn't get it until

21   Monday.  So, going forward if the government can just give

22   whatever they want to give Mr. Schulte prior to the SCIF

23   cutoff, it would help so he has it.  I don't think Mr. Schulte

24   has had time or the opportunity to review either the classified

25   cover letter documents or the confidential attachments that

M4D3SCHC

1    government has produced.  This is the first batch of discovery

2    that is voluminous that was not part of the original trial.

3    And neither Ms. Colson nor I have gone through it.  And the

4    cursory review that the two of us conducted leads us to think

5    we would have further steps to take with that information.

6    What those further steps are we can submit to you ex parte,

7    because they obviously would involve work product and

8    attorney-client and Ms. Colson and I speaking.  I wanted to

9    flag that for the Court, and just let you know it is in fact a

10   voluminous production.  It's not what they've given us before

11   during retrial which has been very limited discovery.

12          I kind of disagree with the government that this, that

13   the information they've given us would not precipitate or

14   require more work by stand-by counsel.  I'm not, I don't really

15   think I agree right now with that statement.  So I flag that

16   for you also.

17          One other thing I wanted the Court to be aware of.  In

18   December of last year, Mr. Schulte reached out to the CISO and

19   asked the CISO to initiate the process about recontacting the

20   CIA witnesses.  December came, January came, February, March.

21   Only in March did the CIA assign a walled attorney to initiate

22   the process.  In April, we were asked to resubmit the

23   subpoenas.  We said we didn't want to resubmit, that the CIA

24   should reach out to those individuals now.  Subsequent to our

25   position, the Court through the CISO informed us to get those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M4D3SCHC

1    subpoenas done.  The CISO contacted us on a Friday, we made

2    arrangements to do it on Monday, and by the end of Monday the

3    subpoenas were done.

4         If there is any delay on the reach out to the CIA

5    witnesses, that is squarely on the CIA, because Mr. Schulte

6    initiated that process in December.  Nobody got back to us

7    until April.

8         I just wanted -- I understand that there's been

9    extension after extension, but those are the two things that

10   are of concern to stand-by counsel on behalf of Mr. Schulte.

11        So if there is any followup from the new discovery, we

12   intend to so inform the Court by no later than next week,

13   Wednesday or Thursday.  I think Ms. Colson is traveling towards

14   the end of the week and it will take us just a week to at least

15   finish the first reading of what they've given us.

16        THE COURT:  Well, obviously, I don't know how to

17   square Mr. Denton's representation that it is not voluminous

18   with your statement that it is.  But, in any event, doesn't

19   sound like it is ripe for me to do anything at this point.

20        If you have any applications to make, you'll make

21   those applications.  The government doesn't intend to offer any

22   of this evidence at trial.  If there is anything in there that

23   is material to your defense, and it impacts the upcoming trial,

24   you'll let me know, but I am going to hope that isn't the case.

25        MS. SHROFF:  Okay, your Honor.  I'm sorry.  I forgot

M4D3SCHC

1    one last thing.  I think Mr. Schulte's expert notice is due

2    today.  Yesterday.  There is one expert that we have been

3    trying to contact and we have not had much luck.  I

4    respectfully ask the Court to give me until next week Wednesday

5    to do that.

6              THE COURT:  Okay.  We're throwing a lot of things up

7    in the air.  Let's try to deal with one at a time.

8              But, first, on the discovery, again, there is nothing

9    for me to decide at this point.  If you have any applications,

10   you'll make those in due course, and I will deal with them.

11   But, hopefully, I can take the government at its word this is

12   not something that will have an impact on the trial or our

13   ability to go to trial.

14             Mr. Denton, any objection to giving an extension on

15   that one expert through next Wednesday?

16             MR. DENTON:  No, your Honor.  That's fine.  I would

17   note we didn't receive any expert notice.

18             THE COURT:  Is there a reason you didn't notice the

19   other ones, Mr. Schulte or Ms. Shroff?

20             THE DEFENDANT:  My letter just said that it is the

21   same expert notice from last, there is no supplemental except

22   for this potential new expert.  So all of the expert -- the

23   notice from last time should be sufficient for the tech expert

24   for this time.

25             THE COURT:  So you're providing notice that you're

M4D3SCHC

1   incorporating by reference your prior notice.  Is that what

2   you're telling me?

3               THE DEFENDANT:  And potentially one more.  That's

4   correct.

5               THE COURT:  Mr. Denton, does that suffice, with the

6   exception of the one additional one through next Wednesday?

7               MR. DENTON:  I think that's fine, your Honor.  Our

8   motions in limine are due on Friday.  I think to the extent

9   that the expert notice raises issues that we for whatever

10  reason are not able to incorporate, we'll let the Court know

11  and ask for more time if we need it on that one issue.

12              THE COURT:  All right.  Very good.

13              Third issue, which I'll address before we turn back to

14  the Section 6 hearing issue we were discussing is the subpoena

15  issue.

16              Ms. Shroff, the bottom line is, I didn't hear about

17  any of this from you at any point until now.  I heard about it

18  from the CISO a week or two ago.  I don't know the precise

19  date.  That's the first I heard about it.

