KBD3PET1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 850 (JSR)

5    PARKER H. PETIT AND WILLIAM
     TAYLOR,
6
               Defendants.
7
     ------------------------------x
8
                                          New York, N.Y.
9                                         November 13, 2020
                                          10:30 a.m.
10   Before:

11                  HON. JED S. RAKOFF,

12                                        District Judge
                                          and a Jury
13
                          APPEARANCES
14
     AUDREY STRAUSS,
15        Acting United States Attorney for the
          Southern District of New York
16   SCOTT HARTMAN
     EDWARD IMPERATORE
17   DANIEL TRACER
          Assistant United States Attorneys
18
     FRESHFIELDS BRUCKHAUS DERINGER US LLP
19        Attorneys for Defendant Petit
     BY:  ERIC B. BRUCE
20        JENNIFER LOEB
          -AND-
21   KOBRE & KIM LLP
     BY:  MATTHEW I. MENCHEL
22        AMANDA TUMINELLI

23   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for Defendant Taylor
24   BY:  WILLIAM WEINREB
          WILLIAM BURCK
25        MICHAEL PACKARD
          DANIEL KOFFMANN

KBD3PET1

1              (In open court; jury not present)

2              THE COURT:  We have not yet heard from the juror who

3      had the remote appointment starting at 9 a.m. and that's a

4      little disconcerting.  My own thought, though I want to hear

5      from counsel, is that if for any reason we haven't heard from

6      her by, say, 11:15, we should replace her with the next

7      alternate.  And the reason is, I know from what she told my

8      courtroom deputy, it takes her about a half hour to get here.

9      I don't see how, consistent with our schedule and the plans of

10     counsel, we could start the next summation any later than

11     11:45.  But let me hear what counsel think about all that.

12             MR. PACKARD:  May we have one moment to confer?

13             MR. BRUCE:  You may have said it earlier.  Which juror

14     number was she?

15             THE COURT:  This is Juror No. 4.

16             MR. BRUCE:  Thank you.

17             (Pause)

18             THE COURT:  Okay?  So what's the government's view?

19             MR. IMPERATORE:  We take no position, your Honor.

20             THE COURT:  That's so brave of you.

21             What's the defendants' view?

22             MR. BURCK:  We have to make sure we have consensus.

23             MR. MENCHEL:  Have we heard from this juror?

24             THE COURT:  I'm sorry?

25             MR. MENCHEL:  I am coming a little late to this party.

KBD3PET1

1    Have you heard from the juror?

2              THE COURT:  No, that's why I'm concerned.  Because her

3    appointment began at 9 a.m.  We told her to call us as soon as

4    the appointment was over so we would know when she would be

5    arriving here.  She has not yet called.

6              So, she made clear from day one that this was a very

7    important appointment in her life, and it was only with some

8    diplomacy we were able to get her to move it to a 9 a.m. time.

9    So, I'm not going to artificially put any pressure on her to

10   end it or whatever.  Social Security Administration, in my

11   experience, can take five minutes or five hours.  This is known

12   as federal bureaucracy.

13             So, my suggestion, but very much subject to hearing

14   from counsel, is that if she has not called by 11:15, meaning

15   she won't be here until 11:45 or later, that we excuse her and

16   substitute the next alternate, both because of our schedule,

17   but also because it's really not fair to all those other jurors

18   to just leave them sitting there for an hour or more.  So

19   that's my suggestion.

20             MR. BRUCE:  Your Honor, if I may.  Did you have a hard

21   stop today at 1 o'clock?

22             THE COURT:  I have to give a speech from 1 to 2.  And

23   for reasons we've discussed many times, I don't think it's

24   right to keep the jury beyond 3:45, because they need to get

25   home before rush hour.

KBD3PET1

1     So, I know defense counsel, if I recall correctly,

2  were anxious to have everything done today, including the

3  government, and I'm very much in agreement with that.  So

4  that's another factor to factor in.

5     MR. MENCHEL:  I'm less concerned about that, your

6  Honor, than just I want -- I was allotted two hours, and I know

7  I told you I was going to try to chisel it down, but I think

8  I'll need the full two hours.

9     THE COURT:  If we haven't heard from her, then we

10  could start at about 11:20.  And you would have to break your

11  summation into two parts.

12     MR. MENCHEL:  That's fine.  Can we just confer?

13     THE COURT:  Yes.

14     (Pause)

15     MR. BURCK:  That's fine with the defense.

16     THE COURT:  Very good.  All right.

17     Now let's deal with the only open legal issue, which

18  is this question of in connection with.  So, I took a look at

19  the relevant case law, and it seems to me clear that if someone

20  holds a security that they otherwise would at least consider

21  selling, if they had known the information that they did not

22  know because of the alleged fraud, that that also qualifies in

23  connection with a purchase and sale.

24     In that regard, take a look at *United States v.*

25  *Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006); *United States v.*

KBD3PET1

*Contorinis*, 692 F.3d, 136, 142 (2d Cir. 2012); *United States v.*
*Victor Teicher*, a decision of my colleague Judge Haight in the
Southern District of New York, reported at 1990 WL 29697;
*Castellano v. Young & Rubicam*, 257 F.3d 171, 180 (2d Cir.
2011); *O'Donnell v. AXA Equitable Life Insurance Company*, 887
F.3d 124, 129 (2d Cir. 2018); and various other cases.

So, I think we can do one of two things. I'll hear
from counsel. Either, if the defendant wants to rely on what
it says is evidence of other sales within the relevant period,
independent of any decision by the funds to hold on, that's
certainly an option. Then we don't have to change anything.
But I think, again, very much subject to hearing from counsel,
that an alternative, if you look at page 18 of the charge, top
paragraph, fourth line, beginning with the word "specifically,"
it presently says, "specifically the purchase or sale of MiMedx
stock," the proposal would be to add the words "or the decision
to hold on to the stock when, if the alleged fraud had been
known, the decision might have been otherwise."

So, let me hear from the government and then from
defense counsel.

MR. TRACER: Sure, your Honor. First of all, we would
request inclusion of that additional language in light of the
fact that that is I think one of our bases for the in
connection with. We did take a look at the transcript last
night, and we think there is actually multiple additional stock

KBD3PET1

1    sales that are in the record, so we won't be solely relying on

2    that.  In particular, Government Exhibit 105 describes the

3    repurchase of shares by MiMedx during the relevant time period.

4    In addition, Government Exhibit 106 describes the exercise of

5    options, which are the purchase of securities, by various

6    insiders in the company during the relevant period, as well as

7    the investor testimony that actually talks about them adding

8    and trimming MiMedx stock during the relevant period, which is

9    a reference to buys and sells.

10            So, in light of all of that, we think there are both

11   purchases and sales in the record, but we would add for that

12   language to be included as well as it is one of our bases.

13           THE COURT:  You make one other point which

14   specifically the purchase or sale of MiMedx stock, I think we

15   should change that to securities, because a stock is only one

16   form of security.

17           MR. KOFFMANN:  On behalf Mr. Taylor, we would oppose

18   the change to the instruction that your Honor just articulated.

19   We, notwithstanding the case law, which we haven't had an

20   opportunity to review in full, but we feel confident that that

21   instruction would be erroneous.  So if the government wants to

22   rely on that theory and that instruction is in there, I

23   understand that.

24           THE COURT:  I would think you would welcome this

25   because it's your legal position, as I understood it earlier,

KBD3PET1

1   that you don't think this is right.  So, if the government is

2   relying on like the sales I just mentioned, also wants to rely

3   on this holding on theory, then if you're correct, you've got

4   an appellate issue right there, assuming arguendo there is a

5   conviction.

6       So, is it your position, you correct me if I'm wrong,

7   is you oppose this addition because you don't think it

8   accurately states the law, but if there is to be an addition,

9   while preserving your full appellate rights, you had no problem

10  with the wording otherwise.  Do I have that right?

11      MR. KOFFMANN:  I think so, your Honor.  Fundamentally,

12  we think the instruction as it is now is accurate, and that the

13  change that you're proposing we believe would be inaccurate.

14      THE COURT:  So, let me go back to the government.  I

15  think it's totally your choice.  You take your chances if -- I

16  must say, I thought the case law was, when I looked into it,

17  fairly overwhelming on this issue, but it's only Second Circuit

18  law.  I've heard that the Supreme Court has authority, even

19  over the Second Circuit.

20      So, what's your choice?

21      MR. TRACER:  We do want it, your Honor.  We would ask

22  it be kept in, the suggestion.

23      THE COURT:  So I'll just read it one more time and

24  we'll conform the jury instructions accordingly.  This is on

25  page 18, fourth line down.  Beginning with the word

KBD3PET1

1   "specifically."  It will now read, "Specifically, the purchase

2   or sale of MiMedx securities, or the decision to hold on to the

3   securities where, if the alleged fraud had been known, the

4   decision might have been otherwise."

5          MR. BRUCE:  We object on the grounds you indicated

6   that we don't think it accurately states the law.

7          THE COURT:  Yes.

8          MR. BRUCE:  For Mr. Petit.

9          THE COURT:  There is no issue you've clearly preserved

10  this issue for appeal.

11         THE DEPUTY CLERK:  Juror No. 8 from the Bronx who is

12  always late is I expect two minutes from entering 11B at this

13  time.

14         There is no answer from Martha Delgado's phone she

15  gave me, and I don't know if that means she is afraid to put

16  Social Security on hold and pick it up, I don't know what it

17  means.  I did ask her last night to call me when she was out

18  the door.

19         THE COURT:  Counsel and I have agreed that if she

20  hasn't made contact with you by 11:15, we will replace her with

21  the next alternate and proceed.  If she has made contact, of

22  course let us know.

23         THE DEPUTY CLERK:  I will.

24         MR. KOFFMANN:  While we are on the topic of

25  instructions, since we have a moment, we obviously saw the

KBD3PET1

1    instructions you handed out yesterday.  And just one note on

2    instruction 12 where your Honor took out the reference to

3    collectibility of payments and made it broader to refer to all

4    four revenue recognition criteria.  We had, during the charge

5    conference, we had handed up a black line with different

6    language.  We understand your Honor didn't adopt that, but we

7    wanted to make sure it was in the record what we had proposed.

8

9           THE COURT:  I think, by the way, although I think I

10   read most of what you had handed up into the record, feel free

11   to go ahead and docket all your proposed language so there will

12   be no question on appeal what it was that you proposed.

13          MR. KOFFMANN:  Very well.  We'll do that, your Honor.

14   Thank you.

15          THE COURT:  So, we will reconvene at 11:15 unless we

16   hear from the juror.

17          MR. TRACER:  Your Honor, just to suggest it.  I think

18   at this point the government would also be comfortable, if

19   defense counsel wants and if the Court is amenable, if we don't

20   hear by 11, just given what we'd like to get done today.  But

21   we defer to the Court.

22          THE COURT:  No, I think we have to in fairness to

23   Juror No. 4 wait until 11:15.

24          MR. TRACER:  Okay.

25          (Recess)

KBD3PET1

```
 1              THE COURT:  Let's reconvene.

 2              We finally heard just a very few minutes ago from

 3     Juror No. 4., and she was still in the interview with Social

 4     Security.  And Social Security was saying that it could go on

 5     at least another half hour.  So, I excused her, consistent with

 6     what we had all discussed.

 7              So we'll get the jury up right away and continue with

 8     summations.  Anything else we need to take up now?  Very good.

 9     We'll sit here until jury comes up.

10              MR. IMPERATORE:  Just one question.  If the defense

11     veers into this issue of uncalled witnesses and suggests that

12     witnesses should have been called, I understand the Court does

13     not currently have an instruction on that in the jury charge.

14              THE COURT:  I indicated that if I thought it became an

15     issue, both I would say something right at the time, and also

16     that I would consider adding something to the jury

17     instructions.  So, both those possibilities are very real

18     possibilities, as I made clear.  And of course, on your

19     rebuttal summation you're free to state that the subpoena power

20     is available to both sides.

21              MR. BURCK:  On that point, your Honor -- can you hear

22     me okay?  We certainly do not intend to say anything close to

23     that there were witnesses who weren't called.  We are going to

24     say, I think consistent with your guidance yesterday, that

25     there are aspects in which there is no evidence in the record
```

KBD3PET1

1    to explain what people thought.

2            THE COURT:  That was the line I drew and, yes, that's

3    fine.

4            MR. BURCK:  Thank you.

5            MR. MENCHEL:  I am going for about an hour or so, and

6    if I want to end it?

7            THE COURT:  Yes.  You pick a time no earlier than

8    12:45, no later than 12:55.  That's totally in your call.

9            MR. IMPERATORE:  Your Honor, if we are doing the

10   rebuttal today, I just want to make sure we will preserve 45

11   minutes for that.  Notwithstanding --

12           THE COURT:  Not 46, but 45.

13           The jury is on their way up.

14           MR. MENCHEL:  Is it your practice to give a two

15   minute, five minute warning or nothing like that?

16           THE COURT:  Do you want me to?

17           MR. MENCHEL:  I wouldn't mind.  Five minutes.  That

18   would be great.  Thank you.

19           THE COURT:  Okay.

20           (Jury present)

21           THE COURT:  Ladies and gentlemen, thank you for your

22   patience.  Because former Juror No. 4 was still in the

23   interview with Social Security, counsel and I agreed that we

24   needed to move forward, so we excused her.  So former Juror 13

25   is now Juror No. 4.  Congratulations.  And I think everyone

1    else is properly seated.

2              So, we are ready to hear from counsel for Mr. Petit.

3              MR. MENCHEL:  Thank you, your Honor.

4              May it please the Court.  Counsel for the government,

5    counsel for Mr. Taylor, ladies and gentlemen of the jury, good

6    morning.

7              I want to begin before I get into the actual closing

8    argument of just spending a moment or two to thank you for your

9    service in this case.  Being a juror, as his Honor said, is an

10   extremely important service.  It's vital to our system of

11   justice.  And it's always an inconvenience to do so.  You

12   sacrifice time away from work, your friends, your family, your

13   regular life.  But I think under these circumstances, given

14   where we are in the world, it's even more extraordinary than is

15   normal.  And on behalf of I can say all parties, I want to

16   thank you for your kind attention and service.

17             Mr. Hartman gave a very persuasive and compelling

18   closing argument yesterday, it was clear to me.  But I would

19   ask your indulgence to still keep an open mind until you've

20   heard all arguments in this case, his Honor's instructions on

21   the law, and then you begin your deliberations.  Because it

22   won't surprise you that we have a very, very different version

23   or view of what the evidence in this case actually showed.

24             A lot happened during these last several weeks, but

25   trials are far from perfect vehicles for absorbing information,

 1    particularly under these circumstances.  Evidence comes in

 2    drips and drabs, comes in a document here or a document there,

 3    out of order, out of chronology.  And I know the evidence in

 4    this case, and I found it difficult to follow at times, so I

 5    can only imagine that you all were struggling with it as well.

 6            And while Mr. Hartman's close argument seemed

 7    compelling, I submit to you that it suffers from two

 8    fundamental flaws.  First, from the very beginning of this

 9    case, as we told you, in the government's opening statement,

10    three weeks ago, they have portrayed everything in this case,

11    every document, every action, every e-mail, as somehow

12    sinister, dirty, shady, no matter how innocuous and no matter

13    how innocent it is.  And I'm going to show you multiple

14    examples of that today.  Everything is supposedly a sham or a

15    secret or a side deal.  You're led to believe that literally

16    nothing is simply as it appears to be.  Basically, as Mr. Bruce

17    said, my colleague, in opening statement, and it's been proven

18    to be true, the government is looking at everything in this

19    case through a dirty window, a dirty prism, if you will, and

20    therefore they see everything as dirty.

21            This is what Mr. Tracer said right from the very

22    beginning in his opening statement about the way MiMedx sells

23    its products.  He said, "They don't wait to receive the money

24    before recording revenue.  They don't wait to be paid before

25    they record the revenue or before they show the money on their

1    books.  Again, MiMedx didn't wait."

2            Now, if you were sitting listening to this for the

3    first time, as you were, it sounds like MiMedx was doing

4    something wrong.  That they should have been waiting before

5    they could recognize the revenue, they should have been waiting

6    to get paid.  This is a perfect example of what I'm talking

7    about.  Next slide, please.

8            In reality, what MiMedx does in the way it books its

9    revenue is standard industry practice.  We brought that out

10   through Mark Andersen at the very beginning.  It's called

11   accrual-based accounting, and there is absolutely nothing wrong

12   with it, as Mr. Andersen himself said right from the very

13   beginning.  In fact, in the second question, he is asked:  It

14   is the default way to actually account for sales under the

15   generally accepted accounting principles, correct?

16   Answer:  Yes, it is a way for all transactions, yes.

17           It is a perfect example of what I'm talking about.

18   There was something sounding nefarious or sinister because

19   MiMedx didn't wait to book its revenue until it got paid.  When

20   no company, no publicly traded company, does that in the normal

21   course.

22           Another example, you heard from Mr. Martin at

23   Stability.  Right.  And they brought out multiple times that

24   Mr. Petit asked for a $2 million order, as though somehow when

25   somebody wants to become a distributor for MiMedx, and MiMedx

1    says, great, you want to become a distributor, we want you to

2    buy our product, that that's wrong.  That that's dirty.  Folks,

3    that's the whole point of becoming a distributor, is you buy

4    the product from the manufacturer, you essentially act as a

5    middleman, as the government said, and you sell it.  There is

6    absolutely nothing wrong with Mr. Petit or anybody at MiMedx

7    going to one of its distributors and saying we'd like you to

8    purchase X amount of product this month.  In fact, as you may

9    remember, there was testimony in this case that a number of the

10   consulting arrangements have an understanding that there will

11   be a minimum purchase amount each quarter.  There is nothing

12   inherently wrong or sinister or evil about any of that.

13          I want to give you some other examples of typical

14   things that there is absolutely nothing wrong with that was

15   painted with a sinister gloss.

16          Setting of aggressive revenue targets and doing all

17   you can to hit them.  That's what companies do.  They set

18   aggressive targets and they shake the bushes and shake the

19   trees to get people to buy their product.

20          Telling your distributors what products they should

21   purchase.  MiMedx is in this industry.  They understand the

22   market.  The distributors are middlemen for them.  There is

23   absolutely nothing wrong with suggesting what products may take

24   off in a given market and what product might not.

25          Thinking that you can exchange products that a

1    customer is having trouble selling, and that such exchanges are

2    revenue neutral.  Actually makes a certain amount of common

3    sense.  It may have been wrong as a matter of accounting in

4    this case, but you can see how most people would think, if I

5    exchange a red backpack for a blue backpack, that should be

6    revenue neutral, meaning it shouldn't have any impact on the

7    revenue number.  This was a widely held belief at MiMedx.

8          Suggest to your distributers after months of back and

9    forth negotiations to sign a distribution agreement isn't

10   nefarious.  That's what good business people do.  They say can

11   you sign this.  We've been going back and forth.

12         Allowing distributors to pay for product as they sell

13   it.  You may recall Mr. Martin testified that's the way I

14   always do business.  I don't have a lot of cash.  I sell, and

15   then I pay the manufacturer for what I sold.

16         Asking distributors to pay down an account receivable

17   or paying for the product they bought.  Is what you would

18   expect someone to do if it's been outstanding for several

19   months.

20         Making sales to a company you might acquire or

21   acquiring to which you've made sales.  There has been no

22   evidence in this case that that's somehow wrong or improper at

23   all.

24         And connecting a potential investor, like Mr. Petit's

25   son-in-law, for an investment opportunity with SLR, there's

1   nothing wrong with that either.

2          These are all many examples of the kind of sinister

3   gloss that's being put on normal, typical business behavior.

4   I'm going to talk about many other example as we go through.

5          I recall during Mr. Carlton's testimony there was a

6   moment when he was asked a question about organic or natural

7   demand.  I don't know if any of you remember that, but there

8   was a question where he talked about something being natural or

9   organic demand.  Folks, there was no evidence of what that even

10  means.  They didn't even ask him to explain it.

11         All I can tell you is this.  If companies want to stay

12  in business, they have to hustle.  There is nothing wrong with

13  that.  Apple, I think there are a billion iPhones in the world

14  right now that people have.  They just came out with an iPhone,

15  they just came out with a new MacBook, and I'm seeing ads

16  everywhere, as I am sure you are.  They are not sitting back on

17  their laurels and saying let's wait for the phone to ring.

18  They go out and they hustle.  The day Apple stops doing that is

19  the day they fail.  It's no different with MiMedx.

20         So the idea that Mr. Petit and others in the company

21  were you pushing their salespeople to sell, that's what you

22  would expect somebody who is the head of a publicly traded

23  company to do.

24         That's really sort of the point I want to make right

25  here.  A courtroom is a very sterile environment.  This is more

1    sterile than normal, literally my air being sterilized as I'm

2    speaking to you.  But it is a sterile environment where things

3    that you would never accept as true outside of this courtroom,

4    somehow take on a life.  And that's why you are here.  You are

5    here because you breathe real life back into this process.

6    What you know about life, business, common sense, life

7    experience, those are the tools you will use to evaluate the

8    evidence in this case.  And when you do that, when you stop

9    just looking at everything as sinister, but actually start to

10   think and use your common sense, you'll see a very different

11   picture emerge from the evidence in this case.

