PCL XL error

UNITED STATES DISTRICT COURT
Subsystem:   KERNEL
SOUTHERN DISTRICT OF NEW YORK
Error:       IllegalOperatorSequence

Operator:   BeginChar
Position:   143

UNITED STATES OF AMERICA

-v-

JOSHUA ADAM SCHULTE,

*Defendant.*

Filed with the Classified
Information Security Officer
CISO
Date 5/16/2022

S3 17 Cr. 548 (JMF)

# MOTION FOR RECONSIDERATION OF THE LATEST DENIED MOTIONS

Joshua Adam Schulte
Slave #79471054
Metropolitan Detention Center (MDC)
P.O. Box 329002
Brooklyn, NY 11232

## TABLE OF CONTENTS

I.   TABLE OF AUTHORITIES............................................................................... ii

II.   PRELIMINARY STATEMENT ...................................................................... 1

III.   MOTION TO SUPPRESS THE EMAIL ........................................................ 1

   A.   The reasonableness and precautions to prevent inadvertent disclosure........ 1

   B.   Time taken to rectify the error, scope of the discovery, and extent of the disclosure ...................................................................................................... 2

   C.   Overreaching issues of fairness...................................................................... 5

IV.   MOTION TO SUPPRESS GOOGLE SEARCH WARRANT ........................ 6

   A.   The search warrant application failed to establish a minimum nexus between the *alleged offense* and the Google Account............................................. 6

   B.   The search warrant application did not establish probable cause to seize Mr. Schulte's email, pictures, browsing history, or any other information unrelated to the phone calls .................................................................... 8

V.   MOTION FOR BIFURCATION ..................................................................... 10

VI.   MOTION TO SUPPRESS NON-RESPONSIVE AND ATTORNEY-CLIENT PRIVILEGED DOCUMENTS SEIZED FROM MCC ........................... 10

   A.   Seizure and search of Non-Responsive documents ..................................... 10

   B.   Attorney-Client Privilege of "Malware of the Mind" ................................. 12

   C.   Attorney-Client Privileged Notebook Excerpts ........................................... 15

      1.   Memorialization of private conversations with attorneys are protected..... 15

      2.   Writings that were discussed with attorneys are protected......................... 16

      3.   Media campaign and legal advice regarding disclosure is protected.......... 16

VII.   CONCLUSION .......................................................................................... 17

# I.   TABLE OF AUTHORITIES

## Cases

*ACLU v. NSA*,
  925 F.3d 576 (2d Cir. 2019) ................................................................................... 17

*Boyd v. United States*,
  116 U.S. 616 (1886) ............................................................................................... 12

*Illinois v. Gates*,
  462 U.S. 213 (1983) ................................................................................................. 8

*Pritchard v. County of Erie (In re County of Erie)*,
  473 F.3d 413 (2d Cir. 2007) ................................................................................... 17

*United States v. Christian*,
  893 F.3d 846 (6th Cir. 2018) ................................................................................... 8

*United States v. Defonte*,
  441 F.3d 92 (2d Cir. 2006) ............................................................................... 15, 16

*United States v. Galpin*,
  720 F.3d 436 (2d Cir. 2013) ..................................................................................... 9

*United States v. Griffith*,
  867 F.3d 1265 (D.C. Cir. 2017) ............................................................................. 11

*United States v. Rettig*,
  589 F.2d 418 (9th Cir. 1978) ................................................................................... 9

*United States v. Rigas*,
  281 F. Supp. 2d 733 (S.D.N.Y. 2003) ..................................................................... 2

*United States v. Roman*,
  942 F.3d 43 (1st Cir. 2019) ...................................................................................... 7

*United States v. Sampson*,
  385 F.3d 183 (2d Cir. 2004) ................................................................................... 10

*United States v. Travisano*,
  724 F.2d 341 (2d Cir. 1983) ..................................................................................... 7

ii

*Upjohn Co. v. United States*,
449 U.S. 383 (1981)...........................................................................................17

*Warden, Md. Penitentiary v. Hayden*,
387 U.S. 294 (1967)............................................................................................7

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978)............................................................................................7

**Other Authorities**

2 Wayne R. LaFave, *Search and Seizure* § 4.6(a) (5th ed. 2012) ..............................9

## II.     PRELIMINARY STATEMENT

On April 29, 2022, the Court denied all the latest defense motions. Dkt. 789 ("Order").

