M6eWsch1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6               Defendant.
                                         Trial
7   ------------------------------x

8                                        New York, N.Y.
                                         June 14, 2022
9                                        9:00 a.m.

10  Before:

11
                        HON. JESSE M. FURMAN,
12
                                         District Judge
13                                       -- and a Jury --

14                      APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  DAVID W. DENTON JR.
17       MICHAEL D. LOCKARD
         Assistant United States Attorneys
18

19  JOSHUA A. SCHULTE, Defendant Pro Se

20

21  SABRINA P. SHROFF
    DEBORAH A. COLSON
22       Standby Attorneys for Defendant

23  Also Present:  Charlotte Cooper, Paralegal Specialist

24

25
```

M6eWsch1

1          (Trial resumed)

2          THE COURT:  You may be seated.

3          Good morning, everyone.  I think we have all but one

4    of the jurors that we were expecting, so we're in relatively

5    good shape on that.

6          Before we start, anything to discuss?  Any update on

7    the 6(c) situation?

8          MR. DENTON:  Yes, your Honor.

9          We have a proposed stipulation with respect to the

10   two, I think, outstanding item, the portion of the Michael

11   memorandum and the portions of the one document -- I guess it's

12   two documents relating to Count Three that we discussed

13   yesterday.  We've just given a copy of that to the defendant.

14   We're happy to hand up a copy to the Court as well.  So we're

15   optimistic that we'll be able to resolve it that way.

16         THE COURT:  OK.  Your suggestions for how we handle

17   it; if it will require a classified hearing to discuss any of

18   the particulars?  If so, I guess one option would be to do that

19   in the break between finishing jury selection and the openings,

20   so that everybody's on the same page for openings.

21         MR. DENTON:  That's certainly an option, your Honor.

22   We literally just had a chance to give it to the defendant, so

23   he certainly needs a chance to take a look at it.  I think

24   we're happy to proceed however the Court would like on that

25   score.

M6eWsch1

1          THE COURT:  All right.  Anything else from you?

2          MR. DENTON:  I think the only other thing we'll note,

3    your Honor, is -- and Mr. Lockard can address this in more

4    detail if necessary, because he's going to be putting on

5    Special Agent Evanchec.  Among the exhibits that the defendant

6    has provided us are large compendiums of the 3500 for Special

7    Agent Evanchec and some of the other witnesses.  Obviously,

8    there are sort of particular rules and circumstances under

9    which a witness's prior statements are admissible.

10          THE COURT:  Tell you what.  Let's hold that until

11   after jury selection.

12          MR. DENTON:  That's fine, your Honor.

13          THE COURT:  Mr. Schulte, I'm assuming you haven't had

14   an opportunity to look at the proposed stipulations, but I

15   would love, before we break, to have a sense of whether we need

16   to have a classified hearing or not, whether there's any issues

17   for me to discuss, because that'll have some bearing on how

18   long the break is between when we finish jury selection and

19   when we can begin openings.  So if you're not in a position to

20   tell me now, before we break, I would like a better sense if

21   you're able to do that.

22          (Defendant conferred with standby counsel).

23          MR. SCHULTE:  I'm sorry.  Are you talking about the

24   stipulations?

25          THE COURT:  Yes.

M6eWsch1

1          MR. SCHULTE:  Yeah.  I don't think there's going to

2     be -- it's on the record, right?  That I don't agree or I

3     don't -- I object to them coming in, but the Court has said

4     you've made your ruling, and it's on the record that I'll sign

5     it, doesn't mean I consent.  Right?

6          THE COURT:  We're talking about different

7     stipulations.  I'm referring to the two new ones that

8     Mr. Denton just referred to, both of which pertain to

9     classified information, one that we discussed yesterday in the

10    classified hearing, and the other that pertains to the Michael

11    memorandum.

12         MR. SCHULTE:  OK.  They just handed them to me.  I

13    haven't read them at all.

14         THE COURT:  Right.  I understand that.

15         MR. SCHULTE:  Oh, OK.

16         THE COURT:  Before we break with the jury, I think I

17    just need to get a better sense of whether we need to have a

18    classified hearing or not so I know how long the break needs to

19    be and what we're going to do during the break.

20         MR. SCHULTE:  OK.

21         THE COURT:  If you have a chance to look at them and

22    we can discuss that before the break, that would be ideal.  If

23    it means giving you a couple more minutes beyond what you need

24    for your peremptory challenges, then I'm prepared to do that.

25         Anything else that you need to raise?

M6eWsch1

1          MR. SCHULTE:  Yes.  I just had, on the same token,

2     once we finish here and we go down to the courtroom, I'd just

3     ask for 20-, 30-minute adjournment for us to figure out the

4     computer situation with the exhibits and stuff, since I haven't

5     had a chance to be able to go through all that yet.

6          THE COURT:  All right.  Well, I don't know if I can

7     give you 20 or 30 minutes, but let's see where we get to.  If

8     we get to the point where the jury -- I didn't tell the jury to

9     bring any lunch, so I do need to give them a longer lunch

10     period today than I would normally give them during trial.  At

11     the same time, I have to end at 3:00 today.  I have a hard stop

12     and just can't go past three.  Certainly a lot of things.

13     We'll see where things stand, and I'll try to give you as much

14     time as I reasonably can, but we also need to resolve these

15     remaining issues.  I will try to do that.  Remind me, and I

16     will certainly try.

17          Anything else?

18          MR. SCHULTE:  No.  That's it.

19          THE COURT:  All right.  Great.  When Mr. Lee gets

20     back, we'll see if that last juror is here, and then we can

21     pick up where we left off.

22          (Continued on next page)

23

24

25

M6eWsch1

1           THE COURT:  You may be seated.

2           All right.  Anything for us to discuss before I bring

3      the jury up for preliminary instructions?

4           Mr. Denton, anything from you?

5           MR. DENTON:  Your intention was to take up other

6      issues after letting them go for lunch, right, your Honor?

7           THE COURT:  I think so, but I would like to have a

8      sense of what the nature and scope of those issues are so that

9      I have a sense of how much time to tell them.

10          MR. DENTON:  That's fine with us, your Honor.

11          THE COURT:  Well, what are the issues?  That's my

12     point.  I need to know.

13          MR. DENTON:  I think that's really a question for

14     Mr. Schulte.

15          THE COURT:  OK.  But you don't have any independent

16     issues to raise in that break.

17          MR. LOCKARD:  It may depend, your Honor, as to how our

18     discussions with Mr. Schulte about the stipulations that we'll

19     need before the first witness takes the stand, but -- so maybe

20     yes, maybe no.

21          THE COURT:  OK.  One question.  Somebody at some point

22     said something about reserved seats for the parties in the

23     courtroom and/or the CIA, etc.  Is there any need for that?

24          I would anticipate that the courtroom is not going to

25     be filled to capacity except, perhaps, during jury addresses.

M6eWsch1

1          MR. LOCKARD:  I don't think we're aware of that issue,

2     your Honor.

3          THE COURT:  OK.  Just so you guys know, we do have an

4     overflow courtroom.  I think it's 20B.  Is that correct?

5          20B is the overflow courtroom if you want to let folks

6     know.

7          Mr. Schulte, issues to discuss on your end?  I guess

8     what do you have to say about the stipulations that the

9     government gave you this morning?

10          MR. SCHULTE:  Yeah.  So, I'm going through them now,

11     and the ones from the last trial, I signed those.  And I'm

12     going through and working with counsel, standby counsel.  We've

13     signed a number of them and have some recommended changes for

14     some of them.  As soon as we're finished going through all of

15     it, we'll give it to the government and then we'll see what the

16     government wants to do.

17          THE COURT:  OK.  I guess what I need an understanding

18     of is which of these, if any, I need resolved before openings.

19     I had thought the stipulation that would address the classified

20     evidence that Mr. Schulte had noticed with respect to making

21     the public disclosure argument, I imagine that's something that

22     both sides would want to know before we open, what form, if

23     any, that evidence is coming in.  Am I wrong about that?

24          MR. DENTON:  No, your Honor.  We'd like that resolved.

25          THE COURT:  OK.  And what about the Michael

M6eWsch1

memorandum; can that wait?

        MR. DENTON:  Probably, your Honor, yes.

        THE COURT:  OK.

        Mr. Schulte, from your perspective, I guess, No. 1, I don't know if you have had a chance to read through the stipulation concerning the public disclosure evidence, but if you haven't, why don't you take a minute and do that so that we can then discuss whether and what kind of discussion we need to have.  Or if it's just a wordsmithing issue that you can sort out with the government, I'm happy to leave that for later.

        MR. SCHULTE:  OK.  Yeah, I'll take a look now.

        THE COURT:  OK.  And from your perspective, are there any other matters that we need to resolve before openings?

        MR. SCHULTE:  Yes, just the -- working on the technical thing, to figure out how exactly we'll, I'll be able to do the exhibits and stuff.  But besides that, nothing else.

        THE COURT:  OK.  My hope is to give you some time to do that during our break, but again, I need a sense of whether we're going to need to have a proceeding, and if so, whether it needs to be in a closed session.  So if you could take a look at that one stipulation now and then let me know when you're ready to discuss it, that would be helpful.

        MR. SCHULTE:  OK.

        All right.  I think we've had time to review the document.

M6eWsch1

1          THE COURT:  OK.

2          MR. SCHULTE:  The stipulation.

3          THE COURT:  And?

4          MR. SCHULTE:  And, you know, I take the position that

5    this stipulation, it doesn't allow me substantially the same

6    ability to make the same defense.  It's not an adequate

7    substitution.  Because it sanitizes the information, it

8    prevents me from presenting the actual documents to the jury.

9    There's multiple documents.  The page numbers, even if other

10   information is redacted in those, being able to present all --

11   you know, multiple documents that have this content along with,

12   you know, multiple other statements.

13          And then I wanted to quote that the Second Circuit

14   said, in *United States v. Wilson*, 750 F.2d 79, 1984, "normal

15   evidentiary principles govern the admissibility of classified

16   evidence."  So I think that, you know, given this, to the

17   degree that the government wants to do a wholesale redaction to

18   the original document, I think that's better, and I'm able to

19   present, you know, my case better and -- to the jury in that

20   way.

21          THE COURT:  OK.  I could be wrong, but -- I take no

22   issue with the principle that you quoted from *Wilson*, but I

23   think that's at the 6(a) stage of the CIPA process.  I've made

24   the determination that the evidence that you're seeking to

25   offer is relevant and admissible, and now we're in 6(c) land,

M6eWsch1

1    where the government can propose a stipulation or redaction and

2    if I find that it does substantially allow you to make the

3    defense that -- you know the relevant language -- then I think

4    I'm required to accept it.  So the fact that you would prefer

5    to use the evidence in a different form, that alone doesn't cut

6    it.  And I don't think redaction here -- I'll hear from

7    Mr. Denton, but I think the concern and problem with redaction

8    is if a document is redacted, that a member of the public could

9    compare the redacted document with the one that's admitted at

10   trial and very easily then -- No. 1, it would confirm that

11   that's an official document, which the government has not to

12   date done, and is itself a problem; and No. 2, the public would

13   very easily see the portions that are redacted from what would

14   then be confirmed to be an official document.  I think that's

15   the source of the problem with respect to doing a redaction.

16           Mr. Denton.

17           (Continued on next page)

18

19

20

21

22

23

24

25

M6E5sch2

1          MR. DENTON:  That, and your Honor, the fact that there

2     is large quantities of information that are irrelevant, we

3     would end up with large documents with page, after page, after

4     page, redacted only to get to a small snippet, I think from an

5     evidentiary perspective we thought this was more efficient as

6     well.

7          THE COURT:  So to the extent that you can address it

8     in this setting, Mr. Schulte, is there another argument as to

9     why this would affect your ability to make the defense that

10    you --

11         MR. SCHULTE:  Yes.  I mean, I think that's the point

12    though, is that having the large document to present how much

13    information that was disclosed and there is multiple documents,

14    too, so it is not just one.  So this page kind of makes it seem

15    it is all from the same document but basically showing there is

16    multiple documents from the release and showing the length of

17    the document, 50 pages, 60 pages, even if a lot of it is

18    redacted, I think that that's -- I want to be able to make that

19    same defense with this stipulation.

20         And as to the Court's earlier point, I mean, the

21    government is charging me with the disclosure of this in saying

22    that it is from the CIA so I am sure they already recognize

23    that it comes from the CIA so to the degree that everything

24    else in there is redacted I don't think that says anything to

25    the public because it's -- right -- it's the government is

1    saying all of this stuff is still classified anyway so if you

2    redacted everything except for the stuff that is relevant here,

3    I don't think that gives away anything.  Right?

4            THE COURT:  So I think that's a misconception.

5            My understanding is that, yes, you are being

6    prosecuted for disclosure of national defense information and

7    in that sense the government has obviously acknowledged that

8    some portion of what appears at Vault 7 and Vault 8 is genuine

9    national defense information and it needs to prove that to the

10   satisfaction of the jury to convict you, but I think the

11   government has relied on the fact that it has never

12   acknowledged that all of Vault 7 and Vault 8 are actual,

13   legitimate, non-altered CIA documents and in that sense

14   requiring them to identify one as an official document, let

15   alone singling it out, I think are the sources of harm that

16   could flow here.

17           MR. SCHULTE:  Well, I think there is -- that brings up

18   a very major issue because the government is introducing

19   Government Exhibit 1 as a classified exhibit and they are

20   taking all of this stuff from WikiLeaks and giving it to the

21   jury and saying this is the classified information he released.

22   So to the degree the government is trying to say that some of

23   the documents are not legitimate CIA documents, that's a

24   critical piece that the defense needs to know and they

25   obviously can't present those documents to the jury.  And then,

1    if some of those documents are not actually NDI or come from

2    the CIA, I think I need to know that so that the defense can

3    raise a proper defense about those documents.

4              THE COURT:  I wouldn't think so.  My understanding is

5    it has never been disputed that some, if not the vast majority

6    of Government Exhibit 12, qualifies as NDI.  I understand the

7    critical issue with respect to the WikiLeaks charges as whether

8    you were in fact the person who stole it and leaked it.  By

9    contrast, I think the MCC charges are a little bit more

10   complicated because of the public disclosure issues and for

11   that reason the government has now narrowed its theory of the

12   case and is identifying the particular information that it

13   alleges is NDI.  So I think there it is certainly important for

14   the jury to understand what they need to decide is NDI for the

15   first charges.  Obviously they do need to make a finding that

16   some of Government Exhibit 1 constitutes NDI but, number one, I

17   don't think that that requires going through the entirety of it

18   and identifying what is and isn't; and number two, you will be

19   able to make the argument if you want to make it that none of

20   it is NDI -- but that doesn't strike me as a very winning

21   argument and doesn't strike me as one that you have even

22   disputed to date, but.

23             MR. SCHULTE:  Yes.  So I think, you know, the point is

24   that the government is trying to say that not all the documents

25   from the WikiLeaks disclosure are CIA documents but at the same

M6E5sch2

1    token they're providing those documents to the jury and saying

2    this is NDI that was released by WikiLeaks and that these are

3    CIA documents.  There is a clear contradiction here.  That's

4    why this has never been argued before because, you are right,

5    it was never -- it was never really a legitimate argument

6    because -- but to the degree that the government is now saying

7    that some of those documents are not legitimate CIA documents,

8    they shouldn't be allowed to present those documents to the

9    jury and say that this is NDI.  Right?  I mean, that's the

10   problem now, is they've never said this before so this is the

11   reason that they're saying that we can't introduce some of this

12   stuff for the MCC counts.  Then the problem comes back to the

13   WikiLeaks count.  They're saying some of this stuff is not NDI,

14   it is not real CIA documents, the defense needs to know that

15   and those documents can't be presented to the jury.

16             THE COURT:  Mr. Denton?

17             MR. DENTON:  Your Honor, we are way off course here.

18   The stipulation that the government proposed quotes the exact

19   language that the defendant identified as the material that he

20   sought to use with one redaction consistent with the broader

21   section 6(c) redactions applied to all of the documents in this

22   case.  I think again, beyond that, there is nothing here to

23   discuss.  This clearly provides them with the information that

24   he asked for and that the Court determined was relevant.  It is

25   the exact language.  There really is no argument here.

M6E5sch2

1    THE COURT:  And I think we are a little bit off course

2  which is to say that Mr. Schulte is now raising a different

3  issue just with respect to Government Exhibit 1.  I'm not

4  necessarily going to revisit my ruling on that but do you want

5  to just respond to that?

6    MR. DENTON:  The material contained on Government

7  Exhibit 1 is classified.  The fact that the government has not

8  publicly acknowledged that it is all CIA material or identified

9  every particular page as CIA material is immaterial to that.

10  The NDI that he is alleged to have stolen and transmitted is

11  actually the original source material from the CIA which has

12  always been acknowledged to be NDI.  There is really no issue

13  about sort of what in, with the WikiLeaks disclosures, is and

14  is not.  There are certainly parts of it that are not CIA

15  documents.  The defendant knows that.  There are parts of it

16  that include the WikiLeaks documents like WikiLeaks cover pages

17  for these things.

18    So again, the parsing of those specific components is

19  not really relevant here.

20    THE COURT:  I agree, so I think there is no reason or

21  need to revisit Government Exhibit 1.  Obviously, the

22  government bears the burden of proving beyond a reasonable

23  doubt that the information at issue is NDI and to the extent

24  that it fails to do so, then I will either grant a Rule 29

25  motion or the jury will return a verdict in defendant's favor

1   but I don't think that on the WikiLeaks charges there is a need

2   to disentangle what is contained in Government Exhibit 1, or at

3   least based on what I expect the evidence to be I don't think

4   there will be such a need.

5          With respect to the issue that was raised, namely the

6   stipulation, again, we are in 6(c) land, I have already made

7   the determination that the evidence that Mr. Schulte wishes to

8   use is relevant and admissible which is the language that he

9   quoted from Wilson.  I, at this stage, my task is to decide

10  whether this stipulation provides the defendant with

11  substantially the same ability to make his defense as would

12  disclosure of the specific classified information and I do so

13  find.

14         Fundamentally, the argument that Mr. Schulte wants to

15  make is that this particular piece of information that he is

16  alleged to have leaked is as part of the MCC counts was

17  previously publicly disclosed as part of the WikiLeaks leak.

18  This allows him to do that and it is a stipulation identifying

19  the precise issues or language that he himself identified when

20  I tasked him with doing so and it states that it is available,

21  publicly, on the Vault 7 release.

22         So I think on the basis of this he can make precisely

23  the argument that he has been seeking to make that I have said

24  he can make.  I don't think that there is any need for the

25  original documents let alone the redacted documents, the length

M6E5sch2

1    of those documents, the number of those documents, those are

2    not relevant issues, it is whether the information was publicly

3    disclosed.  That is the relevant and probative issue and this

4    allows him to make that argument.  He doesn't need to show a

5    redacted document to the jury to make that argument and if,

6    indeed, a redacted document was shown to the jury, I would

7    instruct the jury that it should not speculate as to what has

8    been redacted and consider the redacted materials in any way,

9    shape, or form.  So, by definition, the redacted materials

10   would be irrelevant to the jury's consideration.

11        So all of that is to say that I will grant the

12   government's motion under 6(c) and we will proceed with this

13   stipulation and that resolves the public disclosure issues

14   subject to my potentially revisiting one of those issues as

15   discussed in the classified session yesterday.

16        Unless there is anything further to discuss, I will

17   have the jury brought up in a moment and we can proceed with my

18   preliminary instructions.  I anticipate those would take 20 or

19   30 minutes.  At that point my plan would be to take a break.  I

20   think it would make sense, if the marshals are OK, letting

21   Mr. Schulte remain in the courtroom for 15 or 20 minutes to get

22   familiar with the computer system and make sure it is working

23   and then we can reconvene for opening statements after that

24   break.

25        The marshals are nodding their heads so I trust that

M6E5sch2

1      that's OK.

2            Anything else to discuss?  Otherwise, we will get the

3      jury and a wait their arrival.  All right?  Let's do that.

4      While we are going to get them just one note.  I was looking at

5      who is on the jury and there are date conflicts.  Two of them

6      had mentioned that they had plans over the July 4th weekend;

7      one who was planning to leave on the 30th and be out on the

8      1st -- 30th and the 1st; the other who was going to be out has

9      travel plans from the 1st to the 5th.  My inclination would be

10     to ask them -- well, I think I am inclined to say maybe we

11     should just not have court on July 1st, which is the day before

12     the long weekend and that would, I am sure, make everybody

13     happy including perhaps you, and also mitigate the conflicts

14     with their travel plans and then ask them to conform their

15     travel plans to that.  I think that would hopefully address

16     those two.

17           The only other one that we may need to deal with and I

18     will ask her if she can accommodate us is the juror who has the

19     dress fitting in Oregon and was supposed to be there from July

20     10th to 17th.  She did indicate that she might be able to

21     change that so I am going to start there and hope for the best.

22           Any questions, concerns, objections to proceeding in

23     that manner?

24           MR. DENTON:  No, your Honor.  I think we have some

25     hope that the July 10th would not be an issue but understand if

M6E5sch2

1    the Court wants to raise it now so that she has time to plan.

2              THE COURT:  All right.

3              (pause)

4              THE COURT:  All right.  The jury will be entering in

5    one moment.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6E5sch2

1          (Jury present)

2          THE COURT:  You may be seated.

3          Actually, if I could ask jurors no. 13 through 16,

4    could you slide over one seat?  Both to make sure that everyone

5    can see the witness stand and also, juror 13, that conveniently

6    means there is an empty seat next to you so if you would like

7    to put your legs up to stretch, you are welcome to do so.

8          Welcome back, ladies and gentlemen -- or welcome to

9    the courtroom that we will be using for trial in this matter

10   and we will be spending a fair bit of time here in the coming

11   weeks.  I am going to give you some you preliminary

12   instructions in a moment and then we are going to take a break

13   before we commence with what follows but I will explain more

14   about that in a moment.  But at this time, I would ask you to

15   please rise and raise your right hand so that we can administer

16   the oath to you.

17         (Whereupon, a jury of 12 jurors and 4 alternates was

18   impaneled and sworn)

19         THE COURT:  So this case is now officially on trial.

20   As I stated earlier, the trial is scheduled to last up to five

21   weeks, give or take.  Candidly, it is very hard to predict

22   these things, that's my best estimate at the moment.  I will

23   give you updates on a regular basis when I can, but I assure

24   you that I will do everything that I can -- and I have plenty

25   of powers at my disposal -- to make sure that we make as

M6E5sch2

1     efficient and effective use of your time as we can.

2             A couple things to note on the schedule.  A couple of

3     you mentioned that you do have travel over the July 4th

4     weekend.  I think what I am going to do is the following:  At

5     the moment, what I will say is we are not going to sit on

6     Friday, July 1st.  I am guessing those of you who don't have

7     travel won't begrudge that and will enjoy that day.  If those

8     of you who do have travel around that weekend can change your

9     travel plans so that you don't have to miss or you wouldn't

10    miss the 30th or the 5th -- I know that that changes your plans

11    a little bit -- I would very much appreciate it.  You do need

12    to be here for every trial day.  So, please, make your best

