M6F5sch1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6              Defendant.
                                         Trial
7   ------------------------------x

8                                        New York, N.Y.
                                         June 15, 2022
9                                        9:20 a.m.

10  Before:

11
                     HON. JESSE M. FURMAN,
12
                                         District Judge
13                                       -and a Jury-

14                     APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  DAVID W. DENTON JR.
17       MICHAEL D. LOCKARD
         Assistant United States Attorneys
18

19  JOSHUA A. SCHULTE, Defendant Pro Se

20

21  SABRINA P. SHROFF
    DEBORAH A. COLSON
22       Standby Attorneys for Defendant

23  Also Present:  Charlotte Cooper, Paralegal Specialist

24

25
```

M6F5sch1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Welcome back.  This case is

3   on trial.

4          Just so you know, my latest information is that we are

5   waiting on one juror who had kindly e-mailed to say that he was

6   running late, he should be here any minute, at which point we

7   will get started.  I assume the government's witness is here

8   and ready to go?

9          MR. DENTON:  Yes, your Honor.

10          THE COURT:  Two things for me to raise and then I

11   gather Mr. Schulte has a couple things.

12          First, I told you there was a juror who had wanted to

13   speak with me.  My understanding is it is the juror who is an

14   employee of TSA.  I think he had two concerns or issues that he

15   wanted to talk to me about.  One is it sounds like he is being

16   asked to or made to work overtime or some such thing and was

17   hoping that I might be able to speak to his supervisor.  Unless

18   there is objection, I am certainly happy to call.  I don't know

19   what I would say or be able to say.

20          The second is he is concerned that given the nature of

21   his job, that he might overhear conversations, I gather of

22   passengers going through security at the airport, about this

23   case.  And while I gave him a stern admonition that it is their

24   responsibility not to be present for any conversations, he

25   obviously wouldn't be able to move and absent himself.  I think

M6F5sch1

1  the probability of that is vanishingly small so I'm willing to

2  take the chance, with the understanding that we should let him

3  know that if he does hear anything -- I have already told the

4  jurors this -- that he should obviously report it to my staff.

5          So anyone disagree with either of those things?

6          MR. DENTON:  No, your Honor.

7          THE COURT:  Mr. Schulte?

8          MR. SCHULTE:  One second, Judge?

9          (Defendant and counsel conferring)

10          MR. SCHULTE:  Yes, it's fine the way -- we have no

11  objection.

12          THE COURT:  So I will handle it that way.

13          Then the other thing is juror no. -- I think it is 14,

14  the one with the wedding dress fitting, she has reported that

15  it would be quite expensive for her to change her ticket,

16  unfortunately.  I am inclined to tell her that we are going to

17  plow ahead for the moment given that there is considerable

18  uncertainty about how long things will go but she shouldn't

19  worry, but the bottom line is we won't make her incur that

20  expense.

21          Any objection to that?

22          MR. DENTON:  No, your Honor.

23          THE COURT:  Mr. Schulte?

24          MR. SCHULTE:  No.

25          THE COURT:  And both of these jurors are alternates

M6F5sch1

1    also, just for what it is worth.

2              Mr. Schulte, I understand you have some issues to

3    raise.  I ask you to just phrase them in order of priority,

4    that is to say anything that needs to be addressed and resolved

5    this morning you should prioritize, and if things can wait we

6    can always discuss it later.

7              Go ahead.

8              MR. SCHULTE:  OK.  So the first thing is I think the

9    marshals just need permission or authorization from you for me

10   to be able to use the second laptop for my exhibits.

11             THE COURT:  Use in the courtroom?

12             MR. SCHULTE:  Yeah, be able to access and use it like

13   I use the other.  I think there was court order for me to be

14   able to use this laptop so they need authorization from you for

15   me to use the second laptop.

16             THE COURT:  And the second laptop is something that

17   standby counsel procured?  What is it?

18             MR. SCHULTE:  Yes.

19             THE COURT:  Any objection, Mr. Denton?  Any concerns?

20             MR. DENTON:  I think as long as it is something that's

21   used just here in the courtroom, that's fine, your Honor.  I

22   think to the extent that it was going with the defendant

23   anywhere else other than the courtroom, we would want to make

24   sure that we applied the same security procedures that were

25   applied to his original laptop.

M6F5sch1

1          THE COURT:  Is it just to be used in this courtroom?

2          MR. SCHULTE:  Yes.  That's correct.  It is being

3     locked, I think, in the FBI marshal's room by the SCIF.

4          THE COURT:  So permission granted.  To the extent that

5     the marshals needed that from me, they now have it from me.  If

6     I need to put something in writing, let me know.

7          Next?

8          MR. SCHULTE:  So I wanted to raise I received two

9     government's exhibits yesterday, one of them I can talk about

10    later, I don't think it is coming up any time soon, but the

11    second one I just wanted to note for the Court, Government

12    Exhibit 1703 is the expert presentation for Patrick Leedom who

13    is coming up relatively soon this week, and the expert

14    presentation that they previously provided has been completely

15    rewritten, it is entirely different.  And they're just now -- I

16    just saw it for the first time yesterday.  So, I mean, it is

17    just going to be incredibly difficult for me to be able to

18    review 150 new slides and a whole new expert presentation.

19    That should have been provided weeks and weeks ago.

20         THE COURT:  Mr. Denton?

21         MR. DENTON:  So I don't think the defendant's

22    characterization is accurate.  There certainly were substantial

23    changes of a cosmetic nature, different background, fonts, some

24    of the headers and things like that.  All of the forensics that

25    are described in there are the same.  Some of them have been

M6F5sch1

1    moved around in order but there is no substantive change to the

2    conclusions that Mr. Leedom is going to testify to or the

3    particular forensic artifacts that he is going to show in

4    support of those conclusions.  We did produce an updated

5    version reflecting some of those cosmetic changes -- I forget

6    whether it is last week or the week before -- and have

7    continued to produce updated versions as revisions have been

8    made.

9             THE COURT:  I take it this is not an exhibit to be

10   entered into evidence, this is a demonstrative to assist the

11   jury in understanding its testimony; is that correct?

12            MR. DENTON:  Well, your Honor, I think there is -- it

13   certainly is the latter.  I think that we will expect

14   Mr. Leedom to testify that it summarizes voluminous exhibits

15   that he reviewed that could not conveniently be displayed in

16   the courtroom and so we do think it would be admissible as a

17   summary exhibit, but I think that's also something that the

18   Court can defer on.  All of the individual forensic artifacts

19   that are going to be displayed are separately admitted as

20   government exhibits, that was part of the stipulation that was

21   read yesterday.  So whether it comes in as itself as a summary

22   exhibit under 1006 or just as a demonstrative I'm not sure it

23   really makes much difference.

24            THE COURT:  So Mr. Schulte, from what Mr. Denton said

25   it sounds like there is no issue here but is there a

M6F5sch1

1    substantive difference that you can point me to?

2              MR. SCHULTE:  I mean, I think first I just want to

3    raise that this is the first time I am receiving it so to the

4    degree the government saying they provided a version of this

5    before, that's not true, I just received it yesterday.

6              So I guess I would just ask the Court, you know, I

7    haven't had that much time to review it, I just saw that all

8    the slide presentation is completely different, so I just ask

9    the Court if you could -- or if you could just compare the two

10   and basically rule whether you think, you know, it is

11   substantially different.  I think it is from what I can tell

12   but I haven't had a chance to literally go through every single

13   slide.  I went through the presentation and the conclusion; a

14   lot of the information seems substantially different from the

15   other one.

16             THE COURT:  Well, I'm not going to compare it but you

17   are welcome to compare it and if you can identify any

18   substantive differences between the two then you can alert me

19   to it, say tomorrow morning.  I am certainly happy to consider

20   any application at that time.  Based on Mr. Denton's

21   representation, it sounds like it is cosmetic differences

22   rather than substantive differences.  If you can point me to

23   things that are substantively different and you can explain and

24   persuade me that there is prejudice from the fact that you just

25   got it, then I will consider that and decide what to do.  But

M6F5sch1

1    the burden is on you to demonstrate that there is some problem

2    here and so far that hasn't happened.  Thankfully he is not

3    testifying today so you will have time to review it after trial

4    today, and if there is an issue, you can raise it.

5              Is there anything else?

6              MR. SCHULTE:  Yes.  One minute.

7              (Defendant and counsel conferring)

8              MR. SCHULTE:  Two final matters.  One is about the

9    3500 materials and updates that I am receiving from the

10   government.  So they provided new updates now so I ask the

11   Court, you know, if it's possible that during the lunch break

12   if I am able to essentially work in here with the lunch to go

13   through all of the materials, and also some of the materials

14   that they provided are -- it is illegible, we can't discern

15   what the handwriting, what it actually says so we ask that the

16   government provide some kind of key or reference for what is

17   actually written.

18             THE COURT:  This is with respect to Agent Evanchec?

19             MR. SCHULTE:  Yes.  That's correct.

20             THE COURT:  Mr. Denton, will you tell me what we are

21   talking about here?  Or Mr. Lockard?  Excuse me.

22             MR. LOCKARD:  Yes, your Honor.

23             So we produced some handwritten notes that

24   Mr. Evanchec had taken as 3500.  This morning standby counsel

25   asked if we could help decipher some of those that we agreed to

M6F5sch1

1    do and I think at our next break we can provide that

2    interpretation.

3              THE COURT:  And these are notes that he took when?

4              MR. LOCKARD:  These are notes that he took within the

5    last couple of days.

6              THE COURT:  OK.  Just a reminder, you have to do these

7    things promptly.  If there is new 3500 -- that happens in a

8    trial -- you should immediately produce it and it shouldn't

9    even be a case of days.  We are dealing with an ongoing trial

10   here so it is absolutely imperative that Mr. Schulte, who

11   obviously is detained so you can't get things to him the night

12   before, gets things in a timely fashion so that we don't have

13   any sort of delay.  All right?

14             MR. LOCKARD:  Certainly.

15             THE COURT:  How long do you expect the rest of your

16   direct to be?

17             MR. LOCKARD:  Approximately three hours.

18             THE COURT:  OK.  Well, you will get the key,

19   Mr. Schulte, on the break I guess.  I have no objection to

20   Mr. Schulte remaining in the courtroom during the break if the

21   marshals are OK with that.

22             THE MARSHAL:  Your Honor, we will keep him in the cell

23   block up here, that way one of us can grab lunch at a time.

24             THE COURT:  Great.  That should suffice.

25             MR. DENTON:  One last thing for the record.  The

M6F5sch1

1    government has no applications with respect to yesterday's

2    transcript.  That may have been obvious but just to say we have

3    no issues with that being released.

4              THE COURT:  I will deem that obvious every day unless

5    you tell me otherwise.

6              MR. DENTON:  Understood.

7              THE COURT:  Thank you.

8              We are still awaiting word that we have our final

9    juror, so anything else, Mr. Schulte?

10             MR. SCHULTE:  No.  Nothing else.

11             THE COURT:  So I guess stay as you are and when we

12   have our jurors, we will proceed.

13             MS. SHROFF:  Your Honor, may I just be excused for

14   five minutes?  I need to talk to the CISO about an e-mail I

15   just received.

16             THE COURT:  Sure.  I'm not going to wait to begin.

17             MS. SHROFF:  That's fine.

18             THE COURT:  If you can discretely walk in in the event

19   we have started, that's fine.

20             MS. SHROFF:  Thank you.

21             (pause)

22             THE COURT:  Counsel, two things.  One, why don't we

23   get the witness in so we are ready to go when the jurors are

24   here.  Second, while we are waiting -- and maybe this is what

25   Mr. Lockard Mr. Schulte is doing -- if you can interpret the

M6F5sch1

1    handwriting, this would be an opportune time to do that.

2              MR. LOCKARD:  We are on the same wavelength, your

3    Honor.

4              THE COURT:  Thank you.

5              (pause)

6              THE COURT:  Counsel, one update.  I gather the

7    juror -- there was a subway delay, one of the subways was shut

8    down -- he has gotten off the subway at the station nearby so

9    he should be here any minute and then we will get started as

10   soon as he is ready.

11             While we have a moment and I don't think there is any

12   problem saying this in front of the witness, I would like the

13   government to propose and share with Mr. Schulte, in the first

14   instance, an appropriate limiting instruction on the fact that

15   Mr. Schulte is currently incarcerated.  He alerted the jury to

16   that himself, as you will recall.  This is -- it is not a case

17   where the fact that his incarceration is irrelevant to the

18   jury's determination.  Obviously there are various ways in

19   which it is relevant, both to his arguments and perhaps to the

20   government, and certainly relevant to their understanding on

21   where he was and what he did.  But, that being said, I think

22   it's appropriate for me to instruct the jury at an appropriate

23   time about what they can and can't consider in that regard.  So

24   if you can come up with a proposal, I would appreciate it.

25             MR. DENTON:  Understood, your Honor.  We will.

M6F5sch1

1                   THE COURT:  Thank you.

2                   Yes?

3                   MR. LOCKARD:  This is just a ministerial clarification

4      question.  So your Honor, you may have already said this and I

5      apologize if you did and I have forgotten.  At what time does

6      the Court take the midday break or is that a game time decision

7      depending on where things are?

8                   THE COURT:  I would say in general it will be about

9      11:30 but I'm not sure I will do it that way today given that

10     we are getting off to such a late start.  So I will probably do

11     more of a game time decision today.

12                  MR. LOCKARD:  Thank you.

13                  THE COURT:  All right.  I gather we have a full jury

14     and they are on their way up so we should get started in a

15     moment.

16                  THE DEPUTY CLERK:  All rise.

17                  (Continued on next page)

18

19

20

21

22

23

24

25

M6F5sch1

1          (Jury present)

2          THE COURT:  You may be seated.

3          Welcome back, ladies and gentlemen.  Sorry we are

4    getting off to a late start.  I know one of you had some train

5    trouble.  I gather there was a train line that was shut down

6    and these things unfortunately happen.  As I said yesterday,

7    unfortunately we can't get started until you are all here so as

8    a result we are a bit delayed this morning and I apologize and

9    very much thank those of you who were here on time and ready to

10   go.

11         I can assure you I'm not going to keep you past 3:00

12   as much as I want to make up for lost time.  When I tell you

13   that we are going to end at a particular time, I know you made

14   plans based on that and I'm not going to make that sort of

15   change on you so we will still end at 3:00 today.

16         I also noticed, I think some of you have your phones

17   with you.  Pre-pandemic, jurors weren't allowed to have their

18   phones in the court house but I think that's a change the

19   jurors have welcomed.  I would urge you to leave your phones in

20   the jury room; they will be secured there.  That way there is

21   no chance that they will go off or be a distraction.  If you do

22   have them with you, I would ask you to turn them off -- not put

23   them on silent but turn them off.  Because while we are in

24   trial, obviously you can't be looking at your phones or not

25   answering calls or anything of that sort.  So if you want to

1  take a moment to make sure it is completely off, that would be

2  great, and once everyone is looking up, we will get started.

3            With that, we will pick up where we left off yesterday

4  with the testimony of Agent Evanchec.  You may take off your

5  mask at this time?

6            THE WITNESS:  Yes, your Honor.

7            THE COURT:  And I remind you, you are under oath.

8            THE WITNESS:  Yes, your Honor.

9            THE COURT:  And I also remind you to speak directly

10  into the microphone, loudly and clearly.

11            THE WITNESS:  Yes, your Honor.

12            THE COURT:  With that, Mr. Lockard, you may proceed.

13  RICHARD JOHN EVANCHEC,

14  DIRECT EXAMINATION

15  BY MR. LOCKARD:

16  Q.  Good morning, sir.

17  A.  Good morning, Mr. Lockard.

18  Q.  Special Agent Evanchec, yesterday afternoon you were

19  describing the investigation that the FBI conducted related to

20  the WikiLeaks Vault 7 release.  Do you remember that?

21  A.  I do.

22  Q.  Do you recall describing the particular backup files that

23  the investigation determined had been stolen?

24  A.  I do.

25            MR. LOCKARD:  Ms. Cooper, if you could please display

1    for us again 1207-27 which is in evidence?

2            THE COURT:  Mr. Lockard, if you can keep your voice up

3    too, please?

4            MR. LOCKARD:  Yes, your Honor.

5    Q.  And Agent Evanchec, which backup file is the file that was

6    stolen?

7    A.  March 3rd of 2016.

8    Q.  Remind us again, what is the last date accessed for the

9    March 3rd, 2016 backup file?

10   A.  April 20th of 2016.

11           MR. LOCKARD:  Ms. Cooper, if we could please enlarge

12   that?

13   Q.  And at what time?

14   A.  5:42 p.m.

15   Q.  Agent Evanchec, are you aware whether Mr. Schulte was at

16   work on April 20th of 2016?

17   A.  I am.

18   Q.  Actually, you have in front of you a binder of hard copies

19   of the exhibits.  I welcome you to refer either to the hard

20   copies or to the copy displayed on the screen, whichever is

21   more convenient.

22   A.  Yes, sir.

23   Q.  But if you could please look at Government Exhibit 107

24   which is also in evidence?

25           MR. LOCKARD:  And if you could please pull that up,

1    Ms. Cooper?

2    Q.  Do you recognize what is contained in Government Exhibit

3    107?

4    A.  Yes, sir.  These are badging records that were maintained

5    by the CIA that captured the moments an employee would have

6    used the access card that I described to the jury yesterday,

7    upon entering the building and each vault.

8    Q.  If we could please look at page 4 of Exhibit 107, what date

9    is covered by these badge records?

10   A.  April 18th of 2016 to April 21st of 2016.

11   Q.  And if you could please focus in on the entry that's

12   timestamped 19:06:10 on April 20th?

13   A.  Yes, sir.

14   Q.  First of all, could you convert for us what time is 19:06?

15   A.  It would be 7:06 p.m.

16   Q.  And what activity is reflected there?

17   A.  A computer log off.

18   Q.  And for which employee are these badge records?

19   A.  Joshua Schulte.

20   Q.  If you could look down just a little bit below that at

21   19:07:04; what is reflected by the type close, and the summary

22   arm, disarm, command accepted?

23   A.  This would have indicated that Mr. Schulte was the last

24   person who was in the secure vault that he then closed and sent

25   a command to activate the alarm.

1   Q.  And just a couple seconds after that at 19:07:06, what is

2   reflected there?

3   A.  Exit of that vault.

4          MR. LOCKARD:  Thank you, Ms. Cooper.  You can take

5   that down, please.

6   Q.  And if you could also look at Government Exhibit 405, which

7   is in evidence, and turning to page 9 of that exhibit, do you

8   recognize that agreement?

9   A.  I do.

10   Q.  Was that provided to the FBI by the CIA?

11   A.  It was.

12   Q.  What type of agreement is that?

13   A.  This was an agreement between Joshua Schulte and the CIA

14   wherein he is advised of his responsibilities to protect

15   classified information during his time as a CIA employee and

16   outline certain restrictions and responsibilities he had to

17   protect that information.

18   Q.  And if we could please look at page 2 -- I'm sorry, page 2

19   of that agreement which is page 10 of the exhibit -- I

20   apologize -- is that signed?

21   A.  It is.

22   Q.  By whom?

23   A.  Joshua Schulte.

24   Q.  And on what date?

25   A.  January 3rd of 2012.

M6F5sch1                        Evanchec - Direct

1    Q.  If we could please turn back to, again, page 9 of the

2    exhibit, page 1 of this agreement?

3        Agent Evanchec, could you please read what is stated in

4    paragraph 2?

5    A.  I understand that in the course of my employment or other

6    service with the Central Intelligence Agency, I may be given

7    access to information or material that is classified or is in

8    the process of a classification determination in accordance

9    with the standards set forth in Executive Order 12958 as

10   amended or superseded, or other applicable Executive order,

11   that if disclosed in an unauthorized manner would jeopardize

12   intelligence activities of the United States government.  I

13   accept that by being granted access to such information or

14   material, I will be placed in a position of special confidence

15   and trust and will become obligated to protect the information

16   and/or material from unauthorized disclosure.

17           MR. LOCKARD:  Thank you.  You can take that down,

18   Ms. Cooper.

19           THE COURT:  Ladies and gentlemen, this is probably

20   obvious but, first of all, an Executive Order is an order

21   signed, issued by the president of the United States.  It has

22   the force of law within the Executive branch, that is, actually

23   the source of what information that's kept classified is done

24   so pursuant to Executive orders signed by various presidents

25   over the years.  I can't say I know specifically what that

Executive order is or says but it obviously pertains to,

governs classifications and classified evidence.  So just so

you understand that.

          Go ahead, Mr. Lockard.

          MR. LOCKARD:  Thank you, your Honor.

BY MR. LOCKARD:

Q.  So, Agent Evanchec, we have looked at some badge records

and a secrecy agreement that were provided by the CIA, and

yesterday we read a stipulation that described various other

agency records, e-mails, instant messages, personnel files, and

the like.  What was the nature of your interactions with the

CIA during your participation in this investigation?

A.  Sure.

     Especially the early stages of the investigation the FBI,

in both New York field office and our Washington, D.C. field

office, had near daily interaction with the CIA.  At that stage

they were a victim agency, and consistent with any

investigation the FBI does there is, in the early stages, much

engagement with the victim because, in many cases, the victim

is also a witness.  In this case certainly they were.

          So throughout the investigation they were really in a

position to provide logistical assistance to the FBI.  So for

example, if we identified someone that we wanted to interview

in CIA space we would make a request of the CIA and we had

people assigned to be our liaisons, or if we needed the badge

1    records that we just looked at or we needed e-mails, we would

2    go to them.  So throughout the investigation I authored a

3    number of requests and memorandums to the CIA asking,

4    requesting them to provide that information for us.  So it was

5    really a logistical support function they ultimately provided.

6            In the beginning there was certainly some consultation

7    they offered to help us get our feet under us to understand,

8    again, where the evidence came from, who potentially could have

9    been responsible, who would have had access to it, and things

10   like that, sir.

11   Q.  What was the frequency of your action with CIA personnel?

12   A.  Multiple times a day in the beginning of the investigation

13   for sure.

14   Q.  And you testified yesterday that you had been to the CCI

15   office?

16   A.  I have; yes, sir.

17   Q.  How much time did you spend at the CCI office following the

18   initial Vault 7 release on March 7th of 2017?

19   A.  In total work days time there, probably months.  There were

20   periods that I would be at CCI for weeks at a time and would

21   then come back to New York to meet with my supervisors and my

22   team back there and talk about the investigative strategy.  So

23   I was really bouncing back and forth between both Washington

24   and New York as the investigation called, but total time would

25   have been several months.

1   Q.  And were there other FBI investigators would were also at

2   the CCI offices during those times?

3   A.  There were.

4   Q.  How would you describe the level of access that you had to

5   the CIA during the investigation?

6   A.  We were, first of all, offered secluded space in one of the

7   basements of their buildings in order to conduct our

8   investigation.  We were given assurances under the highest

9   level of the CIA that there would be no barrier to our

10  investigation; if we needed something and asked for it, that it

11  would be given.

12  Q.  Did that bear out?

13  A.  It did.

14  Q.  Now, you testified yesterday that the investigation that

15  was open in New York was focused on a particular subject.

16  A.  That's correct.

17  Q.  And who was that subject?

18  A.  Joshua Schulte.

19  Q.  Why was Mr. Schulte identified as a subject?

20  A.  So almost immediately after the disclosure, our Washington

21  field office deployed to the CIA to understand what had

22  happened.  Within hours of that investigation being opened we

23  began to get reports that Mr. Schulte had, on a number of

24  occasions, reached out to then current employees at the CIA to

25  understand what was happening, to get reflections of what was

1    being discussed about the leak in the agency, and had even at

2    one point, I believe, asked if the FBI was asking questions

3    about him.  In addition to that, the CIA did provide some

4    historical background of Mr. Schulte and his having been under

5    investigation at the time that he had left the agency in

6    November of 2016, had provided examples of him having elevated

7    access in the exact system that was ultimately compromised, and

8    of having personnel conflicts in the CIA.

9          So, they did provide us leads to follow in this

10   investigation and those were primarily focused on Mr. Schulte.

11             THE COURT:  Let me interrupt and just say, ladies and

12   gentlemen, to the extent that Agent Evanchec just described

13   things that he heard from other people, you may not consider

14   that for the truth of those statements, the truth of the

15   matters asserted there.  You may consider it for the effect

16   that it had on the agent and on the investigation, in other

17   words what steps they took in connection with the information

18   they received, but you should not consider those statements for

19   their truth.

20             Go ahead.

21             MR. LOCKARD:  Thank you, your Honor.

22   BY MR. LOCKARD:

23   Q.  Now, was Mr. Schulte the only individual whose potential

24   role in the Vault 7 leaks was investigated by the FBI?

25   A.  No.

Q.  You described an investigation being run principally by the
Washington field office.  What was the nature of that
investigation?

A.  Yes, sir.

As I testified yesterday and explained to the jury, the
Washington field office was working, again, what we call that
un sub investigation -- that unknown subject -- so that in the
event, although New York had a specific subject that it was
uncovering evidence for, in the event that there was a
co-conspirator or that there was somebody completely different
from Mr. Schulte that would have been involved, our Washington
field office had an even bigger effort, quite frankly, at the
CIA, designed to figure out if anybody else could have been
involved in this.  So they had an equally large team, if not
larger, that was dedicated to uncovering additional leads.  And
we worked with that team daily as well to share results of our
investigation so that one investigation was informing the other
and there wasn't a duplication of efforts, and there was
certainly coordinated effort to preserve the time that we were
asking the CIA to invest in our investigation.

So their effort was even bigger than ours and really
focused on identifying anyone else that could have been
involved.

Q.  Now, you talked a moment ago about information you had
heard that there might have been some personnel conflicts

1   involving Mr. Schulte at the agency; is that right?

2   A.  That's correct.

3   Q.  In the course of your investigation, did you review records

4   relating to that conflict?

5   A.  I did.

6   Q.  Based on your review of those records, did you have an

7   understanding of what was sort of the genesis of that conflict?

8   A.  Generally; yes, sir.

9          MR. LOCKARD:  If we could please look at Government

10  Exhibit 1034 which is in evidence?

11  Q.  Agent Evanchec, do you recognize this e-mail or this e-mail

12  chain?

13  A.  I do.

14  Q.  If we could turn to page 6, please?  And then, focusing in

15  on the top, the e-mail that was sent March 1st?  Who sent this

16  e-mail?

17  A.  Mr. Schulte.

18  Q.  And to whom did he send this e-mail?

19  A.  To the security organization within his office.

20  Q.  What's the general topic of this e-mail?

21  A.  In this e-mail Mr. Schulte discusses behavior in the

22  workplace by one of his colleagues -- Amol -- and goes on to

23  insinuate and suggest that Amol made death threats against him

24  specifically saying 'I wish you were dead' and things of that

25  such and wanted to bring this matter to the attention of the

1  security personnel in his office.

2  Q.  And now, does Mr. Schulte refer to a prior complaint that

3  he had made about his colleague Amol?

4  A.  He did.

5  Q.  And if you could look at the e-mail just below this dated

6  October of 2015, is this the earlier allegation about Amol?

7  A.  It is.

8  Q.  Turning back to the March 1, 2016 e-mail, I would like to

9  direct your attention to the sentence third from the bottom

10  that starts:  I have considered just going to the local

11  police --

12  A.  Yes.

13  Q.  -- and trying to get a restraining order but I thought I'd

14  inform security before I did this.

15      What is your understanding of who DDI support security is?

16  A.  I'm sorry, sir.  Can you repeat the question?

17  Q.  What is your understanding of who is the recipient of this

18  e-mail, DDI support security?

19  A.  That is the security officers that are assigned to

20  Mr. Schulte's office.

21  Q.  And did the security office include officers with law

22  enforcement functions?

23  A.  It does.

24  Q.  How does Mr. Schulte's statement that he has considered

25  just going to the local police, how did that inform your

1    investigation?

2    A.   I think it showed a level of desperation with Mr. Schulte

3    in that he was willing to escalate a matter that was in the

4    workplace to an outside local police agency.  Certainly there

5    were armed police officers, as I described yesterday, at his

6    office; there was a security office.  So I believe making a

7    report to the local police about activities that had occurred

8    in secret and top secret office space in the CIA would have

9    been an escalation.

10             THE COURT:  Can I just interrupt for one second?

11             Sorry.  The next couple days I will have various

12   instructions to you but I assume they'll get less frequent as

13   time goes on.

14             You can see in this exhibit a couple things, one is

15   some of the text is blacked out, that's called a redaction.

16   Over the course of the trial you will see various redactions in

17   some of the documents.  The bottom line is you shouldn't

18   speculate as to why something is redacted, you shouldn't

19   speculate as to what is behind the redaction, it is not

20   relevant for your consideration so you shouldn't consider it

21   one way or another in your deliberations.  And relatedly, I

22   mentioned to you yesterday that because of certain

23   sensitivities regarding employees of the CIA that some

24   employees would be identified only by first name or even by a

25   substitute name, so you will see that in this document and

1    other documents as well.  But, once again, don't speculate

2    about why something is redacted or what is behind the

3    redactions but I just wanted to explain what that is.

4              Go ahead.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. LOCKARD:  Thank you, your Honor.  If we could

2     please turn to page 4 of this exhibit, which is a reply to

3     Mr. Schulte's prior email.

4     Q.  What is the official position of the individual who sent

5     that reply?

6     A.  An investigator/federal police officer.

7     Q.  And what is a federal police officer?

8     A.  It's a sworn law enforcement officer that has the powers of

9     police at the federal level.

10    Q.  Agent Evanchec, did you come to learn whether Mr. Schulte,

11    in fact, involved local criminal justice authorities?

12    A.  I did.

13    Q.  What happened?

14    A.  Mr. Schulte, as a result of his perceived conduct of Amol,

15    had filed a restraining order against Amol in a local court.

16    Q.  And did you learn what ultimately happened to that

17    restraining order?

18    A.  The restraining order, from my recollection, sir, was

19    eventually --

20          MR. SCHULTE:  Objection.  Hearsay.

21          THE COURT:  Sustained.

22    BY MR. LOCKARD:

23    Q.  What, if any, effect did Mr. Schulte's complaint and the

24    filing of the restraining order have on the workplace?

25    A.  It ultimately necessitated --

1           MR. SCHULTE:  Objection.  Hearsay.

2           THE COURT:  To the extent it had an impact on your

