M6gWsch1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6              Defendant.
                                         Trial
7   ------------------------------x

8                                        New York, N.Y.
                                         June 16, 2022
9                                        9:00 a.m.

10  Before:

11
                     HON. JESSE M. FURMAN,
12
                                         District Judge
13                                       -and a Jury-

14                        APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  DAVID W. DENTON JR.
17       MICHAEL D. LOCKARD
         Assistant United States Attorneys
18

19  JOSHUA A. SCHULTE, Defendant *Pro Se*

20

21  SABRINA P. SHROFF
    DEBORAH A. COLSON
         Standby Attorneys for Defendant
22

23  Also Present:  Charlotte Cooper, Paralegal Specialist

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.•
                        (212) 805-0300

M6gWsch1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  You may be seated.
 3              Good morning.  Welcome back.
 4              All of our jurors are here, so we should get started
 5    as quickly as we can, but I wanted to discuss the courtroom
 6    closure issues with respect to the next witness.
 7              Anything aside from that for the parties to discuss?
 8              Government.
 9              MR. DENTON:  Not from the government, your Honor.
10              THE COURT:  Mr. Schulte.
11              MR. SCHULTE:  Aside from the courtroom closure, I had
12    one issue I wanted to raise with the Court.
13              THE COURT:  OK.  What is it?
14              (Defendant conferred with standby counsel)
15              MR. SCHULTE:  It may involve CIPA with respect to the
16    witness's testimony.
17              (Defendant conferred with standby counsel)
18              MR. SCHULTE:  This witness, this witness.
19              I just wanted to raise, we talked a little bit about
20    yesterday the Government Exhibit 1617, you know, to which he
21    claimed was classified, I intend to cross him with his previous
22    testimony today.  However, his testimony that the full CIA
23    names are classified is going to be very difficult to disprove
24    without CIPA.  There are hundreds of exhibits, and at least
25    several in the Government Exhibit 1617 alone, that show emails
```

M6gWsch1

1   and email chains with full names of the CIA employees, where

2   those CIA employees have labeled the emails themselves

3   unclassified.  And throughout my time at the agency, the names

4   of overt employees have never been classified before, until

5   this prosecution.

6          So now what the government did is they redacted the

7   overt employees' last names in unclassified emails that those

8   employees sent themselves, which were properly unclassified.

9   So I have nothing to work with except the first name and

10  redacted last name.  There's basically no way for me to bring

11  out on cross that these redactions are actually the last names,

12  and so those are full names of overt CIA employees that were

13  unclassified, at least during my time at the CIA.

14         THE COURT:  Well, first of all, I think on cross --

15  I'll hear from the government, but I can't imagine there would

16  be any problem with you asking the witness and eliciting from

17  the witness not the name that's redacted but the fact that on

18  the email before the redaction was applied for purposes of

19  trial, the person's full name appeared without disclosing what

20  the name is.  The fact that the name was there is not a

21  classified piece of information.

22         MR. SCHULTE:  But I think with the redaction, he may

23  not know.

24         THE COURT:  To the extent that he received the email,

25  he may well know, and you can ask him.  I suppose if he says he

M6gWsch1

1    doesn't know, then we're in different territory.  I don't know

2    if the classified 3500 would have unredacted copies of these

3    things, but if so, then his recollection could perhaps be

4    refreshed with that.

5          Bottom line is it seems like you have enough to work

6    with with this witness that we don't need to get into CIPA just

7    yet.  Depending on what the witness says, to the extent that

8    you want to use as evidence to rebut that testimony other

9    things that are classified that this witness wouldn't be in a

10   position to authenticate, I think we can discuss that later,

11   and you should discuss with the government what exactly you

12   want to do in that regard, and we can go from there.

13         Does that make sense?

14         MR. SCHULTE:  Yes, that makes sense.

15         So for the classified 3500, for the process, he

16   doesn't have a folder up there with the classified 3500, right;

17   I need to ask standby counsel give him a copy?  Or what is the

18   procedure for the classified 3500 at this point?

19         MR. LOCKARD:  There's a binder on the witness stand.

20         THE COURT:  OK.

21         I was under the impression that that's what we were

22   doing -- namely, that it's on the witness stand -- so if you

23   want him to turn to something -- again, I think what you should

24   begin with is just show him the exhibit and say, Isn't it

25   correct that on this exhibit or on other emails that you

M6gWsch1

1   received from people at the CIA, that it contained their full

2   names?  It's not visible here because it's redacted, but isn't

3   it a fact that there were full names?  If he says I don't

4   remember, then you can try to refresh his recollection using

5   the 3500, which is available to him on the witness stand.  OK?

6        MR. SCHULTE:  OK.

7        THE COURT:  And then, again, depending on what the

8   record is at that point, we can take up later what, if

9   anything, else there is to do.

10       All right.  Anything the government wishes to say on

11  that?  I assume what I said is correct -- namely, the fact that

12  it contains a last name is not classified; it's the last name

13  that may be classified.

14       MR. LOCKARD:  We don't have anything to add on that

15  point.

16       THE COURT:  OK.

17       With respect to the closure issues, per my order and

18  Judge Crotty's prior opinion on the subject, for the next

19  witness, the courtroom is technically limited to, per the terms

20  of that order, the parties, the defendant's family, and two

21  members, pool members of the press.

22       On the press front, I don't know if there are members

23  of the press here or not, but hopefully, they can sort out

24  that.  There will be a feed to the press room and a feed to the

25  overflow room.  It is a video and audio feed, but per the terms

M6gWsch1

```
1    of the order, the witness will not be displayed on the video.

2    If there's any issue on who the pool members are of the press,

3    that should be raised with me sooner rather than later.  But

4    hopefully that can be sorted out by the press.

5            I obviously will have to break to implement the terms

6    of that order.  I don't know if, based on the last time, the

7    government has any estimate of how long that break would need

8    to be, and I don't know if there's anything further to discuss

9    about the understanding of how this is going to work.

10           MR. DENTON:  Your Honor, I think we've actually

11   managed to streamline the process a little bit from last time,

12   so I don't think it should take more than four or five minutes.

13   I don't know whether that means the Court wants to send the

14   jury into this jury room -- sending them all the way

15   downstairs, but we're happy to defer the Court on that.

16           I think our plan would be to have the witness actually

17   in the box before the jury comes back in so that we don't have

18   to deal with escorting issues in front of the jury.

19           And then the only other thing I would add with respect

20   to the order is that there would also be legal counsel for the

21   victim agency in the room as well.

22           THE COURT:  OK.  My intention is that if it's that

23   short it would be to just excuse them to the jury room here.

24           A reminder that the witness is to come down the left

25   wall of the courtroom so that he is not visible to the camera.
```

M6gWsch1

1              OK.  That's all helpful.

2              Mr. Schulte, first, for my planning purposes, any

3    estimate on how much longer you have on cross with Agent

4    Evanchec?

5              MR. SCHULTE:  Yeah.  I'm not sure, Judge, but I'm

6    hoping it goes a little bit better today.  Maybe 45 minutes, an

7    hour, something like this.

8              THE COURT:  All right.  Very good.  We'll take it from

9    there.

10             Do you have anything you want to raise on the

11   courtroom closure front?

12             MR. SCHULTE:  Yes.  I just wanted to ask that the

13   Court also allow former counsel and staff from the Federal

14   Defenders to be able to be in the room too.  Jason Fischer is

15   helping sometimes with the tech if I need technical support and

16   other issues like this, and Achal Fernando, who is the

17   paralegal.

18             THE COURT:  OK.  Do they have the requisite clearance,

19   do we know?

20             MR. SCHULTE:  Yes, they do.

21             THE COURT:  All right.  Obviously, it would have been

22   better form to seek that modification to my order before now,

23   but Mr. Denton, Mr. Lockard, any objection to allowing them to

24   remain?

25             MR. DENTON:  I guess, your Honor, I'm a little

M6gWsch1

1   confused, because to the extent they don't represent the

2   defendant -- he's no longer represented in any way by Federal

3   Defenders -- I think, you know, this is not just a matter of

4   people being here because they can.  If there's some active

5   role they're playing in the defense that warrants them being

6   here, that's a different story.  But that wasn't apparent to

7   us, and we're just hearing about it.

8           THE COURT:  All right.  I guess the question that I

9   would have for you, I take it these people were present the

10  last time, during the last trial and, therefore, have seen this

11  witness.  Is that correct?

12          MR. DENTON:  I know Mr. Fernando-Peiris was.  I wasn't

13  sure whether Mr. Fischer was.

14          THE COURT:  Mr. Schulte.

15          MR. SCHULTE:  Yes, he was there as well as another --

16  John, John Lee was also there from the Federal Defenders as

17  well.

18          THE COURT:  So the two people that you're proposing to

19  remain in the courtroom today -- I don't know who they are or

20  what Mr. Lee has to do with it.  Who are they, and were they

21  both present last time?

22          MR. SCHULTE:  Yes.  All three of them were, were

23  present last time.

24          I think the Court has seen, Jason Fischer was the one

25  assisting with some of the technical setup from a few days

M6gWsch1

1    before.  So they've seen the witnesses.  They have the security

2    clearances.  They are assisting -- they've been assisting

3    throughout this preparation --

4             THE COURT:  OK.

5             MR. SCHULTE:  -- trial.

6             THE COURT:  Mr. Denton, again, it would have been more

7    helpful to raise this back when I was addressing this and/or

8    immediately thereafter, but to the extent that while it

9    requires that the closure be no broader than necessary to

10   protect the government's interests, it would be hard to say how

11   it advances the interest to exclude people who have already

12   seen the witness and in that regard already have whatever

13   knowledge they would be prevented from getting by being here.

14   So I'm inclined to allow them to remain.

15             Anything you wish to say?

16             MR. DENTON:  I think that's fine, your Honor.  Again,

17   to the extent that we're talking about people who are playing a

18   role in the defense, I think that's fine.

19             I think from the perspective of maintaining a certain

20   level of consistency with respect to the Court's orders, if

21   they're not people who are playing a role here, the mere fact

22   that they may have the information doesn't necessarily warrant

23   them being here in the abstract.  So I think on those two

24   people, that's fine.  I just don't want to necessarily suggest

25   that anyone who's ever, you know, attended the previous trial

M6gWsch1

1    or otherwise has a security clearance is entitled to be here

2    under the order.

3         THE COURT:  All right.  I don't have to cross that

4    bridge until there's an application.  So bottom line is

5    permission is granted to those two people, and to the extent

6    that there is anyone else, I'll take it up then.  With that

7    modification, the terms of my prior order will apply.  So when

8    we take a break everyone other than the parties, the

9    defendant's family, two pool reporters, the two people that

10   Mr. Schulte just mentioned will be removed from the courtroom.

11        You can listen to the audio feed of the witness and

12   view whatever is visible in the overflow courtroom, 20B, and

13   then we'll proceed from there.

14        All right.  Anything else?  Otherwise, let's get the

15   jury and the witness and proceed.

16        MR. SCHULTE:  Yeah.  I'd just ask for two to three

17   minutes to be able to set everything up real quick, because it

18   takes a little bit of time before the jury comes in, if that's

19   all right.

20        THE COURT:  You'll have two three minutes before the

21   jury gets here.  So you have it, but we're going to get the

22   jury now and proceed when they get here.

23        Can we get the witness back in the courtroom, please.

24        (Continued on next page)

25

1          (Jury present)

2          THE COURT:  You may be seated.

3          Welcome back, ladies and gentlemen.  I hope you had a

4     pleasant afternoon and evening.  And thank you for most of you,

5     if not all, being on time this morning, despite the weather.

6     That kind of complicates things.  I appreciate it.

7          We will pick up where we left off, with the

8     cross-examination of Agent Evanchec.

9          Agent, you may remove your mask at this time.

10          THE WITNESS:  Thank you, your Honor.

11    RICHARD JOHN EVANCHEC, resumed.

12          THE COURT:  I remind you that you remain under oath,

13    and we will proceed.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Juror No. 15, I gather that Mr. Lee's

16    conveyed to you -- OK.  Very good.

17    CROSS-EXAMINATION CONTINUED

18    BY MR. SCHULTE:

19    Q.  Good morning.

20    A.  Good morning, Mr. Schulte.

21    Q.  Yesterday, you testified about the March 15, 2017, search

22    of my Manhattan apartment, correct?

23    A.  That's correct, sir.

24    Q.  How many agents participated in the search?

25    A.  I don't recall the exact number, but it would be normal

1    between eight and 15, generally, on a search.

2    Q.  OK.  And about how many hours did the search take?

3    A.  I believe it went from approximately the 7:00 hour on the

4    15th until the 2 p.m. hour the next day, so looking at 14, 15

5    hours.

6    Q.  And I lived in a one-bedroom apartment, correct?

7    A.  Correct.

8    Q.  By myself, correct?

9    A.  Correct.

10   Q.  So there was only two total rooms, correct; the bedroom,

11   the open living area?

12   A.  Kitchen, bathroom, yes.

13   Q.  So it took 14 or 15 hours to search those two rooms, right?

14   A.  That's correct.

15   Q.  With 15 agents, right?

16   A.  Correct.

17   Q.  You went through my closets, correct?

18   A.  Correct.

19   Q.  Opened the kitchen cabinets, correct?

20   A.  Correct.

21   Q.  Went through my desk, correct?

22   A.  I wasn't present, but that's normal procedure, yes.

23   Q.  And the large reason it took so long, you seized all of the

24   electronics, correct?

25   A.  Correct.

M6gWsch1                          Evanchec - Cross

1   Q.  And how many electronic devices did you seize?

2   A.  I recall there being two servers, a handful of desktop

3   computers and a number of removable media hard drives, thumb

4   drives, such as the like.

5   Q.  You found a lot of computer equipment, correct?

6   A.  That's correct, sir.

7   Q.  You found MP3 players, correct?

8   A.  That's my understanding, yes.

9   Q.  And there was no national defense information recovered

10  from the MP3 players, correct?

11  A.  I don't require -- I don't recall any classified

12  information being found on those, no.

13  Q.  You found thumb drives in my apartment, correct?

14  A.  Correct.

15  Q.  There was no national defense information recovered from

16  those, right?

17  A.  Not that I recall.

18          THE COURT:  Ladies and gentlemen, just a reminder, or

19  let me make clear that "national defense information" is a

20  legal term.  I'll give you instructions on what it means as

21  part of the closing instructions that I give you.  And

22  ultimately, it is your decision whether any of the information

23  at issue here is national defense information.  So in that

24  regard, you can obviously consider the witness's testimony, but

25  it's your decision, and your decision alone.

1           Go ahead, Mr. Schulte.

2   BY MR. SCHULTE:

3   Q.  And you found gaming consoles in my apartment, correct?

4   A.  That's correct.

5           MR. SCHULTE:  I want to show to the parties and the

6   Court, this is Government Exhibit 1638.  I believe it's in

7   evidence.  Is it OK to publish this to the jury?

8           MR. LOCKARD:  I believe it's not in evidence, but no

9   objection.

10          THE COURT:  All right.  Let's lay a foundation first

11  if it's not in evidence.

12  BY MR. SCHULTE:

13  Q.  Is this one of the gaming consoles that you recovered?

14  A.  It appears to be so.

15          MR. SCHULTE:  All right.  I move to introduce it into

16  evidence.

17          THE COURT:  Any objection?

18          MR. LOCKARD:  No, your Honor.

19          THE COURT:  Admitted.

20          (Government Exhibit 1638 received in evidence)

21          THE COURT:  Now you may publish.

22          MR. SCHULTE:  OK.  I'll take it back down.

23  Q.  1639, this is just another one, correct?

24  A.  It appears so, yes, sir.

25          MR. SCHULTE:  I move to introduce this as well.

M6gWsch1                    Evanchec - Cross

1           MR. LOCKARD:  No objection.

2           THE COURT:  Admitted.

3           (Government Exhibit 1638 received in evidence)

4           MR. SCHULTE:  Publish it to the jury?

5           THE COURT:  OK.

6    BY MR. SCHULTE:

7    Q.  And you found no classified information recovered from the

8    Xbox, correct?

9    A.  I didn't personally review those, but to my knowledge, no.

10   Q.  And you even reached out to Microsoft for assistance in

11   scrutinizing the Xbox searches, correct?

12   A.  That's correct.

13   Q.  You found Kindles and various tablets in my apartment,

14   correct?

15   A.  That's correct.

16   Q.  No classified information recovered from those devices,

17   correct?

18   A.  Not that I recall.

19   Q.  You found cell phones in my apartment, correct?

20   A.  Correct.

21   Q.  This is Government Exhibit 1633, and this is an example of

22   some of those, and some tablets, right?

23   A.  It appears so, yes, sir.

24   Q.  Just to make it streamlined a little bit, 1637 is the same,

25   right; a lot of cell phones?

M6gWsch1                         Evanchec - Cross

1    A.  Yes, sir.

2              MR. SCHULTE:  I move to introduce these two exhibits

3    and publish them to the jury.

4              MR. LOCKARD:  No objection.

5              THE COURT:  Admitted.

6              (Government Exhibits 1633 and 1637 received in

7    evidence)

8    BY MR. SCHULTE:

9    Q.  And there was no classified information recovered from any

10   of those devices, correct?

11   A.  Not that I recall.

12   Q.  Next, you found multiple desktop computers in the apartment

13   too, correct?

14   A.  That's correct.

15             MR. SCHULTE:  Take that down.

16   Q.  This is Government Exhibit 1631.  This is one of them,

17   correct?

18   A.  Correct.

19             THE COURT:  I believe this is in evidence.  Would you

20   like to publish?

21             MR. SCHULTE:  Yes, I would.  Thank you.

22             OK.  I'll take that down.

23   Q.  This is Government Exhibit 1634; this is just another one

24   of the desktop computers, correct?

25   A.  Yes, sir.

M6gWsch1                        Evanchec - Cross

1          MR. SCHULTE:  I move to introduce this.

2          MR. LOCKARD:  No objection.

3          THE COURT:  Admitted.

4          (Government Exhibit 1634 received in evidence)

5   BY MR. SCHULTE:

6   Q.  This is Government Exhibit 1635, and it's another large

7   desktop, correct?

8   A.  I believe that's the same device that we just reviewed, but

9   yes.

10  Q.  It has a different number, does it not?

11  A.  It does.  It appears to have the same sticker, so I just

12  can't really tell without looking at a serial number, but

13  that -- both are photos of devices that were seized that day.

14         MR. SCHULTE:  I move to introduce this as well.

15         MR. LOCKARD:  No objection.

16         THE COURT:  1635 is admitted.

17         (Government Exhibit 1635 received in evidence)

18  BY MR. SCHULTE:

19  Q.  And you recovered no national defense information from any

20  of the desktops, correct?

21  A.  That's correct.

22  Q.  You also testified on direct about an encrypted container,

23  correct?

24  A.  Correct.

25  Q.  You testified on direct that I refused to give the FBI the

M6gWsch1                         Evanchec - Cross

1   password to the encrypted container, correct?

2   A.  That's correct.

3   Q.  The FBI was ultimately able to defeat the encryption,

4   correct?

5   A.  That's my understanding.

6   Q.  And no national defense information was found there,

7   correct?

8   A.  Not that I recall.

9   Q.  You also found more than ten unused hard drives throughout

10  the apartment, correct?

11  A.  That's correct.

12  Q.  This is Government Exhibit 1636, and this is some of those

13  hard drives, correct?

14  A.  Yes, sir.

15          MR. SCHULTE:  I move to introduce this into evidence.

16          MR. LOCKARD:  No objection.

17          THE COURT:  Admitted.

18          (Government Exhibit 1636 received in evidence)

19  BY MR. SCHULTE:

20  Q.  So in addition to the hard drives, there's various other

21  electronics, loose electronics that were recovered, correct?

22  A.  That's correct.

23  Q.  There's motherboards there, correct?

24  A.  Correct.

25  Q.  Processors, correct?

M6gWsch1                        Evanchec - Cross

1    A.  Correct.

2    Q.  Multiple antistatic bags and other types of equipment used

3    in handling all sorts of electronic devices, correct?

4    A.  That's -- that's fair.

5    Q.  And there was no classified information recovered from any

6    of those drives, correct?

7    A.  To my knowledge, no.

8             MR. SCHULTE:  I believe this is already in evidence,

9    Government Exhibit 1632.

10            THE COURT:  It is.

11            MR. SCHULTE:  Can I publish it to the jury?

12            THE COURT:  You may.

13   BY MR. SCHULTE:

14   Q.  You found multiple servers in my apartment, correct?

15   A.  Correct.

16   Q.  These are two of the main servers here, correct?

17   A.  Correct.

18   Q.  And at the bottom is what's referred to as an UPS, correct?

19   A.  I'm not sure, sir.

20   Q.  Well, were you aware there was a backup battery in case of

21   power failure?

22   A.  I am not.

23   Q.  OK.  By the way, did you ever ask me anything about

24   building the computers?

25   A.  Not that I recall.  If you have something to refresh my

1   memory, I'm happy to review it.

2   Q.  Well, was there anything about the normal practice when I

3   got a new computer or device?

4   A.  Yeah.  I recall vaguely -- and again, please -- please

5   provide something if it helps clarify my memory -- that each

6   time you built a new computer, you would have, you know,

7   cleaned the previous one in order to create the new one.

8   Q.  OK.  And the FBI examined these servers, correct?

9   A.  That's correct.

10  Q.  And there was no national defense information recovered

11  from the servers, correct?

12  A.  I can't recall specifically.  I believe there was an issue

13  with some of the IRC text content, but I don't know

14  specifically if that was national defense information.

15  Q.  Do you know if there was ever classification reviews and

16  official documentation from the CIA that any of those were

17  classified?

18  A.  I -- I don't recall that specifically, sir.

19  Q.  OK.  So with respect to the electronics in general, all in

20  total, the FBI recovered some 20 terabytes or more, correct?

21  A.  That's correct.

22  Q.  And you desperately wanted to find something -- anything --

23  that pointed to me as the culprit, correct?

24  A.  No.

25  Q.  You did not want to find anything on those devices?

M6gWsch1                          Evanchec - Cross

1    A.  Our objective in FBI investigation is not to find guilt.

2    It's to uncover facts and produce evidence to a jury.

3    Q.  Right, but you wanted to uncover evidence when you reviewed

4    these documents of a crime.  Correct?

5    A.  That is the goal of a search warrant, yes, sir.

6    Q.  OK.  As we've already seen, after seizing and reviewing

7    every single bit of data across all my electronic devices, you

8    did not find any national defense information, correct?

9    A.  That's my understanding and memory, yes, sir.

10   Q.  No national defense information in those 20 terabytes of

11   data, correct?

12   A.  That's my understanding.

13   Q.  You certainly didn't find any CIA backups of in my

14   apartment, correct?

15   A.  No, sir.

16   Q.  You also obtained search warrants for GitHub and Reddit,

17   correct?

18   A.  That's correct.

19   Q.  And you found no national defense information there,

20   correct?

21   A.  That's correct.

22           MR. SCHULTE:  OK.  Next I want to discuss documents

23   recovered from the paper shredder in my apartment.  I believe

24   GX -- Government Exhibit 1621.  It's in evidence.  All right to

25   publish to the jury?

1              THE COURT:  Yes.

2       BY MR. SCHULTE:

3       Q.  All right.  These cover sheets are automatically generated

4       whenever anything is printed from the machines, correct?

5       A.  That's correct.

6       Q.  OK.  So with regard to whatever may follow this cover

7       sheet, that could totally be unclassified information, correct?

8       A.  Yes, that's correct.

9       Q.  And again, you yourself are not an expert in

10      classifications, correct?

11      A.  No, sir.

12      Q.  And all the emails that are referenced in this exhibit,

13      1621, and the other exhibits that were referenced as perhaps

14      being the same documents here, do you recall those exhibits and

15      that testimony?

16      A.  Are you referring to the OIG email?

17      Q.  No.  I'm specifically referring to the shredded documents

18      and any --

19      A.  OK.

20      Q.  -- for example --

21      A.  Understood.

22      Q.  Some of these emails were referenced as, you know, the

23      originals, were kind of compared.  Do you recall that?

24      A.  I do, yes.  Yes.  I apologize for my confusion.

25      Q.  OK.  And all those documents were unclassified, correct?

1   A.  They were -- they were labeled unclassified by the

2   originator.

3   Q.  The materials themselves, though, was actually unclassified

4   from the shredded documents, correct?

5   A.  I'm ultimately not sure what the original classification

6   authority review of those documents were, sir.

7   Q.  You're not sure; that's your testimony?

8   A.  Yeah.  I -- I just can't recall what -- I mean I see

9   redactions on these.  So, I know there was some level of

10  concern with them, but I don't know if any of these rose to the

11  level of classification.  I just don't know sitting here.

12  Q.  That's not what you previously have testified to, though,

13  correct?

14  A.  Can you ask a -- could you rephrase the question?  I'm

15  unclear what you're asking.

16  Q.  Yes.  There was a prior proceeding in this case, correct?

17  A.  Correct.

18  Q.  That proceeding was on February 25, 2020, correct?

19  A.  That sounds correct, yes.

20  Q.  And you testified under oath at that proceeding, right?

21  A.  I did, yes.

22  Q.  And just like you are under oath here today, right?

23  A.  Absolutely.

24  Q.  And when you testified here, it's not the same thing that

25  you testified at that proceeding, is it?

M6gWsch1                        Evanchec - Cross

1   A.  Sir, I don't recall two years after the specifics of this

2   email and its classification.  I just -- I don't recall that at

3   this time.

4   Q.  Well, I'm asking you about your testimony, sir.

5   A.  I would -- I would stand by the testimony I previously

6   made.

7   Q.  You would stand by your previous testimony?

8   A.  For sure.  It was closer to the time of this, so my memory

9   certainly would have been fresher back then.

10            MR. SCHULTE:  One second.

11            THE WITNESS:  No problem.

12            MR. SCHULTE:  So, what I'm showing to the witness is

13   your testimony under oath at that proceeding.

14   Q.  At that time, on pages 2308, lines 2 through 16, you were

15   asked these same questions here.  The question was, all the

16   emails that are referenced in this exhibit --

17            MR. LOCKARD:  Objection.

18   Q.  -- 1621, and the other exhibits that were referenced --

19            THE COURT:  Mr. Schulte, hold on.

20            Was there an objection?

21            MR. LOCKARD:  There is an objection, your Honor.

22            THE COURT:  Sustained.

23   BY MR. SCHULTE:

24   Q.  So this is the -- so you testified before at a prior

25   proceeding in this case, right?

M6gWsch1                          Evanchec - Cross

1   A.  That's correct.

2   Q.  And this is the proceeding from February 25, 2020, correct?

3   A.  That's correct.

4   Q.  You testified under oath at that proceeding, correct?

5   A.  Correct.

6   Q.  And from that proceeding, what I'm showing you here, on

7   page 2308, is your testimony, correct?

8   A.  It appears to be, yes.

9   Q.  OK.  Can you read over that, lines 2 through 16, and let me

10  know if it refreshes your recollection?

11  A.  Sure.  Question --

12          THE COURT:  No, no.  To yourself.  Read it to

13  yourself, please.

14          THE WITNESS:  Sorry.

15          THE COURT:  Thank you.

16          THE WITNESS:  Sorry about that.

17          If you might be so kind as to scroll so I can get to

18  16.

19          MR. SCHULTE:  Sorry.

20          THE WITNESS:  That's OK.

21          I'm done.

22  BY MR. SCHULTE:

23  Q.  Now that you've read through that, does that refresh your

24  memory?

25  A.  It does, yes.  Thank you.

M6gWsch1                          Evanchec - Cross

1    Q.  OK.  And you said that those documents were unclassified

2    from the shredder, correct?

3    A.  That was my testimony, correct.

4    Q.  OK.  So there's nothing about code in any of the documents

5    from the shredder, correct?

6    A.  That's correct.

7          MR. SCHULTE:  We'll go back to Government Exhibit

8    1621, and I'll ask to republish that to the jury?

9          THE COURT:  You may.

10   BY MR. SCHULTE:

11   Q.  OK.  And there were other documents found in the shredder

12   that had absolutely nothing to do with the CIA whatsoever,

13   correct?

14   A.  I believe that's correct, yes, sir.

15   Q.  Just for clarification, you stand by that testimony today,

16   that the documents here, all the -- the shredded documents, are

17   unclassified, correct?

18   A.  Again, I'm not an original classification authority, but my

19   previous testimony was, was my understanding then, which was

20   closer to the time than this, so I stand by that.

21   Q.  That's your understanding then, right?

22   A.  That's my understanding.

23   Q.  This is from the shredder, correct, from the documents that

24   were shredded, page 14?

25   A.  I don't recall this specific, but it certainly looks the

1    same that other documents would -- that would have been

2    recreated by our questioned documents unit.

3    Q.  This was in Government Exhibit 1621 of all the shredded

4    documents, correct?

5    A.  Yeah.  I just don't recall the specific document, sir.

6    Q.  OK.  But it appears to be a PayFlex, bills or pay -- some

7    kind of payment thing, right?

8    A.  It does, yes, sir.

9    Q.  And the same for this page too, correct?

10   A.  Correct.

11   Q.  And this -- you know, it's kind of a jumbled mess; you

12   can't really tell.  There's some references to 1099.  But it

13   appears to be tax-related, bills, something finance-related.

14   Correct?

15   A.  I believe so, yes, sir.

16           THE COURT:  Mr. Schulte, can you just make a record of

17   what page you were showing.

18           MR. SCHULTE:  This is page 16 on the Government

19   Exhibit 1621.

20   Q.  And the following pages appear to be the same, correct?

21   Pages 17 -- correct?

22   A.  Correct.

23   Q.  Page 18 looks similar, correct?

24   A.  Yes, sir.

25   Q.  19, 20.

M6gWsch1                        Evanchec - Cross

1    A.  I don't see a page number, but as you scroll, they do look

2    consistent.

3    Q.  OK.  And page 22 looks like a list of movies, correct?

4    A.  It does.

5    Q.  Goonies, Gremlins?

6    A.  Yes, sir.

7    Q.  Robin Hood with Kevin Costner, correct?

8    A.  Yes, sir.

9    Q.  Page 25, more something to do with PayFlex -- charge,

10   debit, MasterCard, correct?

11   A.  Correct.

12   Q.  Same for 26, correct?

13   A.  Correct.

14   Q.  27?

15   A.  Correct.

16   Q.  28?

17   A.  Yes.

18   Q.  OK.  So there's multiple shredded documents here that have

19   clearly nothing to do with the CIA at all, correct?

20   A.  That's fair.  Correct.

21   Q.  All right.  You also testified there were documents found

22   in the headboard of my bed, correct?

23   A.  Correct.

24          MR. SCHULTE:  I believe this has been admitted by the

25   government, 1642.  I would just ask to publish it to the jury.

1          THE COURT:  You may.

2     BY MR. SCHULTE:

3     Q.  This is that headboard, correct?

4     A.  Yes, sir.

5     Q.  And it may be hard to see from the picture, but right below

6     the mirrors are some essentially fake sliding panels, correct?

7     A.  That appears to be the case.

8     Q.  OK.  The one to the right is in place concealing space,

9     right?

10    A.  Yes, sir.

11    Q.  The one to the left is basically moved over, correct?

12    A.  It appears that way, yes.

13    Q.  And sir, this is where I store all of my unclassified CIA

14    documents, correct?

15    A.  I don't believe that they were unclassified.

16    Q.  OK.  This is where -- we'll get to that later, but all the

17    documents that I had from the CIA were here; it wasn't just --

18    correct?

19    A.  That's my understanding, yes, sir.

20    Q.  Is I had pay stubs from the CIA there too, correct?

21    A.  I don't -- I don't recall specifically those pay stubs,

22    where they were located.

23    Q.  OK.  But the majority of the CIA documents were here,

24    correct?

25    A.  Yes, sir.  That's my understanding.  Absolutely.

M6gWsch1                          Evanchec - Cross

1              MR. SCHULTE:  All right.  This is Government Exhibit

2     1617.  It's also been admitted.  I ask to show it to the jury.

3              THE COURT:  You may.

4     BY MR. SCHULTE:

5     Q.  Looking at Government Exhibit 1617 here, do you recall your

6     testimony about this document?

7     A.  I recall being asked questions about it, yes.

8     Q.  OK.  And this is another document that was found in the

9     headboard, correct?

10    A.  That's correct.  Yes, sir.

11    Q.  Let's start on page 10 here.  OK?

12    A.  Yes, sir.

13    Q.  This is an email from Shirley, correct?

14    A.  Yes, sir.

15    Q.  An email containing Shirley's full name as well as Debra

16    and Brad's full name, correct?

17    A.  It appears that way, yes.

18    Q.  And Shirley labels it unclassified, correct?

19    A.  She does.

20    Q.  OK.  And the subject on this email?

21    A.  "Sean is out of the office today with his kids," then

22    "(N/T)."

23    Q.  I want to move up to pages 1 through 3 here.  And this

24    appears to be -- zoom out.

25         This appears to be an email chain.  Let me just -- you have

1   all the, you know, what appears to be markings of multiple

2   chains in the email that has the same subject line, correct?

3   A.  Correct.

4   Q.  And just to be clear, I'm a party of this email chain,

5   correct?

6   A.  Yes, sir, you are.

7   Q.  And it appears to go in reverse chronological order,

8   correct?

9   A.  Correct.

10  Q.  I want to start on this page and kind of go through it.

11  There's an email listed there, dated October 30, 2015, correct?

12  A.  Yes, sir.

13          THE COURT:  Again, Mr. Schulte, please make a record

14  of what page you're referring to when you show a page.

15          MR. SCHULTE:  OK.  This is page 3 of Government

16  Exhibit 1617.

17  Q.  And the subject line of this email?

18  A.  "Behavior in the workplace."

19  Q.  And it's labeled unclassified, correct?

20  A.  It is.

21  Q.  OK.  Turning to page 2 of the government exhibit, this is a

22  response; it's an email from Burt to me.  Correct?

23  A.  That's correct.

24  Q.  And again, the subject line's the same, "behavior in the

25  workplace," correct?

M6gWsch1                          Evanchec - Cross

1    A.  It is, yes, sir.

2    Q.  And when Burt sent the email, he is given the ability to

3    classify, apply his own classification, correct?

4    A.  That's correct.

5    Q.  And here, he changed the classification of the email,

6    correct?

7    A.  He did.

8    Q.  He did not, right?

9    A.  He changed the handling caveat.

10   Q.  He changed the dissemination, correct?

11   A.  Correct.

12   Q.  So the email, he labeled it unclassified, right?

13   A.  Unclassified, AIUO.

14   Q.  The classification is the first word before the double

15   slashes, correct?

16   A.  The classification unclassified, correct.

17   Q.  OK.  And he applied a dissemination control to that

18   classification, correct?

19   A.  Absolutely.  That's correct.

20   Q.  And that dissemination he added was AIUO, correct?

21   A.  That's correct.

22   Q.  Just to refresh everyone's recollection, do you know what

23   that stands for?

24   A.  I believe it's agency internal use only, if my memory

25   serves me correctly.

M6gWsch1                          Evanchec - Cross

1    Q.  OK.  But the email itself is unclassified, correct?

2    A.  That's correct.

3    Q.  Just moving up a little bit, in between pages 1 and 2 here

4    is an email from William, correct?

5    A.  Yes, sir, correct, on page 2 to 3, yes.

6    Q.  And he sends this email to Burt and several groups,

7    correct?

8    A.  Correct.

9    Q.  William applied his classification to this email too,

10   correct?

11   A.  He did.

12   Q.  And this is -- he applied the unclassified classification

13   and dissemination AIUO, correct?

14   A.  He did.

15   Q.  And that was what was there before, correct?

16   A.  That is correct.

17   Q.  And this gentleman is an investigator with the federal

18   police or a federal police officer, correct?

19   A.  He is, yes, sir.

20   Q.  In the threat management unit, correct?

21   A.  That's correct.

22   Q.  And that's in the office of security at the CIA, correct?

23   A.  That's my understanding, yes.

24   Q.  OK.  And all the way to the top of the chain, all the

25   individuals who work in security all applied the same

M6gWsch1                          Evanchec - Cross

1   classification as unclassified, correct?

2   A.   That's correct.  Yes, sir.

3        Excuse me.

4   Q.   OK.  So this email is unclassified, right?

5   A.   To the best of my understanding.  Not having been a

6   classification authority, I believe so.

7   Q.   OK.  And in fact, all the documents in this exhibit are

8   unclassified, right?

9   A.   Again, I'm not an original classification authority, so I

10  can't -- I can't -- I don't have the power to declare that.  I

11  know that they're marked unclassified by people that should

12  know, so -- but I can't -- I don't have that expertise.

13  Q.   But sir, you testified on direct that this was classified,

14  did you not?

15  A.   I believe that the combination of people's full names,

16  which I can't see here, is problematic.  Again, not being a

17  classification authority, I just don't have that expertise,

18  sir.

19  Q.   OK.  So you -- what you're saying is you see the redactions

20  in the names and you think there could be an issue there,

21  right?

22  A.   That's my understanding.  Depending on the role that an

23  actual employee has in the CIA, I believe that their --

24  identification of their full name is definitely problematic.

25  But again, without being an original classification authority,

M6gWsch1                          Evanchec - Cross

1    I just don't have that expertise.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCHULTE:

2    Q.  OK.  So your testimony is you don't have the expertise, you

3    can't say whether or not this document is classified or not;

4    correct?

5    A.  Yeah, I certainly can't.  I would have to refer to someone

6    who is an expert in that.

7    Q.  OK, but you would agree that the individuals from security

8    who are no more than you in this subject matter have determined

9    that the e-mails is classified, correct?

10   A.  I would certainly expect them to know more than me;

11   absolutely, sir.

12   Q.  OK.  So on that same token -- we can take this down -- I

13   wanted to discuss your testimony regarding that, the full names

14   of CIA employees.

15   A.  Sure.

16   Q.  So, in fact, only the full names of covert CIA officers are

17   classified; isn't that correct?

18   A.  I just don't have that expertise but I know that that is

19   the more problematic version.  I don't have that expertise,

20   sir.

21   Q.  Just looking through if CIA's -- people who worked in the

22   CIA, if their full names were sensitive or anything like that,

23   basically no one -- no e-mail in the CIA could ever be labeled

24   unclassified, right, because it has their full name in the

25   e-mail like we just saw; right?

M6G5sch2                        Evanchec - Cross

1   A.  Again, I'm not sure of the individual policies and
2   restrictions regarding covert and overt employees.  I just
3   don't have that expertise, sir.  I apologize.
4   Q.  You are not expert on the CIA classification; is that
5   right?
6   A.  That's correct.
7   Q.  You are not expert in classification at all, right?
8   A.  I am not.  That would be the original classification
9   authority that would be.
10          MR. SCHULTE:  I want to bring up Government Exhibit
11  1616 and I believe it is in evidence so I ask to be able to
12  publish it to the jury.
13          THE COURT:  You may.
14  Q.  Do you remember testifying about this e-mail on direct
15  yesterday?
16  A.  I do.
17  Q.  And this is what has been referred to as the OIG e-mail;
18  correct?
19  A.  That's correct; yes, sir.
20  Q.  And this is an e-mail from me to OIG, correct?
21  A.  It is.  Yes, sir.
22  Q.  That's the Office of the Inspector General; correct?
23  A.  That's correct.
24  Q.  Can you explain to the jury what OIG is?
25  A.  It is generally an investigative agency that is found in

1   most federal departments that is really a watchdog.  They

2   investigate allegations of misconduct, fraud.  Things like

3   that, so it is an investigative entity within the CIA.

4   Q.  This e-mail was sent on November 10th, 2016; right?

5   A.  That's correct.

6   Q.  It was titled Report to House Intelligence Committee;

7   correct?

8   A.  That's correct.

9   Q.  This e-mail was sent to another government agency, right?

10  A.  It was, yes.

11  Q.  I didn't send it to my mother, right?

12  A.  That's correct.

13  Q.  During your investigation, you never received an indication

14  from OIG that it told me, upon receipt, that the contents of

15  the e-mail were classified; correct?

16  A.  I'm sorry, sir.  Can you just repeat that again?

17  Q.  Yes.

18      During your investigation, right, you never received any

19  indication from OIG that OIG itself had ever reached out to me

20  or notified me that it believed the contents of the e-mail were

21  classified; right?

22  A.  I don't recall having any contact with OIG specifically

23  about this.  I just don't know.  I don't recall there being

24  incident of that.

25  Q.  During your investigation you never received or you don't

1    remember receiving any indication that OIG even responded to my

2    e-mail, correct?

3    A.   I don't recall that.

4    Q.   During your investigation you never received any indication

5    that the CIA requested the OIG e-mail back from me; correct?

6    A.   I don't recall.

7    Q.   Well, the CIA knew that I printed this e-mail and took it

8    out of the CIA; correct?

9    A.   That's correct.

10   Q.   They have the logs of documents that you print, correct?

11   A.   Correct.

12   Q.   So the CIA knew that I had taken is this e-mail, correct?

13   A.   Correct.

14   Q.   And the CIA keeps contact information for former employees,

15   correct?

16   A.   I would assume so.  Absolutely.

17   Q.   So they had my contact information, correct?

18   A.   That's reasonable.

19   Q.   And, to your knowledge, they never -- the CIA never reached

20   out to me at all with concerns that this e-mail was classified;

21   correct?

22   A.   I'm unaware.

23   Q.   OK.  I wanted to ask you a few questions about a document

24   you prepared before your testimony here today.  You created

25   to-do lists before your testimony today, right?

