M6H5sch1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                        17 CR. 548 (JMF)

JOSHUA ADAM SCHULTE,

           Defendant.
                              Trial
------------------------------x

                              New York, N.Y.
                              June 17, 2022
                              9:05 a.m.

Before:

                HON. JESSE M. FURMAN,

                              District Judge
                              -and a Jury-

                    APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  DAVID W. DENTON JR.
    MICHAEL D. LOCKARD
    Assistant United States Attorneys

JOSHUA A. SCHULTE, Defendant *Pro Se*

SABRINA P. SHROFF
DEBORAH A. COLSON
    Standby Attorneys for Defendant

Also Present:  Charlotte Cooper, Paralegal Specialist

M6H5sch1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  Welcome back.

3           Are we getting the witness on the stand?

4           MR. DENTON:  Yes, your Honor.  I understand the CISOs

5      are checking the cameras one last time, but we started the

6      process.

7           THE COURT:  Last I heard 20B, the overflow courtroom,

8      wasn't yet opened, but have we confirmed that it is?  Obviously

9      that is very important.  We will confirm before we get started.

10          While we are waiting, anything for the government to

11     raise?

12          MR. DENTON:  Just to note your Honor raised an issue

13     about a last name in one of the exhibits yesterday.  We have

14     confirmed that that's not an issue, that's not someone for whom

15     the last name is an issue.

16          THE COURT:  I think the name was on the key which is

17     what made me think it was.  But, very good.

18          MR. DENTON:  That was the error, your Honor, not the

19     exhibit.

20          THE COURT:  That's a better kind of error.

21          Mr. Schulte, anything for to you raise?

22          MR. SCHULTE:  Yes.  Just one point.

23          Yesterday Mr. Denton had the witness read and compare

24     several documents to which the witness had no knowledge or

25     hadn't seen the documents before, despite the Court's prior

M6H5sch1

1    admonition the government using a fact witness as a summary

2    witness, so I just ask the Court to remind Mr. Denton about

3    that.

4              THE COURT:  Good morning, Mr. Leonis.

5              THE WITNESS:  Good morning.

6              (Witness resumes the stand)

7              THE COURT:  So I don't think I suggested there was a

8    hard and fast rule of that nature, just simply that it was more

9    a case by case determination of whether it was a waste of time

10   and/or preview of summation.  I do think it is helpful for the

11   jury to see the case as it unfolds and not have everything

12   await summations.  So the bottom line is if you have an

13   objection to a particular request of that nature, you can make

14   it, but I will make a case by case determination and ask you

15   both to use your judgment on it.

16             Let's get the jury, and as long as we can confirm that

17   20B is open, we will proceed.

18             Mr. Hartenstine, thumbs up that 20B is open now?

19             MR. HARTENSTINE:  Correct, your Honor.

20             THE COURT:  Terrific.

21             One thing before we get started.  I'm not intending to

22   break after this witness concludes his testimony.  I assume

23   that the restrictions will simply be lifted once he has cleared

24   the floor and the courtroom will return to its normal public --

25   fully public status.  Is that OK with the government?

M6H5sch1

1                MR. DENTON:  Yes, your Honor.

2                THE DEPUTY CLERK:  All rise.

3                (Continued on next page)

M6H5sch1

1           (Jury present)

2           THE COURT:  You may be seated.

3           Good morning, and welcome back, ladies and gentlemen.

4     Thank you very much for being here on time and letting us get

5     us started on time to make the most of our Friday.  Happy

6     Friday.

7           We will continue with our direct testimony of

8     Mr. Leonis.

9           Mr. Leonis, you may and should remove your mask at

10    this time and I remind you that you remain under oath.

11          THE WITNESS:  Thank you.

12    ANTHONY LEONIS, resumed.

13          THE COURT:  Mr. Denton, you may proceed.

14          MR. DENTON:  Thank you, your Honor.

15          THE COURT:  And ladies and gentlemen, let me just

16    mention one thing.  In case you are wondering, you may have

17    seen Mr. Leonis and the first witness periodically look down

18    and look at a piece of paper.  There is a key -- because I have

19    told you that there are certain names that are sensitive that

20    we are substituting other names or just using first names there

21    is a key for witnesses.  Just because they may not know what

22    names are being used for particular people, there is a key that

23    witnesses have to consult so that's why, if you see Mr. Leonis

24    periodically, when referring to somebody look down at a piece

25    of paper, that is just why.  I wanted to explain that to you.

1          Go ahead, Mr. Mr. Denton.

2          MR. DENTON:  Thank you, your Honor.

3    DIRECT EXAMINATION (Continued)

4    BY MR. DENTON:

5    Q.  Good morning, Mr. Leonis.

6    A.  Good morning.

7    Q.  We spent some time talking about a project called OSB

8    Libraries.  Do you remember that?

9    A.  I do.

10   Q.  Did there come a time when another issue came up with

11   respect to the defendant's privileges on a different OSB

12   project?

13   A.  Yes.

14   Q.  What was the name of that?

15   A.  Brutal Kangaroo.

16          MR. DENTON:  Ms. Cooper, could we put up in evidence

17   what is Government Exhibit 1080, please?  And I think we will

18   go to the last e-mail.  I apologize, I'm not sure which page

19   number it is.  It is page 2 of the exhibit.

20   Q.  Sir, who sent this e-mail?

21   A.  Mr. Schulte.

22   Q.  And who did he send it to?

23   A.  He sent it to ISB.

24   Q.  And remind us, what was ISB's role?

25   A.  They were the network administrators on DevLAN.

M6H5sch1                          Leonis - Direct

1   Q.  And did their role change in April of 2016?

2   A.  Yes.

3   Q.  How?

4   A.  They were the people now maintaining the Atlassian tool

5   suite, the admin of that tool suite.

6   Q.  And do you see where the defendant writes:  Could a stash

7   admin grant me admin privileges for the project Brutal

8   Kangaroo?

9   A.  Yes.

10  Q.  What do you understand that to mean?

11  A.  He was asking for admin privileges to that project.

12          MR. DENTON:  Ms. Cooper, could we go up to the next

13  e-mail on this chain here?

14  Q.  Who is Timothy, sir?

15  A.  He is one of the members of ISB.

16  Q.  And what did Tim write in response to the defendant?

17  A.  He was asking for branch chief approval for his request.

18  Q.  Do you know whether the defendant received admin privileges

19  to Brutal Kangaroo?

20  A.  Yes.

21  Q.  And who did that?

22  A.  I believe -- I believe Tim did.

23          THE COURT:  Sorry.  Let me just clarify.  He was

24  granted admin privileges?

25          THE WITNESS:  He was granted admin privileges.

1          THE COURT:  OK.

2          MR. DENTON:  We can take this down, Ms. Cooper.

3    Q.  You testified yesterday when the defendant left OSB you

4    spoke with him about what OSB projects he would continue

5    working on.

6    A.  That is correct.

7    Q.  Was Brutal Kangaroo one of them?

8    A.  No.  Not in its entirety.

9    Q.  Ha do you mean by not in its entirety?

10   A.  So there was a component of Brutal Kangaroo called

11   Shattered Assurance that he was taking with him, but not the

12   entire project.

13   Q.  Do you recall ever having a conversation with the defendant

14   about his access to Brutal Kangaroo?

15   A.  I believe so.

16   Q.  Was that before or after his request that's described here

17   in the e-mail we were just looking at?

18   A.  I mean, we talked about the projects he was taking with

19   him.  I can't remember.  I'm sorry.

20   Q.  After you learned that the defendant had been granted

21   administrative access to Brutal Kangaroo, did you take any

22   steps?

23   A.  Yeah.  I remember going to ISB and having to review the

24   logs with Dave which, as we saw, that he was granted admin

25   privileges and then he removed the OSB officers that were

M6H5sch1                    Leonis - Direct

1   adminning the project as admins.

2   Q.  And what was your reaction to that?

3   A.  Even today it is the same, it is just like, again?  Really?

4   You know, we -- it was just another -- it is another thing.  It

5   is like --

6   Q.  Another what, sir?

7   A.  It's --

8            MR. SCHULTE:  Objection.

9            THE COURT:  Overruled.

10  A.  It was another time where, again, this was not a project he

11  had admin privileges on and he's attempting and got them back,

12  and then for some reason had to remove the members of the

13  branch that were adminning the project.  There was no reason to

14  do that.  It is just -- it seemed petty.

15           MR. DENTON:  Ms. Cooper, could we show just to the

16  witness, the Court, and the parties, what's been marked as

17  Government Exhibit 1138?

18  Q.  Do you recognize this, sir?

19  A.  Yes.

20           MR. DENTON:  Can we scroll to the second page quickly,

21  Ms. Cooper?

22  Q.  Without telling me what it says, what is this document?

23  A.  It is an e-mail.

24  Q.  Is it more than one e-mail?

25  A.  Yes.

M6H5sch1                    Leonis - Direct

1  Q.  Do the contents of these e-mails direct people to take

2  particular actions?

3  A.  Yes.

4  Q.  And were you a party to these e-mails?

5  A.  Yes.

6          MR. DENTON:  The government offers Government Exhibit

7  1138, your Honor.

8          THE COURT:  Any objection?

9          MR. SCHULTE:  No objection.

10          THE COURT:  Admitted.

11          (Government's Exhibit 1138 received in evidence)

12  BY MR. DENTON:

13  Q.  If we could publish that please, Ms. Cooper?  And if we

14  could start with the bottom e-mail that carries over between

15  the two pages?

16          Who sent this e-mail?

17  A.  Karen.

18  Q.  What was her role at the time?

19  A.  He was the chief of EDG.

20  Q.  And who did she send it to?

21  A.  She sent it to me and then she cc'd Mike, who was the

22  deputy chief of EDG; Dana, head of security; and Susan, who was

23  in HR.

24  Q.  Again, can you just summarize what she directed in this

25  e-mail?

M6H5sch1                    Leonis - Direct

1   A.  She basically said that the decisions that were made in

2   April where the responsibility for that project Brutal

3   Kangaroo, would remain in OSB, and the responsibility for the

4   tool Shattered Assurance would transfer to RDB, i.e., to

5   Mr. Schulte.

6   Q.  In your experience, was it typical for the group chief to

7   be involved in decisions of this nature?

8   A.  This was incredibly rare.  I only -- this is the only time

9   I know of it that I can remember.

10  Q.  Again, in your experience, was it typical for security and

11  HR to be involved in discussions about who would have access to

12  which project?

13  A.  Not at all.

14         MR. DENTON:  If we could then move up to the top

15  e-mail?

16  Q.  Again, sir, who sent this?

17  A.  I did.

18  Q.  What did you direct to happen in this e-mail?

19  A.  I was carrying out the direction that Karen gave me.

20  Q.  And just to focus on the middle paragraph that says -- that

21  starts the project should retain read privileges for general

22  Stash users on DevLAN.

23  A.  Correct.

24  Q.  What was that supposed to achieve?

25  A.  Well, so again, since Shattered Assurance was a component

M6H5sch1                      Leonis - Direct

1   of Brutal Kangaroo, it was our opinion that should Mr. Schulte

2   or any other person need any access to any of the code in the

3   Brutal Kangaroo project, as we had declared before, that they

4   should have it.

5   Q.  And was he able to do that under these directions?

6   A.  He should have been; yes.

7   Q.  What privileges did you not want the defendant to retain?

8   A.  We did not want him to have control over the project -- the

9   entire project.

10         MR. DENTON:  We can take this down Ms. Cooper.  Thank

11   you.

12   Q.  After you sent this e-mail, did you have a conversation

13   with the defendant about his privileges on Brutal Kangaroo?

14   A.  Yes.

15         MR. DENTON:  Ms. Cooper, could we publish what is in

16   evidence as Government Exhibit 1085, please?

17   Q.  What's the date on this e-mail, sir?

18   A.  It is June 21st, 2016.

19   Q.  And who sent it?

20   A.  I did.

21   Q.  Who did you send it to?

22   A.  I sent it to Karen, the group chief; Duane, who was acting

23   branch chief of RDB; and Susan, who was HR; and then I cc'd

24   myself.

25   Q.  Does this document your conversation with the defendant?

M6H5sch1                    Leonis - Direct

1   A.  Yes.

2              MR. DENTON:  If we could zoom in on the bottom

3   paragraph, please, Ms. Cooper?

4   Q.  Can you just read the last sentence, please?

5   A.  Sure.

6       As such, when recently he removed all of OSB from the

7   project, as EDG admins were reviewing project permissions

8   (referencing the e-mail) per management direction, the Brutal

9   Kangaroo project admins/privileges were returned to the early

10  April state.

11             THE COURT:  Forgive me if I missed this.  Is OSB the

12  same thing as ISB?

13             THE WITNESS:  No.

14             THE COURT:  OK.

15             THE WITNESS:  OSB is the branch in AED that contained

16  developers from which Mr. Schulte was in in early March 2016.

17  It was his old branch.

18  BY MR. DENTON:

19  Q.  And what was ISB, by contrast?

20  A.  ISB was the branch -- and it was actually in another

21  division -- that was maintaining the networks that we had.

22  They served as the network administrators for the group.

23  Q.  Mr. Leonis, was it concerning to you that the defendant

24  removed all of OSB from the project?

25  A.  Absolutely.

1    Q.   Why?

2    A.   There was no reason to do that.  First of all, it's one

3    thing to get your admin privileges back but then to remove the

4    people that were adminning the project after you were told not

5    to do that, it makes no sense.  It seems petty.

6            MR. DENTON:  Ms. Cooper, if we could zoom out and go

7    to the next page, please?  And can we blow up the first

8    paragraph?

9    Q.   What was the defendant's reactions to your comments to him?

10   A.   He wasn't happy.

11   Q.   What was the nature of your discussion with him that

12   followed?

13   A.   It was a discussion about how Shattered Assurance and

14   Brutal Kangaroo should be managed.

15   Q.   And had you spoken with other people about those projects

16   before talking to the defendant?

17   A.   Yes.

18   Q.   Who did you talk to?

19   A.   I mean, I talked to EDG management.

20   Q.   And had a decision been made at this point about how this

21   was going to be handled?

22   A.   Yes; in the previous e-mail.

23   Q.   What was the defendant's reaction to that decision?

24   A.   Well, I wrote it down.  I can read it.

25   Q.   Please.

M6H5sch1                    Leonis - Direct

1   A.  Josh indicated that he felt the direction management

2   provided him in April was unclear and that nothing was written

3   down.  He believed the two projects that he had been given were

4   Nader and Brutal Kangaroo.  I responded by saying that I have

5   spoken with Sean many times and in the past, I felt that the

6   direction was clear that he was working on Nader and Shattered

7   Assurance, and that Sean believed that Shattered Assurance and

8   Drifting Deadline were separable.  Josh did not feel the same

9   way and further indicated that the Shattered Assurance code

10  existed under the Brutal Kangaroo project and that they code --

11  the code -- should be kept there with the rest of the project.

12  As such, he believed that he should have access to the Brutal

13  Kangaroo project.  I noted that he had read access to the

14  project and could copy anything he wanted into a new repository

15  for the Shattered Assurance work.  Josh did not feel that this

16  was the best way to handle the project and that the Shattered

17  Assurance code should reside under Brutal Kangaroo.

18  Q.  At what level was the decision about the best way to handle

19  the project made within EDG?

20  A.  Well, by this point it was being made by the chief of EDG.

21  Q.  And when you say he had read access and could copy anything

22  he wanted, just explain, in layman's terms, what you mean.

23  A.  Essentially it's -- it's -- the easiest way to think of it

24  is like if you have a document you can copy and paste things in

25  the document, move it other places.  This was similar.  Right?

M6H5sch1                      Leonis - Direct

1    He could copy all the code, move it to its own new code-based

2    project that he could do whatever he wanted with and we didn't

3    care.  We were like, you need your own version of the code, you

4    go do that.  But that wasn't what we were talking about.  It

5    had to be done the way he wanted it.  It was about control.

6    And that was what was so frustrating about this situation

7    because it didn't have to be that way.  We were offering an

8    opportunity for him to take the code base and do what he needed

9    to do so he could do whatever he wanted, but because it wasn't

10   being done the way he wanted, that's what this discussion was

11   about and it was just so frustrating.  Even today it still

12   frustrates me.

13            MR. DENTON:  Ms. Cooper, could we go back to page 2 of

14   1085 and blow up, it looks like one large paragraph that

15   follows starting with, "This discussion," and all the way down

16   through the paragraph break?

17   Q.  Now, Mr. Leonis, just remind us, when is this conversation

18   taking place?  What time of the year?

19   A.  It's in the summer.

20   Q.  And how long before that had these decisions about

21   Shattered Assurance and Brutal Kangaroo been made?

22   A.  In April.

23   Q.  Do you see here where you write:  Three things I would like

24   to note from this portion of the conversation?

25   A.  Yes.

1    Q.  Why did you want to note those three things?

2    A.  At the time I felt they were important.

3    Q.  What are the three things that you noted here?

4    A.  The first thing was Josh's opinion that he felt like all

5    these decisions were being made behind his back.  And then I

6    proceeded to explain that point.

7         The second was I quoted something that kind of caught me a

8    little off guard.

9    Q.  Can you just read that paragraph that starts "second?"

10   A.  Sure.

11        Second, during this part of the conversation, Josh said the

12   following:  In this case, where he felt that his privileges

13   were being removed unfairly, he wasn't going to allow it to

14   happen and he would, quote unquote, fight back.  These two

15   words caught me a little off guard and I feel they are worth

16   mentioning.  Josh feels that he is being wronged in this

17   situation and that his projects have been unfairly removed from

18   him and that he is being punished unfairly.

19   Q.  Let me start at the end there, sir.  Were the decisions

20   about how Brutal Kangaroo and Shattered Assurance in any way

21   intended to punish the defendant?

22   A.  No.

23   Q.  Why were those decisions made the way they were?

24   A.  Well, the branch that he came from, OSB, wanted to maintain

25   Brutal Kangaroo, and up through management we agreed with that

decision but we also felt that Josh should be able to maintain

and work on the Shattered Assurance project.  But, in doing so,

he needed access to the code base so we made sure that he had

access to the code base so that he could copy whatever he

needed to copy and that was fine.  It is just we thought we

were going to like a yes/yes, everybody wins type of situation,

and it was clear that what we were trying to do was not -- it

wasn't going to work for Josh.

Q.  And when you say in this paragraph that the defendant's

words, that he would fight back caught me a little off guard;

what caught you off guard about that?

A.  I mean, the fact that he is saying that he is going to

basically do something again after we have had now at least two

conversations about -- probably more, I can't remember them

all -- about what he was going to do and he was just still at

the point where he was going to put up a fight about a

management decision that had been made multiple times now.

That's just not the way people talk in a professional

environment.  This is especially when we were trying do

everything possible to give him access to what he needed so he

could do his work.  It is just -- it's not the way we talk to

one another.

        MR. DENTON:  Ms. Cooper, could we go back to the first

page of this exhibit for a moment?

Q.  Sir, what was the date of this e-mail?

M6H5sch1                     Leonis - Direct

1   A.   June 21st, 2016.

2   Q.   And what day was your conversation with the defendant?

3   A.   June 20th, at about 4:00 p.m.

4          MR. DENTON:   Ms. Cooper, if we could put up what is in

5   evidence as Government Exhibit 1093?

6   Q.   What's the date on this e-mail, sir?

7   A.   June 28, 2016.

8   Q.   And who sent it?

9   A.   Mr. Schulte.

10  Q.   Do you know the people that he sent it to?

11  A.   Yeah.  I don't know them personally, but I know of them.

12  Q.   Who are they?

13  A.   I guess to give kind of an understanding of the

14  organization, we talked about CCI.  CCI was under a directorate

15  called the DDI and Mr. Hallman and Mr. Roche were the deputy

16  director and the director of that organization, and Ms. Park,

17  as I remember, was the executive director of the CIA.  So we

18  are talking about several levels above our management team.

19  Q.   In your role as supervisor within AED, did you have

20  interactions with these people?

21  A.   Almost never.

22  Q.   Do you see the subject line on this e-mail?

23  A.   Yes.

24  Q.   Were you one of the defendant's managers during this time

25  period?

```
 1   A.  Yes.

 2   Q.  Did you ever retaliate against him?

 3   A.  No.

 4   Q.  Did you ever observe any other managers retaliate against

 5   the defendant?

 6   A.  Not in my opinion.

 7           MR. DENTON:  Could we blow up the second paragraph,

 8   Ms. Cooper?

 9   Q.  Do you see where it says:  I had incurred the wrath of my

10   group chief Karen?

11   A.  Yes.

12   Q.  Did you deal with Karen frequently in your role as a

13   supervisor?

14   A.  More so when I was division chief, less so as a branch

15   chief.

16   Q.  Was Karen someone you observed express wrath?

17   A.  No.

18   Q.  What was Karen like?

19   A.  I always found her to be a warm person.  She cared so much

20   about people.  When I first got to EDG she was the one that

21   was -- even as a deputy a group chief, was the one walking the

22   hallways trying to talk to people about themselves, she would

23   talk about your family.  She wanted to know about you.  This is

24   not how I remember her.

25   Q.  And do you see where the defendant references my subsequent
```

1    report to security and escalation to TMU?

2    A.  Yes.

3    Q.  Did you participate in meetings and conversations about

4    that report?

5    A.  Not the report specifically that I remember.  I mean, we

6    have talked about, like I think I mentioned yesterday, a

7    meeting about moving people from branches to get them back to

8    work and it may have come up then but I don't remember.

9    Q.  During any of the meetings about this issue, did anyone

10   ever express a concern about the defendant making them look

11   bad?

12   A.  No.

13   Q.  What was the concern that people were focused on during

14   those meetings?

15           MR. SCHULTE:  Objection.

16           THE COURT:  Overruled.

17   A.  Well, there were two things that I remember.  One was at

18   one point we wanted to make sure that, mentally, that people

19   had people to talk to and that they were OK.  At one point we

20   made a manager's direction -- or I can't think of the actual

21   word, but we asked both Amol and Josh to go to a group called

22   EAP, that's the Employee Assistance Program.  They have

23   psychologists and people that you can talk to if you have gone

24   through, you know, difficulties in your life, things that you

25   want to talk about from the workplace, whatever.  And we asked

1   both Josh and Amol to go see them because we were concerned

2   about them so that was one of the things.  And the second thing

3   was we wanted people to get back to work.  You want talented

4   developers to do what they're good at so people were trying to

5   get people re-situated in addition to making sure that they

6   were OK.

7              MR. DENTON:  Ms. Cooper, if we could zoom out here and

8   go down to the third paragraph -- I'm sorry, I think it is the

9   fourth paragraph.  Sorry.

10  Q.  Do you see where the defendant says that he requested to

11  receive orders, in writing, and this request was denied?

12  A.  Give me a second, I'm trying to find it -- oh yes.

13  Q.  When you instructed the defendant and Amol to move

14  branches, did you put that in writing?

15  A.  Yes.

16  Q.  Was that one of the e-mails we looked at yesterday?

17  A.  Yeah.  Yeah, absolutely.

18             MR. DENTON:  If we could zoom out, Ms. Cooper, and go

19  to the next page?  Let me just pull up the top paragraph.

20  Q.  Take a look at this for a second, Mr. Leonis.  Do you see

21  at the bottom of this where the defendant writes:  I inquired

22  to the branch chief if he had given Weber permission to revoke

23  my privileges, to which he denied?

24  A.  Yes.

25  Q.  Was this one of the issues that you were concerned about

M6H5sch1                         Leonis - Direct

1  verifying in your communications with Sean and Jeremy Weber

2  that we looked at yesterday?

3  A.  Yes.

4  Q.  Did Sean confirm what authorization he had given?

5  A.  Yeah.  I believe so.

6          MR. DENTON:  We can take this down, Ms. Cooper,

7  please, and then blow up the next paragraph.

8  Q.  In the third line that refers to the acting division chief;

9  who was that?

