M6T5sch1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        17 Cr. 548 (JMF)

5    JOSHUA ADAM SCHULTE,

6              Defendant.
                                         Trial
7    ------------------------------x

8                                        New York, N.Y.
                                         June 29, 2022
9                                        9:00 a.m.

10   Before:

11
                     HON. JESSE M. FURMAN,
12
                                         District Judge
13                                       –and a Jury–

14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  DAVID W. DENTON JR.
17        MICHAEL D. LOCKARD
          Assistant United States Attorneys
18
     JOSHUA A. SCHULTE, Defendant Pro Se
19
     SABRINA P. SHROFF
20   DEBORAH A. COLSON
          Standby Attorneys for Defendant
21
     Also Present:  Charlotte Cooper, Paralegal Specialist
22                  MERCEDES AVALOS, Spanish Interpreter
                    VIVIAN GOA, Spanish Interpreter
23

24

25
```

M6T5sch1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          I take it everybody has heard our unfortunate news.  I

4  conveyed by e-mail to counsel and to standby counsel last night

5  that juror no. 15 has now reported that he tested positive for

6  COVID last night so we need to discuss how to handle this.  I

7  think -- obviously I have been thinking quite a bit about it --

8  it seems to me there are three options.  One is to plow ahead,

9  probably with a pretty stern warning to the jury that if anyone

10  else tests positive that we may hit pause and resume after five

11  or 10 days, depending on testing, etc., in part to ensure that

12  they don't think that they get a get-out-of-court-free card by

13  simply telling me that they've tested positive.  Second is to

14  hit pause and see if juror no. 15 tests out on day 6, which I

15  think would be Tuesday and can resume on Wednesday, and if he

16  does then we resume then with the full complement of 15 that we

17  have.  Third is I guess a variation on that, hit pause until he

18  can come back.  My concern with the latter two approaches is

19  there are no guarantees that we don't lose other jurors from

20  COVID or otherwise.  We have one juror that we know has travel

21  on July 28th.  I told all the jury that this trial would be

22  five or six weeks so the more days we take off the more risk we

23  have of problems on the back end.  On top of that, this is not

24  the ordinary case, as you guys know, and I am guessing that I

25  will hear from the government that the challenges of arranging

for the two witnesses who are here today and any other

witnesses with special needs are significant and, for that

reason, hitting pause is fairly costly.

So I guess that's a long way of saying that my

inclination would be to plow ahead and take it as it comes and

if we lose another juror, certainly if we lose two more jurors,

to at that point pause when we absolutely need to but until we

absolutely need to, to try to make as much progress as we can.

But I don't know if there is a right answer here.  It is a

choice between bad options.

I would add to that we have the issue of juror no. 13

that I averred to yesterday, I don't know if you have any

thoughts on that front.  I proposed to my deputy that I simply

ignore it and see if he continues to make noise but she assures

me that he will continue to make noise which means that that

may not be an option.

So, thoughts?  First from the government.

MR. DENTON:  Your Honor, I think we share the sense

that there are no good options here but we do feel strongly

that plowing ahead is the right course here.  We do support the

idea of giving the jury some admonition of how things might be

handled down the road.  The Court is correct that the witness

who is on the stand and the two that follow pose some

logistical challenges.  The advantage, I suppose I would say,

of plowing ahead with them is if we are able to get through

M6T5sch1

1    those two witnesses, the two that remain Carlos Betances and

2    Special Agent Schlessinger, we have a lot more flexibility with

3    so if we do, in the unfortunate event, get to a place where we

4    have to hit pause down the road, that will pose a lot less

5    complications than it would doing that right now.

6            THE COURT:  Mr. Schulte, your thoughts?  And let me

7    also ask you, because I think it has some bearing on the proper

8    course here, obviously I won't hold you to it but can you give

9    me a reality-based sense of where defense case stands at this

10   point?  That is to say, there is one scenario in which the

11   government rests next week and if there is no defense case the

12   case goes to the jury next week, in which case I think plowing

13   ahead with only one or two alternates is less risky but if you

14   anticipate a lengthy defense case then, obviously, that risk is

15   a little bit higher.  I don't know how many witnesses we are

16   now down to after my rulings and your decision to pare it, but

17   it would be helpful to have a more reality-based sense of it.

18   You have elicited a bunch of testimony already about the

19   vulnerabilities of the DevLAN system so I think it is fair to

20   say that you may not need to call any witnesses to establish

21   that point and certainly you are not going to call the number

22   that you had proposed to call in your proffer, but where do you

23   stand on that front at the moment?

24           MR. SCHULTE:  Do you want me to start with that or

25   the --

 1              THE COURT:  Sure.  Start with that.

 2              MR. SCHULTE:  So the defense case, each day of trial

 3      we are re-evaluating who we think are -- prioritizing who we

 4      think is most important and, like you said, one of the reasons

 5      that I notified the Court of my intention to go beyond the

 6      scope for some of these witnesses was to get that information

 7      in.  So like you said, I have already gotten in a lot of

 8      information, I think we are down to about 10 witnesses so far,

 9      and the majority of those witnesses are going to be relatively

10      short.  As to how many we would actually call, it is a little

11      early to call -- it is a little bit early to say for sure but I

12      don't expect to have a lengthy defense case.  I would say two

13      to three days at the most and that's being very -- it is not --

14      more likely two days, maybe less.

15              THE COURT:  And your thoughts on how to proceed?

16              MR. SCHULTE:  You know, I previously wrote the Court

17      that I wanted to plow ahead with trial regardless of COVID-19,

18      but after reading your e-mail I think the most prudent course

19      of action maybe would be to prioritize the health of the jurors

20      who have already tested positive.  It may not be fair to them.

21      And I think the most important thing we have for us right now,

22      we already have a long, five-day break, so I think because of

23      that we might as well take advantage of that in case, you know,

24      they all start -- keep coming back here and getting infected

25      and then we have to wait even longer.  So the five-day period

M6T5sch1

1    is, I think, is the COVID period to you know, if someone is

2    quarantined.  So just because of that break I think it may be

3    more prudent just to wait.

4              THE COURT:  That's where I was last night but after

5    thinking about it more, I think I have come around to the view

6    that I articulated that plowing ahead is probably the least

7    worst option, in part because of what Mr. Denton mentioned,

8    that the complexities and logistics of the next few witnesses

9    are significant but in part there is no guarantee that come

10   next Wednesday that we don't have additional jurors testing

11   positive.  Quite frankly, I'm more confident that they're not

12   getting COVID in the courtroom than I am that they're not

13   getting code of outside the court house.  People are wearing

14   masks in the court house because they have to.  I recognize you

15   are not out in the world, Mr. Schulte, but mask compliance on

16   the subway where it is allegedly mandated is pretty low these

17   days.  So the point is, I don't know if there was spread within

18   the jury.  Based on conversations with juror No. 14 it doesn't

19   sound like that's likely, that has certainly not been our

20   experience with jury trials through various surges over the

21   last 20 months so I don't know.

22             I think we will stay the course, plow ahead, try to

23   get done what we need to get done, pray, and I will certainly

24   admonish the jury that if there are any additional positive

25   tests obviously they should let us know, but they should be

M6T5sch1

1    forewarned that we may have to take a break rather than

2    excusing any further jurors, just so that they understand

3    both -- well, any number of things.  I will leave that there.

4            Anything else that we need to discuss before we

5    proceed?  Oh, juror no. 13.

6            MR. DENTON:  Yes, your Honor.

7            I think just related to all of that, we wanted to

8    express our view that the defendant has invoked, over the last

9    few trial days, a number of times the idea that he has asked to

10   go beyond the scope with some of these witnesses.  We have not

11   raised objections based on the cross exceeding the scope of the

12   direct examination as a matter of subject.  However, the

13   defendant does not have license under Rule 403 to waste

14   everybody's time, particularly the jury's, and the Court has

15   ample authority under 611 explicitly to prevent the wasting of

16   time during trials.  The continued wasting of time by the

17   defendant on cross-examination is only going to exacerbate this

18   problem.  The Court has given him ample leeway and certainly

19   extensive admonitions to stop doing that.  That doesn't really

20   appear to have gotten us very far so as this problem comes more

21   and more to a head, we think that it is appropriate for the

22   Court to exercise a little more control over the presentation

23   of evidence in this case to avoid these becoming, for lack of a

24   better term, terminal problems.

25           THE COURT:  Duly noted.  I think he has occasionally

pushed the envelope and I have, I think, several times called

side bars to caution him, but I'm not sure that we are -- I

think the concern may be a lit bit overblown.  But, in any

event, I have already, I think, addressed the issue and we will

certainly police it going forward.

I mentioned yesterday that I wouldn't permit

Mr. Schulte to use this witness as an expert witness and I

expect in light of that and his promise last night or yesterday

to review the remainder of his questions, that we don't see

much of that going forward.  And it sounded, from Mr. Schulte

the other day, that his cross-examination of the coming

witnesses would not be quite as extensive in any event.  So I

appreciate the alert, but I will take it as it comes.

Anything on juror no. 13?

MR. DENTON:  I think, your Honor, we are fine with the

Court's approach of seeing what happens.  I think some more

information about the nature of his complaint and in particular

to what extent, if at all, it is affecting his ability to pay

attention to the evidence and ultimately to meaningfully

deliberate as opposed to just some discomfort from sitting in

the chair all day, which is certainly understandable.  So I

think our view would be let's table it for now and if he raises

it again, as we all expect he may, it may be appropriate for

the Court or Ms. Smallman to get some more information from him

that will let us make an informed decision at that time.

M6T5sch1

1      THE COURT:  Mr. Schulte?

2      MR. SCHULTE:  I don't think somebody's pain should be

3  ignored, especially if it is preventing him from properly

4  paying attention to the testimony so I'm not really sure.  I

5  think the juror wanted to speak with the Court or at least try

6  and discuss his concern so maybe first getting from him what

7  this level of pain is, if it is consistent, if it was just a

8  one-day thing, how he is feeling today and kind of go from

9  there.  That might be the best course.

10      THE COURT:  Let me briefly confer with Ms. Smallman.

11  I think maybe it might be better to give him some due process

12  and let him be heard, in which case my inclination would be to

13  bring him in, maybe put the rest of the jury briefly in the

14  jury room here while we talk to him and then we can take it

15  from there.

16      So let me talk to Ms. Smallman.

17      (Discussion off record)

18      THE COURT:  So, bottom line is we are going to play it

19  a little bit by ear which is to say that my plan is to have

20  Ms. Smallman ask him, tell him if he wants to discuss it that

21  we are prepared to hear from him, in which case we would do

22  what I propose, namely bring him in and put the rest of the

23  jury in the room here before proceeding and if he is content to

24  plow ahead, I think that is a fair way to infer from that that

25  it is not interfering with his ability to serve as a juror and

1    we should plow ahead.  So we will see what he has to say on

2    that score.

3            Anything else that we need to discuss before get what

4    remains of our jury?

5            MR. DENTON:  No, your Honor.

6            THE COURT:  Mr. Schulte?

7            MR. SCHULTE:  No.

8            THE COURT:  So we will go get the jury and see what

9    happens with juror no. 13.  I assume that the witness is in the

10   witness room; is that correct?  Yes.  So I think we should

11   leave him there and see what happens with juror 13 and bring

12   him in if we are going to proceed or when we are ready to

13   proceed.

14           (pause)

15           THE COURT:  So Ms. Smallman says that juror no. 13

16   doesn't want to talk.  She says she'll explain later, but in

17   light of that I think we can proceed.  The jury is headed up.

18   I don't know if we can get the witness on the stand very

19   quickly.  In which case, let's do that.

20           MR. LOCKARD:  It looks like we will have to wait to

21   bring the witness in.

22           THE COURT:  I think he is here so let's bring him in.

23   Get him on the stand please.

24           (Witness resumes the stand)

25           THE COURT:  Good morning.

M6T5sch1

1              THE WITNESS:  Good morning, your Honor.

2              THE DEPUTY CLERK:  Jury entering.

3              (Continued on next page)

1        (Jury present)

2        THE COURT:  You may be seated.  Good morning, ladies

3  and gentlemen.  Welcome back.  Thank you for being here on

4  time.

5        You may notice that there is another juror missing.  I

6  don't know if Ms. Smallman had mentioned something or not -- I

7  think I told her to wait and let me break the news -- but he

8  emailed last night to say that he also has tested positive for

9  COVID.  Obviously it raises the possibility that it is

10 spreading or it spread here but I will say that, number one, in

11 well over a hundred trials we have not seen that happen; and

12 number two, if you are complying with our safety protocols in

13 the jury room -- you are obviously doing that here -- then that

14 shouldn't happen.  But only you know whether you are doing that

15 and we would certainly urge you, going forward, to make sure

16 you do, which is to say stay masked unless you are eating or

17 drinking, and when you are eating and drinking unmasked, make

18 sure you are distanced from each other as the jury room would

19 enable you to be.  it is obviously not welcome news for any

20 number of reasons, thankfully is he OK; also fully vaccinated.

21       So the choice is between plowing ahead and proceeding

22 and making most of your time, or hitting pause and waiting

23 until he could return, which under our current protocols could

24 be as early as the middle of next week if he were to test

25 negative or, if he doesn't, then the week after.  I have made

M6T5sch1

1    the decision to plow ahead to make the most of your time and to

2    pray that we won't see any more of this.  I will say that if we

3    do, we are rapidly reaching the point, we may already be at the

4    point where I just can't excuse any more jurors without running

5    a significant risk of declaring a mistrial and having to do

6    this all over again which, I can assure you, no one here wants

7    to do.

8          So the bottom line is, we are going to plow ahead.  We

9    will sit today and tomorrow as we were planning to do.  I will

10   pray that no one else tests positive and everyone remains

11   healthy.  And if that doesn't end up being the case, we may

12   have to hit pause and obviously that might extend the trial

13   beyond the estimate that I gave you.

14         So there are no good choices here and a lot of

15   difficult choices.  That's the choice I have made for the

16   moment but in the spirit of being transparent with you I have

17   tried to tell you where we are and what I expect.  I just want

18   you to know that if we have any further problems, I may have to

19   act differently and just wait until we can proceed with the

20   number of jurors that we have remaining.  For now we are OK but

21   I don't know how long that we will be able to keep that up.

22         So let me return to the first point I made which is

23   obviously in the courtroom you have all been masked.  I don't

24   know what you are doing in the jury room but would just ask you

25   to be careful and to adhere to our protocols; keep your mask on

1    if you are not eating and drinking, and when you are unmasked

2    keep your distance from each other.  We are still in a

3    pandemic.  I think case numbers were going down.  I gather in

4    Europe they're going back up.  Our expert suggests that that

5    may start to be the case here he too.  Bottom line is I want to

6    keep you all healthy and get the trial done so just be as

7    careful as you can.

8           With that, we will proceed with resuming the

9    cross-examination of Mr. Weber.

10          Mr. Weber, you may remove your mask at this time and I

11   remind you that you remain under oath.

12          Mr. Schulte, you may proceed.

13   JEREMY WEBER, resumed.

14   CROSS-EXAMINATION

15   BY MR. SCHULTE:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  You testified on direct about allegations I made against

19   Amol, correct?

20   A.  That is correct.

21   Q.  Particularly in the spring of 2016, correct?

22   A.  I believe so.  That is correct.

23   Q.  It is fair to say that by the time these allegations were

24   discussed with you, you had long since stopped liking me;

25   correct?

1    A.  I wouldn't say it was long since but I was getting tired of

2    the drama.

3    Q.  At some point you stopped speaking to me completely,

4    correct?

5    A.  After the allegations.

6    Q.  And you took Amol's side, correct?

7    A.  I -- I took the side of the, what I saw was the correct

8    statements.

9    Q.  And that was Amol's side, right?

10   A.  It was Amol's side of the story, correct.

11   Q.  And you were talking to Amol, right?

12   A.  Immediately after I don't know if I did.  I think Amol went

13   on vacation, if I recall correctly.

14   Q.  At some point you went to court to support Amol, correct?

15   A.  That is correct.

16   Q.  And, in fact, the day security spoke to Amol you went out

17   with him for a beer to discuss it, right?

18   A.  I don't recall.

19   Q.  I am going to show just the witness and the parties what is

20   being marked as 3507-510, to refer you to page 6.  If you could

21   just read this to yourself and look up when you are finished?

22   A.  OK.

23   Q.  Does that refresh your recollection?

24   A.  I have a vague recollection of it.

25   Q.  So you went --

1           THE COURT:  Just to be clear, what you are talking

2      about, it being going out for a beer with Amol?

3           THE WITNESS:  That, and it also talked about the day

4      of.

5           THE COURT:  We are not -- don't testify about what the

6      document may or may not say.  Just sitting here today, what do

7      you remember that you didn't remember a moment ago?

8           THE WITNESS:  I believe I remember the statement about

9      Amol saying he couldn't believe he had let Schulte bring him

10     down to his level so I believe that was over a beer.

11     BY MR. SCHULTE:

12     Q.  And you testified that you believed my allegations to be

13     false, correct?

14     A.  That is correct.

15     Q.  You are aware that Amol initially denied the allegations

16     and then admitted to it, correct?

17     A.  I am not aware of that.

18     Q.  I will bring up what is in evidence Government Exhibit

19     1033.  Second to last paragraph here, if you can just start

20     with where it says:  Amol was asked?  If you can read that,

21     please?

22     A.  OK.

23          Amol was asked if he had made statements as listed in the

24     note from Mr. Schulte below.  After momentarily denying he had

25     done so, he admitted he had, indeed, made those comments.  He

1    stressed those comments were taken out of context but I told

2    Amol that such threats are taken seriously, that we were

3    required to request TMU intervention.  Amol added that he felt

4    harassed in the current work environment and blamed

5    Mr. Schulte.

6    Q.  Then later at some point Amol recanted, correct?

7    A.  I am not aware of that.

8    Q.  You are not aware of Amol denying the allegations?

9    A.  I was aware that -- actually, I don't know if I ever talked

10   to Amol if he denied them originally or what.  I don't know if

11   we ever actually talked about it but definitely not aware that

12   there is a scenario where he denied and then admitted and then

13   denied again.

14   Q.  So just to be clear, your testimony is just that you don't

15   recall?

16   A.  I don't recall if I ever talked to him about if he denied

17   the allegations originally.

18   Q.  OK.

19   A.  But I definitely don't recall a scenario where I heard

20   about him flipping around on them.

21   Q.  But you also testified that it was out of character for

22   Amol to physically threaten someone, correct?

23   A.  I believe that is correct.

24   Q.  But, of course, security urges you to specifically report

25   out of character abnormalities, correct?

M6T5sch1                          Weber - Cross

1    A.  I believe so.  I'm not sure, so.

2    Q.  As well as physical threats, right?

3    A.  If I had seen what I had saw as a physical threat I would

4    have reported that.

5    Q.  At this time you know that Amol was struggling with

6    multiple other personal issues, correct?

7              MR. LOCKARD:  Objection.

8              THE COURT:  Sustained.

9    Q.  And around this time there had recently been a mass

10   shooting event at a Navy base, correct?

11   A.  I don't recall.

12   Q.  Regardless, you were not present to witness the

13   allegations, correct?

14   A.  That is correct.

15   Q.  So sitting here today you have no idea what actually

16   happened, right?

17   A.  That is correct.

18   Q.  Moving on to the OSB Libraries.  You removed my

19   administrative privileges to the OSB Libraries on April 4th,

20   correct?

21   A.  I'm not sure of the exact date.

22   Q.  Government Exhibit 1703 on page 55.  Do you recognize the

23   log events that are displayed there?

24   A.  I have never seen it in this format before, but it looks

25   similar to other formats I have seen.

M6T5sch1                         Weber - Cross

1   Q.  But you wrote the program that generated these logs, right?

2   A.  I don't believe so.

3   Q.  But at some point you wrote some script that scraped the

4   privilege changes from Atlassian products, right?

5   A.  I don't believe so.

6   Q.  OK.

7   A.  I -- when I saw permission changes it was through the

8   Atlassian interface.

9   Q.  OK, but at some point Anthony Leonis asked you to write a

10  script to report permission changes through him, right?

11  A.  From what I remember, Anthony asked me to generate a report

12  about who had access to what projects, not permission changes,

13  to my memory.

14  Q.  But you recognize -- or you can recognize what these events

15  display, right?

16  A.  It is similar to another format I have seen; slightly

17  different, but.

18  Q.  Does this refresh your recollection that you removed the

19  privileges on April 4th?

20  A.  I am looking for a date right now.  I apologize, I don't

21  see a date on this.

22          THE COURT:  The question isn't what you see on here,

23  it is just having looked at this, does it refresh your memory

24  that you changed the access permissions on April 4th?  If the

25  answer is no, the answer is no.

M6T5sch1                          Weber - Cross

1          THE WITNESS:  No.

2     Q.  OK, I will pull up what is in evidence as Government

3     Exhibit 1202-1.  This is the type of permissions you were

4     talking about earlier that you would see in Stash, right?

5     A.  That's correct.  That's what I remember seeing.

6     Q.  By the way, this is showing Brutal Kangaroo project, not

7     OSB Libraries; right?

8     A.  That is correct.

9     Q.  But it shows permission change on April 4th, right?

10    A.  Yes, it does.

11    Q.  Do you recall this is the same date that you moved other

12    permissions as well?

13    A.  I don't remember the dates of when I did permission

14    changes.

15    Q.  Do you remember changing the permissions to OSB Libraries

16    the same day you changed it for Brutal Kangaroo?

17    A.  I don't know if that's accurate.

18    Q.  But when you removed my accesses to OSB Libraries you made

19    no effort to inform me that you had removed them, right?

20    A.  Not that I recall.

21    Q.  You didn't send me an e-mail, correct?

22    A.  I believe that to be correct.

23    Q.  And at that time the standard operating procedure had been

24    to send an e-mail, right?

25         MR. LOCKARD:  Objection.

M6T5sch1                         Weber - Cross

1    A.  I don't believe that to be accurate.

2    Q.  I am going to show what is admitted as Government Exhibit

3    1011.  Do you see the date on this e-mail?

4    A.  Yes, I do.

5    Q.  It is 2015, right?

6    A.  That's correct.

7    Q.  Permissions to a project had been changed, right?

8    A.  That's correct.

9    Q.  An e-mail had been sent, correct?

10   A.  That is correct.

11   Q.  To the person whose permissions had been changed, right?

12   A.  To the person who the permission has been added to, yes.

13   Q.  And to his manager, right?

14   A.  That's correct.

15   Q.  But you did not send me an e-mail when you changed my

16   permissions, correct?

17   A.  That is correct.

18   Q.  And you did not send an e-mail to my manager, right?

19   A.  That I believe to be correct.

20   Q.  And you also didn't tell me face to face either, right?

21   A.  That is correct.

22   Q.  And in fact, as an Atlassian administrator I could have

23   simply removed my own permissions, right?

24   A.  That is correct.

25   Q.  But because no one notified me, there would be no way for

M6T5sch1                        Weber - Cross

1   me to find that out, right?

2                MR. LOCKARD:  Objection.

3                THE COURT:  Sustained.

4   Q.  If someone is not notified their permissions have changed

5   they wouldn't know until they tried to use those permissions,

6   right?

7                MR. LOCKARD:  Objection.

8                THE COURT:  Sustained.

9   Q.  The only way I learned I lost my permissions was by logging

10  in, correct?

11               MR. LOCKARD:  Objection.

12               THE COURT:  Sustained.

13  Q.  How would I know that I lost my permissions?

14  A.  The best way, I would assume, is by not being able to

15  access something you had accessed before.

16  Q.  And at this time you were not my supervisor, correct?

17  A.  That is correct.

18  Q.  You and I were both developers, correct?

19  A.  That is correct.

20  Q.  And the real reason that you removed my privileges is

21  because I wasn't following your instructions on committing code

22  to the libraries, correct?

23  A.  That is not correct.

24  Q.  You were not displeased with the way I was committing code

25  to the libraries?

1  A.  I was displeased with the way you were committing code to

2  the libraries.

3  Q.  Well, you did all of this behind my back, correct?

4  A.  It wasn't something that I was trying to hide.

5  Q.  OK.

6     Well, you did hide it because you gave me no notice, right?

7  A.  It was not my intention to hide it.

8  Q.  How was I supposed to know?

9  A.  It wasn't something I had considered.

10  Q.  OK.

11     But you were the one who -- let me rephrase.

12     Sean did not request that you remove me from the libraries,

13  correct?

14  A.  I don't know if that's an accurate statement.  I don't

15  believe -- I don't believe that's true.  Sean and I discussed

16  what projects would and wouldn't remain yours.

17  Q.  So why was that discussion that you and Sean had and not

18  me?

19  A.  It was, as I mentioned on my testimony, it was a branch

20  discussion, from my memory.

21  Q.  But Sean would not -- Sean did not take the position that

22  the library should be removed, it was something you advocated,

23  right?

24  A.  I don't recall.

25  Q.  But, in fact, during this time we were actually in the

M6T5sch1                    Weber - Cross

