M6uWsch1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          17 Cr. 548 (JMF)

5    JOSHUA ADAM SCHULTE,

6              Defendant.
                                          Trial
7    ------------------------------x

8                                         New York, N.Y.
                                          June 30, 2022
9                                         9:00 a.m.

10   Before:

11
                      HON. JESSE M. FURMAN,
12
                                          District Judge
13                                        –and a Jury–

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  DAVID W. DENTON JR.
17        MICHAEL D. LOCKARD
          Assistant United States Attorneys
18

19   JOSHUA A. SCHULTE, Defendant *Pro Se*

20

21   SABRINA P. SHROFF
     DEBORAH A. COLSON
22        Standby Attorneys for Defendant

23   Also Present:  Charlotte Cooper, Paralegal Specialist
                    Elizabeth Caruso
24                  Vivian Goa
                    Interpreters (Spanish)

25


               SOUTHERN DISTRICT REPORTERS, P.C.••
                         (212) 805-0300

M6uWsch1

1              (Trial resumed; jury not present)

2              THE COURT:  You may be seated.

3         All right.  I'm told the witness is not yet in the

4    courthouse, which is unfortunate.  I'll try and get a sense of

5    his timing while we talk, but in the meantime, let's take care

6    of whatever business we have.

7              First, Mr. Schulte, any objections to 1703-1 and

8    1704-1, the proposed summary charts?

9              MR. SCHULTE:  Yes.  I think there's still an

10   objection.  They took, like, 60, 70 percent of the slides, not

11   really any mechanism for how they chose random slides.  And

12   it's just not proper evidence, what they selected.

13             THE COURT:  Can you be a little more specific than

14   that?  The sheer number is not a ground for objection.  The

15   question is whether the selections they made are consistent

16   with Rule 1006, which is to say that they summarize or display

17   the contents of voluminous writings, recordings, or photographs

18   that cannot be conveniently examined in court, as opposed to

19   being something that is just a demonstrative aid to the

20   witness's testimony.  So certainly portions of these are

21   clearly proper under 1006.  I think the burden is on you to

22   identify if you think that something isn't and/or if it is

23   otherwise inadmissible or misleading.

24             MR. SCHULTE:  Would the Court want me to submit

25   something for each of the ones I object to, or -- I mean I

M6uWsch1

1    think a lot of it is still just demonstrative.  Obviously, some

2    of it is admissible under that rule, but I think still that the

3    government didn't really pare down a lot of the demonstrative

4    exhibits, and especially when it didn't really pertain to

5    voluminous records, some of the slides.

6         THE COURT:  OK.  I'd say the only issue is that the

7    government, sounds like, may rest as soon as today, and I think

8    in fairness, I'd wanted this resolved before that.  On the

9    other hand, assuming the government has no objection, I suppose

10   I can always tell the jury that we're sorting out what portions

11   of 1703 and 1704 can be admitted into evidence.  I think I told

12   them that for the moment they're just demonstratives, and then

13   we can always, I think, just admit them after the fact if

14   there's no objection from anybody.

15        MR. LOCKARD:  I think they may need -- I take the

16   Court's point.  The point is that they are not in but they are

17   accepted as demonstratives and can be converted to substantive

18   evidence; I'm not sure we can do that after the government

19   rests.

20        THE COURT:  Why not, if Mr. Schulte has no objection?

21        MR. LOCKARD:  I think we're concerned about the effect

22   on things like Rule 29 motions and other things that are tied

23   to the close of the government's case in chief.  That's the

24   concern.  I think we're less concerned about what goes into the

25   jury room.  I think that's an easy question.  I think we're

M6uWsch1

1    more concerned about motions tied to --

2            THE COURT:  Is there anything in here that is not part

3    of the record in some other form, either by testimony of the

4    witness or the actual underlying evidence?  Most of it

5    references evidence that is in the record, government exhibits,

6    and the like.  To the extent that it is in the record, I think

7    it is complete and there would be no Rule 29 issues.

8            MR. LOCKARD:  That's a fair point, your Honor.  I

9    think especially the witness testimony certainly covers the

10   slides in the deck.

11           THE COURT:  All right.

12           Mr. Schulte, assuming that you have no objection to

13   proceeding in that way, given that it would be to accommodate

14   your desire to go through this more carefully and submit

15   something in writing, I'm happy to give you that opportunity

16   and have you file something by Tuesday, identifying with

17   specificity, any portions of this that you think are not proper

18   under Rule 1006.  Does that work?

19           MR. SCHULTE:  I very much appreciate that.  Thank you.

20           THE COURT:  All right.  And just to be crystal clear,

21   I take it you have no objection to whatever portions are

22   admissible being admitted after the government rests its case.

23   So resting conditioned on that?

24           MR. SCHULTE:  That's correct.

25           THE COURT:  OK.  Great.

M6uWsch1

1      Second, the IRC chat issue, situation.  Has that been

2  resolved?

3      MR. LOCKARD:  We think so.  We've reworked the

4  exhibits, as discussed yesterday afternoon, and included the

5  file titles from which those chats were derived, which contains

6  the year of each of the chats, and we've provided those to

7  Mr. Schulte so that he can review them when he has an

8  opportunity.

9      THE COURT:  OK.

10      Mr. Schulte, have you had an opportunity?  It doesn't

11  sound like there would be much to review.

12      MR. SCHULTE:  I mean, from my understanding, it's the

13  same.

14      (Defendant conferred with standby counsel)

15      MR. SCHULTE:  I just received them, so I haven't had a

16  chance to go through them.  So just having an opportunity to do

17  that, and I think they're -- yeah.

18      (Defendant conferred with standby counsel)

19      THE COURT:  OK.  Well, given the delay in the

20  witness's arrival, it may be that you'll have a chance to do

21  that in a moment.

22      Anything else that you guys need to discuss?

23      MR. LOCKARD:  Not to discuss, your Honor, but I think

24  just in the vein of ensuring that the record on the admitted

25  evidence is clear, you know we've been providing the parties

M6uWsch1

1    and the Court with the government's list of admitted exhibits.

2    I think there is one more set of exhibits that will be admitted

3    through Agent Schlessinger's testimony, and then after that we

4    hope to have an opportunity to see if Mr. Schulte objects to or

5    disagrees with our list of what's in evidence.

6              THE COURT:  All right.  I've been getting a running

7    list, although now that I look, I don't think I have today's --

8    oh, I think I do.  I very much appreciate the government

9    keeping track.

10             MR. LOCKARD:  And we flagged in connection, I think,

11   you know, there are times when the record will reflect that a

12   disk containing exhibits has been received in evidence and then

13   the government's list also contains an individualized list of

14   what's included on those disks, which is not necessarily

15   reflected in the transcript but we think doesn't affect their

16   status as received evidence.

17             THE COURT:  Sorry.  Can you say that again?

18             MR. LOCKARD:  Sure.  The identification of particular

19   documents on a disk has been a little bit inconsistent in the

20   transcript.  So there are times where the transcript will

21   reflect that a disk has been received in evidence as well as

22   identifying the exhibits that are contained on that disk.

23   Other times, the disk itself is indicated as received but not

24   the underlying or the contained exhibits.  We don't think that

25   affects the fact that those contained exhibits were received as

M6uWsch1

1    part of the disk.  We just wanted to flag that so that

2    everybody's aware of it and on the same page.

3              THE COURT:  OK.

4              Mr. Schulte, I would ask that you take the weekend to

5    go through that list and see if you have any disagreement with

6    anything that the government believes is in evidence and be

7    prepared to raise that, I guess, when we resume next week.

8    It's not critical just yet, but certainly when it comes time to

9    submitting the case to the jury, I want to make sure we're all

10   on the same page and have the exhibits that have been admitted

11   collected so that they can be submitted to the jury.  That will

12   be in electronic format, so if the government wants to begin

13   consolidating them -- well, I'll talk to Ms. Smallman about

14   whether it's easier to have you give us a new set so that we

15   don't have to collate or go through the ones that we have or

16   just select from what we already have.  In any case, it's

17   certainly important that everybody's on the same page about

18   what is in evidence.

19             So Mr. Schulte, if you can review the government's

20   lists over the weekend and be prepared to raise anything that

21   you think is inaccurate when we resume next week, that would be

22   great.  OK?

23             MR. SCHULTE:  Yes.  Will do.

24             THE COURT:  All right.  I think I may have said that

25   was the last item on my agenda list, but I have one other,

M6uWsch1

which is the proposed redactions to the transcript from -- I
think if I have it right, we're now talking Tuesday.  I have
received those and I'm OK with the redactions -- well, here's
what I would propose.  I have no problem approving the limited
proposed redactions with respect to the transcript to be
released publicly.  I think that they're narrowly tailored to
what would be justifiably redacted.  To the extent that the
redactions are to questions that I sustained an objection,
there's also no issue with redacting it in the event that the
jury requests this portion of the transcript.

        I do have some concerns, however.  There are a couple
questions where there was no objection, one question that I
posed, that is redacted.  I apologize for that.  And those I
have a little bit of concern redacting from the jury in the
event that the jury requests this portion.  Obviously they may
not request this portion, and then it would be a moot point.
But what I would propose is if the jury does request this
portion, that we give them a version that only redacts -- any
transcript that we give to the jury should redact anything that
I've sustained.  So that's a nonissue.  But with respect to
something where there was no objection or I overruled the
objection, I think we should give a copy to the jury without
the redaction, and then we would collect those after the fact
so that there's no danger of them being released.  But since
what's done is done.  It was said in open court.  It was

M6uWsch1

1    public, or public to the extent that I previously approved at

2    the time.  I have no trouble redacting it from the public

3    version, but I think if the jury requests it, we shouldn't

4    redact something that's technically in evidence.

5              Any objection to proceeding in that manner?

6              MR. LOCKARD:  No, your Honor.

7              THE COURT:  Mr. Schulte.

8              MR. SCHULTE:  No.

9              THE COURT:  I think that's it on my agenda.

10             Anything else from any of you?

11             MR. DENTON:  Not urgent, your Honor, but just since we

12   have a moment, with respect to the defense witnesses for next

13   week, first of all, let me say again we apologize, but to the

14   extent that our misestimation of how things were going to go

15   this week results in our not having a defense witness available

16   today, we apologize for that.

17             Mr. Schulte provided us last night with a trimmed-down

18   list of nine current or former CIA employees or contractors

19   that he intends to call.  One of those, the last name on the

20   list is the individual whom we've discussed previously that we

21   were not -- or I should say the CIA was not able to contact,

22   and his contact information was provided to standby counsel.

23   So we are not making arrangements for him.  I will note,

24   however, based on his status at the time that he retired, he

25   would fall into one of the categories for protected witnesses.

M6uWsch1

1    So if defense counsel is able to arrange and secure his

2    appearance, we'll just have to coordinate on that.

3            For the other eight witnesses, we will have all of

4    them here and ready to go on Wednesday morning and kind of have

5    them available in, you know, as the defendant requests them.

6    We'll try and manage the logistics of getting people up here as

7    efficiently as possible -- up here meaning within the

8    courthouse and just having people kind of ready to go so that

9    there isn't long delay between witnesses.  But based on the

10   defendant's representation of only expecting a two- to

11   three-day case, our plan is just to have everybody available

12   and so we'll be able to move efficiently.

13           THE COURT:  OK.  I think that makes the most sense.

14           For my planning purposes, of the nine, how many fall

15   into the most highly protected category; that is to say, for

16   whom the partial courtroom closure would be implemented?

17           MR. DENTON:  If I could just have a second, your

18   Honor.

19           So, your Honor, I think of the nine, I believe eight

20   of them would fall into different degrees of closure.  One of

21   them would not.  One of them would be able to testify in his

22   full name in open court, like Mr. Roche did.  I think, if I'm

23   remembering correctly, that there are three of those who would

24   be testifying under pseudonyms, and then the other five would

25   be testifying in their true first name only.

M6uWsch1

<table>
<tbody>
<tr><td>1</td><td>THE COURT:  And all eight would be subject to the</td></tr>
</tbody>
</table>

1       THE COURT:  And all eight would be subject to the

2  partial closure of the courtroom, though, or just the three

3  with pseudonyms?

4       MR. DENTON:  Yes, all eight would be.

5       THE COURT:  All right.

6       Mr. Schulte, any disagreement about that?

7       MR. SCHULTE:  I mean --

8       (Defendant conferred with standby counsel)

9       MR. SCHULTE:  Yeah, the status, obviously whatever the

10  status the government says.

11       I wanted to note also that there's at least one other

12  witness, Hannah Slotnick, who is not a CIA witness, who we've

13  subpoenaed.

14       (Defendant conferred with standby counsel)

15       MR. SCHULTE:  And for whom we have no 3500.  I just

16  want to make sure the government is aware of that and the

17  Court's aware of that on the record.

18       And then I'd just ask for a couple seconds to review

19  something with standby counsel about a stipulation with the

20  government.

21       THE COURT:  OK.

22       MR. SCHULTE:  All right.  I think that's cleared up.

23       THE COURT:  OK.  Anything else from your end,

24  Mr. Schulte?  Otherwise --

25       MR. SCHULTE:  No, nothing.

M6uWsch1

1          THE COURT:  Great.  So if you can review the IRC chat

2     exhibits while we're awaiting either Mr. Betances or word about

3     him, that would be great.  I'll stay on the bench in the hopes

4     that that's just a few minutes.

5          MR. DENTON:  Your Honor, with respect to the witness

6     issue, I think at the end of the day today, we can provide the

7     Court with a list of the defense witnesses or at least the

8     defense CIA witnesses and who falls into which category and

9     just itemize it that way in a classified submission.

10         THE COURT:  All right.  I think that would be very

11    helpful so that we can plan accordingly, but I assume that

12    you'll also coordinate with the CISO team and the marshals, as

13    needed.

14         MR. DENTON:  Of course.

15         THE COURT:  All right.  Anything else that we need to

16    discuss while we wait?

17         Is the government still expecting to rest today?

18         MR. LOCKARD:  That's our expectation/hope.

19         THE COURT:  OK.

20         Mr. Schulte, anything else, other than reviewing the

21    IRC chats?

22         MR. SCHULTE:  No, nothing else.

23         THE COURT:  Great.  Why don't you review that, and

24    I'll let you know when I have word about the witness or the

25    witness will appear.

M6uWsch1

1            All right.  I gather the witness is here and is on his

2     way up.  We'll start to round the jury up as well.

3            Mr. Schulte, any chance to review the IRC chat

4     situation?

5            MR. SCHULTE:  Yes, I have.

6            THE COURT:  Any objection to what the government is

7     proposing?

8            MR. SCHULTE:  No.

9            THE COURT:  All right.  Then I don't need to take

10    anything up.

11           Do we know where Ms. Shroff and Ms. Colson are?  Some.

12           MR. SCHULTE:  I think they had to use the restroom

13    real quick.

14           THE COURT:  All right.  Let's get the witness on the

15    stand.  When they're back, we'll get the jury in and get

16    started.

17           (Continued on next page)

18

19

20

21

22

23

24

25

M6uWsch1

1          (Jury present)

2          THE COURT:  You may be seated.

3          Good morning, ladies and gentlemen.  Welcome back.

4    Thank you for being here on time, and my sincere apologies for

5    the fact that we're getting started a few minutes late.  I had

6    Ms. Smallman come down to give you a heads-up that we'd be a

7    little delayed.  We were having some technical difficulties up

8    here, but we have sorted them out, so we can resume.

9          I should have a better sense of where we are by the

10   end of today, so before I excuse you for this very long

11   weekend, I'll give update you an update on where things are,

12   but the good news is that after talking to the parties, I think

13   we're actually in better shape and on better pace than I had

14   expected.  So that's good news, but I'll give you more concrete

15   information on that front before you leave for the weekend, and

16   obviously, of course, that is, knock on wood, subject to all

17   the various things that could possibly go wrong.  But we'll

18   keep our fingers crossed.  But I'm glad to see everyone's here

19   today.

20         We will pick up where we left off yesterday, with the

21   direct testimony of Mr. Betances.

22   CARLOS MANUEL BETANCES LUNA MERA, resumed.

23         THE COURT:  Mr. Betances, you remain under oath.

24         THE WITNESS:  OK.

25         THE COURT:  Mr. Lockard, you may proceed.

M6uWsch1

1    DIRECT EXAMINATION CONTINUED

2    M6uWsch1                    Betances - Direct

3    BY MR. LOCKARD:

4    Q.  Good morning, sir.

5    A.  Good morning.

6    Q.  Mr. Betances, yesterday you testified about certain things

7    that you heard the defendant say while the two of you were at

8    the Metropolitan Correctional Center together.  Do you recall

9    that?

10   A.  Yes.

11   Q.  Mr. Betances, are you able to speak and understand English?

12   A.  A little bit, yes.

13   Q.  What's your first language?

14   A.  Spanish.

15   Q.  And are you more comfortable today testifying here in court

16   with a Spanish interpreter?

17   A.  Yes.

18          MR. LOCKARD:  Ms. Cooper, could we please pull up

19   Government Exhibit 408.  I'm sorry.  820-408.

20   Q.  Mr. Betances, yesterday you testified about certain phones

21   that you charged in your cell.  Do you remember that?

22   A.  Yes.

23   Q.  Is this one of those phones?

24   A.  Yes.

25   Q.  And which phone is this?

M6uWsch1

1   A.  This one is -- hold on.  I can't really make it out too

2   well.

3        Yes, it's the Samsung.  It's the Samsung.

4   Q.  And can you remind us who used the Samsung cell phone?

5   A.  Josh used it at the beginning.  We were using it also, but

6   after he changed the password, I wasn't able to use it.

7   Q.  Mr. Betances, did you write what's written here?

8   A.  No.

9   Q.  So just directing your attention to the sentence that says,

10  "My case involved WikiLeaks and the Vault 7/8 release," did the

11  defendant mention WikiLeaks to you?

12  A.  I heard him talking about it with him once.

13  Q.  And did you hear the defendant mention Vault 7?

14  A.  Yes.  I also heard him talk about that once, but when I

15  heard him talking, he just, all of a sudden, stopped talking.

16        MR. LOCKARD:  Thank you, Ms. Cooper.

17  Q.  Mr. Betances, did you hear the defendant mention

18  information war?

19  A.  I also heard him mention that once -- that, too, once.

20  Q.  Did you understand what he was talking about?

21  A.  Well, the meaning, I guess it means some sort of a war with

22  respect to information, something like that.

23        MR. SCHULTE:  Objection.

24        THE COURT:  Overruled.

25  BY MR. LOCKARD:

M6uWsch1

1    Q.  But other than that, did you understand what he was

2    referring to?

3    A.  Yes.

4    Q.  Did he say anything else about the information war?

5    A.  No.

6            MR. LOCKARD:  Ms. Cooper, could we please play the

7    video that's in evidence as Government Exhibit 820-420.

8            THE COURT:  Counsel, do you mean 420 or 402?

9            MR. LOCKARD:  Thank you, your Honor.  402.

10           (Video played)

11   BY MR. LOCKARD:

12   Q.  Mr. Betances, did you take that video?

13   A.  Yes.

14   Q.  Who is shown in that video?

15   A.  Josh.

16   Q.  And where were the two of you when you took that video?

17   A.  In Chino's cell.

18   Q.  And what was Mr. Schulte holding at that time?

19   A.  The Samsung telephone.

20           MR. LOCKARD:  Ms. Cooper, could we please see

21   Government Exhibit 820-430.

22   Q.  Mr. Betances, what phone is shown here?

23   A.  It's the Samsung.

24   Q.  And did you write what's written here?

25   A.  No.

M6uWsch1

1   Q.  Is this the same phone that Mr. Schulte was holding in the

2   video we just watched?

3   A.  Yes.

4           MR. LOCKARD:  Ms. Cooper, if we could please also see

5   Government Exhibit 820-431.

6   Q.  And again, Mr. Betances, which phone are we seeing here?

7   A.  The Samsung.  That's it.

8   Q.  And again, did you write what's written on this screen?

9   A.  No.

10          MR. LOCKARD:  Can we please turn to Government Exhibit

11  820-436.

12  Q.  Mr. Betances, again, is this the Samsung?

13  A.  Yes.

14  Q.  The same phone that Mr. Schulte was holding in that video?

15  A.  Yes.

16  Q.  Do you see the email address annon1204@protonmail.com?

17  A.  Yes.

18  Q.  Whose email address was that?

19  A.  Josh's.

20  Q.  Did the defendant say anything to you about ProtonMail?

21  A.  Yes.

22  Q.  And what did he tell you about ProtonMail?

23  A.  That it was more efficient; that it was safer to use that

24  email address because it was encrypted; it was better than

25  Gmail.

M6uWsch1

             MR. LOCKARD:  Could we turn to Government Exhibit

820-434.

Q.  Mr. Betances, which phone is shown here?

A.  Samsung.

Q.  And do you see the icon for ProtonMail in the second row of

icons?

A.  Yes.

Q.  I'd like to draw your attention to the icon on the far

right in the top row, Orbot.  Did the defendant say anything to

you about Orbot?

A.  Yes, that it was an application that could change the IP

address location when the phones were used.

Q.  And did the defendant say anything to you about why that

was important?

A.  Well, that we had to have it on every time we had the phone

powered on.

Q.  Mr. Betances, I'd like to draw your attention to the icon

for Signal on the bottom left.  Or middle left, rather.  I'm

sorry.  Did the defendant say anything to you about Signal?

A.  Yes.

Q.  And what did he tell you about Signal?

A.  That, also that it was safer for text messages, video

calls; it was safer than all the other ones.

Q.  And Mr. Betances, if I could draw your attention to the

icon in the middle right called Turbo VPN.  Did the defendant

M6uWsch1

1   say anything to you about Turbo VPN?

2   A.   Yes.

3   Q.   And what did the defendant tell you about that?

4   A.   That we also had to have it on when the phone was powered

5   on because it would change the location of where we were using

6   the telephone.

7   Q.   Mr. Betances, did there come a time when you learned of an

8   effort to take the Samsung somewhere else in the jail?

9   A.   Yes.

10   Q.   And what did you learn about that?

11   A.   That they were going to pay this friend of mine, Flaco, 200

12   bucks to take it down to the library that day.

13   Q.   And who wanted to pay to bring the phone to the library?

14          MR. SCHULTE:   Objection.   Hearsay.

15          THE COURT:   How did you learn about that information?

16          THE WITNESS:   Because Flaco told me.

17          THE COURT:   All right.   Objection sustained.

18   BY MR. LOCKARD:

19   Q.   Mr. Betances, did you observe anything about Mr. Schulte's

20   or Omar's behavior around that time?

21   A.   Yes.   They were very wary.   They wanted to go down to the

22   library then, and -- so once I realized that they wanted to go

23   down there, I threw this little piece of paper at the guard who

24   was right there, and letting him know that something was going

25   to happen in the library, that he could -- he should --

1          THE INTERPRETER:  Interpreter correction.

2     A.  -- that he should conduct a search or everybody should go

3     down and figure out what was about to happen.

4          So that is what happened.  When Josh and Omar came up, they

5     said something had happened, that there was a search, there had

6     been a search in the library, but they never found out that I

7     was the one who had prevented that from happening.

8     Q.  And did you hear Mr. Schulte or Omar discuss why they

9     wanted the phone in the library?

10          MR. SCHULTE:  Objection.

11          THE COURT:  Overruled.

12     A.  They wanted to send something very important.  I don't know

13     what it was, but it was important.  They had spent a week, a

14     long time with the phones.  They would give me the phone back

15     very late at night with a very low charge.

16          THE COURT:  And did one of them say something to that

17     effect?  And if so, who, and what did they say?

18          THE WITNESS:  None of them said anything.  I just

19     found out about it because Flaco had told me about it before,

20     and they had spent a lot of time, and they were very concerned

21     about going down to the library.

22          MR. SCHULTE:  Move to strike.  All of that was

23     hearsay.

24          THE COURT:  Overruled.

25     BY MR. LOCKARD:

M6uWsch1

1    Q.  Mr. Betances, did there come a time when you heard about

2    efforts to bring a USB drive?

3    A.  Yes.

4    Q.  And who did you hear that from?

5    A.  Omar and Josh.  They were trying to bring them in, but that

6    was before going down to the library.

7    Q.  And what did you hear about the USB drive?

8    A.  They needed it urgently.  They needed it inside the jail.

9    Q.  And did you hear from Mr. Schulte and Omar whether they

10   were able to bring it in?

