M765sch1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                      17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6                    Defendant.
                                             Trial
7   ------------------------------x

8                                            New York, N.Y.
                                             July 6, 2022
9                                            9:05 a.m.

10  Before:

11
                         HON. JESSE M. FURMAN,
12
                                             District Judge
13                                           -and a Jury-

14                         APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  DAVID W. DENTON JR.
17       MICHAEL D. LOCKARD
         Assistant United States Attorneys
18

19  JOSHUA A. SCHULTE, Defendant *Pro Se*

20

21  SABRINA P. SHROFF
    DEBORAH A. COLSON
22       Standby Attorneys for Defendant

23  Also Present:  Charlotte Cooper, Paralegal Specialist

24

25

M765sch1

1          (Trial resumed; jury not present)

2          THE COURT:  You may be seated.

3          Good morning.  Welcome back.  I hope everyone had a

4   good long weekend, happy 4th of July.  Last I heard a couple

5   minutes ago we were still missing one or two jurors, but in the

6   meantime I think we have various items to cover.  So let me

7   start with the evidentiary issues that I think I had reserved

8   on and said I would circle back on.

9          First with respect to defense Exhibit 809-2, my ruling

10  remains on that, that is to say that I think that that exhibit

11  is not admissible for the reasons that I previously gave,

12  namely it's hearsay and the arguments that Mr. Schulte asserts

13  for its relevance depend on the truth of the statement, that is

14  his own statement, nor do I think it is admissible pursuant to

15  Rule 106 given that it is a discrete writing and it is not

16  necessary to complete the other exhibit.

17         I also adhere to my ruling on Defendant's Exhibit 812.

18  It is not admissible because it is not relevant to any point at

19  issue in the trial.  In particular, it is the transmission of

20  national defense information, not the initial writing of that

21  information that is the crime and must be willful, so in that

22  regard, as I said on Thursday, the fact that in the first

23  instance Mr. Schulte may have drafted a portion of the document

24  that he later shared with the Washington Post reporter or

25  counsel is not relevant to his intent at the time that he

M765sch1

1   actually shared it with the Washington Post reporter.

2            Again, I note that Mr. Schulte may already have waived

3   attorney-client privilege by sharing, disclosing that document

4   to the government and putting it at issue, but it doesn't sound

5   like the government seeks to enforce it on the basis of what

6   has happened already.  Certainly, if he were to put it into

7   evidence, if there were any basis to put it into evidence, I

8   think it would clearly constitute a waiver.

9            Finally, I do think that some version of Defendant's

10  Exhibit 410 -- that is, the Wordpress document -- is

11  admissible.  The government raised the issue of the content of

12  the articles and admitted one portion of them.  I think that to

13  put that in context and make clear what it was about, what

14  Mr. Schulte's intentions were that he should be allowed to put

15  the remainder of what he posted or attempted to post on

16  Wordpress into evidence, it would not be for the truth, so for

17  that reason there is no hearsay issue and it would be subject

18  to any redactions for 403 issues.  Obviously, the child

19  pornography reference would need to be redacted and I invited

20  the government to identify any other Rule 403-type issues.  I

21  also want to make sure we are all on the same page in terms of

22  what that exhibit actually is given that it sounded like what

23  you guys were looking at might be different from what I was

24  looking at.

25           So, bottom line is that's where I stand on those three

M765sch1

1    exhibits.  Anything to discuss on those, and especially

2    Defendant's Exhibit 410?

3           MR. DENTON:  No, your Honor; except to say I think our

4    understanding had been that given that it was the defendant's

5    exhibit and sort of the prejudice to him that he was going to

6    propose redactions in the first instance.  We discussed that --

7    or I should say Mr. Lockard discussed that with him yesterday

8    during a phone call.  I apologize if we misunderstood the

9    Court's instruction on that but I think collectively we should

10   be able to put something together consistent with the Court's

11   ruling on the exhibit overall that addresses any of those

12   issues.

13          THE COURT:  Mr. Schulte?

14          MR. SCHULTE:  Yes.  I spoke with Mr. Lockard yesterday

15   about who it was that was going to review that, and the

16   government's position was that the Court asked me to do that so

17   I have done that and I have a couple updates for the government

18   and I can provide that to the government.  What I have done is

19   I have just redacted out the content of the two posts that

20   detailed both the child pornography charges and the sexual

21   assault charges, they were both in there so I removed the

22   contents of those, and then have that as 410-A, I believe, and

23   I can provide that to the government to review.

24          THE COURT:  Great.  Do you have that here and can you

25   provide that to them now?

M765sch1

1          MR. SCHULTE:  Yes.  I just -- if I can get the blank

2     CD from them or something I can just give it to them and they

3     can review it.

4          THE COURT:  Great.  So we will do that.  Anything else

5     on those issues?  I would assume not?

6          Mr. Schulte, you were supposed to advise me by I think

7     yesterday if you had any objections with respect to the

8     government's proposed excerpts of Government Exhibit 1703-1 and

9     1704-1 that were offered under Rule 1006.  I didn't receive

10    anything so I assume you have no objection.  Is that an

11    accurate assumption?

12         MR. SCHULTE:  That's correct.

13         THE COURT:  So I will admit those, happy to do that --

14    do you want to offer them, Mr. Denton, so that the record is

15    clear?  How do you want to handle this?

16         MR. DENTON:  I think that makes the most sense, your

17    Honor.  We can do that at the start of the day or we can wait

18    until Special Agent Schlessinger is done or whenever the

19    government rests.  Whatever seems most convenient.

20         THE COURT:  I leave it to you insofar as we are in the

21    middle of cross so Mr. Schulte has the floor, so to speak, so

22    why don't you wait until the agent is done and you can offer it

23    at that point.

24         MR. DENTON:  That makes sense, your Honor.

25         THE COURT:  Mr. Schulte, you were also supposed to

M765sch1

1   review the government's exhibit list to see if you agreed with

2   the government's view on what has been admitted or if you have

3   any corrections.

4           MR. SCHULTE:  As far as my review goes it seems

5   accurate, but I have also asked standby counsel to do reviews,

6   too, and if there is anything that we find we will raise it

7   with the Court.

8           THE COURT:  Great.  So sooner rather than later.  So

9   rush until the case is to be submitted to the jury but I want

10  to mention I want to make sure we are all on the same page as

11  to what is in evidence and gather those and submit them to the

12  jury.  I would ask you guys to speak with Ms. Smallman and find

13  out the best way to do that and coordinate with her about

14  getting it done.

15          Any update on the transcripts?  Are we up-to-date on

16  the transcripts?  Is there any open transcript items, that is

17  to say, redactions?

18          MR. DENTON:  Your Honor, I don't think that there are

19  any substantive issues.  We have no additional proposed

20  redactions.  The Court has addressed the couple we have already

21  submitted.  I'm not entirely sure where we are procedurally in

22  terms of finalizing them, making them public ensuring that all

23  of the orders are implemented, but we will confer with the

24  court reporters and make sure that that's all taken care of.

25          THE COURT:  I think in theory the aim is to have them

M765sch1

1    made public no later than the night after the trial day and

2    since we had a couple days off we should be up-to-date on that

3    so let's make sure we are.

4              I got the government's letter identifying the

5    witnesses that Mr. Schulte may call as part of his case.  I

6    take it we are down to five CIA witnesses from that letter.  Is

7    that an accurate assumption?

8              MR. DENTON:  Yes, your Honor.

9              THE COURT:  And they're all present?

10             MR. DENTON:  Yes, your Honor.

11             THE COURT:  Anything to discuss on that front,

12   recognizing that we need to be careful with what we say in this

13   setting?

14             MR. DENTON:  Yes, your Honor.  There are a couple of

15   things we wanted to raise with respect to the defense

16   witnesses.

17             First, with respect to the CIA witnesses in

18   particular, now that we have finalized the list and reviewing

19   again the defendant's proffers with respect to them, we wanted

20   to emphasize a couple of concerns that we have previously

21   expressed in our letter.  The first and most significant

22   applicable to all of them is that since none of those witnesses

23   are testifying as experts, we would object to them being asked

24   to express any opinions or being posed hypothetical questions

25   that go beyond their personal knowledge.  So, again, I think

M765sch1

1    that's a generally applicable concern.

2           With respect to three of the witnesses, Sherry Hart,

3    Cheng, and Philip, it is not clear to us the non-hearsay basis

4    of personal knowledge they have for the facts that the

5    defendant has proffered and so, again, we will take it as it

6    comes but I expect that the government may object to questions

7    for which the defendant does not lay an appropriate foundation

8    of personal knowledge for those witnesses.

9           THE COURT:  So, Mr. Schulte, it sounds like Mr. Denton

10   is just flagging these and not proposing or asking for any

11   relief at the moment.  In that sense I'm not sure there is much

12   to be discussed, but anything you wish to say?

13          MR. SCHULTE:  No, not on this.  I just had two other

14   issues.

15          THE COURT:  OK.  What are they since we do now have

16   all 14 jurors.

17          MR. SCHULTE:  Well, the first one is whether the

18   witnesses that are here, if they're willing to speak with

19   standby counsel.

20          THE COURT:  I don't know the answer to that.

21          Is there some way to find that out, Mr. Denton?

22          MR. DENTON:  We can ask.  If the Court wants us to do

23   that now we can do that right now.

24          THE COURT:  OK.  Does that need to be one of you or

25   can some other representative from the government go inquire

M765sch1

1    while we are taking care of the remaining witnesses?

2              MR. DENTON:  I think we can have someone else pose the

3    question.

4              THE COURT:  The question would be:  Standby counsel

5    would like the opportunity to speak with you, before calling

6    you to the stand.

7              I don't know if there is anything else you wish to

8    convey, Mr. Schulte or standby counsel.  I am trying to craft

9    the message here.

10             MR. SCHULTE:  I think standby counsel would just like

11   to say -- they would like to speak with them before they get on

12   the stand.  It may impact a decision on whether we actually end

13   up calling them.

14             THE COURT:  Can I actually back up a second?

15             Mr. Denton, just any objection to one of standby

16   counsel going with the representative of the government and

17   actually putting the question directly?  I mean, they're

18   cleared.

19             MR. DENTON:  Substantively no, your Honor.  I think

20   there is a -- I don't know exactly how the CISOs and the

21   marshals have set up the security for who can go in and who can

22   go out.  I think if we can have a moment, your Honor, I think

23   we can probably make sure that that's OK.

24             THE COURT:  OK.  Why don't you do that.  I think that

25   would be a more direct and appropriate way of handling it, if

M765sch1

1   we can.

2               MR. DENTON:  OK.

3               THE COURT:  Before we do that, Mr. Schulte, what is

4   your last issue?

5               MR. SCHULTE:  There is two issues; one is a very minor

6   issue I just wanted to raise for the Court.  The government

7   showed Schlessinger five exhibits that are parts of article 8

8   that was published and it was approximately 80 percent of that

9   article, so I think due to the rule of completeness that the

10  whole thing should come in and I would try to introduce that

11  through Schlessinger.

12              THE COURT:  Can you point me to the actual exhibit

13  that we are talking about?

14              MR. SCHULTE:  Yes; 820-419, 820-420, 820-423, 820-424,

15  and 820-428.  Those were the screenshots taken by Mr. Betances

16  of that article and it is about 80 percent or so of it.

17              THE COURT:  What is the portion that you would propose

18  to offer?

19              MR. SCHULTE:  I just propose to -- I have Defendant's

20  Exhibit 408 that is the entire article, I think it is five or

21  six pages, it is easier to read and it shows the whole thing

22  complete.

23              THE COURT:  Mr. Denton?

24              MR. DENTON:  So I think there is two issues, your

25  Honor.

1          First of all, the rule of completeness is not a

2     percentages question.  The defendant has to make a showing that

3     the omitted portion is necessary to avoid sort of

4     misunderstanding of the admitted portions.

5          Secondly, I think to the extent that the exhibits that

6     the government showed Mr. Betances were screenshots that he

7     took and that reflect that sort of particular iteration or

8     image, offering some different exhibit that the defendant

9     contends represents the text is not actually completing the

10    exhibit.  There is no sort of omitted portion from the

11    screenshots that he is making the assertion that he is saying

12    there are other parts of another document that are relevant.

13    I'm not sure that comes in appropriately under 106.

14          THE COURT:  Putting aside the first point, I am

15    inclined to agree with the second and certainly think that the

16    agent isn't in a position to confirm or lay a foundation that

17    this is the same document that is reflected in the screenshot,

18    so in that sense I'm not sure that you can satisfy the

19    requirements of the rule of completeness, putting aside whether

20    portions of this would otherwise be admissible under the rule.

21          MR. SCHULTE:  Your Honor, so I think these all came in

22    through Schlessinger so it starts, the very first one is a

23    screenshot of the very beginning of it, the name title

24    Presumption of Innocence Origins.  The government went into a

25    lot of detail about this on direct and so just showing the

M765sch1

1    government --

2              THE COURT:  Mr. Schulte, I think the point is if there

3    is a screenshot that Mr. Betances took in the jail that wasn't

4    offered by the government that is part of -- that would be

5    necessary to complete the portions that were admitted that

6    would be one thing, but you are proposing to offer a completely

7    different document that bears resemblance to the document that

8    is in the screenshots but there is no confirmation, in other

9    words there is no way of knowing that this is in fact the same

10   document, whether changes were made to it after the

11   screenshots, whether it reflects the same document as depicted

12   in the screenshot.

13             So given that, you are basically extending the rule of

14   completeness to an entirely separate document that may or may

15   not even be the same document.

16             MR. SCHULTE:  I mean, I think the issue is -- I think

17   there is a separate issue under Rule 403 that it will confuse

18   the jury because they will understand that this is one

19   document.  You know, they showed -- the screenshots are

20   actually from the document that was published on Wordpress so I

21   think that's one thing, but the second thing is the six or

22   seven different screenshots, it is confusing and misleading to

23   the jury as to what this actually is so --

24             THE COURT:  Mr. Schulte, Rule 403 is a rule of

25   exclusion, it is not a rule of admission.  It doesn't get you

M765sch1

1    over the hump to admit another document.  It was a ground to

2    object to those documents being offered but there was no

3    objection when they were offered so 403 doesn't apply, and for

4    the reasons I have stated I don't think 106 applies.

5             Anything further?

6             MR. SCHULTE:  No.  I guess nothing else on that issue

7    then.

8             THE COURT:  Anything else that we need to take up

9    before we get the jury?

10            MR. SCHULTE:  Yes.  One final issue is the proposed

11   redactions.

12            So I just wanted to raise the Court's attention that I

13   just was able to see the June 28th proposed redactions and they

14   redact the very key point of the defense that I intended to

15   bring out on summation.  So throughout this time the government

16   hasn't sent their proposed redaction or I haven't seen any of

17   this until just yesterday.  You know, for the first time I am

18   reviewing this.

19            There is two different issues.  One is to the degree

20   that the government is saying things I am saying are

21   classified, it is important for me to know so I don't say these

22   same things again and cause issues but the most important thing

23   is a lot of these redactions that they proposed specifically at

24   1403 to 1404, it redacts out a key point I need to bring out on

25   summation to undermine the government's -- one of the elements

M765sch1

1    to the count.  So I just wanted to raise that to the Court's

2    attention and I don't know how to address this now.

3          THE COURT:  The short answer is we don't need to

4    address it now, namely before the jury.  It certainly seems

5    like something we need to discuss before summations but we have

6    some time to do that so let's table that and discuss it later.

7          MR. DENTON:  One other issue with respect to defense

8    witnesses, your Honor.

9          In addition to the five CIA witnesses, we understand

10   that the defendant still intends to call Ms. Sotnick, the

11   former paralegal from the Federal Defenders.  I think in light

12   of where we are now, we want to renew our objection to the

13   defendant calling her to testify.  We have been provided with

14   no 26.2 material, the defendant has represented there is none,

15   so we are shooting a little bit in the blind as far as her

16   testimony but it strikes us that one of two things is true,

17   either of which would pose problems for her testifying.  Either

18   the defendant intends to call her exclusively for the purpose

19   of saying that she received a copy of the malware document from

20   him at some point in time and provided it to the Federal

21   Defenders, at which point I think if that is what it is limited

22   to, her testimony would have the same problem as Defendant's

23   Exhibit 812.  It is not clear what relevance that would have to

24   anything.  To the extent that he intends to call her to ask any

25   more substantive questions about his interactions with the

M765sch1

1    Federal Defenders about that document, we then think that we

2    are back in the territory of back-dooring in the advice of

3    counsel defense that the defendant has expressly foresworn.

4    And so we think under either scenario, whatever the defendant

5    intends to do with her, it is not clear that there is an

6    admissible purpose for her testimony and so we would object to

7    that.

8            THE COURT:  I assume that we are going to break after

9    the government rests, at which point we have various things to

10   discuss.  I put out an order this morning raising a few issues

11   that you should be prepared to discuss.  I think that is

12   another one to add to the list so let's table it until then.

13           Anything else other than the question of whether

14   standby counsel can go with the representative of the

15   government to speak with the witnesses?

16           MR. DENTON:  Not from the government, your Honor.

17           THE COURT:  Why don't you find out the answer to that

18   question, let's get the agent on the stand, and then we will

19   get the jury up in a moment.

20           (pause)

21           THE COURT:  Mr. Denton?

22           MR. DENTON:  Your Honor, we have conferred with

23   everyone and we will be able to make that work, so whenever the

24   Court would like us to make time for that it is all set up.

25           THE COURT:  Mr. Schulte, standby counsel, would you

M765sch1

1    like to do that now while we are finishing up cross-examination

2    of the testimony of the current witness?  I would like to

3    minimize delays during the day so I assume we will take a break

4    after the government rests to discuss various things but after

5    that break I'm expecting the defense case to proceed, if there

6    is a defense case.

7               MR. SCHULTE:  I think we will wait during the break

8    and try and do all of that.

9               THE COURT:  Meaning one of standby counsel will be

10   absent during whatever discussion we have during the break?  Is

11   that the plan?

12              MR. SCHULTE:  Yes.

13              THE COURT:  Great.  All right.  I will have the jury

14   come up and we will get going.

15              (Witness resumes the stand)

16              THE DEPUTY CLERK:  Jury entering.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may be seated.

3           Welcome back, ladies and gentlemen.  I hope you had a

4    wonderful and very long weekend.  Happy 4th of July.  Those of

5    you who traveled, I hope your travels were safe and smooth.

6    There is a lot of press reports about crazy travel issues out

7    there these days so hopefully you didn't run into any of that,

8    but beyond that I hope you had a wonderful holiday with your

9    family and friends.

10          We will pick up where we left off, that is with

11   cross-examination of Special Agent Schlessinger and with that,

12   we will proceed.

13          Special Agent Schlessinger, you may remove your mask

14   at this time and I remind you that you remain under oath and

15   Mr. Schulte, you may proceed.

16   EVAN SCHLESSINGER, resumed.

17   CROSS-EXAMINATION (cont'd)

18   BY MR. SCHULTE:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  You testified about the Buffer accounts last week, right?

22   A.  Yes.

23   Q.  You testified that you did not recall whether it was used,

24   right?

25   A.  I don't recall that, no.

1           THE COURT:  You don't recall testifying to that effect

2      or you don't recall whether it was used?  What don't you

3      recall?

4           THE WITNESS:  Both of those things.

5      BY MR. SCHULTE:

6      Q.  OK.  I'm going to show the witness and the parties what's

7      been marked as Defendant's Exhibit 815.  Do you recognize this

8      document?

9      A.  I don't have anything displayed on my screen.

10     Q.  Sorry.

11     A.  I don't recall that specifically, no.

12     Q.  Do you know what type of document this is?

13     A.  Yes.  Generally.

14     Q.  And part of your -- through part of your investigation you

15     would issue search warrants, correct?

16     A.  Yes.

17     Q.  And the entities that you would issue the search warrants

18     to, they would respond to those search warrants, correct?

19     A.  Yes.

20     Q.  And they would give you what is called returns or whatever

21     is relevant to the search warrant to you, right?

22     A.  Yes.

23     Q.  Is this a type of document that would reflect that?

24     A.  Yes.

25          MR. SCHULTE:  I move to introduce Defendant's Exhibit

M765sch1                          Schlessinger - Cross

1    815.

2              MR. DENTON:  Your Honor, we didn't previously receive

3    this as a marked exhibit.  I don't think we have any objection

4    but it would help to see the rest of the document.

5              THE COURT:  Can you scroll through, Mr. Schulte?

6              MR. SCHULTE:  Yes.  That's it.

7              THE COURT:  Any objection?

8              MR. DENTON:  No, your Honor.

9              THE COURT:  Admitted.

10             (Defendant's Exhibit 815 received in evidence)

11   BY MR. SCHULTE:

12   Q.  So this is a return from the Buffer account pursuant to

13   your search warrant in October 2018, correct?

14   A.  Yes.  It appears to be a response from Buffer.

15   Q.  Can you read this highlighted sentence?

16   A.  Starting with:  It appears?

17   Q.  Yes.

18   A.  It appears that this user signed up for our service on

19   September 3rd, 2018, at which they linked a Twitter account but

20   did not post any content through our service.

21   Q.  I am just going to go through page 2 of the document.  This

22   is what the service looks like, correct?

23   A.  I wouldn't know, I haven't used the service.

24   Q.  Oh OK.

25             But just to refresh or just to review quickly, the

M765sch1                        Schlessinger - Cross

1    Buffer is used to queue up Tweets or other types of things to

2    be posted, correct?

3    A.  Yes.

4    Q.  And then page 3.  All right.  I will take that down.

5              I am going to show just the witness and the parties

6    what is marked as Government Exhibit 830.  Do you recognize

7    this document?

8    A.  Yes.

9    Q.  And through your investigation you testified previously

10   about publications through Wordpress, correct?

11   A.  Yes.

12   Q.  And you are able to -- Wordpress essentially posts

13   documents on the web that you can browse to, correct?

14   A.  Yes.

15   Q.  And the Wordpress account that you were investigating was a

16   public account, correct?

17   A.  Yes.

18   Q.  And does this reflect browsing to that site?

19   A.  Yes.

20             MR. SCHULTE:  I move to introduce this.

21             MR. DENTON:  No objection.

22             THE COURT:  Admitted.

23             (Defendant's Exhibit 830 received in evidence)

24   BY MR. SCHULTE:

25   Q.  So each of the notebooks that we have pulled up and that

M765sch1                    Schlessinger – Cross

1   you went through with the government, they were marked as

2   80-sheet notebooks, correct?

3   A.  I think that's right.  I don't recall specifically.

4   Q.  OK.

5           If I can pull up what is in evidence as Government

6   Exhibit 806, just the front cover.  This is what they looked

7   like, right?

8   A.  Yes.

9   Q.  So that's 160 total pages, right?

10  A.  Yes.

11  Q.  And then the government essentially cherry-picked one or

12  two pages from each of those documents, correct?

13          MR. DENTON:  Objection.

14          THE COURT:  Sustained.

15  Q.  The majority of the pages from the notebooks were not

16  displayed, correct?

17          MR. DENTON:  Objection.

18          THE COURT:  Sustained.

19  Q.  And nothing in the notebooks was ever transmitted, correct?

20          THE COURT:  Mr. Schulte, I am pretty confident that

21  these questions were asked and answered last week.

22          MR. SCHULTE:  OK.

23  Q.  You testified on direct that my parents' home was not

24  raided, right?

25  A.  Yes.

M765sch1                     Schlessinger - Cross

1   Q.  And you say that only because you did not execute a search

2   warrant at my parents' home, right?

3   A.  Yes.  That's right.

4   Q.  Isn't it true that FBI agents went to my parents' home in

5   Lubbock, Texas?

6   A.  Yes.

7   Q.  And how many agents went to their home?

8   A.  I believe it was two or three total.

9   Q.  And what time of day was it?

10  A.  I believe it was during the day.  I don't know, I wasn't

11  present for that.

12  Q.  Do you know if that was an announced visit?

13              MR. DENTON:  Objection.

14              THE COURT:  Sustained.

15  Q.  Did you call and set up a time to meet with them?

16              MR. DENTON:  Objection.

17              THE COURT:  The question is whether you did, not

18  whether you know from someone else whether they did.  Did you

19  ever call Mr. Schulte's parents at all?

20              THE WITNESS:  No, I didn't.

21              (defendant conferring with standby counsel)

22  Q.  You testified this was not a raid, right?

23  A.  That's right.

24  Q.  But unannounced people were going to my parents' home,

25  right?

M765sch1                       Schlessinger – Cross

1    A.  I don't know if they were announced or not.  I wasn't

2    involved with the visit in Lubbock.

3    Q.  So then you don't know if it was a raid, correct?

4    A.  I didn't think it met the definition of a raid.

5    Q.  And what is your definition of a raid?

6    A.  Generally, I think of a raid as involving either the

7    execution of a search warrant or an arrest warrant in which a

8    lot of things would go into it logistically.  There would be a

9    whole operational plan.  You would have a minimum number of

10   agents, it would be more than two or three.  Those sorts of

11   things.  That's not what it was.

12   Q.  But you do know that the point of this was to demand the

13   return -- to demand that certain documents that I wrote were

14   deleted, correct?

15   A.  Yes.  There was a concern that there was classified

16   information that was included in one of the documents you had

17   submitted that they may have had in their possession and they

18   were trying to get it back, yes.

19              THE COURT:  What do you mean by Mr. Schulte had

20   submitted?  What are you referring to?

21              THE WITNESS:  It was a pro se bail application.

22   Q.  I mean, nobody called them and asked them if they had this,

23   right?

24              MR. DENTON:  Objection.

25              THE COURT:  Sustained.

M765sch1                        Schlessinger - Cross

1    Q.  But you know that the agents demanded everything that I had

2    ever written that they asked to be deleted, correct?

3    A.  I'm not aware of that, no.

4    Q.  You are aware that they confiscated the computers there,

5    right?

6    A.  No, I'm not.

7    Q.  But you determined there was nothing classified sent to

8    them, correct?

9    A.  Well, there was concern that the pro se bail application

10   contained classified information.  That was the purpose of

11   their visit.

12          THE COURT:  Ladies and gentlemen, just so you know,

13   the words "pro se," that's a legal term and it refers to the

14   submission that is made on behalf of a defendant by the

15   defendant himself, so not through counsel.  So I presume and

16   let me confirm, Agent, that when you say "pro se submission"

17   you are referring to something that Mr. Schulte filed on his

18   own behalf in this case?  Is that correct?

19          THE WITNESS:  Yes, your Honor.  That's correct.

20   BY MR. SCHULTE:

21   Q.  But that application was sent to an attorney in Lubbock,

22   Dan Hurley; right?

23          MR. DENTON:  Objection.

24          THE COURT:  Sustained.

25          Also, let me make clear that while I am permitting

M765sch1                    Schlessinger – Cross

1    this testimony to explain what was and wasn't going on at the

2    time, Mr. Schulte is not charged with revealing any classified

3    information or national defense information in the submission

4    that the Agent is testifying about now.

5    BY MR. SCHULTE:

6    Q.  And through your investigation in this case did you

7    interview an individual named Mike K.?

8    A.  Yes.

9    Q.  How many times did you interview him?

10   A.  I believe I was only present for one interview with Mike.

11   Q.  And you knew that he was placed on administrative leave by

12   the CIA, correct?

13            MR. DENTON:  Objection.

14            THE COURT:  Sustained.

15            MR. SCHULTE:  I move to introduce stipulation

16   Government Exhibit 3007.

17            MR. DENTON:  I don't think we have an objection.  I'm

18   not sure which one that refers to.  Just one second, your

19   Honor?  (pause)  No objection, your Honor.

20            THE COURT:  OK.  You may proceed.

21            MR. SCHULTE:  A group with the Central Intelligence

22   Agency prepared an internal assessment stating that (i) CIA

23   engineer and development group employee Michael was approved in

24   June 2017 for personal foreign travel to Thailand (Bangkok and

25   Phuket) to vacation with three friends; and (ii) a U.S.

M765sch1                    Schlessinger - Cross

1    government record with a name match only of a WikiLeaks

2    affiliate showed travel in June 2017 by that individual with an

3    overlapping time and location with Michael's travel to

4    Thailand.

5    BY MR. SCHULTE:

6    Q.  Through your investigation in this case, did you send a

7    memo to the CIA requesting that Michael be placed on

8    administrative leave?

9            MR. DENTON:  Objection.

10           THE COURT:  Sustained.

11   Q.  Were you involved in the CIA's decision to put Michael on

12   administrative leave?

13           MR. DENTON:  Objection.

14           THE COURT:  Sustained.

15           (Defendant conferring with standby counsel)

16   Q.  Michael was an employee at the CIA during the same time

17   that I was, correct?

18   A.  Yes.

19   Q.  And he worked in OSB, correct?

20   A.  I think that's right.

21           MR. SCHULTE:  No further questions.

22           THE COURT:  Redirect.

23           MR. DENTON:  Very briefly, your Honor.

24   REDIRECT EXAMINATION

25   BY MR. DENTON:

M765sch1                    Schlessinger - Cross

1   Q.  Good morning, Special Agent.

2   A.  Good morning.

3   Q.  When you were testifying on cross-examination on Thursday,

4   Mr. Schulte asked you about whether classification reviews had

5   been conducted of certain documents he wrote.  Do you remember

6   that?

