M77Wsch1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

        Defendant.
                         Trial
------------------------------x

                         New York, N.Y.
                         July 7, 2022
                         9:05 a.m.

Before:

               HON. JESSE M. FURMAN,

                         District Judge
                         -and a Jury-

                 APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
BY:  DAVID W. DENTON JR.
    MICHAEL D. LOCKARD
    Assistant United States Attorneys


JOSHUA A. SCHULTE, Defendant *Pro Se*


SABRINA P. SHROFF
DEBORAH A. COLSON
    Standby Attorneys for Defendant

Also Present:  Charlotte Cooper, Paralegal Specialist

M77Wsch1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  I hope everyone is well.

3    We should be ready to proceed to closings.

4          A couple quick things.

5          First of all, I will tell the jury, but I completely

6    lost track of days yesterday when I said that we would go until

7    5:00 tomorrow.  I'm actually going to end tomorrow at three, so

8    you know, and I will let them know as well.

9          A couple things that we do need to address at some

10   point today, although I don't think we need to do it right now,

11   is the exhibits, whether everyone's in agreement on what came

12   into evidence and whether we have collected all that.

13         Second, how we're handling the classified exhibit, not

14   GX1 but the other one, and whether it should be marked as

15   classified or not.

16         Third, and we don't need to discuss this, it is my

17   intention to send the indictment to the jury, as I think you

18   saw in the draft jury charge.  So that should also be included

19   with the exhibits and available electronically to the jury.

20         And then lastly, I think we've told standby counsel

21   that Mr. Schulte's submissions from yesterday -- there were, I

22   think, two -- need to get docketed.  I want to make sure that

23   they are filed on ECF in the near term.

24         All right.  Ms. Shroff, good?

25         MS. SHROFF:  Yes, we will.  I explained why we

M77Wsch1

1    couldn't do it yesterday.

2              THE COURT:  I'm not chastising; I'm just saying make

3    sure they get filed expeditiously.

4              MS. SHROFF:  We shall.  We shall do it by end of day,

5    maybe tomorrow morning.

6              THE COURT:  Great.

7              Is the government ready to proceed?

8              MR. LOCKARD:  Yes, your Honor.

9              THE COURT:  And I take it, Mr. Lockard, you're doing

10   the principal closing.  Is that correct?

11             MR. LOCKARD:  That's correct, your Honor.

12             THE COURT:  All right.  Do you still estimate two

13   hours, maybe less?

14             MR. LOCKARD:  I would say two hours.

15             THE COURT:  OK.

16             All right.  Anything to raise before we proceed?

17             Government.

18             MR. LOCKARD:  No, your Honor.

19             THE COURT:  Mr. Schulte.

20             MR. SCHULTE:  I think I just need one minute in the

21   back to change shirts.

22             THE COURT:  All right.  Why don't you go do that

23   quickly now, and I'll get a report on the jury.  And then we'll

24   get ready to go.

25             Also, make sure you pull your mask up over your nose,

M77Wsch1

1   please.

2           All right.  Mr. Schulte is back.  We'll get the jury

3   and get started.

4           (Jury present)

5           THE COURT:  You may be seated.

6           All right.  Welcome back.  Good morning, ladies and

7   gentlemen.  I hope you had a pleasant rest of your day

8   yesterday, and thank you for being here on time today.

9           Let me say a few different things.

10          First, one housekeeping matter.

11          Just so the record is clear, given that with my

12  approval, only a first name was used, I just want to make clear

13  that you've heard testimony during trial about Dave C. and you

14  heard from a witness yesterday who testified under the name

15  Dave.  That is the same person.  So Dave is Dave C., just to

16  make that clear if it wasn't already clear to you.

17          Second, I just want to give you a heads-up that just

18  as I've approved certain redactions or substitutions with

19  respect to some of the exhibits you've seen, I've done that in

20  very limited circumstances to the trial transcript as well, for

21  reasons that you don't need to concern yourselves with or worry

22  about.  I'm just telling you that because during the parties'

23  closings today, it's certainly possible that they will show you

24  or reference a portion of the trial transcript that contains a

25  redaction or a substitution.  I just wanted to give you a

M77Wsch1

1    heads-up about that.  As with the other redactions, you

2    shouldn't speculate as to why.  You did hear the testimony and

3    you can consider it, and in that sense, your recollections

4    govern.  But otherwise, you should just treat it as redacted or

5    a substitution.

6          One other housekeeping matter.

7          When I told you yesterday that you should be prepared

8    to be here until 5:00 tomorrow, I completely blanked on what

9    day of the week it was.  Since we were starting on Wednesday, I

10   got a little confused.  I actually can't -- we can't -- sit

11   until 5:00 tomorrow.  So we will actually break tomorrow at

12   3:00 just for your planning purposes.  We'll discuss your

13   schedule more later, and that brings me to the last topic,

14   which is the schedule, just so you have a sense of what today

15   and tomorrow are going to look like.

16         As you know, we're at the stage where the parties will

17   be giving their closing arguments.  The way that works is the

18   government goes first, then Mr. Schulte will go, and then the

19   government has an opportunity to rebut Mr. Schulte's closing.

20   That's because the government bears the burden of proof, so it

21   gets the final word.  And as you know, and as I will tell you

22   again several more times, the government bears the burden at

23   all times in this trial, and that's why it gets a rebuttal.

24         That's the way today will proceed.  I'm guessing, and

25   we'll have to play it a little bit by ear, but I'm guessing

M77Wsch1

1    we'll hear the government's closing, and then to ensure that

2    you can give Mr. Schulte the same close attention that I'm sure

3    you'll give the government, we'll take a 30-minute break, give

4    or take, before Mr. Schulte's closing.  And then depending on

5    where we are, how long his closing is and so forth, we'll

6    probably take a break, maybe a little bit shorter than that,

7    but another break after his closing before the government's

8    rebuttal.  And then we'll see what time it is and whether I

9    would have time to give you my instructions before the close of

10   today or not.

11          We'll have to play it a little bit by ear, but that's

12   the plan.  And then once I give you my instructions, your

13   deliberations will begin.  And with the exception of tomorrow,

14   when we'll end at three, I'll ask you to remain until you've

15   either reached a verdict or until 5 p.m. each day after

16   tomorrow.  So just so you have a sense of what's coming down

17   the pike, but we'll discuss that more as we proceed.

18          Why don't you ask my deputy at a break if you have a

19   question, juror No. 13, and we'll take it from there.

20          With that, we'll proceed with closings, beginning with

21   the government.

22          Let me mention to you, remind you, that what the

23   lawyers say, what Mr. Schulte says, is not evidence.  All

24   right?  You've now heard all the evidence.  It's the testimony

25   of the witnesses, it's the exhibits that have been admitted

into evidence, including the stipulations of the parties, but what the lawyers have said in their questions and what Mr. Schulte has said in his questions and their openings and now their closings is not evidence.  All right?  That's very important.  Particularly Mr. Schulte, obviously, was involved in some of the events that you have heard about and that I'm sure both sides will discuss in their closings, but when he is talking about it in his closing, he's not giving testimony, he's not giving evidence; he's just making an argument based on the evidence that you have now seen and heard.  So it's important to keep that in mind.

If their descriptions of any of the evidence differ from your recollections, it's your recollection of the evidence that governs.  So, too, it's possible that they will make reference to what my likely instructions to you will be, and I will tell you, and remind you later, that if their description of my instructions differs from my instructions, it's my instructions that govern.

Having said all that, it's still important to listen to them with care.  It's their opportunity to make arguments to you about what conclusions you should draw from the evidence to sort of tie it all together, since, obviously, it's come in in bits and pieces.  So it's a very important and very helpful part of the process.  So I would ask that you give them your undivided and careful attention.

1               With that, we will begin with the government.

2               Mr. Lockard.

3               MR. LOCKARD:  On April 20, 2016, Joshua Adam Schulte

4    stole the entirety of the CIA's highly sensitive cyber

5    intelligence capabilities.  The defendant -- at the time one of

6    the CIA's own -- turned on his agency and on his country.  Now,

7    just days before April 20, the CIA had locked the defendant out

8    of the secure restricted vault-like location on the network,

9    where the files containing this data were stored.  They had

10   done that precisely because of the defendant's blatant

11   violation of security rules and his abuse of his administrator

12   authorities for personal ends.

13              But unknown to the CIA, the defendant had kept a

14   secret cryptographic passkey.  That passkey allowed him to

15   bypass those restrictions, and he used it to execute a series

16   of maneuvers on the network that gave him access, that allowed

17   him to tunnel through to that network location, where files

18   containing backups of the entirety of the CIA's cyber tool

19   development were stored.  He stole copies of those backup

20   files.  He searched for and deleted scores of log files in an

21   attempt to cover his tracks, and then he reversed those

22   maneuvers that had given him access to that location in an

23   attempt to make it look like he was never there.

24              Now, shortly after stealing this extraordinarily

25   sensitive intelligence information, the defendant transmitted

1   those backups to WikiLeaks, knowing full well that WikiLeaks

2   would put it up on the internet.  In the weeks following this

3   break-in, the defendant took every step he would need to take

4   in order to transmit those files to WikiLeaks.  He downloaded a

5   program that WikiLeaks itself recommends to leakers to use to

6   send stolen data.  He bought computer equipment to connect

7   large hard drives to his home computer, large hard drives big

8   enough to hold the backup files.  He researched how to verify

9   that large files had transferred over a network and how to

10  confirm that they had transferred without errors or corruption.

11  He downloaded and tested secure data deletion programs designed

12  to nuke computers and destroy any trace of forensic evidence.

13          And after a couple of weeks, the defendant did just

14  that.  He completely wiped his home computers and any number of

15  external hard drives.  He preserved only the data that he

16  wanted to preserve and made sure to leave no trace of anything

17  else behind.

18          And on March 7, 2017, WikiLeaks began releasing that

19  stolen data in a series of publications that it dubbed Vault 7

20  and Vault 8.  Those releases were instantly devastating to this

21  nation's foreign intelligence capabilities.  Overnight, foreign

22  intelligence cyber tools had to be shelved and rewritten.

23  Ongoing operations had to be shuttered.  Individuals -- human

24  beings, who had assisted in getting these cyber tools onto

25  adversary networks -- were put at risk of being exposed, of

M77Wsch1                    Summation - Mr. Lockard

1   being burned, of having their very lives in danger.  The entire

2   computer network the CIA used to develop these tools was

3   switched off, unplugged, and seized by the FBI.  This nation's

4   foreign intelligence cyber capabilities had to be largely

5   rebuilt from the ground up.  And that national security

6   catastrophe was the work of one man -- Joshua Adam Schulte.

7            Now, ladies and gentlemen, over the past several

8   weeks, you have heard and you have seen devastating evidence

9   uncovering the defendant's crimes, because despite his best

10  efforts, despite his attempts to delete every trace of his

11  deeds, he failed.  The defendant left behind a trove of digital

12  evidence, recovered by FBI computer scientists, that shows you

13  step by step how he committed that crime.  It's the computer

14  equivalent of security camera footage.  And in those cases,

15  where there are gaps in the footage, you see step by step how

16  it is the defendant who deleted that video.

17           Now, you've also seen how when WikiLeaks began

18  publishing that CIA information that the defendant had stolen

19  and transmitted, the defendant was quickly identified as a lead

20  suspect.  And it's no surprise why.  While at the CIA, he had

21  violated security protocols, he filed false complaints, he

22  bragged about his ability to get himself access to the

23  classified computer network, and he repeatedly went around or

24  defied his supervisors and their instructions.

25           In November of 2016, several months after he sent the

M77Wsch1                    Summation - Mr. Lockard

1    stolen backups to WikiLeaks, the defendant left the CIA, angry

2    and disgruntled.  So after the Vault 7 release, the FBI sprang

3    into action, quickly learning everything it could about the

4    defendant and making arrangements to interview him.  And during

5    that interview, first held on March 15 of 2017, and in

6    interviews that followed, the defendant lied.  He falsely

7    denied being involved in the leak of the CIA information.  He

8    offered up alternative theories about how the crime could have

9    been committed that he knew were false.  He attempted to divert

10   the investigation's resources and attentions away from himself

11   and down false paths.

12        Now, eventually, the defendant was arrested, and he

13   was held at the Metropolitan Correctional Center, the MCC, here

14   in Manhattan.  And while he was here, as you heard during this

15   trial, he had cell phones smuggled into the prison.  He used

16   those contraband cell phones to set up encrypted email

17   accounts, to set up social media accounts under false names.

18   He used services designed to disguise the location where the

19   phone was being used and to allow anonymous access to the

20   internet.

21        Using those tools, he sent a reporter documents that

22   included sensitive information about the CIA's cyber groups,

23   about its personnel.  He drafted a series of tweets that

24   included even more sensitive information about the CIA's cyber

25   tools and started making arrangements to send those tweets out.

1   And this part of the plot, fortunately, was disrupted before it

2   bore fruit, because the FBI learned of it and they seized the

3   phones.

4            Now, ladies and gentlemen, you've also seen evidence

5   of why the defendant did these things.  And motive is not an

6   element of any of the offenses; it's not something that you

7   have to find during your deliberations.  But nonetheless, the

8   evidence does suggest to you why the defendant did this.  It

9   was ego and it was anger.

10           The defendant would like to think of himself as a bad

11  ass, but in fact, he is a ticking time bomb, a nuclear bomb,

12  one that was ready to explode at any perceived provocation or

13  disrespect.  And in April and May of 2016, the defendant, the

14  so-called nuclear option, set out to lay waste to the CIA's

15  cyber program, to prove his superiority, and to punish the

16  people who he believed had wronged him.  And in carrying out

17  that revenge, he caused enormous damage to this country's

18  national security.

19           Now, ladies and gentlemen, this summation is my

20  opportunity to pull together the evidence that you've seen

21  throughout this trial, to help explain how it fits together and

22  how it leads inescapably to one conclusion -- that the

23  defendant stole national defense information from the CIA; that

24  he transmitted that information to WikiLeaks; that he lied to

25  the FBI to obstruct the investigation; and that while in prison

M77Wsch1                    Summation - Mr. Lockard

1  he released and attempted to release more national defense

2  information.

3           Now, before we talk about what the evidence shows,

4  let's just have a brief overview of what the charges are.  Now,

5  you'll get detailed instructions about the charges from Judge

6  Furman, and later in my remarks, we'll come back and talk about

7  it in a little more detail there.  But for now, let's just have

8  an overview so that as we talk about the evidence you'll see

9  how it's relevant and how it relates to the different charges.

10          The first set of charges relates to the defendant's

11 theft and transmission of those backups from the CIA.

12          Count One charges illegally gathering national defense

13 information, based on the defendant's stealing the CIA backups

14 on April 20 of 2016.

15          Count Two charges illegally transmitting unlawfully

16 possessed national defense information, based on sending those

17 stolen backups to WikiLeaks.

18          Counts Five and Six charge computer crimes, based on

19 how the defendant committed those crimes -- unauthorized access

20 to a computer to obtain classified information, and

21 unauthorized access to a computer to obtain information from a

22 department or agency of the United States.  And that's based on

23 breaking into that network location, the Altabackups folder, on

24 April 20, 2016, to steal the classified backups.

25          Counts Seven and Eight also charge computer crimes.

M77Wsch1                   Summation - Mr. Lockard

1   They charge causing the transmission of a harmful computer code

2   or command, and that's based on the evidence that you've seen

3   of the defendant executing commands on April 20 to delete data

4   and to cause harmful changes to the network:

5           First, that series of reversions involving snapshots

6   that had the effect of deleting about an hour and a half of the

7   defendant's activities on the network; and second, editing and

8   deleting numerous log files on the servers in an attempt to

9   hide the actions that he had undertaken.

10          After the CIA theft and transmission charges, there's

11  an obstruction charge, and that is based on the defendant's

12  lies to the FBI in March of 2017 in an effort to obstruct or

13  impede an ongoing grand jury investigation.

14          Finally, the prison transmission counts.

15          Count Three charges the defendant with illegally

16  transmitting national defense information -- for sending notes

17  and writings in an email to a Washington Post reporter,

18  disclosing sensitive information about the CIA networks and

19  personnel and the CIA's groups.

20          Count Four charges attempting to illegally transmit

21  national defense information, based on writings that the

22  defendant intended to publish, and took steps to publish,

23  including tweets about sensitive cyber tools, about CIA

24  tradecraft.

25          So before we get into the events of April 20, let's

M77Wsch1                    Summation - Mr. Lockard

1    just take one more quick break and talk about some concepts

2    that are going to come up throughout the discussion, and it

3    came up throughout the trial.  And these are going to be

4    important to help us orient ourselves as we go through the

5    evidence.

6          First is the CIA's Center for Cyber Intelligence.

7    You've heard a lot about this organization, and you've learned

8    from this trial that this is the part of the CIA that does

9    offensive cyber operation; that is, intelligence gathering,

10   using cyber tools.

11         Now, you've also heard about some of the groups

12   underneath the CCI.  There's the Engineering and Development

13   Group.  That is the group that used the computer network that

14   you're going to hear a lot about and have heard a lot about,

15   the DevLAN network.  That's the group that developed the cyber

16   tools.

17         And you've heard the words "cyber tool" a lot, and by

18   now you know that a cyber tool is a computer program.  It's a

19   computer program that's developed to gather intelligence on an

20   adversary network.

21         Now, within the Engineering and Development Group,

22   there's one group in particular you've heard a lot about, and

23   that's the Operations Support Branch, or OSB.  It is one of the

24   five developer groups that operate underneath EDG, and it's

25   important in this case because that is the branch where the

1    defendant worked for quite a period of time until he was

2    transferred to another, sister branch, the RDB, and that's

3    where some of the witnesses that you've heard from worked at

4    the time -- Jeremy Weber and Frank Stedman.  This is also the

5    group that owned the server that hosted some of the services

6    that the defendant unlawfully accessed.

7            And as you also heard from the trial testimony, OSB

8    had a couple of particular areas of focus in their cyber tool

9    development.  One area of focus was quick-reaction tools; that

10   is, tools that were needed on a short timeline for an imminent

11   operation.  You also heard that they had a focus on

12   counterterrorism operations.

13           Now, I mentioned that network that the Engineering and

14   Development Group used, the DevLAN.  You've heard a lot about

15   it.  Let's just get the lay of the landscape on the DevLAN

16   network.

17           DevLAN is a classified computer network used by EDG.

18   Access to that network was limited.  It was limited to the

19   people who needed to access it for development, about 200

20   people in the entire CIA.  And as you know, that system, as

21   Anthony Leonis described, contains some of the CIA's most

22   protected technical secrets, enabling the agency to conduct

23   CNE, or computer network exploitation-related activities.  That

24   network was closed.  It did not connect to the internet.  It

25   was accessible only from CCI offices, and it was accessible

M77Wsch1                    Summation - Mr. Lockard

1   only by cleared personnel with a need to know.

2           Now, why is that relevant?

3           That's relevant because one of the things you're going

4   to have to decide is whether the information was national

5   defense information.  Now, you know it relates to the national

6   defense because it relates to intelligence-gathering

7   capabilities and this country's intelligence and military

8   readiness.  You also know that it's closely held because of all

9   those protections, designed to keep that data secure.

10          Now, looking a little bit more underneath the hood of

11  DevLAN, you know that the network was managed by ISB, and that

12  will become important later, because there's going to be a

13  transfer of power from the defendant to ISB.

14          You know that that network had certain computer

15  programs that were used by developers called the Atlassian

16  programs.  Those are the programs like Confluence, which was a

17  wiki for sharing information and documents and programs like

18  Stash, which is where actual computer code and computer

19  development documentation was stored.

20          And you know that the Confluence, which operated as a

21  virtual server, ran on a computer server that was owned by the

22  OSB branch.  Now, you know that those programs, those Atlassian

23  programs, were backed up.  And during the relevant time period,

24  they were backed up to a different location on the network that

25  was called Altabackups.  And you have heard and we will talk

M77Wsch1                    Summation - Mr. Lockard

1  about the defendant's efforts to get access to that Altabackups

2  folder.

3          You've also heard a lot about administrators, and I

4  want to talk about this for just a minute, because there are

5  several different kinds, and it's helpful to keep in mind what

6  kind of administrator we're talking about at any given point.

7          There are systems administrators that are responsible

8  for the entire network -- the servers, the connectors, the

9  desktops, that sort of thing.  That's what ISB does.

10          Then there are the Atlassian administrators.  Those

11  are the people who configure those Atlassian products and have

12  access to the servers where those products run, and their job

13  is to help developers use the products, to set configurations

14  for the programs and to control access to particular projects.

15          Now, you've heard through this trial that for a period

16  of time the defendant was an Atlassian administrator, and we'll

17  talk about what he did with that authority and what happened

18  after he lost it.

19          The last type of administrator you heard about to a

20  significant degree in this trial were project administrators,

21  and that's something that applies to Stash.  Right?  Stash has

22  projects that are different repositories for different

23  projects.  They're different tools, and a project administrator

24  has authority over that particular project to set access for

25  other users.

M77Wsch1                    Summation - Mr. Lockard

1          Now, you also heard a lot about the role of
2    administrators and the importance of things like trust in an
3    administrator.  You heard about that from any number of people.
4    You heard about it from Anthony Leonis.  You heard about it
5    from Jeremy Weber.  You heard about it from Frank Stedman.  You
6    heard about it from the government experts.
7          Why is the role of an administrator important?
8          It's important because administrators, by necessity,
9    have wide access to the network.  They have access to things
10   that an ordinary user doesn't have and doesn't need access to.
11   And with that comes trust, especially on a network like DevLAN
12   that hosted extremely sensitive cyber intelligence tools, cyber
13   intelligence tools that were also subject to a need-to-know
14   requirement because they were classified.
15         We're going to talk a lot about what it is that the
16   defendant did with his administrator powers, and as we do that,
17   I want you to remember what it is the other witnesses said
18   about what type of administrator action is authorized and what
19   type of administrator action is illegitimate.
20         The last thing I want to touch on briefly is
21   classification.  Classified information, as you heard at trial,
22   is basically information that somebody in the government who is
23   authorized to make that determination has found would cause
24   serious harm to the U.S. national interest if it were
25   disclosed.  The reason that's important is access to classified

1    information requires a clearance and it requires a need to know

2    it.

3              DevLAN was a classified system.  It housed classified

4    information.  And as you'll hear in the charge given by Judge

5    Furman, classification is relevant to whether documents are

6    closely held, and it's going to be relevant to whether

7    information was closely held after the WikiLeaks release of

8    Vault 7 and Vault 8.  And we'll talk about that when we get to

9    the prison counts.

10             So let's talk about what the evidence has shown.

11             On April 20, 2016, the defendant used unauthorized

12   computer access to copy CIA backup files and delete data.

13             The defendant then transmitted the stolen backup files

14   to WikiLeaks, who began releasing it on March 7, 2017.  He lied

15   to the FBI and released, and attempted to release, more

16   national defense information from prison.

17             Now, when we talk about what the defendant did on

18   April 20, 2016, we're going to talk about digital forensic

19   evidence.  We're going to talk about different computer

20   commands and different computer locations and different

21   computer authorities that the defendant used.

22             And the how of what the defendant did can be

23   complicated.  There are a lot of different types of commands

24   that we're going to talk about, and we're going to talk about

25   why each one is significant.  We'll talk about reversions.

M77Wsch1                    Summation - Mr. Lockard

1      We'll talk about data access and file copying.  We'll talk

2      about deletion commands.  But what the defendant did is not

3      complicated.  All of those actions had a single purpose and a

4      single plan, which was to get access to the backup files and

5      copy them.  And what it shows is this -- that after April 16,

6      the defendant was not authorized to access the Confluence

7      server, the OSB server, or the Altabackups folder as an

8      administrator.  Between April 14 and April 19, the defendant

9      planned to get into the Altabackups folder and steal the

10     backups.  On April 20, the defendant did just that, and he

11     copied the backup files.  Also, on April 20, the defendant

12     deleted data from OSB's server and from the Confluence virtual

13     server.

14            Let's start with the defendant's loss of his

15     administrator privileges.

16            It began on March 29 of 2016, when the defendant was

17     transferred from OSB to RDB.  And you heard a lot about why

18     that was.  Right?  We don't have to get into it here.  All

19     that's relevant for your purposes about all those office

20     conflicts, all those personnel disputes, all those complaints,

21     what's important for you is the result, on March 29, 2016, was

22     the defendant was transferred.  He was transferred out of OSB

23     and into RDB.

24            That's significant here because the Confluence

25     server -- right -- the program that had one of those backups

1   that was stolen, ran on OSB's server.  I mentioned virtual

2   servers before, and you heard about it during trial.  A virtual

3   server is a computer within a computer.  Right?  It's virtual,

4   meaning it's not a physical computer.  It's a piece of

5   software.  The effect of that for your purposes is that having

6   access to the physical computer that hosts the virtual computer

7   does not give you access to the virtual computer.  It's like

8   walking into a room where there's another computer sitting on

9   the desk.  You can see it, you can pick it up, you can do

10  things on the outside of it, but you have to separately log in

11  to that virtual server.  It's like a separate computer.  And

12  that OSB server was an OSB piece of computer equipment.  It was

13  managed by and it was administered by OSB.  And after March 29,

14  2016, the defendant was not in OSB, and he was not an OSB

15  server administrator.

16          You also heard about the defendant had his projects

17  reassigned.  Right?  There were a couple of projects he was

18  taking with him, but all of his OSB projects were staying with

19  OSB.  And you saw how his project administrator access, his

20  ability to access those projects on Stash, were changed as a

21  result.

22          Now, you also heard about some of the fallout from

23  those changes and project permissions, and in particular, you

24  heard about a confrontation that the defendant initiated over

25  one of the OSB projects called OSB libraries.  And on April 14,

M77Wsch1                 Summation - Mr. Lockard

the defendant approached Jeremy Weber and had a confrontation
with him about it.  The defendant found out he was no longer a
project administrator for the libraries, and he was upset about
that.  In fact, he was so upset that after he went to talk to
Jeremy Weber, he left to talk to the branch supervisor, Sean,
came back and lied to Jeremy Weber about what Sean had told
him.  He lied and said that the branch supervisor said it was
OK for him to be a project administrator.  He was told no
again.  And as Sean confirmed, at no time did he ever tell the
defendant he could have his administrator access back.

