N4L8SCHC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        17 Cr. 548 (JMF)

 5    JOSHUA ADAM SCHULTE,

 6              Defendant.                Conference

 7    ------------------------------x

 8                                        New York, N.Y.
                                          April 21, 2023
 9                                        11:10 a.m.

10    Before:

11                    HON. JESSE M. FURMAN,

12                                        District Judge

13
                           APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    DAVE DENTON, JR.
      MICHAEL D. LOCKARD
17         Assistant United States Attorneys

18    CESAR DE CASTRO
      SHANNON McMANUS
19         Attorneys for Defendant

20

21

22

23

24

25
```

N4L8SCHC

1          (In open court; case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3     the record.

4          MR. DENTON:  Good morning, your Honor.  David Denton

5     and Michael Lockard for the government.

6          THE COURT:  Good morning.

7          MR. DE CASTRO:  Good morning, your Honor.  Cesar De

8     Castro and Shannon McManus for Mr. Schulte, who is seated

9     between us.

10          THE COURT:  Good morning to all of you.

11          A few things on the agenda for today.  But it seems to

12     me, unless counsel thinks otherwise, that I should first

13     address the *Faretta* issue -- that is to say, find out if Mr.

14     Schulte wishes to proceed *pro se*, and if so, engage in colloquy

15     along the lines of what the government has proposed in its

16     April 10 letter.

17          Anyone think I should do something else first or that

18     seems right?

19          MR. DE CASTRO:  That seems right, your Honor.

20          MR. DENTON:  We agree, your Honor.

21          THE COURT:  Mr. De Castro, do you know what Mr.

22     Schulte's desires are?  I will ask him directly, but I will ask

23     you first.

24          MR. DE CASTRO:  He wants to proceed with the *Faretta*

25     hearing.  I mean, obviously people can change their mind at any

N4L8SCHC

1    time, but I think he wants to pursue potentially representing

2    himself with us as shadow counsel.

3            THE COURT:  Do you have any comments on the

4    government's suggested colloquy, advice, etc.?

5            MR. DE CASTRO:  No.  I have reviewed them.  No

6    comments.

7            THE COURT:  All right.  Thank you.

8            Mr. Schulte, let me turn to you.  Maybe you can take

9    that microphone there.

10           Let me confirm, is it indeed your desire to represent

11   yourself with respect to the remaining charges to be tried on

12   September 11?

13           THE DEFENDANT:  Yes.

14           THE COURT:  So let me proceed.

15           You have the right to counsel, that is, you have a

16   right to have a lawyer represent you in these proceedings,

17   including at that trial.  You may waive your right to counsel

18   and represent yourself, but only if you meet certain

19   requirements.  In particular, if you want to represent

20   yourself, you must make a request to do so that is clear and

21   unequivocal, and not for purposes of delay or manipulation,

22   that is knowing, intelligent, and voluntary, and that is

23   timely.

24           First, if you want to represent yourself, you must say

25   so clearly and unequivocally.  If you do not make it clear that

N4L8SCHC

1  you want to represent yourself, then you will be represented by

2  a lawyer.  There is, in other words, a presumption that you

3  will be represented by a lawyer; the only way to overcome that

4  presumption is if you express your contrary desire clearly.

5       Second, your request for self-representation must be

6  knowing, intelligent, and voluntary.  In other words, before

7  you decide what you want to do, you must understand the

8  consequences of your decision and understand what is at stake

9  here.  Although you need not be a lawyer, or have the skill and

10  experience of a lawyer in order to decide to represent

11  yourself, you must be aware of the dangers and disadvantages of

12  proceeding without a lawyer.

13       I will now try to explain to you the difficulties and

14  dangers of self-representation, although let me say for the

15  record I think you understand them quite clearly given the

16  history of this case.  If I say something that you do not

17  understand, please let me know, and I will try to explain it to

18  you again.  It is important that you understand the choice that

19  you are going to be making.

20       You are facing trial on four very serious charges,

21  including one count for receipt of child pornography, in

22  violation of 18, U.S. Code, Section 2252A(a)(2)(B); one count

23  of possession of child pornography, in violation of subsection

24  (a)(5)(B); one count of transportation of child pornography, in

25  violation of subsection (a)(1); and one count of criminal

N4L8SCHC

1   copyright infringement, in violation of 17, U.S. Code, Section

2   506(a)(1)(A), and 18, U.S. Code, Section 2319(b)(1).  The

3   maximum term of imprisonment for these counts taken together is

4   65 years in prison.

5           As you certainly know, you have already been convicted

6   of eleven very serious charges, including one count of illegal

7   gathering of national defense information, in violation of 18,

8   U.S. Code, Section 793(b); three counts of illegal transmission

9   or attempted transmission of unlawfully possessed national

10  defense information, in violation of 18, U.S. Code, Section

11  793(e); two counts of unauthorized access to computers, in

12  violation of 18, U.S. Code, Section 1030(a)(1) and (a)(2); two

13  counts of causing transmission of a harmful computer program,

14  information, code, or command, in violation of 18, U.S. Code,

15  Section 1030(a)(5); one count of obstruction of justice, in

16  violation of 18, U.S. Code, Section 1503; one count of making

17  false statements, in violation of 18, U.S. Code, Section 1001;

18  and one count of contempt of court, in violation of 18, U.S.

19  Code, Section 401(3).

20          Because a jury has found you guilty of these crimes,

21  you are no longer presumed innocent of them.  The conduct of

22  which you have been found guilty can be considered in

23  determining what conditions are appropriate for your

24  confinement, and you cannot escape the consequences of the jury

25  finding you guilty of those crimes by choosing to represent

N4L8SCHC

1    yourself on the counts that remain pending against you.

2            Pretrial, trial, and posttrial proceedings can be

3    complex.  As you know from your prior self-representation, they

4    involve legal work and require intimate familiarity with the

5    Federal Rules of Criminal Procedure and the Federal Rules of

6    Evidence.  They are usually better done by a lawyer, especially

7    a lawyer specializing in criminal defense, than by a layperson,

8    because a lawyer is specially trained to do them and has

9    special knowledge of, and experience with, the substantive and

10   procedural rules of law and of this court.  Obviously, there

11   will be serious consequences if your defense is mishandled.

12           If you choose to reject the representation of a

13   lawyer, that does not entitle you to additional resources to

14   conduct your defense.  And I want to be crystal clear about

15   this because I think this is an ongoing issue.  For example,

16   and listen carefully, you do not have a right to have a

17   personal laptop or computer simply because you have chosen to

18   proceed *pro se*.  You will have to conduct your defense within

19   the limits of the resources that this Court and the MDC make

20   available to you.  While I will continue to ensure that the MDC

21   does not arbitrarily interfere with your right to defend

22   yourself, you are not entitled to any special consideration or

23   exemption from MDC policies simply because you have chosen to

24   represent yourself.

25           And let me be crystal clear about what that means.  To

N4L8SCHC

1    the extent that you have been seeking and I have not granted

2    you certain privileges or resources, you will not get anything

3    by virtue of your decision to represent yourself -- that is to

4    say, to the extent that you are making a decision to represent

5    yourself because you believe that it will give you access to

6    things that you have not thus far been given access to, that is

7    a mistake, and you should understand that.

8            It is almost always a good idea for a defendant in a

9    criminal case to have a lawyer.  Nevertheless, the choice of

10   whether to continue with your lawyer or to proceed *pro se* is

11   entirely yours, so long as you make it in a knowing,

12   intelligent, and voluntary fashion, with a proper understanding

13   of what is at stake.  I am only trying to ensure that you make

14   such an informed decision.

15           Third, and finally, timeliness.  If you make your

16   choice today, it will be timely, because we are still in the

17   pretrial phase of the case, and there are many months before

18   the trial date of September 11.  But I warn you for the future

19   that you do not have a right to manipulate this Court or the

20   schedule that I have set.  You have already changed your mind

21   multiple times about whether you wish to be represented by an

22   attorney or not.  You should think hard before making a

23   decision because it will have ongoing significance for you.

24   For example, if you choose to represent yourself today, and

25   then later ask to have a lawyer represent you, I may deny your

N4L8SCHC

request, especially if granting it would delay the proceedings.
And I have already told you that the September 11 trial date is
a firm date.  This is an important moment in the case and you
have an important decision to make.

         If you decide to represent yourself, I will appoint
what is called standby counsel to assist you, that is, Mr. De
Castro.  You will still largely control the presentation of
your case, as you know from the last trial, but you will have a
lawyer to explain to you the details of courtroom protocol and
the rules of evidence and procedure.  The standby lawyer will
be there to help you, to consult with you about investigating
the facts and the law, to identify possible defenses, and to
suggest appropriate motions to file.  Standby counsel is there
to assist, but will not be permitted to interfere with your
control of the case, with a few exceptions.

         You do not have a right to reject the standby lawyer,
and as I say, I have decided, or I will appoint one for you if
you decide to proceed *pro se*.  So if you represent yourself,
you will have standby counsel.

         Even with standby counsel, however, you will still
largely control the presentation of your motions to me and your
case to the jury.  For example, you will have a right to
control the organization and content of your own defense, to
make motions, if they have not already been waived or
forfeited, to argue points of law, and to address the Court.

N4L8SCHC

1   Of course, you will have to do all of these things within the

2   limits set by the rules of courtroom procedure, evidence, and

3   decorum.  If you fail to comply with those limits, including

4   the deadlines, page limits, or other requirements for court

5   filings, I may refuse to consider things that you file, or may

6   choose to revoke your *pro se* status and require you to be

7   represented by an attorney.

8        Standby counsel may not interfere with your control of

9   the case.  You ultimately retain final authority over the case.

10  That is not to say, however, that standby counsel is prohibited

11  from acting at all.  He may assist you to ensure your

12  compliance with basic rules of courtroom protocol and

13  procedure.

14       In this case in particular, as you know, standby

15  counsel will handle matters related to classified information.

16  As I have already noted, the fact that a jury has found you

17  guilty of crimes related to the unlawful dissemination of

18  classified information, including while you were incarcerated

19  pending trial in this case, has consequences for you.

20  Accordingly, while you will be in control of the presentation

21  of evidence before the jury, standby counsel will, in

22  consultation with you, handle the litigation of the admissible

23  form of any classified evidence.  If you need to discuss

24  classified matters with standby counsel, you will be able to do

25  so in the secure areas of the U.S. Marshals' facility set up

N4L8SCHC

for that purpose, but you will not personally be able to access

the classified materials themselves or be produced to the

courthouse SCIF, unless I grant permission for either of those

things.  But again, do not assume that I will.

If you do not waive your right to counsel and you are

represented by a lawyer, then the lawyer will conduct your

defense in its entirety, subject to decisions that are yours to

make, such as the right to testify, the right to go to trial,

and the like.

To sum up, then, you have a right to be represented by

a lawyer, and you have a right to be represent yourself.  If

you are represented by a lawyer, then it is the lawyer, and not

you, who will conduct the defense.  Conversely, if you

represent yourself, you will be able to perform the lawyer's

core functions, but you will not necessarily be allowed to

direct special appearances by counsel when it is convenient for

you.  Standby counsel will be available to help you overcome

routine procedural or evidentiary obstacles and matters of

