UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA     :

         -V-             :

                                17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,          :

               Defendant. :

-------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOSHUA ADAM SCHULTE'S MOTION TO DISMISS THE INDICTMENT FOR VIOLATION OF THE SIXTH AMENDMENT AND SPEEDY TRIAL ACT

Joshua Adam Schulte, pro se

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT................................................. 1

II. SPEEDY TRIAL ACT VIOLATION.......................................... 3

   A. Legal Standard................................................... 3

   B. Most recent violations: No time since conclusion of 2022 trial
excludable............................................................. 5

      1. Court's 14-month ends-of-justice continuance unreasonable........ 5

      2. Defendant's letter detailing a conflict and requesting speedy trial
necessitates re-evaluation......................................... 9

      3. Removal of counsel necessitated re-evaluation.................... 10

      4. Defendant's repeated requests for a speedy trial................ 10

      5. Court's ex post facto "complexity" pseudo-designation meritless.. 10

   C. Most time since August 2017 arrest not excludable................ 13

      1. Rampant open-ended ends-of-justice continuances for discovery
production unlawful................................................ 13

      2. Non-excludable time between 9/6/17-3/9/20: 624.................. 13

      3. Non-excludable time between 3/9/20-7/27/21: 505................ 15

III. SIXTH AMENDMENT VIOLATION.......................................... 17

   A. Length of delay................................................. 17

   B. Reason for the delay............................................ 17

   C. Defendant's assertion of right.................................. 20

   D. Prejudice to the defendant...................................... 21

   E. Balancing of four factors....................................... 24

IV. INDICTMENT MUST BE DISMISSED WITH PREJUDICE......................... 25

   A. Sixth Amendment violation requires dismissal with prejudice........ 25

   B. STA requires dismissal with prejudice........................... 25

V. CONCLUSION......................................................... 29

I. Preliminary Statement

Mr. Schulte was first arrested in August 2017, but has yet to be tried as of July 2023-- 6 years later. Mr. Schulte's Sixth Amendment right to a speedy trial has been violated in accordance with both the Speedy Trial Act and the Barker Sixth Amendment test.

With respect to the Speedy Trial Act, the most recent violations occurred between July 2022 and present, where the Court scheduled trial an astonishing 12 months outside the limits of The Act, relying upon continuity of counsel; but of course the Court failed to properly balance Mr. Schulte's and the public's right to a speedy trial, Mr. Schulte did not care for continuity of counsel, and in fact requested a speedy trial multiple times, and counsel was ultimately relieved; still the Court refused to honor the Sixth Amendment. Furthermore, the Court began pretending it had actually granted the continuance based on "complexity" despite the clear evidence to the contrary on the record, but regardless, it is clearly established law that the Court may not grant a continuance nunc pro tunc, and even if it could, the Court failed to articulate how the case is complex or its justification for such an extraordinary continuance. Thus none of the time between July 2022 and September 2023 is excludable under the Speedy Trial Act.

But these are only the most recent violations; in fact, over 1,100 days were not excludable between 2017 and 2022. During those five years the district court erroneously granted open-ended discovery-related continuances based solely upon the "rarely used" ends-of-justice exception; but of course the government's lack of diligent preparation is specifically noted as an unacceptable excuse under the Speedy Trial Act.

Accordingly, there are at least 1,554 non-excluded days where only 70 are permissible, resulting in an egregious speedy trial violation.

As for the Barker Sixth Amendment analysis itself, all four factors clearly weigh heavily against the government: As to length, it has been six years since Mr. Schulte's arraignment on the child pornography offenses; and the overwhelming majority of this delay was caused by deliberate delay tactics by the government, or at least through a reckless pattern of neglect and incompetence since they did not care about a speedy trial considering their de facto victory with Mr. Schulte presumed guilty and punished in prison; as for assertion of his right, Mr. Schulte first raised speedy trial issues in 2018 and continued to do so on a regular basis but was ignored; and finally, the

prejudice against Mr. Schulte is unparalleled anywhere else in the world--
presumed guilty and tortured in a concentration camp. Therefore the Barker
analysis likewise results in an egregious speedy trial violation.

Finally, as a result of this Sixth Amendment violation, the indictment
must be dismissed with prejudice. A Sixth Amendment violation under Barker
requires dismissal with prejudice, but even the Speedy Trial Act analysis
dictates the same result. The only factor that is either neutral or even
conceivably weighs against dismissal with prejudice is the seriousness of the
offense, but when put in perspective and weighed against the other three
factors-- the facts and circumstances of the case which led to the dismissal,
the impact of reprosecution on the administration of justice and the Speedy
Trial Act, and prejudice to the defendant, which all firmly weigh against the
government-- dismissal with prejudice is the only possible outcome.

Accordingly, the Court should find that it violated Mr. Schulte's Sixth
Amendment right to a speedy trial under both the Speedy Trial Act and the
Sixth Amendment itself; and that the indictment must be dismissed with
prejudice forthwith.

2

## II. Speedy Trial Act Violation

### A. Legal Standard

As the Supreme Court recently reiterated, "[t]he Sixth Amendment promises that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...'" Ramos v. Louisiana, 140 S. Ct. 1390, 1395 (2000). The effect of delay for purposes of the Sixth Amendment is governed by the four factors identified by the Supreme Court in Barker v. Wingo, 407 U.S. 514 (1972). The Speedy Trial Act ("STA" or "The Act"), enacted two years after the Barker ruling, contains more detailed direction. 18 U.S.C. S 3161 et seq. "It gives effect to, but does not entirely displace, the Sixth Amendment right to a speedy trial." United States v. Fox, 788 F.2d 905, 909 (2d Cir. 1986).

Specifically, the STA "requires that a federal criminal trial 'shall commence within seventy days' after a defendant who has pled not guilty is charged, the charging document unsealed, or the defendant makes an initial appearance." United States v. Pikus, 39 F.4th 39, 52 (2d Cir. 2022) (quoting S 3161(c)(1)). As the Supreme Court has stated, this provision is "unequivocal." Zedner v. United States, 547 U.S. 489, 452 (2008). "When trial is not commenced within the proscribed period of time, 'the information or indictment shall be dismissed on motion of the defendant.'" Id. at 508 (quoting S 3162(a)(2)). Moreover, "the Act was designed with the public interest firmly in mind," Id. at 501, as "the public has as great an interest in a prompt criminal trial as the defendant," thus the STA requires dismissal even where the parties have consented to adjournments other than those expressly allowed in the Act. United States v. Gambino, 59 F.3d 353, 360 (2d Cir. 1995); see also Zedner at 502-03.

The STA "provides a detailed scheme through which periods of delay attributable to specified reasons are excluded from the 70-day calculation. Some enumerated sources of delay are automatically excluded: for instance, delay resulting from any pretrial motions or delay resulting from the absense or unavailability of the defense or an essential witness." Pikus at 52 (internal citation and quotation omitted). See S 3161(h).

