N6FVSCHC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                                    17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

              Defendant.                   Conference

------------------------------x

                                New York, N.Y.
                                June 15, 2023
                                9:35 a.m.

Before:

                HON. JESSE M. FURMAN,

                             District Judge

                    APPEARANCES

DAMIAN WILLIAMS,
    United States Attorney for the
    Southern District of New York
DAVID W. DENTON, JR.
NICHOLAS S. BRADLEY
    Assistant United States Attorneys

JOSHUA A. SCHULTE, pro se

CESAR DE CASTRO
SHANNON McMANUS
    Standby Attorneys for Defendant

N6FVSCHC

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4              MR. DENTON:  Good morning, your Honor.

5              David Denton and Nicholas Bradley, for the government.

6              MR. BRADLEY:  Good morning, your Honor.

7              THE COURT:  Good morning.

8              MR. SCHULTE:  Josh Schulte, appearing *pro se*.

9              MR. DE CASTRO:  Cesar de Castro and Shannon McManus as

10   shadow standby counsel.  Good morning.

11             THE COURT:  Good morning to everyone.  Welcome back.

12             Mr. Lockard is not with us, not going to be with us?

13   Is Mr. Bradley replacing Mr. Lockard?

14             MR. DENTON:  No, he's not here today, your Honor.

15             THE COURT:  Gotcha.

16             Mr. Bradley will be on this case for the purposes of

17   trial?

18             MR. BRADLEY:  I am, yes.

19             THE COURT:  All right.  Welcome aboard.

20             All right.  Let me go through a few things.

21             So if it wasn't clear, my June 6th order, which is at

22   ECF 1055, was intended to and did put to rest any number of

23   recurring issues that Mr. Schulte has been raising.  And if the

24   order did not make it clear enough, let me make even clearer

25   that I have no intention of entertaining going forward, that is

N6FVSCHC

1    to say, I will summarily deny any further requests for a laptop

2    and any further discovery-related complaints, unless they are

3    specific and Mr. Schulte has tried and failed to resolve the

4    issue with the assistance of standby counsel that have been

5    provided to him and through conferring with the government.

6    That is to say, if it's just a generalized complaint that I

7    don't have access to discovery, I don't have access to the Plex

8    server, I don't have access to classified discovery, I'm not

9    going to entertain it.  I will summarily deny it.

10       If he can identify specific things that he needs and

11   explain why he needs them and, if appropriate or necessary, in

12   an *ex parte* filing, I'm certainly happy to consider that.  But

13   he first has to make efforts to and exhaust efforts to resolve

14   them, with the assistance of Mr. de Castro and the government.

15       On the laptop front, let me say one further thing.  As

16   I just made clear, as far as I'm concerned, the June 6th order

17   was the final word on that issue.  To the extent that

18   Mr. Schulte believes that he is entitled to a laptop and that

19   my rulings on that issue have been error, he has obviously

20   preserved that issue and is welcome to raise it on appeal in

21   the event that he's convicted in the upcoming trial.

22       That said, in the last conference, Mr. Denton

23   mentioned that, in his view, it would be relatively easy for me

24   to review the laptop and confirm that there are, as the

25   government has represented repeatedly — or were — files of

N6FVSCHC

1    child pornography, and not just thumbnails; and that that could

2    be done by submitting, I guess, the laptop and a directory of

3    what had been on the laptop when it was provided to Mr. Schulte

4    in the first instance.

5           I will leave it to the government to decide whether,

6    for purposes of belt and suspenders, you think it makes sense

7    to make a comprehensive record, since I certainly think if

8    Mr. Schulte is convicted at the upcoming trial, this is likely

9    to be an issue that he raises on appeal.  I'm happy to make a

10   finding on that issue.  And if you think that is appropriate

11   and prudent — as I think it probably is — I would encourage you

12   to think about what submissions to make and to make those

13   submissions to me.  But I will leave it to the government to

14   think about that and decide how to proceed.  If you're content

15   to leave it on the existing record, I certainly think I have

16   made adequate findings to justify my rulings, but I also think

17   there's an interest in making a comprehensive record for

18   purposes of the circuit's eventual review if this issue does

19   come up there.

20          All right.  Two issues in that order.  I had directed

21   the government and Mr. de Castro to submit a follow-up letter

22   to me, which they did on Monday as directed.  One pertains to

23   standby counsel's ability to review discovery, and the

24   government's letter or joint letter reported that one

25   production set, originally denominated production number 16 of

N6FVSCHC

1    40, standby counsel was unable to open it.

2            Mr. Denton, can you just elaborate on that, that is to

3    say, describe what that production set is, what proportion of

4    the overall discovery it constitutes, and tell me where things

5    stand on that front.

6            MR. DENTON:  Yes, your Honor.

7            So that production set consists principally of returns

8    from electronic service providers for various accounts

9    belonging to the defendant, as well as, I believe, the

10   extraction of one of his cell phones.

11           As we relayed to standby counsel, I think by and

12   large, it's not material that we would expect to rely on at the

13   upcoming trial.  It does not include, for example, the results

14   of the defendant's Google account which were discussed

15   extensively in advance of and during the defendant's last

16   trial.  We discussed the issue that standby counsel was having,

17   and it seemed to pertain less to particular files than to the

18   production as a whole.  It sounded like there was a recurring

19   problem of being able to access the production at all.

20           So we agreed in the first instance we'll make a clean

21   copy for them and see if that helps.  Otherwise, we've got some

22   excellent paralegals who worked on this case, who are very

23   familiar with opening and using the discovery; so we're happy

24   to put them in touch with whoever standby counsel would like to

25   try and assist with that.  We tried to do that over the last

N6FVSCHC

1    couple of days using our file sharing system.  It's a little

2    too big for that, so we are putting it on a thumb drive, and we

3    expect that to be done — fingers crossed — today, but certainly

4    by the end of the week.

5         THE COURT:  All right.  And do you know if that same

6    problem applies to the discovery that is available to

7    Mr. Schulte himself?

8         MR. DENTON:  I don't know, your Honor.  But we are

9    planning to send him another copy in the same way that we are

10   for standby counsel.

11        THE COURT:  All right.  Thank you.

12        That certainly suffices for my purposes.

13        But, Mr. de Castro, anything you want to say on that

14   score?

15        MR. DE CASTRO:  Not much to add, Judge.

16        That's true, we were having difficulties getting into

17   it.  We have conferred with the government about it; we're

18   trying to fix those.

19        One of the issues is because there's so much -- well,

20   I guess there's two issues.

21        There is a lot of discovery in this case, but then

22   there's also been so many reproductions of the discovery for

23   various reasons.  So, for example, let's say, just use regular

24   numbers, production one, for example, if that gets reproduced

25   later in production 12, it may have been reproduced, so we may

N6FVSCHC

1    have it in two different spaces, and then there was a whole

2    reproduction.  So we're just sorting through a lot of that.

