UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     - v. -

JOSHUA ADAM SCHULTE,

              Defendant.

S2 17 Cr. 548 (JMF)


**THE GOVERNMENT'S MOTIONS *IN LIMINE***


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

David W. Denton, Jr.
Michael D. Lockard
Nicholas S. Bradley
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

Page

BACKGROUND ...............................................................................................................1

    A.  The March 15, 2017 Search of Schulte's Manhattan Apartment....................................2

    B.  Schulte's Voluntary Interview Statements......................................................2

    C.  CSAM Discovered on Schulte's Home Desktop ...........................................3

ARGUMENT ...................................................................................................................3

    I.   The Court Should Restrict the Display of CSAM Materials During Trial
       to the Jury, the Court, and the Parties ............................................................3

         A.  Applicable Law....................................................................................4

         B.  Discussion ............................................................................................7

    II.  Evidence of Schulte's Prior Employment by the CIA and References to
       the CIA at Trial Should Be Precluded ..........................................................10

         A.  Relevant Law.....................................................................................10

         B.  Discussion ..........................................................................................10

    III. Schulte's Stipulations Are Binding and Admissible..................................................13

         A.  Relevant Law.....................................................................................13

         B.  Discussion ..........................................................................................14

    IV. Evidence of Schulte's Incarceration is Admissible for a Limited Purpose ................14

         A.  Relevant Law.....................................................................................16

         B.  Discussion ..........................................................................................17

    V.  Arguments Suggesting an Alternative Perpetrator Should Be Precluded
       Without a Sufficient Evidentiary Basis.........................................................17

         A.  Relevant Law.....................................................................................18

         B.  Discussion ..........................................................................................19

    VI. Schulte's Unprotected Interview Statements Are Admissible....................................19

A.  Relevant Law ...............................................................................20

B.  Discussion .................................................................................20

VII.Schulte's Convictions for Making False Statements, Contempt of Court,
and Obstructing a Grand Jury Proceeding Are Admissible in the Event
Schulte Testifies............................................................................20

A.  Relevant Law ...............................................................................21

B.  Discussion .................................................................................21

VIII.Expert Testimony Regarding Schulte's State of Mind Is Inadmissible ...................23

A.  Applicable Law ...............................................................................24

B.  Discussion .................................................................................25

CONCLUSION...........................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                            <u>Page</u>

*Application of Nat'l Broad. Co., Inc.*, 635 F.2d 945 (2d Cir. 1980)................................ 5

*Application of The Herald Co.*, 734 F.2d 93 (2d Cir. 1984)...................................... 9

*Bowden v. Keane*, 237 F.3d 125 (2d Cir. 2001)........................................... 5, 6

*Burstein v. United States*, 232 F.2d 19 (8th Cir. 1956)................................. 14

*Callahan v. Wilson*, 863 F.3d 144 (2d Cir. 2017)....................................... 24

*In re Caswell*, 29 A. 259 (1893) ...................................................... 6

*Matter of New York Times Co.*, 828 F.2d 110 (2d Cir. 1987)............................. 6, 7

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978) ................................ 5

*Osborne v. Ohio*, 495 U.S. 103 (1990) ................................................ 7

*Paroline v. United States*, 572 U.S. 434 (2014)........................................ 7

*Tyson Foods v. Bouaphekeo*, 577 U.S. 442 (2016)...................................... 10

*United States v. Alcantam*, 396 F.3d 189 (2d Cir. 2005) ............................... 6

*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ............................... 6, 7

*United States v. Anderson*, 872 F.2d 1508 (11th Cir. 1989)............................ 11

*United States v. Ashburn*, No. 11 Cr. 0303 (NGG), 2015 WL 862118 (E.D.N.Y. 2015)............ 17

*United States v. Brand*, 467 F.3d 179 (2d Cir. 2006) ................................. 22

*United States v. DiDomenico*, 985 F.2d 1159 (2d Cir. 1993)........................... 25

*United States v. Doe*, 63 F.3d 121 (2d Cir. 1995)....................................... 6

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997)................................... 11

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) .............................. 22

*United States v. Harris*, 548 F. App'x 679 (2d Cir. 2013) ............................ 16

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013) ............................... 25

*United States v. Hendricks*, 921 F.3d 320 (2d Cir. 2019)........................... 18, 19

*United States v. Kanu*, 695 F.3d 74 (D.C. Cir. 2012) ................................. 13

*United States v. Killingbeck*, 616 F. App'x 14 (2d Cir. 2015)........................... 9

*United States v. Kourani*, 6 F. 4th 345 (2d Cir. 2021).................................. 20

*United States v. Lopez*, 18 Cr. 6 (DLC), 2019 WL 1570818 (S.D.N.Y. 2019) ................ 24

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)............................ 18

iii

*United States v. Mickens*, 926 F.2d 1323 (2d Cir. 1991) .............................................................. 17

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) ........................................................ 11

*United States v. Perez*, 387 F.3d 201 (2d Cir. 2004) ................................................................. 16

*United States v. Reiner*, 468 F. Supp. 2d 393 (E.D.N.Y.) ...................................................... 16

*United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989) ........................................................... 12

*United States v. Sampol*, 636 F.2d 621 (D.C. Cir. 1980) .......................................................... 11

*United States v. Smith*, 426 F.3d 567 (2d Cir. 2005) .................................................................. 5

*United States v. Troup*, No. 3:12–CR–36 JD, 2012 WL 3818242 (N.D. Ind. 2012)................. 7, 9

*United States v. Vanderbosch*, 610 F.2d 95 (2d Cir. 1979) ...................................................... 21

*United States v. Waldrip*, 981 F.2d 799 (5th Cir. 1993) ........................................................... 10

*United States v. Wallace*, 607 F. App'x 25 (2d Cir. 2015) ....................................................... 16

*United States v. Weisinger*, 586 F. App'x 733 (2d Cir. 2016) .................................................. 16

*United States v. Wexler*, 552 F.3d 194 (2d Cir. 2008) .............................................................. 24

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ........................................................... 25

*United States v. Wilson*, 586 F. Supp. 1011 (S.D.N.Y. 1983) ............................................ 11, 12

*United States v. Wingate*, 128 F.3d 1157 (7th Cir. 1997) ......................................................... 14

*Wade v. Mantello*, 333 F.3d 51 (2d Cir. 2003) .......................................................................... 18

*Waller v. Georgia,* 467 U.S. 39 (1984).............................................................................. passim

*Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991) .................................................... 14

