N7IzzSCHc–dh

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          17 Cr. 548 (JMF)

5  JOSHUA ADAM SCHULTE,

6            Defendant.
                                         Conference
7  ------------------------------x

8                                        New York, N.Y.
                                         July 18, 2023
9                                        2:45 p.m.

10 Before:

11
                      HON. JESSE M. FURMAN,
12
                                         District Judge
13
                             APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  DAVID W. DENTON JR.
        NICHOLAS S. BRADLEY
17      Assistant United States Attorneys

18 JOSHUA M. SCHULTE, Pro Se Defendant

19 CESAR DE CASTRO
   SHANNON MCMANUS
20      Standby Attorneys for Defendant

21

22

23

24

25

N7IzzSCHc-dh

1          (Case called; appearances noted)

2          THE COURT:  Good afternoon to the three of you.

3          I would note that -- at least at the moment -- Mr.

4    Schulte is representing himself, and therefore, Mr. de Castro

5    and Mr. McManus are here as standby counsel, but that's

6    obviously one of the main issues for us to discuss today.

7          Several submissions have been docketed since we were

8    last together, most notably, Mr. Schulte's letter of July 13

9    indicating, among other things, that Mr. Schulte had sent a

10   letter to me indicating his desire to return to having counsel

11   and that he had done that in a submission that had not yet

12   arrived in Court.  I believe that that submission may have

13   arrived yesterday.

14         There were three different submissions that were

15   docketed yesterday: a letter dated June 20 from Mr. Schulte,

16   which, unfortunately, was received by the court, that is, the

17   court writ large, on June 28 -- that the stamp on the last page

18   indicates but did not make its way to me, let alone the docket,

19   until yesterday -- for reasons that have been explained but

20   were not particularly adequate, just that it found its way in

21   the wrong pile and therefore wasn't immediately dealt with,

22   which is unfortunate, but it is what it is; and the July 3

23   letter that, I think, is the one to which Mr. de Castro was

24   alluding to in his letter of July 13; and a motion to dismiss

25   the indictment on speedy trial grounds.

N7IzzSCHc-dh

1          The biggest issue, as I mentioned, for us to address,

2     is Mr. Schulte's apparent desire to give up his *pro se* status

3     and return to having counsel.  We will get to that shortly, but

4     let me just briefly address the array of other issues raised in

5     these submissions, most of which I have previously addressed.

6          I recognize that the way I've addressed them is not

7     entirely satisfying to Mr. Schulte, and he disagrees with some

8     of the findings that I have made in prior words and rulings,

9     but it is what it is.  He's made his record, and if he wishes

10    to seek relief from the Court of Appeals, he is obviously

11    welcome to do so.

12         Given that I do not intend to respond to each and

13    every complaint that he has made in these most recent

14    submissions, most of which are simply rehashes of the many

15    submissions he's made over the last couple of months, but I do

16    want to say a few things.

17         First, on the issue of the laptop, to make record on

18    one front, the government accepted my invitation to make more

19    of a record regarding the child sexual abuse material that was

20    allegedly found on the laptop and showed me in camera what was

21    purportedly found on the laptop, which included -- based on our

22    observations -- child sexual abuse material and other

23    pornography, and not -- I should stress -- not merely

24    thumbnails, as Mr. Schulte has maintained for months.

25         I did think that it made sense to make more of a

1    record regarding what precisely I was shown, where it came from

2    and the like and requested or directed the government to file a

3    declaration on that score, but that hasn't yet happened.

4           Mr. Denton, I don't know if you can update me on that

5    front.  Tell me where that stands.

6           MR. DENTON:  We are working on it, your Honor.  We've

7    been having some technical difficulties with the software that

8    is used to generate the reports, just because it's not

9    something that we've typically used on U.S. Attorney's Office

10   computers, so that's been an issue.

11          And candidly, over the last couple of weeks, we've

12   been purposely focused on identifying and marking exhibits for

13   trial in order to try and produce those early.  We are mindful

14   of the Court's directive and will provide a declaration from

15   Special Agent Spivack as soon as we possibly can.

16          I would very much hope that would be this week, but,

17   candidly, some of the technical issues are beyond my knowledge,

18   and we have to enlist some help on that.  I'm optimistic, but

19   not certain.

20          THE COURT:  All right.  I will look for that in the

21   near future, I hope.

22          Picking up where I left off, I had previously made

23   clear that Mr. Schulte wasn't getting a laptop to prepare for

24   his coming trial.  In my view, the record on that was more than

25   sufficient even before my in camera review, but the in camera

N7IzzSCHc-dh

1    review certainly supports that ruling and then some.

2              Note that Mr. Schulte, on page 1 of his own

3    submission, dated June 20, states that if the government's

4    allegations are true -- and from my review, they certainly seem

5    to be -- I would have, "undisputable authority to sanction or

6    outright deny my right to self-representation and discovery

7    access."

8              And again the government's allegations certainly do

9    seem to be true based on my preliminary review, but the record

10   on that may be more developed in the coming days.  Again, to

11   the extent that Mr. Schulte thinks that ruling is in error or

12   that he was entitled to an evidentiary adversarial hearing, he

13   is obviously welcome to pursue that on appeal.

14             Other issues, Mr. de Castro's letter indicated that,

15   contrary to the representation that had been made to me, that

16   MDC would make an exception to its policy and allow the passing

17   of papers between standby counsel and Mr. Schulte, that that

18   was not permitted.  I have spoken with the court liaison at the

19   MDC who I'll note is here again today.  We thank him for being

20   here to get to the bottom of that.  He advised yesterday that

21   there was a problem on that front and that it was an error, as

22   I previously made clear.

23             MDC had made an exception to its policy for Mr.

24   Schulte at my request, so I presume that because it is an

25   exception, simply, there was an error in implementing it.

1          The court liaison has indicated that he is going to be

2     holding a training or meeting for the relevant staff this week,

3     and hopefully that will address those concerns going forward.

