1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        S2 17 Cr. 548 (JMF)

5  JOSHUA ADAM SCHULTE,

6            Defendant.               Trial

7  ------------------------------x
                                      New York, N.Y.
8                                     September 13, 2023
                                      9:00 a.m.
9  Before:

10                 HON. JESSE M. FURMAN,
                                        District Judge
11                                      -and a jury-
                        APPEARANCES
12
   DAMIAN WILLIAMS
13      United States Attorney for the
        Southern District of New York
14 BY:  MICHAEL D. LOCKARD
        NICHOLAS S. BRADLEY
15      DAVID W. DENTON JR.
        Assistant United States Attorneys
16
   CESAR de CASTRO
17 SHANNON McMANUS
        Attorney for Defendant
18

19 Also Present:
                    Kayla Collins, Paralegal Specialist
20                  Kimberly Tabares, Paralegal

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Good morning.  Welcome back.  I'm going to

3     inquire about the defense case, but anything else to discuss

4     before we start today?

5          MR. DENTON:  Not from the government, your Honor.

6          MR. De CASTRO:  No, your Honor.  Nothing else.

7          THE COURT:  And are you in a position to tell me

8     whether you intend to present a defense case, if Mr. Schulte

9     plans to testify?

10          MR. De CASTRO:  We do not intend to present a defense

11     case.

12          THE COURT:  So I guess the question I have is, well, I

13     guess in that case, can I deem you to have made a Rule 29

14     motion at the close of the government's case, and I'll just

15     turn immediately to you and ask if there is a defense case so

16     you can say the defense rests, and I'll excuse the jury and we

17     can proceed with charge conference and other legal matters at

18     that time?

19          MR. De CASTRO:  That works for me, yes.

20          THE COURT:  Very good.  In that case, let's get

21     Mr. Berger on the stand.  Is he here?

22          MR. DENTON:  Yes, your Honor.

23          THE COURT:  Let's get him out and we'll get the jury

24     and get started.

25          MR. De CASTRO:  Judge, if you want so we can talk

1    scheduling, and I know you like to know time.  I do too.

2              THE COURT:  Microphone, please.

3              MR. De CASTRO:  Our cross, just so you know for this

4    witness, is very short.  Very short.  Five minutes.  So that

5    would mean, and if they're done at 10:30, we would be done

6    before any break.

7              THE COURT:  Okay.  I sort of assumed that even, if

8    your cross was half an hour.

9              Mr. Berger, if you can come.

10              So, we'll take it as it comes.  My plan is to give the

11   jury a longer break than usual, so we can deal with the charge

12   conference and give you a little bit of time.  Given the charge

13   is not especially long and I provided it to you last night, I'm

14   hoping and assuming that the charge conference won't be too

15   complicated.  And since there's multiple counsel on both sides,

16   hopefully you can tag team and whoever is not handling the

17   closings can perhaps take the lead on that.

18              Let's get the jury.

19              MR. De CASTRO:  One thing before they come out.  We

20   were going to ask for a three sentence addition to the charge.

21   And we have written it out.  Do you want it while we're just --

22              THE COURT:  No.  After is fine.

23              MR. De CASTRO:  That's fine.

24              MR. DENTON:  Just one quick thing.  We did prepare and

25   share with both the Court and defense last night a redacted

1    version of 2302-R.  I would propose that when we get to the one

2    remaining slide that implicates that, if we could enlist

3    Ms. Smallman one last time to turn off the monitor, have

4    Mr. Berger talk for a moment, and switch to the redacted

5    version which can be displayed.

6         THE COURT:  Why don't you formally offer it.  It was

7    arguably admitted already, but just for the record you might as

8    well offer it at that time as well.

9         MR. DENTON:  Will do, your Honor.

10        THE COURT:  Forgive me, I sort of got a little ahead

11   of myself.  I think in light of what Mr. De Castro said, that

12   is to say Mr. Schulte doesn't testify, I should allocute him on

13   that decision, and just confirm that's his decision.  And given

14   what I said that the defense would rest before I excuse the

15   jury, I think now is the time I would need to do that.

16        So, should I have Mr. Berger step down or any

17   objection to doing it with him on the stand?

18        MR. De CASTRO:  No objection with him here.

19        MR. DENTON:  That's fine, your Honor.

20        THE COURT:  Mr. Schulte, good morning.

21        THE DEFENDANT:  Good morning.

22        THE COURT:  How are you feeling this morning?

23        THE DEFENDANT:  All right.

24        THE COURT:  I know you take medication.  You've

25   mentioned that before.  Aside from the regular medication that

1   you take, have you taken any medicine, pills, drugs, or had any

2   alcohol in the last 48 hours?

3            THE DEFENDANT:  No.

4            THE COURT:  Is your mind clear today?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Do you understand what's happening here

7   today?

8            THE DEFENDANT:  I do.

9            THE COURT:  Do you understand that as a defendant in a

10  criminal case, you have the right to testify on your own behalf

11  if you want to testify?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Do you also understand that you have the

14  right not to testify?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Do you understand that if you decide not

17  to testify, that no one, including the jury, may draw any

18  inference or suggestion of guilt from the fact that you did not

19  testify?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Do you understand that whether you testify

22  or not is a decision for you to make, albeit with the

23  assistance of your lawyers, but it is ultimately your decision

24  and your decision alone, and not your lawyers' decision to

25  make?

1          Do you understand that?

2               THE DEFENDANT:  Yes.

3               THE COURT:  Please don't tell me anything that you

4     discussed with your lawyers, but can you confirm that you have

5     discussed with them the question or decision of whether to

6     testify or not in this case?

7               THE DEFENDANT:  Yes.

8               THE COURT:  Have you had enough time to do that, to

9     talk to them about that decision and the advantages and

10    disadvantages of testifying?

11              THE DEFENDANT:  Yes.

12              THE COURT:  Is it your decision not to testify in this

13    case?

14              THE DEFENDANT:  That's correct.

15              THE COURT:  Just to confirm, that is your decision

16    assisted by counsel, but ultimately your decision.  Is that

17    correct?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Mr. Denton, do you think I should ask any

20    other questions?

21              MR. DENTON:  No, your Honor.

22              THE COURT:  Mr. De Castro?

23              MR. De CASTRO:  No, your Honor.

24              THE COURT:  We'll get the jury now and proceed.

25              (Continued on next page)

1              (Jury present)

2              THE COURT:  Good morning.  Welcome back, ladies and

3    gentlemen.  Thank you for being here on time and enabling us to

4    get started relatively on time.

5              We'll continue with the direct testimony of

6    Mr. Berger.

7              Mr. Berger, I remind you that you remain under oath.

8              THE WITNESS:  Understood, your Honor.

9              THE COURT:  With that, you may proceed, Mr. Denton.

10             MR. DENTON:  Thank you, your Honor.

11   MICHAEL R. BERGER,

12        called as a witness by the Government,

13        having been previously sworn, testified as follows:

14   DIRECT EXAMINATION (Continued)

15   BY MR. DENTON:

16   Q.  Good morning, Mr. Berger.

17   A.  Good morning.

18   Q.  Ms. Collins, can we pull up what is in evidence as

19   Government Exhibit 2302, page 3.

20             Mr. Berger, before we broke yesterday, you were

21   testifying about some of the locations, some of the digital

22   locations where child pornography was found on the defendant's

23   desktop.

24             Do you remember that?

25   A.  Yes.

1    Q.  Generally speaking, using the diagram on the screen in

2    front of you, can you remind us where child pornography was

3    located on the defendant's desktop?

4    A.  So from the desktop computer, there was a Linux Mint

5    virtual machine.  Within that virtual machine there was

6    encrypted home directory for the user Josh.  Within that

7    directory, there was an encrypted VeraCrypt container data.bkp

8    that had child pornography within it.  Within that container,

9    there was an additional data.bkp VeraCrypt encrypted container

10   that also contained child pornography.  Also on the desktop

11   computer was an additional VeraCrypt container named volume

12   that also contained child pornography.

13   Q.  So Mr. Berger, I want to pick up talking about the first of

14   those locations that you described, the Linux Mint virtual

15   machine where we broke yesterday.

16        Ms. Collins, can you go to page 67, same exhibit,

17   please.

18        Mr. Berger, can you remind us where on the defendant's

19   desktop that Linux Mint virtual machine was stored?

20   A.  So the virtual machine was stored in a folder named

21   documents that also contained many different personal documents

22   related to the defendant.

23   Q.  What, if any, credentials or authentication was necessary

24   to access the child pornography starting from that documents

25   folder?

1    A.  You would need the password to boot the virtual machine.

2    You would need the password to log into the virtual machine,

3    and then you would need the password for the encrypted

4    VeraCrypt container data.bkp.

5    Q.  What passwords were you able to determine were used for

6    those purposes?

7    A.  They were passwords the defendant used for numerous online

8    services that were stored in the password manager of his mobile

9    device.

10   Q.  Was it possible to access the child pornography in that

11   virtual machine without those personal passwords?

12   A.  No.

13   Q.  Ms. Collins, can we go to page 70, please.

14        Mr. Berger, I think this was where you were yesterday

15   when we broke for the day.  Can you remind us what's shown on

16   Exhibits 509 and 510.

17   A.  These show forensic artifacts pertaining to both the Linux

18   Mint vbox file and the vdi file.

19   Q.  Based on these artifacts, what, if anything, were you able

20   to determine happened with that virtual machine in early May of

21   2016?

22   A.  The virtual machine was copied into its current location on

23   May 5 of 2016.

24   Q.  What, if anything, else happened on May 5, 2016, that you

25   were able to determine?

1    A.  Pertaining to the virtual machine?

2    Q.  Pertain to the defendant's computer as a whole.

3    A.  The computer was formatted prior to the virtual machine

4    being copied into its current location.

5    Q.  I think you started describing some of this yesterday.

6    But, what, if any, effect did those actions have on your

7    ability to gather forensic artifacts about the use of that

8    virtual machine?

9    A.  It would make it very difficult.

10   Q.  Were you nevertheless still able to identify forensic

11   artifacts about the use of the virtual machine prior to May 5,

12   2016?

13   A.  I was.

14   Q.  Let's talk about some of that.  If we could go to the next

15   page, Ms. Collins.

16          Were you able to determine when that virtual machine

17   was first created, Mr. Berger?

18   A.  Yes.

19   Q.  When was it created?

20   A.  October 3, 2015.

21   Q.  If we can go to the next slide, Ms. Collins.

22          How were you able to determine that?

23   A.  There were a number of artifacts indicating the first time

24   files were created within the file system of the virtual

25   machine, that indicated that the very first file in this case

1    the root mount -- the root point of the file system was

2    initially created on October 3, 2015, at 6:59 p.m. UTC.

3    Q.  Explain a little bit if you can, Mr. Berger, about what is

4    involved in creating a virtual machine.

5    A.  So in order to create a virtual machine, you would go into

6    the virtual machine management software, you would click

7    "create new virtual machine," and it would ask you a series of

8    questions about the virtual machine you wished to create.  It

9    would ask you to name it, tell it how much hard drive space and

10   RAM you wanted to allocate to it.  You would also have to

11   provide the install media which I believe I mentioned

12   yesterday, this would be either a physical CD or DVD, or more

13   commonly what's known as a ISO image, which is a singular file

14   containing all of the install information for the operating

15   system.

16           Once you provided all that to the virtual machine

17   software, it would essentially boot the install media and it

18   would walk through the operating system's install process.

19   Q.  Mr. Berger, why is the file that you've highlighted in red

20   here significant to your analysis of when the virtual machine

21   was created?

22   A.  So, if you see that first slash after the bracketed word

23   root, that indicates the root point of the file system on a

24   Linux file system.  It is similar to the C colon directory on a

25   Windows drive, where the C drive would be the root of the drive

1    and everything else would be below that.

2          What we're looking at is that first slash that is the

3    top level of the Linux file system.  That would need to be

4    created before anything else could be copied on to the file

5    system.

6    Q.  You talked about using an operating system to create a

7    virtual machine.  Were you able to determine the particular

8    type of operating system installed on the virtual machine

9    you've been talking about?

10   A.  Yes.

11   Q.  Which was it?

12   A.  It was Linux Mint version 17.2.

13   Q.  What is shown in Government Exhibit 237 here at the bottom

14   of this slide?

15   A.  That is the background image for the desktop, and circled

16   in red is the version 17.2 of Linux Mint.

17   Q.  If we can go to the next page, Ms. Collins.

18          A moment ago, Mr. Berger, you were talking about

19   install media.  Did you find any references to particular

20   install media within the files for this virtual machine?

21   A.  Yes.

22   Q.  Using Government Exhibits 612 and 488 here, can you explain

23   what you found and where?

24   A.  Sure.  So, the vbox file that's highlighted in Exhibit 612

25   is again the configuration information for the virtual machine.

1   It is all of the settings all of the properties for that

2   virtual machine.  The contents of that file are shown in

3   Exhibit 488.

4           What's circled in the red outline is the actual name

5   of a Linux Mint 17.2 ISO file.  This would have been passed to

6   the virtual machine essentially as a virtual optical drive.  So

7   think CD or DVD.  This allows, within the virtual machine, it

8   thinks it is reading the data from a CD or DVD drive, but it is

9   actually reading it from this ISO file that's stored on the

10  host computer.

11  Q.  Did you find a copy of that ISO file on the defendant's

12  host computer?

13  A.  I did.

14  Q.  If we can go to the next page, please, Ms. Collins.

15          When was the version of that file on the defendant's

16  host computer created?

17  A.  That would have been on October 3, 2015, at 4:31 p.m. UTC.

18  Q.  When we talk about it being on the host computer, does that

19  refer to something outside of the virtual machine?

20  A.  Yes, the host computer is the normal desktop computer with

21  a Windows operating system.  And then the virtual machine

22  resides within the host computer.

23  Q.  When was that install media file created on the defendant's

24  desktop relative to when you found the virtual machine was

25  created?

1    A.   About two and a half hours prior.

2    Q.   I want to talk about some other connections between the

3    virtual machine and the defendant's desktop.

4            If we can go to the next page, Ms. Collins.

5            Were you able to identify any connections between the

6    virtual machine and the defendant's Windows user profile?

7    A.   Yes.

8    Q.   Remind us what the defendant's Windows user profile is and

9    what it's for.

10   A.   The user profile pertains to the account on a Windows

11   system.  When you create a new user account on Windows, it

12   creates a user profile.  It allows you to log into the system,

13   and it has a series of directories that are specific to

14   activities you conduct on the system.  These would be things

15   like your desktop folder, your documents folder, your pictures

16   folder.  These are all unique to your user profile.  If another

17   user logs on to the system, they would have their own

18   corresponding desktop documents, etc.

19   Q.   If you go to page 76, Ms. Collins, please.

20           Where did you find evidence that the defendant linked

21   his Windows user profile to the virtual machine?

22   A.   That was in one of the log files that was contained within

23   the virtual machine.

24   Q.   What is a log file?

25   A.   A log file essentially retains information related to

1  certain events that happened.  Oftentimes it can be used for

2  debugging something that went wrong.

3  Q.  Where on the defendant's desktop did you find these log

4  files?

5  A.  They were within a folder called logs, which itself was a

6  subfolder of the Linux Mint virtual machine folder.

7  Q.  Let's take a look at one of those log files.  If we could

8  go to page 77, Ms. Collins.

9        What log file are we looking at here in Government

10  Exhibit 499, Mr. Berger?

11  A.  This is the file named vbox.log.

12  Q.  So, starting at the top, what is the first box highlighted

13  in red show?

14  A.  It shows when the log file was first opened for writing.

15  Q.  If you can just sort of explain that box and sort of what

16  information is contained in it.

17  A.  So starting at the left, there is a running counter of time

18  since the log file was opened.  So this indicates that the

19  entry on line two occurred 2.9 seconds after the log file was

20  created.  It then says log opened, and there is a date and time

21  which indicates it was opened on April 19, 2016, at 36 minutes

22  after midnight Zulu time.

23  Q.  How do you know it was Zulu time?

24  A.  That's indicated by the Z after the fractional seconds

25  after the decimal point.

1    Q.  What time zone does that correspond to?

2    A.  It corresponds to what is known as UTC or GMT, Greenwich

3    Mean Time.

4    Q.  Looking at the next box down, do you see where it says OS

5    product?

6    A.  Yes.

7    Q.  What does that indicate?

8    A.  Windows 10.

9    Q.  Which computer's OS is that referring to?

10   A.  That would be the host computer.

11   Q.  What operating system was the defendant's desktop running?

12   A.  Windows 10.

13   Q.  If we look at the third red box down where the text starts

14   console on line 15.  What does that indicate?

15   A.  That indicates that the state of the virtual machine

16   switched to starting, essentially indicating that the virtual

17   machine was in its start up mode.

18   Q.  Then finally, looking at the last box in red that starts on

19   line 28, do you recognize that file path?

20   A.  Yes.

21   Q.  Where do you recognize it from?

22   A.  That is the path that points to the virtual disk image for

23   the Linux Mint virtual machine.

24   Q.  What subfolders does that indicate that the virtual disk

25   image was located in as of April 19, 2016?

1    A.   The Linux Mint virtual machine was located in a VMs folder

2    located in a documents folder, located in a folder named

3    Win7_data.

4    Q.   Let's look a little further down in this log file.  If we

5    can go to the next page, please, Ms. Collins.

6           Mr. Berger, I am going to ask you to explain to us the

7    entry on line 56 that starts with path.  What information does

8    that contain, and what is its significant to you?

9    A.   So this contains information about the virtual machine and

10   its running state.  Generally in computing, a path is a series

11   of locations where certain files might be located, specifically

12   executable files.

13          In this instance, there are multiple directories that

14   comprise the path string.  The first one there starts with

15   D:/Win7_data and ends with LinuxMint\debug.  The next path

16   indicates a similar path that ends with the Linux Mint folder.

17   And the last entry for the path indicates the folder

18   C:/users/Josh.

19   Q.   What does it do to include that C:/users/Josh in the path

20   entry?

21   A.   It indicates that the user Josh was the one who was

22   performing this activity.

23   Q.   Was there a C:/users/Josh profile on the defendant's

24   desktop when it was seized by the FBI?

25   A.   There was.

1    Q.  What are we looking at in Government Exhibit 479 down at

2    the bottom there?

3    A.  This is an excerpt from the file listing from the C drive

4    from the defendant's computer.

5    Q.  What is highlighted in red there?

6    A.  The folder location for the Josh user profile.

7    Q.  What, if any, conclusions did you draw from the information

8    reflected here in the excerpts from Government Exhibits 499 and

9    479?

10   A.  That when this log file was generated and activity was

11   going on in the virtual machine, it was being conducted by a

12   user logged on as the Josh user account.

13   Q.  Logged on to which computer as the Josh user account?

14   A.  The host computer.

15          THE COURT:  Just to remind us, which is the host

16   computer?

17          THE WITNESS:  The host computer is the physical

18   desktop computer.

19   Q.  If we can go to the next page, please, Ms. Collins.

20          Did you also find evidence of the pattern of usage of

21   that virtual machine by the user Josh?

22   A.  Yes.

23   Q.  Generally speaking, what did you find?

24   A.  There was fairly consistent usage up until May 1st of 2016.

25   Q.  Were you able to identify usage of the virtual machine

1  after May 1st, 2016?

2  A.  I was not.

3  Q.  Let's take a look at some of what you were able to find.

4  If we could go to page 80, Ms. Collins.  Thank you.

5         I want to stay with that vbox log file that we were

6  just looking at a moment ago, Mr. Berger.

7         Focusing on the box at the bottom that contains lines

8  1,687 through 1,693.  What is shown there?

9  A.  On line 1,693, there is an entry in the log file indicating

10 that the state of a virtual machine was changed to powered off,

11 indicating that virtual machine was powered off.

12 Q.  How long was it after the virtual machine was started that

13 it was ultimately powered off in this log file?

14 A.  About 304 hours.

15 Q.  When in time, what date was the virtual machine started?

16 A.  It was started on April 19, 2016.

17 Q.  And what date was it shut down?

18 A.  On May 1st of 2016.

19 Q.  Was the virtual machine running constantly that whole time?

20 A.  Yes.

21 Q.  Were you able to identify evidence of the defendant using

22 the virtual machine during that particular time period?

23 A.  Yes.

24 Q.  If we could go to page 81, please, Ms. Collins.

25        Mr. Berger, what file are we looking at an excerpt

1   from here in Government Exhibit 487?

2   A.  This is what's called the auth.log file.

3   Q.  What kind of information is reflected in the auth.log file?

4   A.  The auth.log file stores authentication related activity

5   under Linux.  Authentication related activity is basically

6   anything where the user has to authenticate to the system with

7   their credentials.

8   Q.  And there are a number of similar looking entries

9   highlighted in red here.  Can you explain what they show,

10  Mr. Berger?

11  A.  Those entries indicate that at those particular times, the

12  screen saver was unlocked with a password.

13  Q.  How are you able to determine that from the information

14  reflected here?

15  A.  You can see there the date and time, then the name of the

16  virtual machine.  After that, you see

17  cinnamon-screensaver.dialogue.  Cinnamon is relating to the

18  graphical user interface that's part of the Linux Mint desktop.

19  Then you can see the unlock log in key where it indicates that

20  the screen saver was unlocked.

21  Q.  You made reference to the name of the virtual machine.  How

22  is the name of a virtual machine set?

23  A.  The host name of a virtual machine is set by the user,

24  either during the install process, and it can also be updated

25  at any point in time after if the user issues the specific

1  command to do so.

2  Q.  What is the name of the Linux Mint virtual machine that

3  we've been discussing yesterday and today?

4  A.  Josh-VirtualBox.

5  Q.  Just to be clear, Mr. Berger, is this just an excerpt from

6  the auth.log file?

7  A.  Yes.

8  Q.  Did you identify other instances of the defendant unlocking

9  the screen saver for the virtual machine at other times?

10  A.  Yes.

11  Q.  How would you characterize the number of times you saw

12  evidence of that?

13  A.  It was fairly regular.

14  Q.  On the far left here, there is a date and time.  What time

15  zone does auth.log record these entries in?

16  A.  These entries are recorded in local time.

17  Q.  If we could go to the next page.  Just taking as an example

18  a two-week period, Mr. Berger, from April 18 to May 1st, 2016,

19  how many times were you able to identify the user Josh

20  unlocking the screen saver for the Josh-VirtualBox virtual

21  machine?

22  A.  35 times.

23  Q.  Did some of that activity correspond to other activity that

24  you saw on the system?

25  A.  Yes, it did.

1    Q.  Let's take an example of that.  Ms. Collins, if we could go

2    to page 83, please.

3              What is shown in the top white box here from

4    Government Exhibit 487, Mr. Berger?

5    A.  This is an excerpt from the auth.log showing how on

6    April 30, 11:36 p.m., local time, the screen saver was

7    unlocked.

8    Q.  And then what's shown in the excerpt from Government

9    Exhibit 605 down below that?

10   A.  That is showing that a folder named "11yr old" which is

11   contained in the downloads folder of the mounted VeraCrypt

12   container was accessed on May 1st, 2016, 3:37 a.m. UTC.  Which

13   translates to April 30, 2016, at 11:37 p.m.

14   Q.  How are you able to tell that the time shown in the excerpt

15   from Government Exhibit 605 is in UTC?

16   A.  The particular program that I used for this analysis by

17   default will display these times in UTC.

18   Q.  How long after the user Josh unlocked the screen saver of

19   the virtual box was the folder 11yr old accessed on the virtual

20   machine?

