N965schC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,              New York, N.Y.

          v.                           17 Cr. 548 (JMF)

JOSHUA ADAM SCHULTE,

               Defendant.

------------------------------x

                                       September 6, 2023
                                       10:15 a.m.


Before:

                    HON. JESSE M. FURMAN,

                                       U.S. District Judge



                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DAVID W. DENTON, JR.
     MICHAEL D. LOCKARD
     NICHOLAS S. BRADLEY
     Assistant United States Attorneys

THE LAW FIRM OF CESAR de CASTRO, P.C.
     Attorneys for Defendant
BY:  CESAR DE CASTRO
     SHANNON McMANNUS

ALSO PRESENT:  KAYLA COLLINS, Paralegal Specialist
               KIMBERLY TABARES, Paralegal Specialist
```

N965schC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4          MR. DENTON:  Good morning, your Honor.  David Denton,

5    Michael Lockard, and Nicholas Bradley for the government.  With

6    us is paralegal from our office, Kayla Collins.

7          THE COURT:  Good morning.

8          MR. DeCASTRO:  Good morning.  Cesar DeCastro, Shannon

9    McManus, and our paralegal Kimberly Tabares for Mr. Schulte,

10   who is seated between us.

11         THE COURT:  Good morning, you may be seated.

12         All right.  We are here for final pretrial conference.

13   My understanding is that Mr. Schulte was delayed for some

14   reason getting here from the MDC.  I do plan to speak to the

15   marshals and the MDC just to ensure we don't have any issues of

16   that sort going forward until trial is over.

17         We have a bunch of stuff to cover today so I will jump

18   right in.  Unless there is objection, I will start with an

19   allocution of Mr. Schulte a *Lafler Frye* allocution just to be

20   sure that if there was any plea offer made by the government,

21   that he has been advised of that and it is his decision to go

22   to trial.

23         Any objection to that from the government?

24         MR. DENTON:  No objection.  I would just note that

25   there was no formal plea offer, in the *Lafler Frye* sense,

N965schC

1    extended with respect to this case, your Honor.

2              THE COURT:  And by this case you mean the three

3    charges that are to be tried?

4              MR. DENTON:  Yes, your Honor.  There was an offer made

5    prior to the 2022 trial that would have been a global

6    resolution that the defendant rejected.  There has been no

7    subsequent plea offer since the resolution of the 2022 trial.

8              THE COURT:  All right.  And I assume that global plea

9    offer expired, if not before, then certainly with the 2022

10   trial; is that correct?

11             MR. DENTON:  Long before, your Honor; yes.

12             THE COURT:  Mr. DeCastro, any objection to my

13   inquiring on this front?

14             MR. DeCASTRO:  No, judge.

15             THE COURT:  All right.  And Mr. DeCastro, is it

16   accurate to say that no plea offer has been made in connection

17   with the remaining charges, the three charges to be tried next

18   week?

19             MR. DeCASTRO:  That's correct.

20             THE COURT:  All right.  And did you nevertheless

21   discuss with Mr. Schulte whether he should go to trial and/or

22   plead guilty, or alternatively plead guilty, notwithstanding

23   the absence of a plea offer?

24             MR. DeCASTRO:  We have discussed it, yes.

25             THE COURT:  And obviously don't tell me what it is,

N965schC

1   but did you make a recommendation to him as to whether he

2   should plead guilty or go to trial?

3          MR. DeCASTRO:  I'm pausing because those are

4   conversations that we have at the lead up of every trial, of

5   course, and we have been having a lot of problems getting in

6   contact with Mr. Schulte.  Yesterday we had a call, which my

7   understanding is he was produced to Brooklyn -- we didn't know

8   about -- they scheduled and confirmed the call.

9          THE COURT:  Can you speak into the microphone?

10          MR. DeCASTRO:  They scheduled, then confirmed a call

11   we never had.  This morning we were here at 8:30 trying to see

12   he him, we never got to see him, they brought him directly

13   here.  And so those are conversations that we certainly have to

14   continue but -- and, of course, I came in sort of little bit

15   later, as the Court knows, and I know those conversations had

16   taken place between prior counsel and Mr. Schulte, and then

17   Mr. Schulte was pro se, and so there is further conversations.

18   I just want to make sure that the record was clear on that.

19          THE COURT:  All right.  I will get in touch with the

20   court liaison from the MDC to also ensure that there are no

21   issues between now and the conclusion of trial with respect to

22   your communications with Mr. Schulte, that is, beyond the

23   ordinary ones given his circumstances, but I certainly want to

24   make sure that if there is an attorney call that it happens and

25   that you don't have any hiccups on that front.

N965schC

1          MR. DeCASTRO:  It's one of those things where, quite

2     frankly, it is just let us know if it is not going to happen.

3     These are things that it seems like when a holiday happens, the

4     entire MDC is incapable of responding to any e-mails or calls.

5     I don't mean to -- I just want the Court to have some

6     information when you are talking to the liaison.  It is just

7     quite frustrating, for example, days of calling to try to

8     figure out where his clothes are.  I think that is completely

9     unacceptable.  And we are trying to call the legal department

10     and that's what we are trying to do.  I have a paralegal trying

11     to figure out they basically -- it's *hey, you can be here at*

12     *this hour, this time, bring the clothes or it's never going to*

13     *happen,* and, you know, dropping the whole world when they tell

14     us to drop it as we are an inmate, is really very difficult and

15     so that's some of the hoops we are trying to go through and we

16     are trying to just manage as best we can.

17          THE COURT:  All right.  I think some of it may be

18     because the head of the legal department is on leave and I

19     suspect that that has not helped matters, let's put it that

20     way.  But, that being said, that is unacceptable and I will

21     contact them and look into it.  Just so I understand, there was

22     a call that was supposed to happen yesterday and he wasn't

23     produced?  Or what happened?

24          MR. DeCASTRO:  So, my understanding is he was produced

25     for his case in the Eastern District and so I -- and

N965schC

1    Mr. Schulte confirmed that for me, that he was in the Eastern

2    District.  Nobody called us, so we sat by the phone for an hour

3    waiting - because they do often call early in the morning

4    sometimes and just say, *Hey, can we do the call now?*  Or they

5    call very late.  So we just waited and we tried to call and of

6    course no one answers.  So, we just sat around.  But my

7    understanding is he was in court yesterday.

8              THE COURT:  Mr. Denton?

9              MR. DENTON:  Just on that point, your Honor.

10             We have been in contact with our colleagues in the

11   civil division in the Eastern District where the defendant has

12   a number of proceedings pending and in which I understand that

13   Judge Komitee has scheduled a number of actual in-person

14   proceedings, sometimes on relatively short notice.  It is

15   obviously unfortunate that that was not communicated to the

16   defendant's criminal counsel here.  We have certainly kept our

17   colleagues apprised of the schedule in this case, including the

18   proceeding today and the schedule for trial, but certainly any

19   assistance that the Court can provide with the MDC would be

20   very helpful on that score.

21             THE COURT:  Well, I will be in touch with the MDC.  I

22   will also get in touch with Judge Komitee and make sure that he

23   knows about our trial starting Monday and therefore doesn't

24   schedule anything that would conflict with it since trial,

25   obviously, takes precedence.

N965schC

1          Anything else, Mr. DeCastro?  Or I will inquire

2     briefly of Mr. Schulte.

3          MR. DeCASTRO:  No.  I think just when you do talk to

4     the liaison, just to put on the list again, that we are at the

5     point where it is pointless to mail anything to him, he just

6     never gets it.  I mean, he gets some things, certainly, but --

7     and it is just so difficult when we don't know who is in that

8     room that is there.  So, if we show up and someone is using the

9     one room that is available for us, then we have to leave and

10    so -- I mean -- we are trying the case so we are ready to just

11    give him and show him things, which he is looking at right now,

12    things for the first time.

13         THE COURT:  All right.  So I was about to say for

14    better or for worse, you are going to be seeing each other

15    daily, and in that regard I assume not mailing anything and

16    some of these issues will be less of an issue during trial, but

17    be that as it may, I will certainly contact the Court liaison.

18         Mr. Schulte, let me ask you a few brief questions.

19    First, in the last 48 Hours have you taken any drugs, medicine,

20    pills, or had any alcohol?

21         THE DEFENDANT:  Just typical medication prescribed to

22    me.

23         THE COURT:  Is that the same medication that you have

24    been on during prior proceedings with me?

25         THE DEFENDANT:  Yes.

N965schC

1          THE COURT:  Is your mind clear today?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And do you understand what's happened here

4    thus far today?

5          THE DEFENDANT:  I do.

6          THE COURT:  Did you hear my discussion with Mr. Denton

7    and Mr. DeCastro, for that matter, regarding the absence of any

8    plea offer in connection with the three charges on which you

9    will be tried next week?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Is it correct to say that you would like

12    to go to trial and that you do not plan to plead guilty, or at

13    this time at least are not pleading guilty; is that correct?

14          THE DEFENDANT:  That's correct.

15          THE COURT:  All right.  Does either counsel believe I

16    should ask Mr. Schulte any additional questions on that front?

17          MR. DENTON:  No, your Honor.

18          MR. DeCASTRO:  No Judge.

19          THE COURT:  Great.

20          In that case, I am prepared to jump into the open

21    motions *in limine* but I don't know if it pays to get an update

22    first.  The government's letter of last week suggested that

23    there might be some stipulations and other things that might

24    alter the nature of things, but perhaps you have already told

25    me the ways in which that would potentially affect the motions

N965schC

*in limine*.  If the motions *in limine* are unaffected and there is nothing to update I can proceed but I thought I would check.

MR. DENTON:  No, your Honor.

I think the Court's order of yesterday was in accord with our expectations for how our decision to forego certain evidence would affect the motions *in limine*.  Certainly with respect to the open question as to Dr. Kiper's testimony that was our intention foregoing some of that, was to take some of those issues off the table.  With respect to the stipulation, I think that's a little bit been affected by counsel's ability to communicate with the defendant.  In the event that we are able to reach that stipulation, I think we would be able to cut four witnesses who would otherwise be necessary for authentication and admission of digital evidence and that would leave us, as we said in our letter, with the three witnesses who will comprise the majority of the government's case-in-chief.

THE COURT:  Let me deal with the motions *in limine* and then we can turn to those sorts of issues.  In light of my order yesterday and my order of August 18, there are, I believe, only a few remaining live issues, the first and most significant concerns the display of the alleged child pornography or I guess it is not alleged, it seems to be conceded, that is to say the child sexual abuse materials.  I think there are two questions that are framed by the parties' briefing and my order directing the government to file a reply;

N965schC

first, whether the materials are admissible at all; and second,

if so, in what manner they can be displayed, that is to say

whether they can be displayed to all the trial participants and

withheld from the public.  The threshold question is obviously

whether the materials are admissible at all so I will start

with that.

The defendant's offer, or at least implicit offer to

stipulate that the materials are child pornography and that

anyone seeing the materials would know that it is child

pornography certainly makes this case closer than in -- and in

particular many of those cases cited by the government where,

as far as I can tell, the second part of the offer to

stipulate -- and again, I am sort of assuming that that is

implicit in the defendant's opposition -- the second part,

namely the concession that anyone who viewed the materials

would know that they are child pornography, I think most, if

not all of those cases, didn't have that component.

There is no question that that stipulation or, again,

effective offer to stipulate, has to be considered in the

Rule 403 balancing analysis, but I find it hard to see -- I

will certainly hear from defense counsel in short order, hard

to see how total preclusion of the evidence can be squared with

the principles articulated by the Supreme Court in its decision

in *Old Chief*.  There, the Supreme Court reaffirmed the standard

rule that "a criminal defendant may not stipulate or admit his

N965schC

1    way out of the full evidentiary force of the case as the

2    government chooses to present it."  That is 519 US at 186-87.

3    The Court further recognized that "the prosecution, with its

4    burden of persuasion, needs evidentiary depth to tell a

5    continuous story."  That is page 190.  And it recognizes that

6    that evidence has force beyond any linear scheme or reasoning

7    with power not only to support conclusions but to sustain the

8    willingness of jurors to draw the inferences, whatever they may

9    be, necessary to reach an honest verdict."  At page 187; that

10   that evidence can be used "not just to prove a fact but to

11   establish its human significance and so to implicate the law's

12   moral underpinnings and a juror's obligation to sit in

13   judgment, thus the prosecution may fairly seek to place its

14   evidence before the jurors as much to tell us a story of

15   guiltiness as to support an inference of guilt to convince the

16   jurors that a guilty verdict would be morally reasonable as

17   much as to point the discrete elements of a defendant's legal

18   fault."  Pages 187 to 188.

