THE LAW FIRM OF
**CÉSAR DE CASTRO, P.C.**

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

January 18, 2024

The Honorable Jesse Furman
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

*Re: United States v. Joshua Schulte*, 17 Cr. 548 (JMF)

Dear Judge Furman,

Mr. Schulte has been detained for more than 6 years. He has been detained in the now shuttered Metropolitan Correctional Center ("MCC"), ordered shut due to the deplorable conditions there, and later the Metropolitan Detention Center ("MDC") where the inhumane conditions are just as bad or worse. The conditions at both facilities for the past six years would be reason alone for this Court to downwardly vary substantially. However, for almost five of the last six years, Mr. Schulte has been subjected to unconscionably punitive conditions while being detained under Special Administrative Measures ("SAMs").

The punitive measures imposed on Mr. Schulte as an inmate in the SAMs unit have included: (1) being locked his small windowless cell for 23 hours a day; (2) no contact with any other inmates; (3) no ability to turn off the lights in his cell; (4) being subjected to nonstop white noise so he cannot hear anything outside his cell; (5) being subjected to low temperatures in his unit year round; (6) continuous video monitoring 24 hours a day; (7) only being permitted one short call or video call with his family per week; (8) frequent missed meals many days a week; (9) severely restricted commissary; and (10) no access to entertainment. As the Court is aware, his legal mail with important information and updates on his case take weeks or months to be delivered, if delivered at all. He wakes up every day, assuming he was even able to sleep, with the lights on, having been on all night. He sits alone, hungry, wearing all of his clothes to try and stay warm, in his cold, bright, small cell, all day, every day, with nothing to occupy his time. The Bureau of Prisons calls these conditions Special Administrative Measures, but to be clear these conditions are nothing short of torture. He has been subjected to more than five years of torture. No alleged crime, and certainly not the crimes for which Mr. Schulte has been convicted, warrants this inhumane and tortuous treatment.

Mr. Schulte has represented himself for a significant portion of the past six years while this case has been pending. He has filed hundreds of motions, many of which have detailed the deplorable

conditions of his confinement and his inability to adequately represent himself. The conditions have been so bad, and Mr. Schulte so desperate for any relief, that he has filed countless motions seeking the identical relief. A reading of all his motions in total reveals a common thread throughout, that the conditions of his confinement are torturous. Mr. Schulte is not a hardened criminal – he had never endured any time in conditions like solitary confinement or the Special Housing Unit before being detained in this case. Rather, this was his first arrest and he has led a law-abiding life.

In addition to the conditions to which he has been subjected, Mr. Schulte's history and characteristics and the need to avoid unwarranted sentencing disparities supports a substantial variance. Mr. Schulte is now 35 years old. He was raised in a close-knit household with love and support from his immediate and extended family. He has also lived his life likely with an undiagnosed neurodivergence, yet was able to have an extremely successful career. He is extremely intelligent. So intelligent, in fact, that he worked for the most clandestine agency in the world, which attracts and accepts only the best and the brightest. While Mr. Schulte maintains his innocence, for purposes of sentencing, Mr. Schulte's convictions were aberrant behavior in an otherwise law-abiding life, and as such, the Court should vary downward significantly from the advisory United States Sentencing Guidelines (the "Guidelines") range. For these reasons, we respectfully submit that the appropriate sentence for Mr. Schulte is 108 months followed by five years' supervised release.

I.      **The Pre-Sentence Investigation Report, the United States Sentencing Guidelines' Advisory Range and Sentencing Recommendation**

The Probation Office, in its advisory Guidelines calculation, applied numerous enhancements that should not apply to Mr. Schulte. The defense objects to these enhancements, as well as other paragraphs that ultimately do not impact the advisory Guidelines range.[1] Specifically, in regard to the paragraphs that impact the advisory Guidelines range, the defense objects to: (1) the Probation Office's conclusion that the Guidelines' terrorism enhancement applies; (2) that an enhancement for Obstruction of Justice applies; (3) the base level of 35 applied to Group 1 and 29 applied to Group 2 due to the National Defense Information ("NDI") material in the counts being classified as top secret; and (4) the applicability of the 2-point enhancement for abuse of a position of trust or use of a special skill. *See Defense Objections to the PSR* annexed hereto as Exhibit "A".

In addition, Mr. Schulte also objects or disagrees with the sentencing recommendation made by the Probation Office. The Probation Office recommends a sentence of 360 months' imprisonment. The Probation Office's recommendation unconscionably does not factor the terrible and inhumane conditions of confinement to which Mr. Schulte has been subjected at the MCC and MDC. As such, for all the reasons below, we respectfully submit that the Court should sentence Mr. Schulte to108 months' imprisonment.

---

[1] Additionally, the defense objected to (1) Paragraph 39 of the PSR, which stated that Mr. Schulte used the internet while on pretrial release; (2) Paragraph 80 of the PSR, which stated that classified documents were found in Mr. Schulte's home; and (3) Paragraphs 90 and 106 *et seq*, relating to any mention of Child Sexual Abuse Materials being found on the laptop provided to Mr. Schulte while incarcerated.

