O215schS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          17 Cr. 548 (JMF)

5   JOSHUA ADAM SCHULTE,

6              Defendant.
                                           Trial
7   ------------------------------x

8                                          New York, N.Y.
                                           February 1, 2024
9                                          2:20 p.m.

10  Before:

11
                    HON. JESSE M. FURMAN,
12
                                           District Judge
13
                         APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DAVID W. DENTON, JR.
         MICHAEL D. LOCKARD
17       Assistant United States Attorneys

18  CESAR DE CASTRO
    SHANNON McMANNUS
19       Attorneys for Defendant

20

21         (Case called)

22         THE DEPUTY CLERK:  Counsel, state your name for the

23  record.

24         MR. DENTON:  Good afternoon, your Honor.  David

25  Denton, Michael Lockard and Nicholas Bradley for the

O215schS

1  government.

2          THE COURT:  Good afternoon.

3          MR. DE CASTRO:  Good afternoon.  Cesar de Castro and

4  Shannon McManus for Mr. Schulte, who is seated between us.

5          THE COURT:  Good afternoon to you, as well.

6          We are here for purposes of sentencing.  It's been a

7  long road but we are final there I there.  In preparation for

8  today's proceeding I have reviewed the presentence report

9  prepared dated December 4 of last year.  I have also received

10 and reviewed the following additional submissions:  The defense

11 submission dated January 19 of this year, as well as the

12 attachments to that submission which include a letter

13 summarizing objections to the presentence report, letters

14 addressed to me from Mr. Schulte's parents, brothers, cousins,

15 aunts, uncles, a nephew, and some friends, as well as a

16 mitigation report which the defense has asked to file under

17 seal.

18          I have also received and reviewed the government's

19 submission dated January 25 of this year, as well as the

20 attachments to that submission which include a letter from the

21 CIA deputy director, a classified letter from the director of

22 the CIA Center for Cyber Intelligence, and letters from

23 identified victims of the defendant's child pornography

24 offenses which the government also asked to be filed under

25 seal.  I have also received a proposed forfeiture order.

O215schS

1          First, are there any additional submissions I should

2     have received?

3          MR. DENTON:  No, your Honor.

4          MR. DE CASTRO:  No, your Honor.

5          THE COURT:  Have you each received the other's

6     submission, to the extent that they are not filed publicly on

7     the docket?

8          MR. DENTON:  Yes, your Honor.

9          MR. DE CASTRO:  We have, yes.

10          THE COURT:  All right.

11          With respect to the sealing request, I guess I would

12     ask the government, is there any reason that the victim letters

13     can't be filed publicly with, I think for the most part, any

14     identifying information that has already been redacted to the

15     extent that you wanted to redact additional things, for example

16     the series names or what have you.  I would be open to that,

17     but it strikes me that the substance of them is of public

18     interest and if they don't identify who the victims are that

19     there is some argument that they should be public.

20          MR. DENTON:  Your Honor, to the extent you would like

21     to ask us to address that, I think we would ask to put

22     something in.  There are some specific sealing provisions in

23     2259 that deal with victim submissions and one of them turns on

24     whether the victim is still a minor, and so I would ask for us

25     to have the opportunity to just confirm whether different

O215schS

1    categories would apply to different parts of those letters.

2            THE COURT:  Fair enough.  So why don't you do that.

3    Can you do that by the end of next week?

4            MR. DENTON:  Yes, your Honor.

5            THE COURT:  Great.  So I will defer judgment on that.

6    I will grant the defense request to file the mitigation report

7    under seal and the classified filing is obviously going to

8    remain classified and therefore sealed.  Those items will be

9    made part of the record, are part of the record.  To the extent

10   that there is an appeal, counsel on appeal can have access to

11   them without further application to me.

12           Mr. Denton, can you confirm that the government has

13   notified any known and identifiable victims of any rights that

14   they have with respect to today's proceedings?

15           MR. DENTON:  We have, your Honor.

16           THE COURT:  Turning then to the presentence report,

17   Mr. De Castro, I take it you have reviewed the presentence

18   report?

19           MR. DE CASTRO:  Yes, your Honor.

20           THE COURT:  And have you reviewed it with Mr. Schulte?

21           MR. DE CASTRO:  We have.  It was a little difficult

22   but we have.

23           THE COURT:  I know from your submission that you have

24   various objections.  I will address those in short order.  I

25   guess aside from those that are set forth in your submission,

O215schS

1    any additional objections or corrections?

2            MR. DE CASTRO:  No, Judge.

3            THE COURT:  We do have an overflow courtroom, by the

4    say, so even more so than usual I would ask that you make sure

5    you speak into the microphones.

6            Mr. Schulte, if you want to pull that microphone close

7    to you, you may.  Did you review the presentence report?

8            THE DEFENDANT:  Yes.  It was provided to me last week

9    but I was able is to review it with counsel on Monday.

10           THE COURT:  Very good.

11           Mr. Denton, have you reviewed the presentence report?

12           MR. DENTON:  Yes, your Honor.

13           THE COURT:  Putting aside the guidelines for a moment,

14   any objections or corrections to the factual recitation in the

15   report?

16           MR. DENTON:  No, your Honor.

17           THE COURT:  Let me address the defense objections with

18   respect to the factual recitations.  I don't know if the

19   objections set forth in Footnote 1 of the defense submission

20   are still being made but to the extent they are I overrule

21   them, first with respect to paragraph 39, which references the

22   circumstances that led to Mr. Schulte's remand when he was on

23   bail.  I think the issue is not material to my sentence and I

24   think the existing language is sufficient.  It states that the

25   alleged violation was accessing the internet through his

O215schS

1    roommate and cousin.  Later references the use in context makes

2    clear that it was through the cousin so I don't think there is

3    any material problem with that.

4         The objection to paragraph 80 is overruled.  The

5    record at trial supports the statement in that paragraph that

6    classified documents were found in Mr. Schulte's home and

7    therefore that paragraph will remain as is.  And I agree with

8    the government that the paragraphs concerning Mr. Schulte's use

9    of the discovery laptop and the materials that were found on it

10   as highly material and relevant to sentencing and therefore

11   ought to remain part of the presentence report, and the record

12   was litigated at some length during the proceeding and even if

13   he was not convicted of offenses relating to that conduct, I

14   think it is relevant to sentencing.  And, it is not accurate to

15   state that the defense was denied access to the laptop and the

16   forensic analysis, as the record makes clear that that is not

17   the case.

18        Hearing no other objections, I will adopt the factual

19   recitations set forth in the presentence report which will also

20   be made part of the record and kept under seal.  If an appeal

21   is taken, counsel on appeal may have access to the presentence

22   report as well without further application to me.

23        Turning then to the guidelines.  As counsel know, I am

24   not bound by the guidelines but I do have to accurately

25   calculate the guidelines range and then consider that range in

O215schS

imposing a sentence.  In this case the presentence report

calculates the offense level as 43, the Criminal History

Category is a VI by virtue of the terrorism enhancement, and

the corresponding guideline sentence is life in prison; a

supervised release range of one to three years on Counts One

through Five, Seven and of the S3 indictment and Count Nine of

the S2 indictment, one year on Count Six of the S3 indictment,

and two to five years on Count Eleven of the S2 indictment, and

five years to life on Counts Twelve through Fourteen of the S2

indictment and a fine range of $50,000 to $250,000.

         The defendant has objected to several aspects of the

guidelines calculation.  When we address the objections in

turn, which are well briefed by both sides, I don't need to

hear further argument on it.

         First, and probably most substantial, is the

disagreement in the application of the terrorism enhancement

which is set forth in Section 3A1.4 of the guidelines.  The

enhancement, by its terms, plainly applies, per application

note 1, the definition of federal crime of terrorism is found

in 18 U.S. Code Section 2332(b)(G)(5).  That provision, in

turn, has two prongs, first the offense must be one that is

calculated to influence or affect the conduct of government by

intimidation or coercion, or to retaliate against government

conduct; and second, must be a violation of an enumerated

statute, a list that includes 18 U.S.C. Section 1030(a)(1) and

O215schS

1    (5), offenses of which Mr. Schulte was convicted of here.

2    Accordingly, the application of the enhancement turns on

3    whether the offense was, quote unquote, calculated to retaliate

4    against government conduct.  I don't think -- and I don't think

5    the government argues -- that the offense was calculated to

6    influence or affect conduct of government by intimidation or

7    coercion.  I find that it was calculated to retaliate against

8    government conduct.  Specifically, trial records support the

9    finding of Mr. Schulte's conduct was calculated to retaliate

10   for various actions taken by the government, namely, the CIA,

11   from his transfer within the CIA, to revocation of his

12   administrator privileges and access to certain computer

13   resources and materials to the reprimands that he received.

14   The fact that this government conduct occurred in the context

15   of the employer/employee relationship does not change the fact

16   that as a matter of plain language, it was government conduct.

17   Moreover, as the government here points out, Mr. Schulte's

18   conduct, stealing the CIA's entire arsenal of cyber tools,

19   explain that he sought to retaliate against government as a

20   whole.  The fact that Mr. Schulte's case is different from

21   Timothy McVeigh's or Osama Bin Laden's doesn't make the plain

22   language of the definition any less applicable.  See, for

23   example, United States v. Steward, 590 F.3d 93 at page 150, (2d

24   Cir. 2009), finding that the terrorism enhancement, quote,

25   plainly applied as a matter of law irrespective of whether the

O215schS

1    defendant's behavior in that case was, quote unquote, atypical.

2    In short, the terrorism enhancement by its plain terms applies.

3          The defendant's other arguments with respect to the

4    enhancement are really Section 355 3(a) arguments about whether

5    I should vary from the guidelines because the enhancement is

6    unduly harsh.  I will defer discussion of that issue until

7    later in the proceeding when we discuss the 3553(a) factors.

8          Second, the enhancement to which the defense objects

9    is the obstruction of justice enhancement in 3C1.1.  The

10   defendant's argument on that score is squarely foreclosed by

11   *United States v. Crisci*, 273 F.3d 235 (2d Cir. 2001) which held

12   that where, as here, there is a separate count of conviction

13   for obstructive conduct, there, as here, a violation of 18

14   U.S.C. Code Section 1001, the Court is required to apply

15   Section 3C1.1.  That is at page 240 of the opinion.  I would

16   note that even if that were not the case, I would apply the

17   enhancement notwithstanding my Rule 29 decision with respect to

18   the obstruction count.  The basis for that decision was that

19   there was an insufficient nexus to the grand jury proceeding,

20   not that the defendant didn't engage in obstructive conduct, he

21   plainly did, not only by lying to the FBI in his initial

22   interview but by doubling and even tripling down in those lies

23   in his subsequent counsel interviews with the U.S. Attorney's

24   office.  The bottom line is that the defendant's objection to

25   that enhancement is overruled as well.

O215schS

1      The third enhancement to which the defense objects is

2  the enhancement for gathering top secret information

3  Section 2M3.2(a)(1) and 2M3.3(a)(1).  That objection is

4  overruled substantially for the reasons set forth in the

5  government's sentencing submission.  There is ample evidence in

6  the record from trial and from the extensive CIPA litigation

7  before trial to support the enhancement.  Contrary to the

8  defendant's suggestion, the government is not required to prove

9  that the information and materials were properly classified as

10  Top Secret, but even if the government was required to prove

11  that it did so here given the extensive evidence in the record

12  from trial, to the deputy director's sentencing submission, to

13  the classified sentencing submission, to support the conclusion

14  that the materials at issue were properly classified as Top

15  Secret given the harm that they could and did cause to national

16  security.

17      Finally, the defense objects to an enhancement for an

18  abuse of position of trust or use of special skill in violation

19  of Section 3B1.3.  That is also overruled, substantially for

20  the reason set forth in the government's submission.  Indeed, I

21  think the argument to the contrary on this one is, or at least

22  borders on frivolous, honestly.  Mr. Schulte plainly used his

23  sophisticated knowledge of and skills with computers and the

24  CIA's computer systems to commit the espionage offenses and his

25  knowledge and skills are not possessed by members of the

O215schS

1    general public.  See, for example, *United States v. Chinniah*,

2    173 F.3d 846 (2d Cir. 1999) which is an unpublished decision

3    but directly on point.

