```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
UNITED STATES OF AMERICA,                                               :
                                                                        :
                                                                        :
              -v-                                                       :        17-CR-548 (JMF)
                                                                        :
JOSHUA ADAM SCHULTE,                                                    :        OPINION AND ORDER
                                                                        :
                           Defendant.                                   :
                                                                        :
------------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

      Defendant Joshua Adam Schulte, a former employee of the Central Intelligence Agency ("CIA"), was convicted of various offenses in connection with the largest leak of classified information from the CIA in history. On February 1, 2024, the Court sentenced Schulte to 480 months' imprisonment for those and other (child pornography) offenses. *See* ECF No. 1124. One loose end remains: whether or to what extent transcripts of certain proceedings held *in camera* pursuant to Section 6 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 § 6, may remain sealed.[1] At the Court's direction, the Government conducted a classification review of the transcripts and redacted all classified information from them. *See* ECF No. 872. Despite that, and a strong presumption in favor of public access to judicial documents and proceedings rooted in both the common law and First Amendment, the Government argues that the Court should — indeed, must — maintain the transcripts under seal. *See* ECF No. 975 ("Gov't Mem."); *see also* ECF No. 974. Intervenors emptywheel, LLC

---

[1] Schulte has appealed his conviction and sentence. *See* ECF No. 1125. Nevertheless, the Court retains jurisdiction to address the issue of sealing. *See, e.g., Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) ("[N]otwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters . . . .").

("emptywheel") and Inner City Press, members of the press, oppose the Government's motion. *See* ECF No. 978 ("ICP Motion"); ECF No. 988 ("emptywheel Motion").[2]

Somewhat surprisingly, the question presented — whether there is a public right of access to transcripts of proceedings held *in camera* (that is, in a closed courtroom) under CIPA Section 6 — appears to be one of first impression, at least in this Circuit.  Courts have addressed whether the public has a right of access to CIPA Section 6 hearings themselves.  Other courts have addressed whether the public has a right of access to filings under CIPA.  But no court appears to have squarely addressed whether the public has a right of access to transcripts of CIPA Section 6 hearings.  For the reasons that follow, the Court concludes that CIPA overrides any common law right of public access to the transcripts of a closed CIPA Section 6 hearing, at least where, as here, the court determines that the classified information may not be disclosed or used at trial.  But the Court concludes that the public has a qualified right of public access to such transcripts under the First Amendment.  It follows that the transcripts at issue here, redacted to protect national security or to preserve other higher values, must be unsealed.

## BACKGROUND

CIPA, enacted in 1980, "was designed to establish procedures to harmonize a defendant's right to obtain and present exculpatory material upon his trial and the government's right to protect classified material in the national interest." *United States v. Pappas*, 94 F.3d 795, 799 (2d Cir. 1996).  More specifically, the statute "sought to 'minimize the problem of so-called graymail — a threat by the defendant to disclose classified information in the course of trial — by requiring a ruling on the admissibility of the classified information before trial.'" *Id.* (quoting

---

[2]   The letter from Inner City Press also appears to reference certain documents in a "parallel civil case," *Schulte v. Attorney General of the United States*, 19-CV-3346 (JMF). *See* ICP Motion 1-2.  But none of those documents are sealed so that issue is moot.

S. Rep. No. 823, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 4294, 4295). In other words, the statute establishes a process to ensure that a district court can and does resolve all questions regarding the use and admissibility of classified information *before* trial rather than having to address such issues *during* trial. *See, e.g.*, *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1364 (11th Cir. 1994) ("[CIPA] ensures that questions of admissibility will be resolved under controlled circumstances calculated to protect against premature and unnecessary disclosure of classified information.").

