XM535schC                          TOP SECRET

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            17 Cr. 548 (JMF)

5    JOSHUA ADAM SCHULTE,

6              DEFENDANT.

7    ---------------------------- --x

8
                                         MAY 3, 20022
9                                        9:15 a.m.

10
     Before:
11
                         HON. JESSE M. FURMAN,
12
                                         District Judge
13

14                            APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  DAVID DENTON
17   BY:  MICHAEL LOCKARD
          Assistant United States Attorneys
18
     JOSHUA ADAM SCHULTE, Pro se
19
     ALSO PRESENT:   SABRINA SHROFF, Standby counsel for defendant
20                   MATT MULLERY, CISO
                     DANIELLA MEDEL, CISO
21                   PATRICE KING, CISO

22

23

24

25

XM535schC                    TOP SECRET

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4              MR. DENTON:  Good morning, your Honor.  David Denton

5    and Michael Lockard for the government.

6              MR. LOCKARD:  Good morning.

7              THE COURT:  Good morning.

8              MR. SCHULTE:  I shall be appearing pro se.

9              THE COURT:  I think the microphones are off for

10   today's purposes so, please, keep your voice up.

11             MS. SHROFF:  Good morning, your Honor.  Sabrina

12   Shroff, standby counsel to Mr. Schulte.

13             THE COURT:  Good morning, and welcome.

14             Again, because I think the microphones are off, so

15   that I can hear you and court reporter can hear you, just keep

16   your voices up.

17             We are here in connection with a variety of things,

18   the most significant of which is the sort of Section 6 issues,

19   but before I turn to that a couple other items -- open items

20   and new items.  One, ███████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

XM535schC                    TOP SECRET



XM535schC TOP SECRET



XM535schC                    ~~TOP SECRET~~



XM535schC                    ~~TOP SECRET~~

1              THE COURT:  With that, let me deal with the two open

2     items from the omnibus motion, they are the motion for

3     disclosure of additional information or materials relating to

4     the polygraph exam and materials relating -- actually, I guess

5     there are three issues, materials relating to the CIA chats and

6     e-mail metadata and then the forensic crime scene which I will

7     get to later.

8              With respect to the polygraph, the government filed a

9     classified letter ████████████████████████████████████████

10    ███████████████████████████████  I guess what I am not clear on

11    is what marginal value any of those materials have beyond the

12    transcript that was already disclosed and, indeed, how this

13    could be used at all except for Mr. Schulte to testify, if he

14    were to testify, that he willingly took a polygraph and had no

15    qualms about doing so, for which the materials themselves

16    wouldn't be necessary.

17             So, Mr. Schulte, do you want to?

18             MR. SCHULTE:  Yes.  So the polygraph --

19             THE COURT:  Just keep your voice up.

20             MR. SCHULTE:  Yes.  Has the government -- I haven't

21    received the response so is that something that the government

22    has?

23             THE COURT:  Do you have a copy of it Mr. Denton.

24             MR. DENTON:  No, your Honor; and we actually believe

25    it is properly submitted *ex parte*.  The details about what

XM535schC                         TOP SECRET

1   specific information is retained about polygraph is -- we have

2   been advised -- considered also quite sensitive and so that's

3   the reason why we made the submission *ex parte*.

4           THE COURT:  I overlooked that.  OK.  And can you

5   elaborate on that to the extent that you can in this setting,

6   why Mr. Schulte can't be privy to what's in this?

7           MR. DENTON:  Again, your Honor, I think my

8   understanding, as it has been conveyed to us, is that what

9   information is collected, how it's documented, how polygraph

10  decisions are made are themselves closely guarded things that

11  are not known to CIA employees for precisely the reason that

12  they do not have the ability to game the system or otherwise be

13  aware of what information goes into the polygraph

14  decision-making process.  So, given that, we do not think that

15  the information is relevant.  The fact of its existence is also

16  not relevant to the defendant.

17          THE COURT:  So, Mr. Denton, with all due respect, I am

18  looking at the letter and it's described at a level of

19  generality that I find it very hard to understand what would be

20  compromised by sharing it with Mr. Schulte.

21          MR. DENTON:  I think, your Honor, there are some parts

22  of it that we can describe and I think perhaps just sort of an

23  additional level of generality to say that ███████████████████

24  ████████████████████████████████████████ and then associated

25  documentation, that much I think we can say.  I'm a little bit

XM535schC                    ~~TOP SECRET~~

1    taking my own marching orders here, your Honor, in terms of

2    what is considered sensitive and what is not, and I'm trying to

3    be careful about it.  So I understand the desire to have a

4    reasonable discussion about this, I'm just trying to be careful

5    myself as well.

6            THE COURT:  OK.

7            Mr. Schulte?

8            MR. SCHULTE:  Yes.  As an initial matter, I don't

9    think that's the proper standard for determining whether it

10   should be produced to me, and the precautions that they're

11   saying there is really no difference between, you know, the

12   results from this polygraph and, say, other polygraphs that are

13   presented.  So I really think in order for me to answer the --

14   in order for me to answer the Court, I really need access to

15   the letter to be able to respond.

16           Standby counsel notes that also, just because he has

17   marching orders from the CIA, that's not the standard.  As the

18   Court noted, Why?  What is the reason for not disclosing that

19   information to me so that I can properly present an argument

20   and rebut what the government is arguing.  Your rules require

21   them to at least ask permission before filing the *ex parte*

22   submission which it doesn't appear that they've done.

23           THE COURT:  Well, in fairness, it is labeled *ex parte*,

24   I just frankly overlooked that in part because I didn't see

25   anything in here that would suggest that it should be *ex parte*

XM535schC                    ~~TOP SECRET~~

1   but, having said that and putting the procedural question aside

2   of whether it should or shouldn't be *ex parte*, I mean,

3   Mr. Denton has disclosed that ████████████████████████

4   ████████████████████████████████████████████████ of

5   certain things.  The question is what possible use you could

6   make of any of that since the -- again, I think the only

7   admissible information or facts here would be that you took --

8   you willingly took the polygraph and had no qualms about doing

9   so.  It was never adjudicated, so in that respect there is no

10  results to be admitted and, in that event, they don't have any

11  results in their possession.

12          So the question -- and I recognize that you are

13  shooting a little bit in the dark given that are you not privy

14  to the particulars although, candidly, I am not privy to much

15  of the particulars either having read the letter -- is what use

16  or relevance any of that has beyond the transcript that's

17  already in your possession.

18          MR. SCHULTE:  So there is three or four issues that I

19  initially wrote regarding the polygraph.  I think first is it

20  is proper Rule 16 because it is a medical test so that falls

21  under the Rule 16 information.

22          The second big point I made in my argument was the

23  polygrapher informed me specifically that the polygraph results

24  were in and the adjudication is simply for the re-investigation

25  so there should at least be some kind of evidentiary hearing or

XM535schC                    ~~TOP SECRET~~

1   some way for me to get this information from the polygrapher

2   because my understanding, and from my understanding for ████

3   ███████████████████████████████████████████████████████████

4   ███████████████████████████████████████████   It is

5   a common occurrence; people fail the polygraph, they have to

6   retake it ███████████████████   So in my experience and with

7   other CIA employees, ████████████████████████████████████

8   ██████████████████████████████████   So that did

9   not happen.  The polygrapher told me I passed the polygraph ███

10  █████████████████████████████████████ and what the

11  government keeps referring to as adjudication is what they

12  refer to as the entire investigation.  So the entire

13  investigation was never adjudicated so they have multiple

14  investigations, the polygraph is just one small point of that.

15  So my understanding is the polygraph results came in, I passed

16  the polygraph, but they did not finish the entire

17  re-investigation.

18       So I believe the polygraph results would be admissible

19  for several reasons.  The first is the biggest reason is that

20  this polygraph is significantly different from a typical

21  polygraph and I believe that the improvement the CIA has made

22  would show that this one would be admissible in Court, and the

23  second thing is this is not a typical situation.  The reason

24  polygraphs typically aren't admissible is because you are

25  taking it specifically for the Court -- for the proceedings,

XM535schC                    ~~TOP SECRET~~

1    right, criminal proceedings, or you hire your own.  This was

2    not done regarding, with respect to any criminal proceedings,

3    this was done with regard to the CIA and the CIA's trust in me.

4    So the results from that polygraph basically say that the CIA's

5    polygraph that they used to protect National Defense

6    Information, National Security Information, that I passed this

7    polygraph I believe would be admissible to that fact, the fact

8    that the CIA would, based on their polygraph results, trust me

9    and that they would acknowledge I did not, you know, commit any

10   security violations during this time.

11            THE COURT:  Two responses.

12            First, under Rule 16 it is not sufficient or enough

13   that it is just a test conducted, it also has to be material in

14   preparing the defense or the government intends to use the item

15   in its case-in-chief.  Obviously the government doesn't intend

16   to use any of these items and the question I had for you is why

17   is this material and I'm not at the moment persuaded that you

18   have made that case.  I'm not aware of any authority that

19   differentiates a polygraph for purposes of a criminal case or

20   some other purpose and its admissibility, nor have you cited

21   any case that supports that proposition.

22            Be that as it may, let me just confirm with

23   Mr. Denton, I don't know if adjudication is a technical term

24   here or if there is some results that are different than

25   adjudication that have not been disclosed to Mr. Schulte that

1    maybe he is just laboring under a misimpression that there are

2    results that could be shared separate and apart from a, quote

3    unquote, adjudication.  But can you just clarify, are there any

4    results of the polygraph test?

5         MR. DENTON:  No, your Honor.

6         THE COURT:  Great.  So then I think this issue is put

7    to rest.  You have the transcript.  Again, I think at most, as

8    far as I can see, the only use that you could make of any of

9    this is that you took the polygraph and had no qualms about

10   doing so.  I don't think your own statements to the polygraph

11   examiner -- hearsay -- is offered by you and there are no

12   results so we don't need to adjudicate or litigate the

13   admissibility of results so the remaining information, I just

14   don't see how it's material let alone admissible and, given

15   that, the motion is denied.

16        The second issue is the metadata issue that the

17   government responded and did cc Mr. Schulte so I assume you

18   have a copy of that Mr. Schulte, is the government's letter of

19   April 29th?

20        MR. SCHULTE:  That's correct.

21        THE COURT:  So do you wish to respond, say anything on

22   this score?  The government's representation is that you have

23   the metadata for all of the communications that have been

24   deemed relevant and that the metadata wouldn't contain the

25   sorts of information that you indicated you needed it for,

XM535schC                    ~~TOP SECRET~~

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████.

3         MR. SCHULTE:  So what the government provided to us

4  were simply, like, PDFs, they're PDFs of the e-mails and

5  messages so they're not in the original format so that is what

6  I was requesting, is that Sametime and Outlook obviously have

7  their own format for the messages so they should pull those out

8  and actually provide them in the original format because there

9  is metadata associated with those that are relevant, there is

10 just no reason to simply print these as PDFs provided to me and

11 regarding the relevant e-mails and Sametime messages, there is

12 no reason that they can't pull the relevant e-mails and

13 basically provide them in the original format.

14        THE COURT:  So the last sentence of the second

15 paragraph states the e-mails and Sametime messages already

16 produced to the defendant in classified discovery contain all

17 available metadata associated with those e-mails and messages.

18        MR. SCHULTE:  Yeah, that's not correct.  Yeah, because

19 they're only provided in PDF form, they're not provided with

20 the original metadata.  PDFs don't -- they converted the file,

21 they took the e-mails and messages and they went to print and

22 they printed them as PDFs and they presented a PDF to us so

23 they don't contain the metadata from the original encoding of

24 the messages.

25        THE COURT:  Mr. Denton?

14

XM535schC                    ~~TOP SECRET~~

1          MR. DENTON:  Your Honor, our understanding, based on

2     our communications with the people responsible for storing

3     this, is that that header information that is included in each

4     of the messages is all the metadata that there is, that there

5     isn't something else.  It is true that they were produced in

6     PDF format and not a PST or something like that but, again,

7     like I said, we specifically asked about whether there would be

8     any other metadata and we were told all that there is are the

9     headers.

10         MR. SCHULTE:  The big question is or the major point

11    here is that that is not in the original format and I don't

12    believe, from my experience with the PST and Sametime files

13    that they do contain additional data associated with those

14    files but, regardless, they should at least provide the

15    original data.  They have it so what is the reason that they

16    cannot simply produce the original in the original format to

17    me?

18         THE COURT:  So Mr. Denton, that was the question I was

19    going to ask; that if the PDF contains all of the available

20    metadata, why can't the original with the actual metadata,

21    embedded within it, whatever that may mean, why can't that be

22    produced?  In other words -- correct me if I misunderstand --

23    but my understanding is that Mr. Schulte has been given, quote

24    unquote, all relevant communications as well as all of his own

25    communications, so the only thing so which he is not privy are

XM535schC                    TOP SECRET

1   communications from others to him which **Judge Crotty** previously

2   blessed as appropriate and **t**he question here is the metadata

3   and there is metadata that -- communications that were already

4   disclosed.  Your position is that he has that, albeit in PDF

5   form, and the metadata of the communications that he is not

6   privy to.  Focusing on the former, that is the things that have

7   already been disclosed to him, if he already has that metadata,

8   albeit in printed format, what's **t**he harm giving it to him in

9   the original format?

10          MR. DENTON:  I think there is two different

11   categories, your Honor.

12          With respect to chat messages, it's literally not

13   possible to give it to him in the original format.  ██████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████

19          With respect to the e-mails, I think that is possible.

20   It is likely to be a pretty significant undertaking, mostly

21   because I know that the triage process of identifying his

22   e-mails and the relevant e-mails was done after they had

23   already been exported to PDF so it wasn't like this was done in

24   a PST that is sitting there that we can hand over, we have to

25   go back to an e-mail pull to sort of re-cull it down to what's

XM535schC                    TOP SECRET

1    already been produced.  I don't think that would be a problem

2    from a sensitivity perspective but I think here, too, we then

3    get to a question of relevance and whether this is something

4    that is appropriate to require the government to do under Rule

5    16.  He has the content of his statements, those are all

6    reflected in the e-mails.  It is not entirely clear what

7    relevance some other form of metadata has.  Like I said, I'm

8    not saying that this is a particularly sensitive thing but I do

9    think it would be a significant amount of work to go back to at

10   this stage.

11            THE COURT:  Mr. Schulte?

12            MR. SCHULTE:  Yes.  This is not something new, we have

13   been asking for this for a long time, and basically the

14   original format is how the data should have been provided to

15   begin with so the fact that the government, you know, provided

16   it in a different format to begin with, the government should

17   have provided it in the original format from the beginning.

18            THE COURT:  What difference does it make to you?  If

19   you have the information and you can make use of the

20   information, what could you do with the original format that

21   you can't do with what you have been given?

22            MR. SCHULTE:  Like, I mean, the biggest issue is we

23   are coming back to the metadata.  I know the government keeps

24   saying that there is no additional metadata in it but from my

25   experience with the PST Outlook file is it does contain this

XM535schC                    TOP SECRET

1    information.  I don't know if you have seen when you use

2    Outlook, it tells you whether or not a message has been read or

3    not.  That data is being stored somewhere.  So it is the same

4    with other features and other things that were enabled on my

5    Outlook inbox.  The fact that you can do things, the features

6    that are enabled, tells you that that data is being stored.

7    Where is that data being stored?  It is being stored as

8    metadata as part of the e-mail.  So I don't know if the Court

9    wants me to get an expert to testify about how Outlook works

10   and that this metadata exists but that's basically what it

11   comes down to.

12          THE COURT:  I'm not suggesting that you need to do

13   that but I think you do need to demonstrate to me that there is

14   some additional information or use that you can make of the

15   original format metadata that you can't make of the metadata

16   that the government says it has provided to you and I have no

17   basis to second guess Mr. Denton's representation that that

18   metadata is the entirety of the metadata associated with each

19   of those messages.  So if you have a basis to tell me

20   otherwise, short of your -- quote unquote -- understanding

21   whether it is in the form of affidavit or otherwise I will

22   certainly revisit it.  But, unless you can make a detailed

23   showing that there is some information that the government

24   should have in its possession that's not disclosed and/or some

25   reason the original format would be usable by you as the

XM535schC                         TOP SECRET

1   information that has been provided is not, I don't think there

2   is any basis to compel the government to produce anything else.

3              MR. SCHULTE:  OK.

4              THE COURT:  So for that reason it is denied without

5   prejudice to renewal, based on one or the other of those

6   showings and we will take it from there.

7              To the extent that the request is for the

8   communications that Judge Crotty had previously blessed

9   non-disclosure of, namely the -- quote unquote -- non-relevant

10  communications, I see no basis to revisit that based on the

11  government's representation that the metadata would reveal or

12  contain the information of the sort that Mr. Schulte says he

13  needs it for namely when he accessed the system, when things

14  were read and on and so forth.

15             So, for that reason, I think to the extent that

16  Mr. Schulte needs it, it is the relevant communications, those

17  have been provided based on the government's representation,

18  the metadata has also been provided, and unless Mr. Schulte can

19  demonstrate in one of the ways I have described a need for

20  anything beyond what he already has, I don't see any basis to

21  order the government to do anything further.

22             With that, again, I am tabling the forensic crime

23  scene issues for the moment, we will circle back to that at the

24  end I think.  Let's turn to the Section 6 issues.

25             For starters, with one exception to which I am going

XM535schC                    ~~TOP SECRET~~

1   to reserve judgment, I will adopt all of Judge Crotty's prior

2   Section 6 rulings.  That decision is not based solely on

3   adherence of the law of the case.  So that certainly does

4   provide a basis to do so.  The doctrine, "does not constitute a

5   limitation on the Court's power, but merely expresses the

6   general practice of reopening what has been decided." *United*

7   *States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982).  Again, the

8   law of the case certainly looms large here, but separate and

9   apart from that, after reviewing the prior rulings in detail, I

10   conclude that they were the product of a thorough and careful

11   CIPA process and that Mr. Schulte -- again, with one exception

12   that I will mention in a moment -- has not only provided no

13   basis to revisit them but has not even argued that they should

14   be revisited in anything other than a conclusory fashion.  The

15   one exception is Judge Crotty's ruling regarding the witness

16   security measures to be used at trial.  I think that's Docket

17   no. 293 and see also Docket no. 260 and 263.  I have already

18   issued an order on that.

