M68Wsch1 ~~TOP SECRET/~~ █ ~~NOFORN~~

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           17 Cr. 548 (JMF)

5    JOSHUA ADAM SCHULTE,

6              Defendant.

7                                           Conference
     ------------------------------x
8
                                            New York, N.Y.
9                                           June 8, 2022
                                            12:30 p.m.
10
11   Before:
12
                     HON. JESSE M. FURMAN,
13
                                            District Judge
14
                         APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  DAVID W. DENTON JR.
          MICHAEL D. LOCKARD
18        Assistant United States Attorneys

19   JOSHUA ADAM SCHULTE, Defendant Pro Se

20   SABRINA P. SHROFF
     DEBORAH COLSON
21        Standby Counsel for Defendant

22
     Also Present:  Harry Rucker, CISO, Department of Justice
23
24
25
```

M68Wsch1                      ~~TOP SECRET/~~ █████ ~~NOFORN~~

1           THE COURT:  Let's confirm with the CISO that everyone

2      present is authorized to be here.

3           MR. RUCKER:  Your Honor, everyone present is

4      authorized to be here, and the court is closed for classified

5      proceedings.

6           THE COURT:  That means that nobody here should have

7      any electronic devices other than what the CISO says is

8      permissible.  And with that, we'll proceed.

9           I'm just giving you fair warning I have a hard stop

10     and time of about 2:20 or so today, 2:30 the latest.  So in

11     that regard, we're going to need to potentially triage and deal

12     with what needs to be dealt with today.

13           I guess actually apropos of that, let me ask you,

14     Mr. Denton, what are the issues of most timely concern on your

15     end so that we can prioritize those and take it as it comes.

16     If we can get through everything, great, but I think we need to

17     prioritize what needs to be resolved today.

18           MR. DENTON:  I think the most significant are the 6(c)

19     rulings with respect to the issues there that are pending and

20     then the 6(a) rulings on the defendant's new Section 5 notice,

21     and CIPA requires those to be made before the proceeding --

22     i.e., trial -- so I would say those should get priority.  And

23     then witnesses would be the next thing after that.

24           THE COURT:  Mr. Schulte, from your standpoint, does

25     that sound right?

M68Wsch1                    TOP SECRET/███████/NOFORN

1              MR. SCHULTE:  I think we should start with the

2     supplemental 10 and work from 10, starting there.

3              THE COURT:  All right.  That is one of the issues that

4     I think Mr. Denton was alluding to.  I think we'll have plenty

5     of time to get through that stuff.  I'm going to take it in a

6     slightly different order.  Let me start with the 6(c) issue or

7     motion with respect to --

8              Just a reminder.  First of all, is the courtroom

9     locked, or do we need to lock it?

10             MR. RUCKER:  I'm going to make sure of that right now,

11    your Honor.

12             THE COURT:  All right.

13             Since we don't have any microphone, if everybody could

14    make sure to keep your voices up for the benefit of me and the

15    court reporter and everyone else, that would be great.

16             I'm going to start with the 6(c) motion with respect

17    to, for lack of a better way to describe it, other classified

18    information that the defendant knows.  In my Section 6(a)

19    opinion, I had held that the fact that Mr. Schulte knows other

20    highly sensitive classified information may be relevant and

21    admissible to rebut the government's argument or suggestion

22    that his conduct in the MCC counts was motivated by a desire to

23    start a quote/unquote information war.  See ECF No. 825, at

24    20-21.

25             In response, the government moved pursuant to Section

M68Wsch1 ~~TOP SECRET/~~ █████ ~~/NOFORN~~

1   6(c) to substitute a stipulation to that effect in lieu of the

2   specific classified information referenced in the CIPA Section

3   5 notice dated January 28, 2022.  The government proposed a

4   stipulation in its May 31, 2022, submission.  I'm inclined to

5   think a stipulation is appropriate but would propose a slight

6   variation on it.

7           Mr. Schulte, do you wish to be heard, since I don't

8   think I got a response from you on this issue?

9           MR. SCHULTE:  I don't think I've ever received this

10  letter, proposed stipulation.  It was from what date?

11          THE COURT:  May 31.

12          Mr. Denton.

13          MR. DENTON:  I think we delivered this through the

14  CISO, your Honor, to the courthouse SCIF.  We certainly did not

15  file it *ex parte*.

16          MR. SCHULTE:  We don't -- we don't have -- there was

17  never a copy sent to the SCIF.

18          THE COURT:  All right.

19          Mr. Denton, do you have a copy there; could you maybe

20  show Mr. Schulte?

21          MR. SCHULTE:  Judge, this is a very substantial

22  filing.  I think I'm going to need more time to be able to read

23  through it.

24          THE COURT:  OK.  I have to say I'm a little frustrated

25  in the sense that I believe the government's deadline on this

5

TOP SECRET/███/NOFORN

1   was May 31, and to the extent that you hadn't gotten it, one

2   would have thought that you would make that known to me no

3   later than last Friday, when we were together.  Be that as it

4   may, I guess we'll address what we can.  If you can focus for

5   the moment on page 2 to the top of page 6, which is the issue

6   I'm raising now -- knowledge of other classified information.

7   If you want to quickly review that, then we can discuss it.

8           MR. SCHULTE:  Does the Court want me to read this now?

9           THE COURT:  Yes.  Yes.  Bottom line is we're three

10  days before trial.  We don't have the luxury of a day here, a

11  day there.  If you hadn't received this on May 31, when the

12  government filed it, you had to tell me, and you had to tell me

13  certainly on Friday that you never received the government

14  filing, since you had every reason to expect that the

15  government would make that filing.  So I suspect that it's

16  sitting in the SCIF, and to the extent you hadn't seen it, you

17  needed to tell me.  It's June 8.  We're starting trial on June

18  13.  I need to resolve these things, and I need to resolve them

19  before trial.  So read pages 2 to the bottom of 5.  It's not

20  that much material.  I don't think this is a particularly

21  complicated issue.  I'll just tell you how I propose to resolve

22  it, and then hopefully we can work our way through this.

23          MR. SCHULTE:  So, I don't believe the stipulation is

24  appropriate here.  The language is not, including -- you know,

25  this includes additional information that's not been written

M68Wsch1                          ~~TOP SECRET/~~ ███ ~~/NOFORN~~

1    down in the defendant's notebook.  It doesn't really discuss

2    the specifics, specific categories that I outlined in the CIPA

3    5.  And I note that the CIPA 5 was kept generic to keep this

4    information in the generic terms so it wouldn't be, couldn't

5    really compromise any specific operations.

6         But specifics, when the government witnesses testify,

7    some of the cross that I would be eliciting would be

8    operations -- for example, something to the effect of, you

9    know, ███████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████  So this type of information that I specifically

13   outlined in the CIPA 5 but also kept it generic, I think that

14   is much more -- you know, this single stipulation doesn't

15   really cover all the different types of information.  And it's

16   so -- you know, it doesn't -- it doesn't really, it doesn't

17   give me the same, substantially the same defense as being able

18   to elicit this from every witness, different types of

19   information that they know that they either worked with me

20   directly on or that they know that I helped, assisted certain

21   operations.

22        So to that degree, I don't think that this really

23   includes that same information and provides me with

24   substantially the same ability to make the defense that I

25   otherwise would do.  And like I said, I'm open with working

M68Wsch1                    ~~TOP SECRET/~~ █████ ~~/NOFORN~~

```
 1  with the government to make sure this stuff is generic enough
 2  that even they can agree to it.  I've never said anything about
 3  specifically saying certain operations or doing -- or
 4  discussing anything specific that the government would oppose.
 5  I've always been of the mind-set that we should reach some kind
 6  of -- we can reach some kind of agreement as to the
 7  generalities of the types of work that I did.
 8          THE COURT:  All right.  Well, I disagree.  I don't
 9  think the particulars of the information, even the categories,
10  let alone the particulars are relevant to the arguments that
11  you wish to make.  But what is relevant is that you were privy
12  to information, other national defense information, potentially
13  even more classified or damaging information that you're not
14  accused of leaking or attempting to leak.
15          I will note the government has flagged as a concern
16  ████████████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████████
19  ███████████████████████████████████  So in that regard, I suppose
20  if you were to testify, whether and to what extent the
21  government can elicit that remains to be seen.  But certainly
22  if there's any need to sort of cure any misleading impression,
23  we'll take that up as it comes.  But bottom line is the
24  government's application for a stipulation is granted under
25  Section 6(c).
```

~~TOP SECRET/~~ █████ ~~NOFORN~~

M68Wsch1                    TOP SECRET/███NOFORN

```
 1              Having said that, I'm inclined to think that the
 2    proposed language that the government has provided potentially
 3    can be improved upon.  I'll put it that way.  I think my
 4    concern is that additional information that had not been
 5    written down in the defendant's notebooks could be read to or
 6    heard to suggest that the information in the defendant's
 7    notebooks is national defense information, which, of course, is
 8    a question for the jury to decide.  And in that regard, the
 9    stipulation should not put a thumb on the scale of that issue
10    and should be neutral.  I would propose the following:
11              "The parties dispute whether the information the
12    defendant is accused of disclosing or attempting to disclose in
13    connection with Counts Three and Four is 'national defense
14    information.'  As I will explain to you at the conclusion of
15    the trial, that is a question for you to decide, but both
16    parties agree that as a result of the defendant's employment at
17    the Central Intelligence Agency, he was privy to sensitive
18    national defense information not at issue in this case, the
19    disclosure of which would be extremely damaging to national
20    security."
21              I also think to the extent that Mr. Schulte is
22    proposing to elicit testimony on this from witnesses, that at a
23    level of generality, I wouldn't think there's a problem with
24    him saying to a witness, isn't it correct or you understood or
25    knew that I was privy to additional information that was not
```

M68Wsch1                           TOP SECRET/██████/NOFORN

1    leaked in the WikiLeaks leak, isn't that correct, or something

2    to that effect.  But again, I think the particulars of either

3    the categories, let alone the specific information, there's no

4    relevance to that, and it wouldn't be admissible and obviously

5    highly damaging.  I think that is consistent with the

6    stipulation approved in *United States v. Wilson*, referenced by

7    the government.

