MX63sSCH                    SEALED

1              THE COURT:  All right.  I'll pick up where we left

2      off, but in closed classified session.

3              MR. HARTENSTINE:  Sorry, your Honor.

4              THE COURT:  We're good?

5              MR. HARTENSTINE:  Your Honor, yes.  Everyone who is in

6      attendance are appropriately cleared and the courtroom has been

7      secured for classified discussion.

8              THE COURT:  OK.  Everybody please just keep your

9      voices up so that the court reporter can hear.  Hopefully we

10     can make it work even with masks, which is technically what our

11     protocols require.  If not, we'll figure it out what to do.

12             MR. DENTON:  Your Honor, real quickly before we begin,

13     in the interest of time, we just wanted to briefly have a

14     conversation on the record that the U.S. Attorney's office is

15     going to take possession of the defendant's broken laptop in

16     the interest of trying to have our IT staff execute this hard

17     drive swap with the replacement as soon as it's available.

18             We just wanted to make sure there was some record the

19     defendant was aware of it and consented to us doing that.

20             THE COURT:  OK.  I'm guessing his consent may be

21     contingent on this.  I assume it goes without saying that the

22     contents would not be viewed by anyone, but certainly not by

23     anyone associated with the trial team in any way, shape, or

24     form?

25             MR. DENTON:  Only the IT staff as necessary to assure

MX63sSCH                         SEALED

1    accomplishment of the objective.

2              THE COURT:  OK.  Mr. Schulte?

3              THE DEFENDANT:  IT staff should not talk to him, but

4    yes.

5              THE COURT:  I think that was implicit in what

6    Mr. Denton was saying.

7              Just to make it explicit, I take it, Mr. Denton, you

8    would represent that no one on the trial team will know

9    anything one way or another about the contents of the laptop,

10   other than the mere fact that it did or didn't work to

11   transfer?

12             MR. DENTON:  Certainly not, your Honor.

13             THE COURT:  Mr. Schulte, with that understanding?

14             THE DEFENDANT:  Yes.

15             MR. LOCKARD:  One additional clarification.  They said

16   they may need the log-in information in order to make the

17   transfer happen or swap the hard drives.  So, Mr. Denton and I

18   don't need the log-in information.  Our IT staff would like the

19   log-in information so they can do this.

20             THE DEFENDANT:  I'll authorize standby counsel, if

21   needed.  I don't think it shouldn't be needed for swapping the

22   stuff.  If so, standby counsel can speak with them and give it

23   to them.

24             MR. LOCKARD:  We're going to try to to this, this

25   afternoon.  I don't know how long this conference is going to

MX63sSCH                    SEALED

1   go, but we're going to try to do it this afternoon.  If it runs
2   too late, we may lose access to the personnel who would be able
3   to do it today.

4            THE COURT:  OK.  Well, all the more reason, let's get
5   started and try to do this as swiftly as we can.  I'm sure you
6   all want to be done with this as, as I want to be done with
7   this.  I didn't think we would be going this long as it is.

8            One other option on that front would be for
9   Mr. Schulte to write down the log-in information and put it in
10  a sealed envelope, and that would be provided to the IT staff
11  only to be used in connection with the swap.  That might
12  facilitate things and avoid any miscommunication.

13           MS. SCHROFF:  That's what we did the last time, your
14  Honor.  We're prepared to do it again.  This is not an issue.
15  I don't know why --

16           MR. LOCKARD:  Cheryl is requesting to take the broken
17  laptop back now.

18           Do you want to give her the log-in information?

19           MS. SHROFF:  Sure.  We offered that to you when we
20  gave it at one o'clock.

21           THE COURT:  Write that down now.

22           Ms. Smallman, do we have an envelope?

23           Does someone have an envelope?

24           (Pause)

25           Let's get started then.  Various issues on my agenda

1  are the most recent Section 5 notice that Mr. Schulte filed, I

2  think, yesterday, maybe a date from a few days ago.  In any

3  event, I got it yesterday, his letter dated yesterday raising

4  three items.  One pertaining to the ████████████████

5  substitution issue, one relate to the use of pseudonyms, and

6  the third the information issue.

7           The third, if we have time to get there, would be the

8  6E motion on NDI.  We also need to discuss further the audio

9  recordings that we began discussing upstairs.

10          I don't know if others have additional items?  I think

11 that covers -- oh, and the witness list issue as well.

12          Let's start with the witness list issue.  Again, I

13 think both sides have a point here.  I don't know if there is

14 an amicable way of just cutting through this and resolving it,

15 but it does seem to me like the government's arguments are most

16 forceful with respect to ███████████████████████████

17 ███████████████    as to whom bringing them here would be rather

18 burdensome.

19          Mr. Schulte, I'm not saying you're proceeding in bad

20 faith.  I think to the extent that it can be identified ahead

21 of time that you don't intend to call someone, obviously

22 bringing them here just for the sake of bringing them here is

23 not something I want to entertain or license, and to the extent

24 that we can resolve any legal issue before they are brought

25 here, we should.

MX63sSCH                    SEALED

1          In an ideal world, everybody could sort through this

2     on their own and I wouldn't need to resolve the dispute, let

3     alone figure out whose burden it is and who has to make a

4     motion.  I'm open to suggestions.

5          Mr. Denton, I don't know if you want to specify the

6     witnesses of particular concern or if you have any suggestions

7     on this front.  I know that there was -- I need to find it --

8     there was one additional witness who Mr. Schulte identified in

9     his ex parte submission whom he does not intend to call.  I can

10    share that name now.

11         Go ahead.

12         MR. DENTON:  Your Honor, per the court's suggestion,

13    we provided the defendant with a list of the witnesses for whom

14    it would be most burdensome for us to bring.  I don't have it

15    here.  We provided it to him on June 1, as the court suggested.

16         So I would think I would be a reasonable starting

17    point to find out whether there are people there he doesn't

18    intend to call.  It seems likes the obvious answer here is to

19    do exactly what happened the last time, which is the defendant

20    wants to pare this list down to a reasonable number of people.

21    We'll just defer on the discussion and make sure that those

22    people are there.

23         But I find it hard to envision a universe in which he

24    is going to have 40 witnesses with noncumulative testimony to

25    offer.  And so if he's going to insist that there are, then I

MX63sSCH                         SEALED

1    think that's a situation in which it really is on him to make

2    an appropriate proffer.

3               THE COURT:  How long is the list of witnesses that

4    you're most concerned about?

5               MR. DENTON:  I think it's about 15, your Honor.

6               THE DEFENDANT:  It's addressed in my letter.  I

7    actually note the ones that are "burdensome." I think one of

8    the more important ones was ███████

9               I think the defense just wanted to get clarification

10   on ██████████████, because I think she's one -- she

11   testified at the last trial.  So she is actually very important

12   to the defense.  She was the group chief.  She was involved in

13   all these decisions, so I think her name came up a lot.

14              I think one of the things we wanted to ask was just

15   clarification on ███████████████ and if there is some way

16   that we can help and her availability, if there is something we

17   can do to help that.

18              MR. DENTON:  Well, I think, your Honor, that's a

19   little bit of a different category.  That is not someone for

20   whom there is sort of a national security concern.  I'm

21   honestly not -- I don't know the specific nature of ████████

22   ██████████   I'm not sure we would be at liberty to share that

23   in any event.  All I know is that she has been ██████████████

24   ████████████████████████████████████████████████████████

25   ███████████████████████████        That's a separate issue from

SOUTHERN DISTRICT REPORTERS, P.C.

MX63sSCH                          SEALED

1     whether the government ████████████████████████████

2     ████████ .

3                THE COURT:   OK.  Seems to me that the remedy there is

4     to move to quash the subpoena or take a Rule 17 deposition or

5     something, if those are health-related issues.  Certainly from

6     Mr. Schulte's proffer and description of who she is, seems like

7     she's a legitimate witness and would provide noncumulative

8     admissible testimony.

9                She testified at the last trial.  It strikes me if she

10    wants to move to quash the subpoena or the government wants to

11    move for some sort of relief as to her, that should happen.

12    But if the question is simply whether she has something

13    relevant and admissible and noncumulative to say, certainly

14    seems like she does.

15               MR. DENTON:   Understood, your Honor.  I think we would

16    agree with that, and obviously she testified before in a trial

17    involving all of these parties, so admission of former

18    testimony for an unavailable witness is also an option.

19               THE COURT:   All right.  Very good.

20               To the extent that the government's motion to quash

21    the subpoena served on her, it is denied.  If there is a motion

22    to squash some other relief on some other basis, I'll entertain

23    it.  She's currently under subpoena and required to appear at

24    trial.

25               I'm happy to go.  I don't know if the easiest thing is

MX63sSCH                    SEALED

1   to go down this list of the most burdensome witnesses and start
2   there.

3           THE DEFENDANT:  I think, if it helps the court, if the
4   government -- as the government has said, we don't intend to
5   call 50 witnesses at trial.  The biggest impediment to us is
6   simply the inability to talk to these witnesses.

7           So if the government can help arrange a classified
8   call with these individuals, we could probably knock this thing
9   down very quickly to 10, 12 witnesses.  So I think that's our
10  big thing, is that we just don't know who can give what
11  testimony.  We know what the 302s say, do they remember that,
12  how good of a witness are they, what other information do they
13  know.

14          All these things would typically come out through the
15  investigation.  If they can just have the CIA set up some call
16  and we can just quickly go through these things, we can take
17  care of this.

18          THE COURT:  OK.  I mean the problem is that you're
19  entitled to compulsory process to subpoena to secure somebody's
20  presence at trial for purposes of testimony and doesn't bind
21  them to speak to you before trial in an interview to prepare
22  for that testimony.

23          My understanding is that, as to all these witnesses,
24  the request was made to speak with them, but --

25          THE DEFENDANT:  That's correct.  I was just proposing

MX63sSCH                    SEALED

1    that this is potentially -- if there is some way the government

2    can work this out, I'm proposing a solution.  This could easily

3    be solved if the government were able to convince these people,

4    Hey, talk to them 5, 10 minutes, that's it.  We should be able

5    to figure it out there.

6            I understand that there is no compulsion or nothing

7    necessary.  I'm just saying that, doing something like this,

8    this is just a solution that I'm proposing.  If the government

9    was able to take this, then we could take care of this problem

10   sooner.

11           THE COURT:  OK.  I'll hear from Mr. Denton in a

12   motion.  Mr. Hartenstine, can I speak to you for a second?

13           MR. HARTENSTINE:  Yes, your Honor.

14           (Discussion off record)

15           THE COURT:  Mr. Denton, your thoughts?

16           I mean, I recognize -- I don't think that the

17   defendant is entitled to that.  But to the extent that this

18   does provide a path to resolving this in a more efficient way,

19   let's say...

20           MR. DENTON:  I don't think there is anything more than

21   we could do, Judge.  We've conveyed the request.  This is not a

22   situation which people -- there may be situations in which

23   people haven't responded.  A lot of them are, No, I don't want

24   to talk to him.

25           I'm not sure that it would be any more appropriate for

MX63sSCH                    SEALED

1     the government to try and persuade them to talk to him than it

2     would be for the government to persuade them not to.  We occupy

3     a studied neutrality on this for good reason, and I think that

4     is where we have to stay on that.

5            THE DEFENDANT:  I think we just wanted the government

6     to convey that, in typical situations, you can contact the

7     witness and say, in lieu of actually coming to trial, we may

8     just be able to handle this through a phone call.  So standby

9     counsel knows that this is what happens typically in this

10    process, that they contact them and simply say, Hey, instead of

11    actually coming to trial.

12           So I don't think that these witnesses have actually

13    been alerted to that.  They were just notified, Do you want to

14    speak with the defense counsel?  If they were notified, Hey, if

15    you were to speak with them, then your presence may not even be

16    required at all.  That is something completely different that I

17    don't think they are aware of.

18           To the degree, especially that many of them are

19    ████████  or in difficult positions, I think if they were -- if

20    the government conveyed this to them, they would be more

21    willing to say, let's speak to them and then we won't have to

22    deal with travel arrangements.

23           I think that is all the defense was trying to do.

24           THE COURT:  OK.  Well, let me quickly say the

25    following.  Mr. Schulte has made an ex parte proffer as to the

MX63sSCH                          SEALED

1    following witnesses: ███████ ████████████  ███████

2    █████  ████████  ████████████████.  Based on the

3    proffer, I see no grounds to quash the subpoena on any of those

4    witnesses.

5           If the government is willing to, and willing to convey

6    the substance of the message that Mr. Schulte just conveyed,

7    which is you're presently under subpoena, you're required to

8    appear at trial, but Mr. Schulte has indicated that he may not

9    enforce the subpoena if you're willing to speak with him and he

10   decided not to call you as a witness, then perhaps they will

11   revisit their decision not to speak with him and that's a way

12   to alleviate the burdens on them and on the government.  But

13   it's inasmuch of the government's interest to convey that

14   message as an alternative to appearing as it is making them

15   appear.

16          Mr. Schulte, I'm not going to -- for one, two,

17   three -- eight of the other witnesses, you have simply attached

18   in reference FBI 302s.  I'm not going to read the 302s to

19   figure out what relevant testimony they have.  I asked you to

20   make a proffer.  That is not a sufficient proffer as far as I'm

21   concerned.  I'm happy to give you another opportunity as to

22   those witnesses.  We can take it up on next Wednesday.