20              Bottom line is it was incumbent upon you and

21  Mr. Schulte if you need something to seek relief.  Whether

22  that's from me ultimately or the CISO, I leave to you.  If you

23  don't bring it up to me, there is nothing I can do about it.

24  When I did hear about it, the issue I heard is you were trying

25  to rely on subpoenas that had been issued in connection with a

M4D3SCHC

1    prior trial three years ago in front of a different judge

2    involving different charges and a different date.  And my

3    reaction was, no, that they have to give a new list, new

4    subpoenas, and I understand you have now done that.

5             As far as I'm concerned, you need to do what you need

6    to do to make sure you're ready.  The fact there was some sort

7    of delay between December and whenever that happened is not on

8    me, and it's not going to be a grounds for adjourning the

9    trial.  To the extent there are additional things of that sort

10   between now and when trial starts, Mr. Schulte, and to the

11   extent you are assisting him, you, need to understand that and

12   need to do what you need to do, even if that means coming to me

13   to seek whatever relief you need.

14            MS. SHROFF:  Fine.  We assumed the CISO related to you

15   the original request came in December.

16            THE COURT:  There is an expression in the Odd Couple

17   about what happens when you make assumptions.  I'll leave it

18   unstated except to say don't assume.

19            If you are not getting what you need from the CISO or

20   from anyone else, I'm here.  You can seek relief.  If you don't

21   seek relief, there is nothing that can be done or will be done

22   by me.

23            MS. SHROFF:  Your Honor, maybe we can seek the relief

24   now and ask the Court to order the CIA and the CISO to give us

25   a first production of which witnesses they've contacted and

M4D3SCHC

1    what the witnesses have said no later than in the next seven

2    days.

3            THE COURT:  Mr. Hartenstine?

4            MR. HARTENSTINE:  Well, your Honor, I would have to

5    seek input potentially from the CIA wall counsel who is now

6    present in court today in terms of how quickly that can be

7    done.  But should the Court order that, I think I could inform

8    the wall counsel a status report is required.

9            THE COURT:  Why don't you talk to the wall counsel

10   promptly and get back to Ms. Shroff no later than this Friday.

11   If there is any issue, Ms. Shroff can promptly seek relief on

12   behalf of Mr. Schulte, and if it is appropriate for me to grant

13   relief, I'll grant relief.

14           Hopefully hearing that I'm concerned about this and

15   don't want this to cause any delay in trial, we can do this

16   without the need for any orders directing a particular

17   timetable, and CIA wall counsel will do what needs to be done.

18           MR. HARTENSTINE:  Yes, your Honor.

19           THE COURT:  All right.

20           Going back to the CIPA 6 hearings.  I guess let me

21   throw out the morning of Tuesday, May 3 beginning at 9 o'clock.

22   Does that work?  And do you think that would then enable us to

23   do whatever would need to be done thereafter, depending on what

24   my rulings are, Mr. Denton?

25           MR. DENTON:  Just double checking, your Honor.  In

M4D3SCHC

1    principle I think that's fine.  We are checking on the specific

2    date and time.  I think that's fine for us, your Honor.

3              THE COURT:  Okay.  So I am going to schedule an

4    initial CIPA 6 hearing for -- Mr. Hartenstine, does that work

5    for you?

6              MR. HARTENSTINE:  Yes, your Honor.

7              THE COURT:  Ms. Shroff, does that work for you guys?

8              MS. SHROFF:  We're all fine with, it your Honor.

9              THE COURT:  So we'll have the initial CIPA 6 hearing

10   on May 3 at 9 a.m.  And Mr. Hartenstine, you and I can talk

11   about making arrangements for that in terms of courtroom, etc.

12   But hopefully we'll square that away.

13             In light of that, Mr. Schulte, I will give you until

14   Monday the 25th to file your opposition.  I will call the

15   marshal and see if a third SCIF day can be arranged for you

16   next week.  But the bottom line is we can't afford any more

17   delay than that.  That's what I will do on that front.

18             Okay?  Any questions about that?

19             THE DEFENDANT:  No.

20             THE COURT:  Okay.  Turning to the next item, is the

21   unclassified productions of production six, nine, and 12.

22             I don't understand why this issue is coming back up.

23   I thought we had resolved it and that there is no single hard

24   drive that encompasses those.  And to the extent one of the

25   issues was a faulty power code, that stand-by counsel was going

M4D3SCHC

1    to provide a power cord.  What is the remaining issue here?

2              THE DEFENDANT:  Yes, so, the issue is it still hasn't,

3    so we talked about this back in December, and the government

4    said that with regard to the lost drive and the productions,

5    that they would be -- they would reproduce it.  And then they

6    would produce the classified productions, extracted root volume

7    and forensic image of the encrypted VM.  And none of that stuff

8    has happened still.  The productions six and nine, you know,

9    it's been, I haven't had this for a couple years now.  I've

10   been waiting a long time for this.  And I brought this up a

11   long time ago and it still hasn't been resolved.