12          That's the first thing that the prosecutors have done

13   a lot of, which is put a sinister gloss.

14          The second thing, and I am going show you this, is

15   they've been cherrypicking the evidence in this case.  Only the

16   pieces, only the documents that fit their narrative.  If a

17   document didn't fit their narrative, or if a witness said

18   something they didn't want to hear, it was ignored in that

19   closing argument.

20          I'm going to go through with you with the documents

21   they didn't put into evidence but that we did, and the

22   testimony that came out not on direct examination -- which I

23   submit to you was highly scripted and I'm going to prove that

24   to you during this closing -- but on the cross-examination,

25   when the witnesses were asked questions that they weren't

1   expecting and therefore gave unscripted answers.  Unrehearsed

2   answers.

3        So with that, let's start with CPM.  What's the

4   government's theory about CPM?  This is their theory about CPM

5   and the third quarter order that you've heard so much about.

6   CPM didn't want or need MiMedx product.  By the way, that is a

7   constant mantra that we've heard in this case, right.  Didn't

8   want, didn't need, couldn't sell.  Didn't want, didn't need,

9   didn't sell.  Martin was like a broken record with that.  Okay.

10       Just to be clear, by the way, there has been no direct

11  evidence of what actually was in Mr. Brooks' own mind during

12  any of this.  Okay.  The only reason they claim that CPM

13  purchased this product was because he was bribed by Mr. Petit

14  to do so.  And the bribe was in some form of secret $200,000

15  payment that apparently no one was supposed to know anything

16  about, it was going to be paid through some kind of illicit

17  funds, through a shell company or through money in a bag we

18  heard about.

19       Let's look at the actual evidence in this case.

20  First, let's start with who Mark Brooks is and what we learned

21  about him.  This was a difficult guy.  If there was anything

22  that the witnesses from MiMedx agreed with, Mr. Schultz and

23  Mr. Carlton, is he was a difficult, tough guy to deal with.  He

24  played games.  He was always late to pay.  He was always hard

25  to negotiate with, according to Mr. Carlton.  And one of the

1    things that you heard a lot of evidence about was he had a

2    tactic of waiting until the end of the quarter before placing

3    an order.  Why?  To get discounts, to get concessions, to get

4    free product.  Now, they didn't like that.  But that doesn't

5    make it a bribe because somebody says I'm not going to sell --

6    I'm not going to buy your product until I get those

7    concessions.  He had them over a barrel, until there came a

8    point when they said we don't care anymore, we're done with

9    you.

10           The fact that Mr. Brooks held out for the things he

11   felt he was entitled to, and the fact that MiMedx and Mr. Petit

12   acquiesced to those things, doesn't make it a bribe.

13           It's tough business negotiation by CPM, no question.

14   But you haven't actually heard or seen any real evidence of a

15   bribe in this case at all.  Next slide, please.

16           As I said, even Mr. Carlton agreed that CPM had a

17   history of waiting until the end of the quarter.

18   "Q.  But it was typical of CPM to hold back until they got the

19   concessions they wanted before they would place an order,

20   right, they did that a lot?

21   "A.  Painfully, yes."

22           What happened in the end of the third quarter was not

23   unusual.  It was typical.  As much as Mr. Schultz was like, we

24   were shocked and blown away, which, by the way, you'll see

25   contemporaneous documents showing not at all, this was

1    something this man did over and over again.  The other thing we

2    learned in this case, which the government seems to think we

3    made up out of whole cloth but which there was abundant

4    evidence for, is that Mr. Brooks felt he was owed money because

5    he didn't get these credits or overrides for GPO sales.

6           You may remember he had Texas.  He was supposed to get

7    the commissions from these group organizations that do mass

8    purchasing.  But MiMedx was going in there and selling

9    directly, and therefore, basically, he was not getting a

10   commission he felt he was entitled to.

11          Mr. Carlton admitted this.  This was a question by the

12   Court:  "Do you have personal knowledge of whether they, CPM,

13   had a complaint about the way MiMedx was interacting with the

14   GPOs in Texas?"

15   Mr. Carlton:  "They complained about a lot of things, but that

16   was one of them, sure."

17   "Q.  You were of the view, were you not -- this is Mr. Carlton

18   again -- that there was actually merit to CPM's position that

19   they were entitled to money that they weren't getting because

20   MiMedx was encroaching into this GPO space.  Fair?

21   "A.  I did advocate for that perspective, sure."

22          We didn't make this up.  This is real.  There was a

23   real issue that Mark Brooks felt he was entitled to money,

24   because MiMedx was selling product in the GPO space that he

25   felt he should be getting a commission or an override on.

1    Their witness, Mr. Carlton, admitted that on cross-examination.

2            Now, what happens.  This is the critical time period.

3    I am going to walk you through slowly and not just cherrypick

4    the documents the government did, but as many as I can in the

5    time we have.

6            In late June, this is just six days, June 24, 2015,

7    from the end of the quarter.  This is important to stop and

8    think about for a moment.  They are claiming that two days

9    later Mr. Petit bribed Mr. Brooks because he was so desperate,

10   so desperate to get this $2 million order.  Well, look what

11   happened?  The exact opposite is true.  This is an e-mail from

12   Mr. Taylor to Mr. Carlton.  A couple of important things about

13   this e-mail, folks.  First of all, you heard testimony in this

14   case that MiMedx would just load up whatever product they had

15   and give it to a distributor because all they wanted to do was

16   hit their number.  That's not true.

17           Look at the e-mail.  "David Nix gave me what we could

18   deliver off of CPM's proposed mix."  David Nix, CPM.  The next

19   paragraph.  "David gave me a list of items they had ordered in

20   the past six months and we can do an alternate mix to get us to

21   just under 1.9 million post 5 percent discount."

22           They are not randomly picking whatever they have.

23   They're choosing a product mix based on prior historical usage

24   by CPM.  Absolutely nothing wrong with that.  Part of the

25   problem that you learned was, although Mr. Brooks was supposed

KBD3PET1                    Summation - Mr. Menchel

1      to be buying this product, because he would wait until the last

2      minute, they didn't have the perfect inventory around, because

3      he would wait until the last minute.

4             But then here's the most important portion of this

5      e-mail from Mr. Taylor.  Remember, they're claiming Mr. Taylor

6      was in a conspiracy with Mr. Petit to bribe Mr. Brooks because

7      they were desperate for the order.  He says, "From my

8      perspective, I think we've given all we can.  If that doesn't

9      work for them, then I guess he is choosing to discontinue doing

10     business with us and we will deal with it."  We will deal with

11     it.  Does that sound like someone the next day is going to do a

12     bribe.  That makes no sense.  That does not comport with

13     anyone's life experience.  That's why you're here.  Because

14     this shows you what happened in real time.  Not some witnesses

15     who have come in years later where they have the thumb, the

16     government's thumb on them to say whatever they want, and I'm

17     going to show you they're worried about that.  But what was

18     being said at the time.  Next slide, please.

19            This is what he was talking about in terms of he felt

20     as far as we could go.  This is from Mr. Taylor.

21     Mr. McLaughlin is, as you may recall, the CPM person.  He's

22     right underneath Mr. Brooks.  This discussion about the $2

23     million order was still in play, right there in black and

24     white.  What also is in black and white is something going

25     forward and this was something I respectfully submit

KBD3PET1                    Summation - Mr. Menchel

1    Mr. Hartman confused yesterday, whether intentionally or not,

2    I'll leave to you.  But if you look at number five, it says "In

3    Texas MiMedx will give CPM visibility to hospitals we are

4    working with to join GPO contracts and where possible allow CPM

5    to opt into the contracts."

6          I don't want you to get confused.  I just showed you

7    testimony from Mr. Carlton who said Mr. Brooks felt he was

8    already owed money in the past for GPO overrides and

9    commissions he didn't get.  This condition number five is going

10   forward.  Going forward, MiMedx is saying we're going to give

11   you visibility into the hospitals and you can decide if you

12   want to join us.  We haven't been doing that before; we're

13   going to do it now.

14         Two different things.  Payment for the past for not

15   getting the overrides and commissions.  Going forward you will

16   work with us if you want to and opt in on GPOs.  Those are not

17   the same.  Next, please.

18         Mr. Petit had enough.  This is now the next day

19   because apparently they turned down that offer.  This is the

20   man they say on June 26 committed a bribe.  Here he is on

21   June 25 telling Mr. Brooks your consultancy relationship with

22   us is over.  And you also heard testimony in this case I

23   believe from Mr. Carlton, that MiMedx was also in the process

24   of completely ending the relationship with CPM, not just this

25   consultancy, but the whole distributor relationship because

1    they were fed up.  Mr. Petit was fed up, everybody in the

2    company apparently was fed up.  So what does he do.  He gives

3    Mr. Brook notice that they're canceling it.  Terminating the

4    agreement.

5              And then on the bottom, and this is extremely

6    important, it's been swept under the rug, it's been ignored by

7    the government.  I want you to look at what happens here.  He

8    says, and the restricted stock award scheduled to vest on

9    June 11, 2016, June 11, 2017, June 11, 2018, we're taking those

10   back.  These haven't vested yet.  These are 15,000 shares.

11             Let me stop for a moment about this.  You heard from

12   Mr. Carlton MiMedx would use these consulting arrangements to

13   give distributors skin in the game, to make them feel they're

14   part of the company as a partner.  Nobody ever said this was

15   wrong until this trial.  This is a way of developing a

16   relationship.  And they would provide market intelligence, but

17   the whole point was to develop a relationship and keep the

18   distributor happy.  This is not a bribe.  No one is saying it

19   is a bribe.  Not even the government is suggesting this is a

20   bribe.  Next slide, please.

21             And here's the biggest irony of this case.  Who is it,

22   after Mr. Petit -- can we go back to the prior slide.  The time

23   of this, if you can highlight it was 6:42 p.m.  That night, he

24   cancels it on June 25.  Next slide, please.  At 11:18 p.m.,

25   7:18 Eastern, actually, just a short while after Mr. Petit has

 1    sent a termination letter, look what Jeff Schultz does.  The

 2    man, by the way, who claimed, you know, he was totally shocked

 3    by all this.  First he completely tries to pretend that he

 4    didn't do what he did.  Mr. Bruce asked him this question.

 5    "Q.  But isn't true, sir, you were willing to go to bat and be

 6    an advocate for CPM within MiMedx; isn't that true?

 7    "A.  No, that's not true.

 8    "Q.  Sir, I am going to refer you, let me see if I can refresh

 9    your memory.  I show you Defense Exhibit 134A.  Take a moment

10    to look that over, sir.

11    "A.  Yes."

12            Let's look at the text message Mr. Schultz to

13    Mr. Brooks left an hour after Mr. Petit had ended the

14    relationship:  Bro, if there is any chance at all that I can be

15    your advocate tomorrow to make this work, God knows I will do

16    everything or anything to assist.

17            I don't have time to put up all the testimony, ladies

18    and gentlemen.  But when he was confronted with this text

19    message, he made a joke about pizza.  Okay.  And then tried to

20    pretend he didn't mean he was being an advocate.  He used the

21    word "liaison."  That's a classic example of a witness shading

22    because he thinks he has to help the government and hurt

23    Mr. Petit.  That's all he cares about.  The truth is he was an

24    advocate.

25            You know who else was?  Mr. Carlton.  Mr. Carlton also

1    advocated that Mr. Brooks was entitled to be compensated for

2    GPO overrides.

3    "Q.  We're going to talk about the longterm relationship but I

4    want to focus on June 25.  Did you not advocate or attempt to

5    see if there was a way to resolve the disputes that CPM was

6    having with MiMedx?

7    "A.  Again, I do remember advocating for the position on

8    overrides because the guys locally thought that there was

9    something Brooks, that was something Brooks deserved."  He goes

10   on to say, "So as memory serves I thought the overrides made

11   sense."

12          So whether it is the GPO business or the GPO

13   commissions, that's not really important.  The bottom line is

14   their witnesses were the ones that were actually advocating to

15   turn around and undo the termination that Mr. Petit canceled.

16   They're the ones, the government witnesses, wanted this

17   relationship reinstated.  And they went to Mr. Petit, and they

18   told him, you know, Mr. Petit, it's true Brooks is a bad guy

19   and he has done a lot of bad things, but you don't have the

20   full story.  We haven't been exactly squeaky clean either.  We

21   have encroached on his space.  The man has a point.

22          And that's when Mr. Carlton remembers, after he spoke

23   to Mr. Petit:  "Do you recall Mr. Petit telling you at a

24   minimum we owe the man an apology?

25   "A.  He did say that. "

1          This is an honorable man, despite what has been

2     portrayed in this courtroom.  Pete Petit is an honorable man.

3     We'll talk about his character a little more.  When he was told

4     that he did not have the full story, he said, "At a minimum, we

5     owe the man an apology."

6          And then the next day, in the morning, after having

7     been informed by Mr. Schultz and Mr. Carlton, he reversed

8     course, not because he was trying to bribe somebody.  But

9     because Schultz and Carlton had advocated on Mr. Brooks' behalf

10    that he was properly owed something that he wasn't getting.

11          Again, folks, just use your common sense.  Do you

12    decide you are going to terminate a relationship the day before

13    only to bribe a man the next day because you're so desperate

14    for business?  That literally makes no sense.

15          Here's what he writes to Mr. Brooks, cc'ing Lexi Haden

16    and Mr. Carlton.  "Mark, I believe I am now fully informed as

17    to the circumstances that have developed around our mutual

18    business activities.  What I was told yesterday was not

19    factual.  Therefore, the decision I made to cancel our

20    consulting agreement was based on misinformation.  With this

21    e-mail I am rescinding the cancellation of your consulting

22    agreement."

23          This is important.  Because what was it that Mr. Brook

24    was going to lose?  He was going to lose 15,000 shares of

25    MiMedx stock.  Still hadn't vested yet those three buckets of

1    5,000, 5,000, 5,000 that I showed you, and Mr. Petit was saying

2    I was wrong, I didn't have all the facts, I'm reinstating that.

3         He goes on.  "This is not the way I wish to conduct

4    business.  I certainly apologize and I would like to schedule a

5    brief call with you.  Thanks for your patience."

6         That sounds like a man who is so desperate for the

7    business that's he will do anything?  He's righting a wrong.

8    That's all he's doing here.  Next slide, please.

9         There was some confusion about this.  You may recall

10   there was testimony in this case from Mr. Carlton -- I think I

11   am going to get to it later if it's not in the deck, that

12   Mr. Brooks didn't want the $15,000 shares back.  He didn't want

13   the $15,000 -- 15,000 shares back, excuse me.  You know why?

14   Because Mr. Petit had just pulled it from him and he didn't

15   want to be in that position again.  That makes perfect sense.

16   Okay.  The man has restricted stock agreements taken away from

17   him the day before, and he didn't want to be in that situation

18   again.  So he wanted instead money in exchange for those 15,000

19   shares.  That's not a bribe.  He's saying I don't want the

20   15,000 right now because you and I are not in a good place.

21   Just pay me the cash.  It says it in black and white.  This was

22   this term sheet I told you about, similar to what we looked at,

23   except it changed now the next day.  Again, the order is still

24   there at 2 million.  And then it says "In replacement of the

25   June 2015 RSAs, the 15,000 shares, MiMedx will convert it to a

KBD3PET1                    Summation - Mr. Menchel

1     $2,000 consulting fee."  He already had the stock as part of

2     his consulting arrangement, and now he was getting the cash

3     instead.

4               You got to walk through these document a little bit

5     more slowly than the government did to really see the truth of

6     what's going on here in this case.  And when you do, it's clear

7     as day.

8               And then this is the cover page to this document.  Oh

9     by the way, again, number five remains the same, in Texas

10    MiMedx will give CPM visibility into the hospitals we are

11    working with.  That's going forward.  That's going forward.

12              Now, Mr. Petit e-mails this term sheet to Mr. Brooks.

13    He says, "Mark, please review the attached and give me or Mike

14    Carlton a call.  Thank you for your patience."

15              Do you remember what Mr. Carlton's testimony was about

16    this $200,000 that's in black and white in an e-mail where

17    Mr. Petit is saying if you have any questions you can call me

18    or Mr. Carlton.  I didn't know anything about this $200,000

19    until I heard it about it from Schultz and I was shocked.  I

20    don't know how else to say this politely.  That is a lie.  That

21    is a bold faced lie.  There is no way that Mr. Petit would have

22    told Mr. Carlton -- I'm sorry, would have told Mr. Brooks,

23    please review the attached this term sheet, and give me or Mike

24    Carlton a call, if Mr. Carlton had no idea what was in that

25    term sheet.  This is another example of what I'm talking about

1    why you folks are here.  Use your common sense.
1              MR. MENCHEL:  (Continued) Mr. Petit would not have
2    invited Mr. Brooks to call either himself – Mr. Petit – or
3    Mr. Carlton, unless Mr. Carlton was fully in the loop as to
4    what these terms were.  That doesn't fit with the government's
5    narrative.  There has to be shock and concern over this
6    $200,000.  So they ignore this.  It's right here at the time,
7    June 26, 2015.  Not five years later.  Then.

8              And by the way, is this some cover story that's
9    elaborately being created because people thought, you know,
10   five years later we might be in a courtroom charged with
11   crimes, we've got to cover ourselves?  That's nonsense.  These
12   are contemporaneous documents being generated in realtime about
13   a business negotiation that is evolving.

14             And that's another important point I want to make.
15   This relationship is a negotiation.  Anybody who knows anything
16   about negotiation is they know this:  It goes back and forth.
17   This for that.  I'll take this instead of that.  And that's
18   what's happening here.  You know, Mr. Hartman man said there's
19   been so many reasons for why the $200,000 was given.  Yeah.
20   Because it he evolved during the course of this negotiation.
21   I'm going to show you that.

22             Next slide, please.

23             By the way, I said he wanted the $200,000 in lieu of
24   the 15,000 shares.  I asked Mr. Carlton "Fair to say these
25   15,000 shares are worth hundreds of thousands of dollars?

1    "A.  Presumably.  It was a pretty significant amount, yes.  I

2    don't know how much."

3          That completely jives with the $200,000 because those

4    stock options were extremely valuable and Brooks wanted the

5    cash because they had a tumultuous relationship, and he didn't

6    want to be at the whim and caprice of Mr. Petit in the future

7    who could cancel them again.  makes total sense.

8          Then it changes again.  Then the decision is -- well,

9    we'll give you the $200,000 and the stock to resolve the GPO

10   issue, the money he felt he was owed in the overrides.  This

11   was a document that I showed Mr. Carlton.

12   "Q.  Can we agree that she" - that's Lexi Haden - "is

13   apologizing to you for not realizing that an additional term of

14   the stock grant had to be added in?"

15         So now, what's happening?  You had the cash in lieu of

16   the stock and now Mr. Carlton is adding back in the stock in

17   addition to the cash.

18   "A.  She is.  There was a moment I remember in time where there

19   was a discussion about whether it was going to be cash or stock

20   or both, and I believe it was going to be both, and I think

21   that's what this is referring to.  Brooks got both stock and

22   cash, from my memory."

23         And you know who was advocating for that?

24   Mr. Carlton.

25   "A.  I was advocating for him to keep the stock and the cash

1    which is what Brooks expected."

2           I want you to look at that statement and think about

3    it for a moment.  Remember what Mr. Carlton said?  He didn't

4    ever speak to Brooks.  Only thing he knows about $200,000 was

5    from Jeff Schultz.  I don't know how to put this politely.

6    That is a lie.  And it's proven right here.  This was

7    cross-examination.  This is the unscripted part.  This is the

8    part where me and Mr. Burck were asking questions that he

9    wasn't prepared for.

10          You know, I think it was Elvis Presley who said:

11   Truth is like sunshine.  You can shut it out for awhile, but

12   eventually it comes back in.  And I would submit to you that

13   that's what happened in the unscripted portion of Mr. Carlton's

14   testimony.  He knowingly gave away the truth.  He was aware of

15   both the stock and the $200,000, and not only was he aware of

16   it, he was aware Brooks wanted both, and he was the one

17   advocating for it.  That is completely at odds with what the

18   government told you yesterday and with what Mr. Carlton said in

19   his own direct examination.  180 degrees different.

20          Next slide, please.

21          This is the email that Mr. Hartman said is a coverup.

22   A coverup.  Remember the government's theory.  The government's

23   theory is that Mr. Taylor and Mr. Petit are in a conspiracy to

24   bribe Mr. Brooks.  It couldn't be further from the truth.  This

25   is not a cover your CYA email.  This is something happening on

1    the same day.  You saw the agreement.  It originally was cash

2    in lieu of the stock.  Then somebody halted and advocated on

3    behalf of Mr. Brooks, that he should get both:  To not only

4    give him back his stock, which he was already entitled to.  The

5    stock he just gave him he was already entitled to under the

6    consulting agreement, but now we're going to give him the cash

7    to make up for the GPO override.

8            I think this slide is actually upside down in terms of

9    the order, but it begins with Mr. Taylor at 3:18 on the top

10   saying, "I thought we needed him to forego the stock from

11   June 11 of this year for 200K."  Exactly what you saw in

12   writing.