Due to mistakes about the facts and law, the Court should reconsider its decision. References to

the party's motions will remain consistent with the Court's Order: Dkt. 765 ("Def.'s Omnibus

Mem."), Dkt. 761 ("Gov.'s Omnibus Opp'n"), Dkt. 766 (Def.'s Omnibus Reply"), Dkt. 772

("Def.'s Suppression Mem."), Dkt. 758 ("Gov.'s Suppression Opp'n"), Dkt. 771 ("Def.'s

Suppression Reply"). Mr. Schulte also notes that the Court repeatedly referenced the "Mar. 28

2022 Conf. Tr." However, March 28, 2022 is the date of the docket entry that the February 14,

2022 pretrial conference transcript became available; there was no pretrial conference on March

28, 2022. Additionally, the Court mistakenly referenced Mr. Schulte's middle initial as 'M', but

it is 'A.' See Order at 1.

## III.     MOTION TO SUPPRESS THE EMAIL

The Court denied the motion to suppress The Email, because it claimed Mr. Schulte

"waived" the privilege by "fail[ing] to assert it for more than six months after learning that the

Government had obtained the document." *Id.* at 4. "To determine whether an inadvertent

disclosure waived the privilege, courts in this Circuit balance four factors: [1] the reasonableness

of the precautions to prevent inadvertent disclosure, [2] the time taken to rectify the error, [3] the

scope of the discovery and the extent of the disclosure, [and 4] overreaching issues of fairness."

*Id.* at 5. The Court is mistaken about the facts.

### A.     The reasonableness and precautions to prevent inadvertent disclosure

The Court incorrectly claims "Defendant apparently knew that Presnall had access to the

document—whether or not he asked his prior attorney to send it to Presnall—and nonetheless did

not ask Presnall to keep it confidential." *Id.* The Court is incorrect as to the facts. See, e.g. Def.'s

Suppression Mem. at 6-7 ("After Mr. Schulte was incarcerated, he requested a copy of The

1

Email from his attorney as he was assisting in reviewing the search warrants and preparing the Franks Suppression Motion. Since Mr. Schulte could not use electronic media, he was unaware how The Email was electronically transferred and printed for him"). Mr. Schulte asked his attorney for a copy of The Email, which Mr. Presnall provided. Mr. Schulte was not aware that his attorney forwarded The Email to Mr. Presnall to print. After Mr. Schulte was arrested, he did not know what became of his property, nor was he aware that he was subsequently evicted and Mr. Presnall took possession of his property—including his privileged notes. He only discovered these facts long after the government superseded him. It appears Mr. Presnall gave the government the printed privileged document that Mr. Schulte possessed and used while he was out on bail. "[T]he reasonableness of a party's actions to protect privileged information should be measured in light of the risks <u>foreseeable</u> to that party at the time the precautions were taken. The mere fact of an accidental disclosure does not automatically render the precautionary measures unreasonable at the time they were performed." *United States v. Rigas*, 281 F. Supp. 2d 733, 739 (S.D.N.Y. 2003). If Mr. Schulte were not re-arrested, the document would have remained in his possession, and never would have fallen into the government's hands—but of course Mr. Schulte could not foresee this eventuality. Accordingly, factor one indicates Mr. Schulte took all the reasonable precautions possible to prevent inadvertent disclosure.

## B.     Time taken to rectify the error, scope of the discovery, and extent of the disclosure

The complexity of this particular case requires consideration of factors two and three together. The reason Mr. Presnall produced the document to the government was simply because he possessed the hardcopy document that Mr. Schulte possessed and used at his apartment, which did not include the accompanying original email. Order at 3 ("Presnall's production did not indicate that the document had come from an email."). On its own, the document does not

2

appear to be privileged. Thus, the only way Mr. Presnall, his attorneys, or the defense could recognize the document as privileged would be with a very keen eye in reviewing and identifying the specific document as an attachment in one of Mr. Schulte's thousands of emails; like finding a needle in a haystack.

The government produced the privileged email in classified discovery on November 12, 2018 along with 145 documents. Less than a month later it produced the bulk of its classified discovery on December 10, 2018—approximately 1500 files spanning over 215 Gigabytes. During this time period, Mr. Schulte was only going to the SCIF once per week, and there was a major disruption due to the superseding indictment, imposition of SAMs, and end of the year; Mr. Schulte only went to the SCIF twice after the government's classified production of the Presnall documents until the end of the year—December 17 and 20, 2018. Neither Mr. Schulte nor his counsel were able to review this staggering amount of discovery immediately.