13    efforts to conform your travel plans to that schedule.  I am

14    trying to accommodate you as much as I can without making the

15    trial even longer so do your best, let my law clerk know, and

16    we will take it from there.

17            I know one of you also had travel plans for later in

18    July.  You had mentioned that you might be able to change that.

19    See if you can.  Also, let my law clerk know and we will take

20    it as it comes.  Depending on how things are going it may be

21    that we are done by then but, obviously, it is hard to know at

22    this point so if you can push it back a few weeks, it would

23    definitely be better.

24            We will start each morning at or as close to 9:00 a.m.

25    as we can to help ensure that we can start on time.  I am going

M6E5sch2

1    to ask you to be in the jury room.  Do not come to this

2    courtroom yourself, you should go to the jury room where you

3    just came from, and please be there by 8:45 at the latest.  As

4    I said to you yesterday, I know some of are you traveling from

5    far away, some of you have to rely on public transportation or

6    have to navigate traffic, just please plan accordingly and

7    maybe build in some extra time at least for the first few

8    mornings as you figure out how much time it takes you to be

9    here to make sure you are here at 8:45 at the latest.  We

10   cannot start until all of you are here.  all right?  I know I

11   said that yesterday and proceeded without a couple of people

12   because we were able to do that for the questioning and they

13   arrived not long thereafter, but we cannot start until all 16

14   of you are here.  So out of respect for one another and because

15   I will do my best to get you out of here as quickly as I can, I

16   need you to do your part, too, and that means being here ready

17   and on time each day ready to go.  So please be back in the

18   jury room each morning and each morning thereafter unless I

19   tell you otherwise by 8:45.

20         As an enticement for you to be on time, I have

21   arranged for some breakfast and coffee for you to be in the

22   jury room.  So hopefully that will be there tomorrow morning

23   and welcome you to the court house.  As I have told you before,

24   as I have told you yesterday, the plan would be to take one

25   lunch break, and only one lunch break during the day.  My guess

M6E5sch2

1    is with getting to and from the room that you are using as your

2    jury room would be somewhere between 30 and 40 minutes,

3    obviously not time for you to get a quick bite to eat, stretch

4    your leg, use the restroom.  That is, you will feel a little

5    bit of a forced march, I assure you, but that's because I am

6    trying to make the most effective use of your time.  So that's

7    the plan and then we will end each day at roughly 2:45 or

8    thereabouts, give or take a few minutes, including, I should

9    note, today.

10         When we get to the parties' summations and my

11   instructions on your deliberations, as I did mention yesterday,

12   I am likely to ask -- or actually require you to be here for

13   longer days but I promise you that I will give you advance

14   warning of when that is likely to come so that you can plan

15   accordingly.

16         Given how short the one break is that we take, you

17   won't be able to go out of the court house or really even the

18   jury room to get food or do anything for that matter so you

19   should bring some sort of snack or a light lunch.  Breakfast

20   may actually be enough to get you through until the end of the

21   day, but bottom line is bring some food to ensure that you can

22   focus for the rest of the day.

23         Now that you have been sworn let me give you some

24   instructions about your duties and responsibilities as jurors.

25   At the end of the trial I will give you more detailed

M6E5sch2

1    instructions and those instructions will govern your

2    deliberations in this case but, for now, let me tell you how

3    the trial will proceed.

4            The first step in the trial which we will begin after

5    my lunch break today will be opening statements.  The

6    government will make an opening statement.  After that I expect

7    the defendant, who I remind you is representing himself, will

8    make an opening statement as well but he is not required to do

9    so and that is because, as I will mention in a moment and you

10   will hear me say on other occasions, the burden rests on the

11   government to prove the defendant's guilt beyond a reasonable

12   doubt.  A defendant in a criminal trial in our system of

13   justice has no burden to do anything whatsoever so that

14   includes making an opening statement.

15           The opening statements are not evidence.  They serve

16   no purpose other than to give you an idea, in advance, of the

17   evidence that each party expects you to hear from the witnesses

18   who will testify and the exhibits that are entered into

19   evidence.  The statements permit each party to tell you a

20   little bit about what the case is all about but the only

21   evidence comes from the witnesses and exhibits.

22           After the opening statements, the government will

23   present its evidence.  The government's evidence will consist

24   of the testimony of witnesses as well as documents and

25   exhibits.  The government will examine its witnesses and the

1    defendant may cross-examine those witnesses.

2           Following the government's case the defendant may

3    present a case, if he wishes to do so.  Again, because of the

4    presumption of innocence and the fact that the burden rests at

5    all times on the government, the defendant is not required to

6    offer any proof.  If the defendant does present a defense case,

7    however, the defense witnesses will testify and the government

8    will have an opportunity to cross-examine them.

9           After the presentation of evidence is complete, the

10   parties will deliver their closing arguments to summarize and

11   interpret the evidence and just as the parties' opening

12   statements are not evidence, their closing arguments are not

13   evidence either.

14          Following closing arguments, I will give you my

15   instructions on the law and then you will retire to deliberate

16   on your verdict which must be unanimous and must be based on

17   the evidence presented at trial.  Your deliberations will be

18   secret, you will never have to explain your verdict to anyone.

19          Under the law, a defendant in a criminal case, as I

20   have mentioned to you, is presumed innocent and cannot be found

21   guilty of the crimes charged unless a jury, after having heard

22   all of the evidence in the case, unanimously decides that the

23   evidence proves the defendant guilty beyond a reasonable doubt.

24   In a criminal case the burden of proof remains with the

25   government -- the prosecution.  For the jury to return a

1    verdict of guilty as to the defendant, the government must

2    prove that the defendant is guilty beyond a reasonable doubt.

3    A person charged with a crime has absolutely no burden to prove

4    that he or she is not guilty and if the defendant chooses not

5    to present any proof, that decision cannot be held against him

6    or her and may not enter into your deliberations at all.  I

7    will, however, instruct you fully on the burden of proof after

8    all of the evidence has been received.

9          Let me say a brief word about the fact that

10    Mr. Schulte is representing himself.  Under the Sixth Amendment

11    to the Constitution of the United States, a defendant in a

12    criminal case has an absolute right to represent himself if he

13    wishes to do so.  Every criminal defendant does have the right

14    to counsel but if he chooses to waive that right, he is

15    entitled to represent himself.  As I have told you, Mr. Schulte

16    has chosen to waive his right to counsel and to represent

17    himself for the duration of the trial.  That means that he will

18    be the one making objections if he believes that the government

19    is offering evidence improperly, he will be the one questioning

20    the witnesses, and he will be the one making his opening

21    statement if he chooses to do so, and any closing argument to

22    you at the conclusion of the trial.

23          As I mentioned, there are lawyers working with

24    Mr. Schulte in a capacity known as standby counsel to assist

25    him if he needs assistance and to help ensure that things run

more smoothly, but the bottom line is that Mr. Schulte is the

one conducting his defense and will control his defense.  You

are not to speculate on the reasons for Mr. Schulte's making

the decision to represent himself.  As I said, under the

Constitution, every criminal defendant has the right to make

that decision and he has made that decision.  You are not to

speculate as to his reasons, nor are you to consider that

decision in any way, shape, or form, in connection with your

deliberations.  In other words, you should evaluate the

evidence as you otherwise would and decide whether the

government has proved Mr. Schulte's guilt beyond a reasonable

doubt.  The burden of proof, as I have said, remains always on

the government.  The fact that Mr. Schulte is now representing

himself should not factor into your assessment of the evidence

and whether the government has met its burden.

Second, Mr. Schulte is representing himself which

means that anything he says in that capacity is not evidence.

Just as what the lawyers say, the questions they ask, the

objections they make are not evidence, the same is true of

Mr. Schulte.  Any question that he asks, any objection that he

makes, anything that he says in his opening statement or his

closing, that is not evidence.  If he chooses to testify when

the time comes then his testimony would be evidence but nothing

else that he says during the trial is evidence.  And, of

course, I remind you, again, that a criminal defendant has no

M6E5sch2

1   obligation to testify or to put on any case because the burden

2   is on the government at all times.

3           Let me explain the jobs that you and I are to perform

4   during the trial.  I will decide which rules of law apply to

5   this case.  I will decide that by making legal rulings during

6   the presentation of the evidence and also, as I told you, in

7   giving you final instructions after the evidence and arguments

8   are complete.  In order to do my job I may have to interrupt

9   the proceedings from time to time to confer with the parties

10  about the rules of law that should apply here.  Sometimes we

11  may talk here at the side bar, just as you saw us do during

12  jury selection, to assure that it is outside of your hearing.

13  Sometimes those discussions may take more time and so, as a

14  convenience to you, I may excuse you from the courtroom.  I

15  promise that I will try to avoid such interruptions as much as

16  possible to keep the case moving and get you out of here as

17  quickly as I can but, please, be patient, and understand that

18  these conferences and interruptions are necessary to ensure the

19  fairness of the trial and often help make the trial move

20  faster.

21          While I decide the law that applies to this case you,

22  the members of the jury, are the triers of fact.  You will

23  weigh the evidence presented and decide whether the government

24  has proved beyond a reasonable doubt that the defendant is

25  guilty of each charge in the indictment.  You must pay careful

M6E5sch2

1    attention to all of the evidence presented and you must base

2    your decision only on the evidence in the case and my

3    instructions about the law.

4          As I have said a few times and will say many more

5    times before this case is over, your decisions in this case

6    must be based solely on the evidence that you see and hear

7    during the trial.  So, what then is evidence?  I will give you

8    further instructions at the end of the case but for now let me

9    tell you that evidence consists only of the testimony of

10   witnesses, documents, and other things admitted into evidence

11   or stipulations agreed to by the parties.  A stipulation, as I

12   will explain to you, is a fancy lawyer term for an agreement

13   between the parties.

14         Some of you have probably heard the terms

15   circumstantial evidence and direct evidence.  Do not be

16   concerned with these terms.  You are to consider all the

17   evidence given in this trial.  Certain things, however, are not

18   evidence and must not be considered by you.  The following is a

19   list of what is not evidence.

20         First, as I have said, arguments, statements, and

21   questions by the lawyers or by the defendant, Mr. Schulte --

22   except if he decides to testify as a witness -- are not

23   evidence, nor are statements that I make or questions that I

24   may ask of a witness.

25         Second, objections to questions are not evidence.  The

M6E5sch2

1    lawyers and the defendant have an obligation to make an

2    objection when they believe evidence being offered is improper

3    under the rules of evidence that govern in this case.  You

4    should not be influenced by the objection or by my rulings on

5    an objection.  If an objection is sustained, ignore the

6    question and any answer that may have been given.  If an

7    objection is overruled, you should treat the answer as you do

8    any other.  If you are instructed that some item of evidence is

9    received for a limited purpose only, you must follow that

10   instruction.

11          Third, testimony that I have excluded or told you to

12   disregard is not evidence and must not be considered.

13          And fourth, anything you may have seen or heard

14   outside the courtroom is not evidence and must be disregarded.

15   You are to decide this case solely on the evidence presented

16   here in the courtroom.

17          There is no formula to evaluate testimony or exhibits.

18   For now, suffice it to say that you bring with you into this

19   courtroom all of the experience and background of your lives.

20   Do not leave your common sense outside the courtroom.  The same

21   types of tests that you use in your everyday dealings are the

22   tests that you should apply in deciding how much weight, if

23   any, to give to the evidence in this case.  The law does not

24   require you to accept all of the evidence admitted at trial.

25   In determining what evidence you accept, you must make your own

1    evaluation of the testimony from each of the witnesses and the

2    exhibits that are received in evidence.  It is essential,

3    however, that you keep an open mind until you have heard all of

4    the evidence in the case.  A case can be presented only step by

5    step, witness by witness, before all evidence is before you.

6    As you know from experience, you can hear one person give his

7    or her version of an event and think it sounds very impressive

8    or even compelling, and yet, upon hearing another person's

9    version of the same event, or even the same person

10   cross-examined with respect to the event, things may seem very

11   different.  In other words, there may be another side to any

12   witness' story.  You should use your common sense and good

13   judgment to evaluate each witness' testimony based on all of

14   the circumstances.  Again, I cannot emphasize too strongly that

15   you must keep an open mind until the trial is over.  You should

16   not reach any conclusions until you have all the evidence

17   before you.

18         Under your oath as jurors, you are not to be swayed by

19   bias or sympathy.  All of us, no matter how hard we try, tend

20   to look at others and weigh what they have to say through the

21   lens of our own experience and background.  We each have a

22   tendency to stereotype others and make assumptions about them.

23   Often we see life and evaluate evidence through a clouded

24   filter that tends to favor those like ourselves.  You must do

25   the best you can to put aside such stereotypes for all

litigants and witnesses are entitled to a level playing field

in which we do the best we can to put aside our stereotypes and

prejudices.  You are to be guided solely by the evidence in

this case and my instructions about the law.

Finally, let me caution you about certain rules and

principles governing your conduct as jurors in this case, some

of which I have already mentioned to you.

First, you must not talk to each other about this case

or about anyone who has anything to do with it until the end of

the case when you go to the jury room to begin your

deliberations.  The reason for this requirement, as I have

mentioned, is that you must not reach any conclusion on the

charges until all of the evidence is in.  As I have said, keep

an open mind until you start your deliberations at the end of

the case.

Second, do not communicate with anyone else about this

case or with anyone who has anything to do with it until the

trial has ended and you have been excused as jurors.  Anyone

else includes members of your family, your employers, and your

friends, and no communicating about the case means no

communicating in any way, shape, or form -- in person, by

telephone, by text, by instant message, by Facebook, by

Twitter, by Google, SnapChat, Instagram, blogs -- whatever at

all.  You may tell your family, your employer, your friends, as

I have said, that you are a juror in a criminal case and

approximately how long I expect it to last but, please, do not

tell them anything else about the case until you have been

discharged by me.  You may think that Tweeting something about

the case or posting something about it on Facebook is harmless,

or mentioning to a friend the kind of case you are on, you may

think that is harmless, but I assure you that it isn't and if

you do anything like that, it will be major inconvenience to

everyone involved in the trial, including you, so do not do it.

Third, this case arises out of activities that have

been covered by the media and the trial itself may be covered

by the media and people may talk about it.  I don't know if

that will happen but it may happen.  From this moment on you,

as jurors, must not pay any attention to outside information or

commentary about this case whether it is in the newspapers, on

TV or radio, on the Internet, on your phones, anywhere.  You

must ignore even the comments and opinions of your family and

friends if they happened to say anything about this case, nor

may you discuss the case, or anyone or anything having to do

with it with anyone else including, as I have said, your family

members, your fellow jurors and so forth until I have

discharged you as a juror in this case.  This means that you

must not speak to anyone about the case or anyone or anything

having to do with it.  You must not read or listen to anything

about this case from any source.  If you see something on the

television that discusses this case, change the channel.  If

M6E5sch2

1    you hear something on the radio, change the channel.  If you

2    see something in the newspaper, turn the page.  If you see

3    something on the Internet, close the browser.  Whatever it may

4    be, it is your obligation to ensure that you are not exposed to

5    any information about the case.

6          If you are exposed to something, I ask you to bring

7    that immediately to the attention of my staff and only my

8    staff.  Don't discuss it with any fellow juror, don't discuss

9    it with anyone except report it to my staff so that we can

10   address it, as appropriate.

11         You must not allow anyone to speak to you about this

12   case as well.  If you are approached by anyone to speak about

13   it, politely tell them that I have directed you not to do so.

14   Do not remain in the presence of anyone who may be discussing

15   the case.

16         If any person should attempt to communicate with you

17   about this case at any time throughout the trial, either in or

18   out of the court house, you must immediately report that to

19   someone on my staff -- either Mr. Lee, who is here with us for

20   the next couple of days; his replacement will be my regular

21   courtroom deputy, Ms. Smallman, will return in a few days; my

22   law clerk; but to no one else but a member of my staff.  And

23   when I say report that to no one else, I mean you should not

24   tell anyone including your fellow jurors.

25         To minimize the improper communications it is

M6E5sch2

1    important that you go straight to the jury room when you come

2    in in the morning -- that's the room that you just came from so

3    take note of where that is so that you know where to go -- that

4    you remain in the jury room for the duration of the trial day

5    unless I tell you otherwise, and that you head directly out of

6    the court house at the end of the trial day.  You should use

7    the bathrooms in the jury room and on that floor and nowhere

8    else.

9           You may not, as I have mentioned, use the cafeteria in

10   the building and you should not linger in the public areas of

11   the court house on this floor, in the lobby, or anywhere else.

12   That is to ensure that you don't run into anyone relating to

13   the case.

14          Fifth -- I think I am up to fifth -- do not do any

15   research or any investigation about the case or about anyone

16   who has anything to do with the case on your own.  Don't go

17   visit any place mentioned during the trial.  And, as I said,

18   don't read or listen to any news report about the case.  Don't,

19   as I have said, go on the Internet or use any digital device

20   that you may have to learn about this case.  Everything that

21   you need to learn you will learn in this courtroom from the

22   testimony of the witnesses or the exhibits that are entered

23   into evidence.  And again, your decision in this case must be

24   made solely on the basis of the evidence presented at trial.

25          Once again, I expect you to inform me immediately

M6E5sch2

1    through my staff if you become aware of another juror's

2    violation of these instructions.

3            Finally, each of you has been given a notebook and a

4    pen.  That is because I do permit jurors to take notes.  Anyone

5    not have a pen or pencil?  Raise your hand.  Great.  You do not

6    have to take notes.  Notes are just an aid to your own

7    recollection.  The court reporters in this case -- you have

8    seen them taking down what everyone says during jury

9    selection -- they will be here throughout the trial and record

10   everything that is said in the courtroom, and any portion of

11   the testimony can be provided to you during your deliberations.

12   If you do take notes, please remember and be aware that

13   note-taking may distract you from something important that is

14   happening on the witness stand.  Whether or not you take notes,

15   rely on your own recollections and don't be influenced by the

16   fact that another juror has taken notes.  And if you do take

17   notes, all notes must be left each day in the jury room.  In

18   fact, any time you are leaving the courtroom, you are being

19   excused to the jury room, you should take your notebook with

20   you and it should remain with you at all times except

21   overnight; leave it in the jury room, that room will be secured

22   and -- that room will be secured.

23           From this point until the time when you retire to

24   deliberate it is your duty not to discuss this case and not to

25   remain in the presence of anyone else who may be discussing

M6E5sch2

1   this case.  In that regard, I remind you that the parties and

2   others involved in this case have been strictly instructed to

3   have no contact with any of you, so if you happen to see any of

4   them outside of this courtroom, again, they don't acknowledge

5   you or hold the door for you or smile at you, don't take

6   offense, they are simply following my instructions.

7        That concludes my preliminary instructions to you.

8   What we are going to do, we are not going to proceed right now

9   with the openings because we have to take care of a couple

10  preliminary matters and I also recognize that today you didn't

11  bring any lunch because you didn't know what our schedule was

12  going to be.  So, instead, while the schedule that I described

13  will be the schedule going forward, today we are going to take

14  a longer break so that you can go out of the court house and

15  get food and then come back and be ready for the afternoon

16  session.  We will be ending today at 2:45, just so you know,

17  and you can plan accordingly.

18       So, it is 11:49.  I would like to start promptly --

19  that means in this courtroom -- at 1:00, so I am going to ask

20  you to be back in the jury room -- again, that's the courtroom

21  on the eleventh floor that my clerk and Mr. Lee just brought

22  you from so make sure you make note of where that is.  I want

23  you back in there by 10 minutes to 1:00 -- so by 12:50.  And I

24  remind you that we cannot start until all 16 of you are there

25  so, please, be back by 12:50.  Don't wander in at 1:05 and

M6E5sch2

think that is harmless.  It means everyone has to wait for you
so be there by 12:50.

        I think you received a placard from my law clerk.
That should enable you to get through the security line more
quickly.  if you show that to the security at the front of the
court house and tell them that you are sitting as a juror on a
pending case, then they will usher you through the line more
quickly.  It is probably more important for the morning than
afternoon but, in any event, it may be helpful.

        So do not discuss the case, keep an open mind, you
haven't heard the opening statements, you haven't heard any
evidence whatsoever.  Don't do any research about the case.  Be
in the jury room by 12:50, at the latest, ready to go.

        These are going to be your seats for the duration of
the trial so remember where you are sitting.  You are now
jurors no. 1 through 16 -- you have been re-numbered -- so
remember where you are sitting.  And if you can line up in that
order, it will facilitate your entry into each row, as you just
did.

        With that, I wish you a pleasant break.  We will see
you promptly at 1:00 for opening statement.

        Thank you.

        (Continued on next page)

M6E5sch2

1            (Jury not present)

2            THE COURT:  You may be seated.  All right.  I assume

3     there is nothing further to discuss before the break?

4            MR. DENTON:  Totally ministerial point, your Honor.

5            It looks like the podium in this courtroom actually

6     has a decent amount of slack in the cables and it is on

7     casters.  If the Court and the marshals have no objection, it

8     would be nice if we could position it a little more centrally,

9     but we will do whatever the Court --

10           THE COURT:  I will step down from the bench in a

11    moment and Mr. Lee can assist you, and wherever it can go

12    without messing things up is fine with me.

13           MR. DENTON:  Thank you, your Honor.

14           THE COURT:  Mr. Schulte, anything you need to raise?

15           MR. SCHULTE:  Only wherever the government places the

16    podium, that's where it should be for me as well.

17           THE COURT:  Yes.

18           So you are going to stay in the courtroom for the next

19    few minutes anyway so that you can test out the system and

20    hopefully sort out anything on that end.  I will ask the

21    marshals to allow Mr. Schulte to remain up to 20 minutes, just

22    so that he can hopefully figure all of that out, and in that

23    time if you can all sort out where the podium should be, that

24    would be great.

25           Please be back here no later than five minutes to 1:00

M6E5sch2

1    so that we can start promptly at 1:00 and I will see you then.

2                Thank you very much.

3                (Luncheon recess)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6E5sch2