3    investigation, I'll allow you to give an answer, with the

4    understanding that that's the only thing the jury may consider

5    it for.

6           So did this have an effect an your investigation?

7           THE WITNESS:  It did, yes, sir.

8           THE COURT:  OK.  Then you may answer.

9    A.  It ultimately required the CIA to move the desks of both

10   the defendant, Mr. Schulte, and Amol.  So they were both taken

11   from their assignment at the operational support branch and

12   moved elsewhere, to other units within AED.

13          THE COURT:  And just to be clear, how did that affect

14   your investigation?  What role did that information play?

15          THE WITNESS:  Your Honor, it -- there would be a

16   continued, as we'll see in, I think, some of the evidence, a

17   continued referral back to the fact that the defendant had been

18   moved from that, and it was a motivation and continued to be a

19   source of anger for him leading up to his, his eventual

20   resignation.

21          THE COURT:  All right.  That was what you understood

22   and one of the reasons that you focused on him, is that

23   correct?

24          THE WITNESS:  Correct.  Yes, sir.

25   BY MR. LOCKARD:

M6fWsch2                         Evanchec - Direct

1    Q.  Was that information reflective of the workplace conflicts

2    that you had been informed of at the outset of the

3    investigation?

4                MR. SCHULTE:  Objection.

5                THE COURT:  Sustained.

6    BY MR. LOCKARD:

7    Q.  Did you come to learn whether CIA security investigated the

8    allegations Mr. Schulte had made?

9    A.  I did, yes, sir.

10               MR. SCHULTE:  Objection.

11               THE COURT:  Overruled.

12               MR. LOCKARD:  I'd like to turn now to Government

13   Exhibit 508, which is in evidence.  And actually, if you could

14   just play it for -- hold on.

15               If you could display for Agent Evanchec 508-T.  And

16   then just, as we get the exhibit lined up, referring back to

17   Government Exhibit 3004, which was received in evidence

18   yesterday, pursuant to paragraph 5, Government Exhibit 508 is

19   excerpts of a recording of an April 8, 2016, interview of the

20   defendant while at the CIA.

21               Perhaps we can just play this recording, which is in

22   evidence, for the jury.  And Ms. Cooper, if we could play

23   through time stamp 00:52.

24               (Video played)

25               MR. LOCKARD:  I just want to pause there.

1   Q.  Agent Evanchec, did you hear a reference to an outside

2   activities report?

3   A.  Yes.

4   Q.  What is an outside activities report?

5   A.  That is a report that CIA employees are required to submit

6   to certain entities within their office anytime they would go

7   outside of the CIA and affiliate themselves with the CIA.  So

8   this was in an effort to ensure that anytime an employee

9   disclosed their relationship with the CIA or conducted any kind

10  of activity the CIA was aware of that, because obviously the

11  CIA takes extraordinary means and methods to --

12          MR. SCHULTE:  Objection.

13          THE COURT:  All right.  Sustained.  We'll leave it

14  there.

15          MR. LOCKARD:  Your Honor, I think actually, it would

16  be helpful.

17  Q.  Agent Evanchec, there is a witness binder in front of you.

18  There should be a tab for 508-T.  Do you see that?

19          THE COURT:  While the witness is looking at that, let

20  me just explain.

21          Similar to a redaction, you can see in this video that

22  the gentleman speaking with Mr. Schulte, his head/face is

23  pixilated.  That's essentially a redaction of the video done to

24  obscure who the person is.  Again, you shouldn't concern

25  yourselves with why that was done, let alone who that person is

1   or, I guess, what is behind the redaction, what he looks like.

2   But I just wanted to explain that.

3   A.  I'm sorry.  Mr. Lockard, can you direct me to --

4   Q.  Is there a 508-T in the binder in front of you?

5           THE COURT:  I think it's possible that a binder fell

6   from the witness box before.  Is that possible?

7           No.  All right.

8           THE WITNESS:  Mr. Lockard, I see a 509-2-T.

9   Q.  Maybe the tab in front of that; is there a 508-T?

10  A.  Yes, sir.  I'm sorry.  I do have it.

11  Q.  Excellent.

12      Prior to your testimony today, have you reviewed that

13  transcript?

14  A.  I have, yes.

15  Q.  And have you reviewed the transcript along with the

16  recording, 508-T?

17  A.  I have, yes, sir.

18  Q.  Does it accurately reflect 508?

19  A.  It does.

20          MR. LOCKARD:  Your Honor, we'd like to use the English

21  transcript as a demonstrative to assist the jury in reviewing

22  this video recording.

23          THE COURT:  All right.

24          Any objection, Mr. Schulte?

25          MR. SCHULTE:  No.

M6fWsch2                          Evanchec - Direct

1           THE COURT:  All right.  I'll allow it.

2           Ladies and gentlemen, just so you understand, here,

3    I'm going to permit the government to give to you a transcript

4    that has been prepared of this recording.  You just heard

5    testimony concerning the agent's review, but just so you

6    understand, because the recording is itself in English, the

7    evidence is the recording.  The evidence isn't the transcript.

8    The transcript was prepared, and you're able to view it just as

9    an aid in listening to and reviewing the exhibit.  The exhibit

10   itself is the recording.  The transcript is not the recording.

11          So again, you can consider it just as an aid in

12   reviewing the exhibit.  And as with all the exhibits, what

13   weight, if any, you give it is up to you.

14          MR. LOCKARD:  Your Honor, if I may, we will employ the

15   passing out and hand them down method.

16          THE COURT:  Sure.  Go ahead.

17          Are there multiple transcripts in these binders?

18          MR. LOCKARD:  There are two, two transcripts.

19          THE COURT:  All right.

20          Ladies and gentlemen, for now, just take the binder,

21   and don't look at anything.  And then just follow my

22   instructions about where to turn.

23          Government, do you have one for the court reporter?

24          There you go.

25          All right.  Mr. Lockard, should we turn to 508-T?

1           MR. LOCKARD:  Yes.  Anyone who would like to follow

2    along in the transcript, we should be on page 3 of the

3    transcript.  So there's a cover page and then a few pages of

4    text.  The second page is page 3.

5           THE COURT:  All right.  Please turn to tab 508-T --

6    please don't look forward at the other exhibit in this

7    binder -- and you can follow along.

8    BY MR. LOCKARD:

9    Q.  OK.  Agent Evanchec, the reference to the outside

10   activities report appears in the transcript on line, I believe,

11   24 on page 2 of the transcript and then the discussion carries

12   over to the second page?

13   A.  That's correct.

14   Q.  And that's the report of an individual's outside activities

15   that relate to the events at the CIA?

16           MR. SCHULTE:  Objection.  Leading.

17           THE COURT:  Sustained.

18   BY MR. LOCKARD:

19   Q.  Can you remind us again, very briefly, what is an outside

20   activities report?

21   A.  Sure.  This is a filing that any employee of the CIA would

22   make, basically letting their leadership know that they had

23   intended to disclose their affiliation with the CIA outside of

24   the CIA.

25           MR. LOCKARD:  OK.  Ms. Cooper, if you could please

1    take us back up and play thorough time stamp 1 minute, 59

2    seconds.

3              (Video played)

4    BY MR. LOCKARD:

5    Q.  Agent Evanchec, directing your attention to the defendant's

6    statement about going to the media and, you know, a potential

7    Washington Post article, how, if at all, does that relate to

8    the earlier statement that we looked at about going to local

9    police?

10             MR. SCHULTE:  Objection.

11             THE COURT:  Sustained.

12   BY MR. LOCKARD:

13   Q.  How, if at all, would this statement affect the

14   investigation that was being conducted?

15             MR. SCHULTE:  Objection.

16             THE COURT:  Overruled.

17   A.  Certainly very early in the investigation, sir, the spring

18   of 2016, it became extraordinary interesting to us as we had

19   determined that the date of the information stolen from

20   Confluence was in March of 2016.  So this time frame overall

21   became essential for the FBI to understand if there were

22   employees in the CIA who were having difficulties, and

23   certainly, again, this is further escalation.  At first, we had

24   heard that there was going to be an effort to contact local

25   police and local authorities, and now we see further escalation

1    in the sense that Mr. Schulte was considering a law firm that

2    would potentially go to the press with his personal issues he

3    was having at the CIA.

4            MR. LOCKARD:  Ms. Cooper, if we could please pick up

5    through the time stamp 2 minutes and 24 seconds.

6            (Video played)

7            MR. LOCKARD:  I want to pause there for a moment.

8    Q.  Agent Evanchec, directing your attention to the defendant's

9    statement about an EAP, what is an EAP?

10   A.  That's the employee assistance program.

11   Q.  And very briefly, what is an employee assistance program?

12   A.  That's a resource available to many federal agencies, where

13   they can go to get counseling or otherwise help with personal

14   issues they may be experiencing.

15   Q.  And do you have an understanding of what the defendant is

16   referring --

17           MR. SCHULTE:  Objection.

18           THE COURT:  Sustained.

19           MR. LOCKARD:  Ms. Cooper, if we could please play

20   through time stamp 3 minutes and 49 seconds.

21           (Video played)

22   BY MR. LOCKARD:

23   Q.  And Agent Evanchec, just directing your attention to the

24   defendant's statement about feeling like he's being punished,

25   was this interview before or after he had moved branches as a

1  result of the allegations and protective order?

2  A.  After.

3      MR. LOCKARD:  Ms. Cooper, if you could please take us

4  back up and play it through time stamp 5 minutes and 38

5  seconds.

6      (Video played)

7  BY MR. LOCKARD:

8  Q.  And just to clarify, directing your attention to the

9  defendant's statement about this information being leaked, what

10  is he referring to?

11      MR. SCHULTE:  Objection.

12      THE COURT:  Sustained.

13  BY MR. LOCKARD:

14  Q.  Special Agent Evanchec, when Mr. Schulte was asked what his

15  desired outcome was, what did he say was his desired outcome?

16  A.  He begins by saying he doesn't even know, and he goes on to

17  say essentially that he would like an apology from his

18  management.

19  Q.  And did he say anything about punishment?

20  A.  He would like --

21      MR. SCHULTE:  Objection.  Leading.

22      THE COURT:  Sustained.  The exhibit speaks for itself.

23      MR. LOCKARD:  Ms. Cooper, if we could please play

24  through time stamp 6 minutes and 29 seconds.

25      (Video played)

1          THE COURT:  Ladies and gentlemen, this probably goes

2     without saying, but one piece of the audio recording there was

3     bleeped out.  That is just another form of redaction for an

4     audio.  So again, same instructions apply to that.

5     BY MR. LOCKARD:

6     Q.  Agent Evanchec -- I want to pause there -- the defendant

7     made a reference to something that happened in the navy yard?

8          MR. SCHULTE:  Objection.

9     Q.  Are you personally familiar with an event that occurred in

10    a navy yard around the time frame of this interview?

11    A.  Yes, there was a mass shooting.

12         THE COURT:  And just to be clear, as far as I know,

13    that has no connection whatsoever to Mr. Schulte or this case.

14    I assume that that testimony is just intended to eliminate the

15    agent's understanding of what that's a reference to.

16         MR. LOCKARD:  And then if we could pick up from there.

17         (Video played)

18    BY MR. LOCKARD:

19    Q.  Agent Evanchec, what is the nature of the threat that

20    Mr. Schulte describes about Amol here in this last part of the

21    recording?

22         MR. SCHULTE:  Objection.

23         THE COURT:  Sustained.

24    BY MR. LOCKARD:

25    Q.  In the March 1, 2016, email that we looked at earlier,

M6fWsch2                          Evanchec – Direct

1   Mr. Schulte first reports concerns about a threat relating to

2   Amol, did he say anything about weapons?

3   A.  No.

4           MR. SCHULTE:  Objection.  He's testifying.

5           THE COURT:  All right.

6           Mr. Lockard, in general, to the extent that something

7   is in evidence, let's let the evidence speak for itself, but

8   I'll allow the answer to stand.

9           Go ahead.

10  BY MR. LOCKARD:

11  Q.  Agent Evanchec, I'd like you to turn to --

12          MR. LOCKARD:  Ms. Cooper, if you could pull up

13  Government Exhibit 1095.

14          THE COURT:  I assume we're done with the transcripts.

15          MR. LOCKARD:  We are done with the transcripts for

16  now.

17          THE COURT:  All right.

18          Ladies and gentlemen, why don't you just put the

19  binders beside you or use them to lean on, but you can put them

20  aside for now.

21  BY MR. LOCKARD:

22  Q.  Agent Evanchec, do you recognize this memorandum?

23  A.  I do.

24  Q.  And who is it addressed to?

25  A.  Joshua Schulte.

1   Q.  And who is it written from?

2   A.  Anthony Leonis.

3   Q.  And at the time of this memorandum, what was Mr. Leonis's

4   role with CCI?

5   A.  He was the acting --

6           MR. SCHULTE:  Objection.

7           THE COURT:  Sustained.

8   BY MR. LOCKARD:

9   Q.  If you could please look at the title next to Mr. Leonis's

10  name, what is that title?

11  A.  Acting chief.

12  Q.  And then if you look at the series of acronyms that follow,

13  what are those acronyms?

14          MR. SCHULTE:  Objection, as to what he knows.

15          THE COURT:  I'll allow it.  Overruled.

16  A.  This is the breakdown of the organization of which

17  Mr. Schulte was an employee of, from the org chart that we saw

18  yesterday.

19  Q.  And again, if you could just remind us, from the highest

20  level to the lowest level, what are those acronyms?

21          THE COURT:  Could we blow up the acronyms themselves,

22  please.

23          MR. LOCKARD:  Ms. Cooper, if you could also pull up

24  Government Exhibit 89, and maybe we could display these side by

25  side.

M6fWsch2                          Evanchec - Direct

A.   Director of digital innovation, Center for Cyber

Intelligence, Engineering Development Group, Applied

Engineering Division.

Q.   Where in the org chart was Mr. Leonis with respect to

Mr. Schulte?

A.   He would have been his second-level supervisor.

           MR. LOCKARD:   Thank you.

Q.   Could you please read paragraph 1 of the memorandum.

A.   "At the end of March 2016, DDI/CCI/EDG/AED/OSB staff were

directed by DDI/CCI and DDI/CCI/EDG management to ensure that

all AED/OSB projects were properly resourced.  All

AED/OSB-related development resources (to include computer

network exploitation, CNE, related code libraries, development

tools, etc.) were accessed and administered by the appropriate

people in AED/OSB, and any projects that were not going to

remain in AED/OSB be moved to the appropriate EDG branch

immediately (Note:  AED/OSB is responsible for developing,

among other things, tools used to acquire data from targeted

systems.)"

Q.   And prior to the workplace conflicts that we've described,

in what group was Mr. Schulte?

A.   The Operations Support Branch, or OSB.

Q.   And after the time frame that he was moved to a different

branch, in which branch was he at that time?

A.   The Remote Development Branch, or RDB.

1          MR. LOCKARD:  And if we could please look at --

2    Ms. Cooper, I think you can take down 89 now.  Thank you.

3    Q.  And now looking at paragraph 2 of the memorandum, could you

4    please read that?

5    A.  "As part of this process, on early April 2016, AED/OSB

6    administrators of AED/OSB's CNE code component libraries (known

7    as the OSB libraries) removed Mr. Joshua Schulte's

8    administrative access to the OSB libraries following

9    Mr. Schulte's transfer from AED/OSB to AED/RDB at the end of

10   March 2016.  In doing so, while Mr. Schulte's administrative

11   rights to the OSB libraries code repository were removed,

12   Mr. Schulte maintained user-based access to the OSB libraries

13   code repository to permit him to access and commit code to the

14   OSB libraries repository through a predefined peer review

15   process."

16         THE COURT:  I think you read, on the first line, code

17   component libraries as opposed to development libraries.  It

18   says code component.

19         THE WITNESS:  Apologies, your Honor.

20   BY MR. LOCKARD:

21   Q.  And if we could please look at paragraph 3, subparagraph

22   (1).

23         MR. SCHULTE:  Objection, your Honor.  He's just

24   reading the document.  He has no personal knowledge.

25         THE COURT:  All right.

1              Sustained.  I'll allow you to display it if it's

2       necessary for his testimony, but otherwise, let's move on.

3       BY MR. LOCKARD:

4       Q.  In the course of your investigation, did you learn about

5       what happened after Mr. Schulte's administrative access to the

6       OSB libraries was removed?

7       A.  Yes.

8              MR. SCHULTE:  Objection, as to when.

9              THE COURT:  Well, the answer is yes.

10             Next question.

11      BY MR. LOCKARD:

12      Q.  And are those events reflected in this memorandum?

13             MR. SCHULTE:  Objection.

14             THE COURT:  Sustained.

15             Let's move on.

16      BY MR. LOCKARD:

17      Q.  Did the information that you learned come from this

18      memorandum?

19      A.  I'm sorry, sir.  Could you repeat the question?

20      Q.  Did the information that you learned about what happened

21      after Mr. Schulte's OSB libraries administrative access was

22      revoked apart from this memorandum?

23      A.  Yes.

24             MR. LOCKARD:  And if we can scroll down to the bottom

25      of this memorandum, the very bottom, where there's a signature

1    block.  Yes.

2    Q.  And where it says, "the undersigned has read and

3    understands the above," is there a signature?

4    A.  There is.

5    Q.  And whose signature is that?

6    A.  Joshua Schulte's.

7            MR. SCHULTE:  Objection.

8            THE COURT:  All right.  It speaks for itself.

9            Counsel, can I actually see everybody at sidebar for

10   one moment, please.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6fWsch2                              Evanchec - Direct

1          (At sidebar)

2          THE COURT:  Mr. Lockard, to some extent it's

3    appropriate to elicit from this witness things that he learned

4    from documents or other people to explain steps that he took in

5    his investigation.  I get that, but what's going on here is

6    bordering on using this witness as a summary witness to

7    basically lay out the government's entire case and

8    investigation, and that's not proper.  So I'm hoping that this

9    discussion can obviate some future objections because there

10   won't be objectionable questions asked, but really, this

11   witness should not be used to just summarize things that other

12   witnesses are going to say or what documents are in evidence.

13   That's not a proper thing to do.

14          I don't know if you have anything to say.  It's hard

15   for me to evaluate what's necessary to explain steps that he

16   took in his investigation versus just summarizing your case.

17   But the former is OK, the latter is not.

18          MR. LOCKARD:  Your Honor, I think certainly documents

19   that are in evidence can be displayed and read by any witness,

20   but we certainly take the Court's point, and we'll move on from

21   this issue.

22          THE COURT:  OK.  But the point is it's been a

23   recurring issue, so I don't know how much of your future

24   examination will raise similar issues.  Yes, it's in evidence,

25   and in that sense, a witness can read it, but that doesn't mean

M6fWsch2                          Evanchec – Direct

1    that you can put on a witness and present your closing

2    statement by having them read everything that you would want to

3    put in your closing statement.  That's not OK.

4              So with that admonition, I'll trust that you'll pare

5    things down and limit it to what's necessary to explain the

6    steps that this agent, this witness took in connection with his

7    investigation and not use him as a summary witness.  OK?

8              MR. LOCKARD:  Yes.

9              THE COURT:  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  I gather one of the jurors has requested

3     to use the restroom.  Obviously, if you can use the restroom

4     right before we come up here so we don't need to take these

5     breaks, that would be ideal.  That being said, I'm not here to

6     torment you, as I said yesterday, so I'll have Mr. Lee just

7     quickly run that juror to the jury room that's here, where

8     there's a restroom, and we'll get started right when she

9     returns.

10             The rest of you, if you want to stand and stretch,

11    you're welcome to do that.

12             Counsel, if you could just wait a moment, that would

13    be great.

14             (Recess)

15             THE COURT:  All right.  We'll pick up where we left

16    off.

17             Mr. Lockard, you may proceed.

18             MR. LOCKARD:  Thank you, your Honor.

19    Q.  Special Agent Evanchec, you testified about some

20    information that you had learned at the outset of the

21    investigation with respect to Mr. Schulte that was conveyed to

22    you by the CIA, is that right?

23    A.  Correct.

24    Q.  What, if anything, did you do to verify or disprove that

25    information?

1   A.  Well, we began to interview a number of the individuals

2   that had firsthand knowledge of that, that information.

3   Q.  And did you take any other steps?

4   A.  We obtained badge records.  We obtained emails.  We

5   obtained instant messaging chats that the defendant had been

6   part of -- and others, quite frankly, that were of interest to

7   us at the time.  So we attempted to obtain any piece of

8   evidence, whether it be part of the computer network or part of

9   the personnel file or any of those other pots of information

10  that I talked about, in order to be able to get and verify that

11  from our own.

12  Q.  If we could turn to, I think in front of you in your

13  witness binder, you should have Government Exhibit 509-2-T.

14  A.  Yes, sir.

15          THE COURT:  Ladies and gentlemen, just wait before you

16  start to look at something until I direct you.

17          Go ahead.

18  BY MR. LOCKARD:

19  Q.  And without telling us what is in that transcript, have you

20  reviewed that transcript?

21  A.  I have.

22  Q.  And have you reviewed it along with the recording that's in

23  evidence as Government Exhibit 509-2?

24  A.  I have.

25  Q.  And does the transcript fairly and accurately reflect the

1    statements that are in that recording?

2    A.  It does.

3          MR. LOCKARD:  Your Honor, the government would like to

4    display the transcript to the jury as a demonstrative.

5          THE COURT:  All right.

6          Any objection, Mr. Schulte?

7          (Defendant conferred with standby counsel)

8          MR. SCHULTE:  If there's a video to it, we request the

9    video be played with it.

10         THE COURT:  I think that's what I understood

11   Mr. Lockard to be proposing.

12         MR. LOCKARD:  Yes, your Honor.

13         THE COURT:  Ladies and gentlemen, at this time you may

14   pick up those binders again and turn to the second tab, which

15   is marked GX509-2-T.  And with the same instructions as

16   earlier, you may follow along with the transcript.  That is to

17   say, the transcript is not the evidence; it is just an aid in

18   helping you to understand the actual evidence, which is the

19   recording.

20         Go ahead.

21         MR. LOCKARD:  Ms. Cooper, if you could please play the

22   video through time stamp 4 minutes and 15 seconds.

23         (Video played)

24         MR. LOCKARD:  Thank you, Ms. Cooper.  We can pull that

25   down.

1          THE COURT:  Can we put the binders away?

2          MR. LOCKARD:  Yes, the binders we can put under the

3     chairs.

4          THE COURT:  Let me modify my earlier instruction in

5     one respect.  You'll notice that there were some names bleeped

6     out that were substituted in the transcript as Jeremy or Jeremy

7     Weber.  I guess that's only really reflected in the transcript,

8     not in the regarding.  So in that regard, you consider the

9     transcript as evidence of that name, Jeremy or Jeremy Weber, at

10    that place in the recording.  But otherwise, my instruction

11    earlier that the evidence is the recording and not the

12    transcript governs.

13         MR. LOCKARD:  Thank you, your Honor.

14    Q.  Agent Evanchec, we've reviewed some of the evidence

15    obtained in your investigation.  I'd like to rewind back to the

16    time period of March 8, 2017, when you first opened the

17    investigation.

18    A.  Correct.

19    Q.  What were your investigative steps specifically with

20    respect to Mr. Schulte?

21    A.  Back in New York, we had put him under physical

22    surveillance.  We had reviewed his online presence -- so his

23    LinkedIn page, I believe some other websites that he had

24    activated.  And we had begun to identify people in his life

25    that could be interviewed.  We immediately requested his

M6fWsch2                          Evanchec - Direct

1    personnel file and his security file from -- from the CIA and

2    had begun our own investigation into, you know, where he was in

3    life at that time and what he had done at the CIA as well.

4    Q.  And what did you come to learn in those early days about

5    where Mr. Schulte was and what was going on in his life?  More

6    specifically, did you learn anything about his plans in March

7    of 2017?

8    A.  Yes.  We had learned that he had planned to travel to

9    Cancun.

10   Q.  And when was the planned travel?

11   A.  I believe it was March 16 of 2017.

12   Q.  How, if at all, did learning about that planned travel

13   affect the investigation?

14   A.  As the case agent, I became very concerned that just over a

15   week after --

16              MR. SCHULTE:  Objection.

17              THE COURT:  Overruled.

18   A.  Just after, a week after the release of WikiLeaks, the

19   subject of a full field investigation at the FBI had planned

20   travel outside of the United States to Cancun, Mexico, where

21   the FBI doesn't have authority.  It was only the second time in

22   his life, I believe, Mr. Schulte had traveled outside the

23   United States.  So those two facts alone were very concerning

24   to me as an FBI agent and the case agent in this investigation.

25   Q.  And just to clarify, at that time, did you know anything

1    about the purpose of the travel?

2    A.   We did not.

3    Q.   How did learning about that travel affect your next

4    investigative steps?

5    A.   It certainly accelerated a need that we assessed was to get

6    in front of him and actually interview him and ask him about

7    the Vault 7 and to ask him about his travel plans.

8    Q.   And so what investigative steps did you plan in connection

9    with that?

10   A.   So, we had planned to meet Mr. Schulte after he left work

11   on the 15th of April and interview him at a nearby coffee shop,

12   and we had also planned to execute, just after that interview,

13   a search warrant of his residence.

14            THE COURT:   Sorry.  You said April.  Was it March or

15   April?

16            THE WITNESS:   March 15, sir.

17   BY MR. LOCKARD:

18   Q.   Prior to this planned interview, had any other steps been

19   taken to conduct searches related to Mr. Schulte?

20   A.   Yes.

21   Q.   What were those?

22   A.   March 13, there was a search of his apartment in Manhattan

23   as well.

24   Q.   And what type of search was that?

25   A.   It was called a delayed notification search.  So it

1    essentially is a search that a court authorizes the FBI to go

2    in and conduct a search warrant -- in this case, of

3    Mr. Schulte's apartment -- but then to delay notification that

4    it had been done to a later time.

5    Q.  Was anything seized during that search?

6    A.  No, sir.

7    Q.  Why not?

8    A.  When agents entered his residence on the 13th of March,

9    they encountered a treasure trove of digital media, and quite

10   frankly, any efforts to copy that image, which was covered

11   under the warrant, would have been worthless.  We only had a

12   certain amount of time before we knew Mr. Schulte would come

13   home for the day.  And so in the absence of being able to

14   conduct a search or to obtain images of his electronic devices,

15   we opted simply to take photographs of the residence and of the

16   digital media inside.

17   Q.  And what happened after that search was attempted?

18   A.  An additional search warrant was obtained to do a --

19   another search of his residence at a later time.

20   Q.  Where did you approach Mr. Schulte to begin the interview?

21   A.  After he was leaving work -- at the time he was an employee

22   of Bloomberg, I believe, on Park Avenue, not far from Grand

23   Central Station.  He was under surveillance at the time, so we

24   waited for him to come out of work, and we approached him and

25   identified ourselves as FBI agents.

M6fWsch2                         Evanchec - Direct

1   Q.  And who was with you?

2   A.  Special Agent David Donaldson.

3   Q.  And what happened after you identified yourselves as FBI

4   agents?

5   A.  Sure.  We told Mr. Schulte that we were investigating the

6   Vault 7 release from WikiLeaks, and we invited him to chat with

7   us, which he agreed.

8   Q.  Where did you go?

9   A.  We went to Pershing Square.  It's a coffee shop, I believe,

10  on East 42nd Street not far from Grand Central Station.

11  Q.  And why did you plan to conduct the interview at the coffee

12  shop?

13  A.  We wanted to go somewhere where Mr. Schulte would feel

14  comfortable talking to us.  We also wanted to go somewhere that

15  would have been safe for agents to go to and that we could have

16  some degree of privacy in our discussion with Mr. Schulte.  And

17  these agents had conducted a site survey, what we call, of that

18  location earlier and assessed that at that time of day it

19  basically afforded us and Mr. Schulte those, the benefits of

20  those things.

21  Q.  And what, if anything, did you tell Mr. Schulte about the

22  nature of the interview?

23  A.  That, I believe, from inviting him to speak with us, he had

24  the option to not, and he chose to.

25  Q.  Did you ask Mr. Schulte about the Vault 7 leaks?

M6fWsch2                          Evanchec - Direct

1    A.  We did.

2    Q.  And what did he say about that?

3    A.  He said they were not too severe, and he said that because

4    they were -- they did not actually contain the source or binary

5    code from what was first released.  But he -- so he did say

6    they weren't too severe.

7    Q.  Did you ask Mr. Schulte about how the leak occurred?

8    A.  We did.

9    Q.  And what, if anything, did he say in response to those

10   questions?

11   A.  I believe he had said that it could have been -- I don't

12   remember specifically, so is there something that you have that

13   can refresh my memory on that?

14   Q.  I believe so.  If you look on the floor near the witness

15   chair, there should be a binder that says volume 2 on it.  It

16   should be a large binder.  It may be behind you.

17   A.  Yes, sir.  I have it.

18   Q.  And if you turn to the document towards the back, I

19   believe, marked 3501-, should be 821, I think.

20   A.  OK.  I have it.

21   Q.  Is that a document that relates to this interview?

22   A.  It is.  It's the 302, or memorialization of the interview.

23   Q.  If you could please read to yourself the material on the

24   second page of that and then put the report to the side.

25              THE COURT:  While the witness is doing that, let me

M6fWsch2                          Evanchec - Direct

1    just tell you, ladies and gentlemen, the rules allow --

2              You can continue reading, Agent.

3              The rules allow a lawyer, where a witness can't recall

4    something, to refresh or try to refresh their document with a

5    document, with really anything.

6              Random digression.  When I studied for the bar, the

7    professor who taught on this subject said you could use

8    anything; you could even use a bowl of fettuccine Alfredo.  So

9    there you have it.  It's now a part of the official record in

10   this case.

11             Bottom line is that unless it is admitted into

12   evidence, you may not consider it.  The evidence is the

13   witness's testimony.  If, by looking at something, his

14   recollection is refreshed and he testifies, then you can

15   consider that testimony as you would any other.  What weight,

16   if any, you give to the fact that he, you know, refreshed his

17   recollection is up to you.  But bottom line is you may not

18   consider documents that are not in evidence.

19             MR. LOCKARD:  I believe the professor went on to say

20   that the witness could then eat the fettuccine.

21             MR. SCHULTE:  Objection, Judge.

22             THE COURT:  All right.  Let's move on.

23   A.  I recall, Mr. Lockard.

24   Q.  OK.  So if you could please put the document to the side.

25             Has that refreshed your recollection?

M6fWsch2                         Evanchec - Direct

1    A.  It has.

2    Q.  OK.  Could you please describe what the defendant said

3    about how the leak occurred or could have occurred?

4    A.  He said that you could check the DevLAN system and audit

5    records to look for spikes in activity, which would suggest

6    copying.  He also suggested that one should look at the backup

7    servers.

8    Q.  Did the defendant say anything about the backup servers?

9    A.  He -- other than that was the place that the information

10   could have come from.

11   Q.  Was he asked any questions about who might have committed

12   the alleged leak?

13   A.  Yes.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1    BY MR. LOCKARD:
 2    Q.  And what did he say in response to that?
 3    A.  He said that he could not imagine that others in his office
 4    could have done this.
 5    Q.  Did you ask him if he committed the leak?
 6    A.  We did.  On multiple occasions.
 7    Q.  What did he say in response to those questions?
 8    A.  He did not.
 9    Q.  What was Mr. Schulte's demeanor like during the course of
10    the interview?
11    A.  Appeared very nervous.
12    Q.  In what way?
13    A.  I recall, while at Pershings, interviewing him, looking
14    down at his hand, and his hand was trembling.
15    Q.  Did there come a time when the interview ended?
16    A.  There did.
17    Q.  How did it end?
18    A.  It ended -- the FBI had served Mr. Schulte with two grand
19    jury subpoenas.  My supervisor had entered our -- approached
20    our table and provided those to Mr. Schulte.  One of the
21    subpoenas was for him to appear before a grand jury on March
22    17th, and one was for a grand jury that permitted the FBI to
23    seize his cellular phone.
24    Q.  During the interview, did Mr. Schulte say anything about
25    his travel plans?
```