```
 1   A.  That's correct.

 2   Q.  Notes that you needed to refine why I was a suspect,

 3   correct?

 4   A.  Correct.

 5   Q.  And that you needed to re-tweak certain information,

 6   correct?

 7   A.  I'm sorry.  What was the first word that you said?

 8   Q.  I'm sorry.

 9       You needed to re-tweak certain information; correct?

10   A.  That's correct.

11   Q.  And that was perceived or alleged gripes with Amol,

12   correct?

13   A.  I don't recall specifically but that was something you

14   refreshed my memory on, correct.

15   Q.  Is it your practice to make lists like this?

16   A.  I do.  I keep to-do lists pretty much every day in

17   everything that I do.

18   Q.  You made to-do lists all through the investigation of this

19   case, correct?

20   A.  Correct.  Yes.

21   Q.  Sometimes you put the to-do lists in e-mails and sent it to

22   other investigative teams, correct?

23   A.  Correct.

24   Q.  And this document, you deemed it to be unclassified;

25   correct?
```

M6G5sch2                        Evanchec - Cross

1   A.  Correct.

2   Q.  But, in fact, it actually contained classified information,

3   did it not?

4   A.  I don't believe so.

5   Q.  You don't believe so.

6       In fact, it contained the true names of several covert CIA

7   officers; correct?

8   A.  I believe it contained the -- not their full names, no.

9   Q.  It contained the last name of officers who are testifying

10  under pseudonyms here?

11  A.  I'm not sure who is testifying under pseudonyms here.

12  Q.  Well, it does contain the last names of covert officers

13  from the CIA, correct?

14  A.  I believe it contained one -- last name of one person only,

15  not the full name.

16  Q.  But that is identifying classified information, is it not?

17  A.  Based on my prior testimony of the e-mails that we reviewed

18  that would be inconsistent.

19  Q.  Well, no, because he is a covert officer; his status is

20  classified at the confidential level?

21  A.  I did not include his full name.

22  Q.  His last name is classified at the confidential level, sir,

23  is it not?

24  A.  Again, I'm not a classification authority, as I previously

25  stated, so I would not be able to make that determination.

M6G5sch2                          Evanchec - Cross

1   Q.  Did you know, sir, that the government declared those

2   information classified and redacted it?

3   A.  I'm not aware what the government did with my notes.

4   Q.  Are you aware that it is a violation of mishandling

5   classified information?

6   A.  I'm not aware of that.

7   Q.  Did you purposefully disclose classified information in

8   those notes, sir?

9   A.  Not purposefully.  I made efforts not to disclose the full

10  name of any CIA officer in those notes.

11  Q.  So it was an innocent mistake, correct?

12          MR. LOCKARD:  Objection.

13          THE COURT:  Sustained.

14  Q.  Well, you testified you didn't do it on purpose, right?

15          MR. LOCKARD:  Objection.

16          THE COURT:  Sustained.

17  Q.  Did the government charge you with a crime for this

18  document?

19          MR. LOCKARD:  Objection.

20          THE COURT:  Sustained.

21          Mr. Lockard, please keep your voice up and speak into

22  the microphone.

23          MR. LOCKARD:  Yes, your Honor.

24  BY MR. SCHULTE:

25  Q.  All right.  I want to ask you about your testimony related

1    to Google searches.

2    A.  Yes, sir.

3    Q.  We can take this down.

4        You testified yesterday that in a 10-year period there were

5    only three searches and nine-page visits for WikiLeaks,

6    correct?

7    A.  Without seeing the exhibit that does sound correct, sir;

8    yes.

9    Q.  And you testified yesterday that between August 2016 and

10   January 2017 there were 39 searches and 115 page visits,

11   correct?

12   A.  Those numbers sound correct.  I don't have those exhibits

13   in front of me but that sounds correct.

14   Q.  And during this time period is when WikiLeaks released the

15   DNC e-mails, correct?

16   A.  What time period specifically are you talking about, sir?

17   Q.  August 2016 until January 2017?

18   A.  That would have been correct, yes.

19   Q.  And this was front page news, right?

20   A.  Absolutely.

21   Q.  This was all over the Internet, correct?

22   A.  Absolutely.

23   Q.  And there was even a fiasco with your FBI director Comey,

24   correct?

25              MR. LOCKARD:  Objection.

1          THE COURT:  Sustained.

2     Q.  Director Comey weighed in about an investigation into

3     Hilary Clinton before the presidential election, correct?

4          MR. LOCKARD:  Objection.

5          THE COURT:  Overruled.

6     A.  The question again, sir?

7          MR. SCHULTE:  Can you read back the question, please?

8          THE COURT:  (reading) director Comey weighed in about

9     an investigation into Hilary Clinton before the presidential

10    election, correct?

11         THE WITNESS:  That's correct.

12    BY MR. SCHULTE:

13    Q.  And of course there was the election in 2016 during that

14    time as well, correct?

15    A.  Yes, sir.  That's correct.

16    Q.  There was Guccifer 2.0, correct?

17    A.  I recall that.  I don't know the dates of that, yes.

18    Q.  OK?

19         THE COURT:  Do you know what Guccifer 2.0 is?

20         THE WITNESS:  I don't recall sitting here today, sir.

21    Q.  There were the shadow brokers who claimed to have NSA code,

22    too, correct?

23    A.  I'm aware of that, again not sitting here, today, aware of

24    the timing of that release, that information, or that news.

25    Q.  And, in fact, during this time WikiLeaks also claimed to

1  have NSA code, correct?

2  A.  I don't recall that in this time period.  I can't say yes

3  or no.  I just don't recall.

4  Q.  Well, in your exhibit you showed to the jury you said the

5  search for WikiLeaks code was suspicious because WikiLeaks

6  didn't have any code; isn't that right?

7  A.  I don't recall suggesting that WikiLeaks didn't have any

8  code, no.

9  Q.  I would like to bring up Government Exhibit 1305-1.  I'm

10  not sure if this has already been admitted into evidence, it is

11  the Google searches.

12          THE COURT:  It is in evidence.

13          MR. SCHULTE:  OK.

14          THE COURT:  Do you want to publish it?

15          MR. SCHULTE:  Yes, I would like to publish it to the

16  jury.

17          THE COURT:  You may.

18  BY MR. SCHULTE:

19  Q.  Can you see this Google visit from a Google search result?

20  A.  From August of '17, sir?

21  Q.  That's correct?

22  A.  I do; yes, sir.

23  Q.  And can you tell what the headline of that article is, sir?

24  A.  It appears to say:  WikiLeaks, too, claims to have NSA

25  code.

M6G5sch2                          Evanchec - Cross

1    Q.  OK, I will take that down now.  Oh, I will publish it to

2    the jury.  Sorry.

3        That article was from TheHill.com, correct?

4    A.  That's correct.  Yes, sir.

5    Q.  Additionally, sir, did you realize that you made the grave

6    mistake in calculating the Google searches during this time

7    period?

8    A.  I don't.

9    Q.  You don't recall that.

10   A.  No.

11   Q.  As an FBI agent you have tons of resources available to

12   you, correct?

13   A.  Correct.

14   Q.  You are, in essence, an investigator; correct?

15   A.  I am.

16   Q.  You look at evidence and make connections; correct?

17   A.  Correct.

18   Q.  Did you not realize, sir, that 80 percent of the searches

19   you claim that I conducted for WikiLeaks were not actually

20   searches at all?

21   A.  I don't know that, sir, again.

22   Q.  Sir, are you familiar with the service Google offers called

23   Google News?

24   A.  I am not.  I don't use Google regularly or gmail regularly

25   so I don't know what that is.

1   Q.  I'm going to show to the witness what is marked as

2   Defendant's Exhibit 302-7.  Does this refresh your recollection

3   or have you ever seen anything, Google news, something like

4   this before?

5          MR. LOCKARD:  Objection.

6          THE COURT:  Sustained.

7          Please don't refer to something that is not in

8   evidence.

9   Q.  Do you recognize this, sir?

10  A.  I have no idea what this is, sir.

11  Q.  You have never used Google News before; is that correct?

12  A.  I don't know where this came from.  I, frankly, don't know

13  what it represents.  I don't.

14         THE COURT:  But the question was have you ever used

15  Google News before.

16         THE WITNESS:  I have used Google to search things.  I

17  don't -- Google News is not somewhere that I routinely go to

18  gather my own news for my own edification.

19  Q.  Did you know that Google makes a special log in its search

20  history when you are using Google News?

21  A.  I don't.  I am not aware of that.

22         MR. SCHULTE:  Now showing to the witness what has been

23  marked as Defendant's Exhibit 302-8, these are selective

24  searches from Government Exhibit 1305-1 that's in evidence.  I

25  move to introduce this into evidence.

1            THE COURT:  Mr. Lockard?

2            MR. LOCKARD:  Objection.  It is not clear we have a

3    copy of this.

4            THE COURT:  Well, until we are able to verify that the

5    content is the same, the government should have had a copy of

6    it.  Mr. Schulte, I will reserve judgment, but you can proceed

7    with the government exhibit that's in evidence.

8            MR. SCHULTE:  OK.  So we will just pull these up in

9    the government exhibit.  So this is Government Exhibit 1305-1

10   and I ask to republish this to the jury.

11           THE COURT:  You may.

12   BY MR. SCHULTE:

13   Q.  So I just want to direct your attention here, this is an

14   Excel spreadsheet so I don't know if it marks a page number or

15   anything, but can you read this timestamp here?

16           THE COURT:  Why don't you say what row it is in the

17   spreadsheet.

18   Q.  OK.  Entry no. 12954.

19   A.  Your question, sir?

20   Q.  Can you read just the date that this search is conducted?

21   A.  Appears to be August 17 of 2016 at 2:45:07 UTC.

22   Q.  Can you read what the search is?

23   A.  Searched for pgoapi.exceptions.notloggedinexception.  Then

24   there is:

25   (https://www.Google.com/?Q=pgoapi.exceptions.notloggedinexceptio

M6G5sch2                          Evanchec - Cross

1    n).

2    Q.  OK.  And then the search after it, Google has it, produces

3    it in the opposite direction so the one after that.  Can you

4    read that?

5    A.  You are referring to line 12953?

6    Q.  Yes.  I'm sorry.  Thank you.

7    A.  Tease OK.

8         Again August 17, 2016, 2:35:27

9    https://www.google.com/search?Q=WikiLeaks&TBM=NWS).

10   Q.  OK.  Do you see any or do you notice any major difference

11   in the search query between these two, the search query:

12   Search?Q is the search query equals?

13             MR. LOCKARD:  Objection.

14             THE COURT:  Sustained.  Sustained.

15   Q.  Do you notice any difference between these two lines

16   specifically in the parentheses?

17             MR. LOCKARD:  Objection.

18             THE COURT:  Speaks for itself.

19             Go ahead.  Next question, please.

20   Q.  Well, you see the difference, correct?

21   A.  I do.

22   Q.  And you read the &TBA=NWS, correct?

23             MR. LOCKARD:  Objection.

24             THE COURT:  Again, the exhibit speaks for itself.

25   Let's move on.

M6G5sch2                        Evanchec - Cross

1    Q.  So this entry -- I'm having problems moving the -- can you

2    see the entry that I have selected here?

3    A.  Line 100568?

4    Q.  Yes.  That's correct?

5    A.  I do see it.

6    Q.  This is the first search that you noted in your exhibit,

7    correct?  From 2010?

8    A.  I can't recall without the exhibit in front of me.

9    Q.  All right, but according to Excel it is the very first

10   search for WikiLeaks, correct?

11   A.  According to the search that you just did, yes.

12   Q.  And can you read what's in the parentheses of that?

13   A.  In the parentheses of this it is

14   https://www.google.com/search?Q=WikiLeaks).

15   Q.  And do you see the difference between this and the other

16   search for WikiLeaks that you read?

17   A.  With one of the other searches, yes.

18   Q.  And the difference is the other one was a Google News

19   search, correct, and this is just a web search, right?

20            MR. LOCKARD:  Objection.

21            THE COURT:  Sustained.  Speaks for itself.

22   Q.  OK, so you didn't, when you compiled your exhibits, your

23   documents that you presented and showed to this jury, you

24   didn't consult with Google before you did that, did you?

25   A.  I did not.

1  Q.  OK.  Did you consult with anyone who knows or understands

2  the way Google puts together their search history?

3  A.  Not upon that list, no.

4  Q.  So you basically, just as a novice, opened up this document

5  and just based on no experience, you just picked out lines;

6  correct?

7  A.  No.

8  Q.  No.  You did more?

9  A.  Yes.  I queried for every time this history set searched

10  for and then included the search terms.  That's what I

11  culminated in my summary.

12  Q.  OK, but you didn't run that by any of the technical experts

13  at the FBI, did you?

14  A.  Not that I recall.

15  Q.  And you said you didn't reach out to Google or anyone with

16  expertise, correct?

17  A.  No, sir.

18  Q.  All right.  I'm going to talk a little bit about the search

19  exhibits you provided about data wiping.  Let me take this off

20  for the jury.

21          MR. SCHULTE:  OK, this is Government Exhibit 1350

22  that's in evidence.  I ask to publish it to the jury.

23          THE COURT:  You may.

24  Q.  So this is what you put together about the data wiping

25  related searches and websites; correct?

1    A.  That's correct.

2    Q.  And you list late April to early May 2016 as the main -- at

3    the top, correct?

4    A.  That's correct.

5    Q.  But this is a little misleading because it is just one day

6    or two days that these searches are conducted, correct?

7    A.  I believe the examples are from one day but I don't recall

8    specifically the number of days that those individual eight

9    searches were conducted.

10   Q.  OK.  We can pull up -- go back to Government Exhibit

11   1305-1.  So this is May 4, 2016, in column 19516; correct?

12   A.  That's correct.

13   Q.  And this is the search for DBAN; correct?

14   A.  Yes.

15   Q.  Or related to DBAN on SSD; correct?

16   A.  That's correct, sir.

17   Q.  And do you note that there is only one of those; right?

18   A.  That's what the table suggests, yes.

19   Q.  And that's UTC May 4, 2016; correct?

20   A.  Correct.

21   Q.  And this is the May 1, 2016 UTC time on entry 19714;

22   correct?

23   A.  Correct.

24   Q.  And just to be clear, this is -- your page lists it as

25   April 30th, 2016, and that's just the time zone difference,

1    correct?  These correspond to the same -- the same time;

2    correct?

3    A.  That's a possibility.  I would have to research it more but

4    that is certainly a possibility.

5    Q.  We can look up this exact Western Digital disk wipe

6    utility?

7              THE COURT:  Forgive me if I missed this, but UTC is

8    Coordinated Universal Time; is that correct?

9              THE WITNESS:  That's correct, sir.

10             THE COURT:  Can you just explain what that is or what

11   it means?

12             THE WITNESS:  I think it is -- I'm not an expert in

13   this by any means, your Honor, but it is a standardized format

14   of time conversion that is universally accepted by the

15   military, by various countries, and it's -- I don't know how

16   many hours it is different from Eastern Time Zone, I can't

17   recall right now, but it is a standardized way of measuring the

18   time of day.

19             THE COURT:  All right.  I believe that the difference

20   is four hours from Eastern Time Zone.  If so, I'm happy to take

21   judicial notice of that.

22             Counsel, is that correct?

23             MR. SCHULTE:  It depends on Daylight Savings Time,

24   sir.

25             THE COURT:  At least at present I believe that is four

M6G5sch2                        Evanchec - Cross

1    hours so I will take judicial notice of that and leave it
2    there.
3              MR. LOCKARD:  No objection.
4              THE COURT:  Go ahead.
5    BY MR. SCHULTE:
6    Q.  But here is the main, you can see all the searches
7    conducted here starting May 1, 2016, 2:51:54 UTC and entry
8    19720; correct?
9    A.  Correct.
10   Q.  Western Digital disk wipe utility, right?
11   A.  Correct.
12   Q.  A Western Digital website with knowledge base answers;
13   right?
14   A.  In line 19719, yes.
15   Q.  And in 19718 is the page visit that you noted:  Kill your
16   data dead with these tips.  Right?
17   A.  Correct.
18   Q.  And then nine seconds later is a backspace back to that
19   digital disk wipe utility search; correct?
20   A.  In line 19717, it appears so.
21   Q.  And then the source searches changed a little bit for the
22   Western utility software which you note right here in the
23   second column on government 1350, correct?
24   A.  Correct.
25   Q.  And that's entry 19716 in the 1305-1, correct?

M6G5sch2                          Evanchec - Cross

1    A.   It appears so; correct.

2    Q.   And there is a visit to another Western Digital page;

3    right?

4    A.   In line 19715 it appears so.

5    Q.   And then in the next line 19714 search the Samsung SSD

6    wipe, right?

7    A.   That's correct.

8    Q.   Visit to Samsung site, right?

9    A.   In line 19713 it appears so.

10   Q.   That takes care of all of the searches that you have laid

11   out here in your GX- 1350, right?

12   A.   I believe so.

13   Q.   So it is just those two days, the May 1st and May 4th;

14   right?

15   A.   I believe that the time frame would have been accurately

16   depicted from late April, early May of 2016; yes.

17   Q.   Do you know what an SSD is?

18   A.   I don't.  That would have been something our computer

19   scientists would have informed us about.

20   Q.   You don't know anything about SSD; is that correct?

21   A.   No.  Not sitting here today.

22   Q.   OK.  So you don't know that SSDs require a different form

23   of clearing the data than normal hard drives?

24   A.   No, not sitting here today, sir.

25   Q.   Sir, how are you conducting search analysis when you do not

1    even understand the technology that is being searched?

2    A.   This would have been a project that certainly would have

3    run by our team in order to make sure that we were capturing

4    the relevant searches.

5    Q.   Do you recall doing that?

6    A.   I don't recall specifically but given that I --

7    Q.   The question was just do you recall.  Yes or no.

8    A.   I don't recall either way.

9    Q.   OK.  I want to talk to you a little bit very briefly about

10   the videotaped CIA interviews you testified about them

11   yesterday; correct?

12   A.   Correct.

13   Q.   There was one on April 8, 2016; correct?

14   A.   That's my understanding; correct.

15   Q.   There was another one on July 19, 2016; correct?

16   A.   Correct.

17   Q.   The government played a few minutes from those interviews

18   during your direct testimony yesterday, right?

19   A.   That's correct.

20   Q.   Isn't it true that the April interview lasted three hours

21   and 18 minutes?

22   A.   I don't recall the specific length of that interview.

23   Q.   But it was a very lengthy interview, correct?

24   A.   My understanding it was more than an hour.  I don't know

25   specifically how long it was.

1    Q.  I mean, you watched the whole interview, right?

2    A.  I watched portions of it throughout the investigation, yes.

3    I don't recall ever watching -- I don't believe I watched it in

4    its entirety, no.

5    Q.  How did you watch portions without watching the entirety of

6    it?  I mean, did you randomly pick times?

7    A.  Yes.  There were portions that were definitely highlighted

8    to me over the course of the investigation that I paid

9    attention to.

10   Q.  OK.  So other people reviewed the entire video and then

11   gave you the highlights?

12   A.  Yes.  I believe that's fair over the course of the last

13   five years, yes.

14   Q.  And then the interview from July 19, 2016, that one was

15   four hours.  Do you recall that?

16   A.  I don't recall the specific length of that.

17   Q.  Do you recall that it was even longer than the first one?

18   A.  It's a possibility.  I just don't recall the actual time

19   length of that one, sir.

20   Q.  OK, but the portions shown yesterday were just very few

21   minutes of the entire --

22   A.  Certainly, yes.

23   Q.  Next I just want to touch briefly on the diplomatic

24   passport and Cancun trip you testified about yesterday.  All

25   right?

 1    A.  Yes, sir.

 2    Q.  You testified about my planned travel to Cancun, correct?

 3    A.  Correct.

 4    Q.  You testified yesterday this was only the second time I had

 5    traveled internationally, correct?

 6    A.  That was my understanding; yes.

 7    Q.  But in fact I had just recently traveled to Cozumel, Mexico

 8    two years before that, correct?

 9    A.  I don't recall the exact history, sitting here today, of

10    your travel.

11    Q.  But you do recall it was to Cozumel, Mexico; right?

12    A.  I recall there being at least one other time you traveled

13    outside the United States.  I don't remember when that actually

14    was, sir.

15    Q.  And you later learned that I was planning to visit Cancun

16    March 16, 2017 with my brother Jason, correct?

17    A.  That's correct.

18    Q.  You later learned that my brother had recently broken up

19    with his girlfriend and wanted to go on a fun trip over spring

20    break?

21              MR. LOCKARD:  Objection.

22              THE COURT:  Hold on.

23              Mr. Lockard, again microphone.  I can't hear you if

24    you don't do that.

25              Sustained.

M6G5sch2                        Evanchec - Cross

1    BY MR. SCHULTE:

2    Q.  But it was a trip my brother had suggested and planned,

3    correct?  You learned that through your investigation?

4    A.  I was aware that you were traveling with your brother.

5    Q.  You didn't interview my brother and conduct an

6    investigation into how that was planned?

7    A.  I don't recall that specifically, sir.

8    Q.  There was a return trip scheduled, correct?

9    A.  There was.  It was a round trip ticket.

10   Q.  Round trip, right?

11   A.  Correct.

12   Q.  If someone were guilty of the WikiLeaks offenses and

13   planned to leave the country, they would have done that well in

14   advance of the published leaks; correct?

15           MR. LOCKARD:  Objection.

16           THE COURT:  Sustained.

17   Q.  With respect to the diplomatic passport, I obtained it

18   after starting at the agency, correct?

19   A.  That's my understanding.  Yes, sir.

20   Q.  But I had never even used it, correct?

21   A.  That's my understanding.

22   Q.  And, in fact, a diplomatic passport doesn't necessarily

23   grant you diplomatic immunity, correct?

24   A.  One of the benefits of that certainly affords that.  I'm

25   not sure the exact country-by-country differences.

M6G5sch2                      Evanchec - Cross