10  A.  That was me.

11  Q.  When you met with the defendant about this memorandum, did

12  you tell him to just sign this and we will move on?

13  A.  No.

14  Q.  Did you give him the opportunity to comment on the memo?

15  A.  Yes, as we read through some of those yesterday.

16          MR. DENTON:  We can go down to the last line here --

17  sorry, last line of that same paragraph.

18  Q.  Can you read the second to last sentence of that?

19  A.  Is that beginning with "Karen"?

20  Q.  Yes, please.

21  A.  Karen used her loyal pawn, Weber, to execute her will of

22  removing me from the OSB Libraries, not inform me, and wait for

23  me to logically add my permissions back to the project I

24  thought was still mine.

25  Q.  And the last sentence as well.

1    A.  Then, she punishes me.

2    Q.  When you were reviewing material on April 15th, who did you

3    consult with?

4    A.  I consulted with Mike.  I consulted with Sean.  Yeah.

5    Jeremy.

6    Q.  Why did you consult with all of those people?

7    A.  So at first I just wanted to make sure that what happened

8    was what really happened.  Once we realized that he did add his

9    permissions back -- even though he had access to the code as we

10   previously directed -- that is a security matter.  And then I

11   also ended up talking to security and HR.  Just unreal.

12   Q.  What do you mean by that, sir?

13   A.  You know, three weeks into your job this is not the kind of

14   stuff that you expect to deal with, right?  I wanted more

15   responsibility, I wanted to help people, and here I'm dealing

16   with a situation where it just -- it just seemed petty.  It is

17   these are the things that, you know, you don't expect to deal

18   with in a workplace with people that have security clearances

19   and go through the process of wanting to build tools to collect

20   intelligence for your country.  Instead, you are dealing with

21   issues like this.  It's just -- I just wanted to help people,

22   you know?  Sorry.

23   Q.  As part of the review you conducted, did you determine

24   whether the defendant had been informed that he was being

25   removed as an administrator of OSB Libraries?

1    A.  Yeah.

2    Q.  Was he informed?

3    A.  He was by Shawn.

4            MR. DENTON:  We can take that down, Ms. Cooper.  We

5    can take the whole exhibit down.  Thank you.

6    Q.  Now, you just mentioned, sir, that at a certain point these

7    issues became a security matter for you; is that right?

8    A.  That's correct.

9    Q.  And what was your response to it becoming a security issue?

10   A.  Well, if it is a security matter you have to talk to

11   security.

12   Q.  Is that something you took seriously?

13   A.  Oh yeah.  I spent a lot of time talking to security.

14           MR. DENTON:  Ms. Cooper, if we could pull up what is

15   in evidence as Government Exhibit 1616?

16   Q.  Mr. Leonis, have you seen this e-mail before?

17   A.  Yeah.

18   Q.  How did you first come to see it?

19   A.  I was asked to review it for classified information.

20   Q.  Approximately when was that?

21   A.  It was after November 10th.

22   Q.  Roughly how soon after?

23   A.  I don't exactly remember.

24   Q.  Are you an original classification authority?

25   A.  No.

1    Q.  What was your role in reviewing this e-mail for classified

2    information?

3    A.  I think they just wanted to, you know, ask somebody what

4    they thought.

5    Q.  What's the classification listed on this e-mail?

6    A.  Unclassified.

7    Q.  And who designated it as unclassified?

8    A.  Mr. Schulte.

9    Q.  Is there classified information in this e-mail?

10   A.  In my opinion there was.

11   Q.  Can you give us an example?

12   A.  So, if you go into the third paragraph that starts

13   "specifically," somewhere down the paragraph you will see

14   something that talks about, you know, it talks about we were

15   still mainly developers and so we largely just relied on trust.

16   And then it talks about essentially how one of our networks was

17   unmanaged and allowed people to have administrative privileges

18   with removable media.  In my opinion, that talks about a

19   vulnerability of one of our networks, and vulnerabilities of

20   one of our networks, from the classification guide, was

21   considered secret.  So that's one of the points.

22        As I have looked at this e-mail now several times

23   since then, I have also noticed that in the fifth line in the

24   e-mail towards the end you will notice that it talks about

25   Foreign Office West.  Putting a location of a CIA facility is

1    also classified, so -- and I believe this e-mail also had the

2    name of an officer in it that was undercover which was

3    considered confidential, the name of an officer and relating

4    them to the agency.

5        So, in my read of this e-mail, it is not unclassified.

6    Q.  Mr. Leonis, do you see the sentence here that starts about

7    eight lines down that begins -- or that reads for two full

8    years I reported through my management chain these security

9    concerns?

10   A.  Yes.

11   Q.  During this time period, were you in the defendant's

12   management chain?

13   A.  I was.

14   Q.  Did he ever report a security concern about DevLAN to you?

15   A.  He did not.

16   Q.  Did you ever learn that he had communicated security

17   concerns about DevLAN to anyone?

18   A.  Not that I was aware of.

19           THE COURT:  Let me just take a moment to advise, in

20   case it wasn't clear, Foreign Office West is also a

21   substitution for the specific location that is referenced

22   there.  That's a substitution that I approved in connection

23   with the litigation of this case, so just so you understand.

24   Q.  During your tenure as the acting deputy chief and then

25   deputy chief of AED, did you have to deal with security

M6H5sch1                     Leonis - Direct

1   concerns related to DevLAN?

2   A.  Yeah.

3   Q.  What were those?

4   A.  Those were the memos and involved one of the aforementioned

5   situations about Brutal Kangaroo.

6   Q.  And who was involved in those?

7   A.  Mr. Schulte.

8   Q.  How quickly did you respond to those issues?

9   A.  I felt we responded immediately.  We took very swift

10  action.

11  Q.  And why did you respond so quickly?

12  A.  Because it was a security issue.

13  Q.  And did you do that alone or in concert with other

14  managers?

15  A.  I did it in concert with a lot of other people.

16  Q.  If we can look at the sentence that says:  This left it

17  open and easy for anyone to gain access and delete our entire

18  EDG source code repository, or even easily download it and

19  upload it, in its entirety, to the Internet.

20      Do you see that?

21  A.  I do.

22  Q.  Is that a concern?

23  A.  Yeah, that was one of the concerns that I just spoke about.

24  Q.  Why was that a concern?

25  A.  It's a vulnerability of our systems.

1   Q.  And how was that vulnerability created?

2   A.  Essentially it was you have the way the system was set up

3   and then actions that people could take.

4   Q.  Did you take any steps during your time as division chief

5   to mitigate the ability of people to access the entire EDG

6   source code repository?

7   A.  In concert with others, yes.

8   Q.  What steps?

9   A.  That was the direction that came from Mike, the deputy

10  group chief, to remove developers as administrators on the

11  Atlassian tool suite.

12  Q.  And did that include the defendant?

13  A.  It did.

14  Q.  Do you see at the bottom -- sorry, I lost my place --

15          MR. DENTON:  We can zoom back out, Ms. Cooper -- I'm

16  sorry -- and then go to the next page, please, and blow up the

17  second paragraph.

18  Q.  Do you see in the third line that says, the sentence that

19  reads:  They informed security that it wasn't a real threat and

20  continued to force me to sit next to the individual who

21  threatened me.

22  A.  I do.

23          MR. DENTON:  Ms. Cooper, could we pull up, side by

24  side, Government Exhibit 1046 and go to page 2?

25  Q.  Was Mr. Schulte forced to continue sitting next to Amol?

M6H5sch1                     Leonis - Direct

1    A.  No.

2    Q.  During your participation in the consideration of this

3    matter, was it your opinion that people took it seriously?

4    A.  Oh yeah.

5    Q.  Did you take it seriously?

6    A.  Absolutely.

7         MR. DENTON:  We can zoom out.  Do you see the, I guess

8    it is the last full paragraph that starts CIA management in

9    Government Exhibit 1616.  If we can blow new up, Ms. Cooper,

10   please?

11   Q.  While you were in EDG, did you perceive management to have

12   a very toxic culture?

13   A.  No.

14   Q.  What was the management culture in EDG like?

15   A.  I felt it was people first.  We wanted to make sure that

16   people had what they needed to do their job.  I know personally

17   I encouraged decisions at the lowest level possible because I'm

18   not a developer and the developers know -- they know their job

19   better than anybody else, they were in the best position to

20   make decisions on whatever they were doing, and as managers it

21   was our job to support them and get them what they needed so

22   I -- I don't agree with that characterization.

23        MR. DENTON:  We can take both of those down,

24   Ms. Cooper.  Thank you.

25   Q.  Mr. Leonis, do you remember yesterday we talked a little

M6H5sch1                        Leonis - Direct

1    bit about the events of March 7, 2017?

2    A.  I do.

3    Q.  After you learned of the disclosure by WikiLeaks, what was

4    the atmosphere in the CCI office like?

5    A.  It was pretty bad.

6    Q.  What do you mean by that?

7    A.  Well, so first, a lot of the tools that, you know, we had

8    been developing, appeared to have been disclosed to the public

9    so the first thing was trying to figure out what were they; you

10   know, we didn't know.  How did it happen.  Whatever.  And then,

11   shortly thereafter, the FBI showed up and essentially the

12   entire -- the entire office became a crime scene.  It was

13   really hard on a lot of people because, you know, you spend a

14   lot of time doing a lot of work and everything that you had

15   spent all of this time on was now, you know, couldn't be used

16   or it was a moot point or you weren't even allowed access to

17   it.  I remember a point in time when there were FBI folks

18   coming in with cameras -- and you don't see cameras in a SCIF

19   very often, if at all, because you are not allowed to have

20   photography in a SCIF, but they were taking pictures of

21   people's desks and removing computers and, you know, people's

22   personal effects were being photographed.  It was just --

23   people just -- and then the other thing was because this was

24   all happening, all the developers weren't allowed to do what

25   they did, which was develop.  There was a period of time where

1    everything just essentially grinded to an absolute halt.  There

2    were people that were part of the review process of the

3    materials that were disclosed.  I was not part of that process

4    and I focused on the people and the division and just tried to,

5    the best you could, just try to make things normal again which

6    was literally impossible.  A lot of sleepless nights.  It

7    just -- man, it was a really rough time for -- and it wasn't,

8    like, a day.  This happened for a very long time.  I mean,

9    look, I'm here talking about this six years later from the

10   start of discussions on, you know, admin privileges, I'm still

11   here talking about it.  It never goes away.  You know, you want

12   to move on at some point.

13           MR. SCHULTE:  Objection.

14           THE COURT:  I will overrule the objection.  Overruled.

15   BY MR. DENTON:

16   Q.  Mr. Leonis, you spent some time yesterday testifying about

17   DevLAN?

18   A.  Yes.

19   Q.  Was DevLAN still in use after March 7, 2017?

20   A.  No.  No.

21   Q.  Do you know what happened to it?

22   A.  Yeah.  The FBI came in and completely took it apart.

23   Q.  Did you have a role in interacting with the FBI in this

24   time?

25   A.  Yeah.

M6H5sch1                       Leonis - Direct

1    Q.  What was your role?

2    A.  Well, on a personal level I got to talk to the FBI several

3    times.  They wanted to know everything I knew and a lot of

4    other things.  I ended up meeting with a lot of people but then

5    I also had to facilitate discussions for other people and then

6    I served as a person that when they came into the office, if

7    they needed help trying to figure out where to go, I had to

8    take them around the office, point them in the right direction.

9    But literally when they show up to do stuff you have to stand

10   back and let them do whatever they have to do, that's their

11   job.  So as a supervisor, it was mainly facilitation and

12   helping them find whatever they need or get whatever they need,

13   but then also I had to spend a lot of time talking to them.  It

14   was pretty bad.

15   Q.  When you say you had to facilitate other people, what do

16   you mean by that?

17   A.  So if they needed to find a developer that they needed to

18   talk to, I knew the developers, knew the branch chiefs, so I

19   was the person that they could come to and just ask.  You know,

20   after a while they kind of knew what they were doing and they

21   just went to wherever they had to go but initially I helped out

22   by just pointing them in the right direction.

23   Q.  And aside from your interactions with the FBI, how did your

24   job as a manager change as a result of these events?

25   A.  I had a lot of people in my office talking.  I became an

1    unofficial psychologist, I guess.  I just let people come in

2    and vent.  A lot of people came in my office and they were in

3    tears.

4              MR. SCHULTE:  Objection.  Relevance.

5              THE COURT:  Sustained.

6    Q.  You referred, sir, to work grinding to a halt.

7    A.  Yes.

8    Q.  What, if any effect, did that have on the mission of EDG?

9    A.  It grinded to a halt too.

10   Q.  With respect to the work that you described being revealed

11   in the leak, what effect did the leaks have on those tools?

12   A.  They were essentially unusable.

13   Q.  And again, what was the effect of rendering those tools

14   unusable?

15   A.  That meant that operations were going to grind to a halt

16   for a while.

17             MR. DENTON:  Just one moment, your Honor?

18             (counsel conferring)

19             MR. DENTON:  No further questions.

20             THE COURT:  Cross-examination.

21             MR. DENTON:  I think I left my mask, your Honor.

22             THE COURT:  I was about to point that out.  Thank you.

23             Mr. Schulte, you may remove your mask if you want.

24   CROSS-EXAMINATION

25   BY MR. SCHULTE:

M6H5sch1                    Leonis - Cross

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  I just want to start off by talking to you a little bit

4   about the division management.  OK?

5   A.  OK.

6   Q.  Before you became acting division chief Debra was chief

7   before you, correct?

8   A.  That's correct.

9   Q.  And before Debra, Paula was the acting division chief;

10  right?

11  A.  I believe so; yes.

12  Q.  As far as you know, Debra did not have any issues with me;

13  correct?

14  A.  Not that I was aware of.

15  Q.  As far as you know, Paula did not have any issues with me;

16  correct?

17  A.  Not that I was aware of.

18  Q.  In fact, I had a great relationship with my management;

19  correct?

20  A.  I can't speak to that.  I'm sorry.

21  Q.  All right.  I had no disciplinary infractions, correct?

22  A.  Again, I wasn't aware of any, but.

23  Q.  After you became division chief you had access to my

24  personnel file, correct?

25  A.  No, as a matter of fact I didn't.

M6H5sch1                          Leonis - Cross

1   Q.  You didn't have access to employees' records?

2   A.  Not generally.

3   Q.  OK.

4   A.  Not those.

5   Q.  Well, I was promoted every single year until my last year,

6   correct?

7   A.  I don't remember.  I'm sorry.

8   Q.  You didn't have access to the promotion records or anything

9   like that?

10  A.  With regard to you I just don't remember any of that.  I'm

11  sorry.

12  Q.  OK.  By the time you became the acting division chief I had

13  been at the CIA for about six years, right?

14  A.  Again, I'm sorry.  I don't remember.

15  Q.  But to your knowledge there is no notations of any

16  disciplinary actions that you are aware of, right?

17  A.  Nothing that I was aware of.

18              (Continued on next page)

19

20

21

22

23

24

25

M6hWsch2                    Leonis - Cross

1    BY MR. SCHULTE:

2    Q.  Yet from the very first day that you took over as the acts

3    division chief, you started keeping a dossier on me in a little

4    white binder, correct?

5    A.  Not from the first day, no.

6    Q.  Not from the first day?

7    A.  No.

8    Q.  All right.  I think there's a binder there for you.  Well,

9    here.

10       I'm showing you what's been marked as 3506-501.  Can you

11   review this, and when you're done, look up?

12   A.  OK.

13   Q.  So now do you recall that immediately after taking your

14   position, you began collecting documents about me?

15   A.  I don't remember that at all.

16   Q.  This doesn't refresh your recollection?

17   A.  No.  We -- I didn't keep a binder when you started working

18   for me.

19   Q.  You never kept a white binder?

20   A.  Later, we actually did, but not from the beginning, no.

21   Q.  OK.  Let me ask you some questions.  Before you became a

22   manager at the CIA, where did you work before?

23              MR. DENTON:  Objection.

24              THE COURT:  Sustained.

25   BY MR. SCHULTE:

M6hWsch2                     Leonis - Cross

1    Q.  Did you ever manage people before working at the CIA?

2    A.  Not formally.

3    Q.  Your first role in management was how long -- was at the

4    agency, correct?

5    A.  I'm sorry.  Can you repeat?

6    Q.  The first time you became a manager of people was when you

7    were working at the CIA, correct?

8    A.  In a formal role, correct.

9    Q.  So when you became a manager, did you have to take any

10   training?

11   A.  Yes.

12   Q.  What training?

13   A.  There were several different types of training.  Some were

14   leadership training.  In fact, I sought out leadership

15   training.  There were a lot of online courses that I had to

16   take.

17   Q.  Did you ever take any conflict resolution training?

18   A.  I -- I can't remember.

19   Q.  You don't recall taking any conflict resolution training at

20   all?

21   A.  I can't remember.

22   Q.  Was there any training about what to do in situations where

23   one employee alleges something against another?

24   A.  I mean I've had -- I've had training that involved having

25   two people sit down together and have discussions.  I just -- I

M6hWsch2                    Leonis - Cross

 1    can't recall when.

 2    Q.  OK.  But the training that you took suggested to you in

 3    these types of situations to sit down with the individuals

 4    involved and hash it out, right?

 5    A.  I don't know how to answer your question.  I've had

 6    training that incorporated situations.  I just -- I don't

 7    remember.  It's been a long time.  I don't remember, but I do

 8    remember having training where we went through situations.

 9    They were just very general.

10    Q.  Well, in your training, did they -- was it taught to listen

11    to both sides of the story?

12    A.  Like I said, I don't -- I don't remember specifics of the

13    training.

14    Q.  OK.  What about communication; did you have training about

15    effective communication?

16    A.  I, I've taken several courses.  I've also taken and read

17    through things on communication and effective communication.

18    Q.  Communication is very important in a management role,

19    correct?

20    A.  Yes.

21    Q.  And trust is also important, correct?

22    A.  Absolutely.

23    Q.  You testified on direct about the importance of trust,

24    correct?

25    A.  I did.

M6hWsch2                    Leonis - Cross

1    Q.  And on direct, you testified that it's very important for

2    people who work together at the CIA, or really anyplace, to be

3    able to trust each other, correct?

4    A.  I do.  I believe that, yes.

5    Q.  It's important for a company to trust its employees,

6    correct?

7    A.  I believe so, yeah.  Absolutely.

8    Q.  And it's fair to say, right, that you want the employee to

9    trust the company?  Right?

10   A.  Yes.

11   Q.  And you want management to trust the people it supervises,

12   correct?

13   A.  Can you repeat that, please?

14   Q.  Yes.  You want management to trust the people that it

15   supervises, correct?

16   A.  Absolutely.

17   Q.  And you want the person who is being supervised to feel

18   that management can also be trusted, right?

19   A.  Yes.

20   Q.  At times, right, it's fair to say that you don't simply

21   trust; you trust and you verify?  Correct?

22   A.  In specific cases, yes.

23   Q.  Not all the time?

24   A.  I believe you should trust and verify, yes.

25   Q.  And that's something you did, right?

M6hWsch2                          Leonis - Cross

```
 1   A.  Yes.
 2              MR. SCHULTE:  OK.  I'd like to pull up what's in
 3   evidence as GX1062 and publish it.
 4              THE COURT:  You may.
 5   BY MR. SCHULTE:
 6   Q.  When you first got an email regarding the OSB libraries,
 7   the email started with Mr. Weber, is that correct?
 8   A.  That's correct.
 9   Q.  When you first received the email, Mr. Weber was asking or
10   trying to inform you about something that happened with the OSB
11   libraries, right?
12   A.  Yes.
13   Q.  And when Mr. Weber emailed you, is it fair to say that I
14   was not on the email chain?  Correct?
15   A.  You were not.
16   Q.  It's sent to you, Sean, and Richard, correct?
17   A.  That is correct.
18   Q.  And it's fair to say that you are in management, correct?
19   A.  Yes.
20   Q.  Sean is in management, right?
21   A.  Yes.
22   Q.  Richard is in management, correct?
23   A.  He was going to be, yes, a managerial role.
24   Q.  OK.  But Mr. Weber and I were both developers, correct?
25   A.  That's correct.
```

1    Q.  And in April of 2016, Jeremy Weber was not a manager,

2    correct?

3    A.  That is correct.

4    Q.  Jeremy Weber wasn't in charge of any people; he wasn't in

5    any people-related management position, correct?

6    A.  He was not a supervisor at that point in time.

7    Q.  In fact, Jeremy Weber had no more or no less authority than

8    I did, correct?

9    A.  No.

10   Q.  That's not correct?

11   A.  Yes.  I'm sorry.  He had no more -- I'm sorry.  He had no

12   more authority or less authority than you did.

13   Q.  OK.  And as a manager in RDB, you did not know the dynamics

14   of OSB, right?

15   A.  Not particularly, no.

16   Q.  You didn't know how Mr. Weber interacted with me, correct?

17   A.  No, not really.

18   Q.  You had no idea that Mr. Weber had stopped speaking to me

19   at this point, correct?

20   A.  I was not aware of that.

21   Q.  In fact, you did not know that Mr. Weber was frustrated

22   because I would not consider him my *de facto* supervisor,

23   correct?

24   A.  I was not aware of any of the things you're talking about.

25          THE COURT:  Mr. Leonis, I'm just going to remind you

M6hWsch2                         Leonis - Cross

1    that the questions that Mr. Schulte asks are not evidence.  So,

2    too, the questions that the government asks are not evidence.

3    It's just the testimony of the witness that is evidence.

4    BY MR. SCHULTE:

5    Q.  You did not know that Mr. Weber imposed arbitrary rules on

6    how tools should be developed, correct?

7              MR. DENTON:  Objection.

8              THE COURT:  Sustained.  Let's move on, please.  The

9    witness has said he's not aware of any of your relationship at

10   that time with Mr. Weber.

11   BY MR. SCHULTE:

12   Q.  But you are aware that Mr. Weber sometimes has a tendency

13   to overreach, correct?

14   A.  I -- I do not have that same characterization, no.

15   Q.  OK.  I'm going to show what's in evidence or publish what's

16   in evidence as GX1139, which you testified about yesterday.  Do

17   you recall this?

18   A.  Yes.

19   Q.  So Mr. Weber sent out an email, and do you know who he sent

20   it to?

21   A.  He sent it to the group, EDG.

22   Q.  Everyone in EDG, correct?

23   A.  Yes.

24   Q.  And it was about migrating Bamboo and Confluence servers,

25   correct?

M6hWsch2                        Leonis - Cross

1    A.   Yeah, that's what it says.

2    Q.   This is ISB's role, correct?

3    A.   At that time it was.

4    Q.   Mr. Weber has no authority or is not in ISB, correct?

5    A.   He should not have sent that email.

6    Q.   OK.  And you responded to him about that, right?

7    A.   Absolutely.

8    Q.   And I think, I believe you testified on direct that you

9    were annoyed with Mr. Weber for this, correct?

10   A.   I was.

11   Q.   OK.  And you don't see this as Mr. Weber overreaching?

12   A.   Mr. Weber should not have sent that email.

13   Q.   OK.  Back to 1062, exhibit 1062 here, Mr. Weber is

14   escalating the situation or the issue directly to you, correct?

15   A.   Yes.

16   Q.   But you are not Mr. Weber's direct manager, correct?

17   A.   I'm in his management chain.

18   Q.   You're in his management chain, but you're not his

19   supervisor, right?

20   A.   I am not his branch chief.

21   Q.   So Mr. Weber should report to his boss, who should then

22   report to you, correct?

23   A.   He included Sean on that email, on the "to" line.

24   Q.   OK.  But he didn't speak with Sean first about the issue,

25   did he?

M6hWsch2                          Leonis - Cross

1    A.  That's -- I -- I think at some point in this email chain

2    there's a -- he does talk to Sean.