1   process of soliciting stakeholders from other branches in AED

2   to join the libraries, correct?

3   A.  I believe that's correct.

4   Q.  We were having a tough time specifically with RDB, correct?

5   A.  I don't recall.

6   Q.  As someone who previously managed the libraries I would

7   have been a great representative stakeholder, correct?

8              MR. LOCKARD:  Objection.

9              THE COURT:  Sustained.

10  Q.  So on April 4, 2016, did you remove me from administering

11  other projects as well?

12  A.  I don't recall the dates or what projects I changed your

13  permissions on.

14  Q.  But we at least saw Brutal Kangaroo occurred on that day,

15  correct?

16  A.  That is correct.

17  Q.  And you removed me from the entire Brutal Kangaroo

18  repository, correct?

19  A.  I don't recall.  I didn't look that closely at the

20  permissions.

21  Q.  OK.  I can display it again, Government Exhibit 1202-1.

22  Does that help?

23  A.  I am looking through the -- so these permissions could be a

24  little bit confusing to follow but I do see a removal of admin

25  but possibly then resetting you to write permissions.

M6T5sch1                     Weber – Cross

1   Q.  Where do you see the write permissions?

2   A.  The permission modified events.

3   Q.  It says the old permission is project write, right?

4   A.  That is accurate.

5   Q.  The new permission is project read, correct?

6   A.  That is accurate.

7   Q.  So first my administrator access to the projects was

8   removed, right?

9   A.  That is correct.

10  Q.  And then my project accesses are changed from write to

11  read, correct?

12  A.  For the project that appears to be correct.

13  Q.  This is for the repository, isn't it?

14  A.  I believe this is for the project.

15  Q.  For which project?  Brutal Kangaroo?

16  A.  Correct.

17  Q.  And so that includes Shattered Assurance, right?

18  A.  I don't recall.  I don't know where Shattered Assurance was

19  stored.

20  Q.  You recall Shattered Assurance was a component of Brutal

21  Kangaroo, right?

22  A.  I believe so.  I don't specifically remember the exact

23  outline of what parts were under the Brutal Kangaroo umbrella

24  and which ones weren't.

25  Q.  OK.  I will pull up Government Exhibit 13 that is in

1   evidence.  Do you recognize what this is?

2   A.  Yes, I do.

3   Q.  It is a user's guide, correct?

4   A.  That is correct.

5   Q.  For Brutal Kangaroo, right?

6   A.  That is correct.

7   Q.  And on page 4 of the document that describes the Brutal

8   Kangaroo tool suite, correct?

9   A.  Yes, it does.

10  Q.  And what does Brutal Kangaroo consist of?

11  A.  Drifting Deadline, Shattered Assurance, Broken Promise,

12  Shadow.

13  Q.  So removing my privileges from Brutal Kangaroo removed me

14  from these projects, right?

15  A.  I don't know if that's accurate.

16  Q.  You don't know if that's accurate?

17  A.  Not -- repos had their own permissions above what the

18  project permissions were.

19  Q.  OK, and this is the repository permissions in 1202-1,

20  right?  It is under the Brutal Kangaroo repository?

21  A.  Again, I believe this to be the Brutal Kangaroo project.

22  Q.  So then what repository would it be under?

23  A.  If you were looking at the Shattered Assurance tool I

24  assume it would be under the Shattered Assurance repository but

25  I don't remember the naming scheme you had.

M6T5sch1                          Weber – Cross

1     Q.  So I think there is a government stipulation that's in

2     evidence, I would just like to show it to the witness, it is a

3     short one.

4                MR. LOCKARD:  We have no objection to Government

5     Exhibit 3008.

6                THE COURT:  I think it is already in evidence.

7                MR. SCHULTE:  It is already in evidence.  I was just

8     trying to refresh the witness' recollection.

9                THE COURT:  OK.  So ask a question, please.

10    BY MR. SCHULTE:

11    Q.  Does this refresh your recollection?

12               THE COURT:  Mr. Schulte, it is helpful, when you are

13    asking if something refreshes his recollection, to ask about

14    what so it is clear.

15               MR. SCHULTE:  OK.

16               THE COURT:  And also, for the record, it is Government

17    Exhibit 3008.

18    BY MR. SCHULTE:

19    Q.  Does this refresh your recollection of how the repository

20    was set up for Brutal Kangaroo?

21    A.  It says Shattered Assurance was part of the Brutal Kangaroo

22    repository.  It doesn't -- it doesn't help me remember if that

23    is accurate or not.

24    Q.  If this statement is accurate?

25    A.  Again, I think I see a potential where there is a

1   possibility that repository and project are being used

2   interchangeably which for organizational purposes isn't a big

3   deal, but when discussing permissions at the Atlassian level

4   matters significantly.

5   Q.  OK, but the -- there is no Brutal Kangaroo project,

6   correct?  That's just the tool suite?

7   A.  They're -- to my recollection and from what was shown on

8   that page earlier, that was the Brutal Kangaroo Atlassian

9   project and we are talking about project permissions.  The

10  repository underneath the Brutal Kangaroo project would have

11  had different permissions, potentially.

12  Q.  Back to Government Exhibit 13.  There is not a Brutal

13  Kangaroo project, right?  There is no source code for Brutal

14  Kangaroo, right?

15  A.  We are talking about, I believe, different things here.

16  Q.  Brutal Kangaroo is a tool suite, right?

17  A.  Yes.

18  Q.  It contains four different tools, right?

19  A.  From what's shown here that is correct.

20  Q.  And there is no tool name called Brutal Kangaroo, correct?

21  A.  I believe that is incorrect.

22  Q.  So if we are looking at the permissions on Stash in 1202-1

23  there is no project Brutal Kangaroo, correct?

24  A.  This page that we are looking at, when you are looking at

25  that upper left-hand corner, that is an Atlassian project

M6T5sch1                          Weber - Cross

1   called Brutal Kangaroo.

2   Q.  At the high level in Stash is the repository setting,

3   correct?

4   A.  Project is above repository.

5   Q.  All right, let's just move on.

6       You do recall, though, that -- OK.

7       In any case, I discovered the removal from the libraries on

8   April 14th, correct?

9   A.  That's when you alerted me to your discovery of it.

10  Q.  And you testified on direct that I was agitated, correct?

11  A.  From my memory that is correct.

12  Q.  And you would be annoyed if someone removed your accesses

13  to a project without informing you too, correct?

14          MR. LOCKARD:  Objection.

15          THE COURT:  Sustained.

16  Q.  If your project accesses were removed and no one told you

17  about that, how would you feel?

18          MR. LOCKARD:  Objection.

19          THE COURT:  Sustained.  Relevance.

20  Q.  And, according to your testimony, you directed me to Sean,

21  right?

22  A.  That is correct.

23  Q.  And then I talked with Sean, right?

24  A.  That is correct.

25  Q.  And according to your testimony I told you that Sean had

1     told me I could have my accesses back, right?

2     A.  That is correct.

3     Q.  So it's your testimony that I came back and lied to you?

4     Is that correct?

5     A.  Either lied or misunderstood what Sean told you.

6     Q.  But at this point I'm an administrator for Atlassian,

7     right?

8     A.  That is correct.

9     Q.  So I did not need you to add my accesses back, correct?

10    A.  That is correct.

11    Q.  I could simply add them back myself, right?

12    A.  That is correct.

13    Q.  So if my position was that Sean approved my accesses, I

14    could just add them back myself, right?

15    A.  That is correct.

16    Q.  So I didn't really need to return to you, right?

17    A.  That is correct.

18    Q.  And, in fact, I told you directly that I was adding the

19    accesses back, correct?

20    A.  That is not my memory of the interaction we had.

21    Q.  Well, based on the fact that I was an Atlassian

22    administrator who could change the permissions myself, does

23    that help refresh your recollection of what was said?

24            MR. LOCKARD:  Objection.

25            THE COURT:  Sustained.

1              Ladies and gentlemen, just a periodic reminder that

2       what Mr. Schulte asks of a witness is not evidence, it is just

3       the witness' testimony.

4       BY MR. SCHULTE:

5       Q.  So again, you were not my supervisor, correct?

6       A.  That is correct.

7              THE COURT:  Mr. Schulte, let's not reask questions

8       that you have asked I think multiple times.  So let's try to

9       pare this down, please.

10      Q.  And I was not a shy person, correct?

11             MR. LOCKARD:  Objection.

12             THE COURT:  Sustained.

13      Q.  You testified before that I was outspoken, right?

14      A.  I don't recall if I testified that you were outspoken.

15      Q.  You testified I had strong views, right?

16      A.  I don't recall if I said that but I wouldn't disagree with

17      that statement.

18      Q.  But from your experience you would not label me as sneaky,

19      right?

20      A.  I haven't given it much thought.

21      Q.  Well, I do not try to hide things, correct?

22      A.  Again, I would have to think about that one.  I don't

23      know -- yeah, I --

24      Q.  After you saw that I reverted changes to my permissions you

25      sent an e-mail to the division chief, correct?

1   A.   Sorry.  After I saw you made the changes?

2   Q.   Right.

3   A.   Yes.  I believe I sent it to Sean and the division chief

4   Anthony.

5   Q.   But you did not first contact your supervisor Sean, right?

6   A.   I don't recall what occurred that evening.

7   Q.   Meaning you don't recall sending an e-mail to Sean?

8   A.   I don't recall if I went and talked to Sean, if there was

9   the potential that possibly Sean and Anthony were both gone at

10  that point.  I don't recall, like, the events of how I made the

11  notifications.

12  Q.   OK.

13       But then you testified there was a back and forth between

14  you and Anthony Leonis, right?

15  A.   Anthony had questions.

16  Q.   And through these conversations -- through your e-mails I

17  was never added on those e-mails, right?

18  A.   I don't recall.

19  Q.   You don't recall if I was added to the e-mail chain?

20  A.   Yes.  I don't remember if you were cc'd on any of the

21  e-mails; I sent them.

22  Q.   Well, here is Government Exhibit 1062 that's in evidence, I

23  will just very quickly go through.  This is your first e-mail

24  that you sent to Anthony Leonis, right?

25  A.   That's correct.

1    Q.  And to Sean, right?

2    A.  That's correct.

3    Q.  And I wasn't on the e-mail, right?

4    A.  That is correct.

5    Q.  And then Anthony responds to you, right?

6    A.  That is correct.

7    Q.  I'm not on the e-mail, right?

8    A.  That is correct.

9    Q.  And then you have a very long e-mail, correct?

10   A.  It is a lengthy e-mail.

11   Q.  And that's -- you send that to Anthony Leonis, right?

12   A.  That is correct.

13   Q.  And I'm not on that e-mail, right?

14   A.  That is correct.

15   Q.  And then there is a response from Leonis, right?

16   A.  That -- yes, that is correct; not to me, though.

17   Q.  Right.  I'm not on the e-mail either, right?

18   A.  That is correct.

19   Q.  Sean responds, right?

20   A.  That is correct.

21   Q.  I'm not on that e-mail, right?

22   A.  That is correct.

23   Q.  And at this point this e-mail is to security and HR, right?

24   A.  I don't know who the "to" line is there.

25   Q.  But I'm not on the e-mail, right?

M6T5sch1                          Weber - Cross

1    A.  That is correct.

2    Q.  And during this time -- so during this time you never

3    emailed me or reached out to me, correct?

4    A.  That is correct.

5    Q.  And there was no meeting that we sat down together, right?

6    A.  There was a meeting, I can't remember if it is in this

7    e-mail, but there was one meeting where we sat down to discuss

8    the libraries.

9    Q.  Who?

10   A.  It was the meeting run by Jojo.

11   Q.  OK.  But I'm just talking about with response to the

12   permissions issue.

13   A.  Oh.  That would be correct, we never had a meeting about

14   it.

15   Q.  And then at one point, April 18th, then I'm issued the

16   memorandum, correct?

17   A.  I don't know the date you were issued the memorandum.

18            (Continued on next page)

19

20

21

22

23

24

25

M6tWsch2                         Weber - Cross

1    BY MR. SCHULTE:

2    Q.  OK.  And Anthony Leonis decided to remove our application

3    administrative privileges to the Atlassian products, correct?

4    A.  I don't know if that was an Anthony decision.

5    Q.  OK.  But it was decided at some point, right?

6    A.  Yes, it was decided at some point.

7    Q.  And to remove our system administrator accesses to the

8    Atlassian server, correct?

9    A.  That is correct.

10   Q.  And migrate the servers to ISB, correct?

11   A.  I don't know when that decision was made.

12   Q.  OK.  But again, the decision was made at some point, right?

13   A.  You'd have to ask ISB when -- when or how or if a decision

14   was made.

15   Q.  I mean you're aware that there was a decision to migrate

16   the servers to ISB at some point, right?

17   A.  Yes.  There was at some point a decision made.

18   Q.  OK.  And to be clear, we had been trying to push this off

19   onto ISB for months, if not years, correct?

20   A.  From essentially the stand-up of the Atlassian products.

21   Q.  From the very beginning, right?

22   A.  Correct.

23           THE COURT:  Mr. Schulte, I think we've covered this

24   ground enough.  So please try to pare things back.

25   BY MR. SCHULTE:

M6tWsch2                         Weber - Cross

1    Q.  OK.  During this time we had our real job and work to do,

2    correct?

3    A.  That's correct.

4    Q.  And we had simply stepped up to provide a valuable resource

5    to our fellow developers, correct?

6    A.  That's correct.

7    Q.  It was a thankless job, right?

8    A.  I would say it was a thankless job, correct.

9    Q.  But it didn't distract us from our real jobs, right?

10   A.  That is correct.

11           THE COURT:  Can we just clarify which jobs we're

12   talking about here, when you say distracted from your real job?

13           THE WITNESS:  The real job I'm referencing is our job

14   as a developer for AED.

15           THE COURT:  And what was distracting you from that?

16           THE WITNESS:  The Atlassian -- the Atlassian product

17   support.

18           THE COURT:  Meaning the administrator

19   responsibilities?

20           THE WITNESS:  Correct.

21   BY MR. SCHULTE:

22   Q.  In any case, you testified that you and ISB went out over

23   the weekend of April 16 and removed all developer accesses to

24   the Atlassian servers, right?

25   A.  I'm sorry.  State the question again.

M6tWsch2                         Weber - Cross

1    Q.  Yes.  You testified that you and ISB went out over the

2    weekend, April 16, 2016, and removed all developer accesses to

3    the Atlassian servers, correct?

4    A.  We removed Atlassian administration access.

5    Q.  OK.  Right.  You also testified on direct that ISB did not

6    have any Linux administrators at that time, correct?

7    A.  They -- they did not have anybody, to my knowledge, that

8    was proficient in Linux.

9    Q.  And you were not a Linux administrator either, correct?

10   A.  That is correct.

11   Q.  You were essentially trying to research and figure out what

12   you were doing as you were doing it, right?

13   A.  My job while I was there was to test the accesses.  I don't

14   know what ISB did or didn't do.

15   Q.  OK.  So you didn't assist them with any of that?

16   A.  I believe I found -- found a web page that explained how to

17   reset SSH keys.  I can't remember if it was me, Dave, or Tim

18   that brought that up.  But for the most part that day, I was at

19   my desk just waiting for me to tell them that they were done.

20   Q.  OK.  And this was something that was directed by Anthony

21   Leonis, correct?

22   A.  He -- he directed me to come in over the weekend.  I don't

23   know who directed ISB.

24   Q.  OK.  And this was specific to the Atlassian servers, right?

25   A.  That is correct.

M6tWsch2                         Weber - Cross

1   Q.  You tested your keys to ensure they no longer worked,

2   right?

3   A.  That is correct.

4   Q.  But you didn't remove your access to other, unrelated

5   servers, right?

6   A.  That is correct.

7   Q.  You didn't remove your access to the Doxygen server, right?

8   A.  Correct.

9   Q.  Just the Atlassian products, right?

10  A.  That is correct.

11          MR. SCHULTE:  I'm bringing up Government Exhibit 1063.

12  Q.  This was an email sent by me, correct?

13  A.  Yes, it is.

14  Q.  On the following Monday, April 18, correct?

15  A.  That is correct.

16  Q.  And the subject is the ISB infrastructure permission

17  change, right?

18  A.  That is correct.

19  Q.  And the email pertains to the Atlassian products, correct?

20          MR. LOCKARD:  Objection.

21          THE COURT:  Sustained.  It speaks for itself.

22          Let's move on, please.

23  BY MR. SCHULTE:

24  Q.  OK.  Just briefly, you testified about deleting log files

25  on direct, correct?

M6tWsch2                        Weber - Cross

A.   I testified if it made sense to delete log files.

Q.   Specifically, you said that deleting old log files is
something that happens, right?

A.   I stated that standard practice often was setting upper
limits on the age of the log files or the total size of the log
files.

Q.   OK.  So -- OK.  But you would also delete corrupted log
files, correct?

            MR. LOCKARD:  Objection.

            THE COURT:  Overruled.

A.   I -- I don't know if I would, so it -- I think -- I think
more likely you would try to recover the corrupted file if it
was -- if it was relevant.

Q.   OK.  If system services or other programs that write to the
log files crashes or enters undefined states, they can cause
damage or corrupt data, right?

            MR. LOCKARD:  Objection.

            THE COURT:  I'll allow it, again, with the admonition,
ladies and gentlemen, that the questions Mr. Schulte asks are
not evidence and you shouldn't necessarily assume anything from
them.  It's only the witness's testimony that is evidence.

A.   Can you repeat the question, please?

            MR. SCHULTE:  Can the court reporter read back the
question, please?

            THE COURT:  Why don't you just do it, Mr. Schulte.

M6tWsch2                    Weber - Cross

BY MR. SCHULTE:

Q.  If system services or other programs that write to log
files crash or enter undefined states, they can damage or
corrupt data, correct?

A.  If -- if something was in an undefined state, I believe
theoretically it could do numerous things, to include corrupt
data.

        THE COURT:  Can you explain what you mean by an
undefined state?

        THE WITNESS:  An undefined state, it -- he's asking a
very theoretical question of a scenario -- in development,
often, a undefined state typically refers to a state that the
development team hasn't thought about.  So the -- the computer
program is performing in unusual ways.  So I think it is safe
to say that an unusual way for a program to perform is to
corrupt data.

BY MR. SCHULTE:

Q.  OK.  You said that this was a theoretical state, right?

A.  From your question.

Q.  Oh, I mean if there's a bug in the software that would
cause issues.  Right?

        MR. LOCKARD:  Objection.

        THE COURT:  Sustained.

        Let's move on, please.

BY MR. SCHULTE:

M6tWsch2                          Weber - Cross

1   Q.  All right.  And a few days later you sent a division-wide

2   email essentially acting as an Atlassian administrator, right?

3   A.  I would have to be shown the email.  I don't know what

4   you're referencing.

5   Q.  All right.  Here's Government Exhibit 1139.

6   A.  Yes, I did send this email.

7   Q.  OK.  And then Anthony Leonis responds and rebukes you,

8   right?

9            MR. LOCKARD:  Objection.

10           THE COURT:  Sustained.

11  BY MR. SCHULTE:

12  Q.  Anthony Leonis responds to your email, right?

13  A.  That is correct.

14  Q.  He's saying you probably should not do this, right?

15           MR. LOCKARD:  Objection.

16           THE COURT:  All right.  It speaks for itself.

17           Next question.

18  BY MR. SCHULTE:

19  Q.  OK.  And at some point in May to June of 2016, there was an

20  issue with Brutal Kangaroo, correct?

21  A.  I don't recall.

22  Q.  You don't remember --

23           THE COURT:  Can you take this off the screen if we're

24  done with it, please.

25  BY MR. SCHULTE:

M6tWsch2                          Weber - Cross

1    Q.  You don't remember testifying about that on direct?

2    A.  Oh, are you talking the permission changes to Brutal

3    Kangaroo?

4    Q.  Yes.

5    A.  Sorry.  Yes, I do recall that.

6    Q.  OK.  And we saw that -- and you testified that you

7    previously removed my access to Brutal Kangaroo, right?

8    A.  I -- I believe, yes, to the Brutal Kangaroo project, we

9    removed your permissions.

10   Q.  OK.  And you reassigned Brutal Kangaroo to Christopher,

11   correct?

12   A.  I believe that was the case.

13           MR. SCHULTE:  I'll show Government Exhibit 1080.

14   Q.  So what is this type of email being sent for?

15   A.  This is you sending an email to ISB asking admin privileges

16   for Brutal Kangaroo.

17           THE COURT:  Page 2 of the exhibit.

18   BY MR. SCHULTE:

19   Q.  And this is an overt email, right?

20           MR. LOCKARD:  Objection.

21           THE COURT:  Sustained.

22   BY MR. SCHULTE:

23   Q.  Then just to explain, this -- on the "to" line, that's the

24   entire OSB -- or that's the entire ISB branch, right; that's

25   what that means?

1   A.  That is correct.

2   Q.  And then Timothy responds to the email, right?

3   A.  That is correct.

4   Q.  He requests branch chief approval, right?

5   A.  That is correct.

6           THE COURT:  Mr. Weber, have you seen these emails

7   before; were you copied on them?

8           THE WITNESS:  I do not believe so.  I -- I -- this is,

9   I think, the first time I've seen these.

10          THE COURT:  All right.  Let's take this down,

11  Mr. Schulte.

12          (Defendant conferred with standby counsel)

13  BY MR. SCHULTE:

14  Q.  OK.  You testified that you're in a position of management

15  now, right?

16          MR. LOCKARD:  Objection.

17          THE COURT:  Sustained.

18  BY MR. SCHULTE:

19  Q.  OK.  You would agree that I am very litigious, correct?

20          MR. LOCKARD:  Objection.

21          THE COURT:  Sustained.

22  BY MR. SCHULTE:

23  Q.  I challenge my PARs through the formal CIA process,

24  correct?

25          MR. LOCKARD:  Objection.

M6tWsch2                          Weber - Cross

1                  THE COURT:  Mr. Schulte, you challenged your what?

2                  MR. SCHULTE:  PARs.  Performance reviews.

3                  THE COURT:  All right.  Overruled.

4                  If you know.

5     A.  I'm not aware of you challenging any of your PARs.

6     Q.  All right.  But you're aware that I utilized the EEO

7     process, right?

8     A.  I believe that's the process you used for your allegations

9     against Amol.  I'm not sure.

10    Q.  OK.  But you remember being contacted with respect to an

11    EEO complaint, right?

12    A.  That -- that does sound familiar.

13    Q.  OK.  And I filed multiple OIG complaints, right?

14    A.  I am only aware of one.

15    Q.  Specifically, fraud, waste, and abuse with respect to the

16    AlmostMeat project, right?

17    A.  That is the one I recall.

18    Q.  OK.  And I always followed proper CIA policy and filed

19    outside activities reports, right?

20                 MR. LOCKARD:  Objection.

21                 THE COURT:  Sustained.

22    BY MR. SCHULTE:

23    Q.  To your knowledge, I always advocated my position through

24    legal means, correct?

25                 MR. LOCKARD:  Objection.

M6tWsch2                        Weber - Cross

1              THE COURT:  Sustained.

2    BY MR. SCHULTE:

3    Q.  I never had any security violations, correct?

4    A.  I don't know if you had security violations or not.

5    Q.  You never witnessed me violate -- have a security

6    violation, right?

7    A.  If I -- if I recall, very early in your career, you

8    mistakenly plugged a thumb drive into a system that shouldn't

9    have one.  I believe that would have technically been a

10   security violation.

11   Q.  OK.  Did you witness any security violations?

12   A.  No, I did not.

13   Q.  OK.  You never saw me walk out with a hard drive, correct?

14   A.  No, not to my knowledge.

15   Q.  Or any electronics, right?

16   A.  Not to my knowledge.

17              (Defendant conferred with standby counsel)

18   Q.  And just to be clear, the issue that you were discussing

19   about the thumb drive, when did that occur?

20   A.  If I recall, it was, like, early 20 -- early 2011, 2010.  I

21   don't recall the exact date, but it was when you were still new

22   to the agency.

23   Q.  It was when I was an intern, right?

24   A.  That could be accurate.  Again, I don't recall the exact

25   timing.

1          (Defendant conferred with standby counsel)

2     Q.  And that was self-reported, right?

3     A.  I believe --

4          THE COURT:  Can I ask you, were you present for that

5     incident, or did you personally witness anything about it?

6          THE WITNESS:  He discussed it afterwards.  He -- he

7     was -- he was open about making the mistake.  I don't know if

8     it was self-reported or if it was discovered and that he then

9     acknowledged it afterwards.

10         THE COURT:  All right.

11         Let's move on, Mr. Schulte.

12         MR. SCHULTE:  No further questions.

13         THE COURT:  Redirect.

14         MR. LOCKARD:  May I proceed, your Honor?

15         THE COURT:  You may.

16    REDIRECT EXAMINATION

17    BY MR. LOCKARD:

18    Q.  Good morning, Mr. Weber.

19    A.  Good morning.

20    Q.  Mr. Schulte was just asking you about security violations?

21    A.  That is correct.

22    Q.  When you say security violation, what do you mean?

23    A.  Security violation is an agency term for -- for breaking

24    of -- breaking of the rules.

25    Q.  Does it have a specific set of definitions?

M6tWsch2                    Weber - Redirect

1    A.  I believe so.

2    Q.  You've also testified about Mr. Schulte's actions on April

3    14 of 2016?

4    A.  That is correct.

5    Q.  When he granted himself admin privileges over the OSB

6    libraries?

7              MR. SCHULTE:  Objection.  Leading.

8              THE COURT:  Sustained.

9    BY MR. LOCKARD:

10   Q.  Did the events, did the actions that Mr. Schulte took on

11   April 14 of 2016 raise security concerns?

12   A.  They did.

13             MR. SCHULTE:  Objection.

14             THE COURT:  Overruled.

15   BY MR. LOCKARD:

16   Q.  What kind of security concerns?

17   A.  Again, it -- it is, from my view, it was a breach of -- a

18   breach of security, using privileges that they shouldn't.  The

19   agency, if they agreed with it, would call that a security

20   violation.  I just -- I'm not the one that can make a statement

21   about if it officially is or not.

22   Q.  How serious did you think that security concern was?

23             MR. SCHULTE:  Objection.

24             THE COURT:  Overruled.

25   A.  I believed it to be a very serious concern.  Again, it

M6tWsch2                          Weber - Redirect

1    demonstrated someone who existed in a cadre of trusted users --

2    being system administrators -- where abusing elevated

3    privileges to write their own rules, essentially.

4    Q.  Mr. Schulte also asked you a series of questions about the

5    Brutal Kangaroo project?

6    A.  That's correct.

7            MR. LOCKARD:  If we could please pull up Government

8    Exhibit 13, and page 2 -- I'm sorry -- page 3 -- page 4.  There

9    we go.  Thank you.

10           If we could focus in on 1.1 and the following

11   paragraphs.

12   Q.  What does it say there in the second full paragraph about

13   Brutal Kangaroo?

14   A.  The part that starts with "the Brutal Kangaroo project

15   consists of the following components"?

16   Q.  That's the sentence.

17   A.  OK.

18   Q.  So what components did the Brutal Kangaroo project consist

19   of?

20   A.  Drifting Deadline, Shattered Assurance, Broken Promise, and

21   Shadow.

22   Q.  You were also asked some questions yesterday on

23   cross-examination about tool names?

24   A.  That's correct.

25   Q.  Who chooses tool names?

1   A.  The project team, typically the project lead.

2   Q.  Do you know why these tools are named Drifting Deadline,

3   Shattered Assurance, and Broken Promise?

4   A.  I --

5              MR. SCHULTE:  Objection.  Beyond the scope.

6              THE COURT:  Sustained.

7   BY MR. LOCKARD:

8   Q.  You were asked some questions about whether project names

9   are unclassified when they're by themselves?

10  A.  That is correct.

11  Q.  Do project names become classified in other contexts?

12  A.  The idea behind a project name is that it would not give

13  any indication to -- any indication to the tool that it

14  correlates with.  So if you named your project something that

15  would identify what the target is or what the capability is,