11   A.  No, because I was the one who would communicate with the

12   person upstairs how and when they could bring them in, and I

13   stopped that also.

14        MR. LOCKARD:  Thank you, Ms. Cooper.  I think we can

15   take this down.

16   Q.  Mr. Betances, we've seen some photographs and a video that

17   you took while you were in the MCC.

18        THE INTERPRETER:  MCC or MDC?  Excuse me.

19        MR. LOCKARD:  While you were in the MCC.

20   A.  Yes.

21   Q.  What did you do with those videos and pictures after you

22   took them?

23   A.  I put them in an email.  And I created a personal account

24   that neither Josh nor Omar knew I had.

25   Q.  And did there come a time when you shared those pictures

M6uWsch1

1    and videos with the government?

2    A.   Yeah.   After what had happened with the library and the

3    USB, I called my lawyer and I told him what was happening.   And

4    after that I met with the government.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6U5sch2                    Betances - Direct

1    BY MR. LOCKARD:

2    Q.  And when you met with the government, were you given any

3    instructions about the cell phones?

4            INTERPRETER:  I'm sorry.  I didn't hear your question.

5    Would you repeat, please?

6    Q.  When you met with the government, were you given any

7    instructions about the cell phones?

8    A.  They told me not to do anything, that I should leave

9    everything the way it was, and that I shouldn't do anything for

10   them.

11   Q.  After that meeting, did there come a time when your cell

12   was searched?

13   A.  Yes.  They found a phone in my cell.

14   Q.  And what happened after the phone was found in your cell?

15   A.  They took me to the SHU.

16   Q.  And can you explain what is the SHU?

17   A.  It's a cell where you can't have communications with

18   anybody, you are locked up.

19   Q.  And for how long were you there?

20   A.  Approximately seven to eight days.

21   Q.  So, Mr. Betances, you said the SHU is a cell where you

22   can't have any communication with the other inmates?

23   A.  I cannot -- I can't communicate with my family but I could

24   communicate with the people inside the SHU.

25   Q.  Did you receive any messages while you were in the SHU?

M6U5sch2                        Betances - Direct

1   A.   Yes.

2   Q.   How were inmates able to pass messages in the SHU at the

3   MCC?

4              MR. SCHULTE:  Objection.

5              THE COURT:  Overruled.

6   A.   Through the air conditioning.

7              THE COURT:  Can you explain that?

8              THE WITNESS:  They talk through the air conditioning

9   ducts and we hear downstairs or I can hear what they are

10  saying.

11  BY MR. LOCKARD:

12  Q.   And from whom did you receive the message that you got in

13  the SHU?

14  A.   Chino.

15  Q.   And who spoke to you directly about Chino's message?

16  A.   A person who was in the cell next to mine.

17  Q.   And why was that person in the cell next to yours?

18             MR. SCHULTE:  Objection.

19             THE COURT:  Sustained.

20  Q.   What had that person done to be in the SHU?

21             MR. SCHULTE:  Objection.

22             THE COURT:  Overruled.

23  A.   He had also been caught with a phone.

24  Q.   Had he been caught with one of the phones that you held and

25  charged?

M6U5sch2                          Betances - Cross

1              MR. SCHULTE:  Objection.

2              THE COURT:  Overruled.

3   A.  Yes.

4   Q.  And what was the message from Chino?

5              MR. SCHULTE:  Objection.

6              THE COURT:  I would like to hear the answer and then I

7   will rule on the objection.

8              INTERPRETER:  I'm sorry, your Honor.  Did you say he

9   could go ahead?

10             THE COURT:  He may answer, yes.

11             INTERPRETER:  Could you please repeat the question?

12  Q.  What was the message you received from Chino?

13  A.  That I shouldn't talk, I should stay silent, and they were

14  going to send me $5,000 to stay silent.

15             THE COURT:  Objection is overruled.

16  BY MR. LOCKARD:

17  Q.  And who is the "they"?

18  A.  Omar and Josh.

19             MR. LOCKARD:  May I have just one moment, your Honor?

20             THE COURT:  Yes.

21             MR. LOCKARD:  No further questions.

22             THE COURT:  Cross-examination.

23             You may proceed.

24  CROSS EXAMINATION

25  BY MR. SCHULTE:

M6U5sch2                        Betances - Cross

1    Q.  Good morning.

2    A.  Good morning.

3    Q.  You were born in the Dominican Republic, correct?

4    A.  Yes.

5    Q.  You first came to the United States in the 1990s, right?

6    A.  That's right.

7    Q.  And you entered the United States illegally, right?

8    A.  Yes.

9    Q.  Your grandmother paid for you to come here, right?

10   A.  Yes.

11   Q.  And it was her hope that you would get a job here, right?

12   A.  Yes.

13   Q.  And you did that after you arrived, right?

14   A.  Yes.

15   Q.  You worked in a restaurant, correct?

16   A.  Yes.

17   Q.  The restaurant paid you, correct?

18   A.  Yes.

19   Q.  They paid you the same wages as other people who worked

20   there, right?

21   A.  Yes.

22   Q.  And that money wasn't enough for you, correct?

23   A.  Yes.

24   Q.  You wanted to make more money, correct?

25   A.  Yes.

M6U5sch2                       Betances - Cross

1   Q.  And you made a decision to sell drugs so that you could

2   make more money, correct?

3   A.  Yes.

4   Q.  You sold drugs in New York, correct?

5   A.  Yes.

6   Q.  In the Bronx?

7   A.  Yes.

8   Q.  And your first job in selling drugs was with your

9   brother-in-law, right?

10  A.  Yes.

11  Q.  You were a lookout for him, correct?

12  A.  Yes.

13  Q.  You would let him know when the police were coming, right?

14  A.  Yes.

15  Q.  You would stay outside of the building from where he was

16  selling drugs, right?

17  A.  Yes.

18  Q.  And he was selling drugs from inside the building, right?

19  A.  Yes.

20  Q.  And your job was to monitor and notify him by radio when

21  the police were coming, right?

22  A.  Yes.

23  Q.  And this was so he wouldn't get arrested, right?

24  A.  Yes.

25  Q.  And this was all the way back in 1996 or 1997, right?

M6U5sch2                        Betances - Cross

1   A.  Yes.

2   Q.  You continued selling drugs after that, right?

3   A.  Yes.

4   Q.  You sold drugs in 1999, right?

5   A.  Yes.

6   Q.  In fact, you pled guilty to selling drugs from December

7   1999, right?

8   A.  Yes.

9   Q.  You pled guilty to selling cocaine, correct?

10  A.  Yes.

11  Q.  And you faced a mandatory minimum sentence of 10 years for

12  that case, correct?

13  A.  Yes.

14  Q.  And by a mandatory minimum, that means without your

15  cooperation, even the Judge cannot give you less than 10 years,

16  right?

17  A.  Correct.

18  Q.  And the only way the Judge can give you less is if this

19  prosecutor write a letter to the Judge, correct?

20  A.  Yes, but --

21  Q.  It is just yes or no.

22  A.   -- to tell the whole truth.

23          INTERPRETER:  Your Honor, may I continue?

24          THE COURT:  Finish the witness' answer, please.

25  A.  Yes, if I tell the whole truth.  If I don't -- yes, if I

M6U5sch2                          Betances - Cross

```
1    don't, they'll take away the agreement.
2              THE COURT:  The question was that the only way you can
3    get a lower sentence is if the prosecutor writes a letter to
4    the Judge.  Yes or no?
5    A.  Yes.
6    Q.  And it is the prosecutor that decides what is true, not the
7    Judge; right?
8    A.  Yes.
9    Q.  And the maximum sentence you face is life in prison,
10   correct?
11   A.  Yes.
12   Q.  And you sold drugs in 2000, right?
13   A.  Yes.
14   Q.  In August 2000 you sold more than five kilos of cocaine,
15   correct?
16   A.  Yes.
17   Q.  And in October of 2000 you sold another 500 grams of
18   cocaine, correct?
19   A.  Yes.
20   Q.  Let's talk about the August 2000 case, OK?  You pled guilty
21   to that offense, correct?
22   A.  Yes.
23   Q.  In fact, you pled guilty to nine charges, correct?
24   A.  Yes.
25   Q.  You had a private lawyer assisting you, right?
```

M6U5sch2                        Betances - Cross

1   A.  Yes.

2   Q.  And when you pled guilty to that offense in August 2000,

3   you faced a maximum sentence of life, correct?

4   A.  Yes.

5   Q.  And the mandatory minimum sentence of 10 years, correct?

6   A.  Yes.

7   Q.  You were deported for selling drugs, correct?

8   A.  Yes.

9   Q.  And this was for your drug conviction in 2000, correct?

10  A.  Yes.

11  Q.  Now, around 2001 you were deported from the United States,

12  right?

13  A.  Yes.

14  Q.  And you were deported back to the Dominican Republic,

15  right?

16  A.  Yes.

17  Q.  And you were deported because you had violated the laws of

18  the United States by selling drugs in the U.S., right?

19  A.  Yes.

20  Q.  You were convicted of a felony, correct?

21  A.  Yes.

22  Q.  And that felony conviction was for selling drugs, right?

23  A.  Yes.

24  Q.  As a result of your deportation you were prohibited from

25  returning to the United States, correct?

1   A.  Yes.

2   Q.  You were told that you could not return unless you got

3   specific permission from the Attorney General, correct?

4   A.  Yes.

5   Q.  And you never got that permission from the Attorney

6   General, correct?

7   A.  No.

8   Q.  You decided to break the law again, correct?

9   A.  What are you referring to with violating the law?

10          INTERPRETER:  Your Honor, that might be my

11  translation.  I could use a different word.

12          THE COURT:  Well, with that understanding,

13  Mr. Schulte, why don't you ask the question again.

14  Q.  You decided to illegally enter the United States again,

15  correct?

16  A.  Yes.

17  Q.  And less than a year from when you were deported, correct?

18  A.  Yes.

19  Q.  You paid someone to illegally enter into the United States,

20  right?

21  A.  Yes.

22  Q.  And you pled guilty to illegal re-entry, correct?

23  A.  Yes.

24  Q.  You illegally re-entered through Texas, correct?

25  A.  Yes.

1    Q.  Now let's talk about how you did that.  You used another

2    person's name to get travel documents, right?

3    A.  Yes.

4    Q.  And that is because you could not enter the U.S. in your

5    own name, right?

6    A.  Yes.  Correct.

7    Q.  What name did you use?

8    A.  Several names.  Arturo Vazquez was the first one as I

9    remember, yes.

10   Q.  The other person didn't know you used their name, right?

11   A.  No.

12   Q.  They didn't give you permission to use their name, right?

13   A.  No.

14   Q.  You used the name without permission to apply for travel

15   documents, correct?

16   A.  Yes.

17   Q.  You filled out forms pretending to be somebody else, right?

18   A.  Yes.

19   Q.  And then you signed those forms, right?

20   A.  Yes.

21   Q.  So you lied on those forms, correct?

22   A.  Yes.

23   Q.  You pretended to be somebody you were not, correct?

24   A.  Yes.

25   Q.  You used those travel documents to return to the United

M6U5sch2                           Betances - Cross

1    States, correct?

2    A.  Yes.

3    Q.  So the government required you to take responsibility for

4    lying on those travel documents, correct?

5    A.  I don't understand your question.  What do you mean when

6    you say the government?

7    Q.  The government as in the United States government, the

8    prosecutors.

9    A.  Yes, OK, but could you repeat the question?  I didn't

10   understand it when you asked me it.

11   Q.  You didn't just confess to being here illegally, correct?

12   A.  Yes.

13   Q.  As part of your cooperation agreement you pled guilty to

14   aggravated identity theft, correct?

15   A.  Yes.

16   Q.  And that has a mandatory minimum sentence for two years,

17   right?

18   A.  Yes.

19   Q.  Then after you returned to this country illegally you

20   worked in construction for a period, right?

21   A.  Yes.

22   Q.  You earned an honest wage for a short time, correct?

23   A.  Yes.

24   Q.  But then you began selling drugs again, correct?

25   A.  Yes.

M6U5sch2                          Betances - Cross

1    Q.  You pled guilty to selling drugs in 2015, correct?

2    A.  From 2015 to 2018, yes.

3    Q.  And you were arrested in March of 2018, correct?

4    A.  Yes.

5    Q.  In front of a building with a friend, correct?

6    A.  Yes.

7    Q.  And charged with conspiracy and drug possession, correct?

8    A.  Yes.

9    Q.  You didn't just sell drugs but you also committed mail

10   fraud, correct?

11   A.  Yes.

12   Q.  You stole someone else's mail, right?

13   A.  Yes.

14   Q.  Checks would arrive in the mail and you were paid to pick

15   up the checks, right?

16   A.  Yes.

17   Q.  You were stealing people's checks, right?

18   A.  Yes.

19   Q.  And you don't know who those checks belonged to, correct?

20   A.  No.

21   Q.  You don't know if it was someone's disability payment,

22   correct?

23   A.  No.

24   Q.  Or someone's tax refund, correct?

25   A.  No.

1    Q.  Or someone's paycheck, correct?

2    A.  No.

3    Q.  People earned money honestly and you stole from them,

4    correct?

5    A.  Yes.

6    Q.  In fact, you were paid to steal from them, correct?

7    A.  Yes.

8    Q.  Now let me show you what has been marked as Defendant's

9    Exhibit 814, just to the parties and the witness.

10           Do you recognize this document?

11   A.  Yes.

12   Q.  It is a document you signed, right?

13   A.  Yes.

14           MR. SCHULTE:  I move to introduce Defendant's Exhibit

15   814.

16           MR. LOCKARD:  No objection.

17           THE COURT:  Admitted.

18           (Defendant's Exhibit  814 received in evidence)

19   BY MR. SCHULTE:

20   Q.  This is your cooperation agreement, correct?

21   A.  Yes.

22   Q.  And that's just between you and the government and not the

23   Judge, correct?

24   A.  Yes.

25   Q.  And as part of the agreement you promised to tell the

1    truth, correct?

2    A.  Yes.  That is my duty.

3    Q.  In fact, you are under oath here today, right?

4    A.  Yes.

5    Q.  And you also agreed to meet with the prosecutors whenever

6    they asked you to meet with them, right?

7    A.  Yes.

8    Q.  You also agreed to let them postpone your sentencing date,

9    correct?

10   A.  Could you repeat that?  I didn't really understand you.  I

11   don't think I was involved in that.

12   Q.  OK.  I withdraw the question.

13   A.  OK.

14   Q.  On page 5 of 8 of the document it says that the prosecutors

15   will forward your cooperation to the attention of Immigration

16   and Customs Enforcement, correct?

17   A.  Yes.

18   Q.  And your hope is that these prosecutors will help you get

19   an S-visa so you can stay in the United States, correct?

20   A.  They haven't promised me anything.

21   Q.  But that's your hope, correct?

22   A.  Of course.

23   Q.  As part of your cooperation agreement you are obligated to

24   meet with the prosecutors, correct?

25   A.  Yes.  And you have asked me that question twice.  I

M6U5sch2                        Betances - Cross

1    answered yes the first time.

2    Q.  OK.  About how many times have you met with the

3    prosecutors?

4    A.  I didn't keep a record of that.

5    Q.  You also pled guilty to having phones in the MCC, correct?

6    A.  Yes.

7    Q.  The MCC is the jail where you and I met, correct?

8    A.  Yes.

9    Q.  And we met around 2018, correct?

10   A.  Yes.

11   Q.  And pleading guilty to having an illegal cell phone was

12   part of your cooperation agreement, correct?

13   A.  Yes.

14   Q.  Let's start with the first phone you smuggled into the MCC.

15   What kind of phone was it?

16   A.  IPhone.

17   Q.  That first phone was given to your wife, correct?

18   A.  Yes; outside of the MCC.

19   Q.  And she brought it into the MCC during visiting hours,

20   correct?

21   A.  Yes, because the person who was supposed to pick it up

22   outside wasn't there.

23   Q.  And bringing the phone into the MCC is illegal, correct?

24   A.  Well, yes; to the visiting floor where we were, yes.

25   Q.  So you had your wife take the risk of bringing the phone

M6U5sch2                          Betances - Cross

1  into the MCC, correct?

2  A.  No, it wasn't a risk for her because up in the visiting

3  area in the locker area where she changed, it wasn't a risk.

4  Q.  You had your wife do something illegal, correct?

5  A.  Yes.

6  Q.  She could have been arrested, correct?

7  A.  Yes.

8  Q.  And sent to prison, right?

9  A.  Yes.

10 Q.  And you were paid $500 for that phone, correct?

11 A.  Yes.

12 Q.  I think you testified Chino deposited $500 into your

13 commissary account, correct?

14 A.  No, he didn't deposit $500, he only deposited $100 because

15 he shared it.

16 Q.  OK.  The commissary account allows you to buy things,

17 correct?

18 A.  Yes.

19 Q.  Like food, right?

20 A.  Correct.

21 Q.  And clothes?

22 A.  Yes.

23 Q.  And batteries?

24 A.  Yes.

25 Q.  Now let's talk about the phones you used at the MCC.

M6U5sch2                        Betances - Cross

1    A.  That we used.

2    Q.  It was an iPhone, right?

3    A.  Yes.

4    Q.  You testified that you stored cell phones in your cell,

5    correct?

6    A.  Yes.

7    Q.  You testified that you stored phones for Omar because he

8    let you use them, correct?

9    A.  Yes.

10   Q.  And you testified that you stored multiple phones for Omar,

11   correct?

12   A.  Yes.

13   Q.  Now, did Omar pay you to store the phones?

14   A.  He never paid me.  He promised he was going to pay me but

15   he never ever paid me.

16   Q.  So why did you do it?

17   A.  So I could use them, make calls on them, and make video

18   calls on them.

19   Q.  So you stored the phones so that you could use them,

20   correct?

21   A.  Yes.

22   Q.  Your testimony is that you put yourself at risk by agreeing

23   to store Omar's phones, right?

24   A.  And also the one that you, Josh, used.

25   Q.  Now you testified several times about getting paid money in

M6U5sch2                           Betances - Cross

1    your commissary account, right?

2    A.  Yes.  I answered that question for you.  I was sent $100

3    one time.

4    Q.  So the only time that you were ever paid to do anything

5    with the phones, smuggling or anything, was just one time?

6    A.  Yes.

7    Q.  So your testimony today is different from your testimony

8    from a prior proceeding, correct?

9    A.  It might seem different but it's not, it's the same.

10   Q.  You testified at a previous proceeding in this case in

11   February 2020, correct?

12   A.  Could you please repeat that question?

13   Q.  Yes.

14          You previously testified at a prior proceeding in this

15   case in February 2020, correct?

16   A.  Yes.  Correct.

17   Q.  And you were under oath when you testified at that

18   proceeding, correct?

19   A.  That's right.  Yes.

20   Q.  Just like you are under oath here today, right?

21   A.  Yes.

22   Q.  At that time, on page 2435, lines 12 and 13, you were asked

23   how much did your wife get to bring the phone into the MCC and

24   you answered $500.

25          INTERPRETER:  Excuse me.  I need to find it in the --

M6U5sch2                          Betances - Cross

1    where would that be?  Pages 2435.  Can somebody tell me where

2    that would be in this binder?  There is a lot of different

3    things in here.

4              THE COURT:  I'm not sure the binder is necessary.

5              INTERPRETER:  No, I need to read what he said.

6              THE COURT:  I think you can just translate the

7    question.

8              INTERPRETER:  Can you please repeat the question, let

9    me repeat that, and repeat the answer.  Thank you.

10   Q.  Your wife was paid $500 for bringing the phone in, correct?

11   A.  It was sent to Chino and Chino is the one who distributed

12   the money.

13   Q.  OK, but it was $500; right?

14   A.  Yes.

15   Q.  And I never paid you anything, correct?

16   A.  No.

17   Q.  In fact, you knew during this time that I did not have any

18   money, correct?

19   A.  There was no way of me knowing.  I knew you but I didn't

20   know if you had it or not.

21   Q.  Well, you know that I never paid for any cell phones,

22   correct?

23   A.  I repeat the same question to you.  How would I know, if it

24   was you and Omar who were doing the transactions?

25   Q.  OK, so on that point you testified on direct multiple times

1  about me and Omar, correct?

2  A.  Yes.

3  Q.  So how do you know or how do you link me and Omar?

4  A.  Because when he came to the unit initially, he started to

5  ask for Omar when he arrived.  When Josh went to the unit he

6  started asking about Omar -- or for Omar.

7  Q.  But Omar and I are not the same person, correct?

8  A.  Of course not.

9  Q.  So when Omar makes a request or tells you something, that

10  does not mean it is coming from me; correct?

11  A.  Right.

12  Q.  You knew during this time that I had a public lawyer,

13  correct?

14          MR. LOCKARD:  Objection.

15          THE COURT:  Sustained.

16  Q.  I never sent you or your wife money in any form, correct?

17  A.  No.

18  Q.  Sir, isn't it true that you smuggled cell phones into the

19  MCC and leased them out to people?

20  A.  No.

21  Q.  Isn't it true that your neighbors, you would lease them

22  cell phones to use and they would pay you, right?

23  A.  No.

24  Q.  So your testimony is you never lent someone else the phone

25  for them to borrow it in exchange for money?

M6U5sch2                        Betances - Cross

```
 1   A.  No.
 2   Q.  So all the phones you kept, you kept all those for
 3   Mr. Almanat?  Is that your testimony?
 4              INTERPRETER:  For Mr. Who?
 5   Q.  For Omar.
 6   A.  And also for you.
 7   Q.  OK.  So did I -- is it your testimony that I brought you a
 8   cell phone to store for me?
 9   A.  Yes.  I stored the Samsung that you used.
10   Q.  OK.  So your testimony was that there used to be an iPhone,
11   correct?
12   A.  Yes, but he had already exchanged it for a Samsung when he
13   had it.  He also used an iPhone.  Josh used an iPhone, too.
14   Q.  OK, so when it was an iPhone, your testimony is that I gave
15   you the iPhone to hold for me?
16   A.  He gave it to me in my hands.
17   Q.  So during this time you were already holding phones for
18   Omar, correct?
19   A.  And for him too.
20   Q.  But the phones you were holding for Omar, your agreement
21   with Omar was that you could use the phone, right?
22   A.  Yes.
23   Q.  So why would you agree to hold a cell phone for me then?
24   A.  Because you were with Omar so I had to hold both of them
25   for that reason.
```

M6U5sch2                           Betances - Cross

1  Q.  So your agreement with Omar was to hold all the phones and

2  you attributed -- let me just rephrase.

3          So your agreement with Omar was to hold all the

4  phones, correct?

5  A.  Yes, including the one that he used.

6  Q.  So your testimony is that Omar gave you the phones and I

7  used one of those phones; is that right?

8  A.  That's right.

9  Q.  So Omar would then provide those phones for others,

10 correct?

11 A.  I can't answer that he used it.  Chino used it, Josh used

12 it, and I used it.

13 Q.  So just in total, how many phones did you store?

14 A.  Four at that time.

15 Q.  So when Omar would go to retrieve a phone -- let me

16 rephrase that.

17          So Omar would come to you to retrieve a phone,

18 correct?

19 A.  When it was not charged, yeah, just battery was gone.

20 Q.  So Omar would give you the phone when it was dead to charge

21 it, right?

22 A.  Yes.

23 Q.  So when it was charged then he would take it from you,

24 right?

25 A.  Yes.

M6U5sch2                         Betances - Cross

1    Q.  But you don't know what Omar did with the phone after he

2    took it from you, right?

3    A.  No.

4    Q.  And during this time you knew that I was doing work for

5    Omar, correct?

6    A.  No.

7    Q.  Your testimony is that I wasn't working on anything for

8    Omar?

9    A.  Yes, because he never mentioned it to me.

10   Q.  OK, but on the phones you saw a technical report from me,

11   correct?

12   A.  Yes.

13   Q.  I am going to show the witness and the parties what's in

14   evidence as -- or it is marked Exhibit 1303-39 on page 8.

15           THE COURT:  Is this a defendant's exhibit with that

16   number or government exhibit?

17           MR. SCHULTE:  This is a government exhibit.

18           MR. LOCKARD:  This is not in evidence.

19           THE COURT:  I understand.  Just what it is marked as

20   for the moment.

21   BY MR. SCHULTE:

22   Q.  Do you recognize this?

23   A.  I just recognize the address and that your last name is on

24   there.

25   Q.  But you took screenshots and videos of this with your cell

M6U5sch2                          Betances – Cross

1   phone, right?