7   A.  Yes.

8   Q.  And in particular he asked you about a determination that

9   the documents on Wordpress did not contain classified

10  information.  Do you remember that?

11  A.  Yes.

12  Q.  Were there classification reviews conducted of documents

13  other than what was posted on Wordpress?

14  A.  Yes.

15          MR. DENTON:  Ms. Cooper, could we put up what is in

16  evidence as Government Exhibit 812, please?

17  Q.  Special Agent, was a classification review of this e-mail

18  and its attachments conducted?

19  A.  Yes.

20          MR. SCHULTE:  Objection.

21          THE COURT:  Overruled.

22          MR. DENTON:  And if we could turn to page 3,

23  Ms. Cooper, and blow up the top sort of half of the page?

24  Q.  What, if any classification determination, was made about

25  the information contained here?

M765sch1                    Schlessinger - Cross

```
 1   A.  It was determined to be classified.

 2           MR. DENTON:  Ms. Cooper, could we then go to

 3   Government Exhibit 801, please?

 4   Q.  What about this document, Special Agent?  Was a

 5   classification review conducted of this document?

 6           MR. SCHULTE:  Objection.  Beyond the scope of cross.

 7   He has no direct knowledge.

 8           THE COURT:  Overruled.  I will allow the witness to

 9   answer at least this question.

10           THE WITNESS:  Yes.

11           MR. DENTON:  If we can go to page 3 of this exhibit as

12   well, Ms. Cooper?

13           MR. SCHULTE:  Same objection.

14           THE COURT:  There is no question yet.

15   BY MR. DENTON:

16   Q.  Special Agent, do you know if there was a classification

17   determination made about the information contained on this

18   page?

19           MR. SCHULTE:  Objection.

20           THE COURT:  Overruled.

21   A.  Yes.

22   Q.  And what was that?

23   A.  It was determined to be classified.

24           MR. DENTON:  Then finally, Ms. Cooper, can we put up

25   the first page of Government Exhibit 809?
```

M765sch1                      Schlessinger - Recross

1    Q.  Special Agent, do you know if a classification review was

2    conducted of this document?

3    A.  Without seeing the specific contents -- I would have to

4    see.

5          MR. DENTON:  Let's take a look at page 10, Ms. Cooper,

6    and if we could just blow up the top half of the page?

7    Q.  Do you know if a classification review was conducted of

8    this portion of Government Exhibit 809?

9    A.  Yes.

10   Q.  And do you know what the result of that was?

11   A.  It was determined to be classified.

12         MR. DENTON:  No further questions, your Honor.

13         THE COURT:  Can we let Agent Schlessinger step down?

14   Mr. Schulte?

15         (Defendant conferring with standby counsel)

16         MR. SCHULTE:  Just briefly.

17   RECROSS EXAMINATION

18   BY MR. SCHULTE:

19   Q.  Do you know if that document was ever shared with anybody

20   that was just displayed, those two notebooks?

21   A.  The last document?

22   Q.  The notebooks, right.

23   A.  I don't know.

24   Q.  Well, they were found in my cell at MCC, correct?

25   A.  Yes.

M765sch1

1    Q.  They were not found on the Internet, right?

2    A.  No.

3            MR. SCHULTE:  No further questions.

4            THE COURT:  Thank you very much, Agent.  You may put

5    your mask on and step down.

6            (witness excused)

7            THE COURT:  Mr. Denton?

8            MR. DENTON:  Your Honor, at this time the government

9    would also offer into evidence Government Exhibit 1703-1, which

10   is an excerpted portion of the expert presentation of Pat

11   Leedom, and Government Exhibit 1704-1 which is an excerpt from

12   the expert presentation of Michael Berger pursuant to

13   Rule 1006.

14           THE COURT:  Mr. Schulte, just confirming, no

15   objection, correct.

16           MR. SCHULTE:  Right.

17           THE COURT:  Those are admitted.

18           (Government's Exhibits 1703-1 and 1704-1 received in

19   evidence)

20           THE COURT:  Ladies and gentlemen, you may recall, I

21   think I mentioned at the time when the government called its

22   expert witnesses it used the slide decks and I said at the time

23   that at a minimum they were -- they could show them to you as a

24   demonstrative aid in understanding the witness' testimony but

25   it was the witness' testimony that was the evidence.  I said

M765sch1

1    that I might circle back to that.

2            So, the government has now offered, as you just heard,

3    excerpts from those slide decks as actual evidence.  The rules

4    permit, in certain circumstances, where the underlying evidence

5    is voluminous or hard to display or observe in court, permit

6    the parties to offer essentially a summary or a chart of

7    evidence and in those circumstances it can be admitted as

8    evidence in and of itself and I have now admitted those two

9    exhibits into evidence so you may consider them as you do any

10   other evidence.  It is up to you, number one, to decide if they

11   accurately reflect evidence that is otherwise in the record; or

12   number two, as with all the evidence, determine what weight, if

13   any, to give to it in your deliberations.  I will give you

14   further instructions on these scores at the conclusion of the

15   case.

16           Mr. Denton?

17           MR. DENTON:  Your Honor, the government rests.

18           THE COURT:  All right.  So, ladies and gentlemen, we

19   have reached a fairly significant juncture in the trial.  You

20   heard Mr. Schulte just say that the government rests.  That is

21   the conclusion of the government's case-in-chief.  I have

22   mentioned to you several times, will mention to you many times

23   before you begin your deliberations, that the burden rests at

24   all times on the government so Mr. Schulte has no burden

25   whatsoever to put on a case, to call any witnesses, to put in

M765sch1

1    any evidence, but the rules do permit him to do that if he

2    wishes to do so.

3           There are a couple, both legal and logistical issues

4    that I need to discuss with the parties at this time, basically

5    in determining whether Mr. Schulte will be putting on a case,

6    and given that that discussion may be a little bit long I'm

7    going to beg your indulgence and actually excuse you to go to

8    the jury room rather than making you sit here while we have

9    those discussions.

10          So, with apologies and with my thanks, we are reaching

11   the point in the trial where it just becomes necessary to sort

12   of take care of some legal issues here and there outside of

13   your presence and when we are doing that I am likely to excuse

14   you either to a jury room or depending on the time of day maybe

15   altogether.  I don't know how long this will take.

16          I thank you in advance for your patience and

17   indulgence but we will bring you back when it is time to

18   proceed and go to the next phase of the case, whatever that may

19   be, and I will certainly be in a better position at that time

20   to let you know what our plans are, what the schedule looks

21   like and so forth.

22          A couple quick things:  Number one, please don't leave

23   the jury room.  This discussion may not take long, it may take

24   long, I don't know.  We will try to keep you posted and get you

25   as soon as we can proceed but given that, I don't want to be in

M765sch1

1    a scenario where we are ready to go and one of you is missing.

2    So with my thanks, please stay in the jury room while we are

3    doing what we need to do.  And then otherwise, my standard

4    instructions apply.  Don't discuss the case.  All right?  You

5    have now heard the government's case-in-chief but you haven't

6    heard any defense case if there is going to be a defense case.

7    You haven't heard the closing arguments.  You haven't heard my

8    instructions about the law.  So while you certainly heard one

9    portion of the case, you are far from done and your

10   deliberations aren't starting yet so don't discuss the case,

11   continue to keep an open mind, don't do any research about the

12   case, and enjoy your break, however long it may be.  With that,

13   you are excused and we will bring you back when we are ready to

14   proceed.

15            THE DEPUTY CLERK:  All rise.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

M765sch1

1              (Jury not present)

2              THE COURT:  You may be seated.

3              We do need to circle back to take care of Defendant's

4      Exhibit 410.  When that issue is resolved I will tell the jury

5      that later.

6              Anything to discuss before I ask Mr. Schulte if there

7      are any motions?  Mr. Denton?

8              MR. DENTON:  Not at this time, your Honor.

9              THE COURT:  Mr. Schulte?

10             MR. SCHULTE:  I just wanted to say that the Court's

11     order from today, I haven't had a chance to read through it.  I

12     just ask an opportunity -- so before -- I think the next thing

13     the Court was going to ask, I do move pursuant to Rule 29 to

14     dismiss all counts and to issue a directed verdict of not

15     guilty.  But, specific to some of the counts, particularly the

16     espionage counts which I don't believe the government has

17     submitted sufficient evidence to show that this is

18     information -- to show that these are documents as opposed to

19     information and the Count Nine issues the Court raised, I

20     haven't had a chance to go through those so I would ask for an

21     opportunity to do that.

22             THE COURT:  So I will certainly give you an

23     opportunity to read my order since I want to discuss those

24     issues and it is necessary for you to read it before we do

25     that, but do you want to articulate or elaborate on your Rule

M765sch1

1    29 motions with respect to the other counts?  I think it might

2    be helpful to distinguish the so-called WikiLeaks counts from

3    the MCC counts.  Or are you just making a motion?  Is there

4    anything particular you want to say on those counts?  We will

5    bracket Count Nine for a moment.

6                 MR. SCHULTE:  Yes.

7                 I just want to specifically touch on the NDI counts,

8    particularly Count Two and Counts Three and Four where the

9    government has not proved or presented any evidence that these

10   are documents as opposed to information because the statute

11   requires the additional requirement for information and I think

12   that this is -- without providing the proof that these are

13   documents, it's a modification of the indictment.  So at the

14   very least I would ask, if the Court denies the motion, to

15   allow me to present certain jury instructions to the jury that

16   if they determine that this is information as opposed to

17   documents that they have to acquit according to the law; that I

18   would provide the specific language to that, to the Court at a

19   later time.

20                THE COURT:  You can submit any instructions you want

21   as long as they accurately state the law.  My reaction is I

22   don't think that accurately states the law.  I think there is

23   probably a Venn diagram situation where there are certain

24   things that would qualify as information but not documents and

25   other things that would qualify as documents that may or may

M765sch1

```
1    not be chargeable as information.  The fact that there may be a

2    middle ground of overlap where the government has the ability

3    to charge under either prong doesn't necessarily mean that it

4    is information, it is not documents.

5            What am I missing?

6            MR. SCHULTE:  I think the point is if it could be

7    charged as both then I think the statute just makes clear that

8    there is a distinction between these two things because if the

9    government always had the opportunity to choose which one, they

10   would always choose the one with lesser requirements for them

11   to prove and I note that at the first trial I was specifically

12   charged under the documents clause and now the government has

13   changed.

14           (Continued next page)

15

16

17

18

19

20

21

22

23

24

25
```

M76Wsch2

1          THE COURT:  You mean the opposite, under the

2     information.

3          MR. SCHULTE:  I'm sorry.  Under the information, which

4     required the additional element.  And this time they chose the

5     lesser one so they didn't have to prove as much.

6          But I think the distinction in the law was that the

7     documents clause, the reason that requires less is because

8     these are specific CIA documents that have particular markings

9     and are provided to the defendant in the case.  And

10    particularly with respect to the MCC counts, where this is

11    literally information that I'm writing down and the government

12    hasn't shown that there was any particular document with this

13    information, such as the Bartender information, that there was

14    no document communicated to me that had top secret or any types

15    of identification of the government that this is classified, I

16    think that's the point of the information clause, is so that if

17    this is verbal information or information in someone's head or

18    information that's communicated in some way besides physical

19    documents, then Congress intended there to be this additional

20    requirement just because of how ambiguous it would be

21    otherwise.

22         THE COURT:  OK.  Do you have any authority that

23    supports that interpretation of the statute?  Because certainly

24    on the plain language of the statute, it refers to document,

25    writing, code book, signal book, sketch, photograph,

M76Wsch2

1    photographic negative, blueprint, plan, map, model, instrument,

2    appliance, or note relating to the national defense, and I

3    don't see why the notebooks that you are charged with respect

4    to here would -- I mean it seems to me that the jury could

5    conclude that those fall within the scope of that as a matter

6    of plain language.

7           I recognize that there is an overlap between the two

8    prongs, and to the extent that the information prong requires

9    an additional element, it certainly raises interesting

10   questions, but I'm not sure as a matter of plain language why

11   the jury could not conclude that these are documents, notes,

12   and so forth, writings.  There's nothing in the language of the

13   statute that suggests it has to be a particular form of

14   document or the kinds of document that you're describing.  That

15   may be the mine run of cases, the core, heartland of cases, but

16   I'm not sure it means it follows that the documents here are

17   outside the scope of the statute.

18          MR. SCHULTE:  I think there was a case that looked

19   into this specific issue.  I think it may have been the *Rosen*

20   case, actually, but I have the language that I can provide to

21   the Court that states both the reasons, based on the decision

22   in that court, why this -- the reasons for my argument here,

23   and also, if the Court denies it, the language for the jury

24   instruction that I can provide to the Court.

25          THE COURT:  All right.  Well, particularly in light of

M76Wsch2

1    that, I think I will reserve judgment on it.  But expressing my

2    skepticism, I would invite you at a minimum to submit whatever

3    instructions you think would be appropriate, but your time to

4    do so is rapidly disappearing, so the sooner the better on that

5    score.  But I'll reserve judgment on that.

6            I guess just to distinguish and understand what I'm

7    reserving judgment on, it seems that we can distinguish the NDI

8    counts with respect to WikiLeaks from the NDI counts with

9    respect to the MCC charges.  As to the WikiLeaks charges, is it

10   your argument that they also don't qualify as documents,

11   writings, plans, etc., that it's only chargeable under the

12   information prong?

13           MR. SCHULTE:  I do think that there is a major

14   distinction between the two because those documents -- or that

15   information was -- there are classification markings on there,

16   so I think there is a significant distinction between the MCC

17   and the WikiLeaks charges.  But I still think that it can only

18   be charged under information because it's electronic as opposed

19   to hard-copy documents.  So that's a different argument for

20   those.

21           THE COURT:  OK.  So the argument there is that an

22   electronic document is not a document within the meaning of the

23   statute?

24           MR. SCHULTE:  That's correct, yes.

25           THE COURT:  OK.

M76Wsch2

1            MR. SCHULTE:  Tangible and intangible is -- anything

2      intangible is only related to information, whereas --

3            THE COURT:  So it's your argument that in a world

4      where we have e-books, that if somebody disclosed a book that

5      contained national defense information, a physical book with

6      physical pages, it could be charged under the documents prong,

7      but if you transmitted an e-book containing the very same

8      words, that would only be chargeable under the information

9      prong; is that your position?

10            MR. SCHULTE:  I believe under the statute from,

11      whatever, 1945, I think that that is correct.

12            THE COURT:  Do you have any authority to support that

13      interpretation and distinction?

14            MR. SCHULTE:  Just the distinction from the court's --

15      I think there's information from the, when Congress actually

16      passed the law, the legislative history, as well as

17      determination from the *Rosen* court, which I intend to present

18      the Court along with everything else.

19            THE COURT:  All right.

20            Any response from the government on this particular

21      issue?

22            MR. DENTON:  Your Honor, I think with respect to the

23      question on Counts Three and Four, I think the Court is

24      correct.  There's nothing in the statute that limits the

25      definition of documents, writings, and notes, in the way that

M76Wsch2

1      the defendant suggests.  Quite to the contrary, I think there

2      are a number of portions of that litany that suggests that

3      Congress did intend things like sketches and notes to be

4      encompassed within the scope of the tangible materials covered

5      by 793.

6              I think there is no basis to support his argument with

7      respect to Count Two, that the fact that the documents were

8      electronic somehow takes them outside the ambit of the statute,

9      and I'm not aware of anything of what he's referring to in

10     either *Rosen* or the legislative history.  We'll be happy to

11     address it.  I do think we can take this up in more detail when

12     we see the defendant's proposed jury instruction.

13             I do think, however, that there is a substantial

14     overlap between documents and information.  Documents

15     necessarily contain information.  I think it's not clear to me

16     that you could ever have something under the tangible prong

17     that wouldn't at least in theory also be chargeable as

18     information.  And so to instruct the jury that if you conclude

19     that it's information, you can't conclude that it's a writing

20     would be incorrect.  And the proper course, I think, is what

21     the parties have suggested so far, is that the Court instructs

22     the jury that they must find that these are documents,

23     writings, and notes and then find that they also relate to the

24     national defense, as the terms of the statute require.

25             THE COURT:  All right.  I'll reserve judgment on those

M76Wsch2

1    counts, awaiting whatever authority Mr. Schulte wants to

2    submit, and to the extent that I continue to reserve judgment

3    and/or deny the motion, any proposed jury instructions on that

4    score, but I've expressed my skepticism and I'll leave it there

5    for the moment.

6         Again, bracketing Count Nine for a moment, any other

7    issue you want to raise on Rule 29, Mr. Schulte?

8         (Defendant conferred with standby counsel)

9         MR. SCHULTE:  I think one final, one final issue is

10   the Computer Fraud and Abuse Act, which I believe are Counts

11   Seven and Eight or it could be Six as well.  But the government

12   is alleging violations of this act due to actions taken by me

13   on the ESXi server that they say constitute, you know,

14   increasing unauthorized access.  But I think the record

15   evidence clearly shows that I had an ESXi root server key,

16   according to the technical experts, that this gives you the

17   authorization to perform any actions, without any limitation,

18   that the government has failed to show, either from

19   management's showing what limitations there are or any types of

20   limitations that were communicated to me as to what I could or

21   could not do or what I was authorized to do or not authorized

22   to do, and especially in light of my email to management

23   informing them that I owned this equipment still, according to

24   the accountable property, and requesting removal of the access,

25   which never happened, I think the CFFA count should be

M76Wsch2

1     dismissed due to this.

2                THE COURT:  All right.

3                Mr. Denton.

4                MR. DENTON:  Your Honor, I think a couple of things.

5            First of all, purely as a factual matter, the

6     allegations of unauthorized access are not limited to the ESXi

7     server.  They also deal with the defendant's unauthorized

8     access to the Altabackups folder on the NetApp file share and

9     the Confluence virtual machine that was used to access that and

10    on which he performed the reversions.

11           There is clearly a significant distinction and,

12    arguably, disagreement between the defendant and everyone else

13    about the distinction between power and authority.  The fact

14    that he had a key that allowed him to do things is quite

15    different from the fact that I think literally all of the

16    testimony is that he was not authorized to take administrative

17    actions on any of those three systems at that time, and we

18    think that from the record evidence, including the testimony

19    about conversations with the defendant, the memorandum that he

20    received on April 18, the message he sent confirming that he

21    did not have any such access anymore, that the jury would well

22    be within its rights to conclude that he exceeded his

23    authorized access on any of those three systems to perform the

24    actions alleged in those counts.

25                THE COURT:  All right.  I agree.  I think the evidence

M76Wsch2

1    is certainly more than sufficient for the jury to reach those

2    conclusions, so the Rule 29 motion on that front is denied.

3              Anything else, other than Count Nine, Mr. Schulte?

4              MR. SCHULTE:  No.  Just generic for the rest.

5              THE COURT:  OK.  I guess it preserves whatever that

6    preserves, but I'm certainly not granting any motion without an

7    articulated basis.

8              Why don't you take a minute to review the order that I

9    entered on Count Nine.  I notice that standby counsel are both

10   here.  I don't know if this is the time when you said you were

11   going to go try to speak to any of the witnesses.  Maybe you've

12   already done that and come back, but just a reminder that if

13   you want to use your time for that purpose, this is the time to

14   use it.

15             (Defendant conferred with standby counsel)

16             MR. SCHULTE:  OK.  I think standby counsel is going to

17   go and see if anyone wants to talk with them and point out the

18   couple documents for the --

19             (Defendant conferred with standby counsel)

20             MR. SCHULTE:  -- that are needed to address some of

21   these issues that we just discussed.

22             THE COURT:  OK.  In the meantime, are you going to

23   review the order regarding Count Nine?

24             MR. SCHULTE:  Yes.

25             THE COURT:  How long do you need before you're

M76Wsch2

1    prepared to discuss those issues?  And I should ask the

2    government the same thing because it raises issues that the

3    government, I presume, would want to address as well.

4            MR. DENTON:  Your Honor, I think that depends on how

5    deep the Court wants to go at this point.  I think at a high

6    level, we'd be prepared to address it now.  I think that there

7    are some questions with respect to, I think, in particular,

8    sort of the question regarding particular statements as kind of

9    a subcomponent of Count Nine as a whole that we might need a

10   minute to do a little bit of work on.  If the Court wants us to

11   do that now, we can.  But I also think in light of the issues

12   the Court has reserved, we're also happy to proceed as

13   efficiently as we can with the jury's time and take that up at

14   another point.

15           THE COURT:  OK.  Why don't we, I guess, do that, which

16   is to say -- well, I guess there are a couple things going on.

17           I think standby counsel should go speak with the

18   defense witnesses so we can nail down which witnesses

19   Mr. Schulte plans on calling.  I think this is the time where

20   we need to discuss the proposed testimony of Ms. Sotnick, if

21   that's the correct name.  I take it the government is basically

22   raising questions about, if not moving to preclude, her

23   testimony.

24           Mr. Schulte, I think a proffer would be appropriate

25   under the circumstances because I think there is some doubt,

M76Wsch2

1   given your waiver of the advice-of-counsel defense, combined

2   with the relevance issues that I raised with respect to defense

3   exhibit 812; it casts some doubt on whether she has any

4   admissible testimony to offer.

5          MR. SCHULTE:  Yeah.  So, the argument that the

6   government raised about exhibit 812 is not relevant here

7   because 812 was a document that was transmitted.  That's Count

8   Three.

9          So Count Four is a document that was never

10  transmitted.  So it goes to whether or not there was ever any

11  intent or any substantial step.  So that's why this testimony

12  is significantly different from that exhibit.  So I think her

13  testimony -- and I think we've litigated this a little bit

14  before, but her testimony has nothing to do with privilege, and

15  anything that had to do with privilege has already been

16  disclosed to the government.  So we notified the government a

17  long time ago about Ms. Sotnick, several motions and letters

18  describing exactly what her testimony would be at trial and

19  what she would offer.

20         It's very simple, five, six questions.  Basically, the

21  fact that she, that I gave her a document and she took it to

22  counsel.  And then that's it.  So I think that testimony is

23  relevant.  It goes to show that there was no intention to do,

24  to release it or to do anything without getting advice, some

25  kind of advice from counsel.  But as we've already litigated,

M76Wsch2

1   the fact that I'm requesting advice does not waive privilege as

2   to if there was any advice given or what the back-and-forth

3   was.  So I believe -- I mean I could be mistaken, but I thought

4   that the Court's ruling -- issued a ruling about that, stating

5   that there's no waiver to privilege as far as simply sending

6   the device -- sending a document through a paralegal to

7   counsel.

8          THE COURT:  I can't actually remember how definitively

9   we resolved this, but I think my view is that it would

10  constitute a waiver at least with respect to the communications

11  surrounding that transmission; that is to say, it puts at issue

12  the purpose for which it was given to the Federal Defenders,

13  and in that sense, any communications surrounding it that would

14  make clear the purpose for which you gave it to Ms. Sotnick

15  would be fair game.  But I think, if I remember correctly, your

16  representation was there were no transmissions, communication

17  or communications around it, other than the actual document

18  itself, in which case maybe you're right and, you know, the

19  government can cross her on what communications, if any, you

20  made in giving it to her.  But it wouldn't waive anything.

21  There wouldn't be anything else to waive as to.

22          Am I remembering that correctly?

23          MR. SCHULTE:  I believe so.  I believe so.  That's

24  correct.  There's no -- I wasn't eliciting any communications

25  surrounding the document, but I did go through and we pulled

M76Wsch2

1    any emails sent about it from the Federal Defenders.  We tried

2    to pull any kind of document at all about this, and we found

3    nothing at all, and we alerted the government to that, that

4    we -- anything -- that we didn't believe that there was

5    anything to be waived because there was no -- regarding the

6    communication surrounding it.  But we took the extra step of

7    saying OK, well, let's go through and see what communication

8    there was surrounding it, and we found nothing.  And so we

9    alerted the government to that, that the only communication

10   about this is through Ms. Sotnick, giving the document to her,

11   and then she was giving it to Sabrina, who was actually on

12   trial during that time.  So that's why there's not really any

13   communication, because she was busy.  She was doing things.

14   And there was no email sent between them.  There was no --

15   there's no documentation from Federal Defenders or anything

16   like that.

17           THE COURT:  And that is consistent with the discussion

18   during the final pretrial conference.

19           Mr. Denton, back to you.  I think Mr. Schulte's point

20   that there's a distinction between Count Three and Count Four

21   on the transmission versus attempt point is somewhat

22   well-taken; that is to say, I think he's entitled to argue from

23   the fact, for example, that it's labeled attorney-client

24   privilege, that the government hasn't sustained its burden of

25   showing that he had -- I'm just floating this as one possible

M76Wsch2

1  argument.

2              I think he can certainly argue that the government has

3  not sustained its burden that he had the intent to release this

4  information.  Right?  I think we can agree that the government

5  does have to prove that to convict him of the attempt charge in

6  Count Four.  And I think that he can point to the

7  attorney-client privilege marking to say that the jury can

8  infer from that that he intended these communications to be

9  only with his counsel and he never intended to disseminate them

10  to the world.  You can obviously point to the fact that he

11  drafted tweets and set up a Twitter account and all sorts of

12  other things that suggest that he intended to disseminate it

13  much beyond counsel, to argue otherwise.  But I think that

14  those are arguments both sides can make to the jury and it's up

15  to the jury to make that decision.

16              Do you agree on those issues thus far?  Are you with

17  me?

18              MR. DENTON:  I am.

19              I will just note that there's a delta there between

20  that and the purpose that Mr. Schulte expressed just a moment

21  ago, which was to show that he did not intend to act without

22  obtaining the advice of counsel.

23              THE COURT:  Hold on.  I just want to say do you agree

24  with what I just stated?

25              MR. DENTON:  Yes, your Honor.

M76Wsch2

1          THE COURT:  OK.

2          Then I think the question becomes, it seems to me that

3     having Ms. Sotnick testify, and I apologize for getting her

4     name wrong earlier, to the effect that he gave this document to

5     her is sort of akin to the evidence that he marked it as

6     attorney-client privilege, it's evidence that he drafted this

7     for her, for counsel, or at least evidence from which the jury

8     could infer that.  Again, you can argue that just because he

9     shared it with counsel doesn't preclude his intention to

10    release it to the world and so on and so forth.  But it seems

11    to me that it's somewhat akin to marking it attorney-client

12    privilege and in that sense may well be admissible.  I'm not

13    sure how compelling the argument is, but I would think that

14    that is certainly an argument that can be made to the jury.  Am

15    I missing something?

16         MR. DENTON:  Again, your Honor, I guess the question

17    is how much do we sort of go down the road of the problem that

18    we talked about on Thursday, which is the fact that he did an

19    otherwise innocent thing with the document isn't necessarily

20    relevant to what his intentions were or what sort of the other

21    evidence is.  To the extent that all Ms. Sotnick can testify to

22    is not Mr. Schulte's intentions, is not what any lawyer did

23    with the document, but merely I got this thing from him and

24    gave it to this other person, it's not clear that it's actually

25    relevant to sort of the implications that the Court is

1    suggesting.  And so I think properly limited to those basic

2    facts, it's not clear that that limited piece is actually

3    really relevant here.

4            THE COURT:  All right.  Although you could also get up

5    on cross and ask a single question:  You don't know whether he

6    intended to or did provide this to anyone other than you,

7    correct?  And if the answer is yes, then that sort of cabins

8    the importance of that testimony.  Am I wrong about that?

9            MR. DENTON:  I'm not sure I'd even feel the need to

10   ask that, your Honor.

11           THE COURT:  OK.

12           Mr. Schulte, anything you want to say in response to

13   Mr. Denton's argument?

14           (Defendant conferred with standby counsel)

15           MR. SCHULTE:  Yeah, just, you know, it may not be

16   determinative, but it's definitely relevant.  The fact that --

17   and there's a big distinction between this document and the

18   tweets.  The malware document has nothing to do with the

19   tweets, and there was nothing -- so these are two completely

20   different documents.  There's nothing -- the only thing in the

21   notebooks about malware is one thing talking about rewriting

22   it.  So I think that it's relevant and it goes a long ways to

23   show that not only that but the time frame.

24           You know, this document was given to Ms. Sotnick in

25   March or spring of 2018.  Right?  So there's six, seven months

M76Wsch2

1    in between, where the document's never transmitted.  There's

2    nothing -- so pointing out the time frame of the document, when

3    it was first given to them and the fact that there's nothing in

4    the notebooks about it except for rewriting it is very relevant

5    to the charge.

6         THE COURT:  All right.  I'm going to deny the motion

7    to preclude her from testifying.  I'm not sure how compelling

8    the argument is, as I've said, but I do think that it provides

9    some corroboration of Mr. Schulte's argument that these things

10   were not drafted for the world, but they were drafted for

11   counsel.  Granted it doesn't preclude the alternative

12   inference, but that's an issue that I think the government can

13   argue to the jury.