        The defendant persists.  Right?  First, he sent an
email, the third time he's told no by Jeremy Weber, copying
Sean, the supervisor, and Anthony Leonis, his boss's boss,
laying out what his privileges are on this project.  And the
defendant then asks if it would be OK to continue his accesses.
And as you saw and heard from Anthony Leonis, the answer was,
again, for the fourth time, no.  It was a polite no.  Anthony
Leonis said this is going to be managed by somebody else, not
by you.  And so the defendant, minutes later, uses his
Atlassian administrator permissions to change his own project
administrator status, after he had been told four times no.

        Now, OSB found out about this pretty quickly.  Jeremy
Weber saw that the defendant had done this and raised the
alarm:  "We have a situation with the libraries and the
Atlassian products in general."

1          Now, I want to take a step back here, because what

2     we've been talking about so far is OSB library privileges.  And

3     as you heard from the trial testimony, the only difference that

4     being an OSB libraries administrator makes is that you can make

5     permanent changes to the libraries directly.  Not being an

6     administrator just means you can still access the code, you can

7     still use the code, but if you want to make changes, it has to

8     go through a peer review process, a process to make sure that

9     your changes aren't going to introduce bugs into programs of

10    other developers who are using the libraries for their

11    programs.  It doesn't seem like that big of a deal.

12          Why is it a big deal?

13          Because at this point this is no longer about the OSB

14    libraries.  This is about the fact that the defendant, who has

15    Atlassian administrator privileges, has just used those

16    privileges to give himself access to something he was denied

17    access to.  It's like a bank manager finding out that an

18    employee has been taking twenties out of the cash drawer.

19    That's kind of a big deal, but if that employee has a key to

20    the vault, then it's a very big deal.  And on April 14, the CIA

21    found out that Mr. Schulte had been taking twenties out of the

22    cash drawer.

23          So they took immediate steps to take his key to the

24    vault away.  The deputy chief of the entire group, EDG, ordered

25    that all developers in OSB be removed as administrators from

M77Wsch1                    Summation - Mr. Lockard

1    the Atlassian products.  And it happened the next day, on

2    Saturday.  And you heard from the trial testimony about how two

3    IT guys from ISB and Jeremy Weber came in.  They changed all

4    the passwords on all of the Atlassian servers, including

5    Confluence, including Stash, how they changed the SSH keys --

6    right -- which is another way to log in.  They changed those as

7    well.  Jeremy Weber was there to test all of his accesses and

8    make sure that they'd been revoked, which they were.  Not only

9    that, but Mr. Weber changed the password to the OSB server, the

10   server that was running the Confluence server.

11            So what does that mean?

12            That means that as of April 18, the defendant knows

13   that he is not an administrator of any of the Atlassian

14   products, and in fact, he's asked to verify that all of his

15   keys have been destroyed.  And he says that they have been.

16   But as we'll talk about in a minute, he lied about that.

17            So after April 16, the defendant has no administrator

18   privileges to any of the servers or to the Confluence server.

19            But what is he doing in the meantime?

20            In the meantime, he's already making plans to copy the

21   backups.  And he starts on April 15.  Now, this is just one day

22   after his confrontation over the OSB libraries.  This is before

23   he knows that his administrator privileges have been revoked.

24            What is he Google searching?

25            He's Google searching "Confluence admin view

M77Wsch1                    Summation - Mr. Lockard

1    restricted pages."

2              Now, why is that relevant?

3              That's relevant because, on Confluence, like in Stash,

4    there are permissions for who can see different pages, and a

5    normal user, their access is determined by what permissions are

6    granted to them.  But an administrator can see all the pages.

7              What restricted pages is Mr. Schulte interested in on

8    April 15?

9              Well, all you have to do is look back to what he did

10   on April 14.  And what he did on April 14 was give himself

11   unauthorized access to the OSB project.  I think the evidence

12   and your common sense tells you he's interested in OSB's

13   Confluence page.

14             And why would he be interested in that?

15             Because there are passwords on that page.  They're

16   available to OSB developers.

17             What else does the defendant do on April 15 that shows

18   his interest in OSB?

19             He logs in as an administrator to OSB's server.

20             (Continued on next page)

21

22

23

24

25

1        MR. LOCKARD:  (continuing)  Now, remember, he is not

2   in OSB.  He hasn't been in OSB for at least a couple of weeks.

3   And, in fact, not only is he not in OSB, but nobody has logged

4   into the OSB server as an administrator for almost six months

5   before this date.  This is not a regular thing.  What reason

6   does the defendant have to be logging into the OSB server as an

7   administrator?  There is no legitimate administrator purpose

8   for this act.  And what the defendant does next tells you what

9   he is interested in.  Actually, there are two things -- one

10  thing that he does and one thing that he does not do.

11       Remember, at this time this is an OSB, not an RDB

12  server.  What does the defendant do next?  He opens a second

13  session as a regular user and he attempts to access the

14  Altabackups folder from there.

15       Now, to realize the significance of this, let's talk

16  about what the Alta backups folder was for.  Right?  It is to

17  store backups.  Kind of obvious.  So why do you need access to

18  the backups folder?  There are just two reasons.  One is to

19  copy the backups so that they're stored there, the other is to

20  restore backups.  Backups are there as an insurance policy in

21  case your computer fails, you lose your data, you can pull up

22  one of the backups without losing that much time or work.  The

23  defendant is not doing either one of these things.

24       Ladies and gentlemen, I submit to you that this shows

25  that on April 15th, the defendant was already thinking about

1    stealing the backups.  Now, that attempt fails and you know

2    why.  As you heard from FBI computer scientist Patrick Leedom,

3    there was one way to get to the Alta backups folder and that's

4    from within the Confluence virtual server.  The Confluence

5    virtual server is the program that needs to write backup data

6    to the backups folder and that's where the access point is.

7    The defendant is trying to find out if he can get to Alta

8    backups without being in the Confluence virtual server.

9              Now, that's what the defendant did and I want to

10   remind you of what the defendant did not do.  He did not close

11   out his administrator session.  When the defendant logged into

12   the OSB server on April 15th as an administrator, he did not

13   log out.  He stayed logged in.  And, in fact, it is that same

14   session that he used on April 20th to steal the backups.  So

15   that's Friday, April 15th.  As we already know, over the

16   weekend the Atlassian administrator privileges were revoked

17   from the developers and reassigned to the Infrastructure

18   Support Branch.  And the defendant gets that information on

19   Monday.  In fact, he gets a couple of pieces of unwelcome news.

20             First, he learns that he is not an Atlassian

21   administrator anymore and he is told, along with the entire

22   division, that ISB personnel are going to be the administrators

23   of the Atlassian products and that there are two people who are

24   going to do this and that their responsibilities include, among

25   other things, the backups.  Mr. Schulte is also asked to

confirm that he no longer has administrator privileges and he

says that he does.  How does he know whether he has

administrative privileges?  He tries them out.  And in fact, he

tries three administrator logins within minutes of each other:

SSH key access to the Confluence server, SSH key access to the

OSB server, and password access to the Confluence server.  Two

of those don't work, one of them does.  On the 18th, he finds

out that he still has that SSH key access to the OSB server but

now he knows he can't log in to the Confluence virtual server

anymore, the server he needs to be in in order to get to the

Altabackups.  But what does he tell the CIA?  He tells the CIA

that all private keys with access have been destroyed or

revoked.  He keeps that OSB key a secret.  He lies about it.

He also complains about it.  He says:  It seems like literally

overnight all my permissions within the products were removed

and all my permissions on the servers themselves were removed.

Now remember, as he is saying this, he is logged into the OSB

server as an administrator.  And what is his complaint?  It was

done without informing him.  Right?  He is insulted.

He gets a second piece of unwelcome news on the 18th.

He gets a memorandum from the CIA telling him that he has

violated Agency security protocols and he has violated the

position of trust that was given to him as an administrator,

and he is given a warning:  Do not attempt to restore or

provide yourself administrative rights to any project and/or

1    system for which they have been removed.

2              If you will permit me to paraphrase just a little bit.

3    He is being told you are not in OSB anymore, keep your hands

4    off OSB stuff.

5              Now, Mr. Schulte gets this memorandum and he reads the

6    description of his threat to Mr. Weber, remember, when he

7    concluded that discussion on April 14th he told Mr. Weber I'm

8    going to get my accesses back, you may as well just give them

9    to me now.  But, on the 18th, Mr. Schulte lies about it.  He

10   says, no, no I said I'm adding my accesses back until somebody

11   with authority tells me otherwise.  Now, ladies and gentlemen,

12   you know that's a lie.  You also know it doesn't make any sense

13   because before he added his accesses back he was told,

14   repeatedly, that he did not have permission to do so, including

15   by Anthony Leonis.

16             So what does the defendant immediately start doing on

17   April 18th?  He starts researching copying large files over

18   Linux and researching copying multiple files over Linux.  Now,

19   why is that significant?  It is significant because the backup

20   files are large and they are backups of Atlassian products

21   which are Linux products.  You have heard how Linux is just

22   another operating system like MacOS or like Windows and it is

23   an operating system that the defendant was very familiar with.

24   In fact, that's the reason why he was asked to be an Atlassian

25   administrator in the first place, because these are Linux

M775sch2                    Summation - Mr. Lockard

1    products.

2            What else does he do on the 18th?  He uses that open

3    administrator session to go into the OSB server and review

4    files and delete files.  What is he reviewing?  He is casing

5    the joint.  He is doing surveillance to figure out what is

6    there and he is deleting files to cover up the fact that on the

7    18th he was casing, he was casing the joint.  And you can see

8    here, between 6:32 and 6:49 p.m., he executes a number of

9    commands called the VI command which you heard from Patrick

10   Leedom which basically pops open a screen on the computer so

11   you can see what is in the file.  So he is opening up these log

12   files to see what they're recording and he is deleting them

13   when he doesn't like what they show.  Right?  He is figuring

14   out where are the security cameras and how can I avoid them.

15   Not only that, he goes specifically into the Confluence folder.

16   Now remember, Confluence is a virtual machine which means it is

17   a piece of software.  Software runs in a folder or is saved in

18   a folder and Mr. Schulte is looking specifically at what is in

19   the Confluence folder.

20           Now, what is significant about that?  What is

21   significant about that is on April 16th, when the Atlassian

22   privileges were being revoked from the developers including

23   Mr. Schulte and were being given to ISB, they took a snapshot

24   of Confluence before they did that.  You have heard what the

25   purpose of the snapshot is.  It is a fallback.  It preserves

1    the state of the system before you make changes so if something

2    unexpected happens, you can revert back to that snapshot, no

3    harm done.  Mr. Schulte finds out that there is a snapshot.  On

4    April 18th he knows that there is a snapshot of Confluence

5    taken from before he lost his administrator privileges.

6           Now, I want to touch briefly on the significance of

7    some of the files that Mr. Schulte is looking at.

8           You have had an opportunity to see a lot of files

9    documenting his activity on the OSB server and it is important

10   to note where these came from.  And as you can see and as

11   Mr. Leedom testified, files like this come from shell.log

12   fileslack.  Now what is fileslack?  Fileslack is where deleted

13   data lives.  You have heard about a couple of places where

14   deleted data continues to exist and can be recovered even

15   though it has been deleted by the user.  Fileslack is one of

16   those kinds of spaces.  And what it means is that the shell.log

17   file, which records the commands that the user is typing in on

18   the keyboard, has been edited and these commands were deleted.

19   Now why is that significant?  It is significant because

20   Mr. Schulte did not want you to see what he was doing.  It

21   tells you what he is up to.  What he is up to is looking to

22   steal data.

23          And if you look at Government Exhibit 1703-1, which

24   contains some of the slides from Mr. Leedom's expert

25   presentation, you will see throughout that presentation that

1   significant information, significant evidence is coming from

2   fileslack, from unallocated space on Mr. Schulte's virtual

3   machine, right, which is the VM he runs on his own desktop.

4   And at the end of the day on the 18th, after he has done his

5   reconnaissance, he closes the vault on the 8th floor of the RDB

6   offices.  What does that tell you?  It tells you he was the

7   last person in the office; he waited until the office had

8   thinned out or everyone had gone home.  The next day he does

9   more Google research that is relevant to his plan to steal the

10  backups.  Now he is looking at hash algorithms.

11          Now, you heard from Mike Berger, an FBI computer

12  scientist, what a hash algorithm is.  It is math which we don't

13  have to get into.  What is important is its purpose.  The

14  purpose of a hash algorithm is to tell you whether two files

15  are identical or even not identical.  Even a small difference

16  if the file data will give you a different hash algorithm

17  result and so it is used especially when you are transferring

18  files to see if it transferred directly, if it had corruptions,

19  if it had errors, if it had dropped data.  It is the kind of

20  algorithm you would want if you are transferring large files

21  like the backups and you want to make sure that they're not

22  corrupted, which leads us to April 20th, the date of the

23  break-in.

24          On April 20th, Mr. Schulte got some more unwelcome

25  news.  A division-wide e-mail goes out that the Confluence

1    server is going to be moved from OSB server to ISB network

2    space.  Now why is that important?  It is important because

3    Mr. Schulte still has that OSB administrative session open and

4    that is the only thing that puts him in the same place as the

5    Confluence server.  Now remember, this server was only on OSB

6    as kind of a historical accident.  At the time that these

7    programs were adopted and installed by the CIA, the OSB server

8    was just a place that had enough space and enough firepower to

9    run the Confluence program.  It was never supposed to stay

10   there, just like the Atlassian administrator privileges were

11   never supposed to stay with the developers.  But now that's

12   changing and you know why.  It is changing in response to

13   Mr. Schulte.  So he does not wait.  He has already made his

14   plans, he has already done his reconnaissance, he already has

15   the blueprints that he needs.  He has already scoped out where

16   the security cameras are and he doesn't waste a minute.  That

17   night he steals the backups.  And as you saw from Mr. Leedom's

18   expert presentation, between 5:30 and about 6:00 p.m.,

19   Mr. Schulte executed a series of commands that restored his

20   access to the Altabackups, copied the backup files from March

21   3rd, 2016, reversed those maneuvers, and deleted a bunch of log

22   files.

23          Like I said earlier, it is a complicated series of

24   steps but the purpose and the result is simple.  So, let's look

25   at the first part of that step.

1        Now remember, Mr. Schulte is logged in as an

2    administrator to the ESXi server that is owned by OSB.  That

3    does not give him access to Altabackups.  Right?  He learned

4    that a few days ago when he tried to access Altabackups from

5    the OSB server and it failed.  So what does he do?  He reverts

6    the Confluence server to April 16th.  Now, between April 16th

7    and April 20th there are no significant differences in the

8    Confluence server except one.  The one significant difference

9    is that on April 20th, Mr. Schulte does not have access to the

10   Confluence server and on April 16th he did.  So he reverts the

11   Confluence machine to the snapshot and you can see the command

12   that he executed to do that.  He takes a snapshot of the server

13   as it exists before he makes any changes, he reverts it, he

14   takes it back in time to April 16th, and then he logs in.  Once

15   he is logged in now he can get to the Altabackups folder.

16        Now, how do you know he logged in?  One reason you

17   know he logged in is shown here.  He deletes log files from the

18   Confluence folder.  Why would he want to delete log files from

19   the Confluence folder if he did not log in to the Confluence

20   machine?  This tells you that he is trying to hide his login.

21   And you can see where the evidence of these deletion commands

22   came from, they came from unallocated space on his computer

23   meaning that he not only deleted the log files from the server,

24   he also deleted files from his own computer.  So once he is in

25   the backups folder, you know what he did next.  He copied the

M775sch2                    Summation - Mr. Lockard

1    March 3rd backups.  One reason you know that is because those

2    backups were in fact copied and they were copied on April 20th

3    during the time that Mr. Schulte had that server in its

4    reverted state.  You also know that those were copied because

5    they showed up on WikiLeaks.

6          Now, as you know, you are going to hear some argument

7    from Mr. Schulte later today and I expect he is going to make a

8    couple of arguments to you about the events of April 20th.  And

9    before I address the arguments I expect you to hear I just want

10   to make an observation about arguments from Mr. Schulte in

11   general.

12         As you have heard from Judge Furman and as you will

13   hear again, Mr. Schulte has no burden to make any arguments to

14   you at all.  He has no burden to put on a defense case.  He has

15   no burden to do anything.  The reason for that is that the

16   burden always rests on the government up and until you deliver

17   your verdict.  And that is right, that is how the defendant

18   gets a fair trial, and the government embraces that burden.

19   But, if the defendant does choose to make arguments to you, you

20   can and you should evaluate them critically the same way that

21   you are critically evaluating what I am telling you now, and

22   you can and should ask yourself:  Do these arguments make

23   sense?  Are they based on the evidence?  Or, Do they make no

24   sense?  Are they confusing?  Are they illogical?  Are they

25   based on the evidence or did they invite you to ignore

1    evidence?  Did they invite you to imagine things that could

2    have happened that there is no evidence of?

3            Now, what I expect you will hear from Mr. Schulte is

4    the argument that you have not seen at this trial --

5            MR. SCHULTE:  Objection.  That is what rebuttal is

6    for.

7            THE COURT:  Overruled.

8            MR. LOCKARD:  I expect you will hear Mr. Schulte argue

9    that during this trial you have not seen a forensic artifact

10   documenting a login command to the Confluence server and you

11   have not seen a forensic artifact of a copy command for the

12   backup files.  And I expect he will ask you to conclude from

13   that that he didn't log in to the server and that he didn't

14   copy those files.  Now, he is right that those two forensic

15   artifacts don't exist but he is wrong about the conclusion you

16   should draw from that.  And the reason he is wrong is because

17   there is plenty of other evidence that he did exactly those two

18   things.  Right?  We just talked about one of them.  The files

19   were copied and they were copied while Mr. Schulte had the

20   ability to copy them so that's one reason you know that he

21   copied those files and you know that he had to log in to the

22   Confluence server to do that.  Another reason is that he

23   deleted and attempted to delete evidence of having done so.  A

24   third reason is that was his plan the whole time.  As we have

25   seen, from April 15th through April 20th, Mr. Schulte has taken

1    a number of steps designed to lead exactly to this point where

2    he has access to the Altabackups folder and he can steal those

3    backup files.

4          So the argument that you don't have those forensic

5    artifacts -- to go back to our bank heist analogy -- it is a

6    little bit like having security camera footage of the burglar

7    getting into the bank, making himself a key to the vault, and

8    then deleting the security footage from inside the vault.

9    Right?  The fact that there is no footage of what happened

10   inside the vault is not evidence that he didn't go in there, it

11   is the opposite.  The fact that he deleted that footage is

12   overwhelming evidence that he did go in the vault and that's

13   what you have here.  So let's talk about that deletion.

14         Between 5:55 p.m. and 6:58 p.m., Mr. Schulte

15   systematically searches out and deletes numerous log files on

16   the OSB server and you saw that during Mr. Leedom's expert

17   testimony.  You saw the RM command which is a Linux command

18   that just means deletes.  So every time you see RM, that's

19   Mr. Schulte deleting a log file.

20         Now, you also heard testimony from a number of people

21   about log files and their purposes.  You have heard that from

22   Mr. Weber, you have heard that from Mr. Leedom, you heard it

23   from Mr. Stedman.  And they all were uniform in the testimony

24   that they gave you which is there is rarely, if ever, good

25   reason to delete a log file.  And on those rare occasions where

1    there might be a legitimate reason to delete a log file, the

2    log files you would delete are the oldest log files.  But, in

3    Mr. Schulte's deletion of files he is both casting a wide net

4    and seeking out the most recent files to delete.  And

5    Mr. Leedom described to you what some of these logs maintain

6    and it is fair to say that it is a wide variety of log files

7    that would record a wide variety of activity including the

8    activity that the defendant is executing on that server that

9    night.  And again, just like he did on April 18th, he goes into

10   the Confluence folder to delete Confluence log files.

11        Let's go back.  Now, there are some log files he

12   doesn't delete and you have heard testimony about how

13   Mr. Schulte unsuccessfully searched for a log file called

14   VIclient on the OSB server and he didn't find it.  The reason

15   he didn't find it is because he was looking in the wrong place.

16   The VIclient log file is on his computer, not on the server.

17   But what is important about the fact that he was looking for

18   it?  Well, you know that because the FBI found evidence in the

19   VI log file that the defendant could not find.  And what is

20   shown in there is Mr. Schulte viewing snapshots of Confluence

21   on April 20th.  It shows Mr. Schulte creating a snapshot on

22   April 20th.  It shows Mr. Schulte reverting the Confluence

23   virtual machine to the April 16th state.  It shows Mr. Schulte

24   re-reverting or undoing his reversion back to the snapshot that

25   he took, that re-reversion that erases that entire period of

M775sch2                    Summation - Mr. Lockard

1   time when he was in the reverted state.  It shows him looking

2   for what snapshots are available and then deleting the snapshot

3   that he took.  This is the evidence that Mr. Schulte was trying

4   to find on April 20th and this is the evidence that he did not

5   want you or anyone else to see.

6          I mentioned earlier how Mr. Schulte is looking for the

7   most recent log files to delete and there is an example of this

8   here where you can see that he is specifically searching out

9   files that were last modified during the time period when he

10  has the Confluence server reverted and specifically deleting

11  those files, the files that would have evidence of what he has

12  been up to.  And what is in those log files?  Those VMware log

13  files while he was in the reverted state?  They contain

14  evidence of exactly what Mr. Schulte was doing -- device

15  connections, snapshot activity, data transfer logs.  That is

16  the kind of data that Mr. Schulte does not want you to see.

17         Now I am going to touch briefly on one issue.  I think

18  Mr. Schulte has suggested at times through his questioning that

19  maybe somebody else was using his computer this entire time.  I

20  think you know very easily that that is not the case for any

21  number of reasons.  You know it, number one, because this is

22  the administrator session that Mr. Schulte opened on April

23  15th.  Right?  This is the session that Mr. Schulte used on

24  April 18th when he was conducting his surveillance.  And, while

25  Mr. Schulte is using this session on April 20th, he is also

1    doing other things on the computer.  Right?  He has one

2    computer that is his DevLAN workstation, he has another CIA

3    workstation right next to it, and while he is stealing the

4    backups he is having IM chats with colleagues, he is sending

5    e-mails to his boss.  And when he is done, he is the person who

6    badges out and locks the vault.  There is no doubt that this is

7    Mr. Schulte behind these commands and that Mr. Schulte stole

8    these backups.

9          Now, as I mentioned a few minutes ago, motive is not

10   an element but the question does come up in your minds:  Why

11   did he do this?  We don't have to dwell on it because the

12   evidence of what he did is, frankly, overwhelming.  But I would

13   submit to you that the evidence you have seen nonetheless

14   suggests a "why," and the "why" is basically Mr. Schulte was

15   having some problems at work, to say the least, in early 2016.

16         His main project, Brutal Kangaroo, was so habitually

17   behind schedule that one of the tools earned the name Drifting

18   Deadline.  It was so behind schedule that the customer who had

19   ordered that tool went and asked for somebody else to provide a

20   replacement.  And you heard testimony about that from Frank

21   Stedman.  That's the Almost Meat project.  And how did

22   Mr. Schulte respond to that frustration and disappointment?

23   With confrontation and escalation, exactly the kind of traits

24   that his colleagues had come to expect from him.  He has a

25   profanity-laced interaction with his supervisor, he barges his

1    way into a meeting, he lies about how long it is going to take

2    for the competitor product to get the tools that it needs, and

3    then afterwards, as you heard from Frank Stedman, he came up to

4    Frank Stedman again and tried to get Frank on his side.  Right?

5    There was that component that Mr. Stedman was delivering that

6    Mr. Schulte said oh, that will take six months and then

7    Mr. Stedman spoke up in the meeting and said, no, it will take

8    three weeks.  After the meeting Mr. Schulte tried again; *Frank,*

9    *don't you think it will take six months?*  And Frank wasn't

10   having any of it, he said no.

11          While that is going on Mr. Schulte's colleague, who is

12   working with him on this project, Amol, who you have heard a

13   little bit about, they don't get along to begin with.  And as

14   the frustrations with the Drifting Deadline project mount it

15   turns toxic.  Right?  Mr. Schulte is filing complaints.  He is

16   escalating.  He is filing threat complaints.  He is escalating

17   again.  He is filing for a protective order.  He is escalating

18   again.  In an interview with security he claims that he thought

19   Amol was going to bring a weapon to work, that he was going to

20   commit a mass shooting.  And every time the defendant escalates

21   it backfires, it results in him getting more isolated from his

22   colleagues, it results in him getting moved from OSB to RDB

23   which is not what he planned, so in early 2016 Mr. Schulte's

24   frustrations are mounting.  And then you saw what happened with

25   the OSB Libraries project.  And after escalating and escalating

1   and escalating in April of 2016, Mr. Schulte exploded.  You

2   have heard about it from his own words when he told Mr. Weber:

3   I will eventually get my access back to the libraries and that

4   access should just be enabled now.

5        You heard about it from Mr. Leonis.  Schulte told him

6   he felt his privileges were being removed unfairly and he

7   wasn't going to allow it to happen and he would fight back.

8        You heard about it from Mr. Roche who is, at the time,

9   literally about three people away from the director of the CIA,

10  and Mr. Schulte told Mr. Roche:  I could restore my privileges

11  if I wanted to.  You know I could do that.

12       And, you saw Mr. Schulte himself in that videotaped

13  interview with security.  Now this is April 8th of 2016.  This

14  is even before the OSB Libraries incident but it shows you the

15  context and the mindset that Mr. Schulte is in.  According to

16  Mr. Schulte:  Access doesn't really apply to me, essentially,

17  is how it works.  So I can get -- they can go through and they

18  can remove my permissions but I still have full permission to

19  everything.  He says I feel like there definitely needs to be

20  some kind of punishment for my management for treating me like

21  this and some kind of apologies.  When I feel like I'm being

22  punished for something that I don't think I should be punished

23  for and no one seems to have my back and everyone is always

24  against me, I feel like I'm going to do whatever I have to do

25  to make the situation right.  So April 20th represents the

1    Nuclear Option going off.

2            Now let's turn to the evidence that tells you that

3    Mr. Schulte then transmitted the stolen backups to WikiLeaks.

4            Now there is some, again, somewhat complicated digital

5    forensic evidence that is involved in this phase of the offense

6    but in reality this is pretty simple.  If you find -- and I

7    submit to you that the evidence compels you to find -- that

8    Mr. Schulte stole the backups, that it is very easy for you to

9    find that he transmitted the backups to WikiLeaks.  That is

10   because WikiLeaks got the backups and they released them and

11   that, frankly, is all you need to know but that is not, in

12   fact, all that we know.