courtroom protocol, again, without undermining your actual

control over the presentation of your defense.

You do not, however, have a right to hybrid

representation, where you and a lawyer act as co-counsel in the

conduct of your defense.  And on that score, let me just

clarify and make clear, as far as I am concerned, your request

to proceed *pro se*, if you persist with it, applies to

N4L8SCHC

1    everything going forward -- that is to say, not just the trial,

2    but any further proceedings with respect to the counts of

3    conviction, including your sentencing.  If at some point in the

4    future you wish to return to have a lawyer, we can address that

5    at that time, but I am not prepared at this time to maintain a

6    hybrid representation where you're represented for some

7    purposes and representing yourself as to others.  I think I

8    regret that I permitted you to do that several months ago,

9    because I think it has caused confusion in the last few months.

10   Going forward I am not going to do that.  So if you decide to

11   proceed *pro se*, it will be for all purposes, unless and until

12   you change your mind and I permit you to have a lawyer again.

13   So I want you to understand that.

14          If you elect to place standby counsel in an active

15   role, or if you do not object when that happens, you could lose

16   your right to represent yourself.  At a minimum, if you do

17   that, any further participation by the lawyer will be presumed

18   to be with your permission, and you will not be allowed to

19   complain about it later.

20          If you represent yourself, I am not going to treat you

21   any differently than any other defendant, and the Court of

22   Appeals is not likely to treat your case any differently

23   either.  In other words, if you make the decision to represent

24   yourself and you make mistakes, you are not going to be able to

25   come back and complain about those mistakes to me or to the

N4L8SCHC

1    Court of Appeals.  You will have accepted responsibility for

2    your mistakes, and they will not be a basis for you to appeal

3    your conviction.  Put differently, there is no ineffective

4    assistance of counsel if you are representing yourself because

5    you are accountable for whatever mistakes you may make.

6            There are some other things that you should know.  If

7    you do choose to represent yourself, you must understand that

8    it does not give you license to abuse the dignity of the

9    courtroom, or a license to violate the relevant rules of

10   procedural and substantive law.  You must always abide by

11   courtroom protocol and maintain proper decorum, and you may not

12   improperly disrupt the proceedings.  You must, for example,

13   follow the rules of evidence.  You must obey my rulings even if

14   you disagree with them, knowing that you have preserved your

15   objection for review by the Court of Appeals.  This includes

16   the rulings that I have made already in your case.  If you

17   deliberately engage in serious and obstructionist misconduct, I

18   may, indeed, likely would, terminate your self-representation.

19   If I am forced to do so, then standby counsel will take over

20   the defense for you.

21           If you have any questions about anything that I have

22   just explained to you, I will be happy to answer them.  In a

23   moment, however, I will ask you questions so that I can learn a

24   little bit more about your background, education, job

25   experience, and familiarity with the legal system, although I

N4L8SCHC

1    think based on your *pro se* representation before me last year

2    you have a pretty good handle on that already, but in any

3    event, I will ask you those questions in order to determine

4    whether your decision today is made knowingly, intelligently,

5    and voluntarily.  I will also inquire about any recent or

6    regular use of alcohol, drugs or medication to assure myself

7    that your judgment today is not clouded.  And I will then hear

8    your decision and make my determination and findings about

9    whether you may proceed *pro se*, if that is your desire.

10            So let me pause there.

11            Mr. Schulte, any questions about anything that I just

12   said?

13            THE DEFENDANT:  I think there are four inaccuracies

14   that I saw.  I think the first was -- and the government, I

15   noticed, they said this in their letter as well -- that I am no

16   longer governed by the standards applicable to pretrial

17   detainees due to the convictions.  And the Second Circuit law,

18   that's not true for the Second Circuit.  So I am still, until

19   there has been a final judgment and sentencing, I am still

20   considered pretrial, and the Court has not adjudicated Rule 29

21   or any of that either.  So in the Second Circuit, that's just

22   not what the law is.

23            The second thing is that I have a right to effective

24   self-representation.  So as far as whatever is needed to

25   maintain effective self-representation and that's necessary.

1    And I just wanted to highlight, the Court mentioned about the

2    laptop.  I just wanted to maintain, and I would like to discuss

3    this after, but in order for me to review the discovery, there

4    is no way for me to review it except through some other

5    computer because MDC does not allow the software.  So I just

6    want to highlight that.  It has nothing to do with

7    self-representation, but as far as actually reviewing

8    discovery, I think I have a right to review my discovery, which

9    includes the materials in the SCIF, and like I said, I think we

10    may need to discuss that later.

11           The other thing is that I have not actually changed my

12    mind multiple times about whether I wanted to represent myself.

13    For the first trial, I specifically made a waiver only for that

14    trial.  I never selected to represent myself here.  And when

15    Judge Crotty did that, he made sure it was on the record that

16    it was only for the espionage trial.  So I haven't gone back

17    and forth on that.  This is the first request for this.

18           And the fourth thing is I think the Court has a

19    misunderstanding of hybrid representation.  Hybrid

20    representation is when counsel is essentially co-counsel for

21    you on the same case.  And the reason for that is so that it

22    makes it confusing for the Court of Appeals if you try to argue

23    ineffective assistance of counsel.  But if there are multiple

24    cases -- for example, the espionage case wasn't even slated for

25    this district, it was a different case.  So if there are two

N4L8SCHC

separate cases, that is not hybrid representation.  So it would

be just like, if I was charged in the Eastern District, I would

have a right to have an attorney represent me on that case if I

wanted to represent myself on a different case in this

district.  So that's not what the legal definition of hybrid

representation is.

Those were just the four inaccuracies that I saw.

THE COURT:  Okay.  Let me address those.  I don't

think your quarrel with whether you're a pretrial detainee has

significance for purposes of your decision to proceed *pro se*,

except that you must understand that you have now been

convicted of many serious offenses, and that certainly factors

heavily into my assessment of various issues relating to the

conditions of your confinement, the resources that you may be

given, and the like.  So you should understand that.  Whatever

your legal status may be is a formal matter and it certainly

bears on my view of what you should be entitled to.  And your

decision to represent yourself is not going to affect that

judgment and those decisions, and I will circle back to that in

a second.

Number two, I don't think it matters whether you have

technically changed your mind or not.  But the fact remains

that there have been periods in this case where you have

represented yourself, periods in your case where you have been

represented by counsel.  That's the important point.

N4L8SCHC

1          Third, on the hybrid representation, I don't need to

2    get into an academic debate with you about what hybrid

3    representation means.  The fact of the matter is this is a

4    single case.  Whatever its origins may be, it is one case, 17

5    Cr. 548.  In this case, you are either going to represent

6    yourself for all purposes or you will be represented by counsel

7    as to all purposes.  The Rule 29/Rule 33 motion is now fully

8    submitted.  You represented yourself in connection with that

9    pursuant to my permission, and so be it.  But going forward

10   it's going to be all or nothing.  You're either representing

11   yourself for all purposes or you will be represented by counsel

12   for all purposes, and there is not going to be any confusion

13   about that.  That's what I mean and you should be absolutely

14   clear in understanding that.

15          The fourth and potentially the most significant thing

16   is your commentary about effective self-representation.

17   Whatever the law entitles you to I will certainly give you.

18   But to the extent that your decision to proceed *pro se* is

19   contingent upon your expectation of any particular resources,

20   it's not a clear and unequivocal request to represent yourself,

21   and I am not going to grant it, because you need to understand

22   that by going *pro se* you are not guaranteed any particular

23   resources.  I have repeatedly cited case law that makes clear

24   that having standby counsel alone is sufficient and therefore

25   addresses any need for particular resources.

N4L8SCHC

1           So if you doing this because you are under the

2     impression that by proceeding *pro se* and representing yourself

3     you will suddenly get your laptop back, or you will get access

4     to the SCIF, or various things that have been taken away from

5     you, number one, you are likely mistaken, because certainly

6     just because you're going *pro se* does not mean I will grant

7     those things back.  And, number two, that's not a clear and

8     unequivocal request to proceed *pro se*, because it's contingent

9     on something that is not just unrealistic but wrong, and

10    therefore, I would not grant your request.  You need to

11    understand that.

12          Do you understand that?

13          THE DEFENDANT:  So just for clarification, the Rule 29

14    hasn't been completed yet.

15          THE COURT:  Oh, it has.  Your deadline to submit a

16    reply was April 13.  I didn't receive anything by that

17    deadline.  It is fully submitted and you will get a decision in

18    due course.

19          THE DEFENDANT:  I was not allowed access to pens or

20    paper or stamps during that time.

21          THE COURT:  Mr. Schulte, it's fully submitted.

22          THE DEFENDANT:  So you --

23          THE COURT:  Mr. Schulte, I am not going to hear

24    anything further on that point.

25          THE DEFENDANT:  I just wanted to make sure it's on the

N4L8SCHC

1    record that I didn't have access to a pen or paper or a stamp.

2    I still don't have access to stamps.  It was something I wanted

3    to address with the Court later on.  I don't know how the Court

4    expected me to file something through telepathy or whatever.

5    There is no possible way to do it.  I want to make sure it's on

6    the record, so when the Court of Appeals reviews this, it will

7    see how crazy it is.

8              THE COURT:  I am sure Mr. De Castro would have brought

9    that to my attention if that were true.  But go ahead.

10             THE DEFENDANT:  That was true.  The last time that

11   counsel went to speak with me I told him.

12             THE COURT:  That's not what we are discussing.

13             THE DEFENDANT:  As far as the laptop, I was very clear

14   a while ago when I said it has nothing to do with being *pro se*.

15   In order to review discovery, I need a laptop and I need access

16   to the SCIF.  If we need to litigate that at some point, that

17   needs to be litigated.  It has nothing to do with being *pro se*.

18   Those needs have to do with the fact of how the discovery is

19   produced or the lack of discovery that I have.  It has nothing

20   to do with being *pro se*.

21             Like I said, the Supreme Court has said I have a right

22   to effective self-representation.  If we need to litigate what

23   that is, we need to litigate what that is.  I am expecting

24   nothing more than that, effective self-representation, as the

25   Supreme Court has guaranteed me, that's all.

N4L8SCHC

1          THE COURT:  Let me ask you again, do you understand

2     that your decision to go *pro se* will not have a bearing

3     on -- well, we will litigate that, but what I am saying is, if

4     your decision to go *pro se* is in an expectation that by going

5     *pro se* you will be given access to resources, like your laptop

6     and the SCIF necessarily, then that belief is mistaken.

7          Do you understand that?

8          THE DEFENDANT:  Yes.  I have never said that.

9          THE COURT:  Does the government have anything it

10    wishes to say at this time?

11         MR. DENTON:  No, your Honor.  I think to the extent

12    that it's something divorced from the request to proceed *pro

13    se*, then we will deal with that as necessary.

14         MR. DE CASTRO:  Judge, if I may, just to add two

15    clarifications.  Not necessarily clarifications, but expand a

16    little on what the Court has said, or at least expand on the

17    discussion of the discovery piece.