In addition, however, to provide some "flexibility," Zedner at 498, the STA also provides that the district court may exclude any delay resulting from a continuance granted sua sponte or on a motion of the parties, provided that "the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweighs the best interest of the

3

public and the defendant in a speedy trial." Id. "This provision gives the district court discretion-within limits and subject to specific procedures-to accomodate limited delays for case-specific needs." Zedner at 479.

Congress created this ends-of-justice provision to "provide courts with the discretion to deal effectively with individual cases." United States v. Tunnessen, 763 F.2d 74, 76 (2d Cir. 1985). Although it sought to ensure flexibility, Congress intended that this exclusion be "rarely used." Id. at 76. See United States v. Toombs, 574 F.3d 1262, 1269 (10th Cir. 2009) ("Th[is] [ends-of-justice] exception to the otherwise precise requirements of the [STA] was meant to be a rarely used tool for those cases demanding more flexible treatment") (internal quotation marks omitted). See also United States v. Pollock, 726 F.2d 1456, 1461 (9th Cir. 1984) ("The 'ends-of-justice' exclusion was not, however, meant to be a general exclusion for every delay no matter what its source, but was to be based on specific underlying factual circumstances"). Moreover, this provision does "not permit unlimited delays, and the trial court has the responsibility to ensure that the length of an excludable continuance is reasonably related to the needs of the case." United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1197 (2d Cir. 1989). In fact, it is "clear that Congress, knowing that the many sound grounds for granting ends-of-justice continuances could not be rigidly structured, saw a danger that such continuances could get out of hand and subvert The Act's detailed scheme. The strategy of S 3161(h)(8), then, is to counteract substantive open-endedness with procedural strictness." Zedner at 508-09. Accordingly, when this section is used, there are two important requirements. First, courts must "se[t] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice... outweigh the best interest of the public and the defendant in a speedy trial." S 3161(h)(7)(A). Second, this Circuit has "stressed that whenever possible the district court should make the findings required by S 3161(h)(7) at the time it grants the continuance, and sufficient findings to support an ends of justice continuance must be put on the record by the time a district court rules on a defendant's motion to dismiss, because without on-the-record findings, there can be no exclusion under S 3161(h)(7)." Pikus at 52-53 (internal citation and quotations omitted).

No ends-of-justice continuance shall be granted "because of general congestion of the court's calendar, or lack of diligent preparation or failure

to obtain available witnesses on the part of the attorney for the Government."
S 3161(h)(7)(C). Nor does a prospective waiver or acquiesence to a continuance
preclude a subsequent challenge by the defendant; speedy trial rights under
the Sixth Amendment are different from other individual Constitutional rights
which can always be waived. The Barker opinion recognizes the strong public
interest in a speedy trial: "... [s]ociety has a particular interest in
bringing swift prosecutions, and society's representatives are the ones that
should protect that interest." 407 U.S. at 527. The Supreme Court renewed its
commitment to this principle in the context of the STA in Zedner, 547 U.S. at
489 (neither prospective waiver nor judicial estoppel arising from defendant's
filings preclude him from asserting a speedy trial defense at a later time).
"Whenever [a prosecution]-- for whatever reason-- falls short of meeting the
Act's requirements, the administration of justice is adversely affected.
Certainly, the public is the loser when a criminal trial is not prosecuted
expeditiously, as suggested by the aphorism, justice delayed is justice
denied." United States v. Bert, 814 F.3d 70, 83 (2d Cir. 2016) (internal
quotations and quotation marks omitted).

Finally, both the government and the Court are charged with policing the
defendant's right to a speedy trial. See Id. at 80 ("The [STA] controls the
conduct of the parties and the court itself during criminal proceedings. Not
only must the Court police the behavior of the prosecutor and the defense
counsel, it must also police itself."). See United States v. Perez-Reveles,
715 F.2d 1348, 1353 (9th Cir. 1983) ("We emphasize that the monitoring of the
limitations period is not the exclusive burden of the district judge. The
Government shares the responsibility for speedy trial enforcement")
(referencing United States v. Didier, 542 F.2d 1182, 1186-87 (2d Cir. 1976)
then United States v. Roemer, 514 F.2d 1377, 1382 (2d Cir. 1975)).


B. Most recent violation: No time since conclusion of 2022 trial excludable
1. Court's 14-month ends-of-justice continuance unreasonable
At the July 26, 2022 conference, defense counsel notified the Court of
outstanding trials all year through the next summer. Based on this the Court
stated (at 32):

I will exclude time between today and September 11, 2023. I find that the
ends served by excluding that time outweigh the interests of the defendant
and the public in a speedy trial, primarily to ensure continuity of

renewed counsel, Ms. Shroff, but also given the many open issues that will
need to be resolved, the need to set a motion schedule and CIPA schedule
and the need for the defendant and counsel to review discovery and
consider and prepare any motions that they wish to bring of that sort or
any other sort, and beyond that, the need to prepare for trial that will,
I assumed not be as complicated as the last one but probably more
complicated than your average child pornography trial.

The Court subsequently confirmed this at the following conference on
September 7, 2021 (at 14):

I have set the trial for next September largely on the basis of your trial
schedule.

a. Continuity of counsel
The Court granted a 14-month continuance so that Mr. Schulte's counsel
could ignore and neglect Mr. Schulte while tending to other clients and other
trials. And indeed, Mrs. Shroff did not ever review a single piece of
discovery, file a single motion, hire an expert, or spend a single second
actually representing Mr. Schulte. And how was this helpful to Mr. Schulte or
the public? In essence this is a continuance due to congestion of the courts--
in direct contravention of The Act. Moreover, the 14-month continuance for
"continuity of counsel" is entirely unreasonable; most continuity-of-counsel
continuances are measured in weeks. "The Act does not provide for the
exclusion of delay based on a generalized finding that government counsel or
defense counsel is 'unavailable' for a particular trial date. Instead, the
provision governing ends of justice continuances states that one factor that
courts shall consider in determining whether to grant such a continuance is
'[w]hether the failure to grant... a continuance... would **unreasonably** deny
the defendant or the government continuity of counsel' or 'deny counsel for
the defendant or the attorney for the government the reasonable time necessary
for effective preparation, taking into account the exercise of due
diligence.'" United States v. Brown, 819 F.3d 800, 820 (6th Cir. 2016)
(quoting S 3161(h)(2)(B)(iv)).
Continuity-of-counsel is but a single factor for the court to consider.
Based on the other factors weighed against Mr. Schulte's and the public's
right to a speedy trial, such a long continuance was entirely unreasonable. If