3    We've been going back and forth with the government, sort of

4    trying to figure out the matrix on that.  They know it, so they

5    just get back to us pretty quickly.

6            In terms of just figuring out access, they are going

7    to help us with that.  One of the things that I think would

8    be -- which is a difficulty for us, is that when we go visit

9    Mr. Schulte, it's not that I can bring a laptop there, I can't

10   do that.  Because then that would alleviate — and I don't know

11   if this is something we may need to do in the future, and it

12   could be just done at the courthouse, is just -- so I know why

13   the government wants me to tell them or Mr. Schulte to tell

14   them which exact files are a problem or what the jail doesn't

15   have to open.  The only way to do that is to try to open it on

16   a jail computer and then tell us, but then he has to make a

17   list.

18           We have the same problem.  I mean sometimes -- you

19   know, normally with discovery, for us, it's we get all this

20   stuff from the government on any case, we try to open it, it

21   never works.  It works; it's just that I have to go get another

22   program for it.  And it's easy.  In this day and age, I just

23   download it in five seconds.  Now, I know the MDC doesn't do

24   that.  So that's what makes it a little bit hard.

25           And then, of course, the mail issues are that he

N6FVSCHC

1    either mails it to me or tells us the list or sends the Court

2    the list, and then we're three weeks behind on it.  That's the

3    difficulty.

4           I only say all that to make a record of it, but also

5    we are trying to work through it now, and the government and

6    standby counsel are trying to figure out a solution that works.

7    And we have some, so we're just trying them in the next week.

8           THE COURT:  All right.  Thank you.  That all makes

9    sense to me.  I understand the practical difficulties.

10          But the fact is that Mr. Schulte can make a list.  And

11   this issue came up months ago.  And I think it was clear then

12   that that was the way that we needed to proceed; that it was

13   incumbent upon him and the burden was on him to identify

14   specific things to which he needed access.  And it wasn't

15   available in a format that he could access and to advise you

16   and to work through those issues.

17          And to the extent that he spent the last few months

18   writing letters to me complaining about me and various other

19   things, you know, he's chosen to devote his time and resources

20   to other things.  That's his choice, and that's fine.  But all

21   I'm saying is that I think he's had ample time to do what I

22   think it was clear he needed to do, which is to identify very

23   particularly the things that he needed access to that he

24   doesn't have, given that all of the discovery, nonclassified

25   discovery, was reproduced to him and is available to him.  But,

N6FVSCHC

1    in any event, I recognize the burdens and the challenges, and

2    you can try to work through them going forward.

3           I will say the court liaison I've referenced in

4    various orders is present in court today; he's here to listen.

5    First of all, he has been extraordinarily helpful to me in

6    addressing many of the issues in this case and is very

7    committed to trying to improve things at the MDC generally, but

8    also to address this particular case and ensure that we can get

9    it to trial and that's done relatively smoothly.

10          So I mention that only because, Mr. de Castro, you

11   know, I think if there are concrete issues in ways that this

12   could be done better from your standpoint, from Mr. Schulte's

13   standpoint, we can discuss them.  And I'm sure that the court

14   liaison would entertain them.  There may be nonstarters.  I

15   don't know if, for example, bringing a laptop into the MDC is a

16   nonstarter, but, you know, they have been willing to work with

17   me to try and address some of these issues and to relax certain

18   rules that would otherwise apply to address some of the issues

19   that have come up.  So let me leave it there.

20          Mr. Schulte, anything that you want to say on any of

21   the issues that I've discussed thus far?

22          MR. SCHULTE:  Yes.

23          Starting with the June 6 order, I just wanted to,

24   first of all, notify for the Court that I had filed a

25   reconsideration motion that the Court hasn't received yet.  But

N6FVSCHC

1    that I disagree; all the facts that the Court stated in this

2    order were not true.  For example, the SCIF -- the Court

3    noticed something about -- said something about, Oh, I provided

4    Mr. Schulte an opportunity to submit an *ex parte* filing

5    regarding the SCIF computer.  And that filing was submitted

6    with the motion.  It was noted in the motion and there is an *ex*

7    *parte* submission sitting there in the record.  And several --

8    almost everything stated in here was incorrect.

9            So I would like to correct the record; I think it's

10   important for me to do that.  I would like to go through that.

11   But if the Court doesn't allow me to, I can always write a

12   letter detailing why all these -- all this stuff that the Court

13   has said is actually false.  And I have filed for the Court --

14   I actually did make a very specific filing of the stuff that I

15   wasn't able to access.  I specifically stated it constituted 95

16   percent of the discovery, I named the production number, and I

17   named the file types.  And I also stated that there's no way to

18   convert these file types; and that it is the government's

19   obligation — it's not standby counsel's obligation — to provide

20   me the discovery pursuant to Rule 16.  The government is

21   obligated to make the discovery available to me, which they did

22   not.

23           THE COURT:  Can I stop you?

24           If you filed a motion for reconsideration, I'm sure it

25   will arrive and I will consider it in the fullness of time.  So

N6FVSCHC

1    as far as I'm concerned, that's the record that you'll make on

2    whatever you think I got wrong in my June 6th order, and I'll

3    consider it and either direct the government to respond or not,

4    as the case may be.  But that's your filing on that issue.

5           To the extent that you say that I have -- that you

6    submitted something previously with specifically identifying

7    files that you could not access, can you point me to what

8    you're talking about, because I'm not familiar with any such

9    filing.

10          MR. SCHULTE:  It's the same filing that I submitted

11   with the *ex parte* submission regarding the SCIF.  It's in the

12   motion for access to the discovery.  I specifically say the

13   SCIF is material to the defense, and here it is in Exhibit A *ex*

14   *parte*.  I submitted that -- I filed -- submitted that.

15          For the discovery, I very specifically in that motion,

16   I detail, say, Here the government didn't produce this for ten

17   months, until April 25th.  Once it was produced, they didn't

18   provide the application, the FTK imager application that they

19   had previously provided; and that the materials, the forensic

20   images, could not be viewed on the computer.

21          I outlined production number six, those files, and I

22   went through all the file types and said these are the file

23   types that can't be viewed.  And there's no way -- there's no

24   way to convert file types, because that's not -- there's no way

25   to do that on that computer.  So I was very specific in that

N6FVSCHC

1    filing.

2            And also, just to note for the Court that this issue

3    has come up before.  And the problem is -- and I requested this

4    from the Court; I still don't have access to the complete

5    docket.  If I had access to the docket, I would point the Court

6    to the specific filings and the --

7            THE COURT:  All right.  Mr. Schulte, that's what

8    Mr. de Castro is there for, to assist you in those sorts of

9    ways.  So you're welcome to ask him for that, and I'm sure he

10   will provide it to you.  And as you know, I have arranged for

11   the MDC to relax its rules about passing things between you.