*Woods v. Kuhlmann*, 977 F.2d 74 (2d Cir. 1992) ....................................................................... 6

## STATUTES

18 U.S.C. § 1001 ................................................................................................................. 1, 20, 21

18 U.S.C. § 1503 ............................................................................................................ 1, 20, 21, 22

18 U.S.C. § 2252 ...................................................................................................................... 5, 16

18 U.S.C. § 2252A ......................................................................................................................... 1

18 U.S.C. § 2256 ........................................................................................................................ 3, 4

18 U.S.C. § 3509 ............................................................................................................................ 5

18 U.S.C. § 401 ..................................................................................................................... 1, 21

**OTHER AUTHORITIES**

Adam Walsh Act ............................................................................................................... 4

Classified Information Procedures Act ............................................................................12

**RULES**

Federal Rule of Evidence 401 .................................................................................... 10, 20

Federal Rule of Evidence 402 .................................................................................... 10, 13

Federal Rule of Evidence 403 ........................................................................ 10, 13, 16, 17

Federal Rule of Evidence 404 ............................................................................................ 1

Federal Rule of Evidence 609 .................................................................................... 21, 22

Federal Rule of Evidence 702 .................................................................................... 24, 26

Federal Rule of Evidence 704 ......................................................................................... 24

Federal Rule of Evidence 801 ......................................................................................... 14

The Government respectfully submits this memorandum in support of motions *in limine* with respect to the September 11, 2023 trial of the defendant Joshua Adam Schulte on charges of receiving, possessing, and transporting child sexual abuse material ("CSAM"), 18 U.S.C. §§ 2552A(a)(2)(B) and (b)(1) (Count Twelve), 2252A(a)(5)(B) and (b)(2) (Count Thirteen), and 2552A(a)(1) and (b)(1) (Count Fourteen).  The Government moves *in limine* for rulings that:

1. Exhibits constituting or containing CSAM may be received in evidence but not made available to the public.

2. Evidence that Schulte was employed by the Central Intelligence Agency ("CIA") until October 2016, or any other trial reference to the CIA, is inadmissible.

3. Schulte's prior factual and evidentiary stipulations are admissible.

4. Schulte's written statements relating to CSAM and CSAM offenses are admissible, and evidence that Schulte was incarcerated when he wrote some of those statements is admissible for the limited purpose of providing context for the writings.

5. Argument that the CSAM offenses were committed by an alternative perpetrator is precluded absent a sufficient evidentiary basis.

6. Schulte's statements during voluntary interviews are admissible.

7. Schulte's verdicts of guilty for the offenses of making false statements, 18 U.S.C. § 1001, contempt of court, 18 U.S.C. § 401 (3), and obstructing grand jury proceedings, 18 U.S.C. § 1503, are admissible in the event Schulte testifies.

8. Defense expert testimony with respect to Schulte's state of mind and the characteristics of CSAM offenses or CSAM offenders is inadmissible.

## BACKGROUND[1]

Schulte, a computer programmer and software developer by training, downloaded and stored thousands of images and videos depicting the rape and other sexual abuse of children while

---

[1]   The Government respectfully submits that all of the testimony and other evidence described in this brief is admissible as direct evidence of the crimes charged.  The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b), and it addresses much of that evidence independently below.  The Government plans to continue to meet with potential witnesses between now and the trial, and will supplement this notice as necessary

living in the Northern Virginia suburbs of Washington, D.C.  Schulte stored this CSAM on his home desktop computer (the "Home Desktop") beneath layers of encryption and organized by victim or by characteristics.  In late 2016, Schulte left his employment for a new job with a financial services firm in New York City, and transported the computer equipment, including the Home Desktop and his CSAM libraries with him.

### A.  The March 15, 2017 Search of Schulte's Manhattan Apartment

On March 15, 2017, the Federal Bureau of Investigation ("FBI") executed a search warrant of Schulte's Manhattan apartment in connection with a criminal investigation.  During the search, the FBI recovered, among other things, Schulte's Home Desktop as well as servers, loose hard drives, a variety of other computer equipment, and cellphones.

### B.  Schulte's Voluntary Interview Statements

After the search of his apartment, Schulte participated in several voluntary interviews, represented by counsel, with FBI Special Agents and Assistant U.S. Attorneys in March and June of 2017.  These interviews were not subject to a proffer agreement.  During these interviews, Schulte stated, among other things, that Schulte had built the Home Desktop a few years ago while employed in Virginia; that the Home Desktop was Schulte's main desktop computer since residing in New York City and no one else had access to it; that there was encryption on the Home Desktop and no one else had the passwords; and that Schulte had only encrypted his pornography.  When asked to provide the passwords to the encrypted portions of the Home Desktop, Schulte refused.

---

should the Government learn of additional information involving the defendant or other Rule 404(b) evidence.

### C.    CSAM Discovered on Schulte's Home Desktop

Using a password found on one of Schulte's cellphones, the FBI was later able to decrypt an encrypted container on the Home Desktop, which contained CSAM files.[2]  Using the same password, the FBI was able to log in to an encrypted virtual computer that Schulte kept on the Home Desktop, within which was yet another encrypted container saved in the home directory named "josh."  Using the password, the FBI decrypted this container and found more volumes of CSAM.  Many of the children whose rape and abuse were recorded in these videos and images were prepubescent, and some were small children.  The filenames for many of the files advertised that they contained images of child rape and sexual abuse, such as "(Pthc) Pedo_7Yo Girl Fucked +Mix", which describes preteen hardcore ("PTHC"), that is, the rape of a 7-year-old girl ("7Yo"); or "Jenny 9yo daughter sucking cock while watching porn."

### **ARGUMENT**

### I.    The Court Should Restrict the Display of CSAM Materials During Trial to the Jury, the Court, and the Parties

At trial, the Government must prove beyond a reasonable doubt that the CSAM materials that the defendant is charged with receiving (in Count Twelve), possessing (in Count Thirteen), and transporting (in Count Fourteen) were in fact "child pornography," as that term is defined in 18 U.S.C. § 2256(8).  *See id.* (defining "child pornography," in part, as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct"); *see also* Modern Federal Jury Instructions ¶ 62-36 (2023) ("[T]he

---

[2]    Schulte used this same password, and variations of it, for a variety of online accounts.

government must prove beyond a reasonable doubt . . . that the visual depiction was child pornography.").