4               MR. DE CASTRO:  Judge, if I could.

5               THE COURT:  Sure.

6               MR. DE CASTRO:  Just to sort of add that, since

7     counsel's here anyway.

8          That was July 7 when there was that misunderstanding.

9     He still has not received that information, so we're now at

10     eleven days where he hasn't.  We drooped it off.  There's the

11     mailbox in the lobby.  We put it in the mailbox in the lobby on

12     that day.  He still has not received that.

13          Obviously, anything we send is important, but there

14     are things that are important, and there are things that are

15     even more important.  One of them, for example, which we have

16     done expert disclosure on -- the government and the defense --

17     it's pretty important that we provide Mr. Schulte, with our

18     experts, the disclosure we provided to the government on his

19     behalf, and he still has not received that.

20          What appears to me is that, for example, I understand

21     the Court got that one filing.  There was a mixup in the mail

22     room, but it seems like it's coming here in about eight days.

23     It seems like the government's filings or any letters they send

24     to him come to him in about a week or eight days, and for us

25     it's two to three weeks.  I don't know why that is.  Obviously,

N7IzzSCHc-dh

1    I have my return address on it so it's clear, but for some

2    reason, it's a couple weeks.  It's been three weeks, normally,

3    for us to get anything we've sent.

4            THE COURT:  All right.  Well, number one, I hope that

5    with the correcting of what I hope was a one-off error and your

6    permission to pass materials back and forth, that this problem

7    will be mooted going forward.

8            MR. DE CASTRO:  Yes.

9            THE COURT:  Number two, a court liaison is here to

10   report back to me to find out what's going on there.

11           I take it these things you're submitting are clearly

12   marked as legal mail.

13           Is that correct?

14           MR. DE CASTRO:  Yes.

15           THE COURT:  Obviously, that is not ideal.

16           MR. DE CASTRO:  And most everything we are providing

17   or we have been in the last weeks is just things that have the

18   ECF filing on them.  They're just literally copies of what has

19   been filed, but I want to make that record also, just because

20   they're here, so they can hear it and we can try to work

21   through that.

22           THE COURT:  We'll try to get to the bottom of it.  It

23   is very important to ensure that there's as little delay as

24   possible in getting papers to and from Mr. Schulte, and

25   especially as we get closer to the September 11 trial date, so

N7IzzSCHc-dh

```
1   I will look into that.  But again, I hope this remedying of the
2   potentially one-off error in terms of not allowing for the
3   exception from the usual policy will mean it's less of an issue
4   going forward.
5         Mr. de Castro's letter of July 13 also indicated that
6   Mr. Schulte hasn't been able to use the law library computer
7   since at least July 6.  I think Mr. Schulte's submission said
8   something similar.  The court liaison reported that that was
9   contrary to the information that he had, and indeed, that there
10  was documentation that Mr. Schulte has used the discovery
11  computer on July 6 and 8.  So, I don't know what's going on
12  there, but it seems that the record doesn't necessarily appear
13  to support what Mr. Schulte is claiming.
14        On top of that, I have checked -- as I have promised
15  -- with the court liaison to ensure that the representations he
16  made to me that are more or less in a prior order have been
17  honored.
18        Mr Schulte's unit team has continued to visit him each
19  weekday and run through the checklist of items that are
20  reflected in a prior order, and obviously, that would have been
21  on opportunity for Mr. Schulte to raise some of these issues to
22  get them more quickly addressed than the litigation process
23  would allow.
24        The bottom line is that the record does not appear to
25  support many of Mr. Schulte's representations and complaints.
```

N7IzzSCHc-dh

1   The ones that it does support, I have tried to, and indeed,

2   have taken steps to address as immediately as possible.  And

3   given that, I think the record makes plain that I have actually

4   gone to great lengths to address Mr. Schulte's concerns and

5   issues and, indeed, have taken what I would describe as

6   extraordinary or unprecedented steps to involve myself directly

7   with the MDC despite these issues.  When issues have been

8   raised in anything other than what I would describe as a

9   blunderbuss fashion, I have addressed them.  At one point I

10  admit examples in standby counsel's letter regarding the PDF

11  reading issues of note a week or two ago.

12          I recognize that I have not always addressed these

13  issues to Mr. Schulte's liking, but it is what it is.  And

14  again, if Mr. Schulte doesn't like my rulings, he has his

15  record and he can seek whatever relief he wishes to seek.

16          THE DEFENDANT:  If I may, just regarding that, those

17  issues with the law library, I just wanted to correct that.

18  They had informed the Court that there had been a new law

19  library and they had trained me on some new computer or

20  something like that.  That would never happen, and to my

21  knowledge, no one ever told me that there was new software or

22  new computer or anything like that.

23          As far as the checklist, I just wanted to clarify this

24  for the record, too, is, they were doing very well coming to me

25  doing the checklist up until last week.  And again on Monday, I

N7IzzSCHc-dh

1   had a couple things I wanted to bring to the Court to get

2   copied.  No one came by Monday.  And last week, I think, maybe

3   one day they came by last week, so it hasn't been happening

4   recently.

5          And then the final thing is with respect to the CSAM

6   material that the government had showed you in camera.  I had

7   simply just asked for the government to provide us a listing of

8   what files that they're going to show the Court and if they

9   could show whatever they're going to show the Court -- at the

10  very minimum -- provide the files so they can verify those are

11  not thumbnail images and, specifically, where these files were.

12         THE COURT:  I think the declaration that the

13  government is preparing might well do that and moot that

14  request.

15         As for the new computer or software that you alluded

16  to, I honestly don't have any idea what you're talking about.

17  I don't know if Mr. Denton does, and I will circle back to the

18  court liaison about Monday and last week to find out what

19  happened, but certainly, what I was told is that the unit team

20  has been checking each weekday.