21   A.  About a minute.

22   Q.  In addition to examples like this, did you find other

23   forensic artifacts of the user accessing folders containing

24   child pornography on the virtual machine?

25   A.  Yes, I did.

1    Q.   Go to the next page, please, Ms. Collins.

2              What types of activity did you find forensic artifacts

3    showing that the user did with that child pornography in the

4    virtual machine?

5    A.   There was evidence of files that were downloaded containing

6    child pornography and extracted to the file system, as well as

7    evidence of child pornography videos being viewed within the

8    virtual machine.

9    Q.   If we could go to page 85, Ms. Collins.

10             Before we get into what you found, Mr. Berger, I want

11   to ask you about where you found it.

12             Can you explain to us where you found some of the

13   forensic artifacts that identify the information that you just

14   described?

15   A.   Sure.  The first location where I found artifacts of the

16   usage or the consumption of child pornography was a file titled

17   recently-used.xbel.  This is a file used by the Linux operating

18   system to store recently opened documents, and it's used to

19   populate essentially the recent files part of the user

20   interface.

21   Q.   If you go to page 86, Ms. Collins.

22             What is shown in Government Exhibit 617 and the blown

23   up portion of that that's highlighted in red?

24   A.   This shows what it would look like to the user if they

25   clicked on that menu in the bottom left of the interface.  You

1    can think of this similar to the start menu under Windows.  It

2    shows all the different programs that you can access, and if

3    you go down to recent files, it will show you a list of files

4    that were recently opened on the system.  This list is

5    populated by that xbel file.

6    Q.  What are some of the files that we see here in that recent

7    files window?

8    A.  There are media files, some of which have names suggesting

9    child pornography, as well as two entries for data.bkp.

10   Q.  What, if any, conclusions were you able to draw from the

11   presence of those files in the recent files display here?

12   A.  That they were all recently used on the virtual machine.

13   Q.  Let's take a look at the recently-used.xbel file itself.

14   If we could go to page 87, Ms. Collins.

15          Mr. Berger, I am going to ask you to sort of start at

16   the beginning and explain to us what we are looking at here in

17   this excerpt from Government Exhibit 492.

18   A.  So this is a particular entry from that xbel file.  It is

19   referring to the data.bkp file, which is located in the Josh

20   home directory.  Then there are time stamps when it was first

21   added to the file as well as when it was last modified.

22          The added modification dates are referring to when it

23   was added to the xbel file and when the entry in the xbel file

24   was modified.  You can see how the first time it was added was

25   on April 19 of 2016, and this entry was last modified on

1    May 1st of 2016.

2    Q.  Just to be clear, that doesn't refer to the data.bkp file

3    itself; is that right?

4    A.  These time stamps refer to the usage of the data.bkp file.

5    Q.  What, if anything, else are you able to tell about the

6    usage of the data.bkp file from this excerpt?

7    A.  It indicates what program is used to open a particular

8    file.  In this case, it indicates that the VeraCrypt

9    application was used to open the data.bkp file.

10   Q.  Let's take a look at another example, if we could go to the

11   next page, please, Ms. Collins.

12          Again, Mr. Berger, if you could just explain to us

13   what we are seeing here.

14   A.  So what we're seeing here is another entry from that

15   recently used xbel file.  In this case, it is referring to a

16   video file, and it is showing how that particular video file

17   was opened with the VLC application.

18   Q.  How are you able to tell that here?

19   A.  You can see under the line that is a portion of which is

20   highlighted in red, where it says exec.  And it points to a

21   particular executable /user/bin/vlc.  /user/bin is a folder on

22   Linux that stores executable or application files.

23   Q.  What is VLC?

24   A.  A very commonly used video player.

25   Q.  Is it capable of playing dot mpg files?

1    A.  Yes, it is.

2    Q.  Mr. Berger, can I also ask you to compare how the path for

3    that file appears in Government Exhibit 492 with how it appears

4    in Government Exhibit 481.

5    A.  So one of the differences as it appears in 492, is instead

6    of spaces that we see in the file path and file name, in

7    Exhibit 481, those spaces are filled with the percent 20

8    character sequence.

9    Q.  Do you see at the start of the second line of the excerpt

10   from Government Exhibit 492 that starts file media VeraCrypt 1?

11   A.  Yes.

12   Q.  What, if anything, does that indicate?

13   A.  That indicates the path to the mounted VeraCrypt container,

14   so this is showing the file was accessed from within the

15   mounted VeraCrypt container.

16   Q.  How is an entry in the recently used file like this

17   created?

18   A.  It would be created when a file is opened for use by the

19   user.

20   Q.  Does it require use by a particular program?

21   A.  Yes.

22   Q.  So what, if any, conclusions were you able to draw from the

23   presence of this reference to the "Jenny 9yo daughter-full"

24   media file in recently-used.xbel?

25   A.  That the file was opened with VLC.

1    Q.  Was there more than one example of VLC being used to open

2    videos with file names indicative of child pornography?

3    A.  Yes.

4    Q.  Let's take a look at another example.  If we could go to

5    page 89, please, Ms. Collins.

6            What's shown here, Mr. Berger?

7    A.  These are additional entries from that recently-used.xbel

8    file.

9    Q.  What do they show?

10   A.  They show two different AVI files, which are another format

11   of movie files, also both being opened with the VLC

12   application.

13   Q.  When you say opened, is that something that happens

14   automatically or is that a result of the user doing something?

15   A.  That would be the user having to go in and open those

16   files.

17           THE COURT:  Can I clarify something.  I think you

18   mentioned in the last slide, and also I see it here, there is a

19   percent 20 in the file path.

20           THE WITNESS:  Yes.

21           THE COURT:  Can you explain, number one, why that is,

22   and if it corresponds to the file path in 481.  Just explain

23   why that happens.

24           THE WITNESS:  Sure.  So, in the computing world, there

25   are certain applications that don't take kindly to file paths

1    and file names having spaces within them.  There are a list of

2    kind of substitution characters that are standardized, and

3    specifically for spaces, the percent 20 is the substitution

4    character sequence for a space in a file name or file path.

5    For whatever reason, the developers of this particular

6    component of the operating system decided that when they stored

7    the file names in this file, they did not want to deal with

8    spaces.  So, that's how they're stored in the file name.

9            THE COURT:  So everywhere there is a space in the name

10   on the sort of file directory, it is replaced by percent 20 in

11   the file path in 492?  Is that correct?

12           THE WITNESS:  Correct.

13   Q.  Just to be specific on that, Mr. Berger, let's take an

14   example.

15           Just looking at the top line in Government Exhibit

16   492.  Do you see where it the file reads (Pthc) percent 20

17   Pedo?

18   A.  Yes.

19   Q.  How does that correspond to Government Exhibit 481 down

20   below?

21   A.  In the top exhibit, 492, where there is a percent 20

22   between the closing parenthesis of Pthc and the P in pedo, in

23   Exhibit 481 it indicates that there is a space between the

24   closing parenthesis after Pthc and the P in pedo.

25   Q.  We've looked at three examples between this slide and the

1    last one, Mr. Berger.  Were there other examples in the

2    recently-used.xbel file of the same content?

3    A.  Yes, there were.

4    Q.  When I say the same content, were there different files or

5    the same files?

6    A.  They were different files.  When you say same content, I

7    believe you are referring to overall child pornography

8    indicative names.

9    Q.  What did the recently-used.xbel indicate was done by the

10   user with those child pornography files?

11   A.  They were opened with the VLC application.

12   Q.  Generally how would you describe the number of times you

13   saw entries reflective of that in this file?

14   A.  There were several.  I would say maybe a few dozen.

15   Q.  Ms. Collins, if we could go to page 90, please.

16          Other than that recently-used.xbel file, Mr. Berger,

17   was there anywhere else you found evidence of viewing or

18   accessing of child pornography on the defendant's computer?

19   A.  Yes.

20   Q.  Where else?

21   A.  There were fragments recovered from unallocated space

22   indicating that archives containing child pornography were

23   extracted.

24   Q.  What is unallocated space?

25   A.  As I mentioned yesterday, unallocated space is the name

1  given to portions of the file system that are not currently in

2  use.  It could be portions that were previously used by other

3  files, those files were marked for deletion, so the space is

4  marked as available for reuse, but the actual content is still

5  there.  It can also be parts of the hard drive that within the

6  current file system have never yet been allocated for holding a

7  particular file.

8  Q.  In your forensic analysis, how do you recover data from

9  unallocated space?

10 A.  I use a specialized forensic software which is capable of

11 essentially sweeping through the unallocated space, looking for

12 particular signatures.

13 Q.  When you conduct forensic analysis, is there any particular

14 relevance to unallocated space when you are looking at a Linux

15 computer like this virtual machine?

16 A.  Yes, there is.

17 Q.  Why is it particularly significant when looking at that

18 type of computer?

19 A.  So, with a Linux operating system, often times users also

20 interact with the system through what's known as the command

21 line.  This is a terminal window where the user types in

22 commands and tells the computer what to do through these

23 commands.

24         Sometimes with Linux, the contents of those terminal

25 sessions can be saved in unallocated space, and it's possible

1   to recover parts of what the user was doing in these sessions

2   by looking through unallocated space.

3   Q.  Let's take a look at some of that.  If we could go to the

4   next page, please, Ms. Collins.

5         First, Mr. Berger, before we get into the content

6   here, under the exhibit sticker where it says "physical

7   offset," what does that mean?

8   A.  The physical offset refers to the physical address on the

9   hard drive where this data is found.  It does not use the file

10  system, because a typical file, the address of which is stored

11  in the index for those files, could actually be stored across

12  multiple locations.  The physical offset is a physical specific

13  address starting with the base address of zero at the beginning

14  of where the data would be stored.

15  Q.  So, turning now to the content of this excerpt from

16  Government Exhibit 468.

17        What is shown here in this excerpt, Mr. Berger?

18  A.  This is a portion of data that was recovered from that

19  physical offset.  It displays the contents of a session from

20  the terminal within the virtual machine.

21  Q.  So just starting at the top, can you walk us through what's

22  shown in that first red box there?

23  A.  So in the first red box, we see the user has entered the LS

24  command.  To go over more of what's in that box, starting at

25  the left, the first Josh before the ampersand -- before the at

1    sign, I'm sorry.  That indicates the current user that is

2    logged on to the terminal at that time.

3           To the right, the Josh-VirtualBox indicates the host

4    name of the virtual machine.  And the /media indicates the

5    current directory where the user is located at that point in

6    time in this terminal session.  Then the user would have the

7    dollar sign prompt, and then they enter a command, in this case

8    the LS command, which will generate a directory listing of the

9    folder that they're currently in.  In this case /media.

10   Q.  So then what's reflected below that red box?

11   A.  The output of the LS command.

12   Q.  And then what's in the red box below that?

13   A.  The CD space VeraCrypt 1 command indicates that the user

14   wants to change directories into the VeraCrypt 1 directory.

15   Once they do that, they enter an LS command and then they are

16   shown the output of that command which is a directory listing

17   of the VeraCrypt 1 directory.

18   Q.  Was the user successfully able to change directories to

19   VeraCrypt 1?

20   A.  Yes.

21   Q.  What, if any, conclusions were you able to draw from that?

22   A.  That the VeraCrypt container was mounted at that time.

23   Q.  Looking at the output from that list command for the

24   VeraCrypt container, do you recognize the output from that

25   command?

1   A.  Yes.

2   Q.  Which container does that refer to?

3   A.  The data.bkp that was present in the home directory.

4   Q.  Moving down to the third red box, what is reflected there?

5   A.  There is an indication the user typed the change directory

6   command again, this time to change into the downloads

7   directory.  After that, there is an LS command which then

8   returns the directory listing of the downloads directory.

9   Q.  How does what we're looking at here correspond with what

10  the user who entered those commands would actually see on their

11  screen?

12  A.  It is essentially the same thing, except on the screen

13  there would be some color coding for the different types of

14  text on the screen.

15  Q.  If we could go to page 92, Ms. Collins.

16          What is shown here in Government Exhibit 616,

17  Mr. Berger?

18  A.  This is a demonstration I created to show what similar

19  commands would look like when entered on the system in the

20  actual terminal window.

21  Q.  Which system did you create this example on?

22  A.  This was in the Linux Mint virtual machine.

23  Q.  How did you decide which commands to use for this example?

24  A.  I looked through commands of artifacts I had recovered from

25  unallocated space.

1    Q.  Does this is reflect what the user Josh would see when

2    entering these commands on the Josh-VirtualBox machine?

3    A.  Yes.

4    Q.  Does the output from that LS command include file names

5    indicative of child pornography?

6    A.  Yes.

7    Q.  Let's take a look at another portion of that same physical

8    offset that you were able to extract.

9            If we could go to page 93, Ms. Collins, please.

10           Mr. Berger, where does this excerpt pick up relative

11   to what we were looking at earlier from Government Exhibit 468?

12   A.  This picks up after the directory listing of the downloads

13   directory has completed.

14   Q.  So is the top part of this reflective of the output of

15   commands that the user Josh would have seen?

16   A.  Yes.

17   Q.  What's shown in the red boxes on this excerpt, Mr. Berger?

18   A.  There are two commands or two instances of the same

19   command, the unzip command.  In the first instance, actually in

20   both instances, the user is trying to unzip a zip file.

21   Q.  Where is that zip file located, if you are able to tell?

22   A.  That is located in the downloads directory.

23   Q.  What does it mean to unzip a file?

24   A.  So a zip file is a compound file.  It can store multiple

25   files or even folders containing files within it.  To unzip a

1    file essentially means you take the zip file, and you extract

2    out those files and/or folders that were within the zip file.

3    You copy them out, and now they are present on the same --

4    within the same level of the file system as the zip file.

5    Q.  What happened when the user tried to unzip the zip file

6    shown here?

7    A.  The first time around, it -- I believe it had an error.  It

8    said it was skipping a particular ADI file indicating that

9    the -- it indicated that the unzip program was not compatible

10   with the particular zip file attempting to be unzipped.

11   Q.  Did you find other artifacts that reflected successfully

12   unzipping media files?

13   A.  Yes, I did.

14   Q.  Go to the next page, please, Ms. Collins.

15        Mr. Berger, where did Government Exhibit 472 come

16   from?

17   A.  It came from a different artifact that again was recovered

18   from unallocated space.

19   Q.  Are you able to tell on what day these particular commands

20   were entered by the user Josh on the Josh-VirtualBox computer?

21   A.  I was not.

22   Q.  Why not?

23   A.  There is no indication of date and time in these commands.

24   The only indication would have been if at the terminal the user

25   used a command to display the current date and time.

1    Q.   What's shown here in Government Exhibit 472, Mr. Berger?

2    A.   At the top of the exhibit, we see the user using the 7z

3    command passing the X argument to extract, and a particular RAR

4    file for extraction.  A RAR file is similar to a zip file, it

5    is a compound file.

6    Q.   What is 7 zip?

7    A.   That's a type of compression program used to both compress

8    and decompress different types of compound files.

9    Q.   What happened when the user Josh tried to use the 7 zip

10   program to unpack this RAR file?

11   A.   The program indicated that the file contained within the

12   RAR file already existed, and asked the user if they wished

13   to -- how they wished to proceed, if they want to overwrite and

14   re-extract the file, or stop.  In this case the user selected Q

15   for quit.  They essentially aborted the extraction process.

16   Q.   What happened next?

17   A.   They then deleted that RAR file, the RM command, which

18   stands for remove, was run on that RAR file.

19   Q.   And are you referring to the RM that's seen in the top line

20   of the second red box in the middle of the exhibit?

21   A.   That's correct.

22   Q.   Which user deleted that file?

23   A.   The user Josh.

24   Q.   What did the user Josh do next?

25   A.   They then went to extract a different RAR file.

1    Q.  What happened when the user tried to extract that RAR file?

2    A.  The program prompted for a password, which would have been

3    entered, although it would not be displayed in this output, and

4    then multiple AVI files were extracted out of that RAR file.

5    Q.  I want to focus on those extracted files for a moment if we

6    could go to page 95, Ms. Collins.

7           Did you find the files that were referenced in this

8    archive from unallocated space in that data.bkp container?

9    A.  Yes.

10   Q.  What did you find?

11   A.  Within the downloads directory, there was a folder entitled

12   "Six Pack Evelyn."  That corresponded to the folder and the

13   file name seen in the unallocated space.

14   Q.  What, if any, conclusions did you draw from the

15   correspondence between what you found in the encrypted

16   container and what commands you saw in the unallocated space?

17   A.  That the commands that were run in unallocated space

18   extracted these files that are shown here in the "Six Pack

19   Evelyn" folder which is located in the downloads folder.

20   Q.  Did you draw any conclusions about who ran those commands?

21   A.  Yes.

22   Q.  Who?

23   A.  The defendant.

24   Q.  Let's take one last example from unallocated space,

25   Mr. Berger.  If we could go to page 96, Ms. Collins.

1          This looks a little different, Mr. Berger.  Can you

2   explain to us what shows in this excerpt from Government

3   Exhibit 471?

4   A.  This is showing that the user Josh ran the top command.

5   The top command in Linux is a system administration utility

6   that shows current system utilization.  There's a lot of

7   information displayed on the screen, including the amount of

8   CPU and memory that each running program is using as shown,

9   starting with the second red highlighted selection.

10  Q.  What is shown about what was running on that

11  Josh-VirtualBox computer at this time?

12  A.  The VLC program was running as well as the Firefox web

13  browser and the VeraCrypt application.

14  Q.  What, if any, conclusions were you able to draw from that

15  information?

16  A.  Based on the high CPU usage of the VLC application, more

17  than likely the VLC program was actively displaying a video.

18  Q.  Were you able to tell precisely what day and time this

19  information reflected?

20  A.  I was not.

21  Q.  If we can go to the next page, please, Ms. Collins.

22          Mr. Berger, you testified at some length yesterday

23  about where the virtual machine was found on the defendant's

24  desktop at the time that it was seized by the FBI.  Do you

25  remember that?

1    A.  Yes.

2    Q.  Were you also able to identify forensic artifacts

3    identifying where it was stored before May of 2016?

4    A.  Yes.

5    Q.  Where was it stored relative to the defendant's personal

6    content at that time?

7    A.  It was stored in the same location, amongst the defendant's

8    personal content.

9    Q.  Go to the next page, please, Ms. Collins.

10          We are going to look at some of those artifacts in

11   particular, but, Mr. Berger, can I ask you to explain at a high

12   level how you were able to determine that.

13   A.  So, the virtual machine was configured in a way that

14   folders from the host computer were shared to it.  This allowed

15   what would normally have been a self-contained virtual machine

16   access to the folders and files on the actual desktop computer.

17   Within the virtual machine, there was a service that would

18   index any and all files it had access to.  This was known as

19   mlocate.  This allows for quick access to look for a file when

20   you want to look for a particular file.

21          If you didn't have an index and you wanted to search

22   your file system for a particular file, when you ran that

23   search it would take some time for the computer to go and crawl

24   through every single file and folder it had access to looking

25   for that file.  The mlocate index service would periodically

1    run and it would crawl every folder and file it had access to,

2    and it would generate a list or database of all the folders and

3    files it can see.

4            That way, if you go and use the locate command to look

5    for a particular file, it could consult that database and

6    immediately return the result, prompting for a very quick

7    response.  It was from this database, the mlocate database, I

8    was able to determine the folders and files that the virtual

9    machine had access to prior to the system being formatted.

10   Q.  Let's look at that in stages, Mr. Berger.  If we could go

11   to page 99, Ms. Collins.

12           What was required for the user to give the virtual

13   machine access to folders that were on the defendant's Windows

14   desktop?

15   A.  The user would have to go into the virtual machine settings

16   and explicitly tell the virtual machine software what folders

17   or drives on the host computer that they wanted the virtual

18   machine to have access to.  They would then create a name for

19   each one of those mount points.

20   Q.  What is shown here in this excerpt from Government Exhibit

21   488, Mr. Berger?

22   A.  This is a portion of the vbox or the virtual machine

23   configuration file showing three particular share folders or

24   mount points.  It shows the host path, which is the path on the

25   host computer that the user wants to provide access to, and

1    then a name that is specified by the user.

2    Q.  What is the effect of including these entries in the Linux

3    Mint vbox file?

4    A.  Once they are included, and the virtual machine is powered

5    on, you can go into the virtual machine and access those

6    locations indicated under host path.

7    Q.  Let's take a look at the next slide, please, Ms. Collins.

8           Where on the computer is that mlocate database that

9    you were just testifying about located?

10   A.  That's within the virtual machine.  Specifically in a

11   directory named /var/lib/mlocate.

12   Q.  Let's take a look at some of what that file shows.  If we

13   go to page 101, Ms. Collins.

14          What's shown here, Mr. Berger?

15   A.  At the top in Exhibit 488 we see again that portion of the

16   vbox file showing the particular folders that are shared to the

17   virtual machine.

18          And in Exhibit 490-1 we see an excerpt of the parse in

19   mlocate.db file indicating the mount points where those shared

20   folders would have been mounted to.

21   Q.  I think you said something about this yesterday.  Can you

22   tell us what a mount point is and how that works?

23   A.  A mount point under Linux is just the term used when you

24   are mounting some other device, whether it be a thumb drive or

25   an external hard drive you plugged in or a share that is

1    accessible across a network, or in this case a share folder

2    coming in from the virtual machine management software.

3    Q.  Are the mount points reflected in the mlocate database the

4    same as those reflected in the virtual machine's configuration

5    file?

6    A.  Yes.

7    Q.  Go to page 102, Ms. Collins.

8            Did the virtual machine index its own location on the

9    defendant's computer?

10   A.  It did.

11   Q.  Explain to us what we are looking at here.

12   A.  What we're looking at here is a portion of that mlocate

13   database.  It is showing from the context of within the Linux

14   virtual machine, the mount point starting at the left with

15   /mount/faggot and then the Win7_data folder contained by the

16   documents VMs Linux Mint folder, and the corresponding Linux

17   Mint virtual machine files that we've previously seen.

18   Q.  By the way, at the very top there, there is a date and

19   time.  What is that?

20   A.  So, the mlocate database tracks dates and times of the

21   folders, not the files that are contained within the folders.

22   Those dates and times indicate the newer of either the created

23   or modified time for the folder entry.

24   Q.  What is that time for the VMs folder in the defendant's

25   documents directory?

1    A.  That is October 3, 2015, at 12:46.

2    Q.  How does that correspond with what you were able to

3    determine about when that virtual machine was first created?

4    A.  It corresponds to that same date.

5    Q.  Are you able to tell as of what day this reflects the

6    location of the virtual machine on the defendant's desktop?

7    A.  It shows that there are dates indicating May 1st of 2016,

8    specifically that Linux Mint folder.  And we also know that the

9    Linux Mint virtual machine was not used after May 1st, 2016.

10   That would indicate that this was generated on May 1st of 2016.

11   Q.  If we could go to page 103, Ms. Collins.

12          How did the location of the virtual machine as

13   reflected in the mlocate database as of May 2016 compare to

14   where the virtual machine was found by the FBI in March of

15   2017?

16   A.  It was relatively in the same location, compared to coming

17   from the documents folder.  The difference was that when the

18   machine was obtained by the FBI in March of 2017, there was no

19   Win7_ data folder.

20   Q.  What, if any, conclusions did you draw from the comparison

21   of the folder structure of where the virtual machine was stored

22   on the defendant's desktop those two times?

23   A.  That the contents of the documents folder were moved

24   together, but they were moved to a different location from the

25   Win7_data folder to the root of the current D drive.

1    Q.  Did that mlocate database within the virtual machine index

2    other contents of the defendant's documents folder?