19          That reasoning would seem to compel the conclusion

20   that the government is entitled to prove its case by presenting

21   at least some of the CSAM to the jury, notwithstanding the

22   defendant's willingness to stipulate to both the fact that the

23   materials are child pornography and that a viewer would readily

24   recognize the fact that it was child pornography.  Among other

25   things, he is not stipulating to his own knowledge of that fact

N965schC

1    and on that score see the case that I cited in my order

2    yesterday, *United States v. Gonzalez* 2021 WL 948763 at pages 2

3    to 4, the District of Arizona decision dated March 12, 2021, in

4    which my former rules committee colleague, indeed the former

5    chair of the standing committee, reached that conclusion in

6    similar circumstances, that is where the defendant apparently

7    conceded or stipulated that material was child pornography and

8    that somebody who viewed it would know that.  And, as that case

9    demonstrates, that doesn't mean that the government can do what

10   it wants without any limits.  For instance, it may be that I

11   should limit the number of files that may be shown to the jury,

12   for how long and how many times, but it would seem to suggest

13   to me that total preclusion, as the defense argued in its

14   opposition without, I would note, any citation to *Old Chief* or

15   its progeny, would be inappropriate and, indeed, would be

16   error.

17        Mr. DeCastro, let me pause there and ask you what, if

18   anything, I am missing.

19        MR. DeCASTRO:  Judge, I don't know that you are

20   missing that much except -- well, there is something I think I

21   can tell you that you are missing which is that, number one, we

22   are not saying that the government can't present its evidence.

23   Just the form of how they present it.  Now, of course I think

24   everybody in this courtroom will agree that, and the government

25   has agreed that they want to limit it anyway given the nature

N965schC

of the evidence in the first place.  There is ways that they

can step, even with us saying, yes, it's child porn, anybody

viewing it would know it is child pornography.  The names of

the file themselves are very prejudicial in and of themselves,

the file name.  This isn't a situation where you have file

names that it is -- I don't know -- courtroom and then you open

it and it is something else.  They're very descriptive.  And so

that, in and of itself, is going to be in front of the jury.

The government intends, with its experts, to show the filed

listings, to show all the names of the files, and then what

they then want to do is put up some of the photos and I

understand the need to do that or wish to do that but I don't

see why, given the overwhelming prejudice, that it would

provide.  The minute the jury sees that image, from our

perspective, they're off.  That's it.  And they're not going to

be focusing on the nuances which the parties have now limited

the issues and surgically limited those issues to what matters.

        And so, the Court can fashion a way that the jury can

understand, even give an instruction as to what the defendant

is conceding in this issue on this point, can talk the

government can put up all the file names.  They can describe

the material.  It is not that they're not -- it is not

preclusion.  I think the Court described it as preclusion.  It

is coming in, but what the Court could say is you can't

sensationalize it.  The government's point is, well, this is

N965schC

1    the material, it is what it is, we are allowed to show it.  But

2    there is plenty of drug cases where they don't have to put the

3    drugs all out on the table.  They're drugs, they put up a

4    forensic scientist who comes up and says they're drugs.

5            THE COURT:  In my experience, they always put the

6    drugs on the table.

7            MR. DeCASTRO:  They don't have to.  There are times

8    when there are ways to limit it and so drugs, guns are bad

9    enough.  We argue all the time on this side you can't put all

10   the guns up on the rail and many judges say it's fine, put them

11   all up on the rail but this is different.  This material is so

12   inflammatory and it is so prejudicial that you run the risk of

13   the jury turning off and --

14           THE COURT:  Can I ask you a question?  Can you cite

15   any case, other than the Ninth Circuit case that I cited in my

16   order yesterday, where a Court did find it error to allow the

17   government to show, in some limited fashion -- let me be very

18   clear that if the government is permitted to show these images

19   to the jury, they will not be permitted to sensationalize it

20   and I am prepared to set pretty strict limits on the number of

21   images, how long they can be shown, and how many times they can

22   be shown.

23           So, assume for the moment that there will be strict

24   limits in that regard.  Can you cite any case in which the

25   government was not permitted to or it was found to be error for

N965schC

1    the government to show it?  And I don't think the Ninth Circuit

2    is authority for that because they're the Ninth Circuit.  In

3    part they found that the balancing test was just the judge

4    didn't properly balance in allowing the jury to see the videos

5    because there was no evidence that the defendant had actually

6    viewed the videos and it was sufficient to show just the covers

7    of the videos.  So in that regard, there were child sexual

8    abuse materials that were shown to the jury, it was just a

9    question of, essentially, the scope or the particulars.

10          MR. DeCASTRO:  The answer is no, but the flip side is

11   that I don't have a case where a Court said that, *You know*

12   *what?  What's the point of showing these when they're*

13   *overwhelmingly prejudicial?*  What is the point when you have

14   the case names, the witnesses who are experts who can describe,

15   the fact that the defense stipulates that the element is gone.

16   I don't have any cases saying that is error to do that.

17          THE COURT:  I think the point, first of all, it is not

18   up to me, it is up to the government, if they're permitted to

19   do it, whether they want to do it.  But I think the point, to

20   quote Justice Souter, is to tell a story to the jury and to

21   convince the jury that a guilty verdict would be morally

22   reasonable as much as justified by the evidence.  In other

23   words, I think the point is that -- and this is the way I read

24   *Old Chief* -- is that defendants can't force the government to

25   try a sterile case, that the government is entitled to

N965schC

1  demonstrate to the jury what is serious about this case and why

2  the conduct is serious and worthy of punishment.  So, I think

3  that's the upshot.

4           MR. DeCASTRO:  That's where I go back to, again, there

5  is not -- you have some cases where the defendant is trying to

6  obfuscate what the files are or something like that.  I mean,

7  this is just clear from the names, and they are --

8           THE COURT:  Can I just clarify, just so I understand

9  precisely what your argument is?  You are not seeking to

10  preclude the file names themselves, I take it, just the images?

11           MR. DeCASTRO:  Yes, just the images.

12           THE COURT:  All right.

13           Mr. Denton, anything you want to say on this score?  I

14  think you are probably sensing where I am headed but I think

15  I'm not inclined to preclude you from showing any of the

16  images.  Obviously you may buy yourself an affiliate issue on

17  that score if you do, but my inclination would be to permit you

18  but with strict limits on how many, for how long, and how many

19  times, and then we can talk about that in a moment.  But,

20  anything you want to say on the broader issues?

21           MR. DENTON:  No, your Honor, only to say that I think

22  we have a plan to do just that, which I think in the 403

23  balancing, the prejudicial effect is minimized by the proposal

24  that we have for how we would handle this and so I think to the

25  extent the Court wants to turn to that issue I'm happy to speak

N965schC

1    to it, but I think Court is correct about what the appropriate

2    mode of analysis is and what *Old Chief* entitles the government

3    to do in presenting it case.

4            THE COURT:  Why don't you turn to that and tell me

5    what your proposal is.

6            MR. DENTON:  So, your Honor, Special Agent Spivak has

7    prepared two thumb drives, Government's Exhibits 1001 and 1002,

8    which contain the files from the two different locations on the

9    defendant's desktop that were identified as containing child

10   pornography.  1001 is from the Linux virtual machine, 1002 is

11   from the separate encrypted container called Volume on the

12   desktop.  There is approximately 3,000 odd files of what

13   Special Agent Spivak would testify are true child pornography,

14   and then approximately 14,000 files of what he will testify

15   are, what he would identify as child erotica, that is to say --

16   and he will explain this with more professional definition --

17   but photographs of underage children that are almost, but not

18   quite, child pornography.  We would propose to offer those

19   thumb drives into evidence so that they are available and part

20   of the record in the case.  But otherwise, other than doing

21   exactly what Mr. DeCastro suggested, which is having him talk

22   about file listings and file names and some description of what

23   the files were that he saw, there would only be four files that

24   we propose to display to the jury.  Three images and one clip

25   from a much longer video.  The first two images have actually

N965schC

1    not descriptive file names, they are long strings of letters

2    and numbers that were nevertheless saved within a subfolder on

3    the virtual machine called "11 YR".  One of those images is an

4    image of the prepubescent female that Special Agent Spivak

5    would characterize as child erotica, and one of them is a

6    photograph from the same series of the same female that he

7    would identify as child pornography.  Part of the point is not

8    just to display the images but to allow Special Agent Spivak to

9    illustrate the distinction that he drew in analyzing materials

10   on the defendant's desktop.

11           With respect to those files, we expect there will also

12   be evidence that that 11 YR folder shows evidence of having

13   been last accessed shortly before midnight on April 30th,

14   2016 -- April 30th into May 1st from the virtual machine, which

15   is during a time period in which Mr. Berger, the government's

16   computer science expert, will testify that there is evidence of

17   the defendant locking and unlocking that virtual machine

18   repeatedly.

19           The video file, which is the third one, also comes

20   from the virtual machine and it is a file entitled, I believe,

21   "Jenny Full."  It is a video clip that goes on for quite some

22   time of which the government would propose to play I think

23   approximately seven to 10 seconds from the start of the video,

24   and per the Court's order we have those materials available

25   here today, we can show the Court exactly what we intend.  That

1    video we would plan to use for a couple of different reasons.

2    First of all, Special Agent Spivak would testify that that

3    video comes from what he would identify as a "known series"

4    that the Jenny collection of child pornography is infamous and

5    that it is one of the ways that they identify the age of minors

6    and child pornography comes from whether these files are ones

7    that have previously been identified.

8            Separately, that same file Mr. Berger will testify

9    came from -- or excuse me was identified in a Linux system

10   filed called recentlyused.XPEL which is essentially sort of the

11   book marking feature in Linux that shows recently accessed

12   files in a dropdown menu.  So there is forensic artifacts

13   showing that the Josh user of the virtual machine actually

14   played that video using the LC player on the virtual machine on

15   the defendant's desk top.

16           The fourth picture is another image file which comes

17   from the Volume container.  Quite simply part of the purpose

18   there is to include an example of child pornography from the

19   other location on the defendant's desktop where child

20   pornography was found.  That is a photograph that appears to be

21   actually a collection of screen shots from a video, it is a

22   single image file but it has, I believe, nine images within the

23   same picture, and of particular relevance is that that file

24   comes from a folder that includes the URL from which it was

25   downloaded and also a date created, modified, and accessed, all

N965schC

1    coming long after the defendant's move to New York, I believe

2    it was, in December of 2016.  And so, as part, the additional

3    relevance beyond simply illustrating the child pornography

4    effect is to include that in the discussion of the defendant's

5    continued use and access of child pornography files after both

6    the transfer of the virtual machine and his move to New York

7    and the storage of those files on a second location on his

8    desktop.

9            So again, your Honor, the sum total we are talking

10   about displaying is three images, and seven to 10 seconds of

11   one video.  I expect that we would do that once during Special

12   Agent Spivak's testimony and then would not make further use of

13   it during the trial.  They are hard to forget and so I don't

14   think we need to readdress them during jury addresses or other

15   parts of the trial.

16           THE COURT:  With respect to the other, I think, close

17   to 17,000 files, you would just have them described by way of

18   Agent Spivak's testimony and a display of the file directories

19   and file names?

20           MR. DENTON:  That's correct, your Honor; yes.

21           THE COURT:  I can't say that I'm eager, but can I see

22   what you would propose to show the jury, just so we are all on

23   the same page and understand precisely what we are talking

24   about?

25           MR. DENTON:  Yes, your Honor.  Give us a moment?  We

N965schC

1   need to do that on a separate laptop pursuant to the Adam Walsh

2   Act, but we have that here and we can do that now.

3           THE COURT:  Thank you.

4           MR. DENTON:  While we are getting this ready, your

5   Honor, Mr. Lockard makes a good point -- we do not intend to

6   play the video with sound on so we would purely show that clip

7   without any audio attached to it.

8           (Continued next page)

N965schC

1              (At side bar)

2              MR. DENTON:  So, your Honor, this is the first image

3    which Special Agent Spivak would describe, what he would

4    characterize as child erotica rather than child pornography.

5    This is a photograph from the same series of the same female

6    that he would describe as child pornography.  And then just

7    while we are here, this is the third image, which comes from

8    the Volume container.

9              THE COURT:  Is that the same person?

10             MR. DENTON:  No.

11             THE COURT:  OK.

12             MR. DENTON:  This comes from a different folder and a

13   different set, this is from the set of files that appears to

14   have been downloaded in December of 2016.

15             THE COURT:  OK.

16             MR. DENTON:  And then the video, your Honor, what we

17   would propose to do is clip out this title screen from the

18   video and then play from 14 seconds and then play it,

19   approximately, I think from there to there, and just stop

20   there.