2

1. <u>The Terrorism Enhancement Should Not Apply to Mr. Schulte, as the Conduct for which he was Convicted does not Qualify as a Federal Crime of Terrorism, and Even if it did, the Terrorism Enhancement Swallows the Advisory Guidelines and Should be Disregarded</u>

Mr. Schulte has not been convicted of a "federal crime of terrorism" and, thus, the Guidelines' terrorism enhancement should not apply. Under §3A1.4, to apply the terrorism enhancement, the crime of conviction must be a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5), which states that a "federal crime of terrorism" is a crime that:

> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; ***and***
>
> (B) is a violation of . . . 1030(a)(1) (relating to protection of computers), 1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers) . . ." (emphasis added).

The conduct for which Mr. Schulte was convicted fails to satisfy subparagraph A of § 2332b(g)(5), and as such, the terrorism enhancement should not apply. The government's theory in the first two "espionage" trials was that Mr. Schulte was upset at his supervisors for failing to take his accusations against another member of his group seriously, and instead transferred him out of the group to which he was then assigned. There is no accusation that Mr. Schulte attempted to "influence or affect the conduct of government." § 2332b(g)(5)(A).

The second way to satisfy subsection A is if the crimes were "calculated . . . to retaliate against government conduct." *Id.* One of Mr. Schulte's supervisors at the CIA transferring Mr. Schulte to another team hardly qualifies as "government conduct". The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, which created § 2332b, was enacted in response to the Oklahoma City Bombing. The perpetrator of the bombing, Timothy McVeigh, carried out the act because he "believed the government was attacking Americans' personal rights and freedoms." *The Oklahoma City Bombing 20 Years Later,* April 16, 2015, https://www.fbi.gov/news/stories/the-oklahoma-city-bombing-20-years-later. Additionally, the enumerated subsections of 18 U.S.C. § 1030 were added to the list of enumerated offenses in § 2332b(g)(5)(b) in the Patriot Act of 2001, Pub. L. 107–56, title VIII, § 808, Oct. 26, 2001, in response to the 9/11 attacks. Osama bin Laden's wrote that his motive for the attacks was, among other things, the United States' support of Israel. These are clear instances of retaliation against official United States "government conduct" that the statute is aimed at combatting. Nothing analogous is present here.

However, even if the Court determines that the terrorism enhancement *technically* applies, the Court should disagree with its application under these facts and decline to apply it because it swallows the initial Guidelines range. *See United States v. Jumaev*, No. 12 Cr. 33 (JLK), 2018 U.S. Dist. LEXIS 119916, at *5(D. Colo. July 18, 2018). If the terrorism enhancement is not applied, even before the defense's other objections are considered, Mr. Schulte's advisory

Guidelines range would be 210 to 262 months' imprisonment.[2]  Even in an applicable scenario (*e.g.* unauthorized access to a protected computer to steal top secret government files in retaliation for United States foreign policy), the results of such an application, a 12-point enhancement to the offense level and mandatory Criminal History Category VI, would swallow the statutory range set by Congress.  Violating §§ 1030(a)(1) or (a)(5)(A) carries a maximum sentence of 10 years.  The advisory Guidelines range for either violation, assuming a base offense level of 24 (the lowest base offense level for transmitting National Defense Information) and applying the terrorism enhancement, would result in an advisory Guidelines range of 324-405 months' imprisonment.

The effect of this single enhancement, raising the Guidelines as far as it does, has troubled many courts.  The Honorable John G. Koeltl was concerned that applying the terrorism enhancement, "while correct under the [G]uidelines, would result in an unreasonable result . . . and produce a guideline range about quadruple the range [that would otherwise apply] without the enhancement."  *United States v. Stewart*, 02 Cr. 395 (JGK) Sent'g Tr. at 114 (S.D.N.Y. Oct. 16, 2006).  After applying the terrorism enhancement, the resulting Guidelines level makes any qualifying crime indistinguishable from the most severe.  *See* James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 LAW & INEQ. 51, 57-58 (2010) (explaining how the terrorism enhancement results in sentences "often disproportionate to the conduct of conviction").

The court in *United States v. Giampietro*, 614 F. Supp. 3d 612, (M.D. Tenn. 2022), wrote that "'[t]he terrorism enhancement under U.S.S.G. § 3A1.4 is steep,' and 'when applied, takes a wrecking ball to the initial Guidelines range".  *See also United States v. Kourani*, 6 F. 4th 345, 360 (2d Cir. 2021); *Jumaev*, 2018 U.S. Dist. LEXIS 119916, at *5.  When an enhancement raises the Guidelines as much as they do with the terrorism enhancement, the Guidelines become unusable.  *See United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010) ("adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders . . . This result is fundamentally incompatible with § 3553(a).").

The Court should conclude that the offenses of conviction do not qualify as a federal crimes of terrorism and, thus, the terrorism enhancement should not apply.  Even if it did apply, the application of the terrorism enhancement to this case is so flawed that it should be disregarded by the Court.  Here, the difference between applying the terrorism enhancement and not applying it is the difference between an advisory Guidelines range of 210 to 262 months', to an advisory Guidelines recommendation of life imprisonment.  By applying this enhancement, the Guidelines ludicrously equate Mr. Schulte to terrorists like Khalid Sheikh Mohammed and Dzhokhar Tsarnaev (the mastermind of the 9/11 attacks and the Boston Marathon bomber, respectively), and the Court should disagree and decline to apply it to Mr. Schulte.