4         In addition, Mr. Schulte clearly abused a position of

5    trust.  Indeed, his position in the CIA itself was a position

6    of trust as he himself acknowledged in the secrecy agreement

7    that he signed which is Government Exhibit 405 of the 2022

8    trial, and his position of trust as an administrator of the

9    Atlassian Suite plainly enabled him to commit the offense even

10   though it had been revoked at the time that he ultimately

11   engaged in the theft and leak of materials at issue because his

12   administrator status was what enabled him, through the

13   reversion to an earlier snapshot of the Confluence server as

14   proved at trial, to obtain unauthorized access.  So, the

15   enhancement in Section 3B1.3 applies for multiple reasons.

16        So those are the objections that were set forth in the

17   defense submission.  Are there any additional objections with

18   respect to the Sentencing Guidelines calculation set forth in

19   the presentence report?

20        MR. DE CASTRO:  No, your Honor.

21        THE COURT:  Government?

22        MR. DENTON:  No, your Honor.

23        THE COURT:  So, in light of those rulings and my own

24   independent calculation of the guidelines, I accept and adopt

25   the guidelines calculation set forth in the presentence report,

O215schS

1    that is, using the November 2023 edition of the guidelines.  I

2    find that the offense level is 43, Criminal History Category is

3    VI, and the guidelines sentence is life in prison.

4             Does either counsel believe that a departure that is

5    within the guideline system and as distinct from what has come

6    to be known as a variance is warranted here?

7             Mr. Denton?

8             MR. DENTON:  No, your Honor.

9             MR. DE CASTRO:  Departure, no; and as the Court knows,

10   I will be arguing for a substantial variance.

11            THE COURT:  Understood.  I will defer on that but have

12   nevertheless considered whether there is any basis for

13   departure which is within the guideline system and as distinct

14   from what has come to be known a variance and I find that there

15   are no grounds that would justify a departure.

16            With that, I will hear first from the government, and

17   then from Mr. De Castro, and then if he wishes to say anything

18   from Mr. Schulte.  Suffice it to say, I am very familiar with

19   the record in this case.  I have read your very lengthy and

20   substantive sentencing submissions, they were both very well

21   and you don't need to repeat things that I would already know

22   from either my familiarity with the record or those

23   submissions, but to the extent that there is anything that you

24   think would be helpful in forming my decision as to the

25   appropriate sentence you may share it and I may have some

O215schS

1      questions for each counsel as well.  So, starting with the

2      government?

3              MR. DENTON:  Thank you, your Honor.

4              I want to make one global observation to start.  The

5      court is in a particularly unique position here of not just

6      having familiarity with the record but of having familiarity

7      with this defendant.  In terms of the volume of proceedings,

8      the length of some of those, and his self-representation

9      through a lot of it, the Court has perhaps some unique insight

10     into Joshua Schulte's character and behavior and persistence,

11     which I think is one of the most telling things about the

12     sentence that the Court should impose here.

13             As the Court has heard from many of the people who

14     worked with him at the CIA, the message time and time again

15     was:  We told you to stop and you just wouldn't do it.  And

16     that was borne out in a lot of his behavior before the Court as

17     well, such as when he was told not to violate protective

18     orders.  He was told to stop and he just kept doing it anyway.

19     And so, I think there is a particular insight that the Court

20     knows here of this defendant that may be, in some respects

21     unique, that informs the sentence that the Court should impose

22     today.

23             It is no small thing for the government to ask the

24     Court to sentence someone to life in prison.  That's not

25     something that anyone asks for lightly but it is a reflection

O215schS

1    of the unique gravity of this defendant's crimes, not just one

2    crime, not a single murder, but three discrete courses of

3    conduct, each with their own levels of harm.

4            First, the original act of espionage that he committed

5    at the CIA ranks in the most damaging disclosures of classified

6    information in American history.  And as we noted, one of the

7    things that makes this case somewhat unique relative to others

8    is that by choosing to transmit all of this information to an

9    entity that disseminated it publicly rather than to a single

10   foreign power, that decision by the defendant had cascading

11   effects that harmed U.S. national security not just vis-à-vis a

12   particular adversary but with respect to every adversary and in

13   an arena of cyber intelligence that is ever more critical.  So,

14   there is this cascading effect of the defendant's choices, and

15   at each stage his choices caused more harm than they might have

16   otherwise.

17           The second course of conduct was the combined effect

18   of what he did while incarcerated.  And there has been so much

19   litigation and discussions in this case about the condition of

20   the defendant's confinement it bears calling that those

21   conditions were not a reflexive and initial position.  They

22   were a response to the defendant's treating, every single time

23   that limits were imposed on him, those limits as a challenge

24   for him to overcome and ignore and violate.  And so, that's

25   what led to the information or the dissemination of more

O215schS

1    classified information from jail, the attempted dissemination

2    of more, and I think it's important that the Court heard at

3    trial why those particular bits of information were important.

4    This is not some sort of stray reference but this is the sort

5    of thing that has meaningful consequences for operations, for

6    employees, for officers, and thus for national security.

7         And then, underlying all of that are the child

8    pornography offenses, which as we note in our letter, the

9    details stand for themselves and the Court, like everyone, had

10   to see some of that.  It speaks to a particular pathology of

11   the defendant and the fact that he not only possessed and

12   viewed that material and collected it and transported it over

13   years while he was at liberty, that was what he chose to do

14   with privileges that he was granted while incarcerated, in fact

15   even while on trial for espionage, was choosing to view child

16   pornography, from in jail.

17        So, each of these courses of conduct, these sort of

18   three discrete groups that we have talked about all throughout

19   this case are crimes that demand just punishment and should

20   reflect the severity of those offenses, but the manner of their

21   commission, the fact of their commission, the timing of their

22   commission also speaks to the need for deterrence and

23   incapacitation of Joshua Schulte in particular.  And so, that

24   is why we have asked for the sentence that we have.  As I say,

25   it is no small thing but the harm that he caused was not small.

O215schS

1              I am happy to answer any questions that the Court has.

2              THE COURT:  OK.  Thank you.  I do have a couple.

3              First I want to disentangle the different purposes of

4       punishment just a little bit.  Put aside seriousness of the

5       offense, essentially retribution and deterrence for a moment

6       and just focus on incapacitation.  I think I am inclined to

7       agree that Mr. Schulte has extraordinary computer skills and

8       has a demonstrated willingness to damage national security of

9       the United States by leaking classified information to which he

10      is privy to as he demonstrated not only in the initial leaks

11      but by leaking from the MCC and even in some of his statements

12      after his conviction.  I guess the question I have is at what

13      point do those risks or threats, just focusing on national

14      security, not the child pornography, I suppose, sort of

15      dissipate?  That is to say, to the extent that he is privy to

16      classified information today, the disclosure of which can harm

17      national security, presumably at some point that information is

18      no longer ripe and therefore damaging to national security.

19      So, too, if he is in prison for a while, at some point one

20      imagines that his computer skills will atrophy since he is not

21      going to be brushing up on them when he is in prison and

22      presumably his ability to do the kinds of things that he did

23      here may not be as readily available to him.

24              So, I guess if you catch the drift, I guess why is a

25      life sentence necessary at least just for purposes of

O215schS

1    incapacitation?  Isn't there a point at which some number of

2    years from now those risks are sufficiently small that he

3    doesn't need to be jailed?

4           MR. DENTON:  So I think the answer is on both it is

5    highly variable.  I think separate from the term of

6    imprisonment that the Court imposes that is why, or one of the

7    reasons at least why special administrative measures have to be

8    rejustified and reauthorized annually, because that is true.  I

9    think there is some information that the defendant is privy to

10   that is so sensitive that it is unlikely to dissipate during

11   the course of his lifetime.  An easy example that we can talk

12   about that has been a persistent issue in this case are the

13   identities of covert officers, people who have served in

14   covered capacities for the CIA that he knows that we have

15   repeatedly had issues with his either disagreeing with the

16   classification of or otherwise publishing that information in

17   filings.  Purposefully or inadvertently it has happened.  That

18   is information that, essentially, for the duration of those

19   officers' lives, will remain sensitive.  And that's before we

20   talk about particular operations or particular things where the

21   ramifications of it are not just the ongoing existence of the

22   operation but potentially even years later the fact that it was

23   conducted by the United States where it was could have serious

24   implications for foreign policy.

25           So, I cannot predict, your Honor, the point at which

O215schS

1    that will dissipate.  I think it is fair to say that it will

2    exist on a slope and the degree to which it will be dangerous

3    will change over time.  As I said, that's why SAMs are

4    appropriately re-evaluated on a fairly frequent basis but it is

5    also true that a significant amount of it will remain sensitive

6    and will require his incapacitation for a very long time.

7            THE COURT:  Second, could you address the 3553(a)

8    arguments with respect to the terrorism enhancement?  I already

9    ruled I certainly think as a matter of plain language it

10   applies but I do think it has been criticized by some

11   commentators -- [phone ringing] -- nobody's phone should be

12   going off -- it has been criticized by some commentators and

13   courts, one I believe described it as taking a wrecking ball to

14   the guidelines.  I do see some merit to that argument here and

15   let me explain in particular why.

16           The two predicate convictions that support it are the

17   violations of Section 1030.  If I am not mistaken, I think the

18   maximum sentence for one of those is 10 years and the other is

19   a year, which is to say that even taken on a consecutive basis,

20   the maximum sentence they would support as a matter of

21   Congress' intent is 11 years.  So the fact that those then sort

22   of trigger an enhancement under the guidelines that, because it

23   also bumps up the Criminal History Category to VI, result in a

24   life sentence under the guidelines seems a little bit of a

25   disconnect.  So, can you address that?

O215schS

1          MR. DENTON:  Sure, your Honor.

2          So, let me start by just addressing substantively I

3     think the reason why the criticisms of the terrorism guideline

4     may be applicable in other contexts but not necessarily in this

5     one.

6          I think as Judge Walker's opinion, concurring in part

7     with Stewart, lays out there is two different objectives that

8     the guideline is intended to serve reflected in the two ways in

9     which it enhances the guideline recommendation.  The first is

10    the additional points on the offense level is designed simply

11    to reflect the seriousness of terrorism crimes.  The terrorism

12    guideline is a Congressional directive, it is not something the

13    commission has done, Congress has made the decision that no

14    matter what the commission decides with respect to specific

15    offense levels for terrorism in general, for this enumerated

16    set of offenses the sentencing guidelines should reflect the

17    unique harms of national security offenses.  One thing I think

18    that is important there is when you look at the two 1030(a)

19    predicates to which the terrorism enhancement applies, the two

20    that they apply to are (a)(1), which deals with effectively the

21    best way to describe it is espionage by computer; and (a)(5),

22    which is the transmission of harmful commands so it is the

23    actual act of causing damage.  He was also convicted under

24    (a)(2) which simply involves accessing computer systems of a

25    government agency.  Congress did not include that in the

O215schS

1    enhancement because it was expressly designed to acknowledge

2    that there are certain types of crimes that have national

3    security implications for which Congress has directed that the

4    commission employ this enhancement.  I think whatever name gets

5    put on the offense, it is clear that the defendant's conduct

6    here falls within that realm of exceptionally grave harm to

7    national security of a different type than an Oklahoma City

8    bombing or Osama Bin Laden, but in some respects within its own

9    sphere, within the sort of information area equally at the far

10   end of the spectrum of how bad it can be.

11          The second is the Criminal History Category

12   enhancement which, again, there too, it reflects this

13   determination that national security offenders are uniquely

14   likely to recidivate and more even than that, uniquely

15   challenging to rehabilitate in a way that the Court can be

16   confident about that is different from other types of offenses.

17   There are some criticisms of how that determination was made

18   but for all of the reasons that I discussed before I think

19   especially apply to this defendant and that is a concern that,

20   as applied to him in particular, rings quite loud.

21          Overall, I think your Honor is correct to note that

22   there is perhaps a mismatch in some respects between the

23   gravity of some of the crimes that are described and what

24   penalties were ascribed to certain offenses and not to others.

25   I think the Court has discretion to decide how to sentence

O215schS

1      across the different counts here and I think with respect to

2      considering the 3553(a) factors, I don't think that those

3      statutory terms necessarily reflect any minimization of the

4      seriousness of the offense.