Sections 5 and 6 of the law are central to that scheme and most relevant here. Section 5 requires a criminal defendant to give advance notice to the Government and court of any intent to disclose classified information "in connection with any trial or pretrial proceeding." 18 U.S.C. app. 3 § 5(a). It expressly prohibits the defendant from disclosing "any information known or believed to be classified" until the required notice has been given and the Government has had a "reasonable opportunity to seek a determination" from the court under Section 6. *Id.* Section 6(a), in turn, requires the court, upon a timely request from the Government, "to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial." *Id.* § 6(a). Significantly, the statute provides that any such hearing "shall be held *in camera* if the Attorney General certifies . . . that a public proceeding may result in the disclosure of classified information." *Id.* And it further provides that, "[i]f at the close of" such a hearing "the court determines that the classified information at issue may not be disclosed or elicited at the trial . . . , the record of such *in camera* hearing shall be sealed and preserved by the court for use in the event of an appeal." *Id.* § 6(d). Finally, Section 6(c) provides that, if the court authorizes the disclosure of classified information, the Government may move to substitute a "statement admitting relevant facts" or a "summary of the specific classified information," and the court must grant that motion "if it finds that the

3

statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." *Id.* § 6(c). It mandates that the court hold a hearing on any such motion and provides that "[a]ny such hearing shall be held *in camera* at the request of the Attorney General." *Id.*

In this case, Schulte served a handful of CIPA Section 5 Notices in advance of his trial (a retrial) on the leak charges in June 2022. *See, e.g.*, ECF Nos. 595, 798, 862. In response, the Government moved, pursuant to CIPA Sections 6(a) and (c), to preclude Schulte from disclosing some of the information that he had noticed and to substitute other evidence, such as a stipulation of relevant facts, instead. *See, e.g.*, ECF Nos. 811, 862. Pursuant to CIPA Sections 6(a) and (c), the Government requested that the Court hold *in camera* hearings on its motions. *See, e.g.*, ECF Nos. 862, 863. The Court did so, holding a handful of hearings in the months before the June 2022 trial. *See* ECF Nos. 794, 862. At the conclusion of the hearings, the Court granted the Government's motions, either precluding Schulte from disclosing the information he had noticed or requiring the substitution of a stipulation upon finding that it would "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." ECF Nos. 862, 863. In accordance with the terms of Section 6(a), the Court sealed the transcripts, and they remain sealed.

Near the end of trial, the Court held a conference to discuss the jury instructions. *See* ECF No. 911, at 2062-64. One subject of discussion was whether the Espionage Act, which Schulte was charged with violating, precluded dissemination of "national defense information," or "NDI," that was already public — an issue that was relevant because Schulte had been charged not only with the original leak of NDI from the CIA (which was published on WikiLeaks in 2017 under the titles "Vault 7" and "Vault 8"), but also with leaking NDI from jail

4

in 2018. During a colloquy on that issue, the Court referenced a discussion that had been held during the CIPA Section 6 hearings and was "therefore not yet public":

> I gave you two hypotheticals. I think one is where a member of the public goes on WikiLeaks today and downloads Vault 7 and Vault 8 and then provides the hard dive with the download to someone who is not authorized to receive NDI, and I posed the question of whether that person would be guilty of violating the Espionage Act and I think your answer was yes. That strikes me as a very bold, kind of striking proposition because in that instance, if the person is not in a position to know whether it is actual classified information, actual government information, accurate information, etc., simply providing something that's already public to another person doesn't strike me as — I mean, strikes me as, number one, would be sort of surprising if that qualified as a criminal act. But, to the extent that the statute could be construed to [] extend to that act one would think that there might be serious constitutional problems with it.
>
> I also posed the hypothetical of the New York Times is publishing something that appears in the leak and somebody sharing that article in the New York Times with someone else. That would be a crime and there, too, I think you said it might well be violation of the law. I think to the extent that that would extend to the New York Times reporter for reporting on what is in the leak, or to the extent that it would extend to someone who is not in position to know or position to confirm, that raises serious constitutional doubts in my mind. That, to me, is distinguishable from somebody who is in a position to know. I think there is a distinction if that person transmits a New York Times article containing classified information and in that transmission does something that confirms that that information is accurate — right — or reliable or government information, then that's confirmation, it strikes me, as NDI. But it just strikes me as a very bold and kind of striking proposition to say that somebody, who is not in position to know or does not act in a way that would confirm the authenticity or reliability of that information by sharing a New York Times article, could be violating the Espionage Act. That strikes me as a kind of striking proposition.