19           The bottom line is I think the government needs to

20   make some additional showing with respect to the need for those

21   measures today as opposed to two-plus years ago, and I also

22   think that the press and the public need to be given an

23   opportunity to weigh in on that.  So, on those issues, I will

24   reserve judgment.  Again, that's really the only prior ruling,

25   Section 6 ruling of Judge Crotty's that Mr. Schulte takes any

XM535schC                    TOP SECRET

1    particular issue with and I will reserve judgment, pending the

2    government's additional submission on that and hearing from

3    members of the public or press at the May 18 conference.  So

4    with that one exception, all of his prior rulings are adopted.

5              Turning to the new CIPA issues.

6              MR. SCHULTE:  Your Honor?

7              THE COURT:  Yes.

8              MR. SCHULTE:  One minor thing on that.  Previously

9    there were a couple things that were argued that I brought

10   today to bring up with the Court that wasn't discussed before;

11   one of them is the Michael memo, and the other I did mention in

12   the CIPA 6 was the audio and video recordings.  So I don't

13   know -- those are the only two specifics that I wanted to bring

14   up to the Court so I don't know what the procedure is for those

15   documents.

16             THE COURT:  So this is the first I am hearing of the

17   Michael memo and in that sense I don't have any idea what you

18   are talking about.  The audio recordings are on my agenda of

19   items to address so I will give you an opportunity to be heard

20   on that.  There, too, I will confess I don't quite understand

21   what is at issue or what we are talking about but why don't we

22   turn to that in due course and I will give you an opportunity

23   to be heard.  All right?

24             MR. SCHULTE:  OK.

25             THE COURT:  Turning to the new CIPA issues that were

XM535schC                    TOP SECRET

1   framed by the Section 6 briefing and Mr. Schulte's Section 5

2   notices, I guess there are several sort of legal issues looming

3   here that I think require discussion more than, and in that

4   sense, candidly, it is not clear to me we couldn't have done

5   this in open session but I think out of an abundance of caution

6   it makes sense we do it here so we can speak freely.

7           One issue seems to be -- I think we have now squarely

8   joined issue on where there is a prior public disclosure of

9   potentially classified or closely-held information, whether

10  that means that it's no longer national defense information.  I

11  agree with the government in one respect which is that

12  Mr. Schulte is not going to be allowed to argue to the jury

13  that it would violate his First Amendment rights to convict him

14  of the offense.  He is not going to be permitted to argue to

15  the jury that they should be scared about their own First

16  Amendment rights if he can be convicted of this, you know, then

17  the First Amendment is implicated or what have you.  Those are

18  not proper arguments to be made to the jury.  Mr. Schulte

19  previously moved to dismiss the count on the grounds that it

20  violated the First Amendment.  I denied that as applied to him,

21  I adhere to that ruling, I see no basis to revisit it and, in

22  any event, that's not an issue for the jury, that's an issue

23  for me.

24          That being said, I don't think the government directly

25  responds to what I understand the heart of Mr. Schulte's

XM535schC                    TOP SECRET

1   argument is, which is not so much the constitutional argument
2   that it violates the First Amendment as an argument about an
3   element of the offense or multiple elements of the offense.
4   That is to say, I take it the government does not dispute that
5   one of the elements of the offense that is charged is that it
6   has to prove that the information at issue is, quote unquote,
7   National Defense Information.  Is that correct?

8             MR. DENTON:  Of course, your Honor.

9             THE COURT:  So what I understand the argument really
10  is, is that by virtue of the fact that it was already public
11  and perhaps even confirmed to be the CIA information by the
12  government -- and that's one question I have here -- that it
13  cannot be National Defense Information because it was public.
14  Secondarily, and we will get to this, there is an argument that
15  either it was National Defense Information or not, that to the
16  extent that the government has to prove some measure of intent
17  or willfulness, that Mr. Schulte's -- I will put it this way
18  although I don't think he put it this way -- that Mr. Schulte
19  harbored a good faith belief that the information was not
20  National Defense Information because it was previously public
21  or otherwise, then that would be essentially a complete defense
22  to the charge.

23            That is sort of what I understand to be the heart of
24  his argument which I think is different from the way the
25  government has characterized it and it seems to me that is a

XM535schC                     ~~TOP SECRET~~

1   fair argument -- that is to say, well, again, two separate

2   issues:  One, National Defense Information; and two, what

3   Mr. Schulte's state of mind is with respect to that issue and

4   let's take those up separately.

5        The is it National Defense Information front, I guess

6   one factual question I have is at any point between the initial

7   leak, that is to say publication by Wikileaks and the

8   disclosure underlying the MCC charges, was it confirmed by the

9   government that the information on Wikileaks was in fact

10  government information, CIA information, National Defense

11  Information?  Relatedly, what steps did the government take to

12  essentially keep that information closely held given that it

13  had been revealed?

14       MR. DENTON:  So to take those in two steps, your

15  Honor:  First, no,

16

17

18

19

20

21

22

23

24

25

XM535schC                           TOP SECRET

5          THE COURT:  So, Mr. Schulte, at page 5 your brief you

6      state:  The CIA and the government publicly acknowledge the

7      Vault 7 information derives from the CIA which constitutes

8      disclosure.

9              What is the basis for that assertion?

10             MR. SCHULTE:  That's correct.

11             So, I have here press releases from the Department of

12     Justice that I can provide to the government and to the Court

13     but the government's press release and indictment of me is a

14     public acknowledgment that the material belonged to the CIA.

15     So the question before the government wasn't does the

16     government still consider this classified, it is has the

17     government acknowledged that this belongs to the CIA.  And the

18     government has acknowledged it belongs to the CIA, it was in

19     the press release and they indicted me for the crime saying

20     this material belonged tore CIA and I stole it from the CIA.

21     So those two things happened before the MCC superseding

22     indictment.

23             THE COURT:  Can you give my deputy a copy of whatever

24     the press release may be and provide it to the government as

25     well?

XM535schC                    ~~TOP SECRET~~

1          MR. SCHULTE:  I also have -- so, in addition to the

2     government's allegations that the government continued to keep

3     the information protected or secret, I have a series of five or

4     six articles where various entities from the New York Times

5     published about this information.  The government did not

6     request the New York Times to take the article down or return

7     the information.  They did not indict these people for

8     basically transmitting this information so I believe all of

9     this shows that the government did not do everything that they

10    could to keep the information secret.  All these people are

11    discussing it, it is circulating through the Internet, and then

12    they indict me for it and no one else and they're not asking

13    these organizations to return the material.  I think that's

14    proof that the information is not closely held by the

15    government.

16          THE COURT:  Let's take this in turn.

17          Mr. Denton, I guess the question arises, Is this case

18    not a confirmation of some sort that the information is

19    government information to the extent that the premise is that

20    it is National Defense Information and it follows that it came

21    from the government?  Is that not some form of confirmation

22    that would change the analysis here?

23          MR. DENTON:  So, your Honor, ███████████████████ █

24    ███████████████████████████████████████████████████████

25    ████████████  ████████████  but if the Court looks at the difference

XM535schC                    ~~TOP SECRET~~

1   between the S2 indictment -- or really the S1 indictment is the

2   relevant one here, the first one that included the espionage

3   charges, and the S3 that post-dated the trial, the S1 and even

4   the press release are abstract and don't acknowledge what the

5   nature of the information was, what particular information was

6   at issue.  There is a reason for that.  ██████████████████████

7   ███████████████████████████████████████████████████     The

8   fact that that information came from particular components at

9   the CIA was not otherwise publicly acknowledged by the

10  government until the trial in the last case.

11          THE COURT:  And trial in the last case post-dates the

12  MCC?

13          MR. DENTON:  Yes.

14          MR. SCHULTE:  This press release on June 18, 2018

15  clearly says:  Joshua Adam Schulte charged with the

16  unauthorized disclosure of classified information and other

17  offenses relating to the theft of classified material from the

18  Central Intelligence Agency.  That, in and of itself, is a

19  confirmation that the materials derived from the CIA and the

20  government believed that it was classified information, so.

21          THE COURT:  But I think Mr. Denton's point is, number

22  one, it doesn't actually specify what the material was, it just

23  charges that you leaked National Defense Information; and

24  number two, I mean, let's say there is a universe of materials

25  that is published on Wikileaks and you are charged with a leak

XM535schC                    ~~TOP SECRET~~

1    in connection with it.  It doesn't necessarily mean that

2    everything on there is classified or that the government will

3    confirm that all of it came from the CIA but unless it

4    specifies and confirms that a particular thing came from the

5    CIA or the government, how is it confirming the fact of -- how

6    is it confirming?

7            MR. SCHULTE:  It is simply confirming that Wikileaks

8    didn't publish anything except for the Vault 7 ████████████

9    information that it says came from the CIA.  So, by indicting

10   me -- and it is not just this, I mean, there is court

11   appearances, public court appearances where the government

12   recognizes this Vault 7, ████████ from Wikileaks that I can pull

13   up as well.  It is not just this.  From the beginning up until

14   the MCC counts it has been publicly acknowledged that this

15   is -- the Vault 7, ████████ Wikileaks disclosures are from the

16   CIA.  I can pull additional court appearances or documents from

17   the government if the Court is not persuaded by this

18   information.

19           THE COURT:  Is there anything prior to the first trial

20   where the government specifically confirmed that some

21   particular information or document on Wikileaks came from the

22   CIA, from the government, or are you relying solely on the fact

23   that the indictment and the charge that you were charged with

24   leaking National Defense Information?

25           MR. SCHULTE:  No, there were -- like I said, the

XM535schC                    ~~TOP SECRET~~

1   government -- they didn't acknowledge any specific document

2   except by saying the Vault 7, ███████ Wikileaks disclosure in

3   general.  They charged me with those.  They specifically said

4   that the charges are related to the Wikileaks Vault 7, ███████

5   disclosure, so therefore referring to all of this stuffs

6   Wikileaks posted involving Vault 7 ███████.

7         They also -- my previous lawyer, they informed him,

8   because he wasn't cleared at the time, he didn't have a

9   security clearance -- that he was informed of it.  Other

10  public -- there has been other public acknowledgments that this

11  material, Vault 7 ███████ material from Wikileaks is CIA

12  information.  I can pull other transcripts.  I can have my

13  previous uncleared lawyers submit uncleared affidavits.  There

14  is a wealth of information showing that the government

15  acknowledged that this information came from the CIA.

16        THE COURT:  Well, I guess to me there is distinction

17  saying that you are charged with the Vault 7 ███████

18  information and specific confirmation that a particular

19  document or item of information came from the CIA and qualifies

20  as National Defense Information.  If the government hasn't

21  officially confirmed that, I mean, I think the government is

22  essentially resting on the proposition that unless there is an

23  official confirmation out there, ███████████████████████

24  ███████████████████████████████████████████████████

25  ███████████████████████████████████████████████████

XM535schC                        TOP SECRET



And if that is the case then that is a quantum of information that is a significant and material one, no?  And that's different than saying, by virtue of the leak that you were involved in leaking National Defense Information without specifying what in the Vault 7 and ▮▮▮ disclosures or publication is, in fact, the National Defense Information.

MR. SCHULTE:  Well, my position is that they can't say that the Vault 7, ▮▮▮ disclosures are from the CIA and then also say, well, we are not confirming which specific documents are ▮▮▮

if you don't want to do that, they shouldn't have said this is from the CIA, this is Vault 7, ▮▮▮ information from the Wikileaks and acknowledge that.

XM535schC                    ~~TOP SECRET~~

1   ▮▮▮▮▮▮▮

2          THE COURT:  But let's say, just as a hypothetical,

3   let's say that the alphabet is classified information.  OK?  Or

4   let me put it differently.  Let's say that several letters in

5   the alphabet are classified and Wikileaks publishes the

6   entirety of the alphabet and the government charges somebody

7   with leaking that information to Wikileaks and saying that they

8   compromised -- they shared, disclosed National Defense

9   Information but doesn't specify which of the letters in the

10  alphabet that Wikileaks published is in fact the National

11  Defense Information.  Presumably they have to to the grand jury

12  that returned the indictment, but they don't confirm to the

13  public.  They simply confirm to the public that in connection

14  with the alphabet leak disclosure, that contained National

15  Defense Information.  If they don't confirm which of the

16  letters of the alphabet are classified, they're not actually

17  confirming -- that, yes, they're confirming at some level of

18  generality that something in there is ass classified,

19  closely-held National Defense Information, CIA information,

20  whatever the case may be, but unless they specify which of the

21  letters they're talking about, they're not actually officially

22  confirming to the world at large what portions of the alphabet

23  are actually legitimate and classified information.

24          MR. SCHULTE:  I think there is two points to that.

25  The first is the analogy of all the letters doesn't come into

XM535schC                    ~~TOP SECRET~~

1   play because there is no information that the entire Vault 7

2   ███████ is derived from a single source of information.  Right?

3   So it is not really -- it is more like, OK, letters Y and Z, so

4   there is only two things that Wikileaks releases, there is not

5   really -- there is no way to get down to specifics and say --

6   there is basically no way for the government to say this

7   specific page is not CIA material ████████████████████

8   ████████████████     ████████████████████

9   ████████████████

10      The other thing is even by disclosing it to a grand

11  jury who are uncleared, I think that is also a disclosure

12  anyway.  You know, these people are not cleared and you are

13  telling them that this information comes from the CIA.  That

14  also constitutes disclosure anyway.  But, like I said, the big

15  picture, the most important thing is the Vault 7 documents,

16  ███████████████████████████████████

17  ████████████████████████████████████

18  ████████████████████████████    ████████

19  ████████████████████    █████████████

20  ██████████████████████████████████████

21  █████████████████████

22      THE COURT:  So I have not reviewed the grand jury

23  minutes so I don't know the way it was presented but let me

24  modify my statement.  I would guess that an agent can simply

25  testify and say, *I have reviewed these leaks and they contain*

1   *information that was closely held by the CIA and so on and so*

2   *forth,* and that would probably suffice for a finding of

3   probable cause.  Whether it suffices at trial is a different

4   question.  In that sense, I'm not presuming that the disclosure

5   was made to an uncleared grand juror.

6          But, Mr. Denton, do you wish to respond to

7   Mr. Schulte?

8          MR. DENTON:  So, first of all, your Honor, with

9   respect to the sort of the point that they 

19         I do want to be clear, with respect to the timing on

20  some of the disclosures, there was additional information

21  beyond what was in the affidavit that was declassified and

22  disclosed in connection with some of the litigation in the

23  summer of 2019 with respect to the motion to suppress.  That

24  all post-dates the MCC conduct which ended in October of 2018

25  as charged in the indictment.

XM535schC                        ~~TOP SECRET~~

1          I think, also, CIPA contemplates expressly this sort

2     of process that took place here in which the government is

3     often forced to charge these things in generality and then is

4     required to provide specific classified notice of the

5     classified information at issue under Section 10, and it is the

6     sort of vagueness of the first indictment, which is necessary

7     to sort of preserve the refusal to confirm or deny, that is why

8     the government provided detailed Section 10 notice, provided a

9     lengthy response to the defendant's demand for a bill of

10    particulars.  It was necessary to provide that information to

11    him because the indictment, frankly didn't, because it was not

12    a public acknowledgment that the government was prepared to

13    make at that time.

14          THE COURT:  Let me ask you, Mr. Denton, the

15    instructions on this that Judge Crotty gave at the first trial,

16    did you take issue with those?  Do you think those correctly

17    state the law?

18          MR. DENTON:  Yes, your Honor.  With respect to the

19    National Defense Information, we do.

20          THE COURT:  Can we drill down on what they mean?  So,

21    to the extent relevant, the instructions -- and I think these

22    are consistent with *Squillacote*, the Fourth Circuit case, I

23    think would you agree that where information has been made

24    public by the United States government is found in sources

25    lawfully available to the general public is not closely held,

XM535schC                        TOP SECRET

1    correct?

2              MR. DENTON:  Obviously.

3              THE COURT:  And your position is that it has not been

4    made public by the United States government, it is it was made

5    public unlawfully by someone who leaked it.

6              MR. DENTON:  That's correct; despite efforts by the

7    government to safeguard it.

8              THE COURT:  OK.  Similarly, where sources of

9    information are lawfully available to the public at the time of

10   the claimed violation and the United States government has made

11   no effort to guard such information, the information itself is

12   not closely held.

13             Again, you agree with that proposition?

14             MR. DENTON:  Yes.

15             THE COURT:  And your position here is that it both was

16   not lawfully available to the public at the time of the MCC

17   leak and the government was taking -- making effort to guard

18   the information?  What's the precise argument?

19             MR. DENTON:  Yes, your Honor.  So it is both.

20             I think there is a temporal question with respect to

21   the government's efforts to safeguard it that is a little bit

22   opaque.  We are all here laboring with relatively little case

23   law and what constitutes "closely held" but I think there is

24   two relevant points.  The first is what did the government do

25   to safeguard the information before it became public in any

XM535schC                          ~~TOP SECRET~~

```
 1    way, this is sort of the Heine scenario in which the government
 2    just simply didn't do anything to stop anybody from publishing
 3    the information.
 4              THE COURT:  Heine is an easy case.  I think
 5    Squillacote, frankly, is not that hard a case.  I think the
 6    question here is at the time of the MCC leaks where the
 7    information is already out there, ███████████████████████
 8    ███████████████████████████████t █████████████████████████
 9    ███, what impact does that have on the MCC leak charges.  And I
10    think that's actually a complicated question, and if the
11    government does confirm at some point between the initial leak
12    and the MCC leak that this is government information, then I
13    think there is reasonable argument that this case is very
14    different than Squillacote.
15              MR. DENTON:  I think that's true, your Honor and part
16    of the reason for that that we talked about in our reply is if
17    that had been the case, that would have relieved the defendant
18    of his obligations under the secrecy agreement.  If the
19    publication is acknowledged, if the discussion of this is
20    authorized by the U.S. government, then he's not bound by the
21    provisions of his secrecy agreement that prevent him from
22    discussing any classified information unless authorized.
23              THE COURT:  But let me press you on that because, as
24    that suggests, that something is National Defense Information
25    for Mr. Schulte, that would not be National Defense Information
```

XM535schC                    TOP SECRET

1   for the New York Times and how can that be the case?  In other

2   words, the definition of National Defense Information would

3   seem to be independent of who the leaker is.  It is either

4   National Defense Information or it is not and it can't turn on

5   the obligations or lack thereof of the person who is linked to

6   that.