8              Mr. Denton, do you wish to be heard on that?  Any

9    views on that proposed stipulation?

10             MR. DENTON:  I don't think so as a substantive matter,

11   your Honor.  I would actually propose, though, perhaps

12   bifurcating it into two different steps, the first being the

13   factual stipulation; that's sort of line 2 about the defendant

14   being privy to the additional information, which I think

15   probably it makes sense to offer as a stipulation and have read

16   by one of the parties, as appropriate.  And then perhaps it's

17   appropriate, when that happens, for the Court to give the first

18   part as an instruction to the jury.

19             I'm not sure that that piece should really be coming

20   from the parties, and I'm not sure the factual points should

21   really be coming from the Court.  So that would be my proposal,

22   to do the factual stipulation, and then the Court can note that

23   the question of what is or is not NDI is for the jury to decide

24   as per your instructions at the conclusion of the case.

25             THE COURT:  I think that probably makes sense and is a

M68Wsch1                    TOP SECRET/███████/NOFORN

1    good point.

2             Mr. Schulte.

3             MR. SCHULTE:  I disagree.  I think it reads like an

4    instruction.  I think it's better to have it together, like the

5    Court initially read it.

6             THE COURT:  All right.  I think Mr. Denton's point is

7    well-taken.  The first really is an instruction that, as

8    phrased, is an instruction, so should be provided as an

9    instruction.  To the extent that this is a stipulation that

10   would be a substitute for the classified information that

11   Mr. Schulte has noticed, it really should be limited to the

12   facts, which are the second portion.  So with that

13   modification, that's the stipulation that I will approve as an

14   adequate substitute, and I find that it would provide

15   Mr. Schulte with substantially the same ability to make his

16   defense as would disclosure of the specific classified

17   information, given that the specific classified information

18   that he noticed is not actually relevant; it's the general

19   proposition that is relevant.  So that resolves that issue.

20            MR. SCHULTE:  One second.  One question, Judge, is

21   there a way -- one more time, could you read what it would

22   read?

23            THE COURT:  Yes.

24            MR. SCHULTE:  Just so we can have it.

25            THE COURT:  Well, you can also get the transcript:

M68Wsch1                    TOP SECRET/████/NOFORN

1              "The parties agree that as a result of the defendant's

2    employment at the Central Intelligence Agency, he was privy to

3    sensitive national defense information not at issue in this

4    case, the disclosure of which would be extremely damaging to

5    national security."

6              (Counsel and defendant conferred)

7              MR. SCHULTE:  Yeah.

8              I think a suggestion about the, you know, he was privy

9    to sensitive info not at issue in this case, you know, instead

10   of saying not a subject of the alleged leak in this case.

11             THE COURT:  Mr. Denton.

12             MR. DENTON:  So, my hesitation there is a factual one,

13   your Honor, in that the attempt charge in Count Four, it is

14   very much the government's position that that was an inchoate

15   and intended to be ongoing offense.  So I think our preference

16   would be for the Court's original phrasing.

17             MR. SCHULTE:  They didn't charge it as an ongoing

18   offense, and they haven't named this, all the information, or

19   the extremely sensitive information th4t I'm privy to, they

20   never, none of that, they never even alleged that that was

21   intended to be transmitted.

22             (Counsel conferred with defendant)

23             MR. SCHULTE:  Nor could they argue that, even if they

24   wanted to.

25             THE COURT:  All right.  What about the following as an

1  alternative -- and let me also be clear, to the extent we're

2  wordsmithing, I'm happy to let you guys, if it doesn't

3  materially alter the substance of the stipulation, try and work

4  out these sorts of wordsmithing things between yourselves.  But

5  what about "he was privy to sensitive national defense

6  information beyond what he is charged with disclosing or

7  attempting to disclose in this case, the disclosure of which,"

8  etc.?  That seems like an accurate statement, probably actually

9  more precise than what my original was.

10         Mr. Denton.

11         MR. DENTON:  That's fine with the government, your

12  Honor.

13         THE COURT:  Mr. Schulte.

14         (Counsel conferred with defendant)

15         MR. SCHULTE:  Yes, I think we're OK with it, but to

16  the degree that, you know, the parties want to --

17         THE COURT:  Can you keep your voice up.

18         MR. SCHULTE:  I said, yeah, I think that sounds all

19  right, but to the degree that the parties want to, like you

20  said, engage in any wordsmithing that doesn't change the

21  overall meaning, we may take that up.

22         THE COURT:  OK.  Great.

23         With that, why don't we turn to the government's

24  Section 10 notice.

25         Mr. Denton, you've got Mr. Schulte's response taking

1    issue with the timeliness of it, and in particular, he alleges

2    that he was not provided notice of the particular statements

3    that you're now relying on and that that essentially deprives

4    him of having prepared to meet the government's case.  That's

5    one issue.

6             The second that I raised upstairs is that the double

7    jeopardy-type issue relating to Hickok, and to the extent that

8    Judge Crotty found that the evidence wasn't sufficient to

9    support that issue at trial, in the first trial, is the

10   government precluded from proceeding on that theory in trial

11   No. 2?  I'll look at those cases that you've cited in your

12   prior submissions.  I haven't had a chance to since we were

13   together this morning.

14            Do you wish to be heard on those two issues?

15            MR. DENTON:  I don't think I have anything other to

16   say on the second, other than what, I think, we set forth

17   before.  I think that there is no double jeopardy issue here.

18   That's been addressed by the Court and by the Second Circuit.

19   I don't think there's any -- there's not just no basis; there's

20   been an affirmative rejection of the idea that the double

21   jeopardy clause has an evidentiary effect.  So I think that

22   should resolve that issue.  But as I said, that's really been

23   set forth already for the Court.

24            With respect to the Section 10 notice, I think as a

25   substantive matter, we disagree that it represents some sort of

M68Wsch1                    TOP SECRET/████/NOFORN

1   expansion; that this is information that is all contained in

2   pages that were discussed extensively.  And in fact, there's a

3   long record in the immediate runup to the prior trial of Judge

4   Crotty specifically asking for the identification of why

5   specific pages were relevant, what they went to with respect to

6   the NDI at issue in this case.  So each of those pages was

7   identified, discussed, presented in court.  There was testimony

8   about the sensitivity of these things.

9        Our goal here is not to expand it but rather to be

10  very specific about the particular aspects of NDI that the

11  government intends to argue about, none of which were public or

12  publicly acknowledged as of the time of the leak.  And so I

13  think our goal really was not to expand this in any way but to

14  hopefully apply some precision in the hope of narrowing the

15  scope of the 6(a) and (c) issues that we needed to continue to

16  grapple with.

17        THE COURT:  Can you point me to somewhere in

18  particular, either the prior Section 10 notice or the -- I

19  refer to it as a bill of particulars, but I take your point

20  that it wasn't technically a bill of particulars filed before

21  the first trial, but would have put Mr. Schulte on notice that

22  these were sort of fair game with respect to these counts?

23        MR. DENTON:  Sure, your Honor.

24        So, I think if you look at the government's -- it's

25  the supplemental Section 10 notice from January of earlier this

M68Wsch1                    TOP SECRET/█████ NOFORN

1    year.  Again, perhaps this could have been more precise, but

2    the government identified that Schulte intended to disclose

3    classified information relating to the national defense

4    concerning the name and purpose of a CIA tool ███████████

5    ████████████████████████████████████████████████████████

6    ██████.

7           So we then took that and went, in the new Section 10

8    notice, and said, OK, here are the exact lines that are

9    referencing that, and on which pages of which government

10   exhibits, which I think is, you know, that's more precision.

11   That's not an expansion.

12          THE COURT:  So your position is that you previously

13   provide notice of basically the category, now you're zeroing in

14   on particular statements as a way of obviating the public

15   disclosure concern that we've been grappling with, is that

16   correct?

17          MR. DENTON:  That's correct, your Honor.

18          I would also say Section 10 does not sort of prescribe

19   a form of notice.  It requires notice.  I think in this case --

20   but again, the defendant is well on notice of what the NDI at

21   issue is because we had a whole trial about it, and there was a

22   lot of testimony in which people looked at these pages and

23   talked about what was sensitive in them and not.

24          THE COURT:  And was there testimony in that trial

25   about the sensitivity, in essence, the NDI nature of these

1   particular pieces of information or statements?

2           MR. DENTON:  I would have to go back and look at each

3   and every one of them, but certainly they were all introduced,

4   and I think by and large there was.  I can't say I've done a --

5           MR. SCHULTE:  That's not true.

6           THE COURT:  Mr. Schulte, hang on, please.

7           Go ahead, Mr. Denton.

8           MR. DENTON:  Again, I'd have to go back and run

9   through the transcripts, but we showed these pages to a number

10  of witnesses and asked them about them and what the

11  consequences would be.

12          THE COURT:  Mr. Denton, do you have a copy of your

13  January Section 10 notice?  I'm not sure I have a copy of it

14  here.  If I do, I'm not finding it immediately.

15          MR. DENTON:  I think I do, your Honor.  Trying keep

16  straight which version is which, your Honor.

17          THE COURT:  I think I've found it.

18          Mr. Schulte.

19          MR. SCHULTE:  Yes.

20          So, first, to correct the record, Judge, these two

21  things that they're trying to introduce now, which is part (b)

22  on page 4 of their new supplemental notice, and page 6, which

23  is (c) -- so (b) and (c).  So at the first trial, this

24  information was not introduced as national defense

25  information --

M68Wsch1                     TOP SECRET/████/NOFORN

1              (Counsel conferred with defendant)

2         MR. SCHULTE:  Oh, (b) and (d).

3              This information was never introduced in the first

4    trial as national defense information.  The government never

5    argued this stuff was national defense information.  They

6    introduced redacted and substituted portions of some of this,

7    and they argued for relevance that it's showing state of mind,

8    but they never argued this was national defense information.