23          In the meantime, perhaps the government, as to those

24   eight witnesses, will convey the same message and obviate the

25   need to end up enforcing a subpoena.  I'm not prepared to rule

MX63sSCH                    SEALED

1   on whether the subpoena will be enforced on the basis of this
2   proffer.
3           THE DEFENDANT:  I'll augment.  I think we provided
4   some similar very large amounts of information to Judge Crotty
5   ex parte.  We have the information.  I wasn't sure how much or
6   what the court really wanted.  I'm happy to take all the notes
7   that we have and provide it to the court.
8           THE COURT:  All right.  I want to know enough to know
9   that they have relevant and admissible testimony that's not
10  cumulative of some other witness.  That is what I want to know.
11  You've made a sufficient showing to my satisfaction for those
12  first five.  As to that next eight, you need to do something
13  beyond what you've done here.
14          Now, I don't know what the most critical defense
15  witness category here is, or if the 13 that we just discussed
16  are the lists that the government provided by June 1.
17          Where else do we stand on this?
18          THE DEFENDANT:  The defense witnesses were just the
19  ones that I noted.  The other list was a burdensome list from
20  the government, and then the rest were simply the remainder of
21  the subpoenas.  The burdensome list was just that was the
22  government's list.
23          I can go through and give particular information about
24  the remainder of the government's list, unless the government
25  wants to come up with a different list or do something else.  I

MX63sSCH                    SEALED

1  can have that to the court.

2          (Defense confers)

3          THE COURT:  OK.  I resolved a little bit of this.  I'm

4  open to other suggestions, short of going through this list

5  name by name.

6          But not really hearing much of a suggestion on that

7  score, Mr. Denton?

8          MR. DENTON:  I mean, your Honor, we obviously have no

9  idea what the defendant's proffer was.  We don't actually know

10  what the list of people he subpoenaed is.  We only know the

11  list of people who have reported them so far.

12          Like I said, I think the law is pretty clear that the

13  basic element of the witness's proffer of admissible testimony

14  belongs to the proponent of the testimony.  If we're talking

15  about a universe of 13 witnesses, I think that is something

16  where some number of them we may not have any disagreement, and

17  we'll just make them available as need be or follow some other

18  course as far as letting them know what the defendant has

19  proposed with respect to phone calls.

20          But if we're talking about more than 50 witnesses, I'm

21  honestly not sure what to do.

22          THE COURT:  OK.  Mr. Schulte, back to you.

23          I guess the easy thing to say is, again, there are

24  26 names, for example, on page six of your submission that you

25  simply reference the names and expect me to go through some

MX63sSCH                    SEALED

1    sort of classified discovery to figure out what the relevance

2    is.   That does not comply with my order, which was to specify

3    and particularize what relevant and admissible testimony they

4    have to offer.

5            My inclination would be, unless you supplement that

6    and explain it to me and explain why they are noncumulative and

7    relevant and admissible, that they are not going to be required

8    to appear.

9            What are your thoughts?

10           THE DEFENDANT:   I mean, I can -- like I said, we have

11   provided the substantial information before to Judge Crotty.   I

12   just wasn't sure what exactly the court wanted.   I can augment

13   it and pull back -- pull the data that we provided to Judge

14   Crotty on it and additional information for every single

15   witness, or I think the best thing is for the government to

16   pick out the ones that are most troublesome, and I should do

17   that for those witnesses, such as the 12 or 13 burdensome

18   witnesses.

19           But if the government is simply going -- I mean, the

20   issue comes down to the same thing.   I mean, this wouldn't

21   exist except for the fact that they are CIA witnesses that

22   can't be contacted by investigators.   So that is the big thing

23   that is holding it up.

24           If the government doesn't want to help at all in

25   proposing simple phone calls for these people and wants to push

MX63sSCH                    SEALED

1    the burden on us, it just doesn't seem fair there.  So I think

2    the government should just pick out which ones are the most

3    difficult, and then I can provide the court with substantial

4    information about their testimony, but...

5              THE COURT:  First of all, it's not actually correct

6    that it wouldn't exist but for that.  The fact of the matter

7    is, even if you could approach these witnesses directly and

8    there were no protective order, they are under no obligation to

9    speak to you or speak to an investigator.  It is merely a

10   function of how they are approached, not whether they are

11   required to speak to you.  There is no guarantee they would

12   speak to you even if you asked them yourself.

13             Be that as it may, I don't have the docket here.  I

14   can't see what the terms of my order were.  I'm pretty sure

15   that I required a more detailed showing than you've given me.

16   Having said that, I will give you an opportunity to supplement

17   it.  I don't care whether you submit it to Judge Crotty's

18   retrial or just new witnesses.  I don't know where under the

19   classified files those lists would be.

20             So you would have to make a proffer to me, and it

21   needs to be a detailed and sufficient proffer for me to

22   determine whether they have relevant admissible testimony that

23   is not cumulative.  If you present 15 witnesses basically

24   saying the same thing, you're not going to be allowed to call

25   15 witnesses or allowed to call one, maybe two of them,

125

1          Given that, I would look with care at this list and

2    try to pare it down as much as you can in anticipation,

3    recognizing that you may not have an opportunity to speak with

4    any of these people before they are put on the stand, which is

5    the only thing that a subpoena requires them to do.

6          But the bottom line is, I'll give you an opportunity

7    to supplement this and try again to comply with my order, but

8    this doesn't cut it at the moment.

9          THE DEFENDANT:  So the other issue is with the

10   noncumulative witnesses, I think the problem is, even if I came

11   up with eight witnesses that said the same thing, there is no

12   way for me to narrow it down from eight.  I don't know who is

13   the best witness, who is going to be the best witness on

14   direct, and if they are even going to remember what they said.

15         You see, I'm just going by what they said in the 302.

16   If I randomly pick two witnesses, they say they don't even

17   remember it, I'm really screwed.  If I had the other six to

18   also choose from, then standby counsel can speak with them when

19   they come, say, here is the 302s.  Remember that?

20         How are they going to come off to a jury.  You see,

21   the problem is not necessarily that even to the degree that

22   some may be cumulative, I don't have a mechanism to pick except

23   randomness to say, OK, let's randomly pick XYZ.  They may not

24   be the best witnesses, right.

25         How am I supposed to narrow that?

MX63sSCH                        SEALED

1          THE COURT:  I understand.  But I think, to some

2    extent, it is what it is.  And if they are cumulative, then

3    that is a basis under the law to quash a subpoena.

4          Having said that, Mr. Denton, I would say, while

5    Mr. Schulte makes a more detailed proffer for my purposes,

6    which I'll allow him at least in the first instance to file

7    ex parte, I would encourage you through the CISO, if need be,

8    to convey to all these witnesses the offer that Mr. Schulte has

9    made, which is is that if these witnesses are willing to speak

10   with them in advance of trial, they may not be required to

11   appear and comply with the subpoena.

12         But, Mr. Schulte, when are you able to -- I don't

13   remember what your SCIF days are these days, or what other

14   submissions you have coming down the pipe.

15         When would you be able to give me a more detailed

16   submission?

17         (Defense confers)

18         THE DEFENDANT:  I think I lost the SCIF day today.  My

19   next one is Monday.  I don't know if there is any way to try to

20   makeup the SCIF day, say, next Tuesday or something like that,

21   to be able to give me until Tuesday to finalize that list.

22         Then I wanted to raise some of these witnesses here,

23   such as we never figured out ████ right.  We never figured him

24   out.

25         Basically, some of the witnesses the government has

MX63sSCH                          SEALED

1   never gotten back to us about them.  This happened before at

2   the first trial.  There was like four or five.  One of them was

3   a major witness, and the government simply never contacted him

4   or provided us any information at all.

5           One of them was ████████████   He is one of the

6   witnesses who has never been contacted even by the CIA, and

7   there is four or five other ones.  That's another issue.

8           THE COURT:  I don't understand what that means.

9           Under the protective order, if you make a request, the

10  CIA is supposed to contact them.  It's your belief that that

11  hasn't been done?

12          THE DEFENDANT:  That's correct.  For some of them,

13  basically, the list, it says contacted yes or no as a column

14  and it doesn't say anything.  The whole row is blank for those

15  individuals.  This happened, the same thing before, at the

16  first trial, where several witnesses were not even contacted at

17  all by the CIA and we didn't have any chance to talk to them.

18          THE COURT:  Mr. Hartenstine, do you know what the

19  story is with those witnesses?

20          MR. HARTENSTINE:  Your Honor, I believe -- my

21  understanding from the CIA team working with them directly on

22  the witness issue, is that those witnesses have not been

23  reached successfully.  So there have been attempts to contact,

24  but they have been unsuccessful.

25          (Defense confers)

1          THE COURT:  Mr. Schulte.

2          THE DEFENDANT:  Yeah.  I mean, if they work for the

3     CIA, I'm not sure how they are having difficulty contacting

4     them.  But basically, if it gets to the point where they are

5     not able to contact them, then we should be able to reach out

6     directly, because how else...

7          I mean, how else can we contact them, right?

8          If the process is set up so the CIA is supposed to be

9     doing it, and the CIA is saying, well, we can't do it, we tried

10    our hardest.  That is not good enough.  There has got to be

11    some way that if they -- if they work for the CIA, how are they

12    not being contacted.  I'm failing to understand what's going

13    on.

14         THE COURT:  Do we know if these are current employees

15    or former employees?

16         I assume not current, otherwise the CIA would

17    presumably know where they are and although to contact them.

18         MR. HARTENSTINE:  Your Honor, I assume the same.  I

19    can't say I know for sure whether or what the status of each

20    individual is.

21         THE COURT:  The CIA is supposed to be one of the most

22    sophisticated spy organizations in the world.  They can't track

23    down their own current and former employees?  That seems a

24    little farfetched.

25         MR. HARTENSTINE:  I'm not sure, your Honor.

MX63sSCH                    SEALED

1              THE COURT:  I know you're the messenger here, but...

2              MR. HARTENSTINE:  Unfortunately, right, that's all the

3    information that I have to provide.

4              THE COURT:  Mr. Denton, do you have any thoughts on

5    this?

6              MR. DENTON:  I don't know anything about it, your

7    Honor, obviously, because we're doing this all through the wall

8    process, to the extent that we can convey to the wall people

9    that this needs to be resolved, we're happy to.

10             I do want to say, your Honor, I think that the court

11   should not give the defendant past Monday to supplement his

12   proffer.  He's got a SCIF day.  The court already pushed back

13   his deadline to make this proffer once.  He didn't make a

14   sufficient proffer.  That would be a basis for the court to

15   rule.

16             If the court is giving him the opportunity to do more,

17   he should do it in a timely fashion.  There are witnesses for

18   whom this is particularly burdensome because of their roles

19   that are particularly sensitive.  It is burdensome for

20   everybody else, too, to be keeping the entire month of June

21   available.

22             If there are any number of witnesses who are not

23   ████████████████████, who nevertheless had to ███████████

24   ██████, or otherwise curtail their activities because the

25   existence of the subpoena means that they need to be available.

MX63sSCH                         SEALED

1          So it is reasonable at this point, when the court is

2     giving the defendant a sporting chance at this, to require him

3     to do it in a timely fashion.

4          THE DEFENDANT:  I think --

5          (Defense confers)

6          THE COURT:  There are two separate issues here.  I

7     think I may well require it by Monday, but I would note that

8     the government didn't raise this issue until May 19 itself.  To

9     the extent that the government is both raising its own burdens

10    and the burdens on these witnesses, it was incumbent upon the

11    government to raise it sooner, recognizing that these are

12    complicated issues and you would need to work through them.

13    And between the limited opportunity for Mr. Schulte to make

14    submissions and for me to resolve it, it doesn't leave a whole

15    lot of time before trial.

16         I hear you.  I understand it.  I recognize that you

17    may not have known who the list was, this time, until recently.

18    But presumably much of this list is coextensive with the list

19    from the first trial, and a lot of it could have been hashed

20    out sooner.  Both of you could have made this easier for me.

21         Mr. Schulte, first I think that I need to understand

22    if these witnesses have not been contacted, what efforts the

23    CIA has made to contact them.  I don't know if that showing

24    should come through the CISO or, is that true, wall counsel

25    needs to make a showing or declaration needs to be filed.

1          But I don't think it is enough to say we tried and

2     just didn't reach them.  I don't know if that means leaving a

3     voicemail message and never trying again.  I don't know what

4     efforts it entails.  I don't know if these are current

5     employees in which case it defies belief that the CIA couldn't

6     actually reach them and contact them.

7          Frankly, it defies the believe they wouldn't be able

8     to contact them even if they were former employees.  I need to

9     understand whatever lists are on that list who have not been

10    contacted, why that is and what efforts were made.  If you want

11    to convey that to the wall team and have them make a submission

12    to me and make an adequate showing to satisfy me that they have

13    made an adequate effort, that would make sense.  I'll leave

14    that to you.  I assure you that I'm not going to simply accept

15    that they haven't been able to be reached.

16          Does the government know who is on that list?

17          MR. DENTON:  No, your Honor, we do not.

18          THE COURT:  I assume the wall team must know who's on

19    that list since they are the ones who have been coordinating

20    this, or Mr. Hartenstine knows?

21          MR. HARTENSTINE:  Yes, your Honor, I know.  And the

22    wall team, which I should note only exists within the CIA at

23    this time, is aware of the entirety of the list as well.

24          THE COURT:  OK.  They need to understand that if those

25    people are not contacted this weekend, that I need to

MX63sSCH                    SEALED

1    understand what effort was made to contact them and why they

2    were not able to reach them.

3            MR. HARTENSTINE:  Yes, your Honor.

4            THE COURT:  What form that takes, I'll leave to you

5    guys to figure out.

6            Mr. Schulte --

7            Yes, Mr. Denton?

8            MR. DENTON:  Your Honor, I don't want to belabor the

9    point.  Just so the record is clear about the history here, the

10   government did raise this issue in its motions in limine on

11   April 22, noting that because of the wall issue, we did not

12   have a specific list of who was involved, but that this issue

13   had arisen before and would likely need to be addressed again.