12             I've spoken with the government about it, and I think

13   the biggest issue they've come across is, there's a production

14   letter that they received from stand-by counsel saying that

15   this material was provided to me on a separate drive.  But,

16   either it was a mistaken -- either it never happened, or

17   something happened in the production to me.  So stand-by

18   counsel had never provided those two productions to me, and the

19   government just disagreed.  So we didn't seem to get anywhere

20   with it.

21             THE COURT:  Okay.  Mr. Denton, do you want to remind

22   me?  My recollection is this issue had been resolved.

23             MR. DENTON:  I think the issue has morphed somewhat,

24   your Honor.  To take the easy one with respect to the

25   reproductions of 49, 50, the root volume and the forensic

M4D3SCHC

1   image.  We received a hard drive from stand-by counsel for that

2   on April 1st.  Our understanding is that the copying of all

3   that material is essentially completed, if not fully completed,

4   and we will deliver it to Mr. Schulte as soon as possible.

5          With respect to productions six, nine and 12, again,

6   as the defendant notes, 12 is a reproduction of prior

7   productions.  It's not an independent production.  We reviewed

8   the file listing of the hard drive that stand-by counsel

9   provided the defendant last June or July, which was intended to

10  resolve all of these issues by providing essentially all of the

11  unclassified discovery on a single drive.  That file listing

12  shows that all of the files that Mr. Schulte has claimed are

13  missing are on that hard drive.  And we pointed him to exactly

14  where we saw those productions being listed.  He said that they

15  were not there.

16         And so, again, we came to the place of saying, we

17  don't know what to tell you, the list we have says they are on

18  this hard drive that stand-by counsel gave you.  You are saying

19  they're not there.  It feels like that's a conversation the

20  defendant should have with stand-by counsel in the first

21  instance.

22         If they want to give us another hard drive, we'll make

23  another copy.  Where we've been going around and around is

24  where this material actually lives that the defendant is

25  supposed to have.

M4D3SCHC

1          THE COURT:  Ms. Shroff, can you shed any light on

2     this?  It seems like if there is an issue it's on your end, and

3     you need to figure out how to solve it.  What am I missing?

4          THE DEFENDANT:  I think, just to speak for them.  I

5     think the issue was the drive that they provided to me was

6     before I raised this issue.  And the biggest issue, this

7     wouldn't be an issue at all if not for the -- the drive that

8     was lost, that the government provided me that was lost.  So,

9     stand-by counsel provided this production to me not at the

10    government's -- not because they requested it.  But it was my

11    request to have a completely undated production.  The six and

12    nine were too large, and I think at the time, I had a hard

13    drive that the government had provided so stand-by counsel did

14    not provide it.

15         So the biggest issue is, this wouldn't be a problem if

16    the missing hard drive had been reproduced like the government

17    said that they were going to reproduce it.  I think that's the

18    issue.  This hard drive that's been missing for years has never

19    been reproduced.

20         THE COURT:  Mr. Denton?

21         MR. DENTON:  Your Honor, I think the process started

22    in April of 2020 or I'm sorry of 2021.

23         THE COURT:  Can I just actually cut to the chase?

24         MR. DENTON:  Sure.

25         THE COURT:  You say you're happy to reproduce it if

M4D3SCHC

1    it's missing.  He says it's missing.  Maybe the answer is just

2    to reproduce it and put a rest to this.

3         MR. DENTON:  That's fine.  If stand-by counsel will

4    give us a hard drive, we'll get copying as soon as we receive

5    it.

6         THE COURT:  Great.  Stand-by counsel, can you provide

7    the government with a hard drive?

8         MS. SHROFF:  We're happy do it, your Honor.  We also

9    ask the government if we could just give them a repository of

10   hard drives so they can just do this without waiting for the

11   two- or three-day delay.  In fact I asked that of Mr. Lockard

12   to do that and we're happy to do that.  Give them

13   five 500-gigabyte hard drives so we don't have to wait.

14        MR. DENTON:  Not for nothing, this production will

15   take a four terabyte hard drive.  And I think as a general

16   matter, we should be able to work out delivery without us

17   holding a store of hard drives for defense counsel.

18        THE COURT:  Guys, I don't need to get into this.  You

19   can sort this out.  You can work professionally with each

20   other.  Get a hard drive to the government, government will get

21   it to you, and I don't want to hear about this again.  Okay?

22   Good.

23        Mr. Denton already addressed SC49, 50, 51, and the

24   extracted root volume?

25        MR. DENTON:  Yes, all of the items listed in that

M4D3SCHC

1    bullet.

2            THE COURT:  What about the forensic image of the

3    decrypted Linux Mint virtual machine?

4            MR. DENTON:  That as well.  They are all being copied

5    onto the same hard drive.  Which, if it's not fully completed,

6    is almost so.

7            THE COURT:  That issue is hopefully put to rest as

8    well.