13           And Mr. Carlton responds -- and it's sort of upside

14   down -- but Mr. Carlton responds at 3:24, just a few minutes

15   later, "Agree to let him keep it based on lost business."

16           I don't know how much clearer it can be.  This is the

17   man that they want you to believe is telling the truth.  This

18   is what he said at the time.  We're going to let him keep both.

19   He already was entitled to get his stock back now we're going

20   to give him cash on top of it.  He's going to take both.  The

21   man who is telling Mr. Taylor that is Mr. Carlton, the man who

22   says he didn't know anything about this except when Jeff

23   Schultz told him, and he was shocked because it smelled like a

24   bribe.  This is just a business discussion.

25           Go back one second, please.

KBDQpet2                        Summation - Mr. Menchel

1          There is no evidence in this case that Bill Taylor

2   wrote this to cover himself because he thought five years later

3   he may be sitting in federal court.  That's absurd.  This is a

4   realtime negotiation that is evolving, evolving.

5          Next, please.

6          Mr. Petit weighs in later that evening and answers the

7   exact same question.  Tells Mr. Taylor we're giving him both,

8   "Both given to avoid going through all hospital contracts in

9   detail and giving a rebate or override."  We're giving him

10  both.  He had the 15,000 shares, he wanted it instead $200,000,

11  but he also was complaining he's owed money for the GPOs, so

12  you know what we're going to do?  We're going to give him the

13  $200,000 and we're going to let him keep the stock, the stock

14  he was already entitled to.  It was already in this agreement.

15  Now we're going to give him the $200,000 to make him happy for

16  the GPOs.

17         Folks, that is not a bribe.  it may be hard-line

18  tactics by Mr. Brooks.  Mr. Petit as the head of the company

19  has every right to decide if he wants to do this.  You know,

20  all you heard about this was Mr. Schultz saying, he got off the

21  phone, Mr. Brooks did, and said, "I got everything I wanted."

22  That's what he testified to.  So what?  They want you to

23  convict this man because Mr. Schultz said that after Mr. Brooks

24  had a one-on-one conversation with Mr. Petit, he got off the

25  phone and said, "I got everything I wanted."  It's memorialized

 1   right here he got everything he wanted.  Nobody was hiding it.
 2   Nobody was expressing shock.  Mr. Carlton certainly wasn't
 3   expressing shock.  He was educating Mr. Taylor, as was
 4   Mr. Petit.  This is the type of evidence -- this actually
 5   flatly refutes that this was a bribe.  This was a business
 6   negotiation, pure and simple.
 7              I asked Mr. Carlton about that email I just showed
 8   you.  Mr. Petit responded to this email as well that you were
 9   on and he said both, "You would agree with me, meaning both
10   given is the stock and cash, correct?
11   "A.  Correct.
12   "Q.  To avoid going through all hospital contracts in detail
13   and giving a rebate or override.  Do you see that?
14   "A.  I see that, yes.
15   "Q.  Do you understand that to mean this GPO discussion you
16   were advocating on behalf of CPM?
17   "A.  I see that, yes."
18              This was cross-examination, and this is what I mean
19   how if you were in this trial, this might have gone over you
20   like nothing, and that's not an insult to any of you at all.
21   You have to really be deep into these documents and look at
22   them chronologically, which they didn't come into evidence like
23   that -- it's not the nature of trials -- to understand what's
24   really going on here.  Flat out he's telling you, Mr. Carlton,
25   the man who said this was a bribe.  "No, I'm the one that told

1    Mr. Petit he should get both because I was advocating on behalf

2    of CPM, they were owed money for this GPO dispute, for the

3    money they hadn't gotten paid in the past."

4                Next slide, please.

5                Mr. Schultz, who, by the way, is a heck of a salesman.

6    We're going to talk more about him.  Remember he told you he

7    was concerned and shocked the deal closed this day.  Brooks

8    accepted.  Yes, he got everything he wanted.  There's not a

9    single text message in this case between Brooks -- I'm sorry --

10   between Schultz and Carlton or an email between Carlton and

11   Schultz or anybody else expressing shock and concern about the

12   $200,000 and the return of the stock.  Nobody.  There's not a

13   single real document in this case that was generated at the

14   time that shows that's true.

15               Look at what Schultz wrote at the time.  This is right

16   after the deal wrapped up.

17               "Pete, I'm still in Dallas tonight and I just wanted

18   to say thank you very much for stepping in and assisting on

19   getting the CPM deal closed today.  Mark is an extremely

20   different person with a unique style, but he has an incredible

21   amount of respect for you, like we all have, and he admires all

22   your successes over the years, and this truly made the

23   difference in coming to a solution."

24               Does that sound like a guy who was shocked and

25   couldn't believe and had never heard in his life of such a

1    thing?  Either the man is the greatest pathological liar or one

2    of those two things.  And they can't both be true, right?

3    Either at the time he's writing stuff he doesn't even remotely

4    believe is true or what he said on the stand before you is not

5    the truth, and I submit it's the latter because this is what he

6    wrote at the time.  No expression of shock or concern.  A thank

7    you to Pete Petit for getting the deal done that he,

8    Mr. Schultz and Mr. Carlton wanted.  And so it is.

9              It's in black and white, ladies and gentlemen.  It's

10   not in a paper bag.  It's not in some illicit agreement.  It's

11   not in some other company's name.  It's right here in the

12   consulting arrangement as it was amended on June 26 and signed

13   by Mr. Brooks and Mr. Petit drafted by the company's lawyer,

14   Lexi Haden.  It says both, "In consideration of duties and

15   services provided by the consultant set forth herein, company

16   shall pay to consultant a one-time consulting fee in the amount

17   of $200,000 to be paid to consultant on or before June 30,

18   2015," and reinstates the 15,000 shares of restricted stock

19   that Mr. Petit had pulled away.  This makes sense.  He merely

20   gave him back the shares he was already entitled to and to make

21   up for the GPOs, he put that in this consulting arrangement as

22   well.

23             Next, please.

24             What happens?  This is the thing, by the way, that

25   Schultz said, "We could never let the auditors see this.  We

1   could never let the auditors see this." He could never have

2   said it more emphatically and more persuasively to you on the

3   stand.  Lexi Haden, the company's general counsel, head lawyer,

4   emails Bill Taylor, John Cranston and Michael Senken, the head

5   accountant, the chief financial officer, the one who is going

6   to be dealing with the auditors when there's an audit about

7   this agreement containing the $200,000 and the 15,000 shares of

8   restricted stock.

9        "Lexi, Hi.  We need to pay Mark Brooks the $200,000

10  consulting fee for the attached final agreement.  Whoever is

11  authorized to approve this request, will you please let

12  accounting know so they can process."

13       I'm sorry, what happened to the brown paper bag?  What

14  happened to some fake shell company?  What's happened in this

15  trial, I submit to you, has been an outrage.  And I don't say

16  that lightly.  This is the truth.  The company knew full well

17  about this thing.  It was not some scam cooked up.  It's right

18  here in black and white.  Just a couple of days later it's

19  forwarded on to the head accountant for payment.

20       Next slide, please.

21       This is what I was talking about yesterday how

22  Mr. Hartman kind of tried to twist this around a little bit.

23  He says, "For starters, it's totally inconsistent with

24  Mr. Petit's testimony to the SEC and his statement to investors

25  that the money was for consulting work.  And, more importantly,

KBDQpet2                    Summation - Mr. Menchel

1    you know from the documents that the defendants themselves

2    introduced at this trial the GPO issues with Brooks continued

3    after June 26 when the defendants agreed to pay him that

4    $200,000."

5          Let's stop right there.  This is exactly what I was

6    telling you about.  The $200,000 was for the money he felt he

7    was owed from past overrides or commissions he was not given,

8    and then they showed you condition 5 "In the future we're going

9    to show you our contracts, and you can decide if you want to

10   opt in."  They're two different things:  One was a payment for

11   the money he was owed, and the other is going forward now,

12   we're going to be inclusive with you.  Mixed them.  Two

13   different things, and he put them together.  They're not the

14   same.

15         Take a look at Defense Exhibit 186.  In this document

16   Mr. Schultz talks about showing CPM the entire hospital list of

17   who are contracted with the GPOs and the IDNs in Texas.

18   They're literally going through all the hospital contracts in

19   detail and deciding about overrides.  This is going forward

20   folks.  This is allowing them to decide do you now want to be

21   in this contract going forwards.

22         "That's exactly what Pete Petit told Lexi Haden,

23   MiMedx's general counsel, that payment was designed to avoid.

24   That is false.  The $200,000 was to not go back and look at the

25   old contracts to see how much money do we actually owe this guy

1    for all this work we did that should have been his work; that

2    he learned about from Brooks -- I'm sorry -- that he learned

3    about from Carlton and Schultz.  And it says it right here.

4    This is the document that Mr. Hartman was referring to.  This

5    is August 5.

6            By the way, before we get to this email -- just take

7    it down for one second?

8            You might remember that there was testimony from both

9    Mr. Carlton and Mr. Schultz, the relationship was over.  Right?

10   The relationship was over.  After this deal, it was over.

11   That's not true.  That's not true.  But the reason why Schultz

12   and Carlton wanted you to believe it was over is because it

13   supports the theory that this $200,000 was just a bribe.  See,

14   we just paid him that money, and then we're going to get out of

15   the relationship with him.  That's not what happened.

16           Jeff Schultz, August 5.  So this is about six weeks

17   later.

18           "Mike and Nick" -- Pete Petit is cc'd on this -- "I

19   just wanted to update you on the very positive meeting Joe

20   Longo and I had with CPM Monday night in Dallas.  We met for

21   three and a half hours, and they were very appreciative of us

22   giving them their override 5 percent for the urology."  That's

23   a separate issue, by the way.  "And they appreciated us showing

24   the entire hospital list of who are contracted with MiMedx in

25   the GPOs and IDNs."

KBDQpet2                         Summation - Mr. Menchel

1          And this is the going-forward piece.  "Overall,

2     they're going to tell us -- they are telling us they are going

3     to participate in them (still vetting through them all) of our

4     GPO/IDN contracts in Texas, and we will have them sign a legal

5     agreement once they commit."

6          This is the going-forward piece.  This is condition

7     number five in the agreement.  We're going to show you what we

8     have.  If you want to join us going forward, we'll do that for

9     you.

10          Next slide, please.

11          Another example about everything that is just called

12     fake or phony.  Even as CPM is being terminated -- this is now

13     in September the relationship does go south again but not as

14     quickly as neither Carlton nor Schultz said it did.  In fact,

15     that email showed they thought it was going to pick up and it

16     was going to be great, but it doesn't happen.

17          Even as they're being terminated, OK, they only sought

18     to exchange $392,000 of the so-called $2.1 million fake order.

19     You know why?  Because I showed you a document earlier where

20     the mix was based on historical patterns they had done in the

21     past.  This wasn't just stuffing the channel with product.

22     MiMedx looked at what it is that CPM normally buys, and that

23     was the inventory they gave them.

24          This is the reference to that return in September.

25     "Good afternoon, Jeff."

1          This is from Sherron Burrow who you heard about who

2    works for CPM to Jeff Schultz.

3          "I hope all is going well with you.  We need to get an

4    RMA number."

5          That's a return authorization number.  If any of you

6    have ever been in business, if you want to send product back,

7    you want to return something, you need something called an RMA.

8          "I need to get an RMA for the product we need to

9    exchange from the last quarter purchase.  Would you be able to

10   help me or direct me to the correct person?  Here's the list of

11   the product that needs to be exchanged."

12         Is it $2.1 million?  Is it a totally fake order just

13   to make the revenue and then go on?  It's a fraction of that.

14   It's $392,000.

15         Next slide, please.

16         I want to talk to you a little bit more about Carlton

17   and Schultz, Mr. Carlton and Mr. Schultz, because that's really

18   the only evidence they've submitted that there was a bribe, and

19   the documents I just walked you through slowly and carefully

20   show anything but.  So let's talk about who these guys are and

21   why they were here.

22         First, his Honor is going to instruct you on how you

23   assess a witness's credibility.  This is a piece of it.  His

24   Honor has a longer instruction.  I don't want to mislead you,

25   but I want to focus on the portions that are relevant to my

1    discussion.

2              This is what your Honor is going to instruct you on, I

3    believe on Monday, if all goes according to plan.

4              Your decision to believe or not believe a witness may

5    depend how that witness impressed you.  How did the witness

6    appear?  Was the witness candid frank and forthright?  Or did

7    the witness appear to be evasive or suspect in some way?  How

8    did the witness testify on direct examination compared with how

9    the witness testified on cross-examination?

10             Let me stop this right there.  How many times on

11   direct examination did Mr. Schultz and Mr. Carlton or even

12   Mr. Martin ever say in response to a government's question, "I

13   don't remember.  I don't know."  I think the answer is never.

14   How many times when we asked questions on cross-examination

15   when we confronted them with things that didn't fit the

16   government's narrative did we hear:  "I don't know.  I don't

17   remember.  I don't know.  I don't remember."  This is exactly

18   what this instruction is supposed to tell you to focus on.

19   Consider that.  Consider how different they were on direct and

20   cross.  Scripted versus unscripted.

21             Did the witness -- was the witness consistent or

22   contradictory?  I just showed you - and I'm going to do a

23   little bit more - how Mr. Carlton swore up and down that he

24   learned about this $200,000 only from Schultz when in reality

25   he was all over this thing working with Mr. Petit.

KBDQpet2                          Summation - Mr. Menchel

1          Did the witness appear to know what he or she was

2    talking about?  Did the witness strike you as someone who was

3    trying to report his or her knowledge accurately?

4          Next slide, please.

5          How much you choose to believe a witness may also be

6    influenced by the witness's bias.  Does the witness have a

7    relationship with the government or a defendant that may affect

8    how he or she testified?  Does the witness have some incentive,

9    loyalty or motive that might cause him or her to shade the

10   truth?

11         I want you to consider all of these things as we walk

12   through.  There was something else I want you to think about --

13   the number of meetings in this case that the government had

14   with these witnesses was extraordinary.  It was extraordinary.

15   His Honor repeatedly instructed you and he's, of course, right,

16   as he always is, that the fact that the government meets with

17   its witnesses is perfectly proper.  People prepare their

18   witnesses.  I have no quarrel with that.  But you should ask

19   yourself, why does it take 10, 15, 20 meetings, full days?  You

20   know the truth doesn't require that much.  If it's the truth,

21   it's just true, and it doesn't change.  You don't need 10, 12,

22   15 meetings if someone is telling you the truth the whole way

23   through.  That's an enormous waste of time and energy.  If you

24   want to shape somebody, if you want to get them on to your

25   team, that's a process.  That takes time.

1          And his Honor did say during one of these instructions

2     "The jury once again needs to understand there is nothing

3     improper about a party that is calling a witness to meet with

4     that witness in advance."  Absolutely true.  That doesn't mean,

5     of course, that you can't evaluate that as part of the mix in

6     assessing credibility, but per se it is not improper in any

7     respect.  I'm asking you to consider it.  Because it's not

8     normal to meet with somebody 20 times to testify for half a

9     day.

10         Next question -- next thing.

11         Let's talk about Schultz.  This man had met with the

12    prosecutors so often, that he calls them inadvertently, I

13    think, by their first names during this trial.

14    "Q.  Do you recall which agents were in the first proffer with

15    you?

16    "A.  Yeah.  It was Ed, Scott for sure.  Don't know for sure if

17    Daniel was there."

18         This is a man that they can prosecute at any moment,

19    right?  They can prosecute him.  The immunity agreement doesn't

20    prevent them from deciding to bring charges.  They just can't

21    use his statements in court against him.  He's calling them by

22    their first names.  That's what happens when you meet with

23    somebody 10, 15, 20 times, you get to know them pretty well.

24         By the way, before we get there, I want to talk to you

25    a little bit more about Mr. Schultz.  What does Mr. Schultz and

 1   Mr. Carlton, what do they do?  They're salesmen.  They're good

 2   at selling.  If they weren't, they wouldn't be doing that job.

 3   I don't know if any of you picked up on this, but when

 4   Mr. Bruce or Mr. Packard was asking Mr. Schultz questions --

 5   they never met him before, total strangers -- he would say,

 6   "That's not correct, Mr. Bruce.  That's not correct,

 7   Mr. Packard."  That's good sales technique, right?  You refer

 8   to somebody by their name, it makes it more emphatic.  it Makes

 9   it more persuasive.  He's a trained salesman.  He knows what

10   he's doing.  He knows how to speak well.

11          What I'm about to show you, I submit to you, is the

12   single, most revealing moment that happened in this courtroom,

13   and I'm willing to bet because it came and went so quickly,

14   most of you probably didn't understand the significance.

15   That's why I want to focus on it.  And again, that's no insult

16   to you.  This is something that came and went in a matter of

17   probably 30 seconds, but it's the reveal.  It gives you the

18   peek behind the curtain about what is really going on in this

19   case.

20          Now, let me set this up for you.  The Court, his

21   Honor, is asking whether Mr. Hartman wants to do something

22   called a voir dire.  That means do you want to ask the witness

23   questions about a document that Mr. Bruce was trying to get in.

24   The document is not important for these purposes.  In fact, I

25   don't think it came in.  It's not important for these purposes.

1   I want to show you what happened when Mr. Schultz was off

2   script with Mr. Hartman because this was not expected.  This

3   happened during Mr. Bruce's examination.  Mr. Hartman asks if

4   he can voir dire the witness.  The judge says he can.

5          And I want you to pay very careful attention to what

6   happens in this exchange:

7   "Q.  Mr. Schultz, the attachment to this memo is a proposed

8   contract; is that right?

9   "A.  Yes.

10  "Q.  And was this particular act of drafting this contract

11  something that was done regularly or was this a specific

12  instance of -- "

13         And before he can even finish asking the question,

14  Schultz is primed to say what he wants him to say.

15  "A.  This was a specific instance for CPM."

16         It's a little reveal, right?  He's already answering

17  the question because he knows where Mr. Hartman wants to go.

18         It gets worse.  Next page.

19         This the next question:

20  "Q.  And the data that was in here, are these data that are

21  drawn from -- or at least in the contract itself, are these

22  drawn from MiMedx's records--"  now here's the thing he does.

23  He says, "Is it this or is it that?  Is it this or is it that?"

24  Telegraphing what the right answer is.

25         "And the data that was in here are these data that are

SOUTHERN DISTRICT REPORTERS, P.C.••
(212) 805-0300

1    drawn from -- or at least in the contract itself, are these

2    drawn from MiMedx's records or are these terms that MiMedx is

3    seeking to have Mr. Brooks adhere to?

4    "A.  These are the terms that Mr. Brooks is -- we're looking

5    for him to accede to."

6         He knows exactly what he's supposed to be saying.

7    "Q.  And was making records like this a regular practice,

8    contracts like this?

9    "A.  No.

10        And here's where everything goes south, folks.  Here

11   is where the reveal occurs in this courtroom that lets you know

12   that these witnesses have been pressured to say whatever those

13   folks at that table want them to say.  Mr. Hartman makes a

14   mistake.  He uses a fancy word that most of us don't use.  He

15   uses the word bespoke.  It's not -- you could be forgiven for

16   not knowing the word.  Apparently Mr. Schultz didn't know the

17   word.  I'm sure a lot of people in this courtroom don't know

18   the word.  Bespoke means custom made, and so he asks

19   Mr. Schultz:

20   "Q.  Was this something that was generated through a

21   quasi-automated process or was in something that was done in a

22   bespoke way?"

23        Schultz does not know what that word is, but he knows

24   what he's supposed to say because the second "or was it in a

25   bespoke way?"  And what does he say?

1    "A.  It was done in a spoke way."

2            This man will literally say anything that these

3    prosecutors put into his mouth, except he screwed up because he

4    didn't know what the word bespoke was.  He just knew he was

5    supposed to say whatever it was Mr. Hartman wanted him to say

6    in the second half of the "or."  Mr. Hartman respectfully has a

7    problem because he used the word "bespoke," and the witness

8    said "a spoke" and that makes no sense.

9            So Mr. Hartman doubles back and says, "Well, I mean,

10   you understand what I mean by that?"

11           And I don't know if you caught it, Schultz put is head

12   down because he realized he had just made a big boo-boo and

13   said:

14   "A.  No, please rephrase this."

15           If there's any question in your mind that these are

16   just shills for the government who will say whatever these

17   prosecutors want them to say, this moment revealed it.  There's

18   so much talk about Mr. Petit in a five-minute back yard

19   conference.  They had dozens of meetings with these guys to

20   prime them to say whatever they wanted them to say, and this is

21   the proof.  An honest witness, fair to both sides, just here to

22   tell the truth, how many times did we hear that?  Straight down

23   the middle would have said in response to that question, "I'm

24   sorry I don't know what a spoke or bespoke, I don't know what

25   you're talking about."  Schultz doesn't do that because he just

1    has to go wherever the government wants him to go.  So he

2    thinks.  Why?  Because, as he testified, they could put him in

3    Mr. Petit's chair anytime they want.  That's tremendous power,

4    folks.  That's tremendous power.  Don't underestimate that

5    power.  Whether you did something wrong or not, sitting in that

6    chair is the worst place you ever want to be.  And Mr. Schultz

7    knew that.  And that's why he was going to say whatever they

8    wanted him to say, whether it was the truth or not.