When Mr. Schulte did finally see the discovery, as produced with only a few documents in the February 25, 2019 unclassified disclosure (which was not provided to him until March), he immediately alerted his counsel, who then promptly informed the government that the document was privileged. See, e.g. Def's Suppression Reply, Ex. A at 2 ¶ 10 ("The day the government provided The Email in discovery, I informed my now-standby-counsel that The Email was protected by the attorney-client privilege, promptly showed them the email chain proving this, and asked them to file a suppression motion."). Counsel immediately contacted the government to request return of the document. Counsel did not believe The Email was relevant (it was not found at the MCC and did not appear significant at the time) or admissible, and opted to wait for the Bill of Particulars before filing a suppression motion to see whether or not the privileged document would even be introduced at trial.

3

So, the Court is incorrect as to the facts since the date the government produced the documents to the defense in *classified* discovery is not the date counsel realized that one of those documents was protected by attorney-client privilege—due both to the staggering amount of discovery and missing email chain for the document. Additionally, once Mr. Schulte actually identified the document (in the *unclassified* discovery production) in March, he immediately notified counsel, who immediately notified the government of the privileged document—just as counsel did regarding the prison notebooks. However, there was no official filing on the record nor any suppression motion, and the government told defense counsel they disagreed.

In the event the Court simply does not believe Mr. Schulte due to the absence of anything on the official record, it would have taken months to identify The Email as privileged. As the Court notes, the government obtained and produced the document without the email chain. Thus, the defense not only had to identify The Email out of the thousands of discovery documents, but it also had to link it back to one of thousands of Mr. Schulte's emails. This would not have been simple, and would have required a very keen eye—the government itself did not realize the document identified by Mr. Presnall was the attorney-client privileged email sent on March 20, 2017, and they had an additional three months to review the discovery before producing it to the defense. And once they were notified that the document was linked to the privileged email and thus protected by attorney-client privilege itself, the government decided not to introduce The Email at trial.

So, even in the event the Court assumes Mr. Schulte did not engage in his case at all, or simply did not alert his counsel to the privilege, a six-month delay in identifying the document as privileged was well within reason; the defense had to review thousands of documents to find the

4

privileged document, then review thousands of emails to link it to a privileged email.

Accordingly, factors two and three also suggest waiver of the privilege is inappropriate.

### C.   Overreaching issues of fairness

The Court suggests that "the fourth factor, fairness, counsels in favor of finding waiver." *Id.* at 6. "[T]o the extend that [Defendant's] delay caused the Government to rely on these privileged documents in preparing its prosecution, suppressing them now [would be] unfair."). *Id.* The Court is mistaken. The government evidently received The Email from Mr. Presnall in August 2018 pursuant to a subpoena. The government superseded Mr. Schulte in October 2018, relying upon The Email. The government then produced The Email to Mr. Schulte in November 2018—along with thousands of other classified documents in discovery. Thus, the government already decided to prosecute Mr. Schulte long before it produced the documents in discovery. Any delay in alerting the government to the privilege simply had no effect on the government's case. Additionally, the government already proceeded to the first trial without introducing this document, and its current case does not depend on this document as it alleges multiple instances of "attempted" transmissions. Accordingly, there is absolutely no prejudice to the government in suppressing The Email for privilege.

Finally, if the Court faults Mr. Schulte's counsel for failing to assert privilege, Mr. Schulte should not be prejudiced by this mistake. If the Court finds that counsel waived the privilege by failing to assert it, this constitutes ineffective assistance of counsel. Since Mr. Schulte is now *pro se*, in the interests of fundamental fairness and justice, and in lieu of jeopardizing the integrity of the forthcoming trial just to introduce an attorney-client privileged document, the Court should consider The Email protected by attorney-client privilege.