```
 1                    A F T E R N O O N   S E S S I O N

 2                          2:00 p.m.

 3            THE COURT:  Is the government ready to proceed?

 4            MR. DENTON:  Yes, your Honor.

 5            THE COURT:  Mr. Schulte, are you ready to proceed?

 6            MR. SCHULTE:  Yes.

 7            THE COURT:  We will get the jury.

 8            While we are getting the jury, two quick notes.  One.

 9  My understanding from the CISO is that all the outstanding

10  issues regarding the defense subpoenaed witness list have been

11  resolved.  My understanding is that one of the remaining two

12  witnesses has agreed to be interviewed by the defense.  So if

13  that information hasn't been conveyed, the relevant

14  arrangements haven't been made, you should talk to the CISO

15  about that.  My understanding is that the contact information

16  for the last one that wall counsel was having trouble reaching

17  has been provided directly to standby counsel in a departure

18  from the usual arrangement.  I think that resolves all of the

19  outstanding issues on that front, but if not, you can let me

20  know later.

21            Second, as promised, I did contact the MDC to see if

22  they could accommodate Mr. Schulte's desire to have use of the

23  printer in the mornings.  I was told that that would likely be

24  too difficult given how early he needs to be taken to court but

25  that arrangements would be made for him to use the computer and
```

M6E5sch2

1    printer every evening at the end of the day.  So Mr. Schulte,

2    try to make due with that and plan ahead accordingly.  If that

3    is becoming a problem, let me know and I will revisit the

4    issue, but I certainly do understand why, given the early

5    mornings, it would be a complicated issue.

6              That's all I need to say and when the jury is here we

7    will proceed.  The government has its first witness ready to

8    go?

9              MR. DENTON:  Yes, your Honor.  He is in the room just

10   outside the courtroom.

11             THE COURT:  All right.  If the folks in the back could

12   clear away from the doors?  The jury will be entering in a

13   moment.

14             THE DEPUTY CLERK:  All rise.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                 THE COURT:  You may be seated.

3                 Welcome back, ladies and gentlemen.  I hope you

4     enjoyed your extended break.  As promised earlier, we will

5     begin now with the next phase of the case which is the opening

6     statements of the parties, beginning with the government's

7     opening statement by Mr. Denton, followed by Mr. Schulte.  I

8     remind you that what they say in their opening statements is

9     not evidence.  But, that being said, it is important, an

10    important part of the process that helps you understand what

11    they expect the evidence to show, and in that regard I would

12    ask you to give both of them your undivided and close

13    attention.  With that, we will proceed.

14                Mr. Denton?

15                MR. DENTON:  Thank you, your Honor.

16                Ladies and gentlemen:  This man, Joshua Schulte, the

17    defendant, is responsible for the single biggest theft of

18    classified national defense information in the history of the

19    Central Intelligence Agency, a leak that caused extraordinary

20    damage to the national security of the United States and put

21    the officers charged with protecting this country at risk.  And

22    when federal investigators confronted the defendant about it,

23    he lied to them; lying to obstruct their investigation and hide

24    the truth of his crimes.

25                On April 20th, 2016, the defendant, who was then

1    himself a CIA officer, stole a trove of sensitive national

2    security files from a top secret CIA computer network in the

3    covert office where he worked.  Files revealing classified

4    cyber tools, custom-built computer software that the CIA uses

5    to track terrorists and collect intelligence from foreign

6    adversaries for America's national defense.  And on March 7,

7    2017, those classified files that the defendant stole were

8    posted for the whole world to see on the website WikiLeaks.

9         The leak was instantly devastating.  Critical

10   intelligence gathering operations all over the world came to a

11   crashing halt.  CIA officers overseas were exposed.  Allies

12   wondered if intelligence they shared with America could also be

13   leaked.  Years of work and millions of dollars spent developing

14   those tools went up in smoke.

15        The FBI sprang into action.  Special agents collected

16   enormous quantities of evidence and interviewed witnesses.

17   Entire CIA computer networks were seized as evidence and combed

18   over by FBI experts in digital investigations.  Their careful

19   work revealed devastating proof of this man's crimes, proof

20   that makes it crystal clear that it was the defendant who

21   hacked that top secret network, stole an arsenal of cyber

22   tools, and leaked it to WikiLeaks.  Proof that the defendant's

23   crimes were the ultimate act of betrayal because Joshua Schulte

24   was one of the CIA's own.  He worked for the very same part of

25   the Agency that created the national security information that

1   he stole; building some of the very tools that he sent to

2   WikiLeaks.  Joshua Schulte violated his oath to protect the

3   United States and safeguard those secrets and he violated the

4   law.

5          Why did he do it?  Why did Joshua Schulte violate his

6   position of trust, betray his nation, damage national security?

7   Why did he destroy the hard and sensitive work of colleagues

8   and his own work as well?  He did it out of spite.  There is no

9   misguided idealism here he did it because he was angry and

10  disgruntled at work.  He felt that the CIA had slighted him,

11  had disrespected him, and so he tried to burn to the ground the

12  very cyber intelligence work that he had once been a part of.

13  He set out to wreck the CIA's intelligence capabilities for

14  payback.  But the defendant's vendetta didn't stop there.  He

15  continued it, even after the FBI arrested him.  While in jail,

16  Schulte got a smuggled cell phone, leaked classified

17  information again, and plotted a campaign to disclose even more

18  sensitive details about national defense.

19         The evidence in this trial will prove that the

20  defendant committed crimes of espionage, stealing national

21  defense information from the CIA.  It will prove that he tried

22  to commit more espionage by leaking more sensitive information

23  from his jail cell.  It will prove he committed crimes of

24  computer hacking when he broke into parts of that top secret

25  CIA network and then tried to cover his tracks by deleting

1  evidence of his crimes, and it will prove that when the FBI

2  interviewed the defendant, he lied to them -- obstructing their

3  investigation of this theft.

4          My name is David Denton.  I'm an Assistant U.S.

5  Attorney here in the Southern District of New York and with my

6  colleague, Mike Lockard, and paralegal Charlotte Cooper, we

7  represent the United States in this case.  Over the next few

8  minutes I'm going to give you a preview of what the evidence

9  will show during the course of this trial, evidence that you

10  will see in the records or logs of the defendant's computer

11  hacking, that you will read in his own words in things that he

12  wrote from jail, and that you will hear from both the FBI

13  agents who caught him and from the CIA officers who worked with

14  him, evidence that will fit together to reveal the truth about

15  each of his crimes.

16          So what will the evidence in this trial prove?  You

17  will learn that Joshua Schulte used to work as a software

18  developer in an elite group at the CIA where programmers built

19  sophisticated cyber tools to support national defense and

20  intelligence operations against America's adversaries overseas.

21  Schulte and his fellow CIA officers in that group worked in a

22  secret building protected by armed guards accessed using

23  special badges and codes.  Inside that building the offices are

24  literally vaults with security doors that have combination

25  locks on them.  Everyone who worked there had a top secret

1   security clearance vetted by CIA investigators to be sure they

2   could be trusted with the precious secrets of America's

3   national defense.  From that secure CIA office, Schulte's group

4   used a top secret computer network to develop the cyber tools

5   the CIA used to collect intelligence on foreign enemies.

6           You will learn that in 2015, Schulte was given a

7   special level of trust within the CIA.  He was made a software

8   administrator.  He was put in charge of the programs that the

9   CIA's developers used to do their work on that network.  As you

10  will hear on tape, he had super access, the kind of access that

11  let him control all the sensitive intelligence projects on that

12  network and even let him control who else had access to them.

13          One of the things you will learn that Schulte did as

14  an administrator was to help make backups of that system.

15  Every day a complete copy of all of the CIA programmers' work

16  was saved automatically in case of some catastrophe that

17  required the system to be restored.  It was one of those

18  backups -- backups he helped create -- that Schulte stole and

19  sent to WikiLeaks and you will see he did it for spite.

20          You will learn that in 2016 Schulte was having

21  problems at work.  He got into arguments and personal disputes

22  with the other developers in his unit and you will learn that

23  when one of those arguments got out of hand, Schulte decided to

24  retaliate against another programmer by falsely accusing his

25  co-worker of making a death threat against Schulte.  Now, the

1    CIA investigated Schulte's allegation and determined it was

2    baseless.  That made Schulte mad.  When the CIA decided to

3    separate Schulte and that co-worker by reassigning both of them

4    to different units within their group, he became even

5    angrier -- angry at his bosses, angry at the whole agency --

6    angry because the CIA didn't take his side.  So he started

7    breaking the rules, critical rules that limit access to

8    sensitive national security information.  He secretly used that

9    super access he had as an administrator to give himself control

10   over sensitive projects he had expressly been told he was not

11   allowed to control because Schulte didn't think those rules

12   should apply to him.

13          Now, you won't be surprised to learn that when the CIA

14   discovered that Schulte had tampered with that network, it

15   raised all kinds of red flags.  It was such a serious violation

16   the CIA decided they had to immediately lock down the top

17   secret network he had accessed.  After the Agency found out

18   what Schulte had done, CIA supervisors ordered people the next

19   day to change the administrative passwords, take away the super

20   access not just from Schulte but from any programmer.  But, you

21   will also learn that in locking down that network, there was

22   one digital lock that the CIA didn't change, a lock that

23   Schulte still had the key to, a key that meant he still had a

24   way to manipulate their top secret network.

25          Four days after his administrative powers were taken

1    away, on April 20th, 2016, Schulte was told that other parts of

2    that top secret system were also going to be changed, that the

3    software that he used to administer was going to be moved on to

4    a new computer.  This was important news for him because that

5    change would mean that that digital key to his secret access

6    would no longer work.  And so, the evidence will show that the

7    same day he learned that news, Schulte stole the

8    preciously-guarded national security information that WikiLeaks

9    posted on the Internet.

10           On the evening of April 20th, Schulte used that key,

11   the access he knew he wasn't supposed to have, to do something

12   you will hear described as a reversion, kind of like restoring

13   a phone.  He used a backup copy of the system called a

14   "snapshot" to take the system back to a particular point in

15   time in the past.  And the point he took it back to was before

16   the system had been locked down, back to a time when Schulte

17   had super access.  The evidence will prove that on the evening

18   of April 20th, from his desk in that secret CIA office, Schulte

19   spent over an hour inside the CIA's top secret network, inside

20   that snapshot from back in time before his administrative

21   powers had been taken away -- administrative powers that

22   Schulte believed no one had a right to take away from him.  And

23   so, Schulte used the administrative powers that he had secretly

24   restored to access those backups, the copies of the entire CIA

25   cyber arsenal.

1          The evidence will show that shortly after he had

2     broken back into the system, Schulte stole one of those

3     backups, a complete copy, a particular one, the backup from

4     March 3rd, 2016.  That March 3rd backup is the source of the

5     exact secrets posted online on WikiLeaks.  And you will see

6     that the last time anyone ever accessed that backup on the

7     CIA's network was the evening of April 20th, 2016 at 5:43 p.m.,

8     14 minutes after Schulte began his break-in.

9          You will learn that after stealing that backup,

10    Schulte tried to cover his tracks.  He started deleting log

11    files, digital records that kept track of what he had done to

12    the top secret network.  He searched for and deleted dozens of

13    log files.  And then, after destroying that evidence, he

14    unwound his reversion, meaning Schulte restored the system back

15    to how it was just before he hacked in, digitally erasing that

16    hour of time as if it never happened, wiping away the records

17    of what he had done in that time.  But Schulte's effort to hide

18    the truth failed because there were log files he couldn't find

19    and destroy that allowed the FBI to piece together a step by

20    step digital record of his break-in.

21          In the days that followed April 20th, 2016, the

22    evening that Schulte hacked into the system and stole that

23    backup, you will learn that he started doing everything he

24    needed to to send that stolen backup to WikiLeaks.  He

25    downloaded programs on his home computer to let him hide his

1    identity on the Internet.  He bought computer equipment to copy

2    hard drives and transfer data without leaving a record on his

3    computer so there would be no trace of that stolen backup.  He

4    researched how to verify if huge files, like the backups, had

5    transferred successfully over the internet and how to destroy

6    digital evidence at home just like he had destroyed digital

7    evidence at the CIA.  And you will see that when all was said

8    and done two weeks after his digital break-in, after he had

9    sent that stolen national defense information to WikiLeaks,

10   Schulte tried to completely wipe his home computer clean of any

11   remaining evidence.  And you will learn that when Schulte took

12   those precise steps on his home computer after April 20th,

13   2016, he was following the exact instructions on WikiLeaks for

14   how to send stolen information without getting caught.

15           A few months later he resigned from the CIA and took a

16   job here in New York and Schulte was here in New York on March

17   7, 2017, when WikiLeaks started posting the sensitive national

18   security information he had stolen and sent to them.  When the

19   leak went public, the FBI immediately started to investigate.

20   Agents interviewed hundreds of people, including Schulte.  But

21   Schulte lied to them, lied to obstruct the investigation by

22   sending them down false paths.  But the evidence will show that

23   when that didn't work and Schulte was put in jail to stand

24   trial, he doubled-down.  He plotted to continue trying to hide

25   evidence of his crimes and to disclose even more classified

1    information.

2            He got a cell phone in jail, a blatant violation of

3    prison rules.  He started writing to reporters.  He sent one

4    reporter a document containing classified information about a

5    CIA network and the officers that used it.  He used the secret

6    phone to create accounts on social media to post things he had

7    written containing even more sensitive information that would

8    expose the tools used in CIA operations and the people who

9    conducted them.  And in notebooks he kept in jail, he wrote a

10   detailed plan for what he would do.  In his own words the

11   defendant wrote:  From here, I will stage my information war.

12           But before Schulte's campaign got into full swing the

13   FBI caught him in the act.  They searched the prison, they

14   found his phone, they found his plan to destroy evidence and

15   leak secrets and put a stop to it, preventing Schulte from

16   leaking even more preciously-guarded intelligence.

17           Now, ladies and gentlemen, like I said, that's just an

18   overview of what the evidence in this trial will prove.  How

19   are we going to prove it?  The evidence is going to come in a

20   lot of different forms.  You will hear testimony from a number

21   of different kinds of witnesses, like the agents and experts

22   from the FBI who investigated Schulte's crimes, specialists in

23   counter-intelligence, cyber crimes, digital forensics.  They'll

24   tell you about the investigation.  You will learn from these

25   witnesses how the FBI analyzed the classified information

1    posted on WikiLeaks and compared it to what was on that secret

2    CIA network.  And you will see how they determined that the

3    stolen information that WikiLeaks published came from one spot,

4    that specific March 3rd backup of the system, the very backup

5    Schulte stole on April 20th, the backup that Schulte helped

6    create and so he knew exactly how to steal.

7            Those forensic experts will also walk you through

8    exactly what Schulte did when he stole those sensitive cyber

9    intelligence tools.  Even though he tried to delete any traces

10   of his theft of classified information, this man's digital

11   fingerprints were left behind.  The FBI's experts found the

12   trail of what Schulte had done in the computer memory of

13   Schulte's own desktop computer at the CIA in spaces where data

14   remained even after Schulte tried to erase them, data that will

15   reveal how Schulte broke in and stole that backup.

16           Now, the details of the CIA's computers and the FBI's

17   sophisticated forensic analysis that these witnesses will tell

18   you about can be technical but the facts that evidence will

19   prove are simple.  On April 20th, 2016, the defendant gave

20   himself access and control to a top secret system, stole the

21   March 3rd backup of that system, tried to cover his tracks by

22   deleting computer records, and then sent the information to

23   WikiLeaks, all of which had devastating consequences for

24   national security.  Now, those witnesses will tell you what

25   Schulte did, the conduct that makes him guilty of the crimes at

1    issue in this trial.  But you will also hear from Schulte's

2    co-workers at the CIA, covert officers responsible for

3    developing the cyber tools that Schulte stole, who will help

4    you understand why his crimes were so damaging and why he

5    committed them.  They will tell you about their group at the

6    CIA and its important work for America's national defense,