1   A.  He did.

2   Q.  What did he say about that?

3   A.  That he had planned to travel on the 16th with his brother.

4   Q.  Did you ask him about his travel documents?

5   A.  We did.

6   Q.  What did he say about that?

7   A.  He said that earlier in the day he had returned home at

8   lunchtime where he assembled his passport and had printed out

9   some travel documents that were in his backpack.

10  Q.  Had you learned any information prior to the interview that

11  related to travel documents?

12  A.  Yes.

13  Q.  What did you learn?

14  A.  We had learned that Mr. Schulte also maintained a

15  diplomatic passport that he did not return to the CIA upon his

16  resignation.

17  Q.  Very generally speaking, what is a diplomatic passport as

18  opposed to --

19              MR. SCHULTE:  Objection.

20  Q.  -- an ordinary travel passport?

21              THE COURT:  Overruled.

22  A.  A diplomatic passport is a document issued by the United

23  States State Department that is given to our diplomatic staff

24  overseas.  And they're very important and very distinct from a

25  passport that that you and I might travel on because they

1   afford some types of diplomatic immunities for those employees

2   overseas.

3   Q.  Can they be used by non-government employees?

4   A.  No.

5           MR. SCHULTE:  Objection.

6           THE COURT:  Overruled.

7   Q.  Did you ask Mr. Schulte about the diplomatic passport?

8   A.  Yes.

9   Q.  What did he say about that?

10  A.  It was at his residence.

11  Q.  After the interview concluded, where did you go?

12  A.  To his residence.

13  Q.  And did Mr. Schulte go with you?

14  A.  He did.

15  Q.  And what happened when you got there?

16  A.  He -- agents were staged there to execute the search

17  warrant.  Mr. Schulte used the key to the apartment to open the

18  door for the FBI.

19  Q.  Did you ask Mr. Schulte any questions about the contents of

20  the apartment?

21  A.  We did.

22  Q.  And what did he say?

23  A.  He said there were no guns inside as a matter of agent

24  safety.  He indicated that there were not any e-mails that he

25  had printed from the CIA there and, otherwise, there was no

1   classified information.

2   Q.  How long did Mr. Schulte stay?

3   A.  The search began at 7:41, I believe, and he stayed until

4   about 10:19 p.m., approximately, if memory serves.

5   Q.  And what, if anything, did you tell him about his continued

6   presence?

7   A.  We reminded him that he was free to go anywhere he wanted

8   to go and he wasn't required to stay at the search.  He opted

9   to leave, indicated that he would return shortly thereafter,

10  and he gave us a time of his return.

11  Q.  Did he return?

12  A.  Not at the time he said.

13  Q.  Did you find the passport?

14  A.  We did not.

15  Q.  What, if anything, did do you next?

16  A.  We had made -- we had kept surveillance on Mr. Schulte

17  after he had left the apartment.  We had learned that he had

18  gone back to Bloomberg, his offices that were there, so we had,

19  myself and some other agents had gone back to Bloomberg.  We

20  had seen Mr. Schulte in the lobby and approached him and

21  announced some of our findings of our search.

22  Q.  And what findings did you announce?

23  A.  We told him that we had in fact found the classified e-mail

24  that he said was not present in his apartment.  We had told him

25  that we had not found the diplomatic passport either.

1    Q.  And then what did you do next?

2    A.  We asked him where the diplomatic passport -- where his

3    passports were, essentially.

4    Q.  What did he say?

5    A.  They were now in his office desk in Bloomberg.

6    Q.  So what did you do after learning that?

7    A.  We, together, went up to his desk, I believe he retrieved

8    them, and the FBI took custody of them.

9         MR. LOCKARD:  Ms. Cooper, if you could please pull up

10   Government Exhibit 1622?

11   Q.  Do you recognize that, Agent Evanchec?

12   A.  That is a diplomatic passport.

13   Q.  And if we go to the next page?  Do you more specifically

14   recognize it?

15   A.  Yes.

16   Q.  What is it?

17   A.  It is a picture of Mr. Schulte, as well as his personally

18   identifying information contained inside the diplomatic

19   passport.

20   Q.  How did your conversation with Mr. Schulte conclude during

21   those events?

22   A.  After we had taken the passports from Mr. Schulte, we

23   advised him that the search was going to take way longer than

24   expected given the amount of volume of data that was in his

25   apartment.  We recommended that he get a hotel in the area and

1  spend the night there so that the FBI could continue the

2  search.  As we were walking to the hotel, Mr. Schulte asked me

3  if I thought he was responsible for the leak, of which I

4  responded:  If you were in my shoes, what would you think?

5  Q.  And what did he respond?

6  A.  He responded by saying that the FBI now possessed all of

7  his data but felt bad that we would have to go through it and

8  review it.  He then ended the evening, our interaction, by

9  saying that no traitor had ever come from Texas.

10         MR. LOCKARD:  At this time we have another

11  stipulation.

12         THE COURT:  Proceed.

13         MR. LOCKARD:  Government Exhibit 3003, which I will

14  read.

15         In the matter of the United States of America versus

16  Joshua Adam Schulte:

17         It is hereby stipulated and agreed, by and among the

18  United States of America, by Damian Williams, United States

19  Attorney for the Southern District of New York, David W. Denton

20  Jr. and Michael D. Lockard, Assistant United States Attorneys,

21  of counsel, and Josh Adam Schulte, the defendant, that:

22         1.  If called as a witness, a special agent ("Agent

23  1") with the Federal Bureau of Investigation ("FBI") with

24  knowledge of the matter, would testify that on or about March

25  14th and 15th, 2017, Agent 1 was present at 200 East 39th

1    Street, Apartment 8C, New York, New York, 10016 (the

2    "apartment") to execute a search warrant (the "search

3    warrant").  While present at the apartment, Agent 1 recovered:

4    (i) a computer that was used by the defendant containing four

5    hard drives and that was logged into evidence as SC01 (the

6    "home computer"; (ii) a thumb drive that bears the marking

7    "ufcu.org" and is marked as Government Exhibit 1603 (the "thumb

8    drive" (iii) a rack containing two servers, the first server of

9    which contained five hard drives and the second server of which

10   also contained five hard drives, and that was logged into

11   evidence as SC48 (the "rack servers"); (iv) six 1-terabyte hard

12   drives that are marked 1608 through 1613, respectively, one

13   640-gigabyte hard drives that marked as Government Exhibit

14   1614, and one 160-gigabyte hard drive that is marked as

15   Government Exhibit 1615.

16        2.  Government Exhibit 1601 is a compact disk

17   containing Government's Exhibits 1601-1 through 1601-26, which

18   are true and accurate copies of photographs of the home

19   computer; Government's Exhibits 1401, 1402, and 1403 are

20   compact disks containing Government's Exhibits 1401-1 through

21   1401-16; 1402-1 through 1402-10, and 1403-1 through 1403-7,

22   which are true and accurate copies of forensic files and data

23   recovered from the home computer; Government Exhibit 1404 is a

24   compact disk containing Government Exhibit 1404-1 through

25   1404-15, which are true and accurate copies of forensic files

1  and data recovered from the thumb drive; Government Exhibit

2  1605 is a compact disc containing Government Exhibit 1605-1

3  through 1605-53, which are true and accurate copies of

4  photographs of the rack servers; government Exhibit 1405 is a

5  compact disc containing Government Exhibit 1405-1 through

6  1405-12, which are true and accurate copies of portions of

7  Internet relay chats recovered from the rack servers.

8         3.   If called as a witness, a special agent ("Agent

9  2") with the FBI with knowledge of the matter, would testify

10 that on or about March 14th and 15th, 2017, Agent 1 was present

11 at the apartment to execute the search warrant.  While Agent 2

12 was present in the apartment, Agent 2 recovered (i) hard copies

13 of Government's Exhibits 1616 through 1619 from a headboard in

14 the defendant's bedroom; (ii) pieces of shredded paper from a

15 shedder that are contained in a bag marked Government Exhibit

16 1620.  Government Exhibit 1621 is a reconstruction of some of

17 the pieces of shredded paper recovered from the apartment.

18        4.   If called to testify, an officer with the Federal

19 Bureau of Prisons would testify that on or about October 5,

20 2018, Officer 1 recovered a Samsung cell phone with IMEI

21 no. 357073084445432 (the "Samsung phone") from Unit 7 South

22 within the Metropolitan Correction Center, 150 Park Row, New

23 York, New York, 10007.  Government Exhibit 821 a compact disc

24 containing true and accurate copies of forensic files and data

25 recovered from the Samsung phone.  Government Exhibit 822 is a

1    compact disc containing true and accurate copies of messages

2    sent and received using the messaging application Signal on the

3    Samsung phone.

4          It is further stipulated and agreed that this

5    stipulation, as Government Exhibit 3003, Government Exhibits

6    1603, 1608 through 1615, 1601, 1401 through 1404, 1605, 1405,

7    1616 through 1621, 821, and 822, and all Government's Exhibits

8    contained on Government's Exhibits 1601, 1401 through 1404,

9    1605, 1405, 821 and 822 may be received, in evidence, as

10   government's exhibits at this trial.

11         The government offers Exhibit 3003 and the exhibits

12   referenced therein.

13         THE COURT:  Admitted.

14         (Government Exhibits 3003, 1603, 1608 through 1615,

15   1601, 1401 through 1404, 1605, 1405, 1616 through 1621, 821,

16   and 822, and all Government's Exhibits contained on

17   Government's Exhibits 1601, 1401 through 1404, 1605, 1405, 821

18   and 822 received in evidence)

19         THE COURT:  Mr. Lockard, just one housekeeping matter.

20   I don't think that 1622 is in evidence.  If it is not, did you

21   intend to offer it?  The passport.

22         MR. LOCKARD:  Thank you, your Honor.  Yes, the

23   government offers Government Exhibit 1622.

24         THE COURT:  Any objection?

25         MR. SCHULTE:  No objection.

1            THE COURT:  Admitted.

2            (Government's Exhibit 1622 received in evidence)

3            THE COURT:  Let's make sure we don't display anything

4    until it is in evidence, please.

5            MR. LOCKARD:  Yes, your Honor.

6    BY MR. LOCKARD:

7    Q.  Agent Evanchec, with Ms. Cooper's assistance, if we could

8    please look at Government Exhibit 1624?

9            Do you recognize what is shown in 1624?

10   A.  I do.

11   Q.  How do you recognize it?

12   A.  I had been with the defendant that night and walked through

13   his house -- his apartment.

14           MR. LOCKARD:  Government offers 1624.

15           THE COURT:  Any objection?

16           MR. SCHULTE:  No objection.

17           THE COURT:  Admitted.

18           (Government's Exhibit 1624 received in evidence)

19           THE COURT:  Just to be clear, this is a photograph of

20   the apartment?

21           THE WITNESS:  Yes, your Honor.

22   BY MR. LOCKARD:

23   Q.  And does this depict the apartment as it appeared during a

24   portion of the search?

25   A.  It does.

1   Q.  And what part of the apartment is shown here?

2   A.  This would be standing at the threshold of the front door

3   looking into the living room and kitchen area.

4           MR. LOCKARD:  And if we can turn to Government Exhibit

5   1627 for the witness?

6   Q.  Do you recognize that?

7   A.  This would have been the living room area as well.

8           MR. LOCKARD:  We offer 1627.

9           THE COURT:  Any objection?

10          MR. SCHULTE:  No objection.

11          THE COURT:  Admitted.

12          (Government's Exhibit 1627 received in evidence)

13          THE COURT:  Did you want to publish?

14          MR. LOCKARD:  Yes, please.

15  BY MR. LOCKARD:

16  Q.  Agent Evanchec, what is shown here?

17  A.  Again, the living room area of Mr. Schulte's apartment.

18  Q.  And does this display some of the computer equipment that

19  was seized during the search and which was described in the

20  stipulation?

21  A.  It does.

22          THE COURT:  Can I ask you a question?  In this

23  photo -- and maybe since I don't think it was shown to the jury

24  we could go back to 1624 for a moment -- there is what appears

25  to be a post-it note on the wall.  Can you just explain, was

1    that something that was there when you arrived or was that put

2    up by agents?  What is your understanding of that?

3            THE WITNESS:  Your Honor, that is normally how the FBI

4    labels rooms when we do search warrants for the purposes of

5    photographing.  I cannot be certain in this situation that that

6    is something that the FBI put there, however.

7            THE COURT:  But custom and practice, when conducting a

8    search, is to put up a number or letter just to indicate

9    particular areas of the premises being searched?  Is that

10   correct?

11           THE WITNESS:  Yes, your Honor.  I can certainly see

12   the entryway being designated by Alpha.

13           THE COURT:  OK.  All right.  Let's go back to 1627.

14   BY MR. LOCKARD:

15   Q.  Picking up on the last question, the post-it note in the

16   upper left labeled D -- or delta -- is that -- similar

17   question.

18   A.  It is similar, tradecraft to how the FBI handles a search

19   warrant; yes.

20   Q.  Let's look at Government Exhibit 1630; Agent Evanchec, if

21   you recognize that?

22   A.  Yes, I do.

23   Q.  What is shown there?

24   A.  This is, again, a different vantage point of his living

25   room looking now into the kitchen, and the front door area

1    would be off to the upper left corner of the photo.

2              MR. LOCKARD:  We offer 1630.

3              THE COURT:  Any objection?

4              MR. SCHULTE:  No objection.

5              THE COURT:  Admitted.

6              (Government's Exhibit 1630 received in evidence)

7              THE COURT:  Mr. Lockard, I don't know how many there

8    are but do you want to cycle through them and offer them all at

9    once?

10             MR. LOCKARD:  That would be fine.

11   BY MR. LOCKARD:

12   Q.  If we can also look at Exhibits 1631, 1632 and 1642, which

13   I don't know where your binder is but they're also in hard copy

14   in the slim binder.