```
1    Q.  I mean, a country has to have you on the list of diplomats,
2    correct?  Approved diplomats, right?
3    A.  I'm not sure of the actual rules.
4    Q.  OK.  But you do know I had never used it before, right?
5    A.  Correct.
6    Q.  When I left the CIA, the CIA forgot to ever request its
7    return, correct?
8                MR. LOCKARD:  Objection.
9                THE COURT:  Sustained.
10   Q.  To your knowledge, did the CIA ever ask for the passport's
11   return?
12   A.  I don't recall that.
13   Q.  But you later learned, through the course of your
14   investigation, that I had conducted searches for how to return
15   that passport; correct?
16   A.  I don't recall that specifically.
17   Q.  In fact, I had actually just reached out to the agency a
18   few days before your warrant; isn't that correct?
19   A.  I don't recall that sitting here today.
20   Q.  I'm going to return very briefly to a discussion about
21   Stash from yesterday.  Do you recall that?
22   A.  I do.
23   Q.  During your investigation you interviewed a CIA employee
24   named Dave C.?
25   A.  Correct.
```

M6G5sch2                        Evanchec - Cross

1    Q.  He worked in the infrastructure branch, correct?

2    A.  That's correct.

3    Q.  During your interview you learned that Dave C. downloaded

4    Stash onto a hard drive, correct?

5           MR. LOCKARD:  Objection.

6           THE COURT:  Sustained.

7    Q.  Through the course of your investigation you learned that

8    Dave C. downloaded Stash onto a hard drive, correct?

9           MR. LOCKARD:  Objection.

10          THE COURT:  Sustained.

11   Q.  Do you recall through your investigation that there was a

12   copy of Stash that was lost and never recovered?

13   A.  I understand that there was a copy of Stash that had been

14   made, and when I left the investigation my memory is that as of

15   that time it had not been recovered.  That would have been in

16   the fall of 2017 time frame.

17   Q.  Those were the crown jewels and most important work of the

18   CCI, correct?

19   A.  Stash certainly had the code which is very important, yes.

20   Q.  And Stash was contained in the Vault 8 release, correct?

21   A.  Yes.  I'm sorry, code definitely was in the Vault 8

22   release.  I don't recall specifically, that was after my

23   primary time in this case had ended, but I understand code that

24   predominantly came from Stash was in the Vault 8, yes.

25   Q.  So there was some back and forth yesterday about your

1    testimony, you basically said that you weren't sure or you

2    didn't think Stash had been released on WikiLeaks, correct?

3    A.   Certainly during my time in the investigation focus was on

4    Confluence for sure.

5    Q.   OK.  And you were working on the investigation as the lead

6    agent on March 31st, 2017, correct?

7    A.   I was one of the lead case agents, yes.

8    Q.   And, in fact, in an e-mail from March 31st, 2017, you

9    openly acknowledged that WikiLeaks had just published

10   information from Stash, correct?

11             MR. LOCKARD:  Objection.

12             THE COURT:  Overruled.

13   A.   The question again?  I'm sorry, Mr. Schulte.

14             MR. SCHULTE:  Will the court reporter read back the

15   question, please?

16             THE COURT:  (reading)  And, in fact, in an e-mail from

17   March 31st, 2017, you openly acknowledged that WikiLeaks had

18   just published information from Stash, correct?

19             THE WITNESS:  I don't recall that specific e-mail.

20   What I do recall -- and potentially you can help me with

21   this -- is every time a new release was made I made a summary

22   of that and where that information came from, so potentially

23   you could show me that document and I am happy to read it.

24   BY MR. SCHULTE:

25   Q.   OK.  I'm going to give you what is marked as 3501-702.  It

M6G5sch2                          Evanchec - Cross

1   might be in your binder there, I think.

2          THE COURT:  Did you find it, Agent?

3          THE WITNESS:  Your Honor, I don't have tabs in my 3500

4   binder so it might take time navigating --

5          MR. SCHULTE:  Is it all right if standby counsel gives

6   it to him?

7          THE COURT:  Yes.

8          THE WITNESS:  Thank you, ma'am.

9          I have read the document, sir.

10  BY MR. SCHULTE:

11  Q.  Do you recognize it?

12  A.  I do.

13  Q.  What is it?

14  A.  It is a document that I had sent on March 31st of 2017 on

15  FBI classified informations about the newest --

16         MR. LOCKARD:  Objection.

17         THE COURT:  Sustained.

18  Q.  Does the document refresh your recollection that Stash had

19  been released -- or documents from Stash had been released by

20  WikiLeaks?

21  A.  Only in the sense that it was the initial assessment hours

22  after, yes.

23  Q.  Well, you sent the e-mail, right?

24  A.  Correct.

25  Q.  And you wrote it, right?

 1  A.  Correct.

 2          THE COURT:  Mr. Schulte, it is not in evidence so

 3  don't refer to the contents of it.  You used it to refresh the

 4  witness' recollection.  It is his testimony that is evidence,

 5  please.

 6          MR. SCHULTE:  OK.

 7  Q.  I would also like to show the witness what is marked in

 8  classified 3500, I think it is in your white binder there.

 9  Does it have tabs?  Is it easy to find?

10  A.  It doesn't; no, Mr. Schulte.

11  Q.  3501-112.

12          THE COURT:  Did you find that, Agent?

13          THE WITNESS:  Sorry.  I thought counsel was pulling

14  that up for me.

15  BY MR. SCHULTE:

16  Q.  You recognize this e-mail, correct?

17          THE COURT:  First of all, don't refer to something

18  that is not in evidence.

19          MR. SCHULTE:  OK.

20          THE COURT:  Second of all, he doesn't have it.  He can

21  take a moment and try and find it, but if standby counsel is

22  able to provide it to him, that might expedite things.

23          MR. LOCKARD:  It should be about three quarters of the

24  way through the third binder.

25          THE WITNESS:  What is the number again?  I'm sorry.

1            MR. SCHULTE:  3501-112.

2            THE WITNESS:  I have it.

3    BY MR. SCHULTE:

4    Q.  Can you take a look at that and read it to yourself,

5    please?

6    A.  Yes, I do have it, and I have read it.

7    Q.  Does it refresh your recollection that on multiple

8    occasions documents exclusive to Stash were accessed to be

9    released by WikiLeaks?

10   A.  Correct; accessed, yes, that's correct.

11   Q.  And you testified yesterday that it was important to

12   identify the source of the data leak to narrow down the

13   suspects, correct?

14   A.  That's correct.

15   Q.  And since Stash data was indeed released on WikiLeaks,

16   whoever provided the data to WikiLeaks must have had access to

17   Stash; correct?

18   A.  Certainly that would have been a priority of the FBI's

19   investigation, yes.

20   Q.  Since I did not have access to Stash during the alleged

21   time frame of the government's leak, I could not have possibly

22   committed this crime then, correct?

23   A.  That was not my understanding.

24   Q.  I believe you -- correct me if I am wrong, but I thought

25   you testified yesterday that it was only Confluence that had

M6G5sch2                          Evanchec - Cross

1   been taken.

2   A.  Your question is about your access to Stash?  I am not

3   sure, sir.

4   Q.  No, my question is about your testimony yesterday, I

5   believe that you testified that, to your knowledge, only

6   Confluence had actually been taken off DevLAN; correct?

7   A.  That's correct.

8           THE COURT:  Do you have any firsthand knowledge of

9   what Mr. Schulte did or didn't have access to during his time

10  at the CIA?

11          THE WITNESS:  Only, your Honor, in the sense that by

12  his own communications with me, that he indicated that he was

13  admin of the Atlassian suite which would have included Stash.

14          THE COURT:  OK.

15  BY MR. SCHULTE:

16  Q.  And you testified earlier about the loss of Stash from a

17  drive, correct, that was never recovered?

18  A.  I'm sorry, sir.  You broke up there in the middle of your

19  question.

20  Q.  I'm sorry.

21      You testified earlier today about the fact that a copy of

22  Stash had been lost and never recovered; correct?

23  A.  There was a copy that, during my time in the investigation

24  I knew was missing and I don't recall the ultimate disposition

25  of that item.

M6G5sch2                           Evanchec - Cross

Q.  At least one other person, Dave C., had Stash on the drive,
correct?

A.  I believe so.

THE COURT:  What drive are you referring to that Dave
C. had Stash on?

THE WITNESS:  My understanding it was on his home --
home directory.

Q.  And that was also copied to an external drive, right?  Hard
drive?

A.  I believe we were talking about the same piece of evidence
you were referring to before; is that correct?

Q.  That's correct.

A.  That's correct.

Q.  And that was not permitted by CIA DevLAN -- by CIA policy;
correct?

A.  I am unclear of that.  Or not sure of that.  I am unclear.

Q.  Just to be clear, yesterday you said only Confluence had
been taken and now you are acknowledging that the Stash
documents had been released; correct?

MR. LOCKARD:  Objection.

THE COURT:  Overruled.

A.  Certainly these e-mails suggest the --

Q.  Yes or no question, sir.

A.  Go ahead again.  I'm sorry.

MR. SCHULTE:  Can the court reporter read back the

1    question, please?

2              THE COURT:  I will do it again:

3              Just to be clear, yesterday you said only Confluence

4    had been taken and now you are acknowledging that the Stash

5    documents had been released; correct?

6              So the question isn't what any e-mails may or may not

7    say, it is just is that your testimony today.

8              THE WITNESS:  Files from Stash, yes.

9              THE COURT:  Mr. Schulte, any estimate of how much more

10   you have on cross?

11             MR. SCHULTE:  I hope to be finishing up pretty soon in

12   the next 20, 30 minutes.

13             THE COURT:  Great.  Keep going.

14   BY MR. SCHULTE:

15   Q.  I want to talk to you now about the surveillance conducted

16   on me throughout your investigation.  During the time as lead

17   case agent the FBI recruited at least four different people to

18   record me; correct?

19   A.  That's correct.

20   Q.  With the hopes of getting a confession, correct?

21   A.  Hopes of collecting evidence.

22   Q.  A confession would be evidence, right?

23   A.  Yes, sir.  Correct.

24   Q.  And these were people I knew, correct?

25   A.  Correct.

M6G5sch2                          Evanchec - Cross

1    Q.  My friends and colleagues, correct?

2    A.  That's correct.

3    Q.  One such person was named Tandeep, correct?

4    A.  That's correct.

5    Q.  And Tandeep worked as a contractor at the CIA, correct?

6    A.  That was my understanding, yes.

7    Q.  He was given a wire to record me, correct?

8    A.  That's my understanding, yes.

9    Q.  After you recruited her she came to New York multiple

10   times, correct?

11   A.  That's my understanding.  Yes.

12   Q.  She took me out to a museum, correct?

13   A.  I believe that you had spent time together.  I'm not sure

14   where, specifically, you went.

15   Q.  She spoke to me on the phone too, correct?

16   A.  Correct.

17   Q.  And when she was done she gave the recording to the FBI,

18   correct?

19   A.  That's correct.

20   Q.  Just to be clear, how were those recordings conducted?  Was

21   the FBI present during those calls?

22   A.  I don't know specifically, I was not part of those.

23   Normally an individual is given a device to record and it

24   doesn't require an FBI agent being there.  I'm not sure if an

25   FBI agent was present during all of her calls or not.  She

1  would have been instructed on how to use that device.

2  Q.  But the FBI reviewed all of those calls, correct?

3  A.  I am certain that we did, yes.

4  Q.  In fact, there were hundreds of recordings from Tandeep,

5  correct?

6  A.  I don't recall the volume.

7  Q.  You don't recall at all, even ballpark how much?

8  A.  I don't.  I was not her handling agent so I don't know.

9  Q.  But I, throughout the calls, all the recordings, everything

10  you gathered from Tandeep, I maintained throughout all of that,

11  I maintained I had nothing to did with the WikiLeaks material,

12  correct?

13          MR. LOCKARD:  Objection.

14          THE COURT:  Sustained.

15  Q.  You gathered no inculpatory evidence, correct?

16          MR. LOCKARD:  Objection.

17          THE COURT:  Sustained.

18  Q.  Do you know that none of those recordings are being

19  introduced at this trial?

20          MR. LOCKARD:  Objection.

21          THE COURT:  Sustained.

22  Q.  If there had been inculpatory evidence from those calls you

23  would have known about it, correct?

24          MR. LOCKARD:  Objection.

25          THE COURT:  Sustained.

M6G5sch2                    Evanchec - Cross

1    Q.  As a result of those recordings you did nothing, correct?

2              MR. LOCKARD:  Objection.

3              THE COURT:  I will allow it.

4              Did you do anything as a result of those calls with

5    Tandeep?

6              THE WITNESS:  Sir, I don't recall the specifics of any

7    action with Tandeep because I was not her handling agent, your

8    Honor.

9    BY MR. SCHULTE:

10   Q.  So the answer is no?

11             THE COURT:  Ms. Shroff, can you please make sure you

12   keep your voice down?

13             MS. SHROFF:  Sorry, your Honor.

14             THE COURT:  The answer is he wasn't her handling agent

15   therefore he doesn't have firsthand knowledge, so let's move on

16   to a different subject, please.

17   BY MR. SCHULTE:

18   Q.  OK.  What about Matthew Roskweller.  He was another person

19   that you recruited, correct?

20   A.  That's correct.

21   Q.  And he worked at Google, correct?

22   A.  Correct.

23   Q.  And the FBI similarly recruited and tasked him to record

24   me, correct?

25   A.  Correct.

M6G5sch2                           Evanchec - Cross

1    Q.   He recorded me on multiple occasions, correct?

2    A.   That's my understanding, yes.

3    Q.   Were you his handling agent?

4    A.   I was.  I was one of them, yes.

5    Q.   OK, great.  So you were able to review the information he

6    provided, correct?

7    A.   Correct.

8    Q.   And through all of the information he provided I maintained

9    that I had nothing to do with the leaks of the CIA materials to

10   WikiLeaks, correct?

11               MR. LOCKARD:  Objection.

12               THE COURT:  Sustained.

13   Q.   If there had been inculpatory evidence you, as the handling

14   agent, would have analyzed it, correct?

15               MR. LOCKARD:  Objection.

16               THE COURT:  Sustained.

17   Q.   Did you take any action with respect to the materials that

18   you received from Matthew?

19   A.   The information that any source gives us, Mr. Schulte, is

20   always of value to us.  It doesn't necessarily mean that if a

21   confession isn't given that we are not going to act on the

22   information we received.  For example, information about, you

23   know, what your plans are, where you are traveling.

24   Q.   It is yes or no, sir.  Did you take any action?  Yes or no.

25   A.   I would assume a hundred percent.  Absolutely.

1   Q.   What action did you take?

2   A.   Certainly information that you and he talked about, whether

3   it was about travel -- this is with any source; travel plans or

4   intentions or your mindset at that time is going to help inform

5   our investigation.  So I don't recall in this case specific

6   search warrants or grand jury subpoenas that I had but

7   certainly it would have informed our investigation.

8   Q.   What about John Altmueller.  He was another FBI source,

9   correct?

10  A.   I don't recall specifically that name.

11  Q.   You don't recall arranging travel to California after to

12  talk to both him and Matthew Roskweller in that area?

13  A.   Yes.  I'm sorry, yes.

14          THE COURT:  Can I just ask the witness whatever

15  document you were just looking at, can you put that to the

16  side, please?

17          THE WITNESS:  Yes, sir.  I just wanted to make sure it

18  wasn't a name.

19          THE COURT:  Great.

20  BY MR. SCHULTE:

21  Q.   The FBI similarly recruited and tasked him to record me,

22  correct?

23  A.   That is my understanding.

24  Q.   You were not the -- you said that you were not his handling

25  agent?

1    A.  No.  I don't recall being his handling agent.

2    Q.  What about Gordon?  The FBI recorded a Gordon, correct?

3    A.  Correct.

4    Q.  And Gordon was my former mentor at the CIA, correct?

5    A.  That's correct.

6    Q.  Gordon was a former CIA security investigator, correct?

7    A.  I knew he was currently employed by the CIA, yes.

8    Q.  Gordon worked on the Nicholson espionage investigation,

9    correct?

10            MR. LOCKARD:  Objection.

11            THE COURT:  Sustained.

12   Q.  Gordon assisted on many espionage investigations, correct?

13            MR. LOCKARD:  Objection.

14            THE COURT:  Sustained.

15   Q.  At one point you tasked Gordon to invite me to a multi-day

16   trip, correct?

17   A.  I was not his handling agent.

18   Q.  Were you aware that Gordon was tasked to invite me to a

19   multi-day trip?

20   A.  Yes.

21   Q.  Who approved that, by the way?  Does that go through some

22   approval process?

23            MR. LOCKARD:  Objection.

24            THE COURT:  Were you involved in the approval process

25   for that?

1              THE WITNESS:  No.  I was not a supervisor, your Honor.

2              THE COURT:  Sustained.

3    BY MR. SCHULTE:

4    Q.  OK.  So the trip was -- you are aware of the trip, correct?

5    A.  I am.

6    Q.  That was to a shooting range; correct?

7    A.  I am aware of that, yes.

8    Q.  And Gordon was wired -- Gordon was wired up each and every

9    day of that, correct?

10   A.  That's correct.

11   Q.  And Gordon grilled me about the WikiLeaks disclosure,

12   correct?

13             MR. LOCKARD:  Objection.

14             THE COURT:  Sustained.

15   Q.  He returned all the recordings over to the FBI, correct?

16   A.  I would assume so.  I was not his handling agent but I

17   would assume so.

18   Q.  Were you also aware at one point Gordon made an

19   emergency -- requested an emergency meeting with me in New

20   York?

21   A.  I'm aware of his travel to New York.  I don't know the

22   characterization or that that was made.

23   Q.  Did you assist in organizing that?

24   A.  I would have, as the case agent, been aware of it.  I don't

25   recall the specifics of my involvement.

1  Q.  OK, but Gordon was tasked with informing me that he wanted

2  to talk to me in an emergency meeting, correct?

3  A.  That's fair, Mr. Schulte.  I don't know the exacts, but

4  that's fair generally.

5  Q.  So Gordon traveled from his home in South Carolina to New

6  York City; correct?

7  A.  That's correct.

8  Q.  And he invited me to Bryant Park, correct?

9  A.  I don't recall the specifics of the arrangements.

10  Q.  He told me to make sure not to bring any lawyers, correct?

11  A.  Again, I was not his handling agent so I don't know what he

12  told you or what he was told to say.

13  Q.  I mean, you received reports on the event, did you not?

14  A.  Certainly would have gotten summaries of them, yes.

15  Q.  So you don't recall that in those summaries, or?

16  A.  I don't recall the specific instructions, no.

17  Q.  He employed multiple manipulative investigative techniques

18  to try and coerce a confession, correct?

19          MR. LOCKARD:  Objection.

20          THE COURT:  Sustained.

21          Do you have any firsthand knowledge of what happened

22  in that meeting as it occurred?

23          THE WITNESS:  No, sir.

24          THE COURT:  Let's move on, please.

25  BY MR. SCHULTE:

1   Q.  Were you aware that the FBI is aware that I went to a

2   bachelor party in April 2017, correct?

3   A.  I am; yes, sir.

4   Q.  And the FBI arranged what's called a bump, correct?

5   A.  That's correct.

6   Q.  What is a bump?

7   A.  A bump is essentially when the FBI elicits the help of

8   someone that can literally have a chance encounter with that

9   person, so we elicited a number of folks to basically engage in

10  conversation with you during that bachelor party.

11  Q.  Do you know what the results of that bump were?

12          MR. LOCKARD:  Objection.

13          THE COURT:  Sustained.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M6gWsch3                          Evanchec - Cross

1   BY MR. SCHULTE:

2   Q.  What about the wedding I later attended that year in Texas;

3   did the FBI set up surveillance for that as well?

4          THE COURT:  Mr. Schulte, you're not testifying.

5   You're asking questions, so please don't include information in

6   a question.  Just ask a question, please.

7          MR. SCHULTE:  OK.

8   Q.  You were aware that I went to a wedding later that year in

9   Texas, right?

10  A.  I don't recall specifically a wedding, sir, no.

11  Q.  OK.  But you're aware of a family vacation to San Diego

12  that year, correct?

13  A.  I am, yes, sir.

14  Q.  With my mother and father, correct?

15  A.  Correct.

16  Q.  My brothers, correct?

17  A.  Correct.

18  Q.  FBI arranged surveillance, correct?

19  A.  That's correct.

20  Q.  You personally received updates about what hotel we were

21  staying in, correct?

22  A.  Certainly, yes.

23  Q.  You received updates about what food was purchased,

24  correct?

25  A.  I don't know that granularity, but we certainly would have

1  been made aware of your movements in surveilling activities.

2  Q.  You were updated that we were playing Frisbee at the beach,

3  correct?

4  A.  I recall that.

5  Q.  You received updates when my mom and I bought Starbucks,

6  correct?

7  A.  If that was one of your movements, that would have been in

8  the surveillance reports, yes.

9  Q.  You received updates about my brothers teasing me for not

10 going into the cold water with them, correct?

11 A.  If that was something that our teams observed and

12 documented, I would have been made aware of it.

13 Q.  And updates when I was -- when we were burying one of our

14 brothers in the sand, correct?

15 A.  Again, if that's an observation of the surveillance team

16 and they documented it, I would have been aware of it.

17 Q.  Well, you received continual updates about every minutia of

18 my family's vacation, correct?

19 A.  Again, if those were documented by the surveillance team,

20 yes.

21 Q.  Even to the extent of what exhibits we viewed at the San

22 Diego Zoo and for how long, correct?

23 A.  Again, if those were observations made by the team and

24 passed to me, I would have been made aware of them.

25 Q.  All right.  I think I just have one last set of questions

M6gWsch3                          Evanchec - Cross

1   for you, sir.

2   A.  Yes, sir.

3   Q.  I want to briefly circle back to your link messages that

4   you testified about yesterday.

5   A.  Yes, sir.

6   Q.  And you acknowledge, do you not, that your investigation

7   into me is purely a political witch-hunt directed by the CIA in

8   a message dated June 26, 2017, correct?

9              MR. LOCKARD:  Objection.

10             THE COURT:  Sustained.

11  BY MR. SCHULTE:

12  Q.  I'm showing you what has been marked as DX -- defense

13  exhibit 101 on page 18.  Do you recognize it?

14  A.  I do.

15  Q.  What is it?

16  A.  It is an instant messaging chat between myself and a

17  colleague -- several colleagues, it appears.

18  Q.  And in this message, you say, from my take at the agency, I

19  think everything --

20             MR. LOCKARD:  Objection.

21             THE COURT:  Sustained.

22  BY MR. SCHULTE:

23  Q.  Can you read this -- I mean to yourself.  Can you read this

24  message you sent June 26, 2017?

25  A.  Yes.

M6gWsch3                          Evanchec - Cross

1    Q.   Does it refresh your recollection?

2    A.   It certainly does, yes.

3    Q.   So is it true that you said, from my take at the agency, I

4    think --

5              MR. LOCKARD:  Objection.

6    BY MR. SCHULTE:

7    Q.   -- politically --

8              THE COURT:  Sustained.

9    BY MR. SCHULTE:

10   Q.   -- we'll go after him with everything --

11             THE COURT:  Sustained.

12   BY MR. SCHULTE:

13   Q.   Does it refresh your recollection that you stated, from my

14   take at the agency, I think that --

15             THE COURT:  Sustained.

16             Can I see the parties at sidebar for a moment, please.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  First of all, I can't help but note this

3    is the longest 45 minutes I've ever experienced.

4          MR. SCHULTE:  I'm sorry.

5          THE COURT:  Second, this is an out-of-court statement,

6    and it is hearsay if it's being offered for the truth.  I don't

7    know if there's a different purpose for its being offered, but

8    there's a separate issue, which the government flagged

9    yesterday.

10         In context, it's quite clear that this message

11   references the fact that they should bring whatever charges

12   they can against you, and in specific context, it is the child

13   pornography charges.  So I think there is a serious risk that

14   if you elicit this from the witness for a nonhearsay purpose

15   you are opening the door of that being brought out.

16         I don't know if the government has a different view or

17   any issues you want to raise, but I just wanted to flag that.

18         MR. LOCKARD:  Your Honor, that is our view, and

19   frankly, we're concerned that given the questioning so far, it

20   may be necessary to elicit from Agent Evanchec if these

21   statements were about a different investigation.

22         THE COURT:  Well, I don't think the way the record

23   currently stands that that would be necessary, because it

24   hasn't yet come out through the witness's testimony.  That

25   being said, if it's elicited, assuming there's a

1   nonhearsay-proffer way to do it, I think that that may well be

2   fair game.

3           Mr. Schulte.

4           MR. SCHULTE:  I think in the message itself, he's

5   saying, you know, if it's just politically, we need to go after

6   him with everything.  So I don't think it's clear at all -- or

7   it has nothing to do with separate charges or any specific

8   charges.  It's just the intent to go after me with everything

9   politically.

10           THE COURT:  But the "everything" he's referring to

11   from two messages before is the fact that they found child

12   pornography allegedly on your computer.

13           MR. SCHULTE:  Were those even from the same -- I

14   thought those were from a different individual that sent -- oh.

15           Yeah, that's -- hold on.

16           MR. LOCKARD:  Mr. Schulte may hope for a different

17   answer, but that is what we expect the testimony would be.

18           MS. SHROFF:  Your Honor, may we just have a second

19   with Mr. Schulte?

20           THE COURT:  Why don't I have the government step away.

21           (Defendant conferred with standby counsel)

22           MR. SCHULTE:  I think I'm finished with the cross now.

23           THE COURT:  OK.  Hold on one second, please.

24           Counsel.

25           All right.  Mr. Schulte has advised that he's done

1    with cross, which he should obviously say in the presence of

2    the jury.

3              Any estimate of how long redirect is likely to be?

4              MR. LOCKARD:  I would expect about 30 to 45 minutes.

5              THE COURT:  I was hoping that it would be short enough

6    that we could just take our long break when you concluded,

7    given the mechanics of the next witness, but so be it.

8              MR. LOCKARD:  We can take that into consideration.

9    We'll try and see if we can get there.

10             THE COURT:  Do what you need to do for your case, but

11   obviously if you can wrap it up before the break, which I

12   expect will be at 11:40, that would be ideal.  But let's

13   resume.  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2                    THE COURT:  You can proceed, Mr. Schulte.

3                    MR. SCHULTE:  No further questions.

4                    THE COURT:  Redirect.

5                    MR. LOCKARD:  Yes, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. LOCKARD:

8    Q.  Good morning, Agent Evanchec.

9    A.  Good morning, Mr. Lockard.

10   Q.  Agent Evanchec, the defendant just asked you a series of

11   questions about surveillance as part of the investigation?

12   A.  Yes, sir.

13   Q.  On the night of April -- March 15, 2017, was there

14   surveillance with respect to Mr. Schulte?

15   A.  There was.

16   Q.  And when was there surveillance?

17   A.  It would have been anytime if he had left the apartment and

18   he was outside of his -- the search location, he would have

19   remained under surveillance.

20   Q.  I think you testified there came a time when he was present

21   at the search and then he left?

22   A.  That's correct.

23   Q.  Was he under surveillance then?

24   A.  He was.

25   Q.  Did you get reports of his activities?

1    A.  We did.

2    Q.  And what did you learn?

3    A.  We learned that after he left the apartment, I believe the

4    sequence of events was that he'd used the phone in the lobby of

5    his building to make a phone call; that he had at one point had

6    stopped at a FedEx location and used a computer; and I believe

7    he also stopped at a CVS or some kind of convenience store, if

8    my memory serves me correctly, before going to Bloomberg.

9    Q.  And the defendant just also asked you a series of questions

10   about the evidence that was recovered from his apartment?

11   A.  That's correct.

12   Q.  And about whether classified information was discovered on

13   the electronics?

14   A.  That's correct.

15            MR. LOCKARD:  Ms. Cooper, if you could please pull up

16   Government Exhibit 1350.

17   Q.  Now, Agent Evanchec, you've testified about the searches

18   that Mr. Schulte ran from his Google account in late April to

19   early May of 2016?

20   A.  That's correct.

21   Q.  What, if any, difference is there between a regular

22   deletion of data from a computer and a wipe utility?

23   A.  Yes.  So, when a user of a computer deletes something, if

24   they delete a document from their desktop, for example, it's

25   not necessarily deleted from that machine.  There are portions

1    of that machine where that document or remnants of that

2    document could still remain, for example.  These, from my

3    understanding and talking with our team, were more

4    sophisticated ways to ensure that there was no trace of certain

5    data on a computer once it was -- once these applications were

6    run against it.

7    Q.  Now, continuing on with the events of March 15, 2017 --

8              MR. LOCKARD:  Ms. Cooper, you can pull that down.

9    Thank you.

10   Q.  -- yesterday, the defendant asked you several questions

11   about your interview.  Do you recall those?

12   A.  I do.

13   Q.  And in particular, the defendant asked you questions about

14   what you asked him about his email to the CIA OIG.  Do you

15   remember those?

16   A.  That's correct.

17             MR. LOCKARD:  Ms. Cooper, if we could pull up

18   Government Exhibit 1616.  And publish.

19   Q.  Again, is this the email about which you were asking

20   Mr. Schulte?

21   A.  It is.

22   Q.  And what is the date that the email was sent?

23   A.  November 10 of 2016.

24   Q.  And on what date did the defendant designate the email as

25   unclassified?

M6gWsch3                    Evanchec - Redirect

1   A.   On November 10 of 2016.

2   Q.   What was the defendant's last day at the CIA?

3   A.   November 10, 2016.

4   Q.   What is the last day that the defendant could have printed

5   this email?

6   A.   November 10, 2016.

7   Q.   Now, at the time the defendant worked at the CIA, in what

8   part of the country did he live?

9   A.   Northern Virginia.

10  Q.   And at the time you interviewed him on March 15 of 2017,

11  where did he live then?

12  A.   Here, in Manhattan, sir.

13  Q.   Now, yesterday, you testified that you could not recall if

14  you asked the defendant about a classified email.  Is there

15  something that would refresh your recollection about the

16  question you posed to the defendant?

17  A.   Certainly the interview summary that I had written just

18  days after would certainly help, sir.

19          MR. LOCKARD:  Ms. Cooper, if we could show Agent

20  Evanchec 3501-821, and specifically page 2, the fourth

21  paragraph.  No.  I'm sorry.  3502-820 -- 3501-820.  I'm sorry.

22  And the fourth paragraph.

23  Q.   Agent Evanchec, certainly review as much as you need to for

24  context, but just let me know when you have had a chance to

25  read that.

1    A.  I've read it, sir.

2    Q.  Does that refresh your recollection?

3    A.  It does.

4    Q.  How did you put your question to the defendant?

5    A.  I'm sorry.  Can you say that again, sir?

6    Q.  How did you put your question to the defendant?

7    A.  Directly if he recalled, basically we set in motion the

8    fact that there was interactions with the CIA's office of

9    inspector general, and we specifically asked him if he

10   possessed any emails related to those interactions, and he said

11   no.

12   Q.  Now, at the time the defendant denied possessing the OIG

13   email, had you told him his apartment would be searched?

14   A.  No, sir.

15   Q.  And during the search, in what room of the apartment was

16   Government Exhibit 1616 found?

17   A.  His bedroom.

18   Q.  And where in his bedroom was the Government Exhibit 1616

19   found?

20   A.  The headboard of his bed.

21   Q.  Now, yesterday, you were also asked several questions about

22   a March 13, 2017, search warrant.  Do you recall those

23   questions?

24   A.  I do.

25           MR. LOCKARD:  And if we could please pull up defense

1    exhibit 104-1, which is in evidence.

2    Q.  Now, you were asked questions about whether the search

3    warrant is unclassified.  Do you recall those?

4    A.  I do.

5    Q.  And is the content of the search warrant unclassified?

6    A.  That's my understanding, yes.

7    Q.  And was certain information declassified in order to

8    include it in the warrant?

9    A.  I'm sorry, sir.  Can you say that again?

10   Q.  Was certain information declassified in order to include it

11   in the warrant?

12   A.  Yes.

13   Q.  Who requested that declassification?

14   A.  It would have been the FBI.

15   Q.  And was that request approved?

16   A.  My understanding it was.

17   Q.  Now, you testified earlier about making requests to the CIA

18   in connection with the investigation?

19   A.  That's correct, sir.

20   Q.  Generally, what was the CIA's responsiveness to those

21   requests?

22   A.  I don't recall any instance, sir, when the CIA did not

23   provide a response to our request.  There may, for example,

24   just to be very clear, times that the records that we requested

25   no longer existed.  For example, you know, we might have

1    requested video surveillance from, you know, certain critical

2    times that we were looking at, and if that video was

3    automatically deleted by the CIA because of retention reasons,

4    we wouldn't have had that, so -- but very broadly, very

5    largely, every request that we made came back and it came back

6    with a very deliberateness to it.

7    Q.  Now, in the course of your duties with the FBI, have you

8    participated in swearing out and executing search warrants?

9    A.  I have.

10   Q.  And have those search warrants included sealing provisions?

11   A.  They have.

12   Q.  And if we could direct your attention to page 30 of the

13   search warrant, specifically, paragraph 42, did this warrant

14   have a sealing provision?

15   A.  It did.

16   Q.  And based on your experience in swearing out and executing

17   search warrants, what does the sealing provision do; what is

18   its effect?

19   A.  The sealing provision essentially makes the government,

20   makes the FBI in this case's, you know, investigative

21   activities undisclosed so that the investigation can carry

22   forward without hindrance.

23   Q.  Does the sealed search warrant become public?

24   A.  It does, eventually.

25   Q.  Does it become public while the sealing order is in effect?