3    Q.  This is the first --

4              THE COURT:  Can you just clarify or remind us, Jeremy

5    Weber was in which group?

6              THE WITNESS:  Jeremy Weber was in OSB.

7              THE COURT:  And the head of that, chief of that was

8    Sean?

9              THE WITNESS:  The branch chief was Sean, that's

10   correct.

11             THE COURT:  And then Sean reported to you?

12             THE WITNESS:  I was the acting division chief at the

13   time, so yes.

14             THE COURT:  All right.

15   BY MR. SCHULTE:

16   Q.  This is the first email in the chain.  It's cut off, but I

17   think we saw this in another exhibit.  But the first email

18   related to the permission changes appears -- this appears to be

19   the very first in that chain, correct?

20   A.  Uh --

21   Q.  I can go back to this and read over it, but in the very

22   first email, there's no -- there's no email to Sean or anything

23   about the change to permissions in OSB libraries, correct?

24   A.  Can you go slowly up?

25   Q.  I'm sorry?

M6hWsch2                    Leonis - Cross

1   A.  There's no "to" information on this email.

2   Q.  Yeah.  I don't know.  It's -- I think there may be another

3   government exhibit that has that information.  I don't know why

4   it's not in here, but the point is the content of the email,

5   it's not about -- Jeremy's not telling anybody about

6   permissions that have been changed to OSB libraries yet.

7   Right?

8   A.  In this -- well, hold on.

9       Can you restate your question?

10  Q.  Yes.  So this is an email to me, correct?

11      Well, you don't know.  It says -- I don't know if there's

12  another exhibit that has this in there.  The purpose of this

13  email is to talk about how the OSB libraries should -- what

14  their position should be in OSB, correct?  It's not -- the

15  point is this email's not about a change in permissions to the

16  OSB libraries, correct?

17  A.  I'm still not following what you're trying to ask.

18  Q.  What I'm trying to ask is this email is the very first,

19  very first time that Mr. Weber talks about any situation with

20  the libraries and allegations that I reinstated my permissions.

21  Correct?

22  A.  This was the first -- the email that you have up right now

23  is the first email that I received from Jeremy, stating that

24  there was a situation with the -- it says libraries and the

25  Atlassian projects -- products in general.

M6hWsch2                          Leonis - Cross

1           THE COURT:  Page 10 of the exhibit.

2     BY MR. SCHULTE:

3     Q.  Right.  So according to this, Mr. Weber -- there's no email

4     from Mr. Weber to Sean, correct; he's just sending the email

5     directly to you?  Right?

6     A.  I can't -- I can't verify if there was another email sent,

7     but Sean is in the "to" line in this email.

8     Q.  OK.  When you received this email, you had no idea if

9     Mr. Weber went ahead and removed my accesses without any

10    approval, correct?

11    A.  I had a lot of questions.

12    Q.  You had a lot of questions, right?

13          You didn't know if Mr. Weber even talked to Sean about

14    removing my access, correct?

15    A.  I had a lot of questions.

16    Q.  And after this email, you don't send an email to me,

17    correct?

18    A.  Not at that point.

19    Q.  Well, not at any point, sir, right?

20    A.  Not at that point.

21    Q.  At no point do you ever send an email to me about

22    Mr. Weber's allegations, correct?

23    A.  I actually sent you the memo --

24    Q.  Right.  Until you issue me --

25    A.  -- that I wrote that you signed --

M6hWsch2                          Leonis - Cross

1   Q.   Right.   So --

2   A.   -- regarding the allegations.

3   Q.   Before you issue me the memo, you don't ever call me into

4   your office and ask my side, correct?

5   A.   We did not have a conversation until Monday about this

6   issue.

7   Q.   I'm sorry, sir.   Can you just yes or no?

8   A.   Restate your question, please.

9            MR. SCHULTE:   Can the court reporter read the

10   question.

11            (Record read)

12   A.   Of this situation, no.

13   Q.   You chose to get only Mr. Weber's side of the story,

14   correct?

15   A.   No.

16   Q.   Well, you could have asked me my side, but you chose not

17   to, right?

18   A.   I needed a lot more information before --

19   Q.   I'm sorry, sir.   Yes or no.

20   A.   At that point in time, no.

21   Q.   OK.   You could have had, you could have called a meeting

22   with all the parties and resolved this directly, correct?

23   A.   I'm not sure how to answer your question, because I don't

24   think that would have been appropriate, to call everybody

25   together without gathering more information.   I need get at the

Leonis - Cross

```
1    truth first before I could assess whether there was something
2    to talk about.
3    Q.  I mean the question is you could have called a meeting, had
4    everyone come to the meeting, and resolve the issue directly,
5    could you not?
6    A.  I could have, but --
7    Q.  That's the question.  Yes or no.
8    A.  I'll say yes.
9    Q.  OK.  And you chose not to do that, correct?
10   A.  I chose not to do that, that is correct.
11   Q.  So when you replied to Mr. Weber's email, you ask him
12   follow-up questions, correct?
13   A.  Absolutely.
14   Q.  And you did not ask me if any part of this recitation was
15   correct, right?
16   A.  You were not included on this email.
17   Q.  OK.  Mr. Weber didn't email you and copy me and say there's
18   a dispute between the admins, can you resolve it for us,
19   correct?
20   A.  I did not receive an email like that.
21   Q.  OK.  And each of us, we work in the same building, correct?
22   A.  Yes.
23   Q.  On the eighth and ninth floors of the building, correct?
24   A.  That is correct.
25   Q.  We work at the same times, correct?
```

M6hWsch2                          Leonis - Cross

 1    A.  I'll say approximately.  I don't remember both of your
 2    schedules.
 3    Q.  And at this point you did not know what official emails or
 4    communications I possessed, correct?
 5    A.  No.
 6    Q.  You didn't know if the former division chief sent me an
 7    email confirming my position with the OSB libraries, correct?
 8              MR. DENTON:  Objection.
 9              THE COURT:  Sustained.
10    BY MR. SCHULTE:
11    Q.  You did not know if I received a different direction from
12    Sean that he either forgot or miscommunicated, correct?
13              MR. DENTON:  Objection.
14              THE COURT:  Sustained.
15    BY MR. SCHULTE:
16    Q.  In fact, based on the process you used, there would be no
17    way for you to determine any information that I alone
18    possessed, correct?
19    A.  Not at that point in time.
20    Q.  Not ever, until you issued the memo, correct?
21    A.  When the memo -- when we had the memo, we offered you the
22    opportunity to make adjustments to that memo, to ensure that
23    your side was included.
24    Q.  We'll get to that in a minute.
25        You testified in your direct yesterday that when people

M6hWsch2                         Leonis - Cross

1    talk, they miscommunicate, correct?

2    A.  At times, yes.

3    Q.  And at this point were you aware of the standard practice

4    that notification be sent to the parties whose accesses in

5    Stash are modified along with their branch chief?

6    A.  I'm sorry.  Can you repeat that?

7    Q.  Back to the Stash practice with project permissions, were

8    you aware that the standard practice was that notification be

9    sent to the parties whose accesses are modified along with

10   their branch chief?

11   A.  I was not aware of that.

12   Q.  You were not aware of that?

13   A.  That didn't happen to me as a branch chief when I was in

14   RDB, so I'm not aware of that.

15          MR. SCHULTE:  This is Government Exhibit 1011.  I'm

16   not sure if it's in evidence already.  It is, right?  OK.  I'm

17   going to publish it to the parties then and the jury.

18   Q.  Can you explain what this is?

19   A.  Yes.  That's an email.

20   Q.  It's from Eliot to ISB, correct?

21   A.  That's correct.

22   Q.  And you're cc'd on it, right?

23   A.  I am.

24   Q.  And what is Eliot asking?

25   A.  Eliot's asking to have, to become the owner of a specific

M6hWsch2                         Leonis - Cross

1    repository because there are two people that essentially were

2    admin on a repository, and they no longer were in EDG.

3    Q.   And then what does Eliot do after sending that email?

4    A.   He sends an email to you and Jeremy, with me cc'd, asking

5    for assistance in changing things.

6    Q.   OK.  And then what is this top email?

7    A.   It's an email from you.

8    Q.   Who do I send it to?

9    A.   To Eliot and Jeremy, and I'm cc'd, notifying Eliot that he

10   has admin access to Panda.

11   Q.   So do you recall now that -- the process that any time

12   Stash permissions were modified, there was always something

13   written, on the record, and sent to the supervisor?

14   A.   No.

15   Q.   You don't?  You're saying this is the only time that ever

16   happened?

17   A.   I'm not saying this is the only time that I was included,

18   but I just don't remember that as a regular occurrence.  Most

19   of the branches, at the lowest levels, managed this sort of

20   thing, and we allowed the developers to do that, so I can't --

21   I can't validate whether I was included on every request

22   regarding change of admin access to any project.

23   Q.   Were you aware that when Mr. Weber removed my accesses to

24   the OSB libraries on April 4, Mr. Weber did not send you a

25   notification?  Correct?

M6hWsch2                       Leonis - Cross

1    A.  I don't -- I don't remember one.

2    Q.  In fact, he didn't send anyone notification, correct?

3    A.  I don't know.  I'm sorry.

4    Q.  If a system administrator, like Mr. Weber, were to tell you

5    that they unilaterally removed someone's access because they no

6    longer trusted that individual, would you be concerned about

7    that?

8              MR. DENTON:  Objection.

9              THE COURT:  Sustained.

10   BY MR. SCHULTE:

11   Q.  Sitting here today, would you be surprised to learn that

12   there is no email from Sean and nothing on the record at all to

13   support Mr. Weber's claim that he had authority to remove my

14   access?

15             MR. DENTON:  Objection.

16             THE COURT:  Sustained.

17   BY MR. SCHULTE:

18   Q.  Sitting here today, you have no knowledge of what Sean sent

19   to me regarding accesses to OSB projects, correct?

20   A.  I'm not aware of emails, if that's what you're asking.

21   Q.  All right.  Let's talk briefly about the code libraries and

22   OSB libraries specifically, OK?  You testified on direct that

23   these were like building blocks, correct?

24   A.  The components of the OSB libraries?

25   Q.  Yes.  Or you know, just libraries in general, code

M6hWsch2                    Leonis - Cross

1    libraries.

2    A.   In the libraries there were code building blocks, I

3    believe, is what I testified to.

4    Q.   In general, code libraries contain modular, routine

5    functionality, correct?

6    A.   You're asking the wrong guy.

7    Q.   Well, you know that the point of the library is, instead of

8    doing the same thing over and over again, you have one kind of

9    piece of code that you just keep using through the library,

10   right?

11   A.   The library could possess pieces of code that developers

12   could use, if needed.

13   Q.   OK.  And with respect to the OSB libraries, you were aware

14   that by April, this had already morphed into an AED/EDG-level

15   library, correct?

16   A.   I believe that -- I don't know how to answer your question.

17   I don't believe it was a AED/EDG library.  We were talking

18   about creating one that everybody could use at that point in

19   time.

20   Q.   Well, the previous division chief already approved the

21   transition before she left, correct?

22   A.   I can't speak to that, no.

23   Q.   You don't know?

24        I'm going to show to you Government Exhibit 1061, which is

25   in evidence.

M6hWsch2                        Leonis - Cross

1              MR. SCHULTE:  I'll publish it to the parties and jury

2      too.

3      Q.  I want to bring your attention to this April 14 email,

4      which is page 3 on Government Exhibit 1061.  So the move or

5      integration or transfer of the OSB libraries to the AED level

6      was one of Debra's goals before she left, correct?

7      A.  Yes, that and the other AED branch libraries.

8      Q.  And she specifically hired an individual, Jojo, to help

9      with that, correct?

10     A.  Yes.

11     Q.  OK.  And in fact, there were already members of other

12     branches working on the OSB libraries team, correct?

13     A.  I don't -- I can't speak to that.

14     Q.  OK.  But you did know that all branches, including RDB,

15     could add new code, modify and write to the OSB libraries,

16     right?

17     A.  I believe that -- can you restate that, please?

18     Q.  OSB libraries, anybody could add new code or write to those

19     libraries, correct?

20     A.  Yes, I believe so.

21     Q.  OK.  So the only permissions that Jeremy's email and the

22     subsequent memo of warning concerns are the approval process

23     and to official versions of the libraries, correct?

24     A.  You said something that -- you said memo of warning?  Is

25     that what you just said?

M6hWsch2                          Leonis - Cross

1    Q.  The issue that Jeremy raises to you, it's not an issue of

2    my ability or anyone's ability to write or add new code to the

3    OSB libraries; it's just an issue of the approval process for

4    official versions of the libraries, right?

5    A.  I believe what I was told was it was a concern about who

6    had admin control over the library.

7    Q.  Right.  And it's the project admins who control when new

8    code is merged into the Master branch, right?

9    A.  I can't speak to that.  I don't know -- I didn't know the

10   process about OSB libraries until it was explained to me

11   several times.  But even now, I still don't quite understand

12   it.

13   Q.  Here's Government Exhibit 1062, and I think you sent

14   questions to Mr. Weber.  I think No. 2 here -- I just want to

15   direct your attention there, on page 8 of the exhibit.

16   A.  Uh-huh.

17   Q.  So the underlying issue is this merge into Develop and

18   Master branches, correct?

19   A.  I'm sorry.  Please restate your question.  What are you

20   asking?

21   Q.  Anyone could write an update to, for example, the privilege

22   escalation OSB library, correct?

23   A.  It appeared so.

24   Q.  OK.  But whether the code makes it into the official

25   release version 2.1, 2.2 or 2.3 depends on the libraries'

M6hWsch2                    Leonis - Cross

1    owners, correct?

2    A.  I believe so.

3    Q.  And that is the issue here, correct, as to what version and

4    when code that I write, or others, get merged into those

5    versions, right?

6    A.  No.  The concern was who had admin control over the

7    library.  It wasn't just about changing code.

8    Q.  No, but that's what admin privileges on the library --

9    that's the only addition that admin administrators of the

10   library have, correct?

11   A.  I'm not sure.  I'm sorry.

12   Q.  You testified on direct about your concern about who has

13   access, administrative access to the project, right?

14   A.  Correct.

15   Q.  So what does that entail?

16   A.  It entails control over the libraries.  Over the projects.

17   Q.  And what does that mean, sir?

18   A.  Being able to change, modify, anything with the libraries.

19   Q.  But you just testified that everyone has the ability to do

20   that, correct?

21   A.  Everybody has the ability to do what?

22   Q.  To write code and make changes to the libraries.

23   A.  They have the ability to make changes to code from the

24   libraries.  But they don't necessarily have the ability,

25   because they may not have the ability to make those changes in

1    the code that is then stored in the library.

2    Q.  I'd like to direct your attention, it says, on one, anyone

3    is free to contribute and use the libraries.  The only controls

4    are the keys to Develop and Master, correct?

5    A.  Well, that's what it says.

6    Q.  So anyone can contribute, write, edit, or make changes to

7    the libraries, right?

8    A.  That's what it says.

9    Q.  OK.  So that's not a concern that Jeremy Weber's raising to

10   you, right; he's not concerned about other people contributing

11   or adding or modifying things with the libraries?  Right?

12   A.  My understanding is he had no concern about people using

13   the libraries and updating code that was associated with the

14   libraries, but not necessarily being able to put that code back

15   into the library as it's, we'll call it updated, the library's

16   updated version.

17          THE COURT:  All right.  Let's move on to the next line

18   of questions, please.

19          MR. SCHULTE:  OK.

20   Q.  After communicating directly with Mr. Weber, you eventually

21   sided with him, correct?

22          MR. DENTON:  Objection.

23          THE COURT:  Sustained.

24   BY MR. SCHULTE:

25   Q.  After communicating with Mr. Weber, you viewed that there

M6hWsch2                          Leonis - Cross

1   was a violation of some sort that occurred, right?

2   A.  I needed to talk to Sean.  I wanted a third party.

3   Q.  The question is after you conducted your investigation,

4   that was your determination, correct?

5   A.  Not at that point, no.

6   Q.  After you conducted your investigation.

7   A.  After I conducted my investigation -- after I conducted my

8   investigation, are you talking about -- when?  Like

9   specifically what time?

10  Q.  I'm talking about after your investigation was completed.

11  A.  So that would be after I spoke to Sean and after I

12  reported, wrote the email to management?  Is that what you're

13  referring to?

14  Q.  Sir, I'm just saying whenever you determined that the

15  investigation was over in your mind, you made a decision or you

16  made the determination that some security issue had occurred,

17  right?

18  A.  Yes.  In midday Friday --

19  Q.  Just yes or no, sir.

20  A.  OK.  I said yes.

21  Q.  Yes.  OK.

22      So then on April 18, you begin to write the memo of

23  warning, correct?

24  A.  It's not a memo of warning.

25  Q.  It's not a memo of warning?

M6hWsch2                      Leonis - Cross

1    A.  No.  It's a memorandum.

2    Q.  OK.  So April 18 you began to write the memorandum, right?

3    A.  I wrote the memorandum, yes.

4    Q.  And throughout the morning on April 18, you are writing

5    multiple drafts and sending them to your supervisors for

6    approval, modifications, edits, correct?

7    A.  I don't remember the process, but -- at this time.

8    Q.  I mean you don't recall --

9    A.  I'm sure I sent emails back and forth with management, but

10   I don't -- I don't remember the process.

11   Q.  At this point you have already made up your mind; you don't

12   really care what I have to say, right?

13   A.  No.  We did care what you had to say.

14   Q.  I mean you're writing the memorandum of warning already

15   without speaking with me?

16   A.  It wasn't a memorandum of warning.

17   Q.  OK.  The memorandum.  You are already writing it, and the

18   subject of the memorandum is self-granting previously revoked

19   admin privileges on an agency computer network, correct?

20   A.  That's correct.

21   Q.  And you have already made the decision that you're going to

22   issue me this memorandum, right?

23   A.  That we were going to talk about it, yes.

24   Q.  No.  That you were going to issue me the memorandum.

25   A.  That we were going to talk with you about it.

M6hWsch2                          Leonis - Cross

1   Q.  Sir, the question is you already decided on April 18 that

2   you were going to issue me the memorandum, correct?

3   A.  Yes.

4   Q.  OK.  So nothing that I had to say was going to influence

5   that decision, correct?

6   A.  The issue -- having a conversation with you?

7        MR. SCHULTE:  Can the court reporter reread the

8   question, please.

9        (Record read)

10  A.  To have a conversation --

11  Q.  Yes or no, sir.

12  A.  I'm sorry.

13       THE COURT:  I think the question is nothing that

14  Mr. Schulte had to say was going to influence your decision to

15  give him the memorandum.

16       THE WITNESS:  To speak with him about it, that's

17  correct.

18       THE COURT:  But to give him the memorandum, would it

19  have influenced that decision?

20       THE WITNESS:  No.  I mean he -- we wanted his input on

21  it, though.

22  BY MR. SCHULTE:

23  Q.  OK.  So your testimony is you just wanted to talk to me

24  about the memorandum, and after talking to me, you were going

25  to decide whether or not to issue it to me.  Is that right?

M6hWsch2                    Leonis - Cross

1    A.   That's probably incorrect.  We were going to have you

2    review the memorandum.  We were going to have you make updates

3    to the memorandum and then have you sign the updated

4    memorandum, or ask that you would sign the updated memorandum.

5         MR. SCHULTE:  OK.  I'm going to show, just the witness

6    and the parties, what's marked as defense exhibit 1002.

7    Q.   Do you recognize this?

8    A.   Yes.  Of.

9         MR. SCHULTE:  I move to introduce this into evidence.

10        MR. DENTON:  No objection.

11        THE COURT:  All right.  In general, I need a little

12   more foundation than that, but in the absence of objection,

13   I'll allow it.  It's admitted.

14        (Defendant's Exhibit 1002 received in evidence)

15        MR. SCHULTE:  I'd like to publish it to the jury.

16        THE COURT:  You may.

17   BY MR. SCHULTE:

18   Q.   What is this, sir?

19   A.   It's an email.

20   Q.   And who are you sending it to?

21   A.   HR and security.

22   Q.   Anyone else?

23   A.   I cc'd myself and Mike S.

24   Q.   And what do you say in the email?

25   A.   I say:  "Here's the memo I'm going to give him shortly.

M6hWsch2                    Leonis - Cross

1   Please provide comments.  I can shorten it if necessary."

2   Q.  You don't say you're going to discuss the memo with me,

3   right?

4   A.  I did not there, no.

5   Q.  You said I'm going to give him the memo, correct?

6   A.  That's correct.

7   Q.  And this is before you've ever spoken to me, correct?

8   A.  That is correct.

9   Q.  So your intention is to give me the memo no matter what I

10  have to say, right?

11  A.  We were going to give you the memo to review, that is

12  correct.

13  Q.  And just to be clear, the actual meeting with the memo did

14  not actually occur until the afternoon, correct, on that day?

15  A.  I don't remember.  I thought it was in the morning.

16  Q.  OK.  Let's take a look at Government Exhibit 1066.  That's

17  in evidence.

18      Can you note the time on this email?

19  A.  3:07 p.m.

20  Q.  Does that refresh your recollection of when this was?

21  A.  No.

22  Q.  It doesn't?

23  A.  No.

24  Q.  Did you not send this email directly after or during the

25  meeting?

M6hWsch2                          Leonis - Cross

1   A.  I sent it later.  I sent it after the meeting.  I don't

2   know if it was directly after.  We wanted to make sure that you

3   had a copy of it.

4   Q.  OK.  So your testimony is you actually don't remember at

5   all what time the meeting took place?

6               MR. DENTON:  Objection.

7               THE COURT:  Sustained.

8               Let's move on.

9   BY MR. SCHULTE:

10  Q.  Did you take any notes at the meeting?

11  A.  I don't remember.

12  Q.  You testified on direct about how concerned you were,

13  correct?

14  A.  Yes.

15  Q.  And you brought me in because you thought this access issue

16  was a big deal, right?

17  A.  I did.

18  Q.  And you took no notes of that meeting, correct?

19  A.  I don't remember.

20  Q.  You cannot even say whether HR was actually present during

21  the meeting, correct?

22  A.  No.  I believe HR was present.

23  Q.  The signed memo did not have a witness signature, though,

24  correct?

25  A.  That's correct.

M6hWsch2                        Leonis - Cross

1    Q.  So if HR was there, they usually sign that as a witness,
2    don't they?
3               MR. DENTON:  Objection.
4               THE COURT:  Sustained.
5    BY MR. SCHULTE:
6    Q.  I think you testified about this a little bit on direct.
7    You said, I think, that you thought I was unhappy, was how you
8    characterized it, is that right, about the memo?
9    A.  You were unhappy about the memo.
10   Q.  Do you recall my demeanor during the meeting?
11   A.  I don't believe you were happy.
12   Q.  I mean I didn't show -- you don't recall any emotion,
13   though, from me, right?
14   A.  I don't remember.
15   Q.  You don't recall that I was emotionless during the meeting?
16   A.  I don't remember.
17   Q.  OK.  There was a previous proceeding in this case, in
18   February of 2020, correct?
19   A.  Yes.
20   Q.  And then you testified under oath at that proceeding,
21   right?
22   A.  Yes.
23               MR. SCHULTE:  I'd like to show the witness.
24   Q.  Does this refresh your recollection?
25               THE COURT:  Can you give a page number, please.

1            MR. SCHULTE:  This is page 795 in the PDF.  I think

2     it's transcript 614.

3     A.  At this time I don't really remember the meeting as much as

4     I did.  It's been a long time.

5     Q.  I'm just asking if this refreshes your recollection

6     about -- I thought you said this happened closer in time.  So

7     does this refresh your recollection?

8     A.  At this time no.  I'm sorry.

9     Q.  All right.  And I disagreed with the memo, correct?

10    A.  You did.

11    Q.  And even after you changed it, I still disagreed with it,

12    correct?

13    A.  That's what I recall, yes.

14    Q.  OK.  And I argued my point, correct?

15    A.  You made points, yes.

16    Q.  When I lost the argument, we all moved on, correct?

17    A.  I, I -- I don't remember those -- I remember us allowing

18    you to make updates to the memo.