16  that could potentially be classified information.  And then if

17  there was any -- any statements tying the project name to the

18  tool, then conceivably, that project would -- that project name

19  would be classified at that point.

20  Q.  What about a disclosure tying a project name to an already

21  publicly discovered piece of code or program?

22  A.  I don't know what the agency's policy on it is, but I would

23  have assume that, again --

24              MR. SCHULTE:  Objection.

25  A.  -- is correlation.

M6tWsch2                    Weber - Redirect

1            THE COURT:  Overruled.

2            Mr. Schulte, can you move the microphone a little

3    closer so that you're speaking into it when objecting.

4            MR. LOCKARD:  Thank you, Ms. Cooper.  We can take this

5    down.

6    Q.  Mr. Schulte also asked you some questions this morning

7    about permissions changes associated with the Brutal Kangaroo

8    project?

9    A.  That is correct.

10   Q.  Did there come a time after Mr. Schulte had been removed as

11   an administrator of the Brutal Kangaroo project that you

12   learned of additional issues with permissions on that project?

13           MR. SCHULTE:  Objection.

14           THE COURT:  Overruled.

15   A.  That's correct.  There was a point where he was given admin

16   privileges back to Brutal Kangaroo.

17   Q.  And did you then review what happened to privileges on that

18   project after Mr. Schulte got admin responsibility back?

19   A.  I believe so.  I'm not sure how I went about doing it.

20   Q.  And did you learn what had happened?

21   A.  I --

22           MR. SCHULTE:  Objection.

23           THE COURT:  Overruled.

24   A.  I saw the end state.  I don't know if I can officially say

25   I knew what had happened or how it had happened.

M6tWsch2                    Weber - Redirect

1  Q.  What was the end state?

2  A.  It --

3          MR. SCHULTE:  Objection.

4          THE COURT:  Overruled.

5  A.  That, if I recall correctly, that Josh was granted project

6  admin access to Brutal Kangaroo and Chris was removed from the

7  project.

8  Q.  And when Mr. Schulte moved from OSB to RDB, who in OSB was

9  supposed to take over the Brutal Kangaroo project?

10 A.  Chris was.

11 Q.  Did you do anything in response to that situation?

12 A.  I believe I informed my leadership.

13 Q.  Yesterday, the defendant asked you some questions about the

14 Hickok server.  Do you remember that?

15 A.  Yes, I do.

16         MR. LOCKARD:  If we could please pull up Government

17 Exhibit 616.

18 Q.  And do you recall the defendant showing you this exhibit?

19 A.  Yes, I do.

20 Q.  Did you have an opportunity to read any of it?

21 A.  I don't think I got a chance to really look at it beyond, I

22 think there was, maybe, a guide or -- a picture of something,

23 but I did not get a chance to review it substantially.

24 Q.  Did Mr. Schulte show you anything in this exhibit

25 describing how many people were in the CIA's EDG group?

M6tWsch2                          Weber - Redirect

1    A.  I don't -- I don't remember that.

2    Q.  Did he show you anything in this document describing how

3    many people were in the COG group?

4              MR. SCHULTE:  Objection.

5              THE COURT:  Sustained.

6    BY MR. LOCKARD:

7    Q.  Would information about the number of people in the CIA's

8    cyber tool --

9              MR. SCHULTE:  Objection.

10             THE COURT:  Let counsel finish the question, please.

11   BY MR. LOCKARD:

12   Q.  Would information about the number of people in the CIA's

13   cyber tool development group be useful information to

14   adversaries?

15             MR. SCHULTE:  Objection.

16             THE COURT:  Overruled.

17   A.  Yes, it is, and the CIA has specific classification

18   statements about how to deal with resourcing decisions

19   surrounding classification.

20   Q.  Would information about the number of people in the CIA's

21   COG group be useful information to adversaries?

22   A.  Yes, it would.

23   Q.  Would information about how those two groups were

24   network-connected be useful information to adversaries?

25   A.  Yes, it would.

M6tWsch2                          Weber - Redirect

1   Q.  The defendant also showed you Government Exhibit 3009.

2              MR. LOCKARD:  If we could pull that up, please, and if

3   we could turn to page 2 of this exhibit.

4   Q.  Do you recall looking at this diagram in the bottom half of

5   the exhibit?

6   A.  I believe this is the one I saw yesterday.

7   Q.  So on this diagram, in the top box, on the left, where it

8   says DevLAN, do you see it has the letters TS in the bottom

9   right corner?

10  A.  Yes.

11  Q.  And then in the box next to that where it's labeled Hickok,

12  do you see the TS in the bottom right-hand corner?

13  A.  Yes.

14  Q.  What does TS stand for?

15  A.  I assume top secret.

16  Q.  What makes information top secret?

17  A.  It is a decision based on the level of damage that its

18  disclosure would do to the U.S. government.

19  Q.  And then if you look in the box on the right, do you see

20  where it says TS/SCI in the bottom right-hand corner?

21  A.  That is correct.

22  Q.  What is TS/SCI?

23  A.  Top secret, secret compartmented information.

24      We discussed yesterday the difference between a

25  classification and dissemination.  Top secret is the

M6tWsch2                          Weber – Redirect

1  classification level of this.  Having an SCI marking is warning

2  people that there is specific information on here that would be

3  subject to different dissemination rules.

4           MR. LOCKARD:  Ms. Cooper, we can take that down.

5  Q.  Mr. Weber, are you familiar with secrecy agreements?

6  A.  Yes, I am.

7  Q.  Do CIA employees sign secrecy agreements?

8  A.  Yes, we do.

9  Q.  Did you sign one?

10  A.  Yes, I did.

11           MR. SCHULTE:  Objection.  Beyond the scope.

12           THE COURT:  Sustained.

13  BY MR. LOCKARD:

14  Q.  Yesterday, the defendant asked you some questions about

15  bringing code in from outside the CIA to inside the CIA?

16  A.  That's correct.

17  Q.  You were asked some questions about some code that you and

18  Mr. Schulte worked on together.  Do you remember that?

19  A.  Yes, I do.

20  Q.  Was that code for a tool?

21  A.  No, it was not.

22  Q.  Did you ever take code out of the CIA?

23  A.  No, I did not.

24  Q.  Are CIA developers allowed to take code out of the CIA and

25  work on it at home?

1           MR. SCHULTE:  Objection.

2           THE COURT:  Overruled.

3   A.  I -- I'm not aware of a process for doing that.  I can't

4   say that there wasn't -- there wasn't ever a situation where

5   some process was followed to enable something like that.

6   Q.  Would you expect there to be a process?

7   A.  Yes.

8           MR. SCHULTE:  Objection.

9           THE COURT:  Overruled.

10  A.  Yes, I would.

11  Q.  Why is that?

12  A.  Anytime something leaves the building, a big -- a big

13  portion of the process would be a review.  We often would do

14  what we refer to as a two-person review.  So the person who is

15  making a claim that something is unclassified would do their

16  first look, and then they would have somebody else review it

17  and make sure that they agreed with that.

18      I would -- in a scenario where somebody was taking

19  something to home to work on it would very much follow a

20  process that followed a two-person review to make sure that

21  nothing classified was going home.

22  Q.  Did you ever speak with the defendant about bringing code

23  from outside the CIA and into the CIA?

24  A.  Sorry.  Can you repeat that question?

25  Q.  Did you ever talk to the defendant about bringing code from

M6tWsch2                    Weber - Redirect

1    outside the CIA to inside of the CCI offices?

2    A.  Yes, I did.

3    Q.  And what did you tell him about that?

4    A.  So, there were two scenarios.  One was the project that we

5    had worked on together, which was meant to be an internal

6    capability to support our testing.

7        The other piece was something that he had worked on that he

8    wanted to see go into the capabilities that he was developing

9    for CNE activity.  We had numerous conversations about how he

10   should not do that because the worry would be the code could

11   get attributed back to him, and then potentially not only would

12   that be dangerous to him as an individual, but there could also

13   be an attribution to the U.S. government at that point.

14            THE COURT:  Can you just spell that out, translate it

15   a little bit?  Is the concern that if somebody, whether

16   Mr. Schulte or otherwise, worked on something outside of the

17   CIA and then brought it into the CIA, that somebody could

18   theoretically trace the code in that tool to the person working

19   in an unclassified setting outside and thereby attribute it to

20   that person?  Is that it?

21            THE WITNESS:  That's correct.

22   BY MR. LOCKARD:

23   Q.  Mr. Weber, do you recall yesterday the defendant asked you

24   some questions about mounting the Altabackups folder?

25   A.  Yes, I do.

M6tWsch2                        Weber - Redirect

1   Q.  And again, just remind us, what was the Altabackup folders

2   used for?

3   A.  That was where the backups for the Atlassian products were

4   stored.

5   Q.  And at the time that you mounted the Altabackups, what was

6   your status with respect to Atlassian administration?

7   A.  I was an Atlassian administrator.

8   Q.  And the defendant asked you about mounting the Altabackups

9   from a virtual machine on your desktop?

10  A.  That's correct.

11  Q.  Are you familiar with a console session?

12  A.  Yes, I am.

13  Q.  What is a console session?

14  A.  It has multiple meanings, but in this specific discussion,

15  what we're referencing is if you've ever seen somebody

16  writing -- writing commands into a text, a text interface, so

17  where they type something and the computer writes back, that's

18  a console session.

19  Q.  And did you use console sessions to access the Confluence

20  virtual machine on the OSB server?

21          MR. SCHULTE:  Objection.  Beyond the scope.

22          THE COURT:  Overruled.

23  A.  I would assume that that's how I would have logged in to

24  the --

25          MR. SCHULTE:  Objection to assumptions.

M6tWsch2                          Weber - Redirect

1            THE COURT:  All right.

2            Can you just spell out, when you say you assume that,

3    what do you mean by that?

4            THE WITNESS:  I don't -- I don't remember specifically

5    how I logged in to the Confluence virtual machine.  There --

6    there were two ways that we would have been able to log in:

7    either going through the vCenter server.  Josh had mentioned

8    the tool called vSphere earlier.  That would allow you to log

9    in to a Confluence way that was very similar to how most users

10   would see logging in, that you're presented with a log-in

11   screen with a username and password.

12           The other way would be via SSHing into the Confluence

13   VM using our public-private key pair.

14           Everything -- everything you did in Linux usually was

15   done through a console.  So if you went the -- if you were

16   taking extra steps to log in via GUI interface, a graphical

17   user interface, only to pull up a console on the virtual

18   machine, that's just executing those commands on your local

19   machine through an SSH.

20           So I don't recall how I did it, but it would make

21   sense to me that I would have --

22           MR. SCHULTE:  Objection as to he has no direct

23   knowledge.

24           THE COURT:  All right.  I'll allow the witness to

25   finish the answer.

Weber - Redirect

1          Go ahead.

2          THE WITNESS:  It makes sense to me the most likely way

3     I logged in was via SSH.

4     BY MR. LOCKARD:

5     Q.  And from where would you access the Altabackups folder --

6          MR. SCHULTE:  Objection.

7     Q.  -- from your desktop or from your Confluence VM session?

8          THE COURT:  The objection's overruled.

9     A.  From the Confluence VM session.

10    Q.  Now, do you remember yesterday the defendant asked you some

11    questions about administration of the ESXi server?

12    A.  That is correct.

13    Q.  And which branch owned the ESXi server that ran the

14    Confluence virtual machine?

15    A.  OSB did.

16    Q.  You mentioned SSH keys at various points in your testimony.

17    Were there SSH keys to access the OSB ESXi server?

18    A.  I don't recall if there was or not.

19    Q.  You talked about the SSH keys used to access the Stash

20    server.  Do you remember that?

21    A.  Yes, I do.

22    Q.  Who set those up?

23    A.  Josh -- Josh would have set up the initial, the initial

24    configuration.

25    Q.  In April of 2016, was the defendant a member of OSB?

M6tWsch2                          Weber – Redirect

1   A.  April of 2016?

2   Q.  Yes.

3   A.  I believe he would have been a member of RDB at that point.

4   Q.  And which branch administered the OSB ESXi server?

5   A.  OSB.

6   Q.  Now, you talked about some changes to Atlassian

7   administrator privileges on April 16 of 2016?

8   A.  Yes, I did.

9   Q.  After April 16, 2016, was the defendant an Atlassian

10  administrator?

11  A.  No, he was not.

12  Q.  On April 16 of 2016, did you change the password to the

13  OSB --

14              MR. SCHULTE:  Objection.

15  Q.  -- ESXi server?

16              MR. SCHULTE:  Beyond the scope.

17              THE COURT:  Overruled.

18  A.  I believe so.

19  Q.  After the defendant left OSB, did you consider him to be an

20  administrator on the OSB ESXi server?

21              MR. SCHULTE:  Objection.

22              THE COURT:  Overruled.

23  A.  No, I did not.

24  Q.  Now, the defendant also asked you some questions about

25  sending out office-wide messages if there were going to be

M6tWsch2                          Weber - Redirect

1    changes to the server.  Do you remember those questions?

2    A.  Yes, I do.

3    Q.  On April 20 of 2016, did you receive any messages from the

4    defendant that he was going to be performing administrative

5    functions on Atlassian products?

6    A.  Not to my knowledge, no.

7    Q.  On April 20 of 2016, did you receive any message from the

8    defendant that he was going to be performing administrative

9    functions on the OSB server?

10   A.  Not to my knowledge, no.

11   Q.  On April 20 of 2016, was the defendant authorized to

12   perform any Atlassian administrative functions?

13   A.  I do not believe so, no.

14   Q.  And on April 20 of 2016, was the defendant authorized to

15   perform any administrative functions on OSB's server?

16   A.  I don't believe so, no.

17           MR. LOCKARD:  Ms. Cooper, could we please look at

18   Government Exhibit 806.  And if we could go to page 2, please.

19   Q.  Now, yesterday you were asked some questions about parsing.

20   Do you remember those questions?

21   A.  Vaguely.

22   Q.  It was a number of questions ago.

23       Do you remember being asked questions about whether

24   Microsoft's parsing programs were classified?

25   A.  Yes, I do.

M6tWsch2                          Weber - Redirect

1    Q.  And looking here, if you could just read the sentence in

2    the very middle of that second box that starts with "I."

3    A.  "I developed software to parse MSFT," Microsoft, "NTFS and

4    EXT3 partitions so that I -- for a operation."

5              MR. LOCKARD:  If we could please look at Government

6    Exhibit 809, page, I think, 11.

7              THE COURT:  Mr. Lockard, I'm just going to ask you if

8    it's to clarify something that he was asked on cross, that's

9    one thing.  If it's just reiterating what's in the exhibit,

10   that's another.  Don't do the latter, please.

11   BY MR. LOCKARD:

12   Q.  Does that sentence refer to a Microsoft parsing program?

13   A.  I would assume, yes.

14   Q.  -- developed?

15   A.  Sorry.

16       It references code he wrote to parse Microsoft file

17   systems.  Not, not a Microsoft tool that did it.

18             MR. LOCKARD:  I'm sorry.  If we can go back to

19   Government Exhibit 806, page 2.  And again, focusing in on that

20   block of text.

21             MR. SCHULTE:  Objection.  Asked and answered.

22             THE COURT:  I don't know what he's asking yet, so,

23   Mr. Lockard go ahead.

24   BY MR. LOCKARD:

25   Q.  Does this sentence describe a use of that parsing program

M6tWsch2                         Weber - Redirect

1   that was developed by the writer?

2   A.  Yes, it does.

3   Q.  And what does it say that that use was?

4   A.  It was to be used --

5          MR. SCHULTE:  Objection.  It speaks for itself.

6          THE COURT:  Sustained.

7          MR. LOCKARD:  If we can move back to Government

8   Exhibit 809, page 11, please.

9   Q.  Do you recall you were asked some questions yesterday about

10  Bartender?

11  A.  Yes.

12  Q.  And the defendant asked if Bartender was outed in 2016?

13  A.  Yes.

14  Q.  Do you believe that Bartender was outed in 2016?

15         MR. SCHULTE:  Objection.

16         THE COURT:  Overruled.

17  A.  The -- I -- I would not have considered Bartender outed

18  based on the vendor report.

19  Q.  Are you familiar with a vendor report that's referenced

20  here in this exhibit?

21  A.  Yes, I am.

22  Q.  Did that vendor report accurately describe Bartender's

23  functions?

24         MR. SCHULTE:  Objection.

25         THE COURT:  Asked and answered.  Sustained.

M6tWsch2                        Weber - Redirect

1    BY MR. LOCKARD:

2    Q.  Did the vendor report include a user guide for Bartender?

3           MR. SCHULTE:  Objection.  Same.

4           THE COURT:  Overruled.

5    A.  No, it did not.

6    Q.  To your knowledge, did WikiLeaks disclose that Bartender

7    was connected to the tool described in this vendor report?

8           MR. SCHULTE:  Objection.

9           THE COURT:  Overruled.

10   A.  I'm not aware of any WikiLeaks statements tying the vendor

11   report to -- to the Bartender tool.

12   Q.  To your knowledge, was the vendor report included in the

13   WikiLeaks Vault 7 or Vault 8 releases?

14   A.  No.

15   Q.  To your knowledge, to this very day, has the tool described

16   in the vendor report ever been publicly identified as

17   Bartender?

18   A.  Not that I'm aware of, no.

19          MR. LOCKARD:  Thank you, Ms. Cooper.  We can take this

20   down.

21   Q.  During your time at OSB, did you ever hear the defendant

22   raise concerns about the network security of DevLAN?

23   A.  Not to my knowledge.

24   Q.  Yesterday the defendant asked you some questions about the

25   views that he had expressed about WikiLeaks.  Do you remember

M6tWsch2                          Weber - Redirect

1    those questions?

2    A.  Yes, I do.

3    Q.  And during the time that you and the defendant worked

4    together on OSB, did the defendant have negative things to say

5    about WikiLeaks?

6    A.  I believe so, yes.

7    Q.  And at the time that he said those things, were you and the

8    defendant still friends?

9    A.  I believe so, yes.

10   Q.  At the time that he said those things, had he yet made any

11   complaints against Amol?

12   A.  Probably.  He -- he often would complain about working with

13   Amol, so --

14   Q.  I'm sorry.  Had he made the complaints that included the

15   false statements that you talked about yesterday?

16              MR. SCHULTE:  Objection.

17              THE COURT:  Overruled.

18   A.  I -- I don't -- I believe he would have -- I believe the

19   statements about WikiLeaks, Assange, the others that we had

20   talked about yesterday would have been made before his

21   allegations against Amol.

22   Q.  And when you heard the defendant speak negatively about

23   WikiLeaks, was that before or after he used his Atlassian

24   administrator privileges to grant himself back access to OSB

25   libraries?

 1           MR. SCHULTE:  Objection.  Asked and answered.

 2           THE COURT:  Overruled.

 3   A.  Before.

 4           MR. LOCKARD:  If we could pull up Government Exhibit

 5   809, page 11, please.  And then focusing in on the top

 6   right-hand corner.

 7   Q.  Can you read the sentence that says, right underneath #fuck

 8   your top secret --

 9           MR. SCHULTE:  Objection.  Beyond the scope.

10           THE COURT:  Sustained.

11           MR. LOCKARD:  Can we turn to page 13, please.

12   Q.  So, we did not -- have you seen this previously in your

13   testimony today and yesterday?

14           MR. SCHULTE:  Objection.  Beyond the scope.

15           THE COURT:  Well, you can answer that question.

16   A.  I don't believe I have.

17   Q.  Do you recognize the handwriting?

18   A.  Yes, I do.

19   Q.  Whose handwriting is that?

20   A.  Josh Schulte's.

21           MR. LOCKARD:  Can we please enlarge that top

22   paragraph.

23           MR. SCHULTE:  Objection.  This is beyond the scope.

24   It's being published to the jury.

25           THE COURT:  Hang on, please.

1           All right.  I'm going to sustain the objection.  Let's

2      take it down, please.

3           MR. LOCKARD:  Thank you, Ms. Cooper.

4      Q.  Mr. Weber, yesterday Mr. Schulte asked you some questions

5      about the public review board.  Do you remember those

6      questions?

7      A.  Yes, I do.

8      Q.  And can you just remind us what is the function of the

9      public review board?

10     A.  It's publication review board.  The publication review

11     board, any time an agency officer is going to publish

12     something, be it an official publish, like a book or something

13     you're doing for school or a résumé, it has to go through the

14     publication review board for a review for classified

15     information.

16     Q.  Do you recall ever learning from the defendant if he had

17     submitted any public statements to the review board?

18          MR. SCHULTE:  Objection.

19          THE COURT:  Overruled.

20     A.  I'm not aware of him submitting anything to the PRB.

21     Q.  And have you ever submitted any proposed public statements

22     to the PRB?

23     A.  No, I have not.

24          MR. SCHULTE:  Objection.  Relevance.

25          THE COURT:  Sustained.

 1  BY MR. LOCKARD:

 2  Q.   Other than in connection with this case, have you ever

 3  spoken publicly about Bartender?

 4  A.   No, I have not.

 5  Q.   Other than in connection with this case, have you ever

 6  spoken publicly about the Hickok server?

 7  A.   No, I've not.

 8  Q.   Other than in connection with this case, have you ever

 9  spoken publicly about the DevLAN network?

10          MR. SCHULTE:   Objection.

11          THE COURT:   Overruled.

12  A.   No, I've not.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. LOCKARD:  A moment, your Honor, please?

2          THE COURT:  OK.

3          (Counsel conferring)

4          MR. LOCKARD:  No further questions.

5          THE COURT:  OK.

6          Mr. Schulte, any recross?  Briefly, please.

7     RECROSS EXAMINATION

8     BY MR. SCHULTE:

9     Q.  You testified about bringing code from outside the CIA into

10    the CIA, correct?

11    A.  That is correct.

12    Q.  You said you should not do that because code could be

13    attributed to the person, right?

14    A.  That it would be a risk.

15    Q.  And that's a risk for having large projects brought in,

16    correct?

17    A.  Depends on what the project is intended for.

18    Q.  Or if the project is public already and it attributed to

19    you that's a risk, right?

20    A.  Again, it depends on what the project is for and how it's

21    used.

22    Q.  OK.  But if you are writing small code snippets that are

23    not public, there is no concern with that, right?

24    A.  I would not agree with that statement.

25    Q.  You would say three or four lines of code could be

M6T5sch3                        Weber - Recross

1    attributed to a person?

2             MR. LOCKARD:  Objection.

3             THE COURT:  Can you explain why you don't agree with

4    the statement that just bringing in a snippet of code would not

5    pose a security threat?

6             THE WITNESS:  One, the definition of a line of code is

7    pretty vague, but assuming it is a small amount of code it's

8    still -- it is too much of a generality of, to really be able

9    to say yes or no.  There is a very good chance that a single

10   line of code could be very unique and would still be present

11   and be a significant fingerprint.  There is a chance that a

12   thousand lines of code would distill down to something that is

13   not unique.  Again, it -- generalities like this are hard to

14   talk to.  It is better to have specific examples.

15   BY MR. SCHULTE:

16   Q.  OK.  So it depends on the situation, right?

17   A.  That is correct.

18   Q.  Next you testified about the number of people in EDG being

19   something that was sensitive, correct?

20   A.  That is correct.

21   Q.  Same with COG, right?

22   A.  That is correct.

23   Q.  As someone in EDG you are not briefed on how many people

24   are in COG, right?

25   A.  I believe that to be a correct statement.

M6T5sch3                          Weber - Recross

1  Q.  So any assessments that you would make on that would not be

2  based on direct knowledge; right?

3  A.  That's correct.

4  Q.  You testified about the Atlassian administrator privileges,

5  correct?  The Atlassian administrator privileges had nothing to

6  do with mounting, right?

7  A.  I believe that is correct.

8  Q.  Atlassian administrator privileges are application

9  permissions, correct?

10 A.  In the -- again, we have been -- we have been re-using

11 words.  Often when I am referring to Atlassian privileges I am

12 usually talking about specifically the interactions with the

13 Atlassian services themselves, but sometimes it's been

14 conflated with also the logging into the Atlassian or the

15 servers that those services are running on.

16 Q.  But the mounting permissions are server permissions,

17 correct?

18 A.  That is correct.

19 Q.  And you also testified that most likely you logged in in a

20 certain way, correct?

21 A.  That is correct.

22 Q.  You don't recall, testifying here today, how you actually

23 logged in; right?

24 A.  I do not remember how I logged in, specifically.

25 Q.  And the mount command can be run from a virtual machine,

M6T5sch3                          Weber - Recross

1    right?

2    A.  That is correct.

3    Q.  It can be run from a virtual machine from your own

4    computer, right?

5    A.  Yes.  I should clarify:  A mount command, a virtual machine

6    running a Linux distro.

7    Q.  Next you testified about the Brutal Kangaroo project

8    permissions that were changed, correct?

9    A.  I was asked about it, correct.

10   Q.  And you were, at some point you were asked about those

11   permission changes by management, correct?

12   A.  I don't know -- I don't know how it came about I got asked.

13   Q.  But you are aware that the permission change to Brutal

14   Kangaroo was sent through e-mail to HR and division management,

15   correct?

16           MR. LOCKARD:  Objection.

17           THE COURT:  Overruled.

18   A.  I believe that was the document you had started showing me

19   earlier.

20   Q.  But the permission changes was not something that you

21   discovered on your own, correct?

22   A.  If I recall it was Chris that would have -- would have

23   realized that he had lost access to the project.

24   Q.  But, I mean, you were informed by management that this

25   happened, correct?

1   A.  I don't recall how I found out about it.

2   Q.  You were asked whether or not you considered me an

3   administrator to the ESXi server, correct?

4   A.  That's correct.

5   Q.  But whether or not you considered me an administrator to

6   the ESXi server does not affect whether or not I was, correct?

7   A.  It was an OSB server so I am not the -- I am not the

8   decision-making authority for if you are an OSB admin.

9   Q.  There was no -- you didn't send out an e-mail about

10  removing me from the ESXi server, right?

11  A.  You were not removed specifically from the ESXi server.

12  Q.  And because you are not in management, you wouldn't have

13  the authority to remove me from that, correct?

14  A.  Again, we didn't remove you from the ESXi server.

15  Q.  And as an ESXi server administrator, you testified before

16  that the ESXi server administrator has the ability to perform

17  physical types of events on virtual machines, right?

18  A.  Again, as they translate to virtual machines, that's

19  correct.

20  Q.  So when they -- when you were asked on redirect about the

21  authority to perform administrative functions on Atlassian

22  products, that's about access in the virtual machine, right?

23          MR. LOCKARD:  Objection.

24          THE COURT:  Overruled.

25  A.  I don't understand the question.  Can you repeat it?

1   Q.  ESXi administrators are authorized to perform physical

2   events like shutting down virtual machine, right?

3   A.  Authorized -- authorized is not the correct term.  Able,

4   yes.

5   Q.  If you have a root key to the ESXi server, I mean, you can

6   do -- you have authorized access to perform anything based on

7   that key, correct?

8   A.  That is not correct.

9   Q.  From a technical standpoint, if you have a root key the

10  system authorizes you to perform those actions, correct?

11  A.  The -- two things here.  One, authorized is the wrong term.