2   A.   That's right.  Yes.

3            MR. SCHULTE:  I move to introduce 1303-39, Government

4   Exhibit.

5            MR. LOCKARD:  We object.

6            THE COURT:  So, first of all, what I have is 1303-39

7   is different or has other -- first of all, is it the entire

8   document that you are offering, Mr. Schulte?  All 70 pages?

9            MR. SCHULTE:  I believe the government is going to

10   introduce it on the next witness.

11            THE COURT:  That's not the question.

12            MR. SCHULTE:  Yes, all of it.

13            THE COURT:  Grounds, Mr. Lockard?

14            MR. LOCKARD:  Hearsay.

15            MR. SCHULTE:  It is not offered for the truth of the

16   matter.

17            THE COURT:  And the purpose for which it is offered,

18   Mr. Schulte?

19            MR. SCHULTE:  It is just offered for, to establish

20   that I did work for Omar and he knows about it from his

21   pictures that he took.

22            THE COURT:  Could you just show the witness the first

23   page of the document, please, and ask if he recognizes that?

24            MR. SCHULTE:  Sure.

25   BY MR. SCHULTE:

M6U5sch2                              Betances - Cross

1    Q.  Do you recognize this?

2    A.  The first page, yes, but not this one.

3             THE COURT:  The first page meaning the first page that

4    you were shown?

5             THE WITNESS:  Exactly, the first one that I was shown.

6             THE COURT:  Mr. Schulte, I am inclined to admit just

7    that one page which I think is page 8 of this document.  That's

8    my ruling.  So I will admit, over the government's objection,

9    page 8 of the document which, just for tracking and convenience

10   purposes.  Why don't we mark that as a new Exhibit 1303-39A.

11            Is that OK with everyone?

12            MR. LOCKARD:  Yes, your Honor.

13            THE COURT:  So that one-page document marked 1303-39A,

14   is admitted.

15            (Government's Exhibit 1303-39A received in evidence)

16            MR. SCHULTE:  May I publish it to the jury?

17            THE COURT:  If it is only that one page, yes.

18   BY MR. SCHULTE:

19   Q.  Do you recognize the address that's listed there?

20   A.  Yes.  It's the address for the MCC, for the jail.

21   Q.  And do you see the suite number in that address?

22   A.  Yes.

23   Q.  And that's the number for the cell that's in MCC, right?

24   A.  Yes; one of the cells, yes.

25   Q.  And do you see the date on the document?

M6U5sch2                    Betances - Cross

1   A.  Yes.

2   Q.  What is the date?

3   A.  January 29th, 2018.

4   Q.  And the case there that's listed there, you recognize that

5   as Omar's criminal case, correct?

6   A.  I have no way of knowing because -- well, yeah, it says

7   Omar's name but I never knew about his case.

8   Q.  You knew that Omar was convicted though, right?

9   A.  Yes.  He was waiting to be sentenced.

10  Q.  And during the time that we were at MCC you knew that I was

11  reviewing the information from his case, correct?

12          MR. LOCKARD:  Objection.

13          THE COURT:  Overruled.

14  A.  No.

15  Q.  OK.

16          I think you testified about a video on direct;

17  820-402, right?

18  A.  Yes.

19  Q.  OK.

20          And in this video you are facing towards me, correct?

21  A.  Yes.

22  Q.  And the door is behind you, right?

23  A.  Yes.

24  Q.  And you are using another cell phone to record me, correct?

25  A.  Yes.

M6U5sch2                      Betances - Cross

1   Q.   So you were not watching as a lookout because you are

2   facing the wrong way, right?

3   A.   Yes, but there was somebody else who was a lookout.

4   Q.   Right, but you were -- you were there to guard the phone I

5   was using, right?

6   A.   Not specifically.  It was so I would prevent any officer

7   from coming in, from taking your phone, from the phone that

8   Omar was using.  That's what it was about.

9   Q.   OK, but you were facing away from the door so you would not

10  know if someone was coming in, right?

11  A.   Yes, but that was because I told one of the guys outside --

12  his name was Pedro, he was my cell mate, we lived together -- I

13  told him to stay outside and keep his eye open.

14       INTERPRETER:  Interpreter correction:  I told him to

15  keep his eyes open.

16  Q.   So your testimony is -- let me rephrase that.

17       Isn't it true that you were there protecting the phone

18  to make sure that I did not steal it, right?

19  A.   Negative.  You couldn't have stolen your own phone.

20  Q.   OK.

21       So just to be clear, there was someone else watching

22  outside the cell and you were inside the cell facing me, right?

23  A.   Exactly.  Correct.

24  Q.   The prosecutor showed you a lot of screenshots that you

25  took on the phone, right?

1  A.  Yes.

2  Q.  Screenshots you took of content from those cell phones,

3  right?

4  A.  Yes.

5  Q.  You took the screenshots without permission, right?

6  A.  Yes.

7  Q.  And then you gathered information about inmates to testify

8  against them, right?

9  A.  When you talk about other inmates, which ones are you

10  referring to?  You are not including yourself.

11  Q.  Other inmates in general.

12  A.  No.  Only yours.

13  Q.  OK, but you testified that at least Omar and Chino were

14  using the cell phones too, right?

15  A.  Yes.

16  Q.  I'm going to show, just to the witness and the parties,

17  what is marked as Government Exhibit 820-143.  It is in

18  evidence so I will show it to the jury.

19      So this is one of the screenshots that you took,

20  right?

21  A.  Yes.

22  Q.  This is a picture of Omar and his family, correct?

23  A.  Yes.

24  Q.  So you were gathering information about multiple inmates,

25  correct?

M6U5sch2                          Betances - Cross

A.   I took photographs of all of the phones that were being

used.

Q.   And you took them so you could testify against those

people, right?

A.   May I remind you that all I wanted to testify about was

what I heard and the conversations?

          THE COURT:  I think the question is did you take these

photos because you also intended to or wanted to testify

against Omar and the other people.

          THE WITNESS:  So the question really is, when I took

those photographs it was for me to gather evidence from all of

the phones but in the end, when I gave all of that evidence to

the government, so that I was called in to be involved, to

check all of those things that I had taken -- images that I had

taken.  So when I was called in I was asked to verify the

information that had to do with Josh because it was important,

which is why they found the information that was there, because

I had an idea that that was very valuable.

BY MR. SCHULTE:

Q.   Well, you hoped to cooperate against anyone that you could,

right?

A.   At the time, yes.

Q.   So you told your lawyer to give your images to the

prosecutor, right?

A.   No.  They called me in and they asked me for the code, the

M6U5sch2                         Betances - Cross

1  password, so they could see them.

2  Q.  OK, but you gave that information to your lawyer first;

3  right?

4  A.  Yes, but I never gave my lawyer the code or the password.

5  Q.  Yes, but then you gave it to the prosecutor; right?

6  A.  Yes, when we were all in the meeting together there.

7  Q.  And then the prosecutors picked out the images or videos

8  and asked you about the ones they picked out, right?

9  A.  No, not right then.  They didn't ask me to do anything.

10 They just told me not to do anything -- they didn't ask me

11 anything -- and just to sit tight.

12 Q.  But you also read through everything so that you could come

13 up with a good story to tell the FBI about other inmates,

14 right?

15 A.  No.

16 Q.  You testified on direct that I was very scared because the

17 FBI had gone to my cousin's house, right?

18 A.  Yes.  You know that yourself because you were really

19 scared.

20 Q.  But, of course, you read that the FBI had gone to my

21 cousin's house through one of your pictures, right?

22 A.  Negative.

23 Q.  I will show Government Exhibit 820-94.  That's in evidence.

24       This is one of the screenshots that you took, right?

25 A.  Yes.

M6U5sch2                          Betances – Cross

1   Q.   And this is –– and this e-mail discusses that the FBI

2   raided or confiscated my cousin's laptop, right?

3   A.   Yes.   That's what it says there.

4   Q.   But I never told you anything about that, right?

5   A.   We did.   We were all meeting together; you, me, Chino,

6   Omar, we were talking about that, and you said that your lawyer

7   told you to stop meeting with Omar because it could get you

8   into trouble.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M6uWsch3                         Betances - Cross

1    BY MR. SCHULTE:

2    Q.  OK.  But that has nothing to do with the FBI or my cousin,

3    right?

4    A.  It does have something to do, because we had that

5    conversation, and you were there.

6    Q.  OK.  So when you described me as very scared, what is that

7    based on?

8    A.  Because you said we had to change the phones, we had to

9    change everything.  You were freaking out.  You were freaked

10   out, in panic mode.

11   Q.  OK.  So your description's not based on the demeanor but

12   based on what you say are requested actions from me, right?

13   A.  I didn't understand your question.  Could you repeat it?

14   Q.  Yes.  It wasn't my outward appearance but what we were

15   discussing that led you to believe I was very scared, right?

16           MR. LOCKARD:  Objection.  Form.

17           THE INTERPRETER:  I'm sorry, sir.  Did you say

18   something?  The interpreter just wants -- did you say something

19   at the very end?

20           MR. SCHULTE:  I think there was an objection.

21           THE COURT:  The objection's overruled.

22   A.  It's not that you made me believe.  It's the way that you

23   were acting, your outward appearance.  You were freaking out.

24   Q.  OK.  And what was I scared of?

25   A.  The fact that we had to change our phones, you were pacing

1    back and forth, because the FBI might be listening in on the

2    calls; they might do something.  And then, so I asked you why.

3    You know, did you talk to somebody on the phones that we were

4    all using?  And that's when you didn't answer me.  You didn't

5    say yes or no.

6    Q.  OK.  But your testimony is that I only used the Samsung

7    phone, right?

8    A.  Yes, but remember one thing.  When you started using the

9    Samsung, you changed the password, so I couldn't get into it.

10   And that was end of September, middle of September, sometime

11   around then.  I no longer had access to that phone because you

12   were using the other phones, but you were using mostly the

13   Samsung.

14       And may I also remind you that you were also worried

15   because the charger, there was something wrong with it.  It

16   wasn't working.  So you weren't able to use the phone for two

17   or three days' time.  And you fixed it yourself.  You used an

18   iPhone charger to make it into a Samsung charger.

19   Q.  OK.  So why did all of the phones need to be changed?

20   A.  Well, that's a question I should ask you.  Why?

21   Q.  Nobody -- nobody asked why during this alleged meeting?

22   A.  I did.  I asked you, but you didn't answer me.

23   Q.  OK.  So then your testimony is because I was very scared,

24   then we -- we got rid of all the phones and SIM cards and

25   bought new ones?

1   A.  We didn't get rid of the phones, just the SIM cards.

2   Q.  OK.  But during this meeting, there was no -- no one else

3   asked why and there was no explanation given?

4   A.  No.

5   Q.  All right.  OK.  So you testified on direct also that I

6   told you I could open the doors of the MCC with a small

7   computer, right?

8   A.  Yes.

9   Q.  OK.  And the doors of the MCC cells, they required keys,

10  right?

11  A.  Correct.

12  Q.  OK.  MCC officers unlocked your cell with a key, right?

13  A.  Yes, correct.

14  Q.  And locked you in with a key, right?

15  A.  Yes, correct.

16  Q.  OK.  So how does a small computer unlock a door that

17  requires a key?

18          MR. LOCKARD:  Objection.

19          THE COURT:  Sustained.

20  BY MR. SCHULTE:

21  Q.  And in fact, I did have a computer at MCC, right?

22  A.  It's my understanding you used to go outside with it,

23  because you told me that yourself.  Well, I don't know what you

24  were doing with it, if you were doing something with it.  That

25  you never told me.

M6uWsch3                          Betances - Cross

1    Q.  OK.  But many inmates at MCC had laptops that they used,

2    right?

3    A.  No.

4    Q.  OK.  But there were computers in the unit, right?

5    A.  Yes.

6    Q.  Right outside your cell, right?

7    A.  Well, yes, they were upstairs on the second floor.

8    Q.  But that's all within the same unit, right?

9    A.  Yes.

10   Q.  OK.  Next, you testified on direct that I told you the

11   Russians would have to help me for the work I was doing, right?

12   A.  Yes, correct.

13   Q.  OK.  So the Russians were going to send paratroopers into

14   New York and break me out of MCC?

15              MR. LOCKARD:  Objection.

16              THE COURT:  Sustained.

17   BY MR. SCHULTE:

18   Q.  What is your understanding of how the Russians were going

19   to help?

20   A.  No, I don't know how they were going to help you.  You were

21   the one who knew that.

22   Q.  What work was I doing for Russia?

23   A.  I don't know what kind of work you were doing for Russia,

24   but I know you were spending long periods of time in your cell

25   with the phones.

M6uWsch3                         Betances - Cross

1    Q.  OK.

2    A.  With a sheet covering you.

3    Q.  OK.  But only Omar ever spoke about Russia, correct?

4    A.  No.  You spoke about Russia.

5    Q.  Your testimony is you never learned anything about Omar and

6    Russian oligarchs?

7    A.  No.

8            MR. SCHULTE:  OK.  I'm going to show just to the

9    witness and the parties what's marked still as Government

10   Exhibit 1303-39, page 41.

11   Q.  So you took pictures of this from your cell phone too,

12   right?

13   A.  No, I don't think so.  Not this one.

14   Q.  You don't remember taking pictures of this one?

15   A.  No.

16   Q.  OK.  What about -- I'm going to show page 55.  What about

17   this one; do you recognize this one?

18   A.  No.

19   Q.  OK.  Next, you testified that I said information war,

20   correct?

21   A.  Yes, correct.

22   Q.  And I said that, according to you, the same time I said

23   something about WikiLeaks, is that right?

24   A.  No.  Separate times.

25   Q.  OK.  And the time when you heard information war, what --

M6uWsch3                          Betances - Cross

1    where were you?

2    A.   In my, in my -- in the tier of my unit.

3    Q.   OK.  And you were sitting at a table, right?

4    A.   You were sitting at the table with Chino.

5    Q.   OK.  And you were -- you were standing?

6    A.   I was walking by.

7    Q.   OK.  So your testimony is you were just walking by and you

8    overheard information war?

9    A.   Yes.  I was passing by.  I almost -- I had almost gone up

10   to you, and then you stopped talking.

11   Q.   OK.  So the only thing that you heard was information war,

12   and then everyone stopped talking?

13   A.   Not everybody.  Just you stopped talking.

14   Q.   So you don't know what -- you don't know what was said

15   about information war, right?

16   A.   No.  My understanding, that it's a war as to information;

17   that's what it means.

18   Q.   OK.  And that was the only time you heard anything about

19   information war, is that right?

20   A.   Correct.

21   Q.   OK.  So you testified in a prior proceeding in this case,

22   correct?

23            THE COURT:  I think we've established that,

24   Mr. Schulte.

25            Next question.

M6uWsch3                        Betances - Cross

1   BY MR. SCHULTE:

2   Q.  At that proceeding, you testified under oath that you heard

3   information war on two occasions, right?

4   A.  One occasion.

5           (Defendant conferred with standby counsel).

6           MR. SCHULTE:  I'm going to show just the witness and

7   the parties a transcript, page 2576, on lines 23 through 25.

8   Q.  And you were asked:  "Have you ever heard the defendant use

9   the phrase 'information war?'"

10          And you responded:  "Yes, on two occasions."

11  A.  Where does it say that here?

12          Yes, I already see it.

13          THE COURT:  And did you testify to that effect in the

14  prior proceeding?

15          THE WITNESS:  Yes.  That's what I testified.  It might

16  be that I didn't remember.  It's been over two years, yeah.

17          THE COURT:  For the record, I think that's page 2407.

18          MR. SCHULTE:  OK.

19          THE COURT:  Mr. Schulte, just for planning purposes,

20  how much longer do you expect on cross?

21          MR. SCHULTE:  I have five pages of questions here.

22  I'm hoping to go quickly after --

23          THE COURT:  Keep going.  Next question.

24          MR. SCHULTE:  OK.

25  Q.  So your memory isn't perfect after two years, correct?

M6uWsch3                        Betances - Cross

```
1    A.  Not like that.  Not like the way you're describing it.  I
2    don't remember some things, but I do remember a lot of things.
3    Q.  OK.  But during your first testimony, your description of
4    where you heard this information is completely different,
5    correct?
6    A.  What do you mean it was different?
7              THE COURT:  Can you just specify which information
8    you're referring to, please.
9              MR. SCHULTE:  All right.  On transcript page 2508 to
10   2409.
11             THE COURT:  Mr. Schulte, if you can just ask the
12   question again but specify the information.
13             MR. SCHULTE:  OK.
14   Q.  You testified that you heard, you overheard information war
15   when you were going into Chino's cell to warn people using a
16   cell phone, correct?
17   A.  Yes, that was one of the times.  Yes.
18   Q.  All right.  And that time you said as soon as you opened
19   the door, you just happen to hear information war and then
20   everyone stops talking, right?
21   A.  Not everybody.  You stopped talking.  What are you
22   referring to when you say everybody?
23   Q.  Well, were other people talking?
24   A.  You were the one that was talking.  The moment that I went
25   in, you were talking with Omar.
```

1   Q.  So I'm confused now.  Now your testimony is that you heard

2   information war on two occasions?

3   A.  Yes, just the way you showed it to me.  I heard it on two

4   occasions.  You refreshed my memory now when you showed it to

5   me.

6   Q.  OK.  So the truth is you get some things wrong after two

7   years, right?

8              MR. LOCKARD:  Objection.

9              THE COURT:  Sustained.

10  BY MR. SCHULTE:

11  Q.  OK.  But the second instance you just testified about is

12  very similar to the -- your previous testimony today, right?

13  A.  I don't understand the question.  Can you please repeat it?

14  Q.  Yes.

15     So every time you hear information war, you happen to walk

16  into a situation and only hear that word and nothing else,

17  right?

18  A.  Yeah.  I don't -- I don't know what information war you're

19  talking about.  I don't even know the meaning of it.  I don't

20  know what you were talking about.

21  Q.  OK.  But the point is each time you don't hear any other

22  context; all you happen to hear is information war, right?

23  A.  That I can remember, yes, because you would stop talking.

24  Q.  OK.  And so now the occasion where you heard WikiLeaks,

25  what was that occasion?

M6uWsch3                          Betances - Cross

1    A.  If I remember correctly, it was on the side of your tier.

2    I don't remember, but I think it was on the tier.  I don't

3    remember very well on which side.

4    Q.  OK.  So what were you doing during this time?

5    A.  I was -- I would always go and check to see if the cell

6    phones were dead or if you were needing anything or if the

7    guard was passing by, that type of thing.

8    Q.  OK.  So what was I doing during this time?

9    A.  Mostly during the day, you were using the phones.  You were

10   sitting at the table talking, things to that effect.

11   Q.  All right.  I'm talking about the specific occasion when

12   you hear the word "WikiLeaks."  What was I doing?

13   A.  You were talking.  You were chatting.

14   Q.  Was I talking to you?

15   A.  No.

16   Q.  OK.  So what did you hear?

17   A.  I've answered the question three times already.  WikiLeaks.

18   I heard that conversation.

19   Q.  OK.  What else was said in the conversation?

20   A.  You stopped talking.  You didn't talk any further.

21   Q.  OK.  So your testimony is you walked by, and you just

22   happened to hear the word WikiLeaks and nothing else, is that

23   right?

24   A.  Yeah.  I heard it.  I just heard WikiLeaks.  At that time I

25   didn't even know what it was.  There was a page that was called

M6uWsch3                         Betances - Cross

1    like that too.

2              THE INTERPRETER:  I'm sorry.  Excuse me.  Correction.

3    A.  There was a website that had that name.

4    Q.  OK.  So just to clarify, every time you heard the word

5    "WikiLeaks" or "information war," you just happened to walk by

6    and you heard that and nothing more.  That's your testimony,

7    right?

8    A.  It's the fourth time you asked me the question.  I said

9    yes.

10   Q.  All right.  I want to talk to you about the Samsung phone

11   now.  OK?

12   A.  OK.

13   Q.  You said I used this phone, correct?

14   A.  Yes, right.

15   Q.  I exchanged an iPhone with another inmate named Jimmy?

16   A.  Yes.

17   Q.  Is this a common occurrence, that people are just swapping

18   phones in MCC?

19   A.  No.

20   Q.  OK.  But there are a lot of phones at MCC, right?

21   A.  The ones that we had, I knew we had them.  If other people

22   had them, I didn't know about it.

23   Q.  OK.  You testified that you were concerned that me and Omar

24   were planning to do something big, right?

25   A.  Yes.

1   Q.  That we -- you testified that we were going to do something

2   really big and needed to go to the law library, right?

3   A.  You were paying $200 to my friend named Flaco to go to the

4   library, yes.

5   Q.  I paid someone money?

6   A.  No.  They were paying.  And Flaco refused to take it

7   downstairs.  And the only option left was that they had to go

8   down and take it themselves.

9   Q.  OK.  So Omar offered to pay money for Flaco to take some

10  phone down, right?

11  A.  That's not how Flaco told me.  That's not the way Flaco

12  described it.  He said that both of them were offering him

13  money.

14  Q.  All right.  But there were cameras in the law library,

15  correct?

16          THE INTERPRETER:  I'm sorry.  Can you repeat the

17  question?

18  Q.  There were cameras in the law library, correct?

19  A.  I don't know.

20  Q.  OK.  But your testimony on direct was that me and Omar

21  needed to send some information from the phone, right?

22  A.  Let me explain it to you again.  Not information.  It's

23  that you had to do something in the, in the library.  That's

24  what I testified about.

25  Q.  OK.  What did I have to do in the law library, according to

M6uWsch3                          Betances - Cross

1    you?

2    A.  Well, you're very smart.  You must know the question.

3    There was something down there that you wanted to use that you

4    couldn't use upstairs.

5    Q.  OK.  You also testified something about a USB drive, right?

6    A.  Yes.

7    Q.  You testified, I believe, that me and Omar wanted a USB

8    device, right?

9    A.  Yeah.  You asked me all the time when the drive was going

10   to arrive.  When was it coming?  When was it coming?

11   Q.  OK.  But there were already USB hard drives given to

12   prisoners in the prison, right?

13   A.  Not to my understanding.

14   Q.  You don't -- you never received or saw anyone using a USB

15   drive with their discovery on it?

16   A.  No, because I -- no, I hardly ever went down to the law

17   library.

18   Q.  All right.  And then you said, you testified that you

19   slipped a note under the guard's door?

20   A.  Yes.

21   Q.  And that was about, you said something was going to happen

22   in the law library, right?

23          THE INTERPRETER:  Could you repeat the question,

24   please?

25          MR. SCHULTE:  Yes.

M6uWsch3                          Betances - Cross

```
 1   Q.  You said that the note said something was going to happen
 2   in the law library, right?
 3   A.  Yes.
 4   Q.  All right.  I'll move on.
 5       You testified on direct about certain accounts, right?
 6   A.  What are you referring to when you say certain accounts?
 7   Q.  Accounts you took pictures of on the cell phones.  Right?
 8   A.  Yes, that's right.
 9   Q.  OK.  And you claimed that certain accounts belonged to me,
10   right?
11   A.  Yeah, because one time I also saw that you had them written
12   down in a notebook.  I think so.
13   Q.  OK.  So I had -- your testimony is I had a list of accounts
14   written down in a notebook, right?
15   A.  No.  I saw that.  I saw that account also on a paper
16   somewhere.  I don't know where.  When you would give me the
17   phones, you left the emails open and I would look at them.  And
18   they were yours, because you were the one that was using the
19   phone in the moment.
20   Q.  OK.  But you don't actually know if, whether these accounts
21   are shared amongst others, right?
22   A.  No.
23   Q.  OK.  And you never actually witnessed anyone send an email
24   from one of these accounts, right?
25   A.  No.
```

M6uWsch3

1  Q.  OK.  At some point you testified that you told the

2  prosecutors where the phone was located in your cell, right?

3  A.  Yeah, but to clarify, you already had the Samsung when they

4  went looking for it.

5  Q.  OK.  But after you told them where it was, the MCC guards

6  came and took the phone, right?

7  A.  No.  They came the following day.

8  Q.  OK.  Well, they took the phone and sent you to the SHU,

9  right?

10  A.  That's right.

11  Q.  OK.  And your testimony today is that Omar and I sent you a

12  message while you were in the SHU, right?

13  A.  Yes.  It was through Chino.  Chino's the one who told me

14  not to talk, that they were going to pay me $5,000.