14        I will caution you, Mr. Schulte, that I will certainly

15   be vigilant to ensure that you don't ask anything that would

16   even remotely suggest that you were relying on advice of

17   counsel, since you have explicitly waived any reliance on that

18   defense.  And to the extent that there is any suggestion on

19   that score in front of the jury, I'm prepared to give a

20   curative instruction to the jury that you're not relying on,

21   and they may not consider, any advice you may have received

22   from counsel.  Understood?

23        MR. SCHULTE:  Yes.  I've made -- I've put the

24   questions through standby counsel to make sure everything

25   should be good, so I don't anticipate any problems.

M76Wsch2

1          THE COURT:  All right.  Well, standby counsel

2     sometimes gets it wrong too, but that's OK.

3          OK.  Other than Sotnick, I don't know.  Are we in a

4     position to know how many other witnesses of the five that you

5     intend to call?

6          MR. SCHULTE:  So, I'm waiting on, you know, Ms. Shroff

7     to talk to them and see, you know, if there's any changes.  But

8     at this point, I expect to call all of them.  But I expect the

9     testimony to be very brief, and I expect to rest today, so --

10          THE COURT:  OK.  That brings me to the next question,

11     which is am I correct in inferring that you're not intending to

12     testify yourself?

13          MR. SCHULTE:  That's correct.

14          THE COURT:  OK.  And obviously you're representing

15     yourself, so in that sense, I think it's fair to assume and

16     infer that that is your decision and your decision alone.  Is

17     that correct?

18          MR. SCHULTE:  That's correct.

19          THE COURT:  To the extent that you have discussed it

20     with standby counsel -- you're obviously welcome to have done

21     so; I'm not asking if you've done so or if they gave you

22     advice.  But I just want to confirm that whatever advice they

23     may or may not have given you, it is your decision and your

24     decision alone not to testify.  Is that correct?

25          MR. SCHULTE:  That's correct.

M76Wsch2

1        THE COURT:  And you understand that you do have the

2   right to testify and that if you choose not to testify, I'll

3   instruct the jury that it may not infer any suggestion of guilt

4   from the fact that you did not testify.  Do you understand all

5   that?

6        MR. SCHULTE:  Yes, I do.

7        THE COURT:  All right.

8        Mr. Denton, do you have any other questions on that

9   score that you would ask me to pose to Mr. Schulte?

10        MR. DENTON:  No, your Honor.

11        THE COURT:  All right.

12        If that's the case, what I would suggest is why don't

13   we take a brief recess, Mr. Schulte can try and pin down how

14   many of the five CIA witnesses he intends to call, and then we

15   can pick up where we left off.

16        We also need to nail down defense exhibit 410.  So if

17   the government has been provided with Mr. Schulte's proposals

18   on that, are you in a position to speak to that now, or do you

19   need to review it?

20        MR. DENTON:  We need a minute to review it, but we

21   should be able to do that here, your Honor.

22        THE COURT:  OK.  Why don't we take a brief recess

23   during which Mr. Schulte can try and nail down how many of

24   these witnesses he intends to call, the government can review

25   defense exhibit 410.

M76Wsch2

1            I'll reserve judgment on the Count Nine issues and we

2     can discuss those later, perhaps at the end of today, or we can

3     discuss when we are going to have a charge conference and

4     perhaps combine it with that.  But in any event, I'll reserve

5     judgment until both sides have had more of an opportunity to

6     review the questions that I posed in the order and do any

7     research on it, etc., etc.

8            Anything else that we need to discuss now other than

9     how long the break is going to be before we check back on these

10    issues and proceed?

11           MR. DENTON:  Not from us, your Honor.

12           THE COURT:  Mr. Schulte.

13           MR. SCHULTE:  It may not be important now, but is the

14    Court intending to do the jury charge before the summations or

15    at least provide the parties with what your instructions will

16    be, so we can incorporate that into the summations?

17           THE COURT:  Well, we'll have the charge conference

18    before summations.  I think it depends a little bit on when you

19    rest today whether we do the charge conference later today or

20    tomorrow morning, and I don't want to definitively resolve that

21    until we see what time you conclude.

22           In any event, we will do the charge conference; that

23    is to say, I'll give you a proposed charge and give you

24    opportunities to raise objections and the like so that

25    everybody's on the same page with respect to what the charge

M76Wsch2

1    will be before summations.  But then the instructions

2    themselves are given to the jury after summations, so you'll

3    know what the charge will be before summations, but I will not

4    actually give those instructions to the jury until after

5    summations.  That's how it works.

6              MR. SCHULTE:  OK.

7              THE COURT:  On that score, I'm quite confident that

8    standby counsel will properly advise you how that process

9    works, so they can fill you in and we'll discuss it further

10   later as well.

11             All right.  Mr. Schulte, how long do you think you

12   need to conclude any discussions that standby counsel may or

13   may not be having with these witnesses before you're in a

14   position to tell me what your intentions are as to them?

15             MR. SCHULTE:  I'd say another 15 minutes.

16             THE COURT:  All right.  It's 10:33.  Let's be prepared

17   to start at 10:50 on the dot, at which point I want to know

18   where things stand on defense exhibit 410 and what witnesses

19   Mr. Schulte plans to call.  And then absent any reason to do

20   otherwise, we'll get the jury up and we'll proceed with the

21   defense case.

22             I'll see you at 10:50.

23             Thank you.

24             (Recess)

25

M765sch3

1           THE COURT:  You may be seated.

2           So first Defendant's Exhibit 410, are we squared away

3     on that?  What is the status?

4           MR. DENTON:  Your Honor, I think we agree

5     substantively on what should happen and what parts should be

6     taken out.  The version that the defendant marked as 410-A

7     actually deleted those portions from the document.  I think our

8     view is that to the extent they should be taken out they should

9     be redacted, like all of the other documents.  I think we are

10    in agreement on that as a reasonable way to proceed.  So, the

11    inestimable Ms. Cooper almost has that complete right now.  I

12    think we are in agreement on approach and finalizing

13    implementation.

14          THE COURT:  Mr. Schulte, are you in agreement with

15    that?

16          MR. SCHULTE:  That's right.

17          THE COURT:  So once we are done with that, I will

18    explain to the jury that Defendant's Exhibit 410, which I

19    previously reserved judgment on, it has been admitted.

20          On the defense witness front, Mr. Schulte, what is

21    your intention?

22          MR. SCHULTE:  After speaking with the witnesses, I'm

23    only going to call two of the CIA witnesses and Ms. Sotnick.

24          THE COURT:  In what order?

25          MR. SCHULTE:  Ms. Sotnick will be first, and then --

M765sch3

1    actually, I don't think I have the list from the government

2    about what they should be called so I just need to --

3         THE COURT:  There is David, Sherry Hart, Cheng, Philip

4    and Gordon.

5         MR. SCHULTE:  David and Cheng.  So Cheng will be

6    called next and David will be called last.

7         THE COURT:  So then we need to discuss logistics of

8    how that will work since those two witnesses would be subject

9    to the partial courtroom closure.  It would be ideal if I

10   didn't need to excuse the jury again after Ms. Sotnick's

11   testimony to implement that but I'm not sure there is any way

12   to do it otherwise.

13        Mr. Denton, do you have any guidance or thoughts?

14        MR. DENTON:  Unfortunately, your Honor, I think we

15   need the CISOs to make that sure everybody who is in the

16   courtroom is allowed to be.  I don't know if we can start that

17   process and figure it out and see whether we need to or not but

18   I think that would be the main reason why we would need to

19   excuse the jury.

20        THE COURT:  OK.

21        MR. DENTON:  I would think we can do that to the jury

22   room as briefly as humanly possible.

23        THE COURT:  So I can confirm that there are some

24   people in the courtroom who would not be allowed to remain

25   because I know that, but why don't we just plan to -- I will do

M765sch3

1       that.  It is not ideal but I have already told the jury that

2       they'll need to indulge us at this phase and we will need to go

3       from there.

4               Anything else that we need to discuss before we bring

5       the jury up and get ready to proceed?

6               MR. DENTON:  Not from the government, your Honor.

7               MR. SCHULTE:  No.

8               THE COURT:  All right.  Is Ms. Sotnick present?

9               MS. SHROFF:  I'm going to go get her.

10              THE COURT:  Let's bring her in and get her on the

11      stand.

12              For those who may not know, I previously entered

13      orders that authorize the partial courtroom closure for

14      testimony of certain witnesses, employees -- current or

15      former -- of the CIA, so the two witnesses after next witness

16      are subject to that order.  Anyone who wishes to listen or

17      watch the Court proceedings and who is not within the scope of

18      that order and can't remain in the courtroom -- and we will

19      make that clear during the break -- you can watch it in the

20      overflow courtroom which is courtroom 20B in this court house

21      where audio can be heard and video of counsel and me is visible

22      but the witness would not be visible.

23              So just for anyone who is here who wishes to continue

24      to watch, that is the situation.

25              (pause)

M765sch3

1                    THE COURT:  The jury is making its way up.

2                    THE DEPUTY CLERK:  Jury entering.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M765sch3

```
1              (Jury present)
2              THE COURT:  You may be seated.
3              Welcome back.  Thank you for your patience.  As I
4     said, we are entering a phase where you will need to tolerate a
5     bit more those kinds of interruptions.  I think by this point
6     you know I don't like to do this but certain things need to be
7     done and hard to choreograph.  That is where we are as easy as
8     it was earlier.
9              First, a bit of housekeeping.  Last Thursday you may
10    recall that I reserved judgment on an exhibit that Mr. Schulte
11    had offered that was marked for identification as Defendant's
12    Exhibit 410, it was the Wordpress returns -- returns, the
13    response to the subpoena that had been served on Wordpress.  I
14    have reviewed that.  Subject to certain redactions that is now
15    admitted.  I think it is admitted as 410-A; is that correct,
16    Mr. Denton.
17             MR. DENTON:  Yes, your Honor.
18             THE COURT:  Mr. Schulte?
19             MR. SCHULTE:  Yes.
20             THE COURT:  That is now in evidence as 410-A with
21    limited redactions.  I remind you and will remind you at the
22    conclusion of the case that are you not to speculate as to what
23    is behind any redactions or as to the reasons for any
24    redactions.  Redacted information is totally irrelevant for
25    your purposes.  So that's first.
```

M765sch3

1          The second is you may have inferred from the presence

2    of someone to my left but Mr. Schulte is going to present a

3    defense case.  I remind you of what I said earlier and will say

4    again, that Mr. Schulte bears no burden whatsoever at this

5    trial so he is allowed to call witnesses but even if he does --

6    and he does intend to -- the burden rests at all times with the

7    government to prove Mr. Schulte's guilt beyond a reasonable

8    doubt.  So the fact that he may call witnesses does not shift

9    that burden in any way, shape, or form to him.  But, that being

10   said, the defense is entitled to put on a case if it wants to

11   do so and Mr. Schulte has elected to present a case.  So with

12   that, we will proceed with the defense case and, Mr. Schulte, I

13   would ask you to call your first witness.

14          MR. SCHULTE:  The defense calls Hannah Sotnick.

15          THE COURT:  Ms. Sotnick, if you would take off your

16   mask and rise and raise your right hand for the oath, please?

17   HANNAH SOTNICK,

18       called as a witness by the Defendant,

19       having been duly sworn, testified as follows:

20          THE DEPUTY CLERK:  Please state and spell your full

21   name for the record.

22          THE WITNESS:  Hannah Sotnick.  H-A-N-N-A-H,

23   S-O-T-N-I-C-K.

24          THE COURT:  You may proceed, Mr. Schulte.

25   DIRECT EXAMINATION

M765sch3                      Sotnick - Direct

1   BY MR. SCHULTE:

2   Q.  Good morning, Ms. Sotnick.

3   A.  Good morning.

4   Q.  I want to direct your attention to the March-April time

5   period of 2018.  Where were you employed at that time?

6   A.  At the Federal Defenders of New York.

7   Q.  And in what capacity?

8   A.  I was a paralegal.

9   Q.  Were you assigned to my case?

10  A.  Yes.

11  Q.  And in what capacity were you assigned?

12  A.  I was the paralegal working on your case.

13  Q.  And again, directing your attention to April of 2018, as a

14  paralegal on my case, did your duties include visiting me at

15  the MCC?

16  A.  Yes.

17  Q.  I am going to show you what has been marked as Government

18  Exhibit 801.

19          THE COURT:  Before you do that, can I just clarify?

20  Is it correct that the Federal Defenders are a group of

21  lawyers?  Is that correct?

22          THE WITNESS:  Yes.

23          THE COURT:  And at that time were the Federal

24  Defenders representing Mr. Schulte in connection with this

25  case?

M765sch3                          Sotnick - Direct

 1              THE WITNESS:  Yes.

 2              THE COURT:  Ladies and gentlemen, just a reminder that

 3    for purposes of this trial Mr. Schulte has, as you know,

 4    elected to proceed without counsel, that is to say he waived

 5    his right to counsel and he is representing himself.  I gave

 6    you some instructions about that earlier.  We will have some

 7    instructions on that score as part of my final instructions to

 8    you but the bottom line is you may not consider his decision to

 9    do that in any way in your deliberations, nor should you

10    consider the fact that he was previously represented, you

11    shouldn't hold that against him.  You may consider it to the

12    extent that it contextualizes what Ms. Sotnick is going to be

13    testifying about.  But, the fact that he was previously

14    represented and the fact that he is now representing himself

15    are not issues that you should consider either favorably or

16    unfavorably to Mr. Schulte in your deliberations.

17              You may proceed, Mr. Schulte.

18    BY MR. SCHULTE:

19    Q.  Let me show you what has been marked as Government Exhibit

20    801.  Do you recognize this document?

21    A.  Can I scroll a little bit?

22              THE COURT:  I don't think you can but Mr. Schulte can

23    scroll through.

24    A.  Yes, I do.

25    Q.  Are you familiar with the title:  Malware of the Mind?

M765sch3                          Sotnick - Direct

1   A.   Yeah.  It sounds familiar.

2   Q.   Did there come a time when I gave this document to you?

3   A.   Yes.

4   Q.   How did I give it to you?

5   A.   When I visited you at the MCC.

6   Q.   And what did you do with it after I gave it to you?

7   A.   I gave it to Sabrina Shroff who was your lawyer at the

8   time.

9   Q.   Do you have a normal practice of what you would do with a

10  document given to you by a client?

11             MR. DENTON:  Objection.

12             THE COURT:  Sustained.

13  Q.   What else did you do with it?

14  A.   Other than give it to your lawyer I don't remember.

15  Q.   In your normal practice would you typically do anything

16  else with the document?

17             MR. DENTON:  Objection.

18             THE COURT:  I will allow it.  Overruled.

19             That is to say, to the extent you received a document

20  from a client like Mr. Schulte at the time, is there anything

21  that you would normally do with it other than give it to the

22  lawyer on the case?

23             THE WITNESS:  It would depend what the document was,

24  but --

25             THE COURT:  Keep your voice up, please.

M765sch3

```
1            THE WITNESS:  It would depend what the document was,
2    but sometimes scan it in or give it to the lawyer or make a
3    copy.
4    BY MR. SCHULTE:
5    Q.  And did you distribute this document to anyone else besides
6    the lawyer?
7    A.  No.
8            MR. SCHULTE:  No further questions.
9            THE COURT:  Cross-examination?
10           MR. DENTON:  No, your Honor.
11           THE COURT:  Ms. Sotnick, can you put your mask back on
12   and step down?  You are excused at this time.
13           (witness excused)
14           THE COURT:  Ms. Smallman, can I talk to you for one
15   second, please?
16           (pause)
17           THE COURT:  Ladies and gentlemen, forgive me for doing
18   this but I'm having a technology issue that I need to fix, it
19   may take about five minutes.  So rather than having you sit
20   here, what I am going to do is have Ms. Smallman take you into
21   the jury room here and not bother to take you all the way to
22   the jury room downstairs; we will fix it, and then we will
23   proceed with the next defense witness.
24           So don't discuss the case, don't do any research about
25   the case, continue to keep an open mind, and with that you are
```

M765sch3

1    excused to follow Ms. Smallman just into the jury room here.

2              THE DEPUTY CLERK:  All rise.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M765sch3

1          (Jury not present)

2          THE COURT:  You may be seated.

3          I obviously said that.  There is no reason the jury

4    should know we are implementing partial courtroom closure but

5    that's the plan, so to the extent that you are not authorized

6    to remain in the courtroom pursuant to the orders that I

7    issued, that is, members of the defendant's family, parties,

8    and two pool reporters I think are the extent of it, please

9    leave at this time and you may watch in the overflow courtroom

10   20B.  And once folks have left, I will ask the CISO to just

11   confirm that everybody remaining is authorized to be here.

12          (pause)

13          THE COURT:  Are we in position to confirm?

14          CISO:  Yes, your Honor.

15          THE COURT:  Anything else that need to happen outside

16   to implement the order?  Are we ready to go?

17          CISO:  As long as the hallway is cleared we are good

18   to go.

19          THE COURT:  Mr. Schulte, the first witness you intend

20   to call is Cheng, you said?

21          MR. SCHULTE:  Yes.  That is correct, yes.

22          THE COURT:  So whoever is taking care of the logistics

23   out there, as soon as the hall is clear and we are ready to go,

24   let's bring Cheng into the witness stand and we will go from

25   there and proceed directly after with David after we are done

M765sch3

1   with him.

2          Just so we are all on the same page, these are

3   witnesses who are testifying only with first names?  Any

4   thoughts?  I think I will have Ms. Smallman say "please state

5   and spell your first name" or should I say no name at all?

6   What's the best way to handle it?

7          MR. DENTON:  I think it is fine to just say first

8   name, your Honor.  The Court has previously explained to the

9   jury the different sets of rules.  If there is any indication

10   that they don't seem to understand why that's the question here

11   and not the full name, if the Court wants to remind them of

12   that instruction, that's fine with us.

13          THE COURT:  I think my thought is Ms. Smallman should

14   ask them to state and spell their first name, and first name

15   only, and I will remind the jury that I have previously

16   authorized certain witnesses to testify and/or be referred to

17   only by first names and that this is one such witness and they

18   shouldn't consider that in connection with their deliberations.

19          Good?

20          MR. DENTON:  That makes sense to us, your Honor.

21          THE COURT:  Mr. Schulte?

22          MR. SCHULTE:  Yes, that's fine.

23          THE COURT:  As soon as Cheng is here we will proceed.

24          THE COURT:  Mr. Cheng, could you please come up to the

25   witness stand?  Step up here, have a seat, and Ms. Smallman

M765sch3

1     will get the jury.

2                  (witness takes the stand)

3                  THE DEPUTY CLERK:  All rise.

4                  (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M765sch3

1           (Jury present)

2           THE COURT:  You may be seated.  Sorry about that.

3   Thank you for your patience to fix my problem.  So we are ready

4   to proceed.

5           Mr. Schulte, please call your next witness.

6           MR. SCHULTE:  The defense calls Cheng.

7           THE COURT:  Ladies and gentlemen, just a reminder, I

8   think I told you this earlier in the case but certain witnesses

9   I have approved, have allowed some witnesses to be identified

10  or to testify under only their first names or even under a

11  pseudonym, and that's to protect their work at the CIA, either

12  present or former.  This is one such witness so he will be

13  testifying only with his first name.  You should weigh the

14  testimony of any witness just as you would any other witness

15  and I will give you instructions on that score at the

16  conclusion of the case and not weigh it differently just

17  because I have authorized them to use first names only or

18  pseudonym, nor should you consider the fact that I have allowed

19  them to proceed in that manner is in any way an expression of

20  my opinion as to the facts in the case.  You, and only you, are

21  the exclusive judges of the facts in this case.

22          So with that, Cheng, if you could please rise and rise

23  your right hand?

24  CHENG,

25      called as a witness by the Defendant,

1          having been duly sworn, testified as follows:

2                  THE COURT:  You may remove your mask at this time.

3                  Could you just spell Cheng for the record, please?

4                  THE WITNESS:  C-H-E-N-G.

5                  THE COURT:  Could you move your chair forward and move

6          the microphone so that you are an inch or two away from the

7          microphone, as I am?  And, please keep your voice up.

8                  THE WITNESS:  C-H-E-N-G.

9                  THE COURT:  Mr. Schulte, you may proceed.

10         DIRECT EXAMINATION

11         BY MR. SCHULTE:

12         Q.  Good morning, sir.  Where do you work?

13         A.  Presently?

14         Q.  Yes.

15         A.  I work at a company called XXXXXX.

16         Q.  Where did you work during the 2016 to 2018 time period?

17         A.  From 2016 to 2018 I worked at the same company.

18         Q.  And your work, through your work you were contracted to

19         work at the CCI office, right?

20         A.  Yes.

21         Q.  Which branch did you work for?

22         A.  I worked in RDB.

23         Q.  And that's part of EDG, correct?

24         A.  Yes.

25         Q.  And have you heard of the DevLAN system?

M765sch3                          Cheng - Direct

1    A.  I have.

2    Q.  What is DevLAN?

3    A.  It is a software development network.

4    Q.  And this network was run through EDG, correct?

5    A.  Yes.

6    Q.  Did you work on the DevLAN system?

7    A.  I did.

8    Q.  Have you heard the term wild, wild west associated with

9    DevLAN?

10   A.  That would be opinions of people who had worked on DevLAN.

11             THE COURT:  Just keep your voice up, please, and move

12   closer to the microphone.

13             Have you heard that term in connection or in reference

14   to DevLAN?

15             THE WITNESS:  Yes.  People who had worked on DevLAN

16   had given that opinion.

17   BY MR. SCHULTE:

18   Q.  And what did you understand it to mean?

19             MR. DENTON:  Objection.

20             THE COURT:  Sustained.

21             THE WITNESS:  I'm sorry?

22             THE COURT:  You don't need to answer it.

23             Next question.

24   BY MR. SCHULTE:

25   Q.  And prior to your work here, did you work at the NSA?

M765sch3                         Cheng - Direct

 1   A.  I did.

 2   Q.  And did you work at NSA during the Snowden leak?

 3   A.  Yes.

 4   Q.  And when you moved to the CIA, how did the DevLAN network

 5   compare?

 6   A.  As far as development-wise the tools available were to, you

 7   know, the specific work, that kind of thing.  As far as how it

 8   was maintained, that kind of thing, it was maintained

 9   differently.

10   Q.  Particularly the security?

11   A.  Yes.  The difference in security was different between when

12   I was working at NSA and with the Agency.

13   Q.  It was an open system, right?

14              MR. DENTON:  Objection.  Form.

15              THE COURT:  Will you just define what you mean by

16   that?

17              MR. DENTON:  Leading.

18              THE COURT:  Sustained.

19   BY MR. SCHULTE:

20   Q.  Was DevLAN an open system?

21   A.  I'm not familiar with what you may be referencing as an

22   open system.

23   Q.  OK.

24              Were there shared passwords on DevLAN?

25   A.  I do not recall that.

1    Q.  What is the difference in security between the NSA system

2    and DevLAN?

3                 MR. DENTON:  Objection.

4                 THE COURT:  Just in general terms.  You said that they

5    were different.  Can you explain what you meant by that?

6                 THE WITNESS:  As far as the security restrictions put

7    in place, there were differences.

8                 THE COURT:  Can you just generally describe what those

9    differences were?

10                THE WITNESS:  The policies put in place at the NSA

11   were at a heightened posture.

12   BY MR. SCHULTE:

13   Q.  On DevLAN system you were an administrator, right?

14   A.  No, I was not.

15   Q.  On your local -- on your DevLAN box, right?

16   A.  Correct.

17                THE COURT:  Meaning you were an administrator on your

18   DevLAN box?

19                THE WITNESS:  Within my workstation.

20                THE COURT:  Can you explain what you mean by that?

21                THE WITNESS:  Yes.

22                So when you are given your workstation you are allowed

23   to set it up, configure it, that kind of thing, but that's

24   restricted to the workstation that you perform your work on.

25                THE COURT:  And by "workstation," is that a computer

1    or computer system?  What do you mean by workstation?

2              THE WITNESS:  Workstation meaning a computer.

3              THE COURT:  So in other words, you were sort of an

4    administrator of your own computer that you were given to work

5    on?  Is that what you are saying?

6              THE WITNESS:  Yes.

7    BY MR. SCHULTE:

8    Q.  And you said the security at NSA was heightened.  Can you

9    explain what you mean by that?

10   A.  There are essentially a set of policies and what not

11   assigned to each -- every account as well as every work station

12   such that -- for security purposes.

13   Q.  Were you concerned by the security practices on DevLAN?

14   A.  As far as the differences?

15   Q.  Yes.

16   A.  I was -- coming from a network that was in an increased

17   security posture it was surprising.

18             THE COURT:  Meaning you were surprised at the

19   relative -- the fact that it was not similarly heightened, that

20   the DevLAN security system was not heightened?  Is that an

21   accurate statement?

22             THE WITNESS:  Yes.

23   BY MR. SCHULTE:

24   Q.  And it is fair to say -- so it is fair to say that you

25   believed security on DevLAN was lax?

1          MR. DENTON:  Objection.

2          THE COURT:  Sustained as to form.

3   Q.  Was the security on DevLAN lax?

4   A.  Just by personal opinion?

5   Q.  Yes.

6          MR. DENTON:  Objection.

7          THE COURT:  Sustained.

8   Q.  What, in particular, surprised you about DevLAN security?

9   A.  It's mainly that developers can essentially work on their

10  own workstations without restrictions, that kind of thing.  The

11  policies put into place as far as transferring data onto the

12  network was trust-based.  Things like that.

13  Q.  Did you ever communicate any of your concerns with anyone?

14  I'm sorry?

15  A.  I'm sorry.  No, I did not.  When you are introduced to the

16  network there is just the general comments, that kind of thing,

17  and that's where the wild, wild west terminology comes from, is

18  just a broad understanding of the staff working at that

19  location.

20  Q.  So essentially there are no controls -- there are no --

21         THE COURT:  Sustained as to form.

22  Q.  So what sorts of restrictions existed at the NSA that were

23  not on DevLAN?

24         MR. DENTON:  Objection.

25         THE COURT:  Sustained.

M765sch3                          Cheng - Cross

1               MR. SCHULTE:  No further questions.

2               THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. DENTON:

5    Q.  Good morning, sir.

6    A.  Good morning.

7    Q.  When Mr. Schulte was asking you some questions just now he

8    asked you about administrator privileges on workstations on

9    DevLAN.  Do you remember that?

10   A.  Yes.

11   Q.  There were also servers on DevLAN, right?

12   A.  Yes.

13              MR. SCHULTE:  Objection.  Beyond the scope.

14              THE COURT:  Overruled.

15   BY MR. DENTON:

16   Q.  You were not an administrator on those servers, right?

17   A.  No, I was not.

18   Q.  You don't know what the security settings were on those

19   servers, right?

20              MR. SCHULTE:  Objection.

21              THE COURT:  Overruled.

22   A.  No, I did not.

23   Q.  Mr. Schulte asked you about your use of DevLAN for your

24   work.  Do you remember that?

25   A.  Yes.

M765sch3

1    Q.  And one of the things you used on DevLAN were products made

2    by a company called Atlassian, right?

3              MR. SCHULTE:  Objection.  Beyond.

4              THE COURT:  I will allow just to see where it goes but

5    go ahead, Mr. Denton.

6              Sorry.  Answer the question, Cheng.

7              THE WITNESS:  Can you repeat the question?

8              THE COURT:  Yes.  Just keep your voice up, please.

9    BY MR. DENTON:

10   Q.  One of the things that you used to do work on DevLAN was

11   software made by a company called Atlassian, right?

12   A.  Yes.

13   Q.  And you were not an administrator of the Atlassian

14   services, right?

15   A.  No, I was not.

16             MR. SCHULTE:  Objection.

17             THE COURT:  Overruled.

18   Q.  You do not know what security settings there were on the

19   Atlassian products, right?

20   A.  No, I do not.

21             MR. DENTON:  No further questions, your Honor.

22             THE COURT:  All right.  You may step down, Cheng.

23   Thank you.  Please put your mask on before you step down and

24   you are excused.

25             (Witness excused)

M765sch3                          Dave - Direct

1                   THE COURT:  Your next witness, Mr. Schulte?

2                   MR. SCHULTE:  The defense calls Dave.

3                   THE COURT:  All right.  As we await the next witness,

4       probably obvious but this next witness is another one I have

5       authorized to use a first name only so my instructions about

6       that earlier would apply to him as well.

7                   Dave, please step up.  You can remove your mask and

8       please raise your right hand for my deputy to administer the

9       oath to you.

10      DAVE,

11           called as a witness by the Defendant,

12           having been duly sworn, testified as follows:

13                  THE COURT:  I think we can do without spelling Dave's

14      name.  With that, Mr. Schulte, you may proceed.

15                  Move your chair up so you are speaking into the

16      microphone and keep your voice up.  With that, we will proceed.