13           So you know that the defendant copied the March 3rd,

14   2016 backups.  Right?  You know that those are the very same

15   backups that WikiLeaks released data from.  You know that in

16   part from Mr. Leedom's testimony.  Remember he testified about

17   how the backups were broken, there was an error in the program

18   that created the backups that resulted in missing data and some

19   of the data that was in the backups that was supposed to be

20   linked up was not linked.  And the WikiLeaks information had

21   exactly the same errors.  So we know that what they released

22   came from a backup and we know that it came from the backup the

23   defendant stole.  You heard the testimony of FBI computer

24   scientist Michael Berger, who went through an extensive

25   analysis, and determined that the data in the leaks came from a

1    window between the afternoon of March 2nd and the early morning

2    of March 3rd.  And you know that the March 3rd backups that the

3    defendant copied fall right within that window.

4              But, the evidence has shown you more.  It has shown

5    the steps that the defendant took to transmit those stolen

6    backups.  On April 18th, the same night that he is casing the

7    OSB server using that secret administrator login, he is also

8    installing an updated version of TOR.  TOR is that anonymous

9    browser that WikiLeaks recommends to be used by leakers.  On

10   April 24th, after he has stolen the backups, he downloads

11   Tails.  That's another program that WikiLeaks recommends.  It

12   is a program that allows you to operate your computer without

13   leaving any trace of what you have done while you are operating

14   it.  It is an amnesic system, it forgets everything.

15             Between April 23rd and April 38th, Schulte tested a

16   secure file deletion program called Eraser Portable and he

17   securely deleted a folder called Brutal Kangaroo on his home

18   computer.  And you heard that he queued up additional backup

19   folder files to be deleted but closed the program without

20   deleting them.  But you also heard how even though he did not

21   use Eraser Portable on those files, they were securely deleted

22   because the FBI forensic review found no trace of those files

23   when his computer was seized.  You heard how he downloaded

24   Darik's Boot and Nuke which is designed to nuke a hard drive.

25   And he researched various Western Digital wiping utilities.

M775sch2                    Summation - Mr. Lockard

1              In addition to data deletion, he also researched how
2      long it takes to calculate a hash value for large files.
3      Again, that's how you tell that a file transferred correctly --
4      and the backups are large files.
5              And, on May 5, 2016, the defendant formatted his home
6      computer after having wiped the drives.  And you also heard how
7      seven other external hard drives were recovered from his
8      apartment, all of which has been wiped.
9              Now again, I expect that Mr. Schulte will make some
10     arguments to you about the fact that there is no forensic
11     artifact showing his transmission of a file to WikiLeaks and
12     that there is no forensic artifact of his communicating with
13     WikiLeaks, and that there is no forensic artifact of stolen CIA
14     data on his home computer.  But that is not evidence that he
15     did not do those things.  The fact that he deleted that
16     evidence is proof that he did it.
17             How else do you know that he did it?  Well, as we have
18     already talked about, the backups were stolen in April of 2016
19     but weren't released by WikiLeaks until 10 months later.  And
20     you know why that is.  It is because of that broken state of
21     the backups and you heard from computer scientist Patrick
22     Leedom that it is an effort to try and rebuild those broken
23     backups and it took WikiLeaks a lot of effort to get it ready
24     to publish.
25             But, in the meantime, the defendant is getting

1    anxious.  He wants to know when is the stolen data going to

2    start to come out.  And you see from his Google search history

3    before July of 2016 he had about two searches for WikiLeaks, I

4    think they were both in 2010; and then one search in July of

5    2016 about the Clinton e-mails from the Democratic National

6    Convention hack.  Starting in August, he is extremely

7    interested in WikiLeaks.  There are 39 WikiLeaks-related

8    searches in that four-month period or five-month period.  There

9    are 115 page sites.  Ask yourself, why is he suddenly so

10   interested in WikiLeaks?  I think the evidence suggests the

11   answer to you, he wants to know what has happened with the

12   stolen data that he sent and when is it going to come out.

13          Now you also heard a lot of evidence about the effect

14   that it had when the Vault 7 release did come out.  You have

15   heard about that from multiple witnesses.  You heard about it

16   from Anthony Leonis.  You heard about it from Jeremy Weber.

17   You heard about it from Rick Evanchec.  I think Mr. Roche

18   summarized it best when he said that the release was

19   devastating.  It was pulling off operations overnight, the vast

20   majority of the operations that we were conducting.  The vast

21   majority because the sources and methods and, most importantly,

22   the techniques that we were using to maintain clandestine

23   signature, which is no one can see the signature, that cloak

24   has been completely -- that information was now out in the

25   public and we did know that there was great interest by

1    adversaries in this information.  And so, the risk became too

2    great to continue an operation that relied on this technology

3    that was now out in the open and known.

4              It was devastating.

5              We have spent quite a while on the defendant's theft

6    and transmission of the backups to WikiLeaks, let's turn our

7    attention to some of the other charges that you are going to

8    consider.  First let's talk about the obstruction charge.

9              Now, you heard during this trial that the defendant

10   was quickly considered a lead suspect because of the, let's

11   say, tense relationship he had with the CIA when he left and

12   because of his abuse of security protocols while he was there.

13   So the FBI interviewed him.  You heard that that first

14   interview was on March 15th of 2017, about a week after the

15   leak starts.  That interview happened in a public place, it

16   happened in a restaurant in midtown.  You heard from Special

17   Agent Evanchec that it was a voluntary and friendly interview,

18   but you also heard that Mr. Schulte was extremely nervous.

19             Now, what happened during that interview?  The

20   defendant said a few things that are relevant to your

21   deliberations.  He denied being responsible for the leak.  He

22   said that his diplomatic passport was at home.  Remember you

23   heard testimony that Mr. Schulte had a diplomatic passport

24   which is a special U.S. government employee passport as a

25   result of his employment at the agency and that he did not turn

1    it in when he left?  During his interview with the FBI he said

2    it was at home.  Now, that was false because they did not find

3    it when they searched his apartment and they, in fact, later

4    found it at his office in Bloomberg.  So you know that when

5    Mr. Schulte said his passport was at home it was either on him

6    at the time or it was still at the office.  But, you know he

7    lied.

8           He said that he didn't have a copy of an e-mail that

9    he had sent to the CIA's Office of Inspector General.  You

10   heard about that e-mail from Special Agent Evanchec as well.

11   It is an angry e-mail that Mr. Schulte sent on his very last

12   day in the office that he printed out and that he took home

13   with him.  And on March 15th, he said that he didn't have a

14   copy of that e-mail and, as you heard, a copy of that e-mail

15   was found in his home, and not just anywhere, it was found in

16   the headboard of his bed, inches away from his head where he

17   left.

18          And at the end of that interview at the restaurant,

19   Mr. Schulte was given a grand jury subpoena.  He was given two;

20   one for his testimony and one for his cell phone.

21          Now, Mr. Schulte spoke with the FBI again, this time

22   at the U.S. Attorney's office.  He was interviewed on March

23   20th and 21st, back to back interviews.  And during those two

24   days Mr. Schulte was asked how the leak could have happened.

25   And what's important to you is he offers up some ways that he

1  knew the leak did not happen because he committed it and he

2  knew how it happened.  So why is he giving false explanations

3  for the leak?  Because he wants to divert the investigation

4  away from what he did.  He wants to draw suspicion away from

5  himself.

6          He was also asked about log files and Mr. Schulte said

7  that the FBI should go look for certain types of log files that

8  would show activity related to the theft of the CIA data.  Now

9  why is that important?  Because Mr. Schulte believes that he

10 has deleted all the log files.  Right?  He thinks this is

11 another false trail.

12         And finally, the defendant denied, in every way

13 possible, that he had anything to do with the leaks, whether he

14 had stolen the data, whether he had been in communication with

15 WikiLeaks, whether he had done anything that made the system at

16 the CIA vulnerable to compromise.  And he said no each and

17 every time.  And, as you know, each and every time he lied.

18         Now that is especially significant at the state the

19 investigation was in in March of 2017 which is still barely

20 weeks after the leak happened.  This is at a time when the FBI

21 doesn't know exactly what was stolen, they don't know exactly

22 when it was stolen, and they don't know how it was stolen.  And

23 as you heard, this was a wide-ranging investigation considering

24 any number of suspects, considering any number of

25 possibilities, leaving no stone unturned.  And the

M775sch2                    Summation - Mr. Lockard

1   investigators were considering every piece of information that
2   witnesses provided including information provided by
3   Mr. Schulte.

4          Now, despite Mr. Schulte's false statements, there did
5   come a time when he was arrested and, as you heard, he was
6   imprisoned at the MCC.  And as the Judge has already instructed
7   you and I will expect he will instruct you again, the fact that
8   Mr. Schulte was in jail at the time is not relevant to the
9   consideration of the evidence of his committing these offenses.
10  It is evidence of where he was when he did it.

11         Now, you have seen some writings that Mr. Schulte made
12  while he was in prison.  These writings give you a window into
13  his mind about what he intends to do.  In one writing he says I
14  will look to break up diplomatic relationships, close
15  embassies, end U.S. occupation across the world.  What can you
16  take away from that?  Well, how would Mr. Schulte be able to do
17  those things, right?  What kind of leverage does Mr. Schulte
18  have?  The leverage that Mr. Schulte has is whatever classified
19  information he knows.

20         In a later writing he writes:  Got to use last night.
21  As you learned from the trial, he was talking about a cell
22  phone that was smuggled into the prison.  He says:  The way is
23  clear.  I will set up a Wordpress of JoshSchulte.wordpress.com
24  and presumptionofinnocence.Wordpress.com.  From here, I will
25  stage my information war.

1         Now, you also heard from Mr. Betances who was another

2    inmate at the MCC who said he heard Mr. Schulte talk about an

3    information war on a couple of occasions and both times, as

4    soon as somebody else came around, Mr. Schulte clammed up.  Now

5    what does that tell you about what Mr. Schulte means by

6    information war?  It means that it is something that he doesn't

7    want other people to know what he was doing.

8         There is more.  Mr. Schulte goes on to describe in

9    another article that he wrote what it is that he intends to do.

10   And here he said the FBI, in all its brilliance, has just taken

11   a senior engineer, with intimate knowledge of the NSA, CIA, and

12   all project and operations he has worked on.  What is he

13   referring to?  He is referring to classified information that

14   he knows.  And he goes on and says, does that sound like the

15   most intelligent move?  Really?  Obviously this isn't intended

16   as a threat.  Well, let's pause here for a moment, ladies and

17   gentlemen.  You all have common sense and you all know that

18   when somebody says something bad is about to happen but it is

19   not a threat, it is usually a threat and that's exactly what

20   this is.

21        Mr. Schulte goes on to make it even more clear.  He

22   says essentially it is the same as taking a soldier in the

23   military, handing him a rifle, and then begin beating him

24   senseless to test his loyalty and see if you end up getting

25   shot in the foot or not.  It just isn't smart.

1          Now, Mr. Schulte is not a soldier in the military, he

2    is a former CIA officer and he doesn't have a rifle.  He has

3    classified information.  That is his bullet.

4          And you also saw in one of the draft Tweets that

5    Mr. Schulte had written:  Until your government protects you

6    and honors your service, send all your government secrets here:

7    WikiLeaks.

8          So how does Mr. Schulte go about it?  Well, first, as

9    you heard, he smuggled in a contraband cell phone.  And you

10   heard about that from Mr. Betances.  You saw a video of

11   Mr. Schulte using that cell phone and you saw pictures of the

12   cell phone.  You saw the encrypted messaging apps that were on

13   that phone like Signal and WhatsApp.  You saw the virtual

14   private network that was on that phone to disguise its IP

15   address.  You heard about how Mr. Schulte said that he could

16   change the IMEI number.  Right?  That's the unique identifying

17   number assigned to each phone, it is a way to disguise what

18   phone you are using.  And he talked to Mr. Betances a little

19   bit about the CIA and he said that they had betrayed him and

20   that he felt humiliated over what they had done to him.

21         So what does Mr. Schulte do with that phone?  He sets

22   up an encrypted ProtonMail account with anon12044 as the e-mail

23   handle and he starts to use that account to communicate with a

24   Washington Post reporter.  And in those e-mail communications

25   on September 24th of 2018, the defendant sent the reporter an

M775sch2                    Summation - Mr. Lockard

1    e-mail containing national defense information.  This is the
2    e-mail we are going to focus on for Count Three, the
3    transmission of NDI from prison.
4           The NDI, the national defense information that
5    Mr. Schulte sends, is information about two groups in CCI:
6    EDG, the Engineering and Development Group that develops cyber
7    tools; and COG, the group that deploys those cyber tools in
8    operations.  He identifies those two groups.  He identifies the
9    number of people in each group.  And he talks about the
10   architecture of the network that allows those two groups to
11   communicate with each other.
12          Now, how does this relate to the national defense?
13   Well, Mr. Roche talked about how it relates to the national
14   defense.  The number of employees that the CIA assigns to
15   particular groups or particular missions is considered
16   classified.  Adversaries can take a mosaic of information with
17   that piece and then start working backward to say for what this
18   number is, where do we think these people are?  What do we
19   think activities we are seeing are associate with this kind of
20   mission?  What do we think this group does specifically?  How
21   can we target those individuals if we get some bit of
22   information or understanding that someone has a connection with
23   this group?
24          It helps adversaries start to unravel where the U.S.
25   intelligence priorities are, how they're resourcing it, and

1    how, potentially, to start to identify the people who were

2    involved in it.  But, that's not all.  Mr. Schulte anticipated

3    and planned to release even more national defense information.

4    He set up a Twitter account with the handle "Free Jason

5    Bourne."  Right?  It is an account that he wrote down in his

6    notebook and he wrote down the password to that account.  And

7    then he started talking about Bartender.  So let's talk a

8    little bit about Bartender.

9           As you heard from Jeremy Weber, Bartender is the name

10   of a CIA cyber tool that was designed for human-enabled

11   operation.  That means people.  In a human-enabled operation

12   there is a person who is helping get that program onto the

13   target network.  And you also heard that Mr. Schulte played a

14   role in Bartender.  It started out as Mr. Weber's project but

15   then Mr. Weber invited Mr. Schulte in to work on it too.

16          Mr. Weber also talked about the dangers of something

17   called attribution.  You heard a lot about attribution at trial

18   so I am just going to summarize it briefly here.  Attribution

19   means identifying the CIA as being behind a particular

20   operation or a particular tool.  And you heard that attribution

21   is a huge concern for developers.  It is a big risk that they

22   spend a lot of time to try and mitigate because the problem is

23   if a tool or an operation is attributed or associated with the

24   CIA, it creates a lot of risks.  It creates a lot of risks of

25   identifying other operations, of identifying other tools, and

1    in particular, of identifying the people who were involved in

2    them.

3              And as you heard from Mr. Weber, Mr. Schulte was well

4    aware of this risk as well as all of the developers and it was

5    a regular topic of conversation in cyber tool development.

6              But what does Mr. Schulte do?  Mr. Schulte starts

7    drafting a series of versions of a Tweet where he intends to

8    release information about Bartender that would attribute it to

9    the CIA.  Right?  In one draft Tweet he says vendor, tool from

10   vendor report, Bartender.  He keeps reworking the Tweet.  Just

11   to authenticate me first.  The CIA was involved in -- blank.

12   The code for initially-planned cyber operation is in Vault 7.

13   Additionally, tool described in vendor report is in fact

14   Bartender, a CIA tool set for operators to configure for

15   deployment.

16             Let's just touch for a minute on what Mr. Schulte says

17   there.  As you have seen in other portions of this notebook,

18   this is a Tweet drafted in the third person.  He is writing

19   this in the voice of somebody else, somebody who claims to be

20   his own colleague at the CIA because he is going to falsely

21   claim that Joshua Schulte is innocent.  What does he say in the

22   tweet?  He says:  Just to authenticate me first.  What is he

23   trying to authenticate?  He is trying to persuade people -- he

24   is trying to persuade people that he is really a CIA officer.

25   So how does he do that?  He is going to do it by revealing

1    information that only a CIA officer would know.  Right?

2    Mr. Schulte knows that this information is not public.  It does

3    not authenticate you as a CIA officer to talk about something

4    that you can find on Wikipedia.

5         Mr. Schulte continues to redraft the Tweet @vendor

6    discovered tool in 2016, which is really the CIA's Bartender

7    tool suite.  Bartender was written to deploy against various

8    targets.  The source code is available in the Vault 7 release.

9         Now, you have also heard about why there is still a

10   serious risk to this kind of attribution publicly identifying a

11   CIA tool with a public report, right, about a piece of malware

12   found in the wild.  And it is exactly that attribution risk.

13   And as Mr. Weber testified, right, to this day, he is not aware

14   of the tool described in the vendor report ever having been

15   publicly identified as Bartender.  It has never been identified

16   as a CIA tool and that is exactly what Mr. Schulte intends to

17   out.  He doesn't just intend to do it, he takes steps to do it.

18        As you know, he opened the Twitter account.  He also

19   opened a Buffer account that is linked to that Twitter account.

20   Buffer is a service that allows you to pre-schedule Tweets to

21   be released in advance on a schedule.  He writes notes to

22   himself about what he plans to do.  He wants to finalize copy

23   by Friday.  He wants to edit during the weekend.  Right?  He

24   wants to DL disk UL WL.  Now, the interpretation of that phrase

25   is for you guys to decide, but I would submit to you that that

1    is just shorthand for download discovery, upload to WikiLeaks.

2    He wants to schedule Tweets on the 27th, send tech reports,

3    Russia piece.  Right?  He is writing out his to-do list.  He is

4    taking affirmative steps to get these Tweets out and into the

5    public.  Now, he never does.  Right?  He is writing this

6    schedule for September and at the very end of September and the

7    beginning of October the phone is seized.

8              Mr. Schulte is also working on another publication, an

9    article that he calls "Malware of the Mind," and in his

10   notebooks he talked on several occasions about reworking

11   various articles to get them out and into the public including

12   the tenth article "Malware of the Mind."

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. LOCKARD:  And this article, again, contains
2   sensitive information about CIA cyber tradecraft.  And again,
3   you heard from witnesses about the attribution risk, not
4   necessarily that the techniques themselves are sensitive, but
5   that it is sensitive to disclose that the CIA uses them or to
6   publicly allege by a former CIA officer that the CIA uses them.
7   He talks about disguising data, where in the file system he
8   would disguise data, how he would use crypto, all things that
9   would be useful for an adversary to attribute to the agency.
10          Now let's turn back again to the charges and talk
11  about what it is you have to decide in order to reach a
12  verdict.  Again, just a reminder about what each count charges.
13          Count One charges illegally gathering national defense
14  information, based on having stolen the CIA backups on April
15  20, 2016.
16          Count Two charges illegally transmitting unlawfully
17  possessed NDI, based on sending the stolen backups to
18  WikiLeaks.
19          And then Counts Five and Six charge essentially
20  hacking, unauthorized access to a computer to obtain classified
21  information or information of a department or agency of the
22  United States.  We've talked about these at length.
23          Counts Seven and Eight charge causing harmful computer
24  commands to a protected computer, based on the deletion of data
25  and the elimination of data from the DevLAN system.

M77Wsch3                    Summation - Mr. Lockard

1          So for Count One, what you need to find is that the

2     defendant stole the CIA backups on April 20, 2016; that he was

3     not authorized to take them; and, having taken them, he was not

4     authorized to keep them.

5          You should consider whether the backups contained NDI,

6     which at this point, I think, is not likely to be seriously

7     contested.  It's national defense information.  It's

8     intelligence information.  It is closely held on a highly

9     guarded network.  It relates directly to this nation's

10    intelligence-gathering capabilities.

11         You'll be asked to find that the defendant had reason

12    to know that the information in the backups would be used to

13    injure the United States or to aid a foreign country.  And

14    you've heard a lot of testimony about the injury that the

15    WikiLeaks release caused to the United States, which I submit

16    to you is readily foreseeable to the defendant.  And you've

17    heard testimony about the assistance that this kind of

18    information provides to adversaries, including foreign

19    countries.

20         Finally, you'll be asked to find whether WikiLeaks was

21    authorized to receive the backups.  And there's really no doubt

22    about that.

23         For the hacking counts, you'll also be asked to find

24    whether the defendant's access to those backups was

25    unauthorized, and you know that it was for any number of

M77Wsch3                    Summation - Mr. Lockard

1    reasons that we've talked about.  You know that on April 20 he

2    was not authorized to be in the backups folder.  You know that

3    on April 20 he was not authorized to be in the Confluence

4    virtual server that he had to go into to get to the backups

5    folder, and you know that he was not authorized to have an

6    administrator session on the OSB server.

7          For Count Five, the question you'll be asked to decide

8    is not whether the information was NDI, but rather, whether the

9    information was classified.  And you've heard ample testimony

10   about how that information was classified.

11         Then, finally, for Count Six, you'll be asked to

12   decide whether the backups were information from an agency of

13   the United States.  And again, there is no doubt that that

14   information was information of the CIA.

15         For Counts Seven and Eight, the key question you'll be

16   asked to decide is whether the computer commands that the

17   defendant executed caused harm to those systems.  Each count

18   charges a different kind of deletion, in effect.

19         Count Seven charges a harmful computer command from,

20   first, reverting the Confluence server back to April 16,

21   spending an hour and a half in a reverted state, then

22   re-reverting to April 20, eliminating all evidence of what

23   happened in that hour and a half, and then deleting the April

24   20 snapshot.  I think you've heard a lot of testimony about how

25   that is harmful to the computer system.  It impairs the

M77Wsch3                    Summation - Mr. Lockard

1    integrity and availability of data, and in fact, as you have

2    seen, did, in fact, impair the availability of data, which was

3    the point.

4              Count Eight charges harmful computer commands from

5    deleting log files.  You've seen evidence of so many -- so

6    many -- log file deletions that occurred on April 20, 2016.

7    And again, the point of each and every one of those was to

8    eliminate data and prevent it from being available not only to

9    system administrators but also to investigators and,

10   ultimately, ladies and gentlemen, to you.

11             For the obstruction charge, this relates to lying to

12   the FBI to obstruct or impede a grand jury investigation.  So

13   you'll be asked to find, did the defendant make false

14   statements -- and we've talked about a number of false

15   statements the defendant made -- and you'll be asked if he did

16   so to obstruct or impede a grand jury investigation.

17             I want to talk to you just for a second about the

18   grand jury investigation and the nexus of his false statements

19   to that investigation.  In particular, I want to focus your

20   attention on the grand jury subpoena that he received at that

21   interview at Pershing Square, that restaurant in midtown.

22             Before the defendant received that grand jury

23   subpoena, he certainly knew there was an FBI investigation.  He

24   had googled it.  He had read internet articles about it.  When

25   he met the FBI that day, they told him they were investigating

1    the Vault 7 release.  When the defendant receives the grand

2    jury subpoena, there could be no doubt at that point that he

3    also knows this is a grand jury investigation.  He received the

4    grand jury subpoena for his phone and for his testimony, so he

5    also knows the grand jury is certainly interested in what he

6    has to say.  And you can find from that that when he goes on to

7    make false statements to the FBI, he has every reason to

8    expect, and in fact, to believe, that those statements will go

9    before the grand jury and that his false statements were

10   intended to obstruct the grand jury's investigation.

11        Now, you heard he also lied before he received the

12   grand jury subpoena, and you can consider that in determining

13   what his intent was in his lies after he received the grand

14   jury subpoena.  Before he received the subpoena, he lied about

15   his diplomatic passport.  He lied about the OIG email.  He lied

16   about whether he had committed the theft.  He did all of those

17   things to impede the FBI, and he had the same state of mind

18   after he received the subpoena.  His intent was to obstruct the

19   investigation and impair the investigation.

20        Finally, the two prison counts:

21        Count Three charges unlawfully transmitting unlawfully

22   possessed national defense information.  And here, you'll be

23   asked to find if the defendant unlawfully possessed documents,

24   writings, and notes pertaining to the national defense and

25   whether he unlawfully transmitted them to a person not entitled

1    to receive them.

2              Now, here, the defendant is taking information that he

3    knows in his head, and he is committing them to a writing.

4    He's committing them to an email, and when he does that, he's

5    not lawfully entitled to retain that email.  That is unlawfully

6    possessed documents, writings, and notes.

7              Now, you'll also be asked to find if the information

8    in that email was national defense information.  Now you know

9    from the testimony of Mr. Roche that it was, or pertained to

10   the national defense; that is, information that's useful to

11   adversaries and that relates to our intelligence-gathering

12   capabilities.  You'll also be asked to find if it was closely

13   held.

14             I expect the defendant is going to argue to you that

15   it was not closely held because that information was already

16   public.  And that argument is wrong for a couple of reasons.  I

17   do not expect the defendant to be able to show you any evidence

18   that the specific information in that email was publicly

19   available, information about COG and EDG and how many personnel

20   were in each of those two groups.

21             Second, even if that information was publicly

22   available, because the defendant stole information from the CIA

23   and gave it to WikiLeaks, who published information about it,

24   you can find that that information still was closely held if

25   the government took steps to protect it, which they did.  That

1   information remained classified.  Mr. Schulte only knew it

2   because he was a CIA employee, who was governed by a secrecy

3   agreement, that still required him to protect classified

4   information.

5           Even after the leak, the government did not officially

6   acknowledge or publicly recognize the validity of that

7   information at the time that that email was sent.  And in fact,

8   you heard testimony from Special Agent Evanchec -- right --

9   that there was a search warrant that was filed.  That search

10  warrant is the subject matter of the email that Mr. Schulte

11  sent to the reporter.  That search warrant contained

12  information that had been specifically declassified in order to

13  be used in the search warrant.

14          Even after it was declassified, it continued to be

15  protected, because it was only disclosed to the defendant under

16  a protective order.  And Special Agent Evanchec testified about

17  that protective order.  And Special Agent Schlessinger

18  testified about that protective order.  That's a court order

19  that prohibits the defendant from disclosing the information

20  outside of his defense team.  So even though the information

21  was declassified for a limited purpose, it remained closely

22  protected and available lawfully only to the defendant.

23          Finally, you'll be asked to determine whether the

24  defendant unlawfully transmitted that email to a person not

25  entitled to receive it.  And you should readily conclude that a

M77Wsch3                    Summation - Mr. Lockard

1    Washington Post reporter without a security clearance was not

2    authorized to receive that email.