18         My understanding is the discovery has been sent to the

19    jail.  This is something that can be litigated certainly later,

20    but that issue, quite frankly, hasn't really bubbled up yet

21    because he hasn't been given access to it yet.  I just received

22    it myself.  I know that prior counsel had not received the

23    discovery in this case.  I am not saying the government did

24    anything in that regard.  It's just that everyone was focused

25    on the espionage piece and then counsel requested the discovery

N4L8SCHC

1    on this piece later in the day, and then I did as well when I

2    came in.  So I received that.  It's voluminous.  So we are

3    going through it.

4              But what I wanted to bring up on the

5    self-representation point is I wanted to make sure that Mr.

6    Schulte, if he was going to represent himself, that we are

7    permitted to manage that process, because it does require,

8    obviously, a lot of communication with the government

9    sometimes.  And as the Court is aware, and the government is

10   aware, we do have an expert that I wanted to make sure to

11   manage, to review that material as well, to be able to discuss

12   any potential defenses with Mr. Schulte.

13             THE COURT:  On that score, I do want to circle back at

14   some point on the discovery piece because I am a little puzzled

15   and concerned about what that means that you just got the

16   materials relating to the upcoming trial.  But on the second

17   point, not only are you permitted to, but my expectation and

18   part of the reason I would have you continue as standby counsel

19   is precisely to serve as an intermediary and help manage the

20   litigation.  Mr. Schulte is in custody.  He is not just in

21   custody; he is subject to rather restrictive SAMs, and that

22   obviously prevents him from communicating with many people on

23   the outside.  So the expectation would be that you would assist

24   him in connection with those things and help manage it.

25             MR. DE CASTRO:  Thank you, Judge.

N4L8SCHC

1          THE COURT:  Can I ask you, Mr. De Castro, since we

2     just addressed it, can you tell me when you met with Mr.

3     Schulte in the last month or two and if you were aware of any

4     restrictions that were placed on his use of pen or paper?

5          MR. DE CASTRO:  I just was consulting with my

6     colleague who met with him this week.

7          THE COURT:  I am most concerned with the period before

8     April 13th, to be candid.

9          MR. DE CASTRO:  So in the prior meetings I have had

10    with Mr. Schulte, it's unclear to me really what access because

11    of the logistics of it, I guess.  We go up, we go up to the

12    special room where they bring him right in off of the unit.  So

13    I don't think I have seen him with a pen.

14         THE COURT:  That's not the question.  The question is

15    whether you had any awareness that he was not allowed to use

16    pen or paper in the last month or two?

17         MR. DE CASTRO:  In terms of pen and paper, I am not

18    aware of it.  It wasn't a topic of conversation because I am

19    more focused on, obviously, this piece, because I know he was

20    self-represented on the prior case.  So it hasn't even been a

21    topic that I was discussing.  So I can't really comment one way

22    or the other.

23         THE DEFENDANT:  This is important and relevant.  In

24    one of my civil cases, this is where the issue came up.  There

25    has been a submission in the civil case where I alerted the

N4L8SCHC

1     judge to know this is my last stamp, I'm writing with a pencil

2     because I don't have a pen; I'm not allowed a pen anymore.  And

3     I actually wrote it on the back of an evidence sheet.  So I

4     submitted that to a civil court a long time before the Rule 29.

5              Also, I did not receive the Rule 29 motion until after

6     the deadline had expired.  As I have told you before, there are

7     so many issues with receiving it.  And another note is that I

8     actually needed to go to the SCIF to address one of the

9     government's arguments, which had to do with something that we

10    litigated in one of our CIPA proceedings.  So I never had

11    access to go to the SCIF either.

12             I would have wrote all of this to the Court, but like

13    I said, I hadn't had access to a pen or paper, and it is

14    documented in at least one civil case and I spoke to the other

15    attorney by phone and notified him of that before the 29

16    motion.

17             MR. DE CASTRO:  Judge, just to add on that.  Civil

18    counsel was here earlier.  A student working with him on it is

19    here as well.  I know it's a subject of that litigation, and it

20    may have been a subject of a conversation with counsel.  Like I

21    said, that wasn't our focus.  So I can't provide any

22    commentary.  I could reach out certainly to civil counsel and

23    provide a letter to the Court.

24             THE COURT:  Give me a moment.

25             Let me put this to rest before we continue with the

1 | *Faretta* inquiry.

2 |           The fact of the matter is that I think it's the most

3 | recent *pro se* submission I received from Mr. Schulte, but

4 | bottom line is I received at least one dated March 17, which I

5 | would note is after the government's deadline to file its

6 | opposition, and at that time, Mr. Schulte had every reason to

7 | understand and expect that his deadline to file a reply was

8 | March 30.  All of which is to say as of March 17, he clearly

9 | had access to paper, and whether a pen or pencil doesn't really

10 | matter, but had the means to make submissions to me, and he

11 | chose to devote his attention to things like the laptop and

12 | seeking my recusal.  It's his choice, but he did not raise any

13 | concerns with respect to his ability to respond to the

14 | government's opposition, which he may or may not have had as of

15 | that date but --

16 |           THE DEFENDANT:  I hadn't received --

17 |           THE COURT:  Mr. Schulte, quiet.  Whether you had

18 | received it or not, you certainly knew you were about to

19 | receive it.  You knew you had two weeks to file a reply.  If

20 | you had any reason at that time to believe that you would not

21 | be able to prepare your reply, you had an opportunity to raise

22 | it with me and you didn't.  So therefore --

23 |           THE DEFENDANT:  I didn't have an issue at that point,

24 | Judge.  It wasn't until later when I didn't have any stamps.

25 | They took away my stamps so I couldn't send a letter.  It has

N4L8SCHC

1   nothing do with the pen or pencil.  I would have written you a

2   letter with pencil, but I couldn't buy stamps; I could only buy

3   one stamp per month.

4           THE COURT:  As far as I am concerned, those motions

5   are fully submitted.  If you have any relief that you would

6   like to seek on that front, you can do so separately, but it

7   doesn't pertain to what we are about to deal with.

8           Let me proceed with the *Faretta* inquiry.

9           I don't think I need to inquire about whether you

10  speak, read, and write English since I am well aware that you

11  do.

12          Are you aware that you have a Sixth Amendment right to

13  counsel?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Are you aware that you also have a Sixth

16  Amendment right to represent yourself?

17          THE DEFENDANT:  Yes.  I don't think it's in the Sixth

18  Amendment, but I have a right to represent myself, yes.

19          THE COURT:  *Faretta* is an application of the Sixth

20  Amendment.  So it is indeed a Sixth Amendment right.

21          While you have the right to represent yourself, the

22  Court must decide for itself whether your waiver of your right

23  of counsel is knowing, intelligent, voluntary, and unequivocal.

24          Do you understand that?

25          THE DEFENDANT:  Yes.

N4L8SCHC

1        THE COURT:  Can you describe your education for me?

2        THE DEFENDANT:  I have degrees in electrical and

3   computer engineering.

4        THE COURT:  Aside from your experience working at the

5   CIA, can you tell me about your work experience.

6        THE DEFENDANT:  I developed malware for the CIA.

7        THE COURT:  I understand that.  But prior to the CIA,

8   can you tell me what you did?

9        THE DEFENDANT:  I developed -- I worked at the NSA on

10  its collection systems.

11        THE COURT:  Let's leave it there.

12        You also worked at Bloomberg after the CIA briefly, is

13  that correct?

14        THE DEFENDANT:  That's right.

15        THE COURT:  Did you ever study law in the United

16  States or anywhere else?

17        THE DEFENDANT:  No.

18        THE COURT:  Do you understand the nature and purposes

19  of this proceeding?

20        THE DEFENDANT:  Yes.

21        THE COURT:  Is your mind clear today?

22        THE DEFENDANT:  Yes.

23        THE COURT:  Do you understand what is happening here

24  today?

25        THE DEFENDANT:  I do.

N4L8SCHC

1          THE COURT:  In the last 48 hours, have you taken any

2    medicine, pills, drugs or alcohol?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Can you tell me when and what you took?

5          THE DEFENDANT:  I have two prescription medications

6    for my health issues.

7          THE COURT:  What medications and when did you take

8    them?

9          THE DEFENDANT:  This is medications I have been taking

10   for a long time so --

11         THE COURT:  Do they affect your ability to understand

12   these proceedings?

13         THE DEFENDANT:  No, they don't.

14         THE COURT:  Are you currently or have you recently

15   been under the care of a doctor or mental health professional?

16         THE DEFENDANT:  No.

17         THE COURT:  Have you received any treatment for

18   addiction, including drug or alcohol addiction?

19         THE DEFENDANT:  No.

20         THE COURT:  Now, let me advise you about the charges

21   for which you have been indicted and the possible penalties for

22   those charges.

23         As I stated earlier, you have already been convicted

24   of eleven very serious charges that were severed from the

25   charges that you still face.  You are facing trial on four

1    other serious charges, including one count of receipt of child

2    pornography, one count of transportation of child pornography,

3    one count of possession of child pornography, and one count of

4    criminal copyright infringement.

5            Do you understand that those are the charges that you

6    continue to face and that will be tried on September 11?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Each of the child pornography counts

9    carries a maximum term of imprisonment of 20 years, a maximum

10   term of supervised release of life and a mandatory term of

11   supervised release of at least five years, a maximum fine of

12   $250,000, or twice the gross pecuniary or financial gain

13   derived from the offense, or twice the gross pecuniary loss to

14   someone other than you as a result of the offense, and a $100

15   mandatory special assessment.

16           The receipt charge and the transportation charge also

17   carry mandatory minimum terms of imprisonment of five years.

18           As for the criminal copyright infringement, it carries

19   a maximum term of imprisonment of five years, a maximum term of

20   supervised release of three years, a maximum fine of $250,000,

21   or twice the gross pecuniary gain or loss, and $100 mandatory

22   special assessment.

23           Do you understand that those are the maximum possible

24   penalties for the crimes that you are charged with?

25           THE DEFENDANT:  Yes.

N4L8SCHC

1          THE COURT:  Do you understand that taking the four

2    remaining counts together, that you face a maximum term of

3    imprisonment of up to 65 years?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you understand the charges for which

6    you are indicted that will be tried in the third trial in this

7    case and the maximum penalties for those charges?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that your sentence will

10   be, in part, governed by the United States Sentencing

11   Guidelines?

12         THE DEFENDANT:  Yes.

13         THE COURT:  That is to say, do you understand that

14   before sentencing for any of the crimes, either the ones you

15   have been convicted of or the ones that you will face in your

16   September trial, that I would have to consider the recommended

17   sentencing range that the guidelines provide?

18         Do you understand that?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Have you discussed the sentencing

21   guidelines with an attorney?

22         THE DEFENDANT:  No, not necessarily.

23         THE COURT:  If you choose to represent yourself, you

24   must stand by yourself.  I can't advise you on how to present

25   your case nor help you with your case.

N4L8SCHC

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you understand, however, that

4    self-representation may conflict with your Fifth Amendment

5    right to remain silent, because you obviously would have to

6    speak in the course of representing yourself?

7          Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Are you generally familiar with the

10   Federal Rules of Evidence?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Are you generally familiar with the

13   Federal Rules of Criminal Procedure?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Do you understand that an attorney may be