the Court had denied the government's request for a 14-month continuance for
continuity of counsel, taken as a whole, this would not UNREASONABLY deny the
defendant continuity of counsel; hence this factor actually weighed AGAINST
granting the government's continuance. And none of the other factors supported
the government's request for a 14-month continuance. Indeed, the ends-of-
justice continuance was intended to be "rarely used" and for short, limited
purposes related to the specifics of the particular case. But here, the Court
identifies no valid reason to invoke the "rarely used" exception, and
certainly nothing specific to this case. Moreover, the Court does not even
appear to consider Mr. Schulte's right to a speedy trial or the public's
right. Indeed, while the Supreme Court noted that the courts need not utter
the magic words "ends-of-justice" for a continuance to be valid under The Act,
it likewise isn't sufficient for the Court to simply parrot these words, and
as if by magic, the Speedy Trial Act is voided. No, the Court must actually
conduct the analysis required by The Act; it must actually consider the rights
of the defendant and the public, and these rights must have some weight in the
decision process-- instead of the worthlessness as defined them by the Court.
How can a 14-month continuance overcome these rights? The Court's decision to
grant a continuance was clearly abuse of discretion; the Court should have
removed Mrs. Shroff and assigned new counsel, especially since Mr. Schulte did
not even want Mrs. Shroff to represent him.

   b. Continuity of Counsel baseless when defendant does not wish to
continue relationship and attorney essentially new to case

   As an initial matter, continuity of counsel is usually a factor only when
an attorney has been working on the case for a long time. But here, the child
pornography (CP) case was a completely different case from the recent
espionage trials. Mrs. Shroff only took on the case around the time Mr.
Schulte had been superseded on the espionage charges, and thus had not spent
any time reviewing the CP discovery or evidence-- no time working on that case
whatsoever. She tried the espionage Case in 2020, but then Mr. Schulte
represented himself. Thus, there was no work product or any progress ever made
on the CP case-- no reason to keep Mrs. Shroff on the case. See, e.g. 2/10/23
Tr. (Mrs. Shroff says she hasn't done any work, has no work product).
Essentially, it was as if Mrs. Shroff were newly assigned to the case (which
she was as an acting attorney); just as it would be absurd to grant a
continuance based on continuity-of-counsel for a newly indicted defendant with

a newly assigned attorney, so too was it absurd and unreasonable for the Court
to grant such a continuance here, for an attorney with no prior knowledge or
work on the case.

But even more compelling, Mr. Schulte did not want any relationship that
did exist-- he did not want to be represented by Mrs. Shroff. Indeed, Mr.
Schulte made this fact abundantly clear-- as if shouting it at the top of his
lungs from Everest. Mr. Schulte only chose to represent himself because he was
so displeased with Mrs. Shroff's performance and neglect, but the Court
refused to replace her. Most recently, Mr. Schulte wrote a scathing letter
earlier in the same year imploring the Court to replace her as standby
counsel. See Dkt. 677. The Court refused to do so. See Dkt. 683. Thus this
case is similar to United States v. Lloyd, 125 F.3d 1263, 1270 (9th Cir. 1997)
("There must, however, be some substance to the prior attorney-client
relationship before its continuity can be of significance and a denial can be
'unreasonable.' There was never any genuine attorney-client relationship
established between [defendant and counsel], and [defendant] did not wish
whatever 'relationship' there was to continue. In short, [the defendant] had
no interest in continuity of counsel to preserve"). The Lloyd Court concluded
that "[o]n th[e]se facts, and especially in light of the fact that [the
defendant] expressly stated to the Court that he did not want [counsel] to
represent him, the district court could not have concluded that [the
defendant] had any interest in continuity of counsel, let alone one that could
outweigh his speedy trial rights as well as those of... the public." Id. at
1271.

   c. Remaining reasons unreasonable

The Court's other purported reasons are even less reasonable: setting
motion schedules, reviewing discovery, and preparing for motions and trial;
none of these are case-specific needs nor do they provide basis for a 14-
month continuance, as Congress clearly intended these routine case functions
to be included in the 70-day allocation for trial preparation. Moreover, there
were no motions to be considered since all issues had already been litigated,
and the government did not provide either Mr. Schulte nor counsel with any
discovery until May 2023.

   d. No legitimate justification for 14-month continuance

"Such a continuance for any substantial length of time is extraordinary
and must be adequately justified by the circumstances of the particular case."

8

United States v. Jones, 56 F.3d 581, 588 (5th Cir. 1995). The Court wholly
failed to explain such a colossal exclusion of time-- over six times the 70-
day allocation from Congress. The Court's purported continuance is in effect
no different from the prospective waiver of all provisions of The Act for all
time in Zedner. Indeed, if district courts simply adopted this court's
actions, and could simply schedule trial from the onset of criminal
proceedings at arraignment while granting a "continuance" of all time to
trial-- then the STA would be effectively meaningless. The courts cannot adopt
an implementation of a Constitutional and valid law that nullifies that law
entirely and directly contravenes both the spirit and literal letter of the
law; and in fact, the Supreme Court has indeed already spoken on this issue--
the binding precedent of Zedner thus compels the Court to recognize that the
continuance here is in essence an attempt to merely bypass the STA and the
Sixth Amendment altogether-- which is a violation of both.

   2. Defendant's letter detailing a conflict and requesting speedy trial
necessitated re-evaluation
   Frustrated by counsel's neglect of him and his case, the defendant viewed
counsel's trial schedule as a conflict-of-interest: he wanted a speedy trial
which counsel could not provide. Thus, he filed a letter requesting the Court
relieve his conflicted counsel and assign counsel who could try the case
immediately. Dkt. 963. This at a minimum required a colloquy and re-
evaluation of the Court's continuance. And once again, this case parallels
Lloyd because the defendant in that case also requested his right to a speedy
trial. Thus, "[the continuance would still be invalid] even if there had been
some evidence in the record from which the district court could have inferred
that an attorney-client relationship had been formed between [attorney and
defendant]. When, as here, the defendant repeatedly asserts his speedy trial
rights and makes clear that he does not want the continuance that his lawyer
has requested, the district court must at a minimum conduct a far more probing
inquiry into the continuity of counsel question." Lloyd at 1271. Thus the
Lloyd Court's opinion and result is likewise applicable here: "The district
court in this case engaged in no analysis of any of the relevant factors, and
most of the necessary information does not appear on the record. Thus, the
district court had no basis for determining whether the government's interest
in continuity of counsel was sufficient to necessitate a continuance...

9

Moreover, had the district court made the requisite inquiry, it is clear that it could not have concluded that a continuance of the trial until thirteen months after the mandate issued would qualify under the 'ends of justice' exception." Id. No reasonable person could possibly conclude that Mr. Schulte desired to be represented by Mrs. Shroff, let alone sit in a concentration camp for 14 months while she neglected him to work on other cases.