12   And in that regard, he should be able to provide you with

13   updated copies of the docket on a regular basis.  So that's a

14   nonissue as far as I'm concerned.

15           MR. SCHULTE:  The issue is the complete docket, like

16   all the docket entries.  They've said that they don't have the

17   resources to do all that, and the government already has

18   already done all that because they were ordered to do it

19   before.

20           THE COURT:  Mr. Schulte, Mr. de Castro can give you a

21   printout of the docket.  And if there are particular documents

22   you need or want, I'm sure that he can also assist you in that.

23           What's next?

24           MR. SCHULTE:  I mean, yeah.  So the -- I mean the --

25   it's still unresolved that I can't review 95 percent of those

1    filings.

2              The other two -- so the SCIF computer, like I said,

3    it's material.  I filed an *ex parte* letter.  The Court ignored

4    it.  So I'll just have to present to the Court of Appeals that

5    the material -- to show the material, and then this upcoming

6    trial will be annulled.

7              The Plex server, I noticed it constitutes 60 percent

8    of the discovery.  And at the last hearing, the government said

9    that they were going to provide it.  They did not do so.  And

10   this server also -- I think I filed a letter, the Court hasn't

11   received it yet, but about 1500 items from the Plex server are

12   material as well that I had previously pulled out.  And I have

13   outlined specifically why all that is material to the defense.

14             THE COURT:  And where did you do that?

15             MR. SCHULTE:  I don't think you've received that

16   motion yet.  But just as I provided -- some of the reasons is

17   access and transfer records, server command logs, installation

18   dates and time, use of virtual machines, including templates,

19   details of access, who has access, and the way that it had

20   access to the desktop, and the users that were able to access

21   the desktop from the server.  And those are just a few

22   examples.  But I have specific files that I had picked out.

23   There was, like I said, 1500 items that are material.  So

24   again, that --

25             THE COURT:  Mr. Schulte, I think part of the problem

1   here, first of all, to the extent that you say I have not

2   addressed something you have filed, that's just demonstrably

3   false.  I have addressed every single thing that you have

4   filed, even though you file things over and over and over again

5   and raise the same issues over and over and over again.

6        It is certainly possible that within a filing you made

7   some request or made some representation that I did not

8   specifically address.  If so, it is merely because of the sheer

9   mass of things that you have filed and complaints that you have

10  raised.  That's something that may have, you know, slipped

11  through the cracks; if so, you're welcome to renew it.  But it

12  is incumbent upon you to file something and say, Judge, here

13  are the very specific things that I need and here is why I need

14  them, okay.

15       It is not sufficient to say that the Plex server

16  constitutes 60 percent of the discovery.  The Plex server, I

17  understand, is 12 terabytes of data.  That's certainly a lot,

18  and it may well -- it's not surprising that that would be 60

19  percent of the discovery, but that does not mean that it is

20  relevant or material to the issues that are going to be tried

21  on September 11th, which pertain only to the child pornography

22  charges.

23       As I understand it, the Plex server is primarily

24  relevant — maybe even exclusively relevant — to the copyright

25  charges that the government has dropped.  So unless you can

N6FVSCHC

1    identify and explain with more than just conclusory assertions

2    why you need access to those kinds of materials, it isn't

3    enough to say that that is a large percentage of the discovery.

4    You need to demonstrate a need, you need to demonstrate a

5    specific need, and you need to itemize what it is that you need

6    and why you don't have access to it.

7          Do you understand?

8          MR. SCHULTE:  For example, back to when you're saying

9    all the materials have been reviewed.  As I said, the *ex*

10   *parte* -- you say in this letter that I never filed the      *ex*

11   *parte* letter regarding the SCIF, and I did.  So that's that.

12         As far as the Plex server, it's material, and I have

13   provided as much information as I can as to why it's material,

14   but I don't have access to it.  And I'm just noting for the

15   Court that Rule 16 requires anything that was seized from me to

16   be provided to me so that I can produce those records to the

17   Court.  And I know that the Court of Appeals has said that even

18   materials that -- that belong to the defendant and were

19   produced to him, normally that's -- that error is ignored; but

20   when it's specifically requested and the Court is notified that

21   it contains material evidence and there's no way for me to

22   specifically attach why -- attach those materials to the Court,

23   then the Court of Appeals has said that any trial is vacated

24   and reversed.  So I provide as much detail as I can as to why

25   it's material for the CP case.  I cannot do so more without

N6FVSCHC

1    access to it, and you've decided not to give me that access.

2            THE COURT:  As I noted in my June 6th order, your

3    expert and standby counsel both have access to it.  Between

4    that and your ability to identify what is in there that you

5    need, that is certainly sufficient in my judgment.

6            Next.

7            MR. SCHULTE:  But that's not the way --

8            THE COURT:  Mr. Schulte, next.  Next.

9            MR. SCHULTE:  I'm just noting for the record that

10   *Faretta* requires that I am in control of the defense, not

11   standby counsel.  It is very clear.  So when I file my *mandamus*

12   petition, it will be clear for them as well.

13           As far as the supplies, I note that I think they

14   mentioned it, but my legal -- I'm still not able to get legal

15   calls.  And as for --

16           THE COURT:  Mr. Schulte, I haven't addressed the

17   supplies issue.

18           Anything else on the issues that we have discussed,

19   namely, the laptop and access to discovery?

20           MR. SCHULTE:  So we went through the material that the

21   government provided to me that I cannot access 95 percent of

22   and I provided to the Court --

23           THE COURT:  Mr. Schulte, please stop repeating

24   yourself.  Is there anything else that you want to raise?

25           MR. SCHULTE:  I'm going through -- I'm going through

N6FVSCHC

1    it right now.

2            The work product issue is another major issue, because

3    all the material that was seized from me, including handwritten

4    notebooks, CDs, the discovery drives, constitutes work product.

5    And I think the Court disregarded this without really

6    considering the implications.  It's not just Rule 16, but this

7    is -- it's a due process -- due process issue, because I have a

8    constitutional right to these materials from both *Faretta* and

9    *Bounds v. Smith*.  *Bounds v. Smith* requires that the Court

10   provide me with materials to work on my case; and *Faretta*

11   requires that I be able to assist in my own case.

12           So all the work product I produce, which is all of the

13   review of the discovery, the motions, the motion practice, the

14   direct, cross-examinations, exhibits, demonstratives, all this

15   information that I have created and the government has, I

16   have -- in addition to Rule 16, I have a due process right to

17   these materials.  You deprived me without any process, and it

18   offends substantive due process as well, because it shocks the

19   conscience that the government will not provide materials that

20   I created for my own defense.  They can basically hold this

21   stuff hostage, take all my work product and not provide it to

22   me.  So I think this is something else that will require the

23   trial to be thrown out, because the Court is not allowing me to

24   have access to this material.  I'm forced to basically start

25   over after ten months.