To meet that burden, the Government intends to introduce into evidence the CSAM materials found on Schulte's Home Desktop, and to display a representative sample of them to the jury during the testimony of FBI Special Agent Aaron Spivack,[3] who the Government expects will testify as to his review of Schulte's Home Desktop folders containing CSAM. *See id.* (instructing the jury that they can "consider all of the evidence, *including your viewing of the depiction*, in determining whether the depiction portrayed an actual person under the age of eighteen engaging in sexually explicit conduct" (emphasis added)).

Due to the fact that the CSAM materials are themselves contraband, and the well-recognized continuing harms to the victims of CSAM offenses from public displays of the images in which those victims are depicted, however, the Government respectfully requests that the Court order that CSAM materials that are admitted into evidence and published at trial be displayed only to the Court, the parties, the witness(es), and the jury, and not be published to the gallery or otherwise made available to the public.

### A.    Applicable Law

Congress has by statute enacted protections restricting access to child pornography used in criminal prosecutions. Specifically, the Adam Walsh Act requires that "any property or material that constitutes child pornography (as defined by section 2256 of this title) shall remain in the care,

---

[3]    Although thousands of visual depictions of CSAM were found on Schulte's Home Desktop, the Government intends to limit the actual publishing of those materials to the minimum that the Government believes will satisfy its burden of proof, and will seek to avoid any unnecessary (and unseemly) prolonged displays in a way that could be considered cumulative, unfairly prejudicial, or unreasonably distressing to the jury.

custody, and control of either the Government or the court."  18 U.S.C. § 3509(m)(1); *cf.* 18 U.S.C.

§ 2252A(a)(3) (criminalizing the "distribution" of child pornography, including by computer).

Where materials are used as exhibits at a criminal trial, however, restrictions on the public's

access to them implicates the requirement of both the First and Sixth Amendments that criminal

court proceedings be open to the public.  *See Application of Nat'l Broad. Co., Inc.*, 635 F.2d 945,

949 (2d Cir. 1980); *see generally Waller v. Georgia,* 467 U.S. 39, 46 (1984) (criminal defendant

has Sixth Amendment right to public trial); *United States v. Smith*, 426 F.3d 567, 574-75 (2d Cir.

2005) ("[t]he First Amendment has consistently been read to provide the *public and press* a right

of access to criminal trials (emphasis in original)); (D.E. 867 at 5 ("There is no question that the

Government's proposal amounts to a partial closure of the courtroom, as it results in evidence

being visible to the Court, the parties, and the jury, but not the public.")).  "Th[e] right to be tried

in open court is not absolute," *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001), and "may give

way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the

Government's interest in inhibiting disclosure of sensitive information," *Waller*, 467 U.S. at 45.

"Every court has supervisory power over its own records and files, and access has been denied

where court files might have become a vehicle for improper purposes. . . .  [T]he decision as to

access is one best left to the sound discretion of the trial court, a discretion to be exercised in light

of the relevant facts and circumstances of the particular case."  *Nixon v. Warner Commc'ns, Inc.*,

435 U.S. 589, 598-99 (1978).

Restrictions on public access to parts of a criminal trial—which may constitute the

equivalent of a partial closure of the courtroom—are appropriate when: (1) the party seeking the

limitation advances an overriding interest that is likely to be prejudiced; (2) the limitation is no

broader than necessary; (3) the court considers reasonable alternatives; and (4) the court makes

findings adequate to support the limitation.  *Waller*, 467 U.S. at 48; *see also United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995) (setting forth the "four steps a district court must follow in deciding a motion for closure"); *United States v. Alcantam*, 396 F.3d 189, 199-200 (2d Cir. 2005) (setting forth procedural protections generally applicable to closure motions). These so-called "*Waller* factors" apply regardless of "whether a closure motion is made by the government over the defendant's Sixth Amendment objection or made by the defendant over the First Amendment objection of the government or press."  *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995).

The scope of the closure sought informs the showing necessary under the *Waller* factors. "[A] party seeking partial closure of a proceeding need only advance a 'substantial reason' rather than an 'overriding interest.'"  *Id.* at 129 (quoting *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992) (concluding that "a less stringent standard was justified because a partial closure does not implicate the same secrecy and fairness concerns that a total closure does," and collecting cases)). Thus, "if a party seeks a relatively narrow courtroom closing, the burden it must carry is not a 'heavy' one."  *Bowden v. Keane*, 237 F.3d 125, 129 (2d Cir. 2001).

In assessing the interests to be weighed in evaluating restrictions on public access, the Second Circuit has long maintained that "the privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation . . . The job of protecting such interests rests heavily upon the shoulders of the trial judge, since all the parties who may be harmed by disclosure are typically not before the court."  *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987). By contrast, in evaluating the strength of the public interest in access, "[c]ourts have long declined to allow public access simply to cater 'to a morbid craving for that which is sensational and impure.'"  *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995) (quoting *In re Caswell*, 29 A. 259, 259 (1893)).

## B.     Discussion

In this case, the Government seeks an extremely narrow exception to limit the unnecessary disclosure of contraband CSAM material to the public in a way that would cause well-recognized harm to the victims depicted in the CSAM material found on the defendant's desktop computer.

With respect to the first *Waller* factor, the interest in preventing the ongoing harm to victims of CSAM offenses is well-recognized.  "[T]he materials produced by child pornographers permanently record the victim's abuse. The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come."  *Osborne v. Ohio*, 495 U.S. 103, 111 (1990); *see also Paroline v. United States*, 572 U.S. 434, 440-41 (2014) ("Every day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again. It hurts me to know someone is looking at them—at me—when I was just a little girl being abused for the camera. I did not choose to be there, but now I am there forever in pictures that people are using to do sick things. I want it all erased. I want it all stopped. But I am powerless to stop it just like I was powerless to stop my uncle . . . My life and my feelings are worse now because the crime has never really stopped and will never really stop . . . It's like I am being abused over and over and over again." (quoting victim impact statement)).  This harm falls squarely within the need to protect "innocent third parties" that the Second Circuit has warned "should weigh heavily in a court's balancing equation."  *New York Times*, 828 F.2d at 116.

By contrast, the public interest in viewing the CSAM materials is minimal.  The CSAM materials are themselves contraband, and the very genesis of their unconscionable creation is the sort of "sensational and impure" interest to which the public right of access does not cater and which the Constitution does not protect.  *Amodeo*, 71 F.3d at 1051; *see also United States v. Troup*, No. 3:12–CR–36 JD, 2012 WL 3818242, at *6 (N.D. Ind. Aug. 31, 2012) ("There is no particularly

compelling reason why the public would need to see child pornography in the gallery during trial, and it would be detrimental to the minors depicted therein to put their victimization on display.").