21         But, Mr. Denton.

22         MR. DENTON:  I just wanted to make a record with

23  respect to the materials that were shown to the Court --

24  Special Agent Spivack showed to the Court -- came from the same

25  Magnet AXIOM forensic extraction previously provided to the

N7IzzSCHc-dh

1    defendant and both of his prior counsel, including Mr. de

2    Castro.  We will provide more detail in the declaration, but

3    just to be clear, what was shown to the Court came from exactly

4    what was previously provided to Mr. Schulte.

5              THE COURT:  That you.

6              THE DEFENDANT:  If that's the case, I just wanted to

7    make this clear on the record that that material didn't

8    differentiate.  All the pictures and stuff were the same size.

9    You couldn't tell that it was a thumbnail image unless you

10   looked at a specific indication within that report.

11             When you go through the report, you just see CSAM

12   materials, and they are large thumbnails, so it doesn't look

13   like they're thumbnails, but they are from a thumbnail database

14   file.  I just want to make sure, if that's the report that

15   you're seeing, you may be looking at files and not realizing

16   that those are actually just thumbnail images and not what the

17   government is saying, which, hopefully, their report will

18   clarify, and we can go forward on that.

19             THE COURT:  Well, what I was shown in camera, there

20   was a differentiation between certain files that were marked as

21   thumbnails and found in a thumbnail directory on a laptop and

22   other files that were not, and it is that distinction that I

23   was resting on to make my finding that what was included on the

24   laptop included child sex abuse materials and what may just be

25   normal pornography.

1          But in any event, the material had been on the laptop.

2     So, again, we'll see what the government files in the coming

3     days, but I think that the record is certainly more than

4     sufficient in justifying the rulings that I have made.

5          Yes, Mr. de Castro, do you wish to say something?

6          MR. DE CASTRO:  Yes.  As long as we're on that thread,

7     it was to respond to the Court's question about the new

8     software, like what we were talking about there.  There's so

9     many threads, I get lost in a lot of them.

10          One issue was that Mr. Schulte was not able to open

11     certain files, like basically, a PDF.  We need a PDF viewer in

12     the jail computer and so what happened was, in response to the

13     Court essentially asking him, like, what are we talking about,

14     we sent the Court -- I believe we did it under seal because

15     some of it is protected material -- what he was getting when he

16     tried to open those files, which was all symbols and gibberish.

17     And I think the government had proceeded with the MDC to

18     install a new application for -- the MDC would install an

19     application that would enable him to open those files.

20          That is what Mr. Schulte is referring to, that no one

21     had alerted him to that at the MDC, that there's a new program

22     for him available.  That's my understanding.

23          THE COURT:  Okay.  That was certainly helpful.

24          I'm trying to load the docket to find the government's

25     letter that reported on that, but Mr. Denton, I don't suppose

1    you have anything further on that score to report.

2              MR. DENTON:  Only, your Honor, I can't speak to what

3    Mr. Schulte specifically was told.  I know we worked closely

4    with the court liaison to get Acrobat Reader installed, and

5    they confirmed that it was installed and working.  I think we

6    assumed that the natural next step was that that would be

7    communicated to Mr. Schulte, but I am sure that to the extent

8    it wasn't, he knows now and I'm sure the unit team will

9    follow-up and make sure that it's working properly.

10             THE COURT:  Just for the record, this is Docket No.

11   1071.  The government communicated that on July 10, the MDC

12   informed the government that Adobe Acrobat Reader had been

13   installed on the computer used by the defendant and that a

14   member of the legal department has used the program to open a

15   PDF file to ensure that it was operating properly, and standby

16   counsel was advised of the availability of Acrobat Reader.

17             I guess something went awry, and Mr. Schulte was

18   advised.  Certainly now he does know, and that's an example --

19   even if it's imperfect or proceeds in fits and starts -- of

20   practical problem-solving where an issue is identified and we

21   can, in fact, figure out a solution.

22             Mr. Denton, I have brackets around speedy trial motion

23   and the *pro se* status for the moment, but is there anything

24   that the government wishes to say in connection with any of the

25   matters that we've addressed or raised in Mr. Schulte's letters

1    over the last couple of weeks?

2            MR. DENTON:  Just one issue, your Honor.

3            With respect to the Court's order regarding the review

4    and return of CDs to Mr. Schulte, there were 12 disks that were

5    still outstanding as of our last update.  Since then, the FBI

6    has finished reviewing five of them, copies of which have been

7    returned to Mr. Schulte.  There are two that the FBI computer

8    science folks are still working on, and then there are five

9    that are undergoing classification review.

10           We have another assistant U.S. attorney from our

11   office who has been nominated as the wall person for purposes

12   of communicating with the agency on that, and it's possible

13   that the wall team may have an application to the Court in

14   connection with that.  Again, we had someone else appointed.

15   He's down there today actually working with them.  That's where

16   the status of that review and return stands.

17           I just had a word with Mr. de Castro about potentially

18   getting him a file listing from the unencrypted portion of the

19   laptop, so that to the extent that there are things that he or

20   Mr. Schulte wants to identify from that to be extracted and

21   provided, we'll continue to work to do that.

22           THE COURT:  All right.

23           I would remind you, Mr. Denton, I think in my

24   endorsement of June 30, I directed that you were to submit a

25   status update every two weeks until the review of those 12

1    disks had been completed.

2              I know there's a lot going on.  Maybe you overlooked

3    it.  I think this is the first I've heard since that order.

4              MR. DENTON:  Understood, your Honor.

5              I think we thought we should take it up with the Court

6    today, but we'll make sure that there are continued updates

7    until that's completed or the Court orders otherwise.

8              THE COURT:  All right.  Very good.

9              Turning now to the speedy trial motion.

10             Mr. Denton, I don't know if you care to respond.  If

11   you do, whether you wish an opportunity to respond in writing

12   or just orally, what are your thoughts?

13             MR. DENTON:  Your Honor, I think we would be prepared

14   to respond orally at a very high level.  I think Mr. Schulte's

15   understanding of the excludability of time is seriously

16   mistaken under the Speedy Trial Act.