3    A.  It did.

4    Q.  Did that include some of the files we looked at yesterday?

5    A.  It did.

6    Q.  Let's take a look at that.  If we could go to page 104,

7    Ms. Collins.

8              Do you see the file highlighted in red on the left

9    there?

10   A.  Yes.

11   Q.  Where is that reference from?

12   A.  That is referencing the full credit report file located in

13   the finance folder, which is located in the documents folder of

14   the Win7_data folder.

15   Q.  Is that the defendant's credit report that we looked at

16   yesterday?

17   A.  Yes.

18   Q.  Was that also present on his computer in March of 2017?

19   A.  Yes.

20   Q.  Did other files within the finance subfolder correspond

21   between May of 2016 and March of 2017?

22   A.  Yes.

23   Q.  Looking at the excerpt from Government Exhibit 609 on the

24   left.  There are some gaps there.  Were there files in that

25   folder on March of 2017 that were not reflected in the mlocate

1   database?

2   A.  Yes, there were.

3   Q.  What kinds of files?

4   A.  Files that show they were created on the system after

5   May 1st of 2016.

6   Q.  What, if any, conclusions were you able to draw about why

7   those are not reflected within the virtual machine?

8   A.  Since the virtual machine did not run after May 1st, 2016,

9   there was no option for the mlocate database to be updated with

10  those newer created files.

11  Q.  Let's look at another example.  If we could go to page 105.

12  You see the reference in both Government Exhibit 490-1 and 610

13  to a file license.jpg?

14  A.  Yes.

15  Q.  Where is that stored?

16  A.  On the left, it indicates it was stored in the legal folder

17  under the documents folder under the Win7_data folder.

18  Q.  Was that file recovered by the FBI in March of 2017?

19  A.  It was.

20  Q.  From where?

21  A.  It was found in the legal directory under the documents

22  directory located in the root of the D drive on defendant's

23  computer.

24  Q.  Do the references highlighted in red here refer to the

25  defendant's driver's license that we looked at yesterday?

1  A.  Yes, they do.

2  Q.  Were there other files in the legal folder that were

3  reflective of the same in both March of 2017 and May of 2016?

4  A.  Yes, there were.

5  Q.  Take a look at one last example.  If we go to page 106,

6  Ms. Collins.

7        What is shown here, Mr. Berger?

8  A.  On the left we're looking at a portion of the mlocate

9  database showing files that were in the school directory

10 located in the documents directory, located in the Win7_data

11 directory.

12 Q.  Were there files reflected in the mlocate database within

13 the virtual machine that you later located on the defendant's

14 desktop when it was seized in March of 2017?

15 A.  Yes.

16 Q.  Did that include the defendant's college diploma?

17 A.  Yes, it did.

18 Q.  If you go to the next slide, please, Ms. Collins.

19       Overall, Mr. Berger, what conclusions were you able to

20 draw from your analysis of the mlocate database file?

21 A.  The mlocate database allowed me to draw the conclusion that

22 the defendant gave access to those files because of the mount

23 point that they set up.  The virtual machine was able to access

24 all of those files indicating where it was stored at the

25 particular point in time, the last time the files were

1  indicated.

2          This would indicate that prior to May 6 of 2016, the

3  virtual machine was kept in the same location with all those

4  files, specifically the personal files that are within the

5  documents folder.  The virtual machine was kept alongside all

6  of those same files, even when it was moved into its current

7  location.

8  Q.  Were you able to draw any conclusions about who moved it

9  into its current location from that information?

10  A.  Yes.

11  Q.  Who?

12  A.  The defendant.

13  Q.  If we can go not next slide, please, Ms. Collins.

14          We spent a long time talking about that

15  Josh-VirtualBox virtual machine.  I want to switch gears and

16  talk about the volume container that you identified earlier.

17  A.  Okay.

18  Q.  Go to page 109, Ms. Collins.

19          We've talked about this some generality, but can you

20  describe for us where that volume container was located on the

21  defendant's desktop relative to the Josh-VirtualBox virtual

22  machine?

23  A.  So the virtual machine was in a few subdirectories below

24  the root of the D drive.  The volume container was found

25  directly in the root of the D drive.

1    Q.  If we go to the next page, please, Ms. Collins.

2            Mr. Berger, first of all, what, if any, significance

3    did the file name "volume" have to you?

4    A.  It was interesting to see the word "volume" as a file.  It

5    is similar to one of the system files that comprised the NTFS

6    file system.  You can see right above that there is a file

7    dollar sign volume, which is one of those system files.

8    Q.  What, if anything, did that indicate to you?

9    A.  It indicated that the file possibly could have been named

10   in an effort to camouflage its presence from someone looking

11   through the file system.

12   Q.  What type of file is volume?

13   A.  It is an encrypted VeraCrypt container.

14   Q.  How were you able to determine that when you started

15   conducting your forensic analysis?

16   A.  After looking at its very large size, and previewing the

17   content of the file, it indicated it was very random binary

18   data, more than likely signifying that it was an encrypted

19   file.

20   Q.  You say its large size, how did the size of the volume

21   container compare to anything else on the defendant's desktop?

22   A.  It stuck out.

23   Q.  How?

24   A.  There was nothing else that came to being that large for a

25   single file.

1    Q.  We talked a bit about VeraCrypt within the Josh-VirtualBox

2    virtual machine.  Was VeraCrypt also installed on the

3    defendant's desktop itself?

4    A.  Yes, it was.

5    Q.  You can go to the next slide, please.

6            Were you able to use VeraCrypt to decrypt the volume

7    container?

8    A.  I was.

9    Q.  How were you able to determine the password to decrypt the

10   volume container?

11   A.  I again used a password that came from the collection of

12   passwords that were stored on the defendant's mobile device.

13   Q.  What was the password for the volume VeraCrypt container on

14   the defendant's desktop?

15   A.  KingJosh3000.

16   Q.  You can go to the next slide, Ms. Collins.

17           Was that also a password that the defendant used for

18   other personal accounts?

19   A.  Yes, it was.

20   Q.  Just briefly looking at these here, did you recognize the

21   user names for some of these accounts?

22   A.  Yes, I do.

23   Q.  Were they the same as some of the user names that we looked

24   at yesterday relating to the other passwords of the defendant?

25   A.  That's correct.

N9D3SCH1                        Berger - Direct

1            MR. DENTON:  Your Honor, at this time the government

2      would offer the redacted version of Mr. Berger's presentation,

3      which has been marked Government Exhibit 2302-R.

4            MR. McMANUS:  No objection.

5            THE COURT:  Admitted.

6            Ladies and gentlemen, I mentioned yesterday there are

7      certain pages on 2302 that contain information that, for

8      privacy reasons, the law doesn't permit public dissemination or

9      publication.  So while you can see it, the redacted version is

10     now admitted, just so that can be publicly displayed.  Thank

11     you.

12           And do you want to put up slide 112 and 2302-R for a

13     moment.

14           (Government's Exhibit 2302-R received in evidence)

15           MR. DENTON:  Yes, Ms. Collins, if we can do that,

16     please.

17           THE COURT:  Then we'll turn this monitor back on.

18     Q.  Mr. Berger, what types of accounts did the defendant use

19     KingJosh3000 as the password for?

20     A.  He used it for Facebook, Amazon, TurboTax, Twitter,

21     LinkedIn, State Farm, and Verizon.

22           (Continued on next page)

23

24

25

1   Q.  Did he use a slight variation of it for that State Farm

2   account reflected in the second box on the bottom row?

3   A.  Yes, it appears he did.

4   Q.  Again, are these just examples of the instances in which he

5   used that password?

6   A.  Yes, they are.

7   Q.  Were there others as well?

8   A.  There were.

9   Q.  Let's take a look what is in this container after you

10  decrypted it.

11          If we could go to page 113, Ms. Collins.

12          Generally speaking, Mr. Berger, what type of files

13  were in the volume container on the defendant's desktop?

14  A.  There were primarily media files, pictures and videos.

15  Q.  Now, looking at the "Created" column that's third from the

16  right, a lot of these files have creation dates that are around

17  the same time.  What, if anything, does that indicate to you?

18  A.  It indicates that they were copied into their current

19  location at the same time.

20  Q.  And approximately when was that?

21  A.  May 1, 2016.

22  Q.  Now let's also take a moment and look at the folder

23  labeled "Pics."  Do you see that, Mr. Berger?

24  A.  Yes, I do.

25  Q.  Does that have the same creation date and time as those

1    other files?

2    A.   It does not.

3    Q.   What is the date that folder was created?

4    A.   December 4, 2016.

5    Q.   What does that indicate about when that folder was created

6    relative to the rest of the files shown here?

7    A.   It was created at a later point in time.

8    Q.   Then looking to the right, Mr. Berger, at the column marked

9    "Access" that's second from the right, do you see that?

10   A.   Yes.

11   Q.   All of the entries in that column have a time access of

12   either 4 a.m. or 5 a.m.  Do you see that?

13   A.   Yes, I do.

14   Q.   Can you explain why that is.

15   A.   That is an artifact of the forensic program I used that is

16   essentially trying to fill in the time field with something

17   relevant.  The volume VeraCrypt container was formatted with

18   the FAT32 file system.  One of the characteristics of that file

19   system is that while it stores a date and time for the created

20   and modified fields, it does not store a time for the last

21   accessed field.  It only stores a date.  Some forensic programs

22   will show the last access as only a date, others will

23   prepopulate it with a time as well.  And since they don't have

24   a time, they will just show midnight on that particular day.

25           The reason that we are seeing 4 a.m. and 5 a.m. is

1    that this particular forensic program by default will display

2    times in UTC.  Depending on the time of year, midnight local

3    time is either four or five hours behind UTC.  You can see here

4    that there are days in December.  So the fourth line down shows

5    access time of December 5, 2016, at 5 a.m. because at that

6    point in time, midnight is five hours behind UTC.  Right below

7    that we see June 21, 2016, and 4 a.m. because in June we are

8    four hours behind UTC.

9    Q.  Let's take a look within some of those folders, Mr. Berger.

10              If we could go to the next page, Ms. Collins.

11              Starting with this first regular folder here named

12   "DWHelper" that's highlighted in red.  Do you see that?

13   A.  Yes.

14   Q.  Does that name mean anything to you?

15   A.  It does.

16   Q.  What?

17   A.  It's a reference to a web browser plug-in that is able to

18   save and download certain videos that are embedded on certain

19   websites.

20   Q.  And what do you mean by a plug-in?

21   A.  Plug-in is kind of an additional piece of software you can

22   get for an existing application.  So modern web browsers offer

23   the ability for developers to write and distribute plug-ins

24   that enhance functionality of the web browser.

25              MR. DENTON:  So let's take a look at what's in that

1   folder.  If you could go to page 115, Ms. Collins.

2   Q.  Generally speaking, Mr. Berger, what types of files are in

3   this folder?

4   A.  It appears they are mostly video files.

5   Q.  Let's just talk about one example in particular here.

6              If we could go to the next page, Ms. Collins.

7              Focusing on this example that's highlighted in red

8   here, Mr. Berger, can you tell us what type of file this is.

9   A.  That is an MP4 file, which is a type of video format.

10  Q.  What, if anything, were you able to determine by looking at

11  the dates created, accessed, and modified for this file?

12  A.  It shows that the file itself was last modified on June 30

13  of 2012.  The file was moved into its current location on

14  May 1, 2016.  And it was last accessed at some point on

15  November 5, 2016.

16  Q.  Are there other files in this folder with file names

17  indicative of child pornography?

18  A.  Yes, there are.

19  Q.  Now, within this folder as well, Mr. Berger, there are a

20  large number of the files that show a date created of May 1,

21  2016.  Do you see that?

22  A.  Yes.

23  Q.  Were you able to find any evidence about where some of

24  these files came from before that date?

25  A.  Yes.

1    Q.   Where did you find evidence of that?

2    A.   Within the virtual machine.

3    Q.   How were you able to find evidence within the virtual

4    machine about files that were in the volume container?

5    A.   The virtual machine, and specifically the mlocate database,

6    showed the existence of files with identical file names

7    existing on the host file system at the point in time the

8    mlocate database was last indexed.

9    Q.   Let's took that.

10            If we can go to page 117, Ms. Collins.

11            What is shown here, Mr. Berger?

12   A.   This is an excerpt of that mlocate database, and the red

13   highlighted portion shows a directory entitled "Porn."

14   Q.   Is that within any other directory on the defendant's

15   desktop?

16   A.   The porn directory is located in the documents directory,

17   which is located in the win7_data directory.

18   Q.   Is that the same documents folder that had all those

19   personal materials that you testified about?

20   A.   That's correct.

21            MR. DENTON:  If we could go to the next slide,

22   Ms. Collins.

23   Q.   Was there a "Porn" folder in the documents directory when

24   the defendant's desktop was seized by the FBI in 2017?

25   A.   There was not.

1  Q.  Did you compare the contents of the "Documents/Porn" folder

2  that was indexed by the mlocate database with the contents of

3  the volume container on the defendant's desktop?

4  A.  I did.

5       MR. DENTON:  Go to the next slide, Ms. Collins.

6  Q.  What is shown on the left here, Mr. Berger?

7  A.  On the left we are looking at a portion of that mlocate

8  database.

9  Q.  What's shown on the right?

10  A.  On the right we are looking at a file listing of the volume

11  container.

12  Q.  What did you find when you compared the mlocate database

13  entries for documents/porn with the volume container on the

14  defendant's desktop?

15  A.  That the listing of files, and specifically the file names,

16  were very, very similar.

17       MR. DENTON:  Go to the next slide, Ms. Collins.

18  Q.  Did that include files with names indicative of child

19  pornography?

20  A.  It did.

21       MR. DENTON:  Go to the next slide, please.

22  Q.  Did it also include some of the same folder structure?

23  A.  It did.

24  Q.  Explain what we're looking at here.

25  A.  We are looking at on the left portions of the mlocate

1  database showing files that were stored in the "DWHelper"

2  folder, which itself was a subfolder of the "Porn" folder.  And

3  on the right, we are looking at a portion of the file listing

4  from the volume container showing those same file names were

5  present within the "DWHelper" folder of the volume container.

6  Q.  And again, did that include some files with names

7  indicative of child pornography?

8  A.  It did.

9  Q.  Let's go back and look at the main volume directory for a

10 moment.

11          Go to the next slide, please.

12          I want to ask you to focus on this directory — this

13 folder, excuse me, labeled "Pics" here.  Do you see that,

14 Mr. Berger?

15 A.  Yes.

16 Q.  What are the dates when that was created, accessed,

17 modified, and so on?

18 A.  This folder was created on December 4, 2016; last accessed

19 on December 5, 2016; and also last modified on December 4,

20 2016.

21 Q.  So that's all after May of 2016, is that right?

22 A.  That's correct.

23 Q.  Let's take a look at what it contains.

24          We could go to the next slide, Ms. Collins.

25          What is shown here, Mr. Berger?

1    A.  This is a directory listing of the pics directory.

2    Q.  What type of files are in the pics directory of the volume

3    container?

4    A.  Appears to be mostly JPEG or picture files.

5    Q.  I want to ask you to focus for a moment on this folder at

6    the top.  Do you see that highlighted in red there?

7    A.  Yes.

8    Q.  Let's look at what's inside that.

9             We could go to the next slide, please.

10            I'm going to ask you to sort of break down some things

11   about this folder.  First of all, just looking at the folder

12   name at the top, what, if anything, stands out to you about

13   that?

14   A.  The folder name appears to have two domain names or website

15   addresses, both of which end in the .ru suffix, indicating a

16   Russian-hosted website.

17   Q.  Looking at the second red box, it's kind of off to the top

18   left of the image, do you see the files that are sort of

19   highlighted there?

20   A.  Yes.

21   Q.  What are those files?

22   A.  The first and second and fourth file appear to be JS, or

23   JavaScript, files, and the third file appears to be a PHP file.

24   Q.  And focusing on those three JavaScript files, what, if

25   anything, were you able to conclude about what they were for?

1    A.  They were most likely downloaded from a portion of a

2    website.  JavaScript is a common language used in the

3    production of websites.  It's used to provide functionality

4    within the website that's rendered in the web browser.  If you

5    were to download a portion of a website, it would not be

6    uncommon to also have JavaScript files that came with that.

7    Q.  Is there anything in the names of those files that

8    indicates that they were downloaded?

9    A.  Yes.  The fact that they have the word "download" appended

10   to them.

11   Q.  So putting together this information about the contents of

12   this imgsrc.ru_files subfolder, what, if any, conclusions were

13   you able to draw about where it came from?

14   A.  It was most likely downloaded from that website.

15           MR. DENTON:  Now, if we could go to the next slide,

16   Ms. Collins.

17   Q.  Based on that information, Mr. Berger, would you expect to

18   find that file in the mlocate database?

19   A.  I would not.

20   Q.  Why not?

21   A.  It was created well after the last time the mlocate

22   database was indexed.

23           MR. DENTON:  Go to page 126, Ms. Collins.

24   Q.  Was there a pics subfolder in the document/porn directory

25   in the mlocate database?

1    A.   There was not.

2    Q.   In addition to everything you've described about what was

3    in the volume container and where it came from, did you find

4    any forensic evidence showing the use of files from within that

5    container?

6    A.   I did.

7              MR. DENTON:   Go to the next slide, Ms. Collins.

8    Q.   Where did you find evidence of the use of files from within

9    the volume container?

10   A.   That was through a forensic artifact known as a jump list.

11   Q.   What is a jump list?

12   A.   Jump list is a concept with the Windows operating system

13   where Windows keeps track of recent files that you use, and in

14   particular, it keeps track of them associated with the program

15   that was used to open them.  This allows you the functionality

16   that when you were to right click on a particular program on

17   the taskbar, it will give you quick access to files that were

18   recently opened with the particular application, as shown in

19   the demonstration screenshot here.

20   Q.   How does a jump list in Windows compare with a recently

21   used xbel file in Linux that you were testifying about earlier?

22   A.   It's very similar.  With Linux, as we saw earlier, there

23   was just one collection of recent files.  It's similar with

24   Windows except it divides it by the particular application.

25   Q.   How are jump list entries created?

1    A.  They're created automatically by the operating system.

2    Q.  And what, if any, action by the user causes them to be

3    created?

4    A.  The user would have to open a particular file.

5    Q.  Let's take a look at some jump list information.  If we

6    could go to the next slide.

7            What's shown in the box on top here, Mr. Berger?

8    A.  That is showing two particular files where jump list

9    information is stored on the Windows operating system.

10   Q.  Just to be clear, are these examples?

11   A.  Yes.

12   Q.  Are there other jump list files that you found on the

13   defendant's desktop?

14   A.  There are.

15   Q.  What sorts of forensic analysis did you do to examine the

16   information contained within those files?

17   A.  I used forensic software which is capable of parsing out

18   the stored information within those files and chose the

19   relevant information pertaining to the use of the individual

20   files and what application they were opened with.

21   Q.  You've testified a little bit here about user profiles

22   within Windows.  Are jump lists connected to user profiles in

23   any way?

24   A.  Yes, they are.

25   Q.  How?

1    A.   If we look in the top screenshot there, starting from about

2    the midpoint right after the 465.32 gigabyte, we see the root

3    of the file system.  It starts with the users directory and

4    then the Josh directory and then the app data directory, and it

5    goes on for a few more subfolders.  That indicates that these

6    particular files are specific to the Josh user account on the

7    system.

8    Q.   Based on the information here, are you able to tell where

9    the files that are referred to in the column marked "Linked

10   Path" down below came from?

11   A.   Yes.

12   Q.   How?

13   A.   The next column that is entitled "Volume Serial Number"

14   indicates the specific volume, or drive, where those files

15   reside.  Windows file systems have a concept of a volume serial

16   number.  When you format a new drive, it randomly picks a

17   serial number, and it will be that serial number for the life

18   of that particular file system.  When jump list data is stored,

19   it retains the volume serial number of where that particular

20   file was living at that time.

21            MR. DENTON:  So if we could go to the next slide,

22   Ms. Collins.

23   Q.   Were you able to determine the volume serial number for the

24   volume VeraCrypt container on the defendant's desktop?

25   A.   I was.

1   Q.  How were you able to determine that?

2   A.  I used a forensic program to look at the file system

3   information.

4   Q.  What's shown in Government Exhibit 619 on the left of the

5   screen here?

6   A.  That is a screenshot of the forensic program used to

7   determine the volume serial number.

8   Q.  What is the volume serial number for the volume container?

9   A.  D1168207.

10  Q.  So looking at the excerpt from 501 on the right, what, if

11  anything, were you able to determine from the entries in the

12  volume serial number column?

13  A.  That those entries came from the volume encrypted

14  container.

15  Q.  Now I want to shift and ask you about the box that's all

16  the way on the left of that excerpt from Government

17  Exhibit 501.  That has four entries that start with "K" and

18  three that start with "N."  Do you see that?

19  A.  I do.

20  Q.  What does that signify?

21  A.  That indicates the drive letter where the container was

22  mounted to when that file was accessed.

23  Q.  How is a drive letter like that selected?

24  A.  It's determined by the user in the VeraCrypt application.

25  When the user goes to mount an encrypted container, they select

1    the container, then they also select an available free drive

2    letter, they then click "mount," enter their password, and the

3    container is mounted to the system at that drive letter.

4    Q.  Was the VeraCrypt —— excuse me, the volume VeraCrypt

5    container always mounted to the same drive letter?

6    A.  It was not.

7    Q.  What, if any, conclusions were you able to draw from that?

8    A.  It was mounted at different points in time.

9    Q.  Was it mounted more than once?

10   A.  It appears that way, yes.

11   Q.  Let's go back to the more expanded view of those jump

12   lists.

13            If we could go to the next slides, Ms. Collins.

14            Mr. Berger, I'm going to ask you to sort of go from

15   left to right and walk us through what these jump lists

16   indicate.

17   A.  So starting at the left, we have the App ID.  This is a

18   unique sequence of letters and numbers that corresponds to the

19   particular application that the file was opened with.  Again,

20   this is how Windows keeps track of the different files and

21   knows what recent files to show for a particular application on

22   the taskbar.

23            The Potential App Name is the forensic software

24   attempting to show you the name that that particular app ID

25   corresponds to.

1        The Linked Path shows the name of the file that was

2   opened.

3        Volume Serial Number shows the volume where that file

4   resided when it was opened.

5        The Jump List Type indicates this is an automatic jump

6   list.  So these were all created automatically by the system.

7        The Last Access Date/Time shows the most recent time

8   that that particular file was accessed.

9   Q.  So working backwards through some of those things, can you

10  tell how many times a file was accessed from the jump list?

11  A.  You cannot.

12  Q.  Why not?

13  A.  It doesn't keep track of that information.  It just keeps

14  track of each file and the most recent date and time in which

15  it was opened, and that allows it to show the sorted by

16  date/time list when you access a jump list in the interface.

17  Q.  So if a file was accessed more than once, would there be

18  more than one jump list entry for the same file?

19  A.  Generally, no.

20  Q.  Then going back to the left where you say that the jump

21  lists were created automatically, what, if anything, did the

22  user have to do to create this jump list?

23  A.  They would just open the file.

24  Q.  Are jump lists created independent of action by the user?

25  A.  They are directly linked to the action of the user, but the

1    user is probably not aware that they are being created.

2    Q.  Going back to the app names here and the app IDs, how do

3    those apps correspond to the files we see listed in the link

4    path column?