21             THE COURT:  OK.

22

23

24

25

N965schC

```
 1              (In open court)
 2              THE COURT:  For the record, I just viewed the three
 3     images and the video excerpt with counsel at side bar,
 4     including defense counsel.
 5              Mr. Denton, anything further you want to add?
 6              MR. DENTON:  No, your Honor.
 7              THE COURT:  Mr. DeCastro?
 8              MR. DeCASTRO:  No, your Honor.  Thank you.
 9              THE COURT:  Well, let me ask you.  I think consistent
10     with my remarks before, I will not preclude the government from
11     all display so the question now is just what they're permitted
12     to display and in what manner and for how long.  It does strike
13     me that the government's proposal is within the bounds of the
14     Gonzalez decision, not that that necessarily is the be-all and
15     end-all of the principles here, but it does seem like a sound
16     balancing of things that are at stake, that is to say, limiting
17     the government to displaying four of the 17,000 images and only
18     briefly only once, and images for which the government at least
19     claims to have evidence of forensic artifacts demonstrating
20     access, and given Mr. Denton's description of their particular
21     relevance, that strikes me as a reasonable balance under 403.
22     But, Mr. DeCastro, do you wish to say anything on that score?
23              MR. DeCASTRO:  No.  I wouldn't add anything to the
24     record already.  Obviously we have made our position that none
25     of them should be shown, but that's it.
```

1          THE COURT:  All right.  Understood.  For the reasons I

2    have described, I will permit the government to show those four

3    files, that is to say the three still images and the one video

4    but only that seven-second excerpt, only video, no audio.  And

5    I don't know if you can excerpt the seconds that you plan to

6    show to ensure that there is nothing shown before and after and

7    make sure that only that portion is shown.  That strikes me as

8    probably the safest way to proceed but, otherwise, I trust that

9    you will set it up in a way that ensures that it is only those

10   seven or so seconds.

11         MR. DENTON:  That is what we plan to do, your Honor.

12   We were just awaiting Court's ruling before today before

13   executing on that task.

14         THE COURT:  To be clear, consistent with what the

15   government proposes, they'll be shown only once, they'll be

16   shown briefly, that is, for a couple seconds or so each, a few

17   seconds each, and will not be shown during the jury addresses.

18   I think that suffices to address the 403 concerns here and

19   balances with the government's rights to use the evidence to

20   prove the elements of these crimes.

21         That brings me to the second question, which is to say

22   the public's right, if you will, to see evidence admitted at

23   trial.  On that score, I am inclined to do what I proposed in

24   my August 18 order, which is to say deny the government's

25   request to conceal the evidence in all respects from the public

N965schC

1    gallery but, instead, allow the government to obscure, in the

2    images shown to the public gallery, the individuals' identity,

3    that is to say, blurring the faces or redacting the faces.  I

4    will discuss in a moment whether that is doable.  I would

5    imagine in 2023 it is, but we can discuss the mechanics of how

6    that would be done in a moment, assuming that that is where I

7    end up.

8              The government's argument in the first instance

9    focused on the harm to the victims by virtue of the fact that

10   they would be identifiable but that harm is substantially

11   mitigated, if not eliminated, by the measures that would

12   prevent any observer from identifying them.  I think mitigated

13   is more accurate than eliminated because, as the government

14   argues in its reply, there is some harm to the victims just by

15   virtue of the images of their victimization being shown or

16   knowing that they are visible or shown to people and members of

17   the public.  The issue is that on the flipside there is,

18   contrary to the government's argument, indeed, a substantial

19   value in public access, to be clear.  That value is not derived

20   from the material itself, the government may well be right that

21   there is no constitutional value in viewing the materials in

22   their own right.  Instead, the value is rooted in the fact that

23   this is a criminal trial and in order to convict the defendant,

24   the government is required to prove beyond a reasonable doubt

25   that the material is child pornography and is admitting the

N965schC

exhibits for that purpose.  That is to say, two of the values

that the *Waller* Court identified as being furthered by public

access to trials are ensuring a fair trial and reminding the

prosecutor and judge of their responsibility to the accused and

the importance of their functions.  I think prohibiting the

public from seeing evidence offered by the government to prove

an essential element of what are serious crimes is not

consistent with those values, whatever value the evidence may

have in its own right.

The government cites *United States v. Troup*, but that

case is from the Northern District of Illinois and over a

decade old and, obviously, is not binding on me, nor is it

particularly persuasive, in my view, on this point.  The

government also quotes that case for the proposition that a bar

on public access is "the least restrictive alternative," but

that portion of the decision pertained to display of

pornographic images of the defendant himself so obscuring the

identity of the person depicted was not a viable option as it

is in these circumstances.  For *Troup*, that is at 2012 WL

3818242 at page 7, Northern District of Indiana, August 31,

2012.  I think I said Northern District of Illinois before but

I misspoke, it is Indiana.  No disrespect intended to either

state.

The government also cited the Second Circuit's summary

order in *Killingbeck*, but that case merely held that the

N965schC

government's proposal here, basically what the government

proposes to do here was not plain error in that case because it

didn't prejudice the defendant's substantial rights.  The

circuit assumed, without deciding, that excluding the public

from viewing the exhibits was error, which is not to say that

it held it was error, but it is assumed for purposes of that

decision that it was error, which is to say it doesn't support

the proposition that that is the appropriate course here.  See

616 F. App'x at page 16.

So, for those reasons, I am inclined to do what I

proposed to do, and we can discuss how that would be

implemented if I adhere to that, but I will give Mr. Denton, if

you want, an opportunity to respond.  I am happy to hear from

you.

MR. DENTON:  Yes, your Honor.

I think the only response I would add would be to

propose a slightly more intermediate alternative.  I think this

is an unusual application of the *Waller* factors because that,

obviously, sort of presumes a public right of access in the

first place which it does not traditionally obtain with respect

to the material that is contraband.  So, to go back to our

example of drugs on the table, the public would certainly have

a right to see that the drugs were introduced but would not

have a right to access the drugs themselves, notwithstanding

the fact that they were an exhibit in evidence.  Here, the

N965schC

1    files themselves are obviously --

2          THE COURT:  Well, no one is proposing to give them to

3    the public.  If there is a request for the exhibits, that

4    request would be denied for precisely the reasons you are

5    describing.  The only question is, akin to seeing the drugs on

6    the table, if the public can see what is being displayed to the

7    jury.  That, I think, there is a value derived from the fact

8    that we have public trials in this country and the public is

9    entitled to see what the government is presenting to the jury

10   in an effort to convict the defendant of what are serious

11   crimes.

12         So, that's what I understand to be the principle at

13   stake here.

14         MR. DENTON:  Yes.  Understood, your Honor.

15         So the alternative to a display of the redacted images

16   that we would propose -- and this may have salutary benefits

17   with respect to the record as well -- is to have Special Agent

18   Spivak describe what is being seen.  So rather than actually

19   showing the public the images themselves -- we can talk about

20   why that would be a little bit complicated for other reasons --

21   we can have Special Agent Spivak describe it in such a way that

22   it is then in the record, in the transcript for anyone who is

23   not present in court but reviewing, and any members of the

24   public who are present would be able to hear literally what is

25   being shown and being described.  That way, again, the

N965schC

1    information would be available to the public without making the

2    contraband image, even in redacted form, available to people

3    who are in the gallery.

4         THE COURT:  OK.  And what are the technical

5    difficulties that you alluded to?

6         MR. DENTON:  So I think, your Honor, in order to

7    comply with the Adam Walsh Act, we need to display the child

8    sexual abuse materials on a separate laptop that is not

9    otherwise connected to things that material could be

10   transferred to, basically, just an air gap laptop for that

11   purpose.  I think we will have to hook that up to the display

12   system in the courtroom separately.  And so, I don't know that

13   we would have a way to hook up two different systems and

14   display two different sets of things at the same time, one set

15   to sort of essentially those before the bar and one set to

16   those behind it.

17        And so, I think given that limitation, what we would

18   really be talking about is exactly what your Honor said is not

19   going to be acceptable, which would be making available a

20   redacted version sometime after the display in court and so I

21   think, like I said, a middle ground we would propose would be

22   to have Special Agent Spivak simply do the description while

23   that is taking place.

24        THE COURT:  And why would it not be possible to

25   have -- just talking out loud, thinking out loud here -- but to

N965schC

1    have the same laptop have two versions of the images and,

2    frankly, both could be admitted into evidence, one is, say,

3    Government Exhibit 1001, the other 1001A, and briefly show each

4    to the jury and in the case of the redacted or blurred one, the

5    display to the public would also be turned on.

6           MR. DENTON:  If I can have a moment, your Honor?

7    Ms. Collins is going to know much better how this works than I

8    do.  If I can have a moment to consult with her about this?

9           THE COURT:  Sure.

10          (Counsel conferring)

11          MR. DENTON:  So, your Honor, I think what you are

12   proposing would be possible with respect to the images, that we

13   could create two different versions, display one I guess sort

14   of the before the bar, and then essentially display it again,

15   in the redacted version, available to everyone in the

16   courtroom.  I don't think there is a way to have the system

17   display two different things from the same computer at the same

18   time.  With respect to the video, my understanding is that

19   redacting video is a much more complicated endeavor and we

20   might not be able to get that done on the air gap system so

21   that presents sort of a separate technical challenge.

22          THE COURT:  All right.  Tell you what.  Here is my

23   thought.  First of all, of the three still images that you

24   showed me, I don't think -- correct me if I am wrong -- that

25   the person is identifiable in the nine composite image

N965schC

1    pictures.  That is to say, it looked to me like it was a minor

2    but wasn't clear to me that that person would be identifiable.

3    That being said, maybe out of an abundance of caution we could

4    blur or redact the face there.  There is no question in my mind

5    that the video is the most disturbing of the four exhibits that

6    you showed me and in that regard I think there is some tension

7    between what I am proposing to do here to ensure the public's

8    right of access with my Rule 403 balancing, that is to say, if

9    we showed that twice, I think it is intentioned with my desire

10   to minimize the display of those exhibits to the jury.  I have

11   less of a concern on that front with respect to the still

12   images because, while disturbing, I don't think they're

13   anywhere near the level of disturbing of that video.  So what I

14   would propose is doing what I have described with respect to

15   the still pictures, that is to say, having on the same computer

16   two versions and we will show them both briefly to the jury and

17   have the public monitor turned on when the blurred version is

18   shown and show the video only to the jury and have Agent Spivak

19   testify and essentially describe what is being depicted in the

20   excerpt that is shown.  Not quite the same as showing it to the

21   public but I also think that, again, recognizing that the two

22   are sort of working in cross-purposes, that might be the right

23   balancing here.

24            Your thoughts?

25            (Counsel conferring)

N965schC

1          MR. DENTON:  I think we can make that work, your

2     Honor.

3          THE COURT:  Mr. DeCastro?

4          MR. DeCASTRO:  That's fine, Judge.

5          THE COURT:  All right.

6          MR. DENTON:  Your Honor, if I may, the only caveat I

7     would say is I assume that is in connection with the Court will

8     give all appropriate and strong instructions to the jury about

9     how they should consider these materials and so on.  It may be

10    appropriate to add a sentence explaining why they're being

11    shown them, in two different versions, twice.

12         THE COURT:  I'm certainly open to that.  Why don't you

13    and Mr. DeCastro confer and if you can come up with proposed

14    language covering all of that, that is to say whatever

15    cautionary language you think I should provide to them when

16    these things are shown, I am certainly open to it.  If you can

17    agree on language, all the better, and if there is disagreement

18    I will decide what to do.  OK?

19         MR. DENTON:  Yes, your Honor.

20         THE COURT:  Great.  So I think that covers the CSAM

21    issue.  There are, I think, three other open items from the

22    motions *in limine*, the next is the so-called alternative

23    perpetrator issue.