---

[2] This is calculated using a base offense level of 35 (§§2M3.2(a)(1)), adding 2 points for using a special skill or abusing a position of power (§3B1.3), adding 2 points for obstruction of justice (§3C1.1), and subtracting 2 points for being a zero-point offender (§4C1.1).

2. <u>The Obstruction of Justice Enhancement Should Not Apply</u>

The Probation Office also incorrectly applies the §3C1.1 obstruction of justice enhancement. The Court granted Mr. Schulte's motion for a judgement of acquittal on the Obstruction of Justice count where he was charged with obstructing justice by lying to the FBI. *See* ECF No. 1101. The government contends that the enhancement applies because Mr. Schulte was also convicted of violating 18 U.S.C. § 1001 for lying to the FBI. However, to violate § 1001, one only needs to make a materially false statement, whereas to receive the obstruction of justice enhancement under §3C1.1, the materially false statement must "significantly obstruct or impede the official investigation or prosecution of the instant offense". Application Note 4(G) to §3C1.1. The government has not met this burden.

3. <u>The Enhancement For Gathering Top Secret Information Should Not Apply</u>

Mr. Schulte objects to the enhancement for gathering or transmitting top secret information under §§2M3.2(a)(1) or 2M3.3(a)(1), and that it should also not apply because the government has not proven that the information in either "Vault 7" or "Vault 8" contained top secret documents. The government contends that this enhancement is appropriate because it produced top secret discovery to Mr. Schulte and his then counsel and litigated how the evidence would be presented to the jury. This is insufficient, because they must prove, by a preponderance of the evidence, *not* that the materials in question have a top secret stamp, but that the materials were properly classified as top secret. Its failure to meet this burden precludes the application of the enhancement.

4. <u>Mr. Schulte Did Not Abuse A Position of Trust or Use a Specialized Skill</u>

Finally, the enhancement for abuse of trust or using a special skill under §3B1.3 should not apply. §3B1.3 states that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense" two offense level points are added. Mr. Schulte's position as one of many software developers was not a position of trust, as he was not a manager, and the government has not shown that his position was given "substantial discretionary judgment that is ordinarily given considerable deference". Application Note 1 to USSG §3B1.3.

The government's position has been that Mr. Schulte's specialized computer skills were integral to the theft, coverup and dissemination of the classified information. Additionally, the PSR states that the government asserted that "[Mr.] Schulte's position and access to classified information qualifies as a position of public or private trust, whereby and in particular, he served as an administrator of the CIA's classified version of the Atlassian suite of software from which he stole information. As such, the defendant exercised managerial discretion, which he abused to restore access that the CIA had removed and to conduct the theft of the classified information." PSR at 58.

However, the government has not shown that the skills that they say Mr. Schulte used to copy the classified information required "substantial education, training or licensing", as is generally the case with a "Special Skill". Application Note 4 to USSG §3B1.3. Regarding the

5

applicability of the abuse of trust enhancement, the government's argument fails as well. It argues that Mr. Schulte serve<u>d</u> as an administrator of the suite of software from which the information was stolen. By the time somebody stole the information in question, Mr. Schulte had already had his access removed. Therefore, he could not have abused a position of trust that he no longer had.

Additionally, the government is also wrong that Mr. Schulte "exercised managerial discretion, which he abused" to restore his access to the material. If this was the case, and Mr. Schulte authorized himself to be able to access the materials, then he could not be guilty under 18 U.S.C. § 1030(a)(1). To be guilty of this crime, one must "knowingly access[] a computer without authorization or exceeding authorized access".

> 5. <u>As Acknowledged by the Second Circuit's Opinion in *Dorvee*, the Application of the Child Pornography Guidelines in Cases Involving Child Sexual Abuse Material are Incompatible with Section 3553(a)</u>

In the PSR, the Probation Office recommends that the Court sentence Mr. Schulte to 60 months' imprisonment for his child pornography convictions. We agree.

For "child pornography" offenses, the Probation Office concluded that the base level was 22, and after numerous adjustments for "Specific Offense Characteristics", it added 11 additional points for a total offense level of 33. Under Criminal History Category I this would equate to a Guidelines recommendation of 135 to 168 months'.

However, the Second Circuit has acknowledged that the Guidelines in child pornography cases are so blanket and unnuanced that they do little to assist a judge at sentencing. The Second Circuit in *Dorvee*, 604 F.3d 84, 96, stated that:

> An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a).

Additionally, when speaking about the "computer enhancement" for using a computer under §2G2.2(b)(6) in particular, the Circuit has stated that it "has the flavor of impermissible 'double counting' -- because it effectively 'increase[s] a defendant's sentence to reflect the kind of harm that has already been fully accounted for' by the base offense level or other enhancements.'" *United States v. Tutty*, 612 F.3d 128, 132 (2d Cir. 2010) (*quoting United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000)).

Upon learning how unreliable the Guidelines are in Child Pornography cases, The Honorable Kimba M. Wood wrote in response to a § 2255 petition that "[m]y incorrect assumption at

6

sentencing – that that Section 2G2.2 was the product of the Sentencing Commission's empirical expertise – was thus a fundamental defect resulting in a miscarriage of justice." *Gordon v. United States*, No. 10 Cv. 5366 (KMW), 2011 U.S. Dist. LEXIS 72592, at *9 (S.D.N.Y. June 30, 2011). At resentencing in *United States v. Gordon,* No. 06 Cr. 577 (KMW) the court reduced the defendant's sentence from 120 months' to the mandatory minimum 60 months' imprisonment. *See* Minute Entry dated Jan. 10, 2012.