5                THE COURT:  And I did get your proposed forfeiture

6      order so you don't need to address that but can you comment

7      with respect to restitution?

8                MR. DENTON:  Yes, your Honor.

9                We would ask the Court to allow us to submit

10     something, a proposed restitution, within 90 days.  The

11     mandatory restitution under, I believe it was also

12     Section 2259, requires a calculation about the victims' actual

13     losses of child pornography offenses and also how much they

14     have been repaid by other cases in which restitution has been

15     ordered.  We have been in touch through our Victim Services

16     Unit with the people who compile that information and asked for

17     it.  They weren't able to get it to us in time for this

18     proceeding but we expect we will, given the complexity of those

19     calculations, we would ask for the extra time to be precise

20     about those numbers.

21                THE COURT:  And you agree that there should not be an

22     assessment under the Justice for Victims of Trafficking Act,

23     the JVTA?

24                MR. DENTON:  No, your Honor.

25                THE COURT:  No?

O215schS

1          MR. DENTON:  I'm sorry.  We agree that there should

2     not be, your Honor.

3          THE COURT:  All right, Mr. De Castro.

4          MR. DE CASTRO:  Judge, can I use the lectern?

5          THE COURT:  As long as you speak into the microphone,

6     that's fine with me.

7          MR. DE CASTRO:  I will.

8          So thank you, your Honor.  Joshua Schulte stands

9     convicted of crimes for which this Court has to determine,

10     among others, what is sufficient but not greater than necessary

11     to rehabilitate him, deter him, deters others, and that is

12     just.  That is, what is the least amount of time necessary to

13     achieve those goals.  If the standard were the most necessary

14     then life imprisonment would serve those goals for Mr. Schulte,

15     it would serve those goals for any other defendant before the

16     Court and for any crime, but that thankfully for the system and

17     thankfully for us that is not the law.  For Mr. Schulte and all

18     defendants the Court must consider the least necessary

19     punishment that would achieve those goals.

20          The Court has the unenviable task of imposing

21     punishment, just punishment on a fellow citizen convicted of

22     crimes.  No doubt that it is one of the most difficult tasks

23     that this Court engages in.  The Court has to weigh so many

24     factors to reach a just result.  The parties can advocate.  You

25     have to achieve a just result and I know that must be

O215schS

1    difficult.

2              Our guideline system treats individuals like a

3    mathematical formula.  While still considered, it has been

4    correctly rejected as the way in which you determine the

5    appropriate sentence for another human being.  And this is a

6    difficult case.  Joshua Schulte has certainly been convicted of

7    serious crimes.  If that was the only factor, that the Court

8    accepted all the government's arguments regarding the

9    seriousness and effect of the crimes, then it is not a

10   difficult sentence.  Then I suppose you go with what the

11   government says.  But there are other questions and factors to

12   weigh.

13             Is Joshua Schulte capable of redemption?  We say yes.

14   His support network, some of which is here today, many who

15   couldn't travel here, his parents are here, siblings are here,

16   they have been there and will be there when he is released from

17   prison.  That tells us, yes, he is capable of redemption.  They

18   will be there to get him on track.  Is he capable of

19   rehabilitation?  Capable of being deterred?  We also of course

20   say yes.  The conditions of confinement have so stripped him

21   down and any further imprisonment, which may include SAMs and

22   it sounds like is likely to include SAMs, will finish the job

23   that neither he nor anyone else subjected to his conditions

24   would likely engage in any future conduct or criminal conduct.

25             Despite the crimes for which he has been convicted and

O215schS

1   facing a potential life sentence, he still has hopes and

2   dreams.  His hopes and dreams have changed obviously

3   drastically since his arrest and now he longs for the simple

4   things in life:  A face-to-face meeting with a loved one where

5   they can touch each other's hand or maybe even have a short

6   embrace, he doesn't have that; a private conversation, one

7   that's not recorded and/or videotaped with anyone other than a

8   prison guard or his lawyers; the feeling of the sun on his

9   face, not in the confines of a prison transport van or in this

10  courtroom; or the residual light from the windows strategically

11  place in the former warehouse that now serves as the MDC.

12          The government and some would argue that by virtue of

13  the crimes of which he has been convicted he has forfeited

14  those rights, those simple pleasures -- those simple pleasures

15  of our everyday existence.  And that's why we impose the SAMs

16  upon him.  But has he really forfeited them forever?  Is life

17  in prison or the equivalent of life in prison a sentence that

18  is sufficient but not greater than necessary?  Of course we say

19  the answer is no.

20          The factors that we spent most of the time on in our

21  sentencing submission were the conditions of confinement.  I'm

22  not going to repeat, I don't try to do that, but I think it is

23  important to highlight some of that and give a little

24  additional color, if we can and since that's, we believe, is

25  the single most important factor that this Court should

O215schS

1    consider.

2            And I want to be clear to make a distinction between

3    the SAMs and his conditions of confinement.  We are not

4    re-litigating the SAMs issue.  It was before Judge Crotty, it

5    was before you, it has been before you a number of motions,

6    before my involvement in this case.  We are not re-litigating

7    that.  The restrictions and limitations regarding his

8    communications and access to materials have been severely

9    restricted, have been litigated, and have been decided.  And

10   the government's point is that the SAMs were imposed on him as

11   a result of his actions.  However, his torturous conditions

12   have gone well beyond any reasonably tailored restrictions to

13   address the potential safety and security concerns.  The

14   conditions under which he has suffered the last five and a half

15   years are not part of the SAMs and they need to be addressed

16   and they're simply not.  And the message to the MDC, over and

17   over again by Courts in this district and most recently by this

18   Court, is that you have to consider the humanity of the people

19   that are in your facility and what has happened over and over

20   and over and over again is your orders are ignored.  They are

21   put on the bottom of the pile and ignored, just like our

22   communications with them, our petitions to them, for anything

23   as counsel to our clients are ignored.

24           The conditions under which he has served the last five

25   and a half years are not required or even contemplated in SAMs

O215schS

```
1    because they're inhuman and they're characterized as torture in
2    almost every civilized nation.  Complete isolation, 23-hour
3    lockdown in a windowless cell 23 hours a day.  Not part of the
4    SAMs and that's what he has had for five and a half years.  No
5    ability to turn off the lights on off the lights.  His lights
6    are on all the time.  He doesn't know if it's daytime or
7    nighttime.  It's not part of the SAMs.  Little to no access to
8    natural light.  That's not part of the SAMs either.  Little to
9    no access to fresh air.  Not part of the SAMs but imposed on
10   him.  Non-stop white noise.  Not part of the SAMs because it is
11   not tailored to any need of the Bureau of Prisons except to
12   torture him.  Freezing cold temperatures year round in his cell
13   with every piece of clothing he has layered upon layer to stay
14   warm.  Not in SAMs.  Every client I have at the MDC describes
15   that.  It is freezing cold there.  Frequent missed meals many
16   days a week.  It is not in SAMs but he is subjected to that.
17   And he has severely restricted commissary.  The one thing that
18   prisoners look forward to, of course is communications with
19   their family and friends and being able to get things from
20   commissary, buy things, buy food, buy radios, things like that.
21          We were recently at the MDC to visit Mr. Schulte.  As
22   he mentioned, he got his PSR on Monday after we had mailed it
23   maybe four times.  We had been with him, we had to put it up on
24   a glass to show him so he could potentially read it.  And when
25   we were there it was confirmed by a lieutenant there that we
```

O215schS

1   were able to speak to that they had just been skipping his

2   commissary.  So, *oh, there is not a lot of people in that unit*

3   *they don't feel like looking up what anybody is ordering so*

4   *they just skip it*.  That's not part of the SAMs either.

5           No access to any form of entertainment is not part of

6   the SAMs.  And that his lawyers have to mail him things

7   multiple times, over and over and over again, wasting taxpayer

8   dollars upon taxpayer dollars, to try to get him simple

9   materials is not part of the SAMs either.  Our material is

10  supposed to be reviewed and provided to him.  He received our

11  mail the other day months -- that we had mailed months earlier

12  in a big bulk.  Here you go, you are about to be sentenced.

13  And that his personal mail is subject to the same, that they're

14  just going to give him his mail quarterly, that's not part of

15  the SAMs either because that's cruel.  Because that's what it

16  is, cruel, because he can't engage.  Even if the communications

17  are going to be monitored for security concerns he can't even

18  have a -- people like to call it these days, snail mail

19  conversations with someone.  Here, here is what is going on in

20  my life, what is going on if your life?  Maybe I can live

21  vicariously through you a little bit.  He can't have any of

22  that.

23          The government, in its submission, defends the SAMs

24  but as it has been forced to do in countless sentencings of

25  inmates housed at the MDC.  As this Court noted in its previous

O215schS

1    decision, prosecutors no longer even put up a fight or dispute

2    the state of affairs at the MDC, that they're unacceptable and

3    none of those conditions that I just described are part of the

4    SAMs.  And I submit I don't think the government would get up

5    and say, yeah, we really think there is a need to put white

6    noise outside this man's cell all the time, keep his lights on

7    all the time, sleep deprive him.  Those are the things we talk

8    about when we talk about torture.

9          So the implementation of the SAMs and all of these

10   other torturous conditions that are obviously left out of the

11   actual SAMs directive warrant Court's consideration and, I

12   submit, unprecedented variance.  The way we treat our prisoners

13   and detainees, those from which we have taken their basic

14   freedoms after due process, speaks volumes about our country.

15   And there cannot be any other appropriate redress than for this

16   Court to substantially vary downward.  And there is no reason

17   to believe that the Bureau of Prisons or the Department of

18   Justice will take its foot off the pedal, and you know that

19   from today.  For the very reasons they argue that Mr. Schulte

20   should receive a life sentence they will argue that a lifetime

21   of SAMs measures should be imposed on him as well.  And like

22   his current conditions, which come with these unwritten

23   conditions that I just went through, inhumane and torturous as

24   they are, they come with that as well.

25          I expect Mr. Schulte will speak more to you about the

O215schS

1   conditions and about how they have affected him.  He is the

2   only one in this room who can do that, who has had to live

3   through them and can tell you the effect they have actually had

4   on him, but I ask the Court to consider these conditions and do

5   not impose a sentence that the government requests of a

6   lifetime of enduring these conditions.

7           I briefly want to talk about his history and

8   characteristics in support of and sort of address the

9   government's argument a little bit which is that in support of

10  his life sentence or the request for a life sentence, the

11  government uses a little bit of Mr. Schulte's support network

12  and his loving and extended family against him.

13          He grew up in a stable and loving household, a great

14  education, started a fine career.  They use that to argue that

15  even with those advantages and a loving network, he still

16  engaged in this conduct, that he will never be deterred.  But

17  it ignores that even accepting all of the facts that the

18  government has argued, that he lived most of his life as a

19  law-abiding United States citizen.  And then, according to

20  them, things went off the rails for a relatively minor reason

21  and caused unprecedented harm.  But the support systems in

22  place that nurtured him and allow him to be an exceptional

23  student, an exceptional programmer, an exceptional brother, an

24  exceptional son, are still there.  And not only are they there

25  but those same people, that same network is willing and able

O215schS

1    and ready to get the train back on the rails, to get it back on

2    track.

3              When he worked for the CIA he was relatively sheltered

4    given the nature of his work, he was far away from the support

5    network.  In the jail and the SAMs he is away from his family,

6    away from his network, away from reality.  He barely speaks to

7    them and calls and visits that are recorded and monitored

8    they're brief, short, they don't -- they just scratch the

9    surface.

10             As the letters from his friends and family all speak

11   to, he has an incredible support network, he is an extremely

12   giving person to them as a family and he has leaned on them and

13   they've leaned on him.

14             A life sentence or the equivalent of a life sentence

15   in years with SAMs restrictions is a sentence depriving him of

16   all meaningful human contact.  A sentence that allows him to

17   return to his family with strict post-release supervision

18   provisions is a sentence that is sufficient but not greater

19   than necessary.

20             Thanks, Judge.

21             THE COURT:  Can I just ask you one question,

22   Mr. De Castro, which is that in your sentencing submission you

23   represent that without the terrorism enhancement your

24   calculation of the guidelines would be 210 to 262 months in

25   prison.