>
> So all of which is to say I think I have come around to the view that merely sharing something that is already in the public domain probably can't support a conviction under this provision except that if the sharing of it provides something new, namely, confirmation that it is reliable, confirmation that it is CIA information, confirmation that it is legitimate bona fide national defense information, then that confirmation is, itself, or can, itself, be NDI. I otherwise think that we are just in a terrain where, literally, there are hundreds of thousands of people unwittingly violating the Espionage Act by sharing the New York Times report about the WikiLeaks leak.

*Id.* at 2062-64.

After trial, the Court ordered the Government to conduct a classification review of the transcripts of the sealed CIPA Section 6 hearings "given the right to public access to judicial proceedings." ECF No. 872. The Government did so, but filed a letter expressing its "belie[f] that the transcripts . . . — even if redacted to remove classified information — should remain under seal" given certain provisions of CIPA (which are discussed below). ECF No. 971. Treating the Government's letter as a motion to keep the redacted transcripts under seal, the Court denied the motion "without prejudice to renewal by formal motion, supported by a memorandum of law showing that keeping the transcripts, even after they have been redacted, under seal is consistent with *both* the common law and First Amendment." ECF No. 974. The Government's present motion (supported by a letter brief, not a memorandum of law) followed, whereupon emptywheel and Inner City were granted leave to intervene and oppose the Government's motion. The Government later filed a reply. *See* ECF No. 990 ("Gov't Reply").

## DISCUSSION

It is well established that the common law provides a "right of public access to judicial documents." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). The common law right arises from "the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). Separate and apart from the common law, the First Amendment provides the public a qualified right of access to criminal proceedings, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) (plurality opinion), including pretrial proceedings, *Press-Enter. Co. v. Superior Ct.* ("*Press-Enter. II*"), 478 U.S. 1, 10 (1986), and to certain documents filed in connection with criminal proceedings, *see In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987); *see also Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91

(2d Cir. 2004) ("[O]ur precedents establish[] the public's and the press's qualified First Amendment right to attend judicial proceedings and to access certain judicial documents."); *United States v. Avenatti*, 550 F. Supp. 3d 36, 44-46 (S.D.N.Y. 2021).

Where it applies, the First Amendment presumption "gives rise to a higher burden on the party seeking to prevent disclosure than does the common law presumption." *Lugosch*, 435 F.3d at 124, 126.  The threshold question is whether the First Amendment presumption applies.  In determining whether it applies, courts have taken two approaches.  The first approach considers (1) whether the filing at issue has "historically been open to the press and general public" and (2) whether "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. II,* 478 U.S. at 8.  The second approach asks "whether the documents at issue 'are derived from or are a necessary corollary of the capacity to attend the relevant proceedings.'" *Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 164 (2d Cir. 2013) (quoting *Lugosch*, 435 F.3d at 120).  Applying these approaches, "[t]he Second Circuit has recognized a qualified First Amendment right of access to a wide variety of judicial documents associated with criminal proceedings, including pretrial suppression hearings, suppression motion papers, voir dire, and more." *United States v. Correia*, No. 19-CR-725 (JPO), 2020 WL 6683097, at *2 (S.D.N.Y. Nov. 12, 2020).  "Indeed, the Second Circuit has consistently affirmed that the right of access applies to 'judicial documents' in criminal cases." *United States v. Smith*, 985 F. Supp. 2d 506, 517 (S.D.N.Y. 2013) (citing cases).  If the "more stringent First Amendment framework applies, continued sealing of the documents may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124 (*citing In re N.Y. Times Co.*, 828 F.2d at 116).

7

The principal question in this case is whether the transcripts at issue are subject to the common law right of access or the First Amendment right of access. The Government argues that they are not subject to either. *See* Gov't Mem. 1-6; Gov't Reply 1-3. Intervenors argue that they are subject to both, though they rest primarily on the First Amendment. *See* emptywheel Motion 1-5; ICP Motion 1. The Court will address each doctrine in turn.