7           MR. DENTON:  So, I recognize the intuitive appeal of

8   that, your Honor.  I think *Rosen* sort of went the opposite

9   direction.  *Rosen*, in that case in adopting a very strict

10  standard for whether information had been closely held or was

11  damaging to the national security, talked about how the First

12  Amendment interests that animate these limiting principles are

13  different based on the relationship of the person to the

14  government.  Like I said, I'm not saying that I dispute the

15  obvious logic of the Court's point, that it is either NDI or it

16  isn't regardless of who is talking about it.

17          THE COURT:  I think that's a different question from

18  whether the prosecution would violate the First Amendment.

19  That's where I think the import of Mr. Schulte's obligations

20  come in.  As applied to Mr. Schulte, I don't think there is any

21  conceivable First Amendment argument because he did have

22  independent obligations that the New York Times, for example,

23  would not have.  But that is a different question, meaning

24  whether it is NDI or not NDI, and in that instance it doesn't

25  seem that that would turn on who the person is.  I think that

XM535schC          ~~TOP SECRET~~

1   gets to the second point that Mr. Schulte raised earlier which

2   is 2017 Wikileaks publishes this information.  The New York

3   Times publishes articles about it; Mr. Schulte writes an

4   article, if we can call it that, about it.  How can it be that

5   it is National Defense Information for Mr. Schulte's purposes

6   but not National Defense Information for the New York Times'

7   purposes?

8           MR. DENTON:  So, I think, your Honor, again, this is

9   where we sort of have to unpack the principles.

10          What the statute requires the government to prove is

11  that the information is related to the national defense in the

12  broad connotation of anything to do with national preparedness,

13  etc., etc., all of those criteria that are set out there.  The

14  limiting principles that are adopted like the requirement that

15  the information be closely held do derive from those First

16  Amendment concerns about the statute.  And so, in that sense,

17  we are not talking about purely a matter of statutory

18  interpretation -- What does material relating to the national

19  defense mean -- it is a question of interpreting a judicial

20  gloss put on, essentially, to avoid a constitutional problem.

21  And so I think in that sense there may very well be a

22  difference between what is -- what constitutes closely held,

23  what constitutes National Defense Information, again looking

24  purely at those limiting principles for one who is at, sort of,

25  the need here of the First Amendment concerns than it would for

XM535schC                    ~~TOP SECRET~~

1     the New York Times where you are talking about the maximum

2     protections of the First Amendment and no other understanding

3     or obligations with respect to materials regarding the national

4     defense.

5              THE COURT:  So to give you a hypothetical, let's say

6     the New York Times publishes exactly what Mr. Schulte is

7     charged with putting in his article, let's say it is a New York

8     Times article.  Wikileaks says X and X is highly classified.

9     Mr. Schulte literally just sends the article to his cousin, or

10    brother, or his friend, or whatever.  Is that disclosure of

11    National Defense Information because Mr. Schulte is subject to

12    heightened restrictions but the New York Times isn't?

13             MR. DENTON:  Your Honor, you are getting into

14    questions that Department of Justice has studiously avoided

15    answering for a long time because they do implicate some of the

16    broadest reaches of the Espionage Act.  I think the answer with

17    respect to Mr. Schulte's re-publication of the information,

18    like in *Wilson*, is yes.

19             In *Wilson*, this letter from the CIA regarding her

20    service had been published, was widely talked about, was in the

21    Congressional record.  She then sought to write about that in

22    her memoir and the Second Circuit's answer was, No, this

23    applies differently to you because you are bound by the secrecy

24    agreement, you don't have the same First Amendment interest.

25    So even if what you purport to be doing is repeating

XM535schC                    TOP SECRET

1    information that is in the public domain, by virtue of that

2    relationship to the government and the obligations attendant to

3    the handling of classified information, yes.

4            THE COURT:  But *Wilson* is not a criminal prosecution.

5            MR. DENTON:  No, yes.  I think the problem, again, is

6    we get back to what is the reason why Courts have put this

7    limiting gloss on National Defense Information?  And it is to

8    address First Amendment concerns.  In a situation where there

9    is no First Amendment concern, where there is no question that

10   if Mr. Schulte had wanted to write about Vault 7 in a memoir,

11   he was not allowed to do so, is it appropriate to expand the

12   definition of National Defense Information beyond those precise

13   parameters that were part of Judge Crotty's instruction that

14   put the focus on whether the material was lawfully available in

15   a way that reflected the government's intention not to guard

16   it.

17           THE COURT:  Let me press you on what does "lawfully

18   available" mean in the context of *Squillacote* and Judge

19   Crotty's instructions.

20           It is lawfully available to the New York Times.  The

21   New York Times can publish an article about what is on the

22   Wikileaks, it has the First Amendment right to do that.  I

23   don't think you are disputing that.  So, is that lawfully

24   available?

25           MR. DENTON:  I think the answer is probably not, your

XM535schC                          ~~TOP SECRET~~

1    Honor, that the information on Wikileaks was not lawfully

2    available.  The fact that the New York Times and others in a

3    certain situation may have a First Amendment right to publish

4    information that is unlawfully available in the same way that

5    they have the right to publish information that's been stolen

6    from a private individual or abstracted through wire taps done

7    without consent, there are any number of circumstances in which

8    they have a First Amendment right to do it but the information,

9    itself, is unlawfully available, it is made available in

10   violation of the law.

11            THE COURT:  Maybe.  Maybe not.  I mean I guess that's,

12   to me, unlawfully derived, obtained is different than

13   unlawfully available.  Right?  And to press the hypothetical

14   further, OK, let's say a non-consensual wiretap is leaked to

15   the New York Times and the New York Times has a First Amendment

16   right to publish it.  Let's say they actually release the audio

17   of it.  Maybe that's not lawfully available to them because it

18   was provided to them in breach of some law but if The

19   Washington Post then publishes an article about the New York

20   Times article, can you actually he say it wasn't lawfully

21   available for The Washington Post?  It is in the New York

22   Times.

23            MR. DENTON:  Well, I think, your Honor, that's where

24   we need to get back to sort of why we are and what the

25   defendant wants to do.  The defendant is not saying he wrote

1   about things that were in the New York Times or that he

2   obtained from other lawful sources.  He is saying that -- and

3   frankly, I am not even sure that he is saying that I was

4   writing about what was on Wikileaks.  What he is saying is that

5   because he was writing about things that were also on

6   Wikileaks -- which in your analogy is the New York Times, the

7   unlawful recipient of the information -- that he therefore

8   should be allowed to introduce classified portions of what

9   remains on Wikileaks in support of that argument.

10          So whether he could introduce material from the New

11  York Times in support of his argument or something like that I

12  think is a little bit of a different question than whether he

13  gets to go back to the unlawfully available material.

14          THE COURT:  Let me pivot to the second issue that I

15  flagged earlier because it may, to some extent, swallow the

16  hole here which is the willfully, the intent element, that is

17  to say whether, and to what extent, Mr. Schulte's state of mind

18  or subjective intent is relevant to the analysis.

19          So two separate issues here, one is the two prongs of

20  the statute, the information prong and the documents prong.  I

21  think Mr. Schulte is just clearly wrong in saying that he has

22  been charged under the information prong, the S3 indictment is

23  very clear that it is the documents prong.  I think that raises

24  some interesting questions.  My understanding is that the same

25  charge in the first trial was brought under the information

XM535schC                       ~~TOP SECRET~~

```
1    prong so maybe there are categories of things that the
2    government can charge under either prong, that is to say, where
3    somebody has information in their head but then writes down,
4    memorializes it in a document, that that can be charged under
5    either.  I presume it's a question for the jury whether this is
6    a, quote unquote, document.  I would also assume that document
7    is given its plain meaning and if it's an actual tangible
8    document it presumably is a document even if the information
9    came from the defendant's head.  But to give you a hypothetical
10   here, let's say I had classified information in my head and
11   shared it with you.  Presumably, that would have to be charged
12   on the information prong; is that correct?
13            MR. DENTON:  Yes.
14            THE COURT:  Let's say I shared it with you by writing
15   it down and passing it to you.  Is it your position, I take it,
16   that that could be charged under either prong?
17            MR. DENTON:  Yes, your Honor.
18            THE COURT:  And that by charging it under the
19   documents prong the government no longer has to prove the
20   intent element of the information prong.
21            MR. DENTON:  Yes, your Honor.
22            THE COURT:  And that's because Congress drafted the
23   law that way and it gives the prosecution the discretion to
24   charge it under either theory; is that correct?
25            MR. DENTON:  Yes, your Honor.
```

XM535schC                         ~~TOP SECRET~~

1        THE COURT:  So I will hear from Mr. Schulte on that

2   and maybe that's right.

3        MR. DENTON:  If I may just, your Honor, on the

4   previous charge, it was a little bit of an unusual hybrid in

5   that it was charged as documents, writings, notes, etc., etc.,

6   and information, and the charge included the intent element.  I

7   think when we heard from the jury the last time, some confusion

8   about how that statute should be applied.  When we sought the

9   superseder part of the goal was to eliminate the hybridization

10  and pick a prong and go with it.

11       THE COURT:  And prong, to be clear, has a lower burden

12  for the government?

13       MS. SHROFF:  Exactly.

14       MR. DENTON:  Yes, your Honor.

15       THE COURT:  So that may be proper, it may not be

16  proper, but I will get to that.

17       The second question is you agree that even on the

18  documents prong, "willfully" is a component of the statute and

19  the government's burden?

20       MR. DENTON:  Yes.

21       THE COURT:  I agree with you that "willfully" doesn't

22  require proof of the defendant's motive and intent; you don't

23  have to slow he had evil motive or bad intent.  I will bracket

24  for a moment whether the government's theory introduces that

25  but we will get to that shortly.  But even on your theory, I

XM535schC                    ~~TOP SECRET~~

1   think to quote from your reply it requires proof that the

2   defendant made a conscious choice to communicate covered

3   information, so that is to say he has to know that it is

4   covered information and made a conscious choice to disclose it,

5   correct?

6          MR. DENTON:  Yes, your Honor.

7          THE COURT:  So I guess the question I have here -- and

8   I am not sure any of the briefing has gotten to the heart of it

9   is -- wouldn't it be a complete defense to the charge if the

10  jury were to find that Mr. Schulte believed, in good faith,

11  that it was not National Defense Information because it was

12  publicly available?  Like, we are dealing with some complicated

13  issues that, as you conceded earlier there is not a whole lot

14  of law out there.  If Mr. Schulte, who is not a lawyer, was

15  laboring under a good faith belief that this was not National

16  Defense Information because it was publicly available on

17  Wikileaks, putting aside whether that is a correct belief, if

18  it is a good faith belief doesn't that defeat the charge

19  because the jury could not find that he willfully disclosed it?

20         MR. DENTON:  So I think there is a factual question

21  and a legal question, your Honor.

22         With respect to the factual question, we think that

23  that is not in any way a defense because, as was true at the

24  previous trial, we will introduce the defendant's various

25  secrecy agreements that make clear that public disclosure of

XM535schC                    ~~TOP SECRET~~

1   information does not authorize a CIA officer to then discuss

2   it, absent official authorization.

3          THE COURT:  And that is certainly a legitimate

4   argument for to you make to the jury.  Let's turn to the legal

5   question.

6          MR. DENTON:  Right.

7          So I think there is a little bit of imprecision of the

8   language in *Diaz* that talks about the choice to communicate

9   covered information.  I think that the willfulness goes to the

10  choice, not the covered information.  So, in *Morrison*, this is

11  where the District Court noted that it is irrelevant whether

12  the defendant personally believed that the items related to the

13  national defense and his underlying motive is equally

14  irrelevant.  A showing of willfulness only requires that he

15  knew he was doing something that was prohibited by law.

16         THE COURT:  Right.  But if he believes in good faith

17  that it is not National Defense Information, how can that be

18  satisfied, that element?

19         MR. DENTON:  Your Honor, I think in that circumstance

20  it is not a question of whether he -- whether he believes it to

21  be National Defense Information or not is a separate question

22  from, again, the purpose that the defense seeks to put here

23  which is show some identity between documents on Wikileaks and

24  documents that he wrote.  If the defendant wants to testify *I*

25  *believed that this was all OK because it was publicly available*

XM535schC                           TOP SECRET

1    *information*, bracket the factual question and we dispute that

2    characterization, that doesn't require him to then show

3    document-for-document identity and require disclosure of

4    additional classified information.  What is in his head, what's

5    his state of mind is something that he can testify to without

6    further disclosure of the specifics of what is on Wikileaks.

7            THE COURT:  All right.

8            Mr. Schulte, let me turn to you.

9            MR. SCHULTE:  Yes.  What do you want me to pick up on

10   or start, basically?

11           THE COURT:  That's a good question.  Let me put this

12   question to you so it is a less abstract and I understand what

13   we are actually litigating here.

14           This arises in the context of your desire to use

15   classified information at trial, that is to say your Section 5

16   notice.  And I guess maybe what I don't understand and I should

17   have started here is given that the Wikileaks, the leaks

18   themselves are admitted into evidence or will be admitted into

19   evidence as a classified exhibit at trial, can't you make all

20   of the arguments that you are trying to make here, and bracket

21   whether and to what extent they're legally proper -- and that's

22   a separate question.  In other words, what evidence besides

23   what is being offered by the government at trial, do you need

24   to make the argument?  If the argument was this stuff was all

25   available on Wikileaks, ergo or therefore it was not National

XM535schC                    ~~TOP SECRET~~

1   Defense Information, or therefore I didn't believe when I

2   disclosed it that it was National Defense Information, can't

3   you make that argument based on the government's exhibit?  What

4   additional classified information would you need to use to make

5   that argument?

6          MR. SCHULTE:  So I think there is two things.  One, as

7   I showed the Court, I also intend to introduce these documents,

8   news articles from the Internet that are talking about the same

9   materials but the biggest issue is prejudice, is the fact that

10  you are telling the jury oh, this is classified information,

11  and restricting that information, that really prejudices me

12  because then the jury thinks, well, this is not -- it goes to

13  their minds when they are looking at information, that their

14  view is that this information is all classified, and the

15  government is going through all of these restrictions, that to

16  them it is confusing and prejudicial to me when they're making

17  the decision.

18         So, the point is that these documents should be

19  displayed just like these other documents from the Internet and

20  it should be showed to the jury that the website that's on the

21  Internet, that they can go to right now, type in a web URL and

22  go to the website just to show that this is on the Internet and

23  publicly available.  I think that's the point.

24         THE COURT:  So I understand you correctly, it's not

25  that you want to introduce additional classified information

XM535schC                    TOP SECRET

1   beyond what the government itself intends to introduce at

2   trial, it is that you just object to the form in which it's

3   presented to the jury?

4          MR. SCHULTE:  Yeah no.  The government didn't a -- at

5   the first trial -- this is another issue for the Court.  But

6   what the government did, especially for their first witness,

7   Rosenzweig, whatever, is that they went through and picked out

8   whatever documents from Wikileaks and they declassified those

9   documents and they gave it to him and he put it in his slide

10  show to go through those specific documents.  So those were the

11  only Wikileaks disclosures that were made and publicly produced

12  as exhibits to the jury.

13         THE COURT:  But the Wikileaks leaks themselves were in

14  evidence as a classified exhibit.  Am I wrong about that?

15         Mr. Denton, is that correct?

16         MR. DENTON:  Yes, your Honor.  It was Government

17  Exhibit 1.

18         MR. SCHULTE:  I think it was on a laptop or something,

19  right?

20         THE COURT:  So I guess the question I have is that

21  given that they're in evidence, putting aside whether that -- I

22  mean, there are two separate questions here is my point.  One

23  is if the information is in evidence, you can make the argument

24  that you want to make, that *Look, Jury, this stuff is actually,*

25  *was available online, look at Government Exhibit 1, ergo it*

XM535schC                      ~~TOP SECRET~~

1    *wasn't National Defense Information or I didn't believe it was*

2    *National Defense Information and therefore didn't willfully do*

3    *anything.*  It seems to me that you can make that argument based

4    on what the government itself plans to introduce at trial and

5    nothing additional that you would need to make that argument.

6    That is a separate argument from there is some prejudice to you

7    from presenting it to the jury as a classified exhibit.

8           MR. SCHULTE:  I think the big issue is the way the

9    material was produced to the jury was they put it all on a

10   laptop and said they could go look at it at some point, it

11   wasn't actually shown to the jury.  So what I do is pick out in

12   my CIPA 5s all of the stuff relevant to the charges against me

13   and I want to pick out certain pages to display to the jury as

14   an exhibit.  I don't want to just put it all on a laptop and

15   say go look at it sometime.  I want to bring these points out

16   specifically and point them out to the jury as exhibits.  That

17   is why I brought up the Rosenzweig expert.  So, he picked out

18   certain exhibits he wanted to show to the jury, the government

19   de-classified them for his disclosure to the jury.  I want the

20   same opportunity.  I want to pick out the documents the

21   government is alleging that is the basis behind the MCC

22   charges.  I just want to exhibit those and show those to the

23   jury instead of --

24           The big point my standby counsel makes to me is the

25   government is entitled to present the case they want to present

1   and they're basically imposing stipulations onto my case where
2   I am entitled to present my case, and my case is if you go to
3   the Wikileaks website, there is no notices like the government
4   would put up on foreign sites, there is no explicit warnings,
5   there is nothing saying -- you know, there is nothing that the
6   government did to try and take down the site or anything like
7   that.  You can go to the site and you can look up and you can
8   find the specific documents here that I want to exhibit.  I
9   want to show the jury this information and this is part of my,
10  the defense -- the main part of my defense I want to raise for
11  these charges.  So being able to actually present them as
12  unclassified exhibits, just like the government did, I think I
13  am entitled to present my case just like they're entitled to
14  present their case.  And the fact that they're able to
15  de-classify things at will shouldn't prejudice me.  If I need
16  documents in the same format the government has provided why
17  can I not have these exhibits unclassified before the jury and
18  have them review it in this manner?

19          THE COURT:  That's what this process is for, right,
20  Section 5 notice is for you to notify, with specificity, what
21  it is you want to use and what you want to use it for.  So,
22  that's the whole point of this exercise.