9    In fact, if you go -- after the trial was concluded and we

10   filed our Rule 29 motion, the government, when they argued

11   against it, they outlined only the specific things that they

12   told us all along.

13             So if you look at the -- starting with the April 29,

14   2019, bill of particulars, they specifically state what exact

15   information from the notebooks that they claim to be national

16   defense information.  And then in the CIPA Section 10 notice,

17   they specifically state these exact same documents -- these

18   exact same documents and statements again.

19             When we went on to trial, this was the only

20   information that we were noticed on.

21             At the summation, the government only alleged those

22   specific parts of the notebook that they claim to be national

23   defense information from their bill of particulars and CIPA 10.

24             When the trial concluded, on the Rule 29 motion, the

25   government only argued these same specific examples from the

M68Wsch1                          TOP SECRET/███████/NOFORN

1   notebooks, and that's all they've ever argued.

2        And then when they filed the recent CIPA 10, I just

3   went through -- or the first CIPA 10 here, the government

4   states, specifically on page 3, "with respect to the MCC

5   charges, the national defense information is," and they outline

6   it -- one, here it is, very specifically.  It's the same

7   information about the ███████ information that they said at

8   the first trial.  The second thing, here it is -- again, you

9   look it, the same language from the bill of particulars.  Here,

10  it is talking about Hickok.  And then No. 3, here, again, they

11  talk about "Malware of the Mind."  It's the same information,

12  again, that they provided in the bill of particulars in the

13  initial CIPA 10.

14       So all this information has always been the same ever

15  since the, from the first trial.  Now, all of a sudden, the

16  government is trying to say, oh, well, we weren't specific the

17  first time, but five days before trial, we're going to

18  specifically introduce all this new information that has never

19  before been litigated before in CIPA 10, not at the first

20  trial, not in the bill of particulars, not in the Rule 29 and

21  certainly not in their CIPA 10 notice that they gave to the

22  Court in January.

23       So I think -- and I think the statute's very clear

24  that the government has to notify portions of the material that

25  are reasonably expect to rely on to establish national defense

M68Wsch1                    ~~TOP  SECRET/~~ ████ ~~/NOFORN~~

1    information element of the offense.  So there's no -- I was not

2    given proper notice of this information.  If I had been, then I

3    would have sought a CIPA 5.  I would have had a completely

4    different CIPA 5.  We would have gone through CIPA 6, all kinds

5    of litigation that this new notice requires.

6            So I think the law is pretty clear here that they're

7    not allowed to, all of a sudden, that they realize that their

8    case is weak and they have to get rid of the ████████ thing,

9    that they're, like, well, let's supplement and add some stuff

10   in that we never noticed before on.  I think that's just absurd

11   and, I think, definitely unfair and certainly didn't provide me

12   notice under CIPA 10 and arguably haven't even provided me

13   notice as far as you would typically get in a defense, in any

14   other, regular case, where the government would have to provide

15   sufficient notice for the indictment.  They haven't noticed any

16   of this information before.

17           THE COURT:  All right.  To be clear, it's paragraphs

18   (b) and (d) that you're objecting to, is that correct?

19           MR. SCHULTE:  Section -- section (b), as in boy, and

20   section (d), as in dog.

21           These things, you won't find these references in any

22   single page in the -- all the way up until now, nothing in the

23   first trial at all.  I mean there's nothing in the bill of

24   particulars, Rule 29, CIPA 10.  Nothing anywhere.  This is the

25   first time that this information has ever been noticed by the

M68Wsch1                    TOP SECRET/███████/NOFORN

1    government as NDI.

2            THE COURT:  And these come from government exhibits at

3    the first trial, though, is that correct, 806 and 809?

4            MR. SCHULTE:  That's correct.  So, some of this

5    information, what the government did, they went through CIPA 6,

6    and they argued that some of this information was classified

7    and should be redacted.  But we specifically argued at those

8    CIPA 6 hearings relevance, and we argued against that.  But the

9    government was -- very specifically said that they don't intend

10   to introduce this as NDI and so they want to redact it and

11   substitute it to make it unclassified.

12           So that was the result of the CIPA 6.  The government

13   specifically said we don't intend to introduce this against him

14   as NDI so we will redact or substitute that.  So Judge Crotty

15   agreed that insofar as the government was not going to allege

16   that this was NDI, then those redactions and substitutions were

17   permissible under CIPA.

18           THE COURT:  So these portions were redacted from 806

19   and 809?

20           MR. SCHULTE:  There were redactions and substitutions,

21   that's correct.

22           THE COURT:  Mr. Denton.

23           MR. DENTON:  Those are not inconsistent, your Honor.

24   All of the components of (c), which the defendant does not

25   object to, are also redacted because the particular point is

TOP SECRET/███████/NOFORN

M68Wsch1 ~~TOP SECRET/~~ ████ ~~NOFORN~~

1     that this was undisclosed information.  And so, for example,

2     instead of identifying ████████████████, they're identified

3     in redacted portions as a tool identified in a vendor report

4     after extensive litigation over whether what specific tool from

5     what vendor in what report was necessary to reach these

6     conclusions.

7                Same thing with respect to operations information, the

8     conclusion was the fact of the operation was what was relevant,

9     and so they're substitutions simply to substitute just

10    operation for some of this.  And so in those circumstances, the

11    entire point of the Section 6 process is that it is not

12    necessary to disclose the actual national defense information;

13    that there can be substitutions that are appropriate, that

14    protect things that have not been disclosed but nevertheless

15    allow the parties to make arguments about their sensitivity and

16    potential for harm to national security, and so on.

17                THE COURT:  All right.

18                MR. SCHULTE:  The point here is that they specifically

19    said that they're not going to introduce it, and that's why the

20    substitutions and redactions were allowed.  Otherwise, we were

21    arguing that we wanted to introduce so we could have a defense

22    and be able to argue that it's not national defense

23    information.  But the government specifically said that they

24    did not intend to introduce it as national defense information,

25    and that's the only reason that Judge Crotty authorized the

M68Wsch1                    TOP SECRET/███████/NOFORN

1    redactions.

2            And just to be clear, he was reading section (c),

3    which is not the new section.  The new sections are (b) and

4    section (d).  Those are the ones that the government has never

5    before stated are national defense information.

6            THE COURT:  Can you just elaborate on what the

7    prejudice is to you.  Let's assume for the moment that this is

8    the first time they're noticed.  What would you have done to

9    prepare a defense with respect to these particular portions had

10   you had more notice?

11           MR. SCHULTE:  Yeah.  So if I had more notice, then I

12   would have -- first of all, we would have had to go through

13   CIPA 66(a) and (c), and I would have argued that this

14   information shouldn't be redacted so that I can go and be able

15   to -- first of all, so it wouldn't be prejudicial, and second

16   of all, so that I can then file CIPA 5 to seek declassification

17   of related information.

18           THE COURT:  Right.  I'm asking you to specify what

19   that would be.  I understand what the statute, the scheme is,

20   but what meaningfully would you have done had you been noticed

21   in January?

22           MR. SCHULTE:  You're talking about the CIPA 6 or the

23   CIPA 5?

24           THE COURT:  Well, under CIPA 5, you would have to

25   notice anything that you would wish to use.

M68Wsch1                    TOP SECRET/████/NOFORN

1          MR. SCHULTE:  Yeah, that's correct.  So I mean we
2     would seek declassification of -- we would require specific
3     information regarding the operation.  And the source code here,
4     for section (b), they're saying parse MSFT and NTSF.  So this
5     stuff is something that I wrote at my house and wrote and
6     brought it in.  This stuff is not sensitive, and so we would
7     seek to declassify ████████████████████, because
8     that specific code I wrote was labeled unclassified.  Right?
9     And so we would basically seek that source code from the CIA
10    ████████████████████████████████████
11    ████████████████

12          And also, you know, we would have to go through the
13    discovery to see what's available, because this type of
14    information hasn't been -- the government would also have
15    additional discovery obligations based on the information here
16    in section (b).  So, you know, there would be additional
17    discovery.  We'd need more information, and then also, I'd be
18    able to conduct substantial research on the internet to be able
19    to pull -- this is actually MFT, not MSFT -- MFT and NTFS to
20    pull the forensics, to pull the Microsoft.  It's actually from
21    the Microsoft's own website on how this information works.  We
22    would have my expert be able to, start to research and look
23    into this to testify about it as well.

24          THE COURT:  And what about paragraph (d)?

25          MR. SCHULTE:  Paragraph (d) --

M68Wsch1                          TOP SECRET/ ███ /NOFORN

```
 1              (Counsel conferred with defendant)
 2              MR. SCHULTE:  OK.  Yeah, just a couple minutes, Judge.
 3              (Defendant conferred with counsel)
 4              MR. SCHULTE:  So, you know, counsel brings up a very
 5    good point, that if we were provided this notice, we would have
 6    a substantial time to be able to sit down and go through
 7    things.
 8              That being said, some of the information -- for
 9    example, ██████████████████████████ this stuff has been
10    publicly -- like it says here, it's publicly available and is
11    acknowledged.  So being able to do research on that;
12    potentially there would be some CIPA 5 declassification for
13    operations related to that, for example, when those took place
14    and when they were no longer being conducted.
15              As far as the ██████████████ you know, the government
16    would have to produce discovery to show whether or not this is
17    actually true and to what event -- I mean to what degree and
18    how much, you know -- so there's a lot of discovery that the
19    government would do, would owe us here.  And this is
20    specifically why the government decided not to, and decided to
21    redact this information and keep it out, because they would
22    have had to disclose what the ████████████████████████████
23    ████████████  The government can't just say, oh, this is NDI.