14           I think, frankly, we did not anticipate, given the way

15   this played out the last time in which the defendant elected

16   not to bring this huge number of people up, that he would

17   choose to subpoena people whose testimony had been precluded,

18   subpoena people whom he had elected not to call after dragging

19   them up here.  So we are happy to deal with what the timeline

20   is, given where we are now, but I think we have tried to put

21   this issue front and center.

22           THE COURT:  All right.  I don't think we need to

23   belabor the point.  I don't have your motion in limine in front

24   of me because it's on my iPad.  I think you simply alerted me

25   that there likely would be an application made of that sort, if

1    it was a lengthy list, not that you actually had raised it for

2    me to resolve.

3            But the point is well taken and certainly to the

4    extent that Secretary Pompeo's presence on the list is an

5    indication, I think the fact that Mr. Schulte has subpoenaed a

6    witness and provides no additional information beyond the

7    information that was given and found unsatisfactory in the

8    first trial, does suggest to some extent that Mr. Schulte has

9    not made an effort to pare down the list in good faith.

10           Mr. Schulte, I'll give you until Monday to file any

11   more detailed proffer recognizing that I think my order was

12   clear and you haven't complied with it to date.  I'll give you

13   an opportunity to fix that and cure it.  I'll try to get you

14   another SCIF day on Tuesday.  I'll speak to the marshal.

15   You're going to have to prioritize this.  We need to resolve it

16   sooner rather than later.

17           Understood?

18           THE DEFENDANT:  Yes.

19           THE COURT:  All right.  Next is the defendant filed

20   another Section 5 notice, I think dated June 2, if I'm not

21   mistaken -- at least I received it on June 2 -- referring to, I

22   guess, a recording of an interview of a witness.  I guess the

23   question I have on this is, I gather there is an unclassified

24   3500 document, 3507.  Mr. Schulte refers to it as 3507-10.  I

25   think it is dash 510 that I think much if not all of the

MX63sSCH                    SEALED

1    substance of the interview.

2         If that is correct, I guess the question I have is,

3    why can't that be used as a substitute for the audio or

4    whatever recording may be?

5         THE DEFENDANT:  I think what it is, it is a summary

6    and it doesn't really say the name of the person, the

7    interview, and it doesn't contain all of the information from

8    the interview.  I think that was the issue.

9         (Defense confers)

10        For clarity on the record, it is ████████████

11   ████████████Jeremy Weber at the first trial.  So a lot of his

12   testimony at the first trial in this interview with the CIA,

13   this individual gives completely different testimony.  So a lot

14   of that testimony of that video would be impeachment evidence

15   to be introduced.  A lot of it is not in the FBI's summarized

16   report.  And to the degree that it is, it is still a better

17   substitute to at least play audio if the government doesn't

18   want the video showing his demeanor and the way he is --

19        THE COURT:  Why is it that you couldn't have noticed

20   this by the deadline that I set for Section 5 notices?

21        If he testified at the first trial -- I don't know who

22   he is, but I'm sure you or Mr. Denton will educate me on

23   that -- presumably it was reasonably foreseeable that he would

24   testify at this trial, and you knew that you might need or want

25   this for impeachment.

1          THE DEFENDANT:  Yes.  I think the issue is the

2     government stated on the record that they were cutting their

3     witnesses down substantially, completely changing their case.

4     And in talking with the experts on CIPA, I was not able to --

5     I'm not able to successfully litigate information or evidence

6     or try and argue its relevance based on speculative inferences

7     from the government's case.

8          I was informed that, you know, these types of

9     arguments cannot be successful until the government's witness

10    list is disclosed.  To the degree that the government could

11    have specified that these witnesses would be testifying

12    beforehand, I would have known.  For example, several of the

13    witnesses, at least three or four of them, were not testifying

14    and there is videos of them as well.

15         So the court would have either had to -- I think the

16    case law I quoted on there was *U.S. v. North*, where you can be

17    overinclusive, right.  So if I had videos of five other --

18         THE COURT:  Mr. Schulte, let me stop you.  It would

19    not have been overinclusive if this witnesses testified at the

20    other trial.  Here, it is the classified information.  If

21    called as a witness at this trial, I would be prepared to use

22    the government could then respond saying we're not planning to

23    call that witness at this trial and moot the issue.  If it

24    wasn't mooted, then I could resolve it in the normal course and

25    timely fashion.  Doing it this way doesn't enable me to do

MX63sSCH                    SEALED

1     that.

2             Fine.  But what is it.  I'll hear from the government

3     who this witness is and how likely it was that you would know

4     that he would be called at this trial.  Before I do that,

5     anything in particular that is in the video that is not in the

6     unclassified 3500?

7             In other words, the fact that you would prefer to use

8     a video or audio doesn't cut it.  If you can substantially make

9     use of this and it doesn't substantially impede your defense,

10    then this is an adequate substitute under 6C.  But regardless,

11    it would probably moot the issue for my purposes.

12            What is it that the video has that this does not?

13            THE DEFENDANT:  I mean, I can give the court -- I can

14    give the court specifics.  I mean, if the court wants to

15    basically not do the video, the government should have the

16    complete transcript.  So if I can get the complete transcript

17    and then pick out the things that I intend to use, maybe that

18    solves the problem there, and there is not a need to go through

19    and litigate this extensively.

20            THE COURT:  All right.  You had other untimely

21    Section 5 notices that were filed before, based allegedly on

22    3500 and government exhibit disclosures.  Why is it that this

23    one you waited until June 2 to file it?

24            (Defense confers)

25            THE DEFENDANT:  Like I said, I consulted with and

1    reviewed the case law and consulted with experts on the CIPA

2    matter.  And from my understanding, if I made these arguments,

3    the government could simply say it is not relevant, speculating

4    on who we are going to call.  We haven't decided yet.

5                THE COURT:  That wasn't my question.  My question was

6    you have now submitted -- I think, I've lost track -- six CIPA

7    Section 5 notices, including at least two that were filed --

8    three including this one -- that were filed after the

9    February 18 deadline that I set.

10               THE DEFENDANT:  That's correct.

11               THE COURT:  Your rationale for the fourth and fifth

12   was that it was based on disclosures and the government's 3500

13   material.  What explains the need to file another one yesterday

14   and why couldn't you have had added it to that one?

15               THE DEFENDANT:  So I think in the first notice that I

16   gave after receiving the 3500 material and the exhibits, I

17   stated that as I'm going through the 3500, there may be

18   additional information.  So as soon as -- I started to

19   review -- the government has massive 3500 and exhibits.  I

20   started to review that material.  And then as I spotted the

21   information that they provided, then I immediately would

22   provide that to the court pursuant to the statute.  That is

23   what I did.

24               As I was reviewing the data, I immediately marked

25   everything down.  And then as soon as I had something, I sent

MX63sSCH                SEALED

1    it to the CISO for you.  But I also wanted to raise one more

2    point that the standby counsel makes, that the video is very

3    important for facial expressions, body language, demeanor.  So

4    it's not -- I'm not in the reasonably same position without the

5    video.  The bias that's in there too.  So it's substantial to

6    be able to show the jury the video and how someone is behaving

7    rather than some summary from an FBI agent.

8              THE COURT:  All right.  Mr. Denton.

9              MR. DENTON:  So, your Honor, ███████████ ██

10   ████████████████████ Jeremy Weber, was one of the

11   defendant's colleagues in the operational support branch.  He's

12   a significant fact witness who testified at some length in the

13   first trial.  I don't think it is credible for the defendant to

14   say he didn't know whether he was going to be the one of the

15   witnesses called again.  I really don't think that holds water.

16             This is all something that the defendant has had for a

17   long time and has known.  There is no reason why this couldn't

18   have been the subject of notice earlier.  It is also a very

19   long video.  So to the extent that he is just noticing the

20   video, we think that he falls well short of the Collin standard

21   for specificity under Section 5.

22             THE DEFENDANT:  So just a point on that, is that ████

23   ██████ was a colleague of mine, but he wasn't even involved in

24   the majority of the events.  Several of the witnesses, such as

25   Dave ████████ who was involved in the actual network

SOUTHERN DISTRICT REPORTERS, P.C.

1    infrastructure, would be someone who I would have considered

2    more the most likely witness for the government to recall, yet

3    they didn't call him.  The same with the CIA investigator,

4    Lenny Small, I think is what he investigated as.  I would have

5    assumed that these two witnesses would be more likely for the

6    government to call.

7         But Jeremy Weber, ███████████ wasn't even involved

8    in the majority of the issues at stake.  A lot of the

9    information that the government tries to get out of him related

10   to the government -- related to the network that he doesn't

11   even have any direct knowledge of.  He was just ██████████

12   ████████   We separated.  We weren't even in the same branch

13   for the duration of all of the events that transpired.

14        So I -- based on the government's own on-the-record

15   statement they are cutting the witnesses significantly,

16   completely changing the trial strategy, my understanding is

17   that they would get different CIA witnesses so there wouldn't

18   be impeachment evidence for them, because they had so many to

19   choose from.

20        There is no way for me to know ahead of time that they

21   are going to recall this witness, but not these other witnesses

22   that they chose, who more likely have more information than

23   Jeremy Weber.

24        THE COURT:  All right.  I'm going to strike the notice

25   as untimely and sufficiently specific.

1          I agree with Mr. Denton.  I think the time has come to

2     start enforcing the deadlines.  I've bent over backwards to let

3     Mr. Schulte file several late ones that were probably

4     unjustified in themselves, but particularly unjustified that

5     this one trails those by a significant margin.

6          The point of the Section 5 and CIPA process more

7     generally is to resolve these issues in a timely and orderly

8     manner.  The point of setting a deadline back in February was

9     to enable us to do that, to brief these issues appropriately,

10    to deal with any declassification issues.  The fact of the

11    matter is that serving a Section 5 notice on June 2 -- and it

12    is dated May 27, but I didn't receive it until June 2 -- is

13    insufficient time to do that here, and particularly given that

14    there is an unclassified summary of the interview.  I think it

15    was incumbent upon Mr. Schulte to identify more than the video,

16    generally to specify what he needed allegedly for this.  Bottom

17    line is, I think he needed to do more and sooner, and this is

18    too little to late.  I'll strike it on that basis.

19         Next is the letter I received, also dated -- this one

20    is dated yesterday.  It raised three issues.  One is -- I'll

21    take them in reverse order.  One is, I think, asking if the

22    government intends to open on the information war issue or

23    introduce that evidence so that Mr. Schulte knows what to

24    elicit from whom.

25         I'm not sure Mr. Schulte is entitled to that notice.

MX63sSCH                    SEALED

1   Mr. Denton, do you want to respond?

2            MR. DENTON:  So I have to confess, your Honor,

3   Mr. Lockard and I were both traveling yesterday.  I have not

4   actually seen that letter yet.  I think we can safely say it is

5   likely that we will refer to the fact that in the defendant's

6   MCC notebooks, he described an information war.  I don't know

7   what more that we would say or what characterization of our

8   arguments would be relevant.

9            THE COURT:  Have you seen a copy of his letter from

10  yesterday?

11           MR. DENTON:  I have not yet.

12           Did you get a chance to see it?

13           MR. LOCKARD:  No.

14           THE COURT:  All right.  Why don't I give it to you.

15  You can look at it.  It's only two pages long.  There are three

16  issues, the other two of which are potentially more

17  significant.

18           Let's discuss it when you've had a chance to review.

19           THE DEFENDANT:  Judge, one second.

20           Standby counsel notified an issue with the witnesses

21  again.  I don't know if you want to bring this up at the end or

22  you want to talk about it again right now?

23           THE COURT:  My general mode of operations is when I

24  resolve an issue, I would like it to be resolved and not to

25  have to revisit it.  That doesn't seem to be the way this case

SOUTHERN DISTRICT REPORTERS, P.C.

1   proceeds.

2            In any event, I'll take it up after we discuss this

3   letter.  First, on the information war, Mr. Schulte, you have

4   heard the government is likely to rely on that, and you can

5   proceed accordingly and tailor your opening and your

6   questioning of witnesses accordingly.

7            There are two other issues here.  Again, I'm taking

8   them in reverse order.  One has to do with ███████████████

9   ███████████████  ███████████████  ███████████████

10  ████████████████████████  ███████████████████████

11  ███████████

12           I guess I think we may be able to resolve this in the

13  following sense.  ████  ████████████████     ██████████████

14  ███████████████  ████████████████████  ██  ██████  ████

15  █████████████████████████████████████

16  ██████████████████████████████████████

17           MR. LOCKARD:  ████████████████████████████

18  ██████████████  ██████████████████████████████████

19  ██████████  ██████████

20           THE COURT:  All right.  So my inclination is to say

21  this is too late to raise that issue.  The government has

22  already prepared the 3500 and exhibits and the reliance on

23  Judge Crotty's orders.  So to the extent that Mr. Schulte had

24  this concern -- I'm certainly not saying it is an illegitimate

25  one, I think it is a fair issue to raise -- I think it was

MX63sSCH                        SEALED

1    incumbent upon him to raise it way, way, way sooner in this

2    process so that the government had adequate time to adjust, if

3    need be.

4            I don't know, Mr. Denton, if you wanted to add

5    anything to that or you disagree with that?

6            MR. DENTON:  No, your Honor.  I think there is more we

7    could say on the substance, but we agree with the timing of it.

8            THE COURT:  Do you want to say more on the substance

9    just for the record?