9            I think that deals with all the housekeeping issues.

10   Have I missed anything, anything new from the government before

11   I turn to Mr. Schulte?

12           MR. LAROCHE:  Not from the government, your Honor.

13           THE COURT:  Mr. Schulte?

14           THE DEFENDANT:  No, I don't have anything.

15           THE COURT:  Great.  So let me briefly address a couple

16   issues raised by Mr. Schulte's omnibus motions and then finish

17   off with some scheduling issues and issues looking forward.

18           I am still working my way through the omnibus motion

19   and I'm not prepared to rule on any of it at this time.  But

20   there are a couple of issues that I want to raise or discuss

21   that I might benefit from hearing from you.

22           First of all, before I get to that, though, I see that

23   stand-by counsel finally filed Mr. Schulte's cleared omnibus

24   motion and reply only last night.  I think my understanding is

25   you had those for a while and they should have been docketed a

M4D3SCHC

1    while ago.  I would just underscore that, and going forward

2    tell you that you should do it promptly.

3               MS. SHROFF:  To be honest with you, your Honor, I

4    think that the Court should know that the filing is somewhat

5    incomplete because the exhibits aren't attached to the omnibus

6    motion.  I didn't want the Court to be surprised by that.  I

7    wanted to just let you know, part of the problem is one exhibit

8    remains classified and we're trying to figure out how to deal

9    with that.  But we have one unclassified exhibit we couldn't

10   get off of the printer, but we will do so shortly and file it

11   on ECF.

12              THE COURT:  Bottom line is there is a deadline and

13   expectation of when you're supposed to file things when they've

14   been cleared, and I want you to make sure you are complying

15   with it and we shouldn't have to be tracking you down to get

16   you to docket things that should be.

17              MS. SHROFF:  I apologize, your Honor.  I was out of

18   the country last week and I'm sorry, but I will make sure we

19   are more timely and meet your deadlines.

20              THE COURT:  Thank you.  On that score, I think that

21   there is one remaining document, aside from the exhibits, that

22   hasn't yet been filed, namely Mr. Schulte's most recent

23   not-yet-fully-submitted motion to suppress.  My understanding

24   is that was cleared without redactions, so it should be

25   fileable as is, but I don't think it's been filed on ECF.  Can

M4D3SCHC

1    you take care of that?

2              MS. SHROFF:  Sure.

3              THE COURT:  Good.  Turning to the motions then.

4         First I want to just discuss the forensic crime scene

5    issues.  Sort of implicated by two of the five motions, one is

6    Mr. Schulte's motion to preclude the government from offering

7    any forensic crime scene evidence, and the second is a motion

8    to compel production.

9         I fully recognize that Judge Crotty addressed these

10   issues most prominently in ECF numbers 124 and 514.  Judge

11   Crotty had invite Mr. Schulte to make more tailored requests

12   and Mr. Schulte purports that he is.  Namely, access to the

13   CIA's Stash and Confluence backups that were allegedly stolen

14   and transmitted to WikiLeaks.  That's page 47 of his

15   memorandum.

16        Now, a couple of questions that I'm looking for some

17   clarification on and I want to think about.

18        First, my understanding from the government's

19   opposition is that the government had previously, prior to the

20   first trial, made a standalone laptop available to defense

21   counsel and the defense expert with certain materials on it.

22   Recognizing that was almost three years ago, I guess I want to

23   know if the plan was to do that again or what the story was

24   there.

25             MR. DENTON:  Yes, your Honor, that is still available.

M4D3SCHC

1    There is some arrangements that need to be made, but those can

2    be made upon request.

3              THE DEFENDANT:  That's never been -- I don't think

4    it's a feasible option, first of all, because I can't go to the

5    CIA to review it.  I would like to review it, and the

6    government has never told us that this is still a viable

7    option.  So, we didn't know this was an option and it's not

8    because -- they say it has to be at the CIA in Virginia.  They

9    are not going to produce it in the SCIF.  That's the whole

10   purpose of the SCIF.  How can I review it.  Unless they want to

11   take me to the CIA to review it there.  But, there's no rules,

12   there's no cases that the government even cites where this is a

13   permissible thing.  Something the government recognizes as Rule

14   16, and they are not going to produce it to me.  They are going

15   to make it difficult for anyone to review it, and their own

16   expert had unfettered access to it.

17             THE COURT:  I'm pretty sure in your briefing you asked

18   at a minimum that things be made available, if not to you, to

19   either your stand-by counsel and your expert.  To the extent

20   the offer is to make it available to your expert, I think it is

21   fulfilling that request.  So, now you know it.  If you want it

22   made available to your expert, then it can be, and you should

23   make that request and I expect everyone will make the necessary

24   arrangements.

25             Obviously, you are not going to the CIA.  I'm not

M4D3SCHC

1    going to order you be taken to the CIA.  And as I said before,

2    you were told when you went pro se that doesn't mean you would

3    have available to you anything and everything in the MDC.