9            More perfect examples of this.  Mr. Schultz, this is

10   on direct examination:

11   "Q.  Mr. Schultz, did you reference at all the $200,000 payment

12   in this email?  Is it anywhere in the email?

13   "A.  No, I didn't because I knew we couldn't put it in that.

14   It was a side deal and a bribe.  So I couldn't mention that in

15   there because I knew it -- it wouldn't be on the books to our

16   audit committee."

17           This is the document I just showed you where the

18   $200,000 is being sent to the chief financial officer of the

19   company for payment.

20           Next slide.

21           So when Schultz is confronted about this, he realizes

22   he has to admit the truth.  He barely did it, but he did it

23   here.

24           "Mr. Schultz, do you recall your testimony from Monday

25   during the conversation you had with Mr. Cochrane about paying

1   the $200,000 through his corporate entity and keeping it away

2   from the audit committee and off the books?

3   "A.  Yes, I do."

4   Q.  Mr. Bruce asks a question, "A $200,000 payment that's in a

5   signed contract between CPM and MiMedx is not something that

6   would be hidden from the audit committee, correct?"

7        He can't help it, he starts to advocate for the

8   government.

9        "$200,000 is pretty outrageous for a consultant."

10        That's not even responsive to the question.

11        "I've never seen that before, but no, if it was in the

12   contract, it wouldn't be hidden from the audit."

13        That's what it takes to get the truth in this matter.

14   And even then he's trying to help the government with his

15   answer.

16        Next, please.

17        Here's another theme that goes on throughout this

18   entire trial, and if I had plenty of time, I would put up every

19   piece of this.  There is actually no evidence of what people

20   said in this case, just what witnesses understood them to say.

21   There's a huge difference.

22        "Mr. Schultz, you can answer.  What was your

23   understanding of why Mr. Brooks was demanding the $200,000?"

24        Notice the way it's framed.  "what was your

25   understanding?"  Did he actually say, "Mr. Schultz --

1   Mr. Brooks said, 'I want $200,000 in cash or I'm not going to

2   place the order?'"  No.  He asking, what was your

3   understanding?

4            "He wanted the $200,000 in cash because then he would

5   place the order.  To place the order, that's why he wanted the

6   money because he knew we needed that quarterly number."

7            The whole government's theory baked into one answer.

8   It's nonsense.

9            Similarly, again.

10  "Q.  Based on what you heard during the conversation, what was

11  your understanding about that?

12  "A.  There was no way he was placing the order unless he got

13  200,000, not a chance."

14           Didn't actually get any details of this conversation.

15           We can move on.

16           I want to go back to this.  This happened repeatedly.

17  When Mr. Schultz was confronted with the fact that only 392,000

18  of this "fake order" had been returned, this is what he said

19  because he's here to advocate for the government and not just

20  play it straight.

21  "A.  As I said before, I don't know what other returns were

22  swapped back.  Could have been more returns they sent back."

23           He said it one, two, three, four, five, six times:  We

24  don't know; there could have been others.

25           Folks, this is a real business.  MiMedx is a real

KBDQpet2                      Summation - Mr. Menchel

1     business.  CPM is a real business.  Millions of dollars don't

2     just magically get returned without paperwork.  We talked about

3     this.  You need a return authorization.  If there was a return

4     authorization for any -- for a penny more than the 392,000 that

5     was already returned, you can guess that these very competent

6     prosecutors, very competent prosecutors would have put those

7     returns in front of you.  They don't exist because it didn't

8     happen.  But Schultz doesn't want to admit that because he's

9     not here to just play it straight.

10            Next, please.

11            This is what I'm talking about.  There is a return

12    authorization.  There's an invoice, a purchase order that has

13    to be backed out.  You don't just return product with no

14    paperwork.  If it existed, Schultz would have been shown it.

15            Next, please.

16            So, quickly about Mr. Carlton, I have to move forward.

17            This was interesting.  Mr. Carlton wasn't sure if he

18    committed a crime.

19            Next slide.

20            But he was sure he could be prosecuted.  And that's

21    what matters.

22            "Do you have an agreement with the government?

23            "I do not.

24    "Q.  Has the government agreed or promised you would not be

25    prosecuted?

1    "A.  I have not been promised that."

2              You should consider the fact that these men are under

3    the thumb of the U. S. government in giving their testimony.

4    It's important.  It matters.

5              Next, please.

6              Another man was basically trained to just say after

7    multiple meetings the buzz words the government wanted to hear.

8    How many times did we hear "hit number, hit number, hit the

9    number, hit a number, hit number?"  Normal conversation doesn't

10   happen that way.  Scripted, rehearsed conversation happens that

11   way.

12             Next slide, please.

13             And When he goes off script, he realizes it, and he

14   corrects.  This was a question by Mr. Burck:

15   "Q.  Do you recall -- well, let me ask you this:  You testified

16   that the numbers, the revenue numbers, the guidance numbers you

17   felt were too high and unrealistic, right?

18   "A.  No, I felt they were aggressive.  I won't say unrealistic

19   but very aggressive.

20   "Q.  So sitting here today, looking back on that period of

21   2015, you would say your testimony is -- let me make sure I get

22   this straight; that it was aggressive but not realistic?

23             Realizing he is off script, he self-corrects.

24   "A.  There were some quarters that seemed unrealistic."

25             He literally changed his testimony in about three

1    seconds because it had been pointed out to him that what he

2    said was true, and he needed to reverse because it doesn't fit

3    the narrative the government wants you to think is going on

4    here.  These numbers were aggressive, yes, but they were not so

5    unrealistically high that people needed to commit fraud to hit

6    them.

7              Next, please.

8              We've already discussed this.  I've shown you now a

9    million documents -- not a million, that's an exaggeration --

10   but plenty of documents that Carlton is directly involved but

11   he stuck to his story that the only way he knew about the

12   $200,000 was through Schultz.  That's how I heard about it.

13   That was the source.

14             And I asked him.  I wanted to make sure I was a

15   hundred percent clear on this.

16             "I want to make sure I understand your testimony.  Is

17   your testimony now that you learned about $200,000 independent

18   of Mr. Schultz or only from Mr. Schultz?

19   "A.  From Mr. Schultz."

20             He just testified he was advocating for the $200,000

21   to Mr. Petit.  But he told you "I only heard about this and I

22   was shocked from Mr. Schultz walking out of this meeting."

23             Next, please.

24             We've already shown you how he was involved.  I'll

25   just move forward here.

 1          Let's talk about the back yard meeting, the fence
 2   meeting.  Another example -- one second -- another example of
 3   cherry-picking and only putting in the pieces that you like
 4   that fit your narrative.
 5          On direct examination, this is what Mr. Carlton said
 6   -- I'm sorry.  Before I get there, it's important to understand
 7   and put this fence meeting into context about who that man is,
 8   Mr. Petit, the man, frankly, I am honored to represent in this
 9   case.
10          These are the things that were said about him from the
11   witnesses who actually came here to testify against him.
12   Mr. Andersen:  Charismatic, family-like environment, fair,
13   hard-charging, treated employees fairly, more involved than
14   other CEOS, always wanted to move forward and make progress.
15          Those are wonderful attributes.  That's what you want
16   in a CEO.
17          Mr. Carlton:  He was a workaholic, all in,
18   hard-working gentlemen, held firm to his views, was open for
19   feedback, he was good listener, he was accessible but he had
20   strong convictions.
21          These are the men that were called in here to try to
22   bury him, and even they had to admit the truth about his
23   character.  And this context is important to understand the
24   fence meeting because Mr. Petit is a passionate man.
25          Let's talk about what they said on direct examination.

KBDQpet2                        Summation - Mr. Menchel

1   Mr. Carlton said on direct examination that Mr. Petit said to

2   him, "I know we're not supposed to be talking."  In fact, you

3   heard Mr. Hartman say that yesterday; that Mr. Petit said to

4   him, "I know we're not supposed to be talking."

5              I want you to remember that.

6              He mentioned Mr. Carlton was going to meet with the

7   prosecutors.

8              The $200,000 was part of the consulting arrangement,

9   and not for the order.  A hundred percent true.

10             Working hard to get everyone back at the company.

11             Was looking forward to straightening things out with

12  the government, Mr. Petit was.

13             And on direct examination he said he understood this

14  conversation, I was supposed to say, it's the consultancy.

15  It's a five-minute meeting.

16             I want you notice what's not there.  There was no

17  testimony about pressure.  He just said, "Look, the guy told me

18  the story.  I didn't think it was right.  I understood he was

19  telling me to say it was for the consultancy."  He never uses

20  the word "pressure" once.  If you have any questions, ask his

21  Honor to have this read back to you.  You can have any part of

22  this transcript -- I think his Honor is going to instruct you

23  on this -- read back or provided in some manner.  I urge you to

24  do it if you don't think this is correct because it is.

25             Next.

1          On cross-examination, the full story comes out.  Not

2     just the cherry-picked pieces that the government wanted to

3     elicit.  First of all, when I asked him, you may remember this:

4     I said, "I don't understand, you're both not in the company.

5     Nobody's been charged with a crime.  Why can't you speak to

6     each other?

7          He completely reverses and says, "Well, my counsel

8     told my I shouldn't be having contact with Mr. Pete."

9          So the story changes from Mr. Petit said, "I know we

10     shouldn't be talking" to Mr. Carlton saying, "Well, I was the

11     one that thought we shouldn't be talking, and Mr. Petit only

12     implied we shouldn't be talking."

13          I don't know how you imply that, but it's another

14     example of what's going on in this case:  Evidence by way of

15     implication, supposition, assumption, understanding, belief.

16     We don't convict people on that.  We convict people on hard

17     evidence.

18          This wasn't brought out on direct examination because

19     it doesn't fit their theory that he was trying to just pressure

20     him.  He tells him to hang in there.  Then he said something to

21     him, Mr. Petit did, about standing your ground.  And when he

22     was asked in his own words what that meant, standing your

23     ground, he said, "Don't let them pressure you into saying

24     something you wouldn't otherwise say."  And the testimony on

25     this was Mr. Carlton understood Mr. Petit was telling him don't

KBDQpet2                        Summation - Mr. Menchel

1    let the government when you go up there pressure you into

2    saying something you wouldn't otherwise say.  If this man was

3    ever more pressured in his life, it was in this moment.  He was

4    afraid of exactly what happened, and all he was telling

5    Mr. Carlton was, these guys have a lot of pressure and power.

6    Don't let them pressure you.  This is what Mr. Carlton said on

7    cross-examination.  I didn't put these words in his mouth.  The

8    word "pressure" is the word he used, Mr. Carlton, what he

9    understood Mr. Petit was telling him not to fall subject to

10   with the government.

11            And then he goes on.  He pulled out a list of probably

12   ten other things to show he was going to rigorously defend

13   himself.  And the $200,000, the consultancy was in a list of

14   probably ten other things he was saying.  You didn't hear that

15   on direct examination.  It made it sound like this whole

16   meeting was about, "Psst, listen, you go up there, tell them

17   it's for that."  This man was rigorously defending his

18   position.  Does that make him guilty of a crime?

19            You know it's not easy to stay silent for five years

20   while people sling accusations against you.  He made his

21   position known.  And Mr. Petit I brought out never asked him to

22   lie, shade or minimize.

23            Next, please.

24            Then we have the redirect examination.  This was a

25   pretty explosive moment.  They just put the words in his mouth

1   though.  Remember, on cross-examination, the word pressure was

2   in reference to the government.  On redirect in a leading

3   fashion where the word pressure is being put into Mr. Carlton's

4   mouth, he, of course, adopts it.

5          "By the way, is there someone in this courtroom who's

6   pressured you not to tell the truth?

7          "Not to tell the truth to the government?

8          "Yes.

9          "Who was that?

10         "Pete.

11         "Is that Mr. Petit?

12  "A.  Yes."

13         Folks, what do you expect him to say?  He knows at any

14  moment they can prosecute him if they're not happy with his

15  testimony.  But when he was given a chance in his own words to

16  say what happened at that fence meeting, both on direct and

17  cross, he never once said Mr. Petit pressured him.  That's a

18  word chosen by the prosecutors which he understands, just like

19  Schultz, did I have to accept.

20         What else were we shown?  You know this document is

21  like a metaphor for this case.  Just so you understand so this

22  is clear, and I think it was brought out during the trial, the

23  rest of this is redacted, meaning it's been taken out.  What is

24  this document?  It's a press release.

25                          (Continued on next page)

1           MR. MENCHEL:  (continuing)  It shows the former

2    chairman and CEO Pete Petit issued the following statement to

3    fellow shareholders.

4           Folks, this is literally Mr. Petit's statement to the

5    world.  It's not some secret handwritten scrawl that he's

6    feeding to Mr. Carlton about his position.  He's telling it to

7    the world.

8           Can you go to the right, please.  Of course the

9    government, just like everything else in this case, wants to

10   cherrypick out the piece that they think fits their case.

11   Mr. Petit made the point the distributor who obtained the

12   consulting agreement.  Thank you.

13          So, also important to understand that that press

14   release, which you didn't learn about until we did the recross,

15   was in a stack of articles about 3 inches stick in a book.  If

16   Mr. Petit wanted to make sure that Mr. Carlton was going to

17   know to say this, he was going to have to dig deep through a

18   lot of material just to find that one sentence.  That's absurd.

19          Let's talk about Stability.  Next slide.  You know

20   this man, Mr. Martin, testified under a non-prosecution

21   agreement.  What that basically means is he's getting a free

22   pass.  Unlike Carlton and unlike Brooks, he knows he is getting

23   a free pass.  All he has to do is play ball.  If he cooperates

24   and tells the truth as they decide it to be -- he admitted

25   this -- they get to decide if he's truthful.  And if they think

1    he is, they won't prosecute him.  If they think he isn't, they

2    will.

3            That's not just for what happened in this case.  It

4    was to get him off the hook for a completely unrelated fraud at

5    a company called Osiris.  Totally rehearsed.  Did not need,

6    could not sell, couldn't pay, didn't really want.  Another

7    example of people who have been primed to just throw these buzz

8    words into their testimony.  Next slide, please.

9            You didn't learn about this on direct, but on

10   cross-examination we showed you the kind of man they are asking

11   you to rely upon to convict Mr. Petit.  The only real evidence

12   about Stability is Brian Martin.  That's the only evidence

13   against Mr. Petit, is that man's word.  That man's word is

14   worth zero.  He is a pathological liar.  This document shows

15   it.

16           At the same time he was committing fraud with Osiris,

17   he was defrauding them.  You got to give him credit.  He's

18   working all the angles.  And when he is asked who is Dover,

19   Dover is some old Stryker reps but my wife is helping them.

20   Total lie.  And he wouldn't admit on direct, on

21   cross-examination, that he was desperate to replace the Osiris

22   product.  You know why he wouldn't admit that?  Because that

23   doesn't buy into the government's theory that he really needed

24   the product that Mr. Petit was asking him to buy.  But you

25   learned during the stipulation that was read yesterday, that at

Kbd3pet3                      Summation - Mr. Menchel

1   earlier meetings that's exactly what he told the prosecutors,

2   and I'll leave it to you to decide what is the truth, what he

3   told them early on or what he said two days ago in court.  I

4   think it's obvious that what he said early on is the truth.

5   Next, please.

6           This is real time documents showing that Stability was

7   more than interested in buying this product.  Next slide,

8   please.

9           To Tom Johnston, you heard he is the number two guy

10  there.  It's time to get to work selling product.  This is

11  September 29 when they are making this order.  At your earliest

12  convenience, I need to obtain market collateral and get the

13  processes in place for our sales staff.

14          Is that someone that's not interested in buying

15  product?  Really.  Either they're lying, which, with Mr. Martin

16  is possible, or this is really the truth.  Either way, from

17  MiMedx's point of view, they were clearly expressing a desire

18  to buy this product and move.  Next slide, please.

19          Remember the whole 4 millimeters, didn't want it,

20  couldn't sell it.  He is talking here about how he's going to

21  price it.  You don't waste your time, waste a product, if you

22  don't want it and all you are going to do is return it.

23          I submit to you, you should trust these documents and

24  not a word that comes from Mr. Martin's mouth.

25          They made a big deal about the fact that Mr. Martin

1    had very little cash or even a negative cash balance and

2    therefore couldn't have paid for the product in time.  You also

3    learned in this case a couple of things.  One, there were

4    tremendously sales, okay.  2013, 20.7 million, and by 2015, the

5    very year in which he's asked to make this $2 million purchase,

6    he had projected to MiMedx they were going to get $27 million.

7    Let me ask you, is it crazy that Mr. Petit would say, if you

8    want to be a distributor let's start with 2?  Why is that

9    crazy?  That's less than one-tenth of what this man projected

10   he would do in a year.  He is asking him to buy it for the

11   quarter.  Next slide.

12        He's showed how much money they were making in sales

13   every month in 2015.  Almost close to 2 million in some cases

14   and that's just a month.  Mr. Petit is asking him to buy

15   product for a quarter, which is three months.  Mr. Petit is

16   asking him to buy one-third approximately of what he can sell

17   in three months.  This was not an outrageous number.  It was

18   not shocking in any way.

19        So what did they do.  They spun another narrative with

20   you which is totally false.  The prosecutors and Mr. Martin

21   wanted you to believe that Stability Biologics had a year's

22   worth of product from Ovation, and therefore there was no way

23   they were going to be able to sell it for at least a year.

24   That was the implication they left you with.  Now, before we

25   even get to the hard proof, if you have a year to go to sell

1    the product you have, why would you be entering into a

2    distribution agreement with another company?  Makes no sense.

3    Why not say, I'll see you guys in a year, I've got a year's

4    worth of product to sell first.  On its face it's nonsensical,

5    but there was hard proof to the contrary.  Next slide, please.

6         He was specifically asked by people at MiMedx what

7    about all this inventory that you have with Osiris?  Our

8    understanding is that all of it, all of our existing inventory

9    can be returned.  We have returned both Ovation and Grafix in

10   March, April, July, August and October without any questions

11   from Osiris.

12        When I asked about that he goes, yeah, but I think we

13   might have had a problem going forward.  Do you believe that?

14   More importantly, do you believe that was the impression he led

15   Mr. Petit or anybody else at MiMedx to believe?  This is the

16   man that told you he told Mr. Petit we can't sell this product.

17   What are you going to believe, Brian Martin or the document he

18   actually wrote at the time when he had a motive to be truthful?

19        I submit to you there is not one thing Brian Martin

20   said in this case about what he said Mr. Petit told him that

21   you can trust.  His Honor will instruct you that reasonable

22   doubt is probably the most important instruction in this case.

23   Requires you to think about the type of doubt you would have in

24   the most important decisions of your own personal life.  I'm

25   paraphrasing, but that's roughly what he is going to say.

Kbd3pet3                              Summation - Mr. Menchel

1              I ask you:  Would you trust Brian Martin in the most

2     important of your own personal affairs beyond any doubt?  Would

3     you?  If the answer to that is no, Mr. Petit is entitled to no

4     less.  Next, please.

5              This one's another example of the government just out

6     of whole cloth bringing in the auditors.

7     Based on your conversation and the timing, what relationship

8     was there between the request?

9     Again, the magic phrase:  It was my understanding, because Pete

10    Petit never said this, so he is going to talk about what is in

11    his own head and tell you to believe that what is in his head

12    is what Mr. Petit said.

13             It was my understanding that Pete Petit was requesting

14    to have a signed distribution agreement to validate the

15    purchases at the end of the third quarter.

16             When you say to validate, to whom did you understand

17    he needed to validate?

18             I believe he needed to validate it to the auditors at

19    MiMedx.

20             This is just spoonfed nonsense.  Because the truth

21    is -- next slide.  When Mr. Urbizo, the auditor, we

22    specifically asked him this question after Mr. Martin

23    testified.  Because we wanted to show you that was a complete

24    falsehood.

25    "Q.  There's no requirement that there be a written

Kbd3pet3                         Summation - Mr. Menchel

1   distribution agreement in order for MiMedx to sell product to

2   one of it customers, correct?  A written distribution

3   agreement.

4   "A.  To sell something to their customer?

5   "Q.  Correct.

6   "A.  Yes, that's true.

7   "Q.  One is not required, correct?

8   "A.  A business can sell anything if they get a purchase order.

9   However they want to sell it, a business can sell something."

10          There's no desperate need for Mr. Petit to get a

11  signed distribution agreement.  That's just fantasy that's been

12  created in this case.  Maybe he wanted to get it signed

13  because, I don't know, it had been pending for three months and

14  he thought it was time to wrap it up.  It's a contract.

15  Mr. Martin told you that.  Is it unreasonable for the CEO to

16  say, hey, time to get this thing signed?  Next.

17          In fact, when he was asked about this, he admitted

18  that Mr. Petit never mentioned the auditors in his discussions,

19  never mentioned accounting, never raised any of those issues.

20  That's just inside the fantasy of Brian Martin who has every

21  incentive in this case to sell you that Mr. Petit was trying to

22  commit some kind of a fraud because he asked him to sign a

23  distribution agreement, and, by the way, to pay him for some

24  product that he bought.  Next.

25          And then again, just like the question about pressure,

Kbd3pet3                       Summation - Mr. Menchel

1   a leading question is put by the prosecutors on redirect that

2   was never mentioned on direct or cross-examination.