5

***

After reviewing the correct facts, including that (i) Mr. Presnall only possessed The Email after Mr. Schulte was evicted from his apartment and unbeknownst to Mr. Schulte, (ii) Mr. Presnall did not possess the email chain, and therefore did not recognize The Email as a privileged document, (iii) the government did not produce The Email until it already superseded Mr. Schulte, (iv) the government produced The Email alongside thousands of classified documents, (v) Mr. Schulte was unable to review discovery at the SCIF when the classified documents were first produced, (vi) Mr. Schulte immediately notified his counsel when he recognized The Email in the unclassified discovery production in March, (vii) Mr. Schulte's counsel immediately notified the government that they believed The Email was privileged, (viii) even if there is no documentation of counsel's notification of privilege, it would have taken multiple months to identify The Email as privileged without Mr. Schulte's assistance, (ix) the government itself did not connect The Email back to the privileged email chain until notified by counsel, at which point they decided not to introduce The Email at trial, and (x) in the event the Court finds fault with Mr. Schulte's counsel for failing to raise the privilege, it should not prejudice Mr. Schulte due to this ineffective assistance of counsel; all four factors counsel the Court against waiver. Accordingly, the Court should reverse and suppress The Email.

## IV.    MOTION TO SUPPRESS GOOGLE SEARCH WARRANT

### A.    The search warrant application failed to establish a minimum nexus between the *alleged offense* and the Google Account

The Court recognized that a search warrant violates the Fourth Amendment, and is not protected by the good faith exception when the affidavit is "so lacking in indicia of probable cause as to render belief in its existence unreasonable" which occurs when the application fails to

6

establish a minimum nexus between the alleged offense and the online account to seize.
However, the Court applied the wrong legal standard for this determination.

The Court found that the Google search warrant application "contain[ed] information
connecting Defendant's electronic devices to the crime alleged: The warrant application
explicitly connected the Wikileaks leak to Defendant's Google account (namely, he used it to
contact former CIA colleagues to discuss the leak, see Def.'s Omnibus Mem. Ex. A, at 26-27)."
Order at 8. However, the Court is mistaken—the minimum nexus requires a connection between
the **_alleged criminal behavior_**—i.e. illegal transmission of NDI—and the Google Account.
"There must, of course, be a nexus… between the item to be seized and criminal behavior."
*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ; see also *United States v.
Roman*, 942 F.3d 43, 54 (1st Cir. 2019) (The affidavit failed to establish "a clear and substantial
connection between the illegal activity and the place searched; rather, the government's
argument relies upon speculative inferences piled upon inferences"). Sending text messages and
calling individuals to discuss the event after it occurred—and became widespread national
news—is not criminal behavior, and in no way links the **crime of illegal transmission of NDI** to
the **Google Account** used to send those *lawful* text messages and phone calls.

"The critical element in a reasonable search is not that the owner of property is suspected
of crime, but that there is reasonable cause to believe that the specific 'things' to be searched for
and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436
U.S. 547, 556 (1978). See, e.g. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)
("To establish probable cause to search a residence, two factual showings are necessary—first,
that a crime was committed, and second, that there is probable cause to believe that evidence of
such crime is located at the residence."). That Mr. Schulte texted and called former colleagues

7

does not establish probable cause to believe evidence of transmitting NDI would exist on his phone or associated Google account. Indeed, even if Mr. Schulte texted and called his former colleagues to admit guilt, this still would not have constituted a probable cause nexus to the Google Account.

Ultimately, the resulting search warrant application for the Google Account fails to establish even a minimum factual nexus between the alleged crime of unlawful transmission of NDI and the Google Account to seize. There is not only no probable cause at all, but the search warrant application is a bare bones affidavit so lacking in indicia of probable cause as to render belief in its existence unreasonable. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found **in a particular place**. And the duty of a reviewing court is simply to ensure that the magistrate has a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (emphasis added); see also *United States v. Christian*, 893 F.3d 846, 866 (6th Cir. 2018) ("the affidavit falls short because it does not provide any 'particularized facts' connecting the Residence to drug activity at the time that the search warrant was executed.")

Accordingly, the Court should reverse and suppress the unconstitutional Google search.

**B.      The search warrant application did not establish probable cause to seize Mr. Schulte's email, pictures, browsing history, or any other information unrelated to the phone calls**

Even if the Court somehow concludes that individuals who discuss national news related to leaks of classified information automatically establishes probable cause that they were

8

somehow involved along with whatever mechanism they used for the lawful communication, there was absolutely no nexus or particularity established to search the broad spectrum of data sought by the warrant. The warrant was "so facially deficient that reliance upon it was completely unreasonable." The fact that Mr. Schulte sent text messages and phone calls about the WikiLeaks disclosures cannot possibly establish probable cause to search his email, pictures, browsing history, or any other information completely unrelated to those calls and texts.