7    about that secret network they used to do their work.  They'll

8    talk about Schulte's arguments in the workplace, his spiral out

9    of control, his quest for revenge.  They'll tell you that

10   Schulte got the nickname Nuclear Option because of his tendency

11   to escalate and overreact when he felt aggrieved.  And they'll

12   tell you about the devastating consequences his actions -- his

13   crimes -- had on their work in America's national defense

14   because secret tools to gather intelligence only worked if the

15   targets don't see them coming.  And because of Joshua Schulte,

16   those tools were all over the Internet.

17          You are also going to see a lot of exhibits in this

18   trial, things like documents and physical evidence.  For

19   example, you will see e-mails and other records showing

20   Schulte's mounting anger at the CIA and the things the agency

21   did to try and address it.  You will see Schulte's own

22   statements, the lies he told to try to get what he wanted and

23   to avoid punishment when he got caught.  You will see the log

24   files from Schulte's CIA computer showing him sending the

25   digital commands on April 20th, 2016, to take that top secret

1    computer system back in time to restore his administrative

2    powers, to delete evidence of what he had done, and to revert

3    the system back to the present to make it seem like it never

4    happened.  You will see records about the March 3rd backup,

5    proof that it was the source of those national security secrets

6    posted on the Internet, proof showing the last time that backup

7    was accessed was on the evening of April 20th, right in the

8    middle of Schulte's digital break-in.  You will watch the

9    defendant talk on video about his administrative access to the

10   CIA network.  You will see him declare to a CIA investigator

11   that he wanted his supervisors to be punished for the ways he

12   thought they had disrespected him.  You will see a video of

13   Schulte when he was in jail using that secret cell phone and

14   read the e-mails to a reporter attaching classified

15   information.

16        You will see things that the defendant wrote in jail,

17   like messages he planned to post on Twitter pretending to be

18   someone else to spread false information to conceal his own

19   guilt.  You will see his plan for disclosing even more national

20   defense information and drafts he wrote of what he planned to

21   expose, draft Tweets he wrote to reveal secret information

22   about CIA tools and operations conducted overseas, precious

23   technical details about the ways the CIA collects intelligence

24   from foreign adversaries, all written by this man as part of

25   his plan for leaking to the world.  You will read in his own

1    words his plan for waging his information war, things he wrote

2    like:  I will look to break up diplomatic relationships, close

3    embassies.  And this:  Send all your government secrets here:

4    WikiLeaks.

5              Now, as I said at the start, this is just a preview,

6    this is just to give you some context for the evidence that you

7    are going to see and hear over the next couple of weeks.  At

8    the end of the trial, after all of the witnesses have testified

9    and you have seen all of those exhibits, Mr. Lockard and I will

10   have another opportunity to talk to you about how the evidence

11   proves the defendant's guilt.  So, for now, I just want to ask

12   you to do thee things during the course of this trial:

13             First, pay close attention to all the evidence.  These

14   can be long days, I know.  Second, carefully follow Judge

15   Furman's instructions about the law.  And finally, as he told

16   you before, just use your common sense.  The same common sense

17   you use every day of your lives to make decisions.  Apply that

18   common sense as you assess the evidence that you are going to

19   see and hear in this trial.  If you do those three things, you

20   will reach the only conclusion supported by that evidence.  As

21   I said before, some of that evidence is going to be complex,

22   but what the defendant did is not.  Joshua Schulte hacked that

23   CIA network, stole that backup of cyber tools, sent it to

24   WikiLeaks, and then lied about it.

25             This man is guilty.  Thank you.

1          THE COURT:  Thank you, Mr. Denton.

2          We will now proceed with the defendant's opening

3    statement and I would ask you to give the same undivided

4    attention to him that you gave to Mr. Denton.

5          Mr. Schulte, you may proceed.

6          MR. SCHULTE:  The evidence does not fit.  There is no

7    battle plan, there is no information war.  The prosecution here

8    simply has it wrong.  I did not commit these crimes.  At the

9    end of the day, you will see that I'm not guilty.

10         Good afternoon, ladies and gentlemen.  My name is Josh

11   Schulte.  I am the defendant in this case.  I was born on

12   September 25th, 1988, in Lubbock, Texas, and today I am 33

13   years old.  I discovered an aptitude for computers and

14   technology at a young age and studied electrical and computer

15   engineering at the University of Texas in Austin.  After my

16   first semester, I became an intern at IBM, but later opted to

17   forego other internships in the previous sector for government

18   work.  I wanted to do something with my life, I wanted to serve

19   my country since I was 12 years old.  I was 12 years old on

20   September 11th, 2001, and like many Americans, that vivid day

21   is burned into my memory.  I was in 7th grade at the time and

22   saw the news while on the student council session.  Ever since

23   that fateful day, I wanted to serve my country, to make sure no

24   such thing could ever happen again so I applied to the NSA and

25   CIA immediately after completing my first semester of college.

M6E5sch2                         Opening - Mr. Schulte

1         After successful background checks and full-scope

2    polygraphs, I was hired by both the NSA and CIA in 2010.  I

3    worked hard and specialized in counter terrorism.  In fact, at

4    the end of 2010, I assisted with many other engineers on a very

5    special case to help verify the location of Osama Bin Laden.  I

6    worked on many operations for the next six years until I

7    resigned and moved to Manhattan to work for Bloomberg, LLP, in

8    2016.

9         Now, I have been called many things throughout my life

10   but no one has ever questioned my loyalty and patriotism, that

11   is until now.

12        On March 7, 2017, WikiLeaks released CIA information

13   from the organization where I previously worked.  The CIA was

14   just as surprised as the rest of the world.  They did not even

15   realize their data had been stolen.  It was incredibly

16   embarrassing for the CIA.  They did not know when their data

17   was taken, they did not know how much of their data was taken,

18   they did not know how their data was taken, and they certainly

19   did not know who had taken their data.  Nothing has changed

20   today, they still don't know what happened.  And the reason

21   they could not identify the leak here, the computer network it

22   was stolen from, called DevLAN, was so incredibly insecure, it

23   was nicknamed the Wild, Wild West by the same programmers who

24   worked on it.  The trial evidence will show that DevLAN had no

25   system to record how much data people transferred across the

1   network, no access logs to record who accessed which files, no

2   records at all to help track down who actually committed this

3   crime.  Everyone was empowered to do whatever they wanted.

4   There were no restrictions.  The trial evidence will show that

5   multiple individuals told management that DevLAN was wildly

6   insecure.  An individual who worked at the NSA during Edward

7   Snowden's leaks even went to management and told them the same

8   thing could happen to DevLAN.  But no one listened.  No one

9   paid attention to the warning signs.  And so now, with no

10   security, no logging, and every single DevLAN user an adept CIA

11   hacker, it was impossible to find the leaker.  But, of course,

12   the CIA could not admit this.  They could not issue a press

13   release and say: Oops.  Sorry, guys.  We messed up.  Our

14   employees told us for years that the system was vulnerable but

15   no one listened.  Sorry, let's just move on.

16          The CIA had to save face.  They faced tremendous

17   political pressure to identify the leaker.  They needed someone

18   to blame, but they had no ideas and no leads.  The evidence

19   will show that the CIA and FBI immediately selected me as the

20   patsy not because there was any evidence, clues or ability to

21   identify the true leaker, but simply because of my previous

22   irks with management and resignation from the CIA approximately

23   six months before WikiLeaks released the CIA files.

24          The trial evidence will show that before the FBI even

25   found a single shred of evidence, the CIA contacted the lead

M6E5sch2                          Opening - Mr. Schulte

1      FBI agent and told him that I was the one they wanted

2      prosecuted.  The CIA directed the FBI to go after me with

3      everything.  This was a political witch hunt from day one.

4      Instead of conducting any investigation whatsoever, the FBI

5      simply worked backwards from me as their selected patsy.

6              There is no direct evidence linking me to the crimes

7      they falsely accuse me of committing.  Instead, the evidence

8      will show that the government is able to seize large sets of

9      data and from that data it can cherry-pick and manipulate the

10     data to show virtually anything they want.  If you missed a day

11     of work because you were sick, they will say you were

12     committing a crime that day.  If you take your kid to the zoo,

13     they will say you were scouting out a terrorist attack.  If you

14     sent a joke SnapChat to your friend with a bomb filter, they

15     will say you were conspiring with others to boom the zoo.

16             That's the benefit when you are trying a

17     circumstantial case.  You don't seem to need any actual

18     evidence.  Why investigate and determine the truth when you can

19     spin and manipulate everything to your benefit.  That's what

20     the government did here.  Instead of looking through the

21     evidence to find the culprit, they first singled me out as the

22     guilty party, then worked backwards perverted, misinterpreted

23     and manipulated the facts to present to you an alternate

24     reality, an upside-down world, the government's twilight zone

25     where they change the path as they see fit.  And the theory

1    they will present to you during this trial is not their first.

2              The FBI's first theory was that the data was stolen on

3    March 7, 2016.  The FBI reasoned that this was exactly one year

4    before the WikiLeaks disclosure so it must be date of theft.

5    The FBI also relied upon other circumstantial evidence claiming

6    some suspicious or incriminating activity when, in reality,

7    there were obvious innocent explanations for everything.  The

8    FBI were so certain of this theory of theft that they filed

9    multiple search warrants swearing by these facts.  But then the

10   FBI discovered critical evidence proving their entire theory of

11   prosecution was impossible.  The FBI didn't miss a beat,

12   though, inventing a whole new narrative and circumstantial

13   evidence, and a whole new theory that I committed the crime on

14   April 20th, 2016, stealing a March 3rd, 2016 backup from the

15   CIA but, like the first theory, it is based entirely upon an

16   alternate reality, one not based on the laws of this Universe.

17             The first aspects of the government's fantasy is

18   motive.  The government claims that I stole the CIA cyber tools

19   and leaked them to WikiLeaks out of spite.  This is a false

20   claim.  Certainly, by 2016, life had given me lemons on

21   multiple occasions from small to big things, but each time I

22   simply made lemonade and went on with my life.  Never once did

23   I react irrationally before, not in my entire career, yet the

24   government's theory is that because my management removed me

25   from actual responsibility that I was neither paid for nor

M6E5sch2                        Opening - Mr. Schulte

1    cared to take, but literally tried multiple times to relinquish

2    to others, that somehow I was driven to insanity, that I

3    sacrificed my entire career and my entire life to leak

4    unrelated materials to WikiLeaks.

5           The trial evidence will show that I stood up for

6    myself.  I explained my position logically and argued my point.

7    When I lost, I moved on.  There was no lingering anger or

8    hatred or malice, I moved on with my life.  But that isn't the

9    only absurdity to the government's spite motive.  Why

10   WikiLeaks?  If someone intended to harm the CIA, they simply

11   would have released the data on the Internet to expose

12   everything.  But that's not what happened here.  Data was

13   leaked to WikiLeaks, who then published a very small subset of

14   the data.  The Vault 7 source told WikiLeaks that he wanted to

15   initiate a public debate about the security, creation, use,

16   proliferation, and democratic control of cyber weapons.  He was

17   a leaker with a political agenda.  This simply does not mesh at

18   all with either the government's alleged spite motive or with

19   my unquestioned patriotism and loyal personality.  Nothing

20   about the government's case makes any sense.

21          Working backwards, after they established the "why,"

22   then the "when" must be close by.  The government establishes

23   its false motive April 18th, and therefore the "when" is April

24   20th, 2016.

25          Now, the government is going to tell you that I broke

1    the rules at the CIA and received a formal reprimand.  The

2    evidence will show that there were no rules on DevLAN.  In

3    reality, the evidence will show that I was the victim of an

4    overly-ambitious co-worker who was displeased with my work on a

5    project and who took advantage of his relationship with

6    management to kick me off that project.

7         The government will also try to tell you that I

8    somehow hid secret backdoor access to servers and lied to

9    management about those back doors.  The government will try to

10   conflate different permissions, accesses, and servers all

11   together to confuse you and pretend that the removal of one

12   type of access included all accesses.  In reality, the back

13   door was the front door, and I even sent management e-mails of

14   my project status and server accesses.

15        As to the events of April 20th, 2016, shortly after

16   management formally reprimanded me, removed me from

17   administrator accesses to servers I didn't want, and removed me

18   from a project that I was still allowed to work on, the

19   government says I used my backdoor access to take a different

20   computer back in time to access and steal backups.  But the

21   evidence will show that this convoluted, confusing theory posed

22   by the government was completely unnecessary because there were

23   alternative direct ways to access the unsecure backups.

24        Additionally, the government will try to convince you

25   that instead of copying the latest backup, the March 3, 2016

1   backup was taken due to sentimental reasons.  The evidence will

2   show that just as the government's first theory that the March

3   7, 2016 backup must have been taken since it was exactly one

4   year before the leak, the new March 3, 2016 theory is equally

5   wholly speculative without a single shred of proof.

6          Most importantly, the computer I used at the CIA was

7   preserved.  Before I left the CIA I had every opportunity to

8   completely wipe my CIA computer and all the data I worked on.

9   In fact, it was actually common practice and many did do so.

10  It was just like cleaning out your desk when you leave a

11  regular job.  A guilty person would have taken advantage of

12  this practice and wiped the entire computer.  I had no reason

13  to and I did not do so.

14         Ironically, the evidence the government intends to

15  present to this jury to convince you of my guilt in fact proves

16  my innocence.  The government has all the recorded logs from my

17  CIA computer.  You will hear that not a single log was deleted.

18  In order for the government to show that I stole the March 3rd

19  backup file, they must show two distinct commands; a command to

20  log into the confluence virtual machine and then a command to

21  copy the backup.  And the government will prove to this jury,

22  through its own expert witness, that neither command was

23  executed.  That should be it, right?  The absence of any of

24  these commands should prove my innocence.  But not to the

25  government.  Their plan is to convict me regardless of my

1    innocence.

2              Remember, this is the most embarrassing of situations

3    for the CIA.  They consider themselves on the cutting edge of

4    technology and what happened to them?  Someone stole their

5    crown jewels and they failed to realize that for an entire

6    year.  It is not a good look for the CIA, so they will tell you

7    that the reason these commands do not exist is because other

8    log files were deleted.  They will try to distract you with

9    smoke and mirrors, they will try to distract you with what they

10   claim is the deletion of log files from other computers, log

11   files that were completely irrelevant to the missing commands

12   from the logs of my own CIA computer.

13        Furthermore, these unrelated log files did not even log the

14   activity the government alleges.  So even if they existed

15   today, they could not possibly show anything incriminating.

16   But that's not all.  The evidence will show that my CIA

17   workstation also contained the log files of all drives I

18   connected to it.  During the time the government says I copied

19   the backups -- despite the absence of any copy command -- I

20   only connected one drive to my computer and I connected it into

21   what is called a write blocker.  This is a forensic device that

22   prevents you from writing to the drive.  So during the time the

23   government claims I copied the backups, you will hear that

24   there was not a single writable drive connected to my computer,

25   nor did my computer even have the space to hold the backups.

M6E5sch2                        Opening - Mr. Schulte

1    So how exactly was a CIA backup copied and to what?  The

2    government will never tell you.  They do not even have a

3    theory.  That's reasonable doubt in and of itself.  My CIA

4    workstation proves my innocence.

5              The government's case is literally forensically

6    impossible.  In reality, the government's absurd fantasy about

7    the theft of CIA national offense and tangible digital

8    information on April 20th, 2016, is riddled with reasonable

9    doubt.

10         Now we turn to my home computers.  The government seized

11   every computer and hard drive I owned from my apartment here in

12   Manhattan.  They also obtained all my records from Google and

13   Amazon.  Now, the government claims that these records will

14   show that I downloaded programs and bought computer equipment

15   to copy hard drives and transfer data without leaving a record

16   on a computer.  This is absurdly false.  The trial evidence

17   will show that I amass tech the way some amass shoes.  I owned

18   a massive server and regularly bought larger and larger drives