15   A.  I recognize this, sir.  I recognize that as the server.

16             THE COURT:  That was 1631 and 1632, respectively.

17   Q.  And 1642?

18   A.  I recognize that, sir, as the defendant's bedroom.

19   Q.  Do all of those photographs fairly and accurately represent

20   the defendant's apartment during the time of the search?

21   A.  They do.  Yes, sir.

22             MR. LOCKARD:  We offer 1631, 1632, and 1642, as well.

23             THE COURT:  Any objection?

24             MR. SCHULTE:  No objection.

25             THE COURT:  Admitted.

```
 1                (Government's Exhibits 1631, 1632, and 1642 received
 2       in evidence)
 3       BY MR. LOCKARD:
 4       Q.  If we can please look at Government Exhibit 1616?
 5                THE COURT:  Did you want to publish those?
 6                MR. LOCKARD:  We will come back to them, I think.
 7       BY MR. LOCKARD:
 8       Q.  Do you recognize Government Exhibit 1616?
 9       A.  I do.
10       Q.  And just to refer back to Government Exhibit 3003, the
11       stipulation which states that hard copies of Government Exhibit
12       1616 through 1619 from the headboard of the defendant's bedroom
13       is the location where those were recovered from.  Had you seen
14       this e-mail prior to the search?
15       A.  I had.
16       Q.  And how did you obtain a copy of the e-mail prior to the
17       search?
18       A.  From my interactions with the CIA.
19       Q.  Did you ask Mr. Schulte about this e-mail during your
20       interview of him earlier that night?
21       A.  I did.
22       Q.  And what did you ask?
23       A.  I asked him if a copy of this was present in his apartment
24       and he said it was not.
25       Q.  If we could please -- let me rephrase.
```

1     Did you determine whether any classified information was

2     contained in this e-mail?

3     A.  We had.

4     Q.  And what is the type of classified information you

5     determined was in the e-mail?

6               MR. SCHULTE:  Objection.

7     A.   The classified information is the pairing of --

8               THE COURT:  Hold on.  Hold on.

9               THE WITNESS:  Sorry.

10              THE COURT:  There was an objection so I need to rule

11    on the objection.

12              I will overrule the objection.

13              Go ahead.

14              THE WITNESS:  I'm sorry, your Honor.

15              THE COURT:  You may answer.

16              THE WITNESS:  Your Honor, I am having trouble hearing

17    the objections.

18              THE COURT:  Mr. Schulte, make sure you speak directly

19    into the microphone when you are objecting so that it is

20    understood.

21              THE WITNESS:  Thank you, your Honor.

22              THE COURT:  You may answer the question.

23              THE WITNESS:  The pairing of the afflation and the

24    pairing of the CIA to the names of actual employees, and their

25    full names, was included in this e-mail.

1    BY MR. LOCKARD:

2    Q.  And we talked yesterday about classified information

3    handling requirements.  Do you recall that?

4    A.  I do.

5    Q.  Is maintaining classified information at home consistent

6    with classification handling requirements?

7    A.  It is not.

8    Q.  If we could please look at Government Exhibit 1642 and

9    publish?  Is the location from where that e-mail is recovered,

10   is that shown in this photograph?

11   A.  It is.

12   Q.  And where was it -- from where was it recovered?

13   A.  The headboard of the bed.

14   Q.  Can you generally describe what the headboard looks like in

15   this photograph?

16   A.  The headboard is a wooden structure that is at the head of

17   the bed against the wall of the bedroom.

18   Q.  In the course of the search were other materials from the

19   CIA found?

20   A.  Yes.

21   Q.  Can we please look at Government Exhibit 1617 which is in

22   evidence?

23       Agent Evanchec, what is shown here?

24   A.  This is an additional e-mail thread that most recently

25   dates March 2nd that the defendant was a recipient to.

1   Q.  And is this an e-mail that you had seen prior to the search

2   that was conducted of the defendant's apartment?

3   A.  Yes.

4   Q.  Generally speaking, what does this e-mail relate to?

5   A.  Basically, the prior topic that we discussed; the dispute

6   between the defendant and Amol and figuring out how that matter

7   would be addressed between the defendant and the CIA.

8   Q.  And were you able to determine whether this document

9   contained classified information?

10  A.  I was.

11  Q.  And what type of classified information?

12  A.  Again, the afflation with the CIA, with the full, complete

13  names of employees at the CIA.

14          THE COURT:  Can I just clarify?  With respect to this

15  document and the prior e-mail that you showed there are

16  redactions in both of them.  Were those redactions in the

17  copies obtained or recovered from the defendant's apartment?

18          THE WITNESS:  They were not, your Honor.

19          THE COURT:  So just to be clear, those redactions have

20  been just made for purposes of display at trial?  Is that your

21  understanding?

22          THE WITNESS:  That's my understanding, your Honor.

23          MR. SCHULTE:  Your Honor, can I have a quick side bar?

24          THE COURT:  No.

25          MR. SCHULTE:  I just --

1              THE COURT:  Mr. Schulte, no.

2    BY MR. LOCKARD:

3    Q.  Can we please turn back to Government Exhibit 1630?

4         Stipulation 3003 refers to pieces of paper from a shredder

5    that were recovered from the apartment.  Is the location where

6    those shredded pieces of paper were found, is that shown in

7    this photograph?

8    A.  It is.

9    Q.  Where is that?

10   A.  On the left-hand side of the photo there is a black box in

11   the entryway, and that was a shredder just in the foreground of

12   the slippers there on the floor -- back ground, rather.  I'm

13   sorry.

14   Q.  If we can pull up Government Exhibit 1621 which is in

15   evidence?  Again, referring back to Government Exhibit 3003,

16   Exhibit 1621 is a reconstruction of some of the shredded pieces

17   of paper recovered from the apartment.  Have you had a chance

18   to review the reconstructions of the shredded documents?

19   A.  I have.

20   Q.  Do you recognize what kind of document this is?

21   A.  I do.

22   Q.  And what kind of document is this?

23   A.  This would have been a cover sheet that I am aware that the

24   CIA printer --

25              MR. SCHULTE:  Objection; would have been.

1           THE COURT:  When you say would have been meaning?

2           THE WITNESS:  This is, your Honor.

3           THE COURT:  That's what you identified this as?

4           THE WITNESS:  I have, your Honor.

5           THE COURT:  You may proceed.

6           THE WITNESS:  This is a cover sheet that CIA printers

7   print that would accompany any print jobs.  So any time a CIA

8   officer or any people that work in the types of offices that

9   Mr. Schulte did would print any type of document, it would come

10  with a cover sheet that would basically segregate that from

11  other print jobs to basically protect the information that was

12  underneath.  So this is basically a printer cover sheet.

13  BY MR. LOCKARD:

14  Q.  And can you remind us, approximately how much time did you

15  spend working in the CCI offices following the March 7, 2017

16  Vault 7 leak?

17  A.  Months, sir.

18  Q.  During those months did you become familiar with CIA print

19  cover sheets?

20  A.  I did.

21  Q.  If we could please look at pages 2 and 3?

22          THE COURT:  Hang on.  Before you do that, the document

23  makes reference to SCI compartments.  Do you know what that

24  means and can you explain it?

25          THE WITNESS:  So as we spoke about yesterday, there

1    are classifications like secret and top secret.  In addition to

2    that there is a level of an additional level of classification

3    that's called SCI and that is, again, even a more restrictive

4    type of information that employees would have to have clearance

5    to obtain and, again, a need to know that information.  So this

6    is just an additional enhanced compartment of classification,

7    your Honor.

8              THE COURT:  All right.  Thank you.

9              MR. LOCKARD:  Thank you, your Honor.

10   BY MR. LOCKARD:

11   Q.  And in the spirit of clarification, does the cover sheet

12   identify the printed materials as classified?  Or does it

13   identify them in some other way?

14        Let me ask you, could you please read the first sentence

15   after the warning?

16   A.  The output is from a top secret system processing data with

17   multiple SCI compartments and handling caveats.

18   Q.  Thank you.

19        And did the reconstructed documents contain additional CIA

20   print cover sheets like this?

21   A.  They did.

22   Q.  Were those print cover sheets the originals, did they

23   contain the redactions that are reflected in Exhibit 1621?

24   A.  They did not.

25   Q.  If we could go to page 4 of 1621?  Have you had an

1   opportunity to review this reconstruction?

2   A.  I have.

3   Q.  And, generally speaking, what does this reconstruction,

4   which is partial, what does it appear to be from?

5   A.  Again, the defendant's dispute with Amol and the

6   involvement of the Threat Management Unit in hoping to resolve

7   that matter.

8   Q.  And if we could turn to page 5 of this exhibit?  Again,

9   were you able to recognize from what this partial

10  reconstruction of the document came from?

11  A.  Yes.  It appears to be an e-mail again.

12  Q.  And without paging through, were there additional

13  reconstructions of shredded e-mails contained in the shredder?

14  A.  There were.

15  Q.  Remind us, at the time that the search was conducted on

16  March 13th and 14th of 2017, at that time how long had

17  Mr. Schulte been separated from the CIA?

18  A.  It would have been since November, so looking at six

19  months.

20  Q.  How long after the initial Vault 7 release by WikiLeaks was

21  the search?

22  A.  Approximately a week.

23  Q.  Agent Evanchec, did there come a time when you spoke with

24  the defendant again?

25  A.  There was.

1   Q.   When was the next time that you spoke with the defendant?

2   A.   On March 20th of 2017.

3   Q.   And where did you speak with the defendant?

4   A.   Those conversations occurred at the United States

5   Attorney's office right here, a block away, in Manhattan.

6   Q.   Who was present?

7   A.   Myself, Special Agent David Donaldson, the defendant, two

8   attorneys that the defendant brought with him, as well as two

9   United States attorneys.

10   Q.   During the course of -- well, let me ask.  After you met

11   with the defendant on March 20th, did you meet with him again?

12   A.   We did; yes.

13   Q.   And when did you meet with him again after March 20th,

14   2017?

15   A.   The following day.

16   Q.   On March 21st?

17   A.   That's correct, sir.

18   Q.   Were the circumstances of that meeting similar to the

19   circumstances you described on March 20th?

20   A.   Yes.  Correct.

21   Q.   In the course of those two days of interviews or those

22   interviews on two consecutive days, was the defendant asked

23   about the Vault 7 leaks?

24   A.   He was.

25   Q.   What, if anything, did he say about how the leaks could

1   have happened?

2   A.   He said a number of things over the course of those two

3   days.  He described three ways, frankly, that the information

4   could have been obtained.  He described the first way was to

5   view a page-by-page scrape of the information which would

6   essentially involve copying of each individual page that was

7   released to WikiLeaks and then turning it over to them.  The

8   second option that he provided was a remote or physical access

9   to the backups, so by physically going to the servers in the

10  CCI office and downloading the information from them or by

11  remotely accessing those servers from a desktop computer.  And

12  the last and third option he provided was the offsite backup

13  servers.

14  Q.   What, if anything, did the defendant say about his access

15  to the offsite backup servers?

16  A.   He said he had never been there.

17  Q.   What, if anything, did he say about other AED developers'

18  access to the offsite backup servers?

19  A.   He indicated that it was highly unlikely that they would

20  have access because if he didn't have access, they wouldn't,

21  because he was the main one.

22  Q.   Did Mr. Schulte talk about his role in backing up files

23  from DevLAN system?

24  A.   He did.

25  Q.   What did he say about that?

1   A.  He indicated that at one point he had written a script that

2   actually sent the information from the live system to the

3   backup.  So that, from what we saw yesterday in those logs,

4   every day in the 6:00 hour, a new backup was added to the file

5   directory.  Mr. Schulte indicated that at one point he had

6   written that script to send those backup files to -- actually

7   those files to backup, and he had also said that at one time he

8   was asked to go into the backup server -- on two occasions he

9   had been asked to go into the backup server and actually did go

10  into the backup server to delete old copies of backup versions.

11  Q.  Did Mr. Schulte describe how he would access the backups?

12  A.  He did.

13  Q.  What did he say about that?

14  A.  I believe he indicated that he would access them through

15  the Stash virtual machine which is one of the applications in

16  DevLAN.

17  Q.  Was Mr. Schulte asked about his administrator role while he

18  was at the CIA?

19  A.  He was.

20  Q.  And what, if anything, did he say about his administrator

21  role?

22  A.  He was one of the administrators to the project and had

23  indicated that he had various administrative rights and

24  applications that granted access to the applications themselves

25  so he, at various times, mentioned his -- the role he had in

M6F5sch3                        Evanchec - Direct

1  the system as an administrator.

2  Q.  Did Mr. Schulte talk about how others might be able to

3  access the backup server?

4  A.  I don't recall.

5  Q.  Was Mr. Schulte asked about log files during these

6  interviews?

7  A.  He was.

8  Q.  What, if anything, did he say.

9  A.  He indicated that the system would maintain log files that,

10  as I mentioned before, might show a spike in activity for a

11  file being downloaded, so he indicated that that was a

12  potential avenue for the FBI to explore in hoping to solve this

13  crime.

14  Q.  During those interviews on consecutive days, did you ask

15  Mr. Schulte whether he had had any role in the Vault 7 release?

16  A.  We did.

17  Q.  And what types of questions did you ask him on that front?

18  A.  There were --

19          I'm sorry, your Honor.  Did you ask something?

20          THE COURT:  No, I just coughed.

21          THE WITNESS:  I'm sorry.

22          That was a litany of questions that basically asked

23  every which way to Sunday if Mr. Schulte had any involvement in

24  the WikiLeaks release.  They were questions like, Did you make

25  the system vulnerable to compromise?  Did you provide the

1    information to WikiLeaks?  Have you been in touch with anybody

2    from WikiLeaks?  Have you been in touch with any foreign

3    governments?

4            There were a series of questions like that to

5    basically encapsulate any possibility that the defendant could

6    have done, any involvement he might have had in the leak.

7    Q.  And what did the defendant say in response to those

8    questions?

9    A.  "No" to each of those questions.

10   Q.  At the time of these interviews, did you know that the

11   backup files had been stolen on April 20th of 2016?

12   A.  We had not.

13   Q.  Did you know which backup files had been stolen?

14   A.  We did not.

15   Q.  After these two days, did there come a time when you spoke

16   with the defendant?

17   A.  We did.  I believe there was another time in June of 2017

18   from what I recall.

19   Q.  What were the circumstances of that meeting?

20   A.  They were very similar to the prior two in March.

21   Q.  And who was present?

22   A.  It was the same parties; myself, Special Agent Donaldson,

23   the defendant, two of his attorneys, and two United States

24   attorneys.

25   Q.  And what was the principal topic of discussion at that

1   interview?

2   A.  The principal topic of that interview was essentially to go

3   through the evidence that we had recovered primarily from his

4   apartment and to get an understanding of what that evidence

5   was, and he went piece by piece and explained what it was and

6   who had access to it, over the course of a couple of hours.

7   Q.  If we could pull up Government Exhibit 1601-2 which is in

8   evidence and publish it if it hasn't been?  And just referring

9   back to Government Exhibit 3003?

10      Actually, Agent Evanchec, do you recognize this photograph?

11  A.  I do.

12  Q.  And what is shown in here?

13  A.  One of the computers that was seized from Mr. Schulte's

14  apartment on March 15th, 2017.

15  Q.  And was Mr. Schulte asked about this computer?

16  A.  He was.

17  Q.  And what did he say about it?

18  A.  That he was the user of this.

19  Q.  Did you ask Mr. Schulte any questions about the Internet

20  relay chats?

21  A.  We did.

22  Q.  What did he say about those?

23  A.  He indicated that his servers had hosted what they call an

24  Internet relay chat which is essentially is a chat function on

25  his laptop.  We asked him about several of the parties that

1  were a part of that.  He had, one by one, kind of gone and

2  explained who those individual participants were.  I think he

3  even made comments about one of the members' mothers having

4  registered the account or having paid for it of some type.  So

5  he provided information about the history of the Internet relay

6  chat.

7  Q.  And did the Internet relay chat, did the users have screen

8  names?

9  A.  They did.

10  Q.  Did he identify his screen name?

11  A.  He did.

12  Q.  What was his screen name?

13  A.  Josh.

14  Q.  Did the FBI discover any encrypted portions of the

15  computers that were seized from the defendant's home?

16  A.  We did.

17  Q.  And what, if anything, did you ask the defendant related to

18  the encrypted portions of his computers?

19  A.  We asked if he would provide us permissions and directions

20  of how to get into those encrypted portions.

21  Q.  And what did the defendant say?

22  A.  He declined to give us that permission.

23          MR. LOCKARD:  Thank you, Ms. Cooper.

24          THE COURT:  Mr. Lockard, is this a natural breaking

25  point?

1          MR. LOCKARD:  It is.

2          THE COURT:  Great.  So we will take our break there.

3          Ladies and gentlemen, a few things.  First, number

4     one, keep an open mind.  Relatedly, do not discuss the case

5     with one another or anyone else for that matter.  Don't do any

6     research about the case.  You have only heard a little bit of

7     the evidence and that is the reason all of those instructions

8     are absolutely critical.  A reminder to take your notebooks

9     with you to the jury room, keep them with you at all times

10    except overnight when they should be left in the jury room.  A

11    reminder, also, that you may want to leave your phones in the

12    jury room when you come back to the courtroom, but if you do

13    bring it hear are here just make sure that they are completely

14    off.

15         With that, it is 11:38.  Let's be ready to go by 12:15

16    so we can get started, just keep it to a 40-minute break.  We

17    will see with the travel to and from the jury room if that

18    amount of time works.  If not, we can adjust things.  But I

19    will keep my fingers crossed to try and keep things moving and

20    make the most use of your time so a reminder to use the

21    restroom before you come back.  With that, enjoy your breaks

22    and we will see you shortly after 12:15.

23         Thank you.

24         (Continued on next page)

25

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Agent, you can step down.  Please put your mask on

4  before you leave the witness box.  Please be back here by 12:15

5  ready to go.

6          (Witness steps down)

7          THE COURT:  Mr. Schulte, did you want to raise

8  something that you had requested a side bar about earlier?

9          MR. SCHULTE:  Yes, I did; once the witness leaves.

10         THE COURT:  Anything else to raise?  Mr. Lockard, do

11 you know how much longer you have on direct?

12         MR. LOCKARD:  Probably less than a half hour left.

13         THE COURT:  OK.  Anything else to raise from the

14 government?

15         MR. LOCKARD:  Not at the moment, your Honor.

16         THE COURT:  Mr. Schulte, the witness has left.

17         MR. SCHULTE:  Yes.

18         Judge, there is a major issue here.  These documents

19 that they've just introduced recovered from my home in the

20 shredded documents, the CIA all confirmed that those were all

21 unclassified and this witness actually testified for 10 pages

22 at the last trial agreeing, confirming, that all of these

23 documents were unclassified.  To the degree the government

24 wants to change their testimony or now claim that they are

25 classified, they should have produced that in discovery because

1     the discovery produced to us was that these documents were not

2     classified, they were all unclassified.  This witness testified

3     they were all unclassified at the last trial.  Now he is

4     changing his testimony.  There was no discovery production to

5     us about this.  It is just crazy.

6             THE COURT:  Well, two responses.  One, if there was no

7     discovery there is no discovery.  The witness has testified as

8     he did.  To the extent that he testified differently in a prior

9     proceeding, it sounds like you have some very good material for

10    cross-examination so that's what cross-examination is for.

11            Anything else from you, Mr. Schulte?

12            MR. SCHULTE:  So I guess the form of the transcripts,

13    when I am submitting those on cross I can just -- I'm just

14    wondering how those come in as exhibits then.  I can submit the

15    whole transcript or the portions of the transcript?

16            THE COURT:  You mean as a prior inconsistent

17    statement?

18            MR. SCHULTE:  Yes.  Just how I bring that up.  And I

19    would also -- I think the major issue here is regarding the

20    discovery is when the CIA conducts classification reviews of

21    all of the documents and that's what I am saying, is that there

22    has to be discovery from that.  The CIA has determined, through

23    its own classification experts -- because he is not a

24    classification expert.  So to the degree that he is saying that

25    the CIA told him that they're classified, wherever he is

1    deriving this knowledge, there should be some underlying

2    document from the CIA classification authority either

3    confirming or stating the classification status of these

4    documents.  That's the only way that the witness can determine,

5    right?  So that's what I am saying, is that if he is saying

6    they're classified and he got that from the CIA, there is

7    documents there that were never produced to us.  The

8    classifying authority has to say what the classification of

9    these documents are.

10             THE COURT:  Mr. Lockard?

11             MR. LOCKARD:  I don't know if the defendant is

12   referring to the fact that the documents are in some cases

13   marked unclassified by the sender but that is certainly

14   something that we can ask Mr. Evanchec about.

15             THE COURT:  I would encourage you to do that, if only

16   to clarify things for the jury, but I think what he is saying

17   is that there should be some discoverable documents or

18   information from the classifying authority concerning the

19   classification of these documents.  If he represents that there

20   is no such discovery then sobeit, but that's, I think, his

21   point.

22             MR. DENTON:  I'm sorry to tag team this, your Honor,

23   but just because it implicates different witnesses.

24             The defendant is aware there was a classification

25   review, particularly of Government Exhibit 1616, the OIG

1    e-mail.  There was testimony about it.  There will be testimony

2    about it from Mr. Leonis and there was a determination that

3    that contained classified information and he has long been on

4    notice of that.

5              MR. SCHULTE:  No, Judge, that's exactly what I am

6    saying, is that they do a classification review for that

7    document.  They did determine that was classified.  I received

8    the discovery from the government so that's what I am saying,

9    all the other documents from the shredder and all the other

10   documents that they were referring to that were not the OIG

11   e-mail.  There is existing documents at the CIA who have done

12   determinations from that, because I know how the process

13   worked, and they have turned over discovery where the CIA has

14   actually conducted the review and determined that the OIG

15   e-mail was classified.  Those same determinations for the other

16   documents exist and the government should have turned those

17   over.

18             THE COURT:  OK.  So now we learn that 1616, there was

19   a classification review and it was turned over.  1617; is that

20   the same?

21             MR. DENTON:  So your Honor, I think with respect to

22   those, there wasn't any testimony or discussion about the fact

23   that they're classified, there is just a discussion about the

24   fact that there are people's full names in there and that they

25   are redacted and that's where it stopped and so there wasn't

1     discussion about formal classification review for good reason.

2                 THE COURT:  1617 I believe that the witness did

3     testify that it contained classified information, namely full

4     names of CIA employees.

5                 MR. DENTON:  I'm not sure whether he specifically

6     identified it as classified.  I'm sorry, your Honor, for not

7     having it directly in front of me, but I think we can clarify

8     that, as needed.

9                 MR. SCHULTE:  The transcript is there, yes.

10                THE COURT:  It also just points to a larger -- I want

11    to make sure that you all get your breaks and that I have my

12    own, but the separate issue that Mr. Schulte is averring to

13    which I think is a valid point is he is not the classifying

14    authority.  So that in regard, to the extent that he says he

15    understands these to contain classified information, he is

16    really not basing that on statements that were made by someone

17    else.  I am inclined to, if you don't clear that up, to provide

18    a curative instruction to the jury on that score.  If there is

19    evidence later in the trial from somebody with firsthand

20    knowledge that can speak to the classification of these

21    documents then sobeit, but it doesn't seem that this is a

22    witness who can testify to that.

23                Mr. Lockard?

24                MR. LOCKARD:  Yes, your Honor.  I think we will

25    proceed on that basis.

M6F5sch3                          Evanchec - Direct

1           THE COURT:  OK.  So I will give you an opportunity to

2    clear that up when we come back, and otherwise I will give a

3    curative instruction.  To the extent that you should look at

4    the transcript and with respect to 1617, and I think it is

5    1621, to the extent that the witness said that anything was

6    classified you can either clean it up or make sure that there

7    is no discovery to be produced, and if there is any issue we

8    will take it up later.

9           Mr. Schulte, as for your question with what to do with

10   prior transcripts if there is a prior inconsistent statement,

11   that's one of the very good reasons that you have standby

12   counsel.  So consult with them about how to do that sort of

13   thing and then we will take it up on cross-examination.