```
 1   A.  No.
 2              MR. LOCKARD:  Thank you, Ms. Cooper.
 3   Q.  Now, in your career with the FBI, have you also
 4   participated in discovery; that is, the production of documents
 5   to individuals who have been charged?
 6   A.  I certainly have.  Yes, sir.
 7   Q.  And have you encountered protective orders?
 8   A.  I have.
 9   Q.  Can you describe, in your experience, generally --
10              MR. SCHULTE:  Objection.
11              THE COURT:  Overruled.
12   Q.  Generally speaking, what is a protective order as it
13   applies to the production of documents?
14   A.  Generally, a judge in a case will apply specific rules to
15   how information that the government provides to a defendant can
16   be used, and at times a judge will find it necessary to put
17   restrictions on that and say that, Hey, the government has
18   provided this information to a defendant in order for he or she
19   to produce their defense but also recognizes that, oftentimes,
20   as in this case, the information is so sensitive that it's
21   necessary to not disclose that outside of the defendant and his
22   or her attorneys in order to protect it.  So it gives the
23   defendant the ability to review evidence so that they can
24   construct an appropriate and responsible defense but also
25   protects the information from disclosure outside of those
```

1    parties.

2    Q.  Are you aware if there's a protective order governing the

3    search warrant affidavit introduced as Defendant's Exhibit

4    104-1?

5    A.  I am.

6    Q.  Was there?

7    A.  There was.

8            MR. LOCKARD:  Ms. Cooper, if we could pull up for Mr.

9    Evanchec Government Exhibit 828.

10   Q.  Is that a document that you recognize?

11   A.  Yes.  It's the protective order.

12           MR. LOCKARD:  The government offers 828.

13           THE COURT:  Any objection?

14           MR. SCHULTE:  Yes, I object.

15           THE COURT:  All right.  Tell you what.  I'll reserve

16   judgment.  We'll take it up at the break.

17           MR. LOCKARD:  Thank you, Ms. Cooper.

18           If you could also pull up for Agent Evanchec

19   Government Exhibit 831.

20   Q.  And do you recognize this document?

21   A.  Appears to be the search warrant that Special Agent

22   Donaldson obtained on March 13, 2017, for a search of

23   Mr. Schulte's apartment.

24   Q.  And directing your attention to the lower left-hand corner,

25   do you recognize what's shown there?  Just do you recognize it?

1    A.  I do.

2    Q.  And does it relate to the protective order?

3    A.  My understanding is it would, yes.

4            MR. SCHULTE:  Objection.

5            THE COURT:  Sustained.

6            MR. LOCKARD:  The government offers exhibit 831.

7            THE COURT:  Any objection?

8            MR. SCHULTE:  Objection.  Mine's already in.

9            THE COURT:  All right.  Overruled.

10           It's admitted.

11           (Government Exhibit 831 received in evidence)

12           MR. LOCKARD:  Thank you, Ms. Cooper.  We can take that

13   down as well.

14           THE COURT:  Do you want to publish it?

15           MR. LOCKARD:  Yes.

16           Please publish Government Exhibit 831.

17           THE COURT:  OK?

18           MR. LOCKARD:  Yes.  Thank you.

19   Q.  Agent Evanchec, you were asked, I believe, yesterday a

20   number of questions about the DevLAN network?

21   A.  That's correct.

22   Q.  For example, you were asked if DevLAN users called the

23   system the wild Wild West.  Do you remember those questions?

24   A.  That's correct.

25   Q.  Now, when you interviewed the defendant on March 15, 2017,

1  did you ask him how he believed the DevLAN system could have

2  been compromised?

3  A.  I'm sorry.  The 15th of March?

4  Q.  Yes.  In your initial interview.

5  A.  I believe we did, yes.

6  Q.  And did he offer some possibilities of how it could have

7  happened?

8  A.  He did.

9  Q.  What, if anything, did he say about whether the system

10  could have been hacked?

11  A.  He said that he thought that was unlikely.

12  Q.  And why was that?

13  A.  I believe he described the system as a closed system.

14  Q.  Now, you were also asked questions by the defendant about

15  whether DevLAN was described as being a dirty network?

16  A.  Correct.

17  Q.  And he also asked if there were things like malware and

18  viruses on the network.  Do you recall that?

19  A.  That's correct.

20  Q.  What did the DevLAN users use DevLAN for?

21  A.  For the development of those tools.

22  Q.  Now, you were asked some questions about whether there were

23  access controls on DevLAN.  Do you recall those questions?

24  A.  I do, yes.

25  Q.  Do you recall the defendant asked, There weren't any access

1    controls, right?

2    A.   That's correct.

3    Q.   Were there access controls for users of DevLAN?

4    A.   My understanding was yes.

5    Q.   Did users of DevLAN have different permissions to different

6    projects?

7    A.   They did.

8    Q.   Could any user of DevLAN access all parts of the DevLAN

9    network?

10   A.   My understanding is no.

11   Q.   What individuals were responsible for implementing access

12   controls to the DevLAN network?

13   A.   They would have been the systems administrators.

14   Q.   Did administrators have a different level of access than

15   users?

16   A.   They did.

17   Q.   Now, we watched a portion of an interview of the defendant

18   at the CIA on July 19, 2016, which is Government Exhibit 509-2.

19   During that interview, did the defendant say anything about

20   whether access controls applied to him?

21   A.   He did.

22   Q.   What did he say about that?

23   A.   Access controls did not apply to him.

24   Q.   And why did the defendant believe that access controls did

25   not apply to him?

1             MR. SCHULTE:  Objection.

2             THE COURT:  Sustained.

3    BY MR. LOCKARD:

4    Q.  What did the defendant say about why access controls did

5    not apply to him?

6    A.  He was a systems administrator, so he was essentially

7    above -- above that.

8    Q.  Now, while at the CIA, was the defendant advised about

9    using administrative rights for the sole purpose of ensuring

10   that the right people have access to data in order to complete

11   job-related tasks?

12   A.  He was.

13            MR. SCHULTE:  Objection.

14            THE COURT:  Sustained.  The jury will disregard that

15   answer.

16   BY MR. LOCKARD:

17   Q.  Did you learn of a time when the defendant was warned about

18   this policy?

19            MR. SCHULTE:  Objection.

20            THE COURT:  Sustained.

21            MR. LOCKARD:  Your Honor, if I could have a moment?

22            THE COURT:  You may.

23            MR. LOCKARD:  No further questions.

24            THE COURT:  All right.

25            Any recross, Mr. Schulte?

1             (Defendant conferred with standby counsel)

2             MR. SCHULTE:  Very brief.

3             If the government wouldn't mind assisting me for a

4    couple exhibits that were just shown, starting with Government

5    Exhibit 1350.

6    RECROSS EXAMINATION

7    BY MR. SCHULTE:

8    Q.  Just to clarify, you testified that you don't have any

9    experience with solid state drives or any of this type of

10   technology, right?

11   A.  That's correct, sir.

12   Q.  OK.  To the OIG email, No. 1616, so you testified that this

13   document was found in my home, and you said that you asked me

14   about it in our discussions March 15, correct?

15   A.  That's correct.

16   Q.  And I had multiple CIA documents, obviously, in my home,

17   correct?

18   A.  Correct.

19   Q.  At least all the other ones were labeled unclassified,

20   correct?

21   A.  Correct.

22   Q.  And I also had multiple --

23             THE COURT:  Mr. Schulte, let's limit ourselves to the

24   scope of the redirect, please, and also just not ask questions

25   that have already been asked.

1              MR. SCHULTE:  OK.

2    Q.   The point is that I had many, many CIA documents in my

3    home, correct, between the shredded documents, the CIA paper

4    hard-copy documents, all these types of documents?  Correct?

5    A.   There were several documents, yes, sir.

6    Q.   OK.  And if you were asking me about a very specific

7    document, it's, you know, reasonable that you may not remember

8    exactly which document you were referring to, correct?

9              MR. LOCKARD:  Objection.

10             THE COURT:  Sustained.

11   BY MR. SCHULTE:

12   Q.   You testified that you never showed me a redacted copy of

13   the OIG email for confirmation that that was what you were

14   talking about, correct?

15             THE COURT:  Sustained.  Asked and answered.

16             MR. SCHULTE:  OK.

17   Q.   You talked a little bit about the transcript where I said

18   that the access controls didn't apply to me, correct?

19   A.   That's correct.

20   Q.   And so in that transcript, I was -- in the transcript, it

21   was talking about -- or let me rephrase.

22        That specific portion of the interview was stating that as

23   a technical matter, the access controls literally did not

24   apply, correct?

25             MR. LOCKARD:  Objection.

1           THE COURT:  Sustained.

2     BY MR. SCHULTE:

3     Q.  Well, did you -- throughout your investigation, you learned

4     that the way the administration software works is that system

5     administrators -- it doesn't matter if you try to restrict

6     system administrators; they still have full access, correct?

7     A.  Can you rephrase your question, sir?

8           MR. LOCKARD:  Yes.  I want to direct, or pull up the

9     transcript, 509-2T on page 5.

10          THE COURT:  Do you want the jury to follow in the

11    transcript?

12          MR. SCHULTE:  Yes, please.

13          THE COURT:  Ladies and gentlemen, you can grab those

14    binders that you hopefully still have there and turn to tab

15    GX509-2T and page 5.

16          I just want to remind you that it's not the transcript

17    that is the evidence.  It is the recording that is the

18    evidence.  The transcript is merely an aid for you to

19    understand and review the recording, with the exception of

20    those redacted and substituted names -- with that one

21    exception.

22          Go ahead, Mr. Schulte.

23    BY MR. SCHULTE:

24    Q.  Sir, can you read the question starting at 6 through my

25    answer ending at 11?