19    Q.  I'm sorry, sir.  The question is just when I lost the

20    argument, we all moved on, correct?

21            MR. DENTON:  Objection.

22            THE COURT:  Sustained.

23    BY MR. SCHULTE:

24    Q.  You testified on direct that the meeting was very short,

25    correct?

M6hWsch2                        Leonis - Cross

1   A.  Yes.

2   Q.  You also stated on direct that this memo is something

3   that's very minor, right?

4   A.  It was.

5   Q.  It doesn't even go in your personnel file, correct?

6   A.  It was not -- it was not a, a letter of warning.  It was

7   just a memorandum.

8   Q.  It invokes no ill effects for the recipient, correct?

9   A.  Can you clarify what you mean?

10  Q.  No.

11  A.  I'm sorry.  I don't know how to answer that question.

12  Q.  I mean there's no official -- there's no official reprimand

13  or no punishment that occurs, right?  There's no docking of

14  pay, nothing like that, that happens, right?

15  A.  It documents for the record what happened.

16  Q.  I understand that.  The question is it doesn't -- this

17  memorandum doesn't dock my pay; it doesn't put me on

18  administrative leave; it doesn't reduce my grade or staff -- it

19  does not -- it has nothing like that, right?

20  A.  It does none of those three things you mentioned.

21  Q.  OK.  It has no ill effect at all, though, right?

22          MR. DENTON:  Objection.

23          THE COURT:  Sustained.

24  BY MR. SCHULTE:

25  Q.  The Saturday before you issued me this memo, you tasked

1   Mr. Weber and ISB to go out and remove permissions from the

2   Atlassian suite and the VMs, right?

3   A.  Actually, Mike tasked ISB to do that, and Mr. Weber.

4   Q.  Did you -- were you involved in those determinations?

5   A.  I was.

6   Q.  OK.

7   A.  But the tasking came from Mike.

8   Q.  All right.  And why did you decide or why did the team

9   decide to do that or that was necessary?

10  A.  We felt that all developers should be removed from

11  administrative access or administrating the libraries at that

12  point in time.

13  Q.  And were you concerned that I cared or had very strong

14  feelings about this position, the accesses?

15  A.  I'm sorry.  Can you restate that, please?

16  Q.  Were you concerned, or did you think that I cared or had

17  very strong feelings about this access, this administrator

18  access?

19  A.  This was a security matter.  I'm -- I'm not sure -- I don't

20  know how to answer your question.

21  Q.  OK.  Did you realize that my, these permissions,

22  administrator, Atlassian administrator accesses were given to

23  me by another developer?

24  A.  No, I was not aware that you were given those permissions

25  by another developer.

```
 1   Q.  You know the individual developer who initially advocated
 2   and installed the Atlassian tools, right?
 3   A.  I don't remember.
 4   Q.  Patrick.
 5            MR. DENTON:  Objection.
 6            THE COURT:  Sustained.
 7   BY MR. SCHULTE:
 8   Q.  OK.  Did you know that management actually played no part
 9   at all in the decisions of who administered the Atlassian
10   tools?
11   A.  I actually do remember that it was mostly a
12   developer-driven initiative at that point in time, when it
13   first started.
14   Q.  And were you aware that neither I nor any developer
15   actually wanted this responsibility?
16            MR. DENTON:  Objection.
17            THE COURT:  Sustained.
18   BY MR. SCHULTE:
19   Q.  I was not paid to be an Atlassian administrator, correct?
20   A.  No.
21   Q.  The Atlassian administrator position and responsibilities
22   interfered with my real job, right?
23            MR. DENTON:  Objection.
24            THE COURT:  Sustained.
25   BY MR. SCHULTE:
```

M6hWsch2                         Leonis - Cross

1    Q.   ISB was the branch that was supposed to take on the role of

2    the Atlassian administrator, right?

3    A.   Yes.

4    Q.   And you were aware that I had tried many times over the two

5    years that I held these extra responsibilities to push them off

6    onto ISB?

7                MR. DENTON:   Objection.

8                THE COURT:   Sustained.

9                MR. SCHULTE:   I'm going to show the witness and

10   parties something that's marked Government Exhibit 1023.

11               Can I publish it to the jury?   It's in evidence.

12               THE COURT:   You may.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M6H5sch3                    Leonis - Cross

1    BY MR. SCHULTE:

2    Q.  Do you recognize this?

3    A.  It's an e-mail.

4    Q.  Who is it sent from?

5    A.  It's sent from -- it's sent by you.

6    Q.  What's the subject of the e-mail?

7    A.  Migration of Atlassian servers and support back to ISB.

8    Q.  Can you brief the brief e-mail here?

9    A.  Sure.  Rufus, I would like to begin moving the Atlassian

10   service support back to ISB.  Would you have time to sit with

11   me next week as I go over upgrades to the various projects and

12   their administration?  Thanks.  Josh Schulte.

13   Q.  And what is the date of this e-mail?

14   A.  January 6th, 2016.

15   Q.  The people that the e-mail is sent to, sir, can you see

16   that?

17   A.  Yes.

18   Q.  And who are those people?

19   A.  Rufus, and Jeremy Weber is cc'd, and Sean is cc'd.

20   Q.  Next, Government Exhibit 2014, also in evidence; do you

21   recognize this?

22   A.  It's an e-mail.

23   Q.  Who is it from?

24   A.  It is from you.

25   Q.  Who is it to?

M6H5sch3                        Leonis - Cross

1    A.  It is to all of AED.

2    Q.  And who is cc'd on it?

3    A.  ISB.

4    Q.  Can you read that short e-mail as well?

5    A.  Sure.

6        We are currently transitioning the Atlassian product

7    support from OSB to ISB (POC Rufus).  We will be assisting

8    Rufus as he is caught up to speed with the products, but please

9    forward all requests directly to ISB.  Thanks, OSB

10   infrastructure.

11   Q.  Now, is there an OSB infrastructure?

12   A.  I was not aware of it.

13   Q.  Do you take that to be a joke?

14           MR. DENTON:  Objection.

15           THE COURT:  Sustained.

16   Q.  So this is January 2016, right?

17   A.  Yes.

18   Q.  Do you know if that transition actually ever happens?

19   A.  I don't believe it did, no, not until after mid-April.

20   Q.  And the POC Rufus, he actually left shortly after this,

21   right?

22           MR. DENTON:  Objection.

23           THE COURT:  Sustained.

24   Q.  You were concerned or you had concerns for several years,

25   yourself, about developers having access and running the

M6H5sch3                         Leonis - Cross

1    Atlassian servers, correct?

2    A.  I don't remember.

3    Q.  OK.  I just want to show the witness and the parties

4    something that is marked Defendant's Exhibit 1005, specifically

5    on page 11.  Do you recognize what this is?

6    A.  It's an e-mail.

7    Q.  And it is sent by you, right?

8    A.  Yes.

9            MR. SCHULTE:  I move to introduce this exhibit into

10   evidence.

11           MR. DENTON:  Objection.

12           THE COURT:  The entirety of it or just this one

13   e-mail?  What is being offered?

14           MR. SCHULTE:  I only want this e-mail.  I can have the

15   exhibit reflect that.

16           THE COURT:  I will admit this one e-mail and will

17   redact the document.

18           MR. DENTON:  No objection to that, your Honor.

19           (Defendant's Exhibit 1005-11 received in evidence)

20           MR. SCHULTE:  May I publish that to the jury?

21           THE COURT:  Just this one e-mail, yes.

22   BY MR. SCHULTE:

23   Q.  So who did you send this e-mail to?

24   A.  It looks like I sent it to Robert.

25   Q.  And what is the date on the e-mail?

M6H5sch3                    Leonis - Cross

1   A.  It says July 21st, 2015, but it says at 5:07 a.m., which is
2   awfully early.
3   Q.  What is the subject of the e-mail?
4   A.  It says Stash repo.
5   Q.  Who is Robert, by the way?
6   A.  I don't remember.
7   Q.  And what does your e-mail say?
8   A.  It says:
9       Hi Bob.  Not sure if are you aware of this, but why doesn't
10  ISB have the admin password to Stash?  Shouldn't ISB be the
11  admin for the Atlassian tool suites?
12  Q.  So you brought up this issue back in 2015, right?
13  A.  It appears so.
14  Q.  Do you know if you ever followed through with that?
15  A.  I guess I asked Robert about it.
16  Q.  Did you ever bring it up to division management or any kind
17  of other management about this issue?
18  A.  I don't remember.
19  Q.  I want to show or publish Exhibit 1063 in evidence --
20  Government Exhibit 1063.
21      You testified about this on direct, correct?
22  A.  Yes.
23  Q.  And this is an e-mail I sent to you, right?
24  A.  Yes.
25  Q.  And since I didn't go out over the weekend to change the

1   privileges, I didn't know that my accesses were changed when I

2   came in Monday the 18th, right?

3              MR. DENTON:  Objection.

4              THE COURT:  Sustained.

5   Q.  You never notified me until I came in on April 18th that my

6   privileges were removed, right?

7   A.  No.

8   Q.  OK.

9        And just to be clear, this e-mail is actually sent before

10  we sit down to discuss the memorandum, right?

11  A.  I don't remember.

12  Q.  Well, I mean, based on the content of the e-mail, isn't

13  that clear to you?

14  A.  Actually, no.

15  Q.  I mean, during the meeting that we had about the memo you

16  explained these answers to these questions, did you not?

17  A.  Yes.

18  Q.  So when I am sending this e-mail and I don't -- and I am

19  asking the questions there, then clearly that must be before --

20             MR. DENTON:  Objection.

21             THE COURT:  Sustained.

22             Mr. Schulte, can you put your mask on and can everyone

23  come up to the side bar, please?

24             (Continued next page)

25

M6H5sch3                         Leonis - Cross

1          (At side bar)

2          THE COURT:  Mr. Schulte, I think that you are

3    repeatedly crossing the line with these questions and basically

4    testifying through your questions.  Asking the witness is he

5    aware of X, when you have every reason to know and/or believe

6    that he doesn't know X just as a way of suggesting that X

7    happened and that you are aware of it is not proper.  Asking

8    him about what you knew, what you thought, not proper.  OK?

9    And he said, very clearly in connection with that one, that he

10   didn't remember whether it was before or after the meeting.

11   And you are essentially injecting your own knowledge into the

12   question by trying to educate him with your own knowledge.

13   Again, improper.

14          The bottom line is don't continue doing this.  If you

15   do, I am going to start admonishing in front of the jury.  And

16   if you continue to do it beyond that, I will cut you off and

17   make you sit down.  It is not OK.  OK?

18          MR. SCHULTE:  Yeah.

19          I think the point I am trying to do is get him to,

20   based on the content to -- because we don't have, there is

21   nothing in evidence that shows the exact date so I can't bring

22   it out in evidence so I'm trying to show --

23          THE COURT:  Exact date of what?

24          MR. SCHULTE:  Exact date and time of when the meeting

25   actually occurred so he is saying that he doesn't remember,

1   right, so I don't have any evidence to go by to bring that out

2   on so I'm trying to use the contents of the e-mail to basically

3   have him infer what that should mean.

4           THE COURT:  I understand that but he answered the

5   question and he doesn't remember.  My point is a broader one

6   which is that repeatedly your questions are, I think, crossing

7   the line from simple questions to suggesting information to the

8   jury.  And asking him about things that he would have no basis

9   or ability to know about I think is crossing that line and I

10  have tried to make this clear in the final pretrial conference

11  that by representing yourself you had to rigidly adhere to the

12  line between your testifying and your acting as a lawyer.  And

13  I'm not going to permit you to continue to ask questions that

14  basically allow you to get in front of the jury your version of

15  these events.  If you want to testify as part of your case you

16  are welcome to testify as part of your case but that will be

17  under oath and it will be subject to cross-examination.  You

18  can't do it through your questioning.

19          MR. SCHULTE:  It is not intentional, I'm not trying to

20  do that.

21          THE COURT:  Good.

22          MR. SCHULTE:  I'm trying to -- you know, it is hard to

23  focus on doing that while you are asking a question referring

24  to things that happened, right?  So I'm consciously trying to

25  avoid doing that so it is not something intentional.

1              THE COURT:  OK.

2              MR. SCHULTE:  I'm hoping that there won't be issues.

3              THE COURT:  Be careful about it.  It is definitely

4    hard, I understand.

5              Anything the government wishes to say?

6              MR. DENTON:  I think at some point, your Honor, giving

7    them another reminder about questions and answers is

8    appropriate, but beyond that I think we agree.

9              THE COURT:  I will do that, if appropriate.

10             Thank you, let's continue.

11             How much longer do you think you have, Mr. Schulte?

12             MR. SCHULTE:  I am hesitant to give estimates anymore

13   after yesterday.  I don't even --

14             THE COURT:  Half an hour?  An hour?  Three hours?

15   What neighborhood?

16             MR. SCHULTE:  I think at least a couple hours.

17             THE COURT:  OK.

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may proceed, Mr. Schulte.

3   BY MR. SCHULTE:

4   Q.  Just to clarify, the memorandum was specifically about the

5   Atlassian products, correct?

6   A.  It was about your admin privileges related to the Atlassian

7   products, correct.

8   Q.  Well, this e-mail I sent to you is about the transfer of

9   the Atlassian products to ISB, right?

10  A.  It's about -- well, it's about multiple things.  That's one

11  of the things you talk about.

12  Q.  And the subject on the e-mail is ISB infrastructure

13  permissions transfer; right?

14  A.  That is correct.

15  Q.  So this has absolutely nothing to do with any other

16  computer or servers I have access to, right?

17             MR. DENTON:  Objection.

18             THE COURT:  Sustained.

19  Q.  I mean, this e-mail doesn't implicate my keys to the IRC

20  server, right?

21             MR. DENTON:  Objection.

22             THE COURT:  Sustained.  It speaks for itself,

23  Mr. Schulte.

24  Q.  Just to be perfectly clear, the Atlassian products Stash

25  Confluence, Bamboo, and Jira; right?

1   A.  Those other things you have talked about are included in

2   the Atlassian tool suite.

3   Q.  Those are the only things, right?  Stash, Confluence,

4   Bamboo and Jira, right?

5   A.  I'm sorry.  I know they are in there, I'm not sure if there

6   are other things.

7              THE COURT:  Jira is J-I-R-A; is that correct?

8              MR. SCHULTE:  Yes.

9   Q.  So specifically this e-mail, as related to the Atlassian

10  products, only implicates those keys on the Stash Confluence

11  Bamboo and Jira servers and applications, right?

12             MR. DENTON:  Objection.

13             THE COURT:  Sustained.

14  Q.  This is Government Exhibit 1071, it is in evidence, it was

15  the first exhibit, I just want to go over it.  So what is the

16  date on this e-mail?

17  A.  It is the 21st of April, 2016.

18  Q.  Can you explain to the jury about CMR transfer equipment

19  and this type of information that is included in this?

20  A.  You want me to explain just the CMR process?  Is that what

21  you are asking?

22  Q.  I guess explain enough so the content of the e-mail is

23  understandable.

24  A.  OK.

25  Q.  Just explain it, I guess.

M6H5sch3                        Leonis - Cross

1    A.  So in our organization there are things called that are

2    accountable property.  Those devices are such that we want to

3    keep track of, for example computers.  So the CMR process was a

4    way that we managed where computers are and who they -- what

5    groups, who they ultimately were being used by so that they

6    were accountable to someone.

7    Q.  And this e-mail is a notification request to you about

8    certain equipment that's in my -- or that I am a custodian for

9    or have accesses to, right?

10            MR. DENTON:  Objection to the compound question, your

11   Honor.

12            THE COURT:  Sustained as to form.

13   Q.  This e-mail is a notification to you about equipment that

14   is under my name for the administrative processes, right?

15   A.  This equipment that you are referring to, I believe, was it

16   says registered to you in OSB.  Is that what you are asking?

17   Q.  Yes.  Yes.  And this is just notifying you of that?

18   A.  Yes, that's what this e-mail says.

19   Q.  OK.  And this is also a notification to you, a request to

20   transfer this to someone else; right?

21   A.  Yes.  Transfer the CMR to someone else.

22   Q.  And my accesses too, right?

23   A.  Yes.  At the bottom it says "and my access."

24   Q.  So I am notifying you of my accesses to this server and

25   requesting it be transferred to someone else to take over,

M6H5sch3                          Leonis - Cross

1    right?

2    A.  You were asking what is the process for transferring this

3    equipment to OSB and removing me, so you were asking what was

4    the process.

5    Q.  But it was -- it is a notification to you about my

6    accesses, correct?

7              MR. DENTON:  Objection.

8              THE COURT:  Sustained.

9              Move on, please.

10   Q.  I am going to show the witness and the parties what I have

11   marked as Defendant's Exhibit 1006.  Do you recognize this?

12   A.  It's an e-mail but I'm trying to remember it.

13   Q.  I am just asking if you recognize the document or you know

14   what it is.

15   A.  It's an e-mail.

16   Q.  And it's an e-mail sent from you, right?

17   A.  It appears so, yes.

18             MR. SCHULTE:  I move to admit it into evidence.

19             MR. DENTON:  Objection.

20             THE COURT:  Sustained.  Sustained.

21   Q.  This is an e-mail that you sent in the regular course of

22   business at the CIA, right?

23   A.  I don't remember the e-mail.  I'm sorry.

24   Q.  It is OK if you don't remember the e-mail but it is on your

25   system, correct?

M6H5sch3                         Leonis - Cross

1   A.  Can you clarify, please?

2   Q.  This is an e-mail that's recorded on the CIA's system,

3   right?

4   A.  Possibly.  I don't remember the e-mail.

5   Q.  The CIA records all the e-mails that are sent on its

6   Enterprise system, right?

7   A.  It does.

8   Q.  And they do that through the regular course of business at

9   the CIA, right?

10  A.  Yes.

11          MR. SCHULTE:  I move to introduce this exhibit.

12          MR. DENTON:  Still an objection.

13          THE COURT:  We will take it up at the break in a

14  moment so let's move on to the next line, which is to say I

15  will reserve judgment and we will discuss it.

16          MR. SCHULTE:  All right.

17  BY MR. SCHULTE:

18  Q.  On direct you testified that developers own their project,

19  correct?

20  A.  Yes.

21  Q.  When developers left the branch they were left to figure

22  out project transitions, correct?

23  A.  Yes.

24  Q.  Some projects migrated with the developer to his new

25  branch, correct?

M6H5sch3                        Leonis - Cross

1   A.   Yes.

2   Q.   Some projects were gradually transitioned to a new

3   developer in the old branch; correct?

4   A.   Yes.

5   Q.   As a manager you knew that abruptly moving a developer off

6   a project was not good for either the project or the developer,

7   correct?

8                MR. DENTON:   Objection.

9                THE COURT:   Sustained.

10  Q.   A good project administrator would slowly transition their

11  project to someone else, right?

12               MR. DENTON:   Objection.

13               THE COURT:   Sustained.

14  Q.   In the management of projects you want to ensure that the

15  project is successful; right?

16  A.   Yes.

17  Q.   And to be a successful tool or project requires the

18  developers or people working on that tool to have a solid

19  foundation on that project, right?

20  A.   Sure.

21  Q.   You couldn't just take a random project and give it to a

22  random developer and expect him to be able to manage it

23  immediately, right?

24  A.   Key word being immediately, correct.  It may take time, but

25  sometimes that was OK.

1    Q.  So over time it is good for the maintainer to be able to

2    facilitate questions by the new developer; right?

3    A.  Sometimes.

4    Q.  Be able to explain to the new developer how the tool works;

5    right?

6    A.  Sometimes.

7    Q.  To be able to explain development decisions, right?

8    A.  Sometimes.

9    Q.  It is more efficient that way, right?

10   A.  More efficient, yes.

11   Q.  And this was the standard practice policy in the division,

12   right?

13           MR. DENTON:  Objection to form.

14           THE COURT:  Overruled.

15   A.  I wouldn't say so.

16   Q.  The standard process in the division was not to transition

17   projects in this manner?

18   A.  I'm not -- in what manner?

19   Q.  To your knowledge, what was the standard practice policy

20   for transitions of projects?

21   A.  It depended upon the project.  It depended on who was

22   involved.  There are many variables.

23   Q.  What are those variables?

24   A.  Operational need could be a variable.  People's skill sets

25   could be a variable.  People's availability could be a

M6H5sch3                        Leonis - Cross

1   variable.

2   Q.  Those are variables as to who it would be transferred to,

3   right?

4   A.  Yes.

5   Q.  My question is once it has been established who the project

6   is transferred to, what is the standard practice policy in

7   executing that transfer of a project?

8   A.  I think once we decide who we are going to transition it to

9   it is transferred and then it is up to the developers to figure

10  out the best way to administer and take care of that project

11  from that point forward.

12  Q.  But it is not policy to just, cold turkey, hand off

13  projects to someone else, right?

14  A.  I don't -- I don't know that there was such a policy.  If

15  we had to transition a project to somebody and we had to do it

16  immediately, we did it.

17  Q.  OK.  But when both, for example -- when both developers,

18  the project from which the project is being transferred from,

19  the developer, who the project is being transferred to, when

20  both those developers remain in the division, the standard

21  process is for a slow transition, correct?

22  A.  Not necessarily.

23          MR. DENTON:  Objection.

24          THE COURT:  I think we have trod this ground enough.

25  Let's go to the next subject, please.

M6H5sch3                       Leonis - Cross

1    Q.  Are you familiar with some named Duane?

2    A.  Yes.

3    Q.  He was someone who moved from OSB to RDB, correct?

4    A.  That is.

5    Q.  And Duane took his project were with him when he moved from

6    OSB to RDB, correct?

7    A.  I don't remember.

8    Q.  You don't remember if he took all of his project with him

9    to RDB?

10   A.  I don't know.

11   Q.  You were the branch chief in RDB, were you not?

12   A.  It was six years ago.

13   Q.  What about someone named David D. who transferred from RDB

14   to OSB.

15           THE COURT:  Is that a question.

16   Q.  The question is do you know the individual Dave D. who

17   worked in RDB?

18   A.  I'm not sure how to answer your question.

19   Q.  Yes or no.

20   A.  There was a Dave D. in RDB, yes.

21   Q.  OK.  And Dave D. moved to OSB, right?

22   A.  Yes.

23   Q.  And he took his projects with him to OSB, did he not?

24   A.  I don't remember.

25   Q.  Before my transition from OSB to RDB I was working on

1    several projects in OSB, right?

2    A.   I don't remember.

3    Q.   You don't remember that I had any work assigned to me?

4    A.   I do remember you had work assigned to you, I remember two

5    projects, specifically.

6    Q.   OK.   Hold on, sir.   Just answer the question.

7         The question is when I was working in OSB and then I moved

8    to RDB, did I have several projects that were assigned to me in

9    OSB?

10   A.   I don't remember.

11   Q.   You don't remember any projects assigned to me in OSB?

12   A.   I remember two.

13   Q.   OK.   So you remember that I was assigned at least two

14   projects in OSB, right?

15   A.   That's correct.

16   Q.   And it is fair to say that you and I never spoke about my

17   move before I came to RDB, correct?

18   A.   I don't remember.

19   Q.   Are you aware that no one in management spoke to me about

20   the details of the move?

21            MR. DENTON:   Objection.

22            THE COURT:   Sustained.

23   Q.   Are you aware of management's --

24            MR. DENTON:   Objection.

25            THE COURT:   Sustained.

M6H5sch3                    Leonis - Cross

1    Q.  My supervisor at OSB was Sean, correct?

2    A.  That's correct.

3    Q.  And to the best of your knowledge --

4            THE COURT:  Sustained.

5    Q.  Sean never sent you an e-mail, a transfer memo in an

6    e-mail, correct?

7    A.  Not that I remember.

8    Q.  There is no -- Sean did not send you an e-mail about what

9    projects were being transferred with me to RDB, correct?