12  You have the ability to do it; and two, when logging into the

13  root ESXi server, to my memory the -- your capabilities to

14  interact with the ESXi server were extremely limited.  It was

15  mainly to interact with the networking stack.  It was not a

16  robust admin interface, from my memory.  Most of the

17  administration was supposed to be done through the V Center.

18  Q.  OK.  But regardless of how it was done, there was a command

19  line interface you can use or a gooey interface, right?

20  A.  To my knowledge, the command line interface on the ESXi was

21  limited.

22  Q.  But performing administrative -- let me rephrase.

23  Performing actions as an ESXi server does not access or log

24  into the Confluence -- to a virtual machine, right?

25  A.  That I believe to be correct.

1   Q.  So with your access as an ESXi administrator, you can't use

2   those accesses to access -- to actually log into the virtual

3   machines, right?

4   A.  Again, you could interact with -- interact with the state

5   of the machine but the theory is that you are correct that you

6   would not be able to leverage your ESXi permissions to do

7   privileged actions on the Confluence or Bamboo machines.

8   Q.  And you testified about whether or not the Bartender was

9   outed in 2015 or 2016, right?

10  A.  That's correct.

11  Q.  But you do know for a fact Bartender was outed in

12  WikiLeaks, right?

13  A.  I believe that to be a correct statement.  My memory -- it

14  has been a few years but I remember WikiLeaks talking about the

15  program.

16  Q.  And from the statements that you were asked to review

17  about -- that were in the notebooks, there is no specific

18  information in that outside of what WikiLeaks published, right?

19  A.  I don't know.  I don't know if that's an accurate statement

20  or not.

21  Q.  Because you haven't reviewed the WikiLeaks disclosure; is

22  that right?

23  A.  Partially I haven't fully -- I haven't reviewed the

24  WikiLeaks disclosures in depth and I also haven't seen the

25  unredacted statements in your notebook so I don't know what the

M6T5sch3                          Weber - Recross

1   correlation of information is.

2              (Defendant and standby counsel conferring)

3   Q.  One last -- a few last questions here.

4       With the SSH keys you testified on redirect that I would

5   have set this up, right?

6   A.  That's correct, to my memory.

7   Q.  And I was tasked to do this, correct?

8   A.  I don't know -- from what I remember, when Patrick passed

9   the maintenance over to you, one of the first things you did

10  was remove user name and login permissions.  You felt that that

11  was a poor security practice and you implemented the ability to

12  exclusively login using public private key pairs.

13  Q.  And this functionality was set up correctly, right?

14  A.  I can't -- I don't know.

15             MR. SCHULTE:  No further questions.

16             THE COURT:  Any brief re-redirect or are we good?

17             MR. LOCKARD:  No, your Honor.  Thank you.

18             THE COURT:  Mr. Weber, you may step down.  Just put

19  your mask on before you do.

20             (Witness excused)

21             THE WITNESS:  Thank you, your Honor.

22             THE COURT:  Mr. Lockard, Mr. Denton, your next

23  witness, please?

24             MR. DENTON:  Your Honor, the government calls Frank

25  Stedman.

1          THE COURT:  Ladies and gentlemen, if you want to

2     stretch while we are waiting on the new witness, you are

3     welcome to do that.

4          JUROR:  May I use the restroom?

5          THE COURT:  Sure.

6          Ms. Smallman, would you escort juror no. 13 to the

7     restroom, please?

8          Mr. Stedman.  If you could remain standing, please?

9     FRANK STEDMAN,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12        THE COURT:  You may remove your mask, please.

13        THE DEPUTY CLERK:  Will you please state and spell

14    your full name for the record?

15        THE WITNESS:  Frank, F-R-A-N-K, Stedman,

16    S-T-E-D-M-A-N.

17        THE COURT:  You may proceed, Mr. Denton.

18        MR. DENTON:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. DENTON:

21    Q.  Good morning, sir.

22    A.  Good morning.

23        THE COURT:  Mr. Stedman, you are an inch or two away

24    from the microphone.  If you can keep your voice up, that's

25    ideal.  Don't be too close.  It needs to be the perfect

1    distance.

2             Go ahead.

3    Q.   Where are you employed?

4    A.   The Central Intelligence Agency.

5    Q.   How long have you worked for the CIA?

6    A.   Around 12 years.

7    Q.   Generally speaking, what type of work have you done in your

8    career at the CIA?

9    A.   So the entire time I have been in the Engineering

10   Development Group doing software development for cyber

11   operations.

12   Q.   I would like to focus your attention on March of 2017.

13   Were you working for the CIA inside the United States at that

14   time?

15   A.   No.

16   Q.   Were you working overseas at a CIA base?

17   A.   Yes.

18   Q.   I'm going to refer to that location as Foreign Office West.

19   OK?

20   A.   OK.

21   Q.   To your knowledge, has the CIA ever publicly acknowledged

22   the existence of Foreign Office West?

23   A.   No.

24   Q.   Approximately when did you start working in Foreign Office

25   West?

1    A.   Fall of 2016.

2    Q.   Before the fall of 2016, where did you work in the CIA?

3    A.   So I was in the Center for Cyber Intelligence Engineering

4    Group, Applied Engineer Division, Operation Support Branch.

5    Q.   Mr. Stedman, can I ask you to look around the courtroom and

6    let us know if you see anyone else who worked with you in that

7    branch?

8    A.   I do.

9    Q.   Can you describe where he is sitting and something that he

10   is wearing?

11   A.   Sitting over there in the suit in the middle of the table,

12   Joshua Schulte.

13        THE COURT:   Identifying the defendant.

14   Q.   Generally speaking, what type of work did OSB do?

15   A.   So OSB did a lot of quick reaction capabilities so anything

16   that was -- we needed to develop to meet a short operational

17   deadline.  We also did some asset enabled and gap jumping

18   operations as well.

19   Q.   Did OSB use a particular computer network to conduct that

20   work?

21   A.   Yes.

22   Q.   What was that called?

23   A.   DevLAN.

24   Q.   And did you personally use DevLAN?

25   A.   Yes, I did.

1   Q.  Did you have access to everything on DevLAN?

2   A.  No.

3   Q.  Why not?

4   A.  To do my job I didn't need it and we operate with kind of a

5   need to know security model, so I didn't need access to

6   everything on DevLAN to do my job.

7   Q.  What types of software would you use on DevLAN to perform

8   your work?

9   A.  All sorts depending on what we were doing.  Visual Studio

10  is what I used primarily to develop code.  We used the

11  Atlassian suite for various things like our code repository,

12  our Wiki issue tracking.  Things like that.

13  Q.  When you say the code repository, what was that part of the

14  Atlassian suite called?

15  A.  That was Stash.

16  Q.  And what about the Wiki, what was that called?

17  A.  Confluence.

18  Q.  Did the defendant have any role with respect to those

19  Atlassian products that you were aware of?

20  A.  Yes.  So, over time we didn't have the Atlassian products

21  the entire time I was there, towards the end but, yeah, he was

22  an administrator of those products for us.

23  Q.  Did he share that role with anyone else?

24  A.  So, originally somebody else was in that role before him

25  but in the time frame I think that you are talking about, 2016,

M6T5sch3                         Stedman - Direct

1    2017, it would have just been him.

2    Q.  Did you have any administrative role in any of the

3    Atlassian products?

4    A.  I did.  I was an administrator on Confluence.

5    Q.  What kind of tasks did that entail?

6    A.  So, the reason I became an administrator on Confluence, I

7    asked for our Wiki.  Typically, when we are working on other

8    networks, we are supposed to use classification blocks so like

9    a header, a footer to denote the classification of the topic

10   that we are discussing.  We didn't have that on Confluence so

11   the reason why I wanted administrator access was to add some

12   Confluence templates that added the classification blocks.

13   Also did some, like, plug-in and add-in work to make it easier

14   for people to find the information they were looking for, kind

15   of correlate information that was related.  Things of that

16   nature.

17   Q.  Why did you think it was important for Confluence pages to

18   incorporate classification blocks?

19   A.  It was basically we were supposed to be operating with

20   classification blocks and we weren't up to code in that sense,

21   so just basically trying to get us closer to the security

22   protocol which we operate on all of other networks.

23   Q.  What kind of information was stored in Confluence?

24   A.  So, it is a Wiki, so often it would be describing

25   techniques and tools.  Not a ton of source code, maybe some

1    proof concept stuff, but mostly just descriptions of

2    capabilities.

3    Q.   Is that information that you would consider sensitive?

4    A.   Yes.

5    Q.   Why?

6    A.   Because it describes everything that the tool does,

7    typically, or a technique that is then signaturable by an

8    adversary who can then attribute it to the CIA.

9    Q.   Explain a little bit more about what you just said of the

10   issues of a tool being signaturable by an adversary.  What does

11   that mean?

12   A.   Yes.  So as part of attribution of an operation or a

13   capability, right, like an adversary will look at a captured

14   piece of malware, they'll try to identify uniqueness in that

15   malware and then they can use that to attribute it to another

16   actor who may use that same technique and then, in the context

17   of Confluence, right, if you have the CIA description of that

18   exact unique technique then they can attribute it further to

19   CIA.

20   Q.   In your capacity as an administrator on Confluence, did you

21   ever have occasion to access the server that the Confluence

22   service was running on?

23   A.   Like, the physical server?

24   Q.   Yes.

25   A.   No.

M6T5sch3                        Stedman - Direct

1   Q.   Why not?

2   A.   Like I said, my interest in being an administrator on

3   Confluence was limited to those reasons, right, like the

4   classification templates, the plug-ins, the add-ins.  I didn't

5   really need anything else.

6   Q.   As a Confluence administrator, did you ever delete log

7   files of activities on Confluence?

8   A.   No, I did not.

9   Q.   Why not?

10  A.   There is no reason to.  The logs are a security and

11  auditing feature, and so to delete them without a proper reason

12  would seem suspicious.

13  Q.   Do you know if there were backups that existed for

14  Confluence in the other Atlassian products?

15  A.   So I think the -- there were backups local, like it depends

16  on the point in time, again, because as these were being stood

17  up there were very few services that were kind of in their full

18  functional state.  But I believe there were local backups and I

19  know there was talk of offsite backups but I don't know that it

20  ever got implemented.

21  Q.   When you say local backups, do you know where those backups

22  were stored?

23  A.   I believe in our server room.

24  Q.   Did you know how to access those backups?

25  A.   No.

M6T5sch3                        Stedman - Direct

1   Q.  I want to talk a little bit about OSB and just to help with

2   something you just said let's focus on the time frame kind of

3   at the end of 2015, start of 2016.  OK?

4   A.  OK.

5   Q.  What was sort of the culture and atmosphere in OSB at that

6   time like?

7   A.  So 2015-2016 Sean was our direct supervisor, the culture

8   was very casual, laid back.  There was a lot of kind of

9   bullshitting throughout the day, often times kind of bridging

10  into the unprofessional.  As it got further into 2016 things

11  got a little bit more on edge, I would say, as a series of

12  events unfolded.

13  Q.  We will get to that series of events in a second.

14      While you were working in OSB, how often did you interact

15  with the defendant personally?

16  A.  Quite frequently.  I sat right across from him, so whenever

17  I was around and he was around we would interact.

18  Q.  Just briefly if you can, can you describe sort of the

19  physical layout of where you said you were sitting across from

20  the defendant?

21  A.  Yes.  So in our vault, it is kind of a big, you know,

22  cubicle form, so in our aisle there is probably like -- it is

23  four or six desks up front and we were back in the bullpen area

24  with four desks.  It was myself, Josh across from me, Jeremy

25  behind him, and Amol behind me.

1   Q.  In addition to interacting with the defendant yourself, did

2   you observe him interact with other members of OSB during that

3   time frame?

4   A.  I did.

5   Q.  Can you describe what his interactions with other members

6   of the branch were like during that time frame?

7   A.  I mean, like I said, we did a lot of joking around in that

8   office so it would be kind of, you know, playing with each

9   other back and forth as far as, like, either making fun of the

10  project or, you know, the code or something to that effect, or

11  the customer.  In particular, things got more on edge and more

12  personal attacks between Josh and Amol as time went on.

13  Q.  So just before we get to that I want to stay on some other

14  aspects of OSB's work.  You talked about sort of joking around.

15  Did people in the branch have nicknames?

16  A.  Yes.

17  Q.  Did you have a nickname?

18  A.  I did.

19  Q.  What was your nickname?

20  A.  My nickname was Dick Move.

21  Q.  How did you get that nickname?

22  A.  So, I believe I brought in baked goods to celebrate maybe

23  my birthday or something, and I got them out after lunch but a

24  couple people had already left for the day at that point in

25  time, so they called me Dick Move because they said I did it

1    intentionally.

2    Q.  What about Amol, did Amol have a nickname?

3    A.  He did; we called him Eeyore, primarily.

4    Q.  What was that a reference to?

5    A.  Kind of just like -- we considered him to have somewhat of

6    a mopey personality and kind of like always somewhat funnily, I

7    guess, depressed in that way when he was talking about the

8    work.

9    Q.  And what about the defendant?  Did he have any nicknames?

10   A.  Yep.  So he -- at one point in time he printed off a name

11   tag that said Bass Ass and put it over his cube, and I think

12   what we called him typically was the Nuclear Option.

13   Q.  What is that a reference to?

14   A.  It is a reference to kind of like this -- he would talk

15   about approaching situations and he wouldn't care about kind of

16   the process or playing nice, he would just skip right from zero

17   to 11.  And so if there was, like, a project or something that

18   we didn't want to do or we thought was a bad idea, the joke was

19   that we could bring him into the meeting and he would tell the

20   customer to their face that they were stupid, that their idea

21   was stupid, that we weren't going to do it.

22   Q.  And sorry.  When you say go from zero to 11, what do you

23   mean by that?

24        MR. SCHULTE:  Objection.

25   A.  I mean kind of skipping --

1           THE COURT:  Hold on one second.

2           THE WITNESS:  Sure.

3           THE COURT:  There was an objection.  The objection is

4   overruled.

5   A.   I mean like skipping professional steps, right?  Like

6   trying to hold another meeting, advise on why you feel this way

7   or was just going to be straight from, like, them telling us

8   what they want and we saying we are not going to do it, it's

9   stupid.

10          THE COURT:  Can I ask you, a couple times you have

11  mentioned customers.

12          THE WITNESS:  Yes.

13          THE COURT:  Can you explain what you mean?  Because it

14  is not clear.

15          THE WITNESS:  Yes.  So the tools we are building are

16  for a customer, in a sense, or for a particular operation.  So

17  most of the time our customer is COG, the operations group, and

18  so they'll have an operation coming up or have an opportunity

19  and they'll ask us to build something for that and we will kind

20  of go back and forth on what's the best tool for the job.

21          THE COURT:  So it is the person or a group within the

22  CIA for whom the tool is being developed?

23          THE WITNESS:  Yes.  The customer would be for whom the

24  tool was being developed.

25          MR. DENTON:  Thank you, your Honor.

M6T5sch3                        Stedman - Direct

 1   BY MR. DENTON:

 2   Q.  With respect to sort of the defendant's nickname Nuclear

 3   Option, did you think that was a fair characterization of his

 4   behavior during this time frame?

 5   A.  I -- once again, it is a point in time thing.  I think

 6   towards the beginning the nickname felt more like just kind of

 7   funny talk and kind of how we all maybe wouldn't approach a

 8   situation but it wasn't the best way to do it.  Getting into

 9   the fall of 2015 into 2016 I think it was more fair, yes.

10   Q.  Do any particular incidents come to mind in your discussion

11   of that time frame?

12   A.  A couple, yes.

13   Q.  And did any of them involve particular cyber tools that the

14   defendant was working on?

15   A.  Yes.

16   Q.  What was the name of the tool?

17   A.  So it is actually, I guess, two portions; Brutal Kangaroo

18   and Drifting Deadline.

19   Q.  Why was the tool called Drifting Deadline?

20   A.  The tool was named Drifting Deadline kind of as a joke

21   about how it was never completed or it never fully complete to

22   the requirement standard.  So yeah, we kept moving the delivery

23   date for the tool.

24   Q.  And who was responsible for that tool?

25   A.  Josh was the lead.

1   Q.  And so what is the incident that you are referring to

2   relating to Drifting Deadline?

3   A.  So I guess it is a little bit of a longer story but I will

4   try to summarize it.

5       So Drifting Deadline was being built for a customer.  Given

6   it was taking as long as it was and hadn't been delivered,

7   there was the operations group put in another requirement for a

8   very similar tool basically to accomplish the same thing.  And

9   they contracted that tool out and so there was a competing tool

10  called Almost Meat that would do effectively the same thing,

11  kind of full Kangaroo suite at the end of the day.  So there

12  was meetings about -- basically there was a piece or component

13  of Drifting Deadline/Brutal Kangaroo that we wanted to also --

14  that the customer also wanted to use in Almost Meat.  It is

15  kind of the most powerful piece of the tool, without that piece

16  it is not really an effective tool, so there were discussions

17  around that that seemed to go or exhibited the Nuclear Option

18  nickname.

19  Q.  Let me stop you there.  This piece of the tool that you are

20  talking about, who wrote that piece?

21  A.  So I wrote the execution vectors which encompassed the

22  exploits.

23       THE COURT:  On Almost Meat or Drifting Deadline?

24  A.  Technically, for both; so originally for Drifting Deadline

25  and we used them also in Almost Meat and I wrote the variation

1   for that.

2   Q.  You said that there were meetings about this, right?

3   A.  Correct.

4   Q.  Is there any particular meeting that is memorable to you?

5   A.  There is.

6   Q.  Tell us about that meeting.

7   A.  Yes.  So we were going to go meet with basically the person

8   who runs the contract for us and then the contracting

9   developers who were going to integrate those execution

10  investigators or exploits into Almost Meat, and I remember this

11  in particular because somewhat jokingly Josh said that he was

12  going to participate in the meeting and Sean said -- or our

13  supervisor said no, you're not.  At the time of the meeting I

14  get up from my desk, walk out towards -- the meeting is across

15  the hall so I walk out towards that way and Josh follows along

16  and I meet Sean at the end of the aisle.  Sean says to Josh,

17  You are not coming to this meeting.  Josh says, Fuck you, I'm

18  coming to this meeting.  Sean was a little bit taken aback but

19  kind of laughed it off a little bit.  And as we were walking

20  across the hall, Sean goes, OK, you can come, but you are

21  sitting in the back of the meeting.

22          We have the meeting.  The question comes up on how

23  long it will take us to do the diversification of the exploits

24  or the execution vectors and be able to provide them to the

25  contractor.  At that point Josh pipes in from the back and says

1  on the order of months, and then I respond and basically say,

2  no, I think it will only take me a couple -- three weeks.

3  Q.  So let's unpack some of what you described there.  First of

4  all, was the defendant invited to this meeting?

5  A.  No.

6  Q.  And when you were referring to Sean, was that your

7  supervisor at the time?

8  A.  Correct.  Yes.

9  Q.  Was he also the defendant's supervisor?

10 A.  Yes.

11 Q.  You talked about discussion of a task involving

12 diversification.

13 A.  Yes.

14 Q.  At a high level, what did that entail?

15 A.  So diversification is really just kind of this process

16 where we are trying to make it more difficult for an adversary

17 to have a sample of one tool and be able to relate that to

18 another tool.  So similar to the attribution discussion

19 earlier, right, we don't want an adversary to be able to, if

20 they do discover an operation or a capability, to use that

21 information to discuss other operations or other capabilities.

22 Q.  Who was going to be responsible for performing that

23 diversification work?

24 A.  That was me.

25 Q.  And who expressed an opinion about how long it was going to

M6T5sch3                      Stedman - Direct

1  take to do that work?

2  A.  Both Josh and myself.

3  Q.  Did you agree with what the defendant had said?

4  A.  No, I did not.

5  Q.  Why not?

6  A.  Because it wasn't him doing the work and I think he was

7  just trying to push off the contracting effort timeline.

8  Q.  After the meeting did you talk to the defendant about what

9  he had said?

10  A.  Just briefly.

11  Q.  Tell us about that interaction.

12  A.  It was mostly -- so, Josh came by my desk afterwards and I

13  was sitting there and he goes, something to the effect of,

14  Don't you think it will take more like, you know, several

15  months?  I said, no, it will take more like a couple weeks I

16  think.  And that was the end of the conversation.

17  Q.  What was your reaction to that conversation?

18  A.  I mean, I didn't think he really had much say in the matter

19  and I think he was really just trying to push a certain

20  objective.

21  Q.  What objective was that?

22  A.  I think he saw Almost Meat being a tool that the operations

23  group asked for being the same thing as Drifting Deadline

24  because they weren't getting what they wanted out of Drifting

25  Deadline; he basically saw it as a competing effort and he

1  wanted to basically dampen its chances of success so that

2  Drifting Deadline and Brutal Kangaroo would be the primary

3  tool.

4  Q.  I want to shift gears back to something you started to

5  reference earlier.  There were some interactions between the

6  defendant and Amol.  Did you observe interactions between the

7  defendant and Amol during your time in OSB?

8  A.  Yes.

9  Q.  As a general matter, what were those interactions like that

10 you observed?

11 A.  I mean, when Amol started with us he was a very formal

12 interactor so, like, we would make fun of him a little bit

13 about how formally he answered the phone, things like that.  So

14 it started out fairly jovial, joking.  Amol was assigned to

15 Drifting Deadline/Brutal Kangaroo, that project.  As the tool

16 continued to not be delivered, interactions became more

17 hostile, more personal attacks when they're talking about it or

18 each other.

19 Q.  What do you mean when you say personal attacks?

20 A.  It was less focused about, like, joking on the customer or

21 the capabilities or the developer's skill and came to the fact

22 that, like, people would be called fat and/or bald or whatever

23 else.

24 Q.  Did there come a time when this sort of level or intensity

25 of these attacks escalated?

1    A.  Yes.

2    Q.  When was that?

3    A.  So I know, like, around the fall of 2015 the attacks, the

4    incidents where Josh had called Amol fat and there were more

5    personal attacks around that.  At some point in there Amol had

6    approached our supervisor basically saying that Josh no longer

7    should be working on the project, or it is affecting him.  And

8    then the following day or a couple days later is when Josh

9    alleged that Amol had threatened to kill him.

10   Q.  Did there come a time when you saw the actual complaint the

11   defendant made against Amol?

12   A.  I did, yeah.

13   Q.  Where did you see it?

14   A.  I was at my desk.

15   Q.  Who showed it to you?

16   A.  Josh.

17           MR. DENTON:  Ms. Cooper, if we could put up what is in

18   evidence as Government Exhibit 1038 and go to page 5, please?

19   And if we could blow up the text to make it a little easier to

20   read?  Thank you, Ms. Cooper.

21   Q.  Mr. Stedman, do you recognize this?

22   A.  Yes.

23   Q.  What is it?

24   A.  It is the statement Josh showed me at my desk.

25   Q.  Did the defendant say anything to you when he showed it to

M6T5sch3                          Stedman - Direct

1   you?

2   A.  He said something to the effect of if you're curious about

3   what's going on, this is what it is -- or something.

4   Q.  And did you read this?

5   A.  I did.

6   Q.  Did you convey any reaction to the defendant after reading

7   it?

8   A.  So he handed it to me, I read through it silently and

9   handed it back to him and I said OK.

10  Q.  Internally, did you have a reaction to this document?

11  A.  Yeah.

12          MR. SCHULTE:  Objection.

13  A.  I was pissed off.

14          THE COURT:  The objection is overruled.

15  Q.  Sorry.  Could you say that again?

16  A.  Yeah.  I was pissed off.

17  Q.  Why were you pissed off?

18  A.  Because I felt like he didn't understand what he was doing

19  in the situation or what he was doing to the branch.

20  Q.  When you say "he," who are you referring to?

21  A.  Josh.

22  Q.  What do you mean by he didn't understand what he was doing?

23  A.  I think -- I think that he didn't understand the level that

24  this would rise to, how it affects everybody's interaction in

25  the branch from here on out, that this would be taken seriously

1   to the level it was and it was no longer just this kind of back

2   and forth game, this was now very serious.

3   Q.  Did the substance of these allegations surprise you when

4   you read them?

5   A.  The substance -- I mean, the short of it is that I didn't

6   believe them.  I think surprise to some degree, yes; to some

7   degree no.  Like surprised that he would take it this far.

8   Surprised -- not so surprised that, like, that he would

9   retaliate I guess.

10  Q.  And why didn't that surprise you?

11  A.  Because I think it's in pattern with all the other events

12  that I have been around him for.

13              MR. DENTON:  We can take that down.  Thank you,

14  Ms. Cooper.

15  Q.  Did there come a time when the defendant and Amol were

16  moved out of the OSB branch?

17  A.  Yes.

18  Q.  When the defendant was moved out of OSB, did you

19  participate in any discussions about what would happen to the

20  OSB projects he had been working on?

21  A.  Yeah.

22  Q.  Who was involved in those discussions?

23  A.  So at the time I was kind of in training on a different

24  floor so I was bouncing between the floors.  I would come up

25  and I would talk to Jeremy a little bit to Sean, but most of it

M6T5sch3                          Stedman - Direct

1    was Jeremy, Sean, Anthony, and myself.

2    Q.  Was the defendant involved in those conversations?

3    A.  Josh was not talking necessarily to Jeremy and myself but

4    to Sean and Anthony, yes.

5    Q.  Generally speaking, what was the subject of those

6    discussions?

7    A.  So if we are talking about the point in time where he was

8    moved to RDB, we were talking about basically which projects he

9    should keep with him and develop out of RDB and which should

10   stay in OSB.

11   Q.  Are you familiar with a project called OSB Libraries?

12   A.  Yeah.

13   Q.  Was that one of the projects that was the subject of these

14   discussions?

15   A.  It was.

16   Q.  Before leaving OSB, what was the defendant's role with OSB

17   Libraries?

18   A.  So he was a co-administrator of those libraries.  We kind

19   of split out categories to different people so that different

20   people would manage or administer each of the libraries.

21   Q.  What, if any decision, did you participate in about how the

22   OSB Libraries would be handled after the defendant was moved

23   out of OSB?

24   A.  So we were discussing basically the plan for those

25   libraries.  While it was intended for them to go to the