15  Q.  OK.  And did Chino tell you that Omar was going to pay you

16  or that I was going to pay you?

17  A.  He said those guys are going to pay you.

18           THE COURT:  All right.  And we're going to stop there

19  for our break.

20           Ladies and gentlemen, you know the drill.  Don't

21  discuss the case.  Don't do any research about the case.

22  Continue to keep an open mind.  Please be ready to go at 12:15

23  so we can start promptly at 12:20.  Enjoy your break.

24           Thank you.

25           (Continued on next page)

M6uWsch3

```
 1              (Jury not present)

 2              THE COURT:  You may be seated.

 3              Mr. Betances --

 4              Can I get the interpreters to help?

 5              THE INTERPRETER:  I'm sorry, your Honor.  I didn't

 6   hear you.

 7              THE COURT:  Can you help me interpret something?

 8              THE INTERPRETER:  Yes, of course.

 9              THE COURT:  Mr. Betances, you're on cross-examination.

10   So during the break assuming that you even see anyone from the

11   government, you may not speak to them about the substance of

12   your testimony.

13              THE WITNESS:  OK.

14              THE COURT:  All right.  The marshals will bring you

15   back in about 35 minutes, and we'll see you then.

16              Enjoy your break.

17              THE WITNESS:  Thank you.

18              (Witness not present)

19              THE COURT:  All right.  Mr. Schulte, there's a saying

20   with respect to cross that sometimes less is more.  I think

21   this cross is a good example of why that's a good expression.

22   It's not clear to me what -- first of all, the cross is about

23   twice the length of the direct at this point.

24              Second, I'm not sure that there's any particular

25   question that you've asked that's relevant.  It's not clear to
```

M6uWsch3

1    me what you're accomplishing.  Indeed, I think to some extent

2    you're causing yourself more harm than good with some of this

3    cross.  But be that as it may, I assume that you'll have a few

4    minutes left.  Is that correct?

5         (Defendant conferred with standby counsel)

6         MR. SCHULTE:  I think it should be less than 15.  I'm

7    already on the last page or so.

8         THE COURT:  All right.  I'm assuming from your

9    estimate yesterday, Mr. Lockard, that the government may not

10   get to the conclusion of its case today.  Is that a fair

11   assumption?

12        MR. LOCKARD:  It's going to depend a little bit on

13   what happens after Agent Schlessinger's direct is concluded.

14        THE COURT:  All right.  I'll keep my fingers crossed,

15   but in either case, we'll be prepared.

16        Anything we need to discuss before I give you your

17   breaks?

18        MR. LOCKARD:  Not from us.

19        THE COURT:  Mr. Schulte.

20        MR. SCHULTE:  No.

21        THE COURT:  All right.  Please be in your seats at

22   12:15.  We'll get the witness on the stand and hopefully get

23   the jury up at 12:20.

24        Thank you.

25        (Luncheon recess)

1        A F T E R N O O N   S E S S I O N

2                        12:15 p.m.

3              THE COURT:  Mr. Lockard, do you have something?

4              MR. LOCKARD:  I just have one very quick thing.

5          There is just a minor issue raised by the interpreters

6    which is I think during Mr. Betances' testimony he will

7    occasionally address the interpreter as though the interpreter

8    is the questioner instead of addressing Mr. Schulte.  And so,

9    we thought it might be appropriate for the Court to remind

10   Mr. Betances to address Mr. Schulte directly for clarity of the

11   record.

12             THE COURT:  All right.

13             THE WITNESS:  So I was also going to ask that same

14   question.  I was confused, too, but I never had the opportunity

15   to have him ask me questions.

16             THE COURT:  You should just answer to him, ignore the

17   fact that the interpreters are here and they will just

18   translate what you say to him.  OK?

19             THE WITNESS:  OK.  Perfect.

20             INTERPRETER:  Thank you.

21             THE COURT:  I don't think that the record needs to be

22   cleared particularly because he has occasionally referred to

23   the defendant in the third person but I don't think there is

24   any confusion who he is referring to.

25             MR. LOCKARD:  We agree.  We just thought it would be a

M6U5sch4                          Betances – Cross

1    helpful tweak.

2              THE COURT:  All right.

3              THE DEPUTY CLERK:  Jury entering.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  You may be seated.  Welcome back, ladies

3      and gentlemen.  I hope you enjoyed your break.  We will

4      continue with the cross-examination of Mr. Betances.

5                Mr. Betances, you remain under oath.

6                THE WITNESS:  OK.

7                THE COURT:  Mr. Schulte, you may proceed.

8                Let me just say, Mr. Betances, I said this to you

9      earlier but just to remind you, you can speak directly to the

10     person asking you the question and ignore that there is an

11     interpreter here.  So in that regard, if you want to refer to

12     Mr. Schulte as "you" rather than by his name, that's fine.

13               THE WITNESS:  OK.

14               THE COURT:  You may proceed, Mr. Schulte.

15     BY MR. SCHULTE:

16     Q.  Before we broke for lunch we were talking about this $5,000

17     bribe, right?

18     A.  Correct.

19     Q.  And it is your testimony today that me and Omar offered to

20     pay you $5,000 to keep quiet and not say anything about the

21     phone, right?

22     A.  That was the message you guys sent me, yes.

23     Q.  But that's not what you testified to before, correct?

24     A.  I didn't mention that that time, no.

25     Q.  So as part of your cooperation to testify in that

1    proceeding in 2020 you did not mention that, right?

2    A.  No, I didn't mention it.  No.

3    Q.  And you were under oath during that time, right?

4    A.  Correct.

5    Q.  And you met with the prosecutors to prepare for your

6    testimony in that proceeding, right?

7    A.  Yes, correct.

8    Q.  And you met with them multiple times, right?

9    A.  Yes, correct.

10   Q.  And you never once mentioned anything about this supposed

11   bribe, right?

12   A.  No, but I remembered it right when they were asking me

13   questions.

14   Q.  OK.  In fact, the first time you ever told the prosecutors

15   about this supposed bribe was June 2022, right?

16   A.  If you are asking me to remember the date I really don't

17   remember it too well.

18   Q.  OK, but you remember the year, right?

19   A.  Correct.

20   Q.  And that would be 2022, right?

21   A.  You are confusing me with your question because we are in

22   2022 now.

23   Q.  Right.  The very first time that you told prosecutors about

24   this supposed bribe was in 2022, right?

25   A.  Yes, correct.

1  Q.  And do you remember that that happened this month in June,

2  right?

3  A.  Well, look.  I mean, if I didn't remember it that time I

4  did remember it this time.  We talk about so many things, I

5  have to tell the truth, and I just talked about all of these

6  things.

7  Q.  So literally years after you began cooperating, correct?

8  A.  Correct.

9  Q.  Years after you promised to tell the truth, correct?

10  A.  Yes, correct.

11  Q.  And yet you want this jury to believe that this happened?

12  A.  Well, they don't have to believe me, they have to believe

13  what I am telling them, because just because I said didn't it

14  say it then but I'm saying that it doesn't mean that they

15  shouldn't believe me now.

16  Q.  OK.  Final line of questioning for you, sir.

17          You testified that cell phones were illegal at the

18  MCC, correct?

19  A.  You asked me that question again four times and I answered

20  yes.

21  Q.  OK, but people had them anyway, right?

22  A.  Whoever could have it.

23  Q.  And drugs were also illegal, correct?

24  A.  Correct.

25  Q.  But people had drugs, too, right?

M6U5sch4                        Betances - Cross

1   A.  According to your understanding, yes, they did have it.

2   Not according to my understanding.

3   Q.  According to your understanding you never saw any drugs at

4   MCC?

5   A.  Usually, no, I never saw them.

6   Q.  Did you witness Chino take drugs?

7   A.  No.

8   Q.  You witnessed me take drugs, correct?

9   A.  No.

10  Q.  And you never -- your testimony is you never smuggled in

11  any drugs into the MCC?

12  A.  Of course not.

13          I don't know where you are trying to go with this one.

14  You know I didn't.

15          MR. SCHULTE:  No further questions.

16          THE COURT:  Redirect?

17          MR. LOCKARD:  No redirect, your Honor.

18          THE COURT:  Mr. Betances, you may step down.  You are

19  excused.  Please put your mask on before you step down and have

20  a good afternoon.

21          (witness excused)

22          THE COURT:  Government, please call your next witness.

23          MR. DENTON:  The government calls Special Agent Evan

24  Schlessinger, your Honor.

25          THE COURT:  All right.  You.

M6U5sch4                     Schlessinger - Direct

1          THE DEPUTY CLERK:  Stand up and take your mask off.

2   Please raise your right hand.

3   EVAN SCHLESSINGER,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6          THE DEPUTY CLERK:  Please have a seat.  Can you please

7   state and spell your first name for the record?

8          THE WITNESS:  Evan Schlessinger.  E-V-A-N

9   S-C-H-L-E-S-S-I-N-G-E-R.

10         THE COURT:  You may proceed.

11         MR. DENTON:  Thank you, your Honor.

12  DIRECT EXAMINATION

13  BY MR. DENTON:

14  Q.  Good afternoon, sir.

15  A.  Good afternoon.

16  Q.  Where do you work?

17  A.  The FBI.

18  Q.  What is your position with the FBI?

19  A.  I am a special agent.

20  Q.  Are you assigned to a particular FBI field office?

21  A.  Yes, I am.

22  Q.  Which field office is that?

23  A.  The Washington, D.C. field office.

24  Q.  How long have you been assigned there?

25  A.  About a year and a half.

1   Q.  Where were you assigned before that?

2   A.  The New York field office.

3   Q.  If I can ask you to slide a little bit closer to the mic?

4   A.  The New York field office.

5   Q.  Were you assigned to a particular squad with the FBI in the

6   New York field office?

7   A.  Yes.

8   Q.  Which squad was that?

9   A.  The counter-espionage squad.

10  Q.  For how long were you assigned to the counter-espionage

11  squad?

12  A.  For approximately four years.

13  Q.  What kind of crimes did the counter-espionage squad

14  investigate during the time that you were a part of it?

15  A.  Generally they investigated crimes dealing with

16  unauthorized disclosures of sensitive or classified

17  information.

18  Q.  As part of your work on that squad, did you participate in

19  the investigation of Joshua Schulte?

20  A.  Yes, I did.

21  Q.  What was your role in that investigation?

22  A.  I became a case agent approximately November or December of

23  2017.

24  Q.  As part of your participation in that investigation, did

25  you work on the execution of a search warrant at the

M6U5sch4                         Schlessinger – Direct

1   Metropolitan Correctional Center?

2   A.   Yes.

3   Q.   Is that also sometimes referred to as the MCC?

4   A.   Yes.

5   Q.   Approximately when did that search occur?

6   A.   October 3rd, 2018.

7   Q.   Was the defendant in custody at the MCC at that time?

8   A.   Yes.

9   Q.   Were other agents involved in that search along with you?

10  A.   Yes.

11  Q.   Roughly how many?

12  A.   About 50.

13  Q.   Why were that many agents involved in the search?

14  A.   There was a lot of urgency to find a contraband cell phone

15  that the defendant had at the MCC.  Also, given the relatively

16  large area that was to be searched, which included the entire

17  7 South tier and the MCC library, we needed as many agents as

18  we could gather to assist.

19  Q.   Generally, what led you to believe that the defendant was

20  using a contraband cell phone?

21  A.   We received information from an MCC detainee by the name of

22  Carlos Betances.

23  Q.   In addition to receiving information from Mr. Betances, did

24  he provide you with materials?

25  A.   Yes, he did.

1   Q.  What kind of materials?

2   A.  Photographs and videos of the defendant using the phone, as

3   well as some of the activity that was occurring on the phone.

4           MR. DENTON:  Ms. Cooper, could we put up what is in

5   evidence as Government Exhibit 820-433, please?  I'm sorry;

6   433.

7   Q.  Special Agent Schlessinger, do you recognize this photo?

8   A.  Yes, I do.

9   Q.  How did you get this photo?

10  A.  From Carlos Betances.

11  Q.  What does it depict?

12  A.  It is a picture of the back side of a cell phone.

13  Q.  And do you see the number there next to the letters IMEI?

14  A.  Yes.

15  Q.  Can you just read those numbers for us?

16  A.  357073084445432.

17          MR. DENTON:  Ms. Cooper, could we put up also what is

18  in evidence as Government Exhibit 3003 and turn to page 3?

19  Q.  I'm not going to ask you to read the entire thing Special

20  Agent Schlessinger, but can I ask you to look at paragraph 4,

21  here?  And do you see an IMEI number listed in that paragraph?

22  A.  Yes.

23  Q.  Is that the same as the IMEI number that was displayed in

24  Government Exhibit 820-433?

25  A.  Yes.

1            MR. DENTON:  Thank you, Ms. Cooper.  Could we publish

2     what is in evidence -- and if we can do both at the same time

3     that would be terrific -- Government's Exhibits 820-419 and

4     420?

5     Q.  Special Agent Schlessinger, have you seen these photographs

6     before?

7     A.  Yes, I have.

8     Q.  And in what context did you first see them?

9     A.  They were provided to us by Carlos Betances.

10    Q.  Can I ask you to read the first sentence of the writing on

11    Government Exhibit 820-419?

12    A.  Presumption of Innocence Origins.

13    Q.  And the first sentence of text below that, please?

14    A.  My case involved WikiLeaks and the Vault 7/8 release.

15    Q.  And do you see about 10 lines up from the top a sentence

16    that starts:  My fellow developers?

17    A.  Yes.

18    Q.  Can you read that, please?

19    A.  My fellow developers and operators were generally

20    successful, despite management's best efforts to derail and

21    disrupt our work with meaningless process, nonsensical

22    directives, a lack of leadership, and incoherent babble and

23    buzz words that only confirmed our suspicions that management

24    literally --

25    Q.  And is Government Exhibit 820-420 a continuation of that

1   text?

2   A.  Yes.

3   Q.  So can you please continue reading through the end of that

4   sentence?

5   A.  -- had no idea or understanding of what we did and,

6   therefore, could not possible lead us.

7          MR. DENTON:  Ms. Cooper, if we could then put up

8   Government Exhibit 820-423 and 820-424, please?

9   Q.  Special Agent Schlessinger, again, have you seen these

10  before?

11  A.  Yes, I have.

12  Q.  Are they a continuation of that same text that you have

13  been reading?

14  A.  Yes.

15  Q.  I'm going to ask you to focus, in particular, on Government

16  Exhibit 820-424.  Can you read what is written in Government

17  Exhibit 820-424?

18  A.  Unfortunately, my life was totally destroyed by government

19  incompetence and malfeasance.  On March 7th, 2017, WikiLeaks

20  unveiled Vault 7 which were classified documents from my old

21  group's internal development network.  I was the only one to

22  have recently departed this group on poor terms while

23  disclosing vulnerabilities in the system, all the while

24  planning to visit Cancun with my brother during spring break in

25  the following week.  Due to these unfortunate coincidences, the

M6U5sch4                    Schlessinger – Direct

1    FBI ultimately made the snap judgment that I was guilty of the

2    leaks and targeted me.  The FBI illegally, with malicious

3    intent and blatant disregard for the truth, filed a probable

4    cause affidavit and obtained a search warrant for my New York

5    City apartment.

6    Q.  Let me stop you there, Special Agent.  Do you see the part

7    that you read that referred to the FBI made a snap judgment?

8    A.  Yes.

9    Q.  How long after the Vault 7 disclosure was the defendant

10   first approached by the FBI?

11   A.  About a week after.

12   Q.  Was he arrested at that time?

13   A.  No.

14   Q.  Approximately how long was it after the leaks before the

15   defendant was charged in this case?

16   A.  About a year and several months afterwards.

17   Q.  And were you a case agent involved in the investigation

18   during that time?

19   A.  At the time he was charged, yes.

20   Q.  What type of tasks were you performing during those

21   intervening months?

22   A.  Collecting evidence, interviewing witnesses, serving legal

23   process.  Things like that.

24           MR. DENTON:  Ms. Cooper, could we take these down and

25   then go to Government Exhibit 820-428?

M6U5sch4                         Schlessinger - Direct

1   Q.  Special Agent Schlessinger, can I ask you to read the

2   paragraph from below the paragraph break that starts:  This was

3   their mistake?

4   A.  This was their mistake.  They did not truly know their

5   enemy.  If the FBI had actually reviewed my security file at

6   the CIA, not only would they find successful background

7   investigations and polygraphs, but also my psychological

8   evaluation which consists of the following vices:  Arrogance

9   and extreme self-confidence, unrelenting determination, and

10  righteous indignation.  Should I be wronged, I will fight with

11  every ounce of strength that I can muster.  I will see this

12  through to the very end and fight until the day a jury of my

13  peers finds me guilty and sentences me.

14           MR. DENTON:  We can take that down, Ms. Cooper,

15  please.

16  Q.  Special Agent Schlessinger, during your search of the MCC

17  did you recover any materials that the defendant had written?

18  A.  Yes, we did.

19  Q.  What kinds of materials?

20  A.  We recovered notebooks and articles that the defendant had

21  written.

22  Q.  During the course of your participation in this

23  investigation, have you had occasion to observe the defendant's

24  handwriting?

25  A.  Yes.

M6U5sch4                        Schlessinger - Direct

1    Q.  Have you become familiar with his handwriting?

2    A.  Yes.

3    Q.  Did you obtain additional search warrants to review the

4    content of the materials that you seized on that day?

5    A.  Yes, we did.

6            MR. DENTON:  Ms. Cooper, can we put up what is in

7    evidence, subject to connection, as Government Exhibit 806?

8    Q.  Sir, do you recognize this?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  This is a notebook that was recovered at the MCC.

12   Q.  And where did you first see it?

13   A.  At the MCC.

14   Q.  Do you recognize the handwriting on the cover?

15   A.  Yes, I do.

16   Q.  Whose handwriting is that?

17   A.  Mr. Schulte's.

18           MR. DENTON:  Ms. Cooper, if we could go to the next

19   page of this exhibit?

20   Q.  Special Agent, can I ask you to read the paragraph in the

21   middle that starts:  If you need help?

22   A.  If you need help, ask WikiLeaks for my code.  I developed

23   software to parse MSFT, NTFS, and EXT 3 partitions so that I --

24   for a operation.

25   Q.  Do you recognize that handwriting?

1   A.  Yes, I do.

2   Q.  Whose is it?

3   A.  Mr. Schulte's.

4          THE COURT:  Mr. Denton, do you want to offer this in

5   full at this time?

6          MR. DENTON:  I am happy to, your Honor.

7          THE COURT:  OK.

8          Any objection?  Mr. Schulte?

9          MR. SCHULTE:  Same objection as before.  I think there

10  is a couple pages that aren't included that I would want to

11  include.

12         THE COURT:  The objection is overruled.

13         Ladies and gentlemen, earlier you may recall that I

14  admitted this subject to connection.  That's just done where,

15  essentially, there is another piece of foundation that needs to

16  be laid and that happens at a different time through a

17  different witness.  So I find that the foundation now has been

18  laid so this is in evidence, in full.

19         (Government's Exhibit 806 received in evidence)

20         THE COURT:  Mr. Denton, you may proceed.

21         MR. DENTON:  Thank you, your Honor.

22         Ms. Cooper, if we could go to page 3 of Government

23  Exhibit 806, and if we could blow up the paragraph at the top

24  of that page, please?  Yes.  Sorry.

25  Q.  Can you read what is written here, Special Agent

1    Schlessinger?

2    A.   Ugh.   Talked to my parents today and found out that my

3    fucking articles that have up -- that were uploaded to FB, a

4    fucking docx fucking format were the wrong fucking articles.

5    They put articles 1 through 7 and only the old ones.   I said I

6    was disappointed and my mom got all upset like she does and I

7    spent the entire phone call trying to apologize.

8              MR. DENTON:   Ms. Cooper, can we go to the next page of

9    Government Exhibit 806, please?   Is it possible to blow up the

10   writing to make that a little larger on both pages?

11   Q.   Special Agent Schlessinger, on the left-hand side here do

12   you see a date?

13   A.   Yes, I do.

14   Q.   What is that date?

15   A.   July 14, 2018.

16   Q.   And can you read the text that is written on the right-hand

17   page?

18   A.   New article plan:   1.   FBI not the only agency against

19   Trump, CIA too.

20             (a) leak documents to make trump look bad.

21             (b) sell documents to make $$$.

22             2.   Political relevant -- I'm not sure what the second

23   word is, there.

24             3.   Incompetence within CIA, government agencies.

25             4.   If I were Russia I would:

1             (a) attack judiciary.

2             (b) U.S. destroy itself.

3             MR. DENTON:  We can take that down, Ms. Cooper, and if

4    we could show Special Agent Schlessinger the first page of

5    Government Exhibit 809?

6    Q.  Special Agent Schlessinger, do you recognize this?

7    A.  Yes, I do.

8    Q.  Where did you first see this?

9    A.  At the MCC.

10   Q.  And what is it?

11   A.  It is another one of the notebooks that we recovered there.

12   Q.  And do you recognize the handwriting that's on the cover

13   here?

14   A.  Yes.

15   Q.  Whose handwriting is it?

16   A.  Mr. Schulte's.

17           MR. DENTON:  Your Honor, the government offers

18   Government Exhibit 809, in full.

19           THE COURT:  Any objection?

20           MR. SCHULTE:  Same objection.

21           THE COURT:  Same ruling.  Overruled, and admitted in

22   full.

23           MR. DENTON:  Thank you, your Honor.

24           (Government's Exhibit 809 received in evidence)

25   BY MR. DENTON:

M6U5sch4                    Schlessinger - Direct

1    Q.   Special Agent Schlessinger, do you see something that looks
2    like a date written on this cover?
3    A.   Yes.
4    Q.   What does that say?
5    A.   7/25 to 9.
6    Q.   If we can go to the second page of Government Exhibit 809?
7    Is there a date written on this page, Special Agent
8    Schlessinger?
9    A.   Yes.
10   Q.   What's that date?
11   A.   8/8/2018.
12   Q.   And can I ask you to read the text in the portion that kind
13   of curls around the date there?
14   A.   If government doesn't pay me $50 billion in restitution and
15   prosecute the criminals who lied to the judge and presented
16   this BS case, then I will visit every country in the world and
17   bear witness to the treachery that is the USG.  I will look to
18   break up diplomatic relationships, close embassies, end U.S.
19   occupation across the world, and finally reverse U.S. jingoism.
20   If this is the way the U.S. government treats one of their own,
21   how do you think they treat allies?
22          MR. DENTON:  Ms. Cooper, can we go to page 3 of
23   Government Exhibit 809?
24   Q.   Do you see a date on this page, Special Agent?
25   A.   Yes.

1    Q.   And what's that date?

2    A.   8/14.

3    Q.   Do you see the text there that says:  Got to use last

4    night?

5    A.   Yes.

6             MR. DENTON:  Ms. Cooper, can we pull up what is in

7    evidence as Government Exhibit 821?

8    Q.   Special Agent, do you recognize what that is?

9    A.   Yes, I do.

10   Q.   What is it?

11   A.   This is a report from the Samsung cell phone that was

12   recovered at the MCC.

13   Q.   How do you recognize it is a report from the Samsung cell

14   phone?

15   A.   The IMEIs match and I have seen it before.

16   Q.   When was the Samsung phone activated?

17   A.   August 13th, 2018.

18   Q.   And how do you know that?

19   A.   The phone activation time entry, it says August 14th but

20   that's in UTC time, and if you convert that to Eastern Standard

21   Time it would be August 13th.

22   Q.   What time of day on August 13th?

23   A.   In the evening.

24            MR. DENTON:  You can take down 821, Ms. Cooper,

25   please.

1   Q.  Can I ask you to keep reading the text that is written on

2   page 3 of Government Exhibit 809?

3   A.  Got to use last night.  The way is clear.  I will set up a

4   Wordpress of joshschulte.wordpress.com and

5   presumptionofinnocence.wordpress.com.  From here I will stage

6   my information war.

7            Facebook I will rename simply Who is John Galt? or who

8   is Joshua Schulte?  From Facebook -- from FB I will post links

9   to the articles and logs as I write them.

10           The Presumption of Innocence blog will only contain my

11   10 articles 1 through 10 ending on the presumption of

12   innocence.  I will post each of them on the FB and delete the

13   previous articles.

14   Q.  Special Agent, just to go back up to the top, can I ask you

15   to read the text that is written in the margins next to the

16   first paragraph?