17                  Mr. Schulte, Go ahead.

18      DIRECT EXAMINATION

19      BY MR. SCHULTE:

20      Q.   Have you heard of the DevLAN system?

21      A.   Yes.

22      Q.   What is DevLAN?

23      A.   DevLAN is a closed network used for development of network

24      exploitation tools.

25      Q.   Was DevLAN a secure system?

M765sch3                              Dave - Direct

1    A.  Yes.

2    Q.  You described it to the FBI as the wild, wild west;

3    correct?

4                MR. DENTON:  Objection.

5                THE COURT:  Sustained.

6    Q.  How did you describe DevLAN to the FBI?

7    A.  As the wild, wild west.

8    Q.  And what sorts of work was done on DevLAN?

9    A.  Development of network exploitation tools, reverse

10   engineering of malware primarily.

11   Q.  Did it have the same security policies as the other

12   networks at the CIA?

13   A.  No.

14   Q.  Was every developer a local admin on their own systems?

15   A.  Yes.

16   Q.  How many developers were developing malware on DevLAN?

17   A.  I don't remember specifically but somewhere in the 120,

18   maybe, 120 folks.

19   Q.  Were there shared passwords on DevLAN?

20   A.  Yes.

21   Q.  Developers could access each other's projects, right?

22   A.  Yes.

23                MR. DENTON:  Objection.

24                THE COURT:  Sustained as to form.

25                Watch your form, please, Mr. Schulte.

M765sch3                          Dave - Direct

1   BY MR. SCHULTE:

2   Q.  Could developers access each others' projects?

3   A.  Yes.

4   Q.  Could you connect DevLAN to the Internet?

5   A.  Potentially, yes.

6   Q.  And how would this be done?

7   A.  If someone were to --

8          MR. DENTON:  Objection.

9          THE COURT:  Overruled.

10  A.  If someone were to move a network cable from one machine to

11  another.

12  Q.  And what other computer systems did developers have at

13  their desks?

14  A.  They had Internet work stations.

15  Q.  And what were -- what networks were those systems on?

16  A.  The systems were on an Internet connected system.

17  Q.  And was there any security monitoring tools in place that

18  would have prevented the swapping?

19  A.  There were monitoring systems on the Internet that showed

20  connections to websites and machines that were on the network.

21  Q.  Was there any monitoring in place to detect if a computer

22  from DevLAN was connected?

23  A.  You would see a computer connect on, if it had a computer

24  name that would connect on -- pull an IP address or connect to

25  the screen, you would see it.

M765sch3                          Dave - Direct

1  Q.  So you would see a new connection on the network?

2  A.  Correct.

3  Q.  But you wouldn't know if that system was on DevLAN?

4          MR. DENTON:  Objection.

5          THE COURT:  Sustained as to form.

6  Q.  Would you know if a system newly connected to the Internet

7  came from DevLAN?

8  A.  We could tell by the computer name.

9  Q.  And what do you mean by that?

10  A.  Each computer name on each network was named uniquely as to

11  which network it was connected to.

12  Q.  So you are referring to the domain that it is registered

13  to; is that right?

14          MR. DENTON:  Objection.

15  A.  I am referring to the computer name which is different from

16  the domain.

17  Q.  OK, but developers could change the computer name, right?

18  A.  Yes.

19          THE COURT:  Sustained as to form.

20          Mr. Schulte, please watch the leading questions,

21  please.

22  BY MR. SCHULTE:

23  Q.  Could developers change the computer name on their systems?

24  A.  Yes.

25  Q.  And developers could bring malware on to -- let me

M765sch3                          Dave - Direct

1   rephrase.

2          Could developers bring malware onto the DevLAN system?

3   A.  Yes.

4   Q.  And malware is -- malware is a way to infect computer

5   systems, right?

6          THE COURT:  Sustained as to form.

7   Q.  How do you define malware?

8   A.  I would define malware as any type of software that is

9   executed on a computer for the purposes of obtaining

10  information without the user's knowledge or damage to the

11  computer or something other than what the expressed purpose for

12  that computer is supposed to be doing.

13  Q.  Was there malware on the DevLAN system?

14  A.  Yes.

15  Q.  What is Stash?

16  A.  Stash is a code repository for code that the developers

17  used for building software.

18  Q.  What would you say to be the most important component on

19  the DevLAN system?

20  A.  I guess I would need a little more clarification on that

21  question.

22  Q.  So why was DevLAN created?

23  A.  DevLAN was created for reverse-engineering of malware,

24  creation of new software tools to be used by other groups

25  within CCI.

M765sch3                          Dave - Direct

1   Q.  With respect to that goal, what would you say is the most

2   important component on the DevLAN network?

3   A.  I would say the code repository.

4   Q.  And that would be Stash, right?

5   A.  Yes.

6   Q.  Did you ever copy Stash into your home directory?

7   A.  I did.

8   Q.  Do you know how the home directories were set up on DevLAN?

9   A.  I do.

10  Q.  Could developers copy code into home directories?

11  A.  Developers could copy code to home directories if the other

12  developers allowed those developers to have access to those

13  directories.

14  Q.  So your testimony is each developer could set up controls

15  on his home directory?

16  A.  Yes.

17  Q.  And how would that happen?

18  A.  It is all based upon Windows active directory and Windows

19  permissions.  Because you have control of your home directory

20  you can assign permissions to whoever you would like to have

21  access to that folder.

22  Q.  I am going to show what is in evidence as Defendant's

23  Exhibit 1201.  Does this list access controls?

24  A.  Yes.

25  Q.  Do you see the entry for home directories?

M765sch3                         Dave - Direct

1   A.  Yes.  Let me look -- yes, I see home right in the middle of

2   the page.

3   Q.  Yes.

4   A.  OK.

5   Q.  Do you see the user or group name associated with this

6   access control?

7   A.  I do.

8   Q.  What is that?

9   A.  It is everyone.

10  Q.  And what is the access type for everyone?

11  A.  Full control.

12  Q.  And what does full control mean?

13  A.  Full control means that you can have access if -- anything

14  underneath home unless specifically -- what is the easiest way

15  to explain this?

16          The home directory everyone has access to.  The

17  folders underneath will have specific permissions on them but

18  if new folders -- someone could add a folder to home and it

19  would -- it would -- add a folder to home and they would be --

20  it would inherit permission for everybody -- full control for

21  everybody.

22  Q.  So everyone had full control through this directory?

23          MR. DENTON:  Objection.

24          THE COURT:  Sustained as to norm.

25  Q.  Did everyone have full control to this directory?

M765sch3                        Dave - Direct

1    A.  To that head -- to the top directory which was home, they

2    did.

3    Q.  And do you see any other access controls in this document

4    that would change those controls?  It is five pages, I am just

5    going to scroll through it.

6    A.  Yes, read.  So everyone's directory underneath was read.

7    Q.  I'm sorry?

8    A.  Everyone's access type underneath was read so they could

9    read the contents of the directory.

10         THE COURT:  What other forms of access are there aside

11   from read?

12         THE WITNESS:  That's all it shows here; source gold @

13   @everybody loan, gold copies, Windows, user group Windows,

14   access type:  Read.

15         THE COURT:  My question is, is read access different

16   than full access?

17         THE WITNESS:  Yes.  Yes, it is.

18         THE COURT:  How does it differ?

19         THE WITNESS:  The difference is you can read the

20   contents of the directory, you cannot upload new files, you

21   cannot delete files, you can only see what is there.

22   BY MR. SCHULTE:

23   Q.  And this access control applies to a different directory on

24   that server?

25   A.  Yes.

M765sch3                          Dave - Direct

1   Q.  And that, I think you said it in your testimony but what is

2   the name of that share?

3   A.  Source gold and binary gold copies.

4   Q.  And that's different from the home share, right?

5   A.  Yes.

6   Q.  And this directory, are there any additional restrictions

7   to the home directory?

8   A.  There is different shares with different permissions, yes.

9   Q.  Specifically, with respect to the home directory, are there

10  any other access controls for that directory?

11  A.  Below home, yes.  Everyone -- under home, everyone had

12  their own personal directory.  By default, that directory was

13  set up upon user creation as full control for only that user

14  and only that user could read, write, or see into that

15  directory.

16  Q.  Do you see that reflected in this document?

17  A.  You would have to scroll up so I could see the rest of it.

18  These are different share names off of the server FS-01.

19          THE COURT:  Just to clarify so I understand, the home

20  directory is home for the entire DevLAN server; is that

21  correct?

22          THE WITNESS:  It's for user shares so individual user

23  shares.  It was organized that most -- everyone would have

24  their own personal drive that they could store stuff up to the

25  network so that it could be network backed up.  Branches would

1   have their own group share directory so they could collaborate

2   within the branch.  So it was a tiered setup as across the

3   organization, a setup the way the organization was defined.

4           THE COURT:  But would your own individual personal

5   drive be in the home folder?

6           THE WITNESS:  Yes.  Correct.

7           THE COURT:  So the home folder itself was full control

8   to everybody across OSB; is that correct?

9           THE WITNESS:  So the way Windows permissions work, in

10  order for people to be able to get to their directory you have

11  to give them access -- everyone has to have access to the

12  primary directory so you have home and then you will have all

13  the users under home.  You need to enable -- everyone has

14  permission to Home so they can drill down into their individual

15  directory.  Now, they won't be able to get to other directories

16  but they will be able to get to theirs unless they

17  specifically, the developers tended to give permissions to some

18  of the folks that they were working with to access their home

19  directory but they would specifically add permissions to their

20  folder.

21          THE COURT:  So your personal folder within the home

22  directory could have different access control?

23          THE WITNESS:  It could, yes; from what we initially

24  set up.

25          THE COURT:  And the default setup for the personal

M765sch3                         Dave - Direct

1    folder within home is limited just to the user?

2              THE WITNESS:  Correct.

3              THE COURT:  And then the user had administrative

4    privileges to grant access to others?

5              THE WITNESS:  Correct.

6              THE COURT:  OK.

7              THE WITNESS:  Because they own that folder.

8    BY MR. SCHULTE:

9    Q.  OK, but the access controls in this document do not reflect

10   that, do they?

11   A.  So what you have shown here is -- are the Windows default

12   permissions, built-in administrators, FS-01 DC backup.  These

13   are different shares off FS-01 that have different access

14   controls.  So the one you have showing right now that you just

15   scrolled off is division -- share name Division, so that would

16   be the different divisions within EDG.  The owner is the DevLAN

17   admins, domain admins, access is full control.

18   Q.  OK, but if the restrictions as you described existed, then

19   you would see those permissions for each individual user, you

20   would see a different set of permissions than everything?

21             THE COURT:  Sustained.

22   A.  Potentially.

23             THE COURT:  Sustained as to form.  Please don't answer

24   the question.

25             THE WITNESS:  Sure.

M765sch3                        Dave - Direct

1           THE COURT:  Mr. Schulte, because it is direct

2      examination you are not permitted to ask leading questions so

3      please try to refrain from doing so.

4      BY MR. SCHULTE:

5      Q.  Access control lists -- to your knowledge, what do access

6      control lists show?

7      A.  Access control shows who is allowed to view that directory

8      or the files within that directory, read them, write them, or

9      delete them, or copy them.

10     Q.  So if the restrictions that you testified about were in

11     place, would you not see it on this document?

12          THE COURT:  Sustained as to form.

13     Q.  If the restrictions you testified about were in place,

14     would you see it on this document?

15     A.  You would see some of them.  This is not a directory

16     listing of everything, it enumerated of all the directories and

17     folders and files on FS-01.  This is a very high level of it.

18     There were probably thousands of directories.

19     Q.  OK.  But if there were access controls different on those

20     subdirectories, would they be listed here?

21     A.  No.

22     Q.  How do you know?

23     A.  Because they would not be listed -- you have to list the

24     subdirectories to show them.  Things are not inherited, it is

25     called inheritance in Windows active directory.  So, the

M765sch3                        Dave - Direct

1   subdirectories that are below the primary directories will, by

2   default, inherit the permissions from the directory above

3   unless specifically changed.

4   Q.  OK, so what would you need to do to get those access

5   controls?

6   A.  You would have to list them, you would have to get those

7   individual directories, and you would have to look at the

8   permissions.  In Windows it is typically a right click in

9   properties in selecting the security tab.

10  Q.  So in order to get the full listing of all the access

11  control lists from the FS-01 server, what would you need to do?

12  A.  You would need to look at almost every directory and follow

13  it down each path and pull directories -- subdirectories to

14  make sure that inheritance is not blocked if there were special

15  permissions put on each subdirectory file all the way down to

16  the file level.  It would be quite a task.

17  Q.  Can you tell from this document what the -- if there were

18  access controls on any of the home directories?

19  A.  No.  Besides full control on the top home directory.

20  Q.  Did you make a second copy of Stash?

21  A.  I did.

22  Q.  What did you do with that?

23  A.  That was per our customer's request, was saved to an

24  external hard drive to be stored offline.

25  Q.  And when did you make this copy?

M765sch3                      Dave – Direct

1    A.   I made that copy on April 16th, I believe is the date,

2    2016.

3    Q.   Where did you place that hard drive?

4    A.   That hard drive was initially placed in the safe at my

5    desk.

6              (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M76Wsch4                          Dave - Direct

1    BY MR. SCHULTE:

2    Q.  And did there come a --

3             THE COURT:  Can you just explain, obviously not

4    specifying, but what you mean by a customer.  Was that an

5    office or --

6             THE WITNESS:  Yeah.

7             THE COURT:  -- person within the CIA?

8             THE WITNESS:  Yeah, that was -- Jeremy Weber directed

9    me to do that.  Jeremy Weber directed me to do that.

10   BY MR. SCHULTE:

11   Q.  And did there come a point when you retrieved the Stash

12   hard drive from the safe?

13   A.  There was a time that I moved it out of the safe and into

14   my desk drawer.

15   Q.  And the hard drive -- and at that point did the hard

16   drive -- at that point you didn't do anything to delete Stash

17   from that hard drive?

18   A.  I did not, not that I remember.  That was quite some time

19   ago.

20   Q.  And do you know what happened to that hard drive?

21   A.  Specifically, no, I can't remember exactly if I had the

22   disk -- most likely had the disk destroyed, but I can't

23   honestly tell you.  I don't remember.  It was quite some time

24   ago.

25   Q.  OK.  But to your knowledge, did you ever find that drive?

M76Wsch4                          Dave - Direct

1    A.  To my knowledge, I do not remember specifically what the

2    end result of that drive was.  I can testify what I probably

3    did to it, but I don't specifically remember.

4    Q.  Did you make any notation about destroying it?

5    A.  I did not.

6    Q.  OK.  Did you lose track of it?

7    A.  I would say I did not.  I just don't remember the exact

8    disposition of what ended up with that drive.

9    Q.  OK.  So sitting here -- OK.

10        Where did you track it to?

11   A.  The drive remained in my desk after I had the safe removed

12   for a while.  So it most likely -- if it left my desk, it went

13   into a destruction bin.  That would be the only thing I would

14   do to it.  No one would take stuff out of my desk.  My desk was

15   typically locked, and we worked in a small vault with only

16   about six people in that vault, with access to only those six

17   people, to gain access to that vault.

18   Q.  Is it in your desk now?

19   A.  No.  The FBI, when they came through, took everything out

20   of my desk.  All media.

21   Q.  But did the FBI find the drive?

22   A.  I don't know.  I don't remember.

23   Q.  OK.  So sitting here today --

24            THE COURT:  Just to clarify, when you say the FBI came

25   through and removed everything from your desk, is that after

M76Wsch4                           Dave - Direct

1   the WikiLeaks leak --

2             THE WITNESS:  Yes.

3             THE COURT:  -- in March 2017?

4             THE WITNESS:  That is correct.

5             THE COURT:  So as part of their investigation, they

6   took everything from your desk?

7             THE WITNESS:  Correct.

8             THE COURT:  And do you know if they did that for other

9   people who worked in the vault?

10            THE WITNESS:  Yes.  They did that for everybody.

11  BY MR. SCHULTE:

12  Q.  OK.  When the FBI began its investigation, did they ask you

13  where the hard drive was?

14  A.  Not that I recall.

15  Q.  OK.  I'm going to show you -- do you recall another

16  proceeding that took place in this case?

17  A.  You would have to give me some more information.

18  Q.  Yeah.  Did you -- did you ever testify under oath about

19  this case before?

20  A.  I did.

21  Q.  And that was in 2020, correct?

22  A.  Yes.

23  Q.  OK.  And at that proceeding, you were asked by the FBI if

24  you ever made a copy of Stash and put it on a hard drive, and

25  you answered yes?

M76Wsch4                         Dave - Direct

1              MR. DENTON:  Objection.

2              THE COURT:  Sustained.

3              (Standby counsel conferred with defendant)

4    BY MR. SCHULTE:

5    Q.  OK.  Were you asked this question at the proceeding?

6              MR. DENTON:  Objection.

7              THE COURT:  May we have a page number, Mr. Schulte.

8              MR. SCHULTE:  Sorry.  It's transcript page 860 to 861.

9    Q.  And at that proceeding, the FBI -- do you recall being

10   asked whether the FBI asked you where the hard drive was?

11   A.  I -- I don't remember.  That was a long time ago.

12             (Defendant conferred with standby counsel)

13             MR. SCHULTE:  OK.  I'm going to show just the witness

14   and the parties page 860 to 861.

15   Q.  Do you recall being asked at that proceeding whether the

16   FBI inquired into where the hard drive was?

17             MR. DENTON:  Objection.

18             THE COURT:  Sustained.

19             You can have the witness look at the document if you

20   wish, and then you can ask a question about whether that

21   refreshes his recollection.

22   BY MR. SCHULTE:

23   Q.  Does this refresh your recollection that you testified that

24   you were unsure --

25             THE COURT:  Sustained.

M76Wsch4                           Dave - Direct

1           You can ask him if it refreshes his recollection about

2      the issue that you previously asked that he didn't recall, but

3      not about what he previously testified to.

4      BY MR. SCHULTE:

5      Q.  Does this refresh your recollection about the hard drive?

6      A.  Yes.

7      Q.  OK.  And when the FBI began its investigation, did you

8      still possess that hard drive?

9      A.  I don't remember.

10     Q.  Does this refresh your recollection about that?

11              MR. SCHULTE:  Let me scroll down.

12              THE WITNESS:  It says here --

13              THE COURT:  No.  Don't say what's on the document.

14              THE WITNESS:  No, I'm not.  Sorry.

15              THE COURT:  The question is looking at the document,

16     does it refresh your recollection about whether you still

17     possessed the hard drive when the FBI began --

18              THE WITNESS:  And I wasn't sure back -- I was not sure

19     if I still had the hard drive.

20              THE COURT:  So sitting here today, having looked at

21     this document, you don't recall whether --

22              THE WITNESS:  I do not recall.

23     BY MR. SCHULTE:

24     Q.  OK.  But by the time the FBI came, had you lost track of

25     the hard drive?

1          THE COURT:  Mr. Schulte, he testified he doesn't

2     remember whether he had it at the time the FBI came or not.  So

3     let's move on, please.

4     BY MR. SCHULTE:

5     Q.  Did you ever mention the safe to the FBI?

6          THE COURT:  Let's take this document down, please.

7     A.  I do not recall whether I mentioned that to the FBI or not.

8          MR. SCHULTE:  OK.  I'm going to show the witness the

9     page again.

10    Q.  Specifically about the safe, does this refresh your

11    recollection about that?

12    A.  Yes, it does.

13         THE COURT:  So sitting here today, do you recall

14    whether you told the FBI about the safe?

15         THE WITNESS:  I do recall that, and I did not tell

16    them about the safe.

17    BY MR. SCHULTE:

18    Q.  OK.  Did you tell them about ever wiping the drive?

19    A.  I don't recall that as well.

20    Q.  Does this refresh your recollection about wiping the drive?

21         THE COURT:  No.  The question is whether it refreshes

22    your recollection about whether you told the FBI about wiping

23    the drive.

24         MR. SCHULTE:  All right.

25    Q.  Does this refresh your recollection about telling the FBI

M76Wsch4                          Dave - Direct

1    whether you had wiped the drive?

2    A.  That is correct.  It does.

3    Q.  OK.  And did you tell the FBI -- or --

4              (Defendant conferred with standby counsel)

5    BY MR. SCHULTE:

6    Q.  Did you tell the FBI that you had wiped the hard drive?

7    A.  I did not.

8              THE COURT:  Do you know sitting here today whether you

9    wiped the hard drive?

10             THE WITNESS:  Honestly, your Honor, I do not remember.

11   BY MR. SCHULTE:

12   Q.  OK.  Did you ever make copies of Confluence or Stash on to

13   other drives?

14             THE COURT:  Let's split that up, please.

15   BY MR. SCHULTE:

16   Q.  OK.  Did you ever make copies of Confluence on to other

17   drives?

18   A.  Could you give me a better definition of what you mean by

19   copies?  To other hard drives?  To file system shares?

20   Q.  Well, specifically, did you ever make copies of Confluence

21   on to other shares on the FS01 server?

22   A.  Yes.

23   Q.  And what shares did you copy it to?

24   A.  I do not remember the share specifically.  The Confluence,

25   the two servers in question were originally running, they were

M76Wsch4                        Dave - Direct

virtual machines running on a server managed by OSB.  At some

point we, when we took control of the servers, shortly

thereafter, we moved those servers, copied them to our

infrastructure, ISB's infrastructure, to run on ISB's ESX

servers.

          THE COURT:  And where did you work; in ISB?

          THE WITNESS:  I worked in ISB.

          THE COURT:  At all times, in 2016 --

          THE WITNESS:  Yes.

          THE COURT:  -- and 2017?

          THE WITNESS:  Yes.  I was there for about 11 years.

BY MR. SCHULTE:

Q.  OK.  Do you recall the FS01 shares OSB test repo?

A.  Yes.

Q.  Do you recall the share DS00?

A.  I do not recall DS00.

Q.  OK.  And did you ever make copies of Confluence on OSB test

repo?

A.  Looking back, I do remember making a copy to OS test repo.

If I remember correctly, it was because we had to stage the

virtual machine copy somewhere because we could not make a

direct connection from ISB's shares to the ESX server that was

running Confluence.  So we had to stage it to OSB repo and then

move it off of there.

Q.  OK.

M76Wsch4                       Dave - Direct

1    A.   Into where its final destination was.

2    Q.   And where was the final destination?

3    A.   It was on the virtual machine share that was used off of

4    FS01 for running all the EDG VMs that we managed.

5    Q.   And do you recall what that share name was?

6    A.   Top of my head, I do not recall right now.

7    Q.   OK.  I'm going to show you what's marked as 3515-505, and

8    if you can just read this to yourself and look up when you're

9    done.

10            THE COURT:  Have you finished reading that paragraph?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  OK.  Your question.

13   BY MR. SCHULTE:

14   Q.   OK.  Does this refresh your recollection about where it was

15   copied to?

16   A.   Yes.

17   Q.   So what share was it copied to?

18   A.   DS00.

19   Q.   OK.  And do you know what the access controls were for OSB

20   test repo?

21   A.   I do not know off the top of my head.

22   Q.   Do you know what the access controls were for DS00?

23   A.   Specifically, no.  But I can, in -- generally tell you that

24   they were NFS-controlled and -- I will retract that.

25        No, I do not know specifically.

M76Wsch4                          Dave - Direct

1    Q.  All right.  I'm going to pull back up Defense Exhibit 1201.

2    And can you tell me what the access controls were on the FS01

3    OSB test repo?

4    A.  Everyone.

5    Q.  OK.  And do you recall if you made copies to any other

6    directories on the FS01 server?

7    A.  Not that I recall from anything we've already talked about.

8    Q.  OK.  Do you know how many server rooms there were for

9    DevLAN infrastructure?

10   A.  For DevLAN infra -- for DevLAN, there were three server

11   rooms.

12   Q.  OK.  And did you have to badge in to those rooms?

13   A.  Only one.

14   Q.  In the server room, were there Post-its with passwords on

15   them?

16   A.  I personally don't recall that.

17   Q.  OK.  Do you know what RDP is?

18   A.  I do.

19   Q.  What is RDP?

20   A.  Remote Desktop Protocol.

21   Q.  You can -- can you use RDP to access someone else's

22   computer?

23            MR. DENTON:  Objection.

24            THE COURT:  Sustained as to form.

25   BY MR. SCHULTE:

M76Wsch4                         Dave - Cross

1    Q.  Have you ever used RDP to access someone else's computer

2    before?

3    A.  Yes.

4    Q.  Did you ever RDP into my computer?

5    A.  I may have, yes.

6               (Defendant conferred with standby counsel)

7               MR. SCHULTE:  No further questions.

8               THE COURT:  All right.

9               Ladies and gentlemen, you may be wondering about our

10   schedule today.  I'd very much like to finish this witness

11   before we take any sort of break.  So with your indulgence and

12   your patience, we will proceed with cross-examination at this

13   time.

14              Mr. Denton.

15              MR. DENTON:  Thank you, your Honor.

16   CROSS-EXAMINATION

17   BY MR. DENTON:

18   Q.  Good afternoon, sir.

19   A.  Good afternoon.

20              MR. DENTON:  Ms. Cooper, could we put up Defense

21   Exhibit 1201 for a second, please.

22   Q.  Mr. Schulte spent a while asking you a number of questions

23   about this document.  Do you remember that?

24   A.  Yes.

25   Q.  Do you see at the top where it says CIFS share ACL?

M76Wsch4                        Dave - Cross

1    A.  Yes.

2    Q.  CIFS is an acronym, right?

3    A.  Yes.

4    Q.  What does it stand for?

5    A.  I do not recall off the top of my head.  It's Windows --

6    it's for Windows permissions, basically, Windows protocol.

7    Q.  And what is a share?

8    A.  A share is just an ability for -- it's a place to share

9    folders, files, information, based upon permissions.

10   Q.  It's network storage, right?

11   A.  Correct.

12            MR. SCHULTE:  Objection.

13            THE COURT:  Overruled.

14   BY MR. DENTON:

15   Q.  Mr. Schulte asked you a number of questions about a share

16   named Home, right?

17   A.  Yes.

18   Q.  Just at the share level, what is Home?

19   A.  Home is the central point for all individual user shares on

20   DevLAN.

21            MR. DENTON:  Ms. Cooper, could we put up what's in

22   evidence as Government Exhibit 1207-60.

23   Q.  Now, sir, this is what you would see if you navigated to

24   that share, right?

25   A.  Correct.

M76Wsch4                          Dave - Cross

1    Q.  And you've got all these individual folders with people's

2    names on them, right?

3    A.  Correct.

4    Q.  And those individuals could decide what permissions they

5    wanted on those folders, right?

6    A.  Yes.

7    Q.  You had a folder there, right?

8    A.  I did.

9    Q.  What permissions did you set on your folder?

10   A.  I was the only one allowed to access my folder.

11   Q.  So where it said on defense exhibit 1201 that access was to

12   everyone, that just got you to this page, right?

13   A.  Correct.

14   Q.  Mr. Schulte then asked you some questions about a copy of

15   Stash that you made.  Do you remember that?

16   A.  Yes.

17           MR. DENTON:  Ms. Cooper, we can take this down.

18   Q.  And you said you did that on April 16, right?

19   A.  Correct.

20   Q.  And was that of 2016?

21   A.  Yes.

22   Q.  What were you doing on April 16 of 2016?

23           MR. SCHULTE:  Objection.

24           THE COURT:  Overruled.

25   A.  On April 16, 2016, we were asked to come in on a Saturday

M76Wsch4                         Dave - Cross

1    to change administrative privileges on all the Atlassian

2    products.

3    Q.  And specifically, what privileges were you changing?

4    A.  Administrative.

5    Q.  And you were taking privileges away from people, right?

6    A.  Yes.

7    Q.  And specifically, you were taking privileges away from the

8    developers who used to run the products, right?

9            MR. SCHULTE:  Objection.  Beyond the scope.

10           THE COURT:  Overruled.

11   A.  Yes.

12   Q.  And that included taking privileges away from Mr. Schulte,

13   right?

14   A.  Yes.

15   Q.  After April 16, 2016, Mr. Schulte was not authorized to do

16   anything --

17           MR. SCHULTE:  Objection.

18   Q.  -- with the Atlassian products, right?

19           MR. SCHULTE:  Objection.

20           THE COURT:  Sustained.

21   BY MR. DENTON:

22   Q.  The copy of Stash that you made on April 16, 2016, was what

23   you call a backup copy, right?

24   A.  Yes.

25   Q.  Has two components, right?

M76Wsch4                        Dave - Cross

1    A.  Yes.

2    Q.  A SQL database and a zip file, right?

3    A.  Correct.

4    Q.  And you made a copy of the specific backup for that day,

5    April 16, right?

6    A.  Correct.

7    Q.  That was not the March 3 backup, right?

8    A.  No.

9    Q.  Mr. Schulte then asked you a number of questions about

10   copies of Confluence that you made, right?

11   A.  Yes.

12   Q.  Those are a different kind of copy, right?

13   A.  Yes.

14   Q.  That's a copy of the entire virtual machine, right?

15   A.  Yes.

16   Q.  Not that two-part backup with a SQL and a zip file, right?

17   A.  Yes.

18   Q.  And you were doing that because you were moving that server

19   to new infrastructure, right?