3              Finally, Count Four charges attempt to illegally

4    transmit unlawfully possessed national defense documents in

5    connection with the Malware of the Mind article and those

6    tweets about Bartender.  We've already discussed extensively

7    why those two sets of writings contain national defense

8    information: the advantages to adversaries that attributing

9    particular cryptographic and cyber tool techniques to the CIA

10   can have; and the risks of attribution from publicly connecting

11   Bartender with another public report about another tool.

12             So the question you'll also be asked to decide is

13   whether the defendant took a substantial step to transmit those

14   things, and I submit to you there are any number of substantial

15   steps that you can find from the evidence.

16             You can find a substantial step from the fact that

17   Mr. Schulte wrote the article and that he wrote the tweets;

18   from the fact that he redrafted and revised those tweets and

19   revised the article; from the fact that he opened a Twitter

20   account in order to be able to publish the tweets; and that he

21   opened a Buffer account in order to be able to schedule tweets

22   in advance.  You can find it from the fact that he smuggled a

23   contraband cell phone into prison in order to be able to open

24   up all those accounts, those encrypted emails and those social

25   media accounts.  So you should readily be able to find that

1   there was a substantial step.

2          OK.  So now we've walked through the charges and the

3   issues that you'll be asked to decide in reaching your verdict.

4   And you're almost to the end of me talking to you.

5          So you've been through, I think, about four weeks of

6   trial at this point and you've been through a couple of hours

7   of my summation, and in a few more minutes I'm going to sit

8   down.  And then after a break, you're going to hear from the

9   defendant.  And then after the defendant is finished, my

10  colleague, Mr. Denton, will have an opportunity to speak to you

11  for just a brief period.  And then you'll receive your

12  instructions from Judge Furman.

13         Before I leave you, I'm going to ask you to remember

14  three things that Mr. Denton asked you to do at the beginning

15  of this trial.

16         The first thing he asked you to do was to pay close

17  attention to the evidence, and I think it is perfectly clear

18  that you've been done that.  Throughout this trial, you've been

19  attentive and you've been attentive during my remarks to you.

20  And I thank you and I appreciate it.

21         Second, he asked you to follow the judge's

22  instructions on the law.  I think it's also clear that you've

23  been following instructions that Judge Furman's given you so

24  far, and I know that you'll continue to faithfully follow his

25  instructions during your deliberations.

M77Wsch3

1          Third, Mr. Denton asked you to use your common sense,
2     the same common sense you use in your everyday lives.  And now
3     that you've paid close attention to the evidence and when you
4     have heard Judge Furman's instructions on the law and when you
5     apply your common sense, I submit to you that you will be led
6     inescapably to one conclusion -- that the defendant is guilty
7     of the charges with which he's been charged.
8          Thank you.
9          THE COURT:  Thank you, Mr. Lockard.
10         All right.  Ladies and gentlemen, as I said earlier,
11    to ensure that you can pay careful attention to both sides, and
12    since we've been at it for just under two hours -- I think
13    that's close to the breaking point for listening attentively --
14    we're going to take a break now.  So let's keep it to 30
15    minutes and then, as a reminder, we'll take another break of a
16    similar length after Mr. Schulte before the government's
17    rebuttal.
18         A quick couple quick but still important reminders.
19         Don't discuss the case.  You haven't heard all the
20    closings.  You haven't heard my instructions.  It's absolutely
21    critical that you continue to keep an open mind until your
22    deliberations begin -- really until you reach a verdict.
23         In addition, don't do any research about the case.
24         With that, it is 11:19, so let's be ready to go, if
25    you can be ready for Ms. Smallman to retrieve you just a couple

1    minutes before 11:50 so that we can start promptly with

2    Mr. Schulte's closing, I would be grateful.

3              With that, you are excused.  Enjoy your break.

4              (Jury not present)

5              THE COURT:  You may be seated.

6              All right.  Anything to discuss before I give you your

7    breaks?

8              Mr. Lockard.

9              MR. LOCKARD:  No, your Honor.

10             THE COURT:  Mr. Schulte.

11             MR. SCHULTE:  No.

12             THE COURT:  All right.  Please be back in the

13   courtroom ready to go at 11:45, and then we will start promptly

14   with Mr. Schulte's closing when the jury is back.  Enjoy your

15   break.

16             Thank you.

17             (Recess)

18             THE COURT:  You may be seated.

19             All right.  Mr. Schulte, are you ready to proceed once

20   the jury is back?

21             MR. SCHULTE:  Yes.

22             THE COURT:  All right.  Very good.  I will get the

23   jury, and we will get going.

24             Are we ready to go?

25             MR. SCHULTE:  Yeah.

M77Wsch3                    Summation - Mr. Schulte

1          THE COURT:  I can't see it from here, but is that

2     laptop in any danger of falling?

3          The jury is likely to be here any minute, so let's

4     figure this out.

5          MR. SCHULTE:  OK.

6          THE COURT:  Good to go?

7          All right.  Mr. Schulte, why don't you just take a

8     seat, and then when the jury is seated and we're ready to go, I

9     will invite you to stand.

10         (Jury present)

11         THE COURT:  You may be seated.

12         All right.  Welcome back, ladies and gentlemen.  I

13    hope you enjoyed your break.  As I said before, I'd ask you to

14    give the same careful and undivided attention to Mr. Schulte as

15    he proceeds with his closing argument.

16         At this time, Mr. Schulte, you may proceed.

17         MR. SCHULTE:  Ladies and gentlemen, Mr. Lockard is

18    very worried about the lack of evidence, and you know that

19    because he kept trying to tell you that the lack of evidence is

20    not evidence of innocence.  He's worried there was no forensic

21    artifact of a log-in to the Confluence server.  He's worried

22    there was no forensic artifact of a copy command.  And he's

23    worried there was no forensic artifact of the transmission to

24    WikiLeaks.  And finally, he's worried there was no forensic

25    artifact of any communication at all between me and WikiLeaks.

1      Well, ladies and gentlemen, he should be worried,

2  because that is reasonable doubt.

3      It's still morning, so good morning, ladies and

4  gentlemen of the jury.

5      Last time I spoke to you directly was three weeks ago,

6  and I told you then I was not guilty of the crimes in this

7  indictment.  Three weeks later, that statement remains true.

8  The government gave you no evidence, technical or otherwise, to

9  convince you beyond a reasonable doubt that I'm the person who

10  copied, exfiltrated, and transmitted the Vault 7 and Vault 8

11  information that ended up on WikiLeaks.  And you know I was

12  right to say that to you nearly a month ago.

13      The government, hand in hand with the CIA, has

14  investigated this case for five years.  Five years they

15  investigated this case.  We've had three weeks of testimony,

16  nine witnesses, 1,200 exhibits, videos, audios, and several

17  long slide shows.

18      What does all of this add up to?

19      I'll tell you what it does not add up to.  The

20  government still is not able to answer for you the very basic

21  questions.  In fact, curiously, I tell you there are more

22  questions now than when the trial first began.

23      So for the next hour or so, I'm going to talk to

24  you -- I'm going to try to be shorter here than the government

25  has been.  I'm going to review the evidence for you.  I'm going

1    to try and cut to the chase, get in, get out, because it's been

2    a long three weeks.

3            First, I'm going to look at how the CIA and the FBI

4    together decided almost immediately that the person to look at,

5    the person to focus on, the person to talk about, the only

6    person to present to you was me.  I'm going to talk to you

7    about the government's motive theory.  We'll dive through the

8    forensics and what the evidence shows about the events at the

9    CIA.  Then we'll walk through the forensics from my home

10   computers here in Manhattan.  Then we'll briefly go through the

11   DevLAN computer network, how it was the furthest thing from

12   being secure, meaning that hundreds of people had access to it.

13   Hundreds of people could have stolen it.  Next we'll go through

14   the charges at the MCC.  And finally, we'll look at the charges

15   and why the proof fails to support them.  When we're finished,

16   you will see that the only forensic, correct, proper, and fair

17   verdict is a verdict of not guilty.

18           Now, as I talk, I'm going to flip through the slides

19   on this PowerPoint.  The PowerPoint will mainly display

20   transcripts and exhibits that back my arguments.  If you want,

21   you can take down the exhibit numbers or transcript page

22   numbers, but typically, I will move through the slides fairly

23   quickly.

24           So let's begin with the crime.

25           On March 7, 2017, CIA documents show up on WikiLeaks.

1    This was front-page news, and until that date in 2017, the CIA

2    had no idea that its crown jewels had been stolen.  All they

3    knew was that WikiLeaks was releasing their information and

4    that more information was yet to come.  The CIA was under

5    pressure -- I will say tremendous pressure -- to find out what

6    was leaked, how it was leaked, and who leaked it.  They wanted

7    to hold someone responsible for the leak, and so they began

8    immediately an investigation, an investigation that focused on

9    me.

10           The CIA joined up with the FBI, and literally, within

11   24 hours, they focused on me, the man who had left the CIA in

12   November 2016 on bad terms.  The lead FBI agent admitted that

13   they had not even interviewed a single CIA witness.  They had

14   not even finished seizing the DevLAN network, let alone

15   actually reviewed it.  They had not conducted any investigation

16   at all, and yet I was already the target of their

17   investigation.

18           Then, within a week, the FBI concocted an impossible

19   theory that the WikiLeaks crime occurred on March 7, 2016,

20   because it was precisely a year before the leaks.  That was a

21   day when many other people were at a manager offsite and I was

22   left alone in the office with no one to see what I was doing.

23   And so the FBI argued I must have stolen the CIA's files.

24           The FBI swore out these false facts in a search

25   warrant to a federal judge and then seized the 20 terabytes of

M77Wsch3                    Summation - Mr. Schulte

1    data from my Manhattan apartment.  They scrutinized every

2    device in my apartment, including even my Xbox, and ultimately

3    came up empty-handed.  The lead FBI agent testified that there

4    was no classified information found on any of the electronics,

5    there was no CIA backups or any CIA information in my home

6    computers.  No national defense information was ever recovered

7    from my Manhattan apartment, and this fact is undisputed by the

8    government.

9         Before we get into the forensics and technical

10   evidence, let's just examine the government's theory of my

11   motive to steal Vault 7 and Vault 8.  I told you in the

12   opening, and I tell you again now, the government's spite

13   motive is pure fantasy.  As the trial evidence has shown you,

14   I've devoted my entire life, entire adult life, my work life to

15   service.  I started as an intern at the NSA and then at the

16   CIA.  Through my performance reviews and personnel files, you

17   saw that I three years -- I went there as an intern, loved it

18   so much I decided to graduate in four years instead of three.

19   I was an award-winning developer.

20        But the government must come up with some motive.

21   Right?  So would do they come up with?

22        They come up with this story that they want you to

23   think that as of April and May of 2016, I was boiling over with

24   rage and anger.  In fact, you heard Mr. Denton go on and on in

25   his opening about anger, rage, spite, and revenge.  And

1   basically they spent three weeks trying to show you that I was

2   so angry with the CIA, so angry with management, that I decided

3   to risk everything -- everything -- not only myself but

4   everybody else and decided to risk the one country that I love

5   by leaking this information.

6           But does this fit with what you learned about me

7   throughout this trial?

8           The government did not ask a single witness if I was

9   angry, not a single witness.  FBI Agent Evanchec, the very

10  first witness, even described my demeanor as polite, willing to

11  answer questions and enjoyable to talk to.

12          Next, Anthony Leonis testified that he did not even

13  recall my demeanor during the short meeting in which he issued

14  me that memorandum.

15          Frank Stedman detailed one specific encounter with me

16  in which he described me as casually annoyed.

17          Sean Roche, who claimed that I made a provocative

18  statement and told him I could get my accesses back, even he

19  described my demeanor as a normal, calm, conversational

20  demeanor.

21          The government even played you videos of CIA security

22  interviewing me.  These were four-hour, grueling interviews,

23  and the government selected few-minute clips from each.  And

24  what was my demeanor in those video clips?

25          You can play them again during deliberation.  I was

1    laid back, calm, and collected.  I'm an engineer.  My entire

2    job and life are based on logic.  I may appear litigious and

3    argumentative, but not angry.

4            Furthermore, Jeremy Weber told you that I was

5    patriotic and that I was also antileaker.  I thought Edward

6    Snowden was a traitor who should be executed.  He told you that

7    I believed in the CIA's mission and thought nothing ever should

8    be done against America, not ever.

9            You heard Mr. Denton tell you during the opening that

10   I was nicknamed the nuclear option "because of my tendency to

11   escalate and overreact when I felt aggrieved."  He told you

12   that I had a quest for revenge.  Mr. Lockard just told you the

13   same thing.  But this is not even close to what the evidence

14   shows.

15           Frank Stedman testified about my nickname, the nuclear

16   option.  And what did he say about it?

17           My colleagues used me when they didn't want to work on

18   a project but didn't want to be the naysayer.  I'm a very blunt

19   person.  The customer's idea is stupid, and I will tell them

20   so.  And we are not going to do it.  Mr. Stedman told you I was

21   the nuclear option because I skipped professional steps.  I did

22   not ask the customers how they feel or get all touchy-feely

23   with them.  I did not beat around the bush; I simply told them

24   no.  So my office used me in situations where this was

25   necessary.

1          Nuclear option has nothing to do with overreaction or

2     flying off the handle.  In fact, what was Mr. Stedman's example

3     of nuclear action?  Do you recall what he said?

4          Mr. Stedman told you that I went to a meeting.  Did I

5     go crazy?  No.  Did I fly off the handle?  No.  At the meeting

6     a customer asked how long will it take to write some specific

7     code.  Mr. Stedman told you that I pipe up from the back and

8     say it will take months.  And Mr. Stedman says, no, not months,

9     but three weeks.

10          That is the definition of nuclear option.  That is

11     what the trial evidence has established.  You can take a look

12     at the transcripts and see it for yourselves.  Nuclear option

13     has nothing to do with escalation, overreaction, anger,

14     revenge, spite, or any of that nonsense he told you in the

15     opening.  It is literally the opposite -- the absence of

16     emotion and speaking bluntly.

17          All right.  Let's briefly go through this motive

18     timeline.

19          On March 1, 2016, I filed my complaint with security.

20     The next day, TMU responds and sets a meeting for March 3.  I

21     meet with security on March 2 in which Amol denies the

22     allegations and then admits them but claims it was all a joke.

23     And at some point, Amol recants and an investigation kicks off.

24          Mr. Weber and Mr. Stedman told you they did not

25     support me.  That investigation continues for several months,

1    until security eventually concludes that there were no

2    witnesses so the event cannot be corroborated or refuted.

3           At some point, I move from OSB to RDB.  Contrary to

4    the government's assertions, at no point do I consider this

5    transfer a punishment or demotion.  The email they cite was not

6    an email asking if the removal -- let me rephrase.

7           The email they cite was an email asking if the removal

8    from my previous branch was a punishment, not whether working

9    in RDB was punishment.  As both Leonis and Weber testified, RDB

10   does great work and at this point in time employed many of the

11   senior developers whom I had worked with before, when I was an

12   intern.

13          The work done in RDB is a logical extension of the

14   work done in OSB.  RDB prepared tools for counterterrorism, as

15   did OSB, except the tools in RDB were longer range tools.

16   Trial evidence shows I was never once angry or upset at being

17   in RDB.  So that's it.  As I told you in my opening, there was

18   an unfortunate situation, and then I moved on.  This move from

19   OSB to RDB contributes nothing at all to motive.

20          Now, you heard Mr. Lockard tell you that I was

21   planning to steal the backups starting as early as April 14,

22   2016.  But of course, this makes no sense.  As of April 14,

23   2016, trial evidence shows I still had access to the Confluence

24   virtual machine.  So if I were going to steal the backups, I

25   could just copy them directly.  I could literally log in to the

1   system and copy the backups, and I could do this on April 14

2   and April 15.

3           Mr. Lockard also told you I was casing the joint and

4   deleted log files on April 16, 2016.  Let's briefly take a look

5   at what the expert said about those very log files that

6   Mr. Lockard displayed to you.

7           Mr. Leedom told you this was normal activity.

8   Mr. Leedom did not testify that there were any logs deleted

9   here, and that is because this deletion is from a newly created

10  file that was just uncompressed.  After reviewing the

11  uncompressed file, it is deleted, but the compressed log file

12  still remains.  It was never deleted.

13          MR. DENTON:  Objection.

14          MR. SCHULTE:  It's in the trial evidence.

15          THE COURT:  All right.

16          Ladies and gentlemen, as I said to you this morning,

17  what the parties argue in their summations is not evidence but

18  their arguments as to what conclusions you should draw from the

19  evidence.  To the extent that your recollections of the

20  evidence differ from theirs, it's your recollections that

21  govern.

22          You may proceed, Mr. Schulte.

23          MR. SCHULTE:  Mr. Lockard told you about googling hash

24  algorithms, but of course, the experts testified that these

25  searches were all relevant to my work at that time.

1          Mr. Berger testified that these searches were directly

2     related to my work siphoning data.  And take a look at what

3     Mr. Berger says.  Mr. Lockard spent substantial time talking

4     about hash files and searches for hashing algorithms, yet all

5     of this was clearly related to my work on CIA tool Nader.

6          What else did Mr. Lockard tell you?

7          That I stayed up late and locked up the vault in April

8     2016.  But of course, the badge records show that I did this at

9     least once every month.

10          Mr. Lockard then brings up the Google searches for

11     WikiLeaks, but of course, as Agent Evanchec testified, there

12     were multiple news events that occurred in the summer of 2016.

13     WikiLeaks dumped the Clinton emails.  Really?  Come on.

14     Everyone was reading that news -- Guccifer 2.0.  The Shadow

15     brokers released data, and even WikiLeaks claimed to have that

16     code.

17          Mr. Lockard also brought up the diplomatic passport.

18     Well, ask yourself, does Mr. Lockard's theory make sense?

19          By this time the CIA considers me a problem employee.

20     I give notice of leaving the CIA.  Do they have an exit

21     protocol in place?  Do they ask me?  Isn't it equally plausible

22     that both the CIA and I forgot about the diplomatic passport, a

23     passport I never used?  And why would I lie about a passport I

24     never used?  And isn't it just equally likely I left it in the

25     office?  And the trial evidence showed as soon as I realized

1    the mistake, the passport was turned over to the FBI.

2            OK.  Back to the events at the CIA.

3            What happens next?

4            The OSB libraries.

5        You heard this story a thousand times throughout

6    trial.  Weber removed my accesses to the libraries, and then I

7    undid his changes.  This action was not performed secretly but

8    openly.  Mr. Weber testified that he did not recall whether I

9    specifically told him I was adding my permissions back.  Yet he

10   just happened to perform a permissions audit and looked at the

11   changes shortly after I confronted him.  None of this really

12   matters except what happens next.

13           The government wants you to believe that I committed

14   crimes against my country because of a memorandum issued to me

15   on April 18, 2016.  Now, you heard the testimony of Mr. Leonis

16   himself, and according to him, issuing a memorandum was very

17   minor.  It ranged very low in the hierarchy of potential

18   discipline.  It did not dock my pay.  It did not put me on

19   administrative leave.  It did not reduce my grade.  It did not

20   even go into my personnel file.

21           Furthermore, Mr. Leonis told you that our meeting was

22   very short.  He issued the memo, I disagreed with it, he made

23   some changes, I signed it, and then we moved on.  A very short

24   meeting and apparently not a very memorable one, because

25   Mr. Leonis could not even recall my demeanor during the

meeting.

Like any other person, life gave me lemons.  And what did I do?  I made lemonade and went on with my life.

The sole consequence of the memorandum, the weekend removal all developers' administrative access, was something I had tried multiple times to relinquish to others.  You heard Mr. Weber's testimony and saw documented, email proof that we had tried to transfer our administrative privileges to ISB since the very first day we took on those roles.  It interfered with our real job.  It was a favor asked of us, particularly asked of me, by the prior administrator.  But it was something that I never wanted or cared about, and neither did Mr. Weber.

The events that transpired after April 20, 2016 are the most critical.  These are events that occur after the government alleges I have already committed the crime -- events they cannot possibly contribute to motive.  And these events show you that I did not commit the crimes alleged.

Now, just think about this.  If someone commits this crime on April 20, 2016, what course of action would be the most logical?

They would have a goodbye party, say nice things and leave very soon after, on cordial terms.  Or at the very least, you would keep your head down and a very low profile.  You would not want to raise any alarms.  Right?  And what did I do?

Once I finished with development on Nader, I turned to

1   the second tool, a tool that the trial evidence supports I

2   believed migrated with me to RDB -- Brutal Kangaroo.  And then

3   lo and behold, I discovered that I do not even have access to

4   Brutal Kangaroo anymore.  So I send an overt branch-wide email

5   to ISB, at least ten people, requesting permissions for the

6   project.  After discovering that Jeremy Weber removed my

7   accesses, I then sent an email to the chief, Anthony Leonis,

8   and to HR about the issue.  Not just once but twice.  I send a

9   follow-up email.

10              And then what happens?

11              Anthony Leonis tells me I should have surmised that he

12  wanted me to pull out the subcomponent Shattered Assurance from

13  Brutal Kangaroo.  But you know that doesn't make sense.  By

14  this time, Shattered Assurance had been put to bed.  And

15  besides, the only way to do anything more on Shattered

16  Assurance was by accessing the other subcomponent, Drifting

17  Deadline, to which they claim I should not access.

18              My group chief then issues me a letter of warning.

19  And do I keep my head down in a low profile?

20              Absolutely not.  I complain to the group chief's boss,

21  and then the group chief's boss's boss, Mr. Sean Roche.  I

22  filed complaints with everyone, including OIG.  And then I find

23  a job in New York and move here.

24              But most importantly, look at my course of action

25  during this time and ask yourself this:  Would someone who has

1    stolen from the CIA make himself such an obvious suspect?

2    Would the leaker paint a big red target on his back?  Of course

3    not.

4              Finally, look at how I did things.  I was litigious.

5    I used formal process.  I engaged with the Office of the

6    Inspector General.  I engaged with the Office of Equal

7    Opportunity, EEO.  Regardless if you think I handled the

8    situation well or not, I think you have to agree that a person

9    who leaked information to WikiLeaks in April 2016 never would

10   have done any of these things.  I used the CIA process to

11   challenge my performance reviews.  I wrote outside activity

12   reports when I began talking to employment litigation law

13   firms.

14             The CIA would not have any idea I was doing these

15   things without reporting them, and these reports eventually led

16   to those interviews with security that the government showed

17   you.  Those interviews only took place because I updated the

18   CIA in accordance with CIA process and procedure.  The result

19   of these actions would only raise your profile following the

20   leaks, which is precisely what happened.  The real leaker would

21   have either resigned immediately or simply kept a low profile.

22   He would not have raised the Brutal Kangaroo issue with HR, and

23   he certainly never would have escalated to the highest level of

24   leadership at the CIA.

25             Now we've arrived at the first of many reasons why the

M77Wsch3                    Summation - Mr. Schulte

1    government's case is riddled with reasonable doubt:  There is

2    simply no motive here.

3            All right.  Now let's talk about the forensics.

4            What evidence did the government's two forensic

5    experts present to you?

6            The government knows -- the government knows -- that

7    DevLAN and Altabackups were not secure and that many people

8    could have taken the backups.  So what does the government have

9    to do to try and convince you about this supposed science, the

10   technical computer evidence that they claim points to me and me

11   alone?

12           If you look at the evidence, you'll see that it fails

13   to support the government's case, and in fact, it supports the

14   defense, just as I told you it would in the beginning.  And a

15   key witness on this point, as you remember, was the

16   government's expert Mr. Leedom.  He showed you a very long

17   slide show about SSH keys, computer reversions, passwords, and

18   many other things.  Mr. Leedom ignored the insecurity of DevLAN

19   and all the possible methods of extraction.  He testified that

20   he did not check any of the limitless possibilities himself or

21   that he no longer remembers the results of those tests.  And

22   we'll get to those in a minute.

23           But, first, let's just focus on the tests Mr. Leedom

24   did perform.  He has clearly picked a team.  The only logical

25   inference one can draw from his forensic analysis is that

1    Confluence backup files were accessed on April 20, 2016.

2              Instead, what does Mr. Leedom do?

3              He asks you to take a giant leap without giving you

4    the necessary technical platform.  And there's where he loses

5    his credibility.  That is when he abandons the role of an

6    expert and becomes an advocate.  And you see this clearly on my

7    first few questions of him on cross-examination.

8              Remember his forensic findings slide?

9              Take a look.  What are the results of Mr. Leedom's

10   forensic findings?  Did he find a single forensic artifact that

11   I even logged into the Confluence VM, let alone accessed or

12   copied the backup files?  Absolutely not.

13             Before we go into detail there, the government's

14   theory rests entirely upon the predicate that the Altabackups

15   directory was locked down.  If the Altabackups were not locked

16   down, which they clearly were not, as the evidence will show,

17   then the snapshot-reversion theory is entirely irrelevant.  If

18   you can just open up this directory and copy the files, then

19   you obviously do not need this complicated, convoluted

20   snapshot-reversion theory.

21             And the government knows there's a gaping hole in

22   their theory, so they try to quickly cover it up.  According to

23   Mr. Leedom, they know the access controls of all the

24   directories and files on the CIA servers.

25             There, it shows the source controls and Gold

1    repositories that he testified about, the process of going

2    through the security.  And here, it tells you the permissions,

3    who has access and what those accesses are.  But somehow,

4    magically, the government does not know what the access

5    controls are to the Altabackups directory, the only one

6    important for this case.  Does that sound right to you?

7           Take a look again.  Here is the directory, just like

8    it exists in the Gold repositories.  So why didn't Mr. Leedom

9    just do the same forensic test to determine the access

10   controls?

11          Because they would show there were no access controls

12   at all.  It is inconceivable that the government and Mr. Leedom

13   cannot perform the same test and tell you the precise access

14   controls for the Altabackups directory.  Yet Mr. Leedom

15   testified that I should go talk to ISB because, he claims, none

16   of the access controls from April 2016 exist anymore.

17          And instead, what does Mr. Leedom do?

18          He relies upon an error message from the ESXi server

19   and suggests that this error message definitively proves that

20   there were access controls on the Altabackup directory.  And

21   then he makes another giant leap, without a shred of forensic

22   evidence, and tells you those access controls must be super

23   strict because that's the way he would set it up.  But

24   Mr. Leedom did not set up the access controls on the Altabackup

25   directory.  Mr. Leedom even testified that DevLAN security was

1    below average.