16   better able to deal with issues relating to trial, posttrial

17   motions, sentencing, appeal, and other matters?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Do you understand that if you choose to

20   represent yourself, you do not have the absolute right to

21   request that counsel be appointed after that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Apropos of what I said earlier, do you

24   understand that if you choose to represent yourself, it will be

25   with respect to all purposes in this case, unless and until I

1    grant a request for you to go back to having a lawyer?

2            Do you understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Do you understand that if you choose to

5    represent yourself, you must understand that it does not give

6    you license to abuse the dignity of the courtroom or license to

7    violate the relevant rules of procedural or substantive law?

8            Do you understand that?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Do you understand that if you fail to

11   comply with the rules of the Court, including rules regarding

12   the timing, length, and/or content of filings, that I may

13   choose to refuse to consider those filings or even to revoke

14   your *pro se* status altogether?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Do you understand that you must obey my

17   rulings even if you disagree with them, knowing that you have

18   preserved any objections or review by the Court of Appeals?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Do you understand that if you choose to

21   represent yourself, that does not automatically entitle you to

22   revisit rulings that I have already made in this case, indeed,

23   it does not entitle you to revisit rulings I have made?

24           Do you understand that?

25           THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand that if you choose to

2     represent yourself, you will certainly have an opportunity to

3     litigate the question of what resources, if any, you are

4     entitled to, but you may have to do so with the resources that

5     are currently available to you while you're incarcerated?

6          Do you understand that?

7          THE DEFENDANT:  Yes.  I just wanted to raise the

8     issues that I have been having with MDC, as I keep raising to

9     you.  I think effective representation requires access to the

10    court, as the Supreme Court has said, which I have not had

11    recently.

12         THE COURT:  Let me ask again.  You are obviously

13    welcome to raise those issues, and I will rule on any

14    applications for relief that you make with respect to whatever

15    resources you think you're entitled to.  But I want you to

16    understand that by proceeding *pro se*, that may not, indeed

17    likely will not, entitle you to any additional resources merely

18    by virtue of the fact that you are proceeding *pro se*.

19         Do you understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Do you understand that to the extent that

22    you are requesting to proceed *pro se* in the expectation that

23    certain resources will therefore be given to you, that is a

24    mistake and that is not an unequivocal request to proceed *pro*

25    *se*?

N4L8SCHC

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  So your decision to proceed *pro se*, if

4    indeed that is your decision, that decision is made independent

5    of whatever resources you may get based on whatever relief you

6    may seek.  Is that correct?

7          THE DEFENDANT:  Yes.

8          THE COURT:  In particular, do you understand that, and

9    subject to whatever relief you seek and whatever relief I

10   grant, that you may not be given access to a personal computer

11   or other electronic resources, and you may not be able to ask

12   for exceptions to MDC policies or the SAMs that apply to you

13   simply by virtue of the fact that you have chosen to represent

14   yourself?

15         Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Do you understand that now that you have

18   been convicted of the eleven counts that have already been

19   tried, putting aside whether you qualify as a pretrial

20   detainee, and putting aside the fact that the Rule 29 motion

21   has not been decided, you are no longer presumed innocent of

22   those charges even though you are presumed innocent of the four

23   charges that remain?

24         Do you understand that?

25         THE DEFENDANT:  Yes.

N4L8SCHC

1          THE COURT:  Do you understand that because you have

2     been found guilty of those eleven charges, you may be subject

3     to additional constraints while in jail that may be different

4     from those applicable to someone who has not been convicted of

5     any crimes, again, putting aside whether you technically

6     qualify as a pretrial detainee or not?

7          Do you understand that?

8          THE DEFENDANT:  That's what I'm saying, is you can't

9     impose sentence until there has been a sentence.

10         THE COURT:  I understand.  But I mentioned earlier,

11    the fact that you were convicted of those crimes certainly

12    bears on my view of what resources can and should be given to

13    you, and you need to understand that.

14         Do you understand that?

15         THE DEFENDANT:  Yes.  Subject to litigation, but yeah,

16    I understand what you're saying.

17         THE COURT:  Do you understand that I am going to

18    appoint Mr. De Castro to act as standby counsel for you?

19         Do you understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Do you understand that standby counsel

22    cannot advocate for you except with respect to certain matters

23    that I will describe in a moment?

24         Do you understand that?

25         THE DEFENDANT:  Yes.

N4L8SCHC

1          THE COURT:  Do you understand that you will not be

2    permitted to have access to classified information simply

3    because you have chosen to represent yourself?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Your standby counsel will handle

6    litigation relating to any classified matters relevant to this

7    case, and again, subject to any rulings I may make, if you

8    choose to litigate the issue, you will not be permitted to

9    access the courthouse SCIF simply because you are proceeding

10   *pro se.*

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Do you understand that if you do choose to

14   represent yourself, you may only disclose classified

15   information that you already know if I have specifically

16   authorized it, after following the procedures spelled out in

17   CIPA, and that if you disclose classified information without

18   being authorized to do so by me, you may be subject to

19   additional charges and penalties?

20         Do you understand that.

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you understand that an experienced

23   criminal defense attorney is almost always more qualified to

24   conduct a defendant's legal defense than is the defendant

25   himself?

N4L8SCHC

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you understand that if you represent

3     yourself and make mistakes, you would not be able to use those

4     mistakes as a basis for a challenge or appeal to your

5     conviction or sentence?

6          THE DEFENDANT:  Yes.

7          THE COURT:  That is to say, do you understand that by

8     proceeding *pro se* you are waiving any claims of ineffective

9     assistance of counsel relating to your representation of

10    yourself?

11         Do you understand that?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Do you waive any claims of ineffective

14    assistance of counsel relating to your own representation of

15    yourself?

16         THE DEFENDANT:  There is nothing to waive.  I just

17    don't have a right to it.

18         THE COURT:  You understand that?

19         THE DEFENDANT:  I understand that, yes.

20         THE COURT:  In light of the penalties you may suffer

21    if you were found guilty of the four remaining charges, in

22    light of all the difficulties of representing yourself, you

23    still wish to represent yourself and give up your right to be

24    represented by counsel for all purposes in this case going

25    forward?

N4L8SCHC

1          THE DEFENDANT:  Yes.

2          THE COURT:  Are you making that decision and that

3   waiver voluntarily?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Has anyone made any threats to you in

6   order to get you to waive your right to counsel?

7          THE DEFENDANT:  No.

8          THE COURT:  Has anyone given you any inducements or

9   made any promises to you to get you to waive your right to

10  counsel?

11         THE DEFENDANT:  No.

12         THE COURT:  Let me make clear, if I haven't already,

13  that in my view, representing yourself at trial is generally an

14  unwise decision and you would be far better off represented by

15  an experienced criminal defense attorney than representing

16  yourself.

17         Do you understand that that is my view?

18         THE DEFENDANT:  I do.

19         THE COURT:  All right.

20         Counsel, any of you think that I should ask any

21  additional questions of Mr. Schulte?

22         MR. DENTON:  Your Honor, I think there has obviously

23  been a lot of back and forth with the defendant about his right

24  to litigate what resources may be available to him.  I think it

25  might be worth just clarifying that in the event that he

N4L8SCHC

litigates those issues and loses, the Court may not give him

the right to then elect to have counsel step in at that point,

that he has got to make a decision at this stage and then it

can't be contingent on the outcomes of what happens later.

THE COURT:  All right.

Let me modify that slightly, but Mr. Schulte, let me

ask you, to the extent that you do litigate issues relating to

what resources or conditions you are subject to going forward,

do you understand that if I rule against any of your requests,

that I may not grant a request for you to go back to having a

lawyer at that time?  I am not saying I will not, but I

certainly may not.  And do you understand that that is a risk?

THE DEFENDANT:  I do.

THE COURT:  As I said earlier, I can assure you that I

will not grant any request to go back to having a lawyer if it

would affect the schedule in this case, and in particular, the

firm trial date of September 11.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Mr. De Castro, anything else that you

think I should ask?

MR. DE CASTRO:  No, your Honor.

THE COURT:  Do both counsel agree that I can and

should make a finding that Mr. Schulte is competent to stand

trial and to represent himself, that he understands that he has

N4L8SCHC

1    the right to be represented by counsel, that he is competent to

2    waive his right to counsel, and that he has waived his right to

3    counsel knowingly, intelligently, voluntarily, and

4    unequivocally?

5              MR. DENTON:  Yes, your Honor.

6              MR. DE CASTRO:  Yes, your Honor.

7              THE COURT:  I so find on the basis of Mr. Schulte's

8    allocution, and therefore, going forward, unless and until I

9    say otherwise, he is now representing himself.

10             All right.  With that, let's turn to other matters.

11             First, Mr. Denton, I don't suppose you know anything

12   about the pen, paper, those issues.

13             MR. DENTON:  No, your Honor.  I would just note that

14   the only other information we have is that on -- it was

15   received later, but Mr. Schulte filed a letter in his Rule

16   41(g) proceeding in the Eastern District of New York that was

17   dated March 21st.  It does not make any reference to these

18   issues.  I am not familiar with what he may have filed in the

19   civil dockets, but that's an additional data point that we do

20   have.

21             THE DEFENDANT:  March 21st was when I raised those

22   issues.  That's when I say I don't not have access to a pen or

23   a pencil and stamps.

24             THE COURT:  Does either of you have the docket number

25   of that case?

1          MR. DENTON:  One second, your Honor.

2          THE COURT:  Mr. Schulte, just to be clear, as far as I

3    am concerned, the Rule 29 motion is fully submitted.  If you

4    wish to submit something and seek relief and make a record of

5    when you ceased to have access to pen, paper, stamps, or

6    whatever you would have needed to file your reply, make a

7    record of when you received the government's opposition, you

8    are certainly welcome to, and I will consider any relief that

9    you seek.  But unless and until I say otherwise, that motion is

10   fully submitted as far as I am concerned.

11         Now, let's talk about the computer situation.

12         MR. DENTON:  The docket number for the letter that I

13   was referring in the Eastern District of New York is 22 Civ.

14   5841.

15         THE COURT:  All right.

16         Let's talk about the laptop computer situation.

17         Per my order of March 29, I raised the question of

18   whether and when I should hold an evidentiary hearing with

19   respect to the defendant's alleged misuse of the laptop and/or

20   other resources insofar as he is adamantly and continuing to

21   dispute the government's allegations and may bear on the

22   question of what resources, if any, he is given in connection

23   with his self-representation.

24         Mr. Denton, I don't know if you can give me in this

25   setting an update on where things stand on that investigation,