3. Removal of counsel necessitated re-evaluation

Next, unlike in Lloyd, Mr. Schulte actually obtained relief from counsel on February 10, 2022. Thus, even assuming arguendo that the Court's initial continuance was reasonable and valid, that continuance is immediately nullified by counsel's departure as a continuity-of-counsel continuance for counsel that is no longer representing a defendant cannot be legitimate. Yet, once again, the Court does not re-evaluate despite Mr. Schulte's multiple requests for a speedy trial.

4. Defendant's repeated requests for a speedy trial

And that wasn't the end as the defendant CONTINUED to demand his speedy trial. See Dkt 963, 1026, (COURT REFUSED TO PROVIDE ACCESS TO DOCKET:_____). He then moved to represent himself to try and force the Court to honor his Sixth Amendment right to a speedy trial. None of it worked. The Court continued to violate Mr. Schulte's Sixth Amendment right to a speedy trial and The STA itself.

5. Court's ex post facto "complexity" pseudo-designation meritless

The Court began pretending that it had issued a continuance based on "complexity" starting at the February conference. See 2/10/23 Tr.

  a. Courts cannot grant ends-of-justice continuances nunc pro tunc

The STA plainly contemplates that the district "judge must determine before granting the continuance that society's interest in meeting the 'ends of justice' outweigh the interest of the defendant and of society in achieving speedy trial." S. Rep. No. 1021, 93rd Cong., 2d Sess. 21, 39 (1974). See also United States v. Carey, 746 F.2d 228, 230 (4th Cir. 1984) ("retroactive continuances that are made after expiration of [speedy trial clock] for reasons the judge did not consider before lapse of the allowable time are inconsistent with the Act"); United States v. Frey, 735 F.2d 350, 353 (9th

Cir. 1984) ("district court erred by making nunc pro tunc findings to accommodate its unwitting violation of the Act"); United States v. Richmond, 735 F.2d 208, 215-16 (6th Cir. 1984) (judgment of conviction reversed because "district court cannot fairly be said to have granted the continuance... based on the findings that it set forth" later); Tunnessen at 77 ("Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive; an order granting a continuance on that ground must be made at the outset of the excludable period"); United States v. Ramirez, 788 F.3d 732, 736 (7th Cir. 2015) ("A judge may not grant an ends of justice continuance nunc pro tunc, providing after the fact justification for unauthorized delays") (citation and quotation omitted).

And the reason for this is clear: "If the judge gives no indication that a continuance was granted upon a balancing of the factors specified by the Speedy Trial Act until asked to dismiss the indictment for violation of the Act, the danger is great that every continuance will be converted retroactively into a continuance creating excludable time which is clearly not the intent of the Act." Tunnessen at 78 (citation and quotation omitted). Accordingly, the Court's reliance of the ex post facto "complexity" justification for the continuance nunc pro tunc must be categorically rejected.

b. Even if complexity designation were properly made, the continuance would still be invalid and no time excludable

"A district court excluding time on the basis of complexity must 'set forth the reasons why the case... continue[s] to be complex for purposes of the exclusion.'" Pikus at 53 (quoting Gambino at 358. "Cases are 'complex' where they, for example, involve numerous defendants, novel legal issues, myriad claims or many necessary witnesses." Id. Similar to the Pikus case, the district "court failed ever to explain on the record why the case was complex." Id. at 54. During the conference when the Court falsely claimed he had designated the case complex, he states (at XX COURT REFUSED TO PROVIDE FULL DOCKET):


But of course none of these are legitimate justifications, let alone for a 14-month continuance. Moreover, the espionage case was never designated

11

"complex," and the Court acknowledged the pending CP trial would be significantly less "complicated." What precisely causes CIPA to make the case "complex" such that a lengthy continuance is necessary? "The court called the case 'complex' without elaborating on the source or implications of that purported complexity." Id. Furthermore, neither Mr. Schulte nor counsel were able to visit the SCIF or prepare CIPA motions prior to the CIPA deadline-- which therefore expired without any motion practice; indeed, there is no CIPA in the CP case.

It appears the Court simply believed "complex" was the magic word necessary to nullify the STA and the Sixth Amendment. But the Court is gravely mistaken as the Second Circuit has noted for years: "even when a case is undisputedly complex, complexity per se is not an excuse for 'indefinite delay,'" Id. (quoting Beech-Nut Nutrition Corp. at 1198), "or 'a means of circumventing the requirements of the Speedy Trial Act.'" Id. (quoting United States v. LoFranco, 818 F.2d 276, 277 (2d Cir. 1987)). Rather, the 'length of an exclusion for complexity must be not only limited in time, but also reasonably related to the actual needs of the case.'" Id. (quoting Gambino at 358).

Thus, even allowing the Court to make a complexity finding nunc pro tunc, "it never made any record about why the case's purported complexity justified that particular adjournment or the overall delay in this case, findings that are necessary to support an adjournment for complexity." Id. The Court's mere "passing reference to the case's complexity," Zedner at 507, and its failure to articulate why the further delay was "reasonably related to the actual needs of the case," Gambino at 358, render the record inadequate to support the exclusion of time.

***

Accordingly, the 14-month continuance was invalid, none of that time is excludable, and the indictment must be dismissed.

C. Most time since August 2017 arrest not excludable

    1. Rampant open-ended ends-of-justice continuances for discovery production unlawful

    Another similarity with Pikus is the government's dilatory attitude towards discovery. In fact, the government deliberately withheld the majority of its discovery obligations, including its Brady Letter, until after Mr. Schulte was superseded on the espionage charges; the government sought to rely upon the CP charges to detain Mr. Schulte pretrial, but delay the case to allow their team more time to develop the espionage case. From the time of Mr. Schulte's arrest in August 2017 until the first trial in February of 2020, the government sought repeated continuances solely to slow-roll discovery: the government provided 14 separate discovery productions during the first year, concluding with its Brady Letter in September; and another 14 in the next year.

    The government sought continuances based on its own lack of diligent preparation to conduct the most basic functions inherent in any prosecution which Congress specifically allocated the 70 days for; instead, the government sought reliance upon the "rarely used" exception to effectively bypass the STA in its entirety. The Court failed to police the government's actions and never actually conducted the inquiry required by The Act, but instead did precisely what Congress feared and specifically intended to prevent: conclusory utterance of magic words as if droning through some sacrament or religious rite that voided the STA and the Sixth Amendment right to a speedy trial. There were no case-specific reasons, ultimately no time limitations, no weighing of different factors against both the defendant's and public's rights to a speedy trial, no implementation of the STA whatsoever. "The 'ends-of-justice' exclusion was not, however, meant to be a general exclusion for every delay no matter what its source, but was to be based on specific underlying factual circumstances." supra, Pollock at 1461. Accordingly, none of the Court's continuous two-year discovery-related continuances comply with the STA, and are therefore non-excludable days. See Perez-Reveles at 1352 ("It is clear that in passing the Act, Congress intended to eliminate the practice of granting continuances as a matter of course").