N6FVSCHC

1          THE COURT:  All right.  Anything else, Mr. Schulte?

2          MR. SCHULTE:  I needed to clarify the issue with

3     respect to the laptop, because the Court says that I've never

4     challenged the government's contention about violating laptop

5     rules.  I want to make sure -- make this clear on the record

6     that I've done nothing but contest the government's lies about

7     mishandling the laptop.

8          As I've informed the Court before, with respect to the

9     BIOS accounts, there's two; there's a privilege/unprivilege.

10    The government configured the BIOS, and then locked it with the

11    privileged BIOS password.  That account was never accessed and

12    the BIOS was never modified.  I want to be very clear with the

13    Court that this is even easier to prove than the child

14    pornography thing.  It takes three seconds to get the logs from

15    here to verify that that administrative account was never

16    accessed, the BIOS was never modified.  The unprivileged

17    account the government left to me; and all this account could

18    do was view the settings that are permanent and set by that

19    password.  So there was never any violation of any laptop rules

20    at all.

21          As far as the encryption that the government complains

22    about, this was first revealed to the government in 2018, when

23    they seized the laptop in 2019, and they never once said that

24    this had any -- that there was any rule against this for the

25    laptop.  In fact, they returned it with encryption.  There's

N6FVSCHC

1   never been any rule ever stated that no encryption can be used,

2   and so there's no violation for this.  The government returned

3   it even though it was encrypted and never complained about and

4   never brought it up.

5           Other thing about the laptop is that the government

6   seems to say that this is the exception and not the rule, which

7   may be true for general population; but under SAMs, it's not

8   the case due to the restrictions on our ability to access

9   things.  Every SAMs inmate, Saipov, Asanov, Abdullah, Elametti

10  and El Chopo, when they were there, all had laptops.  The

11  reason is the law library is very restricted; it is very hard

12  to be able to go to the law library and access this stuff.

13  Every inmate shares it.  It's used for VTCs.  There's no

14  bathroom, you only get an hour at a time, and once it's used,

15  you can't come back, you can't use it on the afternoons or

16  weekends.  And, you know, they keep it freezing cold in there.

17  Typewriter, you have to put it on your lap to use it.  So

18  it's -- the restrictions there are due to SAMs.  If I was under

19  general population, I could have everyday access to these

20  materials.  So the government can't, you know, increase my --

21          THE COURT:  All right.  Mr. Schulte --

22          MR. SCHULTE:  -- restraints without providing --

23          THE COURT:  Mr. Schulte, if you filed a motion for

24  reconsideration, I'm sure you have addressed and made a record

25  on the laptop.

N6FVSCHC

1          Anything else?

2          MR. SCHULTE:  Well, just to clarify, is that -- the

3   reconsideration is not for the June 6 order.  I just recently

4   received this.  So the reconsideration is for the Court's

5   denial of the discovery.  So I haven't -- since I just received

6   this order, I haven't filed anything with respect to that.  So

7   I can do that.

8          THE COURT:  I misunderstood.  I thought you very

9   clearly said you had filed a motion for reconsideration of the

10  June 6th order.  If you have a motion to file on that, make

11  whatever record you want, and I will certainly consider it.

12         Anything else?

13         MR. SCHULTE:  Yes.  The docket 1023, I wanted to note

14  is that I only just received this.  So this is the letter that

15  counsel provided to me, dropped off for me May 19th, and I

16  didn't receive it till June 12th.  So the Court never -- never

17  sent this order to me, so I've only recently had an ability to

18  look at this.  And the Court -- in this order, the Court grants

19  two weeks to work on the Rule 29.

20         So as far as the Rule 29, I just want to also make

21  clear that there is emails to the government telling them that

22  I don't have access to several of the files for the record, and

23  the government acknowledges that.  And they refuse to convert

24  the files because they say that would be -- they can't modify

25  submitted exhibits.

N6FVSCHC

1          THE COURT:  Mr. Schulte, the Rule 29 motion is fully

2    submitted.  The record on that is developed.  You've certainly

3    preserved any arguments you want to preserve on that issue, but

4    that's done.

5          All right.  I think I've heard enough.  As I said, as

6    far as I'm concerned, the June 6th order is my final word on

7    the laptop.  If there's a motion for reconsideration on that

8    issue, I will certainly entertain it.  If the government wants

9    to make additional -- or develop the record on the child

10   pornography front, I'm mindful of the fact that Mr. Schulte is

11   obviously not dropping the issue, it certainly may do so.  But

12   as far as I'm concerned, that issue is in the past in this

13   case.

14         I will certainly look back at Mr. Schulte's prior

15   filings with respect to what discovery he needs.  I do not

16   recall any submission identifying with particularity, let alone

17   explaining why he would need any particular evidence, but I

18   will look at it.  I'll look at the *ex parte* exhibit that was

19   filed in connection with that; and if there's a need to revisit

20   or elaborate on that, I will certainly do so.

21         MR. SCHULTE:  And I just had two more -- two final

22   things for the Court.

23         One, if the Court is going to allow the government to

24   present evidence and put it on the record, then they have to

25   provide equal access to the defense and my expert, so that we

N6FVSCHC

1    can -- you know, there's no due process and the government just

2    filing its one report without giving the defense an ability to

3    do that.  So the Court is going to grant the government, the

4    government is going to take that opportunity; it should provide

5    the defense the same opportunity to present something on the

6    record.

7         And then finally, I just note for the Court that since

8    I don't have discovery, there's no way for me to meet any

9    deadlines, the Court's denied my right to self-representation,

10   so there's no way I can represent myself.  So I request the

11   Court to set in two weeks' time, schedule a hearing so that we

12   can turn it back over to counsel, because without discovery,

13   there's no way I can continue on this.

14         THE COURT:  Well, listen, if you want to give up your

15   right to represent yourself and restore counsel, I'm happy to

16   do that right here, right now, with the understanding that

17   that's it; that Mr. de Castro needs an adequate amount of time

18   to prepare for this case.  We're still three months out from

19   trial, and I think that is an adequate amount of time to

20   prepare for a case that I think there's no question is far less

21   complicated than the last trial in this matter.  But we can't

22   go back and forth.

23         I think -- Mr. Schulte, stop.

24         It's clear to me that you didn't actually -- or you

25   didn't believe when I gave you various warnings in the *Faretta*

N6FVSCHC

1    hearing about what you would and wouldn't have access to, or

2    you had a misunderstanding about what the implications of that

3    would be, but it's now become clear, if upon -- if, in light of

4    that, you wish to reconsider and go back to having counsel, I

5    am more than happy to have Mr. de Castro resume his

6    representation of you and take over this case, believe me.  But

7    there's no need to set a deadline of two weeks.  That decision

8    can be made here and now.