Second, the Government's proposed restrictions on viewing the CSAM materials are narrowly tailored to protect that interest. The only limitation that the Government seeks is on display to spectators of the images and videos of CSAM found on the defendant's desktop computer. Although appropriately analyzed through the rubric of courtroom closure, the Government does not propose excluding anyone from the courtroom. The public will be able to observe in person and receive and review transcripts of the testimony about the CSAM materials that are published to the jury. The public will also receive information about the CSAM materials at issue through other exhibits that the Government intends to offer—such as digital forensics showing a listing of the files found on the defendant's computer, many of which contain descriptive filenames such as "(Lolita)!Pthc – 2010 (Toddlergirl) Kait 5yo Willing-Ffk-Sk-Fcs.avi" and "PTHC- beauty-cumshot 3yo THIS ROCKS pedo child toddler incest2yo 4yo 5yo 6yo 7yo 8yo babyj vicky laura jenny sofie fdsa hussyfan Russian korea.mpg"—which will ensure that the public is not deprived of information about the evidence that the Government seeks to introduce and use in this case and can vindicate the defendant's right "that the public may see he is fairly dealt with and not unjustly condemned." *Waller*, 467 U.S. at 46.[4]

In similar circumstances, the Second Circuit has recognized (in a summary order) that "[e]ven assuming that restricting the display of trial exhibits to the courtroom audience constitutes a partial 'closure' for Sixth Amendment purposes," the restriction is suitably "narrow" when "the public was not excluded from the courtroom and could see the witnesses and hear their testimony,"

---

[4]   Because the jury, the Court, and the parties will all be able to view the exhibits, the Government's proposed restriction in no way affects other due process rights of the defendant.

and is justified by "substantial reasons for doing so—limiting the continuing harm to victims of child pornography." *United States v. Killingbeck*, 616 F. App'x 14, 16 (2d Cir. 2015).

Because the Government's proposed restriction is as narrow as possible, no reasonable alternative exists that would equally protect the interests of the victims of the CSAM materials. *See Troup*, 2012 WL 3818242, at *7 (concluding that proposed restriction on display of pornographic images to the public where "the public will be allowed to remain in the courtroom; the testimony of the witnesses authenticating the evidence will be audible and uncensored; etc." was "so narrowly tailored, in fact, that it is the least restrictive alternative"). Any public display of the images would necessarily create the very harm that the Government seeks to avoid; the proposed limitation is the only way to protect the compelling interests of minor victims, and the Government will ensure the prompt public availability of non-CSAM exhibits and transcripts of testimony to ensure that the public's right of access to the proceedings are otherwise well-served.

With respect to the final *Waller* factor, the Government respectfully submits that the record before the Court is sufficient to make the necessary findings in support of the Government's application. In addition to the well-recognized and universally applicable harms arising from the public re-disclosure of CSAM materials, information regarding the particular CSAM materials at issue in this case has been publicly filed on numerous occasions, notably in the Complaint in this case (D.E. 1), and in connection with the defendant's initial motion to suppress the CSAM evidence (D.E. 108, 109, 110, 111, 120, 121). In addition, by filing publicly this motion, the Government has complied with the requirement to provide the "type of general public notice [that] suffices to afford an adequate opportunity for challenge to courtroom closure." *Application of The Herald Co.*, 734 F.2d 93, 103 (2d Cir. 1984).

Thus, the Government respectfully requests that the Court approve a limitation on the display during trial of any actual CSAM materials to the jury, the Court, and the parties only.

## II.    Evidence of Schulte's Prior Employment by the CIA and References to the CIA at Trial Should Be Precluded

The June 2022 trial included extensive evidence of Schulte's employment at the CIA, the nature of his work there, some of his co-workers and supervisors, and CIA security and personnel issues.  That evidence was highly relevant to the espionage and computer hacking offenses at issue in that trial.  None of it is relevant to the upcoming trial on the CSAM counts, and should be precluded to avoid jury confusion or prejudice.

### A.    Relevant Law

Evidence that is relevant is generally admissible, while irrelevant evidence is always inadmissible.  Fed. R. Evid. 402.  Evidence is relevant if (1) "it has any tendency to make a fact more or less probable than it would be without the evidence" and (2) "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Relevance is generally determined by reference to the elements of the charges or claims to be proved and any applicable defenses.  *See Tyson Foods v. Bouaphekeo*, 577 U.S. 442, 454-55 (2016); *United States v. Waldrip*, 981 F.2d 799, 806 (5th Cir. 1993).  Even relevant evidence, however, may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, [or] undue delay."  Fed. R. Evid. 403.

### B.    Discussion

Unlike the June 2022 trial, where evidence of Schulte's prior employment at the CIA was highly relevant to the charged offenses, the identity of his prior employer has no relevance to the charges at issue in the upcoming trial on CSAM offenses.  Though the fact of Schulte's experience and training as a computer programmer is relevant to the manner in which he committed the

charged CSAM offenses, the identity of his former employer, the fact that he has worked in the intelligence community, and any details of the work he did for the CIA are irrelevant. Moreover, injecting the CIA into the CSAM trial presents a substantial danger of unfair prejudice, jury confusion, and undue delay.

As Judge Weinfeld observed in *United States v. Wilson*, introducing evidence pertaining to intelligence activities has "the tendency to focus attention on what cannot be doubted is the controversial character of foreign covert intelligence and counterintelligence operations. These have been a matter of public notice, editorial expressions of differing views by the news media, public debates, and congressional investigations." 586 F. Supp. 1011, 1016 (S.D.N.Y. 1983). References to the CIA, to Schulte's former employment there, or to the kinds of work that Schulte did for the CIA "would bring before the jury matters utterly irrelevant to the basic charge in this case and serve to divert the jury's attention from those basic issues." *Id.*; *see also United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997) ("The trial court was well within its proper authority to decide either that [the defendant's] past cooperation with army intelligence had no bearing on the crimes charged, or that any probative value was substantially outweighed by the risk of confusing the jury with extraneous matters, or of wasting the court's and jury's time."); *United States v. Noriega*, 117 F.3d 1206, 1216-17 (11th Cir. 1997) ("[E]vidence regarding the nature of [the defendant's] assistance to the United States would have shifted unduly the focus of the trial from allegations of drug trafficking to matters of geo-political intrigue."); *United States v. Anderson*, 872 F.2d 1508, 1519 (11th Cir. 1989) (evidence of the defendant's participation in a "prior covert operation . . . would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment"); *United States v. Sampol*, 636 F.2d 621, 633 n.31 (D.C. Cir. 1980) ("the trial court properly refused to 'put the CIA on trial in this case'").