17             There has been hardly a moment -- certainly since the

18   last trial -- that there has not been some motion or other of

19   his pending, which would be automatically be excluded, separate

20   and apart from the Speedy Trial Act exclusion to which his

21   counsel has consented.

22             With respect to the time in advance of the previous

23   trial, Judge Crotty did, in fact, make the appropriate findings

24   on the record at each conference with respect to exclusion of

25   time, and so we don't think that there is any Speedy Trial Act

N7IzzSCHc–dh

1    violation here.

2              To the extent that we're talking about the substance

3    of those findings, both Judge Crotty and this court have noted

4    the extraordinary complexity of –– certainly, the previous

5    trial, in particular –– but even this one has some unique

6    issues that have been complicated by aspects of the defendant's

7    conduct, collateral investigations into it.

8              We think that the Court's findings –– first Judge

9    Crotty's and then your Honor's –– that time was properly

10   excluded in the interest of justice under the Speedy Trial Act

11   were entirely appropriate.

12             Second, with respect to the Sixth Amendment, I think

13   there is an aspect of this at which, in spirit, if not in

14   letter, the Second Circuit already addressed this in denying

15   the defendant's bail application –– his most recent bail

16   application, I should say –– in which the Second Circuit

17   considered, as part of the Hodge factors, the extent of the

18   delay and, in particular, its chargeability to the government

19   and rejected there the same argument that Mr. Schulte advances

20   here in noting that the delay in bringing this case to trial

21   and retrial is essentially entirely his own fault, that the

22   government sought diligently to pursue a retrial and that the

23   complexity of the case certainly warranted a delay.  So even to

24   the extent that it's appropriate to engage in the Barker

25   analysis, we don't really need to go past step 2.

1          I should say, your Honor, we have not gone through and

2     done the Speedy Trial Act step by step, conference by

3     conference, that we would do in terms of briefing.  To the

4     extent that the Court would like to hear more on this, we're

5     happy to provide a more extensive written response.

6          THE COURT:  Okay.  I guess the question I have for you

7     is -- Well, I don't think it's necessary.  I'm prepared to rule

8     on the motion, but it depends on how much of a record you wish

9     to develop on this issue on the theory that Mr. Schulte may

10    pursue it beyond me.

11         MR. DENTON:  I fully expect he will, your Honor.  I

12    think there is an ample record on it, so we're happy for the

13    Court to address it.  We're simply happy to do whatever's most

14    helpful to the Court.

15         THE COURT:  Mr. Schulte, anything you wish to say on

16    this?

17         THE DEFENDANT:  Yeah.

18         I just want to note that Judge Crotty never found the

19    case complex or did any complexity analysis, and I think

20    Mr. Denton's belief that this rarely-used exclusion to the

21    Speedy Trial Act can be used to exclude time for the government

22    to produce discovery and to slow-roll discovery over such a

23    long period of time is mistaken.

24         As for his statements with respect to the bail

25    application denial, I don't believe that that was the Second

Circuit's decision, that the analysis was that this was my

fault or that the delay was my fault.  I don't recall that

being the Second Circuit's decision at all in that case.

    And I think -- I've gone through each of the

transcripts and shown the record for what the reasons were for

the exclusion and basically explained why those exclusions are

not valid.

    THE COURT:  All right.

    As I said, I am prepared to issue a ruling.

    In one of his files, Mr. Schulte predicted that I

would deny the motion as meritless and on that score, he is

correct.  It is meritless; indeed, it is frivolous, and I don't

think it warrants an opinion or even necessarily a response

from the government.  If the government wishes to develop the

record, it certainly can, but I'm content to leave it with the

following.

    The following is just a few examples of the ways in

which the motion is frivolous and based on an absolutely

inaccurate and distorted view of the record, if not reality.

    First, for example, Mr. Schulte suggests that

excluding time based on mistrust, on availability, was

improper.  And, in part, he says in page 7 of his motion, he

didn't want Ms. Shroff as counsel anyway, and I should have

assigned him new counsel, yet he did not raise that until

February of this year, at which point he did receive new

N7IzzSCHc-dh

1      counsel.

2              Number two, Mr. Schulte says that exclusion of time

3      due to motion practice and CIPA litigation was unjustified,

4      that there were no motions to file and no classified

5      information was relevant to this upcoming trial on pages 8 and

6      12 of the motion.

7              But of course, he didn't say anything of his counsel,

8      didn't say anything at the time that the pretrial schedule was

9      set about either of those things.  In fact, the motion and CIPA

10     motion schedule were set based on counsel conferring with one

11     another and submitting a proposal to me, obviously suggesting

12     that there would be motion practice.

13             More significantly, mr. Schulte himself indicated that

14     the upcoming trial would involve classified evidence.  I would

15     point out, for example, ECF numbers 841 and 885 when the trial

16     date was set, and that was a significant part of the reason for

17     the extended schedule.

18             ECF No. 841, which is a letter from last June, is

19     especially noteworthy.  In that letter, Mr. Schulte had

20     described a, "vast ocean and related maelstrom" that the Court

21     and the parties would need to wade through pursuant to CIPA in

22     connection with the upcoming trial, and, in fact, urged the

23     Court to, "hold off on setting any trial date," all together,

24     in order to allow that litigation to proceed.

25             In other words, Mr. Schulte himself noted last June

N7IzzSCHc-dh

1     that there would be a need for a sentence in the CIPA

2     litigation and resisted setting any trial all together.

3              Now, of course, he says otherwise, and moves -- in

4     part, on that basis -- to dismiss the indictment, but it

5     reveals the complete lack of merit in his argument and that he

6     is simply opportunistically distorting the record to what he

7     thinks is to his advantage.