5    A.  So the app ID is an indication of the application that that

6    particular file was opened with.  So we can see that the first

7    file there, which is an AVI file, was opened with the VLC video

8    player application.  The next file, which is a WMV, or another

9    type of video format, was opened with Microsoft Movies & TV, or

10   the built-in Windows movie player.

11   Q.  If you could tell us about some of the other apps that were

12   used here.

13   A.  Sure.  So continuing on with line 3 and 4, we see that JPEG

14   files, or image files, were both opened with the Microsoft

15   photos application.  There is an MP4, another type of video

16   file, that was also opened with VLC.  There is an HTML file

17   that was opened with the Chrome web browser, and there is a

18   JPEG file that was opened with the Quick Access application.

19   Q.  What does the Quick Access application refer to?

20   A.  It's part of the Windows graphical interface, just kind of

21   a way for you to quickly access certain files.

22   Q.  Mr. Berger, are these all of the jump list entries from the

23   volume container you found?

24   A.  They are not.

25   Q.  How would you describe the number of entries that you saw

1    for files being accessed from the volume container?

2    A.   There was a significant amount of file access.

3    Q.   Were there any jump list entries for the volume container

4    prior to the May 6 format of the defendant's computer?

5    A.   There were not.

6    Q.   So let's talk about what you saw from after that date.

7          If we could go to the next page, Ms. Collins.

8          Mr. Berger, based on your analysis of the jump list on

9    the defendant's desktop, can you describe for us what you

10   learned about the use of the files within the encrypted volume

11   container?

12   A.   Yes.  So many different files within the container were

13   opened, as evident on the jump lists.  This included one HTML

14   file, three different directories, 11 shortcuts that were

15   opened with Quick Access, 26 video files that were played with

16   VLC, 49 photos that were displayed with Microsoft Photos, and

17   75 video files that were opened with the built-in Microsoft

18   movie player.

19   Q.   What, if any, credentials or authentication was necessary

20   to access these files and open them as reflected in the jump

21   lists?

22   A.   You would need to be logged on to the Windows desktop, so

23   you'd need the password for the Josh Windows account.  And

24   you'd also need the password for the volume VeraCrypt container

25   in order to decrypt it and access the files within it.

1    Q.  Whose password was used to access the files within it?

2    A.  The defendant's.

3            MR. DENTON:  Just have a moment, your Honor.

4            No further questions.

5            THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY Mr. McManus:

8    Q.  Good morning, Mr. Berger.

9    A.  Good morning.

10   Q.  So the Tor browser system is for anonymous using, I believe

11   you said?

12   A.  Correct.

13   Q.  And Linux Mint virtual machine had a Tor browser installed

14   on it?

15   A.  That's correct.

16   Q.  And it had bookmarks for websites, right?

17   A.  Correct.

18   Q.  One of them was titled "Pedo Market," I believe?

19   A.  Yes.

20   Q.  And then "Pedo Chan" and "Underage Erotica," correct?

21   A.  I believe so, yes.

22   Q.  And it's common for people to download child pornography

23   using the Tor browser, correct?

24   A.  From my understanding, yes.

25   Q.  And the websites I previously mentioned, those were

1   dot-onion websites, correct?

2   A.   There were some dot-onion and some regular websites stored

3   in there, yes.

4   Q.   So you can access all regular websites from a Tor browser?

5   A.   Correct.

6   Q.   Like a dot-com or a dot-org you can get from a Tor browser?

7   A.   Yes.

8   Q.   Or a dot-ru you can get from a Tor browser?

9   A.   Correct.

10  Q.   I believe a Linux Mint virtual machines there's

11  anonfiles.ru on there, correct?

12  A.   I believe so, yes.

13  Q.   And whoever used the Linux virtual machine used the Tor

14  browser even though you could have accessed that website from a

15  normal browser, correct?

16  A.   Correct.

17  Q.   So what you're saying is the user of the Linux Mint virtual

18  machine was utilizing the Tor browser to access child

19  pornography?

20  A.   It appears that way, yes.

21  Q.   And then download child pornography?

22  A.   It appears that way, yes.

23  Q.   And of course, bookmarked child pornography websites?

24  A.   Correct.

25  Q.   And they would access, like we said, the dot-onion and then

1  other websites that you could access from Google Chrome for

2  instance?

3  A.  Correct.

4  Q.  Was there a Tor browser installed on Mr. Schulte's desktop?

5  A.  I don't recall.

6  Q.  Now, you also mentioned that the Linux Mint virtual machine

7  was used, I believe, constantly up until May 1, 2016?

8  A.  Yes.

9  Q.  And then it wasn't used again after May 1, 2016?

10  A.  That's correct.

11          MR. McMANUS:  Nothing further, your Honor.

12          THE COURT:  Any redirect?

13          MR. DENTON:  No, your Honor.

14          THE COURT:  All right.  Mr. Berger, you may step down.

15          (Witness excused)

16          THE COURT:  Government?

17          MR. DENTON:  The government rests, your Honor.

18          THE COURT:  All right.  So, ladies and gentlemen, you

19  just heard some magic words, that is to say, that the

20  government has rested.  That's the conclusion of the

21  government's case in chief.

22          At this time I'm going to ask defense counsel if the

23  defendant plans to present a case.  I want to remind you that

24  the defendant bears no burden, so he doesn't have to do a

25  thing.  He doesn't have to call any witness.  He doesn't have

1    to introduce any evidence.  The burden remains at all times on

2    the government.  That being said, the defendant may put on a

3    case if he wishes to do so.

4              Mr. de Castro.

5              MR. de CASTRO:  The defense rests.

6              THE COURT:  All right.  So those are some magic words

7    too.  All the evidence is now in.  As I said yesterday, I

8    thought we were moving quickly.  Turns out we're moving a

9    little more quickly even than I thought yesterday.

10             So here's what we're going to do.  It's 10:42, a

11   little earlier than we would normally take our break, but there

12   are some legal issues that I need to discuss with the lawyers,

13   including just making sure we're all on the same page with

14   respect to the instructions that I'll give you after you hear

15   summations.  I do think we will have time today to both do

16   summations and perhaps even get to my instructions, at which

17   time you could begin your deliberations.

18             I'm not going to ask you to stay past 2:30 today

19   because I didn't give you warning yesterday about it.  Having

20   said that, if as a group you agree that you can and want to

21   stay past 2:30, I'll allow you to do that.  So that's something

22   that you can and should think about and plan to discuss later.

23             So as I said, I need to take care of a couple legal

24   things, and for that reason I think we'll need a little bit

25   more than the half-hour that we took yesterday.  It's 10:43

now.  Why don't we take —— why don't I give you an hour, and we

will pick up again at 11:45.  Because of that, you're welcome

to leave the courthouse if you want, because the break will be

a little bit longer.  I will certainly encourage you to stay in

the jury room.  It's hopefully nice enough.  If you want to get

some fresh air, you're welcome to do so.

          I would ask you to be back even earlier than 11:45 so

by 11:35, or so.  And remember that you can identify yourself

as a sitting juror and hopefully get through security more

quickly, but remember to leave some time for that.  Bottom line

is be in the jury room ready to go at 11:45.  I hope and expect

that we will be done with what we need to do by that time, and

we can then pick up with summations and my instructions.

          But as I said, or as I mentioned the other day, when

you get to this point, some flexibility is necessary.  So my

sincere hope is that we will bring you out at 11:45, but trust

that we're doing things efficiently and we'll get to you as

quickly as we can.

          With that, let me give you my standard instructions

that remain very important.  You've now heard all of the

evidence, but you haven't heard the lawyers' closing arguments,

which are a very important part of the case because it's their

opportunity to make arguments to you about what conclusions you

should draw, what inferences you should draw from the evidence.

You also haven't heard my instructions about the law.  Those

1    are two very important things.  So even though you've now heard

2    all of the evidence, it is still critical that you keep an open

3    mind and for that reason still critical that you not discuss

4    the case with each other, or anyone else for that matter, but

5    even with each other.  You'll be getting to your deliberations

6    soon enough, at which time you will, obviously, be able to

7    discuss it with one another.  But for now, as tempting as it

8    may be, resist.  Talk about the weather, talk about other

9    things.  Don't talk about the case.  Don't talk about the case

10   with anyone.  Keep an open mind.  Don't do any research about

11   the case.  Be ready to go at or even a minute or two before

12   11:45.

13            With that, enjoy your break.  Thank you.

14            (Jury excused)

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  You may be seated.

3            All right.  First, I said I'd deem the motion made.

4   Mr. de Castro, Mr. McManus, do you want to formally make a

5   motion at this time?

6            MR. de CASTRO:  We formally make a Rule 29 motion for

7   judgment of acquittal in that the government has not proved its

8   case beyond a reasonable doubt.

9            THE COURT:  That motion is denied.

10           Can we proceed directly to the charge conference?

11           MR. DENTON:  Yes, your Honor.

12           MR. McMANUS:  Yes, your Honor.

13           THE COURT:  Great.

14           MR. de CASTRO:  I already have a copy, but a fresh one

15   would be good.

16           THE COURT:  Court reporter and me.

17           MR. DENTON:  I'll take one.  Why not?

18           THE COURT:  Start with the government.  There were a

19   couple of things that I flagged with highlighting that I

20   thought could or should perhaps come out; two that I think are

21   a little bit more straightforward and then one that might

22   require some discussion.

23           One, I don't think there was any cross-examination

24   during the case about the preparation of witnesses, so although

25   that is a standard instruction, I'd be inclined to remove it.

1          MR. DENTON:  We agree, your Honor.  And I'll say,

2     happy to take them as we come to them, but I think we agree on

3     all of the highlighted language that it can come out.

4          THE COURT:  Oh, great.  So persons not on trial also?

5          MR. DENTON:  Yes, your Honor.

6          THE COURT:  Any objection to those two from the

7     defense?

8          MR. McMANUS:  No, your Honor.

9          THE COURT:  Great.  Then the third that I thought

10    might require discussion, but perhaps won't, is although Count

11    Two does charge the accessed language from the statute, I do

12    think it's both a little bit more of an unsettled area and a

13    little bit complicated to distinguish between the two.  This

14    case doesn't strike me as one where a jury — I mean, if a

15    jury's going to find possession, it would find access and vice

16    versa.  It all seems to be pretty coextensive.  So my proposal

17    and inclination would be to simplify things and limit it to

18    possession.

19         MR. DENTON:  We agree, your Honor.

20         MR. McMANUS:  As do we.

21         THE COURT:  All of the highlighting will come out.

22         With that, let me turn to the government.  And I think

23    you know the drill, but if you can just go through from

24    beginning to end citing page and line number and tell me what

25    objections or corrections you have, that would be great.  And

1   don't hesitate to tell me any typos or anything, any errors

2   that you find.

3           Hang on one second, please.

4           All right.  Mr. Denton.

5           MR. DENTON:  So starting on page 3, line 18.

6           THE COURT:  Go ahead.

7           MR. DENTON:  At the end, that line where it reads "he

8   committed the charged crime," in light of the multiple counts

9   here, we would propose just changing that to "that he committed

10  each charged crime," which is similar to the phrasing on

11  line 16 and 17.

12          THE COURT:  Seems right.

13          Mr. McManus?

14          MR. McMANUS:  Seemed right.

15          THE COURT:  OK.  Next.

16          MR. DENTON:  On page 6, lines 4 and 5, I also don't

17  think we had any exhibits that were marked for identification

18  but not admitted.

19          THE COURT:  Well, there was at least the 3500 material

20  that was shown to refresh recollection.

21          MR. DENTON:  Yes, your Honor.  I think we were just

22  going to propose striking the sentence that starts "in

23  addition" and then just making the following sentence:

24  "Materials brought forth only to refresh a witness'

25  recollection are not evidence."

1          THE COURT:  Fair enough.

2          Any objection to that?

3          MR. McMANUS:  No, your Honor.

4          THE COURT:  OK.  Next.

5          MR. DENTON:  On page 10, line 19, I think we only had

6    the one stipulation.  We propose making that singular.  The

7    stipulation is the same for your purposes.

8          THE COURT:  Agreed.

9          Mr. McManus, you agree?

10          MR. McMANUS:  I think it reads fine either way.

11   That's fine.

12          THE COURT:  All right.  I'll make that change.

13          Next.

14          MR. DENTON:  Next on page 11, the instruction on

15   charts and summaries, although the second sentence, line 3,

16   notes that the charts and summaries were admitted, I think the

17   rest of the instruction comes from the Sand instruction for

18   charts and summaries not admitted as evidence.  So we would

19   propose that the Court delete the lines that start "They are no

20   better" through the end of that paragraph and simply replace it

21   with "You should consider these charts and summaries as you

22   would any other evidence," which is the Sand instruction for

23   charts and summaries that are admitted.  And I've got copies of

24   that.

25          THE COURT:  All right.  Mr. McManus?

1          MR. McMANUS:  That's OK, your Honor.

2          THE COURT:  All right.  So I will delete "they are no"

3     in line 4 through the end of the paragraph and replace with

4     "You should consider these charts and summary as you would any

5     other evidence."

6          Next.

7          MR. DENTON:  The next, your Honor, is just on page 13.

8     The draft instruction reflected the jury would be provided with

9     a copy of the indictment.  That was an open question at one

10    point, so we just wanted to confirm on that.

11         THE COURT:  Yes.  So my inclination, unless you want

12    to prepare a different indictment, is, in light of the removal

13    of the access prong, not to give them a copy of the indictment.

14    I'm not sure it adds very much, and I just worry that it would

15    create confusion since Count Two does include that language and

16    it's not in the instructions.

17         MR. DENTON:  Agreed, your Honor.  I think that's fine.

18    Obviously, we should just take out that reference on line 9 of

19    page 13.

20         THE COURT:  Yes.

21         I assume no objection from the defense?

22         MR. McMANUS:  No objection.

23         THE COURT:  All right.  Next.

24         MR. DENTON:  So the next, your Honor, pertains to the

25    instruction on element two of Count One that starts on page 15

and goes to page 16.  I understand the Court's inclination in

adding the two sentences that go from line 11 to line 14 on

page 15.  I think it is a little bit strange to tell the jury

that something is not in dispute but nevertheless instruct them

on it.  I think we should either agree or stipulate, or

whatever is necessary, that there's no dispute that the

material is child pornography.  And if the Court wants to

repeat the child erotica caution at that point, that's fine,

but if the jury's going to be instructed on the entirety of

their obligation to find what is child pornography, I think we

should propose striking those two sentences that reference

what's in dispute and what may not be child pornography since,

of course, it's up to them whether an image is child

pornography or child erotica.

THE COURT:  All right.  So if I'm understanding you

correctly, you would propose either to say the defendant does

not dispute that ⸺ and query whether it should identify the

specific material or not ⸺ is child pornography and exclude

the instruction as to what constitutes child pornography or

omit that he doesn't dispute and just have the instruction, is

that correct?

MR. DENTON:  That's correct, your Honor.

THE COURT:  All right.  Mr. McManus?

MR. McMANUS:  One moment.

(Counsel confer)

1          MR. McMANUS:  Yes, your Honor, we're good cutting it

2     after "child pornography" on line 12 of page 15.

3          THE COURT:  In other words, deleting the entirety of

4     the instruction after the words "child pornography" on line 12?

5          MR. McMANUS:  Yes, your Honor.

6          THE COURT:  Does anyone think it's necessary to

7     identify what material, or it suffices to just say material

8     generally, since I don't think it's critical which is or isn't?

9          MR. DENTON:  I think this is one, your Honor, where we

10    will defer to precisely what it is that the defendant is not

11    disputing.  We've been discussing it.  I think it would be

12    difficult to do in a way that's not a little bit verbose given

13    the sort of way the material is organized on Government

14    Exhibits 1001 and 1002.  If the defense would like it to be

15    more specific, we have no objection to that.

16         THE COURT:  Well, let me ask you, do you have an

17    objection to leaving it as is and just saying generically

18    material?

19         MR. DENTON:  No, your Honor.

20         THE COURT:  All right.  So why don't we do that.

21         MR. McMANUS:  That works.

22         THE COURT:  You can address it in an argument if you

23    think it's necessary to go into the particulars.

24         Next, Mr. Denton?

25         MR. DENTON:  In a related bane, your Honor, on page 17

1    with respect to the interstate commerce element, it's the

2    instruction that runs from lines 3 to 11 of page 17.  So the

3    parties stipulated in 2401 that the images and videos at issue

4    were in fact transported in interstate or foreign commerce.  So

5    we would propose either saying the parties have stipulated to

6    that, or similarly, if they'd prefer to say the defendant does

7    not dispute, I don't think we care about the formulation.

8            THE COURT:  Mr. McManus.

9            MR. McMANUS:  Stipulation is good with the defense,

10   your Honor.

11           THE COURT:  All right.  So let's get the exact

12   language.  I take it this would be in deleting the second

13   paragraph and then just at the end of the first paragraph, is

14   that correct?

15           MR. DENTON:  Yes, your Honor.  I think what we could

16   say is "The parties have stipulated that the images and videos

17   at issue in this case were in fact transported in or affecting

18   interstate or foreign commerce including by computer," which is

19   the language of the stipulation.

20           THE COURT:  Any objection to that, Mr. McManus?

21           MR. McMANUS:  No, your Honor.

22           THE COURT:  All right.  I'll make that change.  I love

23   things that shorten what I have to read.

24           Next.

25           MR. DENTON:  So the next, I noted it actually on

1  page 20, line 6, but it may affect the instructions with

2  respect to Counts One and Two as well.  To the extent that the

3  Court is not planning to send the indictment back, it may make

4  sense when describing the relevant dates to reiterate them

5  rather than refer to the indictment.

6       So the one I have marked is page 20, line 6, to just

7  substitute "in or about November 2016" for "on or about the

8  date set forth in the indictment," and then I would propose a

9  similar amendment to the prefatory instructions for Counts One

10 and Two as well.

11      THE COURT:  I think that makes sense.

12      MR. McMANUS:  That was going to be my proposal as

13 well.

14      THE COURT:  OK.  I'll do that.

15      Can I ask you, does our deletion of — I assume that

16 deleting the language on the definition of child pornography

17 and elaboration of interstate commerce — maybe I shouldn't

18 assume.

19      Are there any changes that you think we should make to

20 Counts Two and Three instructions, or is it sufficient to leave

21 it as is, since I think it just cross-references the Count One

22 instructions?

23      MR. DENTON:  Just have a moment to take a look, your

24 Honor?

25      Yes, your Honor, I think, given that they're just

1    cross-references, it's fine to leave them.

2            THE COURT:  All right.  Next, Mr. Denton.

3            MR. DENTON:  This was more of a question, your Honor.

4    With respect to page 23, line 3 — 2 and 3, where the Court

5    makes reference to the exhibits containing child pornography

6    not going back to the jury, I don't know whether it's strictly

7    necessary, but whether it might be prudent to advise them that

8    in the event that they wanted to see those, they would be made

9    available for them.  We've got a couple of different options

10   available, including another clean laptop that Ms. Collins was

11   able to procure.  I don't know whether it's necessary to be

12   that specific with them, but something to that effect.

13           THE COURT:  All right.  So a couple things:  First,

14   I'd be inclined to take out the word "alleged" in line 2 since

15   it's not in dispute.

16           Any objection to that, Mr. McManus?

17           MR. McMANUS:  No, your Honor.

18           THE COURT:  All right.  Then what I would suggest is

19   on line 5 stating "If you want to view the child pornography

20   and/or child erotica or if you," and then carry on — sorry, I

21   guess comma, if you want — let me start over.

22           "If you want to view the child pornography and/or

23   child erotica, if you prefer to view any evidence here in the

24   courtroom, or if you want any of the testimony submitted,"

25   etc., etc.

1          MR. DENTON:  That makes sense to us, your Honor.

2          MR. McMANUS:  That works, your Honor.

3          THE COURT:  Next, Mr. Denton.

4          MR. DENTON:  Then just another question, your Honor.

5    When we send things back to the jury, should we also plan to

6    send back the physical desktop and cell phone itself as well?

7          THE COURT:  So I was planning to raise those issues,

8    so let's table those for a moment.

9          Anything else with respect to the instructions or

10   verdict form?

11         MR. DENTON:  No, your Honor, only to say that we agree

12   with deleting the accessing reference on the verdict form as

13   well.

14         THE COURT:  Great.

15         All right.  Mr. McManus, your turn.

16         MR. McMANUS:  We addressed a couple of my concerns.

17   My last one was on page 20, and it's —— we request a lesser

18   included offense instruction.  And I was thinking —— well, it

19   could go —— I'm sorry, that's page 21 above the venue

20   instruction.

21         THE COURT:  Do you have proposed language?

22         MR. McMANUS:  I do.  I shared it with the government

23   last night.  Would you like a copy?

24         THE COURT:  Yes, please.

25         All right.  Mr. Denton?

1           MR. DENTON:  So, your Honor, we don't think a lesser

2     included offense instruction here is appropriate for two

3     reasons.  First, the concern that animates it derives from the

4     ostensible multiplicity of the possession of child pornography

5     and the receipt of child pornography.  Some circuits have

6     addressed that.  The Second Circuit has not taken it on

7     squarely.  But, nevertheless, the law is quite clear that

8     multiplicity is not a bar to the jury's consideration of

9     multiple offenses; that it is only a bar to the entry of

10    judgment on multiple offenses.  And, in fact, it has long been

11    sort of the law and practice in the Second Circuit to submit

12    the case to the jury and then, in the event that their verdict

13    reveals any double jeopardy concerns, to address that by

14    dismissal of counts rather than by direction to the jury on

15    what they can or can't consider.

16          So we think here it's not appropriate.  We think it's

17    also not appropriate under the standard for a lesser included

18    offense instruction which, to warrant its conclusion under

19    Rule 31(c), requires that there be a factual basis for the jury

20    to conclude that the defendant committed the lesser offense but

21    did not commit whatever element was included in the greater.  I

22    think, as was true with the possession and accessing, the

23    evidence kind of collapses here.  He either did it all or he

24    did none of it.  I don't think there's a factual basis to

25    believe the jury would draw that sort of distinction, and in

1  that circumstance, I don't think a lesser included offense

2  instruction is appropriate.

3       In the event that the jury convicts the defendant on

4  more than one count of conviction, here there are certain

5  necessary factual implications of that.  For them to convict

6  him of receiving child pornography venued in the Southern

7  District, they would have to find that he received it here.

8  For them to convict him of transportation of child pornography,

9  they would have to conclude that he already had child

10  pornography in Virginia and then brought it with him to

11  New York.  In the event that he's convicted of all three, we

12  think that the Court will be able to sort of parse out the

13  necessary factual implications of the jury's conclusion, and

14  that's the appropriate context in which to conduct the double

15  jeopardy analysis, not through instructions to the jury.

16       THE COURT:  So I will say that that's a reasonably

17  compelling argument.  Before I get a response, let me propose

18  one possibility, because while reasonably compelling, it also

19  strikes me that this is maybe making a mountain over a molehill

20  because, as you point out, the jury's going to accept all or

21  none, and in that regard, it doesn't really strike me as apt

22  here.

23       Having said that, I'm not sure lesser included offense

24  would be the right way to even describe it, but what I would be

25  inclined to do, at most — and I'm not yet intimating a view on

1    whether I would do this — would be to include an instruction,

2    maybe on Count Two, element one, to just the paragraph at the

3    end, something to the effect of "receiving necessarily includes

4    possession.  Therefore, to convict the defendant of Count One

5    and Count Two, you must find that he possessed and received two

6    different images or videos."  That is to say, not have it as a

7    separate instruction, let alone call it lesser included, but

8    just include a matter-of-fact reference to that.