24         To the extent that the government was motivated by a

25    concern that the defense might argue that the CSAM was planted

N965schC

1    by the CIA or otherwise, that concern seems to be moot, that is

2    to say, it doesn't appear that that is any argument that the

3    defense plans to make.  As the defense seems to concede that

4    Mr. Schulte downloaded the CSAM at issue onto his home computer

5    and the only issue is, essentially, whether he ever viewed it,

6    whether he knew what he was downloading, whether he was

7    responsible for putting it on the server from which they were

8    downloaded, on that score it doesn't seem like the defense is

9    proposing an alternative perpetrator defense in the

10   conventional sense but perhaps I am missing something.  And, to

11   the extent that it does qualify, I am inclined to think that

12   there is -- that Dr. Kiper's report suffices to prove a nexus,

13   that is to say, I don't think the law requires that the defense

14   has to identify who the person was, but Dr. Kiper's expert

15   report seems to provide some evidentiary basis to argue that

16   these files were put on the server by someone other than

17   Mr. Schulte.

18            Mr. Denton, am I missing something here?

19            MR. DENTON:  No, your Honor.

20            I think our point was precisely what your Honor made,

21   which is to the extent the defense was proposing to identify,

22   literally, an alternative perpetrator, whether FBI, CIA

23   whomever planting it or, frankly, any particular other user of

24   the defendant's system, as opposed to simply saying that the

25   government has not proven that it was the defendant, that the

1    former would be subject to sort of the strictures on

2    identification of an alternative perpetrator whereas the latter

3    would not.  It sounds like we are in the latter category and so

4    this may be easy.

5         THE COURT:  Am I correct, I take it it is not

6    essential to the government's theory or, for that matter, the

7    element of the offenses to demonstrate that he placed the

8    images on the server from which they were downloaded to his

9    home computer.  As I understand it your theory, and the

10   charges, derive from the file's presence on his computer

11   itself.  Is that correct?

12        MR. DENTON:  Yes, your Honor.  I would also say, as a

13   factual matter, we expect to show that Dr. Kiper's conclusion

14   about the server is factually incorrect.

15        THE COURT:  That is fine but -- understood.  All

16   right.

17        Mr. DeCastro, it sounds like there may be no issue

18   here at all, but anything you want to clarify?  Or is my

19   understanding of the defense theory accurate?  Correct?

20        MR. DeCASTRO:  Yes.  I think so, Judge.

21        As to the former issue, the whole planting by a

22   government agency or a particular person, we haven't raised

23   that defense, nor do we intend to.  We certainly intend to show

24   access, who potentially had access, those forensic artifacts

25   from both the government and our expert that show that other

1    people had access, for example, to the server and whether other

2    people had access to the computer.  That just becomes an issue

3    of fact for the jury.  I don't think -- we are not saying X

4    user but we certainly can point to there are users and that the

5    government has not been able to identify Mr. Schulte sitting at

6    the computer doing X.

7            THE COURT:  Understood, and given that I think it

8    sounds like there is no issues in dispute here and the issue is

9    moot, but obviously if something changes or anyone makes an

10   argument that is concerning, you should raise it and we will

11   revisit it.

12           The next item is the so-called unprotected interview

13   statements issue.  Per my order from yesterday, the

14   government's motion on that score was granted as unopposed.

15   The defendant's argument was limited to the contention that

16   other statements may be admissible pursuant to the rule of

17   completeness embodied in Rule 106.  It is true, as the defense

18   submission noted, that that rule is, on it's face, limited to

19   written statements, but Courts have indeed held that it, more

20   than closely related, common law rule of completeness applies

21   to oral statements as well and I note that there is a pending

22   amendment to Rule 106 which, absent Congressional action, will

23   go into effect on December 1 that will make explicit that the

24   rule applies to oral statements.  So, I agree that if there is

25   a portion of the defendant's oral statement that should, in

N965schC

1    fairness, be considered at the same time as a portion admitted

2    by the government, that it may well be admissible on rule of

3    the completeness grounds.  But, the problem is I need to know

4    what we are talking about in order to evaluate whether, in

5    fairness, it would need to be admitted.

6         So, Mr. DeCastro, I don't know if you can at this

7    point identify what you think would be admissible on that

8    principle, but the government has certainly, at least in broad

9    strokes, described the statements it intends to elicit, and if

10   you think that there are any statements that are necessary to

11   add, you should identify them.

12        MR. DeCASTRO:  Yes.

13        So, it is a little difficult not knowing exactly what

14   is going to come out of the witness' mouth, of course.  We have

15   the primary 302 that identifies what they intend to elicit, and

16   so I think -- so, primarily the issue for us is, as I just

17   mentioned a little bit earlier, is some of the identifying

18   access to the computer itself.  So, for example, a portion of

19   his statement, which I understand the government intends to,

20   either in a very limited way or we will see, I suppose, have a

21   witness say that he never shared his password, there was no way

22   anybody accessed that desktop computer.  There is a couple

23   issues with that.  And then, later on in his statements, he

24   does talk about -- now these other systems we are talking about

25   which is that server that the Court had identified, maybe that

N965schC

1    originally the material had been downloaded and then

2    transferred or backed up to the desktop computer.  There is a

3    lot of access there and so there are -- we can look at it and

4    say there is lots of people accessing that server and so -- but

5    then there is the statements which I think the government

6    intends to elicit which is that no one else accessed my desktop

7    computer.  Now, that might be true physically, but I think

8    there is actual evidence, computer forensic evidence that would

9    say that that is not true, that there were people that were

10   accessing that desktop and that had accessed that desktop.

11   Some of this is a work in progress for us as it is I think for

12   the government.  We got some additional material last night

13   from their expert so we are working through a lot of that.

14            THE COURT:  Let me stop you.

15            MR. DeCASTRO:  Yes.

16            THE COURT:  There is a difference between there being

17   forensic evidence that there were people who could or did

18   access the desktop and the issue that we are discussing now,

19   which is whether there are statements that the government would

20   not offer that Mr. Schulte made that you think, in fairness,

21   need to come in given the statements that they do intend to

22   offer.  If Mr. Schulte said no one could access my desktop and

23   didn't say anything other than that, then that would certainly

24   be admissible against him.  The fact that there may be evidence

25   to the contrary is a different matter but it doesn't implicate

N965schC

1    the rule of completeness.

2                MR. DeCASTRO:  No, I get it.  I only give you that

3    just for some context because later he does talk about people

4    accessing, in his statements to the government, accessing the

5    server part.  Now, the part of the statement that I am

6    concerned about -- it just depends on how testimony comes in --

7    is my understanding is he said I don't think anybody had access

8    to the computer, or like that I had shared any passwords.  I

9    don't think that I ever shared my encryption passwords with

10   anyone.  Thinking is different than what the Court just

11   described.  And then there are subsequent statements where the

12   government is asking him about the server, that original server

13   where they do talk about his allowing others to access.  And

14   so, those are portions that we may want to elicit from that

15   witness regarding access because he might have been confused

16   between the two computers and that there are so many people

17   accessing with the sort of shared passwords which I think is

18   important for the jury to understand.

19                THE COURT:  How do you propose that we proceed here?

20   I mean, one option is that we can see what the government

21   elicits on direct and to the extent that you -- I mean, you

22   know, there is certainly no issue with you on cross saying he

23   didn't say that, you know, no one had access, he said he

24   thought no one had access, right, in clarifying the statement

25   that the government actually elicited.  That, I think everybody

```
1    would agree, is totally within bounds of proper cross.  The
2    question is whether you intend to go beyond that and try to
3    introduce a statement that he made that the government didn't
4    touch on at all.  I suppose one option, if you propose to do it
5    only through cross, is to the extent that after hearing the
6    direct you think there are such statements, you can flag them
7    to the government and if there is any objection I will take it
8    up at that time.  Does that make sense.
9         MR. DeCASTRO:  Yes, that's fine.  That's totally fine.
10   As we get closer, anyway, I could probably do it the first day
11   and say, look, I intend to go maybe in this direction from this
12   statement, and if they have an objection we can just deal with
13   it at a break.
14        THE COURT:  The other option is to have the government
15   identify -- and perhaps it would be willing to do so, either
16   informally to you or more formally by way of a proffer to me --
17   precisely what statements or portions of Mr. Schulte's
18   statements it intends to elicit.
19        Mr. Denton, do you have any thoughts on the best way
20   to handle this?
21        MR. DENTON:  Your Honor, two things.
22        First, I think we can handle this informally.  I think
23   we have largely identified it, I think we are happy to continue
24   having conversation with Mr. DeCastro.  It also sounds like
25   some of this may be a little bit unknowable until Evanchec says
```

N965schC

1    exactly what he is going to say on the stand.  I would note,

2    however, that I think there is a difference between the

3    requirement of the rule of completeness of contextualizing a

4    statement that is offered, i.e., the defendant's statements

5    about the desktop, with other statements that the defense

6    considers to be helpful, i.e., his statements on an entirely

7    different topic like who had access to a computer.

8            So it is not entirely clear to me that we are in rule

9    of completeness-land with respect statements that Mr. DeCastro

10   is identifying.  We are happy to, again, continue a dialogue

11   here, but I think that is an important distinction that we will

12   continue to try and emphasize.

13           THE COURT:  All right.

14           MR. DeCASTRO:  I am happy to have the dialogue.  On

15   the last point, this is an interview where they are talking to

16   him about a million different computers that they have seized

17   and recovered and they're talking about the particular two that

18   I am talking about, really, back to back.  So I guess it does

19   depend on how the agent testifies and I suppose we will just

20   communicate on, if there is a friction point, we will just

21   raise it to the Court, if that works.

22           THE COURT:  So I would encourage you to have a

23   thorough conversation on this front and an ongoing dialogue.  I

24   mean, other things, I think it makes sense for both sides --

25   and if Mr. DeCastro can actually identify portions of the

N965schC

1   statement that are appropriate to offer on rule of completeness

2   grounds or underlying principles -- it may behoove the

3   government to elicit it itself as part of the direct.  So I

4   think a lot of this can be worked out in advance, and to the

5   extent that after hearing the direct, Mr. DeCastro, you

6   identify statements that you would seek to elicit, I think you

7   need to identify those so that we can discuss them with

8   particularity and see if there are any issues.  All right?

9          MR. DeCASTRO:  Yes.

10         MR. DENTON:  Yes, your Honor.

11         MR. DeCASTRO:  Yes.

12         THE COURT:  Great.

13         The last motion *in limine* item is the other remaining

14   issues regarding Dr. Kiper.  I assume, Mr. DeCastro, I think

15   Mr. Denton made clear that he thought I was correct in my

16   assumption that I articulated in my order yesterday, but my

17   take is that the government's letter of last Friday mooted that

18   portion of the dispute concerning the witness' interpretation

19   of the IRC chats and the Google searches.  That is to say,

20   given that the government doesn't intend to offer those at all,

21   any testimony about the meaning of those is obviously, I would

22   think, moot.

23         Do you agree with that?

24         MR. DeCASTRO:  I think that's right.  What I am

25   pausing about is whether I would -- one second, Judge?

N965schC

 1          (Counsel conferring)

 2          MR. DeCASTRO:  I do, Judge, yes.

 3          THE COURT:  I think that leaves two other disputes

 4    regarding Dr. Kiper.  First, whether and to what extent he can

 5    opine on Mr. Schulte's mental state.  To cut to the chase, I

 6    agree with the government, he cannot.  Parenthetically, the

 7    defense makes some argument to the effect that mental state,

 8    when transferring the files, is not an element of the crime.  I

 9    don't understand that.  It is indeed an element of all three

10    crimes with which Mr. Schulte is charged, that is to say, the

11    government has to prove that he knowingly engaged in the

12    conduct.  At the same time, Dr. Kiper can, assuming a proper

13    foundation is laid, certainly testify to objective facts that

14    he obtained in connection with his forensic review of evidence.

15    What inferences should be drawn from those facts is an issue to

16    be argued by the parties and for the jury to draw itself, thus

17    I do agree that references in the report to what Mr. Schulte

18    knew or what he was aware of, that he inadvertently did X or Y,

19    are problematic and I would not permit Dr. Kiper to testify

20    consistent with that.

21          Ultimately, though, I think this needs to be policed

22    at trial.  That is to say, Mr. DeCastro, I trust that you will

23    try to adhere to the line that I just drew and be careful, but

24    to the extent that you ask a question, or Dr. Kiper says

25    anything that goes across that line and opines on Mr. Schulte's

N965schC

1    mental state, I trust that the government will object and I

2    will deal with it through rulings on objections.

3            Make sense?

4            MR. DENTON:  Yes, your Honor.

5            MR. DeCASTRO:  It does, but just to be clear, I just

6    want to be clear in preparing him.  I mean, certainly he can

7    testify, if I am hearing the Court correctly, about facts that

8    would be indicative of knowing or knowledge or of those things

9    and he has experience, he has been building cases on the other

10   side of the table for most of his career, and so what do they,

11   as forensic examiners, look for to show knowledge.  And then he

12   just can't say whether --

13           THE COURT:  To be clear, I think he can say what

14   forensic examiners look for to prove knowledge, what kind of

15   forensic artifacts demonstrate or can demonstrate knowledge,

16   and he can testify that based on his analysis those artifacts

17   are not present in this case.  I think he can do all of that.