For these reasons, courts routinely vary downward from the Guidelines in Child Pornography cases. *See United States Sentencing Guidelines Statistical Information Packet, Fiscal Year 2022, Southern District of New York*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nys22.pdf (where courts in the Southern District of New York varied downwardly in 100 percent of its Child Pornography sentences). Courts in this Circuit have not only varied downwardly, but in some instances, have given non-prison sentences. *See United States v. R.V.*, 157 F. Supp. 3d 207, 264 (E.D.N.Y. 2016) ("Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography (as opposed to distribution, production and actual sexual abuse). With respect to defendants convicted only of possession offenses, some courts have imposed sentences with minimal or no incarceration.").

As such, we concur with the Probation Office's recommendation that a 60-month sentence is appropriate for the Child Pornography counts.

6. <u>The Probation Office's Sentencing Recommendation is Flawed, as it does not Correctly Apply the U.S.S.G Enhancements Correctly, Nor Consider Mr. Schulte's Conditions of Confinement</u>

In addition, Mr. Schulte also objects to the sentencing recommendation made by the Probation Office. The Probation Office recommends a sentence of 360 months' imprisonment.

We disagree with this recommendation. The Probation Office's recommendation does not consider the terrible conditions of confinement to which Mr. Schulte has been subjected at the MCC and MDC. Additionally, as we have stated, we believe that some of the Guidelines' enhancements were applied erroneously, and even if they do technically apply under the Guidelines, they overstate the convicted conduct. Accordingly, the Court should accept and incorporate all of our objections into the final PSR.

**II.  A Downward Variance is Warranted Because of the Inhumane and Torturous Conditions of SAMs To Which Mr. Schulte Has Been Subjected For Over Five Years**

While not a sentencing factor under 18 U.S.C. § 3553(a), this Court should factor and downwardly vary based on the conditions to which Mr. Schulte has been subjected at the MCC and MDC. A downward variance would be appropriate even if Mr. Schulte was housed in general population during his more than six years of pretrial and presentence detention. However, he has spent almost five and a half years of his six years detained subject to the tortuous and inhumane conditions of the SAMs. This means that he has spent almost five years

in solitary confinement, unable to speak with any other inmate or use the phone outside of his weekly call with his parents (if it gets connected) and subject to constant light and a white noise machine to keep him isolated from human interactions. These inhumane conditions warrant a significant downward variance.

Substandard pre-sentence housing conditions are certainly relevant to a defendant's sentencing. For example, pre-pandemic, judges in this Circuit have considered the substandard conditions in the 11-South Unit of MCC and adjusted sentences accordingly. *See United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563 *5 (S.D.N.Y. Jun. 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit). Harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." *Id.*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Francis*, 129 F. Supp. 2d 612, 616-19 (S.D.N.Y. 2001) (downwardly departing because defendant spent more than thirteen months in substandard conditions including, overcrowding and inadequate hygiene).

More specifically and particularly relevant are the courts in this District and the Eastern District of New York that have varied downward as a result of the onerous pre-sentence detention conditions during COVID-19. *See, e.g.*, *United States v. Edwards*, 20 Cr. 618 (VLB) (S.D.N.Y.) (custody during COVID "unusually harsh"); *United States v. Martinez*, 18 Cr. 669 (JPO) (S.D.N.Y.) (time spent in MCC during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Browning*, 20 Cr. 002 (VSB) (S.D.N.Y.) (not the fault of the BOP but concluding that there was no question that the time was more difficult); *United States v. Diaz*, 20 Cr. 305 (DLC) (S.D.N.Y.) (downward variance based on MDC COVID conditions); *United States v. Paulino*, 19 Cr. 607 (AJN) (S.D.N.Y.) (downwardly varying based on COVID prison conditions); *United States v. Rodriguez*, 19 Cr. 817 (LAK) (S.D.N.Y.) (same); *United States v. Amado-Ortiz*, 19 Cr. 926 (JMF) (S.D.N.Y.) (same); *United States v. Battle*, 20 Cr. 349 (EK) (E.D.N.Y.) (harsh conditions tantamount to unearned disciplinary segregation or worse); *United States v. Carpenter*, 18 Cr. 362 (GRB) (E.D.N.Y.) ("I am going to find that the Guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration."); *United States v. Latney*, 18 Cr. 606 (JS)(E.D.N.Y.) (custody during COVID abnormally harsh).

The appropriate sentence for Mr. Schulte is one that recognizes that he was incarcerated at the MCC and MDC throughout the entirety of the COVID pandemic and varies downwardly based on that fact. More importantly, however, the appropriate sentence for Mr. Schulte should recognize that his pretrial and presentence incarceration has been significantly more onerous as that of the majority of inmates incarcerated during the pandemic because of the SAMs conditions he has been subject to for more than five years, which merits an even greater downward variance. *See United States v. Warsame*, 04 Cr. 29 (JRT) (D. Minn.) ("I have considered, Mr. Warsame, and I have given you substantial credit for the more difficult conditions under which you have spent your five and a half years in detention [under SAMs].")