O215schS

1      MR. DE CASTRO:  Yes.

2      THE COURT:  I am wondering how you got that.  I tried

3  to do my own calculation of that and I came up with a very

4  different number, namely 324 to 405.  Maybe you were including

5  the other enhancements that you were objecting to but I just

6  want to do the math.  I think if you subtract 12 points from

7  the calculation in the PSR it results in 39 points for group 1,

8  but because of the relationship between groups 1 and 2 and 3,

9  then it results in an additional two points by virtue of the

10 number of units in the grouping analysis which results in an

11 offense level of 41 and a guidelines range of 324 to 405.

12      I just wanted to give you an opportunity to comment on

13 that.  Again, I have found the enhancement does apply but I am

14 just wondering what it would be without it.  And the government

15 can also opine on this, if you wish.

16      MR. DE CASTRO:  One second, Judge?

17      (Counsel conferring)

18      MR. DE CASTRO:  Judge, my recollection, I am looking

19 at it right now and then you are asking me to do math?

20      THE COURT:  Sorry.  Math on the spot not fair, but.

21      MR. DE CASTRO:  I think we also did two points for

22 zero point offender off, I think that was one, and I think it

23 is applying our other objections.  But even at the 324-405 we

24 are not in life imprisonment-land as an advisory range and

25 obviously the Court can vary.

O215schS

```
1          If I can mention also, on the terrorism enhancement, I
2    know the question was for the government but on the disregard
3    of the terrorism enhancement or the fact that it is taking a
4    wrecking ball to the guidelines, we obviously make our point
5    there and cite the cases, the cases on that.  But I can say
6    sort of anecdotally, I was recently in a hearing two weeks ago
7    in this court or the court house next-door where Judge
8    Hellerstein, he didn't give his reasoning, necessarily, because
9    our sentencing was sort of adjourned, but what he said he was
10   doing was, our position was the same as it is here and he was
11   fine with the increase in offense level and he eliminated the
12   movement across to the Criminal History VI.  He basically
13   signaled that to us.  That is my view on that.  But I think
14   that what that represents is, you know, another Court in this
15   court house, another Judge in this court house, a very senior
16   member of this court that also sees and has handled a lot of
17   those kinds of cases that -- sees the exact same thing, which
18   is, OK, we are just throwing everybody into the life
19   imprisonment advisory guideline range which is exactly why I
20   say, and courts have said, and everybody has said, this
21   mathematical approach to sentencing just is inhumane and
22   doesn't work.
23          THE COURT:  Not that it matters, but I think just
24   enhancing the offense level and not adjusting the Criminal
25   History Category still results in a life recommendation of the
```

O215schS

1    guideline.

2             Just one note.  The zero point offender adjustment

3    would not apply even without the terrorism enhancement because

4    it doesn't apply to where the offense was a sex offense, which

5    the CSAM offenses obviously were, and arguably wouldn't apply

6    because the defendant did personally cause substantial

7    financial hardship.  The $300 million in costs incurred by the

8    CIA in response to this I think would easily qualify.  But, be

9    that as it may, I don't think that that applies.

10            Mr. Denton, I don't know if you have had a chance to

11   do the math.  Do you want to give me your thoughts?  Again, not

12   that it necessarily matters but using it for comparison

13   purposes.

14            MR. DENTON:  So, with respect to the calculation of

15   the offense level and the defendant's Criminal History

16   Category, we agree with where your Honor ends up.

17            I think I would just note that in discussions that we

18   have had about this, if we were there we would probably be

19   having a very different conversation about whether the

20   government was making application for a departure under the

21   Guidelines.  So, the math as far as the table we agree with.  I

22   think anything beyond that is a little bit speculative.

23            THE COURT:  Understood.

24            And, Mr. De Castro, any objection to the government's

25   proposed forfeiture order?

O215schS

1          MR. DE CASTRO:  We may, Judge.

2          So, actually we didn't have a chance to talk about it.

3  I received it this afternoon and so I have spoken briefly to

4  Mr. Schulte about it, and without knowing exactly what each of

5  these devices really is and I have to cross-reference the

6  voluminous discovery, I just need some time to take a look at

7  it.

8          THE COURT:  I'm not sure that I can defer imposition

9  of forfeiture.  Restitution, by statute, I can up to 90 days,

10  but I think forfeiture has to be part of the oral pronouncement

11  of sentence.  So I don't want to hold up sentencing on account

12  of that but I'm not sure we can defer it.

13          MR. DE CASTRO:  I don't have enough information about

14  those drives.  We would object to anything that that is not

15  related to the offense in any way that has, for example, his

16  personal information on it.  The hard drive that has his

17  resumes and word products on it he should receive.  I don't

18  know from -- I don't remember from any of the testimony at the

19  trials -- the two trials I was not present for, the one I

20  was -- that there was anything related to, for example, a

21  tablet that is on there.  There is no tablet so I don't think

22  that is necessarily -- because I think what the government has

23  done here is to say, OK, we seized everything from his

24  apartment so we are just going to keep it all.  But without

25  some sort of finding that is within the Court's province that

O215schS

1    this is related in some sense to the offense, why isn't it

2    being returned?

3            THE COURT:  Mr. Denton, there is a substantive

4    question and procedural one.  One is procedural:  Can I defer

5    on this, either by imposing forfeiture consistent with the

6    order, subject to reconsideration or revisiting it if it needs

7    to be modified; the second is substantive, with respect to what

8    he proposed in the forfeiture order.

9            MR. DENTON:  So, with respect to the procedure, your

10   Honor, I believe that what you proposed is correct, that

11   forfeiture with respect to specific property does have to be

12   imposed today in some form, the defendant must be alerted to

13   that as part of the sentencing proceeding, but I believe there

14   is sort of opportunity for the Court to amend forfeiture under

15   Rule 36.

16           (Counsel conferring)

17           MR. DENTON:  I apologize, your Honor.

18           We were just discussing the fact that certainly to the

19   extent that the Court imposed forfeiture and Mr. De Castro, on

20   Mr. Schulte's behalf, wants to make an application after the

21   fact we may have other arguments with respect to it but we

22   certainly would not object to it as being untimely, given that

23   we are going to have to continue to address restitution over

24   the next 90 days.

25           I think with respect to the substance and the

O215schS

1    particular property, it is actually not the case that we just

2    listed everything seized from the defendant's apartment.  It is

3    sort of the specific set of computer peripherals, most of which

4    there was testimony about.  In some cases those are hard drives

5    that either were, in fact, or at a minimum appeared to have

6    been wiped that were part and parcel of sort of the cleansing

7    of the defendant's computer electronics that happened in

8    connection with the 1030(a)(1) offense following the

9    transmission.

10           So we do think that kind of between the two different

11   courses of conduct that went through his home electronics, the

12   CSAM offenses where the forfeiture is governed by 2253 and the

13   1030 offenses where it is governed by 1030(i), in both cases

14   sort of the computer peripherals in particular were property

15   that was involved in the offense and therefore subject to

16   forfeiture.

17           THE COURT:  Mr. De Castro, based on the government's

18   representation I am just quickly looking at Rule 36 and it

19   certainly does reference an amendment to the order which seems

20   to contemplate that there are circumstances under which the

21   forfeiture order can be amended.  Do you have any objection to

22   my imposing forfeiture as proposed in the order today, with the

23   understanding that within a certain amount of time you can

24   propose any amendment or modification to it?

25           (Defendant and counsel conferring)

O215schS

1          MR. DE CASTRO:  That's fine, your Honor.

2          THE COURT:  Thank you.

3          Mr. De Castro, let me just say for the record I know

4     this wasn't the easiest CJA assignment, and especially since

5     you sort of came into it after several years of substantial

6     litigation and it was a lot to get up to speed on, I want to

7     commend you and say that you performed an admirable job on

8     behalf of your client and I thank you and Mr. McManus on his

9     behalf.

10          MR. DE CASTRO:  Thank you, Judge.

11          THE COURT:  Mr. Schulte, if there is anything you wish

12     to say before I sentence you, this is your opportunity to do

13     so.  I would just ask that you speak into the microphone and

14     speak slowly and clearly.

15          THE DEFENDANT:  Yes.  I have about 25 to 30 minutes,

16     if the Court allows it.

17          THE COURT:  Go ahead.

18          THE DEFENDANT:  Over the past 1,950 days I have been

19     tortured by the United States government, subjected to

20     conditions worse than every other prisoner in the western

21     hemisphere, including death row inmates.  I have been tortured

22     in atypical conditions worse than those that both the Supreme

23     Court and several Courts of Appeals have found to violate the

24     Fifth and Eighth Amendments of convicted death row inmates, and

25     all before I was even tried.

O215schS

1          Unlike typical prisoners housed in the BOP in state

2     prisons, I am not housed with other people.  I cannot leave my

3     torture cage to mingle with other human beings.  Unlike typical

4     prisoners, I cannot access recreation 24/7 to play physical

5     sports or exercise.  Unlike typical prisoners, I have no access

6     to television, MP3 players, tablets, e-mail, or even simple

7     battery powered radios offered to general population.  I have

8     no access to the institutional library to check out books.  I

9     have no access to typical educational activities such as

10    college courses, teaching, or programs to reduce sentence time.

11    Instead of 300 monthly phone minutes given to general

12    population, I am given 30.  I get no private contact visits

13    with family or attorneys.  I am even severely restricted in

14    sending and receiving mail.  The FBI seizes many items sent to

15    me and the rest are delayed by several months.

16          Unlike typical prisoners, I cannot access the

17    commissary to purchase foods, snacks, medicines, clothing,

18    electronics, puzzles and other resources.  Unlike typical

19    prisoners, I have no access to religious services for the

20    practice of my religion.  According to the 2018 ASCA-Liman

21    Nationwide survey Time-in-Cell, only 5.7 percent of prisoners

22    in the United States have been confined to solitary for more

23    than five years, like me; 9 percent have no access to in-cell

24    programming, like me; 3 percent have no access to TV and music,

25    internet or the library, like me; 66 percent have no access to

1   tablets; and zero percent, at the culmination of all of these

2   restrictions, including severe restrictions and all

3   communications including intra-prison mail and social visits.

4        The United States federal government tortures me in a

5   concentration camp with sleep deprivation with 24/7 blaring

6   lights, 24/7 blasting speakers, 24/7 extreme cold with no heat

7   in the winter, 24/7 starvation with reduced food and skipped

8   meals, and of course, 24/7 indefinite solitary confinement with

9   no human contact ever.

10        I have no hot water to wash my hands or shower with,

11   no clock to note the time, and the window is blacked out to

12   block the free world.  I have minimal to no dental or medical

13   access or treatment.  I have limited to no access to paper,

14   pens, outside recreation, the law library, or any normal prison

15   resource.  If I am granted access to the law library, which is

16   a five by five cage with an often dysfunctional digital law

17   library, I am either given very little time or left in for

18   eight to 10 hours with no food, and forced to urinate and

19   defecate on the floor.

20        I almost never get recreation because I am told there

21   is not enough staff.  I have had three days of recreation in

22   the past four months.  Instead, I am confined to my torture

23   cage for 24 hours a day, seven days a week.

24        I have been held in torture cages with sewage up to my

25   ankles.  Instead of moving me, the correction officers stuff

O215schS

blankets in the space between the bottom of the door and the

floor to ensure the sewage was kept in my torture cage and not

on the unit so they would have to clean it.  I assure you that

you cannot even imagine what it is like to be locked in a small

cage with sewage.  I repeatedly vomited but there was nothing I

could do to escape.  Likewise, I have been held in torture

cages with leaking walls and ceilings coated with mold and

fungi, rats and cockroaches infesting the cages day and night

and dying under bolted chairs and in the walls adding rodent

decay to the constant aroma of sewage and rot.

I have been in torture cages so cold that ice actually

accumulates near the windows.  I have even -- I never even saw

the outside or breathed fresh outside air for over three years.

I have had to wash my clothes in my toilet, gone without toilet

paper or running water and been forced to eat with my bare

hands like an animal.  I have had to bang my torture cage door

to try to inform the presiding officer of missed meals, sewage,

or other issues, only to be ignored and to have the small

window slot and the door slammed in my face.  They look down

upon you as if you are not human, the lowliest filth.