**A. The Common Law Right of Access Does Not Apply Here**

The Court need not dwell long on the common law right of access. That is because CIPA overrides the common law in the circumstances presented here. The Second Circuit has held that "where the issue is whether federal statutory or federal common law governs," courts are to "'start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law.'" *Senator Linie Gmbh & Co. Kg v. Sunway Line, Inc.*, 291 F.3d 145, 166 (2d Cir. 2002) (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981)); *accord In re Application of N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 405-09 (2d Cir. 2009) ("*In re Application of N.Y, Times*"). If an act of Congress "reveal[s] a manifest congressional intent that" a document otherwise subject to the common law presumption of public access "be treated confidentially," that "negate[s]" any "presumption in favor of disclosure." *In re Application of N.Y. Times*, 577 F.3d at 408.

CIPA "reveal[s] a manifest congressional intent" for the transcripts at issue here to "be treated confidentially." *Id.* As noted, Section 6(d) expressly provides that where, as here, "the court determines" at the close of a CIPA hearing held *in camera* "that the classified information at issue may not be disclosed or elicited at the trial or pretrial proceeding, the record of such *in camera* hearing *shall be sealed*." 18 U.S.C. app. 3 § 6(d) (emphasis added). Congress's use of "shall" contrasts with its use of "may" elsewhere in Section 6. *See id.* 6(e)(2) (enumerating actions that a court "may" take if it determines that a defendant is prevented from disclosing or

8

causing the disclosure of classified information and the court determines that the interests of justice would not be served by dismissal). It follows that the statute mandates sealing and, thus, "supersedes any arguable common law right" of access to the transcripts at issue. *In re Application of N.Y. Times*, 577 F.3d at 405; *see also id.* at 407 n.3 (holding that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518(8)(b), overrides any common law right of access to wiretap materials ); *see, e.g.*, *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 504 (D.C. Cir. 1998) (holding that the common law right of access does not apply to grand jury materials because Rules 6(e)(5) and 6(e)(6) of the Federal Rules of Criminal Procedure "supplanted" any common law right of access and stating that "[t]hese Rules, not the common law, now govern"). *See generally Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1321 (2020) ("When, as is the case here, Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." (cleaned up)).[3] Accordingly, the common law right of access does not apply.

## B. The First Amendment Mandates Public Access

The threshold (and hardest) question for purposes of the First Amendment analysis is similarly whether that right of public access even applies to the transcripts at issue. But in contrast to the common law, the First Amendment requires the Court to look beyond CIPA to answer that question because a statute "obviously cannot override a constitutional right of access." *United States v. Poindexter*, 732 F. Supp. 165, 167 n.9 (D.D.C. 1990); *accord United States v. Moussaoui*, 65 F. App'x 881, 887 (4th Cir. 2003); *In re Wash. Post Co.*, 807 F.2d 383,

---

[3] By its terms, Section 6(d) mandates sealing only if the court determines that "the classified information at issue may *not* be disclosed or elicited at the trial." 18 U.S.C. app. 3 § 6(d) (emphasis added). The provision does not speak directly to what a court should do if it determines that the classified information at issue *can* be disclosed or elicited at trial. Because that was not the situation in this case, the Court need not and does not decide whether the common law right of access would apply in that scenario.

393 (4th Cir. 1986); *United States v. Ressam*, 221 F. Supp. 2d 1252, 1259 (W.D. Wash. 2002); *United States v. Pelton*, 696 F. Supp. 156, 157 (D. Md. 1986). Whether the First Amendment right of access applies turns instead on the "experience and logic" approach applied by the Supreme Court in *Press-Enterprise II*. It asks, first, whether the documents "have historically been open to the press and the general public" (experience) and, second, whether "public access plays a significant positive role in the functioning of the particular process in question" (logic). *Hartford Courant Co.*, 380 F.3d at 92 (quoting *Press-Enter. II*, 478 U.S. at 8).[4]

Although the issue requires close analysis, the experience prong weighs in favor of applying the First Amendment to the transcripts at issue here. Notably, courts have long taken a broad view of what criminal proceedings are subject to the First Amendment right of public access. The right plainly applies to trials. *See, e.g.*, *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 603 (1982). And the Supreme Court and Second Circuit have squarely held that it applies in most pretrial proceedings as well. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984); *United States v. Haller*, 837 F.2d 84, 86-87 (2d Cir. 1988); *In re N.Y. Times Co.*, 828 F.2d at 113-14; *In re Application of Herald Co.* ("*Herald Co.*"), 734 F.2d 93, 98 (2d Cir. 1984); *see also United States v. Alcantara*, 396 F.3d 189, 196 (2d Cir. 2005) (sentencing proceedings). The Second Circuit's decisions in *In re New York Times Co.* and *Herald Co.* are especially instructive here. In the former, the court held that the First Amendment applied to a pretrial hearing to preclude the use of certain evidence at trial under the Rules of Evidence. *See* 828 F.2d at 114.