23          MR. SCHULTE:  Right.

24          THE COURT:  And I guess I don't quite understand which
25  of these documents you are seeking to use and how that you

XM535schC                          ~~TOP SECRET~~

1   couldn't use what's already in evidence without compromising

2   classified information to make the same argument.

3              MR. SCHULTE:  The two things is that what was in

4   evidence is it was just a laptop.  So the government put the

5   material on a laptop and gave it to the jury to review.  The

6   way I want to present my case is I want to go through each of

7   these documents, present them to the jury, and have the jury

8   review them as exhibits, not just giving the jury a laptop and

9   say go look at this at your leisure.

10             I also want to show the jury how easy it is to access

11  this information as well, you know, that they can go to the

12  sites, they can pull this information up.  It is just on the

13  Internet.  That's the whole crux of my case, is that this

14  information is on the Internet so being able to show to the

15  jury *If you type this URL in, here is the site, and here is the*

16  *specific information.*

17             The second part, too, is that the de-classification of

18  this information is very minor -- this stuff is already on the

19  Internet and the three points or the three things that I am

20  raising, this material, there is very little prejudice to the

21  government at all in de-classifying this information for the

22  jury.  And, like I said, the government has been able to go

23  through and de-classify the things that it wants to show to the

24  jury.  That's all I'm asking, is to be able to have the same

25  opportunity to show the jury the exhibits, not to have a

XM535schC                          TOP SECRET

1   classified laptop and have them all look at this -- I want to
2   show, pull up the exhibits.  I want to be able to go to the
3   website.  I want them to go to the website to pull it up to
4   show this is accessible on the Internet and how easy it is to
5   access.  That's the point.

6          The other issue that I was raising is in addition to
7   the fact that the information is not closely held we haven't
8   really talked about, but there is no prejudice at all to the
9   government.

10         The second prong is the fact that this information is
11  not harmful to the national defense anymore.  These networks,
12  all of this information, the day Wikileaks information came
13  out, the government shut it down.  The DevLAN was shut down.
14  All of this information was shut down.  So there is no
15  prejudice at all talking about networks that no longer exist
16  anymore or this information that is not even used anymore which
17  is something else that I intend to show to the jury, that this
18  information is not -- why this information is not NDI.  It is
19  not because it is public all over the Internet, it is also
20  because the government shut it down 18 months before the
21  government alleges that I introduced this information from MCC.

22         THE COURT:  Mr. Denton?

23         MR. DENTON:  Your Honor, I think sort of you put your
24  finger on the crux of it which is that to the extent that the
25  defendant's argument is about his state of mind, first of all,

XM535schC                          ~~TOP SECRET~~

1    that is obviously something he would have to testify about.

2    Secondly, I think, again, there is going to be a laptop in

3    evidence that has this material.  To the extent that the

4    defendant wants to point to material that the jury should pay

5    attention to, he has the ability to do that.  His assumptions

6    about what is still sensitive or not sensitive may be relevant

7    to his state of mind but they're not relevant to whether the

8    information should be introduced at trial.  And again, to the

9    extent that there is a question about the sensitivity of it

10   there is a part of Section 6, 6(c), that would allow the

11   government to make that proffer.  I don't think that is

12   relevant here.  Again, it is going into evidence as a

13   classified exhibit.  Section 8 of CIPA specifically authorized

14   that exhibits can be received without changing classification

15   status.  We litigated whether this was an appropriate course.

16   I think here it is, and the defendant's desire to disclose more

17   in a circumstance where, again, it is not really relevant

18   because, as a factual question whether it is there or not is

19   not relevant to whether he thought it was, whether he had a

20   good faith belief it was or not which, again, is something that

21   he would have to testify to and he can testify to.  So I think

22   that's really what it comes down to, your Honor.

23              THE COURT:  And the harm to the government point that

24   Mr. Schulte made?

25              MR. DENTON:  So, first of all, your Honor, there is

XM535schC                    ~~TOP SECRET~~

1    still significant harm that comes from acknowledgment. ▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5             Second, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7

8

9

10

11

12

13

14

15

16             THE COURT:  And putting aside whether he would have to

17   testify for it to come in or be relevant, talk to me about the

18   admissibility or use of these articles that Mr. Schulte has

19   handed up from the New York Times and other publications.

20   Presumably he could take the stand and offer these and say, you

21   know, I believe that what I put in those articles was already

22   part of the public domain including in these articles and

23   therefore didn't have the willfulness required to commit this

24   crime.

25             Is that correct?

55

XM535schC                          TOP SECRET

1              MR. DENTON:  I think that's right with the caveat

2    obviously, your Honor, the articles would not be themselves

3    offered for the truth and it would be important for the Court

4    to instruct the jury on their limited purpose.  It is a little

5    unusual to have newspaper articles coming in but, again, if the

6    defendant wants to put them at issue by saying that these

7    things affected my state of mind then, again, there is an

8    appropriate limiting instruction the Court can give the jury

9    for that purpose.

10             THE COURT:  OK.  And what about the Wikileaks website?

11             MR. DENTON:  Again, your Honor, the Wikileaks website

12   is classified.  The fact that it is available does not mean

13   that it is not classified information.  A lot of the

14   information on there is marked as classified.  And so, again, I

15   think there may be parts of the Wikileaks website at large --

16   and, again, there are some errors in what the defendant

17   represented about what Mr. Rosenzweig testified to -- but it is

18   the case that certain pages were declassified at the last

19   trial.  Again, I think that to the extent that the defendant

20   wants to start pulling up the Wikileaks website, that's a

21   different story.  I think to the extent the Court thinks it is

22   relevant that Vault 7 appears on the Wikileaks on the Internet

23   and is still there, that's something that can probably get

24   addressed by a stipulation under Section 6(c).  The defendant

25   doesn't have the choice to reject a stipulation under CIPA.  To

XM535schC                    ~~TOP SECRET~~

1    the extent he wants to disclose classified information, his

2    right is only to something that gives him the same substantial

3    ability to make his defense, not the precise way he wants to

4    make it.  If we have to, for some reason, enter into a

5    stipulation or frankly even have one of the witnesses testify

6    that Vault 7 is still on the Internet, I think that's something

7    we can do without getting into the specifics of additional

8    parts of it that remain classified.

9            THE COURT:  Well, to be clear, whether it is still on

10   the Internet today is not relevant to any of the issues in this

11   trial as far as I can tell, but whether it was on the Internet

12   at the time of the MCC leaks may well be, or at least I think

13   that's what Mr. Schulte wants to argue and I would think that

14   to the extent that it is a jury question whether it is NDI and

15   it is a jury question whether he had the necessary willfulness,

16   my intuition at the moment -- I'm going to think about this

17   stuff and not issue any ruling on this score today -- is that

18   he needs to have the ability to make those arguments to the

19   jury in some fashion or form.  Now, maybe that's already the

20   case because Government Exhibit 1 will be in evidence and he

21   can point to it.  It may be a stipulation or some variation you

22   are describing would be another necessary piece.  I don't know.

23           But, that's what I am grappling with here.

24           MR. DENTON:  Understood, your Honor.

25           Again, the last time we had an agent testify about

XM535schC                    ~~TOP SECRET~~

1    Government Exhibit 1, about how he downloaded from the Internet

2    on a particular series of days and that that was the material

3    that was stored there.  To the extent that it is necessary to

4    confirm that as of October 2018, the sort of end of the time

5    period for the MCC counts, it was still there, that is

6    something we can have somebody testify to or stipulate to or

7    find some other way to satisfy that.

8              THE COURT:  OK.

9              Mr. Schulte, why would that not suffice and what

10   particular portions of the website or document would you need

11   to point to to make the argument that you want to make that you

12   couldn't make on the basis of Government Exhibit 1 which will

13   presumably be in evidence at this trial as well?

14             MR. SCHULTE:  The first thing I want to bring up is

15   that this is the whole point of CIPA.  Why, during the first

16   trial, did the government say █████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ██████████.  The point of this is for me to identify the

20   information that is relevant to my defense.  I mean, that's the

21   whole point of CIPA.  So the fact that the government is

22   saying, well, this is classified so we will keep it classified

23   and shut down the trial and can't get a public trial for the

24   three or four days of the MCC charge, is just absurd.  That's

25   the whole point of this.

XM535schC                    ~~TOP SECRET~~

1          The other thing is the introduction of the Exhibit 1

2    to the jury is simply to show the jury the information.  The

3    government is alleging that this is National Defense

4    Information.  There was no specific argument for any specific

5    document there.  The introduction of that evidence was simply

6    here is all of the Wikileaks disclosures, you can browse

7    through and look at it and determine basically if this is NDI

8    or not.

9          THE COURT:  But my question is -- and I am inclined to

10   agree with Mr. Denton -- that unless you take the stand I am

11   not sure how this argument is even made but -- well, there is

12   the objective, *This isn't National Defense Information because*

13   *it was publicly available*, I'm not sure you need to take the

14   stand to make that argument if that is a proper argument and

15   I'm going to think about that, versus the *I believed in good*

16   *faith that this wasn't National Defense Information*.  I think

17   there is no way to make that, to inject that argument in the

18   trial unless you take the stand.

19          The question that I am trying to put to you and I want

20   a specific answer is whichever of those arguments you make,

21   whether you testify or you don't testify, why can't you make

22   that argument on the basis of what will be in evidence, namely

23   the leak itself and classified Exhibit 1?  In other words, you

24   can point to that and say, look, ladies and gentlemen of the

25   jury, all the information in the documents that I'm accused of

XM535schC                    ~~TOP SECRET~~

1    leaking from the MCC, all of that information was on the

2    Internet, you can see it for yourself in Government Exhibit 1

3    and you have heard either the stipulation or the witness, as

4    the case may be, that on the date that I am charged with

5    leaking this from the MCC, that all of it was still there on

6    that date so this is not National Defense Information because

7    it was free and available to everyone who typed in the URL and

8    went to the website.   In other words, you can make that

9    argument already.   What additional disclosure do you need to

10   make that argument?

11          MR. SCHULTE:   The first thing is we need access to the

12   Internet to show, to type the URL in, to go to the website to

13   show that this is on the Internet.   But the bigger thing, the

14   bigger issue is I want to specifically go through these

15   documents and show the very specific statement that the

16   government says I made that are NDI.   I don't want to simply --

17   I mean, this is the crux of my defense.   It basically would be

18   neutering my whole defense if I am just saying, *Look at this,*

19   *this is not NDI, take a look at Government Exhibit 1.*   I have a

20   right for the complete defense to show each of the pages and

21   show to the jury, OK, if you read this from exhibit whatever,

22   look what Wikileaks says, it says -- and then show statements

23   the government says that I -- allege that I made.   It is the

24   exact same.   This is the exact same wording.   And then, go to

25   the next one, here it is again, it is the exact same wording.

XM535schC                   TOP SECRET

1   And then go back and show, OK, this is on the Internet.  The
2   government didn't put up any -- there is no special warnings or
3   anything about this.  You can go to this URL and you can see
4   the exact same phrasing here and compare it.  I want to put up
5   multiple exhibits and then compare it with what the government
6   says that I said and to show that it's all the same.

7        So this is not simply, oh, just go take a look at
8   GX- 1.  I want to spend considerable time going through each of
9   these specific documents and showing the exact words that were
10  said on Wikileaks, the exact words the government says I said,
11  and compare them.

12       The other issue, the other big issue comes back to the
13  prejudice.  The GX- 1 was admitted into evidence.  The FBI
14  testified I had to go to a special place, I had to download
15  this on this computer, keep it secure, this is classified, this
16  is very highly classified information from the CIA.  So, by
17  doing all of that, it significantly prejudices me in actually
18  putting up exhibits where the jury is not notified on anything
19  like that, it is just GX- whatever.  We are not saying this is,
20  you know, super sensitive or anything like that.  I should be
21  able to show, for the jury:  Here is the exhibit, this is from
22  the website, this is from the URL, these are the exact words,
23  and not be prejudiced by either shutting down the whole trial
24  to present classified exhibits or otherwise just telling them
25  to reference the classified GX- 1 laptop.

XM535schC                    TOP SECRET

1      So, just as they can call an FBI agent, I would want
2   to call a paralegal to basically testify and show that he went
3   to this website, show how he typed the URL in, how he went to a
4   certain page and to display the information there before the
5   jury.  And, again, I want to make clear that the government has
6   already essentially done this.  Why couldn't they, for
7   Rosenzweig, when he testified, why couldn't they say look at
8   GX- 1.  No.  What they did is they specifically went through
9   the pages, they showed to the jury -- they declassified them
10  and showed them to the jury.  So the government has done this
11  and it has done this to benefit itself and is basically saying
12  I don't have the same opportunity to do the same thing that
13  they have already done and, instead, either shut down the whole
14  trial or let's just reference this classified laptop and tell
15  the jury to look through this.  You know, it just neuters my
16  defense completely, I'm not able to make the same defense that
17  I would otherwise be able to make, this was classified or at
18  least whatever redactions.

19          THE COURT:  Mr. Denton, let me turn back to you.
20          Number one, could Mr. Schulte call a witness, whether
21  a paralegal or someone, to testify that they went on a regular
22  computer and typed in this URL and this is what popped up?
23          MR. DENTON:  No, your Honor.
24          .  The Court would have to authorize its disclosure
25  under Sections 5 and 6.

XM535schC                          TOP SECRET

1          THE COURT:  OK.

2          And the second question, to the extent that

3    Mr. Schulte wants to point to these particular, let's call them

4    extracts from the Wikileaks disclosures, is not one answer here

5    to admit these as Government's Exhibits 1A, 1B, 1C, 1D, have

6    the documents themselves basically just separated from their

7    source, and Mr. Schulte can then more easily direct the jury's

8    attention to them and make whatever arguments he wants to make?

9          MR. DENTON:  Yes, your Honor -- or defense exhibits if

10   he wants to denominate them as such.

11         MR. SCHULTE:  But they would close the courtroom down;

12   is that right?  It wouldn't be a public trial anymore if that's

13   what you are still referring to them as classified exhibits,

14   right?

15         THE COURT:  Mr. Denton?

16         MR. DENTON:  Yes, your Honor.  In a sense there is a

17   limited courtroom closure for the introduction of classified

18   exhibits.  That was all briefed with the introduction of

19   Government Exhibit 1.  There isn't a lot of experience in this

20   district with it.  My understanding is that, in particular in

21   the Eastern District of Virginia where this has happened a

22   number of times, Courts have sort of worked around it where

23   juries have been shown exhibits and the testimony sort of

24   points to the exhibit without getting into its content in any

25   detail.  I think if there the sort of finer points of the

XM535schC                      TOP SECRET

1    limited closure are what's at issue, I think that's something

2    we can certainly work through. Again, to the extent the goal

3    is for the defendant to point to particular parts of Government

4    Exhibit 1, I think your Honor's solution is a particularly fine

5    one and we can identify those, as such. I would note, purely

6    as an administrative matter, the defendant identifies a lot of

7    duplicative pages as potential exhibits. I don't know whether

8    we would need to do all of that way but if they're staying in

9    classified form and they are all coming into evidence anyway, I

10   think we can do basically whatever he feels he wants as far as

11   that list goes.

12           THE COURT: Mr. Schulte, why doesn't that provide you

13   what you need to make the argument you want to make to the

14   jury? Let's bracket, for the moment, the public trial question

15   because that is a separate question. The question here is

16   whether you can make the arguments you want to make as part of

17   your defense.

18           MR. SCHULTE: The point is I lose, basically, the ease

19   of being able to show them without the burden of saying, oh,

20   here is this information classified, this information is

21   protected, and the ease with which they can access it such

22   as -- so, you know, they are saying that I can't have a

23   paralegal testify and actually go to the website in front of

24   the jury without either closing it or without saying, oh, this

25   is classified. So, that's the issue. The issue is I want to

XM535schC                  TOP SECRET

1   be able to present my case and to show this and to be able to

2   show the jury the ease of which they can access this material,

3   the ease with which they could have accessed the material.  The

4   whole point is this is not NDI so I don't want the jury to be

5   prejudiced, with the caveat, oh, this is classified

6   information, this is very protected, you can't disclose this to

7   anyone.  Because then if I am making the argument that this is

8   NDI, it goes against -- the jury's is already prejudiced

9   against me saying the government, we had to do all of these

10  restrictive measures and they couldn't even go to the website

11  on the Internet, they can't even it is so restricted.

12          The point is I can't make the same defense I otherwise

13  could make by simply exhibiting things, just as the government

14  has done with its own, because of the restrictions and

15  prejudice to the jury about how this information is displayed

16  and how they accessed this information easily through the

17  Internet.

18          There is a reason that demonstratives are used, to be

19  able to easily explain to the jury, the government is simply

20  stopping me from doing that.  I want to have -- I want to show

21  a demonstrative of how easily this information is accessible.

22  I don't want -- and that the government didn't take any steps

23  on taking this site down or anything and basically showing this

24  information without the weight of the prejudice behind the

25  classified nature or whatever other things would accompany

XM535schC                         TOP SECRET

1    having them be classified exhibits.

2            I also note for the Court that in the previous trial

3    before Judge Crotty, there was nothing else that was ever

4    introduced as classified exhibits.  We went through binders and

5    binders of information and the whole point was to de-classify

6    it for the jury.  The only thing that was agreed to have a

7    classified exhibit was simply information that both parties

8    were not going to reference specifically but which the

9    government just wanted to show generically the entire -- the

10   documents for the jury to basically browse at its leisure.

11   This is completely different.  What I am proposing is

12   essentially what we did to the other documents before Judge

13   Crotty.  There was never any other introduction, there was

14   never any other classified exhibits at all through the trial.

15           THE COURT:  All right.  Last question for Mr. Denton

16   on this front and then I want to move on since I think we have

17   probably plowed this ground.

18           The question I have for you is you suggested that

19   maybe under 6(c) there is a stipulation that would suffice here

20   and I guess my question is what would that stipulation say that

21   wouldn't be a form of the testimony that you just said would be

22   impermissible, namely, that somebody could just simply go on

23   the Internet and type in a URL and up would pop this document.