24    They have to provide us discovery.  They have to be able to --
25    and then we would have the opportunity, once we receive that
```

M68Wsch1                    TOP SECRET/███████/NOFORN

1   discovery, to determine what additional information we need or

2   declassification of some of these operations.

3           Some of these operations, for example, were not

4   sensitive, and overall, Judge, we would need the time to be

5   able to go through and analyze this and, you know, provide the

6   CIPA 5 notice and provide -- and have research from our expert

7   looking into this.  It's just -- overall, the notice is just,

8   you know, it doesn't comply with the, it doesn't comply with

9   the statute.  They can't just give us, give supplemental notice

10  now.  The statute's very clear that they have to do it by the

11  time specified to give us time to go through these CIPA

12  litigations.

13          THE COURT:  Mr. Denton, you're certainly welcome to

14  address Mr. Schulte's arguments about prejudice, but I think

15  that he makes some valid points, and Section 10 does require

16  that the government to notify the defendant by the deadline,

17  which passed in January, of the "portions of the material that

18  it reasonably expects to rely upon to establish the national

19  defense or classified information element of the offense."

20  It's just not clear to me that the particulars identified in

21  paragraphs (b) and (d) were previously noticed, and the fact

22  that they were redacted in the first trial sort of underscores

23  that.  It does seem like the fair thing at this point might be

24  to preclude the government from relying on those in this trial.

25          MR. DENTON:  So, again, your Honor, I think, first of

M68Wsch1                    TOP SECRET/ ██████ /NOFORN

1   all, we sort of disagree with the premise of the idea that the

2   fact that they were redacted is either a reflection of the

3   government forgoing them or of there not being any notice.

4        The point is that, as with essentially every aspect of

5   this trial, the conclusion that Judge Crotty reached is that

6   there's no circumstance in which the specifics of a CIA

7   operation are relevant to this case.  But for purposes of NDI,

8   the association of the CIA to an operation is a sensitive fact,

9   and the disclosure or attempted disclosure of that can be sort

10  of framed in that context.  It's a bit rich for Mr. Schulte to

11  say that he would be entitled to discovery on whether things he

12  wrote down were true or not, but that's neither here nor there,

13  because the specifics, again, everyone agreed were not

14  relevant.

15       I think honestly, your Honor, there is a question

16  about the level of specificity.  There's no question that the

17  defendant knew exactly what pages.  It's not like we went back

18  to the notebook and pulled out other things.  These are the

19  exact things that were introduced before.  The question is just

20  what is the scope of permissible argument about that.  There

21  was certainly quite a bit of discussion at the previous trial

22  about the MFT, MSFT, that block in (b), because the government

23  was not going to forgo a phrase that started "if you need help,

24  ask WikiLeaks for my code."

25       So there is certainly discussion to be had, admissible

M68Wsch1                    TOP SECRET/███████/NOFORN

1   purposes for this information, and it all was admitted.  So

2   like I said, I think the only question is what is the

3   government allowed to argue from given where we are?

4           THE COURT:  I guess the question I have, the problem I

5   have is I wasn't the judge at the first trial, so you

6   referenced what happened at the first trial and also what these

7   exhibits looked like at the first trial and I don't have those

8   in front of me.  It does seem to me that it turns on whether

9   Mr. Schulte could have reasonably known that the government

10  would rely in the manner that it is now seeking to rely on

11  these statements.  So I'm open to your suggestions and also

12  thoughts on how to resolve this.  But it seems like at a

13  minimum, I need to look at whatever trial transcript pages you

14  think this stuff was previously discussed and what form the

15  exhibits took in the last trial.

16          MR. DENTON:  Can we just have one moment to confer

17  quickly, your Honor?

18          THE COURT:  Sure.

19          Yes, Mr. Denton.

20          MR. DENTON:  Your Honor, I think at the risk of

21  narrowing this even further, our purpose here was not to expand

22  the scope of what the government was going on argue was NDI but

23  rather try and carve a path to narrowing the 6(a) and (c)

24  issues.  And I think honestly, those are -- of the NDI that

25  remains that is most complicated with respect to (b) and (d).

M68Wsch1                    TOP SECRET/████████/NOFORN

1   So I think at this point, your Honor, to the extent that it

2   gets us to resolving the issue that we were actually hoping to

3   resolve, I think we're prepared to at this point also forgo (b)

4   and (d) not as evidence in their evidentiary form.  I mean

5   they've been redacted; there are admissible portions of it.  I

6   think we may very well make argument about them, but to the

7   extent that we're talking about what the NDI is and how that

8   affects the 6(a) and (c) analysis, you know, there's no real

9   dispute that parts 2(a) and (c) were, you know, long properly

10  noticed, and those are sort of factual in a way that I think

11  makes resolving the Section 6 issue simpler.  So for the

12  record, I guess we'll say that we will not rely on (b) and (d)

13  even though we think we properly could.

14          THE COURT:  OK.

15          Mr. Schulte, focusing then on 2(a) and (c), you had

16  suggested upstairs that you were of the view that some of that

17  was in the public WikiLeaks disclosures as well.  Maybe it

18  wasn't 2(a) and (c) you were referring to, but what's your

19  position on that?  If not, or if you can't point me to where in

20  the classified exhibit it exists, I'd be inclined to think that

21  that does moot the 6(a) and (c) issue that we've been grappling

22  with and that as long as the government is proceeding only on

23  these, and we would make that clear somehow to the jury, then

24  it moots the issue that has been bedeviling us.

25          MR. SCHULTE:  Well, I think there's two -- one issue

M68Wsch1                    TOP SECRET/███████/NOFORN

 1   is the Hickok issue, which is not 2(a), but the section right

 2   above 2(a) talking about EDG, COG and Hickok.  So, Hickok is

 3   definitely released in the WikiLeaks disclosure, and most

 4   importantly, the CIA provided me the Hickok user guide

 5   unclassified.  So I think that's the big argument there.  The

 6   Hickok stuff has been disclosed by WikiLeaks.  The CIA actually

 7   labeled -- this came in as exhibit at trial.  I think it was

 8   616.  The user's guide it gave to me was labeled unclassified.

 9            And as far as the number of people go, the government

10   has their unclassified search warrant that states the number of

11   people.  That's where this is coming from, citing the search

12   warrant.

13            THE COURT:  Clearly, you can introduce unclassified

14   evidence at trial, so if you have the user guide that was

15   unclassified, I think Judge Crotty cited that in his opinion --

16            MR. SCHULTE:  Correct.

17            THE COURT:  -- clearly you can introduce that and

18   argue from that that this isn't NDI.  So, too, if there's a

19   government document that includes the same number of employees,

20   you can make the same argument.  The question is, is there

21   anything in the WikiLeaks disclosure that -- to the extent that

22   you want to argue prior public disclosure, is there anything in

23   the WikiLeaks disclosure that technically remains classified

24   that you would need to make that argument with respect to --

25   you're correct -- it's paragraphs 1, 2(a) and 22(c).

M68Wsch1                     TOP SECRET/          NOFORN

1          MR. SCHULTE:  Yes, the one -- I noticed this in my

2     CIPA 5.  So my very first CIPA 5, I cite all the references to

3     Hickok from the WikiLeaks disclosure.  So there's no -- so for

4     this one, for the Hickok disclosure, I don't think there's any

5     public internet site -- I mean there are, but I'm not intending

6     to introduce any public internet sites, just the WikiLeaks

7     disclosure itself.  And I cite those in the CIPA 5 for

8     declassification.

9          THE COURT:  And my understanding is that, in paragraph

10    1, the government represents that information regarding the

11    number of employees in the two groups -- that is, in EDG and

12    COG, I think -  and Hickok's connections to DevLAN had not been

13    publicly disclosed.  Your position is that those things are

14    publicly disclosed in the WikiLeaks leak?

15         MR. SCHULTE:  That's correct.  The number of people

16    may not be.  I have to double-check that.  But definitely the

17    connection between EDG and COG, all the information about

18    Hickok, all that is throughout the WikiLeaks disclosure.

19         THE COURT:  And that's in your first Section 5.

20         MR. SCHULTE:  The very first one, yes, where I cite

21    all the websites and the specific pages from WikiLeaks.

22         THE COURT:  Mr. Denton.

23         MR. DENTON:  Your Honor, the government quoted the

24    exact language.  The defendant cites a number of pages.

25    They're all duplicates, so it's not like there's a number of

M68Wsch1                         TOP SECRET/          /NOFORN

1    separate references to Hickok.  They're just multiple versions

2    of the same page.  That's the only reference there.

3              THE COURT:  The only reference is the "Jira sits on

4    Hickok, which is shared between us and COG"?

5              MR. DENTON:  That's correct, your Honor.

6              THE COURT:  And what is that?  Can you translate that?

7              MR. DENTON:  So, Jira is the issue-tracking component

8    of the Atlassian suite.  It sat on Hickok, which was a physical

9    server, "which is shared between us" -- the page doesn't

10   specify that Atlassian was used by EDG, so I think that's a

11   fair inference, "and COG."

12             THE COURT:  And can you translate that?

13             MR. DENTON:  COG is the cyber operations group.  It's

14   a different component of the Center for Cyber Intelligence.

15             THE COURT:  That I understand.

16             MR. DENTON:  Oh.  Sorry.

17             THE COURT:  What is the classified or NDI nugget in

18   here that you think was not disclosed?  That Hickok is

19   connected to DevLAN?

20             MR. DENTON:  Both that Hickok is connected to DevLAN

21   and also the number of employees across the two groups.

22             THE COURT:  OK.

23             Mr. Schulte.

24             MR. SCHULTE:  So I think the government's incorrect

25   that all these notes are one Vault 7 page.  I think there are

M68Wsch1       ~~TOP SECRET/~~█████~~/NOFORN~~

1   duplicates, but I think that there are -- I remember there's at

2   least three or four separate pages specifically detailing

3   information about Hickok. So I just -- I don't think this is

4   correct from the government.