10           MR. DENTON:  The only thing I would note for the

11   record, your Honor, ████████████████████████████████████████ ▮

12   ██████████████████████████████████████████████████   ████████

13   ███████████████████████████████████████████████████████

14   ██████████████████████    ████████████████████████████████████

15   █████████████████████████████████████████████████████████

16   ███████████████████████████████████████████

17           This was a component of the litigation before Judge

18   Crotty.  This was an argument that was made and rejected.  Yes,

19   I think it is better to stay the course with how we've

20   proceeded thus far.

21           THE DEFENDANT:  To correct the record, that is

22   absolutely not -- █████████████████████████████████████████████

23   ███████   ██████████████████████████████████   ████████████████

24   █████████████████████    ██████████████████████████████████████

25   ██████████████████████████████████   ██████████████████

MX63sSCH                    SEALED

1    ████████████████████████████

2       ████████████ █ ███████████████████████  ████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████  ████████████  ██████████

5    ████████████████████████████████████ What he

6    just said is completely false.  It's not true at all.  It

7    wasn't -- that wasn't raised before Crotty about that either,

8    just to be clear on that.

9         Then regarding the timing, I think the government just

10   recently moved again for this kind of courtroom closure.  We

11   only recently briefed this.  So the reason I was bringing it up

12   again was in case the court overlooked this issue.

13        THE COURT:  Mr. Schulte, I can't have overlooked it

14   because you didn't raise it, and you were given an opportunity

15   to address it and to be heard on that issue, and you didn't

16   raise it at the time.

17        THE DEFENDANT:  I --

18        THE COURT:  Bottom line is, the request is denied.

19        To the extent that Mr. Denton's representation is

20   accurate, that is a good substantive reason on the merits for

21   it.  Regardless, it is too late to do at this point, and I'm

22   not going to entertain it.  You'll have to deal accordingly.

23        With respect to the first point concerning Foreign

24   Office West, ████████████████████  I think there is an argument

25   that I had resolved this by adopting Judge Crotty's ruling on

MX63sSCH                    SEALED

1    it.  There is also, I suppose, an argument that the ground has

2    shifted given my ruling on the public disclosure issues.  I

3    think that is a fair one to sort of re-raise in advance of

4    trial to make sure everybody is on the same page about it and

5    discuss whether and to what extent referencing ████████ in

6    particular is necessary for Mr. Schulte to make the arguments

7    he wants to make with public disclosure.

8         This sort of dovetails with the last issue that I --

9    substantive issue that I want to discuss, which is the NDI 6E

10   stuff, so it might make sense just to merge the two and discuss

11   them together, unless there is a reason to deal with them

12   separately.

13        Mr. Denton, do you have a view on that?

14        MR. DENTON:  No, your Honor.  They are very much

15   linked in our view.

16        THE COURT:  OK.  Before we turn to that, let me deal

17   with just two relatively short, I hope, issues.  One is

18   discussed with Mr. Hartenstine.

19        My understanding is that the preferred approach, if

20   there is spillage, for lack of a better way to describe it at

21   trial, that is to say someone -- let me put it this way.  We

22   start by saying, I obviously trust that everybody is going to

23   do their absolute best to ensure that you don't say anything

24   that is classified or reveal any classified information.

25        I also trust that you will do your absolute best to

MX63sSCH                     SEALED

1    prepare any witnesses that you are calling to ensure that the

2    witnesses understand the parameters of what they can and cannot

3    say.  And I understand that in the last trial, there were some

4    particular issues with respect ██████████   ████████████

5    ██████████████████████████████████████████   ████████

6    ███████████████████████████████████████████

7    ██████████████

8         ██████   ██████████████████████ ██  ████████████

9    ██   ██████████████████████████████████████

10   ██████████████.  And to the extent that there are problems, I

11   want to head them off in advance and not have to deal with them

12   *post hac*.  Number one, this is an admonition, and probably more

13   directed at the government.  But to the extent that Mr. Schulte

14   calls witnesses, him, too.

15        Make sure that you make your witnesses understand ████

16   ████████████████████████████████████████████████

17   ██████████████   ██████████████.  But to make sure

18   that you do your job to prevent any sort of spillage or problem

19   at trial.

20             Mr. Denton, Mr. Lockard, do you understand that?

21             MR. DENTON:  Completely, your Honor.

22             THE COURT:  Mr. Schulte, do you understand that?

23             THE DEFENDANT:  Yes.  But most of my witnesses

24   wouldn't -- I wouldn't be able to speak with them.  Someone may

25   need to, right, someone may need to do that for me.  I don't

MX63sSCH                    SEALED

```
 1    know.  If they won't speak to me, I can't really do that,
 2    right?
 3               THE COURT:  Understood.  To the extent that you are
 4    calling a witness you have not had an opportunity to interview
 5    and discuss this with, we will discuss that when the time
 6    comes.  And either Mr. Hartenstine or someone will convey what
 7    that witness needs to know and doesn't need to do in each
 8    respect.
 9               The second thing is my understanding from
10    Mr. Hartenstine is the preferred approach, if someone runs
11    afoul of this and something classified is said during trial,
```



```
16                                          I want to make sure that
17    everybody is on the same page in that regard.
18               Mr. Denton?
19               MR. DENTON:  I think for minor things like that, that
20    is right, your Honor.  I think it is possible that if we start
21    appearing to go, actually, down the road and more than just a
22    slip of the tongue, that it may be something that we ask to be
23    heard at the sidebar on.
24               THE COURT:  I was referring to the sort of inadvertent
25    just mention of a name or something of that sort, not a more
```

MX63sSCH                    SEALED

1    substantial issue that might warrant being raised and

2    discussed, if not at sidebar, then in the robing room or even

3    in this courtroom or wherever we're allowed to be.

4            MR. DENTON:  Yes, your Honor.  Within that category,

5    we agree.

6            THE COURT:  Mr. Schulte, good?

7            THE DEFENDANT:  Yes.

8            THE COURT:  All right.  In that case, the only last

9    thing on my agenda is the NDI.

10           MR. DENTON:  If I may just, your Honor, on that, we

11   certainly hope to avoid it wherever possible.  Per the sort of

12   provisions of the witness protection order, we try to get the

13   transcripts out as quickly as possible.  I think the order

14   specifies the effect of the day after testimony.

15           What we did last time -- I think we can do again

16   here -- to the extent anybody does identify any such issue,

17   make an application by letter to the court the following

18   morning so that hopefully we can address it at a lunch break,

19   if need be, or otherwise still try to be in a place to get the

20   transcripts out as quickly as we can.

21           THE COURT:  Understood.  Agreed.  I want to just

22   repeat that I gather in the last trial ███████████████████

23   ███  ██████████████████████  ██, ████████████████████

24   ██████████████████  ████████ ██████████████

25   ████████████████████████████████

MX63sSCH                          SEALED

1              I'm not going to be happy to get that sort of

2       application.  Better to avoid that happening in the first

3       instance than to make that application.  Because I'm warning

4       you that it may or may not be granted.  ▌ ███████████████

5       ███████████████████████████▌ ███████████████████████████

6       ███████████████████

7              MR. DENTON:  Understood, your Honor.

8              THE COURT:  So good.

9              All right.  Anything else, other than the NDI issue,

10      government needs to raise?

11             MR. DENTON:  That's it from us, your Honor.

12             THE COURT:  OK.  Mr. Schulte, anything else on your

13      end?

14             (Defense confers)

15             THE DEFENDANT:  Yes, I think there is two issues.

16             One, going back to the witnesses, I just wanted to

17      alert for the court that in addition to the people who have

18      never been contacted, there is multiple people who haven't been

19      followed up on.

20             For example, they say something like, oh, they will

21      get back to them or there needs to be follow up.  I just wanted

22      to note for the court that some of them said that they will

23      think about it and some of them simply have other -- simply

24      need to be -- to talk to, again, that haven't been.

25             To the degree that some of the witnesses hadn't been

MX63sSCH                    SEALED

1    spoken to at all, there should be some followup as well.

2              (Defense confers)

3              THE COURT:  I think Mr. Schulte is entitled to a

4    straight answer yes or no.  Anyone who is not in that category

5    and has either not given an answer or not been reached, I think

6    I need an explanation of what effort has been made or they need

7    to be contacted again, or what have you.

8              Mr. Hartenstine, can you convey that to the wall team

9    people?

10             MR. HARTENSTINE:  Yes, your Honor.

11             THE COURT:  OK.  What's the other issue?

12             THE DEFENDANT:  The other issue I had was about the

13   declassified documents from the CIPA procedure from the first

14   trial.  So after getting the government's final unclassified

15   production letter, the majority of those documents, like, say,

16   75, 80 percent, were incorporated into government exhibits or

17   defense exhibits.  But there is still about 15 to 20 percent

18   that we don't have anywhere else.

19             I wanted to -- we talked to the government about it

20   and they haven't produced -- they haven't provided any

21   unclassified production of all of those declassified documents

22   from the first CIPA proceeding.  I just wanted to raise that.

23             Some of those documents, like I said, I don't have

24   access to except at the class -- they should be declassified

25   pursuant to the former CIPA proceeding.

MX63sSCH                    SEALED

1              THE COURT:  I have no idea what Mr. Schulte is talking

2      about.  Mr. Denton, maybe you can help me out here?

3              MR. DENTON:  Your Honor, for the first Section 6

4      hearings, that were probably about, I don't know, 1,000 or so

5      documents that we went through in some detail.  Every single

6      one of them was assigned an exhibit number.  That was the

7      control number for purposes of those hearings.

8              So my understanding is that the exhibit production

9      that Mr. Schulte has, he has all of that.  When standby counsel

10     raised the issue with us, we said we think he should have

11     everything.  If there is something you think he's missing, tell

12     us what it is, we will go back and look for it.

13             We were told you should look at the transcript.  If

14     they want to identify for us what was -- what is in this 15 to

15     20 percent, I'm honestly not sure what it could be.  Like I

16     said, literally everything talked about at that hearing had an

17     exhibit number for that purpose.  We're happy to go check, make

18     sure he's got it.

19             THE DEFENDANT:  The CIPA documents included documents

20     to the defense, too, not just the government, pursuant to CIPA.

21     It was the documents we raised.  The majority of the documents

22     are those documents that didn't have an exhibit number from the

23     defense or the government that were never provided for the

24     defense.

25             All I'm asking is, if there is an electronic copy of

MX63sSCH                    SEALED

1   all of the declassified documents, if the government can just

2   produce that declassified document for us.  Maybe the CISO has

3   it, I'm not sure.  But we went through a whole proceeding, a

4   whole hearing to declassify these documents.  Whatever the

5   result of those hearings were, I have never received an

6   official unclassified production of those.  That is all I'm

7   trying to get.

8           I don't know if the CISO is in control of that or what

9   is going on.  Do you know?  Whatever.

10          MR. DENTON:  Your Honor, I may be able to help here.

11  The CISO is not in control of that.  The outcome of the 6E

12  proceeding is not declassification.  That is still an executive

13  function that happens after the government decides to

14  essentially accede to the 6E ruling and not exercise the other

15  rights eligible to it under CIPA.

16          The declassification that occurred resulted in a

17  production of a whole range of government and defense exhibits

18  to the defendant, which should include everything discussed at

19  the hearing.  I do not remember there being documents at that

20  hearing that did not have exhibit numbers, because we were

21  dealing with tables full of binders.  There was no way to keep

22  track of everything except by those exhibit numbers.

23          Again, if the defendant wants to give us some help and

24  tell us what he thinks is missing, I'm happy to look for it.

25          THE DEFENDANT:  Will do.

MX63sSCH                    SEALED

1          THE COURT:  Hold on.  Mr. Denton, the answer is yes or

2     no, do you have an electronic repository of whatever the full

3     universe of these documents is?

4          MR. DENTON:  So yes, the repository of the

5     declassified documents is the set of exhibits, so that's what

6     he has.  Apparently he thinks there are things missing from --

7          THE COURT:  I'm not saying he's entitled to this, but

8     it wouldn't be difficult -- is there any harm in just giving

9     him a copy of the complete set that you have and thereby making

10    sure he has it all?

11         MR. DENTON:  That is what we did, your Honor.  That is

12    the production of exhibits.  That includes other materials.

13    But there is nothing we have in that declassified set that was

14    discussed at the Section 6 hearing that is not part of that.

15         THE COURT:  All right.  So I don't quite understand

16    what this issue is all about, but it certainly does seem to me

17    that the burden is on Mr. Schulte to identify what, in

18    particular, he believes he doesn't have, and the government has

19    graciously agreed to produce it if they are given a list, and I

20    trust that they will do so.  I'll leave it to you guys.

21         I think I did overlook a couple things I said in the

22    public session that we needed to take up in closed session

23    before NDI.  Just occurred to me.  Let's quickly do those.

24         I think the only ones that I had on my list are the

25    audio recordings and the Michael memo that we discussed.  I

MX63sSCH                    SEALED

1    don't know if there are others that I'm overlooking.  Either

2    you or my law clerk can remind me.

3              Taking those in order, first, on the audio recordings,

4    Mr. Schulte, can you provide a little bit more detail?

5              I mean, hereto, I'm not sure that your Section 5

6    notice was adequately specific to understand what it is you

7    want to use and for what purpose.  But if you can elaborate a

8    little bit, it might be helpful and enable me to decide whether

9    they would be admissible etc., etc.

10             THE DEFENDANT:  Sure.  So, for example, one of the

11   recordings that the government did produce to me is with one of

12   these individuals, Gordon ███████, who was my former mentor.  So

13   he used to be an investigator.