4              THE DEFENDANT:  Rule 16 material, though, Judge.  I am

5    not asking for something crazy.  I am asking to see the

6    evidence that government is going to use against me.  It is

7    completely different.  This is legitimate Rule 16 material.  I

8    can understand something else.  But, I'm pro se, I expect to be

9    able to see the legitimate Rule 16 evidence.  There is no case

10   that the government even pretends to cite a case where Rule 16

11   evidence is not available to the defendant just because they

12   don't feel like doing it.

13             THE COURT:  I understand.  More broadly, I feel like I

14   don't quite understand, it is hard for me to assess on the

15   basis of the briefing alone, number one, whether there is any

16   basis to Mr. Schulte's complaints and claims and to what has

17   been made available and how adequate that is.  And relatedly

18   whether and to what extent the request he's now making is

19   actually a more tailored request to what he had previously made

20   to Judge Crotty.

21             And I guess I am trying to think of an appropriate way

22   to resolve this.  By now it's really just on the motion papers,

23   lawyers' argument or Mr. Schulte's argument.  And seems to me

24   that one option would be for Mr. Schulte's expert to file a

25   declaration explaining what he has access to and what he

M4D3SCHC

1    doesn't have access to, what he would want access to, why that

2    would be necessary.  And try to help me in a more concrete

3    fashion understand what we're talking about here and what his

4    actual needs are and what his actual requests are.  And the

5    government either submit a counter-declaration from its expert

6    or otherwise respond.  And if I need to hold a hearing with the

7    two experts to figure out what's going on here and what has

8    been provided and what should be provided, then I would do

9    that.

10             But it just doesn't feel like I have enough to go on.

11   I think there is some merit to Mr. Schulte's arguments, which

12   is to say, this evidence goes to the heart of the case against

13   him, and it is obviously critical for him to be able to meet

14   that evidence and counter it and respond to it and know what it

15   is.

16             At the same time, the government represents that it

17   has made all sort of things available to Mr. Schulte and/or his

18   expert, and the problem is I am not in a position to really

19   understand or adjudicate whether that suffices or not.

20             So, I guess I am looking for suggestions about how to

21   cut through the morass here.  But, it seems to me having the

22   experts submit declarations and try to lay it out and explain

23   it to me, and if there is a factual dispute, holding a hearing

24   to resolve it, that might be an appropriate way to do it.

25             I also recognize that time is of the essence, and we

M4D3SCHC

1    would need to do that sooner rather than later.

2              Any thoughts?

3              MR. DENTON:  Your Honor, I think that's fine from the

4    government's perspective.  We would be able to respond to an

5    expert declaration on this score.  I would note that the

6    defendant's expert did submit a declaration, it was in the

7    middle of the last trial on this subject, which the government

8    did respond to.  I'm happy to look up the docket numbers on

9    that if that would be helpful to the Court.

10             We also understand that the defendant's expert has

11   submitted a number of ex parte declarations to the Court on

12   similar motions in the past.  So, again, not clear what that

13   is, but there is some record there.

14             I just want to draw one very specific distinction

15   which is that everything that the government is using in

16   evidence against the defendant has been produced to him.  The

17   only question is whether the defendant should have access to

18   other information to search for exculpatory information that he

19   believes may be there.  There is nothing an expert will testify

20   about or that is going to be displayed in evidence at trial

21   that is not part of the production that is available to the

22   defendant.  Beyond that, we're happy to proceed in whatever way

23   the Court sees fit to address this issue.

24             THE COURT:  I understand that.  And I guess what I

25   just don't know or equipped to understand is your analogy to

M4D3SCHC

1    the proverbial DNA database, and make the rest of the universe

2    available to him to search for what may or may not be there is

3    the relevant analogy or not.  Mr. Schulte.

4            THE DEFENDANT:  It is completely untrue.  The

5    government is alleging that a Stash database and Confluence

6    database were stolen by me.  And they've never produced either

7    of those databases.  Stash they've never produced at all, so

8    this is the most important.  This is like 90 percent of the

9    data that was leaked on the internet was from Stash.  They've

10   never provided Stash to me.  They've never provided it to my

11   expert ever.  So we don't even know that the stuff leaked on

12   the internet came from this backup.

13           So the fact they are trying to say that they produced

14   everything to me that they claim to use at trial is just

15   absurd.  It is not true at all.  Stash is very important.  I've

16   never seen it.  The only thing -- and Confluence is the other

17   thing.  They've only provided that in unredacted form to my

18   expert.  That's what we were talking about before.  Stash

19   they've never even tried to produce that to us, and we've made

20   multiple requests for it.  And this is, like I said, this is

21   the bulk of the information that was released on WikiLeaks and

22   I've never seen it.  My expert can't even testify as to whether

23   or not the stuff on the internet is related to the database,

24   this database or not.

25           THE COURT:  The government's opposition says that

M4D3SCHC

1    prior to the last trial, the laptop was made available that had

2    complete unredacted copies of the Stash repositories or the

3    tools for which source code had been released by WikiLeaks and

4    complete unredacted copies of all Stash documentation released

5    by WikiLeaks.  Is that not the case?