3              Did you view that essentially as a sham document?

4              Yes, I did.  Yes, I believed the document was a sham.

5   I'll leave it to you to decide what real incentive did the man

6   have, except what the prosecutors wanted him to say.

7              The right of return.  First of all, let me talk about

8   this for a minute.  This is very, very important.  There is

9   nothing illegal or improper in business about giving a customer

10  a right of return or right of exchange.  Nothing.  The only

11  question is, how does that count for revenue recognition.  We

12  are going to talk about what that means for Mr. Petit.  But

13  this is not an inherently sinister thing to do.  Okay.

14             And this was the letter which they claim, by the way,

15  was secret because it was FedExed.  I'm going to talk about

16  that in a second.  Mr. Petit gives this man a letter with some

17  contingencies built in, and one of them is if our discussion

18  does not come to a conclusion within a reasonable period of

19  time, we'll commit to exchange and take back.

20             They were very far down the road to acquisition.  So

21  Mr. Petit, was very confident that this with a basically giving

22  away ice to Eskimos.  Because it wasn't going to happen.  If

23  you go to the next slide, please.

24             Mr. Andersen talked about you can make a reasonable

25  estimate of return in deciding whether you can book revenue.

Kbd3pet3                    Summation - Mr. Menchel

1    GAAP allows for a company to recognize revenue even when there

2    is a right of return under certain circumstances, correct?

3              Under certain circumstances, that's true.

4              Next.  This was the document that Mr. Hartman actually

5    said to you yesterday was Fedexed because Mr. Petit didn't want

6    anybody in the world to know about it.  Just one problem.  If

7    that was true, he had his secretary draft it, and she saved

8    three different copies of it on MiMedx's computer system, and

9    then she scanned a copy to herself.  He's pretty lousy at

10   hiding things if that's what he wanted to do. You would have

11   thought he would have drafted it himself or told the secretary

12   don't do the normal thing of saving documents and scanning them

13   and saving them in the system.  Just send it out.  Next.

14             Not only does she save the hard copies, but the other

15   thing that's also FedExed that the government ignored is the

16   distribution agreement.

17             I'm going to submit to you there is a very much more

18   reasonable explanation for why he FedExed documents.  These are

19   contractual documents.  He you want a handwritten signature,

20   you want the original, not an e-mail.  It's no mystery here.

21   This is another example of the government finding something

22   nefarious, looking through a dirty window, and saying because

23   he Fedexed it, it must have been dirty.  Next, please.

24             Your Honor, this is the perfect time to break.

25             THE COURT:  All right.  So ladies and gentlemen, I

KBD3PET3                    Summation - Mr. Menchel

1   have to give another speech at George Washington University by

2   Zoom between 1 and 2., so we will give you an hour and 15

3   minutes for lunch, but we will resume promptly at 2 o'clock.

4   So we'll see you then.

5            (Jury excused)

6            THE COURT:  Counsel, you have 35 minutes and

7   20 seconds left.

8            MR. MENCHEL:  Thank you.

9            THE COURT:  How long is counsel for Mr. Taylor going

10  to be?

11           MR. BURCK:  Your Honor, I'm hoping to be under an

12  hour, but it will probably be, I would say we should safely say

13  an hour.

14           THE COURT:  Okay.  So, I think we'll probably have the

15  government's rebuttal on Monday then.  Looks like the way we'll

16  wind up.  Okay.  Very good.  We'll see you at 2 o'clock.

17           (Recess)

18           (In open court; jury not present)

19           THE COURT:  The jury is on its way up and we'll

20  recommence as soon as they're here.

21           MR. MENCHEL:  Your Honor, if we do finish, if I

22  shorten this, do you think we can get the whole thing done

23  today?

24           THE COURT:  No.

25           MR. MENCHEL:  Okay.  I won't, I'll take my time.

1          THE COURT:  Let me say this.  If the government had a

2     strong interest in that, I would consider it.  But my own

3     feeling is that the jury can only absorb so much on a given

4     day.

5          MR. IMPERATORE:  Your Honor, I can certainly begin it

6     today.  I mean, I think I will need the full 45 minutes, but I

7     can certainly begin it.

8          THE COURT:  All right.  Well, let's see how it goes

9     then.

10         And here is the revised charge, the only change was

11    the one we discussed.

12         MR. IMPERATORE:  One issue we wanted to raise is, we

13    think it's appropriate for the Court to give an instruction on

14    redactions.  Defense, there was a document that was admitted

15    into evidence, and was shown in summation, and defense made a

16    number of insinuations about the redactions.

17         THE COURT:  I was a little surprised at that.  I was

18    also surprised you didn't object right then be there.

19         MR. IMPERATORE:  Well, we're --

20         THE COURT:  I'm not saying you were required to.  So,

21    something along the lines of documents are often redacted,

22    meaning parts of them are eliminated before you see them,

23    because of rules of evidence that come into play.  It has

24    nothing to do with anything else.  Something along those lines.

25         MR. HARTMAN:  I think generally the instruction is

1    you're not to speculate as to what's behind the redactions.

2            THE COURT:  I never give that instruction, because I

3    always thought that's an invitation to speculation.

4            MR. HARTMAN:  I think you're right.

5            MR. MENCHEL:  I thought when the document was

6    received, you did give an instruction on this.  I'm almost

7    positive.

8            THE COURT:  Well, I think it is appropriate to say a

9    brief word on that.

10           MR. MENCHEL:  You are going to do that now?

11           THE COURT:  Now.  Yes.

12           MR. MENCHEL:  Okay.

13           MR. PACKARD:  May I approach to speak with the AUSAs

14   for one moment?

15           THE COURT:  Yes.

16           MR. IMPERATORE:  The defense just alerted us to an

17   argument they may want to make through the closing of

18   Mr. Taylor's counsel.  It relates to an exhibit, Defense

19   Exhibit 636.

20           THE DEPUTY CLERK:  Jury entering the courtroom.

21           THE COURT:  To be continued.

22           (Jury present)

23           THE COURT:  So, ladies and gentlemen, I just wanted to

24   mention, and this is not a matter of great moment but just so

25   you are aware of it, there was a reference in the summation

1    this morning to a redacted document, meaning a document where

2    certain portions of it had been removed and you only get to see

3    the rest of it.

4           That's done because of the rules of evidence.  It has

5    nothing to do with any of the parties' strategy or anything

6    like that.  That is totally a function of the rules of evidence

7    applied by me.  These rules, which you've fortunately been

8    spared, are why people keep saying "objection" during the

9    course of the trial.  They're very important rules, and they

10   come down to us, frankly, from early English time.

11          But that's the reason for redactions, nothing to do

12   with strategy or anything else.  Counsel.

13          MR. MENCHEL:  Thank you, your Honor.

14          May it please the Court.

15          THE COURT:  Please.

16          MR. MENCHEL:  If we can start again, Ray, with SLR.

17   I'm going to move now and discuss with you SLR.  Next slide,

18   please.

19          So what do we know about SLR?  SLR, as you learned in

20   this case, was a trusted distributor that was already in

21   existence, but when Jerry Morrison decided to join with his

22   wife, the whole purpose of this was to take over from CPM, the

23   company that you heard they had so much trouble with in what

24   was in fact the biggest market for MiMedx, Texas.  It made

25   perfect sense from MiMedx's point of view to do all that it

1    could to support Jerry Morrison.

2            This is another example of what I'm talking about, how

3    a sinister gloss is being put on things like giving an employee

4    who is leaving to start a business that you'll be in

5    partnership with a severance package is somehow sinister or

6    wrong.  There is no evidence that that's true.  Simply none.

7    It made perfect sense for Mr. Petit to want to support Jerry

8    Morrison, because he was a good employee of the company, who

9    was transparent, who was honest, who knew this market.  And so,

10   for that reason, okay, and Mr. Petit decided he was going to do

11   all he could to help him.  You saw documents to that effect,

12   and he won't let Jerry fail, as if that's something nefarious

13   or wrong.

14           It was in the interest of MiMedx to find a distributor

15   that they could trust, that they could work with, who was not

16   going to cause all the headaches that CPM had caused.  Nothing

17   nefarious or wrong about that.

18           OrthoFlo, you heard about, was an exciting new

19   product, and in particular it was believed it was going to be a

20   huge hit and big opportunity for MiMedx in Texas.  Next slide,

21   please.

22           So Mr. Petit made a business bet on Mr. Morrison.

23   Something that businessmen do all the time.  They weigh the

24   risk versus the opportunity and they make a decision.  And in

25   this case, he explained right to the audit committee in

1  response to the allegations from Mr. Andersen about SLR, why he

2  had made that business judgment.

3       First, it's important to understand that CPM had

4  generated revenues in the $7 million number a year for MiMedx.

5  As I said, this was their biggest distributor.  These are all

6  the things he wrote, in having SLR become our distributor,

7  assuming he would resign, as we thought through his

8  qualifications we came to the conclusion this would be a very

9  logical solution.  He goes on to say, as far as we could tell,

10  CPM carried an average inventory of about $4 million.  That's

11  very important.  Because a lot of the points the government is

12  making is that the order that Mr. Morrison had was obscenely

13  high.  Well, he is slotting in to take over the business of

14  CPM.  Right here you're learning that CPM at any given time was

15  carrying about $4 million in inventory.  The order was roughly

16  the same amount as what it was CPM had on hand when they were

17  the distributor for MiMedx.

18       Something else that was covered briefly but that's

19  important for you to understand in the context of Mr. Petit's

20  way of thinking.  You learned a little bit about something

21  called reserves.  And this was asked of Mr. Urbizo:

22  "Q.  What are reserves in a nutshell?

23  "A.  Reserves are basically estimates made by management for

24  the accounting function to account for events where you don't

25  know exactly how it's going to play out."

1          There is no question at all that SLR was a risk.  But

2     it was a risk that Mr. Petit, with all of his years of business

3     experience, felt was an appropriate risk to take.

4          I submit to you one of the things that would give a

5     man like Mr. Petit comfort was the fact that they had reserves.

6     Money that had been set aside in case things didn't go well.

7     You saw evidence of that.  And how, over time, MiMedx's

8     reserves would go up to cover any additional risks that they

9     were taking.  This is good business sense.

10         Again, the issue in this case is whether or not, in

11    Mr. Petit's mind, taking a bet on Jerry Morrison was somehow

12    criminal or done for fraud.  And one of the things you should

13    consider is that the company, MiMedx, was well reserved at

14    exactly the moment in time SLR was coming into existence.

15         I'm going to talk a little bit about the freezers.

16    This is another example of something being put into a nefarious

17    spin as though it's somehow wrong for the manufacturer of a

18    product to assist one of its distributors in having -- I'm

19    sorry, was there an objection?

20              THE COURT:  No.  I was just coughing, I'm sorry.

21              MR. MENCHEL:  No problem.

22         As if there is something wrong with assisting a

23    distributor in setting up the storage facilities that they're

24    going to need in order to carry a product.

25         Again, what you know about life, what you know about

1    business, it is common, okay, for manufacturers of goods to

2    assist the sellers of those products in setting up facilities

3    that enable them to sell the product that they sell.  Nothing

4    nefarious or wrong about that at all.  And the way you know

5    that is these freezers were not hidden from accounting.  You

6    were aware that some part of his order was not being shipped,

7    but rather was going to be stored in freezers at a different

8    location, correct?  Yes, I was aware that there was a buy and

9    hold circumstance.

10         That's what buy and hold means.  I am buying it but

11   it's being held by somebody else on my behalf.  Normal business

12   behavior.  Something that was not hidden from Mr. Andersen or

13   accounting at all.  Nor was the consulting arrangement that had

14   been set up hidden from accounting.  We already went over these

15   consulting agreements.  This was clearly a way to develop a

16   relationship with a distributor, and to help them out and there

17   is absolutely nothing wrong with that.

18         Mr. Andersen actually saw the money that was leaving

19   MiMedx going out the door to Mr. Morrison's checks.  It was

20   logged in the company's financials.  Nothing was hidden,

21   nothing nefarious.

22         Here is something else that's important for you to

23   understand.  It was the suggestion in this case that somehow

24   SLR was on life support.  That without these small payments of

25   consulting fees, they would not have survived.  Well, this is a

1    record of the amount of money that they were holding at any

2    given time, and I want to focus in on December of 2015.

3    Because this is the moment in time when he gets that loan that

4    you heard about, that Torpin loan.  He takes that working

5    capital and he uses it to pay off the product that he owed

6    MiMedx.  What's wrong with that?  Companies take out loans all

7    time to fund their capital.  Mr. Martin testified that they had

8    a capital loan that they were using to develop part of their

9    business.  There is absolutely nothing wrong with having a loan

10   in order to finance your business.

11        What's important is, that money went in and out.  In

12   December of 2015, went to Mr. Morrison, got paid, as part of

13   the money that they owed to MiMedx.  And look what happens, his

14   numbers continue to rise.  This 721,000 and this 918,000,

15   that's not from the loan.  The loan was used to go in and go

16   out.  That's money he's making on the sale of the products.

17        I submit to you that Mr. Petit was right.  He was

18   shown to be right in taking a chance on Mr. Morrison.  Because

19   you can tell by this chart, his business was taking off.  It

20   was working.

21        Let's talk about the loan.  It is not a crime to

22   assist somebody in setting up their business, especially when

23   you think that the success of his business is going to benefit

24   you.  We've gone over this already.  SLR was stepping into the

25   shoes of CPM, their largest distributor.  Mr. Petit using his

1    business judgment, thought this is a guy I don't want to fail,

2    because if he succeeds, we succeed.  Nothing dirty or nefarious

3    about that.

4           And it was suggested in some of the questions that the

5    government asked that the fund, the generations skipping trust,

6    had been set up for the purpose of funding Mr. Morrison's loan.

7    That's just not true.  This trust, if you look on the bottom,

8    was set up years before there was any loan from Mr. Petit's

9    children to Mr. Morrison, in September of 2012.  I don't think

10   there's been any real testimony on this, just some documents,

11   but so you understand, this is not Mr. Petit's money.  When you

12   set up a trust like this, and you give money to your children,

13   it's their money.  Not his.  But there's been some suggestion

14   about how children were pressured.  You've heard zero evidence

15   of that in this case.  There is not even a single document that

16   supports that in this case.

17          These are adults; they're not kids.  There is no

18   question Mr. Petit put them together, absolutely.  We've never

19   run from that.  He's never pretended that wasn't true.  The

20   issue, and we'll talk about it in a minute, is whether he

21   thought he had to disclose that in any way to the auditors at

22   MiMedx.  We're going to talk about that.  Next, please.

23          This was not some sham agreement.  This was actually

24   an arm's length negotiation between Mr. Campbell and

25   Mr. Morrison.  Did Mr. Petit play a role in it?  Absolutely, he

KBD3PET3                    Summation - Mr. Menchel

1    played a role in it.  He helped set it up.

2              But if you look at the rest of the e-mail that was

3    quoted yesterday by Mr. Hartman, he says, Mr. Campbell does, in

4    general, I'm not a huge fan of loaning money.  I think that's

5    what banks are for.  He goes on to say -- this part wasn't read

6    yesterday -- might need a hefty equity penalty if note is not

7    paid in full by due date.  This is something he was clearly

8    considering.  Not being pressured.  Considering to do.  You

9    have heard no evidence that this went south in any way or this

10   went bad.  There is no evidence one way or the other on that

11   point.

12             This is the important point.  The government wants you

13   to assume that Mr. Petit, who is not an accountant, he's a

14   businessman, but he's not an accountant, should understand that

15   each one of these things he has to affirmatively disclose,

16   somehow he should magically know that all these things are

17   required to be disclosed.

18             You remember Mr. Andersen was asked this question.

19   "As it relates to any loan from any party or bank or otherwise,

20   you never told Mr. Petit that he had a duty to disclose that to

21   accounting if he ever learned of how a customer was financing

22   its payments, right?

23   "Answer.  No, I never said that to Mr. Petit."

24             For all you know, all these distributors have some

25   form of financing or loan arrangements. No evidence in the

1    record that's somehow something that the company was aware had

2    to be disclosed to the auditors.  What's important is are they

3    paying their bills.  And whether the loan came from Citibank or

4    it came from a private loaner like Mr. Petit's children, you

5    know banks aren't the end-all-be-all of how people get loans.

6    They are a relatively low risk institution.  You might have

7    heard of hedge funds, private equity funds, these people are

8    willing to take risks where banks aren't.  That same thing with

9    people like Mr. Petit's children.

10           When accounting asked the questions, they got answers.

11   "You never asked a question to Mr. Petit that he refused to

12   answer for you with respect to Stability's due diligence and

13   acquisition?

14   "That's correct I never asked a question of Mr. Petit that he

15   refused to answer."

16           This is important.  It goes to his good faith.  There

17   is no evidence in this case of evasiveness.  They tried to

18   suggest that when he sent this letter and distribution

19   agreement, that was hidden from the auditors because you

20   wouldn't find it on the computer's server system.  Not true.

21   We already showed you Pam Martin scanned this thing, made

22   drafts, it was kept in the ordinary course of business at

23   MiMedx.  This is important to Mr. Petit's good faith.

24           They have to prove to you -- we don't have to defend

25   against it -- they have to prove to you that this man did

KBD3PET3                    Summation - Mr. Menchel

1    something with the intent to commit fraud.  Just no evidence of

2    that in this case.

3             Let's talk a little bit about the accounting.  Before

4    we get there.  Accounting is a complicated thing.  Mr. Hartman

5    tried to suggest to you yesterday you don't need to be an

6    accountant to understand these things.  One of the examples he

7    gave you was, why would you ship product to somebody if you

8    know you are going to get it back.  It costs money and time and

9    effort to ship product.  And he used CPM as an example.

10             But CPM is the perfect example of why you would ship

11   product to somebody.  Because as it turned out, of the $2.1

12   million order, only $392,000 worth of product was returned.

13   Again, use your common sense and life experience.  When you

14   ship out product, you may expect a certain amount will be

15   returned.  You've heard about that, that should be accounted

16   for.  But whenever you're shipping out something, there is

17   always a risk something could be returned.  You make a business

18   judgment about whether or not that makes sense to do it, and

19   that's what he did.  There is nothing inherently wrong with

20   that, there is nothing inherently wrong with extending payment

21   terms.  The only issue in this case is do those things affect

22   the treatment of revenue recognition, and would Mr. Petit, a

23   non-accountant, know that.  There has been no evidence that he

24   would.  Next slide, please.

25             Accounting is complicated.  Mr. Andersen admitted as

1    much.

2    "Q.  You also testified yesterday that on occasion when an

3    accounting matter would cross your desk, before opining on that

4    matter, you would need to conduct some additional research on

5    that matter, right?

6    "A.  That's often the case, yes.

7    "Q.  Talk to experts about the matter, right?

8    "A.  On complicated things, yes.

9    "Q.  Because accounting is complicated, right?

10   "A.  Accounting can be complicated, yes."

11          It's reasonable to infer that Mr. Petit left the

12   accounting to the accountants.  He is the CEO of the company.

13   He knows a lot of things.  But if you know anything about a

14   CEO, they're like the general.  Their knowledge is very wide,

15   but not necessarily very deep.  That's why you have lawyers and

16   accountants and other people who are good in their fields to

17   assist you in the business.  Next, please.

18          This is something that again we talked about the blue

19   backpack and the red backpack.  It was understood -- wrongly,

20   as it turned out -- that when you exchange products, it was

21   revenue neutral.  This is an e-mail from Mr. Schultz.  Okay.

22   And he was asked about it.

23   "Q.  I want to make sure I got an answer to this piece of the

24   question.  Those exchanges were always for equal amount, the

25   same amount of money out and the same amount coming back,

1    right?

2    "A.  Yes.

3    "Q.  Revenue neutral.

4    "Q.  The question, sir, was revenue neutral, right?

5    "A.  Yes."

6          This was a commonly held belief at MiMedx.  And it

7    turned out that in certain circumstances it's right, and in

8    certain circumstances it's wrong.  And that's why you have

9    people who specialize in these fields, to advise you.

10          It's also a profession of opinion and judgment.  This

11   is not like just adding up numbers from one column to the next.

12   That's not what accrual accounting is.  It's more complicated

13   than that.

14          Mr. Andersen was asked, "Deciding what's reasonable is

15   a question of judgment, correct?

16   "A.  Yes.

17   "Q.  It is a question of discretion, correct?

18   "A.  In the GAAP criteria, it requires generally speaking a

19   history of returns experience.  It has to be contemplated and

20   then you apply experience on top of that.

21   "Q.  And it's up to the accounting professionals to apply their

22   judgment to reach that answer, correct?

23   "A.  That's correct."

24          You learned in this case that even accountants, people

25   who are CPAs, can look at the same set of facts and come to

1   different conclusions about whether or not something should or

2   should not count as revenue.  Mr. Andersen testified:

3   "Q.  And you told them facts that made you believe that a sale

4   of product to Stability Biologics did not meet GAAP revenue

5   recognition criteria?

6   "A.  That was part of the discussion.

7   "Q.  They didn't challenge your account of the underlying

8   facts, did they?

9   "A.  I'm not sure that they challenged -- they didn't say the

10  facts that I had were wrong with those conversations.