While the Court claims that "the warrant in fact lists specific categories of information sought, defined in relation to the subject offenses described in the warrant," *Id.* at 8, these "specific categories of information sought" are merely the enumeration of *everything* Google possessed, and do not relate the information sought back to the probable cause as required by law. Thus, the Court misapplied the relevant law.

"An otherwise unobjectionable description of the object to be seized is defective if it is broader than can be justified by **'the probable cause upon which the warrant is based.'"** *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting 2 Wayne R. LaFave, *Search and Seizure* § 4.6(a) (5th ed. 2012)); see also *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) (ordering blanket suppression where, "as interpreted and executed by the [searching] agents, the warrant became an instrument for conducting a general search"). The Google warrant, supposedly based entirely upon the fact that Mr. Schulte called and texted former coworkers about the national WikiLeaks news, does not support the seizure of emails, pictures, browsing history, or literally anything at all that is not related to the lawful texting and calling—the predicate for probable cause.

Accordingly, the Court should reverse and suppress the unconstitutional Google search.

9

## V.    MOTION FOR BIFURCATION

While the Court posits that severance is too drastic a solution, it does not explain how bifurcation is not a valid compromise. There can be no question that the government's goal with the MCC Counts is to prejudice Mr. Schulte by showing the jury he is incarcerated and presumed guilty, and otherwise tainting the jury with its absurd fantasy regarding "information wars" to disclose classified information and deliberately injure the government. The MCC Counts are not remotely similar to the Espionage Counts, and should be tried separately in a bifurcated trial.

To the extent that the court claimed Mr. Schulte did not offer "a particularized showing… concerning the testimony the defendant wishes to give," Order at 10, Mr. Schulte did offer such a showing. But, regardless, attached is an *ex parte* affidavit of the "specific testimony he want[s] to give regarding the incident giving rise to [one set of the] counts." *United States v. Sampson*, 385 F.3d 183, 190-91 (2d Cir. 2004) (concluding that severance was justified based on defendant's affidavit). See Ex. A.

Accordingly, this Court should reverse and order bifurcation of the MCC Counts from the WikiLeaks Counts.

## VI.    MOTION TO SUPPRESS NON-RESPONSIVE AND ATTORNEY-CLIENT PRIVILEGED DOCUMENTS SEIZED FROM MCC

### A.    Seizure and search of Non-Responsive documents

The Court is incorrect in both law and fact concerning the seizure of non-responsive documents. Mr. Schulte's argument was not simply that the documents are not responsive because they are not one of the "9 specific documents" listed in the warrant, but also that the documents were not related to NDI. See Def's Omnibus Reply, at 16-17:

10

Moreover, even if the Court agrees that the government can execute a general warrant, the warrant clearly specifies that the documents must pertain to NDI. Yet, the government never sorted the documents into responsive and non-responsive documents. Instead, the greedy government seized and read each and every word Mr. Schulte wrote, hoping to twist his words into anything they could use against him. This is not what a search warrant authorizes. None of the documents mention NDI or are related to NDI whatsoever.

Malware of the Mind, the "Information War," "$50 Billion," Passwords page, and all other seized documents from the MCC simply do not pertain to NDI, and therefore are not responsive to the MCC warrant.

Next, the Court is incorrect on the law regarding the general search of "[a]ny and all notes, documents, records, correspondence, or materials." The search warrant application provides no reason to search any hardcopy documents—it establishes, at the very most, that "classified" information may exist on the contraband cellphones. The relevant case here is *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017); as the Court stated in its Order, [t]he Court in Griffith held that a warrant to search a suspect's home for his cell phone and other electronic devices was not supported by probable cause, and the good faith exception did not apply, where the warrant application 'offered almost no reason to suspect that Griffith in fact owned a cell phone, or that any phone or other device containing incriminating information would be found in his apartment.'" Order at 7-8 (quoting *Griffith* at 1268). Similarly, here, the government offered no reason to suspect that Mr. Schulte possessed notebooks or any hardcopy documents, much less that they would likely contain incriminating information. At most, the government proffered only that contraband cellphones may contain incriminating information,

11

but this does not authorize an overbroad search of anything and everything the FBI could get its hands on. "And enshrined in the Fourth Amendment is the fundamental principle that the Government cannot come into one's home looking for some papers and, without suspicion of broader criminal wrongdoing, indiscriminately take all papers instead." *Boyd v. United States*, 116 U.S. 616, 626-27 (1886).

Accordingly, the Court should reverse and suppress the non-responsive notebook pages.