19   to hold all of that data.  In fact, I routinely bought all

20   sorts of computer equipment from the Internet.  The events

21   after April 20th, 2016, are not unique in any way but represent

22   a continuity of my habits and my hobbies.

23         The government claimed I transmitted the CIA backups that I

24   never possessed from my home between midnight and 4:00 a.m. on

25   May 1, 2016.  This claim is not based upon forensics or

1  evidence, but simply because the log showed I stayed up late
2  this night.  The trial evidence will show that I was recovering
3  data from a failed hard drive and playing an online game that
4  night.  So what did the FBI find on my computers and servers
5  from my Manhattan apartment?  Absolutely nothing.  No national
6  defense information and certainly no backups.  Indeed, once
7  again, the government's own tech expert will prove my
8  innocence.  He is going to prove that the government's own
9  theory of when and how I supposedly transmitted this massive
10  amount of information is literally impossible.  The trial
11  evidence will absolutely prove my innocence.
12      You will notice the government tried to focus you on the
13  March 3, 2016 backup file.  You will see them wave this backup
14  file in your face and construct a timeline analysis.  However,
15  there is absolutely no way to know which backup was actually
16  stolen.  The government's timing analysis only establishes that
17  data up to March 3, 2016 was released by WikiLeaks.  Every
18  single backup file after March 3, 2016, contained all the data
19  that was released by WikiLeaks; the March 4, 2016 backup, the
20  April 4, 2016 backup.  All the backups from March 3, 2016,
21  until the actual leak on March 7, 2017, a full year of backups,
22  contained the very data leaked by WikiLeaks.  Thus, March 3rd
23  is just the lower bound, the earliest date the data could have
24  been taken, thus the range is March 3, 2016 to March 6, 2017.
25  Do not let the government confuse you.  The March 3, 2016

M6E5sch2                      Opening - Mr. Schulte

1    backup is completely meaningless, it holds absolutely no

2    forensic significance and the government will present

3    absolutely no evidence that the March 3rd backup was taken as

4    opposed to any other backup after this date.

5         The government claims that the stolen CIA data was

6    transmitted to WikiLeaks on May 1st, 2016, and that WikiLeaks

7    sat on this information for an entire year before releasing it.

8    Does that sound right to you?  An organization that wants to

9    spread information, give out the news, sits on information for

10   a whole year?  When you have an explosive story, think about

11   the New York Times or the Wall Street Journal, they have a

12   mind-blowing story.  Do they sit on it for a whole year?  It

13   makes no sense.  You do not sit on information to go stale for

14   a year.  You release the information you have.  So the

15   government's timeline does not make any sense.

16        But that's not all I stand accused of today.  The evidence

17   will show you that I am incarcerated.  These fine gentlemen

18   here are U.S. Marshals.  You may see them throughout trial.

19   Yes, after the government accused me of a crime I went to

20   prison.  Although I committed no crime, I am not even accused

21   of any violence, I am still incarcerated.  And I have been

22   serving that prison sentence like any person who has been

23   convicted for the past five years.  If you have not experienced

24   it yourself, you cannot possibly imagine how it felt not only

25   to be arrested and charged as a traitor, but also to be

1    presumed guilty and incarcerated.  You cannot possibly know the

2    pain and suffering of not only myself, but my family.

3            THE COURT:  Mr. Schulte, I am going to interrupt you

4    at this time and ask you to move on and do not address this,

5    please.

6            MR. SCHULTE:  OK.

7            And so the evidence will show I began to write a

8    redress of grievances critical of the justice system.  I was

9    suffering from incredible strain and incredible stress and

10   anxiety and firmly believed in the delusion that I simply

11   needed to publish this redress of grievances that I entitled

12   "The Presumption of Innocence," and American people would wake

13   up, immediately chastise and correct this corrupt government,

14   and then I could fairly fight my case from outside the confines

15   of prison.  I was, of course, mistaken.

16           My family and friends eventually published my

17   unclassified redress of grievances on Facebook which you will

18   read in its entirety.  The government and the FBI, however,

19   were enraged that a prisoner dare criticize them.  So what did

20   they do?  They shut down the prison and with hundreds of FBI,

21   BOP, and other agencies, searched the prison.  They seized my

22   notebooks labeled "attorney-client privilege" and they charged

23   me with releasing national defense information from prison.

24           The first charge is for e-mailing a reporter about the

25   illegal search warrants of my Manhattan apartment executed by

1   the FBI.  And this e-mail is a description of a network called

2   Hickok.  The government claims I purposefully wrote "Hickok" in

3   this e-mail to disclose national defense information

4   notwithstanding the true purpose of the e-mail to explain the

5   corrupt FBI.  The trial evidence will show you that the CIA

6   labeled Hickok unclassified and even distributed the

7   unclassified Hickok user's guide to its employees.  Hence, I

8   believed this information to be unclassified.  After the

9   government discovered the e-mail, the CIA decided to reclassify

10  Hickok as top secret so it could charge me with an additional

11  crime.  You will see this evidence for yourself.

12          The second charge is thought crime.  The government

13  claims I thought about releasing national defense information

14  from my prison cell.  George Orwell's 1984 turned out to be a

15  prophecy.  The government claims that information I wrote in

16  private notebooks labeled "attorney-client privilege" and only

17  ever shared with my attorneys contained national defense

18  information -- information that had already been on the

19  Internet for at least 18 months and reported by the New York

20  Times and every major media outlet.

21          The prosecutor told you that I started an information

22  war to leak national defense information from prison.  These

23  prosecutors are going to utter "information war" hundreds of

24  times throughout this trial and this is the perfect example of

25  how the government deliberately cherry-picks, manipulates, and

1   perverts the truth to deceive you.  You need only review the

2   notebooks for yourself and see the obscure reference to an

3   information war literally defined to be my unclassified redress

4   of grievances criticizing this corrupt despicable justice

5   system which I literally titled "The Presumption of Innocence."

6   The irony appears lost on the government.  It was not a war to

7   release classified information but, instead, the term

8   information war is used as it is colloquially known, a war for

9   the hearts and minds.  Indeed, you have likely heard that

10  President Zelenskyy, of Ukraine, is similarly engaged in an

11  information war for the hearts and minds to gain worldwide

12  support for his country's war efforts against Russia.

13          The government, itself, is going to stipulate and

14  agree that through my work developing malware and engaging in

15  cyber operations against adversaries around the world, I

16  learned substantial national defense information that would be

17  extremely damaging if ever released, yet the thought crime

18  allegations levied against me from the government are as far

19  from this type of information as you can possibly get.

20          Furthermore, the evidence will definitively prove that

21  I took no substantial step to ever disclose any of the

22  unclassified information I wrote in my private notebooks

23  labeled attorney-client privilege.  My redress of grievances

24  was the only thing I ever intended and ultimately did release

25  publicly which the CIA and the government agrees was

M6E5sch2

1    unclassified.

2              Although the illusion that there is a presumption of

3    innocence is indeed nothing but a facade, I ask the jury to

4    grant me the status that our government has denied me.  I ask

5    that you realize how serious this trial is, how my very life is

6    in your hands.  I ask that you put yourselves in my shoes and

7    treat me as you would like to be treated if you were here and I

8    were there.  I also ask that you keep an open mind throughout

9    the entire trial and not make any decisions until deliberations

10   at the end.  Remember that the government will go first for

11   everything.  They went first here during the opening

12   statements, they will call their witnesses first and get to

13   question them first.  And at the end they will not only go

14   first in their summations but they will also go last.  If you

15   do all of this, I am convinced that you will reach the only

16   possible verdict:  That the government failed to prove beyond a

17   reasonable doubt that I am guilty of any crime because I am in

18   fact innocent.  Then, perhaps, although five years denied,

19   justice will be done.

20             Thank you.

21             THE COURT:  Thank you, Mr. Schulte.

22             Ladies and gentlemen, a couple things.  One is just a

23   reminder that what Mr. Schulte said and what the government

24   said, that what they said is not evidence.  All right?  You

25   haven't heard any evidence yet.  The evidence will come solely

M6E5sch2

1      from the witnesses who testify from the witness stand here and

2      any exhibits that are admitted into evidence.  So to the extent

3      that the evidence comes in differently than either the

4      government or Mr. Schulte has predicted, it is the evidence

5      that you should consider and not their statements.

6              Second, at the appropriate time, I will give you

7      instructions about what you may consider with respect -- how

8      you may consider evidence concerning the fact that Mr. Schulte

9      is incarcerated -- he told you that himself -- but at the

10     appropriate time I will give you instructions on that.  The

11     bottom line is, as I stated before and that I state again, he

12     is presumed innocent and the burden is on the government at all

13     times to prove his guilt.  With that, we will proceed with the

14     first witness.

15             Mr. Denton, if you can call the first witness and as

16     that witness comes in, perhaps adjust the podium, please?

17             MR. LOCKARD:  Yes, your Honor.  The government calls

18     Richard Evanchec.

19     RICHARD JOHN EVANCHEC,

20         called as a witness by the Government,

21         having been duly sworn, testified as follows:

22             THE COURT:  And if you, Mr. Evanchec, can take off

23     your mask at this time?

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  Thank you.

1          Make sure you are an inch or two away from the

2     microphone, and speak loudly and clearly so everyone in the

3     courtroom can hear you.

4               THE WITNESS:  Yes, your Honor.

5               THE COURT:  Mr. Lockard, you may proceed.

6               MR. LOCKARD:  Thank you, your Honor.

7     DIRECT EXAMINATION

8     BY MR. LOCKARD:

9     Q.  Good afternoon, sir.

10    A.  Good afternoon, Mr. Lockard.

11    Q.  Who is your employer?

12    A.  The Federal Bureau of Investigation.

13    Q.  What is your current position with the FBI?

14    A.  I am currently a supervisory special agent in the FBI's

15    Dallas, Texas field office.

16    Q.  And what type of squad are you currently supervising?

17    A.  I currently lead a squad that is comprised of 10 special

18    agents and 10 task force officers that are state, local, and

19    federal law enforcement officers, and we handle all violent

20    crime and transnational organized crime in north Texas.

21    Q.  Prior to your responsibility of supervising that task

22    force, what was your position?

23    A.  Prior to this job I was the chief of staff for the FBI's

24    counter-terrorism division.  Prior to that I was a supervisor

25    in the FBI's counter-terrorism division.  And just prior to

1    that I was a special agent here in the New York field office.

2    Q.  When you were in the New York field office, what type of

3    squad did you work on?

4    A.  I was assigned to counter-intelligence Squad 6 here in New

5    York, sir.

6    Q.  What type of cases did that squad investigate?

7    A.  So that squad handled counter-intelligence investigations

8    which is essentially the FBI's role in thwarting foreign

9    governments and their efforts to spy on American citizens,

10   American businesses of the United States government.  So our

11   specific team of agents on CD-6 really focused on insiders,

12   that was the people that worked inside the U.S. government,

13   worked inside businesses and that were using their positions of

14   trust to provide information to foreign governments.  So it was

15   really focused on the insiders, sir.

16   Q.  In the course of your duties as a special agent on that

17   counter-intelligence squad, did you become familiar with an

18   investigation relating to Joshua Schulte?

19   A.  Yes, sir; I did.

20   Q.  What was your role in that investigation?

21   A.  I was one of the lead case agents, sir.

22   Q.  Could you explain what are the responsibilities of a case

23   agent?

24   A.  Sure.  In this investigation, because of the size of this

25   investigation, it was much of a coordination role, and that is

1   making sure that the investigation was resourced, resourced by

2   the appropriate personnel, that there was a clear investigative

3   strategy, that there was communication amongst the various

4   types of people that were there, but ultimately as a case agent

5   in any FBI investigation the case agent is responsible for the

6   overall conduct of that investigation.

7   Q.  Agent Evanchec, do you see Mr. Schulte in the courtroom

8   today?

9   A.  I do; yes, sir.

10  Q.  Can you please point him out or describe where he is?

11  A.  Yes.  He is in the second table behind the U.S. Attorney's

12  office, second seat, white mask -- hup, he stuck his head up

13  right now and he just waved -- wearing a beard and shaved head.

14          THE COURT:  Indicating the defendant.

15  Q.  Special Agent Evanchec, I would like to direct your

16  attention to the date of March 7, 2017.

17  A.  Yes, sir.

18  Q.  Do you recall that date?

19  A.  I do.

20  Q.  Why do you recall that date?

21  A.  That was the date that WikiLeaks had released a treasure

22  trove of classified CIA information that they called Vault 7.

23  Q.  In the course of your duties with the FBI, had you become

24  familiar with the WikiLeaks organization?

25  A.  I have; yes, sir.

1   Q.  Generally speaking, what is WikiLeaks?

2   A.  It's an organization that attempts to obtain classified or

3   proprietary or sensitive information from governments around

4   the world and from organizations.  They then take that

5   information and use their online presence, they use their

6   website, they use their social media to basically send that

7   information throughout the world and they do so without regard

8   to the laws of those nations where that information is stolen.

9   Q.  Prior to the Vault 7 release that you just described, had

10  WikiLeaks previously claimed to have released classified

11  information from the U.S. government?

12  A.  Yes, sir.

13  Q.  Had it previously claimed to have released information from

14  foreign governments?

15  A.  Yes, sir.

16  Q.  Had it claimed to have released information from private

17  individuals at organizations?

18  A.  Yes, sir.

19  Q.  From what sources does WikiLeaks claim to have obtained

20  these kinds of information?

21  A.  From anonymous insiders, much like the people that I spoke

22  about earlier in my testimony, sir.

23  Q.  Turning back to the Vault 7 release that began on March 7

24  of 2017, can you describe what kind of information was included

25  in that release?

A.  Yes.  So this was classified information that was from a
CIA network and on this network were tools, were computer
programs that the CIA had developed in order to hack into the
computer systems and digital media of enemies of the United
States.

Q.  And broadly speaking, when you say enemies of the United
States, what types of targets are you talking about?

A.  Sure.  The CIA's mission overseas really focuses on two
priorities for them in categories of enemies.  I think one,
sir, would be a terrorist organization; they're actively
working to exploit what terrorist organizations are doing,
potentially plots that they're planning.  The second major
category would be hostile foreign governments, that is,
governments that are attempting to spy on the United States and
the American people.

Q.  Are these computer programs that you described, are they
sometimes called cyber tools?

A.  Yes, sir; they are.

Q.  How, if at all, did the development and the use of these
foreign intelligence cyber tools relate to the United States'
national defense?

A.  These were tools, much like I mentioned before that the CIA
was using overseas, to penetrate the computer systems of our
enemies and I think that's important to our national defense
because, as you can imagine, understanding what a terrorist

1    organization like Al Qaeda was doing, what they were planning,

2    how they raised money, that would certainly be something the

3    United States would want to know about so we could harden our

4    defenses and disrupt those plots.

5        Similarly, when we talk about a foreign nation -- a hostile

6    foreign nation, it would certainly be beneficial to know what

7    countries were doing in attempt to steal, potentially, and for

8    example, you know, nuclear capabilities of our submarine or of

9    our military, or our intentions with our military.  So having

10   that type of information and being able to know it really would

11   permit our government to take proactive steps to protect our

12   country and the American people.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   BY MR. LOCKARD:
 2   Q.  Were there additional releases following March 7, 2017?
 3   A.  Yes, sir, there were.
 4   Q.  Approximately how many releases altogether?
 5   A.  I recall, sir, there being approximately 24 through the
 6   fall of 2017, if my memory serves me correctly.
 7   Q.  And what impact did the exposure of those CIA foreign
 8   intelligence cyber tools have as a result of that release?
 9   A.  The impact, very specifically, was catastrophic --
10   catastrophic in the sense that CIA employees' operations
11   overseas to stop a terrorist attack or thwart a spying effort
12   by a hostile foreign government were completely brought to a
13   halt.  WikiLeaks had exposed these cyber tools that you
14   mentioned in such a way that our enemies now knew the
15   capabilities.  They knew the types of weapons the CIA was
16   developing in order to thwart their plans.  So operations
17   overseas were, in many cases that I'm aware of, brought to a
18   complete halt.
19        Back in the United States, in the CIA offices where these
20   tools were being created, the innovation, the research that was
21   going in to develop new tools to provide new capabilities for
22   the CIA was taken off-line completely.  The system that they
23   used to create those tools was unplugged, for lack of a better
24   word.  The individuals that had spent so much of their careers
25   developing these tools were sidelined from the day-to-day jobs
```