14           See you at 12:15.  Thank you.

15           (Luncheon recess)

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

M6fWsch4

```
 1                        AFTERNOON SESSION

 2                            12:15 p.m.

 3           (Jury not present)

 4           THE COURT:  Please be seated.

 5           All right.  We'll get the jury and pick up where we

 6   left off.

 7           MR. SCHULTE:  One minor thing, Judge, real quick.  The

 8   marshals asked me, in order for me to have bottled drink, they

 9   need permission from you.  Is that OK?

10           THE COURT:  Yes.

11           MR. SCHULTE:  Thank you.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (Jury present)

2           THE COURT:  You may be seated.

3           Welcome back, ladies and gentlemen.  I hope you had a

4    good break.

5           We'll pick up where we left off with the direct

6    testimony of Agent Evanchec.

7           Mr. Lockard, you may proceed.

8    BY MR. LOCKARD:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon, Mr. Lockard.

11          MR. LOCKARD:  Ms. Cooper, could we please look back at

12   Government Exhibit 1616.

13   Q.  Agent Evanchec, we looked at this email prior to the break.

14   Do you recall that?

15   A.  I do.

16   Q.  I want to focus in on the portion of the email that appears

17   underneath "signed by" and above OIG.  What is that?

18   A.  That's a classification marking.

19   Q.  And how do classification markings relate to emails?

20   A.  Each email that an employee at the CIA would write would

21   require them to apply a classification --

22          MR. SCHULTE:  Objection.  No expertise.

23          THE COURT:  Where are we looking at here, Mr. Lockard?

24          MR. LOCKARD:  The classification banner.

25          THE COURT:  That's highlighted?

1          MR. LOCKARD:  Yes.  Yes, your Honor.  I'm happy to ask

2     a few preliminary questions.

3          THE COURT:  Why don't you do that.

4          MR. LOCKARD:  Thank you.

5     Q.  Special Agent Evanchec, what is your security clearance?

6     A.  Top secret.

7     Q.  And do you use classified email systems in connection with

8     your work at the FBI?

9     A.  Yes, I do.

10    Q.  And you use those classified email systems on what type of

11    basis?

12    A.  National security cases.

13    Q.  And how often have you used those classified email systems?

14    A.  Throughout my career.

15    Q.  Have you engaged in email communications with CIA

16    officials?

17    A.  I have.

18    Q.  At the classified level?

19    A.  I have.

20    Q.  For how long were you at the CCI offices after the March 7,

21    2017, leak?

22    A.  Three to four months.

23    Q.  Did you have encounters with CIA emails and email systems

24    during that time?

25    A.  Extensively.

M6fWsch4                          Evanchec - Direct

1    Q.  Are you familiar with the classification designations for

2    emails on CIA email systems?

3    A.  I am.

4    Q.  What does this classification banner mean in this email?

5    A.  That means that Mr. Schulte had classified this email

6    unclassified as he sent it and wrote it.

7                THE COURT:  And just to be clear, what you're saying

8    is that on your system and the CIA's system, to your knowledge,

9    it's the sender of the email that classifies or makes reference

10   to what level of classification, if any, it is?

11               THE WITNESS:  Yes, your Honor.

12   BY MR. LOCKARD:

13   Q.  Now, who ultimately is responsible for the actual

14   classification of the document, generally speaking?

15   A.  The writer designates the classification.  Is that what

16   you're asking?

17   Q.  I guess I'm asking does the sender of an email have the

18   ability to change the classification level of information

19   contained in the email?

20   A.  No.

21   Q.  What is the sender of the email's responsibility with

22   respect to the information in the email and the classification

23   markings?

24   A.  To properly classify that email.

25   Q.  Now, turning to government -- and again, I'm sorry, is this

1  an email that you had asked Mr. Schulte about during your

2  interview on March 15?

3  A.  It is.

4  Q.  And what did he tell you about this email?

5  A.  That this email was not located at his apartment in

6  Manhattan.

7  Q.  And was it found in his apartment in Manhattan?

8  A.  It was.

9  Q.  And again, where was it found?

10 A.  In the headboard of his bed.

11 Q.  Turning to Government Exhibit 1617, where was this email

12 also found?

13 A.  The headboard of his bed.

14 Q.  And again, looking in at the classification banner, who

15 would have selected that classification banner?

16 A.  The writer of each individual email.

17 Q.  OK.  Now, what effect, if any, did the discovery of

18 Government Exhibits 1616, 1617, and the other documents found

19 during the search have on the course of the investigation that

20 you were leading with respect to Mr. Schulte?

21 A.  Given that we had known there was classified information in

22 the collection of documents that we reviewed, it showed a

23 propensity of the defendant to mishandle classified

24 information.

25           THE COURT:  All right.  Let me interrupt to say a

1    couple of things.

2           First of all, that's just the witness's opinion by way

3    of explaining what steps he then took.  Obviously, whether the

4    defendant committed the crimes that he's charged with is

5    ultimately a question for you, members of the jury, and in that

6    regard, whether he had a propensity to do anything is up to

7    you.

8           The second thing, let me just explain or ask Agent

9    Evanchec, earlier you testified that some of these documents --

10   I think 1616 and 1617 -- contained some classified information;

11   namely, the full names of CIA employees.  Is that correct?

12          THE WITNESS:  Depending on -- my understanding, your

13   Honor, is depending on that employee's actual role, that would

14   be the case.

15          THE COURT:  OK.  But with respect to these particular

16   documents, to the extent that you identified them as containing

17   classified information, is that something that you were told by

18   someone at the CIA or by someone else?

19          THE WITNESS:  Yes.  It would have to be, your Honor,

20   original classification authority are the ultimate

21   classification reviewers in the U.S. government.  I know at the

22   FBI we have several of them.  I'm not sure how many the CIA

23   has, but that actual entity, that individual with that

24   authority would actually be the one to determine why something

25   is classified.

1          THE COURT:  OK.  To translate that, in other words,

2     the determination of whether a document that originated at the

3     CIA contained classified information would be determined by

4     someone at the CIA.  Is that correct?

5          THE WITNESS:  Correct, yes, sir.

6          THE COURT:  And when you said that these documents,

7     1616 and 1617, contained classified information that was

8     something that you were told was determined by someone at the

9     CIA?

10          THE WITNESS:  That's correct, your Honor.

11          THE COURT:  All right.

12          Ladies and gentlemen, I'm going to instruct you that

13     you're not to consider Agent Evanchec's testimony on that score

14     for its truth, just for, again, the fact that he was told that

15     these contain classified information and what effect, if any,

16     that had on him and the steps he took in his investigation.

17     But since it's something he was told, it's not firsthand

18     testimony.

19          And I also remind you, as I think I said yesterday,

20     ultimately, you'll be asked to decide whether certain

21     information in this case qualifies as what is known as national

22     defense information.  I will give you thorough instructions on

23     that at the conclusion of the case.  Classified information and

24     national defense information, again, are not exactly the same

25     idea.  But whether something was deemed or treated as

1    classified by the government is a factor that you may consider

2    in deciding whether information is national defense

3    information.

4              With that, Mr. Lockard, you may proceed.

5              MR. LOCKARD:  Thank you, your Honor.

6    Q.  And Agent Evanchec, if we can just turn away from

7    classification issues for the moment and just focus in on the

8    subject matter that this email relates to, again, what does

9    this email relate to?

10   A.  The defendant's dispute with Amol.

11             MR. SCHULTE:  Objection.  Asked and answered.

12             THE COURT:  Sustained.

13             MR. LOCKARD:  Your Honor, we have one final

14   stipulation to read during this witness's testimony.

15             THE COURT:  Go ahead.

16             MR. LOCKARD:  It is marked as Government Exhibit 3002.

17             In the matter of the United States of America v.

18   Joshua Adam Schulte, defendant:

19             "It is hereby stipulated and agreed by and among the

20   United States of America, by Damian Williams, United States

21   Attorney for the Southern District of New York, David W. Denton

22   Jr. and Michael D. Lockard, Assistant United States Attorneys

23   of counsel, and Joshua Adam Schulte, the defendant, that:

24             "1.  If called as a witness a representative of Google

25   Inc. ('Google') with knowledge of the matter would testify that

1    Government Exhibits 1305-1 through 1305-10 are true and correct

2    copies of documents from the account joshschulte1@gmail.com,

3    including subscriber information, emails, and Google searches

4    conducted and websites visited by the user of that account, and

5    the date and time those searches occurred and the websites

6    visited search history, were made at or near the time by, or

7    from information transmitted by, a person with knowledge of the

8    matters set forth in the records; they were kept in the course

9    of a regularly conducted business activity; and it was the

10   regular practice of that business activity to maintain the

11   records.

12        "2.  If called as a witness, a representative of

13   Amazon.Com Inc. ('Amazon') with knowledge of the matter would

14   testify that Government Exhibit 1306-1 contains true and

15   correct copies of documents from Amazon associated with Amazon

16   user account joshschulte1@gmail.com, which were made at or near

17   the time by, or from information transmitted by, a person with

18   knowledge of the matters set forth in the records; they were

19   kept in the course of a regularly conducted business activity;

20   and it was the regular practice of that business activity to

21   maintain the records.

22        "3.  If called as a witness, a representative of

23   Automattic Inc. ('Automattic') with knowledge of the matter

24   would testify that Government Exhibits 1301-1 through 1301-4B

25   are true and correct copies of documents from Automattic

1    associated with Automattic profile

2    https://en.gravatar.com/joshschulte1, which includes WordPress

3    websites joshschulte.wordpress.com,

4    presumptionofslavery.wordpress.com and

5    presumptionofinnocence.net, and which were made at or near the

6    time by, or from information transmitted by, a person with

7    knowledge of the matters set forth in the records; they were

8    kept in the course of a regularly conducted business activity;

9    and it was the practice of that business activity to maintain

10   the records.

11           "4.  If called as a witness, a representative of

12   Buffer Inc. ('Buffer') with knowledge of the matter would

13   testify that Government Exhibit 1302-1 is a true and correct

14   copy of documents from Buffer associated with the Buffer

15   account with the user ID 5b8c7b584c2e71709f92901, and

16   associated with the email address

17   freejasonbourne@protonmail.com, and which were made at or near

18   the time by, or from information transmitted by, a person with

19   knowledge of the matters set forth in the records; they were

20   kept in the course of a regularly conducted business activity;

21   and it was the regular practice of that business activity to

22   maintain the records.

23           "5.  If called as a witness, a representative of

24   Twitter Inc. ('Twitter') with knowledge of the matter would

25   testify that Government Exhibits 1304-1 through 1304-3 are true

and correct copies of documents from the Twitter account

@freejasonbourne, and which were made at or near the time by,

or from information transmitted by, a person with knowledge of

the matters set forth in the records; they were kept in the

course of a regularly conducted business activity; and it was

the regular practice of that business activity to maintain the

records.

           "6.   It is further stipulated and agreed that this

stipulation, as Government Exhibit 3002, and Government

Exhibits 1305-1 through 1305-10, Government Exhibit 1306-1,

Government Exhibits 1301-1 through 1301-4B, Government Exhibit

1302-1, and Government Exhibits 1304-1 through 1304-3 may be

received in evidence as government exhibits at trial."

           The government offers Government Exhibits 3002 and the

exhibits referred to therein.

           THE COURT:  Admitted by stipulation.

           (Government Exhibits 1301-1 through 1301-4B received

in evidence)

           (Government Exhibit 1302-1 received in evidence)

           (Government Exhibits 1304-1 through 1304-3 received in

evidence)

           (Government Exhibits 1305-1 through 1305-10 received

in evidence)

           (Government Exhibits 1306-1 and 3002 received in

evidence)

M6fWsch4                          Evanchec - Direct

1   BY MR. LOCKARD:

2   Q.  Now, Agent Evanchec, I'd like you to turn back to the slim

3   binder that's in front of you that has the exhibit tab markings

4   on it.

5   A.  Yes, sir.

6   Q.  And towards the back, you should see Government Exhibits

7   1350, '51, '52, and '53.

8   A.  Yes, sir.

9   Q.  Do you recognize those documents?

10  A.  I do.

11  Q.  Did you prepare them or assist in their preparation?

12  A.  I did.

13  Q.  Do they accurately summarize certain Google searches and

14  website visits from the defendant's Google account?

15  A.  They do.

16          MR. LOCKARD:  The government offers 1350, 1351, 1352,

17  and 1353.

18          THE COURT:  Any objection?

19          MR. SCHULTE:  No objection.

20          THE COURT:  Admitted.

21          (Government Exhibits 1350, 1351, 1352, and 1353

22  received in evidence)

23  BY MR. LOCKARD:

24  Q.  Agent Evanchec, did the defendant's Google search history

25  include searches relating to the deletion of data from

M6fWsch4                          Evanchec - Direct

1    computers?

2    A.  They did.

3           MR. LOCKARD:  Could we please pull up Government

4    Exhibit 1350.

5    Q.  Generally speaking, what is reflected in this exhibit?

6    A.  This exhibit documents the number of times the defendant's

7    Google account was used to conduct several searches related to

8    the deletion of data.  And this period of review was from late

9    April of 2016 to early May of 2016, so a rather limited time

10   frame.

11   Q.  Now, did your review of the defendant's Google searches

12   include the time periods prior to April of 2016?

13   A.  We reviewed those as well.

14   Q.  Were there similar searches prior to April of 2016?

15   A.  Not to this volume, from my recollection.

16          THE COURT:  Can you just explain; you either prepared

17   these or were involved in their preparation?  Is that correct?

18          THE WITNESS:  Correct, yes, sir.

19          THE COURT:  And what did you base that preparation on?

20          THE WITNESS:  So, your Honor, we had served a search

21   warrant on Google, which then returned all of the defendant's

22   searches that he had conducted through Google for a number of

23   years.  So we went through line by line and reviewed those

24   actual searches.

25          THE COURT:  All right.  And then this is a summary of

1    what you found in the search?

2                THE WITNESS:  Yes, your Honor.  It's a summary.

3                THE COURT:  All right.

4                Ladies and gentlemen, I'll give you further

5    instructions on this at the conclusion of the case, but in

6    certain circumstances, where there's voluminous documents or

7    data and it would be difficult to examine that or introduce it

8    at trial, parties are permitted to introduce a summary or a

9    chart basically summarizing that data rather than presenting

10   the data itself or in addition to presenting the data itself.

11   So in that regard, you may consider this as evidence of what

12   the agent found in the data that he reviewed.

13               You may proceed.

14   BY MR. LOCKARD:

15   Q.  And again, when is the time frame of the searches that are

16   reflected in the summary chart?

17   A.  Late April of 2016 to early May of 2016.

18   Q.  And looking below that, what's reflected in the left-hand

19   column of that table?

20   A.  The actual search that was entered into the Google search

21   engine.

22   Q.  And what's reflected on the right-hand column?

23   A.  The number of times that was searched.

24   Q.  And how many total searches during the late April to early

25   May 2016 time frame did the defendant conduct, or were

conducted from the defendant's Google account, relating to the

wiping of computer storage?

A.   Eight.

Q.   What does "related pages visited" mean?

A.   So, each time the defendant caused these search terms to be

entered, he may or may not have chosen to actually visit some

of the results that came of that.  So if you see below, it's on

April 30, the defendant searched Western Digital disk utility

wipe, and you can then see amongst the returns that he obtained

what actual link he had opted to select and to review,

presumably.

Q.   Does that reflect that the browser that was used to conduct

the search then navigated to that page?

A.   That is correct.

Q.   And what is the title of the first related page?

A.   The first April 30, 2016, visited site is "how to install

more than one operating system on a hard drive or dual boot of

a system."  And that was on WD support.

Q.   And what is the title of the second website listed there?

A.   "Kill your data dead with these tips and tools," from

PCWorld.com.

          MR. LOCKARD:   Thank you, Ms. Cooper.  We can take that

down.

Q.   Does the defendant's Google search history include searches

related to WikiLeaks?

M6fWsch4                         Evanchec - Direct

1    A.   It does.

2            MR. LOCKARD:  Could we please pull up Government

3    Exhibit 1351.

4    Q.   Agent Evanchec, can you describe what is summarized by this

5    chart?

6    A.   Yes.  This is the number of times that Google was used from

7    the defendant's Gmail account to search WikiLeaks-related

8    topics from 2006 until July of 2016.

9    Q.   And what were the total number of WikiLeaks-related

10   searches in that time period?

11   A.   Three.

12   Q.   And when were the earliest two?

13   A.   The earliest examples that are cited are July 29 of 2010.

14   Q.   And there's a second in July of 2010?

15   A.   Correct.

16   Q.   And there's a third in July of 2016?

17   A.   That's correct.

18           MR. LOCKARD:  If we could turn to Government Exhibit

19   1352.

20   Q.   And what is summarized in this document?

21   A.   The defendant's searches of WikiLeaks types of searches

22   between August 2016 and January of 2017.

23   Q.   And approximately how many WikiLeaks-related searches were

24   conducted on the defendant's Google account during that

25   several-month time period?

1    A.  39.

2    Q.  And how many total pages did the defendant visit?

3    A.  115.

4    Q.  Now, is this time period before or after the Vault 7

5    release?

6    A.  This was before the Vault 7 release was made public.

7    Q.  And what was the date of the Vault 7 release?

8    A.  March 7, 2017.

9    Q.  Do you see in the table of searches conducted about five

10   lines down?

11   A.  Yes.

12   Q.  What was that search?

13   A.  "WikiLeaks code."

14          MR. LOCKARD:  OK.  Ms. Cooper, if we could zoom back

15   out.

16          Let's turn to, actually, if we can look at Government

17   Exhibit 1353.

18   Q.  What's summarized in this chart?

19   A.  It's where a number of searches that I, as the lead

20   investigator, found of interest that the defendant had

21   conducted between March 7 of 2017, and March 14 of 2017.  So

22   this would have been the first week after the WikiLeaks release

23   of Vault 7.

24   Q.  And when did the FBI first make contact with Mr. Schulte?

25   A.  On March 15, 2017.

1   Q.  So during that one week between the Vault 7 release and

2   your interview of Mr. Schulte, approximately how many searches

3   related to WikiLeaks or Vault 7 did the defendant conduct?

4   A.  I think in totality, those categories don't only relate to

5   WikiLeaks, but it's 28.

6   Q.  So let's talk about some of the searches that are in here.

7   Why did you include the CIA as a search related to Vault 7?

8   A.  They were the victim of the hack.

9   Q.  And why did you include the FBI as a search related to

10  Vault 7?

11  A.  It was the lead investigative agency of this case.  In

12  addition, the subject had inquired with current employees of

13  the CIA whether the FBI was asking questions about him on site.

14           THE COURT:  Again, ladies and gentlemen, you can't

15  consider that for its truth, just the fact that that was the

16  agent's understanding and what effect it had on his

17  investigation.

18  BY MR. LOCKARD:

19  Q.  And why is "unredacted names CIA" and "unredacted names"

20  included as a relevant Vault 7 search?

21  A.  Because there were the full names of CIA employees that

22  were included in that leak -- or excuse me, in that release of

23  WikiLeaks information.

24  Q.  And why is dank memes included in the Vault 7 related

25  searches?

1    A.   There were a number of memes that internally in the CIA

2    they had created over the course of my review of their evidence

3    that were more of interest and included one of the managers at

4    the CIA and the CCI.

5              MR. LOCKARD:  If we could turn to page 2 of this

6    exhibit and just look at some of the related website visits

7    that were conducted related to these searches.

8    Q.   What is the title of the website that the defendant visited

9    on March 9?

10   A.   Reception of WikiLeaks.

11   Q.   And then the title of the site visited on March 10?

12   A.   "Are the CIA documents on WikiLeaks really a big deal?"

13   Q.   And the last one?

14   A.   "Authorities questioning CIA contractors in connection with

15   WikiLeaks dump."

16             MR. LOCKARD:  Your Honor, if I may have just a moment?

17             THE COURT:  Yes.

18             Somebody's device was going off.  If that happens

19   again, it will be my device, so I recommend you shut it off.

20             MR. LOCKARD:  No further questions, your Honor.

21             THE COURT:  Cross-examination.

22             MR. SCHULTE:  Just one second.  Sorry.

23   CROSS-EXAMINATION

24   BY MR. SCHULTE:

25   Q.   Good afternoon.

1    A.  Good afternoon, Mr. Schulte.

2    Q.  You testified on direct that an unsub investigation started

3    on March 7, 2017, right?

4    A.  That's correct, yes, sir.

5    Q.  And that was in the Washington office, right?

6    A.  That's correct, yes, sir.

7    Q.  And that was the day of the leak, right?

8    A.  That's correct.

9    Q.  And by March 8, you were already conducting a full field

10   investigation into only me, correct?

11   A.  That's correct.

12   Q.  And that investigation was conducted out of New York,

13   correct?

14   A.  Yes, sir.

15   Q.  By you, right?

16   A.  I was one of the agents, yes, sir.

17   Q.  What is a full field investigation?

18   A.  That is basically the FBI's effort to investigate an

19   allegation of either a crime or a threat to national security.

20   Q.  And so it was an unsub investigation for less than 24

21   hours, correct?

22   A.  It remained -- there remained, sir, an unsub investigation

23   for years.

24   Q.  And from the outset of the investigation, I was and

25   remained the only subject of your investigation, correct?

M6fWsch4                           Evanchec - Cross

1    A.  You were the only individual that the FBI was able to

2    predicate a full investigation of, that's correct.

3    Q.  And you said you spent months at the CCI office, correct?

4    A.  Yes, sir, that's correct.

5    Q.  Sometimes you were there for weeks at a time, correct?

6    A.  That's correct, yes, sir.

7    Q.  You were interviewing witnesses, correct?

8    A.  Yes, sir.

9    Q.  Reviewing documents?

10   A.  Yes, sir.

11   Q.  You had unfettered access to DevLAN, correct?

12   A.  Correct.

13   Q.  But as of March 8, the investigation was only just

14   beginning, correct?

15   A.  Correct.

16   Q.  By March 8, you had not reviewed any of the CIA

17   electronics, right?

18   A.  Not -- not independently, no, sir.

19   Q.  Well, no one had, right?

20   A.  No one at the FBI had actually gone into those forensics at

21   that point, no, sir.

22   Q.  You had not reviewed a single byte of the 1.4 petabytes

23   that you said that were seized from the CIA, correct?

24   A.  At that point those devices were not even seized yet.

25   Q.  OK.  You had not interviewed witnesses, correct?

1   A.  At that point we had certainly had discussions with the

2   CIA.  It was the victim agency, so the victim had been engaged

3   with at that point, yes.

4   Q.  Although I'm talking about witnesses.  Had you actually

5   investigated or talked to any individual witnesses by March 8?

6   A.  By the -- by that time, my memory doesn't serve me exactly

7   correctly if I had myself interviewed any witness, but I

8   definitely had discussions with the CIA.  So I don't mean to

9   split hairs there, sir, but just I want you to be aware of that

10  nuance.

11  Q.  But had anyone on your team interviewed individual CIA

12  witnesses?

13  A.  I don't believe that we had 302s into the file at that

14  time.  I'm sure there are official documents of our interviews.

15  Q.  OK.

16  A.  I think that's fair.

17  Q.  You didn't talk to any of the foreign office people,

18  correct?

19  A.  At that point, no, sir.

20  Q.  You didn't even know anything about the DevLAN

21  infrastructure, correct?

22  A.  We -- we did.  We were aware of DevLAN and very

23  introductory parts of it, I would say, but not the in-depth

24  knowledge by any means.

25  Q.  OK.  But it's fair to say you didn't really, you had no

1    idea what had been stolen yet by that time?

2    A.  We did know that the information was from DevLAN, yes.

3    Q.  But specifically, the time frame or anything about -- all

4    you knew was that information seemed to come, originate from

5    DevLAN, correct?

6    A.  Sir, because WikiLeaks had given so many different

7    releases, that entirety of that information wasn't known until

8    late in the fall of 2017.

9    Q.  OK.  But you immediately began pursuing me as a sole

10   suspect on March 8, right?

11   A.  Sir, we were -- we were investigating you.  I wouldn't say

12   that we were pursuing you.

13   Q.  OK.  And you testified about physical security, correct;

14   about the building, CCI?

15   A.  Yes, that's correct.  Yes, sir.

16   Q.  You testified that the CCI building is located in an

17   undisclosed location, correct?

18   A.  That's correct.

19   Q.  The CCI office is a nine-floor building, right?

20   A.  That's correct.

21   Q.  Hundreds of people work in that building, correct?

22   A.  Yes, sir.

23   Q.  All of those people have security clearances, correct?

24   A.  Yes, sir.

25   Q.  But DD1 is where the CIA brings all its job applicants,

1    correct?

2              MR. LOCKARD:  Objection.

3              THE COURT:  Mr. Schulte, can you explain what you mean

4    by DD1?

5              MR. SCHULTE:  I'm going to go into detail.  That's an

6    open CIA facility, so I'm just --

7              THE COURT:  Well, OK.  Overruled.

8              Do you know if that's the case, Agent?

9              THE WITNESS:  Sir, it was not a topic of my

10   investigation to investigate CIA human resources of new

11   applicants.

12   BY MR. SCHULTE:

13   Q.  But you said that the building is in -- you testified that

14   it's in an undisclosed location, correct?

15   A.  Correct.

16   Q.  But were you aware that they have their own visitors center

17   there and --

18   A.  I'm aware there's a visitors center, yes.

19   Q.  OK.  Were you aware that there were more uncleared visitors

20   to DD1 than any other CIA facility?

21   A.  I would have no reason to know that, no.

22   Q.  OK.  Did you know that DD1 is an SC0 site?

23   A.  I don't know what that is, sir.