```
 1              THE COURT:  All right.  I'm going to sustain.  It
 2    speaks for itself.
 3              Next question.
 4    BY MR. SCHULTE:
 5    Q.  So, are you aware of how system administration works, the
 6    privileges specifically involved?
 7    A.  Very broadly, from our discussions and from these
 8    interviews, yes.
 9    Q.  So system administrators are designed to have full control
10    of the system, correct?
11    A.  Correct.
12    Q.  So you cannot actually limit access to a system
13    administrator, correct?
14    A.  It would be very difficult.  Yes.
15    Q.  So if you applied -- if you tried to apply restrictions to
16    the system administrator, those technically would not be
17    enforced by the system, correct?
18              MR. LOCKARD:  Objection.
19              THE COURT:  Sustained.
20              You can put the binders away now, ladies and
21    gentlemen.
22              Let's wrap things up, Mr. Schulte.
23              MR. SCHULTE:  OK.
24    Q.  I guess you're just not completely familiar with the
25    technology and how the system access controls work with respect
```

1   to system administration, is that correct?

2   A.   Not beyond what you've explained to us and what I saw from

3   these interviews.

4               MR. SCHULTE:  All right.  No further questions.

5               THE COURT:  All right.

6               Are we good to go, Mr. Lockard?

7               MR. LOCKARD:  We are, your Honor.

8               THE COURT:  All right.

9               Ladies and gentlemen --

10              I'll wait for Mr. Schulte to put his mask on and get

11   back to the table.

12              -- it is time for our break.  It's 11:42 -- 11:43 now,

13   so let's plan to get going, if you can be ready to go for

14   Mr. Lee to come get you, let's say, about 12:20, so that we can

15   get started promptly in about 40 minutes, that would be ideal.

16              A couple of important reminders:

17              One, take your notebooks with you.  No. 2, don't

18   discuss the case.  Three, keep an open mind, and 4, don't do

19   any research about the case.

20              With that, I wish you enjoyable breaks, and we'll see

21   you in about 40 minutes.  Thanks very much.

22              (Continued on next page)

23

24

25

M6gWsch3

 1          (Jury not present)

 2          THE COURT:  You may be seated.

 3          Agent Evanchec, I neglected to excuse you in the

 4  presence of the jury, but I think that will be obvious to them.

 5  You are excused, and you may step down.

 6          THE WITNESS:  Thank you, your Honor.

 7          (Witness not present)

 8          THE COURT:  Government, we need to discuss 828.  I

 9  don't know if you have anything to raise, but I certainly want

10  to give you your breaks.

11          Mr. Lockard, what is the reason or relevance of 828,

12  and is it necessary, given the testimony about Government

13  Exhibit 831?

14          MR. LOCKARD:  It may not be.  I think the relevance of

15  the document was Mr. Schulte's introduction of the fact that

16  the warrant was unclassified, which I think suggested to us

17  that he was going to argue that information that was in the

18  warrant, that the information that was in the warrant could be

19  disclosed without regard to whether it was national defense

20  information or was otherwise publicly disclosed.  And so the

21  sealing and the protective order establishes that there

22  continued to be protections over those pieces of information.

23  I think the testimony establishes it, and at this point we

24  don't need 828.

25          THE COURT:  All right.  So then I don't need to rule

M6gWsch3

1    on it.  Among other things, since it makes reference to

2    Mr. Schulte's prior counsel, there are certainly at least

3    redaction issues, but they're mooted by that.

4            Anything else that the government needs to address?

5            MR. DENTON:  Just a purely mechanical matter.  With

6    respect to the next witness, your Honor, I expect he's going to

7    go through a number of emails or documents for which he was the

8    author or recipient.  Certainly the point of his testimony is

9    to ask him questions about those.  It would normally be my

10   practice to ask the witness to read the relevant portion of the

11   document before testifying about it, but I don't want to run

12   afoul of the Court's inclination to let the exhibits speak for

13   themselves.

14           THE COURT:  Let me be clear.  I think to some extent

15   it's helpful to the jury to understand the testimony for them

16   to hear what the exhibits contain, but for example, on recross,

17   to ask about an interview that has already been asked about

18   several times and played, at that point, I just think that the

19   probative value of having the witness describe something that

20   he wasn't personally involved in or present for is outweighed

21   by the waste of time.  So it's not an express prohibition on

22   using or eliciting from the witness anything that's in an

23   exhibit.  It's more a case-by-case determination, and that

24   applies to both sides, to be clear.

25           With that, I'll let you proceed.

M6gWsch3

1          MR. DENTON:  We'll use some judgment about it, your

2     Honor.

3          THE COURT:  OK.

4          Anything you need to raise, Mr. Schulte?

5          MR. SCHULTE:  No.

6          THE COURT:  OK.

7          When we resume, it will be subject to the restricted

8     partial closure of the courtroom that I have previously

9     approved, as modified this morning.

10         For those who weren't here, unless you are permitted

11    to be here, which is to say you are a party, a member of the

12    defendant's family, the two people that the defendant mentioned

13    this morning, and two pool members of the press, you will not

14    be permitted back into the courtroom after the break.  There is

15    an overflow courtroom, 20B, and a feed into the press room as

16    well, both of which are video but not the witness stand, and

17    audio, and after the witness testifies, those restrictions will

18    be lifted.

19         Further, Mr. Schulte and government counsel, I remind

20    you that no questioning that would elicit information that

21    could be used to identify the witness would be permissible.

22         Any questions about that?

23         As I said this morning, I think members of the press

24    are present now who were not present this morning, hopefully

25    you guys can figure out who the two pool members can or will

M6gWsch3

1    be.  If there's any problem on that score, I suppose I'll need

2    to resolve it, and you'll need to alert me during the break.

3    But hopefully you can sort that out.

4              Any questions from anyone, including members of the

5    press on that?

6              All right.  In that case, my understanding is that the

7    court information security officer and the marshals are going

8    to take care of clearing the floor and securing the floor.  The

9    witness should be in before the break concludes so that there's

10   no issues on that score, and then we'll bring the jury in and

11   get started.

12             My intention is not to tell the jury about these

13   precautions that are being taken.  Everyone agree with that?

14             MR. DENTON:  Yes, your Honor.

15             THE COURT:  OK.  Mr. Schulte, do you agree as well?

16             MR. SCHULTE:  Yes, I agree.

17             THE COURT:  All right.  It's now 11:50.  I've taken a

18   few minutes of your break, but be back a minute or two before

19   12:so that we can get started, and the witness should be on the

20   stand at that time.  And to the extent that there's classified

21   information on the bench, you guys will handle it.

22             Thank you very much.

23             (Luncheon recess)

24

25

M6G5sch4

1               A F T E R N O O N   S E S S I O N

2                        12:25 p.m.

3          THE COURT:  My understanding is that the courtroom has

4     been limited to those who are permitted to be here.  We will

5     get the jury and get started.

6               (Pause)

7               THE DEPUTY CLERK:  All rise.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Welcome back, ladies and gentlemen.  I

3    hope you enjoyed your break.  As you can see, we have our next

4    witness already on the stand just to expedite things and save

5    some time so, with that, I will ask you to please, rise, sir,

6    take off your mask and raise your right hand so my deputy can

7    administer the oath to you.

8    ANTHONY LEONIS,

9           called as a witness by the Government,

10          having been duly sworn, testified as follows:

11          THE DEPUTY CLERK:  Please state your full name and

12   spell it.

13          THE WITNESS:  Anthony Leonis.

14          THE DEPUTY CLERK:  You may be seated.

15          THE WITNESS:  Thank you.

16          THE COURT:  Mr. Denton, you may proceed.

17          MR. DENTON:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. DENTON:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  Are you employed?

23   A.  Yes.

24   Q.  Where do you work?

25   A.  The CIA.

1    Q.   What does that stand for?

2    A.   The Central Intelligence Agency.

3    Q.   How long have you worked for the Central Intelligence

4    Agency?

5    A.   Over 10 years.

6    Q.   I would like to focus your attention on 2015 and 2016.

7    Were you working in any particular part of the CIA at that

8    time?

9    A.   Yes.   I was working in the Center for Cyber Intelligence.

10   Q.   What is the Center for Cyber Intelligence?

11   A.   The Center for Cyber Intelligence is a component of the CIA

12   that does offensive cyber operations.

13   Q.   Were you working in any particular group within the Center

14   for Cyber Intelligence?

15   A.   Yes.

16   Q.   What group was that?

17   A.   I was working in the Engineering Development Group,

18   otherwise known as EDG.

19   Q.   Generally speaking, what type of work did EDG do?

20   A.   EDG was responsible for building the tools that were used

21   in CCI's mission.

22   Q.   And again, generally speaking, what was the object of that

23   mission?

24   A.   To collect foreign intelligence via computer means.

25   Q.   Without identifying any particular targets, what types of

M6G5sch4                    Leonis - Direct

1    entities did EDG develop tools to collect intelligence from?

2    A.  So foreign governments of interest to the United States,

3    terrorists.  Generally individuals, organizations -- foreign

4    individuals and organizations of interest to the United States

5    government.

6    Q.  Mr. Leonis, would I like to ask you to look around the

7    courtroom and let us know if you see anyone who worked in EDG

8    during that time as well.

9    A.  I do.

10   Q.  Can you describe where that individual is sitting and an

11   article of clothing that he is wearing?

12   A.  He is sitting at the table next to you, the second person

13   in, shaved head.

14          THE COURT:  Identifying the defendant.

15   Q.  Mr. Leonis, would I like to talk for a second about the

16   structure of EDG.

17          MR. DENTON:  Ms. Cooper, could we publish what is in

18   evidence as Government Exhibit 89?

19   Q.  Mr. Leonis, we have talked about the Center for Cyber

20   Intelligence and the Engineering Development Group.  I would

21   like you to help us walk through more of this diagram.  What is

22   the Applied Engineering Division?

23   A.  The Applied Engineering Division is a group inside of the

24   Engineering Development Group comprised of in-house software

25   developers who develop tools for the CCI's mission.

1  Q.  And did you work in the Applied Engineering Division?

2  A.  I did.

3  Q.  In 2015 did you work in a particular branch in the Applied

4  Engineering Division?

5  A.  I did.

6  Q.  What branch was that?

7  A.  I worked in the Remote Development Branch, otherwise known

8  as RDB.

9  Q.  And what was your position in that branch?

10 A.  I was the branch chief, basically the supervisor.

11 Q.  What were some of your duties and responsibilities as

12 branch chief for RDB in that time?

13 A.  My main responsibilities were essentially to take care of

14 the people that were in the branch.  So if they needed, say,

15 computer equipment, if they needed help with requirements that

16 they were getting from the operators, if they needed help just

17 in general, it was my job to facilitate that assistance.

18 Q.  Were you personally developing software in that role?

19 A.  No, I wasn't.

20 Q.  Did there come a time when you had another position within

21 the Engineering Development Group?

22 A.  Yes.

23 Q.  What was that?

24 A.  So in 2016, around the March time frame, the chief of the

25 division had indicated that there might be an opportunity to

1    take on more responsibility and I expressed interest in taking

2    on more responsibility.  Towards the end of the month I found

3    out that both the chief of the division and the deputy chief of

4    the division were going to be leaving.  So I was assigned as

5    the acting chief of the division and the acting deputy chief of

6    the division in addition to my job as the chief of RDB, so I

7    had three roles at that time.

8    Q.  And again, what were some of your duties and

9    responsibilities in those management roles at the AED level?

10   A.  Well, so at the division level now you are supervising and

11   managing supervisors, right, so now I had responsibility to

12   essentially help all of the branch chiefs in the other branches

13   manage the division.  It was a lot of work to do that and the

14   deputy job in addition to my branch chief role.

15          MR. DENTON:  You can take that down, Ms. Cooper.

16   Thank you.

17   Q.  I want to talk more about your experience at the CIA

18   generally.

19   A.  Sure.

20   Q.  Are you familiar with the concept of a security clearance?

21   A.  I am.

22   Q.  What is that?

23   A.  It's a -- it is basically a clearance or a -- something

24   that allows you to look at different types of classified

25   information.

Q.   Do CIA employees need to have a security clearance to work
there?

A.   Yes, they do.

Q.   Are there different levels of security clearances?

A.   There are.

Q.   What are those levels?

A.   So there is a secret level security clearance, which allows
you to look at secret level information and below.  There is a
top secret security clearance which allows you to look at top
secret and secret level information and below.  And then there
is a -- there are additional types of clearances or I will say
an additional component of a top secret security clearance that
allows you to look at what is known as compartment information.

Q.   And again, we don't need to get into all of the details
but, generally speaking, what are the differences between some
of those levels of security clearance?

A.   Obviously if you have top secret security clearance you are
able to look at top secret and secret information.  If you have
only a secret clearance you could not look at top secret
information.

Q.   And what's the difference between secret and top secret
information?

A.   Essentially top secret information, if released, would have
very, very grave effects on the country or are deemed to have
grave effects, if released.  Secret level information, to an

1    extent, would also not -- would be problematic but not as much

2    as top secret information's release.

3    Q.  Was a security clearance required to work in EDG while you

4    were there?

5    A.  Yes.

6    Q.  What type of security clearance?

7    A.  A top secret security clearance with -- so that you can

8    also look at compartmented information as well.

9    Q.  And is there a particular term for a clearance that lets

10   you look at compartmented information?

11   A.  It's an ISSA clearance.  It allows you to look at SCI

12   material.

13   Q.  Why was that level of security clearance required to work

14   in EDG?

15   A.  Because it was possible that you could end up working on

16   projects that required additional compartments to do your work.

17   Q.  Again, at a general level, what's involved in getting a

18   security clearance?

19   A.  So there is paperwork that you have to fill out.  There is

20   a background check.  You go through a polygraph exam for an SCI

21   clearance.  There are some other things that you go through as

22   well, but it is fairly involved and it takes a while.

23             THE COURT:  Am I correct that SCI, which you refer to,

24   is that secure compartmentalized --

25             THE WITNESS:  Special compartmented information.

1          THE COURT:  Special compartmented information.  And

2     that refers -- "compartmented" means essentially information on

3     a particular subject that is classified at the top secret level

4     but you need to be cleared or read-into that particular

5     compartment to have access to it?

6          THE WITNESS:  That's correct.

7          THE COURT:  OK.

8     BY MR. DENTON:

9     Q.  And you just referred to a polygraph.  In layman's terms,

10    what is that?

11    A.  It is a lie detector test.

12    Q.  Does your security clearance entitle you to have access to

13    all classified information at a particular level?

14    A.  No.

15    Q.  Even with a security clearance, what limits your ability to

16    access certain classified information?

17    A.  It's essentially need to know.  So if you have a need to

18    know about specific subject or type of information or an

19    operation or whatever it is, then normally you are granted

20    access to it.  There are pieces of information that are

21    available to everyone but a lot of information is need to know.

22    Q.  When someone obtains a security clearance, are they

23    required to make any commitments about the handling of

24    classified information?

25    A.  Yes.  It is a lifelong commitment.

 1    Q.  And is that in writing?

 2    A.  Yes.

 3    Q.  Is it a standard form?

 4    A.  Yes.

 5          MR. DENTON:  Ms. Cooper, if we could put up what is in

 6    evidence as Government Exhibit 405 and turn to page 9?

 7    Q.  Mr. Leonis, take a second and look at this and let me know

 8    if you recognize what kind of document this is.

 9    A.  It is a secrecy agreement.

10    Q.  Have you signed an agreement like this?

11    A.  Yes, I have.

12          MR. DENTON:  Ms. Cooper, can we blow up paragraph 2

13    here, please?

14    Q.  Mr. Leonis, can I ask you to read the last sentence of that

15    paragraph?

16    A.  I accept that by being granted access to such information

17    or material I will be placed in a position of special

18    confidence and trust and will become obligated to protect the

19    information and/or material from unauthorized disclosure.

20    Q.  Mr. Leonis, in your experience are CIA officers placed in a

21    special position of confidence and trust?

22    A.  Yes.

23    Q.  How so?

24    A.  Well, you get to see or you have access to a number of

25    different types of operation, operational material, or

1    information of a classified nature and, as a result, you are

2    expected to protect it.

3    Q.  And what role does trust play in protecting classified

4    information?

5    A.  It's a huge -- it's a huge role.  People that have these

6    types of clearances and all the money and time that people

7    invest in obtaining those clearances and getting those

8    clearances, once you get that information and then -- or those

9    clearances and then you have access to the information, it is

10   expected that you protect it and that's -- that's very, very

11   important in protecting the country.

12            MR. DENTON:  Ms. Cooper, if we could zoom back to the

13   full document and then blow up paragraph 3 in the subparts

14   there?

15   Q.  Could I ask you to read that, Mr. Leonis, please?  Just

16   paragraph 3:

17   A.  In consideration of being employed or otherwise retained to

18   provide services to the Central Intelligence Agency, I hereby

19   agree that I will never disclose, in any form or manner, to any

20   person not authorized by the Central Intelligence Agency to

21   receive it, any information or material in either of the

22   following categories.

23   Q.  And if you could just go on and read (a) and (b), please?

24   A.  (a) information or material received or obtained in the

25   course of my employment or other service with the Central

Intelligence Agency that is marked as classified, or that I

know is classified; (b) information or material received or

obtained in the course of my employment or other service with

the Central Intelligence Agency that I know is in the process

of a classified classification determination.

Q.  Sir, I would like to ask you about a couple of terms in

3(a) there.  What does it mean for something to be marked as

classified?

A.  Essentially, when documents are marked as classified they

have header information that basically tells you what the

classification of the overall document is, and many documents

actually have markings for paragraphs at their classification

level as well.

Q.  In 3(a) where it says marked as classified or that I know

is classified, what is the difference between information that

is marked as classified and information that you know is

classified?

A.  Well, some material is marked as classified so obviously

that would be that one, and there are security classification

guides that say what is classified and what is not, so knowing

the security classification guide and understanding what is

classified or not, maybe there is information that you have

been provided that you can't share because you know it's

classified.

Q.  And are there certain categories of information that you,

1   in your experience, know generally to be classified?

2   A.  Yes.

3          MR. DENTON:  Ms. Cooper, if we could then turn to page

4   4 of this document?

5   Q.  Again, Mr. Leonis, do you recognize the type of document

6   that this is?

7   A.  Yes.

8   Q.  And is this a document that you have also signed a version

9   of?

10  A.  Yes.

11         MR. DENTON:  Ms. Cooper, can we blow up paragraph 2 of

12  this, please?

13  Q.  Could you read that, Mr. Leonis?

14  A.  I hereby acknowledge that I have received a security

15  indoctrination concerning the nature and protection of

16  classified information including the procedures to be followed

17  in ascertaining whether other persons to whom I contemplate

18  disclosing this information have been approved for access to it

19  and that I understand these procedures.

20  Q.  Did you receive training in the handling of classified

21  information?

22  A.  Yes.

23  Q.  How often?

24  A.  Yearly we have to do an online training for the

25  classification of documents.

1    Q.   During the time period that you were a supervisor in EDG,

2    was that a standard requirement for employees in EDG?

3    A.   Yes, it was.

4    Q.   You talked about EDG's work on computers a moment ago.  Do

5    you remember that?

6    A.   I do.

7    Q.   Did you receive any special training on the handling of

8    classified information on computers?

9    A.   Yes.

10   Q.   What kind of training?

11   A.   Yearly there is a security training, it is an information

12   security course that everybody in the agency takes regarding

13   how to handle classified materials and agency computer systems

14   and how to handle using them and what you can do and what you

15   can't do.

16            MR. DENTON:  Ms. Cooper, if we could go back to the

17   whole document and then take a look at paragraph 3, please?

18   Q.   Mr. Leonis, could I ask you to read just through the end of

19   sub letter (a) please?

20   A.   I have been advised that the unauthorized disclosure,

21   unauthorized retention, or negligent handling of classified

22   information, by me, could cause damage or irreparable injury to

23   the United States, or could have or could be used to advantage

24   by a foreign nation.  I hereby agree that I will never divulge

25   classified information to anyone unless (a) I have officially

1  verified that the recipient has been properly authorized by the

2  United States government to receive it.

3  Q.  Sorry.  If I could ask you to just finish the sentence,

4  please?

5  A.  Or (b) I have been given prior written notice of

6  authorization from the United States government department or

7  agency (hereinafter Department or Agency) responsible for the

8  classification of information or last granting me a security

9  clearance that such disclosure is permitted.

10 Q.  What is your understanding of the type of injury to the

11 United States that could result from the disclosure of

12 classified information?

13 A.  So some classified information can be used by foreign

14 governments against the United States and its people, and so it

15 could be used by criminals to do things that people wouldn't

16 want them to do.  So there are a lot of different types of

17 damage and injury that can be caused by release of classified

18 information.

19 Q.  In addition to these documents, when you started working at

20 the CIA were you required to take an oath?

21 A.  Yes.

22 Q.  What were you required to swear to do?

23 A.  Essentially to protect the country, uphold the

24 constitution.  Essentially you were taking on a responsibility

25 to protect and defend this country and its people.

1  Q.  Are all CIA officers required to take that oath?

2  A.  Yes.

3       MR. DENTON:  We can take this down, Ms. Cooper,

4  please.

5  Q.  Now, Mr. Leonis, while you worked at the Center for Cyber

6  Intelligence, where in the United States was it physically

7  located?

8  A.  The CCI office.

9  Q.  And is that in any particular state?

10 A.  It's in the Washington metro area.

11 Q.  Does the U.S. government publicly acknowledge that the CCI

12 office is a CIA facility?

13 A.  No.

14 Q.  What is your understanding of the reason why the CCI office

15 is not acknowledged to be a CIA facility?

16 A.  Well, it is to protect the people and the things that are

17 done there.

18 Q.  Was anyone free to walk into that office off the street?

19 A.  No.

20 Q.  What stopped them?

21 A.  Well, first there was a fence, and then there are also

22 security guards so you have to pass through the fence and the

23 security guards by showing your badge.

24 Q.  And as an employee, how would you get into the building?

25 A.  So after you walk through the door of the actual building

1   you need your badge and you have to badge-in.

2   Q.  Did the CIA store classified information at the CCI office?

3   A.  Yes.

4   Q.  Were there particular places in the CCI office where

5   classified information was stored?

6   A.  Yes.

7   Q.  What places were those?

8   A.  They were called SCIFs.

9   Q.  And what does that stand for?

10  A.  Special Compartmented Information Facility.

11  Q.  And again, just generally, what is that?

12  A.  It's essentially a locked office that -- where you have to

13  badge-in to each one, whichever ones you have access to, to be

14  able to first get in the office and then classified information

15  usually is locked up predominantly.

16  Q.  You said whichever ones you have access to.  Did everyone

17  have access to all of the SCIFs in the CCI office building?

18  A.  No.

19  Q.  What limited that?

20  A.  There were access controls, so if you had a need to know or

21  go into a specific component of the CCI office, you had the

22  ability to badge-in.

23  Q.  Were you allowed to take classified information out of the

24  CCI office building?

25  A.  You could, as long as you were taking it to a facility or,

1   like, a place that you were allowed to take it.  And that

2   required you to follow specific security procedures, etc.

3   Q.  Were you allowed to take classified information home?

4   A.  No.

5   Q.  Was there any procedure in place if you did take classified

6   information to a place you weren't supposed to?

7   A.  I mean, yes.  If you made a mistake, you went to security

8   and you told them about it.

9   Q.  Did you use e-mail during your work at the CIA?

10  A.  I did.

11  Q.  Was that a classified e-mail system or an unclassified

12  e-mail system?

13  A.  Classified.

14  Q.  Did you ever send unclassified e-mails on that system?

15  A.  Yes.  Of course.

16  Q.  How would you notify people whether an e-mail was

17  classified or not?

18  A.  There is a banner in the e-mails that say what level the

19  e-mail is.

20          MR. DENTON:  Ms. Cooper, if we could put up what is in

21  evidence as Government Exhibit 1071?

22  Q.  Mr. Leonis, do you recognize this?

23  A.  Yes.

24  Q.  What is it?

25  A.  It's an e-mail.

1    Q.  Who sent it?

2    A.  Mr. Schulte.

3    Q.  And who received it?

4    A.  It was sent to me and it was cc'd to Richard.

5    Q.  Are you able to tell what the classification of this e-mail

6    was?

7    A.  It was SECRET//NOFORN.

8    Q.  What does that mean?

9    A.  So "secret" is the classification level and then after the

10   double slash, "NOFORN" means that it can't be given to foreign

11   nationals.

12   Q.  Are you able to tell who classified this e-mail?

13   A.  Usually it is in the block that was striked out.

14   Q.  What kind of authority do CIA employees have to decide what

15   classification something like this e-mail should be?

16   A.  Most people are derivative classifiers.

17   Q.  What is a derivative classifier?

18   A.  So there are a set of original classifiers in the U.S.

19   government, a small set, and then the people that work in their

20   organizations, whatever, may have a derivative classification

21   which is you are classifying a document based on security guide

22   that was provided to you.

23          MR. DENTON:  We can take this down, Ms. Cooper.  Thank

24   you.

25   Q.  I want to switch back to talking about the work of the EDG

1     in a little more detail.  You talked about developing software.

2     Do you remember that?

3     A.   Yes.

4     Q.   Generally speaking, what type of software did EDG develop?

5     A.   I think, as I mentioned before, offensive cyber tools,

6     tools that were used to collect foreign intelligence.

7     Q.   Can you give me an example at a high level of what a cyber

8     tool does?

9     A.   So at a high level, if a cyber tool was placed on, let's

10    say a computer, and that computer had documents of interest to

11    the U.S. government, the cyber tool could collect those

12    documents and send them back to the U.S. government.

13    Q.   Who tasked you with creating cyber tools?

14    A.   It was the operational groups in CCI.

15    Q.   After you were tasked with creating a cyber tool, what was

16    the general process of developing one?

17    A.   So normally when a requirement came about for a tool there

18    was a requirement, so here is what the operational team is

19    looking for.  That requirement would be provided to a

20    developer, whether -- we will say one of the in-house