10   A.  Not that I remember.

11   Q.  And you are not familiar with the technical aspects of the

12   tools or projects in Stash, correct?

13   A.  No, not really.

14   Q.  It is fair to say you had management responsibilities and

15   you were simply not a developer, correct?

16   A.  That is correct.

17   Q.  And part of being a good manager is to give clear

18   instructions to those you supervise, right?

19   A.  Yes.  Ideally.

20   Q.  But you didn't send me any e-mails about which projects I

21   was to keep, correct?

22   A.  You mean when you left OSB what projects they defined you

23   were going to keep?

24   Q.  You didn't send me any e-mail as to which projects I was to

25   keep in the transition to your branch, right?

M6H5sch3                          Leonis - Cross

1    A.  Not that I remember.

2    Q.  So it is fair to say that you sent me no e-mails as to what

3    privileges I was to retain on my move to RDB, right?

4    A.  I don't really understand how to answer your question.

5    Q.  The question is simply did you send me an e-mail as to what

6    privileges I was to retain in my transfer to RDB.

7    A.  Not that I remember.

8    Q.  OK.  I am going to show Government Exhibit 13 that is in

9    evidence.

10            THE COURT:  I think before you do that, transition to

11   a new topic, let's take our break.

12            Ladies and gentlemen, it is 11:38, so let's try to get

13   started up here at 12:20, so 12:15 please be ready to be

14   retrieved and escorted back.  Important reminders:  Don't

15   discuss the case, continue to keep an open mind, don't do any

16   research about the case.  With that, enjoy your breaks and we

17   will see you at 12:20.

18            Thank you.

19            (Continued on next page)

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  You may be seated.

3         Mr. Leonis, you are excused for the break as well.

4    Two things.  One is because you are on cross at the moment, you

5    are not permitted to speak with anyone from the government team

6    about the substance of your testimony.  So to the extent that

7    you can avoid any communications, great, but definitely don't

8    discuss the substance of your testimony.  With that, please,

9    assuming that the choreography is all handled, please be back

10   in the courtroom at 12:15 and ready to go at 12:20.

11             THE WITNESS:  Thank you, your Honor.

12             (Witness steps down)

13             THE COURT:  So first, on Defendant's Exhibit 1006, I

14   had assumed that the objection was a hearsay objection and

15   wanted to discuss whether there was an exception to it but my

16   law clerk helpfully pointed out to me that I think the very

17   same e-mail is already in evidence as Government Exhibit 1065

18   so it may be a moot point.

19             MR. DENTON:  In that case that's fine, your Honor.

20             THE COURT:  Mr. Schulte, do you want to just return to

21   it using the Government Exhibit 1065?  The only thing that is

22   not in is the top e-mail that said "FYI" but I don't see the

23   relevance of that.

24             MR. SCHULTE:  That was the point of the document,

25   actually.

M6H5sch3                        Leonis - Cross

1             THE COURT:  Can you speak into the microphone?

2             MR. SCHULTE:  That was the point of the exhibit,

3    actually.  He is forwarding my e-mail to management and I

4    wanted to question him as to, you know, if he thought this was

5    why he was -- what the point of this was.

6             THE COURT:  And what is the point of that?

7             MR. SCHULTE:  My interpretation is that anything that

8    I am doing is -- he is proceeding to be, I don't know,

9    suspicious or he is trying to alert management of anything I am

10   doing.  I don't really know what exactly.  It's not -- it is

11   not hearsay, it just said FYI.

12            THE COURT:  I was referring to your e-mail but I now

13   understand.  I will admit it and you can circle back to it.

14            I would say, I recognize why the management -- whether

15   management was good or bad and Mr. Leonis was a good or bad

16   manager has some relevance to this case but that's not

17   ultimately what this case is about so I permitted quite a bit

18   of questioning on that front but let's try and keep it a little

19   bit more streamlined.  All right?

20            Anything to discuss before I let you take your breaks?

21   Mr. Denton.

22            MR. DENTON:  I just want to express a little concern

23   about the pace, your Honor, particularly just because

24   Mr. Leonis is one of the witnesses for whom keeping him around

25   over a long weekend would be particularly challenging.  I would

1    very much hope we could finish with his testimony today.

2              THE COURT:  I very much hope the same.

3              Mr. Schulte?

4              MR. SCHULTE:  I am going to do my best.  I think -- or

5    I am hoping actually from this point on it should go quicker.

6    We will see if that actually turns out to be true, but I am

7    hoping that --

8              THE COURT:  Well, over the break, given my admonition

9    about the fact that this case isn't about whether the division

10   or group was well managed and my desire to be done with this

11   witness before the end of the day, see if you can pare things

12   down and then we will get started.

13             Anything for you to raise, Mr. Schulte?

14             MR. SCHULTE:  No, but I just want to note for the

15   Court that on direct there was substantial evidence that they

16   presented or that they tried to show about management's

17   reprimand to me and my supposed actions to that, so I think a

18   lot of the cross has to do with management's decisions and how

19   this is not true, how the government is saying that this --

20             THE COURT:  Again, I do understand why it has some

21   limited relevance and that's why I haven't cut you off all

22   together, but whether he followed best practices in terms of

23   being a manager and should have convened a meeting versus

24   handling it the way he handled it isn't really the issue.  The

25   issue may well be -- and certainly what he did and your

M6H5sch3                        Leonis - Cross

1    reaction to it is the issue, but whether he should have taken

2    different steps or you believe today he should have taken

3    different steps is not an issue.

4              MR. SCHULTE:  OK.

5              THE COURT:  In any event...

6              MR. SCHULTE:  I understand, yeah, it should be

7    substance from here on.

8              THE COURT:  So we will pick up again at 12:20, be back

9    at 12:15.  Thank you.

10             (Luncheon recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                          AFTERNOON SESSION

 2                          12:15 p.m.

 3              (Jury present)

 4              THE COURT:  You may be seated.

 5              All right.  Welcome back.  I hope you enjoyed your

 6      break.  We will continue with cross-examination of Mr. Leonis.

 7              Of course, I remind you you're under oath, and you may

 8      remove your mask.

 9              One other thing.  I'm going to admit the defense

10      exhibit that I had reserved judgment on.  It's defense

11      1006, I believe.  Yes, 1006.

12              (Defendant's Exhibit 1006 received in evidence)

13      BY MR. SCHULTE:

14      Q.  Good afternoon.

15      A.  Good afternoon.

16      Q.  Before you testified today, you met with the prosecutor,

17      Mr. Denton, correct?

18      A.  Yes.

19      Q.  You met with him to discuss your testimony, right?

20      A.  Yes.

21      Q.  You met with him multiple times, correct?

22      A.  Yes.

23      Q.  More than 15?

24      A.  I don't recall it being that many times.

25      Q.  More than ten?

M6hWsch4                          Leonis - Cross

1    A.  It was about ten.

2    Q.  About ten?

3        And at some those meetings, there were multiple prosecutors

4    there, right?

5    A.  I only know -- remember -- I will say yes.

6    Q.  OK.

7    A.  There was more than one.

8    Q.  You met with him yesterday, right?

9    A.  I did.

10   Q.  And that was after you already began testifying on direct,

11   correct?

12   A.  Yes.

13   Q.  You met with him the day before too, on Wednesday, right?

14   A.  I did.

15   Q.  Some meetings lasted several hours, right?

16   A.  Like two, two, maybe three, at most.

17   Q.  You discussed your testimony here today, right?

18   A.  Yes.

19   Q.  About what questions Mr. Denton would ask you, right?

20   A.  Yes.

21   Q.  You discussed what answers you might give, right?

22   A.  No.  He did not tell me what to say or anything like that.

23   Q.  No.  The question is you discussed, you practiced your

24   question and answers, right?

25   A.  He asked me questions, and I answered them.

M6hWsch4                         Leonis - Cross

1    Q.  So you practiced your questions and answers, right?

2    A.  Yes.

3    Q.  OK.  You also discussed emails you would review on the

4    stand, right?

5    A.  Yes.

6    Q.  You actually reviewed those emails with the government,

7    correct?

8    A.  The emails that the prosecutor was going to show?  Yes.

9    Q.  You read through them together, right?

10   A.  I read through them.

11   Q.  And the government selected which emails to introduce into

12   evidence, correct?

13   A.  I don't know.

14   Q.  Well, you didn't select them, right?

15   A.  I did not select the emails.

16   Q.  OK.  You also discussed my cross-examination, right?

17   A.  Briefly.

18   Q.  The government discussed what questions I might ask,

19   correct?

20   A.  Not really.

21   Q.  You didn't discuss the questions that -- well, what did you

22   discuss then about the cross?

23   A.  What it would be like, the types of, I guess, things that

24   might come up.  That's about the general part of it.

25   Q.  You practiced -- you practiced potential cross-examination,

1    right?

2    A.   Actually, no.

3    Q.   No?  Did you -- you practiced what to do if you couldn't

4    remember?

5    A.   No.

6    Q.   Now, you and I didn't meet before your testimony, right?

7    A.   That's correct.

8    Q.   In fact, you and I haven't spoken in years, right?

9    A.   That's correct.

10   Q.   Not since I worked at the CIA, right?

11   A.   That's correct.

12            MR. SCHULTE:  OK.  I want to circle back to defense

13   exhibit 1006 now in evidence?

14            Can I publish it to the jury?

15            THE COURT:  You may.

16   BY MR. SCHULTE:

17   Q.   This is the first email in this chain, correct?

18   A.   Can you go to the bottom?

19   Q.   Yeah.

20   A.   Yes.

21   Q.   I think you testified about this one on direct, right?

22   A.   I don't remember.

23   Q.   OK.  And the subject of the email?

24   A.   "Update to Atlassian products/admins."

25   Q.   And this email was about the changeover to ISB, right, for

M6hWsch4                         Leonis - Cross

1    the Atlassian products?

2    A.  Yes, it appears so.

3    Q.  And then there was a response to that -- a reply to that

4    email, right?

5    A.  It appears so, yes.

6    Q.  And who was this email from?

7    A.  It was from you.

8    Q.  And who did I send it to?

9    A.  You sent it to James and -- I can't see who else you sent

10   it to.  I was cc'd on it.

11   Q.  I cc'd you, right?

12   A.  Yeah.

13   Q.  And what is it that I say in the email?

14   A.  Would you like me to read it?

15   Q.  Yes, please.

16   A.  "I've worked a little with Tim on some of the

17   support/management of the Atlassian tool set (and Rufus before

18   him) ideally, if at all possible, having support admins sitting

19   in IRC on #atlassian-support would be the most efficient way of

20   assisting developers in the division.  As people have issues,

21   they will generally complain in #AED on IRC, so this is the

22   best place to be to receive notifications of any issues that

23   people are experiencing.  Thanks, Josh Schulte."

24   Q.  So how would you characterize this email?

25           MR. DENTON:  Objection.

M6hWsch4                    Leonis - Cross

1              THE COURT:  Sustained.

2      BY MR. SCHULTE:

3      Q.  OK.  After you received this email, then you forward it,

4      right?

5      A.  Yes.

6      Q.  And you're forwarding it to Mike S., right?

7      A.  That's correct.

8      Q.  And he's your boss, correct?

9      A.  Yes.

10     Q.  And the contents of your email is just FYI, right?

11     A.  That's correct.

12     Q.  So were you concerned with my email?

13     A.  It seems a little unusual coming after my email, given that

14     on Monday, April 18, you just signed a memo that says and

15     understood that you are no longer an Atlassian administrator.

16     And now you're talking to the group, it looks like, I guess, or

17     someone, about contributing to help with Atlassian management

18     and admin.  It seems a little odd after you were just told

19     you're no longer an admin for the Atlassian products.

20              That's the way I read that.

21              THE COURT:  Is that, to be clear, how you read it at

22     the time?

23              THE WITNESS:  Yeah.  I mean that's why FYI.  Right?  I

24     wouldn't have sent it to Mike if I didn't find it odd.  As I'm

25     thinking about it, yeah, that's my -- that's my recollection.

M6hWsch4                        Leonis - Cross

1    BY MR. SCHULTE:

2    Q.  But this email is not saying that I'm continuing -- it

3    doesn't say anything about continuing my administration of the

4    server, right?

5              MR. DENTON:  Objection.

6              THE COURT:  Sustained.

7    BY MR. SCHULTE:

8    Q.  Your email doesn't say that you're concerned or that it's

9    odd; it just says FYI, right?

10   A.  Yeah, it says FYI, for your information.

11   Q.  And at this time are you familiar with or were you familiar

12   with IRC?

13   A.  Not really.

14   Q.  Did you know that it existed?

15   A.  I think IRC is -- that was a chat service?  Is that -- I

16   think it was a chat, some sort of chat, as I'm thinking about

17   it.

18             MR. SCHULTE:  OK.  We can take that down.

19             Government Exhibit 13 is in evidence.

20   Q.  You testified about this document on direct, correct?

21   A.  Yes.

22   Q.  It says it's a users guide, is that right?

23   A.  That's correct.

24   Q.  What is a users guide?

25   A.  It's written by the tool developers to help the operators

1   understand how the tool works as the user of the tool so that

2   they can, you know, use the tool effectively.

3   Q.  And on page 4, this is system overview and description of

4   Brutal Kangaroo tool suite, right?

5   A.  Yes.

6   Q.  I think you actually read this on the direct, right?

7   A.  I think so.

8   Q.  It defines Shattered Assurance here as something that,

9   quote, automates Drifting Deadline, right?

10  A.  It utilizes it.

11  Q.  Can you explain what this means, automation or utilization

12  of Drifting Deadline?

13  A.  Basically it says Shattered Assurance is a server tool that

14  handles the automated infection of thumb drives, and it uses

15  Drifting Deadline for the individual infection.

16  Q.  So in order for Shattered Assurance to work, it needs

17  direct access to Drifting Deadline, correct?

18  A.  It does.

19          MR. DENTON:  Objection.

20  BY MR. SCHULTE:

21  Q.  So each of these tools is connected, correct?

22  A.  They had connections, but I was also told that they were --

23  Q.  The question was just if they're connected.

24  A.  They had connections.

25  Q.  That was the reason that it was under a tool suite, right?

M6hWsch4                        Leonis - Cross

1    A.  That was one of the reasons.

2    Q.  What was the other?

3    A.  Probably as part of the development process, they were

4    initially developed together.

5    Q.  Are you familiar with the development of tool suites as

6    opposed to individual projects?

7    A.  Yes.

8    Q.  So how were those different than individual projects?

9    A.  Sometimes developers develop multiple tools at the same

10   time, and they put them all together and they build a tool

11   suite.  Each project could be in a tool suite, but sometimes

12   they can be separated.

13   Q.  Work on them, or at least here, work on Drifting Deadline

14   and Shattered Assurance must be synchronized, correct?

15              MR. DENTON:  Objection.

16              THE COURT:  Sustained.

17   BY MR. SCHULTE:

18   Q.  Well, changes to Drifting Deadline could disrupt Shattered

19   Assurance, correct?

20              MR. DENTON:  Objection.

21              THE COURT:  Sustained.

22   BY MR. SCHULTE:

23   Q.  Do you have an understanding of the tools?

24   A.  I'm sorry.  What do you mean by that?

25   Q.  I mean do you have an understanding of the components of

M6hWsch4                         Leonis - Cross

1    Brutal Kangaroo?

2    A.   A general one.

3    Q.   But you -- OK.  You understand in general how they work,

4    right?

5    A.   In general.

6    Q.   So based on how it's described here, the description of the

7    tool and your understanding of how this works, the development

8    must be synchronized on those tools, right?

9              MR. DENTON:  Objection.

10             THE COURT:  Sustained.

11   Q.   Brutal Kangaroo is the project, correct?

12   A.   Brutal Kangaroo is the tool suite, yes.

13   Q.   And it contains multiple tools, right?

14   A.   It did.

15   Q.   Drifting Deadline is one tool, right?

16   A.   Yes.

17   Q.   Shattered Assurance is one tool, right?

18   A.   That's correct.

19   Q.   And Shattered Assurance uses Drifting Deadline, right?

20   A.   It's -- that's what it says here.

21   Q.   So those tools are connected, right?

22             THE COURT:  Mr. Schulte, I think we've covered this.

23   BY MR. SCHULTE:

24   Q.   Sir, as of April 2016, whenever I moved into your branch,

25   RDB, did you realize that Shattered Assurance was already

M6hWsch4                    Leonis - Cross

1    completed?

2              MR. DENTON:  Objection.

3              THE COURT:  Sustained as to form.

4    BY MR. SCHULTE:

5    Q.  You were the manager in RDB when I transferred there in

6    April, correct?

7    A.  I was the branch chief.

8    Q.  So you would know, as the branch chief, what tools are

9    worked on, which tools are completed, which ones are in

10   progress, right?

11   A.  Generally, yes.

12   Q.  So were you -- did you realize that Shattered Assurance was

13   one of those completed tools?

14   A.  I was told that you were bringing that to work on, so its

15   state -- I don't remember what I knew about it at the time.  I

16   knew you were bringing it to work on it.  You were going to

17   work on Nader and you were going to work on Shattered

18   Assurance.

19   Q.  Your understanding is you thought that I was going to be

20   working on Shattered Assurance, correct?

21   A.  Yes.

22   Q.  But you didn't check into the status of the tool itself?

23   A.  I don't remember doing that.

24   Q.  So you don't recall whether that tool was already finished?

25   A.  No.

M6hWsch4                          Leonis - Cross

Q.   OK.   Did you know whether there was any work that needed to
be done on Shattered Assurance?

          MR. DENTON:   Objection.

          THE COURT:   Sustained.

          I think we've covered this, Mr. Schulte.   He didn't
know what the status of the tool was at that time.

BY MR. SCHULTE:

Q.   Did you know that I was the only developer that worked on
the Brutal Kangaroo tool suite?

          MR. DENTON:   Objection.

          THE COURT:   I'll allow it.   Overruled.

A.   No.

Q.   Let's talk a little bit about weekly activity reports.
These were also referred to as WARs, correct?

A.   Yes.

Q.   What are WARs?

A.   They are a report by each branch that provides the weekly
status of each developer's work.   So it's a -- each developer
usually contributes to these weekly activity reports, which we
shortened for WAR -- so WAR, that was the shortened term,
abbreviation -- so that we could get an understanding of what
was the status of, that each developer was working on, what
tools were in work, generally, what was going on in the branch.

Q.   And when I worked in OSB, I wrote WARs, correct?

A.   I would imagine so.

M6hWsch4                        Leonis - Cross

1    Q.  When I moved to your branch, I was required to send WARs to

2    you, correct?

3    A.  Yes, for a period of time.

4    Q.  And I did that, correct?

5    A.  I believe so.

6    Q.  I began sending you weekly reports of what I was working

7    on, correct?

8    A.  Yeah, I would believe so.

9    Q.  As my direct supervisor, it was your job to review my WARs,

10   correct?

11   A.  Yes.

12   Q.  You were required to comment on them, correct?

13   A.  Sometimes.

14   Q.  You were required to approve of my list of active projects,

15   correct?

16   A.  I was required to review your active projects.

17   Q.  And my list of work to do in the future, correct?

18   A.  If that's what you chose to report on.

19   Q.  And you were called to sign off on them each week, correct?

20   A.  I don't remember signing off on WAR reports.  They were

21   submitted, and we kept them.  I don't know what you mean by

22   sign off.

23   Q.  I mean if someone sent you a WAR that said they didn't do

24   anything, you would follow up, right?

25   A.  Well, I never received one, but -- that said somebody

M6hWsch4                    Leonis - Cross

1   didn't do anything.  So I probably would follow up.

2   Q.  And you used those to adjust work based on resources,

3   correct?

4   A.  Sometimes.

5   Q.  If a developer had ten projects in his queue and another

6   had two, you could adjust those based on needs and resources,

7   right?

8   A.  I could.

9   Q.  I mean as a manager, that was your job, right?

10  A.  Some developers had multiple projects that they were

11  working on, and if we deemed that they were the developers that

12  should have had those projects, they stayed with them.

13  Q.  Well, the question is with respect to the resources in the

14  branch, you, as the manager, managed those resources, right?

15  A.  Yes.

16  Q.  Now, for multiple weeks, in those WARs to you --

17          MR. SCHULTE:  Well, let's pull up Government Exhibit

18  1137.  OK.

19          This is already in evidence, so may I publish it to

20  the jury?

21          THE COURT:  You may.

22  BY MR. SCHULTE:

23  Q.  I'm on page 32 of Government Exhibit 1137.  Do you

24  recognize this document?

25  A.  It's an email or a chain of emails.

1    Q.  To whom?

2    A.  It's a 35-page document.  I'm not sure who it was all sent

3    to.

4    Q.  Well, this specific email on page 32, who was it sent to?

5    A.  It was sent to Sean.

6    Q.  And what's the subject of the email?

7    A.  It says, "WAR 7/1".

8    Q.  Just to help everyone understand the notation and how this

9    works in a WAR, can you kind of walk through this?

10   A.  Your -- your WAR here?

11   Q.  Yes.  Yes, so people can understand what this is.

12   A.  So this is how you reported to Sean at that time, I guess,

13   what you were doing.

14   Q.  OK.  So this first -- what does this mean, requirement

15   number 2014, question, question, question, question?

16   A.  I don't -- I don't remember seeing something where a

17   requirement number had several questions after it.

18   Q.  Well, what is a requirement?

19   A.  A requirement is from the operational teams that defined a

20   tool that needed to be built or a capability that needed to be

21   built.

22   Q.  And were those requirements given numbers?

23   A.  Usually, yes.

24   Q.  In the second line, what does this mean, customer?

25   A.  That was one of the operational groups.

1   Q.  So that's the owner of the requirement, right?

2   A.  Yes, I guess.

3   Q.  And NCS/COG, who is that?

4   A.  That's one of the operational groups.

5   Q.  And then the tool name?

6   A.  It says, "Brutal Kangaroo (Emotional Simian replacement)."

7   Q.  And that's typically, tool name's the name of that project

8   with respect to the requirement, correct?

9   A.  I think it depended, but --

10  Q.  And what -- how many developers are working on this

11  project?

12  A.  Well, you've only listed one.  There's you.

13  Q.  OK.  What's the status of this project?

14  A.  It says it's in testing.

15  Q.  Well, what does in IVV stand for?

16  A.  Independent verification and validation.

17  Q.  And you said that's testing, right?

18  A.  Yes.

19  Q.  So when the tools are completed, they're given over to

20  another team to test the tool, correct?

21  A.  Yeah, usually.

22  Q.  What does RC-5 mean?

23  A.  I believe it means release candidate 5.

24  Q.  And what does that mean?

25  A.  That means you've developed at least five release

M6hWsch4                          Leonis - Cross

1    candidates up to that point.

2    Q.  So generally, when the tool -- or when the tool is sent to

3    IVV it's sent as RC-1, correct?

4    A.  I don't know.  I mean -- I don't know.  You can send -- you

5    can send more -- I mean you don't have to send RC-1.

6    Q.  How does IVV keep track of the release candidates that

7    they're testing?

8            MR. DENTON:  Objection.  Relevance.

9            THE COURT:  Sustained.

10   BY MR. SCHULTE:

11   Q.  OK.  So I think the point here is this tool is completed,

12   it's in IVV --

13           MR. DENTON:  Objection.

14           THE COURT:  Sustained.

15           MR. SCHULTE:  OK.

16           Let's go to page 27.

17   Q.  This is in August of 2015 -- yes, August of 2015.  Correct?

18   A.  Yes.

19   Q.  It's another weekly activity report, correct?

20   A.  It appears so.

21   Q.  Specifically here, it says it's working on QRC.  Can you

22   explain what that is?

23   A.  Quick-reaction capability.  It's -- it's a situation when

24   the operators say, Hey, we need a tool, you know, in a short

25   period of time.  And so a QRC was, is how we term something

M6hWsch4                          Leonis - Cross

1     that the operators needed in a very short period of time.