```
 1   division level, they would still be administered out of OSB
 2   with everybody else in the division able to contribute to them
 3   in the same way a normal user would.
 4   Q.  And what, if any effect, did that decision mean for the
 5   defendant's administrative role in the OSB Libraries?
 6   A.  It meant that he would lose his administrator role for the
 7   OSB Libraries as he moved to RDB.
 8           THE COURT:  All right, and that's where we will call
 9   it for the morning.
10           Ladies and gentlemen, first the usual reminders:
11   Don't discuss the case, continue to keep an open mind, don't do
12   any research about the case.  And then second, a reminder from
13   this morning, just please, please, please, to keep yourselves
14   safe and keep the trial on track.  Please adhere to our safety
15   protocols so remain masked unless you are actively eating or
16   drinking, and if you are actively eating or drinking, try to
17   distance yourself from anyone else who is unmasked, again, as
18   much for your own safety as for keeping things moving on track
19   and getting you back to your lives.
20           With that, you are excused.  Let's be ready to go at
21   12:15 so we can start up at 12:20 promptly.
22           THE DEPUTY CLERK:  All rise.
23           (Continued on next page)
24
25
```

M6T5sch3                        Stedman - Direct

 1                 (Jury not present)

 2                 THE COURT:  You may be seated.

 3                 Mr. Stedman, you may step down.  Put your mask on

 4      before you do.  Please be wherever you are told to be at 12:15

 5      so that you are ready to go back on the stand for us to resume.

 6                 Thank you, and enjoy your break.

 7                 THE WITNESS:  Thank you.

 8                 (witness steps down)

 9                 THE COURT:  Mr. Denton, I am assuming, based on your

10      estimate of yesterday, that you have somewhere between 20 and

11      30 minutes on direct; is that an accurate assumption?

12                 MR. DENTON:  That's about right, your Honor.

13                 THE COURT:  Anything else that the government wants to

14      discuss or raise now?

15                 MR. DENTON:  Not unless there was something about

16      juror 13 to discuss.  But, he seemed to be doing OK standing up

17      this morning.

18                 THE COURT:  Yes.  Apparently when Ms. Smallman said

19      that I was willing to have him brought in and speak to me he

20      changed his tune and said as long as he could stand -- and he

21      did that a couple times -- that he would be fine.  So I assume

22      that he had no issues until he learned that we do have an issue

23      so keep our fingers crossed.

24                 Mr. Schulte, anything you need to discuss?

25                 MR. SCHULTE:  Just a small thing I just wanted to

1    raise to the Court's attention.

2           The government keeps bringing out or showing documents

3    of information they claim to be classified like the NTFS

4    parsing statement or Foreign Office West and those are no

5    longer part of the indictment or the charged conduct, so I just

6    wanted to make sure that -- I guess it would be an instruction

7    to the jury that they are aware of that.

8           THE COURT:  I think the issue is a valid one, which is

9    to say that I certainly think that at the appropriate time the

10   Jury needs to understand what precise statements they need to

11   evaluate and we will need to discuss how best to accomplish

12   that, so you should both be thinking about it with respect to

13   the MCC charges but I don't think now is the time for us to go

14   through that.

15          I did get proposed redactions to the transcript of

16   June 27th.  I think that the proposed redactions are quite

17   limited and narrowly tailored to what I think the potential

18   spillage is, or spillage from that day so I approve those.  I

19   don't know what needs to happen to implement those and have the

20   transcript publicly available but I would ask everybody to make

21   sure that happens expeditiously and also obviously means that

22   Mr. Schulte can take it with him.

23          I was told there may be spillage issue with respect to

24   yesterday's transcript so I would just ask the government and

25   its stakeholders to make sure you review that promptly and let

M6T5sch3                       Stedman – Direct

1    me know as quickly as you can if there are any proposed

2    redactions for that so that we can get that done and public as

3    well.  All right?  Very good.

4              Enjoy your break.  See you.  Please be in the

5    courtroom at 12:15.  I think we have had some slippage on that

6    front as well so I want to try to keep to our schedule.

7              Thank you, enjoy your break.

8              MR. DENTON:  Your Honor, do you want Mr. Stedman on

9    the stand then or wait to see if there is anything we need to

10   take up?

11             THE COURT:  Since no one had anything to take up now I

12   will assume there will be nothing in half an hour and he should

13   be on the stand.

14             Thank you.

15             MR. DENTON:  Will do.

16             LAW CLERK:  All rise.

17             (Luncheon recess)

18             (Continued on next page)

19

20

21

22

23

24

25

M6tWsch4

1                                    AFTERNOON SESSION

2                                         12:15 p.m.

3                  (Jury not present)

4                  THE COURT:  You may be seated.  We'll get the jury and

5       carry on.

6                  Two things.  One, I'm told that there is a technical

7       issue with respect to processing Friday's transcript that has

8       caused a little bit of a delay given the redaction issue from

9       Friday.  So I just wanted to say that.  Maybe the parties are

10      already aware, but to the extent that the press or the public

11      was looking for it, that is why.  But we're hoping to fix that

12      expeditiously and get it done.  And I already approved the

13      redactions to Monday's, so hopefully that will get done without

14      any technical problems.

15                 To circle back to yesterday, I assume when we're done

16      with this witness we can hopefully lift the restrictions and

17      deal with all that in the swapping of the witnesses.  Is that

18      do believe, do you think?

19                 MR. DENTON:  Yes, your Honor.

20                 We will have the next witness available to come in

21      immediately.  Depending on whether the Court wants to take a

22      minute, another stand and stretch just to let people come if

23      they want to, that's fine, but from a moving-forward

24      perspective, we'll be ready to start right away.

25                 THE COURT:  OK.  And do you know how long it will take

M6tWsch4

1    before Mr. Stedman has cleared the area such that the

2    restrictions would be liftable?

3              MR. DENTON:  Shouldn't take more than a couple

4    minutes, at most.

5              THE COURT:  OK.  I would say why don't you as with Mr.

6    Stedman take your time a little bit in getting the next witness

7    on the stand, and perhaps by doing it that way, we can just

8    proceed without much of a delay, if anything.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may be seated.  Welcome back.  I hope

3    you enjoyed your breaks.  We will continue with the direct

4    testimony of Mr. Stedman.

5           Mr. Stedman, you remain under oath.  And you may and

6    should remove your mask at this time.

7           Go ahead, Mr. Denton.

8           MR. DENTON:  Thank you, your Honor.

9    Q.  Good afternoon, Mr. Stedman.

10   A.  Good afternoon.

11   Q.  Before we broke, you were talking about a decision to

12   remove the defendant as an administrator on the OSB libraries

13   project.  Do you remember that?

14   A.  Yes.

15   Q.  And just remind us quickly who participated in the

16   discussions that led to that decision that you were talking

17   about.

18   A.  So, I think from a line level, Jeremy and myself were more

19   kind of -- we would provide suggestions and we'd be the ones

20   implementing it, but I believe most of those decisions were

21   made by Sean and Anthony, supervisor on the next level up.

22   Q.  Now, you talked about having been an administrator on

23   Confluence.  Do you remember that?

24   A.  Uh-huh.

25   Q.  Did there come a time when you lost your administrative

M6tWsch4                          Stedman - Direct

1  role on Confluence?

2  A.  Yes.

3  Q.  How did you come to lose your administrative role on

4  Confluence?

5  A.  So, in spring of 2016, everybody who was a line-level

6  employee lost their administrator access to all the Atlassian

7  suite.

8  Q.  How did that come to be?

9  A.  So, there was an incident where Josh used his administrator

10  credentials for Stash to put himself back onto the OSB library

11  repositories.  That weekend, Jeremy and a member of the

12  infrastructure team came in and removed all access, Jeremy and

13  an administrator came in to remove all accesses for line-level

14  people from the Atlassian suite.

15  Q.  And when you say an administrator came in with Jeremy, an

16  administrator of what?

17  A.  Yeah.  We had an infrastructure team that was supposed to

18  be administering the Atlassian suite, and so they were the ones

19  who helped remove and basically took ownership of that

20  administrator right on Atlassian.

21  Q.  And how did you react to that news?

22  A.  I mean, to me, it was less an issue that I lost my

23  administrator credentials to Confluence.  It was more so kind

24  of surprise, maybe a little bit of disappointment that Josh had

25  crossed that line.

1   Q.   What do you mean by crossed that line?

2   A.   So, the security model in place on DevLAN and in most

3   networks is, like, there's trust placed in those administrators

4   to use it appropriately.  To use your administrator credentials

5   to give yourself access that you were explicitly denied to,

6   like something that you were explicitly denied access to is

7   breaking that trust, and there's not really any going back from

8   breaking that trust.

9   Q.   When you were a Confluence administrator, did you have the

10  ability to change people's permissions on Confluence?

11  A.   Ability to change, like, page permissions and probably,

12  like, people's ability to view certain pages, yeah.

13  Q.   From your perspective, did the fact that you had the

14  ability to make those changes mean that you were authorized to

15  make whatever changes you wanted?

16  A.   No.

17  Q.   Why not?

18  A.   Right?  Like I said, there's trust put in the administrator

19  to use it appropriately and that for -- for the mission.

20  Right?

21  Q.   Did there come a time after these changes were made to the

22  Atlassian administrator permissions when you had a conversation

23  with the defendant about his privileges?

24  A.   Yeah, it was the Monday after that weekend.

25  Q.   Where did that conversation happen?

M6tWsch4                          Stedman - Direct

1   A.  At my desk.

2   Q.  And what floor of the CCI office was your desk on at that

3   time?

4   A.  I was on the ninth.

5   Q.  And where was the defendant working at that time?

6   A.  I believe he was on the eighth.

7   Q.  And tell us about that conversation, please.

8   A.  Yeah.  So, I think it was following that weekend, we all

9   lost access to Atlassian, at least from the administrator

10  perspective.  Josh came up to my desk and said something to the

11  effect of, hey, Sean said I could be an administrator on the

12  OSB libraries, and basically insinuating can you put me back

13  on, to which I responded that I'd need to hear it from Sean.

14  Q.  And what did the defendant do after that?

15  A.  He kind of walked away towards Sean or Anthony's office.

16  Q.  Did you ever, as you put it, hear it from Sean?

17  A.  No.

18  Q.  What was the defendant's demeanor like during that

19  conversation?

20  A.  So, to me it appeared that he was annoyed, but he kind of

21  made it come off as, like, somewhat casually, like, this was

22  all just a big mistake, I just hadn't been informed yet, could

23  you please fix it.

24  Q.  Did there come a time after that conversation when you left

25  the CCI office?

1    A.  Yes.

2    Q.  And is that when you moved to Foreign Office West?

3    A.  Correct, yeah.

4    Q.  During the interim, before you moved to Foreign Office

5    West, did you have much other interaction with the defendant?

6    A.  No, I did not.

7    Q.  When you moved out to Foreign Office West, did you have

8    access to DevLAN from there?

9    A.  Yes, I did.

10   Q.  How did you access DevLAN from that foreign office?

11   A.  So, we had a -- I had a single DevLAN workstation that I

12   could use.

13   Q.  And what was the connection like between DevLAN and Foreign

14   Office West?

15   A.  Very poor.

16   Q.  What do you mean by very poor?

17   A.  Like, I remember specifically creating a PowerPoint

18   presentation.  It wasn't even a big one, and I tried to move it

19   to a file share on DevLAN and it said it would take six hours.

20   It was moving at about 40K a second.

21   Q.  And is that a reference to the connection speed?

22   A.  Yeah, yeah.

23   Q.  Did that ever improve or otherwise change during the time

24   that you were in Foreign Office West?

25   A.  No, it did not.

1  Q.  Is information about DevLAN's connections something you

2  would ever share outside the CIA?

3  A.  No.

4  Q.  Why not?

5  A.  So, in my mind every piece of information that you describe

6  about our network, our tradecraft, the way that we operate is

7  giving our adversary kind of a leg up.

8  Q.  And how would that be giving an adversary a leg up, at a

9  general level?

10  A.  Yeah.  At a general level, I think when intelligence

11  agencies are trying to decide, you know, which operations to

12  pursue to get the most kind of bang for your buck, they're

13  looking at how much they know about what is there that they're

14  after and how difficult it is to get to that point.  So in that

15  evaluation, the more that we reveal about what exists there and

16  how, how it's laid out and how to get to it, I think, helps the

17  adversary.

18  Q.  And when you talk about that kind of sensitive information,

19  would that include information about other networks connected

20  to DevLAN?

21  A.  I would include it, yeah.

22  Q.  Mr. Stedman, I want to ask you to think back to March 7,

23  2017.  Do you remember that day?

24  A.  I do.

25  Q.  Why is that a memorable day?

A.  It's the day that the leaks happened and I lost all my

work.

Q.  Please describe what happened the day that you learned

about those leaks.

A.  Yeah.  So, I was at Foreign Office West and I was sitting

at my computer and then somebody from our headquarters messaged

me and said that the tool that I'd been working on the last

couple of years was in the news.  I knew that that tool had not

yet been deployed, so there's only really one location where

that information could have come from.  And so I guess kind of

the fallout from there, we kind of realized the potential

exposure or the leak.  I went around the office notifying

people, trying to figure out what it meant for us.  The chief

of Foreign Office West called a meeting and we discussed kind

of all the potentials of, you know, from whether we prepared

to, to leave, especially the people who would have potentially

been revealed in the leaks and how to mitigate the effect it

had on all of our office's operations.

Q.  And again, at a general level, what was the effect that it

had on your office's operations?

A.  I mean we stood down on all operations.  We tried to

mitigate to the extent that we could the blowback that it had

to the people involved and the tools.  All the tools that were

in the leaks could no longer be used, so it was just basically

trying to figure out how to mitigate it to the degree we could.

M6tWsch4                          Stedman - Direct

1  Q.  After the leak happened, did you continue using DevLAN?

2  A.  No.

3  Q.  Why not?

4  A.  I think we understood early on that there was potential

5  there that somebody had leaked from DevLAN, and then I think

6  maybe -- that was informal guidance.  I think maybe the

7  following day we heard the formal guidance not to touch the

8  system.

9  Q.  And what, if anything, happened to the computer that you

10 used to access DevLAN from Foreign Office West?

11 A.  The FBI came and retrieved it.

12 Q.  We were talking a moment ago about the sensitivity of

13 information about DevLAN connections.  Now that you were no

14 longer using DevLAN, was that still information you would

15 consider sensitive?

16 A.  Yup.

17 Q.  Why?

18 A.  I think back to the same thing I said before.  Any

19 information about how we operate, how we used to operate --

20 right -- a lot of things don't change significantly over time.

21 And so any detail about that, to me, gives information that our

22 adversary can use against us.

23 Q.  Are you familiar with a CIA tool named Bartender?

24 A.  I am.

25 Q.  Did you have any involvement in work on Bartender?

1  A.  Very little, if any.

2          MR. DENTON:  If we could put up Government Exhibit 809

3  and go to page 10, Ms. Cooper.

4          If we could blow up the top left sort of quarter of

5  the page, please.

6  Q.  Mr. Stedman, do you see where it says "tool described in

7  vendor report is in fact Bartender"?

8  A.  Yes.

9          MR. SCHULTE:  Objection.

10          THE COURT:  Overruled.

11  BY MR. DENTON:

12  Q.  Are you familiar with Bartender having been identified in a

13  vendor report?

14  A.  Yes.

15  Q.  Generally speaking, what kind of vendor report are we

16  talking about?

17  A.  So, security products, antivirus, they tend to do reports

18  on any piece of malware that is significant for one reason or

19  another.  Right?  So it's either unique in the way it operates

20  or what it had achieved was unique.  So in this case, we're

21  talking, you know, a vendor report detailed how Bartender

22  worked and potentially a little bit of information about the

23  operation that it was used in.

24  Q.  Have you read that report?

25  A.  I have.

1   Q.  Did it use the name Bartender to describe this tool?

2   A.  No, it did not.

3   Q.  Did it associate that tool with the CIA?

4   A.  No.

5   Q.  Do you know whether Bartender was discussed in the

6   WikiLeaks materials?

7   A.  I believe it was, yeah.

8   Q.  Did the material disclosed by WikiLeaks associate the CIA

9   tool Bartender with the tool identified in this vendor report?

10  A.  No.

11  Q.  Would it be problematic to associate the CIA tool Bartender

12  with the tool that was described in the vendor report?

13  A.  I believe so, yes.

14  Q.  Why would that be problematic?

15  A.  So, and especially so for Bartender, a lot of the tools

16  that we develop, there's a human operator involved that is

17  either involved in the deployment or the operation to some

18  degree.  If you highlight the fact that it is a CIA tool that

19  the vendor report is talking about, then there's now renewed

20  motivation for both the vendor and/or other intelligence

21  agencies to go searching for that data elsewhere to try to

22  reveal, you know, the human involved in that operation as well

23  as other operations and other humans involved in other

24  operations.

25  Q.  Now, you said that the tools that were disclosed in the

1    WikiLeaks releases were no longer used.  Is that right?

2    A.  Correct.

3    Q.  Is the concern that you just described still applicable

4    even after those tools stopped being used?

5    A.  Yes.

6    Q.  Why?

7    A.  Because -- so, the humans involved in our operations are --

8    are -- there are several that are still around.  And not only

9    that -- right -- the historic holding of data that they can

10   then use to unravel this operation, where it's deployed, they

11   may be able to signature tradecraft as well as find people or

12   individuals that were involved in that operation and link them

13   to current operations.

14        MR. DENTON:  We can take that down, Ms. Cooper.  Thank

15   you.

16   Q.  Other than testifying in connection with this case, have

17   you ever talked publicly about your work on cyber tools for the

18   CIA?

19   A.  No.

20   Q.  Why not?

21   A.  There's -- there's nothing to gain from it, and like I said

22   with everything else, it only gives more information to our

23   adversaries.

24   Q.  During the course of your career at the CIA, about how much

25   of your time had been spent on the development of cyber tools?

1  A.  All of it.  So 10 to 12 years, something like that.

2  Q.  And what impact, if any, did the WikiLeaks disclosure have

3  on your work up to that point?

4  A.  Destroyed all of it.

5  Q.  And when you say destroyed all of it, what do you mean?

6  A.  Meaning that everything that I had written to deploy on a

7  target system, which is probably 95 -- 90 to 95 percent of what

8  I'd written, was no longer to be -- no longer able to be used

9  for CIA operations.

10  Q.  And what, if any, effect did that have on your work going

11  forward after the leaks?

12  A.  I mean for that group in particular, I think we're still

13  dealing with morale issues surrounding kind of the -- the

14  defeated state of losing all of your work.  So, yeah, it's

15  definitely still affecting our ability to execute operations as

16  well as the morale of the workforce.

17          MR. DENTON:  If I could just have a moment, your

18  Honor?

19          No further questions.

20          THE COURT:  Cross-examination.

21  CROSS-EXAMINATION

22  BY MR. SCHULTE:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  You did not witness the incident between me and Amol that

1   Mr. Denton asked you about, correct?

2   A.   Which incident is this?

3   Q.   From, you said, spring of 2016.

4   A.   The alleged death threat?

5   Q.   That's correct.

6   A.   I did not witness it, no.

7   Q.   In fact, at the time the incident was set to occur, you

8   were not in the office, correct?

9   A.   I believe I was on another floor.

10  Q.   And you signed the complaint and witness statement to that

11  effect, right?

12  A.   That I was on another floor?

13  Q.   That you weren't --

14  A.   Present?

15  Q.   Yeah.

16  A.   Yeah.  I was not present in that office.

17  Q.   OK.  I think you testified about the government exhibit,

18  809, the last document you testified about.  OK.  You've never

19  seen this document before, right?

20  A.   I've seen it presented to me before, yeah.

21  Q.   By the prosecutors, right?

22  A.   Correct.

23  Q.   Before that you never saw it, right?

24  A.   Correct.

25  Q.   It was not posted on the internet, right?

M6tWsch4                    Stedman - Cross