17   A.  Give me a phone and a blog and I will change the world.

18   Q.  Now, Special Agent, as part of your participation in this

19   investigation, did you also obtain records from electronic

20   service providers pertaining to certain accounts?

21   A.  Yes, we did.

22           MR. DENTON:  Ms. Cooper, could we publish what is in

23   evidence as Government Exhibit 1301-1, please?

24   Q.  Special Agent, do you recognize this?

25   A.  Yes, I do.

1    Q.   What is it?

2    A.   This is a search warrant return from one of the providers.

3    Q.   And what's the date and time of the first entry at the top

4    there?

5    A.   August 14, 2018; 4:40.

6    Q.   And who is the user?

7    A.   JoshSchulte1.

8    Q.   And then do you see an entry for August 14th at 7:36 p.m.?

9    A.   Yes, I do.

10   Q.   What is the event that's listed there?

11   A.   Set user role.

12   Q.   What role is that?

13   A.   The administrator role.

14        MR. DENTON:   If we could go back to Government Exhibit

15   809, Ms. Cooper?

16   Q.   Special Agent Schlessinger, do you see the language that

17   reads from FB I will post links to the articles and blogs?

18   A.   Yes.

19   Q.   Did you investigate Facebook accounts created by the

20   defendant?

21   A.   Yes, we did.

22        MR. DENTON:   Ms. Cooper, can we show just Special

23   Agent Schlessinger and the parties Government Exhibit 823?

24   Q.   Special Agent, do you recognize this?

25   A.   Yes.

M6U5sch4                    Schlessinger - Direct

1    Q.  What is it?

2    A.  This is a Facebook page.

3    Q.  And did you take this image?

4    A.  Yes, I did.

5    Q.  How did you take it?

6    A.  I took a screenshot of it.

7              MR. DENTON:  Your Honor, the government offers

8    Government Exhibit 823.

9              MR. SCHULTE:  No objection.

10             THE COURT:  Admitted.

11             (Government's Exhibit 823 received in evidence)

12             MR. DENTON:  If we could publish that, please,

13   Ms. Cooper?

14   Q.  Is this one of the Facebook pages that was listed in

15   Government Exhibit 809 that we were just talking about?

16   A.  I believe it was, yes.

17             MR. DENTON:  Can we blow up the "About" section,

18   Ms. Cooper, over on the right side?  Thank you.

19   Q.  What is the link that is listed there?

20   A.  Presumptionofinnocence.net.

21   Q.  Do you know what is at that link?

22   A.  Yes.

23   Q.  What is it?

24   A.  That's the Wordpress site that was referenced earlier.

25             MR. DENTON:  Thank you, Ms. Cooper, we can take that

1   down.  And if we can go back to Government Exhibit 809 and turn

2   to page 4?

3   Q.  Can you read the first sentence here, Special Agent?

4   A.  I texted my dad from WhatsApp and Signal recently and

5   finally got a response at 1 percent battery.

6   Q.  What are WhatsApp and Signal?

7   A.  They're commercial messaging applications.

8          MR. DENTON:  Ms. Cooper, could we pull up what is in

9   evidence as Government Exhibit 820-434?

10  Q.  Special Agent, do you see an application for WhatsApp on

11  this phone?

12  A.  Yes.

13  Q.  What about Signal; is that there as well?

14  A.  Yes.

15         MR. DENTON:  We can take that down and go back to page

16  4 of Government Exhibit 809.

17  Q.  Can you keep reading that top paragraph, please?

18  A.  I said please put articles on drafts in gmail.  Response:

19  My lawyer advised me not to.  Fucking incredible.  Fucking

20  incredible.  My own father, who fucked me into $150,000 of

21  credit card debt, won't help me.  Why the fuck is everyone such

22  a God damn pussy?  Everyone is so fucking pussy.  Grow a pair

23  and stand up to these assholes.

24  Q.  Please continue with the next paragraph.

25  A.  I'm not sure what the first word is there -- finally able

1    to call and talk to him and I felt so fucking bad.  The man

2    sounded terrified at the government and said they're watching

3    my e-mail, they're listening and watching everything.  But he

4    also said Josh Dratel was coming to see me Thursday or Friday.

5    I thought I convinced him to set up a Proton e-mail account for

6    me to upload the articles.

7            THE COURT:  Ladies and gentlemen, just a reminder that

8    these are in evidence and it is up to you, number one, what

9    weight, if any, to give them; and number two, if your reading

10   of them differs from how any witness reads them, you should

11   rely on your own interpretation of reading them.

12           Mr. Denton?

13           MR. DENTON:  Thank you, your Honor.

14   BY MR. DENTON:

15   Q.  Special Agent Schlessinger, are you familiar with

16   ProtonMail?

17   A.  Yes.

18   Q.  What is ProtonMail?

19   A.  It is a secure e-mail service based in Switzerland.

20           MR. DENTON:  Ms. Cooper, can we go to next page of

21   Government Exhibit 809, please?

22   Q.  Is there a date listed on this page?

23   A.  Yes.

24   Q.  What is it?

25   A.  Tuesday the 21st.

1    Q.  Can you start, sir, by reading the text that's kind of in

2    the top right corner near the margin?

3    A.  They got IMEI of my phone via subpoena of phone number.

4    Q.  Can you read the numbers 1 through 5 on the numbered list

5    here?

6    A.  1.  Delete all Google docs from JohnSmith.

7               2.  Delete all e-mails from John Smith.

8               3.  Delete suspicious e-mails from my gmail.

9               (a) new logins from phones.

10              (b) Paypal.

11              (c) Wordpress.

12              (d) PW changes.

13              4.  Create new ProtonMail,

14   presumedguilty@ProtonMail.com.

15              5.  Migrate Wordpress to ProtonMail.

16   Q.  Then if we can zoom back out and look at the portion with

17   the header research?  Can you read that?

18   A.  Research.  1.  Gmail keep deleted e-mails?

19              2.  Changing Samsung IMEI

20              (a) without rooting.

21              (b) generate new IMEI.  Subpoena for IMEI question

22   mark?  Worst case, all three have compromised IMEIs.

23   Q.  Special Agent, are you familiar with what routing is?

24   A.  Yes, generally.

25   Q.  Generally speaking, what is it?

M6U5sch4                        Schlessinger - Direct

1   A.  It is to obtain root-level access of a system which would

2   allow you to do whatever you would like on the system.

3          MR. DENTON:  Ms. Cooper, can we put up what is in

4   evidence as Government Exhibit 820-435?

5   Q.  Special Agent, do you see an application there labeled

6   Kingo Root?

7   A.  Yes.

8   Q.  Do you know what that is?

9   A.  I believe it is an app that allows you to obtain root-level

10  access.

11         MR. DENTON:  Ms. Cooper, I'm sorry.  If we can go back

12  to page 5 of Government Exhibit 809 and if we can go on to the

13  bottom part of the page below that line?

14  Q.  Can you read what is written here, please?

15  A.  6.  Clean off apps.

16         7.  Reset factory phone.

17         Set up WhatsApp, Signal --

18         MR. SCHULTE:  Objection.  Speaks for itself.

19         THE COURT:  I will allow the witness to read it, but

20  subject to the instructions I gave you earlier.

21         Go ahead.

22  A.  Set up WhatsApp, Signal, Telegram, all with different

23  numbers.  New phone use old phone's WhatsApp.  Need to set up

24  WhatsApp with non-call number.

25         MR. DENTON:  You can zoom out there.

1   Q.  Special Agent Schlessinger, do you remember reading up

2   above there item 3(d) PW changes?

3   A.  Yes.

4   Q.  What's the date on this page?

5   A.  Tuesday, the 21st.

6           MR. DENTON:  Ms. Cooper can we put up what is in

7   evidence as Government Exhibit 822-2?

8   Q.  Sir, do you recognize this document?

9   A.  Yes, I do.

10  Q.  What is it?

11  A.  This is a list of Internet searches that were conducted

12  from the Samsung cell phone.

13  Q.  And how do you recognize it?

14  A.  This was a report I ran from the forensic review software

15  that we use.

16          MR. DENTON:  Ms. Cooper, can we go to page 2 of this

17  and blow up lines 39 to 42?

18  Q.  Special Agent, what is the search that is reflected in line

19  39?

20  A.  Generate random password.

21  Q.  And what's the date of that search?

22  A.  August 22nd, 2018.

23          MR. DENTON:  Ms. Cooper, can we go back to page 5 of

24  Government Exhibit 809?  I'm sorry, page 6.

25  Q.  Special Agent, do you see a list of letters and numbers

M6U5sch4                         Schlessinger - Direct

1   next to an e-mail address at the top there?

2   A.  Yes.

3   Q.  What e-mail address is that?

4   A.  Presumedguilty@ProtonMail.

5   Q.  What happens if you try to log into that ProtonMail account

6   with the letters and numbers to the left of it?

7   A.  You will successfully log on to that account.

8   Q.  How do you know that?

9   A.  I was present when that occurred.

10  Q.  Looking down, do you see the phrase annon1204?

11  A.  Yes.

12  Q.  And the letters and numbers that are to the right of that?

13  A.  Yes.

14          MR. DENTON:  Ms. Cooper, can we publish Government

15  Exhibit 820-436?

16  Q.  Do you see a ProtonMail account with that user name?

17  A.  Yes.

18  Q.  What happens if you try to log into that ProtonMail account

19  with the numbers and letters on page 6 of Government Exhibit

20  809?

21  A.  You will successfully log onto that account.

22  Q.  How do you know that?

23  A.  I was present when that occurred.

24          MR. DENTON:  Then if we could go back to Government

25  Exhibit 809, page 6, Ms. Cooper?

1   Q.   Finally, below that do you see "Free Jason Bourne"?

2   A.   Yes.

3   Q.   Have you seen a ProtonMail account with that user name?

4   A.   Yes.

5   Q.   Do you see that string of letters and numbers there?

6   A.   Yes.

7   Q.   What happens if you try to log into that account with those

8   letters and numbers?

9   A.   You will successfully log into that account.

10  Q.   And again, how do you know that?

11  A.   I was present when that occurred.

12  Q.   Special Agent, you should have, on the podium there, a

13  binder that's marked for identification as Government Exhibit

14  1303.

15  A.   Yes.

16  Q.   And just for the record, that contains Government's

17  Exhibits 1303-6 -44, -47,-48, -49, -50, and Exhibit 812?

18  A.   Yes.

19  Q.   Do you recognize what those are?

20  A.   Yes, I do.

21  Q.   What are they?

22  A.   These are e-mails from the accounts we just discussed.

23  Q.   How do you recognize them?

24  A.   I was there when they were accessed.  I have reviewed them.

25          MR. DENTON:  Your Honor, the government offers

 1    Government Exhibit 812, Government Exhibit 1303-6, -44, and -47

 2    through -50.

 3              THE COURT:  Any objection?

 4              MR. SCHULTE:  I guess we don't see them.

 5              THE COURT:  I think they're in the binder but you

 6    should have received copies previously.  Do you want to look at

 7    the binder?

 8              Do we have a copy of the binder for Mr. Schulte?

 9              MR. DENTON:  We don't have a copy of the binder but

10    since Special Agent Schlessinger has had a chance to review it,

11    I am happy to get it and show it to them.

12              THE COURT:  OK.  Why don't you put your mask on,

13    Mr. Denton, and retrieve it and then we can proceed.

14              MR. SCHULTE:  No objection.

15              THE COURT:  Those exhibits are admitted.

16              (Government's Exhibits 812, 1303-6, 1303-44, and

17    1303-47 through 1303-50 received in evidence)

18              MR. DENTON:  Thank you, your Honor.

19              Ms. Cooper, can we pull up along side this page

20    Government Exhibit 820-434?

21    Q.  Special Agent, do you see the sort of text below the

22    password to the presumedguilty@ProtonMail account that is

23    written in Government Exhibit 809?

24    A.  Yes, I do.

25    Q.  How does that text correspond to what we are looking at in

1  Government Exhibit 820-434?

2  A.  It references apps that are also on that phone.

3  Q.  And just to take a couple ones in particular, do you see

4  the reference in both exhibits to Orbot?

5  A.  Yes.

6  Q.  Do you know what that is?

7  A.  Yes.  Orbot is an app.  It is used in conjunction with

8  Orfox.  It provides access to the TOR service which allows you

9  to browse the Internet anonymously.

10        MR. DENTON:  Ms. Cooper, can we switch to Government

11  Exhibit 822-2 and go to page 2?  Can we blow up line 51 down

12  there?

13  Q.  What is reflected in line 51?

14  A.  A search for:  Can't log in to ProtonMail through TOR.

15  Q.  On what date?

16  A.  August 22, 2018.

17        MR. DENTON:  If we can take all of that down and go to

18  page 7 of Government Exhibit 809, Ms. Cooper?

19  Q.  Is there a date listed on this page?

20  A.  Yes.

21  Q.  What is it?

22  A.  August 23rd.

23  Q.  Could you read the first two sentences of the text up here

24  at the top?

25  A.  Well, a lot has happened lately.  Yesterday I started

1    cleansing the phone and in the process set up a new ProtonMail

2    which I transferred the Wordpress to.

3    Q.   Down at the bottom do you see a sentence kind of by itself?

4    Could you read that, please?

5    A.   Yesterday I started e-mailing Shane from the Washington

6    Post.

7    Q.   During the course of your investigation, have you reviewed

8    press reporting about this case?

9    A.   Yes.

10   Q.   And did that include reporting in the Washington Post?

11   A.   Yes.

12   Q.   Who was the author of that reporting?

13   A.   Shane Harris.

14          MR. DENTON:   Ms. Cooper, can we go to page 3 of

15   Government Exhibit 822-2?  Can we look at lines 83 and 84 down

16   at the bottom there?

17   Q.   What is reflected there?

18   A.   A search for:  Sean Washington Post.

19   Q.   And what date and time?

20   A.   August 22nd, 2018; 8:45 p.m.

21          MR. DENTON:   Ms. Cooper, can we take that down and put

22   up what is now in evidence as Government Exhibit 1303-6?

23   Q.   Starting with the bottom e-mail in this chain, what's the

24   date and time of the e-mail?

25   A.   August 22nd, 2018; 8:58 p.m.

1    Q.  And who sent it?

2    A.  The annon1204 account.

3    Q.  Who was it sent to?

4    A.  Shane Harris.

5    Q.  Can you read the top paragraph in that e-mail?

6    A.  Shane, sorry to bother you with this request, but if you

7    could please forward the nine articles that Shane Presnall sent

8    you on behalf of Josh Schulte we would greatly appreciate it.

9    Shane Presnall is under subpoena as they wrongly claim he

10   assisted Josh in violation of a protective order, so we don't

11   want to go to him for this request.

12   Q.  I'm sorry.  Can you also just read the next paragraph?

13             MR. SCHULTE:  Objection.  It speaks for itself.

14             THE COURT:  Overruled.

15   A.  We are family and friends of Josh and are looking to

16   further post these articles and new ones that he has written...

17   The current ones on Facebook are old rough drafts but we have

18   lost the newest versions that we believe were forwarded to you.

19   Thanks.

20   Q.  Do you see a reference there to an individual named Shane

21   Presnall?

22   A.  Yes.

23   Q.  Do you know who that is?

24   A.  Yes.

25   Q.  Who is he?

1    A.  He is Mr. Schulte's cousin.

2            MR. DENTON:  Now, Ms. Cooper, can we pull up, if we

3    can at the same time, Government's Exhibits 820-412 and -413?

4    Q.  Special agent, are these the same e-mails that we were just

5    looking at in Government Exhibit 1303-6?

6    A.  Yes.

7            MR. DENTON:  We can take those down, Ms. Cooper,

8    please, and go back to Government Exhibit 809 and turn to page

9    8?

10   Q.  Special Agent, do you see some phone numbers at the top of

11   this page?

12   A.  Yes, I do.

13   Q.  Starting with the one that starts with 940, do you

14   recognize that?

15   A.  Yes, I do.

16   Q.  Whose phone number is that?

17   A.  Shane Presnall's.

18   Q.  And the number starting with 202, do you recognize that

19   phone number?

20   A.  Yes.

21   Q.  Whose phone number is that?

22   A.  Shane Harris.

23   Q.  How do you know that?

24   A.  That phone number is publicly available -- or was.  I

25   believe it was on Shane Harris' Twitter bio.

1   Q.   Can you read the text that is written there in between

2   those phone numbers?

3   A.   Shane Harris or spoof e-mail:  Shane.Presnall@gmail.com.

4   Q.   Please keep going.

5   A.   I am hoping to write/edit my nine articles.  I don't know

6   how I can get them -- oh, I may text Shane Harris from Shane

7   Presnall' number.  Omar claims that some service exists to do

8   this.  I'm dubious.  Although, I feel this may not work either.

9   IDK.  Basically on hold for my publication.

10           Secondly, I want to rewrite article no. 10, Malware of

11   the Mind.

12           MR. DENTON:  Ms. Cooper, can we pull up Government

13   Exhibit 1301-4?

14   Q.   Special Agent, do you recognize this?

15   A.   Yes, I do.

16   Q.   And what is it?

17   A.   This is a legal return from Wordpress.

18   Q.   Generally, what is Wordpress?

19   A.   It's a blogging service.

20   Q.   And I apologize, this is a little difficult to read, but do

21   you see in the bottom two paragraphs the URL right before the

22   paragraph break?

23   A.   Yes, I do.

24   Q.   What URL is that?

25   A.   Presumptionofinnocence.net.

1           MR. DENTON:  Can we go to the next page, Ms. Cooper?

2   Q.  About a third of the way down this page do you see a title?

3   A.  Yes, I do.

4   Q.  What title is there?

5   A.  10.  Malware of the Mind.

6   Q.  Is there a publication date that's listed just below that?

7   A.  Yes.

8           THE COURT:  I'm going to ask you, Agent, why the

9   document appears with all the sort of coding in it.  Is that

10  just how it came from Wordpress?

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  Do you know when it was produced what the

13  request was for?  Why it was produced in that form?

14          THE WITNESS:  As I recall, this is just how they

15  provided the legal search warrant return.

16          MR. DENTON:  I apologize it is not a little bit

17  prettier.

18  BY MR. DENTON:

19  Q.  Now, if we can zoom back out?

20          Special Agent, can you read the text that is listed

21  there next to "Content Encoded"?

22  A.  Today we are facing a stealth constitutional crisis.  A

23  malware of the mind has entered and corrupted the justice

24  system.  Technology has advanced so rapidly that the law and

25  law enforcement are decades behind and are unable to catch up.

M6U5sch4                        Schlessinger – Direct

1    Into this chasm defendant, defense attorneys, judges, and

2    juries are increasingly blindsided by the evolution of

3    innovative prosecutorial techniques based on faux forensics,

4    manipulation, and intentional misrepresentation which are, in

5    turn, nothing more than long shot theories and, in some cases,

6    blatant fabrications analogous to accusations of witch craft

7    and wizardry.

8             This final article is incomplete as it was written by

9    Mr. Schulte entirely from prison and he is unable to get it

10   out.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. DENTON:  Ms. Cooper, can we take that down and put

2    up what has been marked as Government Exhibit 801.

3    Q.   Special Agent, do you recognize Government Exhibit 801?

4    A.   Yes, I do.

5    Q.   What is it?

6    A.   This is an article that was recovered from the MCC.

7    Q.   And whose handwriting do you see here?

8    A.   The defendant's.

9            MR. DENTON:  Your Honor, the government would offer

10   Government Exhibit 801 now in full.

11           THE COURT:  Subject to prior rulings, any objection?

12           MR. SCHULTE:  Same objection as before.

13           THE COURT:  All right.  Admitted.

14           (Government Exhibit 801 received in evidence)

15   BY MR. DENTON:

16   Q.   Special Agent, what's the title of this document?

17   A.   Malware of the Mind.

18   Q.   Is that the same as the title of the post in Government

19   Exhibit 1301-4?

20   A.   Yes.

21           MR. DENTON:  Ms. Cooper, could we turn to page 3 of

22   Government Exhibit 801.  If we could blow up the bottom

23   paragraph and I guess if we could grab the last couple

24   sentences of the paragraph above too, please.

25   Q.   Special Agent, can you read, starting from the end of this,

1    the top paragraph, "I can guarantee"?

2    A.   "I can guarantee you that there are multiple encrypted

3    volumes on my server that the FBI never decrypted or even

4    found, which brings me to my next point.  Do you know what my

5    specialty was at the CIA?  Do you know what I did for fun?

6    Data hiding and crypto.  I designed and wrote software to

7    conceal data in a custom-designed file system contained within

8    the drive's slack space or hidden partitions.  I disguised

9    data.  I split across files and file systems to conceal the

10   crypto.  Analysis tools would never detect random or

11   pseudorandom data indicative of potential crypto.  I designed

12   and wrote my own crypto.  How better to fool buffoons like

13   forensic examiners and the FBI than to have custom software

14   that doesn't fit into their two-week class where they become

15   forensic experts.  Make no mistake.  I am an expert in data

16   hiding and cryptography, with thousands of hours of experience

17   and among the top specialists in the world -- or was."

18   Q.   Special Agent, without going back to the prior exhibit,

19   does any of this text appear in the content listed in

20   Government Exhibit 1301-4 that we were just looking at from

21   WordPress?

22   A.   No.

23            MR. DENTON:  Thank you, Ms. Cooper.  If we could go

24   back to Government Exhibit 809 and go back to page 8.  And if

25   we could look at what's below in the second half, the bottom

1    half of the page, below the line.  That's perfect.

2    Q.  Can you read the text that's below the line?

3    A.  "Anonymous.  Attila, Turkey.  USG acknowledges coup

4    attempt.  Classified information.  Reality winner.  Tool from

5    vendor report.  Bartender for" redacted "vendor" redacted

6    "China and Russia openly attacking U.S., looking to undermine

7    world reserve currency."

8    Q.  Special Agent, if I could ask you, with Ms. Cooper's help,

9    could we jump to page 14 of this exhibit, is there a date on

10   this page?

11   A.  Yes.

12        MR. DENTON:  If we could blow up the date in the top

13   paragraph.

14   Q.  What's the date here?

15   A.  September 2, 2018.

16        MR. DENTON:  I'm sorry, Ms. Cooper.  Can we blow up

17   the paragraph of text there.

18   Q.  Can you read that, please?

19   A.  "Well, it's September now.  Locked in all day.  Hopefully

20   tonight I can set up Signal from my cell and message Harris to

21   confirm Annon's permission and get my fucking articles.  I also

22   need to confirm my Twitter."

23        MR. DENTON:  Ms. Cooper, could we put up what's in

24   evidence as Government Exhibit 822-1.

25   Q.  Special Agent, do you recognize what this exhibit is?

1    A.   Yes.

2    Q.   What is it?

3    A.   These are the Signal messages that were extracted from the

4    Samsung phone.

5    Q.   And just looking at the first entry here, what does that

6    say?

7    A.   "Hi.  I got your number from Shane P.  I'm messaging from

8    Josh's phone.  I'm hoping to validate Anonymous's legitimacy,

9    helping our family and authorize release of Josh's articles to

10   them when you get the chance.  The group is apparently some

11   computer group Josh was a part of before they have agreed to

12   switch from NYT to talk to you instead to help us.  They claim

13   to have NYT some info on Russia and oligarchs already but will

14   give you more info.  So far they have been trustworthy and

15   helpful for us.  We have never met any of them, though."

16           MR. DENTON:  If we could scroll over to column W,

17   Ms. Cooper.

18   Q.   When was that message sent?

19   A.   September 2, 2018.

20   Q.   And just looking at column Q, do you recognize that phone

21   number under recipient?

22   A.   Yes.

23   Q.   Whose phone number is that?

24   A.   Shane Harris.

25           MR. DENTON:  We can take that down, please,

M6uWsch5                    Schlessinger - Direct

1    Ms. Cooper, and if we could put up in what's in evidence as
2    Government Exhibit 812.
3    Q.  Do you recognize this?
4    A.  Yes.
5    Q.  What is it?
6    A.  These are emails from the Annon1204 ProtonMail account.
7              MR. DENTON:  And if we could blow up the bottom email
8    in this chain.
9    Q.  Do you see this email here?
10   A.  Yes.
11   Q.  Can you read the first paragraph?
12   A.  "Dear Shane.  Sorry for the delay, the FBI raided Josh's
13   parents' house last week and forcibly made them delete his
14   articles.  I'm attaching the search warrants in Josh Schulte's
15   case along with his notes.  We intend to send you other
16   documents in the coming days."
17   Q.  Now, Special Agent, you said earlier that you were one of
18   the case agents in this investigation, is that right?
19   A.  Yes.
20   Q.  And does that entail being involved in supervising the
21   investigation?
22   A.  Yes.
23   Q.  To your knowledge, did the FBI ever raid Mr. Schulte's
24   parents' house?
25   A.  No.