20   A.  Yes.

21   Q.  Why were you moving it off of OSB infrastructure?

22   A.  We were moving it off OSB infrastructure for control of the

23   virtual machine.  There were -- if you have a virtual machine

24   on an ESX or host that hosts virtual machines, if you have

25   access to that virtual machine, you don't have access to the

M76Wsch4                         Dave - Cross

1    VM.  That VM could be copied, deleted, snapshotted, and

2    changed.  You do not have full control over that VM.

3    Q.  And so the purpose of the copies that you made that

4    Mr. Schulte was asking you about was to move that VM off of

5    OSB's infrastructure so you would control it, right?

6    A.  Yes.

7              MR. SCHULTE:  Objection.

8              THE COURT:  Overruled.

9    BY MR. DENTON:

10   Q.  And I think you described what you were doing with that

11   copy of the virtual machine as staging, right?

12   A.  Correct.

13   Q.  And Mr. Schulte asked you some questions about the test

14   repo share, right?

15   A.  Yes.

16   Q.  And that's where you were staging the virtual machine,

17   right?

18   A.  That is correct.

19   Q.  Staging is temporary, right?

20   A.  Yes.

21   Q.  A virtual machine is a pretty big file, right?

22   A.  Yes.

23   Q.  Takes up a lot of space, right?

24   A.  It does.

25   Q.  And so you moved it off of OSB test repo when you set it up

M76Wsch4                              Dave - Cross

1    later, right?

2    A.  Yes.

3    Q.  Did it stay on OSB test repo when you set up the virtual

4    machine on ISB infrastructure?

5    A.  At this time I don't remember.  I -- based upon the nature

6    of what we were doing, I would have cleaned it off OSB repo.

7    Q.  And again, that was a different copy of Confluence than the

8    backup files, right?

9              MR. SCHULTE:  Objection.

10   A.  Correct.

11             THE COURT:  Overruled.

12   BY MR. DENTON:

13   Q.  Mr. Schulte then asked you some questions about something

14   called RDP, right?

15   A.  Yes.

16   Q.  Now, in your work in ISB, you essentially provided IT

17   support to EDG, right?

18   A.  Yes.

19   Q.  And RDP is something you used to help people with their

20   computers, right?

21   A.  Yes.  We were -- if I could continue?

22   Q.  Yes.

23   A.  RDP is used as a little bit of a troubleshooting.  If we

24   have a user that's having issues with connections, it allows us

25   to connect to that workstation and view the problem as they

M76Wsch4                          Dave – Redirect

1   would be viewing it without us having to go down and sit down

2   and log in to their computer.  Rarely did we use RDP.

3   Q.  And it's the kind of thing where, like, a little box pops

4   up that says do you want to accept the connection from this

5   person, right?

6   A.  Correct.

7   Q.  So when you RDPed into someone else's computer, you

8   essentially got their permission, right?

9   A.  Correct.

10              MR. SCHULTE:  Objection.

11              THE COURT:  Overruled.

12              MR. DENTON:  If I could just have a second, your

13  Honor?

14              No further questions, your Honor.

15              THE COURT:  Any redirect?

16              MR. SCHULTE:  Very brief.

17  REDIRECT EXAMINATION

18  BY MR. SCHULTE:

19  Q.  Mr. Denton asked you about copying the entire Confluence

20  virtual machine, correct?

21  A.  Yes.

22  Q.  But the Confluence virtual machine would contain all the

23  data from the backups, right?

24              MR. DENTON:  Objection.

25              THE COURT:  Sustained as to form.

M76Wsch4                         Dave - Redirect

1    BY MR. SCHULTE:

2    Q.   Would the Confluence virtual machine contain all the data

3    from the backups?

4    A.   It depends.  I don't recall specifically if there was

5    backup data on that Confluence virtual machine.  As I recall,

6    the Confluence backed up to another file structure on FS01.  I

7    believe it was called Altabackup.

8    Q.   So let me -- the -- there were -- the data on Confluence

9    was what was backed up, right?

10            MR. DENTON:  Objection to form.

11   BY MR. SCHULTE:

12   Q.   Was the data on Confluence backed up?

13   A.   As I previously described, the data was backed up into the

14   Altabackup on FS01, which is an NFS share.

15   Q.   OK.

16   A.   Are you talking about the back -- was Confluence actually,

17   the VM actually backed up?

18   Q.   No.  I'm sorry.  The question is if you had a copy of the

19   Confluence virtual machine, that would contain all the data

20   from any backup, right?

21            MR. DENTON:  Objection.

22            THE COURT:  Sustained.

23            (Defendant conferred with standby counsel)

24   BY MR. SCHULTE:

25   Q.   Would the Confluence virtual machine contain the data from

M76Wsch4                          Dave - Redirect

1   Confluence?

2   A.   Yes.

3   Q.   OK.  And that's the same data that is eventually -- that's

4   the same data that's created in backup?

5   A.   I don't understand that question.

6   Q.   When you run a backup of Confluence, it copies the same

7   data from the VM, correct?

8                MR. DENTON:  Objection to form, but --

9   BY MR. SCHULTE:

10  Q.   OK.  He asked you about staging VMs, correct?

11  A.   Yes.

12  Q.   And you don't -- do you recall ever deleting a copy of the

13  Confluence from OSB test repo?

14  A.   Specifically, I would have as a matter of form.

15  Q.   No.  The question was just do you recall?

16  A.   At this -- at this moment, many years later, no, I don't

17  remember doing that --

18  Q.   OK.

19  A.   -- specifically.

20  Q.   When was the first time that you met with Mr. Denton here?

21               MR. DENTON:  A little beyond the scope, your Honor.

22               THE COURT:  Sustained.

23               MR. SCHULTE:  Nothing further.

24               THE COURT:  Any recross?

25               MR. DENTON:  No, your Honor.

M76Wsch4

1        THE COURT:  All right.  Dave, you may put your mask on

2   and step down.

3        (Witness not present)

4        THE COURT:  All right.

5        Mr. Schulte.

6        MR. SCHULTE:  The defense rests at this point.

7        THE COURT:  OK.

8        Ladies and gentlemen, you just heard that Mr. Schulte

9   has rested his case as well, which means that at this point you

10  have, in fact, heard all of the evidence.  Bear with me for one

11  moment.  I'm going to ask the parties to come up to sidebar

12  just so we can talk through some logistical and scheduling

13  issues.

14        Just so you know, I think what I'm going to do is

15  actually let you go home for the day; that is to say, we're not

16  going to proceed this afternoon.  In part, that is because, as

17  you know, at the conclusion of the case, I'm going to give you

18  instructions about the law.  They're going to be fairly

19  lengthy; I'm giving you a heads-up now.  And we need to sort of

20  work through those and make sure that everybody's in agreement

21  about the precise language, and so forth, as you'll see.

22        That will take some time.  My hope is that we can do

23  that this afternoon.  What I want to talk to them about is just

24  to get a sense of scheduling issues so that I can tell you when

25  to appear tomorrow and what our plans are.  If you bear with

M76Wsch4

1    me, you're welcome to stretch where you are, but just remain

2    where you are for the moment, and I will return to you and give

3    you an update on our plans.

4              Parties.

5              (At sidebar)

6              THE COURT:  First, before we talk about the schedule,

7    I think it would be helpful, it makes sense for me to just

8    confirm for the jury they heard testimony throughout the trial

9    about Dave C.  I assume that everybody agrees that this is the

10   Dave C. that was referenced earlier.  I think given the

11   ambiguities that could otherwise arise from the use of a first

12   name and first name without initials it would pay for me to

13   advise the jury that they heard testimony about a Dave C.

14   Everybody agrees that that was the Dave C. that was referenced

15   in that testimony.

16             Any objection to that?

17             MR. DENTON:  No, your Honor.

18             MR. SCHULTE:  No.

19             THE COURT:  OK.

20             So let's talk about scheduling.  It's about 12:40 now.

21   We need to put some finishing touches on the draft charge.

22   Also, Mr. Schulte probably needs some time to propose those

23   charges that he mentioned earlier as well as any proposed

24   charges on the NDI issue and the Counts Three and Four issues

25   that I flagged over the weekend.  I guess the question is can

M76Wsch4

1    we do the following.

2            If we got you the draft jury charge -- I'll figure out

3    what that would mean in your case, Mr. Schulte.  If we got it

4    to you in about two hours, so about 2:45 or so at the latest

5    and possibly even earlier, could we reconvene at 4:00 to have a

6    charge conference so that we can begin promptly tomorrow

7    morning with summations?

8            MR. DENTON:  That's fine with us, your Honor.

9            (Defendant conferred with standby counsel)

10           MR. SCHULTE:  Yeah, so, I think -- am I able to -- if

11   I'm able -- am I able to go back to the SCIF to work on this

12   and finish this up; I think that should be enough time.

13           THE COURT:  OK.  I think the answer is yes, but I'll

14   confirm that when we let the jury go.

15           Just for my planning purposes tomorrow, do you have an

16   estimate, government, how long your summation is likely to be?

17           MR. LOCKARD:  Around two hours, hopefully a little

18   shorter.

19           THE COURT:  And Mr. Schulte.

20           MR. SCHULTE:  About the same.

21           THE COURT:  And obviously hard to tell rebuttal, but

22   I'm guessing half an hour, give or take.

23           MR. DENTON:  At the outside, your Honor.

24           THE COURT:  OK.  Very good.

25           Anything else you need to discuss now?  I'm going to

M76Wsch4

1    let the jury go, and then we can talk about logistics of all

2    this.

3              MR. DENTON:  Not from the government, your Honor.

4              (Defendant conferred with standby counsel)

5              MR. SCHULTE:  Oh, I need to move for a Rule 29 at the

6    end of the defense case.

7              THE COURT:  All right.  We'll take that up after the

8    jury goes.

9              MR. SCHULTE:  OK.

10             THE COURT:  Thank you.  Very good.

11             (In open court)

12             THE COURT:  All right.  Thank you for your patience,

13   and not just that moment, but throughout today.  I know it's

14   been a little bit of a different schedule and structure today.

15   But as I said, it's just harder to choreograph at this stage.

16             I am going to let you go in a moment so that we can

17   take care of everything that we need to take care of before we

18   can proceed with the summations.  It may take a while, and so

19   rather than have you sit in the jury room and come back today

20   so we can only get the beginning of the summations done, I

21   think it makes a lot more sense to finish what we need to do

22   today and then proceed with all the summations tomorrow.  So

23   that's the plan.  Hopefully you don't mind getting dismissed

24   early from school today.

25             We will start tomorrow, I hope, at the same time.

M76Wsch4

1    Same time, same place, which means you should be in the jury

2    room by 8:45.  Summations are also a little bit hard to

3    choreograph, because it makes sense to wait to finish each

4    before taking any sort of break.  So I'll ask you to bear with

5    us tomorrow as well.  I did ask you to sit at least until 4:00.

6    It's possible that I will end up dismissing you early tomorrow

7    if it didn't make sense to me to begin my instructions

8    tomorrow.  If I think I can get through my instructions

9    tomorrow, then I may ask you to stay for that, but we'll have

10   to play it a little bit by ear.  Again, it's just harder to

11   choreograph these stages of things.

12          Either way, I would anticipate that your deliberations

13   would begin no later than the day after tomorrow.  I mentioned

14   to you earlier that when your deliberations begin, I would be

15   asking you to stay until 5:00, so I'm going to ask you to do

16   that not tomorrow but beginning the day after tomorrow.  So

17   please plan accordingly.  I hope this is welcome news, all

18   things considered.  It does mean that we're actually ahead of

19   the pace that I had previously thought we'd be on, so in that

20   sense, hopefully that's welcome news and not unwelcome news.

21          Very important reminders.  Do not discuss the case

22   with each other or with anyone else.  All right?  You've now

23   heard all the evidence.  All the evidence is in, but you have

24   not heard the parties' arguments, and those are very, very

25   important in understanding the evidence and contextualizing it,

M76Wsch4

1    deciding what conclusions to draw from it and so on and so

2    forth.  So that's a very important part of the case even if

3    it's not technically evidence.  Nor have you heard my

4    instructions about the law, which includes what conclusions

5    you'll need to draw; that is to say, what issues you will need

6    to decide.

7            Those are very important things, and for that reason,

8    you should continue to keep an open mind.  You should continue

9    to ensure that you don't discuss the case with each other or

10   anyone else for that matter, and obviously, you should continue

11   to avoid any research about the case or reading anything about

12   the case or anything of that sort.  So with those very

13   important but surely familiar instructions at this point, I

14   will excuse you for the day.  Please be back in the jury room

15   no later than 8:45 tomorrow.

16           Ms. Smallman will correct me if I'm wrong.  I think we

17   will probably have lunch order forms for you tomorrow -- no,

18   not tomorrow.  Beginning with deliberations we'll have lunch

19   order forms, so not tomorrow, but I'll give you further

20   instructions about that tomorrow.  Bottom line is tomorrow,

21   bear with us as we get through the day, but be in the jury room

22   by 8:45 so we can start promptly.

23           With that, I wish you a very pleasant afternoon and

24   evening, and we'll see you tomorrow.

25           Thank you very much.

M76Wsch4

```
 1                (Jury not present)
 2                THE COURT:  You may be seated.  If somebody can close
 3     the door back there, I'd be grateful.
 4                Thank you.
 5                All right.  As discussed at sidebar, I need to put
 6     some finishing touches on the draft jury instructions.
 7     Obviously, I won't have an opportunity to consider any
 8     instructions that Mr. Schulte submits.
 9                But while I do that, Mr. Schulte, you'll have an
10     opportunity to draft any that you wish to submit for my
11     consideration, either in response to my order over the weekend
12     about the NDI instructions and the Count Three and Count Four
13     instructions or with respect to the documents-information
14     distinction that you referenced earlier or, for that matter,
15     anything else.  So while I'm putting the finishing touches on
16     my draft, you can come up with any proposals that you want to
17     make.
18                I'm going to try to get you the draft instructions no
19     later than 2:45.  First, my impression is, Mr. Schulte, the
20     marshals are OK with Mr. Schulte going to the SCIF.
21                THE MARSHAL:  Yes, your Honor.
22                THE COURT:  Great.  And what's the easiest way for us
23     to get a copy of the draft charge to Mr. Schulte in the SCIF?
24                MR. SCHULTE:  I think you can email it to standby
25     counsel, and they can get a copy.
```

M76Wsch4

1            THE COURT:  Great.  As soon as we are done, we will

2    email copies to standby counsel and counsel for the government.

3    Again, I'm hoping that that will be no later than 2:45.  It may

4    even be sooner.  We certainly had a solid draft before this

5    morning, but there are some issues that we're still working on.

6    In the meantime, frankly, if either side has additional

7    proposals that they want me to consider, you can either draft

8    those or submit them, as the case may be, recognizing that,

9    obviously, I can't consider them until I get them.

10           As you'll see, the draft charge will have two things.

11   One is line numbers.  The second is annotations for anything

12   that is not a standard charge of mine.  The annotations will be

13   stripped from the copy of the instructions that is ultimately

14   given to the jury.  That's just for your reference and my

15   reference as to sources and authority for a particular

16   instruction.

17           I will keep the line numbers in just because I think

18   it's helpful for us in the charge conference to be able to

19   reference particular lines, and if the jury has any questions

20   about the instructions, it also enables them to do so in an

21   easy way.  So when we have the charge conference, and we will

22   do that this afternoon, I would expect, beginning with the

23   government, to go through basically from beginning to end, for

24   you to reference by page number and line number anything that

25   you have an objection to or correction to, any sort of

1    suggestion or submission.

2              Needless to say, if you catch typos, please bring them

3    to my attention.  No ego here on that front.  I'm sure you'll

4    find typos, and I would much prefer to catch them on the front

5    end, so the more eyes the better.  So if anyone catches a typo,

6    please share it with us.  But bottom line is, more

7    substantively, any objections or suggestions that you have, you

8    should reference by page number and line number, and we'll go

9    through from beginning to end, and then Mr. Schulte will have

10   an opportunity to do the same.

11             At that time, you should also plan to discuss the

12   Count Nine issues that I raised in my order yesterday and also

13   the issues that Mr. Schulte raised earlier about the redactions

14   to the transcript that he wishes to rely on as part of closing.

15   So I need to know what that involves.  Hopefully we can discuss

16   that in open session.  If not, we'll figure out how to proceed.

17             So the plan would be to reconvene here at 4 p.m. for

18   the charge conference, assuming that I can get you the charge

19   within approximately two hours.

20             Anything else that you need to discuss?

21             I neglected to tell the jury that Dave was Dave C.  I

22   apologize for that.  I'll do that first thing tomorrow.  I

23   think no harm in that delay, but that is my plan.

24             Anything else from the government?

25             MR. DENTON:  Just one point to note for the record

M76Wsch4

1    regarding the Court's order yesterday about the NDI issue.

2           Your Honor, we, per the Court's order, got the process

3    started for classification review on the transcript of those

4    conferences.  That is very much in process.  In taking a look

5    at it, I do think that there are some potential complications

6    of the interaction between the public right of access

7    referenced in the order and the sealing provisions of Section 6

8    of CIPA.  Bottom line, we're getting a redacted version done,

9    and we would just appreciate the opportunity to be heard when

10   the time comes on what should or should not be public there.

11          THE COURT:  That is fine, and we can do that in due

12   course.

13          There's more urgency, obviously, with respect to any

14   redactions that need to be made to the trial transcript, since

15   I think it's in everybody's interest to ensure that before

16   summations tomorrow, we're all on the same page with respect to

17   what, if anything, is redacted.  That means, again per my

18   discussion earlier, I take it that we're up to date through

19   last Thursday.  I think whoever needs to review the transcript

20   from today, that needs to be done expeditiously, and by the end

21   of today, we need to all be on the same page as to whether

22   there's any redactions to be made there.  OK?

23          MR. DENTON:  Understood, your Honor.

24          THE COURT:  Anything else from you, Mr. Denton?

25          MR. DENTON:  No, your Honor.

M76Wsch4

1              THE COURT:  Mr. Schulte.

2              MR. SCHULTE:  Yes, a couple things.

3              I just wanted to make sure to put on the record that I

4      move for a Rule 29 motion after the defense rests.

5              THE COURT:  OK.

6              MR. SCHULTE:  And --

7              THE COURT:  And I would say same ruling as earlier.

8      Denied with respect to the CFFA -- I think that's the

9      acronym -- counts, and I reserve judgment on the other

10     arguments that you made.

11             MR. SCHULTE:  OK.

12             And then if -- standby counsel was saying that they

13     may be able to email you versions that we have for the NDI and

14     other stuff that the Court requested.  So I don't know if the

15     Court wants us to do that or would prefer just to wait until

16     the charge conference at four.

17             THE COURT:  If you have something, the earlier the

18     better for my purposes because then I can consider it before I

19     give you my initial proposed draft.

20             MR. SCHULTE:  OK.

21             THE COURT:  So if you have it, fantastic.  Email it,

22     and then you should also file it on ECF so that it's part of

23     the public record.  But the sooner the better.

24             MR. SCHULTE:  OK.

25             THE COURT:  And that goes for anything else that you

M76Wsch4

1    draft in the next two hours.  If you're faster than I am and

2    you're able to get me something before I get you anything, then

3    great; send it along.

4              MR. SCHULTE:  OK.

5              And then the last thing, I just wanted to put on the

6    record that defense exhibit 1201 that was showing the access

7    controls, so we had requested from the government all access

8    controls, including home directories and everything, and in

9    discovery, this is the only document they produced and they

10   said there were no access controls on the home directory.

11             So I think there's, you know, a significant issue, and

12   this is not the only testimony.  There's other testimony from

13   the tech experts where they were able to say things that we had

14   requested and weren't able to review since we didn't have

15   access to any forensic images of those servers.  So I just

16   wanted to put that on the record, that it's caused significant

17   issues.

18             THE COURT:  OK.  Given your role at the CIA at the

19   time, I have to imagine that you would have personal knowledge

20   of the fact that the access controls might be different than

21   what's reflected in 1201, but be that that as it may.

22             Mr. Denton, anything you want to put on the record

23   about this?  I hear no application, so in terms of just making

24   a record, anything you wish to say?

25             MR. DENTON:  No, other than to note that obviously the

M76Wsch4

1      Court has addressed the defendant's access to these materials

2      repeatedly, and we don't think this changes anything.

3                THE COURT:  All right.

4                And then final thing, let get an updated version of

5      the exhibit list with respect to what was admitted today.  If

6      the government can complete that and get it to Mr. Schulte, I

7      want to make sure that, no later than tomorrow morning,

8      everybody's in agreement about what is in evidence and we have

9      a plan for getting that to the jury as soon as they begin their

10     deliberations.

11               On that score, we can discuss this later, but am I

12     correct that the only classified exhibit that came into

13     evidence was GX1, the WikiLeaks leak; that there's no other

14     classified exhibit in evidence?

15               MR. SCHULTE:  There was a second exhibit.  It was just

16     a technical thing, like, 1207 something, I believe.  That was

17     the other.  It had all the forensic stuff from my workstation.

18     It was, like, a massive document.  That was the other

19     classified exhibit.

20               THE COURT:  OK.  I wasn't sure.  So 1207 --

21               MR. DENTON:  It's 1203-28, your Honor.

22               THE COURT:  OK.  And is the plan, would both of those

23     be on a laptop that's provided to the jury in the jury room

24     separate and apart from any exhibits that are loaded on to our

25     system for them?

M76Wsch4

1          MR. DENTON:  Government Exhibit 1 is on the laptop.

2      The laptop itself is the evidence item from the FBI.

3          1203-28 is currently on a classified disk.  I think we

4      can probably provide a classified laptop that has just that,

5      but I think I'll talk to Ms. Cooper and to the security folks,

6      and we'll work something out with Ms. Smallman and chambers on

7      how to handle that.

8          THE COURT:  And GX1, does the laptop work?  Does it

9      have a power cord?

10         MR. DENTON:  Yes.

11         THE COURT:  OK.  Great.  Why don't you talk through

12     how that will be handled.  Most of the documentary exhibits

13     will all be loaded on to our system, which enables them to

14     access it through the network, so obviously, the classified

15     exhibits should not be loaded on to that and should be handled

16     separately.  But you should think through how that should be

17     done.

18         Anything else to discuss before we break so that we

19     can make the most of our afternoon?

20         Mr. Denton.

21         MR. DENTON:  Just on that point, your Honor, am I

22     correct in my impression that it is not the Court's practice to

23     give the jury copies of either the indictment or the jury

24     charge in their deliberations?

25         THE COURT:  You're wrong.  It is my current practice

M76Wsch4

1    to give them copies of the jury charge.  I always do that.  And

2    whether I give them copies of the indictment turns, actually,

3    on the particulars of the case.

4         I think it would make sense to do it here just given

5    the number of charges and the nuances between them.  And in

6    particular, with respect to Count Nine, perhaps, given the

7    statements that are referenced therein, I think it would

8    probably be helpful to them, but I'm happy to discuss that as

9    part of the charge conference if there's disagreement or

10   discussion about what that would entail.

11        MR. DENTON:  Happy to take it up then, your Honor.

12        THE COURT:  All right.

13        Mr. Schulte, anything else before we break?

14        MR. SCHULTE:  Yes.  Just one thing about the laptop

15   with the classified exhibits.  I don't think that it should be

16   marked as classified or sensitive, or anything like that, in

17   any way to give prejudice to the defense about the documents.

18        THE COURT:  All right.  GX1, I think, is in evidence,

19   and however it's marked it's marked.  So we're not going to

20   change that.

21        MR. SCHULTE:  I'm talking about the laptop itself, the

22   physical laptop, like no stickers on it or anything.

23        THE COURT:  But I think GX1 is a physical laptop, and

24   whatever form it's in now is the form it's going to go to the

25   jury.  So that is what that is.

M76Wsch4

1               To the extent that Mr. Schulte is raising issues with

2       respect to the other exhibit, 1203-28, I guess, why don't we

3       plan to discuss that at the charge conference and discuss how

4       that would be done.  All right?

5               Anything else that we need to discuss now or want to

6       put on the radar for later discussion?

7               (Defendant conferred with standby counsel)

8               THE COURT:  The clock is ticking.

9               MR. DENTON:  Not that I think we need to take up now,

10      your Honor.  Thank you.

11              THE COURT:  All right.

12              Mr. Schulte.

13              MR. SCHULTE:  No, nothing further.

14              THE COURT:  All right.  I will see you here at 4:00,

15      and hopefully we can work through all these issues and the

16      charge.

17              See you then.

18              (Recess)

19

20

21

22

23

24

25

M765sch5

1              THE COURT:  You may be seated.

2              We are starting five minutes late because I started

3    editing the draft six minutes after I told you I would aim for

4    so I made up for it.

5              So, in addition to the charge we have a handful of

6    other things to address.  Maybe it makes sense to take up

7    Rule 29-related issues as to Count Nine first since that may

8    have bearing on the proposed charge, although I think to some

9    extent the proposed charge flags some of the issues or attempts

10   to address some of the issues that I think there may be.

11             So I guess let me put to the government two things.

12   One is do you agree or concede that there is no basis for an

13   instruction charge based on any statements that Mr. Schulte

14   made in the first initial interview on March 15th, 2017 prior

15   to his receipt of the grand jury subpoena, that is to say is

16   there any evidence in the record from which a jury could find

17   that he knew when he made those statements before receiving the

18   subpoenas that he knew that there was a pending grand jury

19   proceeding?

20             MR. DENTON:  So let me take that in a couple of parts,

21   your Honor.

22             I think, first of all, it is a question of how much is

23   a reasonable inference for the jury to draw.  There is

24   obviously evidence that the defendant was searching for and

25   visiting websites about the investigation of the leaks and the

M765sch5

1   FBI's involvement in it and the fact of a criminal

2   investigation that predates that interview, so there is

3   evidence in that.  I don't think there is any evidence in the

4   record that specifically uses the words "grand jury" at that

5   point.  We didn't introduce what the actual websites were that

6   he visited, only the searches.  I think, however, this gets to

7   a broader question which is kind of the distinction between an

8   obstruction charge in this context and, for example, a false

9   statements charge in which the unit would be sort of the

10  particular statement as opposed to, as charged here, the effort

11  to impede or obstruct the grand jury proceeding which is

12  charged as a single offense and is a ongoing offense that

13  involves multiple false statements to the grand jury.  And so,

14  in that context if we were taking alone the statements that

15  were made during the first interview there might be a separate

16  question, but in the context of an ongoing pattern of conduct

17  of false representations made to the FBI in connection with

18  their investigation which he learned, beyond any doubt, at the

19  end of that proceeding -- the end of that first interview I

20  should say, was a grand jury proceeding which he personally was

21  served with a subpoena as well as a subpoena for his phone.  I

22  think, again, the jury can consider the conduct during the

23  first interview as part of the overall effort to impede the

24  grand jury's investigation.

25          THE COURT:  So it is your position that, let's say,

M765sch5

1    there is an effort to impede a government investigation but the

2    defendant acquires knowledge that it is a grand jury

3    investigation at some point after the efforts begin but before

4    they conclude, that the jury could base the obstruction

5    conviction on conduct before the defendant learned of the grand

6    jury proceeding?

7          MR. DENTON:  Not exclusively on that conduct, no.

8    Like I said, I think here it is a continuing course of conduct

9    that includes components that occurred both before and after

10   the specific provision of the grand jury subpoena to him.

11         THE COURT:  So that may be so, but how could it

12   possibly constitute obstruction at a point in time when he is

13   not aware that there is a proceeding to obstruct?

14         First of all, I think the argument you are

15   articulating sounds a lot like Justice Scalia's dissent in

16   *Aguillar*, but bracket that for a moment, even if that is right,

17   it strikes me that it requires subjective knowledge that there

18   is a grand jury proceeding because, in the absence of that

19   knowledge it's not possible, by definition, to have the

20   necessary intent, namely the corrupt intent to obstruct or

21   interfere with a proceeding if you don't know about the

22   proceeding at all.

23         MR. DENTON:  That much is certainly true, your Honor.

24   So there is no disagreement on that score.  Again, like I said,

25   I think the difference here between an obstruction charge and a

M765sch5

1    false statements charge is that there are not six different

2    counts of obstruction for the false statements conviction

3    because if we parsed that finely, there is a course of conduct

4    being the obstructing the grand jury proceeding -- I think we

5    can address this when we get to the Court's charge -- but I

6    think the Court's charge on what is required with respect to

7    both nexus and knowledge does appropriately inform the jury

8    about what they can and should consider there.  And so, if the

9    question is would the statements from the first interview, if

10   that was all there was, suffice to support a conviction on

11   Count Nine, the answer is probably not but that's not what

12   there is here and that's not what is charged either.  So I

13   think in that context it is certainly reasonable for the jury

14   to consider conduct that is part of the continuing pattern,

15   subject to the instruction that the Court intends to give them

16   that an element of the offense is did the defendant have

17   knowledge of the proceeding.