2              How can he possibly assume that the Altabackups

3    directory was locked down, especially considering the lack of

4    security mechanisms on DevLAN?  And what was the reason for

5    that error message from the ESXi server?

6              He told you I logged in to the ESXi server as a

7    regular user, a user with no ability to run a mount command or

8    perform any administration on the server, and then I run the

9    mount command and it fails.  Well, of course it fails.  I did

10   not have permission to run that command.  So Mr. Leedom's giant

11   leap of faith crumbles here.

12             Furthermore, there is significant testimony that the

13   Altabackups were not locked down.  You heard Mr. Weber's

14   testimony about using the mount command in his own VM.  If

15   Mr. Weber can mount the Altabackups in his own VM, then they're

16   not locked down at all.  And even after the permissions change,

17   you heard testimony from Dave.  Dave was able to copy Stash

18   backups and Confluence across the network.  But after the

19   permissions changed, there was only one Atlassian

20   administrator, and it's not Dave.  It's Tim.

21             So if there are all these access controls, how is Dave

22   copying all these backups around?

23             But let's run with Mr. Leedom's baseless hypothetical

24   that the Altabackups had some access controls.  Mr. Leedom

25   acknowledges that this error message does not indicate what

M77Wsch3                        Summation - Mr. Schulte

1    those are.  Mr. Leedom also acknowledges that the Altabackup

2    server is on a completely different subnetwork than the ESXi

3    server.  It's like a computer at your home trying to connect to

4    a computer at your friend's home to download a file.  There are

5    many things that must be done to ensure connectivity across

6    networks, and Mr. Leedom presents absolutely no evidence to you

7    that the ESXi server was configured to access the Altabackup

8    servers or mount any directories from that server.  This is

9    reasonable doubt in and of itself.

10        The government failed to prove to you that the

11   Altabackups were ever protected; that there were any access

12   controls at all on the Altabackups.  Without access controls

13   the potential suspect list is every single person who can

14   connect to DevLAN, literally all 200 people.  Everyone is a

15   suspect, and most importantly, that snapshot reversion that he

16   spent the majority of his time testifying about is completely

17   irrelevant to the theft.  The two are not related in the least.

18        So there was absolutely no need to execute a reversion

19   to access the Altabackups directory, and this snapshot

20   reversion is completely unrelated to the backups, but let's

21   delve down into Mr. Leedom's theory and see how much more

22   reasonable doubt we can find.

23        He claimed that the theft took place on a very

24   specific date, April 20, 2016, and also gave you a very

25   specific time.  He said that I reverted Confluence back to

1   April 16 and stole the March 3, 2016, Confluence backup and

2   reverted back to April 20.  And specifically the time period

3   between the two reversions is 5:35:37 p.m. to 6:51:17, an hour

4   and 15 minutes.

5          Look at what Mr. Leedom says on cross-examination

6   because that theory, I tell you, does not hold up.  I asked

7   Mr. Leedom a series of questions about whether he found any

8   evidence of the copy command and instruction to copy the

9   backups during the reversion period, and he admitted that he

10  searched high and low for a copy command.  I mean how else are

11  you going to copy data without a copy command?

12         I asked him:  You really looked, you looked for one,

13  right?  And he said:  Yes, yes, I looked.  And then he admitted

14  that the government had asked him to look.  The government

15  wanted to find a copy command.  He looked and he looked, and he

16  never found any evidence of any copy command whatsoever.  In

17  fact, Mr. Leedom was able to review all the logs from my CIA

18  workstation, because they were never deleted.  He also found a

19  transcript file from my virtual machine.  And what do those

20  transcript files say?

21         If there was a copy command or a log-in to the

22  Confluence virtual machine, they would be right there.

23         (Continued on next page)

24

25

1          MR. SCHULTE:  (Continuing)  But there is no command

2     ever executed.  You see the last command that's executed, 21:29

3     is the result, and the very next command is at 21:55.  And

4     between that time, between 5:42 and 5:43, the Confluence backup

5     files are accessed.  If there is access or copy to that, those

6     files, you would have seen them right in between these files,

7     right in between these logs.  These logs they have, they're

8     completely in tact, if you go back.  It is not missing any

9     data, it is all complete and in one file.  So what you would

10    expect to see are these commands in between here.  This is the

11    time period when the backup files are accessed.  So you would

12    expect to see, as Mr. Leedom said, these commands which he

13    never found, or he testified that would see a command to do the

14    copy.

15          So how could I have possibly copied any files without

16    executing a copy command?  This has absolutely nothing to do

17    with any deleted log files from the ESXi server.  As I told you

18    in my opening, the government is trying to distract you with

19    these unrelated deleted files.  In fact, Mr. Leedom himself

20    admitted that there would be no copy command log in those

21    files.  The reversion from Confluence also could not have

22    affected the log files from my CIA work station.  If I had

23    copied the backups, the logs would be stored right on my

24    computer.

25          But, most importantly, he has the logs from my

1    computer, the computer I am using to access the ESXi server and

2    other servers.  Everything I do, every command I run from my

3    computer is logged right here.  He has all of those logs and

4    admits those logs were never deleted.  So where is it?  Where

5    is the copy command?  If I didn't copy the backups then there

6    would not be a copy command, right?  And there is no copy

7    command.  So obviously I did not copy the backups.  The missing

8    copy command is yet more reasonable doubt.

9            Next Mr. Leedom testified that he recovered all of the

10   removable media I used at the CIA, yet he found that none of it

11   contained forensic evidence of the backups.  In fact, the logs

12   from my CIA computer definitively show that no devices were

13   ever connected during the reversion period.  No storage device.

14   No thumb drive.  No removal of hard drive.  No drive.  Nothing.

15   Nothing that was ever connected to my work station computer

16   during the reversion period.  Nothing is plugged in.  What am I

17   copying the backups to without a device connected to my

18   computer?  Well, there are countless logs and other activities

19   that Windows records that would alert the forensic examiner

20   that the backups were copied right to my computer.  And anyway,

21   the backups would have been copied onto some device for it to

22   make -- let me rephrase that.  And anyway, the backups would

23   have to be copied onto some device to make it outside of the

24   CIA.  So what is the government's theory?  To what device are

25   the backups copied?  They never tell you.  They never tell me.

1   They still do not have a theory.  That, ladies and gentlemen,

2   is the very definition of reasonable doubt, when the government

3   has no clue and cannot pose to you a theory based upon even

4   circumstantial evidence, then that, alone, requires acquittal.

5          Next Mr. Leedom does not even present to you, with any

6   forensic evidence, for whether those files could even be copied

7   in the time frame of the reversion.

8          After the final reversion back to April 20th, 2016, at

9   6:51:17 p.m., that cannot even access the Confluence VM

10  anymore.  The copy must finish in this time frame.  Yet,

11  because he has no theory as to what device the data is copied

12  to, he cannot possibly give an estimation for the amount of

13  time the copy will take.  It depends upon how fast the device

14  is.  It also depends upon the network speed.  According to the

15  size of the backups, that's at least 200 gigabytes, about 1,000

16  episodes of Netflix.  And all in an hour and 15 minutes?  You

17  can do the math.  Is that possible?  I mean when you need to

18  download 200 gigabytes from the Internet, can you do it in 75

19  minutes?

20         Think about it.  How long does it take to download

21  files onto your computer.  And does Mr. Leedom establish that

22  the DevLAN network is faster than the Internet?  Does he

23  establish any bandwidth for DevLAN at all?  No.  He does not

24  even have a slide about it.  He does not even want to talk

25  about it.  The government very quickly just asks him if it were

1   possible and he said yes, without presenting to you evidence or

2   even a slide illustrating the speed of DevLAN.  The government

3   has failed to prove that the backups could be copied in the

4   short window.  Ladies and gentlemen, once again, this failure

5   establishes reasonable doubt.

6          And that's not all.  There is yet another major

7   problem with the government's theory.  During the time when the

8   Altabackups are accessed, 5:42 to 5:43, the trial evidence

9   shows I'm not in the vault or at my computer.  According to the

10  badge records I tried to badge into the vault at 5:45 from an

11  access point near the mens bathroom, according to Mr. Weber's

12  testimony.  I mean, take a look at this.  If I am badging in

13  from the bathroom at 5:45, at 5:42 and 5:43 I'm in the

14  bathroom, I wouldn't even be at my computer.  It is just not

15  possible that I ever accessed, let alone copied, the backup

16  files.  Ladies and gentlemen, once again, you have reasonable

17  doubt.

18         Finally, there is one remaining, very significant

19  forensic finding here.  Mr. Leedom told you that those

20  transcript files from my CIA computer were not normal.

21  Normally you only see the input of commands but not the output,

22  yet he found transcript files from my computer showing both

23  input and output.  These are the activities that show the

24  deletion of log files from the ESXi server.  He admitted to you

25  that he has absolutely no idea how these files were generated

1    but he agreed that they could be generated through user

2    intervention.  He also agreed that system administrators will

3    record their actions on a system to preserve activity logs.

4    Then, if something happens, you can review what another

5    administrator did.  Mr. Leedom offers you no other explanation

6    for these files.  None.  The trial evidence should make it

7    clear to you that I must have generated those files.

8            The trial evidence makes clear that the generation of

9    these files requires user intervention, it requires the

10   purposeful intent by the user to record his session and all

11   commands executed thereafter.  And the trial evidence also

12   makes clear that recording sessions transcripts is in

13   accordance with system administration best practices.  If

14   something abnormal occurs, such as deleting log files, a record

15   of it should be kept so that when other administrators log in,

16   they are not baffled by the missing logs or other abnormal

17   activity.  They can review the transcripts and see what

18   happened, that's the point of transcript files, to record

19   abnormal activity.  And this requires direct user intervention,

20   you have to take deliberate, purposeful action to treat these

21   files.

22           So now think to yourselves, would someone purposefully

23   record themselves committing a crime?  Generating transcript

24   files to record yourself committing a crime is a forensic

25   equivalent of installing a security camera and setting it to

1    record in a store before you rob it.  Does that make any sense

2    to you?  Based upon the existence of these files, you should

3    infer that I purposefully recorded them and was not doing

4    anything malicious or illegal.  The very existence of these

5    transcript files establishes reasonable doubt.  And this is

6    even confirmed when you look at Mr. Leedom's slides.

7            If someone were trying to cover their tracks, they

8    would just delete logs at the very end after they were finished

9    doing whatever malicious act they were doing but you don't see

10   that here.  Here you see a very methodical method is followed.

11   You see deletions throughout this hour at regular intervals,

12   specifically the first and the last occur within two minutes,

13   and in between it is every 20 minutes.  You see a check of log

14   files, then a deletion, and then 20 minutes later the same

15   exact thing; a process that is being followed here, a technical

16   procedure, and not malicious activity.

17           As I told you during my opening statements, the

18   government's own forensic experts have proven my innocence or

19   at the very least their experts have left you with

20   insurmountable reasonable doubt.  Mr. Leedom's testimony is

21   devastating to the government's case.  Think about this:  The

22   government cannot establish the four core steps necessary to

23   commit this crime.  And what are those steps?  Access -- you

24   need access to the information such as a login to the

25   Confluence virtual machine.  OK?  You need a disk, a disk drive

1    or some mechanism to store the data you want to steal, inserted

2    it in the drive, and the copy command.  Files cannot copy by

3    themselves, you need a copy command.

4            Exfiltration.  You need some way to take the data out

5    once you have made a copy.  If there is no login to the

6    Confluence VM during the reversion period, no copy command, no

7    removal drive connected to my computer and no network speed

8    established to tell you how long such a copy would take.  And,

9    I never took any devices out of the CIA.  And, I was actually

10   in the bathroom during the access to the backups.  I could not

11   have stolen that information and if I couldn't have stolen that

12   information I certainly couldn't have sent it to anyone, let

13   alone WikiLeaks.  And one of these failures establishes -- any

14   one of these failures establishes reasonable doubt and a

15   combination of all of these establishes that the government's

16   theory isn't just doubtful, it is impossible.

17           Is Mr. Denton able to tell you how I copied the

18   Altabackup files without leaving a copy command anywhere?  No.

19   And because he can't, he falls back on the "because you deleted

20   it" argument.  He never explains how I download all of those

21   files without connecting any device, any thumb drive, hard

22   drive, anything to my computer.  He never tells you how it is

23   possible to download 200 gigabytes in an hour, how I copy filed

24   from the bathrooms, how I take this non-existent device out of

25   the CIA without anybody noticing.  There were armed guards.

1    You have to badge in, badge out, sit in a vault, sit in a safe.

2    How do I get it out?

3            Now let's move on from Mr. Leedom and the CIA to my

4    Manhattan apartment and Mr. Berger.  And recall the first

5    witness, FBI Agent Evanchec who testified that none of the

6    files on my home computer, including the encrypted containers

7    had any classified information on them.  So what did Mr. Berger

8    offer you?  Mr. Berger confirmed these results.  Mr. Berger

9    also testified extensively about certain activities in April

10   and May 2016 like Google searches and Amazon purchases, but for

11   a computer geek like me, like I told you in my opening, this

12   activity is consistent with my habits and hobbies.

13           MR. DENTON:  Objection.

14           THE COURT:  Ladies and gentlemen, a reminder that what

15   Mr. Schulte is saying in his closing, everything he has said

16   during this trial is not evidence.  You can consider it as

17   argument but not as evidence and in that regard, with that, you

18   should listen to what his argument is.

19           You may proceed, Mr. Schulte.

20           MR. SCHULTE:  As the trial evidence showed and you are

21   about to see, there is literally nothing unique about the

22   activities in April and May 2016.

23           While Mr. Leedom worked as a contractor for the FBI,

24   Mr. Berger is the FBI.  It is clear what team he has chosen.

25   Mr. Berger deliberately omits evidence, demonstrating that my

1    activity is normal during this time, he zooms in on details,

2    cherry-picks data points and insinuates to you that certain

3    activity is nefarious or suspicious.  In essence, what

4    Mr. Berger has done is zoom in and ignore the big picture.

5          Take a look at this example.  It looks like a straight

6    line, right?  But that is zoomed in at 2,000 percent.  When you

7    zoom out, you see that it is a circle, a shape composed of

8    absolutely zero straight lines.  Appearances can be deceiving.

9    This is what the government, and particularly Mr. Berger, has

10   tried to do to you -- zoom in and ignore everything else.  Zoom

11   in and focus on a few Google searches while ignoring my full

12   Google search history.  Zoom in and focus on a single device I

13   purchased while ignoring my full Amazon purchase history.  Zoom

14   in and focus on activity of a certain night while ignoring the

15   surrounding 1,000 days that formed my habits.  At the end of

16   the day you just have to ask yourselves, isn't their bias

17   skewing their investigation?  Why obfuscate?  Why not provide

18   full context?  Why not function as an expert instead of an FBI

19   agent and advocate for the government?

20         Mr. Berger testified that I transmitted CIA backups to

21   WikiLeaks.  Let's see.  And what is the basis for that

22   conclusion?  Google searches.  They really should be renamed

23   the Federal Bureau of Google because their entire forensic

24   analysis consistently starts and ends with Google searches.

25   And of course this slide that Mr. Berger presented to you, no

1    evidence that anything was ever transmitted to WikiLeaks, it

2    does not even give you a theory as to when or how this

3    occurred.

4            Mr. Berger starts with the WikiLeaks website.  He

5    showed you what it looks like in April 2016, but recall FBI

6    Agent Evanchec's Google search analysis.  I never visited the

7    WikiLeaks website in April or May of 2016.  I could not have

8    possibly even seen the WikiLeaks site.  But, of course, when

9    the Google searches don't mesh with the conclusions the FBG

10   wants you to draw, then they ignore the Google searches.

11           Mr. Berger tries to insinuate that I must have visited

12   the WikiLeaks website because I downloaded Tails even though

13   the forensics shows I consistently downloaded Tails and other

14   Linux distributions.  There is literally nothing special about

15   Tails.  There is nothing in evidence that distinguishes Tails

16   from any other live boot Linux distribution.

17           Mr. Berger then tries to make something special out of

18   TOR on a virtual machine.  Mr. Berger fails to establish that

19   the VM was even installed on my home computer or even used by

20   me but regardless, the forensics show that the VM and TOR were

21   installed and used back in 2015.  Again, this is typical

22   activity throughout this time.

23           Next Mr. Berger talks about the purchase of a SATA

24   adapter.  Only, it is not a SATA adapter, it is a hard drive

25   docking station.  Its primary function is an offline clone to

1    make complete copies of other hard drives.  It cannot be

2    connected to the Internet, it is not used to transfer data, and

3    I would not need it to connect hard drives to my computer since

4    I have fast eSATA ports on the back.  Not only that, but I buy

5    the same device several months later.

6         Let's talk about these other devices that Mr. Berger

7    does not even mention.  118, you see a hidden camera in a pen

8    that is purchased; multiple hard drives; all kinds of digital

9    devices are purchased throughout this period.  My purchase

10   history shows this activity is normal, it is consistent with my

11   habits and my hobbies.

12        Mr. Berger then talked about Eraser Portable -- and

13   I'm not really sure why -- securely deleting a folder labeled

14   Array List, and as he confirmed, which is a basic data

15   structure taught in entry-level programming classes.  Securely

16   deleting this shows that I was simply testing Eraser Portable.

17        And as for Brutal Kangaroo, you heard Mr. Weber tell

18   you that we worked on projects outside and then brought them

19   into the CIA.  Brutal Kangaroo was a project I was working on

20   at this time and, as Mr. Weber told you, sometimes source code

21   can be linked to individuals.  So after taking source code into

22   the CIA, it would be prudent to erase that code afterwards.

23   And, of course, as Mr. Weber told you, tool names are

24   unclassified.  So there was absolutely nothing improper with

25   having a folder named Brutal Kangaroo at my house and nothing

1    improper with writing code and bringing it into the CIA.

2            Mr. Berger then identifies for you a particular night,

3    April 30th, 2016 to May 1, 2016, and he identifies this night

4    because of late Google searches and logins to a virtual

5    machine.  But of course what he fails to tell you is that the

6    forensic evidence shows I was up late playing League of

7    Legends.  In fact, the forensic evidence showed I often stayed

8    up late playing games.  This is not uncommon, but he zooms in

9    to this specific night and ignores all other days.

10           Mr. Berger also talks about wiping and reformatting.

11   He claims that I wiped my computer on May 5, 2016, and

12   reformatted it.  But, of course, that isn't true at all.  When

13   installing a RAID 5 system, it automatically formats the drive

14   such that each file is essentially split equally across all

15   three drives.  And the forensics clearly support that I

16   upgraded my home computer.  I installed a RAID 5.  The new RAID

17   installation explains everything.  It explains the Google

18   searches, the data transfer, the docking station to clone hard

19   drives and the use of DBAN and other disk wiping utilities.

20   You don't want to keep your financial and personal data sitting

21   around on loose drives.  It is common best-practice security to

22   wipe those drives.

23           So what is Mr. Berger's theory about the transfer of

24   data to WikiLeaks?  He doesn't really have much of a theory

25   except to speculate a time frame between April 20th and May

M775sch4                    Summation - Mr. Schulte

1   5th.  But even for that theory he doesn't give you any

2   forensics, any forensic evidence.

3           Once again, Mr. Berger slips off his expert witness

4   hat and flips on his FBI government advocate badge.

5   Mr. Berger's forensic findings that there is absolutely no

6   evidence at all that I ever contacted or transmitted any data

7   to WikiLeaks establishes even more reasonable doubt.

8           Finally, it is important to talk about NetFlow logs.

9   Whenever you use your computer at home your Internet provider,

10  be it Verizon, *Comcast* or whoever, they record the amount of

11  data you send and receive as well as the IP address --

12          MR. DENTON:  Objection.

13          THE COURT:  Sustained.  Sustained.

14          Please stick to the evidence, Mr. Schulte.

15          MR. SCHULTE:  Mr. Leedom:

16          Question:  Can you explain for the jury what NetFlow

17  logs are?

18          Answer:  It is essentially like, a summary of, bytes

19  in and out of a network.  So, theoretically, if you had NetFlow

20  logs you could determine between two points in time how much

21  data transferred from one point to another.

22          So from the NetFlow logs you can determine basically

23  the amount of data sent or received by each connection,

24  correct?

25          Yes.

1      Which would have been very huge in your incident

2   response, correct?

3      Yes.  It was one of the first things I asked for when

4   we showed up.

5      And as for Mr. Berger the question was:  NetFlow logs

6   would establish definitively whether or not data was

7   transmitted or received during this time period, correct?

8      He responded:  If, depending on the records they would

9   establish what data was transferred or received over the

10  connection from Verizon, then yes.

11     So this data can irrefutably link you to every single

12  data transfer you perform.  Even if you use TOR or other

13  proxies, an anonymizer, your Internet provider will still

14  capture the fact --

15     MR. DENTON:  Objection.

16     MR. SCHULTE:  It is in the record.

17     THE COURT:  Ladies and gentlemen, I think you

18  understand at this point that what Mr. Schulte is arguing is

19  his argument that is not evidence and in that regard you should

20  rely only on the evidence and the conclusions that you draw

21  from it.  With that in mind, please listen to Mr. Schulte.

22     Go ahead.

23     MR. SCHULTE:  Your Internet provider will still

24  capture the fact that you transferred data across it.

25  Mr. Leedom testified about the importance of NetFlow logs.

1   This was the first thing he asked for.  If DevLAN had kept

2   these logs then we would not be here today.  The data would

3   definitively unmask the two perpetrators.  Unfortunately, no

4   such logs exist on DevLAN.  However, Verizon did record those

5   logs from my home connection.  Verizon provided the NetFlow

6   logs to the government.  The government reviewed those NetFlow

7   logs and provided them to me.  The government then stipulated

8   to the accuracy and admissibility here at trial under

9   stipulation GX- 3006; you have them, Defendant's Exhibit 208.

10  We even went through the data with Mr. Berger, it is a big

11  spreadsheet.  And through Mr. Berger we cut it down to this

12  time frame between April 20th and May 6th, and that's marked as

13  Defendant's Exhibit 208-A.

14          Since the government cannot establish any connection

15  to WikiLeaks or transfers of 200 gigabytes in this time frame

16  you can only infer that neither occurred.  Here is the data,

17  here I am on trial.  Those NetFlow logs, according to their

18  experts, would show if I sent a byte of data to WikiLeaks.  And

19  the government, five years later, never pointed you to any of

20  that data.  The government did not even seek to introduce it

21  but both the existence of these logs and the government's

22  failure to direct you to any transmissions to WikiLeaks or

23  transmissions of 200 gigabytes of data during this time frame

24  raises significant reasonable doubt.

25          Let's take a minute to go through the timing analysis

for the Vault 7 and 8 release by WikiLeaks.

Both experts testified about this to varying degrees.
The point is version control which existed in both Stash and
Confluence and keeps track of all iterations for each file.
Every time you modify a file, that changed the file that saved.
And what this means is every successive backup contains all the
data from all preceding backups.  March 4th contains the day
from March 3rd, plus the new changes.  So it is really trivial
to go through the data and select files from a particular date.
So while the experts tell you it has to be the March 3rd, 2016
backup given to WikiLeaks, this is simply not true.  They are
not testifying as experts at this point but as FBI agents,
advocates for the government.  No forensic expert could testify
as to what files WikiLeaks received, they simply have no idea.
The forensics can only establish one thing, what is called a
lower bound.  This is the earliest backup that could have been
taken.  And the reason forensics can establish this is because
an old backup cannot possibly have new files.  A backup taken
on March 3, 2016, cannot contain files from March 4, 2016.
Those files haven't been created yet.  So if you have files
from March 4th, then you can establish that March 4th is the
lower bound, it is the absolute earliest backup that could have
been taken.

But, the reverse is not true.  A new backup can and
does contain old files, this is why upper bound can be

1    established.  If you have files from March 4th, they can come

2    from any backup on or after March 4th.  So a timing analysis

3    for version controlled backups is very limited.  It can

4    establish only a lower bound and in this case the lower bound

5    is March 3rd, 2016.  The data released by WikiLeaks could

6    originate from each and every backup from March 3rd, 2016 to

7    March 6, 2017.

8            I also want to talk to you just for a few seconds

9    about the document that the government keeps showing you, OK;

10   1207-27, 1207-30.  The document that indicates that March 3rd,

11   2016 Confluence backup was accessed on April 20th, 2016.  That

12   doesn't show it copied.  I don't know how many times they

13   showed it to you.  I think they showed it to every witness they

14   could find.  You know, we could have made this whole process

15   more fun by turning it into a drinking game when you take a

16   shot each time the government shows you 1207-27, although I

17   don't think you would be able to walk by the end of the day.

18           Let's just take a look at 1207-27 because what this

19   document does not tell you, it simply does not tell you who or

20   which work station is doing the accessing.  It doesn't tell you

21   that.  And you know they tried to fill that gap because David

22   Denton, in his opening statements, tried to get you to think

23   that March 3rd somehow had some significance to me and that is

24   why March 3rd was picked.  But Mr. Lockard did not even try to

25   explain why, on April 20th, a March 3rd backup is being taken.

1    Why isn't the April 20th backup taken?

2              There is nothing in the evidence to support any claims

3    that there was any significance at all to March 3rd because I

4    never mentioned this date.  There is no evidence of me

5    mentioning this date.  The only people who somehow think March

6    3rd is an important date are the prosecutors because it is

7    their mission to convict me.

8              Second -- and every single witness tells you this --

9    access, again, is not the same thing as copying.  Just remember

10   what the government's own witnesses told you, that the April 20

11   timestamp -- I remember they told you this, it stood out like a

12   giant red flag -- because it is the only entry where the

13   numbers in the right column do not match the numbers in the

14   left column.  Right?

15             So think about it.  I am a trained expert in stealing

16   computer information without leaving a trace, right?  That was

17   literally my job.  It is a job for which I won awards.  I even

18   wrote about it in the notebooks at MCC.  Why would I leave such

19   an obvious red flag?  You heard testimony that access times are

20   changed by a single command, a touch command.  Do you think the

21   CIA malware I write leaves time stamps like this when it steals

22   data from adversaries?  I wouldn't have a job for very long if

23   it did.