1   but if you can, please do, and beyond that, please give me your

2   thoughts on that question.

3        MR. DENTON:  So I don't think that there is much

4   substantively to say beyond our last update, your Honor.  There

5   obviously have been some issues that the FBI is working

6   through.  The FBI continues to examine the laptop and the other

7   devices.

8        With respect to the other devices and not the laptop

9   itself, I would note that the FBI determined that the defendant

10  created encrypted partitions on a number of the discovery hard

11  drives that have been provided to him, which, again, we are

12  working on, but that complicates the search process.  And I

13  would note it's separately concerning to us because it's not

14  clear why those would be necessary in discovery hard drives.

15       I think with respect to the question of a hearing,

16  your Honor, there is sort of three nested questions there.  The

17  first is whether a hearing is appropriate.  The second is, to

18  the extent that a hearing is necessary in the context of some

19  form of process, what kind of hearing it needs to be, and

20  whether it needs to be an actual hearing or simply the Court's

21  consideration of the facts before it.  And then the third is

22  whether it bears on the ultimate issue.

23       I think the first question is an important one.  As

24  the Court has repeatedly reminded Mr. Schulte, he has no right

25  to a discovery laptop.  I think if we were taking this case as

1    a blank slate, Mr. Schulte in jail, charged with the offenses

2    that remain pending against him, this is not the sort of case

3    in which a defendant would be provided with a discovery laptop.

4         And so, in the absence of a sort of regulatory,

5    statutory or constitutional right to something, and going back

6    to sort of first principles here, a *Goldberg v. Kelly*

7    determination of when due process requires a hearing, but it's

8    not clear to me that a hearing is required for something that

9    he is not entitled to as a matter of right in the first place.

10        THE DEFENDANT:  So just to address that real quickly,

11   the discovery laptop was first provided to me because of the

12   child pornography case, and it was provided to me because the

13   MCC refused to provide the electronic software needed to review

14   the discovery.  Because at first I was not provided a laptop.

15   The government produced discovery, and when I was not able to

16   review it, it was litigated through Crotty and the MCC said

17   that they won't allow that software to be installed, and that

18   was the reason the laptop was provided.  So to say that this is

19   not the case that requires a laptop, that was before the

20   espionage case was ever superseded.

21        I just wanted to make sure the Court is clear on this.

22   What I am talking about is the software that is required is the

23   forensic images require software called FTK.  E-mails that the

24   government has seized require special e-mail software to

25   review.  There is other software necessary, 7-Zip, to review

N4L8SCHC

1   archives that the government has created.  I was provided a CD

2   from the government with 20 different software suites on it.

3   It was all the stuff that was necessary to review and not a

4   single one of those 20 pieces of software the MCC allowed, none

5   of that software is permitted on these computers.

6           Just to also raise this.  The government seized my

7   discovery in September, and to this day I still do not have it.

8   And we raised this with the government a long time before.  So

9   it's really outrageous that for nine months I haven't even had

10  discovery at all and they are just now providing it.  I just

11  wanted to make sure that's raised as well.

12          THE COURT:  I plan to get back to the discovery issues

13  in short order.  But, Mr. Denton, you flagged three separate

14  questions or issues.  I am not sure you gave me your views on

15  them.  I can probably infer some of them, but what are your

16  views?

17          MR. DENTON:  Sure, your Honor.

18          So assuming for a moment that the Court feels the need

19  to make factual findings related to this, there is no sort of

20  talismanic requirement that we call witnesses and have an

21  adversarial hearing, because in the bail context the Court

22  relies on the charging instruments and the proffers of the

23  government.  In this instance, the Court has reviewed and in

24  some cases approved search warrants based on affidavits sworn

25  to by law enforcement officers.  The government has made

N4L8SCHC

1    additional proffers regarding the facts.  And the Court had the

2    opportunity to observe the defendant's use of the laptop,

3    including some of the things that gave rise to concerns that we

4    alerted the Court to during the last trial.

5         So I think, again, to the extent that we are in a sort

6    of due process land here, where there is not a sort of clear

7    procedural path, the Court has freedom to be flexible and

8    decide what level of process is due.  In this circumstance,

9    given that what we are talking about is conduct that may be the

10   subject of potential charges or, at the very least, may bear on

11   pending charges, conducting an evidentiary hearing divorced

12   from, for example, a pretrial motion or other sort of clearly

13   established right to fact-finding, raises additional problems,

14   and given that there is sort of a sound basis for the Court to

15   rely on proffers, we think the flexibility that the due process

16   clause permits would be appropriate.

17        Then the third point with respect to the outcome sort

18   of brings us back to the point that the Court reminded Mr.

19   Schulte of a number of times, which is this is not the only

20   reason why the government has concern about him having a

21   laptop.  While, obviously, the fact that he may have engaged in

22   additional criminal conduct in jail is related to the

23   possession of child pornography is undoubtedly serious, the

24   fact remains that Mr. Schulte has been convicted of some very

25   serious computer crimes while in jail.

N4L8SCHC

1      So I think, again, we are not simply talking about
2  whether there is a factual determination about whether he is
3  guilty or innocent of as yet uncharged criminal conduct.  There
4  is sort of the whole tapestry that goes into whether it's
5  appropriate for Mr. Schulte, at this moment in time, to have
6  access to an unmonitored computer.  And we think that the
7  answer there, when putting everything together, is fairly
8  obviously no.

9      THE DEFENDANT:  So to address --

10      THE COURT:  Mr. Schulte, thank you.

11      Mr. Denton, let me ask you this.  One issue that seems
12  to be in dispute is whether there were thumbnails and only
13  thumbnails of child pornography on the computer or full files.
14  I take it from your submissions that you disagree with the
15  defendant's claim that they were merely thumbnails, let alone
16  thumbnails that he claims the government put on there.

17      If I were to try to resolve that dispute, how hard
18  would that be, what form do you think it could take, and so
19  forth?

20      MR. DENTON:  I do not think it would be hard, insofar
21  as I can say I have seen the images opened.  So I know that
22  there is a way to do it.  I don't know technically how
23  difficult it would be.  We have certainly been able to proffer
24  it based on our conversations with the agent who examined it.
25  If it was necessary to submit some sort of declaration, I would

N4L8SCHC

1    want to be very careful about exhibits in this context, but I

2    think we can certainly consider putting something like that

3    together.

4            With respect to the claim about the government having

5    put it there, that I think there is a very easy solution to,

6    which is we have the file listing of what was on the laptop

7    when it was given to him.  I think it's a very large Excel

8    file, but we can certainly provide the Court with that.

9            THE COURT:  Mr. Schulte.

10           THE DEFENDANT:  Two things.  One, I agree that an

11   evidentiary hearing I think is necessary if something

12   essential, such as reviewing discovery, is up for the debate

13   here.  And I agree with Mr. Denton that this would be very easy

14   to be able to determine whether these are just, as I have been

15   saying, thumbnail images versus actual files, very easy to do.

16   But we have our expert that we would want to be able to review

17   the laptop, who has not been able to review any discovery yet,

18   but for him to be able to review it.  And then, also, I think

19   that there is some discovery that's necessary that would

20   describe the content.

21           As for the allegation that the government put the

22   files there, I want to be very clear.  I have never said that

23   the government put the files there.  I said what the government

24   did is they connected the discovery drive to the laptop, and at

25   that point they didn't copy any of the child pornography over,

1   but that was all that was necessary for the system to

2   automatically copy the thumbnails.  So that also, I think,

3   would be something that would be easily proven through the

4   forensics on the laptop, plugging in the device and showing

5   them this is where those files were generated.  But just to be

6   clear, I am not saying the government actually copied the files

7   over; it was automatically copied once they plugged the drive

8   in.

9            But both of those things I think are very easy to show

10  through an evidentiary hearing, and I think one is necessary,

11  and that we should have a right to review that evidence and

12  have our expert submit his affidavit as well.

13            MR. DENTON:  Your Honor, just one thing.  On the last

14  point, that's just flatly false.  The defendant's former

15  defense counsel was the one who loaded the files on the laptop,

16  and for what it's worth, did not have access to the child

17  pornography because it was being stored, in connection with the

18  Adam Walsh Act procedures that were previously being adhered

19  to, in the SCIF storage.  The government did not load anything

20  onto the laptop or connect it to anything.  All we did was

21  review it, make a file of the segments, and send it on.

22            THE COURT:  Let me table for a moment any question or

23  my commentary on whether or when a hearing would be appropriate

24  because it may be affected by our discussion about discovery.

25            Mr. Denton, can you elaborate or respond to what Mr.

1    De Castro and Mr. Schulte have said with respect to the

2    discovery relating to the upcoming trial, when it was made,

3    what it consists of?  I had assumed, perhaps mistakenly, that

4    all of that was produced long ago and there was no additional

5    discovery to be provided.

6              MR. DENTON:  That is correct, your Honor.  All of the

7    discovery -- and what Mr. De Castro and Mr. Schulte are

8    referring to are reproductions of materials -- that was in fact

9    produced long before the first trial in this matter, much less

10   the second.

11             We had a somewhat extended back and forth with Mr.

12   Schulte's prior counsel who asked us to reproduce the

13   discovery.  That obviously includes quite a bit that related to

14   the espionage charges and has nothing to do with the search of

15   the defendant's home or anything like that.  We asked Mr.

16   Schulte's former counsel to identify which of the previous

17   discovery productions should be reproduced.  Ultimately Ms.

18   Shroff declined to do that.  And so we ended up in a position

19   where we just reproduced all of the unclassified discovery,

20   including everything related to the espionage case.  So that

21   took longer than a more targeted production of relevant

22   materials only to the child pornography case.  But now Mr. De

23   Castro has everything with one exception, which is the

24   defendant's Plex server, the movie server.  And then the

25   defendant has a copy of it, or I should say the MDC has a copy

N4L8SCHC

1    of it, and we will work with them to figure out why he doesn't

2    yet have it, but they have confirmed to us that they received

3    it.

4            THE COURT:  A few follow-up questions.

5            First of all, why doesn't Mr. De Castro or didn't Mr.

6    De Castro have the Plex server, whatever that was called?

7            MR. DENTON:  We did not reproduce that because I think

8    that's something like 12 terabytes.  Ms. Shroff has a copy of

9    it.  The defendant has a copy of it.  We sent a copy of it to

10   the MDC.  We are working on making another copy of it.  It's a

11   massive thing that requires a particular externally powered

12   hard drive and it's a little more complicated to copy.

13           THE COURT:  Was it made available to Mr. De Castro; in

14   other words, did you offer him access to it in some fashion?

15           MR. DENTON:  We didn't discuss that specifically.  We

16   haven't discussed making it available separately because we are

17   copying another copy of it.  That's still in progress.

18   Certainly, if Mr. De Castro wants to, in his capacity as

19   standby counsel, see it in the interim, we are happy to make

20   arrangements for that.

21           THE COURT:  You alluded to conversations with Ms.

22   Shroff in which she asked you to reproduce certain things that

23   had already been produced, and then ultimately the culmination

24   of that where you just reproduced everything.  Can you tell me