    2. Non-excludable time between 9/6/17 - 3/9/20: 624

    The time between the 9/6 indictment and 9/13 arraignment is 7 unexcluded

13

days (Total=7).

On September 13, 2017, the government moved to exclude time "so the government can produce discovery and the defendant can review it with counsel and the parties can begin discussing potential dispositions." (at 33). These 48 days are not excludable (55).

There is no exclusion between October 31st and November 8th, and therefore these 8 days are non-excludable (63).

On November 8, 2017, the government moved to exclude time "given that the defense is still reviewing discovery in contemplation of motions." (at 10). These 36 days are not excludable (99 - 29 days over 70-day limit; violation).

On December 14, 2017, the government moved to exclude time "so that defense counsel can continue considering the discovery and also consider potential motions to be filed." (at 6). These 21 days are not excludable (120)

There is no exclusion between January 4 and 8, and therefore these 4 days are not excludable (124).

On January 8, 2018, the government moved to exclude time "so that parties can complete discovery, the defense counsel can begin reviewing it, and also continue considering motion practice in this case." (at 19). These 38 days are not excludable (162).

There is no exclusion between February 15 and March 15, and therefore these 28 days are not excludable (190).

On March 15, 2018, the government moved to exclude time "so defense counsel... can get up to date on the case, review discovery, and discuss next steps with government counsel." (at 10). These 33 days are not excludable (223).

The Court granted two exclusions from April 17th to May 11th. These 24 days are not excludable (247).

On May 11, 2018 the government moved to exclude time "so that defense counsel can continue reviewing discovery." (at 15). These 60 days are not excludable (307).

On June 28, 2018, the government moved to exclude time from July 10 to July 20 "so that the parties can continue their discussions and also the defendant can continue reviewing discovery in this case." (at 9-10). These 10 days are not excludable (317).

On July 18, 2018 the government moved for an adjournment that was granted by the Court. These 19 days are not excludable (336).

14

On August 8, 2018, the government moved to exclude time "so that the parties can continue their discussions, the defense can continue reviewing the discovery, and consider motions." (at 15). These 50 days are not excludable (386 - over a full year up in smoke based on discovery exclusions).

On September 27, 2018, the government moved to exclude time for similar reasons until April 8, 2019. An extraordinary 193 days, none of which are excludable (579).

There is no exclusion between April 8 and April 10, and therefore those 2 days are not excludable (581).

On April 10, 2019, the government moved to exclude time for discovery reasons. These 30 days are not excludable (611).

Counsel finally began to work on the case nearly two years later, and the first motion was filed on May 10, 2019, automatically stopping the speedy trial clock.

Motion practice ends for a time, and between October 12 to 25, there is no exclusion (624).

The remaining time is excludable for motion practice until trial from 2/3/2020 - 3/9/2020 resulting in a partial verdict.

Accordingly, the total non-excludable days between 9/6/17 and 3/9/20 is 624.


3. Non-excludable time between 3/9/20 - 7/27/21: 505

At the conclusion of trial, once again only the CP indictment remains. Time is excluded until April 22 for post-trial motions, but the STA specifically only excludes time for pretrial motions. Thus, these 44 days are not excludable (Total=44).

The global pandemic then took hold; while the pandemic was certainly outside the government's control, they continued detaining Mr. Schulte after a hung jury for a trial that could not be scheduled. The government should have granted Mr. Schulte the presumption of innocence and released him; he had never been accused of harming anyone, and a jury did not find him guilty. Thus the government's decision to keep Mr. Schulte incarcerated, which was in their control, completely countered their inability to control the pandemic. Hence none of that time is excludable; nor were there any exclusions of time until Mr. Schulte began representing himself and filing motions. Accordingly, the 461 days between April 19, 2020 and July 27, 2021 are not excludable (505).

Thus the total non-excludable time is 505 days.

***

We therefore have three sets of non-excludable time. First and foremost, the most recent time between the July 13, 2022 verdict and the scheduled CP trial on September 11, 2023 is 425 days. The initial time from Mr. Schulte's arrest and indictment on September 6, 2017 to the conclusion of the first trial on March 9, 2020 is 624 days. And finally, the time between March 9, 2020 until July 27, 2021 is 505 days. The total non-excludable time is therefore 1,554 days; 22.2 times the allocated 70 days by statute. Mr. Schulte's speedy trial right under the STA was violated.

III. Sixth Amendment Violation

The Sixth Amendment of the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy... trial." U.S. Const. amend. VI. "... [T]he right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment." Klopfer v. State of North Carolina, 386 U.S. 213, 223 (1967). In Barker, the Supreme Court established the balancing test which remains the standard for reassuring compliance with the speedy trial guarantee; the analysis is guided by four factors: "[l]ength of delay, the reason for delay, the defendant's assertion of the right, and prejudice to the defendant." Barker at 514.

A. Length of delay

"Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." Doggett v. United States, 505 U.S. 647, 651-52 (1992). "Although there is no bright-line rule, courts generally have found that delays approaching one year are presumptively prejudicial," and "a general consensus among the courts of appeals [is] that eight months constitutes the threshold minimum." United States v. Gregory, 322 F.3d 1157, 1161-62 and n.3 (9th Cir. 2003) (citations omitted). This Circuit has "held that a delay of 'four and one-half years is unquestionably substantial,' and has stated that a delay of nearly seven years is 'extreme.'" United States v. Black, 918 F.3d 243, 255 (2d Cir. 2019) (quoting United States v. New Buffalo Amusement Corp., 600 F.2d 368, 377 (2d Cir. 1979) then United States v. Tigano, 880 F.3d 602, 612 (2d Cir. 2018)). Once a delay has been established, the burden is upon the government to prove that the delay was justified and that [defendant's] speedy trial rights were not violated." Tigano at 612 (citation omitted).

It is thus self-evident that the 6 year delay between defendant's August 2017 arrest and September 2023 trial represents a presumptively prejudicial delay which triggers examination under Barker; "The extreme length of delay thus weighs heavily against the government." Tigano at 612.

B. Reason for the delay

Barker instructs the lower courts to weigh the reasons for delay depending

17

on whether they are deliberate, valid, or the result of negligence or overcrowded dockets. Barker at 531. "Barker established a spectrum of weights, in which 'deliberate' attempts to delay trial weighed most heavily against the government, 'valid' reasons for delay such as missing witnesses are taken off the scale entirely, and reasons of 'negligence or overcrowded dockets' are weighed somewhere in the middle because 'the ultimate responsibility for such circumstances must rest with the government rather than the defendant." Tigano at 612-13 (quoting Barker at 531).