9          MR. SCHULTE:  No, I think it's necessary for two weeks

10   for me to confer with counsel and to allow my filings to reach

11   the Court that I have already filed.  And I have at least two

12   final motions that I want to submit for the Court.  And just --

13   and one final thing, to make sure that the record is very clear

14   that the Court has denied my right to self-representation.  So

15   I need a couple weeks to prepare these, and I want to -- and

16   then so I would like to file these and then turn it over to

17   counsel once this is on the record.

18         THE COURT:  All right.  Well, listen, you can file

19   whatever you want to file.  You can at any point make a request

20   to go back to having counsel.  As I warned you back in April,

21   if that request is made without enough time for Mr. de Castro

22   to prepare for trial such that the trial date would be put in

23   jeopardy, then I'm going to deny the request and you'll have to

24   proceed on your own.  We're not going to go back and forth.

25   We're not going to move the trial date.  So you should proceed

N6FVSCHC

1   as you wish to proceed, recognizing the rights that you have

2   and the implications of the decisions that you have made.

3           But I'll consider whatever it is that you file.  I

4   would certainly urge you to reduce the number of things that

5   you file and concentrate on making specific requests; but you

6   want to make whatever record you want to make, I think I have

7   in no way, shape, or form denied you your right to represent

8   yourself.  To the contrary, I have gone to great lengths in

9   this case to ensure that you have a meaningful right to

10  represent yourself.  It's just there are certain things that

11  you think you are entitled to that, quite frankly, you're not.

12          Mr. Denton, let me turn back to you.  I don't know if

13  you want to address any of the things that Mr. Schulte has

14  spoken to.  In particular, though, it might pay for you to

15  address his references to his prior filings on the discovery

16  front, the Plex server.  And to the extent that he has

17  requested his work product, I think I had been under the

18  impression that he or at least representatives of him had been

19  given access to what was on -- or portions of what was on the

20  laptop, if not to have copies of it, then to at least see it.

21  But tell me what the story is there.

22          MR. DENTON:  Yes, your Honor.

23          So just take those in order.

24          With respect to the prior filings, I think we are also

25  not familiar with, sort of, a request with specificity.  We

N6FVSCHC

1    have been in consultations with standby counsel this past week

2    about purely the mechanics of Mr. Schulte getting Mr. de Castro

3    a list and Mr. de Castro getting it to us.  I can't promise

4    that everything will be doable, but it is certainly possible to

5    convert document files and Excel files into PDFs or other

6    formats.

7         We have also been in regular contact with the court

8    liaison at the MDC about these issues at a pretty high degree

9    of specificity.  So I think we're happy to, you know, continue

10   those discussions with standby counsel and with the MDC to try

11   and come up with ways to make things work.  It's simply not

12   tenable for us to get a request that says, Well, I can't open

13   any Excel files, so convert all of them.  I think there we

14   would lean on some help from standby counsel.

15        I think also we're pretty happy to be open with

16   standby counsel and Mr. Schulte about what parts of the fairly

17   voluminous discovery we consider relevant to the government's

18   case at a far more limited trial.  There's a lot of evidence

19   and a lot of material that was produced as part of the

20   investigation and the prosecution of the espionage crimes that

21   have already been tried.  And we have no need to be coy about,

22   sort of, which falls into which bucket.  So we are happy to

23   have that conversation as candidly as we can.

24        The Court has set deadlines for this, but we are also

25   mindful of the salutary benefits of identifying exhibits and

N6FVSCHC

1   producing them in exhibit form sooner rather than later; so

2   that is certainly something that we're working on to try and

3   alleviate these issues.

4           With respect to the Plex server, I would simply say

5   the same thing that we've said with respect to all of this:  We

6   are happy to engage in a reasonable discussion about what parts

7   might be relevant.  To the extent that the many, many terabytes

8   of unlawfully downloaded movies that are no longer being

9   prosecuted under the copyright charge are not in that bucket,

10  it's then entirely possible that we may be able to reach some

11  reasonable accommodation about exporting a part of it; and

12  we're happy to do that, again, in consultation with standby

13  counsel.  So to the extent that it sounds like a lot of what

14  Mr. Schulte has referred to are, sort of, metadata and forensic

15  artifacts, that may be something we can accomplish without

16  needing to produce 12 terabytes of movies.

17          THE COURT:  Can I interrupt for a moment.

18          Would it be feasible for you to produce an exhibit

19  list and copies of those exhibits by the July 14th deadline for

20  the submission of motions *in limine* and request to charge,

21  which would not preclude later revisions to that list, but at

22  least to the extent that you can, by that date, identify the

23  bulk of what the government anticipates using at trial, I think

24  it would be salutary and might focus the defense on those items

25  and ensure that he has them in a form that he can access.

N6FVSCHC

1          MR. DENTON:  I think, your Honor, we have, sort of,

2     also been viewing that as kind of a soft target in our minds.

3     I think the upcoming expert disclosures will also very heavily

4     inform that.  So I think we will be able to accomplish a lot of

5     that, but there are still a few unknowns, so I wouldn't want to

6     commit too firmly to that.

7          THE COURT:  All right.

8          Well, here's what I'm going to do to make it a little

9     more firm:  I am going to order you to disclose the exhibits

10    and exhibit list by that date, with two provisos:  One is,

11    again, doesn't preclude later modification to the list, but to

12    the extent that I assume that the government can — if not now,

13    certainly by then — identify the vast majority of what it would

14    intend to use at trial, I think it would make sense to provide

15    a list of those things to the defense and ensure that

16    Mr. Schulte can identify anything on the list that he can't

17    access, to the extent that you don't provide copies of it on

18    that date itself.

19         Number two, if, despite your due diligence, you can't

20    meet that deadline for some reason, you can always request a

21    reasonable extension.  But I just think it makes sense to

22    ensure that sooner rather than later that list and copies of

23    those exhibits are provided so that we can put a lot of these

24    things to rest.  Okay?