11

Permitting the defendant to refer to the CIA or his previous work there would introduce substantial unfair prejudice and juror confusion.  Jurors would tend to speculate about the nature of Schulte's work there and the jury's deliberations would tend to be influenced by any biases or prejudices the jurors may have about the CIA or intelligence activities.  *See, e.g.*, *Wilson*, 1016 ("Wilson is the defendant on trial, not the CIA.").  Indeed, the jurors may well speculate, with no evidentiary basis whatsoever, that the defendant's previous employment at the CIA may relate to potential defenses that Schulte might offer.  On previous occasions, Schulte has, in fact, falsely claimed that he was framed for the CSAM offenses because of the investigation of the espionage crimes he committed while employed at the CIA.

Injecting the CIA into this CSAM trial would not only risk substantial unfair prejudice and confusion, but it would also risk undue delay by requiring the presentation of otherwise irrelevant evidence to provide necessary context for the defendant's CIA employment.  For example, at the June 2022 trial, not only was Schulte's employment at the CIA and the general nature of his work there highly relevant to the charges at issue, but the trial testimony included extensive and time-consuming evidence addressing those issues.  The manner of presentation of that evidence was the subject of extensive pretrial litigation, the Court's rulings pursuant to the Rules of Evidence and the Classified Information Procedures Act, and careful courtroom management and witness protection measures.  A similar presentation of evidence, with the accompanying rulings on the scope and manner of presentation of such evidence, would consume substantial additional trial time and trial resources.  *See United States v. Rewald*, 889 F.2d 836, 853 (9th Cir. 1989) ("[E]xtensive documentary and testimonial evidence of [the defendant's] foreign travels may have considerably delayed an already lengthy trial. . . .  Of course, the government would be permitted to offer rebuttal evidence, thereby further drawing out the proceedings.  These developments

would have turned the jury's attention away from the issues [pertaining to the defendant's guilt or innocence] to events transpiring many hundreds of miles away with little to no connection to this case.") (citations omitted).

Accordingly, evidence of or references to the identity of Schulte's former employer as the CIA, the nature of the work that he performed there, and his work in the intelligence community should be precluded pursuant to Rules 402 and 403 of the Federal Rules of Evidence.

## III.    Schulte's Stipulations Are Binding and Admissible

At the February 2020 trial, Schulte entered into factual and testimonial stipulations through counsel.  (*See, e.g..*,  2020 GX 3002 (testimonial stipulation regarding document custodians and admissibility of exhibits), 2020 GX 3003 (testimonial stipulation regarding law enforcement officers and corrections officer testimony and admissibility of exhibits) (the "Stipulations").  In connection with the June 2022 trial, the Court ruled that these stipulations remained binding on Schulte, and new versions of the stipulations were prepared and received in evidence to avoid any jury confusion that might arise from the form or presence of counsel with respect to the 2020 Stipulations.  (June 3, 2022 Tr. at 40-41); *see also* GX 3001 – 3005.

### A.    Relevant Law

The Stipulations, entered into by Schulte through counsel, remain binding on him and are admissible at trial, as are the exhibits referred to in the Stipulations.   "[T]he general rule on stipulations"—*i.e.*, that "[s]tipulations, like admissions in the pleadings, are generally binding on the parties and the court—has long been applied . . . in criminal prosecutions as well." *United States v. Kanu*, 695 F.3d 74, 78-79 (D.C. Cir. 2012).  "[A] formal, written stipulation of the parties that [certain] evidence need not be presented through live testimony at trial" should "properly be regarded as a factual evidentiary stipulation, and not limited in time," and thus was enforceable at a retrial even over the defendant's newfound objection to the stipulation.  *Id.* at 80–81; *see also*

13

*United States v. Wingate*, 128 F.3d 1157, 1160 (7th Cir. 1997) (same). "Stipulations fairly entered into are favored" because, among other things, factual stipulations "expedite a trial and eliminate the necessity of much tedious proof." *Burstein v. United States*, 232 F.2d 19, 23 (8th Cir. 1956); 73 Am. Jur. 2d Stipulations § 10 (2022) ("It is generally considered that stipulations which tend to expedite the trial should be enforced unless good cause is shown to the contrary."); *see also Wingate*, 128 F.3d at 1161 ("Additionally, the government stated that it relied on the stipulation in preparing its case; the trial court could properly take into account that reliance.").

**B.      Discussion**

These stipulations will also have the effect, as they did at the February 2020 and June 2022 trials, of avoiding the need for the testimony of several witnesses and streamlining the trial.   The Schulte entered into these stipulations in connection with his prior trials does not relieve him from them for his upcoming CSAM trial.  Moreover, the Stipulations are also admissible as statements by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(C) & (D); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1097 (10th Cir. 1991) ("A stipulation is an admission which cannot be disregarded or set aside at will." (internal quotation marks omitted)).[5]

**IV.      Evidence of Schulte's Incarceration Is Admissible for a Limited Purpose**

Following Schulte's arrest on or about August 24, 2017, he began keeping notebooks with writings about his case, among other things.  Schulte continued writing in notebooks when his bail conditions were revoked on or about December 14, 2017.  Those notebooks (the "Notebooks") were seized during a search pursuant to a search warrant of Schulte's cell at the Metropolitan

---

[5]   If the defendant requests or the Court deems it appropriate, the Government is prepared to propose redactions to the Stipulations to avoid any confusion regarding the counsel named therein.

Correctional Center ("MCC") in or about October, 2018, and reviewed by a wall team for potential privilege.

The Government intends to offer certain of Schulte's statements in the Notebooks as evidence of his state of mind with respect to his receipt, possession, and transportation of CSAM. Some of those statements also reflect Schulte's bail conditions (home confinement) or incarcerated status, which is inextricable from the context and meaning of Schulte's statements relating to CSAM. For example, during a time period when Schulte was charged only with CSAM offenses, Schulte wrote:

- Kenny & Koss [Schulte's prior counsel] fail to produce any positive results again. . . not only have they forced me to turn over my cell phone, which is the only way they were able to decrypt the CP apparently, against my better judgement . . . .

- So that week they [Schulte's visiting family members] did all the typical tourist stuff while I was confined to my 700 ft2 apartment, accused of a federal crime. A non-violent, victimless crime.