8              I would also point out that Mr. Schulte has, as

9     Mr. Denton noted, basically consistently and regularly filed

10    motions.  By my count, if I remember correctly, between the

11    time that the case was reassigned to me in the Fall of 2021 and

12    the trial date in 2022, Mr. Schulte filed no fewer than 90 or

13    100 separate motions.  During the pandemic, those, if not all

14    those motions would obviously have been automatically excluded.

15             Since he has resumed his *pro se* status this year, he

16    has continued to file motion after motion, most recently being

17    this one.  It belies his representation of the claim that there

18    was no motion practice to be had.

19             Mr. Schulte contends that I made an ex-post or

20    retroactive complexity finding.  That is not the case at all.

21    I articulated in my original findings on July 26 of 2022 that,

22    notably, are quoted in the motion itself that this case was

23    complex, more complex than your usual child pornography case,

24    that it would involve not just regular motion practice, but

25    classified information, proceeding factor motion practice, and

N7IzzSCHc-dh

1    that clearly supports an exclusion on the grounds of

2    complexity.

3            On page 15, Mr. Schulte makes the outlandish

4    suggestion that time during the pandemic should not be

5    excludable, because while the government couldn't control the

6    pandemic, it could control whether he was held in custody

7    during that time and had an obligation to release him during

8    the pandemic.  That argument barely warrants a response; it's

9    not just frivolous, but perhaps, worse.

10           And finally, he argues that there is a six-year delay

11   from arrest to trial but ignores the fact that the charges were

12   severed and that in that interim, there was a pandemic, there

13   was not one, but two trials on serious and complex

14   espionage-related charges.

15           In the interim, there is no grounds for the motion

16   under the Speedy Trial Act.  There is even less ground under

17   the Sixth Amendment, given that a majority if not all of the

18   delay was chargeable, and if not for Mr. Schulte -- certainly

19   not to the government -- had ample justifications for the

20   delay.

21           I understand that, at least now, Mr. Schulte insists

22   that he wishes to go to trial.  I don't know if he can.  Last

23   June, he resisted a trial date when I was prepared to do so,

24   but the bottom line is that there's no violation of the Speedy

25   Trial Act or the Speedy Trial Clause, and for that reason, the

N7IzzSCHc-dh

1    motion is denied.

2            That brings me to the request set forth in both Mr.

3    Schulte's July 3 letter and Mr. de Castro's letter of July 13

4    to resume having counsel.

5            Mr. Schulte, is that your desire?  I certainly

6    understand that you take the position that I have denied you

7    meaningful self-representation, and the record is what the

8    record is on that.

9            You can pursue whatever belief it is that you wish to

10   pursue on that at the appropriate time, but the bottom line is

11   the question I have for you is:  At this time, would you like

12   to return to having Mr. de Castro as your lawyer, or do you

13   wish to continue to proceed *pro se*?

14           THE DEFENDANT:  I just wanted to raise two issues.

15           A minor one is, I think you said at the last court

16   that this would be fine, that anything that you received that I

17   filed before, you would still consider.  I don't know what else

18   is out there.  I don't think there's much, but under that

19   understanding that if it was before today, you would still

20   consider it.

21           And then the second thing is, at the last June

22   conference, you said that you ordered the government to allow

23   that the laptop be reviewed and that I could have access to the

24   encrypted partition, decrypt, give it to standby counsel to

25   give it to their wall team to review, and you approved all

N7IzzSCHc-dh

1    that.  And the government, we've just been notified, are still

2    kind of resisting that.  I don't know if we need to await the

3    transcript for that, but I just wanted to raise this as one of

4    the last issues, that I would still like to be able to take off

5    my work product to give to counsel.

6          But yes, obviously, aside from working out those two

7    issues, like I've said in the letter, I would like them to take

8    over as counsel now.

9          THE COURT:  All right.  And do you understand that,

10   Mr. Schulte, assuming that I permit you to return to having

11   them as counsel -- and they have indicated that they are

12   prepared to do what they need to do and have an adequate amount

13   of time to prepare -- that that's probably it in the sense

14   that, as I've said before, I'm not going to permit you to make

15   a decision about your representation -- whether it is to

16   proceed with them or request for a new lawyer or proceed by

17   yourself -- if it means it delays the September 11 trial.

18         So this is probably the last window of time that they

19   would have to be adequately prepared for that trial.  They've

20   told me that they can do it, and I'm prepared, on that basis,

21   to allow them to do that.

22         But do you understand that?

23         THE DEFENDANT:  At this point, I can't even review

24   discovery, so there's not going to be any request to represent

25   myself.  I can't do it, so.

1          THE COURT:  All right.

2          With respect to the first issue raised, to the extent

3     that there aren't any additional submissions that I received,

4     if they were sent during the time when you were representing

5     yourself, I will certainly be prepared to consider them.

6          With respect to the second, I think Mr. Denton

7     mentioned earlier that the government is working on providing a

8     file listing to standby counsel, and so, I think that process

9     is underway.

10         But Mr. Denton, perhaps you can give us an indication

11    of timing on that front.

12         MR. DENTON:  We just discussed it today, your Honor.

13    I confess, it sounds entirely reasonable to me, but as soon as

14    we're done here, we're going to ask the FBI and get it to

15    Mr. de Castro as quickly as we can.

16         THE COURT:  All right.  Great.

17         Mr. de Castro, I'm expecting you to tell me if there's

18    any delays or issues on that front, but I'll assume that that

19    process will take its course.

20         MR. DE CASTRO:  I don't expect there to be delay on

21    that piece.

22         It's sort of two buckets.  The first bucket is the

23    file listing for the computer.  Then there's the portion of it

24    that is encrypted, and so, the point of contention has been

25    that if Mr. Schulte provides access to that part, the

N7IzzSCHc-dh

 1      government is going to then search it.  He has proposed,

 2      meaning Mr. Schulte has proposed that he provide it to me the

 3      way to access it, I access it and look through whatever we

 4      would need and provide that to the wall team.