9              And, I mean, I think you're right, the jury's either

10   going to accept all of the evidence or not, in which case I

11   don't think this is a particularly large obstacle for the

12   government to overcome if the jury buys its case.

13             MR. DENTON:  If we could just have a moment, your

14   Honor?

15             THE COURT:  Sure.

16             (Counsel confer)

17             MR. DENTON:  So, your Honor, I think we have sort of

18   two concerns on that approach.  The first is as a matter of law

19   the jury can, in fact, convict him on the basis of two

20   different — or the single set of images.  A jury is entitled

21   to convict on multiplicitous counts.  As a matter of law, I

22   think our concern, particularly given the presentation of

23   evidence, is that the jury's not going to be able to sort of

24   figure out how to parse the instruction that sort of now they

25   need to think about which particular images in which context

1    and that they can't convict on one basis or another.  So I

2    think our — in addition to sort of the questions about the

3    sort of basis for the instruction, I think we fear that that

4    would be confusing with respect to Count Two.

5            THE COURT:  Mr. McManus?

6            MR. McMANUS:  So we would agree with your proposal to

7    put it earlier on in the elements.  I think that the language

8    at the bottom of the proposed instruction saying "or separate

9    conduct" would address Mr. Denton's first concern.  I do think

10   that there are some issues that we've raised about different

11   receipt dates, different possession dates, and I think your

12   language would be helpful for the jury.

13           THE COURT:  Can you address Mr. Denton's argument,

14   number one, that there's no — as a matter of law a jury is not

15   precluded from convicting on multiplicitous counts.

16   Number one, that this is an issue of multiplicity; number two,

17   that that's a concern with respect to entry of judgment not the

18   jury's verdict; and number three, Mr. Denton's argument that

19   just given the unusual facts here and the charges, that it's

20   probably easy enough to parse what the jury's verdict means in

21   the event that the defendant is convicted of multiple counts.

22           MR. McMANUS:  I'll start with the third one.  I think

23   that that could absolutely track.  There are instances, say,

24   that they convict — the jury convicts for receipt and not

25   possession, then it could be inferred that it would be for

1    the —

2           THE COURT:  Well, if the jury convicts of receipt not

3    possession, there's no issue.

4           MR. McMANUS:  I'm sorry, yes.  Possession not receipt,

5    rather, then it could be inferred that the first tranche of

6    anything before November 11 —

7           THE COURT:  Again, if the defendant is convicted on

8    either of Count One or Count Two and not the other, then

9    there's no issue here.  It's only if he's convicted on Count

10   One and Count Two that we have even arguably an issue.  I think

11   Mr. Denton's point is that we can probably parse it even if he

12   is convicted of those two things, and especially if he's

13   convicted also of Count Three.

14          Mr. McManus:  So, yes, that's what I was — I was

15   agreeing with, that, as Mr. Denton's premises, I think that if

16   they do convict on Count One and Count Two, it would be — I

17   still think the language would be helpful that the jury

18   consider two separate or there is separate conduct.  I think

19   that addresses the concern.

20          THE COURT:  As a matter of fact, what is the basis on

21   which a jury could essentially conclude that there was only a

22   single file or single visual depiction that was both received

23   and possessed here?  In other words, the government's case has

24   basically presented a whole host of child pornography, that is

25   to say, well more than one unit, and the jury either is going

1    to accept that or reject it.  But it doesn't seem like this is

2    a case where there's a single image at issue and there's a

3    concern that the jury might convict of both on the basis of

4    that image.

5              What's the factual basis for the language here?

6              MR. McMANUS:  So the factual basis for that, your

7    Honor, would be the — I think it would be reasonable for the

8    jury to look at the Russian download, for instance, and

9    depending on how much weight they give to the government's

10   evidence about Mr. Schulte's access of it, considering the

11   website was accessed in a download, that receipt and possession

12   could be for one image.

13             THE COURT:  All right.  Mr. Denton, anything further?

14             MR. DENTON:  No, your Honor.

15             THE COURT:  All right.  I think I'm going to deny the

16   request for the reasons that Mr. Denton argued.  I don't think

17   it fits the facts of this case, and I think we can parse the —

18   or almost certainly would be able to parse the jury's verdict.

19   I think to add it could only create confusion in a case where

20   really it doesn't fit as a factual matter.

21             Anything else, Mr. McManus?

22             MR. McMANUS:  Nothing else, your Honor.

23             THE COURT:  So no other objections or corrections to

24   either of the instructions or the verdict form?

25             MR. McMANUS:  No, your Honor.

1          THE COURT:  All right.  Great.

2          So it is 11:14.  I told the jury to be ready at 11:45,

3     so you should be as well.

4          Before we close, though, the evidence issues that

5     Mr. Denton alluded to, I would — first of all, my inclination

6     would be to send them everything other than the child

7     pornography and child erotica.  So that would include the

8     physical exhibits as well.

9          As for the electronic exhibits, can you guys

10    coordinate — and I assume the government has a clean laptop

11    that has loaded onto it only the exhibits?

12         MR. DENTON:  Yes, your Honor.

13         THE COURT:  OK.  So can you show it to the defense to

14    make sure everybody's in agreement that it contains everything

15    and only things that were admitted into evidence?

16         MR. DENTON:  We'll do, your Honor.

17         THE COURT:  All right.  I will ask for confirmation of

18    that at the close of the summations so that we can — or at the

19    close of the instructions before it's sent to the jury.

20         I indicate in the instructions that they will also

21    have a list of the exhibits just because I think that's sort of

22    helpful to provide an index, if you will.  Do you have that,

23    and/or is there any objection to the exhibit list that the

24    government had provided to the Court going to the jury?

25         MR. de CASTRO:  We're fine with the Court's, unless

1    the government wants to provide a clean copy.  Doesn't matter

2    to us.

3            THE COURT:  I didn't mean mine, but ——

4            MR. de CASTRO:  I know.

5            THE COURT:  In other words, I think the government

6    should delete the date identified and date admitted columns and

7    just have the exhibit number and description.

8            MR. DENTON:  That's fine, your Honor.  We can take

9    care of that.  Should we get some hard copies of that in

10   addition to an electronic one on the laptop?

11           THE COURT:  I think that would be a good idea.  Why

12   don't we make 12 hard copies so each juror can have one and

13   also have it electronically on the laptop.  OK?

14           MR. DENTON:  Yes, your Honor.

15           THE COURT:  I think that covered my issues.  Anything

16   else from the government?

17           MR. DENTON:  No, your Honor.

18           THE COURT:  Mr. de Castro?

19           MR. de CASTRO:  No, Judge.

20           THE COURT:  All right.  So be here a couple minutes

21   before 11:45 ready to go, and we will start with closings.  If

22   you want to move the podium, coordinate with Ms. Smallman just

23   before we start.

24           I will see you at 11:45.  Thank you.

25           (Lunch recess)

1          (In open court; jury not present)

2          THE COURT:  Anything to discuss before we check and

3   bring out the jury?

4          MR. DENTON:  No, your Honor.

5          MR. De CASTRO:  No, Judge.

6          THE COURT:  Great.

7          (Jury present)

8          THE COURT:  Welcome back, ladies and gentlemen, I hope

9   you had a good longer break.

10         As I noted, we will continue now with the parties'

11  closing arguments.  The lawyers' closing arguments.  A couple

12  notes.  Number one, as I told you earlier and will tell you

13  again, what the lawyers say is not evidence.  You've now heard

14  and seen all of the evidence.  It is the witnesses' testimony,

15  any exhibits that were accepted and admitted into evidence, and

16  the stipulation between the parties.  What the lawyers say is

17  not evidence.

18         Having said that, it is their opportunity to make

19  arguments to you to tie the evidence together, to make

20  arguments to you about what conclusions you should draw from

21  the evidence, and about your verdict, and it is certainly a

22  very helpful part of the process.  So even though this trial

23  has been relatively short, and in that sense, the evidence is

24  somewhat fresh in your mind I'm sure, it is very important to

25  listen with care to both sides.

1          Number two, it is not uncommon for lawyers in their

2     closing arguments to talk about what they expect my

3     instructions to be.  My instructions are an important part of

4     the case.  I told you earlier that one of the things we needed

5     to discuss was precisely what instructions I'd give you, and

6     that's because it is important for them to know what I will

7     instruct you so that they can make arguments accordingly.  So,

8     they may make reference to what they expect my instructions to

9     be.

10          I want to be clear that it's my instructions that

11     govern.  So to the extent they say anything about my

12     instructions that differs from what I later say, and I will

13     give you my instructions when they conclude, it is my

14     instructions -- not their description of it -- that you should

15     follow.

16          The way this will work is the government goes first,

17     and then the defense lawyer has an opportunity to give a

18     closing statement, their closing argument as well, and then the

19     government gets to give a rebuttal.  And that's because, as

20     I've mentioned several times, it is the government that bears

21     the burden of proof, so they get the final word for that

22     reason.

23          With that, we will proceed with Mr. Bradley's closing

24     argument, and I would ask you to listen with care to him.

25          And Mr. Bradley, you may proceed.

1            MR. BRADLEY:  Thank you, your Honor.

2            Joshua Adam Schulte, downloaded, possessed, and

3    transported thousands of pictures and videos containing child

4    pornography.  Files that show the rape and sexual abuse of

5    children.  Children forced to perform sexual acts during the

6    most vulnerable, innocent moments of their lives.  Horrific

7    acts of child sexual abuse that the defendant collected,

8    organized, and repeatedly viewed.

9            Now, yesterday my colleague Mr. Lockard stood right

10   here and explained what the evidence in this case would show.

11   Now you have seen the evidence, you have heard the evidence,

12   and you know exactly what it proves.

13           The defendant kept his child pornography files on his

14   home desktop computer, with the other things that were

15   important to him.  He kept his child pornography under digital

16   lock and key, using the same passwords he used for his personal

17   accounts on American Express, on gmail, and other places.  He

18   kept his child pornography organized into folders like pics,

19   kids, and young, even downloads.  He knew that these files were

20   child pornography, because their names advertised exactly what

21   they would show.  Names like "Great Show of 11yr Girl," and

22   much worse.  Names that are hard to say out loud, and even

23   harder to forget.

24           And the defendant downloaded these files from

25   anonymous websites and the dark web, even bookmarking websites

1    like Pedo Market and Pedo Chan.  The defendant did all of this

2    first in Virginia, and then again in New York City.  This is

3    what the evidence shows, and that is why the defendant is

4    guilty.

5            Now, this summation is my opportunity to pull together

6    the evidence that you've seen throughout this trial, and to try

7    to explain how it all fits together.

8            Now, this has been a short trial, but it hasn't been

9    short on evidence.  So first I am going to give you a brief

10   overview of what the charges are and the elements that the

11   government is required to prove for each.  You'll get detailed

12   instructions shortly from Judge Furman, and you should follow

13   those instructions carefully.  But for now, I want to go over

14   the charges so that as we talk about the evidence, you'll see

15   how it's relevant and how it relates to each of the three

16   charges in this case.

17           Now, as you can see on the screen in front of you,

18   Count One charges the defendant with receiving child

19   pornography by downloading those materials over the internet.

20   Count Two charges the defendant with possessing child

21   pornography at his apartment in New York City.  Finally, Count

22   Three charges the defendant with interstate transportation of

23   child pornography, when he moved his desktop computer full of

24   child pornography from Virginia to New York, in November of

25   2016.

1             Each of these counts has elements that the government

2     must prove beyond a reasonable doubt.  So let's take a look at

3     Count One.

4             I expect you'll hear from Judge Furman that the

5     government must meet four elements, and those elements are

6     required to prove that the defendant knowingly received images

7     and videos containing child pornography.  First, the defendant

8     knowingly received or downloaded a visual depiction such as a

9     picture or video.  Second, that the depiction contained child

10    pornography.  Third, that the defendant knew the material

11    depicted one or more minors, and that the minors were engaged

12    in sexual or sexually explicit conduct.  And finally, that the

13    visual depiction was shipped or transported in or affecting

14    interstate commerce.

15            Count Two, the possession charge, has basically the

16    same elements as with Count One, except that instead of proving

17    that the defendant received child pornography, the government

18    must prove that the defendant knowingly possessed the images

19    and videos containing child pornography.

20            And finally, Count Three, the transportation charge,

21    requires the government to prove, again, beyond a reasonable

22    doubt, that the defendant knowingly transported a visual

23    depiction in interstate commerce, here, by bringing a desktop

24    computer from Virginia to New York in 2016; second, that the

25    visual depiction contained child pornography; and finally, that

1    the defendant knew that the material depicted one or more

2    minors, and that the minors were engaged in sexually explicit

3    conduct.

4           These are the elements that I expect you'll be

5    instructed on for each of the counts by Judge Furman.  But

6    first, let's take a step back on two key points.

7           First, the defendant agreed that there were thousands

8    of pictures and videos of child pornography on his desktop

9    computer.  You heard testimony from Agent Spivack and from FBI

10   computer scientist Michael Berger on this point as well, and

11   the contents of the defendant's computer are in evidence in

12   this case.  You can see that agreement, defendant's agreement

13   on those facts here in Government Exhibit 2401.  So you can

14   check that element off for each count.

15          Second, there is also no question that the child

16   pornography files traveled in interstate commerce, including by

17   computer.  The defendant has agreed to those facts as well,

18   which again is shown in Government Exhibit 2401.  So that

19   element is also proven as to Counts One and Two.

20          Same for Count Three.  You heard that when the

21   defendant was interviewed by the FBI, he admitted that he drove

22   his desktop computer from Virginia to New York in November of

23   2016.  So the government has met its burden of proof for those

24   elements as well.

25          So with all in mind, members of the jury, let's talk

1    about those first and third elements of each count, the

2    knowledge elements.  Whether the defendant knew about the

3    massive amounts of child pornography on his computer, that he

4    received, that he possessed, and that he transported.  The

5    evidence at this trial proves that he did.

6         Now, you heard how the defendant kept his over 3,000

7    images and videos of child pornography on his home desktop

8    computer, organized into files like new, young, and 13yo.  You

9    heard how he used his computer programming skills to hide his

10   child pornography in two places on that computer, behind layers

11   of encryption that only the defendant had the digital key for,

12   the passwords.  One of those places was a Linux virtual machine

13   that he put in his documents folder, the same documents folder

14   where he put other important items, like his driver's license,

15   his tax returns, his credit report, and other items.

16        The second place is an encrypted container called

17   volume which sat right out on the open.  He put it right out in

18   the open on his D drive, at the top level.

19        There is no great mystery here, members of the jury.

20   You saw the evidence, and you heard the evidence.  The

21   defendant knew exactly what he had on that computer.  How do

22   you know that?  Well, first, the defendant admitted he

23   encrypted what he called his porn on his computer, and that no

24   one else had access to it.  Second, the defendant encrypted his

25   porn with personal accounts found on his phone that had

1    passwords, again, only found on his phone under the user Josh,

2    and kept it with other personal sensitive documents.  Third,

3    the defendant clearly labeled his child pornography, and he

4    downloaded it from anonymous websites, including the dark web.

5    And fourth, the defendant repeatedly opened and watched his

6    child pornography.

7         So let's go through each of these in turn.  First, you

8    can start with the defendant's own words.  You heard from Agent

9    Evanchec that the FBI found the defendant's desktop computer

10   and cell phone during a search of the defendant's apartment in

11   New York City in March of 2017.  That desktop, which you see

12   right there on the screen circled, was the computer filled with

13   child pornography in this case.  And the passwords to access

14   that child pornography were found right on the defendant's cell

15   phone, shown here as Government Exhibit 2002.

16        Again, here is a picture of Government Exhibit 2401,

17   the stipulation, that agreement I mentioned earlier, in

18   evidence.  Defendant agreed that that desktop computer and that

19   cell phone were found in his apartment, and that they were both

20   used by him.

21        But it doesn't stop there.  In June of 2017, Agent

22   Evanchec interviewed the defendant.  And the defendant's

23   admissions about his desktop computer are crystal clear.  The

24   defendant said he was the only user of his desktop computer,

25   and that no one else had access to it.  He built the computer

1    in Virginia, and he brought it up to New York in November of

2    2016.  He used multiple layers of encryption on that computer,

3    and did not share the passwords with anyone.  He even mentioned

4    the VeraCrypt program that you heard from Mr. Berger that were

5    used to encrypt the child pornography containers on that

6    computer.  And what did the defendant encrypt?  What did he

7    tell the FBI?  It's just porn.  I encrypt my porn.

8           It is also clear that the porn the defendant is

9    referring to is actually child pornography.  And you know that

10   from Agent Evanchec's testimony.  Agent Evanchec testified that

11   the FBI was already reviewing the defendant's desktop computer

12   and its encrypted locations based on a search warrant.  And

13   during that review, Agent Evanchec and others found the

14   defendant's porn.  It was child pornography.  As Agent Evanchec

15   testified, he saw a video that showed a very young girl being

16   sexually assaulted by an adult male.

17          That child pornography on the defendant's computer,

18   that porn as he referred to it, was exactly why the defendant's

19   demeanor changed when discussing his computer's encryption with

20   Agent Evanchec.  You heard him testify as to that, Agent

21   Evanchec on the stand yesterday.

22          Even though the defendant thought that no one else

23   would be able to access his porn, you heard from Mr. Berger

24   that was exactly what the FBI was able to do.  Using his own

25   passwords from his own phone, the FBI's experts were able to

1    figure out precisely where the defendant kept his child

2    pornography on his computer, what else he kept with it, how he

3    opened that child pornography, what programs he used to view

4    it, which files he watched it on, and more.

5            The irrefutable ones and zeros of his own desktop

6    computer that the FBI was able to extract, and that you saw

7    here on display during this trial.  The defendant knew exactly

8    what was on his computer, and the evidence proves it.

9            First, Agent Spivack and Mr. Berger testified that the

10   defendant's child pornography was kept in two locked locations,

11   which you can see here on the screen.  One of these locations

12   was the volume container, and another was a Linux Mint virtual

13   machine.

14           Now just taking a step back, remember that a virtual

15   machine is basically a way to describe a computer within a

16   computer.  And a container is just a way to describe a large

17   encrypted file used to store data.  And that encryption was

18   done by a program Mr. Berger described called VeraCrypt, the

19   same one that the defendant mentioned to Agent Evanchec.  While

20   these locations had different layers of encryption, they were

21   all unlocked by the passwords on the defendant's phone.

22           As you heard Mr. Berger testify, the defendant

23   encrypted the virtual machine and the encrypted data.bkp

24   containers with the same passwords the defendant used to log

25   into his Google and his DoorDash accounts.

1            Here are just two examples from the defendant's phone.

2    As you know, there are many other examples, and we've redacted

3    the user names here just because they are being displayed to

4    the gallery.  But you know and you've seen what those user

5    names are.  They're variations of the defendant's own name.

6    And you also know that these passwords, for example, the one on

7    left side of the screen, pointing to the Linux virtual machine,

8    that was used to unlock the full disk encryption, that full

9    layer of protection.  Then the defendant used the password

10   Gohan, which you see on the right side of the screen, the same

11   password he used for his DoorDash account.  And he used that to

12   get into his second layer.  And that was the home directory

13   under the user name Josh.  And finally, that user, Josh, was

14   the only account in the virtual machine, just like Josh was the

15   only user account in the desktop itself.  And only Josh had

16   access to the encrypted data.bkp files containing the child

17   pornography that Agent Spivack testified about.

18           How did the defendant get through that last layer of

19   protection?  How did he decrypt those data.bkp containers

20   within the home directory?  With the same password you see on

21   the left side of your screen, that he used for his Google

22   account.

23           And by the way, let's just not even forget the name of

24   the virtual machine itself, which you heard earlier today from

25   Mr. Berger.  Josh-VirtualBox.

1          You also heard about the second encrypted child

2     pornography location on the defendant's computer, the volume

3     container.  Now, we'll get into what that container was and

4     where it was in a moment, but for now it is important to note

5     how the defendant encrypted that file as well, with the same

6     password he used to access his Amazon account and other places

7     as well.  What was the password to that?  KingJosh3000.

8          You saw multiple examples of these passwords from the

9     defendant's phone.  Passwords for accounts on websites that

10    people use in their every day lives.  Passwords for things that

11    people use for important things, like banking, taxes, e-mail,

12    things that you wouldn't share access to.  Passwords you

13    wouldn't give out to other people.  These were the same

14    passwords that the defendant used to secure his child

15    pornography from the outside world.

16         Again, in the defendant's own words, it's just porn.

17    I encrypt my porn.

18         You also know this massive collection of child

19    pornography didn't end up there by accident.  The defendant put

20    it there.  The defendant was a sophisticated computer

21    programmer.  He built that desktop himself.  You know the

22    defendant wouldn't just copy over hundreds of gigabytes of

23    child pornography in the two largest files on his hard drive

24    set up and somehow not even notice.

25         And you know these child pornography stashes weren't

1   just in random places on his computer.  He kept them right next

2   to the other things that were important to him.  And look, you

3   don't really have to go far to find where these files were.

4   The defendant put his Linux Mint virtual machine, the only

5   virtual machine on his home desktop computer, in a folder

6   labeled VMs, in the documents folder.  It was the same

7   documents folder where he kept his credit report, his driver's

8   license, and his college diploma.  And the volume container,

9   where was that?  Well, he put it right there at the top layer

10  of the defendant's computer.  Right there on the D drive.

11         Here is another example of that documents folder.  The

12  defendant put that VMs folder right next to other carefully

13  labeled folders such as finance and legal.  And that contained,

14  as you heard and saw today, and yesterday, years of tax

15  returns, bank records, and other personal documents.

16         Here's just one example from Mr. Berger's testimony

17  showing the defendant's finance folder.  You can see just how

18  the defendant organized his records by year, with multiple

19  subfolders for things like bank statements, even a thing called

20  mortgage stuff.  Mr. Berger explained that virtual machine

21  lived right there among the defendant's personal documents from

22  the day he first created it in October 2015.

23         This shows you, this proves that the defendant used

24  his desktop computer for the important personal things in his

25  life, and he knew exactly what was on it, including what he

1   described as his encrypted porn.

2        So just turning to the third point now, you heard from

3   Agent Spivack just what that encrypted porn was.  Horrific

4   images and videos showing the sexual assault and rape of

5   children, just like Agent Evanchec saw as well.

6        Now, let's be clear.  What you heard and what you saw

7   yesterday during Agent Spivack's testimony was shocking,

8   disturbing, and tragic.  We're not going to show it again.  But

9   it was important to understand just how obvious the child

10  pornography was on the defendant's computer.  And you know that

11  for several reasons.

12       First, you heard and saw how the defendant kept his

13  child pornography.  It wasn't just some haphazard mix of files

14  that could have escaped notice.  First of all, they're way too

15  big for that.  But second, he had thousands of files organized

16  into folders with descriptions like downloads, kids, and young.

17       Second, many of the files clearly advertise themselves

18  as child pornography.  Here is just an example in the folder

19  labeled new.  Common abbreviations you heard about in the world

20  of child pornography appear again and again.  PTHC or preteen

21  hard core, 2yo, 4yo pedo, and more.  Agent Spivack reviewed

22  these files, and sure enough, they were exactly as they were

23  advertised.  You saw some of these examples, including those

24  that were not clearly labeled from the 11yr old folder in the

25  downloads directory.  And also for the victim known as Jenny,

1   who you heard is one of the more well-known and recognized

2   child pornography victims because of the horrific abuse that

3   she suffered.