18   What I don't think he can do is then say, therefore, I conclude

19   that Mr. Schulte didn't know that this is child pornography.

20   That is an argument that you can make to the jury but that

21   question is ultimately one for the jury, not for the expert to

22   opine on.

23           MR. DeCASTRO:  Understood.

24           THE COURT:  OK.

25           MR. DENTON:  Apologies, your Honor, but just one

N965schC

1    clarification on that.  I think, by and large, we agree with

2    the characterization about, sort of, he can testify about what

3    kinds of things forensic examiners look for.  I think there was

4    an element of his report -- and maybe this is where your Honor

5    is going that goes beyond that that talks about --

6              THE COURT:  It is.

7              MR. DENTON:  OK.  We will go there then, your Honor.

8              THE COURT:  I think the closer question is precisely

9    what I think you were about to get to, which is whether and to

10   what extent Dr. Kiper can opine on typical child pornographers.

11   Is that where you were going?

12             MR. DENTON:  Yes, your Honor.

13             THE COURT:  I guess the question I have for you,

14   Mr. Denton, is how that proposed testimony differs from

15   testimony that the government offers all the time about, for

16   instance, red flags that investigators typically see in money

17   laundering transactions with drug traffickers and the like.

18   That is to say, I think the government often puts on an expert

19   to say these are the kind of red flags or hallmarks of a drug

20   trafficking operation and then presents evidence that, lo and

21   behold, those hallmarks are present in this particular case.

22   Here, I understand Mr. DeCastro to be proposing to do something

23   similar which is to say, based on Dr. Kiper's lengthy

24   experience -- and it doesn't sound like there is any dispute

25   about his qualifications and experience -- that he identifies

N965schC

1     what sort of hallmarks, if you will, of most if not all of the

2     child pornographers he experienced in his career, and then

3     testifies that he didn't see evidence of those here.  I would

4     think there is plenty of fodder for cross-examination on that

5     score; number one, child pornographers don't need to adhere to

6     the typical traits or what have you, that's not an element of

7     the crime.  And I'm happy to give appropriate cautionary

8     instructions if the government thinks there are cautionary

9     instructions to give, but it does strike me that it is not

10    necessarily improper to offer testimony on that score to

11    contextualize it and make clear the significance of what

12    Dr. Kiper did or did not find in his forensic examination.

13              What am I missing there?

14         MR. DENTON:  I think three things, your Honor.

15              First, I think there is an issue on which we have a

16    question about Dr. Kiper's qualifications.  Dr. Kiper was a

17    CART examiner for many years, he was not an investigating

18    agent.  It is not clear to us that he has testified about this

19    before or that he has any particular experience with child

20    pornography cases and so he certainly is not a behavioral

21    analyst or psychologist or anyone that can testify about what

22    would be typical behavior of a person who commits a particular

23    type of crime.  So it is not clear to me that he has expertise

24    in that regard.

25              The second deals with sort of the sufficiency -- I

N965schC

1      guess not sufficiency but specificity of the notice.  It is not

2      clear to me what he means as child pornographer, or what we are

3      using as the baseline of typical here in the sense that there

4      are a lot of different permutations of this and between people

5      who distribute child pornography, child pornographers who are

6      producers of it, other types of different activity in this

7      area, it is not really clear to us that he has been specific

8      about what the basis for his knowledge is as uniquely relevant

9      here.

10             And then I think the third point is just a more

11     general 403 point.  If Dr. Kiper testifies about that, we are

12     going to put Special Agent Spivak back on in rebuttal to

13     testify that as an actual expert in child pornography cases,

14     the evidence in this case is entirely typical.  And at that

15     point we are not really providing testimony that is helpful to

16     the jury either within the sense of the expert rules or

17     Rule 403, we are simply having two different agents say, well,

18     I used to see this and now I see that.  And that's not helpful

19     to the jury as opposed to what evidence is present in this case

20     and the arguments that are to be made from that.

21             So I think those are the ways in which this is

22     distinct from, perhaps, a more arcane form of criminal

23     transaction that requires expert explanation to the jury from

24     someone with actual experience as an investigator of those

25     types of crimes.

N965schC

1          THE COURT:  Number one, there was no *Daubert* motion

2     here to include Dr. Kiper on the grounds of his qualifications

3     or lack thereof, so I think that ship has sailed and there is

4     no argument made in your motion *in limine* to preclude him on

5     that ground.  Obviously, that is fodder for cross-examination

6     if you think that his experience is limited and/or you know he

7     is -- well, if you think it is limited then you can cross him

8     on that.

9          Mr. DeCastro, do you wish to respond to any of this?

10    Some of it may depend on what -- I sort of agree that unless we

11    have a definition of what a "typical child pornographer" is,

12    that that might be problematic.  On the other hand, I can

13    imagine if the testimony is I worked thousands and thousands of

14    child pornographer cases in my experience with the FBI and in

15    every case there are certain things that I saw, namely like

16    thousands of files repeatedly accessed, etc., etc.  I mean, I

17    think that -- well, anyway, what do you have to say?

18          MR. DeCASTRO:  I think Dr. Kiper is experienced enough

19    to be able to identify the hallmarks of, for lack of a better

20    term, the typical child pornographer, possessor, or

21    distributor, or creator.  Those kinds of things.  I know this

22    relates a little to his training.  He was a trainer of the

23    trainers in CART.

24          THE COURT:  What is CART?

25          MR. DeCASTRO:  CART is the -- what does it stand for?

1          MR. DENTON:  Computer Analysis Response Team.

2          MR. DeCASTRO:  It is all the computer techs that

3    essentially analyze all the devices and they analyzed all the

4    devices in this case.  He was a trainer of trainers so he was a

5    line agent for a period of time but he was a trainer of

6    trainers.  And on that point, I think he can describe what you

7    look for.  Now, it doesn't prohibit the government from saying

8    not everybody is the same.  This is the same as in drug cases.

9    The typical drug crew does blah-blah-blah and we are showing

10   you, Jury, this is the kind of hallmarks of a drug distribution

11   network.  The defense tries to point out that there aren't or

12   that it is different and the government is free to argue that.

13   And then, the point that Mr. Denton just made is yes, they're

14   free to call their expert back on rebuttal to say what is wrong

15   with Dr. Kiper's analysis and/or conclusions with respect to

16   those hallmarks.  Maybe their investigator can say times have

17   changed.  I don't know.  I guess that we have to sort of see

18   what happens during the course of trial, but I don't see how he

19   should be prohibited from testifying as to those general

20   hallmarks that you look for as an investigator.

21          THE COURT:  Mr. Denton?

22          MR. DENTON:  I think, your Honor, we come back to sort

23   of where I ended which is the question fundamentally is, is

24   this helpful to the jury?  And it is not clear that there has

25   been any sort of explanation about why this is a unique type of

1    investigation or unique type of crime that warrants expert

2    testimony from two different experts on what is typical

3    behavior or not, or why typical behavior is relevant.

4    Dr. Kiper is more than free, as everyone has agreed, to opine

5    on what he found or didn't find and what conclusions he drew

6    from that, but he is not allowed to opine that, well, the

7    absence of certain evidence indicates the absence of a crime

8    any more than you can have an expert testify in a murder case

9    as a homicide detective that most people are killed by people

10   they know.  At a certain point there is a difference between

11   testimony about the generalities of how crime is committed and

12   the sort of expert testimony that the Court has referred to,

13   which both district courts and the Court of Appeals have

14   policed more stringently so recently with respect to whether it

15   is truly helpful to the jury to have someone talk about sort of

16   typical criminal behavior as opposed to the evidence in this

17   case.  We think that rather than having dueling experts talk

18   about what is typical, the jury is far better served by expert

19   testimony about the evidence in this case.

20           MR. DeCASTRO:  Judge, it seems we have this fight when

21   the conduct is atypical.  When it is typical, the government

22   moves to put it in all the time and the witnesses say what is

23   typical of the drug crews.  Or what is typical of this is, for

24   example, let's just talk about CSAM.  I would think that if

25   there was evidence of him accessing it every single day, they

N965schC

1    would want to put that in and say that is typical of someone

2    who collects and categorizes and views it.

3            THE COURT:  Right, but I think I guess what Mr. Denton

4    would say on that score is that is evidence that is probative

5    of the defendant's actual conduct in the case and then,

6    therefore, may be helpful to the jury in understanding and

7    contextualizing that conduct.  The fact that some other person

8    commits a crime in a different way isn't necessarily probative

9    of the fact that the defendant committed a crime.  In other

10   words, it may be that most child pornographers -- I'm not

11   expert on this -- but it may be that most child pornographers

12   download thousands and thousands of images and view them in an

13   obsessive way, but the fact that somebody downloaded only 10

14   images and only looked at them once doesn't make that person

15   innocent of the crime.

16           MR. DeCASTRO:  And the witness isn't opining on

17   innocence or not.  What they are saying is what they typically

18   see in their experience.  None of us are experts in

19   investigating -- well, you know, these cases every single day,

20   and if there are standards in their industry of forensic

21   analysis and the things they look for and the absence of which

22   might indicate that -- not that the person can opine on it that

23   something was inadvertent, for example, well, the witness

24   should be allowed to say not the inadvertent conclusion of

25   things but that this is what I typically have seen in my

N965schC

1    experience.  That's what experts are for.  I think the jury

2    certainly would -- I think it is useful for the jury to

3    understand.  They're going to have a tech expert testify for a

4    whole day about all the computer systems and how everything is

5    set up and how the things are organized, these files organized

6    where they are.  Is that typical or atypical?  I don't think it

7    becomes a side show fight, I think it becomes a few pieces of

8    testimony that both witnesses can testify about and we can

9    argue it before a jury.

10            THE COURT:  I think I need to think about this.  My

11   inclination is to allow some latitude here but rule on

12   objections as they come, which is to say I think descriptions

13   of the typical child pornographer are probably problematic for

14   the reasons that Mr. Denton articulated, but some testimony

15   saying, from his experience, the kinds of evidence that

16   investigators look for as evidence to demonstrate defendants'

17   knowledge that they accessed, that they viewed it, the kind of

18   artifacts that they look for and often find in cases involving

19   child pornography, and then testimony that those artifacts are

20   not present here, I think that strikes me as permissible.  But,

21   the devil may be in the details and I probably need to police

22   the line through objections.

23            Is that sufficient for now?

24            MR. DENTON:  Yes, your Honor.

25            I think I would just note, with respect to sort of the

1    amended expert rule and the requirement that the government

2    give notice of expert testimony that it would offer to rebut a

3    defense expert, we certainly would intend to call Special Agent

4    Spivak to testify to some amount of contrary conclusion.

5    That's a little bit difficult to define with specificity

6    pending sort of the Court's ruling and how it plays out.  I

7    think we are happy to give whatever level of notice is

8    necessary to uncover the ground there by whatever time the

9    Court thinks is necessary to sort of address that.  So, I think

10   that's one ministerial point.

11          I think there is one other issue that is a little bit

12   larger and potentially more problematic that some of this could

13   raise which is that Dr. Kiper makes a great deal out of the

14   defendant's not accessing the Linux Mint Virtual machine after

15   May 1st of 2016.  Dr. Kiper may not be aware of the large body

16   of other evidence that was introduced at the last trial about

17   what the defendant was doing on May 1st, 2016 and why he

18   stopped using that virtual machine.  The government has no

19   intention of going down the road of the espionage evidence at

20   this trial but to the extent that Dr. Kiper goes down the road

21   of saying that no one who was really into child pornography

22   would stop using the place where they had collected it, I think

23   we would very likely need to introduce evidence that showed why

24   he stopped using it, which would mean evidence about the

25   transmission of the Wikileaks and the use of the virtual

N965schC

machine for that purpose at that time.

THE COURT:  And connect those two things for me, which is to say perhaps refresh my recollection of what the significance of May 1st is.  I think that is the evidence that he wiped the -- well, anyway.

MR. DENTON:  Yes, your Honor.

So there was the evidence with respect to the transmission to Wikileaks during that kind of April 30th, May 1 window that Mr. Berger testified about at some length at the last trial.  We do not intend to have him testify about any of that on his direct case this time.  He will testify about the reformatting of the defendant's computer purely as a fact that happened and what effect that had on his ability to conduct forensic analysis and not any of the explanations as to why that happened and when it did, nor will he get info sort of the use of tails or other evidence that was introduced at the last trial around that time.

However, to the extent that Dr. Kiper intends to use the cessation of use of the virtual machine and the evidence of what happened with the reformatting, copying, all that, to say, well, the only explanation for this is that this belonged to somebody else because no one who was really into child pornography would stop using their child pornography virtual machine in this way, I think we would need to meet that conclusion with evidence of why the defendant did what he did.