In SAMs, Mr. Schulte is: (1) locked his small windowless cell for 23 hours a day; (2) has no contact with any other inmates; (3) has no ability to turn off the lights in his cell; (4) is subjected

to nonstop white noise so he ca nott hear anything outside his cell; (5) is subjected to low temperatures in his unit year round; (6) is subjected to continuous video monitoring 24 hours a day; (7) is only allowed one short call or video call with his family a week; (8) misses meals many days; (9) has severely restricted commissary; and (10) denied access to any entertainment. This is the equivalent of solitary confinement with numerous additional restrictive and inhumane conditions.

Mr. Schulte has been confined under SAMs since October 26, 2018.  It is impossible to understate the effect that the conditions that he has had to endure has had on him.  As this Court has rightly held "confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *United States v. Chavez,* No. 22 Cr. 303 (JMF), ECF No. 31 at 10 (*citing Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023); *Porter v. Pa. Dep't of Corr.,* 974 F.3d 431, 441-43 (3d Cir. 2020)). The effects of solitary confinement are well documented.  It has a psychological and physical impact on the person detained.  It is classified as torture in many areas of the world, and considered torture by many judges in the United States.  It is troubling that, knowing the impact that this has on people, the practice of solitary confinement is permitted in our country.

In their Amicus brief in a case in the Fourth Circuit, Drs. Stuart Grassian and Craig Haney describe to the Circuit the dramatic consequences of solitary confinement on a detainee.  They write that "[c]ommon psychological injuries from solitary confinement include severe depression, hallucination, cognitive dysfunction, memory loss, anxiety, paranoia, insomnia, withdrawal, lethargy, stimuli hypersensitivity, and panic."  Brief for Stuart Grassian, M.D. and Craig W. Haney, Ph.D., J.D. as Amicus Curiae in *Porter v. Clarke*, No. 18-6257, ECF No. 31-1 at 9-10 (4th Cir. 2018) (*citing* Terry A. Kupers, Waiting Alone to Die, in LIVING ON DEATH ROW: THE PSYCHOLOGY OF WAITING TO DIE 47, 54 (Hans Toch & James Acker eds., 2018); Craig W. Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 CRIME & DELINQUENCY 124, 133 (2003); Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, 34 CRIME & JUST. 441, 488-90 (2006)).

There is a physical impact on detainees in solitary confinement in addition to psychological. Drs. Grassian and Haney write that "[p]hysiological injury, too, is a consistent effect of solitary confinement, and commonly includes hypertension, heart palpitations, decline in neural activity, gastrointestinal disorders, headaches, severe insomnia, and weight loss."  Brief for Stuart Grassian, M.D. and Craig W. Haney, Ph.D., J.D. as Amicus Curiae in *Porter v. Clarke*, No. 18-6257, ECF No. 31-1 at 10-11 (4th Cir. 2018) (citing Kupers, Waiting Alone to Die, at 54; Haney, Mental Health, at 133; Smith, at 488–90).  They go on to write that:

> Physical injury also occurs at the subclinical level. Advances in neurobiology, brain chemistry, and neuroimaging technologies have established that the types of traumatic psychological harms associated with solitary confinement often trigger detectable changes in neural pathways and the morphology and neurochemistry of the brain. These changes can be accurately characterized as a physical injury or illness because they adversely affect the nature and functioning of the sufferer's brain.

Brief for Stuart Grassian, M.D. and Craig W. Haney, Ph.D., J.D. as Amicus Curiae in *Porter v. Clarke,* No. 18-6257, ECF No. 31-1 at 11-12 (4th Cir. 2018) (citing Ajai Vyas et al., Effect of Chronic Stress on Dendritic Arborization in the Central and Extended Amygdala, 965 BRAIN RESEARCH 290, 290–94 (2003); Carol Schaeffer, "Isolation Devastates the Brain": The Neuroscience of Solitary Confinement, SOLITARY WATCH (May 11, 2016)).

The Second Circuit has written about prolonged solitary confinement when ruling on if an Italian practice of semi-solitary confinement constituted torture. These conditions, known as 41-bis detention, are far more humane than what Mr. Schulte has had to endure, where detainees are allowed one hour to socialize with a small group of other detainees every day. Ultimately, the Circuit ruled that, while this practice did not rise to the legal definition of torture, "[t]he conditions of prolonged 41-bis incarceration are indeed severe and, as we have noted, can in aggravated circumstances amount to cruel, inhuman and degrading treatment that is similar to 'cruel and unusual punishment' under the Eighth Amendment." *Gallina v. Wilkinson*, 988 F.3d 137, 148 (2d Cir. 2021).

As it relates to the particular conditions at MDC, this Court recently made several findings regarding the inhumane conditions to which inmates are subjected in *Chavez,* No. 22 Cr. 303 (JMF). When the Court made all of these conclusions, it was not considering the MDC practices, procedures, policies, and conditions as they relate to an inmate like Mr. Schulte who has been subjected to the harshest conditions of any inmate housed at MDC. Rather the deplorable conditions, policies, and practices described by the Court are generally imposed upon general population inmates.