Often times, when the other officers take a break,

they would wander upstairs to our unit as their friend shows us

off like a zoo, opening the window slot, pointing and defining

each man as the crimes he was accused of or other fun facts --

*there is El Chapo; that is the terrorist who ran those people*

O215schS

1   *down on the highway; here is the CIA traitor* -- sometimes

2   banging on the door to get each slave to turn and look towards

3   the officer and his friend for them to sneer at you with

4   disgust and laugh.

5          I have also been physically assaulted, thrown to the

6   ground, stomped upon, held nearly nude in an open cage to the

7   freezing outside air, while shivering, my wrists twisted behind

8   my back far enough to dislocate, and my head smashed against

9   the wall or enough to cause a concussion.

10         One of the officers even frequently came to my torture

11  cage to watch me sit on the toilet despite his 24/7 camera feed

12  from his desk.

13         In drastic contrast with typical prisoners, I have

14  absolutely no resources to spend my time or busy my mind.  I

15  spend my time doing absolutely nothing in my torture cage

16  slowly losing my mind.  The best time during my days are those

17  when I came to loss of conscious, whether I dream or not, but

18  just to be able to cease existing and thus cease the pain and

19  torture for however long that I can is a relief.

20         Just as Viktor Frankl, and other concentration camp

21  survivors described dreams and consciousness to be their own

22  respite, so is it with American concentration camps.  Thus,

23  picture a man wearing all the clothes provided to him curled up

24  with all the blankets provided to him, shivering in the

25  freezing cold, starving and exhausted, while bright lights and

O215schS

1    loud speakers assault him, longing for death as he desperately

2    tries to attain the loss of consciousness.  Now picture this

3    for every second of every minute of every hour of every day for

4    the past 2,000 days, and you have an approximation not of Nazi

5    Germany, Soviet Russia, or communist China, but New York City's

6    very own Auschwitz.  You will still not understand nor could

7    you possibly grasp an approximation of the concepts for this

8    torture unless you actually experience it, which is why Charles

9    Dickens said that very few men are capable of estimating the

10   immense amount of torture and agony which this dreadful

11   punishment, prolonged for years, inflicts on the sufferers.  I

12   hold this slow and daily tampering with mysteries of the brain

13   to be immeasurably worse than any torture of the body because

14   its wounds are not upon the surface and it exerts few cries

15   that human ears can hear.

16          Indeed, as Dickens said:  Indefinite solitary

17   confinement devours the victim from the inside out and no

18   person who truly experiences it, desires anything but to end

19   this torture in any way possible.  To simply crave

20   non-existence, how could any rational person not?

21          As so-called psychologists in prison seek to treat the

22   effects of long-term solitary confinement with more solitary

23   confinement is something that only the SS could dream up.  This

24   is precisely why "concentration camp" is an apt name for my

25   place of torture.  There is no exaggeration.  Nazi

concentration camp survivors have themselves made the

comparison to solitary confinement and equivocated the mental

torture which they unanimously agreed was worse than any of the

physical pain.

I can relate to much of what Viktor Frankl writes in

his *Man's Search for Meaning*, particularly when he calls camp

life provisional existence of unknown limits, which is the

perfect example of life in an American concentration camp as

well.  Frankl also writes:  This intensification of inner life

helps the prisoner find a refuge from the emptiness,

desolation, and spiritual poverty of his existence by letting

him escape into the past.  When given free rein, his

imagination played with past events, often not important ones,

but minor happenings and trifling things.  His nostalgic memory

glorified them and they assumed a strange character.  Their

world and their existence seemed very distant and the spirit

reached out for them longingly:  In my mind I took bus rides,

unlocked the front door of my apartment, answered my telephone,

switched off the electric lights.  Our thoughts often centered

on such details and the memories could move on to tears.

Like Frankl's experience, while seeking oblivion, I

reach for and live entirely in the past recalling when I could

turn off a light, have a hot shower, a full stomach, feel the

wind or rain on my face, experience the monotony and tedium of

ordinary life, or simply sit down across from another human

O215schS

1    being and speak to him.

2            Multiple Nobel Peace Prize laureates have likewise

3    condemned the torture of solitary confinement.  Nelson Mandela

4    wrote in his autobiography that his two-week stint in solitary

5    was the worst torture he ever experienced in his life, which he

6    had initially sought himself in exchange for wearing specific

7    clothing, not realizing how bad solitary really was and then

8    begged for its reversal.  He wrote:  I had never been in

9    isolation before and every hour seemed like a year.  There was

10   no natural light in my cell, a single bulb burned overhead 24

11   hours a day.  I did not have a wristwatch and I often thought

12   it was the middle of the night when it was only late afternoon.

13   I had nothing to read, nothing to write on or with, no one to

14   talk to.  The mind begins to turn in on itself and one

15   desperately wants something outside of one's self on which to

16   affix one's attention.  I have known men who took half a dozen

17   lashes in preference to being locked up alone.  After a time in

18   solitary, I relished the company even of insects in my cell and

19   found myself on the verge of initiating conversations with a

20   cockroach.

21           I can say here today that I have actually spoken to

22   the cockroaches and rats in my torture cage, as well as

23   objects, as Tom Hanks individualized his volleyball in Cast

24   Away.  The crazy part it is doesn't even seem crazy after a

25   while.  As Nelson Mandela summed it up, nothing is more

O215schS

1    dehumanizing than the absence of human companionship.

2          Today, the United Nations Nelson Mandela Rules state

3    that anything over two consecutive weeks of solitary

4    confinement is a form of torture and a human rights violation.

5    The entire field of psychology unanimously concurs with this

6    assessment.  In fact, there is not a single study of solitary

7    confinement where a non-voluntary confinement, that lasted

8    longer than 10 days, failed to resolve negative psychological

9    effects and even a few days of solitary confinement

10   predictively shifts the EEG pattern towards an abnormal pattern

11   characteristic of stupor and delirium.

12         Not only have I experienced the typical psychological

13   effects of solitary -- anxiety, depression, paranoia,

14   hypersensitivity, cognitive dissonance, lethargy, impaired

15   mental functioning, which these scientific words can hardly

16   describe what it is like to actually believe the sadist

17   inspired to move the fungus on one wall to the other, or

18   created a wall stain insulting you, or feeling so

19   claustrophobic you can't breathe or perceiving a particular

20   rat's footsteps, to be so tired and depressed that you cannot

21   even get up to eat or drink.  Furthermore, long-term solitary

22   confinement does not only impair its victims psychologically

23   leading to mental illness and death, it also has numerous

24   neurological and physiological detrimental effects.  As a

25   direct result of my torture at the hands of this government,

O215schS

there is reduced electrical activity and neuron growth in the
brain, decreased connections between neurons and fewer blood
vessels in the brain leading to decreased cognition and poor
performance on intellectual and perceptual motor tests.
Solitary causes hypertension, heart attacks, strokes, insomnia,
deterioration of eyesight, and drastically increases the
likelihood of these effects.

Studies have also found direct causality with
longevity.  One study estimated a loss of 10 years of life
expectancy for four years of solitary, as well as decreased
longevity even after release such as 15 times likelier to die
within five years of release compared to prisoners never
exposed solitary and 127 percent higher likelihood to die
within the first two weeks after release.  The scientific
literature on the effects of solitary continues to grow and
warn of its permanent damage.

The United States federal government condemns Russia,
China, North Korea, and other countries for human rights
abuses, yet the United States operates concentration camps and
tortures and murders its own people right here.  While the
government only scoffs and says that I deserve to be tortured,
I deserve to be in a concentration camp, I say no man deserves
to be tortured and I have no doubts that history will side with
me as scores of years from now our descendants will recall this
torture, the use of solitary confinement, and those who

O215schS

1   perpetrate it, with the same contempt and revulsion as the

2   1940s concentration camps and those who perpetrated them.

3          These tortures are also well documented in court.

4   Contrary to the government's assertions, these tortures have

5   absolutely nothing to do with SAMs.  SAMs neither authorizes

6   nor encourages this torture.  Thus, my challenges were not to

7   SAMs but habeas corpus petitions based on my conditions.  Since

8   my conditions of confinement were worse than conditions for

9   sentenced death row inmates found unconstitutional I did not

10  think this would be an issue.

11         My first challenge to the conditions of confinement in

12  2018 were ordered administratively closed until I was

13  convicted.  My appeal was dismissed.  My second habeas

14  challenge in 2019 was dismissed and the judge ordered I must

15  file the habeas petition in my criminal case, not as a separate

16  civil case, and my appeal was dismissed.  So, I filed a third

17  habeas petition in 2021 in my criminal case which was dismissed

18  and the judge ordered I must file a habeas petition as a

19  separate civil case, not in my criminal case -- the exact

20  opposite of the previous order.  So I again filed an appeal

21  asking the Second Circuit to resolve this issue in which every

22  Court refused to even entertain my habeas petition.  Once

23  again, the Second Circuit dismissed the case without a reason.

24  I followed all the rules and procedures.

25         Even though this confinement condition issue was the

O215schS

1    same issue reviewed by other district courts, courts of appeals

2    and the Supreme Court, and even though I filed nearly identical

3    briefs as the attorneys in those cases because I was too poor

4    to pay an attorney, my cases were not even entertained by the

5    courts.  Because it said "pro se" next to my name, no Court

6    read a single word I wrote.  Even if I were the best attorney

7    in the country, nothing I wrote would ever be read.

8         Furthermore, although the complaints of my conditions

9    were read by the government, the government took no action of

10   its own to remedy any of the issues.  The Bureau of Prisons

11   simply does not care how it treats those it is responsible for

12   but it considers us all to be a slaves and that our lives are

13   worthless.  It is not only the deliberate human rights abuses,

14   but perhaps worse is the callous disregard for other human

15   beings.  And the BOP will never change because there is no

16   political pressure or public outcry and the only thing

17   remaining to uphold the principles of the republic is the

18   judiciary.  The courts must incentivize the Department of

19   Justice to actually want the BOP to change.

20        Now I want to spend a few minutes on the government's

21   proposed 30-plus year trial penalty.  Before trial, the

22   government wrote up a plea deal for zero to ten years on the

23   espionage, and zero to five years on the CP charges.  The

24   government repeatedly asserts that the espionage crime was so

25   heinous that the defense's proposed 48-month sentence is a

O215schS

1    mockery of justice and only life in prison will suffice.  Such

2    statements to the Court are clearly disingenuous as both the

3    CIA and the DOJ approved of a zero to ten-year sentence for the

4    same conduct they now claim requires life in prison.  Not only

5    did the CIA and DOJ believe that a zero to ten-year sentence

6    was appropriate, but the Pimentel letter given to the defense

7    did not include the terrorism enhancement.  They offered

8    similar plea deals after the first trial ended in a hung jury.

9    In both instances the defense made clear that any plea deal

10   must preserve my right to appeal at least the concealed

11   discovery issue.  The government refused the defense access to

12   the most critical discovery in the case:  The forensic crime

13   scene, but allowed its own experts access as well as all

14   derived testimony.  This is an issue of first impression with

15   any Court of Appeals because up until now, the government only

16   provided the defense with complete forensic images of all

17   computers involved in the alleged crime.  This is the first

18   case in the history of the United States in which the

19   government refuses to provide the defense with forensic images.

20         The government's case-in-chief is that I used my CIA

21   work station to access the server distilled from a third sever

22   and provided the defense access to none of these three

23   essential computers.  None.  Instead, the government forced the

24   defense to forego an independent examination and instead rely

25   upon the findings of the government's experts who picked out

O215schS

which forensic artifacts it wanted to focus on and ignore the
rest.  Thus, I could not call my forensic witness because they
could not testify without conducting an independent forensic
examination, the entire purpose to his expertise and why he was
hired.  The government's expert not only received this access,
but also stated in affidavits that reviewing the complete
forensic images was the only way to conduct the forensic
examination and they could not do so otherwise and could not
have found any of the forensic evidence it intended to use at
trial without the complete forensic images.  So, not only could
the defense call no expert or present any defense, but it also
could not cross-examine the government witnesses by reproducing
any of its findings or subjecting them to an independent
analysis.