---

[4] As noted, the Second Circuit has endorsed a second approach to whether the First Amendment right of access extends to judicial documents, which "considers the extent to which the judicial documents are derived from or are a necessary corollary of the capacity to attend the relevant proceedings" to which the First Amendment right of access attaches. *Lugosch*, 435 F.3d at 120 (cleaned up). But there is no First Amendment right of access under that approach where, as here, "the relevant proceedings . . . are not public." *In re Application of N.Y. Times*, 577 F.3d at 410.

In the latter, the court held that it applied to a pretrial suppression hearing. *See* 734 F.2d at 98-99. Moreover, in so holding, the Circuit pointedly observed that "the modern suppression hearing, unknown at common law, is a type of objection to evidence such as took place at common law . . . in *open court* during trial. There is no sound reason for having the *existence* of a right of access to a hearing on the admissibility of evidence turn on whether the hearing is held during or before the trial . . . ." *Id.* at 98-99 (citation omitted).

The hearings that gave rise to the transcripts at issue here fit comfortably within that tradition of historically open proceedings. True, they were hearings held pursuant to Section 6 of CIPA, a statute that did not exist until 1980. But, in essence, they were no different than the hearings at issue in *In re New York Times Co.* and *Herald Co.* insofar as their purpose was to determine the admissibility of certain evidence at trial. In fact, if anything, the logic of the Second Circuit in *Herald Co.* applies even more forcefully here, as one need not look as far back as the common law to find a relevant tradition of openness. Indeed, the statute itself provides that a Section 6(a) hearing is intended "to make all determinations concerning the use, relevance, or admissibility of classified information *that would otherwise be made during the trial*." 18 U.S.C. app. 3 § 6(a) (emphasis added). In other words, until 1980, the substance of what is now known as a CIPA Section 6(a) hearing was considered part of the trial itself and, thus, had long "historically been open to the press and general public." *Hartford Courant Co.*, 380 F.3d at 92; *see* S. Rep. No. 823, 96th Cong., 2d Sess. 1980 ("Under *present procedures*, decision[s] regarding the relevance and admissibility of evidence are normally made as they arise during the course of the trial." (emphasis added)), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4297.

In arguing that experience does not support application of the First Amendment here, the Government takes a myopic view of the proceedings that gave rise to the transcripts at issue. Invoking *In re Application of N.Y. Times* — in which the Second Circuit held that wiretap

11

applications had not historically been open to the public because they were a "modern invention and, since the time of their creation in Title III [of the Omnibus Crime Control and Safe Streets Act of 1968], [had] been subject to a statutory presumption *against* disclosure," 577 F.3d at 410 — the Government argues that CIPA Section 6 hearings are "entirely a creature of statute, and accordingly have from their inception been . . . held *in camera*." Gov't Mem. 3. But for one thing, that is true only "if the Attorney General certifies . . . that a public proceeding may result in the disclosure of classified information"; otherwise, the statute does not mandate closed hearings. 18 U.S.C. app. 3 § 6(a); *see also* S. Rep. No. 823, 96th Cong., 2d Sess. 1980 ("It is hoped that the hearings [under Section 6(a)] will be held publicly as often as possible. At public hearings the parties can talk about certain information in the abstract."), *reprinted in* 1980 U.S.C.C.A.N. 4294, 4301. For another, the argument ignores the language of the statute and the legislative history, which confirm that CIPA Section 6 hearings, unlike wiretap applications, are not really a "modern invention." The statute merely changed the timing of, and procedures applicable to, such hearings; such hearings took place — openly, as part of trials — long before the statute and their rebranding as "CIPA Section 6" hearings.