24           MR. DENTON:  So I think, your Honor, the issue comes

25   from sort of the public display.  I think that if the issue is

XM535schC                    ~~TOP SECRET~~

1  just confirming that a particular page remains available on the

2  Internet without either a witness or the government displaying

3  it and giving it imprimatur and otherwise putting it up in a

4  public proceeding, I think that's fine.  I question whether

5  there is any relevance as to what your Honor earlier noted as

6  opposed to what was available now as opposed to what was

7  available in October of 2018 but I think, again, there might be

8  some stipulation that doesn't involve the actual disclosure of

9  the classified information that simply says this is still on

10  Wikileaks.

11          THE COURT:  But would it be something in the nature of

12  between March of 2017 and -- well, whatever date -- and October

13  of 2018, Government Exhibit 1 was available on the Internet?

14          MR. DENTON:  Yes.  I think that would work, your

15  Honor.  We might have to modify it to reflect that the leaks

16  came out in dribs and drabs but we can figure out the details

17  on that.  In concept, I think that would work.

18          THE COURT:  I would think about that because I think,

19  at a minimum, that is certainly -- I think Mr. Schulte is

20  entitled to that to make some of the arguments that he wishes

21  to make here.  I am also inclined to think that, at a minimum,

22  admitting these documents as essentially pullouts from

23  Government Exhibit 1 so that they're more easily identifiable

24  to the jury is also fair game, but I will ponder the rest of

25  this and we will revisit it, as needed, and I will issue

XM535schC                    TOP SECRET

1   rulings, as needed, or we will take it as it comes.

2        I think that covers a lot of this.  One other

3   component of the Section 5 notice was, essentially, the

4   relevance of sort of other CIA operations information,

5   essentially that, for lack of a better way of describing it,

6   the argument that Mr. Schulte had more damaging National

7   Defense Information at his disposal and if he really wanted to

8   harm the United States he could have revealed or would have

9   revealed that than what he allegedly did reveal.  I guess I am

10  inclined to think here that but for one significant thing that

11  I will get to in a moment, that the government is right that

12  his motives are not relevant and the fact that he could have

13  inflicted more damage is not necessarily relevant.  But, the

14  one significant caveat to that is to the extent the government

15  intends to introduce Mr. Schulte's statement that he wanted to

16  or was engaged in a, quote unquote, information war with the

17  United States, does that not open the door to this sort of

18  argument?  That is to say, yes, the government doesn't have to

19  prove ill will or evil motive, but if part of the government's

20  theory of the case is that Mr. Schulte was in fact engaging in

21  a, quote unquote, information war, is it not fair game for

22  Mr. Schulte to come back and say that makes no sense because I

23  had all these other more significant weapons at my disposal and

24  if I was engaged in a war with the United States, it makes no

25  sense that I would have done this and not used these weapons.

XM535schC                      <del>TOP SECRET</del>

1            So that's my question to you, Mr. Denton.

2            MR. DENTON:  So I think two things, your Honor.

3            First of all, that very much does require the

4      defendant to testify.  The second thing is I think the

5      defendant indicated that he intended to testify about the

6      specifics of that information.  I think there is a difference

7      between what your Honor characterized, which is an argument or

8      testimony that why would anyone think this was an information

9      war, this was so innocuous.  That is very different from

10     saying, *and you know it's innocuous because here is the* ███

11     ████████████████████████████████████████████████

12            THE COURT:  I want to be clear, he is not going do

13     that.  And I don't know if he is suggesting that that's what he

14     plans to do but that, to me, is definitely not even close to

15     the line.

16            But I guess the question to me is is that a legitimate

17     argument.  And then we can talk about what he would need to

18     make that argument and maybe it is not more than either a

19     stipulation or generalized testimony that he was privy to

20     various information at the CIA regarding ██████████████

21     ███████████████████ regarding this and that that were highly

22     classified, potentially deeply damaging to the United States,

23     and there is no allegation that he disclosed any of that,

24     without getting into the particulars.

25            MR. DENTON:  Again, I think something along those

XM535schC                    ~~TOP SECRET~~

1   lines might be possible, your Honor.  I think it is just,

2   there, it really is the devil is in the details.  So we are

3   responding to what the defendant put in his Section 5 notice

4   which included ███████████████████ and a laundry list of things

5   that we don't think was sufficiently specifically and so didn't

6   meet the requirements of Section 5.  I think if he wants to, if

7   the Court is inclined to give him permission to give him a more

8   specific notice of what he intends to say, then we can address

9   that and there may be a stipulation but the devil is very much

10   in the details on where there would be sensitivity there.

11          THE COURT:  Do you agree that at that level of

12   generality the argument that he is engaged in information war

13   sort of opens the door to at least some rebuttal of that sort?

14          MR. DENTON:  I'm not sure that it does, your Honor,

15   because the defendant's characterization of his own statements

16   I don't think requires evidence of other things that were --

17   could have been in his mind.  Again, to the extent that the

18   defendant wants to testify, *That's not what I meant*, that's

19   very different from saying, *And I could have meant something

20   else*.  The hypothetical is not relevant to his testimony that

21   7this is not what I meant when I said that.

22          He has a theory that the information war was about his

23   petitioning of grievances with respect to the justice system.

24   If he wants to say, *That's what I meant about that*, that's

25   totally fair game.  But to say, *I could have meant something*

1   *else and I would have done it this way*, I think is a

2   hypothetical that's not relevant to the question of what his

3   state of mind actually was.

4           THE COURT:  All right.

5           Mr. Schulte?

6           MR. SCHULTE:  The government is mischaracterizing

7   information, that's the problem, is that as defined in the

8   notebooks, yes, I say "information war," I defined it

9   specifically to be unclassified redress of grievances.  What

10  the government is arguing, as they did in the first trial, oh,

11  he declared information war so he could release classified

12  information.  So, by the government saying that, the Court is

13  right, that is what opens the door, is by the government saying

14  that I intended to release classified information, that is what

15  then opens the door to say, well, this doesn't even make sense

16  because the things that the government says are classified and

17  how they're produced in these documents, you know, two

18  sentences on page 84 out of a 160-page document, how is that

19  intent?  How is that showing that I am trying to release

20  classified information when, in reality, I know all this

21  information.

22          And the Court is also right where I specifically say

23  that this information, I state it in generic terms, and so it

24  doesn't make sense when the government is saying, well, he

25  needs to be more specific so that we can determine if it is

XM535schC                          TOP SECRET

```
 1    relevant.  But the whole point is I am putting it in generic
 2    terms so that it is unclassified to be used so it doesn't make
 3    sense for the government to say I have to be specific so that I
 4    can be generic when I am purposefully being generic about the
 5    information I know to keep it unclassified so we can continue
 6    to protect it from disclosure.
 7            So by saying that I had -- that I know ███████████
 8    particular -- I know ███████████ that could cause harm to the
 9    U.S. or ███████████████████████ that I worked on, you
10    know, this type of information.  And that's why I stated
11    generically in the CIPA 5 that there is no -- I'm not trying to
12    say anything specific.  And I even say in the CIPA 6 that, you
13    know, the point of it is not to divulge specific information
14    regarding CIA sources and methods.  The point is generic,
15    unclassified testimony.
16            THE COURT:  I do think the devil is in the details.
17            To be clear, in your Section 5 notice you say, I
18    intend to testify about all this highly classified information
19    including the ███████████████████████ in ████████
20    ███████████████████
21            MR. SCHULTE:  Correct.
22            THE COURT:  Just to be clear, you are not proposing or
23    suggesting that you would divulge ███████████████████
24            MR. SCHULTE:  No.  That's right.  The information
25    there is literally what I am going to be testifying.  I'm not
```

XM535schC                    ~~TOP SECRET~~

1    saying that these are the ███████ I'm not going to be

2    testifying, *Here is the* ███████ and cause damage.  I'm saying I

3    know that --

4           THE COURT:  In other words, you would testify

5    essentially as you just state here, that I was privy to the

6    ██████████ --

7           MR. SCHULTE:  Correct.

8           THE COURT:  -- ████████████████████████████

9    and had I intended to cause damage in the United States and

10   engaged in a war I could have disclosed that but I didn't.

11          MR. SCHULTE:  Correct.

12          THE COURT:  So, Mr. Denton, maybe that clarifies it.

13   If the level of generality or detail, as the case may be, is

14   literally what is here, just that Mr. Schulte does propose to

15   testify and say he was privy to this kind of information

16   without disclosing the particulars of any of the information,

17   problem?  Not a problem?

18          MR. DENTON:  I think two things, your Honor.

19          First, the problem for Mr. Schulte is, again, where

20   does this come in as a matter of relevance?  I think it is

21   seriously freighting the government's use of "information war"

22   to say he gets to introduce a whole bunch of information that

23   is, as a matter of law, not relevant to an element of the

24   offense.  So I think to the extent that that's what we are

25   bearing it on, again, we are far afield from the defendant's

XM535schC                    ~~TOP SECRET~~

1    own version of what "information war" meant.

2            THE COURT:  But let me ask you to assume for the sake

3    of argument that I disagree with you and that by introducing

4    the concept of Mr. Schulte being engaged in an information war,

5    you are opening the door to him saying information war?  That

6    makes no sense.  I was privy to all of this more damaging

7    information and there is no allegation that I have disclosed

8    that.  So let's assume that I disagree with you on that.

9            MR. DENTON:  So I think, your Honor, in that instance,

10   again, we would have to have a pretty serious discussion.  I

11   think even this level of generality is, A, more than would

12   be -- is something that we could tolerate, I think again

13   talking about the ███████████████████████████

14   particularly when you associate that with the type of work that

15   Mr. Schulte did and the testimony about the types of tools that

16   he worked on gets problematic.

17           Also, to the extent the defendant is purporting to

18   testify about ██████████████████████████████

19   ████████████   I think we may have a candor question.  We need

20   to figure out whether what he is proffering is something he

21   actually knew or is true.  There are representations he makes

22   in his notebooks that are false about operations that were

23   conducted or that he worked on.

24           THE COURT:  I mean that --

25           MR. DENTON:  I would say, your Honor, I think at that

XM535schC                    TOP SECRET

1    point what would probably fit the bill is a statement that, you

2    know, Mr. Schulte, as a result of his work at the CIA, was

3    privy to additional, highly-sensitive classified information

4    that was not recorded in Government's Exhibits 801, 806, and

5    809.

6            THE COURT:  Mr. Schulte?

7            MR. SCHULTE:  So Mr. Denton is basically saying I

8    don't get to try my case at all, it is all by stipulation for

9    the government.  It is just -- it is absurd, especially the

10   government is saying, well, the statements that I am making are

11   not true.  I mean, I don't know what they're trying to do.  If

12   they're going to bring it out on cross-examination then they're

13   bringing out the detail.  That doesn't really make any sense so

14   I am not really clear what he is trying to say about that.

15           But, the big issue that we come back to is they're

16   trying to say, oh, his information war -- the point is if the

17   government is trying to say the information war is something

18   other than what was actually defined in the notebooks which it

19   specifically states this redress of grievances, so the

20   government is trying to say that it is to release classified

21   information then I should be able to testify that this is

22   absurd because here is actual, true National Defense

23   Information that I know about that were never released,

24   intended to release, even discussed in the notebooks.

25           THE COURT:  Well, I think in answer to the first

XM535schC                    TOP SECRET

1     point, that's what 6(c) is about.  To the extent that I think

2     it is relevant and admissible, it may be that it is admissible

3     but in a form that we wouldn't necessarily want it to be

4     admitted in at a normal trial because it involves classified

5     information.  So that is what this exercise is about.

6            I am inclined -- again, I'm going to reserve judgment

7     here too so I can think a bit more about it, I am inclined to

8     think that by introducing the concept of an information war and

9     making the argument that that was part of the defendant's

10    motive here, that the government does open the door to

11    testimony of this nature, then I think the question is a 6(c)

12    one, what does the testimony entail or look like and at what

13    level of generality is it summarized but we are not at the 6(c)

14    stage just yet.

15           Yes, Mr. Denton?

16           MR. DENTON:  Your Honor, I think there is an issue

17    here that I'm not really following where the factual

18    introduction of the defendant's statement about the information

19    war and the law are going to coincide.  The defendant has put

20    his intent at issue.  He is claiming he did not intend to

21    disclose classified information.  That does not require the

22    government to prove or him to disprove that he had any intent

23    to harm the United States.  And so, again, the question of what

24    "information war" means in the context of the defendant having

25    written it down, it's words that he said, it's not a statement

XM535schC                    TOP SECRET

1    one way or the other, and his intent remains not an element of

2    the offense either way.  And so, I sort of fail to see how the

3    introduction of his own statement and testimony from another

4    witness who will testify about his use of the statement in

5    context of the notebooks does anything other than, again, the

6    basic legal point of putting his intent at issue and intent to

7    harm is not the relevant intent.

8              THE COURT:  All right.  I understand, and to the

9    extent that is an argument under 6(a), I will take it under

10   advisement.  If I disagree with you then we are in 6(c) land

11   and will discuss what form it will take.  And you may be on

12   firm ground in arguing the level of detail disclosed here is

13   problematic and also not necessary for him to make the argument

14   that he wants to make but we are not there yet.  So, I will

15   reserve judgment and we will circle back to it.

16             Let's take a five-minute break and we will pick up

17   from there.  See you in five minutes.

18             (Recess).

19             MS. SHROFF:  Your Honor, I'm sorry.  Before the Court

20   starts, may I tell the Court I checked about the ███████████,

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████

XM535schC                    ~~TOP SECRET~~

███████████████████████████████████████████████
███████████████████████████████████████████████

THE COURT:  Great.  Thank you.

On the theory that you guys might not have electronic devices available to you, I will let you know that the Second Circuit affirmed the denial of bail on my ruling in December. So just so you know.

The only remaining things that I have to cover -- we are almost near the end, I think -- are number one, the ███ issue; number two, the audio-video recordings; number three, the Michael memo that Mr. Schulte raised today; and number four, the forensic crime scene.  I think that's all that I have on my remaining agenda.  When I say that's all I'm not sure it will be so quick but, nevertheless, I think we have covered the big picture items.

On the ███ front, Mr. Schulte, let me start with you.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

XM535schC                          TOP SECRET

4          THE COURT:  So, Mr. Schulte, I am inclined to agree

5    with the government that you have not disclosed with the

6    requisite specificity what you propose to testify to ████

7    ████████████████████████████████████████ so in that

8    sense I disagree that I don't think the ball is, quote unquote,

9    in the government's court, I think it is firmly in yours under

10   Section 5 and you haven't satisfied the particularity

11   requirement of that section.

12         So, if you want to elaborate and explain?

13         MR. SCHULTE:  Yes.

14         So this comes back to the same issue before about my

15   testimony.  This is just generic. ████████████ ████████

21         THE COURT:  And the purpose --

22         MR. SCHULTE:  So the government is saying that I'm not

23   specific enough, that's the point, is I'm trying to be generic

24   to keep it unclassified.  I'm not trying to say, oh, ████████

25   ████████████       I am trying to keep it generic to keep it

XM535schC                    TOP SECRET

1    unclassified ████████████████████████████████████

2    ████████████.

3              THE COURT:  OK.  And the purpose of that testimony is

4    what?

5              MR. SCHULTE:  It is the same -- it is just the same,

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13             THE COURT:  OK, but I think the devil is in the

14   details again and I think ████████████████ is cause for

15   concern.  Can you elaborate on what you propose to --

16             MR. SCHULTE:  Yes.

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

XM535schC                    TOP SECRET



So, again, I think the question is how does the testimony match up with the admissible purpose ████████

████████████████████████████████████████████

████████████    ████████████████████████████████

THE COURT:  Mr. Schulte?

MR. SCHULTE:  Yes.  So, I'm sorry, is Mr. Denton saying ████████████████████████████████████████

████████████?

THE COURT:  I don't know.  I guess the question is --
and, unfortunately, I don't think I have your original
Section 5 notices here ████████████████████████████

██████████  ████████████████████████████  ████████

████████████████████████████████████████████

████████████  ███████████████.

MR. DENTON:  I think again, your Honor, that ended up

XM535schC                          TOP SECRET

1    getting worked out. 

14                              Again, I think we can carve this

15   down to what is the point, and the point is that the defendant

16   can testify about things within his personal knowledge relevant

17   to an issue in the case.

18                 THE COURT:  Ms. Shroff, it is very hard to tell when

19   you are speaking to Mr. Schulte whether it is something on the

20   record to me or not and I would ask you just to refrain from

21   commenting, particularly when somebody else is speaking.

22                 Mr. Schulte, can you respond to that and clarify what

23   exactly you are seeking to offer here?  I mean, to the extent

24   you are simply proposing to

25

XM535schC                    ~~TOP SECRET~~

1   ███████████         To the extent that you are proposing to go beyond

2   that, then I think we need to adjudicate whether that is

3   proper.

4         MR. SCHULTE:  Right.

5

6

7

8

9

10

11

12

13         So all I was trying to do here was to make sure that

14   the government understands that this is part of that testimony.

15

16

17

18

19

20

21

22

23

24

25

XM535schC                          TOP SECRET



XM535schC                    ~~TOP SECRET~~

1    ████████████████████████████████████

2         THE COURT:  And if Mr. Schulte were to testify

3    literally verbatim as to what is in his notice here, that he

4    relied on -- or that ████████████████████████████████████████

5    ████████████████████████████  -- I don't even know what

6    number two means -- if he were to testify just to this but not

7    to any of the particulars, OK?  Not OK?

8         MR. DENTON:  I think then we have a 403 question which

9    is what does this have to do with anything.

10        THE COURT:  That is a good question.

11        Mr. Schulte, what does this have to do with anything?

12        MR. SCHULTE:  Yeah, I mean, I think the government

13   objected to ██████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18        THE COURT:  Well, that's not the question I am asking

19   you.  What is the relevance of what you are proposing to

20   testify to here.  ████████████████████████████████████████

21   ███████████████████████████████████████████████

22   ████████████████████████████  Mr. Denton takes no issue with you

23   testifying about that, but why do you need to go beyond that to

24   offer any testimony or evidence concerning ███████████████████

25   ██████

XM535schC                    ~~TOP SECRET~~



1     MR. SCHULTE:

12    ＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿and also,

13    as standby counsel just noted, that I am essentially being

14    forced to, you know, give the whole -- my whole testimony to

15    the government which, you know, is problematic in and of itself

16    but, essentially, the whole testimony regarding

XM535schC                          ~~TOP SECRET~~

1        THE COURT:  Mr. Denton?

2        MR. DENTON:  Your Honor, there is a level of

3   commentary there that is new going back to even the last

4   Section 6 proceeding.  First of all, I don't know if I am

5   misinterpreting what Mr. Schulte said or what, but Mr. Schulte

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮      That is a lie.