5          I don't have the CIPA 5 before me or the pages from

6   WikiLeaks, but I'm fairly certain -- and even this statement

7   here, "Jira sits on Hickok, which is shared between us and

8   COG," I mean that -- that -- what that means is that it's

9   between DevLAN and COG █████ network. There's no other way to

10   interpret that.

11          THE COURT: OK.

12          Mr. Denton, your thoughts on how to proceed here.

13   Obviously, none of us have Mr. Schulte's first Section 5

14   notice, let alone the WikiLeaks pages.

15          MR. DENTON: We don't have it here, your Honor. I

16   think we had previously provided the Court with a binder that

17   contained all of those pages. We went through it ourselves in

18   this. I think the Court may be able to do the same, or

19   Mr. Schulte can identify where specifically we should look.

20   But I think, you know, that's really all there is. This is the

21   place we are.

22          THE COURT: And your response to Mr. Schulte's last

23   point, which is, in essence, that the fair interpretation of

24   the line that "Jira sits on Hickok, which is shared between us

25   and COG," that that is in essence a way of saying that it's

1    connected to DevLAN?

2         MR. DENTON:  Well, that's only true if you have a

3    bunch of other information, like Mr. Schulte does.  The

4    presence of COG's network ███ is not revealed there and would

5    not be known to someone on the outside.  The fact that Jira was

6    connected to Hickok -- or, sorry, that Jira was on Hickok

7    connected to DevLAN as opposed to an entirely separate network

8    is not an inference that would be obvious to someone who did

9    not have insider knowledge of how the systems were set up.

10        MR. SCHULTE:  I mean the problem is, you know, this is

11   taking this out of context.  When you're actually looking at

12   the site, it's talking about DevLAN and specifically saying --

13   you know, when you take it out of context like this, the

14   problem is, you know -- I don't know if what the Court would

15   like me to, perhaps on Friday I can put the specific examples

16   and send it to the Court or, what.  But, you know, citing a

17   single sentence from one of the, like, four or five pages is

18   not sufficient here for the government.

19        THE COURT:  OK.  Well, I guess that is what I would

20   like you to do, which is to say, recognizing that the

21   government is withdrawing 2(b) and (d) and is now prepared to

22   limit its theory of Counts Three and Four to what is set forth

23   in the remainder of this notice, unless Mr. Schulte persuades

24   me and points me to something in the WikiLeaks disclosure that

25   does publicly disclose anything in paragraph 1 -- and I'll take

M68Wsch1                      TOP SECRET/███████/NOFORN

1    a look at the specific page cited by the government, but unless

2    Mr. Schulte persuades me that there is such a 7hing, then I'm

3    inclined to think that the government's revised approach does

4    moot the 6(a), 6(c) issues that we've been grappling with

5    because it is limiting its theory to things that were not

6    previously disclosed in the WikiLeaks leak and, therefore,

7    technically remain classified even if publicly disclosed.

8           MR. SCHULTE:  Sorry.  I just wanted to raise one

9    point.  This was just one of the issues.  All the other ones

10   have the same issue.

11          Do you want me to do that for all of them as well?

12          THE COURT:  When you say all the other ones, what are

13   you referring to.

14          MR. SCHULTE:  I'm saying the remainder of the -- the

15   remainder of the NDI and 2(c) NDI, you know, we were just

16   looking at the Hickok thing, which is the first thing here.

17   The other thing, 2(a) and (d), those all also have implement --

18   those also have stuff from WikiLeaks, from the WikiLeaks

19   disclosure as well.

20          It's all in my CIPA 5, so what I can do is just print

21   the pages and highlight the information and send it to the

22   Court on Friday, for all this information.

23          THE COURT:  Whatever form you want to submit it to me,

24   the more specific the better for my purposes.

25          MR. SCHULTE:  OK.

M68Wsch1                    TOP SECRET/▮▮▮▮   NOFORN

1        THE COURT:  Unless you're able to point me to

2    something that does appear in the WikiLeaks leak that would

3    constitute a prior public disclosure of this, I don't think

4    there's an argument to be made on that front, and there would

5    be no need to disclose any classified information defending

6    against the charge on the grounds of its prior public

7    disclosure.  And for that reason, I think it would moot the

8    6(a), 6(c) issue.  That's my tentative ruling, but it's subject

9    to revision in the event that Mr. Schulte, on Friday, points me

10   to something in the WikiLeaks disclosure that does, in fact,

11   disclose some of that information that the government maintains

12   was not publicly available.

13        All right.

14        MR. DENTON:  Your Honor, if I may say just one thing

15   on that?

16        With respect to 2(c), which talks about the tool

17   Bartender, the government does not dispute, and has not

18   disputed, that the tool Bartender is disclosed in the leaks and

19   is referenced there.  The specific classified information, the

20   NDI, which the government expects and did previously elicit

21   testimony about, is the association of that CIA cyber tool with

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████        So the fact of

24   Bartender's revelation in the leaks is not what we're relying

25   on.  It's the connection.        (Continued on next page)

TOP SECRET/▮▮▮▮   NOFORN

M688SCH2                    ~~TOP SECRET/~~ █████ ~~/NOFORN~~

1          THE COURT:  Understood.

2          With that understanding, Mr. Schulte, you can try to

3     point me to specific references in the Wikileaks leak that is

4     his prior disclosure, if you will, to those alleged NDIs, but

5     if you can't, then it moots that issue.

6          Let me turn to the classified Michael memorandum.  Mr.

7     Schulte submitted a letter, I think dated June 6, concerning

8     the memorandum, maintaining that it's not double hearsay.

9     That's demonstrably false.  There are a bunch of statements in

10    the memorandum attributed, for example, to Michael, some of

11    which are clearly hearsay, double hearsay, that is hearsay

12    within hearsay, and for that reason Mr. Schulte is just wrong

13    in claiming that there is no double hearsay problem.  I had

14    invited him to identify with specificity portions that he

15    maintained were not double hearsay and that he wanted to use,

16    and having failed to do that, I think there is no basis to

17    offer the document.

18         Having said that, he asked that I allow the one

19    reference to the travel fact that Michael traveled to Thailand

20    at a time when somebody associated with WikiLeaks was allegedly

21    in Thailand.  And, Mr. Denton, I would like your position on

22    that, namely, if there is an admissibility issue; and if there

23    isn't, whether there might be a stipulation to be had that

24    would substitute for this document.

25         What are your thoughts?

M688SCH2                    TOP SECRET/          /NOFORN

1          MR. DENTON:  Your Honor, I think it is, in a

2     traditional sense, it is hearsay.

3

4

5

6

7                                   I think there is a stipulation

8     to be had to that effect.

9          The only thing I would note is that we would probably

10    suggest some additional language taken from earlier in the memo

11    because, while that stipulation may be entirely appropriate,

12    the start of the memo makes perfectly plain that the concern

13    about Michael is not a concern about his having committed the

14    theft, it's about his not reporting his awareness of what the

15    defendant had done.  The defendant is referred to in the memo

16    as KP or Kinetic Piranha.  So I think whether we characterize

17    it as a rule of completeness type thing, if we are going to

18    proceed by stipulation, some balancing may be appropriate, and

19    we are happy to take the pen on trying to craft something that

20    includes what both parties would like to use from the document.

21          THE COURT:  Mr. Schulte.

22          THE DEFENDANT:  I think it's more than that.  The

23    document specifically states -- it's about Michael.  At the

24    very top, it's a ruling as to whether he is a danger to the CIA

25    or a danger to his security clearance or access to classified

SECRET  SECRET  SECRET

M688SCH2            TOP SECRET/ ███ NOFORN

1    information.  So to the degree that the government just said,

2    oh, they are just concerned about Michael's relationship with

3    me, this is well after the fact and it's not just about that.

4    It talks about a lot of different information, specifically

5    about Michael and his accesses and his -  I think it quotes

6    peculiar or suspicious behavior on DevLAN, other issues.

7            So, I think simply -- if there is a stipulation,

8    stipulating just to the fact from the memo.  It doesn't have to

9    say whether or not Michael is -- whether or not the CIA is even

10   suspicious of Michael or anything to that degree, but simply

11   the fact that, whatever the exact statement is, that on such

12   and such a date Michael traveled, and at the same time a

13   Wikileaks affiliate traveled ███████ , something like that.

14           THE COURT:  It seems like the devil may be in the

15   details here.  The first step is seeing if you can reach

16   agreement on something, and I am leaving it to the government

17   to propose what it thinks should be, in fairness, included.

18           So can I leave it to you to try to sort something out,

19   with the understanding that some form of a stipulation that is

20   a substitute for this memorandum as a whole and references the

21   Thailand travel would be used?  And if there are disputes over

22   what else should be included in the stipulation, I will resolve

23   those when you guys have tried to hash it out yourselves first.

24           Does that make sense?

25           MR. DENTON:  We can certainly do that, your Honor.  I

M688SCH2                TOP SECRET/█████/NOFORN

1   think, not to ignore it, we do still have a relevance objection

2   on it.  I think the fact of overlapping travel after the leaks

3   had already started is not necessarily relevant to anything.  I

4   went to London in March of 2017 where Julian Assange was

5   located.  I don't think that makes me a suspect in the leaks.

6   So I think what goes in here may, as you say, have the devil in

7   the details, but the relevance I think does seem a little far

8   afield.

9           THE DEFENDANT:  I think the Wikileaks disclosure

10  wasn't completed yet.

11          THE COURT:  Mr. Schulte, I got it.  I think it's not a

12  particularly strong piece of evidence.  I think it's easily

13  disposed of.  But I am inclined to think that Mr. Schulte is

14  entitled, because the leaks were ongoing, to at least make the

15  point.  More to the point, it appears in a government document.

16          So what I would propose is some form of stipulation to

17  the effect of, in a memorandum, or perhaps something, after Mr.