14             The FBI had him come and talk to me and ████████████

15   That whole thing was recorded.  So this same individual

16   scheduled -- he's a big -- we're both big gun people.  He

17   scheduled some weekend going shooting.  And during the whole

18   weekend, he was wired-up recording conversations.  So he would

19   instigate conversations about the CIA, about several issues

20   that had come out, that have come out during trial.  And some

21   of this testimony, or a lot of this testimony, I don't even

22   think is classified.  To the degree that it is, it should be

23   declassified for introduction at trial.

24             A lot of it has to do with, for one, I intend or I

25   subpoenaed Gordon to testify, so he would be there anyway to go

MX63sSCH                    SEALED

1    through it.  But the testimony is relevant to show the

2    interrogation techniques used and how extensive the FBI's

3    investigation is, and what they use to try and elicit

4    testimony -- and then statements and other information that was

5    given relevant to the incidents that occurred during this

6    CIA --

7              THE COURT:  What statements in particular, since that

8    is what I'm trying to get at?

9              In other words, what statements in there and for what

10   purpose would you offer them, do you intend to use or want to

11   use?

12             (Defense confers)

13             THE DEFENDANT:  So I think one of the things to

14   introduce is the fact that the CIA individual was, you know,

15   a very professional investigator who was involved in lots of

16   espionage cases.  The way -- the investigative techniques that

17   he employed, the tone, the fact of his relationship to me and

18   the way that they used him to ask me questions, such as related

19   to the specific permissions issues on DevLAN and the specific

20   things that occurred with management.

21             And basically to show that, even through all these

22   types of interrogations, the testimony is -- the testimony is

23   the same, that it's been the whole time.  Just showing that the

24   length to which the government has gone through using the CIA

25   investigators to try and obtain this information, and there was

MX63sSCH                         SEALED

1    no -- he invited a confession.  There is no confession and

2    other techniques he used to try and coerce a confession that

3    were not successful.

4         THE COURT:  All right.  So to the extent that it is

5    offered for those purposes, the motion -- the government's

6    motion is granted.  Number one, I think the notice was untimely

7    and it would require parsing it more finely and going through

8    these recordings, and that is precisely why notice was required

9    by February and no time remaining to do that.

10        Separate and apart from that, the reasons that

11   Mr. Schulte has provided do not justify his admission of any of

12   these recordings.  It's quite clear they are being offered for

13   the truth of the matter, mainly that he consistently denied his

14   involvement in this, and that the only relevance of that would

15   be for their truth.

16        To the extent it is offered for state of mind, it

17   hinges on the truth of the statements.  And the law is clear

18   that it is not admissible under the exception for those

19   purposes, given that if offered by him, I would cite the cases

20   cited by the government on page five of its memorandum.

21        Last thing I will say on this score is, to the extent

22   that it is offered to show the techniques that the government

23   used to try to elicit a confession, the government is not on

24   trial.  They are not required to use any particular

25   investigative techniques.  Those are instructions that will be

MX63sSCH                    SEALED

1   given to the jury.  So it's not relevant or admissible for

2   these purposes either.

3         The only remaining argument that I think was not

4   addressed by that is if the witness appears at trial using his

5   impeachment for that witness.

6         Mr. Denton, I don't know if you wish to be heard on

7   that.  It may be ...

8         Do you wish to be heard?

9         MR. DENTON:  Obviously --

10        THE COURT:  Hang on.

11        (Pause)

12        Go ahead, Mr. Denton.

13        MR. DENTON:  Obviously, your Honor, there are

14   permissible and impermissible scopes of impeachment for some of

15   this stuff.  Honestly, we may need to figure that out as it

16   goes.  It's not uncommon, I think, for there to be discussion

17   over whether a prior inconsistent statement is, in fact,

18   inconsistent and in what form any of that would be admissible.

19   To the extent that the witness testifies and the defendant

20   wants to ask the witness about these events, he obviously can't

21   use the witness as a substitute for the recording to elicit his

22   own statements that suffers from the same infirmity.

23        I think to the extent that they would be relevant not

24   as subjects of questions in that circumstance, I think he

25   fairly can sort of refer to these facts insofar as they are

MX63sSCH                    SEALED

1   part of admissible narrative, the part of recording needs to

2   come in as an inconsistent statement, or I'm not sure what

3   other purpose there might be.  I think we're going to have to

4   deal with that as it comes.

5        THE COURT:  All right.  Understanding that if he

6   appears as a witness, there may be further discussion of

7   whether and to what extent it is admissible, the government's

8   motion to preclude the recordings is granted.

9        MS. SCHROFF:  Your Honor, may Mr. Schulte ask for me

10  to inform the court about certain facts as to ███ ███, may I

11  do so?

12       THE COURT:  No, you may not.

13       MS. SCHROFF:  OK.

14       THE COURT:  Mr. Schulte represents himself.  I thank

15  you for requesting and asking.

16       The other issue is the Michael memorandum.  This, too,

17  is untimely, but it may or may not be prohibitive to work

18  through these issues, as I averted in open session.  I could be

19  wrong, but I guess the question I had for Mr. Schulte is:  My

20  understanding is that really the most relevant, maybe the

21  primary reason that Mr. Schulte wants to use this memorandum,

22  is the information concerning Mr. ████ travel ██████ and

23  it coinciding with someone who was believed to have an

24  association with WikiLeaks being ██████.

25       I understand that postdates the first leak, and in

1    that sense, certainly would not -- the theory could not be that

2    that is when the leak occurred.  I get that.  But it may be

3    that that is relevant and admissible.  If that is the case, I

4    guess I want Mr. Schulte to confirm that that is -- that he

5    would be content with that.  If so, we can focus our discussion

6    on that particular fact in the memorandum, mindful also of my

7    ruling with respect to the other Michael memorandum that I made

8    upstairs.

9              Let me start with you, Mr. Schulte.  Are there other

10   parts of this document that you would want to offer?

11             Because I do think there are double hearsay issues

12   with respect to a bunch of statements in here.  We would need

13   to work through those.  In that regard, it's kind of necessary

14   to know what precise parts of it would propose to use.

15             THE DEFENDANT:  So I basically wanted to use the

16   entire document.  To the degree the court wouldn't, I wanted to

17   basically be very specific that this at least when to use this

18   statement.  To the degree the government alleges the statements

19   contain double hearsay, I think the parties can maybe just go

20   through it, and I may be willing to simply take out whatever

21   the government doesn't like.  If that saves the court time.

22   The parties can maybe work through it.  If not, we can go

23   through it.

24             THE COURT:  Mr. Denton.

25             MR. DENTON:  I think, your Honor, with respect to that

160

1    statement, we have our relevance objection.  To the extent the

2    court has overruled it, we will deal with that.  With respect

3    to identifying the rest, it is the defendant's burden to

4    identify what he wants to use, not the government's burden to

5    identify what it has a problem with.  I think to the extent the

6    defendant wants to take a crack at what he thinks is relevant

7    and admissible, we may have objections to some parts of it.  We

8    may have an ability to work out a solution on the rest.

9            THE DEFENDANT:  I think the whole thing is relevant

10   and admissible.  I'm saying, to the degree that the government

11   disagrees with that, in order to save the court time, if the

12   government wants to say, oh, we object to certain sections in

13   there, I'm happy to go through there and see if there is no

14   problem, just for time sake, just to agree not to introduce

15   those.

16           I think the entire document is, for the same reason as

17   the Michael memo is, it's a record kept in the ordinary course

18   of business.  ███████████████████████████        I think

19   the entire thing is admissible and relevant.

20           THE COURT:  The difference is that this is rife with

21   statements of third parties in the Michael memorandum, for the

22   most part is not.  So in that regard, I think there is a

23   significant and material difference between the two.  And I

24   think to the extent you're offering the document, it's not

25   admissible because it is filled with double hearsay.

MX63sSCH                    SEALED

1        Given that, I think you should be the first one to

2   identify which portions of this you would like to use and

3   introduce, and then the government can focus on those and

4   either argue to me why they constitute double hearsay, not

5   admissible, or you guys can perhaps work out a solution and a

6   substitute or whatever the case may be.

7        We can work through the 6C process in an expedited

8   fashion.  I think the first step is you identifying which

9   portions of this you attempt to offer because it is not

10  admissible.

11       THE DEFENDANT:  I think the double hearsay, there is

12  other exceptions because it is not necessarily irrelevant for

13  the truth.  It's not necessarily going to be introduced for the

14  truth.

15       THE COURT:  OK.  So to the extent that the notice is

16  for the entirety of the document, the government's motion to

17  preclude is granted.  If you want to go through this and

18  identify portions of it that you would like to use with

19  specificity, which is really what Section 5 requires, I'm

20  certainly happy to entertain that.  I'm sure that the

21  government would be happy to entertain that and, perhaps, we

22  can sort it out without the need for litigation.  But that is

23  the next step.  I'll give you until Monday to cure that as

24  well.

25       If you want to identify particular passages in here

MX63sSCH                    SEALED

1  that you actually want to use and believe are admissible for

2  some non-hearsay purpose or don't constitute hearsay, you can

3  provide that notice to me and to the government not ex parte,

4  and the government can respond and we'll resolve it.

5          Understood?

6          THE DEFENDANT:  OK.

7          THE COURT:  All right.  Very good.  That leaves the --

8          MR. DENTON:  Briefly, on the Michael memo and related

9  issues, your Honor.  I want to flag one thing in light of the

10 court's ruling upstairs.

11         So Mr. ████ was placed on administrative leave.  That

12 was the subject of the memo the court deemed admissible.  He

13 was subsequently taken off of administrative leave.  A copy of

14 that memorandum was produced to the defendant.  I gather that

15 he has, at some point between then and now, left the CIA for

16 the private sector.

17         With respect to the admission of the original memo

18 putting him on administrative leave, I think we would have two

19 observations, and potentially ultimately applications.  The

20 first is that at the first trial, the memo was allowed to be

21 introduced through a federal defender's paralegal.  We think in

22 this case, we then called a witness with personal knowledge of

23 the memo to testify to it in rebuttal.

24         I think the right course would be for us to make that

25 witness available, if the defendant wants to call him.  That is

MX63sSCH                    SEALED

1    someone who can authenticate it and offer it in the right way.

2          The second is that I expect we would seek to offer the

3    memo taking Michael off administrative leave as a memo that is

4    necessary to consider both documents together under Rule 106.

5          THE DEFENDANT:  I don't think -- the government never

6    notified us that Michael ever left the CIA, was fired or

7    terminated or resigned.  This is the first time we are hearing

8    that.

9          So does the government have more information on that,

10   or what?

11         MR. DENTON:  I just learned that in the last day or

12   two, your Honor.  I don't have any other information on that.

13   He was not fired.  He left of his own volition, and not on

14   administrative leave, which the defendant knows because we

15   produced that memo to him.

16         THE COURT:  All right.  I mean, the salient issue --

17   two issues that Mr. Denton raised.  The first has to do with

18   the custodian issue, and I mentioned upstairs that that is a

19   requirement of the business records rule.

20         In that regard, it would not suffice to admit this

21   through the paralegal from the Federal Defenders' office, if

22   that is even an option here.  That may be how it was done in

23   the last trial, but I'm guessing and sense that was done as a

24   remedy for what Judge Crotty found to be a belated disclosure

25   on the part of the government.

1          It's not the case here.  Up to Mr. Schulte if he wants

2     to offer this, lay a proper foundation which requires calling a

3     proper custodian, and it's up to him.  The government should

4     certainly make available, if he requests, in a proper fashion

5     who that custodian might be.  But, again, he has to lay the

6     proper foundation for it to come in.

7          The second issue is the memo regarding him being taken

8     off administrative leave.  That's a separate issue from his

9     departure from the CIA.  I'm not sure what relevance, if any,

10    this has to this.  I'm also -- I think without seeing that

11    memo, I wouldn't know whether it actually should come in.

12         I'm not sure that Rule 106 applies.  I think that

13    pertains to a writing where a portion of it is offered and the

14    rest of the writing needs to be considered for purposes of

15    completeness.  I don't think the rule applies to one document

16    being offered to enlighten as to another document.

17         You're certainly welcome to tell me if there is

18    authority for that proposition, but I don't think that is what

19    the rule means.

20         MR. DENTON:  I think we can address the specifics of

21    the rule.  I think there is a provision of it that talks about

22    documents necessary to be considered together.  Either way, I

23    think that to the extent that the one memo is admissible as a

24    business record, the other memo is also admissible as a

25    business record.

MX63sSCH                    SEALED

1          We can certainly write to the court and definitely

2     provide the court with a copy of that memo.  I'm really just

3     flagging it in light of fact that the court ruled on the first

4     issue this morning.

5          THE COURT:  All right.  I think you're probably

6     correct that if that one that I ruled on is a business record,

7     so, too, with this one.  I obviously don't know what, if

8     anything, it says and whether it has double hearsay issues.

9          Again, putting those issues aside, I would think that

10     the government could certainly offer it as a business record,

11     if it lays the proper foundation, and double hearsay problems

12     whether it is introduced at the same time as in together with

13     the first memo under Rule 106 or that is done on the

14     government's rebuttal case or something.

15          We can cross that bridge when the time comes.  If you

16     have authority for the proposition that Rule 106 extends that

17     far, I'm happy to consider it.  Just wanted to flag that issue.

18          All right.  Anything else to discuss on either of

19     those issues?

20          All right.  Then last, maybe biggest issue, is the NDI

21     stuff.  As I said upstairs, I think really it is a public

22     trial, courtroom closure issue.  Unless something can point me

23     to Judge Crotty's opinion that actually makes the relevant

24     findings under *Waller*, then I conclude that I should adhere to

25     it either under law of the class case it is correct.  I think I

MX63sSCH                    SEALED

1    need to make my own finding on that fresh.