6            MS. SHROFF:  While Mr. Schulte is conferring, may I

7    just make a suggestion, your Honor.  If the Court wants another

8    affidavit from Dr. Bellovin, we're happy to supply one.  He

9    made multiple submissions to Judge Crotty.

10           What the government gave us in terms of their

11   disclosure was not the actual workable data that an expert

12   could look at and work from.  I believe what they gave us was

13   an image that the expert could make no use of.

14           But more importantly, if the government truly believes

15   that that is all that this case requires, is the smaller amount

16   that they produced to us, why did they not so limit their own

17   expert at trial?  The bulk of the expert's testimony was he, we

18   went through, I'm pretty sure I crossed him.  He gave us a full

19   disclosure of how much access unfettered -- and we are not even

20   asking for unfettered -- but how much access he had to the

21   data.  Once we had that testimony, we moved mid trial to get

22   that.  The government opposed.  And to be -- the trial

23   transcript, I think the briefing I can point you to if you

24   want, and I can of course write to the Court.

25           But if the government's position really is that

M4D3SCHC

1    Mr. Schulte should try this case only based on what they intend

2    to offer as evidence against him, I don't think that

3    comports -- I don't want to be all due process-y, but I don't

4    think that comports with due process.

5               He is not going on a fishing expedition here.  To be

6    candid, I think this is 90 percent of why he decided to go pro

7    se.  Because the technical data is not available to him in the

8    manner in which he can use it to defend himself.

9               Imagine if somebody said to you, you know, if this

10   were a child porn case, you'd give me the metadata.  I wouldn't

11   just get an image of the child -- I wouldn't get the photo of

12   the pornographic image.  I'd get the underlying data, all of

13   it, and I would get access to the computer that I used

14   allegedly to sell, receive or produce the child porn.  I think

15   this is very similar.

16              THE COURT:  Well --

17              MS. SHROFF:  I'm also happy to just make Dr. Bellovin

18   available for testimony.  We could have an ex parte session

19   where the Court could question our expert.  I think

20   Dr. Bellovin would be happy to explain it to you.  I believe we

21   did that as well with Judge Crotty.

22              THE COURT:  And why would that need to be ex parte?

23   Because it seems to me that it would be appropriate for the

24   government to be able to respond, and the best way for me to

25   understand whether what Mr. Schulte has been provided suffices

M4D3SCHC

1    is through the adversary process and them having an opportunity
2    to explain why it does suffice.
3         MS. SHROFF:  Maybe part of it would be, part of it,
4    what has been produced and what else he needs, need not be ex
5    parte.  But certainly what he intends to do with what he would
6    receive would be ex parte, because that would show work
7    product.
8         THE COURT:  Okay.  You know better than I what was
9    previously filed, particularly if it was filed ex parte or
10   under seal.  I'm not sure I have it or have access to it
11   readily available.
12        It seems to me the easiest thing would be for him to
13   take those things and create a new filing and submit it to me
14   for me to look at, and the government have an opportunity to
15   respond.  If it reveals defense strategy, you can redact those
16   portions.  But for the most part, I would think this could be
17   done not on an ex parte fashion.
18        MS. SHROFF:  Your Honor, how about we provide the
19   Court with an affidavit as much as we can that we don't
20   consider that needs to be ex parte, and the portions that we
21   think should be ex parte we mark as such, and then the Court
22   can go from there.
23        But what Dr. Bellovin would do or what testing he
24   would run, I don't think I would want to share with the
25   government and I hope the Court would not require us to.

M4D3SCHC

1        THE COURT:  I'm happy to give you an opportunity to

2   make a case for why portions of it should be ex parte.  But I

3   think a lot of it can be done publicly or at least on notice to

4   the government.  And I think it needs to be done soon.  That's

5   my point.

6        How soon can you file something of this nature?

7        MS. SHROFF:  So, I would need to contact Dr. Bellovin.

8   His schedule is not great.  I think he is a new grandfather, he

9   is been sort of unavailable to us.  How about could I write to

10  the Court by 5 o'clock tomorrow and let you know?

11       THE COURT:  Yes.

12       MS. SHROFF:  Okay.

13       THE COURT:  Recognizing that it has to be on a short

14  schedule.  Because this needs to be resolved and it needs to be

15  resolved soon, because this is something that could affect our

16  ability to begin trial in June, if I agree with you that more

17  needs to be made available.  You obviously need time to do it.

18  If I disagree, then I think we can stick with the schedule.

19       MS. SHROFF:  That's fine, but I do believe the

20  production of Stash they gave us was not the metadata or

21  anything that the expert could use, and Dr. Bellovin I think --

22       THE COURT:  I expect he'll be able to explain that to

23  me, and hopefully I will be able to understand it.

24       MS. SHROFF:  Okay.

25       THE COURT:  What I want you to do is discuss with

M4D3SCHC

1    government and submit something by 5 p.m. proposing a method to

2    proceed on this front on a relatively short schedule, and I

3    will rely on stand-by counsel, even if you can't speak with

4    Mr. Schulte, to make that proposal.  Since time is of the

5    essence, I need it tomorrow by 5.  Okay?