11  "Q.  No, they just disagreed with you about whether those facts

12  prevented MiMedx from recognizing the revenue from those sales?

13  "A.  I think that, yeah, they definitely disagreed on how to

14  recognize revenue."

15          If accountants, people who are trained to do this, can

16  have disagreements about whether or not a transaction should or

17  should not be recognized as revenue, you ought to question how

18  Mr. Petit, experienced as he is but not an accountant, should

19  know all these things.  This is not as simple as the government

20  wants you to believe.  It's complicated, and open to opinion

21  and judgment and discretion.

22          You heard evidence in this case, in fact, that the two

23  top accountants at MiMedx, Mr. Senken the CFO, and Mr. Andersen

24  who was the controller, disagreed.

25  "Q.  When you met with them after sending the e-mail, what, if

1    anything, did Mr. Senken say to you?"

2            This was on direct examination, by the way.

3    "A.  He said that, a number of things.  This was normal course

4    of business, this is what they'd always done, and that I didn't

5    understand all the facts and circumstances, that the accounting

6    was correct.  He told me that in the course of those meetings

7    that my concerns had been shared with the external auditors,

8    with the audit committee and with the external counsel, and

9    that none of them agreed with me, and that my conclusions were

10   wrong."

11           Folks, what's important here is that it really doesn't

12   matter who is right or wrong for the purposes of this trial.

13   This just gives you insight that this is not as cut and dried

14   and easy to understand as the folks at that table want you to

15   believe.  It's not.

16   "Q.  Mr. Senken also told you that everyone he discussed it

17   with disagreed with the concerns you raised in this e-mail,

18   correct?

19   "A.  That's correct."

20           It doesn't mean that Mr. Andersen is right or wrong.

21   It just shows you this is a subjective, opinion-oriented type

22   of profession when you are dealing with accrual accounting.

23           I want to talk about the law and how it relates to the

24   government's burden.  The government has to prove beyond and to

25   the exclusion of every reasonable doubt that Mr. Petit acted

KBD3PET3                    Summation - Mr. Menchel

1   not only unlawfully, but knowingly, willfully, and with a

2   specific intent to defraud.  That he made materially false and

3   materially misleading statements.

4           And I submit to you that there is very -- there is no

5   evidence in this case that Mr. Petit acted knowingly,

6   willfully, or at all with any specific intent to defraud.

7           Conspiracy, similar concept.  Has to prove that he

8   intentionally joined and participated in such a conspiracy.

9   Next, please.

10          What do these words mean?  Knowingly means to act

11  consciously and voluntarily, rather than by mistake or accident

12  or mere inadvertence.

13          Intentionally and willfully mean to act deliberately

14  and with a bad purpose, rather than innocently.  Next slide,

15  please.  We can skip over that one.  Next slide, please.  I'm

16  sorry.  Go back.  Next slide.

17          This is important.  It went quickly, but it's

18  important for you to understand that MiMedx did publicly

19  disclose when things weren't always going their way in their

20  filings.  Again, it speaks to Mr. Petit's good faith.  One of

21  the things you learned from Mr. Docter, who was one of the

22  investors who testified, was that, in fact, the DSOs were going

23  up in this case.  The DSOs are the number of days outstanding

24  before someone pays you.  And Mr. Docter, using his experience,

25  explained why that could happen.  You'd have to know who their

1    customers are, and if there is a different mix of customers

2    from one period to the other, because some customer take longer

3    to collect from.  Some companies don't even bill until 45 days

4    after you recognize revenue, so all those things figure in.

5          The very things we're dealing with in this case,

6    extension of payment terms, when people pay, all of the things

7    that the government says are so set in stone, Joseph Docter

8    understood doesn't work that way in the real world.  He

9    understand that the days outstanding numbers could be going up,

10   which the company fully disclosed, and yet there could be

11   legitimate reasons for why that happens.

12         They publicly disclosed this on a phone conversation,

13   on a conference call you heard yesterday.  Mr. Senken -- you

14   heard this played live.  He's asked about the DSOs.  He says,

15   "As Bill mentioned, and I don't like to bring this out in case

16   any customer is listening," let me stop you there.  What he's

17   saying is in case any of the distributors or people that buy

18   our product are listening, "but we target around 75 days."  In

19   other words, what he's saying is, yes, we have payment terms of

20   30 days, we have payment terms of 60 days.  But we realize that

21   in the real world, and he's disclosing this to the investing

22   public, our internal target is 75.

23         This speaks to the whole issue of flexibility that we

24   have been talking about throughout this trial.  And he says,

25   "We were doing better than that.  It's not that we offer

1   extended terms, we don't.  We haven't changed our terms,

2   whether that be a distributor or otherwise."  But then he goes

3   on to say, "Even though our terms say we don't care if you

4   don't get reimbursed, you still owe it to us."  Let me stop you

5   there.  What he's saying is even though you bought the product

6   from us, it's not our problem whether you get paid for yours,

7   you owe us.  He goes on to say, "Practically speaking, the

8   payments are a reflection of how quickly they get reimbursed.

9   And that's a big part of what's happening."  What he's saying

10  is, yes, we have payment terms, but we know, just like with

11  Brian Martin and with Jerry Morrison, we're not really going to

12  get paid until they get paid, and that's a big part why our

13  DSOs are going up, and we're okay with that.

14          His Honor told you at the beginning of the case one of

15  the disputed elements is whether or not Mr. Petit and

16  Mr. Taylor acted with fraudulent intent.  Let's discuss that.

17  He's also going to give you an instruction on what good faith

18  and lack of intent mean.

19          First of all, Mr. Petit's good faith is a complete

20  defense to both of the charges here.  If the defendant you are

21  considering believed in good faith it acted properly, even if

22  he was mistaken in that belief, and even if others were injured

23  by his conduct, there would be no crime.

24          Going on, while each of the defendants assert a good

25  faith defense to both charges, keep in mind the defendant has

1    no burden to establish his good faith since he is presumed

2    innocent.  Rather, as to each charge, the burden is always on

3    the government to prove guilty knowledge, criminal intent, and

4    lack of good faith on the part of the defendant, beyond a

5    reasonable doubt.

6            It is a very high burden those folks have.  When you

7    think about all evidence you've heard in this case, when you

8    put away the bribe nonsense, which is just not true, what

9    evidence is there that Mr. Petit acted with a guilty conscious?

10   Zero.  Next, please.

11           In fact, the evidence provings the opposite.  That he

12   was acting in good faith.  Even though we have no burden,

13   that's what the evidence showed.  The $200,000 payment that

14   they made so much about in this case was disclosed to Lexi

15   Haden, was disclosed to Mike Senken.  Nothing was hidden,

16   nothing was in a bag, nothing was in a shell company.  It's

17   right there in black and white for everybody who is important

18   in that company to see.  Next.

19           The Torpin loan as well.  They made a big deal.  This

20   was something that Mr. Petit was struggling somehow to keep

21   secret.  He set up the meeting between Mr. Campbell and

22   Mr. Morrison in his own conference room.  This is, again, where

23   life experience and common sense comes into play and why you

24   folks are in this trial.  If you want to keep a loan secret

25   from your chief financial officer or your controller, do you

KBD3PET3                          Summation - Mr. Menchel

1    bring the two principals of that loan into your conference room

2    where you work?  That makes no sense.  You only do that if you

3    don't think there is anything wrong with doing it.  And you're

4    not afraid if Mike Senken down the hall walks into the

5    conference room and says, hey, Pete, what's going on here.

6    Certainly could have happened.  Mark Andersen could have walked

7    in, too.

8         You have to step back and think about what you know

9    about life in this process, and when you do, things that they

10   tried to make so nefarious, like the fact that Mr. Petit went

11   out of his way to assist somebody he had been a mentor to,

12   somebody that he trusted, believed in, and more importantly,

13   believed would ultimately benefit MiMedx, there is nothing

14   wrong with putting together two parties for one to help the

15   other that might be mutually beneficial to each.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

1              MR. MENCHEL:  (Continued) Next, please.

2         Stability negotiations that we heard so much about,

3   this purchase of the company which they suggested was somehow

4   nefarious.  Again, in full view of the general counsel that

5   they were trying to be acquired.

6              MR. IMPERATORE:  Objection.

7              MR. MENCHEL:  Actually, your Honor, let me withdraw

8   that and let me rephrase.

9         I misspoke.  Not acquired, there was a distribution

10  agreement being entered into between these two parties.

11             This was, I thought, one of the most --

12             THE COURT:  We'll take this up after you are finished

13  You have seven minutes left.

14             MR. MENCHEL:  I'm almost done.

15             THE COURT:  OK.

16             MR. MENCHEL:  This is I think one of the most

17  important pieces of evidence that came out in this trial from

18  Mr. Martin.  When Mr. Martin was telling Mr. Petit about the

19  Osiris situation and how that relationship was set up Mr. Petit

20  referred to that as a crazy fraudulent scheme.  He expressed

21  anger.  He said someone was going to go to jail for this.  And

22  you may remember I also asked Mr. Martin at the time:

23  "Q.  Did Mr. Petit say this was going to be set up and was

24  going to be bad for Osiris?"

25             He didn't remember saying that, but we brought out in

1   stipulations yesterday and in fact, he hadn't even really told

2   the prosecutors that Mr. Petit also said, "What happened was

3   going to be bad for Osiris."

4           Folks, if you're thinking about committing a fraud,

5   why are you expressing all of these things to Mr. Martin?  That

6   makes no sense.

7           Never at one point does he say, "Oh, this Dover thing

8   is interesting.  Can we work with you guys to commit the same

9   scheme?"  Never once does he say that.  He's expressing real

10  outrage apparently about what he heard and what he believed was

11  going to happen to these men.  If Mr. Petit was doing the same

12  thing, he'd be quite a fool to be saying that in one hand and

13  doing the same thing in the other.

14                          Next, please.

15          Mr. Andersen himself on direct examination first

16  brought out that he did not believe that this was a question of

17  integrity.  He said that to you.

18          "This was not a question of integrity, right?

19  "A.  That I said that to him, I didn't think this was a

20  question of integrity.

21  Q.  Rather, he thought this was a difference of opinion on

22  accounting matters, correct?

23  "A.  Yes."

24          This is not about fraud.  This could be about

25  legitimate disagreements and how to apply these rules.

1          Next, please.  May I have the charge?

2          I just want to end on this note.  You've heard a lot

3     of in evidence this case, and I think there's a lot of

4     reasonable doubt about what really happened here.

5          Remember, we don't have the burden to prove anything.

6     The burden stays on the government at all times to prove their

7     case beyond and to the exclusion of every reasonable doubt.

8     His Honor is going to be instructing you in detail probably on

9     Monday about what that means.  Let me just end on this point.

10         When you were first chosen as jurors in this case, we

11    were in that jury room, and Judge Rakoff was presiding over the

12    jury selection process, and I listened very carefully to what

13    he said to all of you, and I actually wrote it down at the time

14    because I thought it was a very succinct way about what it is

15    to be a juror.  I tried to capture it as best I could.  I don't

16    know if this is word for word, but it's close.

17         He said, In the United States, we give jurors a public

18    responsibility that no other country comes close to.  He said,

19    in most country criminal cases are decided by judges, but under

20    our Constitution, the determination of justice of where the

21    truth lies of whether the government has met its burden on

22    things that are far too important to be determined by anyone

23    other than ordinary citizens like yourself, who he said, come

24    together reason together to arrive at a just verdict.

25         And I submit to you, that when you really examine the

1  reliable evidence in this case -- and by that I mean the

2  documentary evidence created at the time, versus witnesses

3  who've been pressured to say something that is now completely

4  at odds with that.  When you look at what they said during

5  cross-examination and how they said it during cross-examination

6  versus direct examination, when you look at the complete lack

7  of evidence that Mr. Petit formed any intent to commit any

8  fraud, then I believe you will come to the only verdict

9  consistent with the evidence, the law and justice, and that is

10  to find Mr. Petit not guilty of both of these charges.

11          Thank you, your Honor.

12          THE COURT:  Thank you very much.  We will take a very

13  short sidebar on the objection that was raised.

14          (At the sidebar)

15          THE COURT:  I knew I should have copyrighted my

16  remarks to the jury.

17          MR. BURCK:  Yes.  I just found out from my colleague

18  what the issue was.  I wasn't aware what he was talking about.

19  I'm taking that out of the summation, so it's not an issue.

20          THE COURT:  OK.

21          MR. HARTMAN:  That's a different issue.

22          THE COURT:  I'm glad to hear that.

23          And now there was an objection.

24          MR. HARTMAN:  So the issue was to the slide that

25  references all the statements that Ms. Haden is on.  You know,

1  I understand that the argument was this was being done out in

2  the open, but that had been teed up already.  I don't know what

3  relevance Ms. Haden's involvement would have other than this

4  reliance argument that's been sort of gestured to throughout

5  the trial.

6          I think our request at this point, Judge, is, again,

7  the sort of request -- the instruction that the Court gave in

8  the *Stoker* case, an instruction to the jury that says, you

9  know, there was an argument made about what was told to

10  counsel.  You shouldn't --

11          THE COURT:  I'll give them a short instruction to that

12  effect right now and then we will pick up.

13                           (In open court)

14          THE COURT:  Ladies and gentlemen, one other small

15  matter.  There have been some documents in this case of

16  communications with the woman, who was the general counsel of

17  MiMedx.

18          You should understand, there is no defense in this

19  case of so-called reliance on counsel.   There is no suggestion

20  that she was opining on the legality or illegality of anything.

21  Those emails came in because they were relevant for other

22  issues in this case, and you can consider them for all the

23  issues that are relevant in this case, but there is no defense

24  here of reliance on counsel, and you should not even speculate

25  about that.

1            OK.  We will continue with Mr. Taylor.

2            MR. BURCK:  Thank you, your Honor.

3            Good afternoon, ladies and gentlemen of the jury.  I

4    want to thank you on behalf of Mr. Taylor for the attention

5    you've paid to this case over the last several weeks, and I

6    know the last two days have been very long ones.

7            You have a lot to absorb.  I will try my best not to

8    rehash anything you've already heard other than where I really

9    need to because I know you get the case after being here for so

10   long and having heard from the government and Mr. Menchel, so

11   I'm going to do my best to be try and be very, very specific

12   with you.

13           One area I do want to repeat, and it is something we

14   really do agree with the government about:  Is that common

15   sense is the touchstone for this case.  Common sense.  Not

16   accounting sense.  Not government sense.  Not lawyer sense.

17   Your common sense.  That's the touchstone.  That's what

18   matters.  What you believe happened here based on your

19   judgment, based on your own life experience, based on what you

20   think the facts show.  That is what you will need to apply

21   common sense to determine what Bill Taylor intended in this

22   case.

23           The government uses a lot of words like bribery and

24   sham and shady and cheating and greed, rhetoric, rhetoric.

25   Judge Rakoff is going to instruct you on Monday, and one of the

1   instructions he is going to give you is about rhetoric.  You

2   are to perform your duty of finding the facts without bias or

3   prejudice as to any party.  You are to perform your final duty

4   in an attitude of complete fairness and impartiality.  You are

5   not to be swayed by rhetoric or emotional appeals.

6        When you use your common sense and you don't listen or

7   rely on rhetoric, you will find that the evidence reaches only

8   one conclusion here, which is that Bill Taylor did not commit

9   any of the crimes that he's been accused of.

10       So what is Bill Taylor doing here?  Why is he here?

11   Well, let's take a look at the charges.  He is accused of

12   conspiring to deceive auditors.  To deceive auditors.  But he

13   wasn't in the accounting department.  The accounting department

14   didn't report to him.  He wasn't on the audit committee.  He

15   didn't make any accounting decisions.  And he barely had any

16   contact at all with the outside auditor, Cherry Bekaert.  He is

17   also accused of conspiring to make misleading statements in SEC

18   filings.  But he had no role, none, in preparing MiMedx's

19   financial statements.  And at bottom we're talking about

20   securities fraud, and there is no evidence, no evidence that

21   Bill Taylor did anything to deceive anybody about anything.

22       The government's own star witnesses, Mike Carlton,

23   Jeff Schultz, they said it plainly:  Bill Taylor never told

24   them to lie to anybody.  He never told them to withhold

25   information from anybody -- not from accountants, not from

1    MiMedx, not from any one.

2             Bill Taylor didn't do what the government accuses him

3    of doing, and you will see that after you go back and

4    deliberate, look at all the evidence, and use your common

5    sense.

6             Now, let's talk about the evidence and let's leave

7    aside the rhetoric.

8             What was Bill Taylor's job?  You've heard a lot about

9    it, but I just want to remind you.  He ran the company's

10   operations.  He was the chief operating officer.  This is a

11   chart you saw way at the beginning of the trial.  You see a lot

12   of people under him.  He's got a lot of hats.  Running the

13   operations of a company is complicated, lots of different

14   things you're running.  But you know one of the hats he didn't

15   wear -- accounting.  Accounting was run by somebody else,

16   Michael Senken.  You've heard that name quite a bit in this

17   trial as well, and he had a bunch of people helping him about

18   accounting and finance.  Bill was not part of that group.  And

19   Bill Taylor -- excuse me -- Michael Senken did not report to

20   Bill Taylor.  This is a chart again you saw at the very

21   beginning of the trial.  Bill Taylor and Michael Senken are at

22   an equal level.  Accounting does not run through or to Bill

23   Taylor.

24             You also learned that Bill Taylor is not on or was not

25   on the audit committee at the company.  Shouldn't be surprising

1    since he doesn't have accounting as one of his functions.

2    Matthew Urbizo, who you saw testify a couple days ago told you

3    that.  There's no dispute about that.  He wasn't on the audit

4    committee, and he barely had anything to do with Cherry Bekaert

5    or Matt Urbizo or anyone else from the audit.  Matt Urbizo told

6    you that:

7    "Q.  You had very little interaction with Bill Taylor?

8    "A.  I did not interact with Bill Taylor much at all."

9            That was Matt Urbizo two days ago.

10           Bill Taylor had no role in preparing the company's

11   financial statements.  None.  Matt Urbizo told you that as

12   well.  He didn't certify, meaning he didn't say these are

13   accurate.  He didn't sign anything to say these are accurate

14   statements.  It wasn't his job.

15           This is a management certification.  This is not

16   something Bill Taylor signed or had anything to do with.

17   Urbizo told you the same thing.  He didn't know anything about

18   accounting, not because he's dumb or he doesn't know anything

19   about business.  Because it's not his field.  It's a

20   complicated field.  People get degrees in it.  This was not

21   Bill Taylor's field.  It wasn't his job.

22           He also didn't sign the management representation

23   letters.  And this is very important.  He is accused of making

24   all of these misrepresentations and he didn't even sign the

25   representation letters that the government spent so much time

1    on.

2          Now, you remember those letters?  Certain executives

3    of MiMedx certified financials were in compliance with GAAP.

4    That's what it said.  In Q2 2015, no Bill Taylor.  In Q3 2015,

5    no Bill Taylor.  And for the whole year, no Bill Taylor.

6          Mr. Urbizo again said it very plainly:

7    "Q.  So he was not part of the management making those

8    representations to you and your colleagues, right?

9    "A.  That's right."

10         Now, the government spent quite a bit of time

11   yesterday on a meeting that happened in February 2016 after

12   Mark Andersen had reported concerns about revenue recognition

13   issues to the company and Cherry Bekaert sat down with various

14   people from management, including Bill Taylor and Pete Petit.

15   You heard some testimony about that.  Now, I want you to go

16   back to Matt Urbizo's testimony and think about it.  Because he

17   was there.  He was at that meeting.  Did Bill Taylor prepare

18   the memo that was the subject of that meeting?  What did Matt

19   Urbizo tell you?

20         "It's your understanding that Mr. Senken compiled the

21   information that's included in this email, correct?

22   "A.  Yes."

23         And Mr. Taylor may very well have been sitting there,

24   but Mr. Urbizo -- and think back to the testimony -- didn't say

25   one word, not one word about what Bill Taylor did, said, asked

1    about.  Nothing.  Not a word.

2           Let's talk about the revenue recognition memo.  You

3    remember this memo.  This is one that Bill Taylor wrote.  The

4    government talked about this.  The government probably thinks

5    that we're probably going to run away from this, you know, we

6    can't explain this, he talks about revenue recognition.  Wrong.

7    It's about a page long.  The title says it all:  Revenue

8    Recognition Basics.  It's exactly what it says it is.  It's a

9    summary of the basics on revenue recognition.  And that's what

10   Bill knew about.  He knew the basics, or he thought he knew the

11   basics.  Does this one-page document -- think back to the

12   testimony from Mark Andersen and from Matt Urbizo.  Does this

13   one-page document have all the detail and all the nuance about

14   GAAP and all the other issues of revenue recognition and other

15   issues related to it?  No.  It basically comes down to the two

16   lines in a one-page memo.  Bill didn't know one-tenth -- and I

17   may be even overestimating, one-tenth of what Mark Andersen or

18   Matt Urbizo knew about accounting.  And that's not surprising.

19   It wasn't his job.

20           Now, Bill thought that he had a grasp of what these

21   terms meant from a layman's perspective, from a common sense

22   perspective.  And what you're going to see is that everything

23   he did, everything he was aware of was consistent with a common

24   sense understanding of these rules.