## B.    Attorney-Client Privilege of "Malware of the Mind"

The Court is mistaken regarding the facts surrounding "Malware of the Mind." Some of these mistakes are simply because the Court was not privy to the *ex parte* proceedings before the first trial in front of Judge Crotty. The Court states that "[n]otably, however, when the [g]overnment identified portions of this document as evidence it intended to rely on in the first trial, see ECF No. 257 at 13-14, Defendant did not assert that they were protected by attorney-client privilege despite asserting that other seized documents were privileged." Order at 12.

As an initial matter, Mr. Schulte and his counsel notified the government multiple times that it believed both the MCC Notebooks and Malware of the Mind were protected by attorney-client privilege. See *Memorandum of Law in Support of Defendant Joshua Adam Schulte's Motion to Suppress Evidence Seized from the Metropolitan Correctional Center*, Dkt. 98, at 19 (June 18, 2019):

Like the information seized in *Clark*, Mr. Schulte's narrative writings and diary entries contain information he "considered to be relevant to his potential legal remedies." For example, in a 133-page document entitled "Malware of the Mind," which Mr. Schulte wrote for and shared with counsel, he articulated legal arguments as to why he believed

12

the FBI's warrants to search his devices were illegal. But the wall team improperly failed to redact this document as privileged and subsequently turned it over to the prosecution.

Moreover, the Court's assertion that Mr. Schulte "proffers no evidence to corroborate [his claim that Malware of the Mind was privileged]" is also incorrect. Mr. Schulte named paralegal Hannah Sotnick, whom he intends to call at trial. There are also multiple *ex parte* letters and hearings, as discussed in more detail below. The Court should, at the very least, hold an evidentiary hearing if these facts are in dispute.

Next, the Court concluded "that any privilege was waived by Defendant's failure to assert it prior to trial." Order at 13. But the Court itself recognized that Mr. Schulte did raise the privilege prior to trial, *Id.*, Dkt. 242 at 23 ("Mr. Schulte's MCC notebooks and the "malware" article are privileged and therefore inadmissible."). And contrary to the Court's Order, Mr. Schulte's counsel continued to claim Malware of the Mind was privileged and sought wholesale suppression of the entire document. See Dkt. 282 at 2 ("The Court should exclude the notebooks in their entirety").

Regarding the Court's final false assertion, that counsel did not "press the theory raised here, that he sent a draft of the article to his attorneys to seek legal advice," the error is not the Court's fault, as he was not presiding during these issues before the first trial. However, counsel sent the Court multiple *ex parte* letters regarding the privilege and conflict-of-interest. Most notably is the record of the *Curcio* Hearing conducted on December 18, 2019, and particularly the *ex parte* sealed side bar (attached here as *ex parte* Exhibit B). Note the following at 5-8:

THE COURT: Thank [sic] for coming.

MR. MAHER: Of course.

13

MR. ZAS: Judge, just to make clear the ground rules here, our understanding is what we are about to tell you is privileged; it is not for the government's ears.

THE COURT: Right.

MS. SHROFF: There has been no waiver of privilege by Mr. Schulte.

MR. ZAS: That's right. We are not intending to waive but we want you to know.

[…]

MR. ZAS: With respect to the document that people have referred to as Malware of the Mind.

THE COURT: Yes.

MR. ZAS: That was a document that Mr. Schulte had prepared himself at the prison.

THE COURT: Right.

MR. ZAS: At some point he gave the original of that document to a paralegal who was then working in our office. The paralegal took that document back to our office, scanned it into our computer system, put a copy in Ms. Shroff's inbox and I think put a copy in the file, and then returned the original document to Mr. Schulte in the prison.

So, what I just told you could become relevant as bearing on whether he intended to disclose it publicly, whether he was using counsel to get advice on whether there was anything improper about keeping and disclosing it.

[…]

THE COURT: Mr. Larsen can testify to that and so can Mr. Schulte.

MS. SHROFF: No. Mr. Larsen could not testify to the Malware of the Mind. Only the Federal Defenders office and I could testify to Malware of the Mind.

14

Thus, Mr. Schulte's attorneys clearly raised the privilege of Malware of the Mind multiple times before trial, and the record clearly corroborates Mr. Schulte's declaration that he sent the document to his attorneys for advice. Mr. Schulte has definitively proven that the communication of Malware of the Mind was (1) between a client and his attorney (2) that were intended to be, and in fact were, kept confidential—the government does not dispute or provide any evidence that Malware of the Mind was ever disclosed to anyone other than Mr. Schulte's counsel—and (3) for the purpose of obtaining and providing legal advice. Accordingly, the Court should reverse, deem Malware of the Mind privileged, and suppress it at trial. Alternatively, the Court should hold an evidentiary hearing.