1    as the FBI conducted an exhaustive investigation of what had

2    happened.

3    Q.  What, if any, risks did the information in the Vault 7

4    releases create for individuals?

5    A.  Any time you expose how a CIA officer conducts their

6    business -- and it would have been the types of tools they were

7    deploying -- you put the people that are responsible for using

8    those tools at jeopardy.  You essentially permit a hostile

9    foreign government, to use that example, the ability to trace

10   back if a tool was, you know, present on one of their systems

11   or on one of their devices and to do basically an investigation

12   of how that got there.  So that essentially put our CIA

13   officers overseas at risk of being identified, potentially

14   arrested, and depending on where that CIA officer was

15   stationed, certainly in personal harm's way.

16   Q.  Agent Evanchec, sitting next to you on the witness rail is

17   a Redweld.  Do you see that accordion folder?

18   A.  Yes, sir.

19   Q.  Could you please take a look at the contents of that

20   folder?

21   A.  Yes, sir.

22   Q.  Have you seen that item before?

23   A.  I have, yes, sir.

24   Q.  And do you recognize it?

25   A.  I do.

M6eWsch3                              Evanchec - Direct

1   Q.  What is that?

2   A.  This is a HP laptop computer that contains a copy of the

3   downloaded Vault 7 release that was copied by the FBI in 2019.

4           MR. LOCKARD:  The government offers that laptop as

5   exhibit 1.

6           THE COURT:  Is it marked as Government Exhibit 1?

7           THE WITNESS:  Yes, sir, it is.

8           THE COURT:  All right.

9           Any objection?

10          MR. SCHULTE:  Yes.  The defense objects.

11          THE COURT:  All right.  And just on the grounds that

12  we've previously discussed?

13          MR. SCHULTE:  Yes.

14          THE COURT:  Overruled.  It's admitted.

15          (Government Exhibit 1 received in evidence)

16  BY MR. LOCKARD:

17  Q.  Agent Evanchec, there should also be up there in the

18  witness box with you a black three-ring binder.

19  A.  Yes, sir.

20  Q.  OK.  Does that binder bear your initials?

21  A.  Yes, sir, it does.

22  Q.  And did you review the contents of that binder before your

23  testimony this afternoon?

24  A.  Yes, Mr. Lockard.

25  Q.  And generally speaking, what are the contents of that

1  binder?

2  A.   These are essentially screenshots and files that WikiLeaks

3  had released as part of their Vault 7 dissemination that

4  relates to many of the tools and products and discussion boards

5  that were housed on the CIA systems that I spoke about earlier

6  in my testimony.

7  Q.   Does that consist essentially of a selection of some of

8  those files from the Vault 7 release?

9  A.   It does, yes, sir.

10        MR. LOCKARD:   The government at this time offers the

11  exhibits in the binder, which comprise -- I can list them

12  off -- Government Exhibits 2; 3; 4, 4-1, and 4-2; 5, 5-1, and

13  5-2; 6, 6-1, and 6-2; 7, 7-1, 7-2, 7-3, 7-4, 7-5 and 7-6; 8,

14  8-1, and 8-2; 9, 9-1, 9-2, 9-3; 10, 10-1; 11, 11-1, and 11-2;

15  12, 12-1, 12-2; 13, 14, 14-1; 15, and finally, 16.

16        THE COURT:   Any objections other than previously

17  raised?

18        MR. SCHULTE:   No.

19        THE COURT:   Admitted.

20        (Government Exhibits 2; 3; 4, 4-1 and 4-2; 5, 5-1 and

21  5-2 received in evidence)

22        (Government Exhibits 6, 6-1 and 6-2; 7, 7-1, 7-2, 7-3,

23  7-4, 7-5 and 7-6 received in evidence)

24        (Government Exhibits 8, 8-1 and 8-2; 9, 9-1, 9-2, 9-3;

25  10, 10-1 received in evidence)

1          (Government Exhibits 11, 11-1 and 11-2; 12, 12-1,

2    12-2; 13; 14, 14-1; 15, and 16 received in evidence)

3          MR. LOCKARD:  Ms. Cooper, if you could please pull up

4    Government Exhibit 2 and publish it.

5    Q.  Agent Evanchec, do you recognize what's been admitted as

6    Government Exhibit 2?

7    A.  I do.

8          THE COURT:  Hold on one second, Mr. Lockard.

9          Just to make sure our technology is working, can

10   everybody give me a thumbs up if the monitor in front of them

11   is working.

12         Excellent.

13         You may proceed.

14         MR. LOCKARD:  Thank you, your Honor.

15   Q.  Agent Evanchec, what is shown here in Government Exhibit 2?

16   A.  This would have been one of the pages of the Vault 7

17   release.  The formating is consistent with what I've observed

18   in the CIA systems as part of my investigation.  So this is,

19   very generally, the CIA internal systems documents that were

20   exposed in Vault 7.

21   Q.  And what did WikiLeaks subtitle the Vault 7 release?

22   A.  I'm sorry.  I don't understand your --

23   Q.  Could you just read where it says Vault 7 and then what

24   follows?

25   A.  Oh.  Yes, sir.  "Vault 7 CIA hacking tools revealed."

1           MR. LOCKARD:  Thank you.

2           Ms. Cooper, if you could please pull up Government

3    Exhibit 13 and publish it.

4    Q.  And again, Agent Evanchec, do you recognize what's shown

5    here as Government Exhibit 13?

6    A.  I do, yes, sir.

7    Q.  And generally speaking, what is this document?

8    A.  This is a user guide that's classified as secret that is

9    the -- basically the overview of one of those cyber tools

10   called Brutal Kangaroo.

11          MR. LOCKARD:  Ms. Cooper, if you could please turn us

12   to page 4 of the exhibit, which is page 1 of the user guide.

13   Q.  Drawing your attention to the third paragraph in section

14   1 -- third paragraph of the document, second paragraph in

15   section 1.1, does this user guide contain a description of the

16   components of the Brutal Kangaroo project?

17   A.  It does, sir.

18   Q.  And what is the component Drifting Deadline described as?

19   A.  A thumb drive infection tool.

20   Q.  And what is the component described as Shattered Assurance;

21   how is that described?

22   A.  A server tool that handles automated infection of thumb

23   drives in the primary mode of propagation for the Brutal

24   Kangaroo suite.  Shattered Assurance utilizes Drifting Deadline

25   for the individual infection of thumb drives.

1           MR. LOCKARD:  Thank you, Ms. Cooper.  You can pull
2     that down.
3     Q.  What's your understanding generally what of that means,
4     those descriptions?
5     A.  It's essentially a thumb drive that was created by the CIA.
6     It could be input into a computer network that would
7     subsequently render other thumb drives that were later put in
8     to be infected as well.
9     Q.  And looking at the designation in front of the description
10    of the Brutal Kangaroo project, where it says (S) --
11    A.  Yes.
12    Q.  -- what does that mean?
13    A.  That indicates that paragraph is classified, and it's
14    classified as secret.
15          THE COURT:  Can I interrupt for one second.  First of
16    all, similarly, can you just explain what the marking on the
17    top is that says secret/noforn.
18          THE WITNESS:  Yes, your Honor.
19          This is a standard classification marking, your Honor,
20    that the U.S. government uses.  The first part of that, prior
21    to the forward slashes, you see the word "secret," and that's
22    the classification level.
23          For the jury as well, oftentimes at the CIA I would
24    see the word "secret" or even "top secret" where that word is.
25    After the two slashes, you see the word "noforn," and that's

1    what we call a handling caveat.  That essentially means that --

2    it's further restrictions on the classification.  So in this

3    case, noforn means not for foreign dissemination, so there's no

4    circumstance where this document would be able to be given to

5    any country even if it was an ally of the United States.

6             THE COURT:  All right.

7             Let me interrupt, ladies and gentlemen, and say two

8    things to you.  First of all, certain documents that you'll see

9    over the course of the trial contain these classification

10   markings.  Two things to tell you.  One is certain documents,

11   such as this one, have been declassified in connection with

12   this case, in the litigation of this case, to permit the

13   government and Mr. Schulte to use them and enter them into

14   evidence and show them to you.

15            There may be some caveats to you that I'll describe to

16   you at the appropriate time, but just so you understand, these

17   are no longer classified, and that's why they're being publicly

18   shown.

19            The second thing is, as I will instruct you at the

20   close of the case and may give you further instruction during

21   the case, ultimately, it is up to you, the jury, to find

22   whether the government has proven beyond a reasonable doubt

23   that the information, at least for certain of the counts, the

24   information at issue qualifies as what is known as national

25   defense information.  All right?

1            In connection with that, you may consider the fact

2    that the government considers and treated the information as

3    classified, but classified information and national defense

4    information are not necessarily the same thing.  So that is a

5    factor you may consider.  I will give you further instructions

6    about that at the appropriate time, but you may consider the

7    markings on these documents as a reflection of how the

8    government treated them, how the government viewed them, not

9    for the truth of the fact that they were classified

10   information, let alone national defense information.  That is

11   ultimately your decision to make, and I'll give you further

12   instructions as appropriate.

13           Mr. Lockard.

14           MR. LOCKARD:  Thank you, your Honor.

15   Q.  Agent Evanchec, you mentioned something called a handling

16   requirement.  What is the concept of handling requirements in

17   the context of classified information?

18   A.  Essentially, sir, additional requirements that guide how

19   that document can be handled.  So something may be, for

20   example, secret and sometimes you might see releasable to G.B.,

21   which would be Great Britain.  So there are certain

22   restrictions even within classifications that dictate how

23   something can be properly handled.

24   Q.  Are there other handling requirements that come with the

25   classification of documents?

M6eWsch3                         Evanchec - Direct

1   A.  Yes, there are.

2   Q.  And generally, what are those handling requirements?

3   A.  Another example that you might see in this case, that I saw

4   in my investigation, is AIOU.  That would be agent internal --

5   excuse me, AIUO, agency internal use only, And oftentimes that

6   meant that that information was not allowed to be taken outside

7   of the CIA.  So there would be any number of them.  I just

8   chose to give you that example because it was fresh in my mind.

9           MR. LOCKARD:  Ms. Cooper, you can bring that down.

10  Thank you.

11  Q.  And just focusing in on classification as something that is

12  either secret or top secret, does that come with handling

13  requirements?

14  A.  Both would, yes, sir.

15  Q.  What types of handling requirements?

16  A.  Again, you would have restrictions on dissemination to

17  foreign governments.  You'd have prohibitions on taking outside

18  of controlled CIA or U.S. government space.  Those were

19  generally the handling caveats that you'd see, as your Honor

20  mentioned, on the top and bottom of the document.