24   Q.  You've never heard of SC; you don't know what that acronym

25   means?

1    A.  No, sir, I don't.  I apologize.

2              THE COURT:  Do you know what DD1 is?  Is that what

3    we're referring to as the location of the -- excuse me; I'm

4    forgetting the acronym -- the CCI building?

5              THE WITNESS:  I'm under the impression, your Honor,

6    that the defendant is talking about the CCI building, and if

7    not, we could certainly revisit some of these topics.

8              THE COURT:  OK.  But let's refer to it as the CCI

9    building rather than using an acronym, since it's a little

10   confusing if that's what you're intending.

11             MR. LOCKARD:  Your Honor, I think a sidebar may be

12   helpful to navigate this issue.

13             THE COURT:  I think we can leave it there for the

14   moment, but let's go on.

15             MR. SCHULTE:  OK.

16   Q.  But you were investigating, and you testified about

17   accesses on direct, correct?

18   A.  Correct.

19   Q.  So would it not have been in your field of investigation

20   about who could access a building?

21   A.  Certainly during my term -- my time in the secure parts of

22   that building, I had never seen an applicant or someone who

23   didn't possess a security clearance, no, sir.

24   Q.  But as part of your investigation, you didn't conduct any

25   investigation as to how many uncleared people show up to DD1 --

M6fWsch4                          Evanchec - Cross

1    I mean to the CCI building or anything of that nature?

2    A.  No, sir.  My focus was the crime scene, which was on the

3    eighth and ninth floors.  So my investigation would have been

4    focused on who would have had access to those floors only and

5    not -- I think what you're prescribing is to be public areas of

6    the building, which I was not aware of.

7    Q.  OK.  As far as the security goes, do you know if there are

8    different kinds of badges and accesses that allow different

9    personnel into different parts of the building?

10   A.  Yes, sir, I do.

11   Q.  OK.  And what types of badges would be permitted into the

12   eighth and ninth floor?

13   A.  So, my understanding is, is so long as any of those badges,

14   whether it was a contractor or whether it was a visitor or

15   whether it was a full-time CIA employee so long as that person

16   held a top secret security clearance, they would be able to

17   enter that building.  And if they hadn't, there would certainly

18   be prescriptions of the security division there that the CCI

19   would place on that person being escorted and things like that.

20   So certainly, you know, the infrastructure and the security

21   there had certain prescribed rules for how that would work and

22   how that would look.

23   Q.  All right.  You also talked a little bit on direct about

24   the security clearances in general, correct?

25   A.  That's correct, yes, sir.

Q.  And over 5 million people have top secret security

clearance in the U.S., correct?

A.  I'm -- I can't verify that.  I'm not aware, sir.

Q.  In this courtroom, the lawyers have top secret security

clearances, correct?

A.  I believe so.  I'm not certain of the actual clearances at

this moment.

Q.  The government works with multiple defense contractors, and

they all have security clearances, correct?

A.  Depending on the assignment, they certainly would.

Q.  And in fact, anyone who can pay for the security clearance

process, they can -- they can get one, correct?

A.  No, sir.

Q.  They can't?  How -- what is the process for obtaining the

security clearance, the beginning process?

A.  I believe there needs to be an actual need for that hosting

agency, that hosting organization to issue a security

clearance.  So certainly someone that is wealthy in the United

States can't walk into the CIA and demand a security clearance.

They would certainly need to be employed by an organization or

entity that would have a need to carry that work forward.

Q.  OK.  You testified about the structure -- CCI, EDG, AED --

on direct, correct?

A.  Yes, sir, that's correct.

Q.  And the information published by WikiLeaks came from that

1    CCI office, correct?

2    A.   That's correct.

3    Q.   In total, there were about a thousand people who worked in

4    CCI, correct?

5    A.   In the building overall, that's probably a fair and

6    accurate assessment.

7    Q.   All right.  So DevLAN next.  You testified on direct about

8    the DevLAN network, correct?

9    A.   Yes, sir, I did.

10   Q.   And in the course of your investigation, you learned that

11   DevLAN was described by CIA employees as the wild Wild West,

12   correct?

13   A.   That's correct.

14   Q.   That was because there were no security protocols or rules,

15   correct?

16   A.   That's not correct.

17   Q.   OK.  What did that -- what was that in reference to?

18   A.   The wild Wild West?

19   Q.   Yes.  Yeah.

20   A.   I believe that, that there were employees that had

21   suggested that the system lacked extraordinary security

22   measures that the CIA put in place with other systems, but in

23   our conversations with you and I, sir, you had talked about

24   your role with administering accesses in that system itself.

25   So I'm not sure that for a layperson, like someone walking in

M6fWsch4                              Evanchec - Cross

 1  Washington, D.C. --

 2              MR. SCHULTE:  I think, you know, just a question and

 3  answer.

 4              THE COURT:  Hold on.

 5              Agent, do me a favor, and listen to the question.  And

 6  just answer the question.

 7              THE WITNESS:  Yes.

 8              THE COURT:  The question had been your understanding

 9  of what wild Wild West being used in reference to DevLAN, what

10  that meant.

11              THE WITNESS:  Yes, your Honor.  And I apologize, your

12  Honor.

13              THE COURT:  Thank you.

14  A.  That there were certainly engineers, Mr. Schulte, that had

15  been disappointed with the lack of controls that existed in

16  DevLAN that weren't necessarily there with other systems.  So

17  that is an accurate statement.

18  Q.  So the DevLAN system, it didn't have the requisite security

19  protocols that other enterprise networks of that scale would

20  have, correct?

21  A.  That's my understanding, yes.

22  Q.  There were shared passwords amongst the administrators,

23  correct?

24  A.  Correct.

25  Q.  There were no firewalls, correct?

1   A.   I can't speak to firewalls, sir.

2   Q.   There was certainly no antivirus software?

3   A.   I can't speak to antivirus software.

4   Q.   OK.   But access controls, there weren't any access

5   controls, right?

6   A.   There certainly were, yes.

7   Q.   What is your understanding of where on DevLAN contained

8   access controls?

9   A.   How would someone get onto DevLAN; is that your question,

10  sir?

11  Q.   Well, how would someone from DevLAN access information on

12  DevLAN?

13  A.   They would need to have access to the physical space where

14  that server and the system that were in place were housed.

15  They would certainly need to have the credentials to get onto

16  that computer.   So someone couldn't walk off the street to get

17  it, basically.

18  Q.   They couldn't get in the building, right?

19  A.   Correct.   Absolutely.

20  Q.   So I'm talking specifically about people who, once they log

21  into DevLAN, there's no access controls, there's no protection

22  of the data on DevLAN, correct?

23  A.   That's my understanding, yes, sir.

24  Q.   There were no standard log-in capabilities that every other

25  enterprise network used, correct?

1   A.  That's my understanding, yes.

2   Q.  And CIA employees also described DevLAN as a dirty network,

3   did they not?

4   A.  Correct.

5   Q.  And that was because there were all types of viruses,

6   malware, data and devices on the network, correct?

7   A.  Yes, sir, that's correct.

8   Q.  You also testified on direct that DevLAN is a LAN, right?

9   A.  That was my understanding, yes.

10  Q.  What is a LAN?

11  A.  It's a -- in this case, it was a contained set of servers

12  that connected to computers that worked within itself to

13  accomplish the mission that they needed to do.

14  Q.  Do you know what it stands for?

15  A.  Developmental local area network, I believe, is what DevLAN

16  stood for.

17  Q.  And there were, in fact, international connections to other

18  foreign offices through DevLAN, correct?

19  A.  Yes, sir.

20  Q.  So it was technically not a local area network, right?

21  A.  There were certain abilities of two offices outside the

22  United States to connect to that secure system, yes.

23       MR. SCHULTE:  All right.  I want to take a look at

24  Government Exhibit 602.  I have the defense exhibits here.

25  Should I grab the government exhibits, or is the government

1  able to pull those up?  Is that all right?

2         THE COURT:  I think the government can pull them up.

3  If you just direct them to what you'd like to pull up, they'll

4  have them here.

5         Thank you.

6         MR. SCHULTE:  Thanks.

7         THE COURT:  And just the witness for the moment.

8         MR. SCHULTE:  Page 2, please.  I think this is in

9  evidence.  Right?

10        THE COURT:  I believe it is, yes.  Would you like it

11  published?

12        MR. SCHULTE:  Yes, please.  Publish it.

13        THE COURT:  All right.  Thank you.

14  BY MR. SCHULTE:

15  Q.  So this is the network diagram of DevLAN, correct?

16  A.  It appears that way, yes.

17  Q.  And do you see where Hickok is on the right side?

18  A.  The gateway?

19  Q.  Yes.

20  A.  I do, yes, sir.

21  Q.  OK.  So I just wanted to -- so DevLAN connected to a

22  separate network there, right, this COG network?

23  A.  It appears so, yes, sir.

24  Q.  So individuals from COG could access the computers on

25  DevLAN, correct?

1  A.  I'm not sure entirely what they could access, but this

2  diagram seems to suggest that there's some connectivity between

3  COG and the network itself.  What computers I'm not actually

4  sure, sir, but it does appear from this diagram to show that.

5  Q.  OK.  And you see the DevLAN offsite backup, right, at the

6  top, top left, WMA storage?

7  A.  I do, yes, sir.

8  Q.  OK.  And that's another connection to the DevLAN network,

9  right?

10 A.  Sir, I believe this document shows that.  My understanding

11 was that that was not a site that had connectivity.  I thought

12 it was a physically isolated space.  That was what my

13 recollection is.

14 Q.  OK.  But the backup is storing the data, backing up the

15 data from DevLAN, correct?

16 A.  It certainly is another location where the DevLAN

17 environment of information existed, yes, sir.

18 Q.  OK.  And the top, the field locations, Foreign Office East,

19 Foreign Office West, do you see those?

20 A.  Yes, sir.

21 Q.  And those are overseas locations, correct?

22 A.  Yes, sir.

23 Q.  And from those locations, they can also access DevLAN,

24 right?

25 A.  Correct.

1    MR. SCHULTE:  OK.  We can take that down.  Thank you.

2    Q.  I'd like to move on now to the CIA backups themselves.  So

3    we've heard a lot of about Confluence, but what is Stash?

4    A.  Stash, my understanding, is the actual code itself.  So

5    this would have been the commands that would actually be used

6    to infiltrate systems and electronic devices.

7    Q.  So Stash was the actual code repositories from DevLAN,

8    correct?

9    A.  That's my understanding, yes.

10   Q.  OK.  And your understanding is that Stash was also stolen

11   from the CIA, correct?

12   A.  I'm not aware of that.

13   Q.  You're not aware of Stash being stolen from --

14   A.  I'm only aware of Confluence and pieces of, of source code

15   that were included in that having been -- been released.

16   Q.  So you're aware that source code was released, correct?

17   A.  Correct.

18   Q.  And the source code resided in Stash, correct?

19   A.  My understanding, sir, is that at times that source code

20   was actually in the wiki in Confluence.  That was my

21   understanding.

22        THE COURT:  Could you just explain what you mean by in

23   the wiki in Confluence?

24        THE WITNESS:  Oh.  Sorry.  So, confluence, your Honor,

25   as I tried to describe yesterday, is really a wiki.  It was a

1    discussion board that housed, you know, any number of user logs

2    or, you know, discussions by developers, whatnot.  So we really

3    referred to it as a wiki during our investigation.  That's what

4    Confluence was.  It was really a discussion board, where any

5    random things could be put there.

6              THE COURT:  And can you just explain what you mean by

7    wiki?  Since there's been testimony about WikiLeaks, I just

8    want to --

9              THE WITNESS:  Sure, add to the discussion.  Much like

10   Wikipedia, users can go in and edit that type of stuff.  So

11   wiki, I think, generally is kind of accepted as a

12   user-generated platform that people can go and alter

13   information on.

14             THE COURT:  When you say Confluence is a wiki, at

15   least until it was leaked and appeared on WikiLeaks, you're not

16   suggesting there was any connection to WikiLeaks?

17             THE WITNESS:  No, your Honor.

18             THE COURT:  OK.

19   BY MR. SCHULTE:

20   Q.  So you're -- are you aware that WikiLeaks released

21   something called Vault 7 and Vault 8?

22   A.  Yes.

23   Q.  And so is it your testimony that both of those derived

24   solely from Confluence?

25   A.  No.  There were portions of Stash that were in those as

M6fWsch4                          Evanchec - Cross

1   well.

2   Q.  So, I'm a little confused.  If Stash wasn't disclosed to

3   WikiLeaks, how did they publish Stash material?

4   A.  I think, I guess, in my mind, just so you know where I'm

5   coming from -- it may be helpful -- I considered the actual

6   portions of code to be Stash type of documents.  So when I say

7   that there was portions of Stash, there were portions of code

8   that certainly were released by WikiLeaks.  I believe those

9   predominantly came from the actual Confluence subset

10  themselves, is my understanding.

11  Q.  So you just testified that Confluence was the wiki,

12  correct?

13  A.  Correct.

14  Q.  And the source code from DevLAN is stored in Stash,

15  correct?

16  A.  That's correct, sir.

17  Q.  So are you also saying then that there is -- Stash is also

18  stored on Confluence?

19  A.  No.

20  Q.  OK.  So Stash material was released by WikiLeaks in at

21  least Vault 8, correct?

22  A.  Correct.

23  Q.  So where did that information -- where did Vault 8 derive

24  from?

25  A.  It derived from DevLAN, and in the Confluence system, and

1    the Confluence systems at the time had source code actually in

2    it.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SCHULTE:

2   Q.  OK.  So just to be clear, so your testimony is that all the

3   material from WikiLeaks all came from a Confluence -- from the

4   Confluence application; is that correct?

5   A.  Sitting here today I can't be a hundred percent sure that

6   there wasn't a page or two that was from somewhere else but my

7   understanding was Confluence, yes.

8   Q.  I mean, that's a pretty big -- pretty important part of

9   your investigation, right?  Because you need to find out -- the

10  first question you ask is where the data came from, correct?

11  A.  Correct.

12  Q.  That would have been the very first question that you

13  conducted in this investigation, right?

14  A.  Absolutely.

15  Q.  I mean, you need to know who had access to that

16  information; correct?

17  A.  Absolutely.

18  Q.  So if someone did not have access to that information they

19  couldn't possibly be a suspect, right?

20  A.  Correct.

21  Q.  So I guess, you know, I'm just struggling to understand

22  how -- so is your testimony today that you just don't remember

23  at all or just you never figured out?

24  A.  No.  So my involvement in the case had kind of dwindled

25  into the late summer and early fall of 2017 so, you know,

1    frankly, I wasn't following the case as much then after the

2    interaction that we had and the interviews that we had in the

3    summer of 2017.

4    Q.  OK.  So it would be more accurate to simply say that you

5    just don't know whether the information released from Vault 8

6    was originated from Stash?

7    A.  We certainly know that the Confluence from March 3rd was

8    stolen and I will leave my testimony at what I have testified

9    to.

10   Q.  And just for clarification, what is that?

11   A.  That the Confluence from March 3rd of 2016 was stolen.

12   That is the information, largely, that is made available on

13   WikiLeaks and that there are portions of code that have been

14   promulgated by WikiLeaks in the Vault 7 and Vault 8 releases.

15   Q.  OK.  But then your connection to the investigation ended

16   what time?  What date?

17   A.  Approximately the fall of 2017 it was dwindling down.

18   Q.  OK.  But both Stash and Confluence relied on what is called

19   version control, correct?

20   A.  I'm not aware of what version control is, sir.

21   Q.  OK.  The information released by WikiLeaks -- the pages --

22   you could see previous pages, you could see all the edit

23   history, correct?

24   A.  That's my understanding.

25   Q.  In fact, let's, if we can pull up GX- 5-2, I think it is an

1   example.  If we can go to the next page, please?  Is there

2   another one after this?  The last page, please?  The page

3   before it?  OK.

4        So at the bottom here it lists previous versions, correct?

5   A.  It does.

6   Q.  And so essentially the documents released have the complete

7   history.  Any time the document was edited it's recorded here,

8   correct?

9   A.  That's my understanding, yes.

10  Q.  So based on this system, each successive backup file

11  contains all the data from the previous backups, correct?

12  A.  I believe that's a fair assessment.

13  Q.  So if WikiLeaks received the March 6th, 2017 backup file

14  they could have simply selected previous versions from March

15  3rd, 2016 and released those files, correct?

16            MR. LOCKARD:  Objection.

17            THE COURT:  Sustained.

18            Mr. Lockard, make sure you use the microphone, please.

19            MR. LOCKARD:  Yes, your Honor.

20  BY MR. SCHULTE:

21  Q.  Based on this page here, you don't know what backup file

22  these documents originated from, correct?

23  A.  Looking at this page alone?  No.

24  Q.  Based on your investigation into this disclosure and your

25  understanding of how the backup files work and the data they

1   contain --

2   A.  Sure.

3   Q.  -- is it true to say that the March 6, 2017 backup file

4   would contain all the data from March 3rd, 2016?

5              MR. LOCKARD:  Objection.

6              THE COURT:  Sustained.

7              Can I ask the agent, you testified on direct that you

8   understood or learned that the data stolen came from the March

9   3rd backup.  Is that something that you determined yourself or

10  that is something that you were told by someone who conducted

11  an analysis?

12             THE WITNESS:  Our computer scientists, your Honor.

13             THE COURT:  Ladies and gentlemen, let me say once

14  again, because it is something the agent heard from someone

15  else, you are not to consider that testimony for its truth but

16  merely for what effect it had on his investigation and the

17  steps he took in connection with it.  With that, I don't think

18  we need to examine this witness about that conclusion.

19             Go ahead, Mr. Schulte.

20  BY MR. SCHULTE:

21  Q.  OK.  Can we pull up GX- 1207-27?

22             So this is a list of the Confluence database files,

23  correct?

24  A.  Yes, sir.

25             THE COURT:  This is in evidence?  Did you want to

1   publish this, Mr. Schulte?

2         MR. SCHULTE:  Yes, it is in evidence.  Can we publish

3   it?

4         THE COURT:  Yes.

5   Q.  So just to be clear, this particular document showing the

6   access times, you didn't know this document existed until

7   sometime in 2020, correct?

8   A.  I was not aware of the existence of this document during my

9   time in the investigation.

10  Q.  So during your -- so from the time that you initiated the

11  investigation in 2018 until the time you left the investigation

12  you never saw this document, correct?

13        THE COURT:  I think you said 2018.  You meant 2017; is

14  that correct?

15        MR. SCHULTE:  Yes.

16        THE WITNESS:  I'm sorry.  What was your question,

17  Mr. Schulte?

18  Q.  I'm sorry.  From the time that your investigation began

19  related to the WikiLeaks disclosure until the time you left

20  that investigation, you never saw this document; correct?

21  A.  I still remain involved in the investigation to this day.

22  Q.  OK.  So I guess from the time you initiated the

23  investigation until the time I was charged with the crimes you

24  never saw this document; correct?

25  A.  I don't believe so.

1    Q.  OK.  Just to clarify here, because it shows the dates and

2    the database files, your testimony is you don't know that the

3    latest backup, the March 11th file, the last file here, you

4    don't particularly know whether that contains the data from

5    February 1st, correct?  That's your computer scientist, right?

6    A.  I'm not sure I understand your question.

7    Q.  The last backup file on the list here, 20160311; correct?

8    You see it?

9    A.  Yes.

10   Q.  Your testimony is you don't know if that file contains all

11   the information in the first file here, 20160201, correct?  It

12   is your computer scientist who made the determination, right?

13   A.  Certainly with every subsequent set of files there can be

14   changes made to any older files that are in there so I'm not

15   sure that's an accurate statement.

16   Q.  Yes, but we just saw how the Confluence file contained the

17   prior previous edit history, correct?

18            MR. LOCKARD:  Objection.

19            THE COURT:  Sustained.

20   Q.  Can we pull back up the Marble file, 5-2, on the second to

21   last page, please?

22        So this shows every time the document was modified,

23   correct?  That's what you testified earlier?

24   A.  I believe it shows previous versions.

25   Q.  The previous versions are previous versions of the file,

1   these are the changes to that file, correct?

2              MR. LOCKARD:  Objection.

3              THE COURT:  Is that your understanding, Agent?

4              THE WITNESS:  Your Honor, I'm frankly not clear on the

5   question so if Mr. Schulte would ask it again?

6              THE COURT:  Can you ask it a different way, please?

7   BY MR. SCHULTE:

8   Q.  So is it your understanding here that the version

9   history -- these previous versions -- contain the history of

10  the file, the previous modifications to the file?

11  A.  Sir, with just this piece of information I don't know that

12  I can make that determination.  I would need to look at the

13  entirety of it.

14  Q.  All right.  But it is safe to say that that is beyond your

15  knowledge whether or not the entire history is contained within

16  each backup?

17  A.  Sitting here today and looking at only this document, I

18  can't say.

19  Q.  Well, just talking about overall, your entire -- your

20  entire knowledge of how the backups worked through your

21  investigation you, sitting here today, you don't know?

22  A.  That is something that the computer scientists really

23  focused on and our other cyber teams.  As I mentioned

24  yesterday, I was the case agent involved in the coordination

25  and overall engagements with you.  That was my role.

M6F5sch5                          Evanchec - Cross

1   Q.  OK.  The backup files from both Confluence and Stash,

2   through your investigation did you learn that these are digital

3   files?  Correct?

4   A.  Correct.

5   Q.  They are stored on the computer, correct?

6   A.  Correct.

7   Q.  They're intangible files, correct?

8   A.  What do you mean by intangible files, sir?

9   Q.  Well, the definition of intangible is you can't touch it;

10  it is digital, right?

11  A.  You can certainly print them and pages from the Wiki, for

12  example, touched them.  So did they exist in a system in

13  digital formats?  Yes.

14  Q.  OK.  So can we pull up Government Exhibit 1207-41?

15       So just to be clear on this point, there is no -- it

16  doesn't show on this page but, to your knowledge, there is no

17  access time of April 20th for any Stash files, any Stash

18  backups; correct?

19  A.  I'm happy to review that date if you would like me to.

20  Q.  No.  I'm saying, to your knowledge, that there is no --

21  there is no access -- there is no modified date on any of the

22  Stash backups like you testified about the Confluence backups,

23  correct?

24  A.  Not to my knowledge sitting here today, sir.

25  Q.  OK.  OK, back to the 1207-27, please.

1              So I'm going to ask you a little bit about the access

2      times.  If you open the file, the access time is updated;

3      correct?

4      A.  Correct.  Correct.

5      Q.  If you touch the file the access time is updated, correct?

6      A.  That's my understanding, yes.

7      Q.  If you simply look at the file properties such as the file

8      size the access time is updated, correct?

9      A.  That I am not clear of, sir.

10     Q.  OK.  You could run a chron job and that would update the

11     access time, correct?

12     A.  I can't speak to that, sir.

13     Q.  But a service could update the access time, correct?

14     A.  Service meaning?

15     Q.  A service running on either the system or the network, in

16     general.

17     A.  I can't speak to that directly myself.

18     Q.  A security sweeper that sweeps the network, that could

19     update the access time too, correct?

20     A.  I can't speak to that, sir.

21             THE COURT:  Mr. Schulte, I think it is quite clear to

22     everyone that this witness is not a computer expert, that he

23     received certain information from computer experts at the FBI

24     and relied on that in his investigation.  I permitted him to

25     testify with respect to that information to explain his

1    investigation but let's reserve questions about -- that are

2    really more proper for an expert on these issues, please.

3            MR. SCHULTE:  OK.

4    BY MR. SCHULTE:

5    Q.  Were you briefed or did you review any of the CIA malware

6    that was developed on DevLAN?

7    A.  I personally did not, no.

8    Q.  Are you familiar with false flag operations?

9    A.  I am.

10   Q.  What are false flag operations?

11   A.  False flag operations are essentially where, presumably, an

12   intelligence officer would pose as an officer of another

13   country or of a terrorist organization in order to try to

14   elicit information from someone thinking they would be more

15   sympathetic talking to someone that the actual officer was not.

16   Q.  Are you aware of false flag operations with respect to

17   malware or software, in general?

18           MR. LOCKARD:  Objection.

19           THE COURT:  Sustained.

20   Q.  Were you aware that malware could change file times?

21   A.  Not personally aware of that, no.

22   Q.  So these screenshots here of the Stash or Confluence

23   backups they're from, specifically, the FSO1 file server from

24   DevLAN, correct?

25   A.  That's correct, it is my understanding.

1  Q.  The actual data WikiLeaks received may not even derive from

2  this file server, correct?

3  A.  I believe those assessments were made and that it was

4  determined that it was a match.

5  Q.  I'm sorry?

6  A.  I said my understanding is those assessments were made and

7  it was assessed that they were from the March 3rd version of

8  Confluence.

9  Q.  No, that's not the question.  The question is the backup

10  file may not have originated from this particular server,

11  correct?

12  A.  I don't believe that was the assessment of our team.

13  Q.  OK, but you don't actually know whether WikiLeaks received

14  an official backup file or files pulled directly from the Stash

15  or Confluence virtual machines themselves, correct?

16  A.  That's correct.

17  Q.  You wouldn't know if WikiLeaks received a backup from the

18  CIA's offsite backup location, the WMA storage; right?

19  A.  That's not our assessment that's where it came from.

20  Q.  I'm going to circle back to the initiation of your

21  investigation.  Did you ever speak with the director of the CIA

22  about this case?

23  A.  He was on the -- not directly.  I was in earshot of a

24  conversation that our team had had with him early in the

25  investigation.

M6F5sch5                    Evanchec - Cross

1    Q.  So the answer is no?

2    A.  Directly I did not speak to the director of the CIA, no.

3    Q.  Do you know who the director was at this time?