21    developers, and that developer would actually work to build the

22    tool according to the specifications in the requirements, they

23    would test it, and then they would deliver it to the

24    operational group.

25    Q.   When you say build the tool, what does building a tool

1    involve?

2    A.   So most of these tools were coded so people would use their

3    computer coding skills, coding languages like CE Python,

4    whatever it might have been, to write a tool using source code.

5    Then they would compile that tool which would create

6    essentially something that the operator could use in doing its

7    collection.

8    Q.   And you just used the term "compile."  In this context,

9    what does compiling mean?

10   A.   Compiling is taking the source code and transforming it

11   into a program that the computer understands so that it can do

12   the collection.

13   Q.   Is that source code that EDG developed classified?

14   A.   Some of it is.

15   Q.   Why?

16   A.   It's mainly because of its association with the CIA.

17   Q.   Why is the association with the CIA something that would

18   make source code classified?

19   A.   So if those tools were used in an operation and they were

20   collected by an adversary, the adversary, if it knew about that

21   tool, how it was developed and whatever, could basically

22   connect the operation back to the U.S. government.

23   Q.   And why would that be problematic for you?

24   A.   Because most of the operations we do we don't want other

25   people to know that we are doing.

1    Q.  Other than the source code that you have been talking about

2    and the finished programs, did the development process involve

3    any other documentation for cyber tools?

4    A.  Yes.  I spoke about the requirements document.  There were

5    also user guides so the operators needed to know how to use the

6    program that was basically the tool that was developed so there

7    were user guides.  There were also delivery documents basically

8    documenting what was actually developed.  Sometimes there were

9    additional pieces of documentation that developers wrote mainly

10   to keep track of what they used or components of the tool that

11   maybe they put into it.  So there is a lot of different

12   documentation that was developed.

13   Q.  Again, focusing on the time period we talked about earlier,

14   2015 and 2016, did EDG use a computer network to develop those

15   cyber tools?

16   A.  Yes.

17   Q.  Generally speaking -- pardon my ignorance -- what is a

18   computer network?

19   A.  I guess the easiest way to describe it is a number of

20   computers connected together.

21   Q.  Did the computer network that EDG used to develop cyber

22   tools have a name?

23   A.  It was called DevLAN.

24   Q.  Are you familiar with that network?

25   A.  Yeah.

1   Q.   Was DevLAN a classified computer network?

2   A.   Yes.

3   Q.   Did it hold information at a particular classification

4   level?

5   A.   Yes.

6   Q.   What was that?

7   A.   At least top secret.

8   Q.   Putting aside the formality of the classification level,

9   would you consider the information kept on DevLAN to be

10  sensitive?

11  A.   Absolutely.

12  Q.   Why?

13  A.   As a number of the cyber tools that were developed in-house

14  were on DevLAN, so if that information was released, that would

15  be a problem.

16  Q.   Was DevLAN connected to any unclassified networks?

17  A.   Not to my knowledge.

18  Q.   Why not?

19  A.   Because we wanted to keep that computer network basically

20  secure by keeping it away from other things.

21  Q.   Was DevLAN connected to the Internet?

22  A.   No.

23  Q.   The same thing; why not?

24  A.   We wouldn't want that computer network attacked by an

25  outside actor.

1   Q.   Generally speaking, who did have access to the DevLAN

2   network?

3   A.   Predominantly EDG officers.

4   Q.   And during that time period, again 2015-2016, approximately

5   how many people worked in EDG?

6   A.   Somewhere around 200.

7   Q.   How did users access DevLAN?

8   A.   So most users had a computer at their desk, DevLAN work

9   station at their desk, computer, and they would log into that

10  computer with their user name and their password.

11  Q.   Did you have one of those computers?

12  A.   I did.

13  Q.   Did you have other computers at your desk as well?

14  A.   I did.

15  Q.   Again, we don't need to get into specifics, but what kinds

16  of other computers did you have?

17  A.   I had computer -- basically I had one other computer.  I

18  had another computer for another computer network associated

19  with the CIA.

20  Q.   Where were those desks where the DevLAN computers were

21  located?

22  A.   They were in the SCIF.

23  Q.   How were those computers connected to DevLAN?

24  A.   Through a network connection.

25  Q.   Again, focusing on this 2015-2016 time frame, did EDG use

1    particular software on DevLAN to conduct the cyber tool

2    development work?

3    A.  Yes.  There were tool suites on DevLAN that allowed for

4    configuration control and tracking of the development of these

5    tools.

6    Q.  Anyone in particular?

7    A.  The Atlassian tool suite.

8    Q.  What is Atlassian?

9    A.  So, it is a tool suite used by the development community to

10   provide source control, a place for documentation, a place

11   where developers could write their requirements or actually

12   parts of their project.  So if you were developing a piece of

13   code or a program you could write, hey, here is some tasks that

14   I need to do as part of developing a program, or here is some

15   information I want to store or keep for other people so that

16   they know what I did.

17   Q.  Was Atlassian one program or more than one?

18   A.  It had a number of subcomponents.

19   Q.  What were those?

20   A.  Stash is known as the source code repository so that's

21   where source code was stored.  There was a wiki called

22   Confluence.  And then there were a couple of other things

23   there.

24   Q.  Let me ask you, what is a wiki?

25   A.  So if you have ever at home Googled, let's say, a topic

1    like trees or something like that, sometimes you will see

2    something pop up called Wikipedia, and you can read about

3    trees, for example.  That's a wiki.  It allows people in the

4    community to add information about any particular topic.  So

5    Confluence allowed developers to add information about their

6    tool development activities.

7    Q.  You said there were some other components.  Why did you

8    emphasize Confluence and Stash?

9    A.  Because those are the two that I predominantly know about.

10   Q.  Did everyone in EDG have access to everything in those

11   programs?

12   A.  No.

13   Q.  How was access limited?

14   A.  So there were -- we will use Stash, for example, because

15   I'm a little bit more familiar with that.  In Stash there were

16   groups of people that had access controls to given parts of the

17   tool development, the code that was there.  So if you and

18   another developer were working on a specific tool, you could

19   restrict access to that tool and the code to just you and that

20   other developer.  So there were access controls put in place.

21   Q.  Sir, I would like to direct your attention to March 7,

22   2017.

23   A.  OK.

24   Q.  Do you remember that day?

25   A.  Yes.

1    Q.   Why is that a memorable day?

2    A.   March 7, 2016 you said?

3    Q.   2017.

4    A.   2017, you said.

5         So, on March 7, 2017, I remember that day for two reasons.

6    One was I had the opportunity to drive my boss at the time to a

7    conference, a meeting.  And so, I drove to his house and pulled

8    into his driveway and I was waiting for him to come out of his

9    house and I was looking forward to it because it was a good

10   opportunity, we were going to be in the car for a while and

11   just talk.  And I got a phone call from Mike S. who basically

12   said, hey, I need you guys to come in here right now.

13   Something's happened.

14              And so when --

15   Q.   Sorry, sir.  Let me stop you for one sec.  Who is Mike S.?

16   A.   He is the deputy group chief of EDG.

17   Q.   Please continue.

18   A.   So when my boss got in the car, I said, hey, change of

19   plans, we have to go into the office.  So when we got to the

20   office we went to the CCI front office, and we noticed there

21   were a lot of people sitting in the conference room there and

22   they were looking at materials that were released on the

23   Internet from our source code repository on DevLAN.

24   Q.   Did you recognize the material that had been released?

25   A.   Yes; some of it.

1    Q.   What did you recognize it as?

2    A.   Those were tools from our source code repository on DevLAN.

3    Q.   Were there additional disclosures of EDG's information

4    after that day?

5    A.   Yes, as I understand it.

6    Q.   Where did those disclosures take place?

7    A.   On a site called WikiLeaks.

8    Q.   Was the information disclosed by WikiLeaks classified or

9    unclassified?

10   A.   It was classified.

11   Q.   You referred to that information as coming from DevLAN.

12   Did it come from any particular parts of DevLAN?

13   A.   Yeah.  Some of it -- the stuff that I recognized came from

14   our Confluence and Stash code repositories, the Atlassian tool

15   suite that I just talk about.

16        MR. DENTON:  Ms. Cooper, if we could put up what is in

17   evidence as Government Exhibit 13?

18   Q.   Mr. Leonis, do you recognize this?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's a user guide for a tool called Drifting Deadline.

22   Q.   Was this one of the documents disclosed by WikiLeaks?

23   A.   Yes.

24   Q.   Did this come from DevLAN?

25   A.   Yes.

1    Q.  Do you see at the top of the very top of the page where it

2    says SECRET//NOFORN?

3    A.  Yes.

4    Q.  What does that mean?

5    A.  Well, first, it is classified at the Secret level and it is

6    not to be distributed to foreigners.

7              MR. DENTON:  If we can go out?  Ms. Cooper, can you

8    blow up the image that is in the center of that page?

9    Q.  Mr. Leonis, what is the Information Operations Center?

10   A.  So it was the precursor to CCI.  So I can't remember when,

11   but at some point CCI was -- or IOC it was called, the

12   Information Operations Center, was reorganized into CCI.

13             MR. DENTON:  Thanks, Ms. Cooper.

14   Q.  Are you familiar with the Brutal Kangaroo program?

15   A.  Yes.

16   Q.  How did you become familiar with it?

17   A.  So as a supervisor in EDG, this was one of the tools that I

18   was made aware of.

19   Q.  Are you familiar with any of the developers who worked on

20   that?

21   A.  Yes.

22   Q.  Who were some of them?

23   A.  So they were in a branch called OSB.

24   Q.  And what does that stand for, sir?

25   A.  Operational Support Branch.

1  Q.  Please continue.

2  A.  So Mr. Schulte was one of the developers.  Christopher was

3  one of the developers, as I understood it.  And there are a few

4  other people.

5          MR. DENTON:  Ms. Cooper, can we go to page 4 of this

6  document, please?  If you could zoom if on the text paragraph

7  below the header 1.1?

8  Q.  I'm going to ask you help us understand some terms here.

9  First of all, what is a tool suite?

10 A.  So it's -- we talked about collection tools that would

11 imply that there was more than one collection tool or component

12 of the suite of tools, so there were multiple tools in the

13 suite.

14 Q.  And what are closed networks?

15 A.  Closed networks are those networks that are not connected

16 to the Internet.  So DevLAN would be an example of a closed

17 network.

18 Q.  And what is air gap jumping?

19 A.  So air gap jumping is being able to move from one computer

20 to another via, in this case, a thumb drive.  So if the tool --

21 if the collection tool was, let's say, implanted on a computer,

22 let's say computer A, let's say a laptop, for that matter, and

23 you applied this thumb drive tool into that computer A, the

24 tool would actually infect the thumb drive and allow the thumb

25 drive, when plugged into the next computer, it would actually

1  infect the computer B or other computers that that thumb drive

2  touched.

3  Q.  When you talked about thumb drives being plugged in, as a

4  general matter, who are we talking about doing that?

5  A.  Any number of people.  I mean, there are somebody -- for

6  example, if this tool was implanted on a network that -- a

7  foreign network and, you know, a person plugged their thumb

8  drive into it, they could unwittingly transfer the tool to

9  another computer.

10         MR. DENTON:  Ms. Cooper, could we zoom out of this and

11  go to page 6 of this document, please?  And could we zoom in

12  that starts at the first tab and everything below it?

13  Q.  Now, Mr. Leonis, we don't need to read all of this.  Can

14  you summarize for us what type of information is here?

15  A.  So it talks about how the user can configure the tool and

16  what they must do.

17  Q.  Is the disclosure of this information problematic for the

18  Brutal Kangaroo tool suite?

19  A.  Yeah, because it is talking about the type of DLLs which

20  are computer programs on a Windows computer.  It talks about

21  how you can configure the actual files and what OSs --

22  operating systems -- that you can target.  And specifically, it

23  talks about the execution vectors and what versions of Windows

24  they are patched on or they work on.

25  Q.  Was this document released by WikiLeaks?

1    A.  Yes.

2    Q.  What, if any impact, did the disclosure of this document

3    have on Brutal Kangaroo?

4    A.  It was unusable at that point.

5    Q.  Generally speaking, what are some of the other types of

6    documents and information that WikiLeaks disclosed from EDG?

7    A.  Since I wasn't part of actually the review process I don't

8    know the complete set, but documents like this, user guides,

9    information from Confluence, like I said notes from developers.

10   And then there were actual tools, code repositories that were

11   actually put out by WikiLeaks so actual tools that could be

12   built by anyone and used.

13            MR. DENTON:  Thank you, Ms. Cooper.  We can take that

14   down.

15   Q.  Did everyone who worked in EDG have access to all the

16   information disclosed by WikiLeaks?

17   A.  I don't believe so, no.

18   Q.  Were there particular people who did have access to all of

19   that information?

20   A.  Yeah.  I mean, it is just like administrators, computer

21   administrators, administrators of the Atlassian tool suite

22   would have access to the information at least contained in it.

23   Q.  You testified about being a supervisor within the division.

24   Do you remember that?

25   A.  I do.

1    Q.   Were you an administrator on the system?

2    A.   No.

3    Q.   Looking around the courtroom, do you see anyone who was?

4    A.   On particularly what specifically?

5    Q.   On the system, the type of administrator that you were

6    describing who would have access to the information released by

7    WikiLeaks?

8    A.   Specific to the Atlassian tool suite, yes.

9    Q.   And who is that?

10   A.   Mr. Schulte.

11   Q.   In addition to Mr. Schulte, did any other EDG employees

12   serve as administrators?

13   A.   Yes, they did.

14   Q.   What type of employees were those?

15   A.   So it depends on what the date was because prior to, I will

16   say mid-April 2016, there were other developers that were

17   administrators of the Atlassian tool suite, let's say

18   post-April 2016 that responsibility was transferred to a branch

19   called ISB, and then it was just the system administrators for

20   the DevLAN system that had access to it.

21   Q.   Now, you have testified for a while now about DevLAN and

22   about its infrastructure, right?

23   A.   Yes.

24   Q.   Other than in connection with this case, have you ever

25   spoken about DevLAN publicly?

1    A.  No.

2    Q.  Why not?

3    A.  I just generally don't talk about work at home.  Or even

4    publicly, for that matter.

5    Q.  And why don't you talk about work publicly?

6    A.  Well, one, I'm not really supposed to; but two, I just -- I

7    have a clearance and I want to keep it so I just try to stay

8    away from talking about what I do outside of work.

9    Q.  Now, you testified about your role in EDG in early 2016.

10   Do you remember that?

11   A.  Yes.

12   Q.  And about your role as chief of RDB, right?

13   A.  That's correct.

14   Q.  Before March of 2016, was the defendant in RDB?

15   A.  No.

16   Q.  And I think you said he worked in a branch called OSB; is

17   that right?

18   A.  That's correct.

19   Q.  Generally speaking, what type of work did OSB do?

20   A.  OSB did mostly quick reaction tools.  So what that -- or

21   quick reaction capabilities, QRCs is what they're called.

22   That's when operators would come up to the branch OSB and say

23   we need this capability for this operation, and it usually was

24   in a short period of time.  So that branch -- OSB -- that was

25   mainly what they did.

1    Q.  And how is that type of work different than what your

2    branch -- RDB -- did?

3    A.  RDB did more strategic developments.

4           So we were provided requirements and some of those

5    requirements were multi-tiered, they required multiple

6    capabilities, and usually they took a lot longer period of

7    time.

8    Q.  Roughly how big was a branch in that period of time?

9    A.  I will say roughly 15 but some branches were larger and

10   some were smaller.

11   Q.  Before March of 2016 had you interacted with Mr. Schulte?

12   A.  Yeah.

13   Q.  How did you come to interact with him?

14   A.  So as branch chief in RDB, when I first started I got to

15   know Sean, the branch chief of OSB, and Sean was great.  He

16   took me under his wing.  That was my first branch chief job.  I

17   needed a lot of help so I would go upstairs and I would talk to

18   him.  And there were a number of times when I was looking for

19   him and he wasn't in his office and where I would find him was

20   at the end of the row where Mr. Schulte and Jeremy and a few

21   other developers were.

22   Q.  So help orient us to the layout.  You said you would go

23   upstairs.  Where were OSB and RDB located relative to one

24   another?

25   A.  At first, when I became branch chief of RDB, we were on the

1    same floor.  I forget when it happened, but shortly thereafter

2    EDG did a reorganization of where branches were sitting and RDB

3    was moved from the ninth floor to the eighth floor, and so

4    essentially OSB was on the upper floor and RDB was on the floor

5    below it.

6    Q.  And you talked about seeing Sean -- I think you said -- at

7    the end of the row; is that right?

8    A.  That's correct.

9    Q.  Describe a little bit about what the layout of OSB looked

10   like.

11   A.  OK.  So if memory serves me correct, there were at least

12   two rows, and a row had cubicles in it.  And in each row on

13   either side you had either four cubicles or three cubicles.  So

14   when you went into a row, essentially there was a hallway, and

15   depending on which way you were going, there were offices on

16   one side and then there were cubicles of developers on the

17   other.  So when you entered a row, you basically walked by a

18   number of cubicles to find whoever you were looking for.

19   Q.  Within AED at this time, how would you characterize the

20   relative seniority of the developers in OSB?

21   A.  They were more junior developers, a couple years of

22   experience.  Some had more.  There are a few developers in OSB

23   that were more senior but predominantly it was more junior.

24   Q.  And during your visits to the OSB space, were you able to

25   observe kind of the culture and atmosphere in that branch?

1    A.  Yeah.  I mean it was -- it was like any other branch.  I

2    mean, people would be joking around, people would be talking.

3    I mean, it seemed very collegial, in my opinion.

4    Q.  Before March of 2016 were you the defendant's supervisor?

5    A.  No.

6    Q.  After you became the acting deputy division chief and

7    acting division chief were you in his supervisory chain?

8    A.  Yes.

9    Q.  Again, just explain to us how that worked.

10   A.  So somewhere in March of 2016 -- yeah, March of 2016, the

11   end of March of 2016, Mr. Schulte was moved -- well, first I

12   became the acting division chief and acting deputy division

13   chief, which meant that now I was supervising over all of the

14   branches in AED so in that regard he was in my -- he was

15   underneath me.

16   Q.  So let me ask you about that.  When you assumed those roles

17   at the division level, were you involved in any meetings about

18   Mr. Schulte?

19   A.  Yeah.

20   Q.  Who else was involved in these meetings?

21   A.  I think of one in particular that stands out, it was

22   shortly after I assumed those three jobs at the same time,

23   Mike, the deputy group chief, said, Hey, you need to come to

24   this meeting.  And he took me to the CCI front office, and at

25   the CCI front office pretty much you had the chief of CCI, the

1    deputy chief of CCI, representatives from HR, etc., and then

2    there was Mike, and me, and I was the most junior person in the

3    room.

4    Q.  And what was that meeting about?

5    A.  It was about Josh and Amol.

6    Q.  What do you mean when you say Josh and Amol?

7    A.  So if memory serves me correct, there was a -- there was a

8    situation that had come about and the CCI front office was

9    trying to figure out how to deal with it.

10   Q.  As best you can remember, what was the situation you were

11   trying to deal with?

12   A.  I think there were two parts to it.  One, there was a

13   protective order that was put in place or that was obtained by

14   Mr. Schulte against Amol and so they were trying to figure out

15   how to deal with that and there were some other issues, I

16   guess -- I think there was some sort of TMU -- threat

17   management -- concern that was initiated by Mr. Schulte, and

18   people were just trying to figure out how to get everybody back

19   to work.

20   Q.  When you say TMU, what is that?

21   A.  Threat Management Unit.

22   Q.  Have you dealt with them during your tenure at the CIA?

23   A.  Very, very rarely.

24   Q.  What do they do?

25   A.  When there is a threat to people or, you know, their job is

1   to investigate it and basically help come up with measures to

2   protect people.

3   Q.  Prior to this meeting, had you ever meet with the EDG front

4   office before about an employee dispute?

5   A.  Not that I remember at that point in time.

6   Q.  What made this situation unusual?

7   A.  Well, first, I never had been taken to a meeting in the CCI

8   front office with all of those people present so that was

9   pretty odd.  And second, I mean this is -- you said why is it

10  memorable?  Is that what you said?

11  Q.  Why is it unusual.

12  A.  Unusual.  You had chiefs of all those, all in the same

13  room, talking about it.  Usually personnel issues were dealt at

14  the lowest levels possible so branch chiefs could deal with

15  personnel issues, and the fact that we were -- or division

16  chiefs, if they warranted it, but the fact that we were sitting

17  in the CCI front office talking about a personnel issue, that

18  was pretty serious.

19          MR. DENTON:  Ms. Cooper, could we put up what is in

20  evidence as Government Exhibit 1046, please?

21  Q.  Mr. Leonis, do you recognize this?

22  A.  Yes.

23  Q.  And what is it?

24  A.  It's an e-mail.

25  Q.  Is it more than one e-mail?

1  A.  Yeah.

2  Q.  And the last one here, who sent it and who received it?

3  A.  You mean at the very top?

4  Q.  At the very top.

5  A.  It was sent by Mr. Schulte and it was sent to me.

6          MR. DENTON:  So Ms. Cooper, if we could go to the last

7  page of this e-mail -- next to last page?

8  Q.  Now, did you receive this whole e-mail chain, sir?

9  A.  Eventually, but not at -- not at the first e-mail.  I

10  wasn't on the first e-mail.

11  Q.  Let's start with the first e-mail.  Again, who sent it?

12  A.  Debra, who was the outgoing chief of AED at the time.

13  Q.  Is that who you replaced?

14  A.  Yes; as acting.

15  Q.  And who did she send it to?

16  A.  She sent it to Mr. Schulte and Amol.

17  Q.  And did she direct that some action be taken?

18  A.  Yes.

19  Q.  What was that?

20  A.  So she asked them to both move to two new cubicles.

21          MR. DENTON:  So then Ms. Cooper, if we can take that

22  down and it is a little tricky, if we can do the next e-mail

23  up?  That's perfect.  Thank you.

24  Q.  So now, who sent this one, sir?

25  A.  I did.

1    Q.  And who did you send it to?

2    A.  Well, on the "to" line I sent it to Amol and Mr. Schulte,

3    and then there were a number of people cc'd on the e-mail.

4    Q.  And generally speaking, what were their roles?

5    A.  So HR; security; you had the chief and deputy chief of CCI;

6    the chief and deputy chief of EDG; myself, who was acting chief

7    and deputy chief of AED; Debra, who was the outgoing chief of

8    AED; and Sean who was the branch chief, at the time, of OSB.

9    Q.  Why did you copy all of those people?

10   A.  Well, one, I was directed to send this e-mail, so.

11   Q.  Who directed you to send this e-mail?

12   A.  I can't remember if -- I believe it was actually Bonnie,

13   but it was either somebody in CCI leadership or EDG leadership.

14   Q.  Did this come after that meeting that you were describing

15   earlier?

16   A.  Yeah.

17   Q.  Can you just read for us the first sentence of the e-mail

18   itself?

19   A.  Sure.

20       After further consultations with HR, security, and the CCI

21   front office, effective immediately (Tuesday, 29 March 2016)

22   the following adjustments are being made:  Josh will be moving

23   to AED/RDB and Amol will be moving to AED/MDB.

24   Q.  What is this e-mail directing to happen?

25   A.  So essentially we were reassigning Mr. Schulte to a new

1   branch and Amol to a new branch.

2   Q.  And which branch was Amol being assigned to?

3   A.  MDB.

4   Q.  And which branch was Mr. Schulte being assigned to?

5   A.  RDB.

6   Q.  Was that your branch?

7   A.  It was.

8   Q.  What was your understanding of why Mr. Schulte and Amol

9   were being reassigned?

10  A.  My understanding at the time was essentially as a result of

11  this security situation there were three -- basically it had

12  caused some -- it was distracting to the branch, for one; and

13  then two, the two officers were being reassigned so that we can

14  get them back to work.  So we wanted to move Josh somewhere

15  where we thought he would be working on similar types of

16  materials, and Amol had capabilities that he could be moved to

17  another branch where he could do something else.  So that was

18  pretty much it.

19  Q.  And among your many hats at this time, did you become

20  Mr. Schulte's branch chief as a result of this move?

21  A.  Yeah.

22          MR. DENTON:  So if we could zoom out, Ms. Cooper, and

23  go to the next e-mail up in this chain?

24  Q.  Who sent this e-mail?

25  A.  Mr. Schulte.

1    Q.  Who did he send it to?

2    A.  It was sent to me and then all the people that I cc'd.

3    Q.  Do you see where he writes:  I just want to confirm this

4    punishment of removal from my current branch.

5    A.  Yeah.

6    Q.  Was Mr. Schulte being punished?

7    A.  No.

8    Q.  Did you view being moved to RDB as a punitive measure?

9    A.  No.  Actually, I thought it was a -- it was good.

10   Q.  Why?

11   A.  Well, I just -- RDB was my branch at the time.  I thought

12   highly of my branch but it was an opportunity for a new start,

13   he was going to be with some more senior developers,

14   specifically Duane who had been an OSB previously, and I just

15   saw it as an opportunity for him to work on a different area of

16   the mission and have an opportunity to do some cool things.

17   Q.  During any of the meetings that you participated in about

18   this, did anyone discuss punishing Mr. Schulte for reporting to

19   security an incident?

20   A.  No.  Not while I was there.

21          MR. DENTON:  And if we could zoom out again,

22   Ms. Cooper, and just look at the last e-mail?

23   Q.  Again, Mr. Leonis, what was the reason for Mr. Schulte's

24   move?

25   A.  It was mainly because of the, as I understood, the

1    protective order and some of the other things that happened,

2    and so we were just trying to get everybody back to work.

3    Q.  How did this move, in your view, contribute to getting

4    everything back to work?

5    A.  Well, one, by reassigning Amol and Mr. Schulte, one, it

6    removed the distraction from the branch so the branch could get

7    back to work.  Secondly, by putting Amol and Mr. Schulte in a

8    branch that they had the skills to work in, it allowed them to

9    pursue in the mission and also get back to work.

10   Q.  Do you see where it says Mr. Schulte will be unable to

11   compete his move by the time he leaves?

12   A.  Yeah.

13   Q.  Did he eventually move to RDB?

14   A.  Yes.

15          MR. DENTON:  You can take this down, Ms. Cooper.

16   Thank you.

17   Q.  Mr. Leonis, within each branch in AED, who, for lack of a

18   better term, owned the projects that the developers were

19   working on?

20   A.  Well, the developers did.

21   Q.  And how did that work?

22   A.  So the easiest way to explain it is that developers who

23   were developing these projects or developing these tool sets,

24   they either developed them on their own, right, so they would

25   be the only developer with access to their code, or they worked

1    in teams.  The Atlassian tool suite was a mechanism that people

2    used to store their code and also provide access to those

3    people.  You can do two different things, you can have what we

4    call write access, which allowed people to make changes to that

5    code; or you could also give people read access which just

6    meant that they could see the code and they could download it,

7    they could use it but they couldn't literally change it.  And

8    we allowed the developers to figure that out because, well,

9    they were the experts.  They knew what they were doing, they

10   knew what the code was for, and we believed in allowing

11   people -- you know, allowing people to make decisions at the

12   lowest level possible.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. DENTON:

2   Q.  When a developer moved from one branch to another, did they

3   typically retain access to those projects that they had

4   previously been working on?

5   A.  Not necessarily.  Movements between branches was rare.

6   Usually what we did was we allowed the developers to figure

7   out, in the branch, what things would move with that person or