2     Q.  And for QRCs, you said those are quick reactions, right?

3     A.  Yup.

4     Q.  So as a manager, it becomes your -- QRCs become your

5     priority, right?

6     A.  I think it depends on what the manager decides is the

7     priority.

8     Q.  OK.  Before the high pro -- for the quick reactions that

9     require quick turnarounds, you'll typically pull resources to

10    make sure those get done quickly, right?

11    A.  I think it's depending upon the situation.

12    Q.  OK.  Now, my last WAR that's shown is on page 11, March 23,

13    2016, right?

14    A.  I'm not sure if there are others that you sent to Sean.

15    Q.  OK.  But this is -- we'll go through the next one next, but

16    you see this email was sent March 23, 2016, right?

17    A.  Yes.

18    Q.  And that's -- in April is when I moved to RDB, correct?

19    A.  Yes.

20    Q.  And here, the WAR lists a tool, Drifting Deadline, that's

21    being worked on, right?

22    A.  Yes, that's what's listed.

23    Q.  And that's another one of the components to Brutal

24    Kangaroo, correct?

25    A.  Yes.

M6hWsch4                    Leonis - Cross

1    Q.  There's no work on Shattered Assurance, correct?

2            MR. DENTON:  Objection.

3            THE COURT:  Sustained.

4            Let's move on from these, Mr. Schulte.

5            MR. SCHULTE:  All right.

6    Q.  Let's move on to my first WAR that I send to you.  What

7    date is this?

8    A.  It's the 13th of April 2016.

9    Q.  This is shortly after I arrived in RDB, correct?

10   A.  That's correct.

11   Q.  So I'm sending you my WAR that's due that day, that week,

12   correct?

13   A.  Yes.

14   Q.  And I also -- can you read the email here?

15   A.  Sure.  How far do you want me to go?

16   Q.  Just here.

17   A.  The first line, starting with "if"?

18   Q.  Then the rest, yeah.  I mean that's fine, the first line.

19   A.  "If there is some other format or preference for the way

20   RDB does their WAR, please let me know.

21           "Requirement number:  Ops?

22           "Customer:  COG.

23           "Operation developer:  Josh Schulte.

24           "Tool name:  Drifting Deadline.

25           "Due date:"  Question mark.

1      "Description:  Deployment of DD against --

2      :Status:  4/13, 2016.

3      "I believe Christopher and Frank Stedman are now working on

4    a" blank "involving" blank "as an execution vector that would

5    be used for the next operation in place of the potentially

6    compromised" blank.

7    Q.  And the execution vector, that's a library in the OSB

8    libraries, correct?

9    A.  I don't know.

10   Q.  Well, with your -- you understand -- from your

11   understanding, the OSB libraries contains a library for

12   execution vectors, correct?

13            MR. DENTON:  Objection.

14            THE COURT:  Sustained.

15   BY MR. SCHULTE:

16   Q.  And you respond to my email, right?

17   A.  Yes.

18   Q.  And what do you say?

19   A.  Would you like me to read it, the whole thing?

20   Q.  Sure, yes.

21            THE COURT:  Let's move this along and not do that.

22   It's in evidence.  It's visible.

23            Ask your next question, please.

24   BY MR. SCHULTE:

25   Q.  According to this WAR, I moved -- I'm working on, I'm

M6hWsch4                          Leonis - Cross

1   telling you that I'm working on Drifting Deadline, correct?

2   A.  Yes, according to this WAR.

3   Q.  I'm not saying I'm working on Shattered Assurance, right?

4   A.  You're going to have to go down.

5   Q.  OK.

6   A.  Not in that email.

7   Q.  And you clearly read the email because you responded to it,

8   right?

9   A.  I read your WAR, yeah, and responded.

10   Q.  And you didn't say to me stop working on Drifting Deadline,

11   right?

12   A.  Not in this email.

13   Q.  You didn't tell me that I was supposed to be working on

14   Shattered Assurance instead, right?

15   A.  Not in this email.

16   Q.  Specifically, you say this looks good, right?

17   A.  Yeah.  It says it right there.

18   Q.  OK.  And this is not even the final email I sent you about

19   my progress on Drifting Deadline, correct?

20   A.  It does not appear so.

21   Q.  So my next WAR I send is April 20, 2016, right?

22   A.  Yes.

23   Q.  And it lists several projects that I'm developing and

24   others that are on deck, correct?

25   A.  Yes.

1  Q.  And again, here, on April 20, you don't tell me to stop

2  working on Drifting Deadline, right?

3  A.  Not in this email.  You sent it to me.

4  Q.  All right.  Exhibit 1062 we've talked about a little bit.

5  It's in evidence.  This is the email from Sean to you on April

6  15, correct?

7  A.  That's correct.

8  Q.  And this was in response to your question about the OSB

9  libraries, right?

10 A.  Yes.

11 Q.  And in the highlighted section here, Sean specifically says

12 that he told me that they decided to transfer the two official

13 projects that I was currently working on to RDB control, right?

14 A.  That's what it says.

15 Q.  And according to my WAR, the two tools that I was working

16 on at this time were Nader and Drifting Deadline, correct?

17         MR. DENTON:  Objection.

18         THE COURT:  Overruled.

19 A.  In your WAR you had other things.

20 Q.  But the only two official projects here listed Drifting

21 Deadline and Nader, right?

22 A.  Can you go down really quick?

23 Q.  Yeah.

24 A.  You also reference Crimson.  You also reference execution

25 vectors.  There are other things.

1  Q.  There are other things that are being worked on, correct,

2  but the only -- and the format with the requirement, the only

3  tools, the only official tools with requirement, there's only

4  two that's listed, correct?

5  A.  Technically, only one of them appeared to have a

6  requirement number.  The other didn't.  And the due date for

7  the Drifting Deadline too, there was a question mark.

8  Q.  OK.  Well, the only tools with customers listed, even if it

9  doesn't officially have a requirement number yet, there's only

10 two, right?

11 A.  That you document, yes.

12         THE COURT:  Mr. Schulte.

13         MR. SCHULTE:  OK.

14         THE COURT:  The document's in evidence.  It speaks for

15 itself.  Let's move on, please.

16         Next question, please.

17         MR. SCHULTE:  OK.

18 Q.  Move on to the events surrounding the letter of warning.

19         THE COURT:  Sustained.

20         You're referring to the memorandum?

21         MR. SCHULTE:  No.  No.  The letter.

22         THE COURT:  OK.  So just bring it up, and then it will

23 be clear what you're talking about.

24         MR. SCHULTE:  OK.  Showing the witness and the parties

25 Government Exhibit 1079, and it is in evidence, so publish it

```
 1   to the jury.

 2   Q.  So what time is this sent?

 3   A.  12:39 p.m.

 4   Q.  On what day?

 5   A.  May 26.

 6   Q.  And who is it sent to?

 7   A.  It's sent to ISB.

 8   Q.  And the subject?

 9   A.  "Stash project 'Brutal Kangaroo' admin access."

10   Q.  And it's a request for the privileges in Brutal Kangaroo to

11   be restored to me, correct?

12   A.  Yes.

13   Q.  And there's a response from someone named David, right?

14   A.  Yes.

15   Q.  And he says "completed," correct?

16   A.  That's correct.

17   Q.  And 1080 is in evidence as well.  This is the email you

18   testified about on direct, right?

19   A.  Yes, I believe so.

20   Q.  And this one's from Timothy, correct?

21   A.  Yes.

22   Q.  And he's another individual in ISB, right?

23   A.  Yes.

24   Q.  And this email's sent at 1:15, correct?

25   A.  Yes.
```

1  Q.  But according to David's email, which is at 1:04, it's

2  already been completed, correct?

3  A.  Yeah.  That's what it looks like.

4  Q.  And this is where he requests branch chief approval for the

5  request, right?

6  A.  Yes.

7  Q.  And then I respond, right?

8  A.  Yes.

9  Q.  And when -- and this is sent the same day, right, May 26?

10  A.  Yes.

11  Q.  And who was this sent to?

12  A.  It's sent to me, Timothy, Susan, and William.

13  Q.  It's about the Brutal Kangaroo admin access, right?

14  A.  Yes.

15  Q.  And what does it say?

16  A.  You want me to read it?

17  Q.  Yes, please.

18          THE COURT:  No.  Thank you.  Let's move this along,

19  please.

20  A.  So "first, you" --

21          THE COURT:  No, no.  I don't want you to read it.

22  It's in evidence.  It's visible.

23          What's your next question, please?

24  BY MR. SCHULTE:

25  Q.  So the -- I'm writing a note to vet it with you, right?

1    A.   The request, you mean the email that Timothy sent you?

2    Q.   The request, yes.  Right?

3    A.   That's what it says here.

4    Q.   And since it's also sent to you and HR, I also bring up a

5    personal or a personnel issue, right?

6              MR. DENTON:  Objection.

7              THE COURT:  Sustained.

8              Let's move this along, please.

9              MR. SCHULTE:  Judge, can you allow the jury a minute

10   to read the email?

11             THE COURT:  I think they've had that already, so let's

12   move on.

13   BY MR. SCHULTE:

14   Q.   And do you know if you ever respond to this request?

15   A.   I don't remember.

16             MR. SCHULTE:  OK.  Exhibit -- showing just the witness

17   Government Exhibit 708, which is in evidence.

18   Q.   So, do you recognize what this is?

19   A.   Not exactly.

20   Q.   I mean what format or what kind of document is this?

21   A.   I've never seen it.

22   Q.   This is a Same Time message, correct?  This is what a Same

23   Time message looks like from the CIA computer system, right?

24   A.   It's not the way I've seen them, but --

25   Q.   OK.  But it's, it shows an originator person and a

M6hWsch4                    Leonis - Cross

1    destination person, and this is a direct message, right; that's

2    how Same Time works?

3              THE COURT:  I think the witness testified he doesn't

4    recognize this, so --

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6H5sch5                      Leonis - Cross

1    BY MR. SCHULTE:

2    Q.  OK.  Timothy is the same Tim that's on the -- Timothy

3    that's in the e-mail chain from before, right?  He is the

4    member in ISB?

5    A.  I think so.

6    Q.  But the ISB, Timothy and ISB, they're the ones that would

7    control or have access to all the audit logs, right?

8    A.  ISB would have access to the audit logs on the Atlassian

9    tool suite.

10   Q.  So if you needed someone to review those or you needed

11   access to those logs you would have to reach out to Timothy or

12   someone in ISB, right?  If ISB is the one that controls access

13   to the logs you have to go through them to get them, right?

14   A.  I don't remember them giving them to people but they would

15   have access to them.

16   Q.  OK.  For the purposes, they're the ones who can corroborate

17   whatever is in the audit log because you can't see that even as

18   a manager, right?

19   A.  I cannot see that as a manager.

20   Q.  Right.  So if I send an e-mail -- if someone ends an e-mail

21   to you, like before saying, talking about changes to

22   permissions, you would have to have someone from ISB confirm

23   that for you, correct?

24   A.  That's correct.

25   Q.  And that's what's being done here, right?

1          MR. DENTON:  Objection.

2          THE COURT:  Sustained.

3    Q.  So you testified on direct about what you described as my

4    actions removing OSB from Brutal Kangaroo, correct?

5    A.  That's correct.

6    Q.  You testified that there was no reason to do that, right?

7    A.  We are talking about the admin privilege, the admin of

8    Brutal Kangaroo specifically, and if we are talking about the

9    admin of that project specifically there was no reason to do

10   that.

11   Q.  That was your testimony, right?

12   A.  That is correct.

13   Q.  You testified that you thought it was petty, correct?

14   A.  I did.

15   Q.  Sir, if a project is moved from one branch to the next,

16   would that not be the first step taken, is to change the

17   permissions on the project?

18   A.  That should be one of the first steps, yes.

19   Q.  So the project was moved from OSB to RDB, the first thing

20   that would be done is remove OSB as the admin group and add RDB

21   as the admin group; correct?

22   A.  Say that one more time?

23          MR. SCHULTE:  Can the court reporter reread the

24   question?

25          THE COURT:  Go ahead.

1          (Record read)

2     A.  So, remember that --

3     Q.  It is just yes or no, sir.

4     A.  I can't answer the question the way it was proposed.

5          THE COURT:  Just answer the question as you want to.

6     A.  So Shattered Assurance was inside Brutal Kangaroo so the

7     Brutal Kangaroo project stayed with OSB.  You were instructed

8     to take Shattered Assurance and develop that project, which

9     means that you had to take it and make your own project.

10         MR. SCHULTE:  I object, Judge.  That's not the

11    question.

12         THE COURT:  Overruled.

13         What's your next question?

14         MR. SCHULTE:  I move to introduce the stipulation

15    Government Exhibit 3008.

16         THE COURT:  Any objection?

17         MR. DENTON:  No, your Honor.

18         THE COURT:  OK.  Admitted.

19         (Government's Exhibit 3008 received in evidence)

20         MR. SCHULTE:  It is hereby stipulated and agreed, by

21    and among the United States of America --

22         THE COURT:  Tell you what.  The jury has heard the

23    opening paragraph with many stipulations, just read the

24    substantive portion.

25         MR. SCHULTE:  Great.

1                As of June 22nd --

2                THE COURT:  Go ahead.

3                MR. SCHULTE:  As of June 22, 2016, the source code for

4       the component of the --

5                THE COURT:  Slower for the court reporter, please.

6                MR. SCHULTE:  As of June 22nd, 2016, the source code

7       for the component of the Brutal Kangaroo tool suite known as

8       Shattered Assurance was part of the Brutal Kangaroo repository

9       on Stash and could be accessed only through the Brutal Kangaroo

10      Stash repository.

11      Q.  I would like to show to the witness what is marked as

12      Defendant's Exhibit 1007.  Do you recognize this?

13      A.  Not off the top of my head, no.

14      Q.  I mean, do you recognize what this is?

15      A.  It appears to be an e-mail.

16      Q.  It's an e-mail from you, right?

17      A.  Yes.  That's what it says.

18      Q.  It is sent May 31st, 2016; right?

19      A.  That's what it says.

20               MR. DENTON:  Your Honor, we have no objection to him

21      just offering it.

22               MR. SCHULTE:  OK.

23               THE COURT:  All right.  Admitted.

24               (Defendant's Exhibit 1007 received in evidence)

25      BY MR. SCHULTE:

M6H5sch5                      Leonis - Cross

1   Q.  So this is an e-mail that you send in response to my e-mail

2   where I -- that says that you can vet it with you, right?

3   A.  Yes.

4   Q.  So you never actually respond to me in that e-mail, right?

5   A.  No.

6   Q.  But you send -- or you forward this e-mail to -- who do you

7   forward it to?

8   A.  I forwarded it to Susan from HR and Mike, and I cc'd myself

9   and Duane, who was the acting branch chief of RDB.

10  Q.  So at this point you don't send any e-mail to ISB whether

11  this is authorized or not with respect to the Brutal Kangaroo

12  repository, correct?

13  A.  I don't know if there are other e-mails that were

14  accompanied by this.  They weren't on this one.

15  Q.  In the e-mail you don't say -- Duane, you said, is now the

16  acting chief for RDB so you are no longer in that role, right?

17  A.  Yes.  I appointed him while I was in the acting role at the

18  division level to handle RDB-related activities.

19  Q.  So from this e-mail you are basically stating that you need

20  to speak with the chief of RDB about what I am working on,

21  correct?

22  A.  I asked Duane to actually mentor you and spend time with

23  you and assist you with your activities, so I wanted Duane to

24  have a chance to chat with you and I wanted to chat with Duane.

25  Q.  But the e-mail mentioned nothing at all about Brutal

1    Kangaroo itself, right?

2    A.  My e-mail?

3    Q.  Yes.

4    A.  No.

5    Q.  You don't say to Duane that this is not what I'm supposed

6    to be working on or anything like that, right?

7              MR. DENTON:  Objection.

8              THE COURT:  Sustained.

9    Q.  At this point when you send this e-mail, May 31st, 2016, do

10   you even know what projects that anyone in RDB is working on?

11   A.  I don't remember.

12   Q.  OK.  We will take that down.

13       I'm going to show to the witness and the parties what is

14   marked as Government Exhibit 1081 and just receive confirmation

15   it is admitted.  So who is this e-mail sent to?

16   A.  It is sent to Susan.

17   Q.  And Susan is in HR, correct?

18   A.  That's correct.

19   Q.  And the e-mail is requesting a follow-up or update to the

20   May 26 e-mail, correct?

21   A.  I'm not sure what you're -- I see what you wrote up top but

22   I don't see another e-mail so I'm not sure what you are

23   referencing.

24   Q.  Back to Defendant's Exhibit 1007; May 26, 2016, you see

25   where it says @Susan?

M6H5sch5                        Leonis - Cross

1    A.  Yes.

2    Q.  And this is talking about your memorandum and other

3    accesses; correct?

4    A.  Can I have a second to look at it, please?

5    Q.  Yes.

6    A.  What was your question again?

7    Q.  At the information there, or that this was in response --

8    or let me rephrase that.

9        This was about the April 18th memorandum that you had given

10   me, correct?

11   A.  It says as I previously stated on 4/18.

12   Q.  And 4/18 was when you issued the memorandum, right?

13   A.  That's correct.

14   Q.  And that memorandum was about unauthorized access to the

15   OSB Libraries, correct?

16   A.  That's correct.

17   Q.  That memorandum was directed to me, correct?

18   A.  It was.

19   Q.  And in the memorandum you modified -- you modified it

20   before I signed it, correct?

21   A.  It was changed while you were there based on things that

22   you wanted added.

23   Q.  And one of those things was that I said specifically that

24   the removal was unauthorized.

25   A.  I believe so.

1   Q.  So back to Government Exhibit 1081, this e-mail is

2   requesting a follow-up of that May 26 e-mail; right?

3           MR. DENTON:  Objection.

4           THE COURT:  Sustained.

5   Q.  By this time, June 3rd, 2016, you still hadn't responded to

6   the May 26 e-mail, correct?

7   A.  I don't remember.

8           THE COURT:  Mr. Schulte, how much longer do you think

9   you have on cross?

10          MR. SCHULTE:  I'm not sure.  Another hour or so?

11          THE COURT:  You are going to have to begin to move a

12  little more quickly and have a few fewer pauses so we can

13  hopefully wrap up and get the witness off the stand today.

14          MR. SCHULTE:  OK.

15          Well, you reviewed your e-mails for this testimony,

16  correct?

17  A.  Not all of them, no.

18  Q.  You reviewed the ones that -- only the ones that the

19  government selected for you to review, right?

20  A.  I reviewed the -- I reviewed e-mails and documents that the

21  government showed me.

22  Q.  And in those e-mails there was no -- you didn't review

23  one -- or you didn't see any response to the May 26 e-mail,

24  right?

25  A.  I don't remember an e-mail like that.

1   Q.  So is it your testimony that in the May 26 e-mail that I am

2   sending to you regarding the Brutal Kangaroo permissions, that

3   this is a lie or attempts to gain unauthorized access to Brutal

4   Kangaroo?

5   A.  I'm sorry.  Can you restate that question?

6   Q.  Yes.

7       Is it your testimony that this e-mail that I sent to you,

8   May 26, about vetting my project accesses of Brutal Kangaroo

9   with you, is it your position that this e-mail is a lie and

10  malicious attempt --

11          MR. DENTON:  Objection.

12          THE COURT:  Sustained.

13          Mr. Schulte, your next question, please.

14  BY MR. SCHULTE:

15  Q.  Did you view this e-mail to be a violation of the

16  memorandum that you gave me?

17  A.  This specific e-mail?

18  Q.  Yes.

19  A.  This e-mail came across to me as a reaction of somebody who

20  was upset about the whole situation.

21  Q.  The question was did you view this e-mail to be a violation

22  of the memorandum that you gave me on April 18.

23  A.  I believed that you requesting admin access to Brutal

24  Kangaroo after you were told that that was not a project that

25  you were going to have admin access to, a violation of the

1   memorandum.

2   Q.  Can you -- was there any e-mail or transfer memo or any

3   documentation that stated which projects I was taking with me

4   from OSB to RDB?

5   A.  I don't explicitly remember right now.  There were a lot of

6   e-mails that were sent and things that were documented.

7   Q.  Back to Government Exhibit 1137, I'm specifically sending

8   an e-mail to you about working on --

9          MR. DENTON:  Objection.

10  Q.  -- components of Brutal Kangaroo, correct?

11         THE COURT:  Sustained.  Let's move on, please.

12  Q.  All right.  Moving on to the actual drafting of the letter

13  of warning, the group chief Karen issued the letter of warning;

14  correct?

15  A.  That's correct.

16  Q.  Would it be fair to say that giving somebody a letter of

17  warning is a fairly serious matter?

18  A.  It is a serious matter.

19  Q.  You want to be careful you have your facts right, correct?

20  A.  Yes.

21  Q.  You want to be sure that you are not saying something

22  that's inaccurate; correct?

23  A.  Yes.

24  Q.  And certainly Karen wouldn't do that, right?

25  A.  I believe Karen to be very diligent in trying to make sure

1    her facts were correct.

2    Q.  And you helped Karen with this letter, right?

3    A.  She asked for my help at one point.

4    Q.  How did you assist her?  By e-mail?  Or same time?  Or you

5    spoke with her directly?

6    A.  I remember speaking with her.  I don't remember what else I

7    did.

8    Q.  OK.  But you and Karen never held a meeting or invited me

9    to a meeting to sit down about it, right?

10   A.  I don't remember.  I don't remember all the meetings that

11   we had in lead-up to the letter of warning.

12   Q.  But the question was, was there any meeting where I was

13   invited to the meeting to discuss it?

14   A.  I don't remember a meeting.

15   Q.  And from the May 26 meeting, all the way until I think it

16   is the day before the letter of warning or the decision to give

17   the letter of warning, you don't speak to me about this issue

18   yet, right?  There is no e-mail?

19   A.  I don't remember.

20   Q.  Sorry.  I'm sorry, I didn't hear?

21          THE COURT:  He said I don't remember.

22          MR. SCHULTE:  OK.

23   BY MR. SCHULTE:

24   Q.  And then a day before the official issuance of the letter

25   of warning we sit down to speak on June 21st, 2016; correct?

1    A.  I really don't remember.

2    Q.  OK.  Government Exhibit 1085, it has been admitted into

3    evidence.  This is an e-mail that you send, right?

4    A.  Yes.

5    Q.  And who do you send it to?

6    A.  I sent it to Karen, Duane, and Susan about meeting with

7    you.

8    Q.  And what's the date of the e-mail?

9    A.  It was the 21st of June.

10   Q.  And you are just summarizing the fact that you sat down

11   with me about planned future work; right?

12   A.  That's not the only thing it looks like I talked about.

13   Q.  Right, that's the first thing; and the second thing was

14   about the Brutal Kangaroo project, correct?

15   A.  That's what it says.

16   Q.  And you say in the e-mail that you believed the two

17   projects that were supposed to be migrated were Shattered

18   Assurance and Nader, correct?

19   A.  That's correct.

20   Q.  There is no e-mail or any official documentation that

21   reflects that?

22           MR. DENTON:  Objection.  Asked and answered.

23           THE COURT:  Sustained.

24   Q.  You testified earlier the importance of communication as a

25   manager, correct?

1    A.  Yes.

2    Q.  Would you agree that failing to keep records and

3    establishing project work is a breakdown in communication,

4    failure as a manager?

5              MR. DENTON:  Objection.

6              THE COURT:  Sustained.

7    Q.  And as we have discussed, the only official documentation

8    that exists is from the WARs --

9              MR. DENTON:  Objection.

10             THE COURT:  Sustained.

11   Q.  It's not -- you discuss -- I think you testified, actually,

12   that you were frustrated based on this conversation with me,

13   correct?

14   A.  I was frustrated that we had had conversations about what

15   you were doing and your actions and it appeared that you were

16   continually not doing what management asked to you do.