```
1    A.  Not that I'm aware of.

2    Q.  It wasn't published in a book, right?

3    A.  Not that I'm aware of.

4    Q.  The document does not identify any vendor report, right?

5            MR. DENTON:  Objection.

6            THE COURT:  Sustained.

7    BY MR. SCHULTE:

8    Q.  Well, there's nothing in the document that you reviewed

9    that was not already on WikiLeaks, correct?

10   A.  I'm not certain about that.

11   Q.  You're not certain?

12   A.  Correct.  I'm not certain.

13   Q.  The prosecutor didn't ask you to compare anything to the

14   WikiLeaks disclosure, right?

15   A.  Correct.

16           MR. SCHULTE:  No further questions.

17           THE COURT:  All right.

18           I assume no redirect.

19           MR. DENTON:  No, your Honor.

20           THE COURT:  All right.

21           Mr. Stedman, you may put your mask back on, and you

22   are excused.

23           (Witness excused)

24           THE COURT:  Mr. Denton, can you call your next

25   witness, please.
```

1          MR. DENTON:  Yes, your Honor.

2          The government calls Sean Roche.

3          THE COURT:  All right.  Ladies and gentlemen, if you

4    want to stand and stretch in place while we await the witness,

5    I'm not sure if he's right outside or we need to find him, but

6    give us a minute and we'll get started promptly.

7     SEAN P. ROCHE,

8          called as a witness by the government,

9          having been duly sworn, testified as follows:

10         THE COURT:  Thank you.

11         Counsel, you may proceed.

12         MR. DENTON:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. DENTON:

15   Q.  Good afternoon, Mr. Roche.

16   A.  Good afternoon.

17   Q.  Just make sure that you speak forward into the microphone.

18   A.  Yes.

19         THE COURT:  And keep your voice up, please.

20         THE WITNESS:  Yes.

21   BY MR. DENTON:

22   Q.  Where do you work, sir?

23   A.  Amazon Web Services.

24   Q.  And how long have you been there?

25   A.  A year and two months.

1  Q.  Where did you work before that?

2  A.  I was on President Biden's transition team, and I was also

3  serving as an independent consultant, adviser and board member.

4  Q.  And what did you do before that?

5  A.  I worked at the Central Intelligence Agency.

6  Q.  And when did you leave the Central Intelligence Agency?

7  A.  31 October 2019.

8  Q.  How long did you work for the CIA?

9  A.  More than 26 years.

10  Q.  During the course of your career, did you work in any

11  particular field or specialty at the CIA?

12  A.  Yes.

13  Q.  What was that?

14  A.  I focused on projects and systems that performed technical

15  collection in all environments.

16  Q.  What do you mean when you say technical collection?

17  A.  These were systems that collected signals, collected

18  images, collected scientific phenomenology to support our

19  national security objectives.

20  Q.  At the time that you left the CIA, what was your position?

21  A.  I was the associate deputy director of the CIA for digital

22  innovation.

23  Q.  And what component of the CIA did you work in?

24  A.  A component called the DDI, the Directorate of Digital

25  Innovation.

1   Q.   When was the Directorate of Digital Innovation created?

2   A.   It was announced March 6 of 2015 and started to be created

3   and was officially stood up, officially, on 1 October of 2015.

4   Q.   Did you play a role in its creation?

5   A.   Yes.

6   Q.   What was that?

7   A.   I was the deputy for that directorate.

8   Q.   And what was the purpose of creating the Directorate of

9   Digital Innovation?

10  A.   The purpose was, as we realized, as the world became much

11  more digital, that we had an opportunity to enhance the

12  agency's ability to collect human intelligence, to conduct

13  in-depth analysis, and to be able to communicate very quickly

14  and securely across the world.

15  Q.   Broadly speaking, what were some of the components of DDI?

16  A.   There were four main components.  One was the Center for

17  Cyber Intelligence that conducted cyber espionage and the cyber

18  intelligence mission.  Another was the Open Source Center that

19  collected and exploited publicly available information.  The

20  other component was the worldwide Information Technology

21  Enterprise, or ITE, that ran our secure networks and secure

22  systems at the enterprise level.  And the final component was

23  the agency data office that curated all of this data that we

24  were collecting by various means.

25  Q.   In your capacity as the deputy director of DDI, did you

M6tWsch4                          Roche - Direct

1    have occasion to interact with line officers who worked in your

2    directorate?

3    A.  All the time.

4    Q.  How did you come to interact with line officers from your

5    level?

6    A.  We had various forums for doing it.  We created a forum

7    called breakfast with the bosses, where we would go to

8    different parts of the organization, different buildings, and

9    spend two to three hours meeting with officers.  In exchange,

10   we bought them breakfast and had coffee with them and talked to

11   them one on one about how things were going and learned from

12   them what we could do to make it go better.

13        I traveled overseas extensively to some of the most

14   inhospitable environments to sit down one on one with officers

15   and ask what we were doing in the field and, more importantly,

16   what we needed to do in the field.

17        I sent out a weekly message to our entire workforce and

18   frequently got requests for career counseling, mentoring.

19        And most importantly, I spent a lot of time walking the

20   halls and randomly dropping into someone's office and sitting

21   and saying what are you working on, how's it going, and where

22   do you want to go from here?

23   Q.  On a kind of day-to-day basis, what were your duties and

24   responsibilities like as the deputy director of DDI?

25   A.  Most of it was focused on allocating resources to the

1    highest priority, and those resources were mainly funding and

2    the most important resource we have, which is talent, and

3    making sure that those were constantly aligned and constantly

4    adjusted as new challenges came in and as we faced new threats.

5    Q.  Mr. Roche, I'm going to ask you to look around the

6    courtroom and let us know if you recognize anyone who worked as

7    a line officer in DDI in the 2015, 2016 time frame.

8    A.  Yes.  I recognize the gentleman at the table in the gray

9    suit wearing a white mask.

10        THE COURT:  Indicating the defendant.

11        MR. DENTON:  Thank you, your Honor.

12   Q.  Sir, have you met personally with the defendant?

13   A.  Yes, I have.

14   Q.  We'll get back to that in a second.  But just in terms of

15   the organizational structure, where in the senior management

16   hierarchy of the CIA were you as the deputy director of DDI?

17   A.  Well, it starts with the most senior level.  The leadership

18   tier is composed of three individuals: the director, the deputy

19   director, and the executive director, which has been

20   occasionally called the chief operating officer.

21   Q.  And when you say the director, are you referring to the

22   director of the CIA as a whole?

23   A.  Yes, I am.

24       So, underneath that layer, those top three, there are five

25   directorates.  I was the deputy in one of those directorates.

1  Q.  Did there come a time in 2016 when you received an email

2  from the defendant?

3  A.  Yes.

4  Q.  Do you recall having any interaction with him prior to

5  receiving that email?

6  A.  I did not have any interaction prior to that email.

7          MR. DENTON:  Ms. Cooper, if we could put up what's in

8  evidence as Government Exhibit 1093.

9  Q.  Sir, do you recognize this?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  This is an email I received at 3:06 in the afternoon from

13  the defendant.  I read it very close to, almost within a moment

14  of receiving it, and responded to it within less than five

15  minutes.

16  Q.  Before we get to that, let me ask you, who is this email

17  addressed to on that line?

18  A.  The "to" line is Andrew Hallman, my direct supervisor, who

19  was the leader of this directorate, the DDI directorate.  The

20  copies are to Meroe Park, who is the executive director of the

21  CIA, one level up, part of that troika that is the leadership

22  team on the seventh floor.  And to myself.

23  Q.  And what's the subject of this email?

24  A.  "Resignation over retaliatory management."

25          MR. DENTON:  Ms. Cooper, if we could blow up the

1   second full paragraph.

2   Q.  Mr. Roche, do you see the sentence, the second sentence

3   that starts, "I was told by my branch chief and others that

4   this was a mistake and that I had incurred the wrath of my

5   group chief, Karen, for making her look bad for this report"?

6   A.  Yes, I do.

7   Q.  Do you know who the defendant's group chief, Karen, was?

8   A.  Very well.

9   Q.  Have you worked with her before?

10  A.  Since 2005.

11  Q.  Have you supervised her?

12  A.  Yes, repeatedly.

13  Q.  What is Karen like as a manager?

14  A.  Karen is one of the most soft-spoken, kind, and

15  people-oriented managers I ever worked with.  I never heard her

16  utter a foul word.  And in fact, we, among the senior managers,

17  when evaluating her, we refer to her sometimes as our best den

18  mother, because she took everyone under her wing that was in

19  her command and tried to make them better and work with them.

20  Q.  Just to skip back to the start of this paragraph, sir, the

21  first sentence that says, "Unfortunately, in 3/2016 an employee

22  threatened to kill me which resulted in my subsequent report to

23  security and escalation to TMU."

24  A.  Yes.

25  Q.  Would you describe that as a serious incident in your

1    experience as a CIA manager?

2    A.  Very serious.

3    Q.  Do you know what the initials TMU stands for?

4    A.  That stands for Threat Management Unit.

5    Q.  Have you worked with the Threat Management Unit in the

6    past?

7    A.  Extensively.

8    Q.  What do they do?

9    A.  The Threat Management Unit is a fast-response unit

10   dedicated with a group of skills, both security, psychology,

11   counterintelligence.  They have connections with all the local

12   law enforcement and federal law enforcement, and their job is

13   to respond rapidly to threats to CIA facilities or to CIA

14   persons.

15          MR. DENTON:  If we could go back to the main document,

16   Ms. Cooper, and blow up the second paragraph.

17          Sorry.  I think I've got this wrong here.  I'm sorry,

18   Ms. Cooper.  Could we go back to -- I think it must be the

19   second page.  I'm sorry.  My notes must be off.

20   Q.  Now, Mr. Roche, I'm not going to ask you to read this

21   entire thing, but do you see a reference to a memorandum that

22   the defendant has attached?

23   A.  Yes, I do.

24   Q.  Did he, in fact, send you a copy of that memorandum as an

25   attachment?

M6tWsch4                          Roche - Direct

1   A.  I believe he did, yes.

2   Q.  Did you review it?

3   A.  Yes.

4   Q.  What was your reaction to that memorandum?

5   A.  I became very, very concerned because the issue of anyone

6   attempting to escalate privileges violates a number of security

7   regulations and rules that are foundational in an organization

8   that compartments its work very carefully to know who has

9   access, who needs access, and when they have that access.

10  Q.  And so what was your reaction to the defendant having

11  received this memorandum?

12  A.  That we had a serious problem regarding the defendant's

13  ability to understand and follow the rules that we have, the

14  important rules, some of the most important rules that we have

15  that are in place to protect the agency's mission.

16  Q.  And is there anything in particular about the work of your

17  directorate, DDI, that makes those sorts of controls important?

18  A.  Yes.  The fact that we had so many operations going on that

19  have an intricate web of commitments with foreign intelligence

20  services that are being executed by our officers who are

21  operating under cover overseas and that the information coming

22  from those operations is extremely sensitive, to the point

23  where it -- it really can affect the ability of the U.S.

24  government to provide the national security we need for our

25  people.

1        MR. DENTON:  Ms. Cooper, could we go to the next page

2   of Government Exhibit 1093, please.  And if we could blow up

3   the bottom three or four lines of the first full paragraph.

4   Q.  And do you see the last two sentences there, Mr. Roche?

5   A.  Yes, I do.

6   Q.  Can you read those, please?

7   A.  "I feel wronged and continually mistreated by the system.

8   I've reached out to HR and CCI, but no one will help me."

9   Q.  As a general matter, was it typical for you to receive

10  multipage emails from line officers in DDI?

11  A.  No.

12  Q.  What was your reaction to this email overall?

13  A.  My reaction, based on reading it, was that the -- it hit me

14  with a level of anger, vitriol, and someone who was very

15  disenfranchised and angry and someone that I needed to connect

16  with right away and determine what we needed to do to get this

17  person back to a place where they would be reasonable and

18  listen.

19        MR. DENTON:  Ms. Cooper, could we move on to what's in

20  evidence as Government Exhibit 1096, please.

21  Q.  Mr. Roche, can you remind us, what time did the defendant

22  send you his email?

23  A.  It was 1506 and some seconds.

24  Q.  And what time did you respond?

25  A.  1509 and 30 seconds.

M6tWsch4                         Roche - Direct

```
1   Q.  And can you just read us your response, please?

2   A.  "Josh, I spend hours a day on issues associated with

3   personnel.  It's one of the most important obligations I have

4   to this agency.  Would you like to come see me about this

5   tonight?  I have a meeting with the D/CIA that will be over at

6   1745, and I will stay as long as it takes.  Please let me know

7   if you would like to speak to me.  I certainly hope that you

8   will.  This is important, and it is now the No. 1 issue on my

9   plate.  Very respectfully, Sean."

10  Q.  When you referred in there to the D/CIA, what does that

11  refer to?

12  A.  That's the director of the CIA.

13  Q.  When you say this is the No. 1 issue on your plate, was the

14  defendant's email something you took seriously?

15  A.  I took it very seriously.

16  Q.  Was it something you thought needed to be addressed?

17  A.  Immediately.

18  Q.  Were you the only person who responded to the defendant's

19  email?

20  A.  I believe that my boss, Andrew Hallman, wrote a response

21  that indicated that I had the lead and also indicated that this

22  kind of issue is the issue we deal with absolutely all the

23  time.

24          MR. DENTON:  Ms. Cooper, could we put up what's in

25  evidence as Government Exhibit 1097, please.
```

M6tWsch4                    Roche - Direct

1    Q.  And who sent this email, sir?

2    A.  My supervisor, Andrew Hallman.

3    Q.  And what was his response to the defendant?

4    A.  "Josh, just getting to my email and -- to the contrary,

5    Sean and I spend most of our time on personnel issues, and I

6    know Sean is in touch.  I'll sit down with him to discuss where

7    we're at.  Regards, Andrew."

8    Q.  When he says that you and he spent most of your time on

9    personnel issues, was that true?

10   A.  Absolutely.

11   Q.  Why were personnel issues such a focus?

12   A.  It's people who deliver the mission at CIA, and as a senior

13   officer, your job is to clear obstacles and make -- make those

14   mountains seem like molehills so they can get the job

15   accomplished; to give them the confidence they need to take on

16   really, really challenging work; and to also help give them the

17   guidance to make it successful in a world where we have to

18   operate as a clandestine service.

19   Q.  Just to ask about some of those personnel matters more

20   generally, you talked about your job involving resourcing

21   decisions, is that right?

22   A.  Yes.

23   Q.  Is the number of employees that the CIA assigns to

24   particular groups or particular missions considered sensitive

25   information?

M6tWsch4                          Roche - Direct

1   A.   It's considered classified.

2   Q.   Why is that?

3   A.   It's an indicator of how much emphasis we're putting on a

4   particular mission.  The number will often have components that

5   are in the foreign field, which can indicate who in the foreign

6   field might be associated with a particular mission.  And so

7   overall, it also can give an indicator of where we are in the

8   life cycle of that mission, where its -- perhaps where its

9   maturity is based on the number of people assigned to it.

10  Q.   What sort of risks would there be if information about the

11  number of people assigned to CIA groups became public or became

12  known to an adversary?

13  A.   They can take a mosaic of information with that piece and

14  then start working backwards to say for what this number is,

15  where do we think these people are?  What do we think

16  activities are we seeing associated with this kind of mission?

17  What do we think this group does specifically?  How can we

18  target those individuals if we get some bit of information or

19  understanding that someone has a connection with this group?

20         MR. DENTON:  Ms. Cooper, if we could go back to

21  Mr. Roche's email, Government Exhibit 1096.

22         If we can just blow up the top email here, make it a

23  little larger.

24         Thank you.

25  Q.   Did the defendant take you up on your offer to meet with

1    him that evening?

2    A.   No.  I called over to the CCI front office.  I also had my

3    staff start to reach out to the administrative staff, the front

4    office staff, and I spoke to -- I believe it was the deputy

5    director of CCI, and he called me back within a short time and

6    determined that the defendant had, in fact, logged out and left

7    the building very shortly after sending me the email.

8    Q.   Did you eventually have a meeting with the defendant?

9    A.   Yes, I did.

10   Q.   Did he ever actually respond to your email to him?

11   A.   No, he did not.

12   Q.   How did you arrange that meeting with him?

13   A.   To the best of my recollection, I had, again, the staff --

14   my staff working with the front office staff at CCI to ensure

15   that I was able to meet with him as soon as possible.  My

16   recollection is that we met at about 10:00 in the morning on

17   June 30, two days after -- less than two days after the

18   afternoon email of the 28th.

19   Q.   Is there a particular reason the timing of your meeting

20   with him is memorable to you?

21   A.   Yes.  I was on annual leave that day.  I was on vacation

22   that day, and I was -- that morning I was headed to the airport

23   for an international flight, but I diverted and we set it up so

24   I could meet with him before I left.

25   Q.   Just briefly, before we get to the meeting, did you take

1    any other steps with respect to the defendant prior to meeting

2    with him?

3    A.  Yes.  I took the normal step of pulling his agency bio,

4    which had background information on him, his education, his

5    assignments, other things.  I also talked to the CCI front

6    office, who arranged discussions and feedback with various

7    members of the CCI leadership team who had worked with him.

8    And I got background and information on -- I asked about in his

9    email what these specifics were, what information we had about

10   these incidents, and basically used his email as a study guide

11   to understand the issues that had come up and led to him

12   sending me that note.

13   Q.  So turning to your meeting with the defendant, where did

14   you meet with him?

15   A.  I met with him in the deputy director of CCI's office, one

16   of the upper floors of the CCI building, that day, the 30th.

17   Q.  Do you remember that meeting?

18   A.  Very well.

19   Q.  Is there any particular reason it was memorable?

20   A.  It -- to me, it was -- the situation was as serious as I

21   thought it might be.  And overall, the responses at the

22   meeting, to me, indicated that we did have one of those very,

23   very serious situations, where an employee might decide to harm

24   the agency mission, harm an agency officer, or possibly harm

25   themselves.

1    My first obligation is to the agency mission, so it was

2    very memorable.

3    Q.  Before we get into the specifics of what was said, what was

4    the defendant's demeanor like during that meeting?

5    A.  Oh, he had a, I'll say a normal, conversational demeanor --

6    it -- I remember, my memory is that he wore an off-white shirt

7    with a UT Longhorn symbol on it -- and came in and sat down

8    across from me at the table, and we started to go through the

9    issues.

10   Q.  Let's talk about some of those issues.  Did you discuss

11   issues pertaining to the defendant's report to TMU that he

12   wrote to you about?

13   A.  I'm paraphrasing here from a conversation six years ago,

14   discussion of the threat came up, the threat from another

15   employee.  My recollection is that the defendant commented he

16   felt he had no response from TMU; that TMU wasn't doing their

17   job; that they weren't -- again, paraphrasing, they weren't

18   competent or they weren't responsive to his needs.

19   Q.  And what, if any, response did you give to the defendant

20   about that?

21   A.  I told him that I had personal experience working with TMU

22   in some very serious situations, and my consistent experience

23   is that they take any form of threat extremely seriously.

24       I also recall, in paraphrased words, telling the defendant

25   we remove people from the workplace who threaten other

1    employees immediately, while they investigate; and that I had

2    to disagree with him.  I hadn't talked to TMU about him, but

3    I've dealt with TMU extensively in my career and found them to

4    be extremely responsive.  Again, the charter of that unit is to

5    take rapid action.

6    Q.  What about managers; did you talk about the defendant's

7    complaints about his interactions with his managers from his

8    email?

9    A.  I recall that the defendant, you know, mentioned, hey, I

10   really don't think I have good managers, basically -- I'm

11   paraphrasing -- and continuing to paraphrase, you know, why are

12   bad managers allowed to stay in place?

13       I recall telling him that first-line supervisors, it's

14   often their first time to manage and so they often do need

15   help; that first-line managers we provide a lot of resources

16   for them.  Specifically raised -- there was some discussion of

17   the senior manager, Karen, and he expressed, hey, I don't think

18   very much of this person, or I -- just Karen, reiterating some

19   of the thoughts, and paraphrase, Karen was out to get him or

20   incompetent or treating him badly.  I said, hey, listen, I've

21   known her a long time.  I've got to disagree with you there.

22   I've never seen any behavior -- it's impossible for me to

23   contemplate the behavior you're describing from someone I've

24   known since 2005.

25   Q.  Sir, when you say you're paraphrasing, what kind of

M6tWsch4                          Roche - Direct

language did the defendant use in referring to Karen and some

of the other managers?

A.   The language was basically negative in the sense of, you

know, words to describe them as either not caring, incompetent,

vengeful.   And so words that would describe them as negative

towards him.

Q.   Did you talk to the defendant about matters relating to his

access permissions on mission networks?

A.   Yes, I did.   I raised the issue of the memorandum that he

received, and I noted to him and told him specifically that in

an era following the treacherous acts of Snowden in 2013 -- and

that's referring to a traitor who gave information away to

WikiLeaks, who worked at NSA -- and told him the issues of

self-escalation of privileges or changing privileges or

anything on a system that starts to break down the assigned

department compartmentation is a very, very serious issue.   And

I think the words were pretty close to this, where I said, you

know, we removed people for this, we fire people for this.

     And you know, I recall needing to tell him, and perhaps he

said, oh, I didn't realize that happened, or something like

that, but I recall telling him, you know, we have walked people

out of the CIA for -- for doing less, far less serious things,

about security, because demonstrating that you can't follow

security rules is a reason to walk someone out the door.

That's how serious it is.   And I conveyed the seriousness and

1   told him that he needs to take this seriously.

2   Q.  What did the defendant say in response to that?

3   A.  He said, well, you know, I could get back -- I could

4   restore my privileges if I wanted to, you know I could do that.

5   And so implying that he knew that, you know, or wasn't

6   completely locked out or there was a way back in.

7   Q.  Did you talk about any next steps for the defendant's

8   career at the CIA?

9   A.  He did ask.  He said, well, we've got a promotion panel

10  coming up.  How do you -- do you think what's happened here

11  will affect promotion?  I said yes, I do.  I do think it will,

12  I said.  And I reminded him how the promotion decisions are

13  made.

14      For his grade, the promotion decision is a local decision

15  made by a board within CCI.  His manager would have a

16  recommendation to that board, and the board would meet him and

17  evaluate him.  And I just basically went over the mechanics.

18  Q.  Just stepping back to a higher level, after the meeting was

19  over, what was your reaction to your meeting with the

20  defendant?

21  A.  You know, we had a calm discussion, but this is someone who

22  sent me a note saying I've resigned, I'm resigning.  So I come

23  into the room, he hasn't resigned, which was the first thing.

24  So when are you leaving?  So you sent a note to the most senior

25  people saying you're resigning.  And turns out, well, I haven't

M6tWsch4                    Roche - Direct

1    put in my resignation.

2         So we had this discussion, and my overall impression was

3    that he -- you know, I had not convinced him that the managers

4    were not bad people.  I had not convinced him of the

5    seriousness of the issue that he'd received, the letter, the

6    memorandum he received.  And I found out -- you know, we had a

7    decent conversation, but I didn't think that budged him one

8    bit.  And so I was very, very concerned.  So my next action was

9    to meet with the deputy director of CCI.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6T5sch3                         Roche - Direct

 1  BY MR. DENTON:   (Continuing)

 2  Q.  And in what ways were you concerned after that meeting?

 3  A.  Well, I was concerned that back to the original concern.  I

 4  have someone who was very, very upset at the agency and my

 5  concern there is that he is going to do something about it.

 6  And the something about it is, again, in order of precedent, is

 7  this going to result in a harm to the agency mission, a harm to

 8  another agency officer, or possibly a harm to himself?  So I

 9  have someone who is very upset and I think also just, you know,

10  quite frankly, very determined in his thinking.  Again, the

11  conversation was a moderated conversation, it was back and

12  forth, but I don't think that the fact that the deputy director

13  or the director came over to him to speak to these things, I

14  don't think, made any difference to him at all.  But I wasn't

15  willing to accept what he had put forward and it wasn't in --

16  it wasn't coherent with the information I had gathered on the

17  previous day from according to his chain of command.

18          MR. DENTON:  Ms. Cooper, we can take this exhibit

19  down.  Thank you.

20  Q.  After that meeting, sir, did you have any further personal

21  interactions with the defendant?

22  A.  No.  I think I literally just saw him once in the CCI

23  building when I was visiting for something else, but no.

24  Q.  So I would like to ask you to think forward to March 7,

25  2017.  Do you remember that day?

1    A.  Yes, I do.

2    Q.  What happened that day?

3    A.  I was sitting at my desk that morning, I was waiting to

4    have -- I had an appointment with one of my managers and right

5    before that appointment I heard someone trying to get my

6    boss -- Andrew has an office next to mine and someone said,

7    Hey, you have to take this call right now.  It was the director

8    of CCI.  He didn't sound like himself.  He was -- his voice was

9    panicked and he said we have got a really big problem.  There

10   is -- our information is being released on WikiLeaks right now.

11   People are already seeing it, it's already been viewed.  This

12   is a lot of information, it is a lot of stuff.  We have got a

13   big, big problem.  We have got to tell somebody what's

14   happened.  And I remember I kept telling him, OK, let's get an

15   assessment of what is happening.  And then he said I have got

16   people on it.  I have got people on it.  I said, OK, let's

17   follow up.

18       When he described to me what was appearing on WikiLeaks,

19   the kind of information and he said this is -- this is our

20   information on how we build our tools, this is our discussions

21   back and forth from our internal system, it became apparent how

22   serious this was.  Within about 10 or 15 minutes I had -- I

23   delayed my appointment a little bit, I had another call from

24   CCI and asked what do we know so far, and it was clear at that

25   point that this was a massive breach.

M6T5sch3                          Roche - Direct

1   Q.  Focusing on sort of the near term on March 7th and the days

2   that immediately followed, did you take any steps to address

3   the damage caused by the leak?

4   A.  Yes.  We -- this was -- I will say it was equivalent of an

5   in-flight emergency.

6        So there are three basic steps to the components we took

7   immediately.  We dropped everything else we were doing across

8   these teams, across -- and we started to rally the resources we

9   needed across CIA.  We first had to deal with the operations

10  and we had to navigate a path forward and then figure out our

11  communication plan in that order, in that priority.  And those

12  applied to the teams we were -- our teams in the field, the

13  partner intelligence services that we had worked on on these

14  operations and, most importantly, most sensitively, where there

15  were human beings involved in enabling the use of these tools

16  because our digital cloak -- our cloak that allowed us to

17  remain clandestine -- clandestine means there is no sign of

18  what is going on -- was gone.  So, to me, the analogy was this

19  was a digital Pearl Harbor.  We were dead in the water.  The

20  capability we had was exposed and we went into full crisis

21  response mode.

22  Q.  At a very high level, what did you do to address the first

23  of those things you identified, the operations that were at

24  stake?

25  A.  We had to go through the operations and determine the

M6T5sch3                    Roche - Direct

1   priority would be where did we have human-enabled operations

2   where, now that these are uncloaked, that there might be some

3   possibility of tracing back to someone who took great risk to

4   enabled the operation.  The next level was where would this

5   expose our officers overseas for the operations they were

6   conducting; and, close to that, our other sister agencies in

7   the IC which we work with on these operations; and finally,

8   where we had discussion or enabling discussions, or enabling

9   access from a foreign intelligence service.  That's how we

10  prioritized the operations and the response basically is which

11  ones do we pull off -- in other words come off the target,

12  de-activate the target, de-activate all the bread crumbs that

13  would lead back to us.  That's how we started basically coming

14  off of operations, killing the op.

15  Q.  And then I think the second thing you described was

16  navigating a path forward.  What did that entail in the sort of

17  near term?

18  A.  So because we were getting information from these

19  operations that fed other things we were doing, we had to come

20  up with a path forward for not interrupting that path, that

21  work flow that came from these operations.  These operations

22  informed intelligence reporting directly.  They also informed

23  other things that we were doing to be able to add with other

24  all-source intelligence.  So the navigate path was to say what

25  is the vector forward?  Is there something else we can do?  Do

we have any tools that were not exposed in the quiver?  That's

the second path.  Then the third path is to be able to

consistently and accurately, and in a timely way,

communicate -- impact, communicate the plan forward, those

first two components to all of the different parties that are

part of this mission.

Q.  And what were some of the challenges involved in that

communication component?

A.  That it was an over -- it had become a public fact, there

was public reporting on this.  The number of e-mails and the

number of calls was overwhelming for a team that was, in

real-time, trying to do that damage assessment.

     The biggest impact was the -- everything in the

intelligence business is about trust.  The biggest impact is

the loss of trust and concern for the operation when you are

asking your own team, when you are asking a sister agency, and

especially when you are asking a foreign intelligence service

to work with you on an operation and they are concerned, now

that something has happened, that they are at risk.  And, it

happens very suddenly.  So the conversations were very

difficult at times because when someone instantaneously has a

surprise like this there is a lost of trust and lost of trust

is probably the most serious moment for an intelligence

officer; it is very hard to get back, it is something you build

over years.

M6T5sch3                        Roche - Direct

1    Q.  Are you familiar with something called the WikiLeaks Task

2    Force?

3    A.  Yes, I am.

4    Q.  What is that?

5    A.  WikiLeaks Task Force was an action that was ordered to look

6    at what is called mission networks out of this event.  Take

7    this event that happened on a mission network and let me

8    explain.

9         We have two types -- basically two categories of networks,

10   computer networks at the CIA.  There is an enterprise network

11   that operates worldwide and that just about every employee,

12   every staff employee and a lot of contractors have access to

13   it, it is the main network, the enterprise network.  For both

14   technical reasons and for some mission-specific reasons we also

15   need separate mission networks that are maintained by

16   individual missionaries.  So, this information came from a

17   mission network.

18        The WikiLeaks Task Force was tasked with looking at the

19   systemic issues associated with this breach and understand what

20   we had to do for those mission networks and make

21   recommendations of how we get them to the same standard as the

22   enterprise network which the White House and Congress have

23   referred to as and regard it as the gold standard for insider

24   threat and security.

25   Q.  Did there come a time when the CIA made a formal criminal

1    referral in connection with these leaks?

2    A.  Yes.  Very soon -- very soon after it happened.

3    Q.  And what is a criminal referral?

4    A.  A criminal referral is to the Department of Justice that a

5    criminal act has occurred.  This was a -- we considered it

6    immediately a digital crime scene and that started a component

7    that we don't do, the investigation component.

8    Q.  What effect did that referral and investigation have on the

9    work of DDI in the aftermath of the leaks?

10   A.  Well, so that -- the investigation itself, which was done

11   by the FBI, run by the FBI, was walled off from the rest of us

12   so that that investigation, they could use their tradecraft,

13   their authorities, and their expertise.  They are the experts

14   on investigating.

15       After -- the immediate effect and aftermath of the task

16   force reports was the actions we started taking on mission

17   networks to get them to a higher standard and a closer standard

18   to the enterprise networks.

19   Q.  Again, just to ask specifically what, if any relationship,

20   was there between the work of that task force and the criminal

21   investigation?

22   A.  They were walled off from each other.  There was -- the

23   investigation operated under a different tradecraft, different

24   set of authorities, different physical area.  The WikiLeaks

25   Task Force report was saying this network went bad.  What do we

1    know about how this did not meet the standard that we need, not

2    an investigation of the incident in a criminal sense.  And so,

3    those two were separate activities.

4    Q.  Without getting into the specifics of anything in

5    particular, what effect did the WikiLeaks disclosures have on

6    the CIA's ability to conduct cyber intelligence operations?

7    A.  It was devastating.  It was pulling off operations

8    overnight, the vast majority of the operations that we were

9    conducting, the vast majority because the sources and methods

10   and, most importantly, the techniques that we were using to

11   maintain clandestine signature which is no one can see the

12   signature, that cloak had been completely -- that information

13   was now out in the public and we did know that there was great

14   interest by adversaries in this information and so the risk

15   became too great to continue an operation that relied on this

16   technology that was now out in the open and known.

17   Q.  Remind me, sir, when did you leave the CIA?

18   A.  31 October 2019.

19   Q.  Were you still dealing with fallout from the WikiLeaks

20   disclosures when you left the CIA?

21   A.  Every day.

22            MR. DENTON:  No further questions, your Honor.

23            THE COURT:  Cross-examination.

24   CROSS-EXAMINATION

25   BY MR. SCHULTE:

M6T5sch3                          Roche - Cross

1    Q.  Good afternoon.

2    A.  Good afternoon.

3    Q.  I will pull up Government Exhibit 1093.  It is fair to say

4    that you received this document via e-mail, you received the

5    e-mail with attachments, right?

6    A.  I believe so, yes.

7    Q.  And this was the first time you had ever heard of me,

8    correct?

9    A.  That's correct.

10   Q.  And before you got this e-mail you had not had any

11   conversation with Karen about me, right?

12   A.  That's correct.

13   Q.  You had not had conversations with anyone else, this is the

14   first time you have heard of me; right?

15   A.  That's correct.

16   Q.  And when you get this e-mail do you know, do you remember

17   where you were?

18   A.  Yes.

19   Q.  Where were you, sir?

20   A.  I was sitting at my desk in the original headquarters

21   building.

22   Q.  You were in your office when you got the e-mail?

23   A.  That's correct.

24   Q.  And when you got the e-mail, you see that there is three

25   people copied on it, right?

M6T5sch3                           Roche - Cross

1    A.   There is one primary and two copies that I have.

2    Q.   And before you replied I think your reply was marked in

3    1096, I will just pull that up.  Before you replied you talked

4    to this individual named Andrew Hallman?

5    A.   No, I didn't talk to Andrew before I replied.

6    Q.   So you just replied to the e-mail before there is any --

7    before Andrew ever responds, right?

8    A.   That's correct; before Andrew was informed I responded to

9    the e-mail within, about, three minutes.

10   Q.   And your e-mail states, basically, look, this is part of my

11   job and come, let's have a conversation; correct?

12   A.   Yes; let's have it immediately.

13   Q.   And you figure out that I did not reply to your invitation

14   to meet, correct?

15   A.   I never saw any reply, no.

16   Q.   And then when you learn there is no reply it's because I

17   had logged off and left for the day, right?

18   A.   That's what I was told.

19   Q.   So it's because you couldn't reach me by phone that you

20   figured out I had left for the day?  Or because you looked at

21   the system and saw that I had logged out?

22   A.   I called the CCI front office and said you have an officer

23   named Joshua Schulte.  He has sent me an e-mail.  Can you

24   please tell me where I can reach him, where he is?  Can you get

25   him on the phone with me?  They provided information to me

1  telling me -- they called me back and said this officer has

2  logged off, there is no sign he is online, and they conveyed to

3  me that you had left for the day.

4  Q.  OK.

5      And you're -- OK.  And they're able to determine that from

6  the badge records, correct?

7  A.  I did not ask them questions about how they determined it.

8  I gave them an order to tell me where I could reach you, how I

9  could reach you.  They responded.

10 Q.  So when you learned that then you tried to reach out to me

11 the next day, right?

12 A.  I had my staff working with the CCI staff to arrange a

13 meeting.

14 Q.  So you directed somebody else to set the meeting between

15 us, right?

16 A.  Yes.  I have a full-time scheduler and a staff of people

17 who re-work my calendar and my appointments.

18 Q.  It was set up, the meeting you said, was June 30th;

19 correct?

20 A.  Yes.

21 Q.  And the notification for that meeting was the day before or

22 a few days before, right?

23 A.  I don't recall the exact notification.  I would assume that

24 it was the day before because, I mean, I needed to be there, it

25 was 10:00 in the morning.  It was definitely not that morning

1    of.

2    Q.  And when I showed up to the meeting you thought -- or you

3    testified that my demeanor was normal, correct?

4    A.  Yes.

5    Q.  And what does normal demeanor, what does that mean to you?

6    A.  Well, we were speaking in a conversational tone.  We were

7    speaking in a moderate, normal, conversational tone.

8    Q.  It's fair to say, right, that it was me who sent you the

9    memo of warning that I had been given; correct?

10   A.  Yes, I believe that was the attachment.

11   Q.  It is also fair to say that I sent you the letter of

12   warning and the attachment too, right?

13   A.  I believe so.

14   Q.  And then during the meeting, overall, how long was the

15   meeting?

16   A.  My guess, it was about 40-45 minutes.

17   Q.  And I think you said that before you met with me you did

18   some prep, right?

19   A.  That's correct.

20   Q.  You had your secretary John pull up my agency bio, correct?

21   A.  I had my staff -- they were executive assistants -- pull

22   your agency bio; that's correct.

23   Q.  And you read it, right?

24   A.  That is correct.

25   Q.  Learned that I was born and raised in Texas, right?

1          MR. DENTON:  Objection.

2          THE COURT:  Sustained.

3   Q.  And it is fair to say that the management below you, CCI

4   management, EDG management, none of the managers below you ever

5   notified you about the memo or letter of warning; right?

6   A.  That is correct.

7   Q.  Is that normal for you not to be in the loop on things like

8   this?

9   A.  Yes, it is.

10  Q.  So you are not surprised that nobody in management below

11  you had looped you in?

12  A.  I'm not surprised an office level dealt with the issue

13  they're assigned to deal with which are those kind of

14  memorandums.  That's within their authority, it is their job to

15  deal with them.

16  Q.  And you said that the unit -- the group level works DDI,

17  CCI, EDG, AED; correct?

18  A.  I don't recall saying that.  I'm a little confused.

19  Q.  Oh, I'm just clarifying the structure.

20  A.  I didn't discuss the structure of CCI.  I'm sorry.

21  Q.  Oh, you are talking about during the meeting.

22  A.  During the meeting we -- I am sure we mentioned what unit

23  you were assigned to and what part -- I'm sorry, I thought you

24  meant in my testimony.  So, I'm confident we discussed unit of

25  assignment and which order within the group.  I am sure that

1  came up.

2  Q.  OK.  And you described it as a level-set conversation,

3  right?

4  A.  That's correct.

5  Q.  And you testified on direct that you wanted to -- or that

6  meeting was alone, correct?  There was no one else there?

7  A.  It was just you and myself; yes, that's correct.

8  Q.  And was there a particular reason you didn't invite HR or

9  someone else?

10 A.  I wanted to give you the opportunity to speak freely in an

11 organization that you said was not helping you; to reach out, I

12 wanted to hear directly from you, and I wanted you to in no way

13 feel that there was anyone in the room to intimidate your

14 response.

15 Q.  And there was the meeting wasn't recorded or anything like

16 that, right?

17 A.  No.  No.

18 Q.  And after the meeting you made no notes of that meeting,

19 correct?

20 A.  After that meeting I was getting on an international flight

21 so I was not in a position to make notes, as I got to Dulles to

22 get on an international flight, on a sensitive topic.  Instead,

23 I spoke to the deputy director of CCI, conveyed the meeting,

24 and gave him actions to take forward as the deputy for the

25 office.

M6T5sch3                        Roche - Cross

1    Q.  I'm sorry.  So you had a phone call conversation?

2    A.  No, I had a face-to-face in his office -- the office that

3    we used -- after our conversation.

4    Q.  But then after that you didn't write any notes of what

5    transpired during the meeting, correct?

6    A.  I went to Dulles and got on an international flight.

7    Q.  OK, just in general after that.  At no point after that you

8    didn't?

9    A.  No.

10   Q.  And you weren't concerned enough with the meeting to change

11   your travel plans or anything, right?

12   A.  That's correct.

13   Q.  And I think you said something to the effect of that during

14   the meeting I told you that I could get permissions back or

15   something like this?

16   A.  You said, and I am paraphrasing but pretty, very close to

17   this, you said, You know, I could still get back on that system

18   if I wanted to.  There is still a way, I can still get back on.

19   Q.  How did you take that?

20   A.  I took that that you knew how to restore your privilege

21   access, that you had enough expertise to redo that if you

22   wanted to, that you had already proven to yourself that you

23   could do that but, most importantly, that the letter and

24   memorandum saying do not do this, it's very serious, that

25   that -- that didn't mean anything to you.  To tell me that, to

1   tell me that you could overcome the system or get back on and

2   recreate the privilege, to me, that was demonstrating a callous

3   disrespect for a really important component of security.

4   Q.  Well, I think that is more than that, it seems like almost

5   a threat, does it not?

6             MR. DENTON:  Objection.

7             THE COURT:  Did you take it as a threat?

8             THE WITNESS:  I took it as a provocative statement

9   that this is something you would do, could do, or had already

10   decided to do.

11   Q.  So you -- a statement like this that said -- you didn't --

12   you didn't do anything about that, correct?

13   A.  I did do something about that.  I spoke to the deputy

14   director of CCI specifically about it.

15   Q.  I mean did you -- did you contact security?

16   A.  I had a discussion with the office deputy director and

17   asked him what was being done to ensure that your actions were

18   being monitored and audited.  That was -- I had a specific

19   discussion about it with security and counter-intelligence.

20   Q.  But there is no e-mails or there is nothing on the record

21   about any of this, right?

22   A.  No.  I decided to do it face-to-face, which I believe was

23   the most effective way for me to manage a group I worked with

24   for 20 years.

25   Q.  OK.  But just in general, during this time frame, there is

1  no e-mail, there is no SameTime, there is no official

2  memorialization or documentation, correct?

3  A.  There was a lot of documentation done at CCI that had the

4  background to the story.

5  Q.  There was a lot of documentation about this meeting?

6  A.  No, about the events that led to this meeting.

7  Q.  OK.  I'm talking specifically about your alleged statement

8  that I told you I would get the accesses back.  Was there

9  anything specifically done about that?

10  A.  Things were done about that.  I told the deputy director of

11  CCI to ensure that security and counter-intelligence were

12  monitoring and auditing your activity on the network.

13  Q.  I think you testified on direct something to the effect of

14  people can get fired for this type of activity; referring to

15  the memo, right?

16  A.  Yes.

17  Q.  So your testimony is this is a fireable offense, but when

18  one of your employees tells you he can do this again you don't

19  take any action as far as employment comes?

20  A.  I did take action.  We were following the prescribed rules.

21  You had received a warning.  You were told that the next steps

22  could heighten it to the next level of punishment and I did

23  take steps with the deputy director of CCI to ensure that

24  auditing and monitoring were in place from both

25  counter-intelligence and security.  I gave him that directive.

M6T5sch3                          Roche - Cross

1  Q.  OK, but I'm saying you didn't have authority to either

2  recommend or remove, basically, my accesses, correct?

3  A.  So I had the authority to recommend that to the people who

4  control the system and that would be CCI.

5  Q.  And you never did that, correct?

6  A.  No, I did not.  They assured me that they were monitoring

7  and auditing the situation.

8  Q.  You didn't even tell my supervisor in an e-mail, correct?

9  A.  I told your supervisor's supervisor.

10  Q.  Are you familiar with forced administrative leave?

11  A.  Yes.

12  Q.  And what is that?

13  A.  Forced administrative leave is when an employee is

14  effectively removed from the workplace usually pending an

15  investigation of some matter but is still on the payroll, but

16  not having access to any of the buildings.

17  Q.  I'm going to show just to the witness and the parties

18  what's been marked as Defendant's Exhibit 501.  Do you

19  recognize this document?

20  A.  No.

21  Q.  Do you know what it is?

22  A.  No.

23  Q.  You have never seen a document like this before?

24  A.  I can't recall if I have or haven't.  I don't recall this

25  document.

1  Q.  Do you recall the process for how forced administrative

2  leave can occur?

3  A.  I know the authorities reside in the Office of Security,

4  they are outside my authority.

5         THE COURT:  Let's take the document down, please.

6  Q.  But it is safe to say there were no, following -- following

7  our meeting there was no official disciplinary action taken,

8  correct?

9  A.  As a result of the meeting?  No.

10  Q.  And so what actions -- what specific actions were taken

11  after the meeting?

12  A.  Actions were taken by the CCI front office in coordination

13  with other offices in the agency.

14  Q.  Yes.  I'm asking specifically what were those actions.

15  A.  Those actions were to ask for audit and monitoring of all

16  your activity on networks.

17  Q.  Did you receive e-mails about that?

18  A.  I had, as I recall, a verbal update during a bi-weekly

19  meeting.

20  Q.  So there is nothing recorded on that in the record either,

21  right?

22  A.  In the normal course of events that may become

23  counter-intelligence issues it is not normal to put them on

24  typical e-mail traffic.  E-mail would be appropriate for the

25  disciplinary action but not something that might become a

1    criminal matter.

2    Q.  So your testimony is you believe there was a criminal

3    matter during at this time?

4    A.  I believed there was the possibility it could evolve to

5    that.  The tradecraft is that those matters are not handled via

6    e-mail.

7    Q.  So the CIA's policy is to only communicate that information

8    verbally?

9              MR. DENTON:  Objection.

10             THE COURT:  Sustained.

11   Q.  If there is no documentation or anything written down, how

12   does that assist in law enforcement?

13   A.  I don't do the law enforcement mission.

14             MR. DENTON:  Objection.

15   A.  I don't have those authorities.

16   Q.  So the main party that you basically placed in -- as the

17   responsible party, was your deputy John; is that right?

18   A.  That's correct.

19   Q.  I'm going to move on for a little bit about WikiLeaks.  You

20   testified on March 7, 2017 you received a call about the

21   WikiLeaks publication, correct?

22   A.  That's correct.

23   Q.  And you don't have any idea how WikiLeaks got the Vault 7

24   and Vault 8 information, correct?

25   A.  Correct.

M6T5sch3                        Roche - Cross

1    Q.  You don't have any idea of who else got the same

2    information that WikiLeaks got, correct?

3    A.  I'm sorry.  Who else?

4    Q.  You are not aware if there is any other -- if anyone else

5    or entity that would have received that same information that

6    WikiLeaks received, right?

7    A.  I'm not aware.

8    Q.  And you are not aware of how much or what data WikiLeaks

9    specifically has that it hasn't released, right?

10   A.  On March 7th we -- no, I did not know.

11   Q.  No, after March 7th.  I'm talking about the information

12   that WikiLeaks has not released; you don't know how much that

13   is, right?

14   A.  If they haven't released it I don't know what they have, so

15   no.

16   Q.  OK.

17          THE COURT:  Do you know, one way or another, if they

18   have any information beyond what they've released?

19          THE WITNESS:  No, your Honor.  The last time -- in

20   2019 when I left, there was still speculation as to what they

21   might have.  But, no, I don't know.

22   BY MR. SCHULTE:

23   Q.  And your reports found that DevLAN did not have the gold

24   standard of security, correct?

25   A.  That wasn't my report.  The WikiLeaks Task Force made a

1    reference to the standard for monitoring that exists on the

2    enterprise network and referred to it as the gold standard.

3    That was from the WikiLeaks Task Force report which I was not

4    part of.

5    Q.  I'm sorry.  So but that gold standard was not the same

6    standard that DevLAN used, right?

7    A.  That's my understanding.

8    Q.  And that there were multiple security vulnerabilities with

9    the DevLAN system, right?

10   A.  With mission networks in general.  I don't have the

11   information on DevLAN, I don't know it, but WikiLeaks looked at

12   mission networks and there were issues with the mission

13   networks, per se, at large.

14   Q.  But the WikiLeaks Task Force, you weren't involved with

15   that, right?

16   A.  No, I was not.

17   Q.  You didn't receive updates on it or anything?

18   A.  No, I was not.

19   Q.  Completely independent?

20   A.  That reported to the front office of the CIA.

21   Q.  One second.

22              MR. SCHULTE:  No further questions.

23              THE COURT:  Any redirect?

24              MR. DENTON:  No, your Honor.

25              THE COURT:  Mr. Roche, put your mask back on and step

M6T5sch3                        Roche - Cross

1    down.  You are excused.

2                (Witness excused)

3                THE COURT:  Mr. Denton, next witness?  Mr. Lockard?

4                MR. LOCKARD:  The government calls Carlos Betances

5    Luna Mera.

6                THE COURT:  Ladies and gentlemen, you may rise and

7    stretch as we get everything in place.  (pause)

8                Ladies and gentlemen, let me just give you some brief

9    instructions while we are still trying to get things in place.

10   You may have noticed that two women have walked near the

11   witness box.  My understanding is that the next witness is

12   going to be testifying through a Spanish language interpreter.

13   The instruction I want to give you is that I don't know if any

14   of you understand Spanish or speak Spanish but it is OK.  The

15   important point is that it is important that everybody is

16   working off of the same evidence, and in that regard I instruct

17   you that if you do understand Spanish, it is the translation

18   that is evidence, not the actual Spanish language.  So to the

19   extent that you might have translated something differently, I

20   would ask you to disregard that and just pay attention to the

21   translation rather than to the witness' Spanish answer.  And,

22   hopefully, we will be ready to go in a moment.

23               Counsel, are we almost ready to go?  (pause)

24               Let me ask you if you can give me a thumbs up or not.

25   I don't know how long this is going to take but, if you would

M6T5sch3                        Roche - Cross

1   like, I can have you excused to the jury room here to stretch

2   and use the restroom for a minute or two.  Obviously, Murphy's

3   Law, the witness will get here when I excuse you but,

4   nonetheless, don't discuss the case, don't do any research

5   about the case, continue to keep an open mind.  If you want to

6   step out there and be ready to go as soon as Ms. Smallman comes

7   to get you, that would be great.

8                   THE DEPUTY CLERK:  All rise.

9                   (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  You may be seated.

 3              Are we waiting on the marshals to get the witness?  Is

 4    that what is going on here?

 5              THE MARSHAL:  Your Honor, he is on his way up right

 6    now.

 7              THE COURT:  OK.

 8              (pause)

 9              THE COURT:  Let's get the witness out, please.

10              Mr. Schulte, I assume you might have gone to use the

11    restroom yourself but please wait for the jury to leave the

12    room before you leave?  Thank you.

13              Does the government have an estimate of how long the

14    direct on this witness will be?

15              MR. LOCKARD:  We may finish before the end of the day.

16              THE COURT:  All right.

17              (Witness takes the stand)

18              THE COURT:  We will check on the jury.

19              THE DEPUTY CLERK:  Jury entering.

20              (Continued on next page)

21

22

23

24

25
```