1    Q.  If you could read the next paragraph, please.

2    A.  "We have decided to share with you an initial exposé

3    (depending on how the first one goes with you we will share up

4    to nine more) involving Russian oligarchs, business ties and

5    wire transfers involving hundreds of millions of dollars to

6    Donald Trump's closest advisers and law firms, including

7    Giuliani and Mark Kasowitz firms.  Trump's self-reported best

8    friend plays a starting role."

9               MR. DENTON:  If we could zoom out and just blow up the

10   next two emails on the top half of the page, Ms. Cooper.

11   Q.  Now, Special Agent, do you see a listing here for

12   attachments?

13   A.  Yes.

14   Q.  Have you reviewed those attachments?

15   A.  Yes.

16               MR. DENTON:  Could we go to page 14 of this exhibit,

17   Ms. Cooper.

18   Q.  Special Agent, do you recognize this?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  This was a search warrant application, an affidavit in this

22   case.

23   Q.  Do you see at the bottom where it says USG-confidential?

24   A.  Yes.

25   Q.  Are you familiar with a classification marking for a

1  classification level of confidential?

2  A.  Yes.

3  Q.  Does this refer to that classification level or to

4  something else?

5  A.  It refers to something else.

6  Q.  What does this marking refer to?

7  A.  It refers to the fact that the document is under a

8  protective order.

9         MR. DENTON:  Now, if we could go up to page 2 of this

10 exhibit.

11        THE COURT:  What's your understanding of a protective

12 order?

13        THE WITNESS:  It's, in this instance, at least, to

14 prevent it from being shared with unauthorized parties.

15        THE COURT:  All right.

16        Ladies and gentlemen, let me just instruct you that a

17 protective order, at least in some contexts, is an order that

18 is issued by a judge in a case that basically restricts the

19 sharing of certain documents relating to the case.  So it

20 limits the distribution of documents to those who are

21 authorized under the protective order to receive them and bars

22 anyone who receives them pursuant to the protective order from

23 sharing them with anyone outside of the protective order.

24        MR. DENTON:  Thank you, your Honor.

25        Ms. Cooper, could we go up to page 2 -- I'm sorry.  It

1    must be the next page.  I'm sorry.  It must be page 3.

2              There we go.  Thank you.

3    Q.  Do you see a reference at the top there to probable cause?

4    A.  Yes.

5    Q.  Did the search warrant that we were just looking at have a

6    section describing probable cause?

7    A.  Yes.

8              MR. DENTON:  Could we blow up paragraph 8(b),

9    Ms. Cooper.  I'm sorry.  8(b).  Thank you.

10   Q.  Special Agent, can you read that?

11   A.  "3 of 200 people in one CIA group had access to classified

12   info.  In reality, two groups -- EDG and COG -- and at least

13   400 people had access.  They don't include COG, who was

14   connected to our DevLAN through Hickok, an intermediary network

15   that connected both COG and EDG.  Reckless disregard for the

16   truth.  There is absolutely no reason they shouldn't have known

17   this connection exists.  Step one in narrowing down the

18   possible suspects and to completely disregard an entire group

19   and half the suspects is reckless.  All they needed to do was

20   talk to one person on infrastructure branch or through any

21   technical description/diagram of the network."

22             MR. DENTON:  If we could zoom out there.

23   Q.  Special Agent, who was this attachment sent to?

24   A.  Shane Harris.

25   Q.  Does Shane Harris work for the CIA?

1     A.  No.

2     Q.  Does he work for the U.S. government?

3     A.  No.

4           MR. DENTON:  If we could then go to the bottom of page

5     9 of this exhibit, Ms. Cooper.  If we can blow up that bottom

6     paragraph.

7     Q.  Can you read that, please?

8     A.  "CI had to be stolen between 3/7 and 3/8 because later data

9     is from 3/8.  Truth:  3/7 and 3/8 establish only the lower

10    bound from the first possible date the data could have been

11    stolen.  Since data existed from 3/7 and 3/8, it could not be

12    that the data was stolen before this date, although it is

13    within reason that data was continuously stolen, in which case

14    this date would be the last date the data was stolen.  However,

15    since the backups are stored from the time of the backup

16    indefinitely, any date after 3/7 and 3/8 is a reasonable date

17    that the data could have been stolen up until the WikiLeaks

18    release.  As an easy counterexample, on 7/9, someone could have

19    copied the 3/7 backup and give it to --"

20          MR. DENTON:  Could we go to the next page, Ms. Cooper.

21    Q.  And just finish that.

22    A.  "-- WikiLeaks.  In fact, in all actuality, the date of the

23    backup is almost certainly not the date the data was stolen as

24    any intelligent person would try to obfuscate the day the data

25    was stolen."

1        MR. DENTON:  Ms. Cooper, could we pull up what's in

2    evidence as Government Exhibit 1207-30 and blow up the top

3    three or four lines there.

4    Q.  Special Agent, do you see a file there that was created on

5    March 3, 2016?

6    A.  Yes.

7    Q.  Was it accessed the same day that it was created?

8    A.  No.

9        MR. DENTON:  Ms. Cooper, if we could go back to

10   Government Exhibit 809 and go to page 9.

11   Q.  Special Agent, can you read the email address that's listed

12   in this page here?

13   A.  Freejasonbourne@protonmail.com.

14   Q.  Is that one of the ProtonMail accounts that you were able

15   to access?

16   A.  Yes.

17   Q.  And below that there is a reference to Twitter.  Do you see

18   that?

19   A.  Yes.

20   Q.  What account is referenced there?

21   A.  Free Jason Bourne.

22   Q.  Do you know who Jason Bourne is?

23   A.  Yes.

24   Q.  Who is that?

25   A.  He is a fictional CIA operative in the Jason Bourne movies.

 1              MR. DENTON:  Ms. Cooper, could we pull up what's in

 2     evidence as Government Exhibit 1304-1.

 3     Q.  Do you recognize this, sir?

 4     A.  Yes.

 5     Q.  What is it?

 6     A.  This is a return from Free Jason Bourne.

 7     Q.  And what's the date created for this account?

 8     A.  September 1, 2018.

 9     Q.  Is there an email associated with it?

10     A.  Yes.

11              THE COURT:  And by return, do you mean a search

12     warrant return, what was produced in response to a search

13     warrant?

14              THE WITNESS:  Yes, your Honor.

15              THE COURT:  OK.

16              MR. DENTON:  Now, Ms. Cooper, could we then pull up

17     Government Exhibit 1303-44.

18     Q.  Do you recognize this?

19     A.  Yes, I do.

20     Q.  What is it?

21     A.  This is an email from the Free Jason Bourne ProtonMail

22     account.

23     Q.  And who is this an email from?

24     A.  Twitter.

25     Q.  Do you see a location listed there?

1    A.  Yes.

2    Q.  What location is that?

3    A.  Moldova.

4    Q.  On September 1, 2018, where was the defendant being housed?

5    A.  At the MCC.

6    Q.  Is that in Moldova?

7    A.  No.

8           THE COURT:  Mr. Denton, I apologize.  We're having

9    just a technology issue.  Can we take a 30-second break and

10   maybe everybody can stretch while I'm just dealing with

11   something.  You're welcome to stand and stretch where you are

12   if you'd like.

13          All right.  I've succeeded in fixing my problem.  I

14   apologize to everybody, but hopefully you enjoyed your stretch

15   nonetheless.

16          Mr. Denton, you can carry on.

17          MR. DENTON:  Thank you, your Honor.

18          Ms. Cooper, could we then pull up Government Exhibits

19   1303-48 and 1303-49.  If we can do them side by side, that

20   would be great.

21   Q.  Special Agent, who sent the email that's on the left here

22   in 1303-48?

23   A.  Twitter.

24   Q.  Who is it sent to?

25   A.  Free Jason Bourne.

M6uWsch5                    Schlessinger - Direct

1    Q.  What's the location that's listed there?

2    A.  Toulouse, France.

3    Q.  What's the location that's listed in 1303-49?

4    A.  Bucharest, Romania.

5    Q.  What is the difference in time between these two emails?

6    A.  About 15 minutes.

7    Q.  Are you aware of any way to travel between Bucharest and

8    Toulouse in 15 minutes?

9    A.  No, I'm not.

10          MR. DENTON:  Ms. Cooper, could we pull up Government

11   Exhibit 820-434.

12   Q.  Special Agent, do you see an icon there labeled Turbo VPN?

13   A.  Yes.

14   Q.  Do you know what that is?

15   A.  Yes.

16   Q.  And what does it do?

17   A.  Well, VPN stands for virtual private network.  It describes

18   a general networking concept.  It has a variety of uses.  One

19   use is to disguise your location.

20          MR. DENTON:  If we can take that down and go to

21   Government Exhibit 1303-47.

22          THE COURT:  Can you just elaborate?  Does that mean

23   that -- by disguise your location meaning that it makes it seem

24   as if the device is somewhere else, not where it actually is?

25          THE WITNESS:  Yes, that's my understanding, your

M6uWsch5                    Schlessinger – Direct

1   Honor.

2   BY MR. DENTON:

3   Q.  Now, Special Agent, what's the date of this email?

4   A.  September 1, 2018.

5   Q.  And what's the subject of it?

6   A.  Confirm your Twitter account, Free Jason Bourne.

7           MR. DENTON:  Ms. Cooper, can we go back to Government

8   Exhibit 809 and go to page 14.

9   Q.  What's the date that's listed here, sir?

10  A.  September 2, 2018.

11  Q.  Can you read the last sentence of the top paragraph?

12  A.  "I'm also need to confirm my Twitter."

13          THE COURT:  Whoever's device that was, please shut it

14  off.

15          MR. DENTON:  Now, if we could go to the next page,

16  please, Ms. Cooper.

17  Q.  What's the date that's listed here?

18  A.  September 12.

19          MR. DENTON:  If we could blow up the text that's below

20  the redactions, Ms. Cooper.

21  Q.  Can you read the first three lines, Special Agent?

22  A.  "Finalize copy by Friday.  Edit during weekend, Saturday,

23  sun.  Finalize.  Monday 17th to Tuesday 18th, DL disc UL WL."

24          MR. DENTON:  Ms. Cooper, could we pull up Government

25  Exhibit 822-2 and go to page 7.

1          If we could blow up lines 179 and '80.

2     Q.   What are those searches for, Special Agent?

3     A.   WikiLeaks and send WikiLeaks message.

4          MR. DENTON:   If we could go back to page 15 of

5     Government Exhibit 809, Ms. Cooper.

6     Q.   And Special Agent, if I could ask you to read the other

7     three lines of the text below the redaction?

8     A.   "19, 20, 21:  Schedule tweets, 27th, send tech reports MCC

9     letter.  Russia piece.  Rest 22-25."

10         MR. DENTON:   Ms. Cooper, could we put up what's in

11    evidence as Government Exhibit 1303-50.

12    Q.   Special Agent, do you know what Buffer is?

13    A.   Yes, generally.

14    Q.   What is Buffer?

15    A.   It's an app that you can use to help manage your social

16    media accounts.

17    Q.   What are some of the things that you can do with Buffer?

18    A.   You can schedule tweets for Twitter or posts on Facebook in

19    advance.

20    Q.   Which email address registered this Buffer account?

21    A.   Freejasonbourne@protonmail.com.

22         MR. DENTON:   Ms. Cooper, if we could then go back to

23    page 9 of Government Exhibit 809.

24    Q.   Special Agent, do you see below where it says Free Jason

25    Bourne, there's a bracketed reference to the @Dept. of Justice?

1  A.  Yes.

2  Q.  Are you familiar with that formulation's usage in

3  connection with Twitter postings?

4  A.  Yes, I am.

5  Q.  What is it?

6  A.  It's used to identify a specific Twitter user.

7         MR. DENTON:  Ms. Cooper, if we could blow up that

8  text.

9  Q.  Special Agent, can you read this for us, please?

10  A.  "The @Dept. of Justice arrested the wrong man for Vault 7.

11  I personally know exactly what happened, as do many others.

12  Why are they covering it up?  Meet the CIA's" struck "X:

13  Jeremy Weber and Karen at the CIA set up Josh Schulte -- Joshua

14  Schulte.  Jeremy Weber hacked Atlassian's Crowd, and when

15  Schulte, the admin, found out, Karen issued him a memo/letter

16  of warning for self-granting admin privileges.  The system

17  administrator self-granting admin privileges.  Hmmm.  Right

18  over the FBI's head too.  Or was it?  Schulte is the scapegoat

19  because he routinely reported security issues at the CIA,

20  including infrastructure branch's abysmal management."

21         MR. DENTON:  Thank you.

22         Ms. Cooper, could we go to the next page, please, and

23  continue.

24  Q.  Can you read the text that's in the box at the top left?

25  A.  "Just to authenticate me first.  The @CIA was involved in"

1    redacted.  "The code for the initially planned cyber operation

2    is in Vault 7.  Additionally, tool described in vendor report

3    is in fact Bartender, a CIA tool set for operators to configure

4    for" redacted "deployment."

5             MR. DENTON:  If we could zoom out, Ms. Cooper.

6    Q.  Now, just below that, Special Agent, do you see where it

7    says, "I'm a former co-worker of @JoshuaSchulte, just below the

8    section you were just reading?

9    A.  Yes, I do.

10   Q.  Do you recognize the handwriting there?

11   A.  Yes.

12   Q.  Whose handwriting is that?

13   A.  Mr. Schulte's.

14            MR. DENTON:  If we could go to the next page,

15   Ms. Cooper, and if we could blow up the top of this page.

16   Q.  Do you see some text that follows hashtag symbols in the

17   top right there?

18   A.  Yes, I do.

19   Q.  Are you familiar with what that formulation indicates in

20   connection with Twitter postings?

21   A.  Yes, I am.

22   Q.  What does it indicate?

23   A.  It's a way to index a particular topic or categorize a

24   tweet.

25   Q.  What are the hashtags that are listed here?

1   A.  #top secret.  #fuck your top secret.  Or dump the secrets

2   here.

3   Q.  Can you read what's, the portion of the page that's blown

4   up here?

5   A.  "Let me first authenticate," struck through "established

6   credibility myself.  The USG was involved in the" redacted.

7   "Source code for the planned" redacted "cyber espionage

8   component is in the Vault 7 release."

9   Q.  If you could continue, please.

10  A.  "The @CIA conducted numerous operations against" redacted

11  "and" redacted.  "Source code is available in the Vault 7

12  release."

13          THE COURT:  Ladies and gentlemen, I'm sure I don't

14  need to give you this reminder, but just a reminder that, No.

15  1, you shouldn't speculate as to what is behind the redactions

16  or why things have been redacted.  I've approved the

17  redactions.  And where there are substitutions, I've also

18  approved those substitutions so you may consider what has been

19  substituted for what is behind the substitution.

20          You may proceed.

21          MR. DENTON:  Thank you, your Honor.

22          Ms. Cooper, if we could zoom out and blow up the rest

23  of this page.

24  Q.  Can you read that portion of the page, Special Agent?

25  A.  "@vendor discovered tool in 2016, which is really the CIA's

M6uWsch5                      Schlessinger - Direct

1    Bartender tool suite.  Bartender was written to deploy against

2    various targets.  The source code is available in the Vault 7

3    release."

4    Q.  And the next paragraph, please.

5    A.  "Vault 7 contains numerous zero days and malware that could

6    easily be deployed," struck through "repurposed and released

7    onto the world in a devastating fashion that would make

8    NotPetya look like child's play."

9    Q.  Sir, do you know what NotPetya is?

10   A.  Yes, generally.

11   Q.  Generally, what is a reference to?

12   A.  Russian malware.

13        MR. DENTON:  If we could zoom out and just look at the

14   whole page for a second, Ms. Cooper.

15        Thank you.

16   Q.  Special Agent, is the text on this page similar to the text

17   that you were reading on the previous page of this exhibit?

18   A.  Yes.

19   Q.  Is it identical?

20   A.  I don't believe so.

21        MR. DENTON:  If we could go to the next page, page 12,

22   Ms. Cooper, and just blow up the text here.

23   Q.  Can you read the text that's in the top margin here?

24   A.  "To the United States intelligence community.  Why would

25   you keep America's secrets when your own country prosecutes

M6uWsch5                          Schlessinger - Direct

1     your own?"

2     Q.  And are some parts of that struck through?

3     A.  Yes.

4     Q.  What do they say there?

5          THE COURT:  Sorry.  Does it say, with the strike

6     through, "when the government wrongly prosecutes your own"?  Is

7     that what it says.

8          THE WITNESS:  I'm sorry.  I don't --

9          THE COURT:  In other words, there's language crossed

10    out, and I think it says, "the government wrongly prosecutes

11    your own."  Is that correct?

12         THE WITNESS:  Yes, I see that now.  I'm sorry.

13         THE COURT:  All right.

14         Again, ladies and gentlemen, your own interpretation

15    of the exhibits is what governs.

16         MR. DENTON:  If we could go to the next page,

17    Ms. Cooper, and blow up the top paragraph there.

18    Q.  Can you read that for us, Special Agent?

19    A.  "Your service, intense security investigations, and

20    pristine criminal history can't even get you bail.  As Josh

21    Schulte has said, you are denied a presumption of innocence.

22    Ironic.  You do your country's dirty work, but when your

23    country accuses you of a crime, you are arrested and presumed

24    guilty.  Until your country," struck through "government

25    protects you and honors your service, send all your government

1   secrets here:  WikiLeaks."

2   Q.  Special Agent, who wrote that?

3   A.  Mr. Schulte.

4          MR. DENTON:  No further questions.

5          THE COURT:  Cross-examination.

6          I realize you just had a stretch break, but if you

7   want to stretch while Mr. Schulte is setting up, you're welcome

8   to do that.

9   CROSS-EXAMINATION

10  BY MR. SCHULTE:

11  Q.  Good afternoon.

12  A.  Good afternoon.

13  Q.  You testified about Twitter, correct?

14  A.  Yes.

15  Q.  And there's all this stuff about Jason Bourne, right?

16  A.  Yes.

17  Q.  You testified about Toulouse and Moldova and all those

18  different places, right?

19  A.  Yes.

20  Q.  You looked at the handle for Twitter, correct?

21  A.  Yes.

22  Q.  @freejasonbourne, correct?

23  A.  Yes.

24  Q.  And was there anything posted under that handle?

25  A.  Other than the picture, there was nothing.

M6uWsch5                    Schlessinger - Cross

1   Q.  You mean the photo of Matt Damon?

2   A.  Yes.

3   Q.  OK.  But there were no tweets on there, right?

4   A.  No.

5   Q.  And you talked about this Buffer account, right?

6   A.  Yes.

7   Q.  And there was no use of that account either, right?

8   A.  I don't recall.

9   Q.  You don't recall if there were tweets planned to be sent?

10  A.  I don't, no.

11  Q.  Well, you testified that there's no tweets on Jason Bourne

12  account, right?

13  A.  Yes.

14  Q.  OK.  So there were -- there can't be any tweets planned if

15  nothing was tweeted, right?

16          MR. DENTON:  Objection.

17          THE COURT:  Sustained.

18  BY MR. SCHULTE:

19  Q.  OK.  Through your investigation, did you seize the Buffer

20  account?

21  A.  No, we didn't seize it.  We served a search warrant on it,

22  I believe.

23  Q.  OK.  Through your search warrant, it didn't return any use

24  of that account, right?

25  A.  I don't recall what was in the search warrant return

1    exactly.

2    Q.  OK.  Well, if something was there, you would have talked

3    about it here, right?

4              MR. DENTON:  Objection.

5              THE COURT:  Sustained.

6    BY MR. SCHULTE:

7    Q.  You would have wanted to know if there were planned tweets

8    in the Buffer account, right?

9    A.  Yes.

10   Q.  OK.  And none of the -- there were absolutely nothing,

11   nothing at all posted on the Twitter account, either messages,

12   private messages, or tweets, right?

13             THE COURT:  Asked and answered.

14   BY MR. SCHULTE:

15   Q.  In fact, none of the, those notebook entries that you were

16   going through, none of that is posted on -- is posted anywhere,

17   right?

18   A.  I don't know if -- what exactly is posted or isn't posted

19   from all of the notebooks.

20   Q.  As the FBI agent, you don't know what from the notebooks

21   was posted?

22   A.  Well, there were aspects of the journal entries that may

23   have been incorporated in other articles that you wrote, and

24   whether those were posted on the WordPress site, I just

25   couldn't say.

M6uWsch5                     Schlessinger – Cross

1  Q.  OK.  But you seized everything from the WordPress site too,

2  right?

3  A.  Yes.

4  Q.  We saw lots of references to that, the articles, right?

5  A.  Yes.

6  Q.  And those articles were all about the criminal justice

7  system, right?

8  A.  I don't know if they were all about the criminal justice

9  system.  It was certainly a major theme among those articles,

10 yes.

11 Q.  OK.  But you seized and read through all those articles,

12 correct?

13 A.  Yes.

14         MR. SCHULTE:  OK.  I'm going to show the witness and

15 the parties what's noted as defense exhibit 410.

16 Q.  Do you recognize this?

17 A.  Appears to be from the WordPress return.

18 Q.  Similar to what you testified before on direct about

19 returns from WordPress, right?

20 A.  Yes, it looks similar.

21 Q.  OK.  And I think you testified earlier that the

22 WordPress -- that the FBI received search results from its

23 search warrant from WordPress, right?

24 A.  Yes.

25 Q.  And that would be all of the posted documents in WordPress,

1    right?

2    A.  Yes.

3              MR. SCHULTE:  Move to introduce defense exhibit 410.

4              MR. DENTON:  Object to the content being introduced,

5    your Honor.  The metadata is fine.

6              THE COURT:  OK.  Well, can I reserve on that and we

7    can discuss later what that means and what my ruling is; is

8    that OK, Mr. Schulte?

9              MR. SCHULTE:  Yes.

10             THE COURT:  OK.

11             Ladies and gentlemen, I'll circle back to you on this

12   one.  I just need to look at it and talk to the parties about

13   what precisely that means.

14             Can I just, Agent, confirm, is this file the content

15   that was returned in connection with the search warrant served

16   on WordPress?

17             THE WITNESS:  It's being presented a little bit

18   differently than what I'm used to seeing, but it appears to be

19   very similar, so it looks to be the same to me.

20             THE COURT:  All right.

21             Again, I'll circle back to you on it.

22             Go ahead, Mr. Schulte.

23   BY MR. SCHULTE:

24   Q.  You testified about the prison notebooks that were

25   recovered, correct?

1  A.  Yes.

2  Q.  OK.  And when all of these writings -- when these notebooks

3  were being written, do you know how long I had already been in

4  prison?

5          MR. DENTON:  Objection.

6          THE COURT:  Sustained.

7          Ladies and gentlemen, just a reminder.  I told you, I

8  think, very early in the case I would give you instructions,

9  and I will, at the close of the case about what uses, if any,

10  you can -- what you may consider the fact that Mr. Schulte was

11  in custody for.  As I remind you, he is presumed innocent of

12  the charges.  The burden remains on the government at all

13  times, and I will tell you now that you certainly can't

14  conclude from evidence that he was in jail that he has a bad

15  character or a criminal propensity.  But again, I'll give you

16  further instructions on that at the conclusion of the case.

17  BY MR. SCHULTE:

18  Q.  Well, you were the case agent on the case, right?

19  A.  I was one of them, yes.

20  Q.  OK.  And you're testifying on behalf of the United States,

21  right?

22  A.  Yes.

23  Q.  You wanted to have a timeline prepared, correct?

24  A.  Yes, there was a timeline element to it.  Yes.

25  Q.  So based upon your investigation, do you know how long I

1   would have been sitting in jail when the accounts were created?

2          MR. DENTON:  Objection.

3          THE COURT:  Upon reflection, I'll allow it.  So

4   overruled.

5          You can answer.

6   A.  Approximately eight or nine months.

7   Q.  OK.  Let's talk about Shane Harris.  OK?

8   A.  OK.

9   Q.  You testified that Mr. Shane Harris is the reporter for the

10  Washington Post, is that correct?

11  A.  Yes.

12  Q.  In light of your investigation, of all the articles that

13  Mr. Harris received, did you review all of them?

14  A.  I don't know if I've reviewed all of them.  I've reviewed

15  the article that was published in May of 2018.