18              THE COURT:  So I said we would bracket the charge for

19   a moment but just jumping to the language that I proposed on

20   page 44, do you agree with that way of handling it?  So lines 5

21   to 7:  For that reason, I instruct you that you may not find

22   this element of Count Nine satisfied based on the defendant's

23   conduct including any statement he may have made before he was

24   served with a grand jury subpoena.

25              MR. DENTON:  So I think there is some -- I think we

1    sort of question whether that last sentence is necessary in

2    that it sort of directs them to the service of the grand jury

3    subpoena separate and apart from the knowledge of the

4    investigation.  In principle, though, we do agree with that.

5    And certainly the first two sentences, lines 1 through 5 on

6    page 44, certainly do accurately convey the necessary

7    instruction we think.

8             THE COURT:  OK.  So how does this differ from the

9    facts in *Aguillar* where first of all there was a federal

10   district judge who was the target of that investigation,

11   probably someone far more schooled than Mr. Schulte with

12   respect to the ways of criminal investigations and the

13   likelihood of a grand jury investigation and, indeed, the

14   evidence there, I gather, is that during the conversation he

15   explicitly asked the agent if the matter was the subject of a

16   grand jury investigation and was told that it was, albeit not

17   that his statements would be repeated to the grand jury and,

18   indeed he testified, as Justice Scalia notes in dissent, that

19   it was his impression that his statements to the FBI agents

20   would be reported to the grand jury.  And, even so, the

21   majority found that that did not satisfy the elements of the

22   obstruction count that you are charging here.

23            MR. DENTON:  So I think there is two things, your

24   Honor.  The first is what *Aguillar* does not address.  The

25   Second Circuit has subsequently noted that sort of the nexus

M765sch5

1    requirement from *Aguillar* is satisfied in situations where the

2    obstruction is aimed at a third-party in a way in which it is

3    foreseeable to the defendant that the third-party would act on

4    the false statement or otherwise in a way that would result in

5    obstructing the proceeding.  Among others, that's *United States*

6    *v. Desposito*, 704 F.3d 221, 231 (2d Cir. 2013), and for that

7    reason there was some fairly extensive testimony I think from

8    Special Agent Evanchec about not just what he said to the

9    defendant, kind of how that informed actions that were taken as

10   part of the investigation which were sort of before the grand

11   jury at that point.  So I think in that context there is sort

12   of more than there was in *Aguillar*.

13          Second, I think again at the point at which the

14   defendant has, if we are talking about the second and third

15   interviews which form the bulk of the statements, the defendant

16   was actually given a grand jury subpoena for his own testimony

17   at that point and so we are, at that point, well beyond sort of

18   the impression from *Aguillar* that his statements might be

19   conveyed to a grand jury that an FBI agent had told him existed

20   and was generally looking into the conduct.  At that point the

21   defendant is well on notice that his own statements are the

22   subject of the grand jury's investigation.

23          THE COURT:  Is that so?  He is certainly on notice

24   that the grand jury wishes to hear from him, but directly.  It

25   might actually lead someone to draw the opposite inference,

M765sch5

1    that his statements to the FBI aren't going to be reported to

2    the grand jury unless they're inconsistent with what he

3    testifies to before the grand jury directly.

4              MR. DENTON:  Well, I think, your Honor, first of all,

5    I don't think there is anything in *Aguillar* or the subsequent

6    case law that limits the form of obstruction through false

7    statements to perjury before the grand jury itself.  Certainly

8    the statute does not contain any such limitation and I am not

9    sure of any case law that goes that far.  I think this is also

10   an issue that would present fairly staggering consequences for

11   criminal investigations more generally and that it is obviously

12   the case that it is frequently the election or preference of

13   criminal defendants, including in this case Mr. Schulte and his

14   counsel, to meet with the government and FBI rather than

15   testify before the grand jury.  It would be sort of an odd

16   conclusion to find, absent any limitation in the statute, that

17   somehow that precluded an obstruction of the investigation of

18   which he is aware.

19             THE COURT:  I don't know if I agree with that.  Among

20   other things you could, as you have, charged him with a 1001

21   violation, indeed he has been convicted of the 1001 violation

22   so the question it just whether it fits the elements of a

23   particular crime you have charged here.

24             I am going to look at the case that you cited in a

25   moment.  Assume for the moment that, if I am not persuaded that

M765sch5

1    this is distinguishable from *Aguillar*, right now I am at least

2    persuaded that I need to think about it more carefully and

3    therefore we want to reserve judgment on whether the count, as

4    a whole, survives *Aguillar*.  I am very concerned about the

5    possibility of a verdict that doesn't make clear -- I take what

6    you said before as something close to a concession that if the

7    jury's verdict were based solely on the statements that he made

8    before he received the grand jury subpoena that there may well

9    be a problem with that verdict.  So I'm concerned about a

10   verdict, if the jury convicts on Count Nine, where it's either

11   I or a later Court conclude that a verdict, based on statements

12   during that interview, would not support a conviction and the

13   verdict is not clear as to whether the jury relied on those

14   statements.  That was the effort that I made on page 44 to

15   essentially avoid any possibility of that.

16           What is your thought on that score?

17           MR. DENTON:  So again, I think your Honor correctly

18   instructs the jury about the requirement of the defendant's

19   knowledge but, again, I think this is sort of an odd

20   circumstance.  It was not necessarily incumbent on the

21   government to itemize sort of the overt acts of falsehood in

22   the indictment.  We could have charged this case simply by

23   referring to the statutory element of acting corruptly to

24   impede, endeavor to impede, etc. an ongoing proceeding, to wit,

25   by making false statements to the FBI.  So I don't think there

M765sch5

1    is a circumstance here in which sort of the inclusion of what

2    might, in another context, be considered overt acts,

3    necessarily sort of leads to the conclusion that the jury is

4    going to reach an improper verdict in a circumstance where they

5    are, as either some or all of the top seven lines of page 44,

6    correctly instructs them as to the level of knowledge that they

7    must find the defendant had in order to convict him on Count

8    Nine.

9          THE COURT:  Mr. Schulte, anything you wish to say?

10   Let's take it in order.  First on Count Nine, generally with

11   respect to *Aguilar* and its progeny, I am just reading

12   *Desposito* now.

13         MR. SCHULTE:  Yes.

14         So I think the mere knowledge of an investigation is

15   not equivalent knowledge of a grand jury proceeding.  These are

16   distinct legal things so for the government to say that, oh,

17   because he Googled and saw that there was an investigation that

18   that means that there is a grand jury proceeding.  I think the

19   Court is right to say that these are not the same thing so I

20   don't think that these statements or anything made prior to

21   knowledge of a specific -- prior to knowledge of a grand jury

22   investigation that those statements, that it is just not

23   possible for statements to be made to impede a grand jury that

24   there is no knowledge about that proceeding at all.

25         With respect to the testimony or what evidence is

M765sch5

1    actually -- what is actually in evidence, it was only Agent

2    Evanchec, the first witness, who testified about the statements

3    relevant for Count Nine and he testified about the March

4    interview at Pershing Square but he gave very bare bones

5    testimony about any subsequent interviews.  The government did

6    not elicit specific testimony about the statements during the

7    subsequent interviews.  It was very specific to the actions

8    before the grand jury subpoena was issued.  There wasn't

9    testimony elicited about the various statements that are

10   actually outlined in the indictment so I think that's another

11   big issue there.

12           As far as -- there is no evidence that the agents ever

13   even informed me, aside from giving me the grand jury subpoena

14   after which I don't go to a grand jury, there is no -- there is

15   no grand jury proceeding that actually occurs, and that meeting

16   directly with the FBI there is no -- there is nothing in

17   evidence to say that I would think that there would be a grand

18   jury proceeding still, that it wasn't cancelled because I

19   agreed to talk with the FBI.  I have no knowledge about the

20   fact that there is even a grand jury proceeding that exists

21   after the fact because there was just no testimony, there is

22   nothing on the record to show that I would know that that would

23   continue.  But I think the biggest issue is, like I said, is

24   simply that the only statements that Evanchec testified about

25   were statements that were made before there was ever a grand

M765sch5

1    jury subpoena, and then after the fact there is nothing in

2    evidence.

3         THE COURT:  All right.  So I think I am going to

4    reserve judgment on the Rule 29 motion with respect to Count

5    Nine.  I will confess that I have pretty serious doubts about

6    whether it should be granted.  In light of *Aguillar* it does

7    seem to me that the argument is making is quite close to the

8    argument rejected -- argument of dissent -- that did not carry

9    the day.  That being said, looking at *Desposito*, the Second

10   Circuit, for example, has found that the nexus requirement is

11   satisfied in situations where the discretionary actions of a

12   third person are required to instruct the judicial proceeding

13   if it was foreseeable to the defendant that the third-party

14   would act on the communication in such a way as to obstruct the

15   judicial proceeding.  I think I would like to see -- I think I

16   need to do further research or you to do further research in

17   the first instance on how far that principle has been taken and

18   whether it would extend to this situation which does seem quite

19   close to the facts of *Aguillar* to me.

20        So, I will reserve judgment on the Rule 29 motion and

21   I guess we can bracket, for the moment until we get to it in

22   the jury instructions, how to deal with the count as a matter

23   of instructions mindful of my concern, again, that I think we

24   want to know precisely what the jury -- we want to minimize, to

25   the extent possible, any possibility, if the jury returns a

M765sch5

1    verdict on the basis of statements for which there is

2    insufficient evidence to support a verdict.

3           So, two things we need to be thinking about before we

4    get there.  One is whether I ought to incorporate some of the

5    language that I just read from *Desposito* into the instructions

6    somehow; and the second is whether to keep what I have done,

7    which is to keep a pretty explicit instruction that they cannot

8    rely on statements that were made before the service of the

9    grand jury subpoenas at the end of that interview.  So bracket

10   those for now but we will discuss them when we get there.

11          We also need to talk about the transcript redactions.

12   I am happy to do that now or after we conclude with the jury

13   instructions.  I don't have a particularly strong feeling one

14   way or another.

15          MR. DENTON:  So, your Honor, I think from an

16   administrative perspective all of the transcript redactions

17   have been completed.  We have confirmed that from a substantive

18   perspective we are happy to discuss that whenever the Court

19   would prefer with respect to the one issue the defendant

20   raised.  I will note that I think there will be one very

21   limited application with respect to the transcript today that

22   literally concerns I think a single word but --

23          THE COURT:  I am guessing that I can guess it.

24          MR. DENTON:  I imagine you probably can, your Honor,

25   but I think that is sufficiently not substantive, that it

M765sch5

1     shouldn't affect the parties' preparations for tomorrow.

2              THE COURT:  OK.  So I guess, Mr. Schulte, to the

3     extent we can discuss it in this setting, do you want to tell

4     me what redactions, assuming you have seen all of them, what

5     redactions to the earlier transcripts you would object to or

6     have a problem with?

7              MR. SCHULTE:  I think the problem is through the

8     process I haven't really been alerted to what the redactions

9     are.  I only just yesterday saw the redactions for the Jeremy

10    Weber testimony which is important for me to sum up on that I

11    gave the numbers earlier.  So it refers to the -- his testimony

12    about the Bartender and basically whether this information is

13    already exposed by WikiLeaks.

14             THE COURT:  There are two issues; one is I agree that

15    Mr. Schulte needs to know what has been redacted.  I sort of

16    idly assumed perhaps that he was privy to the redactions that

17    were being proposed as we were proceeding but I think he needs

18    to know that.  Can that be done now?  Has that been done?

19             MR. DENTON:  To the extent he is not, your Honor, we

20    are happy to do that.  I think we were operating under the same

21    assumption that as we conveyed these things to the Court,

22    standby counsel was conveying them to him.  I think we provided

23    him with hard copies when we could but obviously a lot of this

24    was happening over nights and weekends as well.

25             THE COURT:  Is there a way to quickly provide him with

M765sch5

1    whatever the redactions are?  What's the best way to do this?

2              MR. DENTON:  I think we can put something together

3    quickly to provide to him, your Honor.

4              THE COURT:  Then why don't we table that until we

5    conclude the rest of the charge conference and hopefully we

6    will be able to circle back to it.

7              Again, beginning with the government going in order,

8    any suggestions to the draft I submitted earlier?

9              MR. DENTON:  We have a few things, some more

10   significant than others as we go.  Do you want me to proceed in

11   order, your Honor?

12             THE COURT:  Yes, please.

13             MR. DENTON:  So the first proposal is on page 4 and I

14   caveat this at the beginning by saying I am very loathe to make

15   suggestions to the Court's standard charges, but I think in

16   light of some of the cross-examination that has happened and

17   what we anticipate Mr. Schulte is going to argue, it may be

18   worth, in this instance, adding a sentence to the Court's

19   instruction on reasonable doubt that comes from the Sand charge

20   and that I think is common in this court house at least, that

21   informs the jury that a reasonable doubt is not a guess or

22   whim, it is not speculation or suspicion.  Again, recognizing

23   that the Court's language is the Court's language, in view of

24   the some of the cross-examination that I think has invited

25   speculation, it is appropriate to include that language from

M765sch5

1    the Sand charge.

2              THE COURT:  Where would you put that?  Line number?

3              MR. DENTON:  I would put it at the end of line 16,

4    your Honor.

5              THE COURT:  Mr. Schulte?

6              MR. SCHULTE:  I disagree.  I don't think that that is

7    necessary on this instruction so I'm not sure what the

8    government is saying or what they're trying to anticipate the

9    arguments to be, but I think the Court's instruction here is

10   very standard and there is no need to add anything that would

11   confuse or be unnecessary for the jury.

12             As far as whatever issues that they said occurred on

13   cross-examination they were free to object and they did object

14   to whatever things they felt were objectionable.

15             THE COURT:  I think I will add it.  I do think, as we

16   have discussed in the context of pretrial litigation, there

17   have been various things sort of thrown out as possibilities

18   for how the information could have been leaked, other

19   perpetrators, etc., and I think it is important that the jury

20   know that simply speculating on that sort of stuff is not what

21   a reasonable doubt is.

22             Next?

23             MR. DENTON:  Just a typo on page 11, your Honor.  In

24   the first word of line 6, I think that should be "cooperating

25   witnesses."

1          THE COURT:  Indeed.

2          OK, next?

3          MR. DENTON:  At the top of page 15, your Honor, and

4    this is more stylistic than anything, I think it just read a

5    little awkwardly to refer to the defendant you are considering

6    and --

7          THE COURT:  Oh.

8          MR. DENTON:  So to the extent that the Court wanted to

9    delete that or just make reference to:  You may not consider

10   the fact that the defendant was in custody, and leave it at

11   that.  No substantive use there, just purely semantic.

12         THE COURT:  Yes.  That was due to the fact that this

13   came from a charge I gave in a multi-defendant case so that is

14   the reason for it.  I will say:  However, you may not consider

15   the fact that the defendant was in custody as evidence that he

16   is of bad character or has propensity to commit a crime.

17         MR. DENTON:  Sounds good to us, your Honor.

18         THE COURT:  Mr. Schulte, any objection to that?

19         MR. SCHULTE:  No.

20         THE COURT:  Next?

21         MR. DENTON:  On page 17, your Honor, line 5, again,

22   this is more semantic than anything.  It just struck us as odd

23   to refer to the video recordings as "of certain incidents."

24   They're obviously not surveillance videos or anything like that

25   so we were going to propose substituting "events" there.  Like

M765sch5

1    I said, "incident" seemed like a more loaded word than what the

2    recordings actually were.

3           THE COURT:  Why doesn't it just say:  Some video

4    recordings have been admitted into evidence; and not

5    characterize what they're of.

6           MR. DENTON:  That's fine with us, your Honor.

7           THE COURT:  Mr. Schulte, any objection?

8           MR. SCHULTE:  No.

9           THE COURT:  Next?

10          MR. DENTON:  On page 20, your Honor, again entirely

11   semantic, line 6 and 7 of two sentences that both start with

12   "specifically."  So to the extent it is easier to use one or

13   not the other.  Again, not a substantive point.

14          THE COURT:  All right.  I will strike it from the

15   first one.

16          Go ahead.

17          MR. DENTON:  Line 19, just a typo in the first word

18   there.

19          THE COURT:  Thank you.

20          MR. DENTON:  The next is the largest and most

21   substantive one which is the NDI instruction on pages 23 and

22   24.

23          THE COURT:  I am not surprised.

24          MR. DENTON:  So I think, your Honor, we are happy to

25   get into the specifics of the language.  I think we think that

M765sch5

1    the instruction that we proposed this morning is more

2    appropriate for a number of reasons.  I think first of all, the

3    way the Court has framed this ultimately results in a frankly

4    fairly imbalanced charge on NDI that sort of freights the

5    jury's consideration of public disclosure almost to the

6    exclusion of everything else.  There is sort of the brief

7    reference to it being classified being relevant later, but

8    given the Court's ruling and the clear law that public

9    disclosure is, at best, a fact that the jury can consider and

10   like classified status is not dispositive one way or the other,

11   it seemed odd to overly emphasize it.  It is also language that

12   departs pretty substantially from the language that has been

13   used to describe the closely held element in a number of other

14   cases.  *Sterling* and *Abu-Jihaad* are essentially verbatim copies

15   of one another which are copies of the language from the Fourth

16   Circuit in *Squillacote*.  As the Court has observed, in

17   *Abu-Jiahaad* the same exact issue was presented regarding

18   whether the public availability of some information somehow

19   meant it was no close longer closely held, neither Judge

20   Kravitz nor the Second Circuit thought any further prophylaxis

21   of the public availability was necessary.  So I think, given

22   sort of the similarity there and the lengthy history of

23   approval of that language, it is better to use sort of the

24   tried and true rather than to write on a blank slate here.

25            THE COURT:  So I have obviously thought a lot about

M765sch5

1   this, starting with the May 24th opinion that I issued but

2   plenty of thought since then and I am not sure I agree.

3          First of all, plenty of this language comes almost

4   verbatim from the decision in *Rosen* and in that sense it is not

5   entirely blank slate.  But second, as you I think yourself

6   noted in the earlier discussion on this issue which might have

7   been in the classified hearing, this case is, if not unique it

8   is certainly rare and the situation that we have with respect

9   to Count Three and Four where, in essence, the defendant is

10  charged, arguably, with sort of a second order leak, that is to

11  say leaking information that had already been leaked.  Now, I

12  recognize the government has limited its theory in light of my

13  ruling and is now relying principally, though not necessarily

14  entirely, on information that was not in the leak, but the rub

15  is in the not entirely part because I do think that that makes

16  this issue still a live issue by virtue of my conclusion that

17  the statements in the WikiLeaks leak about where Hickok was,

18  etc., being in the leak, that that rendered it -- that portion

19  of the statement on which you were relying for Count Three made

20  it already in the public domain, albeit by way of an illegal,

21  unlawful leak.  It didn't moot the prior public disclosure

22  issue.

23         So that's the context and a little bit of the

24  background.  I think I have frankly come around to thinking

25  that for reasons and constitutional avoidance and otherwise

1    that there is a lot to -- that Mr. Schulte is not entirely

2    correct but is substantially correct, that is to say that if

3    all -- let me put it differently.  I think the reason that

4    Mr. Schulte is in a different position with respect to the MCC

5    counts is that he is someone in a position to know whether the

6    information was classified, was NDI, was CIA information and in

7    that sense by virtue of leaking it again, so to speak, he is

8    providing official confirmation but it is the official

9    confirmation that is the new information that would qualify as

10   NDI and I think *Rosen* kind of highlights that, that particular

11   nuance.  I think that distinguishes Mr. Schulte from -- I gave

12   you a hypothetical, again, I think it is currently in the

13   classified hearing and therefore not yet public, but I gave you

14   two hypotheticals.  I think one is where a member of the public

15   goes on WikiLeaks today and downloads Vault 7 and Vault 8 and

16   then provides the hard dive with the download to someone who is

17   not authorized to receive NDI, and I posed the question of

18   whether that person would be guilty of violating the Espionage

19   Act and I think your answer was yes.  That strikes me as a very

20   bold, kind of striking proposition because in that instance, if

21   the person is not in a position to know whether it is actual

22   classified information, actual government information, accurate

23   information, etc., simply providing something that's already

24   public to another person doesn't strike me as -- I mean,

25   strikes me as, number one, would be sort of surprising if that

M765sch5

1    qualified as a criminal act.  But, to the extent that the

2    statute could be construed to the extend to that act one would

3    think that there might be serious constitutional problems with

4    it.

5              I also posed the hypothetical of the New York Times is

6    publishing something that appears in the leak and somebody

7    sharing that article in the New York Times with someone else.

8    That would be a crime and there, too, I think you said it might

9    well be violation of the law.  I think to the extent that that

10   would extend to the New York Times reporter for reporting on

11   what is in the leak, or to the extent that it would extend to

12   someone who is not in position to know or position to confirm,

13   that raises serious constitutional doubts in my mind.  That, to

14   me, is distinguishable from somebody who is in a position to

15   know.  I think there is a distinction if that person transmits

16   a New York Times article containing classified information and

17   in that transmission does something that confirms that that

18   information is accurate -- right -- or reliable or government

19   information, then that's confirmation, it strikes me, as NDI.

20   But it just strikes me as a very bold and kind of striking

21   proposition to say that somebody, who is not in position to

22   know or does not act in a way that would confirm the

23   authenticity or reliability of that information by sharing a

24   New York Times article, could be violating the Espionage Act.

25   That strikes me as a kind of striking proposition.

M765sch5

1        So all of which is to say I think I have come around

2   to the view that merely sharing something that is already in

3   the public domain probably can't support a conviction under

4   this provision except that if the sharing of it provides

5   something new, namely, confirmation that it is reliable,

6   confirmation that it is CIA information, confirmation that it

7   is legitimate bona fide national defense information, then that

8   confirmation is, itself, or can, itself, be NDI.  I otherwise

9   think that we are just in a terrain where, literally, there are

10  hundreds of thousands of people unwittingly violating the

11  Espionage Act by sharing the New York Times report about the

12  WikiLeaks leak.

13       MR. DENTON:  So, your Honor, I think there is a couple

14  of different issues there and one of them is sort of whether

15  the question that you are posing right now is actually the

16  right question for this moment in time when we are talking

17  about the elements of the offense.

18       In the context of that earlier discussion, and I will

19  repeat it here, I think one of the things that we emphasized is

20  there is a difference between whether a set of conduct, either

21  the hypotheticals that you describe would satisfy the elements

22  of a violation of 793 as opposed to the separate question of

23  whether a person or an organization in that context would have

24  a well-taken, as-applied First Amendment challenge to the

25  application of the statute to them in that context.

1           THE COURT:  But I have to say -- and I recognize this

2   may be in tension with my prior holding on this issue -- the

3   First Amendment is an area where somebody -- I mean, the

4   overbreadth doctrine in the First Amendment context allows

5   somebody, as to whom a statute could be applied,

6   constitutionally to challenge the statute on the grounds that

7   it does cover conduct that would violate the First Amendment.

8   So in that regard, it is distinct from a vagueness challenge.

9   I think to the extent that you are saying that in those

10  instances -- I mean, the reason being that the First Amendment

11  embodies a concept of chilling.  If a New York Times reporter

12  doesn't know whether he is violating the Espionage Act by

13  repeating what is in the WikiLeaks leak notwithstanding the

14  fact that there is serious public interest in it, it may chill

15  the suppression and that suppression is protected by the First

16  Amendment.  That's the point in the overbreadth doctrine.

17          Go ahead.

18          MR. DENTON:  I think, your Honor, I understand that is

19  the point of the overbreadth doctrine.  That is a fear that

20  every Court to have considered the question in the context of

21  793 has considered sufficiently hypothetical that no

22  overbreadth challenge has ever been sustained as to 793,

23  despite many who have tried, including Mr. Schulte before Judge

24  Crotty.

25          I think my point is more to say that those

M765sch5

1    constitutional questions are a little bit aside from the

2    approach that the Court takes with respect to instructing the

3    jury on the elements of a constitutionally applied statute as

4    to the defendant.  I think it is not necessarily the case that

5    at this point it is appropriate to sort of get into

6    constitutional avoidance, and particularly where here we are

7    talking about the closely held element -- what does it mean for

8    it to be closely held -- the Court has ruled and it is

9    consistent with the law across the board that the fact that the

10   information has become public is a fact that the jury can

11   consider.  Every Court to have addressed this question frames

12   that in the context of information that is lawfully available.

13   I recognize that we, in our previous discussions on this, had

14   sort of some questions about what the specific parameters of

15   "lawfully available" are, but that is language that has been

16   included in every charge we can find with respect to a 793(e)

17   offense.

18            THE COURT:  Right, but I think when we had that

19   discussion I posed the question of what lawfully available

20   means and you didn't really have an answer at hand, which is to

21   say is the WikiLeaks leak lawfully available.  I mean, the

22   government's view is that it is on -- it remains classified,

23   that it was unlawfully leaked, but I don't think it is a crime

24   for somebody -- a member of the public to go own a computer and

25   access Vault 7 on WikiLeaks.

1          MR. DENTON:  And your Honor, this is why I think

2    interpreting what it means for it to be lawfully available,

3    both sort of the standard language that refers to where the

4    information is lawfully available to the public and the

5    government has made no effort to guard the information, which

6    is sort of a, you know --

7          THE COURT:  But I'm not going to include a term, in

8    fact, I'm not going to explain to the jury what it means, and

9    if you can't persuade me that we understand -- that you and I

10   and Mr. Schulte and those of us who have wrestled with this

11   statute for weeks and months, if we don't understand what it

12   means there is no way I can explain to the jury what it means,

13   let alone have them understand what it means.

14         MR. DENTON:  Sure.  So your Honor, I think in that

15   context the right thing is to the extent the Court is borrowing

16   from decisions rather than from prior instructions is to use

17   the language from *Squillacote* which says that the instructions

18   should focus the jury's attentions on the actions of the

19   government in deciding whether the information has been closely

20   held.  In this case that's an easy question, the government has

21   done nothing whatsoever to authorize its disclosure.

22         THE COURT:  Let me give you another hypothetical.

23         Let me say during the course of the trial Mr. Schulte

24   had revealed -- let's say there was spillage, leakage, whatever

25   the phrase we have used in this setting during trial, right,

M765sch5

1    and he revealed something that was highly classified.  Let's

2    say that there is a reporter who was present in the court and

3    recognizes that that is significant -- recognizes that it is

4    likely classified information and sensitive and so on and so

5    forth, which is to say recognizes that it would fall within the

6    ambit of the statute and that the statute prohibits the

7    transmission of national defense information to someone who is

8    not clear to have it but says it is in the public interest to

9    report on it and writes an article that during trial

10   Mr. Schulte revealed X.  Is that person guilty of violating the

11   statute?

12        MR. DENTON:  Again, your Honor, I think you are asking

13   a lot of different questions all at once there.

14        THE COURT:  I think it is just one.

15        MR. DENTON:  Well, your Honor, so if the question is

16   does that conduct satisfy the elements of a violation of 793,

17   almost certainly yes.  In that context, does he have an

18   as-applied First Amendment challenge?  Quite possibly.  So I

19   think, again, the First Amendment, as applied as a particular

20   defense to conduct, that's what an as-applied challenge is.  In

21   that particular context does it abridge --

22        THE COURT:  An overbreadth challenge allows someone

23   like Mr. Schulte to raise this issue.  I don't think that it --

24   I think that construed in the manner that I am construing it I

25   don't think there is a constitutional problem and for that

M765sch5

reason I don't think there is infirmity in the charge, which is

to say I would still deny any motion to dismiss the charge but

it strikes me that there is a -- and I don't know if any Court

has considered this, the language in *Rosen* is certainly

consistent with what I am proposing because it is drawn largely

from *Rosen*, but it strikes me that that may be a necessary

construction of the statute to avoid constitutional infirmity

and it doesn't matter that it's constitutional as applied to

Mr. Schulte.  If that's the way the statute should be

interpreted to avoid an overbreadth problem and First Amendment

problem, then that's the way the statute should be interpreted

and the way the instructions should be given to the jury.

         MR. DENTON:  So, your Honor, I think the problem is

you are approaching this in the context of what is the furthest

out there hypothetical of sort of the bleeding edge of the

Espionage Act in this context.  Obviously an overbreadth

challenge considers sort of a broader spectrum, right, as a

comparison of the total potential conduct that could be reached

by a statute versus its plainly legitimate sweep, which Courts

have uniformly held in the context of the Espionage Act, a

plainly legitimate sweep is quite broad.  And so, to the extent

that there is conduct at its bleeding edges that would merit an

as-applied challenge by someone in a position to bring one,

overbreadth challenges are not well taken because they are not

adjudged by what is sort of the most extreme example that

M765sch5

1    anyone can come up with but rather do look at that sort of Venn

2    diagram.

3              THE COURT:  Until you narrowed your theory of

4    prosecution here this wasn't hypothetical, it was this case,

5    that is to say that you charged Mr. Schulte with leaking what

6    he had already allegedly leaked.