24             Go back to Mr. Leedom again.  Remember when I asked

25   him if he ever heard of something called a touch command?  And

1    he said a touch command is a command in Linux, it is a command

2    you can use to change file access times; a very short, easy

3    command to run.  And he agreed with me that malware sometimes,

4    what he called, time stomps files.  Do you remember that?  He

5    explained that malicious actors time stomp files when cleaning

6    up their activities to mask the fact that they accessed or

7    edited a file.

8         And you know from Jeremy Weber that I was an expert in

9    Linux and system administration.  Whenever the individual who

10   set up the Atlassian project leaves for an overseas assignment

11   who does he go to for help?  Out of all the developers at the

12   CIA he came to me.  So if I am really going to be stealing the

13   data on April 20th and all I have to do is use a simple touch

14   command to change the April 20 access time back to March 3rd,

15   2016, I could have, and it would have looked just like this.

16   That's your touch command.  Look at the day now.  That's a

17   simple touch command, it would have looked just like this.  The

18   timestamp on the right column would have matched the timestamp

19   on the left column with a simple touch command.

20        THE COURT:  Ladies and gentlemen, I think it is clear

21   from the slide itself but that is a modification of evidence

22   that is in the record just intended for argument and

23   demonstration purposes.  That obviously is not in evidence

24   itself.

25        MR. SCHULTE:  So why would I leave such a giant red

1   flag like this for investigators to find?  You know I wouldn't

2   have, and that's how you know it wasn't me who committed these

3   crimes.  And I want to take a minute here to point out a

4   fundamental contradiction in the government's theory when it

5   suits them.  When it suits them, they want you to think of me

6   as this careful, genius, cyber criminal who can cover up his

7   tracks at-will, and then there are other times when I am so

8   inept and such a bumbling data stealer that I am hunting in the

9   ESXi server looking in the wrong place and that's why I can't

10  find and delete VIclient files.  So which one is it?  Which one

11  is it?  Because you can't be both, right?

12          And do not for a minute believe that they have any

13  evidence that this information went directly from the CIA to

14  WikiLeaks.  They have never proven that to you and they have

15  never explained again why the March 3rd, 2016 backup file on

16  April 20th, 2016.  Nor have they explained why WikiLeaks, a

17  news organization who wants to publish leaked materials, why

18  they would wait a full year to release this information.  It

19  makes no sense.  It is far likelier that WikiLeaks received

20  this data at the end of 2016 into 2017.  And maybe Mr. Denton

21  will also explain to you why WikiLeaks waited almost a year and

22  not a week, like Mr. Leedom took, to discombobulate the

23  information.  A year.  Why would WikiLeaks wait a whole year to

24  release this information?  We will have to wait and see what he

25  says.

1           Before moving on, I just want to remind you that it is

2    up to you how much credence you give to each witness and you

3    should be careful in reviewing the government's tech expert's

4    testimony.  On one hand they presented you technical evidence

5    and on the other they testified as FBI agents; Berger worked

6    directly with the FBI and Leedom was an FBI contractor.  The

7    government did not go to the private sector and ask an

8    independent forensic analyst to conduct a review, they asked

9    one of their own to conduct a review.  In fact, think of the

10   difference in their demeanor on direct versus cross.  When the

11   questioning got tough, how did those experts react?  They don't

12   know, they just do what they're told.  That's not the role of

13   an expert analyst.  They don't sit around and take direction

14   from the government and make conclusions the government pays

15   them to make.  A forensic analyst is supposed to take the

16   initiative to perform all tests and analyses required, to set

17   out and test the hypotheses and document each step so another

18   scientist can confirm their result.  But, of course, that

19   didn't happen here.  They work for the government so there is

20   substantial bias in their testimony and you can tell when they

21   crossed the line when they present you with facts, forensic

22   artifacts and testable hypotheses, they are functioning as

23   experts.  But when they start speculating and they ask you to

24   take giant leaps without laying any technical foundation, when

25   they start making baseless conclusions, then they are

1    functioning as FBI agents and advocates for the government.

2         There are several examples of this that you have

3    already heard.  Mr. Leedom's expert presentation included a

4    slide of his forensic findings that we already went through in

5    which he concludes the March 3rd, 2016 Confluence backup file

6    was accessed, not copied or accessed by me.  These are forensic

7    findings he made as an expert witness.  However, when he states

8    belief that I am guilty, that's the testimony of an FBI

9    government advocate.  The same with Mr. Berger.  Although

10   Mr. Berger admits there are no forensic artifacts and not a

11   shred of evidence, forensic or otherwise, that I ever

12   transmitted anything to WikiLeaks, he states his belief that I

13   am guilty.

14        Again, this is testimony of an FBI government

15   advocate, not an forensic expert, so when reviewing the expert

16   testimony you should look for what the basis is for the

17   testimony.  Is there forensic data references?  Forensic

18   artifacts?  A repeatable test?  If not, then you should ignore

19   their testimony.

20        So you might be asking yourself now, OK, if it wasn't

21   you, then who was it?  I just want to take a minute to remind

22   you it is not our job to solve this puzzle.  It is not our job

23   to solve this crime.  It is not my job and it is certainly not

24   your job, that's the government's job.  We are not the FBI, we

25   are not in the business of accusing, we do not bear the burden

1   of indicting and proof.  So what did the government's

2   investigation uncover?

3           The FBI learned from working with the CIA, day in and

4   day out over a period of five years, that the CIA's DevLAN

5   network was highly insecure; there were no access controls,

6   there were no user controls, user shared passwords, passwords

7   were weak, passwords were stored openly, there were no audit

8   logs, there were no login activity checks, anyone could connect

9   their DevLAN work station computer to the Internet just by

10  taking the cable from one computer and plugging it into the

11  other.  I mean, think about how crazy this is.  You just swap

12  out the cables in the back and instantly all the classified

13  information is connected to the Internet.  It could be

14  transmitted without leaving your desk.

15          You have Dave making all these copies of Stash and

16  Confluence and storing them in public locations.  Do you recall

17  that?  The OSB test repo and a live Confluence system, no

18  access controls.  Dave even loses a hard drive with a copy of

19  Stash.  You know, there is simply no accountability.

20          Special Agent Evanchec told you that nearly every

21  witness he interviewed described DevLAN as the wild, wild west.

22  Why?  Why use that phrase?  Because it tells you the system is

23  not locked down.  Nearly ever CIA witness told you this.  You

24  know that people on DevLAN shared passwords and not only do

25  they share passwords, they were extremely weak and simple

1    passwords.  What does that do?  It made it impossible to

2    account for who was using the password and, again, it left the

3    system vulnerable.

4         Take a look at the WikiLeaks task force report

5    GX- 5001.  They tell you, they confess and they say we cannot

6    determine the precise scope of the loss because DevLAN did not

7    require user activity monitoring or other safeguards that exist

8    on our enterprise system.  These are not the defense's words,

9    these are the words of the CIA.  Day-to-day security practice

10   had become woefully lax.  Most of our sensitive cyber weapons

11   were not compartmented.  CIA admits the user share system

12   administrative level passwords.  There were no effective

13   removable media controls.  And, historical data was available

14   to users in definitely.  This is all in their exhibit.  It goes

15   on to tell you the stolen data resided on a mission system that

16   lacked user activity monitoring, it lacked a robust server

17   audit capability.  And then it says the CIA did not realize the

18   loss had occurred until a year later when WikiLeaks publicly

19   announced it in March of 2017.  Had the data been stolen for

20   the benefit of a state adversary and not published, we, the

21   CIA, would still be unaware of the loss.

22        So why is this important?  The bottom line is this:

23   Because the system was insecure, because the system was poorly

24   monitored, the government cannot know and it certainly cannot

25   prove to you which of the many people with access to this

1    information committed this crime, when they committed it, or

2    how they did it.  And they haven't even touched upon foreign

3    adversaries, nation states, non-state actors, they haven't even

4    touched upon any of that.

5         Think about it this way.  It is like your home.  If

6    hundreds of people have a key to your home, if you leave the

7    door open, if you leave your windows open, you always leave

8    your door and your windows open and unlocked, can anyone just

9    come in and at any time that they want, take your stuff, walk

10   out with it, and you would never know it was gone until you

11   needled to use it again.  You wouldn't know who stole something

12   from your house if you left your house that unlocked.  And you

13   know who else doesn't know?  The CIA doesn't know.

14        And it wasn't just DevLAN in general that we are

15   talking about that was insecure.  We already went through the

16   access controls on Altabackup.  Mr. Leedom claims those access

17   controls were lost, he has no idea what they were, but based on

18   the set of security on DevLAN it should be clear that there

19   were many ways to -- the backups.  So if DevLAN and Altabackups

20   are not properly protected, what does that mean to you?  You

21   already know this because you have been here with me for three

22   weeks.  You know what it means.  It means that all 200 people

23   on DevLAN had access and could have committed this crime.  If

24   that many people had the access and ability to commit the

25   crime, that is reasonable doubt.  And even if there were access

1    controls, who were the people who used DevLAN?  They were all

2    trained CIA hackers with access to all the malware they've ever

3    developed at their fingerprints.  These are people trained to

4    steal data without leaving a trace.  This is CIA malware that

5    cannot even be detected by anti virus software, malware that

6    cannot be identified by people like Mr. Leedom who are trained

7    forensic examiners.  Even if there were any access controls on

8    DevLAN or any of the other data, you would just need to pull

9    off malware that has already been written, software that's been

10   around for years, and then run that malware on DevLAN to

11   exploit it and take what you want.

12          So once again, since all 200 people on DevLAN had

13   access to malware that could break into DevLAN itself and the

14   ability to commit the crime, that is reasonable doubt.

15          Let's not forget that there are spies working for

16   other countries who are trained to do exactly the same thing.

17   We are not the only people who have a monopoly on this skill

18   set.  And the other side can do to the CIA exactly what the CIA

19   does to them.  This is just common sense.  Foreign intelligence

20   services want access to classified U.S. computer systems and

21   documents just as the CIA wants access to classified documents

22   from other countries.  There were also venerabilities outside

23   DevLAN itself.  Let's take a look at the offsite backup.

24          The offsite backup is a storage location outside of

25   the CCI office that contains all the data from DevLAN.  The

1    government mostly ignored the offsite backup.  Neither expert

2    has even been to the site and they provided zero forensic

3    evidence from the offsite backup in their presentations.  What

4    was the process for transmitting this data to the offsite

5    backup?  Was it electronically?  Was it hand-carried?  Was it

6    exploitable?  The government gave you no evidence.  Who has

7    access to this DevLAN data from the offsite backup?  What are

8    the access controls there?  How many people have access?  The

9    government never says.  Why couldn't WikiLeaks receive a copy

10   of the data from this site?  It is the same data.

11        Let's talk about the Hickok Jira connection.  Again,

12   the government completely ignores this but EDG's DevLAN network

13   is connected to COG's network through Hickok, and Jira sits on

14   Hickok and Jira mounts the Altabackups.  So, someone from EDG

15   or COG just needs to access Jira and they can access all the

16   CIA backups to the Altabackups.  Did the government even

17   conduct an investigation into Hickok or the COG network?  They

18   did not.  Neither expert knew anything about Jira, Hickok, or

19   COG.  Neither expert had reviewed or accessed any of those

20   networks.

21        The government either did not even conduct a full

22   investigation or chose not to call the witnesses who did.  I

23   mean, think about this.  It would be just one slide -- one

24   slide -- with the access times of the backups from the offsite

25   backup, one slide detailing the security of these other

1    networks and why it could not have come from them instead of

2    the Altabackups, but these experts the government showed you

3    didn't even conduct investigations into these sites.  So who

4    did?  Did anyone?  You have no idea.  I have no idea.  If

5    someone hacked the servers at the offsite backup site and sold

6    the backups from there, how would the government know?  If

7    someone from COG hacked the Jira server, accessed DevLAN and

8    stole the backups how would the government know?

9           These are not crazy speculative theories, these are

10   the first steps in an investigation.  Step one, how many places

11   contained the data released by WikiLeaks?  Step two, who had

12   access to these places?  Step three, what were the securities

13   policies?  Step four, forensic examination.  Once you eliminate

14   a site you go to the next one.  These experts all testified

15   that the data must come from DevLAN, specifically to

16   Altabackup, but why?  What is their basis for that

17   determination?  If they testify -- they testified they never

18   even reviewed the other sites so how can they make such a

19   conclusion?

20          The government does not have a shred of proof for any

21   of these espionage charges.  So what do they give you?  They

22   focus over and over and over again on the MCC evidence and they

23   focus on my writings.  And they seem to think that these

24   writings will take the place of actual proof of theft on the

25   WikiLeaks charges.  But these prison charges are the equivalent

1    of the sacrificial bunt in baseball.  The government knows they

2    have no chance to convict on these charges but they use the MCC

3    counts to present you with private personal prison notebooks

4    and statements I wrote therein.  The whole point is to show you

5    videos of me in prison to humiliate me, vilify me, dirty me up

6    and make me seem like a bad person.

7            Now, if you were falsely accused of a crime and

8    incarcerated for years pretrial, isolated from your families,

9    friends, and life itself, you may have acted differently.  But

10   I'm not accused of smuggling cell phones into MCC, of using

11   cell phones at MCC, of using drugs at MCC, or anything like

12   that.  I'm accused of transmitting national defense information

13   from prison.  And you will soon see how absurd these

14   allegations are and recognize the sacrificial bunt as the dirty

15   play that it is, a way for the government to kick a man while

16   he is down.

17           MR. DENTON:  Objection.

18           THE COURT:  Sustained.

19           MR. SCHULTE:  So what kicked off the event that the

20   led to the MCC charges?

21           The evidence shows you that there are many cell phones

22   in the MCC.  Mr. Betances told you that I went and exchanged an

23   iPhone for an Android with another inmate.  Cell phones abound.

24   They are everywhere at the MCC.  But when the government learns

25   that I have access to a cell phone from the MCC, what do they

1   do?  They shut down the MCC and send in 50 trained FBI agents

2   to find that cell phone.  And why do they do this?  United

3   States government is terrified of the highly sensitive national

4   defense information that I retain in my head.  I worked for the

5   NSA and the CIA for years developing, testing, and assisting in

6   the deployment of cyber operations around the world.  I have,

7   to this very second, knowledge and information that can cause

8   substantial damage to the United States.  Had I wanted to harm

9   the United States isn't that the information that I would set

10  loose into the world?  Isn't that the information that I would

11  threaten to post on Twitter?  Isn't that the information that I

12  would e-mail Shane Harris?  But in the hundreds of pictures and

13  videos taken by Mr. Betances, there was not a single classified

14  document or any illegal activity at all aside from the cell

15  phone itself.

16          In the government's shakedown what do they uncover?

17  What did those 50 FBI agents find?  What was I doing with cell

18  phones at the MCC?  More of the same.  I was drafting articles

19  critical of the criminal justice system.  I was fighting my

20  case, the charges against me.  Evidence will show, through the

21  notebooks and evidence collected through electronic search

22  warrants and subpoenas, that I viewed my incarceration in a

23  federal prison just like any convicted inmate, to be an

24  egregious violation of that social contract created and signed

25  by Convention in 1787.

1    So let's look at what I sent Shane Harris.  I sent him

2   a copy of the government's search warrant.  Why?  What is this

3   trial going to show you?  I was trying to get him to write

4   about my innocence.  I wanted his help, his audience, his

5   reach.  I wanted to prove my innocence.  Remember, by now, I

6   had been in jail for over a year already.

7    So let's look at these writings.  You have them in

8   evidence.  I am clearly deteriorating at this point.  Prison is

9   not a nice place.  It is not a place that anybody wants to be

10  so compare, compare my prison writings to the way I write at

11  the CIA and you can see I am coming apart.  In fact, you can

12  see multiple times where I am talking about using drugs in the

13  notebooks, particularly when you see what the government

14  references as draft Tweets.  The evidence shows that these are

15  not reel Tweets or even planned Tweets, this is a re-counting

16  of a man's hallucinations.

17   What does the government want you to believe about

18  these writings?  The government wants you to believe this is

19  some kind of planned army-like information war against the

20  United States.  Just compare what the United States wants you

21  to think about as this information war and what the information

22  war actually is.

23   Let's just take a look at the titles:  Presumption of

24  Innocence.  A Petition for Redress of Grievances.  A Loss of

25  Citizenship.  Do You Want to Play A Game?  Detention is not

1    Punishment.  Guilty Until Proven Wealthy.  Can You Afford To Be

2    Accused.  A Proposed Solution Origin.  Does this sound like a

3    battle plan?  Is this what he called a battle plan?

4          So what did the trial evidence actually tell you about

5    the MCC conduct?  My focus here is not about anything other

6    than trying to prove that I am an innocent man sitting in jail.

7    That's what the plan is, right?  I want to get out because I am

8    innocent.  I want a chance to fight my case from outside, to be

9    with my family.  So what do I do?  Yes, I use a cell phone, a

10   cell phone that was smuggled in, and I used it to try and get

11   my story of innocence out to the Washington Post.  I tried to

12   get it to the Washington Post and to anybody else who will

13   listen.  And that is what I do with the search warrants.  I

14   write out why I believe the search warrants are false and that

15   is what I am trying to get out.

16         And look, I'm not going to stand here and tell you

17   that using a cell phone in a prison is right.  It's not, it's

18   against the rules.  Did I use a cell phone?  Yes, but that's

19   not what I am charged with.  I am charged with far more serious

20   crimes here and they have no proof I committed those crimes

21   which is why they're so focused on the MCC conduct.  They want

22   you to focus on the MCC conduct because that is the only way

23   they think they can get you to believe I committed the

24   WikiLeaks offenses.

25         Just for a moment, take a look at what I say.  Take a

1    look at what I say in these articles and just for a moment take

2    a look at Malware of the Mind.  See if this is what you would

3    have in your head if you are trying to betray your country.

4    What does it say?  Today we are facing a stealth constitutional

5    crisis.  A Malware of the Mind has entered and corrupted the

6    justice system.

7            What am I talking about?  I am talking about the

8    justice system.  Again, from there I go on to talk about the

9    justice system in the context of technology, how the law does

10   or does not progress with technology and how these prosecutors

11   and FBI agents, with very little knowledge of forensics are

12   deemed experts.  I am talking about how wrong this is, how

13   somebody who has no real expertise and so trusted to defeat the

14   presumption of innocence it is in this context that I talk

15   about my work at the CIA.  And what I say in this document is

16   too generic to even be classified.  No CIA witness even told

17   you this information was sensitive let alone classified or

18   national defense information.  In fact, the government did not

19   even ask a single witness from the CIA whether this information

20   was classified.

21           So let's go back to Exhibit 801 and take a look at the

22   contents of this.  Introduction, transcripts, certainly not

23   part of a battle plan.  Right?  Search warrant, not part of a

24   battle plan.  The complaint, not a battle plan.  Ethics and

25   logical look at the charges, tyranny, conspiracy, and

1   conclusion.  It is not a battle plan.  This is a man talking
2   about the constitutional system and how it works -- how it
3   works and how it hurts an innocent person if you are sitting in
4   jail.

5           From here I will stage my information war: and then I
6   clearly define what that information war is.  Facebook, I will
7   rename simply who is John Galt or who is Josh Schulte.  That is
8   not a battle plan.

9           And then I tell you I'm going to put this up on
10  Wordpress.  And then I put it on Wordpress.  What am I talking
11  about?  What does the trial evidence show you?  I am talking
12  about my innocence.  I am talking about anything other than my
13  innocence.  The Wordpress I titled the Presumption of
14  Innocence.  The website is named PresumptionofInnocence.net.
15  Do you think anybody would want to know about my opinions about
16  the presumption of innocence?  Of course not.  No one actually
17  cares but that's what I am focused on.  It has nothing to do
18  with destroying America or having a battle plan of any sort.

19          This is what they have given you because they have no
20  evidence that I stole anything from the CIA.  Go back and look
21  at my words and the notebooks.  These are the words, the
22  thoughts, the thoughts about a criminal justice system that has
23  nothing to do with anything else.

24          And Mr. Betances adds nothing to this testimony.  I
25  want you to just think about Mr. Betances for two seconds.

1    Like me, Mr. Betances is in prison.  It is the prosecutors who

2    hold his life in their hands.  They want him to testify a

3    certain way and if he does so, he can get released from prison

4    and a visa to live here in the U.S.  So of course he tells the

5    prosecutors that he heard a few words from me:  WikiLeaks,

6    Russia, information war.  This is what they want him to say and

7    he knows it.  But, at the end of the day, Mr. Betances just

8    wants the same thing as the rest of us.  He wants to be free

9    and enjoy the precious few years he has on this earth.  He is

10   just telling the prosecutors what he knows they want to hear so

11   he can get back to his family and his life.

12          And with that, I'm on my final section.  Now I want to

13   go through the formal charges and help you sort out the facts.

14   The indictment has nine charges, nine crimes, and as you hear

15   from Judge Furman, there is a nice checklist, so to speak, to

16   help you decide my fate.  Each count has a number of elements,

17   it works like an AND gate.  In order to convict you need to

18   find guilt beyond a reasonable doubt for each element.  So that

19   means as soon as you find the government failed to prove any

20   element beyond a reasonable doubt, then you must stop there and

21   find me not guilty.  You do not even need to look at the other

22   elements.  So, as we go through the elements for each count, I

23   am going to highlight the easiest elements that the government

24   failed to establish so if you start with those, I think you can

25   finish up your deliberations quickly.

M775sch4                    Summation - Mr. Schulte

1              Count One charges me with illegal gathering of
2     national defense information.  It has three elements but I'm
3     going to focus on the first one, taking information.  The
4     government did not even come close to proving this element of
5     Count One.  They have not answered these very basic questions:
6     How was it taken, what was it copied to, and when was it taken.

7              Now, let's not forget the first hour or so we spent
8     going through all the reasonable doubt here.  Remember, they
9     never presented to you a copy command, they never presented to
10    you media it was copied to, a network speed, an explanation for
11    how I can copy something from the bathroom, the transcript
12    files that I generated.  But that's not all the reasonable
13    doubt.  Recall all of the different possibilities that the
14    government's forensic experts fail to eliminate.

15             The government did nothing to assuage your concerns
16    about other possible places or origins or suspects.  Overall,
17    the evidence is clear that I did not take any CIA backups and
18    the jury should find me not guilty on Count One.

19             Count Two charges me with illegal transmission of
20    unlawfully possessed national defense information.  It has
21    three elements, I'm going to focus on the first and the last.
22    Because you just found that I did not take the CIA backups, I
23    therefore could not possibly possess them and both FBI Agent
24    Evanchec and Mr. Berger did not find a single backup or any
25    classified or national defense information from my home.

1    That's it.  Once you find the government failed on a single

2    element you can move on.  But in case you are not convinced,

3    element three easily fails as well and for similar reasons.

4            The government did not present to you a single

5    forensic artifact that I transmitted anything to WikiLeaks.

6    And remember those NetFlow logs?  The government asked my

7    Internet provider Verizon for those logs, it has had them for

8    years, logs that if I were guilty would show connections to

9    WikiLeaks and transfers of 200 gigabytes during May of 2016.

10   But did they show that?  The government's expert didn't even

11   testify about them.  Overall, the evidence is clear that I did

12   not transmit any CIA backups to WikiLeaks and the jury should

13   find me not guilty on Count Two.

14           (Continued on next page)

1      MR. SCHULTE:  Count Three charges me with illegal

2    transmission of unlawfully possessed national defense

3    information from prison.  Specifically, the indictment charges

4    me with disclosing information about internal computer

5    networks; namely, Hickok.  I'm going to focus on the second and

6    third elements here.

7      Count Three is based exclusively on this email.  As

8    you can see, the purpose of this email is to highlight and

9    argue that the FBI's initial search warrant in this case was

10   unconstitutional.  Government Exhibit 812 is a 13-page document

11   with the search warrant attached.  And if you review the full

12   document in context, you can see the point of the email is to

13   go through and challenge the search warrant line by line.  The

14   point is not to disseminate sensitive information.

15     Do you recall the stipulation by the government about

16   the information I retained in my head after leaving the CIA?

17     The government recognizes that I retained NDI that

18   would be extremely damaging to national security.  You see no

19   attempt to do so in this email, an email focused exclusively on

20   my case and in particular the search warrant.  As the trial

21   evidence shows, there is clearly no intention, belief, or

22   indication that these two clauses are sensitive, let alone

23   classified or national defense information and.  This is

24   important for both elements two and three.

25     If the information is not NDI, then element two fails.

And as for element three, the government must prove beyond a

reasonable doubt that this information was willfully

communicated; that a transmission occurred willfully to do

something the law forbids.  But you can tell from the context

alone there is no willful attempt to violate the law.  If the

information is not believed to be unlawful NDI and not so

willfully communicated, then you must acquit.

But first let's drill down into Hickok.  As you can

see, this email was sent on September 24, 2018, or 18 months

after WikiLeaks already published information about Hickok,

EDG, and DevLAN.  The government even stipulated to these

facts.  It is not disputed that WikiLeaks published this

information on the internet.  If you compare the statement that

the government claims to be classified with what WikiLeaks

published on the internet, you will see that I said nothing

more than what was already out there.  I did not endanger

national security or expose national defense information.

Furthermore, all the CIA witnesses testified that

DevLAN was shut down right after the leaks.  If DevLAN was shut

down, Hickok must've been shut down too, or at the very least,

no longer worked since it required access to DevLAN.  Its

exposure by WikiLeaks also strongly suggests it was no longer

used.  So how can it relate to the national defense -- how can

I expose national defense information when the CIA is not even

using it anymore?

1          If someone publishes a book about the networks the CIA

2     used in the 1950s, is that national defense information?  Of

3     course not, the CIA no longer uses them.

4          Next, the government did not put a single CIA

5     expert -- the government did not put on a single CIA expert

6     classifier.  Not one.  There's no evidence in the record that

7     this information is even classified.  And while classified

8     information is not necessarily national defense information,

9     documents marked unclassified cannot possibly be national

10    defense information.  In fact, the evidence in the record shows

11    that the CIA provided me the Hickok user's guide when I worked

12    there, which they labeled as unclassified.  The CIA cannot tell

13    its employees something is unclassified and then charge them

14    with a crime for talking about it.  That's absurd.  And the

15    government showed you absolutely no evidence that Hickok was

16    ever labeled classified or otherwise communicated to me as

17    something that was classified.  So how could I possibly believe

18    it to be so?

19         So, there's a trifecta here proving my innocence of

20    this crime.  Hickok is very clearly not closely held by the

21    government and does not pertain to the national defense and,

22    therefore, is not national defense information.