25   the timing of those steps?

N4L8SCHC

1          MR. DENTON:  There were a series of discussions during
2     the sort of winter.  I can look up and get back to the Court
3     about the particular dates.  Ms. Shroff asked us to reproduce
4     the discovery.  We said, that's quite a lot.  We are happy to
5     go through the index with you.  Tell us what you want.  We will
6     give you anything in particular that you want, but there are
7     many terabytes of data, a lot of which is CIA information and
8     declassified information, and it seems like a waste to do that.
9     That went on probably longer than it should have, your Honor,
10    and ultimately we just got to a place where we decided we are
11    just going to reproduce everything.  Mr. De Castro got us those
12    series of hard drives both for himself and for Mr. Schulte.  It
13    took a while to copy, and so that's where we are now.  I think
14    that was all sent in the last month.  I am not sure exactly
15    what dates.

16          Again, to be clear, there is nothing there that had
17    not been produced previously.

18          THE COURT:  I guess I am concerned, though.  The
19    existing schedule order in this case provided for CIPA notices
20    by February 24, expert disclosures by March 10, CIPA motions
21    under 6(a) by March 21, and non-CIPA motions by April 13, all
22    of those deadlines having now passed.  No one sought an
23    extension of any of those deadlines.  I wasn't aware that there
24    was any issues going on with respect -- to be clear, I want to
25    be clear, there is no discovery violation here.  To the extent

1    that things were reproduced, the defendant already had access

2    to them.  But be that as it may, I am just a little puzzled and

3    concerned about the schedule and the implications of this

4    information.

5            MR. DENTON:  So, first of all, your Honor, with

6    respect to some aspects of the deadlines, particularly those

7    dealing with classified information, none of that is within the

8    realm of what we are talking about.  I gather there was some

9    cleanup that was done in the SCIF, but otherwise, everything

10   that had been produced remains there.  So none of the CIPA

11   information should have been affected.  This deals only with

12   the unclassified discovery.

13           THE COURT:  So can I assume on that basis that there

14   is no CIPA issue with respect to the upcoming trial?

15           MR. DENTON:  I can say that I don't believe the

16   government intends to rely on any classified information.

17           THE COURT:  Did the defendant give you any CIPA

18   Section 5 notices?

19           MR. DENTON:  He did not, your Honor.

20           THE COURT:  Keep going.

21           MR. DENTON:  I think, again, with respect to the other

22   pretrial motions, we did adjourn the expert notice deadline,

23   with the consent of the parties, just so that we could have a

24   little more time, until the end of May in particular, in light

25   of the amended requirements of Rule 16(g), to give both parties

N4L8SCHC

1    the opportunity to prepare reports that are compliant with

2    that.

3               THE COURT:  Remind me, did I authorize that or you

4    just agreed between yourselves?

5               MR. DENTON:  You did, I believe, your Honor.

6               I'm sorry, your Honor.  It was a discussion between

7    counsel.

8               THE COURT:  In light of the recent amendments, I think

9    that is something that should have been brought to my

10   attention, but as long as it doesn't affect the trial date, I

11   retroactively bless it.

12              Next.

13              MR. DENTON:  We appreciate that, your Honor.  What we

14   agreed on was May 26, so that it was in advance of the motion

15   *in limine* deadline in case either party wanted to litigate

16   issues relating to the adequacy or admissibility of the expert

17   disclosures.

18              THE COURT:  Let me formally say that expert

19   disclosures are to be made by May 26.

20              Next.

21              MR. DENTON:  I think with respect to the pretrial

22   motions, your Honor, I am not entirely sure what to say.  It is

23   true that that deadline has come and gone, that we have been in

24   these discussions about discovery.  I am not entirely sure that

25   there would have been any other litigation to be had

1    necessarily.  I don't want to speak for Mr. De Castro or Mr.

2    Schulte, but obviously there has been quite a lot of litigation

3    over the search of his home, and then of his computer, that

4    gave rise to the charges that are pending against him.  So I

5    suppose it didn't surprise us that motions were not filed, and

6    I am not sure we necessarily saw a connection between the two

7    discussions.

8         THE COURT:  Can you talk about, now that Mr. Schulte

9    is representing himself, what is your understanding of what he

10   has and has access to and his means of reviewing it in the MDC.

11        MR. DENTON:  So he should have access to a complete

12   copy of the unclassified discovery.  Again, we gather that we

13   are in a seemingly repeated situation in which we have sent

14   material to the MDC, they have confirmed receiving it, but it

15   hasn't made it to Mr. Schulte yet.  So we learned of that today

16   and we will follow up with the MDC about that.

17        With respect to Mr. Schulte's technical ability to

18   review the information, again, I can't say that I know exactly

19   what he has available to him.  To the extent that there are

20   files that he wants to open and can't, we are happy to take

21   requests through standby counsel to reproduce that in a form

22   that he can access.  My understanding is that PDFs certainly

23   are something he can take a look at.  So if it's a matter of

24   converting things to that form that he wants to take a look at,

25   we are happy to receive and respond to requests along those

N4L8SCHC

1    lines.  Obviously, to the extent that he wishes to look at

2    things and not alert the government to that, standby counsel

3    can also assist him with converting or looking at things in a

4    particular format.  But within the constraints of what the MDC

5    makes available, we are happy to figure out what he needs.

6              THE COURT:  Mr. Schulte.

7              THE DEFENDANT:  Two things.  I just want to highlight,

8    the government keeps saying reproduction, it was only a

9    reproduction.  To be clear, all of my discovery was taken in

10   September.  So I didn't have any.  So I needed a reproduction

11   of it.

12             As for the discovery that I would need access to, it's

13   not simply a matter of changing the format.  Forensic images

14   only come in one format and there is no software going to be

15   available.  No matter what the government claims to change it

16   to, the MDC only allows a PDF viewer.  You can't even open

17   Office documents or anything like that.  And they have been

18   very vocal to the effect they will refuse to allow any other

19   software ever put onto that computer.  So something like 95

20   percent of the discovery is forensic images and none of these

21   can be reviewed.

22             As for the CIPA and classified issue, I just wanted to

23   raise to the Court so that the Court knows that the primary

24   server in this case is classified.  The government classified

25   it because it had Snowden documents from the internet on it,

1    and that is the reason that the SCIF is necessary to review

2    this.  This is Rule 16 material because it was a server that

3    was taken from my home, so it is proper Rule 16, and it's also

4    critical for the defense's case.  So there needs to be some

5    access to this provided so that it can be reviewed.

6            The last thing I want to raise is the expert on May

7    26.  Standby counsel has let me know that the expert still has

8    not been given access to anything at this point.  He still

9    hasn't been able to review anything.  He has been trying to for

10   a while.  So I wanted to raise that because that may become an

11   issue later on if the expert is still not able to review any of

12   the discovery.

13           THE COURT:  Mr. Denton.

14           MR. DE CASTRO:  I'm sorry.  If you don't mind, your

15   Honor, I just wanted to go through some of those issues because

16   I was counsel at that point.

17           THE COURT:  Just keep your voice up, please.

18           MR. DE CASTRO:  So apologies on the expert deadline.

19   The government and I spoke.  I was in the middle of a trial

20   from January until the end of February.  And we knew we needed

21   to discuss the issue given sort of access to materials.  And

22   then that takes me back to the discovery issue, which the

23   government is correct, it's a reproduction.  I didn't want to

24   suggest they didn't produce discovery.

25           When I came into the case as replacement co-counsel,

1    without getting into detail, I don't think it's necessary, I

2    learned that that original discovery, meaning this case's

3    discovery, which, of course, was not the focus of the last

4    trial, I wasn't given access to it pretty easily, or I wasn't

5    sure if counsel had it or what was going on there.

6         So, as Mr. Denton said, there was a significant back

7    and forth between Ms. Shroff and the government about producing

8    it, not producing it, all of those gymnastics.  So when I took

9    over, I just said, okay, I don't have it.  I need to get it.  I

10   don't want to deal with trying to get it wherever it is.  It's

11   just much easier if I send you a drive.  And they did.  So I

12   know it took a long time to produce and we received it.

13        So the expert issue was another issue that I raised

14   when I came into the case, which was we need an expert because

15   I can't look at these things and understand them pretty

16   clearly.  And so the Court granted us an expert that we found,

17   meaning this counsel found, in March.  And then the government

18   was aware of who it was.  And so the government -- it is true,

19   the expert has not had any access to anything yet.  And the

20   expert and the government agents are communicating directly,

21   and we are waiting for him to have access to the images to

22   opine on the child pornography issues, to the extent that there

23   is a defense related to the possession charges.

24        I did send the government a drive for the copyright

25   material, which I understand is pretty massive.  I did speak

N4L8SCHC

1    with Mr. Lockard -- I know Mr. Denton was not present -- that

2    if I need to go in and see it, I can go in and see it.  But we

3    focused more on the other discovery materials, and they are

4    copying the copyright material, which I understand is just huge

5    and it mostly consists of motion pictures.

6            THE COURT:  What exactly has the expert not been given

7    access to, and previously, have you requested that he be given

8    access to it?

9            MR. DE CASTRO:  Yes.  I think the government has to

10   speak to that because we have asked for him to be able to

11   review the evidence in the case.  I know the second piece about

12   this alleged possession during the trial and all of that stuff

13   is related, but I have really asked for him to be able to

14   review the original evidence on the original charges, because,

15   of course, Mr. Schulte is not charged with this additional

16   possession or there hasn't even been a 404(b) motion or

17   anything like that.  So it's sort of sitting there, but I have

18   asked for that access, and I understand -- and we have put the

19   agent in direct communication with the FBI.  And if I can look

20   at my e-mail, I can tell you that he spoke to them, and I know

21   that he is waiting for them to get back to him, that is, the

22   FBI agent to get back to him on when he can access it, how, and

23   he will come and do it.

24           THE COURT:  And is the "it" just the images of child

25   pornography?  Is it unclassified and just subject to the Adam

N4L8SCHC

1    Walsh procedures, or is it classified?

2              MR. DE CASTRO:  My understanding is it's all

3    unclassified.  I don't know if they have gotten past initial

4    discussions.  The expert has not raised any classified issues

5    with me.  But if the government has any different information,

6    they can let me know.

7              THE COURT:  Mr. Denton, can you elaborate?

8              MR. DENTON:  Yes, your Honor.

9              So just in terms of what we have done since the expert

10   was retained.

11             First of all, we have made sure that MDC has cleared

12   the expert on the SAMs list so he is free to confer with Mr.

13   Schulte.  The expert was traveling.  There was some phone tag

14   between him and the agents.  My understanding is that they have

15   now spoken.  In the interest of making it productive, the

16   expert has given the agents a set of sort of technical

17   requirements of what he will need and what he wants.  It is all

18   unclassified, but it is not just looking at the images of child

19   pornography.  He wants the forensic images of the entire

20   devices in a particular form along with a variety of other

21   materials.  I honestly can't really speak to what precisely

22   they are, but I gather they are sort of the type of technical

23   information that would be productive.  They have discussed that

24   the expert would like, essentially, a sort of week-long block