1. Deliberate delay

In this case, the year between arrest and filing of the Brady Letter in September constitute deliberate delay by the government. Particularly, they slow-rolled discovery during this time to give them more time for their espionage indictment using the CP case merely as a means to hold Mr. Schulte in prison. Between September 2017 and September 2018 the government produced 14 rounds of discovery plus the Brady Letter; the government knew all the material from its Brady Letter at the time Mr. Schulte was arrested a year before; the defendant's seized electronics were not produced until July 2018, coincidentally when Mr. Schulte was superseded on the espionage charges; FBI 302s, additional forensics, subpoena returns, and other discovery weren't produced until 2019. Almost all of these late productions contained materials critical to motion practice-- which obviously could not take place until the materials were provided in the summer of 2019-- as well as discovery review, expert review, and trial preparation. There can be no excuse except deliberate delay to postpone the CP trial in preference of the espionage trial-- which is exactly what happened. "A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government." Barker at 531.

Likewise, the delay between July 2022 and September 2023 was also deliberate; Mr. Schulte and counsel had no discovery, and repeatedly requested the government produce it. The government decided not to do so until May 2023, but made 95% of it unavailable to the defendant. Moreover, it refused to produce many of the additional servers and work product required by Rule 16. The government also sought to delay for pure tactical reasons: it wanted more time to investigate the discovery laptop with the goal of superseding yet again or introducing it as 404(b) materials, though of course the government

eventually discovered that it was responsible for the creation of the CP
thumbnail images on the discovery laptop. But regardless, delaying the trial
brought significant advantages for the government. Finally, there was
absolutely no excuse for the entire delay between July 2022 and trial
particularly in light of Mr. Schulte's repeated requests for a speedy trial--
including direct notifications to the government.

2. Pattern of neglect

"Between diligent prosecution and bad-faith delay, official negligence in
bringing an accused to trial occupies the middle ground." Doggett at 656-57.
Much of the delay between September 2018 through trial in 2020 is the result
of, at best, negligence by the government; discovery continued to trickle
through, another 14 slow-rolled unclassified productions, 20 classified
productions, issues ensuring the defendant had access to the discovery, etc.
There is simply no excuse for the court granting discovery-related
continuances continually for over two years. "A more neutral reason such as
negligence or overcrowded courts should be weighed less heavily but
nevertheless should be considered since the ultimate responsibility for such
circumstances must rest with the government rather than the defendant." Id.
See also United States v. Carini, 562 F.2d 144 (2d Cir. 1977) ("While it is...
true that 'institutional' delays are not counted as heavily against the
government as are delays caused or encouraged by the prosecution for tactical
reasons," delays "occasioned by... unexplained inaction of the District Court,
caused, no doubt, by an overloaded docket... are properly chargeable against
the government under prevailing case law") (collecting cases). However,
"[a]lthough negligence is obviously to be weighed more lightly than a
deliberate intent to harm the accused's defense, it still falls on the wrong
side of the divide between acceptable and unacceptable reasons for delaying a
criminal prosecution once it has begun." Doggett at 657.

3. Inherent criminal proceedings neutral delay

The remaining time can best be described as government-responsible neutral
delay. The parties engaged in motion practice between the summer 2019 up until
trial began in February of 2020. "Time spent in motion practice is neutral
time which counts against the government." United States v. Tucker, 2020 U.S.
Dist. LEXIS 64308, *27 (WDNY Apr. 9, 2020). See also United States v. Visipi,

545 F.2d 328, 334 (2d Cir. 1976) ("We have repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated and that it cannot escape this duty on the ground that delay is for institutional reasons"). Then trial-related matters persisted into the next year and then the trial itself resulted in a hung jury. The next year from 2020 through the summer of 2021 resulted in more delays for institutional reasons. "This factor must take into account the affirmative duty of the district court and the government to monitor the progress of a criminal case toward disposition and to take steps to avoid unnecessary delay when possible." Tigano at 613.

Accordingly, this factor weighs heavily against the government.


C. Defendant's assertion of right

"The defendant's assertion of his speedy trial right... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." Barker at 531-32. Defense counsel first put the government on notice with respect to speedy trial delays at the January 8, 2018 conference (at 19):

Eventually we may have an issue with speedy trial, when it comes to access to the application and access to the discovery materials, but when that comes I will mention it to the court.

The government ultimately denied Mr. Schulte's attorney access to the discovery, and Mr. Schulte was scammed out of hundreds of thousands of dollars while incarcerated, forcing him to request a free attorney. Since free attorneys take on 60-70 cases each, they benefit greatly from delayed trials and never raise speedy trial challenges. Thus, although Mr. Schulte repeatedly asked Mrs. Shroff to move for a speedy trial, she refused to do so. Therefore, Mr. Schulte himself wrote to the court numerous times asking for a speedy trial-- but most often his letters were returned to him since he was represented by counsel. Some made it onto the docket, others were removed but produced in discovery, but most were simply prevented from the record-- most often at the request of Mrs. Shroff.

Mr. Schulte's first letter to the court requesting a speedy trial was mailed to the court on July 4, 2018 (from discovery production 18, JAS_022217-27, at 6): "I have no choice but to request a speedy trial. This request is

20

against the advice of counsel..." Mr. Schulte sent similar letters to the
court in October 2018, March 2019, September 2019, May 22, 2020 (Dkt. 398:
COURT REFUSED TO PROVIDE FULL DOCKET, CANNOT CITE), February 2021, and once he
was able to represent himself he directly notified the court "that the
government had already violated [his] speedy trial right." (COURT REFUSED TO
PROVIDE FULL DOCKET, CANNOT CITE) at XX. Then, Mr. Schulte sent numerous
letters starting in October 2022 that he wanted his speedy trial: Dkt 963,
1023, 1026 (COURT REFUSED TO PROVIDE FULL DOCKET, CANNOT CITE)...

All total, Mr. Schulte personally requested his Sixth Amendment Speedy
Trial Right no less than (10-12) times, averaging a request to the court every
6 months during his 6 year pretrial incarceration. "[W]e conclude that in the
context of a speedy trial action... a defendant's assetion of his own right to
a speedy trial-- even though ignored or contravened by his counsel-- is the
relevant factor for purposes of Sixth Amendment analysis." Tigano at 618. Like
in Tigano, Mr. Schulte's "repeated assertions of his right to a speedy trial
place him in the extreme end of our circuit's case law." Id. at 619.
Accordingly, Mr. Schulte has firmly and vociferously asserted his right to a
speedy trial multiple times, and this factor weighs heavily against the
government.