25         MR. DENTON:  Understood, your Honor.

N6FVSCHC

1          And I'll just say, like I said, we certainly see no
2    need to be guarded about this.  We're prioritizing the
3    identification and marking of the materials from the desktop
4    that pertain specifically to child pornography that was found
5    there.  There's a whole variety of other materials, like
6    results from the defendant's -- searches of the defendant's
7    Google account or the chat server that he maintained, which I
8    expect the government would introduce but are, in some sense,
9    secondary.  In those cases, I think we may try and have a
10   conversation with standby counsel about where those exhibits
11   would be, what those files are, and kind of try and provide
12   some direction, even if the specific exhibits themselves will,
13   sort of, be forthcoming later.
14          THE COURT:  Understood.
15          Okay.  Anything else on the discovery front before you
16   turn to the work product issue?
17          MR. DENTON:  The only other thing I would note, your
18   Honor, because the Court wanted an update on this before it was
19   rescheduled, the defendant's expert has been reviewing the
20   material that's subject to the Adam Walsh Act this week.  My
21   understanding is that he reviewed it at the FBI on Monday and
22   Wednesday, met with the defendant on Tuesday in between, is
23   doing some work today, and then will be back at FBI tomorrow.
24   We've had some productive conversations, both with him and with
25   standby counsel about some materials that he's asked to be

N6FVSCHC

1    exported.  Some of that is possible; some of it we can't

2    necessarily do in compliance with the Adam Walsh Act, so we've

3    made clear we're happy to give the expert as much time as he

4    needs for the materials that we can't give him to take with

5    him.

6            THE COURT:  All right.  And obviously June 30th is the

7    deadline for expert disclosures, so everybody should be mindful

8    of that.

9            Okay.  Anything else on that front?

10           MR. DENTON:  No, your Honor.

11           I'm happy to address the work product issue.

12           THE COURT:  Please.

13           MR. DENTON:  So, your Honor, we did give the defendant

14   and standby counsel — previous standby counsel — access to

15   review the laptop and do so consistent with the restrictions

16   necessary for its handling.  We hit a bit of a roadblock

17   because, as I understand it, a lot of the defendant's work

18   product is in encrypted partitions that the government is

19   working or has worked to unlock.  But he has, sort of, been

20   unwilling to do that.  So we're in a position where he can't

21   really identify for us what he wants us to export and provide

22   him, because he won't give us the means to access it.  We can't

23   just give it to him, tell him to unlock and handle the evidence

24   in the first instance.  So, again, I think we're happy to

25   engage in the discussion, but he's kind of got to meet us

N6FVSCHC

1    halfway to make it work.

2          MR. SCHULTE:  I don't have to turn over -- I have a

3    Fifth Amendment right; I don't have to turn over any evidence

4    to the government.  It's crazy for the government to require

5    me, in order to give them work product, to give them access to

6    all this information.  That's not how it should work.

7          I have requested before to be allowed to access the

8    material with experts or standby counsel, specifically pick out

9    the material I wish, give it to my counsel, who will then give

10   it to the wall team to review and then hand it to me.  There's

11   no reason that this can't be done.

12         THE COURT:  I think Mr. Denton, here and elsewhere, is

13   being entirely reasonable in what he is offering and is

14   offering to work with standby counsel and you, Mr. Schulte, to

15   try and provide you with what it is you need.  But I think the

16   burden is on you in the first instance to identify what those

17   things are.  So you know what work product is on your laptop;

18   you can discuss with Mr. de Castro what it is you need.  The

19   fact of the matter is your cross-examinations of witnesses who

20   are relevant only to the espionage counts and are not relevant

21   to this, that's not necessary.  So there are probably a handful

22   of things on there that may be helpful for the upcoming trial,

23   that's fine.  You should identify those to Mr. de Castro; he

24   can discuss it with the government.  I'm sure that the

25   government — at least the prosecution team — will not review

1    your work product, but can make it available to Mr. de Castro

2    to provide to you.  That's the end of the matter.  That's it.

3            Mr. Schulte --

4            MR. SCHULTE:  I just wanted to say --

5            THE COURT:  No.  Mr. Schulte, that's it.  I'm not

6    discussing this issue any further.

7            MR. SCHULTE:  No, I just want to clarify --

8            THE COURT:  Mr. Schulte, I am -- Mr. Schulte, stop,

9    okay?  You don't get to just talk on and on and on and

10   filibuster.  I get to tell you when you're done, you're done.

11   Thank you.

12           Mr. Denton, anything else on that?

13           MR. DENTON:  The only other thing I'd say with respect

14   to the laptop, your Honor, is I think my only hesitation about

15   making any further presentation to the Court is simply the

16   logistical difficulties, given the handling of the material,

17   which, candidly, I don't have much experience with.  We will

18   confer with people who do and figure out the most effective way

19   to provide information responsive to the Court's questions.

20           THE COURT:  Understood.

21           Suffice it to say if it would facilitate, I'm

22   certainly happy to go to the FBI and use a space there to

23   review something; that is to say, it doesn't need to be done in

24   chambers, but I'll leave it to you to think through what those

25   issues are and whether you want to make that sort of

1    submission.  All right?

2              MR. DENTON:  Understood, your Honor.

3              THE COURT:  All right.

4              The other item that the government -- or the joint

5    letter of June 12th addressed is mail delivery.  I certainly

6    appreciate your efforts on that score, and the court liaison's

7    efforts to facilitate that, especially as we get up to trial,

8    to ensure expeditious delivery in both directions of mail.

9              Let me just say in reference to something Mr. Schulte

10   said a moment ago, I'm a little concerned that he indicated

11   that he didn't receive my March 23rd order until recently.  And

12   it may be that that is because of the transition from

13   Ms. Shroff to Mr. de Castro and, sort of, the prior system on

14   that score had broken down.  But it used to be that both the

15   government and standby counsel, if I remember correctly,

16   basically, took steps to send anything that was filed in this

17   case to Mr. Schulte as a sort of belt and suspenders to ensure

18   that he received things in a timely fashion.  And I had been

19   relying on that system continuing.  And to the extent that

20   there was a breakdown in it, I want to make sure that, going

21   forward, we're all on the same page there.

22             Mr. de Castro.

23             MR. DE CASTRO:  Yes, Judge, thanks.

24             So we have -- we did mail it to him.  Something is

25   going on with -- so I think it's helpful that the liaison is

N6FVSCHC

1    here.  So we had our mitigation specialist there on Monday.  So

2    we did mail the decision; he had not received it.  And the mail

3    delivery came in while she was sitting with him.  And he

4    received mail from us that was stamped received by the MDC May

5    22nd.  This is this past Monday, so three weeks earlier.  And

6    so for whatever reason, our mail is taking three to four weeks,

7    even -- we're talking after it's received at the MDC.  One of

8    our packages had been stamped, you know, late May that had been

9    hand-delivered, meaning we put it in the box at the MDC.

10   Another had stamps on it.

11          Now, the mail that the mitigation specialist has sent

12   him he's getting in seven days.  So I don't know why -- and we

13   are mailing him things almost daily, and that is taking a very

14   long time.  And then things she is mailing he is receiving

15   pretty promptly.  So I don't know if there is -- those go into

16   two different buckets and we say, Okay, here's legal mail.  My

17   thought, I mean, I would think that would be facilitated, the

18   legal mail, but it seems to be getting there slower.