- I just cannot fathom that I am in federal prison because I'm accused of a fucking crime. I'm a danger to society? Is that actually true? Even if I went home and watched CP all day every day there would be no danger to the community for that. None. Fuck America.[6]

---

[6]   The Notebooks contain other evidence of Schulte's state of mind with respect to the CSAM offenses that do not reflect his bail or incarcerated status, such as: "encrypted volumes still unable to be decrypted – and these are just the ones you know about," which the Government intends also to introduce. The Notebooks also contain lengthy essays, written in the first-person by a fictional FBI agent, that assert CSAM was planted on Schulte's computer by the FBI because the FBI was unable to find evidence that Schulte had committed the espionage and computer hacking offenses. The Government does not intend to offer this latter category of Schulte's statements at the September 11, 2023 trial because, though highly probative of his state of mind, they risk causing unnecessary complication and juror confusion. However, should Schulte be allowed to put the espionage and computer hacking offenses before the jury or claim that the FBI planted CSAM on his computer, the Government reserves the right to offer these statements.

A.        Relevant Law

Among the elements that the Government must prove in a prosecution for violations of 18

U.S.C. §§ 2252A(a)(1), (a)(2)(B), (a)(5)(B), and (b)(2) is that the defendant's receipt, possession,

and transportation of child pornography was knowing.  *See United States v. Harris*, 548 F. App'x

679, 681-82 (2d Cir. 2013) (affirming admission of video clip and still image of CSAM at trial

because the "the images were still probative of whether [the defendant] *knew* that the images were

child pornography given the youth of the minors depicted"); *United States v. Weisinger*, 586 F.

App'x 733, 736 (2d Cir. 2016) (evidence of defendant's online viewing of erotic incest stories

involving stepfathers and stepdaughters was probative of intent to produce and receive child

pornography involving the defendant's girlfriend's daughter); *United States v. Wallace*, 607 F.

App'x 25, 28-29 (2d Cir. 2015) (affirming admission of, among other things, magazine advertising

"the youngest girls allowed by law" to show "sexual interest in young girls" to rebut defense that

defendant did not knowingly or intentionally download the CSAM found on his computer); *United

States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y.) (Bianco, J.) (in bail proceedings in a child

pornography possession prosecution, the court could consider evidence of the defendant's fetish

for young boys, slavery, and cannibalism as probative of the defendant's knowing possession of

child pornography and overall state of mind).

Additionally, "[e]vidence of a party's consciousness of guilt may be relevant if reasonable

inferences can be drawn from it and if the evidence is probative of guilt."  *United States v. Perez*,

387 F.3d 201, 209 (2d Cir. 2004).  Consciousness of guilt evidence is admissible "if the court

determines (1) the evidence is offered for a purpose other than to prove the defendant's bad

character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403,

and (3) provides an appropriate instruction to the jury as to the limited purposes for which the

16

evidence is introduced, if a limiting instruction is requested." *Id.* (citing *United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991)).

## B.    Discussion

Schulte's statements that he turned over his phone to the FBI "against his better judgment"; that he believes the receipt, possession, and transportation of CSAM is a "non-violent, victimless crime"; and that he hypothesized about "watch[ing] CP all day every day" and believed doing so would reflect "no danger to the community for that," "None"; or similar statements are evidence that Schulte knew that he possessed CSAM. Such evidence is directly probative of Schulte's state of mind and consciousness of guilt, particularly when the Government expects that Schulte's knowledge of the CSAM will be placed at issue during the trial, *see infra*, Sections V and VIII.

Additionally, evidence of Schulte's bail status or incarceration at the time he made the statements is necessary to make the statements intelligible and to provide context for them. Nor is the probative value of the Notebooks substantially outweighed by any danger of unfair prejudice under Rule 403. *See United States v. Ashburn*, No. 11 Cr. 0303 (NGG), 2015 WL 862118, at *3 (E.D.N.Y. Feb. 27, 2015) (evidence of emails and prison calls during defendants' pretrial detention admissible to show co-conspirator communications and to corroborate witness testimony).[7]

## V.    Arguments Suggesting an Alternative Perpetrator Should Be Precluded Without a Sufficient Evidentiary Basis

In prior statements, submissions, and Court proceedings, Schulte has suggested that the CSAM on his home computers was placed there by someone else without his knowledge, including

---

[7]    The Court can also provide an appropriate limiting instruction regarding Schulte's incarcerated status to limit any potential prejudice.

assertions that the CSAM was planted by the FBI.[8]  Schulte's speculation of an alternative perpetrator should be precluded unless he establishes a sufficient evidentiary basis—which he has not, and there is no reason to believe he could.

### A.    Relevant Law

Where the purported relevance of evidence is based on the defendant's assertions that another person could have committed the charged offenses, the Second Circuit has admonished courts to "be sensitive to the special problems presented by 'alternative perpetrator' evidence." *Wade v. Mantello*, 333 F.3d 51, 61 (2d Cir. 2003) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998)).  Before permitting the defendant to introduce evidence that someone else could have committed the crimes with which the defendant is charged, the Court "must ensure that the defendant shows a 'sufficient . . . nexus between the crime charged and the asserted 'alternative perpetrator.'"  *United States v. Hendricks*, 921 F.3d 320, 331 (2d Cir. 2019) (quoting *Wade*, 333 F.3d at 61-62).  "It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime.  Such speculative blaming intensifies the grave risk of jury confusion."  *McVeigh*, 153 F.3d at 1191 (precluding testimony that "would have forced the government to attempt to disprove the nebulous allegation that [another group] was involved in the bombing.  This side trial would have led the jury astray, turning the focus away from whether McVeigh—the only person whose actions were on trial—bombed the Murrah Building.").  In *United States v. Hendricks*, the Second Circuit affirmed the preclusion of evidence purportedly showing third-party culpability because the defendant's proffer was "insufficient to show the required nexus," noting that "[a]lthough the evidence [the defendant] cites might tend to

---

[8]    Schulte has also at times incorrectly asserted that the CSAM was found on a server, rather than on the Home Desktop.

show that [the third party] knew about the robbery, none of the evidence places [the third party] anywhere near the robbery scene or suggests that he was otherwise involved in the crime."  921 F.3d at 331.