 5              And I don't think the government is okay with that, I

 6      think the government -- I'll let them make their point, but --

 7      I think their position is, if Mr. Schulte gives me the ability

 8      to access a portion of it, that they have a search warrant;

 9      they're going in and searching it.  And so that's, I think, the

10      primary issue Mr. Schulte wants to address to decide what to do

11      there.

12              THE DEFENDANT:  Yeah, and I think that we brought this

13      up last time.  The Court agreed with me.  Like I said, we can

14      look at a transcript.  But my understanding is, the Court

15      ordered that to happen, that I can decrypt it, me and counsel

16      go through it and we provide what we want to take off to the

17      wall team to review, and the wall team will provide it to me

18      and to them.

19              It's just a matter of going through the transcript,

20      but my understanding is that you agreed with me against the

21      government at that point, but we can look at the transcript to

22      verify that.

23              THE COURT:  Okay.

24              Mr. Denton, I confess, that doesn't ring a bell to me,

25      and it would surprise me if I said that Mr. Schulte should be

N7IzzSCHc-dh

1    permitted -- either himself or through counsel -- to look

2    through something for which the government has a search warrant

3    and is encrypted by him.

4            MR. DENTON:  That is correct, your Honor.

5            That's not what the Court ordered.  We made the same

6    offer at the last conference that to the extent that standby

7    counsel or Mr. Schulte wants to identify things that they would

8    like extracted from the laptop or the materials, we're happy to

9    work with them on that.  We're going to try and take some slack

10   out of that line by getting a file listing to Mr. de Castro so

11   that they can do it without having to sit there and go through

12   it manually in the FBI's space under the Adam Walsh Act.  I

13   hope that will expedite the process.

14           As Mr. de Castro knows, we have a search warrant for

15   the laptop.  To the extent that the defendant wants things out

16   of it, he's free to tell us how to decrypt it, and we'll give

17   him things that he wants from it, but he can't have it both

18   ways, your Honor.

19           THE DEFENDANT:  I found it in the transcript.  If you

20   want to -- I'm just on page 30.

21           MR. DE CASTRO:  Sorry, we're just having a look at it.

22   Mr. Denton provided us with a transcript.

23           THE COURT:  I don't think I have the transcript, so I

24   will ask you for it.

25           MR. DE CASTRO:  We have ordered it, but we haven't

N7IzzSCHc-dh

1   gotten it yet, so let's read through it first.

2            THE DEFENDANT:  Okay, I guess it's -- I guess it's not

3   as clear as I had originally thought it to be.  But, I mean, we

4   can address it here.  I think I was basically stating that, you

5   know, there's no obligation for me to give the password to the

6   government to review it, but if we decrypted it and took off

7   the stuff we wanted and handed that to the wall team for them

8   to review, the government's not losing anything by doing that.

9            And they can't compel me to turn the material over.

10  And it's going to be discovery in the civil Bivens case anyway,

11  so I'm not really sure what the problem is with that, but I

12  don't know.

13           THE COURT:  Great.

14           Well, I take that to be concession that I didn't order

15  any such thing in June.  But be that as it may, what I don't

16  understand, Mr. Schulte, in various submissions to me, you have

17  represented that the reason that you created the encryption is,

18  you didn't view that as a violation of any restrictions on your

19  use of the laptop -- and that is a slightly preposterous

20  position, in my view -- but be that as it may, you took the

21  position that you created the encryption in order to ensure

22  that the government didn't have access to your work product.

23           Number one, the government has a search warrant that

24  entitles them to search that, if they can get into it.  Number

25  two, if that's the case, I don't see why you would have any

N7IzzSCHc-dh

1   objection whatsoever to a wall team reviewing what is behind

2   that encrypted wall and providing you with a file directory and

3   providing standby counsel -- potentially, soon-to-be counsel --

4   with a file directory such that you can identify what you want.

5   Clearly, it seems to me that you are trying to have it both

6   ways in precisely the way that Mr. Denton suggested.

7          THE DEFENDANT:  I mean, I think I've said before, I

8   have no problem even showing it to you so you can see it.  It

9   is my work product.  The problem is that I don't want to -- We

10  see how the government is.  They pick out one paragraph on a

11  100-page document and say:  Oh, look, he violated the Espionage

12  Act.

13         I think the point is, it's all work product, but I

14  wanted my counsel to review it to make sure there's no -- I

15  mean, you see what I'm saying?  I don't want the government to

16  come in and say:  Oh, this is classified.  And they make up

17  stuff all the time and say stuff is classified when it's not.

18         The point was to have the wall team review the work

19  product to make sure that they would agree with me that there

20  would be nothing incriminating, and give it to the government.

21  It is all work product.  I just don't know what the government

22  is going to make up and try and claim.

23         THE COURT:  I understand, Mr. Schulte, but the fact

24  remains that they have a search warrant that entitles them to

25  look at it.  There is a very clear and easy solution here. If

N7IzzSCHc-dh

1    you wish to gain access to anything that is in that encrypted

2    partition, you can tell the government -- through counsel or

3    otherwise -- how to gain access to the encrypted partition, and

4    the government can then provide you with a directory of what is

5    there.

6            That comes at the cost of the government looking

7    through whatever is in there, but again, if that's just work

8    product that you were preparing for trial, you shouldn't have

9    any concerns about the wall team doing that.  That is the very

10   clear, easy solution here.  If you wish to get a directory and

11   gain access to it, then share that information with the

12   government.  If you don't share that information with the

13   government, I see no way out of this impasse, and you're not

14   going to get access to what's in there.

15           THE DEFENDANT:  Okay.  So you're -- just to be clear,

16   you're just saying that if I -- Basically, my work product is

17   held hostage.  If I want it, I'm compelled to reveal my

18   password in order to get access to that.

19           Is that what you're saying?

20           THE COURT:  I wouldn't describe it in those words, but

21   I would say because you took the steps to create the encrypted

22   partition, that the government can't gain access to it,

23   notwithstanding the fact that the government does have a search

24   warrant to look at it.  Then we are in a situation where the

25   government is holding it as evidence, and unless and until you

1    provide a means for them to get into it and work with you and

2    counsel to obtain what it is you wish to get from there, then

3    yes, I think the answer is, you're not getting it.