4           You also heard Agent Spivack explain why these common

5   names are in these files and why they're on display.  It is to

6   help the defendant and others find child pornography on the

7   internet.  It is because they need to know what these files

8   show, when they're looking for them and hunting them down.  So

9   when you see files like PTHC, 5yo, Kelly New Stuff, you know

10  exactly what it shows, as Agent Spivack very sadly testified to

11  yesterday.  And it also means that the defendant knew exactly

12  what it showed when he opened files like that again and again.

13          It was also clear evidence of where the defendant got

14  these files from.  The internet.  In other words, where the

15  defendant received all of his child pornography.  Not only did

16  the defendant label one of these files as downloads, you also

17  heard Agent Spivack testify that he found a text file listing

18  web addresses and file descriptions that matched up with child

19  pornography that he found on the defendant's virtual machine.

20  This included a file that, as you can see here, literally

21  advertised the sexual abuse of 3- and 4-year-old girls, and

22  guidebooks and magazines on sexually abusing children.  These

23  web addresses were from a website called anonfiles, which is a

24  type of anonymous website that Agent Spivack testified is a

25  common place to download child pornography.

1         Now, both Mr. Berger and Agent Spivack also found

2    evidence of the defendant using an anonymous internet browser

3    called Tor, T-O-R.  It was sitting right on the desktop for the

4    virtual machine, right above the VeraCrypt program the

5    defendant used to decrypt that data.bkp container full of the

6    child pornography, some of which you saw during this trial.

7    The defendant even bookmarked multiple websites on this Tor

8    browser, websites that advertised their connections to child

9    pornography.  Websites like Pedo Chan and Pedo Market.

10   Websites that the defendant used to find and download that

11   child pornography.

12        These are just a few examples shown on the screen

13   here.  But these were websites that the defendant accessed on

14   the dark web so frequently, he needed to put them in his

15   bookmarks.

16        And by the way, let's not forget these are exactly the

17   kinds of tactics recommended by one of the child pornography

18   magazines that Agent Spivack found in the virtual machine as

19   well.

20        All of this, members of the jury, matches up with what

21   the defendant told Agent Evanchec.  You know what he said, and

22   I'll say it again.  It's just porn.  I encrypt my porn.

23        The child pornography downloads, the child pornography

24   bookmarks, the anonymous file listings, the websites, the

25   downloads folder, the graphic file names, they all show that

1    the defendant knew exactly what he was looking for when he

2    downloaded and possessed those images and videos of child

3    pornography.

4            I want to turn to our last point here on this roadmap.

5    The evidence also proves that not only did the defendant

6    download and keep child pornography, he also opened it, he

7    viewed it, he watched it repeatedly.

8            Agent Spivack found dozens of child pornography

9    pictures and videos in the recently-used.xbel file between mid

10   April and May 1st of 2016 alone.

11           Here is just an example from his presentation of the

12   18 child pornography files that were opened between April 20

13   and April 22, 2016.  You saw an example of one of these files.

14   The Jenny video.  Mr. Berger explained that the way that these

15   files end up being recorded in the recently used file is when

16   the user, the defendant, actually clicks on the file and opens

17   it in a program such as VLC, the media player you heard about.

18   Each one of these files is only here because the defendant

19   clicked on it and opened it.  The defendant actually watched

20   these files depicting a child's darkest moments right there on

21   his computer.

22           And that access, that viewing of these files, that

23   links up with other forensic evidence you heard from

24   Mr. Berger, including that the defendant logged into that

25   virtual machine on April 19, 2016, and stayed logged in

1   continuously until May 1st, 2016.  Using, again, the same

2   personal passwords we talked about earlier to boot up the

3   virtual machine and repeatedly unlock the screen saver.

4        You heard from Mr. Berger that he on one occasion, one

5   time span between April 18, 2016 and May 1st, 2016 alone, he

6   unlocked that screen saver 35 times.  And one of those unlocks,

7   just one example, was close in time to him accessing the

8   documents in the 11yr subfolder.  We looked at some of these

9   examples during Agent Spivack's testimony as well.

10       Not only that, members of the jury, the defendant gave

11  his virtual machine, the one named after him, he gave that

12  virtual machine access to the same documents folder where his

13  personal documents were kept.  And that virtual machine was

14  indexing those personal files as late as May of 2016.

15       So what does that indexing mean?  It means the virtual

16  machine and the defendant's personal documents were kept on the

17  same hard drive set up and had been for a long time.  This

18  shows you once again that it was the defendant's virtual

19  machine full of child pornography.

20       Now, members of the jury, you heard a lot of testimony

21  about that Josh virtual machine.  But don't forget, that wasn't

22  the only place where the defendant kept his child pornography.

23  There was also the volume container.  That volume container,

24  which sat on the top level of the defendant's D drive on his

25  home desktop computer.  And you know it was his because he kept

1    the password on his phone, password that he even had his own

2    name on it.  KingJosh3000.

3         You heard from Agent Spivack that he found dozens more

4    images and videos of child pornography in this encrypted volume

5    container, and that many of them were created in December of

6    2016.  So what does that mean?  It means that even after the

7    defendant moved from Virginia to New York City in November in

8    2016, he continued to receive and download child pornography.

9         And here is an example of some of those child

10   pornography files created in the volume container in December

11   of 2016.  And you heard that from Agent Spivack.  You know

12   where these files came from, because they were labeled with a

13   Russian image sourcing website that Agent Spivack testified is

14   another commonplace to download child pornography.  You also

15   saw an example of one of those files from that image imgscr.ru

16   folder and website yourself.

17        Finally, Mr. Berger explained how the defendant's own

18   computer revealed where some of these other child pornography

19   files in the volume container came from.  They came from his

20   own computer, from a folder in his documents folder called

21   porn.  The same thing he called it to Agent Evanchec.

22        He kept that porn in a folder which you see here in

23   the red box on the left side of the screen, before moving them

24   into the encrypted volume container, which we'll show in a few

25   minutes, the mlocate file in the virtual machine, that Josh

1    virtual machine that was running in the background, indexing

2    its own location all along.  It indexed the files in that porn

3    folder which you can see on the left side of that screen.  It

4    did that as late as April 30 of 2016.

5            And then lo and behold, after the defendant

6    reformatted his computer, those same files, his porn, appeared

7    line by line in the volume container.

8            I just want to note where that porn folder went,

9    because as you can see on the right side of the screen, that

10   when the FBI searched the defendant's computer in March 2017,

11   that porn folder was gone.  But you know from the mlocate file,

12   and the mlocate index and the virtual machine, that it was

13   there, and he used to have a folder there called porn.  And

14   where did it go?  You know it went into the volume container.

15   And you heard about that from Mr. Berger's testimony.

16           Those files that moved from the documents folder to

17   the volume container, the former porn folder, contained child

18   pornography.  Including, for example, the folder that's boxed

19   down there, the file unfortunately titled "My Young Vagina

20   Pussy 3," which as Agent Spivack sadly described for you was

21   just another example of child pornography.

22           This proves yet again that the defendant knew exactly

23   which files were on his computer, including his child

24   pornography, including those child pornography files that he

25   moved from his porn folder in his documents directory into the

volume container.  You can see here from the indexing as of

May 2016 where those files used to live in the documents

folder, and how they matched line by line in the volume

container in March of 2017, after he moved them.

This proves yet again that the defendant knew these

files were on his computer, he put them there, he moved them

around, and he organized them.  And not only that, he watched

them again and again.

Just one last point.  Mr. Berger also told you about

his review of what he called the jump list menus in the volume

container, and those jump lists you heard help the system give

quick access to recently used or opened files.  And as you

heard, these jump lists show the defendant repeatedly opening

and viewing files from the volume container, and he did that in

the 10 months between May of 2016, and when the FBI searched

his apartment in March of 2017.

This activity, which you heard included opening dozens

of videos and photos that included the child pornography files

that Agent Spivack testified to on direct, and he described

those in horrific detail.

Members of the jury, I'm about to sit down.  There are

three counts in this case, and they are simple.  We also talked

about the evidence, and that evidence is undeniable.  That

evidence proves beyond a reasonable doubt that the defendant,

Joshua Adam Schulte, this man, right there, knowingly received,

1    possessed, and transported thousands of images and videos

2    containing child pornography.

3            Members of the jury, at the beginning of this trial,

4    Mr. Lockard asked you to use your common sense as jurors.  That

5    common sense will tell you that the evidence in this case leads

6    only to one inescapable conclusion:  That the defendant, Joshua

7    Adam Schulte, is guilty on all counts.

8            Thank you.

9            THE COURT:  Thank you, Mr. Bradley.

10           Mr. De Castro?

11           MR. De CASTRO:  May it please the Court, government,

12    ladies and gentlemen of the jury, good afternoon.

13           I want to start by addressing yesterday.  Yesterday

14    was an extraordinarily difficult day.  You were asked to hear

15    about and view images that I'm sure deeply affected all of you.

16    It will affect all of us.  As the judge and Mr. McManus echoed

17    yesterday, you're not here to pass judgment on child

18    pornography.  You are not being asked to decide whether child

19    pornography should be illegal.  It is illegal, and it should be

20    illegal.

21           If you were disgusted by the evidence discussed and

22    shown yesterday, you had every right to be.  If you were

23    saddened by the evidence discussed and shown yesterday, you had

24    every right to be.  If you were angered by the evidence

25    discussed and shown yesterday, you also had every right to be.

1   Whatever your feelings were, you had every right to feel them.

2   No child should be subjected to abuse, and no child should be

3   subjected to the abuse that is memorialized in the photos and

4   videos constituting child pornography.

5            But you are here to decide whether the government

6   proved beyond a reasonable doubt that Joshua Schulte knowingly

7   received, possessed, and transported child pornography.  We

8   submit that it did not.

9            Yesterday and today, through Agents Evanchec, Spivack,

10  and Mr. Berger, the government presented its case.  Their case

11  is a forensically based case.  You heard all about it in

12  summation.  You learned about virtual machines, VeraCrypt, the

13  Linux operating system, the dark web, and many other computer

14  terms.

15           You heard about a lot about a Linux Mint virtual

16  machine, basically a computer inside of a computer, and when

17  it's open, it runs like any other computer would.  And when it

18  isn't, it looks like any other file.  The virtual machine was

19  full of child pornography, it was accessed often, until May 1st

20  of 2016, and then it was not accessed again.

21           You also heard about a volume container that

22  Mr. Bradley was just talking about, also where they found child

23  pornography.

24           But the containers, the Linux Mint VM and the volume

25  container, I submit to you, are very different in two very

1    significant ways.  The first is the Linux Mint folder had

2    thousands of child pornography files in it, approximately

3    3,000, and approximately 13,000 child erotica files.  Whereas

4    the volume container only had 90 child pornography files inside

5    of it.

6          The second difference is that the Linux Mint folder

7    had folders organizing the different child pornography.  The

8    volume folder had it all in one folder.  In fact, the

9    government's own witness, Agent Spivack, yesterday, even

10   acknowledged that the behaviors on the Linux Mint VM versus the

11   volume container appear to be different.

12         In its most basic terms, the government's case boils

13   down to arguing that they seized Mr. Schulte's computer from

14   his Manhattan apartment, and on it they found child

15   pornography, and he had transported that computer to Manhattan

16   from Virginia.  But since that's not enough to find Mr. Schulte

17   guilty, the government went to great lengths to show you where

18   the materials were found, and all of what they submit are the

19   sophisticated means in which he hid his crimes.

20         However, you're here to find the facts and apply the

21   law.  But in doing so, as Mr. Bradley said, I will echo, to use

22   your common sense.  When you look at the evidence introduced

23   yesterday and today, you will see that the government's view of

24   Joshua Schulte doesn't fit with the evidence it presented about

25   him.

1          Think about all the technical evidence they presented

2    yesterday and today, and ask yourselves why would Joshua

3    Schulte, a highly advanced and sophisticated computer

4    programmer, who worked in computer technology and had a degree

5    in the same, leave all of these computer clues that lead

6    directly to him and no one else?

7          What did the evidence show about Mr. Schulte?  That he

8    had a very advanced level of computing skills.  He had a higher

9    level of technical expertise.  He built his own computers.  He

10   studied computer engineering and received his undergraduate

11   degree from the University of Texas at Austin.  After school he

12   worked in computer programming jobs in Texas, Washington, D.C.,

13   and New York City.

14         We submit that common sense tells you that no one with

15   such higher level of technical computer knowledge like Joshua

16   Schulte would have done things the government claims he did.

17   They presented a very technical and seemingly complex analysis.

18         If you believe that Mr. Schulte did all of these

19   things, then you also must believe that he did everything to

20   lead forensic examiners in this case directly to himself.

21         If you believe Mr. Schulte did all of these things,

22   then it's hard to imagine a way someone could implicate

23   themselves more in these crimes.

24         Ask yourselves, would a highly advanced computer

25   programmer commonly use the same couple passwords for

1    everything from banking to e-mail to ride sharing and accessing

2    child pornography?  Would a highly advanced computer programmer

3    set the user names of the computer to their own name if it has

4    child pornography in it?  Would a highly advanced computer user

5    use simple passwords with no capital letters, symbols, and

6    numbers, in the case of Gohan?  Would a highly advanced

7    computer programmer set passwords that include his own name

8    within the password?  Would a highly advanced computer

9    programmer keep personal items including his driver's license

10   with a photo of himself near folders in which he possessed

11   illegal child pornography?  Would a highly advanced computer

12   programmer who has terabytes and terabytes of available storage

13   in his apartment keep illegal child pornography on his desktop

14   computer, or would he keep it on one of the jump drives or

15   other media that they found in his home?  Ask yourselves if a

16   highly advanced computer programmer would have VeraCrypt on the

17   Linux Mint desktop, the very program he allegedly used to

18   access child pornography?  Ask yourselves if a highly advanced

19   computer programmer would keep all of his passwords that easily

20   access the child pornography saved in the passwords file on his

21   cell phone?

22           Remember, Mr. Berger told you about encryption, he

23   talked about it yesterday, and he showed you a chart that had

24   the little spirals and it was the rings, the levels of

25   encryption.  And that chart was significant, and certainly

1   colorful, and suggested that it was complex, and that there was

2   various levels of encryption.  But ask yourselves if a highly

3   advanced computer programmer would literally use the same

4   passwords, just alternating between two commonly used

5   passwords, that again were on his phone.

6        The first level password to decrypt was gohan9740

7   followed by some other characters.  The second level was Gohan.

8   The next level was back to the next one, gohan9740, and the

9   last one was Gohan again.  Not very sophisticated.

10       Most importantly, would a highly advanced computer

11  programmer tell the FBI and federal prosecutors, after he knew

12  they had taken all of his computers, that he was the only user

13  of that computer on which there was child pornography?

14  Remember, he told the FBI and federal prosecutors that he had a

15  storage server that lots of people accessed.  There is no

16  evidence that any child pornography was housed on that server.

17  He had a Plex server, he told -- Agent Evanchec testified he

18  said he had a Plex server with movies he shared with family and

19  friends.  There is no evidence that any child pornography was

20  housed on that server.  But the computer in which they found

21  thousands of files of child pornography and child erotica in

22  encrypted containers, he told them no one else accessed.

23       Does that make any sense?  Does your common sense tell

24  you that a sophisticated computer programmer like Mr. Schulte

25  would do these things?  I submit to you that it does not, and

1    that the government has failed to prove its case beyond a

2    reasonable doubt, and you should find Mr. Schulte not guilty.

3           Thank you.

4           THE COURT:  Thank you, Mr. De Castro.  You'll now hear

5    from Mr. Denton, the government's rebuttal.

6           MR. DENTON:  Ladies and gentlemen, as you heard from

7    Judge Furman throughout this trial, the defense has no burden

8    to do anything in this case.  The burden of proof rests on the

9    government at all times, from the very beginning until the

10   moment you decide on your verdict.

11          But when the defense elects to make arguments to you,

12   you should pay careful attention to them and scrutinize them

13   the way you scrutinize everything in this case.  And I think

14   you should scrutinize what Mr. De Castro just told you very

15   carefully.

16          He told you that the forensic evidence in this case

17   points directly at one conclusion:  That Joshua Schulte did all

18   of the things that the witnesses you heard testify say he did.

19   That he downloaded, possessed, transported, and viewed child

20   pornography.  But the argument he made to you was, well, he's

21   just too smart to get caught like that.

22          Let's take that apart for a moment, because what he's

23   also saying is, he was too dumb to catch that someone else

24   planted all of this evidence on his computer, and somehow

25   managed to put it in plain sight, and yet the Mr. sophisticated

1   computer programmer had no idea.

2           That doesn't add up.  Because again, these things

3   didn't just materialize out of nowhere.  As you heard from the

4   witnesses, these forensic artifacts require people to do

5   things.  The virtual machine has to be created.  The encrypted

6   containers have to be created.  They have material put in them.

7   Those jump lists come when someone actually clicks on the file

8   and says let's watch this in VLC or Windows Media Player.  So

9   someone had to do those things without Mr. sophisticated

10  computer programmer noticing.

11          And not only is there no evidence whatsoever that

12  anyone else even could have of done that, much less that they

13  did, it doesn't make sense.  Because let's talk about what that

14  would have required.

15          First of all, someone would have had to create that

16  Linux Mint virtual machine.  They would have had to do it using

17  what you heard Mr. Berger describe as install media that he

18  found on the defendant's desktop, name the virtual machine

19  Josh, create an account in the name Josh, the same account, by

20  the way, that he used for all of those various other things,

21  and give it those passwords.  Someone had to get his password

22  and give it to that virtual machine.  Passwords he said he

23  didn't share, and passwords your common sense tells you he

24  wouldn't share.  That's not his Netflix password.  That's his

25  Amex password.  Nor is it something so simple.  Granted there

1    is the one version, the Gohan one, that's a little shorter, but

2    the main password that protected all of that stuff is a pretty

3    sophisticated one with numbers and dollar signs.

4         So this mysterious person, who somehow snuck all this

5    evidence on to the defendant's computer, did it having his own

6    password. And then would have had to watch all of that child

7    pornography on his computer. That's what that recently used

8    file that you heard a lot about from Agent Spivack and

9    Mr. Berger shows. And did it without Mr. computer programmer

10   ever noticing.

11        He would have had to give that virtual machine access

12   to all of the defendant's personal documents, and do it without

13   him noticing. He would have had to then do it again in the

14   volume container, knowing yet another password that belonged to

15   the defendant. KingJosh3000. There is one thing that Mr. De

16   Castro is right about, it is that the defendant has a high

17   opinion of himself.

18        But why would he do all of these things? That

19   question that Mr. De Castro asked you. Because he didn't know

20   that the FBI was going to search his apartment. He didn't know

21   that some of the best computer scientists in the FBI were going

22   to be able to figure this out. Granted, Mr. Berger makes it

23   sound easy. But you heard that he's one of the FBI's top

24   professionals in this kind of work, that he does this sort of

25   forensics for a living, and he's able to explain to you why

1    complicated things like jump lists and Linux system files show

2    things like opening files, extracting files, all of that.  But

3    it's not that easy, it is not that straightforward, it is not

4    that much in plain sight.

5            The fact that the evidence points to a plain

6    conclusion doesn't mean that it was just there in plain sight.

7    It means that the FBI found the evidence that proves that the

8    defendant is guilty.

9            Now, ladies and gentlemen, I can't stand here and tell

10   you why someone would want to download and receive and watch

11   the kinds of videos and pictures that you had to see and that

12   you heard a lot about.  I can't tell you why.  It doesn't make

13   sense to me.  But your question as jurors is not why something

14   happened.  Your question as jurors is not what could have

15   happened.

16           I expect Judge Furman will tell you that a reasonable

17   doubt is not speculation.  It is a doubt grounded in the

18   evidence.  So this is not about what could have happened, it is

19   about what did happen.

20           What the evidence showed did happen was that the

21   defendant was the one who downloaded those files, who unzipped

22   them in the virtual machine, who protected them with his

23   passwords, who watched them using video players, who ran

24   commands to list out the names of the files, horrifying names,

25   that showed up on his screen in front of him, and then

1    disappeared in the recesses of memory where Michael Berger

2    found them.

3              Who did it again.  I can't tell you why he decided to

4    collect more in the volume container after having other child

5    pornography elsewhere.

6              But your question is not why or what could be.  It is

7    what is.  And there is no dispute that that volume container on

8    his desktop was full of child pornography, and that he watched

9    it, and opened it over and over again, from the time he lived

10   in Virginia until the time he lived in New York.

11             The evidence in this case is clear about what the

12   defendant did, and it proves who did it.  That man, Joshua Adam

13   Schulte, who is guilty as charged.

14             Thank you.

15             THE COURT:  Thank you, Mr. Denton.

16             All right, ladies and gentlemen, that concludes the

17   parties' closing arguments.  Given that it has only been an

18   hour since you returned, I think I'll go directly into my

19   instructions.

20             I've prepared a written version of them.  As I'll tell

21   you at the outset, you should listen to me.  But if you want to

22   follow along, you may do that.  So at this time, Ms. Smallman

23   will distribute the written copies to you, and then we will

24   proceed.

25             Members of the jury, you've now heard all of the

1    evidence and the lawyers' closing arguments.  It is my duty at

2    this point to instruct you as to the law.  I'm going to read my

3    instructions to you.  It is not my favorite way to communicate,

4    and not the most scintillating thing to listen to, but there is

5    a need for precision, and it is important that I get the words

6    just right, so that is why I will be reading.

7         I have given you a copy of my instructions to follow

8    along, because they cover many points.  Please limit yourself

9    to following along.  That is, as tempting as it may be, do not

10   read ahead in the instructions.  If you find it easier to

11   listen and understand while you are following along with me,

12   please do.  If you would prefer, you can just listen and not

13   follow along.  In the unlikely event that I deviate from the

14   written instructions, it is my oral instructions that govern

15   and that you must follow.  But you make take your copy of the

16   instructions with you into the jury room, so you can consult

17   it, if you want to reread any portion of the charge to

18   facilitate your deliberations.

19        For now, listen carefully and try to concentrate on

20   the substance of what I'm saying.  You should not single out

21   any instruction as alone stating the law.  Instead, you should

22   consider my instructions as a whole when you retire to

23   deliberate in the jury room.

24        My instructions to you will be in three parts.  First

25   I will give you general instructions, for example, about your

1   role as the jury, what you can and cannot consider in your

2   deliberations, and the burden of proof.  Second, I will

3   describe the law that you must apply to the facts as you find

4   them to be established by the evidence.  Finally, I will give

5   you some instructions for your deliberations.

6           You, the members of the jury, are the sole and

7   exclusive judges of the facts.  You must weigh and consider the

8   evidence without regard to sympathy, prejudice, or passion for

9   or against any party.  It is your duty to accept my

10  instructions as to the law and to apply them to the facts as

11  you determine them.  If either party has stated a legal

12  principle differently from any that I state to you in my

13  instructions, it is my instructions that you must follow.

14          In reaching your verdict, you must remember that all

15  parties stand equal before a jury in the courts of the United

16  States.  The fact that the government is a party and the

17  prosecution is brought in the name of the United States does

18  not entitle the government or its witnesses to any greater

19  consideration than that accorded to any other party.  By the

20  same token, you must give it no less deference.  The government

21  and the defendant Joshua Schulte stand on equal footing before

22  you.

23          It would be improper for you to consider in reaching

24  your decision as to whether the government sustained its burden

25  of proof any personal feelings you may have about the

1   defendant's race, national origin, religious beliefs, sex or

2   age.  All persons are entitled to the same presumption of

3   innocence, and the government has the same burden of proof with

4   respect to all persons.