N965schC

1    So we do not plan to open that door.  Mr. Berger is going to

2    stay far away from it.  If Dr. Kiper opens it, though, I think

3    we are not going to have a choice but to meet his conclusion.

4            THE COURT:  All right.

5            MR. DeCASTRO:  A couple points.

6            I don't follow a hundred percent because, in terms of

7    virtual machines there is like thousands of them in this, in

8    all of this computer evidence, it is not just one virtual

9    machine and I don't understand that the virtual machine we are

10   talking about in this case relates, has any WikiLeaks

11   connection.  So I don't know how we would be opening a door by

12   identifying that from -- it is just identifying fact.  And the

13   government made mention of it earlier that they intend to be

14   eliciting fact of additional usage, just in a different place,

15   so I don't really know where -- I am not following what door we

16   are opening.

17           THE COURT:  Tell you what, because I think the devil

18   may be in the details here, I think you guys should have a

19   conversation about this and it may be that -- well, it may be

20   that you are on different pages and in which case we can

21   revisit this.  It may be that there is something Mr. DeCastro

22   doesn't understand or know or not appreciating a connection the

23   government might draw here.  I think it is certainly fair for

24   him to understand what the line is here, that is to say that

25   how he would be opening a door if in fact it would be opening a

N965schC

1    door to something that would be potentially quite significant.

2    So, I think everybody should understand what's at stake here

3    and the government's position on what would open that door, and

4    if Mr. DeCastro disagrees about whether that would open the

5    door and wants to go there, then we can revisit it.  If

6    Mr. DeCastro agrees it would open the door and decides not to

7    go there, then we don't need to revisit it, presumably it would

8    be a moot point, or if he wants to take his chances and see how

9    I rule we can see where he goes and then he can take his

10   chances.  But getting into the WikiLeaks transmission issue and

11   the espionage charges and the like, strikes me as a very

12   significant issue that we should all be on the same page about

13   well before it happening.

14        MR. DENTON:  We will have a detailed conversation and

15   make sure we all know what we are talking about, your Honor.

16        THE COURT:  And I trust that one or both of you will

17   raise it with me again if there is any need for further

18   discussion.

19        MR. DENTON:  Yes, your Honor.

20        THE COURT:  All right.

21        MR. DeCASTRO:  Will do.

22        THE COURT:  That actually brings me to one additional

23   issue which is not -- well, I suppose it is touched upon in the

24   motions *in limine* given the government's motion which was

25   granted as unopposed to exclude any mention of the CIA.  I just

1    want to make sure we are all on the same page on that score.

2            There is the one issue that we just discussed that you

3    will have further discussions on and we can revisit, as needed,

4    but we are more broadly, I take it that the government doesn't

5    plan to, or let me ask you how you plan to deal for, in a

6    sense, the search warrant and search of the computers.  Is it

7    your plan to say there was a search warrant obtained and the

8    search warrant was executed and not really describe the

9    underlying circumstances or reasons for that?  And then the

10   other area that I thought might warrant discussion, and maybe

11   there are others, was the testimony about Mr. Schulte's

12   statements.  My understanding is -- and this is based in part

13   on the government's own motion *in limine* -- that some of those

14   statements that the government proposes to offer concern his

15   prior employment at the NSA and at the CIA and I want to just

16   make sure we are all on the same page with respect to how the

17   government plans to elicit that because I don't want -- the

18   government moved and I granted the motion to exclude any

19   mention of the CIA and his prior connections at the same time

20   eliciting those statements in a manner that leaves the jury

21   guessing as to what is going on, and suspicious, might be

22   problematic as well.  So, I want to just discuss that.

23           MR. DENTON:  So, your Honor, we intend to stay away

24   from it completely.  I think with respect to the search warrant

25   and the investigation, we will just accept the cost of starting

N965schC

*in media res* on that with the execution of the search warrant

and I think everyone will testify to their participation in an

investigation of the defendant and leave it at that and not get

into to what, or what squad they work for, or what kind of

investigation it was.

With respect to his statements and prior employment,

we do not intend to elicit anything about the CIA or NSA,

simply the fact that he was employed as a computer programmer,

that he was familiar with Linux and these other programs, that

he now worked in an IT computer job here in New York, and who

in particular he worked for I don't think we think is relevant

and we can potentially, as I said, kind of leave that out

entirely.

THE COURT:  Mr. DeCastro, does that all make sense to

you?

MR. DeCASTRO:  Yes, Judge.  I mean, as you say, we

didn't, on the motions *in limine* when they moved to preclude

that piece, we didn't oppose any mentions and my understanding,

in talking to the government anyway before at different dates,

that they did not intend to elicit his place of employment so

we are fine with that.

THE COURT:  That's my understanding as well but I just

want to make sure that what Mr. Denton is proposing to do, that

is to say start *in media res*, that is to say that there is a

search warrant that was obtained and jumped directly to the

N965schC

1    search and just directly to what was found without discussing

2    any of the context or background and elicit that he worked as a

3    computer programmer in or around the Virginia area and then

4    moved to New York where he worked as a programmer without

5    describing the nature of his employment, that that was OK with

6    you.

7              MR. DeCASTRO:  Yes.  That is what we understood they

8    were doing.

9              THE COURT:  Great.  All right.  So that covers the

10   legal-type issues that I thought we needed to discuss today.  I

11   did briefly look at your respective requests to charge and the

12   government's response to the defense requests to charge at

13   ECF 1091.  I didn't see any big picture issues that we need to

14   address before trial.  There are obviously some issues that we

15   will need to address at or before the charge conference but

16   there doesn't didn't seem to be anything we need to discuss

17   today, but let me know if you disagree.  And, more broadly, as

18   you know, I would like you guys to make sure that you are

19   trying to identify any issues that might come up during trial

20   that I do need to address or should address, and bringing those

21   to my attention sooner rather than later.  What I want to avoid

22   is the need for side bars.  I think everybody understands that

23   I don't like side bars and try to keep them to an absolute

24   minimum, so it is incumbent upon you to identify issues that

25   warrant discussion before they come up so that we can address

N965schC

1    them outside the presence of the jury either before they come

2    in in the morning or at the conclusion of the day.

3          So that's the broad point to make here but, more

4    specifically, are there any other issues that you think we

5    ought to address now?  And, in particular, obviously, if there

6    might be anything that would affect your opening that you might

7    want or need pretrial rulings on, this is the moment to ask.

8          Mr. Denton.

9          MR. DENTON:  So, a couple of small things, your Honor.

10         First, with respect to the request to charge, just to

11   flag one small thing that we did not make a submission on.  To

12   the extent that we put into evidence the two thumb drives

13   containing the child pornography, that's not something that we

14   will be able to send back to the jury so we would need an

15   appropriate instruction on that point.

16         Second, we are talking about Counts 12, 13 and 14 of a

17   long indictment here.  We think it would be appropriate to

18   produce a redacted or altered indictment that simply renumbers

19   them as 1, 2, and 3.  We are happy to prepare that or otherwise

20   do that in whatever way the Court thinks best here.

21         THE COURT:  Number one, not committing to the notion

22   that the indictment will go to the jury, the charges here

23   aren't especially complicated and it may not even be necessary,

24   but I think you should prepare a trial indictment just in case,

25   that is to say take Counts 12, 13, 14 -- whatever they are --

1   and just make them three counts, Counts, One, Two and Three,

2   and for purposes of trial I plan to renumber them in that

3   manner to avoid any prejudice to the defendant.  So I guess

4   that's consistent with what you are proposing but I am not yet

5   convinced that the indictment needs to go to the jury since it

6   is not evidence and they will be told what the nature of the

7   charges is in the instructions.  All right?

8           MR. DENTON:  That's fine, your Honor.  We will have it

9   ready to go and that way the Court can decide.

10          THE COURT:  Yes.

11          I'm not going to send the thumb drives in with the

12  jury given that they are contraband.  I think one issue you

13  might want to look to and give some thought to, just out of an

14  abundance of caution -- my hope is this issue doesn't arise --

15  but what happens if the jury, during its deliberations, says we

16  want to see other files that are on the thumb drives that were

17  admitted that is beyond the four that I have allowed the

18  government to show.  What happens then?  Do I say to the jury,

19  sorry, we are only showing you those four and otherwise you

20  need to accept the testimony describing the rest, or given that

21  they are in evidence are they entitled to see them.  My hope is

22  that that scenario doesn't arise but I think it might pay to

23  spend a little time in advance looking into it just in case, so

24  we are prepared in the event that it does.

25          MR. DENTON:  That is our hope as well, your Honor.

N965schC

1          I think, based on what we have found so far, they

2     would be entitled to see material that is in evidence but that

3     would have to be something we kind of bring the jury out and

4     show them in the same way that we would show them other

5     contraband.  I'm not sure what that means in terms of the

6     Court's ruling on the *Waller* issue.  I think we might need to

7     figure out some way to do something for the public then but we

8     haven't gotten there yet so we will give that some thought.

9          THE COURT:  Just flagging that to put a pin in it.

10          Mr. DeCastro, anything you want to say on the two

11     issues that Mr. Denton raised?

12          MR. DeCASTRO:  No, Judge.

13          THE COURT:  Do you have any other issues that you

14     think we ought to address today?

15          MR. DeCASTRO:  We have nothing new.

16          THE COURT:  All right.

17          MR. DENTON:  One final thing.

18          THE COURT:  Yes.

19          MR. DENTON:  We raised this with defense counsel last

20     week.  We understand they are still planning to call Dr. Kiper.

21     We have not gotten any 26.2 material or exhibits for Dr. Kiper

22     other than the expert notice that we received.  There have been

23     some proffers at points of things that he might say that are

24     not reflected in the expert notice like other people having

25     access not just to the server but to the desktop, in fact.  So

N965schC

1    we do not anticipate this being a long trial at this point, and

2    particularly if we are able to reach a stipulation I think the

3    government's case would be no more than two full trial days of

4    testimony, so we would ask that anything that the defense is

5    going to produce on that score we get by Friday so that we are

6    not trying to digest it in the middle of a quick trial.

7         MR. DeCASTRO:  We don't have any issue with that.  I

8    think the reasoning behind that is we haven't had access to our

9    client, that's been a little bit hard, and no issue with the

10   government providing us additional exhibits as they get them

11   ready, so it just changes a little bit.  So, they'll certainly

12   get the material.  We have to make that decision, whether we

13   are still calling Dr. Kiper, and of course we will provide the

14   material to them.  Friday is fine with me.

15        THE COURT:  Great.  So do it by Friday.

16        I was about to turn to disclosure issues and timing.

17   One note on that score, just to circle back, I think that the

18   Rule 16 to which Mr. Denton alluded earlier, I think that that

19   deadline and the disclosure requirements are specific to any

20   experts that the government would call in its case-in-chief,

21   which is to say I'm not sure that that rule or the recent

22   amendment applies to a rebuttal expert, but obviously I should

23   look into what notice, if any, you need to provide of any

24   potential rebuttal expert and to the extent that you propose to

25   call one, make sure you do what you need to do.  I just want to

N965schC

1    flag that.

2              On the disclosure front, Mr. Denton, can you tell me

3    3500 exhibits, when you plan to give those to me?  Whether and

4    when you have given them or plan to give them to Mr. DeCastro?

5    As you know, I like them in electronic form, I assume you can

6    do that through USAfx, and to be clear, obviously we are not

7    talking about the child pornography exhibits, those you don't

8    need to provide at all but the rest of them, tell me what the

9    situation is.

10             MR. DENTON:  So, your Honor, we produced the vast

11   majority of the exhibits including the actual forensic

12   exhibits -- I forget when the actual deadline was the Court

13   set -- but two, three weeks ago now.  We have continued to

14   produce some things that are either sort of works in progress

15   like the presentations for the government's two experts, which

16   we have marked as exhibits, we continue to produce sort of

17   revised versions of those as they're prepared; ditto with

18   respect to 3500, we have produced that material and are

19   continuing to produce new 3500 as it is ready.  We are happy to

20   give all of that to the Court whenever the Court would like.

21   We had hoped to provide sort of the most complete set possible,

22   so whenever Court would like it, we can arrange that.

23             THE COURT:  I think it would make sense to make it the

24   most complete set possible, which is to say easier to do it in

25   one fell swoop than add things piecemeal.  So, Friday or even

N965schC

1    Monday morning would work, as long as we have a plan, but does

2    Friday make sense?

3            MR. DENTON:  I think that makes sense, your Honor.  I

4    am sure anything we add over the weekend would be minimal.