Mr. Schulte has been sitting in his cell since his conviction on the espionage counts in July 2022, not knowing what his ultimate sentence will be and how much longer he will have to endure this torture. He knows that, at sentencing, the government will likely take the position that he should be tortured in these conditions until his death. The conditions of his confinement, and in particular the application of the SAMs, has had an extremely detrimental effect on his mental health. Julie Smyth, LMSW, has visited Mr. Schulte at the MDC many times and interviewed members of his family.[3] Regarding his conditions of incarceration, she writes:

> SAMs has physically isolated Josh in a small cell for over five years. Outside of this cell, white noise machines play from the speakers to keep Josh from even hearing the conversations or footsteps of nearby officers – an act that further isolates him from even knowing if another person is nearby. For context on that timeframe, the United Nations' ("U.N.") Standard Minimum Rules for the Treatment of Prisoners deems that solitary confinement beyond a period of 15 days constitutes cruel, inhumane and degrading treatment and, under some conditions, torture. <u>Josh has been held under SAMs for more than 120-times the amount of time deemed torturous by the U.N.</u>

---

[3] As it contains details of Mr. Schulte's personal medical history, we request that Ms. Smyth's report be filed under seal.

*Report from Julie Smyth, SMSW* annexed hereto as Exhibit "B" at 4-5 (emphasis in the original). Ms. Smyth further concluded that:

> knowledge that SAMs is far more restrictive than general solitary confinement, his detention has been physically and psychologically torturous. Furthermore, the presumption based on interviews that Josh already had a neurodivergence since childhood means that the social isolation of SAMs may be even more damaging than for someone who is neurotypical.

*Id.* at 6.

The physical and psychological impact of solitary confinement and SAMs should not be ignored when the Court determines an appropriate sentence for Mr. Schulte. Even if Mr. Schulte were housed with the rest of the inmate population, a downward variance would be appropriate. As the Court wrote about the issues at the MDC, "[i]t has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *Chavez* at 2-3. Mr. Schulte experiences the worst of these issues on a daily basis, except unlike the rest of the inmate population that is afforded human interaction, Mr. Schulte has had to suffer through these issues for the past five and a half years, in torturous isolation. The Court should equate each year that Mr. Schulte has spent incarcerated under SAMs to multiple years spent in standard pretrial conditions at the MDC and vary downward significantly from the advisory Guidelines range.

**III.    Mr. Schulte's History and Characteristics, the Deterrent Effect of the Torturous Conditions of his Pretrial Incarceration, and an Analysis of Sentences in Similar Cases Reveals that a Sentence of No More than 108 Months' Imprisonment is Sufficient but not Greater than Necessary to Achieve the Goals of Sentencing**

In addition to the tortuous conditions to which he has been subjected, Mr. Schulte's history and characteristics and the need to avoid unwarranted sentencing disparities among similarly situated defendants warrants a significant downward variance. Mr. Schulte has led a law abiding, and objectively successful life, despite suffering from an undiagnosed neurodivergence. He is good-hearted as evidenced by the multitude of selfless acts recalled by his family in their letters to the Court. Additionally, it is respectfully submitted that sentencing Mr. Schulte to anything more than 108 months' imprisonment would create an unwarranted sentencing disparity. The sentencing range for similarly situated defendants convicted of espionage offenses involving information leaks that we have reviewed has been 13 months' to 63 months' imprisonment. Sentencing Mr. Schulte to a term of imprisonment exceeding 63 months would create an unwarranted sentencing disparity.

1. <u>Mr. Schulte's History and Characteristics as a Law-Abiding Citizen and Loving Family Member Warrant a Downward Variance</u>

Mr. Schulte is a 35-year-old man with no prior criminal history. He was raised in a middle-class home in Lubbock, Texas. He and his three younger brothers were raised by his parents Roger and Deanna, who still reside in Lubbock. Mr. Schulte grew up surrounded by a loving

11

immediate and extended family who cherished their time with him.  *See Letters of Support from Family and Friends* annexed hereto as Exhibit "C".

While Mr. Schulte did, and continues to, enjoy a close relationship with his family, he did not grow up with many close friends.  Ms. Smyth writes in her report that "[h]e did well academically and was attracted to computers and computer programming in middle school.  But from an early age Josh struggled to discern and implement certain social norms that come naturally to most others."  Exhibit B at 1.  He could not grasp things like pleasantries, or understanding why something he said would come off as hurtful or rude.  Mr. Schulte has a family history of neurodivergent and developmental disabilities.  His parents suspect, in hindsight, that based on some of his curious behavior growing up, he would have been diagnosed as Autistic.  Public awareness of how to identify signs of Autism, however, was not as prevalent when Mr. Schulte was growing up as it is today, and as he was successful in school and did not present the common signs of Autism, his parents never had him tested.

Although we do not possess an official diagnosis, there is support for his parents' belief.  When Mr. Schulte began his studies at the University of Texas at Austin, along with the rest of the incoming class, he sat down with the school's mental health professionals.  They told him that he should be evaluated for Autism.  This was Mr. Schulte's first time living away from home and was trying to make friends at a college, and for the first time he realized why he failed to fit in growing up.  It's impossible to know how Mr. Schulte's life, and quality of life, would have changed if he had been treated.

Despite all of this, however, Mr. Schulte was able to establish a successful career, first with internships at the National Security Agency and the Central Intelligence Agency ("CIA"), and then full-time employment with the CIA as a programmer.  It is undeniable that Mr. Schulte is extremely bright.  By and large he excelled in school and received his degree from a very good university in the difficult field of electrical engineering.  He was ultimately recruited and accepted into one of the most selective agencies in the country, only hiring the best of the best and most trustworthy people that could be security cleared.  However, as the Court is aware, interoffice, interpersonal clashing at the CIA is what led Mr. Schulte to leave the agency.  This falls squarely in Mr. Schulte's parents' belief that he has undiagnosed Autism, and Ms. Smyth's findings as well.