        In essence, the defense had no right to an expert
which the appeals attorney working on this case told me was
absurd and a guaranteed reversal on appeal, or on divine
intervention.  He believed it was barely a step away from just
declaring the defendant guilty without a trial, akin to the
Oppenheimer security clearance review.

        Regardless, counsel advised this was an issue that
should not be waived, but of course the government refused to
allow my right to appeal on this issue because the government
knows it will be reversed, and so sought to win through
coercion and intimidation, giving me an ultimatum to either

O215schS

1    give up my right to appeal or face full tyranny and oppression

2    of the United States government, tortured in a concentration

3    camp for life.

4          So I want this Court to know that this case could have

5    ended in 2020, four years ago.  I knew that without access to

6    the key forensics I could never have a fair trial, so through

7    my attorneys I made it clear that the plea must preserve this

8    issue on appeal.  The government refused.  Thus, here we are

9    four years later.

10         The government's proposed sentence of life in prison

11   is nothing short of old fashioned Mafia-style bullying,

12   coercion, and intimidation.  It is a penalty for not doing what

13   the government commanded.  It is a penalty for advocating my

14   right for an appeal.  The district courts are not infallible,

15   they make mistakes all the time, honest mistakes, thus the

16   appeals court exists to review the lower courts.  It would be a

17   monumental injustice to punish me with over 30 extra years in

18   prison simply because I wanted to reserve my right to an

19   appeal.

20         The Supreme Court has already voiced its concern about

21   the coercive nature of plea bargaining.  The trial penalty of

22   30-plus years now proposed by the government is both

23   unprecedented and erodes the very foundations of justice.  What

24   innocent man would not choose to falsely condemn themselves and

25   risk over 30 years in prison?  The DOJ and CIA approved a zero

O215schS

1    to ten-year penalty for espionage.  They would not have done so

2    if they did not believe it to be an acceptable outcome and

3    sentence.  Thus, this Court should not even consider any

4    sentence beyond the approved penalty.

5         Furthermore, it should be clear from the government's

6    proposed sentence that this is not justice the government

7    seeks, but vengeance.  Today the DOJ and CIA seek to commit

8    torture and murder under the guise of justice.  The CIA seeks

9    its revenge upon a man they believe embarrassed and wronged

10   them, and the DOJ seeks to make a statement to all.  All of

11   those who refuse to relinquish their right to appeal and plead

12   guilty will be punished severely for doing so.  Is there truly

13   a difference between beating a man until he pleads guilty and

14   forcing a man by threatening life in prison unless he pleads

15   guilty?

16        The United States federal government condemns Russia,

17   China, and North Korea for coercive unjust legal systems based

18   on intimidation, yet the United States seeks to do the same

19   here under the guise of justice.

20        The Court should reject vengeance and look to the

21   facts.  The government does not dispute that the average

22   sentence in 793 cases is five years, nor does it dispute that

23   no one has ever been sentenced to more than six years.  The

24   district courts have unanimously declined to follow the 793

25   guidelines finding them overly punitive.  The 793 guidelines

O215schS

1   are even worse than the CP guidelines in that they mandate a

2   first-time offense of either the statutory maximum for secret

3   documents or double the statutory maximum for top secret

4   documents.  The Second Circuit, itself, expressed serious

5   doubts on the applicability of the 3793 guidelines in dictum in

6   *United States v. Malachy*.  Thus, this court should like way

7   follows the other courts in the circuit and across the country.

8   While the probation office proposed an unprecedented sentence

9   of five times the average, even that sentence disparity is not

10  enough for the government.  Since the government seeks

11  vengeance and a life sentence it says, well, let's pretend I

12  was convicted for a different crime where life sentences are

13  actually given and then quote those cases.  This is beyond

14  absurd.  The government is clearly trying to manipulate the

15  court seeking the unprecedented in the hopes that the Court

16  will split the difference and still hand down a sentence of

17  triple or quadruple the average.

18         Nor is the government's argument that the case is

19  unique a truthful statement.  The government's entire sentence

20  is predicated phon the CIA's loss of its cyber tools but

21  WikiLeaks has never released the CIA's cyber tools.  Those

22  tools were stored in Stash.  WikiLeaks only released

23  Confluence, which was an internal unofficial blog in Wiki,

24  which contained almost no classified information and was

25  described by nearly every CIA witness and FBI 302s as

O215schS

insignificant, yet the government does not even mention

confluence or single harm resulting in its disclosure.

Furthermore no Stash files of a single CIA cyber tool were

presented to the jury nor even provided to the defense in

discovery.  The defense filed numerous motions for access to

Stash and all were denied.  The CIA even admitted in GX- 5001

that, "We cannot determine the precise scope or the loss

because DevLAN did not require user activity monitoring or

other safeguards that exist in our enterprise systems."

     To this day, the CIA has absolutely no idea what was

taken besides the published Confluence files.  The protocol

requires them to assume the worst, scrap everything, and start

over, but justice is based on due process, not assumptions.

Since the Stash cyber tools were never disclosed by WikiLeaks,

provided to the jury, or produced to the defense in discovery,

might well have been proof of any reliance of this material at

sentencing.  And any attempts by the government to compare this

to Pearl Harbor, where the United States was literally attacked

by another country, 19 naval ships sunk or damaged and 2,403

people murdered in an act of war, is a disgusting exaggeration

that does not even merit a response.

     So the 48-month sentence for the espionage case is not

only reasonable but consistent with other 783 espionage cases

and within the government's zero to 10-year approved penalty

for the crime, and hence, not possibly include my conditions of

O215schS

1    confinement.  And so, the truly difficult question for this

2    Court today is how do you quantify torture.

3            Torture is always wrong and matters not what crime the

4    government alleges.  Torture is never a just punishment.  How

5    much typical prison credit would a man interred at Auschwitz

6    receive?  What about New York City's Auschwitz?  What is a just

7    multiplier for the 1,950 days I was tortured?  Even if the

8    Court sentences me to the maximum 15 years of the government's

9    approved penalty and applies the lowest multiplier of 2 used

10   for people housed in general population, the result would still

11   be time-served.  Yet a multiplier of only 2 is vastly unjust.

12           Justice encompasses not only the process of

13   adjudicating guilt or innocence but also the punishment given.

14   Any punishment given in excess of the crime committed is an

15   affront to justice and, indeed, the greatest crime of all.

16   Here my punishment of torture in a concentration camp far

17   exceeds the convicted crimes not because those crimes are not

18   serious, but due to the unconscionable brutal, barbaric, and

19   inhumane torture imposed by the government.  There is simply no

20   just multiplier to those 2,000 days of immense torture by

21   infinity and yet there is another reason for the sentence.

22           We should not be here forced to quantify torture yet

23   the government chose to torture me, and the Bureau of Prisons

24   continues to do so and neither respects your authority nor

25   honors any order from the judiciary.  The BOP is a rogue

O215schS

1    Executive Branch agency that will never be reined in until the

2    Court's heavily incentivizes the DOJ to make long-needed

3    corrections to the BOP by sentencing those tortured and abused

4    in BOP facilities to time-served.  How quickly will the BOP

5    then leap to obey the judiciary as required by the

6    Constitution?  Until then, the DOJ will take immense pride in

7    its concentration camps and continue to torture those it hates

8    and despises, taking special satisfaction in my pain and

9    suffering.

10           And, of course, you now know that the BOP has brutally

11   tortured me in the past and will continue to torture me for

12   whatever additional sentence you impose.  The BOP invites this

13   Court to be a party to torture and to violate not only the

14   principles of a republic based on inalienable human rights, but

15   also to violate the Torah, all the laws of God, and the very

16   concepts of morality, honor, and justice.  That is an

17   invitation that this Court should categorically refuse.

18           In conclusion, I ask this Court to follow the other

19   district courts and the dictum of the Second Circuit and reject

20   the espionage guidelines and, instead, adopting the range used

21   on average by these Courts.  I ask the Court to reject the

22   government's offer to pretend I was convicted of a different

23   crime and its offer to rely upon materials never publicly

24   disclosed, presented to the jury, or provided to the defense.

25   I ask the Court to reject the government's request for

O215schS

1  vengeance and its coercive use of plea deals by capping the

2  incidents of espionage to the zero to 10-year penalty approved

3  by and written on paper by the CIA and DOJ.

4          Finally, I ask this Court to take my torture for

5  nearly 2,000 days in a concentration camp into its

6  consideration.  The need to provide substantial incentive for

7  the DOJ to end the BOP's blatant human rights atrocities and to

8  reject the BOP's invitation to become a party to its immoral

9  human rights abuses abhorrent to all the laws of God.  I ask

10 this Court to consider my incarceration since 2017 and 2,000

11 days of torture as sufficient punishment and sentence me to

12 time-served.

13         Thank you.

14         THE COURT:  Let me say immediately that I think the

15 record is what the record is and not all of it bears out

16 everything that Mr. Schulte just said.  I ruled several times

17 with respect to some of the issues that he commented upon,

18 including access to the so-called forensic crime scene and the

19 distinction between Stash and Confluence and access thereto and

20 obviously he will have the right to appeal those rulings, but I

21 don't think that he has accurately characterized them.

22         I will also say that I have gone to great lengths in

23 this case, more so than any other case in the 12 years I have

24 been on the bench, to contact and deal with the BOP and MDC

25 with respect to certain issues that have arisen over the course

O215schS

1    of the two and a half years or so that I have presided over it

2    and there, too, I'm not sure that the facts support everything

3    that Mr. Schulte has described, which is not to say that the

4    conditions of his confinement have not been difficult and I

5    will have more to say on that in due course.

6            Be that as it may, Mr. Denton, I am going to give you

7    an opportunity to respond, if you wish, just because

8    Mr. Schulte spoke for 29 minutes.  If there is anything that

9    you wish to say in response, I would give you an opportunity to

10   be heard.

11           MR. DENTON:  Your Honor, I think I would be happy to

12   address anything in particular that the Court would like to

13   hear from the government on, but otherwise I think we generally

14   agree with the assessment that not everything he said is borne

15   out by the record.

16           THE COURT:  Do you know if there is any victim present

17   who wishes to be heard?

18           MR. DENTON:  I was not alerted to anyone who wished to

19   speak in advance of the proceeding, your Honor, so I don't

20   believe so.

21           THE COURT:  Thank you.

22           Counsel, is there any reason why sentence should not

23   be imposed at this time?

24           MR. DE CASTRO:  No, your Honor.

25           MR. DENTON:  No, your Honor.

O215schS

1          THE COURT:  In imposing sentence I am required to

2     consider the factors set forth in 18 U.S. Code Section 3553(a).

3     They include, first, the nature and circumstances of the

4     offense and the history and characteristics of the defendant;

5     second, the need for the sentence imposed to advance the

6     purposes of sentencing, namely, to reflect the seriousness of

7     the offense, to promote respect for the law and to provide just

8     punishment for the offense, to afford adequate deterrence to

9     criminal conduct; to protect the public from further crimes of

10     the defendant, and to provide the defendant with needed

11     education or vocational training, medical care, or other

12     correctional treatment in the most effective manner; third, the

13     kinds of sentences available; fourth, the guidelines range or

14     sentence which I have found to be life imprisonment; fifth, any

15     pertinent policy statement; sixth, the need to avoid

16     unwarranted sentencing disparities among defendants with

17     similar records who have been found guilty of similar conduct;

18     and seventh, the need to provide restitution to any victims of

19     the offense.

20          Ultimately, I am required to impose a sentence that is

21     sufficient but no greater than necessary to comply with the

22     purposes of sentencing that I mentioned a moment ago.

23          Sentencing is perhaps the most difficult task that a

24     judge has and this sentencing is especially challenging just

25     given the sheer length of the record here and the number of

O215schS

1   offenses that Mr. Schulte has been convicted of and everything

2   that I have observed over the last two and a half years.

3        Let me start by saying that I absolutely agree with

4   the government that a substantial sentence is warranted and

5   that is true for several reasons.

6        First and foremost, it is the seriousness of the

7   offenses.  It is hard to overstate the seriousness of the

8   espionage offenses.  This was the largest leak in CIA history

9   and one of the largest unauthorized disclosures of classified

10  information in the history of the United States.  It did have,

11  as substantiated by the deputy director's unclassified letter,

12  and even more substantiated by the classified letter, an

13  immediate and catastrophic effect on the CIA and caused untold

14  damage to national security and Mr. Schulte's attempts to

15  downplay that I think are not borne out by the record.