Additionally, the few courts that have considered whether the First Amendment applies to proceedings and filings similar to those here have taken a broader view of how to characterize the proceedings and filings than the one pressed by the Government. *See, e.g.*, *Moussaoui*, 65 F. App'x at 890-91 (considering the history of public access to "oral arguments" generally when discussing an appeal arguably based on CIPA Section 7); *Pelton*, 696 F. Supp. at 157 (considering the history of public access to "criminal trial[s]" when discussing the showing of tape recordings of telephone calls classified pursuant to CIPA Section 8(a)); *United States v. Vinas*, No. 08-CR-823 (NGG), 2017 WL 2462503, at *1 (E.D.N.Y. June 6, 2017) (considering the history of public access to "judicial documents" when discussing a letter that was sealed

pursuant to a CIPA Section 3 protective order). *But see Poindexter*, 732 F. Supp. at 167 (focusing on the "type of pretrial proceeding involved here" — namely, a pretrial deposition of a former President of the United States). Consistent with the teachings of these cases, and the language of the statute and legislative history, the Court therefore concludes that a CIPA Section 6 hearing is properly understood, for purposes of the experience prong of the First Amendment test, as either a type of hearing that took place during trial or as a pretrial hearing on the admissibility of evidence. In either case, it would have historically been open.

Notably, even if the Court were to accept the Government's argument and treat CIPA Section 6 hearings as a novelty, unknown to the law prior to their creation by statute in 1980, the experience prong would still favor application of the First Amendment here. That is because the question in this case is not actually whether the First Amendment applies to CIPA Section 6 *hearings*, but rather whether the First Amendment applies to *transcripts* of those hearings. In fact, even that is not the right way to frame the question because Intervenors do not seek access to the transcripts in their entirety; they seek access only to the *unclassified* portions of the transcripts. *See* emptywheel Motion 1; ECF No. 974. There is a robust history of allowing the press and public access to transcripts of proceedings and to filings under CIPA, redacted to remove any reference to classified information. *See, e.g.*, *Poindexter*, 732 F. Supp. at 170 (providing public access to tapes from a deposition with the classified portions edited out); *Pelton*, 696 F. Supp. at 159 (providing public access to redacted versions of transcripts); *Moussaoui*, 65 F. App'x at 891 (providing public access to a redacted transcript); *United States v. Abu Marzook*, 412 F. Supp. 2d 913, 928 (N.D. Ill. 2006) (providing public access to a redacted transcript); *see also Vinas*, 2017 WL 2462503, at *1 (noting that both parties had consented to release portions of a letter "determined to be unclassified"). In short, the experience prong favors application of the First Amendment to the transcripts at issue here.

The logic prong — whether "public access plays a significant positive role in the functioning of the particular process in question," *Hartford Courant Co.*, 380 F.3d at 92 — also favors application of the First Amendment to the transcripts. The Supreme Court and the Second Circuit have long recognized the importance of public access to criminal trials. Among other things, openness is "for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46. In *Waller*, *Herald Co.*, and *In re New York Times Co.*, the Supreme Court and Second Circuit extended that logic to pretrial hearings concerning the admissibility of evidence, in part recognizing that such hearings can be "as important," *id.*, or as "decisive," *Herald Co.*, 734 F.2d at 98, as a trial itself. *See also In re N.Y. Times Co.*, 828 F.2d at 113-14. "Public disclosure of such proceedings," the Second Circuit has reasoned, "enhances the basic fairness of the judicial process and the appearance of fairness that is essential to public confidence in the system." *Id.* at 114.