9        To the extent that he wants to assert that he had some

10  involvement in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that is also false.

11  I think what we are prepared to do is reach a reasonable

12  agreement about what he can say about his personal involvement

13  in things that was an explanation for this conduct.  If the

14  defendant wants to lie about it, then we are just not going to

15  be able to reach a stipulation.  We are not going to agree to

16  facts that are false.  So we are getting a little further

17  afield than I thought we had ever been on this subject.

18       MR. SCHULTE:  Yes, so that's -- as an initial matter,

19  I have been involved in actually discussing ▮▮▮▮▮▮▮ but

20  that's not what I was saying here at all.  ▮▮▮▮▮▮▮▮▮ ▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

XM535schC                         ~~TOP SECRET~~



1

2

3

4

5

6

7

8

9

10          So that's what the testimony would be.

11          THE COURT:  OK.  I'm not quite sure what to do with

12   this.

13

14

15

16

17

18

19

20          MR. DENTON:

21

22

23

24

25

XM535schC                    ~~TOP SECRET~~

1          THE COURT:  Why don't you do that -- can you do it by

2     the end of this week?

3          MR. DENTON:  Definitely, your Honor.

4          MS. SHROFF:  Your Honor, we ask that the government

5     provide us with a copy of whatever it gives to the Court to

6     Mr. Schulte too.

7          I wanted to point out that the trial strategy at the

8     first trial is not necessarily the trial strategy at the second

9     trial.  It could very well be that his defense team had decided

10    that he wasn't going to testify at the first trial.  So, the

11    arguments that Mr. Schulte makes now should not necessarily be

12    precluded because we didn't make them in the first trial

13    because we may have made different judgment calls at the first

14    trial.

15         And I just remind Mr. Schulte, and noting the Court's

16    admonition to not speak at the same time as the other

17    proceedings are going on which is hard as standby counsel, I

18    just wanted to note that he is not required to preview his

19    entire testimony here for the government to then shape their

20    own case-in-chief and how they're going to cross-examine him.

21    I don't think CIPA requires that of Mr. Schulte and I think

22    Mr. Schulte may want to object on that ground.

23         THE COURT:  First of all, Mr. Schulte is representing

24    himself, you are not representing him, so in that regard I will

25    hear from him but not from you.

XM535schC                    ~~TOP SECRET~~

```
 1            Number two, I don't object to you communicating with
 2    Mr. Schulte.  I object to you communicating with him in an
 3    audible fashion that makes it difficult for the court reporter
 4    and me to know when you are speaking in a way that we are
 5    intending to hear and listen to and respond to versus just
 6    speaking to him.
 7            So I'm not preventing from communicating --
 8            MS. SHROFF:  No, no.  I didn't mean to imply that.
 9            THE COURT:  Number three, I think Section 5 does in
10    fact require Mr. Schulte to disclose to the government and to
11    me what, if any, classified information he intends to use as
12    part of his case, whether it is through his testimony or
13    otherwise, so that we can litigate whether he is permitted to
14    do so and, if so, whether there is a substitute or redaction or
15    whatever the case may be.  This is not normal litigation and
16    you have been down this road before, you understand how this
17    works but I think you are just flat wrong about that.
18            MS. SHROFF:  Your Honor, in the last trial we asked
19    for the Section 5 notice about his testimony to be given just
20    to Judge Crotty and we asked Judge Crotty to hold off on such a
21    hearing after the government ended its case.
22            THE COURT:  Well, no such request has been made to me
23    so I have not been presented with that.
24            In any event, Mr. Schulte said that what he proposes
25    to do is ███████████████████████████████████ ████████
```

XM535schC                          TOP SECRET

1        ███████████████████████████████████ and that requires
2   me to look at the documents that the government will submit to
3   me by the end of the week and of course they will provide a
4   copy to Mr. Schulte.

5            Now I will turn to the next item which was the
6   recordings and here I am just not quite sure I understand what
7   the issue is.  So, Mr. Denton, let me start with you.  Maybe
8   you can elaborate or explain what we are talking about here.

9            MR. DENTON:  Sure, your Honor.

10           So in answer of the defendant's arrest as part of the
11  investigation, a number of individuals who were working in
12  essence as confidential sources for law enforcement -- they
13  were penal known to the defendant -- had communications with
14  him that were recorded and provided.  There is 70-some-odd of
15  them.  All but nine of them are either unclassified or
16  declassified and are available to the defendant in unclassified
17  discovery.  There are nine that include classified information
18  which remain classified and were not the subject of a Section 5
19  notice so we were a little surprised to see that in the
20  defendant's response as well.

21           Again, to the extent that the defendant wants to use
22  them, give us notice on what, we can have a discussion about
23  how or whether they can be redacted in an appropriate way for
24  use at trial.  Again, to the extent the defendant is seeking to
25  offer his own statements for their truth, there would be an

XM535schC                    ~~TOP SECRET~~

1   admissible problem separate from the CIPA problem but I think,

2   again, we are just a little bit at odds on what we are supposed

3   to be doing about the recordings.

4        THE COURT:  Mr. Schulte, I didn't see this anywhere in

5   your Section 5 notice so was a little puzzled myself.  So, can

6   you explain?

7        MR. SCHULTE:  Both this issue and the micro issue --

8        THE COURT:  Let's take them one at a time so start

9   with the recordings.

10       MR. SCHULTE:  Right.

11       So, the CIPA 5 I submitted was supplemental and I

12  basically said I renew the same objections or discussions on

13  the previous CIPA 5, so my intent today in coming to the

14  hearing was specifically to talk about these two issues so I

15  didn't think I had to give a new CIPA 5 notice on the same

16  issues that were noticed before.  If that was not correct then

17  I am mistaken.  I am mistaken on that.

18       THE COURT:  So these recordings were in your Section 5

19  notice before the first trial?

20       MR. SCHULTE:  Yes.  We moved to de-classify this

21  information for the first trial was my recollection.

22       THE COURT:  So I read Judge Crotty's rulings on the

23  CIPA Section 5 and 6 issues and I don't recall seeing anything

24  about the recordings.

25       MR. DENTON:  Your Honor, there were two separate

XM535schC                    ~~TOP SECRET~~

1     issues.  They were not part of the CIPA proceedings.  The

2     defendant objected to the classification of the recordings and

3     moved for an order requiring the government to declassify them

4     because he felt they were unclassified.  Judge Crotty rejected

5     that and, again, we noted that there were only nine of them

6     that had that and the Court held that he would not compel

7     declassification.

8               That's as far as it went.

9               THE COURT:  Were those recordings identified in his

10    Section 5 notice before the first trial?

11              MR. DENTON:  I don't believe they were, your Honor.

12              THE COURT:  OK.

13              Mr. Schulte?

14              MR. SCHULTE:  So, the point to declassify the

15    recordings was for use at trial, so my recollection is this was

16    included in the CIPA proceeding.  But, even if it wasn't, we

17    moved to declassify it for use at trial so it should have been

18    basically -- it should have been pursuant to the same CIPA.

19    The whole point of the CIPA is for declassification for use at

20    trial or substitution so we moved -- or the Judge had separate

21    orders regarding that, is my recollection, and maybe I am

22    mistaken about that, but I thought that was all with the same,

23    with the CIPA 6 proceeding before.  If it wasn't, it is still

24    the motion to remove the classified or declassify it would

25    still be technically a CIPA motion or related to CIPA so I

XM535schC                         TOP SECRET

1    think it is still relevant for discussion here.

2         I think the big issue regarding these nine documents

3    or these nine recordings is we never really received

4    explanations or testimony for what specifically was classified

5    or why it was classified and that's basically the point of

6    bringing this up again, is, you know, what is classified, why

7    is it classified, and the biggest question is, is it still

8    classified now.  So that's, you know, the Judge previously

9    denied the request but, you know, so much time has passed now

10   whether this information is still classified or not, what is

11   classified, and then proceeding from there to introduce them at

12   trial because that was the whole point, is that when I am

13   testifying that this would be -- these conversations and audio

14   recordings would be admissible at trial.

15        THE COURT:  Well, there are two separate issues here,

16   one is whether they're properly classified and I have any

17   authority to direct that they be unclassified and I have ruled

18   on that issue before, at least as presented to me, I don't

19   think that there is a basis to direct the government to

20   declassify these things and, in any event, you have provided me

21   no basis to reconsider what sounds like a definitive ruling on

22   that by Judge Crotty.  That's a separate question from the CIPA

23   process which requires to you provide notice under Section 5 if

24   you intend to use classified information and then there is a

25   process under CIPA to adjudicate whether and in what form that

XM535schC                    ~~TOP SECRET~~

1   information can be used.  It does not sound like you are

2   disputing that you have never noticed these recordings under

3   Section 5.  So, under Section 5, under CIPA, there is no basis

4   for you to use these at trial because they have never been

5   noticed, let alone properly noticed.  So if you want to try and

6   remedy that at this point you can try to remedy that but at the

7   moment it is not ripe for me to rule on it and the deadline for

8   you to provide notice under Section 5 has obviously passed.

9           Is that the same issue for the Michael memorandum?  I

10  don't even know what that is but I don't recall reading about

11  the Michael memorandum in Judge Crotty's prior rulings either.

12          Mr. Denton, do you know?

13          MR. DENTON:  I'm not sure what the issue is but I can

14  provide some context, your Honor.

15          The Michael memorandum is also what Judge Crotty

16  referred to in his Rule 29 order as the CIMC memorandum.  There

17  was a co-worker of the defendant's who was called as a witness

18  at the last trial who will not be called as a witness at this

19  trial who was placed on administrative leave.  Judge Crotty

20  directed us to produce a copy of the memorandum, directing that

21  during the trial.  I'm not sure, it has been a while since I

22  have looked at the original version of the memo, I think the

23  version that was introduced at trial was redacted only in

24  ministerial parts and was declassified for introduction at

25  Judge Crotty's very firm insistence.  So I'm not sure what the

XM535schC                    ~~TOP SECRET~~

1   classification issue is here.  We have a separate objections

2   raised in our motions *in limine* about why we don't think it is

3   admissible in the retrial but I don't see that as a CIPA issue,

4   that's just a motion *in limine* issue.

5              THE COURT:  Mr. Schulte, I will obviously take it

6   under advisement in connection with the motions *in limine,* but

7   what is the CIPA issue here?

8              MR. SCHULTE:  The CIPA issue is whether or not -- or

9   basically that I intend to use this material at trial so I have

10  to -- so we have to go through whatever CIPA proceedings,

11  whether or not or what material should be redacted or

12  substituted or --

13             THE COURT:  That sounds like it was declassified and

14  used at the first trial.

15             MR. SCHULTE:  A lot of the material I believe was not

16  declassified so basically what I am trying to litigate is some

17  of this information that was provided to us only as classified

18  and they did it -- it wasn't declassified for the first trial,

19  I basically want to declassify it at this time for trial.

20             THE COURT:  Is there a reason it wasn't in your

21  Section 5 notices?

22             MR. SCHULTE:  Yes.

23             So, for both of these issues my understanding was they

24  were both in the original CIPA 5 or they were at least

25  litigated pursuant to CIPA before.  I mean, I know -- the

XM535schC                    ~~TOP SECRET~~

1    Microsoft came in the middle of trial so we had to basically do

2    a quick kind of CIPA litigation there, but my understanding is

3    whatever was previously litigated, there is no point in raising

4    new -- raising a new CIPA 5.  That was -- so, for both of these

5    issues, both the Michael and the audio recordings, I want to be

6    clear that I do want to give notice.  I know it's kind of late

7    now but I think it's, according to standby counsel, 30 days

8    before trial.  We have provided --

9                THE COURT:  It is actually 30 days before trial or

10   whatever deadline the Court sets, and I already set a deadline

11   and that deadline has passed.  So you can certainly make late

12   notice if you want and litigate the propriety of that and

13   whether I will allow it but, unless and until you do, there is

14   no reason to adjudicate that.

15               MR. SCHULTE:  So -- I'm sorry.

16               THE COURT:  I just don't understand.  Mr. Denton is

17   suggesting that the Michael memorandum or CIMC, whatever it may

18   be called, that there were no substantive redactions, that

19   there were only ministerial redactions.  Mr. Schulte is

20   suggesting otherwise, that there were classified information in

21   that.

22               MR. SCHULTE:  I have the documents here --

23               THE COURT:  This is the point of the Section 5 notice,

24   is to make it clear what you propose to use and adjudicate

25   whether you can.  But if you have it there and it shows what

XM535schC                    ~~TOP SECRET~~

1    was redacted, I'm certainly happy to take a look at it quickly

2    but I just don't know what is going on here.

3              MR. SCHULTE:  I mean it may be, you know, I may be

4    completely mistaken.  I thought that whenever I renewed the

5    same objections in the supplemental CIPA 5 my intention or my

6    thought process was all the previous stuff, I can bring any of

7    that to the hearing because it's -- since it has all been

8    previously provided to the Court or the Court has already ruled

9    or reviewed it, my -- perhaps I was mistaken about that, that I

10   could bring any of those materials here to the hearing to

11   basically it review it here.

12             THE COURT:  Well, you are not, except that I have

13   adopted all of Judge Crotty's rulings on that with the

14   exception of the witness protection order I am reserving

15   judgment on.  So in that regard, you have renewed your request

16   but I am adhering to his ruling.  Is there some particular part

17   of the Michael memorandum you wish to use that you were not

18   permitted to use the last time?

19             MR. SCHULTE:  Yes.  I have the documents here I can

20   give to the Court and the government.

21             THE COURT:  Please do.

22             MR. DENTON:  Your Honor, I think I see what the

23   confusion is here.

24             There was the memorandum from CIMC that Judge Crotty

25   authorized to be introduced at trial.  This is a separate

XM535schC                     ~~TOP SECRET~~

1   document, this was the ███████████████████████internal

2   assessment on Michael that Judge Crotty ordered us to produce

3   to the defense as *Giglio* in anticipation of the defense

4   recalling Michael on cross-examination -- which the defense

5   elected not to do.  This was never asked to be declassified or

6   introduced in any way so we are talking about two different

7   documents.

8           MR. SCHULTE:  Yes.  The issue was that this came in

9   the middle of the trial, it should have been produced to the

10  defense before, and Judge Crotty ruled that this was improperly

11  a violation of *Brady* and so we had to litigate this on the fly

12  in the middle of trial.  So my interpretation is this was

13  considered basically part of -- the only reason this stuff

14  didn't come in at trial is because we eventually decided not to

15  recall Michael but I think that the litigation of the relevance

16  of this at trial was basically litigated and that this stuff

17  was ruled to be relevant, we just never were able to recall

18  Michael or go over some of these specific documents.

19          THE COURT:  But the point of the Section 5 notice is

20  so that you can put the government and me on notice of what

21  classified documents or information you wish to use at trial so

22  that we can then proceed to litigate the permissibility of

23  that.  So, if this was not subject to any Section 5 notice

24  before the first trial and it wasn't part of your Section 5

25  notices before this trial, you have not complied with your

1    obligations under the statute to use this document.

2              MR. SCHULTE:  OK.  Am I able to move now?  Is the

3    Court willing to look at it now or what is the Court willing

4    to --

5              THE COURT:  I think, as with the recordings, if you

6    want to file a late Section 5 notice you can do that and then

7    if the government wishes to move on procedural ground to

8    preclude you from using it because it is late or filing to

9    comply with my deadline or on the merits, I will take it up.

10   But, unless you have properly noticed it under Section 5 this

11   is not the way this process is supposed to work and I think you

12   have to frame what you are offering it for so that the

13   government can respond in an appropriate fashion.

14             So the bottom line is it is not ripe for me to

15   consider at this time.  If you wish to serve a notice I will

16   take it under advisement whether you can use it and we will go

17   from there, but I don't think it is ripe for me to decide

18   today.

19             The last item on my agenda is the forensic crime

20   scene.  I have only quickly reviewed the submissions thus far.

21   There is a threshold procedural question which is whether the

22   government should be given the unredacted version of the

23   defense expert's affidavit.  Mr. Schulte, you didn't respond to

24   that in your reply.  I am inclined to think that they should

25   get it, number one, because I don't think there is anything

100

XM535schC                          TOP SECRET

 1    particularly earth-shattering behind the redactions that the

 2    government probably couldn't figure out on its own, but that is

 3    to say I'm not sure it reveals much in the way of defense

 4    strategy that wouldn't be obvious; and number two, to the

 5    extent that you wish to call your expert you would -- I think

 6    the government is correct -- need to disclose it by the 13th

 7    anyway.  So, in that regard, what's the harm in providing it to

 8    the government now to give it meaningful opportunity to

 9    respond?

10           MR. SCHULTE:  Yes.  So I think the issue is that the

11    declaration from the expert is essentially made after he has

12    been able to review -- conduct his examinations and the

13    material that he has found or has, you know, deduced is

14    favorable to the defense.  So the issue here is, like -- so

15    this issue happened before where basically the defense had to

16    reveal defense strategy and the expert's proposed test for the

17    government, then the government's expert was able to deduce and

18    find information that it then used against me at trial.  So I

19    think the biggest issue here is we don't want to keep repeating

20    that where we keep telling the government here is all the tests

21    that that expert intends to run or here is all the defense

22    strategy and so now give it to your expert to go and conduct

23    these tests yourself or do or find whatever else that is then

24    used against me at trial.  So I believe that was the concern,

25    is that he outlines tests that he would perform but we don't

XM535schC                          TOP SECRET

1    necessarily know what the outcome of those tests would be

2    because we are not able to conduct those tests.

3           So basically our belief is that, you know, this is not

4    really relevant to the testimony because he can't even testify

5    about this material yet because we don't even have access to

6    it.

7           THE COURT:  But that's the rub.  The government says

8    that he does and I think in order to meaningfully respond to

9    his contention that he doesn't, the government has to see what

10   he suggests he can't do with what he has been provided, not to

11   mention you didn't address my point or the government's point

12   that you would be required to disclose the affidavit by the

13   13th in the event that you intend to call him as a witness.

14   So, if that's the case, what's the harm in disclosing it on May

15   3rd?

16          MR. SCHULTE:  Yeah, so as -- right.

17          So, the argument that I raised before is relevant in

18   response to your question, basically why this has to be

19   produced May 13th, why not produce it now.  But the thing is

20   the expert's testimony would only be about what he can testify

21   about so none of this would actually be included in that

22   because my expert cannot testify about any of this information.