18  Schulte was identified as a suspect, this person was

19  interviewed about his connections with Mr. Schulte and his -- I

20  don't know.  I am going to leave it to you guys to try to sort

21  it out in the first instance, but perhaps describing what the

22  nature of the document is.

23          And in this document, the government noted that he

24  traveled to Thailand at the same time as somebody from

25  Wikileaks traveled, and obviously it's specifying the times in

1   the middle of the ongoing leaks.  It seems like it would allow

2   Mr. Schulte to make the principal argument that he wanted to

3   make from this document.

4          So, again, recognizing that there may be some further

5   resolution required on this front, I will treat that issue as

6   tentatively resolved -- that is to say, the memorandum won't

7   come in and some form of a stipulation will.

8          MR. DENTON:  I think the only thing we would say

9   there, unlike most stipulations, we think that this should fall

10  within the realm of the other memorandum, which is that the

11  defendant has to call an appropriate custodian.  The

12  stipulation is a substitute for the document.  We can either

13  have him read it or not, but in order for it to come in, there

14  has got to be a witness who is going to talk about it.

15         THE DEFENDANT:  If the parties are going to disagree

16  to a stipulation, otherwise the memo, I can introduce that

17  through -- it's a business record from the CIA.  I don't need

18  to call a witness to introduce a business record.

19         THE COURT:  You do.  As we discussed on Friday, the

20  business record rule requires the testimony of a custodian who

21  can testify to the foundational requirements.  Having said

22  that, if Mr. Schulte demands that a proper custodian appeared

23  to testify -- I think the government offered on Friday to make

24  that person available -- it seems like the easier course here

25  would simply be to work that into the stipulation rather than

1   calling a witness to say that there is a document, it appears

2   in the government's files, it's kept in the ordinary course of

3   business, and then, without identifying or introducing the

4   document, then offering a stipulation that provides whatever

5   information is included in the stipulation.  I would think that

6   the more efficient thing would be to just have a single

7   stipulation that covers all of that.

8           Mr. Denton.

9           MR. DENTON:  The only appropriate custodians for these

10  documents are from ██████████████████████ who maintains

11  the records, and, in fact, a relatively limited subset of

12  people who actually saw these records at all.  And all of them

13  would be in a position to offer explanation, as the

14  government's rebuttal witness did at the last trial, about the

15  records themselves and specifically why they don't mean what

16  the defendant has asserted they do.  So we think the

17  appropriate course here is to have a live witness custodian.

18          THE COURT:  Well, tell you what.  Try to sort it out.

19  If it doesn't go in a stipulation, then Mr. Schulte can demand

20  the live witness custodian, the government will make that

21  custodian available, and as ridiculous as that would be, we

22  will go that route.  The alternative would be, if the

23  stipulation would suffice, the government can always call as a

24  rebuttal witness the custodian to put it in proper context.

25  But it also may depend on what goes into the stipulation,

M688SCH2                    TOP SECRET/████/NOFORN

1   because if there is not much about the document other than the
2   travel fact and what the document is, then perhaps there is no
3   need for it to be put in context.  But recognizing that there
4   are some big issues that need to be resolved, and in that sense
5   this issue may not be put to rest, I will leave it there for
6   now.

7           I was prepared to go through the remainder of Mr.
8   Schulte's, I think it's May 23rd Section 5 notice.  My concern
9   is that he obviously hadn't seen the government's May 31st
10  response to that until earlier in this proceeding so I am not
11  sure what to do on that score.

12          The only thing that I think may require some
13  discussion is the government proposes -- in fact, why don't I
14  do this.  Mr. Schulte, if you turn to pages 10 through 12 of
15  the government's submission, the portions addressing the file
16  listing from the Brutal Kangaroo stash repository.  The
17  government proposes a stipulation as a substitute on that issue
18  as well.  So why don't you just read through that and we can
19  address that now.  The rest of this maybe I can table for later
20  or we can get through the witnesses and see how much time we
21  have remaining.

22          THE DEFENDANT:  I have read through the issue here.
23          THE COURT:  Keep your voice up.
24          THE DEFENDANT:  So I think, as far as the government's
25  claim that the source code is classified, these are names such

M688SCH2   ~~TOP SECRET/~~ ███ ~~NOFORN~~

1   as shatteredassurance.CPP.  So I think at least the government

2   should provide the listing of files in the SCIF in a classified

3   format so then we can potentially go over it further.

4          I think the issue here is the government's stipulation

5   doesn't really explain the layout of the repository.

6          So the stash repository is set up in such a way, and

7   based on the list of files, that you can't simply do this, you

8   can't simply take this project out.

9          So the whole point of this issue in the testimony is

10  that the management and other individuals are stating this --

11  as the government says in footnote 2 -- Oh, you can just take

12  this out and create another project or something, but that's

13  not actually true.  I don't know whether any of the

14  witnesses -- only ███ may know the actual specifics of the

15  repository, but he may not know.  So if I was able to show the

16  witness the listing of files, then I can elicit testimony from

17  him that this is not possible and what the government is

18  claiming or what the managers are trying to say is simply not a

19  possible scenario.

20         So to the degree that the government is saying any of

21  the files are classified, we could look to potentially redact

22  or change the names.  But for the most part, I wrote the tool

23  so I know the names are not classified names.  They are just

24  literally names of the tool.  Brutalkangaroo.CPP, it's a source

25  file, and other source files like that.  Those are not

1   classified.  And to the degree the government says any of those

2   files are classified, I think the simplest solution is change

3   the name to something -- that's what they have done to all the

4   projects before.  So some simple substitutions like this, then

5   it doesn't implicate any classified information, which I don't

6   think is really implicated at all in generic names anyway.  But

7   the point is I am trying to get the structure, the file

8   structure of this repository, to introduce the facts that I

9   need to introduce.

10          THE COURT:  I guess that's what I am trying to

11  understand, what are the facts that you need to introduce?  My

12  understanding is that it was to establish the fact that you had

13  reason to be within the Brutal Kangaroo repository, that is

14  reason to access it, as a way of rebutting the argument that

15  you were accessing something that you had no business being in.

16  It seems to me that the government's proposed stipulation

17  provides you that.  What else is it that you're trying to

18  establish?

19          THE DEFENDANT:  So the only issue with the

20  government's stipulation is the sentence here:  A user with

21  read only access to Brutal Kangaroo repository would be able to

22  copy the Shattered Assurance code and create the new staff

23  repository.  That's false.  And that's what the layout would

24  show, that you can't do that, you have to copy -- you would

25  basically have to copy the whole thing and replicate the whole

M688SCH2                    TOP SECRET/███████/NOFORN

1    thing.

2           This gets into a back and forth between management,

3    where management is saying basically what the government is

4    saying here.  That, Oh, you should have known better, all you

5    had to do was take the small little file and then create your

6    own repository.  But that wasn't true.  You needed the entire

7    thing.  And it doesn't make sense to copy the entire thing.

8           I think that's a disagreement between -- I don't know

9    what the government's position is.  At trial, the government

10   took the position with management, who is basically saying, oh,

11   no, you could do it this way.  But it's not true.  And the

12   layout of the repository would show that that's not true.  So I

13   think the problem is a dispute with the facts.  Someone like

14   their own witness, if shown the repository and the layout,

15   would be able to confirm my version of the facts and reject the

16   government's own version.

17          THE COURT:  So, Mr. Denton, I guess my question for

18   you is, why do we need the second sentence of this proposed

19   stipulation at all?

20          MR. DENTON:  I gave Mr. Schulte my copy.  So I am

21   going off memory here.

22          MS. SHROFF:  Now he has made notes.

23          THE COURT:  This whole thing reads:  "As of June 22,

24   2016, the source code for the tool known as Shattered Assurance

25   was a part of the Brutal Kangaroo repository on stash and could

M688SCH2            TOP SECRET/██████/NOFORN

1    be accessed only through the Brutal Kangaroo stash repository."

2            So that's the first sentence.  It seems to me that

3    provides what Mr. Schulte principally wants, which is an

4    explanation of essentially why he still had some right, if you

5    will, to be accessing the Brutal Kangaroo stash repository,

6    because he was permitted to still be working on Shattered

7    Assurance, so he claims.

8            It seems like the sentence second which reads:  "A

9    user with read only access to the Brutal Kangaroo repository

10   would be able to copy the Shattered Assurance code and create a

11   new stash repository, to which that user would have

12   administrator access, but would not be able to alter the code

13   in the Brutal Kangaroo repository or change the permissions for

14   other users of that repository."  That seems like something

15   that the government could elicit if there is a need

16   to -- that's sort of the government's theory and it sounds like

17   it's disputed, and in either case, you can elicit from your

18   witnesses what you want with respect to what could or couldn't

19   be done in the repository.  Am I wrong?

20           MR. DENTON:  No.  I think that works, your Honor.

21   Like I said, trying to do this orally is a little bit tricky.

22   I think that probably works.

23           THE COURT:  Mr. Schulte.

24           THE DEFENDANT:  Yes.  That works for me.  That's all I

25   wanted.

M688SCH2                          TOP SECRET/███████/NOFORN

1           THE COURT:  Great.  As a substitute for, I think this

2    is C2 in Mr. Schulte's notice of May 23, we will have a

3    stipulation with just the first sentence of the government's

4    proposed stipulation and that will resolve that issue.

5           We have only about half an hour remaining.  I would

6    like to make the best use of our time and also discuss how we

7    are going to resolve anything that remains unresolved and

8    anything that requires further discussion.