2         Mr. Denton, I'm not sure, maybe you can get the prior

3    briefing on those issues to me, but obviously sooner rather

4    than later is pretty important here.

5         MR. DENTON:  Your Honor, depending on how long we're

6    here, we can try to dig it up today.  If not, I certainly think

7    we can have it to you on Monday.

8         THE COURT:  OK.  Well, I will not be able to see it on

9    Monday.  My law clerk can certainly begin to look at it, and

10   the sooner the better.  No later than Monday.

11        As I understand it, the government's proposal is to

12   have the WikiLeaks leak in its entirety admitted as Government

13   Exhibit 1, have essentially the particular pages that

14   Mr. Schulte has identified admitted as classified exhibits,

15   sort of pull-outs from that, that would enable him to point to

16   that, and point the jury to it as a way of saying, look, it was

17   already publicly disclosed.

18        I guess a few issues.  One is, I think I need to work

19   through the *Waller* public trial issues and decide whether that

20   is a significant -- whether the findings can be made here.

21   There was already a judgment on that.  I haven't seen the

22   government's briefing.

23        My inclination is to think that it is proper to treat

24   Government Exhibit 1 that way.  It is probably proper to do so

25   with respect to pull-outs from Government Exhibit 1.

1              I'm certainly happy to hear from Mr. Schulte on that.

2       I think it is principally a public trial issue more than it is

3       a CIPA issue.

4              I guess one question I had is, first of all, I

5       wondered whether and to what extent this is sort of dovetails

6       with the bifurcation issue that remains under advisement,

7       because it's in the motion for reconsideration.  All of these

8       problems arise in connection with the MCC charges, not in

9       connection with the underlying Wikileaks charges.

10             I query whether we could just plainly sort of try the

11      case as the WikiLeaks, even if someone at the MCC is admissible

12      with respect to those, but without getting into the thorniness

13      of what was public and what wasn't public.  That is one

14      question.

15             Number two, maybe it is too late to do this, but I

16      recognize that the government may have some issues with this,

17      because I understand that the WikiLeaks pages are technically

18      still classified, but they are also public.  In the literal

19      meaning of that.  The one way to have tried this case would

20      have been to put into classified evidence, ████████████████

21      ████████████████████████████    ████████████████████████████

22      ████████████████████████████    and then to point the jury and

23      say, Look at these ██████████████

24                         ████████████████████████████████████    I

25      understand the government has taken the view that, number one,

MX63sSCH                        SEALED

1   ██████████████████████████████████  ████████████

2   ████  ██████████████████████████████████

3   ████████████████       It seems to me that the harm, the real

4   harm that the government is concerned about is ████████████

5   ██████████████  ████████████████████████████████████

6   ██████████████████████████

7           So one way to have done this -- and I'm just floating

8   this, we can discuss whether this is feasible, not feasible,

9   doable at this point, not doable at this point -- would be to

10  ████████████████████████████████████████████████

11  ██████████████████████████████  ██████████  ████

12  ████████████  ██████████████████████████████████

13  ████████       And then everybody can make the arguments that they

14  want to make from that.

15          Maybe there are any number of problems with that.

16  Might be too late.  I float that as a thought.

17          Mr. Denton?

18          MR. DENTON:  I think there is couple of problems, your

19  Honor.  The first as a purely formal matter, the Wikileaks

20  pages are classified.  I understand the court's view with what

21  is public, but that is classified information.  It is covered

22  by CIPA.  It is falls under the rubric of Section 8, which

23  allows documents to be admitted into evidence without a change

24  in their classification status.

25          I recognize that this then implicates *Waller*.  When a

MX63sSCH                    SEALED

1   document is classified and admitted without a change in its

2   status, it is subject to harmed being restrictions applicable

3   to everybody.   So I think I honestly don't think there is way

4   to do that as far as having the ████████████████████.

5          So I think also there are some sort of practical

6   problems with how we would go about doing that.  I think this

7   is sort of part of what comes with the bifurcation issue, too.

8   We're sort of buying one problem and selling another.  To the

9   extent that it solves the issue with respect to the treatment

10  of classified exhibits at stage one, we then have an issue

11  about all of those witnesses having to be recalled to testify

12  about the NDI status and the harm that would have resulted from

13  the disclosures or attempted disclosures.

14          So I think, again, it may simplify one thing at the

15  cost of complicating something else.  This is sort of the

16  paradigmatic example of the circumstance in which this type of

17  procedure has been used.  It is not that common, but we think

18  as it pertains to the trial as a whole deals with a relatively

19  small part of the trial.  And I think with respect to the harm

20  and the things the government is concerned about, the

21  declaration that the government submitted in support of its

22  application under 6C talk about some more specific harms,

23  beyond just the fact of acknowledgment that come with some of

24  the particular things that the defendant is seeking to

25  highlight here.

MX63sSCH                    SEALED

1          So since Section 6C expressly permits the court to

2     consider the harm that would result, we think those are things

3     that the court should take into consideration here as well.

4          THE COURT:  OK.  How do you propose that Mr. Schulte

5     at trial either examines witnesses or argues to the jury as a

6     way of arguing?  I understand your position is that the fact

7     that this was made public is irrelevant to the NDI analysis.

8     For reasons I explained, I think that is wrong.

9          How does Mr. Schulte make the argument that he wants

10    to make to the jury if it is handled in the way that you're

11    proposing?

12         MR. DENTON:  Well, I'll suggest what I think he could

13    do, then I'll tell you what I think the problem with it is.

14    The easy solution and the way it is described in the context of

15    a lot of these -- I hate the term silent witness rule, it

16    doesn't accurately describe what is going on -- invite the

17    witness or the jury to compare two documents and say, right, do

18    you see that portion reflected in that exhibit; yes or no?

19    They can say what is there and not there.

20         The reason why this is a problem, the defendant is not

21    going to be able to do that.  He is factually wrong about the

22    overlap ██████████████████████████████████  As a

23    matter of practice, if what he wants to do is ask people, is

24    ███████████████████████████████████████

25    ██████████  ████████  : ████████████████████

SOUTHERN DISTRICT REPORTERS, P.C.

MX63sSCH                        SEALED

1          So he can do that, and he can invite the jury through

2     argument to draw the same comparison.  He can even make the

3     affirmative argument, say the things I wrote in these notebooks

4     are all things that had already been made public in the leak.

5     And then, again, invite the jury to make the comparison.

6          THE DEFENDANT:  There is a couple things.  He starts

7     out with talking about CIPA 8.  CIPA 8 talks about leaving the

8     designation of classified, it doesn't say closing the

9     courtroom.

10          Judge Ellis discussed in the *Rosen* --

11          MS. SHROFF:  You have to wait.

12          THE COURT:  I understand.  I read the *Rosen* decisions

13     you relied on earlier, and the government relies on a later

14     decision.  I think Judge Ellis ultimately concluded that, as

15     long as it wasn't a significant part of the case, the limited

16     courtroom closure, essentially under Section 8, was appropriate

17     in that case.

18          I reserve judgment on whether that is the case here.

19     Because, again, *Waller* briefing hasn't been submitted to me,

20     and I don't think, nor has anyone pointed me to Judge Crotty

21     having made the relevant findings.  Certainly I think *Rosen*

22     stands for the proposition that this is doable and proper, not

23     under CIPA, per se, but as a limited courtroom closure under

24     *First Enterprise* and *Waller*.

25          You can disagree with that.  I think that is probably

MX63sSCH                    SEALED

1    the right approach and the right way to think about it

2    analytically, I just haven't had an opportunity to review it

3    because I haven't seen the briefing.

4            THE DEFENDANT:   So, as he discusses there, there is

5    extreme prejudice to me because I'm not able -- there is a

6    complete difference between having the Exhibit GX 1.   For

7    example, in the first trial the GX 1 was never exhibited to the

8    jury.   There was nothing discussed to the jury.   It was just,

9    Here is a laptop that has the Wikileaks disclosure.

10           We moved on.   That was it.   I think that is completely

11   different than saying, OK, now I have 30 exhibits orders,

12   however many exhibits, classified exhibits, we have to do this

13   silent witness rule.   Oh, look here.   And to the degree that

14   the government is saying he is not going to be able to show it,



18           So how is that not the same?

19           The point is, if you're telling the jury that we have

20   to do all these special restrictions and you can't look, you

21   can't say anything in the courtroom, and all these special

22   things, then that's extremely prejudicial to me.   I can't make

23   the point this document is not anything special.   It's not

24   national defense information.   By taking that away and posing

25   all of these restrictions, especially over time as this builds

MX63sSCH                    SEALED

1    up.

2           This not just one exhibit.  This is all the MCC

3    counts.  I know there is countless exhibits through the CIPA 5.

4    There is at least 20 different exhibits that we're going to be

5    going through.  And depending on how the government is bringing

6    this up through each witness, could be brought up through every

7    single witness, too.

8           This is a substantial closure, and I'm just not able

9    to make this same argument that this information is not

10   national defense information.  Look at it, it's just being able

11   to talk openly to the witness so that the jury can see.  It's

12   just way too -- it's way too prejudicial to do that.

13          If you're looking at the reasons for it, I mean, most

14   of the time, this type of information is information that if

15   you're going to do a courtroom closure, it's to protect

16   identities of actual undercover assets or something like this.

17   Where the information is already on the Internet, the question

18   then becomes, when can the government not close the courtroom.

19          I mean, why can't they just close the courtroom for

20   every single thing that they say is classified and introduce it

21   all through this supposed CIPA 8 loophole, closing the

22   courtroom, information already on the Internet can't even be

23   introduced in the courtroom, then that just opens the door to

24   everything.

25          I mean, why do we even have the first CIPA hearing?

MX63sSCH                    SEALED

1          Why not introduce all those as classified, too, right?

2   It's a slippery slope, doesn't make any sense, and there is

3   clear prejudice and very little harm to the government.  This

4   stuff is already on the Internet.  █████████████

5   ██████████████████████████  There is simply no

6   harm.  The DevLAN network is offline.  These tools aren't being

7   used.  There is no harm.

8          THE COURT:  I got it.

9          I think the court reporter needs a break and it is

10  hard to do her job.  I want to respect that.  So let's take a

11  ten-minute break, and then we'll pick up from there.

12  Obviously, I would like to finish this up as quickly as we can,

13  but we need to work through some of these issues.

14          I'll see you in ten minutes.

15          (Recess)

16          All right.  Thank you.

17          Let me just apologize to the court reporter.  I'm not

18  sure she reasonably expected this would be an all-day matter.

19  I certainly didn't.  I appreciate everyone's patience.

20          With that, yes, Mr. Lockard.

21          MR. LOCKARD:  Your Honor, in the interest of

22  continuing to address things that we didn't expect to address,

23  I did want to provide an update about the laptop and pose a

24  request to Mr. Schulte.

25          So the update is that our IT staff was able to power

1   up the computer.  It did boot up.  They are unable to log in to

2   check to see if the hard drive is working.  The password they

3   received did not work.

4           So the request from Mr. Schulte is, can we get the

5   correct password for the laptop.  The second part of the update

6   is that when the IT personnel did boot the computer up, it

7   appeared to them that the bios configuration had been changed.

8   The bios configuration, my understanding that that is the

9   system that runs the hardware and the ports and things like

10  that, in way that they can no longer confirm if the laptop is

11  compliant with BOP and DOJ security requirements.

12          So if we do get the correct passwords, they will be

13  able to confirm or reset the security settings so that the

14  laptop can go back to the MDC with Mr. Schulte.

15          THE COURT:  The suggestion being that Mr. Schulte

16  altered the bios settings, whatever that may be?

17          MR. LOCKARD:  Your Honor, we are making no inferences.

18  He's had the laptop a long time.  They would like to reconfirm

19  the configuration.

20          THE DEFENDANT:  The laptop is working now?  Hold on.

21          (Defense confers)

22          THE COURT:  First item is, I think we need to give the

23  government the correct password so the IT folks can see if they

24  can get to the content.  I thought that had been done.

25          THE DEFENDANT:  I gave them -- I mean, I gave standby

MX63sSCH                     SEALED

1    counsel the correct password.  To the degree they are not

2    working...

3              To confirm, they are able to get the laptop itself

4    powered on and working, or they just took the hard drive out or

5    what were they able to do to fix the laptop?

6              MR. LOCKARD:  They were able to turn the laptop on.

7    It did boot up.  The password you provided could not -- did not

8    provide access to the laptop.

9              THE DEFENDANT:  Could it have been reset somehow,

10   factory reset or something?

11             Is there any way, after this is over, that they can

12   bring the laptop, and standby counsel and myself can look

13   through it to see if it's been reset, or if is that acceptable?

14             MR. LOCKARD:  I don't know the answer to any of those

15   questions.  This is what I have been conveyed.  I think in

16   light of the concern about the configuration settings, our IT

17   needs to make sure that it is still configured appropriately

18   for being able to be in BOP space and used by an inmate.

19             THE DEFENDANT:  The laptop has been provided to them

20   before and hasn't been changed since the last time the

21   government reviewed it.  Nothing has changed since then.

22             To the degree anything is different, I don't know.  It

23   could be a reset, if the laptop could have been reset or

24   something.

25             It just would be nice if standby counsel and myself to

MX63sSCH                    SEALED

1   be able to -- if it's been reset, that would explain why the

2   passwords don't work anymore, right?  That's all I'm trying to

3   figure out.

4            (Defense confers)

5            MR. LOCKARD:  OK.

6            THE COURT:  I don't know what to tell you.

7            MR. LOCKARD:  This is where you are.  If you can

8   provide us with passwords that work --

9            MS. SCHROFF:  Can you give him the password back?

10           MR. LOCKARD:  We don't have it.

11           THE COURT:  Guys, I don't know why you couldn't have

12  discussed this before I came out.