6             MS. SHROFF:  Okay.

7             THE COURT:  Second issue I wanted to raise, and I need

8    to be careful here because portions of this are redacted in

9    Mr. Schulte's reply, although I'm not quite sure what why it is

10   redacted.  But he seeks certain information pertaining to the

11   polygraph examination that was conducted before his departure

12   from the CIA.  In particular, he makes representations about

13   certain thing that he believes are in the CIA's possession.

14   This is from the original memorandum and not redacted.  Namely,

15   logged heart rate, oxygen, and other readings along with the

16   polygrapher's written notes.

17            Mr. Denton, can you clarify whether any of those

18   materials or information exist?  And I know you produced the

19   transcript, and I understand that the examination was never

20   adjudicated because he left the CIA.  But, trying to figure out

21   if there is anything there to produce.

22            MR. DENTON:  I'm trying to figure out whether I can

23   answer that in this setting or not.  I'm not sure that I can

24   address that here.  I think to the extent that the Court would

25   like us to, we're happy to submit something in an appropriate

M4D3SCHC

1    manner on that.

2            THE COURT:  Okay.  Please do, because I would like a

3    better sense of what, if anything, there may be and do that

4    relatively quickly too so I can resolve that in the appropriate

5    fashion.

6            Those are the only things I wanted to discuss on the

7    omnibus motion for the moment.

8            Now let's go over upcoming deadlines and other things

9    of that sort.  As already discussed, Mr. Schulte's reply on his

10   remaining motion to suppress is due by Friday.  I gave him one

11   extra day on that.

12           His CIPA Section 6 opposition is due on the 25th now.

13   I gave himself extra days on that, and we'll try to arrange an

14   additional SCIF day.  I don't know if that will be doable, but

15   I'll do my best and make a call to the marshal after this

16   proceeding.

17           Motions in limine are due on April 22.  As I

18   previously noted, it does seem to me that Mr. Schulte has

19   averted to an intent to offer or argue various things that

20   probably do warrant litigation by way of motion in limine, and

21   I trust the government has been keeping track of that and will

22   move as appropriate.

23           We've discussed the CIPA hearing schedule.  For

24   starters we'll have an initial hearing, oral argument on May 3

25   at 9 a.m. and we'll take it from there.  I do have trials

M4D3SCHC

1    scheduled for later in May, which may complicate the need for

2    hearings later in May.  But I will move things around as needed

3    and ensure we get it done.

4              The responses to motions in limine, the government's

5    3500 material, proposed trial exhibits, and defendant's witness

6    exhibit are due I think May 13 if I'm not mistaken.

7              And then the final pretrial conference is scheduled

8    for June 3.

9              Anything that I've missed, anything we need to discuss

10   on that?

11             MR. DENTON:  No, not from the government, your Honor.

12             THE COURT:  Mr. Schulte?

13             THE DEFENDANT:  They wanted a clarification for what

14   was the May 13?  What was due May 13?

15             THE COURT:  May 13 is any responses to motions in

16   limine and requests to charge.  Government is to provide

17   proposed trial exhibits and 3500 materials, and defendant is to

18   provide witness statements pursuant to Rule 26.2.  It's laid

19   out on docket no. 733 which is the comprehensive pretrial

20   schedule.

21             All right.  I think you may all know that trial is

22   apparently going to be held in courtroom 15A at 500 Pearl

23   Street.  There are various things that need to be done to make

24   sure that is a suitable setting, so that's been identified as

25   the venue for trial.

M4D3SCHC

1           Trial is scheduled to start on June 14 as you know.  I
2    just want to underscore what I said earlier, that we don't have
3    a lot of time between now and then.  So it means that these
4    distractions of this discovery-related issues, the MDC-related
5    issues, they can't be occupying everyone's time between now and
6    then.  And in that regard, I do expect the reset button to
7    work, and for everybody, including the MDC, to do what they
8    need to do to ensure that we don't need to spend our time on
9    these sorts of issues any further, and we can focus on the
10   substantive and important issues that need to be litigated.
11          That also means, as I said, to the extent that either
12   side has any needs, it is incumbent upon you that you make
13   whatever requests for relief you need in a timely fashion so
14   those can be addressed.  If you don't and I don't hear about
15   something, it is what it is and you aren't going to get
16   whatever it is you might otherwise have gotten.  Because it is
17   important that we stick to the schedule and that you raise
18   things in a way that enables me to resolve them.
19          Does either side think -- we have the May 3 hearing
20   date but that's not a public hearing.  You think it's
21   appropriate to schedule another public status hearing between
22   now and the final pretrial conference?  Should we take it as it
23   comes and we can always put something on the schedule?  What
24   are your thoughts?
25          Mr. Denton.

M4D3SCHC

1      MR. DENTON:  I think our inclination is take it as it

2 comes and see if we need one.  But we're of course happy to put

3 one down as a placeholder and treat it the opposite way, and we

4 can let the Court know if we don't think we need one at that

5 point.