25           So, before we go into the specific transactions, I

1    just want you to keep in mind his limited knowledge, his

2    limited role, and his limited responsibilities, because that

3    helps put in context everything that he did, and it helps you

4    understand one of the most critical things, maybe the most

5    critical thing in this case from Bill Taylor's perspective,

6    which is that he acted in good faith.  He did his best.  And

7    you're going to hear from Judge Rakoff about the good faith

8    defense on Monday.  Let's just briefly read it to you.

9         In this regard, let me advise you that a defendant's

10   good faith is a complete defense to both of the charges in this

11   case.  If the defendant you are considering believed in good

12   faith that he was acting properly, even if, even if he was

13   mistaken in that belief, and even if others were injured by his

14   conduct, there would be no crime.

15        You have to keep that in mind as you think about the

16   evidence in this case and when you deliberate.

17        At bottom, every decision that Bill Taylor made was a

18   good faith business decision.  It was not an accounting

19   decision.

20        Let's go to CPM, the first transaction in the

21   chronology.  This, of course, is the transaction you've heard a

22   lot about involving the $200,000 to Mark Brooks.  There are two

23   parts of this that are relevant to Mr. Taylor:  One is the

24   $200,000 payment and the second is the swap issue.

25        I'm going to start with the $200,000 payment.  Now, I

1    know you've heard a lot about it so I'm going to try not to

2    re-tread old ground, but you have to keep in mind the evidence

3    showed a history between CPM and MiMedx that is vital to

4    understanding how things played out and how Bill Taylor thought

5    about the situation.  There were all kinds of disputes between

6    CPM and MiMedx.  These list some of them.  Again, I'm not going

7    to rehash old ground that Mr. Menchel went over, but this long

8    history led up to June 2015, and Bill Taylor's job is to try to

9    resolve the disputes between MiMedx and CPM.  But -- and you

10   heard this from a number of people -- not only was there bad

11   blood between CPM and MiMedx, there was really, really bad

12   blood between Mark Brooks and Bill Taylor.  In fact, you heard

13   testimony that Bill Taylor didn't like Mark Brooks but Mark

14   Brooks hated Bill Taylor.  In fact, a question to Jeff Schultz:

15   "Q.  In fact, you understood Brooks hated Bill Taylor by June

16   of 2015, correct?

17   "A.  Yes."

18          Hate is a strong word, but it was used a few times

19   with respect to this relationship.

20          Now, in Q2 of 2015, June 2015, Bill tried to close the

21   deal with CPM working with somebody who was not Mark Brooks.

22   It was Bill McLaughlin, who was the CFO of the company.  And

23   you saw Bill's final offer.  This is on June 24 of 2015.  This

24   is before the deal on the $200,000 and the stock.  This is

25   before the deal.

1          Bill Taylor says that CPM will place the $2 million

2    order in a mix that MiMedx can ship by June 30, 2015.  This is

3    June 24.  He's talking about an order that you're going to hear

4    about again after the deal is agreed.  Then you see additional

5    terms that he's talking about, "the overall relationship MiMedx

6    will pay CPM a 25 percent override in the sales to Universal

7    Instrumentation starting July 1, 2015.  In Texas, MiMedx will

8    give CPM visibility to hospitals we are working with to join

9    GPO contracts."  You heard about the GPO contracts these

10   business disputes they were having.

11          Bill is trying to close the deal.  He's trying to get

12   the deal done.  There is also a consulting agreement, an

13   amendment to a consulting agreement.  You heard testimony that

14   there'd been a long-standing consulting agreement between Mark

15   Brooks and the company and MiMedx for a long time, and it was

16   amended.

17          Bill Taylor here throws out a new proposal.

18   "companies shall pay to consultant an hourly rate of a thousand

19   dollars for monthly meetings relative to duties described in

20   section 2."  This is the idea he has.  This was Bill Taylor's

21   final offer.  And you know, because you heard about it from a

22   number of people in this case, it didn't work.  Mark Brooks

23   said, "No way, no how, I'm not doing it.

24          You also know from the testimony that as of the next

25   day after this initial email, this email that tries to

1   summarize the deal, as of June 25, Bill Taylor is not running

2   the negotiation.  He stepped back from the negotiation.  These

3   were texts that you were shown during the trial.  Bill Taylor

4   to Mike Carlton and Jeff Schultz, "Our hands are tied.  He

5   needs to call Pete and discuss."

6          Bill Taylor a few minutes later, "Maybe he and Pete

7   can find a different way to handle."

8          And before we move on, I just want to step back again

9   briefly just to give you more context.  And you saw this at the

10  trial as well.  Back in the first quarter of 2015, so some

11  months before this happened, Bill was also trying to deal with

12  CPM because, as we talked about and as you heard at the trial,

13  long-standing bad blood.  Back in February of 2015, Bill Taylor

14  is sending an email to a bunch of people in MiMedx saying, "We

15  can do all this" - about CPM orders -"but we need to start

16  planning for zero from him."  So Bill Taylor is thinking this

17  relationship may not last.  It may not be worth it.  We may

18  have to think about going to zero on this guy.

19         And then you see again the Q2 2015 email.  And you saw

20  Mr. Menchel brought this up as well.  June 24, 2015, "If this

21  doesn't work for them"- them being CPM/Mark Brooks - "then I

22  guess he is choosing to discontinue doing business with us and

23  we will deal with it.  We are going way above and beyond."

24  That's what Bill Taylor says.  And he meant it.  And it didn't

25  work.  And Mark Brooks hated him.  And he couldn't get the deal

1     done, and so he stepped back.  He stepped back.

2              The next day after he stepped back was the first day

3     the $200,000 payment comes up.  And recall Jeff Schultz's

4     extensive testimony about this, he says that the call was

5     between Pete Petit and Mark Brooks.  Nothing about Bill Taylor.

6     In fact as he said:

7     "Q.  And Bill Taylor wasn't on the call, right?

8     "A.  From what I gather, no."

9              No evidence that he was on that call.

10             And what did Bill Taylor do when he learned about the

11    200K?  We know when he learned about the 200K because we've

12    seen this document.  He was confused.  I want to spend a moment

13    on this email because this email is very, very important.  This

14    is something Mr. Menchel talked about.

15             This is an email that starts as one from Lexi Haden,

16    the general counsel of the company, attaching a draft of the

17    Brooks agreement.  Bill Taylor responds to that email from Lexi

18    Haden and says, "I thought we needed him to forego the stock

19    from June 11 of this year for the 200 K?" Question mark?  Now,

20    using your common sense, somebody asks that question, does it

21    not imply that they believed that the 200K was meant to be

22    replacement for the stock?  You could just read on your own.

23    That's the question he asked.  This is when Bill Taylor found

24    out about the 200K and keeping the stock.  That's the question

25    he asked in response to the email from Lexi Haden.

1           And who answered Mr. Taylor's question?  Both Pete

2   Petit and Mike Carlton answered his question.  And they both

3   gave very similar answers.  Mike Carlton said, "This is an

4   agreement to let him keep it based on lost business." You heard

5   Michael Carlton said the "it" referred to the stock regardless

6   of whether it referred to the stock or 200K, whatever it was

7   talking about, this deal, it was answering Bill's question.

8           Pete Petit, "Both given to avoid going through all

9   hospital contracts in detail and giving a rebate or override."

10  The point being and this is what Bill Taylor was told and he

11  understood and had no reason to disbelieve, this was being done

12  to settle a business dispute.  That's what he understood.  In

13  fact, the evidence, as Mr. Menchel took you through it, that

14  was one hundred percent true.  But Bill had no reason to think

15  there was anything wrong at all with this deal.  He thought

16  that maybe they were settling a business dispute, which is what

17  he was trying to do right before, before he had to step back.

18  And the fact that it's in a consulting agreement, what evidence

19  in the record is there that Bill Taylor would be like, "Oh,

20  well, we can't do it that way."  There is no evidence like

21  that.

22          Now, was this wrong as an accounting matter?  You know

23  who doesn't know the answer to that question?  Bill Taylor.  No

24  idea.

25          Now, the government tried in various ways to make this

1    seem very nefarious, really ugly, shady, shady payment.  And

2    the way they did it was interesting.  They had Jeff Schultz get

3    up there and they had him talk about this:  "We're going to

4    funnel the money through Bill Cochrane.  200K.  What do you

5    think, Bill?"  Bill said according to Jeff Schultz, "Let me

6    think about it."  And then a few days later he told him --

7    Schultz testified to all this -- "let's not talk about it any

8    more."  The government wants you to think that because Jeff

9    Schultz, Jeff Schultz brought this idea to funnel money through

10   a third party to Bill Taylor, and then Bill Taylor said, no

11   we're not going to do that, that somehow Bill Taylor is guilty

12   of this crime, this alleged crime.  Jeff Schultz brought it to

13   Bill Taylor.  Bill Taylor said no, and they want you to think

14   that Bill Taylor is somehow guilty because he heard something

15   from Jeff Schultz which he refused to follow up on and then

16   told him no, we're not doing that.  Does that make any sense?

17            I also want to touch on the idea that with respect to

18   this CPM transaction that Bill Taylor had something to do with

19   hiding this payment from auditors.  It's preposterous,

20   honestly.  Now, Mr. Urbizo told you that the accounting

21   department in MiMedx was his contact, John Cranston, Mike

22   Senken, and accounting knew, they knew about the $200,000

23   payment, and they knew about the consulting agreement.  MiMedx

24   accounting knew about both.  The evidence in the trial showed

25   that.  Lexi Haden, the general counsel, told them.  Remember

1    this email?  Lexi Haden, Bill Taylor, Pete Petit, Mike Senken,

2    John Cranston:  "Money for Mark Brooks."  That's the subject

3    matter of the email from the general counsel.

4         "Hi.  We need to pay Mark Brooks for the $200,000

5    consulting fee per the attached final agreement."  And the

6    final agreement has an attachment which has a $200,000 payment.

7    The accounting department in MiMedx who's responsible for

8    providing information to the outside auditors had this

9    information.

10        Now, again, if this was not done properly in terms of

11   an accounting perspective, you know who didn't know about that,

12   who wouldn't have known about that?  Bill Taylor.  No clue.

13   And if accounting didn't tell Cherry Bekaert about the

14   consulting agreement and about the payment for $200,000 that

15   they had from the general counsel of the company, the top

16   lawyer at the company, well mistakes happen, but this one was

17   not made by Bill Taylor.

18        Now, just to digress briefly about Cherry Bekaert.

19   Mr. Urbizo, I'm sure, is a fine person, probably a very good

20   accountant, but he admitted on cross-examination that there was

21   some stuff he just missed.  Do you remember the testimony, the

22   cross-examination my colleague Mr. Packard did on him where he

23   showed him that Cherry Bekaert actually did find out about the

24   Brooks consulting agreement?  It was actually referenced.  This

25   was an email on the side.  It's from John Cranston to Allison

1    Pearson, who is at Cherry Bekaert.  He forwards it on to

2    Matthew Urbizo, and the text of the email it expressly

3    references a consulting agreement.  Now, Cherry Bekaert may not

4    have followed up, and again, I don't think that's for any

5    nefarious reason.  It was a mistake potentially, but Urbizo got

6    this, and if he thought it was important, he missed it.

7            We also showed Mr. Urbizo the work papers, the work

8    papers, their own papers from Cherry Bekaert that showed that

9    he got stock, stock from the company.  Remember, he talked

10   about that would be something to be concerned about?

11   Distributor pool, it's highlighted.  Listed Mark Brooks 15,000,

12   2,455, and it even shows the forfeiture of those stock later on

13   when they canceled the relationship with CPM.  He missed this

14   too.  People make honest mistakes.  It doesn't make it a crime.

15   It doesn't make them criminals.

16           Now, let's talk about the swaps.  Again, nothing

17   nefarious here.  Still on CPM and the swaps.  That's the second

18   part of supposedly what Bill Taylor did wrong.

19           Now, let's go back to Mr. Urbizo again.  Do you

20   remember that Mr. Packard, my colleague, walked him through a

21   spreadsheet, this spreadsheet, and there's a whole bunch of

22   product swaps and product exchanges that he saw, that he

23   received, that he knew about?  And these product exchanges were

24   called even exchanges, meaning they're revenue neutral:  Same

25   money in; same money out.  That's how Jeff Schultz put it.

1    Testified to that.

2              And this is very important because Jeff Schultz saw

3    this as revenue neutral:  Same money in; same money out.  No

4    big deal.  He's a non-accountant like Bill Taylor, and both

5    Jeff Schultz and Mike Carlton thought exchanges are different,

6    different from returns.  Jeff Schultz said:

7    "Q.  Fair to say that in 2015, you viewed product exchanges as

8    being different than product returns?

9    "A.  Yes."  That makes sense from a common sense perspective.

10             Now, if Jeff Schultz was wrong about that, Mike

11   Carlton was wrong about that, Bill Taylor was wrong about that,

12   and Pete Petit was wrong about that, well, they're not experts

13   on accounting.  They don't know GAAP rules.  They weren't

14   trained in GAAP analysis.  Matt Urbizo knows that, but he's an

15   expert.  Bill Taylor is not an expert.  He's not even close to

16   an expert.  There's no evidence that he knew anything more than

17   what he saw in that revenue recognition memo.

18             Product swaps were no big deal at MiMedx.  They were

19   no big deal.  That helps explain why nobody thought there was

20   anything wrong with discussing a possible swap upfront with

21   CPM.  They did swaps all the time.  Bill didn't think it was

22   wrong.  No one else thought it was wrong.  There were all sorts

23   of emails you saw in this trial where people were talking about

24   it openly.  It wasn't hidden.  Nobody was hiding the fact there

25   was going to be a swap.  In fact, the swaps were talked about

KBDQpet4                    Summation - Mr. Burck

 1  before they even had the $200,000 deal.  This is June 24.

 2  You've seen this email before.  Very briefly, they're talking

 3  about a swap.  Everyone was open about it.

 4          After the order, after the deal was struck between

 5  Pete and Mark Brooks, they continued to talk about it openly.

 6  Mark Diaz to Bill Taylor, Pete Petit, Mike Carlton, very

 7  importantly, Michael Senken, Al Evans, John Cranston, all in

 8  accounting.  What does it say?  "CPM PO received."  The PO was

 9  a result of the deal struck between Pete and Mark Brooks

10  received.  June 29, 2015.  "mix needs adjustment on the PO

11  (Reference earlier email)."  Seems pretty straightforward.

12  Doesn't seem very criminal.  Doesn't seem like people were very

13  concerned about this.  And they weren't because this was

14  normal.  Nothing unusual about this.

15          Lots of people were involved.  Lots and lots of people

16  were involved in the swaps.

17          Schultz texts with Bill Taylor, you saw these texts.

18          "I got the PO.  Just leaving Brooks' office.  I am

19  wondering if the beating I took is worth it.  I sure hope it

20  is.  I defended our flag."

21          Bill Taylor, "Did we get the right mix?

22          "We are working it out.  Just talked to Diaz.  Brooks

23  understands ship what we can and we'll exchange it out later.

24  Diaz will work it out with Sherron on Monday."

25          Does that sound like a criminal conspiracy people are

1    doing something shady and didn't want to talk about it?

2              Carlton told Schultz the same thing.  He said that

3    "CPM could remix the next quarter."  Same day, June 29.

4              The evidence showed that Schultz didn't think there

5    was anything wrong with this at the time.  He changes when he

6    was sitting up here, after the government had however many, 10,

7    20 meetings with him.  But is there any evidence he thought so

8    at the time?

9              Remember him joking around, remember those texts that

10   my colleague took him through?  Jeff Schultz, same day,

11   June 29:  Bill Taylor to Mike Carlton:  "Sherron won't make a

12   move unless she hears from Brooks or Bill.  A lot like me with

13   you.  LOL.  Now that made you smile.  Smiley face.  Smiley

14   face."

15             This is business as usual, folks.  That's it.  Nobody

16   actually thought that what they were doing was wrong at the

17   time.

18             And you know that for another reason.  Because Jeff

19   Schultz a year and a half later in an unrelated deal did

20   something very, very similar.  Jeff Schultz, December 28, 2016,

21   about a year and a half after all of this, he writes to a

22   differ customer, "Thank you so much for the purchase order

23   yesterday.  We need you to make a few slight changes to the PO

24   so we can process it today."  Yesterday they get the PO.  Today

25   we're making some changes.

1          Number 3 highlighted, "Remove AmnioCord from the PO,

2     and we will ship it in January due to low inventory.  If you

3     can increase other amounts of the other product to equal 31K

4     from AmnioCord, that would be great.  We will swap out that

5     product for AmnioCord in January."  An upfront swap which you

6     heard testimony, oh, that was really, really terribly unusual.

7     Here is one for you right there.

8          Same sort of deal.  Change your order, substitute

9     products when you got to ship, swap later.

10          Now, what about the Brent Miller email?  This is the

11     smoking gun that Mr. Hartman talked about yesterday.  Smoking

12     gun, he said, yesterday.  The rhetoric, smoking gun.  Let me

13     adopt the rhetoric for a moment.  This isn't a gun.  It's not

14     smoking.  And if it were, Mr. Taylor didn't hold it, and he

15     didn't fire it.  How do you know that?  He's not even on the

16     email.  This is the smoking gun, folks.  None of the people on

17     this email are sitting here in court as defendants.  Bill

18     Taylor is not on it.  Pete Petit's not on it.

19          Second, what's so stunning and horrible about this

20     email?  Well, it talks about staggered shipment of exchange

21     products to CPM.  "bill wants to ship the CPM replacement

22     product in August over a two to three week period in four

23     shipments."  But that is standard practice and you heard about

24     that at trial.  You heard about that at trial.

25          Schultz:

1    "Q.  Does that refresh your recollection that MiMedx would wait

2    to ship exchange products until it had sufficient inventory to

3    fulfill new customer orders?

4    "A.  Yes."

5          Schultz also told you that for the same reason, the

6    same reason, they'd ship in installments just like proposed

7    here.

8    "Q.  For these same inventory management reasons, sir, fair to

9    say MiMedx would also ship exchanged product in installments

10   meaning smaller orders over time as opposed to one big

11   shipment?

12   "A.  I would think so" was his answer.

13         This is standard inventory management, this smoking

14   gun.

15         Third, the idea that anyone at MiMedx could just sort

16   of pull a fast one and time the exchange to avoid auditors from

17   learning about it is just dead wrong.  Urbizo testified that

18   regardless of when an exchange took place, the auditors learned

19   about it during their audit.  You saw the long list of

20   exchanges.

21         (Continued on next page)

22

23

24

25

1              MR. BURCK:  (Continuing) There is no evidence that a
2    swap could be hidden.  Nothing in the record that a swap could
3    be hidden.  This was going to be known, regardless.

4              Fourth, what about this line "No more e-mails on this.
5    Let's meet."  That sounds suspicious.  That sounds really
6    nefarious.  That's what the government wants you to think.
7    Well, let's look at the e-mail that's responding to.  David
8    Nix, who works at MiMedx, to Mark Diaz and Brent Miller,
9    exchanges and returns.  "Mark, has it been discussed how the
10   distributor returns will be managed.  Financial versus
11   non-financial has an impact of what can be done with the
12   tissues that are returned."  Then he goes on to list four
13   different issues.  CPM EpiFix, CPM Q2 exchange, Arthomed,
14   Alphatech.

15             The response.  Mr. McLeod, can you show the top
16   e-mail.  "We can discuss this Monday afternoon.  Set up a
17   meeting.  We have to manage timing for two reasons, our
18   inventory rebuild and revenue recognition issues.  We have
19   auditors in here the end of July looking at the books.  No more
20   e-mails on this, let's meet."

21             In your experience, when you're talking about
22   something complicated, are you going to write everything on
23   e-mail?  Or do you sometimes discuss it in person.  Does that
24   happen on occasion.  I think this is too complicated to write
25   about in an e-mail, let's talk about it.  Does this happen to

1    you?

2              Let's go to the last point.  This goes to the last

3    point.  As I mentioned, nobody on this e-mail is in this

4    courtroom sitting as a defendant.  Neither of these two men are

5    on this e-mail.  There is no evidence in the record, other than

6    this e-mail, about what these three men meant by this e-mail.

7    None.  What was Mr. Miller talking about?  What did he mean?

8    The government wants you to hear smoking gun and say, okay,

9    this is it.  This is where I get these guys.  But, if you look

10   at the e-mail, and you use your common sense, I don't think

11   you'll see anything much of anything, other than an e-mail that

12   three people exchanged, and they are the ones who know what

13   they meant.

14             Most critically, and I'm going to close on CPM and

15   move on to the last three transactions.  Most critically,

16   ladies and gentlemen, don't forget what Jeff Schultz, who was

17   no friend of Bill Taylor or Pete Petit in this trial, what he

18   said.  A series of questions that my colleague asked him at the

19   end of his cross-examination.

20   "Q.  During that half a decade," this is the period of time

21   they worked together, Bill Taylor and Jeff Schultz, "where you

22   worked with Bill Taylor, he never told you to lie to MiMedx's

23   accountant Mr. Schultz, did he?

24   "A.  No.

25   "Q.  He never told you to hide any information from MiMedx's

1    accountants, did he?