## C.   Attorney-Client Privileged Notebook Excerpts

The Court is incorrect in law and fact regarding the notebooks. As stated above, counsel previously moved for blanket suppression of the notebooks, thus the specific privilege arguments were not waived.

### 1.   Memorialization of private conversations with attorneys are protected

The Court is incorrect in law regarding the memorialization of private conversations with attorneys. "The memorializations of private conversations [defendant] had with her attorney are protected from disclosure by the attorney-client privilege." *United States v. DeFonte*, 441 F.3d 92, 95 (2d Cir. 2006).

The $50 billion statement, GX 809 p. 2 and GX 806 p. 4, is a direct, verbatim memorialization of a private conversation between Mr. Schulte and Ms. Shroff. See Def.'s Omnibus Mem. at 63, Ex. G-1, and Ex. G-2 (the government properly redacted the bottom half of the page and proceeding pages, but failed to redact the top half from the same

15

memorialization). Accordingly, the $50 billion statement is protected by attorney-client privilege
and must be suppressed.

**2.      Writings that were discussed with attorneys are protected**

The Court is incorrect in law regarding specific writings that were written for, and

ultimately discussed with, counsel. See *United States v. Defonte*, 441 F.3d at 96 (finding

attorney-client privilege would apply to writings from a journal that has been taken from an

inmate's cell at the MCC so long as those writings were an outline of what the inmate wished to,

and ultimately did, discuss with counsel).

GX 806 p. 1, regarding WikiLeaks, forensics, and specific software is clearly related to

Mr. Schulte's defense, and was written and communicated directly with counsel. The Passwords

Page, GX 809 p. 6 and GX 806 p. 8, was likewise written and communicated directly with

counsel. Accordingly, these notebook entries must be suppressed.

**3.      Media campaign and legal advice regarding disclosure is protected**

The Court is incorrect in law regarding media campaigns. While the Court notes that "[a]

media campaign is not a litigation strategy," Order at 14, writing about such a strategy

specifically to ask counsel if it is protected by privilege or lawful is itself protected by privilege.

Mr. Schulte did not attend law school, and had no legal training regarding attorney-client

privilege. He wanted to assist in his defense as much as possible, and thought of engaging in a

media campaign. He wanted to discuss this *idea* with counsel, particularly whether it was

protected by privilege, lawful, whether they would assist, and advice as to which documents

could be disclosed without harm to the defense. There can be no question that inquiring into the

legality and feasibility of such a venture is protected by attorney-client privilege. The privilege

functions to "encourage attorneys and their clients to communicate fully and frankly and thereby

16

to promote broader public interests in the observance of law and administration of justice."
*ACLU v. NSA*, 925 F.3d 576, 589 (2d Cir. 2019) (quoting *Pritchard v. County of Erie (In re County of Erie)*, 473 F.3d 413, 418 (2d Cir. 2007); see also *Upjohn Co. v. United States*, 449
U.S. 383, 389 (1981) (explaining that one purpose of the privilege is "to encourage clients to
make full disclosure to their attorneys" (internal quotation marks omitted)).

Since Mr. Schulte did not know whether a media campaign would be lawful, privileged,
or helpful to his case, how could he possibly find out without asking? This Court cannot expect
defendants to possess full legal knowledge *a priori*. This Court cannot prejudice Mr. Schulte for
engaging in a full and frank conversation with his attorneys and asking questions—how could he
otherwise know the answer without asking?

Accordingly, all notes written regarding the media campaign, which were communicated
to counsel, are protected by attorney-client privilege, including the "Information War" comment
(GX 809 p. 3-4, 7-8, 14-16; GX 806 p. 5-6, 9-10, 16-18) and GX 806 p. 2-3.

## VII.  CONCLUSION

The court should reconsider its Order, reverse its decision, and grant Mr. Schulte's
motion (1) to suppress the attorney-client privileged email; (2) to suppress evidence seized from
Google; (3) for bifurcation of trial; and (4) to suppress non-responsive and attorney-client
privileged documents seized from MCC.

Dated: New York, New York

January 24, 2022

Respectfully submitted,

Joshua Adam Schulte

17