21  Q.  And who is allowed access to information or documents that

22  have been classified?

23  A.  Only those individuals that have a active security

24  clearance and those who have a need to know; that is, they

25  have -- because of their work assignment, they actually have a

M6eWsch3                     Evanchec - Direct

1    need to work on that specific product or read that exact

2    document.

3        Just because you may possess a secret or top secret

4    clearance doesn't mean you have a right to every top secret or

5    secret document.  I have to have an articulable need to know in

6    order to gain access to documents and files that are

7    classified.

8    Q.  Agent Evanchec, in the course of the investigation, did you

9    learn more specifically what CIA group's information had been

10   included in the Vault 7 release?

11   A.  I had.

12   Q.  And which group is that?

13   A.  The Center for Cyber Intelligence.

14       MR. LOCKARD:  Ms. Cooper, could we please pull up

15   Government Exhibit 89 for Agent Evanchec.

16       THE COURT:  Just the witness only, please.

17   BY MR. LOCKARD:

18   Q.  Do you see what's been identified as Government Exhibit 89?

19   A.  I do, yes, sir.

20   Q.  And do you recognize it?

21   A.  I do.

22   Q.  And is that an accurate depiction of the subject matter

23   that's being depicted there?

24   A.  At the time of my investigation, it is.

25       MR. LOCKARD:  The government offers exhibit 89.

1          THE COURT:  Any objection?

2          MR. SCHULTE:  No objection.

3          THE COURT:  Admitted.

4          (Government Exhibit 89 received in evidence)

5          MR. LOCKARD:  Could we please publish?

6          THE COURT:  You may.

7          Ladies and gentlemen, let me, just as we're starting

8    up, if you haven't picked up on this already, until something

9    is actually admitted into evidence, it's not in evidence, and

10   you may not consider it, which is why there will be moments and

11   times where things are displayed to the witness that you may

12   not see on your monitors.  If either party wants to publish

13   something that is in evidence, admitted into evidence -- that

14   is, show it to you -- then they'll request to do so, and at

15   that time you'll be able to see it.

16          I should also mention that at the close of the case,

17   with certain limitations that I will explain when you begin

18   your deliberations, you will actually have all of the evidence

19   with you in the jury room.  But while you should obviously take

20   the opportunity, when shown evidence, to look at it here in the

21   courtroom, you'll also have a chance to review it later.

22   BY MR. LOCKARD:

23   Q.  Agent Evanchec, can you generally describe what's shown in

24   this chart?

25   A.  Yes.  This is an organization chart that basically outlines

1   all of the offices and essentially the chain of command that

2   Mr. Schulte would have been under as an employee of the

3   operation support branch, which is where he was during the

4   pertinent time of this investigation.  You can see the

5   different work groups and leadership that he would have been

6   under at that time.

7   Q.  And just starting at the top, you mentioned that the stolen

8   information in Vault 7 was from the Center for Cyber

9   Intelligence?

10  A.  That's correct, sir.

11  Q.  Broadly speaking, what was the mission of the Center for

12  Cyber Intelligence at the time of your investigation?

13  A.  Very broadly, this is the CIA's organization that handled

14  all things, all things cyber.  If there was a cyber need that

15  the CIA had, it would come to this organization to handle.

16  Q.  And moving one rung down on the org chart, what was the

17  mission of the engineering and development group at the time of

18  your investigation?

19  A.  This, again, would have been -- excuse me.

20      This would have been a group of engineers that were

21  collecting certain requirements needed from officers in the

22  field, and they would be designing and creating tools that were

23  needed to carry forward that mission.

24  Q.  Was the engineering and development group responsible for

25  using or deploying those tools?

1   A.  They were not.  That's a different group.

2   Q.  And then down underneath the Applied Engineering Division?

3   A.  Another subset of that, that specifically targeted

4   individual types of computer systems and individual types of

5   digital media.  So again, these were engineers that were

6   focused on developing those types of cyber tools, as you

7   mentioned before.

8   Q.  Are these the different branches that the engineers working

9   on the CIA's foreign intelligence cyber tools work in?

10  A.  They are.

11  Q.  Have you been to the offices of the CCI?

12  A.  I have.

13  Q.  Is the location of those offices disclosed or undisclosed?

14  A.  It is undisclosed.

15  Q.  How do you get into the CCI offices?

16  A.  To get in, you would -- you would be in a vehicle; that's

17  the only way to enter the facility.  I think there's one

18  pedestrian entrance as well, but you approach a heavily

19  fortified gate that has a barrier preventing vehicles from

20  coming in.  It would be staffed by heavily armed police

21  officers that are carrying military-grade rifles and pistols.

22       You would -- at that time of being stopped at the gate, you

23  would be required to show a CIA-issued identification that

24  would bear your photo, and then after confirming that your

25  photo looks like the person in the vehicle, the barrier would

1    lower.  That vehicle would then be permitted to go inside a

2    parking lot.

3         After parked, you would exit your vehicle.  You would go

4    through a heavily fortified entry door to the building.  Just

5    after making your way through that door, you would encounter a

6    full-body turnstile that you would be required to present that

7    same badge to a reader and then enter a unique identification

8    PIN.  At that time the full-body turnstile would permit you to

9    enter the building, and that's how you would gain access.

10   Q.  And after gaining access to the building, where were the

11   offices for the development branches in the Applied Engineering

12   Division?

13   A.  IT'S MY understanding they were on the eighth and ninth

14   floors.

15   Q.  And what, if anything, would you do to then gain access to

16   those offices?

17   A.  So, once again, each office -- it's actually called a vault

18   in the CIA -- would have its own individual card reader again,

19   and you would be required to present your identification badge

20   to that card reader and then again enter that unique PIN that

21   was issued to you in order to gain access to your work space.

22   Q.  Is anyone with a CIA badge allowed to enter those

23   particular vaults?

24   A.  No, sir.

25   Q.  Who was permitted to enter?

1    A.  Only the individuals who were assigned to or had a need to

2    access that work space were granted access to that space.  So

3    you may have worked on the fifth floor of the CCI building, but

4    that did not mean that you had access to other offices

5    throughout, and you would have had to have an established need

6    to know and approval, and that approval had to have been

7    granted by the security branch within the office to be given

8    access to that vault.

9    Q.  What, if any, other additional security measures were there

10   for those individual office vaults?

11   A.  So, during the hours that the vault was not occupied by

12   employees, it was secured by an alarm system and by an

13   additional door-locking mechanism.  And essentially, if you

14   were the last person at night to leave your vault, you would be

15   required to arm an alarm system that was motion activated so

16   that if someone was able to gain entrance to that vault at

17   night, in an unauthorized manner, an alarm would go off that

18   would signal to the police force there at the building, and

19   they would respond.

20       Additionally, as the last person to leave, you would engage

21   an additional spin dial-type of safe lock that would be an

22   additional type of security feature that would prevent you from

23   going in.

24       And that door, I should mention, is a fortified steel door.

25   Q.  You talked earlier a little bit about security clearances?

1    A.  Yes.

2    Q.  Were the personnel at the CCI offices, did they have

3    security clearances?

4    A.  They did.

5    Q.  Generally speaking, what security clearance would employees

6    there have?

7    A.  Top secret.

8    Q.  Now, were the CIA cyber tools, those foreign intelligence

9    computer programs, were they written on any particular computer

10   system within the CCI?

11   A.  They were.

12   Q.  And did that system have a name?

13   A.  It did.

14   Q.  What was it called?

15   A.  DevLAN.

16   Q.  Do you know what DevLAN stands for?

17   A.  I believe it was development local area network.

18   Q.  From where could the DevLAN computer network be accessed?

19   A.  Only within CIA spaces.

20   Q.  Turning back again to the initial release of Vault 7 on

21   March 7, 2017, when did the FBI begin investigating the Vault 7

22   release?

23   A.  Immediately after the release on March 7 of 2017.

24   Q.  And what was that nature of the investigation that opened

25   on March 7?

1  A.  The initial investigation actually opened via Washington

2  field office was what the FBI calls an unsub investigation, and

3  that is essentially the FBI was aware that a massive crime had

4  been committed but did not yet know who the perpetrator of that

5  was.  So we open what we called an unknown subject

6  investigation in order to find out who the perpetrator was.

7       So the initial investigation opened on the 7th was an unsub

8  investigation sponsored by our Washington D.C. field office.

9  Q.  When did you personally become involved in the

10  investigation related to the Vault 7 release?

11  A.  The following day, on the 8th of March.

12  Q.  And what was the nature of your investigation?

13  A.  It was specifically a full field investigation on Joshua

14  Schulte.

15       THE COURT:  Mr. Lockard, if we're done with this

16  exhibit, can we take it down?

17       MR. LOCKARD:  Oh, yes, we can.

18  Q.  Now, between the two investigations, approximately how many

19  FBI personnel were involved?

20  A.  From both offices, I would say over the course of this

21  investigation, over a hundred.

22  Q.  What were the first steps taken in those investigations?

23  A.  The very first steps that were taken were essentially a

24  fact-finding effort, you know, where was this information,

25  where were these computer systems within the CIA, who had

access to this computer system?  And those questions were asked

so that the next step could be taken, which would be to begin

to collect and preserve evidence that could speak to who

committed this crime.

So after the fact-finding mission of finding where the

system was and who had access to it, our Washington field

office very methodically, one by one, took control of every

piece of digital media that was part of or that could have ever

touched the DevLAN system.

Q.  And approximately how many pieces of computer equipment did

the FBI seize as part of securing the DevLAN network?

A.  Sir, it was hundreds and hundreds of pieces.  You know,

when I left the investigation, I understood that there were

upwards of 1.4 petabytes of data that had been collected from

those offices.

Q.  So, you hear a lot about megabytes and gigabytes and

terabytes, what is a petabyte?

A.  A petabyte is an extraordinarily large volume of data.  My

understanding is one petabyte of data would basically be the

equivalent of over 220,000 movies, or DVDs.  And we had 1.4

petabytes, so an extraordinarily large volume of data.

I've also heard petabyte described as over 500 billion

pieces of paper.  So we're talking about an extraordinary

amount of evidence, a nearly unprecedented in the FBI's

investigative history amount of data, classified data that was

M6eWsch3                          Evanchec - Direct

1    recovered.

2    Q.   What did the FBI then do with that seized data and computer

3    equipment?

4    A.   That -- those computers, those servers, those hard drives,

5    those thumb drives were all cataloged by serial number, and

6    they were taken into a sequestered space that the FBI

7    controlled in order to maintain the integrity of that evidence.

8    Q.   And after securing and cataloging the evidence, what did

9    the FBI then do?

10   A.   That data was then loaded on to new servers, additional

11   servers, so that it could be reviewable.  There was such a huge

12   volume of evidence that we had to assemble a massive team to go

13   through very meticulously and review it.  So they were uploaded

14   on to a new system that would thereby allow dozens of computer

15   scientists or analysts or special agents to simultaneously

16   review that information and, even more importantly, would allow

17   us to write computer programs to go and search against that

18   data to find anomalies or to find suspicious things that

19   happened in there.

20       So the short answer was uplifting that into a new system

21   and new servers in order to allow for a multipronged,

22   multifaceted review of that evidence.

23   Q.   Now, when did Mr. Schulte's employment at the CIA come to

24   an end?

25   A.   On November 10 of 2017.

1   Q.  Did the FBI seize computers --

2   A.  Excuse me.  I'm sorry.

3       November 10, 2016.

4   Q.  Thank you.

5       Did the FBI seize the computers that Mr. Schulte had used

6   when he was with the CIA?

7   A.  We did.

8           MR. LOCKARD:  At this time the government would offer

9   a stipulation.

10          THE COURT:  Is it marked as an exhibit?

11          MR. LOCKARD:  It is marked as Government Exhibit 3005.

12          THE COURT:  You may proceed.

13          Ladies and gentlemen, I mentioned earlier a

14  stipulation is just a fancy lawyer term for an agreement; that

15  is to say, it's an agreement between the government in this

16  case and Mr. Schulte.  You may consider the stipulation as you

17  would any other evidence.  What weight, if any, you choose to

18  give to it is up to you, as with any evidence.

19          With that, Mr. Lockard, you may proceed.

20          MR. LOCKARD:  Thank you, your Honor.

21          I think, particularly for the benefit of the court

22  reporter, if we could please display 3005?

23          THE COURT:  You may.

24          MR. LOCKARD:  "It is hereby stipulated and agreed by

25  and among the United States of America, by Damian Williams,

United States Attorney for the Southern District of New York,

David W. Denton Jr. and Michael D. Lockard, Assistant United

States Attorneys, of counsel, and Joshua Adam Schulte, the

defendant, that:

          "1.  If called as a witness, a member of the Federal

Bureau of Investigation ('FBI')'s computer analysis response

team ('CART member-1') with knowledge of the matter would

testify that on or about March 10, 2017, CART member-1 was

present at the office building for the Central Intelligence

Agency ('CIA'), Center for Cyber Intelligence ('CCI'), located

in the Washington Metropolitan area (the 'CCI building').

While CART member 1= was present in room 9E79 of the CCI

building, CART member-1 recovered (i) a Dell Precision computer

tower that was used by the defendant to access the CIA computer

network called DevLAN while the defendant was employed at the

CIA and that was logged into evidence as E0001_RM9E79_tower

('device E0001') and (ii) a SanDisk Extreme USB device that was

logged into evidence as E0003_RM9E79_FM104 ('device

E0003_FM014').  Device E0001 contained four hard drives ('hard

drive-1' through 'hard drive-4').  Government Exhibit 1201 is a

compact disc containing true and accurate copies of photographs

of device E0001; Government Exhibit 1202 is a compact disc

containing true and accurate copies of forensic files and data

recovered from hard drive-1; Government Exhibit 1203 is a CD

containing true and accurate copies of forensic files and data

recovered from hard drive-3; Government Exhibit 1203-28 is a CD

containing a true and accurate copy of a log file recovered

from hard drive-3; Government Exhibit 1204 is a compact disc

containing true and accurate copies of photographs of device

E0003_FM014; and Government Exhibit 1205 is a compact disc

containing true and accurate copies of forensic files and data

recovered from device E000_FM014.

         "2.  If called as a witness, another member of FBI

CART ('CART member-2') with knowledge of the matter would

testify that on or about March 11, 2017, while CART member-2

was present in room 9E79 of the CCI building, CART member-2

recovered a NetApp server containing 24 hard drives that was

logged into evidence as E0018_RM9E79_24HDD ('device E0018').

Government Exhibit 1206 is a compact disc containing true and

accurate copies of photographs of device E0018, and Government

Exhibit 1207 is a compact disc containing true and accurate

copies of forensic files and data recovered from device E0018.

         "3.  If called as a witness, another member of FBI

CART ('CART member-3') with knowledge of the matter would

testify that on or about March 23, 2017, while CART member-3

was present in room 9W89A of the CCI building, CART member-3

recovered an ESXi server that was logged into evidence as

E022_RM9W89A_Dell ('device E0022').  Government Exhibit 1208 is

a compact disc containing true and accurate copies of

photographs of device E0022, and Government Exhibit 1209 is a

M6eWsch3                                     Evanchec - Direct

1    compact disc containing true and accurate copies of forensic

2    files and data recovered from device E0022.

3           "4.  If called as a witness, another member of FBI

4    CART ('CART member-4') with knowledge of the matter would

5    testify that on or about June 9, 2017, while CART member-4 was

6    present in room 9E78 of the CCI building, CART member-4

7    recovered a Dell Precision tower 7910 containing two hard

8    drives that was logged into evidence as E0056-RM9E78-010

9    ('device E0056').  Government Exhibit 1210 is a compact disc

10   containing true and accurate copies of photographs of device

11   E0056, and Government Exhibit 1211 is a compact disc containing

12   true and accurate copies of forensic files and data recovered

13   from device E0056.

14          "5.  If called as a witness, another member of FBI

15   CART ('CART member-5') with knowledge of the matter would

16   testify that on or about March 12, 2017, while CART member-5

17   was present at an offsite CIA facility located in the

18   Washington Metropolitan area, CART member-5 recovered a NetApp

19   server that was logged into evidence as E0012_RMLE70E ('device

20   E0012').  Government Exhibit 1212 is a compact disc containing

21   true and accurate copies of forensic files and data recovered

22   from device E0012.

23          "It is further stipulated and agreed that this

24   stipulation, as Government Exhibit 3005, Government Exhibits

25   1201 through 1212, and all government exhibits contained on

M6eWsch3                          Evanchec - Direct

1    Government Exhibits 1201 through 1212 may be received in

2    evidence as government exhibits at trial."

3            The government offers exhibit 3005 and all of the

4    identified exhibits therein.

5            THE COURT:  Admitted pursuant to stipulation.

6            (Government Exhibits 1201 through 1212 and 3005

7    received in evidence)

8            THE COURT:  Go ahead.

9    BY MR. LOCKARD:

10   Q.  Agent Evanchec, before we were talking about the seizure of

11   computer evidence and data from the CCI offices; you were

12   talking about how Vault 7 included classified information from

13   the DevLAN computer network.  In the course of the

14   investigation, was the FBI able to determine specifically what

15   computer files had been taken?

16   A.  We were.

17   Q.  And specifically, what computer files had been taken?

18   A.  Application called Confluence.

19   Q.  And were particular files containing the Confluence data

20   identified?