4    A.  I believe it was Michael Pompeo.

5    Q.  What about the director's staff, were you in contact with

6    them?

7    A.  I personally was not.  I don't -- the director's staff, I'm

8    not sure what you mean by that either but I was not in touch

9    with anyone who had -- was working directly in his office, from

10   what I can recall.

11   Q.  You never provided the director or his office any updates

12   on the case?

13   A.  I am aware that his team was certainly updated on the case

14   and we were constantly updating directors of both the CIA and

15   the FBI.

16   Q.  You sought approval from the director to declassify

17   information for a search warrant though, correct?

18   A.  That's correct.

19   Q.  And when was that?

20   A.  That would have been sometime, March 13th, 14th time frame,

21   my understanding, or maybe days just before that.  The early

22   part of March 2017.

23   Q.  And isn't it true that on that date the director of the CIA

24   declassified the fact that the WikiLeaks disclosures were,

25   indeed, authentic CIA documents?

1    A.   That's my understanding.

2    Q.   OK.   And isn't it true that your first theory was that the

3    data was actually stolen on March 8th, 2017?

4    A.   I believe it was March 7 and 8th; yes, that's correct.   7th

5    into the 8th, I believe, was the estimate early on in the

6    investigation.

7    Q.   You didn't supply a specific date?

8    A.   I'm sorry?

9    Q.   You didn't have a specific date in the search warrant of

10   theft, when you believed the theft occurred?

11   A.   I believe our -- I didn't swear to the search warrants but

12   I believe the initial theory at the time the search warrants

13   were sworn out was the date of information was March 7th or

14   8th.

15   Q.   Why did you need the director's approval for the search

16   warrant?

17   A.   Because the information that we were seeking to use and

18   confirm in the search warrants was classified.

19   Q.   Do you know who actually wrote the search warrants that you

20   provided to the director?

21   A.   I don't.

22   Q.   You don't know who wrote them?

23   A.   I don't, no.   Not sitting here today I can't recall that

24   specifically.

25   Q.   Do you know when you emailed the -- do you know if you

1    emailed the copies of the search warrants directly to the

2    director for approval?

3    A.  I can't recall that sitting here today.  I certainly would

4    not have been in direct e-mail communication with the director

5    of the CIA.

6    Q.  So you don't know if he suggested any changes to the

7    substance of it?

8    A.  I can't recall that sitting here today, sir.

9    Q.  And the search warrant itself was unclassified, correct?

10   A.  That's correct.

11   Q.  I would like to publish, just to the witness and the

12   parties --

13            THE COURT:  Something just came up on my screen.

14   Q.  I think this is already coming in on GX- 812 but I would

15   like to introduce the search warrant through DX 104-1.

16            THE COURT:  Well, do you want to let the witness

17   identify it and authenticate it?

18            MR. SCHULTE:  Sure.

19   Q.  Yes.  Can you identify this document, sir?

20   A.  Yes.  This appears to be the search warrant signed by

21   Special Agent David Donaldson to execute a search warrant at

22   your residence that was signed on the 13th of March, 2017.

23   Q.  And this is the search warrant that we were just discussing

24   about -- that was emailed to the director for approval;

25   correct?

1   A.  I can't speak to where it was emailed.  This is a search

2   warrant that David Donaldson caused to be signed.

3   Q.  OK, but the search warrant is unclassified, correct?

4   A.  That's correct.  Yes, sir.

5            MR. SCHULTE:  I would like to move now to introduce

6   it.

7            MR. LOCKARD:  Objection.  If it is in as 812 I think

8   we can use 812.

9            THE COURT:  Is 812 in?  And, if so, can you point me

10  to when it was admitted?  Is there a stipulation?

11           MR. SCHULTE:  I believe in 812 it is attached as an --

12           THE COURT:  That's not my question, Mr. Schulte.

13           MR. SCHULTE:  OK.

14           THE COURT:  My question is whether it is in evidence.

15  I don't believe it is.

16           MR. LOCKARD:  I think it is.  Certainly we don't

17  object to 812.

18           THE COURT:  Mr. Schulte, can you show me what is in

19  the rest of this document, please, so I can go through it?

20           MR. SCHULTE:  Yes.

21           MR. LOCKARD:  Your Honor, 812 is not currently in

22  evidence.  It is subject to another stipulation but certainly

23  we could read and enter it now.

24           THE COURT:  Well, the witness has authenticated this.

25  Can we admit this and be mindful that it may well be a

M6F5sch5                        Evanchec - Cross

1     duplicate of a portion of 812?

2                  MR. LOCKARD:  Yes.  No objection, your Honor.

3                  THE COURT:  So it is admitted as Defendant's Exhibit

4     140-1; is that correct, Ms. Shroff?

5                  MR. SCHULTE:  Yes, that's correct.

6                  THE COURT:  Would you like to publish it to the jury?

7                  MR. SCHULTE:  Yes.

8                  THE COURT:  You may.

9                  (Defendant's Exhibit 104-1 received in evidence)

10                 THE COURT:  And let me just briefly instruct you,

11    ladies and gentlemen, that you may know this or have surmised

12    it but a search warrant is basically -- under the Fourth

13    Amendment of the Constitution, the law enforcement can't search

14    someone's property or apartment or digital records without

15    authorization from a Judge like me.  A search warrant is

16    authorization to do that -- I should say subject to various

17    exceptions and many Supreme Court opinions and the like.  But,

18    for your purposes, it is important to understand that, in

19    general, you are not permitted to just conduct a search for any

20    reason at any time and, in general, it does require a warrant

21    that is authorized by a Judge on a finding under a showing of

22    probable cause.  So that is to say, in order to authorize a

23    search, a Judge has to be persuaded that there is probable

24    cause to conduct a search, that evidence or the fruits of the

25    crime may be found in the premises.  But the fact that a Judge

1    found probable cause is not relevant for your consideration of

2    whether the government has proved beyond a reasonable doubt,

3    based on the evidence that you will see in the course of this

4    trial, that Mr. Schulte committed the crimes charged, all

5    right?

6            So with that, you may proceed, Mr. Schulte.

7            MR. SCHULTE:  Thank you.

8    BY MR. SCHULTE:

9    Q.  I would like to direct your attention at 8(a).  Can you

10   read that, please?

11   A.  The information that WikiLeaks claimed was classified CIA

12   information, that is, the classified information, was at the

13   time of its disclosure, in fact, classified CIA information.

14   Q.  OK.  And one last section here, 8(b).  Can you read that,

15   too, please?

16   A.  Yes, sir.

17           Specifically, the classified information was created and

18   maintained by one specific group within CIA which is

19   responsible for various computer engineering activities,

20   including the development of computer code (the "CIA group").

21   That CIA group exists within a larger CIA component (the "CIA

22   component").  In March 2016, less than 200 employees were

23   assigned to the CIA group and only employees of the CIA group

24   had access to the computer network on which the classified

25   information that was stolen from the CIA grab's computer

network was stored.  (Moreover, as described in detail below,

only three of those approximately 200 people who had worked for

the CIA group had access to the specific portion of the group's

computer network on which the classified information was likely

stored.)

Q.  And here the CIA group is EDG, correct?

A.  That's my understanding.

Q.  So these two -- these two statements you requested and

received authorization from the CIA to declassify this

information to put it in this search warrant; correct?

A.  I'm only aware, Mr. Schulte, that there was a request for

declassification.  I'm not sure exactly what was declassified.

Q.  OK, but the search warrant is unclassified, correct?

A.  That's correct.

Q.  So if it is in the search warrant then it is not

classified -- or it is unclassified, correct?

A.  That would be safe to assume, yes.

Q.  And the search warrant is dated March 13, 2017; correct?

A.  Correct.

Q.  And with the knowledge that one CIA group and CCI contained

200 employees, it is not a leap to assume other groups within

CCI likely contained about 200 employees too, right?

            MR. LOCKARD:  Objection.

            THE COURT:  Sustained.

Q.  Based on your expertise as an investigator, seeing that one

M6F5sch5                        Evanchec - Cross

1    group contains 200 employees, it is not much to infer that

2    other groups contained equal number, likely equal number of

3    employees, right?

4            MR. LOCKARD:  Objection.

5            THE COURT:  Sustained.

6    Q.  OK.  After the execution of this search warrant, how often

7    did you meet with the CIA?

8    A.  Certainly when I was present at CCI it would have been

9    daily.  When I was there throughout the earlier parts of the

10   investigation there was near daily requests for information

11   from the CIA.

12   Q.  So did the CIA ever tell you or direct you to target me in

13   the investigation?

14   A.  No.

15   Q.  Do you know if you had a meeting with the CIA on June 26,

16   2017?

17   A.  I can't recall specifically that meeting that day sitting

18   here today, sir.

19   Q.  Do you ever recall the CIA telling you that you have to go

20   after me with everything, from their political standpoint, on

21   June 26, 2017?

22   A.  I don't recall the specifics of a meeting that day.

23   Q.  OK.  What are Link messages?

24   A.  Link messages are essentially messages that -- if you are

25   referring to the FBI Link systems they are instant messages

1    that we share and communicate, as any Skype would or instant

2    messaging capability.

3    Q.  And your link messages are all recorded, correct?

4    A.  Correct.

5    Q.  The messages are recorded in the regular course of business

6    at the FBI, correct?

7    A.  Correct.  That's correct.

8    Q.  I would like to show just the witness and the parties, do

9    you recognize this?

10   A.  Yes.  It appears to be a transcript of instant messaging

11   chats, correct.

12          THE COURT:  Mr. Schulte, when you show the witness an

13   exhibit, make a record of what the exhibit number is so that it

14   is clear?

15          MR. SCHULTE:  This is Defendant's Exhibit 101.

16   Q.  So specifically I want to point your attention here at

17   Defendant's Exhibit 101-1.  Can you -- I would like to publish

18   this to the jury.

19          MR. LOCKARD:  Objection.

20          THE COURT:  Sustained.

21          MR. SCHULTE:  OK.

22   Q.  Does this refresh your recollection of June 26, 2017?

23   A.  This without context, no.

24   Q.  OK.  Does this help?

25          THE COURT:  Again, please make a record of what we are

M6F5sch5                        Evanchec - Cross

1    showing.  This is, am I correct, page 18 of Defendant's Exhibit

2    101?

3                MR. SCHULTE:  That's correct.

4                THE COURT:  So Agent, I think Mr. Schulte is asking

5    you to look at this page in its entirety.  When you have done

6    so and read it to yourself, please, look up, and Mr. Schulte

7    will ask you a question.

8                MR. LOCKARD:  Your Honor, I think a side bar on this

9    may be appropriate.

10               THE COURT:  I don't think we need that.

11               But, Mr. Schulte, go ahead.

12               MR. SCHULTE:  So does this refresh your recollection?

13               THE COURT:  About what?

14               MR. SCHULTE:  About the message that you sent June

15   26 --

16               THE COURT:  No.  All right.  We will have a side bar.

17               Counsel, please approach.

18               (Continued next page)

19

20

21

22

23

24

25

1        (At side bar)

2        THE COURT:  For starters, Mr. Lockard, do you want to

3    elaborate?  I don't know if there is a concern that I may not

4    be aware of here, but.

5        MR. LOCKARD:  There is a concern.  It is not the

6    classification concern.  The Link message -- Link messages for

7    Agent Evanchec include a reference to C20, which is a criminal

8    squad in the New York field office that was conducting the

9    child pornography investigation and we just wanted to alert the

10   Court and Mr. Schulte that this line of questioning may well

11   end up opening a door that he does not want to open.

12       THE COURT:  OK.  I assume, subject to the door being

13   open, that the agent understands and has been instructed that

14   he is not to mention those charges.  Is that correct?

15       MR. LOCKARD:  That is correct.

16       THE COURT:  OK.

17       Mr. Schulte?

18       MR. SCHULTE:  So my understanding -- and he testified

19   that it is a business record so I -- it is enterprise e-mail

20   system, messaging system, so I would move to introduce the

21   whole thing.

22       THE COURT:  So just because it is maintained in the

23   ordinary course of business, that doesn't get it in as a

24   business record.  There are other requirements.  And e-mail,

25   alone, is not automatically a business record.

1        MR. SCHULTE:  I think the statement alone then, the

2   101-1, it is admissible, it not hearsay because it is an

3   adverse party statement.

4        THE COURT:  OK.  You are wrong about that too, but --

5        MR. SCHULTE:  OK.

6        THE COURT:  -- I will certainly happily let you say,

7   having look at that, does it refresh your recollection that you

8   had a meeting on June 26, 2016 with the CIA and that at that

9   meeting they said X.  The witness can either say yes or no.  I

10  think he has now looked at it.  If it refreshes his

11  recollection then it refreshes his recollection.  If it

12  doesn't, you are going to have to move on.  You certainly

13  haven't established a foundation for the admission of the

14  document in its entirety, let alone that particular piece of

15  it.  OK?

16       MR. SCHULTE:  So the statement itself, if he doesn't,

17  or if he says he doesn't recollect it, there is no

18  recollection, it goes to state of mind when he is about his

19  investigation.

20       THE COURT:  He is not your adverse party and in that

21  sense it is not a statement of an adverse party.  That rule

22  doesn't apply to this, nor short of any context does this

23  statement make any sense whatsoever.  Again, you can ask him if

24  it refreshes his recollection and you will take whatever answer

25  you are given but that statement alone there are 401 problems,

1   there are 403 problems, there are 800 problems so I don't see

2   how you are going to get it in.  You can try under some other

3   theory but none you have given me is the proper basis.

4           While we are here, do you know how much longer you

5   have on cross of this witness?

6           MR. SCHULTE:  Yeah, I still have -- it will probably

7   go at least until the end.

8           THE COURT:  OK.  And the next witness is one of the

9   witnesses subject to the security procedures?

10           MR. DENTON:  Yes, your Honor.  He is here.

11           THE COURT:  So if you are able to wrap it up today

12   that would be ideal, it would be nice to start with that

13   witness tomorrow.  But, if not, we will take it as it comes.

14           While we are at side bar, is there any reason here to

15   discuss the CCI building issue or shall we take that up later

16   in a different setting?

17           MR. DENTON:  We can take it up here, your Honor.

18           I think the issue is that that is -- that is not the

19   CCI building -- which it has a different number -- but it is,

20   if not over the line, certainly right at the line of unmasking

21   something that the Court has uniformly held should be redacted

22   in a way that seemed fairly deliberate to us.

23           THE COURT:  So Mr. Schulte, I would urge you to look

24   at the key and just be careful.  I think the government knows

25   more than I do so I'm not sure why, given the various acronyms

1    that have been thrown around over the course of this trial that

2    would cause any harm, but be that as it may, if you look at the

3    key, there are certain things we are not going to be saying out

4    loud here and just make sure you --

5              MR. SCHULTE:  I think that brings up another issue and

6    that's, you know, for the other witnesses it may come out as

7    well but for this witness the problem is as an SC0 facility it

8    is an open building, both the buildings are.  So, I mean, I

9    don't know how I can come up --

10             THE COURT:  So you asked your questions of this

11   witness, he gave you his answers.  That may be something you or

12   the government can elicit from other witnesses.  It may be

13   something that you testify to, but we have covered that.

14             Let's resume.

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MR. SCHULTE:

3    Q.  All right.  Does this refresh your recollection that there

4    was a meeting on June 26, 2017?

5    A.  It does not.

6    Q.  Does it refresh your recollection that there was any

7    meeting in June?

8    A.  There is no reference to a meeting that I can see in

9    this --

10           THE COURT:  Hold on.

11           Agent, that's not the question.  This document is not

12   in evidence.  Don't testify about what this document may or may

13   not say.  The question is having looked at this document, does

14   it refresh your recollection whether there was a meeting in

15   June?

16           THE WITNESS:  No.

17   BY MR. SCHULTE:

18   Q.  Does it refresh your recollection about the going to

19   Baltimore?

20           THE COURT:  Sustained.

21           MR. SCHULTE:  OK.

22           THE COURT:  Move on, Mr. Schulte.

23           Let's take this document down, please.

24   BY MR. SCHULTE:

25   Q.  Moving on to the first time that we met that you testified

1   about on direct.  So you testified that we met on March 15th,

2   2017; correct?

3   A.  That's correct.

4   Q.  And that was one day before my travel to Cancun, correct?

5   A.  Correct.

6   Q.  And you and Agent Donaldson brought me to the Pershing

7   Square Diner, correct?

8   A.  You agreed to meet us there, yes.

9   Q.  And can you tell the jury what a Miranda warning is?

10  A.  Miranda warnings are essentially warnings that you would

11  give to someone who is in custody and is to be arrested that

12  basically advises them of their rights, including one of them

13  is the right to be silent.

14  Q.  And you did not give me a Miranda warning, correct?

15  A.  We did not.

16  Q.  Can you tell the jury what a 1001 warning is?

17  A.  A 1001 warning is -- it is a felony to lie to an FBI agent,

18  so you can charge someone criminally for lying to an FBI agent

19  in the course of an investigation.

20  Q.  And you did not give me a 1001 warning either, correct?

21  A.  Not at that time; no, sir.

22          THE COURT:  Let me just interrupt for a moment to

23  explain a couple principles of law.

24          Miranda warning, that name comes from *Miranda v.*

25  *Arizona*, it is a Supreme Court case from sixty-some-odd years

1    ago that established the principle that the police, when they

2    engage in a custodial interrogation of a person, that is, if

3    they're in custody and they question that person, that they, in

4    order to use that statement against them to prove their guilt

5    at a trial, that they have to give them certain warnings about

6    the right to remain silent, the right to have an attorney, so

7    on and so forth.

8            Two things.  Number one, it only applies to if someone

9    is in custody, it doesn't apply if they're free to go.  Number

10   two, I instruct you that the statements that Mr. Schulte made

11   in that March 15th interview are admissible, I ruled that they

12   are admissible, I have allowed them into evidence so there is

13   nothing -- you may consider them.  Having said that, you can

14   certainly consider the fact that Mr. Schulte was not given

15   warnings about either Miranda or 1001 which pertains to a

16   section of the United States Code.  You can consider those in

17   connection with your evaluation of the statements that he made

18   and what weight you give to them.

19           Mr. Schulte, you may proceed.

20   BY MR. SCHULTE:

21   Q.  And at this time you did not tell me that I was a suspect

22   in the leaks, correct?

23   A.  At that initial point, no, sir, I don't believe.

24   Q.  In fact, when you approached me you specifically requested

25   assistance in helping solve the crime; correct?

1  A.  That's my memory; yes, sir.

2  Q.  And how would you describe my demeanor at the first

3  meeting?

4  A.  You were willing to answer our questions, you were polite

5  and, quite frankly, enjoyable to talk to.

6  Q.  And you testified that at some point during the

7  conversation you handed me a couple of subpoenas, correct?

8  A.  That's correct.

9  Q.  And then you seized my cell phone, correct?

10  A.  Pursuant to the subpoena, yes.

11  Q.  And you also demanded my passport, correct?

12  A.  No.

13  Q.  You did not -- did you request my passport at that time?

14  A.  No.

15  Q.  You didn't request the passport at that time?

16  A.  Not at that time I believe, sir.  It wasn't until later in

17  the evening.

18  Q.  I would like to show you one of your FBI 302s from that

19  time.

20  A.  Sure.

21        THE COURT:  Mr. Schulte, please make reference to

22  Defendant's Exhibit or Government Exhibit rather than

23  characterizing something that is not in evidence, please.

24  Q.  OK.  We will have to come back to that.  OK.  I want to

25  talk to you a little bit about the OIG e-mail now.  Right?  You

1    claim I said it was -- or I told you I did not have a copy of

2    the OIG e-mail, correct?

3    A.   Correct.

4             THE COURT:  Just so we are clear, is that Government

5    Exhibit 1616?  Is that what you are referring to?

6             MR. SCHULTE:  Yes.

7             THE COURT:  I'm asking the Agent.  Is that when you

8    are testifying about the OIG e-mail, is that Government Exhibit

9    1616?

10             THE WITNESS:  I would have to see, your Honor.

11             MR. SCHULTE:  Can we pull it up, please?  Thank you.

12             THE WITNESS:  Yes, your Honor.

13             THE COURT:  And what is OIG?

14             THE WITNESS:  The Office of the Inspector General,

15    your Honor.

16    BY MR. SCHULTE:

17    Q.   So this e-mail was later recovered from my home, correct?

18    A.   Yes.  That's correct.

19    Q.   And you testified on direct that you believe that I lied to

20    you about possessing the OIG e-mail, correct?

21    A.   Correct.

22    Q.   It was an e-mail that I labeled unclassified, correct?

23    A.   Correct.

24    Q.   And just to be clear, while I was working at the CIA, I had

25    the authority of a derivative classifier, correct?

M6F5sch5                          Evanchec - Cross

1   A.  Correct.

2   Q.  And what does that mean?

3   A.  That means, essentially, that as I spoke earlier, original

4   classification whose that position is ultimately responsible

5   for classification, they're able to delegate classification to

6   people assuming that they will apply them correctly.

7   Q.  So I was authorized by the CIA to make classification

8   decisions, correct?

9   A.  So long as those abided by the rules of classification,

10  yes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6fWsch6                          Evanchec - Cross

BY MR. SCHULTE:

Q.   Right.  But during the course of your investigation, you

found multiple -- multiple emails and other documents that I

classified, correct?

A.   Correct.

Q.   And at the end of the day, based upon the training the CIA

gave to me, I'd made those classification decisions, correct?

            MR. LOCKARD:  Objection.

            THE COURT:  Sustained.

BY MR. SCHULTE:

Q.   You testified that you have top secret security clearance,

correct?

A.   That's correct, yes, sir.

Q.   So do you have a similar email system that the FBI uses for

sending classified information?

A.   I do, yes, sir.

Q.   So how do you -- so based on your training, you determine

whether information is classified and at what level, correct?

A.   That's correct.

Q.   And how does your email system work when you're going to

review the document?

A.   Sure.  So, the way our system works, sir, is we would

generate an email, and just prior to pressing send, it would

prompt you with a drop-down menu that would ask you how you

want to classify this document.  And it would give you the

1    options to make it unclassified or classified or secret or top

2    secret.  And then, only then, only after that point that you

3    input those classifications does the system allow you to

4    actually press send.  So you're required to make those

5    decisions and note those designations prior to pressing send.

6    Q.  And when you press send and the menu comes up, how many

7    different options are you presented?

8    A.  They're -- frankly, there are dozens of boxes specially

9    given as handling caveats that I mentioned yesterday, like not

10   for foreign dissemination.

11   Q.  OK.  But those are the dissemination controls, correct?

12   A.  Correct.

13   Q.  For the classification decision, how many boxes, how many

14   different options?

15   A.  Depending on the system, most likely three -- unclassified,

16   secret, and top secret.

17            THE COURT:  Do you know if the FBI's system on that

18   score is similar to the CIA's email system?  Do you know?

19            THE WITNESS:  I believe so, based on what I've seen,

20   sir.

21   BY MR. SCHULTE:

22   Q.  So when you -- there are three levels of classification,

23   correct?

24   A.  Correct.  Again, depending on the system that you're on.

25   So if you're on a secret system, it wouldn't give you the

1    option to press top secret because there's presumably no top

2    secret information there.  So it just depends on your system.

3    Assuming there's a top secret system, there should be three.

4    Q.  But the system doesn't allow you to simply click one of

5    those three options, correct?

6    A.  Our systems it does.

7    Q.  Is there a classification reason that must be supplied,

8    like a specific reason why the document's classified at a

9    certain level?

10   A.  Yes.  So I think what you're -- an example of that might

11   be -- it might help -- if it's a human source or the reporting

12   on a human source, you might designate that it's HUMINT type of

13   intelligence.  Is that what you're talking about, sir?

14   Q.  No.  Those would be the SCI controls, correct?

15   A.  Correct.

16   Q.  So those are -- can you explain to the jury SCI?

17   A.  SCI, as I testified yesterday, is an additional category,

18   additional category of classified information, mostly national

19   defense information, that would be even more restricted than

20   even top secret.  So you could have SCI, which is a very

21   sensitive pot of information, either at secret level or top

22   secret, but it requires additional read-ins.  That's basically

23   briefings to warn you about the dangers of exposing that.  So

24   that's generally what SCI is.

25   Q.  OK.  Are you familiar with the way the CIA classification

M6fWsch6                         Evanchec - Cross

1    system works?

2    A.  I believe it was very similar to what I just attempted to

3    explain.

4    Q.  OK.  Have you seen what's referred to as the classification

5    banners at the bottom of the page?  I mean not the banner at

6    the top that designates the classification level but the actual

7    block.  Classification block is what it's referred to.

8    A.  I've seen those, yes.

9    Q.  Does the FBI have those as well, or --

10   A.  Yes.

11   Q.  -- to your knowledge, it's just -- you do have them, right?

12   A.  I believe those are uniform across the intelligence

13   community, sir.

14   Q.  OK.  So in those classification blocks, it says something

15   like declassification-by date, right?

16   A.  Correct.

17   Q.  It will say declassifier, your number, right?

18   A.  Correct.

19   Q.  And it gives a classification reason, which is a numerical,

20   numeric code that specifically relates the classification

21   information to one of multiple different types, correct?

22   A.  Correct.

23   Q.  And so those different types of classification can be