8   what projects they could take.  And it was up to the developers

9   to figure that out, and when they couldn't figure it out, the

10  branch chiefs ultimately got involved.

11  Q.  At the time that the defendant moved from OSB to RDB, did

12  you discuss with him whether he would be allowed to maintain

13  access to any of the old projects that he had been previously

14  working on?

15  A.  Yes.

16  Q.  What did you talk about?

17  A.  Well, predominantly, the decision was being made by OSB,

18  and they decided that -- that there were some projects that

19  they wanted to maintain control over, but I think the decision

20  at the time was that Mr. Schulte could take a tool called Nader

21  and a tool called Shattered Assurance with him to RDB.

22  Q.  Did you discuss the defendant keeping his access to a

23  project called OSB libraries?

24  A.  I personally didn't at that point in time.

25  Q.  What is your understanding of what OSB libraries is?

1    A.  So, OSB libraries, as I understand it --

2              MR. SCHULTE:  Objection.

3              THE COURT:  Overruled.

4    BY MR. DENTON:

5    Q.  Please continue, sir.

6    A.  Oh.  OSB libraries, as I understood it, was a -- the way I

7    like to think of it was it was a bunch of code snippets, if you

8    want to think of them like Legos.  Right?  So if you're trying

9    to build something, like build something in Legos, you take a

10   bunch of Legos, you put them together, and you come up with

11   something.  Right?  The OSB libraries was a number of those

12   code snippets that, because of the way OSB worked and they were

13   building quick reaction tools, it allowed developers to pull

14   from those libraries, pull code from those libraries and use

15   them in the tools that they were building.  It helped them kind

16   of move quickly when they had requirements, short-order

17   requirements.

18   Q.  And was that type of requirement generally unique to OSB?

19   A.  There were other branches with QRC requirements, but

20   generally, that's a lot of what OSB did.

21   Q.  Did there come a time when you became aware of a dispute

22   over the defendant's access to OSB libraries?

23   A.  Yes.

24             MR. DENTON:  Ms. Cooper, if we could show what is in

25   evidence as Government Exhibit 1061, and start with the last

1    email in the chain.  And, sorry, I think we may need a piece of

2    the page above.

3    Q.  Mr. Leonis, who sent this email?

4    A.  Jeremy Weber.

5    Q.  Do you know Jeremy Weber?

6    A.  Yes.

7    Q.  Who is he?

8    A.  He was a developer in OSB at the time.

9    Q.  And when did he send this email?

10   A.  Thursday, April 14, 2016, at 3:30 p.m.

11   Q.  And who did he send it to?

12   A.  Mr. Schulte.

13   Q.  And did you receive this email?

14   A.  Yes.

15   Q.  What's your understanding of why he copied you on this

16   email?

17   A.  It was either for two reasons -- two reasons.  One, I was

18   the branch chief of RDB, but I was also serving as the division

19   chief or acting division chief.  So in either role, he could

20   have sent it to me.

21   Q.  Can you read this email for us?

22   A.  Yes.

23       "Josh, I discussed these things -- "discussed things with

24   Sean, and this is the situation.  In the short term, the OSB

25   libraries remain an OSB project and are under Frank Stedman and

1  my guidance.  You are free to contribute to the libraries by

2  creating a branch and following the pull-request model that is

3  in place.  We are hoping to move the libraries to Kevin's

4  authority and to make them officially an AED-level resource.

5  When Kevin takes over and if he desires for you to have direct

6  authority for the two long-lived branches, then we will give

7  you commit access to the Master and Develop.  Until something

8  officially changes, you must follow the pull-request model and

9  leave it to either Frank or me to complete the merge."

10  Q.  Can I ask you to translate here?  What is this email

11  saying?

12  A.  In short, Jeremy was relaying that the OSB library project

13  was going to be maintained by OSB and that Mr. Schulte could

14  contribute to the library and provide updates, but they would

15  go through Frank or Jeremy to be incorporated into the

16  libraries.  And then at a later date, the libraries would

17  hopefully be moved to -- it says Kevin, and he was somebody

18  looking into taking all the libraries across the many branches,

19  because other branches had similar type libraries for code

20  development, and move them into something that people across

21  the AED could use.

22        MR. DENTON:  Ms. Cooper, if we could zoom out and go

23  to the next email in this chain.

24  Q.  Mr. Leonis, who sent this email?

25  A.  Mr. Schulte.

M6gWsch5                     Leonis - Direct

1   Q.  And did you receive it?

2   A.  Yes.

3   Q.  Generally, were the recipients the same as on the last

4   email?

5   A.  Generally, I think.  It looks like maybe Kevin was added.

6   Q.  Can we talk a little bit about the second and the start of

7   the third paragraphs?  Can you read the second paragraph and

8   the first sentence of the third?

9   A.  Sure.

10       "I've talked with Anthony and Sean a bit about working

11  on/transitioning some of my old projects, but I haven't

12  specifically talked about the OSB libraries until now.

13       "Since the OSB libraries were initially my idea that

14  stemmed from Brutal Kangaroo, and I've spent a lot of time and

15  effort managing and helping to administer them, I'd like to

16  stay on along with Frank Stedman and Jeremy Weber as helping

17  administrating them."

18  Q.  How long after the original email from Jeremy Weber did the

19  defendant sent this?

20  A.  I'm sorry.  I can't tell.

21           MR. DENTON:  All right.  If we could zoom out.

22  A.  It looks like nine minutes.

23           MR. DENTON:  And then, Ms. Cooper, if we could go up

24  to the response here.

25  Q.  Who responded to the defendant's email?

1   A.  I did.

2   Q.  And first, before we get into the details, let me ask you,

3   sir, did you agree to the defendant's request that he be

4   allowed to continue administering OSB libraries?

5   A.  No.

6   Q.  What did you say?

7   A.  Can I read the email, just briefly, quick?

8   Q.  Take your time.

9   A.  In short, I was talking about the fact that we were going

10  to move a lot of these source codes, these libraries, these

11  branch libraries, eventually to the AED level.  It was

12  something that Debra, the outgoing division chief, was

13  interested in doing, and Jojo was brought on essentially to

14  help with that fact.  So I talked about, you know, setting up a

15  meeting with Jojo, talk about how we can get people from the

16  branches in that discussion and develop a plan to -- to move

17  all these libraries to the AED level.

18  Q.  So when that happened, would anyone in OSB continue to

19  administer the libraries?

20  A.  Not particularly.

21  Q.  Would the defendant be able to administer OSB libraries?

22  A.  That wasn't -- that was not the plan at least.

23  Q.  Mr. Leonis, what's the time on this email?

24  A.  3:59 p.m.

25  Q.  And on what day?

1    A.   Thursday, April 14.

2              MR. DENTON:  Ms. Cooper, if we could now switch and

3    pull up Government Exhibit 1062 and go to page 10.

4    Q.   What's the date of this email, sir?

5    A.   Thursday, April 14.

6    Q.   And what time was it sent?

7    A.   4:40 p.m.

8    Q.   Who sent it and to whom?

9    A.   Jeremy sent it, and he sent it to myself, Sean, who was the

10   outgoing branch chief at that point, and Richard, who was going

11   to essentially serve as the acting branch chief for OSB at the

12   time.

13   Q.   Can you read this email for us, please?

14   A.   Sure.

15        "Anthony, we have a situation with the libraries and the

16   Atlassian products in general.  After we talked with Josh, and

17   I sent the email saying that he doesn't have direct access to

18   our two main branches, he went and modified the permissions to

19   the project to return his previous rights.  He is able to do

20   this because he is one of the Atlassian administrators, and I

21   think we need to remove him from this group.  I can explain the

22   situation further, but this act has shown that he believes

23   access controls shouldn't apply to him."

24   Q.   What is your understanding of the sentence that reads, or

25   starts, "he is able to do this because he is one of the

1  Atlassian administrators"?

2  A.  So, as an Atlassian administrator, he had the ability to

3  change the permissions on projects in the Atlassian tool suite.

4  And the main reason for that was, at the time the ISB group,

5  who generally maintained the networks, they were undermanned.

6  So since developers knew what developers needed, and this

7  Atlassian tool suite was put in place, there were developers

8  who served as administrators on the tool suite basically so

9  that when a developer needed a change to, let's say,

10 permissions or help with the Atlassian tool suite, they could

11 go to one of those administrators and get the help.

12 Mr. Schulte was one of those administrators at that point in

13 time.

14 Q.  And in the last sentence, where it says, "this act has

15 shown he believes access controls shouldn't apply to him," what

16 was your understanding of that?

17 A.  So, in Jeremy's opinion at that point in time, he was

18 stating that because essentially Mr. Schulte was told he's not

19 administering the library and then he decided to use his

20 Atlassian administrative privileges to give himself access to

21 that library or change that library, he was using his

22 administrative privileges to do something that he was told he

23 couldn't do.  So, in a sense, Jeremy was saying that this is a

24 problem.

25 Q.  Do you remember what your reaction was when you got this

1    email?

2    A.  Yeah.

3    Q.  What was your reaction?

4    A.  My first reaction, I remember, was this is my third week

5    into this job and this is a pretty heavy situation.  And truly,

6    I was just like:  OK.  I'll stop.  We need -- we need to stop

7    and figure out what actually, really happened.

8    Q.  Why was that your first reaction?

9    A.  Because this was a heavy accusation.  I mean this is --

10   you're essentially telling somebody who is placed in a position

11   of trust that they can't be trusted, and so that had a lot of

12   implications.  And for me, I just -- it's a very strong

13   statement to make that -- make the statement, let's figure out

14   what actually happened.

15            MR. DENTON:  Ms. Cooper, if we could go back to 1062

16   and scroll up to the email on page 9 that starts in the middle

17   of the page, please.

18   Q.  Again, sir, what's the date on this email?

19   A.  It's Friday, which is the next morning, April 15, at 7:29

20   a.m.

21   Q.  And who sent this email?

22   A.  I did.

23   Q.  Who did you send it to?

24   A.  To Jeremy, Sean, and Richard.  I cc'd myself.

25   Q.  And why did you send this email?

1    A.  Well, as I state there, I need a little bit more background

2    to better understand the situation.

3    Q.  And what kind of information did you want to know?

4    A.  Well, it's in the three questions that I listed there.

5    Q.  Why don't you just read those?

6    A.  The three questions were, are the OSB libraries an entirely

7    OSB product?  Meaning if you weren't in OSB, in that branch,

8    you couldn't -- can't generate and/or use the components and

9    libraries.  Right?  So the point being if Josh had been moved

10   to RDB, and was this a case of if he wasn't in the branch,

11   could he access or use it.  Right?

12       Second, what was -- what were Josh's permissions on these

13   projects.  Right?  Was this a case of wanting to have access to

14   contribute, which we, we had just talked about the previous

15   day, saying that was OK.  Or was this a case of somebody

16   actually wanting control?  Meaning to be able to do what you

17   wanted to do with the libraries.

18       Third, Jeremy had mentioned that he spoke to Josh, and my

19   question was, well, was it in writing?  Is there something I

20   can look at?  Or was it in person.  And then if it wasn't in

21   writing, and it was actually in person, I wanted to better

22   understand actually what was said.  Because I mean when people

23   talk, they miscommunicate.  Right?  So I really just wanted to

24   get down to the bottom of it.

25   Q.  And if you can just continue and read what you said in the

1    next paragraph here.

2    A.  Sure.

3         "My concern is that if Josh wants to use the libraries and

4    no longer has access to them, that's one thing.  On the other

5    hand, if he changed his permissions to enable him to administer

6    the libraries, that's another."

7    Q.  What's the distinction that you're drawing there, sir?

8    A.  Well, if you go back to what we just talked about the

9    previous day and we said, Hey, we're going to allow you to have

10   access so that you can, you know, use the code in the library

11   and you want to make updates, go ahead, right.  So if there was

12   a change made and it was an accident, where he could no longer

13   read the code that was there or use it, well, I can understand

14   why maybe he made a change, and maybe he just made the wrong

15   change.  Right?  People make mistakes, right?

16        On the other hand, if he changed his permissions to

17   administer the libraries, meaning he was -- he had access to

18   read the code, as he was told he could, and then he decided to

19   change his permission so that now he could write the code, that

20   was a huge problem.  Because we just said no.  Right?  We said

21   no, that's not the way it was going to be.

22   Q.  Do you see at the bottom where you say, "but in this matter

23   I urge caution"?

24   A.  Yes.

25   Q.  What did you mean by that?

1  A.  Well, as I said before, I mean this -- it was a very strong

2  statement to say that a person was basically using their

3  privileges for their own personal gain/use.  For me, that's --

4  you're talking about a person that has a security clearance,

5  somebody that's working with us, somebody that's trusted.  You

6  know, let's, let's, everybody take a step back.  Take a deep

7  breath.  Let's figure out what actually happened.

8  Q.  Did Jeremy Weber ever provide you with the information you

9  were asking for?

10 A.  Yes.

11        MR. DENTON:  Ms. Cooper, if we could scroll up to the

12 next email in this chain, please.

13 Q.  Again, sir, if you can just tell us when this email was

14 sent, who sent it and to whom?

15 A.  Jeremy sent the email.  It was on Friday, April 15, at

16 12:12 p.m., and it was sent to me, Sean, and Richard.

17 Q.  And did his email respond to the questions in your email?

18 A.  Yeah.  It was pretty verbose.

19        MR. DENTON:  So, we're not going to do this one quite

20 as exhaustively.  If we can zoom out, Ms. Cooper, please.

21        First of all, could we start with just the first

22 couple of lines of the main paragraph here, on page 6.

23 Q.  Again, we don't need to read all of this, but can you just

24 summarize what information Jeremy was conveying to you here?

25 A.  Well, as I stated before, one of the reasons this library

1    was created was to assist the branch in building tools for

2    quick-reaction capabilities, which is some of what he was

3    saying here.  So that was the purpose of the libraries at that

4    point.

5    Q.  And did he identify who was involved in creating the

6    libraries?

7    A.  Yes.

8    Q.  Who is that?

9    A.  Jeremy, Frank Stedman, Matt, and Mr. Schulte.

10          MR. DENTON:  So, if we can zoom out, Ms. Cooper, and

11   just scroll down.

12   Q.  Just looking at this page, we're not going to get into this

13   in a lot of detail, but generally, what is described here?

14   A.  It's a lot about -- I mean it's about the libraries, and it

15   looked like how they -- how they, you know, used them, how they

16   set them up, etc.  It's fairly verbose.

17   Q.  Did you have a reaction to the verbosity when you received

18   this?

19   A.  Yeah, I asked three questions.

20          MR. SCHULTE:  Objection.

21          THE COURT:  Sustained.

22          MR. DENTON:  If we could go down to the next page.

23   Q.  So let's start with the paragraphs that begin below, "now

24   on to your specific questions.

25   A.  Yes.

1          MR. DENTON:  If we could start with No. 1, Ms. Cooper.

2     Q.  How did Jeremy Weber respond to your first question?

3     A.  That the libraries were an OSB-owned product, meaning that

4     the branch, OSB, owned the library, OSB libraries.

5     Q.  Now, you talked about different things between sort of

6     ownership and access.  What did he tell you about access to the

7     libraries more broadly?

8     A.  It's in the last line there.  "Anyone is free to

9     contribute/use the libraries as they desire.  The only thing

10    OSB controls is the keys to master -- Develop and Master."

11         MR. DENTON:  If we could zoom out, Ms. Cooper, and

12    look at the paragraph 2.

13    Q.  And could you just read this, Mr. Leonis?

14    A.  Sure.

15         "Josh used to have the ability to merge items into Develop

16    and Master.  He didn't always follow the process and ending up

17    making more work for Frank Stedman pretty often due to this

18    disregard to the pull-request model.  His defense was always

19    they were admin changes and not new code.  I want to make clear

20    that we did not limit his ability to contribute to the

21    libraries; that is still something he can do.  All we did was

22    remove his ability to merge changes into the long-lived

23    branches, thus removing his ability to control what goes into

24    the official versions."

25    Q.  What was your reaction to that information?

1  A.  So that meant to me that he had the ability to basically

2  access the code in those libraries.

3          MR. DENTON:  If we could go back and go to the third

4  paragraph, Ms. Cooper.

5  Q.  Mr. Leonis, do you recall whether anything struck you about

6  this part of Mr. Weber's email when you first read it?

7  A.  Yeah.

8  Q.  What do you remember striking you?

9  A.  It's the line in quotes.

10 Q.  And which line is that?

11 A.  In the highlighted section, it's the sixth from the bottom.

12 Q.  Is that the line that says, "will eventually get access

13 back to the libraries and that access should just be enabled

14 now"?

15 A.  Yes.

16 Q.  Why did that strike you?

17 A.  Essentially, what -- what I interpreted that to mean was

18 that despite the fact that he was told that he wasn't allowed

19 to basically administer the libraries, that he was essentially

20 saying that I'm going to have -- get my access back one way or

21 another, and so you should just make it happen now.

22          MR. DENTON:  Ms. Cooper, could we zoom out for a

23 second.  I think we need to grab something from across the page

24 here.  Could we do it from that line that Mr. Leonis was just

25 referencing through the end of this paragraph?

1   Q.  Mr. Leonis, could you just read the rest of this paragraph
2   after the quoted language?
3   A.  "I took this statement as him just saying he was going to
4   win the argument and I shouldn't bother pushing back.  After he
5   departed, I discussed these things with Sean, where it was
6   affirmed that the OK to give admin access to Schulte was not a
7   thing, and that I should email Schulte the specifics of his
8   role (see the email sent last night).  Following sending the
9   email and reading his response, I took a look at the audit logs
10  on the libraries themselves.  The logs showed that Schulte had
11  re-enabled his direct write access to Master and Develop
12  shortly after sending a response to my email detailing his
13  responsibilities.  Again, the only reason to have access to
14  Master and Develop is to control what is able to be merged into
15  the libraries.  Not having access to these branches in no way
16  limits being able to contribute to/use the libraries."
17  Q.  Did this email assuage your concerns about the situation of
18  defendant's access to the OSB libraries?
19  A.  No.
20  Q.  What, if anything, did you do in response to this email?
21  A.  I talked to Sean.
22          MR. DENTON:  If we could zoom out, Ms. Cooper, and go
23  up to the previous email in this chain.  I think the one that's
24  right on this page, I think page 5 of the exhibit.
25          Thank you, Ms. Cooper.

1    Q.  When you sought confirmation from Sean, did you copy anyone

2    else on that email?

3    A.  No.

4    Q.  Why not?

5    A.  It was a direct conversation between myself and Sean.  I

6    cc'd myself, but that's just so I had a copy.

7    Q.  Why did you want confirmation from Sean?

8    A.  I wanted a third party.  I wanted to know from the

9    supervisor, you know, what -- it said that they had all talked

10   to him, so, what was actually said?  So let's figure that out.

11   But I also wanted to know, you know, what did he know?  What

12   was his view of the whole thing?

13   Q.  Did Sean respond to your email?

14   A.  He did.

15          MR. DENTON:  If we could go up to page 4, please,

16   Ms. Cooper.

17   Q.  And is this email that response, Mr. Leonis?

18   A.  It is.

19   Q.  Can you just read this for us, please?

20          THE WITNESS:  Is it possible to move it to the other

21   side of the screen?

22          Thank you.

23          MR. DENTON:  Thank you, Ms. Cooper.

24   A.  "I had a discussion with Josh yesterday as to the status of

25   his involvement in the OSB libraries.  He indicated that he was

1   told that he would no longer be a part of the library

2   initiative but was confused because he thought he would be able

3   to continue working on the projects with which he was involved.

4   I told him we wanted to make sure that OSB projects stayed in

5   OSB and RDB projects remained in RDB, and that was the reason

6   we decided to transfer the two official projects he was working

7   on to RDB control.  I told him we never specifically discussed

8   the libraries but that it was my impression that anyone could

9   contribute to the initiative and that he would just need to

10  work with Jeremy and Frank to get new code incorporated into

11  the library repository.  At no/no time during the conversation

12  did we discuss administrator access (or any other access, or

13  any access permissions for that matter) to the database.  It

14  was a short conversation centered more around the fact that

15  Josh would still be able to use and contribute to the library

16  initiative.

17      "After he left my office, he went to discuss the libraries

18  with Jeremy.  I was informed by Jeremy later that Josh had

19  stated that I said it would be fine to re-add him to the

20  administrator group.  I told Jeremy that was not accurate,

21  shared with him the gist of our conversation, and told him he

22  should send -- I'm sorry, and told him he should send a note to

23  Anthony and Brent about the request.  At some point soon after,

24  Jeremy discovered that access permissions had been altered and

25  included that information in the note that was ultimately

1   drafted last night."

2   Q.  Did Sean's email add to or reduce your level of concern

3   about this situation?

4   A.  It added to it.

5   Q.  Why?

6   A.  Because it confirmed that Sean said that -- it confirmed

7   for me that Sean did not say that Josh could have access to the

8   OSB libraries as an administrator, and he shared that with

9   Jeremy.  And essentially, it led me to believe that Josh

10  basically took action to restore his administrative control to

11  that library without permission.

12  Q.  What, if anything, did you do after receiving this email

13  from Sean?

14  A.  I drafted a long note.

15  Q.  As you sit here today, do you remember drafting that note?

16  A.  I do.

17  Q.  Why is that memorable for you?

18  A.  I've never drafted a note like that up to that point.  I've

19  never drafted a note like that after that.  That was -- that

20  was one of those -- that was, again, three weeks into a job

21  that I just started, and here, I'm writing a note about a

22  security issue.

23  Q.  And why was that such a big deal for you?

24  A.  I mean the issue was, like, somebody using their

25  administrative privileges to access code that they weren't --

1    they weren't -- they were told they weren't supposed to is a

2    problem because, as an administrator, you're there to help

3    everybody else.  You're not there to do it for yourself.  And

4    so that was a position of trust, and it was clear that that

5    trust had been violated.  And so something needed to be done.

6    We needed to fix it and address it right away.

7                MR. DENTON:  Ms. Cooper, if we could go up in this

8    chain to the next email, which begins, I think, halfway down

9    page 1.

10   Q.  What is this email, sir?

11   A.  This is the email that I wrote.

12   Q.  And who did you send it to?

13   A.  I sent it to security and HR and then cc'd myself and Mike,

14   who was the deputy chief of the group, and Karen, who was the

15   chief of the group.

16   Q.  What were Mike and Karen like as supervisors?

17   A.  I thought they were wonderful.  Mike, when I first started

18   as a, especially as a division chief, he took me under his

19   wing, because I needed a lot of help.  I needed a lot of

20   guidance, and he was just one that just -- he would help me out

21   whenever I needed it.  If I needed to talk to somebody, he --

22   his door was open to me.  It was great.

23       Karen, for me, was -- she was always people first.  She was

24   somebody that I admired, I thought very highly of, somebody

25   that actually taught me how to conduct myself in promotion

1    panels and even somebody that I -- I talked to as a mentor,

2    somebody I really respected.

3    Q.  Were they involved in the meetings and discussions you

4    described earlier involving the defendant's dispute with Amol?

5    A.  Yeah.

6    Q.  At any point during those conversations, did you ever hear

7    either of them ever express any animosity toward the defendant?

8    A.  No.

9    Q.  Did you ever hear them express any frustration with the

10   fact that he had filed a security report?

11   A.  Not that I remember.

12   Q.  So let's go back to this email.  What time did you send

13   this email?

14   A.  Friday, April 25 -- I'm sorry -- April 15, at 2:06 p.m.

15   Q.  And generally speaking, what was your goal in sending this

16   email?

17   A.  It was essentially to inform HR and security and document

18   for the record, you know, what had happened and try to explain

19   the concern that I had and that I wanted to make people aware

20   of.

21            MR. DENTON:  If we could start, Ms. Cooper, with the

22   first paragraph below the line of stars there.

23            I'm sorry.  On the -- I guess it's page 2 of the

24   exhibit.

25   Q.  And can you read the first sentence here, sir?

A.   "At the end of March 2016, EDG/AED/OSB staff were directed

by EDG and CCI management to ensure that all OSB projects were

properly resourced (all OSB-related development resources, to

include computer network exploitation, CNE-related code

libraries, development tools, etc.) were accessed by the

appropriate people in OSB, and any projects that were not going

to remain in OSB be moved to the appropriate EDG branch

immediately."

Q.   Why did you write that?

A.   It kind of set the ground floor.  Right?  So, one of the

things that everybody wanted to make sure of was that when some

of these personnel moves were being made, that if OSB didn't

have the resources to maintain the -- the programs or the

libraries, or whatever they had, that they were given the,

given to people that could do it.  So they were -- the first

thing they were asked to do was make sure you got the people to

do the job that you need to do, make sure that people who need

access to the code repositories have access to the code

repositories, and anything that wasn't supposed to stay in OSB

be moved to wherever it was going as quickly as possible.

Q.   Then in the next sentence, that says, "this move was made

following a personnel situation that occurred in March of

2016," what personnel situation are you referring to?

A.   The one between Mr. Schulte and Amol.

Q.   And what relationship did that have to the resourcing

1    issues that you were just describing?

2    A.  Well, Amol was being moved to MBB and Mr. Schulte was being

3    moved to RDB.  So that's two less developers in the branch.  So

4    we're talking about resourcing; you're losing two people.  Can

5    you still do the same work?

6          MR. DENTON:  If we could go back to the whole

7    document, please, Ms. Cooper, and could we blow up the next

8    paragraph, the third full paragraph on page 2 of the exhibit.

9    Q.  In the middle of this paragraph, sir, do you see the

10   sentence that reads, "This action was taken in direct response

11   to the direction provided by EDG and CCI management at the end

12   of March 2016"?

13   A.  Yes.

14   Q.  What direction are you referring to?

15   A.  It's related to the email we talked about earlier, about

16   people moving, moving branches.

17         MR. DENTON:  And if we could zoom out again,

18   Ms. Cooper, and go down to the next page, could we blow up

19   paragraph 3.  I'm sorry.  The paragraph numbered three at the

20   top of the page.  And we're on page 3 of the exhibit.

21   Q.  Do you see where it says, "discovered that Joshua

22   reinstituted his administrative access to the server via other

23   administrative rights Joshua possessed on EDG's DevLAN system"?

24   A.  I do.

25   Q.  Explain a little bit about the relationship between

1    different types of administrative rights, as you understand it.

2    A.  So, I think the difference there -- I think the easiest way

3    to explain is there's administrative rights for DevLAN, the

4    system, and then there was administrative rights for the

5    Atlassian tool suite.  So I was talking about Mr. Schulte's

6    administrative access and rights for the Atlassian tool suite,

7    vice his -- he didn't have administrative rights to the DevLAN

8    system.

9            MR. DENTON:  If we could zoom out, Ms. Cooper.

10   Q.  Why did you view this conduct as concerning?

11   A.  Well, I kind of lay it out throughout the email.  I can

12   kind of touch through it, if that makes sense.

13   Q.  Please.

14   A.  So, you'll notice I said in this email, I said these

15   actions are very concerning for many reasons, and I just kind

16   of walked myself through them -- or walked through them.  The

17   first was administrative rights were provided to trusted

18   individuals for the sole purpose of ensuring that the right

19   people have access to data in order to complete tasks, their

20   daily jobs.  You were giving administrative rights to people so

21   they could help others.  Right?  That's important.