17   Q.  But that's not correct, is it, sir?

18   A.  Yeah, it is.

19   Q.  Do I not, in the WARs, does the WARs not properly inform

20   you that?

21             MR. DENTON:  Objection.

22             THE COURT:  Sustained.

23             Mr. Schulte, would I begin to start wrapping up your

24   cross.  You have another 15 to 20 minutes I will give you.

25             MR. SCHULTE:  Can we have a side bar, Judge?

1        THE COURT:  No.

2        MR. SCHULTE:  I still have a lot of material to go

3   through with the letter, the entire letter.

4        THE COURT:  So you are going to have to do it more

5   efficiently than you are doing this.  OK?  You will have a

6   closing argument, you can tie things together at that time.

7   That's not what the examination is for.  So new questions, and

8   let's do it more quickly, please.

9   BY MR. SCHULTE:

10  Q.  OK, I want to talk about in here you reference this "fight

11  back" statement.  Is there not a formal way for CIA employees

12  to seek redress and fight back if they thought they were being

13  treated improperly?

14  A.  I do not agree with the --

15  Q.  The question is just --

16  A.  So I'm going say no because "fight back" is not words we

17  use when we are trying to figure out --

18  Q.  The question is --

19       THE COURT:  Hold on.  One person at a time.  OK?  The

20  answer was "no" to the question posed.

21  Q.  OK.  Do you recall that I challenged a PAR through the CIA

22  process?

23  A.  I think I remember that, yes.

24  Q.  I never actually worked under you long enough for you to

25  give me a PAR, correct?

1    A.  Not as a branch chief.

2    Q.  But you recall a time when Sean issued me a PAR from 2016;

3    correct?

4    A.  Yes.

5              THE COURT:  Sir.  What is a PAR.

6              THE WITNESS:  A PAR?

7              THE COURT:  Yes.

8              THE WITNESS:  It's a performance report the easiest

9    way to explain it.  PAR is short for Performance -- I can't

10   remember the A -- but Reports, and they are written by managers

11   about the performance of an employee.  And then usually there

12   is a reviewer in addition to a rater section that is provided.

13   BY MR. SCHULTE:

14   Q.  You realize that the PAR had been challenged, right?

15   A.  I think I remember that, yeah.

16   Q.  Regardless of the words used, one does have formal redress

17   to challenge management; correct?

18   A.  There are mechanisms to address concerns.

19   Q.  Did you know that through the CIA's formal process, the PAR

20   was modified?  Did you realize that?

21   A.  I don't remember.

22   Q.  You don't recall what the outcome of that --

23   A.  No.

24   Q.  -- challenge was?

25   A.  Not at this time.

1   Q.  So the term "fight back," when this was said, do you recall
2   any -- how do you call the demeanor of this entire -- how do
3   you characterize the demeanor of this meeting in June?
4   A.  You were frustrated.  In fact, I say it lower in the
5   e-mail.
6   Q.  OK.  So you describe it as frustrated, not extremely -- or
7   not -- your characterization is frustrated, that's right?
8   That's your testimony?  I withdraw.
9       Let's read -- let's move on to Government Exhibit 1091.
10  This is in evidence.  This is an e-mail from HR, correct?
11  A.  It's from Susan, yes.
12  Q.  And it is about the letter of warning that was issued by
13  Karen, correct?
14  A.  It appears that it is an e-mail about the meeting -- notes
15  from the meeting.
16  Q.  Back to 1085 at the bottom of the page, I just want to note
17  quickly that whenever the administrator permissions to Brutal
18  Kangaroo were modified by infrastructure branch this was --
19          MR. DENTON:  Objection.
20  Q.  -- correct procedure following the previous guidance,
21  correct?
22          MR. DENTON:  Objection.
23          THE COURT:  Sustained.
24  BY MR. SCHULTE:
25  Q.  There was a time when the policy with respect to how

1    infrastructure branch handled permission changes to projects,

2    right?

3    A.   I'm sorry.  Can you restate that, please?

4    Q.   There was a time when you changed the policy for how ISB

5    should handle permission change requests, correct?

6    A.   When I changed?

7    Q.   When you changed the -- when you instituted a new policy.

8    A.   When we removed your admin access to the Atlassian tool

9    suite, the process by which projects were being managed or the

10   admin privileges on projects could be changed and managed,

11   changed.

12   Q.   But you sent out an e-mail at one point about guidance for

13   how ISB should handle those change requests, correct?

14   A.   I believe so, yes.

15   Q.   And you changed that policy so that branch chief approval

16   was required, correct?

17   A.   Yes.  I believe that's what the policy was.

18   Q.   And that policy change was in June -- was in June, correct?

19   A.   That required branch chief approval?

20   Q.   Yes.

21   A.   That's not what I remember.

22   Q.   OK.

23        Showing the witness Government Exhibit 1088, it is in

24   evidence; real quick, this e-mail was sent from you, right?

25   A.   Yes.

1    Q.  And this is on June 16, correct?

2    A.  Yes.

3    Q.  And this e-mail is instituting the policy of requiring

4    branch chief approval, correct?

5    A.  This e-mail documents that you must receive an e-mail with

6    the requested change and positive concurrence from your branch

7    chief.  That's what the e-mail says.

8    Q.  And this e-mail was sent June 16, which is after the

9    request I sent on May 26 regarding the Brutal Kangaroo?

10            MR. DENTON:  Objection.

11            THE COURT:  Sustained.

12   Q.  I would like to show the parties what is marked Defendant's

13   Exhibit 1009.  Do you recall any issues after the decision to

14   basically split the components out of -- from Brutal

15   Kangaroo -- after that decision was reached do you recall any

16   additional problems with Brutal Kangaroo?

17   A.  I don't remember.

18   Q.  Does this document look familiar to you?

19   A.  I don't remember this document.  I'm sorry.

20   Q.  It is an e-mail that you sent, correct?

21   A.  That's what it says.

22   Q.  And when did you send it?

23   A.  It says it is an e-mail that I sent on the 22nd of August.

24   Q.  And the subject is -- what's the subject?

25            MR. DENTON:  It is not in evidence but we have no

M6H5sch5                         Leonis - Cross

1    objection, your Honor.

2              THE COURT:  All right.  I will deem it admitted.

3              (Defendant's Exhibit 1009 received in evidence)

4    BY MR. SCHULTE:

5    Q.  So you recall your previous testimony that I think you

6    characterized your frustration with respect to e-mails or --

7    e-mails that were sent regarding Brutal Kangaroo and keep --

8    the fact that all of the components had to be kept together.

9    Do you recall what I'm talking about?  The testimony?

10   A.  I do not recall it the way you are explaining it.

11   Q.  OK.  So what is --

12   A.  I was frustrated by the fact that you kept trying to obtain

13   your admin privileges over the Brutal Kangaroo project after

14   being told not to do so, not to be told reinstating your admin

15   privileges and it kept coming up.  And as a supervisor, when we

16   asked you not to do that and you continued to do it, it became

17   a problem.  It was very frustrating.

18   Q.  Sir, when did you ask me not to access Brutal Kangaroo?

19   A.  When did I not ask you to access Brutal Kangaroo or admin

20   privileges of Brutal Kangaroo?

21   Q.  Yeah.  What was the first time, the first instance that you

22   talked to me about the Brutal Kangaroo permissions?

23   A.  We told you in the memorandum that was sent on the 18th

24   that you should not attempt to restore your admin privileges to

25   any project.  That included Brutal Kangaroo.

1   Q.  It didn't say Brutal Kangaroo in the document, correct?

2   A.  It said no projects.

3   Q.  That's correct, but in -- but it also said -- or you

4   confirmed that projects were transferred with me from OSB to

5   RDB, correct?

6   A.  They were.  And you had the ability to copy the project

7   and --

8   Q.  That was --

9        THE COURT:  Mr. Schulte, you have to wait for the

10   witness to answer finish his answer, please.

11        THE WITNESS:  You had the ability to copy the

12   projects, make your own code repository and admin that code

13   repository, not restore your admin privileges to a code

14   repository that you were told belonged to another branch.

15   BY MR. SCHULTE:

16   Q.  When was I told that that project belonged to another

17   branch?

18   A.  You were told what your projects were and what projects you

19   could take with you.

20   Q.  And who -- was that you who told me that?

21   A.  The documentation shows that I did.

22   Q.  The documentation doesn't mention Brutal Kangaroo, sir.

23   A.  It sells you which ones you had.

24        THE COURT:  Mr. Schulte, you are not testifying.

25        Ladies and gentlemen, I remind you that what

M6H5sch5                       Leonis - Cross

1   Mr. Schulte is saying in his examination is not evidence, only

2   the witness' testimony is evidence.

3           Can you get your mask, Mr. Schulte, and can I see

4   counsel and Mr. Schulte at side bar?

5           (Continued next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At side bar)

2          THE COURT:  Mr. Schulte, please put your mask on.  Put

3    your mask on.

4          Mr. Schulte, I warned you 20 minutes ago that you had

5    15 to 20 minutes left.  This is excruciating.  I don't know

6    what you are trying to do with this but you have dwelled on the

7    same topic for dozens of transcript pages.  You are asking

8    questions repeatedly over and over again, you are making

9    arguments through your questions that you can make in closing

10   argument.  And, what won't be reflected in the transcript is, I

11   would say, before each question you were pausing for as much

12   time as it takes to you ask a question which is doubling the

13   length of the examination so I think I would be well within my

14   rights under Rule 611 to cut you off at this point and tell you

15   to sit down.  I'm not going to do that.  Instead, I am telling

16   you, I am asking you what remaining topics you have to cover

17   because I think you are going to need to choose and focus on

18   what is most important at this point.  You have spent hours

19   going over the same thing, basically.

20         MR. SCHULTE:  Yes.  I mean, I just note that it's

21   taking more time because I'm focusing to try and make sure that

22   I am asking the question that is following your guidance.  Like

23   the last question I was asking was about the memo and the way

24   I'm -- it is taking a lot of time for me to be able to properly

25   phrase the question in a way that the Court is not going to

1    take issue with for the testimony so I am spending a lot of

2    time trying to make sure those questions are proper, as the

3    Court ordered.

4            THE COURT:  Over the weekend I would urge you to

5    prepare for your crosses next week and to do that in advance

6    but the point is what topics do you have left to cover here?

7            MR. SCHULTE:  So the two -- I wanted to go through --

8    I can maybe do that quickly; the security, physical security,

9    DevLAN security types of security.  The issues that I was

10   trying to address now was going through the letter of warning

11   that was issued to me and that every single fact mentioned in

12   the letter of warning there is a corresponding document

13   disproving it so that's what I am trying to get through now and

14   struggling with the witness' testimony because -- I mean

15   it's --

16           THE COURT:  Number one, I'm not sure that ultimately

17   is relevant, and candidly, I think you are playing into the

18   government's theory of the case by making clear to the jury

19   that even today you remain aggrieved by you as being mistreated

20   but that's your decision to make.  Beyond that, all of those

21   documents are in evidence.  If you want, in summation, to stand

22   up and point to the letter of warning and then demonstrate to

23   the jury why all of the things in the letter of warning were

24   inaccurate, you may do so, but I'm not going to permit you to

25   do it through the witness.  OK?  So why don't you turn to the

M6H5sch5                          Leonis - Cross

1    physical security and the DevLAN security issue and then let's

2    wrap this up.

3              MR. SCHULTE:  OK.

4              THE COURT:  OK?  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6H5sch5                    Leonis - Cross

1              (In open court)

2    BY MR. SCHULTE:

3    Q.  OK, I want to turn to security.  I want to start off with

4    physical security.  You testified on direct that the CCI office

5    is unacknowledged by the CIA, correct?

6    A.  That's correct.

7    Q.  Did you know that it is -- did you know that the CCI office

8    is an SC0 site?

9    A.  I do not know that.

10   Q.  Do you know what SC is?

11             MR. DENTON:  Objection.

12             THE COURT:  Just yes or no.

13   A.  I do.

14   Q.  OK.  What does "SC" stand for?

15             MR. DENTON:  Objection.

16             THE COURT:  Sustained.

17   Q.  At the facilities where CIA applicants are tested, correct?

18   A.  At the CCI office?

19   Q.  The site.

20   A.  I'm not sure if I can answer that question.

21   Q.  Well, CIA applicants are uncleared personnel, correct?

22   A.  They are.

23   Q.  And when they're uncleared they receive e-mails on the

24   Internet about their application process, correct?

25   A.  I don't know the current application process that well.

M6H5sch5                      Leonis - Cross

1    I'm sorry.

2    Q.  OK, but those applicants, they go -- they're tested at this

3    site, correct?  They --

4              MR. DENTON:  Your Honor, I think we are getting into a

5    bit of the issue that came up the other day.

6              MR. SCHULTE:  I have Defendant's Exhibit 502 that I

7    would like to introduce.  May standby counsel approach and

8    provide the copy?

9              MR. DENTON:  We don't have a copy, your Honor.

10             THE COURT:  Nor do I.  Do you have copies for the

11   government and for me?

12             MR. SCHULTE:  Yes.  Yes, we are providing copies.

13             MS. SHROFF:  May I approach?

14             THE COURT:  You may.

15             MR. DENTON:  We object, your Honor.

16             MR. SCHULTE:  It is being admitted not for the truth

17   but the fact that the address and --

18             MR. DENTON:  Objection.

19             THE COURT:  Mr. Schulte.

20             May I see counsel at side bar again, please?

21             (Continued next page)

22

23

24

25

1            (At side bar)

2            THE COURT:  Mr. Denton?

3            MR. DENTON:  Your Honor, first of all, it's not clear

4    that this is an admissible source for a document in any event.

5    Its relevance is not apparent and the defendant has never once

6    suggested that he intended to unmask the location of the CCI

7    office which has been the subtext of extensive discussion in

8    the CIPA process throughout this case.

9            MR. SCHULTE:  I don't think that it has been subject

10   of the -- I mean, the witnesses are all testifying incorrectly

11   that this is not an SC0 site, that it is not an open building,

12   that the website is not on the CIA's public -- it is on the

13   CIA's public website under CIA University.  I mean, the fact

14   that this is open, publicly acknowledged by the CIA, as an SC0

15   site, all of the witnesses are saying the opposite and I wasn't

16   expecting that testimony.  Because of that, I think this is now

17   proper -- not for the truth but to show that not only the

18   address but the building itself and the facility is publicly on

19   the Internet and the CIA itself acknowledges it.

20           MR. DENTON:  First of all, your Honor, we were just

21   handed this document so we don't think we have sufficient

22   notice of it to be able to consider it and whether any CIPA

23   practice is appropriate.  It was not the subject of a Section 5

24   notice, nor is this the source the defendant cites, which is

25   the CIA website.  This is a cryptomeme which I believe is the

M6H5sch5                    Leonis - Cross

1     same website that tried to unmask the officers who testified

2     under pseudonyms in the previous trial in this case.

3               THE COURT:  I take it --

4               MR. SCHULTE:  I --

5               THE COURT:  Hold on.  I take it this wasn't disclosed

6     by the deadline for Mr. Schulte to provide defense exhibits?

7               MR. DENTON:  No.

8               THE COURT:  You are not going to get this in.  You can

9     ask if this building has any members of the public who are

10    uncleared who enter it but I'm not going to permit you to

11    elicit testimony that would tie an address that may or may not

12    be available, publicly, to the location that we are discussing

13    which has, indeed, been the subject of extensive litigation and

14    is, by Judge Crotty's ruling and my own ruling, it was

15    substituted for that location, CCI office, and that was

16    intended to mask where that was.  So you are not going to

17    elicit testimony that would tie a specific building or specific

18    office, let alone introduce this.  OK?

19              MR. SCHULTE:  All right.

20

21

22

23

24

25

1                    (In open court)

2    BY MR. SCHULTE:

3    Q.   Next I want to talk to you about DevLAN.  Have you heard

4    the developers describe DevLAN as the wild, wild west?

5    A.   I don't remember that.

6    Q.   Do you recall people sharing passwords on DevLAN?

7    A.   I -- no, I don't remember that.

8    Q.   Do you recall that there very limited any access controls

9    on DevLAN?

10   A.   No.  That's not my understanding.

11   Q.   All right.  Do you recall that all the developers were

12   administrators for their own systems and computers on DevLAN?

13   A.   They were administrators for their work station.

14   Q.   There were no net flow logs monitoring the amount of data

15   transferred across the network, correct?

16   A.   I don't know that information.

17   Q.   Is it your testimony that DevLAN was a secure network?

18   A.   DevLAN was a secure network.  It had security features.

19                    (Continued on next page)

20

21

22

23

24

25

M6hWsch6                    Leonis - Cross

1    BY MR. SCHULTE:

2    Q.  Developers had access to the internet in the secure CIA

3    vault, correct?

4    A.  Yes.

5    Q.  And developers could switch out the internet cables on

6    their DevLAN systems with the one connected to the systems on

7    the internet, correct?

8    A.  I'm not sure how that would work.

9    Q.  Well, I mean the internet cables in the back of the system,

10   you could swap them based on one -- take the DevLAN system,

11   plug it into the unclassified, unclassified --

12            MR. DENTON:  Objection.

13   Q.  -- on DevLAN, right?

14            THE COURT:  If you understand the question, you may

15   answer it.

16   A.  I, I -- there are policies about things like that, so I'm

17   not sure how that would actually work.

18   Q.  Did you know that there was an incident in which one of the

19   networks was connected to another one just by this method?

20   A.  No.

21   Q.  Would it surprise you --

22            MR. DENTON:  Objection.

23   Q.  -- if an employee --

24            THE COURT:  Sustained.

25   BY MR. SCHULTE:

1    Q.  Did you know that CIA employees put the Stash backup in

2    their public home directory that's accessible to everyone?

3    A.  No.

4    Q.  Did you know that an employee saved the Stash backup on a

5    hard drive?

6    A.  I'm unfamiliar with the situation.

7    Q.  Well, would it concern you to learn --

8            MR. DENTON:  Objection.

9            THE COURT:  Sustained.

10   BY MR. SCHULTE:

11   Q.  Do you know an employee named Jade who worked in IAC?

12   A.  Yes.

13           MR. SCHULTE:  I'll show the witness and the parties

14   what's marked as defense exhibit 1201.

15   Q.  Do you recognize this?

16   A.  No.

17   Q.  Do you recognize what the data represents?

18   A.  Not particularly.

19           MR. SCHULTE:  I'll show the witness and the parties

20   what's marked as Government Exhibit 1207-85.

21   Q.  Does this look familiar?

22   A.  No.

23   Q.  You don't recognize the data this represents?

24   A.  No.

25   Q.  You had access to DevLAN, correct?

1    A.   Yes.

2    Q.   And you were -- you used -- on DevLAN there was an FSO1

3    server, correct?

4    A.   I don't remember.

5    Q.   Do you remember home directories?

6    A.   Not particularly.

7    Q.   OK.  With respect to the WikiLeaks publication, I think you

8    testified that after the WikiLeaks disclosure on March 7, 2017,

9    the DevLAN network was shut down, correct?

10   A.   Yes.

11   Q.   It was no longer used, right?

12   A.   No.

13   Q.   And the tools exposed by WikiLeaks were no longer used

14   either, right?

15   A.   That's correct.

16   Q.   How soon after the WikiLeaks disclosure did you realize

17   that the documents disclosed were from DevLAN?

18   A.   When I came back to the CCI office, when we were called in

19   by Mike, the deputy chief of the group, it became very apparent

20   that the documents that we were looking at came from DevLAN.

21   It was that day.

22   Q.   Is it true that up until then, the CIA had no idea that the

23   data was even missing?  Correct?

24   A.   I can't speak to that.

25   Q.   Is that because you don't know?

1  A.  I was unaware of anyone that knew, but you asked if the CIA

2  knew.  The CIA's a very large place.  There was a component of

3  the CIA that knew.  I wouldn't have known that.

4  Q.  OK.  And it's standard procedure at the CIA to basically

5  close up shop after a leak?

6          MR. DENTON:  Objection.

7          THE COURT:  Sustained.

8          Let's wrap it up, Mr. Schulte.

9  BY MR. SCHULTE:

10  Q.  Were you aware of the existence of the WikiLeaks task

11  force?

12  A.  Yes.

13  Q.  You were also aware that advanced forensic division was

14  conducting its own investigation?

15  A.  I don't remember.

16  Q.  Do you know how many different parts of the agency were

17  looking into this?

18  A.  No.

19  Q.  Do you know if any team at the agency was investigating who

20  was responsible?

21  A.  I don't remember.

22  Q.  Do you know if any of these investigations were *ad hoc* or

23  official duties?

24  A.  I just told you I don't remember if any team was -- who was

25  doing it.  I mean I knew of people in CCI that were looking at

M6hWsch6                      Leonis - Cross

1   the data that was coming off.  As far as any other

2   investigations, I was not party to them.

3   Q.  So you didn't receive any reports that these groups

4   generated?

5   A.  I don't remember.

6           THE COURT:  All right.  Mr. Schulte, when I say wrap

7   it up, let's limit it to, let's say, five more questions, and

8   then we'll have redirect.

9           (Defendant conferred with standby counsel)

10  BY MR. SCHULTE:

11  Q.  OK.  Just quickly, last few questions are just about

12  classification in general and the CIA system.  When you send an

13  email, you're required to select a specific classification,

14  correct?

15  A.  You're required to classify the email.

16  Q.  And you do this through a classification guide, correct?

17  A.  You use the classification guide to assist you in

18  classifying the email.

19  Q.  How many classification reasons exist for you to choose

20  from?

21  A.  I don't remember.

22  Q.  Thousands?

23  A.  No.

24  Q.  Hundreds?

25  A.  No.

1   Q.  Less or more?

2   A.  There's less.  But there are also other classification

3   guides.  There are multiple classification guides that you can

4   use to classify documents.  I'm specifically thinking about the

5   agency's classification guide.

6   Q.  OK.  Overall, though, how many different classification

7   reasons, ballpark, do you know can be used?

8   A.  I'm trying to think.  It's under a hundred.  It's

9   definitely more than ten.

10             MR. SCHULTE:  All right.  No further questions.

11             THE COURT:  Redirect?

12             MR. DENTON:  No, your Honor.

13             THE COURT:  All right.  Mr. Leonis, you are excused

14  and may step down.  Have a pleasant weekend.

15             (Witness excused).

16             THE COURT:  Government, call your next witness.

17             MR. DENTON:  The government calls Patrick Leedom, your

18  Honor.

19   PATRICK THOMAS LEEDOM,

20       called as a witness by the government,

21       having been duly sworn, testified as follows:

22             THE COURT:  Counsel, you may proceed.

23             MR. DENTON:  Thank you, your Honor.

24  DIRECT EXAMINATION

25  BY MR. DENTON:

M6hWsch6                         Leedom - Direct

1   Q.  Good afternoon, sir.

2   A.  Good afternoon.

3   Q.  Where do you work?

4   A.  I work for Microsoft.

5          THE COURT:  Just slow down a little.  See if you can

6   move up and Get an inch or two away from the microphone.  If

7   keep your voice up and you speak slowly, it will make it easier

8   for everyone.

9          Go ahead.

10         MR. DENTON:  Thank you, your Honor.

11  Q.  What do you do for Microsoft?

12  A.  I'm an incident response manager.

13  Q.  What does an incident response manager do?

14  A.  For Microsoft, we respond to cyber security incidents on

15  the network as well as perform investigations.

16  Q.  When did you start working at Microsoft?

17  A.  This last December, about six months ago.

18  Q.  Where did you work before that?

19  A.  I worked for the MITRE Corporation.

20  Q.  What is the MITRE Corporation?

21  A.  The MITRE Corporation is a not-for-profit government

22  contractor that operates FFRDCs.

23  Q.  What's an FFRDC?

24  A.  It's a federally funded research and development center,

25  kind of like our National Labs.  They perform research and

1  development for the government.