1        (Jury present)

2            THE COURT:  You may be seated.

3            You guys got a little out of order.  Welcome back.  I

4    hope you enjoyed your brief break.  We will continue where we

5    left off.

6            The government has already called its next witness who

7    is present, so I will ask the witness to please take off your

8    mask and if you could rise and raise your right hand so that

9    Ms. Smallman, my deputy, can administer the oath to you,

10   please?

11   CARLOS MANUEL BETANCES LUNA MERA,

12       called as a witness by the Government,

13       having been duly sworn, testified through an interpreter,

14       as follows:

15           THE DEPUTY CLERK:  Please have a seat.  Can you please

16   state and spell your full name for the record?

17           THE WITNESS:  Carlos Manuel Betances Luna Mera.

18           THE COURT:  Counsel, you may proceed.

19   DIRECT EXAMINATION

20   BY MR. LOCKARD:

21   Q.  Good afternoon, sir.

22   A.  Good afternoon.

23   Q.  Mr. Betances, where were you born?

24   A.  In the Dominican Republic.

25   Q.  And where do you live now?

M6T5sch3                        Betances - Direct

1    A.  New York.

2    Q.  And specifically where?

3    A.  Rockland County.

4    Q.  What type of facility are you in?

5    A.  Essex County.

6    Q.  And where did you live in the summer of 2018?

7    A.  Also in New York.

8    Q.  And in what facility?

9    A.  Can you please repeat that question?  I did not understand.

10   Q.  In what facility did you live in the summer of 2018?

11   A.  Oh.  An apartment.

12   Q.  In the summer of 2018?

13   A.  Yes.

14   Q.  And did there come a time when you were arrested?

15   A.  Yes.

16   Q.  Where did you live after that?

17   A.  Also in the Bronx, New York.

18   Q.  Mr. Betances, were you incarcerated in the summer of 2018?

19   A.  Yes.

20   Q.  Where?

21   A.  In the Bronx.

22   Q.  Did there come a time when you were in the Metropolitan

23   Correctional Center?

24   A.  Yes.

25   Q.  And when was that?

M6T5sch3                        Betances - Direct

1   A.  March 2018.

2   Q.  Do you see anyone in the courtroom who was with you at the

3   Metropolitan Correctional Center in 2018?

4   A.  Yes.

5   Q.  Who is that?

6   A.  Josh.

7   Q.  Can you describe where Josh is sitting?

8   A.  In between two ladies.

9           MR. LOCKARD:  I ask the record reflect that the

10  witness has indicated the defendant.

11          THE COURT:  So noted.

12  Q.  Mr. Betances, have you pleaded guilty to any crimes?

13  A.  Yes.

14  Q.  To what crimes have you pleaded guilty?

15  A.  Drug trafficking, conspiracy, mail fraud, and entering the

16  country illegally.

17  Q.  Have you pleaded guilty to any crimes relating to identity

18  theft?

19  A.  Yes.

20  Q.  Have you pleaded guilty to any crimes relating to

21  contraband in jail?

22  A.  Yes.

23  Q.  Now, can you explain, very generally, what it is that you

24  did that made you guilty of the drug trafficking crimes?

25  A.  I introduced someone who would be able to buy drugs in

M6T5sch3                          Betances - Direct

1  Texas, and for that I was charged with drug trafficking and

2  possession.

3  Q.  Did you expect to make money from those drug deals that you

4  introduced?

5  A.  Yes.

6  Q.  And what was the drug?

7  A.  Cocaine.

8  Q.  And did you do anything when you were in New York relating

9  to drug trafficking?

10  A.  Yes.

11  Q.  Can you briefly describe what that was?

12  A.  I would install GPSs in cars that were coming in loaded

13  with drugs.

14  Q.  You said you also had pleaded guilty to mail fraud?

15  A.  Yes.

16  Q.  Can you describe what you did that made you guilty of mail

17  fraud?

18  A.  I was getting paid to pick up the incoming mail that was

19  arriving at their home addresses.

20  Q.  Were you getting paid by the people that the mail was

21  addressed to?

22  A.  No.  Somebody else.

23  Q.  And what was in the mail that you picked up?

24  A.  IRS checks.

25  Q.  Did you assist in stealing those checks?

M6T5sch3                          Betances – Direct

1   A.  Yes.

2   Q.  With respect to identity theft, did you use another

3   person's identification?

4   A.  Yes.

5   Q.  What did you use it for?

6   A.  To travel to the Dominican Republic and to be able to drive

7   in the United States.

8   Q.  And for the illegal re-entry?

9   A.  Yes.  I was deported for that in 2001.

10  Q.  And after you were deported, did you return to the United

11  States?

12  A.  Yes.

13  Q.  And when you returned, did you return legally or illegally?

14  A.  Illegally.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

M6tWsch6                              Betances - Direct

1    BY MR. LOCKARD:

2    Q.  And with respect to the contraband in the jail, what did

3    that relate to?

4    A.  Cellular phones.

5    Q.  And were you involved in that activity with anyone else?

6    A.  Yes.

7    Q.  Do you see any of those people here today?

8    A.  Yes.

9    Q.  And who is that?

10   A.  Josh.

11   Q.  The defendant?

12   A.  Yes.

13   Q.  Mr. Betances, when you pleaded guilty to those crimes, did

14   you have a plea agreement?

15   A.  Yes.

16   Q.  Under that plea agreement, do you have any obligations to

17   the government?

18   A.  Yes, to tell the whole truth.

19   Q.  And do you have any obligations about meeting with the

20   government?

21   A.  Yes.

22   Q.  What are those obligations?

23   A.  Also to tell the truth.

24   Q.  And do you have any obligations about testifying?

25   A.  Yes.

1    Q.  And are you required to testify when asked?

2    A.  Yes.

3    Q.  And if you live up to your obligations under your plea

4    agreement, do you have an understanding of whether the

5    government then has an obligation to you?

6    A.  Yes.

7    Q.  And what is that?

8    A.  To write everything, all the good things that I have done

9    for the government and also the bad things are included there.

10   Q.  And is that written down into a letter?

11   A.  Yes.

12   Q.  And who is that letter to?

13   A.  Can you please repeat the question?

14   Q.  Who is that letter given to?

15   A.  The judge.

16   Q.  And what's your understanding of what that letter is for?

17   A.  To provide the judge with a recommendation such that the

18   judge may give me below the time that I am supposed to get.

19   Q.  Do you understand whether or not the government will make a

20   particular sentencing recommendation for you?

21   A.  No.

22   Q.  And who determines your sentence?

23   A.  The judge.

24   Q.  And through your cooperation, do you hope for a lower

25   sentence?

M6tWsch6                          Betances - Direct

1    A.  Yes.

2    Q.  OK.  Mr. Betances, I'd like to ask you about Mr. Schulte.

3    A.  OK.

4    Q.  When did you first meet the defendant?

5    A.  In the summer of 2018.

6    Q.  And what were the circumstances of that meeting?

7    A.  Just a regular, normal meeting, and he showed up.

8    Q.  Did there come a time when you and Mr. Schulte talked about

9    cell phones?

10   A.  Yes.

11   Q.  What was that conversation?

12           THE INTERPRETER:  For the interpreter, what or when?

13           MR. LOCKARD:  What was that conversation.

14           THE INTERPRETER:  Thank you.

15   A.  It was about how to introduce the cell phones into the MCC.

16   Q.  What did the defendant tell you about that topic?

17   A.  Yeah.  It was Omar, he and Chino and myself were meeting

18   together at the time, and they were telling me about how to

19   introduce the phones.  And they were telling me about how to do

20   it, who to contact, when to contact them, because in the past

21   they had already been deceived as to certain other cell phones

22   that they had paid for and had not been delivered to them.

23   Q.  You mentioned Omar and Chino?

24   A.  Yes.

25   Q.  Were they also at the MCC with you and the defendant?

M6tWsch6                         Betances - Direct

1    A.  Yes.

2    Q.  Did there come a time when the defendant asked you anything

3    to provide cell phones?

4    A.  When the phones were being delivered or once the phones

5    were already at the MCC?

6    Q.  Did there come a time when the defendant asked for your

7    help with cell phones?