16  Q.  Article that was published in May of 2018?

17  A.  Yes.

18  Q.  OK.  But they were titled the Presumption of Innocence,

19  correct?

20  A.  Oh, I'm sorry.  I thought you were referring to

21  Mr. Harris's articles in the Washington Post.

22  Q.  I'm sorry.  No.  I'm talking about the articles Mr. Harris

23  received.  Did you review all of those?

24  A.  Yes.

25  Q.  OK.  And they were titled the Presumption of Innocence,

1    correct?

2    A.  Yes, I remember that title.

3    Q.  It was a redress of grievances, right?

4    A.  Yes.

5    Q.  And that specific redress of grievances titled Presumption

6    of Innocence was about the criminal justice system, right?

7              MR. DENTON:  Objection.

8              THE COURT:  Sustained.

9    BY MR. SCHULTE:

10   Q.  There was nothing about Russia in those articles, right?

11   A.  I don't recall anything about Russia in those articles.

12   Q.  Sitting here, do you remember today how many articles were

13   contained in the presumption of innocence?

14   A.  I think it was about ten.

15   Q.  And those were the ones that were published on WordPress,

16   correct?

17   A.  Yes.

18   Q.  And do you remember how long each of them was?

19   A.  I don't recall exactly, no.

20   Q.  OK.  I'm going to show, this was -- you testified about

21   this on direct, 820, Government Exhibit 820-408, right?  And do

22   you remember all these screenshots that Mr. Betances took?

23   A.  Yes.

24   Q.  Where it says "article 8 subtitled Origins," do you

25   remember that?

1   A.  Yes.

2   Q.  Nothing to do with Russia, right?

3   A.  I don't recall it having anything to do with Russia, no.

4   Q.  That had only to do with my case, right?

5   A.  I don't recall everything that was discussed in the

6   article.  I remember it was -- some of the articles were very

7   long, and given that I reviewed some of them many years ago, I

8   don't remember every topic that was discussed in each article.

9   Q.  Well, at the time they were obtained by the FBI, you read

10  each one, right?

11  A.  Yes.

12  Q.  The CIA reviewed each one, right?

13  A.  I don't know.

14  Q.  You don't know if the CIA conducted a classification

15  review?

16  A.  I believe they did, yes.

17  Q.  OK.  And the CIA's determination for the redress of

18  grievances was that it was unclassified, right?

19  A.  I think that's right, yes.

20  Q.  OK.  By the way, do you know if Mr. Harris received all

21  those?

22  A.  I believe he received some of them.  I don't know if he

23  received all of them.

24  Q.  Do you know if the Washington Post published all of those?

25  A.  I don't remember.

M6uWsch5                          Schlessinger - Cross

1   Q.  They didn't publish any of them, right?

2   A.  I don't know.

3   Q.  OK.  You didn't follow up as the case agent or one of the

4   co-case agents to see if the Washington Post published

5   anything?

6   A.  We did at the time.  I just don't remember if the articles

7   were featured or referenced in those news articles.

8   Q.  Well, you remember the ProtonMail email that referenced

9   Marc Kasowitz, right?

10  A.  Yes.

11  Q.  OK.  And there's no relation between me and Marc Kasowitz,

12  right?

13  A.  No.  You're -- not that I'm aware of.

14  Q.  OK.  Let's talk about the cell search at the MCC.

15      Now, in the cell search at the MCC, did you know what cell

16  I was in?

17  A.  Yes.

18  Q.  And just real quick, you did know that there was a

19  relationship between Mr. Amanat and Marc Kasowitz, right?

20  A.  I know it was a -- it's connected to Mr. Amanat.  I don't

21  know exactly how.

22  Q.  OK.

23  A.  Or how it relates to Mr. Amanat.

24  Q.  So that could be -- MCC search, you coordinated with MCC,

25  right?

M6uWsch5                    Schlessinger – Cross

1   A.  Yes.

2   Q.  MCC told you which cell I was in, correct?

3   A.  Yes.

4   Q.  They told you my bunkmate, right?

5   A.  Yes.

6   Q.  Mr. Omar Amanat, right?

7   A.  Yes.

8   Q.  And the further you went along, you researched Omar Amanat,

9   the criminal detainee, correct?

10  A.  Did I research Mr. Amanat?

11  Q.  That's right.  Yes.

12  A.  I wouldn't say I researched him.  I -- we were sort of

13  aware generally of what he was in prison for.

14  Q.  OK.  You tried to figure out what Mr. Amanat had been

15  charged with, right?

16  A.  I was aware of it generally, yes.

17  Q.  OK.  And you understand him to have money, correct?

18  A.  That was my understanding, yes.

19  Q.  He had several retained lawyers, right?

20          MR. DENTON:  Objection.

21          THE COURT:  Sustained.

22  BY MR. SCHULTE:

23  Q.  And then you went and searched the cell, right?

24  A.  Yes.

25  Q.  And it's one cell, correct?

M6uWsch5                        Schlessinger – Cross

1    A.  Yes.

2    Q.  OK.  And were you able to distinguish between Mr. Amanat's

3    stuff and my stuff?

4    A.  In most instances, yes.

5    Q.  OK.  In most instances -- so you found stuff in there that

6    you believed was definitively mine, correct?

7    A.  Yes.

8    Q.  And you thought there was stuff there that was definitively

9    Mr. Amanat's, correct?

10   A.  Yes.

11   Q.  OK.  And did you find anything from me to anyone in Russia?

12   A.  No.

13   Q.  OK.  Did you find anything at all that I sent to anyone in

14   Russia?

15   A.  No.

16   Q.  OK.  And when you searched the cells, you didn't find any

17   cell phones, correct?

18   A.  That's correct.  When we searched, we didn't find any cell

19   phones.

20   Q.  In fact, the first day you searched MCC you didn't find any

21   cell phones, correct?

22   A.  That's correct.

23   Q.  OK.  So 50 Federal Bureau of Investigations agents went in

24   and didn't find it themselves, right?

25   A.  Correct.

1   Q.  OK.  But then the Bureau of Prisons eventually found the

2   cell phone, right?

3   A.  Yes.

4   Q.  It was a Samsung with the IMEI that you identified,

5   correct?

6   A.  Yes.

7   Q.  And they gave it to you, right?

8   A.  Yes.

9   Q.  And where did they find it?

10  A.  7 south.

11  Q.  Do you know if it was found in someone's cell or where it

12  was found specifically?

13  A.  I don't think they told me any more specifically than that.

14  Q.  OK.  Didn't you want to know specifically where it was

15  found?

16  A.  No.  I mean it was the phone that we were looking for.

17  That was the primary concern.

18  Q.  So it wasn't a concern about who might have access or who

19  might be using it?

20  A.  Well, we were primarily interested in your activity on the

21  phone.

22  Q.  But it would be important to identify how many people would

23  have had access to the phone, right?

24  A.  Yes, potentially.

25  Q.  Right.  How long was it before the second cell phone was

M6uWsch5                          Schlessinger - Cross

 1   found?

 2   A.  Well, the -- so, actually, there was a phone that was

 3   discovered before the Samsung phone.  Then we received word

 4   that BOP had discovered two cell phones.  I took custody of

 5   both those cell phones at the same time.

 6   Q.  And one of those was the Samsung, is that right?

 7   A.  Yes.

 8   Q.  And you learned that I was moved into administrative

 9   segregation before the search, right?

10   A.  No.  I learned that during the search.

11   Q.  You learned that while you were conducting the search at

12   MCC, that I'd been moved?

13   A.  Yes.

14   Q.  OK.  Isn't it fair to say that during your investigation,

15   you learned that Mr. Amanat was still in general population?

16   Correct?

17   A.  Yes.

18   Q.  And between the time the first -- between the time of the

19   first day that you go into the MCC and the time you get the

20   phones, the phone is still in use, right?

21   A.  I think so, yes.

22   Q.  There's a couple of days when the Samsung phone is in the

23   MCC and you just can't find it, right?

24   A.  Yes.

25   Q.  Did you check, as part of your investigation here, to see

M6uWsch5                         Schlessinger – Cross

1    if during the time that I moved out of that cell but Amanat is

2    still in general population, whether the Samsung phone was in

3    use?

4    A.   Yes.

5    Q.   And what did you find?

6    A.   The phone may have been in use during that time, but none

7    of the accounts that we discussed earlier were active around --

8    during that time.

9    Q.   None of the accounts were active during that time?

10   A.   Yes.  For example, the Annon1204 ProtonMail account had no

11   activity in that period.

12   Q.   OK.  What about -- what about the, I think, the chat

13   messages from Signal that you discovered?

14   A.   I don't recall.

15   Q.   OK.  This is in evidence as Government Exhibit 822-1.  Do

16   you see the messages here at the end?

17   A.   Yes.

18                  (Continued on next page)

19

20

21

22

23

24

25

M6U5sch6                    Schlessinger – Cross

1    BY MR. SCHULTE:

2    Q.  Those are outgoing messages, right?

3    A.  Yes.

4    Q.  And they are being sent on October 2nd, 2018; correct?

5    A.  Yes.

6    Q.  And at this point these messages are being sent I'm in

7    administrative segregation, correct?

8    A.  I don't know when you were put into administrative

9    segregation.

10            MR. SCHULTE:  OK.  I move to introduce the

11   stipulation, Government Exhibit 3011.

12            MR. DENTON:  No objection.

13            THE COURT:  Admitted.

14            (Government's Exhibit 3011 received in evidence)

15            MR. SCHULTE:  If called as a witness, a representative

16   of the United States Bureau of Prisons, with knowledge of the

17   matter, would testify that Defendant's Exhibit 802 is a true

18   and correct copy of records from the BOP which were made at or

19   near the time by, or from information transmitted by, person

20   with knowledge of the matter set forth in the records that were

21   kept in the course of a regularly conducted business activity,

22   and it was the regular practice of that business activity to

23   mean the records.

24            If called as a witness, a representative of BOP with

25   knowledge of the matter would testify that AD in EX --

1   Defendant's Exhibit it should say there -- 802 means

2   Administrative Detention which is an administrative status

3   which removes an inmate from the general population when

4   necessary to ensure the safety, security, and orderly operation

5   of correctional facilities or protect the public.

6   Administrative detention status is non-punitive and can occur

7   for a variety of reasons.

8          I move to introduce Defendant's Exhibit 802.

9          MR. DENTON:  No objection.

10         THE COURT:  Admitted.

11         (Defendant's Exhibit 802 received in evidence)

12  BY MR. SCHULTE:

13  Q.  So based on the "AD" there I was moved to administrative

14  detention on October 1, 2018 at 2:35; correct?

15  A.  Yes.  If that's what that means.  I have never seen this

16  before.

17  Q.  Yes.  I mean, I can go back to the stipulation.  The

18  government stipulated that "AD" means administrative detention.

19         THE COURT:  Next question.

20  Q.  Let me just go back.  So back to the question on October

21  2nd, 2018, this message is being sent by someone other than me,

22  correct?

23  A.  Yes.  Most likely.

24  Q.  Well, you found the cell phone on 7 South you said,

25  correct?

1    A.  Yes.  Well, I didn't find it but BOP found it.

2    Q.  And on October 2nd I'm not on 7 South, right?

3    A.  Correct.

4    Q.  And I just want to show the fields here.  This is the

5    sender phone number, correct?

6    A.  Yes.

7    Q.  This field?

8         And you would see that this is being sent from my

9    phone number, correct?

10   A.  Yes.

11   Q.  And what about the Samsung phone in general?  Is it being

12   used during this time?

13   A.  It appears to be, yes.

14   Q.  I am going to show Government Exhibit 822-2.  This was the

15   forensic report that you testified earlier was from the Samsung

16   phone, correct?

17   A.  Yes.

18   Q.  There is activity on October 3rd from the browser there,

19   correct?

20   A.  Yes.

21   Q.  Going back to 822-1; these messages are being sent to Shane

22   Harris, right?

23   A.  Which messages are you referring to?

24   Q.  The messages from my phone number in Government Exhibit

25   822-1.

M6U5sch6                    Schlessinger – Cross

1    A.  The last one is, yes.

2    Q.  Oh, the last one is?  OK.

3           THE COURT:  That's line 561, for the record.

4           MR. SCHULTE:  Thanks.

5    Q.  And when you checked the Proton e-mails, did you notice

6    that more than one person was in fact using the ProtonMail

7    account?

8    A.  Yes.

9    Q.  You did not think more than one person was accessing the

10   account?

11   A.  No.

12   Q.  OK.  And what's that based on?

13   A.  Well, the password for the account was found in your

14   notebook.  It seemed to pertain mainly to your case.  It seemed

15   to involve or at least refer to members of your family.  For

16   those reasons I didn't think anyone else was using the Annon

17   ProtonMail account.

18   Q.  So you don't know if the password was shared with someone,

19   correct?

20   A.  No, I don't.

21   Q.  So you're speculating based on what you see as the content

22   of the account; is that right?

23          MR. DENTON:  Objection.

24          THE COURT:  Sustained.

25   Q.  I'm going to show just the witness and the parties what's

1    marked as Government Exhibit 1303-39 and this is the first page

2    of that.

3              Do you recognize this e-mail?  This document?

4    A.  Yes.

5    Q.  And where did it come from?

6    A.  The annon1204 ProtonMail account.

7    Q.  When is this sent?

8    A.  September 26, 2018.

9    Q.  Who is it sent to?

10   A.  Shane Harris.

11   Q.  And there is multiple exhibits in this, correct?

12   A.  Yes.

13             MR. SCHULTE:  I move to introduce this into evidence.

14             MR. DENTON:  Objection.  Hearsay.

15             MR. SCHULTE:  It is not for the truth, just access of

16   the account.

17             THE COURT:  If not for the truth, Mr. Denton.  Any

18   objection?

19             MR. DENTON:  I think the not for the truth proposition

20   depends on the truth of the statements asserted in it.

21             THE COURT:  I will allow it but, ladies and gentlemen,

22   I will admit it not for the truth, that is to say you can't

23   rely on any statements in this document for their truth, just

24   for the fact that they were said, or more to the point, found

25   on the Proton e-mail account.  With that understanding, it is

1    admitted.

2              (Government's Exhibit 1303-89 received in evidence)

3    BY MR. SCHULTE:

4    Q.  So you testified before that the content of the ProtonMail

5    account did not pertain to anything except me, correct?

6    A.  No, that's not what I said.  I said it mainly dealt with

7    your case.

8    Q.  But if there is e-mails being sent about someone else and

9    other people's case, that would change your determination if

10   anyone else also had access to that account?

11   A.  No.

12   Q.  It wouldn't change your assessment?

13   A.  No, it would not.

14   Q.  So if an e-mail is sent from an account and the e-mail

15   pertains to a completely different individual, you still

16   believe that that person wouldn't have access to it?

17             MR. DENTON:  Objection.

18             THE COURT:  Sustained.

19   Q.  You testified earlier about -- OK, just these two, can you

20   read those two paragraphs, starting with:  The oligarch hired?

21   A.  The oligarch hired two of Trump's primary law firms, the

22   Kasowitz firm and Giuliani's firm, and sent hundreds of

23   millions of dollars to them.  We have the evidence in the form

24   of wire transfers.  The Yahoo hacks in 2014 by the Russian

25   government, the largest breach in history, were started as a

M6U5sch6                    Schlessinger - Cross

1   result of this business dispute.

2   Q.  And then just the last one?

3   A.  Hacks of this person's e-mails account by a Moscow based IP

4   resulted in a false arrest and an American Khodorovsky banished

5   to Siberia and sent to an American gulag.

6   Q.  Are you familiar with the attachments in this e-mail?

7   A.  Yes.  Generally, I have looked at them.

8   Q.  Showing page 41 of the document, you recognize this as

9   something that was written by Mr. Amanat?

10              MR. DENTON:  Objection.

11              THE COURT:  Sustained.

12              You may not rely on any of this for its truth, just

13   for the fact it was found on the Proton e-mail.

14              With that, Mr. Schulte, move on, please.

15   Q.  I will just move to page 55.  Did you investigate -- did

16   you conduct an investigation into this e-mail?

17   A.  I'm not sure what you mean by conduct an investigation into

18   the e-mail.  We reviewed and collected those e-mails and

19   reviewed them.

20   Q.  Was this important in your investigation to identify where

21   these documents would come from?

22   A.  We weren't particularly interested in these documents

23   because it didn't seem to pertain to your case.

24   Q.  Did you try and find out who wrote them?

25   A.  No.

1   Q.  So your focus in reviewing all of the discovery identified

2   from MCC was specific to a relation to me; is that true?

3   A.  Yes.

4   Q.  And you are -- let me rephrase.

5          I am not a part of Omar Amanat's criminal case,

6   correct?

7   A.  No, but you did write a forensic report as part of his case

8   that I'm aware of.

9   Q.  OK, but I wasn't a co-defendant on his case, correct?

10  A.  Correct.

11  Q.  Let's start, move on to Government Exhibit 809.

12         THE COURT:  Mr. Schulte, any estimate of how much more

13  you have left?

14         MR. SCHULTE:  I think it will go through until the

15  end.

16  Q.  You testified about this page, correct?

17  A.  Yes.

18  Q.  This is page 2 in Government Exhibit 809 and the very top

19  part was what you read on direct, correct?

20  A.  Yes.

21  Q.  But this part, this top part was written after the middle

22  section, correct?

23         MR. DENTON:  Objection.

24         THE COURT:  Sustained.

25  Q.  Well, identifying the bottleneck in the middle section

1    there would indicate that you can't write that section without

2    the middle part first, right?

3              MR. DENTON:  Objection.

4              THE COURT:  Sustained.

5    Q.  Let's review that section.  I say how I'm called down at

6    6:00 a.m. to 2:00 p.m., something or other, right?

7    A.  Yes.

8    Q.  And I say I took my last piece, right?

9    A.  Yes.

10   Q.  And I'm feeling great, right?

11   A.  Yes.

12   Q.  I envision my appointment as a cardinal and becoming a

13   young pope as I unify Christianity and the church, right?

14   A.  Yes.

15   Q.  Through your investigation you learn that drugs are

16   smuggled into the MCC, correct?

17             MR. DENTON:  Objection.

18             THE COURT:  Sustained.

19   Q.  And the bottom line, it says:  Took too much and feel sick.

20   Right?

21   A.  Yes.

22   Q.  And through your investigation and search of MCC, you

23   learned that I used drugs while I was incarcerated, correct?

24             MR. DENTON:  Objection.

25             THE COURT:  Sustained.

M6U5sch6                        Schlessinger – Cross

```
1    Q.  You are an FBI investigator, right?

2    A.  Yes.

3    Q.  You wanted to make sense of this page, correct?

4    A.  Yes.

5    Q.  So through your experience and your investigation, what did

6    you determine from that?

7              MR. DENTON:  Objection.

8              THE COURT:  Sustained.

9              Let's move on, please.

10   Q.  The statement that you testified about on direct, it is

11   saying that the criminals who lie to the Judge should be

12   prosecuted, right?

13   A.  Yes.

14   Q.  And if they are not, then I will visit every country in the

15   world, right?

16   A.  Yes.

17   Q.  And to bear witness; which means to give testimony, right?

18             MR. DENTON:  Objection.

19             THE COURT:  Sustained.

20   Q.  As a private citizen you are free to travel to the United

21   Kingdom, right?

22   A.  Yes.

23   Q.  And you can demand an audience with Parliament over there,

24   right?

25   A.  I wasn't aware of that.
```

1    Q.  It won't be granted but you can make the demand, right?

2              MR. DENTON:  Objection.

3              THE COURT:  Sustained.

4              Whoever has a device that just dinged, please --

5    please -- shut it off.  If it goes again I will have my deputy

6    find it and take it.

7    Q.  And $50 billion restitution would put you in the top 10

8    wealthiest people in the world, right?

9    A.  I suspect so.  I don't know for sure.

10   Q.  That's a very high restitution valuation, correct?

11   A.  Yes.

12   Q.  In any case, there is zero likelihood I'm going to leave

13   the MCC to go visit any of those countries on the dates I am

14   writing it, right?

15   A.  That's right.

16   Q.  That's 8/8/2018, right?

17   A.  Yes.

18   Q.  And I have no foreign job openings that I have been hired

19   for, correct?

20             MR. DENTON:  Objection.

21             THE COURT:  Sustained.

22   Q.  Do you find out, by the way, if I do anything to end U.S.

23   occupation around the world?

24             MR. DENTON:  Objection.

25             THE COURT:  Sustained.

M6U5sch6                        Schlessinger - Cross

1   Q.  So on Government Exhibit 806, you testified about this on

2   direct, correct?

3   A.  Yes.

4   Q.  If you need help, ask WikiLeaks for my code; right?

5   A.  That's what it says.

6   Q.  And how long has the WikiLeaks leak been up by the time

7   that this is written?

8   A.  About a year and a half or so.

9   Q.  And my code is up on WikiLeaks, correct?

10  A.  That's what it says.

11  Q.  No, I'm asking you if that's true.

12  A.  I believe parts of it is, yes.

13  Q.  And this could be read seriously, correct?

14  A.  Yes.

15  Q.  It could be read as a flippant statement too, right?  If

16  you need help, ask WikiLeaks for my code; right?

17              MR. DENTON:  Objection.

18              THE COURT:  Sustained.

19  Q.  Through your examination of my notebooks you note sarcasm

20  in there, right?

21              MR. DENTON:  Objection.

22              THE COURT:  Sustained.

23              Mr. Schulte, you will have an opportunity to make

24  arguments to the jury about what inferences they should draw

25  from the notebooks, but since this witness has no firsthand

M6U5sch6                    Schlessinger - Cross

1    knowledge as to what your intentions were, just simply what

2    words appear on the page, please don't ask him questions along

3    those lines.

4                MR. SCHULTE:  All right.

5    BY MR. SCHULTE:

6    Q.  If we could take a look at Government Exhibit 801?  You

7    testified a little bit about this on direct, right?

8    A.  Yes.

9    Q.  And it is titled Malware of the Mind, correct?

10   A.  Yes.

11   Q.  There is an introduction, right?

12   A.  Yes.

13   Q.  Transcripts, right?

14   A.  Yes.

15   Q.  When you read the section about transcripts it is about

16   court transcripts, correct?

17   A.  I believe so.

18   Q.  And search warrants, right?

19   A.  Yes.

20               THE COURT:  Mr. Schulte, just to save us time, I'm

21   going to ask you not to just use this witness to go through an

22   exhibit that's in evidence.  You will have an opportunity to

23   make those arguments to the jury.

24   Q.  OK.  I just wanted to highlight the introduction that I

25   think you have already seen that was -- it was on one of the

1    Wordpress in a government exhibit, right?

2    A.  A version of it, yes.

3    Q.  I will take that down.

4         I think that's Government Exhibit -- one second -- no,

5    it's not.  OK, we are going to come back to that but in this

6    document there was nothing about Russia, right?  Malware of the

7    Mind?

8    A.  I don't think so, no.

9    Q.  That document, too, was about the criminal justice system,

10   right?

11   A.  There are portions of it that are about the criminal

12   justice system.  I don't know if the whole thing is about it.

13   Q.  But you know from -- let me display it again -- from the

14   table of contents that it is at least 133 pages, right?

15   A.  Yes.

16   Q.  And this document was never transmitted, correct?

17   A.  I don't think so, no.

18   Q.  In fact, there are multiple pages in the notebooks that

19   outline a plan to rewrite this Malware of the Mind, correct?

20   A.  Yes.  That's right.

21   Q.  Government Exhibit 809 on page 8, this says:  Secondly, I

22   want to rewrite article no. 10, Malware of the Mind, correct?

23   A.  Yes.

24   Q.  I'm going to show, just to the witness and the parties,

25   what is noted as Defendant's Exhibit 809-2.  Do you recognize

M6U5sch6                    Schlessinger - Cross

1    this?

2    A.  Yes.

3    Q.  And this is the same document that we were looking at

4    before, right?

5    A.  I believe so.

6              MR. SCHULTE:  I move to introduce this page that

7    wasn't included in the other document.

8              MR. DENTON:  Objection.  Hearsay.

9              THE COURT:  Sustained.

10   Q.  I offer it for completeness and not for the truth?

11             THE COURT:  We are almost at the end of the day, we

12   will discuss that after the jury leaves, but for now the

13   objection is sustained.