7              MR. DENTON:  So, your Honor, I think I am not sure

8    that we, with one exception, necessarily believed that there

9    was ever really that overlap.  There was one particular piece

10   of NDI that certainly was in the leak that was also discussed

11   separately by Mr. Schulte.  I think in the main, the focus has

12   always been on the same NDI which I think our position is the

13   evidence we believe has shown overwhelmingly was not

14   information that was in the leak.

15             THE COURT:  OK.  So I think you have largely failed to

16   persuade me that I should take a wholly different approach so

17   let's start to reign this in and talk about the particulars of

18   my proposed instruction.  If you think there is any infirmity

19   with it, or problem with it, or you even think that there is --

20   I mean, if you have particular suggestions I am certainly open

21   to them but I think, in general, I am inclined to take the

22   approach that I have taken.

23             MR. DENTON:  Sure.

24             So, your Honor, I think a couple of specific things.

25   On page 23 at line 14, I think it is not particularly helpful

M765sch5

1    in the context of this case to make reference to what

2    information typically can or cannot qualify as NDI, and so we

3    would suggest that the Court sort of delete the reference after

4    the semicolon on 14 and 15 and simply instruct them that they

5    should consider whether the information is in the public

6    domain.  The Court then proceeds to give more specific

7    instructions so a generality is not really helpful there, in

8    our view.

9              THE COURT:  That language is straight from *Rosen*.

10   That does not change your view, I take it?

11             MR. DENTON:  No, your Honor.  Like I said, the

12   proposal we have about focusing on the actions of the

13   government is straight from *Squillacote*.  I'm not sure why

14   *Rosen* would be more persuasive in that context.

15             THE COURT:  I think it is more directly on point.

16   That's why.  In other words, I think *Rosen* addresses the

17   precise issue that is implicated here.  I'm not sure

18   *Squillacote* does.

19             MR. DENTON:  Your Honor, again, I think there is a

20   difference between an observation by a district judge in an

21   opinion and the actual instruction that the Court gives the

22   jury instructing the jury on what is typically the case I don't

23   think is necessarily helpful, particularly in a case like this

24   which is anything but.

25             THE COURT:  OK.  I will ponder that for a moment.

1                What else?

2                MR. DENTON:  So I think, your Honor, on page 24, the

3       language on -- I guess the second paragraph, line 6 through 9,

4       I think, again, recognizing that that does come from some of

5       the cases that have discussed this, I don't think there is any

6       sort of relevance of that to this case or any sort of factual

7       basis.  I think the disclosure of the information by WikiLeaks

8       is there.  There is nothing in the record regarding sort of

9       general belief regarding the truth of the statements or whether

10      it is believed to have come from the U.S. government.  I think

11      absent anything in the record to sort of support an argument

12      that that was true, that language is not really applicable

13      here.

14               THE COURT:  OK.  Anything else on this charge?

15               MR. DENTON:  Yes, your Honor.

16               On line 10 of page 24, I think that to the extent that

17      the Court is going to instruct the jury that they should

18      consider whether the information was in the public domain.  It

19      is also appropriate to instruct them that they should consider

20      whether it has been classified.  I'm not sure we have a view as

21      between them but we think it should be symmetric.

22               THE COURT:  All right.  Anything else?

23               MR. DENTON:  Then finally, I think we would suggest

24      that the Court include the language from *Sterling* and

25      *Abu-Jiahaad* that was in our letter at page 2 that says:  In

M765sch5

1    deciding this issue, you should examine the information and

2    also consider the testimony of witnesses who testified as to

3    its content and significance and who described the purpose and

4    use to which the information could be put.

5           And we would propose to put that sort of as a

6    stand-alone paragraph between what are currently lines 14 and

7    15.

8           THE COURT:  All right.  So anything else on this

9    charge or is that it?

10          MR. DENTON:  That's it, your Honor.

11          THE COURT:  OK.  Mr. Schulte, let me turn to you.  I

12   guess my inclination I think is to, as I said, generally leave

13   this as is but I would ask you to respond to the government's

14   objection.  First of all, I am going to change "should" in line

15   13 to "may" just so it is symmetrical.  I agree that they

16   should be symmetrical and I think "may" is the better

17   instruction.

18          So, first the government's objection to the clause

19   after the semicolon in lines 14 and 15 on page 23 and --

20          MR. SCHULTE:  Yes.

21          Like you noted, Judge, it is straight from *Rosen*, it

22   was carefully considered.  I think your instruction for NDI was

23   carefully considered in the adaptations that you note,

24   especially from the prior case as well.  I think this is

25   important and it's a balance of -- a balance charge and it is

M765sch5

1    critical to the issues here; the fact that this case is unique

2    in that, as you said, Counts Three and Four is basically

3    information circulated by WikiLeaks already and it is in the

4    public domain so I think it is important to include that.

5          THE COURT:  OK.  I'm not sure that's an accurate

6    characterization of where the case stands at this juncture, but

7    be that as it may.

8          Turning to page 24 to paragraph lines 6 through 9, I

9    think Mr. Denton's point there is somewhat well taken, which is

10   to say that there is no factual basis to argue that proposition

11   here.  I guess my question would be what is the factual basis

12   to make that argument?  That language comes from a Fourth

13   Circuit case that I quoted in my May 24th opinion and certainly

14   is one reason why the fact of information being in the public

15   domain is not categorically irrelevant but I'm not sure there

16   is any factual basis for the jury to find here that it would be

17   so widely circulated and generally believed to be true to have

18   come from the U.S. government as to qualify for this.

19         (Defendant and standby counsel conferring)

20         THE COURT:  Mr. Schulte?

21         MR. SCHULTE:  I think on one point, since it was

22   posted on WikiLeaks it was something that was widely circulated

23   and, you know, it is on the Internet, it is a big -- WikiLeaks

24   is a major news site.  As for generally believed to be true or

25   have come from the U.S. government, I don't think the

M765sch5

1      government has issued any information as to whether the

2      government ever denied that this information came from U.S.

3      government.  In fact, there was search warrants soon after in

4      which it was declassified that this is the case so I don't

5      think there is anything in the evidence to show that it

6      wasn't -- that the government did not deny it.  And then also

7      it is reported on by every newspaper, TV outlet, so it is

8      something that is widely circulated, for sure.

9              THE COURT:  I think the information has to be the

10     specific information that is the subject of the charge so with

11     respect to Count Three, for instance, it would have to be the

12     information pertaining to Hickok that the government is now

13     relying on.  Is it your position that just by virtue of being

14     on WikiLeaks that would qualify under this sort of scenario or

15     exception?

16             MR. SCHULTE:  I think it could, yes.  I think the fact

17     that it is -- I think all the information that WikiLeaks

18     published, all of that information is widely circulated.  If

19     the major newspapers are leaking to it, posting things saying

20     CIA hacking tools; I think that and the fact that there have

21     been articles specifically about that content circulated, I

22     think that is what constitutes -- could be argued to constitute

23     something that is widely circulated.

24             THE COURT:  And then your position on the addition of

25     the paragraph from the government's letter between lines 14 and

M765sch5

1    15?

2              MR. SCHULTE:  I would object.  I don't think that --

3    it is not necessary, it is not something that is needed,

4    especially in the facts of this case.

5              THE COURT:  I think I'm going to rule, as follows:

6              I'm going to leave the "typically" line on page 23 in.

7    I am also going to leave the paragraph line 6 through 9 on page

8    24 in.  I think it is a stretch to say that that would apply

9    here but I also think it is an accurate statement of the law

10   and the government can easily argue the point.  I will,

11   however, add the paragraph that the government proposes from

12   its letter at the place that it suggests.  I think it is

13   appropriate to explain to the jury that they can consider not

14   just the information but other evidence in making their

15   findings on that element.

16             Mr. Denton, back to you.

17             MR. DENTON:  Just briefly, your Honor, in light of

18   that ruling and given the observation the Court made which we

19   agree with, I think it would be appropriate on line 6 not to

20   refer generally to information but say, All that said, if the

21   particular information at issue has been so widely circulated

22   and is so generally believed to be true; that way we are just

23   focusing the attention which I think will dovetail with the

24   Court's later instructions with the NDI at issue.

25             THE COURT:  I am inclined to agree.

M765sch5

1          Mr. Schulte, I presume you object but anything you

2    want to say beyond that?

3          MR. SCHULTE:  I think the way it is worded here is

4    clear.  I don't think it is coercive to the jury's thinking to

5    add any of that.

6          THE COURT:  I don't think it is coercive, I think it

7    accurately states the law so I will make that change.

8          Next, Mr. Denton?

9          MR. DENTON:  On page 25, your Honor, in line 10 near

10   the end of the line we would propose, just again framing it

11   that the information would be used to the injury of the United

12   States rather than against.  "Against," particularly in this

13   context where we are talking about the cyber tools, has

14   complicating connotation so the statutory language is just a

15   little cleaner.

16         THE COURT:  I think that's right.

17         Mr. Schulte, any objection?

18         MR. SCHULTE:  I guess the government is saying they

19   want to take out on line 10, "be used against the United

20   States" and change that to "be used to the injury," like on

21   line 7 and lines 5 that's already stated?

22         MR. DENTON:  That's correct, your Honor.

23         THE COURT:  We are just talking about line 10 though

24   right, Mr. Denton?

25         MR. DENTON:  Yes.

M765sch5

1          MR. SCHULTE:  I don't think it matters.

2          THE COURT:  All right.  So I will make that change.

3     Next?

4          MR. DENTON:  On page 30, your Honor, in line 16 in the

5     reference to the third item of NDI, I think the word is

6     actually "discovered" rather than "discussed."

7          THE COURT:  What line is this?

8          MR. DENTON:  Line 16 on page 30, the fourth bullet.

9          THE COURT:  Mr. Schulte, do you agree with that?

10         MR. SCHULTE:  I don't know off the top of my head what

11    that is but I think it touches on a different issue which is

12    the Court is kind of directing the jury as to how to read the

13    notebooks here.

14         THE COURT:  So I recognize that, and it is a little

15    bit in tension with the instructions that I gave them

16    repeatedly during trial that it is up to them to read the

17    notebooks but I'm not sure it struck me that it was better to

18    do it this way and to ensure that the jury was properly

19    instructed about the government's more limited theory on these

20    two counts, and that is to say I wasn't sure that there was an

21    alternative to quoting the actual language.

22         So I guess bracketing that issue for a moment, it does

23    look to me like it is "discovered" and not "discussed."  You

24    are welcome to tell me if you think otherwise, Mr. Schulte, it

25    is your handwriting.  But if you want to look at the exhibit

M765sch5

1    looking at it more closely, I think that is a fair point,

2    bracketing whether I should be including the recitations or

3    not.  I am inclined to change "discussed" -- if I include this

4    at all -- to "discovered."

5              Any objection?

6              MR. SCHULTE:  No.

7              THE COURT:  Mr. Denton, next?

8              MR. DENTON:  So, your Honor, I think the next is -- it

9    is a question of semantics that may have substantive

10   implications on page 32 in the last sentence, lines 22 to 24.

11             THE COURT:  OK.

12             MR. DENTON:  I think it may make sense to -- well, let

13   me explain the concern and then I can provide sort of a

14   specific proposal.

15             I think the second clause that refers to when he

16   accesses a computer to obtain information he is authorized to

17   access contains a number of different components and so the

18   portion that comes after the em dash simply just refers to even

19   if he does so, kind of embeds a lot of those different things

20   together.  I think given, sort of *Van Buren*, the specific

21   references the obtaining of the information rather than the

22   accessing of the computer.  So I think it might make sense, on

23   line 24, to just say rather than even if he does so say, even

24   if he obtains the information for an improper purpose.

25             THE COURT:  OK.  I will think about that.  I would

M765sch5

1   note that the language here is straight from Judge Crotty's

2   charge in the first trial from your request, but be that as it

3   may.

4         MR. DENTON:  Like I said, your Honor, I don't think

5   that the charge, as written, is incorrect.  Just in reading it

6   struck us -- and perhaps should have struck us in our original

7   submission -- as a little bit opaque on what the "does so" is

8   specifically referring to.

9         THE COURT:  So your suggestion is change "does so" to

10  "obtain information?"

11        MR. DENTON:  For an improper purpose.

12        THE COURT:  OK.  I don't think there is anything

13  incorrect or wrong or problematic about that, Mr. Schulte.  So

14  changing "does so" to "obtaining the information."  Any

15  objection?

16        MR. SCHULTE:  Yes.  I think the point of this element

17  is the access.  So if you change it to even if he accesses the

18  computer for an improper purpose, that would be the better

19  substitution there because this element is specifically about

20  the access.  The obtaining -- obtained information is the third

21  element so I think that's what this is discussing.

22        THE COURT:  But I think the point here is to ensure

23  that the jury understands that even if, say hypothetically the

24  jury were to conclude that you entered the Altabackups to

25  obtain the information to leak it, that that, alone, would not

M765sch5

1       constitute a violation if you were authorized to access the

2       Altabackups.  In other words, the improper purpose with the

3       information is not a substitute for unauthorized access.  In

4       other words, this strikes me as clarifying the point and

5       essentially clarifying it in a way that is favorable to you.

6               Am I missing something?

7               MR. SCHULTE:  No.  I guess that's fine.  I just --

8       yeah.  No problem.

9               THE COURT:  OK.  So I will make that change.

10              Next, Mr. Denton?

11              MR. DENTON:  Next is on page 34, your Honor, in line

12      9.  I think that that misstates the element of the offense

13      which is correctly described down in lines 13 through 15 that

14      the defendant obtained the information with reason to believe

15      that the information could be used against the interests of the

16      United States, not with the intention to use such information.

17              THE COURT:  So your suggestion would be?

18              MR. DENTON:  That the defendant obtained information

19      protected against unauthorized disclosure for reasons of

20      national defense or foreign relations, with reason to believe

21      such information could be used against the interests of the

22      United States or to the advantage of a foreign nation.

23              THE COURT:  So changing the "intent to use" to "reason

24      to believe" and adding "could be used" after information?

25              MR. DENTON:  Yes, your Honor.

M765sch5

1        THE COURT:  Mr. Schulte, any objection?

2        (Defendant conferring with standby counsel)

3        MR. SCHULTE:  I don't have the indictment in front of

4   me or the language but if that's the language in the statute or

5   in the indictment, I don't have an issue, but if it is not then

6   I think that would be a problem.

7        THE COURT:  The indictment reads:  With reason to

8   believe that such information so obtained could be used to the

9   injury of the United States or to the advantage of any foreign

10  nation.

11       MR. SCHULTE:  OK.

12       THE COURT:  All right.  I think the language that we

13  had may have come from Sand but I agree that the government's

14  proposal is more consistent with the statute so I will change

15  it.

16       Next?

17       MR. DENTON:  On page 38, your Honor, line 18, just a

18  typo in the year which I think should be 2016 rather than 2012.

19       THE COURT:  Certainly correct; yes.  Thank you.

20       Next?

21       MR. DENTON:  So then, your Honor, that brings us to

22  Count Nine, and I think putting aside the larger issues the

23  Court has raised, our proposal here is actually quite modest.

24  I think rather than highlighting the service of the grand jury

25  subpoena to the extent that the Court is inclined to keep the

M765sch5

1    language on lines 5 through 7, I think we would just suggest

2    that it should be before he was -- or before you find he knew

3    there was a grand jury proceeding rather than directing them to

4    a particular sort of way of drawing that conclusion.

5              MR. SCHULTE:  What page is this?

6              THE COURT:  Page 44, line 7.

7              I think the suggestion is basically to change the last

8    phrase from "was served with a grand jury subpoena" to "before

9    he had knowledge of an ongoing grand jury."  Something to that

10   effect.

11             Is that it?

12             MR. DENTON:  Yes, your Honor.  I think and also to add

13   an "only," so "based only on the defendant's conduct."

14             THE COURT:  Mr. Schulte?

15             (defendant and standby counsel conferring)

16             MR. SCHULTE:  I think this is very clear with the law.

17   I wouldn't have any knowledge before the grand jury subpoena so

18   I think this is consistent with what we have already discussed

19   and what the law says and what a layperson would know.

20             THE COURT:  Mr. Denton, my inclination is to accept

21   the change to the end of the sentence to make it "had knowledge

22   of an ongoing grand jury proceeding," but not to include the

23   word "only."  I will give you an opportunity to respond but I

24   will say it does heighten the danger that either I or the Court

25   of Appeals would conclude that there is -- I think it makes it

M765sch5

1    less clear to the jury, precisely the relevant point in time,

2    and if either I or the Court of Appeals were to conclude, for

3    instance, that stuff you pointed to about Mr. Schulte's general

4    awareness of a criminal investigation, the FBI's involvement,

5    etc., was not, as a matter of law, sufficient to find that he

6    knew of a grand jury proceeding, I think it heightens the

7    vulnerability of a conviction on this count if it's not

8    abundantly clear -- if it is not made abundantly clear to the

9    jury that they can't rely on statements made prior to the grand

10   jury subpoena.

11            So I am not saying I will agree but I guess my

12   question to you is you are prepared to buy that issue?

13            MR. DENTON:  So I think so, your Honor, and just to

14   put it in what I think, for us, is an analogous and simpler

15   context, in a case where you have a narcotics conspiracy with a

16   particular charged time frame, it is often the case that acts

17   that occurred before that are admitted as direct proof of the

18   conspiracy or even acts in furtherance of the conspiracy and so

19   are not limited by 404(b), but obviously the Court still

20   instructs the jury on sort of a finding about making

21   conclusions about facts that occur within the charged time

22   period.  I think here, highlighting that as long as the jury's

23   verdict is based on conduct that occurs after he has

24   knowledge -- and again, taking this sentence in context with an

25   otherwise very robust expression of the nexus and knowledge

M765sch5

1    requirements -- the "only" actually serves to protect everybody

2    by highlighting to the extent that they do not find conduct

3    after that point, they can't rely just on the conduct that

4    falls in the window that would be problematic.

5          THE COURT:  Let me think about that but I think I have

6    made clear my concern.

7          Next?

8          MR. DENTON:  The only other thing we have is at the

9    bottom of that page, a comma after "venue."  Otherwise, that's

10   all we have, your Honor.

11         THE COURT:  Where are we looking?

12         MR. DENTON:  On line 22, the end of the --

13         THE COURT:  Yes.  Thank you.  OK.  Nothing with

14   respect to the rest of the charge?

15         MR. DENTON:  Only one suggestion with respect to

16   formatting on the verdict form but we can deal with that later,

17   if that's easier.

18         THE COURT:  No.  Go ahead.

19         MR. DENTON:  I just think bumping down Count Eight,

20   that conclusion to the next page.

21         THE COURT:  Yes.  I agree completely.  I didn't really

22   see that before, but thank you.

23         OK.  Mr. Schulte, turning to you, we can go in order

24   as well.

25         I thank everybody, especially the court reporter, for

M765sch5

1    staying past 5:00 and bearing with me but let's see if we can

2    get this done.

3              Mr. Schulte?

4              MR. SCHULTE:  Starting on page 5, I have an adaptation

5    for the circumstantial evidence that standby counsel has that

6    if they can hand it up to the parties?

7              THE COURT:  Sure.  Do you want to just articulate it

8    though?  This is in lieu of the rain example?

9              MR. SCHULTE:  I think the charge, as written, only

10   comes to establishing an inference that something has occurred

11   but this instruction, also, shows that the inference cannot be

12   drawn, such as it says:  In other words, the fact of rain is an

13   inference that could be drawn from the wet raincoat and

14   dripping umbrella but need not be.  Each juror must be guided

15   by his or her own common sense, experience, or judgment, in

16   determining what inference, if any, is justified or reasonable.

17             THE COURT:  I'm going to leave it as is.  I think this

18   is a pretty time-tested instruction and I think it has been

19   given in this court house for decades.  I don't think it has

20   been -- I certainly recognize the point, but taken as a whole

21   with the rest of the instructions, it is quite clear that it is

22   up to the jury to draw what inferences it wants and it can draw

23   inferences in either direction or no inferences at all and you

24   can argue the point as it actually applies to this case, not as

25   to whether it is raining.

M765sch5

 1              Next?

 2              MR. SCHULTE:  Page 15, a couple issues.  We think that

 3    the false exculpatory statements instruction is -- should be

 4    taken out entirely.  We don't think even the government is

 5    alleging that there are false exculpatory statements.  We don't

 6    know what this would be referring to exactly.

 7              THE COURT:  I mean, I don't know what your

 8    befuddlement is.  You are convicted of making false statements

 9    to the FBI and the gravamen of Count Nine is that you made a

10    whole set of false and misleading statements.  That is the

11    false exculpatory statement, so no.  I know you objected to it,

12    you raised that in your response to the government's

13    submission, but this seems like a totally appropriate case for

14    false exculpatory instruction.  I think the jury is properly

15    instructed that they may draw inferences from false exculpatory

16    statements if they find such statements were made.  So I am

17    puzzled by your puzzlement but, bottom line, it is staying in.

18              Next?

19              MR. SCHULTE:  The other issue on this page was if the

20    title for false exculpatory statements would just be instead of

21    "false" just "exculpatory statements" and then have the jury

22    decide, because it leads the jury on to lead that they're false

23    exculpatory as opposed to just the exculpatory statements.

24              THE COURT:  I think the instruction makes clear that

25    it is up to them to decide whether they were false and then

1    just properly instructs them about what inferences they can

2    draw if they conclude there were false exculpatory statements

3    so I think it accurately characterizes it.  As you will see,

4    when I read the instructions I don't actually read the header

5    in any event, so it is the instruction that controls.

6              Next?

7              MR. SCHULTE:  I think on page 20 there was a minor

8    thing on line 2.  Your verdict on one count should not control

9    your decision.  I think it might be better to say should not

10   "influence" instead of "control."

11             THE COURT:  I'm not sure if that's accurate.  If they

12   conclude you didn't engage in an obstruction by making false

13   statements they can, as we just discussed, consider that in

14   evaluating whether you committed the crimes that you falsely

15   denied.  I would think that is a form of one verdict

16   influencing the other even if the verdicts are separate.

17             Mr. Denton?

18             MR. DENTON:  I think we would agree with that, your

19   Honor, and that also implicates some of the overlapping conduct

20   of the 1030 counts with the 793 counts, relating to the

21   WikiLeaks charges as well.

22             THE COURT:  And I would also point out I think some of

23   the counts involve overlapping elements altogether and, in that

24   sense, the verdict on one could well influence the verdict on

25   the other.  I think it is a more accurate statement.

M765sch5

1                Next?

2                MR. SCHULTE:  On page 23 and 24, we already kind of

3       went through the NDI but I think standby counsel sent up our

4       proposal and I think specifically at issue here is what you

5       raised in your order, particularly about the second

6       judicially-created limitation to NDI that it must be

7       potentially damaging to the U.S.  So the fact, you know, that I

8       note in the document that I provided the Court that if the

9       government has recipes for hot chocolate that keeps it closely

10      held, that someone can't be charged under the Espionage Act for

11      that.  It has to actually be established that information must

12      be potentially damaging to the U.S. or beneficial to --

13               THE COURT:  I think the hot chocolate example is not a

14      very good one because it wouldn't be national defense

15      information in the first instance.

16               MR. SCHULTE:  I think that's the point, is in defining

17      national defense information there is two things that establish

18      that.  One that we have been discussing a lot is closely-held,

19      but the second is that it actually needs to be defense

20      information, be potentially damaging to the U.S. or beneficial

21      to a foreign nation.  I think, as I stated in the letter to the

22      Court, that the legislative history behind it is clear and I

23      think the *Rosen* Court also brought that issue up and several

24      Courts have.

25               THE COURT:  Right, but I think the *Rosen* Court was

M765sch5

 1    dealing with the information prong, not the documents prong,

 2    and I expressed several reasons in my opinion for why I had

 3    some pause about whether this second gloss, if you will,

 4    applied to the concept in the context of the documents prong.

 5             MR. SCHULTE:  Right.  I think that you noted also,

 6    though, that even when the information prong is not used, when

 7    only the documents prong is used, that this language was still

 8    used in those cases.  I think it's not dependent upon the

 9    specific type, whether it is information or documents or

10    anything like that, it is particularly with respect to defining

11    what NDI is.  So it doesn't matter the type, whether it is

12    documents or information, but what exactly is NDI.  I think

13    that's --

14             THE COURT:  I understand and I did cite one example of

15    a case involving the documents prong where this additional

16    gloss was included, that's the *Kiriakou* case but, as I noted,

17    it wasn't included in *Abu-Jihaad*, it wasn't included in Judge

18    Crotty's instructions, it wasn't included in either side's

19    request to charge.  So in that sense I think it is not entirely

20    clear and there is some good reasons to think it doesn't apply

21    to the documents prong and it would sort of swallow the

22    distinction between the two and the additional signed or

23    requirement hole.

24             Mr. Denton, do you have a view?  I am not sure the law

25    is entirely clear.  I am also not sure there is any reasonable

M765sch5

1      procedure here that the information would trigger or would

2      satisfy that requirement, but.

3              MR. DENTON:  So I think, your Honor, we particularly

4      share the concern that in this context it would sort of swallow

5      the statutory distinction to engraft the application onto the

6      documents prong given that the legislative history and the

7      subsequent interpretations are quite clear that at least, as a

8      statutory element, it does only modify the information prong.

9              Also, I think, as the Court observed, the term

10     "national defense" does not do no work in this context.  The

11     fact that it is frequently sort of undisputed what it pertains

12     to, but there is still an element of this that it has got to be

13     relating to a subject of the national defense and not just any

14     information that the U.S. government has decided to keep

15     closely held.  So in that context, I don't think there is any

16     sort of infirmity in the statute that would warrant engrafting

17     a further limitation on it, particularly given that that raises

18     issues of statutory interpretation that have been resolved the

19     other way.

20              THE COURT:  Mr. Schulte?

21              MR. SCHULTE:  I think it is particularly important

22     here.  Lines 10 and 11 are kind of vague as to what this

23     national defense means or applies to, but if you look at this

24     case in particular, the Count Three that is talking about

25     Hickok, the connection between DevLAN and the COG network, the

M765sch5

1    important part is that has come out through the evidence was

2    this was all shut down after WikiLeaks in 2017.  So is this

3    information even damaging or relevant to the United States if

4    these networks are not even in use anymore?  I think that's a

5    very particular point that I would like to argue or would be a

6    strong argument, the fact that this network has been shut down,

7    the tools are not being used, Hickok doesn't exist anymore so

8    how can this possibly qualify as NDI?  How can knowledge of

9    this even endanger U.S. national security or anything like

10   that.

11        So that's why I think it is relevant to this case.

12        THE COURT:  I could be wrong but I'm not sure there is

13   anything in the record that Hickok was taken down.  I think you

14   tried to elicit that through one of the witnesses and he

15   actually didn't know the answer.

16        MR. SCHULTE:  That's correct, but the definition of

17   Hickok is it is a bridge between EDG and COG, so if EDG doesn't

18   exist then Hickok can't exist.  If you are bridging two

19   networks and one network is taken off, that is through evidence

20   so basically Hickok can't exist, it doesn't do anything.

21        THE COURT:  Unless a new network was created to

22   substitute for DevLAN, in which case perhaps it just became a

23   bridge between that new network and COG so I don't know, I am

24   just not sure there is an evidentiary basis to say that Hickok

25   was taken down but I will leave it to argument and we will see

M765sch5

1    on that issue.

2              I will ponder, but I think my considered view is that

3    it is inappropriate to engraft this requirement onto the

4    documents prong for the reasons that I have discussed in my

5    opinion.  I will confess that I am not sure that the law is

6    crystal clear on this, as with many other issues in this case.

7    So in that sense, Mr. Denton, I hope you are prepared to buy

8    the appellate issue if it comes to it but my, at least

9    considered view at the moment, is not to add that language.

10             Next?

11             MR. SCHULTE:  I just want to note quickly on page 23,

12   line 21, there is a typo there.  That the information came *from*

13   the United States government.  I think the "from" is missing.

14             THE COURT:  Thank you.

15             Next?

16             MR. SCHULTE:  On page 30 we kind of went through this

17   a little bit about the passages but I think it is important to

18   note the very top one, Government Exhibit 801, page 3.  The

19   government didn't actually elicit testimony from CIA experts or

20   anyone about this particular passage or that it was classified,

21   let alone NDI.  So I think at least for this particular passage

22   it shouldn't -- because the government didn't do their job to

23   actually identify this passage or eliciting any testimony about

24   it, I don't think that it should be -- the Court should point

25   it out to the jury.  It would be basically for the government

M765sch5

1    to prove to the jury that this was part of their case.  The

2    other things they went through various CIA witnesses but the

3    top thing they didn't even bring out at all.  It is not even in

4    evidence.

5              THE COURT:  Well, the statement is certainly in

6    evidence and I think that there was evidence that any

7    information that would link a particular person to particular

8    tools would raise issues of -- was sensitive and problematic

9    because it would essentially enable or could enable an

10   adversary, for instance, to -- I can't remember the word I am

11   blanking on at the moment -- but essentially attribute, I think

12   attribution, attribute malware to the United States that

13   otherwise wouldn't be linkable.  So my inclination is to think

14   that it is -- you may well be right or it may be a fair

15   argument but that it is argument so I am going to leave it in.