23         The government's also trying to claim that my

24    statement that 200 COG employees was national defense

25    information.  I leave this up to you and Judge Furman as to

1   whether or not you can even consider this, since the indictment

2   clearly limits Count Three to information about CIA internal

3   computer networks, not the number of personnel.  Regardless, my

4   statement about 200 COG employees is not national defense

5   information.  As an initial matter, the trial evidence makes

6   clear that I did not have any need to know how many people

7   worked in COG.  The trial evidence makes clear that I would not

8   have any idea how many people actually worked in COG.  The

9   government has not identified for the jury that the size of COG

10  was 200 people, which they must in order to prove the

11  information is NDI.

12          If I say the U.S. government keeps aliens locked up at

13  Area 51, the government cannot arrest me and charge me with

14  disseminating NDI, since this is false, to my knowledge.  The

15  government cannot closely hold false information, and false

16  information is not related to the national defense.

17          The government also failed to establish that I was

18  ever briefed on the number of people in COG or that I was told

19  this information was classified.  In fact, as noted with

20  respect to Hickok, the government did not present a single

21  expert classifier to testify that this information was ever

22  classified.  The failure of any of these things requires

23  acquittal.

24          And it's clear from the record where the number 200

25  comes from.  The unclassified search warrant claimed that there

1  were 200 employees in EDG.  It is, therefore, a logical,

2  reasonable inference that COG, another group in CCI, contained

3  the same number of employees as EDG.  Regardless, if you look

4  at the context of GX812, the point of this was to stress that

5  there was an entire group that had been left out of the search

6  warrant, twice as many possible suspects.

7          Next, because the trial evidence clearly shows I had

8  no reason to suspect, let alone believe, that this statement in

9  the email was NDI, there can be no willful transmission; the

10  jury should find me not guilty on Count Three.

11          Count Four is the attempt charge from MCC.

12          This count has the same three elements as Count Three,

13  substituting element three's transmission element with an

14  attempted transmission.  Specifically, the government claims

15  that I attempted to disseminate national defense information by

16  writing information in my private notebooks that I labeled

17  attorney-client privilege and never released publicly.

18          I'm going to focus on the second and third elements,

19  and Count Four is based exclusively on GX801 and GX809.  So

20  let's start with Government Exhibit 801.

21          First of all, is this NDI?  Check your trial

22  transcripts.  The government does not even ask a single CIA

23  witness whether this information is classified: Not Mr. Weber;

24  not Mr. Leonis; not Mr. Stedman; not Mr. Roche -- no one from

25  the CIA.  This information is clearly written very generically.

1    What basis exists to believe this information is even

2    classified, let alone NDI?

3           None.  The government has not even tried to prove this

4    beyond a reasonable doubt.

5           And what about the attempt?  Was there ever an attempt

6    to disclose Malware of the Mind.

7           Defense witness Hannah Sotnick testified about this

8    document.  She told you it was given to her in April or May --

9    in April of 2018, and she gave it to my attorney.  The trial

10   evidence shows it was never publicly disclosed.  Agent

11   Schlessinger testified to that, and there were also multiple

12   pages in the notebooks -- there were also multiple pages in the

13   notebooks to rewrite this document.  The government

14   cherry-picked page 84 out of 146 and claimed that this page was

15   somehow written to harm the United States.

16          And how is that possible when it was never even

17   released?

18          April 2018 through October 2018 and not once ever was

19   the document disclosed.  And the record is clear that there was

20   no attempt to release it.  There is no substantial step taken.

21   I mean at the very least, the first 83 pages must be disclosed

22   before we even get to this page, and not a single full page was

23   ever disclosed.

24          Next, the government claims that the supposed tweets

25   about Bartender is also NDI that I attempted to disclose.  As

1    an initial matter, the information at issue here is not NDI.

2    The tool described in the vendor report is, in fact, Bartender.

3    It's too generic to be national defense information.

4    Additionally --

5              MR. DENTON:  Objection, your Honor.

6              THE COURT:  Ladies and gentlemen, I'll give you

7    instructions on what constitutes national defense information.

8    As I said before, it's my instructions that govern, and to the

9    extent that either party states anything that is inconsistent

10   with my instructions, you are to follow my instructions.

11             Go ahead, Mr. Schulte.

12             MR. SCHULTE:  Additionally, Bartender was previously

13   exposed before WikiLeaks exposed it a second time, at which

14   point the CIA halted all operations.  Due to WikiLeaks,

15   Bartender, like DevLAN, was shuttered long before I ever ended

16   up writing notebooks at the MCC.  But most importantly,

17   WikiLeaks specifically exposed Bartender nearly 18 months

18   before I wrote about it in my notebooks.

19             And I'd just note for the jury this is a substitution

20   that the judge approved for the transcripts.

21             Mr. Weber expressed his concern with my statement

22   about Bartender.  In his opinion, the statement is classified

23   because it points to an operator being witting to the usage of

24   the tool.

25             However, Mr. Weber then concedes that the Bartender

1   document exposed by WikiLeaks would have made the exact same

2   statement.  So that's it.  Even if the statement were found to

3   be classified, it cannot possibly be NDI since it was released

4   publicly all over the internet in March 2017, eight months

5   before I wrote about it in my notebooks at the MCC.

6           And finally, once again, Mr. Weber is not a

7   classification expert.  The government did not call a single

8   classification expert.  So there is absolutely no credible

9   evidence in the record to support the conclusion that these

10  generic statements about Bartender, a tool exposed not only by

11  WikiLeaks but also years before, was ever classified, let alone

12  NDI.

13          And what about the attempted transmission?

14          Well, you need not even consider that, since the

15  Bartender information is not NDI.  But even so, there was

16  clearly no attempt to disclose this information publicly.

17          What evidence is in the record regarding the supposed

18  Bartender tweets?

19          They were never posted online, either on the Twitter

20  account or on the Buffer account as a planned tweet.  There was

21  never a plan -- there was never any disclosure or any plan to

22  disclose them, which brings me to my next point -- argument.

23          According to the government, despite no such evidence

24  in the record, the heroic FBI swooped in and stopped me from

25  posting these tweets or Malware of the Mind on the internet.

1    Right?  That is the government's argument.  But then, even

2    though this information was never published on the internet,

3    the government then publicly disclosed it here at trial so it

4    could charge me with a crime.  Yet according to Mr. Weber, the

5    CIA would never deliberately disclose sensitive national

6    defense information.

7              Think about it.  If I wrote about something that could

8    actually endanger national security operations or something

9    like that, would the CIA deliberately --

10             MR. DENTON:  Objection, your Honor.

11             THE COURT:  Ladies and gentlemen, the government is

12   not on trial here, and its decisions about what to charge

13   Mr. Schulte with and what it had to disclose or reveal publicly

14   in order to charge him with that are not on trial or your

15   concern either.  Your concern is solely whether the government

16   has proved beyond a reasonable doubt the crimes with which

17   Mr. Schulte is charged.

18             Mr. Schulte, you may proceed.

19             MR. SCHULTE:  Indeed, the fact that the government did

20   not call a single classification expert lends substantial

21   weight behind this argument.  The information in Count Four was

22   simply not NDI.

23             THE COURT:  And let me say one additional thing.

24             The question that you'll be asked to decide is whether

25   the information qualifies as national defense information at

1    the time, not today at trial.  It's not today that is relevant

2    for your consideration.

3            Go ahead.

4            MR. SCHULTE:  Accordingly, the jury should find me not

5    guilty of Count Four.

6            Count Five charges me with unauthorized access to a

7    computer to obtain classified information, particularly the CIA

8    backups.  Count Five is essentially a combination of Counts One

9    and Two and has similar elements.  Count Five has a total of

10   four elements, none of which the government proved beyond a

11   reasonable doubt.

12           The government did not prove beyond a reasonable doubt

13   that I ever accessed the Confluence VM.  There were no forensic

14   artifacts of a log-in to the Confluence VM or any command sent.

15   The snapshot and reversion of the Confluence VM does not

16   constitute access.  These are authorized commands of an ESXi

17   system administrator.  These are the equivalent of performing

18   physical maintenance to the outside of the machine -- power on,

19   power off, etc.

20           Next, because I did not obtain or copy the CIA

21   backups, the government failed to prove beyond a reasonable

22   doubt that I ever obtained protected information.  The

23   reasonable doubt for this element is the same as I discussed in

24   Count One, and for the same reasons I'm not guilty on Count

25   One.  I'm also not guilty for Count Five.

1          And finally, the government failed to prove beyond a

2     reasonable doubt that I ever transmitted any CIA backups.  The

3     reasonable doubt for this element is the same as that discussed

4     in Count Two, and for the same reasons I'm not guilty in Count

5     Two, I am also not guilty for Count Five.

6          Count Six charges me with unauthorized access of a

7     computer to obtain information from a department or agency of

8     the United States.  It's essentially charging me with the same

9     thing as Count Five.  It only has three elements, each of which

10     is also contained or similar to those in Count Five, which the

11     government failed to prove beyond a reasonable doubt for the

12     same reasons, and we won't go into that analysis here.  The

13     jury should find me not guilty on Count Six.

14          Count Seven charges me with causing transmission of a

15     harmful computer program, information, code or command by

16     executing a snapshot-reversion on the Confluence virtual

17     machine.  It has four elements, none of which the government

18     proved beyond a reasonable doubt.

19          The government has and will continue to try to argue

20     that I lied to my management about not deleting my key to the

21     ESXi server.  However, the email I sent about revoking my keys

22     was only for the Atlassian servers.  It clearly has nothing to

23     do with the ESXi server or other system administration, and

24     this is the interpretation of both Mr. Leonis and Mr. Weber.

25     It clearly has nothing to do with the ESXi server or other

1    system administration.

2            Furthermore, I later send an email to Leonis,

3    informing him about my accesses to the ESXi server.  So even if

4    the previous email was vague about what accesses I retained,

5    this email was crystal clear.  I tell Leonis about my accesses

6    and request their transfer.  Leonis does not ask me why I still

7    have server access.  He does not say I thought you destroyed

8    your key to that server.  He says nothing like that.  In fact,

9    I don't think it's in evidence that he ever responds.

10           Furthermore, I continued to administer the ESXi server

11   until I resigned.  My access key even remained on the ESXi

12   server after I resigned -- from November 2016 until the FBI

13   seized it in March of 2017.  And according to Mr. Weber's

14   testimony, he was not a Linux administrator.  So who was left

15   to administer the server?

16           And the reason the government will try so hard to

17   convince you I lied or hid back-door, secret accesses to the

18   ESXi server is because that root server key authorized me to do

19   anything.  The trial evidence clearly shows that as a primary

20   system administrator with the sole root access key and the

21   individual who literally owned the server, according to CIA

22   accountable property, I had both the ability and authority to

23   execute any command.  The CMI property holder is like the title

24   to a house, and the root server key is the keys to the front

25   door.  For all intents and purposes, I was the owner and

1    accountable property holder.  There was no hacking, stealing,

2    or subversion, I literally logged in to the computer with my

3    key.  Regardless, performing system snapshots and reversions

4    are not harmful computer commands.  This is not a virus or

5    malware.  It's literally routine maintenance.  This is like

6    saying getting a routine oil change constitutes theft.  It just

7    makes no sense.

8           Next, the government did not even remotely show any

9    intent to damage or deny a service to a computer.  These are

10   normal ESXi commands.  Each step of the process is required.

11   The initial snapshot on April 20, 2016, was required to

12   preserve the state, to save all the data on that server between

13   April 16 and April 20, 2016.

14          Next, the trial evidence shows the reversion was

15   typical system administration and maintenance.  Reverting the

16   system to April 16, 2016, did not cause any damage because the

17   April 20, 2016, snapshot saved the data.

18          Next, the reversion back to April 20, 2016, was

19   absolutely required.  The government makes it sound as if the

20   purpose of this final reversion was to erase all records on the

21   computer during that time.  That's simply not true.

22          Think about it.  What was going to happen to all the

23   data that was created or modified in Confluence between April

24   16 and April 20, 2016?

25          If I left the system on April 16, that data would be

1    irrevocably lost.  It was absolutely critical to execute a

2    final reversion to restore this data.  Failing to do so would

3    constitute harm to the system by losing this data.

4           Finally, the reversion could not have possibly caused

5    any damage to Confluence VM itself, since there was no log-in

6    or access of the Confluence VM during the reversion period.  So

7    ultimately, there was no damage to the Confluence VM.  It was

8    left in the exact same state, when it all started, that April

9    20, 2016, snapshot.  A reversion is essentially like losing

10   changes in a file that you close without saving.  That's what

11   happened here.  So if there are no changes to that file --

12   *i.e.*, no log-ins or access to the Confluence VM -- then there

13   is nothing wrong with closing the file without saving it; *i.e.*

14   reverting.  And as previously noted, this final reversion was

15   necessary to preserve the modified data between April 16 and

16   April 20, 2016.

17          Simply put, the government did not establish there was

18   any damage to the Confluence VM caused by the reversion.

19          Finally, the government does not even present any

20   evidence to support final element: harmful consequences.

21          What were the harmful consequences of the

22   snapshot-reversion?  Did it disrupt the commuter system used by

23   national defense?  How could it when the system resumed

24   normally from the April 20, 2016, snapshot?

25          There's no email in the record of anyone raising any

1  alarms about this.  The government simply did not even attempt

2  to prove element four.  The jury should find me not guilty on

3  Count Seven.

4          Count Eight also charges me with causing transmission

5  of a harmful computer program, information, code, or command,

6  but this time for deleting log files on the ESXi server.  And

7  likewise, the government failed to prove all four elements

8  beyond a reasonable doubt.

9          As we've already seen, the root server key allowed me

10 to perform any function on the ESXi server.

11         Next, there is no evidence in the record at all that

12 there was any intent to damage the ESXi server.  Additionally,

13 there's absolutely no evidence that deleting the log files

14 caused any damage to the system.  There is no evidence that the

15 log files contained viable data and were not corrupted, and

16 there's nothing the log files would have recorded that wasn't

17 already recorded through the transcript files found on my CIA

18 workstation.

19         Finally, like Count Seven, the government did not even

20 attempt to establish any harmful consequences from the log

21 deletions.  To the extent the government attempts to argue the

22 loss of the log files, it is not clear from the record that

23 those particular log files from April of 2016 would exist in

24 March of 2017.  Mr. Weber testified on direct that he typically

25 deleted old log files.  So even if the April 20, 2016, logs had

not been deleted, would the system administrators have deleted
those files in October of 2016, December of 2016, February of
2017?

The log deletion policy is not in the record, and the
government failed to establish that there were any harmful
consequences from the deletion of these files in April of 2016.
The jury should find me not guilty on Count Eight.

Finally, Count Nine charges me with obstruction of
justice.  It has three elements, and the government proved none
of them beyond a reasonable doubt.

With respect to element one, the government
established that Agent Evanchec issued me a subpoena at the
conclusion of our first conversation outside the Pershing
Square diner to appear before a grand jury on March 17, 2017.
But that's it.  The government did not establish the scope of
this procedure or that it continued to exist into June of 2017.

With respect to element two, again, the government
only established my knowledge of the proceeding after the
meeting at the Pershing Square diner ended and did not
establish that I knew this proceeding would or could extend
into June of 2017.

As to the third element, the government did not prove
that four of these statements were false, and the remaining
three implicate the OIG email that was later reclassified after
my initial classification of unclassified.  But the government

M77Wsch5                    Summation - Mr. Schulte

1    first failed to show how these statements about the OIG email,

2    which could not have even been communicated to the grand jury,

3    since they were quickly shown to be incorrect when the OIG

4    email was discovered in my apartment, hours later, were ever

5    delivered to the grand jury or how they could possibly obstruct

6    or impede the grand jury investigation.

7            The government also failed to show that these

8    statements were deliberately false as opposed to mistakenly

9    incorrect, particularly because the trial evidence shows that

10   Agent Evanchec did not identify the OIG email as the email I

11   labeled as unclassified, never presented me a copy or permitted

12   me to conduct a review at my apartment.

13           Finally, the record evidence is very clear that the

14   OIG statements were made before I was issued the grand jury

15   subpoena and, therefore, before I had any knowledge of the

16   proceeding.  The jury should find me not guilty on Count Nine.

17           Just go back, when Judge Furman is instructing you on

18   the jury charges, to the facts as they have come out, and you

19   will see that the government has failed to prove guilt beyond a

20   reasonable doubt.

21           Look, I'm going to sit down now.  My work is almost

22   done.  It's been three weeks of trial and a lot of evidence,

23   and my work is almost done and your work is just about to

24   begin.  So as you undertake this work, I ask you to ask

25   yourself about these witnesses.  Do I trust these witnesses?

1    Do I trust these people?  Do I trust the information they gave

2    me?  If I were your relative or your friend, is this the kind

3    of proof that would be enough?  Would you trust the evidence?

4            When you go back to deliberate, I ask you to please

5    think of all the gaps that the government is asking you to

6    fill.  Ask yourself why are there so many gaps that they want

7    me to say it has to be this and it has to be that.  It's not

8    your job to fill these gaps.  It's not your job to take the

9    assumptions that the government has given you.  They are not

10   evidence.  Do not do what they are asking you to do.  Do not

11   fill those gaps.

12           Your job as jurors is to put the government to the

13   task of proving guilt beyond all reasonable doubt, and that is

14   all I ask you to do.  After this, I won't be able to speak to

15   you again.  This is my one shot of telling you about all the

16   evidence that proves that I'm not guilty.  The government gets

17   to give a rebuttal.  The government gets one final chance to

18   stand up and answer everything that I have just said, and I

19   won't be able to answer back.  I just won't have the

20   opportunity.  But you will.

21           You know everything that I know, and no matter what

22   Mr. Denton says next, you will be able to answer that.  All you

23   have to do is say what would Mr. Schulte say in response to

24   this argument, and you will have the answer.  Because in three

25   weeks, you know all of it.  So I ask you, no matter what

 1    Mr. Denton says, ask yourself the four questions I asked you at
 2    the beginning.
 3          As I told you during my opening, all I ask from you is
 4    to grant me the presumption of innocence.  I ask that you
 5    realize how my life is in your hands.  I ask that you put
 6    yourselves in my shoes and treat me as you would like to be
 7    treated if you were here and I were there.  If you do this and
 8    go into the deliberations with an open mind, I am convinced you
 9    will reach the only possible verdict -- that the government
10    failed to prove beyond a reasonable doubt that I am guilty of
11    any crime because I am, in fact, innocent.
12          Then, hopefully, justice will be done and we can all
13    go home.
14          Thank you.
15          THE COURT:  Thank you, Mr. Schulte.
16          All right.  Ladies and gentlemen, first of all, this
17    is probably so obvious that it doesn't need to be said, but
18    I'll say it anyway.  Mr. Schulte's slide deck had a couple
19    clips from, I think, commercially released movies.  If I'm not
20    mistaken, one was Mission Impossible with Tom Cruise.  Suffice
21    it to say those are not evidence.  Those are movies.  He just
22    used them for demonstrative and argumentative purposes, and
23    that's fine.  I just want to make clear that they are not
24    evidence and obviously don't reflect what happened or didn't
25    happen in this particular case.

M77Wsch5

1          All right.  You've been paying careful attention, I've

2     seen, for quite a while now.  I know we've pushed through the

3     lunch hour.  I hope you guys had something to eat in the

4     earlier break.  So we will take a break now just so you can

5     stretch, eat some more, if you like, use the restroom, etc.

6     Let's take another half-hour break after which the government

7     will have an opportunity to give its rebuttal.  I will see

8     where we are at that point.  I think odds are pretty high that

9     we won't get to the instructions today, because I don't want to

10    begin them and then break in the middle for the day.  So we'll

11    see, again, where we are, but we may have to do that tomorrow

12    morning.

13          In any event, keep an open mind.  Don't discuss the

14    case.  Don't do any research about the case, and enjoy your

15    break.  It's 2:02 now, so please be ready at 2:30, and we'll

16    start as promptly thereafter as we can.

17          Thank you.

18          (Jury not present)

19          THE COURT:  You may be seated.

20          All right.  Mr. Schulte, that was very impressive,

21    impressively done.

22          MR. SCHULTE:  Thank you.

23          THE COURT:  Depending on what happens here, you may

24    have a future as a defense lawyer.  Who knows?

25          Anything to discuss?

M77Wsch5

1              MR. DENTON:  No, your Honor.

2              THE COURT:  Mr. Schulte, anything for you to discuss?

3              MR. SCHULTE:  No.

4              THE COURT:  All right.  I'll see you, and please be

5    back at 2:30.

6              Thank you.

7              (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M775SCH6

 1          THE COURT:  Mr. Denton, are you ready to proceed when

 2  the jury gets here?

 3          MR. DENTON:  Yes, your Honor.

 4          THE COURT:  While we are waiting, I will give you a

 5  heads up, I understand the jury is about to be here.  If you

 6  haven't already, just for our records, if each side could give

 7  their slide deck from their closings so that we have them I

 8  think it would be helpful and a good idea but no rush.

 9          The jury should be here in just a minute.

10          THE DEPUTY CLERK:  Jury entering.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  You may be seated.

3           Welcome back, ladies and gentlemen.  I hope you

4    enjoyed your break.  We will continue, as I told you earlier,

5    with the government's rebuttal.  I would ask that you give

6    Mr. Denton the same careful attention you have given the

7    previous two summations.  I also just remind you, again, that

8    what the lawyers say, what Mr. Denton says, it is not evidence.

9           With that, Mr. Denton, you may proceed.

10          MR. DENTON:  Thank you, your Honor.

11          MR. DENTON:  Well, ladies and gentlemen, I get the

12   last word here.  As you heard this morning, the government has

13   the burden of proof in this case and that is extremely

14   important, that is what ensures that Mr. Schulte is getting a

15   fair trial here.  Because the government has the burden, we get

16   one last opportunity to present this case to you and I want to

17   talk a little bit about that burden because it is something

18   that we embrace, like Mr. Lockard said, it is the burden to

19   prove his guilt beyond a reasonable doubt.  And Mr. Schulte

20   talked a lot about reasonable doubt.  And Judge Furman is going

21   to give you some very specific instructions about it but I

22   really want you to think for a moment about what it is and the

23   words basically defines themselves.  It is doubt based on

24   reason.  It is not speculation, it is not suspicion, it is not

25   a guess, or a whim.  And most importantly, like everything in

1    this case, your decision about whether the government has

2    proven Mr. Schulte's guilt beyond a reasonable doubt must be

3    based on evidence, based on the exhibits and the testimony that

4    you heard in this case.

5             There are a lot of things that I think you just heard

6    from Mr. Schulte that sounded probably very familiar to things

7    that he tried to get witnesses to say when he was

8    cross-examining them; his questions, trying to get those things

9    out.  His statements now about things that he presented to you

10   as facts are not evidence.  When the witnesses said no to him,

11   that's the evidence.

12            MR. SCHULTE:  Objection.

13            THE COURT:  Objection is overruled.

14            Again, the lawyers argument is just argument.  It is

15   your recollection of the evidence that controls.

16            MR. DENTON:  So, ladies and gentlemen, as everybody

17   told you at the start of this case, the single most important

18   thing we can ask you to do is pay close attention to the

19   evidence and base your decision on that, so I want to talk

20   about some of the things that Mr. Schulte talked about that do

21   have answers in the evidence.

22            Ms. Cooper, if we could put up Government Exhibit

23   1703-1, page 44?

24            While we are working on that let me explain what I

25   want to talk about here.  That page is the timeline that

1    Mr. Leedom put together that shows the reversion of the

2    Confluence virtual machine on April 20th and the deletion of

3    the log files that happened.  Mr. Schulte does not dispute that

4    he did those things.  He said, well, that was just normal

5    systems administrator activity.  That's not what the evidence

6    showed.

7                MR. SCHULTE:  Objection.

8                THE COURT:  Overruled.

9                MR. DENTON:  Mr. Leedom specifically told you nothing

10   about that was normal.  Nothing about that was consistent with

11   normal systems administrator activity.  That was consistent

12   with somebody covering their tracks.  That's what the evidence

13   shows but I want to talk through what exactly it shows because

14   your common sense will tell you that, too.

15               The reversion that the defendant did on April 20th,

16   from the snapshot he took that day from the snapshot that they

17   made on April 16th essentially did one thing, it gave him back

18   administrator access to the Confluence virtual server.  That's

19   the change that happened on April 16th.  That's what he is

20   going back to, that's what he is re-enabling by doing that

21   reversion, he is putting his access back into the live machine.

22   He is letting himself be an administrator again.  And he also

23   told you just a moment ago why being an administrator mattered.

24   He spent a while talking about the Altabackups saying there

25   were no user permissions, no user controls on the Altabackups,

M775SCH6                        Rebuttal - Mr. Denton

anybody could get there.  But then he started talking about

that time when he tried to get to the Altabackups and it didn't

work.  His answer was, well, of course it didn't work, I wasn't

an administrator, I was using my regular user account.

        Exactly.  A regular user can't get to those

Altabackups, you have got to be an administrator which, by the

way, puts the lie to his whole claim that there were no access

controls whatsoever on the Altabackups.  He told you there

were, only administrator could get there.  That's access

control.  Not every regular person could get to it, not anyone

could get into that folder and steal backup files.

        Being an administrator on the Confluence vertical

server on April 20th mattered to Mr. Schulte because that's

what he knew he needed to get to that backup folder.  He had

found out just days before that he couldn't get to the

Altabackups without being an administrator and so that's what

he did.  And there is a piece that doesn't make any sense about

his reversion either.  You heard about the use of snapshots,

you heard why they have some place in normal function.  There

is a real legitimate purpose for it.  It's to be able to undo

things that went wrong.  If there is a problem at 5:29 p.m.,

you can roll it back to something before then and that makes

the problem go away.  What doesn't make sense is going back to

the snapshot with the problem at the end of the time, going

back to bkup.  The snapshot that he created is the piece that

1  makes no sense here because that would have undone whatever he

2  tried to do as normal maintenance.  No evidence, not even an

3  offer from him what that maintenance was.  But if he had been

4  doing something to try to fix the system the reversion would

5  make that all go away.  The only purpose of the re-reversion

6  back to bkup at 6:51 is to hide everything that happened in

7  between.  And that's what the evidence showed.  That's what the

8  witnesses who testified explained to you.  That's the effect of

9  that action.  It erases what happened during that hour and a

10 half of time.  And you know what happened in that hour and a

11 half of time.