25   where he can come and review the material, confer with Mr.

1    Schulte, review the material again, and so on.

2         So, at this point, as of the end of last week was

3    their last direct communication.  That's just in process.  The

4    agents are assembling what he has asked for.  He is looking at

5    his schedule about when we might be able to make that work.  I

6    can't say exactly when that will happen, but I don't see any

7    impediments to making that happen.

8         THE COURT:  Let me say on that score make it happen.

9         Mr. De Castro, to the extent you are necessary to help

10   manage that process, given Mr. Schulte's custody and SAMs, you

11   have to make it happen too.

12        MR. DE CASTRO:  I am on it.

13        THE COURT:  That should not cause any delays.

14        Mr. Denton, can you respond to the few points that Mr.

15   Schulte made.  Number one, he can't review forensic images in

16   the MDC, and number two, that the primary server is classified

17   and potentially relevant here.

18        MR. DENTON:  I can speak to the latter I think

19   relatively easily.  There was a server that was seized from the

20   defendant's house that did contain classified information and

21   that is in the SCIF.  It was produced because it was seized

22   from the defendant.  It is not clear to me that it is relevant

23   here; it is not the primary server.  It is his server, but it

24   was his desktop computer that contains the child pornography.

25   That's unclassified.  That image has always been maintained

1   solely pursuant to the Adam Walsh Act.  That was previously

2   kept in the SCIF because that was the easiest compliant place

3   to do it.  But as we have discussed, and as we have already

4   dealt with at least once, we are no longer doing that; and so

5   if the defendant wants to see that, or his expert wants to see

6   that, that does not require production to the SCIF.

7          With respect to the viewing of forensic images, I am

8   sure that there is some limitation on that at the MDC.  I doubt

9   that they have sort of the full suite of software that the

10  defendant would like.  I am not sure that that alone entitles

11  him to a laptop.  He has got an expert who can look at the

12  images, and forensic artifacts certainly can be exported to the

13  forms in which they can be viewed.  We didn't pull up FTK

14  imager in the courtroom in front of the jury.  We had exhibits

15  that were shown.

16         So, again, to the extent that the defendant wants to

17  see things that he currently can't, he has the combined good

18  offices of the government, standby counsel, and an expert who

19  can help make them available in that way that he can.

20         THE COURT:  Finally, Mr. Denton, let me circle back to

21  the, quote/unquote, laptop investigation.

22         I am concerned that it's taking so long.  I think they

23  were seized, if I remember correctly, in September.  It's now

24  close to May.  I understand it's complicated.  I understand

25  there are encryption issues.  I understand there are

N4L8SCHC

1    classification issues.  But that is a long time.  And my

2    concern is it may be that you decide to bring additional

3    charges; it may be that you don't but argue that this is

4    admissible at trial on the existing charges.  I don't want to

5    be sandbagged in either of those cases.  Or the third option is

6    that this proves to be irrelevant and unrelated to the

7    forthcoming trial, which would be less of a concern.  But I

8    feel like we kind of need to know which of those buckets we are

9    in, because if it's either of the first two, I think Mr.

10   Schulte and his expert, standby counsel, whoever, is entitled

11   to whatever discovery they are entitled to in connection with

12   that, and there may be issues that we need to litigate and so

13   forth and I am just concerned that that ends up blowing up what

14   was a carefully crafted schedule.

15          So, can you speak to what is going on and address my

16   frustration slash concern that this is still lingering?

17          MR. DENTON:  I don't think I can other than to say

18   that your frustration and concern is fair, and that we

19   certainly, I think, would be and should be in a position to

20   inform the Court of which of those buckets we expect to be in.

21   I think this is partly a limited resource problem.  We have got

22   only a few folks who are able to do this kind of work on the

23   government side in the form necessary here, and they have been

24   dealing with the reproductions, the need to make old material

25   available to the defendant.  We arranged for him and his prior

N4L8SCHC

1    counsel to come and view it.  They are trying to walk and chew

2    gum at the same time as best they can, but there's only so many

3    hours in a day, and there have been a lot of days, your Honor

4    is correct.  So the best I can say is we understand the

5    concern, and we are happy to confer and advise the Court and

6    Mr. Schulte about, at a minimum, sort of which bucket we expect

7    those things to be in.

8         THE COURT:  I am not going to set a deadline for that

9    at the moment, but there may be a day where I do.  And you

10   should know and you should convey to the powers that be and

11   whoever is in the position to decide what resources get devoted

12   to what that my frustration is growing, and we are nearing the

13   time where I do give you a drop-dead deadline, because I think

14   we need to have an answer to those questions so that we can

15   deal with whatever the ramifications are for the September

16   trial.

17        MR. DENTON:  Understood, your Honor.

18        THE DEFENDANT:  Just to clarify real quick, the laptop

19   was confiscated in July.  So it's almost been a year now.  They

20   had even longer.

21        THE COURT:  Thank you.

22        So I guess my inclination is to say the following with

23   respect to all of the issues that we have just discussed.  I

24   think it's not clear to me that a hearing is necessary or

25   appropriate at the moment, in part because I think it bears

1  most directly on issues relating to -- well, I think it's most

2  affected by two things that I think are not fully clear.  One

3  is what bucket we are in as to those materials.  That is what I

4  just discussed with Mr. Denton.  If it turns out we are in the

5  third bucket, and the government has no intention of using it

6  in any way, shape or form in connection with the upcoming

7  trial, then it's less relevant or necessary to get to the

8  bottom of the parties' disputes on that issue.

9          Number two, I think it's also unclear to me what

10  access the defendant has to the materials that he needs to

11  prepare for the upcoming trial; and more to the point, whether,

12  to the extent that he doesn't presently have access, whether

13  there are means to give him access, for example, by converting

14  things into a format that he has access to in the MDC.  And I

15  think some additional efforts can be made on that score, with

16  the assistance of standby counsel, with the assistance of the

17  government, and with Mr. Schulte now articulating what he needs

18  and identifying it, and working through, on a practical level,

19  if there is a way to give him what he feels he needs without

20  necessarily visiting the issue of the laptop and deciding

21  whether he should have a laptop.

22          All of which is to say I am inclined to leave things

23  where they are at the moment, recognizing that Mr. Schulte can

24  obviously seek relief if he thinks he is entitled to it.  But

25  also recognizing that the government needs to give an answer on

N4L8SCHC

1    the bucket question and that Mr. Schulte, with the assistance

2    of Mr. De Castro and the assistance of the government, and my

3    efforts, as I will communicate directly with the MDC, but first

4    try to resolve as much as possible with respect to access

5    issues to discovery, resolve it in a way that wouldn't

6    necessitate any additional resources beyond those that he

7    already has.  That's my thought.

8              Mr. Denton, your thoughts on that.

9              MR. DENTON:  Your Honor, we think that seems fine.  We

10   are happy to try and work with standby counsel and defendant's

11   expert on anything the defendant needs.  Certainly, if it would

12   help for us to communicate with the MDC as well, we will

13   continue to do so.

14             THE COURT:  Let me underscore that the clock is

15   ticking.  It's April 21.  September 11 is not quite as far off

16   as it once was.  So all of these things, there is some urgency

17   and everybody needs to start acting like there is urgency and

18   dealing with them.

19             Do you understand that?

20             MR. DENTON:  Heard loud and clear, your Honor.

21             MR. DE CASTRO:  Judge, if I could suggest, I just

22   spoke to Mr. Schulte, that you set a deadline for the

23   government to get to the bottom of the issue of his access.

24   The only reason I say that is I do not doubt that the

25   government is going to call today.  It's just that I think that

N4L8SCHC

1    the BOP seems to operate differently when there is a deadline,

2    just for a letter or something like that.  That's just my

3    experience with the BOP.

4              THE COURT:  I guess it is a form of a deadline.  I do

5    want to stay on top of this.  I plan to reach out to the BOP

6    and MDC myself.  There is a gentleman who is appointed as a

7    liaison to deal with the courts and MDC-related issues, and I

8    have dealt with him many times, and in particular many times

9    about this case, and he has been quite responsive and helpful.

10   So I assume that that will facilitate things.

11             But I agree, it does make sense for me to remain on

12   top of this and, therefore, be informed as to what is going on.

13   So why don't I impose on the government in submitting a letter,

14   why don't we say by the end of next week, at least a

15   preliminary report relating to these issues, and if I feel the

16   need for a follow-up report, I will tell you.

17             Does that make sense, Mr. Denton?

18             MR. DENTON:  Yes, your Honor.  Just to be clear, the

19   issues you would like us to report on are the defendant's

20   access in jail, and to the extent there are any discussions

21   about providing things in another format, the status of that

22   subject?

23             THE COURT:  I guess to put a finer point on it,

24   whether and how the defendant can be given access to the

25   discovery materials in jail without the need for a laptop or

N4L8SCHC

1     resources that he doesn't presently have.

2          MR. DENTON:  That's fine, your Honor.  I think we can

3     solve the first part of that problem pretty readily, just

4     making sure he has access to the hard drives, which he can then

5     plug into the MDC computer.  We can certainly make sure that

6     happens in short order.

7          The second question of whether he needs things in a

8     different form, or whether the software is adequate, may

9     require some dialogue, and we will just report on the state of

10    play on that by next Friday.

11         THE COURT:  Great.

12         Mr. De Castro, if we need your assistance on that

13    score, Mr. Schulte, he may be able to give you some of the

14    information today when I get off the bench, but I presume that

15    you will need to be an intermediary with respect to what he

16    believes he needs in order to see whatever he needs to see, and

17    you can convey that to the government.  And then I am hoping

18    that you all can work through it with the MDC's assistance if

19    it means for Mr. Schulte to get access to what he thinks he

20    needs.

21         MR. DE CASTRO:  I am on it.

22         THE COURT:  Mr. Schulte.

23         THE DEFENDANT:  On that same point, I wanted to go

24    through the three MDC issues ongoing.  Although before I do

25    that, what about the classified server?  Are we going to

N4L8SCHC

1    discuss the need in the Rule 16 of the SCIF, to access that

2    server, because there is no CP on that server.  The government

3    just says, because someone looked at the Snowden documents on

4    the internet, the whole server is classified.

5            THE COURT:  If there is no CP on it, what relevance

6    does it have for the upcoming trial?

7            THE DEFENDANT:  Two points.  One, since it was

8    obtained and belonged to the defendant, according to Rule

9    16(a)(1)(E)(iii), the government has to produce it anyway.

10           THE COURT:  And it was produced.  So that's not an

11   issue.  What is the second?

12           THE DEFENDANT:  There is no way for me to view it.

13           THE COURT:  You previously had the opportunity to view

14   it.  What is the next issue?

15           THE DEFENDANT:  The next issue is that it is actually

16   material for the defense, and I can speak to that *ex parte* if

17   the Court wishes, but it's the most critical piece of the

18   defense's case.

19           THE COURT:  So I am not persuaded at the moment, but

20   if you wish to make an application, you can make an application

21   on an *ex parte* basis if you think it discloses something about

22   your defense that the government shouldn't be privy to.  But

23   unless and until you persuade me that it is relevant and

24   material to the issues in this trial, I am not persuaded that

25   you need access to it going forward.  You previously had access

N4L8SCHC

1     to it.