   D. Prejudice to the defendant

   Mr. Schulte's "repeated pleas for trial also speak to the fourth and final
prong, the prejudice suffered by [defendant] in the form of anxiety and the
oppressiveness of his lengthy period of pretrial incarceration." Id. The
Supreme Court directs that prejudice is assessed "in the light of the
interests of defendants which the speedy trial right was designed to
protect...: (i) to prevent oppressive pretrial incarceration; (ii) to minimize
anxiety and concern of the accused; and (iii) to limit the possibility that
the defense will be impaired... We have discussed previously the societal
disadvantages for the accused who cannot obtain his release are even more
serious. The time spent in jail awaiting trial has a detrimental impact on the
individual. It often means loss of a job; it disrupts family life; and it
enforces idleness. Most jails offer little or no recreational rehabilitative
progress. The time spent in jail is simply dead time. Moreover, if a defendant
is locked up, he is hindered in his ability to gather evidence, contact
witnesses, or otherwise prepare his defense. Imposing these consequences on

21

anyone who has yet been convicted is serious." Barker at 532-33. The defendant has been detained for over six years awaiting trial; this fact alone demonstrates prejudice. Indeed, the median time spent in prison is 24 months according to the 2021 Sourcebook of Federal Sentencing Statistics, U.S. Sentencing Commission. Mr. Schulte has spent three times that amount-- and all awaiting trial; Mr. Schulte has seen other inmates arrested, sentenced, released, and arrested on new charges all-the-while awaiting his trial. Moreover, the government's delay tactics in producing discovery meant that Mr. Schulte was unable to obtain his speedy trial on the CP trial in that first year before the government superseded on the espionage offenses, which the government then required to be tried first. He was thus detained pretrial, presumed guilty of charges that he could not even challenge at trial. Even after the hung jury at the first espionage trial, Mr. Schulte was still held pretrial. But he wasn't held in the general population-- the prejudice to Mr. Schulte was infinitely worse-- he was tortured in a concentration camp, held indefinitely in solitary confinement, and under the worst conditions of anyone in the civilized world; even Russian and Chinese prison camps are more humane than the concentration camps used to torture people in the United States. Furthermore, since he was poor, he had no access to the courts or redress as the American courts are pay-to-play.

1. Concentration camp - indefinite solitary confinement

See Dkt. 474. "The prisoner is led to the cell from which he never again comes forth, until his whole term of imprisonment has expired. He never hears of wife and children; home or friends; the life or death of any single creature. He sees the prison officials, but with that exception he never looks upon a human countenance, or hears a human voice. He is a man buried alive; to be dug out in the slow round of years; and in the meantime dead to everything but torturing anxieties and horrible despair... [V]ery few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers... I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torment of the body... because its wounds are not upon the surface, and it extorts few cries that human ears can hear." Id. at 8 (quoting Charles Dickens). There is truly no greater evil in the history of the world than prolonged, indefinite solitary confinement-- it is the single most

22

barbaric, inhumane, and immoral form of torture that only those devoid of any conscience would ever condone or allow. Mr. Schulte's torture is infinitely beyond any other pretrial detainee.

2. Concentration camp - unimaginable torture

In addition to indefinite solitary, Mr. Schulte was exposed to other ghastly human rights atrocities. See Dkt. 447. See also Schulte v. Warden, MDC, 22-CV-766-EK (EDNY 2022). Mr. Schulte was and is tortured with 24/7 blasting speakers in his torture cage; he is subjected to 24/7 bright lights and sleep deprivation; 24/7 extreme cold with no heat in the winter; 24/7 starvation with arbitrarily reduced food rations; he has no access to commissary, the library, television, or any form of entertainment-- he is to sit in his torture cage and twiddle his thumbs until insanity finally takes him; his social visits and calls are severely restricted; he has limited to no access to recreation. in toto Mr. Schulte is tortured like no other pretrial detainee, sentenced inmate, or even death row inmate-- there is no one in the United States who is tortured to the same degree as Mr. Schulte.

3. Concentration camp - pay to play: no right to judicial review due to poverty

Finally, Mr. Schulte was unable to get a single court to review the merits of his habeas challenges over the past six years simply because he is too poor to pay an attorney to make the same arguments and file the same papers.

After exhausting all administrative remedies, Mr. Schulte filed for injunctive habeas relief in 2019. Judge Crotty blocked and administratively closed that action: "On April 12, 2019, Pro Se Plaintiff Joshua Schulte filed a complaint for violation of Civil Rights... Subsequently, Plaintiff filed a joint Petition to End Torture and Inhumane Conditions (as an addendum to the Petition for Writ of Habeas Corpus... These petitions 'seek[] an end to torture and inhumane conditions wrought by defendants'" Schulte v. Attorney General et al., 19-CV-3346 (PAC), Dismissal Order, August 14, 2019, Dkt. 11. Judge Crotty administratively closed the petition.

So, Mr. Schulte filed a habeas petition again, seeking the same injunctive relief. This time a different judge dismissed it, claiming Mr. Schulte must seek relief in the criminal court due to Younger v. Harris, 401 U.S. 37 (1971). See Schulte v. Barr, 20-CV-9244 (JPO), Dismissal Order, December 7,

23

2020, Dkt. 5.

So, Mr. Schulte filed the habeas petition in his criminal case, Dkt. 447. The court dismissed the petition, directing Mr. Schulte back to the civil court to file a separate civil action instead. Dkt. 453.

So, Mr. Schulte appealed both decisions, asked the Court of Appeals to decide which court should review the merits of the petition-- and begged any court to do its job and at least READ and review the merits. Since Mr. Schulte was too poor to pay an attorney to write the same words, his appeal was summarily dismissed.

Accordingly, there is no justice in America; or rather, at least two justice systems: one for the rich, and one for the poor; it's a pay-to-play fraud in which you must pay to purchase an attorney or get no chance at justice.

The total resulting prejudice to Mr. Schulte is infinite; totally devoid of any numerical representation. The prejudice to Mr. Schulte alone would carry the entire Barker analysis as this factor weighs infinitely against the government.


E. Balancing of four factors

"Weighing the four Barker factors leads us to the inescapable conclusion that [defendant's] Sixth Amendment right to a speedy trial was violated by his," six years "of pretrial incarceration." Tigano at 619. There can really be no question here-- all four factors are weighed heavily against the government.

24

IV. Indictment Must Be Dismissed With Prejudice

   A. Sixth Amendment violation requires dismissal with prejudice

   "When the [Speedy Trial] right is violated, the only remedy is dismissal
of the charges with prejudice." United States v. Pennick, 713 Fed. Appx. 33,
35 (2d Cir. 2017). See Barker at 552; Strunk v. United States, 412 U.S. 434,
440 (1973).


   B. STA requires dismissal with prejudice

   Section 3162(a)(2) provides that in deciding whether the indictment should
be dismissed with or without prejudice, "the court should consider, among
others, each of the following factors: the seriousness of the offense; the
facts and circumstances of the case which led to the dismissal; and the impact
of a reprosecution on the administration of this [Act] and on the
administration of justice." In addition, pursuant to United States v. Taylor,
487 U.S. 326, 334 (1988), the court also is to consider the prejudice to the
defendant as an additional factor." The statute does not establish a
preference between a dismissal with or without prejudice." United States v.
Percoraro, 592 F. Supp. 3d 4, 10 (NDNY 2022); see also Taylor at 336 (noting
that district courts must carefully consider each factor and clearly
articulate their effect).