19          Now, anecdotally, this happens with every client I

20   have at MDC.  I seem to have to mail things sometimes two and

21   three times.  It happens at other facilities at the BOP as

22   well.  I'm not trying to, you know, crash on the BOP, but it is

23   very hard for us to engage in communications with clients via

24   mail.  It just never gets there.

25          We have tried.  I know the government has talked to

N6FVSCHC

1    the facility about, Well, can we FedEx it?  Any FedExes to most

2    BOP facilities are returned to me.  And I do know that we mail

3    to a P.O. Box.  But these letters that our mitigation

4    specialist observed were stamped received by MDC May 22nd,

5    received by him, which was this Monday, which was whatever that

6    was, May --

7              THE COURT:  June 12th.

8              MR. DE CASTRO:  June 12th.  So that becomes difficult.

9              Now, she read the order to him, so she read it to him.

10   But that was the way that was communicated.

11             THE COURT:  Okay.  Well, I appreciate your sharing

12   that.  The court liaison is here and has heard what you had to

13   say, and I'm sure we'll look into it and I will follow up with

14   him on that.  This has been a recurring issue in this case and,

15   for that matter, other cases.  But certainly between now and

16   September 11th, I want to ensure that these sorts of issues

17   don't derail us in any way, shape, or form.  So I'll do what I

18   can to ensure that any issues on that front are addressed.

19             I would also anticipate, Mr. de Castro, that as we get

20   closer to trial, you'll be visiting Mr. Schulte on a more

21   regular basis.  And given that I've made provision for you to

22   be able to share things, that is, transfer things in-person

23   visits, I would urge you to bring copies of anything that had

24   been filed to ensure that Mr. Schulte has received them and

25   that should address some of these concerns going forward as

N6FVSCHC

1    well.

2         But bottom line is, as previously, I expect the

3    government and standby counsel to be providing things that are

4    filed, including and especially any orders that I issue.  And

5    that should hopefully ensure that he receives them in a timely

6    fashion, but I will follow up with MDC to make sure that that

7    is the case.

8         Yes, Mr. Schulte.  You seem to want to say something

9    on this.  Hang on.

10         Mr. Denton, did you want to add something?

11         MR. DENTON:  Just, your Honor, for purposes of the

12    history on this, I would note that during the period between

13    the fall and, I think, late March/early April, when Mr. Schulte

14    was represented by counsel, the government was not mailing him

15    every docket entry.  We resumed that practice with the Court's

16    order setting a *Faretta* hearing, and then the government's

17    letters and everything that follows.  So we are doing that now,

18    but there was a period of time when we were not.

19         THE COURT:  That makes total sense to me.

20         Yes, Mr. Schulte.

21         MR. SCHULTE:  I just wanted to note that I think,

22    through my inquiries to the BOP, long periods of the delay, two

23    to three weeks, they claim to be because the mail was being

24    reviewed by internal BOP and FBI pursuant to the SAMs.  I just

25    wanted to bring this up because, according to the SAMs, my

N6FVSCHC

1  incoming mail is reviewed for any classified information that I

2  put in it, which doesn't make any sense because that's not

3  possible.  So I think either -- there's no way -- it's just

4  arbitrary; there's no reason for my incoming mail to be

5  reviewed.  And so it should either be --

6          THE COURT:  All right.  Mr. Schulte, I'm going to look

7  into the mail delay issue, and hopefully that will get to the

8  bottom of what, if any, causes there are of that and, more to

9  the point, ensure that going forward there is no such delay.

10  So I don't think we need to dwell on it further.

11          Turning to the other items that I addressed in the

12  June 6th order, I also sought to resolve Mr. Schulte's

13  recurring complaints about things like paper, pens, typewriter

14  ribbon, and the like.  Let me be clear here too.  I'm not

15  particularly interested in litigating the past.  I have my own

16  reasons to doubt Mr. Schulte's representations on that front,

17  but that's neither here nor there.

18          There's three months between now and the trial date.

19  That's plenty of time to prepare for trial.  The important

20  point is that I think there is now — thanks in no small part to

21  the efforts of the court liaison, for which I thank him — a

22  system in place going forward to ensure that these issues will

23  be addressed in a timely fashion.  As promised in that order, I

24  have checked with the court liaison to ensure that those

25  representations are being met.  He has reported to me on the

N6FVSCHC

1   whole that they have been, that Mr. Schulte's unit team has

2   visited him each weekday and run through the checklist of items

3   that are set forth in the order, with the exception, I think,

4   of Wednesday, when Mr. Schulte was in an extended legal visit.

5   He reported that there were two minor issues that arose, but,

6   as he understands it, both were addressed.

7           One, there was a mix-up with respect to the typewriter

8   ribbon, namely, commissary staff were apparently confused about

9   the proper one to order, but apparently he reports that he saw

10  the proper ribbon, I think, yesterday, and was assured that it

11  would be provided to Mr. Schulte yesterday.

12          And second, there was apparently a little bit of

13  confusion, at least in one instance, with respect to a member

14  of the unit team about the order or the permission for

15  Mr. Schulte and Mr. de Castro to exchange materials in their

16  in-person meeting, again, because that's a departure from

17  standard MDC policy, one that MDC has made at my request.  I

18  think that has now been addressed.  And my understanding is

19  that the acting warden has issued a memorandum to the relevant

20  staff, reiterating that Mr. Schulte and Mr. de Castro are

21  permitted to exchange materials.  So I don't think that -- or

22  hopefully that is not an issue going forward.

23          I think, hopefully, that addresses all of those

24  issues.  But, Mr. Schulte, to the extent that you were going to

25  say something earlier on this front, anything you wish to say

1   about any of those items?

2           MR. SCHULTE:  No.  I was just discussing the mail.  I

3   think once -- once the team began doing what was said here, I

4   mailed the Court notifying the Court that these materials were

5   being provided.  The only question I have is to ensure that

6   it's the -- the entire -- his entire team is able to pass

7   documents to me, correct, not just Mr. de Castro.

8           THE COURT:  Correct.  I mean, counsel, using

9   Mr. de Castro's shorthand, but anyone working with

10  Mr. de Castro, indeed.

11          All right.  Very good.

12          Let me just reiterate that, Mr. Schulte, to the extent

13  that you want to reconsider your decision to represent

14  yourself, in light of what you now clearly understand to be the

15  implications of that decision and the resources that are and

16  are not available to you, you should certainly think about it;

17  would urge you to discuss it with Mr. de Castro, and just

18  remind you again that the longer you wait to raise that issue,

19  the more danger it is that I would deny any application to go

20  back to having counsel.  So it's in your interest to sort that

21  out sooner rather than later, and also for you to understand

22  that it's not a revolving door.  If you go back to having

23  counsel, given that we are rapidly approaching the trial date,

24  in all likelihood, that would be a final decision and there

25  would be no going back.  So you should understand that.