### B.  Discussion

In this case, Schulte should be precluded from arguing that the CSAM was planted on his computer by a government agency, or that it was placed there by a third party, without satisfying the *Hendricks* requirement of demonstrating a "sufficient . . . nexus between the crime charged and the asserted 'alternative perpetrator.'"  Because Schulte has not, and cannot, proffer a sufficient basis, such arguments would simply confuse the issues before the jury.

## VI.   Schulte's Unprotected Interview Statements Are Admissible

Before his arrest in this case, Schulte, represented by counsel, participated in interviews at the U.S. Attorney's Office on March 15, 16, 20, and 21, and June 29, 2017.[9]  FBI Special Agents and Assistant U.S. Attorneys participated in those interviews, which were conducted without a proffer agreement, and which were prefaced with reminders that Schulte's presence was voluntary and he was not required to answer any questions.  During those interviews, Schulte stated, *inter alia*, that he began working for an employer[10] in Maryland in or about 2010 and then began working for another employer[11] in Virginia in approximately 2010; that the Home Desktop was Schulte's main desktop computer since residing in New York City; that Schulte had built the Home Desktop a few years earlier while employed in Virginia; that no one else had access to the Home

---

[9]   Schulte also participated in an interview on November 17, 2017, which was conducted pursuant to a proffer agreement.  The Government does not expect to offer any of Schulte's statements from this proffer in its case-in-chief.

[10]   The National Security Agency.

[11]   The CIA.

Desktop; that there was encryption on the Home Desktop; that no one else had the passwords to the encryption; that Schulte had only encrypted pornography on the Home Desktop; and that he had encrypted the pornography because "God forbid [his] mom sees it." Schulte refused to provide the password to the encrypted portions of the Home Desktop when asked.

### A. Relevant Law

"Incriminating statements made in non-custodial settings are inadmissible if the statements were not made voluntarily—that is, if the defendant's will was overborne." *United States v. Kourani*, 6 F. 4th 345, 351 (2d Cir. 2021) (internal quotation marks omitted). The court "evaluate[s] voluntariness based on the totality of the circumstances, including (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Id.* at 351-52 (quotations omitted).

### B. Discussion

Schulte's statements were made during voluntary interviews held at the U.S. Attorney's Office during which he was represented by counsel, and where he was reminded that the interviews were voluntary and he was not required to answer questions. Schulte has never moved to suppress any of these statements, and there was no basis to do so. Under the totality of the circumstances, the statements clearly are voluntary and admissible.

## VII. Schulte's Convictions for Making False Statements, Contempt of Court, and Obstructing a Grand Jury Proceeding Are Admissible in the Event Schulte Testifies

Following the 2020 trial, a guilty verdict was returned as to Counts Eight and Ten of the indictment, charging Schulte with violating 18 U.S.C. §§ 1001 and 401(3). (D.E. 351.) Following the 2022 trial, a guilty verdict was returned as to, *inter alia*, Count Nine of the third superseding indictment, charging Schulte with violating 18 U.S.C. § 1503. (D.E. 882.) Sentencing on those

counts, together with the other counts on which Schulte was convicted at the 2022 trial, has been scheduled for January 10, 2024.

### A.      Relevant Law

Rule 609 makes evidence of a witness's prior conviction admissible for impeachment purposes under specified circumstances.  Under Rule 609(a)(1)(B), evidence of a prior conviction "must be admitted" where the witness is a defendant in a criminal trial and the prior conviction was for a crime punishable by imprisonment for more than one year, and the probative value of the evidence outweighs its prejudicial effect to that defendant.  Under Rule 609(a)(2), evidence of a prior conviction "must be admitted" regardless of punishment if the crime required proving a dishonest act or false statement.  A jury verdict of guilty prior to the entry of judgment is similarly admissible under Rule 609 if it meets the other requirements of Rule 609, and the defendant may reveal to the jury the fact that judgment has not been entered.  *United States v. Vanderbosch*, 610 F.2d 95, 97 (2d Cir. 1979).

In connection with the June 2022 trial, the Court previously ruled that the false-statements and contempt guilty findings would be admissible as impeachment in the event the defendant testified at that trial, as would the fact that the defendant has not yet been sentenced for those offenses and has not yet had an opportunity to appeal them.  (June 3, 2022 Tr. at 76.)

### B.      Discussion

The guilty verdicts following Schulte's 2020 trial for making false statements, 18 U.S.C. § 1001, and contempt of court, 18 U.S.C. § 401 (3), and the jury's guilty verdict following the 2022 trial for obstructing a grand jury proceeding, 18 U.S.C. § 1503, must be admitted under Rule 609(a)(1)(B) and (a)(2) in the event Schulte testifies.

First, the guilty verdicts for the violations of §§ 1001 and 401 (3) are admissible for the same reasons the Court previously found.  (June 3, 2022 Tr. at 76; *see also* D.E. 780 at 33-35.)

Second, a violation of 18 U.S.C. § 1503 is punishable by a term of imprisonment up to ten years, § 1503(b)(3), and therefore satisfies that prong of Rule 609(a)(1)(B).  Furthermore, under Rule 609(a)(2), Schulte's conviction under § 1503 required proof that the defendant "corruptly acted to obstruct or impede, or endeavored to obstruct or impede" a grand jury proceeding, that is, that he acted "having the improper intent or purpose of obstructing justice." (July 8, 2022 Tr. at 2346-47.)  Schulte violated § 1503 by lying to the FBI and attempting to conceal information from the FBI relevant to its and the grand jury's ongoing investigation of the theft of classified information from the CIA.  (*See, e.g.*, D.E. 1021 at 22-23 & 69-71.)  Thus, the guilty verdict for the defendant's violation of the obstruction statute satisfies Rule 609(a)(2).

Under Rule 609(a)(1)(B), the probative value of the defendant's convictions for making false statements, contempt of court, and obstruction is not outweighed by any unfair prejudice to the defendant.  Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980); *see also United States v. Brand*, 467 F.3d 179, 195 n.1 (2d Cir. 2006) (same).  Here, the nature of the defendant's conduct underlying the three guilty findings is no more sensational than the conduct for which he will stand trial, which involves egregious conduct relating to heinous CSAM materials, nor does it suggest to the jury any improper basis for assessing the defendant's proposed testimony or reaching an ultimate verdict in this case.  And the evidence of these guilty findings is highly probative both of Schulte's truthfulness and of his purported intent to behave only in a law-abiding way.

Thus, should the defendant testify, evidence of the three guilty findings should be admitted to impeach Schulte.