4                All right.

5                Mr. Denton, anything else on that front?

6                MR. DENTON:  No, your Honor.

7                We'll stay in contact with standby or counsel, as the

8    case may be, and try and finish working through this.

9                THE COURT:  And does the government have a position on

10   Mr. Schulte's request to return to having counsel?

11               MR. DENTON:  With standby counsel's helpful

12   observation that it would not affect the trial date, we do not

13   have a position, your Honor.  We would only ask that the Court

14   conduct a similar allocution to collapse time when counsel is

15   reinstated, to make sure that Mr. Schulte's decision is knowing

16   and voluntary, and he's in the appropriate frame of mind.

17               THE COURT:  Can you remind me what time that you are

18   referring to?  I'm not sure there was a time where counsel was

19   reinstated.

20               MR. DENTON:  After the trial at the conference.  I

21   think it was July 26, your Honor.

22               I think the Court did a brief colloquy just to ensure

23   that he was not under the influence of medication or other

24   things, confirmed that he understood he had a right to continue

25   representing himself but was electing to proceed with the

N7IzzSCHc-dh

1    services of counsel.

2            THE COURT:  Fair enough.

3            Mr. de Castro, any objection to my doing that?

4            MR. DE CASTRO:  No, your Honor.

5            THE COURT:  All right.

6            Mr. Schulte, first of all, I don't need to ask you

7    about your education and prior history, but in the last 48

8    hours, have you consumed any medicine, pills, drugs, or have

9    you consumed any alcohol?

10           THE DEFENDANT:  Just the same medication I'm

11   prescribed.

12           THE COURT:  And again, just to confirm, does that

13   medication have any effect on your ability to understand these

14   proceedings?

15           THE DEFENDANT:  No.

16           THE COURT:  Is your mind clear today?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Do you understand what's happening here in

19   these proceedings?

20           THE DEFENDANT:  I do.

21           THE COURT:  All right.  Now do you understand you have

22   the right -- as you exercised it in trial last year -- to

23   represent yourself under the Sixth Amendment?

24           THE DEFENDANT:  Yes.

25           THE COURT:  And do you understand that you also have

1   the right to counsel, and if you cannot afford to pay the cost

2   of counsel, counsel would be appointed to represent you free of

3   cost?

4                THE DEFENDANT:  Yes.

5                THE COURT:  Have you discussed whether to proceed *pro*

6   *se* or with counsel with Mr. de Castro?

7                THE DEFENDANT:  Yes.

8                THE COURT:  And have you had enough time to discuss

9   that issue, the pros and cons of proceeding with counsel or

10  without counsel with Mr. de Castro?

11               THE DEFENDANT:  Yes.

12               THE COURT:  And is it your decision to, essentially,

13  revoke your decision to proceed *pro se* and to proceed with

14  counsel going forward with the exception of any filings that

15  have been received or that were submitted during the time that

16  you were representing yourself?

17               THE DEFENDANT:  I think, as I stated in the letter, my

18  position is, I've been denied the right to self-representation.

19  So on that front, I would like counsel so that someone actually

20  represents me at trial.

21               THE COURT:  All right.  And again, you have made

22  whatever record there is to make on that front.

23               Do you understand, as I said before, that -- Again,

24  I'm not saying that I would deny an application to go back to

25  *pro se* status made between now and the conclusion of trial, but

N7IzzSCHc-dh

1    I might well do that, particularly if it would affect your

2    ability to proceed with trial on September 11, but you do not

3    have the right to, as I said last July, just willy-nilly go

4    back and forth.

5              Do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Do you understand that I would not grant

8    an application if it would delay proceedings?

9              Do you understand that?

10             THE DEFENDANT:  I do.

11             THE COURT:  All right.

12             Mr. Denton, that seems to be the questions that I

13   posed last July.

14             Do you think there are any additional questions I

15   should ask today?

16             MR. DENTON:  No, your Honor.

17             Just that, obviously, we've discussed at some length

18   the circumstances of the defendant's self-representation and

19   representation, and combined with his answers today, that would

20   satisfy that the defendant's made a knowing and voluntary

21   decision.

22             THE COURT:  Mr. de Castro, do you have any additional

23   questions that I should pose?

24             MR. DE CASTRO:  No, your Honor.

25             THE COURT:  All right.  And do you agree, Mr. de

N7IzzSCHc-dh

1    Castro, that -- again, recognizing that Mr. Schulte takes the

2    position that I have denied him his right to meaningful

3    self-representation and that he might well be entitled to

4    relief on that basis -- he otherwise proceed *pro se* and

5    consented to be represented by counsel going forward?

6                MR. DE CASTRO:  I do.

7                THE COURT:  All right.

8                Mr. Schulte, again, recognizing that you've reserved

9    whatever rights that you may have to raise the issues that you

10   have alluded to, do you agree that you have knowingly and

11   voluntarily waived your right to proceed *pro se*, and do you

12   consent to have counsel going forward?

13               THE DEFENDANT:  Yes.

14               THE COURT:  All right.

15               On that basis, I will grant the application and

16   appoint Mr. de Castro to represent Mr. Schulte going forward.

17               Again, we'll entertain any submissions that I receive

18   that were sent during the time that Mr. Schulte was

19   representing himself, but going forward, unless and until I say

20   otherwise, Mr. de Castro is back as counsel of record.

21               And I do find that Mr. Schulte has knowingly and

22   voluntarily waived his right to represent himself and consented

23   to proceed with counsel going forward.

24               Again, I certainly understand that he has made a

25   record of that, that this is on the basis of rulings that I

N7IzzSCHc-dh

have made.  I think that those rulings are consistent with the

warnings that I gave Mr. Schulte back in the spring when he

decided to proceed *pro se* -- and perhaps he didn't think I

would follow through on them and that he would be given special

privileges by virtue of representing himself -- but having not

received those privileges, I understand that he is voluntarily

and knowingly consenting to counsel going forward.