5            The personalities and the conduct of counsel are not

6   in any way at issue.  If you formed opinions of any kind about

7   any of the lawyers in the case, favorable or unfavorable,

8   whether you approved or disapproved of their behavior, those

9   opinions should not enter into your deliberations.

10           In addition, remember that it is the duty of a lawyer

11  to object when the other side offers testimony or other

12  evidence that the lawyer believes is not properly admissible.

13  Therefore, you should draw no inference from the fact that

14  there was an objection to any testimony or evidence.  Nor

15  should you draw any inference related to the weight or

16  importance of any testimony or evidence from the fact that I

17  sustained or overruled an objection.  Simply because I have

18  permitted certain testimony or evidence to be introduced does

19  not mean that I have decided on its importance or significance.

20  That is for you to decide.

21           The defendant has pleaded not guilty to the charges

22  against him.  As a result of that plea of not guilty, the

23  burden is on the government to prove guilt beyond a reasonable

24  doubt.  This burden never shifts to a defendant for the simple

25  reason that the law never imposes upon a defendant in a

1   criminal case the burden or duty of testifying or calling any

2   witness or locating or producing any evidence.

3           Furthermore, the law presumes the defendant to be

4   innocent of the charges against him.  The presumption of

5   innocence was in his favor when the trial began, continued in

6   his favor throughout the entire trial, remains with him even as

7   I speak to you now, and persists in his favor as to each

8   charged crime during the course of your deliberations in the

9   jury room, unless and until you determine that the government

10  proves beyond a reasonable doubt that he committed each charged

11  crime.

12          The question that naturally arises is, what is a

13  reasonable doubt?  A reasonable doubt is a doubt based on your

14  reason, your judgment, your experience, and your common sense.

15  It is a doubt that a reasonable person has after carefully

16  weighing all the evidence.  It is a doubt founded in reason,

17  and arising out of the evidence in the case or the lack of

18  evidence.  A reasonable doubt is not caprice or whim.  It is

19  not speculation or suspicion.

20          Proof beyond a reasonable doubt does not mean proof

21  beyond all possible doubt.  It is practically impossible for a

22  person to be absolutely and completely convinced of any

23  disputed fact that by its very nature cannot be proved with

24  mathematical certainty.  The government's burden is to

25  establish guilt beyond a reasonable doubt, not all possible

1    doubt.

2        If, after a fair and impartial consideration of all

3    the evidence, you can candidly and honestly say you are not

4    satisfied with the guilt of the defendant, that you do not have

5    an abiding belief of the defendant's guilt -- in other words,

6    if you have such a doubt as would reasonably cause a prudent

7    person to hesitate in acting in matters of importance in his or

8    her own affairs -- then you have a reasonable doubt, and in

9    that circumstance, it is your duty to acquit.

10        On the other hand, if, after a fair and impartial

11   consideration of all the evidence, you can candidly and

12   honestly say you do have an abiding belief of the defendant's

13   guilt, such a belief as a prudent person would be willing to

14   act upon in important matters in the personal affairs of his or

15   her own life, then you have no reasonable doubt, and in that

16   circumstance, it is your duty to convict.

17        There are two types of evidence that you may properly

18   use in deciding whether the defendant is guilty or not guilty

19   of the crimes with which he is charged.

20        One type of evidence is called direct evidence.

21   Direct evidence of a fact in issue is presented when a witness

22   testifies to that fact based on what he or she personally saw,

23   heard, or otherwise observed through the five senses.  The

24   second type of evidence is circumstantial evidence.

25   Circumstantial evidence is evidence that tends to prove a

1   disputed fact indirectly by proof of other facts.

2          There is a simple example of circumstantial evidence

3   that is often used in this courthouse.  Assume that when you

4   came into the courthouse this morning, the sun was shining and

5   it was a nice day outside.  Also assume that the courtroom

6   shades were drawn, and you could not look outside.  Assume

7   further that as you were sitting here, someone walked in with

8   an umbrella that was dripping wet, and then a few moments later

9   someone else walked in with a raincoat that was also dripping

10  wet.  Now, because you could not look outside the courtroom and

11  you could not see whether it was raining, you would have no

12  direct evidence of that fact.  But on the combination of facts

13  that I have asked you to assume, it would be reasonable and

14  logical for you to conclude that it was raining.

15         That is all there is to circumstantial evidence.  You

16  infer on the basis of your reason, experience, and common sense

17  from one established fact the existence or the non-existence of

18  some other fact.

19         The matter of drawing inferences from facts in

20  evidence is not a matter of guesswork or speculation.  An

21  inference is a logical, factual conclusion that you might

22  reasonably draw from other facts that have been proved.  It is

23  for you, and you alone, to decide what inferences you will

24  draw.

25         Many material facts, such as a person's state of mind

are not easily proved by direct evidence.  Usually such facts

are established by circumstantial evidence, and the reasonable

inferences you draw.  Circumstantial evidence may be given as

much weight as direct evidence.  The law makes no distinction

between direct and circumstantial evidence.  The law simply

requires that before convicting a defendant, you must be

satisfied of the defendant's guilt beyond a reasonable doubt

based on all of the evidence in the case.

What, then, is the evidence in this case?

The evidence is (1) the sworn testimony of the

witnesses, (2) the exhibits received into evidence, and (3) any

stipulations made by the parties.  Anything else is not

evidence.

For example, the questions posed to a witness are not

evidence.  It is the witness's answers that are evidence, not

the questions.  In addition, materials brought forth only to

refresh a witness's recollection are not evidence.  Moreover,

testimony that has been stricken or excluded by me is not

evidence and may not be considered by you in rendering a

verdict.

Arguments by the advocates are also not evidence.

What you heard during the opening statements and summations is

merely intended to help you understand the evidence and reach

your verdict.  If your recollection of the facts differs from

the lawyers' statements, you should rely on your recollection.

1  If a lawyer made a statement during his or her opening or

2  summation, and you find there is no evidence to support the

3  statement, you should disregard the statement.

4          Last, any statements that I may have made during the

5  trial or during these instructions do not constitute evidence.

6  At times, I may have admonished a witness or directed a witness

7  to be responsive to questions or to keep his or her voice up.

8  At times I may have asked a question myself.  Any questions

9  that I asked or instructions that I gave were intended only to

10 clarify the presentation of evidence and to bring out something

11 that I thought might be unclear.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  (Continuing) You should draw no inference

2     or conclusion of any kind, favorable or unfavorable, with

3     respect to any witness or any party in the case by reason of

4     any comment, question, or instruction of mine.  The rulings I

5     have made during the trial and these instructions are no

6     indication of my views of what your decision should be.  Nor

7     should you infer that I have any views as to the credibility of

8     any witness, as to the weight of the evidence, or as to how you

9     should decide any issue that is before you.  That is entirely

10    your role.

11         Finally, I instruct you that all of the evidence

12    presented to you in this case was lawfully obtained.  Whether

13    you approve or disapprove of how any evidence was obtained

14    should not enter into your deliberations.

15         How do you evaluate the credibility or believability

16    of the witnesses?  The answer is that you use your common

17    sense.  There is no magic formula by which you can evaluate

18    testimony.  You may use the same test here that you use in your

19    everyday life with evaluating statements made by others to you.

20    You may ask yourselves:  Did the witness impress you as open,

21    honest, and candid?  How responsive was the witness to the

22    questions asked on direct examination and on cross-examination?

23         If you find that a witness intentionally told a

24    falsehood, that is always a matter of importance you should

25    weigh carefully.  On the other hand, a witness may be

1    inaccurate, contradictory, or even untruthful in some respects

2    and entirely believable and truthful in other respects.  It is

3    for you to decide — to determine whether such inconsistencies

4    are sufficient or inconsequential and whether to accept or

5    reject all of the testimony of any witness or to accept or

6    reject only portions.

7           You are not required to accept testimony even though

8    the testimony is uncontradicted and the witness' testimony is

9    not challenged.  You may reject it because of the witness'

10   bearing or demeanor or because of the inherent improbability of

11   the testimony or for other reasons sufficient for you to

12   conclude that the testimony is not worthy of belief.

13          In evaluating the credibility of the witnesses, you

14   should take into account any evidence that a witness may

15   benefit in some way from the outcome of the case.  Such an

16   interest in the outcome creates a motive to testify falsely and

17   may sway a witness to testify in a way that advances his or her

18   own interests.  Therefore, if you find that any witness whose

19   testimony you are considering may have — excuse me, may have

20   an interest in the outcome of this trial, you should bear that

21   factor in mind when evaluating the credibility of his or her

22   testimony and decide whether to accept it with great care.

23          Keep in mind, though, that it does not automatically

24   follow that testimony given by an interested witness is to be

25   disbelieved.  There are many people who, no matter what their

interests in the outcome of the case, may be would not testify

falsely.  It is for you to decide, based on your own

perceptions and common sense, to what extent, if at all, the

witness' interest has affected his or her testimony.

You've heard testimony from two expert witnesses.  As

I previously explained, an expert witness is someone who by

education or experience has acquired learning or experience in

a specialized area of knowledge.  Such a witness is permitted

to express his opinions on matters about which he has

specialized knowledge and training.  The parties may present

expert testimony to you on the theory that someone who is

experienced in the field can assist you in understanding the

evidence or in reaching an independent decision on the facts.

Your role in judging credibility applies to the expert

as well as other witnesses.  In weighing an expert's opinion,

you may consider the expert's qualifications, education, and

reasons for testifying, as well as all of the other

considerations that ordinarily apply, including all the other

evidence in the case.  If you find the opinion of an expert is

based on sufficient data, education, and experience, and the

other evidence does not give you reason to doubt his

conclusions, you would be justified in placing reliance on his

testimony.  However, you should not accept a witness' testimony

simply because the witness is an expert.  The determination of

the facts in this case rests solely with you.

1      You've heard testimony from law enforcement or other

2  government witnesses.  The fact that a witness may be employed

3  as a law enforcement official or government employee does not

4  mean that his or her testimony is necessarily deserving of more

5  or less consideration or greater or lesser weight than that of

6  an ordinary witness.  It is your decision, after reviewing all

7  the evidence, whether to accept the testimony of any law

8  enforcement witness or government witnesses, as it is with

9  every other type of witness, and to give that testimony the

10 weight you find it deserves.

11      There are people whose names you have heard during the

12 course of the trial but who did not appear here to testify.  I

13 instruct you that each party had an equal opportunity, or lack

14 of opportunity, to call any of these witnesses.  Therefore, you

15 should not draw any inferences or reach any conclusions as to

16 what they would have testified to had they been called.  Their

17 absence should not affect your judgment in any way.

18      You should, however, remember my instruction that the

19 law does not impose on a defendant in a criminal case the

20 burden or duty of calling any witness or producing any

21 evidence.  The burden of proof remains at all times with the

22 government.

23      I remind you that the defendant is not required to

24 call any witnesses or offer any evidence since he is presumed

25 to be innocent.  On the other hand, the government is not

required to prove each element of the offense by any particular

number of witnesses.  The testimony of a single witness may be

enough to convince you beyond a reasonable doubt of the

existence of the elements of the charged offenses if you

believe that the witness has truthfully and accurately related

what he or she has told you.  The testimony of a single witness

may also be enough to convince you that reasonable doubt

exists, in which case you must find the defendant not guilty.

A stipulation was entered into relating to various

facts in this case.  A stipulation is an agreement between

parties as to what certain facts were or what the testimony

would be if certain people testified before you.  The

stipulation is the same for your purposes as the presentation

of live testimony.  You should consider the weight to be given

such evidence just as you would any other evidence.

The government presented exhibits in the form of

charts and summaries.  As I mentioned to you earlier, I

admitted these charts and summaries in place of or in addition

to the underlying testimony or documents that they represent in

order to save time and avoid unnecessary inconvenience.  You

should consider the charts and summaries as you would any other

evidence.

If certain testimony or evidence was received for a

limited purpose, you must follow the limiting instructions I

have given.

1          There is no legal requirement that the government

2    prove its case through any particular means.  While you are to

3    carefully consider the evidence and/or lack of evidence adduced

4    by the government, you are not to speculate as to why the

5    government used the techniques it did or why it did not use

6    other techniques.  Your concern is to determine whether or not,

7    on the evidence or lack of evidence, the government has met its

8    burden of proving each element of each charge beyond a

9    reasonable doubt.

10         The law does not require any party to call as

11   witnesses all persons who may have been present at any time or

12   place involved in the case or who may appear to have some

13   knowledge of the matter in issue at this trial.  Nor does the

14   law require any party to produce as exhibits all relevant

15   papers and things available to either party during the course

16   of the trial.

17         The defendant did not testify.  Under our

18   Constitution, a defendant is presumed innocent and has no

19   obligation to testify or to present any other evidence because,

20   as I've told you many times, it is the government's burden to

21   prove the defendant guilty beyond a reasonable doubt.  That

22   burden remains on the government throughout the entire trial

23   and never shifts to the defendant.  A defendant is never

24   required to prove that he is innocent.

25         You may not attach any significance to the fact that

the defendant did not testify.  No positive or negative inference, for or against, the defendant may be drawn by you because the defendant did not take the witness stand.  You may not speculate as to why he did not testify.  You may not consider this in any way in your deliberations in the jury room.

That concludes my introductory instructions.  Let me now turn to the charges.

The defendant is formally charged in an indictment. As I instructed you at the outset of this case, the indictment is simply a charge or accusation.  It is not evidence and it does not prove or even indicate guilt.  It does not create any presumption or permit any inference that the defendant is guilty.  As I have told you many times, the defendant is presumed innocent and has entered a plea of not guilty.  It is the government's burden to prove the defendant's guilt beyond a reasonable doubt.

The indictment contains three charges, or counts, against the defendant.  Each count accuses the defendant of committing a different crime.  You must, as a matter of law, consider each count, and you must return a separate verdict for each count in which the defendant is charged.  Your verdict on one count should not control your decision as to the other count.

Count One charges that between in or about 2009 and in

or about March 2017, the defendant knowingly received material that contained child pornography by downloading from the Internet electronic files depicting child pornography.

Count Two charges that, between in or about 2009 and in or about March 2017, the defendant knowingly possessed material that contained child pornography.

Count Three charges that, in or about November 2016, the defendant knowingly transported child pornography in interstate commerce.

I will explain each count to you in turn.

As noted, Count One charges the defendant with receipt of child pornography.  In order to convict the defendant of Count One, the government must prove the following four elements beyond a reasonable doubt:

First, that between in and about 2009 and in or about March 2017, the defendant knowingly received a visual depiction, as I will explain that term to you;

Second, that the visual depiction contained child pornography, as I will explain that term to you;

Third, that the defendant knew both that the material depicted one or more actual minors and knew that the minor or minors were engaged in sexually explicit conduct; and

Fourth, that the visual depiction was shipped or transported in or affecting interstate or foreign commerce by any means including by computer.

1          The first element of the offense that the government

2     must prove beyond a reasonable doubt is that the defendant

3     knowingly received a visual depiction.  A visual depiction

4     includes any photograph, film, video, or picture, including

5     data stored on computer disc or by electronic means that is

6     capable of conversion into a visual image.

7          To receive a visual depiction means to take possession

8     of it.  This includes the knowing acceptance of a depiction

9     previously requested.  Receiving includes the downloading of a

10    photograph or video by means of the Internet.

11         The government must prove that the defendant received

12    the depiction knowingly.  An act is done knowingly when it is

13    done voluntarily and intentionally and not because of accident,

14    mistake, or some other innocent reason.  Direct proof of

15    knowledge is almost never available.  It would be a rare case

16    when it could be shown that a person wrote or stated that as of

17    a given time in the past, he committed an act with knowledge.

18    Such proof is not required.  The ultimate fact of knowledge,

19    though subjective, may be established by circumstantial

20    evidence based upon a person's outward manifestations, his

21    words, his conduct, his acts, and all the surrounding

22    circumstances disclosed by the evidence and the rational or

23    logical inferences that may be drawn from them.

24         The second element of the offense that the government

25    must prove beyond a reasonable doubt is that the visual

depiction the defendant received is child pornography.  The

defendant does not dispute that material in this case was, in

fact, child pornography.

      The third element of the offense that the government

must establish beyond a reasonable doubt is that the defendant

knew that the material he received was child pornography.

      As I stated before, an act is done knowingly when it

is done voluntarily and intentionally and not because of

accident, mistake, or some other innocent reason.

      For this element, the term "knowingly" refers to an

awareness of the sexually explicit nature of the material and

to the knowledge that the visual depictions were in fact of

actual minors engaged in that sexually explicit conduct.

      The government must show that the defendant had

knowledge of the general nature of the contents of the

material.  The defendant need not have had specific knowledge

as to the identity or actual age of the underage person

depicted in the material.  The defendant must have had

knowledge or an awareness that the material contained a visual

depiction of a minor engaging in sexually explicit conduct.

Such knowledge may be shown by direct or circumstantial

evidence or both.  Eyewitness testimony of the defendant's

viewing of the material is not necessary to prove his awareness

of its contents.  The circumstances may warrant an inference

that he was aware of what the material depicts.  Furthermore,

1    the defendant's belief as to the legality or illegality of the

2    material is irrelevant.

3            The fourth element of the offense that the government

4    must establish beyond a reasonable doubt is that the visual

5    depiction was shipped or transported in or affecting interstate

6    or foreign commerce by any means, including by computer.  The

7    parties have stipulated that the images and videos at issue in

8    this case were, in fact, transported in or affecting interstate

9    and foreign commerce, including by computer.

10            As noted, Count Two charges the defendant with

11    possession of child pornography.  In order to convict the

12    defendant of Count Two, the government must prove the following

13    four elements beyond a reasonable doubt:

14            First, that between in or about 2009 and in or about

15    March 2017, the defendant knowingly possessed a visual

16    depiction;

17            Second, that the visual depiction contained child

18    pornography;

19            Third, that the defendant knew that the material

20    depicted one or more actual minors and knew that the minor or

21    minors were engaged in sexually explicit conduct; and

22            Fourth, that the visual depiction was shipped or

23    transported in or affecting interstate or foreign commerce by

24    any means, including by computer.

25            The first element of the offense that the government

must establish beyond a reasonable doubt is that the defendant

knowingly possessed a visual depiction. To possess something

means to have it within a person's control. This does not

necessarily mean that the person must hold it physically, that

is, have actual possession of it. As long as the visual

depiction is within the defendant's control, he possesses it.

If you find that the defendant either had actual possession of

the depiction or that he had the power and intention to

exercise control over it, even though it was not in his

physical possession, you may find that the government has

proved possession.

The law also recognizes that possession may be sole or

joint. If one person alone possesses it, that is sole

possession. However, it is possible that more than one person

may have the power and intention to exercise control over the

visual depiction. This is called joint possession. If you

find that the defendant had such power and intention, then he

possessed the depiction even if he possessed it jointly with

another person.

The government must prove the defendant possessed

child pornography knowingly. I have previously instructed you

on what it means for the defendant to have acted knowingly, and

you should follow those instructions here as well.

The second, third, and fourth elements that the

government must prove beyond a reasonable doubt before you can

convict him on Count Two are that the images and videos

contained child pornography, that the defendant knew both that

the material depicted one or more actual minors and that the

minor or minors were engaged in sexually explicit conduct, and

that the images and videos had been shipped or transported in

or affecting interstate or foreign commerce by any means,

including by computer.  I have previously instructed you about

the requirements of these elements in connection with Count

One, and you should follow those instructions with respect to

Count Two as well.

As noted, Count Three charges the defendant with

transporting child pornography in interstate commerce.  In

order to convict the defendant of Count Three, the government

must prove the following three elements beyond a reasonable

doubt:

First, that in or about November 2016, the defendant

transported or shipped in or affecting interstate or foreign

commerce by any means, including by computer, a visual

depiction;

Second, that the visual depiction was child

pornography; and

Third, that the defendant knew both that the material

depicted one or more actual minors and that the actual minor or

minors were engaged in sexually explicit conduct.

The first element that the government must prove

 1  beyond a reasonable doubt is that the defendant knowingly

 2  transported or shipped the visual depiction described in the

 3  indictment in interstate or foreign commerce.

 4      I have previously instructed you on what a visual

 5  depiction is, on what it means for the defendant to act

 6  knowingly, and on what it means for material to be transported

 7  in interstate commerce, and you should follow those

 8  instructions here as well.

 9      It is not necessary for the government to show that

10  the defendant personally transported or shipped the visual

11  depiction.  It is sufficient if the government proves that the

12  defendant knowingly caused the interstate shipment to take

13  place.

14      The second and third elements of the offense that the

15  government must prove beyond a reasonable doubt are that the

16  visual depiction contained child pornography and that the

17  defendant knew both that the material depicted one or more

18  actual minors and that the actual minor or minors were engaged

19  in sexually explicit conduct.  I have previously instructed you

20  about the requirements of these elements in connection with

21  Count One, and you should follow those instructions with

22  respect to Count Three as well.

23      In addition to all of the elements I have described

24  for you, in order to convict the defendant of each count in the

25  indictment, you must also decide whether any act in furtherance

of the count occurred within the Southern District of New York.
The Southern District of New York includes Manhattan.  The
government does not have to prove that the complete crime was
committed within the Southern District of New York or that the
defendant was ever in the Southern District of New York.  It is
sufficient to satisfy this element if any act in furtherance of
the crime occurred within this district.

Venue must be examined separately for each count in
the indictment.  Venue on one count does not establish venue on
another count, although, if applicable, you may rely on the
same evidence to establish venue on multiple counts.

I should note that on this issue, and this issue
alone, the government need not prove venue beyond a reasonable
doubt but only by a mere preponderance of the evidence.  Thus,
the government has satisfied its venue obligations as to a
count if you conclude that it is more likely than not that any
act in furtherance of the crime charged in that count occurred
in the Southern District of New York and that it was reasonably
foreseeable to the defendant that the act would take place in
the Southern District of New York.  By contrast, if you find
that the government failed to prove venue by a preponderance of
the evidence with regard to any count, then you must acquit the
defendant of that count.

It does not matter if the evidence you heard at trial
indicates that a particular act occurred on a different date.

1    The law requires only a substantial similarity between the

2    dates alleged in the indictment and the dates established by

3    the evidence.

4        That concludes my substantive instructions.  Let me

5    give you some instructions regarding your deliberations.

6        In a few minutes, you are going to go into the jury

7    room and begin your deliberations.  Your first task will be to

8    select a foreperson.  The foreperson has no greater voice or

9    authority than any other juror but is the person who will

10   communicate with me when questions arise or when you have

11   reached a verdict and who will be asked in open court to pass

12   your completed verdict form to me.  Notes should be signed by

13   the foreperson and should include the date and time that they

14   were sent.  They should also be as clear and precise as

15   possible.  Any notes from the jury will become part of the

16   record in this case.  So please be as clear and specific as you

17   can be in any notes that you send.  Do not tell me or anyone

18   else how the jury stands on any issue until after a unanimous

19   verdict is reached.

20       All of the exhibits, with the exception of the

21   exhibits containing the child pornography and/or child erotica,

22   will be given to you near the start of deliberations.  Just to

23   be clear, there are some physical exhibits.  You'll receive

24   those.  The electronic exhibits, which I think was most of what

25   you saw during trial, you'll actually receive in a laptop that

1    has them all preloaded.  Those, and only those, are on the

2    laptop.  So you should be able to access it in that manner.

3            In addition, you will also be provided with a list of

4    all of the exhibits that were received into evidence.  You'll

5    get both a physical list for each of you to have, and it will

6    also be on the laptop as well.