5            THE COURT:  Why don't you communicate with my chambers

6    to make sure that we have a plan to get that.  And,

7    Mr. DeCastro, same on your end, any defense exhibits, Rule 26.2

8    materials, can you get those to me by Friday?

9            MR. DeCASTRO:  Sure.

10           THE COURT:  All right.  Very good.  And also

11   electronic.  We have a means to submit things by file transfer

12   protocol if it is voluminous and that makes sense.  Otherwise,

13   if they're small enough, you might be able to just e-mail them

14   to us.

15           MR. DeCASTRO:  OK.

16           THE COURT:  Very good.

17           Just a reminder that under my Rules you are required

18   to submit word versions of your respective exhibit lists by

19   Monday morning is fine on that score, but just make sure that

20   you look at my rules and comply with them.

21           Mr. DeCastro, I don't know -- and I know you were

22   talking to Mr. Schulte and he was reviewing things at the

23   outset of this, but are you in position to say whether you

24   think you will agree to the proposed stipulation, that is to

25   say I am trying to get a sense of --

N965schC

1          MR. DeCASTRO:  I am going to review it with him right

2      after this proceeding over in 500, so I can let the Court know

3      by the end of the day.

4          THE COURT:  OK.  That would be helpful, since it

5      sounds like it has some bearing on the length of trial.

6          MR. DeCASTRO:  Yes.

7          THE COURT:  Just so I understand, though, Mr. Denton,

8      you said earlier that that would obviate the need to call four

9      witnesses but I take it those witnesses wouldn't be especially

10     long regardless, or am I making an incorrect assumption on that

11     score?

12         MR. DENTON:  No, your Honor.  I think two of the

13     witnesses would be pretty brief, they would be sort of the

14     seizing witnesses.  The other two witnesses are the imaging

15     witnesses, sort of the Dr. Kipers, if you will, who made the

16     extractions, and then Mr. Berger and Mr. Spivak will testify

17     about the content of their analysis.  That may take a little

18     longer if we have to explain the process of how that goes.  I

19     still don't think that they're going to be particularly long,

20     but obviously given the time it takes to get people back and

21     forth, four witnesses would have a not immaterial effect on the

22     length of the trial.

23         THE COURT:  And Mr. DeCastro, I'm not going to hold

24     you to it, but at this time are you in position to say whether

25     you would anticipate presenting a defense case of one sort or

N965schC

1    another?  Do you have any sense or do you not want to say?  It

2    would just be helpful in terms of knowing how long trial is

3    likely to last and what I should tell the prospective jurors.

4           MR. DeCASTRO:  Understood.  On the defense case we are

5    certainly considering, at this moment, calling Dr. Kiper, and

6    then I don't know after that.

7           THE COURT:  All right.  Very good.  Per my order

8    yesterday, just a reminder that you should, by the end of

9    today, submit a list to us, in Microsoft Word format, of names

10   and places likely to come up during trial, just for my

11   inclusion in jury selection process.  I would actually add to

12   that if you can include any and all names of anyone on your

13   trial teams, who you expect to be in the courtroom at any time

14   during trial so I can have the proper spellings and have a

15   comprehensive list on that score, that would be helpful.  So,

16   lawyers, agents paralegals or assistants, anyone who will be

17   assisting, you should include their names.

18          Let's talk about jury selection.  You should be here

19   by 9:30 a.m. on Monday and we will get going as soon as we have

20   a prospective jury.  It will probably be a little later than

21   that but I don't want to make them wait.  We will get going as

22   soon as we can and we may have some final things to address on

23   Monday before we have them in any event.

24          I do intend to pick the jury on Monday and you should

25   be prepared, therefore, to open.  The government should be

N965schC

1   prepared to call its first witness or witnesses.  The bottom

2   line is we will get done as much as we can that day.  It would

3   surprise me if we had a jury before lunch.  I suspect

4   mid-afternoon might make more sense but, in any event, you

5   should be prepared to proceed with not just openings but first

6   witnesses.

7          I do intend to pick 14 jurors, that is to say 12 and

8   two alternates.  Given the length of this case I don't think we

9   need to do more than that, though if you disagree you can let

10  me know.  As you know, I will conduct all voir dire.  I will

11  take into consideration your requests on that score and include

12  them as I see appropriate.  I did have a couple questions I

13  wanted to pose to you, though.  The first is neither of you

14  propose that I include any reference or inquiry regarding the

15  CIA, or more to the point, I think the government said only if

16  that motion was granted, which it has been.  So, one option is

17  to make no mention of the CIA at all.  Another option, I guess

18  the question is, is there any concern with someone who

19  previously worked at the CIA?  They will obviously be asked if

20  they know Mr. Schulte, if they have heard of Mr. Schulte and so

21  forth and that may be sufficient to cover any issues here, but

22  would you want to know if somebody had any previous employment,

23  friends or close friends who worked at the CIA and, if so,

24  should I throw them into the list that I would ask about law

25  enforcement agencies?  I can just say law enforcement and

N965schC

1    intelligence agencies and reference the FBI, CIA and the like

2    without explaining the reasons.  I'm open to doing either.  The

3    cleaner way would be obviously not any mention but, on the

4    other hand, if you think it is worthwhile or necessary to know

5    if somebody has a unique connection to the CIA, then it might

6    pay to include it in some slightly sanitized version.

7              Your thoughts?

8              MR. DENTON:  I think, your Honor, we think the cleaner

9    version is appropriate, especially given that anyone who knows

10   the defendant is certainly going to know why and say it.  I

11   think otherwise it is more likely to, even in the sanitized

12   form, stick out a little bit and potentially cause some odd

13   reactions.

14             MR. DeCASTRO:  I think we want to know if someone has

15   connection and I think you can include it with sort of a list

16   of law enforcement which I don't think would -- I don't think

17   it would stick out too much.  You can say something like the

18   Court just said, intelligence agencies like the CIA, NSA,

19   things like that and see if anybody responds.  I think that

20   would be helpful to know because, certainly from our

21   perspective, of course, anybody who has a connection to the

22   CIA, worked at the CIA, is arguably going to know who Joshua

23   Schulte is.

24             THE COURT:  I guess to play devil's advocate, they

25   will be asked if they know who Joshua Schulte is, so if they do

1    know him they well say "yes" to that.

2             MR. DeCASTRO:  Sometimes it rings a bell in different

3    ways for people so a name sometimes just rings a different

4    bell, *Oh, now I'm making I the connection I didn't make before.*

5    I think it makes sense.  It will stick out for us only, I don't

6    think it sticks out to potential jurors.

7             THE COURT:  I will think about it.  I think my

8    inclination is probably to include it as part of a longer list.

9    There are all sorts of questions that I pose that I think

10   jurors, first of all, they're not going to remember when it

11   comes time to deliberate the questions that I ask, but second,

12   all sorts of questions about, for instance, if they have any

13   experience in a law office or with a court that they probably

14   don't understand the relevance or significance of and probably

15   therefore wouldn't stick out to them.

16            Second is the government's request at paragraph 37

17   requests a question regarding, among the evidence that the

18   government expects at trial, are certain electronic

19   communications.  I wanted to know is that still relevant in

20   light of your plan to forego introduction of the IRC chats and

21   the Google searches?  I don't know enough about the evidence

22   here to know if that is what that question referred to and

23   therefore it should be omitted now or if it is still relevant.

24            MR. DENTON:  No, your Honor.  I think you can take

25   that one out.

N965schC

1            THE COURT:  All right.  Mr. DeCastro, does Mr. Schulte

2      waive his right to be present at side bars with prospective

3      jurors?  If not, I want to make sure we are all on the same

4      page.  Last time we managed to do it with the marshals dressed

5      in counsel-type attire and I think it was not necessarily

6      obvious, but I just want to make sure we are all on the same

7      page.

8            MR. DeCASTRO:  No.  It is OK.  He waives his right to

9      be present at the side bar with jurors.

10           THE COURT:  Good.  Just to go over the jury selection

11     method, certainly the government knows how it works in my

12     courtroom, it is described in an attachment to my individual

13     rules and practices for trial which you should familiarize

14     yourselves with so you can look at it there.  But, just in

15     brief, I use the struck panel method as many of my colleagues

16     do.  I will qualify 32 jurors, both sides will then exercise

17     peremptory challenges simultaneously, that is the key point to

18     emphasize.  That is to say, you will each make a list of the

19     jurors that you wish to strike, you will exchange those lists,

20     and then they'll be given to me and, absent a motion, the jury

21     will be determined based on your respective strikes.

22           The second thing to make very clear here is the

23     regular potential jurors here are jurors 1 through 28, 29

24     through 32 are the prospective alternate jurors.  So when

25     exercising your strikes that is 10 strikes for the defendant,

N965schC

1    six for the government.  As to the regular jurors, you should

2    limit yourselves to jurors no. 1 through 28, and when

3    exercising your one additional strike on alternates, 29 through

4    32.  If there are overlapping strikes, that is to say you both

5    strike the same juror, the regular jury will be the 12 lowest

6    number jurors from 1 through 28, the alternates will be the two

7    lowest jurors 29 through 32.  If there are no overlaps, then we

8    will be left with 12 and 2 respectively and there is no issue

9    on that score.

10              Any questions about any of that?

11              MR. DENTON:  No, your Honor.

12              MR. DeCASTRO:  No, your Honor.

13              THE COURT:  Very good.

14              Other trial-related issues.  It sounds like this trial

15    may be a week-long trial, given or take.  My guess is I will

16    probably tell the prospective jurors that it may last up to two

17    weeks but perhaps shorter, just out of an abundance of caution.

18    Any thoughts on that front?

19              MR. DENTON:  No, your Honor.  I think our only

20    question is whether the Court intended to do anything different

21    on Friday for the trial day.

22              THE COURT:  Well, let me talk about scheduling.

23              As you may know, my general practice which I plan to

24    adhere to here is on day one when we are selecting a jury or

25    until we have a jury, we will go from 9:00 to 5:00 with

N965schC

1    appropriate breaks and, obviously, a longer lunch.  Once we

2    have a jury, which again I hope will be on Monday afternoon,

3    then every day thereafter, until we get to summations and

4    deliberations, will be 9:00 to 2:30 with one, and only one,

5    half-hour break, and that will be strictly enforced.  My plan

6    on the Friday, because it is the start of a Jewish holiday, is

7    to end at 2:30.  I observe that holiday, that's sufficient for

8    me.  I'm guessing it would be sufficient for most, if not all

9    jurors, but if somebody articulates an issue on that front --

10   and I will tell them that as part of jury selection -- we will

11   address it but that is my plan.

12            Does that work for everybody here?

13            MR. DENTON:  Yes, your Honor.

14            MR. DeCASTRO:  Works here.

15            THE COURT:  And once we get to summations and

16   deliberations, as I will tell the jurors I may change the

17   schedule just to ensure, for instance, that all the summations

18   ideally occur in one day and they can deliberate as long as

19   they want.  Well, not as long as they want but longer than

20   2:30.  Having said that, I am planning to end Friday at 2:30.

21   So if, by chance, we get to summations, we may not do them on

22   Friday, we will have to play it by ear and see where things

23   are.  But the point is I'm not going to go until 5:00 on Friday

24   given the start of the holiday.

25            Again, familiarize yourselves with my individual rules

N965schC

1    and practices for trial.  Some of you have already experienced

2    trial with me so you have a sense of them, but in particular I

3    would draw your attention to rules regarding objections and

4    handling of exhibits and emphasize, number one, that I don't

5    entertain speaking objections.  It generally suffices just to

6    say "objection" or if you think that I might not appreciate or

7    understand the ground for the objection you can state in one or

8    two words what that is "Objection.  Foundation."  "Objection.

9    Hearsay."  "Objection.  Relevance."  Something of that nature

10   but don't go beyond that.  If there is a need to discuss

11   something in depth we will do it at the next break and I don't

12   want that happening in front of the jury.

13            Relatedly, as I said before, I try to keep side bars

14   to zero but certainly to an absolute minimum, so that is

15   something you should understand and, therefore, if you can

16   identify any issues, you should raise them with me sooner

17   rather than later and outside the presence of the jury.

18            You do have to have your witnesses available and ready

19   to go when the time comes.  If one witness finishes and the

20   next witness is not available to take the stand at that time,

21   then I will deem that side to have rested and we will proceed

22   to the next phase of the case.  So plan accordingly.