In spite of some of his social flaws, Mr. Schulte is and was adored as a cousin, nephew, son, and brother.  His family speaks at length about his selflessness and generosity.  For example, Mr. Schulte's cousin Landon Presnall recounted a story of how Mr. Schulte invited his cousins to his house in D.C. for the holidays, "knowing how important it was for us to be with family during these times."  Exhibit C, Letter from Landon Presnall.  Mr. Schulte organized activities for his cousins and paid for everything, "insisting that he wanted to treat his cousins to a good time.  What he wouldn't say explicitly, though, is that he wanted to make us smile, he wanted to make us laugh, and he wanted us to feel loved and come back."  *Id.*  He would do anything to make his family, who were also his closest friends, happy.

His aunt, Kelly Buchanan, recalled a memory of selflessness in her letter to the Court.  "I remember when my daughter got married, he had no idea what a gift registry was.  When his

mother explained what it was, he bought my daughter 5 to 6 major gifts." Exhibit C, Letter from Kelly Buchanan. Mr. Schulte was working on a government salary at the time. He did not have unlimited money, but what he did have he always wanted to share with his family that means so much to him.

Mr. Schulte was always happy spend money on the people in his life. However, the personal time you dedicate to others is much harder and speaks volumes as to one's character. Another of Mr. Schulte's cousins, Chelsea Pritchard, also wrote of his selflessness and how important family is to him. She writes that "Josh came home while my grandpa was still in the hospital. He stayed the night at the hospital so my grandma could go home and get some much-needed rest. Family was always very important to Josh and still is today. He would do anything for any one of us." Exhibit C, Letter from Chelsea Pritchard. His family tells many other stories in their letters, from simple things like helping his aunt prepare and clean up after holiday dinners, to more time intensive and selfless acts like traveling five hours to be the only family member to make his cousin's graduation and flying cross country to surprise his grandparents at their anniversary celebration. Actions like this are not obligations, they are choices. And Mr. Schulte always chose to make his loved ones' lives better when he could.

Being incarcerated thousands of miles away from his family has been hard for his entire family. As Ms. Smyth writes in her report, "Josh is also extremely limited in his interactions with his family – his greatest support system. Letters can take months to get to and from SAMs detainees at MDC and 15-minute phone calls only take place every other week. Due to SAMs limitations and monitoring, conversations are limited to 'small talk.' The limited interactions and intensive monitoring of communications with family members begin to feel worthless." Exhibit B at 5. This is of course difficult for Mr. Schulte, but also difficult for his family, living so far away. They worry about his safety, and with the rationing of phone calls in SAMs, many family members have not been able to speak to him at all.

Mr. Schulte's parents speak to their son as often as the BOP permits. Often their scheduled calls start late or do not come in at all. When they are able to visit in person, which is rare, they have to sit in a small room, divided by a glass panel. Mr. Schulte's mother, Deanna Schulte, writes that:

> I have had to watch not only how this has affected Josh, but how it has affected my other sons as well. We have had to travel so far just to see Josh and what we see when we visit we will never be able to erase from our minds; we have had very limited contact with him which is worrisome; we watch as he changes and breaks: and we continue to try to maneuver a frustrating and dehumanizing system. Our lives have changed because of this situation but we know we must continue in order to support Josh.

Exhibit C, Letter from Deanna Schulte. There is no doubt that Mr. Schute's family is his support system, and the toll that his incarceration has taken on them all is immense.

Mr. Schulte's history and characteristics show that he is much more than the crimes for which he has been convicted. He is a kind, smart young man that, although he struggles

13

socially, was able to do well in school and in his career. He loves and supports his family, and they love and support him as well. This all supports a significand downward variance from the advisory Guidelines range.

> 2. Mr. Schulte's Horrific Conditions of Confinement Provide Substantial Deterrence Against any Future Criminal Activity, and Knowledge of the Conditions Under Which He Has been Confined Serve to Deter the Public from Similar Criminal Activity as Well

When considering the factors under § 3553(a), the Court must also consider what length of sentence provides both general and specific deterrence. Based on the conditions that Mr. Schulte has suffered through for five years in SAMs, and considering the fact that he will likely not have access to classified information ever again, we believe that any additional term of imprisonment will not offer any additional deterrence. Additionally, based on his convictions under 18 U.S.C. 2552A, he will be required to register as a sex offender and subject to additional oversight.

As explained in detail above, Mr. Schulte's conditions of pretrial and now post-trial detention have been nothing short of torture. He is alone almost every hour of every day in a cold, brightly lit cell with white noise running at all hours so he cannot hear anyone else, and doesn't know if someone is right outside his cell, or if he is all alone. He is also videotaped at all times. He does not have a modicum of privacy. As shown by the rate of suicide and attempted suicide for inmates in solitary confinement, this is a fate worse than death. One would be hard-pressed to find a better general deterrence than simply referencing Mr. Schulte's presentence confinement.