16       The monetary costs of Mr. Schulte's conduct are

17  staggering.  As I mentioned, according to the deputy director,

18  the sheer cost of withdrawing the computers and networks and

19  infrastructure rose to the level of $300 million and that is

20  merely the tip of the iceberg as those filings make plain the

21  impact on our nation's intelligence operations was enormous.

22  We will likely never know the full extent of the damage that it

23  caused but I have no doubt that it was massive and real, and in

24  contrast to Mr. Schulte's views, I do not think it is an

25  exaggeration to describe it as a digital Pearl Harbor -- not a

O215schS

1    literal Pearl Harbor but a digital one.

2            Moreover, those effects were not incidental but were

3    Mr. Schulte's design, and unlike other leakers who have been

4    held accountable for their conduct, Mr. Schulte was not driven

5    by, in any sense, misguided ill will or altruism such as

6    blowing the whistle on something he perceived to be wrongdoing

7    or problematic.  Instead, he was motivated by anger, spite, and

8    perceived grievance and it is absolutely inexcusable,

9    unforgivable that he took that anger and spite out on the

10   country that he had sworn an oath to protect.  In short, to

11   satisfy a personal vendetta he, as the deputy director put it,

12   cost the CIA hundreds of millions of dollars, degrading its

13   ability to collect foreign intelligence against this country's

14   adversaries, placed directly at risk his own colleagues at the

15   CIA, programs at the CIA and assets, and jeopardized this

16   country's national security.

17           That of course doesn't address the child pornography

18   counts, as the trial last fall made clear, that Mr. Schulte was

19   in possession of what can only be described as a massive trove

20   of disgusting materials made depicting the rape and sexual

21   abuse of children as young as 2 years old including images of

22   bondage and sado-masochism and involving sex acts performed on

23   children by adult men and by animals.  And, as the letters

24   submitted by the government make plain, the mere possession of

25   those kinds of materials causes added injury to those who were

O215schS

victimized by those terrible crimes.

Number two, I am blown away, to put it mildly, by
Mr. Schulte's complete lack of remorse and acceptance of
responsibility.  He has never once acknowledged his conduct or
his role in any of this and in that regard I think the child
pornography crimes are perhaps the most telling.  The espionage
crimes were arguably triable only because Mr. Schulte took such
careful steps to cover his tracks and the evidence was largely
circumstantial, even if in my judgment it was ultimately
strong, but the trial that occurred last fall with respect to
the child pornography charges was, to put it mildly, a
bloodbath.  There was overwhelming evidence.  As far as I can
tell, Mr. Schulte had absolutely no defense and yet even there
he was unable, unwilling, and incapable of accepting
responsibility or expressing remorse for his terrible crimes.

Now, even worse than that, he has demonstrated a
complete unwillingness to conform his behavior to the law and
desire to inflict further damage on his victims.  As the
government put it in its sentencing letter:  Arrest did not
deter Mr. Schulte.  Revocation of his bail did not deter
Mr. Schulte.  Court orders and repeated reminders from the
Court did not deter Mr. Schulte.  Even imposition of SAMs that
we have discussed at length today did not deter Mr. Schulte.
Those measures, in fact, to the contrary, and as you heard
moments ago, merely added fuel to Mr. Schulte's grievances and

O215schS

1    another reason to retaliate against the country that he once

2    swore to protect.  I point in these regards to the conduct that

3    gave rise to the MCC charges, that is to say Mr. Schulte's

4    efforts to leak additional classified information from jail,

5    his declaration of a "information war on the United States,"

6    his threatening if he wasn't paid money to "break up diplomatic

7    relationships, close embassies, and U.S. occupation across the

8    world."  And even after he was convicted of those offenses he

9    made a series of implied threats in various post-trial

10   submissions as the government recounts on page 19 of its

11   submission.

12          On top of that, there is the subject of the discovery

13   laptop, the laptop that was provided to Mr. Schulte in

14   connection with preparing his defense.  Even though he was

15   subject to SAMs he abused that privilege.  He created a

16   15-gigabyte encrypted partition to which, even today, the

17   government has not been able to access, and he loaded onto that

18   laptop 2400 images and videos of child pornography that he

19   viewed even while in jail and during the trial on the espionage

20   counts.

21          Thus, I have no doubt that the need to reflect the

22   seriousness of these various offenses, the need to protect the

23   public from further crimes of Mr. Schulte, and the need for

24   deterrence all point strongly to the need for a very long

25   sentence.  So too, I would say, does the need to avoid

O215schS

1    unwarranted sentencing disparities for similarly situated

2    defendants.  On that score, I am inclined to agree with the

3    government that Mr. Schulte is more akin to Mr. Hanssen and

4    Mr. Ames than to the cases that the defense has pointed to:

5    *Reality Winner* and *Jeffrey Sterling*.  Indeed, there is an

6    argument, and the government has made it, that Mr. Schulte's

7    disclosures were even more harmful and more grave than those

8    made by Mr. Hanssen and Mr. Ames; it is a single adversary

9    given that he released it to the world without regard for who

10   accessed it and what the implications of that were.  His

11   conduct is certainly a far cry from those of the *Winner* case

12   and the *Sterling* case, given the scope and scale of the

13   information that was released, given his motive, given his

14   complete lack of remorse and acceptance of responsibility,

15   given his ongoing conduct in the MCC, his continuing threats to

16   release highly classified information, and cause even more

17   damage to national security and the abuses of his laptop that I

18   described.

19          Having said all of that, I am not going to impose a

20   life sentence.  I do agree and ultimately conclude that a life

21   sentence would be greater than necessary to serve the purposes

22   of sentencing.  There are few reasons for that conclusion.

23          Number one, short of the death penalty, a life

24   sentence is obviously the harshest sentence available under

25   law.  In my view it should generally be reserved for the

O215schS

1   absolute worst of crimes, usually crimes that have resulted in

2   the loss of life or lives and there is no evidence here,

3   although it is certainly possible, that Mr. Schulte's espionage

4   crimes resulted in the deaths of people.  There is no evidence,

5   direct evidence that it did and he certainly didn't kill or

6   intentionally kill anybody.

7            Number two, as I have sort of averred to, I do think

8   that the terrorism enhancement is overly harsh, at least as

9   applied in this case.  Again, without it, by my calculation,

10  the guidelines range would be 324 to 405 months.  I think it is

11  harsh in part for the reason that I referenced earlier, that it

12  is triggered by two offenses that would not result in a maximum

13  penalty of anything close to life and in that regard reflect a

14  Congressional assessment that those offenses are do not justify

15  a life sentence.  Obviously, I could impose a life sentence

16  here given the extent of the other crimes that Mr. Schulte has

17  been convicted of but I think there is a disconnect between the

18  statutory maximums that give rise to the terrorism enhancement

19  and the guidelines.

20           Having said that, I'm not going to and am not inclined

21  to disregard it all together because I do think that it applies

22  and itself reflects a Congressional assessment of the conduct

23  that Mr. Schulte committed but I agree that some variance is

24  appropriate to mitigate its harshness.

25           Finally, I am going to vary on the basis of the

O215schS

1    conditions of confinement.  I do want to make a few things

2    clear before I explain why.

3           Number one, to a large extent, Mr. Schulte did indeed

4    bring those conditions upon himself.  To the extent that he has

5    been subject to Special Administrative Measures the last

6    five-plus years is a decision.  I previously worked in the

7    attorney generals' office, it is a decision made by the

8    Attorney General of the United States.  I know it is not a

9    decision that is not made lightly and it was made here for

10   understandable and justifiable reasons, namely that

11   Mr. Schulte, because of his own conduct that gave rise to the

12   MCC charges, made clear that even confinement was not

13   sufficient to protect this country from the harms that he could

14   and was prepared to cause to national security.  So, in that

15   regard, he did indeed bring it upon himself.

16          Number two, I want to say that any comparison to

17   victims of a Nazi concentration camp is, in my mind, offensive.

18   I'm not talking about the conditions of confinement, I'm

19   talking about the difference between someone who commits

20   serious crimes and harms this country as you have done,

21   Mr. Schulte, versus somebody whose only crime is being of

22   Jewish origin and persecuted for that reason, and to compare

23   yourself to the victims of the Nazi is offensive.

24          Number three, I want to say that as I said, I think my

25   own involvement in dealing with the MDC and BOP does not

O215schS

1    necessarily bear out everything that Mr. Schulte described in

2    his remarks, and finally I want to make clear that to the

3    extent that you suggested or insinuated that I did not read

4    every word of every submission that you made to me, that is

5    absolutely untrue.  You made plenty of submissions, countless

6    submissions regarding your conditions of confinement.  I read

7    every single one of them.  As you know, ultimately when you

8    were before me you were detained in Brooklyn and for that

9    reason your challenges to the conditions of confinement had to

10   be brought in the Eastern District, not here.  I want to be

11   clear that not only did I read all of them but I actually did

12   take unprecedented action to address many of them in connection

13   with this case.

14         Having said that, I do think that the harsh conditions

15   of confinement justify a variance from the life sentence that

16   the guidelines recommend.  I have written, and written

17   recently, about the nature of the conditions of confinement in

18   general population at MDC.  For those two don't know what I am

19   talking about, I certainly encourage you and urge you to read

20   my opinion in United States v. Chavez which describes, in

21   detail, the really dreadful conditions of that facility.  And,

22   there is no question in my mind that the conditions in the SAMs

23   unit, to which Mr. Schulte has been subjected, are even harsher

24   and I think some of the things that Mr. De Castro mentioned are

25   really arguably not part of SAMs and in that regard, valid

O215schS

1    consideration for a variance.  But the bottom line is I agree

2    that it is incumbent upon this country to treat those we detain

3    in humane manner, and even if some of the conditions of which

4    Mr. Schulte has complained are justified by his own conduct it

5    is, in my view, it is worthy to consider the conditions under

6    which he has been held and the conditions under which he is

7    likely to be held for some substantial time going forward in

8    assessing the appropriate sentence here.

9            Let me say that I am not especially persuaded by some

10   of the other arguments made in the defense submission.

11           First, the defense submission makes reference to an

12   undiagnosed -- potentially undiagnosed neuro-divergence.  It is

13   undiagnosed.  It is, in my view, pure speculation and perhaps

14   there is some data to support that speculation, but it is not

15   diagnosed and I am not going to take it into consideration and

16   there is certainly no suggestion in the defense submission that

17   Mr. Schulte didn't know right from wrong and wasn't capable of

18   conforming his behavior to the law.

19           Second, there is a suggestion that this conduct was

20   aberrant behavior in an otherwise law-abiding life.  I don't

21   dispute that Mr. Schulte appears to have lived a law-abiding

22   life for much of his life.  He did perform service to his

23   country until he betrayed his country.  He obviously is a very

24   talented and very intelligent human being; I have observed that

25   and experienced that myself and his computer skills are

O215schS

1  testament to that.  But the conduct for which he is being

2  sentenced today is conduct that occurred over a very long time

3  beginning in 2016 when he first stole the information at issue

4  in this case, through really the last months in this case and I

5  have described it already and not going to redescribe it, but

6  the bottom line is that conduct occurred over a long time and

7  he engaged in for days, if not weeks, engaged in the theft of

8  the materials from the CIA and the leak to WikiLeaks even later

9  than the fall of 2016.  His Google searches made clear that he

10 was looking for information on WikiLeaks and why they had not

11 yet published the information.  He had many opportunities, over

12 a long period of time, to rethink the conduct that got him

13 here.  And, as I said before, not only did he not do that but

14 he doubled-down, even tripled-down on it in the conduct that he

15 committed while he was incarcerated.