"The same logic applies" in most respects to CIPA Section 6 hearings. *Id.* Like suppression hearings, such hearings can be dispositive — whether that is because the court's ruling results in a guilty plea or because it leads to dismissal. *See* 18 U.S.C. app. 3 § 6(e)(2) (mandating dismissal of the indictment or information if a defendant is prevented by an order from disclosing or causing the disclosure of classified information unless the court "determines that the interests of justice would not be served by dismissal of the indictment or information"). And like pretrial evidentiary hearings, such hearings can — as the hearings in this case did — involve extensive colloquy with respect to factual and legal issues beyond the classified information itself. That is because evidentiary rulings frequently turn, as some of the rulings in this case did, on whether or to what extent evidence is relevant to, or probative of, issues in the

14

case, *see, e.g.*, Fed. R. Evid. 401, 403, which may, in turn, require determinations with respect to the elements of the charged offense or the validity of a proffered defense. Thus, public disclosure of CIPA Section 6 hearings would serve the same salutary purposes as public disclosure of the types of hearings at issue in *Waller*, *Herald Co.*, and *In re New York Times Co.*

Admittedly, there is a countervailing logic that applies to many, if not most, CIPA Section 6 hearings that does not apply to (most of) the types of proceedings at issue in *Waller*, *Herald Co.*, and *In re New York Times Co.*: the need to protect national security. That need explains "Congress's preferred policy of favoring confidentiality," *In re Application of N.Y. Times*, 577 F.3d at 410, at least where, as here, the Government "certifies . . . that a public proceeding may result in the disclosure of classified information," 18 U.S.C. app. 3 § 6(a). But notably, Congress did not mandate confidentiality for *all* Section 6 proceedings — only for those that "may result in the disclosure of classified information." *Id.* Underscoring the point, the Senate Report on CIPA expresses the "hope[]" that Section 6 hearings "will be held publicly as often as possible." S. Rep. No. 823, 96th Cong., 2d Sess. 1980, *reprinted in* 1980 U.S.C.C.A.N. 4294, 4301. And in any event, while courts should generally grant "heightened deference to the judgments of the political branches with respect to matters of national security," *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001), they may not give the political branches a blank check when it comes to the constitutional right of public access. Indeed, the Second Circuit has instructed that "[t]ransparency" is "especially" important "when a judicial decision accedes to the requests of a coordinate branch, lest ignorance of the basis for the decision cause the public to doubt that complete independence of the courts of justice which is peculiarly essential in a limited Constitution." *United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (cleaned up); *see also, e.g.*, *In re Wash. Post Co.*, 807 F.2d at 391-92 ("A blind acceptance by the courts of the government's

insistence on the need for secrecy . . . would impermissibly compromise the independence of the judiciary and open the door to possible abuse.").[5]

More significant for present purposes, the question presented here is, again, not whether CIPA Section 6 *hearings* should be public, but whether the *transcripts* of such hearings — redacted to remove classified information no less — should be public. There is a logic to Congress's preferred policy of confidentiality when it comes to a CIPA hearing (at least where, as here, the Government certifies that a public proceeding may result in the disclosure of classified information). Where practicable, it is certainly good practice to limit the closed portion of a CIPA Section 6 hearing to discussion of the classified information only and to conduct the remainder of the hearing in public. But, in many instances, "[s]uch a bifurcated procedure would be extremely disruptive, disjointed, and impractical," not the least because the courtroom must be secured for a closed CIPA Section 6 hearing, so it would be necessary to either move back and forth between a secure and regular courtroom or to "re-secure[]" the courtroom "each time the Court excused the public." *Abu Marzook*, 412 F. Supp. 2d at 927. Additionally, courts are not necessarily in a good position to determine the metes and bounds of what is and is not classified, especially in real time. These practical concerns weigh in favor of erring on the side of caution and holding CIPA Section 6 hearings that may involve classified information *in camera* in their entirety. But these practical concerns do not apply to transcripts,

---

[5] For these reasons, the Court parts ways with the district court's decision in *United States v. Ressam*, which held that the First Amendment right of public access does not apply to documents that are submitted in connection with a sealed CIPA hearing. *See* 221 F. Supp. 2d 1252, 1258-60 (W.D. Wash. 2002). In concluding that the logic prong did not favor transparency, the *Ressam* court gave undue weight to "the structure and purpose of CIPA," *id.* at 1259, and ignored that CIPA itself contemplates some transparency. The court also reasoned that "evidentiary determinations regarding classified information are questions of law, the public resolution of which would not materially enhance either the fairness or public perception of the process." *Id.* at 1259. That reasoning, however, cannot be squared with the Second Circuit's holding in *In re New York Times Co.* or the values underlying the right to public access. *See Waller*, 467 U.S. at 46.