23   All this affidavit is saying is that these are the tests that

24   he would perform but he is not going to testify to the jury,

25   these are tests that I would perform but I couldn't perform so

XM535schC                    ~~TOP SECRET~~

1    we don't think that those materials would be basically produced

2    pursuant to that expert notice.  He needs to be able to conduct

3    the task before he would be able to proffer any testimony that

4    would be given to the government on May 13th.

5              THE COURT:  Mr. Denton?

6              MR. DENTON:  Your Honor, I think we think it is pretty

7    obvious that an affidavit of an expert submitted in the case is

8    a prior statement on the subject of his testimony and so it

9    would be 26.2.  I think, your Honor, to the extent that what

10   might make sense in order to simply avoid this issue is if the

11   Court wants to ask if there are, you know, review the

12   affidavits that we have submitted and see if the Court thinks

13   that you do need to hear from us more on some of the unredacted

14   portions, we would think we would be entitled to a response.

15   To the extent it is not anything earth-shattering, I think we

16   tried to anticipate as much as we could in discussing with the

17   experts what their affidavits should address.  It may be that

18   this is a moot point and the defendant can decide what he wants

19   to do on May 13th.  I think we are entitled to it but I am also

20   trying to find ways for there to be less to do here.

21             THE COURT:  I appreciate that.

22             So let me just turn briefly at least to the merits and

23   I think I would still -- I'm not sure the affidavits

24   accomplished what I hoped they would accomplish which is

25   clarifying the situation because we have a situation where one

1    expert is saying he needs this in order to meaningfully test

2    what the other experts are doing and so forth and the other

3    experts are saying he doesn't and in that sense it's sort of

4    the affidavits have replicated what the parties' briefs already

5    said.  Be that as it may, in the government's letter, page 4,

6    it seems that the government is making available some

7    additional information that was not previously made available,

8    namely an unredacted copy of Confluence -- an April 25th

9    Confluence backup on that basis.  Mr. Denton, you state that

10   the defense now has access to the exact same material that

11   Mr. Berger used to conduct his analysis.  I guess I am trying

12   to pinpoint precisely what Mr.Berger and Mr. Leedom had and

13   used that was not made available to the defense.  Representing

14   that whatever Mr. Berger has reviewed has been made available

15   to the defense, you didn't make that same disclosure with

16   respect to Mr. Leedom, and what is the daylight there.

17          MR. DENTON:  Again, your Honor, some of that is the

18   function of the fact that Mr.Berger performed the more discrete

19   tasks with respect to the timing analysis on Stash and

20   Confluence.  He did a lot of unclassified work on the

21   defendant's home computer that is not really at issue, I think.

22   So again, Mr. Berger's expert report specifically identified

23   the sources of data for his conclusions.

24          Mr. Leedom was not simply just an expert witness, he

25   was part of the investigative team, he was part of the effort

TOP SECRET

1    to identify and produce material for discovery.  So insofar as

2    the defendant has averred that Mr. Leedom had access to

3    everything the government did, that is by and large true.

4    That's separate and apart from the question of what did he have

5    access to that was relevant and has formed any part of his

6    conclusions that was produced to the defendant.  All of that

7    has been produced -- and then some -- in responses to requests

8    from the defendant, Mr. Leedom's own understanding of what

9    might be relevant, a meeting with the defense expert to discuss

10   what material was available and the defendant's expert would

11   like.

12        So, again, I think the question of what Mr. Leedom had

13   access to versus what is the corpus of relevant information are

14   two different questions and we are confident that the entire

15   corpus of relevant information has been produced.

16        THE COURT:  Mr. Schulte, let me turn to you and kind

17   of in particular I have two concerns.  One is the way that it

18   was left with Judge Crotty was denial of your request for

19   access to the full forensic crime scene but without prejudice

20   to a more tailored request, quote unquote.  I am not sure that

21   you have satisfied that condition and certainly don't think

22   that Dr. Bellovin's affidavit comes anywhere near it because

23   his affidavit is basically I need all where I have nothing so

24   it is not tailored at all.

25        Number two, and slightly relatedly, it seems to me

XM535schC                    TOP SECRET

1    that there are many steps that you and/or your expert could

2    have taken to do more of what has been available and that you

3    haven't availed yourself of to the full extent of what's been

4    provided, to wit, number one, Mr. Leedom states in his

5    affidavit that he made himself available to your expert to

6    discuss what he did, what he reviewed, and what would be

7    available and made clear that he would be available thereafter

8    but was never requested to speak with him again; and number

9    two, there doesn't seem to be any dispute that a substantial

10   amount of information was made available to Dr. Bellovin onsite

11   at the CIA and the stand-alone laptop and that he basically

12   went there on one day and spent very little time reviewing it.

13           Now, I understand that he would like to review it, for

14   instance, with access to the Internet and what have you, but

15   the fact that it is not under ideal circumstances or conditions

16   what he would want doesn't necessarily mean that you have been

17   deprived of a meaningful opportunity to review it.

18           So, I guess I have two questions or concerns.  One is

19   that you are not making any more of a tailored request before

20   the first trial; and number two, that there is plenty more that

21   could be done with what has been made available and you and

22   your expert haven't availed yourself of it, why should I give

23   you everything when you haven't even availed yourself of what

24   has been made available?

25           MR. SCHULTE:  Yes.

1    So, the first thing that the government said about the

2    timing analysis I think is incorrect and this comes into play

3    about the more tailored request. So, as the government says,

4    they conducted a timing analysis on Confluence and Stash. They

5    now say that they're going to give us the Confluence backup but

6    not the Stash backup. So, the Stash backup is the more

7    important data. This information is the more sensitive data,

8    this is the data that the more serious charges stem from. So

9    as with regard to more tailored requests, this is specifically

10   the more tailored request, the access to Confluence and Stash

11   backups that were used in the timing analysis that Mr.Berger

12   referenced had to use for his timing analysis. So the fact

13   that they're now agreeing to provide the Confluence we will

14   wait and see what is actually provided but that's, like I said,

15   is a step in the right direction. The other thing is why is

16   there no Stash? Why can we not conduct a timely analysis on

17   Stash? So that's the first thing. The second thing regarding

18   the forensic crime scene, as the Court recalls the, motion made

19   was --

20        THE COURT: Can I stop you with the first thing

21   because my understanding, this is from paragraph 8 of the

22   Leedom declaration, is that the stand-alone laptop contains

23   unredacted copies of the Stash repositories, unredacted copies

24   of all Stash documents, all Stash commit logs for all projects

25   redacting only the user names of who committed or saved

1    particular versions and so forth.

2           So, am I missing something?  It seems like that was

3    disclosed.

4           MR. SCHULTE:  So, I mean, it hasn't been produced to

5    us in discovery so I can access it as well.  And as far as the

6    redactions to the Stash backup, we don't really know --

7    Dr. Bellovin, all he knows is that information has been

8    redacted from it because he didn't have a bit for bit copy of

9    it so he can't testify as to the integrity of the data, what

10   has or has not been redacted.  So, the government's expert says

11   only certain things have been redacted, but the biggest point

12   is I have a right to review this material.  There is nothing in

13   Rule 16 that says the government can only produce it to my

14   expert in some location way far out of the jurisdiction.  I

15   have a right to review this material, this is material the

16   government is saying that I stole.  I am representing myself

17   and even as a defendant I have a right to review this

18   information.  So, the biggest thing is it is not appropriate,

19   there is no case law that the government cites that says this

20   is not appropriate, and there is no reason that the government

21   can't produce this in the SCIF which the whole point of the

22   SCIF is for classified discovery production.

23           THE COURT:  Well, that's a different argument than you

24   haven't been provided this.  I think you, by meaning the

25   defense team, you have been provided it, it is just a question

XM535schC                    TOP SECRET

1    of whether it has been provided to you in the SCIF here as

2    opposed to made available to you which is I think all that

3    Rule 16 actually requires.

4           But Mr. Denton, now that we have zeroed in on that

5    issue, do you wish to address that?  I think the gravamen of

6    the claim is that it doesn't suffice to make it available to

7    Dr. Bellovin in Langley, it has to be provided in the SCIF here

8    so that Mr. Schulte, who is representing himself, can review it

9    himself.

10          MR. DENTON:  So your Honor, think it is helpful to

11   talk about what Stash is.  Stash involves the actual

12   repositories of source code for CIA cyber tools, and so that is

13   not something that can be handled just anywhere.  It is not

14   something that can be handled on regular SCIF network

15   computers.  It is put on an air gap stand-alone laptop because

16   of the sensitivity of how this has to be handled.  I think in

17   many cases where defendant's expert is reviewing sensitive

18   material that is not classified, access for the expert and not

19   the defendant himself is the rule, not the exception.  The

20   defendant doesn't typically get the sample of cocaine or the

21   gun that an expert needs to sign out to go run his tests on.

22          I think this is a standard course.  I think the

23   government has made it available to the defense and to the

24   defendant's expert.  Where we have been able to we made as much

25   as we can available in the SCIF.  So, again, the April 25th

XM535schC                    TOP SECRET

1    Confluence backup the defendant has had the copy of that that

2    was redacted consistent with the Court's Section 4 rulings.  We

3    are just now going a step further and also making an unredacted

4    complete copy available to Dr. Bellovin.

5         Stash we can't really do that for because the Court's

6    Section 4 ruling specifically approved the deletion of source

7    code from the discovery that was produced to the defendant.  We

8    are making as much available as we can and making fulsome an

9    opportunity for testing as best we can.  We will let

10   Dr. Bellovin come and take a look at it again but it has to be

11   in circumstances that are suitable for control of the

12   sensitivity of the information.

13        THE COURT:  Mr. Schulte?

14        MR. SCHULTE:  So that's not -- the legal standard is

15   not whatever the CIA determines that's the way it's supposed to

16   be provided.  I mean, this is a clear case that the defendant

17   has to show certain relevance, materiality, and this

18   information, pursuant to CIPA, the whole point of CIPA is it is

19   supposed to be produced for use by the defendant so this is --

20   so the government says --

21        THE COURT:  Mr. Schulte, again, the gravamen of your

22   argument is that it has to be produced for you to use in the

23   SCIF here.  It is being made available to the defense, which is

24   I think in compliance with Rule 16 by virtue of the fact that

25   your expert has it available to him, albeit not in the SCIF

XM535schC                     TOP SECRET

1   here.  I mean, child pornography can't be just disclosed to

2   defense counsel but if it is made available for inspection in

3   the FBI, you know, then that suffices.  Are you aware of any

4   authority that stands for the proposition that a defendant who

5   represents himself, that he has to be taken out of jail and

6   taken to the cocaine to see that it's cocaine when it is made

7   available to his expert?  I would think not.

8          MR. SCHULTE:  I think one of the biggest differences

9   here, it is not just that I am representing myself but as a

10  defendant with expertise in this matter, I want to be able to

11  assist.  I have --

12         THE COURT:  I understand, but when you went pro se you

13  were explicitly advised by Judge Crotty that by going pro se

14  you were not going to be relieved of the restrictions that were

15  imposed upon you by virtue of being incarcerated and being

16  under SAMs.  It wasn't a backdoor way of basically loosening

17  the restrictions imposed on you and you said I understand and I

18  want to proceed pro se anyway.

19         MR. SCHULTE:  This has nothing to do with that.

20         THE COURT:  Well, it does, because you are suggesting

21  that by virtue of having gone pro se you are entitled to be

22  taken to Langley to engage in this review yourself or if that's

23  not an option, that it has to be brought to you and the point

24  is, like, there are legitimate concerns that the CIA has about

25  bringing it here.  If those are legitimate but it is being made

XM535schC                    TOP SECRET

1    available to the defense through your expert in a different

2    location, the fact that you were incarcerated and under SAMs

3    and aren't going to the CIA to review it doesn't strike me as

4    raising a problem if it is available to your expert.

5              MR. SCHULTE:  No, I'm not saying the reason should be

6    that I am representing myself.  I said regardless of the fact I

7    am representing myself, I am a defendant with expertise --

8    technical expertise in this matter.  I mean, if a defendant is

9    a forensic science expert and he wants to be able to conduct

10   his own tests, I think he has a right to do that.  As someone

11   with the expertise that I have, I am not -- I don't have to

12   just say, OK, let me have my -- hire an expert and let him do

13   it.  I want to be able to check the material myself, I want to

14   be able to conduct the test myself.  I think I have a right to

15   do that.

16             THE COURT:  Do you have any cases that support that

17   proposition?

18             MR. SCHULTE:  I think it should be the opposite, the

19   government needs to provide cases to suggest that this material

20   can be produced in this manner, that it doesn't have to be

21   provided to the District Court where the criminal proceedings

22   are and it doesn't have to provide materials to the defendant

23   and it can restrict the environment and provide whatever other

24   restrictions it has.

25             I think the government needs to provide precedent that

XM535schC                    TOP SECRET

```
 1    shows any of this is lawful.  I don't think any other case has
 2    been like this where the discovery has been refused to be
 3    provided to the defendant or even in the jurisdiction of the
 4    district court where the criminal proceedings are ongoing.
 5              THE COURT:  Earlier you said that was point number
 6    one.  What was point number two you wanted to make?
 7              MR. SCHULTE:  Regarding -- so there is the Stash and
 8    Confluence backups and then there is the other server.  So are
 9    we proceeding on to those servers or still talking about the
10    backups here?
11              THE COURT:  You said I have two points, one is that
12    they're talking about Confluence but Stash is more important;
13    we have addressed that.  I am asking what your second point was
14    that you wanted to make.
15              MR. SCHULTE:  So regarding the Confluence and Stash
16    issue, I think the other unfortunate thing is to note that the
17    redactions -- if the government is removing source code or
18    providing other redactions to the Stash itself, the experts
19    can't really conduct a timing analysis and can't even confirm
20    whether the materials released by Wikileaks are in fact derived
21    from this backup or from this certain date.  So, I think the
22    other major issue is that the document, the Stash backup must
23    be provided without redactions so that -- a bit for bit copy so
24    that the witness can confirm that this is the actual data that
25    the government alleges was stolen from the CIA.  If whatever
```

XM535schC                    ~~TOP SECRET~~

1    redactions that they propose to do really affect the integrity

2    of the data so that the expert can't really confidently come up

3    and testify about it because he doesn't have a full copy of the

4    actual forensic data to be able to testify.  So, that was the

5    other issue, is that if they provide the Stash backup they

6    should provide it completely unredacted so that the expert can

7    actually testify that this is the data that the government

8    alleges was stolen and he conducts his analysis.

9            THE COURT:  Thank you.  I will reserve judgment on

10   that issue, too, for the moment.

11           That exhausts the issues I needed to raise.  Anything

12   else from the government, Mr. Denton?

13           MR. DENTON:  Yes, your Honor; one thing.

14           With regard to the witness protections and witness

15   issues more generally, we will obviously put in the letter --

16   we will not keep everybody in suspense -- the government

17   intends to call three CIA witnesses at the next trial.  They

18   were all people who testified at the previous one.  █████████

19   ████████████████████████████████████████████████████████

20   ██████████████████████████████████         We will lay all of that

21   out.

22           The point that we wanted to flag for the Court is that

23   we understand that the defendant has subpoenaed at least 40 CIA

24   officers who have reported receiving subpoenas.  We would

25   expect that witness protections would implicate quite a lot of

XM535schC                        ~~TOP SECRET~~

 1  them.  We also noted this in our motions *in limine* because this

 2  happened the last time before the last trial:  The defendant

 3  subpoenaed, I think, close to 70 witnesses.  We would expect --

 4  again, we are still figuring out what the universe is that

 5  there would be serious questions about the presentation of

 6  cumulative evidence, and we just wanted to flag it for Court

 7  because included among defendant's subpoenaed witnesses are a

 8  significant number of ███████████ covert officers and within

 9  that subset a number of ████████████████████, and

10  so making arrangements ██████████████████████

11  ██████ doing that in a way that is sufficiently secure as to

12  protect their cover and their ongoing work, is a little bit of

13  something that takes some doing.  And so, it's an issue that I

14  think we are trying to figure out the best way to raise with

15  the Court, in advance of the trial, so that we have enough

16  notice on how this is all going to be handled to make those

17  decisions.

18          I will note that there is at least one witness that

19  the defendant moved to quash the subpoena as to the last time

20  and preclude her testimony. ██████████████████

21  ██████████████████████

22          THE COURT:  You said the defendant moved to quash.

23          MR. DENTON:  No, the government moved to quash or to

24  preclude her testimony.  Judge Crotty did not rule on that

25  because the defense withdrew the subpoena.  He did rule on the

XM535schC                        ~~TOP SECRET~~

1   motion to quash a subpoena to Secretary Pompeo.  But, we expect

2   that we will certainly move to quash the subpoena as to that

3   one woman and may, as to others, but like I said, we are

4   talking about more than 40 people here so figuring out how we

5   are going to resolve this, again, is something I think we need

6   to think about in advance.

7            MR. SCHULTE:  Judge, just one thing, is that when we

8   finish talking about the backups, like I said, I still had

9   another discussion about the remaining server and the motion

10  for preclusion so that was still another issue that we didn't

11  get an opportunity to address the Court on, so I was hoping to

12  be able to address that issue.

13           THE COURT:  OK.  Well, I said is there anything else,

14  I was going ask you the same, so you can now address that in a

15  moment but before we get there, I guess Mr. Denton, what are

16  you asking me to do with respect to the defense witnesses?  It

17  doesn't seem like it is ripe for me to involve myself in.  I

18  confess I haven't bothered to look at the motions *in limine*

19  yet, number one, because I have enough on my plate; number two,

20  the responses aren't in so I don't know whether and to what

21  extent you have addressed it in there but it seems like there

22  has to be an application and I'm not sure there is one at the

23  moment.

24           MR. DENTON:  Your Honor, I think it is a little bit of

25  a challenging circumstance.

XM535schC                     <del>TOP SECRET</del>

1          We noted in the motion *in limine* that this was an

2    issue that came up before the last trial.  We provided a sort

3    of precis of the relevant law and the defendant's obligation to

4    make the necessary showing and the Court's powers with respect

5    to cumulative evidence.  I think, again, with respect to the

6    one witness we can certainly say we will file a separate

7    application to preclude her testimony yet again.  With respect

8    to the others, I think again, it is a challenging situation

9    because I don't think the government is saying that all of

10   these witnesses should be precluded in toto.  I think that 40

11   is overkill and it is hard to imagine 40 witnesses each with

12   relevant non-cumulative testimony.