9           Let's talk about the latter first.  It seems to me

10   there are a couple of options.  One is we could schedule

11   another proceeding on Friday.  I think they are all classified

12   issues so it would be a classified proceeding.  We could

13   schedule one for early afternoon on Friday.  The other option,

14   as eager as I am to keep things moving once we have a jury,

15   would be to do jury selection on Monday, and depending on

16   whether we finish or not, we could either do a classified

17   hearing on the morning of Tuesday before we proceed with

18   openings or finish selecting a jury on Tuesday, if we are still

19   going, and do a classified hearing on Tuesday afternoon,

20   followed by openings on Wednesday morning.  Bottom line is we

21   could leave the rest to be resolved after the jury is selected

22   but before we open.

23           Any thoughts on either of that?  Either legal issues,

24   practical issues, or trial preparation issues?

25           MR. DENTON:  I think, your Honor, the bulk of the

1   remaining issues deal with the defendant's, I think fifth

2   Section 5 notice, all of which I think the government has

3   Section 6(a) objections to that were articulated.  Technically,

4   that is something the Court has to address in writing.  It

5   doesn't require much writing.  But I wonder whether we really

6   do need another proceeding.  I think to the extent that the

7   Court has the defendant's submission and the government's

8   submission, it may be the sort of thing where we would just be

9   happy for the Court to rule and go from there.

10          THE COURT:  Mr. Schulte.

11          THE DEFENDANT:  We are not sure if the hearing is

12   actually required or needed, but we suggest -- Friday is my

13   last SCIF day.  I really need to be there.  So we would suggest

14   doing it after the jury selection and before the opening

15   arguments.  The trial hasn't technically started until opening,

16   right?

17          THE COURT:  I will tell you what.  It's possible that

18   we could do both of these things, which is to say, Mr. Schulte,

19   why don't you, having now been given the government's May 31st

20   submission, I will give you an opportunity to address any of

21   the remaining issues by Friday and I will consider your

22   submission.  If I can resolve it on the papers and issue a

23   ruling under 6(a), then there is no need for any hearing

24   whatsoever, and perhaps that can be done before we even begin

25   jury selection.  If there is a need for a hearing or further

49

1   discussion, then we will convene either Monday morning before

2   jury selection or after a jury has been selected.  But I can't

3   imagine that the statute is so rigid that it requires us to do

4   it before we do jury selection.

5              Mr. Denton.

6              MR. DENTON:  I don't have any particular objection

7   other than to note that the Court's order regarding this on May

8   25th set a date for the defendant to respond of Monday, June 6.

9              So, again, putting aside the defendant's failure to

10  sort of raise his view that he didn't get it, he had a deadline

11  that came and went.  One of the big issues here is the

12  deadlines that come and go.  And doing a Section 6 proceeding

13  on the eve of trial is very much not what CIPA contemplates.

14  So we will do what we have to do, but I just wanted to

15  emphasize the government's view on that.

16             THE COURT:  It may not be a major concern.  If I agree

17  with your arguments under 6(a) and that resolves it, then there

18  is no cause for complaint.  In any event, since Mr. Schulte

19  didn't see it, and putting aside that he could have raised that

20  concern earlier, I will give him until Friday to submit a

21  response to it and I will at least consider it.  And in that

22  response, Mr. Schulte, you are welcome to address why I should

23  consider it even though it is technically untimely.  But we

24  will proceed in that fashion.

25             I think that means the only remaining issue to discuss

M688SCH2                        TOP SECRET/███████/NOFORN

1    today is the witness issues.

2            One, I received a letter from Mr. Schulte *ex parte*, or

3    it maybe copied some CIA wall counsel, I am not quite sure what

4    this notation means, but concerning the CIA's outreach to

5    subpoenaed witnesses, and in particular the five witnesses who

6    are identified.  I don't know the best way to proceed on this.

7    The government is obviously present.  I don't know if the CISO

8    who is here today is in a position to even speak to these

9    issues.  So I am open to suggestion.  There is no request in

10   here except to direct the CIA and the CISO to, quote unquote,

11   act expeditiously, which I have already done.

12           Mr. Schulte, do you have any thoughts or requests on

13   how to proceed with this?

14           THE DEFENDANT:  So standby counsel advises as of last

15   night she checked again and a majority of these witnesses,

16   there still hasn't been any response.  I just note for the

17   Court that one of them I specifically brought up with the CISO

18   like eight months ago because we had the same issue before the

19   first trial, and I said we really need to speak with this

20   witness.  We didn't get a chance to even do anything at the

21   last trial.  I have been talking about this specific witness

22   multiple times with the CISO.  So I don't know how to proceed

23   from now.  I don't know how we are able to contact these

24   witnesses.

25           THE COURT:  I would note that you didn't raise it with

M688SCH2                TOP SECRET/          /NOFORN

1    me.  So to the extent that you have been asking the CISO for

2    something for eight months, if you weren't getting what you

3    needed, it was incumbent upon you to raise it with me in a more

4    timely fashion.

5              Having said that, which witness number are we talking

6    about on that score?

7              THE DEFENDANT:  It's the one that says we have never

8    gotten any response at all from him.

9              THE COURT:  I don't actually see anyone who fits that

10   category.

11             THE DEFENDANT:  Is there a way that the trial team can

12   step out for a moment and we can go through it?

13             THE COURT:  Sure.

14             Any objections?

15             MR. DENTON:  No, your Honor.

16             THE COURT:  Why don't you step out and in a couple of

17   minutes we will have you come back.  I would like to make as

18   valuable use of our remaining time as we can.

19             (Continued on next page)

20

21

22

23

24

25

M688SCH2                    TOP SECRET/██████/NOFORN

1           (Government counsel and team enter courtroom)

2           THE COURT:  So the last item on the agenda is the

3    40-some-odd witnesses that the defendant has subpoenaed and

4    whether there is a basis to quash the subpoenas or address this

5    pretrial.

6           I guess one question I have is, how much of this needs

7    to be resolved today or is this something that we could take up

8    in the first few days of trial, whether we delay things or just

9    deal with it at the end of a day trial or some other thing?  I

10   sadly expect that it is going to require going through the list

11   with some level of detail.  Having said that, or before I hear

12   from counsel on that, let me say a few things.

13          First of all, the defendant's most recent submission,

14   which was made *ex parte* again, but I think by invitation from

15   me, does identify four new witnesses that he is withdrawing the

16   subpoenas as to.  So the seven, I think total, are as follows:

17   ███████████  ██████████    ██████████████   ███████████

18   █████████    ██████████████     and   ██████████████

19          Three of those we already knew about.  Four are new.

20   So that's seven that we can take off the list.

21          As to the remainder, I will tell you that I am

22   prepared to grant a motion to quash as to at least some of

23   these.  A huge number of them are basically proffered for the

24   same point, which is basically that the DevLAN system was

25   insecure and a lot of people had access to it, it was the,

M688SCH2                    TOP SECRET/████████/NOFORN

 1   quote unquote, wild west or what have you.  There may be a

 2   basis to call a couple of witnesses on that.  I sort of expect

 3   that point will probably come out in cross of some of the

 4   government's witnesses, and in that regard, there may be no

 5   need whatsoever for defense witnesses on that score, but there

 6   certainly is no need to call 20 witnesses to proffer the same

 7   thing.  And although I know Mr. Schulte has complained that he

 8   doesn't know who his best witnesses would be, that's not the

 9   purpose of a subpoena.  A subpoena secures somebody's testimony

10   at trial and it doesn't require anybody to be interviewed; and

11   in that sense, it doesn't guarantee that he can choose his,

12   quote unquote, best witness.

13           So, from that standpoint, I am inclined to say that

14   you should be severely curtailed in the number of witnesses

15   that he would call for that purpose.  I think some of the

16   witnesses that I have already permitted, and there were five

17   that I have already ruled on, do cover that ground, and in that

18   sense, it may be that none of the others should be permitted at

19   all, and there are plenty on this list who were identified

20   simply for the proposition that DevLAN was an insecure system

21   or what have you.

22           Second, it strikes me that from the proffer made

23   several of the witnesses, separate and apart from that, there

24   are some issues of relevance, some of the testimony its

25   relevance is not immediately apparent to me, although perhaps

M688SCH2                     ~~TOP SECRET/~~ ███████ ~~NOFORN~~

```
 1   Mr. Schulte could elaborate or explain.  There are issues of
 2   speculativeness.  To the extent that the proffer is made that
 3   they, quote unquote, believed that the leaker could be someone
 4   else, or that it could have been someone from the outside or
 5   someone with access to this system or that system, I don't know
 6   why a witness would be permitted to offer his or her
 7   speculation on that issue.  That's not permissible testimony.
 8   And relatedly, it seems like a number of these are essentially
 9   trying to use fact witnesses as expert witnesses, that in
10   essence is trying to elicit from some of these witnesses that
11   in their expert opinion the leaker could have been someone who
12   had this access, or this access, or someone outside or inside
13   or what have you, and if they were not properly noticed as
14   experts, and gather they were not, it strikes me as that is
15   impermissible testimony as well.
16        The last category, several of them are proffered for
17   the specific testimony concerning specific potential
18   alternative suspects.  And in light of the law that the
19   government cited with reference to the Michael memorandum -- I
20   don't know if there is more to proffer on that basis -- I don't
21   think that testimony is proper either.  There has to be a nexus
22   to this case.  There has to be some specific basis to proffer
23   that person.  As an alternative suspect is not sufficient to
24   offer a fact witness's speculative belief that the leaker might
25   have been X, Y or Z.  There has to be some factual basis to
```

M688SCH2 ~~TOP SECRET/~~ ███ ~~/NOFORN~~

 1   make that identification.

 2          All of which is to say, I think this list is rife with

 3   problems.  I am happy to go through them.  I am happy to let

 4   Mr. Schulte, having heard that, sort of go back to the drawing

 5   board and pare this down to a more reasonable list that I am

 6   more likely to bless.  I am happy to go through it one by one,

 7   but not today since it's already 2:10, 2:15.  I am open to your

 8   suggestions.  I again understand that the government wished for

 9   these things to be resolved before trial.  They were only

10   raised recently and I really haven't had enough time to go

11   through it, but I am welcome to your thoughts on the timing and

12   process.