13           In any event, Mr. Schulte, write the password down

14  again, give it to Mr. Lockard, and they will try that.  Maybe

15  it a handwriting issue.  I don't know.

16           I certainly agree, if the bios configuration is not

17  what BOP and protective order requires, then that should be

18  conformed to what it does require, without intimating who did

19  what.  Bottom line is, first step is to get access to the

20  computer.  Hopefully we can resolve it here now.

21           MR. LOCKARD:  Yes.

22           Our goal is to make sure it is compliant, get it

23  fixed, back to Mr. Schulte.  If he writes down the password,

24  I'll hand it back to the paralegal to take to the IT

25  department.

MX63sSCH                    SEALED

1        MS. SCHROFF:  We did try to resolve it before the

2   court came out, your Honor.  The government wanted it on the

3   record.

4        THE COURT:  Since we're not going to be together again

5   until Wednesday, what happens if this doesn't work?

6        What's the backup plan?

7        MR. LOCKARD:  I don't know.  Mr. Schulte does have a

8   SCIF day Monday and potentially Tuesday.  We may be able to

9   discuss it with him on Monday, or see whether IT staff comes

10  back, after they have a chance to take a second look at it.

11  Beyond that, I don't know.

12       THE DEFENDANT:  My question is, if the laptop is

13  working, why can't they just -- I brought it here through the

14  marshals.  Why can't they just bring it here and have standby

15  counsel and myself look through it, and if it is working, then

16  we can just take it back and I can continue working on the

17  case?

18       THE COURT:  You can't take it back if it's not

19  configured according to --

20       THE DEFENDANT:  We'll look through and sit with the IT

21  people.

22       THE COURT:  Bottom line is, try to work this out as

23  fast as you guys can.  Government has an incentive to do that.

24  If this lingers, the likelihood of adjournment goes up.  I

25  imagine the government is not eager for an adjournment.  I'm

MX63sSCH                    SEALED

1    not eager for an adjournment.  So see if you can sort it out

2    today, and if you can't sort it out today, I urge you to try to

3    figure it out over the weekend on Monday.  In any event, the

4    sooner, the better.  I'll deal with whatever comes, if it isn't

5    resolved by Wednesday, we'll have to do what we have to do.

6            I did speak to the U.S. Marshal, by the way, and he

7    seemed to think it would not be a problem to arrange an extra

8    SCIF day on Tuesday.  He was probably leaving me a message as

9    I'm sitting here.  I don't know the answer.  I'm hoping that

10   means Mr. Schulte gets an extra SCIF day on Tuesday.

11           Back to the NDI issue, Mr. Denton, let me turn to you

12   and ask you two things:  One is, first of all, if this is a

13   proper approach, whether it is analyzed as a CIPA issue or

14   *Waller* issue, what have you, why doesn't Section 8 swallow

15   Section 6C whole?

16           That is to say, under what circumstances is it

17   appropriate to do this, as opposed to going through the 6C

18   process and either requiring new classification or providing

19   the government an opportunity to make substitution or

20   redaction?

21           Why wouldn't this always be the way it's done?  That

22   is one question.

23           The second is, you use ████████████████ as a

24   specific example.  Maybe it would be helpful to talk through

25   how Mr. Schulte can make the arguments he wants to make with

MX63sSCH                    SEALED

1    that as a specific example.  I think to complicate matters

2    further, what I understand the case may be is that Mr. Schulte

3    intends to or wants to introduce articles from newspapers and

4    elsewhere ████████████████████████████ and basically say,

5    Look, see my disclosure from the MCC.  That was already public.

6    See this *New York Times* article, and it doesn't matter.

7              How would that happen and work at trial?

8              MR. DENTON:  Your Honor, I think to take those in

9    order, first, Section 8 does not swallow Section 6 for a number

10   of reasons.  First is, as explained by Judge Ellis and the

11   court and various others, we do not have star chamber trials in

12   which everything is classified.  Section 8 obviously runs into

13   some limits at some point.  One of those is practical, which is

14   that both parties do want to be able to exhibit exhibits, and

15   so there is a volume consideration that it is appropriate for

16   certain things at a certain level of sensitivity and a certain

17   practicality in handling them.  And Section 6 is appropriate

18   for, frankly, the vast majority of everything else.

19             This is appropriate in this situation because, for

20   reasons that we have laid out previously, redacting these

21   documents is a unique challenge.  so the Section 6 process is

22   not particularly well-suited to this type of information.

23             For that reason, I actually think it makes sense to

24   table the question of ████████████████████████,

25   because if we were just talking about the classified leak

MX63sSCH                    SEALED

1   documents, I think the answer that we would give you is this is

2   the paradigmatic substitution. ███████████████████

3   ████████████████████████████    ██████████████████████

4   ████████████████████████████████████████

5   ██ █████████████████    ███████    █████████████████

6   █████████████████████    ████    ████████    ████████

7   ████████████████

8           I think the reason I suggest we table it is that, to

9   the extent the court is going to permit the introduction of

10  press articles ██████████████████████████████████   I

11  think we're going to have to have some consultation by how the

12  government is going to proceed on that.

13          At that point, I don't think we would be able to

14  continue to protect the ██████████████████████████   ██████

15  ████████████████████████████████████.   And so

16  I think this is something that we would ask to sort of table

17  until next week.

18          OK.   Isn't that the necessary implication of my ruling

19  on the public disclosure issue?

20          I mean, I understand the government may take the

21  position that the information is classified in some sense, but

22  it can't be the case that Mr. Schulte can't use an article from

23  the *New York Times* -- to pick a random example at trial -- or

24  is it your position that that is classified and he's not

25  permitted to introduce an article from the *New York Times*, even

MX63sSCH                         SEALED

1    if in another case the same article may be admissible without

2    restriction.

3              MR. DENTON:  So, your Honor, I think that I would have

4    two positions.  The first is that the court's ruling with

5    respect to what constitutes closely held has really only

6    addressed public.  The court's rulings have not, at any point,

7    addressed other aspects of that judicially created limitation

8    that courts have universally adopted.  The first we talked

9    about this morning, which is lawfully, publicly available, and

10   the second is that the closely held inquiry focuses on whether

11   the government has taken steps to treat it -- to treat it as

12   closely held.

13             I think, again, the relevance of *New York Times'*

14   articles reporting on something goes to its publication.  It

15   doesn't go to the aspect of sort of, in the first instance,

16   lawfully available, and in the second, what, if anything, the

17   government has done about that.

18             THE COURT:  First of all, I agree with you as to the

19   latter.  But for the reasons I think I did articulate in the

20   opinion, I think whether and to what extent information is

21   public, I think you're entitled to argue.  Although it was

22   significantly public, number one.  There was no official

23   acknowledgment and, therefore, in that sense the information

24   was still closely held.

25             Number two, the government itself didn't play any role

MX63sSCH                    SEALED

1   in this and continued to keep it closely held.  It's up to the

2   jury to decide if it wants to send the NDI, given all of those

3   facts.  Among other things, the case law, I think, I quoted

4   makes clear that at some point information may be so commonly

5   known as such common knowledge that no matter what the

6   government's efforts may be, it no longer can constitute NDI.

7             I think that is an argument that Mr. Schulte is

8   entitled to make, and you're certainly entitled to try and meet

9   it by demonstrating all the different ways in which the

10  government has tried to curb the damage and contain the leak

11  and continue to make it closely held.  But I think it is up to

12  the jury to ultimately make those determinations.  I think that

13  is on the second piece.

14            So focus on the first piece, which you averted to

15  upstairs for a second.  I think the devil is in what lawfully

16  was the language lawfully obtained.

17            MR. DENTON:  I think it is lawfully available is the

18  question.

19            THE COURT:  So what does that mean, right?

20            MR. DENTON:  Right.

21            THE COURT:  I could go on *New York Times* right now --

22  for that matter, I could go on Wikileaks right now, and it is

23  not unlawful for me to access either the Vault 7 leak on

24  Wikileaks or the *New York Times* article about it, is it?

25            MR. DENTON:  I'm only hesitating, your Honor, because

SOUTHERN DISTRICT REPORTERS, P.C.

MX63sSCH                        SEALED

1    I know for any of us who hold security clearances, it would be.

2                THE COURT:  Unlawful?

3          I understand it might be a violation of our security

4    clearance.

5                MS. SHROFF:  It's not unlawful.

6                THE COURT:  But --

7                MR. DENTON:  I guess that is a distinction that I'm

8    not entirely certain on.

9          Your Honor, the candid answer here is that this is a

10   blank canvas.  This is the first case of this type.  So it is

11   really a question for the court, in deciding the scope of this

12   judicially grafted limitation, whether information that there

13   is no dispute that the government went to extraordinary lengths

14   to protect, while it was within the CIA, whether after having

15   been abstracted from the CIA by virtue of a crime -- again, no

16   one disputes that the theft was a crime -- somehow it is

17   deprived of its closely held status because it was the subject

18   of a criminal act.  It is only publicly available because of a

19   crime.

20               THE COURT:  I understand, but it doesn't change the

21   fact that it is publicly available.

22         No one -- I don't think Mr. Schulte is issuing that

23   this would be a defense to the Wikileaks charges.  This is only

24   relevant to the MCC charges.  It's the government's decision to

25   charging with leaking classified information that may or may

 1   not be already public by virtue of the first leak.

 2            Now, to the extent that it is not, the government can

 3   certainly rebut this argument by saying, Look, jury, here are

 4   several things he revealed that are actually not ████████████

 5   ██████████ and, therefore, this argument has no merit at all.

 6            I understand you take the position that he actually

 7   went beyond what was public, and in that regard there is no --

 8   this argument loses.  But that, I think, is an argument you can

 9   make to the jury and up to the jury to decide.

10            I think the question is -- maybe there is no precedent

11   here, I'm writing on a blank canvas, that is what makes this so

12   hard -- if Joe, member of the public, can pull up the Wikileaks

13   page and find this and that is not a violation of law, I would

14   think that that information is, quote-unquote, lawfully

15   available, even if it technically still remains classified.

16            MR. DENTON:  So I think this really is a blank-slate

17   question for the court, your Honor.  So the lawfully available

18   is an abstraction of the concept of closely held, right.  It is

19   the term that has been used in jury instructions to describe

20   what closely held means.

21            THE COURT:  Where is that lawfully available language

22   come from, *Corin* or *Heiney*?

23            MR. DENTON:  I think it actually may come from one of

24   the Fourth Circuit cases from the mid '80s.  I'm not entirely

25   sure.  I don't think it comes from *Corin* or *Heiney*, which talk

MX63sSCH                    SEALED

1  about a narrower universe of what the closely held terminology

2  means.

3          Again, there has never been a case like this.  You

4  know, *Corin* and *Heiney* are the paradigmatic examples.  There

5  was no question that in *Corin*, the information had been

6  published.  And then in *Heiney*, that it was available to be

7  collected subject to no protections by the possessors of the

8  information.  The services had taken no steps to protect the

9  information.

10          So, again, what you're dealing with here, blank

11  canvas, is information that it is beyond dispute the government

12  took extraordinary steps to protect.

13          THE COURT:  Let me ask you this:  Forget Mr. Schulte,

14  former CIA employee.  If a member of the public, not subject to

15  CIA secrecy agreements, what have you, in the wake of the Vault

16  7, ██████████████████ literally just went on Wikileaks,

17  downloaded it onto a hard drive, and handed it to someone who

18  was not cleared, unauthorized to receive NDI, is that a

19  violation of the statute?

20          MR. DENTON:  It's probably not a willful violation of

21  the statute, your Honor.

22          THE COURT:  Well, let's say that the person

23  understands the law, that something remains classified even if

24  it is technically public, particularly where it is the subject

25  of an unlawful leak, and everybody agrees, and understands that

1   this was an unlawful leak.

2           So understanded that, in doing that, they are

3   technically handling something that remains classified

4   information.   Why wouldn't that be willful?

5           MR. DENTON:   Honestly, your Honor, I think it is

6   possible that that is something that we might take the view

7   could be charged.   If I can just, for a second, and just step

8   back and say, for purposes of the trial, the government intends

9   to focus on the information that was not included in the leak.

10          I sincerely doubt, as a practical matter of

11  prosecutorial discretion whether the government would charge

12  simply for republishing information that is on Wikileaks.

13  Whether we have the authority to, whether that is consistent

14  with the law, is a different question.   Purely the matter of

15  what is going to happen at trial.   █████████████████████

16  █████████████████████████████████████████████████

17  █████████████████████████████████████████████████████

18  ████████████████████████████████████████████

19          And so that is one of the areas where the rubber meets

20  the road here, and one of the answers may be that if the

21  government chooses not to rely on that.   But we haven't had a

22  chance to talk to the relevant people and make that decision.

23          It's possible that, you know, if we don't think that

24  any other avenue is appropriate, we may just forego that one.

25  With respect to the other information, like I said, we do not

MX63sSCH                    SEALED

1    expect this to be a debate at trial, from the government's

2    perspective, over whether the leak was lawfully available or

3    not.  We expect it to be a factual matter.  This is not public.

4    This is not part of the leak.  That is provable and

5    demonstrably so.

6            So, practically speaking, we don't expect this to

7    occupy much, if any, time in front of the jury.

8            THE COURT:  This being the argument that it's not NDI

9    because it was publicly available, because you're basically

10   going to rest on and point to things that were not even

11   publicly available in the leak?

12           MR. DENTON:  That's correct.

13           THE COURT:  OK.  That's an interesting revelation.  I

14   didn't know that.