6      THE COURT:  All right.  Maybe that's the better way to

7 go and put one on the calendar.  If there is nothing that we

8 really need to discuss, we can always cancel it, rather than

9 trying to schedule it.

10      To that end, would May 10 at 2:30 work for everybody?

11      MS. SHROFF:  Your Honor, could we have the following

12 week, would that be possible?

13      THE COURT:  Is there a reason for that?  Because I'm

14 on trial.

15      MS. SHROFF:  I have a one-week trial from the 9th to

16 the 13th.  If it gets shifted I will promptly notify the Court,

17 but as of today I still have that trial date.

18      THE COURT:  I'll try to move things around.  How about

19 May 18 at 3 o'clock.

20      MS. SHROFF:  That's fine, your Honor.

21      THE COURT:  Mr. Denton?

22      MR. DENTON:  That's fine with us, your Honor.

23      THE COURT:  Mr. Hartenstine?

24      MR. HARTENSTINE:  Yes, your Honor.

25      THE DEFENDANT:  The 18th is a Wednesday.  I have my

M4D3SCHC

1    social calls on Wednesdays now.  So is there any way we could

2    do it another day?  Or if it -- I think the issue is, my social

3    calls are early, are at 11 to 12, but the marshals still come

4    at 10.  Unless the Court can order the marshals to come later

5    to get me.  I don't know.

6              THE COURT:  Well, I'm going to call the marshal

7    already.  I will ask if he can.  Bottom line is I can't make

8    any other date available that works for stand-by counsel.  So,

9    it's going to have to be that day and hopefully the marshals

10   can accommodate you, but if they can't, so be it.  All right.

11             And again, why don't you submit letters on May 3, you

12   might be able to be in a position to say we don't need that

13   conference.  But at a minimum you can submit letters by the

14   prior Friday, by Friday the 13th.  If you think that -- well,

15   why don't I put it this way.  Either way you should submit

16   letters by Friday the 13th, either telling me you don't think

17   there is a need for the conference, in which case we can cancel

18   it.  Or if you think we need a conference, telling me the

19   issues we need to discuss.

20             Is there a speedy trial application from the

21   government?

22             MR. DENTON:  Yes, your Honor.  Just one other thing we

23   wanted to mention.  Truly ministerial.  I think at some point,

24   whether it's in one of those conferences in May, we were hoping

25   to have a discussion about the physical logistics of trial with

M4D3SCHC

1     the defendant representing himself while being in custody.  To

2     the extent we need to make any arrangements with the marshals

3     or either side needs to think about what that means for

4     presentation of exhibits, I don't think we have a particular

5     view.  Just it would be useful to know what the ground rules

6     the Court and the marshals will set are.  But we can discuss

7     that further down the road.  We wanted to alert the Court we

8     were thinking about it.

9              THE COURT:  Okay.  I definitely think that warrants

10    thought, and I think you should be giving thought to it,

11    ideally discussing it with one another, discussing it with the

12    marshals, and certainly raising it with me, if not on May 16,

13    then in a timely enough fashion so we can make sure everybody's

14    on the same page.  But I agree those are important issues and

15    we'll need to attend to them.

16              Anything else?

17              MR. DENTON:  No, your Honor.  Beyond that, I think we

18    would ask that the Court exclude time under the Speedy Trial

19    Act between now and the previously adjourned trial date of

20    June 14 to facilitate the defendant's preparation for trial,

21    there are obviously motions pending, but nevertheless, we think

22    an exclusion of time in the interest of justice is warranted

23    here.

24              THE COURT:  Mr. Schulte, any opposition to that?

25              THE DEFENDANT:  No.

M4D3SCHC

1      THE COURT:  I will exclude time between now and the
2  trial date of June 14.  It is automatically excluded right now
3  by virtue of the pending motions and I think there will be more
4  motions filed.  Be that as it may, I find that the exclusion of
5  time is in the interest of justice and outweighs the interests
6  of the defendant and the public in a speedy trial, given the
7  complexity of the issues that we're dealing with, given the
8  complexity of the claims or the charges, and the defendant's
9  need to prepare.
10      Anything else from you, Mr. Schulte?
11      THE DEFENDANT:  No.
12      THE COURT:  Ms. Shroff?
13      MS. SHROFF:  Your Honor, may I just inquire on behalf
14  of Mr. Schulte if the Court is going to sit on Fridays, if the
15  Court is going to keep its regular 9 to -- the truncated trial
16  day.
17      THE COURT:  That certainly was my plan.  Five days a
18  week, I haven't figured out whether it's 9 to 2:30 or 3.  I've
19  varied a little bit over the course of COVID.  But roughly in
20  that zone.
21      MS. SHROFF:  Thank you, your Honor.
22      I wanted to reach out to the marshal because if he
23  needs to use the SCIF at the end of the trial day, I wanted to
24  make sure that the marshal is on notice.
25      THE COURT:  I will mention that to him as well.

M4D3SCHC

1          I will issue an order memorializing what we've done

2     today.  I will see some of you on May 3 and more of you perhaps

3     on May 16.  Thank you very much.

4          (Adjourned)