2    "A.  No.

3    "Q.  He never told you to lie to MiMedx's auditors?

4    "A.  No.

5    "Q.  He never told you to hide information from MiMedx's

6    auditors?

7    "A.  No.

8    "Q.  He never told you to delete your e-mails, delete your

9    texts, shred documents?

10   "A.  Not that I can remember."

11          I want to move on to SLR.  And I want to talk a bit

12   about it.  I mean a bit.  Because SLR, very hard to understand

13   exactly what that has to do with Bill Taylor, but I'll try.

14   The government focuses on the Torpin loan, this personal loan

15   from Pete Petit's family to Jerry Morrison.  Now, if you think

16   back, you're probably wondering what does that have to do with

17   Bill Taylor.  Nothing.  There is no evidence, not a document,

18   not a word spoken by a witness, not an e-mail, nothing,

19   nothing, connecting Bill Taylor to that loan.  Nothing.  That

20   loan, ladies and gentlemen, has nothing to do with Bill Taylor.

21          How about the rest, how about the rest about SLR.

22   Well, Jerry Morrison clearly didn't, couldn't pay for this and

23   he had to -- you know, he's, he couldn't make this order.

24   Well, let me say, how many people at MiMedx knew that?

25   Everybody who knew Jerry Morrison?  Dozens of people?  Who

1    didn't know that Jerry Morrison had worked at MiMedx and was

2    now taking over as one of the biggest distributors in Texas?

3    So that's the crime?  That's his intent?  What everybody else

4    knew?  That Jerry Morrison was taking over?  Your common sense

5    probably tells you that doesn't make a lot of sense.

6          I'm going to go over to Stability, and I'm going to be

7    even briefer on Stability.  Brian Martin testified for hours

8    and hours about Stability.  Now, Brian Martin is a confessed

9    liar and fraudster, so, not sure how much stock you can put in

10   his word.  Probably not much, as Mr. Menchel very ably

11   demonstrated.  But even putting that aside, Bill Taylor barely

12   came up at all in that entire testimony.  He was barely

13   mentioned at all.  And you know what is really telling?

14   Mr. Hartman yesterday when he gave his summation, do you know

15   how many times he mentioned Bill Taylor with respect to

16   Stability by name?  Zero.  Not once.  Didn't mention him a

17   single time by name.  And that's for a single reason.  There is

18   no evidence in this record, not a document, not a human being,

19   nothing, that would connect Bill Taylor to the letter that the

20   government complains about, the letter that was dated

21   September 25 that gave the right of return that Pete Petit

22   sent.  Nothing connecting Bill Taylor to that.  No knowledge of

23   it, nothing.  There is no evidence that Bill Taylor knew

24   anything about the phone calls that were allegedly happening

25   between Mr. Martin and Mr. Petit.  Nothing.  Not a single

1    person, document, nothing.  Not even Mr. Martin.  And there is
2    no evidence that Bill Taylor knew anything about this
3    alleged -- by Mr. fraudster, liar, Mr. Martin -- that he didn't
4    want the product.  Nothing.
5         So even if he you believe him, he didn't say that Bill
6    Taylor knew anything about it.  There is no documents to
7    suggest he knew anything about them.  There is nothing at all
8    in the evidence that Bill Taylor for some reason was, like, oh,
9    this distribution agreement is a problem because, of course, as
10   Mr. Urbizo testified multiple times, you don't need a
11   distribution agreement to have a deal.  You can use the PO.
12        Mr. Taylor appears at Stability only at the very
13   beginning, when everybody was excited -- remember those e-mails
14   that you saw at trial with Mr. McLaughlin, or sorry --
15   Mr. Johnston, Tom Johnston being excited about being a
16   distributor for MiMedx and Mr. Martin being excited.  He was
17   involved then, and then he was involved at the very end when
18   the distribution agreement was signed.  Nothing in between.
19   Not a peep about Mr. Taylor.
20        I'm going to close on First Medical.  There is more to
21   talk about with First Medical than certainly with Stability and
22   certainly with SLR.
23        Couple big picture points about First Medical.  First
24   of all, unlike what the government's alleging with some of
25   these other orders, there is no allegation that the First

1    Medical order was a fake order or was somehow some kind of like

2    trickery.  Nothing.  The evidence was that First Medical is a

3    real company, out of Saudi Arabia, that was doing a lot of

4    business with MiMedx.  That wanted to do more business with

5    MiMedx and had done some big deals with MiMedx and they wanted

6    to do another order.  That's the evidence of the case.  This is

7    not one of the so-called fake orders they are talking about.

8           You heard from Mr. Carlton about this.  Mr. Carlton is

9    really the evidence for the government against Mr. Taylor about

10   First Medical.  It is really about what he testified.  But

11   Mr. Carlton told you that:

12   "Q.  If it hadn't been for the revenue target or the quarterly

13   revenue figure, when would that sale to First Medical more

14   naturally have taken place in relation to the tender?

15   "A.  Sometime at the end of the first quarter, or maybe more

16   over the second quarter, potentially, after the bid had already

17   took place."

18          What he is talking about is the order in the fourth

19   quarter of 2015, the question was, would that happen, would

20   that have happened in the fourth quarter.  He says no, but it

21   would have happened probably first quarter, maybe second

22   quarter.  We are talking about a difference of about a month.

23   December, January.  January is the beginning of the first

24   quarter.  So there is no question here we are talking about a

25   real order, even from Mike Carlton's perspective.

 1          You also know that First Medical could pay.  They had

 2     a letter of credit from a bank.  Mr. Carlton testified about

 3     that.  The only question was when they would buy the product.

 4     When they would take the product.  Now, you heard a lot from

 5     Mike Carlton about what he remembers about these negotiations

 6     with First Medical.  He gave you his opinions about what other

 7     people thought and what he believed they meant five years ago.

 8     But we all know that Mike Carlton is not a mind reader.  And we

 9     also know this is the same Mike Carlton who used the word

10     "wrongful" and "wrong" multiple times in his examination when

11     it suited him.

12          Here's some examples.  He was talking about what I did

13     was wrong with the inflating the revenue, and hiding stuff from

14     the auditors, I thought the transaction was wrong at a certain

15     point.

16          But then when it didn't suit him, when I was asking on

17     cross-examination:

18     "Q.  Back in 2018, Mr. Carlton, isn't it true that you did not

19     believe that the December 2015 transaction involving First

20     Medical was wrong?

21     "A.  I don't remember saying that, no.

22     "Q.  You don't remember saying that, but what did you believe?

23     What did you think then?  You didn't think it was wrong, right?

24     "A.  What do you mean -- can you please clarify what wrong

25     means."

1          This is this was Mike Carlton.  Wrong, I know what
2     wrong is when the government is asking me questions.  But when
3     defense counsel for Mr. Taylor or Mr. Petit asks, I don't know
4     wrong.  Wrong?  You tell me what wrong means.  So let's,
5     instead of focusing on the unreliable witness, to put it
6     politely, of Mr. Carlton.  Let's look at what the document
7     says.  And let's go to the two e-mails that the government says
8     show Mr. Taylor's criminal behavior.

9          The first one is the deal, that's the one that the
10    government says was the cover story, and the second one we call
11    the relationship e-mail.  I want to explain that to you.  They
12    think that's the side deal, the real story.

13         Were they sent four seconds apart?  They sure were.
14    You know why?  What does the evidence tell you.  He was writing
15    them to the same person, Bassam El Hage, and it was about the
16    same order.  The same transaction.  The first, the deal, this
17    is one that the government claims was some kind of false cover.
18    You remember Mark Andersen testified that he went, when he
19    learned something was off about First Medical from his
20    perspective, he went and talked to Bill Taylor about it.  Bill
21    Taylor here fixes the problem that Mr. Andersen raised with
22    him.  The issue was he wanted a set term.  He wanted 180 days
23    from the receipt of the product by First Medical.  That's what
24    Mr. Taylor got from Mr. Bassam El Hage.  180 days.  That's what
25    ended up in the PO.

1              The second e-mail, which he sent a few seconds later,

2    this discussed the relationship between MiMedx and First

3    Medical.  And Mike Carlton, of all people, told you that all

4    customers that MiMedx had were partners.  They're meant to be

5    partners.  Now, what were the three things in this e-mail that

6    the government has an issue with.  There it is.  Highlighted.

7    Remember the tender was discussed by Mr. Carlton, the tender

8    was going to, they thought would issue in March of 2016.  And

9    all this was around that question of the tender.

10             Mr. Taylor writes to Bassam El Hage, "In the event

11   that the tender is delayed or for some unlikely event it does

12   not occur, MiMedx will give First Medical additional extended

13   payment terms, if requested, and will assist First Medical in

14   selling the product or another option would be to repurchase

15   the product."

16             So there are three things that the government is

17   concerned with.  One is the possibility, the possibility of

18   extended payment terms; second is the possibility of helping

19   them sell the product; and third is this alleged possibility of

20   a right of return.  Well, let's look at each of these.

21             The payment terms first.  You heard testimony and you

22   saw documents that showed that people, customers were late all

23   the time.  All the time.  This is Mark Andersen himself:

24   "Yes, it was not uncommon to have customers at MiMedx to pay

25   late?

1    "A.  Yes, there were many customers who were paying late.  Yes,

2    that's true."

3            Extended payment terms routinely provided to

4    customers.  You saw this chart, there are literally thousands

5    of payments that are longer than 90 days.  120 days 150 days,

6    almost 3,000, 300 plus days, this is not unusual.  There is

7    nothing strange about that.  That was common.  It was helping a

8    relationship with a client.  It's his job to help customers to

9    make them -- to be flexible.

10           How about the promise to help sell product.  Well,

11   remember, there is a history of First Medical and MiMedx

12   working together to help First Medical sell product.  To Mike

13   Carlton:

14   "Q.  You wanted to help them sell product in the market; is

15   that what you said?

16   "A.  Yeah, we supported all customers through education and

17   helping them sell, yes.

18   "Q.  Including First Medical, right?

19   "A.  Correct."

20           We supported all customers through education and

21   helping them to sell.  Yes.  All customers.  Anything unusual

22   about First Medical being assisted in this way?  No, of course

23   not.

24           If you look at the actual e-mail, right after the

25   criminal sentence, Bill Taylor explains what he means by

1    assisting with selling.  "We will continue supporting sales

2    efforts in the territory by continuing training such as what

3    Mr. Frank Burrows and Dr. Thomas Davenport have recently

4    performed and will be performing again in February."

5            What this case really comes down to, what the

6    government really thinks they got Bill Taylor on, is the last

7    part.  The option to repurchase.  They say that's a right of

8    return.  Using your common sense and reading the e-mail

9    yourself, rather than relying on the government, you will see

10   it is not a right of return.  It is the opposite of a right of

11   return.  Not only did he not use the word "return," he used the

12   word "repurchase."  Repurchase.  Different word.  Different

13   meaning.  And it was an option that belonged only to MiMedx, as

14   the seller.  The option was something that MiMedx always had.

15   If a customer, any customer, had a problem selling products,

16   MiMedx could, at their option, buy them back.

17           This was about managing the relationship with First

18   Medical.  It was customary, it was routine, it was providing

19   flexibility.  And he gave MiMedx or MiMedx gave First Medical

20   extended payment terms, if requested, if the delay happened or

21   if the tender didn't issue, like they did everybody.  They were

22   helping sell, like they did everybody, and then this was a

23   MiMedx option, belonging solely to them to repurchase.  Not

24   First Medical's option.

25           Now think about it.  The only party to this deal that

1    could repurchase, repurchase product is the seller, MiMedx, who

2    had sold the product to First Medical in the first place.  The

3    buyer doesn't have an option to repurchase product.  The buyer

4    has an option to resell product.  But that's not what it says,

5    it says repurchase.  Common sense.  Read the e-mail yourselves.

6              Now, everybody at MiMedx believed that the tender was

7    going to happen.  That's what they thought would happen.  They

8    thought the sale was going to occur.  Mike Carlton testified:

9    "Q.  From a sales perspective, you thought that that tender was

10   probably going to happen, right?

11   "A.  From a sales perspective, if the government issued a

12   tender we felt confident we'd win it."

13             They thought MiMedx would get paid.  That was the

14   reasonable expectation of everybody.  And nobody used the word

15   return, except Mike Carlton.  I want to talk about that for a

16   few minutes we have left.

17             During the trial, the government showed you this

18   exhibit.  This is a series of texts between Mike Carlton and

19   Bill Taylor.  Mike Carlton asked Bill Taylor in the top text,

20   "BT, can you send the e-mail sent to Mr. Majed letting them

21   know they can return if the tender doesn't issue.  Send to me."

22   Mr. Taylor then responds back "Just sent."  Here's the key.

23   This is a text being exchanged between two people.  Normal

24   texting shorthand.  The e-mail that Bill sent back to him was

25   about a repurchase, not a return.  What did Mike Carlton do

1   with the e-mail that he got from Bill Taylor that showed the

2   repurchase?  Did he just forward it on, say here it is?  No.

3   He wrote, "Dear Bassam, did this help?  MiMedx will return

4   repurchase the inventory if needed.  Thanks, Mike."

5          He ad libbed and added "return" to the prior e-mail.

6   "Return repurchase."  And Mike Carlton admitted that Bill

7   Taylor never asked him or authorized him to send this e-mail.

8   "You didn't ask Bill Taylor whether or not you could say return

9   or repurchase before you sent this e-mail, did you?

10  "A.  I did not, no."

11         So Bill Taylor didn't even know about this e-mail.

12  You remember when I showed Mr. Carlton on the stand, I showed

13  him this, this e-mail, the repurchase language.  And I asked

14  him, look at the word repurchase.  Do you remember how confused

15  he got?  Mike Carlton:

16  "Q.  To repurchase a product would require MiMedx to buy it

17  back, isn't that right?

18  "A.  I'm assuming so.

19  "Q.  You are assuming so or is that what it means?

20  "A.  Looking at it now, makes sense to me.  At the time I

21  thought Bill meant return, but looking at it now, you have to

22  write a check to purchase the product back."

23         Looking at it now.  That's what he said.  Sitting

24  there on the stand.

25         Now, another text the government showed you was this

1    one between Mike Carlton and Bassam El Hage.  Bill Taylor is

2    not on this text chain.  It says, "Also, when the audit letter

3    comes just acknowledge as correct.  No need to send them any

4    other information."

5          The prior e-mail mentions that Bill is curious about

6    the tender and Mike Carlton sends this.  What did Mike Carlton

7    testify to?  He said that Bill Taylor instructed him to send

8    this text, as if Bill Taylor was dictating text language to him

9    in a conference room somewhere.  Now, again, does that make

10   sense to you?  That Bill Taylor is standing right next to him

11   and saying send this text to Bassam El Hage this way.  His name

12   doesn't appear in that text.  But remember that last e-mail

13   that Mike Carlton admitted that he didn't get approval from

14   Bill Taylor to send.  He ad libbed it.

15         Here, what makes more sense, that he ad libbed this or

16   did Bill Taylor say, say exactly like this.  I want to make

17   sure you put it this way.

18         Again, use your common sense and make your own

19   conclusion about what makes more sense.

20         THE COURT:  Counsel, how much more do you want?

21         MR. BURCK:  I think I can finish in five.

22         THE COURT:  Very good.

23         MR. BURCK:  Let's turn to the audit confirmation

24   letter.  This is the letter that supposedly is hiding

25   information from the auditors because it doesn't list payment

1    terms.  Doesn't say anything special about anything beyond

2    what's in the PO.  Well, that's for a good reason because there

3    wasn't anything special about what was in the PO.  It was what

4    it appeared to be.  Didn't mention a right of return because

5    there was no right of return.  Didn't mention extended payment

6    terms, because there weren't any at that point.  Remember, this

7    audit letter was signed in February of 2016.  February 2016.

8    The tender is supposed to hit in March of 2016.  You heard

9    testimony from Mr. Carlton that the tender was going to happen

10   then in March 2016.  This is before then.  None of the options

11   about extending terms or anything else would happen unless, if,

12   if, if, remember what this e-mail says, a problem happens with

13   the tender.  So at this point this is all pre.

14          So Bassam El Hage and First Medical, again, there is

15   no evidence in the record about what they thought about any of

16   this, other than what you heard from Mike Carlton.  But, we

17   have no reason to think that they thought they had anything at

18   that point.  Now, maybe from an accountant's perspective this

19   is wrong.  Maybe it's inaccurate.  But Bill Taylor, Mike

20   Carlton, and certainly not Bassam El Hage, none of them are

21   accountants, and there is no reliable evidence that these

22   non-accountants knew at the time that when this happened, that

23   this was a problem.  The evidence is they acted in good faith.

24          And you will recall that Mr. Carlton testified that

25   Mr. Taylor had asked to see a draft of the audit letter before

1    it went to the accountants, and there was in fact a text about

2    that.  But you also heard testimony from Mike Carlton that he

3    admitted that never happened.  No one ever received a draft.

4         The last set of texts I want to show you involve this

5    allegation that Bill Taylor told Mike Carlton to just say sign

6    and send for the First Medical audit letter.  Now, this in

7    front of you is the government's exhibit that was shown to

8    Mr. Carlton on the stand.  These are the texts that they

9    showed, these are all excerpts of texts, and the incriminating

10   texts are at two -- at 11:39:46 a.m. Bill Taylor, Mike Carlton,

11   See if Bassam can send a draft of the signed letter to me prior

12   to him sending to the auditors. Okay.  This is separate, just

13   confirm for the auditors.  And Bill Taylor, Mike Carlton, no

14   extra commentary, just sign and send.  And then okay.

15        That's what they showed to Mr. Carlton, that's what he

16   said, oh yeah, they were talking about First Medical.

17        Well, what did we show you?  All those texts in

18   between.  And if you look at the texts that immediately

19   precedes the one that says from Bill Taylor, this is separate,

20   just the confirm for the auditors, it's about Athletic

21   Surgical.  That's what Mr. Carlton admitted.  All the texts

22   that are in yellow are about First Medical.  Even the one

23   that's after -- sorry.  Athletic Surgical.  Excuse me.  All

24   Athletic Surgical.  Even the one that's after is about Athletic

25   Surgical.  All of them.  But he wants you to believe that he at

Kbd3pet5                    Summation - Mr. Burck

1    12:27:48 when he said "okay" to "no extra commentary, just sign

2    and send," that he was referring back to a text that happened

3    40 minutes before at 11:47:39 a.m., when Mike Carlton and Bill

4    Taylor said "okay," and the text before that is clearly about

5    First Medical.  He wants you to think that he wasn't talking

6    about text that was right before.  No, no, no, I was harkening

7    back to 40 minutes earlier and saying I'm talking about First

8    Medical.  That's what I understood him to be talking about.

9            Use your common sense, folks.  You know these texts

10   are about Athletic Surgical, which has nothing to do with this

11   case, and you know that Bill Taylor is telling Mike Carlton,

12   "This is separate, just the confirm for the auditors, no extra

13   commentary" about Athletic Surgical, not about First Medical.

14           I want to conclude -- your Honor, I'll wrap up right

15   now.

16           THE COURT:  That's fine.

17           MR. BURCK:  I want to conclude with on First Medical

18   with the same thing that I concluded with on CPM with Jeff

19   Schultz.  You didn't hear anything about Mr. Taylor lying,

20   telling anyone to lie, to hide anything to conceal anything.

21   Mr. Carlton testified to that.

22   "Q.  Now did Mr. Taylor ever tell you don't tell anybody about

23   that deal we have with First Medical?

24   "A.  He did not.

25   "Q.  Did he ever tell you don't send this e-mail to anybody?

Kbd3pet5

1    "A.  He did not.

2    "Q.  Did he ever ask you to conceal information from anybody at

3    MiMedx?

4    "A.  He did not."

5         Ladies and gentlemen, nobody has testified that Bill

6    Taylor ever told him to lie about anything, to hide anything,

7    because he had no reason to do anything like that, and he would

8    not have done that.

9         On the first day of this trial, my colleague

10   Mr. Weinreb told you that at the end, we would be asking you to

11   return a verdict that is just, that is fair, and reflects the

12   evidence, not the rhetoric of this case.  And that's what I'm

13   doing now, ladies and gentlemen.

14        Bill Taylor is not guilty of these crimes.  And we ask

15   that you return a verdict that reflects that he's not guilty.

16   Thank you.

17        THE COURT:  Thank you very much.

18        Okay, ladies and gentlemen, another full day.  On

19   Monday, the government gets its rebuttal summation for 45

20   minutes at the outset, then I will give you my instructions of

21   law, and then the case will be yours to deliberate.  So that

22   will be probably late Monday morning.

23        So, now that the pressure is on, have a very good

24   relaxed weekend and we'll see you at 9:45 on Monday.

25        (Jury excused)

Kbd3pet5

 1              THE COURT:  Anything any counsel needs to raise with

 2     the Court?

 3              MR. IMPERATORE:  Not from the government.

 4              MR. MENCHEL:  No, your Honor.  Thank you.

 5              MR. BURCK:  No, your Honor.  Thank you.

 6              THE COURT:  Everyone, have a good weekend.  We'll see

 7     you 9:30 on Monday.

 8              (Adjourned until November 16, 2020, at 9:30 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25