21   A.  Yes.

22   Q.  Which files were those?

23   A.  They were files from a backup copy of the system.

24   Q.  And what was the date of the backup that contained the data

25   that was released in the Vault 7 release?

M6eWsch3                              Evanchec - Direct

1   A.  March 3, 2016.

2   Q.  And in the course of the investigation, was the FBI able to

3   determine on what date those March 3 backups were stolen?

4   A.  We were.

5   Q.  And generally speaking, what type of investigative

6   technique led to that conclusion?

7   A.  Very broadly, it was a very exhaustive forensic analysis of

8   the treasure trove of digital media that I spoke about earlier

9   in my testimony.

10  Q.  And what part of the FBI team performed that analysis?

11  A.  Our computer scientists.

12  Q.  And did they determine who had stolen the March 3, 2016,

13  backups on April 20?

14  A.  They had.

15          MR. SCHULTE:  Objection.  Hearsay.

16          THE COURT:  Sustained.

17          MR. LOCKARD:  Ms. Cooper, could you please pull up

18  Government Exhibit 1207-27, which is in evidence.  And publish.

19  Q.  Special Agent Evanchec, do you recognize what's shown here

20  as Government Exhibit 1207-27?

21  A.  I do, yes, sir.

22  Q.  And what is shown here?

23  A.  This is a file directory from the Altabackup, which is the

24  backup I talked about before, of the Confluence application.

25  Q.  And how often was the Confluence system backed up?

M6eWsch3                        Evanchec - Direct

1    A.  Daily.

2              MR. LOCKARD:  And if we could focus in on, I think,

3    about seven or eight from the bottom, the March 3, 2016,

4    backup.  Actually, before we go in --

5    Q.  So there's a column here for the name of the file.  Are

6    there also columns with date information for the files?

7    A.  Yes, sir, there are.

8    Q.  And what's the first date column?

9    A.  It is the date modified.

10   Q.  And then the second date column?

11   A.  The date accessed.

12   Q.  And the third date column?

13   A.  The date created.

14             MR. LOCKARD:  OK.  Thank you, Ms. Cooper.  If you

15   could zoom in on March 3.

16   Q.  So what is the date modified and date created date for the

17   March 3?

18   A.  March 3, 2016.

19   Q.  What is the date accessed date for the March 3 backup?

20   A.  April 20 of 2016.

21   Q.  And what is the time stamp on that access date?

22   A.  5:42 p.m.

23             MR. LOCKARD:  We have another stipulation that we

24   would read at this time, Government Exhibit 3004.

25             THE COURT:  You may proceed.

1          MR. LOCKARD:  "It is hereby stipulated and agreed by

2     and among the United States of America, by Damian Williams,

3     United States Attorney for the Southern District of New York,

4     David W. Denton Jr. and Michael D. Lockard, Assistant United

5     States Attorneys, of counsel, and Joshua Adam Schulte, the

6     defendant, that:

7          "1.  Government Exhibit 100 is a compact disc

8     containing true and accurate Central Intelligence Agency

9     ('CIA') badge records for i) Joshua Adam Schulte, identified as

10    Government Exhibits 105, 107, 108, and 109; (ii) Rufus,

11    identified as Government Exhibits 101 and 112; (iii) David,

12    identified as Government Exhibits 102 and 113; (iv) Timothy,

13    identified as Government Exhibits 103 and 114; (v) Andrew,

14    identified as Government Exhibit 104; (vi) Jeremy Weber,

15    identified as Government Exhibits 106 and 117; (vii) Michael,

16    identified as Government Exhibit 115; and (viii) Amol,

17    identified as Government Exhibit 116.  Government Exhibits 101

18    through 109 and 112 through 117 were made at or near the time

19    by, or from information transmitted by, a person with knowledge

20    of the matters set forth in the records; they were kept in the

21    course of a regularly conducted business activity; and it was

22    the regular practice of that business activity to maintain the

23    records.  The time stamps on Government Exhibits 101 through

24    109 and 112 through 117 reflect local time in 24-hour format.

25          "2.  Government Exhibit 111 is a true and accurate

copy of floor plans for the eighth and ninth floors for the

CIA's Center for Cyber Intelligence office in which the

defendant worked:

"3.  Government Exhibit 200 is a compact disc

containing true and accurate copies of portions of the

defendant's CIA personnel file, including Government Exhibit

201, which is a training the defendant took while employed at

the CIA; Government Exhibit 202, which is a portion of the

defendant's CIA employee bio; Government Exhibits 401 through

405, which are various nondisclosure agreements and security

paperwork signed by the defendant prior to resigning from the

CIA; Government Exhibits 406 through 408, which are various of

the defendant's performance activity reports at the CIA;

Government Exhibit 409 is a letter of warning provided to the

defendant on or about June 22, 2016; and Government Exhibit 411

is a complaint filed by the defendant to the office of Equal

Employment Opportunity Commission.

"4.  Government Exhibit 300 is a compact disc

containing true and accurate copies of documents, marked as

Government Exhibits 301 through 304, recovered from the

defendant's desk area following his resignation from the CIA.

"5.  Government Exhibit 500 is a compact disc

containing true and correct copies of portions of the

defendant's CIA security file, including Government Exhibits

506 through 507, which are outside activity reports completed

by the defendant while employed at the CIA; Government Exhibit

505, which is a complainant statement signed by the defendant

while employed at the CIA; Government Exhibit 508 is excerpts

of a recording of an April 8, 2016, interview of the defendant

while at the CIA; and Government Exhibit 509 is excerpts of a

recording of a July 19, 2016, interview of the defendant while

at the CIA.

          "6.  Government Exhibits 601 through 616 are true and

accurate copies of network documentation for certain CIA

computer systems.

          "7.  Government Exhibits 701, 702, 704 through 708,

712 through 714, 716, 718, 719, and 720 are true and accurate

copies of electronic communications that were transmitted over

CIA messaging systems.  The time stamps on Government Exhibits

701, 702, 704 through 708, 712 through 714, 716, 718, 719, and

720 reflect local time in 24-hour format.

          "8.  Government Exhibits 1001 through 1012, 1015

through 1056, 1058 through 1098, 1100 through 1103, 1105, 1107,

1108, 1110 through 1116, 1118, 1119, 1121, 1124, 1128 through

1130, and 1132 through 1137 are true and accurate copies of

email communications sent and received using CIA computer

systems.

          "9.  Government Exhibit 5001 is a true and accurate

copy of portions of the CIA's October 17, 2017, WikiLeaks task

force final report.

1              "It is further stipulated and agreed that this

2      stipulation, as Government Exhibit 3004, and Government

3      Exhibits 100, 111, 200, 300, 500, 601 through 616, 701, 702,

4      704 through 708, 712 through 714, 716, 718, 719, 720, 1001

5      through 1012, 1015 through 1056, 1058 through 1098, 1100

6      through 1103, 1105, 1107, 1108, 1110 through 1116, 1118, 1119,

7      1121, 1124, 1128 through 1130, 1132 through 1137, and GX5001

8      may be received in evidence as government exhibits at trial."

9              The government offers those exhibits.

10             THE COURT:  All right.  They're admitted by

11     stipulation.

12             (Government Exhibits 100, 111, 200, 300, 500, 601

13     through 616 received in evidence)

14             (Government Exhibits 701, 702, 704 through 708, and

15     712 through 714 received in evidence)

16             (Government Exhibits716, 718, 719, and 720 received in

17     evidence)

18             (Government Exhibits 1001 through 1012, 1015 through

19     1056, and 1058 through 1098 received in evidence)

20             (Government Exhibits 1100 through 1103, 1105, 1107,

21     and 1108 received in evidence)

22             (Government Exhibits 1110 through 1116, 1118, 1119,

23     1121, and 1124 received in evidence)

24             (Government Exhibits1128 through 1130 and 1132 through

25     1137 received in evidence)

1          (Government Exhibits 3004 and 5001 received in

2     evidence)

3          THE COURT:  Ladies and gentlemen, sorry for stealing

4     three minutes of your time.  I told you we'd end at 2:45, but I

5     didn't want to interrupt the stipulation, so it's now 2:48.  I

6     thank you for that.  We'll stop there for the day.  Tomorrow

7     I'm sure you'll learn more about some of those exhibits.  We'll

8     pick up where we left off.

9          Let me note one thing.  In one of those paragraphs,

10    there was a reference to various, I think, CIA employees by

11    first name only.  As you'll see, given sensitivities involved

12    and some of the people who worked for or work for the CIA, with

13    my permission -- or actually, at my direction -- the parties

14    are going to refer to certain people just by their first names

15    and in certain limited circumstances by actually other names

16    altogether.  But we'll give you further instructions on that; I

17    just wanted to explain that and that it is with my approval.

18         A few important instructions for the end of the day.

19         No. 1, don't discuss the case with each other, with

20    anyone you live with, or anyone you work with -- anyone -- in

21    any way, shape or form.  Don't do any research about the case

22    or anyone involved with it.  You need to keep an open mind.

23         You've heard the parties' opening statements, and

24    you've heard the very beginning of the evidence, but there's

25    plenty more to come and it's critical that you keep an open

1    mind.

2              I mentioned this yesterday, but if you happen to

3    develop COVID-19 symptoms, let alone test positive for COVID-19

4    overnight, please contact us.  Call us.  I know that we gave

5    you our contact information, so you should let us know, and

6    we'll give you further instructions, but we obviously want to

7    keep everybody safe and healthy throughout the trial, and

8    that's an important part of it.

9              As I told you, we'll start tomorrow promptly, I hope,

10   at or just after 9:00.  To enable us to do so, please be in the

11   jury room where you went to earlier on the 11th floor by no

12   later than 8:45.  If all goes according to plan, there will be

13   coffee and breakfast items waiting for you there.  And just a

14   reminder that we cannot start until all 16 of you are here.  So

15   out of respect for one another, if not for us, please be there

16   by 8:45 so that we can start promptly and make the best of your

17   time.

18             Also, a reminder, tomorrow we will start our sort of

19   standard schedule, which involves just the one short break

20   during the middle of the day, usually about 30 or 40 minutes,

21   tops, so you may want to bring a snack to tide you over until

22   the end of the day.  We'll stop at 2:45 tomorrow as well.

23             With that, one last reminder, just because these are

24   the first days, remember to keep your juror placard, and when

25   you arrive in the morning, when there may well be more people

M6eWsch3                              Evanchec – Direct

1    coming into the courthouse, just have it handy.  Make sure you

2    show it and identify yourself to the security officer as a

3    sitting juror, and they will hopefully escort you through the

4    process a little more quickly.

5           With that, all those very important instructions, I

6    wish you a very pleasant evening, and we will see you tomorrow

7    morning.

8           You're excused at this time.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  You may be seated.

 3              Members of the public, if you could just wait a moment

 4     to let the jury clear the floor, I would appreciate it.

 5              All right.

 6              Sir, you may step down from the witness stand.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  Please be here a few minutes before nine

 9     tomorrow so that we're ready to go promptly when the jury is

10     here.  I will see you tomorrow.

11              (Witness not present)

12              THE COURT:  All right.

13              Mr. Denton or Mr. Lockard, can you give me a preview,

14     tomorrow, how many witnesses or what witnesses you might be

15     calling?

16              MR. LOCKARD:  So, we expect that Agent Evanchec will

17     take up most of tomorrow, depending on cross.  If he concludes,

18     then Anthony Leonis will follow him.

19              THE COURT:  OK.  And remind me when, or tell me, based

20     on where we are when you would expect the witness who might

21     testify this week who would be subject to the security

22     protocols would be testifying.

23              MR. LOCKARD:  Possibly tomorrow.

24              THE COURT:  Is that Anthony Leonis?

25              MR. LOCKARD:  Yes, sir.
```

M6eWsch3

1              THE COURT:  OK.  Thank you for clarifying that.

2              All right.  Anything else that the government needs to

3    raise?

4              MR. DENTON:  Yes, your Honor.

5              One kind of ongoing issue.  We still have not heard

6    anything from the defense about reductions in the list of

7    subpoenaed witnesses.  We're now at the point where we probably

8    do need to start making travel arrangements for people to get

9    up here even from the D.C. area, and it seems rather pointless

10   to spend the effort to do that for 40-plus people, given both

11   the representations from the defense on Friday that they were

12   planning to cut that list down and the Court's at least very

13   strong suggestion that the defendant's proffer was not

14   sufficient as to a significant number of them.  So I don't know

15   quite what to say other than that we've made our motion, and if

16   we don't hear something from the defense soon, I think we're

17   just going to ask the Court to start ruling there.

18             THE COURT:  All right.

19             Mr. Schulte, what's the status on that?

20             MR. SCHULTE:  Yes.  We did cut the list significantly,

21   but I haven't been to the SCIF in a while.  So whenever --

22   today, after this is over, when we go -- we can have the list

23   ready and give it to the government.

24             THE COURT:  Great.  Per the arrangements I made with

25   the marshal, my understanding is you'll be brought to the SCIF

M6eWsch3

1    after trial each day.

2            Marshal's giving me the thumbs up, so I assume that

3    you will indeed be there.  Make sure you get that list to the

4    government, and if there are any issues, we can begin

5    discussing them and begin working through them tomorrow.

6            I did want to make one observation or comment,

7    Mr. Schulte.

8            I interrupted you only once during your opening when I

9    thought you crossed the line in terms of commenting on the

10   conditions of confinement and the impropriety of your

11   confinement.  But more broadly, I was a little concerned.  I

12   tried to make clear in the final pretrial conference the

13   importance of adhering to and respecting the line between when

14   you testify, if you choose to testify, which is evidence, and

15   everything else that you say.  And I think that much of what

16   you did, particularly at the beginning of the opening, when you

17   basically introduced yourself to the jury and gave a biography

18   and talked about joining the government after 9/11, if you

19   testify, it may well be that some of that comes into evidence,

20   but it was not presented in that way.  It was not couched with

21   a "I expect the evidence to show."  It was really presented as

22   a first-person testimonial, and in that sense it really did

23   cross the line.

24           The government did not object.  I chose not to

25   interrupt.  I chose to give a cautionary instruction at the

M6eWsch3

1   close of your opening, evenhanded, addressed to both the

2   government's opening and your own.  But I just want to

3   underscore that going forward, in your questioning to the

4   witnesses, in your closing arguments, you must adhere to that

5   line.  You must respect it.  If you don't, I will have no

6   choice but to cut you off and make clear to the jury that the

7   only evidence presented by you is if you take the stand and

8   testify under oath subject to cross-examination.  Anything else

9   that you say you're saying in your capacity as a lawyer, and

10  you'd better understand that distinction and ask questions in a

11  way that doesn't potentially cause confusion.

12          All right?

13          MR. SCHULTE:  Yes.  I understand.  I think I expect

14  some of the, several of the documents to come in with that

15  information from the beginning, so it's not necessarily

16  testimonial, but that was my anticipation.

17          THE COURT:  Again, it may well be that the evidence

18  does support those statements, but it wasn't presented in that

19  manner.  It was presented as a sort of firsthand testimonial,

20  and I thought I had made clear at the final pretrial conference

21  that you should be careful and not do anything of that sort.

22          In any event, I'll leave it there, and hopefully that

23  is sufficient.

24          I need to leave in a moment.  Give me one second,

25  though.

M6eWsch3

1          All right.  As I said, I have a hard stop today at

2     three.  I need to leave.  It doesn't sound like there's

3     anything else from you.  I am told that one of the jurors

4     wishes to speak to me.  I don't know what that pertains to.

5     I'll try and find out some more information, and we can take it

6     up in the morning if need be.  Hopefully, it's not anything

7     significant.

8          With that, we are adjourned for the day.  Please be

9     here a few minutes before nine so that if there's anything for

10    us to take up before we begin with the jury we can do so

11    promptly.  I expect to have the witness in the witness box no

12    later than 9:15, ideally even before that.

13          Have a good evening, and I will see you tomorrow

14    morning.

15               (Adjourned to June 15, 2022, at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                     Page

RICHARD JOHN EVANCHEC

Direct By Mr. Lockard  . . . . . . . . . . . . 106

```
 1                        GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3    1   . . . . . . . . . . . . . . . . . 114

 4    2; 3; 4, 4-1 and 4-2; 5, 5-1 and 5-2  . . . . 115

 5    6, 6-1 and 6-2; 7, 7-1, 7-2, 7-3, 7-4,  . . . 115

 6             7-5 and 7-6

 7    8, 8-1 and 8-2; 9, 9-1, 9-2, 9-3; 10, . . . . 115

 8             10-1

 9    11, 11-1 and 11-2; 12, 12-1, 12-2; 13;  . . . 116

10             14, 14-1; 15, and 16

11    89   . . . . . . . . . . . . . . . . . 123

12    1201 through 1212 and 3005  . . . . . . . . 136

13    100, 111, 200, 300, 500, 601 through  . . . . 142

14             616

15    701, 702, 704 through 708, and 712  . . . . . 142

16             through 714

17   716, 718, 719, and 720   . . . . . . . . . . 142

18    1001 through 1012, 1015 through 1056, . . . . 142

19             and 1058 through 1098

20    1100 through 1103, 1105, 1107, and 1108   . . 142

21    1110 through 1116, 1118, 1119, 1121,  . . . . 142

22             and 1124

23   1128 through 1130 and 1132 through 1137  . . . 142

24    3004 and 5001  . . . . . . . . . . . . . • 143

25
```