24   anything from communications intelligence, comments, to any

25   kinds of -- any types of classification, right?

1          MR. SCHULTE:  Objection.

2     A.  I don't deal with that type of information on a daily

3     basis.

4          THE COURT:  There was an objection.  The witness

5     already answered, so I'll leave it, but let's move on,

6     Mr. Schulte.

7     BY MR. SCHULTE:

8     Q.  So in your career, classifying documents, sometimes people

9     make honest mistakes when they classify documents, correct?

10         MR. LOCKARD:  Objection.

11    A.  I think that's --

12         THE COURT:  Sustained.

13    BY MR. SCHULTE:

14    Q.  Have you ever made a mistake classifying a document, sir?

15         MR. LOCKARD:  Objection.

16         THE COURT:  Sustained.

17    BY MR. SCHULTE:

18    Q.  Do you know if someone makes an honest mistake in

19    classifying a document, if they can be charged with a crime?

20         MR. LOCKARD:  Objection.

21         THE COURT:  Sustained.

22    BY MR. SCHULTE:

23    Q.  Do you realize, sir, that this OIG email was initially

24    confirmed to be unclassified to the CIA for approximately two

25    months?

1              MR. LOCKARD:  Objection.

2              THE COURT:  Sustained.

3     BY MR. SCHULTE:

4     Q.  So this document, this OIG document here, the government

5     never charged me with a crime for this document, correct?

6              MR. LOCKARD:  Objection.

7              THE COURT:  I will allow that.

8              Do you know the answer to that question?

9              THE WITNESS:  I don't, your Honor.

10             THE COURT:  All right.  The witness says he doesn't

11    know the answer to that question.

12             I'm not sure this is visible to the jury, so let's

13    publish it so that the jury understands what document we're

14    discussing.

15             Next question, please.

16             MR. SCHULTE:  OK.  I'd like to show just to the

17    parties defense exhibit 813.  I believe the government has

18    Government Exhibit 813, but I don't believe it's in evidence,

19    so I'm offering this defense exhibit 813 into evidence.

20             THE COURT:  All right.  Denied.

21             Next question.

22             MR. SCHULTE:  813-1 is a --

23             MR. LOCKARD:  Objection.

24             MR. SCHULTE:  -- present since --

25             THE COURT:  Hold on, Mr. Schulte.

1          Is there a question that you want to pose to this

2    witness about this exhibit?

3          MR. SCHULTE:  Yes.  The question is --

4          THE COURT:  All right.  So you're showing the witness

5    what's marked as defense exhibit 813-1.  What's your question?

6    BY MR. SCHULTE:

7    Q.  The question is do you recall that you referred to the OIG

8    email during our discussions as the classified email?

9          THE WITNESS:  Your Honor, I can't see the exhibit.

10         THE COURT:  All right.  That's fine.  Just answer the

11   question.

12   A.  I'm sorry, Mr. Schulte.  Can you just rephrase the

13   question -- repeat the question?

14   Q.  Yes.  Do you recall that during your discussions with me

15   you referred to this OIG email as the classified email?

16   A.  I did.

17   Q.  OK.  And did I not specifically tell you that I had no idea

18   what you were talking about because I never printed or retained

19   any classified documents in my apartment?

20         MR. LOCKARD:  Objection.

21         THE COURT:  Overruled.

22   A.  I recall asking you if you had a classified OIG or an OIG

23   email in your apartment, and you said no.  That's the

24   recollection that I have.

25   Q.  I'm sorry, sir.  Didn't you just testify that you referred

1    to the document as the classified email?  Right?

2    A.  I can't recall.  I definitely recall it being -- referring

3    to it as the OIG.  I just don't have a memory of referring --

4    of making a distinction of it being classified or not.  I just

5    don't recall, sir.

6    Q.  But you just stated earlier that you did refer to it as the

7    classified email, correct; that was what you just said?

8    A.  My testimony is I don't recall if indicated a

9    classification of that email or not.  That's my final

10   testimony.

11   Q.  There's a big difference between something is referred

12   to --

13            THE COURT:  Mr. Schulte, pose a question, please, just

14   a question.

15   BY MR. SCHULTE:

16   Q.  You did not bring with you a redacted version of the OIG

17   email to show me, correct?

18   A.  No, we had not, sir.

19   Q.  And you did not tell me that this was an email that I

20   classified unclassified, correct?

21   A.  I don't think we had any further -- I don't think we

22   provided any further information about it, frankly.

23   Q.  All right.  So do you not believe, sir, that your reference

24   to the OIG email simply did not mesh at all with what I

25   believed you were talking about?

 1              THE COURT:  Sustained.

 2   BY MR. SCHULTE:

 3   Q.  Do you not think that I simply didn't -- I simply

 4   misunderstood what you were talking about?

 5              MR. SCHULTE:  Objection.

 6              THE COURT:  Sustained.

 7              Mr. Lockard, microphone, please.

 8   BY MR. SCHULTE:

 9   Q.  OK.  You did not record the meeting that took place on

10   March 15, 2017, correct?

11   A.  We did not.

12   Q.  OK.  And did you know that by this time, in 2017, almost

13   every single police department in the country required body

14   cams?

15              MR. SCHULTE:  Objection.

16   A.  The FBI --

17              THE COURT:  Sustained.

18   BY MR. SCHULTE:

19   Q.  Now, the FBI does many covert recording operations,

20   correct?

21              MR. LOCKARD:  Objection.

22              THE COURT:  Sustained.

23   BY MR. SCHULTE:

24   Q.  Well, in this specific case, you had multiple of my former

25   friends and colleagues wear wires to spy on me, correct?

1    A.  They were lawfully given wires to collect evidence, yes.

2    Q.  So why did you not record the meeting?

3    A.  It's not required by FBI policy.

4    Q.  So is it not true, sir, that the FBI deliberately does not

5    record these meetings so it can then claim anything that

6    happened in those meetings afterwards?

7              THE COURT:  Sustained.

8    BY MR. SCHULTE:

9    Q.  If you recorded the session, there would be no dispute of

10   what was said, correct?

11   A.  Correct.

12   Q.  Instead, you are asking the jury to rely upon your memory

13   of what happened five years ago, correct?

14             MR. LOCKARD:  Objection.

15             THE COURT:  Sustained.

16   BY MR. SCHULTE:

17   Q.  OK.  You, as the FBI, are charged by the prosecutors to

18   gather evidence for a trial, correct?

19   A.  We are required by our positions to obtain evidence.

20   Whether that leads to a trial or leads to an exoneration,

21   that's our goal, is to collect evidence and come to a

22   conclusion, a truthful conclusion about what happened.

23   Q.  OK.  And eyewitness testimony has been scientifically

24   proven to be unreliable, correct?

25             MR. LOCKARD:  Objection.

| | |
|---|---|
| 1 | THE COURT:  Sustained. |
| 2 | BY MR. SCHULTE: |
| 3 | Q.  OK.  Well, you, as the FBI, prefer to provide video or |
| 4 | audio evidence to a jury if possible, correct? |
| 5 | MR. LOCKARD:  Objection. |
| 6 | THE COURT:  Sustained. |
| 7 | BY MR. SCHULTE: |
| 8 | Q.  Video evidence of someone committing a crime is compelling, |
| 9 | correct? |
| 10 | MR. LOCKARD:  Objection. |
| 11 | THE COURT:  Sustained. |
| 12 | Let's move on to the next line of questioning, please. |
| 13 | BY MR. SCHULTE: |
| 14 | Q.  OK.  The individuals you testified about that you gave |
| 15 | recording devices to, you did not ask them to write down what |
| 16 | transpired, correct; you gave them the wire? |
| 17 | A.  That's correct. |
| 18 | Q.  OK.  And you gave them the wire to record the audio, |
| 19 | correct? |
| 20 | A.  Correct. |
| 21 | Q.  But you preferred the audio over their written |
| 22 | recollection, correct? |
| 23 | MR. LOCKARD:  Objection. |
| 24 | THE COURT:  Sustained. |
| 25 | BY MR. SCHULTE: |

M6fWsch6                        Evanchec - Cross

1   Q.  OK.  So on March 15, 2017, before you came to talk to me at

2   Bloomberg, you scouted out the area and selected Pershing

3   Square diner, correct?

4   A.  I personally did not do that, but I understood that that

5   happened, yes.

6   Q.  OK.  And you did all this extensive planning, between

7   obtaining the latest search warrant on March 14, until the plan

8   to specifically meet with me on the 15th, correct?

9   A.  Correct.

10  Q.  You had extra FBI agents blend in at Pershing Square diner,

11  correct?

12  A.  Correct.

13  Q.  And they could have easily been set up to have video or

14  audio recording, correct?

15          MR. LOCKARD:  Objection.

16          THE COURT:  Overruled.

17  A.  That was a possibility, yes.

18          THE COURT:  Ladies and gentlemen, let me interrupt and

19  say two things.

20          One is, as I'll instruct you at the conclusion of the

21  case, the government is not required to use any particular

22  investigative techniques as part of either investigation or in

23  connection with this trial.  Having said that, you are

24  obviously free to consider what techniques they did and didn't

25  use in evaluating what evidence there is or the absence of

1    evidence in deciding whether the government has proved beyond a

2    reasonable doubt that the defendant committed the crimes with

3    which he is charged.

4          The second thing is just, as a matter of law, I

5    instruct you that law enforcement is not required to record any

6    conversation that they conduct with a suspect or a witness.

7    Some law enforcement agencies do, as the agent testified, but

8    as a matter of law, that is not a requirement.

9          Mr. Schulte, you may proceed.

10         MR. SCHULTE:  OK.

11    Q.  So you, Special Agent Donaldson, who were there overtly

12    with me, correct?

13    A.  Correct.

14    Q.  So you, Donaldson, and the other FBI agents could have worn

15    wires to record the audio, correct?

16    A.  Yes, that's an option.

17    Q.  OK.  So do you know whose decision it was whether or not to

18    do those things?

19    A.  It was a collective decision based on FBI policy.

20    Q.  What is the FBI policy?

21    A.  That in matters such as this, we're not required to record,

22    as your Honor had mentioned.  And that's that.

23    Q.  OK.  So the FBI policy is you're not required to, correct?

24    A.  Correct.

25    Q.  But you can if you choose to, right?

1    A.  Sure, absolutely.

2    Q.  So before a meeting such as this, does the team get

3    together and determine, you know, how you're going to plan this

4    out?

5    A.  Largely for counterintelligence investigations, that is not

6    a routine matter of business.

7    Q.  So is it that a team -- is it the team lead who makes these

8    decisions, or --

9    A.  It's collectively the team.  Certainly my supervisor would

10   have been part of that conversation.

11   Q.  OK.  Do you know if there were any conversations about it

12   or not?

13   A.  I don't recall, sir.

14   Q.  And during the meeting, up until the search warrant was

15   served and executed, you testified that it was a largely

16   friendly kind of environment, correct?

17   A.  Correct.

18   Q.  OK.  So while I was at bloom -- after --

19            MR. SCHULTE:  Sorry.  Let me rephrase that.

20   Q.  After the search warrant was served, everyone came back to

21   my apartment, correct?

22   A.  Correct.

23   Q.  I think you or some agents walked with me back to the

24   apartment, correct?

25   A.  Correct.

1  Q.  And then I think we waited there a little bit until the

2  search warrant was served, correct?

3  A.  Correct.

4  Q.  And then at some point, I left and I went back to -- I went

5  back to Bloomberg, right?

6  A.  Correct.

7  Q.  Now, do you have any obligation if you discover that the

8  search warrant you obtained, if you discover that the evidence

9  in the search warrant you obtained from the judge is false?

10           MR. LOCKARD:  Objection.

11           THE COURT:  Sustained.

12  BY MR. SCHULTE:

13  Q.  If you obtain a lawful search warrant from a judge --

14  correct?

15  A.  Correct.

16  Q.  -- and before you execute that search warrant, you learn

17  that everything that you testified to in the search warrant was

18  incorrect or major parts of it were incorrect, do you have an

19  obligation to inform the judge?

20           MR. LOCKARD:  Objection.

21           THE COURT:  Sustained.

22  BY MR. SCHULTE:

23  Q.  Sir, isn't it true that you received notification that the

24  March 7, 2016, date of theft sworn out in your search warrant

25  was impossible before you ever executed the search?

1    A.  I don't -- I wasn't the author of the search warrant.  I

2    don't recall the timing of that.

3    Q.  Do you know what time the FBI executed its search warrant

4    and began the search?

5    A.  On the 15th, sir?

6    Q.  Yes.

7    A.  I believe it was 7:41 p.m.

8    Q.  7:41 p.m., you said, right?

9    A.  That's my recollection, yes, sir.

10          MR. SCHULTE:  OK.  I want to show just the witness and

11   the parties defense exhibit 110.

12          THE COURT:  OK.

13   BY MR. SCHULTE:

14   Q.  Do you recognize this document?

15   A.  It appears to be an email from a New York agent to myself

16   and my supervisor.

17   Q.  Does this document refresh your recollection about the

18   events on that day, March 15, 2017?

19   A.  It does.

20   Q.  OK.  And what time did you receive this email?

21   A.  This was received on internal FBI systems at 6:41 p.m. on

22   the 15th.

23   Q.  And who else was it sent to?

24   A.  My --

25          THE COURT:  Sustained.  It's not in evidence.

1             MR. SCHULTE:  I'd like to move to introduce it into

2     evidence.

3             MR. LOCKARD:  Objection.

4             THE COURT:  Sustained.

5     BY MR. SCHULTE:

6     Q.  So does this refresh your recollection about knowledge

7     about the information that was initially sworn out in the first

8     search warrant?

9     A.  It suggests that there was a change.

10            MR. LOCKARD:  Objection, your Honor.

11            THE COURT:  Hold on.  That's not the question.  The

12    question isn't what this document says.  It's sitting here

13    today, does it refresh your recollection about the information

14    that was contained in the search warrant that was executed that

15    day?

16            THE WITNESS:  Your Honor, I don't -- I don't

17    specifically recall this email.  It is what it is.  I see it.

18            THE COURT:  That's also not the question.  The

19    question is just looking at it, whatever it may be --

20            THE WITNESS:  Yes.

21            THE COURT:  -- even if it's a bowl of fettuccine

22    Alfredo, does it refresh your recollection sitting here today

23    about information that was in that warrant?

24            THE WITNESS:  It does.

25            THE COURT:  OK.

1          THE WITNESS:  Yes.  I'm sorry, your Honor.

2          THE COURT:  Thank you.

3    BY MR. SCHULTE:

4    Q.  Does it refresh your recollection that you learned

5    information at 6:41 p.m.?

6    A.  That's not when I learned it.

7    Q.  Well, when did you learn it?

8    A.  At this time of this email, I was with you, so I would not

9    have been able to access it.  We were discussing it, quite

10   frankly, so I'm assuming it would have been the next business

11   day, when I read my email, that I would have received this

12   information.

13         THE COURT:  I think to help the jury, does this

14   refresh your recollection that you learned before executing the

15   search warrant at -- I think you said it was 7:41 p.m., that

16   the date, the relevant date was not March 7 but an earlier

17   date?  Does it refresh your recollection that you learned that

18   before executing the search warrant?  Your testimony is no?

19         THE WITNESS:  It would not have.

20         THE COURT:  OK.

21         MR. SCHULTE:  Just showing the witness and the parties

22   what's marked as defense exhibit 109.

23   Q.  Does this refresh your recollection about the events that

24   were occurring on March 15, 2017?

25         MR. LOCKARD:  Objection.

1               THE COURT:  Sustained.

2      BY MR. SCHULTE:

3      Q.  During the discussion and meeting with me on March 15,

4      2017, do you know if -- do you recall if updates were being

5      periodically sent throughout the night?

6      A.  They were.

7      Q.  OK.  And how were those updates being transmitted?

8      A.  These updates were being transmitted by our cell phones, I

9      believe, through government email accounts.

10     Q.  So you had your -- you had access to your cell phone and

11     other internet-enabled devices during this time, correct?

12     A.  Unclassified systems, yes.

13     Q.  OK.  So your testimony about this system is different from

14     the other system?

15              MR. LOCKARD:  Objection.

16              THE COURT:  I don't understand the question, so let's

17     try a new question.

18              MR. SCHULTE:  OK.

19     Q.  The defense exhibit 110, this email system is different

20     from your defense exhibit 109 email system?

21              MR. LOCKARD:  Objection.

22              THE COURT:  Sustained.

23              These documents are not in evidence, Mr. Schulte.

24     Please don't refer to their contents.

25              MR. SCHULTE:  OK.

M6fWsch6                              Evanchec - Cross

1    Q.  You testified earlier that you would have received

2    information about this in the next business day or so, right?

3    A.  Just depends on when I would have read that email, sir.

4    Q.  OK.  But once you read it, you would have learned that

5    information, correct?

6              MR. LOCKARD:  Objection.

7    A.  Correct.

8    Q.  OK.  After you learned this information, to your knowledge,

9    was any judge notified?

10             MR. LOCKARD:  Objection.

11             THE COURT:  Sustained.

12   BY MR. SCHULTE:

13   Q.  OK.  Isn't it true that you learned nearly every single

14   fact you wrote in your search warrant, which was sworn out by

15   Agent Donaldson, was false?

16             THE COURT:  Sustained.

17   BY MR. SCHULTE:

18   Q.  Was there a time -- was there a time in which you

19   discovered contradictory evidence to what was sworn out in the

20   search warrants?

21             MR. LOCKARD:  Objection.

22             THE COURT:  Sustained.

23             Ladies and gentlemen, it's 2:45, so that brings us to

24   the end of your part of this day.

25             Let me give you some instructions before I excuse you

1    for the day.

2           First, an instruction to those in the audience, if you

3    remain when the jury's excused, please wait a minute or so just

4    so the jury can clear the floor before exiting the courtroom.

5           To the jury, second, don't discuss the case with each

6    other, with anyone whatsoever, in any way, shape or form.

7    Don't do any research about the case.  Please keep an open mind

8    about the case.  You've heard only some of the evidence, and

9    obviously, as I've said many times and will say many times

10   more, you need to keep an open mind until you've heard

11   everything and you begin your deliberations.

12          A couple reminders about tomorrow.  One, hopefully we

13   can start on time tomorrow, so to that end, please try to be in

14   by 8:45, at the latest.  And again, we will hopefully have

15   breakfast and coffee there for you.  I recognize that subway

16   problems and the like are not necessarily in your hands, but

17   all I can ask is that you do your best because we need to wait

18   until all of you are here.

19          No. 2, I do recommend that you bring with you a snack

20   or small lunch just to eat during the break since it is a

21   relatively short break and I want to stick to our schedule as

22   much as possible.  It's probably best and easiest if you not

23   leave the jury room during the break.  You're not imprisoned

24   there, so you are free to leave if you need to.  But I would

25   just urge you, I think it's probably best practice, because I

M6fWsch6

1    want to start on time after the break.

2          Reminder -- I'm not going to say this every day, but

3    first couple days -- if you do develop Covid symptoms overnight

4    or test positive, for that matter, please do alert us know so

5    that know we and can deal with it accordingly.

6          Finally, just a specific note for one of you -- I

7    think it's juror No. 15, if I'm not mistaken -- you asked my

8    staff if I could contact your supervisor about an issue.  I'm

9    happy to do that.  If you provide that contact information and

10    name to my staff, I'll take care of that.

11          Another concern, let me say generally to all of you, I

12    have admonished you that it is your obligation to not stay in

13    the presence of anyone who's discussing this case, if anyone

14    happens to be discussing it.  You should obviously do your best

15    on that front.  If you are exposed to some sort of conversation

16    or news item about it, anything of that sort, and you can't do

17    anything about it, it is what it is.  Just alert my staff --

18    tell only my staff -- about it, and then we'll deal with it

19    accordingly.  But all I can do on that score is ask you again

20    to do your best as well.

21          With that, I wish you very pleasant afternoon and

22    evening.  We'll see you, hopefully, tomorrow at or just after 9

23    a.m., and we'll get a full day in.

24          Thank you.

25          (Continued on next page)

M6fWsch6

1          (Jury not present)

2          THE COURT:  You may be seated.

3          All right.  Let me tell you before you step down, sir,

4     No. 1, please be back in the courtroom a few minutes before

5     nine tomorrow, or actually in the witness room, and counsel

6     will give you instructions about when to enter.

7          Because you're on cross-examination, I'm going to

8     instruct you not to communicate with the prosecution team about

9     the substance of your testimony.  If you need to discuss

10    logistics, those sorts of things, that's one thing, but you may

11    not discuss the substance of your testimony or the case more

12    generally.

13         Understood?

14         THE WITNESS:  Yes, your Honor.

15         THE COURT:  All right.  With that, you're excused for

16    the afternoon, and we'll see you tomorrow morning.

17         THE WITNESS:  Yes, sir.

18         (Witness not present)

19         MR. DENTON:  Your Honor, that's a good opportunity for

20    me just to note that -- Special Agent Evanchec is obviously an

21    FBI agent.  For a number of the other witnesses, in order to

22    implement some of the arrangements, there will be various

23    government, FBI people interacting with them.  That will not

24    include the prosecution team.  Everyone is being advised that

25    none of those communications should not involve the substance

M6fWsch6

1    of the case for any witness on cross-examination.

2            I just wanted to note that that's going to be

3    required.

4            THE COURT:  All right.  So certainly with you making

5    sure that everybody understands those ground rules, I will make

6    the point over any break during cross-examination of

7    instructing the witness accordingly as well, and shouldn't be

8    any problem with communicating about things about logistics,

9    whereabouts, those sorts of things, but nothing relating to the

10   substance of the case or the testimony.

11           All right.  Anything that the government wants to

12   raise?

13           MR. LOCKARD:  No, your Honor.

14           THE COURT:  Mr. Schulte, anything you want to raise?

15           MR. SCHULTE:  Just one quick matter.

16           I just want to bring to the Court's attention again

17   the ferrying back and forth to MDC, if the Court was ever able

18   to determine if it's possible for me to basically have my

19   documents in the car so when we're waiting at MDC for, like,

20   three hours, I can work on the cross, which -- and other types

21   of stuff.

22           THE COURT:  The short answer is I did speak to the

23   U.S. Marshal about that, and what he said, which seemed

24   reasonable to me, was that if you selected whatever documents

25   you would need for that ride, that that would be no problem for

M6fWsch6

1    you to read some documents, but it would have to be whatever

2    you needed, not the entirety of your materials or the whole box

3    and also not a pen either.  So with that understanding, that

4    seemed reasonable to me, and so hopefully they're doing that.

5                MR. SCHULTE:  OK.  Thank you.

6                THE COURT:  All right.

7                Mr. Schulte, first of all, let me just confirm.  I

8    have steen standby counsel giving you what seems to be advice

9    and handing you Post-it notes, and the like.  So just to

10   confirm again that you're directing your defense and firmly in

11   control and just relying on them for advice.  Is that correct?

12               MR. SCHULTE:  Yes, that's correct.

13               THE COURT:  Second, although I will pay you the

14   compliment of saying that, on the whole, I think you're doing a

15   better job than I might have expected for somebody with no

16   trial experience, I would maybe encourage you to talk to them

17   about the rules of evidence, particularly with respect to

18   refreshing recollections and also using exhibits.

19               So when you show an exhibit to a witness, what you

20   should do is say:  I'm showing the witness what is marked as

21   defense exhibit 1.  Do you recognize that?

22               And until an exhibit is in evidence, you shouldn't

23   refer to the contents of it.  You shouldn't characterize it.

24   You shouldn't do anything.  It's up to the witness to

25   authenticate it and to lay a foundation for it to come into

M6fWsch6

1   evidence.  If you're using an exhibit to refresh recollection,

2   you need to ask a specific question to which the witness says I

3   don't recall, at which point then you're permitted to use

4   something to refresh recollection.  Again, you need to make a

5   record of what it is.  You show it to the witness.  You say

6   please review that to yourself.  And once the witness has done

7   that, you say, now do you recall, and you can repeat the

8   question to which the witness had previously said that they

9   didn't recall.

10          It's not sort of free rein to just ask generally does

11  that refresh your recollection about the events of the day

12  altogether.  It's a specific question to which the witness

13  previously said they didn't recall.  OK?

14          MR. SCHULTE:  Thank you.

15          THE COURT:  So just a couple of minor points that I'm

16  seeing over and over.  I would encourage you to -- and standby

17  counsel, maybe encourage you also to, on your own, perhaps help

18  Mr. Schulte out on some of those fronts.  But again, on the

19  whole, I think you're doing an admirable job given that you

20  don't have legal training and haven't done this before.

21          All right.  With that, I will see you tomorrow

22  morning, same time, same place, and wish you guys a pleasant

23  afternoon and evening.  And thank you very much.

24          (Adjourned to June 16, 2022, at 9:00 a.m.)

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   RICHARD JOHN EVANCHEC

 4   Direct By Mr. Lockard  . . . . . . . . . . . 166

 5   Cross By Mr. Schulte . . . . . . . . . . . . 263

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2   Exhibit No.                                     Received

 3   3003, 1603, 1608 through 1615, 1601,  . . . . 218

 4           1401 through 1404, 1605, 1405,

 5           1616 through 1621, 821, and

 6           822, and all Government's

 7           Exhibits contained on

 8           Government's Exhibits 1601,

 9           1401 through 1404, 1605, 1405,

10           821 and 822

11   1622    . . . . . . . . . . . . . . . . . . . 219

12   1624    . . . . . . . . . . . . . . . . . . . 219

13   1627    . . . . . . . . . . . . . . . . . . . 220

14   1630    . . . . . . . . . . . . . . . . . . . 222

15   1631, 1632, and 1642 . . . . . . . . . . . 223

16   1631, 1632, and 1642   . . . . . . . . . . 223

17   1301-1 through 1301-4B . . . . . . . . . . 255

18   1302-1   . . . . . . . . . . . . . . . . . . 255

19   1304-1 through 1304-3  . . . . . . . . . . 255

20   1305-1 through 1305-10 . . . . . . . . . . 255

21   1306-1 and 3002  . . . . . . . . . . . . . 255

22   1350, 1351, 1352, and 1353 . . . . . . . . 256

23                        DEFENDANT EXHIBITS

24   Exhibit No.                                     Received

25   104-1   . . . . . . . . . . . . . . . . . . . 297
```