22       I noted the sentence out of our, the agency's computer

23   trainings, computer security training to kind of point out

24   what -- that there were regulations to IT systems and account

25   management.  And --

1    Q.  Is that one of the trainings that you testified about

2    earlier?

3    A.  Yeah.  Everyone, everyone has to take that training each

4    year.

5    Q.  Please continue.

6    A.  And I pointed out that people that have rights to those, to

7    any system, they're reviewed on -- you know, they're reviewed,

8    especially when people change their job responsibilities.

9         One of the things I pointed out was that whenever this

10   change of access is reviewed, it doesn't mean that the

11   individual's access who was adjusted was permitted to change

12   their access just because they moved groups, even if they had

13   administrative rights.  And that's important to understand,

14   because -- just because you have administrative rights doesn't

15   mean that you get to decide what you get access to.  Having

16   administrative rights is a position of trust, and so people in

17   those positions of trust are expected to use those rights

18   appropriately.

19        In the next paragraph, I talk about the sensitivity of the

20   tools that were on DevLAN, to kind of point out that

21   administrative rights on that system were a very important

22   thing and that it was really important that people use those

23   administrative rights to assist people in the branch, the

24   branches or the division or the group, and that they were to

25   understand that it was a position of trust and that they had to

1    maintain that trust by executing their responsibility

2    appropriately and maintaining a level of professionalism and

3    not putting their specific wants and needs above anything else.

4    Q.  Let me pause you there, sir, and ask you a couple of

5    questions about this paragraph.

6    A.  Sure.

7    Q.  Where you describe "the DevLAN system and any code bases

8    connected to it as containing some of the CIA's most protected

9    technical secrets," why did you describe it that way?

10   A.  Well, so these -- these tools that were on DevLAN were

11   being used to -- were being used in operations to, on behalf of

12   the U.S. government to obtain information that the U.S.

13   government believed it required to protect the United States.

14   And so some of those tools were incredibly, incredibly -- they

15   were very important.  And so I wanted to emphasize that this

16   wasn't a minor thing we're talking about.  Right?  When

17   somebody does something on that network to change accesses, it

18   needs to be taken seriously.

19   Q.  And then in the last paragraph -- sorry, the last sentence

20   of that paragraph, you say, "violation of this trust is a

21   serious matter -- as EDG's and the CCI's operational model

22   requires that all individuals can be trusted."  What about the

23   operational model put such emphasis on trust?

24   A.  So, throughout the entire process of an operation, you have

25   operators that are being given these tools to go conduct an

M6gWsch5                          Leonis - Direct

1    operation.  They couldn't just willy-nilly just go do whatever

2    think wanted.  There was an entire process for which they had

3    to follow to be able to use the tools.  Same is true for the

4    actual tools themselves.  These tools could be used for a

5    variety of things, and they should only be employed in a way

6    that was controlled and documented.  And so a lot of trust is

7    being, was being placed in not only the developers but the

8    operators and other people in CCI so that when these

9    capabilities were being developed and/or used, they were used

10   in a way that was responsible and followed, followed processes.

11           MR. DENTON:  Ms. Cooper, if we could roll down just so

12   that we can read the carryover of this last paragraph on pages

13   3 to 4 of the exhibit, please, and if we can blow up that

14   carryover paragraph.

15   Q.  Sir, I'm just going to ask you to read that, please.

16   A.  OK.

17       "As a result, Joshua's direct insistence that he maintain

18   access, using language indicating that he would find a way to

19   ensure that this access is maintained regardless of

20   management's decision to remove his access and willingness to

21   reinstitute his administrative access to a system that he

22   should not have these rights must be taken seriously.  This is

23   in direct violation of agency policy and raises concerns

24   whether Joshua should be permitted continued access to EDG's

25   code bases in the future.  EDG's development model relies on

1  very talented individuals across the country coming up with

2  technical solutions to some of the toughest cyber problems, but

3  it also relies entirely on the fact that all individuals can be

4  trusted to protect EDG, CCI, agency and IC equities by

5  following the security models with the appropriate accesses in

6  place to protect us all.  Failure to do so puts our entire set

7  of cyber tools, and those using them, at risk for years to

8  come."

9  Q.  Why did you include this paragraph?

10 A.  I was trying to make it clear that, you know, just a minor

11 thing like using your administrative privileges, it may seem --

12 to access a code database may seem just, you know, minor thing,

13 but if somebody was willing to do that on something that they

14 desired, what stopped them from doing it to anything else?  It

15 was a violation of the policy that, the agency's policy on how

16 IT systems were managed.  And it raised concerns that security

17 and others needed to look into.  So it was a pretty serious

18 issue.

19 Q.  In the last sentence, where you say that this could put not

20 only the set of cyber tools but also those using them at risk,

21 how did the vulnerability that you perceived from these actions

22 contribute to putting those using tools at risk?

23             MR. SCHULTE:  Objection.

24             THE COURT:  Overruled.

25 A.  Can you restate your question?  I'm sorry.

1   Q.  In the last sentence here, sir, where it says, "Failure to

2   do so puts our entire set of cyber tools -- and those using

3   them -- at risk" --

4   A.  Right.

5   Q.  -- how did the vulnerability that you identified from this

6   conduct put those using cyber tools potentially at risk?

7             MR. SCHULTE:  Objection.

8             THE COURT:  Overruled.

9   A.  So, the concern was that if we can't trust the individuals

10  that are administering the tools, those tools could be changed.

11  They could be, you know -- they could be removed from the

12  system.  Any number of things could happen to those tools,

13  because they're technically not secure.  That's the issue.

14      And when somebody employs these tools, they have an

15  expectation of what they're getting.  If somebody were to take

16  those tools and, for example, remove them from the system and

17  then somebody was to use them in an operation, that could

18  potentially put the person who is doing the operation,

19  depending on how it was done, and others at risk.  It's a very

20  serious matter.

21            MR. DENTON:  Ms. Cooper, if we could take this down

22  and go back up to the first page of Government Exhibit 1062,

23  please.

24  Q.  Sir, in this top email, do you see where it refers to,

25  "Dana says that he spoke to Anthony Leonis this afternoon"?

1    A.  Yes.

2    Q.  Did you, in fact, have a meeting with Dana about this?

3    A.  Yes, I did.

4    Q.  What is Dana's role?

5    A.  Dana was the chief of security for CCI at the time.

6    Q.  And what were you discussing in that meeting?

7    A.  I was trying to convey to him the seriousness of what I

8    thought had occurred.

9    Q.  And did you have an opinion about what should be done in

10   response to that?

11   A.  Yeah.  I was concerned that not only administrative access

12   should be removed, but potentially his other accesses should be

13   reviewed.

14   Q.  And why was that your reaction?

15   A.  I had a concern about -- again, it's about trust.  Right?

16   If you can't trust somebody to do the job that you've provided

17   to them and they're willing to put themselves above whatever

18   you've asked them to do, how do you know that something else

19   isn't going to happen?  And it was -- it wasn't for me to make

20   the decision as to what happened next, but security needed to

21   get involved, and I was trying to explain to them that it

22   wasn't a small thing.  And it was a complex issue that -- it

23   was hard to explain, so I was trying to convey to him the

24   severity of the situation.

25   Q.  Other than meeting with Dana, did you meet with anyone else

1  that afternoon on April 15 about this issue?

2  A.  I don't -- I don't particularly remember.

3  Q.  Did there come a point on that afternoon when you received

4  instructions?

5  A.  Yes.

6          MR. DENTON:  Ms. Cooper, we can take 1062 down,

7  please.

8  Q.  Who did you receive instructions from?

9  A.  Mike, the deputy chief of EDG.

10 Q.  And did you speak with him about that in person?

11 A.  I believe so.

12 Q.  Did you discuss this incident with him?

13 A.  Yes.

14 Q.  Generally speaking, what was his reaction to this?

15 A.  He was very concerned.

16 Q.  And what instructions did he give you?

17 A.  Essentially -- and it wasn't just me.  Right?  There were

18 multiple people involved.  He basically stated that all

19 developers who had had access to administer the Atlassian tool

20 suite were to be removed from that responsibility, and those

21 responsibilities were to be transferred to the infrastructure

22 branch, who maintained DevLAN.

23 Q.  And did he give you any explanation for those instructions?

24 A.  Essentially, he wanted it done right away.

25 Q.  And why was that?

1    A.  Because this was a security issue, and he wanted it done

2    right away.

3    Q.  I think in the email we were looking at, it showed this was

4    on a Friday.  Is that right?

5    A.  That's correct.

6    Q.  Were those changes, in fact, made?

7    A.  Yes.

8    Q.  How soon?

9    A.  They were done over the weekend.

10         MR. DENTON:  Ms. Cooper, if we could pull up what's in

11    evidence as Government Exhibit 1065, please, and if we could

12    scroll down to the second email on this chain.

13    Q.  Who sent this, sir?

14    A.  I did.

15    Q.  And who did you send it to?

16    A.  I sent it to everyone in AED.

17    Q.  When did you send it?

18    A.  I sent it on Monday, April 18, at 1:28 p.m.

19    Q.  And if we could look at the paragraph that splits between

20    pages 1 and 2 of exhibit 1065, please, do you see right after

21    the page break in the second line where it refers to a brief

22    DevLAN audit?

23    A.  Yes.

24    Q.  What is that referring to, sir?

25    A.  Essentially this security situation.

1  Q.  And then in the next sentence, where it says, "SED/ISB

2  personnel transferred all system admin responsibilities across

3  all Atlassian products to SED/ISB removing local admin rights

4  from all local AED branch system admins this past weekend," can

5  you translate that for us, please?

6  A.  Essentially the admin responsibilities for the Atlassian

7  tool suite were then transferred to ISB.

8  Q.  After this change, were any developers supposed to be

9  performing administrator tasks on Atlassian products?

10 A.  No.

11 Q.  Was any developer authorized to use administrative access

12 on the Atlassian products?

13 A.  Not after that.

14         MR. DENTON:  If we could zoom out and go to the next

15 paragraph, please, Ms. Cooper.

16 Q.  And do you see the reference to, at the top of this

17 paragraph, to "two people in SED/ISB who will maintain and

18 update the Atlassian suite/repository for EDG"?

19 A.  Yes.

20 Q.  First of all, just remind us.  What is ISB?

21 A.  ISB was the Infrastructure Support Branch.

22 Q.  And what was their role?

23 A.  They were the ones that were maintaining the computer

24 networks in EDG.

25 Q.  Do you know who the two people referenced here are?

1   A.  I believe one of them is David.  The other I can't remember

2   off the top of my head.

3   Q.  Were either of them developers?

4   A.  No.

5   Q.  What is your understanding of why the decision was made

6   that no developer should have administrative access?

7   A.  Well, I mean just -- it was -- it was a clean break.  It

8   was -- it was basically done without prejudice.  There were

9   developers that had it.  Mr. Schulte was one of them.  But in

10  everybody's opinion, after this incident, we decided that all

11  developers shouldn't have access to it.  It should be a third

12  party, so that if there were issues, whatever, it wasn't

13  something that was going to have an effect, like be managed in

14  a branch or have any branch-related connotations to how tools

15  were managed; it was being done by a third party outside of all

16  the branches.

17          MR. DENTON:  We can take that down, please,

18  Ms. Cooper.  Thank you.

19  Q.  Did there come a time on that Monday when you spoke with

20  the defendant about his restoration of his administrative

21  privileges?

22  A.  Yes.

23  Q.  Roughly, when in the day was that?

24  A.  I believe it was in the morning.

25  Q.  Was anyone else at the meeting?

1    A.   I believe Susan from HR was there.

2    Q.   Just generally, could you describe the meeting for us?

3    A.   Yeah, it was -- it wasn't a long meeting.  Essentially,

4    we'd written up a memo that described the situation.  We asked

5    him to review it.  We also asked him if he had any changes.  He

6    did.  He had some things that he wanted to add, and we made

7    some of those changes.  And then we asked him to sign it.  And

8    that was about it.

9             MR. DENTON:  Ms. Cooper, could we put up what's in

10   evidence as Government Exhibit 1095, please.  If we could just

11   zoom in on the text.  Thank you.

12             (Continued on next page)

1   BY MR. DENTON:

2   Q.   Who is this memo from?

3   A.   It is from me.

4   Q.   And who is it to?

5   A.   It is to Mr. Schulte.

6   Q.   And what is it's date?

7   A.   Monday, April 18th, 2016.

8   Q.   And what is the subject line?

9   A.   Self-granting previously revoked admin privileges on an

10  agency computer network.

11  Q.   Now, let me ask you, sir, in sort of the hierarchy of

12  potential discipline for this, where does a memorandum like

13  this rank?

14  A.   It is very low.  It is more of a memorandum for the record,

15  if anything.

16  Q.   Now, at the top of the first paragraph here the memo

17  repeats some of the information from the e-mail we just looked

18  at.

19  A.   That's correct.

20  Q.   Why did you include that in this memo to the defendant?

21  A.   Well, for one, I thought it was well written -- I wrote

22  it -- but secondly, I think it was important to convey to him

23  things that I convey to others.

24  Q.   And do you see in the middle of the paragraph where it says

25  the following information was learned?

1   A.   In the middle of the page?

2   Q.   Yes.  I'm sorry.

3   A.   Yes.

4   Q.   What does that section of the memo describe?

5   A.   It describes, essentially, my understanding of how the

6   administrative accesses were restored.

7   Q.   Can you read the last two sentences of the first paragraph?

8   A.   Sure.

9   Q.   I should say the paragraph numbered 1.

10  A.   You mean at the beginning of at the conclusion?  Is that

11  where you are asking?

12  Q.   Yes.  Let's start from there, please.

13  A.   OK.

14       At the conclusion of the final discussion with Mr. Weber on

15  Thursday, 14 April 2016, Mr. Schulte reportedly remarked that

16  he "will eventually get access back to the libraries and that

17  his access should be enabled now," to Mr. Weber before

18  Mr. Schulte left the area.  Upon reading the above, Mr. Schulte

19  remarked that his exact quote was that "I am adding my access

20  back, until someone with authority advises me otherwise."

21  Q.   How did that last sentence that starts "upon reading the

22  above" get into this memo?

23  A.   That was one of the sentences that he requested be added.

24  Q.   And did you agree to do that?

25  A.   We have it here.

1    Q.  And what about the next paragraph that is numbered 2?

2    A.  That was another sentence that he asked to be added.

3    Q.  And do you see where it says Mr. Schulte viewed his removal

4    from the OSB libraries as unauthorized?

5    A.  That's correct.

6    Q.  Was that one of the issues that you considered it important

7    to investigate before taking any action?

8    A.  Absolutely.

9    Q.  And what did you conclude?

10   A.  That his removal was not unauthorized, as a matter of fact

11   apparently Sean had said this is the way it's going to be.

12   Q.  And then can I ask you to read the last paragraph above the

13   signature, please?

14   A.  Sure.

15       Lastly, effective 0800 on Monday, 18 April, the OSB

16   libraries and any associated computer network exploitation

17   (CNE) related code libraries, development tools, etc., will be

18   administered by designated AED/OSB personnel until further

19   notice.  Please do not attempt to restore or provide yourself

20   administrative rights to any project and/or system for which

21   they have been removed.

22   Q.  And what is below that part, sir?

23   A.  The undersigned has read and understands the above.

24   Q.  Do you recognize the signature that is there?

25   A.  Yes; it was Mr. Schulte's.

1    Q.  What was the defendant's reaction when you discussed this

2    memo with him?

3    A.  He wasn't happy.

4    Q.  Did he disagree with what you had written in the memo?

5    A.  Yeah, that's why we had allowed him to make some changes to

6    it.

7    Q.  Did he ask you to make any changes to the other parts

8    describing his conduct?

9    A.  I don't remember.

10   Q.  How long a meeting was it?

11   A.  It wasn't that long.

12        MR. DENTON:  If we can take this down, Ms. Cooper, and

13   put up what is in evidence as Government Exhibit 1063, please?

14   Q.  Who sent this e-mail, sir?

15   A.  Mr. Schulte.

16   Q.  And who did he send it to?

17   A.  He sent it to me.

18   Q.  At what time on what day?

19   A.  It was Monday again, at around 12:59 p.m.

20   Q.  Can you read the first line there?

21   A.  Sure.  Under "Anthony," I'm assuming?

22   Q.  Please.

23   A.  I verified that all private keys with access have been

24   destroyed/revoked.

25   Q.  What is your understanding of why the defendant was sending

1   you this information?

2   A.   Because we asked him to.

3   Q.   And what does this mean?

4   A.   This means that essentially his ability to use or access

5   things with his administrative privileges -- the keys

6   themselves -- were destroyed.

7   Q.   And what is a key in this context?

8   A.   Just think of it as something that allows the computer

9   system to verify your ability to do things.

10   Q.   And then down at the bottom of the next paragraph where it

11   says:  It seems like overnight (literally) all my permissions

12   within the products were removed and all my permissions on the

13   servers themselves relocated... and all without anyone

14   informing me.  Is there a reason to this sudden turnover that

15   occurred without my knowledge?

16        Do you see that?

17   A.   I do.

18   Q.   Was there a reason for this sudden turnover occurring

19   without his knowledge?

20   A.   Yes.

21   Q.   What was that?

22   A.   He used his administrative privileges to access something

23   he was told he shouldn't.

24   Q.   Why did you feel the need to change that before telling him

25   about it?

1   A.  Well, we wanted to make sure that there was a security

2   issue that we found and we wanted to basically fix it before we

3   notified him so that should he take any additional action, he

4   was unable to.

5   Q.  And why was a component of that asking him to verify that

6   private keys with access had been described/revoked?

7   A.  So that he wouldn't be able to use them in the future.

8           MR. DENTON:  We can take this down, Ms. Cooper, and

9   show just to the witness what's been marked for identification

10  as Government Exhibit 1139.

11  Q.  Without describing the contents, sir, do you recognize

12  this?

13  A.  I think so.

14  Q.  Again, without saying what it says, what is it?

15  A.  It's an e-mail.

16  Q.  Did you send it?

17  A.  I sent one of them.

18  Q.  The e-mail you sent, did you direct that action be taken?

19  A.  I did.

20          MR. DENTON:  Your Honor, the government offers

21  Government Exhibit 1139.

22          THE COURT:  Any objection?

23          MR. SCHULTE:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 1139 received in evidence)

1          THE COURT:  Would you like to publish?

2          MR. DENTON:  Yes, your Honor.  I'm sorry.

3          Ms. Cooper, can we publish that, please?

4    BY MR. DENTON:

5    Q.  If we could start on the bottom e-mail, who sent this, sir?

6    A.  Jeremy Weber, did.

7    Q.  When did he send it?

8    A.  Wednesday, April 20th, around noon.

9    Q.  And can you just summarize what you understand him to be

10   saying in this e-mail?

11   A.  So he is talking about ISB migrating the component of the

12   Atlassian tool suite and he is basically asking everyone in EDG

13   to log out before they leave on Friday, and that if there is an

14   issue, they should contact him.

15   Q.  And where it says they will be migrating the Bamboo and

16   Confluence servers to new hardware, what did that mean?

17   A.  So it must have been on old hardware and they were moving

18   it to new hardware.

19   Q.  Do you know which hardware it was on at that time?

20   A.  I don't remember.

21         MR. DENTON:  If we could zoom out and then just go up

22   to the previous e-mail on the page?

23   Q.  Who sent this?

24   A.  I did.

25   Q.  Who did you send it to?

1    A.  To Jeremy, and I cc'd Jim.

2    Q.  Why did you send this e-mail?

3    A.  Well, first I was actually kind of annoyed because we had

4    just spent the weekend transitioning all of the Atlassian tool

5    suite admin privileges to ISB and one of the former admins --

6    which was Jeremy -- was sending an e-mail about administrating

7    part of that system and it wasn't his responsibility at that

8    point.

9    Q.  And again, what date and time was this e-mail?

10   A.  It was sent on Wednesday, April 20th, at 12:57 p.m.

11              MR. DENTON:  If we could zoom back out, Ms. Cooper?

12   Q.  What was the date that the changes described in this e-mail

13   chain were supposed to occur?

14   A.  At the bottom there?  Is that what you're --

15   Q.  Yes, sir.

16   A.  Monday, April 25th, at 6:00 a.m.

17              MR. DENTON:  If we could please put up what is in

18   evidence as Government Exhibit 1070?

19   Q.  Generally speaking, Mr. Leonis, what is the e-mail that you

20   sent at the bottom of this chain here?

21   A.  Asking people in the branch if they want to go to a

22   conference.

23   Q.  And among your many hats that you were wearing at this

24   time, in what capacity were you sending this message?

25   A.  That was as branch chief.

1    Q.  Was the defendant in your branch at that time?

2    A.  He was.

3           MR. DENTON:  If we can go up and take a look at the

4    e-mail at the top of this chain?

5    Q.  Did the defendant respond to your e-mail?

6    A.  He did.

7    Q.  What time did he respond to it?

8    A.  On the same day, at 5:52 p.m.

9    Q.  And what day was that?

10   A.  The Wednesday, April 20th.

11   Q.  And just to ask about the e-mail system that is described

12   here, is that something you can access after you leave work for

13   the day?

14   A.  Say again?

15   Q.  The e-mail system on which this e-mail was sent, is that

16   something you can access from home?

17   A.  Oh no.

18   Q.  Where do you access that from?

19   A.  At work.

20   Q.  And any particular place at work?

21   A.  At your desk is one of the places.

22          MR. DENTON:  Ms. Cooper, if we could pull up

23   Government Exhibit 1207-27, and if we could blow up the lines

24   that are next to the government exhibit sticker?  Sorry, the

25   rows that are next to the government exhibit sticker.

M6G5sch6                        Leonis - Direct

1    Q.  Mr. Leonis, do you see under the column name an entry

2    called Confluence_DB-20160303-0625?

3    A.  I do.

4    Q.  What is the date accessed for that entry?

5    A.  April 20th, 2016, at 5:42 p.m.

6    Q.  Approximately how long is that before the e-mail that the

7    defendant sent to you about going to a conference?

8    A.  It is not that long.

9           MR. DENTON:  Ms. Cooper, can we pull up Government

10   Exhibit 1207-30?  If we can blow up the top few lines, here?

11   Q.  Same thing here, sir.  Do you see an entry that has a date

12   created of March 3rd, 2016 in the second line?

13   A.  I do.

14   Q.  What is the date and time accessed for that entry?

15   A.  It's the same day; April 20th, 2016, at 5:43 p.m.

16   Q.  Again, approximately how long is that before the e-mail

17   that the defendant sent to you about going to a conference?

18   A.  Not that long.

19          THE COURT:  All right.  And that brings us to 2:45, so

20   we are going to stop there for the day.  Ladies and gentlemen.

21   I think you are getting the drift of my instructions but don't

22   discuss the case with one another or anyone else for that

23   matter.  Don't do any research about the case.  Continue to

24   keep an open mind.  You have heard one additional day of

25   evidence but there is still plenty to go, it is critical to

M6G5sch6                        Leonis – Direct

keep an open mind.  Please try to be here at 8:45 at the latest

tomorrow so we can start promptly and get a full day in before

the weekend.

        With that, I wish you a very pleasant afternoon and

evening and we will see you tomorrow morning.

        Thank you.  You are excused.

        (Continued on next page)

1          (Jury not present)

2          THE COURT:  You may be seated.

3          Mr. Leonis, you may step down and exit the courtroom

4    and I would ask that the restrictions, as soon as Mr. Leonis

5    has gotten where he needs to go, be lifted, and we will see you

6    tomorrow morning.  Please be here no later than quarter to nine

7    yourself and ready to go and we will proceed in the same

8    fashion at that time.

9          Have a good evening.

10          (Witness steps down)

11          THE COURT:  The witness has left the courtroom.  A

12    couple things.  First, my law clerk alerted me to the fact, I

13    think there is a last name that was not redacted in Government

14    Exhibit 1046 in at least two places.  You may want to look at

15    that and make sure that it is redacted from the copy that goes

16    to the jury, let alone will be released publicly if anyone were

17    to want it.  So take a look at that.

18          Second, my inclination would be -- I think the jury

19    has undoubtedly noticed that periodically the witnesses are

20    looking down, I assume, checking the name key.  I would be

21    inclined to just explain to them that the witnesses have a name

22    key that because there are substitutions of names and some

23    witnesses identified by first names just to help the witnesses

24    given that they know the people by their real names, that they

25    have been provided with a key.  Otherwise, I think they might

1   wonder what witnesses are looking at.

2              Any objection from the government?

3              MR. DENTON:  No.  That makes sense to us, your Honor.

4              THE COURT:  Mr. Schulte, any objection?

5              MR. SCHULTE:  I don't think there is anything wrong

6   with that.

7              THE COURT:  I will do that in the morning.

8              Mr. Denton, any estimate on how much longer you have

9   on direct?

10             MR. DENTON:  I'm going to try very hard to keep it

11  under an hour but hope springs eternal.

12             THE COURT:  And is that a real hour or the kind of

13  hour that we saw this morning?  You don't have to answer that,

14  that's fine.  Assuming that you get there, I don't know how

15  long Mr. Schulte's cross will be but I assume it will be

16  sizeable, who else is on tap for tomorrow?

17             MR. DENTON:  We have got Mr. Leedom available and I

18  expect he will be on the stand for a while so he will certainly

19  carry us through the end of the day, at a minimum.

20             THE COURT:  All right.  Anything that the government

21  needs to raise?

22             MR. DENTON:  No, your Honor.

23             THE COURT:  Mr. Schulte, anything from you?

24             MR. SCHULTE:  No.

25             THE COURT:  I guess I want to just confirm, I assume

1   from the fact that I haven't heard anything otherwise that

2   Mr. Schulte gave his revised witness list to the government; is

3   that correct?

4           MR. DENTON:  He did, your Honor.  I think we are

5   trying to figure out how to make some decisions about it.  The

6   list is down to 18.  I think we may have some requests either

7   of Mr. Schulte or of the Court as far as ordering and managing

8   volume.  Obviously 18 people aren't all going to testify at

9   once.  We are still getting our heads around it and trying to

10  get to a solution.

11          THE COURT:  Well, as you know, you need to raise

12  things with me with enough time for me to rule on it and for us

13  to address it but, regardless, I would say first raise any

14  concerns with Mr. Schulte directly so that maybe you can sort

15  things out and work them out but, if not, you know how and

16  where to find me.

17          I do have another matter in the courtroom in a little

18  while.  So you don't have to rush, but if you can just make

19  sure you clear the tables, that would be great.  Assuming there

20  is nothing further, I will see you guys the same time tomorrow.

21          Have a good evening.  Thank you.

22          (Adjourned to June 17, 2022, at 9:00 a.m.)

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     RICHARD JOHN EVANCHEC

4    Cross By Mr. Schulte . . . . . . . . . . . . 351

5    Redirect By Mr. Lockard  . . . . . . . . . . 425

6    Recross By Mr. Schulte . . . . . . . . . . . 438

7    ANTHONY LEONIS

8    Direct By Mr. Denton . . . . . . . . . . . . 448

9                        GOVERNMENT EXHIBITS

10   Exhibit No.                               Received

11    1638     . . . . . . . . . . . . . . . . . 354

12    1638     . . . . . . . . . . . . . . . . . 355

13    1633 and 1637  . . . . . . . . . . . . . . 356

14    1634     . . . . . . . . . . . . . . . . . 357

15    1635     . . . . . . . . . . . . . . . . . 357

16    1636     . . . . . . . . . . . . . . . . . 358

17    831    . . . . . . . . . . . . . . . . . . 434

18    1139     . . . . . . . . . . . . . . . . . 532

19

20

21

22

23

24

25
```