2  Q.  And how long did you work for MITRE?

3  A.  About seven years.

4  Q.  And what was your position there?

5  A.  I was a lead cyber security engineer.

6  Q.  And what did you do as a lead cyber security engineer at

7  MITRE?

8  A.  I was primarily a contractor for the FBI.

9  Q.  And did you work within any particular unit at the FBI?

10  A.  Yes, I did.

11  Q.  What was that?

12  A.  That was the technical analysis unit.

13  Q.  And is that in a particular FBI division?

14  A.  Yes, it is.

15  Q.  What division?

16  A.  It's in the cyber division.

17  Q.  What does the technical analysis unit do?

18  A.  We primarily perform forensic analysis to support different

19  field offices around the country.  For example, if a field

20  office didn't have a dedicated computer scientist to do

21  computer forensics, they would send us the case; we would help

22  them work it out.  We also supported the FBI's

23  incident-response team, when they went to victims to handle

24  incidents.

25  Q.  And what type of work did you personally do as part of the

M6hWsch6                          Leedom - Direct

1   technical analysis unit?

2   A.   Primarily digital computer forensics, malware analysis as

3   well as working with the incident-response team on deployments.

4   Q.   What is the incident response team?

5   A.   At the FBI they call it the CAT team, the cyber action

6   team.

7   Q.   And did you personally do work with the cyber action team?

8   A.   Yes, I did.

9   Q.   What type of work?

10  A.   Primarily, we would deploy to victim organizations that

11  requested the FBI's help to do, like, on-site forensic

12  analysis.

13  Q.   How many times did you deploy with the cyber action team

14  during your career?

15  A.   Maybe about five times.

16  Q.   Generally, how soon after an incident is the cyber action

17  team deployed?

18  A.   As soon as possible.  So it could be days, usually.

19  Q.   You talked before about forensic analysis.  What type of

20  forensic analysis are you referring to?

21  A.   I've done everything from, you know, basic computer

22  forensics, malware analysis, forensics involving databases,

23  forensics involving insider threat activity.  Pretty much

24  anything that would happen on a computer.  Those are the types

25  of cases that I worked.

1   Q.  And just at a very high level, what is the process of

2   conducting that kind of digital forensic analysis?

3   A.  So, the first thing you would do is we would receive -- it

4   changes based on the type of investigation.  Would you like it

5   from, like, an incident-response perspective or more --

6   Q.  Sure.

7   A.  OK.  So, from an incident-response perspective, we would

8   arrive on-site at, like, let's say, a victim company, and we

9   would work with their systems administrators to get evidence

10  from the network or deploy something to collect evidence from

11  the network, which we would then analyze to try and determine

12  what happened.  Let's say they had a, like, a malware incident,

13  so we would analyze the malware, see what it did, and see if it

14  might have stolen something, things like that.

15  Q.  Do you use digital tools as part of that forensic work?

16  A.  Yes, we do.

17  Q.  Have you helped develop any of those tools?

18  A.  Yes.

19  Q.  Tell us about that.

20  A.  So, working for MITRE, we built a tool for the bureau that

21  was to assist with this digital evidence collecting

22  specifically for the incident-response team, basically allowed

23  you to take multiple computers and triage them all at once.  So

24  since we were only on site for, like, a week at a time, you

25  would want to use your time as best as possible.  So it helped

M6hWsch6                        Leedom - Direct

1   fulfill that.

2   Q.  Approximately how many cases did you work on with the FBI?

3   A.  Dozens of cases, maybe, like, 50 to a hundred cases.

4   Q.  And again, generally, what type of work did you perform on

5   particular cases?

6   A.  Digital forensics.

7   Q.  Did any of those investigations involve the analysis of

8   computer networks?

9   A.  Yes.

10  Q.  About how many?

11  A.  Most of them.  Most computers are networked.

12  Q.  Are you familiar with something called a virtual machine?

13  A.  Yes, I am.

14  Q.  What is a virtual machine?

15  A.  It is essentially a computer that runs inside of another

16  computer.

17  Q.  Did you work on investigations involving virtual computers?

18  A.  Yes.

19  Q.  What about investigations involving database

20  reconstruction?

21  A.  Yes.

22  Q.  What is that?

23  A.  Databases are found in just about everything nowadays.

24  When you're browsing the internet, your web browser uses a

25  database to store all of that information.  Databases are

1    stored to -- databases are used to store, like, all of the

2    products that are on Amazon.  All those are stored in a

3    database, so they're pretty frequent.

4    Q.  Did you work on any investigations involving analysis of

5    classified networks?

6    A.  Yes.

7    Q.  What is a classified network?

8    A.  So, a classified network a is government network that is

9    accredited a certain classification level, be it secret or top

10   secret.

11   Q.  And are there particular things you have to do that are

12   unique to investigations of classified networks?

13   A.  Yes, absolutely.

14   Q.  Like what?

15   A.  So, obviously, the location where the network is stored is

16   going to present some issues.  These networks are also not

17   connected to the internet.  So certain tools or things you

18   might use are going to be a little bit different.

19       The types of data that are stored on the network have to be

20   handled a very special way.  So you couldn't just, you know --

21   like we would deploy with laptops.  So we wouldn't even be able

22   to bring those in to -- to those types of sites, usually.

23   Q.  And you referred to insider threat investigations earlier.

24   Do you remember that?

25   A.  Yes.

1    Q.  What's an insider threat investigation?

2    A.  So, an insider is kind of defined as, like, someone that's

3    working against the company or government entity, usually an

4    employee or a contractor.  So an insider threat investigation

5    would be trying to determine, like, what an individual person

6    did or if an individual person in that company was responsible

7    for a certain act.  Usually it's when, like, intellectual

8    property is stolen or there's some kind of sabotage, or

9    something like that.

10   Q.  And did you work on investigations involving insider

11   threats?

12   A.  Yes.

13   Q.  Have you received any training in computer forensics?

14   A.  Yes, I have.

15   Q.  What kind of training?

16   A.  I have a certification, the GCFE.

17   Q.  What does that stand for?

18   A.  It stands for GIAC certified forensic examiner.

19   Q.  And what is involved in getting that certification?

20   A.  It covers basic -- you take a class.  I think it's about a

21   week long.  It covers basic Windows, forensic techniques,

22   techniques for acquiring digital forensic evidence in a

23   particular way.  It also covers, like, presentations and things

24   like that.  And then you take a test, and you have to score a

25   certain high score on a test to receive the certification.

1    Q.  In addition to that certification, have you received other

2    training in computer forensics?

3    A.  Yes.

4    Q.  Tell us what.

5    A.  I've taken many classes, everything from general

6    programming classes to cyber security courses; things like how

7    the internals of computers work; how to perform incident

8    response; specialized training on specific types of forensics,

9    like on MacOS or Mobile, things like that.

10   Q.  And what percentage of your work over the last ten years

11   has been computer forensics?

12   A.  It's a very high percentage.  At least, I'd say, over 80

13   percent.

14   Q.  Have you received any awards or recognition for your

15   forensic work?

16   A.  I have.

17   Q.  Tell us about some of that.

18   A.  Sure.  So, working at MITRE, we couldn't be officially

19   recognized by the bureau, just the way contracts work.  So I'd

20   receive several internal awards for different types of cases

21   that I've worked.  The most -- the most interesting, I received

22   the director's award from MITRE for work with that tool that I

23   described earlier that we built for the incident-response team,

24   because the incident-response team at the bureau actually

25   received the attorney general's award for that, and it was a

1   pretty prestigious award.

2   Q.  Have you received any awards from foreign entities for your

3   work?

4   A.  I have.

5   Q.  Like what?

6   A.  I received an award from the Polish military

7   counterintelligence service for incident-response deployment

8   that we had with them.

9   Q.  And when you say that we had, are you referring to the FBI?

10  A.  Yes.  Specifically the CAT team, the incident-response

11  team.

12          MR. DENTON:  Your Honor, the government offers

13  Mr. Leedom as an expert in digital forensics and computer

14  science.

15          THE COURT:  Any objection?

16          MR. SCHULTE:  No objection.

17          THE COURT:  All right.  He is accepted as such.

18          Ladies and gentlemen, let me just give you a brief

19  instruction.  I'll instruct you further on this at the

20  conclusion of the case, but for now, understand that an expert

21  witness is someone who, by education or experience, has

22  acquired learning or experience in a specialized area of

23  knowledge.  Such a witness is permitted to express his or her

24  opinions on matters about which he or she has specialized

25  knowledge and training, and a party is permitted to present

1    expert testimony to you on the theory that someone who is

2    experienced in the field can assist you in understanding

3    evidence or in reaching an independent decision on the facts.

4           I'll, again, give you more thorough instructions at

5    the close of the case about how to assess the credibility of

6    witnesses, and those instructions will apply to experts as well

7    as other witnesses.

8           In weighing an expert's opinion, including this

9    witness's opinions, you may consider the expert's

10   qualifications, education, and reasons for testifying as well

11   as all the other considerations that ordinarily apply,

12   including all of the other evidence in the case.  If you find

13   that the opinion of an expert is based on sufficient data,

14   education, and experience, and the other evidence does not give

15   you reason to doubt his or her conclusions, you would be

16   justified in placing reliance on his or her testimony.

17   However, you should not accept witness testimony simply because

18   the witness is accepted as an expert.  The determination of the

19   facts in this case rests solely with you.

20           With that, you may proceed.

21           MR. DENTON:  Thank you, your Honor.

22   Q.  Mr. Leedom, I'd like to direct your attention to 2017.  Did

23   there come a time in that year when you became involved in the

24   investigation of disclosures of classified information on the

25   website WikiLeaks?

Leedom - Direct

1   A.  Yes.

2   Q.  Were there particular disclosures that you were focused on?

3   A.  Yes.

4   Q.  What were they called?

5   A.  It was the Vault 7 and the Vault 8 releases.

6   Q.  When did you personally become involved in that

7   investigation?

8   A.  It was a few weeks after the initial release on WikiLeaks.

9   I believe it was, like, late March.  May have been early April.

10  Probably late March 2017.

11  Q.  And based on your participation in that investigation, did

12  you review forensic data related to those leaks?

13  A.  Yes, I did.

14  Q.  Did that involve the use of the techniques that you

15  described earlier?

16  A.  Yes.

17  Q.  So based on your review of that material, did you reach any

18  conclusions as to whether the information released in Vault 7

19  and Vault 8 came from any particular computer network?

20  A.  Yes, I did.

21  Q.  What conclusion did you reach?

22  A.  It came from the DevLAN network at the CIA.

23  Q.  Before these disclosures, did you have access to DevLAN?

24  A.  No.

25  Q.  Did you review forensic files and data from DevLAN?

M6hWsch6                          Leedom - Direct

1    A.  Before the disclosures?

2    Q.  After the disclosures.  Excuse me.

3    A.  Yes, after the disclosures.

4    Q.  As part of your investigation, did that include reviewing

5    servers connected to DevLAN?

6    A.  Yes, it did.

7    Q.  Did that include computers that the defendant used to

8    access DevLAN?

9    A.  Yes, it did.

10   Q.  Did you review computers that other people used to access

11   DevLAN?

12   A.  Yes.  Many.

13   Q.  Give us a sense of scale.  How did the material you

14   analyzed in this case compare with other cases that you've

15   participated in?

16   A.  It was certainly the largest that I've ever worked.  We had

17   many, many, many computers and servers.  It was essentially

18   like seizing an entire, like, small company.  It was a lot, a

19   lot of pieces.

20   Q.  And in terms of time, how much time have you spent working

21   on your forensic analysis in this case?

22   A.  Many hours.  It was most of my full-time work over the last

23   few years.

24   Q.  As part of your work in this investigation, have you

25   reviewed the actual Vault 7 and Vault 8 disclosures on

1    WikiLeaks?

2    A.  I have.

3    Q.  I want to focus on the initial disclosure on March 7, 2017.

4    As a result of your forensic analysis, were you able to

5    determine where on the DevLAN network that information came

6    from?

7    A.  Yes.

8    Q.  What conclusions did you reach about that?

9    A.  It came from the Confluence application on DevLAN.

10   Q.  And did it come from any particular place within the

11   Confluence application on DevLAN?

12   A.  It came from the -- there's a like a backup database, just

13   some backup files for it.

14   Q.  And did you reach any conclusions about any particular

15   backup file that it came from?

16   A.  Yes.

17   Q.  Which backup file was that?

18   A.  The March 3 backup.

19          MR. DENTON:  Ms. Cooper, if we could put up Government

20   Exhibit 1207-27, which is in evidence.  And if we could blow up

21   the lines next to the government exhibit sticker.

22   Q.  Mr. Leedom, based on your forensic analysis, have you

23   reached any conclusions as to some of the defendant's

24   activities on the DevLAN network?

25   A.  Yes, I have.  So, on April 20, 2016, the defendant accessed

M6hWsch6

the Confluence virtual machine that was running on the DevLAN

network.  It was running on a machine called the -- the OSB

server, the OSB ESXi server.  He then reverted that virtual

machine to a previous snapshot that was made on April 16,

before ISB changed all those administrator passwords.  And

essentially by reverting the machine to this earlier snapshot,

he was able to regain access to that machine again.

     It stayed reverted for a little over an hour, at which time

the defendant copied this highlighted database backup as well

as -- it has a pairing file that goes with it.  After that hour

had elapsed, he restored the virtual machine to the state that

it was in before he started and then deleted that backup, which

essentially erased, you know, all activity, from a log

perspective, of what happened over the last hour.  And in

addition to that, on the server that was running the Confluence

VM, he actually deleted a bunch of log files for that server

specifically for the time period of about an hour.

          THE COURT:  All right.  And that brings us to 2:46.

So with my thanks to the jury for giving me an extra minute of

your day, we'll stop there for the week.

          Ladies and gentlemen, let me give you my standard

instructions and then remind you of a couple things about the

schedule next week.

          First of all, you're going into a weekend, which

means, I hope, that you'll be seeing more people than, perhaps,

M6hWsch6

1    you've seen over the last few days, including family, friends,

2    etc.  I just want to remind you and underscore that you cannot

3    discuss this case with anyone.  All right?  You can tell them

4    that you are on a criminal jury that's expected to last another

5    few weeks, but don't tell them what the case is about, the name

6    of the case or anything about it, to ensure that you're not

7    exposed to any information about the case.

8            On that score, just a reminder you shouldn't discuss

9    the case with each other or with anyone else for that matter.

10   You shouldn't do any research about the case.  You should

11   ensure that you do everything humanly possible to ensure that

12   you don't read anything about the case, in the news or

13   otherwise.  And you should continue to keep an open mind.

14           We've now completed week 1 of trial, but there's still

15   plenty to go, and as I've said and will say many more times,

16   it's important that you keep an open mind until deliberations

17   begin.

18           Monday is a federal holiday.  It's Juneteenth.  I

19   think National Independence Day is the formal name, but it's

20   Juneteenth.  So, first of all, anyone celebrating Juneteenth,

21   and all of us should celebrate it, happy Juneteenth.  We will

22   not be sitting on Monday as a result of that.  The courthouse

23   will be closed.

24           I also just want to remind you that next week we're

25   not going to be sitting on Wednesday and Thursday.  So next

M6hWsch6

1    week will be a slightly short, slightly odd week.  We're only

2    going to sit on Tuesday and then again on Friday.  In other

3    words, don't come here on Monday, but do come here on Tuesday,

4    and please be here at the same time, no later than 8:45, so

5    that we can get off to a prompt start and make the most of that

6    day before we have to take another break.

7            With all those instructions and reminders, I wish you

8    a wonderful weekend and holiday, and we will see you on Tuesday

9    morning.

10            Thank you very much.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6hWsch6

1              (Jury not present)

2              THE COURT:  You may be seated.

3              Mr. Leedom, if you wait a minute until the jury

4    clears, you may step down, and you're excused for the weekend

5    as well.  We'll see you on Tuesday morning.  Please be here no

6    later than 8:45 yourself so that we're ready to go as soon as

7    we've got the jury.

8              Have a pleasant weekend.

9              (Witness not present)

10             THE COURT:  All right.  Mr. Denton, anything from the

11   government?

12             MR. LOCKARD:  Your Honor, I think, as we discussed

13   before, we think it would be appropriate to just again confirm

14   on the record that the defendant has solicited the assistance

15   of standby counsel; that it has been provided in the presence

16   of the jury throughout the course of the week and over the

17   course of the last couple days since he was last allocuted on

18   that issue.

19             Then in addition to that, in the spirit of not letting

20   people fully enjoy their weekend, the issues that we think will

21   need to be addressed next week, there are two additional points

22   that we just wanted to, like I said, flag.

23             One of those is the 26.2 issue, which we had discussed

24   prior to the start of trial.  We raise it now for a couple

25   reasons.  One, before trial, the Court admonished the defendant

M6hWsch6

1    that his deadline had passed and that he should produce any

2    26.2 material promptly to mitigate any risks associated with

3    that.  We have received none.

4            We also raise it because, No. 1, there have been

5    references on the record to phone calls with prospective

6    witnesses; and No. 2, we have received none of the previously

7    filed *ex parte* affidavits of Dr. Bellovin, and Dr. Bellovin

8    visited the CIA facilities the week before trial, took notes,

9    which were couriered back to the courthouse SCIF, and delivered

10   to Mr. Schulte.  And we've received no 26.2 material for

11   Dr. Bellovin.

12           THE COURT:  OK.  Was there a second issue?

13           MR. LOCKARD:  The second issue is just, again, to flag

14   the issue with the defendant's list of subpoenaed witnesses.

15   That has now been pared down, I think, as we discussed earlier,

16   to about 18.  There are a couple of discrete issues with some

17   of those witnesses and then also an issue that we'll discuss

18   with Mr. Schulte and standby counsel about scheduling.

19           With respect to discrete witness, there are two on the

20   list for which it appears no subpoenas were ever issued to the

21   CIA wall team.  And there's one of those for whom there's no

22   proffer in the defendant's letter describing the subject matter

23   of their testimony.

24           In addition to that, there's one additional witness,

25   who it appears is going to raise some CIPA issues for which we

M6hWsch6

1    don't believe any Section 5 notice has been given.

2              THE COURT:  OK.  Well, if there are witnesses who

3    haven't received subpoenas, they're not subject to subpoena.  I

4    suppose they could appear voluntarily, but, all right.

5              MR. LOCKARD:  We wanted to note the issue, your Honor.

6    And that's it.

7              THE COURT:  OK.  And have you identified these

8    witnesses to Mr. Schulte so that he knows what these issues

9    are?

10             MR. LOCKARD:  We're going to address this with him.

11   It's something that we've sort of worked out over the last day

12   or so.

13             THE COURT:  All right.  Let me take those in order.

14             First, Mr. Schulte, just to confirm, again, it

15   continues to be pretty clear to me that you're consulting

16   standby counsel for advice but that you are thoroughly in

17   control of your own defense.  I want to make sure that that is

18   correct and the advice you're getting from them is solicited or

19   not unsolicited, or at least you were consenting to it and

20   happy to continue getting what you're getting.

21             MR. SCHULTE:  That's correct.

22             THE COURT:  OK.

23             Second -- let me take it out of order.  I think on the

24   witness issues, I would just ask the government to identify the

25   witnesses that they're discussing on that score and try to

M6hWsch6

1  raise these things with Mr. Schulte in the first instance, and

2  then we can take it up next week.  If we need to have a

3  classified hearing, then we'll have a classified hearing.  But

4  I think the first step should be you guys discussing it and

5  seeing if you can sort it out and seeing if Mr. Schulte is, in

6  fact, intending to call these witnesses, the ones that are not

7  subject to subpoena, if he has any reason to believe that they

8  will be showing up of their own volition, so on and so forth.

9  So talk to one another about it, and let's revisit it on

10  Tuesday so that we can discuss whether and how we should

11  address it.

12       On the 26.2 statements, I don't know if anything needs

13  to be said.  There was a deadline.  I did give Mr. Schulte a

14  stern admonition about the deadline and urged him to comply

15  with it.  I think I actually extended it and gave him a second

16  opportunity to comply with it and said that if he wanted to

17  avoid any consequences of not complying with it, then he should

18  comply with it.

19       That's sort of the state of play.  I don't know if

20  there's an application, or what, but until he calls somebody or

21  states an intention to call somebody, I'm not sure what there

22  is to do.

23       Mr. Lockard.

24       MR. LOCKARD:  I think that's right, your Honor.  We

25  thought it would be helpful to raise the issue with the Court

M6hWsch6

1    and with Mr. Schulte, and we'll take it from there.

2              THE COURT:  All right.

3              Mr. Schulte, you've heard the issue.  Again, not one,

4    but two deadlines have passed.  So it is what it is, but it is

5    a continuing obligation.  So to the extent that you or standby

6    counsel are conducting interviews and there are any notes of

7    those interviews and you intend to call those witnesses, you

8    should certainly produce things promptly upon their creation.

9    To the extent that things existed prior to those deadlines, you

10   know, you should do what you want to do, but certainly if you

11   don't turn it over and turn it over with enough time for the

12   government to prepare, if the government is prejudiced by it,

13   then there may well be consequences up to and including

14   precluding you from calling a witness.  So just be mindful of

15   that, and we'll proceed accordingly.

16             Anything questions?  Had anything you want to raise,

17   Mr. Schulte?

18             MR. SCHULTE:  Not with respect to this.

19             THE COURT:  OK.  Anything else?

20             MR. SCHULTE:  Yeah, just one minor thing.

21             I asked the Court if you can reach out to MDC to

22   ensure that, especially over the weekend, I'm able to go to the

23   law library and access the laptop.  The last several days I

24   haven't been able to have that access.

25             THE COURT:  You haven't had access in the evening?

M6hWsch6

1          MR. SCHULTE:  No, I have not.

2          THE COURT:  And why is that?  Did you request to use

3     it?

4          MR. SCHULTE:  My understanding is that the lieutenants

5     were not aware that that was authorized.

6          THE COURT:  OK.  That surprises me, and I will

7     certainly contact the MDC, No. 1, to make sure that you're

8     provided reasonable access over the weekend and, No. 2, that

9     they provided assurances to me already that you would be given

10    access in the evenings.  So I'm not happy to hear that if

11    that's, in fact, what happened.

12          I do urge you to take advantage of the time, as I said

13    at sidebar, to pare down or review your cross-examinations of

14    witnesses going forward.  Again, I think that the examination

15    of Mr. Leonis was not the most efficient cross-examination I

16    have seen, and you went over many things many times and I think

17    it can be done -- you know, sometimes less is more, for one

18    thing.  But in addition, it certainly can be done more

19    efficiently than you did it.  So if you don't want to be at

20    risk of being cut off or me telling you to sit down, then I

21    would urge you to just pare it down prophylactically and be

22    prepared to also limit your questions to what you should be

23    asking.

24          All right.  I will see you on Tuesday morning, same

25    time, same place.  I wish you all a pleasant weekend, and I

M6hWsch6

1    will see you then.

2              Thank you.

3              MR. DENTON:  Thank you, your Honor.

4              (Adjourned to June 21, 2022, at 9:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION
 2    Examination of:                         Page
 3    ANTHONY LEONIS
 4    Direct By Mr. Denton . . . . . . . . . . . . 547
 5    Cross By Mr. Schulte . . . . . . . . . . . . 575
 6     PATRICK THOMAS LEEDOM
 7    Direct By Mr. Denton . . . . . . . . . . . . 697
 8                    GOVERNMENT EXHIBITS
 9    Exhibit No.                           Received
10     1138    . . . . . . . . . . . . . . . . . 551
11     3008    . . . . . . . . . . . . . . . . . 665
12                    DEFENDANT EXHIBITS
13    Exhibit No.                           Received
14     1002    . . . . . . . . . . . . . . . . . 603
15     1005-11 . . . . . . . . . . . . . . . . . 614
16     1006    . . . . . . . . . . . . . . . . . 636
17     1007    . . . . . . . . . . . . . . . . . 666
18     1009    . . . . . . . . . . . . . . . . . 681
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.•
(212) 805-0300