8    A.  Yes.  We were all together there.  It was Omar, himself,

9    Chino, and me.  And they were asking me for help in introducing

10   the phones, bringing the phones in.

11   Q.  Mr. Betances, were there regular phones at the MCC?

12   A.  Yes.

13   Q.  And were inmates allowed to use them?

14   A.  Yes.

15   Q.  Were there signs next to those phones?

16   A.  Yes.

17   Q.  What did those signs say?

18   A.  That all calls were being recorded and monitored.

19   Q.  Now, were there also cell phones at the MCC?

20   A.  Yes.

21   Q.  Were they allowed?

22   A.  No.

23   Q.  How did the cell phones that you used get into the MCC?

24   A.  So, mostly they were brought in and they would be put by

25   these specific lockers.  A magnet was used to adhere him to

M6tWsch6                         Betances - Direct

1   them.  And then there was somebody that would come down from 11

2   south, and he would be told of the location, because he also

3   had somebody there that would keep in contact with him to tell

4   him where they were.

5   Q.  You mentioned 11 south?

6   A.  That's right.

7   Q.  Is that a unit within the MCC?

8   A.  Yes.

9   Q.  And when the cell phones got in, what did you do with them?

10  A.  I would give them to Josh and Omar, Chino.

11  Q.  Did you also use the phone?

12  A.  Yes.

13  Q.  And did you have a particular role that you played with

14  those phones?

15  A.  Yes.

16  Q.  What was your particular role?

17  A.  I was in charge of charging the phones and storing them.

18  Q.  Mr. Betances, you have in front of you a disk.  Do you see

19  it?

20  A.  Yes.

21  Q.  And it's labeled GX820?

22  A.  Yes.

23  Q.  Do you recognize that disk?

24  A.  Yes.

25  Q.  Before your testimony today, did you review the contents of

1    that disk?

2    A.  Yes.

3    Q.  And did you recognize the contents?

4    A.  Yes.

5    Q.  What are the types of documents that are on that disk?

6    A.  There are videos and pictures.

7    Q.  And who took them?

8    A.  I did.

9           MR. LOCKARD:  At this time the government offers

10   exhibits that are stored on the disk identified as Government

11   Exhibit 820.  Specifically, we offer Government Exhibits 820-1

12   through 820-223 and 820-402 through 820-449.

13          THE COURT:  Any objection?  Had.

14          MR. SCHULTE:  No objection.

15          THE COURT:  Admitted.

16          (Government Exhibits 820, 820-1 through 820-223, and

17   820-402 through 820-449 received in evidence)

18          MR. LOCKARD:  Ms. Cooper, could we please pull up

19   Government Exhibit 820-1, which is now in evidence.

20   Q.  Mr. Betances, what's shown here?

21   A.  It's an iPhone.

22   Q.  What types of phones did you charge and store for yourself,

23   Chino, Omar, and the defendant?

24   A.  IPhones and Samsungs.

25   Q.  Is this one of those phones?

1    A.  Yes.

2    Q.  And who used this phone?

3    A.  All of us did.  Chino, myself, Josh, and Omar.

4            MR. LOCKARD:  Thank you.  You can take that down.

5    Q.  Mr. Betances, why did you start taking photographs in the

6    MCC?

7            THE INTERPRETER:  For the interpreter, when or why?

8            MR. LOCKARD:  Why did you start taking photographs in

9    the MCC.

10           THE INTERPRETER:  Thank you.

11   A.  Once I was watching the cell to make sure no guards were

12   approaching, and I approached Chino's cell when I overheard a

13   conversation where Josh was telling Omar that the Russians were

14   going to have to help him in exchange for the work that he was

15   doing, for the work that Josh was doing.

16   Q.  What, if anything, happened after you heard that statement

17   from the defendant?

18   A.  Nothing else happened, because they kept quiet.  They

19   stopped saying anything.

20   Q.  Did you know what the defendant was talking about?

21   A.  No.

22           MR. LOCKARD:  Ms. Cooper, could you please pull up

23   Government Exhibit 820-2.

24   Q.  Mr. Betances, do you recognize this phone?

25   A.  Yes.

1    Q.  Is this the same phone we looked at earlier?

2    A.  That's right, yes.

3    Q.  What type of information is shown in this screen?

4    A.  It is a history of when access is gained to an internet

5    page.

6    Q.  When you were taking these pictures, did Josh, Chino, and

7    Omar know that you were taking them?

8    A.  No.

9          MR. LOCKARD:  Thank you, Ms. Cooper.

10   Q.  During the time that you knew Mr. Schulte at the MCC, did

11   he talk about what he had done prior to his arrest?

12   A.  That he was working with the CIA.

13   Q.  And did you hear the defendant talk about the CIA?

14   A.  On a couple of occasions.  On several occasions I did hear

15   him talk about it.

16   Q.  What kinds of things would the defendant say about the CIA?

17   A.  That they had betrayed him; that he felt humiliated over

18   what they had done to him.

19   Q.  Did you hear the defendant talk about using computers?

20   A.  I did once hear him say that if he had but just a small

21   computer with it, he would have been able to even open the

22   doors of the MCC.

23         MR. LOCKARD:  Ms. Cooper, could we please pull up

24   Government Exhibit 820-12.

25   Q.  Mr. Betances, are we still looking at the same cell phone?

M6tWsch6                          Betances - Direct

1    A.  Yes.

2    Q.  Do you know who the user J is in this chat?

3    A.  No.

4           MR. LOCKARD:  Can we look at Government Exhibit

5    820-24, please.

6    Q.  Mr. Betances, what is shown here?

7    A.  Another iPhone, different from the first one.

8    Q.  And who used this second iPhone?

9    A.  All of us used it.  Josh, Omar, Chino and myself.  All of

10   us did.

11          MR. LOCKARD:  Can we turn to Government Exhibit

12   820-88.

13   Q.  Mr. Betances, what is shown here?

14   A.  A Samsung phone.

15   Q.  And who used the Samsung phone?

16   A.  Josh did.

17   Q.  Did you also use the Samsung?

18   A.  On occasion, when I didn't have the password.

19   Q.  Did there come a time when you no longer had the password?

20   A.  Yes, the time came when I no longer had the password.

21   Q.  And did you ask the defendant about that?

22   A.  Yes, I did ask him, but he had a password with a lot of

23   digits, and he said that he was the only one that could use

24   that phone at the time.

25   Q.  Mr. Betances, who asked you to get a Samsung?

M6tWsch6                          Betances - Direct

```
 1   A.   Josh.

 2   Q.   And did the defendant say why he wanted a Samsung?

 3   A.   Yes.

 4   Q.   What did he say about that?

 5   A.   He said that he needed a Samsung because with the

 6   applications and the things that he could do on the Samsung

 7   were easier done on a Samsung than on an iPhone.

 8   Q.   And did you overhear a conversation before you were asked

 9   about the Samsung?

10   A.   What are you referring to by conversation?

11   Q.   Did you hear a discussion that led to the request for the

12   Samsung?

13              MR. SCHULTE:  Objection.

14   A.   Oh, yes.  He wanted to replace the iPhone.  He no longer

15   wanted to use an iPhone but, rather, a Samsung.  So they made

16   an exchange with this guy called Jimmy in in the same unit, and

17   that's how they got the Samsung.

18              THE COURT:  Two things.

19              One is the objection to that question is overruled.

20              Mr. Betances, if you hear an objection, if you could

21   just wait before you begin your answer to ensure that I can

22   rule on the objection, I'd appreciate it.

23              THE WITNESS:  OK.

24              THE COURT:  And Mr. Schulte, if you can make sure that

25   you speak into the microphone to ensure that everybody hears
```

1    it, that would be appreciated as well.

2            MR. SCHULTE:  Will do.

3    BY MR. LOCKARD:

4    Q.  Mr. Betances, what did the defendant say about why he

5    didn't want to use iPhones anymore?

6    A.  Because of a conversation in Chino's cell, he was very

7    scared because his cousin -- or, I don't know who it was.  The

8    FBI had gone to that person's house.  They had taken his

9    computer, and since then, he was very scared.  So he wanted to

10   replace all phones.  He wanted to get all new phone chips, and

11   because of something like that that had happened; he didn't

12   know what.

13           MR. LOCKARD:  Could we please look at Government

14   Exhibit 820-27.

15   Q.  Mr. Betances, what is shown here?

16   A.  A SIM card.

17   Q.  Is this one of the SIM cards that you and Chino and the

18   defendant and Omar got?

19   A.  Yes.

20           MR. LOCKARD:  And if we could look at Government

21   Exhibit 820-105.  I'm sorry.  105.

22   Q.  Mr. Betances, what is shown here?

23   A.  A SIM card, which is the one that was used on the Samsung.

24           MR. LOCKARD:  And if we could look at Government

25   Exhibit 820-433.

M6tWsch6

1    Q.  Mr. Betances, what information is shown in this picture?

2    A.  It is the information on the back of the Samsung, which

3    shows the IMEI and some other numbers that appear there.

4    Q.  Did the defendant ever talk to you about IMEI numbers?

5    A.  Yes.

6    Q.  What did he say about IMEI numbers?

7    A.  Yes, that he could change the number on the phone and get a

8    new number on it, assign a new number to it, using a program he

9    had and make it as though it was a factory new phone.

10            MR. LOCKARD:  Can we go back to Government Exhibit

11   820-94 again -- sorry.  Not again.

12   Q.  Mr. Betances, is this the Samsung the defendant used?

13   A.  Yes.

14            MR. LOCKARD:  And Ms. Cooper, if we could please go

15   back to Government Exhibit 820-88.  820-88, please.

16   Q.  Looking at the top of this email, where it says to

17   Annon1204, do you know whose email address that is?

18   A.  Yes, it's Josh's.

19            THE COURT:  How do you know that?

20            THE WITNESS:  Yes, because on the cell phone, on the

21   account that he used, he would leave the email open sometimes,

22   and so I took the picture.  I took an image of the screen of

23   the phone.

24            THE COURT:  All right.  And that's where we will stop

25   for the day.

M6tWsch6

1          Ladies and gentlemen, first, Ms. Smallman tells me

2     that some of you have asked about the schedule for next week

3     just so you can plan accordingly.  A reminder that we won't be

4     sitting this Friday or Tuesday, but we will sit Wednesday,

5     Thursday, and Friday of next week.  And Wednesday and Thursday

6     I'll ask that you be here until 4:00.  We'll end a little later

7     at the end of the day, but that way we'll make up a little bit

8     for the lost time.  Hopefully, that is not a problem and you

9     can make the necessary arrangements.

10          You know the drill.  First of all, stay healthy.

11          Second of all, keep an open mind.  Don't discuss the

12     case with each other or anyone else for that matter.  Don't do

13     any research about the case.

14          Enjoy your afternoon and evening.  We'll see you all

15     tomorrow -- same time, same place.

16          Thank you very much.

17          (Continued on next page)

18

19

20

21

22

23

24

25

M6tWsch6

```
 1              (Jury not present)
 2              THE COURT:  You may be seated.
 3              All right.  First of all, Mr. Denton or Mr. Lockard,
 4     can you fill me in how much longer on direct and who the next
 5     witnesses are; how many more do we have?  We seem to be picking
 6     up the pace a about bit, which is good.
 7              MR. LOCKARD:  It's fantastic.
 8              Mr. Betances has, I would guess, just a little bit
 9     left, maybe about 15 minutes.  After Mr. Betances is done, then
10     Special Agent Evan Schlessinger will be the government's final
11     witness.
12              THE COURT:  So is there a chance you'll rest tomorrow?
13              MR. LOCKARD:  There's a hope.
14              THE COURT:  Great.  What does that mean in terms of a
15     defense case and the defense witnesses?
16              MR. DENTON:  We will have the first set of them here
17     and ready to go on Tuesday.
18              THE COURT:  Well, but if we get done tomorrow and
19     there's more to the day, would they be available to begin
20     tomorrow?
21              MR. DENTON:  I don't think we'd have anyone available
22     tomorrow.  I think it is extremely unlikely that we would have
23     a long gap in the end of the day.  I think Special Agent
24     Schlessinger's probably about an hour and a half, two hours on
25     direct.  So my guess is he will take us close enough to the end
```

M6tWsch6

1    of the day that it's a reasonable place to break.

2              THE COURT:  All right.  Well, I get to decide that,

3    and usually I like to use every one of my allotted minutes.

4    But in any event, I'm certainly not going to hold it against

5    Mr. Schulte if the government hasn't made his witnesses

6    available.

7              Mr. Schulte, anything that you want to say on that in

8    terms of preparing, planning for a defense case?

9              (Defendant conferred with standby counsel)

10             MR. SCHULTE:  Yes.  I think standby counsel already

11   gave the government the list of witnesses and for the next few

12   days, if there's -- if the defense determines that there's, you

13   know, any changes to that, we would let the government know.

14             THE COURT:  All right.  It certainly sounds like you

15   should be prepared to proceed with any defense case on the

16   first day of next week, so on Wednesday, barring unexpected

17   developments.  But I'll assume that we're not going to get

18   there tomorrow, and notwithstanding my general desire to move

19   from one thing to the next, I'll assume that we'll break then

20   and take up any legal issues, etc.

21             I assume from the exhibits that were introduced

22   through the last witness that the government has decided not to

23   use 820-224.  Is that correct, Mr. Lockard?

24             MR. LOCKARD:  That is correct, your Honor.

25             THE COURT:  All right.  That moots that issue.

M6tWsch6

 1          Do we still need to resolve the IRC chat issue?

 2          MR. LOCKARD:  No.  I think we are not going to be

 3   offering the two lengthy IRC chats that Mr. Schulte had raised,

 4   which are 1405-9 and -12.  And I think the last remaining issue

 5   is just ascribing a year to the rest of the chats, which we are

 6   working on accomplishing.

 7          THE COURT:  OK.  Mr. Schulte, does that --

 8          Well, Mr. Lockard, when you say working on

 9   accomplishing, what's the means or method of doing that?

10          MR. LOCKARD:  So, I think we will, you know, if

11   Mr. Schulte agrees on the years, we can potentially just

12   stipulate to it.  If not, we'll either introduce it through

13   Mr. Schlessinger's testimony or we will not be offering the

14   chats, one of those two things.

15          THE COURT:  All right.

16          Mr. Schulte, anything you want to say on that score?

17          MR. SCHULTE:  I think if the chats are going to be

18   offered as exhibits, the year should be in the exhibit.

19   Otherwise, it's too confusing.  So if the government's planning

20   to introduce it, I think they should just, at the top or

21   somewhere in the document just note what the year is.

22          THE COURT:  I think it doesn't sound like there's

23   disagreement on that, but can we just do that by stipulation?

24          MR. SCHULTE:  That's what I'm saying.  If there's a

25   stipulation but it's not in the exhibit, when they're reviewing

M6tWsch6

1  it, it's going to be too confusing.  They'll have to -- see

2  what I'm saying?  I'm saying in the exhibit itself, the

3  government should just update the exhibit and put the year in

4  there instead of doing a stipulation or anything like that, so

5  it's not so confusing.

6         MR. LOCKARD:  If that's the only issue, it's an easy

7  fix.  I think we had understood it to be a different issue.

8         THE COURT:  OK.  Meaning everyone's in agreement that

9  we can modify -- normally, we don't tinker with exhibits, but

10  if everyone agrees that it would be better to just add the year

11  with respect to the dates in the exhibits and that's OK, then I

12  suppose they'll be received.

13         MR. LOCKARD:  I think perhaps just for a clean record

14  we might designate them -1A, -2A, etc., but that's something

15  that we can work out.

16         THE COURT:  OK.  Why don't you discuss that with

17  Mr. Schulte and hopefully you can reach agreement on that.

18            Anything else from the government?

19         MR. DENTON:  Just two things, your Honor.

20            First, the Court sustained the objection.  This is the

21  second today that the defendant has tried to suggest that the

22  redacted text in his notebooks is the actual text.  I'm not

23  sure that there's necessarily sort of an instruction that's

24  appropriate at this point.  Certainly it does kind of fly in

25  the face of the Court's instruction to the jury that they

M6tWsch6

1    should not speculate about what is under the redactions.  So we

2    wanted to flag that as an issue of concern.  To the extent that

3    the defendant is seeking to mislead the jury about what his

4    notebooks contain, some curative instruction, we think, would

5    be appropriate.  It's a sufficiently unusual situation that I

6    don't have a proposal at hand right now, so I think we're just

7    flagging it for the moment so that if it comes up again,

8    everyone's aware that we do intend to ask for that.

9              THE COURT:  OK.  I think I sustained your objection to

10   that particular question, and between that and the several

11   instructions I've given the jury about redactions, I'm not sure

12   that there is a need for a curative instruction, but if you --

13             MR. DENTON:  No.  Your Honor, I think I'm essentially

14   flagging if it happens again, we are going to ask for it.  I

15   think that the sustaining of the objection solved the issue

16   here.  It was the second time this happened with a second

17   witness.  Insofar as we're going to be discussing aspects of

18   the defendant's notebooks, I imagine, in some detail tomorrow,

19   we just wanted to note the concern, and we can decide on an

20   appropriate form of relief when and if it comes up.

21             THE COURT:  All right.  To the extent that you're

22   laying down a marker for Mr. Schulte's benefit, it has been

23   laid, and I will consider it if and when it's appropriate.

24             Next.

25             MR. DENTON:  We provided the Court and Mr. Schulte

M6tWsch6

1    with Government Exhibits 1703-1 and 1704-1, which reflect the

2    portions of the expert presentations that we think would be

3    admissible under 1006.  That doesn't have to be resolved now,

4    but obviously before the close of the government's case, we

5    will seek to move those into evidence.  We're happy to take

6    that up once the Court and Mr. Schulte have had a chance to

7    review.

8              THE COURT:  OK.  I think I found them on here.  I now

9    have them but haven't looked at them.  To be more precise, I

10   just scrolled through very quickly.

11             When did you give them to Mr. Schulte?

12             MR. DENTON:  This morning, your Honor.

13             THE COURT:  All right.  Why don't we plan to take that

14   up at some point tomorrow, either first thing in the morning or

15   certainly before the government rests.

16             Anything else from the government?

17             MR. DENTON:  No, your Honor.

18             THE COURT:  All right.

19             Mr. Schulte, first, let me just, my periodic question

20   to confirm that you're still controlling your defense, but to

21   the extent you are consulting with standby counsel, it is

22   because you are seeking their advice, not because you're

23   receiving any unsolicited advice.  Is that an accurate

24   statement?

25             MR. SCHULTE:  That's correct.

M6tWsch6

1          THE COURT:  All right.  Anything that you want to

2     raise.

3          MR. SCHULTE:  Yes.  I want to raise the same issue

4     that the government just discussed.

5          So the government has been going into detail on its

6     witnesses, asking them do you know what specific vendor report

7     this refers to, and this is kind of crazy.  The government

8     can't have its cake and eat it too.  We went through the whole

9     CIPA.  We tried to get it declassified so that we could

10    introduce the evidence.  The government said that they wouldn't

11    and it wouldn't be introduced.  So to the degree that the

12    government is trying to say that this is referring to a

13    specific report and asking every witness what is that report, I

14    think the government is opening the door for the question to

15    say OK, does this mention that report?

16         You know, the government can't have it both ways.  So

17    I think as the Court has already instructed the jury that

18    they're not to speculate what's under the redactions, I don't

19    think the government, it's proper for them to question the

20    witness and say do you know what report is referred to in this

21    document.

22         THE COURT:  Mr. Denton.

23         MR. DENTON:  I'm not really sure I follow quite what

24    the concern is.  No one identified what the report is.  No one

25    identified what the vendor called the tool.  The question was

M6tWsch6

1    just simply, I think, to both of the witnesses did the report

2    either identify the tool by that name or associate it with the

3    CIA or those purposes, which I think is an entirely fair

4    question given the defendant's arguments.

5         THE COURT:  I think what Mr. Schulte's referring to

6    are questions of one or both witnesses that were asked about

7    this in the nature of are you familiar with the vendor that is

8    referred to in the notebook.  And I think, if I understand

9    correctly, the point is that he should be entitled to sort of

10   test whether it actually referred to a vendor if that question

11   is asked.

12        Mr. Schulte, is that an accurate characterization?

13        MR. SCHULTE:  Well, I think the questions that he just

14   said that he's asking, did the vendor report specifically say,

15   or whatever.  So he's asking about information about the vendor

16   report and then either implying or making it seem like that's

17   what's behind the redaction.  So that's what I think is the

18   problem, is that when the government's asking or assuming or

19   inferring that what's under the redaction is a specific vendor

20   report and then asking questions about that specific vendor

21   report, I think that is the problem.

22        THE COURT:  All right.  I think, for instance, on -- I

23   don't remember which page we were -- page 11 of Government

24   Exhibit 809 refers to @vendor, @vendor being a substitute

25   discovered tool.  And Mr. Denton, I think that if I understand

M6tWsch6

correctly, I think Mr. Schulte's point is that he wants to be

able to -- that the jury should be entitled to know whether or

to what extent he actually identified the vendor report that

has been testified to.  And to the extent that there's a

substitute in here, it sort of makes that a little bit more

difficult to assess whether and to what extent it would be

identifiable to someone.  Obviously these witnesses have

testified that they were able to identify it, but the jury

doesn't know what's under the redaction.

          Having said that, this obviously went through the CIPA

process, but I'm not sure -- I might have to revisit or go back

and look at that and see what arguments were made at the time

and whether this issue or argument was made.

          But what's your response.

          MR. DENTON:  I think putting that aside, unless the

defendant's argument is that somehow he was talking about a

different vendor report, I don't think any of the witnesses

were asked if they knew what Mr. Schulte had written.  I think

they were asked if they were familiar with the fact that the

tool had been identified in a vendor report; what sort of that

vendor report said, not in the specifics but in the sense of

did it use the name, did it tie it to the CIA?  What sorts of

things would be harmful about tying the tool name together with

the vendor report, which honestly, I'm not sure actually turns

on which specific vendor report is.  I think we would make the

M6tWsch6

1    same arguments, the same category of injury that results from

2    that.

3              So again, I'm not sure why the specific reference to

4    the underlying report is necessary to make that argument.

5              THE COURT:  And not having the classified unredacted

6    version of this before me, and recognizing there are limits to

7    what can be said here, does the unredacted version clearly

8    identify the vendor report at issue?

9              MR. DENTON:  Yes.  It specifically identifies the

10   company name of the vendor and the tool name that that vendor

11   assigned to the malware, which was a specific name, not

12   Bartender or one of the CIA tool names.

13             THE COURT:  OK.

14             Mr. Schulte, I'm not sure precisely what you're asking

15   for.  I'm certainly happy to look back at the litigation on

16   this issue and at the transcript and what questions were asked,

17   but it sounds like --

18             MR. SCHULTE:  I think -- I mean I think the Court

19   understands the issue, but when we went through the CIPA

20   process, the defense wanted to declassify this so that we could

21   properly cross the witness, and the government said that they

22   didn't intend to show what the vendor report is.  So then at

23   that point the defense has no ability to show that the

24   information is already public or anything about the vendor

25   report, and the Court agreed that as long as the government

M6tWsch6

1    isn't going to introduce specifics about that, then it should

2    be substituted.  So I'm just flagging for the Court that the

3    government shouldn't be trying to infer or to suggest what is

4    under the redactions and should just abide by the Court's

5    previous ruling that the jury's not to speculate anything about

6    that.

7              THE COURT:  OK.  Well, I assume that the government

8    will abide by that and doesn't plan to --

9              Well, Mr. Denton, maybe I shouldn't assume.  I assume

10   you're not going to suggest that it identifies the specific

11   vendor; that is to say, suggest or imply anything about what is

12   beneath the substitution or the redaction.

13             MR. DENTON:  No, your Honor.  I think what we plan to

14   do is pretty obvious, which is refer the jury to the witness's

15   testimony about the unique harms of associating a CIA tool not

16   identified by name as such with a vendor report describing an

17   incidence of malware that was found in the wild and referring

18   to why that would be uniquely harmful.

19             THE COURT:  All right.  I don't think there will be an

20   issue, but if there's an objection, I'll rule on it at that

21   time.

22             Anything else, Mr. Schulte?

23             MR. SCHULTE:  No.  Nothing else.

24             THE COURT:  All right.  If those who are involved in

25   reviewing the transcripts of Monday and yesterday, any report

M6tWsch6

1   on that or update on that?  I guess I should ask.

2             MR. DENTON:  I know that it was being worked on

3   intensely as of the lunch break, your Honor.  I haven't heard

4   any more since then, but we will get on it promptly and make

5   sure that we get an update to the Court and to standby counsel

6   as soon as we can.

7             THE COURT:  I know we're trying to work through the

8   technical issues with respect to Friday's, which I think are on

9   the court reporter end of things, not the government or the

10  CIA, but make sure you do what you need to do as quickly as you

11  can so that we can make things public and available to

12  Mr. Schulte as quickly as we can.

13            All right.  I will see you tomorrow.  I will pray that

14  we don't get any more positive tests in the meantime.

15            I guess one last thing.  As I said before the break, I

16  think there's been a little slippage on our keeping strictly to

17  the times that I like to start.  I do want to be on the bench

18  at 9:00, which means everybody in their seats before 9:00,

19  including the defendant, obviously.  But if we can try to do

20  that so that we can begin with the jury at 9:15 promptly, that

21  would make me happy.

22            See you tomorrow.  Thank you.

23            (Adjourned to June 30, 2022, at 9:00 a.m.)

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                  Page

3    JEREMY WEBER

4    Cross By Mr. Schulte . . . . . . . . . . . .1555

5    Redirect By Mr. Lockard  . . . . . . . . . .1587

6    Recross By Mr. Schulte . . . . . . . . . . .1610

7    FRANK STEDMAN

8    Direct By Mr. Denton . . . . . . . . . . . .1618

9    Cross By Mr. Schulte . . . . . . . . . . . .1656

10    SEAN P. ROCHE

11    Direct By Mr. Denton . . . . . . . . . . . .1659

12    Cross By Mr. Schulte . . . . . . . . . . . .1686

13    CARLOS MANUEL BETANCES LUNA MERA

14    Direct By Mr. Lockard  . . . . . . . . . . .1704

15                         GOVERNMENT EXHIBITS

16    Exhibit No.                                  Received

17     820, 820-1 through 820-223, and 820-402 . . .1714

18            through 820-449

19

20

21

22

23

24

25