14   Q.  I would like to show Government Exhibit 812.  This was an

15   e-mail you testified to on direct, right?

16   A.  Yes.

17   Q.  I think you testified about this section starting with

18   probable cause, right?

19   A.  Yes.

20   Q.  And you went through a couple of lines of questions, right?

21   A.  Yes.

22   Q.  OK.  I will take that down.

23             I'm going to show the parties and the witness what is

24   marked as Defendant's Exhibit 812.  Do you recognize this?

25   A.  No.  I haven't seen this e-mail before.

M6U5sch6                    Schlessinger - Cross

1   Q.  You haven't seen the e-mail before, right?

2   A.  That's right.

3   Q.  But do you recognize what this is?

4   A.  Yes.  That looks to be from the same as the previous

5   document.

6           MR. SCHULTE:  I move to introduce this Defendant's

7   Exhibit 812 into evidence.

8           MR. DENTON:  Objection.

9           THE COURT:  Sustained.

10          This is where we will end for the day, ladies and

11  gentlemen.  All right, so as you know, we are not going to be

12  sitting tomorrow or, for that matter on Tuesday just given some

13  pre-existing commitments, so we will break for a very long

14  weekend, longer than I would like but such is life, and it is a

15  holiday after all.  So we will pick up on Wednesday at the same

16  time.

17          A few things.  First of all, I told you I would give

18  you a better sense of where things are.  The good news is I

19  think we are very close to the end of the government's case,

20  which is a pretty significant moment in the case and, as I have

21  told you repeatedly, the government bears the burden at all

22  times so there is no obligation on a criminal defendant in our

23  system of criminal justice to present any evidence

24  whatsoever -- I will give Mr. Schulte a moment to get back to

25  the table.

M6U5sch6                        Schlessinger - Cross

1          So just a reminder, again, the burden is, at all

2    times, on the government.  A criminal defendant in our system

3    has absolutely no burden whatsoever.  He doesn't heed to call a

4    single witness, put in a single exhibit, testify -- anything.

5    At the same time, he has the right to do all of those things if

6    he wishes to do so.  So after the government rests and -- and I

7    expect that will probably happen on Wednesday morning -- we

8    will proceed, or I will find out if Mr. Schulte plans to

9    present a defense case, and if he does, then we will proceed

10   directly into the defense case.  In either event, I do expect

11   that we will probably conclude with the evidentiary portion of

12   the case either sometime next week or perhaps early the week

13   after.  At that point we would proceed to the next phase which

14   is the summations and then my instructions and, after that,

15   your deliberations.

16         So that's where things stand so I hope that's welcome

17   news in the sense that we are certainly within the time frame

18   that I predicted, even with some of the delays that we have

19   had.

20         I do want to remind you -- I said this to you a while

21   back so you may not remember -- I said that when we get to

22   summations, instructions, and deliberations, that I would

23   likely ask you to sit for the full day, until 5:00 p.m. because

24   it becomes harder to manage the schedule given the length of

25   the summations, given the length of the instructions, and once

M6U5sch6                    Schlessinger - Cross

1   you begin your deliberations it is important to make as much
2   progress as you can each day.  So I am just giving you the
3   heads up about that.  Certainly next Wednesday I will be in a
4   better position to tell you when we are likely to get there,
5   but just want to give you a heads up about that and remind you
6   since you may need to adjust things accordingly.  Again, we
7   will have more information next Wednesday but the good news is
8   that we are making pretty good progress and all things
9   considered barring again -- knock on wood -- anything
10   unexpected, that that should be roughly where we are next week.

11          It is going to be a long break.  I hope that you guys
12   have barbecues and other fun things planned for the coming
13   weekend and that you will be with family and friends to
14   celebrate the holiday.  I just want to remind you again, it is
15   very, very, very important that you adhere to my instructions
16   and you don't discuss anything about the case.  You are welcome
17   to say that you are sitting as a juror in a criminal case but
18   don't say anything about it or about any of us, anyone involved
19   in the case.  Just leave it at that.  Don't talk about it at
20   all.  If you happen to be in the presence of anyone who is
21   talking about this case -- not that I expect that will
22   happen -- it is your obligation to immediately withdraw and
23   remove yourself and avoid any information or news about it.
24   And I remind you that if you are exposed to anything, you
25   should bring that promptly to the attention of my staff or

M6U5sch6                   Schlessinger – Cross

1    Ms. Smallman next week.

2           Additionally, don't do any research about the case,

3    don't communicate about the case in any way, shape, or form.

4    And, continue to keep an open mind.  You haven't yet heard all

5    of the government's case and if the defendant has a case you

6    haven't yet heard that.  And, nor have you heard the other

7    things that I mentioned that are coming down the pike so it is

8    still very important that you keep an open mind.

9           With that, I wish you all a very, very wonderful,

10   pleasant holiday.

11          Juror no. 13 has a question.

12          JUROR:  Yes.  Are we still sitting until 4:00 on

13   Wednesday and Thursday?

14          THE COURT:  Good question.  The answer is yes.  Thank

15   you for reminding me.  I meant to say that but yes is the

16   answer.

17          So with that, I wish you a wonderful holiday.  Stay

18   safe.  Stay healthy.  Enjoy your friends and family, whatever

19   plans you have.  We will see you next Wednesday.  Please be in

20   the jury room by 8:45 ready to go and we will proceed at that

21   time.

22          Thank you very much.  You are excused.

23          THE DEPUTY CLERK:  All rise.

24          (Continued on next page)

25

M6U5sch6

1        (Jury not present)

2        THE COURT:  You may be seated.

3        Agent, I very much hoped to be done with your

4   testimony today but we didn't quite get there so you either get

5   a weekend in New York or a trip back to New York.  But, in any

6   case, you need to be here next Wednesday before we start.  I do

7   want to caution or remind you that since you are on

8   cross-examination you shouldn't discuss, with anyone from the

9   prosecution team, anything relating to the substance of your

10   testimony.  Logistics, that sort of thing is fine, but don't

11   discuss the substance of your testimony.

12        Understood?

13        THE WITNESS:  Understood, your Honor.

14        THE COURT:  With that, you are excused.  Have a

15   wonderful holiday yourself and see you next Wednesday.

16        THE WITNESS:  Thank you, your Honor.

17        (witness steps down)

18        THE COURT:  I have a couple exhibits we need to

19   discuss, the first is Defendant's Exhibit 410.  There is one

20   potential issue with it which is it makes reference to the

21   child porn charges and, at a minimum, I would think that that

22   portion would need to be redacted.  But, Mr. Denton, I don't

23   know precisely what you mean when you say no objection to the

24   metadata but objection to the content.

25        MR. DENTON:  So, your Honor, because of the way the

1    exhibit is there is kind of two components to it, there is the

2    portions that I was intending to describe as metadata that sort

3    of identifies posts, links, whether they were made, things like

4    that.  There is also reams of the defendant's own statements

5    which are obviously hearsay and inadmissible and I think that

6    we can solve the child pornography problem by either excising

7    or redacting the content and if he wants to offer the sort of

8    record that shows that posts were made and when, that's fine,

9    but his own statements are hearsay and inadmissible.

10           THE COURT:  Mr. Schulte?

11           MR. SCHULTE:  The exhibit was not introduced for the

12   truth but the government spent substantial time of their direct

13   on the articles, page after page after page was talking about

14   the articles and what was released, what information was

15   published, what information was disseminated from the MCC.  So

16   I think it -- and the government has basically highlighted or

17   took a couple portions of several of the articles that they

18   wanted to show and have been read to the jury.  But I think, as

19   far as the government's case goes with information war and

20   attempts to disseminate classified information, I think the

21   point is to show that information was disseminated from MCC and

22   that this is part of the -- these are the only documents that

23   were released, there was no Twitter, there are no Tweets, and

24   the articles are continually referenced in the government's

25   direct.

M6U5sch6

1           THE COURT:  I understand all of that but how does that

2     make this admissible?  In other words, I don't expect the

3     government will get up and say that you tweeted anything or the

4     like.  I think their theory on those fronts is that it was an

5     attempt.

6           MR. SCHULTE:  Yes.  So I think the point is that

7     that's exactly -- the government is going to be on and on -- is

8     going to be going on and on about, during summation about

9     information war and this -- and an attempt to release

10    classified information from prison but the CIA's review

11    determined that no information from the electronic accounts

12    contained any classified information with the exception to the

13    Hickok e-mail which is the dispute of whether or not that

14    information already released as public.  So as far as the

15    Hickok charge goes --

16          THE COURT:  Mr. Schulte, just try to focus on this

17    exhibit.  What about this exhibit is relevant or admissible and

18    for a non-hearsay purpose?

19          MR. SCHULTE:  Introducing it to show what Wordpress

20    received.

21          THE COURT:  Why is that relevant?  In other words, the

22    government has introduced one thing that Wordpress received.

23    Obviously they're not going to argue that about anything else

24    that Wordpress received because it is not in evidence.  What

25    reason are you offering it into evidence?

1      I need a purpose here, not just a truism about what

2   this exhibit is.

3           (Defendant and standby counsel conferring)

4      MR. SCHULTE:  The purpose is to show that what was

5   sent to Wordpress was just about the criminal justice system

6   and it was not an intent to engage in an information war or an

7   attempt to disclose NDI or an attempt to disclose classified

8   information.

9      THE COURT:  OK.

10      MR. SCHULTE:  I think it goes to the willfully -- part

11   of it goes to the willfully element and -- I mean, essentially

12   if the electronic accounts show what was actually sent and

13   there was no classified information and something was sent, I

14   think that is what makes it relevant and admissible.

15      THE COURT:  So is it for the fact that it was sent to

16   Wordpress, not the truth of any matters asserted in it?  Is

17   that what you are trying to say?

18      MR. SCHULTE:  Yes.

19      THE COURT:  Mr. Denton, why would it not be with that

20   limitation?

21      MR. DENTON:  Your Honor, I think it is black letter

22   law that evidence of the absence of criminal activity is not

23   admissible as evidence pertaining to the defendant's intent on

24   another occasion.

25      THE COURT:  Let me stop you.  Agreed.  So stipulated.

M6U5sch6

1     I think the argument here, if I understand it

2  correctly, would be, in essence, to show that the entirety of

3  what was sent to Wordpress in an effort to put in context what

4  the government introduced into evidence to demonstrate that the

5  point wasn't to engage in an information war or to reveal

6  anything of a sensitive nature, but rather that it was part of

7  his agitation about his criminal case and how he has been

8  treated and so forth.

9     MR. DENTON:  Your Honor, I think they are obviously

10  separable.  As the Court already noted, we are not going to

11  argue that the Wordpress articles were a component of the NDI

12  that was released or that is alleged to have attempted to have

13  been released.  Part of the reason why we went through some of

14  the Wordpress stuff is to verify the use of the phone, to show

15  the corroboration between statements in the defendant's

16  notebooks and in subsequent actions.  So the fact that he said

17  he would take certain actions with respect to the Wordpress,

18  and did, is evidence that the notebooks reflected a plan.  We

19  are not going to argue that the Wordpress articles were NDI or

20  constituted some part of the NDI.  And so I think they fall

21  into that SCARPA category of actions on separate occasions that

22  are not necessarily informative of one another.

23     THE COURT:  Mr. Schulte, anything else you want to say

24  on this?

25     MR. SCHULTE:  Yes.

M6U5sch6

1        I think it is important to the defense case especially

2   because of the attempted transmission charge and the

3   substantial step allegations that the government is going to

4   argue significantly that because this stuff was written down in

5   a notebook that this constituted a substantial step or that

6   there was some plan to release this information.  So the fact

7   that the only -- so putting the government's case into context

8   and showing that that's not the case and that we didn't --

9   there was no following of any plan that the government is

10  alleging is critical to the defense.

11       THE COURT:  I'm going to reserve judgment.  I will

12  give you a ruling, if not over the weekend, then at the

13  beginning of trial.  Why don't you prepare three versions of

14  the exhibit; one, which is -- well, two versions, one which

15  redacts all of the content and just has the metadata; the other

16  of which just redacts the child pornography references but that

17  otherwise leaves the contents as is and I will circle back to

18  it.

19       The other exhibit that I said we would discuss is

20  809-2 which is another portion of the notebooks and I think

21  references Malware of the Mind -- or rewriting Malware of the

22  Mind.  Mr. Schulte offered it for completeness.  Do you want to

23  elaborate on that?  It seems to me an entirely separate entry

24  in what is essentially a diary.  How is that necessary to

25  understand the separate entry?  It seems like a separate

M6U5sch6

1   writing.

2              (Defendant and standby counsel conferring)

3   BY MR. SCHULTE:

4   Q.  I think there is two issues.  I think there is completeness

5   based on some of the documents from the same day that are bled

6   over but I need to double-check and check that.  I think the

7   second point is to show -- is to refute the government's claim

8   of an attempted transmission just because a document is

9   written.  There is no -- the government's substantial step is

10  going to say well, he wrote this document, therefore that's a

11  substantial step.  So I think it is very critical to show

12  that --

13             THE COURT:  So first of all --

14             MR. SCHULTE:   -- it goes to show state of mind as

15  well.  And the fact that documents can be rewritten and just

16  because it is in one state on one day it doesn't mean that's

17  the final version or that's some version that is intended to be

18  released.

19             THE COURT:  First of all, I think drafting a document

20  is a substantial step.  Second of all, the fact that you

21  intended to rewrite it doesn't change that.  Third of all,

22  there is evidence in the record already that you intended to

23  rewrite it and this is just cumulative of that evidence.

24  Fourth of all, its relevance for state of mind turns on it

25  being true and you can't offer your own statement because it's

M6U5sch6

1    hearsay.

2            So, for all of those reasons, it is inadmissible

3    unless there is a rule of completeness issue.  But, since it is

4    a different date entry, unless you can point me to something

5    that is necessary to consider in conjunction with in fairness,

6    it is not coming in.  So, I think that resolves that.

7            I will say, seeing Agent Schlessinger's testimony and

8    putting together all of the relevant pieces, just an editorial

9    note that I think that my conclusion about the Malware of the

10   Mind document not being privileged, I feel even more sure that

11   that was the correct decision.  It seems to me, putting

12   together all the evidence that intentioned that Mr. Schulte

13   could not carry his burden of showing that that was intended to

14   be shared only with counsel and on a confidential basis it

15   seems quite clear that, putting all of the evidence together,

16   that it was intended for dissemination and for that reason it

17   obviously wasn't a confidential or privileged document.

18           Anything else that we need to discuss?  Otherwise, I

19   have a couple matters on after this that I am already running

20   late for.

21           Mr. Denton?

22           MR. DENTON:  Your Honor, on Exhibit 410 we recognize

23   the Court has reserved judgment on that.  I want to put sort of

24   a fourth version in the hopper.  At least in the version we are

25   looking at, it is a 94-page 35000-word document.  To the extent

M6U5sch6

1    that the only thing the Court deems admissible is sort of the

2    fact that there were postings that did not contain NDI, we

3    would think it might be more appropriate to stipulate to that

4    fact rather than put, essentially, a giant manifesto in

5    evidence not for the truth.

6           So I want to put that option out there given the scope

7    of the document.

8           THE COURT:  I don't think that that's appropriate and

9    I think you are misunderstanding the import of it.

10          I don't think it is SCARPA.  The fact that there is no

11   NDI in here is what Mr. Schulte can use it for.  I agree with

12   you on that.  What I am thinking about is whether he can put it

13   in just to show that it is, in essence, the entire purpose of

14   the Wordpress document was, you know, to issue a manifesto to

15   the world about his unfair treatment and it was not part of an

16   information war with any intention of releasing anything

17   classified or sensitive or anything of that sort.  That's why I

18   think -- and if done for that, it would not be for the truth.

19   In other words, it doesn't matter whether he is being

20   mistreated by the FBI or not.  That's not the issue in this

21   trial and the jury will be instructed that they should not rely

22   on it for its truth but it will be for, essentially, what the

23   entirety of it is, the fact that he wrote it, not for the truth

24   and content of it, per se.

25          MR. DENTON:  Understood, your Honor.  I think at that

M6U5sch6

1    point, even if we get past the hearsay and the not for the

2    truth problems, then there is a sort of looming 403 problem in

3    the sense that it is a massive document that is essentially an

4    manifesto offered for a comparatively small point.  I think at

5    that point it is risk of confusing the jury and potentially

6    inflaming them if people decide to sit down and to read his

7    entire screed, it significantly outweighs the fairly limited

8    value it serves.  But, we recognize the Court has reserved on

9    this so I don't need to belabor the point now.

10        THE COURT:  Unless I am looking at something

11   different, what I opened as Defendant's Exhibit 410 -- it

12   opened for me in Internet Explorer, for some reason and I

13   didn't even think Internet Explorer existed anymore -- and it

14   does not appear to be 84 pages.  So, I don't even know if I am

15   looking at what is being offered or not.  But, let me add

16   another option, which is if the government identifies any

17   particular content in here that it thinks should be excluded

18   under 403, then you are certainly welcome to make that proposal

19   as well in the event that I do decide that it should come in in

20   more or less its entirety with the child porn redacted.  And if

21   you think that there is something else that should be redacted

22   pursuant to 403, I will consider that.  All right?

23        MR. DENTON:  We will make sure we are looking at the

24   same thing and take a look at it over the weekend, your Honor.

25        THE COURT:  Perhaps one or both sides can submit to my

M6U5sch6

1    chambers what we are talking about to make sure that we are all

2    on the same page and looking at the same thing.

3         MR. SCHULTE:  I just wanted to note, I think the

4    output -- you were asking the witness earlier, the output that

5    they provide is not very good so I don't know what the

6    government wants to do.  There could be other sources or other

7    ways to display the data or some way -- whatever.  I mean, we

8    can work out with the government how to change it so it is

9    displayed better or whatever.

10        THE COURT:  Well, that's a separate issue.  You are

11   certainly welcome to discuss it with one another and if there

12   is a better way to present it to the jury and everybody is in

13   agreement, I would certainly be open to that.

14        Mr. Denton?

15        MR. DENTON:  The only other issue we wanted to raise

16   was we wanted to flag a concern about the last exhibit that the

17   defendant attempted to offer, Defendant's Exhibit 812.  The

18   Court sustained the objection to it but there is sort of a

19   looming issue there that we wanted to note.  That's an e-mail

20   between the defendant and a member of his defense team at

21   Federal Defenders.  We received it as a marked exhibit, no

22   issue there, but I'm not entirely sure that the defendant has

23   contemplated the privilege waiver that it entails or that might

24   be involved if he goes further down this road.  So we wanted to

25   alert him and the Court to the fact that if there are attempts

M6U5sch6

1    to introduce this e-mail or other communications with the

2    Federal Defenders, I think we are going to need to seek a

3    ruling and potentially take additional investigative steps

4    based on the waiver of privilege.

5          THE COURT:  Number one, I sustained the objection.

6    Number two, I would think that if it is a waiver, it has

7    already been waived because he disclosed it to you and to me.

8    So you can decide what, if anything, to do with that.  If it

9    doesn't go any further maybe we will just leave it there, but.

10         MR. DENTON:  I think our hope is to leave it there and

11   so we are just flagging that if it recurs then we are not going

12   to leave it there.

13         THE COURT:  Mr. Schulte?

14         MR. SCHULTE:  Yes.  I mean, this was an exhibit that I

15   wanted to bring to the Court's attention as well.  I think the

16   government introduced an exhibit that has a scanned copy of

17   this information so this information is already -- the

18   government already has it and they provided it in their own

19   exhibit that has this exact same document -- information in

20   there.

21         The point is I think it is important to show that this

22   document was written and sent to my defense team and so that

23   really goes against the government's argument that this was

24   somehow written with the intent to willfully disclose

25   classified information.  So that's why I think it is relevant

M6U5sch6

1   and admissible, because it shows when and to whom the document

2   is written to.  And the purpose, obviously, is not to disclose

3   classified information but to help with the defense.  The fact

4   that later on it is disclosed publicly obviously waives the

5   privilege but it doesn't change the initial intent of the

6   document.

7           THE COURT:  Why is the initial intent relevant?  The

8   fact that you later shared it with a Washington Post reporter

9   is what the government is relying on.  The fact that you

10  earlier wrote it for your lawyer doesn't seem to be relevant to

11  that.

12          MR. SCHULTE:  Well, I think it is relevant because it

13  shows that when writing this document there is no intent to

14  willfully disclose classified information because this is a

15  privileged document, this is to -- with respect to the defense.

16  The fact that --

17          THE COURT:  But you sent it to a reporter.

18          MR. SCHULTE:  Right, but the first e-mail, when it was

19  initially sent it wasn't sent to a reporter, right?  It was

20  sent to a reporter after the fact.

21          THE COURT:  But it doesn't matter what your intent was

22  when you first drafted it, it is the fact that you sent it to

23  the reporter.  Now whether it has anything classified or NDI in

24  it is a separate question but I don't think there is any

25  relevance to the fact that in the first instance at some date

M6U5sch6

1      prior to when you decided to send this to a Washington Post

2      reporter that you happened to draft it for your defense team.

3              What am I missing here?

4              MR. SCHULTE:  Because the state of mind when it is

5      being written is what is the important part because this is

6      written with the state of mind to help the defense.  And if it

7      is shared later on with someone else, you can't change what the

8      state of mind or what the intent of the document was.  This was

9      initially supposed to be for your defense and that's what you

10     are thinking when you are writing it.  I think that's what's

11     relevant.  Even if you share it with other people, you are not

12     thinking -- does that make sense or that doesn't make sense?

13             THE COURT:  I don't think it makes sense.

14             Mr. Denton?

15             MR. DENTON:  The willful element of 793(e) modifies

16     the transmission of the information and not the drafting of the

17     document so I think it is not relevant to that at all.

18             THE COURT:  Well, I will ponder it and -- I will

19     ponder it but I also do think that if you go down this path

20     further, Mr. Schulte, you are certainly at significant risk of

21     waiving privilege and opening up to examination and discovery

22     what communications you had with your counsel since it may be

23     necessary to understand in context.  So be forewarned and, in

24     any event, I have sustained the objection for the moment.

25             Anything else that we need to discuss?

M6U5sch6

1          MR. DENTON:  Not from the government, your Honor.

2          THE COURT:  Mr. Schulte?  Mr. Schulte?

3          MR. SCHULTE:  No.

4          THE COURT:  So I am expecting a classified submission

5     from the government with a list of witnesses and what

6     categories they fall into and so forth.  If there is any

7     material developments with respect to the scope or extent of

8     the defense case over the weekend, I would appreciate a heads

9     up just so I can plan accordingly, but certainly on Wednesday

10    morning I expect a pretty reality-based estimate of how long

11    the defense case would be which probably includes the question

12    of whether you are likely to testify, Mr. Schulte, recognizing

13    that you may not make the ultimate decision on that score until

14    you have had other witnesses testify.  But I just want to have

15    an understanding of the schedule and how next week is likely to

16    go.

17          With that, I will stay on the bench because I have

18    another matter that I need to get to right away so I would ask

19    you guys to clear out as quickly as you can.  I wish you all a

20    very pleasant holiday and weekend and will see you next

21    Wednesday morning.

22          Thank you.

23          MR. DENTON:  Thank you, your Honor.

24          (Adjourned to July 6, 2022 at 9:00 a.m.)

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   CARLOS MANUEL BETANCES LUNA MERA

 4   Direct By Mr. Lockard  . . . . . . . . . . .1749

 5   EVAN SCHLESSINGER

 6   Direct By Mr. Denton . . . . . . . . . . . .1812

 7   Cross By Mr. Schulte . . . . . . . . . . . .1864

 8                      GOVERNMENT EXHIBITS

 9   Exhibit No.                              Received

10   1303-39A   . . . . . . . . . . . . . . . .1782

11    806  . . . . . . . . . . . . . . . . . . .1821

12    809  . . . . . . . . . . . . . . . . . . .1823

13    823  . . . . . . . . . . . . . . . . . . .1828

14    812, 1303-6, 1303-44, and 1303-47 . . . . .1836

15           through 1303-50

16    801  . . . . . . . . . . . . . . . . . . .1844

17   3011  . . . . . . . . . . . . . . . . . . .1879

18   1303-89  . . . . . . . . . . . . . . . . . .1884

19                      DEFENDANT EXHIBITS

20   Exhibit No.                              Received

21    814  . . . . . . . . . . . . . . . . . . .1770

22    802  . . . . . . . . . . . . . . . . . . .1880

23

24

25
</pre>