16   It is one of the statements that the government relied on in

17   its Section 10 notice.

18             I just noticed there is a typo in line 9, I think it

19   should be "fool" and not F-O-L-L, so I will correct that as

20   well.

21             MR. DENTON:  Yes, your Honor, and apologies for not

22   catching these before.  I think in line 7 it should be "to

23   conceal the crypto."

24             THE COURT:  Yep.

25             MR. DENTON:  And then in line 8 "indicative of

1    potential crypto."

2            THE COURT:  Yep.  Thank you.

3            Mr. Schulte, next?

4            MR. SCHULTE:  I think on page 33 there is essentially

5    a conscious avoidance paragraph here starting on line 17

6    through 23 that I don't think is relevant in this case or that

7    has come out in evidence.  There is no denial of knowledge.

8            THE COURT:  I mean, I guess thinking out loud here but

9    to the extent that you have argued that you could have

10   construed the e-mails or the fact that you had an SSH key to

11   mean that you had authorization to access the things that you

12   allegedly accessed, I would think that the jury is entitled to

13   understand that basically blinding yourself to all of the

14   reasons that you should have known that that wasn't the case

15   would be an evidentiary basis to --

16           MR. SCHULTE:  You are referring to -- what are you

17   referring to?  The SSH key?

18           THE COURT:  In other words, you have, I think,

19   suggested through some of your questions to the jury -- and I

20   assume you may argue tomorrow -- that you were in fact

21   authorized to access the virtual machine and the backups and

22   whatever the case may be because you were an administrator,

23   because you had an SSH key, so on and so forth.  I mean, you

24   will make whatever arguments you want to make but I think to

25   the extent that you have made that argument, I think that there

M765sch5

1   is an evidentiary basis for the government to argue that

2   essentially for you to conclude that would be to stick your

3   proverbial head in the sand which is what a conscious avoidance

4   charge perfect is for.

5               MR. SCHULTE:  But I think that for this instruction it

6   would require deliberate disregard, like you said, but the

7   evidence shows there is a direct e-mail from me to Leonis

8   telling him I have these accesses and can he remove them.  So I

9   don't think that, especially with respect to that that there

10  was any deliberate disregard or anything like that; it was an

11  up-front e-mail to the individual telling them that I have this

12  access.

13              THE COURT:  Mr. Schulte?

14              MR. DENTON:  I think, your Honor, first of all, this

15  highlights an issue for tomorrow in terms of what is

16  appropriately the scope of argument versus testimony from the

17  defendant.  Either way, I think it is entirely within the ambit

18  given that the defendant has tried to suggest that e-mails

19  didn't exist telling him that he wasn't authorized things, that

20  other, you know, things suggested to him that he was in fact

21  authorized, his interpretation of the memorandum and

22  conversation that he had with Mr. Leonis.  So we do think a

23  charge on this is appropriate here and we think the Court's

24  language accurately states the law and balances it with the

25  actual brief requirement that the Second Circuit has instructed

M765sch5

1    should be there for balancing.

2           MR. SCHULTE:  Well, I think that in this case whatever

3    arguments can be made about the interpretation or how you --

4    how any communications were between Leonis there is a specific

5    e-mail in evidence that I am e-mailing Leonis and the e-mail

6    says the subject, the OSB ESXi server, can you take this off my

7    CMR -- which is in evidence -- as this is accountable property

8    assigned to me.  The e-mail specifically says I still have

9    access to this server, I still own the server, can you transfer

10   this server to someone else.  So that is the clear evidence.

11   So it is not the case that I am pretending or I don't think

12   that I should have these accesses.  The government is free to

13   argue, oh, well -- whatever the government wants to argue but

14   they can't say that I tried to hide it or I had deliberately

15   disregarded whether I knew I should have this or not because

16   the e-mail is addressed to --

17          THE COURT:  The point is that the government is able

18   to argue that you had knowledge that it was not -- you were not

19   authorized to access what you accessed and that for you to

20   suggest otherwise to the jury is to basically -- that you can't

21   blind yourself to what is glaringly obvious and if there were

22   any red flags to suggest that you didn't have satisfaction,

23   that you have been stripped of access, and for you to exercise

24   administrative privileges was a violation of the access that

25   you were authorized to have, and that for you to conclude

M765sch5

1    otherwise if the jury were to reach the conclusion that you did

2    conclude otherwise, you would basically be blinding yourself to

3    reality.  So, I will leave it in.

4              Next?

5              MR. SCHULTE:  I think the last thing is for Count Nine

6    and Count Four.  I think you mentioned in your order dated

7    today about that the decision should be unanimous as to which

8    specific statements.  On Count Nine, to the degree that the

9    Court is going leave Count Nine in and also for Count Four, I

10   think there should be language in both of those that the jury

11   must be unanimous as to -- for Count Four which particular

12   attempts that the jury agrees on and to be unanimous as to

13   that, and then for Count Nine for them to be unanimous as to

14   which statement they find to be the violation.

15             THE COURT:  So I think I just raised the issue but I

16   also cited a case *United States v. House*, which is a Second

17   Circuit, albeit granted it is a summary order but it doesn't

18   seem to view the issue as even a close one.  It seems to

19   suggest that unanimity is not actually required for a 1503

20   charge as to specific conduct or statements that underlie that

21   charge.  And, I think it may be distinguished or

22   distinguishable from the false statements charge, for instance,

23   on that score.  So I read *House* to suggest that the law is

24   directly contrary to what you just suggested and for that

25   reason that the general unanimity instruction is probably

M765sch5

1    appropriate.

2              I'm not sure I have looked into it with respect to

3    Count Four but, Mr. Denton, do you have response on either

4    count?

5              MR. DENTON:  So, I think with respect to Count Nine,

6    your Honor, we read it the same.  We did not find anything

7    additional during the period that we had to take a look at it.

8    I do think that that is the case and it gets to sort of the

9    distinction that I made earlier and that the Court just

10   referenced as between the gravamen of the conduct being

11   obstructing the proceeding versus the specific false statement.

12             I think with respect to Count Four, that falls more

13   within the Second Circuit's kind of general -- I guess guidance

14   is the right word -- that as a general matter where it is not

15   particularly confusing of what conduct is at issue or there is

16   not sort of that kind of overlap, a general unanimity

17   instruction will generally suffice given how comparatively

18   little we are talking about in the context of Count Four.  I

19   don't think there is any need to highlight it for the jury and

20   the general unanimity instruction will do the trick there as

21   well.

22             THE COURT:  I think I agree.  I will look and see if I

23   can find any authority with respect to Count Four but I think

24   *House* disposes of the issue with respect to Count Nine and my

25   guess is the law is the same under Count Four.

1           Anything else, Mr. Schulte?

2           MR. SCHULTE:  No.  That's it.

3           THE COURT:  I think I had said on Count Nine whether

4    the language from just *Desposito* the government had to draw my

5    attention to and we ought to incorporate that somehow.  Anyone

6    have a thought on that that that is where the discretionary

7    actions of a third person are required to obstruct the judicial

8    proceeding.  The nexus requirement is satisfied if it was

9    foreseeable to the defendant that the third-party would act on

10   the communication in such a way as to obstruct the judicial

11   proceeding.  I guess there are two options; one is that that

12   concept is adequately conveyed here, the second would be to add

13   it somewhere in which case let's discuss where that ought to

14   go.

15          Mr. Denton, do you have a view?

16          MR. DENTON:  So I think in view of the concerns your

17   Honor has expressed and which we certainly hear, there is value

18   in adding it and being more specific.  I think my inclination

19   would be to put it at the end of page 43.

20          THE COURT:  Before you go further can I suggest

21   perhaps 42, line 13, the end of that paragraph since it is

22   really discussing the nexus requirement and this is a gloss on

23   the nexus requirement?

24          MR. DENTON:  That makes sense, your Honor.

25          THE COURT:  OK.  So, Mr. Schulte, any objection to

M765sch5

1   adding -- I mean, I would obviously just modify it as

2   appropriate to fit here but something to the effect of where

3   the discretionary actions of a third person are required to

4   obstruct the judicial -- a proceeding or the proceeding, the

5   nexus requirement is satisfied if it was foreseeable to the

6   defendant that the third-party -- and then just quote the

7   language from *Desposito*.

8           MR. SCHULTE:  I'm not sure.  I haven't read it or I

9   haven't seen it.  I think our position is that it's not needed

10  and I am not entirely even sure what that language really

11  means.  It is kind of confusing, what is the third-party that

12  it is referring to?

13          THE COURT:  I don't think it is confusing, let alone

14  confusing in the context of this case, so I am not inclined to

15  think there is merit to that.  I guess if you can -- do you

16  have any quarrel with that being an accurate statement of the

17  law?  It is from a 2013 Second Circuit case.

18          MR. SCHULTE:  No.  It is in there so there is nothing,

19  you know -- it seems to be the accurate statement.

20          THE COURT:  So I will add it at that spot along the

21  lines of what I just quoted.

22          Mr. Schulte, any objections with respect to the

23  verdict form?  I am going to move Count Eight down to page 2 of

24  the form so it appears with the not guilty/guilty options.

25          MR. SCHULTE:  No.

M765sch5

1          THE COURT:  All right.  Very good.  So we will fix all

2     of these things.  Thank you, all, for your helpful suggestions

3     and comments.  Some of the issues are quite interesting and

4     thorny.

5          Two further things to discuss before we finish.  One

6     is the redaction issue and the second, before we get to that,

7     is I do think it does pay for me to just admonish you,

8     Mr. Schulte, the need to be very, very careful in your

9     summation not to testify.  If you verge into anything that

10    sounds like testimony that you are providing information that

11    is not part of the record, I will not hesitate to both sustain

12    an objection or remind the jury that what you say is not

13    evidence.  But, it has obviously been an issue throughout this

14    case, it is to some extent an unavoidable issue where the

15    defendant is representing himself, but I think in the summation

16    it really counsels heavily in favor of, rather than arguing "I

17    did this," "I did that," or "I said this," or "I meant that,"

18    "the evidence showed that" and then adding to it.  I think,

19    using that formulation to make abundantly clear that you are

20    not testifying, you are not offering your version of the events

21    but rather sticking to what is in the record and basing your

22    arguments on the evidence is very, very important.

23          (Continued on next page)

24

25

M76Wsch6

1          THE COURT:  So I would just urge you, admonish you to

2     try and adhere to that line, and to the extent possible, use

3     formulations of that sort to avoid any problems, with the

4     understanding that I will have to interrupt and address the

5     issue if it is a problem.

6          Do you understand all that?

7          MR. SCHULTE:  Yes.  I think it's definitely a fine

8     line that we've tried to walk, you know, taking stuff from her

9     closing last time, where she's referring to me as Mr. Schulte

10    and I substitute "I" in, I don't know how much -- it's just,

11    the pronoun is at issue, right?  I have to, referring to myself

12    in the third person would be kind of strange.

13         THE COURT:  And I'm not requiring that you do that,

14    since I think that would be awkward, although some courts have

15    indeed required that to make this distinction clear.  But the

16    problem is that an argument that Ms. Shroff made in the first

17    trial being made by you, even if the language is identical

18    except for substitution of a personal pronoun for your name,

19    that is the rub.  Right?  You're making the argument, so when

20    you make it and substitute your personal pronoun without any

21    couching that it is based on the evidence, there's no ambiguity

22    when Ms. Shroff make the argument that the jury is going to

23    think that she's testifying and providing a firsthand account

24    of what happened.  There is that potential and that danger when

25    you're making the argument, which is why I think it counsels in

M76Wsch6

1    favor of erring on the side of caution and rather than simply

2    taking Ms. Shroff's closing and substituting "I" throughout to

3    basically ensure that when you're making statements of that

4    nature, that you're tethering it to the evidence in the record,

5    if not citing the specific exhibit, to at least say that "I

6    argue that the evidence shows that I" did X, Y, and Z.  And I

7    think that is something that you should try to do as much as

8    possible.

9             I'm not saying that if you stray from it in any

10   instance I will sustain an objection or provide a curative

11   instruction, but it's something that I will be on the lookout

12   for, so you should be mindful of it.  All right?

13             MR. SCHULTE:  All right.  Yes.

14             THE COURT:  Mr. Denton, you sort of alluded to that

15   issue.  I don't know if you feel the need to say anything

16   beyond that, but I think that would hopefully suffice.

17             MR. DENTON:  Yes, your Honor.

18             THE COURT:  On the redactions, anything we can discuss

19   there?  Has Mr. Schulte now seen what the redactions are?

20             MR. DENTON:  Your Honor, I think we were a little

21   confused about the issue.  I think we had understood

22   Mr. Schulte's concern to be that he didn't know what had been,

23   what the redacted versions looked like.  It sounds like the

24   issue is actually that he does not have the underlying sort of

25   pre-redacted versions, which we did not realize.  I would hope

M76Wsch6

1     that that's something that the CISOs could help get a copy of

2     to him in the SCIF.  But I also think that --

3            THE COURT:  The problem is that it's 6:00.  I'm

4     assuming that the marshals are long past the time that they

5     want to get him back to the MDC, which is to say that he may

6     not be going to the SCIF, and I'm not confident that he'll have

7     time to go there in the morning.  But he needs to know what he

8     can say in his closing, so that's certainly a fair question and

9     concern.

10           MR. DENTON:  I think from that perspective, your

11    Honor, he does have that.  He has the redacted transcripts with

12    the redactions that the Court has approved.  So insofar as

13    there is a version that is appropriate to be used in a public

14    proceeding, that he's got.

15           THE COURT:  OK.  But I don't think he's been given an

16    opportunity to take issue with any of the redactions, and I

17    didn't think that there was anything problematic with them, but

18    maybe I was wrong about that.  So to the extent that he does

19    think that there's something that prevents him from making an

20    argument that he wishes to make, I think he has to be heard on

21    that.  I want to ensure that he can be heard, and the question

22    is how to do that and when to do that.

23           MR. DENTON:  Your Honor, I think whatever opportunity

24    he has to be in the SCIF, you know, would make the most sense

25    for the CISOs to provide him with copies of those pages.

M76Wsch6

1    Certainly while we're here in the courthouse, we would need

2    their assistance to make copies of our classified copies.  If

3    that is for some reason a problem, one of us can run back to

4    the U.S. Attorney's Office and try and do it in our SCIF, but

5    it seems like we're overcomplicating the process at that point.

6              THE COURT:  Mr. Schulte.

7              MR. SCHULTE:  Yeah.  So I think I raised this morning

8    that there's one specific thing.  When I received the Weber,

9    redactions from Weber, there's a very important piece of

10   evidence that I want to sum up on that has been redacted.

11             THE COURT:  What page are we talking about and what,

12   generally speaking -- well, what page are we talking about?

13   Let's start there.

14             MR. SCHULTE:  I said it this morning, but I don't have

15   access to this information right now.  I can try and pull it

16   up, but I think it was -- it was the testimony from Weber with

17   respect to Bartender and what information had been released

18   already.  And the Court redacted --

19             It's 1483 to 1484.

20             THE COURT:  This morning you said 1403 to 1404, which

21   is what was causing me some confusion at least.

22             OK.  Mr. Denton, obviously, we need to be careful with

23   what we're saying in this setting, so that makes it a little

24   harder to discuss.

25             MR. DENTON:  I actually don't think this is a

1    particularly hard one, your Honor.

2            The portion that's redacted is the identification of a

3    specific document that the defendant did not have the Court's

4    approval to disclose.  To the extent that what he wants to do

5    is argue that certain information had been made public, none of

6    that is redacted.  What was or was not disclosed, you know, to

7    the extent that the witness was able to respond to the

8    questions on that, that is all there.  The only thing that's

9    been redacted is sort of the reference to a particular

10   document, for which notice was not given and approval was not

11   obtained.  So I think he's really not in any problematic

12   position here.

13           MR. SCHULTE:  I think, I mean this was actually

14   litigated, the specific information from that page.  But the

15   question was generically whether or not Bartender information

16   was or was not exposed on WikiLeaks.  So since that particular

17   type of document is redacted, the question is how do I make the

18   argument or how do I refer to that?  There wasn't a

19   substitution.  The whole type of document is redacted, so I

20   need to have some way to reference that.

21           THE COURT:  Here's the problem.  I think Mr. Denton

22   has a point that, at least to my recollection, Mr. Schulte

23   didn't identify that particular document in the CIPA litigation

24   that preceded trial.  On the other hand, nor was there an

25   objection, and it came into evidence, and it's in evidence.

M76Wsch6

1    The jury heard it.  They can rely on it, and I'm a little bit

2    reluctant to redact something that's in evidence and

3    Mr. Schulte is entitled to rely on as being in evidence.

4         I don't know if there's a way that we could -- I

5    realize that this isn't the way CIPA litigation is supposed to

6    go; I don't know if there's an appropriate substitution that

7    could be used here, something that would mitigate any concerns.

8    But that's the problem.  I think if the government had

9    objected, even if I hadn't sustained the objection, just

10   because I didn't understand it at the time, the government

11   would be on firmer ground.  But having not objected and let it

12   come into evidence, it's now in evidence.

13        MR. SCHULTE:  I think one of the issues here is that

14   this is such a generic thing that I don't think the government

15   even believed it to be classified.  So I think that's the

16   problem.  It's something so generic anyway that I would have no

17   reason to believe that it would be classified.  I don't think

18   the government did either, so I'm not even sure why it's being

19   redacted or what the reasons are for that.  But since it's in

20   evidence, unless the government is going to agree to some kind

21   of substitution, but if that was already the most generic way

22   to refer to that, so I don't know what substitution there would

23   be.

24        I also raise to the Court's attention that this raises

25   another issue, because I haven't really seen these and I don't

M76Wsch6

1     know what's behind them.  I don't really know what is, you

2     know, off limits.  I don't know what things I said that the

3     CISO or the CIA took umbrage at, so, you know, going forward

4     tomorrow, you know, I don't really know what has been ruled to

5     be -- what they've decided to be classified.  So it kind of

6     puts me in a bad position, that I don't know what the basis is

7     for those redactions too.

8              THE COURT:  Mr. Denton.

9              MR. DENTON:  So, a couple of things, your Honor.  I

10    think, first of all, the defendant has the redacted

11    transcripts, as the Court has previously observed.  Possibly

12    with this one or maybe one other exception, everything that's

13    been redacted was in response to objections, so the defendant

14    shouldn't be relying on it in any event.

15             I would disagree with his characterization that the

16    government didn't know this was classified.  Honestly, it's

17    taken a certain amount of judgment to decide what to object to

18    and what not to of the defendant's questions.  The fact is it

19    is classified.  The fact that it came into evidence does not

20    change that fact.  It is a reference to a specific, particular

21    document, which is the problem.  And so I think to the extent

22    that what the defendant wants to do, the point for which it is

23    relevant is not a specific document for which he did not give

24    notice or anything like that, but simply a generic and,

25    frankly, fairly confusing set of questions about what

M76Wsch6

1   information is where, substituting simply "document" would

2   probably get the job done.  Say "I reference the document"

3   rather than the specific identification of what that document

4   is.

5           THE COURT:  In one of the notebooks, I think vendor,

6   there was an @vendor substituted for what I assume was the name

7   of the vendor, perhaps.  Taking a key from that, what about, to

8   make it clear that it's a particular document, substituting

9   @document?  So it would be the @document would have talked to

10  that and the @document was exposed by WikiLeaks, and on 1484,

11  the @document would have made the statement.

12          MR. DENTON:  So, your Honor, I think just the

13  reference in the notebooks is actually a reference to the

14  defendant having cited the vendor's actual Twitter handle.

15  Whether we do it with an "at" or capital-D document or some

16  version of that, I don't think we'd have any problem with

17  something that suggests a particular document.

18          THE COURT:  All right.  Fair point.

19          MR. SCHULTE:  I think the other thing to say, you

20  know, to the extent that the government says that they made a

21  judgment call, you know, if they made a judgment call and

22  decided not to object, it came into evidence the way that it

23  came into evidence.  So they kind of have to live with, you

24  know, the judgment that they made.  And it's unfortunate like

25  that, but the particular type of document is critical to that

M76Wsch6

1    charge and critical to that -- or attempted charge and to show

2    that the information, that this type of document is out there

3    and the types of information that the jury has seen from, for

4    example -- I forget whatever it is, for Brutal Kangaroo, they

5    were able to see that type of document.

6            So basically by saying the type of document, it's

7    critical for the defense in summations to make the argument

8    that, you know, you saw the types of information in this

9    document and then relying on the testimony that he gave that

10   this document's out there and the fact that, to his knowledge,

11   nothing -- that that document would contain all the

12   information.

13           THE COURT:  Well, let's not go any further in this

14   setting.  I think the fact of the matter is yes, the government

15   could have and perhaps should have objected.  But so, too, you

16   could have and should have noticed it in your Section 5 notice

17   pretrial, because it certainly seems like you anticipated

18   wanting to rely on this document, and the burden was on you to

19   notice it before trial.  So in that regard, while, yes, the

20   government could have objected, it also has to make a judgment

21   call about making objections on this score since it underscores

22   and draws attention to the problem, and those problems are

23   supposed to be headed off in pretrial litigation.

24           It seems to me that the appropriate resolution here is

25   essentially a form of substitution and that that enables you,

M76Wsch6

1    given the context of the question and answer, which is

2    discussing whether the document would have contained the sorts

3    of information that you're discussing, you're able to make that

4    argument without reference to the particular kind of document

5    that it may be.  So it strikes me that that strikes the right

6    balance and is the equitable and fair resolution here.

7          On that score, let's look for an appropriate

8    substitute.

9          MR. SCHULTE:  Why don't we just call it the Bartender

10   document, by the way it's specific to Bartender.

11         THE COURT:  Mr. Denton, any objection to that?

12         MR. DENTON:  I think potentially, your Honor, I think

13   our view would be if we just call it the capital-D document,

14   that serves the specificity purpose and otherwise avoids any

15   potential other complications.

16         MR. SCHULTE:  I think that would be too generic, and

17   it would send the wrong message.  I think it's important to

18   note that the document's specifically about Bartender.  It

19   doesn't matter what type it is, but I think saying specifically

20   the Bartender document is a better substitution for what that

21   is and how the jury should infer what types of information is

22   in that document.

23         THE COURT:  All right.  I agree that Bartender

24   document is more appropriate.  I think even in the absence of

25   the adjective, use of Bartender there it's clear that that's

M76Wsch6

1  essentially what the document would be.  So let's do that.

2         I guess the question is how to tell the jury that I've

3  approved that substitution.  Should I do that before

4  summations?  Should I leave it to Mr. Schulte, if he's going to

5  show this to essentially make the substitution and show it to

6  the jury with the substitution, and I'll explain to the jury

7  that I've approved that substitution?

8         What are your thoughts?

9         MR. SCHULTE:  My interpretation or my opinion is I

10  don't think the Court really needs to explain it.  I can put it

11  up from the redactions and have, you know, the Bartender

12  document and just refer to it like that.  I don't really know

13  if there's really any -- based on the Court's prior rulings

14  about redactions and substitutions, just the generic name

15  should suffice.  I don't think we need to go into any detail.

16         THE COURT:  Well, I think the difference is this is a

17  transcript of something that they heard in court, and they need

18  to understand that I said it was necessary or OK to redact in

19  that way.

20         All right.  Tell you what.  Why don't I leave it to

21  you to make the argument, and when you make it, I may just

22  briefly interrupt you to make clear to the jury that I approved

23  that redaction/substitution and that they're not to concern

24  themselves with what was behind it and leave it there.  All

25  right?

M76Wsch6

1           Mr. Denton.

2           MR. DENTON:  I don't have any issue with the Court's

3    process on that.  I will note, your Honor, that the proposed

4    intention of the defendant to invite the jury to infer the

5    contents of a classified document not in evidence are

6    problematic on any number of levels, and so to the extent that

7    he wants to refer to the evidence to make his point about what

8    is or is not public, that's one thing.  To the extent that he

9    invites the jury to speculate about the contents of a

10   classified document, then we're going to have a problem.

11          THE COURT:  All right.

12          MR. SCHULTE:  I think the point is the testimony

13   that's coming in through evidence about what types of

14   information is in that document.  That's what's in evidence.

15   There's no speculation being done or I'm not inviting the jury

16   to speculate.  I'm saying look at the testimony.  What he

17   testified is in this document, and he's testifying that all of

18   this information about Bartender is in the document.  And he's

19   testifying that he doesn't believe, you know, anything from --

20   anything from the notebooks was not already released by

21   WikiLeaks.  The point is that specific testimony.  It's not

22   about speculation or anything like that.

23          THE COURT:  All right.  I think as long as you hew to

24   what the witness testified to and what the evidence is, then

25   there shouldn't be any issue, and I already gave you an

M76Wsch6

1    admonition on that score.

2          Upon reflection, I think what I may do is before the

3    summations begin, note that on occasion in the transcripts,

4    that I've approved some redactions or substitutions to the

5    transcripts themselves and so to the extent that they request

6    any transcripts during their deliberations, they may see that,

7    and it's also possible that during the parties' summations

8    they'll see transcripts in which there are redactions or

9    substitutions and that I've approved those, and that way I

10   won't have to interrupt Mr. Schulte.  So I think that's the

11   better way of doing that.

12         All right.  Anything else?

13         MR. DENTON:  Not from the government, your Honor.

14         THE COURT:  Mr. Schulte.

15         MR. SCHULTE:  Yeah.  The only last problem is I don't

16   have today's transcript to sum up on, so if there's any way I

17   can get that before I go back.

18         THE COURT:  I don't know the answer to that.  I assume

19   you mean the trial transcript, not the transcript of this

20   proceeding.

21         MR. SCHULTE:  That's correct, yeah.  The trial

22   transcript from today.

23         THE COURT:  I'm not generally involved in the process

24   of getting that to either side, but do we know where that

25   stands or what the status of it is?

M76Wsch6

1          There is the one word that I suspect I know what it

2     is, but given that there may be an issue with at least one

3     page.

4          MR. DENTON:  I'm not sure, your Honor.  I think as of

5     when we came up this afternoon, that was still in process with

6     the court reporters, so I don't think we have a copy of it yet.

7     I assume this will go in the normal course, and we'll all get

8     it when we all get it.

9          THE COURT:  All right.  I think that's right.

10         The fact is, Mr. Schulte, in some cases summations are

11    done immediately after the close of evidence or the same day,

12    and in that sense, it is what it is, and hopefully you'll get

13    it as quickly as you can, if not this evening before you

14    return, then certainly tomorrow morning.  If not, you'll have

15    to make do with your recollection, and it's the jury's

16    recollection that governs anyway.

17         Other than that, anything else?

18         Mr. Denton.

19         MR. DENTON:  No, your Honor.

20         THE COURT:  Mr. Schulte.

21         MR. SCHULTE:  No.

22         THE COURT:  Exhibit lists, my law clerk reminds me.

23         Mr. Schulte, have you had an opportunity to review the

24    most recent exhibit lists?  Are we all on the same page about

25    that?  Have we discussed it?

M76Wsch6

1          You know what?  Bottom line is we've been at this long
2    enough, let's leave it there.  First thing tomorrow I expect an
3    update on this score.  Hopefully everybody will agree on what's
4    in and what isn't, and if you haven't already spoken to my
5    deputy, you should speak to her in the morning about the best
6    way to actually get it on to the system.  But as long as you
7    guys have done that, we have plenty of time before that needs
8    to happen, so we'll take it up tomorrow.

9          All right.  Very good.  With that, thank you all for
10   sticking with me for so long, and especially the court
11   reporters.  And I'll see you tomorrow morning first thing.
12   We'll proceed with summations.

13          Thank you very much and have a good night.
14          MR. DENTON:  Thank you, your Honor.
15          (Adjourned to July 7, 2022, at 9:00 a.m.)
16
17
18
19
20
21
22
23
24
25

<pre>
 1                           INDEX OF EXAMINATION
 2   Examination of:                              Page
 3   EVAN SCHLESSINGER
 4   Cross By Mr. Schulte . . . . . . . . . . .1930
 5   Redirect By Mr. Denton . . . . . . . . . .1939
 6   Recross By Mr. Schulte . . . . . . . . . .1942
 7   HANNAH SOTNICK
 8   Direct By Mr. Schulte . . . . . . . . . .1976
 9   CHENG
10   Direct By Mr. Schulte . . . . . . . . . .1985
11   Cross By Mr. Denton  . . . . . . . . . . .1991
12   DAVE
13   Direct By Mr. Schulte  . . . . . . . . . .1993
14   Cross By Mr. Denton  . . . . . . . . . . .2017
15   Redirect By Mr. Schulte  . . . . . . . . .2024
16                         GOVERNMENT EXHIBITS
17   Exhibit No.                               Received
18    1703-1 and 1704-1  . . . . . . . . . . .1943
19                         DEFENDANT EXHIBITS
20   Exhibit No.                               Received
21    815  . . . . . . . . . . . . . . . . . .1932
22    830  . . . . . . . . . . . . . . . . . .1933
23
24
25
</pre>