12        Ms. Cooper could we put up 1203-27, please?

13        That's the time when those March 3rd files in the

14 Altabackups are accessed, right in the middle of that

15 reversion; 5:42 and 5:43.  And when we focus on those backup

16 files there is an important piece of forensic evidence that you

17 didn't hear word one about from Mr. Schulte, which is the

18 forensic analysis that Mr. Leedom did on that error in the

19 backup script, the character and coding problem that meant that

20 the database was broken, that those links between different

21 parts of it didn't match up quite right.  That's why the

22 version of Confluence that's on WikiLeaks looks so strange in

23 many respects, it is directly tied to that error in the script.

24 And what does that error do?  It means that you can't use a

25 different version, you can't make March 4th look like March 3rd

1    because those relationships are broken.  You can't do it as a

2    different version and so it is that backup file, that March 3rd

3    backup file that you know was the one that was stolen and put

4    on WikiLeaks.

5            And you know that the reason the defendant stole it is

6    because he was angry.  He has tried to tell you that, no, he

7    just made lemonade out of his life.  And Judge Furman is going

8    to give you some instructions on motive and intent and

9    knowledge and one of the things you will hear is that it is not

10   possible to look in someone's mind.  Your decision on that has

11   to be based in the evidence that surrounds people's actions,

12   the things they've done, the things they've said, and frankly,

13   ladies and gentlemen, I don't think the idea that Mr. Schulte

14   was calm and collected and moved on with his life is supported

15   by a single piece of evidence.

16           Even the little things, like having his access taken

17   away to part of Brutal Kangaroo, he is literally still writing

18   about years later.  He is complaining about what happened when

19   Jeremy and Karen wronged him and set him up in 2018 when he is

20   in prison.  That's not a man who lets go, that's a man who

21   holds a grudge.  And a man who holds a grudge is one who is

22   prepared to, as he put it himself, do whatever it takes.

23   Because he thinks that the normal rules don't apply to him.

24           Going back to April 20th, his explanation for deleting

25   all those log files was that SSH key meant I was allowed to do

M775SCH6                        Rebuttal - Mr. Denton

1    whatever I wanted.  That's what he said to you today.  It's the
2    same thing that he said to Sean Roche when he told him I could
3    get my access back any time I wanted.  It is the same thing he
4    told CIA security when he said access controls don't apply to
5    me.  But you heard from almost every single witness in this
6    case, and honestly your common sense as people who live in the
7    world and have to interact with others tells you, there is a
8    big difference between being able to do something, between
9    having the power, and having permission; having authority,
10   having authorization to do something.  Those are not the same
11   things.  And you heard about that in particular in the context
12   of this network at the CIA, that it was a network that relied
13   on trust, that it relied on empowering people to make things
14   work for others, to serve as administrators, to protect the
15   system.  And that was the trust that he violated.
16           And, by the way, when we talk about deleting those log
17   files on April 20th, he again tries to tell you, well, this was
18   some routine thing, look, this is only 20 minutes apart.  No
19   evidence whatsoever of that in the record.  No evidence that
20   this was normal.  And in fact, the evidence shows quite the
21   contrary.  He is not repeating a cycle every 20 minutes, he is
22   searching for new log files and deleting more.  And is not just
23   deleting any log files, he is deleting the newest log files,
24   which every witness told you is something you would never do,
25   you would always want the newest log files.  So why is he

1    deleting the newest log files?  He is hiding what he did, he is

2    hiding what he did in that time.

3          Those are important things for you all to recognize

4    because, as he pointed out, Count Seven and Eight in this case

5    concern specifically that reversion and the deletion of those

6    log files.  There is no question he did those things.  Once you

7    reach that conclusion on those counts, the question that you

8    then have to ask yourselves is why?  What was the point?  What

9    was all of that hiding?  And he comes up with, you know, some

10   theory that, well, it could have been a different backup file,

11   it could have been a touch command, I was too smart to steal it

12   this way, I would have stolen it much better.  But that's not

13   what the evidence shows.  The evidence shows that that backup

14   file was stolen at that time.  That's the evidence.  Everything

15   else is speculation.

16         He makes a lot of the fact that there is no copy

17   command and Mr. Lockard talked about this already so I'm not

18   going to belabor the point but I think it is important in this

19   context to recognize how he is trying to confuse you about

20   where evidence would be.  He tried to put up a whole bunch of,

21   you know, essentially faked log files to say, well, this is

22   where the command would be, this is where it would be.  He is

23   actually totally wrong about that.  The logs that he was

24   showing you are logs from that actual server, not from the

25   Confluence virtual machine, not from the actual computer that

M775SCH6                    Rebuttal - Mr. Denton

1    has the connection to the Altabackups, not from the place that

2    the experts told you is where the copy command would be and

3    that it was erased by the reversion.  And you know that also

4    again from your common sense.

5           There is no question that backup file was copied.

6    It's on WikiLeaks.  Right?  It was copied at some point by

7    somebody.  All of the other evidence shows that it was Joshua

8    Schulte but there is no question that it was copied.  So where

9    is the copy command?  Where was the time when the evidence of

10   that would have been deleted?  Where is it that caused that

11   command to go missing?  It is in his actions.  It is in what he

12   did on April 20th when he reverted that system in a way that

13   makes no sense except if you are covering up a crime.

14          Now, there are a number of other things that he talked

15   about about his actions on April 20th, and I think a lot of

16   them, again, you will find there is no support for in the

17   evidence.  He tried to suggest that he couldn't have stolen

18   these because he was going to the bathroom.  First time we are

19   hearing that.  Also, if you look at the map that he showed you,

20   the door is like steps from his desk, it's not as if he

21   couldn't get to his desk and do these things.  Nor is it like

22   he has got to sit there.  He asked you to think about any

23   number of things you would do.  How many times do you download

24   or copy something and walk away from your computer for a

25   minute, get a coke and a smile, and then come back?  That tells

1    you nothing.  But the question is, where is the evidence -- and

2    it's not there.

3          He also said a number of things about what wasn't

4    there with respect to the transmission to WikiLeaks.  And,

5    ladies and gentlemen, as Mr. Lockard said, first of all, this

6    is at a certain level a pretty easy question, it's on

7    WikiLeaks, they got it, it was transmitted, Mr. Berger

8    explained that.  In some respects the evidence of transmission

9    is the fact that someone outside of this secure building has

10   this stuff.  And so once you know that he stole it, and you

11   know that because he has admitted what he did on April 20th and

12   you know there is no other explanation for it --

13               MR. SCHULTE:  Objection.

14               THE COURT:  Overruled.

15               MR. DENTON:  -- the fact that WikiLeaks has it proves

16   that he transmitted it.

17          And, by the way, with respect to what he did at home,

18   he again tries to put words in the mouths of witnesses and say,

19   well, this is all entirely consistent with this other thing I

20   claimed I was doing.  But, actually, remember when he tried to

21   push that with Mr. Berger, kept trying to get him to say, oh

22   yeah, this is the program you would use if you were setting

23   this thing up.  Mr. Berger kept saying no, it is actually not,

24   this is not what I would use that for, this is something you

25   would use to really nuke your computer, this is not what you

M775SCH6                         Rebuttal - Mr. Denton

1    would use for that purpose.

2              And he tries to get you to focus on little things in

3    isolation.  It is kind of funny he had his own circle and a

4    line thing because what he did was talk these little pieces and

5    not look at the fact that what essentially he is doing is going

6    down the WikiLeaks checklist.

7              Remember, Mr. Berger put up those screenshots from the

8    WikiLeaks onion page, that dark web page that you access

9    through TOR.  First of all, you need TOR to get there.  He

10   downloaded a new version of it on April 18th.  They tell you to

11   use Tails as an operating system that allows you to hide all of

12   your activity.  He gets that on April 24th.  It tells you to

13   figure out ways to delete data, especially if you are at high

14   risk.  Awfully coincidental that all of a sudden after having

15   stolen that data, for the first time in ages he is researching

16   how to kill data, how to erase hard drives.  And then it says

17   at the end of that list, that checklist from WikiLeaks, if all

18   else fails, basically, dump the whole computer.  And he did the

19   digital version of that.  He didn't throw it in the river but

20   he completely wiped it.  Total fresh start in early May.

21             And so, ladies and gentlemen, Mr. Lockard and I have

22   never shied away from being candid with you about the effects

23   of the defendant's conduct on the evidence that is available,

24   the things he deleted that mean there are things we can't show.

25   But what it does show is that the defense that he just put on

1    for you is a defense that has been years in the making, setting

2    up these lines like there is no copy command --

3            MR. SCHULTE:  Objection.

4            THE COURT:  Overruled.

5            MR. DENTON:  -- that you don't have the evidence of

6    transmission from my home computer.  Those are all things that

7    he was preparing by taking these actions through the spring of

8    2020.

9            Now, ladies and gentlemen, I want to skip ahead for a

10   moment because I really don't want to keep you too long here

11   and talk about the defendant's conduct in 2018.  First of all,

12   he could not be more wrong that the purpose of these charges is

13   to somehow insult him or otherwise cause you to view him in a

14   negative light.  Judge Furman has instructed you many times

15   that where these crimes happened, the fact that he was

16   incarcerated at the time, is only relevant to where it happened

17   and not anything that you should consider against him, you

18   should not view him as likely to commit a crime or anything

19   because of that.  And, as he said himself, these are serious

20   crimes and I can say that they would be just as serious if they

21   were committed from a penthouse on Park Avenue.  The

22   fundamental point is to focus on what he did.  And not just on

23   what he did in the context of the crimes but what he said, what

24   he actually wrote in some of these things.

25           Ms. Cooper, is there any chance we can do Government

1    Exhibit 809 and go to page 5, please?

2             This is the defendant's to-do list.  Look at what he

3    circled.  Delete suspicious e-mails from my gmail.  Literally

4    written down:  Delete suspicious e-mails.  Going down he is

5    talking about erasing the phone, about resetting the IMEI,

6    about all of these ways that he can hide activity.  This isn't

7    a guy who is interested in bringing the flaws of the criminal

8    justice system to light, this is someone who is hiding, who is

9    hiding the things that he has done wrong.

10            Ms. Cooper, can we then go to page 10 of this exhibit?

11            I'm going to talk about the top corner of this that we

12   have talked a bit about quite a bit that describes Bartender

13   but I want you to just focus for a second on the rest of this

14   document for a moment.  He is impersonating someone.  He is

15   claiming that I'm a former co-worker of Joshua Schulte and I

16   know he is innocent, I know exactly what happened.  Everything

17   he has been telling you is nobody knows what happened but all

18   of a sudden here he is, Joshua Schulte, pretending to be

19   someone else and saying he knows exactly what happened?  It's a

20   lie.  It's false.  It's designed to try and portray him as

21   innocent and one of the things I think you are going to hear

22   from Judge Furman, when he gives you his instructions, is that

23   it is reasonable for you to infer that an innocent person would

24   not find it necessary to invent an explanation that would

25   establish their innocence.  And that stands to reason, that is

1    just your common sense.  Someone who is actually innocent of a

2    crime is not going to pretend to be someone else so they can

3    put out stuff ranting about Donald Trump and the FBI as a way

4    to claim their innocence.

5            But let me focus for a moment on the actual national

6    defense information here because I think the defendant has

7    really tried to obscure this.  He spent a lot of time talking

8    about his articles.  He left up on the page his whole redress

9    of grievances.  Nothing about the MCC charges is directed at

10   any criticism the defendant has of the criminal justice system.

11   That is not what is at issue, that is not what he is being

12   prosecuted for.  And Judge Furman is actually going to give you

13   very specific instructions about the exact parts of his

14   writings that are at issue in those counts.

15           So this one is a good example.  If we look at the

16   section at the top, he talked a lot about how, well, Bartender

17   was in WikiLeaks, bartender was already in WikiLeaks so, you

18   know, that's -- it can't have possibly been damaging for me to

19   reveal this.  But that's not the detail that matters.  You

20   heard from both Jeremy Weber and Frank Stedman that no one has

21   ever associated Bartender with that tool in a vendor report.

22   And you heard from them why that is actually very significant

23   and puts people at risk because what WikiLeaks released, the

24   information about how Bartender works and what it does, tells

25   people what the capability of the CIA is.  That's bad enough.

1    But associating it to the vendor report, which I think they

2    talked about being, when tools are caught in the wild, would

3    allow an enemy to figure out when and where the CIA had run an

4    operation with that tool.  And as he himself says, it is a tool

5    for operators to use for people, for those who have made common

6    cause with the United States and are willing to help us collect

7    intelligence overseas.  And what he was prepared to do to

8    authenticate himself as a fake co-worker of himself is to out

9    the times when human beings conducted operations for the CIA.

10   And you heard from every witness who was asked about that, what

11   a big deal that is and that's not in WikiLeaks.

12          Ms. Cooper, if we could go to Government Exhibit 812

13   and go to page 3?  And if we can blow up the second paragraph,

14   please?

15          Here, too, Mr. Schulte tries to focus on Hickok was

16   out there, Hickok was out there.  That fact was there.  But

17   that's not really what matters here.  You heard from Sean Roche

18   why details about the number of people that the CIA assigns to

19   groups might, to a casual observer not necessarily seem like

20   the biggest deal in the world but to them it is because other

21   countries have their own CCI, other countries have their own

22   intelligence apparatus that will take pieces of information

23   like this and, as he explained to you, be able to figure out

24   things like where those people might be based, how many

25   resources the CIA is devoting to a particular type of mission

1   and particular work.  And that's the kind of thing that really

2   can provide an advantage to an enemy.  It might seem like a

3   small detail but sending it to the Washington Post is not.

4            And on this point, Mr. Schulte made a whole big deal

5   about how he didn't intend to hurt anybody with this, he just

6   intended to express his criticism of the search warrants in

7   this case.  These espionage counts are complicated, I'm not

8   going to lie to you.  And Judge Furman is going to give you

9   some pretty detailed instructions about what the government has

10  to prove.  Frankly, I think you will find that other than the

11  top line of what each element is there is not much agreement

12  between what Mr. Schulte said and what the Court's instructions

13  are so you should follow the Court's instructions.  But, one of

14  the things that you will hear is that there is no element of

15  that offense that requires you to believe that Mr. Schulte

16  intended to harm the United States.  The requirement is that it

17  be national defense information and that he willfully sent it

18  to someone who couldn't receive it -- a Washington Post

19  reporter.

20           Ladies and gentlemen, I'm reaching the end here and I

21  want to sort of close where I started, which is with the

22  evidence.  There is a line I have always been fond of from John

23  Adams that facts are stubborn things and whatever our wishes,

24  our inclinations, or the dictates of our passions, they cannot

25  alter the state of the facts and the evidence.  Mr. Schulte's

M775SCH6

1    wishes do not alter the evidence.  You have heard the evidence

2    for three weeks.  You have seen the witnesses.  Your

3    observations are evidence as well.  It is time for you now do

4    what all of us asked you at the beginning which is reach a

5    verdict that is based on the evidence.  Those stubborn facts,

6    that whatever gloss Mr. Schulte tries to put on them, can't

7    hide what he did on April 20th, 2016 and why he did it.  He is

8    the one who broke into that system to get back administrator

9    access he knew had been taken away from him.  He is the one who

10   knew that that was the access he needed to get to those backup

11   files.  He is the one who took that backup, the backup that he

12   sent to WikiLeaks that you know is there, that you know

13   forensically is the same file because of that error that he

14   never even mentioned.  Those stubborn facts prove that that is

15   what Mr. Schulte did.  They are what proved that he is guilty

16   of the crimes charged in this case.

17            Thank you.

18            THE COURT:  Thank you very much, Mr. Denton.

19            Ladies and gentlemen, it is 3:06 which puts me in a

20   bind because that's enough time to get most of the instructions

21   done but it might mean that we would push past 4:00 if I

22   started them.  I did tell you that we would end at 4:00 so I

23   don't know if you have organized your lives based on that, in

24   which case I think the better course would probably be just to

25   do them tomorrow.  And, it has also been a long day and it is

M775SCH6

1    an important part of the process that you listen to the

2    instructions and you pay careful attention to them so I guess I

3    am looking for a little bit of a sign from you.  If folks would

4    prefer to call it a day there -- I am seeing a bunch of nods so

5    that's a signal.  So, I will call it a day there and we will

6    start fresh with the instructions tomorrow which is the final

7    step before you begin your deliberations.

8            So, let me underscore the instructions you have heard

9    many times.  Do not discuss the case.  Sorry, you have now

10   heard all of the evidence, seen all the evidence and heard both

11   sides' argument.  You have not heard my instructions, that is

12   quite important, nor have you begun your deliberations.  You

13   will have plenty of time to talk about it once you begin your

14   deliberations so for now, as tempting as it may be, do not

15   discuss the case.

16           In addition, I am sure your minds are working and you

17   are thinking about the arguments that each side has made and

18   conclusions you should draw from the evidence but you should

19   also continue to keep an open mind.

20           Deliberation is a very important part of this process.

21   You will have an opportunity to hear from your fellow jurors

22   and that may influence things and it is critical you continue

23   to keep an open mind.  So don't discuss the case, continue to

24   keep an open mind, don't do any research about the case, don't

25   read anything about the case or anything of that sort.

M775SCH6

1        Please be back in the jury room same time tomorrow.

2   In addition to the normal breakfast that you will hopefully

3   find there, we will be -- you will find some lunch order forms.

4   That's because once your deliberations start you basically are

5   confined to the jury room for the duration of your

6   deliberations and to enable you to have lunch while you are

7   there.  Obviously, that's the point.  So there will be some

8   lunch order forms, each of you can fill them out, and then

9   before the day begins Ms. Smallman will collect them from you

10  and during your deliberations lunch will be delivered directly

11  to you.  We are a full-service operation here.

12       Other than that, we will start with the instructions

13  tomorrow.  I would estimate they'll take an hour to an hour and

14  a half and your deliberations will begin and, as I said before,

15  we will end tomorrow at 3:00 -- either when you return a

16  verdict or 3:00 whichever is earlier but I will give you

17  further instructions about that tomorrow.

18       So with that, admonitions and instructions in mind, I

19  wish you a pleasant afternoon and evening.  You are excused and

20  we will see you tomorrow morning.

21            (Continued on next page)

22

23

24

25

M775SCH6

1          (Jury not present)

2          THE COURT:  You may be seated.

3          The case was well argued by both sides, well tried by

4     both sides.  A couple housekeeping matter before we break for

5     the day and if you have anything to raise I will hear that as

6     well.

7          First, I think that we now have what at least the

8     government thinks is all the evidence in the record so for what

9     I understand is two exhibits, one is Defendant's Exhibit 410-A,

10    that is the redacted version of the Wordpress returns if I am

11    not mistaken, and Defendant's Exhibit 809-1, which is the

12    better quality color copy of one of the notebooks.  That one we

13    do have a copy of it but the copy we have still has those names

14    and phone numbers which I think were going to be redacted.  So,

15    I think those are the only two exhibits that we still need and

16    would ask you guys to make sure that we get them so that we can

17    add them to the jury's folder.

18         Any problem with that?  Mr. Schulte, I assume they're

19    in your possession.

20         MR. SCHULTE:  Yes.  I just provided them to the

21    government 15 minutes ago or so, so.

22         THE COURT:  Great.

23         Second, I just want to make sure -- well, I got a copy

24    of the indictment which I also plan to load onto the jury

25    system.  It does have Judge Crotty's initials since he was the

M775SCH6

1    presiding judge when the indictment was returned.  I directed

2    my deputy to redact those but in a manner that doesn't even

3    reveal that they were there, that is, white them out.  I

4    assumed everybody would be OK with that.

5          Mr. Lockard is nodding.

6          MR. LOCKARD:  Yes, your Honor.

7          THE COURT:  Mr. Schulte?

8          MR. SCHULTE:  Yes.

9          THE COURT:  Next, Mr. Schulte, have you confirmed that

10   the exhibits that you received from the government are an

11   accurate reflection of what is in evidence?

12         MR. SCHULTE:  Yes.  I believe so.

13         THE COURT:  OK.  Great.  So once those last two

14   exhibits are added that should be hopefully a complete set.

15         Two other questions, one is the transcripts of the two

16   video recordings, 508-T and 509-2T.  I don't know if they're

17   included in what is being sent to the jury.  Obviously, for the

18   most part, they're just demonstratives and it is the recording

19   that is evidence.  On the other hand, to the extent that they

20   contain substitutions, I told the jury that for those purposes

21   they are the evidence and for that reason I think there is an

22   argument for including them.

23         MR. LOCKARD:  We did include them for exactly the

24   reason the Court just identified because they contained the

25   substitutions that are evidence.

M775SCH6

1          THE COURT:  Mr. Schulte, any objection to that?  It

2     seems appropriate.

3          MR. SCHULTE:  I think that they should not come in

4     unless the jury asks for them because what is actually in

5     evidence is the video, and it is in English.  So unless they

6     specifically request for the audio, I just think the video

7     should come in.

8          THE COURT:  Normally I would agree, but given that I

9     instructed them that where something is redacted or substituted

10     it is the transcript that is evidence, I think that

11     necessitates them going in as well.  So, if they are already

12     included, then that is what I think should happen.

13          And then the last on my list is the question that we,

14     that was posed yesterday about the second classified exhibit.

15     Again, Government Exhibit 1 is marked or is not marked,

16     whatever form it is in, it is in, and it was admitted in that

17     form, but the log files -- I don't have the exhibit number

18     handy -- to the extent that those are being loaded on a

19     different laptop or being provided on some sort of disk,

20     Mr. Schulte raised the question about their having

21     classification markings.

22          What is the government's view on this?

23          MR. LOCKARD:  So, your Honor, I think our proposal is

24     to include that -- so the exhibit itself is a disk and the disk

25     already has been marked with classification markings.  We

M775SCH6

1    could, as an alternative, have that file that's on the disk

2    loaded onto a separate stand-alone laptop and make that

3    available.  The laptop, because of the nature of what it can

4    house, would itself have classification markings on it.  I

5    don't think we have a strong view about classification markings

6    or not.  We do just want to make sure that there is not an

7    accidental spill as a result of the jury not being aware of how

8    that material should be handled.  I think that's our concern.

9          THE COURT:  That shouldn't be a big concern because

10   they're not going to be leave being the jury room with any of

11   the evidence and I am happy to instruct them that if they don't

12   return a verdict they should leave the evidence in the jury

13   room and it will be secured overnight.

14         MR. LOCKARD:  I think our main sort of -- this may be

15   a hypothetical concern but if it was on an unmarked disk that

16   could be inserted into an unclassified disk reader, that would

17   present a problem.  If that's not a risk then it is not

18   something we would worry about.

19         THE COURT:  Are you telling me it was entered in the

20   form of a disk and the disk already has a classification

21   marking?

22         MR. LOCKARD:  That is correct.

23         THE COURT:  So I guess, again, if it was admitted in

24   whatever form it is admitted, it is admitted in that form.  The

25   question is just how the jury would access it, what are the

M775SCH6

1     options on that front.

2              MR. LOCKARD:  So the options are, I mean, essentially

3     they're going to need a stand-alone and the question is should

4     we just have it with a disk reader and the disk, as marked, or

5     should we just load the file onto the laptop and have them

6     access it that way.

7              THE COURT:  Can they, when you say disk reader, would

8     the disk reader -- in other words, can the --

9              MR. LOCKARD:  They're going to need a laptop

10    regardless, I think.

11             THE COURT:  Right, but can the laptop not have a

12    classification marking and then they can just put the disk in?

13    Again, the disk may have a classification marking but if that

14    is how it is admitted then it is in evidence in that form.  As

15    long as they can read it and as long as there is no issue with

16    respect to reading it on a computer or drive that is not itself

17    marked, that seems to me the preferable way to do this.

18             MR. LOCKARD:  That may be possible.  We will have to

19    work with our IT and security vault to make that happen.

20             THE COURT:  Why don't you see if you can make that

21    happen and record back to us in the morning.

22             Mr. Schulte, anything you wish to say on that front?

23             MR. SCHULTE:  Yes.

24             The defense's position is simply that we don't think

25    there should be any markings on it so if we are able to figure

M775SCH6

something out for that, I think that's a good way to go.
Obviously there has to be some way for them to actually read
the data so if we want to just put that on another computer
instead of having the disk or somehow do something like this to
make it easier, I'm open to that.  I don't think it --

THE COURT:  Well, let me say the following.  Again,
whatever is in evidence is in evidence, and if it's already
marked it is already marked and should go to the jury in that
form.  What I agree with Mr. Schulte on is if we are giving
them something else, that is to say a laptop with the
information on it or laptop to read the information, I don't
think we should be adding to what has been in evidence anything
that -- I mean anything other than a vehicle for the jury to
view it, that is to say, it shouldn't convey any information
and a classification marking on that would, I think, so I think
his point is well taken on that score.

I will leave it to the government to try and solve
this conundrum but it seems to me if the disk is in and it is
marked, then sobeit.  But, if it can just be given to them with
a laptop to use to read it, then I think we have no problem and
that's the solution.

But why don't you consult with your people and we will
circle back to this in the morning.

MR. LOCKARD:  Yes, your Honor.

THE COURT:  Anything else from the government?

1          MR. LOCKARD:  Nothing else.

2          THE COURT:  Mr. Schulte, I may as well ask my periodic

3    question just to confirm that you continue to control your

4    defense, that to the extent you are consulting with Ms. Shroff

5    and Ms. Colson, as you have done throughout the case, you are

6    doing so on your own volition and because you are seeking their

7    advice and not unsolicited.

8          Is that correct?

9          MR. SCHULTE:  That's correct.

10         THE COURT:  Anything you would like to raise before we

11   adjourn for the day?

12         MR. SCHULTE:  I was wondering if there was any way we

13   could get the final jury charge copy that the Court had put

14   together.

15         THE COURT:  Sure.  I don't see any reason not to.  We

16   have copies here.  I was prepared to proceed directly into the

17   charge so if each side wants one copy, that's fine by me.

18         Anything else, Mr. Schulte?

19         MR. SCHULTE:  No.  That's it.

20         THE COURT:  All right.  Very good.  So, with that,

21   please be here by 9:00 tomorrow so we can start promptly when

22   the jury gets here.  I will give my instructions and then the

23   jury will begin deliberations.

24         Have a restful evening.  Thank you.

25         (Adjourned to July 8, 2022 at 9:00 a.m.)