2             THE DEFENDANT:  So I don't get access to it anymore

3     because I already had access to it, that's the Court's ruling?

4             THE COURT:  My ruling is, if you think there is relief

5     that you need and to which you are entitled, you can make an

6     application to me.  If you think that that is done

7     appropriately on an *ex parte* basis, then you can ask that it be

8     done on an *ex parte* basis.  But I am not going to grant you

9     access to it now on the basis of what I understand the record

10    to be.  Okay?

11            THE DEFENDANT:  Okay.

12            So the three MDC issues.  The first issue is that I am

13    not able to pass legal documents back and forth with my lawyer.

14    So at MCC they allowed us to do that; they had a little thing

15    that you can pass documents back and forth.  So without an

16    ability to do this, and because of the mail delays, this is a

17    big issue.

18            Then the two issues are the pen/paper issue.  A month

19    or so ago the MDC determined that we weren't allowed access to

20    commissary anymore.  And I just need to raise it because it

21    violates the federal regulation, 28 C.F.R. 541.31.  So

22    disciplinary segregation, they can do the limited commissary.

23    But the administrative detention, they are not allowed to do

24    so.  So we have always been on the administrative detention.

25    The MDC determined that we are not getting punished enough so

N4L8SCHC

1  now our commissary is restricted, and that means no access to

2  pen, paper and stamps.  I was able to in the last few weeks

3  finally get them to give me pens and paper.  So I have been

4  able to get those.  But what they have said is this is just

5  until they run out and then I don't get it anymore because of

6  the restricted commissary.  But the stamps, they are still

7  limited.  I can only buy one stamp per month, so there is no

8  way for me to send any documents, and it has been like that for

9  many months.  So that's the second issue.

10      And the third issue is, I want to bring to the Court's

11  attention a violation of the SAMs.  The FBI in the last -- two

12  months ago the FBI seized some of my mail, and according to the

13  SAMs, they have a reasonable time of 14 business days to

14  explain how that mail has to do with classified information,

15  and they violated that condition.  So I also want the Court to

16  seek relief on to this issue too.

17      THE COURT:  With respect to the first few issues, I am

18  certainly happy -- that is to say, access to discovery, access

19  to pen, paper, stamps and passing documents to counsel, I am

20  happy to communicate with the liaison at the MDC to ask about

21  those and try to resolve them.

22      As to the alleged violation of SAMs, I guess I will

23  ask you, Mr. Denton, to address that, but would ask you to

24  address two issues:  One, the substance of it, and two, to the

25  extent that Mr. Schulte believes he has a right to relief, is

N4L8SCHC

1     that something that is within my jurisdiction or is that

2     something he would have to raise in the Eastern District where

3     he is detained?

4          MR. DENTON:  It's the first I am hearing of it, your

5     Honor, so I unfortunately do not have a copy of the SAMs here.

6     I think it almost certainly would be the case that it would

7     have to be raised in the Eastern District, but I don't want to

8     speak more without a copy of the SAMs or some information about

9     what happened.

10          THE DEFENDANT:  So my belief, just real quick, is this

11     was actually litigated before Crotty.  So the second SAMs

12     motion before him I was at the MDC, and my understanding is

13     that the SAMs is to be litigated through the criminal court and

14     not through the Eastern District.  That's the way Crotty did

15     it.

16          THE COURT:  First of all, please call him Judge

17     Crotty.  Second of all, since this is the first that I am

18     hearing of it, I am not going to do or say anything about it

19     now.  If you think you're entitled to relief, let alone relief

20     from me, you can seek it.  But in the meantime, Mr. Denton, I

21     would ask you to look into it, and if it's a misunderstanding,

22     maybe it can be put to rest.  But hopefully -- I will leave it

23     there.  All right.

24          MR. DENTON:  Yes, your Honor.  I will just note I

25     think part of the reason for my hesitation is that, as the

N4L8SCHC

Court has noted before, the jurisdictional question turns a
little bit on whether the alleged infringement relates to the
matters pending before this Court or simply the issues of
confinement in Brooklyn.  So we will find out what is going on
and advise as to where we are.

THE COURT:  Very good.

I was going to go through or want to walk through a
little bit the existing motions, coming motions, and schedule,
but anything else before I turn to that, which is my last
subject?  I do need to wrap up.

THE DEFENDANT:  I wanted to raise an issue with
respect to the sentencing.  I just wanted to raise that I do
have a right to a speedy sentencing, and I wanted to, if at all
possible, start, for example, setting up, like, the PSR or
having the parties file motions with respect to any *Fatico*
issues so that we can -- ideally, I would like to have the
sentencing ready so that it can be done when this next trial
finishes.  I know the government is hoping that there is a
conviction, but I am presumed innocent.  I expect that to be so
that by that time I should be able to do the sentencing on what
has already been convicted.

THE COURT:  I think it's entirely premature given that
there is a Rule 29 motion that you have filed, and for that
matter, you maintain today is not fully submitted.  So
certainly until that is resolved I don't see any reason to do

N4L8SCHC

1     anything on the sentencing front.  If you think there are

2     *Fatico* issues and that we ought to be dealing with those even

3     before the next trial, then you can make that request to me and

4     identify what you think they are.  I personally think your

5     resources and attention are better devoted to preparing your

6     defense in connection with the charges that you're still facing

7     since there is going to be plenty of work to do on that front.

8     I can assure you that if you spend time on other issues, you're

9     not going to get more time or an adjournment of the trial date.

10    So I think you're better off preparing for your trial.

11         In terms of upcoming things and motions.  Number one,

12    as I stated, my view is that the Rule 29/33 motion is fully

13    submitted.  If Mr. Schulte wishes to seek relief with respect

14    to that, then he may do so and I will consider it.  But unless

15    and until I am persuaded to allow the filing of a reply, it's

16    fully submitted and I will issue a decision in due course.

17         Number two, I already enumerated the deadlines that

18    have passed.  As far as I am concerned, those deadlines have

19    passed -- that is to say, there were non-CIPA motions filed;

20    there was no CIPA notice given.  So unless and until I say

21    otherwise, as far as I am concerned, those motions are behind

22    us and we are moving forward.  In which case the next deadlines

23    are the May 26 expert disclosure deadline that I have now

24    adopted, and the June 9 deadline for motions *in limine* and

25    requests to charge.  I don't think the existing scheduling

1    order included proposed voir dire, but to be clear, I would

2    make the same deadline for that.  So the June 9 deadline for

3    any motions *in limine*, requests to charge, and proposed voir

4    dire.  If you wish any relief with respect to that deadline,

5    confer with each other, with the assistance of Mr. De Castro as

6    intermediary, and you may seek it.  But unless and until I say

7    otherwise, those are the next deadlines that you all are

8    facing.

9              Then, finally, one just loose end.  There is a pending

10   motion with respect to the transcripts of the CIPA proceedings.

11   In its papers, the government made some arguments with respect

12   to the nature and extent of the redactions that were made on

13   the basis of classification.  I think in order to evaluate

14   those arguments, I need to see the redactions, and I don't

15   think I have.  So I am going to ask the government within a

16   week to submit copies of the transcripts.  I would say,

17   ideally, a single copy with the relevant redactions highlighted

18   so that I can, without the need to compare two documents,

19   easily see what the government has redacted.  If that's not

20   feasible, given that we are dealing with classification issues,

21   then, at a minimum, an unredacted version of the transcripts

22   and a version with the redactions so I can compare.

23             All right, Mr. Denton?

24             MR. DENTON:  Yes, your Honor.  I will just note the

25   U.S. Attorney's Office did not prepare the redactions.  They

N4L8SCHC

1    were done by the SISO office in consult with the equity holders

2    so we don't have a red-boxed version.  But we will either get

3    one or we certainly do have unredacted and redacted copies.  So

4    one form or another we will certainly get those to the Court.

5           THE COURT:  Ms. Smallman advises me that we don't

6    currently have a final pretrial conference date on the

7    calendar.  So why don't we take care of that and why don't we

8    say Wednesday, September 6, at 10 a.m.

9           Does that work for the government?

10          MR. DENTON:  Yes, your Honor.

11          THE COURT:  Does it work for standby counsel?

12          MR. DE CASTRO:  Yes, your Honor.

13          THE COURT:  I recognize there may be need for

14   conferences even before then, but at a minimum, that will be a

15   final pretrial conference date.

16          Anything else from the government?

17          MR. DENTON:  Your Honor, I think just with respect to

18   one issue that we were discussing a moment ago about access to

19   the server that's in the SCIF.  This was incorporated in the

20   Court's *Faretta* sort of warnings and colloquy, but I would just

21   note that we have no objection, to the extent that Mr. De

22   Castro wants to assist Mr. Schulte by reviewing material in the

23   SCIF, we have no objection to him doing that.  There is also a

24   space that the marshals have available that is not the main

25   SCIF on the ninth floor where everything is stored, but a SCIF

N4L8SCHC

1    space in their pens, where to the extent it is necessary for

2    Mr. Schulte to confer with Mr. De Castro about anything in the

3    SCIF, we have no objection to that either.

4              THE COURT:  That's helpful to know.  To the extent

5    that Mr. Schulte seeks any relief as to, say, access to the

6    classified server, obviously he would and should address why

7    that, namely, Mr. De Castro's access to it, would not suffice

8    and he needs personal access to it.

9              Mr. Schulte, anything else for today's purposes from

10   you?

11             THE DEFENDANT:  One final thing is that Judge Crotty

12   before had ordered the government to provide me with CDs of the

13   electronic docket, the entire docket, and every month I would

14   get new ones.  The government hasn't been doing it for a long

15   time, and they have seized all the CDs from me so I don't have

16   a copy of the electronic docket.  So I ask the Court to

17   reaffirm Judge Crotty's order and just have the government

18   download that electronic docket and provide monthly updates for

19   me to review.

20             THE COURT:  Is there a reason that Mr. De Castro

21   wouldn't be able to do that?  He has access to the docket as

22   well.

23             THE DEFENDANT:  I think it's just that the government

24   had already downloaded it all to provide it to me.  That was

25   the order before.  So I just thought it's the easiest way.

N4L8SCHC

1       THE COURT:  Mr. De Castro, why don't you see if you

2   can give Mr. Schulte what he needs, and that seems like the

3   easiest thing at the moment.  I am not inclined to think that I

4   need to involve myself in it.  But Mr. Schulte certainly does

5   need to know what is going on in this case, and on that score,

6   it's in the bucket of issues that you all should be discussing

7   in terms of making sure that he has access to whatever

8   information and materials he needs.

9       MR. DE CASTRO:  I am happy to do it.  I think if I

10  experience what I sometimes experience, having to send things

11  three times before they get to him, I will then speak to the

12  government.

13      THE COURT:  I also invite counsel informally to reach

14  out to me, hopefully not to excess, but again, we have a

15  liaison person at the MDC.  I intend to contact him after this

16  proceeding and also make sure, as I did before his last trial,

17  that this is very high on his radar in terms of issues that he

18  is dealing with.  What I don't want is a replay of what it

19  sounds like happened in the winter, of extended discussions

20  before we reach resolution.  If you're having problems, I

21  expect you guys to resolve them between yourselves.  If you're

22  having problems with the MDC and the government can't

23  facilitate a resolution, please bring it to my attention, and I

24  am happy to involve myself more actively to ensure that that

25  doesn't affect our schedule.

N4L8SCHC

1              All right.   Thank you very much.

2              We are adjourned.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25