   1. Seriousness of the offense

   While any felony charge is serious, "there are degrees of seriousness."
United States v. Montecaluo, 861 F. Supp. 2d 110, 115 (EDNY 2021). As for mere
possession of CP, there are at least two greater tiers-- distribution and
production; there are no lesser tiers-- possession is the least CP-related
offense. Moreover, this crime is not a contact offense crime of violence as it
does not directly harm any victims; it is a non-violent, victimless crime.
Hence, it is clearly a lesser offense than armed robbery, drug-related
offenses, or even simple assault; if society were able to eliminate a single
crime, it would surely choose assaults and violent crimes against direct
victims over CP possession.

   Finally, while the criminal penalties today are extremely high for these
offenses, it was not so in the past, and this Circuit has called into serious
question the guidelines for mere CP possession cases. See, e.g. United States
v. Dorvee, 616 F.3d 174 (2d Cir. 2010) (noting that the CP guidelines were not

based on the typical sentencing commission's evaluation of empirical evidences, but by Congressional mandate... violates S 3553 principles by resulting in no distinction between possession and more serious crimes like distribution... and illogical result that actual contact sexual offenses with children result in lower guidelines). In this district, defendants found guilty of the CP offenses charged here are routinely sentenced to the mandatory minimum of 5 years-- which Mr. Schulte has already served.

Accordingly, while there can be no question of the seriousness of the offense, put in perspective, it is relatively less serious than most other felonies, and this factor should not weigh strongly in favor or against dismissal with prejudice.


2. The facts and circumstances of the case which led to the dismissal

The second statutory factor focuses equally on the impact of the Court's conduct and the impact of the government's conduct on any judicial delay. United States v. Pringle, 751 F.2d 419, 429 (1st Cir. 1984) (noting that the STA "is as much aimed at the delay caused by judicial congestion and mismanagement as it is aimed at the deliberate stalling of counsel"). "When a STA violation is caused by the court or the prosecutor, it weighs in favor of granting a dismissal with prejudice." United States v. Ramirez, 973 F.2d 36, 39 (1st Cir. 1992). In this determination, the sanction of dismissal with prejudice does not require a finding of "evil motive." United States v. Caparella, 716 F.2d 916, 980 (2d Cir. 1983). On the contrary, this "facts and circumstances" factor may tip in favor of dismissal with prejudice in situations where the delay is attributable to a "truly neglectful attitude." Taylor at 338. Thus, "[a] district court may not merely assume responsibility for a speedy trial violation, find no improper motive, and then weigh the statutory factor in favor of dismissal without prejudice without providing further explanation for its determination." Bert at 80.

Here, there are two periods of deliberate delay: first when the government slow-rolled discovery production during the first year so it would not conduct a CP trial before superseding on the espionage charges, then again when it sought to deprive Mr. Schulte of all his discovery and delay with the hopes of superseding again or introducing the discovery laptop as 404(b). See, supra II.C and III.B.1. There are also long periods indicating a pattern of neglect during the unending discovery-related continuances. See, supra II.B.2. The

Court and the government clearly bear the brunt of the responsibility, particularly considering the lackadaisical attitude and given Mr. Schulte's many requests for a speedy trial.

Finally, it is firmly established that the length of the delay as 'a measure of the seriousness of the speedy trial violation is a critical consideration in evaluating the facts and circumstances that led to dismissal." Bert at 81 (quoting Taylor at 340). Here, the "sheer length" of 1,554 non-excludable days is "sufficient alone to tip [the] second factor in favor of dismissal of the indictment with prejudice." United States v. Stayton, 791 F.2d 17, 21-22 (2d Cir. 1986).

Accordingly, considering the deliberate delay, pattern of neglect, irresponsibility of both the government and the court, as well as the length of delay, this factor weighs heavily for dismissal with prejudice.

3. The impact of a reprosecution on the administration of justice and the STA

"The administration of justice depends heavily upon the prompt processing of criminal proceedings. Unreasonable or unnecessary delay can not only violate the rights of an accused under the Sixth Amendment but also undermine respect for law and thus harm the public." United States v. Hillegas, 598 F.2d 453, 456 (2d Cir. 1978). "The Act is intended both to protect the defendant from undue delay in the resolution of his case and to benefit society by ensuring quick resolution of criminal trials." United States v. Moncuso, 302 F. Supp. 2d 23, 32 (EDNY 2004). "'[A] violation of any of the Act's time limits... negatively impacts on the administration of the Act.' A dismissal with prejudice will further the administration of justice by acting as 'a deterrent to other would-be offenders [and a] reaffirmance of Congress' basic purpose in enacting the [STA].'" United States v. Bilotta, 645 F. Supp. 369, 373 (EDNY 1986) (quoting Caparella at 981).

It is clear here that a dismissal with prejudice will further both the administration of justice and the STA by encouraging the courts to comply with The Act, halt regular reliance of the "rarely used" ends-of-justice exception, halt the regular issuance of continuances as a matter of course, and compel the government to both provide discovery promptly and assist the courts in the difficult policing of The Act.

Furthermore, Mr. Schulte has already spent 6 years incarcerated, most of

27

which spent tortured in a concentration camp. There can be no question that he has been severely punished." As a result, the government and the public will suffer very little, if any, prejudice if the case ends now." Percoraro at 14. Indeed, the resources and efforts of reprosecution are simply efforts better spent elsewhere.

Accordingly, this factor weighs heavily in support of dismissal with prejudice.

4. Prejudice to the defendant

See, supra III.D. This factor weighs heavily in support of dismissal with prejudice.

5. Balancing of factors

In light of the STA analysis, it is clear that the court must dismiss the indictment with prejudice.

28

## V. Conclusion

For all reasons stated herein, the court should find that Mr. Schulte's Sixth Amendment right to a speedy trial was violated along with the Speedy Trial Act, and that the indictment must be dismissed with prejudice.

Dated: Brooklyn, New York
7/7/23

Joshua Adam Schulte,

(with limited access to the law library, typewriter, and the limitations of the typewriter itself, it took a total of 6 months to complete this single motion; and cost $60 in black ribbons)

29





RECEIVED
SDNY PRO SE OFFICE
2023 JUL 11 PM 3: 54

ATTN: U.S. v. Schulte, 17 CR 548 (JMF)
Pro Se Intake Office
U.S. District Court SDNY
500 Pearl Street
New York, NY 10007

Josh Schulte #79471054
MDC
P.O. Box 329002
Brooklyn NY 11232