1          Let's just go over the upcoming deadlines and

2     schedule, make sure we're all on the same page.

3          What I have is that June 30th is the deadline for

4     expert disclosures.  July 14 is the deadline for motions *in*

5     *limine*, request to charge, and proposed voir dire.  I will also

6     add the new deadline for the government to produce an exhibit

7     list and copies of those exhibits in some form that Mr. Schulte

8     would be able to access.

9          July 28th, deadline for responses to the motions *in*

10    *limine*; August 11, deadline for the production of 3500 and 26.2

11    materials; September 6 at 10 a.m. is the final pretrial

12    conference; and September 11th is the trial.

13         Did I miss anything?  Anyone think I got any of those

14    wrong?  I'm going to issue a bottom-line order after today's

15    conference and memorialize those so that we have an up-to-date

16    schedule.

17         MR. DENTON:  That's correct, your Honor.

18         One thing I would note in connection with, sort of,

19    the exhibit list and the motions *in limine* running in parallel,

20    I expect there will be some motion practice from both sides

21    about the actual introduction of child pornography exhibits at

22    trial and the relevant scope of any of that.  Again, we're

23    working to compile a list and be candid with standby counsel

24    and Mr. Schulte about what we intend to do on that score.  We

25    will come up with a way to address that in the exhibit list as

N6FVSCHC

1    well.

2              THE COURT:  All right.  And also, this should be

3    obvious, but just to be clear, to the extent that there are

4    things that would be subject to the Adam Walsh Act on the

5    exhibit list, you don't need to turn over copies of those to

6    Mr. Schulte, as long as they are available to standby counsel

7    and the expert in a manner consistent with the Adam Walsh Act.

8              All right.

9              MR. DE CASTRO:  Judge, you said September 6 was the

10   final pretrial, right?

11             THE COURT:  Correct.

12             MR. DE CASTRO:  I just wanted to make sure my calendar

13   was right.  Ten o'clock, I think; is that right?

14             THE COURT:  That's what I have.  Ms. Smallman is

15   nodding her head, so that seems to be correct.

16             MR. DE CASTRO:  I think that's right.

17             THE COURT:  Yes.

18             And, Mr. Denton, in light of the dropping of the

19   copyright charges, I don't know if that alters your estimate or

20   you have a better sense as we get closer of trial length, but

21   any update on that front?

22             MR. DENTON:  No, your Honor.

23             I think one of the significant issues that we'll start

24   discussing now is what, if any, stipulations we're going to be

25   able to reach, again, in particular with respect to the victims

N6FVSCHC

1      of the child pornography offenses.  I think if we end up in a

2      scenario were we need to call a bunch of people to authenticate

3      that they are, in fact, pictures of minors, that will expand

4      the scope of the trial.  I would not imagine that's in

5      Mr. Schulte's interest, but that will have a fairly significant

6      effect, I think, on what the length of the trial is.

7               THE COURT:  So what's your best estimate now, assuming

8      that you do not get those stipulations, as to how long trial

9      would be.

10              MR. DENTON:  I think we would certainly be done within

11     two weeks.

12              THE COURT:  Okay.  And you're discussing the

13     stipulations now on an expedited basis?

14              MR. DENTON:  We are coming up with a list of what we

15     think we would need, and we will discuss it with Mr. Schulte

16     and Mr. de Castro.

17              THE COURT:  All right.  Very good.

18              Is there anything in particular that we need to be

19     worrying about with respect to trial logistics, mechanics,

20     courtroom, etc., for this trial?  At the last trial there were

21     many such issues, and we worked with them with the CISO; but

22     given the nature of this trial, I'm not sure that there is

23     anything out of the ordinary that is necessary.

24              Do you have a thought on that?

25              MR. DENTON:  So the only thing that I'm aware of, your

N6FVSCHC

1    Honor, would be limitations on the display of exhibits of the

2    child sexual abuse materials.

3              THE COURT:  Let me qualify what I said.

4              Ordinary child pornography trial.  That is to say, you

5    know, I'll certainly do what needs to be done on that score,

6    but aside from those types of things, anything else?

7              MR. DENTON:  No, your Honor.

8              THE COURT:  Okay.

9              All right.  Mr. Schulte, anything you want to say with

10   respect to these matters, the deadlines and what I just

11   discussed?

12             MR. SCHULTE:  No, I don't think so.

13             THE COURT:  All right.

14             So that's all that was on my agenda.

15             I'm not going to -- before I ask if you have anything

16   further, I'm not going to put any conferences on the calendar

17   between now and the September 6 final pretrial conference.  But

18   obviously, based on whatever issues are raised in Mr. Schulte's

19   filings and the parties' filings on or before July 14th, it may

20   warrant reconvening, in which case I will schedule a conference

21   and we will reconvene.  But if you have any reason to think

22   that we should reconvene, you can certainly let me know and I

23   will take that under advisement.

24             Anything else from the government?

25             MR. DENTON:  No, your Honor.

N6FVSCHC

1          THE COURT:  Mr. Schulte?

2          (Mr. Schulte confers with standby counsel)

3          MR. SCHULTE:  No.

4          THE COURT:  All right.

5          Before we adjourn, let me just say, we're a little

6    less than three months out from trial.  In my opinion, given my

7    understanding of the nature of the evidence and charges to be

8    tried at this trial, that is plenty of time to prepare for

9    trial, even with some of the issues that Mr. Schulte has raised

10   in the last three months.

11          That being said, I just want everybody to hear me loud

12   and clear, we're certainly entering crunch time, which means

13   that these issues need to be resolved and put to rest and

14   attention needs to be devoted to preparing for trial.  So that

15   means, in the first instance, to the extent that Mr. Schulte

16   has any issues, the burden is on him and Mr. de Castro and his

17   team to identify what those issues are, and work with the MDC

18   and work with the government to try and resolve them in a

19   practical and meaningful fashion.

20          The government has offered repeatedly to try and do

21   what it can do to facilitate, and I appreciate that.  And I do

22   not doubt their representations on that front, but Mr. Schulte,

23   in my opinion, has not raised things in a manner that enables

24   the government — let alone me — to resolve these issues in a

25   practical or meaningful manner.  Bottom line is everybody here

N6FVSCHC

1    — and that includes the court liaison who is listening — needs

2    to understand that, going forward, time will be of the essence.

3    So it's not the time to just, you know, engage in a

4    letter-writing campaign and raise things in a conclusory or

5    generalized fashion; it's time to identify things with

6    particularity and fix them and work through to figure out

7    practical solutions to ensure that everybody has what they need

8    to try this case and ensure a fair trial.

9            With that, we are adjourned.

10           Have a good weekend, everybody.  And that's it.

11           Thank you.

12                            *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25