**VIII.   Expert Testimony Regarding Schulte's State of Mind Is Inadmissible**

On June 30, 2023, Schulte provided an expert disclosure for Dr. J. Richard Kiper, a former

FBI agent (*see* Exhibit A) who, among other things, worked as a forensic examiner for the FBI.

Dr. Kiper's accompanying statement of opinions summarized his review of the electronic evidence

that the Government produced in discovery, as well as chat logs containing stored conversations

between Schulte and others through an Internet Relay Chat ("IRC") program and the search history

from Schulte's Google account.  Based on his review, Dr. Kiper concluded that the virtual machine

containing CSAM found on Schulte's Home Desktop was "created by any dozens of users of a

shared computer system" and "was inadvertently copied to Schulte's computer, where it remained

neither viewed nor accessed for many months until its eventual discovery by the government."

Ex. A at 13 (Dr. Kiper Summary of Findings).

Although purporting to base his opinions on a review of the electronic materials produced

in discovery, Dr. Kiper attempts to draw multiple conclusions about Schulte's state of mind,

whether his behavior is consistent with that of a "child pornographer," and whether Schulte fits

"patterns of behavior [that] are expected to emerge while investigating [CSAM]."  *Id.* at 2, 4-5,

11-14.  For example:

- "I have observed no evidence that the user of Schulte's computer was even aware that the \VMs\Linux Mint\ folder was among the 200,000 items copied to his computer."  *Id.* at 4.

- "My years of experience with [CSAM] investigations inform my opinion that this is not behavior indicative of a child pornographer."  *Id.* at 5.

- "Obviously the user was not searching for [CSAM]."  *Id.* at 10.

- "[T]his is not behavior typical of a person with a strong disposition towards [CSAM]."  *Id.* at 10.

- "In my experience, a handful of mentions of and jokes about [CSAM] among friends . . . is not indicative of a typical child pornographer."  *Id.* at 11.

23

- "I see no indication that Schulte knew that a hidden, containerized, group of [CSAM] files were among the 200,000 files he had copied on May 6, 2016." *Id.* at 12.

- "The fact that Schulte did not single out the Linux Mint VM files for copying . . . demonstrates that the copying of [CSAM] material was most likely inadvertent." *Id.*

- "The fact that Schulte chose not to access the Linux Mint VM . . . demonstrates that he had no interest in its contents . . ." *Id.*

- "The Google searches and IRC [chat] excerpts cited in the Complaint do not support the characterization of Schulte having a history of engaging with [CSAM] material." *Id.* at 13.

- "The Google searches were largely misinterpreted and did not consider other user behavior adjacent in time." *Id.*

- "A complete and accurate reading of IRC conversations reveal that participants are in a perpetual state of joking around, demonstrating only a passing curiosity about child pornography topics." *Id.*

## A.     Applicable Law

Expert testimony based on a reliable foundation is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed R. Evid. 702.  Such testimony assists the trier of fact "when it sheds light on activities not within the common knowledge of the average juror."  *United States v. Wexler*, 552 F.3d 194, 204 (2d Cir. 2008).   Expert testimony is not admissible "if it usurps the role of the jury in applying the law to the facts before it, as such testimony undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  *Callahan v. Wilson*, 863 F.3d 144, 153 (2d Cir. 2017); *see also United States v. Lopez*, 18 Cr. 6 (DLC), 2019 WL 1570818, at *4 (S.D.N.Y. Apr. 11, 2019).

Rule 704 further prohibits an expert witness in a criminal case from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  Fed R. Evid. 704.  As such, it is well established that Rule 704(b) "disables even an expert from

expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993) (internal quotation marks and citations omitted). Expert testimony "concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *Id.* (collecting cases); *see also United States v. Haynes*, 729 F.3d 178, 196 (2d Cir. 2013) (holding testimony "regarding whether the defendant 'realized' that there were drugs in the car was erroneously admitted because it is expert testimony about the defendant's state of mind"). The party offering expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

### B.      Discussion

Dr. Kiper's proffered expert testimony contains multiple opinions about Schulte's mental state that invade the function of the jury and are inadmissible. Dr. Kiper may, with appropriate foundation, render opinions regarding any review or technical analysis he performed on the electronic evidence in this case based on his qualifications as a forensic examiner. He cannot, however, opine on Schulte's mental state regarding his knowing receipt, possession, and transportation of CSAM. As explained above, Dr. Kiper's expected testimony is replete with references to whether Schulte was "aware," "knew," or had "interest" in the CSAM on his computer. The Second Circuit has repeatedly rejected such attempts to "stat[e] the bottom-line inference" through expert testimony." *DiDomenico*, 985 F.2d at 1165; *Haynes*, 729 F.3d at 196.

Dr. Kiper's proffered opinions regarding whether Schulte's behavior is consistent with that of a "typical" "child pornographer" are similarly inadmissible. For starters, it is unclear what Dr. Kiper means by the term "child pornographer," nor is it at all relevant or helpful for the jury. Whether Schulte's actions—through his computer use, Google searches, IRC chats, or otherwise—comport with Dr. Kiper's view of a "child pornographer" is ultimately beside the point and would

25

confuse the jury by suggesting it is somehow a standard the Government must prove at trial.  The Government does not need to prove that Schulte is a "child pornographer," but rather that he knowingly possessed, received, and transported CSAM in accordance with the Court's jury instructions.  Dr. Kiper's attempts to compare Schulte's actions to a non-existent baseline should be excluded.[12]

Finally, Dr. Kiper's attempts to contextualize Schulte's Google searches and IRC chats are not admissible under any expert standard.  Dr. Kiper claims, among other things, that the Government "misinterpreted" Schulte's search history and that Schulte was merely joking about CSAM in IRC chats by explaining the meaning of a winking-face emoji (citing to Wikipedia).  Ex. A at 10-11.  It does not require "scientific, technical, or other specialized knowledge" under Rule 702 to interpret Schulte's Google search history and IRC chat logs, nor would Dr. Kiper's gloss on their meaning help the trier of fact, which is more than capable of evaluating them without expert assistance.

---

[12]   To the extent Dr. Kiper attempts to opine on Schulte's "disposition" or "interest" in CSAM, Ex. A at 10, 12, he has offered no qualifications, examination, or other psychological basis for such an assertion, which is plainly inadmissible.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
        July 28, 2023

<div style="margin-left:50%;">

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____/s/_____
    David W. Denton, Jr.
    Michael D. Lockard
    Nicholas S. Bradley
    Assistant United States Attorneys
    (212) 637-2744 / -2193 / -1581

</div>