I think the only other thing on my agenda is to

address the upcoming deadlines.  I already extended the

deadline for motions in limine, request to charge and the like.

That was last Friday to this Friday.  I'm happy to discuss

that, unless the parties are prepared to proceed with that

deadline, and then we should just talk about the remaining

deadlines thereafter.

Mr. Denton and Mr. de Castro.

MR. DENTON:  If we could just have a moment.

MR. DE CASTRO:  Judge, we've discussed.  If instead of

this Friday, just the following Friday would work for those

deadlines.  That would be the 28th.

THE COURT:  And then responses would be two weeks

thereafter, or are you proposing something shorter?

I mean, I guess my only concern is --

MR. DE CASTRO:  Is the date?  Yeah.

THE COURT:  My only concern is that I don't have an

accurate amount of time to decide on anything that is being

N7IzzSCHc-dh

1   filed, and I don't know, at the moment, what the volume is of

2   things that you're going to be filing.  If the history of this

3   case is any indication, there may well be many complicated

4   issues to resolve.  Maybe there won't be.

5           MR. DE CASTRO:  We don't think there are.  I think,

6   maybe, shorten that to a week.

7           We've already discussed with the government what we

8   believe their motions will be.  They've discussed with us what

9   our potential motions might be.  They're not extensive in terms

10  of how many of them.  And so, in fact, because they're moving

11  on, I think, one or two grounds, we're not going to -- we're

12  just going to oppose, so I think a week would be fine, and I

13  believe the government's fine with that too.

14          THE COURT:  So the proposal would be initial

15  submissions on July 28 and the opposition by August 4.

16          Is that correct?

17          MR. DE CASTRO:  Yes.

18          THE COURT:  Mr. Denton.

19          MR. DENTON:  That's fine with the government, your

20  Honor.

21          THE COURT:  I will adopt those changes.  And under the

22  current schedule, the deadline for the exchange of 3500

23  material exhibits proposed and Rule 26.2 materials is August

24  11.

25          Any issues with leaving that in place?

N7IzzSCHc-dh

1          MR. DENTON:  Not from us, your Honor.

2          And I would just note that, consistent with the

3   Court's requests from the prior conference, I think we're going

4   to push out the vast majority of our exhibits in the next day

5   or two.  We were waiting to see what the resolution today was,

6   to figure out the mechanics specifically, but that's largely

7   ready to go.

8          THE COURT:  Mr. de Castro, you're good with the August

9   11 deadline?

10         MR. DE CASTRO:  That's fine.

11         THE COURT:  We'll leave that in place, the September 6

12   pretrial conference and then the trial date.

13         Anyone think that there are additional deadlines that

14   we ought to set, or do those suffice?

15         MR. DENTON:  Not a deadline, your Honor, but just with

16   respect to one of the motions in limine with respect to the

17   handling of CSAM exhibits at trial.

18         It seems like courts that have confronted that have

19   typically analyzed it under Waller as a partial courtroom

20   closure.  It's a little bit of an odd one, because it's not

21   clear to me how the public right of access attaches to

22   contraband.  But be that as it may, to the extent that the

23   Court deems it necessary to hold a conference to afford members

24   of the press and public to comment on that motion -- which

25   will, of course, be publicly filed -- we would ask that the

N7IzzSCHc-dh

1   Court set something between submission of the motion and the

2   final pretrial conference, just as an interim for that purpose.

3         THE COURT:  Is it your view that the final pretrial

4   conference is too late for that?  Do you think we need to have

5   that done before?

6         MR. DENTON:  No.  I think the final pretrial

7   conference would be fine, your Honor.  Only if the Court was

8   intending to try and rule in advance of that or at the

9   conference would it be necessary to hold something earlier,

10   because we wanted to flag that that was a motion that was

11   coming.

12         THE COURT:  All right.  And are you prepared to give

13   me a preview of what motions are coming from the government?

14         MR. DENTON:  Sure, your Honor.  If I could just have a

15   moment.  We've divided and conquered on some of this.

16         I expect that we're going to have the motion with

17   respect to the Waller factors and motion with respect to what

18   materials we think would be admissible in the event the

19   defendant elects to testify.

20         I think we would have a more general 403 motion with

21   respect to the government's view that the defendant's prior

22   employment at the CIA or the CIA in general is not a relevant

23   factor at this trial.

24         I think there's a couple of aspects of the expert

25   notice that we received from the defendant and his counsel that

N7IzzSCHc-dh

1    we think go beyond the scope of what he should be allowed to

2    testify to that go to the ultimate issue, so there's something

3    with respect to that.  And I think that's essentially it, your

4    Honor.

5                THE COURT:  Mr. de Castro, are you able to give me a

6    preview on your end?

7                MR. DE CASTRO:  I can, Judge.  I think we would just

8    be responding at this point.  A couple of those issues are

9    issues we were going to raise, but we would just respond to the

10   government's.

11               THE COURT:  All right, very good.

12               I'll set those deadlines.  I think I will be attuned

13   to the potential need for public hearing on the Waller issue,

14   so to speak, but I think I'll reserve on that until I see

15   whatever the submission is, and then decide how to proceed on

16   that, ensuring, obviously, that members of the public and the

17   press have an opportunity to be heard on it at the appropriate

18   time.

19               Anything else from the government?

20               MR. DENTON:  No, your Honor.

21               THE COURT:  From the defense?  Mr. de Castro.

22               MR. DE CASTRO:  No, your Honor.  Thank you.

23               THE COURT:  I may well see you before September 6,

24   since that seems to be the way this case has generally gone.

25               If not, I'll certainly see you then.  And in the

N7IzzSCHc-dh

1    meantime, I'll look for your submissions.

2              Thank you very much.  We are adjourned.

3              (Adjourned)