7            If you want to view any of the child pornography

8    and/or child erotica, if you prefer to view any evidence here

9    in the courtroom, or if you want any of the testimony submitted

10   to you or read back to you, you may also request that.  Keep in

11   mind that if you ask for testimony, however, the court reporter

12   must search through her notes.  The parties must agree on what

13   portions of testimony may be called for, and if they disagree,

14   I must resolve those disagreements.  That can be a

15   time-consuming process.  So please try to be as specific as you

16   possibly can in requesting portions of the testimony, if you

17   do.

18           Again, your requests for testimony — in fact, any

19   communication with the Court — should be made to me in

20   writing, signed by your foreperson with the date and time, and

21   given to one of the court security officers.  I believe we have

22   a notes template for you to use in connection with any

23   communications.

24           If any of you took notes during the course of the

25   trial, you should not show your notes to or discuss your notes

1    with any other jurors during your deliberations.  Any notes you

2    have taken are to be used solely to assist you.  The fact that

3    a particular juror has taken notes entitles that juror's views

4    to no greater weight than those of any other juror.  Finally,

5    your notes are not to substitute for your recollection of the

6    evidence in this case.  If during your deliberations you have

7    any doubt as to any of the testimony, you may, as I just told

8    you, request that the official trial transcript that has been

9    made of these proceedings be submitted or read back to you.

10          All of us, no matter how hard we try, tend to look at

11    others and weigh what they have to say through the lens of our

12    experience and background.  We each have a tendency to

13    stereotype others and make assumptions about them.  Often we

14    see life and evaluate evidence through a clouded filter that

15    tends to favor those like ourselves.  You must do the best you

16    can to put aside such stereotypes, for all litigants and

17    witnesses are entitled to a level playing field.

18          In particular, it would be improper for you to

19    consider, in reaching your decision as to whether the

20    government sustained its burden of proof, any personal feelings

21    you may have about the defendant's race, religion, national

22    origin, gender, sexual orientation, or age.  Similarly, it

23    would be improper for you to consider any personal feelings you

24    may have about the race, religion, national origin, gender,

25    sexual orientation, or age of any witness or anyone else

1    involved in this case.  Additionally, you must not be

2    influenced by any personal feelings you may have about child

3    pornography or the nature of the charged crimes.

4         Indeed, under your oath as jurors, you are not to be

5    swayed by bias, prejudice, or sympathy.  You are to be guided

6    solely by the evidence in this case, and as you sift through

7    the evidence, the crucial question that you must ask yourselves

8    for each count is has the government proved each element of

9    each count beyond a reasonable doubt?

10         It is for you, and you alone, to decide whether the

11   government has sustained its burden of proving the defendant's

12   guilt beyond a reasonable doubt solely on the basis of the

13   evidence or lack of evidence and subject to the law as I have

14   instructed you.

15         It must be clear to you that once you let prejudice,

16   bias, or sympathy interfere with your thinking, there is a risk

17   that you will not arrive at a true and just verdict.

18         If you have a reasonable doubt as to the defendant's

19   guilt with respect to a particular count, then you must render

20   a verdict of not guilty on that particular count.  On the other

21   hand, if you should find that the government has met its burden

22   of proving the guilt of the defendant beyond a reasonable doubt

23   with respect to a particular count, then you should not

24   hesitate because of sympathy or any other reason to render a

25   verdict of guilty on that count.

1          I also caution you that under your oath as jurors, you

2     cannot allow to enter into your deliberations any consideration

3     of the punishment that may be imposed upon the defendant if he

4     is convicted.  The duty of imposing a sentence in the event of

5     conviction rests exclusively with the Court, and the issue of

6     punishment may not affect your deliberations as to whether the

7     government has proved the defendant's guilt beyond a reasonable

8     doubt.

9          The most important part of this case, members of the

10    jury, is the part that you as jurors are now about to play as

11    you deliberate on the issues of fact.  I know you will try the

12    issues that have been presented to you according to the oath

13    that you have taken as jurors.  In that oath you promised that

14    you would well and truly try the issues joined in this case and

15    a true verdict render.

16         As you deliberate, please listen to the opinions of

17    your fellow jurors and ask for an opportunity to express your

18    own views.  Every juror should be heard.  No one juror should

19    hold the center stage in the jury room, and no one juror should

20    control or monopolize the deliberations.  If after listening to

21    your fellow jurors and if after stating your own view, you

22    become convinced that your view is wrong, do not hesitate

23    because of stubbornness or pride to change your view.  On the

24    other hand, do not surrender your honest beliefs solely because

25    of the opinions of your fellow jurors or because you are

1    outnumbered.

2         Your verdict must be unanimous.  If at any time you

3    are not in agreement, you are instructed that you are not to

4    reveal the standing of the jurors, that is, the split of the

5    vote, to anyone, including me, at any time during your

6    deliberations.

7         We have prepared a verdict form for you to use in

8    recording your decisions, a copy of which is attached to these

9    instructions.  Do not write on your individual copies of the

10   verdict form.  My staff will give the official verdict form to

11   Juror No. 1, who should give it to the foreperson after the

12   foreperson has been selected.

13        You should draw no inference from the questions on the

14   verdict form as to what your verdict should be.  The questions

15   are not to be taken as any indication that I have any opinion

16   as to how they should be answered.

17        After you have reached a verdict, the foreperson

18   should fill in the verdict form and note the date and time, and

19   you should all sign the verdict form.  The foreperson should

20   then give a note, not the verdict form itself, to the court

21   security officer outside your door, stating that you have

22   reached a verdict.  Do not specify what the verdict is in your

23   note.  Instead, the foreperson should retain the verdict form

24   and hand it to me in open court when I ask for it.

25        I will stress again that each of you must be in

1    agreement with the verdict that is announced in court.  Once

2    your verdict is announced in open court and officially

3    recorded, it cannot ordinarily be revoked.

4           Finally, I say this not because I think it is

5    necessary, but because it is the custom in this courthouse to

6    say it.  You should treat each other with courtesy and respect

7    during your deliberations.

8           All litigants stand equal in this room.  All litigants

9    stand equal before the bar of justice.  All litigants stand

10   equal before you.  Your duty is to decide between these parties

11   fairly and impartially and to see that justice is done.

12          Under your oath as jurors, you are not to be swayed by

13   sympathy or prejudice.  You should be guided solely by the

14   evidence presented during the trial and the law as I gave it to

15   you, without regard to the consequences of your decision.  You

16   have been chosen to try the issues of fact and to reach a

17   verdict on the basis of the evidence or lack of evidence.  If

18   you let sympathy or prejudice interfere with your clear

19   thinking, there is a risk that you will not arrive at a just

20   verdict.  You must make a fair and impartial decision so that

21   you will arrive at the just verdict.

22          Members of the jury, I ask your patience for a few

23   moments longer.  It is necessary for me to spend a few moments

24   with the lawyers and the court reporter at the sidebar.  I will

25   ask you to remain patiently in the jury box without speaking to

1    one another, and we will return in just a moment to submit the

2    case to you.

3               Thank you.

4               (At sidebar)

5               THE COURT:  All right.  Any objections to the charge

6    as read?

7               MR. DENTON:  Not from the government, your Honor.

8               MR. de CASTRO:  Not from the defense.

9               THE COURT:  All right.  Anything else?  Is the

10   evidence ready to be submitted to the jury?

11              MR. DENTON:  Yes, your Honor.

12              MR. de CASTRO:  It is.

13              THE COURT:  You reviewed it; it has all the evidence

14   and only the evidence?

15              MR. de CASTRO:  We have reviewed it, and we can

16   confirm that.

17              THE COURT:  Great.  Thank you.

18              (In open court; jurors present)

19              THE COURT:  All right.  So this is actually the moment

20   where I have to break the news to two of you, that is, Jurors

21   13 and 14, that you're actually alternates and will not be

22   called upon, now at least, to deliberate.

23              I want to stress you are not yet formally excused as

24   jurors; that is to say, there are circumstances in which some

25   juror — during deliberations an alternate is called upon to

1    join the jury and to deliberate with the jury.  So for that

2    reason, all of the restrictions that have applied to you to

3    date continue to apply, which is to say you should not discuss

4    the case with each other or anyone else.  You should not do any

5    research about the case or anyone involved in it, and you

6    should continue to keep an open mind since you will not be

7    beginning deliberations.

8         We will get in touch with you.  We'll call you or

9    email, whatever would more convenient for you, when the jury

10   has reached a verdict, at which point you will be formally

11   excused, and those restrictions will no longer apply.  But

12   until you receive a call from us or email, or whatever the case

13   may be, then again don't discuss the case, don't do any

14   research about the case, and continue to keep an open mind.

15        I did want to thank you.  I don't know if it's a

16   relief or disappointment that you won't be called upon to

17   deliberate, but in either case, it is very — what you've done

18   is very important.  It may not feel that way, but it's

19   important to ensure that we have a jury of 12 people to render

20   a verdict.  And by your presence, you have certainly given me

21   comfort and helped to ensure that that is the case.  Once

22   again, there are circumstances in which alternates are called

23   upon to join deliberations, so in that regard, you may still be

24   needed in that way.

25        At this time, with my thanks and with the parties'

1    thanks, I'm sure, as well, I'm going to ask you to follow

2    Ms. Smallman into the jury room, to quickly get your personal

3    belongings from the jury room, and then to exit the jury room

4    so that I can then excuse the jury to begin its deliberations.

5         The rest of you, please stay where you are.

6         (Alternate jurors excused)

7         THE COURT:  While they're doing that, I'll call upon

8    the court security officer who will secure the jury's

9    deliberations to step forward so I can administer the oath to

10   you.  Sir, if you could please raise your right hand.

11        (Marshal sworn)

12        THE COURT:  Thank you.

13        All right.  Ladies and gentlemen, while we're waiting,

14   let me just give you some logistical information.

15        When Ms. Smallman comes back, I will excuse you to

16   begin your deliberations.  In a minute or two after you go, we

17   will bring the evidence to you as I've described.  Again, it

18   will not include the child pornography and child erotica, but

19   otherwise all of the evidence that has been admitted will come

20   to the jury room for you to have, along with a copy of the

21   exhibit list or list of those exhibits.

22        My understanding from Ms. Smallman is that at least

23   preliminarily you have said that you want to finish today at

24   2:30.  That's fine.  If as a group you decide that you would

25   like to continue past 2:30 and, obviously, if we haven't ── I

mean, if you reach a verdict by then, that's one thing, but if

you haven't and you'd like to continue past 1:30 — 2:30,

excuse me, you're welcome to do so.  In that instance, just

send us a note so we know and can plan accordingly.  That is,

send a note indicating how late you would like to stay.  You

can stay as late as 5:00.  You can stay later than 2:30.  Any

time between 2:30 and 5:00 is fine with me.

If I do not get a note from you before 2:30, I will

bring you to the courtroom at that time to excuse you for the

day and give you some instructions about the — well, give you

some instructions.  So bottom line is if we don't hear from you

before 2:30, I will have the court security officer get you and

bring you out to the courtroom, and at that time I will dismiss

you for the day.

If you wish to communicate, including but not limited

to telling me that you want to spend more time than 2:30, then

just send us a note using the notepaper that you'll be given.

Hopefully that is all clear enough.  And then when Ms. Smallman

returns, we will submit the case to you and excuse you to begin

your deliberations.

So perfect time.

All right.  Ladies and gentlemen, you may begin your

deliberations at this time.  So please follow Ms. Smallman and

the court security officer into the jury room.  And once again,

if I don't hear from you before, we will see you at 2:30.

1          Thank you.

2          (At 1:31 p.m., jury excused to begin deliberations)

3          THE COURT:  You may be seated.

4          All right.  First of all, if you can give to

5     Ms. Smallman the evidence to go into the jury room, that would

6     be great.

7          I would ask two things:  One, pretty short trial, so

8     in that regard I don't expect —— well, I hope, knock on wood,

9     that the deliberations won't be too, too long either.  So I'd

10    ask you to stick around at least until 2:30, since we'll know

11    about then if they plan to stay longer than that; and if they

12    don't, then I will bring them out at 2:30 and excuse them for

13    the day.

14         In addition, assuming that the government has the

15    capacity to do this while you're waiting, I think it would make

16    sense —— I don't think there were many interruptions or

17    objections —— just to save us time, in the event that there is

18    a request for any portion of the transcript, I would propose

19    that you go through it and redact what needs to be redacted and

20    show that to the defense so that, in the event that there is a

21    request, we can immediately provide a copy of the transcript to

22    the jury and there's no delay on that front.  May as well use

23    the time for productive means.

24         All right.  Any questions about that?

25         MR. DENTON:  No, your Honor.  Will do.

1          THE COURT:  All right.  Anything else from the

2  government?

3          MR. DENTON:  No, your Honor.

4          THE COURT:  Anything from the defense?

5          MR. de CASTRO:  No, Judge.  Thank you.

6          THE COURT:  All right.  Let me just say, it is my

7  practice to say, but only when it's true, that the case is well

8  tried before we get a verdict, and I do want to say that here.

9  I appreciate the degree to which both sides made efforts to

10  streamline the case and do it in an efficient and fairly

11  disciplined manner, and I think that's the way it came in.  So

12  I thank you all for that.

13          I will see you certainly by 2:30.  If we do get a note

14  that they want to stay past 2:30, I'm not going to necessarily

15  convene you or bring them out, let alone bring them out.  I

16  think I'll just have my staff let you know that and that will

17  guide when you need to be here.

18          All right.  See you when I see you.  Thank you.

19          (Recess pending verdict)

20

21

22

23

24

25

1      (In open court; jury not present.  Time noted 2:08

2   p.m.)

3      THE COURT:  As I think you were advised, we received a

4   note dated today, 2 p.m., signed by the foreperson stating:

5   We, the jury, have reached a verdict.

6      I mark that as Court Exhibit 1.

7      We then got another note, which is same date, 2:07,

8   also signed by the foreperson saying:  Please provide us with

9   another verdict form.  Thank you.  And then with the name

10   foreperson.

11      I assume that just means that in filling out or

12   signing the form, that they made some sort of mistake.  And for

13   that reason, I took the liberty of just sending them another

14   form.

15      I assume no objection from the government?

16      MR. DENTON:  No, your Honor.

17      THE COURT:  From the defense?

18      MR. De CASTRO:  No, Judge.

19      THE COURT:  So then we will wait for them to come out

20   and proceed.

21      (Jury present.  Time noted 2:15 p.m.)

22      THE COURT:  Welcome back, ladies and gentlemen.  We

23   received both of your notes, the first indicating that we have

24   reached a verdict, and the second requesting another verdict

25   form which I sent in to you.

1          I think am I correct that the foreperson is Juror No.

2     4.  Is that correct?

3               THE FOREPERSON:  Juror No. 3, me.

4               THE COURT:  You're 4.

5               THE FOREPERSON:  Yes.

6               THE COURT:  In any case, is it the case that you have

7     reached a verdict?

8               THE FOREPERSON:  We have.

9               THE COURT:  Can you hand the verdict form to

10    Ms. Smallman to deliver to me, please.

11         All right.  I am going to now read your verdict aloud.

12    After I read your verdict, I am going to ask each of you to

13    confirm this is in fact your verdict.

14         As to Count One, which charges the defendant Joshua

15    Schulte with receipt of child pornography, the jury finds the

16    defendant guilty.

17         As to Count Two, which charges the defendant with

18    possession of child pornography, the jury finds the defendant

19    guilty.

20         As to Count Three, which charges the defendant with

21    the transportation of child pornography, the jury finds the

22    defendant guilty.

23         The verdict form appears to have been signed by all 12

24    jurors dated today, 2:13 p.m.

25         Juror No. 1, is that your verdict?

1        JUROR NO. 1:  Yes.

2        THE COURT:  Juror No. 2, is that your verdict?

3        JUROR NO. 2:  Yes.

4        THE COURT:  Juror No. 3, is that your verdict?

5        JUROR NO. 3:  Yes.

6        THE COURT:  Juror No. 4, is that your verdict?

7        JUROR NO. 4:  Yes.

8        THE COURT:  Juror No. 5, is that your verdict?

9        JUROR NO. 5:  Yes.

10        THE COURT:  Juror No. 6, is that your verdict?

11        JUROR NO. 6:  Yes.

12        THE COURT:  Juror No. 7, is that your verdict?

13        JUROR NO. 7:  Yes.

14        THE COURT:  Juror No. 8, is that your verdict?

15        JUROR NO. 8:  Yes.

16        THE COURT:  Juror No. 9, is that your verdict?

17        JUROR NO. 9:  Yes.

18        THE COURT:  Juror No. 10, is that your verdict?

19        JUROR NO. 10:  Yes.

20        THE COURT:  Juror No. 11, is that your verdict?

21        JUROR NO. 11:  Yes.

22        THE COURT:  And Juror No. 12, is that your verdict?

23        JUROR NO. 12:  Yes.

24        THE COURT:  The jury is unanimous.

25        Counsel, is there any reason that I cannot dismiss the

1  jury at this time?

2         MR. DENTON:  No, your Honor.

3         MR. De CASTRO:  No, your Honor.

4         THE COURT:  All right.

5         Ladies and gentlemen, in a moment I am going to

6  dismiss you, which means that you are formally excused from

7  jury service, which, among other things, means that the rules

8  that I've been repeating to you throughout this proceeding will

9  no longer apply.  So you can discuss the case, you can do

10  research about the case, and obviously you don't need to keep

11  an open mind anymore.  You've rendered a verdict.

12         It is possible that either the lawyers may ask to

13  speak to you or, conceivably, members of the press could ask to

14  speak to you, or someone else for that matter could ask to

15  speak to you.  It entirely up to you if you wish to speak with

16  anyone who inquires about this case to you.  It is also

17  entirely up to you to say you're not interested in speaking to

18  them.  And certainly, if you have any issues -- and I want to

19  be clear, I don't expect you to have any issues with anyone

20  trying to speak to you and you don't want to, you can reach out

21  to my chambers and we will do what we can.

22         The one thing I would ask is while you're free to

23  speak your mind, I think that there is much to be said for

24  respecting the privacy of the jury room.  Our country has

25  relied on juries for over 130 years, and what happens in the

1    jury room is supposed to stay in the jury room, and that has

2    served us well.  It is one thing to share your own views of the

3    case, if you wish to do so.  It is another thing to share the

4    views of other jurors, and I think there is a lot to be said

5    for respecting the deliberations and views of your fellow

6    jurors.  So that's the one request I would make.  But

7    ultimately, whether you speak to anyone about it and what you

8    say is entirely up to you.

9            There are a couple things that I need to take care of

10   with the lawyers.  It won't take very long.  If you're willing

11   to stay and have a few minutes and want to stay in the jury

12   room, I would love an opportunity to just come in and thank you

13   more personally, and also hear your feedback about the jury

14   process, and if there's any ways we could improve jury service.

15   If you want to get back to your lives and go back to your jobs

16   or pick up your kids or whatever the case may be, you are

17   welcome to do so.  I won't take offense.  If you're willing to

18   wait 5 minutes, 10 minutes, I'm happy to talk to you and hear

19   your thoughts about the process.  Thank you.

20           My staff has heard me say this many times but with

21   their indulgence I will tell you, there is a legendary judge in

22   this court, a man by the name of Edward Weinfeld, who many of

23   us seek to emulate because he's the epitome of what it means to

24   be a wise and distinguished judge.

25           There is one thing that he did that I take issue with,

1   which is he didn't thank jurors for their service.  He took the

2   view that jury service is one of the few obligations of

3   citizenship in our country, and you are obliged to do it,

4   therefore you don't warrant thanks.  But I disagree with him.

5   It's certainly true that it is one of the few obligations of

6   citizenship in our country.  But nevertheless, it does mean

7   taking time out of your busy lives, coming downtown, some of

8   you from very far away, paying careful attention throughout the

9   trial.  And I'm not commenting on your verdict, but it is

10  certainly apparent and obvious to me you have performed your

11  service conscientiously in the sense of being here on time and

12  paying careful attention throughout.  To me, that means that

13  you deserve our thanks.

14       This system could not function but for citizens like

15  you who are willing to take time out of their busy lives and

16  help resolve disputes.  It is a pretty extraordinary thing

17  about our system of justice that 12 ordinary people are drawn

18  from the street and render a verdict, and somebody can't be

19  convicted of a crime in our country if they contest the charges

20  without 12 people like you rendering a verdict.  That's a

21  pretty extraordinary thing.  But it requires people like you

22  taking the time to do it.

23       So, I'm sure if the parties were allowed that they

24  would join me in thanking you for your service.  I want to

25  thank you for your service.  And again, if you are willing to

1    stay a few minutes to meet with me and my staff, I would love

2    to have the opportunity to thank you more personally.

3              But with that, you are free to go, and you are

4    excused.  Thank you.

5              (Jury excused)

6              THE COURT:  The deadline for any post-trial motions

7    will be those set forth in the rules.  So, unless and until I

8    extend or alter them, the default deadlines apply.

9              Sentencing has already been set for January 10 at

10   10 a.m.  I will order the government to provide its factual

11   description of the various offenses of conviction to probation

12   within the next week, and defense counsel must arrange for

13   Mr. Schulte to be interviewed by probation within the next two

14   weeks.

15             Mr. Schulte, let me advise you that probation will

16   prepare a presentence report in connection with sentencing.  If

17   you choose to speak with probation, it is important that

18   anything you say is truthful and accurate.  Among other things,

19   that report is very important to me in deciding what sentence

20   to impose upon you.

21             Before sentencing, you and your lawyers will have an

22   opportunity to review the report.  I would urge you to review

23   it with care, and if you find any mistakes in the report or

24   anything that you wish to bring to my attention in connection

25   with your sentencing, that you share that with your lawyers so

1    they can share it with me in turn.

2              Do you understand all that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Mr. De Castro, do you wish to be present

5    in connection with any interview?

6              MR. De CASTRO:  I do, Judge.

7              THE COURT:  I'll order no interview take place unless

8    counsel is present.

9              In accordance with my individual rules and practices,

10   defense submissions with respect to sentencing are due two

11   weeks prior to sentencing.  The government's submission is due

12   one week prior to sentencing.  I recognize there's some

13   holidays in there, so as we get closer, if you want to adjust

14   those, I would be open to that.  But at the same time, given

15   the nature of this case, I want to have an adequate amount of

16   time to review your submissions and prepare for sentencing.

17             So, bottom line is you can seek a modest adjustment to

18   preserve holidays if need be, but do that in advance.

19             Anything else from the government?

20             One additional thing.  Apparently one of the jurors

21   indicated that the juror wished to write a note to one or more

22   of the attorneys.  Don't know what that's about.  But

23   obviously, she has a First Amendment right and is free to do

24   what she wants.  She did ask for -- I think it's a she, I could

25   be wrong -- but did ask for an address.  Any objection to my

1  giving a mailing address?  I assume everybody's mailing

2  addresses are fairly easy to find on Google anyway.

3          MR. DENTON:  No, your Honor.  I think they are all on

4  the docket.

5          MR. De CASTRO:  Agreed.

6          THE COURT:  Very good.  Well, I will do so and hold my

7  breath that it doesn't cause us any trouble.

8              Anything else from the government?

9          MR. DENTON:  No, your Honor.

10         THE COURT:  Anything else from the defense?

11         MR. De CASTRO:  No, your Honor.

12         THE COURT:  And my thanks to all of you for trying an

13  efficient and well tried case.  And with that, we are

14  adjourned.  Thank you very much.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                        Page

 MICHAEL R. BERGER

Direct By Mr. Denton . . . . . . . . . . . . 265

Cross By Mr. McManus . . . . . . . . . . . . 326

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 2302-R    . . . . . . . . . . . . . . . . . 308