23            Mr. DeCastro -- sorry.  Go ahead.

24            (Counsel conferring)

25            MR. DeCASTRO:  Sorry.  Go ahead, Judge.

1          THE COURT:  My law clerk reminded me that I skipped

2     over something important, which is I did want to discuss with

3     you the description of the case that I propose to give to the

4     jury during jury selection.  Before he gives you a copy of the

5     description let me just give you an introduction which is that

6     it slightly differs from what I would normally do.  Normally I

7     would just include a fairly dry recitation of the charges.

8     Here, based in part on my intuitions and on conversations that

9     I had with other judges who have tried child pornography

10    cases -- I have not myself -- I decided to at least propose for

11    your consideration something a little bit different, which is

12    to say that to discuss with the prospective jurors what --

13    well, you will see in a moment, but one of my colleagues in

14    particular mentioned that in the course of individual colloquy

15    with jurors who expressed misgivings about being selected as

16    jurors in a case involving child pornography, that she found it

17    very helpful to kind of put them at ease to say that you are

18    not called upon to express whether you favor or disfavor child

19    pornography, that you are being asked to decide if the

20    government has proved the elements of the crime and that's all

21    you are asked to do.  That is to say sort of that they

22    understand the limited nature of their task.  Relatedly, I

23    think it might be important for them to understand that they

24    will, as part of the trial given my ruling earlier, be shown

25    some of the relevant images here, but also prepared to sort of

N965schC

1    say that it is not in dispute that they constitute child

2    pornography and focus on what I understand the central issue to

3    be, which is Mr. Schulte's knowledge.

4        Part of the theory here is that some of what I propose

5    to say here is stuff that I probably would say in the course of

6    jury selection in response to answers that jurors may give

7    publicly or otherwise and in that regard maybe it's better and

8    more effective to do it prophylactically and at the outset than

9    wait until somebody says something that prompts me to say

10   something of this sort.

11       So, with that proviso or introduction, I will have my

12   law clerk hand out what I came up with and we can discuss if

13   you have issues with it and go from there.

14       (Counsel reviewing document)

15       Can we turn to it?  I know the government objected to

16   the inclusion of the line that Mr. Schulte had proposed saying

17   I am not charged with creating child pornography or engaging in

18   communications with any children.  I did include that.  Again,

19   the theory is a little bit that one or more jurors may say I

20   wouldn't have a problem sitting on a trial involving images of

21   child pornography but if I knew that someone had communicated

22   with a child or harmed a child or made it, that would be a

23   different matter, in which case I would obviously say that that

24   is not what this case is, it doesn't involve charges of that

25   nature.  So, a little bit on the theory that I have described

1    earlier, I thought that it might make sense to prophylactically

2    make clear what the case does and doesn't involve.

3              With that, Mr. Denton, your thoughts?

4              MR. DENTON:  Sure, your Honor.

5              One entirely ministerial on line 13.  Just for

6    technical reasons I would suggest maybe the "receipt,

7    possession and transportation" rather than "transfer of child

8    pornography."  I think we would ask that the Court take out the

9    next two sentences.  I understand the logic there.  I think

10   it's a little bit odd to get into what he is not charged with.

11   I think to the extent that is a concern, that is one that can

12   be addressed at side bar with individual jurors.  It seems like

13   fewer people are likely to have that kind of parsing concern

14   than people would have kind of the more global concerns that

15   the Court is appropriately trying to put them at ease about.

16             And then I think with respect to the second to last

17   paragraph on page 2 --

18             THE COURT:  Wait.  Can I stop you for a moment?

19             First of all, no issue with changing it to

20   "transportation," that is, indeed, the right word so thank you

21   for that.

22             When you say the next two sentences?

23             MR. DENTON:  The line about what Mr. Schulte is not

24   charged with, and then also sort of "the few, if any people,

25   approve of child pornography."  I think rather than sort of

1    inviting any consideration of the approval of child

2    pornography, the point that the Court made a moment ago I think

3    is best communicated by the next sentence which is just telling

4    them nothing about this case has to do with approval or

5    disapproval of the particular images and whether few people do

6    or many people do, it is just not something that we need to

7    invite any speculation or commentary about from the jury.

8            THE COURT:  OK.  Carry on.  Was there something else?

9            MR. DENTON:  Only on page 2, lines 3 to 5.  I think,

10   your Honor, I don't think it's necessary to define, in the

11   preliminary instructions, what the central issue is or what the

12   sort of question about what the government will be able to

13   prove is.  I think it would sort of suffice to move to the

14   final conclusion and say, all those selected as jurors will see

15   some of the materials, they will only be a minor part of the

16   evidence.  The Court will give more fulsome instructions on

17   what the government has to prove.  I think it just sort of

18   invites concerns to isolate something separate from the broader

19   charge the Court will give.

20           THE COURT:  So, you would propose to strike the

21   sentence beginning:  "Instead" on line 3?

22           MR. DENTON:  Yes; and then ending after "pornography"

23   on line 5.

24           THE COURT:  Mr. DeCastro, your thoughts generally and

25   then we can go through the government's proposed changes.

N965schC

1              MR. DeCASTRO:  Can I have one second, Judge?

2              THE COURT:  Sure.

3              (Defendant and counsel conferring)

4              MR. DeCASTRO:  We have no problem with

5      "transportation," which is line 13.

6              THE COURT:  Let me step back.  Are you good with this

7      as a general idea?  Then we can discuss the particulars.

8              MR. DeCASTRO:  Yes; as a general idea, yes.

9              THE COURT:  Now particulars then.  So we will change

10     "transfer" to "transportation."

11             MR. DeCASTRO:  We don't have any objection to removing

12     "the few, if any people, approve of child pornography," which

13     is line 15.

14             THE COURT:  OK.  But I take it you would like to

15     include --

16             MR. DeCASTRO:  Yes.

17             THE COURT:  -- what he is not charged with.

18             MR. DeCASTRO:  Correct.  That was in our original

19     proposal.  I think it is important.  I think it, like page 2, I

20     mean, I think it gives potential jurors some comfort once they

21     hear the charge, nature of the charges and I think the Court

22     articulated well what happens in jury selection in my

23     understanding of these cases.

24             For page 2, I think line 1, I think there is an "or"

25     that was supposed to be "for".  Or expected to view many such

N965schC

1    materials or for very long -- oh no.  That's fine.  Sorry about

2    that.

3            So for the line which is line 3 on page 2, I think

4    that the government wanted to strike, I think we would prefer

5    that it remain in.  I would propose a slight edit.  So the

6    sentence the Court is giving:  "Instead, the central issue is

7    whether the government will be able to prove beyond a

8    reasonable doubt that Mr. Schulte knew that the materials were

9    child pornography."  I thought that we could change that so say

10   that "Mr. Schulte knew of the existence of those materials and

11   that they were child pornography."  That's my proposal.  And

12   the reason why I think we should keep it in is largely for the

13   same reasons that it is in the beginning, it is just telling

14   the jury that you are going to be here and be asked to

15   essentially answer some specific questions, not to be opining

16   on child pornography and approval or disapproval of it but

17   there is a specific issue that you are going to hear about and

18   probably hear about an hour later when we open.  So, I don't

19   think there is any harm in telling the jury what the issue is

20   here.

21           THE COURT:  Very good.  So, number one, turning back

22   to page 1, line 13 I will change "transfer" to "transportation"

23   and then I am going to leave in that he is not charged with

24   creating child pornography or engaging in sexual

25   communications.  I certainly understand the government's point

N965schC

1    but it is also an accurate statement and I think it will put

2    some jurors at ease.  What I would propose to do is set that

3    off with a semicolon.  "So, as you just heard, they involve the

4    receipt, possession, and transportation of child pornography;

5    Mr. Schulte is not charged with creating child pornography or

6    engaging in sexual communications with any children."  Actually

7    I just realized that I am just reading this so the jury won't

8    know if it is a period or semicolon but that's beside the

9    point.  And then, strike the next sentence about "few, if any,"

10   and start with:  "To be clear, if you are selected as a

11   juror..." and go on from there.  So, that's page 1.  And then

12   on page 2, I will leave that sentence in.  As Mr. DeCastro

13   noted, I think it will be apparent during openings shortly

14   thereafter and in that regard won't prejudice anybody.  I

15   assume that the defense may request a defense theory of the

16   case instruction at the conclusion and I presume it will focus

17   on these things so I think it will give comfort to some jurors

18   to know that that's essentially the narrow sort of issue that

19   they will really be asked to focus on and probably obviate some

20   complications in jury selection.  So, I will, at Mr. DeCastro's

21   request, change it to line 4, to that "Mr. Schulte knew of the

22   existence of the materials and that they were child

23   pornography" and otherwise I will leave that line in.

24           All right.

25           MR. DENTON:  Your Honor, given that you are leaving

N965schC

1    that in, purely as a stylistic convention in the format, on

2    page 1, line 17 to 18, the Court frames it as, "Your task will

3    be to decide whether the government has proved..." and so I

4    think it might make sense in this sentence as well to say,

5    "The central issue will be whether the government has proven or

6    has proved..." Just for parallelism sake, if nothing else, but

7    hardly a major point.

8         THE COURT:  I'm not sure I understand the suggestion

9    but I think I am fine with what it currently is, so given that

10   you said it is not a major point, I will reject it.

11        We are almost done here.  A couple other housekeeping

12   matters.  Mr. DeCastro, you alluded earlier to some issues with

13   respect to the delivery of clothing.  I don't think I signed a

14   clothing order.  I may need to.

15        MR. DeCASTRO:  We have been trying to iron out, with

16   the MDC, the clothes that he had already there which we picked

17   up.

18        (Defendant and counsel conferring)

19        MR. DeCASTRO:  The MDC said the old order was fine.

20        THE COURT:  Good.

21        MR. DeCASTRO:  They found what they had, they gave it

22   back to us so we could launder it and we are delivering it

23   tomorrow.

24        THE COURT:  OK.

25        MR. DeCASTRO:  So that shouldn't be an issue.

N965schC

1          THE COURT:  Bottom line if you need something from me,

2     let me know, but I want to make sure that is taken care of.

3          Am I correct in assuming that neither side intends to

4     use demonstratives during opening statements?  If so, I want to

5     make sure the other side is aware and I rule on any objections.

6          Mr. Denton?

7          MR. DENTON:  No, your Honor.

8          MR. DeCASTRO:  No, Judge.

9          THE COURT:  No issue there.

10          Any issues with respect to witnesses being present in

11     the courtroom, either fact or expert?  I don't know if there is

12     a need for experts to be present.  They can be present in some

13     circumstances but to the extent that anyone is not on the list

14     of those who are permitted to be in the courtroom, under

15     Rule 615 we should address it and see if there are any issues.

16          Mr. Denton?

17          MR. DENTON:  The only non-expert witness we plan to

18     call is Special Agent Evanchec, who is going to go first, and I

19     think we planned to have the other two witnesses here.  We have

20     no objection to Dr. Kiper being here and hopefully that will

21     make things go quickly when the time comes.

22          MR. DeCASTRO:  Same.

23          THE COURT:  All right.  So then there is no issue on

24     that front.

25          The bottom line admonition is do whatever you can to

N965schC

1   ensure that there are no delays, especially when we get the

2   jury in the box, so I would encourage you to make sure this

3   week that you come here and do a run through, a tech run

4   through to make sure that your equipment is working, you know

5   how to use the system, and there are no issues on that score.

6   I would also encourage you, each morning, to do another run

7   through, that is to say make sure it is working and test things

8   so that we don't have any problems.  I also have a backup plan

9   in case we do have problems.

10          Again, you have to have your witnesses here when they

11  are ready to be called and if they are not, you will be deemed

12  to have rested but it sounds like they'll all be here anyway so

13  that's not an issue.

14          If you have any audiovisual needs, that is to say

15  electronic device orders that you need, you better ask me

16  sooner rather than later to make sure there is no issues on

17  that front.  Again, I would encourage you to make arrangements

18  with my chambers to do a tech walk-through or dry run, just to

19  make sure that everybody has whatever they need and you can

20  iron out any issues in advance.

21          That covers everything that I planed to discuss today.

22  Anything else from the government?

23          MR. DENTON:  No, your Honor.

24          THE COURT:  Mr. DeCastro?

25          MR. DeCASTRO:  No, Judge.

N965schC

1            THE COURT:  All right.  So, you know how to find me if

2    you need to find me.  There are a couple things that you will

3    be submitting today and in the coming days.  Otherwise, I will

4    see you at 9:30 on Monday and we can take care of any final

5    lingering issues at that time and then get started with the

6    jury when they are ready to go.

7            Needless to say, trial is in this courtroom so come

8    here.  And, with that, have a good few days and I will see you

9    on Monday.

10           Thanked.

11                                 o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25