Just as his experience at MCC and MDC provide general deterrence to the public, they provide specific deterrence as to Mr. Schulte as well. Additionally, there is no risk of Mr. Schulte committing an espionage offense after his release because will not have clearance to access classified materials. And if the Court adopts Probation's recommended Supervised Release conditions, he will have his internet activity monitored. Even if Mr. Schulte were to attempt to engage in any act of espionage after he is released, which we strongly believe he will not, it is likely that he would return to solitary confinement. This is the very definition of specific deterrence.

### 3. A Substantial Downward Variance is Necessary to Avoid a Sentencing Disparity Among Those Convicted of Comparable Crimes

If the Court were to impose a lengthy sentence here, it would create an unwarranted sentencing disparity compared with other "leaking" cases around the country. As the Probation Office notes in the Judiciary Sentencing Information ("JSIN") section of the PSI, there are an insufficient number of leaking cases in this District. *See* PSR at 53. However, there have been a number of leaking cases around the country that the Court can reference. According to JSIN, the average length of imprisonment for someone sentenced under §2M3.3 for Fiscal Years 2018-2022 is 61 months', and the median length is 56 months'. https://jsin.ussc.gov/analytics/saw.dll?Dashboard (selecting §2M3.3 in the Primary Guidelines dropdown list). Any sentence close to the Probation Office's recommended sentence would be substantially longer than any espionage case that we have reviewed.

In *United States v. Shamai Leibowitz,* 09 Cr. 632 (AW) (D. Md.), the defendant leaked classified FBI documents to a blogger. Mr. Leibowitz was charged with and pled guilty to violating 18 U.S.C. § 798(a), disclosure of classified information, and was sentenced to 20 months' imprisonment. In *United States v. Jeffrey Sterling,* 10 Cr. 485 (LMB) (E.D.Va.), the defendant, a former CIA employee, leaked information about a CIA operation and a human asset that Mr. Sterling was handling, to a journalist who ultimately published the information. Mr. Sterling was charged with violating 18 U.S.C. §§ 793(d) and (e) and found guilty after trial. The defendant's advisory Guidelines range was 235-293 months' imprisonment. He was sentenced to 42 months' imprisonment. At sentencing, Judge Leonie Brinkema imposed Mr. Sterling's 42 month sentence to send a "clear message [] to other people at the agency or in any other kind of clandestine or sensitive or secret operation of the government that when you take an oath in which you promise that you will not reveal secrets, that if you do knowingly reveal those secrets, there's going to be a price to be paid." *Sentencing Transcript*, ECF No. 475 at 25.

Additionally, the Court can compare the Probation Office's recommended sentence with the sentences imposed in *United States v. Stephen Jin-Woo Kim,* 10 Cr. 225 (CKK) (D.D.C.) and *United States v. Donald John Sachtleben*, 13 Cr. 200 (TWP) (D.Ind.). In *Kim*, the defendant pled guilty to violating 18 U.S.C. § 798(d), was facing an advisory Guidelines range of 121-151 months' imprisonment and received a 13 month sentence. In *Sachtleben*, the defendant pled guilty to violating 18 U.S.C. §§ 793(d) and (e), and was sentenced to 43 months' imprisonment.[4]

Finally, the Court can reference perhaps the most covered espionage case in recent history, *United States v. Reality Winner,* 17 Cr. 034 (JRH) (S.D.Ga.). Ms. Winner was a former Air Force linguist and intelligence contractor who leaked a top-secret government report on Russian hacking. She was indicted and pled guilty to violating 18 U.S.C. § 793(e). Ms. Winner was sentenced to 63 months' imprisonment. It has been reported that the government in Ms. Winner's case stated that "her sentence was the longest ever imposed in federal court for an unauthorized release of government information to the media." Dave Philipps, *Reality Winner, Former N.S.A. Translator, Gets More Than 5 Years in Leak of Russian Hacking Report*, N.Y.

---

[4] This defendant was also charged in *United States v. Donald Sachtleben*, 12 Cr. 127 (TWP) with violating 18 U.S.C. §§ 2252(a)(2) and (a)(4)(B), where he was sentenced to 97 months' which ran consecutive to his espionage sentence.

15

TIMES (Aug. 23, 2018), https://www.nytimes.com/2018/08/23/us/reality-winner-nsa-sentence.html.

As is plainly aware, sentences in these kinds of cases where classified government information has been leaked, are far lower than the sentences recommended by the Probation Office. In fact, the Probation Office's recommendation for Count 1 alone is almost double the sentence received by Ms. Winner. The Court must consider the sentences received by comparably situated defendants when calculating a sentence for Mr. Schulte, and we believe that our recommended sentence, where Mr. Schulte has served more than six years at MCC and MDC already under tortuous conditions, avoids an unwarranted sentencing disparity.

**IV.     Conclusion**

Mr. Schulte has been incarcerated at MCC and MDC for over six and a half years, and he has been subjected to continuous torture for five and a half of those years. Mr. Schulte is a bright, kind young man that has been impacted by years of torture, but who can fully reintegrate into society upon his release with the help of his family. Mr. Schulte's convictions represent aberrant behavior in an otherwise law-abiding life, and as such, the Court should vary downward significantly from the advisory Guidelines. We respectfully submit that the appropriate sentence for Mr. Schulte is 108 months' imprisonment followed by five years' supervised release.

Respectfully Submitted,

/s/

César de Castro
Shannon McManus


cc:     All Parties (*via* ECF)