16         I do want to comment for a moment on the letters that

17 I received from Mr. Schulte's family.  They are moving letters.

18 I will single out the letter from his mother in particular.  I

19 have no doubt that the pain that this experience in the last

20 six years has caused to Mr. Schulte's family is extraordinary

21 and I don't envy his parents, I don't envy his brothers, his

22 aunt, his uncle, any of his family members.  But those letters

23 simply don't describe the person who has done what Mr. Schulte

24 has done over the past eight years.  They don't acknowledge the

25 child pornography materials that were found on his computer and

O215schS

1    the evidence of what he did with those.  And when they

2    described Mr. Schulte as the patriot dedicated to protecting

3    this country, they obviously failed to grapple with the nature

4    and gravity of what he did to harm this country and the country

5    that he swore to protect and defend.  There is something

6    revealing in one of the letters, that is the letter from

7    Mr. Schulte's brother, which describes how at a moment in the

8    trial he turned to his mother and said:  Did you know about any

9    of this?  And her answer was:  No.  All of that is to say there

10   is a lot about Mr. Schulte that his family obviously didn't

11   know.  I do not doubt that he was a loving and supportive son,

12   and grandson, and brother, and nephew, but the fact of the

13   matter is it doesn't reflect the person who committed the

14   crimes for which he is being sentenced today.  It is a credit

15   to Mr. Schulte's family that they can and do still stand behind

16   him, but the bottom line is that what they write in their

17   letters, as moving as it is, is not justification for a lower

18   sentence.

19           With that, I will state the sentence that I intend to

20   impose.  Mr. Schulte, I would ask you to please rise.

21           Mr. Schulte, it is the judgment of this Court that you

22   are remanded to the custody of the Bureau of Prisons for a

23   total of 480 months, that is 40 years, structured as follows:

24           120 months on Counts One through Three of the S3

25   indictment to be served concurrent with one another; 120 months

O215schS

1   on Counts Four and Five of the S3 indictment, concurrent with

2   one another and consecutive to Counts One and Three; 120 months

3   on Counts Seven and Eight of the S3 indictment, concurrent with

4   one another and consecutive to Counts One through Five; 40

5   months on Count Six of the S3 indictment and Counts Nine and

6   Eleven of the S2 indictment, concurrent with one another and

7   consecutive to the other counts that I just discussed; and an

8   additional 80 months on Counts Twelve, Thirteen and Fourteen of

9   the S2 indictment, concurrent with one another and consecutive

10  to the other counts.  In essence, that results in a 400-month

11  sentence for the espionage and related offenses which I would

12  note is effectively within the guidelines range that would have

13  applied without the terrorism enhancement, and an additional 80

14  months consecutive for the child pornography offenses which, in

15  my view, justify and deserve their own punishment because they

16  are a discrete offense and caused separate harm above and

17  beyond the harm caused by the espionage crimes.  That is to be

18  followed by lifetime term of supervised release, structured as

19  follows:  Three years each on Counts One through Five and Seven

20  and Eight of the S3 indictment and on Count Nine of the S2

21  indictment; one year on Count Six of the S3 indictment; five

22  years on Count Eleven in the S2 indictment; and a lifetime term

23  of supervised release on Counts Twelve through Fourteen of the

24  S2 indictment.

25          During your term of supervised release you will be

O215schS

1    subject to the following mandatory conditions, all of which are

2    set forth on page 65 of the presentence report:  You shall not

3    commit another federal, state or local crime.  You shall not

4    illegally possess a controlled substance.  You shall refrain

5    from any unlawful use of a controlled substance and submit to

6    one drug test within 15 days of your release and at least three

7    periodic drug tests thereafter as determined by probation.  You

8    shall cooperate in the collection of DNA as directed by

9    probation.  You shall comply with the requirements of the Sex

10   Offender Registration and Notification Act as directed by the

11   probation officer, the Bureau of Prisons, and any state sex

12   offender registration agency in which you reside, work, are a

13   student or are convicted of a qualifying offense, and you must

14   make restitution in accordance with that rule of law and

15   monetary fines.

16          In addition, the standard conditions of supervised

17   release which are set forth on pages 66 and 67 of the

18   presentence report shall apply.  Among other things, you shall

19   not shall possess a firearm or destructive device.  You shall

20   report to the probation office in the judicial district where

21   you are authorized to reside, within 72 hours of your release

22   from custody.

23          Finally, you must meet the following special

24   conditions which are set forth on pages 67 to 69:

25              1.  You shall undergo a sex offense-specific

O215schS

evaluation and participate in an outpatient sex offender

treatment and/or outpatient mental health treatment program

approved by the probation department.  You shall abide by all

rules, requirements and conditions of the sex offender

treatment program and refrain from accessing websites, chat

rooms, instant messaging or social working sites to the extent

that the sex offender treatment and/or mental health treatment

program determines that such access would be detrimental to

your ongoing treatment.  You will not view, access, possess, or

download any pornography involving adults unless approved by

the sex offender specific treatment provider.  You must waive

your right to confidentiality and any records for mental health

assessment and treatment imposed as a consequence of this

judgment to allow the probation department to review the course

of treatment and progress with the treatment provider.  You

must contribute to the costs of services rendered based on your

ability to pay and the availability of third-party payment, and

I authorize the release of available psychological and

psychiatric evaluations and reports including the presentence

investigation report to the sex offender treatment provider

and/or mental health treatment provider.

        2.  You must not have contact with any victim in this

case.  That includes any physical, visual, written, or

telephonic contact with those persons.  Additionally, you must

not directly cause or encourage anyone else to have such

O215schS

contact with any victim.

3.  You must not have deliberate contact with any
child under 18 years of age unless approved by the probation
department.  You must not loiter within 100 feet of places
regularly frequented by children under the age of 18 such as
schoolyards, playgrounds and arcades.  You must not view or
access any web profile of users under the age of 18 that
includes, but is not limited to, social networking websites,
community portals, chat rooms, or other online environments
which allow for real-time interaction with other users without
prior approval from your probation officer.

4.  You are restricted from viewing, accessing and
possessing or downloading any sexually explicit material
involving minors including those created via the method of
morphing or other image creation format including artificial
intelligence.  You will not view or possess any visual
depiction as defined in 18 U.S.C. Section 2256 including any
photograph, film, video, picture, or computer-generated image
or picture, whether made or produced by electronic, mechanical,
or other means, of sexually explicit conduct by a minor under
the age of 18.

5.  You will not access any websites, chat rooms,
instant messaging, or social networking sites where your
criminal history, including this conviction, would render such
access a violation of terms of service of that website, chat

O215schS

1    room, instant messaging, or social networking website.

2                6.  You shall permit the Probation Department to

3    install any application or software that allows it to survey

4    and/or monitor all activity on any computers, automated

5    services, or connected devices that you will use during your

6    term of supervision and that can access the internet.  The

7    probation department is authorized to install such applications

8    or software.  Tampering with or circumventing the probation

9    department's monitoring capability is prohibited.  To ensure

10   compliance with this condition you must allow the probation

11   officer to conduct initial and periodic unannounced

12   examinations of any device that is subject to monitoring.  You

13   must notify any other people who use the device that it is

14   subject to examination pursuant to this condition.  You must

15   provide the probation department with advance notice of any

16   planned use of any device, and you will not use any device

17   without approval until compatibility is determined and

18   installation is completed.  Applications for your devices shall

19   be approved by the U.S. Probation office.  Once the probation

20   office ensures compatibility with the surveillance and

21   monitoring application or software, websites, chat rooms,

22   messaging and social networking sites shall be accessed via the

23   device, web browser unless otherwise authorized, and you will

24   not create or access any internet service provider account or

25   other online service using someone else's account name,

O215schS

designation, or alias.  You will not utilize any peer-to-peer

or file sharing applications without prior approval of your

probation officer.  Use of any device in the course of

employment will be subject to monitoring or restriction as

permitted by your employer.

You shall submit your person and any property,

residence, vehicle, papers, computer, or other electronic

communication, data storage devices, cloud storage or media and

effects to a search by any probation officer and, if needed,

with the assistance of law enforcement.  Any such search is to

be conducted when there is reasonable suspicion concerning

violation of a condition of supervised release or unlawful

connect conduct by you.  Failure to submit to a search may be

grounds for revocation and you shall warn any other occupants

that the premises may be subject to search pursuant to this

condition.  Any search shall be conducted at a reasonable time

and in a reasonable matter.

8.  You must participate in an outpatient mental

health treatment program approved by the probation department.

You must continue to take any prescribed medications unless

otherwise instructed by your healthcare provider.  You must

contribute to the costs of services rendered based on your

ability to pay and the availability of third-party payment.  I

authorize the release of available psychological and

psychiatric evaluations and reports including the presentence

O215schS

1    report to the healthcare provider.

2             9.   You must not incur any new credit charges or open

3    additional lines of credit without the approval of your

4    probation officer unless you have satisfied your financial

5    obligations

6             10.   You must provide the probation officer with

7    access to any requested financial information unless you have

8    satisfied your financial obligations.

9             Finally, you shall be supervised in the district of

10   your residence.

11            I'm not going to impose a fine or an assessment under

12   the JVTA because I find that you do not have the ability to pay

13   the fine and qualify as indigent for the purposes of the JVTA.

14   I will defer entry of the restitution order for the statutory

15   maximum period of 90 days pursuant to 18 U.S.C.

16   Section 3664(d)(5).  I would ask that the government well

17   before that deadline confer with defense counsel and submit a

18   proposed restitution order.

19            I am imposing the mandatory special assessments of

20   $100 per count and $25 for Count Six of the S3 indictment for a

21   total of $1,225, which shall be due and payable immediately.  I

22   will sign the proposed forfeiture order and find that you are

23   to forfeit to the United States the specific property described

24   therein and defined therein, which I find or make at least a

25   preliminary finding that you used to facilitate the offenses

O215schS

1    set forth in the order.  I will give defense counsel two weeks

2    to file any request to modify or amend that order.  Before

3    doing so, you should confer with the government and if nothing

4    is filed within two weeks, that will be become the final order.

5              Does either counsel know of any legal reason why the

6    sentence should not be imposed, as stated?

7              MR. DENTON:  No, your Honor.

8              MR. DE CASTRO:  No, your Honor.

9              THE COURT:  Sentence, as stated, is imposed.  I find

10   that for the reasons I stated at length earlier, that this

11   sentence is sufficient but no greater than necessary to satisfy

12   the sentencing purposes set forth in Section 3553(a)(2)

13   including and especially the need to promote respect for the

14   law, to reflect the seriousness of Mr. Schulte's many offenses,

15   and to provide just punishment for those offenses, to afford

16   adequate deterrence not only to others but to Mr. Schulte, and

17   especially important, to protect the public from further crimes

18   of the defendant.

19             Mr. De Castro, do you have any -- I am guessing that

20   the security issues here will drive the designation and perhaps

21   the designation has even already been made since I had entered

22   an order directing the government to try and speed that along,

23   but any request with respect to location subject to those

24   parameters?

25             MR. DE CASTRO:  Yes; it would be closest to his family

O215schS

1      in Texas; closest to Lubbock, Texas.

2                 THE COURT:  Well, I will leave it to the Bureau of

3      Prisons, consistent with at least the current conditions of

4      confinement and need for security measures to determine the

5      correct and proper facility, but to the extent it is compatible

6      with those considerations, I will recommend to the Bureau of

7      Prisons that he be designated to a facility as close to Lubbock

8      Texas as possible to facilitate the maintenance of ties to his

9      family.

10                I think there are open counts to be dismissed; is that

11     correct, Mr. Denton?

12                MR. DENTON:  Yes, your Honor; they were the same

13     counts but charged in the later indictment, so the government

14     would move to dismiss the counts in the underlying original S1

15     and S2 indictments.

16                THE COURT:  Well, I will grant the motion and dismiss

17     any open counts against Mr. Schulte.

18                Mr. Schulte, to the extent that -- well, actually you

19     have not given up your right to appeal, you do have the right

20     to appeal.  Any notice of appeal must be filed within 14 days

21     of the entry of judgment.  If you cannot afford to pay the

22     costs of an appeal, you may apply for leave to appeal in forma

23     pauperis.

24                Mr. De Castro, I assume you will be filing a notice of

25     appeal?

O215schS

1              MR. DE CASTRO:  I will be, yes.

2              THE COURT:  Anything further from the government?

3              MR. DENTON:  No, your Honor.

4              THE COURT:  Mr. De Castro?

5              MR. DE CASTRO:  No, your Honor.

6              THE COURT:  In that case, we are adjourned.  Thank you

7     very much.

8                                    o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25