which can be reviewed in the fullness of time and redacted to separate information that should remain confidential from information that can and should be public. Given that, logic strongly favors public access here. As with any other criminal proceedings or documents that are traditionally open, it "serves the important function of discouraging either the prosecutor or the court from engaging in arbitrary or wrongful conduct." *In re Wash. Post Co.*, 807 F.2d at 389.

For all of these reasons, the Court concludes that the First Amendment right of public access applies to the transcripts of the CIPA Section 6 proceedings at issue here.[6] Thus, continued sealing is warranted "only . . . [if] necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124 (citing *In re N.Y. Times Co.*, 828 F.2d at 113). There is no doubt that the Government has a compelling interest in protecting national security. *See Aref*, 533 F.3d at 82-83 ("[T]ransparency must at times yield to more compelling interests. 'It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.'" (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981))); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (reaffirming "the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business"). But the transcripts at issue here have already been redacted by the Executive Branch to remove all reference to classified information, so the only material that would be made public is unclassified. And it should go without saying

---

[6] As noted, no court appears to have decided the precise question presented here. That said, the decision, if not analysis, of then-District Judge Amy St. Eve in *Abu Marzook* supports the Court's conclusions here. There, the Government moved, over the objection of a newspaper and public interest group, to conduct certain portions of a pretrial suppression hearing in a closed courtroom pursuant to CIPA. *See* 412 F. Supp. 2d at 917. Judge St. Eve held that the suppression hearing was subject to the First Amendment right of public access but granted the Government's motion to close the courtroom to protect classified information. *See id.* at 924-27. She ordered that a transcript of the proceeding, with all classified information redacted, be publicly docketed as "the only reasonable alternative" to a public proceeding. *Id.* at 927.

that the Government does *not* have the same interest in concealing unclassified information from the public. *See, e.g.*, *Snepp v. United States*, 444 U.S. 507, 513 n.8 (1980) ("If in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned."); *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009) ("The government has no legitimate interest in censoring unclassified materials, and, thus, may not censor such material, contractually or otherwise." (cleaned up)).

The Government argues that there is no meaningful difference between sealing the transcripts in their entirety and releasing redacted versions given the "substantial" nature of the redactions. *See* Gov't Mem. 4-5. Having reviewed the redactions, however, the Court finds that that argument — which is, at bottom, an argument that sealing of the transcripts in their entirety *is* narrowly tailored to protect national security — is without merit. The interests of protecting national security and the public's right of access "can be reasonably well-accommodated by making public a redacted version of the transcripts. While a redaction necessarily reduces the total amount of information available to the public, . . . there will remain a substantial amount of information available to the public, and the flow of information will not be 'truncated.'" *Pelton*, 696 F. Supp. at 159. The Government also suggests that the present redactions may not be sufficient to protect national security. *See* Gov't Mem. 5 ("The specific issues of law discussed, and the extensive colloquies regarding the suitability of particular substitutions, summaries, and stipulations would reveal, by themselves, the specific type of relief sought by the parties on specific subjects, which would in turn provide significant indications about what classified information was at issue."). The Court is skeptical, but, in any event, the proper way to address that concern would be through additional or broader redactions, not wholesale sealing.

## CONCLUSION

It is indeed "'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307. That interest, backed by CIPA, plainly supports protecting classified information from unnecessary disclosure in litigation. But the First Amendment guarantees the press and public access to most, if not all, criminal proceedings, and CIPA cannot abrogate that venerable constitutional right. The net result is that, even where a pretrial hearing is properly held in a closed courtroom pursuant to CIPA Section 6, a transcript of that proceeding — redacted to protect classified information and to preserve other higher values — must be made publicly available. Accordingly, the Government's motion to keep the transcripts at issue here sealed must be and is DENIED. To the extent that the Government believes that additional redactions beyond those that were made in connection with the declassification process are justified, it shall propose them, in accordance with the procedures set forth in the Court's Individual Rules and Practices for Criminal Cases, no later than **May 2, 2024**. In the absence of an application for leave to make additional redactions by that deadline, the Government shall docket the transcripts at issue no later than **May 3, 2024**.

SO ORDERED.

Dated: April 9, 2024
New York, New York

JESSE M. FURMAN
United States District Judge