13         So, on the one hand I understand it is the

14   government's burden to move to preclude them.  On the other

15   hand, I think our application is basically let's come to a

16   reasonable ground on how many people the defendant should call

17   here and do so in enough time in advance of trial that we can

18   work with the FBI and the CIA to make arrangements for people's

19   safe arrival in New York.

20         THE COURT:  So maybe it makes sense to impose a

21   deadline by which the defendant needs to identify which of

22   those 40 witnesses he actually intends to call so that we can

23   know what, if anything, needs to be litigated.

24         MR. DENTON:  That makes sense, your Honor, to us.

25         THE COURT:  Mr. Schulte?

XM535schC                          ~~TOP SECRET~~

1          MS. SHROFF:  Your Honor, may I have a second with him?

2          THE COURT:  You may.

3          MS. SHROFF:  Thank you.

4          MR. SCHULTE:  So I think the issue here is the same

5     issue that we had at the first trial where due to the

6     government's restrictions on contacting the witnesses, this is

7     not a typical case where the attorneys can reach out, contact

8     the witnesses, determine specifically what is or what the

9     witnesses would testify, confirm, based on FBI 302s and other

10    information.  So because the restrictions imposed by the

11    government, we are not really able to begin this process of

12    whittling down or talking to the witnesses to determine who is

13    going to testify specifically to what or if the testimony is

14    helpful.  So due to these restrictions we are not really able

15    to do that.

16         THE COURT:  I think the only restriction is that you

17    need to go through the CISO to contact any of the CIA witnesses

18    and request that they be willing to speak to you.  They're not

19    obligated to speak to you.  A subpoena doesn't obligate them to

20    speak to you, a subpoena requires them to show up in court.

21    But, you know, at some point you are going to have to decide

22    whether you intend to enforce the subpoena without regard to

23    what the witness would say or not.

24         MR. SCHULTE:  Right.  For the first trial, that's

25    where my attorneys were -- when the witnesses came in that were

XM535schC                    ~~TOP SECRET~~

1    subpoenaed, they would sit down and speak with them then, right

2    before we were going to begin calling our case and calling the

3    witnesses to testify.  So that was the strategy for the first

4    trial that was restricted because of the communication of the

5    CIA.

6         The CIA, basically, is not allowing the witnesses to

7    communicate with us.  As we have said on the record before and

8    Ms. Shroff has said -- she can talk about it again -- but the

9    CIA discovered that certain witnesses were talking with

10   Ms. Shroff, they were removed so she could not speak with them

11   even though they agreed to speak with her.  So, the witnesses

12   are not, due to the CIA's issues, are not able to really speak

13   with us and so we will have to do what we did at the first

14   trial which is have counsel speak with them when they come in

15   for testimony at trial.

16        We do have -- the basis for calling these witnesses is

17   based off 302s where they have made the statements that they've

18   made from 302s and other documents, so the defense spent a long

19   time going through the witnesses to come up with the set that

20   we think that provide substantive, relevant testimony, but then

21   from there we weren't really able to pick out the best ones for

22   use at trial so that was why we relied on that strategy for the

23   first trial.

24        THE COURT:  Mr. Denton?

25        MR. DENTON:  So again, your Honor, what happened the

XM535schC                          ~~TOP SECRET~~

1    last time, the defendant shotgunned out 70 subpoenas, we

2    objected to them.  The defense ultimately, in order to moot our

3    objection, agreed to narrow the list down to I think it was 12

4    people that we brought to New York.  We, again, agreed to

5    convey the defense's request to speak with those witnesses.

6    The defense spoke with I don't think all of them but a

7    significant number of them and elected to call none of them.  I

8    think what we are looking to do is avoid a situation in which

9    we have to bring 40 people-plus, including any number of people

10   that have to be █████████████████████████████████████████

11   ███████████████████████████████████ just for the defendant to see.

12           I think it is entirely reasonable to set some date to

13   narrow the list down.  We are not saying it has to be a final

14   list, I think we can work with a reasonable number and let the

15   defendant make his decisions at game time about who among that

16   he wants to call but, again, I struggle to see how there would

17   be 40 witnesses in almost any trial that would not have some

18   cumulative effect.  So, doing a little bit of that work in

19   advance, makes sense to us.

20           THE COURT:  Yes, Ms. Shroff?

21           MS. SHROFF:  Your Honor, in an average case if there

22   was a witness and there were 40 of them, Mr. Schulte's

23   investigator would go talk to the 40.  The lawyer might go to

24   the 40, some other lawyers might go to the other 40.  We would

25   whittle down the toilet number from 40 to 4.  The problem here

XM535schC                    T̶O̶P̶ ̶S̶E̶C̶R̶E̶T̶

1    is our investigator can't go to the 40 so the investigator

2    can't come back to Mr. Schulte and say out of the 40, only

3    three are worthwhile but these three are the ones that are

4    worthwhile.  So the reason he has to -- and I don't think

5    shotgun is the correct word to use -- but the reason that he

6    asked to speak to all 40 is because that is the only way he can

7    decide which of the 40 are the best witnesses for him which is

8    what happened at the last trial.  We didn't subpoena them

9    because we wanted to.  We offered to sit down and talk to them.

10   We offered to go to the CIA; Mr. Zass, myself, the

11   investigators.  We offered.  We don't want to inconvenience

12   anybody.  And if they want us to do that again, they can make

13   the 40 available in D.C. if he wasn't going pro se.

14          So the reason this approach is awkward has nothing to

15   do with the defense being unaccommodating.  If they want to

16   make us go to them we are happy to go to them but there is no

17   other way to whittle down the number because we don't know what

18   they would say because we are not able to communicate with them

19   and that is why we asked to do the outreach, so that in the

20   outreach we would have whittled down the number.  But, we were

21   not able to.

22          So I just wanted to make sure and that's -- that what

23   happened at the last trial.

24          THE COURT:  Can we just clarify?  Unless I am

25   misremembering, the provisions in the protective order don't

XM535schC                    ~~TOP SECRET~~

1    prevent from you conducting outreach, they just require that

2    you go through the CISO to make the request.  So, if the

3    witness says I don't want to talk to them, then you are stuck

4    with that and you don't get to make a personal appeal but you

5    weren't prevented from making outreach.  Am I wrong?

6           MS. SHROFF:  We were prevented from making outreach

7    because the protective order said that we can't reach out to

8    them directly.

9           THE COURT:  Directly.

10           MR. SCHULTE:  Right.

11           THE COURT:  But you can out reach to them through the

12    CISO.  In other words, is there any witness you have not been

13    able to contact and say we are interested in speaking to you,

14    are you willing to conduct an interview with us?

15           MS. SHROFF:  I have, but that is my point -- that a

16    CISO seeking for Mr. Schulte is very different than his

17    advocate speaking for Mr. Schulte.  And, the outreach is the

18    most important part.  The first time you knock on a witness'

19    door it is important how you convey your need to have that

20    person testify for your client.  That is an important aspect.

21    I understand that it superseded in this case because of CIPA

22    and whatever other issues but that was my point, is that the

23    outreach itself sort of ties his hands and I don't even know,

24    because I haven't fully finished the responses, I don't think

25    we have 40 yeses.  So I am not really sure we are even at the

XM535schC                    ~~TOP SECRET~~

1    stage where Mr. Denton is saying we are at 40 and we are going

2    to waste the time of 40 people.  But he has no other way to

3    decide which one of the 40 to call because he simply can't.

4    What is he supposed to do?

5              THE COURT:  Well, for starters, he is supposed to

6    proffer what the witnesses could testify to as a way of

7    whittling down to some non-cumulative number of witnesses.  He

8    is not going to call 40 witnesses -- or I think it is very

9    unlikely that he will be permitted to call 40 witnesses so in

10   that regard, whittling it down to some subset of 40 which would

11   not be cumulative as to which he might be entitled to enforce a

12   subpoena does seem like an appropriate course but that does

13   seem to me to warrant setting a deadline to identify which of

14   the 40 he really genuinely wants.

15             MS. SHROFF:  But he has to talk to the 40 to figure

16   out which of the 40 he wants because no. 39 may be a better

17   witness than no. 24.  The only way he can figure that out is to

18   talk to 24 and 39.  Who is a better witness for you, the only

19   way to know is to talk to the witness.

20             THE COURT:  But, Ms. Shroff, he can't say I'm serving

21   a subpoena on every employee from the CIA and I expect the

22   government to arrange for them -- every single one of them --

23   ████████  ████████  ████████  ████████████, to be brought to the

24   court house on the first day of trial so I can go through and

25   talk to every employee of the CIA to determine who would be my

XM535schC                    TOP SECRET

1    best witnesses.  That's not the way the system works.

2         MS. SHROFF:  But in this particular case he has no

3    other option.  What is the option?

4         THE COURT:  The option is to identify a reasonable

5    number of witnesses who are likely to be called.

6         MS. SHROFF:  Right, but based on what, other than a

7    paper name.

8         THE COURT:  All right.

9         Well, Mr. Denton, I am not sure how to proceed here

10   except to say maybe you should go ahead and make a motion and

11   if you want to argue that the 40 are cumulative and then he can

12   respond why they're not cumulative and/or have to identify

13   which of them he really wants now then I will adjudicate that

14   but I'm not sure how else to proceed.

15        MR. DENTON:  That's fine, your Honor; we can make an

16   application.

17        Like I said, our application is not that he doesn't

18   get to call any witnesses, I think it is more an application to

19   reach a reasonable scope so we will figure out the best way to

20   do that and file something.

21        THE COURT:  And I would encourage you, to the extent

22   that there are communications between the two sides these days

23   to talk to one another about it and try to reach an

24   accommodation.  I agree Mr. Schulte should be entitled to call

25   subpoenaed witness as any criminal defendant is, but it doesn't

XM535schC                    T̶O̶P̶ ̶S̶E̶C̶R̶E̶T̶

1    allow him, for instance, to serve a subpoena on every employee

2    of the CIA.   Something between and that and zero seems

3    appropriate because this is really a process question and when

4    he needs to identify which witnesses he wants to call and to

5    allow the government a reasonable amount of time to make the

6    necessary arrangements.   I would add, just not ███████████

7    ███████████, but I don't know what the COVID restrictions are

8    with respect to ████████████ these days and coming into

9    the court house but that is something you will also need to

10   keep in mind, that somebody who is subpoenaed ███████████

11   cannot come into the court house and testify when they are

12   brought ████████████

13            Ms. Shroff?

14            MS. SHROFF:  Your Honor, we would ask the CIA to

15   provide to Mr. Schulte the exact language they used to e-mail

16   each of the people subpoenaed.   They declined so we asked,

17   through the CISO, that the material be preserved in case

18   Mr. Schulte wants to pursue an appeal based on that.   And we

19   just ask the Court to receive that information *in camera*

20   because it won't be shared with us.

21            THE COURT:   All right.

22            Mr. Denton, why shouldn't it be shared with them?

23            MR. DENTON:  I honestly don't know, your Honor.   This

24   is all happening with the wall folks, this is not something

25   that we have been involved in so I'm really not sure what is

XM535schC                    TOP SECRET

1      going on with that.  So, I can ask and try find out what is

2      going on.

3              THE COURT:  Why don't you ask and try to find out

4      what's going on.  Maybe everybody should be able to see it.

5      And to the extent Mr. Schulte takes issue with it, he can raise

6      it and regardless, I would think it should be made part of the

7      record in some fashion or form.  So, see if you can sort that

8      out.

9              MR. DENTON:  I do want to say, your Honor, we have

10     been very careful to observe the wall limitations here.  When I

11     say the number 40, that is the number of people who were

12     provided with the subpoena and then, in turn, reported having

13     received it pursuant to the regulations.  That's the only way

14     we are getting this.  We have been very careful about the wall

15     procedures.

16             THE COURT:  Understood.

17             All right, Mr. Schulte.  You had one other issue you

18     wanted to raise before we conclude?

19             MR. SCHULTE:  Yes.  Well, just a continuation of the

20     expert affidavits and the servers.

21             So we discussed the Stash and Confluence backups

22     already, we have already addressed that issue, but the other

23     big issue was the servers, the ESXi server, the Episode 1

24     server, and the CIA work station.

25             So, the big issue here is that it is not only -- the

XM535schC                         TOP SECRET

1    original motion was not only to produce certain servers but it
2    was also to preclude the government, in the case that we are
3    not able to review them.  So the biggest issue here is
4    Mr. Leedom's testimony.  I know the government said of course
5    he had access to everything because he was part of the
6    investigation team.  So the issue here is Mr. Leedom picked
7    out -- he went through, conducted forensic examinations of the
8    servers, and based on those examinations he picked out the
9    files that he said were relevant or he picked out the data that
10   he thinks was relevant and he picked out -- he came up with
11   this timeline of events and had a huge PowerPoint presentation
12   about this.

13         The biggest issue here is the defendant is,
14   essentially, not able to call any expert because the
15   information that he picks out as relevant, just like when it
16   comes to forensic science, the expert can be mistaken or as I
17   have stated in here either -- could even deliberately exclude
18   information or kick out information or we have no idea how he
19   is conducting it which is why, when it comes to forensic
20   science, the defense is allowed to conduct his own analysis on
21   the fingerprints, the DNA, or whatever.

22         So, digital forensics is the same when it comes to
23   forensic science.  We don't know what Mr. Leedom missed.  He
24   doesn't have a Ph.D, he doesn't have the credentials that
25   Dr. Bellovin has, so Dr. Bellovin should be allowed to review

XM535schC                    TOP SECRET

1  the servers at the crux of this issue here that the government
2  says this is their case-in-chief, they are saying I have these
3  servers, it is the main server with the Computer Fraud and Use
4  Act charges, the main servers with the Espionage Act.  And so,
5  our expert wants the ability to conduct the same tests that
6  Mr. Leedom did and to rely upon his same expertise and to rely
7  upon his knowledge from his extensive years of experience in
8  this field to see -- to be able to conduct a similar
9  examination and I think the law is clear when it comes to
10  forensic science that this is how it should be conducted and I
11  think digital forensic is not any different at all than the
12  forensic science.

13           THE COURT:  Mr. Schulte, you are sort of repeating
14  yourself and repeating arguments that you have already made,
15  either both in writing or orally.  I understood you to be
16  trying to raise or discuss a narrower point which is the point
17  you make on page 5 of your reply, that my CIA work station, the
18  ESXi server and the FS-01 server, that the government's
19  response didn't address those.

20           Is that the argument that you were trying to make?
21           MR. SCHULTE:  You are talking about in the reply that
22  I -- regarding the affidavits?
23           THE COURT:  Yes; that you filed yesterday.
24           In other words, I get your argument.  I understand in
25  your expert's affidavit makes the case for why complete access

XM535schC                    ~~TOP SECRET~~

```
 1    to the full mirror image or forensic image or whatever terms
 2    should be used is necessary.  I get it.  Maybe I will agree
 3    with you, maybe I won't agree with you.  I get that.  But you
 4    don't need to repeat the argument.  I understood you to be
 5    making narrower point that hadn't been made.
 6              MR. SCHULTE:  We never discussed the server, we only
 7    discussed the two backups so I basically wanted to touch base
 8    on this orally and to say that, essentially, without this, I
 9    don't know how the Court will rule one way or the other but my
10    expert is either, without access to this can either only not
11    testify at all or he can only testify that he wasn't provided
12    the material so he was not able to conduct any test.  So I
13    don't know how the jury is going to perceive that but I just
14    wanted to be clear that I am basically forced that I can't
15    really have an expert testify at all if that is the case.
16              THE COURT:  What is the "this" is the point.  We have
17    discussed Stash and Confluence.  I get that.  The "this" is?
18              MR. SCHULTE:  The three servers.
19              THE COURT:  CIA work station, FS-01, and ESXi?
20              MR. SCHULTE:  Correct.
21              THE COURT:  Mr. Denton?
22              MR. DENTON:  Your Honor, that's the precise request
23    that Judge Crotty denied, in fact it is broader than the
24    request that Judge Crotty denied.  Judge Crotty denied the
25    request for the entirety of his CIA work station and the ESXi
```

XM535schC                    ~~TOP SECRET~~

1   server.  The government's affidavits and letter do address

2   these, this is the bulk of Mr. Leedom's affidavit about log

3   files and identifying various parts of these servers.  There is

4   a little terminological inexactitude, the FS-01 is also called

5   the NetApp, things like that.  But I think at the end of the

6   day, like I said, this is just the request that Judge Crotty

7   denied already.

8             THE COURT:  And denied at?

9             MR. SCHULTE:  I think --

10            THE COURT:  Docket entry 124 and 514?

11            MR. DENTON:  Yes, your Honor.

12            MR. SCHULTE:  The issue, I think originally it was a

13  request for DevLAN was the request.  So this is not a request

14  for DevLAN, this is a request for three specific servers.  In

15  addition, the point is that there was an additional argument

16  made that the government should then be precluded if the Court

17  is going to agree that the material is too classified to

18  present to the defense that the argument is, well, the

19  government should be precluded from relying on that same

20  testimony or evidence that was not provided to the defense.

21            THE COURT:  OK.  I get that and that's the motion that

22  you made and it is under advisement.

23            Mr. Denton, is there anything else you want to say on

24  that score?

25            MR. DENTON:  No, your Honor.  I think Docket entry 514

XM535schC                         TOP SECRET

1   has some discussion about the relationship between the earlier

2   request for all of DevLAN and requests for these three servers

3   in particular.

4           THE COURT:  All right.  I will take a look at that.

5           Anything else, Mr. Schulte?

6           MR. SCHULTE:  I don't think so, no.

7           THE COURT:  So, I have made a couple rulings,

8   otherwise I will take the other items under advisement and tell

9   you how I am proceeding, whether that is a definitive decision,

10  whether we need to have further hearings under 6(c) or

11  otherwise.  I just need to figure out where I stand on these

12  things and we will go from there.  I have plenty of work to do,

13  you have plenty of work to do, and we will go from there.

14          Thank you very much.  Thank you for your patience.

15  Have a good day.

16                              o0o

17

18

19

20

21

22

23

24

25