13          MR. DENTON:  Your Honor, let's start with a purely

14   logistical question.  With respect to 12 or 13 people that the

15   government has identified as being in particularly sensitive

16   positions, we are essentially out of time to make arrangements

17   to get them here.  We will do what we have to do, but I think

18   there is a real cost to not resolving those now.

19          THE COURT:  Can you remind me who those are?  Some of

20   them I have already resolved.

21          MR. DENTON:  So the five we have got covered.  They

22   will be here.  And I can say with respect to ███, we have

23   confirmed since this morning she will be available.  I think

24   the only accommodation we would ask is that we do our best to

25   kind of pick a day for her so that we can minimize the amount

M688SCH2                          TOP SECRET/███████NOFORN

1    of travel ████████████████████████████████████████████████
2    ██████████████████████████. But she will be here.
3              THE COURT: I am sure we can do that, and I am
4    prepared to take her out of turn, if need be, █████████████
5    ████████████████████
6              Who are the others?
7              MR. DENTON: I'm sorry, your Honor. I don't have the
8    list with me. We had identified them to the defendant. We
9    have a continuing objection to the defendant making these
10   proffers *ex parte*. These are evidentiary issues. The
11   government has filed a motion *in limine* and the government is
12   entitled to know what evidentiary basis the defendant proffers
13   for the admissibility of evidence in this trial.
14             So we do not think that proceeding *ex parte* with this
15   is appropriate, and it limits our ability to frankly give on
16   some of these people. There are some proffers where we say,
17   fine, we are not going to fight about this, we will bring them
18   here. That's what we did the last time. We have tried to
19   force this into a posture where we would do exactly what
20   happened, which is the defense would make a more reasonable
21   proffer as to who would they actually want. The defendant
22   keeps refusing the opportunity.
23             THE COURT: I understand.
24             Am I right that ████████████ ████████████ ██████
25   ██████ ████████████ ██████████████ ████████████████ ██████████

M688SCH2                    TOP SECRET/▮▮▮▮NOFORN

1    ▮▮▮▮ and ▮▮▮▮▮▮

2              MR. DENTON:  I think that's right, your Honor.

3              THE COURT:  Mr. Schulte, let's try and resolve those

4    eight now, and then let's table the rest for later, whether

5    that's Friday or early next week.

6              THE DEFENDANT:  Starting with the first one, ▮▮▮▮

7    ▮▮▮▮  we are not sure what the difficulty with her is.  We

8    were able to speak with her.  And she is in DC.  She is a

9    ▮▮▮▮▮▮▮▮  So it doesn't seem there is any difficulty

10   for her.  But after questioning her and coming up with a

11   writing of her testimony, we definitely intend to call her as a

12   witness.

13             THE COURT:  She is the second.

14             Mr. Denton, do you have reason to question that she is

15   in DC?

16             MR. DENTON:  I think the issue is not where people

17   are; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮

19             THE COURT:  Why would ▮▮▮▮▮▮▮▮ who is

20   in DC be complicated to get to New York?  They can certainly

21   travel within the United States.  No?

22             MR. DENTON:  They can.  I think the issue is, again,

23   in dealing with the association with this trial, I can't

24   pretend to understand all the specifics, and frankly we have

25   not been informed of all the specifics, precisely because Mr.

```
 1    Lockard and I are very publicly associated with this trial.  So
 2    my understanding is that that is the list of people for whom it
 3    was considered difficult to make travel arrangements.
 4              THE DEFENDANT:  She was here the last time and there
 5    was no issue, the government didn't raise any issues about
 6    that.  So to the degree that these witnesses are in DC, or
 7    otherwise can easily make the trip, I don't see that as a
 8    burden for the government.  We should be focusing on, if some
 9    of these witnesses are overseas, those are the ones we should
10    really be prioritizing, right?
11              MR. DENTON:  Your Honor, it's not a question of can
12    we.  It's that we need time.  And contrary to the defendant's
13    suggestion, we screamed bloody murder the last time because it
14    required moving heaven and earth to get people here in the way
15    that the defendant suggested.
16              THE DEFENDANT:  It's an Amtrak train ride.  It's not
17    like these people are having to come from overseas and deal
18    with the issues with ███████████████████████ and
19    other kinds of ██████████ .  ████████████████
20    ████████████    ██████████████████████████
21    ████████████        So I don't think that that alone is
22    justification for burdensome issues from the government.
23              THE COURT:  Well, here is the problem.  I don't have
24    time to do this right now.  So I think the government has a
25    couple of choices.  It can take the steps necessary to have
```

1    these people here, recognizing that it may all be for naught if

2    they don't end up testifying, whether that's because I order it

3    or Mr. Schulte decides not to call them.  We can take this up

4    on Monday or Tuesday.  You can identify a few that are

5    particularly concerning.  I am open to suggestions.  We can

6    reconvene on Friday to go through this one by one.  I can't

7    imagine that a day and a half makes a huge material difference

8    on this front.

9              MR. DENTON:  I think actually having it done on Friday

10   would make a material difference, just in terms of our ability

11   to make arrangements over the weekend while the trial team and

12   others are not physically in trial for the entire day.  I hate

13   to burn the time on Friday, but I think that the best course

14   would be for the Court to provide the government copies of the

15   defendant's *ex parte* filings so that we can take a position,

16   and then we will go through the list on Friday when the Court

17   is available.

18             THE DEFENDANT:  Friday is my last SCIF day and I

19   already have so much to do, and now there is another deadline

20   that the Court has for that letter.  With trial on Monday, it's

21   just going to be extremely difficult for me to -- there is at

22   least a couple of weeks before the government's case, and the

23   two or three days we have next week, I think there is plenty of

24   time in between to be able to work it out.

25             THE COURT:  Let's reconvene on Friday at 1:00.  We

M688SCH2   ~~TOP SECRET/~~ █████ ~~/NOFORN~~

1   will do this as quickly as we can.  I also, upon reflection and

2   having reviewed the list in detail, I don't think that this

3   meaningfully reveals anything about Mr. Schulte's defense

4   strategy, and for that reason, I will direct that it be

5   disclosed to the government promptly so that the government can

6   go through it, and perhaps streamline what we need to go

7   through and resolve since it may consent to some of these

8   people, and if not, can assist me in paring it down on the

9   grounds that I have suggested.

10          Mr. Schulte, in the meantime, I would ask you to go

11   through this, and to the extent you are willing to withdraw

12   additional ones it will make this task a lot easier.  You're

13   not going to call all these witnesses, I assure you of that.

14   There is no need to call more than one or two witnesses to talk

15   about the vulnerabilities in the DevLAN system.  And I suspect

16   that that will be a ground that is amply covered even in the

17   government's case-in-chief, and in that regard there may be no

18   need for any witness.  But there are witnesses who have other

19   things to say and can also say that, and for that reason, I

20   think if that is all the witness has to say, I am inclined to

21   say they should not be testifying as a witness at this trial.

22          MS. SHROFF:  May I just have one second with Mr.

23   Schulte?

24          THE COURT:  You may.  But I really need to go.

25          THE DEFENDANT:  Judge, if there is any way at the

1   beginning of Friday I can work through -- if we just work on

2   the few, the eight or so the government has specified, we give

3   them the list, they submit their submission, and then Friday

4   morning we can go through it and hopefully work it all out so

5   we don't need to come back.  Would that work out?  Friday

6   morning at the SCIF.

7           THE COURT:  If you all can work it out and you report

8   back to me that there is no need for a hearing, great.  I am

9   more than happy to do that.  I have a sentencing Friday

10  morning.  I have another criminal appearance Friday morning.

11  And I may be continuing a hearing that otherwise will take all

12  day tomorrow and Friday.  So I have even less time than any of

13  you guys have, and I am not happy about this.  But it seems to

14  me that we need to resolve this, and by doing this *ex parte* you

15  have prevented the government from seeing it.  I am not going

16  to allow that any longer, but the fact of the matter is we need

17  to resolve it.

18          I don't have a copy of that list that is not marked up

19  with my own notes.  Ms. Shroff, can you get a copy to the

20  government promptly?  What is the best way to arrange for that?

21          MS. SHROFF:  Mr. Schulte would have to be taken to the

22  SCIF now.

23          Your Honor, what I was trying to get Mr. Schulte to

24  tell the Court, may I?

25          THE COURT:  Yes.

M688SCH2                    TOP SECRET/█████NOFORN

```
 1          MS. SHROFF:  I think Mr. Schulte will have largely
 2   resolved the issues on the 8th. ████████ would be the
 3   first person he would actually call.  And there is one other
 4   person whose name starts with ████  So the government is on
 5   notice already that they need to make travel arrangements for
 6   those two individuals.
 7          To the extent there are any others that we need to
 8   litigate about, we can certainly do that on Monday after the
 9   jury is picked, because none of these witnesses are going to be
10   called for at least another two weeks, and the government has
11   the 20th and the other two days that the Court is not sitting
12   to make whatever travel arrangements they need to make for a
13   person to come from Washington or Virginia to New York.  It
14   seems like a very simple travel itinerary to put in place, even
15   if you are traveling ████████████  I am sure all of
16   these people travel and take their kids to, I don't know where
17   people take their kids these days, Five Flags or Six Flags.
18          THE COURT:  Be that as it may, we will reconvene on
19   Friday at 1:00 if the parties haven't resolved it before then.
20          The government is to get a copy of this list no later
21   than tomorrow.  I assume if Mr. Schulte can be brought to the
22   SCIF now and they can get a copy now, all the better.  But in
23   any event, certainly by tomorrow they should have it.
24          Standby counsel, if you can facilitate that, I will
25   appreciate it.  And if you resolve it before Friday at 1 p.m.
```

M688SCH2                    TOP SECRET/█████ NOFORN

1   that will make me thrilled.   Just let me know and then we can

2   cancel that proceeding.

3           See you on Friday unless you manage to resolve it.

4   Otherwise I will see you on Monday in 23A at 9:30.

5           (Adjourned)