15           Maybe one possibility here is that the government

16   provides a bill of particulars and identifies precisely what it

17   does intend to point to, and then that narrows the range of

18   what is relevant.  Maybe it moots the issue of public

19   disclosure altogether.

20           MR. DENTON:  I mean, we may be able to do that, your

21   Honor.  We did do that in our Section 10 notice.  We did

22   identify the specific information.  We have also been fairly

23   clear in our recent Section 6 filings about the scope of what

24   was in the defendant's notebooks and particular things that are

25   obviously not in the leak.

MX63sSCH                    SEALED

1          THE COURT:  Right.  I understood that was an

2     additional argument that you had on top of the argument that

3     even if it was public, it's still NDI, and separate and apart

4     from that, other things that moot that.

5          I understood that you were going to be making both of

6     those arguments to the jury.  If I'm being told now you're only

7     going to be making that argument, we are sort of in a different

8     territory.

9          MR. DENTON:  I think, your Honor, again interplay

10    here, while there are avenues for us to protect the aspects of

11    the leak that remain classified, the court's ruling with

12    respect to the admissibility of media articles does make this

13    significantly more complicated and does kind of force us to, I

14    think, look at this in a different light.  Because there simply

15    aren't the same tools available to protect the same sensitive

16    information with respect to those things.

17         THE COURT:  All right.  So what's your suggestion for

18    how we proceed?

19         MR. DENTON:  I think, your Honor, that to the extent

20    that the application is with respect to the introduction of the

21    pages that the defendant has identified, as classified extracts

22    from Government Exhibit 1, then I think the answer is exactly

23    what the court said.  We will provide the previous briefing on

24    *Waller*.  To the extent the court wants any supplement to that,

25    we're happy to provide it.  We're already working on making

MX63sSCH          SEALED

1   sure we can get a copy of the application.  The 6C application

2   will go on the docket as soon as possible.  I think that will

3   essentially resolve the issue.  Because either way, that would

4   be how we propose to deal with those exhibits the defendant has

5   identified.

6          Whether there is a separate issue with respect to the

7   scope of argument and what the government intends to do or not

8   do at trial, I think we just need a chance to take the court's

9   ruling of this morning, talk to people about its implications,

10  and make a decision about how the government is going to go

11  forward.

12         THE COURT:  OK.  I thought I already ruled on it

13  before this morning, perhaps it wasn't clear what the

14  ramifications were.

15         MR. DENTON:  The media articles piece really

16  meaningfully changes things, your Honor.

17         THE COURT:  I recognize that, but I would have thought

18  that that was clear, and followed from my opinion on this issue

19  generally.  If something is public, it's public.  If the

20  defendant is able to point in some public document, whether it

21  is a *New York Times* article or otherwise, to information that

22  he is accused of having leaked, that strikes me as sort of a

23  clear application of my ruling.

24         In any event, I understand you may not have understood

25  it, and that's maybe my feeling, maybe yours.  In either case,

MX63sSCH                          SEALED

1   you can take it and do with it what you want.

2          One possibility is that we just table all of this.   I

3   mean, I used ▆▆▆▆▆▆ only as an example because it struck me

4   as a concrete example we might be able to have a discussion

5   about this.   But I don't know if there are other things of that

6   sort in the 33 pages or documents that Mr. Schulte has

7   identified that would present the same sort of practical

8   problems.

9          THE DEFENDANT:   Hickock also was the same.

10          THE COURT:   Hickock, at least in part, has been

11   reclassified, or at least the existence of it, right?

12          THE DEFENDANT:   There was two issues.

13          THE COURT:   Right.

14          THE DEFENDANT:   Hickok CIA always has unclassified and

15   changed to classified just to charge me with a crime.   But

16   also, the fact it was also released in Wikileaks ▆▆▆▆▆▆▆▆

17   ▆▆▆▆▆▆▆   So Hickock is all over the Wikileaks disclosure, ▆▆

18   ▆▆▆▆▆▆▆▆▆.   I want to show to the jury, like, here is

19   the disclosure from Wikileaks, ▆▆▆▆▆▆▆▆▆▆▆▆▆.

20          I mean, all of the MCC stuff is going to be the exact

21   same.   Here it is, ▆▆▆▆▆▆▆   Here it is, ▆▆▆▆▆▆   Here it

22   is, Hickock.   Here it is, Hickock.

23          MR. DENTON:   Your Honor, I don't want to go too far

24   down -- I'm not giving away any strategy to say that what the

25   government intends to do is take all of those documents the

MX63sSCH                    SEALED

1    defendant has identified and ask the witnesses whether, in any

2    of them, it includes things like the number of employees in the

3    cyber operations group or what the cyber operations group is or

4    how Hickok connects to DevLAN, all facts that are not included

5    in any of those documents.  So the fact that the word Hickok

6    appears in these places does not solve the defendant's problem

7    here.

8             When we talk about the information is not included in

9    those documents, if he advances this argument, we're going to

10   meet it the exact same way that he proposes.

11            THE COURT:  I guess that is my suggestion, which is I

12   don't think that the Section 10 notice, I think that is served

13   on the defendant.  I don't think I've seen a copy of it.

14   Certainly not a bill of particulars that would bind the

15   government at trial.

16            Maybe the answer is if the government is content to

17   proceed saying we are only going to prosecute him for leaking

18   information that was beyond the scope of the original location,

19   then it moots this issue altogether, and there is no need to

20   get into whether and to what extent publicly disclosed.

21            Let me put it differently.  What information you're

22   charge as leaking, he can then point to things that are in the

23   public domain about that.  But presumably it wouldn't cover

24   ██████████    It wouldn't cover the all things you're talking

25   about.

MX63sSCH                    SEALED

1        MR. DENTON:  So I think that is right, your Honor.  I

2    just don't think that necessarily solves the problem, if the

3    defendant is going to say, however incorrectly, that there are

4    pages from the leak that contain the information that I

5    disclosed.

6        THE COURT:  What I'm hypothesizing is you give him a

7    bill of particulars, let's say ten things that these are

8    classified national defense information items that were leaked

9    from the MCC that are not in the Wikileaks leak.

10       MR. DENTON:  Yes.

11       THE COURT:  Not publicly available, right.

12       MR. DENTON:  Yes.

13       THE COURT:  Presumably he won't be able to point to

14   anywhere in the Wikileaks like those ten things.  So it kind of

15   moots the issue altogether.

16       Now, if he's able to point to a *New York Times* article

17   that has it.  Fine, point to the *New York Times* article, and

18   we'll deal with that, I guess.  You can choose your list

19   carefully, and if you choose it carefully with things that are

20   not public, presumably there is no argument to be made here.

21       MR. DENTON:  I think we would agree with that, your

22   Honor.  I'm not sure whether the defendant is going to agree

23   with that.

24       THE COURT:  Mr. Schulte?

25       In other words, the government would be foregoing

SOUTHERN DISTRICT REPORTERS, P.C.

MX63sSCH                    SEALED

1    prosecuting you for disclosure of NDI that is publicly

2    available and was part of the original leak.  My understanding

3    is -- in essence, it's conceded -- in essence it's giving you

4    what you were have been arguing all along, which is that you

5    can't be charged with leaking information that was publicly

6    available, and just focusing on information that the government

7    maintains is not publicly available.

8           Now, given my ruling, I think you would be entitled to

9    present evidence, if there is evidence, that that information

10   is publicly available.  But if the government chooses it

11   wisely, presumably it won't run the risk of the Wikileaks

12   disclosure being --

13          THE DEFENDANT:  So, just to note for the court,

14   before, in the last trial before Crotty, they did issue a bill

15   of particulars.  That is what I've been going off this whole

16   time, is their bill of particulars they have already issued

17   supplemented by the CIPA 10.  Based on those documents, all the

18   information has already on Wikileaks.  If they want to provide

19   a whole other bill of particulars or try to point out things

20   that aren't available, that weren't available on Wikileaks,

21   yes, I'm completely in complete agreement that we should look

22   at it and then go from there.

23          Because based on what they have provided to me, it's

24   just not possible for them to come up with it.  If they think

25   they can, I'm open to meeting that

MX63sSCH                          SEALED

1          THE COURT:  All right.  Maybe the answer here is let

2     the government go back and talk amongst themselves and see how

3     they want to proceed, and that might meaningfully change the

4     landscape here.

5          Does that make sense?

6          I would say the only risk of doing this leaves

7     unresolved a pretty significant issue, and if we can't resolve

8     it next Wednesday.  It might be an independent reason why

9     starting trial a week from Monday becomes more difficult, but I

10    would obviously like to keep that trial date.

11         MR. DENTON:  Your Honor, I think we can walk and chew

12    gum at the same time.  We will still pull together all the

13    materials on the *Waller* analysis and pending pieces of the 6C

14    while at the same time considering this issue.  And hopefully,

15    to the extent that we are not able to reach a mutually

16    agreeable resolution at the very least, we kept that ball

17    rolling downhill.

18         THE COURT:  First, for sure you will do both those

19    things.  Second of all, I think whether or not you take this

20    modified approach and moots the public disclosure issue, there

21    is still a *Waller* issue because you're proposing, as I

22    understand it, to admit Government Exhibit 1 as a classified

23    exhibit and not have it publicly available.  And to the extent

24    that Judge Crotty didn't make the *Waller* findings, I need to

25    make them.  It doesn't moot the issue altogether.  There is a

MX63sSCH                          SEALED

1     need to do both regardless.

2              MR. DENTON:  Of course.

3              THE COURT:  OK.  Good.  Then I would propose that we

4     call an end to this very, very long day and let you guys go

5     discuss this.  Hopefully you can also figure out what is going

6     on with the laptop.  And recognizing that there is some pretty

7     big issues that remain to be resolved, we'll reconvene next

8     Wednesday and take it from there.

9              Does that make sense?

10             MR. DENTON:  It does, your Honor.  I don't want to

11    keep us here longer.  I just want to note one additional thing.

12    There's been a lot of discussion at various points about the

13    defendant's various ex parte filings.  It seems like a number

14    of those pertain to factual representations that may end up

15    being the subject of his testimony.

16             I'm honestly not familiar with a circumstance or any

17    case in which a defendant has made ex parte submissions to the

18    court.  Some, I assume, under oath, some at least subject to

19    some ethical obligation.  We wanted to flag for the court we

20    think it is likely the government would be entitled to

21    production or some of all of those, in the event the defendant

22    testifies.

23             THE COURT:  That's an interesting issue.  We'll have

24    plenty of time to ponder it.

25             I think to some extent it may be a moot point in the

1   sense that, by the time the defendant testifies, I assume he

2   would probably testify last as part of a defense case.  The

3   reasons to keep those things ex parte may no longer be

4   applicable in which case.  There may be no justification to

5   keep them ex parte, and the government would get them.

6          But separate and apart from that, you're completely

7   right.  You may be entitled to some prior relevant statements,

8   and I'll certainly consider that.  You should raise it in the

9   appropriate time.

10          MR. DENTON:  Just flagging it now, not something that

11   needs to be resolved.

12          THE COURT:  OK.  Understood.

13          Anything else from the government?

14          MR. DENTON:  No, your Honor.

15          THE COURT:  Mr. Schulte?

16          THE DEFENDANT:  No, I don't think so, except for the

17   laptop.  Is there -- I don't know if the court is able to have

18   issue an order or something for me to be able to remain here

19   for another 15 or 20 minutes to try to resolve it before I have

20   to go back.

21          THE COURT:  Is it possible to find out whether and

22   when it would be we would have an answer?

23          You don't have your phone in here.  Is that possible

24   to find out?

25          MR. LOCKARD:  It's going to be the first thing we

MX63sSCH          SEALED

1    attend to after the conference is over.

2          THE COURT:  Do the marshals know timing in terms of

3    Mr. Schulte's return to the MDC?

4          MARSHAL:  We're ready for immediate departure.

5          THE COURT:  I'm sure.  If you need a delay, it is what

6    it is.  I, too, am ready for immediate departure.

7          I think it would make a lot of sense to hold off for

8    15 minutes to at least find out if there is a resolution.  If

9    there is a resolution, then it may be as simple as telling

10   Mr. Schulte that, and then he can go back.

11         If there isn't, I don't know the best way to approach

12   this.  Seems like the government get an answer, make sure

13   Mr. Schulte knows where things stand, and then he can go back

14   at that point.

15         Does that make sense?

16         MR. HARTENSTINE:  Your Honor, if I might suggest, if

17   we call an end to the classified discussion, then everyone

18   could have their cell phones back and perhaps look into this

19   issue.

20         THE COURT:  Even better.

21         I'll stay on the bench.  Go get your phone and let's

22   try to get an answer.

23         MS. SCHROFF:  Your Honor, may I ask on Wednesday, if

24   there is a time for the court appearance?

25         Ms. Colson and I are both traveling Tuesday and not

MX63sSCH                    SEALED

1    sure when.

2              THE COURT:   I think I said 9:15.   I don't have the

3    docket here.   I'm pretty sure I said 9:15.   The only thing I

4    will give you heads up about, I have another appearance at 11,

5    maybe ones after that.   I don't have my calendar with me.   It's

6    on my phone.

7              Given how long this went and given the potential need

8    for a classified session next Wednesday, I may -- I don't

9    know -- just plan to have Wednesday open for whatever we need

10   to do.   We'll have to work around things as best as possible.

11             Starts 9:15.

12             MS. SCHROFF:   I just ask because we have the witnesses

13   the day before, not in New York.   I want to make sure I can go

14   back.

15             THE COURT:   The order said 9:15.

16             I'll stay here and hopefully get good news in a

17   moment.

18             (Adjourned)

19

20

21

22

23

24

25